1    A.   Uh-huh (affirmative response).

2    Q.   We asked for minutes of the board

3  meetings that involved these three sites, and we

4  didn't receive any.

5         We were told there was none.   There was

6  no discussions at board meetings about the

7  development of the new headquarters building and

8  new headquarters branch.

9    A.   I would assume that there was -- there

10  would have been some discussion.

11    Q.   Do you ever recall seeing any such in

12  the minutes?

13    A.   I don't recall one way or the other.

14    Q.   Did you review the minutes?

15    A.   I review minutes, yes.

16    Q.   Okay.

17    A.   But if you are asking me if I remember

18  minutes from ten years ago or eight years ago, I

19  don't.

20    Q.   I hear you.

21         When the problems came up later in the

22  ball game with these sites, were there no

23  discussions at board meetings about those

24  problems?

25    A.   No.

NON-CERTIFIED COPY

Exhibit 4

Page 37

1    Q.  Why was that?

2    A.  Why would I discuss that with my board.

3    That is -- that is not an issue that I would

4    bring to the board.

5    Q.  But a $15 million development is

6    something that you would discuss --

7    A.  We do --

8    Q.  -- with the --

9        Let me ask my question, because she

10   can't take us both at the same time.

11       A $15 million development in the

12   beginning is something that you would discuss

13   with the board, I would assume; is that correct?

14   A.  That is correct.  We do developments

15   every -- you know, we have always got facilities

16   under development.

17       Either we have outgrown a facility or we

18   are replacing or we are going into a greenfield

19   and starting a new location somewhere.

20       And, you know, typically a four or $5

21   million facility, that doesn't require any board

22   approval.  I don't think this would required

23   board approval, but it -- I did run it by the

24   board.  I mean, it was discussed.  I know that.

25   Q.  Okay.

NON-CERTIFIED COPY

Exhibit 4

Page 38

1    A.  Because it is a -- a much larger

2    expenditure.

3    Q.  Was there any limit dollar-wise to your

4    authority at the Company?

5    A.  No.  I mean, look I spend $400 million a

6    year in CapEx and without board approval.  It is

7    normal course of business.  So, no, there is

8    not.

9    Q.  All right.

10    MR. FRANCO:

11        Let me show you another document,

12    which I'm going to label as Exhibit 3.

13    EXAMINATION BY MR. FRANCO:

14    Q.  Now, take a minute.  You can look at it,

15    if you want.  I'm going to ask some particular

16    questions, but if you need to look at it after I

17    ask you a question, that is fine.

18    A.  Okay.

19    Q.  I'm going to start at the top.  This is

20    a July 10, 2008, Email from Brad Barber to you,

21    and it talks about the URS campus project

22    corporate facility cost justification.

23        That is the attachment, which I don't

24    have attached to this.  For the Record, this

25    document goes from Bates stamp H&E 2958 through

NON-CERTIFIED COPY

Exhibit 4

1    2960.

2          The last Email from Brad Barber to you

3    says, "See below and please advise Leonard.  We

4    are on hold until you approve."

5          And if you go back to the very first

6    Email, it is from Leonard St. Germain to Johnny

7    Jones on July 2, 2008.  It says, "Johnny,

8    attached is the cost breakdown for URS to first,

9    complete the plans to the point of the submittal

10   for permitting."  And then it goes on.

11         My first question is:  This looks like

12   in 2008 there was some discussion about

13   completing plans, negotiating prices.  That was

14   later put on hold until around 2011, or did the

15   concept start to resurrect itself in 2008?

16        A.  I really can't answer that question.  I

17   don't recall when the -- when we started talking

18   about it again.

19        Q.  All right.  It is fair to say that this

20   series of Emails talks about cost breakdown for

21   URS to do work at the Baton Rouge site?  Fair

22   statement?

23        A.  Uh-huh (affirmative response).

24        Q.  And this says, "We are on hold until you

25   approve it."  So --

NON-CERTIFIED COPY

Exhibit 4

Page 40

1       A.   Correct.

2       Q.   -- you approved, I assume, the concept

3    that URS was going to do work.   In other words,

4    that was something that you approved; am I

5    correct?

6       A.   I -- I assume, at some point, I approved

7    it, yes.

8       Q.   Okay.  But my question is:  Why are you

9    approving work by cost proposals for URS to do

10   work?  Why didn't you leave that to Mr. St.

11   Germain?

12      A.   Well, I can't answer that.  I don't -- I

13   don't remember the circumstances.  But if this

14   was an '08 situation, that was, you know, at a

15   time when we were in the, you know, grips of

16   this recession.  So they may have been running

17   it by me for that reason.  I don't know.

18      Q.   Okay.

19      A.   I don't recall.

20      Q.   All right.

21          MR. FRANCO:

22              The next document, which I'm going

23   to label as Exhibit 4, is entitled a Short Form

24   Master Agreement Professional Services Between

25   H&E and URS.  This one is dated August 13, 2009,

NON-CERTIFIED COPY

Exhibit 4

1   at the top.

2          MR. BARRIERE:

3              Excuse me, Phil.  You gave me an

4   extra copy.

5          MR. FRANCO:

6              I'm sorry.

7          MR. BARRIERE:

8              That is fine.

9   EXAMINATION BY MR. FRANCO:

10     Q.  And if you look at the last page of

11  this, Mr. Engquist, you will again see that this

12  one was signed by Mr. St. Germain, as well,

13  correct?

14     A.  Correct.

15     Q.  Now, with respect to this agreement, do

16  you recall discussing this agreement before Mr.

17  St. Germain signed it?

18     A.  Specifically, no, I do not.

19     Q.  Okay.  Would your answer be the same,

20  that this agreement would have been vetted with

21  your Counsel before Mr. St. Germain signed it?

22     A.  I would assume so, yes.

23     Q.  Okay.  Do you recall anyone at the

24  Company raising any questions about this

25  agreement?

NON-CERTIFIED COPY

Exhibit 4

1      A.  Specifically, no.

2      Q.  Look at Paragraph 4, 4.1.  Do you see

3  the second sentence in that which talks about

4  consultant's sole liability to client?

5      A.  I do.

6      Q.  Do you ever remember discussing that

7  concept or any concern about that concept?

8      A.  I do not.

9      Q.  Look at Paragraph 9, limitation of

10  liability.  Do you ever remember discussing

11  anything about limitation of liability with

12  anybody before Mr. St. Germain signed this

13  contract?

14      A.  I do not.

15      Q.  I assume, sir, that H&E complies with

16  its contracts, doesn't it?

17      A.  Yes.

18      Q.  And I assume when H&E signs a contract,

19  it intends to comply with its contract.  Is that

20  a fair statement?

21      A.  That is a fair statement.

22      Q.  In fact, let me just ask this question:

23          Mr. St. Germain signs this document as

24  VP of operations.  Is that accurate at the time?

25      A.  Yes, I am sure it is.

NON-CERTIFIED COPY

Exhibit 4

1    Q.  Have you ever seen that document that I

2  just showed you before?

3    A.  I do not know.  I don't -- I don't

4  recall.

5    Q.  What was Frankie Wynn's position at H&E

6  in 2009?

7    A.  I would have to go back and look.  I

8  mean, I -- I don't recall his title at the time.

9    Q.  Was he a vice president?

10    A.  I don't think so, no.

11    Q.  Okay.  Do you remember Frankie Wynn

12  expressing any concerns about the 2009 agreement

13  I just showed you?

14    A.  Not specifically, no.

15    Q.  Now, at the time the Baton Rouge

16  facility was resurrected because of the economy,

17  the development of that facility, were there

18  also discussions about developing or renovating

19  the Kenner branch?

20    A.  Well, at some point there was.  I don't

21  remember the timeframe there --

22    Q.  Okay.

23    A.  -- to tell you a date on that.

24    Q.  Why was there a need to renovate the

25  Kenner branch; do you recall that?

NON-CERTIFIED COPY

Exhibit 4

Page 44

1      A.  Too small, just old branch, just needed

2   to be expanded.

3      Q.  When you say expanded, there was only a

4   certain amount of land there available, correct?

5      A.  That is correct.

6      Q.  So you are talking about expansion on

7   the site itself?

8      A.  Yeah.  And then we -- you know, we had

9   some property next to it that at some time some

10  old apartments I think was included in that.

11        But, again, you know, I have people that

12  do that work.  I don't -- I am not specifically

13  involved in those issues.

14     Q.  Who was in charge of that, at the time?

15  Mr. St. Germain, as well?

16     A.  I -- yes, at the beginning of that, it

17  was still Leonard.

18        MR. FRANCO:

19           Now, let me show you a document

20  which we will label as Exhibit 5.

21  EXAMINATION BY MR. FRANCO:

22     Q.  This is a December 18, 2009 Email from

23  Leonard St. Germain to Neil Favre.  And it looks

24  like Mr. Favre was a senior accountant at H&E at

25  the time.

NON-CERTIFIED COPY

Exhibit 4

1        My question is:  This discusses a need

2    to get construction documents prepared for the

3    Kenner branch renovation project, and this is in

4    2009, December of 2009.  Certainly, the economy

5    had not recovered by December of 2009.  So I am

6    little confused as to why this concept is being

7    discussed.

8        Does this help refresh your memory at

9    all?

10       A.  No.

11       Q.  It also says, "The Company-owned" -- I'm

12    reading from the second sentence at the top

13    Email.

14       "The Company-owned side of the

15    renovation will be completed first and should

16    run around $700,000.  The remaining balance of

17    the renovation is owned by John Engquist."

18       Was there some part of that site that

19    you owned?

20       A.  I need to go back and resurrect this.

21    It -- at one point, we owned the site in its

22    entirety.  And then I believe we -- at some

23    point, you know, we started working to eliminate

24    related-party transactions because we are a

25    public company.

NON-CERTIFIED COPY

Exhibit 4

Page 46

1          At one time, we owned a lot of the

2   facilities.  Or, the family did.

3      Q.  I see.

4      A.  And systematically we were selling those

5   facilities off or selling them back to the

6   Company to eliminate related-party transactions.

7   And I'm assuming that is what this is.  I would

8   have to go back and look.

9      Q.  Okay.  And, certainly, that helps

10  explain the difference in the Company-owned side

11  and the remaining balance.

12          But I'm still a little confused.  Why is

13  this being discussed in December of 2009?  Does

14  that help refresh your memory at all?

15     A.  I -- I mean, I can't answer that.  I

16  really -- I don't know.

17     Q.  Do you recall perhaps was there a need

18  to do some repair work short of renovations

19  first?

20     A.  You would have to ask Leonard about

21  that.

22     Q.  All right.

23         MR. FRANCO:

24             Let me show you another document,

25  which I'll label as Exhibit 6.

NON-CERTIFIED COPY

Exhibit 4

Page 47

1    EXAMINATION BY MR. FRANCO:

2        Q.  This is a letter dated May 3, 2011 from

3    Neal Johnson at URS, and it is to three

4    different companies, Milton J. Womack --

5            Is that Buquet?  Is it --

6        A.  Buquet & LeBlanc, right.

7        Q.  -- Buquet & LeBlanc and Arrighi?

8        A.  Arrighi.

9        Q.  Arrighi.  Thank you.

10           And attached to this is a bid analysis.

11   Do you see that?

12       A.  I do.

13       Q.  All right.  Now, this is in connection,

14   obviously, with the Baton Rouge facility.

15           And in May of 2011, what URS was saying

16   is that H&E selected Womack to build the

17   headquarters and the branch facility, correct?

18       A.  Correct.

19       Q.  Was there a requirement imposed by H&E

20   on who could bid on the Baton Rouge project?

21       A.  A requirement?  I -- I don't know.  I

22   can't -- I can't answer that.

23       Q.  Let me ask it more particularly.

24           Let me ask this:  Is Milton J. Womack a

25   customer of H&E, the general contractor?

NON-CERTIFIED COPY

Exhibit 4

1      A.  Yes.  All three of these.

2      Q.  Are customers?

3      A.  Are customers, yes.

4      Q.  Wasn't that the requirement for bidding,

5  that the construction company had to be a

6  customer of H&E?

7      A.  I am sure it was taken into

8  consideration.  I don't know that that was a

9  requirement or not.

10     Q.  So you didn't give that order, that they

11  had to be a --

12     A.  No.

13     Q.  -- customer?

14     A.  No.

15     Q.  And you don't --

16     A.  And I'm sure we give preference to a

17  customer.  We certainly would, but I don't

18  recall that being a requirement.

19     Q.  Okay.  And you don't recall --

20     A.  Womack is not a large customer of ours

21  at all.  They don't rent much equipment.  They

22  are a true contractor.  They sub all their work

23  out.  They own very little equipment.

24     Q.  Are you personal friends with anyone at

25  the Womack company?

NON-CERTIFIED COPY

Exhibit 4

1      A.  I know -- I know the principals of that

2  company well.  Terry Hill, yes, he is a friend

3  of mine.  I've known him a long time.

4      Q.  Do you share any facilities with him,

5  ownership or rental?

6      A.  No.

7      Q.  But you would consider yourself personal

8  friends?

9      A.  I would.

10     Q.  And you associated personally with him?

11     A.  Occasionally.  David Arrighi is a fiend

12  of mine.  Donn Peterson is a friend of mine.  I

13  know all these people.

14     Q.  Did you have any conversations with any

15  of these companies before they bid on this

16  project?

17         MR. BARRIERE:

18             Relative to the bid?

19         MR. FRANCO:

20             Relative to the -- right.

21  EXAMINATION BY MR. FRANCO:

22     Q.  Relative to the project?

23     A.  No.

24     Q.  Okay.  Did you have any conversations

25  with anyone inside H&E as to why Womack was

NON-CERTIFIED COPY

Exhibit 4

1    $400,000 better in bid and significant number of

2    days better in the bid?

3        A.  No.  Womack is a very good contractor.

4    All three of these are good contractors.

5        Q.  If --

6        A.  We had originally awarded this to a

7    Arrighi.  And then that large timeframe went by

8    when we shut the project down.  And we elected

9    to rebid it, and Womack got the -- got it on

10   rebid.

11       Q.  Okay.  When you say "we awarded it to

12   Arrighi," was that through URS participation?

13       A.  I would assume so.

14       Q.  Was it bid out or --

15       A.  It was bid.

16       Q.  To a number of different companies?

17       A.  As far as I know, yes.

18       Q.  And it was originally to Arrighi because

19   they were the low bidder?

20       A.  I would assume that to be the case, yes.

21   But I know there was a -- you know, Arrighi was

22   very unhappy when he was not successful the

23   second time around.

24       Q.  Do you remember why it was rebid?  Was

25   it changed?

NON-CERTIFIED COPY

Exhibit 4

1      A.  Just the timeframe that went by.  We --

2  we thought it was prudent to rebid.

3      Q.  Do you recall whether the second bid was

4  a cheaper or more expensive price contract-wise

5  for the award?

6      A.  From -- from the original Arrighi bid?

7      Q.  Yes.

8      A.  I don't -- I don't know.

9      Q.  But your recollection is URS assisted in

10 both bids, the first one and the second one?

11     A.  That is more of an assumption than a

12 recollection.

13     Q.  So if any of the problems at these three

14 facilities were the result of contractor -- what

15 word am I looking for -- were the result of

16 something the contractor failed to do properly,

17 is there any hesitation in suing the contractor?

18     A.  If I thought the contractor improperly

19 installed the concrete or whatever?

20     Q.  Yes, sir.

21     A.  Oh, there would be no hesitation.

22     Q.  Even though these people are your

23 personal friends?

24     A.  That wouldn't enter into the equation

25 whatsoever.

NON-CERTIFIED COPY

Exhibit 4

Page 52

1    Q.  Okay.  Mr. Engquist, it is fair to say

2  that you didn't sign any of the H&E contracts

3  applicable to any of these three jobs, did you,

4  sir, to your recollection?

5    A.  No.

6    Q.  You would leave that Mr. St. Germain or

7  Mr. Jones or Mr. --

8    A.  Wynn or whoever.

9    Q.  -- Wynn?

10    A.  That is correct.

11    Q.  Okay.

12       MR. FRANCO:

13           Let me show you the next document

14  I'm going to label Exhibit 7.

15       THE WITNESS:

16           (Reviewing document.)

17  EXAMINATION BY MR. FRANCO:

18    Q.  Please tell me when you are ready.

19    A.  Sure.  Go ahead.

20    Q.  All right.  This is an Email dated

21  November 27th, 2012, from Becky Walker to Neal

22  Johnson and Johnny Jones, and you are copied on

23  this.

24           And, first of all, who is Becky Walker

25  and how was she involved in the Baton Rouge

NON-CERTIFIED COPY

Exhibit 4

1  facility?

2      A.  She is a local interior designer that I

3  believe was brought in by URS to do certain

4  areas of the facility from an interior design

5  standpoint.

6      Q.  Okay.  So we are talking November 27,

7  2012, and at that point, I assume there has been

8  substantial construction in the branch lobby.

9  Fair statement?

10     A.  Uh-huh (affirmative response).  Yes.

11     Q.  And basically you didn't like the look

12  of it at the time?

13     A.  That is true.

14     Q.  All right.  And there is another

15  discussion about how they are going to get your

16  desk into your office, right?

17     A.  Right.

18     Q.  At that time, November of 2012, had the

19  parking lot been constructed, Mr. Engquist?

20     A.  I don't know.  I would assume it was,

21  yes.

22     Q.  Okay.  Because I would assume you had to

23  park to get into your building?

24     A.  I would assume the parking lot was

25  there, yes.

NON-CERTIFIED COPY

Exhibit 4

Page 54

1      Q.  All right.  Were you occupying the

2   building in November of 2012 at that time?

3      A.  No.

4      Q.  Okay.  How long had the parking been

5   completed?

6      A.  I have no idea.

7      Q.  Okay.  Now, I want to talk about

8   December 17, 2012.  At that point, the building

9   was being occupied; am I correct?  And I'm

10   talking about Baton Rouge.

11      A.  Uh-huh (affirmative response).

12      Q.  What happened with respect to the

13   parking lot at that time?

14      A.  Well, the first day we occupied the

15   building, I got to the office early, went into

16   my office, was going through routine stuff like

17   I do every day.

18         And I got a call from my CFO who was --

19   probably got to work around 8:30.  And there

20   were people circling the parking lot with no

21   places to park.  So she called me and said --

22   and advised me we didn't have enough parking

23   spaces.

24      Q.  Tell me what happened after that.

25      A.  I went down and looked at the situation.

NON-CERTIFIED COPY

Exhibit 4

Page 55

1   It was evident we did not have enough parking

2   spaces for existing employees.  And then, you

3   know, I had some conversation with Brad Barber.

4   And I believe, at that time, we asked for a

5   meeting with Mr. Johnson.

6       Q.  Fair to say that you are upset?

7       A.  That is fair to say, yes.

8       Q.  Fair to say you used, I'll call it,

9   colorful cursing?

10      A.  That is a good possibility.

11      Q.  At that time, was there also a board

12  member who tried to park and couldn't park at

13  that time?

14      A.  I don't know.  I don't remember that.

15      Q.  So that is not what generated your

16  review of the parking lot that day?

17      A.  No.

18      Q.  Okay.

19      A.  What generated it was a call from my CFO

20  because she couldn't park.

21      Q.  And how long had you all occupied the

22  building at that time?

23      A.  That is the first day.

24      Q.  Okay.  And at the time, Mr. Engquist,

25  was there still construction going on at the

NON-CERTIFIED COPY

Exhibit 4

1   site in the yard?

2      A.  I don't recall.

3      Q.  You don't recall that there was still

4   contractors parking in the parking lot?

5      A.  I don't recall, no.  I just answered

6   that.

7      Q.  When you went to look at the site

8   outside, did you see any contractors working in

9   the yard?

10     A.  I don't recall.  There may have been,

11  but I -- I don't know.  I just know there was no

12  parking spaces.

13     Q.  Right.  Did you prohibit any contractors

14  from parking in the parking lot?

15     A.  Me, personally, no.

16     Q.  Did you order that any contractors not

17  park in the parking lot?

18     A.  Me, personally, no.

19     Q.  Do you know whether the branch office

20  had been completed at that time?

21     A.  I don't recall.

22     Q.  I am sorry.  And you said this, but I

23  didn't pick it up.

24         Who did you immediately, at the Company,

25  raise this issue with at H&E?

NON-CERTIFIED COPY

**Exhibit 4**

1    A.  Probably Brad Barber.

2    Q.  What was Mr. Barber's title at the time?

3    A.  President, chief operating officer.

4    Q.  Did you get pretty upset with Mr.

5  Barber, as well?

6    A.  Did I get upset with Mr. Barber?  I

7  don't believe.

8    Q.  All right.  After that, you said there

9  was a meeting almost immediately with URS.  Is

10  that a fair statement?

11    A.  As soon as we could arrange it, yes.

12    Q.  Did you attend that meeting?

13    A.  I did.

14    Q.  Do you remember who was present?

15    A.  Myself, Brad Barber, Neal Johnson,

16  Johnny Jones.  I don't know if Frankie Wynn was

17  there or not.  He may have been.

18    Q.  What was Mr. Jones' position with the

19  Company at that time?

20    A.  He was over product support.

21    Q.  Another vice president?

22    A.  Uh-huh (affirmative response).

23    Q.  So as of that time, who was at the

24  Company in charge of the development?

25    A.  I believe --

NON-CERTIFIED COPY

Exhibit 4

1    Q.  Had it shifted?

2    A.  Yeah.  I believe it had shifted to

3  Johnny at that time.

4    Q.  Johnny Jones?

5    A.  Yes.

6    Q.  Mr. Jones had been with the Company for

7  a long time?

8    A.  He has.

9    Q.  Do you remember when he joined the

10  Company?

11    A.  No, but I -- Johnny had probably been

12  there 20 years, I would guess.  He had been with

13  us a long time.

14    Q.  What about Mr. Barber?  He was

15  relatively new?

16    A.  No, not at all.

17    Q.  How long --

18    A.  I mean, Brad has currently been with us

19  probably 18 years.  So he is -- he has been with

20  us a long time.

21    Q.  Okay.  In terms of seniority, not with

22  the Company, but in terms of years, it would

23  have been Mr. Jones there the longest, then Mr.

24  Barber?

25    A.  That is correct.

NON-CERTIFIED COPY

Exhibit 4

1    Q.  And then Mr. Wynn?

2    A.  Yes.

3    Q.  Okay.  Now, where did the meeting take

4  place with URS?

5    A.  It -- at our office in one of the

6  conference rooms.

7    Q.  Okay.  And how did you react to URS at

8  that meeting, Mr. Engquist?

9    A.  I was not very happy with URS.

10    Q.  Did you curse them?

11    A.  Did I curse them specifically?  I don't

12  think so, no.

13    Q.  Did you curse?

14    A.  Yes, I am sure I did.

15    Q.  Did you ask any of the H&E people prior

16  to that meeting what involvement they had in

17  determining the number of parking spaces?

18    A.  Prior to that, no.  After the fact, I

19  had some conversations.

20    Q.  All right.  Let's talk about during the

21  meeting.  You talked about prior to the meeting

22  you didn't ask them what involvement they had.

23        During the meeting, did you discuss any

24  involvement that your own people had with

25  determining or knowing about the number of

NON-CERTIFIED COPY

Exhibit 4

Page 60

1    spaces?

2        A.  Well, prior to this meeting, I talked

3    to -- I had some conversation with Johnny and

4    Frankie Wynn, and they both assured me that they

5    had questioned the number of parking spaces and

6    were assured we had adequate parking.

7        Q.  Did they tell you that they knew the

8    number of parking spaces that were going to be

9    constructed?

10       A.  I don't recall specifically what they

11   said.  They told me they were assured we had

12   adequate parking.

13       Q.  And by adequate parking, what did you

14   understand by adequate parking?

15       A.  Well, the bare minimum would be that our

16   existing employees could park there, and we --

17   it was always my assumption that we had growth

18   built into this facility.

19       Q.  Did you have any growth built into the

20   facility recorded anywhere?  In other words, is

21   there anything that says, "We are going to grow

22   at a certain percentage by X day," any

23   projections?

24           MR. BARRIERE:

25               Object to the form of the question.

NON-CERTIFIED COPY

Exhibit 4

Page 61

1    Vague.

2              You may answer, if you understand

3    it.

4         THE WITNESS:

5              I don't understand the question.

6         MR. FRANCO:

7              Okay.

8    EXAMINATION BY MR. FRANCO:

9         Q.  Were there any projections of growth at

10   H&E at this time?

11        A.  My understanding is that we were looking

12   for 30 percent growth capacity in that facility.

13        Q.  Was that recorded anywhere at H&E, a

14   document?

15        A.  No.

16        Q.  Were there any projections recorded to

17   that extent at H&E?

18        A.  I -- I don't know.

19        Q.  How long was that growth going to take

20   place?

21        A.  A lot of variables there.  It depends on

22   the economy.

23        Q.  Has it taken place, as we sit here?

24        A.  No.  30 percent growth from there, no.

25        Q.  Now, at the meeting with URS, was there

NON-CERTIFIED COPY

Exhibit 4

1   any discussion about the fact that H&E was aware

2   of how many spaces the parking lot was going to

3   be before it was constructed?

4       A.  Not that I recall.

5       Q.  Are you aware that H&E personnel

6   reviewed the construction plans before they were

7   finally approved?

8       A.  Sure.

9       Q.  Are you aware that those plans disclosed

10  the number of parking spaces?

11      A.  I -- I have not looked at those plans

12  myself.

13      Q.  That wouldn't shock you, though, would

14  it?

15      A.  No.

16      Q.  And your people that were communicating

17  with URS knew how many staff people H&E had,

18  didn't they?

19      A.  Absolutely.  So did URS.

20      Q.  You were aware, I assume, that after the

21  meeting took place, that URS submitted some

22  design proposals to increase the number of

23  parking spaces, correct?

24      A.  Yes.

25      Q.  And you were also aware that there was

NON-CERTIFIED COPY

Exhibit 4

1  some space limitations at that site for whatever

2  H&E wanted to do now or in the future, correct?

3     A.  Yes.

4     Q.  Were you involved in the decision as to

5  exactly how to redesign the parking spaces for

6  extra spaces?

7     A.  At a high level, yes.

8     Q.  Are you aware that design concept

9  changed a couple of times in the communications

10 between URS and H&E?

11    A.  I don't recall that specifically, no.

12    Q.  Was the parking lot area increased?

13    A.  It was.

14    Q.  How long did that take?

15    A.  I could not tell you.

16    Q.  It wasn't days, obviously?

17    A.  No.

18    Q.  It wasn't weeks, was it?  Probably

19 months?

20    A.  I can't -- I can't answer that.  I don't

21 know the timeframe it took.

22    Q.  Okay.

23    A.  But the parking was increased.

24    Q.  All right.  Now, the CFO complained in

25 December of 2012 that there was not enough

NON-CERTIFIED COPY

Exhibit 4

Page 64

1   parking spaces.  Where did the people park from

2   the time that that message was delivered to you

3   until the parking lot was increased?

4        A.  I can't answer that.  I assume in the

5   equipment yard and -- and wherever they could.

6   At the branch, equipment yard.

7        Q.  Are you aware that there was a

8   discussion with URS originally about using the

9   yard for overflow parking?

10       A.  I'm not aware of that.

11       Q.  There was also parking at the branch

12  office, correct?

13       A.  Correct.

14       Q.  And I am sorry, sir.  You answered this.

15  I just forgot what you said.

16          There was no discussion at the meeting

17  with URS that your people were aware of the

18  number of spaces that had been designed before

19  it was constructed?

20       A.  Not to my knowledge, no.

21       Q.  Now, you talked about a conversation

22  before.  What about a conversation after that

23  meeting?  Did you have a conversation with your

24  people after that meeting about the fact that

25  they knew how many spaces and approved how many

NON-CERTIFIED COPY

Exhibit 4

Page 65

1    spaces were going to be in the parking area?

2        A.  I -- I told you earlier they were

3    assured by URS that they -- that there was

4    adequate parking there.

5            URS knew how many employees were in that

6    facility.  They -- they were involved in

7    furnishing the facility for those employees.

8    They were fully aware of our headcount.

9        Q.  Okay.  And so I want to say that I don't

10   have the plans in front of me, sir, and just

11   accept this right now for an assumption.

12           Let's assume the original parking spaces

13   noted on the plans or specs was 153 for the

14   headquarters building, right?  Your people would

15   know whether they had a 153 or more or less

16   staff personnel; is that correct?

17       A.  Yeah.  They would know how many people

18   we had, yes.

19       Q.  And so did you have 153 or more staff

20   personnel as of December of 2012?

21       A.  I don't know what the headcount was.

22       Q.  So your people, looking at the number of

23   spaces and knowing the number of staff people,

24   would know if there wasn't sufficient enough

25   parking, wouldn't they?

NON-CERTIFIED COPY

Exhibit 4

Page 66

1      A.  My people tell me they had that

2  discussion with URS prior to this whole issue

3  arising and were assured they had adequate

4  parking.

5      Q.  Right.  But my question is a little more

6  particular.

7          They would know by looking at the number

8  of spaces how many staff people they had, didn't

9  they?

10     A.  That question makes no sense to me.  I

11  don't understand your question.

12     Q.  All right.  Your people knew how many

13  staff people they had at headquarters --

14     A.  Yes.

15     Q.  -- correct?

16     A.  Yes.

17     Q.  And by looking at the parking spaces,

18  they would know whether there was enough to

19  cover that staff planned at the parking area,

20  wouldn't they?

21     A.  I think that is why -- why they

22  questioned URS on whether there was enough

23  parking.

24     Q.  Right.  So if there was 153 spaces

25  designed and constructed, they should know

NON-CERTIFIED COPY

Exhibit 4

1    whether there was 153 more or less staff people,

2    correct?

3        A.  My people should know that, yes.

4        Q.  And, for instance, if there was 153

5    spaces and you had 250 staff people, then by

6    looking at the documents, they should have been

7    able to tell that there wasn't sufficient

8    spaces; am I correct?

9        A.  I would assume so.

10       Q.  Okay.  Did Mr. Wynn tell you the day

11   that the problem arose that he observed 40

12   trades people in their trucks that were parking

13   at the parking lot?

14       A.  No.

15           MR. FRANCO:

16               Let me take a five-minute break.

17           THE WITNESS:

18               Sure.

19           (Recess held.)

20   EXAMINATION BY MR. FRANCO:

21       Q.  Mr. Engquist, were you aware that URS

22   redesigned the parking area at no charge?

23       A.  Well, they certainly should have.

24       Q.  But my question is:  Were you aware of

25   that?

NON-CERTIFIED COPY

Exhibit 4

Page 68

1    A.  Not -- no, I don't recall that.

2    Q.  Okay.

3        MR. FRANCO:

4            Off the Record.

5        (Off-the-Record discussion held.)

6        MR. FRANCO:

7            Let me show you the next document,

8    Exhibit 8.

9        THE WITNESS:

10           (Reviewing document.)

11   EXAMINATION BY MR. FRANCO:

12   Q.  So, Mr. Engquist, at the top, this is an

13   Email dated January 2, 2013, from Brad Barber to

14   you and Leslie Magee.

15       Leslie was your CFO, as I recall?

16   A.  That is correct.

17   Q.  All right.  And this is Revision 2 for

18   additional parking, the design.  Do you recall

19   this being designed?

20   A.  Yes.  I -- I generally recall this, yes.

21   Q.  Okay.  And I assume, ultimately, you

22   approved this design?

23   A.  No, I don't think we approved this

24   design, if my memory serves me correct.

25   Q.  Is there something you can look at?

NON-CERTIFIED COPY

Exhibit 4

Page 69

1    Well, let me ask it this way:

2        It says, "The attached is what we will

3    price and plan to add, 52 added parking spots.

4    Please note that the area nearest the display

5    area up front will not be done, but was designed

6    as a Phase 2 should we ever need."

7        A.  Okay.  Yes, and I'll -- yes, that is

8    correct.

9        Q.  Let's go back to the plan.  The plan

10   shows a Phase 1 of 52 new spaces and then a

11   Phase 2 with 26 new parking spaces, correct?

12       A.  Right.

13       Q.  Who made the decision not to add the

14   Phase 2 at that time?

15       A.  I think it was jointly between myself,

16   Brad, and Leslie.  We felt like it would ruin

17   the look of the facility.

18       Q.  Because there were a space issue of the

19   entire facility for what you wanted to do,

20   correct?

21       A.  Well, yeah, and -- and we could have

22   done that, but I felt like it would just destroy

23   the look of the facility.

24       Q.  Do you still feel that way?

25       A.  Yes.

NON-CERTIFIED COPY

Exhibit 4

Page 70

1      Q.  Now, once that decision was made, then

2   that Phase 1 was then sent out for pricing?

3          MR. BARRIERE:

4              Is that a question or a statement?

5   EXAMINATION BY MR. FRANCO:

6      Q.  Do you recall that that was sent for

7   pricing?

8      A.  I am sure it was.

9      Q.  All right.  Let me ask you this

10  question:

11             If you look back at the diagram --

12             I am sorry, sir.  It is the exhibit I

13  just --

14     A.  Uh-huh.

15     Q.  -- gave to you.

16             It shows that there was 153.  So my

17  number was correct earlier in my question as

18  existing spaces.  Do you see that in the middle

19  of the document?

20     A.  Okay.

21     Q.  And then Phase 1 was adding 52 to bring

22  it to -- I can't read that.  Is it 205 spaces?

23  Correct?

24     A.  200 and --

25          MR. BERRY:

NON-CERTIFIED COPY

Exhibit 4

1              It is now, yeah.

2    EXAMINATION BY MR. FRANCO:

3        Q.  Did you have 205 staff people at that

4    time?

5        A.  I don't recall what our headcount was at

6    that time.

7        Q.  Okay.  I'm sorry.  I know my order here.

8        A.  No problem.  Are we through with this?

9        Q.  Yes.  All right.

10           MR. FRANCO:

11               Next I am going to show you a

12    document I am going to label as Exhibit 9.

13    EXAMINATION BY MR. FRANCO:

14       Q.  This is bids to put that Phase 1 of

15    parking in, correct?

16       A.  All right.

17       Q.  And it looks like the bid was from

18    Womack at $129,730.  You see that total?

19       A.  I do.

20       Q.  Did you approve that?

21       A.  I -- I assume we did, yes.

22       Q.  Now, Mr. Engquist, is it fair to say,

23    sir, that if you wanted to add 52 extra spaces

24    originally, you would have had to pay for 52

25    extra spaces?  Fair statement?

NON-CERTIFIED COPY

Exhibit 4

1    A.  Yeah.  I don't know what the

2  relationship would have been if they had done it

3  to begin with versus having to go back and do

4  it.

5    Q.  Right.

6    A.  I mean, there is a -- there is no

7  correlation there.

8    Q.  And I understand.  I'm not going to ask

9  you about specific numbers at this point.

10       But the concept is if you believed you

11  needed 52 extra spaces, you would have had to

12  pay for that originally, wouldn't you?

13    A.  It would have cost something, yes.

14    Q.  And so this 130,000 includes some amount

15  that you would have had to pay originally.

16  Isn't that a fair statement?

17    A.  Yes.  But I am sure it wasn't anything

18  like that number.

19    Q.  Well, you really don't know if the

20  paving would have been different between

21  original and here, the addition?

22    A.  I don't understand your question.

23  Whether --

24    Q.  Okay.  There was so much extra paving

25  that had to be done for 52 spaces.  Fair

NON-CERTIFIED COPY

Exhibit 4

1    statement?

2        A.  There would have been some additional

3    paving, yes.

4        Q.  Right.  And there would have been some

5    foundation work that had to be done for that

6    paving originally, correct?

7        A.  I assume there would have been some,

8    yes.

9        Q.  All right.  So as you look at this

10   130,000, you can't tell us today, I assume, how

11   much of this 130,000 it would have cost to have

12   the 52 extra spaces originally?

13       A.  I have no idea.

14       Q.  And as far as you know, have you had any

15   problems with the parking lot capacity since the

16   addition has been added?

17       A.  I think we still have capacity issues.

18   On any given day, we will have 30 or 40

19   employees from out of state in our office, be it

20   financial reviews, be it training, whatever.

21           So it is not just our employees.  There

22   is -- we have customers coming in.  We have

23   employees from out of state.

24       Q.  I understand.  But my question, I'm not

25   sure I got it through to you correctly.

NON-CERTIFIED COPY

Exhibit 4

1          Since the addition has been added, have

2     you had any problems with the capacity of the

3     parking for the headquarters building?

4          A.   I believe we still have capacity issues.

5          Q.   Oh, you still have capacity issues?

6          A.   Yes.

7          Q.   And where do those people park?

8          A.   I can't answer that.

9          Q.   Fair to say they have to park somewhere

10    around the facility, correct?

11         A.   That is true.

12         Q.   And can you cite any particular issue

13    that happened with somebody not being able to

14    park?

15         A.   No, not specifically.

16         Q.   And that hasn't caused you to do Phase

17    2 either?

18         A.   No.

19         Q.   Because you still would rather the

20    landscaping area?

21         A.   I would rather the landscaping.

22         Q.   Now, was it you who demanded that URS

23    pay for the additional parking completely?  Did

24    that come from you originally?

25         A.   It probably came from me and Brad

NON-CERTIFIED COPY

Exhibit 4

1   Barber.  Either/or, yes.

2       Q.  And so your position is, or was at the

3   time, that URS should pay the entire amount for

4   the 52 extra parking spaces, correct?

5       A.  That was our position at the time,

6   right.

7       Q.  And you didn't take into consideration

8   that some of that number would have been

9   necessary for the original construction of 52

10  extra spaces, did you?

11      A.  I did not.

12      Q.  Now, there was a meeting with URS

13  personnel to discuss H&E's demand that URS pay

14  for the full amount of the parking addition,

15  correct?

16      A.  I don't specifically recall the meeting,

17  but I'm sure there was.

18      Q.  All right.  You didn't participate,

19  apparently?

20      A.  I don't know if I did or didn't.

21      Q.  You don't recall?

22      A.  I don't recall.

23      Q.  At some point, URS offered not only to

24  design the facility with no extra charge, but

25  offered some dollars toward the difference

NON-CERTIFIED COPY

Exhibit 4

1    between what it would have cost originally and

2    what it cost to add the modifications, correct?

3        A.  I don't recall that specifically, and I

4    may not have been involved in that.

5        Q.  Okay.  So as you sit here, sir, just for

6    clarification, you are not aware that in

7    addition to designing it, the addition for free,

8    that URS offered a little over $17,000 as the

9    difference between what it would have cost

10   originally compared to what it cost to add the

11   new parking?

12       A.  I don't remember the specifics of that,

13   no.

14       Q.  Do you remember that they offered any

15   amount toward that?

16       A.  Well, I'm assuming what you are saying

17   is that they offered something.  I just don't

18   recall.

19       Q.  I guess my question is -- and I'm a

20   little confused.  It may be my fault.

21           Did somebody at your Company tell you

22   that they offered some number to cover the

23   difference between the original cost and the

24   modification?

25       A.  And what I've told you three times is I

NON-CERTIFIED COPY

Exhibit 4

1    don't recall that.

2        Q.  Now, around that same time, did you give

3    an order to your people not to pay any further

4    URS invoices?

5        A.  I did.

6        Q.  And what was that based on?

7        A.  It was based on all of the problems we

8    had with their design and with the parking and

9    all of the above.

10       Q.  Do you recall whether that order was in

11   January of 2013?

12       A.  I -- I couldn't tell you the date on it.

13       Q.  I assume it came after URS declined to

14   pay for the full $130,000 for the addition.  Is

15   that a fair statement?

16       A.  I don't recall the timing of it, but I

17   certainly issued a stop payment.

18       Q.  There was a stop payment on all invoices

19   no matter what the invoices were for?

20       A.  I don't -- I don't recall that

21   specific -- I would have to go back and look.

22       Q.  Are you aware that there was work done

23   by URS after that time period?

24       A.  I am not aware of that, no.

25       Q.  But your order never changed, did it?

NON-CERTIFIED COPY

Exhibit 4

Page 78

1       A.  No.

2       Q.  Did anyone at H&E tell you that URS was

3   continuing to provide additional services after

4   this date?

5       A.  No.

6       Q.  So was it your understanding that the

7   invoices you ordered not to be paid were for

8   invoices for the prior work prior to this time?

9       A.  I don't recall.

10      Q.  If you had known that URS submitted

11  additional invoices after January of 2013 for

12  work that didn't involve the parking lot, would

13  you have continued your order not to pay it?

14          MR. BARRIERE:

15              Objection.  Calls for speculation.

16          THE WITNESS:

17              Yeah, I'm not aware of that.

18  EXAMINATION BY MR. FRANCO:

19      Q.  You are not aware that they provided

20  additional services?  Is that what you are

21  saying?

22      A.  Right.

23      Q.  Well, my question is:

24              If they provided additional services not

25  related to the parking lot, would you have still

NON-CERTIFIED COPY

Exhibit 4

1    ordered not to pay those involves?

2         A.  I don't know what I would have done.

3         MR. BARRIERE:

4              Please note my objection.

5    Speculation.

6    EXAMINATION BY MR. FRANCO:

7         Q.  And it is your testimony, sir, that no

8    one from H&E approached you with that issue,

9    that URS continued to provide additional

10   services and you still don't want to pay them?

11        A.  I -- I do not recall anyone with

12   information approached me with that.

13        Q.  Were you involved in the letter that URS

14   sent about outstanding invoices?  Did that ever

15   cross your desk, to your recollection?

16        A.  I don't know if it did or not.  Do you

17   have the letter?

18        Q.  Not in front of me.

19        A.  I don't recall.

20        Q.  Did anyone at H&E tell you that the

21   issue of the parking lot and cost of the

22   modification was elevated to upper management at

23   URS?

24        A.  Not that I know of.

25        MR. FRANCO:

NON-CERTIFIED COPY

Exhibit 4

1          Okay.  Let me show you another

2  document.  I'm going to label it as the next

3  exhibit, Exhibit 10.

4  EXAMINATION BY MR. FRANCO:

5      Q.  All right.  At the top, Brad Barber is

6  forwarding these other Emails to you on February

7  5, 2013, correct?

8      A.  Correct.

9      Q.  And you will see at the bottom of the

10  first page, Debra Sanders' response to Johnny

11  Jones.  Do you see that?

12          And it says, "...we are willing to cover

13  the difference in cost for building the parking

14  now as opposed to earlier with the rest of the

15  parking."

16      A.  Yes, I see that.

17      Q.  And you see the number, that they

18  calculated the cost difference at $17,507?

19      A.  Yes.

20      Q.  Okay.  So at some point, you were aware

21  of that because you got these Emails.  Fair

22  statement?

23      A.  Yep.

24      Q.  All right.  Did anyone from H&E talk to

25  you about what they calculated the cost

NON-CERTIFIED COPY

Exhibit 4

Page 81

1  difference to be?

2      A.  I don't recall the conversation, but I'm

3  sure somebody did.

4      Q.  But that wasn't acceptable to you, just

5  for URS to pay the cost difference?

6      A.  Yeah, it is pretty clear by this it was

7  unacceptable to us.

8      Q.  Well, it was unacceptable to Brad

9  Barber.  My question is --

10     A.  Brad Barber is in a position where he

11 can make that decision.

12     Q.  Okay.  And you didn't disagree with

13 that?

14     A.  Obviously, not.

15     Q.  Okay.

16         MR. FRANCO:

17             Give me a couple minutes.  We may be

18 finished with at least this portion, and then

19 maybe we can do the 1442.

20         THE WITNESS:

21             Okay.

22         (Recess held.)

23 EXAMINATION BY MR. FRANCO:

24     Q.  Mr. Engquist, when we were talking about

25 your order to stop paying invoices of URS about

NON-CERTIFIED COPY

Exhibit 4

1    the problem with the parking and the problems

2    with design, did you say problems with design?

3        A.  I may have.

4        Q.  Okay.

5        A.  I don't recall what was said.

6        Q.  What problems in January of 2013, sir,

7    were you aware of with respect to design

8    problems by URS?

9        A.  There was a lot of -- there was a lot of

10   things like the paneling and -- or, you know,

11   executive office suites and stuff like that,

12   which had to be replaced.

13       Q.  You are talking about interior building

14   issues?

15       A.  Uh-huh (affirmative response).

16       Q.  Okay.  So was there any issue with the

17   design of the parking of the yard at that point

18   in time, to your knowledge?

19       A.  Of the parking field?

20       Q.  Yes.

21       A.  Not other than it was not enough parking

22   spaces.

23       Q.  No, no, no.  That is my fault.  The

24   yard.

25       A.  Okay.  Not -- not to my knowledge.

NON-CERTIFIED COPY

Exhibit 4

Page 83

1    Wait.  The equipment yard?

2        Q.  Yes.

3        A.  I -- I don't know that any of that had

4    surfaced at that point in time.

5        Q.  So when you said you stopped payment

6    because of parking and design issues, you are

7    talking about interior building headquarter

8    design issues?

9        A.  Right.  And the inadequate parking.

10       Q.  And, of course, the inadequate parking?

11       A.  Right.

12       Q.  Okay.  When was the first time you

13   became aware of issues with the yard parking?

14   And you know what I mean by yard, for the

15   record, correct, the equipment yard.

16       A.  I can't tell you.  I can't give you a

17   date on that, but it is -- I mean, it was some

18   time ago.

19       Q.  Okay.  And what was your understanding

20   of what the problem was in the yard?

21       A.  Well, the joints were cracking up and we

22   were in a position of a brand new yard work

23   falling apart.

24       Q.  And what did your people think the

25   reason for that was?  What did they tell you?

NON-CERTIFIED COPY

Exhibit 4

Page 84

1      A.  Our -- my people's belief is that it is

2    inadequate design.  It was poorly designed.

3      Q.  Okay.  Did your people eliminate a

4    contractor problem with the construction of the

5    yard?

6      A.  I am not aware there was a contractor

7    problem with the construction of the yard.  I

8    don't know what you are talking about.

9      Q.  Okay.  That is my point.  Did you

10   question whether the concrete had been

11   constructed properly by the contractor in the

12   yard?

13     A.  We had no -- we believe the contractor

14   laid the concrete according to URS's design.

15     Q.  What was the basis for that belief?

16     A.  That is -- that is the feedback I would

17   get.

18     Q.  From?

19     A.  From my people.

20     Q.  Who?

21     A.  Frankie Wynn, you know, Johnny Jones

22   earlier, you know, Leonard.  All the people that

23   had been involved in that.

24          And we have had other -- I mean, and I

25   don't have specifics on them, but we have had

NON-CERTIFIED COPY

Exhibit 4

Page 85

1   outside sources look at the problem.

2       Q.  Right.  Now, why was that lot paved in

3   the first place?  Why was that yard paved in the

4   first place?

5       A.  Why was it paved?

6       Q.  As opposed to limestone.

7       A.  We typically don't use limestone.  I

8   mean, we have some yards that we do, but -- and

9   I believe there may have been a zoning issue on

10  that, on using the limestone there.

11      Q.  So when you construct a new site similar

12  to this now, you pave it?

13      A.  It depends on the type site, but some we

14  do and some we have asphalt.  I mean, it varies

15  depending on what type facility it is.

16      Q.  So sometimes you do use limestone on a

17  new --

18      A.  I'm sure we have, yeah.

19      Q.  And I assume cost has something to do

20  with those decisions, as well?

21      A.  It -- it could.  I mean, it could.

22      Q.  Now, to your knowledge, H&E hasn't been

23  prevented from using the yard, has it?

24      A.  Have we been prevented from using the

25  yard?

NON-CERTIFIED COPY

Exhibit 4

1       Q.  Yes.

2       A.  We still use the yard.

3       Q.  Because of the cracks and the spalling

4    it has.

5       A.  At some point, we are going to have to

6    replace all that concrete.

7       Q.  We will see about that.

8           But at this point, it hasn't stopped the

9    use that H&E has needed for that yard, correct?

10      A.  No, but it will at some point.

11      Q.  How long did you expect the pavement to

12   last without replacing in the first place?

13      A.  Many, many, many years.

14      Q.  How many?

15      A.  I don't have a -- I mean, that -- that

16   concrete ought to last 20 years.

17      Q.  Are you aware that you have this

18   spalling in paved areas similar to paved areas

19   at other locations?

20      A.  Am I aware of what?

21      Q.  Are you aware that H&E is experiencing

22   spalling at joints at other locations that have

23   paved areas?

24      A.  I'm not aware of that, no.

25      Q.  Nobody has told you that?

NON-CERTIFIED COPY

Exhibit 4

1      A.  I'm not aware of that.

2      Q.  Are you aware of the maintenance program

3  to keep that yard clean at Baton Rouge?

4      A.  What do you mean maintenance program?  I

5  mean, the maintenance is you keep the yard

6  clean, and we have got a sweeper that runs all

7  day long every day.  So we -- we keep our yard

8  clean.

9      Q.  And that sweeper was purchased when?

10     A.  Oh, I have no idea.

11     Q.  You say it runs all day long every day

12  pretty much?

13     A.  Well, it runs consistently.  We keep our

14  yard clean.

15     Q.  How do you keep it clean in Kenner?

16     A.  I can't answer that.

17     Q.  Do you have an issue with the new yard

18  in New Orleans?

19     A.  I'm -- I do not know.

20     Q.  No one has raised an issue with similar

21  spalling and cracking with the paved surface in

22  the New Orleans site?

23     A.  No, not to me.  Now, it may be raised to

24  other levels in the Company.

25     Q.  Okay.  The Kenner site has essentially

NON-CERTIFIED COPY

Exhibit 4

1    been replaced by the New Orleans site, as I

2    understand it, for your activities.  Is that a

3    fair statement or not?

4         A.  No, that is not a fair statement.  We --

5    we have just taken the rental operations away

6    from the Kenner site and moved them to New

7    Orleans.  We still have a big distribution

8    component at the New Orleans site.

9         Q.  At the New Orleans site or the Kenner

10   site?

11        A.  The -- the Kenner site is -- excuse me.

12   The Kenner site is the distribution center.  The

13   New Orleans site is a rental center.

14        Q.  Okay.  And which has the most

15   heavy-tracked equipment?

16        A.  Well, they both have track equipment,

17   but probably the new New Orleans site because of

18   excavators and dozers.  But they both have track

19   equipment.  I don't know that one does more than

20   the other.

21        Q.  Kenner had all of the activities before

22   New Orleans was online, correct?

23        A.  That is correct.

24        Q.  And that was not only sales, but

25   servicing, correct?

NON-CERTIFIED COPY

Exhibit 4

Page 89

1     A.  Yes.

2     Q.  And rental?

3     A.  That is right.

4     Q.  They had a lot of traffic at Kenner,

5  didn't they?

6     A.  Yeah.

7     Q.  Okay.  They don't have that amount of

8  traffic at Kenner anymore, do they?

9     A.  Probably not, no.  With -- with the

10  rental operations being moved, it would be less

11  traffic.

12     Q.  All right.  So just to make sure I

13  understand, out of Kenner, is it just sales now?

14     A.  Primarily sales, yes.

15     Q.  All right.

16     A.  Yes.

17     Q.  So all the heavy-tracked equipment that

18  comes in from the jobs with the mud and rocks on

19  it, those are primarily at New Orleans now?

20     A.  No.  You will have customer equipment

21  coming in, dozers and excavators, to be serviced

22  and repaired that come in all the time to the

23  Kenner facility.

24     Q.  And they also come in at New Orleans?

25     A.  Absolutely, but not for repair work.

NON-CERTIFIED COPY

Exhibit 4

1    Primarily for rental equipment coming in and

2    out.

3        Q.  So the repair work is primarily done at

4    Kenner?

5        A.  That is correct.

6        Q.  Who was in charge of developing the site

7    at New Orleans for H&E?

8        A.  The -- the new facility?  Probably Marty

9    Emigh was heavily involved in that.  He does all

10   our greenfield stuff.  And I am sure that Brad

11   Barber was involved.

12       Q.  What about Mr. St. Germain?

13       A.  I don't know what Leonard's involvement

14   was at that point in time because he is -- you

15   know, he transitioned into a new position.

16       Q.  What about Frankie Wynn?

17       A.  I am not sure what his involvement was.

18   He may have been involved.  I just -- I don't

19   know.

20       Q.  What is Frankie Wynn's primary

21   responsibility at the Company?

22       A.  He is -- he is working at the

23   facility -- Brad is a better guy to answer that

24   question than I am, Brad Barber.  He -- Frankie

25   reports to Brad.

NON-CERTIFIED COPY

Exhibit 4

1    Q.  Okay.  Mr. Jones left the Company?

2    A.  That is correct.

3    Q.  When?

4    A.  I don't have a date on it, but he has --

5  he has been gone -- he has probably been gone a

6  year.  I don't know.

7    Q.  And Mr. Jones had been with the Company

8  for a long time?

9    A.  A long time.

10    Q.  Who was there longer, Mr. Jones or Mr.

11  St. Germain?

12    A.  Mr. St. Germain.

13    Q.  Okay.  But you would say Mr. Jones had

14  been there over 20 years?

15    A.  Yes.

16    Q.  Why did he leave?

17    A.  He accepted another job.

18    Q.  Where?  For who?

19    A.  Out of state.  Indiana, I believe.

20    Q.  For a competitor?

21    A.  No.  No, for a -- some kind of parts

22  operation.  After-market parts operation.

23    Q.  Okay.  And, actually, he was based in

24  Baton Rouge before he left?

25    A.  That is correct.

NON-CERTIFIED COPY

Exhibit 4

Page 92

1    Q.  And he moved to Indiana?

2    A.  That is correct.

3    Q.  Was this a better opportunity for him?

4    A.  I assume he felt it was.

5    Q.  He wasn't asked to leave?

6    A.  No.

7    Q.  Was he replaced?

8    A.  Brad may have done some restructuring.

9    Was he was specifically replaced?  He -- I would

10   say we restructured, and, again, Brad can answer

11   that, the structure, better than I can.  That is

12   who -- it is their responsibility.

13   Q.  Okay.

14       MR. FRANCO:

15            Mr. Engquist, that is all the

16   questions I have of you, personally, sir.

17            I'm going to move, if it is okay

18   with your Counsel, to the 1442 deposition, which

19   I expect is going to be short.

20       MR. BARRIERE:

21            Do you have a copy of that notice?

22   I wasn't even aware of the logistics on that.

23       MR. FRANCO:

24            Sure.

25       MR. BERRY:

NON-CERTIFIED COPY

Exhibit 4

1            You stipulated that this was a

2    personal deposition.

3         MR. BARRIERE:

4            Yeah, I thought this was.

5            Well, you want to start a 1442, and

6    I'm going to tell you I wasn't even aware of the

7    arrangements.

8         MR. FRANCO:

9            We are off the Record.

10        (Deposition concluded at 12:07)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Exhibit 4

Page 94

```
 1              WITNESS' ATTESTATION

 2         I have read or have had the foregoing

 3    testimony read to me, pursuant to Rule 30(e) of

 4    the Federal Rules of Civil Procedure and/or

 5    Article 1445 of the Louisiana Code Civil

 6    Procedure, and hereby attest that, to the best

 7    of my ability and understanding, it is a true

 8    and correct transcription of my testimony, with

 9    the exception of any attached corrections or

10    changes, complete with reasons for changes, on

11    the Witness' Amendment Pages;

12         I have in no way altered the printed

13    transcript pages containing testimony herein,

14    tampered with the seal on the last numbered page

15    herein, or tampered with the security strip on

16    the binder hereof.  The integrity of this

17    certified transcript has been maintained in the

18    identical form as it was received by me, with

19    the exception of any changes on the Witness'

20    Amendment Pages.

21    -------------
22    Date

23

24         _____
                 JOHN ENGQUIST
25               (Signature)
```

NON-CERTIFIED COPY

Exhibit 4

Page 95

1              REPORTER'S PAGE

2         I, KAY E. DONNELLY, Certified Court

3    Reporter in and for the State of Louisiana, the

4    officer, as defined in Rule 28 of the Federal

5    Rules of Civil Procedure and/or Article 1434(B)

6    of the Louisiana Code of Civil Procedure, before

7    whom this proceeding was taken, do hereby state

8    on the Record:

9         That due to the interaction in the

10   spontaneous discourse of this proceeding, dashes

11   (--) have been used to indicate pauses, changes

12   in thought, and/or talkovers; that same is the

13   proper method for a Court Reporter's

14   transcription of proceeding, and that the dashes

15   (--) do not indicate that words or phrases have

16   been left out of this transcript;

17        That any words and/or names which could

18   not be verified through reference material have

19   been denoted with the phrased "(spelled

20   phonetically)."

21

22                    _____
                       KAY E. DONNELLY
                       Certified Court Reporter
23                     State of Louisiana
                       Certificate No. 87008

24

25

NON-CERTIFIED COPY

Exhibit 4

Page 96

```
 1              C E R T I F I C A T E
 2        This certification is valid only for a
      transcript accompanied by my original signature
 3    and original required seal on this page.
             I, KAY E. DONNELLY, Certified Court
 4    Reporter in and for the State of Louisiana, as
      the officer before whom this testimony was
 5    taken, do hereby certify that JOHN ENGQUIST, to
      whom oath was administered, after having been
 6    duly sworn by me upon authority of R.S. 37:2554,
      did testify as hereinbefore set forth in the
 7    foregoing ninety-five (95) pages; that this
      testimony was reported by me in the stenotype
 8    reporting method, was prepared and transcribed
      by me or under my personal direction and
 9    supervision, and is a true and correct
      transcript to the best of my ability and
10    understanding; that the transcript has been
      prepared in compliance with transcript format
11    guidelines required by statute or by rules of
      the board; and that I am informed about the
12    complete arrangement, financial or otherwise,
      with the person or entity making arrangements
13    for deposition services; that I have acted in
      compliance with the prohibition on contractual
14    relationships, as defined by Louisiana Code of
      Civil Procedure Article 1434 and in rules and
15    advisory opinions of the board; that I have no
      actual acknowledge of any prohibited employment
16    or contractual relationship, direct or indirect,
      between a court reporting firm and any party
17    litigant in this matter nor is there any such
      relationship between myself and a party litigant
18    in this matter.  I am not related to counsel or
      to the parties herein, nor am I otherwise
19    interested in the outcome of this matter.

20

21
                        _____
22                      KAY E. DONNELLY
                        Certified Court Reporter
23                      State of Louisiana
                        Certificate No. 87008
24                      August 12, 2016

25
```

NON-CERTIFIED COPY

Exhibit 4

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


```
*   *   *   *   *   *   *   *   *
                            *
H&E EQUIPMENT SERVICES      *
                            *  NUMBER 626,308
VERSUS                      *
                            *  DIVISION "D"
URS CORPORATION             *
ARCHITECTURE, P.C., URS     *
CORPORATION, L O'NEAL       *
JOHNSON AND THOMAS E.       *
RYAN, III                   *
                            *
*   *   *   *   *   *   *   *   *
```


          Deposition of FRANKIE WAYNE WYNN,

taken on Tuesday, August 9, 2016, commencing at

10:02 a.m., in the offices of Adams and Reese,

LLP, Attorneys at Law, 4500 One Shell Square,

New Orleans, Louisiana, 70139.

NON-CERTIFIED COPY

Exhibit 5

1                 I N D E X

2

3                                    Page

4

   Caption                            1
5  Index of Exhibits                  3
   Appearances                       13
6  Agreement of Counsel              14

7  Examination

8     PHILIP A. FRANCO, ESQ.         15

9
                *   *   *   *   *
10

   Witness' Certificate             231
11 Reporter's Page                  232
   Certificate                      233
12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Exhibit 5

Page 3

1                    INDEX OF EXHIBITS

2

3     Number                                    Page

4     1  August 21, 2009 Email from        34
           Frankie Wynn to Leonard
5           St. Germain attaching URS
           Short Form Master Agreement
6           for Professional Services
           Renovations and Additions
7           to Kenner LA Branch
           H&E 0005236-0005246
8
       2  URS Short Form Master Agreement   36
9           for Professional Services
           Between H&E Equipment Services
10          and URS Corporation
           Architecture PC August 13,
11          2009 Effective Date

12     3  October 14, 2010 Email string    38
           from Frankie Wynn to Brad
13          Barber, et al
           H&E 0003269-0003270
14
       4  URS Attachment 1 Time and        40
15          Materials Work Authorization
           10-10 10/22/2010 and
16          October 15, 2010 Letter from
           Neal Johnson to Frankie Wynn
17          URS 038394-038395

18     5  December 8, 2010 Email string    41
           from Thomas Ryan to Frankie
19          Wynn, et al
           H&E 0007552-0007553
20
       6  December 22, 2010 Email string   43
21          from Frankie Wynn to John
           Johns and Attachment 1, Scope
22          of Work, Schedule of Fees and
           Charges and Project Program
23          H&E 0009209-0009217

24

25

NON-CERTIFIED COPY

Exhibit 5

Page 4

1   (Cont.)      INDEX OF EXHIBITS

2

3      Number                                    Page

4      7   URS Attachment 1 Time and            47
               Materials Work Authorization
5              12-10 12/17/10 Belle Chasse
               URS Attachment 1 Time and
6              Materials Work Authorization
               09-100 8/31/09 Kenner
7              URS 031072-031086

8      8   January 6, 2011 Email string         50
               from Frankie Wynn to John
9              Jones, et al
               H&E 0009311-0009312
10

11     9   A-4 Application Site Plan            51
               City of Baton Rouge 1-12-11
11             URS 054688-054690

12

13    10   January 19, 2011 Email from          55
               Thomas Ryan to Neal Johnson
13             Kickoff Meeting Minutes
               January 14, 2011
14             URS 039196-039197

15

16    11   Lump Sum Work Order                  57
               No. 02-11 2/2/2011
16             H&E 0037269-0037270

17

18    12   Geotechnical Engineering Report      58
               by Terracon Consultants, Inc.
19             February 9, 2011
               URS 065986-066005
20

21    13   February 22, 2011 Email string       65
               from John Jones to Brad
21             Barber, et al
22             H&E 0003300

23

24

25

NON-CERTIFIED COPY

Exhibit 5

1    (Cont.)      INDEX OF EXHIBITS

2

3    Number                                        Page

4    14   March 2, 2011 Email string          66
          from Neal Johnson to Cody
5         Lewis, et al attaching URS
          Attachment I Phase IV Scope of
6         Services February 16, 2011
          URS 030824-030826
7
     15   URS Design Development Cost          67
8         Analysis for Kenner, LA
          February 14, 2011
9         URS 059882-059884

10   16   May 3, 2011 Letter from Neal        68
          Johnson to Milton J. Womack,
11        Buquet & LeBlanc and Arrighi
          Construction
12        H&E 0003392-0003393

13   17   June 16, 2011 letter proposal       70
          from Terracon to Frankie Wynn
14        URS 041088-041097

15   18   August 5, 2011 Email string         72
          from Arin Barkataki to Tim
16        Gaines
          URS 033341-033344
17
18   19   September 8, 2011 Email string      76
          from Frankie Wynn to James
19        Brown, et al
          H&E 0003672-0003674
20
     20   September 19, 2011 Email string     78
21        from Brad Barber to Frankie
          Wynn
22        H&E 0003742-0003743

23   21   September 20, 2011 Email string     80
          from Neal Johnson to Frankie
24        Wynn, et al
          URS 055094-055097
25

NON-CERTIFIED COPY

Exhibit 5

Page 6

1    (Cont.)        INDEX OF EXHIBITS

2

3    Number                                        Page

4    22  September 27, 2011 Email from        83
          Eryn Manint to
5          Becky@tdsola.com, et al
          H&E 0007534-0007537

6

7    23  October 4, 2011 Email string         85
          from Frankie Wynn to
8          John Jones
          H&E 0011032-0011034

9    24  November 1, 2011 letter from         87
          Terracon to Frankie Wynn
10         c/o Thomas Ryan
          URS 044305-044312

11

12   25  December 16, 2011 Email string       88
          from Frankie Wynn to
13         Brad Barber, et al
          H&E 0004073-0004078

14   26  December 29, 2011 Email string       90
          from Ottis Seaborn to Daily
15         Update, et al
          H&E 0062142-0062149

16

17   27  January 9, 2012 Email string         91
          from Neal Johnson to Frankie
          Wynn
18         H&E 0062403-0062404

19   28  January 18, 2012 Email string        93
          from Frankie Wynn to John
20         Jones
          H&E 0012783-0012784

21

22   29  January 27, 2012 Email string        94
          from Neal Johnson to James
          Brown, et al
23         URS 033683-033698

24

25

NON-CERTIFIED COPY

Exhibit 5

1    (Cont.)        INDEX OF EXHIBITS

2

3    Number                                    Page

4    30   February 2, 2012 Email string        100
            from Brad Reese to Thomas
5           Ryan, et al
            H&E 0013163-0013164
6
     31   February 10, 2012 Email string       101
7           from Frankie Wynn to Neal
            Johnson, et al
8           URS 074030

9    32   February 9, 2012 Email string        102
            from Ottis Seaborn to Thomas
10          Ryan, et al
            URS 074031
11
     33   February 24, 2012 Email string       103
12          from Thomas Ryan to Frankie
            Wynn
13          H&E 0063708-0063716

14   34   March 12, 2012 Email string          106
            from Frankie Wynn to Neal
15          Johnson, et al
            H&E 0064270-0064271
16
     35   March 15, 2012 Email from Ottis      107
17          Seaborn to Thomas Ryan, et al
            URS 070252
18
     36   URS Project Observation Report       108
19          March 20, 2012 Kenner
            URS 034337-034346
20
     37   March 29, 2012 Email string          111
21          from Frankie Wynn to John
            Jones, et al
22          H&E 0013645

23   38   August 3, 2012 Email string          111
            from Frankie Wynn to John
24          Jones
            H&E 0013874-0013876

25

NON-CERTIFIED COPY

Exhibit 5

Page 8

1    (Cont.)      INDEX OF EXHIBITS

2

3    Number                                    Page

4    39  August 3, 2012 Email string          113
         from Neal Johnson to Tim
5        Gaines, et al
         H&E 0013938-0013945
6
     40  August 3, 2012 Email string          114
7        from Neal Johnson to
         Murray McCullough, et al
8        H&E 0050870-0050873

9    41  August 16, 2012 Email from Neal      116
         Johnson to Murray McCullough,
10       et al
         H&E 0051125
11
     42  August 13, 2012 Email string         118
12       from Neal Johnson to John
         Jones, et al
13       H&E 0014772-0014773

14   43  MAAP Meeting Minutes Project:        125
         Kenner September 21, 2012
15       URS 048304-048306

16   44  September 25, 2012 Email string      127
         from Ottis Seaborn to Daily
17       Update, et al
         H&E 0051948-0051949
18
     45  October 3, 2012 Email string         129
19       from Frankie Wynn to James
         Brown, et al
20       H&E 0028572-0028574

21   46  October 4, 2012 Email string         130
         from Brad Reese to Neal
22       Johnson, et al
         H&E 0016469-0016471
23

24

25

NON-CERTIFIED COPY

Exhibit 5

1   (Cont.)     INDEX OF EXHIBITS

2

3   Number                              Page

4     47  November 2, 2012 Email from     132
              John Jones to Stephan Dorsey,
5             et al
              H&E 0029709

6
      48  November 12, 2012 Email string   133
7             from John Jones to Neal
              Johnson, et al
8             URS 049687-049689

9     49  November 19, 2012 Email string   136
              from Neal Johnson to Murray
10            McCullough
              URS 057251-057253

11
      50  December 17, 2012 Email from     138
12            John Jones to Neal Johnson,
              et al
13            H&E 0020068

14    51  January 9, 2013 Email from       150
              Thomas Ryan to Stephan Dorsey,
15            et al re: ASI #136 Parking
              Revisions
16            H&E 0020851-0020856
                       and
17        September 7, 2012 Email from
              Neal Johnson to Stephan Dorsey,
18            et al Re: Revised Change Order
              Request for Change Proposal #17
19            H&E 0051587-0051589

20    52  January 4, 2013 Email string     152
              from Neal Johnson to Frankie
21            Wynn, et al
              H&E 0020538-0020540

22
      53  January 8, 2013 Email string     154
23            from John Jones to Neal
              Johnson, et al
24            H&E 0022251-0022252

25

NON-CERTIFIED COPY

Exhibit 5

Page 10

1  (Cont.)      INDEX OF EXHIBITS

2

3    Number                              Page

4    54  January 11, 2013 Email string    154
         Frankie Wynn to John Jones
5        H&E 0021025-0021027

6    55  AIA Document G704-2000           157
         Certificate of Substantial
7        Completion 1/7/13
         H&E 0055262

8

     56  January 18, 2013 Email string    160
9        from Frankie Wynn to Stephan
         Dorsey, et al
10       H&E 0022314-0022324

11   57  January 25, 2013 Email string    163
         from John Jones to Stephan
12       Dorsey, et al
         H&E 0022872-0022879

13

     58  March 15, 2013 Email string      164
14       from Brad Reese to Frankie
         Wynn
15       H&E 0037939-0038941

16   59  March 18, 2013 Email string      167
         from Frankie Wynn to John
17       Jones
         H&E 0032308-0032312

18

     60  March 27, 2013 Letter from       168
19       Brad Reese to Frankie Wynn
         URS 051379-051384

20

     61  April 16, 2013 Email string      169
21       from Frankie Wynn to Neal
         Johnson, et al
22       H&E 0024328-0024330

23   62  April 8, 2013 Email from Brad     173
         Barber to Vincent Provenza,
24       et al
         H&E 0004354

25

NON-CERTIFIED COPY

Exhibit 5

Page 11

1   (Cont.)        INDEX OF EXHIBITS

2

3     Number                              Page

4     63   May 13, 2013 Email string from     173
             Frankie Wynn to Thomas Ryan,
5            et al
             H&E 0024757-0024758

6

      64   June 12, 2013 Email from          180
7            Frankie Wynn to John Jones,
             et al
8            URS 079105

9     65   June 18, 2013 Email from Jack     183
             Groves to Frankie Wynn, et al
10           H&E 0052765-0052766

11    66   MAPP Change Proposal Request      187
             No. 53.0 June 21, 2013
12           URS 079315-079323

13    67   June 24, 2013 Email string        188
             from Neal Johnson to Frankie
14           Wynn, et al
             H&E 0025356-0025358

15

      68   June 27, 2013 Email string        189
16           from Frankie Wynn to Thomas
             Ryan, et al
17           H&E 0025349-0025350

18    69   July 29, 2013 Email from          191
             Frankie Wynn to Neal Johnson,
19           et al
             H&E 0021331-0021332

20

      70   List of Kenner Project Change     195
21           Orders

22    71   Gootee General Contractors        198
             Change Orders

23

24

25

NON-CERTIFIED COPY

Exhibit 5

Page 12

1  (Cont.)      INDEX OF EXHIBITS

2

3    Number                               Page

4    72  Superior Millworks February 20,    199
         2013 Change Request estimate
5        H&E 0008385

6    73  August 13, 2013 Email from         201
         Frankie Wynn to John Jones
7        H&E 0008374

8    74  August 14, 2013 Email string       202
         from Frankie Wynn to Stephan
9        Dorsey
         H&E 0054903
10

     75  October 7, 2013 Email from         203
11       Frankie Wynn to Thomas Ryan,
         et al
12       H&E 0007780

13   76  October 30, 2013 Email string      204
         from John Jones to Jeff
14       Stringer, et al
         H&E 0008042-0008043
15

     77  November 27, 2013 Email string     212
16       from Frankie Wynn to Brad
         Barber, et al
17       H&E 0004952-0004962

18   78  August 4, 2015 Letter from         214
         Travelers to H&E Equipment
19       TPCC 0004-0005

20   79  January 10, 2014 Travelers         219
         Claim Acknowledgment
21       TPCC 0061-0062

22   80  January 21, 2013 Letter from       223
         Neal Johnson to Frankie Wynn
23       enclosing invoices
         H&E 0001679-0001727

24

25

NON-CERTIFIED COPY

Exhibit 5

Page 13

```
 1   APPEARANCES:

 2

         Representing the Plaintiff:
 3
         FISHMAN HAYGOOD, LLP
 4       Attorneys at Law
         201 St. Charles Avenue, Suite 4600
 5       New Orleans, Louisiana  70170

 6       BY:  BRENT B. BARRIERE, ESQ.
              ALYSSON L. MILLS, ESQ.
 7

 8

 9
         Representing the Defendant:
10
         ADAMS AND REESE, LLP
11       Attorneys at Law
         4500 One Shell Square
12       New Orleans, Louisiana  70139

13       BY:  PHILIP A. FRANCO, ESQ.
              KELLEN J. MATHEWS, ESQ.
14

15   ALSO PRESENT:

16     Neal Johnson

17

18
     Reported by:
19               KAY E. DONNELLY
                 Certified Court Reporter
20               State of Louisiana

21

22

23

24

25
```

NON-CERTIFIED COPY

Exhibit 5

Page 14

1                    S T I P U L A T I O N

2

3          It is stipulated and agreed by and between

4    counsel that the deposition of FRANKIE WAYNE

5    WYNN is hereby being taken under the Louisiana

6    Code of Civil Procedure in accordance with the

7    Code.

8          The formalities of sealing and

9    certification are hereby waived.  The witness

10   will reserve the right to read and sign the

11   deposition.  The party responsible for service

12   of the discovery material shall retain the

13   original.

14         All objections, save those as to the form

15   of the questions, are hereby reserved until such

16   time as this deposition, or any part thereof,

17   may be used or sought to be used in evidence,

18   and are to be made in accordance with the Code

19   of Civil Procedure.

20              *   *   *   *   *

21         KAY E. DONNELLY, Certified Court Reporter,

22   in and for the State of Louisiana, officiated in

23   administering the oath to the witness.

24

25

NON-CERTIFIED COPY

Exhibit 5

1        FRANKIE WAYNE WYNN, H&E Equipment

2    Services, 7500 Pecue Lane, Baton Rouge,

3    Louisiana, 70809, after having been first duly

4    sworn, testified on his oath as follows:

5    EXAMINATION BY MR. FRANCO:

6        Q.  Mr. Wynn, my name is Phil Franco.  We

7    have met before, have we not?

8        A.  Yes, sir.

9        Q.  Have you ever been deposed before?

10       A.  Yes, sir.

11       Q.  So you understand that routine?

12       A.  I think so.

13       Q.  All right.  If you don't understand my

14    question or if you don't understand a word in my

15    question, ask me and I'll try to clarify it for

16    you.

17       A.  Okay.

18       Q.  Otherwise, I will assume that you

19    understand my question.

20            Would you state your full name and

21    address for the Record?

22       A.  Frankie Wayne Wynn, 19347 North Trent

23    Johns Drive, Baton Rouge, Louisiana, 70810.

24       Q.  And prior to your deposition today, Mr.

25    Wynn, did you review any documents in order to

NON-CERTIFIED COPY

Exhibit 5

1    prepare?

2        A.  Yes, sir.

3        Q.  And did select those documents, or did

4    the attorneys provide documents to you?

5        A.  Both.

6        Q.  What documents did you review on your

7    own that were not sent to you by Counsel?

8        A.  There could have been some duplicates.

9    I went through some Emails that I had on my

10   computer.  I'm assuming that those were --

11       Q.  Produced?

12       A.  -- produced to you guys.

13       Q.  As far as you know, they did search your

14   computer for Emails?

15       A.  Yes, sir.

16       Q.  Okay.  Were there particular ones you

17   focused on?

18       A.  No, sir.

19       Q.  Did you review all your Emails?

20       A.  No, sir.

21       Q.  Did you review Emails for a certain time

22   period?

23       A.  No, sir.

24       Q.  And why did you review those?  In order

25   to refresh your recollection?

NON-CERTIFIED COPY

Exhibit 5

1      A.  Just to refresh my memory.

2      Q.  Did you meet with anybody prior to your

3  deposition today regarding your deposition?

4      A.  Yes, sir.

5      Q.  And who was that that you met with?

6      A.  A representative of Fishman Haygood.

7      Q.  And how long did you meet to prepare for

8  your deposition?

9      A.  About an hour an half, I would guess.

10      Q.  Okay.  Was anybody else with you other

11  than --

12      A.  No.

13      Q.  -- you and the attorney at Fishman?

14      A.  No, sir.

15      Q.  Did you speak to anybody else about your

16  deposition other than Counsel?

17      A.  Yes.

18      Q.  And who was that?

19      A.  John Berry.

20      Q.  And he is in-house counsel --

21      A.  Correct.

22      Q.  -- for H&E?

23      A.  (Nods yes.)

24      Q.  And how long did you talk to him for?

25      A.  We have talked probably a few minutes

NON-CERTIFIED COPY

Exhibit 5

1   for the last couple of weeks.

2       Q.  What did about any other H&E personnel?

3   Have you talked to any other H&E personnel about

4   your deposition or the case?

5       A.  Yes.

6       Q.  Who would that have been?

7       A.  Leonard St. Germain.  I think he is the

8   only one.

9       Q.  And when did you speak to him about your

10  deposition?

11      A.  I spoke to him when I heard that he was

12  going to be deposed, and I just let him know

13  that he could expect to be deposed in this case.

14      Q.  Did you talk to Mr. St. Germain about

15  any of the substance of the case?

16      A.  I don't think so.

17      Q.  Anybody else that you spoke to about the

18  case or your deposition?

19      A.  I don't believe so.

20      Q.  Can you give me the extent of your

21  formal education?

22      A.  I got a degree from Louisiana Tech

23  University, major in business management.

24      Q.  And when was that?

25      A.  1976.

Exhibit 5

NON-CERTIFIED COPY

Page 19

1      Q.  Have you had any formal education since

2   then?

3      A.  Not other than seminars, conferences.

4   That is it.

5      Q.  Has there has been a general subject for

6   the conferences or seminars that you have

7   attended since then?

8      A.  Concentrating mostly in safety and risk

9   management.

10      Q.  What was your first full-time employment

11   after Louisiana Tech?

12      A.  I was a credit representative for

13   General Electric Credit Corporation.

14      Q.  And how long did you do that?

15      A.  Eight months.

16      Q.  Then what did you do?

17      A.  I became a credit representative for

18   Scott Truck & Tractor Company.

19      Q.  And, generally, what does a credit

20   representative do?

21      A.  Review credit, approve credit, decline

22   credit, collect past due accounts.

23      Q.  And how long did you do that for Scott?

24      A.  In that position until 1980.

25      Q.  And then you went to a different

NON-CERTIFIED COPY

Exhibit 5

Page 20

1    position with the same company?

2    A.  Yes, sir.  I was transferred to Baton

3    Rouge, Louisiana, in 1980.

4    Q.  What did you do then for Scott?

5    A.  Still did some of the credit duties,

6    plus I was over their accounting department, the

7    safety department.

8         Did everything except those activities

9    associated with sales and service and parts

10   stuff, say the bookkeeping --

11   Q.  The actual operations you weren't

12   involved in?

13   A.  No, sir.

14   Q.  Scott Truck & Tractor, did they do the

15   same kind of business that H&E does?

16   A.  Yes, sir.

17   Q.  The same type of equipment, basically?

18   A.  Yes, sir.

19   Q.  Did they sell, as well as rent

20   equipment?

21   A.  Yes, sir.

22   Q.  Did they service equipment?

23   A.  Yes, sir.

24   Q.  All right.  How long did you do that in

25   Baton Rouge for Scott?

NON-CERTIFIED COPY

Exhibit 5

Page 21

1        A.  Until June of 2005.

2        Q.  And then what happened?

3        A.  My position was eliminated, and I went

4   work for H&E Equipment Services.

5        Q.  And it was H&E at that time, not Head &

6   Engquist, correct?

7        A.  Correct.

8        Q.  And who hired you at H&E?

9        A.  Johnny Jones.

10       Q.  And what position were you hired in?

11       A.  Risk manager.

12       Q.  What were your duties as risk manager?

13       A.  My duties in the beginning was to

14   reorganize and better establish the credit

15   department -- I'm sorry -- the safety department

16   for H&E.

17       Q.  How long did you occupy that position,

18   or better stated, what was your next position,

19   if any?

20       A.  I was -- my title was changed to

21   Director of Facilities, Compliance and Risk

22   Management.

23       Q.  Director of Facilities, Compliance and

24   Risk Management?

25       A.  Yes, sir.

NON-CERTIFIED COPY

Exhibit 5

Page 22

1      Q.  And the risk management part stayed the

2  same, I assume?

3      A.  Yes, sir.

4      Q.  What was compliance?  What was the

5  difference or the addition of compliance?

6      A.  I was the director of the DOT compliance

7  division of the Company, handling titling and

8  transferring of equipment, purchasing -- not

9  equipment -- titled vehicles, which did include

10  some equipment, purchased haul trucks, service

11  trucks, pickup trucks, trailers.

12      Q.  But not the heavy equipment?

13      A.  No, sir.

14      Q.  And what did the position of director of

15  facilities include?

16      A.  My duties included maintaining and

17  reviewing the leases for the entire Company, the

18  other branch locations across the country,

19  negotiating leases, determining if there was a

20  need for an upgrade for a facility, along with

21  others in the Company.

22      Q.  What about the day-to-day operation of

23  the facilities, were you involved in any of that

24  as Director of Facilities?

25      A.  Well, here, again, the leases, because

NON-CERTIFIED COPY

Exhibit 5

Page 23

1    we had so many leases, it was pretty much a

2    daily process of reviewing the leases.

3           We had several critical dates for every

4    location, two years out, one year out, six

5    months out.

6           Determining if we were going to stay on

7    a location, upgrade the location, move to

8    another location.  So, it was -- it was a daily

9    job.

10       Q.  Was director of facilities a new

11   position created at the Company, or did somebody

12   else occupy that position prior to you?

13       A.  Someone else had those duties.

14       Q.  And who was that?

15       A.  Leonard St. Germain.

16       Q.  And then you assumed that role?

17       A.  Yes, sir.

18       Q.  Oh, okay.  When did you become director

19   of facilities?  Did I ask you that?  I don't

20   think I did.

21       A.  I believe that was in 2009.

22       Q.  Do you recall the month?

23       A.  No, sir, I don't.

24       Q.  So between 2005 ans 2009, Mr. St.

25   Germain was assuming the duties of director of

NON-CERTIFIED COPY

Exhibit 5

1    facilities?

2        A.  Yes, sir.

3        Q.  And since 2009, has your title or

4    position changed with the Company?

5        A.  The title has not changed, but some of

6    the duties have changed.

7        Q.  So your title is the same today as it

8    was in 2010, for instance?

9        A.  Yes.

10        Q.  And what duties have changed?

11        A.  I no longer purchase what we call the

12    rolling stock for the Company, which are

13    vehicles, trucks, pickup trucks, haul trucks,

14    trailers.

15            My duties are more concentrated in

16    claims.  I assist the Safety Department in

17    incident investigation.  I attend depositions,

18    hearings, trials, as a representative of H&E.

19        Q.  Is that claims and defenses of cases

20    against H&E, or does that include cases by H&E?

21        A.  Both.

22        Q.  Both.

23            Were you involved in the filing of this

24    particular lawsuit?

25        A.  How do you mean by "involved"?

NON-CERTIFIED COPY

Exhibit 5

Page 25

1      Q.  Who at the Company was the lead contact

2  with the attorneys in connection with this

3  particular lawsuit when it was filed?

4      A.  Jamie Seymour.

5      Q.  And she was in-house counsel?

6      A.  He.

7      Q.  Jamie is a he?

8      A.  Yes, sir.

9      Q.  Jamie Seymour was in-house counsel?

10     A.  Yes, sir.

11     Q.  Spell Seymour for me.

12     A.  S-E-Y-M-O-U-R, I believe.

13     Q.  Was that a full-time job?

14     A.  Yes, sir.

15     Q.  And did Jamie leave?

16     A.  Yes, sir.

17     Q.  When did he leave?

18     A.  I think it was less than a year ago.

19     Q.  What was the reason that he left, if you

20  know?

21     A.  I don't know.

22     Q.  And that is when Mr. Berry took over?

23     A.  Yes, sir.

24     Q.  Where did Mr. Seymour go?

25     A.  Blue Cross.

NON-CERTIFIED COPY

Exhibit 5

Page 26

1    Q.  As counsel for Blue Cross?

2    A.  Yes, sir.

3    Q.  In Baton Rouge?

4    A.  Yes, sir.

5    Q.  Do you know who was responsible for

6  providing facts for the lawsuit that was filed?

7    A.  I believe that was Jamie.

8    Q.  All right.  But what business person?

9  Do you know?

10       I'm sure Jamie wasn't involved in the

11  details, facts as they developed at the

12  beginning, correct?

13    A.  I believe he had spoken to Johnny Jones

14  and Leonard St. Germain and also to me.

15    Q.  Now, do your duties as director of

16  facilities, today, are they the same as they

17  were in 2010, for instance?

18    A.  No.

19    Q.  How are they different today than they

20  were before your position changed?

21    A.  My responsibilities in regards to

22  facilities is mainly centered around the Baton

23  Rouge facility.

24       Prior to that, as I said before, it was

25  all of the leases, all of the locations all over

NON-CERTIFIED COPY

Exhibit 5

1    the country for H&E.

2        Q.  And it's not your fault.  I don't

3    understand that.

4            Are your duties, with respect to the

5    Baton Rouge facility, the same now as they were

6    in 2010?

7        A.  Yes.

8        Q.  And when did your duties change?

9        A.  I'm not sure of the date, but the duties

10   that were transitioned from me went to another

11   individual, and that was probably two or three

12   years ago.

13       Q.  Did it change your compensation?  Has

14   your compensation changed?

15       A.  No.

16       Q.  And your title, you said, remained the

17   same?

18       A.  Yes, sir.

19       Q.  Who assumed the duties under director of

20   facilities that you had previously done?

21       A.  Mark -- I'm sorry.  Marty Emigh,

22   E-M-I-G-H.

23       Q.  And you said two to three years ago.  If

24   you put that in perspective of these three

25   facilities that are at issue in the lawsuit,

NON-CERTIFIED COPY

Exhibit 5

Page 28

1    were those three jobs closed out by then when

2    your duties changed, or was some of that still

3    in play?

4        A.  It was probably still in play, because

5    there was a transition period where I was, you

6    know, helping Marty, you know, with questions

7    that he had about leases, landlords, what was

8    going on, so there was a transition period.

9        Q.  All right.  Let me ask it this way,

10   Mr. Wynn:

11          As I recall in these 20,000 documents

12   produced in this case, so bear with me, there

13   were documents in 2013 still going on between

14   contractors, URS, and H&E.  So three years from

15   today would have been 2013 sometime.

16          2014, is, I believe, when the suit was

17   filed; is that right?

18       A.  That was '13.

19       Q.  '13.

20          The suit was filed in November of 2013.

21   Let me ask it this way:  In November of 2013,

22   had your position changed?

23       A.  I don't recall.

24       Q.  And what was the reason that the duties

25   changed?

NON-CERTIFIED COPY

Exhibit 5

1    A.  It was my understanding that they needed

2    an individual, not only to handle the existing

3    leases, but also with new greenfield start-up

4    locations.

5         The Company was in an expansion mode,

6    and it was going to take someone that could

7    dedicate their full time to that particular

8    position.

9    Q.  What was Marty Emigh's qualifications

10   for being in that position, to your knowledge?

11   A.  I don't know.

12   Q.  Is it pronounced Emigh?

13   A.  Emigh.

14   Q.  Emigh.

15        Was Mr. Emigh previously with H&E?

16   A.  Yes, sir.

17   Q.  What position did he occupy before that?

18   A.  I'm not sure what position he was in

19   prior to that, but I think he had worked in

20   several different areas.

21        I think he had been a branch manager,

22   but I'm not sure of everything that he had done

23   prior to that.

24   Q.  With respect to responsibility for these

25   three projects, did your involvement change as a

NON-CERTIFIED COPY

**Exhibit 5**

1    result of your duties changing?

2        A.  For the projects that we are talking

3    about?

4        Q.  Baton Rouge, Kenner and Belle Chasse.

5        A.  I was -- I was still involved in those

6    up until -- well, even today.  Because of the

7    lawsuit, I'm still involved.

8        Q.  Was Mr. Emigh also involved in those

9    projects when he took that position, that new

10   position?

11       A.  Yes, sir.

12       Q.  And who is your immediate supervisor

13   today?

14       A.  John Berry.

15       Q.  And when did that take place?

16       A.  When Mr. Berry was hired a couple of

17   months ago.

18       Q.  Who was your lead supervisor prior to

19   Mr. Berry?

20       A.  Jamie Seymour.

21       Q.  So you didn't report directly to

22   Mr. St. Germain or Mr. Barber?

23       A.  I reported to Mr. St. Germain when I was

24   employed by H&E in the beginning.

25       Q.  When did that change?

NON-CERTIFIED COPY

**Exhibit 5**

1     A.  It changed when Leonard's position

2  changed -- or Leonard St. Germain and my

3  position changed in that 2009 period.

4     Q.  That is when you started reporting to

5  Mr. Seymour?

6     A.  No.  At that time, I reported directly

7  to Johnny Jones.

8     Q.  Who is on first?  Okay.

9        So let me get this straight, please.

10  When you first came onboard, you were reporting

11  to Mr. St. Germain?

12     A.  Correct.

13     Q.  Then you started to report to Johnny

14  Jones?

15     A.  Correct.

16     Q.  Do you remember the year?

17     A.  That would have been in 2009 when my

18  title changed.  My title changed and

19  Mr. St. Germaine's title changed.

20     Q.  And then, subsequently, you reported to

21  Mr. Seymour.  When did that happen?

22     A.  Before I reported to Mr. Seymour, I

23  reported to Melissa Samuel.

24     Q.  And what position was she?  Was she

25  in-house counsel?

NON-CERTIFIED COPY

Exhibit 5

Page 32

1    A.  She was in-house counsel, but her title

2  was VP of Corporate Services, I believe, but I'm

3  not positive about that.

4    Q.  And what time period did you report to

5  her?

6    A.  I don't remember the dates.

7    Q.  Okay.  And then you reported to Jamie

8  Seymour?

9    A.  Correct.

10    Q.  You were onboard at H&E beginning in

11  2005.  Who was the point person for the Baton

12  Rouge project with respect to URS?

13    A.  To best of my knowledge, it was Johnny

14  Jones.  I believe Johnny is the one that

15  actually bought the property that started all of

16  this.

17    Q.  And at that time, you reported to

18  Mr. St. Germain?

19    A.  Correct.

20    Q.  And Mr. St. Germain reported to

21  Mr. Jones?

22    A.  Correct.

23    Q.  I'm writing this down because I know I'm

24  not going to remember it.

25         For the Kenner project, who was the

NON-CERTIFIED COPY

Exhibit 5

Page 33

1    point person at H&E with respect to URS?

2        A.  In the beginning, I believe it was

3    Mr. St. Germain.

4        Q.  And you still reported to him at that

5    time during Kenner?

6        A.  Yes.

7        Q.  All right.  One more.  Belle Chasse.

8            Who was the point person with respect to

9    URS with Belle Chasse?

10       A.  I don't know.

11       Q.  Was it you?

12       A.  I'm not sure if I was the one that had

13   the first contact with URS in regards to Belle

14   Chasse.  I don't know if Mr. St. Germain had

15   contacted URS before I got involved or not.

16       Q.  Well, when I say "point person," I don't

17   necessarily mean the one who initiated the

18   discussions with URS.

19           I mean, who was the one that was the

20   primary person at H&E to communicate with URS

21   for the project?

22       A.  When it got to the point of the bidding

23   process, I was involved.

24       Q.  From that point on?

25       A.  Yes, sir.

NON-CERTIFIED COPY

Exhibit 5

Page 34

1       Q.  And who did you report to at the time?

2   Was it Mr. St. Germain again?

3       A.  I think I was reporting to Johnny Jones

4   at that time.

5       Q.  Mr. St. Germaine's position changed

6   because somebody in the Company retired, as I

7   understand; it that correct?

8       A.  I think that is correct.

9       Q.  I'm going to show you documents as we go

10  along, and we will identify these as Wynn

11  Exhibit No., even though I say Exhibit 1 or 2,

12  5, whatever.

13          MR. FRANCO:

14              Do Wynn exhibits, as we did the

15  other day.

16  EXAMINATION BY MR. FRANCO:

17      Q.  Mr. Wynn, the first document I'm going

18  to show you, which I have labeled as Exhibit 1,

19  is H&E 5236, and this appears to be at the top

20  an Email from you to Leonard St. Germain dated

21  August 21, 2009.

22          Do you see that?

23      A.  Yes, sir.

24      Q.  Mr. St. Germain had sent you prior to

25  this Email the attached Short Form Master

NON-CERTIFIED COPY

Exhibit 5

1  Agreement for Professional Services, correct?

2      A.  Yes, sir.

3      Q.  And you reviewed that document and you

4  had comments about that document, correct?

5      A.  Correct.

6      Q.  Had you seen the 2006 Master Agreement

7  with URS prior to this time?

8      A.  No.

9      Q.  And so you say, "Since I haven't seen an

10  agreement such as this before, these may be

11  standard terms in the industry but I have listed

12  my concerns."

13          And you go on and list concerns, one of

14  which, if you turn the page to the second page,

15  you are talking about Paragraph 9 entitled

16  "Limitation of Liability," and, more

17  specifically, Paragraph 9.1, correct?

18      A.  Correct.

19      Q.  And you say, "Are you okay with the

20  $250,000 liability limitation?"  Correct?

21      A.  Correct.

22      Q.  Did you get a response from

23  Mr. St. Germain to your concerns?

24      A.  No.

25      Q.  Not verbally or in writing?

NON-CERTIFIED COPY

Exhibit 5

1    A.  No, sir.

2    Q.  You just provided those, and he took it

3  from there?

4    A.  Yes, sir.

5    Q.  Are you aware he then executed this

6  agreement?

7    A.  Yes, sir.

8    Q.  Did you have any concerns when you

9  looked at this agreement with Paragraph 4?  Can

10  you turn to Paragraph 4?

11    A.  (Witness complying.)

12       On Page 1?

13    Q.  Yes, sir.

14    A.  If it was not listed in my Email, I

15  apparently had no concern.

16    Q.  Let me snow you the next document, which

17  I've already marked Exhibit 2.  I just wanted to

18  show you, sir, that that document that was sent

19  to you was, in fact, executed by Mr. St.

20  Germain.

21       Do you see that signature page?

22    A.  Yes, sir.  Page 5?

23    Q.  Yes.

24    A.  Yes.

25    Q.  Were you ever sent a copy of that

NON-CERTIFIED COPY

Exhibit 5

1    executed document, to your knowledge?

2        A.  I don't recall.

3        Q.  Did you have any occasions subsequent to

4    this point in time in 2009 to discuss this 2009

5    agreement with anybody at H&E?

6        A.  I believe I discussed it with Jamie

7    Seymour just as a part of this lawsuit, but not

8    prior to that.

9        Q.  Was it after the lawsuit was filed or

10   before?  Do you remember?

11       A.  I think it was after.

12       Q.  Was anybody else part of that

13   conversation other than you and in-house

14   counsel?

15       A.  I don't recall.

16       Q.  And you don't recall discussing this

17   agreement any other time with any other H&E

18   person other than Counsel?

19       A.  No, sir.

20       Q.  Now, you were involved when the Baton

21   Rouge project was begun in 2006, correct?  And

22   when I say "project," I mean with URS.  You were

23   involved in that?

24       A.  No, sir.

25       Q.  Not at all?

NON-CERTIFIED COPY

Exhibit 5

Page 38

1      A.  No, sir.

2      Q.  So you didn't get involved until the

3   Baton Rouge project was resurrected again in the

4   2009-2010 range, correct?

5      A.  Correct.

6      Q.  Do you recall why the project had been

7   put on hold for Baton Rouge?

8      A.  I believe it was because of the economy

9   it had been put on hold.

10      Q.  I'm going to show you the next exhibit,

11   which is H&E 3269, and I'm going to label it as

12   Exhibit 3.

13          I'm going to focus on the bottom Email

14   first.  This an Email from Neal Johnson at URS,

15   October 13,2010, to Johnny Jones and you.  And

16   it says, "Thanks for the time this morning.  We

17   are excited about moving forward with H&E."

18          So I assume this took place once the

19   decision was made in H&E that you all were to

20   proceed forward with Baton Rouge, correct?

21      A.  Correct.

22      Q.  And at the same time, it looks like

23   there was an effort to move forward to do

24   something in Kenner, as well as potentially in

25   Belle Chasse.  Is that a fair statement?

NON-CERTIFIED COPY

Exhibit 5

1     A.  Yes, sir.

2     Q.  This talks about a meeting that morning.

3   Is this the gist of what was discussed at that

4   meeting, what is described in this Email, to

5   your recollection?

6     A.  I don't recall the meeting.

7     Q.  Okay.  Do you recall who was even

8   present?

9     A.  No, sir.

10    Q.  And at this time, it is you and Johnny

11  Jones that are involved, looks like from this

12  Email.

13        Does that refresh your recollection as

14  to who was doing the communication with URS in

15  connection with this work as of that time?

16    A.  At this point in time, it was Johnny.

17    Q.  Because, according to what you told me,

18  you started to report to Mr. Jones in 2009, so

19  would make sense here, correct?  We are in 2010?

20    A.  Yes, sir.

21    Q.  What was Mr. Jones' position at the

22  Company at the time of this Email in 2010?

23    A.  I don't recall.

24    Q.  Now, you then sent this Email to Brad

25  Barber and Leslie Magee.  I understand Leslie

NON-CERTIFIED COPY

Exhibit 5

Page 40

1    Magee was the CFO at the time, correct?

2        A.  Correct.

3        Q.  Remind me.  Is Leslie a male or a woman?

4        A.  Female.

5        Q.  Female.  Okay.

6            And Brad Barber was the COO at the time?

7        A.  I'm not positive, but I think that is

8    correct.

9        Q.  At any rate, regardless of his title, he

10   was over Johnny Jones at the Company?

11       A.  Yes, sir.

12       Q.  Were you told to keep him advised of

13   things?  Is that why this was sent, or did you

14   just do that on your own?

15       A.  I don't recall.

16       Q.  I'm going to show you the next document,

17   which is actually two documents.  I'm going to

18   label this as Exhibit 4, and this bears URS

19   38394 and 95.

20           This is a Time and Materials Work

21   Authorization 10-10, and the Attachment 1 that

22   is referred to in that document.

23           Is that your signature on the bottom

24   left?

25       A.  Yes, sir.

NON-CERTIFIED COPY

Exhibit 5

Page 41

1    Q. And at that time, you are the director

2  of facilities, correct?

3    A. Correct.

4    Q. And so you were authorized to sign this

5  on behalf of H&E, am I correct?

6    A. Correct.

7    Q. All right.  Did you run these documents

8  past anybody else before you signed them?

9    A. It was my normal procedure, any of these

10  documents, I would run them by Johnny Jones, put

11  them on his desk, give him a chance to take a

12  look at them.  Then after he reviewed them, I

13  would sign them.

14    Q. Was there any particular reason why he

15  didn't sign them and that you signed them?

16    A. Not that I'm aware of.

17    Q. That was your responsibility, as far as

18  you were concerned?

19    A. Yes, sir.

20    Q. The next document I'm going to show you

21  is an Email from Thomas Ryan, December 8, 2010,

22  which I'm going to label as Exhibit 5, which is

23  H&E 7552.

24    At the top, Mr. Ryan says that, "We will

25  proceed with the phasing described below...."

NON-CERTIFIED COPY

Exhibit 5

1        This is at the Kenner facility, and so,

2   as I understand it, Mr. Wynn, the Kenner

3   facility was going to be phased because it was

4   an operating facility and you all wanted to try

5   to do or continue to do business out of that

6   facility while work was going on?

7       A.   Correct.

8       Q.   Was there a wash rack at the Kenner

9   facility prior to this project at Kenner?

10      A.   Yes.   There was an existing wash rack,

11  yes, sir.

12      Q.   There was?   Okay.

13           And this was going to be a new wash rack

14  or not?   Do you recall?

15      A.   I believe the plan was to eliminate the

16  existing wash rack and build a new one on the

17  back side of the property.

18      Q.   Okay.   Now, when I say "yard," you know

19  what I mean by yard at the facility, right?

20      A.   No, sir.

21      Q.   All right.   When I say "yard," I'm going

22  to mean the part of the facility where equipment

23  was unloaded and/or stored.

24      A.   Okay.

25      Q.   Okay?   Was the yard at the existing

NON-CERTIFIED COPY

Exhibit 5

1    Kenner facility paved or aggregate?

2        A.  It was partially paved and partially

3    aggregate.

4        Q.  Do you remember what part was paved, as

5    opposed to what part was aggregate?

6        A.  No, sir.

7        Q.  In terms of use of the equipment, the

8    equipment in the yard, did it roll over the

9    aggregate part or the paved part, or both?

10       A.  Both.

11       Q.  Both.

12           Was there any distinction made as to

13   what equipment would traverse over what part of

14   the yard?

15       A.  No, sir.

16       Q.  Do you know why part of it was paved and

17   part of it was aggregate?

18       A.  No, sir.

19       Q.  The next document I'm going to show you,

20   I'm going to label as Exhibit 6, and this is

21   H&E 9209.

22           This is again a series of Emails.  The

23   Email at the top you are sending December 22,

24   2010, to John Jones, and it is the Reman Center

25   Work Authorization, and you are sending him

NON-CERTIFIED COPY

Exhibit 5

Page 44

1    something for him to review before you sign it,

2    correct?

3        A.  Correct.

4        Q.  Which is consistent with your prior

5    testimony of what you did with these work

6    orders, correct?

7        A.  Correct.

8        Q.  This is the Belle Chasse facility,

9    correct?  Let me ask you a different way.

10          The Belle Chasse facility was referred

11   to as the Reman Center?

12       A.  Correct.

13       Q.  What does "Reman Center" mean?

14       A.  Remanufacturing.

15       Q.  Okay.  Got it.

16          Now, the work order that is attached,

17   again, you sent on and we will get to that, but

18   you sent the blank on to Johnny Jones for him to

19   look at before you signed it, right?  Before you

20   would sign it --

21       A.  Correct.

22       Q.  Correct?

23       A.  Correct.

24       Q.  In the Email at the bottom, Neal Johnson

25   says, when he is talking to you, "As we

NON-CERTIFIED COPY

Exhibit 5

Page 45

1   presented, we are offering to complete the work

2   on a time and material basis.  You will only be

3   invoiced for the time we expend.  The project

4   due diligence a lot more involved than the

5   Kenner facility, the facility is a lot larger

6   and somewhat more complex."

7           Do you agree that the Reman facility at

8   Belle Chasse is a lot larger than Kenner?

9       A.  Yes, sir.

10      Q.  Do you agree that the Belle Chasse

11  facility was somewhat more complex in what was

12  done than what was done in the Kenner facility?

13      A.  I'm not sure exactly what Neal meant by

14  "complex."

15      Q.  Do you ever recall responding to this

16  disagreeing with anything that Mr. Johnson said

17  in his Email?

18      A.  I don't recall.

19      Q.  As I understand it, the Reman Center

20  work that was done was actually to move the

21  facility to a different facility in Belle

22  Chasse; is that correct?

23      A.  The part that URS was doing?

24      Q.  Yes.

25      A.  They weren't -- they weren't involved in

NON-CERTIFIED COPY

Exhibit 5

1   moving, the physical moving --

2       Q.  Okay.

3       A.  -- from one facility to the other.

4       Q.  But from H&E's standpoint, H&E was

5   moving its facility across the street, I want to

6   say?

7       A.  The same side of the street, down the

8   street.

9       Q.  Down the street?

10      A.  Yes, sir.

11      Q.  And this was going to be a larger

12  facility or the same size?

13      A.  Larger.

14      Q.  Larger facility?

15      A.  Yes.

16      Q.  And this was basically to repair heavy

17  cranes, am I understanding that correctly?

18      A.  Repair and remanufacturing.

19      Q.  Heavy cranes?

20      A.  Correct.

21      Q.  Not bulldozers or the earth-moving

22  equipment?

23      A.  Correct.

24      Q.  All right.  The next document I'm going

25  to show you --

NON-CERTIFIED COPY

Exhibit 5

Page 47

1          MR. FRANCO:

2               Hold on a second.  Give me one

3    second, sir.

4          (Off the Record.)

5    EXAMINATION BY MR. FRANCO:

6      Q.  The next document I'm going to label as

7    Exhibit 7 begins at this point with URS 31072.

8    And I'm going to go through them one by one with

9    you.

10          The first document is listed as Time and

11   Materials Work 12-10, and this is for

12   "Relocation of Crane Reman Facility - Phase I."

13          Is that your signature?

14     A.  Yes, sir.

15     Q.  All right.  And, again, you would have

16   sent this document to Johnny Jones before you

17   signed it?

18     A.  Correct.

19     Q.  Turn to the other parts of attachments

20   to that document.  Turn to 31076 at the bottom.

21     A.  (Witness complying.)

22     Q.  That is Lump Sum Authorization No.

23   11-12.  That is "Relocation of Crane Reman

24   Facility - Phase II."

25          Do you see that?

NON-CERTIFIED COPY

Exhibit 5

Page 48

1    A.  Yes, sir.

2    Q.  That is Belle Chasse, and is that your

3  signature at the bottom?

4    A.  Yes, sir.

5    Q.  Again, you would have sent this to Mr.

6  Jones before you signed it?

7    A.  Correct.

8    Q.  Let's go keep turning to get to Bates

9  stamp 31081.

10    A.  (Witness complying.)

11    Q.  That should be "Time and Materials Work

12  Authorization 09-100," and that is for the

13  Kenner location.

14        Do you see that?

15    A.  Yes, sir.

16    Q.  And that is signed by whom?

17    A.  Appears to be Leonard St. Germain, as a

18  representative for H&E.

19    Q.  And this one is dated August 31, 2009.

20  My question is even simpler.

21        Why did Mr. St. Germain sign this, as

22  opposed to you?  Datewise it makes a difference?

23  Is that the issue?

24    A.  Yes.  I do not believe the transition of

25  duties had taken place.

NON-CERTIFIED COPY

Exhibit 5

Page 49

1      Q.  Yet?

2      A.  On 8/31/09.

3      Q.  And I'm sorry to have to ask you again,

4   but I'm still trying to catch up with the

5   duties.  Okay?

6          What were your duties in August of '09?

7   It didn't include director of facilities, is

8   that correct?

9      A.  Correct.

10         MR. FRANCO:

11             Off the Record.

12         (Off the Record.)

13   EXAMINATION BY MR. FRANCO:

14     Q.  I think there is another one.  Turn to

15   31085, and that is "Work Authorization 10-10."

16   And that is also for Kenner, correct?

17     A.  Correct.

18     Q.  And this time you signed it, am I

19   correct?

20     A.  Correct.

21     Q.  And that is after you sent that to

22   Mr. Jones for his review?

23     A.  That was my policy and procedure back

24   then, yes, sir.

25     Q.  And, now, the ones that you have signed,

NON-CERTIFIED COPY

Exhibit 5

Page 50

1    as far as you were concerned, you were

2    authorized by H&E to sign these documents?

3        A.  Correct.

4        Q.  I'll skip to the next one.

5            Mr. Wynn, you were aware that with

6    respect to the Kenner project -- and when I talk

7    about the projects, I'm obviously talking about

8    the projects with URS -- the changes that were

9    being made to the Kenner facility required

10   obtaining approval from the City of Kenner

11   Department of Planning?

12       A.  I think I was probably made aware of

13   that, yes, sir.

14       Q.  Well, actually, let me just go ahead and

15   show you the exhibit.  I'm going to show you

16   Exhibit 8.

17           Look at the bottom Email from Thomas

18   Ryan to you.  "As we discussed on the phone..."

19   -- this is in reference to the subject "Kenner

20   Planning Approval" -- it says "...the changes we

21   are making to the Kenner facility will require

22   obtaining approval from the City of Kenner

23   Department of Planning."

24           Do you see that?

25       A.  Yes.

NON-CERTIFIED COPY

Exhibit 5

Page 51

1      Q.  And then you sent that on to John Jones,

2  correct?

3      A.  Correct.

4      Q.  I'm going to show you the next exhibit,

5  which is Exhibit 9, URS 5468, an Application

6  Site Plan.

7          This appears to be for the City of Baton

8  Rouge/Parish of East Baton Rouge.

9          Do you see that?

10      A.  Yes, sir.

11      Q.  And let's go to the last page.  Is that

12  your signature?

13      A.  Yes, sir.

14      Q.  Do you recall that the application that

15  had previously been made with respect to the

16  Baton Rouge facility had to be renewed after the

17  project was put on hold?

18      A.  I don't recall that, no, sir.

19      Q.  Do you know who filled in this

20  information on this document?  Was it you or

21  somebody else?

22      A.  I think this would have come from URS

23  already completed for my signature.

24      Q.  All right.  I want you to look at

25  Paragraph 10 for me on the second page.

NON-CERTIFIED COPY

Exhibit 5

Page 52

1    A.  (Witness complying.)

2    Q.  According to Paragraph 10, for the

3  headquarters building the required number of

4  spaces, parking spaces, was 148, plus 5 for

5  handicapped.

6        Do you see that?

7    A.  Yes, sir.

8    Q.  And then what was being proposed and

9  sent to the City and the Parish was 147

10  proposed, plus 6 for handicapped.

11        Do you see that?

12    A.  Yes, sir.

13    Q.  For a total of 153 spaces.

14        Do you see that?

15    A.  Yes, sir.

16    Q.  Did you have discussions with the URS

17  people about those numbers?

18    A.  At this point in time?

19    Q.  Yes.

20    A.  No, sir.

21    Q.  Okay.  So you, obviously, saw those

22  numbers, correct?

23    A.  I would assume so, yes, sir.

24    Q.  Did you question those numbers --

25    A.  No, sir.

NON-CERTIFIED COPY

Exhibit 5

Page 53

1      Q.  -- at this time?

2      A.  No, sir.

3      Q.  Did you assume that had been discussed

4  previous?

5      A.  No.

6      Q.  Did you ask anybody at H&E about these

7  parking space numbers here?

8      A.  No, sir.

9      Q.  And you signed this and you were

10  authorized to sign it on behalf H&E, correct?

11      A.  Correct.

12      Q.  And according to the acknowledgment, you

13  are certifying that all information contained is

14  accurate, to the best of your knowledge?

15         Do you see that above in Paragraph 14?

16      A.  On that particular date, yes, sir.

17      Q.  Was there a subsequent conversation

18  between H&E and URS that changed those numbers

19  for parking spaces, to your knowledge, sir?

20      A.  There was a conversation regarding if

21  the number of parking spots were going to be

22  sufficient at a later date.

23      Q.  And what date that was, if you recall?

24      A.  I don't recall.

25      Q.  Was that after there was a problem that

NON-CERTIFIED COPY

Exhibit 5

Page 54

1    developed after H&E moved into the Baton Rouge

2    facility?  Is that what you are talking about?

3        A.  That was before then.  Before we moved

4    in.

5        Q.  So there was a conversation about

6    parking spaces before H&E moved into the Baton

7    Rouge headquarters building?

8        A.  Yes.  Yes, sir.

9        Q.  And who did that conversation take place

10   between?

11       A.  It was -- and I don't know -- I don't

12   recall how many times, but it was -- a

13   discussion was had during progress meetings.

14       Q.  What were the discussions?  I assume you

15   were present?

16       A.  I stated the question.  My question was:

17   Were there going to be sufficient sparking

18   spaces?

19       Q.  And what response did you get?

20       A.  The response was, there was a formula

21   that was used and it would be sufficient, and

22   the parking -- I believe the answer was, the

23   parking spaces coincide with the formula.

24       Q.  You said there was more than one

25   discussion to that extent?

NON-CERTIFIED COPY

Exhibit 5

Page 55

1    A.  I believe so, yes, sir.

2    Q.  And URS was, obviously, present?

3    A.  Yes, sir.

4    Q.  Was there a discussion about how many

5    staff people were expected to be in the

6    headquarters building during those discussions?

7    A.  No, sir.

8    Q.  We will get to the explosion later.

9         Next I'm going to show a document that

10   I'm going to label as Exhibit 10, which is URS

11   39196.

12        The third page is an Email from Thomas

13   Ryan, January 19, 2011, to Neal Johnson, copying

14   Chad Herndon, and the subject is "Belle Chasse

15   Kickoff Meeting Minutes," and the kickoff

16   meeting minutes were attached.  It shows who was

17   present and it doesn't show that you were

18   present.  So, apparently, you weren't there.

19   Does that make sense?  All right.

20        So you weren't present at this meeting.

21   Let me ask a question about what is referred to

22   in Paragraph 1.

23        And this is in reference to Belle

24   Chasse.  This is in January of 2011 to put it in

25   perspective.  It says, "POC for Owner to be

NON-CERTIFIED COPY

Exhibit 5

Page 56

1    Frankie Wynn."

2          And my understanding is "POC" means

3    point of contact.

4          A.  That is my assumption.

5          Q.  Is that accurate, to your knowledge,

6    that you were the point of contact for the owner

7    for the Belle Chasse project?

8          A.  Yes, sir.

9          Q.  Did you also serve as the point of

10   contact with that same understanding of what

11   that is for the Kenner project?

12         A.  Yes.

13         Q.  Were you the point of contact for the

14   Baton Rouge project when the project was

15   resurrected after it had been put on hold?

16         A.  Both Johnny Jones and myself were points

17   of contact.

18         Q.  So that one you split with him, as

19   opposed to Kenner and Belle Chasse?

20         A.  Johnny was more involved in the Baton

21   Rouge project than he was the other two.  That

22   is why he was point of contact.  He was also

23   attending some of the progress meetings.

24         Q.  So at some point, all three of these

25   projects were moving forward at the same time,

NON-CERTIFIED COPY

Exhibit 5

Page 57

1    at some point in time, correct?

2        A.  Correct.

3        Q.  You were the point of contact mainly for

4    Kenner and Belle Chasse, and did Mr. Jones

5    assume the primary point of contact position for

6    Baton Rouge?

7        A.  I think I was still primary.

8        Q.  You were?

9        A.  Yes, sir.

10       Q.  All right.  I'm going to show you

11   another Work Order No. 02-11, as the next

12   exhibit, which will be Exhibit 11.  And that is

13   H&E 37269.

14           Is that your signature, sir?

15       A.  Yes.

16       Q.  And, again, you would have vetted this

17   with Mr. Jones before you signed it?

18       A.  That was my policy.

19       Q.  This is for the East Baton Rouge

20   Planning Commission 2011 Resubmittal.

21           Do you see that, right below the first

22   paragraph?

23       A.  Yes, sir.

24       Q.  And this Attachment 1 references the

25   fact that the East Baton Rouge Planning

NON-CERTIFIED COPY

Exhibit 5

Page 58

1    Commission approval was granted on December 11,

2    2006.  They had expired on December 11, 2009, so

3    they had to be resubmitted.

4          Do you see that?

5      A.  Yes.

6      Q.  And you signed this on February 2 of

7    2011; is that correct.

8      A.  Yes, sir.

9      Q.  Let's look at the next exhibit, which is

10   Exhibit 12, which would be URS 65986.

11         This is entitled "Geotechnical

12   Engineering Report," for the Kenner facility

13   from Terracon.

14         Did you receive a copy of this at any

15   time?

16     A.  I don't recall receiving this specific

17   document, but I assume I did.

18     Q.  Do you remember looking at a

19   geotechnical report for Kenner at some point in

20   time?

21     A.  No, sir.

22     Q.  This document says it was prepared for

23   H&E Services, and if you look at 4.5 -- let me

24   see something.  Hold on.  I'm sorry.  Give me

25   one second.

NON-CERTIFIED COPY

Exhibit 5

1          All right.  I've got it.  I'm sorry.

2   4.5, Page 11 of the report, it says,

3   "Anticipated traffic volumes and loading

4   conditions for this facility were not provided,

5   but were assumed based on experience with

6   similar projects."

7          Do you see that?

8      A.  Yes, sir.

9      Q.  Do you recall the loading conditions of

10  the equipment or the weight of the equipment

11  being requested from H&E by URS?

12     A.  No, sir.

13     Q.  Did anybody tell you at H&E that loading

14  conditions or weight of the equipment had been

15  requested by URS?

16     A.  No.

17     Q.  Do you recall discussing anything in

18  this geotechnical report with anybody at H&E?

19     A.  No, sir.

20     Q.  What about with anybody at URS?

21     A.  No, sir.

22     Q.  What about with anybody at Terracon?

23     A.  No, sir.

24     Q.  Look at Paragraph 4.5.2, "Pavement

25  Maintenance."  And, again, this is in reference

NON-CERTIFIED COPY

Exhibit 5

Page 60

1    to Kenner.

2        The second sentence says, "Preventive

3    maintenance should be planned and provided for

4    through an ongoing pavement management program."

5        Did H&E have an ongoing pavement

6    management program for the Kenner facility?

7        A.  I believe they had a street sweeper.

8    Yes, sir.

9        Q.  At Kenner?

10       A.  I believe.

11       Q.  Have you ever seen it?

12       A.  I don't recall seeing it, no, sir.

13       Q.  The reason I ask you that is because the

14   testimony from Mr. Jones yesterday was that H&E

15   purchased a street sweeper for Baton Rouge, and

16   it was the only street sweeper that they had

17   purchased.

18       Do you recall being involved in a

19   purchase or lease of a second street sweeper?

20       A.  No, sir.

21       Q.  What was the pavement management

22   program?  Was there any such program in writing

23   with respect to Kenner or Baton Rouge?

24       A.  No, sir.  Not that I'm aware of.

25       Q.  Was there an official pavement

NON-CERTIFIED COPY

Exhibit 5

Page 61

1    management program at H&E for Kenner or Baton

2    Rouge?

3        A.  What do you mean by "official"?

4        Q.  Any specific requirements set out

5    anywhere for what the pavement management would

6    be?

7        A.  Not that I'm aware of.

8        Q.  Were you involved in the purchase of the

9    street sweeper at Baton Rouge?

10       A.  I was aware of it.  I was not involved.

11   I knew that they were going to and did purchase

12   a sweeper, yes, sir.

13       Q.  Do you know when that was done?

14       A.  I don't recall.

15       Q.  Do you know when it began to be used at

16   the Baton Rouge facility?

17       A.  No, sir.

18       Q.  Do you know how often it is used at the

19   Baton Rouge facility?

20       A.  No, sir.

21       Q.  Is there a particular person in charge

22   of using that street sweeper in Baton Rouge?

23       A.  An operator for the sweeper?

24       Q.  Yes, sir.

25       A.  I'm not aware that there is a specific

NON-CERTIFIED COPY

Exhibit 5

Page 62

1    individual, no, sir.

2        Q.  Who is in charge of the maintenance at

3    the Baton Rouge facility of the pavement?

4        A.  The branch manager would be in charge of

5    deciding when and if the pavement needed

6    sweeping.

7        Q.  And who is the branch manager of Baton

8    Rouge?  Did that change through this process?

9            Let me ask it this way:  Who is the

10   current branch manager of Baton Rouge?

11       A.  Jeff Stringer.

12       Q.  And has he been the branch manager since

13   the new facility has been up and running?

14       A.  I believe so, yes, sir.

15       Q.  You have no reason to disagree that

16   preventive maintenance is reflected in here?

17           "Preventive maintenance activities are

18   intended to slow the rate of pavement

19   deterioration and to preserve the pavement..?"

20   Do you have any reason to disagree with that?

21       A.  No, sir.

22       Q.  Preventive maintenance, according to

23   this document, consists of crack and joint

24   sealing and patching as necessary.

25           Are you aware that H&E has done any

NON-CERTIFIED COPY

Exhibit 5

1    crack and joint sealing at the Kenner facility,

2    to your knowledge?

3        A.  No, sir, I'm not aware.

4        Q.  Are you aware of whether H&E has done

5    any crack and joint sealing at the Baton Rouge

6    facility?

7        A.  Not aware, no, sir.

8        Q.  Are you aware whether H&E has done any

9    patching of concrete at the Kenner facility?

10       A.  Not aware, no, sir.

11       Q.  Are you aware of whether H&E has done

12   any patching of concrete at the Baton Rouge

13   facility?

14       A.  Yes.  There has been some patching in

15   Baton Rouge.

16       Q.  Is that in connection with the drain?

17       A.  Yes, sir.

18       Q.  Because, as you know, we went out there

19   one day with you and saw that drain issue,

20   correct?

21       A.  Correct.

22       Q.  That is the patching that you are

23   talking about?

24       A.  Yes, sir.

25       Q.  Was there any other patching of any

NON-CERTIFIED COPY

Exhibit 5

Page 64

1   cracks or any joints that you are aware of in

2   Baton Rouge?

3        A.  Not that I'm aware of.

4        Q.  As director of facilities, did you have

5   occasion to visit the other locations of H&E,

6   other than Baton Rouge, Kenner and Belle Chasse?

7        A.  Not in my position as facilities

8   manager, no, sir.

9        Q.  In your capacity as risk manager, is

10  that why it took place?

11       A.  Yes, sir.

12       Q.  Because of a safety issue or a claim, or

13  whatever --

14       A.  Yes, sir.

15       Q.  -- happens?

16       A.  Yes, sir.

17       Q.  Did you have occasion to inspect or look

18  at the condition of the paved area at those

19  other sites at any time?

20       A.  No, sir.

21       Q.  So you can't tell me the condition of

22  those paved areas?

23       A.  No, sir.

24       Q.  Let me show you the next document I'm

25  going to label as Exhibit 13.  This is H&E 3300.

NON-CERTIFIED COPY

Exhibit 5

Page 65

1    This is from Neal Johnson to you and John Jones,

2    February 21, 2011, and then John Jones passed it

3    on to Brad Barber.

4          Do you see that?

5       A.  Yes, sir.

6       Q.  And it basically says, "Everything at

7    the East Baton Rouge Planning Commission went as

8    planned this afternoon."  And that is in

9    connection with the headquarters building.   "The

10   project was approved as expected."

11         Do you see that?

12      A.  Yes, sir.

13      Q.  It says, "Murray McCullough did an

14   excellent job pushing this forward."

15         What did you understand Mr. McCullough's

16   role was in the Baton Rouge project?

17      A.  I'm not sure what his role was.

18      Q.  Is there any reason to believe that the

19   document we identified earlier of what was

20   filled out for the Baton Rouge Planning

21   Commission was not the document that was

22   presented to the Planning Commission?

23      A.  I can't answer that.  I don't recall.

24      Q.  Certainly, that is what you thought was

25   going to happen, correct, when you filled out

NON-CERTIFIED COPY

Exhibit 5

Page 66

1    this document?

2       A.  Yes, sir.

3       Q.  Okay.  The next document I will show you

4    I'm going to label as Exhibit 14, and this is

5    URS 30824.  Frankie Wynn sending this to Neal

6    Johnson, and then Neal sends it on to URS.

7           This is Attachment 1 and Lump Sum Work

8    Order No. 01-11.  And is that your signature,

9    sir?

10      A.  Yes, sir.

11      Q.  And this is for Phase IV services for

12   the headquarters and branch facility.

13          Do you see that?

14      A.  Yes, sir.

15      Q.  And, again, you vetted this past Mr.

16   Jones before you signed it?

17      A.  Yes, sir.

18      Q.  This is for the construction, for the

19   bidding and negotiation phase and for the

20   construction administration phase.

21          Do you see that on Attachment 1?  I'm

22   sorry, sir.  Turn to Attachment 1.

23      A.  What was the question again?

24      Q.  This work order was for the bidding and

25   negotiation phase and for the construction

NON-CERTIFIED COPY

Exhibit 5

1   administration phase of the Baton Rouge

2   headquarters and branch project.

3       Do you see that?

4   A.  Yes, sir.

5   Q.  And you understood by reading that what

6   the contract administration phase was that was

7   described here; is that correct?

8   A.  Yes, sir.

9   Q.  Next I want to show you what will be

10  Exhibit 15, URS 59882.

11      This is entitled "URS Design Development

12  Cost Analysis" for the Kenner site.

13      Do you recall ever seeing this in the

14  past?

15  A.  I don't recall this specific document,

16  no, sir, but I would assume I did see it.

17  Q.  I want to focus on the site work, which

18  is the second category on the first page.

19  A.  Okay.

20  Q.  Priced out here was 100,000 square feet

21  of 8-inch thick concrete.

22      Do you see that?

23  A.  Yes, sir.

24  Q.  And then there is a smaller, much

25  smaller square footage, 12,856 square feet of

NON-CERTIFIED COPY

Exhibit 5

Page 68

1   4-inch concrete.

2         Do you see that?

3     A.  Yes, sir.

4     Q.  Are you aware of the fact that

5   specifications or the plan for the Kenner site

6   was for 8-inch thick concrete at the yard area

7   where the equipment was operated and stored?

8     A.  I don't recall.

9     Q.  The next document is going to be Exhibit

10  16, H&E 3392.  This is a letter from Neal

11  Johnson to some contractors.  You recognize

12  these contractor names, don't you:  Womack,

13  Buquet and Arrighi?

14    A.  Yes, sir.

15    Q.  Were you involved in the bidding for the

16  Baton Rouge project?

17    A.  How do you mean by "involved"?

18    Q.  Well, tell me what you were involved in

19  in connection with selecting the contractor for

20  the Baton Rouge project.  How about that?

21    A.  We chose Milton Womack upon the

22  suggestion of URS.

23    Q.  And that was based on the bid that was,

24  I guess, about $400,000 less than the next

25  bidder and the significant number of days less

NON-CERTIFIED COPY

Exhibit 5

Page 69

1    than the next bidder.  Fair statement?

2        A.  Yes, sir.

3        Q.  Now, these three contractors, Womack,

4    Buquet and Arrighi, were all customers of H&E;

5    is that correct?

6        A.  I don't know.

7        Q.  You don't know?

8        A.  No, sir.

9        Q.  Did you participate in any conversations

10   where only those contractors that were customers

11   of H&E were allowed to bid on the Baton Rouge

12   project?

13       A.  No, sir.

14       Q.  Had you dealt with Womack in the past?

15       A.  No, sir.

16       Q.  Had you been the point of contact for

17   any of the construction of any of the H&E

18   facilities prior to Baton Rouge, Kenner or Belle

19   Chasse?

20       A.  I believe there was one of the

21   facilities that we were in the process of -- I

22   don't remember if it was a build-to-suit or if

23   it was a refurb, or what it was, but it was one

24   of the locations up on the East Coast.  That

25   part of the transition period from Leonard

NON-CERTIFIED COPY

Exhibit 5

Page 70

1    St. Germain to me, I was closing out that

2    particular project, and it probably lasted maybe

3    a month or so.

4        Q.  You were on the tail end?

5        A.  Yes, sir.

6        Q.  What kind of facility was that?  Did it

7    deal with -- let me ask it this way:  Did it

8    deal with heavy-track equipment?

9        A.  I don't recall which location it was.

10       Q.  You don't recall whether it was a paved

11   yard or not?

12       A.  No, sir.

13       Q.  Kenner and Belle Chasse were the first

14   projects where you were the point of contact

15   from the very beginning of the project?

16       A.  I think there had been some work done on

17   both Belle Chasse and Kenner before I got

18   involved, but once it ramped and started,

19   officially, I was point of contact, yes, sir.

20       Q.  Let me show you the next exhibit, which

21   is Exhibit 17.  This is URS 41088.

22           This is a letter addressed to you from

23   Terracon, and it is the Proposed Construction

24   Materials Engineering and Testing Services

25   Agreement.

NON-CERTIFIED COPY

Exhibit 5

Page 71

1          I assume you saw this at some point in

2  time?

3      A.  Since it is not signed, I'm not sure if

4  I actually saw this or not.

5      Q.  Okay.  Let me ask you something.

6          You were certainly aware that Terracon

7  or a representative of Terracon were out at the

8  Kenner site and Belle Chasse site doing work?

9      A.  Yes, sir.

10     Q.  And what did you understand Terracon was

11  out there doing?

12     A.  They were to examine the areas before

13  concrete was poured for compaction, proper

14  forming, wire mesh, rebar, before the actual

15  pour of concrete took place.

16         And then during the pour, they would

17  take samples and then they would also do

18  testing.

19     Q.  So they were there observing what the

20  contractor was doing to get the concrete put in

21  place basically.  Fair statement?

22     A.  Yes, sir.

23     Q.  Which included rebar, dowels, whatever

24  else was supposed to be in the concrete?

25     A.  Yes, sir.

NON-CERTIFIED COPY

Exhibit 5

1          MS. MILLS:

2              Do you want a break?

3          MR. FRANCO:

4              Mr. Wynn, we didn't tell you at the

5     beginning, but any time you need a break, you

6     just need to tell us and we will take a break.

7          THE WITNESS:

8              Okay.

9          MR. FRANCO:

10             And I'll do the same thing because

11    of my age.

12         THE WITNESS:

13             Fair enough.

14         MR. FRANCO:

15             One second.

16         (Off the Record.)

17    EXAMINATION BY MR. FRANCO:

18     Q.  Let me show you the next document, which

19    we will label as Exhibit 18.  This is URS 33341.

20             Attached to these Emails it says --

21    first of all, it says, "Please find the addendum

22    letter report for the light duty pavement

23    areas," and in parentheses it says "Geotech

24    pavement report."

25             And attached to this is a letter from

NON-CERTIFIED COPY

Exhibit 5

1    Terracon dated August 5, 2011, addressed to you.

2            Do you see that?

3        A.  Yes, sir.

4        Q.  And it refers to the prior geotech

5    report, which recommended a minimum 7-inch

6    concrete thickness, and it said, "Now the

7    standard duty pavement areas for passage of

8    vehicles should be constructed using a minimum

9    of 6-inch concrete pavement thickness."

10           Do you see that?

11       A.  No, sir.

12       Q.  First paragraph.  Very first paragraph.

13   Take your time and read that full paragraph for

14   me.

15       A.  (Witness reviewing document.)

16           Yes, sir, I see it.

17       Q.  So what this paragraph is saying is, in

18   the original report, Terracon recommended 7-inch

19   concrete of pavement for the entire paved

20   system.

21           Do you see that?

22       A.  Yes, sir.

23       Q.  Now they are saying the standard duty

24   pavement section is recommended for passenger

25   vehicle areas in this report, and that thickness

NON-CERTIFIED COPY

Exhibit 5

1    should be a minimum of 6 inches.

2         Do you see that?

3    A.  Yes, sir.

4    Q.  Did you have any discussions with

5    Terracon or URS about this letter?

6    A.  Not that I'm aware of.

7    Q.  Okay.  Do you know what pavement

8    thickness was actually installed at the Kenner

9    site?

10    A.  I don't recall.

11    Q.  Did you have any reason during the

12    process to check on what thickness was supposed

13    to be installed according to the design?

14    A.  No, sir.

15    Q.  It also says in this report, the bottom

16    sentence of the first page, "...it has been an

17    accepted practice to install nominal

18    reinforcement in the pavement consisting of

19    minimum #3 rebar at 18-inch on-centers to

20    maintain the joint connection."

21         Do you see that?

22    A.  Yes.

23    Q.  Do you know what rebar was installed and

24    how far it was apart?

25    A.  No, sir.

NON-CERTIFIED COPY

Exhibit 5

1      Q.  Did you have any discussion with

2   Terracon or URS about the design of that rebar?

3      A.  No, sir.

4      Q.  Have you had any discussions with anyone

5   about the actual construction of that rebar?

6      A.  No, sir.

7      Q.  Did you ever see a budget in writing at

8   H&E for any of these three projects?

9      A.  I believe what we used as a budget was

10  the bid prices for the projects.

11     Q.  All right.  What is a Capital Order at

12  H&E?  And "Capital" is capitalized and "Order"

13  is capitalized.

14          Do you know what a Capital Order was at

15  H&E?

16     A.  It is an accounting term used for a

17  project or an item that is going to be

18  capitalized and depreciated over time, is my

19  understanding.

20     Q.  Did that have anything do with a budget,

21  what was a Capital Order for any of these

22  projects?

23     A.  On these particular projects, there

24  would have been a budget number assigned to that

25  Capital Order, I believe.

NON-CERTIFIED COPY

Exhibit 5

Page 76

1      Q.  I'm going to show you an Email real

2  quickly.  I'm going to label the next exhibit as

3  19, which is H&E 3672.

4          At the top you talk about, "There is

5  already a Capital Order in place that I charged

6  the expenses."

7          Did you tell James Brown that?  Did you

8  tell Mr. Barber that?  Is that the Capital Order

9  you were just talking about?

10         I believe it is fair to say that the

11  rest of this string of Emails is discussing the

12  potential selection of the contractor for the

13  Kenner site, and it looks like James Brown is

14  asking, "Where do I input the cost of this

15  renovation?"

16     A.  Correct.

17     Q.  And you said, "There is already a

18  Capital Order in place that I charge the

19  expenses."

20     A.  Correct.

21     Q.  So is that the Capital Order accounting

22  that you are talking about that was recorded at

23  H&E?

24     A.  Yes.  This Capital Order that I was

25  referring to was the Capital Order that was

NON-CERTIFIED COPY

Exhibit 5

Page 77

1    assigned to this renovation project.

2        Q.  You believe that the budget that was

3    either officially or unofficially set up at H&E

4    tracks the bids, the contractor bids that were

5    accepted?

6        A.  I believe that that was the budget

7    number, was the bid price.

8        Q.  Did you ever see that in a document

9    anywhere, a budget?

10       A.  Not that I'm aware of.

11       Q.  Did you ever have any discussions with

12   anybody at H&E about the cost of any of those

13   three projects exceeding a budget at H&E?

14       A.  I don't believe there was a discussion

15   specifically discussing exceeding the budget,

16   but I would meet with the controller

17   periodically to give her an update on --

18       Q.  Costs?

19       A.  -- costs, where we were, what was left,

20   updating -- if the budget had changed, if it had

21   been decreased or increased, just for accounting

22   purposes.

23       Q.  So there was a number you were

24   discussing as a budget number?

25       A.  Like I said earlier, I believe that

NON-CERTIFIED COPY

Exhibit 5

Page 78

1    would have been the bid price of the project.

2        Q.  Let me show you the next exhibit, which

3    will be Exhibit 20.  Any time I show you a

4    document, Mr. Wynn, you are clearly entitled to

5    look at the whole document.

6            To save us some time, I'm going to tell

7    you what I'm focusing on, but that doesn't mean

8    that you don't need to look at the rest of the

9    document.

10           I want to focus on the third paragraph

11   of the first page, in which you state, "I

12   discussed H&E's concern with MAPP's past

13   relationship with H&E and their lack of rentals

14   or purchases."

15           Do you see that?

16       A.  Yes, sir.

17       Q.  Can you explain that, what was H&E's

18   concern and what you discussed?  One at a time.

19           What was H&E's concern that you

20   discussed with MAPP?

21       A.  I think I had spoken to one of our

22   salespeople and they were trying to get more

23   revenue from MAPP, wanting us to rent more

24   equipment from them.  I think that is what this

25   was in reference to.

NON-CERTIFIED COPY

Exhibit 5

1      Q.  Wanting MAPP to rent more equipment from

2  you?

3      A.  Correct.

4      Q.  You said it in reverse.

5      A.  I'm sorry.

6      Q.  That is all right.

7          Did you have that conversation with MAPP

8  in connection with the Kenner project?

9      A.  I believe so, yes, sir.

10     Q.  And was it -- and I'm sorry if I asked

11 you this.  This is my third or fourth deposition

12 with these people.

13         Was it a requirement for the Kenner

14 project that the contractors that were allowed

15 to bid were, in fact, customers of H&E?

16     A.  Not that I'm aware of, no, sir.

17     Q.  In the selection of MAPP, was the

18 selection of MAPP for Kenner related to your

19 discussion that MAPP would rent more equipment

20 from H&E?

21     A.  No, sir.

22     Q.  But you made them aware of that before

23 you selected MAPP for Kenner?

24     A.  Restate that.

25     Q.  Yes.

NON-CERTIFIED COPY

Exhibit 5

Page 80

1          You made MAPP aware that you wanted them

2    to rent more equipment from H&E before MAPP was

3    selected to do the Kenner project?

4         A.  I don't believe so.

5         Q.  It was after they were selected?

6         A.  I think so.

7         Q.  Was it H&E's position that the

8    contractors on those three jobs, as well as

9    their subs, should only be using H&E equipment?

10        A.  No.

11        Q.  Was not, to your knowledge?

12        A.  No.

13        Q.  Let me show you the next exhibit,

14   Exhibit 21.  I want to talk about the bottom of

15   this where you say, "We will leave this item in

16   the contract."  Let me see if I can summarize

17   this.

18          There was an effort to reduce some of

19   the costs at Kenner by installing limestone

20   parking instead of paved parking.  Is that your

21   recollection?

22        A.  I don't recall.

23        Q.  All right.  Let's look at it again.

24   I'll take you through it.

25          Look at 55096 at the top.

NON-CERTIFIED COPY

Exhibit 5

1    A.  Okay.

2    Q.  This is from you, actually.  It says,

3    "Attached is MAPP's proposal to reduce paving

4    costs on the Kenner project.  This would include

5    changing some of the paved area to limestone.

6    The area that would be affected is in the first

7    attachment.  Let me know if you approve of this

8    change.  It has been determined that there is

9    possibly enough parking space on the paved apron

10   at the rear of the shop building to accommodate

11   our needs.  The paved area that would be changed

12   to limestone will be utilized for overflow

13   parking."

14        Does that help refresh your

15   recollection?

16   A.  I didn't recall this specific Email, no,

17   sir.

18   Q.  Okay.  And look at the next Email on the

19   prior page.  This is from your branch manager.

20   It says, "We cannot park any vehicles on the

21   apron at the rear of the shop."

22        And further down it says, "The City will

23   also require all vehicle parking area to be hard

24   surfaced?"

25        Do you see that?

NON-CERTIFIED COPY

Exhibit 5

1    A.  Yes, sir.

2    Q.  Was that your recollection that Kenner

3  required paved parking in all locations as

4  opposed to aggregate or limestone because of

5  dust as a zoning requirement?

6    A.  I know that it all ended up paved.

7  There wasn't any limestone in Kenner.

8    Q.  Why?

9    A.  I don't recall why.

10    Q.  Okay.  And you don't recall not being

11  able to take advantage of a cost savings by

12  installing limestone parking?

13    A.  Well, like I said, the only thing I

14  recall is that everything in Kenner --

15    Q.  Was paved?

16    A.  -- was paved.  There was no limestone

17  that I -- well, there was limestone probably six

18  inches between the pavement and the fence, but

19  there wasn't anything parked on it.  It was just

20  for vegetation control, I think is what it is

21  for.

22    Q.  Okay.  Who was Becky Walker?

23    A.  She owned Design Studio.

24    Q.  Was she hired in connection with the

25  Baton Rouge development?

NON-CERTIFIED COPY

Exhibit 5

Page 83

1      A.  Hired by who?

2      Q.  Well, let me show you this.  Maybe this

3  will help.

4          This will be Exhibit 22.

5          Now, looking at this, this is an H&E

6  FF&E Project Phase V.  It says, "Items tabled

7  for work session continuation..."

8          Do you remember attending a work session

9  with Becky Walker in connection with the Baton

10  Rouge facility?

11      A.  We had many work sessions.  I don't

12  remember this specific one.

13      Q.  All right.  What did you understand

14  Becky Walker's role to be in the project?

15      A.  She had advised us on design furniture,

16  work station placement.

17      Q.  What about the wallboards?  Did she

18  advise you on that?

19      A.  I don't know about that.

20      Q.  And who brought her on?  Was it H&E or

21  was it URS?

22      A.  I think it was URS.

23      Q.  And, subsequently, has H&E continued to

24  do business with Becky Walker, to your

25  knowledge?

NON-CERTIFIED COPY

Exhibit 5

Page 84

1      A.  Yes.

2      Q.  What does she do for H&E now?

3      A.  I don't know if she is doing anything

4  for us now.

5      Q.  What did you use her for after these

6  three projects?  I didn't mean to say that you

7  used her for all three projects.  You used her

8  only in Baton Rouge, correct?

9      A.  Yes, sir.

10      Q.  After the Baton Rouge project, what did

11  H&E use her for, to your knowledge?

12      A.  Outdoor furniture selection, redesigned

13  the lunchroom.

14      Q.  At Baton Rouge?

15      A.  Yes, sir.

16      Q.  So all of her services were in

17  connection with Baton Rouge subsequent to the

18  URS involvement?

19      A.  Yes, sir.

20      Q.  What else did she do in Baton Rouge?

21  Did she change the mailroom?

22      A.  No.

23      Q.  Did she change the wallboards?

24      A.  I don't believe she was involved in

25  that.

NON-CERTIFIED COPY

Exhibit 5

Page 85

1     Q.  I'll show you the next exhibit.  This

2  will be Exhibit 23, I think.

3          All right.  This starts off, and this is

4  H&E 11032.  It starts off with an Email from

5  Terracon stating that there was a concrete test

6  that was lower than expected.

7          Do you see that?

8     A.  Yes, sir.

9     Q.  And you then ask URS, "Is that something

10  we should be concerned about?"  And Mr. Ryan

11  says, "This is important, but not unheard of.

12  Heck provided concrete that did not meet the

13  specified design strength, so they will be

14  paying for any changes and/or additional testing

15  due to the failed concrete.  Heck, in

16  coordination with Womack, is having a testing

17  company core out a sample of the actual pile

18  tomorrow to test before the pile is rejected.

19  Once this core is tested the structural engineer

20  will either accept it and keep moving forward

21  per the plans or reject it and modify that

22  particular pile group by adding another pile to

23  be installed.

24          "The pile will probably be rejected.

25  Either way, we will keep you informed...."

NON-CERTIFIED COPY

Exhibit 5

Page 86

1        Do you see that?

2      A.  This was in connection with a pile that

3  was part of the building, correct?

4      Q.  Let me make it a simple question for

5  you, Mr. Wynn.

6        Is there any reason to believe that what

7  Mr. Thomas Ryan told you in this Email did not

8  become reality?  In order words, that this is

9  what was planned and this is what was done, and

10  if it was rejected, then it would be replaced?

11      A.  Yes, sir.  I think that is what

12  happened.

13      Q.  Okay.  That is what I was looking for.

14        MR. FRANCO:

15          You can turn that one over.  It is a

16  duplicate.

17        MS. MILLS:

18          Can we take a quick break.  I don't

19  want to interrupt you.  We can go --

20        MR. FRANCO:

21          No.  That is fine.

22          Off the Record.

23      (Brief recess held.)

24  EXAMINATION BY MR. FRANCO:

25      Q.  Mr. Wynn, I'm going to show you the next

NON-CERTIFIED COPY

Exhibit 5

Page 87

1    exhibit, which is going to be labeled Exhibit

2    24.  It is URS 44305.  It is the letter from

3    Terracon dated November 1, 2011, to you, and

4    they are submitting this agreement to provide

5    construction materials engineering and testing

6    services for the above-referenced project.

7           Now, let's look at the back of this one,

8    and I think we will see a signature; is that

9    correct?

10   A.  (Witness reviewing document.)

11          Yes, sir.

12   Q.  And this is for the Kenner project; is

13   that right?  The back of the first page?

14   A.  Yes, sir.

15   Q.  I want you to look at Scope of Services,

16   and it talks about field services.

17          Do you see that?

18   A.  Yes, sir.

19   Q.  And it says, "To address construction

20   quality control, Terracon will provide an

21   engineering technician to perform field testing

22   and related construction monitoring activities

23   during pertinent construction activities."

24          Do you see that?

25   A.  Yes, sir.

NON-CERTIFIED COPY

Exhibit 5

Page 88

1      Q.  Is that your understanding what they

2  were doing out there?

3      A.  Yes, sir.

4      Q.  All right.  And, of course, you were

5  authorized to sign this on behalf of H&E,

6  correct?

7      A.  Yes, sir.

8      Q.  As far as you know, was Terracon paid

9  for its services in Kenner?

10      A.  Yes, sir.

11      Q.  And were you aware that Terracon was out

12  at Kenner every time concrete was poured?

13      A.  That was my understanding.  I wasn't

14  there to observe it, but that was the

15  understanding that we had with Terracon.

16          MR. FRANCO:

17              Okay.  You can turn the next one

18  over.

19  EXAMINATION BY MR. FRANCO:

20      Q.  Next I'm going to show you the next

21  exhibit, which we will label Exhibit 25, which

22  is H&E 4073.

23          The first page, the bottom Email, Thomas

24  Ryan is sending the field report for the Baton

25  Rouge branch, and then you forward that on to

NON-CERTIFIED COPY

Exhibit 5

1    Brad Barber and John Jones.

2         Do you see that?

3    A.  Yes, sir.

4    Q.  Prior to tis observation report, what

5    did you understand URS was doing in connection

6    with project observation?

7    A.  On this particular --

8    Q.  On this particular one and on any

9    project observation report.  You received

10   several project observation reports, correct?

11   A.  Yes, sir.

12   Q.  Was URS at the site every day?

13   A.  I don't know.

14   Q.  Do you know how often URS went to the

15   site?

16   A.  No, sir.

17   Q.  But you received these project

18   observation reports, as far as you know, on some

19   kind of routine basis?

20   A.  Yes, sir.

21   Q.  What did you understand URS was out at

22   the site doing?

23   A.  Observing what was going on and make

24   sure it met all the specs.

25   Q.  When you say, "make sure it met all the

NON-CERTIFIED COPY

Exhibit 5

Page 90

1    specs," what did you understand URS was doing as

2    compared to what Terracon was doing with respect

3    to the paved areas?

4        A.  Well, Terracon was doing the actual

5    testing.  I don't believe URS did any testing of

6    any --

7        Q.  Did you understand what Terracon was

8    doing other than just testing?

9        A.  They were observing, also.  As I stated

10   earlier, they were out there before the pour was

11   made.  During the pour and after the pour.

12       Q.  When URS made a visit to the site, you

13   didn't necessarily accompany them, correct?

14       A.  No, sir.

15       Q.  I'll show you the next document which

16   will be labeled as Exhibit 26, H&E 62142.

17          This document is from Ottis Seaborn at

18   MAPP.  He is sending a daily update to a number

19   of different people, which this particular one

20   does not include you, does it?

21       A.  Yeah, I think --

22       Q.  Oh, yes.  It does include you.

23          So, do you remember receiving daily

24   updates from Mr. Seaborn about what was going on

25   at Kenner?

NON-CERTIFIED COPY

Exhibit 5

Page 91

1      A.  I don't think it was -- I don't know if

2  it was every day, but we did get updates from

3  Ottis on a regular basis.

4      Q.  Okay.  Look at Page 62147.

5      A.  Okay.

6      Q.  Do you understand what that is?  Those

7  rods?  Let me ask it simpler.

8          Do you understand those to be dowel

9  rods?

10     A.  Yes.

11     Q.  At expansion joints?

12     A.  Yes, sir.

13     Q.  Can you tell whether those are smooth

14  rods or not?

15     A.  I can't tell.

16     Q.  Okay.  And part of Terracon's job was to

17  observe the installation of those rods, as well,

18  correct?

19     A.  Correct.

20     Q.  Okay.  Let's look at the next one,

21  Exhibit 27, which is H&E 62403.

22          This is another series of Emails.  At

23  the bottom, Neal Johnson tells a number of

24  people, including you, that "The concrete" --

25  and this is again at Kenner -- "is breaking at

NON-CERTIFIED COPY

Exhibit 5

1    4,090 psi at 7 days?  Very nice!"

2         And then you asked Neal, "To your

3    knowledge, have we specified 5,000 psi on any of

4    our projects?"

5         Do you see that?

6    A.  Yes, sir.

7    Q.  Why did you ask whether he had specified

8    5,000 psi?

9    A.  I have no idea.

10   Q.  Were you aware that at Kenner there was

11   a part of the design that allowed the concrete

12   to reach its psi quicker so that you all could

13   put equipment on that concrete faster?  Do you

14   recall that?

15   A.  Yes, sir.

16   Q.  Okay.  And do you recall that the psi

17   for Kenner was 4,000?

18   A.  I believe that would be correct, yes,

19   sir.

20   Q.  Okay.  So the fact that it was at 4,090

21   in seven days was an indication that it had

22   reached what it was supposed to reach in a

23   seven-day period.  Is that your understanding?

24   A.  Yes, sir.

25   Q.  But in response to that -- and I'm just

NON-CERTIFIED COPY

**Exhibit 5**

1  going to ask this question again now that we

2  have gone through that -- why would you ask if

3  he specified 5,000 in any of the projects at

4  that time?  Did you not understand maybe that

5  the psi was supposed to be 4,000?

6     A.  Again, I have no idea why I asked the

7  question.

8        MR. FRANCO:

9           Off the Record.

10       (Off the Record.)

11  EXAMINATION BY MR. FRANCO:

12     Q.  The mix we were talking about just now

13  for Kenner, do you recall it being called a

14  seven-day High Early concrete mix?

15     A.  I do recall us using some seven-day,

16  yes, sir.

17     Q.  Okay.  If you will pass that one.

18        Let's just get this on the Record.

19  Exhibit 28 will be H&E 12783.

20        And I'm going to focus on the top, Mr.

21  Wynn.

22        Here you tell Mr. Jones in reference to

23  MAPP, so it is in reference to Kenner, it says,

24  "We are using a shorter time set-up mixture on

25  the Kenner project in the noted area so we can

NON-CERTIFIED COPY

Exhibit 5

Page 94

1    move equipment on it in 7 days.  Otherwise, we

2    could not use this area for 28 days."

3         So you explained that to him, correct?

4    A.  Yes, sir.

5    Q.  Whose request was it to use the

6    seven-day mix?

7    A.  I don't recall if it was anyone's

8    request.  I know that H&E, URS and MAPP talked

9    about the different staging as we had discussed

10   earlier.

11        We didn't want to lose the use of any

12   one area for any extended period of time, and so

13   we were given the option.  And I don't recall if

14   it was recommended by MAPP or URS, or both.

15        I think we used some three-day, some

16   seven-day, in order to get -- like the Email

17   said, to get the equipment back on the yard --

18   on the concrete quicker.

19        So I think it was a joint effort by all

20   the parties to stage it in such a way that we

21   could get it back on -- get the equipment back

22   on the concrete as soon as possible and have use

23   of that area.

24   Q.  In connection with that, let me show you

25   what I will label as Exhibit 29, URS 3363.

NON-CERTIFIED COPY

Exhibit 5

Page 95

1          And, again, this is in reference to

2     Kenner.  It is an Email from Neal Johnson dated

3     January 27, 2012, to James Brown, your branch

4     manager.

5          And it says, "Tim Gaines - our civil

6     engineer has reviewed the attached test breaks

7     and has authorized the release of these areas

8     for the owner's use."

9          Do you see that?

10     A.  Yes, sir.

11     Q.  It says, "lease limit sharp turns and no

12     drop loans on the fresh concrete."

13          Do you see that?

14     A.  Yes, sir.

15     Q.  And you are copied on this, correct?

16     A.  Yes, sir.

17     Q.  Did you give any particular instructions

18     to anybody to limit sharp turns and no drop

19     loads on the fresh concrete?

20     A.  No, I didn't.

21     Q.  Do you know of anybody who did?

22     A.  It looks like Neal did in this Email.

23     Q.  I'm talking about at H&E.  Did anybody

24     at H&E give those instructions to anybody els at

25     H&E?

NON-CERTIFIED COPY

Exhibit 5

1      A.  Not that I'm aware of.

2      Q.  Okay.  And so, as you sit here, you

3   don't know whether there were sharp turns or

4   drop loads on the fresh concrete, correct?

5      A.  No.

6      Q.  "No," you don't know?

7      A.  No, I don't know, but I would assume

8   since James Brown was copied on the Email, that

9   he took these instructions as they were written.

10     Q.  Okay.  But you don't know, as you sit

11  here, whether James Brown instructed that of

12  anybody else at H&E or not, do you?

13     A.  No.

14     Q.  And you certainly don't know if any

15  sharp turns were taken or drop loads were taken

16  on the new concrete?

17     A.  No, sir.

18     Q.  Mr. Wynn, I'm going to talk about the

19  mail slots briefly, probably.

20          You are familiar with the complaint

21  about mail slots at the Baton Rouge facility?

22     A.  Yes, sir.

23     Q.  Okay.  Were you involved when the mail

24  slots were originally designed?

25     A.  No, sir.

NON-CERTIFIED COPY

Exhibit 5

Page 97

1     Q.  Did you participate in going to the URS

2   office to look at mail slots?

3     A.  No, sir.

4     Q.  Do you know who did?

5     A.  No, sir.

6     Q.  As the point of contact for the Baton

7   Rouge facility, once you got involved in it, did

8   you review the construction drawings?  Did you

9   have the opportunity to review the construction

10   drawings?

11     A.  I had the opportunity, yes, sir.

12     Q.  Did you discuss those construction

13   drawings with anyone from URS?

14     A.  Not that I'm aware of.

15     Q.  Did you review the construction

16   drawings?

17     A.  Not that I recall.

18     Q.  You didn't look at them at all?

19     A.  Well, I looked at them, yes, sir.

20     Q.  Okay.  So you looked at the construction

21   drawings.  They were given to you by URS?

22     A.  Restate that, please.

23     Q.  Yes.

24        The construction drawings were provided

25   to you by URS?

NON-CERTIFIED COPY

Exhibit 5

Page 98

1      A.  Yes, sir.

2      Q.  Why would they be provided to you, in

3  your understanding?

4      A.  That was part of the contract, that they

5  would supply them to us.

6      Q.  Okay.  But they were supplied to you

7  before any construction took place, correct?

8      A.  I think so, yes, sir.

9      Q.  In fact, they were provided to you

10  before bidding took place, weren't they?

11      A.  I believe so.

12      Q.  Who else that you were aware of at H&E

13  was provided with the construction drawings for

14  any of the projects?

15      A.  Johnny Jones and Leonard St. Germain had

16  access to them, also.

17      Q.  Did you ever meet with them and review

18  the construction drawings?

19      A.  We talked about them, yes, sir.

20      Q.  Okay.  You talked about them just with

21  H&E people or with URS people, or both?

22      A.  Probably both --

23      Q.  Okay.

24      A.  -- at some point in time throughout the

25  length of these --

NON-CERTIFIED COPY

Exhibit 5

1    Q.  Projects?

2    A.  -- projects.

3    Q.  What was the problem with the mail slots

4  at the Baton Rouge facility after they were

5  constructed?

6    A.  Interoffice envelopes or FedEx envelopes

7  wouldn't fit.

8    Q.  They were too large?

9    A.  The envelopes were too large, yes, sir.

10    Q.  The actual size of the mail slots, was

11  that noted on the construction drawings?

12    A.  I would assume so, yes, sir.

13    Q.  And no one at H&E raised a question

14  about the size of those mail slots before they

15  were actually constructed, to your knowledge?

16    A.  No, sir.

17    Q.  Now, after the problem arose with the

18  mail slots, did URS, to your knowledge, redesign

19  the mail slots?

20    A.  Yes, sir.

21    Q.  And were the mail slots then put in

22  according to that new design?

23    A.  I believe so, yes, sir.

24    Q.  Was anything else in the mail area or

25  mailroom changed after construction, to your

NON-CERTIFIED COPY

Exhibit 5

1    knowledge?

2        A.  I think there was a sitting area, a desk

3    area, I believe that was also part of it.

4        Q.  Was that a change that just H&E

5    requested, or was that something that they said

6    should have been done differently from the

7    beginning?

8        A.  I don't recall.

9        Q.  Who dealt with URS on that additional

10   mailroom change?

11       A.  I did.

12       Q.  But you just don't recall the details?

13       A.  No, sir.

14           MR. FRANCO:

15               You can turn that over.

16   EXAMINATION BY MR. FRANCO:

17       Q.  Let me show you the next document, which

18   is Exhibit 30.  This is H&E 13163.

19           I want to show you, the middle of the

20   first page where Mr. Ryan on February 2, 2012,

21   in connection with Kenner, tells the contractor,

22   Brad and Ottis, "The attached report is for the

23   7-day High Early concrete mix that was an

24   additional cost."

25           Do you recall that being an additional

NON-CERTIFIED COPY

Exhibit 5

1  cost, correct?

2      A.  No, sir.

3      Q.  You do not?  You do not recall it?

4      A.  No, sir.

5      Q.  "The mix is supposed to reach 4,000 psi

6  in 7 days, but only reached 2,870 psi in 6 days.

7  Unless the mix gains a significant amount of

8  strength tonight, it will not reach its designed

9  strength in 7 days as intended."

10         Do you see that?

11     A.  Yes, sir.

12     Q.  And the contractor responds that the

13 concrete sub and supplier have been notified,

14 correct?

15     A.  Yes, sir.

16     Q.  So URS, after receiving this test

17 report, takes the issue directly to the

18 contractor.  Is that a fair statement?

19     A.  Yes, sir.

20     Q.  And I assume you don't know what

21 happened with that particular test?

22     A.  I don't recall, no, sir.

23     Q.  Turning to the next one, I'm going to

24 show you the next document, which is Exhibit 31,

25 URS 74030.

NON-CERTIFIED COPY

Exhibit 5

Page 102

1          I want to focus on the bottom Email.  It

2    is from James Brown, your Kenner branch manager,

3    and it says, "The area being recommended for

4    3-day mix is vital to me."

5          So it is your recollection, and I think

6    you said this, but it didn't hit me when you

7    said it, not only did you use a 7-day mix, but

8    you used a 3-day mix at some points in Kenner?

9      A.  Correct.

10     Q.  So that you could get on it even

11   quicker?

12     A.  Correct.

13     Q.  And you don't recall the 3-day mix

14   costing more money?

15     A.  I don't recall it being more.  I'm not

16   disputing it.  I just don't recall it being

17   more.

18     Q.  That is fine.  I understand.  Thank you.

19          Let me show you the next exhibit,

20   Exhibit 32, which is URS 74031.

21          This is from Ottis Seaborn.  Again, we

22   are talking about the Kenner site, and it says,

23   "Thomas, Over the past few months due to the

24   impacts from delays for removing spoiled

25   materials at the failed proof roll areas, our

NON-CERTIFIED COPY

Exhibit 5

1   schedule has been failing and some of the

2   strategy to keep both H&E's daily operations and

3   phasing turn-over dates are getting off-course.

4           "We (myself & James Brown) have worked

5   together to modify the pour phases to assure the

6   daily operations of H&E have a minimal or no

7   interruption of their business.

8           "The next two phases scheduled to pour

9   are critical!  And we recommend H&E use High

10  Early mixtures at both areas.  Please see

11  diagram for details."

12          Do you see that?

13      A.  Yes, sir.

14      Q.  So part of the reason for using the High

15  Early mixtures was that the contractor fell

16  behind in the schedule at Kenner.  Fair

17  statement?

18      A.  According to Ottis, yes, sir.

19      Q.  Let me show you the next exhibit, which

20  will be Exhibit 33.  It starts at H&E 63708.

21          This is a February 2012 Email regarding

22  Kenner from Thomas Ryan to you, and it says,

23  "The latest concrete paving pour using the High

24  Early mixture met the design strength in 7 days

25  as planned (report attached) so we gave Ottis

Exhibit 5

NON-CERTIFIED COPY

1   and James approval to move equipment across it."

2          Do you see that?

3      A.  Yes, sir.

4      Q.  And then attached -- I'm sorry.  Below

5   that is an Email to Ottis, and it says, "Below

6   is the approval from the civil engineer with

7   conditions."

8          Do you see that?

9      A.  Yes, sir.

10     Q.  And if you turn the page, there is an

11  Email from Tim Gaines that says, "Based on

12  previous reviews, the concrete has met the 4,000

13  psi strength.  I would allow H&E to use the

14  pavement, but would warn against point loads and

15  turning movements to allow more cure time."

16         Do you see that?

17     A.  Yes, sir.

18     Q.  My question now is the same as it was

19  before.  Can you tell us that there were no

20  point loads or turning movements on the concrete

21  that is at issue in this Email?

22     A.  No, sir.

23         MR. BARRIERE:

24             What is a point load?

25         MR. FRANCO:

NON-CERTIFIED COPY

Exhibit 5

Page 105

1    You would have to ask them.

2    Off the Record.

3   (Off-the-Record discussion.)

4 EXAMINATION BY MR. FRANCO:

5  Q.  Mr. Wynn, at some time in March of 2012,

6 do you recall sending your resume to

7 Mr. Johnson?

8  A.  Yes.  I think so, yeah.

9  Q.  What was the reason that you did that?

10  A.  I think there was a job opening at URS,

11 if I recall.

12  Q.  For what?

13  A.  I don't recall.  Apparently, it was

14 something that I thought I was qualified for.

15  Q.  Was there some discontent at H&E?

16  A.  No, sir.

17  Q.  Did you tell Mr. Johnson that you were

18 concerned about your job?

19  A.  No, sir.

20  Q.  Did you tell anybody at H&E that you had

21 sent your resume to Mr. Johnson?

22  A.  No.

23  Q.  What was the result of sending your

24 resume to Mr. Johnson?

25  A.  I stayed at H&E.

NON-CERTIFIED COPY

**Exhibit 5**

1      Q.  Was there any further communications

2  about that, to your knowledge?

3      A.  I don't recall.

4      Q.  Let me show you the next exhibit, and we

5  are in March of 2012, H&E 64270, which is

6  Exhibit 34.

7          At top you tell Neal Johnson and Thomas

8  Ryan in connection with Wash Bay SOG.  What does

9  "SOG" mean?

10     A.  I don't recall what that means.

11     Q.  All right.  And you basically say, "I

12  don't want to have any issues in Baton Rouge as

13  we have had in Kenner."

14          What issues were you talking about in

15  Kenner?  And feel free to look at the whole

16  string and see if that helps refresh your

17  recollection.

18     A.  I don't recall what the issue was.

19     Q.  Do you recall an issue about the slab in

20  the rear of the service building in Kenner

21  cracking?

22     A.  Not in relation to the wash bay.

23     Q.  Correct.

24     A.  Yes, sir.

25     Q.  And that was finally torn up and

NON-CERTIFIED COPY

Exhibit 5

1    repoured?

2        A.  Yes, sir.

3        Q.  Correct?

4        A.  Yes, sir.

5        Q.  Because the contractor had done

6    something incorrectly?

7        A.  That is what I was told, yes, sir.

8        Q.  That doesn't refresh your memory as to

9    what you are talking about here?

10        A.  I don't think that has anything to do

11    with the wash bay.

12        Q.  Do you recall any particular problem

13    with the wash bay in Kenner?

14        A.  No, sir.

15        Q.  Let me show you the next Email, which

16    I'll label as Exhibit 35, URS 70252.

17            Now, just to put this in time

18    perspective, the prior one that I just asked you

19    about was March 12.  This one is from Ottis

20    Seaborn, is March 16.  So, we are talking four

21    days later.

22        A.  Okay.

23        Q.  And it says, "Subject:  (Kenner branch)

24    successful pours."

25            Do you see that?

NON-CERTIFIED COPY

Exhibit 5

Page 108

1      A.  Yes, sir.

2      Q.  And it talks about Foundation A and

3  Foundation A-A.

4          Do you recall where that was?

5      A.  No, sir.

6      Q.  It says, "All concrete work has been

7  completed at the wash rack and service warehouse

8  addition."

9          Does that help refresh your recollection

10  as to what you may have been concerned about in

11  Kenner?

12     A.  No, sir.

13         MR. FRANCO:

14             I will turn that one over.  All

15  right.

16  EXAMINATION BY MR. FRANCO:

17     Q.  Let me show you the next exhibit, which

18  is Exhibit 36.  It is URS 034337.

19         This is a Project Observation Report

20  similar to the one I showed you earlier in your

21  deposition, but I want you to look at the

22  pictures at the bottom of 34341 and 2.

23         See it says "Service bldg, rear slab

24  spalling"?

25     A.  Yes, sir.

NON-CERTIFIED COPY

Exhibit 5

1      Q.  And the next picture is "Service bldg

2   rear slab cracking and spalling."

3          Do you see that?

4      A.  Yes, sir.

5      Q.  And then the next page, the pictures

6   showing the rear slab spalling at the service

7   building in Kenner, correct?

8      A.  Correct.

9      Q.  That is the slab that was torn up and

10  repoured; is that correct?

11     A.  Yes, sir.

12     Q.  Do you know what the contractor did to

13  cause that problem?

14     A.  No, sir.

15     Q.  Did anybody tell you what the contractor

16  did to cause that problem?

17     A.  I don't recall.

18     Q.  And just for the Record, this is a March

19  20, 2012 report, and the pictures are labeled or

20  dated March 20, 2012.

21          So does that help refresh your

22  recollection as what problems you didn't want to

23  see at Baton Rouge that you experienced in

24  Kenner?

25     A.  I think the issue was regarding the wash

NON-CERTIFIED COPY

Exhibit 5

Page 110

1    bay, and these photographs have nothing to do

2    with the wash bay.

3        Q.  Right.  But were you concerned that the

4    contractor at Kenner had not laid the concrete

5    properly, and you didn't want to see that

6    problem in Baton Rouge?

7        A.  I don't believe so.

8        Q.  Do you recall an elevation conflict at

9    parts of the warehouse site paving area in

10   Kenner?

11       A.  Yes, sir.

12       Q.  Do you know what the reason for that

13   conflict in the elevation was?

14       A.  I believe when the survey was done, a

15   benchmark was used inside the part warehouse as

16   the lowest point of the property.  I believe

17   that is true.

18       Q.  So the conflict was because the survey

19   was done incorrectly.  Is that your

20   understanding?

21       A.  I think that is what I was told, yes,

22   sir.

23       Q.  And do you know who the survey was done

24   for?

25       A.  Who was it done for?

NON-CERTIFIED COPY

Exhibit 5

Page 111

1      Q.  Done for?

2      A.  It was done for H&E, I guess.

3      Q.  And who paid for that survey?

4      A.  I don't recall.

5      Q.  Do you recall what company it was?

6      A.  No, sir.

7      Q.  By the way, let me identify this as

8  Exhibit 37, and that is H&E 13645.

9          Just for the Record, Mr. Wynn, the

10  bottom Email addresses the service building slab

11  we have talking about, and I just wanted to

12  establish for the Record that it was decided to

13  proceed with the removal and replacement of the

14  new service building slab.  You see where it

15  says "A-A"?

16     A.  Yes, sir.

17     Q.  So, for the Record, I just wanted to

18  establish that that was Slab A-A.

19         Do you have any reason to disagree with

20  that?

21     A.  No, sir.

22     Q.  All right.  The next exhibit is Exhibit

23  38, which is H&E 13874.

24         Do you recall the pavement joint filler

25  being discussed?

NON-CERTIFIED COPY

Exhibit 5

Page 112

1              You might want to start at the last part

2    of the back of the Email stream, Mr. Wynn, to

3    refresh your memory.

4       A.   (Witness reviewing document.)

5       Q.   At the back, Mr. Neal Johnson tells

6    Murray McCullough, and it copies you, it says,

7    "During the progress meeting yesterday, the

8    pavement joint filler was discussed."  And this

9    is his reference to the Baton Rouge project.

10             It says, "The specifications call out a

11   joint sealer, ASTM D-1190 hot poured elastic

12   type...Their paving subcontractor indicated to

13   them that this project is typically only used on

14   concrete highways and not parking lots."

15       Do you see that?

16       A.   Yes, sir.

17       Q.   And then Mr. McCullough responds and he

18   says at the end, "...I would prefer that the

19   contractor use the sealant specified,

20   particularly in the areas of the pavement where

21   the heavy equipment will be stored."

22       Do you see that?

23       A.   Yes.

24       Q.   And then it continues on, "...are a ASTM

25   performance spec and do not list the

NON-CERTIFIED COPY

Exhibit 5

Page 113

1    manufacturer.  Can you send me a spec sheet on

2    the project.  We really want to make sure this

3    is the right stuff."

4         Do you see that?

5    A.  Yes, sir.

6    Q.  Do you recall what happened on that?

7    A.  I believe that the product that was

8    specified in the original specs were used.

9    Q.  Okay.  I'm going to show you the next

10   exhibit, which is Exhibit 39.

11        Now, this is an Email that starts off

12   from your branch manager, James Brown, in Kenner

13   at the bottom of the first page.  And he is

14   attaching pictures of cracks in concrete.  And

15   he sends that to you, and you send it to Neal

16   Johnson and Thomas Ryan and Johnny Jones.

17        Do you know who took these pictures?

18   A.  No.

19   Q.  It wasn't you?

20   A.  I don't know.

21   Q.  Okay.  Do you know if these are

22   construction joints or expansion joints?

23   A.  Most, if not all of them, look like

24   expansion joints, from my understanding of what

25   an expansion joint is.

NON-CERTIFIED COPY

Exhibit 5

Page 114

1      Q.  Which were wider, the expansion joints

2  or the construction joints?

3      A.  The expansion joints.

4          Here again, to what I've been told about

5  what construction joints and expansion joints

6  is.

7      Q.  You had no experience in that before

8  this?

9      A.  No, sir.

10     Q.  Do you know what area of the Kenner

11  facility this was in?

12     A.  No.  I really can't tell from these

13  close-up shots.

14     Q.  This is in August of 2012.  Do you know

15  when that concrete was poured?

16     A.  No, sir.

17     Q.  Do you know if this was a seven-day or

18  three-day quick dry concrete?

19     A.  I do not know.

20     Q.  And do you know whether any sharp turns

21  or loads, heavy loads were carried on this

22  contrary to the request from Tim Gaines?

23     A.  I do not know.

24     Q.  I'm going to show you the next exhibit,

25  which is Exhibit 40, which is H&E 50870.

NON-CERTIFIED COPY

Exhibit 5

Page 115

1          I want to focus on the first page.  This

2    is from Dale Phillips at Womack, attaching the

3    product data sheet for the pavement sealant that

4    meet the project specs.  And that was the joint

5    sealant we were talking about earlier in the

6    deposition.

7          Do you see it?

8      A.  Yes, sir.

9      Q.  Do you recall receiving a copy of this?

10   It was sent to you.  I assume you got it?

11     A.  I assume I did, yes, sir.

12     Q.  Okay.  If you look at the specs for the

13   joint sealant that is on Page 50873, for the

14   application it says, "The joints and cracks to

15   be sealed must be clean and dry."

16          Do you see that?

17     A.  No, sir.

18     Q.  I'm sorry.  Look at the first page at

19   the top in the right column, right under

20   "Application."  It says "Surface Preparation."

21   Okay?

22     A.  Yes, sir.

23     Q.  It says, "The joints and cracks to be

24   sealed must be clean and dry."

25          Do you see that?

NON-CERTIFIED COPY

Exhibit 5

1        A.  Yes, sir.

2        Q.  In the expansion joints, how far down do

3    the joints go?

4        A.  I don't know.

5        Q.  Okay.  If I told you that expansion

6    joints go all the way through the length of the

7    pavement depth, would that surprise you?

8        A.  No, sir.

9        Q.  Okay.  Did you observe the joints and

10   cracks being cleaned and dried before the joint

11   sealant was put in?

12       A.  No, sir.

13       Q.  Do you know how the contractor removed

14   dirt at the bottom level of the expansion

15   joints?

16       A.  No, sir.

17       Q.  Did you see any vacuum cleaners out

18   there?

19       A.  No, sir.

20       Q.  Any vacuum machines?

21       A.  No, sir.

22       Q.  Let me show you the next exhibit, which

23   is Exhibit 41, which is H&E 51125.

24            This is from Neal Johnson.  It says,

25   "Confirming our conversation, a sample of the

NON-CERTIFIED COPY

Exhibit 5

1  paving joint sealant has been installed and

2  ready for review."

3        Do you see that?

4     A.  Yes, sir.

5     Q.  Do you know who was present for that

6  sampling?

7     A.  Who went out and looked at it?

8     Q.  Yes.  This is copied to you.  Let me be

9  more clear.

10        Were you there?

11    A.  I was there for -- I don't know if it

12  was this inspection.  I'm assuming it was, but I

13  was there for an inspection of the joint

14  sealant, yes, sir.

15    Q.  For a sample of the joints?

16    A.  Yes, sir.

17    Q.  For the Baton Rouge facility?

18    A.  Yes, sir.

19    Q.  And do you recall during that sampling

20  whether the joint material was level with the

21  top of the pavement, above the top of the

22  pavement, or below the top of the pavement?  Do

23  you recall?

24    A.  I don't recall.

25    Q.  Do you recall any discussions about

NON-CERTIFIED COPY

Exhibit 5

Page 118

1    whether it was supposed to be level, above or

2    below?

3        A.  No, sir.

4        Q.  Let me show you the next exhibit, which

5    is Exhibit 42, H&E 14772.

6            This is an Email string, of course, so

7    let's start off with the first one, August 13,

8    2012, from Ottis Seaborn at MAPP.

9            And, obviously, that is in connection

10   with Kenner.  So it is the new paving for a

11   dumpster pad.

12           Do you see that?

13       A.  Yes, sir.

14       Q.  So at some point in Kenner, there was a

15   dumpster pad at the rear of the property that

16   was added.  Do you recall that?

17       A.  Yes, sir.

18       Q.  And he is asking about do we dowel it or

19   do something different, and Tim Gaines responds,

20   and he said he would dowel into the existing

21   pavements.  But, more importantly, I want to

22   concentrate on the second paragraph.

23           He says, "I'm also requesting that the

24   pavement be cleaned and the joints be cleaned.

25   One of the concerns I have to do with the joints

NON-CERTIFIED COPY

Exhibit 5

Page 119

1    raveling is that there is a lot of dirt and

2    trash on the pavement.  If this material gets in

3    the joints, it will cause some of this raveling.

4    There was also a large amount of rock on the

5    pavement.  This is causing point loads on the

6    pavement, and this on a joint or close to a

7    joint will cause the pavement to ravel.  Please

8    have the pavement swept and as much of the rock,

9    sand and trash removed from the pavement."

10        Do you see that?

11    A.  Yes, sir.

12    Q.  And then Neal Johnson sends that to you

13    and Johnny Jones, correct?

14    A.  Yes, sir.

15    Q.  And this is at the Kenner site, correct?

16    A.  Yes, sir.

17    Q.  So was there some raveling that had

18    occurred prior to this time, as far as you

19    recall?

20    A.  I don't even -- I don't ever recall

21    joint raveling.  I'm not familiar with that

22    term.

23    Q.  Okay.

24    A.  I realize that I'm copied on the Email,

25    but I'm not familiar with "raveling."

NON-CERTIFIED COPY

Exhibit 5

Page 120

1      Q.  Okay.  Do you understand or did you

2  understand that raveling and spalling were used

3  to describe the same condition?

4      A.  No, sir.

5      Q.  You certainly understood that regardless

6  of what raveling was, the request was to clean

7  the pavement?

8      A.  Yes, sir.

9      Q.  Right?

10     A.  Yes, sir.

11     Q.  And it is true, is it not, sir, that

12  when these earth-moving pieces of equipment are

13  unloaded from the job, they have dirt and gravel

14  and rocks embedded frequently in parts of the

15  tread, correct?

16     A.  What do you mean by "frequently"?

17     Q.  Most of the time.

18     A.  I wouldn't agree with that, no, sir.

19     Q.  You wouldn't?

20     A.  No, sir.

21     Q.  So did they ever come with rocks or

22  gravel or dirt when they unloaded?

23     A.  I'm usually not present when they load

24  and unload equipment at the branches.

25     Q.  Well, you are not suggesting that they

NON-CERTIFIED COPY

Exhibit 5

Page 121

1    never came from a job with dirt or rocks or

2    gravel, are you?

3        A.  No, sir.

4        Q.  And when they do that, when they unload

5    them, they then track that equipment over the

6    paved area to the wash rack for cleaning.  That

7    is where they go, isn't it?

8        A.  Sometimes they go directly to the wash

9    rack.  Other times, they are just put in a line

10   to be next in line.

11       Q.  But the point is:  Eventually, their

12   target is to go to the wash rack to get cleaned?

13       A.  Yes, sir.

14       Q.  And when they are traveling on the

15   cement, if there is any rocks or dirt in there,

16   those rocks and dirt get on the concrete,

17   doesn't it?

18       A.  Yes, sir.

19       Q.  And those rocks and dirt can be ground

20   into the joint, can't it?

21       A.  I can't comment on that.  I don't know.

22       Q.  You don't know?

23       A.  No, sir.

24       Q.  So you are not suggesting that the rocks

25   and dirt that are on the bottom of those tracks

NON-CERTIFIED COPY

Exhibit 5

Page 122

1    when they are traveling can't get ground into

2    the edges of the expansion joints, are you?

3        A.  I'm not saying one or the other.

4        Q.  And in Kenner, for instance, the

5    testimony that I understand so far is you never

6    saw a sweeper at the Kenner site, did you?

7        A.  I can't be sure.  I thought there was

8    one at Kenner, but I won't testify that there

9    was.

10        Q.  And if Mr. Jones testifies that there

11    was only one sweeper purchased and that was for

12    the Baton Rouge site, you would have no reason

13    to disagree with that, would you?

14        A.  Was his testimony that there was not one

15    at Kenner before or after the project?  Because

16    the one that was purchased in Baton Rouge, was,

17    you know, in conjunction with completion of the

18    project and moving in.

19            I'm not sure if there was one already at

20    Kenner or not, and that is -- I don't know what

21    Johnny was saying.  There possibly was not one

22    purchased for Kenner.  It is possible that there

23    was one already there.  That is the only thing

24    that I'm saying.

25        Q.  My understanding, and the transcript

NON-CERTIFIED COPY

Exhibit 5

Page 123

1   will reflect exactly what you said, Mr. Wynn,

2   but my understanding is there was only one

3   sweeper purchased by H&E.  It was the only one

4   purchased.

5        A.  I don't disagree with that.

6        Q.  Would you assume for me that there is a

7   bulldozer that comes off of a truck and is

8   unloaded, and it has rocks and dirt and gravel

9   in the tread.  Would you assume that for me?

10       A.  Okay.

11       Q.  As it comes off and unloaded, it then

12   travels.  You don't clean those treads before it

13   starts maneuvering anywhere, do you?

14       A.  Well, in most cases the truck drivers

15   are instructed to clean as much as they can off

16   the tracks before they ever put it on the truck

17   before it gets to the yard.

18       Q.  And, sir, I was on the yard at one time,

19   and you will recall a bulldozer was being

20   unloaded at that time.  Do you recall that?

21       A.  No, sir.

22       Q.  You don't recall when we went there in

23   December that there was actually a piece of

24   heavy earth-moving equipment being unloaded?

25       A.  No, sir, I don't recall that.

NON-CERTIFIED COPY

**Exhibit 5**

1      Q.  All right.  Have you ever heard of

2   putting -- what is the wash building for?

3      A.  To clean equipment.

4      Q.  To clean equipment for what?

5      A.  So it could be rerented.

6      Q.  I understand.  But what needs to be

7   cleaned?

8      A.  Dirt.

9      Q.  Rocks, gravel, dirt?

10     A.  In some cases, yes, sir.

11     Q.  Where does that wash bay empty to?

12     A.  To a pit or pits.

13     Q.  And what is normally in the pit?

14     A.  I don't understand the question.

15     Q.  Dirt?  Rocks?  Gravel?

16     A.  Yes, sir.  Uh-huh (affirmative

17   response).

18     Q.  And that dirt, rocks and gravel that is

19   in the pit was on the tracks when it traveled

20   over the paved areas, wasn't it?

21     A.  Yes, sir.

22        MR. BARRIERE:

23           Object to the form.

24   EXAMINATION BY MR. FRANCO:

25     Q.  Let's see.  Do you ever recall Murray

NON-CERTIFIED COPY

Exhibit 5

Page 125

1    McCullough telling you or anybody from H&E in

2    your presence to make sure the pavement was

3    cleaned?

4         A.  No, sir.

5              MR. FRANCO:

6                   You can turn that over.

7    EXAMINATION BY MR. FRANCO:

8         Q.  Let me show you the next document,

9    Exhibit 43, URS 48304.

10              This is styled as "Meeting Minutes."

11   Kenner Renovations," September 21, 2012, and it

12   notes that you were present.

13              Do you have any reason to disagree with

14   that?

15        A.  No, sir.

16        Q.  Turn to the first page of the meeting

17   minutes and look at Item 11.06.  It says,

18   "Concrete paving joints that are damaged, MAPP

19   feels that these are caused by rocks, bolts,

20   etc., on the site near the cracks being wedged

21   into the joints by equipment and causing

22   excessive cracking.  Neal Johnson confirmed that

23   Tim Gaines will review further and propose some

24   suggestions."

25              Do you see that?

NON-CERTIFIED COPY

Exhibit 5

Page 126

1      A.  Yes, sir.

2      Q.  Do you recall that discussion?

3      A.  No, sir.

4      Q.  You are not suggesting that it didn't

5  take place, though, correct?

6      A.  Correct.

7      Q.  So in response to my earlier questions,

8  apparently, MAPP observed rocks and bolts and

9  other things being wedged into joints.  Do you

10  recall them telling you that?

11      A.  No, sir.

12      Q.  But, apparently, that was stated this

13  way at the meeting, correct?

14      A.  Correct.

15      Q.  What was your response to that, if any?

16      MR. BARRIERE:

17          Object to the form.  I thought he

18  testified that he was not informed of this.

19      MR. FRANCO:

20          That is incorrect.  You need to

21  listen.  He was at the meeting.

22      THE WITNESS:

23          I would assume that I wanted for Tim

24  Gaines to review and give us some suggestions,

25  which never happened.

NON-CERTIFIED COPY

Exhibit 5

Page 127

1    EXAMINATION BY MR. FRANCO:

2        Q.  I understand, but my point was:  Did you

3    respond that there was not rocks, bolts, etc.,

4    on the site near the cracks being wedged into

5    the joints by equipment and causing excessive

6    cracking?

7        A.  I don't --

8        Q.  Do you deny that?

9        A.  I don't understand the question.

10       Q.  Yeah.  When MAPP raised that question,

11   that issue, at the meeting, did you deny that

12   there were rocks and bolts on the site near the

13   cracks being wedged into the joints?

14       A.  No, sir.

15       Q.  You deny that?

16       A.  No, sir, I didn't.

17       Q.  Let me show you the next exhibit,

18   Exhibit 44, which is H&E 51948.

19           This is an update like we looked at

20   before from Ottis Seaborn with MAPP.  It

21   references Kenner, and I want to focus on the

22   last bullet point.

23           It says, "Concrete demo:  All Around

24   Concrete Cutting was on site today to cut out

25   the damaged areas of paving at phases B-1 seq.

NON-CERTIFIED COPY

Exhibit 5

1    2."

2         Do you have any idea where that is?

3    A.  No, sir.

4    Q.  Do you have any idea why there was

5    cutting out of damaged areas?

6    A.  No, sir.

7    Q.  Now, the reason I introduced that, the

8    slab area that we talked about before that was

9    in place, that was in A-A.  You recall that?

10   A.  Yes, sir.

11   Q.  So this is obviously a different part --

12   I should say a different location, correct?

13   A.  I would assume so, yes.

14   Q.  According to this, at least?

15   A.  Yes, sir.

16   Q.  And you don't have any recollection

17   about where on the site that was, whether that

18   was a building slab, or whether it was part of

19   the yard?

20   A.  No, sir.

21   Q.  Do you recall anything around a drain

22   having to be cut out and replaced at Kenner?

23   A.  No, sir.

24   Q.  I'm going to show you another exhibit,

25   Exhibit 45, which is H&E 28572, and this is in

NON-CERTIFIED COPY

**Exhibit 5**

Page 129

1    reference to Kenner.  It is a series of Emails.

2        I want to focus on the second page, and

3    it is another Email from Ottis Seaborn of MAPP,

4    October 3, 2012, and under the bullet point

5    Concrete, it says, "MCC was on site today."

6        Do you know who MCC was?

7    A.  One of the subcontractors, I assume.

8    Q.  Do you remember that it was the concrete

9    subcontractor?

10   A.  I'll agree with you if you say it is.

11   Q.  It says, "Frank had a worker start

12   breaking the bad areas of the concrete in the

13   paving areas so that they could be repoured and

14   corrected."

15       Do you know what part of the pavement

16   that referred to?

17   A.  No, sir.

18   Q.  Do you know who Frank was?

19   A.  No, sir.

20   Q.  Was it you?

21   A.  No.

22   Q.  It was somebody from MAPP, apparently?

23   A.  Well --

24   Q.  Somebody from MCC, but it wasn't you?

25   A.  It was not me.

NON-CERTIFIED COPY

Exhibit 5

Page 130

1      Q.  And then look at the next page.  It says

2   "Master Punch List."

3           Do you see that?

4      A.  Yes, sir.

5      Q.  All right.  Look down at the bottom.

6   There is a bullet point that says, "Repair

7   damaged paving at various locations in process."

8           Do you see that?

9      A.  Yes, sir.

10     Q.  Do you know what paving that is

11  referring to?

12     A.  No, sir.

13     Q.  Do you know whether MAPP charged you for

14  any of that work?

15     A.  I don't recall.

16     Q.  Do you recall why the areas of the

17  concrete had to be repoured and corrected?

18     A.  No, sir.

19     Q.  Do you know who rejected that concrete?

20     A.  No, sir.

21     Q.  All right.

22         MR. FRANCO:

23             You can turn that over.

24  EXAMINATION BY MR. FRANCO:

25     Q.  The next exhibit is Exhibit 46, H&E

NON-CERTIFIED COPY

Exhibit 5

1    16469.

2         And this, again, is in reference to

3    Kenner, and this starts off with an Ottis

4    Seaborn updated on October 3, 2012.

5         It says, "Concrete."  It says "MCC was

6    on site today.  MCC doubled the workers they had

7    breaking the bad section of concrete at the

8    boxed out area of the drain basin at the main

9    drive."

10        Does that help refresh your recollection

11   about where this area was?

12   A.  Yes, sir.

13   Q.  Where was that area?

14   A.  In the main drive.

15   Q.  And was it a drain?

16   A.  That is what Ottis says it is.

17   Q.  Okay.

18   A.  I don't disagree with Ottis.

19   Q.  Do you recall that having to be

20   repoured?  Broken up and repoured?

21   A.  Not specifically, no.

22   Q.  But, apparently, that is what is being

23   referenced here, that they were breaking that

24   up, correct?

25   A.  Yes, sir.

NON-CERTIFIED COPY

Exhibit 5

Page 132

1      Q.  Do you know why they had to break it up

2   and repour it?

3      A.  No, sir.

4      Q.  And look at the Email on the front part,

5   the first page, and it is from Neal Johnson.

6   This is a continuation of all these, the string.

7          It says, "Ottis and Brad:  We need your

8   respond to your plan of correction action for

9   this work.  As of now, we would consider these

10  joints to be rejected as installed."

11         Do you see that?

12     A.  Yes, sir.

13     Q.  Do you know what joints are being

14  referenced there?

15     A.  No, sir.

16     Q.  Do you know what happened to those

17  rejected joints?

18     A.  No, sir.

19     Q.  Turn over to the next one.

20         Let me show you the next exhibit,

21  Exhibit 47, H&E 29709.

22         And that is from John Jones to Womack,

23  copying you.  And it says, "The board is

24  meeting" -- and this is November 2, 2012.  "The

25  board is meeting this morning and my

NON-CERTIFIED COPY

Exhibit 5

Page 133

1    understanding is they will break for lunch and

2    it is highly likely that they will come by the

3    site after lunch...."

4         Do you remember whether they did or

5    didn't?

6         A.  No, sir.

7         Q.  Do you remember accompanying any board

8    members to the site?

9         A.  No, sir.

10        Q.  The next exhibit is Exhibit 48, URS

11   49687.

12        This is from Johnny Jones to a number of

13   people, copying you.  It says, "Neal, I have

14   drawn off a section basically along the back

15   near the detention pond and then working around

16   the side by Corporate."

17        And there is an attachment of Baton

18   Rouge.  They were talking about -- he is talking

19   about Baton Rouge, right?

20        A.  Yes, sir.

21        Q.  "I would think we would just start

22   lining equipment across the back and then work

23   our way forward with 200 plus machines.  We may

24   end up further out than what I have depicted.

25   If they have to fix some of the sealing, can

NON-CERTIFIED COPY

Exhibit 5

1   that be done early this week?"

2       I assume he meant sealant?

3   A.  I don't know.

4   Q.  Do you recall?

5   A.  No, sir.

6   Q.  Do you recall whether there is any

7   sealant that had to be fixed by the contractor

8   at Baton Rouge?

9   A.  It is my recollection that there were

10  some areas that needed repair.  I think the

11  sealant had pulled out of the joint, is my

12  recollection.

13  Q.  And do you know which joints the sealant

14  had been pulled out of?

15  A.  No, sir.

16  Q.  That is between the construction joints

17  or the expansion joints, you don't know which?

18  A.  No, sir.  I don't recall.

19  Q.  Do you recall any issue about the

20  construction joints not even being cut to what

21  was specified in the drawings depth-wise?

22  A.  The construction joints?  Yes, sir.

23  Q.  And tell me what you recall about that.

24  A.  My recollection is that Womack --

25  Womack's understanding was that the construction

NON-CERTIFIED COPY

Exhibit 5

1    joints were to be cut at a depth one-fourth the

2    depth of the slab, and I believe URS's

3    interpretation was it should be a quarter of an

4    inch.

5         Q.  And do you recall anyone from URS saying

6    that?

7         A.  Yes, sir.

8         Q.  Who?

9         A.  Mr. Johnson.

10        Q.  He said it was supposed to be a quarter

11   of an inch?

12        A.  That is my recollection, yes, sir.

13        Q.  And did you all look at the plans and

14   specs while you all were discussing that?

15        A.  I don't recall.

16        Q.  When did that come up in the project?

17   After they had cut some of them or before they

18   started cutting any of them?  Do you recall?

19        A.  I don't recall.

20        Q.  Do you recall also there was an issue

21   that Womack wasn't even cutting them to a

22   quarter of an inch at some locations?

23        A.  I don't recall.

24        Q.  Who was present in the conversation when

25   Mr. Johnson stated that the construction joints

NON-CERTIFIED COPY

Exhibit 5

Page 136

1    were to be cut a quarter of an inch deep?

2        A.  I don't recall.  It was at one of the

3    progress meetings.

4        Q.  At one of the progress meetings?

5        A.  Yes, sir, I believe so.

6        Q.  And weren't there notes kept of the

7    progress meetings?

8        A.  I believe so, yes, sir.

9        Q.  Do you remember who from Womack raised

10   the question about whether that it should be a

11   quarter of the depth of the slab?

12       A.  I don't -- I don't recall who it was.

13       Q.  Do you recall any request for

14   information being submitted by the contractor,

15   Womack, concerning the depth of the construction

16   joints?

17       A.  I don't recall.

18       Q.  You know what a request for information

19   is, don't you?

20       A.  Yes, sir.

21       Q.  Let's look at the next exhibit, which is

22   Exhibit 49.

23            This is a string Emails, URS 57251, and

24   I want to focus on the bottom one on the first

25   page.

NON-CERTIFIED COPY

Exhibit 5

1          Stephan Dorsey sends to Neal Johnson,

2    copies you, Thomas Ryan, and says, "...Heck

3    Industries has forwarded the attached

4    correspondence to correspond to the failed

5    concrete cylinder breaks from last year."

6          And this is in connection with the Baton

7    Rouge site, obviously, because Womack is

8    involved, right?

9       A.  Yes, sir.

10      Q.  And then you send that to Neal and ask

11   him what does the engineer say.

12          I want to focus now on the statement by

13   Heck that is attached.  Look at the second

14   paragraph.  And he says, "With respect to the

15   low-psi breaks on the building slab, the

16   industry standard reads as follows:  'For

17   evaluating cylinder breaks, the strength of each

18   concrete mixture will be satisfactory if every

19   average of any three consecutive compressive

20   strength tests equals or exceeds specified

21   compressive strength, and no compressive

22   strength test value falls below specified

23   strength by more than 500 PSI."

24          Do you see that?

25      A.  Yes, sir.

NON-CERTIFIED COPY

Exhibit 5

Page 138

1      Q.  In the tests that were questioned, do

2  you know whether those tests, any of those tests

3  were more than 500 psi below 4,000 psi?

4      A.  No.

5      Q.  Do you know whether every average of any

6  of the consecutive compressive tests equals or

7  exceeds 4,000 psi?

8      A.  No.

9      Q.  All right.  Now we come to December of

10  2012.  I'm going to show you the next exhibit,

11  which is Exhibit 50, H&E 20068.

12         This is from Johnny Jones and it copies

13  you, to Neal and Thomas Ryan.  It says, "Neal, I

14  need your presence here in the facility in short

15  order.  The executive group is very upset with

16  the parking situation.  We have 142 parking

17  spaces, including the guest parking by the

18  flagpoles and 6 handicap places for a total of

19  148.  We currently have 153 people in the office

20  here...  we need to determine some resolution

21  quickly."

22         Do you see that?

23      A.  Yes, sir.

24      Q.  What happened?  What generated this?

25      A.  What generated it?

NON-CERTIFIED COPY

Exhibit 5

1      Q.  Yes.

2      A.  I don't understand the question.

3      Q.  Okay.  What was the reason Johnny Jones

4  sent this Email?  What happened?

5      A.  Because we ran out of parking spots for

6  the people.

7      Q.  Who raised that issue?

8      A.  I wasn't finished answering the

9  question.

10      Q.  Sorry about that.

11      A.  We ran out of parking spots and we had

12  more employees with no place to park.

13      Q.  Who raised that issue for the first time

14  at H&E?

15      A.  I think John Engquist did.

16      Q.  And how did he raise it?

17      A.  How did he raise it?

18      Q.  Was he upset?

19      A.  Absolutely.

20      Q.  Did he curse?

21      A.  I don't recall what he said.

22      Q.  You don't?

23      A.  No, sir.

24      Q.  Was he angry at anyone at H&E?

25      A.  He was angry at anybody that got in his

NON-CERTIFIED COPY

Exhibit 5

Page 140

1    way.

2        Q.  Okay.  And how did he discover that

3    there was not enough parking?  Did he say?

4        A.  I believe he got a call, a text, or

5    Email from the CFO.  When she got to the

6    building, she couldn't find a place to park.  I

7    believe that is what happened.

8        Q.  And that is what led to this Email, you

9    believe?

10       A.  Yes, sir.

11       Q.  Is that an accurate number that you

12   currently have, 153 people in the office?

13       A.  I don't know.  I didn't count them.

14       Q.  Okay.  And we will follow this along.

15           Did you URS show up for a meeting that

16   day or the next day?

17       A.  Within a day or two.  I don't recall how

18   long it was.

19       Q.  Well, did you attend that meeting?

20       A.  Yes, sir.

21       Q.  Was Mr. Engquist there?

22       A.  Yes, sir.

23       Q.  How did he react at that meeting?

24       A.  He was still angry.

25       Q.  Was he cursing?

NON-CERTIFIED COPY

Exhibit 5

1      A.  I don't recall what was said.

2      Q.  Yelling?

3      A.  He probably raised his voice, yes, sir.

4      Q.  Did anybody from H&E at that time tell

5   Mr. Engquist or anybody at the meeting that you

6   all had reviewed the plans about how many

7   parking spaces were supposed to be constructed?

8      A.  No.

9      Q.  Nobody raised that issue at that time

10  about H&E reviewing the plans, correct?

11     A.  No.

12     Q.  Did anyone after that meeting tell

13  Mr. Engquist that they had the opportunity to

14  review the construction plans for the parking

15  spaces?

16     A.  Well, you have to understand that the

17  number of people in the building changed during

18  the course of the construction, and Johnny Jones

19  had a spreadsheet.  Every individual, every work

20  station was labeled.

21         That information was given to URS and to

22  Becky Walker.  So everybody was aware of what we

23  needed, plus there was also a thought, the

24  understanding there would be enough parking

25  spots for 30 percent growth.

NON-CERTIFIED COPY

Exhibit 5

Page 142

1      Q.  How many parking spaces were in the

2  plans?

3      A.  I don't recall.

4      Q.  Let's take a look.

5          MR. FRANCO:

6              Off the Record.

7          (Off the Record.)

8  EXAMINATION BY MR. FRANCO:

9      Q.  I'm going to show you what is labeled as

10  "Before construction plans" for the Baton Rouge

11  facility.  Okay?

12     A.  Okay.

13     Q.  Now, we have agreed we are not going to

14  attach this to the deposition, but I want to

15  look at Drawing C-201.

16          Now, my eyes aren't what they used to

17  be.  This is a condensed version of those plans.

18  The actual plans are much larger than this for

19  the Jury, correct?

20     A.  Right.

21     Q.  All right.  Can you tell me on this plan

22  how many parking spaces it shows?

23     A.  For which area?

24     Q.  For the headquarters part.  It shows

25  parking for both the headquarters and the

NON-CERTIFIED COPY

**Exhibit 5**

Page 143

1    branch.

2        A.  Right.  It looks like -- it looks like

3    147 spaces.

4        Q.  And what about the eight spaces

5    underneath that?

6        A.  Is that eight or 6?  I think that is --

7        Q.  That is either six or eight.  Can we

8    agree on that?

9        A.  Yes.  Handicap.

10       Q.  Okay.  Handicap.

11           So in looking at these plans, you didn't

12   have to go to the drawings and count these

13   number of spaces in the parking area.  It tells

14   you and lists how many parking spaces to be

15   constructed, correct?

16       A.  Correct.  Yes, sir.

17       Q.  And these were the plans that you and

18   other people at H&E were given to review,

19   correct?

20       A.  Yes, sir.  Uh-huh (affirmative

21   response).

22       Q.  Okay.

23       A.  And I'll say again, those numbers

24   changed.

25       Q.  And when those numbers changed, did

NON-CERTIFIED COPY

Exhibit 5

Page 144

1    anyone from H&E call to URS's attention that the

2    parking area should be changed before it was

3    constructed?

4        A.  No.

5        Q.  And that day that this Email was done,

6    December 17, 2012, to your memory, that is the

7    day that, apparently, John Engquist found out

8    about the parking spot issue, correct?

9        A.  Yes, sir.

10       Q.  All right.  Did you go out and look at

11   the parking lot that day?

12       A.  I saw the parking lot, yes, sir.

13       Q.  Did you see any construction workers'

14   vehicles parked on that lot at the headquarters

15   building?

16       A.  I don't think I was able to distinguish

17   between an employee's vehicle or a subcontractor

18   or a construction worker's.

19       Q.  Well, there were contractors working at

20   the site, at the Baton Rouge site that day,

21   weren't there?

22       A.  I'm not aware of that.

23           MR. BARRIERE:

24               Object to form.

25   EXAMINATION BY MR. FRANCO:

NON-CERTIFIED COPY

Exhibit 5

Page 145

1    Q.  Do you recall telling Mr. Johnson that

2  that day you observed over 40 trades people in

3  their trucks finishing the work, which

4  contributed to the parking issue?

5    A.  No, sir.

6    Q.  Now, when you went out there, did you

7  see any trucks parked on the parking lot at the

8  headquarters building?

9    A.  I don't recall what type vehicles.  I'm

10  sure there were passenger vehicles, there were

11  trucks, cars.

12    Q.  So you couldn't tell whether any of

13  those vehicles were contractor's vehicles or

14  staff vehicles, could you?

15    A.  Not unless there was a name on the side

16  of the vehicle.  I could have --

17    Q.  Right.

18    A.  -- distinguished by that.

19    Q.  Right.  If there wasn't a name, if it

20  was just a worker, and didn't have the name of

21  the Company on the side of the vehicle, you

22  couldn't tell if that vehicle was a staff

23  vehicle or a construction worker vehicle,

24  correct?

25    A.  Probably not.

NON-CERTIFIED COPY

Exhibit 5

1    Q.  And there wasn't any sign posted for

2  construction workers not to park in the

3  headquarters parking lot, was there?

4    A.  No.

5    Q.  There never had been a sign, correct?

6    A.  No.

7    Q.  And as a result of what happened that

8  day, there were no signs subsequently erected,

9  correct?

10    A.  Correct.

11    Q.  And did you advise any of the

12  contractor's superintendents that they were not

13  allowed to have their people park in that

14  parking lot?

15    A.  I advised them to park in the rear area

16  of the parking lot.

17    Q.  Of the headquarters parking lot?

18    A.  Yes, sir.

19    Q.  So, in fact, you allowed the contractors

20  to park in part of the parking area for the

21  Baton Rouge headquarters?

22    A.  They had no other place to park, sir.

23    Q.  Okay.  I understand.  I'm not trying to

24  say that is a fault or not fault.  I'm just

25  asking you the questions.  Okay.

NON-CERTIFIED COPY

Exhibit 5

Page 147

1          Now, I can save us a lot of time,

2     because I know the answer to this.  I just want

3     to make sure.

4          After that problem was called to the

5     attention of URS, that there was not sufficient

6     parking, URS redesigned the parking area,

7     correct?

8          A.  Yes, sir.

9          Q.  More than one time.  There were a couple

10    of different reiterations it went through,

11    right?

12         A.  Yes, sir.

13         Q.  And, ultimately, a Phase I and a Phase

14    II was designed for additional parking?

15         A.  Correct.

16         Q.  And, eventually, H&E constructed Phase

17    I, correct?

18         A.  We had it constructed.  We didn't

19    construct it.

20         Q.  You had it constructed by Womack, I

21    presume?

22         A.  Yes.

23         Q.  And it has not gone forward with Phase

24    II?

25         A.  Correct.

NON-CERTIFIED COPY

Exhibit 5

Page 148

1    Q.  Correct.

2         How long did it take for the additional

3    parting spaces to be constructed?

4    A.  I don't recall.

5    Q.  Was it weeks?

6    A.  I don't recall.

7    Q.  Where did the people in the staff office

8    park before the additional spaces were added?

9    A.  I believe we had them parking at the

10   branch.

11   Q.  How many spaces were at the branch?  Do

12   you recall, roughly?  I can look at the plans

13   again.  Do you recall?

14   A.  No, sir.

15   Q.  Was it more than 20?

16   A.  Probably.

17   Q.  In fact, why don't we pull those plans

18   up real quickly.  Just tell me what the number

19   is, will you?

20        MR. BARRIERE:

21            At the branch?

22        MR. FRANCO:

23            At the branch.

24        MR. BARRIERE:

25            We can look at them again, but it is

NON-CERTIFIED COPY

Exhibit 5

1  28 cars parked.

2      MR. FRANCO:

3          28?

4      MR. BARRIERE:

5          Well, 27 and 2.

6      MR. FRANCO:

7          27, plus 2 handicapped?

8      MR. BARRIERE:

9          Yes.

10  EXAMINATION BY MR. FRANCO:

11     Q.  Would you accept the fact that there

12  were 27 parking spaces and two handicap at the

13  branch building?

14     A.  I won't dispute that.

15     MR. FRANCO:

16         Off the Record.

17     (Off the Record.)

18  EXAMINATION BY MR. FRANCO:

19     Q.  You would admit or acknowledge, Mr.

20  Wynn, that there was only a certain amount of

21  space that could be used at the Pecue site for

22  all the things that H&E wanted at that site,

23  correct?

24     A.  I would agree that there is only a

25  limited space, yes, sir.

NON-CERTIFIED COPY

Exhibit 5

1      Q.  Right.  And I believe the additional

2   parking that was added was 52 spaces?  Let's

3   see.  Let's make sure of that.  All right.

4           I am going through the Emails that says

5   this will not work and this will not work and

6   this will not work, so just bear with me a

7   second.  All right.

8           H&E 20851 -- yes.  Go all the way to

9   20851, January 8, 2013.

10          I'm going to show you the next exhibit,

11  Exhibit 51, which is H&E 20851.  And this

12  appears to be the final plan.  If you look at

13  20853, Page 1, page 2.

14          So 52 new parking spaces were added

15  according to Page 1.

16      A.  Okay.

17      Q.  Is that accurate, to the best of your

18  knowledge?

19      A.  Yes, sir.

20      Q.  Now, those new 52 spaces took up space,

21  obviously, at the site, didn't they?

22      A.  Yes, sir.

23      Q.  They would have taken up space if they

24  were originally there, wouldn't they have?

25      A.  Well, the footprint of the Corporate

NON-CERTIFIED COPY

Exhibit 5

Page 151

1    building could have been changed.

2        Q.  How?

3        A.  Could have made it smaller, made it more

4    than two floors.

5        Q.  Okay.  And if you do more than two

6    floors, it is more expensive to go up, isn't it?

7        A.  I would assume so.

8        Q.  And one of the things that H&E was

9    concerned about throughout the process of all

10   three projects is "How much is this going to

11   cost us?"  Fair statement?

12       A.  We are always concerned about how much

13   something is going to cost.

14       Q.  All right.  We will get to the cost

15   later.

16           Now, with respect to the mailroom

17   layout --

18           MR. BARRIERE:

19               If we are going to switch topics,

20   let's take a few minutes.

21           MR. FRANCO:

22               Okay.  That is fine.

23           (Recess held.)

24   EXAMINATION BY MR. FRANCO:

25       Q.  I want to switch gears to the mailroom

NON-CERTIFIED COPY

Exhibit 5

Page 152

1    millwork.  I'm going to show you the next

2    exhibit, which is labeled as Exhibit 52.  Its

3    H&E 20538.

4          This is a series of Emails and the one I

5    wanted to focus on, this talks about the

6    redesign of the mailroom, and then at the top of

7    the second page, Brad Barber tells you, "Let URS

8    know right now they will be responsible for the

9    full cost of this mistake on their part."

10   Correct?

11       A.  Correct.

12       Q.  And you forward that to Neal and Thomas,

13   as you were directed to do, correct?

14       A.  Correct.

15       Q.  And Neal responds to both you and Johnny

16   Jones and he says, "The mailroom millwork and

17   layout design and construction documents were

18   presented and approved by H&E over two years

19   ago."

20          Is that accurate?

21       A.  I would think so, yes.

22       Q.  And it says, "...URS is currently

23   providing all redesign services to H&E for any

24   and all of the current requested modifications

25   at no charge."

NON-CERTIFIED COPY

Exhibit 5

Page 153

1          Was that accurate, to your knowledge?

2     A.  I believe so.

3     Q.  Okay.  Now, Brad Barber, did he look at

4  any of the construction documents?  Do you know?

5     A.  I don't know.

6     Q.  But you did and Johnny Jones did at

7  certain times, correct?

8     A.  Yes, sir.

9     Q.  Back to the before construction

10  drawings.  I'll look at Drawing A, 402A.  Do you

11  see the mail slot --

12     A.  Yes, sir.

13     Q.  -- depicted on that document?

14     A.  Yes, sir.

15     Q.  And it has dimensions on it, does it

16  not?

17     A.  I believe so, yes, sir.

18     Q.  I can't read those dimensions on this

19  reduced copy, but on the bigger picture, you

20  could read the dimensions.  Fair statement?

21     A.  Yes, sir.

22     Q.  Were those mail slot dimensions ever

23  requested to be changed before they were

24  constructed?

25     A.  No, sir.

NON-CERTIFIED COPY

Exhibit 5

Page 154

1     Q.  Let me show you another exhibit, which I

2   will label as Exhibit 53.  It is H&E 22251.

3         Johnny Jones says at the top, "...we

4   should have counted the slots and determined

5   what is required...."

6         Do you know what he meant by that?

7     A.  No, sir.

8     Q.  Let me show you the next exhibit.

9     MR. BARRIERE:

10        Bear with me one second.

11    MR. FRANCO:

12        Sure.

13    (Off the Record.)

14  EXAMINATION BY MR. FRANCO:

15    Q.  I'll show you the next exhibit, Exhibit

16  54, which is H&E 21025.

17        At the bottom of the first page is an

18  Email from Brad Reese at MAPP to you and Neal,

19  and then you forward this to Johnny Jones about

20  Kenner remaining items, correct?

21    A.  Yes.

22    Q.  Now, on this list of remaining items, if

23  you look at the middle of the first page, it

24  says "Punch," and that is Punch List Item 54,

25  55, 56, 57.  Do you see that?

NON-CERTIFIED COPY

Exhibit 5

1    A.  Yes, sir.

2    Q.  And it says, "Detailed expansion joint

3 at..." and there is different locations for

4 those four entries.

5       Do you see that?

6    A.  Yes, sir.

7    Q.  What had to be done at those expansion

8 joints according to this punch list, in your

9 understanding?

10    A.  I don't know.

11    Q.  Was any work ultimately done on those

12 expansion joints as a result of this punch list?

13    A.  I don't know.

14    Q.  Did H&E, to your knowledge, pay MAPP for

15 the amounts MAPP claimed were due as a result of

16 the Kenner project?

17    A.  Yes.

18    Q.  Despite the fact that there were certain

19 items in the punch list that were not remedied?

20    A.  For example?

21    Q.  Expansion joints or concrete?

22    A.  Yes.

23    Q.  Why did H&E pay MAPP despite the fact

24 that there were items involving the concrete

25 that remained on the punch list?

NON-CERTIFIED COPY

Exhibit 5

1      A.   I would assume that we paid what URS

2   recommend we pay.

3      Q.   Do you know that?

4      A.   That was the procedure that we used,

5   that we paid the general contractors what URS

6   recommended.

7      Q.   Okay.  And if URS recommended

8   contractors be paid, what happened to the punch

9   list items that remained?  Was that not an item

10  that URS said had to be completed?

11     A.   I don't recall.

12     Q.   In the normal course of these projects,

13  it was your understanding that if it was on a

14  punch list, that it had to be remedied.  Fair

15  statement?

16     A.   I'm not sure if every single item on

17  every project on a punch list was satisfied.

18  Some of them were just accepted.

19     Q.   All right.  With all respect, that

20  wasn't my question, so let me make sure you

21  understand.

22     A.   Okay.

23     Q.   What is the normal purpose of the punch

24  list?

25     A.   To detail items that aren't complete.

NON-CERTIFIED COPY

Exhibit 5

Page 157

1    Q.  That need to be completed?

2    A.  Yes, sir.

3    Q.  And who generally participates in the

4    punch list or, more particularly, who

5    participated in the punch lists on these

6    projects?

7    A.  URS and the general contractor.

8    Q.  Okay.  So if it was on the punch list,

9    then you would assume that URS and the

10   contractor agreed that it was a punch list item,

11   correct?

12   A.  Yes, sir.

13   Q.  And so can you explain then why there

14   were items on the punch list that were not

15   corrected at Kenner?

16   A.  Well, I would have to go back to the

17   original answer there.  I would assume we paid

18   what URS recommended we pay.

19   Q.  Okay.  Do you recall any discussions

20   about paying for items that were on the punch

21   list?

22   A.  No.

23   Q.  Let me show you the next document, which

24   I'm going to label as Exhibit 55, and this is

25   H&E 55262.

NON-CERTIFIED COPY

Exhibit 5

1          At the time I put these exhibits

2  together, that is not the complete document.

3  There is a bunch of documents that go with this.

4  I'll represent that to you.

5          The purpose that I wanted to get from

6  this document is that this is your signature on

7  it, am I correct?

8     A.  Yes, sir.

9     Q.  On behalf of H&E?

10    A.  Yes, sir.

11    Q.  And it says, "The Owner accepts the Work

12 or designated portion as substantially complete

13 and will assume full possession at 8:00 on

14 December 17, 2012," correct?

15    A.  Okay.

16    Q.  Now, I am recalling this, but do you

17 recall that attached to this document -- I'm

18 sorry.  What facility does this reference for

19 the Record?

20    A.  The project is H&E headquarters and

21 branch buildings.

22    Q.  Now, attached to this document is

23 normally a punch list, isn't there?  Do you

24 recall that?

25    A.  I don't recall what was attached to it.

NON-CERTIFIED COPY

Exhibit 5

1     Q.  All right.  That is my fault for not

2  including the whole document.

3          That date of December 17, 2012, happens

4  to be the same date that the issue of the

5  parking lot came up.  Do you recall that?

6     A.  Yeah, those are the same dates.

7     Q.  Did H&E pay Womack for all amounts that

8  Womack claimed were due?

9     A.  We paid Womack what URS recommended we

10  pay.

11    Q.  And, again, it is the same question.

12         As I understand it, Mr. Wynn, tell me if

13  this is the way it went:  You would get a

14  certificate of substantial completion, which the

15  architect and the contractor would sign off on,

16  present it to you for signature, and after

17  confirming with the architect, you would sign

18  it, correct?

19    A.  If they recommended it, yes, sir.

20    Q.  But attached to this to be done, even

21  though there was substantial completion, is

22  normally a punch list, isn't there?

23         Isn't that what substantial completion

24  is, substantially complete, and then there are

25  punch list items that are necessary usually to

NON-CERTIFIED COPY

Exhibit 5

Page 160

1    be done after substantial completion?  That is

2    the normal way it works, right?

3        A.  I agree.

4        Q.  So there is an amount in this document

5    to be paid subject to completion of the punch

6    list.  That is the normal way it works, right?

7        A.  I agree.

8        Q.  Now, I showed you a punch list for

9    Kenner involving expansion joints, and as you

10   sit here, you don't know whether any of that

11   work on the expansion joints was done, correct?

12       A.  I don't recall.

13       Q.  And you can't tell me if there was any

14   work on the punch list items at either Kenner or

15   Baton Rouge or Belle Chasse, for that matter,

16   which have not yet been completed, can you --

17       A.  No.

18       Q.  -- as you sit here?

19       A.  No.

20       Q.  Let me show you the next exhibit, which

21   is Exhibit 56, which is H&E 22314.

22           You are attaching some photos, sending

23   them to Stephan Dorsey at Womack in reference to

24   Baton Rouge, correct?

25       A.  Yes, sir.

NON-CERTIFIED COPY

Exhibit 5

1    Q.  And this is the drain area.  I assume

2  there is that more than one drain area at the

3  Baton Rouge site?

4    A.  Yes, sir.

5    Q.  So this is one of the drain areas at the

6  Baton Rouge site, correct?

7    A.  Yes, sir.

8    Q.  What was your conclusion as to why this

9  cracking appeared at that location?

10    A.  I have no idea.

11    Q.  Okay.  Did anyone tell you what they

12  thought the reason for this cracking and

13  separation was?

14    A.  I don't recall if there was an

15  explanation.

16    Q.  Was that area redone in Baton Rouge, to

17  your knowledge?

18    A.  Yes, I believe so, if -- I think this

19  was the first drain that we saw some problems

20  with.  It was -- it was redone more than once.

21    Q.  Okay.  And I'm sorry.  I forgot what you

22  just told me.

23        Was there more than one drain?

24    A.  Yes, sir.

25    Q.  Was the work that was done more than

NON-CERTIFIED COPY

Exhibit 5

Page 162

1   once on the same drain?

2        A.  Yes, sir.

3        Q.  Did the other drain require any -- how

4   many drains were there, do you recall?

5        A.  I think there is seven.

6        Q.  Was the same work necessary for the

7   other drains?

8        A.  No.

9        Q.  This was the only one that failed?

10       A.  No.  There were at least two that

11  failed.

12       Q.  And were those corrected?

13       A.  They were patched, yes, sir.

14       Q.  By whom?

15       A.  Womack.

16       Q.  Both of them?

17       A.  Yes, sir, or a subcontractor for Womack.

18       Q.  Did the other one require more than one

19  rework?

20       A.  I don't recall.

21       Q.  Are these drains in this condition today

22  as depicted in this picture?

23       A.  No.

24           MR. BARRIERE:

25               Phil, if you are about to switch

NON-CERTIFIED COPY

Exhibit 5

1   gears, let me tell you what I have, just to make

2   certain, St. Germain's deposition is here on

3   Friday.

4        MR. FRANCO:

5            Yes.  Thank you.  I just asked my

6   paralegal about running through the operation,

7   the same thing.

8   EXAMINATION BY MR. FRANCO:

9        Q.  I'm going to show you the next exhibit,

10  which I'll label as Exhibit 57, which is H&E

11  22871.

12           This was the authorization for Womack to

13  do the Phase I parking addition.  Okay?

14       A.  Okay.

15       Q.  Can you tell me on the attached sheet

16  what of those charges would have been necessary

17  if the parking had originally been put in place

18  with the rest of the construction of the parking

19  area?

20       A.  I cannot.

21       Q.  Do you know anybody who has done that?

22       A.  No.

23       Q.  Did you ask anybody to do that?

24       A.  No, sir.

25       Q.  Did anybody at H&E ask anybody to do

NON-CERTIFIED COPY

Exhibit 5

Page 164

1    that, to your knowledge?

2        A.  No, sir.

3        Q.  Let's look at the next document, which

4    is Exhibit 58, which is H&E 37939.

5            Let's start off at the bottom.  Brad

6    Reese at MAPP sends to you and Neal and Thomas

7    an Email that says, "...our subcontractor

8    proposes the following solution to the concrete

9    areas in need of repair."

10            Do you see that?

11       A.  Yes, sir.

12       Q.  Do you recall this?

13       A.  Maybe not this specific Email, but I

14   recall us talking about what the possible

15   remedies would be.

16       Q.  And then you asked for the name of the

17   subcontractor, and it was Maintenance Protection

18   Systems that would allegedly do this work,

19   right?

20       A.  Correct.

21       Q.  Is it fair to say that in general what

22   was recommended was that certain epoxy products

23   be used to fix the crack repairs and the joint

24   repairs?  Is that a fair statement.  Is that a

25   fair summary?

NON-CERTIFIED COPY

Exhibit 5

Page 165

1      A.  What was the question again?

2      Q.  Is it a fair summary that these were

3  basically epoxy repairs?

4      A.  It talks about the sealant in the

5  joints; it talks about general crack repair in

6  the paving, the building.

7      Q.  Agreed.  It addresses those three

8  issues, cracks in the pavement, control joint

9  issues and expansion joint issues.  And I

10  understand that.

11      The question is:  Did you understand

12  this to be an epoxy product that would be put in

13  the joints and the cracks to fix them?

14      A.  I believe that is correct, yes, sir.

15      Q.  Okay.  Why wasn't this repair done?

16      A.  I don't know if it was ever approved by

17  URS.  Now, I believe that -- and I'm not sure if

18  it was this product, but there were some epoxy

19  -- a different type of epoxy used at the

20  transition joints from where the -- from the

21  parking out into the yard.  It was a transition

22  area that a different type of epoxy was used.

23      Q.  In the joints?

24      A.  In the joints?  Yes, sir.

25      Q.  And that was original construction or

NON-CERTIFIED COPY

Exhibit 5

Page 166

1   was that a fix?

2       A.  No.  I think that was a fix.

3       Q.  And who approved that?

4       A.  It would have had to have been approved

5   by URS.

6       Q.  You are assuming that, or do you know?

7       A.  I'm assuming that because -- yes, I'm

8   assuming that.

9       Q.  Was it the same epoxy?

10      A.  I'm not sure.

11      Q.  Okay.  And that was a relatively small

12  area?

13      A.  Yes, sir.

14      Q.  What was the need for it?  What does it

15  do?  The joints in that area were spalling?

16      A.  At the joint, the concrete was actually

17  crumbling off.

18      Q.  At the transition between the service

19  building and the --

20      A.  Apron.

21      Q.  -- apron?

22      A.  Yes, sir.

23      Q.  Do you know who paid for that?

24      A.  No, I don't.

25      Q.  Do you know what the conclusion was as

NON-CERTIFIED COPY

Exhibit 5

1    to why that was spalled at that location?

2        A.  No.

3        Q.  Did that area involve heavy-track

4    equipment?

5        A.  Yes, sir.

6        Q.  Do you recall that MAPP was looking to

7    H&E to pay for the epoxy suggested repair, and

8    that was one of the reasons why H&E did not

9    agree to go forward with that repair?

10       A.  I don't recall that, no, sir.

11       Q.  All right.  Let me show you the next

12   exhibit, Exhibit 59, which is H&E 32308.

13           Look at your Email right in the middle.

14   It says, "In other words, MAPP is looking to us

15   for the cost to repair the paving in Kenner."

16           And this goes back to the string which

17   includes the same Email we spoke about that

18   suggested the epoxy.

19           Does that refresh your memory?

20       A.  No, sir.

21       Q.  All right.  But you are not denying

22   that, at least from your perspective?  You are

23   saying, "MAPP is looking to us for the cost to

24   repair the paving in Kenner," correct?

25       A.  Yes, sir.

NON-CERTIFIED COPY

Exhibit 5

Page 168

1    Q.  And then you tell Johnny Jones, "MAPP

2    says they installed per specs," correct?

3    A.  Correct.

4    Q.  Let me show you the next document I'll

5    label as Exhibit 60.  It is URS 51379.

6         I'm going to focus on -- this is a

7    letter to you from MAPP, and it obviously

8    references the Kenner project.

9         And it says at the end of the first

10   paragraph, "...we have reviewed the punch list

11   and have the following comments and

12   clarifications."

13        Do you see it says "Site & Paving"?

14   A.  Yes, sir.

15   Q.  No. 3 says, "The catch basin was

16   installed per the contract documents."

17        Do you see that?

18   A.  Yes, sir.

19   Q.  The catch basin had to be redone, didn't

20   it?

21   A.  I believe so.

22   Q.  And that was redone at the expense of

23   whom, do you know?

24   A.  I don't recall.

25   Q.  It also says, "The joints and concrete

NON-CERTIFIED COPY

Exhibit 5

Page 169

1    paving were installed per the contract

2    documents," correct?

3        A.  Correct.

4        Q.  But No. 3, to your knowledge, was not

5    accurate, was it, that "the catch basin was

6    installed per the contract documents," was it?

7        A.  I don't know.

8        Q.  You are familiar with the problem with

9    the executive wall panels?

10       A.  Yes, sir.

11       Q.  And what was your position in connection

12   with that problem?

13       A.  I don't understand the question.

14       Q.  Okay.  What happened with the wall

15   panels in the executive area?

16       A.  The paneling delaminated.

17       Q.  And what was your understanding was the

18   reason that happened?

19       A.  I'm not sure if I ever understood what

20   caused it.

21       Q.  Let me show you Exhibit 61, which is H&E

22   24328.

23           And, again, you can read the whole

24   thing, but I want to focus on Page 2, Mr. Wynn.

25       A.  Okay.

NON-CERTIFIED COPY

Exhibit 5

Page 170

1      Q.  At the bottom, your Email to Brad

2   Barber, Johnny Jones, Leslie Magee, Thomas Ryan,

3   and Neal Johnson, "Proposal for Executive Wall

4   Panels" is the subject, and it says, "Attached

5   is Womack's proposal for the executive area wall

6   panels.  I have explained to Phillip with Womack

7   that H&E's position is this is an installation

8   problem and not a design problem."

9          That is your statement, correct?

10     A.  Yes, sir.

11     Q.  How did you come to that opinion?

12     A.  That is what I was told by URS.

13     Q.  But that Email was April 4, 2013, and

14   you send a copy of that to Neal Johnson, and he

15   responds by saying, "Not familiar with specifics

16   of this effort...is anyone designing or

17   detailing this installation?"

18          And, in fact, if you look further, on

19   April 16, Mr. Johnson says, "Frankie, we are not

20   aware of any assertion or allegation..."  And I

21   assume that means of design defect.

22          Do you see that?

23     A.  Where is that?

24     Q.  Right on the first page.

25     A.  Yes, sir, I see it.

NON-CERTIFIED COPY

Exhibit 5

1      Q.  So if Mr. Johnson is telling you he is

2   not even aware of an assertion of a design

3   defect on April 16, how could he have told you

4   this was not a design problem back on April the

5   4th?

6      A.  Well, I'm saying it is not a design

7   problem and he is saying it is not a design

8   problem.

9      Q.  He is saying he wasn't aware of an

10   assertion or allegation that it was a design

11   problem.  So if he is saying he wasn't even

12   aware there was an allegation of a design

13   problem, how could he have told you it wasn't a

14   design problem on Aril the 4th?

15      A.  I thought we were talking about what the

16   problem was, an installation problem.

17      Q.  Well, no.  What we were talking about is

18   you said back on April 4th that you reached that

19   position that it was not a design problem

20   because that is what URS told you.

21          And Neal Johnson, 12 days later is

22   saying he wasn't aware of any assertion or

23   allegation of a design problem with respect to

24   the wall panels.

25          So how could he have told you that it

NON-CERTIFIED COPY

Exhibit 5

1    was not a design problem before he was aware of

2    an assertion or allegation of a design problem?

3        A.  I don't know.

4        Q.  Mr. Wynn, I didn't ask you this, but as

5    a result of Mr. Engquist's reaction to the

6    parking spaces, do you recall an instruction

7    from him that URS should not be paid any further

8    invoices?

9        MR. BARRIERE:

10           Object to the form of the question.

11       THE WITNESS:

12           I'm not sure of the timing, but he

13   did direct me and the Accounting Department at

14   some point in time not to pay any more URS

15   invoices.

16   EXAMINATION BY MR. FRANCO:

17       Q.  To help refresh your memory, in terms of

18   timing, would that have been in the beginning of

19   2013, if the issue -- let's do it this way:

20           The issue of the parking lot arose on

21   December 17, 2012.  Do you know about when that

22   instruction came to you?

23       A.  No.

24       Q.  But is it fair to say it would have been

25   in January of 2013?

NON-CERTIFIED COPY

Exhibit 5

1     A.  I'm okay with that.

2     Q.  Just by coincidence, I'll get to the

3  next exhibit, which is Exhibit 62, H&E 4354.

4         And this is an Email from Brad Barber to

5  URS people copying you, and it says, "We have

6  had more than one vendor URS contracted with

7  come to us and ask for direct payment.  Why is

8  URS not paying the vendors they used on our

9  project?"

10         Do you know the answer to that?

11     A.  They weren't paying the subcontractors

12  because we weren't paying them, was my

13  understanding.

14         MR. FRANCO:

15             Skip the next one.  Skip the next

16  one.

17  EXAMINATION BY MR. FRANCO:

18     Q.  Let's do the next one.  Exhibit 63 will

19  be H&E 24757.

20         This is at the top an Email from you to

21  Womack and URS, and it says, basically, "...it

22  would be fruitless to perform a 'final'

23  walkthrough at this time," correct?

24     A.  Yes, sir.

25     Q.  And this is in connection with the Baton

NON-CERTIFIED COPY

Exhibit 5

1    Rouge project, obviously, because it involves

2    Womack, right?

3        A.  Yes, sir.

4        Q.  Did you talk to anybody else at H&E

5    about that position before you conveyed it on,

6    or was that simply your decision?

7        A.  I don't recall that.  I would have

8    assumed that I would have a conversation with

9    probably Johnny Jones, and Johnny would have had

10   a conversation with Brad or John Engquist.

11       Q.  All right.  And what is normally the

12   reason for the final walkthrough?

13       A.  To complete the project.

14       Q.  To see if the punch list items were

15   completed; is that correct?

16       A.  Yes, sir.

17       Q.  So did you ever do a final walkthrough?

18   I mean, this says it would be fruitless, so my

19   follow-up question is:

20           Did you ever do a final walkthrough on

21   the headquarters Baton Rouge project?

22       A.  I don't recall.

23       Q.  But you pay Womack what Womack

24   requested?

25       A.  If it was approved by URS, yes, sir.

NON-CERTIFIED COPY

Exhibit 5

1    Q.  Now, URS approves, that is a completion,

2  correct?

3    A.  Yes, sir.

4    Q.  They don't make a subsequent approval

5  after the punch list items, do they, for paying

6  any money?

7        MR. BARRIERE:

8            Object to the form of the question.

9        THE WITNESS:

10            I don't recall.

11  EXAMINATION BY MR. FRANCO:

12    Q.  Do you recall if any money was held out

13  because of punch list items on the Baton Rouge

14  or Kenner projects?

15    A.  Yes, I believe it was.

16    Q.  Do you recall if that money was paid

17  over to Womack or MAPP?

18    A.  It eventually was, yes, sir.

19    Q.  Did that have URS sign off on it?

20    A.  I don't recall.

21    Q.  The epoxy that was used at the

22  transition joint by the service area, was that

23  in Baton Rouge or Kenner?

24    A.  Kenner.

25    Q.  In Kenner.

NON-CERTIFIED COPY

Exhibit 5

1          Did you have a subsequent conversation

2   with either MAPP or Womack about using that same

3   repair for any of the other joints at either of

4   the facilities?

5        A.  I don't recall, but it is possible.  We

6   were trying to figure out what could be done.

7        Q.  But if you don't recall the

8   conversation, then you don't recall the result

9   of the conversation, do you?

10       A.  No, sir.

11       Q.  But we can say that no repairs were done

12  to those other joints at either site by H&E or

13  anybody else.  Is that a fair statement?

14       A.  At which other sites?

15       Q.  Both.  Both, Baton Rouge and Kenner.

16       A.  Could you restate the question?

17       Q.  Yes.  I would be glad to.  I'm sorry.

18  That was a long question.

19          Other than that transition joint you

20  talked about, there were no repairs made to any

21  of the joints at Baton Rouge or Kenner by H&E or

22  by any of the contractors; is that correct?

23       A.  There was a metal -- or metal plates, a

24  plate or plates installed at the same transition

25  area in Baton Rouge at the service department.

NON-CERTIFIED COPY

Exhibit 5

1    Q.  And who did that work?

2    A.  I think Womack did that.

3    Q.  At whose request?

4    A.  I think we had -- H&E had asked either

5  Womack or URS, I don't recall, if there was a

6  fix for that problem.

7    Q.  At the transition?

8    A.  Yes.  Going from the service bay to the

9  apron.

10    Q.  At Baton Rouge --

11    A.  At Baton Rouge.

12    Q.  -- we are talking about now?

13    A.  Yes.

14    Q.  And you are saying somebody other than

15  H&E suggested a steel plate?

16    A.  Yes, sir.

17    Q.  You don't if it was URS or Womack?

18    A.  I don't recall.

19    Q.  Was it anybody other than potentially

20  Womack or URS?  Some other expert of some kind

21  or some other contract?

22    A.  I don't recall.

23    Q.  Were you involved in that inquiry --

24    A.  Yes.

25    Q.  -- discussion?

NON-CERTIFIED COPY

Exhibit 5

1    A.  Yes, sir.

2    Q.  And what kind of metal plate was

3  installed at that transition joint?

4    A.  I'm not sure what the metal was.

5    Q.  Did you request a mockup of that before

6  it was done or a drawing?

7    A.  I don't recall.

8    Q.  Do you remember if Mr. McCullough

9  offered some type of metal plate over the joints

10  in the Baton Rouge area at some point in time?

11    A.  In which areas?

12    Q.  At the joints.  At the expansion joints.

13    A.  On the yard --

14    Q.  Yes.

15    A.  -- as opposed to the transition area?

16    Q.  Yes.  I'm not talking about the

17  transition area now.

18        I'm talking about, do you recall Mr.

19  McCullough ever suggesting the possibility of a

20  steel plate over the expansion joints at the

21  Baton Rouge facility in the yard area?

22    A.  I recall somebody recommending that.  I

23  don't remember it being Mr. McCullough.

24    Q.  And do you recall somebody at H&E

25  rejecting that?

NON-CERTIFIED COPY

**Exhibit 5**

1      A.  Yes, sir.  It had --

2      Q.  Who?

3      A.  I'm sorry.  It had also been recommended

4  in Kenner.

5      Q.  Okay.

6      A.  I think by MAPP.

7      Q.  And you recall that being rejected by

8  H&E?

9      A.  Yes, sir.

10      Q.  By Mr. Jones?

11      A.  Yes, sir.

12      Q.  And do you recall why he rejected it?

13      A.  I don't.

14      Q.  Do you know whether the steel plate that

15  we just talked about was the same as the steel

16  plate that was used at the transition joint in

17  Baton Rouge.

18      A.  I'm sorry.  Can you restate the

19  question?

20      Q.  Yes.

21          Do you remember that the steel plate

22  that was rejected by Mr. Jones was the same

23  steel plate remedy that was used at the

24  transition joint in Baton Rouge?

25      A.  I don't know.  If it was -- I don't know

NON-CERTIFIED COPY

Exhibit 5

1   if it was the same type of material or not.

2       Q.  Is that steel-covered transition joint

3   still there today?

4       A.  It is still there, but it had to be

5   replaced either once or twice.

6       Q.  For what reason?

7       A.  It was pulling -- it was bolted into the

8   concrete and it was pulling out.

9       Q.  It was pulling out of the concrete?

10      A.  Yes, sir.

11      Q.  So that didn't resolve the issues at

12  that joint completely, did it?

13      A.  Correct.

14      Q.  I think I know the answer to this, but

15  is that steel plate there today?

16      A.  Yes, sir.

17      Q.  All right.  The next exhibit is Exhibit

18  64, URS 79105.

19          This is from you to Johnny Jones, Thomas

20  Ryan, Womack, and it says, "The Sika rep,"

21  capital S-I-K-A, "will be at my office at 7:30

22  tomorrow morning for all who would like to

23  attend.  He is to review the joint issues at the

24  H&E Baton Rouge branch and give us thoughts on

25  causation and repair."

NON-CERTIFIED COPY

**Exhibit 5**

1          Who communicated with the Sika rep to

2    set up this meeting?

3          A.  I probably communicated with the rep,

4    but I don't recall who gave me his name.

5          Q.  Was this the same product that we saw

6    earlier that has been recommended by MAPP --

7          A.  I don't believe.

8          Q.  -- this possible product?

9          A.  I don't believe so.

10         Q.  It is a different product?

11         A.  Yes, sir.

12         Q.  And was it an epoxy product?  Let me ask

13    a better question.

14             Did the meeting take place?

15         A.  Yes.

16         Q.  Who attended?

17         A.  I don't recall.

18         Q.  Were you there?

19         A.  Yes, sir.

20         Q.  And I assume a Sika representative was

21    there?

22         A.  Yes, sir.

23         Q.  What were his thoughts on causation and

24    repair at the Baton Rouge branch?

25         A.  I don't recall what his suggestion was

NON-CERTIFIED COPY

Exhibit 5

Page 182

1   as to what caused it.  It seemed like that -- I

2   think -- that his recommendation was to recut

3   the joints and refill that area with concrete

4   that had metal filings in it that would make it

5   stronger.  I think that was his representation.

6       Q.  Metal filings, F-I-L-I-N-G-S?

7       A.  Yes.

8       Q.  You don't recall what he said about

9   causation?

10      A.  No, sir.

11      Q.  Had he, to your knowledge, ever run

12  across this same issue at other locations using

13  heavy-track equipment on pavement?

14      A.  I don't know.

15      Q.  You don't recall that discussion at all?

16      A.  No, sir.

17      Q.  What was the result of that suggestion?

18  What happened?

19      A.  We never -- we never moved on it one way

20  or the other.

21      Q.  Did he give you a price?

22      A.  I don't recall if he ever gave us a

23  price or not.  I don't think that we were

24  impressed with his presentation, if I remember

25  correctly.

NON-CERTIFIED COPY

Exhibit 5

Page 183

1      Q.  And he wasn't, at that point,

2  recommending taking up all the concrete and

3  re-laying all the concrete at Baton Rouge, was

4  he?

5      A.  I don't recall.

6      Q.  Well, if he is talking about cutting out

7  joints, that wouldn't be replacing all the

8  concrete, would it?

9      A.  No, not in -- not in this Email.

10      Q.  Okay.  Well, this wasn't an Email.  I'm

11  talking about the discussion that took place.

12      A.  Correct.

13          MR. FRANCO:

14              Take the next two out.

15  EXAMINATION BY MR. FRANCO:

16      Q.  Well, let's see.  Let's do this.  The

17  next exhibit is Exhibit 65, and this is H&E

18  52765.

19          This is from Jack Groves dated June 18,

20  2013, to you copying, Kevin Bohannon.

21          Do you know who Kevin Bohannon is?

22      A.  No.

23      Q.  All right.  Jack Groves is apparently

24  from Coastal Corrosion Enterprises.  Do you see

25  that?

NON-CERTIFIED COPY

**Exhibit 5**

1      A.  Yes, sir.

2      Q.  Was he the guy that you had this meeting

3   with, the Sika rep?

4      A.  I don't recall.

5      Q.  Let's do this:  It says, "Thank you for

6   inviting me to attend Thursday's meeting to

7   discuss concrete 'joint deterioration' at your

8   new facility on Pecue Lane."

9          This is dated on Tuesday, the 18th.  The

10   prior Thursday would have been 17, 16, 15, 14,

11   the 13th, which happens to coincide with your

12   prior Email that there was going to be a meeting

13   on June 13 at 7:30.

14      A.  Yes, sir.

15      Q.  Fair statement?

16      A.  Yes, sir.

17      Q.  All right.  So this is, apparently, the

18   guy you met with?

19      A.  Okay.

20      Q.  It says, "The base reason for joint

21   deterioration is the inability for regular

22   concrete to stand up to the heavy-tracked

23   vehicles operated on it."

24          Do you see that?

25      A.  Yes, sir.

NON-CERTIFIED COPY

Exhibit 5

1      Q.  Is that what was discussed at the

2  meeting?

3      A.  I don't recall the meeting.

4      Q.  He is saying the use of a dry shake

5  mineral hardener will reach 200 percent of

6  design st strength.

7          Do you see that?

8      A.  Yes, sir.

9      Q.  The dry shake iron aggregate hardener

10  will reach 400 percent of design strength.  That

11  is what he is saying?

12      A.  Yes, sir.

13      Q.  And he says, "...when recommending

14  concrete for your type service, the joints are

15  very critical," right?

16      A.  Correct.

17      Q.  And he says it would have been most

18  beneficial to not only have used iron aggregate

19  dry shake, but to have also used what is called

20  iron armored joints, correct?

21      A.  Yes.  That is what --

22      Q.  That is what he says?

23      A.  That is what I remembered about the

24  meeting, from this first Email --

25      Q.  Okay.

NON-CERTIFIED COPY

Exhibit 5

1      A.  -- he recommended the iron filings in

2   it.

3      Q.  So he said try the iron aggregate system

4   and try the Sikadur system, right?

5      A.  Yes, sir.

6      Q.  And this is the presentation that you

7   testified that you weren't very impressed with?

8      A.  Yes, sir.

9      Q.  Why was that?  Why were you not very

10  impressed with it?

11     A.  I just didn't like the recommendation.

12     Q.  Why is that?

13     A.  I don't recall why.

14     Q.  Now, certainly, iron armored joints

15  would be a fairly expensive addition, wouldn't

16  it?

17     A.  I don't know the cost.

18     Q.  But, certainly, it would cost more than

19  what you have out there, wouldn't it?  It would

20  be an addition to what you have there

21  originally, wouldn't it?

22     A.  I don't know that.

23     Q.  Well, I mean, let's just talk about

24  common sense.

25        The original design didn't call for iron

NON-CERTIFIED COPY

Exhibit 5

1   armored joints, did it?

2      A.  No.

3      Q.  So adding the cost of iron armored

4   joints, apparently, you would have to add some

5   cost to that, wouldn't you?

6      A.  I would assume.  I don't know.

7      Q.  You wouldn't think that the iron armored

8   joints would be free, would you?

9      A.  I'll restate it again.  I don't know.

10     Q.  Did you discuss how this aggregate

11  would, in fact, adhere to the Portland cement?

12     A.  No, sir.

13     Q.  There was no followup after this Email,

14  to your knowledge?

15     A.  Not that I'm aware of.

16     Q.  See Exhibit 66, URS 79315.

17         At some point in time, sir, MAPP

18  submitted a proposal to do a mockup for parking

19  lot expansion joints using the Sika materials

20  that we had seen earlier.  Do you recall that?

21     A.  I do not recall that.

22     Q.  You do not recall them suggesting a

23  mockup at all?

24     A.  No, sir.

25     Q.  And look at the attachment.  Look at

NON-CERTIFIED COPY

Exhibit 5

Page 188

1    Page 79318.  It says "Mock UP of Expansion Joint

2    Repairs."  Right in the center, page 79318.

3            Do you see that?

4    A.  Yes, sir.

5    Q.  Do you recall rejecting this mockup?

6    A.  No, I do not.

7    Q.  All right.  Let's see.  Let's look at

8    Exhibit 67.  This is H&E 25356.

9            I want to focus on the first Email.

10   This is on the second page, I think.  It is from

11   Womack to all Womack people, and then it was

12   forwarded to you.  And it says that, The

13   following list reflects the outstanding items on

14   the H&E project as of today..."

15           This is June of 2013, and this is the

16   Baton Rouge site.  And you will see two

17   highlights there in gray.  I don't know where

18   they came from, but they are highlighted.

19           One is executive wall panels and the

20   other is site paving expansion and construction

21   joint issue.  It says, "Waiting on H&E's

22   response."

23           Do you see that?

24   A.  Yes, sir.

25   Q.  And then you send that to Thomas Ryan

NON-CERTIFIED COPY

**Exhibit 5**

Page 189

1   and Neal Johnson, and you say, "See Stephan's

2   comments below."  And it says, "The only

3   controversial issue is still with the joints.  I

4   need an opinion from URS in regards to whether a

5   design or installation issue.  I have forwarded

6   Womack's opinion previously."

7          And Mr. Neal Johnson responds to you,

8   correct?

9      A.  Yes.

10     Q.  And he says, "There are no design or

11  engineering issues.  The issues with the work in

12  place is either a construction, warranty or a

13  maintenance issue."

14         Do you see that?

15     A.  Yes, sir.

16     Q.  So he responded to you, didn't he?

17     A.  Yes, sir.

18     Q.  Let's look at Exhibit 68, H&E 25349.

19         This is another Email chain, of course,

20  and I want to focus on the middle Email.  It is

21  from Thomas Ryan to you, Johnny Jones and Neal

22  Thompson.

23         And it says, "Corporate and Branch Punch

24  List," so this refers to Baton Rouge.  And it

25  says, "Frankie, Just to clarify, you have signed

NON-CERTIFIED COPY

Exhibit 5

1  off on everything on the punch list except the

2  warped wood panels in the executive area,

3  correct?"  And you answer, "Correct."  Is that

4  true?

5      A.  I assume so, if I said it was.

6      Q.  So why did you sign off on the punch

7  list for Baton Rouge for the concrete?

8      A.  Well, the concrete was an ongoing issue

9  just like it is now.  We requested time and time

10  again for URS to give us a reason why the

11  concrete failed.  We were told -- and we had

12  several of their experts review the concrete.

13          We were told that we would get a report,

14  the recommendation on what caused it and what

15  needs to be done.  And as of today, we still

16  haven't received that.

17      Q.  You received an Email on June 24, 2013,

18  from URS saying there were no design or

19  engineering issues, that the issues with the

20  work in place is either a construction, warranty

21  or a maintenance issue.

22      A.  And I don't agree with that.

23      Q.  I know.  But you did receive that?

24      A.  Yes, sir.  I also received several

25  Emails from Mr. Johnson stating that we would

NON-CERTIFIED COPY

Exhibit 5

1    get a report from their experts that we never

2    got.

3        Q.  Now, you just said you didn't agree with

4    what I just read.  You didn't agree that it was

5    a construction issue?

6        A.  I didn't -- I didn't, and don't know

7    what it is.

8        Q.  Right.  You don't know.  It is not that

9    you didn't agree with it.  You don't know, do

10   you?

11       A.  No, I don't.  Didn't and I don't.

12       Q.  The next exhibit is Exhibit 69, which is

13   H&E 21331.

14           This is in reference to Belle Chase

15   Project Change Orders.  It is from you.  It is

16   dated July 29, 2013.  It says, "Everyone

17   involved" -- I'm reading part of it, so bear

18   with me.

19           "Everyone involved was aware of the cost

20   sensitive nature of the Belle Chase Project and

21   the need for absolute accuracy to stay within

22   the contracted amount?"

23           Do you see that?

24       A.  Yes, sir.

25       Q.  I assume you had those conversations

NON-CERTIFIED COPY

Exhibit 5

1   with the contractor, as well as URS.  Is that a

2   fair statement?

3          MR. BARRIERE:

4               Conversations with whom?

5   EXAMINATION BY MR. FRANCO:

6       Q.  Contractor and URS.

7       A.  Well, Neal was included on the Email, so

8   I'm having the conversation with him through the

9   Email.

10      Q.  Okay.  Was the Belle Chasse project the

11  only cost sensitive project?

12      A.  They were all cost sensitive.

13      Q.  All right.  It says, "Attached are

14  examples of increases in the cost in the Belle

15  Chasse Project.  Some are admittedly unforeseen,

16  but many are due to errors in the drawings or

17  omissions.  We discovered Friday that due to an

18  existing roof and a new roof not aligning, we

19  will have to eliminate the folding door and make

20  additional changes to ductwork."

21          Are you familiar with the existing roof

22  not aligning with the new roof?

23      A.  Yes, sir.

24      Q.  And this is at Belle Chasse, correct?

25      A.  Yes, sir.

NON-CERTIFIED COPY

Exhibit 5

1    Q.  What was the reason for that?  Do you

2  know?

3    A.  I didn't do the design.  I don't know.

4    Q.  Was it an elevation issue?

5    A.  I don't know what the problem was --

6    Q.  Right.  We --

7    A.  -- but that was --

8    Q.  I'm sorry.  I thought you were finished.

9  Go ahead.

10    A.  My understanding is that the ductwork

11  wouldn't fit in the area that was allotted on

12  the plans.  That was my understanding.

13    Q.  And I understand what you just said, but

14  my question is:  Was that a result of an

15  elevation issue in the design of the new

16  building compared to what was existing at the

17  old roof?

18    A.  I don't know.

19    Q.  My question was really:  Is this related

20  to the survey that was ultimately done of the

21  elevation of any of the buildings?

22    A.  No one ever said it was a problem with

23  the survey.

24    Q.  Did they say what the problem was?

25    A.  The problem --

NON-CERTIFIED COPY

Exhibit 5

1      Q.  Well, did they ever say what the cause

2   of the problem was?

3      A.  It was a design problem.

4      Q.  Right.  But was the design problem based

5   on the survey, is my question?  Do you know

6   that?

7      A.  I already answered that.

8      Q.  You don't know?

9      A.  What I said -- I believe what I said

10   was:  Nobody ever mentioned the survey as being

11   a part of this problem, and the fact that we had

12   to eat a $3,000 I-beam.

13      Q.  Mr. Wynn, I'm sorry if I asked you this

14   question.

15           Do you know why the mockup that we

16   talked about before was not done?

17      A.  I don't recall why we didn't do that.

18      Q.  The roof issues, Ms. Wynn, because I'm

19   not familiar with the details of the premises,

20   was that in connection with Building C?

21      A.  I think this was -- I think it was

22   Building A.

23      Q.  Were there some elevations problems in

24   connection with Building C?

25      A.  I don't recall.  I can't remember which

NON-CERTIFIED COPY

Exhibit 5

Page 195

1    building was which letter.

2        Q.  Okay.  I'm going to show you a document

3    I'm going to label as Exhibit 70.  This is not

4    Bates stamped so I'm not sure where this came

5    from.  This is Kenner Project Change Orders.

6            Have you ever seen that before?

7        A.  I don't recall seeing this in this

8    particular form.  I mean if it is presented as

9    Kenner Change Orders and it came from MAPP, I'll

10   accept it as their change orders.

11       Q.  That is my understanding, but just let

12   me ask you some questions about this document.

13           This document includes -- this is Kenner

14   now, so keep that in mind.  It says, "Change

15   Order Item," and we can always verify this by

16   going through the change orders.

17           But it says No. 5, "Replace Drain Box A,

18   15,658."  That is the drain box repair we talked

19   about before?

20       A.  Okay.  I'll agree.

21       Q.  Then No. 6 says, "Elevation Conflicts

22   $13,038.  What did that have to do with?

23       A.  Could I see it?

24       Q.  Yes.  I think that is 6, I think.

25       A.  The only thing I can imagine is that

NON-CERTIFIED COPY

Exhibit 5

Page 196

1   that was the conflicts in the survey that we

2   talked about where the wrong benchmarks were

3   used.

4       Q.  Okay.  That is what I thought it was,

5   too.  All right.

6           And then on the second page, wow, there

7   was a $261,000 change order for hurricane

8   damage?

9       A.  Yes, sir.

10      Q.  Okay.

11      A.  We were lucky enough to have a hurricane

12  come through in the middle of construction, and

13  a lot of the stuff that had already been done

14  has to be redone.

15      Q.  Was that all insured?

16      A.  No, sir.

17      Q.  Was any of it insured?

18      A.  I believe our deductible was either 100

19  or -- it was over $100,000.

20      Q.  So it was taken care of subject to the

21  deductible?

22      A.  Yes, sir.

23      Q.  Which hurricane was that?  Do you

24  remember?  There has been several of them, so I

25  lose track.

NON-CERTIFIED COPY

Exhibit 5

Page 197

1     A.  Me, too.

2     Q.  That is all right.

3     A.  It wasn't Katrina.

4         MR. FRANCO:

5             Off the Record.

6         (Off the Record.)

7     EXAMINATION BY MR. FRANCO:

8     Q.  On the same list, it says --

9         MR. BARRIERE:

10            Back on the Record now?

11        MR. FRANCO:

12            Yes, back on the Record.

13    EXAMINATION BY MR. FRANCO:

14    Q.  "Joint between new and existing service

15    building, $8,596."

16            What was that?

17    A.  I believe that the elevations, the

18    existing elevations in service department didn't

19    match the elevation of the new concrete that was

20    poured.

21            When they took the wall down, there was

22    a difference, and I think that is what that was

23    to create that difference in elevation.

24    Q.  That is another elevation issue probably

25    related to survey?

NON-CERTIFIED COPY

Exhibit 5

1      A.  I don't know.  That was in a totally

2   different area.  I'm not sure if that was

3   related to the survey or not.

4      Q.  All right.  Let me show you the next

5   document, which I'll label as Exhibit 71.  This

6   does not have a Bates stamp either.

7         Now, this is from Gootee, which would

8   have involved the Belle Chasse project, correct?

9      A.  Yes, sir.

10     Q.  And it says "COP."  That is Change Order

11  Proposal, correct?

12     A.  I believe so, yes, sir.

13     Q.  All right.  Then there is a list of

14  approved, and there is a list of pending, and

15  there is a list of rejected, correct?

16     A.  Yes, sir.

17     Q.  All right.  Look at the approved change

18  order proposals.  And, again, they are

19  highlighted, and I don't know who highlighted

20  this, but it wasn't me or us.

21         And it says under Change Order 1, Item

22  No. 20 says, "Demo of Steel Plates."  Do you

23  recall what that $2,500 was for at Belle Chasse?

24     A.  I believe those steel plates were

25  actually plates that were in the existing slab

NON-CERTIFIED COPY

Exhibit 5

1    that were removed so they could pour the new

2    concrete on top of it.  I believe that is what

3    that was.

4         Q.  Well, why was it a demo?

5         A.  Demolition.

6         Q.  Oh, okay.  I got it.

7             And the Building A, additional concrete,

8    that was because of an elevation issue?

9         A.  Yes, sir.

10        Q.  Plumbing for an icemaker cost you

11   $4,000?

12        A.  It is a nice icemaker.

13        Q.  Apparently, so.  Do they come out in

14   figures?  All right.

15            The next exhibit I'm going to show you

16   is Exhibit 72, and that is H&E 8385.

17            This looks like an invoice from Superior

18   Millworks to Womack, and this is an estimate for

19   work, looks like in the mailroom.  Is that a

20   fair statement?

21        A.  Yes, sir.

22        Q.  All right.  It says, "Add new mail slots

23   and base cabinet at 3rd wall."  So that is the

24   new mail slots that we talked about earlier,

25   correct?

NON-CERTIFIED COPY

Exhibit 5

Page 200

1     A.  Yes, sir.

2     Q.  But there were some additional things

3  done in that mailroom according to this,

4  correct?

5     A.  I believe that is right, yes, sir.

6     Q.  Why were two existing walls of cabinets

7  reworked?  Was that just an addition, a change

8  that H&E decided to make?

9     A.  I don't recall.

10     Q.  What about adding a new base cabinet at

11  the fourth wall, was that a change that H&E

12  just desired to make?

13     A.  I don't recall that either.

14     Q.  And re-laminate existing countertops,

15  that didn't have to do with mail slots, did it?

16     A.  I believe it did.

17     Q.  It did?

18     A.  I think when they -- when they reworked,

19  they had to re-laminate, put new countertops.

20     Q.  But the base cabinet and reworking

21  existing walls of cabinets, did that have to do

22  with the mail slots?

23     A.  I don't recall.

24     Q.  All right.  How was the wood panels

25  issue resolved at Baton Rouge?

NON-CERTIFIED COPY

Exhibit 5

Page 201

1      A.  Which panels?

2      Q.  I assume that is the executive wood

3  panels.

4      A.  There was a thicker paneling that was

5  installed over the existing paneling.

6      Q.  And did that resolve the buckling issue?

7      A.  It has up until now, yes, sir.

8      Q.  Was the buckling only at the joints of

9  those or not?

10     A.  I don't know if "buckling" is the right

11  word.  I think the paneling actually

12  delaminated.  It came -- it separated.

13     Q.  Do you know why it separated?

14     A.  No, sir.

15     Q.  Was it glued to the wall?

16     A.  I don't recall how it was installed.

17     Q.  Do you know why a decision was made to

18  put thicker paneling on there?

19     A.  I believe that was a recommendation

20  either by URS or by the subcontractor.  I'm not

21  sure which.

22     Q.  Let me show you Exhibit 73, which is H&E

23  8374.

24          This is from you to Johnny Jones.  It

25  says, "Received a call from Neal Johnson..."

NON-CERTIFIED COPY

Exhibit 5

Page 202

1    August 6, 2013, "Received a call from Neal

2    Johnson stating that he had several engineers

3    and other 'concrete experts' review the joint

4    issues at the Kenner site and the last one told

5    him to avoid the problem, the construction

6    joints should not have been cut."

7        That was your recollection, correct?

8    A.  Apparently, so.

9    Q.  And then you say, "Stephan Dorsey

10   (Womack Construction Baton Rouge Project) has

11   also confirmed Neal's statement above since the

12   breaking/crumbling first appeared."

13       That is what you told Johnny Jones on

14   August 13, 2013, correct?

15   A.  Yes, sir.

16   Q.  Now I'm going to show you Exhibit 74.

17   This is H&E 54903.

18       The one I just referenced was August 13.

19   The next day you sent an Email to Stephan Dorsey

20   and you said, "Do you have progress meeting

21   notes or RFI's pertaining to questions regarding

22   whether or not to install construction joints at

23   the Baton Rouge project?"

24       The response was, "I'll check, but as we

25   discussed a little bit last week, what I

NON-CERTIFIED COPY

**Exhibit 5**

1    remember is that we questioned the need for the

2    joint sealant material, not the actual joint

3    itself."

4         Do you see that?

5    A.  Yes, sir.

6    Q.  So Mr. Dorsey actually didn't confirm

7    your statement about the fact that the

8    construction joints should not have been cut,

9    did he?

10   A.  No, sir.

11        MR. BARRIERE:

12        Object to the form of the question.

13   EXAMINATION BY MR. FRANCO:

14   Q.  Next exhibit is Exhibit 75.  This is H&E

15   7780.

16        This is from you, October 7, 2013.  It

17   says, "During a walkthrough of the Belle Chasse

18   Project on Friday, 10/4/2013, spalling and

19   cracking of the concrete was observed in the

20   paint building (Building K).

21        "A similar condition was present at the

22   Kenner, LA project and the slab had to be

23   replaced.

24        "Please have this inspected, along with

25   the entire project for this condition.  Let me

NON-CERTIFIED COPY

Exhibit 5

Page 204

1   know the plan of action as soon as possible?"

2        What happened as a result of this?  Do

3   you recall?

4        A.  I believe because of the size of the

5   spalling in Building K, that it was agreed upon

6   that we would just leave it like it was and see

7   if it got any worse, and if it got any worse,

8   then Gootee would replace it.

9        Q.  Did it get any worse, to your knowledge?

10        A.  Not that I'm aware of.

11        Q.  So, it hasn't been replaced?

12        A.  Not that I'm aware of.

13        Q.  Did Gootee say why that condition

14   happened?

15        A.  I don't recall if they gave a reason.

16        Q.  All right.  Next exhibit is Exhibit 76.

17   This is H&E 8042.

18        This says, "Concrete cracks in yard."

19   This was from John Jones, copied to you and Jeff

20   Stringer, who is the branch manager at Kenner --

21   I'm sorry -- at Baton Rouge.

22        It says, "Jeff, this is going to end up

23   in litigation more than likely.  URS has sent a

24   supposed expert to review of which we have not

25   heard a response and we have engaged our own

NON-CERTIFIED COPY

Exhibit 5

Page 205

1   expert which is working up some information."

2        Who was that?

3    A.  I'm not sure who it was.

4    Q.  Does the name Mr. Bailey ring a bell?

5    A.  Yes.  Bob Bailey.

6    Q.  So you had engaged Mr. Bailey back in

7   October of 2013?

8    A.  Like I say, I don't know if this was in

9   reference to him and his company or not.  I

10  don't know.

11   Q.  Oh, okay.  I thought you said that was

12  the one --

13   A.  No, I -- I'm familiar with Mr. Bailey

14  and his company, but I don't know if that is

15  what this Email is referring to.

16   Q.  Was there somebody else at this time?

17   A.  I don't recall if there was anyone else.

18  That is why I was hesitant about answering.  I

19  don't remember if there was someone else before

20  Mr. Bailey.

21        I don't think there was, but -- I'm not

22  sure if this -- if this was referring to  Mr.

23  Bailey's company or not.

24   Q.  At the time this suit was filed, which

25  was November of 2013, as I understand it.  Is

NON-CERTIFIED COPY

**Exhibit 5**

Page 206

1   that correct?  November of 2013, had you or had

2   H&E consulted with an expert --

3       A.  I don't recall the dates.

4       Q.  Okay.  And it says, "...we engaged our

5   own expert...."  Who is the "we"?

6       A.  I do not know.

7       Q.  Was it you?

8       A.  I don't know.

9       Q.  You don't recall whether it was you or

10  not?

11      A.  I've already answered the question.

12      Q.  Okay.  Do you recall if there was a

13  point person at H&E who was appointed to head-up

14  the litigation effort --

15      A.  No.

16      Q.  -- for H&E?

17      A.  No.

18      Q.  Do you know who retained Mr. Bailey at

19  H&E?

20      A.  I don't recall.

21      Q.  When did you first come into contact

22  with Mr. Bailey?

23      A.  I don't recall.

24      Q.  Do you recall receiving some information

25  from the expert after this Email?

NON-CERTIFIED COPY

Exhibit 5

Page 207

1       A.  I don't recall the dates.

2       Q.  And I wasn't asking about a date.  Do

3   you recall receiving some information from your

4   own expert as you referenced in here?

5           MR. BARRIERE:

6               Object to the form.

7               The witness hasn't identified --

8   cannot recall who the expert referenced is.  How

9   can he know who he received information from.

10          MR. FRANCO:

11              That is a speaking objection, the

12  last time I checked --

13          MR. BARRIERE:

14              It is a wake-up --

15          MR. FRANCO:

16              -- and it is not appropriate, but --

17  EXAMINATION BY MR. FRANCO:

18      Q.  My question is very simple.

19              You said you engaged your own expert.

20  To me, that is an H&E expert.

21              Do you recall receiving some information

22  from an H&E expert --

23      A.  Yes.

24      Q.  -- in connection with this concrete

25  issue?

NON-CERTIFIED COPY

Exhibit 5

Page 208

1      A.  Yes.

2      Q.  And you don't recall when, as I

3  understand?

4      A.  Correct.

5      Q.  Do you recall what the information was?

6         MR. BARRIERE:

7             Answer "yes" or "no."

8             I need to consult with you

9  thereafter as to the substance.

10             I'm not sure you are entitled to

11  discover on this.  I'm not even sure what you

12  are referring to.

13         MR. FRANCO:

14             I'm not entitled to discover his

15  information?

16         MR. BARRIERE:

17             Not if it is a consulting expert.

18         MR. FRANCO:

19             Why is that?

20         MR. BARRIERE:

21             It is just what the Code of Civil

22  Procedure says.  It is not discoverable

23  information if it is a consulting expert.

24         MR. FRANCO:

25             A consulting expert?

NON-CERTIFIED COPY

Exhibit 5

Page 209

1          MR. BARRIERE:

2              Yeah.  I don't know what we are

3    talking about.  He is said he doesn't know what

4    expert you are talking about.  He has told us

5    that on several occasions.

6          MR. FRANCO:

7              Okay.  Would you repeat my question,

8    and we will go from there?

9              (Whereupon, the requested question was

10   read back by the court reporter.)

11         THE WITNESS:

12             I don't know which expert you are

13   talking about.

14   EXAMINATION BY MR. FRANCO:

15      Q.  But my question was:  Did you receive

16   information on the cause of this concrete issue

17   from an expert?

18      A.  Yes.

19      Q.  Was that in writing?

20      A.  Yes.

21      Q.  Do you know who that came from?

22      A.  We got a report from Mr. Bailey's

23   company.

24      Q.  And when did you get the first such

25   report?

NON-CERTIFIED COPY

Exhibit 5

Page 210

```
 1       A.  I do not recall the date.

 2       Q.  Do you recall whether it was before the

 3  lawsuit was filed?

 4       A.  I don't recall.

 5       Q.  Do you recall that a recent opinion was

 6  just issued by Mr. Bailey on behalf of his

 7  company in this case that we received?

 8       A.  State that again, please.

 9       Q.  Yes.

10           Do you know that H&E just produced a

11  written report from Mr. Bailey within the last,

12  I want to say, two weeks?

13       A.  I didn't know it was produced, but I

14  knew that he presented a report, an updated

15  report, yes, sir.

16       Q.  It was an updated report?

17       A.  Well, a different report, a new report.

18       Q.  So, apparently, there was more than one

19  report?

20       A.  Yes, sir.

21       Q.  Do you know how many there were?

22       A.  To my knowledge, there were only two.

23       Q.  Do you recall the difference between the

24  two?

25       A.  No, sir.
```

NON-CERTIFIED COPY

Exhibit 5

Page 211

1      Q.  Do you know why there were two reports?

2      A.  No.

3      Q.  Who was involved requesting those

4   reports?  Was it you?

5      A.  I don't recall who requested the

6   reports.

7      Q.  Okay.  I'm sorry if I asked you this.

8   Do you recall who retained Mr. Bailey?

9      A.  No.

10      Q.  Were you involved in retaining

11   Mr. Drennan as an expert in this case?

12      A.  No.

13      Q.  Had you had any prior experience with

14   Mr. Drennan?

15      A.  No, sir.

16      Q.  Did you consult with Mr. Drennan at all?

17      A.  Yes.

18      Q.  Did Mr. Bailey, to your knowledge, view

19   the premises at the yards at Baton Rouge or

20   Kenner?

21      A.  Yes.

22      Q.  How many times, to your knowledge?

23      A.  To my knowledge, twice.

24      Q.  Was one in connection with his first

25   report, and the other in connection with his

NON-CERTIFIED COPY

Exhibit 5

Page 212

1   second report?

2      A.  Yes, sir, I believe so.

3      Q.  Who were those reports provided to at

4   H&E?

5      A.  Other than myself, I don't know.

6      Q.  Did you convey those reports on to

7   anybody else at H&E?

8      A.  I don't believe so.

9      Q.  Let me show you Exhibit 77, which is H&E

10  4952.

11         This is from Al Naquin at MPS, enclosing

12  a "quote based on the worst joints that have

13  measured at your Baton Rouge facility."

14         Do you see that?

15     A.  Yes, sir.

16     Q.  Who requested that from MPS?

17     A.  I don't recall who requested it.

18     Q.  All right.  Who made contact with MPS?

19     A.  I don't recall.

20     Q.  So you sent this on to Brad Barber

21  saying, "I have received the attached estimate

22  for repairs to the areas of the pavement and

23  joint sealant at the Baton Rouge Branch that are

24  in the most need of attention."

25         Do you see that?

NON-CERTIFIED COPY

Exhibit 5

Page 213

1    A.  Yes, sir.

2    Q.  Was that work done?

3    A.  No, sir.

4    Q.  Why not?

5    A.  I don't recall, other than the fact that

6    it was rejected.

7    Q.  By whom?

8    A.  I don't remember if it was either Johnny

9    Jones or Brad, or both.  I don't recall.

10    Q.  What was the reason it was rejected?

11    A.  I don't recall.

12    Q.  Do you see the page that is Bates

13    stamped 4962, please?

14    A.  Yes, sir.

15    Q.  At that time, were the areas of the

16    pavement and joint sealant that was in most need

17    of repair, the estimate was $80,985, plus

18    $218,007; is that correct?

19    A.  Yes, sir.

20    Q.  One of your duties, as I understand it,

21    in 2015, was to be in charge of risks, risk

22    manager?  You were a risk manager in 2015, as

23    well?

24    A.  Yes, sir.

25    Q.  All right.  And as a risk manager, you

NON-CERTIFIED COPY

Exhibit 5

Page 214

1   handled insurance claims, am I correct?

2       A.  Correct.

3       Q.  For H&E, is my point?

4       A.  Correct.

5       Q.  I'm going to show you a copy of what is

6   labeled Exhibit 78, which is entitled or Bates

7   stamped TPCC-0004 and 5.

8           This is a letter from Travelers to H&E

9   and it says that Travelers concluded the

10  investigation in reference to the

11  above-captioned claim.

12          "As you are aware, we inspected your

13  property on January 13, 2014, and found damage

14  to the paved surfaces on your property."

15          Do you see that?

16      A.  Yes, sir.

17      Q.  And they denied this claim, according to

18  this letter, correct?

19      A.  Correct.

20      Q.  Who made this claim for damages to the

21  paved surfaces to Travelers?

22      A.  I did.

23      Q.  And did you do that orally, or did you

24  do it writing, or both?

25      A.  I don't recall.  Sometimes we just pick

NON-CERTIFIED COPY

Exhibit 5

1   up the phone and call our contacts.  Sometimes

2   we send an Email.  I don't remember how it was

3   done.

4       Q.  And what was the basis upon which you

5   submitted this claim for damage to the paved

6   areas?  Why did you conclude that you should

7   make this claim to the insurance company?

8       A.  Well, I was hoping that there would be

9   coverage there, or at least I would get a

10  recommendation from an expert telling me what

11  caused it and what could be done to correct it

12  since I hadn't gotten a response from URS.

13      Q.  You keep saying you didn't get a

14  response from URS, and I'm going to keep

15  pointing out that there is an Email in there

16  from Neal Johnson telling you the opinion of

17  URS, wasn't there?

18      A.  We will agree to disagree.

19      Q.  Why are we disagreeing?  Is that not a

20  response by URS?

21      A.  We asked and were told, and it actually

22  happened, that several of their experts reviewed

23  the concrete in Baton Rouge and Kenner, and we

24  were told we would get a report with why it

25  happened and what could be done to fix it.  As

NON-CERTIFIED COPY

Exhibit 5

Page 216

1   of today, we have not seen the report.

2       Q.  But you have seen URS's position.  We

3   agree on that in that Email, correct, that

4   wasn't a design defect?

5       A.  Well, I agree that there was an Email.

6       Q.  When you got your first report from Mr.

7   Bailey, did you send that to URS?

8       A.  No.

9       Q.  Why not?

10      A.  It wasn't my position to send it to URS.

11      Q.  What was the conclusion in the first

12  report as to the cause of the damage to the

13  paved areas?

14      A.  I don't recall.

15      Q.  Was there a repair estimate?

16      A.  I don't recall.

17      Q.  You were quite familiar with insurance

18  policies as a risk manager, weren't you?

19          MR. BARRIERE:

20              Object to the form of the question.

21          THE WITNESS:

22              I don't think I've ever read a

23  policy from cover to cover.

24  EXAMINATION BY MR. FRANCO:

25      Q.  When you submitted the insurance claim

NON-CERTIFIED COPY

Exhibit 5

1    to Travelers, I assume you submitted it on the

2    basis that there was damage to the paved

3    surfaces as reflected in this letter.  Is that

4    the basis upon which you submitted it?

5        A.  I believe so, yes, sir.

6        Q.  Did you review the policy before you

7    submitted the claim to Travelers?

8        A.  No, sir.

9        Q.  Did you, when you submitted the claim,

10   tell Travelers what you believed the cause of

11   the damage to be?

12       A.  I don't recall if I shared any

13   information with them.  I just told them that

14   there was a problem, I needed to file a claim,

15   and could they send an adjuster to take a look

16   at it.

17       Q.  Did you accompany that adjuster at the

18   site?

19       A.  I think I did, but I'm not positive.

20       Q.  Did you tell that adjuster what you

21   believed the cause of the damage to be?

22       A.  No.

23       Q.  Mr. Wynn, as you sit here today, have

24   you eliminated that the cause of the damage

25   could be construction defects?

NON-CERTIFIED COPY

Exhibit 5

Page 218

1          MR. BARRIERE:

2               Object to the form.

3               You can answer, subject to the

4    objection.

5          THE WITNESS:

6               I don't know.

7    EXAMINATION BY MR. FRANCO:

8       Q.  Do you know why the contractors were not

9    sued in this case?

10         MR. BARRIERE:

11              Objection to the form.  Don't answer

12   if that requires you to discuss Counsel's

13   conversations.

14         MR. FRANCO:

15              No, it doesn't.

16   EXAMINATION BY MR. FRANCO:

17      Q.  Did you discuss that with Counsel?

18         MR. FRANCO:

19              And that is a speaking objection

20   again.

21         MR. BARRIERE:

22              It is not a speaking objection.

23         MR. FRANCO:

24              Yes, it is.

25         MR. BARRIERE:

NON-CERTIFIED COPY

Exhibit 5

Page 219

1              No, it is not, Phil.

2    EXAMINATION BY MR. FRANCO:

3        Q.  I don't want to know your conversations

4    with your attorney, sir.

5              Do you know why the contractors were not

6    sued in this case?

7        A.  No, sir.

8        Q.  Did you discuss that with anybody other

9    than lawyers?

10        A.  No.

11        Q.  The contractors in this case, Womack in

12    Baton Rouge and MAPP at Kenner, are current

13    customers of H&E; is that correct?

14        A.  I have no idea.

15        Q.  Let's look at the next exhibit, which is

16    Exhibit 79.  This is at the bottom TPCC-0061 and

17    62.

18              This is a Claim Acknowledgment in

19    connection with the letter we just saw from

20    Travelers.

21              The claim handler is William Knox.  Does

22    that refresh your memory as to who it was?

23        A.  No.

24        Q.  It says here, "Description of Loss."  Do

25    you know what a Claim Acknowledgment normally is

Exhibit 5

NON-CERTIFIED COPY

Page 220

1    in dealing with Travelers on behalf of H&E?

2        A.  Do I know?

3        Q.  Yes.

4        A.  Yes, sir.

5        Q.  What does a Claim Acknowledgment reflect

6    normally?  Does it reflect what was reported to

7    Travelers?

8        A.  It could reflect what was reported or

9    what Travelers gleaned from the report.

10       Q.  It says "Description of Loss.  Concrete

11   breakage and crumbling at expansion and

12   construction joints due to metal track machines

13   and haul truck traffic."

14           Do you see that?

15       A.  Yes, sir.

16       Q.  Is that what you advised Travelers?

17       A.  I don't believe so.

18       Q.  So that was Travelers' conclusion?

19       A.  I don't know whose conclusion it was.

20       Q.  Did the claims handler bring anybody

21   with him to examine?

22       A.  Not that I remember.

23       Q.  Are you familiar with the concept of

24   using rubber guards on heavy-track equipment

25   when it is on concrete?

NON-CERTIFIED COPY

Exhibit 5

1      A.  No, sir.  I'm more familiar with track

2   equipment using rubber tracks, not really

3   familiar with guards.

4          There could be guards that I'm not aware

5   of, but I'm familiar with track equipment that

6   actually has rubber tracks rather than no

7   tracks.

8      Q.  As director of facilities -- what was

9   your title, director of facilities?

10     A.  That is part of it.

11     Q.  As director of facilities, did H&E use

12  any rubber guards, to your knowledge, on any

13  track equipment?

14         MR. BARRIERE:

15             Object to form.  Lack of foundation.

16         THE WITNESS:

17             I think we have some equipment that

18  has the rubber tracks on it that I referred to

19  earlier.  I'm not familiar with guards.

20  EXAMINATION BY MR. FRANCO:

21     Q.  I presume H&E has owner's manuals that

22  deal with heavy-track equipment it sells?

23     A.  Owner's manuals come with the equipment

24  from the manufacturer.

25     Q.  But that is something that also is in

NON-CERTIFIED COPY

Exhibit 5

1   the possession of H&E?

2        A.  If we own the equipment and the

3   equipment has the manual in it, then, yes.

4        Q.  What about the equipment, the

5   heavy-track equipment that H&E sells?  Do they

6   have owner's manuals with that equipment that

7   they pass on to the buyer?

8        A.  Yes, sir.

9        Q.  Have you ever read those owner's

10  manuals?

11       A.  I have read some of the owner's manuals

12  in regard to an incident.

13       Q.  Okay.

14          MR. BARRIERE:

15              In regard to what?

16          THE WITNESS:

17              Incidents, accidents.

18          MR. BARRIERE:

19              Oh, incidents.

20  EXAMINATION BY MR. FRANCO:

21       Q.  Do you know whether there is any

22  provision in the owner's manuals with respect to

23  the use of that equipment on concrete?

24       A.  Not that I'm aware of.

25       Q.  I'm going to hand you a group of

NON-CERTIFIED COPY

Exhibit 5

Page 223

1    documents at this point in time, and we are

2    going to label them in globo as Exhibit 80.  And

3    the first one begins with H&E 1679, and I think

4    these go all the way through 1727.

5         Now, looking at the first one, this is a

6    January 21, 2013 invoice from URS to your

7    attention at H&E, correct?

8         A.  Correct.

9         Q.  And there is a stamp on this document,

10   and it says "Approved."  Whose initials are

11   those?

12        A.  Those are mine.

13        Q.  And you approved that on 2/20/2013?

14        A.  Yes, sir.

15        Q.  In the amount of $9,852.02.  That is how

16   I read this.  Is that correct?

17        A.  That is correct.

18        Q.  And for the Record, you did that on the

19   February 19th, 2013 invoice, too, correct?

20        A.  There is different dates and different

21   amounts, but it is approved.

22        Q.  And that was your responsibility to

23   approve these invoices at the time, I take it?

24        A.  Yes.

25        Q.  And you approved the March 14, 2013

NON-CERTIFIED COPY

Exhibit 5

Page 224

1   invoice that is attached 4/2/13, correct?

2       A.  Yes, sir.

3       Q.  And you approved the June 12, 2013

4   invoice on July 1, 2013, correct?

5       A.  Yes, sir.

6       Q.  And you approved the June 12, 2013

7   invoice on 7/1/2013, correct?

8       A.  That is correct.

9       Q.  There were two different invoices dated

10  that same day, correct?

11      A.  That is correct.

12      Q.  And in spite of the fact that you

13  approved these invoices, why weren't they paid?

14      A.  Per John Engquist's instructions if they

15  have not been paid.

16      Q.  Now, I will represent to you that none

17  of these invoices that I just showed to you --

18  and you can look at them if you want to -- dealt

19  with the parking spaces.

20          Did you understand that only invoices

21  related to parking spaces were supposed to not

22  be paid, or all invoices were not supposed to be

23  paid after John Engquist gave his instructions?

24      A.  I'm not sure what he told the Accounting

25  Department, but it was my understanding there

NON-CERTIFIED COPY

Exhibit 5

1   was nothing to be paid from whatever date that

2   he instructed them.

3       Q.  Regardless of whether it was related to

4   the parking spaces?

5       A.  I don't think -- as far as I know, he

6   didn't make any distinction.

7       Q.  All right.

8       MR. FRANCO:

9           If you will give me some time, we

10  may be finished.

11      MR. BARRIERE:

12          Excellent.

13      (Off the Record.)

14      MR. FRANCO:

15          I have some further questions.

16  EXAMINATION BY MR. FRANCO:

17      Q.  Mr. Wynn, in connection with this

18  litigation, there were Interrogatories that were

19  sent out, written questions about the condition

20  of the paved areas at other locations, and we

21  received responses about the condition of those

22  other locations from H&E.

23          Were you involved in responding to those

24  Interrogatories about the conditions of the

25  other sites?  And when I say "other sites,"

NON-CERTIFIED COPY

Exhibit 5

1  other than Baton Rouge, Kenner and Belle Chasse.

2      A.  To the best of my knowledge, that

3  information came from Jamie Seymour and Marty

4  Emigh.

5      Q.  And Jamie Seymour was in-house counsel

6  and Marty Emigh was also an in-house counsel?

7      A.  No.  Marty Emigh was -- I think his

8  title these days is VP of Operations.  He is the

9  one that is handling all the leases on the

10  existing facilities and new construction.

11      Q.  Did you participate at all in those

12  responses?

13      A.  Other than knowing that they were

14  looking for the information, I believe that is

15  -- I don't think they asked me because I wasn't

16  aware -- hadn't been to all the locations,

17  wasn't aware of the condition of the concrete or

18  how it was built or what the designs were.

19      Q.  Which is consistent with your prior

20  testimony that you weren't familiar with the

21  paved areas at the other sites, even though you

22  may have visited those sites for other reasons?

23      A.  Correct.

24          MR. FRANCO:

25              All right.  That is all the

NON-CERTIFIED COPY

Exhibit 5

Page 227

1    questions -- hold on.

2    EXAMINATION BY MR. FRANCO:

3        Q.  After these projects, H&E constructed a

4    site in New Orleans, correct, a branch office?

5        A.  After the projects that are involved in

6    the litigation?

7        Q.  Yes.

8        A.  Yes, sir.

9        Q.  And as I understand it, certain of the

10   operations at Kenner were moved to the New

11   Orleans site; is that correct?

12       A.  It is my understanding that they moved

13   some of the employees and some of the equipment.

14       Q.  Okay.  Are you familiar with what is

15   conducted out of New Orleans that was previously

16   conducted out of Kenner?

17       A.  It is my understanding that the location

18   in Kenner is a -- what we would call a sales

19   site where equipment is for sale.  The New

20   Orleans location is for rental equipment.

21       Q.  But what about servicing?  Is that the

22   New Orleans site now, as well?

23       A.  I believe both locations service

24   equipment.

25       Q.  You do?

NON-CERTIFIED COPY

Exhibit 5

1      A.  I think so, yes, sir.

2      Q.  Were you involved in the construction of

3  the New Orleans site on behalf of H&E?

4      A.  No, sir.

5      Q.  Who handled that as the point person at

6  H&E?

7      A.  Marty Emigh.

8      Q.  And are you aware of whether or not

9  there is spalling and cracking alleged to be

10  occurring at the joints at the New Orleans site?

11      A.  I have no idea.

12      Q.  And that is spalling --

13      A.  I don't want to know.

14      Q.  Are you aware whether there is any claim

15  that has been made by H&E in connection with the

16  paved area at the New Orleans site as part of

17  your duties as a risk manager?

18      A.  No, sir, I'm not aware.

19      Q.  Would you be aware of such a claim as a

20  risk manager normally?

21      A.  Not necessarily.

22      Q.  Not necessarily?

23      A.  No.  That would be something that Marty

24  Emigh would handle with either a subcontractor

25  or the general contractor that did the work or

NON-CERTIFIED COPY

Exhibit 5

Page 229

1    the landlord.

2        Q.  Do you know who designed that paved

3    area?

4        A.  No, sir.

5            MR. BARRIERE:

6                It wasn't URS.

7            MR. FRANCO:

8                I'm surprised it is not part of the

9    allegations based on what I've seen.

10   EXAMINATION BY MR. FRANCO:

11       Q.  As risk manager, are you aware of any

12   other claims that H&E has made in connection

13   with joints at paved areas or cracks in paved

14   areas?

15       A.  No, sir.

16       Q.  Okay.

17           MR. FRANCO:

18               Mr. Wynn, thank you very much for

19   your time.  I appreciate it.

20               I think you told the court reporter

21   you want to read and sign.

22           THE WITNESS:

23               Yes, sir.

24           MR. BARRIERE:

25               He does.  And you know where to send

NON-CERTIFIED COPY

Exhibit 5

Page 230

1   it.

2           (Whereupon, the deposition was concluded

3   at 4:27 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Exhibit 5

Page 231

1              WITNESS' ATTESTATION

2        I have read or have had the foregoing

3   testimony read to me, pursuant to Rule 30(e) of

4   the Federal Rules of Civil Procedure and/or

5   Article 1445 of the Louisiana Code Civil

6   Procedure, and hereby attest that, to the best

7   of my ability and understanding, it is a true

8   and correct transcription of my testimony, with

9   the exception of any attached corrections or

10  changes, complete with reasons for changes, on

11  the Witness' Amendment Pages;

12       I have in no way altered the printed

13  transcript pages containing testimony herein,

14  tampered with the seal on the last numbered page

15  herein, or tampered with the security strip on

16  the binder hereof.  The integrity of this

17  certified transcript has been maintained in the

18  identical form as it was received by me, with

19  the exception of any changes on the Witness'

20  Amendment Pages.

21

     -------------
22   Date

23

                   _____
24                  FRANKIE WAYNE WYNN
                        (Signature)
25

NON-CERTIFIED COPY

Exhibit 5

Page 232

1              REPORTER'S PAGE

2              I, KAY E. DONNELLY, Certified Court

3    Reporter in and for the State of Louisiana, the

4    officer, as defined in Rule 28 of the Federal

5    Rules of Civil Procedure and/or Article 1434(B)

6    of the Louisiana Code of Civil Procedure, before

7    whom this proceeding was taken, do hereby state

8    on the Record:

9              That due to the interaction in the

10   spontaneous discourse of this proceeding, dashes

11   (--) have been used to indicate pauses, changes

12   in thought, and/or talkovers; that same is the

13   proper method for a Court Reporter's

14   transcription of proceeding, and that the dashes

15   (--) do not indicate that words or phrases have

16   been left out of this transcript;

17             That any words and/or names which could

18   not be verified through reference material have

19   been denoted with the phrased "(spelled

20   phonetically)."

21

22                          _____
                            KAY E. DONNELLY
                            Certified Court Reporter
23                          State of Louisiana
                            Certificate No. 87008
24

25

NON-CERTIFIED COPY

Exhibit 5

Page 233

1                    C E R T I F I C A T E

2            This certification is valid only for a
        transcript accompanied by my original signature
3       and original required seal on this page.
                 I, KAY E. DONNELLY, Certified Court
4       Reporter in and for the State of Louisiana, as
        the officer before whom this testimony was
5       taken, do hereby certify that FRANKIE WAYNE
        WYNN, to whom oath was administered, after
6       having been duly sworn by me upon authority of
        R.S. 37:2554, did testify as hereinbefore set
7       forth in the foregoing two hundred thirty-two
        (232) pages; that this testimony was reported by
8       me in the stenotype reporting method, was
        prepared and transcribed by me or under my
9       personal direction and supervision, and is a
        true and correct transcript to the best of my
10      ability and understanding; that the transcript
        has been prepared in compliance with transcript
11      format guidelines required by statute or by
        rules of the board; and that I am informed about
12      the complete arrangement, financial or
        otherwise, with the person or entity making
13      arrangements for deposition services; that I
        have acted in compliance with the prohibition on
14      contractual relationships, as defined by
        Louisiana Code of Civil Procedure Article 1434
15      and in rules and advisory opinions of the board;
        that I have no actual acknowledge of any
16      prohibited employment or contractual
        relationship, direct or indirect, between a
17      court reporting firm and any party litigant in
        this matter nor is there any such relationship
18      between myself and a party litigant in this
        matter.  I am not related to counsel or to the
19      parties herein, nor am I otherwise interested in
        the outcome of this matter.

20

21

22                      _____
                        KAY E. DONNELLY
23                      Certified Court Reporter
                        State of Louisiana
24                      Certificate No. 87008
                        August 14, 2016

25

NON-CERTIFIED COPY

Exhibit 5

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


\* \* \* \* \* \* \* \* \*
                         \*
H&E EQUIPMENT SERVICES  \*
                         \* NUMBER 626,308
VERSUS                   \*
                         \* DIVISION "D"
URS CORPORATION          \*
ARCHITECTURE, P.C., URS  \*
CORPORATION, L O'NEAL    \*
JOHNSON AND THOMAS E.    \*
RYAN, III                \*
                         \*
\* \* \* \* \* \* \* \* \*


VOLUME I


        1442 Deposition of H&E EQUIPMENT

SERVICES, through its Representative, JOHN

ENGQUIST, taken on Friday, August 5, 2016,

commencing at 12:09 p.m., in the offices of

Adams and Reese, LLP, Attorneys at Law, 450

Laurel Street, Suite 1900, Baton Rouge,

Louisiana, 70801.

NON-CERTIFIED COPY

Exhibit 6

Page 2

1              I N D E X

2

3                                    Page

4

Caption                          1
5    Index of Exhibits               3
Appearances                      4
6    Agreement of Counsel            5

7    Examination

8       PHILIP A. FRANCO, ESQ.          6

9

                *   *   *   *   *
10

Witness' Certificate            12
11   Reporter's Page                 13
Certificate                     14
12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Exhibit 6

Page 3

1          INDEX OF EXHIBITS

2

   Number                          Page
3
      1 Amended Notice of 1442 Deposition    6
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Exhibit 6

Page 4

1   APPEARANCES:

2

       Representing the Plaintiff:
3
          FISHMAN HAYGOOD, LLP
4         Attorneys at Law
          201 St. Charles Avenue, Suite 4600
5         New Orleans, Louisiana  70170

6         BY:  BRENT B. BARRIERE, ESQ.

7

8

9      Representing the Defendant:

10        ADAMS AND REESE, LLP
          Attorneys at Law
11        4500 One Shell Square
          New Orleans, Louisiana  70139
12
          BY:  PHILIP A. FRANCO, ESQ.
13             KELLEN J. MATHEWS, ESQ.

14
     ALSO PRESENT:
15

16     Representing H&E Equipment Services:

17        JOHN A. BERRY, ESQ.
          Corporate Counsel
18        7500 Pecue Lane
          Baton Rouge, Louisiana  70809
19
          Neal Johnson
20
       Reported by:
21             KAY E. DONNELLY
               Certified Court Reporter
22             State of Louisiana

23

24

25

NON-CERTIFIED COPY

Exhibit 6

Page 5

1                    S T I P U L A T I O N

2

3          It is stipulated and agreed by and between

4    counsel that the 1442 deposition of H&E

5    EQUIPMENT SERVICES, through its Representative,

6    JOHN ENGQUIST, is hereby being taken under the

7    Louisiana Code of Civil Procedure in accordance

8    with the Code.

9          The formalities of sealing and

10   certification are hereby waived.  The witness

11   will reserve the right to read and sign the

12   deposition.  The party responsible for service

13   of the discovery material shall retain the

14   original.

15         All objections, save those as to the form

16   of the questions, are hereby reserved until such

17   time as this deposition, or any part thereof,

18   may be used or sought to be used in evidence,

19   and are to be made in accordance with the Code

20   of Civil Procedure.

21                    *   *   *   *   *

22         KAY E. DONNELLY, Certified Court Reporter,

23   in and for the State of Louisiana, officiated in

24   administering the oath to the witness.

25

NON-CERTIFIED COPY

Exhibit 6

Page 6

1        JOHN ENGQUIST, H&E Equipment Services,

2   7500 Pecue Lane, Baton Rouge, Louisiana, 70809,

3   after having been first duly sworn, testified on

4   his oath as follows:

5   EXAMINATION BY MR. FRANCO:

6      Q.  Mr. Engquist, I don't want to confuse

7   you, so let me explain a little bit about what

8   is going on here.

9        We just finished taking your deposition

10  personally.  We have the right to take the

11  deposition of the company, H&E.  And we specify

12  certain subjects, and then it is the Company's

13  responsibility to designate some person to

14  testify on those subjects.

15       We were told that on the subject of the

16  URS outstanding invoices that you would be

17  designated as the Company rep to testify to

18  that, as opposed to anybody else in the Company.

19       So, that is where we are right now.

20   A.  Okay.

21       MR. FRANCO:

22          So first I would like to attach as

23  Exhibit 1 our Notice of Deposition for the 1442

24  deposition.

25  EXAMINATION BY MR. FRANCO:

NON-CERTIFIED COPY

Exhibit 6

1     Q.  And I would like to confirm, Mr.

2   Engquist, that, at this time, you are the one

3   being designated to testify about the

4   outstanding invoices?

5     A.  Yes.

6     Q.  Now, earlier in your deposition

7   personally, we talked about the fact that you

8   ordered that URS not be paid any further monies

9   because of issues with parking and with issues

10   of, as we clarified that to be, the interior

11   design of the building, of the headquarters

12   building, correct?

13     A.  Correct.

14     Q.  Sir, were there any issues, at the time

15   you ordered these invoices not to be paid, with

16   the Belle Chasse facility?

17     A.  I don't recall.

18     Q.  Are you aware, sir, that there are

19   invoices outstanding that started in May of

20   2013, let's put that in perspective, through

21   November of 2013 for services that were provided

22   at the Belle Chasse facility that not have been

23   paid?

24     A.  I'm not aware of that, no.

25     Q.  And you are not aware that those involve

NON-CERTIFIED COPY

Exhibit 6

Page 8

1   a total $118,541.20?

2      A.  Not -- no.

3      Q.  Knowing that, would it still be your

4   position that those invoices should have been

5   ordered not to be paid?

6      A.  I can't answer that.  I'm just

7   unfamiliar with the situation.

8      Q.  And nobody has approached you with what

9   I've just told you, that there is 118,000 and

10  some change outstanding for work at Belle Chasse

11  that you haven't paid?

12     A.  No.

13     Q.  I assume it is not H&E's protocol not to

14  pay invoices for service rendered, correct?

15     A.  No, that is not our policy.

16     Q.  Are you aware that there were certain

17  design changes that were made at Baton Rouge

18  that were not part of the original plans and

19  specs; that H&E actually made some design

20  changes that they wanted implemented?

21     A.  I am -- I know of no specifics there,

22  no.

23     Q.  Were you aware when you ordered that no

24  invoices be paid that there were invoices in

25  July of 2013 and December of 2013 in reference

NON-CERTIFIED COPY

Exhibit 6

1   to the Kenner facility that had not been paid?

2       A.  No.

3       Q.  And you weren't aware when you gave

4   those orders of any problems at the Kenner

5   facility at that time, correct?

6       A.  No.

7       Q.  No, you were not aware?

8       A.  Correct.

9       Q.  Were you aware of any problems, when you

10  gave the order not to pay, with URS's

11  performance in connection with the bidding and

12  negotiations for contracting at Baton Rouge?

13      A.  Repeat the question.

14      Q.  Yes.

15          URS assisted H&E in connection with

16  bidding and contracting at the Baton Rouge

17  facility, correct?

18      A.  Yes.

19      Q.  Were you aware of any problems that were

20  incurred?

21      A.  No.

22      Q.  So, it is fair to say, I presume, sir,

23  that as to the invoices that were generated by

24  URS for work done after January of 2013, you

25  can't tell me any particular problems with any

NON-CERTIFIED COPY

Exhibit 6

1    of those particular invoices that were not paid,

2    am I correct?

3        A.  No.  No, I'm not familiar with those

4    invoices.

5        Q.  Who would normally have the

6    responsibility to pay URS invoices at H&E?

7        A.  Well, it is different by department and

8    by -- you know, it just depends on what they are

9    for.  I mean, that could have been -- it could

10   go to Brad Barber.

11          Look, I mean, I don't approve invoices,

12   generally speaking.  I don't get involved at

13   this level of stuff.

14       Q.  So it could have been Frankie Wynn?  It

15   could have been --

16       A.  It could have been.

17       Q.  Excuse me.

18       A.  Yes, it could have been.  It could have

19   been a multitude of people.

20       Q.  One second.

21          So just to make it clear, for instance,

22   at Belle Chasse, as we sit here, you can't tell

23   me any reason why those invoices have not been

24   paid other than your order not to pay any

25   invoices?

NON-CERTIFIED COPY

Exhibit 6

1       A.   That is correct.

2            MR. FRANCO:

3                That is all the questions I have.

4   Thank you.

5            (Deposition concluded at 12:17 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Exhibit 6

Page 12

1           WITNESS' ATTESTATION

2       I have read or have had the foregoing

3   testimony read to me, pursuant to Rule 30(e) of

4   the Federal Rules of Civil Procedure and/or

5   Article 1445 of the Louisiana Code Civil

6   Procedure, and hereby attest that, to the best

7   of my ability and understanding, it is a true

8   and correct transcription of my testimony, with

9   the exception of any attached corrections or

10  changes, complete with reasons for changes, on

11  the Witness' Amendment Pages;

12      I have in no way altered the printed

13  transcript pages containing testimony herein,

14  tampered with the seal on the last numbered page

15  herein, or tampered with the security strip on

16  the binder hereof.  The integrity of this

17  certified transcript has been maintained in the

18  identical form as it was received by me, with

19  the exception of any changes on the Witness'

20  Amendment Pages.

21

    --------------
22  Date

23

24              _____
                  JOHN ENGQUIST
25                  (Signature)

NON-CERTIFIED COPY

Exhibit 6

Page 13

```
 1                  REPORTER'S PAGE

 2          I, KAY E. DONNELLY, Certified Court

 3   Reporter in and for the State of Louisiana, the

 4   officer, as defined in Rule 28 of the Federal

 5   Rules of Civil Procedure and/or Article 1434(B)

 6   of the Louisiana Code of Civil Procedure, before

 7   whom this proceeding was taken, do hereby state

 8   on the Record:

 9          That due to the interaction in the

10   spontaneous discourse of this proceeding, dashes

11   (--) have been used to indicate pauses, changes

12   in thought, and/or talkovers; that same is the

13   proper method for a Court Reporter's

14   transcription of proceeding, and that the dashes

15   (--) do not indicate that words or phrases have

16   been left out of this transcript;

17          That any words and/or names which could

18   not be verified through reference material have

19   been denoted with the phrased "(spelled

20   phonetically)."

21

22                    _____
                      KAY E. DONNELLY
                      Certified Court Reporter
23                    State of Louisiana
                      Certificate No. 87008
24

25
```

NON-CERTIFIED COPY

Exhibit 6

Page 14

1                    C E R T I F I C A T E

2          This certification is valid only for a
   transcript accompanied by my original signature
3   and original required seal on this page.
           I, KAY E. DONNELLY, Certified Court
4   Reporter in and for the State of Louisiana, as
   the officer before whom this testimony was
5   taken, do hereby certify that JOHN ENGQUIST, to
   whom oath was administered, after having been
6   duly sworn by me upon authority of R.S. 37:2554,
   did testify as hereinbefore set forth in the
7   foregoing thirteen (13) pages; that this
   testimony was reported by me in the stenotype
8   reporting method, was prepared and transcribed
   by me or under my personal direction and
9   supervision, and is a true and correct
   transcript to the best of my ability and
10  understanding; that the transcript has been
   prepared in compliance with transcript format
11  guidelines required by statute or by rules of
   the board; and that I am informed about the
12  complete arrangement, financial or otherwise,
   with the person or entity making arrangements
13  for deposition services; that I have acted in
   compliance with the prohibition on contractual
14  relationships, as defined by Louisiana Code of
   Civil Procedure Article 1434 and in rules and
15  advisory opinions of the board; that I have no
   actual acknowledge of any prohibited employment
16  or contractual relationship, direct or indirect,
   between a court reporting firm and any party
17  litigant in this matter nor is there any such
   relationship between myself and a party litigant
18  in this matter.  I am not related to counsel or
   to the parties herein, nor am I otherwise
19  interested in the outcome of this matter.

20

21

22                  _____
                    KAY E. DONNELLY
                    Certified Court Reporter
23                  State of Louisiana
                    Certificate No. 87008
24                  August 12, 2016

25

NON-CERTIFIED COPY

Exhibit 6



**Remittance Page**

| | |
|---|---|
| Invoice Date | 05/24/2013 |
| Invoice | 5531264 |
| Project | 19230060 |
| Page | 1 |

Reference:  WO1112

For:   Belle Chasse Phase II

Professional Services for Period Ending 05/10/2013

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:        $11,854.12  USD
Terms:             Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**    URS Corporation
                            P.O. Box 116183
                            Atlanta GA 30368-6183
                            US

**Overnight Courier:**      URS Corporation
                            Lock Box No. 116183
                            100 South Crest Drive
                            Stockbridge, GA  30281
                            Attention:  Atlanta Lockbox
                            (877) 786-3333

**Electronic Funds Transfer:**
    Account:        URS Corporation
    Bank:           Wells Fargo Bank
    Account No.:    4520-086471
    ABA Routing No.:  121-000-248
    Swift Code:     WFBIUS6S

Remittance Information can be sent to:
    Email:          RemitTo@urs.com
    Fax:            (512) 419-6937    Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 7

Attachment 2-A


NON-CERTIFIED COPY



| | | |
|---|---|---|
| Invoice Date | | 05/24/2013 |
| Invoice | | 5531264 |
| Project | | 19230060 |
| Page | | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO1112

For:  Belle Chasse Phase II

Professional Services for Period Ending 05/10/2013

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job:  19230060  H&E Belle Chasse Phase II | 11,854.12 | 0.00 | 11,854.12 |
| Total this job | 11,854.12 | 0.00 | 11,854.12 |
| | | | |
| TOTAL THIS INVOICE | 11,854.12 | 0.00 | $11,854.12 USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 7

Attachment 2-A

NON-CERTIFIED COPY



| | | Invoice Date | 05/24/2013 |
| --- | --- | --- | --- |
| | | Invoice | 5531264 |
| | | Project | 19230060 |
| | | Page | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO1112

For:   Belle Chasse Phase II

<u>Professional Services for Period Ending 05/10/2013</u>
*Job:  19230060  H&E Belle Chasse Phase II*

| PHASE | FEE | PERCENT COMPLETE | FEE EARNED | PREVIOUS BILLING | CURRENT BILLING |
| --- | --- | --- | --- | --- | --- |
| Design Phase | 162,994.15 | 100.00% | 162,994.15 | 162,994.15 | 0.00 |
| Bidding and Negotiation Phase | 14,817.65 | 100.00% | 14,817.65 | 14,817.65 | 0.00 |
| Construction Admin Phase | 118,541.20 | 10.00% | 11,854.12 | 0.00 | 11,854.12 |
| TOTALS | 296,353.00 | | 189,665.92 | 177,811.80 | 11,854.12 |

*Total due this job*        11,854.12

**TOTAL THIS INVOICE**        $11,854.12 USD

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320792

**Exhibit 7**

**Attachment 2-A**

NON-CERTIFIED COPY



**Remittance Page**

| | |
|---|---|
| Invoice Date | 06/19/2013 |
| Invoice | 5563141 |
| Project | 19230060 |
| Page | 1 |

Reference:  WO1112

For:   Belle Chasse Phase II

<u>Professional Services for Period Ending 06/07/2013</u>

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

**Total Due:**       $10,668.71  USD
Terms:            Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**    URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**     URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**

| | |
|---|---|
| Account: | URS Corporation |
| Bank: | Wells Fargo Bank |
| Account No.: | 4520-086471 |
| ABA Routing No.: | 121-000-248 |
| Swift Code: | WFBIUS6S |

Remittance Information can be sent to:
Email:      RemitTo@urs.com
Fax:       (512) 419-6937    Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 7**

**Attachment 2-A**

NON-CERTIFIED COPY



Invoice Date | 06/19/2013
Invoice | 5563141
Project | 19230060
Page | 2

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO1112

For:  Belle Chasse Phase II

Professional Services for Period Ending 06/07/2013

|  | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job: 19230060  H&E Belle Chasse Phase II | 10,668.71 | 0.00 | 10,668.71 |
| Total this job | 10,668.71 | 0.00 | 10,668.71 |
| TOTAL THIS INVOICE | 10,668.71 | 0.00 | $10,668.71 USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 7

Attachment 2-A

NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 06/19/2013 |
| Invoice | 5563141 |
| Project | 19230060 |
| Page | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO1112

For:  Belle Chasse Phase II

Professional Services for Period Ending 06/07/2013
*Job: 19230060  H&E Belle Chasse Phase II*

| PHASE | FEE | PERCENT COMPLETE | FEE EARNED | PREVIOUS BILLING | CURRENT BILLING |
|---|---|---|---|---|---|
| Design Phase | 162,994.15 | 100.00% | 162,994.15 | 162,994.15 | 0.00 |
| Bidding and Negotiation Phase | 14,817.65 | 100.00% | 14,817.65 | 14,817.65 | 0.00 |
| Construction Admin Phase | 118,541.20 | 19.00% | 22,522.83 | 11,854.12 | 10,668.71 |
| **TOTALS** | 296,353.00 | | 200,334.63 | 189,665.92 | 10,668.71 |

*Total due this job*    10,668.71

**TOTAL THIS INVOICE**    $10,668.71 USD

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320790

**Exhibit 7**

**Attachment 2-A**

NON-CERTIFIED COPY



**Remittance Page**

| | |
|---|---|
| Invoice Date | 07/29/2013 |
| Invoice | 5599459 |
| Project | 19230060 |
| Page | 1 |

Reference:  WO1112

For:  Belle Chasse Phase II

<u>Professional Services for Period Ending 07/12/2013</u>

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:        $40,043.22  USD

Terms:            Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**    URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**    URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**

Account:        URS Corporation
Bank:           Wells Fargo Bank
Account No.:    4520-086471
ABA Routing No.: 121-000-248
Swift Code:     WFBIUS6S

Remittance Information can be sent to:
Email:      RemitTo@urs.com
Fax:        (512) 419-6937    Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 7**

**Attachment 2-A**


NON-CERTIFIED COPY



| | Invoice Date | 07/29/2013 |
|---|---|---|
| | Invoice | 5599459 |
| | Project | 19230060 |
| | Page | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO1112

For:   Belle Chasse Phase II

<u>Professional Services for Period Ending 07/12/2013</u>

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job:  19230060  H&E Belle Chasse Phase II | 40,043.22 | 0.00 | 40,043.22 |
| Total this job | 40,043.22 | 0.00 | 40,043.22 |
| **TOTAL THIS INVOICE** | **40,043.22** | **0.00** | **$40,043.22 USD** |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
If you have any questions regarding this invoice.

**Exhibit 7**

**Attachment 2-A**

NON-CERTIFIED COPY



|  |  |
|---|---|
| Invoice Date | 07/29/2013 |
| Invoice | 5599459 |
| Project | 19230060 |
| Page | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO1112

For:  Belle Chasse Phase II

Professional Services for Period Ending 07/12/2013
Job: 19230060  H&E Belle Chasse Phase II

| PHASE | FEE | PERCENT COMPLETE | FEE EARNED | PREVIOUS BILLING | CURRENT BILLING |
|---|---|---|---|---|---|
| Design Phase | 162,994.15 | 100.00% | 162,994.15 | 162,994.15 | 0.00 |
| Bidding and Negotiation Phase | 14,817.65 | 100.00% | 14,817.65 | 14,817.65 | 0.00 |
| Construction Admin Phase | 158,584.42 | 39.45% | 62,566.05 | 22,522.83 | 40,043.22 |
| TOTALS | 336,396.22 |  | 240,377.85 | 200,334.63 | 40,043.22 |

Total due this job        40,043.22

TOTAL THIS INVOICE        $40,043.22 USD

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320786

Exhibit 7

Attachment 2-A



 **URS**

**Remittance Page**

| | |
|---|---|
| Invoice Date | 08/20/2013 |
| Invoice | 5624795 |
| Project | 19230060 |
| Page | 1 |

Reference: WO1112

For: Belle Chasse Phase II

Professional Services for Period Ending 08/09/2013

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

**Total Due:**       $20,412.79  USD
Terms:              Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**    URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**    URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention: Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**
Account:        URS Corporation
Bank:          Wells Fargo Bank
Account No.:      4520-086471
ABA Routing No.:    121-000-248
Swift Code:      WFBIUS6S

Remittance Information can be sent to:
Email:        RemitTo@urs.com
Fax:          (512) 419-6937   Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 7**

**Attachment 2-A**


NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 08/20/2013 |
| Invoice | 5624795 |
| Project | 19230060 |
| Page | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO1112

For:  Belle Chasse Phase II

<u>Professional Services for Period Ending 08/09/2013</u>

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job:  19230060  H&E Belle Chasse Phase II | 20,412.79 | 0.00 | 20,412.79 |
| **Total this Job** | **20,412.79** | **0.00** | **20,412.79** |
| | | | |
| **TOTAL THIS INVOICE** | **20,412.79** | **0.00** | **$20,412.79 USD** |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 7

Attachment 2-A

NON-CERTIFIED COPY



|  | | Invoice Date | 08/20/2013 |
|--|--|--------------|------------|
|  | | Invoice | 5624795 |
|  | | Project | 19230060 |
|  | | Page | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:   WO1112

For:   Belle Chasse Phase II

<u>Professional Services for Period Ending 08/09/2013</u>
*Job: 19230060  H&E Belle Chasse Phase II*

| PHASE | FEE | PERCENT COMPLETE | FEE EARNED | PREVIOUS BILLING | CURRENT BILLING |
|-------|-----|------------------|------------|------------------|-----------------|
| Design Phase | 162,994.15 | 100.00% | 162,994.15 | 162,994.15 | 0.00 |
| Bidding and Negotiation Phase | 14,817.65 | 100.00% | 14,817.65 | 14,817.65 | 0.00 |
| Construction Admin Phase | 178,997.21 | 46.36% | 82,978.84 | 62,566.05 | 20,412.79 |
| **TOTALS** | 356,809.01 | | 260,790.64 | 240,377.85 | 20,412.79 |

*Total due this job*          **20,412.79**

**TOTAL THIS INVOICE**          **$20,412.79** USD

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320784

**Exhibit 7**

**Attachment 2-A**

NON-CERTIFIED COPY

 **URS**

**Remittance Page**

| | |
|---|---|
| Invoice Date | 09/25/2013 |
| Invoice | 5657774 |
| Project | 19230060 |
| Page | 1 |

Reference:  WO1112

For:   Belle Chasse Phase II

Professional Services for Period Ending 09/06/2013

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:        $15,967.40  USD
Terms:             Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**   URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**   URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**
Account:        URS Corporation
Bank:           Wells Fargo Bank
Account No.:    4520-086471
ABA Routing No.:  121-000-248
Swift Code:     WFBIUS6S

Remittance Information can be sent to:
Email:          RemitTo@urs.com
Fax:            (512) 419-6937    Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 7**

**Attachment 2-A**


NON-CERTIFIED COPY



| | | |
|---|---|---|
| Invoice Date | 09/25/2013 |
| Invoice | 5657774 |
| Project | 19230060 |
| Page | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO1112

For:  Belle Chasse Phase II

Professional Services for Period Ending 09/06/2013

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job:  19230060  H&E Belle Chasse Phase II | 15,967.40 | 0.00 | 15,967.40 |
| Total this job | 15,967.40 | 0.00 | 15,967.40 |
| TOTAL THIS INVOICE | 15,967.40 | 0.00 | $15,967.40 USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 7

Attachment 2-A


NON-CERTIFIED COPY



| | | Invoice Date | 09/25/2013 |
|---|---|---|---|
| | | Invoice | 5657774 |
| | | Project | 19230060 |
| | | Page | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:   WO1112

For:   Belle Chasse Phase II

<u>Professional Services for Period Ending 09/06/2013</u>
*Job: 19230060  H&E Belle Chasse Phase II*

| PHASE | FEE | PERCENT COMPLETE | FEE EARNED | PREVIOUS BILLING | CURRENT BILLING |
|---|---|---|---|---|---|
| Design Phase | 162,994.15 | 100.00% | 162,994.15 | 162,994.15 | 0.00 |
| Bidding and Negotiation Phase | 14,817.65 | 100.00% | 14,817.65 | 14,817.65 | 0.00 |
| Construction Admin Phase | 194,964.61 | 50.75% | 98,946.24 | 82,978.84 | 15,967.40 |
| TOTALS | 372,776.41 | | 276,758.04 | 260,790.64 | 15,967.40 |

*Total due this Job*   15,967.40

**TOTAL THIS INVOICE**   $15,967.40 USD

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320780

**Exhibit 7**

**Attachment 2-A**

NON-CERTIFIED COPY



**URS**

**Remittance Page**

| | |
|---|---|
| Invoice Date | 10/24/2013 |
| Invoice | 5688671 |
| Project | 19230060 |
| Page | 1 |

Reference:  WO1112

For:  Belle Chasse Phase II

Professional Services for Period Ending 10/11/2013

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

**Total Due:**        $13,987.96  USD
Terms:               Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**     URS Corporation
                            P.O. Box 116183
                            Atlanta GA 30368-6183
                            US

**Overnight Courier:**       URS Corporation
                            Lock Box No. 116183
                            100 South Crest Drive
                            Stockbridge, GA  30281
                            Attention:  Atlanta Lockbox
                            (877) 786-3333

**Electronic Funds Transfer:**
     Account:        URS Corporation
     Bank:           Wells Fargo Bank
     Account No.:    4520-086471
     ABA Routing No.:  121-000-248
     Swift Code:     WFBIUS6S

Remittance Information can be sent to:
     Email:          RemitTo@urs.com
     Fax:            (512) 419-6937   Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 7**

**Attachment 2-A**

NON-CERTIFIED COPY



|                |            |
|----------------|------------|
| Invoice Date   | 10/24/2013 |
| Invoice        | 5688671    |
| Project        | 19230060   |
| Page           | 2          |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO1112

For:   Belle Chasse Phase II

Professional Services for Period Ending 10/11/2013

|                                              | SERVICES  | EXPENSES | TOTAL           |
|----------------------------------------------|-----------|----------|-----------------|
| Job: 19230060  H&E Belle Chasse Phase II     | 13,987.96 | 0.00     | 13,987.96       |
| Total this job                               | 13,987.96 | 0.00     | 13,987.96       |
| **TOTAL THIS INVOICE**                       | 13,987.96 | 0.00     | **$13,987.96 USD** |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 7

Attachment 2-A





|  |  |
|---|---|
| Invoice Date | 10/24/2013 |
| Invoice | 5688671 |
| Project | 19230060 |
| Page | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO1112

For:   Belle Chasse Phase II

<u>Professional Services for Period Ending 10/11/2013</u>
*Job: 19230060  H&E Belle Chasse Phase II*

| PHASE | FEE | PERCENT COMPLETE | FEE EARNED | PREVIOUS BILLING | CURRENT BILLING |
|---|---|---|---|---|---|
| Design Phase | 162,994.15 | 100.00% | 162,994.15 | 162,994.15 | 0.00 |
| Bidding and Negotiation Phase | 14,817.65 | 100.00% | 14,817.65 | 14,817.65 | 0.00 |
| Construction Admin Phase | 208,952.57 | 54.05% | 112,934.20 | 98,946.24 | 13,987.96 |
| **TOTALS** | 386,764.37 | | 290,746.00 | 276,758.04 | 13,987.96 |

*Total due this job*      13,987.96

**TOTAL THIS INVOICE**      $13,987.96 USD

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320776

**Exhibit 7**

**Attachment 2-A**

NON-CERTIFIED COPY



**Remittance Page**

| | |
|---|---|
| Invoice Date | 11/18/2013 |
| Invoice | 5713835 |
| Project | 19230060 |
| Page | 1 |

Reference: WO1112
For:  Belle Chasse Phase II

Professional Services for Period Ending 11/08/2013

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:          $5,607.00  USD
Terms:              Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**   URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**     URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**
Account:       URS Corporation
Bank:          Wells Fargo Bank
Account No.:   4520-086471
ABA Routing No.:  121-000-248
Swift Code:    WFBIUS6S

Remittance Information can be sent to:
Email:      RemitTo@urs.com
Fax:        (512) 419-6937   Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 7**

**Attachment 2-A**


NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 11/18/2013 |
| Invoice | 5713835 |
| Project | 19230060 |
| Page | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO1112

For:   Belle Chasse Phase II

Professional Services for Period Ending 11/08/2013

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job:  19230060  H&E Belle Chasse Phase II | 5,607.00 | 0.00 | 5,607.00 |
| Total this job | 5,607.00 | 0.00 | 5,607.00 |
| TOTAL THIS INVOICE | 5,607.00 | 0.00 | $5,607.00 USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 7

Attachment 2-A

NON-CERTIFIED COPY



|  |  |
|---|---|
| Invoice Date | 11/18/2013 |
| Invoice | 5713835 |
| Project | 19230060 |
| Page | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO1112

For:  Belle Chasse Phase II

Professional Services for Period Ending 11/08/2013
Job: 19230060  H&E Belle Chasse Phase II

| PHASE | FEE | PERCENT COMPLETE | FEE EARNED | PREVIOUS BILLING | CURRENT BILLING |
|---|---|---|---|---|---|
| Design Phase | 162,994.15 | 100.00% | 162,994.15 | 162,994.15 | 0.00 |
| Bidding and Negotiation Phase | 14,817.65 | 100.00% | 14,817.65 | 14,817.65 | 0.00 |
| Construction Admin Phase | 214,559.57 | 55.25% | 118,541.20 | 112,934.20 | 5,607.00 |
| TOTALS | 392,371.37 |  | 296,353.00 | 290,746.00 | 5,607.00 |

Total due this job    **5,607.00**

TOTAL THIS INVOICE    **$5,607.00** USD

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320774

Exhibit 7

Attachment 2-A

NON-CERTIFIED COPY

 **URS**

**Remittance Page**

| | |
|---|---|
| Invoice Date | 07/29/2013 |
| Invoice | 5591796 |
| Project | 19229626 |
| Page | 1 |

Reference:  PS 100

For:    H & E Kenner Phase II

Professional Services for Period Ending 02/08/2013

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

| | |
|---|---|
| Total Due: | $231.48  USD |
| Terms: | Net 30 |

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**   URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**    URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**
Account:          URS Corporation
Bank:             Wells Fargo Bank
Account No.:      4520-086471
ABA Routing No.:  121-000-248
Swift Code:       WFBIUS6S

Remittance Information can be sent to:
Email:            RemitTo@urs.com
Fax:              (512) 419-6937   Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 8**

**Attachment 2-B**

NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 07/29/2013 |
| Invoice | 5591796 |
| Project | 19229626 |
| Page | 2 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  PS 100

For:   H & E Kenner Phase II

<u>Professional Services for Period Ending 02/08/2013</u>

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| **Job: 19229626  H&E Kenner Phase II** | | | |
| Task:  00001  Project Management | 124.98 | 0.00 | 124.98 |
| Task:  00010  Site Civil | 106.50 | 0.00 | 106.50 |
| Total this job | 231.48 | 0.00 | 231.48 |
| | | | |
| **TOTAL THIS INVOICE** | 231.48 | 0.00 | $231.48 USD |

Project Manager: Chad Herndon

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 8

Attachment 2-B


NON-CERTIFIED COPY



|  |  |
|---|---|
| Invoice Date | 07/29/2013 |
| Invoice | 5591796 |
| Project | 19229626 |
| Page | 3 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  PS 100

For:   H & E Kenner Phase II

<u>Professional Services for Period Ending 02/08/2013</u>

**Job:  19229626  H&E Kenner Phase II**
  **Task:  00001  Project Management**

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Administrator III |  |  |  |
| Shillingburg, Stephanie B | 0.25 | 84.80 | 21.20 |
| Vampran, Lee D | 2.00 | 51.89 | 103.78 |
| Subtotal | 2.25 |  | 124.98 |
| Total Labor |  |  | **124.98** |
| *Total due this task* |  |  | *124.98* |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this Invoice.

F7320593

**Exhibit 8**

**Attachment 2-B**

NON-CERTIFIED COPY



|  | | Invoice Date | 07/29/2013 |
|---|---|---|---|
|  | | Invoice | 5591796 |
|  | | Project | 19229626 |
| Reference: PS 100 | | Page | 4 |

For:   H & E Kenner Phase II

**Task: 00010  Site Civil**

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Senior Engineer | | | |
| Gaines, Timothy F | 1.00 | 106.50 | 106.50 |
| Subtotal | 1.00 | | 106.50 |
| **Total Labor** | | | **106.50** |
| *Total due this task* | | | *106.50* |
| *Total due this job* | | | *231.48* |
| **TOTAL THIS INVOICE** | | | **$231.48** USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 8**

**Attachment 2-B**

NON-CERTIFIED COPY

Invoice Date  07/29/2013
Invoice    5591796
Project    19229626
Reference   PS 100

BILLING BACKUP

Page 1

| G/L DATE<br>SRV DATE | JOB/<br>LBR CMT | GL ACCT | TASK | DOC / INV# | EMP /<br>VENDOR # | NAME /<br>DESCRIPTION | HOURS /<br>QTY | RATE | BILLING<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| **Job:  19229626  H&E Kenner Phase II** | | | | | | | | | |
| **Task:  00001  Project Management** | | | | | | | | | |
| **Labor** | | | | | | | | | |
| Administrator III | | | | | | | | | |
| 08/17/20<br>08/17/2012 | 19229626 | 50110 | 00001 | T4 8246013 | 39606 | Shillingburg, Stephanie B<br>Administrator III | 0.25 | 84.80 | 21.20 |
| 10/19/20<br>10/19/2012 | 19229626 | 50110 | 00001 | T4 8415703 | 37776 | Vampran, Lee D<br>Administrator III | 1.00 | 51.89 | 51.89 |
| 08/17/20<br>08/17/2012 | 19229626 | 50110 | 00001 | T4 8245742 | 37776 | Vampran, Lee D<br>Administrator III | 1.00 | 51.89 | 51.89 |
| **Total Labor** | | | | | | | | | **124.98** |

NON-CERTIFIED COPY

Attachment 2-B

Exhibit 8

Invoice Date  07/29/2013                    BILLING BACKUP                                                      Page 2
Invoice       5591796
Project       19229626
Reference     PS 100

| G/L DATE JOB/<br>SRV DATE LBR CMT | GL ACCT | TASK | DOC / INV# | EMP /<br>VENDOR # | NAME /<br>DESCRIPTION | HOURS /<br>QTY | RATE | BILLING<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|
| *Task: 00010 Site Civil* | | | | | | | | |
| **Labor** | | | | | | | | |
| Senior Engineer | | | | | | | | |
| 08/17/20  19229626<br>08/17/2012 | 50110 | 00010 | T4 8242017 | 67000 | Gaines, Timothy F<br>Senior Engineer | 1.00 | 106.50 | 106.50 |
| **Total Labor** | | | | | | | | **106.50** |

 **URS**

**Remittance Page**

| | |
|---|---|
| Invoice Date | 12/23/2013 |
| Invoice | 5744512 |
| Project | 19229626 |
| Page | 1 |

Reference:  PS 100

For:   H & E Kenner Phase II

<u>Professional Services for Period Ending 12/13/2013</u>

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

**Total Due:**        $481.93  **USD**

Terms:        Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**     URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**     URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**

| | |
|---|---|
| Account: | URS Corporation |
| Bank: | Wells Fargo Bank |
| Account No.: | 4520-086471 |
| ABA Routing No.: | 121-000-248 |
| Swift Code: | WFBIUS6S |

Remittance Information can be sent to:
Email:        RemitTo@urs.com
Fax:        (512) 419-6937    Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 8**

**Attachment 2-B**

NON-CERTIFIED COPY



|  |  |
|---|---|
| Invoice Date | 12/23/2013 |
| Invoice | 5744512 |
| Project | 19229626 |
| Page | 2 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  PS 100

For:  H & E Kenner Phase II

Professional Services for Period Ending 12/13/2013

|  | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| **Job: 19229626  H&E Kenner Phase II** |  |  |  |
| Task: 00001  Project Management | 55.93 | 0.00 | 55.93 |
| Task: 00010  Site Civil | 426.00 | 0.00 | 426.00 |
| Total this job | 481.93 | 0.00 | 481.93 |
|  |  |  |  |
| TOTAL THIS INVOICE | 481.93 | 0.00 | $481.93 USD |

Project Manager: Chad Herndon

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 8

Attachment 2-B

NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 12/23/2013 |
| Invoice | 5744512 |
| Project | 19229626 |
| Page | 3 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference: PS 100

For: H & E Kenner Phase II

Professional Services for Period Ending 12/13/2013

**Job: 19229626 H&E Kenner Phase II**
  **Task: 00001 Project Management**

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Administrator III | | | |
| Vampran, Lee D | 1.00 | 55.93 | 55.93 |
| Subtotal | 1.00 | | 55.93 |
| **Total Labor** | | | **55.93** |
| *Total due this task* | | | 55.93 |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320597

**Exhibit 8**

**Attachment 2-B**

NON-CERTIFIED COPY

 **URS**

| | |
|---|---|
| Invoice Date | 12/23/2013 |
| Invoice | 5744512 |
| Project | 19229626 |
| Page | 4 |

Reference:  PS 100

For:    H & E Kenner Phase II

**Task: 00010  Site Civil**

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Senior Engineer | | | |
| Gaines, Timothy F | 4.00 | 106.50 | 426.00 |
| Subtotal | 4.00 | | 426.00 |
| **Total Labor** | | | **426.00** |
| *Total due this task* | | | *426.00* |
| *Total due this job* | | | *481.93* |
| **TOTAL THIS INVOICE** | | | **$481.93** USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 8**

**Attachment 2-B**

NON-CERTIFIED COPY

Invoice Date  12/23/2013                    BILLING BACKUP                                    Page 1
Invoice       5744512
Project       19229626
Reference     PS 100

| G/L DATE JOB/<br>SRV DATE LBR CMT | GL ACCT | TASK | DOC / INV# | EMP /<br>VENDOR # | NAME /<br>DESCRIPTION | HOURS /<br>QTY | RATE | BILLING<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|
| **Job:  19229626  H&E Kenner Phase II** | | | | | | | | |
| **Task:  00001  Project Management** | | | | | | | | |
| **Labor** | | | | | | | | |
| Administrator III | | | | | | | | |
| 09/13/20  19229626<br>09/13/2013 | 50110 | 00001 | T4 9341601 | 37776 | Vampran, Lee D<br>Administrator III | 1.00 | 55.93 | 55.93 |
| **Total Labor** | | | | | | | | 55.93 |

NON-CERTIFIED COPY

Attachment 2-B

Exhibit 8

Invoice Date  12/23/2013
Invoice      5744512
Project      19229626
Reference    PS 100

BILLING BACKUP

Page 2

| G/L DATE  JOB/ SRV DATE LBR CMT | GL ACCT | TASK | DOC / INV# | EMP / VENDOR # | NAME / DESCRIPTION | HOURS / QTY | RATE | BILLING AMOUNT |
|---|---|---|---|---|---|---|---|---|
| **Task:  00010  Site Civil** | | | | | | | | |
| Labor | | | | | | | | |
| Senior Engineer | | | | | | | | |
| 04/26/20  19229626 04/09/2013 | 50110 | 00010 | T4 8935310 | 67000 | Gaines, Timothy F Senior Engineer | 4.00 | 106.50 | 426.00 |
| **Total Labor** | | | | | | | | 426.00 |

NON-CERTIFIED COPY

Attachment 2-B    Exhibit 8

 **URS**

**Remittance Page**

| | |
|---|---|
| Invoice Date | 12/19/2012 |
| Invoice | 5357940 |
| Project | 19229775 |
| Page | 1 |

Reference:  WO#0111

For:   H&E Phase IV BN & CA

Professional Services for Period Ending 12/07/2012

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:          **$66,001.45  USD**
Terms:                Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**    URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**      URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**
Account:          URS Corporation
Bank:             Wells Fargo Bank
Account No.:      4520-086471
ABA Routing No.:  121-000-248
Swift Code:       WFBIUS6S

Remittance Information can be sent to:
Email:       RemitTo@urs.com
Fax:         (512) 419-6937    Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 12/19/2012 |
| Invoice | 5357940 |
| Project | 19229775 |
| Page | 2 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO#0111

For:  H&E Phase IV BN & CA

Professional Services for Period Ending 12/07/2012

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job: 19229775  H&E Phase IV BN & CA | 66,001.45 | 0.00 | 66,001.45 |
| Total this job | 66,001.45 | 0.00 | 66,001.45 |
| TOTAL THIS INVOICE | 66,001.45 | 0.00 | $66,001.45 USD |

Project Manager: Neal Johnson

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY



| | | |
|---|---|---|
| Invoice Date | | 12/19/2012 |
| Invoice | | 5357940 |
| Project | | 19229775 |
| Page | | 3 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference: WO#0111

For:   H&E Phase IV BN & CA

<u>Professional Services for Period Ending 12/07/2012</u>
*Job: 19229775  H&E Phase IV BN & CA*

<u>LUMP SUM</u>

| | |
|---|---|
| Lump Sum Billing | 66,001.45 |
| **Total Lump Sum** | **66,001.45** |
| *Total due this job* | **66,001.45** |
| **TOTAL THIS INVOICE** | **$66,001.45** USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320603

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY



**URS**                        Remittance Page

| | |
|---|---|
| Invoice Date | 12/19/2012 |
| Invoice | 5357943 |
| Project | 19229964 |
| Page | 1 |

Reference:  1111

For:    H&E Design Changes

Professional Services for Period Ending 12/07/2012

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:              $3,487.50  USD
Terms:                  Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**     URS Corporation
                             P.O. Box 116183
                             Atlanta GA 30368-6183
                             US

**Overnight Courier:**       URS Corporation
                             Lock Box No. 116183
                             100 South Crest Drive
                             Stockbridge, GA  30281
                             Attention:  Atlanta Lockbox
                             (877) 786-3333

**Electronic Funds Transfer:**
       Account:          URS Corporation
       Bank:             Wells Fargo Bank
       Account No.:      4520-086471
       ABA Routing No.:  121-000-248
       Swift Code:       WFBIUS6S

Remittance Information can be sent to:
       Email:            RemitTo@urs.com
       Fax:              (512) 419-6937    Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 9

Attachment 2-C


NON-CERTIFIED COPY



Invoice Date    12/19/2012
Invoice    5357943
Project    19229964
Page    2

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  1111

For:  H&E Design Changes

Professional Services for Period Ending 12/07/2012

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| **Job: 19229964  H&E Design Changes** | | | |
| Task: 00001  Project Management | 2,092.50 | 0.00 | 2,092.50 |
| Task: 00002  Design/Construction Documents | 1,065.00 | 0.00 | 1,065.00 |
| Task: 00004  Pricing Coordination | 330.00 | 0.00 | 330.00 |
| **Total this job** | **3,487.50** | **0.00** | **3,487.50** |
| **TOTAL THIS INVOICE** | **3,487.50** | **0.00** | **$3,487.50 USD** |

Project Manager: Larry Johnson

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY



| | | |
|---|---|---|
| Invoice Date | | 12/19/2012 |
| Invoice | | 5357943 |
| Project | | 19229964 |
| Page | | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference: 1111

For: H&E Design Changes

<u>Professional Services for Period Ending 12/07/2012</u>

**Job: 19229964  H&E Design Changes**
   **Task:  00001  Project Management**

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| PRINCIPAL | | | |
| Johnson Jr, Larry O | 12.00 | 165.00 | 1,980.00 |
| ADMINISTRATION | | | |
| Vampran, Lee D | 1.00 | 50.00 | 50.00 |
| Shillingburg, Stephanie B | 1.25 | 50.00 | 62.50 |
| Subtotal | 14.25 | | 2,092.50 |
| **Total Labor** | | | **2,092.50** |
| | | *Total due this task* | 2,092.50 |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320654

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY



|  | Invoice Date | 12/19/2012 |
|---|---|---|
|  | Invoice | 5357943 |
|  | Project | 19229964 |
|  | Page | 4 |

Reference:  1111

For:    H&E Design Changes

**Task: 00002  Design/Construction Documents**

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| SR. ARCHITECT | | | |
| Ryan, Thomas E | 9.00 | 100.00 | 900.00 |
| PRINCIPAL | | | |
| Johnson Jr, Larry O | 1.00 | 165.00 | 165.00 |
| Subtotal | 10.00 | | 1,065.00 |
| **Total Labor** | | | **1,065.00** |
| | | *Total due this task* | *1,065.00* |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**





| | Invoice Date | 12/19/2012 |
|---|---|---|
| | Invoice | 5357943 |
| | Project | 19229964 |
| | Page | 5 |

Reference: 1111

For:    H&E Design Changes

**Task: 00004 Pricing Coordination**

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| PRINCIPAL | | | |
| Johnson Jr, Larry O | 2.00 | 165.00 | 330.00 |
| Subtotal | 2.00 | | 330.00 |
| **Total Labor** | | | 330.00 |
| *Total due this task* | | | 330.00 |
| *Total due this job* | | | 3,487.50 |
| **TOTAL THIS INVOICE** | | | $3,487.50 USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

Attachment 2-C


NON-CERTIFIED COPY

Invoice Date   12/19/2012
Invoice        5357943
Project        19229964
Reference      1111

BILLING BACKUP

Page 1

| G/L DATE  JOB/<br>SRV DATE  LBR CMT | GL ACCT | TASK | DOC / INV# | EMP /<br>VENDOR # | NAME /<br>DESCRIPTION | HOURS /<br>QTY | RATE | BILLING<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|
| **Job: 19229964  H&E Design Changes** | | | | | | | | |
| **Task: 00001  Project Management** | | | | | | | | |
| **Labor** | | | | | | | | |
| PRINCIPAL | | | | | | | | |
| 12/07/20   19229964<br>12/07/2012 | 50110 | 00001 | T4 8547355 | 66831 | Johnson Jr, Larry O<br>PRINCIPAL | 3.00 | 165.00 | 495.00 |
| 11/30/20   19229964<br>11/30/2012 | 50110 | 00001 | T4 8525429 | 66831 | Johnson Jr, Larry O<br>PRINCIPAL | 2.00 | 165.00 | 330.00 |
| 11/23/20   19229964<br>11/23/2012 | 50110 | 00001 | T4 8507340 | 66831 | Johnson Jr, Larry O<br>PRINCIPAL | 7.00 | 165.00 | 1,155.00 |
| ADMINISTRATION | | | | | | | | |
| 11/16/20   19229964<br>11/16/2012 | 50110 | 00001 | T4 8493210 | 37776 | Vampran, Lee D<br>ADMINISTRATION | 1.00 | 50.00 | 50.00 |
| 11/23/20   19229964<br>11/23/2012 | 50110 | 00001 | T4 8512122 | 39606 | Shillinburg, Stephanie B<br>ADMINISTRATION | 1.25 | 50.00 | 62.50 |
| **Total Labor** | | | | | | | | **2,092.50** |

NON-CERTIFIED COPY

Attachment 2-C

Exhibit 9

NON-CERTIFIED COPY

Attachment 2-C    Exhibit 9

Invoice Date  12/19/2012

BILLING BACKUP

Page 2

Invoice      5357943
Project      19229964
Reference    1111

| G/L DATE  JOB/<br>SRV DATE LBR CMT | GL ACCT | TASK | DOC / INV# | EMP /<br>VENDOR # | NAME /<br>DESCRIPTION | HOURS /<br>QTY | RATE | BILLING<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|
| **Task: 00002  Design/Construction Documents** | | | | | | | | |
| Labor | | | | | | | | |
| SR. ARCHITECT | | | | | | | | |
| 11/16/20  19229964<br>11/16/2012 | 50110 | 00002 | T4 8491717 | 128516 | Ryan, Thomas E<br>SR. ARCHITECT | 9.00 | 100.00 | 900.00 |
| PRINCIPAL | | | | | | | | |
| 11/30/20  19229964<br>11/30/2012 | 50110 | 00002 | T4 8525429 | 66831 | Johnson Jr, Larry O<br>PRINCIPAL | 1.00 | 165.00 | 165.00 |
| Total Labor | | | | | | | | 1,065.00 |

Invoice Date   12/19/2012

BILLING BACKUP

Page 3

Invoice        5357943
Project        19229964
Reference      1111

| G/L DATE JOB/ SRV DATE LBR CMT | GL ACCT | TASK | DOC / INV# | EMP / VENDOR # | NAME / DESCRIPTION | HOURS / QTY | RATE | BILLING AMOUNT |
|---|---|---|---|---|---|---|---|---|
| **Task: 00004 Pricing Coordination** | | | | | | | | |
| Labor | | | | | | | | |
| PRINCIPAL | | | | | | | | |
| 11/30/20  19229964 11/30/2012 | 50110 | 00004 | T4 8525429 | 66831 | Johnson Jr, Larry O PRINCIPAL | 2.00 | 165.00 | 330.00 |
| **Total Labor** | | | | | | | | **330.00** |

NON-CERTIFIED COPY

Attachment 2-C

Exhibit 9



**URS**

Remittance Page

| | |
|---|---|
| Invoice Date | 12/19/2012 |
| Invoice | 5357991 |
| Project | 19230248 |
| Page | 1 |

Reference: 1012

For: H&E BR HQ Interior Design

Professional Services for Period Ending 12/07/2012

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

| | |
|---|---|
| Total Due: | $858.75  USD |
| Terms: | Net 30 |

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**   URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**   URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**
Account:          URS Corporation
Bank:             Wells Fargo Bank
Account No.:      4520-086471
ABA Routing No.:  121-000-248
Swift Code:       WFBIUS6S

Remittance Information can be sent to:
Email:          RemitTo@urs.com
Fax:            (512) 419-6937    Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 9

Attachment 2-C







| | | |
|---|---|---|
| Invoice Date | | 12/19/2012 |
| Invoice | | 5357991 |
| Project | | 19230248 |
| Page | | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  1012

For:   H&E BR HQ Interior Design

Professional Services for Period Ending 12/07/2012

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| **Job: 19230248  H&E BR HQ Interior Design** | | | |
| Task:  00001  Project Management | 858.75 | 0.00 | 858.75 |
| Total this Job | 858.75 | 0.00 | 858.75 |
| **TOTAL THIS INVOICE** | 858.75 | 0.00 | $858.75 USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 9

Attachment 2-C

NON-CERTIFIED COPY



| | | |
|---|---|---|
| Invoice Date | | 12/19/2012 |
| Invoice | | 5357991 |
| Project | | 19230248 |
| Page | | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  1012

For:   H&E BR HQ Interior Design

Professional Services for Period Ending 12/07/2012

Job: 19230248  H&E BR HQ Interior Design
Task: 00001  Project Management

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| PROCUREMENT | | | |
| Shillingburg, Stephanie B | 0.75 | 65.00 | 48.75 |
| PRINCIPAL | | | |
| Johnson Jr, Larry O | 4.00 | 165.00 | 660.00 |
| ADMINISTRATIVE | | | |
| Vampran, Lee D | 3.00 | 50.00 | 150.00 |
| Subtotal | 7.75 | | 858.75 |
| **Total Labor** | | | 858.75 |
| | *Total due this task* | | *858.75* |
| | *Total due this job* | | *858.75* |
| | **TOTAL THIS INVOICE** | | **$858.75 USD** |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320823

**Exhibit 9**

**Attachment 2-C**



Invoice Date  12/19/2012
Invoice       5357991
Project       19230248
Reference     1012

BILLING BACKUP

Page 1

| G/L DATE  JOB/<br>SRV DATE  LBR CMT | GL ACCT | TASK | DOC / INV# | EMP /<br>VENDOR # | NAME /<br>DESCRIPTION | HOURS /<br>QTY | RATE | BILLING<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|

**Job: 19230248  H&E BR HQ Interior Design**
   **Task: 00001  Project Management**

Labor
PROCUREMENT

| 11/23/20  19230248<br>11/23/2012 | 50110 | 00001 | T4 8512122 | 39606 | Shillingburg, Stephanie B<br>PROCUREMENT | 0.75 | 65.00 | 48.75 |

PRINCIPAL

| 11/23/20  19230248<br>11/23/2012 | 50110 | 00001 | T4 8507340 | 66831 | Johnson Jr, Larry O<br>PRINCIPAL | 4.00 | 165.00 | 660.00 |

ADMINISTRATIVE

| 11/16/20  19230248<br>11/16/2012 | 50110 | 00001 | T4 8493210 | 37776 | Vampran, Lee D<br>ADMINISTRATIVE | 3.00 | 50.00 | 150.00 |

       Total Labor                                                              858.75

NON-CERTIFIED COPY

Attachment 2-C

Exhibit 9



**URS**        Remittance Page

| | |
|---|---|
| Invoice Date | 01/14/2013 |
| Invoice | 5357942 |
| Project | 19229873 |
| Page | 1 |

Reference:  WO0711

For:  H&E HQ & BR Branch-Phase V

<u>Professional Services for Period Ending 12/07/2012</u>

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

**Total Due:**      $28,882.00  USD

Terms:      Net 30

*   Make checks payable to: URS Corporation
*   Please Indicate invoice number and/or project number on check
*   Please include this stub with payment

**Regular Mail (USPS):**    URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**    URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**

| | |
|---|---|
| Account: | URS Corporation |
| Bank: | Wells Fargo Bank |
| Account No.: | 4520-086471 |
| ABA Routing No.: | 121-000-248 |
| Swift Code: | WFBIUS6S |

Remittance Information can be sent to:
Email:     RemitTo@urs.com
Fax:       (512) 419-6937  Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**


NON-CERTIFIED COPY



|  |  |
|---|---|
| Invoice Date | 01/14/2013 |
| Invoice | 5357942 |
| Project | 19229873 |
| Page | 2 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO0711

For:   H&E HQ & BR Branch-Phase V

Professional Services for Period Ending 12/07/2012

|  | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job:  19229873  H&E Phase V FF&E | 28,882.00 | 0.00 | 28,882.00 |
| Total this job | 28,882.00 | 0.00 | 28,882.00 |
| TOTAL THIS INVOICE | 28,882.00 | 0.00 | $28,882.00 USD |

Project Manager: Larry Johnson

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 01/14/2013 |
| Invoice | 5357942 |
| Project | 19229873 |
| Page | 3 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO0711

For:   H&E HQ & BR Branch-Phase V

Professional Services for Period Ending 12/07/2012
*Job: 19229873  H&E Phase V FF&E*

LUMP SUM

| | |
|---|---|
| Lump Sum Billing | 28,882.00 |
| **Total Lump Sum** | **28,882.00** |
| *Total due this job* | **28,882.00** |
| **TOTAL THIS INVOICE** | **$28,882.00** USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320623

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY

 **URS**

**Remittance Page**

| | |
|---|---|
| Invoice Date | 02/25/2013 |
| Invoice | 5424197 |
| Project | 19230248 |
| Page | 1 |

Reference: 1012

For:  H&E BR HQ Interior Design

<u>Professional Services for Period Ending 02/08/2013</u>

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:        $6,605.00  USD
Terms:            Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**    URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**    URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**
Account:        URS Corporation
Bank:           Wells Fargo Bank
Account No.:    4520-086471
ABA Routing No.: 121-000-248
Swift Code:     WFBIUS6S

Remittance Information can be sent to:
Email:          RemitTo@urs.com
Fax:            (512) 419-6937    Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY


**URS**

| | |
|---|---|
| Invoice Date | 02/25/2013 |
| Invoice | 5424197 |
| Project | 19230248 |
| Page | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  1012

For:   H&E BR HQ Interior Design

<u>Professional Services for Period Ending 02/08/2013</u>

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| **Job:  19230248  H&E BR HQ Interior Design** | | | |
| Task:  00001  Project Management | 5,145.00 | 0.00 | 5,145.00 |
| Task:  00002  Design/Construction Documents | 1,460.00 | 0.00 | 1,460.00 |
| Total this job | 6,605.00 | 0.00 | 6,605.00 |
| **TOTAL THIS INVOICE** | 6,605.00 | 0.00 | $6,605.00 USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 9

Attachment 2-C

NON-CERTIFIED COPY



| | | |
|---|---|---|
| Invoice Date | | 02/25/2013 |
| Invoice | | 5424197 |
| Project | | 19230248 |
| Page | | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference: 1012

For:  H&E BR HQ Interior Design

Professional Services for Period Ending 02/08/2013

Job: 19230248  H&E BR HQ Interior Design
   Task: 00001  Project Management

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| PRINCIPAL | | | |
| Johnson Jr, Larry O | 23.00 | 165.00 | 3,795.00 |
| ARCHITECT | | | |
| Ryan, Thomas E | 13.00 | 100.00 | 1,300.00 |
| ADMINISTRATIVE | | | |
| Vampran, Lee D | 1.00 | 50.00 | 50.00 |
| Subtotal | 37.00 | | 5,145.00 |
| **Total Labor** | | | **5,145.00** |
| | | *Total due this task* | *5,145.00* |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320825

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY



**URS**

| | | |
|---|---|---|
| Invoice Date | | 02/25/2013 |
| Invoice | | 5424197 |
| Project | | 19230248 |
| Page | | 4 |

Reference:  1012

For:    H&E BR HQ Interior Design

*Task: 00002 Design/Construction Documents*

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| PRINCIPAL | | | |
| Johnson Jr, Larry O | 4.00 | 165.00 | 660.00 |
| ARCHITECT | | | |
| Ryan, Thomas E | 8.00 | 100.00 | 800.00 |
| Subtotal | 12.00 | | 1,460.00 |
| Total Labor | | | **1,460.00** |
| | *Total due this task* | | **1,460.00** |
| | *Total due this job* | | **6,605.00** |
| | **TOTAL THIS INVOICE** | | **$6,605.00 USD** |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY

NON-CERTIFIED COPY

Attachment 2-C    Exhibit 9

| Invoice Date | 02/25/2013 |
|---|---|
| Invoice | 5424197 |
| Project | 19230248 |
| Reference | 1012 |

BILLING BACKUP

Page 1

| G/L DATE SRV DATE | JOB/ LBR CMT | GL ACCT | TASK | DOC / INV# | EMP / VENDOR # | NAME / DESCRIPTION | HOURS / QTY | RATE | BILLING AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| **Job: 19230248 H&E BR HQ Interior Design** | | | | | | | | | |
| **Task: 00001 Project Management** | | | | | | | | | |
| **Labor** | | | | | | | | | |
| **PRINCIPAL** | | | | | | | | | |
| 12/21/20 12/21/2012 | 19230248 | 50110 | 00001 | T4 8582568 | 66831 | Johnson Jr, Larry O PRINCIPAL | 4.00 | 165.00 | 660.00 |
| 01/11/20 12/14/2012 | 19230248 | 50110 | 00001 | T4 8629674 | 66831 | Johnson Jr, Larry O PRINCIPAL | 1.00 | 165.00 | 165.00 |
| 01/11/20 12/11/2012 | 19230248 | 50110 | 00001 | T4 8629674 | 66831 | Johnson Jr, Larry O PRINCIPAL | 1.00 | 165.00 | 165.00 |
| 01/11/20 12/10/2012 | 19230248 | 50110 | 00001 | T4 8629674 | 66831 | Johnson Jr, Larry O PRINCIPAL | 1.00 | 165.00 | 165.00 |
| 12/21/20 11/15/2012 | 19230248 | 50110 | 00001 | T4 8589201 | 66831 | Johnson Jr, Larry O PRINCIPAL | 2.00 | 165.00 | 330.00 |
| 12/21/20 11/14/2012 | 19230248 | 50110 | 00001 | T4 8589201 | 66831 | Johnson Jr, Larry O PRINCIPAL | 2.00 | 165.00 | 330.00 |
| 12/21/20 11/13/2012 | 19230248 | 50110 | 00001 | T4 8589201 | 66831 | Johnson Jr, Larry O PRINCIPAL | 1.00 | 165.00 | 165.00 |
| 12/21/20 11/12/2012 | 19230248 | 50110 | 00001 | T4 8589201 | 66831 | Johnson Jr, Larry O PRINCIPAL | 1.00 | 165.00 | 165.00 |
| 01/18/20 01/18/2013 | 19230248 | 50110 | 00001 | T4 8660444 | 66831 | Johnson Jr, Larry O PRINCIPAL | 2.00 | 165.00 | 330.00 |
| 01/11/20 01/11/2013 | 19230248 | 50110 | 00001 | T4 8640187 | 66831 | Johnson Jr, Larry O PRINCIPAL | 6.00 | 165.00 | 990.00 |
| 01/04/20 01/04/2013 | 19230248 | 50110 | 00001 | T4 8620300 | 66831 | Johnson Jr, Larry O PRINCIPAL | 2.00 | 165.00 | 330.00 |
| **ARCHITECT** | | | | | | | | | |
| 01/18/20 01/18/2013 | 19230248 | 50110 | 00001 | T4 8662030 | 128516 | Ryan, Thomas E ARCHITECT | 5.00 | 100.00 | 500.00 |

Invoice Date  02/25/2013

BILLING BACKUP

Page 2

Invoice  5424197

Project  19230248

Reference  1012

| G/L DATE SRV DATE | JOB/ LBR CMT | GL ACCT | TASK | DOC / INV# | EMP / VENDOR # | NAME / DESCRIPTION | HOURS / QTY | RATE | BILLING AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 01/11/20 01/11/2013 | 19230248 | 50110 | 00001 | T4 8642546 | 128516 | Ryan, Thomas E ARCHITECT | 8.00 | 100.00 | 800.00 |
| ADMINISTRATIVE 01/18/20 01/18/2013 | 19230248 | 50110 | 00001 | T4 8663484 | 37776 | Vampran, Lee D ADMINISTRATIVE | 1.00 | 50.00 | 50.00 |
| | Total Labor | | | | | | | | 5,145.00 |

NON-CERTIFIED COPY

NON-CERTIFIED COPY

Invoice Date 02/25/2013
Invoice       5424197
Project       19230248
Reference     1012

BILLING BACKUP

Page 3

| G/L DATE<br>SRV DATE | JOB/<br>LBR CMT | GL ACCT | TASK | DOC / INV# | EMP /<br>VENDOR # | NAME /<br>DESCRIPTION | HOURS /<br>QTY | RATE | BILLING<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| **Task: 00002 Design/Construction Documents** | | | | | | | | | |
| **Labor** | | | | | | | | | |
| **PRINCIPAL** | | | | | | | | | |
| 12/21/20<br>12/21/2012 | 19230248 | 50110 | 00002 | T4 8582568 | 66831 | Johnson Jr, Larry O<br>PRINCIPAL | 4.00 | 165.00 | 660.00 |
| **ARCHITECT** | | | | | | | | | |
| 12/21/20<br>12/14/2012 | 19230248 | 50110 | 00002 | T4 8589483 | 128516 | Ryan, Thomas E<br>ARCHITECT | 1.00 | 100.00 | 100.00 |
| 12/21/20<br>12/13/2012 | 19230248 | 50110 | 00002 | T4 8589483 | 128516 | Ryan, Thomas E<br>ARCHITECT | 1.00 | 100.00 | 100.00 |
| 12/21/20<br>12/12/2012 | 19230248 | 50110 | 00002 | T4 8589483 | 128516 | Ryan, Thomas E<br>ARCHITECT | 2.00 | 100.00 | 200.00 |
| 12/21/20<br>12/11/2012 | 19230248 | 50110 | 00002 | T4 8589483 | 128516 | Ryan, Thomas E<br>ARCHITECT | 2.00 | 100.00 | 200.00 |
| 12/21/20<br>12/10/2012 | 19230248 | 50110 | 00002 | T4 8589483 | 128516 | Ryan, Thomas E<br>ARCHITECT | 2.00 | 100.00 | 200.00 |
| **Total Labor** | | | | | | | | | **1,460.00** |

Attachment 2-C    Exhibit 9



**Remittance Page**

| | |
|---|---|
| Invoice Date | 03/21/2013 |
| Invoice | 5456789 |
| Project | 19229775 |
| Page | 1 |

Reference:   WO#0111
For:   H&E Phase IV BN & CA

<u>Professional Services for Period Ending 03/08/2013</u>

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:          $2,100.55  USD
Terms:               Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**    URS Corporation
                           P.O. Box 116183
                           Atlanta GA 30368-6183
                           US

**Overnight Courier:**    URS Corporation
                         Lock Box No. 116183
                         100 South Crest Drive
                         Stockbridge, GA  30281
                         Attention:  Atlanta Lockbox
                         (877) 786-3333

**Electronic Funds Transfer:**
    Account:          URS Corporation
    Bank:             Wells Fargo Bank
    Account No.:      4520-086471
    ABA Routing No.:  121-000-248
    Swift Code:       WFBIUS6S

Remittance Information can be sent to:
    Email:            RemitTo@urs.com
    Fax:              (512) 419-6937    Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 9

Attachment 2-C





| | |
|---|---|
| Invoice Date | 03/21/2013 |
| Invoice | 5456789 |
| Project | 19229775 |
| Page | 2 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO#0111

For:   H&E Phase IV BN & CA

Professional Services for Period Ending 03/08/2013

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job: 19229775  H&E Phase IV BN & CA | 2,100.55 | 0.00 | 2,100.55 |
| Total this job | 2,100.55 | 0.00 | 2,100.55 |
| TOTAL THIS INVOICE | 2,100.55 | 0.00 | $2,100.55 USD |

Project Manager: Neal Johnson

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 9

Attachment 2-C

NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 03/21/2013 |
| Invoice | 5456789 |
| Project | 19229775 |
| Page | 3 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference: WO#0111

For: H&E Phase IV BN & CA

<u>Professional Services for Period Ending 03/08/2013</u>
*Job: 19229775  H&E Phase IV BN & CA*

LUMP SUM

| | |
|---|---|
| Lump Sum Billing | 2,100.55 |
| **Total Lump Sum** | **2,100.55** |

| | |
|---|---|
| *Total due this job* | ***2,100.55*** |

| | |
|---|---|
| **TOTAL THIS INVOICE** | **$2,100.55** USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320606

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY



**Remittance Page**

| | |
|---|---|
| Invoice Date | 06/19/2013 |
| Invoice | 5555403 |
| Project | 19229964 |
| Page | 1 |

Reference:  1111

For:   H&E Design Changes

Professional Services for Period Ending 06/07/2013

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

| | |
|---|---|
| **Total Due:** | **$975.00**  USD |
| **Terms:** | Net 30 |

\*   Make checks payable to: URS Corporation
\*   Please indicate Invoice number and/or project number on check
\*   Please include this stub with payment

**Regular Mail (USPS):**      URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**      URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**
Account:        URS Corporation
Bank:           Wells Fargo Bank
Account No.:    4520-086471
ABA Routing No.:  121-000-248
Swift Code:     WFBIUS6S

Remittance Information can be sent to:
Email:          RemitTo@urs.com
Fax:            (512) 419-6937    Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY


**URS**

| | |
|---|---|
| Invoice Date | 06/19/2013 |
| Invoice | 5555403 |
| Project | 19229964 |
| Page | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference: 1111

For: H&E Design Changes

<u>Professional Services for Period Ending 06/07/2013</u>

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| **Job: 19229964  H&E Design Changes** | | | |
| Task: 00001  Project Management | 975.00 | 0.00 | 975.00 |
| **Total this job** | **975.00** | **0.00** | **975.00** |
| | | | |
| **TOTAL THIS INVOICE** | **975.00** | **0.00** | **$975.00** USD |

Project Manager: Larry Johnson

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
If you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 06/19/2013 |
| Invoice | 5555403 |
| Project | 19229964 |
| Page | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  1111

For:  H&E Design Changes

**Professional Services for Period Ending 06/07/2013**

Job: **19229964  H&E Design Changes**
   Task: **00001  Project Management**

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| SR. ARCHITECT | | | |
| Ryan, Thomas E | 9.00 | 100.00 | 900.00 |
| ADMINISTRATION | | | |
| Vampran, Lee D | 1.50 | 50.00 | 75.00 |
| Subtotal | 10.50 | | 975.00 |
| **Total Labor** | | | 975.00 |
| *Total due this task* | | | 975.00 |
| *Total due this job* | | | **975.00** |
| **TOTAL THIS INVOICE** | | | **$975.00** USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
If you have any questions regarding this invoice.

F7320659

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY


Invoice Date   06/19/2013
Invoice        5555403
Project        19229964
Reference      1111

BILLING BACKUP

Page 1

| G/L DATE  JOB/<br>SRV DATE LBR CMT | GL ACCT | TASK | DOC / INV# | EMP /<br>VENDOR # | NAME /<br>DESCRIPTION | HOURS /<br>QTY | RATE | BILLING<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|
| **Job:  19229964  H&E Design Changes** | | | | | | | | |
| **Task:  00001  Project Management** | | | | | | | | |
| **Labor** | | | | | | | | |
| **SR. ARCHITECT** | | | | | | | | |
| 06/07/20   19229964<br>06/07/2013 | 50110 | 00001 | T4 9056122 | 128516 | Ryan, Thomas E<br>SR. ARCHITECT | 9.00 | 100.00 | 900.00 |
| **ADMINISTRATION** | | | | | | | | |
| 05/17/20   19229964<br>05/17/2013 | 50110 | 00001 | T4 8997471 | 37776 | Vampran, Lee D<br>ADMINISTRATION | 1.00 | 50.00 | 50.00 |
| 05/03/20   19229964<br>05/03/2013 | 50110 | 00001 | T4 8958072 | 37776 | Vampran, Lee D<br>ADMINISTRATION | 0.50 | 50.00 | 25.00 |
| Total Labor | | | | | | | | 975.00 |

NON-CERTIFIED COPY

Attachment 2-C

Exhibit 9

 **URS**

**Remittance Page**

| | |
|---|---|
| Invoice Date | 06/19/2013 |
| Invoice | 5555428 |
| Project | 19230248 |
| Page | 1 |

Reference:  1012

For:   H&E BR HQ Interior Design

<u>Professional Services for Period Ending 06/07/2013</u>

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:                    $5,190.00  USD

Terms:                         Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**    URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**    URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**

| | |
|---|---|
| Account: | URS Corporation |
| Bank: | Wells Fargo Bank |
| Account No.: | 4520-086471 |
| ABA Routing No.: | 121-000-248 |
| Swift Code: | WFBIUS6S |

Remittance Information can be sent to:

| | |
|---|---|
| Email: | RemitTo@urs.com |
| Fax: | (512) 419-6937    Attn:  Cash Applications |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

 NON-CERTIFIED COPY



| | | | |
|---|---|---|---|
| Invoice Date | | | 06/19/2013 |
| Invoice | | | 5555428 |
| Project | | | 19230248 |
| Page | | | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  1012

For:   H&E BR HQ Interior Design

<u>Professional Services for Period Ending 06/07/2013</u>

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| **Job: 19230248  H&E BR HQ Interior Design** | | | |
| Task: 00001  Project Management | 5,990.00 | 0.00 | 5,990.00 |
| Task: 00002  Design/Construction Documents | -800.00 | 0.00 | -800.00 |
| **Total this job** | **5,190.00** | **0.00** | **5,190.00** |
| **TOTAL THIS INVOICE** | **5,190.00** | **0.00** | **$5,190.00 USD** |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY



|  |  |
|---|---|
| Invoice Date | 06/19/2013 |
| Invoice | 5555428 |
| Project | 19230248 |
| Page | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  1012

For:   H&E BR HQ Interior Design

Professional Services for Period Ending 06/07/2013

*Job:  19230248  H&E BR HQ Interior Design*
   *Task:  00001  Project Management*

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| PRINCIPAL | | | |
| Johnson Jr, Larry O | 6.00 | 165.00 | 990.00 |
| ARCHITECT | | | |
| Ryan, Thomas E | 49.00 | 100.00 | 4,900.00 |
| ADMINISTRATIVE | | | |
| Vampran, Lee D | 2.00 | 50.00 | 100.00 |
| Subtotal | 57.00 | | 5,990.00 |
| **Total Labor** | | | **5,990.00** |
| | | *Total due this task* | *5,990.00* |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320827

**Exhibit 9**

Attachment 2-C

NON-CERTIFIED COPY



| | | | |
|---|---|---|---|
| Invoice Date | | | 06/19/2013 |
| Invoice | | | 5555428 |
| Project | | | 19230248 |
| Page | | | 4 |

Reference: 1012

For:    H&E BR HQ Interior Design

**Task: 00002 Design/Construction Documents**

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| ARCHITECT | | | |
| Ryan, Thomas E | -8.00 | 100.00 | -800.00 |
| Subtotal | -8.00 | | -800.00 |
| **Total Labor** | | | **-800.00** |
| | | *Total due this task* | *-800.00* |
| | | *Total due this job* | *5,190.00* |
| | | **TOTAL THIS INVOICE** | **$5,190.00 USD** |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY

BILLING BACKUP

Page 1

Invoice Date  06/19/2013
Invoice       5555428
Project       19230248
Reference     1012

| G/L DATE JOB/<br>SRV DATE LBR CMT | GL ACCT | TASK | DOC / INV# | EMP /<br>VENDOR # | NAME /<br>DESCRIPTION | HOURS /<br>QTY | RATE | BILLING<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|
| **Job: 19230248 H&E BR HQ Interior Design** | | | | | | | | |
| **Task: 00001 Project Management** | | | | | | | | |
| **Labor** | | | | | | | | |
| **PRINCIPAL** | | | | | | | | |
| 05/24/20   19230248<br>05/24/2013 | 50110 | 00001 | T4 9013366 | 66831 | Johnson Jr, Larry O<br>PRINCIPAL | 3.00 | 165.00 | 495.00 |
| 05/17/20   19230248<br>05/17/2013 | 50110 | 00001 | T4 8993698 | 66831 | Johnson Jr, Larry O<br>PRINCIPAL | 3.00 | 165.00 | 495.00 |
| **ARCHITECT** | | | | | | | | |
| 06/07/20   19230248<br>06/07/2013 | 50110 | 00001 | T4 9056122 | 128516 | Ryan, Thomas E<br>ARCHITECT | 9.00 | 100.00 | 900.00 |
| 05/31/20   19230248<br>05/31/2013 | 50110 | 00001 | T4 9035510 | 128516 | Ryan, Thomas E<br>ARCHITECT | 7.00 | 100.00 | 700.00 |
| 05/24/20   19230248<br>05/24/2013 | 50110 | 00001 | T4 9016063 | 128516 | Ryan, Thomas E<br>ARCHITECT | 8.00 | 100.00 | 800.00 |
| 05/17/20   19230248<br>05/17/2013 | 50110 | 00001 | T4 8996085 | 128516 | Ryan, Thomas E<br>ARCHITECT | 9.00 | 100.00 | 900.00 |
| 05/17/20   19230248<br>05/10/2013 | 50110 | 00001 | T4 8996085 | 128516 | Ryan, Thomas E<br>ARCHITECT | 2.00 | 100.00 | 200.00 |
| 05/17/20   19230248<br>05/09/2013 | 50110 | 00001 | T4 8996085 | 128516 | Ryan, Thomas E<br>ARCHITECT | 3.00 | 100.00 | 300.00 |
| 05/17/20   19230248<br>05/08/2013 | 50110 | 00001 | T4 8996085 | 128516 | Ryan, Thomas E<br>ARCHITECT | 3.00 | 100.00 | 300.00 |
| 05/17/20   19230248<br>05/07/2013 | 50110 | 00001 | T4 8996085 | 128516 | Ryan, Thomas E<br>ARCHITECT | 2.00 | 100.00 | 200.00 |
| 05/17/20   19230248<br>05/06/2013 | 50110 | 00001 | T4 8996085 | 128516 | Ryan, Thomas E<br>ARCHITECT | 2.00 | 100.00 | 200.00 |
| 05/24/20   19230248<br>05/02/2013 | 50110 | 00001 | T4 9002987 | 128516 | Ryan, Thomas E<br>ARCHITECT | 1.00 | 100.00 | 100.00 |

NON-CERTIFIED COPY

Attachment 2-C

Exhibit 9

NON-CERTIFIED COPY

Attachment 2-C    Exhibit 9

Invoice Date  06/19/2013
Invoice     5555428
Project     19230248
Reference   1012

BILLING BACKUP

Page 2

| G/L DATE SRV DATE | JOB/ LBR CMT | GL ACCT | TASK | DOC / INV# | EMP / VENDOR # | NAME / DESCRIPTION | HOURS / QTY | RATE | BILLING AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 05/24/20 04/26/2013 | 19230248 | 50110 | 00001 | T4 9002987 | 128516 | Ryan, Thomas E ARCHITECT | 1.00 | 100.00 | 100.00 |
| 05/24/20 04/25/2013 | 19230248 | 50110 | 00001 | T4 9002987 | 128516 | Ryan, Thomas E ARCHITECT | 2.00 | 100.00 | 200.00 |
| 05/24/20 04/24/2013 | 19230248 | 50110 | 00001 | T4 9002987 | 128516 | Ryan, Thomas E ARCHITECT | 1.00 | 100.00 | 100.00 |
| 05/24/20 04/23/2013 | 19230248 | 50110 | 00001 | T4 9002987 | 128516 | Ryan, Thomas E ARCHITECT | 2.00 | 100.00 | 200.00 |
| 05/24/20 04/22/2013 | 19230248 | 50110 | 00001 | T4 9002987 | 128516 | Ryan, Thomas E ARCHITECT | 1.00 | 100.00 | 100.00 |
| 04/19/20 04/19/2013 | 19230248 | 50110 | 00001 | T4 8917160 | 128516 | Ryan, Thomas E ARCHITECT | 2.00 | 100.00 | 200.00 |
| 05/24/20 04/18/2013 | 19230248 | 50110 | 00001 | T4 9002987 | 128516 | Ryan, Thomas E ARCHITECT | 1.00 | 100.00 | 100.00 |
| 03/15/20 03/15/2013 | 19230248 | 50110 | 00001 | T4 8818951 | 128516 | Ryan, Thomas E ARCHITECT | 1.00 | 100.00 | 100.00 |
| 02/22/20 01/10/2013 | 19230248 | 50110 | 00001 | T4 8747107 | 128516 | Ryan, Thomas E ARCHITECT | -2.00 | 100.00 | -200.00 |
| 02/22/20 01/09/2013 | 19230248 | 50110 | 00001 | T4 8747107 | 128516 | Ryan, Thomas E ARCHITECT | -2.00 | 100.00 | -200.00 |
| 02/22/20 01/08/2013 | 19230248 | 50110 | 00001 | T4 8747107 | 128516 | Ryan, Thomas E ARCHITECT | -2.00 | 100.00 | -200.00 |
| 02/22/20 01/07/2013 | 19230248 | 50110 | 00001 | T4 8747107 | 128516 | Ryan, Thomas E ARCHITECT | -2.00 | 100.00 | -200.00 |
| ADMINISTRATIVE | | | | | | | | | |
| 06/07/20 06/07/2013 | 19230248 | 50120 | 00001 | T4 9057499 | 37776 | Vampran, Lee D ADMINISTRATIVE | 1.00 | 50.00 | 50.00 |
| 03/01/20 03/01/2013 | 19230248 | 50110 | 00001 | T4 8781211 | 37776 | Vampran, Lee D ADMINISTRATIVE | 1.00 | 50.00 | 50.00 |

Total Labor                                                                                   5,990.00

Invoice Date  06/19/2013                                   BILLING BACKUP                                              Page 3
Invoice      5555428
Project      19230248
Reference    1012

| G/L DATE  JOB/ SRV DATE  LBR CMT | GL ACCT | TASK | DOC / INV# | EMP / VENDOR # | NAME / DESCRIPTION | HOURS / QTY | RATE | BILLING AMOUNT |
|---|---|---|---|---|---|---|---|---|
| **Task:  00002  Design/Construction Documents** | | | | | | | | |
| **Labor** | | | | | | | | |
| ARCHITECT | | | | | | | | |
| 02/22/20  19230248 12/14/2012 | 50110 | 00002 | T4 8746413 | 128516 | Ryan, Thomas E ARCHITECT | -1.00 | 100.00 | -100.00 |
| 02/22/20  19230248 12/13/2012 | 50110 | 00002 | T4 8746413 | 128516 | Ryan, Thomas E ARCHITECT | -1.00 | 100.00 | -100.00 |
| 02/22/20  19230248 12/12/2012 | 50110 | 00002 | T4 8746413 | 128516 | Ryan, Thomas E ARCHITECT | -2.00 | 100.00 | -200.00 |
| 02/22/20  19230248 12/11/2012 | 50110 | 00002 | T4 8746413 | 128516 | Ryan, Thomas E ARCHITECT | -2.00 | 100.00 | -200.00 |
| 02/22/20  19230248 12/10/2012 | 50110 | 00002 | T4 8746413 | 128516 | Ryan, Thomas E ARCHITECT | -2.00 | 100.00 | -200.00 |
| **Total Labor** | | | | | | | | **-800.00** |

NON-CERTIFIED COPY

Attachment 2-C

Exhibit 9



**Remittance Page**

| | |
|---|---|
| Invoice Date | 08/25/2013 |
| Invoice | 5565894 |
| Project | 19229964 |
| Page | 1 |

Reference:  1111

For:   H&E Design Changes

Professional Services for Period Ending 01/11/2013

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

| | |
|---|---|
| Total Due: | $1,202.50  USD |
| Terms: | Net 30 |

\*   Make checks payable to: URS Corporation
\*   Please indicate invoice number and/or project number on check
\*   Please include this stub with payment

**Regular Mail (USPS):**   URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**   URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**
Account:          URS Corporation
Bank:             Wells Fargo Bank
Account No.:      4520-086471
ABA Routing No.:  121-000-248
Swift Code:       WFBIUS6S

Remittance Information can be sent to:
Email:        RemitTo@urs.com
Fax:          (512) 419-6937    Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**





| | | Invoice Date | 06/25/2013 |
| | | Invoice | 5565894 |
| | | Project | 19229964 |
| | | Page | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  1111

For:  H&E Design Changes

**Professional Services for Period Ending 01/11/2013**

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| **Job: 19229964  H&E Design Changes** | | | |
| Task: 00001  Project Management | 1,052.50 | 0.00 | 1,052.50 |
| Task: 00002  Design/Construction Documents | 150.00 | 0.00 | 150.00 |
| Total this job | 1,202.50 | 0.00 | 1,202.50 |
| **TOTAL THIS INVOICE** | 1,202.50 | 0.00 | $1,202.50 USD |

Project Manager: Larry Johnson

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 06/25/2013 |
| Invoice | 5565894 |
| Project | 19229964 |
| Page | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference: 1111

For: H&E Design Changes

Professional Services for Period Ending 01/11/2013

Job: 19229964  H&E Design Changes
    Task: 00001  Project Management

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| PRINCIPAL | | | |
| Johnson Jr, Larry O | 6.00 | 165.00 | 990.00 |
| ADMINISTRATION | | | |
| Vampran, Lee D | 1.00 | 50.00 | 50.00 |
| Shillingburg, Stephanie B | 0.25 | 50.00 | 12.50 |
| Subtotal | 7.25 | | 1,052.50 |
| **Total Labor** | | | **1,052.50** |
| | *Total due this task* | | *1,052.50* |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320661

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY



| | | Invoice Date | 06/25/2013 |
| | | Invoice | 5565894 |
| | | Project | 19229964 |
| | | Page | 4 |

Reference:  1111

For:    H&E Design Changes

**Task:  00002  Design/Construction Documents**

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Architect I | | | |
| Miller, John B | 3.00 | 50.00 | 150.00 |
| Subtotal | 3.00 | | 150.00 |
| **Total Labor** | | | **150.00** |
| | | *Total due this task* | *150.00* |
| | | *Total due this job* | *1,202.50* |
| | | **TOTAL THIS INVOICE** | **$1,202.50** USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

Attachment 2-C

NON-CERTIFIED COPY

Invoice Date  06/25/2013                    BILLING BACKUP                                    Page 1
Invoice       5565894
Project       19229964
Reference     1111

| G/L DATE SRV DATE | JOB/ LBR CMT | GL ACCT | TASK | DOC / INV# | EMP / VENDOR # | NAME / DESCRIPTION | HOURS / QTY | RATE | BILLING AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| **Job: 19229964  H&E Design Changes** | | | | | | | | | |
| **Task:  00001  Project Management** | | | | | | | | | |
| **Labor** | | | | | | | | | |
| PRINCIPAL | | | | | | | | | |
| 12/21/20 12/21/2012 | 19229964 | 50110 | 00001 | T4 8582568 | 66831 | Johnson Jr, Larry O PRINCIPAL | 1.00 | 165.00 | 165.00 |
| 12/14/20 12/14/2012 | 19229964 | 50110 | 00001 | T4 8565521 | 66831 | Johnson Jr, Larry O PRINCIPAL | 5.00 | 165.00 | 825.00 |
| ADMINISTRATION | | | | | | | | | |
| 12/14/20 12/14/2012 | 19229964 | 50110 | 00001 | T4 8569485 | 37776 | Vampran, Lee D ADMINISTRATION | 1.00 | 50.00 | 50.00 |
| 12/14/20 12/14/2012 | 19229964 | 50110 | 00001 | T4 8569736 | 39606 | Shillingburg, Stephanie B ADMINISTRATION | 0.25 | 50.00 | 12.50 |
| | Total Labor | | | | | | | | 1,052.50 |

NON-CERTIFIED COPY

Attachment 2-C

Exhibit 9

NON-CERTIFIED COPY

Invoice Date  06/25/2013
Invoice       5565894
Project       19229964
Reference     1111

BILLING BACKUP                                    Page 2

| G/L DATE JOB/<br>SRV DATE LBR CMT | GL ACCT | TASK | DOC / INV# | EMP /<br>VENDOR # | NAME /<br>DESCRIPTION | HOURS /<br>QTY | RATE | BILLING<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|
| **Task: 00002 Design/Construction Documents** | | | | | | | | |
| **Labor** | | | | | | | | |
| Architect I | | | | | | 3.00 | 50.00 | 150.00 |
| 12/14/20   19229964 | 50110 | 00002 | T4 8568025 | 128563 | Miller, John B | | | |
| 12/14/2012 | | | | | Architect I | | | |
| Total Labor | | | | | | | | 150.00 |

Attachment 2-C

Exhibit 9




 **URS**

Remittance Page

| | |
|---|---|
| Invoice Date | 07/24/2013 |
| Invoice | 5588906 |
| Project | 19229964 |
| Page | 1 |

Reference: 1111

For: H&E Design Changes

<u>Professional Services for Period Ending 07/12/2013</u>

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:       $2,450.00  USD

Terms:              Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**   URS Corporation
                                          P.O. Box 116183
                                          Atlanta GA 30368-6183
                                          US

**Overnight Courier:**      URS Corporation
                                          Lock Box No. 116183
                                          100 South Crest Drive
                                          Stockbridge, GA  30281
                                          Attention:  Atlanta Lockbox
                                          (877) 786-3333

**Electronic Funds Transfer:**
   Account:          URS Corporation
   Bank:               Wells Fargo Bank
   Account No.:     4520-086471
   ABA Routing No.:   121-000-248
   Swift Code:       WFBIUS6S

Remittance Information can be sent to:
   Email:              RemitTo@urs.com
   Fax:                (512) 419-8937   Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**


NON-CERTIFIED COPY



| | | Invoice Date | 07/24/2013 |
|---|---|---|---|
| | | Invoice | 5588906 |
| | | Project | 19229964 |
| | | Page | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  1111

For:   H&E Design Changes

Professional Services for Period Ending 07/12/2013

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job: 19229964  H&E Design Changes | | | |
| Task: 00001  Project Management | 2,450.00 | 0.00 | 2,450.00 |
| Total this job | 2,450.00 | 0.00 | 2,450.00 |
| | | | |
| TOTAL THIS INVOICE | 2,450.00 | 0.00 | $2,450.00 USD |

Project Manager: Larry Johnson

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 9

Attachment 2-C

NON-CERTIFIED COPY



| | | | |
|---|---|---|---|
| | Invoice Date | 07/24/2013 |
| | Invoice | 5588906 |
| | Project | 19229964 |
| | Page | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference: 1111

For:   H&E Design Changes

<u>Professional Services for Period Ending 07/12/2013</u>

*Job:* **19229964** *H&E Design Changes*
   *Task:* **00001** *Project Management*

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| | | | |
| SR. ARCHITECT | | | |
| Ryan, Thomas E | 24.00 | 100.00 | 2,400.00 |
| | | | |
| ADMINISTRATION | | | |
| Vampran, Lee D | 1.00 | 50.00 | 50.00 |
| | | | |
| Subtotal | 25.00 | | 2,450.00 |
| | | | |
| **Total Labor** | | | **2,450.00** |
| | | *Total due this task* | *2,450.00* |
| | | | |
| | | *Total due this job* | *2,450.00* |
| | | | |
| | | **TOTAL THIS INVOICE** | **$2,450.00** USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320664

**Exhibit 9**

Attachment 2-C

NON-CERTIFIED COPY

NON-CERTIFIED COPY

Attachment 2-C          Exhibit 9

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Invoice Date | 07/24/2013 | | | | BILLING BACKUP | | | Page 1 |
| Invoice | 5588906 | | | | | | | |
| Project | 19229964 | | | | | | | |
| Reference | 1111 | | | | | | | |

| G/L DATE SRV DATE | JOB/ LBR CMT | GL ACCT | TASK | DOC / INV# | EMP / VENDOR # | NAME / DESCRIPTION | HOURS / QTY | RATE | BILLING AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| **Job: 19229964  H&E Design Changes** | | | | | | | | | |
| **Task: 00001  Project Management** | | | | | | | | | |
| **Labor** | | | | | | | | | |
| SR. ARCHITECT | | | | | | | | | |
| 06/28/20 06/28/2013 | 19229964 | 50110 | 00001 | T4 9117846 | 128516 | Ryan, Thomas E SR. ARCHITECT | 11.00 | 100.00 | 1,100.00 |
| 06/21/20 06/21/2013 | 19229964 | 50110 | 00001 | T4 9097073 | 128516 | Ryan, Thomas E SR. ARCHITECT | 8.00 | 100.00 | 800.00 |
| 06/14/20 06/14/2013 | 19229964 | 50110 | 00001 | T4 9076688 | 128516 | Ryan, Thomas E SR. ARCHITECT | 5.00 | 100.00 | 500.00 |
| ADMINISTRATION | | | | | | | | | |
| 06/14/20 06/14/2013 | 19229964 | 50110 | 00001 | T4 9078052 | 37776 | Vampran, Lee D ADMINISTRATION | 1.00 | 50.00 | 50.00 |
| Total Labor | | | | | | | | | 2,450.00 |






**URS**

**Remittance Page**

| | |
|---|---|
| Invoice Date | 07/25/2013 |
| Invoice | 5588931 |
| Project | 19230248 |
| Page | 1 |

Reference: 1012

For:   H&E BR HQ Interior Design

Professional Services for Period Ending 07/12/2013

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

| | | |
|---|---|---|
| **Total Due:** | $3,050.00 | USD |
| Terms: | Net 30 | |

\*   Make checks payable to: URS Corporation
\*   Please indicate invoice number and/or project number on check
\*   Please include this stub with payment

**Regular Mail (USPS):**   URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**   URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**
Account:          URS Corporation
Bank:             Wells Fargo Bank
Account No.:      4520-086471
ABA Routing No.:  121-000-248
Swift Code:       WFBIUS6S

Remittance Information can be sent to:
Email:          RemitTo@urs.com
Fax:            (512) 419-6937   Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY

 **URS**

| | |
|---|---|
| Invoice Date | 07/25/2013 |
| Invoice | 5588931 |
| Project | 19230248 |
| Page | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  1012

For:   H&E BR HQ Interior Design

Professional Services for Period Ending 07/12/2013

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| **Job: 19230248  H&E BR HQ Interior Design** | 3,050.00 | 0.00 | 3,050.00 |
| Task:  00001  Project Management | | | |
| **Total this job** | 3,050.00 | 0.00 | 3,050.00 |
| **TOTAL THIS INVOICE** | 3,050.00 | 0.00 | $3,050.00 USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

Attachment 2-C

NON-CERTIFIED COPY



| | | |
|---|---|---|
| Invoice Date | | 07/25/2013 |
| Invoice | | 5588931 |
| Project | | 19230248 |
| Page | | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  1012

For:   H&E BR HQ Interior Design

Professional Services for Period Ending 07/12/2013

Job: *19230248  H&E BR HQ Interior Design*
   Task: *00001  Project Management*

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| ARCHITECT | | | |
| Ryan, Thomas E | 30.00 | 100.00 | 3,000.00 |
| ADMINISTRATIVE | | | |
| Vampran, Lee D | 1.00 | 50.00 | 50.00 |
| Subtotal | 31.00 | | 3,050.00 |
| **Total Labor** | | | **3,050.00** |
| | | *Total due this task* | *3,050.00* |
| | | *Total due this job* | *3,050.00* |
| | | **TOTAL THIS INVOICE** | **$3,050.00** USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320829

**Exhibit 9**

Attachment 2-C

NON-CERTIFIED COPY

BILLING BACKUP

Page 1

Invoice Date   07/25/2013
Invoice         5588931
Project          19230248
Reference      1012

| G/L DATE  JOB/ SRV DATE  LBR CMT | GL ACCT | TASK | DOC / INV# | EMP / VENDOR # | NAME / DESCRIPTION | HOURS / QTY | RATE | BILLING AMOUNT |
|---|---|---|---|---|---|---|---|---|
| **Job:  19230248  H&E BR HQ Interior Design** | | | | | | | | |
| **Task:  00001  Project Management** | | | | | | | | |
| **Labor** | | | | | | | | |
| ARCHITECT | | | | | | | | |
| 07/12/20   19230248 07/12/2013 | 50110 | 00001 | T4 9157709 | 128516 | Ryan, Thomas E ARCHITECT | 5.00 | 100.00 | 500.00 |
| 07/05/20   19230248 07/05/2013 | 50110 | 00001 | T4 9137241 | 128516 | Ryan, Thomas E ARCHITECT | 6.00 | 100.00 | 600.00 |
| 06/28/20   19230248 06/28/2013 | 50110 | 00001 | T4 9117846 | 128516 | Ryan, Thomas E ARCHITECT | 7.00 | 100.00 | 700.00 |
| 06/21/20   19230248 06/21/2013 | 50110 | 00001 | T4 9097073 | 128516 | Ryan, Thomas E ARCHITECT | 8.00 | 100.00 | 800.00 |
| 06/14/20   19230248 06/14/2013 | 50110 | 00001 | T4 9076688 | 128516 | Ryan, Thomas E ARCHITECT | 4.00 | 100.00 | 400.00 |
| ADMINISTRATIVE | | | | | | | | |
| 06/14/20   19230248 06/14/2013 | 50110 | 00001 | T4 9078052 | 37776 | Vampran, Lee D ADMINISTRATIVE | 1.00 | 50.00 | 50.00 |
| **Total Labor** | | | | | | | | **3,050.00** |

NON-CERTIFIED COPY

Attachment 2-C

Exhibit 9

 **URS**

**Remittance Page**

| | |
|---|---|
| Invoice Date | 08/21/2013 |
| Invoice | 5626064 |
| Project | 19229775 |
| Page | 1 |

Reference: WO#0111
For: H&E Phase IV BN & CA

Professional Services for Period Ending 08/16/2013

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:       $-8,618.22  USD
Terms:            Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**   URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**   URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**
Account:        URS Corporation
Bank:           Wells Fargo Bank
Account No.:    4520-086471
ABA Routing No.: 121-000-248
Swift Code:     WFBIUS6S

Remittance Information can be sent to:
Email:          RemitTo@urs.com
Fax:            (512) 419-6937   Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**


NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 08/21/2013 |
| Invoice | 5626064 |
| Project | 19229775 |
| Page | 2 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  WO#0111

For:   H&E Phase IV BN & CA

<u>Professional Services for Period Ending 08/16/2013</u>

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job:  19229775  H&E Phase IV BN & CA | -8,618.22 | 0.00 | -8,618.22 |
| Total this job | -8,618.22 | 0.00 | -8,618.22 |
| **TOTAL THIS INVOICE** | -8,618.22 | 0.00 | $-8,618.22 USD |

Project Manager: Neal Johnson

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 9

Attachment 2-C

NON-CERTIFIED COPY



| | | |
|---|---|---|
| Invoice Date | | 08/21/2013 |
| Invoice | | 5626064 |
| Project | | 19229775 |
| Page | | 3 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:   WO#0111

For:   H&E Phase IV BN & CA

Professional Services for Period Ending 08/16/2013
*Job: 19229775  H&E Phase IV BN & CA*

LUMP SUM

| | |
|---|---|
| Lump Sum Billing | -8,618.22 |
| **Total Lump Sum** | **-8,618.22** |
| | |
| *Total due this Job* | *-8,618.22* |
| | |
| **TOTAL THIS INVOICE** | **$-8,618.22** USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320609

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY

 **URS**

**Remittance Page**

| | |
|---|---|
| Invoice Date | 10/24/2013 |
| Invoice | 5681317 |
| Project | 19229964 |
| Page | 1 |

Reference: 1111

For:   H&E Design Changes

Professional Services for Period Ending 10/11/2013

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:          $950.00  USD

Terms:              Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**   URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**     URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA 30281
Attention: Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**

| | |
|---|---|
| Account: | URS Corporation |
| Bank: | Wells Fargo Bank |
| Account No.: | 4520-086471 |
| ABA Routing No.: | 121-000-248 |
| Swift Code: | WFBIUS6S |

Remittance Information can be sent to:

| | |
|---|---|
| Email: | RemitTo@urs.com |
| Fax: | (512) 419-6937    Attn: Cash Applications |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY



|  | Invoice Date | 10/24/2013 |
|---|---|---|
|  | Invoice | 5681317 |
|  | Project | 19229964 |
|  | Page | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  1111

For:   H&E Design Changes

Professional Services for Period Ending 10/11/2013

|  | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job: 19229964  H&E Design Changes |  |  |  |
| Task:  00001  Project Management | 950.00 | 0.00 | 950.00 |
| Total this job | 950.00 | 0.00 | 950.00 |
|  |  |  |  |
| TOTAL THIS INVOICE | 950.00 | 0.00 | $950.00 USD |

Project Manager: Larry Johnson

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 9

Attachment 2-C

NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 10/24/2013 |
| Invoice | 5681317 |
| Project | 19229964 |
| Page | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  1111

For:   H&E Design Changes

Professional Services for Period Ending 10/11/2013

Job:  19229964  H&E Design Changes
   Task:  00001  Project Management

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| SR. ARCHITECT | | | |
| Ryan, Thomas E | 8.00 | 100.00 | 800.00 |
| ADMINISTRATION | | | |
| Vampran, Lee D | 3.00 | 50.00 | 150.00 |
| Subtotal | 11.00 | | 950.00 |
| **Total Labor** | | | **950.00** |
| *Total due this task* | | | *950.00* |
| *Total due this job* | | | *950.00* |
| **TOTAL THIS INVOICE** | | | **$950.00** USD |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320667

**Exhibit 9**

**Attachment 2-C**



Invoice Date  10/24/2013
Invoice       5681317
Project       19229964
Reference     1111

BILLING BACKUP

Page 1

**Job: 19229964  H&E Design Changes**
   **Task:  00001  Project Management**

| G/L DATE JOB/<br>SRV DATE LBR CMT | GL ACCT | TASK | DOC / INV# | EMP /<br>VENDOR # | NAME /<br>DESCRIPTION | HOURS /<br>QTY | RATE | BILLING<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|
| **Labor** | | | | | | | | |
| SR. ARCHITECT | | | | | | | | |
| 07/19/20  19229964<br>07/19/2013 | 50110 | 00001 | T4 9178270 | 128516 | Ryan, Thomas E<br>SR. ARCHITECT | 8.00 | 100.00 | 800.00 |
| ADMINISTRATION | | | | | | | | |
| 09/13/20  19229964<br>09/13/2013 | 50110 | 00001 | T4 9341601 | 37776 | Vampran, Lee D<br>ADMINISTRATION | 1.00 | 50.00 | 50.00 |
| 08/16/20  19229964<br>08/16/2013 | 50110 | 00001 | T4 9261077 | 37776 | Vampran, Lee D<br>ADMINISTRATION | 1.00 | 50.00 | 50.00 |
| 07/19/20  19229964<br>07/19/2013 | 50110 | 00001 | T4 9179608 | 37776 | Vampran, Lee D<br>ADMINISTRATION | 1.00 | 50.00 | 50.00 |
| Total Labor | | | | | | | | 950.00 |

NON-CERTIFIED COPY

Attachment 2-C

Exhibit 9

 **URS**

**Remittance Page**

| | |
|---|---|
| Invoice Date | 10/24/2013 |
| Invoice | 5681338 |
| Project | 19230248 |
| Page | 1 |

Reference: 1012
For: H&E BR HQ Interior Design

Professional Services for Period Ending 10/11/2013

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:          $550.00  USD
Terms:              Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**    URS Corporation
                            P.O. Box 116183
                            Atlanta GA 30368-6183
                            US

**Overnight Courier:**      URS Corporation
                            Lock Box No. 116183
                            100 South Crest Drive
                            Stockbridge, GA  30281
                            Attention:  Atlanta Lockbox
                            (877) 786-3333

**Electronic Funds Transfer:**
    Account:        URS Corporation
    Bank:           Wells Fargo Bank
    Account No.:    4520-086471
    ABA Routing No.: 121-000-248
    Swift Code:     WFBIUS6S

Remittance Information can be sent to:
    Email:          RemitTo@urs.com
    Fax:            (512) 419-6937    Attn:  Cash Applications

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

**Exhibit 9**

**Attachment 2-C**

NON-CERTIFIED COPY

 



|  |  |
|---|---|
| Invoice Date | 10/24/2013 |
| Invoice | 5681338 |
| Project | 19230248 |
| Page | 2 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference: 1012

For:  H&E BR HQ Interior Design

Professional Services for Period Ending 10/11/2013

|  | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| **Job: 19230248  H&E BR HQ Interior Design** |  |  |  |
| Task: 00001  Project Management | 550.00 | 0.00 | 550.00 |
| **Total this job** | 550.00 | 0.00 | 550.00 |
| **TOTAL THIS INVOICE** | 550.00 | 0.00 | **$550.00 USD** |

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

Exhibit 9

Attachment 2-C

NON-CERTIFIED COPY



| | Invoice Date | 10/24/2013 |
|---|---|---|
| | Invoice | 5681338 |
| | Project | 19230248 |
| | Page | 3 |

H & E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference: 1012

For: H&E BR HQ Interior Design

<u>Professional Services for Period Ending 10/11/2013</u>

*Job: 19230248  H&E BR HQ Interior Design*
  *Task: 00001  Project Management*

| LABOR | HOURS | RATE | AMOUNT |
|---|---|---|---|
| ARCHITECT | | | |
| Ryan, Thomas E | 5.00 | 100.00 | 500.00 |
| ADMINISTRATIVE | | | |
| Vampran, Lee D | 1.00 | 50.00 | 50.00 |
| Subtotal | 6.00 | | 550.00 |
| **Total Labor** | | | **550.00** |

*Total due this task* 550.00

*Total due this job* **550.00**

**TOTAL THIS INVOICE** **$550.00** USD

Please contact Larry O Johnson Jr at 225 231-6343 or via email at neal.johnson@urs.com
if you have any questions regarding this invoice.

F7320831

**Exhibit 9**

Attachment 2-C

NON-CERTIFIED COPY

Invoice Date  10/24/2013                    BILLING BACKUP                                      Page 1
Invoice       5681338
Project       19230248
Reference     1012

| G/L DATE  JOB/ SRV DATE  LBR CMT | GL ACCT | TASK | DOC / INV# | EMP / VENDOR # | NAME / DESCRIPTION | HOURS / QTY | RATE | BILLING AMOUNT |
|---|---|---|---|---|---|---|---|---|
| **Job:  19230248  H&E BR HQ Interior Design** | | | | | | | | |
| **Task:  00001  Project Management** | | | | | | | | |
| **Labor** | | | | | | | | |
| ARCHITECT | | | | | | | | |
| 07/26/20  19230248 07/26/2013 | 50110 | 00001 | T4 9198671 | 128516 | Ryan, Thomas E ARCHITECT | 1.00 | 100.00 | 100.00 |
| 07/19/20  19230248 07/19/2013 | 50110 | 00001 | T4 9178270 | 128516 | Ryan, Thomas E ARCHITECT | 4.00 | 100.00 | 400.00 |
| ADMINISTRATIVE | | | | | | | | |
| 07/19/20  19230248 07/19/2013 | 50110 | 00001 | T4 9179608 | 37776 | Vampran, Lee D ADMINISTRATIVE | 1.00 | 50.00 | 50.00 |
| **Total Labor** | | | | | | | | **550.00** |

NON-CERTIFIED COPY

POSTED

NOV 18 2016

2-13

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES, INC. | * | SUIT NO. 626,308    DIV.: D |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| | * | |
| URS CORPORATION | * | PARISH OF EAST BATON ROUGE |
| ARCHITECTURE, P.C., URS | | COST OK $ 1635 |
| CORPORATION, L. O'NEAL | * | STATE OF LOUISIANA |
| JOHNSON AND THOMAS E. RYAN, | | NOV 17 2016 |
| III | | CK 055393 |
| | | DEPUTY CLERK OF COURT |

## MOTION FOR SUMMARY JUDGMENT ON RECONVENTIONAL DEMAND

NOW INTO COURT, through undersigned counsel, comes URS Corporation ("URS"), as Plaintiff-in-Reconvention, who, pursuant to La. Code Civ. Proc. art. 966 *et seq.*, respectfully moves this Court for Summary Judgment on its Reconventional Demand herein on the basis that there is no genuine issue as to material facts and URS is entitled to judgment as a matter of law in the amount of TWO HUNDRED THIRTY-TWO THOUSAND NINE HUNDRED THIRTY-NINE AND 14/100 ($232,939.14) DOLLARS, plus interest at the rate of 12% per annum, costs and attorney's fees, against H&E Equipment Services, Inc., for the outstanding amount of invoices due for professional services rendered, all as more fully set forth in the attached Memorandum in Support of Motion for Summary Judgment.

WHEREFORE, URS prays that its Motion for Summary Judgment be served upon the defendants; set for hearing; and that after due proceedings are held, this Court render a judgment in favor of URS granting this Motion for Summary Judgment and awarding it TWO HUNDRED THIRTY-TWO THOUSAND NINE HUNDRED THIRTY-NINE AND 14/100 ($232,939.14) DOLLARS, plus interest at the rate of 12% per annum, costs and attorney's fees, against H&E Equipment Services, Inc. and for any other relief available under these premises.

REC'D C.P.
NOV 23 2016

REC'D C.P.
NOV 18 2016

1

EBR3897249

NON-CERTIFIED COPY

Respectfully submitted,

ADAMS AND REESE, LLP

Philip A. Franco (Bar #5819), T.A.
Ronald J. Sholes (Bar # 14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone:   (504) 581-3234
Fax:              (504) 566-0210
E-mail: Phil.Franco@arlaw.com
             Ron.Sholes@arlaw.com
             Kellen.Mathews@arlaw.com

*Attorneys for Defendants, URS Corporation Architecture, P.C.; URS Corporation; L. O'Neal Johnson and Thomas E. Ryan, III*



2

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon all counsel of record via e-mail and/or United States Mail, postage prepaid and properly addressed, this 17th day of November, 2016.

_____

Kellen J. Mathews



3

NON-CERTIFIED COPY

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES, INC. | * | SUIT NO. 626,308    DIV.: D |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| | * | |
| URS CORPORATION | * | PARISH OF EAST BATON ROUGE |
| ARCHITECTURE, P.C., URS | | |
| CORPORATION, L. O'NEAL | * | STATE OF LOUISIANA |
| JOHNSON AND THOMAS E. RYAN, | | |
| III | | |

## ORDER

Considering the foregoing Motion for Summary Judgment, Statement of Undisputed Material Facts and Memorandum in Support filed by Defendant/ Plaintiff-in-Reconvention URS Corporation ("URS"):

**IT IS HEREBY ORDERED,** that Plaintiff, H&E Equipment Services, Inc. be made to appear and show cause, if any, on the _13_ day of _Feb._, 201_7_ at 1:00 p.m. why the Motion for Summary Judgment filed on behalf of by Defendant/ Plaintiff-in-Reconvention URS Corporation should not be Granted.

THUS DONE AND SIGNED this _21_ day of _Nov_, 2016, at Baton Rouge, Louisiana.

_Janice Clark_
**HON. JANICE CLARK**
Judge, 19th Judicial District Court

**PLEASE SERVE:**

H&E Equipment Services, Inc.
*Through its attorney of record:*
Brent B. Barriere
FISHMAN HAYGOOD LLP
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170-4600

1

NON-CERTIFIED COPY

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES, INC. | * | SUIT NO. 626,308    DIV.: D |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| | * | |
| URS CORPORATION | * | PARISH OF EAST BATON ROUGE |
| ARCHITECTURE, P.C., URS | | |
| CORPORATION, L. O'NEAL | * | STATE OF LOUISIANA |
| JOHNSON AND THOMAS E. RYAN, | | |
| III | | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. H&E Equipment Services, Inc. ("H&E"), through its Vice President of Operations, Leonard St. Germain entered into a Short Form Master Agreement for Professional Services ("Agreement") dated August 13, 2009.[1]

2. St. Germain was "authorized to execute this document" and "vetted [the Agreement] with either [Frankie] Wynn [H&E's Director of Operations] and/or Ashley Moore [Outside Counsel for H&E] before [he] signed it."[2]

3. Pursuant to Paragraph 1.1 of the Agreement, URS Corporation Architecture, P.C., or its affiliate, was to provide professional services to H&E in connection with projects to be designated.[3]

4. Pursuant to the Agreement, URS Corporation ("URS") performed various professional services for H&E at its facilities located in Baton Rouge, Kenner, and Belle Chasse, Louisiana.[4]

5. Pursuant to Paragraph 2.1 of the Agreement:

   "Client shall pay undisputed portions of each progress invoice within thirty (30) days of the date of the invoice. If payment is not received within thirty (30) days from the due date of such payment, Consultant may suspend further performance under one or more Work Authorizations until payments are current. Client shall notify URS of any disputed amount within fifteen (15) days from date of the invoice, give reasons for the objection, and promptly pay the undisputed amount."[5]

6. Additionally, pursuant Paragraph 15.1 of the Agreement, "without limiting any express or implied obligations of Client under applicable law, Client shall…(4) give Consultant prompt written notice of any suspected deficiency

---

[1] Dep. of Leonard St. Germain at p. 87, L.L. 4-17 and Exhibit 27 thereto.  **(Exhibit 1 hereto)**
[2] Dep. of St. Germain at p. 87, L.L. 4-17 **(Exhibit 1 hereto)**
[3] Attachment 1 to Affidavit of O'Neal Johnson, §1.1 **(Exhibit 2 hereto)**
[4] Affidavit of Johnson at ¶ 5 **(Exhibit 3 hereto).**
[5] Attachment 1 to Aff. of Johnson **(Exhibit 2 hereto)**; See also, Aff. of Johnson at ¶ 4 **(Exhibit 3 hereto).**

EBR3897246
NON-CERTIFIED COPY

in the Services."[6]

7. In December of 2012, H&E's Chief Executive Officer, John Engquist, became upset because he felt that there were not enough parking spaces designed for the parking area at the Baton Rouge headquarters building [7]

8. In January of 2013, Mr. Engquist, gave an internal order that URS was not to be paid any further monies as a result of his reaction to the design of the parking spaces at the Baton Rouge headquarters building.[8]

9. Subsequently, URS continued to provide professional services to H&E under the Agreement, as reflected in URS's invoices.[9]

10. Mr. Engquist's stop payment order never changed even though URS subsequently provided unrelated professional services.[10]

11. URS issued invoices for professional services rendered to H&E at the Belle Chasse, Louisiana facility, subsequent to January, 2013, as follows:[11]

| Invoice No. | Date | Amount |
|---|---|---|
| 5531264 | 05/24/2013 | $11,854.12 |
| 5563141 | 06/19/2013 | $10,668.71 |
| 5599459 | 07/29/2013 | $40,043.22 |
| 5624795 | 08/20/2013 | $20,412.79 |
| 5657774 | 09/25/2013 | $15,967.40 |
| 5688671 | 10/24/2013 | $13,987.96 |
| 5713835 | 11/18/2013 | $5,607.00 |
| TOTAL | | $118,541.20 |

12. In addition to the fact that the Belle Chasse invoices referenced in Paragraph 11, *supra.*, are for professional services rendered after January, 2013, these invoices are wholly unrelated to the Baton Rouge headquarters building.

13. URS issued invoices for professional services rendered to H&E at the Kenner, Louisiana facility, subsequent to January, 2013, as follows:[12]

| Invoice No. | Date | Amount |
|---|---|---|
| 5591796 | 07/29/2013 | $231.48 |
| 5744512 | 12/23/2013 | $481.93 |
| TOTAL | | $713.41 |

---

[6] Attachment 1 to Aff. of Johnson at §15.1, p.4 **(Exhibit 2 hereto).**
[7] Dep. of John Engquist at p. 54-55; p. 77., L.L. 6-9 **(Exhibit 4 hereto).**
[8] Dep. of Frankie Wynn, p. 172, L.L. 4-173, L. 1 **(Exhibit 5 hereto);** Dep. of Engquist at p. 54-55; p. 77, L.L. 2-9; **(Exhibit 4 hereto);** Dep. of H&E at p. 7, L.L. 6-13 **(Exhibit 6 hereto).**
[9] Aff. of Johnson at ¶ 7 **(Exhibit 3 hereto).**
[10] Dep. of Engquist, p. 77, L. 22, p. 78, L. 5. **(Exhibit 4 hereto).**
[11] Aff. of Johnson at ¶ 8 **(Exhibit 3 hereto);** Attachment 2-A to Aff. of Johnson **(Exhibit 7 hereto).**
[12] Aff. of Johnson at ¶ 10 **(Exhibit 3 hereto).;** Attachment 2-B to Aff. of Johnson **(Exhibit 8 hereto).**

NON-CERTIFIED COPY

14. In addition to the fact that the Kenner invoices referenced in Paragraph 13, *supra.*, are for professional services rendered after January, 2013, these invoices are wholly unrelated to the Baton Rouge headquarters building.[13]

15. H&E maintained the stop payment order despite the fact that Mr. Engquist was "not aware of any problems at the Kenner facility at that time."[14]

16. URS issued invoices for professional services rendered to H&E at the Baton Rouge, Louisiana facility as follows:[15]

| Invoice No. | Date | Amount |
|---|---|---|
| 5357940 | 12/19/2012 | $66,001.45 |
| 5357943 | 12/19/2012 | $3,487.50 |
| 5357991 | 12/19/2012 | $858.75 |
| 5357942 | 01/14/2013 | $28,882.00 |
| 5424197 | 02/25/2013 | $6,605.00 |
| 5456789 | 03/21/2013 | $2,100.55 |
| 5555403 | 06/19/2013 | $975.00 |
| 5555428 | 06/19/2013 | $5,190.00 |
| 5565894 | 06/25/2013 | $1,202.50 |
| 5588906 | 07/24/2013 | $2,450.00 |
| 5588931 | 07/25/2013 | $3,050.00 |
| 5626064 | 08/21/2013 | $8,618.22 |
| 5681317 | 10/24/2013 | $950.00 |
| 5681338 | 10/24/2013 | $550.00 |
| **TOTAL** | | **$113,684.53** |

17. In addition to the fact that the Baton Rouge invoices referenced in Paragraph 16, *supra.*, included services rendered after January, 2013, none of these invoices involve the design of the  parking lot or interior of the Baton Rouge headquarters building that are the subject of any allegations by H&E in the pending lawsuit.[16]

18. Frankie Wynn, H&E's Director of Facilities at the time, who was in charge of these projects internally, approved URS invoices subsequent to the order from Mr. Engquist not to pay URS invoices.[17]

19. H&E did not notify URS of any disputed amount of any of these invoices within 15 days of the date of the invoice.[18]

20. H&E did not notify URS of any reason for any dispute as to the amount of

---

[13] Aff. of Johnson at ¶ 11 **(Exhibit 3 hereto).**
[14] Dep. of H&E at p. 8, L.L.  3-8 **(Exhibit 6 hereto).**
[15] Aff. of Johnson at ¶ 12; Attachment 2-C to Affidavit of Johnson **(Exhibit 9 hereto).**
[16] Aff. of Johnson at ¶ 13 **(Exhibit 3 hereto).**
[17] Dep. of Wynn at p. 223-224 **(Exhibit 5 hereto).**
[18] Aff. of Johnson at ¶ 14 **(Exhibit 3 hereto).**

NON-CERTIFIED COPY

any invoice within 15 days of each invoice.[19]

21. H&E did not provide URS prompt written notice of any deficiency in the services which are the subject of the outstanding invoices.[20]

22. H&E did not pay even the undisputed portions of the invoices at issue.[21]

23. Per John Engquist's internal instructions nothing was to be paid to URS from the date Engquist instructed not to pay.[22]

24. To date, URS has still not been paid on any of these invoices.[23]

25. The total balance of the Unpaid Invoices referenced in Paragraphs, *supra.*, is TWO HUNDRED THIRTY-TWO THOUSAND NINE HUNDRED THIRTY-NINE AND 14/100 ($232,939.14) DOLLARS.[24]

26. Pursuant to Paragraph 2.1 of the Agreement: "Client shall pay an additional charge of one percent (1%) per month or the maximum percentage allowed by law, whichever is the lesser, for any past due amount."[25]

27. Pursuant to Paragraph 2.1 of the Agreement: "In the event of a legal action for invoice amounts not paid, attorneys' fees, court costs, and other related expenses shall be paid to the prevailing party."[26]

Respectfully submitted,

ADAMS AND REESE, LLP

Philip A. Franco (Bar #8819), T.A.
Ronald J. Sholes (Bar # 14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone:   (504) 581-3234
Fax:            (504) 566-0210
E-mail: Phil.Franco@arlaw.com
         Ron.Sholes@arlaw.com
         Kellen.Mathews@arlaw.com

*Attorneys for Defendants, URS Corporation Architecture, P.C.; URS Corporation; L. O'Neal Johnson and Thomas E. Ryan, III*

---

[19] Aff. of Johnson at ¶ 15 **(Exhibit 3 hereto).**
[20] Aff. of Johnson at ¶ 16 **(Exhibit 3 hereto).**
[21] Aff. of Johnson at ¶ 17 **(Exhibit 3 hereto).**
[22] Dep. of Wynn at p. 224, L.L. 12-25; p. 225, L.L. 1-6 **(Exhibit 5 hereto).**
[23] Aff. of Johnson at ¶ 18 **(Exhibit 3 hereto).**
[24] Aff. of Johnson at ¶ 19 **(Exhibit 3 hereto).**
[25] Attachment 1 to Aff. of Johnson at §2.1, p.1 **(Exhibit 2 hereto).**
[26] Attachment 1 to Aff. of Johnson at §2.1, p.1 **(Exhibit 2 hereto).**

4


NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served

upon all counsel of record via e-mail and/or United States Mail, postage prepaid and

properly addressed, this 17th day of November, 2016.

Kellen J. Mathews



5

NON-CERTIFIED COPY

# DOUG WELBORN, CLERK OF COURT
## 19th Judicial District Court
## Parish of East Baton Rouge
## 300 North Boulevard
## Baton Rouge, LA 70801
## Phone  (225)389-3960

NO.    C626308 Division D              23-NOV-2016

TO:    ORLEANS PARISH SHERIFFS OFFICE
       CIVIL DEPARTMENT
       421 LOYOLA AVE
       NEW ORLEANS, LA 70112

Please find attached RULE NISI  to be served in your parish for the above numbered suit.

Kindly make your return(s) on the duplicate(s) enclosed, and

X       note the enclosed check for payment of service;

ڤ       send us your bill for service;

ڤ       note that this is a pauper suit and no funds are available; or

ڤ       note that this is a government suit and no funds are necessary.

Thank You,

Deputy Clerk of Court for
**Doug Welborn, Clerk of Court**

Requesting Attorney:  PHILIP ANTHONY FRANCO

---

REPLY:                              DATE:_____

_____

_____

_____

_____

_____

                    By:_____

                    Deputy Sheriff, Parish of _____

---

**Letter to Out Of Parish Sheriff - 5213**



EBR3837638

NON-CERTIFIED COPY

6709-16-000115

# RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**vs.**

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**NUMBER  C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

**TO:  H&E EQUIPMENT SERVICES INC
THRU BRENT B BARRIERE
201 ST CHARLES AVE. 46TH FLOOR
NEW ORLEANS, LA.  70170-4600**

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

**MOTION FOR SUMMARY JUDGMENT ON RECONVENTIONAL DEMAND ,
STATEMENT OF UNDISPUTED MATERIAL FACTS, & MEMORANDUM**

You MUST come to Court at 1:00 PM, on FEBRUARY 13, 2017 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

**\* \* \* \* \* SEE ATTACHED ORDER \* \* \* \* \***

**YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on **23-NOV-2016**.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

Requesting Attorney:
PHILIP ANTHONY FRANCO

---

### SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20____.

SERVICE $_____
MILEAGE $_____
TOTAL:  $_____

_____
Deputy Sheriff
Parish of _____

**RULE NISI (OOP) - 6709**


EBR3939138

NON-CERTIFIED COPY

# FishmanHaygood

Fishman Haygood LLP
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170
fishmanhaygood.com

LORETTA MINCE
(504) 586-5273
LMINCE@FISHMANHAYGOOD.COM

November 30, 2016

File No. 3107-04

*Via* **Federal Express**

Clerk of Court
19th JDC, Parish of East Baton Rouge
300 North Boulevard
Baton Rouge, Louisiana 70802

Re:    *H&E Equipment Services, Inc. v URS Corporation Architecture, P.C., et al*
Docket No. 626308, Sec. "D"

Dear Ms. Welborn:

Please find enclosed Opposition to Motion for Protective Order and Motion to Quash Subpoena Duces Tecum filed on behalf of Plaintiff, H&E Equipment Services, Inc.

I have enclosed our check for $180.00 to cover the cost for filing and service fees for the attached documents. Please return a stamped copy for our file in the enclosed stamped envelope.

Respectfully,

Loretta Mince

RS/dob
Enclosures
cc:    Philip A. Franco (w/encs.) (via email)
Kellen Matthews (w/encs.) (via email)
Theresa Dries Wilson (w/encs.) (via email)

EBR3896183

REC'D C.P.

DEC 02 2016

REC'D C.P.

DEC 07 2016

1145753v.1

NON-CERTIFIED COPY

ORIGIN ID:NEWA      (504) 586-5252
LORETTA G. MINCE
FISHMAN HAYGOOD, L.L.P.
201 SAINT CHARLES AVE
STE 4600
NEW ORLEANS, LA 70170
UNITED STATES US

SHIP DATE: 29NOV16
ACTWGT: 1.00 LB
CAD: 5347965/INET3790

BILL SENDER

TO  **CLERK OF COURT**

**CLERK OF COURT**

**19 JDC, PARISH OF EAST BATON ROUGE**

**300 NORTH BOULEVARD**

**BATON ROUGE LA 70802**

(504) 586-5252            REF: 3107-4
INV
PO                                    DEPT



FedEx.
Express

E

**WED - 30 NOV 10:30A**

**PRIORITY OVERNIGHT**

TRK# 7778 1955 4173
0201

**42 OPLA**          **70802**
                     LA-US  **MSY**

NON-CERTIFIED COPY

67        000112

# RULE NISI

6709-16-000112

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**NUMBER  C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

TO:    **H&E EQUIPMENT SERVICES INC
THRU BRENT BARRIERE
LORETTA G MINCE
201 ST. CHARLES  AVE., STE. 4600
NEW ORLEANS, LA.  70170**

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

DEFENDANTS' MOTION FOR EXPEDITED CONSIDERATION OF MOTION
FOR PROTECTIVE ORDER AND MOTION TO QUASH SUBPOENA DUCES
TECUM TO ENFORCE THIS COURT'S AMENDED CASE MANAGEMENT ORDER

You MUST come to Court at 9:30 AM, on DECEMBER 8, 2016 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

**\* \* \* \* \* SEE ATTACHED ORDER \* \* \* \* \***

**YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A
BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on **18-NOV-2016**.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

Requesting Attorney:
PHILIP ANTHONY FRANCO

---

**SERVICE INFORMATION:**

Received on the _24_ day of _Nov_, 20_16_ and on the _1_ day of _Dec_, 20_16_, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _201 St Charles  4600 Deann_

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____ a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20____.

SERVICE:$_____    _____
MILEAGES                        Deputy Sheriff
TOTAL: $_____    Parish of _Orlean_

**RULE NISI (OOP) - 6709**

NON-CERTIFIED COPY

EBR3709561

EBR3938493

ENTERED _____
PAPER    _11_  _9106_  _01_    RETURN
                                PARISH
SERIAL NO    MINUTES

6709-16-000115

# RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**NUMBER  C626308 Division D**

vs.

**19th JUDICIAL DISTRICT COURT**

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

RECEIVED
2016 NOV 29 A 11: 12
CADDO PARISH
SHERIFF'S OFFICE

TO:   **H&E EQUIPMENT SERVICES INC
THRU BRENT BARRIERE
LORETTA G. MINCE
201 ST CHARLES AVE., STE. 4600
NEW ORLEANS, LA.  70170**

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

## MOTION TO SET TRIAL DATE AND REMAINING DEADLINES

You MUST come to Court at 9:30 AM, on DECEMBER 08,2016 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

## * * * * * SEE ATTACHED ORDER * * * * *

**YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on **18-NOV-2016**.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

Requesting Attorney:
KELLEN J MATHEWS

---

**SERVICE INFORMATION:**

Received on the ___ day of _____, 20__ and on the ___ day of _____, 20__, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20 ___.

SERVICE: $ _____
MILEAGE: $ _____
TOTAL: $ _____

_____
Deputy Sheriff
Parish of _____

**RULE NISI (OOP) - 6709**

ENTERED

PAPER    SERIAL NO.    DEPUTY    RETURN    PARISH

EBR3938481

NON-CERTIFIED COPY

# Civil Engineering Expert Report

H&E EQUIPMENT SERVICES, INC.

VERSUS

URS CORPORATION ARCHITECTURE, P.C.,
URS CORPORATION, L. O'NEAL JOHNSON,
AND THOMAS E. RYAN, III

SUIT NO. 626,308, DIVISION D
19th JUDICIAL DISTRICT COURT
EAST BATON ROUGE PARISH, LA
STATE OF LOUISIANA

SEPTEMBER, 2016





EBR3896185



GWS Engineering, Inc.
Engineering Consultants - Land Surveyors

7520 Perkins Rd. • Suite 290 • Baton Rouge, LA   70808



EXHIBIT

1

NON-CERTIFIED COPY

## I.    INTRODUCTION

On August 25, 2015, GWS Engineering, Inc. (hereinafter referred to as **"GWS"**) was contacted by Ms. Mary Anne Wolf, Esq, with Keogh, Cox and Wilson, LTD. concerning GWS, and specifically its Owner, G. Wayne Sledge, P.E., P.L.S., EXW℠ to serve as an expert witness in the case of H & E Equipment Services, Inc. (hereinafter referred to as **"H&E"**) and URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, II (hereinafter referred to collectively as **"URS"**), Suit No. 626,308, Division D,19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana.  We were requested to provide expertise in the field of Civil Engineering (and Land Surveying, if necessary) regarding the captioned lawsuit involving the project known as the H & E Equipment Services Site, in Baton Rouge, Louisiana on behalf of Benchmark Group, LLC, (hereinafter referred to as **"BM"**).

The description of the services requested was for GWS to review various documents, pleadings, letter agreements, contracts, depositions, construction plans, discovery responses, etc. and prepare an expert report to address claims included in the Citation of November 20, 2013, as well as any supplemental allegations made by the Plaintiff during the discovery process.  More specifically, this review included the following:

A.    Expert Report of James R. (Bob) Bailey, Ph.D., P.E.;

B.    Expert Report of Wallace C. Drennan, III;

C.    Construction Plans prepared by Benchmark Group, LLC, dated 07/01/11;

D.    Original Citation, dated November 20, 2013;

E.    Geotechnical Report prepared by Soil Testing Engineers, Inc. dated January 11, 2007;

F.    Project Manual for New Facilities for H & E Equipment Services, prepared by URS, dated March 16, 2011;

G.    H & E Equipment Services, Inc.'s Responses to Defendants' First Set of Requests of Admission, dated January 21, 2016;

H.    H & E Equipment Services, Inc.'s Supplemental Responses to Defendants' Second Set of Interrogatories, dated January 19, 2016;

I.    Amended and Supplemental Responses to Defendant's First Set of Interrogatories on behalf of H & E Equipment Services, Inc., dated September 25, 2015;

J.    All Discovery Documents;

K.    Standard Specifications for Public Works Construction by the East Baton Rouge Parish Department of Public Works;

L.    The State of Louisiana Department of Transportation and Development (LA DOTD) Standard Specifications;

M.    Various Project Photographs;

N.    Discussions with the Murray L. McCullough, P.E., Benchmark Group, LLC;

NON-CERTIFIED COPY

O.   Site visits on January 22, 2016, and August 24, 2016;

P.   Concrete Compressive Strength Summary Report (pages 1-15), dated 10/02/12 by Terracon;

Q.   Mix Designs Submittal by Heck Industries, Inc., date unknown;

R.   Site construction plans for H & E facilities located in Bossier City, Louisiana, Grand Prairie, Texas, Houston, Texas, Sulfur, Louisiana, Atlanta, Georgia, Alexandria, Louisiana, and Charlotte, North Carolina;

S.   Amended and Supplemental Responses to Defendant's First Set of Interrogatories on behalf of H & E Equipment Services, Inc., dated May 18, 2016;

T.   Highway Engineering Handbook, Second Edition, McGraw-Hill, 2003;

U.   Proposal for Engineering and Landscape Architectural Services, H & E Corporate Facility - Pecue Lane at Airline, by Benchmark Group, L.L.C., dated July 2, 2008;

V.   Aggregate Test Reports provided by LA Testing and Heck Industries, dated 2010;

W.   Deposition of Mr. Leonard St. Germain, H&E Equipment Services, Inc.;

X.   H & E Equipment Services, Inc.'s Supplemental Responses to Defendants' First Set of Interrogatories, dated August 30, 2016; and

Y.   Deposition of Mr. Chad Herndon, Ex-Employee, URS

## II.   PETITION

In response to the request, what follows is a listing of the allegations included in the original Petition as well the Supplemental Response:

### A.   Issue.

In the original petition, it was alleged by H&E that certain design deficiencies in the plans and specifications began to manifest themselves during the course of construction of the Baton Rouge facility.   More specifically, these deficiencies included:

1.   Design deficiencies to the parking lot.

2.   Major portions of the concrete parking aprons and staging areas for H&E heavy equipment began experiencing a substantial and unanticipated amount of cracking, spalling and deterioration as a result of errors and defects in the design of the parking and staging areas.

3.   The design deficiencies relate to the defective and negligent design of the concrete pad, the expansion joints, the control joints, the specified concrete strength, and/or the specified surface of the parking and staging areas.

Page 2

NON-CERTIFIED COPY

4.  Failed to design the project in accordance with appropriate industry standards and/or in accordance with the required standard of care ordinarily exercised by others in the same profession.

5.  Defendant failed to address and remedy observed crumbling and spalling in the concrete.

6.  H&E suffered damages consisting of the anticipated costs of removing and replacing and/or repairing the concrete pads showing signs of spalling and cracking as a result of Defendants' deficient designs and specifications.

## III.  OVERVIEW

On or about August, 2006, H&E and URS entered into an agreement for Professional Services wherein, among other things, URS was to furnish professional design and construction administration services to H&E in connection with the construction of a new headquarters building and dealership facility to be located on Pecue Lane, Baton Rouge, LA.  In a subsequent agreement, URS contracted with BM to provide the necessary civil design services for the parking areas, parking lot drives, equipment storage areas, landscaping and retention pond.

My review found that the construction plans and specifications prepared by BM for the Baton Rouge facility were appropriate for the project and the design complied with the standard of care for such a facility.  Overall the pavement is in good condition and does not warrant total replacement.  The limited area of cracking and spalling is most likely caused by deficiencies occurring in the construction and by lack of routine care and appropriate maintenance.

It was apparent from our review of the aforementioned documents that the allegations were not supported by documented evidence but are based upon the theory that the project was constructed in accordance with the plans and specifications.  No evidence has been presented to confirm that assumption.  The lack  of any expert report in direct support of the allegations supporting the claims, the lack of evidence among the documents supporting the various claims, the lack of evidence showing BM caused compensable damages, and the lack of details and documentation on specific problems (joint issues) creates a situation of various claims and pleadings without providing the necessary foundation or documentation in support.

NON-CERTIFIED COPY

The original pleadings and the expert reports prepared by Bailey and Drennan, point only to design deficiencies as the cause of the pavement damage. However, there are numerous other possibilities for what is occurring at the site. Other possibilities include:

- pavement thickness not as specified (construction defect);
- delay in joint sawing (construction defect);
- failure to saw cut joints continuously through curb (construction defect);
- improper concrete mix design (construction defect);
- excessive slump of the concrete (construction defect);
- failure of the contractor to comply with the plans and specifications;
- construction methods (construction defect);
- failure to construct joints as designed;
- failure to properly seal joints;
- non-spec concrete delivered to the site (construction defect);
- spalling/scaling due to heavy equipment use/misuse beyond design capacity;
- inadequate inspection and quality control by inspection contractor; and
- inadequate or improper maintenance of the pavement/joints upon acceptance by the Owner.

It is important to note that none of these other "alternatives" were investigated by the plaintiff or their experts. Our findings, based upon actual evidence, indicates that one of more of these potential causes is actually creating the current conditions. Furthermore, our peer review of the BM plans and specifications indicated that the design met and/or exceeded the standard of care for the industry in the local area. These findings will be explained in further detail later in this report.

It is readily apparent based upon the pleadings and expert reports, that there were numerous issues requiring considerable interface between the various parties and contractors. However, it is our opinion that based upon the evidence reviewed that BM was not negligent and did not breach the standard of care in the design of the paved areas. To the contrary, the record indicates standard procedures, normal and customary field adjustments and the contractual obligations were followed in the site design as regards to the Civil Engineering Consultant. Projects like this are "living entities" which require updating as conditions and situations arise, and interfacing with the client or his representatives. The actions taken by BM, based upon my review of the available documents, are consistent with the standard of care that one would expect from a Civil Engineering Consultant on such a project. Accordingly, the various allegations outlined in the petition are, in my opinion, unsubstantiated and without basis. Had supporting documentation or evidence been provided, a more substantive review of the claims could have been performed on an allegation by allegation basis, but such information was not presented in the records reviewed. What was presented was a theoretical exercise amounting only to speculation in attempting to place fault on the plans and specifications for a project which has not been shown to have been built utilizing the aforementioned plans and specifications.

NON-CERTIFIED COPY

As regards to the negligence allegation, the review of the documents (specifically the expert reports of Bailey and Drennan) does not indicate that BM was negligent in performing its services but suggests only one alternative when there are many more - many of which have empirical data to support the position that the construction phase was the most likely cause of the issues. This analysis was based upon the review of actual data and testing reports and not a theoretical exercise simply assigning blame to the designer. Having been involved in the design of hundreds of paving projects during my 40+ year career, it is my opinion that the design of the project by BM was prepared in accordance with sound engineering principles used for similar projects in the area as well as other similar H&E projects throughout the United States.

## IV.  H & E EXPERT REPORTS

### A.  Wallace C. Drennan, III.

On July 28, 2016, Wallace C. Drennan, III, prepared and submitted a report to Ms. Lori Mince, with Fishman Haygood, L.L.P. in connection with this litigation matter. He was requested to "prepare a report addressing issues related to cracking and spalling of concrete pavement at the H&E Equipment Services facilities in Baton Rouge....". As Mr. Drennan is not a professional engineer, he would have insufficient design knowledge or design experience to critique a professional engineer's judgement and design. Mr. Drennan indicates in the report that he is in the construction business in New Orleans, LA. Having read his report, the following are my comments, observations and opinions regarding same:

1. I am personally not aware of true "as-built plans" as indicated in the report. In fact, no evidence has been presented which detailed exactly what was built on the project site.

2. Mr. Drennan made no review of any of the available testing reports.

3. Mr. Drennan made no review of Sheet C-509 of the "For Construction" plans for the project. This particular sheet contained the General Construction Notes and included references to specifications, etc.

4. Contrary to Mr. Drennan's opinion, smooth dowel bars are not required for all Construction Joints. It is, and always has been, the site engineer's option to detail the type of joint he feels is appropriate for the design condition. BM has extensive design experience in concrete pavement construction and has developed the expertise necessary to make an independent evaluation of the joint design for each project. Thus was the case in this particular

NON-CERTIFIED COPY

instance.  This use of professional judgement is what separates professionals from laymen in the ability/authority to make such design considerations.

5.      The plans on Details 1 & 2 (sheet C-501) do not reflect #3 rebar running across the CJs.  Those particular details are pavement sections which have nothing to do with the CJs.  Mr. Drennan's entire statement on this matter is factually inaccurate.

6.      As a non professional, Mr. Drennan's opinion as to the appropriate size of the rebars is unqualified.  The design professional has the authority vested upon him by the Louisiana State Board of Engineering and Land Surveying to use "professional judgement" in his designs.  BM has such firm authority as does Murray McCullough, P.E..  In discussions with Mr. McCullough, he indicated that this particular joint design has been in use by his firm for many years and has always been successfully used.  A statement by a non licensee that a professional deviation from any standard plan is inappropriate and without standing.

7.      No foundation or basis was provided for the cost to correct the alleged deficiencies, thus the estimated cost provided is unfounded and unsubstantiated.  Based upon my two site visits in January and August, 2016, total replacement is obviously not warranted throughout the project site.  The entire paved area is serviceable and in use by the Owner.  A large portion of the paved areas have no signs of excessive cracking.

8.      This report provided no explanation for the spalling or cracking of the concrete.  The report as was written essentially described the joint designs in several governmental publications.  Any cause and effect correlation between the joints and the pavement condition was not provided nor explained.

In summary, Mr. Drennan, a Contractor, expressed many opinions which should be reserved for a licensed professional engineer.  In several cases he misinterpreted the construction documents thus arriving at unfounded and inaccurate statements and personal opinions.  His reporting and evaluation on this litigation matter is inappropriate and erroneous.  In particular, he expressed no cause and effect correlation between the joint details and the spalling and cracking and any alleged design defects.  In addition, he was silent on the many other potential causes of such pavement issues mentioned in the Overview.

NON-CERTIFIED COPY

B.    **James R. Bailey, Ph.D, P.E.**

On July 29, 2016, James R. (Bob) Bailey, PhD., P.E., prepared and submitted a report to Ms. Loretta G. Mince, Esq., with Fishman Haygood, L.L.P. in connection with this litigation matter. He was requested to "evaluate the cause of damage to concrete pavements at two separate facilities operated by H&E Equipment". These facilities are in Baton Rouge, LA and Kenner, LA. Having read his report, the following are my comments, observations and opinions regarding the Baton Rouge site:

1.    Dr. Bailey stated that he conducted an investigation to determine the nature, mechanism(s) and extent of damage at the two facilities. This report only involved site visits, reviewing architectural and engineering drawings, photos, e-mails and performing an engineering analysis. What is noteworthy is this investigation did not investigate the actual measurables at the site (pavement thickness, joints construction, dowel bars sizes, etc.) but was only a theoretical analysis based upon only certain, selected documents and details.

2.    Dr. Bailey observed the absence of steel edge guards along the length of the expansion joints, yet he could not identify any specification in the United States related directly to their use in the design of concrete surfaces under tracked vehicles. In addition, apparently no request was made to URS or BM by H&E to investigate such issues. A review of all the H&E equipment yards studied will indicate that with one exception, they do not use such steel edge guards. The Owner has and continues to reject this option as well as the protective coating suggested in his report. Further discussions on this fact will follow later in the report.

3.    Contrary to Dr. Bailey's opinion, the design provided by BM met or exceeded the standard of care customarily employed by other Civil Engineers in the same general area. To state that research in New Zealand was necessary for the proper design of this facility when H&E operates similar facilities without edge guards throughout the southern portion of the United States far exceeds such standard of care requirements. If H&E sites were experiencing pavement problems, that is information that should have been brought forth to the design team at the onset of the project. The Owner (H&E) was not an uninformed or unknowledgeable user of such a facility.

NON-CERTIFIED COPY

4.  This report quotes extensively from the American Concrete Institute Manual titled ACI 330R-0 but this manual is not a substitute for engineering judgement. The plans and specifications clearly and repeatedly referred to similar public documents in common use in the local area. These included the Standard Specifications for Public Works Construction by the East Baton Rouge Parish Department of Public Works, and The State of Louisiana Department of Transportation and Development (LA DOTD) Standard Specifications. These documents were referenced in the plans and supplemented the Project Manual prepared for this particular project by licensed Professional Engineers and Architects familiar with the local area and its typical design parameters.

5.  Contrary to Dr. Bailey's assertion that the distributed steel reinforcement was appropriate but missing from the concrete pavement, a close examination of Details 1 and 2, Sheet C-501 of the Construction Plans, clearly shows that #3 rebars at 24" each way were specified to be placed within the concrete panels. The details for the expansion joints also shown on Sheet C-501 clearly show appropriate dowels which is also contrary to Dr. Bailey's report. McCullough indicated that this particular joint design has been in use by his firm for many years and has always been used successfully. The construction document Dr. Bailey was apparently reviewing was not the document for the Contractor to use for the construction of the project. Dr. Bailey's entire statement on this matter is factually inaccurate.

6.  Dr. Bailey correctly repeats from the STE report that "the design life of the pavement system is dependent upon periodic maintenance of the pavement. This maintenance includes but is not limited to cleaning and resealing joints, sealing cracks and immediate repairs of damaged areas". To date, I am not aware of H&E providing any of these maintenance services deem "dependent" by Dr. Bailey's quote. Furthermore, according to the final punch list, the Contractor did not seal the joints adequately resulting in lack of care being a probable cause for the four years the facility has been operational (H&E 001043).

7.  Dr. Baileys discussion of 6" pavement is theoretical only and irrelevant. He conducted no testing to determine the actual concrete depth in the affected areas. If the Contractor did not meet the thickness specified, this would increase the likelihood of excessive cracking.

Page 8

NON-CERTIFIED COPY

8.     In my 40+ years as a site design professional, I have never been presented with evidence that corner cracking at some of the expansion joints suggest that improper spacing of dowels near the corners may have occurred. To the contrary, according to the Highway Engineering Handbook, Second Edition, McGraw-Hill, 2003, Sec. 3.56, "...Corner breaks are cracks found at the corner of the slab." "...and are generally the result of loss of support under the corner of the slab." The hypothesis suggesting this occurs as a result of dowel placement is an interesting theory, but no proof was presented in the report, and is merely speculation.

9.     In Dr. Bailey's report on "Pavement Surfaces", he states that several products are available that can be used for new construction to provide a surface that has both high abrasion resistance and high overall strength. Such "add ons" are outside the standard of care for the area and has never been used by any of the numerous facilities owned and operated by H&E to my knowledge.

10.     The examples provide by Dr. Bailey for the use of metal edge guards are not inclusive of heavy equipment yards thus such a suggestion is, again, outside the normal standard of care.

11.     H&E has decades of experience using heavy equipment sites. Contrary to Dr. Baileys assertion, it is H&E who should have informed URS of any likelihood of near-term progressive damage to the concrete pavement resulting from the movement of tracked vehicles. According to documents I have reviewed, H&E Equipment operates numerous such sites across the United States. H&E is not uninformed or unfamiliar with such operations and if there were any such possibilities of unusual pavement issues, it was encumbered upon H&E to advise the design professions, not the reverse.

12.     Dr. Bailey was silent on the many other potential causes of such pavement issues addressed in this report.

In summary, Dr. Bailey's resume' shows him to be well educated and experienced engineer with multiple professional licenses in many states. However, a close review of his resume' does not reflect a career spent as a design professional on projects such as the H&E facility. His expertise, according to his Curriculum Vita, includes storm surges, hurricane risk management, wind loads, wind risk assessment, revenue interruption risks, vulnerability assessments to hurricane winds, experimental verification of the theoretical solution of laminated glass units, well research, lecturing storm damage assessment, building envelope systems, soil mechanics, numerical analysis, structural analysis and design, materials testing, etc. - but not Civil Site design. In fact his designing of such a parking, storage facility is not mentioned in his CV.

Page 9

NON-CERTIFIED COPY

The single minded approach to the analysis reflects a lack of a comprehensive understanding of the complex design considerations which go into the actual design and construction of such a facility. These designs are not theoretical exercises. It is real concrete, real steel, and real decisions have to be made which affect the Owner, the Owners construction budget, and contractor requirements/needs addressed, local regulatory agency requirements and the multitude of other issues that must be identified and addressed solely based on experience. For Dr. Baily to dismiss the many other potential causes of these issues: pavement thickness not as specified, delay in joint sawing, failure to timely saw cut joints, improper concrete mix design, the excessive slump of the concrete, failure of the Contractor to comply with the plans and specifications, construction methods, failure to construct joints as designed, failure to properly seal joints, non spec concrete delivered to the site, spalling due to heavy equipment use/misuse, inadequate inspection and quality control by the inspection contractor and inadequate or improper maintenance to the pavement after completion by the Owner indicates a fundamental failure to understand the many issues involved with such a project.

Taking selective examples from suggested guidelines without any direct evidence in support, and to not include and acknowledge the necessary component of engineering judgement is totally inappropriate in this case. Dr. Bailey has no expertise in the issues involving the pavement design at such a facility as the H&E facility in Baton Rouge. Engineering judgement by experienced engineers has not influenced his only working theory of inadequate design, as it should. In addition, his basis to establish the "standard of care" for the local area is totally without a foundation in either fact or experience. Dr. Baily's report reflects that of a theorist rather than a design engineer with appropriate experience in this particular matter.

## V.    Other H&E Equipment Yard Locations

In documents provide by H&E in conjunction with this case, ten (10) other sites have been identified as having equipment yards similar to the one located in Baton Rouge, Louisiana. These sites are as follows:  Alexandria, LA, Lake Charles (Sulfur), LA, Shreveport, LA, Charlotte, NC, Raleigh, NC, Winston Salem, NC, Dallas (Grande Prairie), TX, Baltimore, MD, Corpus Christie, TX, and Houston, TX.

In responses to Interrogatories, and the deposition of Leonard St. Germain, H&E provided information on the pavement conditions for those sites. Their responses are summarized for each site as follows:

NON-CERTIFIED COPY

1

1        19th JUDICIAL DISTRICT COURT
2         PARISH OF EAST BATON ROUGE
3         STATE OF LOUISIANA

4

5    H&E EQUIPMENT SERVICES,     *     DOCKET NO.
  INC.           *     626,308
6                *
  VERSUS           *
7                *     SECTION: "D"
  URS CORPORATION       *
8    ARCHITECTURE, P.C., URS     *
  CORPORATION, L. O'NEAL     *
9    JOHNSON, AND THOMAS E.     *
  RYAN, III          *

10    *   *   *   *   *   *   *   *   *   *

11

12

13

14       Deposition of GUY WAYNE SLEDGE, P.E.,
  P.L.S., 18835 Lake Harbour Avenue, Baton Rouge,
15   Louisiana  70816, taken in the Law Offices of
  ADAMS and REESE, LLP, Suite 4500, One Shell
16   Square, 701 Poydras Street, New Orleans,
  Louisiana  70139, commencing at 10:04 o'clock
17   a.m., on Friday, the 30th day of September 2016.

18

19   APPEARANCES:

20

21      FISHMAN HAYGOOD, L.L.P.
    Attorneys at Law
22      (By:  LORETTA G. (LORI) MINCE, Esquire
    lmince@fishmanhaygood.com
23      Suite 4600
    201 St. Charles Avenue
24      New Orleans, Louisiana  70170-4600
    (Attorneys for the Plaintiff,
25       H&E Equipment Services, Inc.)



EXHIBIT

2

NON-CERTIFIED COPY

2

1  APPEARANCES CONTINUED:

2

3          LAW OFFICES OF ADAMS and REESE
           (By:  PHILIP A. FRANCO, Esquire)
4          philip.franco@arlaw.com
           Suite 4500
5          One Shell Square
           701 Poydras Street
6          New Orleans, Louisiana  70139
           (Attorneys for the Defendants,
7           URS Corporation Architecture, P.C.,
            URS Corporation, L. O'Neal Johnson,
8           and Thomas E. Ryan, III)

9

10 REPORTED BY:

11

12         JANET GILLEN ROBINSON, CCR
           Certified Court Reporter
13         HUFFMAN & ROBINSON, INC.
           Suite 220, Metairie Office Tower
14         433 Metairie Road
           Metairie, Louisiana  70005
15         (504) 831-1753 / (800) 749-1753
           www.huffrob.com
16

17             E X A M I N A T I O N    I N D E X

18

19                                      PAGE

20
   EXAMINATION BY MS. MINCE...................6
21
   RE-EXAMINATION BY MS. MINCE...............244
22

23 EXAMINATION BY MR. FRANCO.................235

24

25

NON-CERTIFIED COPY

3

# E X H I B I T   I N D E X

Sledge Exhibit Number 1....................9
        (Document entitled "Civil
         Engineering Expert Report,"
         dated September 2016.")

Sledge Exhibit Number 2....................67
        (Drawing Issued 3/16/11, URS C-501)

Sledge Exhibit Number 3....................124
        (Document entitled "Project
         Manual, dated March 16, 2011
         Bates Stamp Number URS -062010
         through Bates Stamp Number
         URS - 062144)

Sledge Exhibit Number 4....................135
        (Document entitled "SECTION
         0330-CAST-IN-PLACE CONCRETE
         Bates Stamp Number URS - 062190
         through Bates Stamp Number URS - 062197)

Sledge Exhibit Number 5....................136
        (Document produced by Witness)

Sledge Exhibit Number 6....................166
        (Drawing C-3.1, "PAVING AND
         JOINT DETAILS"
         Bates Stamp Number H & E 0002799)

Sledge Exhibit Number 7....................186
        (Document entitled "PHASE II
         DESIGN DEVELOPMENT SERVICES
         FOR H&E EQUIPMENT SERVICES
         HEADQUARTERS AND EQUIPMENT
         DIVISION OFFICE, BATON ROUGE,
         LOUISIANA, ATTACHMENT 1."
         Bates Stamp Number H & E 0000026)

NON-CERTIFIED COPY

4

Sledge Exhibit Number 8...................186
        (Letter dated October 23, 2006,
        From:  Chad Herndon, To:
        Leonard St. Germain) Bates Stamp
        Number H & E 0000133 through
        Bates Stamp Number H & E 0000135)


Sledge Exhibit Number 9...................188
        (Document entitled "Scope of
        Services, Attachment 1."
        Bates Stamp Number H & E 0000147)


Sledge Exhibit Number 10..................191
        (Document entitled "Statement of
        Probable Cost, dated 11.21.08
        Bates Stamp Number H & E 0001031
        through Bates Stamp Number
        H & E 0001042.")


Sledge Exhibit Number 11..................198
        (Document entitled "Meeting Minutes,
        dated December 2, 2008
        Bates Stamp Number URS - 08854
        and Bates Stamp Number URS - 08855)


Sledge Exhibit Number 12..................201
        (E-mail From:  Chad Herndon,
        To:  Leonard St. Germain,
        dated Tuesday, February 6, 2007
        Bates Stamp Number H&E 0005163)


Sledge Exhibit Number 13..................213
        (Document entitled "Guide to
        Design of Slabs-on-Ground,
        ACI 360R-10.")


Sledge Exhibit Number 14..................236
        (Drawing entitled "Figure 6.
        Designated Area for Heavy Duty
        Pavement at Baton Rouge Site.")

NON-CERTIFIED COPY

5

## S T I P U L A T I O N

It is stipulated and agreed by and
between Counsel for the parties hereto that the
deposition of the aforementioned witness is
hereby being taken, pursuant to notice, under the
Louisiana Code of Civil Procedure, Article 1421,
et seq., for all purposes, including use at
trial, in accordance with law;

That the formalities of reading and
signing are not waived;

That the formalities of filing,
sealing and certification are specifically
waived;

That all objections, save those as to
the form of the question and the responsiveness
of the answer, are hereby reserved until such
time as this deposition, or any part thereof, may
be used or sought to be used in evidence.

It is further stipulated that Janet
Gillen Robinson, in her capacity as a Certified
Court Reporter in the State of Louisiana, may
administer the oath to the witness.

NON-CERTIFIED COPY

6

1          GUY WAYNE SLEDGE, P.E., P.L.S.,

2 18835 Lake Harbour Avenue, Baton Rouge, Louisiana

3 70816, after having been first duly sworn by the

4 above-mentioned Certified Court Reporter, did

5 testify as follows:

6 EXAMINATION BY MS. MINCE:

7          Q.    Good morning.  I'm Lori Mince.  We

8 met a few minutes ago.  I represent H&E Equipment

9 in connection with a lawsuit that's been filed

10 against URS.

11              You've issued an expert report in

12 this case, and I'm going to take your deposition

13 to ask you some questions about the statements,

14 and opinions, set forth in your report.

15              Have you ever given a deposition

16 before?

17          A.    Yes, ma'am.

18          Q.    How many times?

19          A.    I don't know an exact number.

20 Twenty-five to thirty-five, probably.

21          Q.    All right.  Have all of your

22 depositions been in your capacity as an expert.

23          A.    Yes.

24          Q.    And have you ever been qualified as

25 an expert in a Court?

NON-CERTIFIED COPY

144

1    of the issue that those -- those doing the actual

2    construction -- which can affect some of this

3    stuff.

4            Q.    All right.  Now let's go to Page 5.

5            A.    (Complies)

6            Q.    All right.  You say:

7                  "As regards to the negligence

8            allegation, the review of the documents

9            (specifically the expert reports of Bailey

10           and Drennan) does not indicate that

11           Benchmark was negligent in performing its

12           services but suggests only one alternative

13           when there are many more - many of which

14           have empirical data to support the

15           position that the construction phase was

16           the most likely cause of the issues."

17                  When you say "the construction phase

18    was the most likely cause of the issues," what,

19    specifically, are you referring to about the

20    construction phase?

21           A.    I have no evidence whatsoever, that

22    I reviewed, as to what the contractor actually

23    did.  That's -- that's the great unknown, to me,

24    because the contractor -- a good contractor, and

25    bad plans, you get a good project -- bad plans, a

NON-CERTIFIED COPY

145

1  good contractor, you get a good project.

2              The contractor is an integral, major

3  component of this, and I have no idea what he --

4  if the work he did was timely, if it was truly in

5  accordance with all the specs, I just have no

6  data on that.

7              Past history indicates most of it is

8  contractor-related.

9         Q.    "Past history"?  I don't know what

10  you mean by "past history."

11        A.    When we've had problems with

12  projects.

13        Q.    Oh, you mean history on other

14  projects?

15        A.    Yes.  History on other projects.

16        Q.    Not this project?

17        A.    No.

18        Q.    I see.

19        A.    It's -- it's just, history tells me

20  that the contractor is a major player on this

21  stuff.

22        Q.    All right.  So when you say in this

23  sentence:

24              "...empirical data to support the

25              position that the construction phase was

NON-CERTIFIED COPY

1

```
 1              19th JUDICIAL DISTRICT COURT
               PARISH OF EAST BATON ROUGE
 2                 STATE OF LOUISIANA

 3

 4

 5    H&E EQUIPMENT SERVICES,      *    DOCKET NO.
      INC.                         *    626,308
 6                                 *
      VERSUS                       *
 7                                 *    SECTION: "D"
      URS CORPORATION              *
 8    ARCHITECTURE, P.C., URS      *
      CORPORATION, L. O'NEAL       *
 9    JOHNSON, AND THOMAS E.       *
      RYAN, III                    *
10
      *   *   *   *   *   *   *   *   *   *
11

12

13

14            Deposition of CARL JOSEPH LAROSCHE,
      P.E., 7708 Lenape Trail, Austin, Texas 78736,
15    taken in the Law Offices of ADAMS and REESE, LLP,
      Suite 4500, One Shell Square, 701 Poydras Street,
16    New Orleans, Louisiana 70139, commencing at 9:52
      o'clock a.m., on Thursday, the 29th day of
17    September 2016.

18

19    APPEARANCES:

20

21         FISHMAN HAYGOOD, L.L.P.
           Attorneys at Law
22         (By: LORETTA G. (LORI) MINCE, Esquire
           lmince@fishmanhaygood.com
23         Suite 4600
           201 St. Charles Avenue
24         New Orleans, Louisiana 70170-4600
           (Attorneys for the Plaintiff,
25          H&E Equipment Services, Inc.)
```

EXHIBIT

3

NON-CERTIFIED COPY

2

APPEARANCES CONTINUED:

        LAW OFFICES OF ADAMS and REESE
        (By:  PHILIP A. FRANCO, Esquire)
        philip.franco@arlaw.com
        Suite 4500
        One Shell Square
        701 Poydras Street
        New Orleans, Louisiana  70139
        (Attorneys for the Defendants,
         URS Corporation Architecture, P.C.,
         URS Corporation, L. O'Neal Johnson,
         and Thomas E. Ryan, III)




REPORTED BY:

        JANET GILLEN ROBINSON, CCR
        Certified Court Reporter
        HUFFMAN & ROBINSON, INC.
        Suite 220, Metairie Office Tower
        433 Metairie Road
        Metairie, Louisiana  70005
        (504) 831-1753 / (800) 749-1753
        www.huffrob.com




        E X A M I N A T I O N   I N D E X



                                        PAGE


EXAMINATION BY MS. MINCE.................6

NON-CERTIFIED COPY

3

# E X H I B I T   I N D E X

Larosche Exhibit Number 1.................8
    (Expert Report, dated
    September 9, 2016)

Larosche Exhibit Number 2.................8
    (Expert Report, dated
    September 9, 2016)

Larosche Exhibit Number 3.................9
    (Document entitled "CURRICULUM VITAE")

Larosche Exhibit Number 4................43
    (Document entitled "RSMeans
    Repair & Remodeling Cost
    Data 2008
    Bates Stamp Number URS - 094174 through
    Bates Stamp Number URS -  094230)

Larosche Exhibit Number 5................46
    (Document entitled "Preliminary
    Engineer's Opinion of Cost Bates
    Stamp Number URS - 094231
    and Bates Stamp Number 094232)

Larosche Exhibit Number 6................46
    (Document entitled "7.6 Unit Pricing
    Breakdown, with attachments
    Bates Stamp Number URS - 094233 through
    Bates Stamp Number URS - 094252)

Larosche Exhibit Number 7................56
    (E-mail From:  Carl J.
    Larosche, P.E., To:  Phil Franco)

Larosche Exhibit Number 8...............110
    (Schematic C-302, with attachments
    Bates Stamp Number URS - 095317 and
    miscellaneous Bates Stamp Numbers)

Larosche Exhibit Number 9...............143
    (Document entitled "Branch Building
    Figure 6.  Designated Area for
    Heavy Duty Pavement at Baton Rouge Site
    (Source:  URS Drawings C-302 and C-305.")

Larosche Exhibit Number 10..............146

NON-CERTIFIED COPY

4

## STIPULATION

It is stipulated and agreed by and between Counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken, pursuant to notice, under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, including use at trial, in accordance with law;

That the formalities of reading and signing are not waived;

That the formalities of filing, sealing and certification are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

It is further stipulated that Janet Gillen Robinson, in her capacity as a Certified Court Reporter in the State of Louisiana, may administer the oath to the witness.

NON-CERTIFIED COPY

5

1    THE COURT REPORTER:

2          What type stipulation, Counsel?

3    MR. FRANCO:

4          General.

5    MS. MINCE:

6          Fine.

7    MR. FRANCO:

8          I assume, Chuck, you want to read

9    and sign your deposition?

10   THE WITNESS:

11         Yes, please.

12   MR. FRANCO:

13         She will send it directly to you,

14   Chuck.

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

6

1          CARL JOSEPH LAROSCHE, P.E.,

2  7708 Lenape Trail, Austin, Texas  78736, after

3  having been first duly sworn by the

4  above-mentioned Certified Court Reporter, did

5  testify as follows:

6  EXAMINATION BY MS. MINCE:

7          Q.    Good morning.

8          A.    Hi.

9          Q.    We met a few minutes ago.  I'm Lori

0  Mince, and I represent H&E Equipment in a lawsuit

1  that H&E has brought against URS.

2          A.    O.K.

3          Q.    I'm going to take your deposition

4  today, regarding the opinions you've set forth in

5  two expert reports, dated September 9th, 2016.

6              Have you ever given your deposition

7  before?

8          A.    I have.

9          Q.    How many times?

0          A.    I don't know the exact number.

1          Q.    More than five?

2          A.    Yes.

3          Q.    More than ten?

4          A.    Yes.

5          Q.    So you understand the basic drill.

NON-CERTIFIED COPY

30

1   anyway.

2          I take it, you've been qualified as

3   an expert before?

4          A.    Yes.

5          Q.    How many times?

6          A.    I do not know.

7          Q.    More than ten?

8          A.    Yes.

9          Q.    Can you tell me in what areas you

0   have been qualified as an expert?

1          A.    Structural engineering, material

2   science, historical preservation, material

3   testing, nondestructive testing, building

4   enclosure systems.

5          Q.    Nondestructive testing, tell me more

6   about that.

7          A.    Nondestructive testing is -- we use

8   nondestructive testing quite often in our

9   assessment of existing structures.  We employ a

0   variety of different techniques, to ascertain

1   such things as geometry, reinforcement

2   positioning, material composition, material

3   density, material strength.

4          Q.    All right.  So do you have any

5   experience with non -- the use of nondestructive

NON-CERTIFIED COPY

31

1  testing to assess a concrete slab?

2       A.    We do.

3       Q.    And, in particular, to determine the

4  existence of steel reinforcement within that

5  slab?

6       A.    We do.

7       Q.    And, also, perhaps, the thickness of

8  the slab?

9       A.    We do.  We employ that often.

10      Q.    And is that done, using -- it's,

11 essentially, X-ray technology?  Explain how

12 that's done?

13      A.    Which aspect?

14 MR. FRANCO:

15           Wait.

16           Objection to the form of the

17      question.

18           Explain how what's done?

19 EXAMINATION BY MS. MINCE:

20      Q.    Nondestructive testing, to ascertain

21 the presence of steel reinforcement.

22      A.    We use ground penetrating radar, in

23 most instances, to detect, positioning and

24 placement, of reinforcement in concrete

25 structures.

NON-CERTIFIED COPY

32

1    Q.    And can you also use nondestructive
2 testing to determine pavement thickness?
3    A.    Yes.
4    Q.    And tell me how that's done.
5    A.    Acoustic emission.
6    Q.    Acoustic what?
7    A.    Emission.
8    Q.    Emission.
9    A.    Impact echo.
0    Q.    Spell the second word?
1    MR. FRANCO:
2         Echo.
3 EXAMINATION BY MS. MINCE:
4    Q.    Echo.
5    A.    Strike acoustic emission.
6    Q.    I'm sorry?
7    MR. FRANCO:
8         For thickness?
9    THE WITNESS:
0         For thickness.
1 EXAMINATION BY MS. MINCE:
2    Q.    Yes.  What is the technique used to
3 determine thickness?
4    A.    Impact echo.
5    Q.    Impact echo.

NON-CERTIFIED COPY

**EXponent**

*Failure Analysis Associates*

Exponent
475 14th Street Suite 400
Oakland, CA 94612

telephone 510-268-5000
facsimile 510-268-5099
www.exponent.com

August 26, 2016

Loretta G. Mince, Esq.
Fishman Haygood, L.L.P.
201 St. Charles Avenue
46th Floor
New Orleans, Louisiana 70170

Subject:   H&E Equipment Facilities
             Exponent Project No. 1306663.001

Dear Ms. Mince:

I reviewed the Change Order (CO) documents related to the construction of the H&E Equipment facilities at Baton Rouge, Kenner, and Belle Chasse.  Based on the CO documents produced by URS, and my education, training, and 28 years of experience in the construction industry, the added project costs could have been mitigated.  Using the Cost of Change v. Time model, the cost of work added to the scope by change order can be estimated  to be 1.5 to 2 times greater than the cost otherwise would have been had the scope of work been included in the contract documents prior to bidding the project.

If you have any questions or require additional information, please do not hesitate to contact me at 510-268-5083.

Sincerely,

Matt Vail, P.E.
Senior Manager
Construction Consulting Practice
Exponent, Inc.

STATE OF LOUISIANA
JAMES R. BAILEY
License No. 33830
PROFESSIONAL ENGINEER
IN
CIVIL ENGINEERING

James R. (Bob) Bailey, Ph.D., P.E.
Senior Managing Engineer
Exponent, Inc.

*BAILEY*
EXHIBIT NO. 8
K. DONNELLY

1306663.001 - 6908



EXHIBIT
4

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *  *
                         *
H&E EQUIPMENT SERVICES   *
                         * NUMBER 626,308
VERSUS                   *
                         * DIVISION "D"
URS CORPORATION          *
ARCHITECTURE, P.C., URS  *
CORPORATION, L O'NEAL    *
JOHNSON AND THOMAS E.    *
RYAN, III                *
                         *
*  *  *  *  *  *  *  *  *
```

Deposition of JAMES R. BAILEY,

Ph.D., P.E., taken on Thursday, September 22,

2016, commencing at 9:43 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.

EXHIBIT
5

NON-CERTIFIED COPY

1                    I N D E X

2

3                                          Page

4

       Caption                              1
5      Index of Exhibits                    3
       Appearances                          7
6      Agreement of Counsel                 8

7      Examination

8        PHILIP A. FRANCO, ESQ.            9

9

10            *   *   *   *   *

11     Witness' Certificate               215
       Reporter's Page                    216
12     Certificate                        217

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 3

1                    INDEX OF EXHIBITS

2

3    Number                                    Page

4      1  July 29, 2016 James R. Bailey,       26
            Ph.D., P.E., Exponent, Inc.,
5           Investigation of Damaged
            Concrete Pavements at H&E
6           Equipment Facilities

7      2  Field Notes of James R. Bailey,      53
            Ph.D., P.E., Exponent, Inc.
8
       3  Concrete Pavement Details            148
9           January 18, 2008, Baton Rouge

10     4  January 18, 2013 Email string        149
            from Frankie Wynn to Stephan
11          Dorsey, et al, attaching
            photographs
12          H&E 0022314-0022324

13     5  February 8, 2007 Email from          150
            Chad Herndon to Leonard
14          St. Germain, et al
            H&E 0005163
15
       6  November 13, 2012 Benchmark          152
16          Field Report No. 1 (Branch
            Office) Wesley Wilkerson
17          URS 049989

18     7  1/27/2014 Portland Cement            154
            Concrete Pavement Details
19          H&E 072388-072390

20     8  August 26, 2016 Supplemental         155
            Report by James R. Bailey,
21          Ph.D., P.E., Exponent, Inc.

22     9  July 27, 2016 Email string from      161
            Frankie Wynn to Jeff Stringer,
23          et al re: Vehicle Traffic at
            Baton Rouge
24          H&E 072397-072399

25

NON-CERTIFIED COPY

Page 4

1   (Cont.)       INDEX OF EXHIBITS

2

3    Number                        Page

4    10   July 27, 2016 Email string    165
          from Bob Bailey to Frankie
5         Wynn
          H&E 072402-072403
6
7    11   Joints in Concrete Construction   169
          Reported by ACI Committee 224
          ACI 224.3R-95 (Reapproved
8         2001)
          H&E 072541-072584
9
     12   Photograph                   177
10        H&E 073577

11   13   Photograph                   177
          H&E 073580
12
     14   Photograph                   178
13        H&E 073586

14   15   Photograph                   178
          H&E 073590
15
     16   Photograph                   179
16        H&E 073595

17   17   Photograph                   182
          H&E 073610
18
     18   Photograph                   183
19        H&E 073617

20   19   Photograph                   184
          H&E 073618
21
     20   Photograph                   188
22        H&E 073622

23   21   Photograph                   189
          H&E 073631
24

25

NON-CERTIFIED COPY

1    (Cont.)        INDEX OF EXHIBITS

2

3      Number                              Page

4
       22   Photograph                191
5           H&E 073632

6      23   Photograph                193
            H&E 073633
7
       24   Photograph                194
8           H&E 073643

9      25   Photograph                195
            H&E 073651
10
       26   Photograph                195
11          H&E 073654

12     27   Photograph                196
            H&E 073661
13
       28   Photograph                196
14          H&E 073702

15     29   Photograph                196
            H&E 073703
16
       30   Photograph                197
17          H&E 073705

18     31   Photograph                198
            H&E 073719
19
       32   Photograph                198
20          H&E 073428

21     33   Photograph                201
            H&E 073441
22
       34   Photograph                202
23          H&E 073443

24

25

NON-CERTIFIED COPY

Page 6

1   (Cont.)      INDEX OF EXHIBITS

2

3    Number                          Page

4

5    35   Photograph               203
         H&E 073478

6    36   Photograph               203
         H&E 073479

7    37   Photograph               203
8        H&E 073522

9    38   Photograph               205
         H&E 073523

10   39   Photograph               205
11       H&E 073536

12   40   Photograph               206
         H&E 073562

13   41   Photograph               207
14       H&E 073855

15   42   Photograph               208
         H&E 073861

16   43   Photograph               209
17       H&E 073920

18   44   Photograph               209
         H&E 073921

19   45   Photograph               209
20       H&E 073933

21   46   Photograph               211
         H&E 073955

22   47   Photograph               211
23       H&E 074022

24   48   Photograph               212
         H&E 074026

25

Page 7

```
 1   APPEARANCES:

 2

         Representing the Plaintiff:
 3

           FISHMAN HAYGOOD, LLP
 4         Attorneys at Law
           201 St. Charles Avenue, Suite 4600
 5         New Orleans, Louisiana  70170

 6         BY:  BRENT B. BARRIERE, ESQ.
                LORETTA G. MINCE, ESQ.
 7

 8

 9
         Representing the Defendant:
10

           ADAMS AND REESE, LLP
11         Attorneys at Law
           4500 One Shell Square
12         New Orleans, Louisiana  70139

13         BY:  PHILIP A. FRANCO, ESQ.

14
         Reported by:
15               KAY E. DONNELLY
                 Certified Court Reporter
16               State of Louisiana

17

18

19

20

21

22

23

24

25
```

NON-CERTIFIED COPY

1              S T I P U L A T I O N

2

3       It is stipulated and agreed by and between

4  counsel that the deposition of JAMES R. BAILEY,

5  Ph.D., P.E., is hereby being taken under the

6  Louisiana Code of Civil Procedure in accordance

7  with the Code.

8       The formalities of sealing and

9  certification are hereby waived.  The witness

10 will reserve the right to read and sign the

11 deposition.  The party responsible for service

12 of the discovery material shall retain the

13 original.

14      All objections, save those as to the form

15 of the questions, are hereby reserved until such

16 time as this deposition, or any part thereof,

17 may be used or sought to be used in evidence,

18 and are to be made in accordance with the Code

19 of Civil Procedure.

20              *   *   *   *   *

21      KAY E. DONNELLY, Certified Court Reporter,

22 in and for the State of Louisiana, officiated in

23 administering the oath to the witness.

24

25

NON-CERTIFIED COPY

1          JAMES R. BAILEY, Ph.D., P.E., Senior

2     Managing Engineer, Exponent, Inc., 10850

3     Richmond Avenue, Suite 175, Houston, Texas,

4     77042, after having been first duly sworn,

5     testified on his oath as follows:

6     EXAMINATION BY MR. FRANCO:

7          Q.  Good morning, sir.

8          A.  Good morning.

9          Q.  We met yesterday, correct?

10         A.  Correct.

11         Q.  In fact you sat in for the entire

12    deposition of Mr. Drennan yesterday; is that

13    correct?

14         A.  Yes.

15         Q.  Dr. Bailey, you were available for

16    deposition yesterday?

17         A.  I could have been.

18         Q.  Did you ever instruct your lawyers that

19    you were not available for deposition yesterday?

20         A.  I don't recall that I did.

21         Q.  Okay.  Were you aware that I requested

22    to have your deposition first before Mr.

23    Drennan's?

24         A.  No.

25         Q.  So you weren't aware that I was told

NON-CERTIFIED COPY

Page 155

1    A.  (Reviewing document.)

2    Q.  You've referred to that in your report,

3 haven't you?

4    A.  Correct.

5    Q.  All right.  Would you, for the Record,

6 read the title of that at the top?  What I have

7 highlighted, what does it say?

8    A.  "Roadway showing joints."

9    Q.  Thank you.

10     Okay.  Let's cover this issue first.

11 Mr. Bailey, I'm going to label for the next

12 exhibit, as Exhibit 8, a copy of that August 26,

13 2016 letter from you to Ms. Mince.  Can you

14 identify that for me?

15    A.  (Reviewing document.)

16    Q.  What is that?

17    A.  Yes.  This is a letter addressed to Ms.

18 Mince from me and one of my colleagues, Matt

19 Vail, with Exponent, dated August 26, 2016,

20 regarding questions pertaining to change order

21 documents.

22    Q.  Okay.  Now, Mr. Matt Vail signed this

23 letter, correct?

24    A.  Correct.

25    Q.  And then you put your stamp on this

NON-CERTIFIED COPY

1  letter, correct?

2      A.  Correct.

3      Q.  Did you actually -- this is in reference

4  to the change orders in this case, correct?

5      A.  Correct.

6      Q.  Did you review the change orders?

7      A.  Yes.

8      Q.  Okay.  And who made this calculation

9  using the cost of change versus time model?  Who

10  did that?

11      A.  That particular part cited in this

12  letter was done by Matt.

13      Q.  Okay.  So are you familiar with the cost

14  of change versus time model that he's talking

15  about?

16      A.  Yes.  He is -- he shared that with me.

17      Q.  Well, wait.  Was that your first

18  exposure to that time model?

19      A.  I've heard of it.

20      Q.  You've heard of it, but was this your

21  first exposure in this case to dealing with that

22  particular model?

23      A.  In this case, yes.

24      Q.  So you've never used it before this

25  case?

NON-CERTIFIED COPY

Page 157

1      A.  In this case, no.

2      Q.  Okay.  I'm sorry.  You have never used

3  it before this case?

4      A.  Oh, before this case?  No.  There has

5  been these kind of cost versus change time

6  models.

7      Q.  Have you ever given an expert opinion on

8  the cost of change versus time model before this

9  case?

10      A.  An expert opinion, no.

11      Q.  Okay.  And whose model is that?

12      A.  Oh, it's one that was -- it's a

13  published model.  I can't recall specifically

14  the author of it.  It has been cited, but we --

15  we have used -- and I say we, our consulting

16  practice has used --

17      Q.  So --

18      A.  -- this with assisting the claims.

19      Q.  So let me get this straight.  Matt Vail

20  did this calculation.  You didn't do the

21  calculation, correct?

22      A.  Well, to clarify, it was my opinion when

23  asked by Ms. Mince what I thought the impact

24  would be due to change orders versus if it had

25  been done during the construction.

NON-CERTIFIED COPY

1        What is that impact?  What does that

2   affect?  And I told her my opinion was probably

3   something on the order of 1.5, okay.

4        Q.  Okay.

5        A.  And I also acknowledged, though, that I

6   have colleagues in my construction consulting

7   practice that would be able to provide even a

8   more specific answer beyond my professional

9   opinion.

10        And so that's when I contacted Mr. Vail

11   and said, "Look, what is your opinion?  What do

12   you think?"  And he cited that particular cost

13   model, and said he thought it would be another

14   1.5 to 2.

15        I said, "Fair enough.  I'll put my

16   signature on that because I think that's

17   consistent with my opinion."

18        Q.  So you were actually relying on what Mr.

19   Vail did?

20        A.  In part, yes.

21        Q.  Okay.

22        A.  In addition to my own experience.

23        Q.  Okay.  And in putting your seal on this

24   document, did you review the actual construction

25   contract or construction contracts?

NON-CERTIFIED COPY

1      A.  I mean, they were provided to me.  I

2  didn't view them in detail, no.

3      Q.  Okay.  So you didn't review the parts of

4  them that had to do with change order requests?

5      A.  No.

6      Q.  And you haven't done that as of today?

7      A.  No.  I just reviewed some of the change

8  orders and some of the bigger ones, in

9  particular, pertaining to Baton Rouge and

10  Kenner.

11      Q.  Are you familiar with the fact that --

12  of how H&E approached any of the change orders

13  in this case with respect to cost?

14      A.  No.

15          MR. BARRIERE:

16              Object to the form of the question.

17  Vague.

18  EXAMINATION BY MR. FRANCO:

19      Q.  Did anyone ever tell you that any time

20  any cost was presented to H&E or any change was

21  per -- strike that?

22          Any change was presented to H&E the

23  first question they asked was, "How much does it

24  cost?"

25      A.  No.

NON-CERTIFIED COPY

Page 160

1      Q.  And you say this cost of change versus

2  time model is published?

3      A.  Yes.

4      Q.  By whom?

5      A.  I have the reference.  I believe it's

6  part of my production, actually, but I don't

7  recall specifically.

8      Q.  Did you do anything to check the actual

9  market prices for any of the change orders at

10  the time they were done?

11      MR. BARRIERE:

12          Object to the form of the question.

13      THE WITNESS:

14          Mr. Vail reviewed -- I produced some

15  of those change orders and their history to him.

16  So he reviewed those on my behalf, in addition

17  to what I looked at.

18  EXAMINATION BY MR. FRANCO:

19      Q.  He reviewed the change orders.  Did he

20  review the market prices for those kinds of

21  services at the time?

22      MR. BARRIERE:

23          Object to the form of the question.

24      THE WITNESS:

25          I don't know.

NON-CERTIFIED COPY

Page 161

1        MR. FRANCO:

2            Okay.

3    EXAMINATION BY MR. FRANCO:

4        Q.  I'm going to show you the next exhibit,

5    which will be Exhibit 9, which is a string of

6    E-mails from -- the top one is from Frankie

7    Wynn, July 27, 2016.  It is H&E 72397, et

8    cetera.

9            This came out of your documents, sir.

10   Okay.  It starts off with an Email by you back

11   on July 27, 2016, which was after your -- what

12   is the date of your report?

13       A.  It is dated July 29.

14       Q.  Okay.  So this is just before your

15   report is issued, correct?

16       A.  Correct.

17       Q.  And here you are referring to the

18   geotechnical report on Baton Rouge that no

19   specific traffic data was provided.

20           And so you asked some questions about

21   that, right?

22       A.  Correct.

23       Q.  And so you asked whether a total of 134

24   vehicles per day seemed reasonable around the

25   branch building area.  Why did you ask that

NON-CERTIFIED COPY

# FishmanHaygood

Fishman Haygood LLP
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170
fishmanhaygood.com

LORI G. MINCE
PARTNER
(504) 586-5273
LMINCE@FISHMANHAYGOOD.COM

October 21, 2016

File No. 3107-04

*VIA* EMAIL AND U.S. MAIL

Mr. Philip A. Franco
Kellen J. Matthews
Adams & Reese, LLP
4500 One Shell Square
New Orleans, La. 70139
philip.franco@arlaw.com
Kellen.matthews@arlaw.com

Re:    *H&E Equipment Services, Inc. v. URS Corporation Architecture, P.C., et al*
19th JDC for the Parish of East Baton Rouge, Docket No. 626308, Sec. "D"

Dear Phil and Kellen:

Enclosed please find correspondence from Wallace C. Drennan, III related to his prior expert report and deposition testimony.

If you have any questions or if I can be of any assistance, I encourage you to contact me at (504) 586-5273.

Sincerely,

Lori G. Mince

LGM/ccm

1135072v.1



EXHIBIT
6

NON-CERTIFIED COPY

PHONE
(504) 828-8000
FAX
(504) 836-2939

**WCD**

Wallace C.
**Drennan, Inc.**

General Contractors
P.O. BOX 15438
NEW ORLEANS, LA 70175-5438

LA CONTRACTOR'S
LICENSE NO. 1033

October 13, 2016

Ms. Lori Mince
Fishman Haygood LLP
201 St. Charles Ave., 46th Floor
New Orleans, LA 70170

Re: Head and Enquist Baton Rouge

Dear Lori,

During my deposition, I testified that the estimate prepared for the removal and replacement of concrete at the Baton Rouge site included the entire site. Following my deposition, I confirmed that the square footage reflected in the estimate does not include the parking area adjacent to the office building.

Additionally, during my deposition, counsel for URS inquired about the cost of demolishing eight inches of pavement verses demolishing six inches of pavement and removing two inches of fill. Following my deposition, I reviewed this and determined that the difference in the price for removal of eight inches of concrete verses removal of six inches plus two inches of fill for the entire project would be $0.42 per square yard.

If there are any questions please feel free to contact me.

Sincerely,

Wallace C. Drennan, III
President

**CONSTRUCTING FOR OVER 50 YEARS**

NON-CERTIFIED COPY



**Wiss, Janney, Elstner Associates, Inc.**
9511 North Lake Creek Parkway
Austin, Texas 78717
512.257.4800 tel | 512.219.9883 fax
Texas Registered Engineering Firm F-0093
www.wje.com

Via E-mail: *phil.franco@arlaw.com*

September 9, 2016

Mr. Phil Franco
Partner
Adams and Reese, LLP
701 Poydras Street, Suite 500
New Orleans, LA 70139

Re: Engineer Opinion of Probable Cost for Concrete Pavement Repairs
    H&E Equipment Services - Baton Rouge, LA
    WJE No. 2016.4614.0

Dear Mr. Franco:

At your request, Wiss, Janney, Elstner Associates, Inc. (WJE) prepared an engineer's opinion of probable cost (EOPC) to repair damages to the concrete pavement at the H&E Equipment Services branch facility located in Baton Rouge, Louisiana (H&E Baton Rouge). We understand that the concrete pavement was installed in 2012 and began to exhibit distress shortly after construction. As part of the EOPC, WJE completed a visual assessment to establish the approximate scope of the damage and overall condition of the concrete pavement. This letter report summarizes the results of our visual assessment and presents our opinion of the probable cost to repair the concrete pavement at H&E Baton Rouge at this time.

## Background

H&E Baton Rouge is located near the intersection of Pecue Lane and Airline Highway in Baton Rouge Louisiana. The branch facility is located on a 16-acre site that includes an equipment wash bay, headquarters facility, stormwater retention pond, two paved areas for passenger vehicle parking, a large paved area for equipment inventory storage, and several driveways. The facility was designed by URS Architects Engineers Planners (URS) and their subconsultants.

The scope of WJE's work was limited to the large paved area surrounding the branch building and an associated equipment wash bay. The large paved area consists of approximately 200,000 square feet of concrete pavement designed by Benchmark Group, LLC (Benchmark) as a subconsultant of URS. Beginning shortly after installation during the first half of 2012, the concrete pavement has been routinely subject to static and moving loads from rubber-tired vehicles and steel-tracked heavy equipment (e.g. bulldozers, excavators, etc.).

## Pavement Design

WJE reviewed pertinent sheets of the construction drawings (dated for construction on July 1, 2011) to establish a basic understanding of the pavement design for repair detailing purposes only. WJE was not retained by Adams and Reese, LLP to comment on the adequacy of the design with respect to anticipated loads and known site conditions.

**Headquarters & Laboratories**–Northbrook, Illinois
Atlanta | Austin | Boston | Chicago | Cleveland | Dallas | Denver | Detroit | Honolulu | Houston | Los Angeles
Minneapolis | New Haven | New York | Princeton | San Francisco | Seattle | South Florida | Washington, DC



EXHIBIT
7

NON-CERTIFIED COPY



The concrete pavement plan for the branch facility, including pavement thickness, joint layout, and grading, is shown on sheets C-302 through C-306 of the construction drawings. The concrete pavement design consists of heavy and standard duty pavements. Heavy duty pavement was required to be placed adjacent to the branch building (outside of the service bays), extending approximately 100 feet north and south of the building and approximately 55 feet west of the building. The driveways extending from this area to Pecue Lane were also specified as heavy duty. The remainder of the equipment inventory storage area was designated as standard duty pavement.

All concrete pavement thickness and reinforcing details are shown on sheet C-501 of the construction documents. The heavy-duty pavement is specified as 8-inch thick reinforced concrete with No. 3 bars spaced at 24 inches on center in each direction. The subgrade for the heavy duty pavement consists of 12 inches of compacted stone base overlying 12 inches of lime-stabilized sub-base. The standard-duty pavement is 6-inch thick reinforced concrete with No. 3 bars spaced at 24 inches on center in each direction. The subgrade for the standard duty pavement consists of 10 inches of compacted stone base overlying 10 inches of lime-stabilized sub-base.

Typical details for expansion and "construction" (referred to as "contraction" below) joints are also shown on sheet C-501 of the construction documents. The expansion joints are 3/4 inch in width as formed by a pre-molded filler material. Doweling across the expansion joint is shown as No. 4 smooth dowels placed at the mid-depth of the pavement and spaced at 18 inches on center. Each dowel is 18 inches in length, centered on the joint, and is free to slide on one end (via lubrication and an expansion cap). The contraction joints consist of a saw cut 1/4 inch wide and 1/2 inch deep. Bituminous seals are shown along the length of both the expansion and construction joints. The maximum spacing of the joints is 15 feet.

## Visual Assessment

Mr. Carl J. "Chuck" Larosche, PE, and Mr. Dean Deschenes, of WJE, completed a visual assessment of the concrete pavement at the branch facility on August 24, 2016. WJE was accompanied by Mr. Phil Franco and other experts working on behalf of URS and their subconsultants. Observed damage was documented through detailed notes, photographs, and sketches while walking a majority of the pavement area over a period of approximately one hour. Sounding of the concrete and probing of the joints was conducted at a limited number of locations to investigate underlying conditions. The typical damages observed during the site visit and our estimation of the damage quantities relative to the full pavement area are outlined below.

- *Surface abrasion and scaling*: Typical damage is characterized by superficial loss of the concrete paste at the pavement surface and exposure of the underlying concrete aggregates (Figure 1). This damage was concentrated along the travel lanes between the branch building service bay doors and the wash bay at the southwest corner of the branch facility. We estimate that approximately 10 percent of the pavement area along the travel lanes between the branch facility and the wash bay is subject to this damage. This equates to approximately 1,600 square feet of abrasion and scaling.

- *Spalling and raveling at the pavement joints*: Typical damage is characterized by spalls extending less than one pavement thickness from either the expansion or control joints (Figure 2). More significant spalling extending one pavement thickness or more from the expansion joints (Figure 3) was also observed at several locations, primarily along the travel lanes between the branch building service bay doors and the wash bay at the southwest corner of the branch facility. We estimate that the more

NON-CERTIFIED COPY



significant expansion joint deterioration is present along approximately 8 percent of the total expansion joint length. This equates to approximately 375 linear feet of joint damage.

- *Drying shrinkage cracking*: Typical damage is characterized by narrow cracks (less than 1/8 inch in width) oriented parallel to the adjacent joints and extending across the full length or width of the affected panel (Figure 4). We estimate that one panel length/width crack is present in approximately 30 percent of the pavement panels. This equates to approximately 4,000 linear feet of drying shrinkage cracking.

- *Corner breaks*: Typical damage is characterized by a crack extending diagonally from one joint to the immediately adjacent orthogonal joint within approximately 2 feet of a panel intersection (Figure 5). We identified subsidence of the underlying base material in at least one location through acoustical sounding. We estimate that corner breaks are present at approximately 10 percent of the panel intersections. This equates to approximately twenty-five panel intersections.

- *Storm water drain settlement*: Typical damage is characterized by differential settlement in elevation from the storm water pre-cast catch basin to the immediately adjacent pavement, as well as pavement cracking extending from one or more corners of the storm water inlet structure (Figure 6). The observed pavement distress is likely caused by settlement of the underlying base material. We identified subsidence of the underlying base material at the drain located near the northwest corner of the branch facility through probing (Figure 7). We observed base material settlement at two locations within the paved area.

- *Load-induced panel failures*: Typical damage is characterized by several cracks radiating from one or more points within a single panel area (Figure 8). The observed pavement distress may be caused by incidental point loads created by inadequate support from the underlying base material. In one instance, we observed a stone that had been forced into the pavement and is presumed to be the origin of the cracking (Figure 9). We estimate that approximately 7 percent of the panels are subject to load-induced failures. This equates to seventy panels for the purposes of repair estimation below.

The pavement outside of the heavily trafficked areas and only subject to the storage of light equipment at the time of our site visit was in fair to good condition (Figure 10). Noted defects in this area were limited to drying shrinkage cracking.

## Typical Repair Concepts

Based on our assessment, we have developed the following conceptual repairs for the damages noted above. These conceptual repairs were developed in conjunction with, and per the direction of Dr. Gary Anderton, one of the experts working on behalf of URS and their subconsultants. Dr. Anderton is the former chief of the Geotechnical and Structures Laboratory at the U.S. Army Corp of Engineers ERDC Pavement Testing Facility.

- *Surface abrasion and scaling*: Repair of this superficial damage was not considered assuming further exposure of the pavement to steel-tracked heavy equipment.

- *Spalling and raveling at the pavement joints*: Repair of the superficial damage (spalling less than one pavement thickness from the pavement joints) was not considered assuming further exposure of the

NON-CERTIFIED COPY



pavement to steel-tracked heavy equipment. Repair of the more significant spalling at the expansion joints may be accomplished through full-depth replacement of the pavement, extending 1 foot to either side of the affected joint and along the full width or length of the affected panel. The full-depth repair would be doweled into the existing concrete.

- *Drying shrinkage cracking*: Repair of the drying shrinkage cracks was deemed necessary to prevent water intrusion into, and degradation of, the underlying base material. Typical repair of the drying shrinkage cracks may be accomplished through cleaning and manual filling of the cracks with a high molecular weight methyl methacrylate.

- *Corner breaks*: Repair of the corner breaks may be accomplished through full-depth replacement of affected panel intersections and replacement of the underlying base material as necessary. We assumed that all four corners at a given panel intersection, consisting of approximately 25 square feet of pavement, will be replaced at each affected location. The full-depth repair would be doweled into the existing concrete.

- *Storm water drain settlement*: Typical repair of the storm water catch basins may be accomplished through remediation of the underlying base material, reinstallation of the storm water drain structure, and replacement of the affected surrounding pavement. We assumed that eight pavement panels, each measuring 15 feet square, will need to be replaced at each affected location. Dowels would be placed at the joints between the new panels and at the joints between the new panels and existing concrete.

- *Load-induced panel failures*: Typical repair of the load-induced panel failures may be accomplished through full-depth replacement of the affected panels and replacement of the underlying base material as necessary. We assumed that the typical panel geometry was 15 feet square by the specified thickness. The full-depth repair would be doweled into the existing concrete.

The typical repair concepts described above are included in our opinion of probable costs to correct the damages noted during our visual assessment.

## Engineer's Opinion of Probable Cost

We anticipate that the cost to repair the concrete pavement at H&E Baton Rouge as outlined above will be $600,000. See the attached table for a detailed breakdown of the probable costs per division (existing conditions; concrete; thermal and moisture protection; earthwork; and exterior improvements). Costs are presented in present-day dollar amounts. Our opinion of the probable cost is based on our site observations, the typical repairs defined in consultation with Gary Anderton, standard estimating guides, and our experience with costs of similar work.

NON-CERTIFIED COPY



## Closing

Our findings and EOPC are based on review of documents, information, and conditions made available and provided by Adams and Reese, LLP. The findings and EOPC included in this report are based on information and conditions made available to us at the time of our assessment. Other conditions or information may exist, or may become available over time, which were not observed during the development of this report. WJE reserves the right to supplement or modify these findings if additional information becomes available.

Sincerely,

**WISS, JANNEY, ELSTNER ASSOCIATES, INC.**

Dean Deschenes
Associate III

Craig Quadrato
Senior Associate

Carl J. Larosche, PE
Principal

Attachment:    Engineer's Opinion of Probable Cost

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *  *
                         *
H&E EQUIPMENT SERVICES   *
                         * NUMBER 626,308
VERSUS                   *
                         * DIVISION "D"
URS CORPORATION          *
ARCHITECTURE, P.C., URS  *
CORPORATION, L O'NEAL    *
JOHNSON AND THOMAS E.    *
RYAN, III                *
                         *
*  *  *  *  *  *  *  *  *
```

Deposition of WALLACE C. DRENNAN

III, taken on Wednesday, September 21, 2016,

commencing at 9:44 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.

EXHIBIT
8

NON-CERTIFIED COPY

Page 2

1                    I N D E X

2

3                                        Page

4

Caption                          1
5    Index of Exhibits               3
Appearances                      5
6    Agreement of Counsel            6

7    Examination

8       PHILIP A. FRANCO, ESQ.        7
LORETTA G. MINCE, ESQ         180
9       PHILIP A. FRANCO, ESQ.      183

10

          *   *   *   *   *
11

Witness' Certificate            207
12    Reporter's Page                 208
Certificate                     209
13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

1                    INDEX OF EXHIBITS

2

3     Number                                    Page

4     1   July 28, 2016 Wallace C.         21
              Drennan III report
5

      2   January 11, 2007 STE             42
6             Report of Geotechnical
              Investigation Proposed
7             H&E Buildings, Pecue Lane,
              Baton Rouge, Louisiana
8             H&E 0000211-0000244

9     3   February 9, 2011 Terracon        90
              Geotechnical Engineering
10            Report H&E Equipment -
              Addition and Renovation,
11            Kenner, Louisiana
              H&E 0065373-0065415
12

      4   Wallace C. Drennan, Inc.        140
13            Cost Detail H&E Concrete
              Replacement Baton Rouge
14            8" and 6" concrete
              H&E 074065-074075
15

      5   Wallace C. Drennan, Inc.        141
16            Cost Detail H&E Concrete
              Replacement Baton Rouge
17            All 8" concrete
              H&E 074057-074064
18

19    6   Wallace C. Drennan, Inc.        151
              Cost Detail H&E Concrete
20            Replacement Kenner
              7" and 6" concrete
21            H&E 074085-074096

22    7   Wallace C. Drennan, Inc.        151
              Cost Detail H&E Concrete
23            Replacement Kenner
              All 8"
24            H&E 074076-074084

25

NON-CERTIFIED COPY

1    (Cont.)       INDEX OF EXHIBITS

2

3     Number                                    Page

4     8  Photograph                         155
           H&E 074103
5
      9  Photograph                         157
6          H&E 074106

7    10  Photograph                         161
           H&E 074108
8
     11  Photograph                         164
9          H&E 074136

10   12  Photograph                         166
           H&E 074162
11
     13  Photograph                         167
12         H&E 074186

13   14  Photograph                         170
           H&E 074236
14
     15  Photograph                         173
15         H&E 074261

16   16  Photograph                         175
           H&E 074299

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 5

```
 1   APPEARANCES:

 2

        Representing the Plaintiff:
 3
          FISHMAN HAYGOOD, LLP
 4        Attorneys at Law
          201 St. Charles Avenue, Suite 4600
 5        New Orleans, Louisiana  70170

 6        BY:  LORETTA G. MINCE, ESQ.

 7

 8

 9      Representing the Defendant:

10        ADAMS AND REESE, LLP
          Attorneys at Law
11        4500 One Shell Square
          New Orleans, Louisiana  70139
12
          BY:  PHILIP A. FRANCO, ESQ.
13

14      ALSO PRESENT:
          James R. Bailey, Ph.D., P.E.
15        Exponent, Inc.

16
        Reported by:
17              KAY E. DONNELLY
                Certified Court Reporter
18              State of Louisiana

19

20

21

22

23

24

25
```

NON-CERTIFIED COPY