Page 6

1                    S T I P U L A T I O N

2

3          It is stipulated and agreed by and between

4    counsel that the deposition of WALLACE C.

5    DRENNAN III is hereby being taken under the

6    Louisiana Code of Civil Procedure in accordance

7    with the Code.

8          The formalities of sealing and

9    certification are hereby waived.  The witness

10   will reserve the right to read and sign the

11   deposition.  The party responsible for service

12   of the discovery material shall retain the

13   original.

14         All objections, save those as to the form

15   of the questions, are hereby reserved until such

16   time as this deposition, or any part thereof,

17   may be used or sought to be used in evidence,

18   and are to be made in accordance with the Code

19   of Civil Procedure.

20                  *   *   *   *   *

21         KAY E. DONNELLY, Certified Court Reporter,

22   in and for the State of Louisiana, officiated in

23   administering the oath to the witness.

24

25

NON-CERTIFIED COPY

Page 7

```
 1        WALLACE C. DRENNAN, Wallace C. Drennan,

 2   Inc., P.O. Box 15438, New Orleans, Louisiana,

 3   70175, after having been first duly sworn,

 4   testified on his oath as follows:

 5   EXAMINATION BY MR. FRANCO:

 6      Q.  Good morning, Mr. Drennan.  My name is

 7   Phil Franco, and I represent URS and the other

 8   defendants in this case.

 9          Have you ever been deposed before, sir?

10      A.  Yes.

11      Q.  About how many times have you been

12   deposed?

13      A.  More than ten.

14      Q.  Okay.  So you understand the process?

15      A.  Yes.

16      Q.  If you don't understand a word that I'm

17   using or my question, would you please let me

18   know, and I will try to rephrase that for you so

19   that you can understand it.

20      A.  Yes.

21      Q.  Otherwise, I will assume that you

22   understand my question.

23          Would you state your full name and

24   address for the Record, please?

25      A.  Wallace C. Drennan III, 2225 Chestnut
```

NON-CERTIFIED COPY

1    joints.

2        Q.  Okay.

3        A.  And the other one is to put in eight

4    inches with the same joints.

5        Q.  All right.  Let's talk about the as-is.

6    That's your estimate that has the -- at the top,

7    it says "Head & Engquist concrete replacement

8    Baton Rouge," right?

9        A.  Correct.

10       Q.  Because the other one says all

11   8-inch?

12       A.  Yes.

13       Q.  All right.  So that's the one we're

14   referring to now.

15           And that's as-is, meaning you are going

16   to put back -- this is an estimate to put back

17   8-inch where 8-inch is currently -- 8-inch thick

18   concrete currently is at the site and where

19   6-inch concrete currently is at the site.

20       A.  And it also includes the removal --

21       Q.  Correct.

22       A.  -- and the disposal of the existing

23   pavement.  Yes.

24       Q.  Okay.  Is it a fair statement that you

25   would agree to put the 8-inch and 6-inch back

NON-CERTIFIED COPY

Page 106

1   where it is?  Is that the --

2        MS. MINCE:

3             Object to the form.

4   EXAMINATION BY MR. FRANCO:

5        Q.  -- appropriate way to do it?

6        A.  No.  I don't agree with that.  Ms. Mince

7   asked me to -- that's how Ms. Mince asked me to

8   prepare estimates.

9        Q.  To price it out?

10       A.  Yes.

11       Q.  And so you would not, if you were

12   replacing this concrete at Baton Rouge, you

13   wouldn't replace it with 8-inch and 6-inch?

14       A.  If I was doing it, no, I would not.

15       Q.  And why is that?

16       A.  I believe the thicknesses are

17   inadequate.

18       Q.  And what thickness would you put?

19       A.  In the light duty area, 8-inch; and at

20   least 8-inch in the heavy duty area, and maybe

21   10.

22       Q.  Where would you describe the light duty

23   area and the heavy duty area of Baton Rouge?

24       A.  I guess wherever the owner told me it

25   would it be, told me they wanted it.

NON-CERTIFIED COPY

1    Q.  So you would depend on what the owner

2    told you as to where the heavy duty should go.

3    Fair statement?

4    A.  Yeah.  I mean, it's up to him to control

5    that, you know, when he puts the facility in

6    operation.

7    Q.  Okay.  Has anyone told you that in

8    connection with this estimate where the heavy

9    duty is supposed to go and where the light duty

10   is supposed to go?

11   A.  That would be according to the plan --

12   Q.  Okay.

13   A.  -- the light duty and heavy duty.

14   Q.  What plan are you referring to?  I'm a

15   little confused.

16   A.  The plan for the -- the current Baton

17   Rouge --

18   Q.  Drawings?

19   A.  -- plan drawings.

20   Q.  Oh, okay.

21   A.  Yes.

22   Q.  So, in other words, just looking at the

23   removal part, you are calculating 8,445 square

24   yards of 8-inch concrete according to the

25   plans --

NON-CERTIFIED COPY

1    A.  Yes.

2    Q.  -- and 23,140 square yards of where the

3  6-inch concrete is?

4    A.  Yes.

5    Q.  Where did you get the square yards from?

6    A.  That was taken off the plans from -- the

7  as-built plans from Baton Rouge.

8    Q.  Okay.  What psi is this estimate based

9  on?

10    A.  4,000.

11    Q.  And you agree that's what it should be?

12    A.  Yes.

13    Q.  All right.

14    A.  Now, I just noticed another change, too.

15       This 8-inch concrete pavement has welded

16  wire fabric in it, 6-inch by 12-inch ARC 1,

17  which we refer to as highway mesh, so it is a

18  little different in the plans.

19    Q.  I'm going to go through that with you.

20    A.  Okay.

21    Q.  So your estimate is -- based on what you

22  are putting down is 8-inch and 6-inch thick

23  concrete based on the areas we just talked about

24  at 4,000 psi, correct?

25    A.  Yes.

NON-CERTIFIED COPY

Page 143

1    whether it's 8 inches of all concrete or 6

2    inches of concrete and now two inches of base he

3    has to remove, the square yards remain the same.

4            He's still breaking the same surface

5    amount of concrete, but he still has to haul

6    away 8 inches of material, because where the

7    concrete was 6 inches, now we're installing 8

8    inches.

9            So that's why the cubic yards of 7,018

10   equals 31,585 square yards divided by 4.5, which

11   is 4.5 square yards 8 inches thick per cubic

12   yards.

13       Q.  Sir, he is pricing out removal of 8

14   inches of concrete at 31,585 square yards, isn't

15   he?

16       A.  No.

17       Q.  No?

18       A.  Part of --

19       Q.  I'm looking at No. 5.  It says,

20   "Concrete pavement removal, 31,585 square yards,

21   $245,687.86," correct?

22       A.  I see that.  But instead of -- when he

23   removes the 6-inch concrete, as part of the same

24   objection, he has to take out two more inches of

25   material, which is the base course so he can get

NON-CERTIFIED COPY

1   to -- put in new 8-inch pavement, so --

2      Q.  But he's got --

3      A.  He put the cubic yardage of materials

4   down here, down in the trucking of the broken

5   concrete, because, whether it's concrete or

6   cardboard boxes, it takes up so many cubic

7   yards, has to be hauled away, and he still has

8   to excavate that same amount, too, so --

9      Q.  Well, the price in No. 4 for removing

10  the 8-inch is $7.78, correct, per unit, direct

11  cost, right?

12     A.  $7.78 --

13     Q.  For 8-inch concrete pavement removal,

14  right?

15     A.  Right.

16     Q.  But to remove the 6-inch concrete

17  pavement removal, he's only -- it's only $5.20

18  in Exhibit 4, correct?

19     A.  Correct, but I'm not making myself

20  clear.

21         In Exhibit 4, when you are removing 6

22  inches of concrete pavement, you are replacing

23  it back with 6 inches.

24     Q.  Okay.

25     A.  Correct?

NON-CERTIFIED COPY

1    Q.  Uh-huh.

2    A.  So all you have to remove is 6 inches of

3  thickness.

4    Q.  Uh-huh.

5    A.  In Exhibit 5, when you are removing the

6  6-inch concrete pavement, you have to remove 6

7  inches of concrete, plus two inches of base

8  course material, so it's more cubic yards per

9  square yard.  That's why the price is more.

10    Q.  Okay.  Well, you are not breaking out

11  base material, are you?  You are breaking out

12  concrete, aren't you?

13    A.  Yes, you are.  But whether you are

14  breaking up 6- or 8-inch concrete, your breaker

15  point is still going in the concrete and

16  shattering it.

17    Q.  Well, then, why is there a different

18  price?  Why is there a different price for the

19  8-inch and 6-inch in the 8- and 6-inch estimate?

20  Why is there a different price for 6-inch

21  concrete pavement removal than 8-inch concrete

22  pavement removal?

23    A.  Because of the cubic yards of concrete

24  that's removed and hauled off.  It varies per

25  square yard.

NON-CERTIFIED COPY

1      Q.   Okay.  And in your estimate for the

2   8-inch, total 8-inch, all 8-inch, it says

3   "Concrete pavement removal and remove broken

4   pavement."  It doesn't say anything about

5   foundation, does it?

6      A.   No, it doesn't.  But it still has to be

7   removed, the foundation, to make room for the

8   inches of concrete.

9      Q.   And you are saying that it costs the

10  same to remove two inches of concrete, break up

11  two inches of concrete and remove two inches of

12  concrete as it does to simply remove two inches

13  of base material, sir?

14          MS. MINCE:

15              Object to form.

16          THE WITNESS:

17              I just looked at some -- on the

18  6-inch concrete removal, I did -- there's a

19  50-square yard per hour man-hour.

20              And so on the 8-inch removal, it

21  should probably be 50 square yards on No. 5,

22  too, because it's just 6-inch concrete pavement

23  that's being broken to make them equal to each

24  other.

25              But they still -- it's still going

NON-CERTIFIED COPY

1    to be a higher price because there are more

2    cubic yards per square yard being removed

3    underneath the 8-inch pavement removal item on

4    No. 5, as compared to No. 4.

5    EXAMINATION BY MR. FRANCO:

6        Q.  Now, if you could answer my question.

7            MR. FRANCO:

8                Could you read my question back,

9    please?

10               (Whereupon, the requested question was

11   read back by the court reporter.)

12           MR. FRANCO:

13               Let me reask the question.

14   EXAMINATION BY MR. FRANCO:

15       Q.  You are telling the Jury that it cost

16   the same to break up two inches of concrete and

17   remove that two inches as it cost to simply

18   remove two inches of base material?  Is that

19   what you are telling the Jury?

20           MS. MINCE:

21               Object to form.

22           THE WITNESS:

23               No, I did not say that.

24               I told you that the breakout cost

25   should be the same on No. 4 for 6-inch concrete

NON-CERTIFIED COPY

Page 148

1    pavement removal as the 8-inch cost.

2              Just the breakout, which is 40

3    square yards, which is the 8-inch rate, but it

4    should be -- it should say 50.

5              The difference is going to be in the

6    removed concrete between Exhibit 4 and 5.

7    Exhibit 5 is 6 inches of material to remove

8    after it's broken, and Exhibit -- that was

9    Exhibit 4.  I'm sorry.

10             Exhibit 5 is 8 inches of material

11   has to be removed.

12   EXAMINATION BY MR. FRANCO:

13       Q.  Sir, the price of concrete pavement

14   removal is $7.78 per unit, correct?

15       A.  Yes.

16       Q.  Okay.  That's for concrete.  That's not

17   for base, is it?

18       A.  It's for concrete and base --

19       Q.  Okay.

20       A.  -- on --

21       Q.  You don't have to break up the base, do

22   you?  You just dig it out?

23       A.  Correct.  And I'm not -- I'm not

24   breaking out the base here.

25             I'm telling you, instead of 40 per

NON-CERTIFIED COPY

1  square yards on No. 5, it should be corrected to

2  say 50, the same rate as the 6-inch breakout,

3  and it would make --

4      Q.  It would lower the estimate, wouldn't

5  it?

6      A.  Oh, yeah.  It would make it 31 cents

7  lower per square yard.

8      Q.  So that your original estimate for all

9  8-inch is incorrect, isn't it?

10     A.  The breakout rate is incorrect for the

11  8-inch concrete pavement removal on Exhibit No.

12  5.

13     Q.  In fact, so the Jury recalls this, the

14  vast majority of the pavement at Baton Rouge is

15  6 inches, am I correct?  Not 8 inches?

16     A.  In our calculations, 8 inches is 800,845

17  square yards and 6 inches is 23,140 square

18  yards.

19     Q.  Now, if you could please answer my

20  questions "yes" or "no" first so the Jury

21  understands the answer, and then you are free to

22  explain.  So let me ask it again.

23         Is it true that the vast majority of the

24  pavement at the Baton Rouge area is 6 inches and

25  not 8 inches; is that correct?

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                      SECTION: "D"

H&E EQUIPMENT SERVICES, INC.

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____

                                    DEPUTY CLERK

POSTED
DEC 0 2 2016

COST OK $ _____

NOV 3 0 2016
DEPUTY CLERK OF COURT

## OPPOSITION TO MOTION FOR PROTECTIVE ORDER AND MOTION TO QUASH SUBPOENA DUCES TECUM

**MAY IT PLEASE THE COURT**:

Plaintiff H&E Equipment Services, Inc. (hereinafter referred to as "H&E") respectfully submits this opposition to the Motion for Protective Order and Motion to Quash Subpoena Duces Tecum filed by Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III (collectively, "URS"). For the reasons stated below, URS's motion should be denied.

### OVERVIEW

In this case, H&E seeks damages from URS related to URS's defective design of three H&E facilities located in Baton Rouge, Kenner, and Belle Chasse. The largest issue in the case relates to the design of the pavement at H&E's facilities in Baton Rouge and Kenner. At the Baton Rouge facility, the plans and specifications for the pavement were prepared by URS's subcontractor, Benchmark. At the Kenner location, the plans and specifications for the pavement were prepared by URS's own engineers.

As will be proven at trial, the design for the pavement at both locations violates the standard of care in numerous respects. For example, the design does not comply with the pavement design requirements promulgated by the Louisiana Department of Transportation and Development or the East Baton Rouge Department of Public Works. Additionally, the design is at odds with the guidelines promulgated by the American Concrete Institute. H&E seeks the cost, in excess of $5 million, to replace the pavement at both sites to meet these minimum standards. There is currently no trial date set in this matter.

REC'D C.P.

DEC 0 2 2016

REC'D C.P.

DEC 0 7 2016

1144403v.2

EBR3896184

NON-CERTIFIED COPY

## SUMMARY OF ARGUMENT

In its motion, URS takes the incredible position that H&E should be barred from performing non-destructive testing *on its own property.* URS's position is all the more surprising because the testing has become necessary only because URS's experts recently called into question whether the pavement at the Baton Rouge and Kenner locations was installed in accordance with the defective drawings prepared by URS and its subcontractor, Benchmark. In an effort to resolve this issue, H&E scheduled the testing, and invited URS's experts to attend. URS did attend the testing, and H&E provided URS with the results of the testing. As a result, URS's request for this Court to enter an order prohibiting the testing is moot. Additionally, this Court should deny URS's request that the results of the testing be deemed inadmissible. First, the admissibility of the testing is not properly addressed in a motion for protective order. More importantly, *URS's own experts* injected this issue into the case by speculating on the possibility that the pavement at the H&E facilities was not installed as URS designed it. To the extent URS intends to defend its defective design on this basis, the testing results are plainly relevant and admissible.

Additionally, URS seeks to quash a third-party subpoena issued for the purpose of obtaining drawings related to the steel reinforcement in the pavement, notwithstanding that the drawings in question are (or were) indisputably in the possession of both URS and Benchmark, but neither URS nor Benchmark produced them.[1] The third-party, Franklin Fabricating Services, Inc. ("Franklin"), has made a return on the subpoena, and as a result, this issue is also moot.

Finally, URS seeks to strike (1) a supplemental expert report by Bob Bailey that was provided to URS well in advance of the production of its own expert reports, and well in advance of the expert depositions conducted in this case, and (2) a letter written by Wallace Drennan that merely corrected an error in Drennan's testimony and responded to a question posed to Drennan at his deposition. As to the one-page supplement provided by Dr. Bailey, URS had ample opportunity to refute the opinions in the supplemental report. URS also had the opportunity to question Dr. Bailey regarding the supplemental report and did so during Dr. Bailey's deposition. As to the one-page letter provided by H&E expert, Wallace C. Drennan, Mr. Drennan merely provided clarification and responses to two points raised by URS during his deposition.

---

[1] URS asserts that all drawings were made available to H&E's prior counsel in hard copy form, and that if H&E's prior counsel failed to obtain copies of them, H&E is "out of luck."

2

NON-CERTIFIED COPY

Mr. Drennan's letter was tendered to URS in advance of trial and in the interest of transparency. Clearly, neither prejudices URS.

For the reasons set forth herein, URS's motion should be denied.

## LAW AND ARGUMENT

### I.    Standard for Motion for Protective Order

"It is well settled under Louisiana law that the discovery statutes are to be liberally and broadly construed to achieve their intended objectives. A party generally may obtain discovery of any information which is relevant to the subject matter involved in the pending action."[2] The Louisiana Supreme Court, in *Hodges v. Southern Farm Bureau Casualty Insurance Company*, set forth the basic objectives of the Louisiana discovery process as follows:

> (1) to afford all parties a fair opportunity to obtain facts pertinent to the litigation, (2) to discover the true facts and compel disclosure of these facts wherever they may be found, (3) to assist litigants in preparing their cases for trial, (4) to narrow and clarify the basic issues between the parties, and (5) to facilitate and expedite the legal process by encouraging settlement or abandonment of less than meritorious claims.[3]

Article 1426 of the Louisiana Code of Civil Procedure provides that "for good cause shown," a court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]"[4] "The existence of good cause for a protective order is a factual matter to be determined from the nature and character of the information sought weighed in the balance of the factual issues involved and a comparison of the consequential hardships caused by granting or denying the order."[5]

### II.    H&E properly conducted additional testing.

As an initial matter, and as noted above, the testing URS sought to block has already occurred. URS attended the testing and has been provided with the results. As a result, URS's motion is moot as to this issue.

URS's objection to the testing is also without merit. On July 29, 2016, H&E tendered its expert reports setting forth the opinions of Bob Bailey and Wallace C. Drennan, Jr. On September 9, 2016, URS tendered expert reports on behalf of five experts. Among the opinions included in the expert reports offered by URS, URS's experts stated that H&E's claim that the cracking and other failures of the concrete were caused by defective design would require

---

[2] *Bridges v. Hertz Equip. Rental Corp.*, 2008-0400 (La. 6/20/08); 983 So. 2d 1256, 1258 (citing *Hodges v. S. Farm Bureau Cas. Ins. Co.*, 433 So. 2d 125 (La. 1983)).
[3] 433 So. 2d at 129; *see also Lehmann v. Am. S. Home Ins. Co.*, 615 So. 2d 923, 925 (La. App. 1st Cir. 1993), *writ denied*, 617 So. 2d 913 (La. 1993) (quoting *Hodges*, 433 So. 2d 125).
[4] La. Code Civ. Proc. art. 1426(A).
[5] *La. Workers' Comp. Corp. v. Quality Exterior Servs., L.L.C.*, 2011-1197 (La. App. 1 Cir. 5/2/12); 92 So. 3d 1034, 1038.

3

NON-CERTIFIED COPY

confirmation that the pavement was installed as designed. For example, URS's design called for concrete six-inches thick in the majority of the yard in Baton Rouge, which is plainly insufficient. Nevertheless, URS's experts assert that H&E's claim regarding the insufficient thickness of the pavement should be rejected because, among other reasons, no testing has been performed to verify that the contractor poured the pavement to the thickness specified by URS and Benchmark. As URS expert G. Wayne Sledge states in his report:

> No evidence has been presented which indicates that thickness was actually poured and where. Accordingly, the question of both the adequacy and as-built thickness being less than specified for the concrete remains a potential cause.[6]

During the depositions of URS's experts which occurred from September 26 to September 30, 2016, URS experts again reiterated their uncertainty regarding whether the concrete was installed in accordance with the plans and specifications prepared by URS and Benchmark. Mr. Sledge testified at his deposition:

> I have no evidence whatsoever, that I reviewed, as to what the contractor actually did. That's – that's the great unknown, to me, because. . . [t]he contractor is an integral, major component to this, and I have no idea what he—if the work he did was timely, if it was truly in accordance with all the specs, I just have no data on that.[7]

In response to this criticism, H&E retained the services of a ground penetrating radar company to locate concrete reinforcing steel within the existing concrete pavement and determine the pavement thickness. To be clear, this testing was conducted by H&E, and on H&E's own property. Clearly, H&E does not require URS's permission to perform testing on its own property.

In its motion, URS suggests that the ground penetrating radar method proposed by H&E is unreliable; however, the admissibility of the testing is not properly addressed in a motion for protective order. Furthermore, URS's own expert, Carl Larosche, testified at his deposition that the ground penetrating radar method of determining pavement thickness is reliable.[8]

Finally, because there is no trial date set, URS is not prejudiced.

---

[6] Expert Report of G. Wayne Sledge, attached hereto as Exhibit 1, at 3; *see also id.* ("The limited area of cracking and spalling is most likely caused by deficiencies occurring in the construction. . . . It was apparent from our review of the aforementioned documents that the allegations were not supported by documented evidence but are based upon the theory that the project was constructed in accordance with the plans and specifications[.]"); *id.* at 5 ("[T]he review of the documents . . . does not indicate that [Benchmark] was negligent in performing its services but suggests only one alternative when there are many more – many of which have empirical data to support the position that the construction phase was the most likely cause of the issues[.]"); *id.* at 10 ("For Dr. Baily to dismiss the many other potential causes of these issues: pavement thickness not as specified . . . indicates a fundamental failure to understand many issues involved with such a project[.]").

[7] Deposition of G. Wayne Sledge, attached hereto as Exhibit 2, at 144:21-145:6.

[8] *See* Deposition of Carl Joseph Larosche, attached hereto as Exhibit 3, at 30:9-32:24.

4

1144403v.2     NON-CERTIFIED COPY

In sum, URS should not be permitted to assert defenses based on speculation, and then bar H&E from presenting evidence to establish that URS's speculations are incorrect. The Court should deny URS's request for a protective order as to H&E's proposed testing.

**III.    URS's motion to quash H&E's subpoena *duces tecum* to Franklin is moot.**

URS's motion to quash H&E's subpoena *duces tecum* to Franklin should also be denied because it is moot. Franklin was engaged to provide steel reinforcement for the pavement at the Baton Rouge location. URS disputes whether it approved certain aspects of the pavement design including the installation of steel reinforcement across pavement joints. Through its subpoena *duces tecum* to Franklin, H&E seeks documents that should have been produced by Benchmark and URS. Documents produced by URS show that specific drawings were created and approved by URS and Benchmark for pavement and steel reinforcement. However, copies of the drawings were not produced during discovery. URS maintains that it made the drawings available at an earlier point in the litigation to H&E's prior counsel and that the prior counsel may have neglected to copy them. URS refused to make the drawings available to undersigned counsel. H&E issued a subpoena to Franklin to acquire the drawings. Franklin has made a return on the subpoena, and as a result, this issue is moot.

**IV.    URS is not prejudiced by H&E's supplemental expert reports.**

On August 26, 2016, two weeks before URS tendered their experts' reports on September 9, 2016, H&E provided URS with a one page supplement to Dr. Bailey's report.[9] The supplemental report was signed by Dr. Bailey and a colleague who worked with him on the report.[10] During Dr. Bailey's deposition, URS's counsel questioned Dr. Bailey extensively regarding the supplement and the supplement was included as an exhibit to his deposition.[11]

On October 21, 2016, H&E provided URS with a correspondence from its expert, Mr. Drennan.[12] In it, Mr. Drennan addresses two points which were raised in his deposition. First, he confirmed that his estimates to replace the pavement at the Baton Rouge facility did not include the pavement in the office building parking lot.[13] Second, he responded to URS's questioning regarding his estimate for the cost of demolishing pavement.[14] The correspondence

---

[9] *See* August 26, 2016 Supplemental Report of Bob Bailey, attached hereto as Exhibit 4.
[10] *Id.*
[11] *See* Deposition of Robert Bailey, attached hereto as Exhibit 5, at 155:10-161:2.
[12] *See* October 21, 2016 Letter Enclosing Letter from Wallace C. Drennan, attached hereto as Exhibit 6.
[13] *Id.*
[14] *Id.*

5

1144403v.2                NON-CERTIFIED COPY

was tendered to URS to provide it with advance notice of Mr. Drennan's position on those two issues which were raised by URS.

URS's assertion that they are somehow prejudiced by supplements to H&E's expert reports should be rejected. Dr. Bailey's report was supplemented two weeks before URS tendered their expert reports. Furthermore, URS questioned Dr. Bailey about his opinions in the supplemental report in his deposition.

URS's objection to the inclusion of an additional signatory on Dr. Bailey's supplemental report is also unfounded. The supplemental report was signed by Dr. Bailey and a colleague, Matt Vail, who works with him at the same company, Exponent.[15] There is no significance in multiple people from the same company signing an expert report. And, ironically, one of URS's expert reports was also signed by multiple individuals, only one of whom was designated as an expert. Specifically, while URS only disclosed one expert, Carl Larosche, from Wiss, Janney, Elstner Associates, Inc., that report had two additional signatories, neither of whom was previously disclosed.[16]

URS's arguments regarding Mr. Drennan's letter of October 13 are also flawed. Mr. Drennan's one-page letter simply clarifies two issues raised during his deposition by URS. First, Mr. Drennan testified that his estimate to replace the pavement at the Baton Rouge facility of 31,585 square feet included the office building parking lot.[17]  After his deposition, Mr. Drennan checked this fact, and confirmed that the 31,585 square feet used in his estimate did not include the office building parking lot.[18]  Second, counsel for URS asked Mr. Drennan questions regarding whether demolishing 8-inches of concrete would be more or less expensive than demolishing 6-inches of concrete and removing 2-inches of fill.[19] Following the deposition, Mr. Drennan calculated the difference. In the interests of transparency and rather than ambush URS at trial, H&E believed it was prudent to inform URS of Mr. Drennan's response to those points raised during his deposition.

In sum, because URS cannot show that it is prejudiced by Dr. Bailey and Mr. Drennan's supplements to their reports, its motion to strike should be denied.

---

[15] *See* August 26, 2016 Supplemental Report of Bob Bailey, Exhibit 4.
[16] *See* September 9, 2016 Expert Report by Carl Larosche, attached hereto as Exhibit 7 at pg. 5.
[17] *See* Deposition of Wallace C. Drennan, attached hereto as Exhibit 8 at 107:22-108:7.
[18] *See* October 21, 2016 Letter Enclosing Letter from Wallace C. Drennan, Exhibit 6.
[19] Deposition of Wallace C. Drennan, Exhibit 8 at 143:19-149:7.

1144403v.2

NON-CERTIFIED COPY

## CONCLUSION

For the above stated reasons, URS's motion should be denied.

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by facsimile, email and/or by placing same in the United States mail, postage prepaid and properly addressed, this 30st day of November, 2016.

Loretta G. Mince

FILED
EAST BATON ROUGE PARISH, LA
2016 NOV 30  PM 3: 53
DEPUTY CLERK OF COURT

7

1144403v.2

NON-CERTIFIED COPY

COST CK A###

DEC - 6 2016

BY ____

DY CLERK OF COURT

H&E EQUIPMENT SERVICES     \*     SUIT NO. 626,308     DIV.: D

    \*     19TH JUDICIAL DISTRICT COURT

VERSUS     \*

    PARISH OF EAST BATON ROUGE

    \*

URS CORPORATION     \*     STATE OF LOUISIANA
ARCHITECTURE, P.C., URS
CORPORATION, L. O'NEAL
JOHNSON AND THOMAS E. RYAN,
III

---

### REPLY MEMORANDUM IN SUPPORT OF
### MOTION FOR PROTECTIVE ORDER AND
### <u>MOTION TO QUASH SUBPOENA DUCES TECUM</u>

**MAY IT PLEASE THE COURT:**

Defendants, URS CORPORATION ARCHITECTURE, P.C., ("URS Architecture"),

URS CORPORATION ("URS Corporation"), L. O'NEAL JOHNSON ("Johnson") AND

THOMAS E. RYAN, III, ("Ryan") (all collectively referred to hereinafter as "URS")

respectfully submit this Reply Memorandum in Support of their Motion for Protective

Order and Motion to Quash Subpoena Duces Tecum to respond to the Opposition

submitted by Plaintiff, H&E Equipment Services, Inc. (hereinafter "H&E"). In essence,

H&E fits the definition of "cavalier" in its nonchalant disregard of this Court's

Amended Case Management Order entered March 14, 2016, which was drafted and

submitted by consent of the parties. H&E would like to restart this three year old case.

### <u>PREJUDICIAL TESTING</u>

H&E's argument that testing on its own property is somehow immune from this

Court's authority when the entire purpose of the testing is to discover facts to be used

against URS by a new expert in this case is without authority. The point is that H&E

tested the very area at issue in this suit with the intent to have a new expert use it

against URS in this suit. As one court has put it: "Discovery is not a game of 'blind

REC'D C.P.

DEC 07 2016


NON-CERTIFIED COPY

man's bluff.'" *Journet v. Vehicle Vin No. 1GRAA06283T500670* 2006 WL 1663708 (S.D.

Texas 2006). Moreover, H&E would like to ignore that URS seeks to exclude the use of

this test. H&E is correct that the Court unfortunately cannot now prevent the test

which has already taken place. But H&E is wrong that the Court cannot prohibit the

test from being used in this case.

Courts have stricken testing conducted after the expert reports have been

submitted and depositions have occurred regardless of the reliability or lack thereof of

the testing. In *Journet, supra*, the court precluded testimony about testing done after

expert reports were issued and experts were deposed. In doing so, the court recognized

the extent of the prejudice to the complaining party, which is very applicable to the case

at bar. The complaining party would have to depose any proffered expert who would

rely on the test results. The test results would require all experts to "readjust" their

work and issue new reports and be deposed a second time. The complaining party

devoted "substantial energy and resources to defending the case based on the plaintiff's

original theories ... according to their experts' reports and depositions .... Allowing the

plaintiffs to 'restart' the case, apparently in search of better or more persuasive evidence

... after plaintiff's experts on design and causation have been deposed, would be unfair

and prejudicial ...." 2006 WL 1663708 at 12.

It is also important to note that the radar test done by H&E was not even the

testing that had previously been requested by its existing expert. Mr. Bailey requested

coring testing, which is a much more reliable and indicative testing. H&E refused. (See

Deposition of James Bailey dated 9-22-16 at pp. 68-69, attached hereto as Exhibit 1).

URS's expert, Mr. Larosche, has used radar testing for limited purposes, but such

testing obviously depends on who does it and how it is done. H&E has not thus far

NON-CERTIFIED COPY

made available to URS all the data from the radar test to date.  And there is already evidence observed during testing that indicates the radar testing done was not even reliable.  Required calibration was not done to determine concrete thickness.  Nor did the radar test evaluate improper foundation or composition of the concrete.  Allowing this test to be used in this case will require URS to retain yet another expert to assess the methodology, the data, the report, render a report, and be deposed, all after all cut off dates imposed by this Court have expired.  All other experts will have to readjust their work.  The case will be restarted.

H&E's argument that this testing has only become necessary because URS's experts recently raised the issue of proper installation of pavement is simply wrong. First of all, URS's expert reports raising the issue of causation by improper installation were timely issued on September 9, 2016.  H&E's test was not done until November 2, 2016, after all cut off dates had expired.  But even more importantly, H&E has had the burden of proving causation of its damages for the three years this case has been pending.  That includes excluding other reasonable causes.  *Benjamin, ex rel Benjamin v. Housing Authority of New Orleans*, 2004-1058 (La. 12-1-04), 893 So.2d 1, 4-5.  H&E's burden to prove causation has included the issue of proper installation for the last three years.

### PERSISTENT VIOLATION OF SCHEDULING ORDER

H&E has continued to cavalierly violate this Court's Order without requesting prior consent of this Court.  After this Court allowed H&E to add Mr. Drennan as an expert after the applicable cut off date, over URS's objection, H&E unilaterally and without seeking consent of the Court, added yet another expert, Matt Vail, regarding damages.  H&E has attempted to disguise Mr. Vail's opinion as a so-called

NON-CERTIFIED COPY

supplemental report of Mr. Bailey.  But a simple reading of Mr. Bailey's deposition reveals that Mr. Bailey did not sign the report, did not make the calculations, was not familiar with the model used, had only heard of the model used, has never given an opinion like that before, and did not even review the change orders at issue in the opinion. (See Ex. 4 to Opposition, pp. 155-157).

H&E also unilaterally added a so-called supplemental report by Mr. Drennan after the cut off date for his report and _after_ his deposition was taken.  This so-called supplemental report was nothing more than a change of opinion from his original report.  In other words, it is nothing more than an attempt to rehabilitate Mr. Drennan after his original opinion was proven wrong in his deposition.  These so-called supplemental reports are also contrary to LSA-C.C.P. art. 1425(B) requiring a "complete statement of all opinions to be expressed" in the original report.  There is no provision in Article 1425 or in this Court's Case Management Order for any supplemental expert report.

Finally, H&E simply issued a subpoena duces tecum to a third party after the discovery cut off without seeking permission from the Court to exceed its Order.  The subpoena duces tecum sought drawings that URS had previously made available to H&E.  H&E simply brushes off the issue as moot.  But the issue is H&E's unbridled violation of this Court's Scheduling Order.  That is not moot.  It has to be stopped and actions taken which violated the Order without prior consent of this Court should be vacated.  Otherwise, we have H&E controlling the scheduling of this case rather than the Court.

This Honorable Court should issue an order prohibiting the use of the radar test so that this three year old case does not have to be restarted, and set this case for trial.

4

NON-CERTIFIED COPY

The Court should also issue an order prohibiting the use of the co-called supplemental expert reports issued in violation of LSA-C.C.P. art. 1425(B) and this Court's Case Management Order.

Respectfully submitted,

ADAMS AND REESE, LLP

Philip A. Franco (Bar #5819), TA
Ronald J. Sholes     (Bar # 14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210

Attorneys for Defendants

5

NON-CERTIFIED COPY

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing pleading has been served upon

all parties by facsimile, email and/or by U.S. Mail, postage prepaid and properly

addressed, this 6th day of December, 2016.

_____
Kellen J. Mathews

6

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *  *
                         *
H&E EQUIPMENT SERVICES   *
                         *  NUMBER 626,308
VERSUS                   *
                         *  DIVISION "D"
URS CORPORATION          *
ARCHITECTURE, P.C., URS  *
CORPORATION, L O'NEAL    *
JOHNSON AND THOMAS E.    *
RYAN, III                *
                         *
*  *  *  *  *  *  *  *  *
```

Deposition of JAMES R. BAILEY,

Ph.D., P.E., taken on Thursday, September 22,

2016, commencing at 9:43 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.

Exhibit 1

NON-CERTIFIED COPY

EBR3920551

Page 68

1      A.   Sure.

2      Q.   To look at what you're looking at.

3      A.   (Reviewing document.)   As indicated in

4    my report in Figure 5, it's Detail 1 on the

5    drawing C501.

6      Q.   Okay.   That is a drawing of the

7    eight-inch and the six-inch pavement, correct?

8      A.   Detail 2 is of the six-inch pavement.

9      Q.   Okay.   And where is the drawings for the

10   actual joints, sir?

11     A.   That is shown, as I indicated in my

12   report.   I believe it is Detail 4 on that Sheet

13   5, C501.

14     Q.   Okay.   Does the detail of the typical

15   transverse construction joint No. 4, does that

16   show any rebars through the joints, sir?

17     A.   No.

18     Q.   And you didn't do any coring to find out

19   whether there was any rebar through any of the

20   contraction joints at either site, did you?

21     A.   I considered it and offered it as a

22   possibility, an option as part of my work, but

23   was instructed, at this time, not to do that.

24     Q.   You thought it was prudent to do that,

25   didn't you?

NON-CERTIFIED COPY

Page 69

1      A.  It can help verify and clarify, yes.

2      Q.  The coring would also tell you the

3  thickness of concrete that was laid actually,

4  wouldn't it?

5      A.  Yes.

6      Q.  Did you offer that, as well?

7      A.  Yes.

8      Q.  And, yet, that was rejected at this

9  time?

10     A.  At this time, yes.

11     Q.  Who rejected that?

12     A.  Ms. Mince.

13     Q.  Okay.  Now, you also referred to, in

14  that same paragraph, Doctor, you say, "Repairs,

15  including replacement of the existing pavements,

16  will be necessary to allow the extensive use of

17  heavy equipment over these paved areas..."

18          Is it your opinion that all the existing

19  pavements need to be replaced?

20     A.  In my opinion, it proves that improper

21  sizing and placement of steel reinforcement and

22  pouring a slab in terms of its thickness is

23  insufficient.  It might well warrant complete

24  replacement for heavy equipment in use, what

25  areas are designated for use by heavy equipment.

NON-CERTIFIED COPY

A



**CLERK OF COURT**
FILE COPY

CASE ID:
FILING DATE:
ATTORNEY:
NO. PAGES:

**EXHIBIT/ATTACHMENT TO:**

NON-CERTIFIED COPY

## NINETEENTH JUDICIAL DISTRICT COURT

## STATE OF LOUISIANA

## PARISH OF EAST BATON ROUGE

| | | |
|---|---|---|
| **H&E EQUIPMENT SERVICES, INC.** | : | NUMBER: 020308 |
| **Plaintiff,** | : | DIVISION D |
| **VERSUS** | : | |
| **URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON, AND THOMAS E. RYAN, II** | : | COST OK $ 1300.00 |
| | : | NOV 20 2013 |
| **Defendants** | : | CH002724O |

### PETITION FOR DAMAGES

H&E Equipment Services, Inc. ("H&E" or "Plaintiff"), by and through its undersigned

counsel, and for its petition against Defendants, URS Corporation Architecture, PC, URS

Corporation, L. O'Neal Johnson, and Thomas E. Ryan, II, hereby states the following action

based on breaches of contract and professional duty, negligence and other tortious acts, and

unfair trade practices in violation of the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401,

*et seq.*

1.

Plaintiff H&E is a Delaware corporation with its principal business in East Baton Rouge

Parish, Louisiana.

2.

Defendants are URS Corporation Architecture, P.C. ("**URS Architecture**"), a North

Carolina corporation authorized to do and doing business in Louisiana, URS Corporation ("**URS**

**Corp.**"), a Nevada corporation authorized to do and doing business in Louisiana, L. O'Neal

Johnson ("**Johnson**"), an individual domiciled in East Baton Rouge Parish, Louisiana, and

Thomas E. Ryan, II ("**Ryan**"), an individual domiciled in East Baton Rouge Parish, Louisiana.

3.

Jurisdiction and venue are both proper in this Court pursuant to the Louisiana Code of

Civil Procedure.

4.

Plaintiff H&E is a business that sells, services, and rents heavy equipment for use on

construction and industrial projects. H&E owns and operates facilities in various locations in

Certified True and Correct Copy
eCertID: 000115236

*Deanna J. Mahan*
East Baton Rouge Parish
Deputy Clerk of Court

Alteration and subsequent re-filing of this certified copy may violate La. R.S. 14:132, 133, and/or RPC Rule 3.3(a)(3).

Generated Date:
11/26/2013 10:05 AM

EBR2115647

**EXHIBIT**

**A**

NON-CERTIFIED COPY

Louisiana and around the United States. H&E's facilities in Baton Rouge, Kenner and Belle Chasse, Louisiana, are made the subject of this lawsuit.

5.

Defendants URS Architecture and URS Corp. are together an architectural and engineering design firm that advertises and holds itself out as an international leader in providing program management, planning, engineering, architectural design, environmental and construction phase services to a wide range of commercial and industrial clients worldwide. Defendant Johnson is a registered professional architect licensed by the State of Louisiana and employed by URS Architecture and/or URS Corp, who served as lead architect for URS Architecture and/or URS Corp. on the projects made subject of this lawsuit. Defendant Ryan is a registered professional architect licensed by the State of Louisiana and employed by URS Architecture and/or URS Corp., who also provided architectural services on behalf of URS Architecture and/or URS Corp. on the projects made subject of this lawsuit.

6.

In or around August of 2006, H&E entered into an Agreement for Professional Services with URS Architecture, whereby URS Architecture agreed to furnish, among other things, professional design and construction administration services to H&E in connection with the construction of its new headquarters building and dealership facility to be located on Pecue Lane in Baton Rouge, Louisiana ("**Baton Rouge Project**").

7.

In or around August of 2009, H&E contracted with URS Architecture, whereby URS Architecture agreed to provide "a proposal for professional services for assistance with determining a legitimate budget for the renovations and additions to [H&E's] facility located at 125 East Airline Drive in Kenner LA", which proposal thereafter expanded to include professional design and construction administration services to H&E ("**Kenner Project**").

8.

The professional services agreement between H&E and URS Architecture was also expanded to include delivery of professional design and construction administration services in connection with the renovation and relocation of H&E's "Crane Remanufacturing Facility" located in Belle Chasse, Louisiana ("**Belle Chasse Project**"). The Baton Rouge Project, the

 **Certified True and Correct Copy** eCertID: 000115236

_Deanna J. Mahan_
East Baton Rouge Parish
Deputy Clerk of Court
Alteration and subsequent re-filing of this certified copy may violate La. R.S. 14:132, 133, and/or RPC Rule 3.3(a)(3)

Generated Date:
11/26/2013 10:05 AM

NON-CERTIFIED COPY

Kenner Project and the Belle Chasse Project shall collectively be referred to hereinafter as the "Projects."

9.

Pursuant to its agreement with H&E, URS Architecture agreed to furnish all design-related and construction administration-related services for each of the Projects in exchange for a certain specified lump-sum price, or alternatively, a reasonable and customary price based upon certain hourly rates. Moreover, Defendant URS Corp. participated in contract performance and delivery of services, and thereby assumed responsibility for the acts and omissions of Defendants URS Architecture, Johnson and Ryan. URS Architecture and URS Corp. shall together be referred to hereinafter as "URS."

10.

The construction work for each of the Projects was put out for bid, and general contractors were selected under the guidance and management of URS. Being parts of the Baton Rouge Project, construction of the "**BR Branch Building**" was substantially completed on November 21, 2012, and construction of the "**Headquarters Building**" was substantially completed on December 14, 2012. The Kenner Project construction was substantially completed on March 5, 2013. The Belle Chasse Project remains under construction at the time of the filing of this petition.

11.

During the course of construction of each of the Projects, certain design deficiencies in the plans and specifications for each of the respective Projects began to manifest themselves, which required additional and/or changed work by the contractors and for which H&E incurred significant additional costs.

12.

With respect to the Baton Rouge Project, such design deficiencies include, but are not limited to, the parking lot, mailroom and executive conference room of the Headquarters Building. With respect to the Belle Chasse Project, such design deficiencies regard, but are not limited to, site elevations and roof misalignment.

13.

In addition, shortly after completion of the Baton Rouge Project and the Kenner Project, major portions of the concrete parking aprons and staging areas for H&E's heavy equipment at

Certified True and Correct Copy
eCertID: 000115236

East Baton Rouge Parish
Deputy Clerk of Court

Generated Date:
11/26/2013 10:05 AM

Alteration and subsequent re-filing of this certified copy may violate La. R.S. 14:132, 133, and/or RPC Rule 3.3(a)(3).

NON-CERTIFIED COPY

both facilities began experiencing a substantial and unanticipated amount of cracking, spalling and deterioration. Upon information and belief, the occurrence of such immediate cracking, spalling and deterioration is the result of errors and defects in the design of the parking and staging areas. Specifically, the design deficiencies relate to the defective and negligent design of the concrete pad, the expansion joints, the control joints, the specified concrete strength, and/or the specified surface of the parking and staging areas. The damaged and deteriorated areas of the parking and staging area are in need of repair and/or replacement at substantial cost to H&E.

14.

Despite the continuing professional relationship and obligation to recommend remedial action, URS has failed and refused to address with H&E the concrete deficiencies in Baton Rouge and Kenner in order to gain an unfair economic advantage over H&E.

15.

For example, by Request for Information dated January 15, 2013, URS Corp. and Ryan were asked to "confirm the acceptable material and methods to use for making these repairs" to the Kenner Project concrete, to which Defendants URS Corp. and Ryan never responded. For another example, Johnson emailed H&E's Frankie Wynn on June 11, 2013: "URS management is having a conference all this afternoon about the H&E Baton Rouge Branch pavement. If I am directed, I will share the outcome. If not, I will let you know what I do not know." Defendants Johnson and URS failed or refused to "share the outcome" of this critical URS management meeting with H&E. Simply put, Defendants URS, Johnson, and Ryan have actively suppressed the truth about the concrete deficiencies in Baton Rouge and Kenner, have continued to stonewall H&E, and have prejudiced H&E by its silence and inaction.

16.

URS has breached its agreement with H&E by, among other things, failing to design the Projects in accordance with appropriate industry standards and/or in accordance with the required standard of care ordinarily exercised by others in the same profession. As a result of such breaches and failures, H&E has suffered damages in a yet to be determinable amount.

17.

All conditions precedent to the enforcement of the agreement between H&E and URS have been satisfied.


Certified True and
Correct Copy
eCertID: 000115216

_Deanna J. Mahan_
East Baton Rouge Parish
Deputy Clerk of Court
Alteration and subsequent re-filing of this certified copy may violate La. R.S. 14:132, 133, and/or RPC Rule 3.3(a)(3)

Generated Date:
11/26/2013 10:05 AM

NON-CERTIFIED COPY

18.

Additionally, and/or alternatively, URS, as the architectural and engineering firm of record for the design of the Projects, owed H&E a legal duty to exercise the ordinary skill, care and diligence exercised by other architects and engineers in the same or similar circumstances. URS, however, knowingly, recklessly and/or grossly failed to exercise the ordinary skill, care and diligence in designing and managing the construction of the Projects. Such negligent acts and/or omissions constitute a direct and proximate cause of damages to H&E.

19.

In addition, Defendant Johnson, as a design professional and the lead architect of record for the design of the Projects, owed H&E a professional duty to exercise a special degree of skill, care and diligence exercised by other architects in the same or similar circumstances. Johnson, however, knowingly, recklessly and/or grossly failed to exercise the required standard of care in performing his professional services on the Projects. Such negligent acts and/or omissions constitute a direct and proximate cause of damages to H&E.

20.

Defendant Ryan, as a design professional and architect performing professional services on the Projects, owed H&E a professional duty to exercise a special degree of skill, care and diligence exercised by other architects in the same or similar circumstances. Ryan, however, knowingly, recklessly and/or grossly failed to exercise the required standard of care in performing his professional services on the Projects. Such negligent acts and/or omissions constitute a direct and proximate cause of damages to H&E.

**DAMAGES**

21.

H&E does not know the full extent of its damages due to defendants' breaches of contract and duty, delictual acts and deceptive trade practices; however, H&E believes its damages currently exceed $3,000,000.00. H&E may seek leave to amend to more clearly articulate the extent of its damages, as ascertained.

**JURY DEMAND**

22.

Plaintiff H&E requests a trial by civil jury on all issues so triable.

Certified True and Correct Copy
eCertID: 000115236

East Baton Rouge Parish
Deputy Clerk of Court

Generated Date:
11/26/2013 10:05 AM

Alterations and subsequent re-filing of this certified copy may violate La. R.S. 14:132, 133, and/or RPC Rule 3.3(a)(3).

NON-CERTIFIED COPY

## REQUEST FOR NOTICE

### 23.

Plaintiff H&E requests written notice to its counsel ten (10) days in advance of the date

fixed for trial or hearing on any exception, motion, or rule in this proceeding pursuant to La.

Code Civ. P. art. 1572, and Plaintiff further requests pursuant to La. Code Civ. P. arts. 1913 and

1914 immediate notice to its counsel of all interlocutory and final orders and judgments on any

exceptions, motions, rules or trial on the merits in these proceedings.

### PRAYER

**WHEREFORE**, Plaintiff, H&E Equipment Services, Inc. prays that Defendants, URS

Corporation Architecture, PC, URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, II,

be served with a copy of this petition, and duly cited to appear and answer same, and that after

the lapse of all legal delays and due proceedings are had, there be judgment rendered herein in

favor of Plaintiff for all sums reasonable in the premises, including damages, together with legal

interest thereon at the maximum legal rate from the date the obligation became due until paid,

attorney's fees on the account determined due, penalties, court costs, and such additional relief as

is just and to which it may be entitled. Moreover, Plaintiff, H&E Equipment Services, Inc.,

specifically requests that Defendants, URS Corporation Architecture, P.C., URS Corporation, L.

O'Neal Johnson and Thomas E. Ryan, II, be cited to the Louisiana Attorney General for their

violations of the Louisiana Unfair Trade Practices Act and that there be judgment against

Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and

Thomas E. Ryan, II, for damages and attorney's fees thereunder.

TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.

BY: _____

Edward J. Laperouse, II, #29310
John Ashley Moore, #9635
L. Adam Thames, #32722
Megan F. Bice, #35042
451 Florida Street, 8th Floor (70801)
P. O. Box 2471
Baton Rouge, LA 70821
Telephone: (225) 387-3221
Facsimile: (225) 346-8049
Email: ted.laperouse@taylorporter.com
Email: ashley.moore@taylorporter.com
Email: adam.thames@taylorporter.com
Email: megan.bice@taylorporter.com

*Attorneys for Plaintiff, H&E Equipment Services, Inc.*

Certified True and
Correct Copy
eCertID: 000115236

East Baton Rouge Parish
Deputy Clerk of Court

Generated Date:
11/26/2013 10:05 AM

Alteration and subsequent re-filing of this certified copy may violate La. R.S. 14:132, 133, and/or RPC Rule 3.3(a)(3)

FILED
EAST BATON ROUGE PARISH, LA.
2017 NOV 20 PM 3:37

NON-CERTIFIED COPY

East Baton Rouge Parish Clerk of Court - C626308 PET/DAMAGES W/JURY REQUEST          Page 7 of 7

**PLEASE SERVE:**

**URS Corporation Architecture, P.C.**
through its Registered Agent for service:
CT Corporation System
5615 Corporate Blvd., Suite 400B
Baton Rouge, LA  70808

**URS Corporation**
through its Registered Agent for service:
CT Corporation System
5615 Corporate Blvd., Suite 400B
Baton Rouge, LA  70808

**L. O'Neal Johnson**
1544 La Annie Dr.
Baton Rouge, LA 70815

**Thomas E. Ryan, II**
621 Highland Creek Parkway
Baton Rouge, LA 70808

**PLEASE ALSO SERVE:**   *

**Louisiana Attorney General**
**Consumer Protection Division**
Livingston Building
1885 Third Street
Baton Rouge, LA 70802



Certified True and
Correct Copy
eCertID: 000115236

_Dianna J. Mahan_
East Baton Rouge Parish
Deputy Clerk of Court

Generated Date:
11/26/2013 10:05 AM

Alteration and subsequent re-filing of this certified copy may violate La. R.S. 14:132, 133, and/or RPC Rule 3.3(a)(3).

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


\* \* \* \* \* \* \* \* \*
                          \*
H&E EQUIPMENT SERVICES    \*
                          \* NUMBER 626,308
VERSUS                    \*
                          \* DIVISION "D"
URS CORPORATION           \*
ARCHITECTURE, P.C., URS   \*
CORPORATION, L O'NEAL     \*
JOHNSON AND THOMAS E.     \*
RYAN, III                 \*
                          \*
\* \* \* \* \* \* \* \* \*


Deposition of JOHN ENGQUIST, taken

on Friday, August 5, 2016, commencing at 9:59

a.m., in the offices of Adams and Reese, LLP,

Attorneys at Law, 450 Laurel Street, Suite 1900,

Baton Rouge, Louisiana, 70801.



EXHIBIT

B

NON-CERTIFIED COPY

Page 13

1    got one in Florida.  I've got one in Los

2    Angeles.  I've got one in San Francisco.  Only

3    one board member from Louisiana.

4        Q.  And are you the majority shareholder of

5    the Company?

6        A.  Yes.  And if -- if I am not the largest

7    shareholder today, I'm the second largest one.

8    The big institutional funds, that -- that goes

9    back and forth, but --

10       Q.  So these board members, were they

11   elected primarily by you?

12       A.  No.  By -- well, no, I -- they were

13   elected by a nominating committee on our board,

14   and, you know, Bruce Bruckmann, who had been

15   certainly severely, heavily involved in that.

16           Bruce was the principal in Bruckmann,

17   Rosser, and Sherrill, who was the private equity

18   shop that I sold half of the business to in '99.

19   And he has been a board member ever since and a

20   significant shareholder himself.

21       Q.  So is it fair to say the business of H&E

22   really hasn't changed?  It has just grown?

23       A.  It -- it has changed in that when -- you

24   know, when I started there, we were essentially

25   a distribution company.

NON-CERTIFIED COPY

Page 14

1          And today we have a distribution

2     component, but we are the seventh on eighth

3     largest rental business in the country.

4          So we have grown the rental component of

5     our business exponentially.  It is much more

6     rental focused than when I started there.

7          Q.  Percentage-wise, how is the rental

8     revenues --

9          A.  Today --

10         Q.  Wait.  Let me finish.

11              -- compared to sales?

12         A.  Today it is probably 35 percent rentals,

13    and the rest is distribution, various components

14    of the distribution, new equipment sales, used

15    equipment sales, parts, and service.

16         Q.  There came a time when H&E, obviously,

17    decided it wanted a different headquarter

18    building.  Time period, is it fair to say around

19    2006?

20         A.  Yeah.  I mean, that is -- you know, I

21    don't know exact, but, yeah, that is correct.

22              We had -- you know, we had moved our

23    corporate headquarters from Airline to Sherwood

24    Forest in the old IBM building there.  And it

25    was -- we have been outgrown that building for

NON-CERTIFIED COPY

Page 15

1   some time.

2       Q.  Do you remember when you moved to

3   Sherwood Forest?  Even the year?

4       A.  I don't.  I -- I don't.

5       Q.  That is fair.

6       A.  It is a matter of record.

7       Q.  So the concept was you had outgrown the

8   building and you wanted a new location basically

9   for the headquarters, correct?

10      A.  That is correct.

11      Q.  All right.  Did you put anyone in charge

12  of finding the facility at H&E?

13      A.  Yeah.  Leonard St. Germain and -- and

14  later Johnny Jones were involved in that at that

15  time.

16      Q.  All right.  What was Leonard St.

17  Germain's position or title at the Company at

18  that time?

19      A.  He -- he was over our parts and service

20  operations, I believe.

21      Q.  What was his title, if you recall?

22      A.  I assume at the time -- and I'm not

23  certain -- vice president of product support.

24      Q.  But he was a vice president of

25  something?

NON-CERTIFIED COPY

Page 16

1    A.  He was, yes.

2    Q.  All right.  And you said that later

3  became the task mainly of whom?

4    A.  Well, at some point in this whole

5  process, Leonard's job transitioned to a VP of

6  used equipment.

7      And at that point in time, Johnny Jones

8  took over those responsibilities.  And I can't

9  give you a date on that, but it was at some

10  point in that process.

11    Q.  What was Johnny Jones' position or title

12  at the time?

13    A.  He -- well, he was involved in parts and

14  service, also.  And, you know, there was some

15  shifting between their responsibility.  I can't

16  give you an exact timeframe on that.

17    Q.  All right.  Was he also a --

18    A.  Yes.

19    Q.  He was a vice president?

20    A.  Yes, he was.

21    Q.  So, he was a vice president when he took

22  over that transition?

23    A.  And you are referring to Johnny Jones?

24    Q.  Yes.

25    A.  Yes.

NON-CERTIFIED COPY

Page 17

1    Q.  Okay.  Do you remember what time period

2  that was?

3    A.  No, I don't.  But, again, I could go

4  back and look, but I couldn't give you a good

5  date.

6    Q.  So as far as you were concerned, who was

7  mainly responsible at the Company for

8  investigating a new location?

9    A.  Well, I think, you know, we had Johnny,

10  and, at some point, I think Leonard was involved

11  looking for a piece of property early on --

12  early in this process.

13        And we found this property on Pecue and

14  Airline, which I then went out and looked at and

15  probably negotiated the price and whatnot, and

16  ended up buying the piece of property.

17        Then we went through the design aspect

18  and, you know, getting everything put together.

19  And then the recession hit, and we put

20  everything on hold.

21    Q.  Okay.  We are going to get to that.

22        When you bought the property, was the

23  concept at that time just for the headquarters

24  or was the concept for a combination

25  headquarters and branch?

NON-CERTIFIED COPY

Page 18

1      A.  Combination headquarters and branch.

2      Q.  Why was that the target at that point?

3  Why did you want a headquarters and --

4      A.  Because we had two inadequate

5  facilities, one in Baton Rouge on -- at 6600

6  Airline Highway, and then one in Gonzales

7  that -- we had really outgrown both of them, and

8  we felt we could consolidate both of those

9  locations into one larger facility.

10     Q.  I'm sorry.  What was the one in Baton

11  Rouge?  Where was that?

12     A.  6600 Airline Highway.  Which is our

13  original location.

14     Q.  Was the headquarters building next to

15  that location --

16     A.  It was.

17     Q.  -- originally?

18     A.  Originally, it was one and the same.  We

19  were all in that one facility, yes.

20     Q.  How did it come about that URS was

21  directed to help you with the design or layout

22  of the Baton Rouge facility?

23     A.  I -- I think it was, you know, a number

24  of people.  Johnny, Leonard, you know, Brad

25  Barber, myself.  You know, we picked them

NON-CERTIFIED COPY

1  because they are a large national firm.

2      Q.  But you were involved in that decision,

3  I take it?

4      A.  Yes.

5      Q.  Had you done any business with URS prior

6  to that time?

7      A.  No.

8      Q.  Did you interview any other architect or

9  design engineering companies in connection

10  with that?

11      A.  I can't answer that.  I suspect Leonard

12  and Johnny could answer that question.  I

13  don't -- I don't know.

14      Q.  But you don't recall being involved in

15  that?

16      A.  No.

17      Q.  I am going to show you, Mr. Engquist, a

18  copy of -- and I am sorry.  I'm going to be

19  tossing these across the table.  I'm not trying

20  to be rude, but --

21      A.  All right.

22      Q.  -- it is not an easy distance here.

23          One copy for you.  One copy for Mr.

24  Barriere.

25      A.  All right.

NON-CERTIFIED COPY

Page 20

1        MR. FRANCO:

2            I'm going to label it as Exhibit 1.

3    EXAMINATION BY MR. FRANCO:

4        Q.  This is the agreement for professional

5    services between H&E and URS.  Have you seen

6    this before?

7        A.  I don't know if I seen -- I'm sure I

8    have.

9        Q.  Okay.  For the Record, this is dated

10   August 28th, 2006.  And if you turn to the last

11   page, it appears to be signed by Leonard St.

12   Germain.  Do you see that?

13       A.  Yep.

14       Q.  Did you discuss this agreement with Mr.

15   St. Germain before he signed it?

16       A.  I don't recall one way or the other.  I

17   mean, we would have had legal counsel review

18   this agreement, and whether or not I did, I

19   don't know.

20       Q.  There is no question that Mr. St.

21   Germain, at the time, was the one mainly

22   involved with this Baton Rouge concept?

23       A.  Yes.

24       Q.  And is there any question that he had

25   the authority to sign this?

NON-CERTIFIED COPY

Page 34

1          The site proposal that I showed you just

2     now was dated in 2006.  That is when the

3     discussion started about the development of the

4     Baton Rouge site, correct?

5          A.  I would assume that is correct.

6          Q.  All right.  And there was some work done

7     by URS in connection with the development of the

8     site contemporaneously at that time, correct?

9          A.  I couldn't argue that.  Sure.

10         Q.  That is fine.

11         There came a time when that concept of

12    developing the Baton Rouge site was put on hold

13    by H&E; is that correct?

14         A.  That is correct.

15         Q.  Do you remember what time period that

16    was?

17         A.  I am assuming.  I don't -- I don't know

18    exact -- I am assuming it was probably in '08

19    during the -- you know, during the depths of the

20    recession, and we elected to put the project on

21    hold.

22         Q.  And can you tell me the reason it was

23    put on hold?

24         A.  Yeah.  We were in the midst of a -- you

25    know, the biggest recession our sector had ever

NON-CERTIFIED COPY

Page 35

1  seen, and we elected to conserve cash, as

2  opposed to proceeding with it.

3      Q.  Do you remember when it was put back on

4  the front burner?

5      A.  This is somewhat of an educated guess.

6  I think it was probably in the '11 timeframe.

7      Q.  That long of a period of --

8      A.  Yeah, I -- we wouldn't have started the

9  project in '10.  That is kind of when our sector

10  bottomed down.  So I'm assuming it was in 2011.

11      Q.  Whose decision was it, at that time, to

12  start proceeding again with it?

13      A.  Probably my decision.  Ultimately, it

14  was my decision, but there was other people

15  involved with that.

16      Q.  Okay.  Did you need board approval for

17  that?

18      A.  Whether or not I needed board approval,

19  I am sure I ran it by the board.

20      Q.  How often does H&E have board meetings?

21      A.  Quarterly.

22      Q.  Quarterly only?

23      A.  Uh-huh (affirmative response).

24      Q.  And there are minutes kept of the board

25  meetings, I presume?

NON-CERTIFIED COPY

Page 36

1    A.  Uh-huh (affirmative response).

2    Q.  We asked for minutes of the board

3   meetings that involved these three sites, and we

4   didn't receive any.

5        We were told there was none.  There was

6   no discussions at board meetings about the

7   development of the new headquarters building and

8   new headquarters branch.

9    A.  I would assume that there was -- there

10  would have been some discussion.

11   Q.  Do you ever recall seeing any such in

12  the minutes?

13   A.  I don't recall one way or the other.

14   Q.  Did you review the minutes?

15   A.  I review minutes, yes.

16   Q.  Okay.

17   A.  But if you are asking me if I remember

18  minutes from ten years ago or eight years ago, I

19  don't.

20   Q.  I hear you.

21       When the problems came up later in the

22  ball game with these sites, were there no

23  discussions at board meetings about those

24  problems?

25   A.  No.

NON-CERTIFIED COPY

Page 37

1    Q.  Why was that?

2    A.  Why would I discuss that with my board.

3    That is -- that is not an issue that I would

4    bring to the board.

5    Q.  But a $15 million development is

6    something that you would discuss --

7    A.  We do --

8    Q.  -- with the --

9        Let me ask my question, because she

10   can't take us both at the same time.

11       A $15 million development in the

12   beginning is something that you would discuss

13   with the board, I would assume; is that correct?

14   A.  That is correct.  We do developments

15   every -- you know, we have always got facilities

16   under development.

17       Either we have outgrown a facility or we

18   are replacing or we are going into a greenfield

19   and starting a new location somewhere.

20       And, you know, typically a four or $5

21   million facility, that doesn't require any board

22   approval.  I don't think this would required

23   board approval, but it -- I did run it by the

24   board.  I mean, it was discussed.  I know that.

25   Q.  Okay.

NON-CERTIFIED COPY

Page 38

1    A.  Because it is a -- a much larger

2  expenditure.

3    Q.  Was there any limit dollar-wise to your

4  authority at the Company?

5    A.  No.  I mean, look I spend $400 million a

6  year in CapEx and without board approval.  It is

7  normal course of business.  So, no, there is

8  not.

9    Q.  All right.

10    MR. FRANCO:

11      Let me show you another document,

12  which I'm going to label as Exhibit 3.

13  EXAMINATION BY MR. FRANCO:

14    Q.  Now, take a minute.  You can look at it,

15  if you want.  I'm going to ask some particular

16  questions, but if you need to look at it after I

17  ask you a question, that is fine.

18    A.  Okay.

19    Q.  I'm going to start at the top.  This is

20  a July 10, 2008, Email from Brad Barber to you,

21  and it talks about the URS campus project

22  corporate facility cost justification.

23      That is the attachment, which I don't

24  have attached to this.  For the Record, this

25  document goes from Bates stamp H&E 2958 through

NON-CERTIFIED COPY

1   2960.

2         The last Email from Brad Barber to you

3   says, "See below and please advise Leonard.  We

4   are on hold until you approve."

5         And if you go back to the very first

6   Email, it is from Leonard St. Germain to Johnny

7   Jones on July 2, 2008.  It says, "Johnny,

8   attached is the cost breakdown for URS to first,

9   complete the plans to the point of the submittal

10  for permitting."  And then it goes on.

11        My first question is:  This looks like

12  in 2008 there was some discussion about

13  completing plans, negotiating prices.  That was

14  later put on hold until around 2011, or did the

15  concept start to resurrect itself in 2008?

16      A.  I really can't answer that question.  I

17  don't recall when the -- when we started talking

18  about it again.

19      Q.  All right.  It is fair to say that this

20  series of Emails talks about cost breakdown for

21  URS to do work at the Baton Rouge site?  Fair

22  statement?

23      A.  Uh-huh (affirmative response).

24      Q.  And this says, "We are on hold until you

25  approve it."  So --

NON-CERTIFIED COPY

Page 40

1    A.  Correct.

2    Q.  -- you approved, I assume, the concept

3    that URS was going to do work.  In other words,

4    that was something that you approved; am I

5    correct?

6    A.  I -- I assume, at some point, I approved

7    it, yes.

8    Q.  Okay.  But my question is:  Why are you

9    approving work by cost proposals for URS to do

10   work?  Why didn't you leave that to Mr. St.

11   Germain?

12   A.  Well, I can't answer that.  I don't -- I

13   don't remember the circumstances.  But if this

14   was an '08 situation, that was, you know, at a

15   time when we were in the, you know, grips of

16   this recession.  So they may have been running

17   it by me for that reason.  I don't know.

18   Q.  Okay.

19   A.  I don't recall.

20   Q.  All right.

21       MR. FRANCO:

22           The next document, which I'm going

23   to label as Exhibit 4, is entitled a Short Form

24   Master Agreement Professional Services Between

25   H&E and URS.  This one is dated August 13, 2009,

NON-CERTIFIED COPY

Page 41

1   at the top.

2          MR. BARRIERE:

3                Excuse me, Phil.  You gave me an

4   extra copy.

5          MR. FRANCO:

6                I'm sorry.

7          MR. BARRIERE:

8                That is fine.

9   EXAMINATION BY MR. FRANCO:

10      Q.  And if you look at the last page of

11  this, Mr. Engquist, you will again see that this

12  one was signed by Mr. St. Germain, as well,

13  correct?

14      A.  Correct.

15      Q.  Now, with respect to this agreement, do

16  you recall discussing this agreement before Mr.

17  St. Germain signed it?

18      A.  Specifically, no, I do not.

19      Q.  Okay.  Would your answer be the same,

20  that this agreement would have been vetted with

21  your Counsel before Mr. St. Germain signed it?

22      A.  I would assume so, yes.

23      Q.  Okay.  Do you recall anyone at the

24  Company raising any questions about this

25  agreement?

NON-CERTIFIED COPY

Page 42

1      A.  Specifically, no.

2      Q.  Look at Paragraph 4, 4.1.  Do you see

3   the second sentence in that which talks about

4   consultant's sole liability to client?

5      A.  I do.

6      Q.  Do you ever remember discussing that

7   concept or any concern about that concept?

8      A.  I do not.

9      Q.  Look at Paragraph 9, limitation of

10  liability.  Do you ever remember discussing

11  anything about limitation of liability with

12  anybody before Mr. St. Germain signed this

13  contract?

14     A.  I do not.

15     Q.  I assume, sir, that H&E complies with

16  its contracts, doesn't it?

17     A.  Yes.

18     Q.  And I assume when H&E signs a contract,

19  it intends to comply with its contract.  Is that

20  a fair statement?

21     A.  That is a fair statement.

22     Q.  In fact, let me just ask this question:

23         Mr. St. Germain signs this document as

24  VP of operations.  Is that accurate at the time?

25     A.  Yes, I am sure it is.

NON-CERTIFIED COPY

Page 43

1      Q.  Have you ever seen that document that I

2  just showed you before?

3      A.  I do not know.  I don't -- I don't

4  recall.

5      Q.  What was Frankie Wynn's position at H&E

6  in 2009?

7      A.  I would have to go back and look.  I

8  mean, I -- I don't recall his title at the time.

9      Q.  Was he a vice president?

10      A.  I don't think so, no.

11      Q.  Okay.  Do you remember Frankie Wynn

12  expressing any concerns about the 2009 agreement

13  I just showed you?

14      A.  Not specifically, no.

15      Q.  Now, at the time the Baton Rouge

16  facility was resurrected because of the economy,

17  the development of that facility, were there

18  also discussions about developing or renovating

19  the Kenner branch?

20      A.  Well, at some point there was.  I don't

21  remember the timeframe there --

22      Q.  Okay.

23      A.  -- to tell you a date on that.

24      Q.  Why was there a need to renovate the

25  Kenner branch; do you recall that?

NON-CERTIFIED COPY

Page 44

1      A.  Too small, just old branch, just needed

2   to be expanded.

3      Q.  When you say expanded, there was only a

4   certain amount of land there available, correct?

5      A.  That is correct.

6      Q.  So you are talking about expansion on

7   the site itself?

8      A.  Yeah.  And then we -- you know, we had

9   some property next to it that at some time some

10  old apartments I think was included in that.

11          But, again, you know, I have people that

12  do that work.  I don't -- I am not specifically

13  involved in those issues.

14     Q.  Who was in charge of that, at the time?

15  Mr. St. Germain, as well?

16     A.  I -- yes, at the beginning of that, it

17  was still Leonard.

18          MR. FRANCO:

19              Now, let me show you a document

20  which we will label as Exhibit 5.

21  EXAMINATION BY MR. FRANCO:

22     Q.  This is a December 18, 2009 Email from

23  Leonard St. Germain to Neil Favre.  And it looks

24  like Mr. Favre was a senior accountant at H&E at

25  the time.

NON-CERTIFIED COPY

## AGREEMENT FOR PROFESSIONAL SERVICES
### ("Agreement")

This Agreement between __H&E Equipment Services, Inc, 11100 Mead Road, Suite 200, Baton Rouge, LA 70816 225 298-5244__ , ("Client") and __URS Corporation Architecture, NC, PC__ ("URS"), a __North Carolina__ corporation; __7389 Florida Blvd, Suite 300 Baton Rouge, LA 70806__("URS"), is effective as of __August 28, 2006__ . The parties agree as follows:

It is the expressed intent of the parties that this Agreement shall be made available to the subsidiaries and affiliated companies of URS. For the purposes of this Agreement, as it applies to each Work Order, the term "URS" shall mean either, __URS Corporation Architecture, NC, PC__ , or the affiliated company identified in the Work Order. The applicable Work Order shall clearly identify the legal name of the affiliate or subsidiary accepting the Work Order.

**ARTICLE I - Work Orders.** The Scope of Services ("Services"), the Time Schedule and the Charges are to be set forth in a written Work Order to this Agreement. The terms and conditions of this Agreement shall apply to each Work Order, except to the extent expressly modified by the Work Order. Where charges are "not to exceed" a specified sum, URS shall notify Client before such sum is exceeded and shall not continue to provide the Services beyond such sum unless Client authorizes an increase in the sum. If a "not to exceed" sum is broken down into budgets for specific tasks, the task budget may be exceeded without Client authorization as long as the total sum is not exceeded. Changes in conditions, including, without limitation, changes in laws or regulations occurring after the budget is established or other circumstances beyond URS control shall be a basis for equitable adjustments in the budget and schedule.

**ARTICLE II - Payment.** Unless otherwise stated in an Work Order, payment shall be on a time and materials basis under the Schedule of Fees and Charges in effect when the Services are performed. Client shall pay undisputed portions of each progress invoice within thirty (30) days of the date of the invoice. If payment is not maintained on a thirty (30) day current basis, URS may suspend further performance until payments are current. Client shall notify URS of any disputed amount within fifteen (15) days from date of the invoice, give reasons for the objection, and promptly pay the undisputed amount. Client shall pay an additional charge of one and one-half percent (1½%) per month or the maximum percentage allowed by law, whichever is the lesser, for any past due amount. In the event of a legal action for invoice amounts not paid, attorneys' fees, court costs, and other related expenses shall be paid to the prevailing party.

**ARTICLE III - Professional Responsibility.** URS is obligated to comply with applicable standards of professional care in the performance of the Services. Client recognizes that opinions relating to environmental, geologic, and geotechnical conditions are based on limited data and that actual conditions may vary from those encountered at the times and locations where the data are obtained, despite the use of due professional care. URS is not responsible for designing or advising on or otherwise taking measures to prevent or mitigate the effect of any act of terrorism or any action that may be taken in controlling, preventing, suppressing or in any way relating to an act of terrorism.

**ARTICLE IV - Responsibility for Others.** URS shall be responsible to Client for URS Services and the services of URS subcontractors. URS shall not be responsible for the acts or omissions of other parties engaged by Client nor for their construction means, methods, techniques, sequences, or procedures, or their health and safety precautions and programs.

**ARTICLE V - Risk Allocation.** The liability of URS, its employees, agents and subcontractors (referred to collectively in this Article as "URS"), for Client's claims of loss, injury, death, damage, or expense, including, without limitation, Client's claims of contribution and indemnification, express or implied, with respect to third party claims relating to services rendered or obligations imposed under this Agreement, including all Work Orders, shall not exceed in the aggregate:



EN 64157

EXHIBIT NO. 1

K. DONNELLY

EXHIBIT

B-1

NON-CERTIFIED COPY

(1)    The total sum of $5,000,000 for claims arising out of professional negligence, including errors, omissions, or other professional acts, and including unintentional breach of contract; and any actual or potential environmental pollution or contamination, including, without limitation, any actual or threatened release of toxic, irritant, pollutant, or waste gases, liquids, or solid materials, or failure to detect or properly evaluate the presence of such substances, except to the extent such release, threatened release, or failure to detect or evaluate is caused by the willful misconduct of URS; or

(2)    The total sum of $2,000,000 for claims arising out of negligence, breach of contract, or other causes for which URS has any legal liability, other than as limited by (1) above.

**ARTICLE VI - Insurance.**  URS agrees to maintain during the performance of the Services: (1) statutory Workers' Compensation coverage; (2) Employer's Liability; (3) General Liability; and (4) Automobile Liability insurance coverage each in the sum of $5,000,000.

**ARTICLE VII - Consequential Damages.**  Neither Party shall be liable to the other for consequential damages, including, without limitation, loss of use or loss of profits, incurred by one another or their subsidiaries or successors, regardless of whether such damages are caused by breach of contract, willful misconduct, negligent act or omission, or other wrongful act of either of them.

**ARTICLE VIII - Client Responsibility.**  Client shall:  (1) provide URS, in writing, all information relating to Client's requirements for the project;  (2) correctly identify to URS, the location of subsurface structures, such as pipes, tanks, cables and utilities;  (3) notify URS of any potential hazardous substances or other health and safety hazard or condition known to Client existing on or near the project site;  (4) give URS prompt written notice of any suspected deficiency in the Services; and  (5) with reasonable promptness, provide required approvals and decisions. In the event that URS is requested by Client or is required by subpoena to produce documents or give testimony in any action or proceeding to which Client is a party and URS is not a party, Client shall pay URS for any time and expenses required in connection therewith, including reasonable attorney's fees.

Client shall reimburse URS for all taxes, duties and levies such as Sales, Use, Value Added Taxes, Deemed Profits Taxes, and other similar taxes which are added to or deducted from the value of URS Services. For the purpose of this Article such taxes shall not include taxes imposed on URS net income, and employer or employee payroll taxes levied by any United States taxing authority, or the taxing authorities of the countries or any agency or subdivision thereof in which URS subsidiaries, affiliates, or divisions are permanently domiciled.  It is agreed and understood that these net income, employer or employee payroll taxes are included in the unit prices or lump sum to be paid URS under the respective Work Order.

**ARTICLE IX - Force Majeure.**  An event of "Force Majeure" occurs when an event beyond the control of the Party claiming Force Majeure prevents such Party from fulfilling its obligations.  An event of Force Majeure includes, without limitation, acts of God (including floods, hurricanes and other adverse weather), war, riot, civil disorder, acts of terrorism, disease, epidemic, strikes and labor disputes, actions or inactions of government or other authorities, law enforcement actions, curfews, closure of transportation systems or other unusual travel difficulties, or inability to provide a safe working environment for employees.

In the event of Force Majeure, the obligations of URS to perform the Services shall be suspended for the duration of the event of Force Majeure.  In such event, URS shall be equitably compensated for time expended and expenses incurred during the event of Force Majeure and the schedule shall be extended by a like number of days as the event of Force Majeure.  If Services are suspended for thirty (30) days or more, URS may, in its sole discretion, upon 5 days prior written notice, terminate this Agreement or the affected Work Order, or both.  In the case of such termination, in addition to the compensation and time extension set forth above, URS shall be compensated for all reasonable termination expenses.

**ARTICLE X - Right of Entry.**  Client grants to URS, and, if the project site is not owned by Client, warrants that permission has been granted for, a right of entry from time to time by URS, its employees, agents and subcontractors, upon the project site for the purpose of providing the Services.  Client recognizes that the use of investigative equipment and practices may unavoidably alter the existing site conditions and affect the environment in the area being studied, despite the use of reasonable care.

NON-CERTIFIED COPY

**ARTICLE XI - <u>Documents</u>.** Provided that URS has been paid for the Services, Client shall have the right to use the documents, maps, photographs, drawings and specifications resulting from URS efforts on the project. Reuse of any such materials by Client on any extension of this project or any other project without the written authorization of URS shall be at Client's sole risk. URS shall have the right to retain copies of all such materials. URS retains the right of ownership with respect to any patentable concepts or copyrightable materials arising from its Services.

**ARTICLE XII - <u>Termination</u>.** Client may terminate all or any portion of the Services for convenience, at its option, by sending a written Notice to URS. Either party can terminate this Agreement or a Work Order for cause if the other commits a material, uncured breach of this Agreement or becomes insolvent. Termination for cause shall be effective twenty (20) days after receipt of a Notice of Termination, unless a later date is specified in the Notice. The Notice of Termination for cause shall contain specific reasons for termination and both parties shall cooperate in good faith to cure the causes for termination stated in the Notice. Termination shall not be effective if reasonable action to cure the breach has been taken before the effective date of the termination. Client shall pay URS upon invoice for Services performed and charges incurred prior to termination, plus reasonable termination charges. In the event of termination for cause, the parties shall have their remedies at law as to any other rights and obligations between them, subject to the other terms and conditions of this Agreement.

**ARTICLE XIII - <u>No Third Party Rights</u>.** This Agreement shall not create any rights or benefits to parties other than Client and URS. No third party shall have the right to rely on URS opinions rendered in connection with the Services without the written consent of URS and the third party's agreement to be bound to the same conditions and limitations as Client.

**ARTICLE XIV - <u>Assignments</u>.** Neither party to this Agreement shall assign its duties and obligations hereunder without the prior written consent of the other party.

**ARTICLE XV - <u>Hazardous Substances</u>.** All non-hazardous samples and by-products from sampling processes in connection with the Services shall be disposed of by URS in accordance with applicable law; provided, however, that any and all such materials, including wastes, that cannot be introduced back into the environment under existing law without additional treatment, and all hazardous wastes, radioactive wastes, or hazardous substances ("Hazardous Substances") related to the Services, shall be packaged in accordance with the applicable law by URS and turned over to Client for appropriate disposal. URS shall not arrange or otherwise dispose of Hazardous Substances under this Agreement. URS, at Client's request, may assist Client in identifying appropriate alternatives for off-site treatment, storage or disposal of the Hazardous Substances, but URS shall not make any independent determination relating to the selection of a treatment, storage, or disposal facility nor subcontract such activities through transporters or others. Client shall sign all necessary manifests for the disposal of Hazardous Substances. If Client requires: (1) URS agents or employees to sign such manifests; or (2) URS to hire, for Client, the Hazardous Substances transportation, treatment, or disposal contractor, then for these two purposes, URS shall be considered to act as Client's agent so that URS will not be considered to be a generator, transporter, or disposer of such substances or considered to be the arranger for disposal of Hazardous Substances, and Client shall indemnify URS against any claim or loss resulting from such signing.

**ARTICLE XVI - <u>Venue</u>.** In the event of any dispute between the parties to this Agreement, the venue for the dispute resolution shall be any state or federal court in the United States having jurisdiction over the parties. The foregoing notwithstanding, if the project is located outside the United States, the laws of the State of California shall govern and in such event, any dispute under the Agreement not resolved amicably shall be resolved under the binding rules of the American Arbitration Association.

**ARTICLE XVII - <u>Integrated Writing and Enforceability</u>.** This Agreement constitutes the final and complete repository of the agreements between Client and URS relating to the Services and supersedes all prior or contemporaneous communications, representations, or agreements, whether oral or written. Modifications of this Agreement shall not be binding unless made in writing and signed by an Authorized Representative of each party. The provisions of this Agreement shall be enforced to the fullest extent permitted by law. If any provision of this Agreement is found to be invalid or unenforceable, the provision shall be construed and applied in a way that comes as close as possible to expressing the intention of the parties with regard to the provisions and that saves the validity and enforceability of the provision.

NON-CERTIFIED COPY

**THE PARTIES ACKNOWLEDGE** that there has been an opportunity to negotiate the terms and conditions of this Agreement and agree to be bound accordingly.

CLIENT

_____
Signature

Leonard St. Germain, V.P. Operations
Typed Name/Title

8/30/06
Date of Signature

URS

_____
Signature

Craig Gardner, Vice President, Office Manager
Typed Name/Title

8/28/06
Date of Signature

PSA-1.DOC (Rev. 1)   30-AUG-04                    - 4 -

NON-CERTIFIED COPY



**URS**

## SHORT FORM MASTER AGREEMENT FOR PROFESSIONAL SERVICES
## BETWEEN
## H&E Equipment Services, Inc.
## AND
## URS Corporation Architecture PC

**THIS AGREEMENT** ("Agreement") for Professional Services, (together with the attachments hereto) dated and effective as of August 13, 2009 (the "Effective Date"), is hereby made and entered into by and between H&E Equipment Services, Inc., a Delaware corporation, (hereinafter "Client") having a place of business located at 11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816 and URS Corporation Architecture PC, a North Carolina corporation (hereinafter "Consultant") having a place of business located at 7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806 Consultant and Client are each individually referred to as a "Party" and collectively as the "Parties".

The Parties agree as follows:

### 1. WORK AUTHORIZATIONS

1.1   Consultant agrees to undertake and perform certain consulting and professional engineering services ("Services") in accordance with the terms and conditions contained herein, as may be requested by Client from time to time. The Services to be performed, Consultant's compensation, and the schedule for performance for each task shall be described in one or more authorizations issued to Consultant by Client, the form of which is attached hereto as Attachment 1 ("Work Authorization"). A Work Authorization shall be valid and binding upon the Parties only if accepted in writing by Client and Consultant. Each duly executed Work Authorization shall be subject to the terms and conditions of this Agreement, except to the extent expressly modified by the Work Authorization.

1.2   It is the expressed intent of the parties that this Agreement shall be made available to subsidiaries and affiliated companies of Consultant. For the purposes of this Agreement, as it applies to each Work Authorization, the term "Consultant" shall mean either Consultant as defined above or the subsidiary or affiliate of Consultant identified in the Work Authorization. The applicable Work Authorization shall clearly identify the legal name of the entity accepting the Work Authorization.

### 2. PAYMENTS FOR SERVICES

2.1   Unless otherwise stated in a Work Authorization, payment shall be on a time and materials basis under the Schedule of Fees and Charges in effect when the Services are performed. Client shall pay undisputed portions of each progress invoice within thirty (30) days of the date of the invoice. If payment is not received within thirty (30) days from the due date of such payment, Consultant may suspend further performance under one or more Work Authorizations until payments are current. Client shall notify URS of any disputed amount within fifteen (15) days from date of the invoice, give reasons for the objection, and promptly pay the undisputed amount. Client shall pay an additional charge of one percent (1%) per month or the maximum percentage allowed by law, whichever is the lesser, for any past due amount. In the event of a legal action for invoice amounts not paid, attorneys' fees, court costs, and other related expenses shall be paid to the prevailing party.

2.2   Client shall reimburse Consultant for all taxes, duties and levies such as Sales, Use, Value Added Taxes, Deemed Profits Taxes, and other similar taxes which are added to or deducted from the value of Consultant's Services. For the purpose of this Article such taxes shall not include taxes imposed on Consultant's net income, and employer or employee payroll taxes levied by any United States taxing authority, or the taxing authorities of the countries or any agency or subdivision thereof in which URS subsidiaries, affiliates, or divisions are permanently domiciled. It is agreed and understood that these net income, employer or employee payroll taxes are included in the unit prices or lump sum to be paid Consultant under the applicable Work Authorization.

2.3   Where charges are "not to exceed" a specified sum, Consultant shall notify Client before such sum is exceeded and shall not continue to provide the Services beyond such sum unless Client authorizes an increase in the sum. If a "not to exceed" sum is broken down into budgets for specific tasks, the task budget may be exceeded without Client authorization as long as the total sum is not exceeded. Changes in conditions, including, without limitation, changes in laws or regulations occurring after the budget is established, or other circumstances beyond URS control, shall be a basis for equitable adjustments in the budget and schedule.

### 3. CONFIDENTIALITY

3.1   For a period commencing with the disclosure of any confidential information under this Agreement and/or a Work Authorization(s) and ending on the second anniversary such disclosure was first made, Consultant and Client each agree not to disclose to third parties, including also subcontractors and vendors (unless such subcontractors and vendors have a need to know and are bound to similar obligations of confidentiality), any information that is identified as confidential in writing on the materials made available to the other Party hereunder

### 4. WARRANTY

4.1   Consultant warrants that any consulting and professional engineering Services performed by it under a Work Authorization shall be performed in accordance with that degree of care and skill ordinarily exercised by members of Consultant's profession practicing at the same time in the same location. Consultant's sole liability to Client for any non-conforming Services shall be to re-perform the non-conforming or defective Services, written notice of which must be promptly given by Client to Consultant. Consultant's obligation for re-performance of non-conforming Services as set

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1



NON-CERTIFIED COPY

# URS

forth in the preceding sentence shall extend for a term commencing at the substantial completion of such Services under a Work Authorization and ending one year later.

4.2   THE WARRANTY SET FORTH IN THIS ARTICLE 4 IS EXCLUSIVE, AND IN LIEU OF ANY AND ALL OTHER WARRANTIES RELATING TO THE SERVICES, WHETHER STATUTORY, EXPRESS OR IMPLIED, AND CONSULTANT DISCLAIMS ANY SUCH OTHER WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY AND ALL WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE AND ANY AND ALL WARRANTIES ARISING FROM COURSE OF DEALING AND/OR USAGE OF TRADE. ANY OTHER STATEMENTS OF FACT OR DESCRIPTIONS EXPRESSED IN THE AGREEMENT OR ANY WORK AUTHORIZATION SHALL NOT BE DEEMED TO CONSTITUTE A WARRANTY OF THE SERVICES OR ANY PART THEREOF. CONSULTANT'S REPERFORMANCE OF DEFECTIVE OR NON-CONFORMING SERVICES THROUGH THE ONE YEAR PERIOD PROVIDED FOR IN THIS ARTICLE 4 SHALL CONSTITUTE COMPLETE FULFILLMENT OF, AND CLIENT'S EXCLUSIVE REMEDY FOR, ALL THE LIABILITIES OR RESPONSIBILITIES OF CONSULTANT TO CLIENT FOR NON-CONFORMING OR DEFECTIVE SERVICES, WHETHER THE CLAIMS OF CLIENT ARE BASED ON DELAY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, WARRANTY, INDEMNITY, ERROR AND OMISSION OR ANY OTHER CAUSE WHATSOEVER.

5.    WORK BY OTHERS

5.1   The performance by Consultant of Services under a Work Authorization shall not constitute an assumption by Consultant of the obligations of Client or its other contractors. Consultant shall not control or have charge of, and shall not be responsible for, construction means, methods, techniques, sequences, procedures of construction, health or safety programs, or precautions connected with the work of Client or its other contractors, and shall not manage, supervise, control or have charge of construction. Client shall require Consultant to be named as an additional insured along with Client on any liability insurance policies provided by Client's construction contractors. To the fullest extent permitted by law, Client shall defend Consultant against any claim, suit or proceeding asserted by one of its other contractors and indemnify, defend and save Consultant harmless from any and all actual or alleged claims and losses (including, without limitation, attorney's fees) sustained by such contractor in connection with the Services, regardless or whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

6.    INSURANCE

6.1   In the event Consultant performs Services under any Work Authorization in connection with a project for which Client or another party with which Client has contracted obtains all-risk or builder's risk property insurance, Client, as the case may be, shall name, or shall cause such other party to name, Consultant as an additional insured on such all risk or builder's risk property insurance. Client acknowledges that Consultant has an insurable interest in such all risk or builder's risk property insurance.

6.2   Consultant and Client each waive all rights of recovery and subrogation against each other with respect to a loss occurring to property of the other, to the extent that such waivers do not invalidate the property insurance of either.

7.    INDEMNITY

7.1   Each Party shall indemnify, defend and save the other Party, its officers, directors, employees and affiliates harmless from any loss, cost or expense claimed by third parties, excluding employees of either Party, for property damage and/or bodily injury, including death, to the proportionate extent such loss, cost or expense arises from the negligence or willful misconduct of the indemnifying Party, its employees or affiliates in connection with the Services.

7.2   Notwithstanding any other provision contained elsewhere in this Agreement to the contrary and to the fullest extent permitted by law, Client shall be liable for and indemnify, defend and save Consultant, its officers, directors, employees and affiliates harmless from and against any and all actual or alleged claims, damages (including incidental, consequential, indirect and special damages), losses, and expenses (including, without limitation, all penalties, attorney's fees, fines and administrative or civil sanctions arising out of or related to such claim) (collectively "Losses") arising out of: (1) economic loss suffered by third parties; and/or (2) investment decisions of Client or third parties in reliance upon the results of the Services, regardless of whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

7.3   The indemnity and save harmless obligations of Consultant and Client under this Article 7 shall not apply with respect to any Hazardous Material, as Consultant's and Client's rights and obligations with respect thereto are set forth in Article 10.

8.    WAIVER OF CONSEQUENTIAL DAMAGES

8.1   Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, neither Client nor Consultant shall be liable, whether based on contract, tort, negligence, strict liability, warranty, indemnity, error and omission or any other cause whatsoever, for any consequential, special, incidental, indirect, punitive or exemplary damages, or damages arising from or in connection with loss of power, loss of use, loss of revenue or profit (actual or anticipated), loss by reason of shutdown or non-operation, increased cost of construction, cost of capital, cost of replacement power or customer claims, and Consultant hereby releases Client and Client hereby releases Consultant from any such liability.

9.    LIMITATION OF LIABILITY

9.1   Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, in no

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

NON-CERTIFIED COPY

# URS

event shall the total cumulative aggregate liability of Consultant, its subconsultants, and their respective partners, officers, directors, shareholders, employees, and agents (referred to collectively in this Article as "Consultant") to Client resulting from, arising out of or in connection with the performance or nonperformance of any or all Services or other obligations under a Work Authorization, exceed $250,000 or ten percent (10%) of the compensation paid Consultant pursuant to such Work Authorization, whichever is greater, or extend beyond the expiration of the warranty period under Article 4 for the Services performed under the Work Authorization, regardless of the legal theory under which such liability is imposed. The remedies stated in the Agreement are Client's sole and exclusive remedies for any failure by Consultant to comply with obligations to Client, and Client hereby irrevocably waives any right to assert a claim against Consultant based on a legal theory that a remedy provided herein fails of its essential purpose.

10.    HAZARDOUS MATERIAL

10.1    Nothing in this Agreement shall be construed or interpreted as requiring Consultant to assume the status of, and Client acknowledges that Consultant does not act in the capacity nor assume the status of, Client or others as a "generator," "operator," "transporter," or "arranger" in the treatment, storage, disposal, or transportation of any hazardous substance or waste as those terms are understood within the meaning of the Resource Conservation and Recovery Act (RCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), or any other similar federal, state, or local law, regulation, or ordinance. Client acknowledges further that Consultant has played no part in and assumes no responsibility for generation or creation of any hazardous waste, pollution condition, nuisance, or chemical or industrial disposal problem, if any, which may exist at any site that may be the subject matter of any Work Authorization.

10.2    It is acknowledged by both parties that the Services do not include services related to regulated substances, pollutants, or hazardous or toxic wastes ("Hazardous Material"). In the event Consultant or any other party encounters undisclosed Hazardous Materials, Consultant shall notify Client and, to the extent required by law or regulation, the appropriate governmental officials, and Consultant may, at its option and without liability for delay, consequential or any other damages to Client, suspend performance of Services on that portion of the project affected by Hazardous Material until Client: (i) retains appropriate specialist consultant(s) or contractor(s) to identify and, as appropriate, abate, remediate, or remove the Hazardous material; and (ii) warrants that the project site is in full compliance with all applicable laws and regulations. Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, Client shall indemnify, defend and save Consultant and its affiliates, subconsultants, agents, and suppliers of any tier, and any and all employees, officers, directors of any of the foregoing, if any, from and against any and all Losses which arise out of the performance of the Services and relating to the regulation and/or protection of the environment, including, without limitation, Losses incurred in connection with characterization, handling, transportation, storage, removal, remediation, disturbance or disposal of Hazardous Material, whether above or below ground and not brought to a Client site or other proposed project site by Consultant in the performance of the Services without Client's approval.

11.    CHANGES

11.1    The Parties may from time to time by mutual agreement seek to modify, extend or enlarge the Services under a Work Authorization ("Modification"). In the event the Parties agree to a Modification to add additional Services, or to make other modifications to the Services, Consultant's compensation, the schedule and any other relevant terms and conditions of the applicable Work Authorization shall be equitably adjusted prior to performance of such Services.

12.    OWNERSHIP OF DOCUMENTS

12.1    Consultant grants to Client a transferable, irrevocable and perpetual royalty-free license to retain and use all work products delivered to Client for any purpose in connection with the project specified in each Work Authorization, upon full payment for Client for Consultant's Services. Client also may use such work product for other purposes with Consultant's written consent. Re-use of any such work product by Client on any extension of the project or on any other project without the written authorization of Consultant shall be at Client's sole risk and Client shall indemnify, defend and save Consultant and its affiliates, consultants, agents, subcontractors and suppliers of any tier, and any and all employees, officers and directors of any of the foregoing, if any, from and against any and all Losses suffered as a result of, or arising out of, or in connection with such re-use. Consultant shall have the right to retain copies of all such work product. Consultant retains the right of ownership with respect to any patentable concepts or copyrightable materials arising from its Services.

13.    TERMINATION/SUSPENSION

13.1    Client may terminate all or any portion of the Services under one or more Work Authorizations for convenience, at its option, by sending a written notice to Consultant. Either party can terminate this Agreement or a Work Authorization for cause if the other commits a material, uncured breach of this Agreement or becomes insolvent. Termination for cause shall be effective twenty (20) days after receipt of a notice of termination, unless a later date is specified in the notice. The notice of termination for cause shall contain specific reasons for termination and both parties shall cooperate in good faith to cure the causes for termination stated in the notice. Termination shall not be effective if reasonable action to cure the breach has been taken before the effective date of the termination. Client shall pay Consultant upon invoice for Services performed and charges incurred prior to termination, plus reasonable termination charges. Any suspension of Services by Client shall result in an equitable adjustment to Consultant's compensation, time for performance, or any of its other obligations under a Work Authorization.

14.    FORCE MAJEURE

14.1    Any delay or failure of Consultant in performing its required obligations hereunder shall be excused if and to the extent such delay or failure is caused by a Force Majeure Event. A "Force Majeure Event" means an event due to any cause or causes beyond the reasonable control of Consultant and shall include, but not be limited to, acts of God, strike, labor dispute fire, storm, flood, windstorm, unusually severe weather, sabotage, embargo,

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

3

NON-CERTIFIED COPY

# URS

terrorism, energy shortage, accidents or delay in transportation, accidents in the handling and rigging of heavy equipment, explosion, riot, war, court injunction or order, delays by acts or orders of any governmental body or changes in laws or government regulations or the interpretations or application thereof or the acts or omissions of the Client or its other contractors, vendors or suppliers. In the event of a Force Majeure Event, Consultant shall receive an equitable adjustment extending Consultant's time for performance for such Services sufficient to overcome the effects of any delay, and an increase(s) to Consultant's compensation sufficient to account for any increased cost in performance or loss or damage suffered by Consultant.

15.     RESPONSIBILITIES OF CLIENT

15.1     Without limiting any express or implied obligations of Client under applicable law, Client shall: (1) provide Consultant, in writing, all information relating to Client's requirements for the project; (2) correctly identify to Consultant the location of subsurface structures, such as pipes, tanks, cables, and utilities; (3) notify Consultant of any potential hazardous substances or other health and safety hazard or condition known to Client existing on or near the project site; (4) give Consultant prompt written notice of any suspected deficiency in the Services; (5) with reasonable promptness, provide required approvals and decisions; and (6) furnish or cause to be furnished Consultant full, unrestricted and legal access to, and use of, the site and all necessary rights of way and easements, in order to perform the Services.  In the event Consultant is requested by Client or is required by subpoena to produce documents or give testimony in any action or proceeding to which Client is a party and Consultant is not a party, Client shall pay Consultant for any time and expenses required in connection therewith, including reasonable attorney's fees.

15.2     Consultant may rely upon and use in the performance of any Services information supplied to it by Client without independent verification and Consultant shall not be responsible for defects in its Services attributable to its reliance upon or use of such information.

17.     TERM

17.1     Unless otherwise specified, the term of this Agreement shall run from the Effective Date until Consultant has completed the Services and received all payments due under the Agreement.

18.     GENERAL

18.1     Client and Consultant each represent and warrant that this Agreement has been duly authorized, executed and delivered and constitutes its binding agreement enforceable against it.  This Agreement and any executed Work Authorizations supersede all prior written and/or oral contracts and agreements that may have been made or entered into between Client and Consultant regarding the subject matter hereof, including but not limited to any and all proposals, oral or written, and all communications between the Parties relating to this Agreement or any Work Authorization(s), and constitute the entire agreement between the Parties hereto with respect to the subject matter hereof.

18.2     This Agreement and Work Authorization(s) may not be assigned by Consultant or Client in any way, including by operation of law, unless otherwise mutually agreed to in writing, any such attempted non-authorized assignment shall be null and void and of no force or effect.

18.3     Any cost opinions or estimates provided by Consultant will be on a basis of experience and judgment, but since Consultant has no control over market conditions or bidding procedures, Consultant cannot and does not warrant that bids, ultimate construction cost, or project economics will not vary from such opinions or estimates.  Neither this Agreement nor any of the Services provided hereunder shall constitute or provide for, and Consultant shall not be considered to have rendered, any legal or financial opinion(s) regarding the feasibility of this project or any other or regarding any other matter.  Unless otherwise expressly included in a Work Authorization, Consultant shall under no circumstances provide as part of the Services a consent, opinion or similar document, or act as a qualified person or expert, in connection with any filing by Client with the United States Securities and Exchange Commission, or similar non-United States agency, authority or commission.

18.4     Notices shall be effective hereunder as follows only if in writing and addressed to the authorized representative designated in applicable Work Authorizations: (1) upon delivery, if delivered personally to the person; (2) upon transmission, if transmitted to the facsimile number of the person; and (3) upon posting, if by first class or overnight mail (postage prepaid).

18.5     All contract issues and matters of law will be adjudicated in accordance with the laws of the state where the project is located, excluding any provisions or principles thereof which would require the application of the laws of a different jurisdiction; provided, however that if the project is located outside the United States, the laws of the State of California shall govern. Venue for any litigation shall be any state court or United States District Court having jurisdiction over the parties and subject matter.

18.6     The terms and conditions of this Agreement shall prevail, notwithstanding any variance with any purchase order or other written instrument submitted by Client whether formally rejected by Consultant or not.  This Agreement may be modified only by amendment when signed by each Party. In the event that any one or more of the provisions of this Agreement shall be found to be illegal or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect, and such term or provision shall be deemed stricken to the extent and in the jurisdictions necessary for compliance with applicable law.

18.7     Nothing in this Agreement shall be construed to give any rights or benefits to anyone other than the Client or Consultant.

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

4

NON-CERTIFIED COPY



**URS**

18.8    The headings in this Agreement are for convenience only, and shall not affect the interpretation hereof. The terms "hereof", "herein," "hereto" and similar words refer to the entire Agreement and not to any particular Article, Section, Attachment, Exhibit or any other subdivision of this Agreement. References to "day" or "days" shall mean calendar days unless specified otherwise.

18.9    The provisions of this Agreement which by their nature are intended to survive the termination, cancellation, completion, or expiration of the Agreement, including, but not limited to, indemnities and any expressed limitations of or releases from liability, shall continue as valid and enforceable obligations of the parties notwithstanding any such termination, cancellation, completion, or expiration.

18.10    It is understood and agreed that any delay, waiver or omission by Consultant or Client to exercise any right or power arising from any breach or default by Client or Consultant in any of the terms, provisions or covenants of this Agreement or any Work Authorization shall not be construed to be a waiver by Consultant or Client of any subsequent breach or default of the same or other terms, provisions or covenants on the part of Consultant or Client.

19.    ATTACHMENTS AND EXHIBITS

The following attachments and exhibits, which are attached hereto, are part of this Agreement.

Attachment 1 – Work Authorization

Attachment 2 – Fee Proposal, Scope of Work, Schedule

Attachment 3 – URS 2009 Schedule of Fees and Charges

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, effective as of the day and year first above mentioned.

H&E Equipment Services, Inc.

By: _____
        (Signature)

Name: _Lemer_ St. Germein_____
        (Printed)

Title: _V.P. Operation_____

URS Corporation Architecture PC

By: _Craig N. Gordon_____
        (Signature)

Name: _Craig W. Gordon_____
        (Printed)

Title: _VP/OM_____

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100 Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

5

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*   *   *   *   *   *   *   *   *
                        *
H&E EQUIPMENT SERVICES  *
                        * NUMBER 626,308
VERSUS                  *
                        * DIVISION "D"
URS CORPORATION         *
ARCHITECTURE, P.C., URS *
CORPORATION, L O'NEAL   *
JOHNSON AND THOMAS E.   *
RYAN, III               *
                        *
*   *   *   *   *   *   *   *   *
```

Deposition of FRANKIE WAYNE WYNN,

taken on Tuesday, August 9, 2016, commencing at

10:02 a.m., in the offices of Adams and Reese,

LLP, Attorneys at Law, 4500 One Shell Square,

New Orleans, Louisiana, 70139.



EXHIBIT

C

NON-CERTIFIED COPY

Page 21

1      A.  Until June of 2005.

2      Q.  And then what happened?

3      A.  My position was eliminated, and I went

4  work for H&E Equipment Services.

5      Q.  And it was H&E at that time, not Head &

6  Engquist, correct?

7      A.  Correct.

8      Q.  And who hired you at H&E?

9      A.  Johnny Jones.

10      Q.  And what position were you hired in?

11      A.  Risk manager.

12      Q.  What were your duties as risk manager?

13      A.  My duties in the beginning was to

14  reorganize and better establish the credit

15  department -- I'm sorry -- the safety department

16  for H&E.

17      Q.  How long did you occupy that position,

18  or better stated, what was your next position,

19  if any?

20      A.  I was -- my title was changed to

21  Director of Facilities, Compliance and Risk

22  Management.

23      Q.  Director of Facilities, Compliance and

24  Risk Management?

25      A.  Yes, sir.

NON-CERTIFIED COPY

Page 22

1    Q.  And the risk management part stayed the

2    same, I assume?

3    A.  Yes, sir.

4    Q.  What was compliance?  What was the

5    difference or the addition of compliance?

6    A.  I was the director of the DOT compliance

7    division of the Company, handling titling and

8    transferring of equipment, purchasing -- not

9    equipment -- titled vehicles, which did include

10   some equipment, purchased haul trucks, service

11   trucks, pickup trucks, trailers.

12   Q.  But not the heavy equipment?

13   A.  No, sir.

14   Q.  And what did the position of director of

15   facilities include?

16   A.  My duties included maintaining and

17   reviewing the leases for the entire Company, the

18   other branch locations across the country,

19   negotiating leases, determining if there was a

20   need for an upgrade for a facility, along with

21   others in the Company.

22   Q.  What about the day-to-day operation of

23   the facilities, were you involved in any of that

24   as Director of Facilities?

25   A.  Well, here, again, the leases, because

NON-CERTIFIED COPY

Page 23

1    we had so many leases, it was pretty much a

2    daily process of reviewing the leases.

3            We had several critical dates for every

4    location, two years out, one year out, six

5    months out.

6            Determining if we were going to stay on

7    a location, upgrade the location, move to

8    another location.  So, it was -- it was a daily

9    job.

10    Q.  Was director of facilities a new

11    position created at the Company, or did somebody

12    else occupy that position prior to you?

13    A.  Someone else had those duties.

14    Q.  And who was that?

15    A.  Leonard St. Germain.

16    Q.  And then you assumed that role?

17    A.  Yes, sir.

18    Q.  Oh, okay.  When did you become director

19    of facilities?  Did I ask you that?  I don't

20    think I did.

21    A.  I believe that was in 2009.

22    Q.  Do you recall the month?

23    A.  No, sir, I don't.

24    Q.  So between 2005 ans 2009, Mr. St.

25    Germain was assuming the duties of director of

NON-CERTIFIED COPY

Page 34

1      Q.  And who did you report to at the time?

2  Was it Mr. St. Germain again?

3      A.  I think I was reporting to Johnny Jones

4  at that time.

5      Q.  Mr. St. Germaine's position changed

6  because somebody in the Company retired, as I

7  understand; it that correct?

8      A.  I think that is correct.

9      Q.  I'm going to show you documents as we go

10  along, and we will identify these as Wynn

11  Exhibit No., even though I say Exhibit 1 or 2,

12  5, whatever.

13          MR. FRANCO:

14              Do Wynn exhibits, as we did the

15  other day.

16  EXAMINATION BY MR. FRANCO:

17      Q.  Mr. Wynn, the first document I'm going

18  to show you, which I have labeled as Exhibit 1,

19  is H&E 5236, and this appears to be at the top

20  an Email from you to Leonard St. Germain dated

21  August 21, 2009.

22          Do you see that?

23      A.  Yes, sir.

24      Q.  Mr. St. Germain had sent you prior to

25  this Email the attached Short Form Master

NON-CERTIFIED COPY

Page 35

1   Agreement for Professional Services, correct?

2       A.  Yes, sir.

3       Q.  And you reviewed that document and you

4   had comments about that document, correct?

5       A.  Correct.

6       Q.  Had you seen the 2006 Master Agreement

7   with URS prior to this time?

8       A.  No.

9       Q.  And so you say, "Since I haven't seen an

10  agreement such as this before, these may be

11  standard terms in the industry but I have listed

12  my concerns."

13          And you go on and list concerns, one of

14  which, if you turn the page to the second page,

15  you are talking about Paragraph 9 entitled

16  "Limitation of Liability," and, more

17  specifically, Paragraph 9.1, correct?

18      A.  Correct.

19      Q.  And you say, "Are you okay with the

20  $250,000 liability limitation?"  Correct?

21      A.  Correct.

22      Q.  Did you get a response from

23  Mr. St. Germain to your concerns?

24      A.  No.

25      Q.  Not verbally or in writing?

NON-CERTIFIED COPY

Page 36

1    A.  No, sir.

2    Q.  You just provided those, and he took it

3  from there?

4    A.  Yes, sir.

5    Q.  Are you aware he then executed this

6  agreement?

7    A.  Yes, sir.

8    Q.  Did you have any concerns when you

9  looked at this agreement with Paragraph 4?  Can

10  you turn to Paragraph 4?

11    A.  (Witness complying.)

12      On Page 1?

13    Q.  Yes, sir.

14    A.  If it was not listed in my Email, I

15  apparently had no concern.

16    Q.  Let me snow you the next document, which

17  I've already marked Exhibit 2.  I just wanted to

18  show you, sir, that that document that was sent

19  to you was, in fact, executed by Mr. St.

20  Germain.

21      Do you see that signature page?

22    A.  Yes, sir.  Page 5?

23    Q.  Yes.

24    A.  Yes.

25    Q.  Were you ever sent a copy of that

NON-CERTIFIED COPY

Page 47

1          MR. FRANCO:

2               Hold on a second.  Give me one

3     second, sir.

4          (Off the Record.)

5     EXAMINATION BY MR. FRANCO:

6          Q.  The next document I'm going to label as

7     Exhibit 7 begins at this point with URS 31072.

8     And I'm going to go through them one by one with

9     you.

10              The first document is listed as Time and

11    Materials Work 12-10, and this is for

12    "Relocation of Crane Reman Facility - Phase I."

13              Is that your signature?

14         A.  Yes, sir.

15         Q.  All right.  And, again, you would have

16    sent this document to Johnny Jones before you

17    signed it?

18         A.  Correct.

19         Q.  Turn to the other parts of attachments

20    to that document.  Turn to 31076 at the bottom.

21         A.  (Witness complying.)

22         Q.  That is Lump Sum Authorization No.

23    11-12.  That is "Relocation of Crane Reman

24    Facility - Phase II."

25              Do you see that?

NON-CERTIFIED COPY

Page 48

1    A.  Yes, sir.

2    Q.  That is Belle Chasse, and is that your

3    signature at the bottom?

4    A.  Yes, sir.

5    Q.  Again, you would have sent this to Mr.

6    Jones before you signed it?

7    A.  Correct.

8    Q.  Let's go keep turning to get to Bates

9    stamp 31081.

10    A.  (Witness complying.)

11    Q.  That should be "Time and Materials Work

12    Authorization 09-100," and that is for the

13    Kenner location.

14        Do you see that?

15    A.  Yes, sir.

16    Q.  And that is signed by whom?

17    A.  Appears to be Leonard St. Germain, as a

18    representative for H&E.

19    Q.  And this one is dated August 31, 2009.

20    My question is even simpler.

21        Why did Mr. St. Germain sign this, as

22    opposed to you?  Datewise it makes a difference?

23    Is that the issue?

24    A.  Yes.  I do not believe the transition of

25    duties had taken place.

NON-CERTIFIED COPY

Page 49

1    Q.  Yet?

2    A.  On 8/31/09.

3    Q.  And I'm sorry to have to ask you again,

4    but I'm still trying to catch up with the

5    duties.  Okay?

6        What were your duties in August of '09?

7    It didn't include director of facilities, is

8    that correct?

9    A.  Correct.

10       MR. FRANCO:

11          Off the Record.

12       (Off the Record.)

13   EXAMINATION BY MR. FRANCO:

14   Q.  I think there is another one.  Turn to

15   31085, and that is "Work Authorization 10-10."

16   And that is also for Kenner, correct?

17   A.  Correct.

18   Q.  And this time you signed it, am I

19   correct?

20   A.  Correct.

21   Q.  And that is after you sent that to

22   Mr. Jones for his review?

23   A.  That was my policy and procedure back

24   then, yes, sir.

25   Q.  And, now, the ones that you have signed,

NON-CERTIFIED COPY

Page 50

1    as far as you were concerned, you were

2    authorized by H&E to sign these documents?

3        A.  Correct.

4        Q.  I'll skip to the next one.

5            Mr. Wynn, you were aware that with

6    respect to the Kenner project -- and when I talk

7    about the projects, I'm obviously talking about

8    the projects with URS -- the changes that were

9    being made to the Kenner facility required

10   obtaining approval from the City of Kenner

11   Department of Planning?

12       A.  I think I was probably made aware of

13   that, yes, sir.

14       Q.  Well, actually, let me just go ahead and

15   show you the exhibit.  I'm going to show you

16   Exhibit 8.

17           Look at the bottom Email from Thomas

18   Ryan to you.  "As we discussed on the phone..."

19   -- this is in reference to the subject "Kenner

20   Planning Approval" -- it says "...the changes we

21   are making to the Kenner facility will require

22   obtaining approval from the City of Kenner

23   Department of Planning."

24           Do you see that?

25       A.  Yes.

NON-CERTIFIED COPY

**From:**            Frankie Wynn
**Sent:**            Friday, August 21, 2009 12:32 PM
**To:**              Leonard StGermain
**Subject:**       FW: URS Short Form Master Agreement For Professional Services Renovations and
                       Additions to Kenner LA Branch
**Attachments:**    URS Short Form Master Agreement For Professional Services Renovations and Additions to
                       Kenner LA Branch.pdf

**Tracking:**          **Recipient**                            **Delivery**

                      Leonard StGermain                     Delivered: 8/21/2009 12:33 PM

Since I haven't seen an agreement such as this before, these may be standard terms in the industry, but I have listed my concerns.

Are you Ok with the Sales, Use, Value Added Taxes, Deemed Profits Taxes, and other similar taxes....?

2.7     Client shall reimburse Consultant for all taxes, duties and levies such as Sales, Use, Value Added Taxes, Deemed Profits Taxes, and other similar taxes which are added to or deducted from the value of Consultant's Services. For the purpose of this Article such taxes shall not include taxes imposed on Consultant's net income, and employer or employee payroll taxes levied by any United States taxing authority, or the taxing authorities of the countries or any agency or subdivision thereof in which URS subsidiaries, affiliates, or divisions are permanently domiciled. It is agreed and understood that these net income, employer or employee payroll taxes are included in the unit prices or lump sum to be paid Consultant under the applicable Work Authorization.

Why should H&E be required to name Consultant as an additional insured?

5.     **WORK BY OTHERS**

5.1     The performance by Consultant of Services under a Work Authorization shall not constitute an assumption by Consultant of the obligations of Client or its other contractors. Consultant shall not control or have charge of, and shall not be responsible for, construction means, methods, techniques, sequences, procedures of construction, health or safety programs, or precautions connected with the work of Client or its other contractors, and shall not manage, supervise, control or have charge of construction. Client shall require Consultant to be named as an additional insured along with Client on any liability insurance policies provided by Client's construction contractors. To the fullest extent permitted by law, Client shall defend Consultant against any claim, suit or proceeding asserted by one of its other contractors and indemnify, defend and save Consultant harmless from any and all actual or alleged claims and losses (including, without limitation, attorney's fees) sustained by such contractor in connection with the Services, regardless or whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

Why should H&E be required to name Consultant as an additional insured?

6.     **INSURANCE**

6.1     In the event Consultant performs Services under any Work Authorization in connection with a project for which Client or another party will which Client has contracted obtains all-risk or builder's risk property insurance, Client, as the case may be, shall name, or shall cause such other party to name, Consultant as an additional insured on such all risk or builder's risk property insurance. Client acknowledges that Consultant has a insurable interest in such all risk or builder's risk property insurance.

6.2     Consultant and Client each waive all rights of recovery and subrogation against each other with respect to a loss occurring to property of it other, to the extent that such waivers do not invalidate the property insurance of either.

Don't like the part that says.....regardless of whether or not the foregoing arose out of the negligent acts or omissions of the Consultant.





H&E 0005236

NON-CERTIFIED COPY

**7.    INDEMNITY**

7.1    Each Party shall indemnify, defend and save the other Party, its officers, directors, employees and affiliates harmless from any loss, cost or expense claimed by third parties, excluding employers of either Party, for property damage and/or bodily injury, including death, to the proportionate extent such loss, cost or expense arises from the negligence or willful misconduct of the indemnifying Party, its employees or affiliates in connection with the Services.

7.2    Notwithstanding any other provision contained elsewhere in this Agreement to the contrary and to the fullest extent permitted by law, Client shall be liable for and indemnify, defend and save Consultant, its officers, directors, employees and affiliates harmless from and against any and all actual or alleged claims, damages (including incidental, consequential, indirect and special damages), losses, and expenses (including, without limitation, all penalties, attorney's fees, fines and administrative or civil sanctions arising out of or related to such claims) (collectively "Losses") arising out of: (1) economic loss suffered by third parties; and/or (2) investment decisions of Client or third parties in reliance upon the results of the Services, regardless of whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

7.3    The indemnity and save harmless obligations of Consultant and Client under this Article 7 shall not apply with respect to any Hazardous Material, as Consultant's and Client's rights and obligations with respect thereto are set forth in Article 10.

Are you Ok with the $250,000 liability limitation?

**9.    LIMITATION OF LIABILITY**

9.1    Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, in no event shall the total cumulative aggregate liability of Consultant, its subconsultants, and their respective partners, officers, directors, shareholders, employees, and agents (referred to collectively in this Article as "Consultant") to Client resulting from, arising out of or in connection with the performance or nonperformance of any or all Services or other obligations under a Work Authorization, exceed $250,000 or ten percent (10%) of the compensation paid Consultant pursuant to such Work Authorization, whichever is greater, or extend beyond the expiration of the warranty period under Article 4 for the Services performed under the Work Authorization, regardless of the legal theory under which such liability is imposed. The remedies stated in the Agreement are Client's sole and exclusive remedies for any failure by Consultant to comply with obligations to Client, and Client hereby irrevocably waives any right to assert a claim against Consultant based on a legal theory that a remedy provided herein fails of its essential purpose.

Termination for convenience should be mutual for H&E.

**13.    TERMINATION/SUSPENSION**

13.1    Client may terminate all or any portion of the Services under one or more Work Authorizations for convenience, at its option, by sending a written notice to Consultant. Either party can terminate this Agreement or a Work Authorization for cause if the other commits a material, uncured breach of this Agreement or becomes insolvent. Termination for cause shall be effective twenty (20) days after receipt of a notice of termination, unless a later date is specified in the notice. The notice of termination for cause shall contain specific reasons for termination and both parties shall cooperate in good faith to cure the causes for termination stated in the notice. Termination shall not be effective if reasonable action to cure the breach has been taken before the effective date of the termination. Client shall pay Consultant upon invoice for Services performed and charges incurred prior to termination, plus reasonable termination charges. Any suspension of Services by Client shall result in an equitable adjustment to Consultant's compensation, time for performance, or any of its other obligations under a Work Authorization.

Frankie Wynn
Risk Manager
H&E Equipment Services, Inc.
11100 Mead Road, Ste. 200
Baton Rouge, LA 70816
Office: 225-298-5229
Mobil: 225-603-4438
Fax: 225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com



2

H&E 0005237

NON-CERTIFIED COPY



# URS

## SHORT FORM MASTER AGREEMENT FOR PROFESSIONAL SERVICES
## BETWEEN
## H&E Equipment Services, Inc.
## AND
## URS Corporation Architecture PC

**THIS AGREEMENT** ("Agreement") for Professional Services, (together with the attachments hereto) dated and effective as of August 13, 2009 (the "Effective Date"), is hereby made and entered into by and between H&E Equipment Services, Inc., a Delaware corporation, (hereinafter "Client") having a place of business located at 11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816 and URS Corporation Architecture PC, a North Carolina corporation (hereinafter "Consultant") having a place of business located at 7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806 Consultant and Client are each individually referred to as a "Party" and collectively as the "Parties".

The Parties agree as follows:

## 1.    WORK AUTHORIZATIONS

1.1    Consultant agrees to undertake and perform certain consulting and professional engineering services ("Services") in accordance with the terms and conditions contained herein, as may be requested by Client from time to time.  The Services to be performed, Consultant's compensation, and the schedule for performance for each task shall be described in one or more authorizations issued to Consultant by Client, the form of which is attached hereto as Attachment 1 ("Work Authorization").  A Work Authorization shall be valid and binding upon the Parties only if accepted in writing by Client and Consultant.  Each duly executed Work Authorization shall be subject to the terms and conditions of this Agreement, except to the extent expressly modified by the Work Authorization.

1.2    It is the expressed intent of the parties that this Agreement shall be made available to subsidiaries and affiliated companies of Consultant.  For the purposes of this Agreement, as it applies to each Work Authorization, the term "Consultant" shall mean either Consultant as defined above or the subsidiary or affiliate of Consultant identified in the Work Authorization.  The applicable Work Authorization shall clearly identify the legal name of the entity accepting the Work Authorization.

## 2.    PAYMENTS FOR SERVICES

2.1    Unless otherwise stated in a Work Authorization, payment shall be on a time and materials basis under the Schedule of Fees and Charges in effect when the Services are performed.  Client shall pay undisputed portions of each progress invoice within thirty (30) days of the date of the invoice.  If payment is not received within thirty (30) days from the due date of such payment, Consultant may suspend further performance under one or more Work Authorizations until payments are current.  Client shall notify URS of any disputed amount within fifteen (15) days from date of the invoice, give reasons for the objection, and promptly pay the undisputed amount.  Client shall pay an additional charge of one percent (1%) per month or the maximum percentage allowed by law, whichever is the lesser, for any past due amount.  In the event of a legal action for invoice amounts not paid, attorneys' fees, court costs, and other related expenses shall be paid to the prevailing party.

2.2    Client shall reimburse Consultant for all taxes, duties and levies such as Sales, Use, Value Added Taxes, Deemed Profits Taxes, and other similar taxes which are added to or deducted from the value of Consultant's Services.  For the purpose of this Article such taxes shall not include taxes imposed on Consultant's net income, and employer or employee payroll taxes levied by any United States taxing authority, or the taxing authorities of the countries or any agency or subdivision thereof in which URS subsidiaries, affiliates, or divisions are permanently domiciled.  It is agreed and understood that these net income, employer or employee payroll taxes are included in the unit prices or lump sum to be paid Consultant under the applicable Work Authorization.

2.3    Where charges are "not to exceed" a specified sum, Consultant shall notify Client before such sum is exceeded and shall not continue to provide the Services beyond such sum unless Client authorizes an increase in the sum.  If a "not to exceed" sum is broken down into budgets for specific tasks, the task budget may be exceeded without Client authorization as long as the total sum is not exceeded.  Changes in conditions, including, without limitation, changes in laws or regulations occurring after the budget is established, or other circumstances beyond URS control, shall be a basis for equitable adjustments in the budget and schedule.

## 3.    CONFIDENTIALITY

3.1    For a period commencing with the disclosure of any confidential information under this Agreement and/or a Work Authorization(s) and ending on the second anniversary such disclosure was first made, Consultant and Client each agree not to disclose to third parties, including also subcontractors and vendors (unless such subcontractors and vendors have a need to know and are bound to similar obligations of confidentiality), any information that is identified as confidential in writing on the materials made available to the other Party hereunder

## 4.    WARRANTY

4.1    Consultant warrants that any consulting and professional engineering Services performed by it under a Work Authorization shall be performed in accordance with that degree of care and skill ordinarily exercised by members of Consultant's profession practicing at the same time in the same location.  Consultant's sole liability to Client for any non-conforming Services shall be to re-perform the non-conforming or defective Services, written notice of which must be promptly given by Client to Consultant.  Consultant's obligation for re-performance of non-conforming Services as set

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1

H&E 0005238

NON-CERTIFIED COPY



**URS**

forth in the preceding sentence shall extend for a term commencing at the substantial completion of such Services under a Work Authorization and ending one year later.

4.2    THE WARRANTY SET FORTH IN THIS ARTICLE 4 IS EXCLUSIVE, AND IN LIEU OF ANY AND ALL OTHER WARRANTIES RELATING TO THE SERVICES, WHETHER STATUTORY, EXPRESS OR IMPLIED, AND CONSULTANT DISCLAIMS ANY SUCH OTHER WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY AND ALL WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE AND ANY AND ALL WARRANTIES ARISING FROM COURSE OF DEALING AND/OR USAGE OF TRADE. ANY OTHER STATEMENTS OF FACT OR DESCRIPTIONS EXPRESSED IN THE AGREEMENT OR ANY WORK AUTHORIZATION SHALL NOT BE DEEMED TO CONSTITUTE A WARRANTY OF THE SERVICES OR ANY PART THEREOF. CONSULTANT'S REPERFORMANCE OF DEFECTIVE OR NON-CONFORMING SERVICES THROUGH THE ONE YEAR PERIOD PROVIDED FOR IN THIS ARTICLE 4 SHALL CONSTITUTE COMPLETE FULFILLMENT OF, AND CLIENT'S EXCLUSIVE REMEDY FOR, ALL THE LIABILITIES OR RESPONSIBILITIES OF CONSULTANT TO CLIENT FOR NON-CONFORMING OR DEFECTIVE SERVICES, WHETHER THE CLAIMS OF CLIENT ARE BASED ON DELAY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, WARRANTY, INDEMNITY, ERROR AND OMISSION OR ANY OTHER CAUSE WHATSOEVER.

5.    **WORK BY OTHERS**

5.1    The performance by Consultant of Services under a Work Authorization shall not constitute an assumption by Consultant of the obligations of Client or its other contractors. Consultant shall not control or have charge of, and shall not be responsible for, construction means, methods, techniques, sequences, procedures of construction, health or safety programs, or precautions connected with the work of Client or its other contractors, and shall not manage, supervise, control or have charge of construction. Client shall require Consultant to be named as an additional insured along with Client on any liability insurance policies provided by Client's construction contractors. To the fullest extent permitted by law, Client shall defend Consultant against any claim, suit or proceeding asserted by one of its other contractors and indemnify, defend and save Consultant harmless from any and all actual or alleged claims and losses (including, without limitation, attorney's fees) sustained by such contractor in connection with the Services, regardless or whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

6.    **INSURANCE**

6.1    In the event Consultant performs Services under any Work Authorization in connection with a project for which Client or another party with which Client has contracted obtains all-risk or builder's risk property insurance, Client, as the case may be, shall name, or shall cause such other party to name, Consultant as an additional insured on such all risk or builder's risk property insurance. Client acknowledges that Consultant has an insurable interest in such all risk or builder's risk property insurance.

6.2    Consultant and Client each waive all rights of recovery and subrogation against each other with respect to a loss occurring to property of the other, to the extent that such waivers do not invalidate the property insurance of either.

7.    **INDEMNITY**

7.1    Each Party shall indemnify, defend and save the other Party, its officers, directors, employees and affiliates harmless from any loss, cost or expense claimed by third parties, excluding employees of either Party, for property damage and/or bodily injury, including death, to the proportionate extent such loss, cost or expense arises from the negligence or willful misconduct of the indemnifying Party, its employees or affiliates in connection with the Services.

7.2    Notwithstanding any other provision contained elsewhere in this Agreement to the contrary and to the fullest extent permitted by law, Client shall be liable for and indemnify, defend and save Consultant, its officers, directors, employees and affiliates harmless from and against any and all actual or alleged claims, damages (including incidental, consequential, indirect and special damages), losses, and expenses (including, without limitation, all penalties, attorney's fees, fines and administrative or civil sanctions arising out of or related to such claim) (collectively "Losses") arising out of; (1) economic loss suffered by third parties; and/or (2) investment decisions of Client or third parties in reliance upon the results of the Services, regardless of whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

7.3    The indemnity and save harmless obligations of Consultant and Client under this Article 7 shall not apply with respect to any Hazardous Material, as Consultant's and Client's rights and obligations with respect thereto are set forth in Article 10.

8.    **WAIVER OF CONSEQUENTIAL DAMAGES**

8.1    Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, neither Client nor Consultant shall be liable, whether based on contract, tort, negligence, strict liability, warranty, indemnity, error and omission or any other cause whatsoever, for any consequential, special, incidental, indirect, punitive or exemplary damages, or damages arising from or in connection with loss of power, loss of use, loss of revenue or profit (actual or anticipated), loss by reason of shutdown or non-operation, increased cost of construction, cost of capital, cost of replacement power or customer claims, and Consultant hereby releases Client and Client hereby releases Consultant from any such liability.

9.    **LIMITATION OF LIABILITY**

9.1    Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, in no

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100 Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

2

H&E 0005239

NON-CERTIFIED COPY



# URS

event shall the total cumulative aggregate liability of Consultant, its subconsultants, and their respective partners, officers, directors, shareholders, employees, and agents (referred to collectively in this Article as "Consultant") to Client resulting from, arising out of or in connection with the performance or nonperformance of any or all Services or other obligations under a Work Authorization, exceed $250,000 or ten percent (10%) of the compensation paid Consultant pursuant to such Work Authorization, whichever is greater, or extend beyond the expiration of the warranty period under Article 4 for the Services performed under the Work Authorization, regardless of the legal theory under which such liability is imposed. The remedies stated in the Agreement are Client's sole and exclusive remedies for any failure by Consultant to comply with obligations to Client, and Client hereby irrevocably waives any right to assert a claim against Consultant based on a legal theory that a remedy provided herein fails of its essential purpose.

**10.    HAZARDOUS MATERIAL**

10.1    Nothing in this Agreement shall be construed or interpreted as requiring Consultant to assume the status of, and Client acknowledges that Consultant does not act in the capacity nor assume the status of, Client or others as a "generator," "operator," "transporter," or "arranger" in the treatment, storage, disposal, or transportation of any hazardous substance or waste as those terms are understood within the meaning of the Resource Conservation and Recovery Act (RCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), or any other similar federal, state, or local law, regulation, or ordinance. Client acknowledges further that Consultant has played no part in and assumes no responsibility for generation or creation of any hazardous waste, pollution condition, nuisance, or chemical or industrial disposal problem, if any, which may exist at any site that may be the subject matter of any Work Authorization.

10.2    It is acknowledged by both parties that the Services do not include services related to regulated substances, pollutants, or hazardous or toxic wastes ("Hazardous Material"). In the event Consultant or any other party encounters undisclosed Hazardous Materials, Consultant shall notify Client and, to the extent required by law or regulation, the appropriate governmental officials, and Consultant may, at its option and without liability for delay, consequential or any other damages to Client, suspend performance of Services on that portion of the project affected by Hazardous Material until Client: (i) retains appropriate specialist consultant(s) or contractor(s) to identify and, as appropriate, abate, remediate, or remove the Hazardous material; and (ii) warrants that the project site is in full compliance with all applicable laws and regulations. Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, Client shall indemnify, defend and save Consultant and its affiliates, subconsultants, agents, and suppliers of any tier, and any and all employees, officers, directors of any of the foregoing, if any, from and against any and all Losses which arise out of the performance of the Services and relating to the regulation and/or protection of the environment, including, without limitation, Losses incurred in connection with characterization, handling, transportation, storage, removal, remediation, disturbance or disposal of Hazardous Material, whether above or below ground and not brought to a Client site or other proposed project site by Consultant in the performance of the Services without Client's approval.

**11.    CHANGES**

11.1    The Parties may from time to time by mutual agreement seek to modify, extend or enlarge the Services under a Work Authorization ("Modification"). In the event the Parties agree to a Modification to add additional Services, or to make other modifications to the Services, Consultant's compensation, the schedule and any other relevant terms and conditions of the applicable Work Authorization shall be equitably adjusted prior to performance of such Services.

**12.    OWNERSHIP OF DOCUMENTS**

12.1    Consultant grants to Client a transferable, irrevocable and perpetual royalty-free license to retain and use all work products delivered to Client for any purpose in connection with the project specified in each Work Authorization, upon full payment by Client for Consultant's Services. Client also may use such work product for other purposes with Consultant's written consent. Re-use of any such work product by Client on any extension of the project or on any other project without the written authorization of Consultant shall be at Client's sole risk and Client shall indemnify, defend and save Consultant and its affiliates, consultants, agents, subcontractors and suppliers of any tier, and any and all employees, officers and directors of any of the foregoing, if any, from and against any and all Losses suffered as a result of, or arising out of, or in connection with such re-use. Consultant shall have the right to retain copies of all such work product. Consultant retains the right of ownership with respect to any patentable concepts or copyrightable materials arising from its Services.

**13.    TERMINATION/SUSPENSION**

13.1    Client may terminate all or any portion of the Services under one or more Work Authorizations for convenience, at its option, by sending a written notice to Consultant. Either party can terminate this Agreement or a Work Authorization for cause if the other commits a material, uncured breach of this Agreement or becomes insolvent. Termination for cause shall be effective twenty (20) days after receipt of a notice of termination, unless a later date is specified in the notice. The notice of termination for cause shall contain specific reasons for termination and both parties shall cooperate in good faith to cure the causes for termination stated in the notice. Termination shall not be effective if reasonable action to cure the breach has been taken before the effective date of the termination. Client shall pay Consultant upon invoice for Services performed and charges incurred prior to termination, plus reasonable termination charges. Any suspension of Services by Client shall result in an equitable adjustment to Consultant's compensation, time for performance, or any of its other obligations under a Work Authorization.

**14.    FORCE MAJEURE**

14.1    Any delay or failure of Consultant in performing its required obligations hereunder shall be excused if and to the extent such delay or failure is caused by a Force Majeure Event. A "Force Majeure Event" means an event due to any cause or causes beyond the reasonable control of Consultant and shall include, but not be limited to, acts of God, strike, labor dispute fire, storm, flood, windstorm, unusually severe weather, sabotage, embargo,

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

3

H&E 0005240

NON-CERTIFIED COPY



terrorism, energy shortage, accidents or delay in transportation, accidents in the handling and rigging of heavy equipment, explosion, riot, war, court injunction or order, delays by acts or orders of any governmental body or changes in laws or government regulations or the interpretations or application thereof or the acts or omissions of the Client or its other contractors, vendors or suppliers. In the event of a Force Majeure Event, Consultant shall receive an equitable adjustment extending Consultant's time for performance for such Services sufficient to overcome the effects of any delay, and an increase(s) to Consultant's compensation sufficient to account for any increased cost in performance or loss or damage suffered by Consultant.

15.    RESPONSIBILITIES OF CLIENT

15.1    Without limiting any express or implied obligations of Client under applicable law, Client shall: (1) provide Consultant, in writing, all information relating to Client's requirements for the project; (2) correctly identify to Consultant the location of subsurface structures, such as pipes, tanks, cables, and utilities; (3) notify Consultant of any potential hazardous substances or other health and safety hazard or condition known to Client existing on or near the project site; (4) give Consultant prompt written notice of any suspected deficiency in the Services; (5) with reasonable promptness, provide required approvals and decisions; and (6) furnish or cause to be furnished to Consultant full, unrestricted and legal access to, and use of, the site and all necessary rights of way and easements, in order to perform the Services. In the event Consultant is requested by Client or is required by subpoena to produce documents or give testimony in any action or proceeding to which Client is a party and Consultant is not a party, Client shall pay Consultant for any time and expenses required in connection therewith, including reasonable attorney's fees.

15.2    Consultant may rely upon and use in the performance of any Services information supplied to it by Client without independent verification and Consultant shall not be responsible for defects in its Services attributable to its reliance upon or use of such information.

17.    ·    TERM

17.1    Unless otherwise specified, the term of this Agreement shall run from the Effective Date until Consultant has completed the Services and received all payments due under the Agreement.

18.    GENERAL

18.1    Client and Consultant each represent and warrant that this Agreement has been duly authorized, executed and delivered and constitutes its binding agreement enforceable against it. This Agreement and any executed Work Authorizations supersede all prior written and/or oral contracts and agreements that may have been made or entered into between Client and Consultant regarding the subject matter hereof, including but not limited to any and all proposals, oral or written, and all communications between the Parties relating to this Agreement or any Work Authorization(s), and constitute the entire agreement between the Parties hereto with respect to the subject matter hereof.

18.2    This Agreement and Work Authorization(s) may not be assigned by Consultant or Client in any way, including by operation of law, unless otherwise mutually agreed to in writing, any such attempted non-authorized assignment shall be null and void and of no force or effect.

18.3    Any cost opinions or estimates provided by Consultant will be on a basis of experience and judgment, but since Consultant has no control over market conditions or bidding procedures, Consultant cannot and does not warrant that bids, ultimate construction cost, or project economics will not vary from such opinions or estimates. Neither this Agreement nor any of the Services provided hereunder shall constitute or provide for, and Consultant shall not be considered to have rendered, any legal or financial opinion(s) regarding the feasibility of this project or any other or regarding any other matter. Unless otherwise expressly included in a Work Authorization, Consultant shall under no circumstances provide as part of the Services a consent, opinion or similar document, or act as a qualified person or expert, in connection with any filing by Client with the United States Securities and Exchange Commission, or similar non-United States agency, authority or commission.

18.4    Notices shall be effective hereunder as follows only if in writing and addressed to the authorized representative designated in applicable Work Authorizations: (1) upon delivery, if delivered personally to the person; (2) upon transmission, if transmitted to the facsimile number of the person; and (3) upon posting, if by first class or overnight mail (postage prepaid).

18.5    All contract issues and matters of law will be adjudicated in accordance with the laws of the state where the project is located, excluding any provisions or principles thereof which would require the application of the laws of a different jurisdiction; provided, however that if the project is located outside the United States, the laws of the State of California shall govern. Venue for any litigation shall be any state court or United States District Court having jurisdiction over the parties and subject matter.

18.6    The terms and conditions of this Agreement shall prevail, notwithstanding any variance with any purchase order or other written instrument submitted by Client whether formally rejected by Consultant or not. This Agreement may be modified only by amendment when signed by each Party. In the event that any one or more of the provisions of this Agreement shall be found to be illegal or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect, and such term or provision shall be deemed stricken to the extent and in the jurisdictions necessary for compliance with applicable law.

18.7    Nothing in this Agreement shall be construed to give any rights or benefits to anyone other than the Client or Consultant.

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100 Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

4

H&E 0005241

NON-CERTIFIED COPY

# URS

18.8    The headings in this Agreement are for convenience only, and shall not affect the interpretation hereof. The terms "hereof", "herein," "hereto" and similar words refer to the entire Agreement and not to any particular Article, Section, Attachment, Exhibit or any other subdivision of this Agreement. References to "day" or "days" shall mean calendar days unless specified otherwise.

18.9    The provisions of this Agreement which by their nature are intended to survive the termination, cancellation, completion, or expiration of the Agreement, including, but not limited to, indemnities and any expressed limitations of or releases from liability, shall continue as valid and enforceable obligations of the parties notwithstanding any such termination, cancellation, completion, or expiration.

18.10    It is understood and agreed that any delay, waiver or omission by Consultant or Client to exercise any right or power arising from any breach or default by Client or Consultant in any of the terms, provisions or covenants of this Agreement or any Work Authorization shall not be construed to be a waiver by Consultant or Client of any subsequent breach or default of the same or other terms, provisions or covenants on the part of Consultant or Client.

19.    **ATTACHMENTS AND EXHIBITS**

The following attachments and exhibits, which are attached hereto, are part of this Agreement.

Attachment 1 – Work Authorization

Attachment 2 – Fee Proposal, Scope of Work, Schedule

Attachment 3 – URS 2009 Schedule of Fees and Charges

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, effective as of the day and year first above mentioned.

**H&E Equipment Services, Inc.**

By:    _____
         (Signature)

Name:    _____
             (Printed)

Title:    _____

**URS Corporation Architecture PC**

By:    _____
         (Signature)

Name:    _____
             (Printed)

Title:    _____

I:\Proposals\Facilities\H&E Equipment Services – Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

5

H&E 0005242

NON-CERTIFIED COPY

**URS**

### ATTACHMENT 1

### TIME AND MATERIALS WORK AUTHORIZATION 09-100

In accordance with the Agreement for Consulting and Professional Services between H&E Equipment Services, Inc. ("Client"), and URS Corporation Architecture PC ("Consultant"), a North Carolina corporation, dated 08.13.09, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

> Renovations and Additions to Kenner, LA Branch
> H&E Equipment Services, Inc.

> Client Authorized
> Representative: Leonard St. Germain
> Address:        11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816

> Telephone No.:  225.298.5244

> Consultant Authorized
> Representative: Chad Herndon
> Address:        7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
> Telephone No.:  225.922.5244

SERVICES. The Services shall be described in Attachment 2 to this Work Order.

SCHEDULE. The Estimated Schedule shall be set forth in Attachment 2 to this Work Authorization. Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

PAYMENT. Payment of $0.00 is due upon signature of this Work Authorization and will be applied against the final invoice for this Work Authorization. URS charges shall be on a "time and materials" basis and shall be in accordance with the Consultant's Schedule of Fees and Charges in effect at the time the Services are performed. Payment provisions and the Consultant's current Schedule of Fees and Charges are attached to this Work Authorization as Attachment 3.

TERMS AND CONDITIONS. The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

ACCEPTANCE of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

| CLIENT | CONSULTANT |
|--------|------------|
| _____ | _____ |
| Signature | Signature |
| _____ | _____ |
| Typed Name/Title | Typed Name/Title |
| _____ | _____ |
| Date of Signature | Date of Signature |

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100 Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1

H&E 0005243

NON-CERTIFIED COPY



**URS**

ATTACHMENT 2

August 13, 2009

Leonard St. Germain
H&E Equipment Services
Baton Rouge, LA

Re:    Renovations and Additions to H&E Equipment – Kenner LA

Leonard:

**URS** is pleased to provide you with a proposal for professional services for assistance with determining a legitimate budget for the renovations and additions to your H&E Equipment facility located at **125 East Airline Drive** in **Kenner LA**. A list of work items we discussed is attached (**Attachment 2**)

As we discussed the first order of business will be to determine the existing condition of the buildings and develop drawings and sketches of the renovations. From these documents, we can obtain accurate construction estimates for the work. With this data a realistic presentation can be offered for consideration by management.

We propose to provide you these services for a total fee not to exceed amount of **$20,000.00** based on our "Standard Billing Rate Schedule" This schedule includes the cost of all project personnel associated with the project, documentation and all reimbursement costs incurred during the course of the performance of the outlined scope of work.

Thank you for considering **URS** for this opportunity. If you have any questions or require any additional information, please feel free to contact me at 225.231.6343 or cell 225.324.5848. Thank you for your consideration.


Sincerely,

URS Corporation



Neal Johnson                                    Mike Richardson
Principal Architect                             Vice President




URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

H&E 0005244

NON-CERTIFIED COPY



**ATTACHMENT 2**

Re: Renovations and Additions to H&E Equipment – Kenner LA
**2 | P a g e**

## SCOPE OF WORK

Based on our recent site visit the focus of the project will include:

1. Developing drawings of the existing site and buildings.
2. Review of existing truck traffic circulation including company, employee and customer vehicle parking. Additional paving with drainage consideration will be included.
3. Evaluate the condition of all exterior roofs and walls of all buildings on the property.
4. Evaluate condition and operational status of the existing Office / Sales area with a focus on renovating the restrooms and upgrading the finishes in all other areas. Review of the HVAC and Electrical systems to be included.
5. Evaluate circulation and storage utilization of the Parts Area.
6. Evaluate covered area west of Parts Building (existing Equipment Wash Area)
7. Develop sketches and drawings for a:
   a. New entrance for Office / Sales building.
   b. New office / tool storage and break room area to the front (east) end of the Shop Building.
   c. Demolish existing office/tool storage and break room to be used as transition area.
   d. Add a new overhead door on south side of building in this immediate area.
   e. New enclosed service bay with overhead doors to the rear (west) end of the Shop Building.
   f. New open frame bay to the rear (west) end of the Shop Building.
   g. New 40' x 70' Equipment Wash Building to be located at the rear (west) end of the site.
8. Assist in obtaining realistic budget pricing from three (3) local qualified general contractors.

## SCHEDULE

We anticipate the effort will require 3 calendar weeks to complete.

H&E 0005245

NON-CERTIFIED COPY

**URS**                                                                      Attachment 3

## URS CORPORATION
## SCHEDULE OF FEES AND CHARGES
### Engineering/Environmental & Consulting Services

> The following describes the basis for compensation for services performed during the fiscal year 2009. This Schedule of Fees and Charges will be adjusted annually on January 1 of each subsequent year to reflect merit and economic salary increases, and changes in the expected level and mode of operations for the new year. The new Schedule of Fees and Charges will apply to existing and new assignments.

### PERSONNEL CHARGES

The charge for all time required in the performance of the Scope of Services, including office, field and travel time, will be at the Unit Priced Hourly Rates set forth below for the labor classifications indicated.

| Labor Classification | Hourly Rate ($) |
|---|---|
| Clerk* | 48 |
| Technical Typist/Word Processor* | 55 |
| Editor/Drafter/Designer/Illustrator* | 75 |
| Lab/Field Supervisor* | 75 |
| Technician* | 63 |
| Senior Technician | 68 |
| Graduate Staff Professional | 70 |
| Staff Professional | 82 |
| Senior Staff Professional | 93 |
| Assistant Project Professional | 99 |
| Project Professional | 115 |
| Senior Project Professional | 130 |
| Consulting/Sr. Consulting Professional | 160 |
| Principal/Sr. Principal Professional | 180 |
| Principal/Sr. Principal Professional | 200 |
| (research / site visit/report writing) | |
| Principal/ Sr. Principal Professional | 300 |
| (depositions / testifying in court) | |

Charges for contract personnel under URS supervision and using URS facilities will be made according to the hourly rate corresponding to their classification.

When staff are performing project fieldwork, a minimum daily charge of 4 hours will apply.

A maximum of eight (8) hours travel time per day will be charged for travel within the continental United States.

When URS staff appears as expert witnesses at court trials, arbitration hearings, mediation and depositions, their time will be charged at minimum $250.00 per hour.

Overtime (hours worked in excess of eight (8) hours per day) by exempt personnel will be charged at the above straight time hourly rate.   Overtime by non-exempt personnel (classifications identified with an asterisk "*") will be charged at 1.5 times the above hourly rate.

### OTHER PROJECT CHARGES

#### Subcontracts and Equipment Rental
The cost of services subcontracted by URS to others and other costs incurred by URS will be charged at cost plus 10%.

#### Communications
The cost of communications for office telephone, telex, facsimile, postage, and incidental copying costs will be charged at a flat rate of 3% of total gross labor charges.

#### Vehicles and Mileage
Field vehicles (pick-ups, vans, trucks, etc.) used on project assignments will be charged at $65.00 per day. The mileage charge for personal autos will be the then current mileage rate established by the Internal Revenue Service.

#### Specialized Equipment
The use of specialized URS equipment will be the fixed rental rates set forth in the Schedule of URS Specialized Equipment Charges.

*This fee schedule contains confidential business information and is not to be copied or distributed for any purpose other than the use intended in this contract or proposal.*

I:\Proposals\Facilities\Office Practice\Contracts\2009 schedule of fees and charges.doc

H&E 0005246

NON-CERTIFIED COPY

# URS

### ATTACHMENT 1

### TIME AND MATERIALS WORK AUTHORIZATION 12-10

In accordance with the Agreement for Consulting and Professional Services between H&E Equipment Services, Inc. ("Client"), and URS Corporation Architecture PC ("Consultant"), North Carolina corporation, dated August 13, 2009, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

    Relocation of Crain Reman Facility – Phase 1
    Belle Chasse, LA
    H&E Equipment Services, Inc. - Owner

    Client Authorized
    Representative:  Frankie Wynn
    Address:        11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816
    Telephone No.:  225.298.5244

    Consultant Authorized
    Representative:  Neal Johnson
    Address:        7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
    Telephone No.:  225.231.6343

**SERVICES.** The Services shall be described in Attachment 2 to this Work Order.

**SCHEDULE.** The Estimated Schedule shall be set forth in Attachment 2 to this Work Authorization. Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

**PAYMENT.** Payment of $0.00 is due upon signature of this Work Authorization and will be applied against the final invoice for this Work Authorization. URS charges shall be on a "time and materials" basis and shall be in accordance with the Consultant's Schedule of Fees and Charges in effect at the time the Services are performed. Payment provisions and the Consultant's current Schedule of Fees and Charges are attached to this Work Authorization as Attachment 3.

**TERMS AND CONDITIONS.** The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

**ACCEPTANCE** of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

CLIENT

_Signature_

Frankie Wynn/Director of Facilities
_Typed Name/Title_

12/27/2010
_Date of Signature_

CONSULTANT

_Signature_

WILLIAM A. STEVENSON, SENIOR VP
_Typed Name/Title_

1/5/11
_Date of Signature_

h:\Proposals\Facilities\H&E Equipment Services - Belle Chasse\Phase 1 Proposal

1

WYNN

EXHIBIT NO. 7

K. DONNELLY

EXHIBIT

C-2

URS 031072

NON-CERTIFIED COPY

# URS

December 15, 2010

Frankie Wynn
Director of Facilities – Risk - Compliance
H&E Equipment Services
Baton Rouge, LA

Re:    Relocation of H&E Equipment Services Crain Reman Facility – Phase 1
        Belle Chasse, LA

Mr. Wynn:

**URS** is pleased to provide you with a proposal for professional services for assistance with the relocation of your **H&E Equipment Services Crain Reman Facility** currently located on **Engineers Road in Belle Chasse, LA** to a site across the street from your sales / management office.

As we discussed, the work will be commissioned in phases. Phase 1 will include the determination of the existing condition of the buildings and the development of drawings and sketches of the renovations. From these documents, we can obtain accurate construction estimates for the work. With this data a realistic presentation can be offered for consideration by management.

We propose to provide you these services for a total fee not to exceed amount of **$44,000.00** based on our "Standard Billing Rate Schedule" This schedule includes the cost of all project personnel associated with the project, documentation and all reimbursement costs incurred during the course of the performance of the outlined scope of work.   A Work Authorization document **(Attachment 1)** is included for your signature. A Scope of Work and a Delivery Schedule is also attached **(Attachment 2)**.

Thanks for the opportunity to continue our services to H&E Equipment Services.

Sincerely,
URS Corporation


Neal Johnson                                    Mike Richardson
Principal Architect                             Vice President


Attachment 1     Work Authorization 12-10
Attachment 2     Scope of Work and Schedule
Attachment 3     Schedule of Fees and Charges


URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031073

NON-CERTIFIED COPY



ATTACHMENT 2

Relocation of H&E Equipment Services Crain Reman Facility – Phase 1
Belle Chasse, LA

## SCOPE OF WORK

Based on our recent site visit the focus of the project will include:

1. Developing drawings of the existing site and buildings.
2. Review of existing crane and truck circulation including company, employee and customer vehicle parking. Additional paving with drainage consideration will be included.
3. Evaluate the condition of all exterior roofs and walls of all buildings on the new property.
4. Evaluate condition and operational status of the existing fabrication building with a focus on renovating the restrooms and upgrading the finishes in all other areas. Review of the HVAC and Electrical systems to be included.
5. Evaluate site circulation in regards to existing building and above ground utility constraints.
6. Evaluate circulation of cranes through the rehabilitation process and parts storage utilization
7. Develop sketches and drawings for:
    a. Renovation of the existing buildings to remain on site.
    b. New additions to the existing buildings to enclose certain tasks.
    c. Demolish some existing buildings.
    d. New buildings as required for new layout.
    e. Addition of new overhead doors as required for new layout.
    f. New covered service bays on existing buildings as required.
    g. New overhead cranes as required to support correct loads.
8. Assist in obtaining realistic budget pricing from three (3) local qualified general contractors.

## SCHEDULE

We anticipate the effort will require 5 calendar weeks to complete.

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031074

NON-CERTIFIED COPY

Attachment 3

# URS CORPORATION
## SCHEDULE OF FEES AND CHARGES
### Engineering/Environmental & Consulting Services

The following describes the basis for compensation for services performed during the fiscal year 2010. This Schedule of Fees and Charges will be adjusted annually on January 1 of each subsequent year to reflect merit and economic salary increases, and changes in the expected level and mode of operations for the new year. The new Schedule of Fees and Charges will apply to existing and new assignments.

## PERSONNEL CHARGES

The charge for all time required in the performance of the Scope of Services, including office, field and travel time, will be at the Unit Priced Hourly Rates set forth below for the labor classifications indicated.

| Labor Classification | Hourly Rate ($) |
|---|---|
| Clerk* | 50 |
| Technical Typist/Word Processor* | 57 |
| Editor/Drafter/Designer/Illustrator* | 78 |
| Lab/Field Supervisor* | 78 |
| Technician* | 65 |
| Senior Technician | 70 |
| Graduate Staff Professional | 73 |
| Staff Professional | 85 |
| Senior Staff Professional | 96 |
| Assistant Project Professional | 102 |
| Project Professional | 120 |
| Senior Project Professional | 138 |
| Consulting Professional | 150 |
| Sr. Consulting Professional | 165 |
| Principal/Sr. Principal Professional | 186 |

Charges for contract personnel under URS supervision and using URS facilities will be made according to the hourly rate corresponding to their classification.

When staff are performing project fieldwork, a minimum daily charge of 4 hours will apply.

A maximum of eight (8) hours travel time per day will be charged for travel within the continental United States.

When URS staff appear as expert witnesses at court trials, arbitration hearings, mediation and depositions, their time will be charged at $250.00 per hour.

Overtime (hours worked in excess of eight (8) hours per day) by exempt personnel will be charged at the above straight time hourly rate. Overtime by non-exempt personnel (classifications identified with an asterisk "*") will be charged at 1.5 times the above hourly rate.

## OTHER PROJECT CHARGES

### Subcontracts and Equipment Rental
The cost of services subcontracted by URS to others and other costs incurred by URS will be charged at cost plus 10%.

### Communications
The cost of communications for office telephone, telex, facsimile, postage, and incidental copying costs will be charged at a flat rate of 3% of total gross labor charges.

### Vehicles and Mileage
Field vehicles (pick-ups, vans, trucks, etc.) used on project assignments will be charged at $65.00 per day. The mileage charge for personal autos will be the then current mileage rate established by the Internal Revenue Service.

### Specialized Equipment
The use of specialized URS equipment will be the fixed rental rates set forth in the Schedule of URS Specialized Equipment Charges.

### Other Direct Costs
Materials, supplies, travel expenses, and other direct costs will be billed at cost plus a 5% handling charge.

*This fee schedule contains confidential business information and is not to be copied or distributed for any purpose other than the use intended in this contract or proposal.*

**URS**

I:\PROPOSAL\FACILITIES\B&E EQUIPMENT SERVICES - BELLE CHASSE\PROPOSAL\ENG FEE SCHEDULE (ATTACHMENT 3).DOC

URS 031075

NON-CERTIFIED COPY

# URS

## LUMP SUM WORK AUTHORIZATION NO. 11-12

In accordance with the Agreement for Consulting and Professional Services between H&E Equipment Services, Inc. ("Client"), and URS Corporation Architecture PC ("Consultant"), North Carolina corporation, dated August 13, 2009, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

Relocation of Crain Reman Facility -- Phase II
Belle Chasse, LA
H&E Equipment Services, Inc. - Owner

Client Authorized
Representative:  Frankie Wynn
Address:         11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816
Telephone No.:   225.298.5244

Consultant Authorized
Representative:  Neal Johnson
Address:         7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
Telephone No.:   225.231.6343

SERVICES.  The Services shall be described in Attachment 1 to this Work Order.

SCHEDULE.  The Estimated Schedule shall be set forth in Attachment 1 to this Work Authorization.  Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

PAYMENT AND EQUITABLE ADJUSTMENTS.  This is a lump sum Work Authorization.  Consultant's lump sum compensation and provisions for progress and final payments are specified in Attachment 1 to this Work Authorization. Payment of $0.00 is due upon signature of this Work Order and will be applied against the final invoice for this Work Authorization.  Consultant shall give Client prompt written notice of unanticipated conditions or conditions which are materially different from those anticipated by Consultant at the time the lump sum compensation was agreed upon.  If Client wishes Consultant to proceed, Consultant's lump sum compensation shall be subject to equitable adjustment for such conditions.

TERMS AND CONDITIONS.  The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

ACCEPTANCE of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

~~CLIENT~~ CONSULTANT                              CLIENT ~~CONSULTANT~~

_____                           _____
Signature                                         Signature
Vice President/Office Mgr.                         FRANKIE W. WYNN/DIR. OF
Typed Name/Title                                  Typed Name/Title      FACILITIES
2/22/12                                            2/17/2012
Date of Signature                                 Date of Signature

I:\Projects\H&E Equipment Services - Belle Chasse\Phase II - Lump Sum Work Order

1

URS 031076

NON-CERTIFIED COPY

**URS**

Attachment 1

February 18, 2012

Frankie Wynn
Director of Facilities – Risk - Compliance
H&E Equipment Services
Baton Rouge, LA

Re:    Relocation of H&E Equipment Services Crain Reman Facility – Phase II
       Belle Chasse, LA

Mr. Wynn:

URS is pleased to provide you with a fee proposal for the **Phase II development of the H&E Equipment Services Crain Reman Facility in Belle Chasse, LA.** This phase of the project will include the following tasks:

1. Measurement of the existing facilities,
2. Completion of final design solutions,
3. Representing H&E for all permitting activities including the Pontchatrain Levee District Board, Plaquemines Parish, the State Fire Marshal, and all other regulatory agencies.
4. All construction documents as required for permitting and hard dollar pricing,
5. Assisting in the contractor pricing and construction contract negotiations, and
6. Construction Administration during the construction phase to occupancy.

This proposal is based on the work described in the approved Project Program dated January 16, 2012.

We propose to provide you these design services for a total fee of **$ 296,353.** The fee is not based on a construction cost. Fees will be "lump sum", billed monthly based on the percent complete of each task.

A Work Order document (**Attachment 1**) is included for your signature. A Scope of Work and a Delivery Schedule is also attached (**Attachment 2**).

As we discussed, our fee will not be adjusted due to the dollar cost of the project changing higher or lower. In the event a major scope of work involves changes such as a building addition or major variation from the current program, we will reserve the right to renegotiate our fixed fee.

The time frame to complete the final Design and Construction Documents will be 8 - 10 weeks.

URS is very excited to provide you with our professional services. If you have any questions or require any additional information, please contact me at 225.231.6343 or cell 225.324.5848.

Sincerely,
**URS Corporation**

Neal Johnson
Principal Architect

Mike Richardson
Vice President

Attachment 1    Work Authorization 11-12
Attachment 2    Scope of Work and Schedule

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031077

NON-CERTIFIED COPY



ATTACHMENT 2

Relocation of H&E Equipment Services Crain Reman Facility – Phase II
Belle Chasse, LA
021612

## SCOPE OF WORK

Based on our recent discussion, our Phase II effort will include:

1. Developing as-built drawings of the existing buildings being renovated.
2. Develop site drainage design solution
3. Develop master demolition plan
4. Building A - Main Shop Building
   a. Master Plan Space
   b. Design new entrance doors
   c. Design new concrete apron
   d. Develop interior demolition plan
   e. Design new office area
   f. Design new break room / library / training area
   g. Design new locker / shower / restroom area
5. Building B - Welding Building
   a. Design new entrance doors
   b. Design new concrete apron
   c. Design new restroom area
6. Building C - Wash Area
   a. Design New Space
7. Building D - Blast Area
   a. Design New Space
8. Building K - Painting Area
   a. Design New Space
9. Develop documents for submittal to regulatory agencies
10. Develop bid documents to provide to invited general contractors
11. Assist H&E in obtaining construction pricing proposals
12. Prepare construction contract
13. Review progress of work during construction
14. Attend monthly progress meetings during construction
15. Assist H&E in closing out the construction project.

## SCHEDULE

We anticipate the design effort will require 8 calendar weeks to complete.
We anticipate the construction period will take 24 weeks to complete

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031078

NON-CERTIFIED COPY

## ARCHITECTURAL DISCIPLINE LABOR BUDGET

| PROJECT: | New Facility Renovations and Additions | | | | DATE: | 2/14/2012 |
|---|---|---|---|---|---|---|
| CLIENT: | H & E Equipment Services - Belle Chasse, LA | | | | REVISION: | |
| PROJECT DESCRIPTION: | | PROJECT IS PROJECTED TO BE: | | | 8 WEEK (2MO) DESIGN | |
| | | | | | 24 WEEK (6 MO) CONSTRUCTION | |
| URS Proposal No. | | | | | BY: | Neal Johnson |

| TASK NO. | Task Name | PIC NJ $177 | PM TK $180 | Architect MH $100 | Designer $75 | SR Engineer $120 | Engineer $90 | Drafting $83 | Admin LV $50 | Task Hours |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Project Management** | | | | | | | | | |
| | Set up project | | 10 | 10 | | | | | 10 | 30 |
| | Consultant coordination | | 10 | 10 | | | | | | 20 |
| | Review meetings with H & E - 2/mo @ 2 hrs ea | | 32 | 32 | | | | | | 64 |
| | Review meetings in-house - 1/wk @ 2hrs ea | | 16 | 16 | 16 | | | | 36 | 84 |
| | Manage process - 2 hrs / week | | 32 | | | | | | 64 | 96 |
| 2 | **Schematic Design** | | | | | | | | | |
| | *Due Diligence* | | | | | | | | | |
| | Site Measurments | | | 16 | 16 | | | | | 32 |
| | Develop existing condition drawings | | | 20 | 20 | | | | | 40 |
| | *Design ... Site Work* | | | | | | | | | |
| | Develop new entrances | 1 | | 4 | | 8 | 20 | 16 | | 47 |
| | Develop signage, flagpole, landscaping | | | | 8 | | | | | 8 |
| | Offsite Drainage Improvements | | | 2 | 2 | 2 | 10 | 16 | | 32 |
| | Utility Plan / STP | | | 2 | | 12 | 20 | 16 | | 50 |
| | Civil Details | | | 2 | | 1 | 2 | 3 | | 8 |
| | Review / Incorporate survey into project | | | 2 | 2 | | 3 | 6 | | 13 |
| | Develop master demolition plan | | | | 8 | | | | | 8 |
| | *Building A / Paint Shop Building* | | | | | | | | | |
| | Master Plan Space | | | 2 | 4 | | | | | 6 |
| | Design new entrance doors | | | 2 | 2 | | | | | 4 |
| | Design new concrete apron | | | 2 | 2 | | | | | 4 |
| | Develop interior demolition plan | | | 2 | 4 | | | | | 6 |
| | Design new office area | | | 6 | 20 | | | | | 26 |
| | Design new break room / library / training area | | | 4 | 12 | | | | | 16 |
| | Design new locker / shower / restroom area | | | 4 | 8 | | | | | 12 |
| | *Building B - Welding Building* | | | | | | | | | |
| | Design new entrance doors | | | 2 | | | | | | 2 |
| | Design new concrete apron | | | 2 | | | | | | 2 |
| | Design new restroom area | | | 2 | 8 | | | | | 10 |
| | *Building C - Wash Area* | | | | | | | | | |
| | Design New Space | | | 6 | 6 | | | | | 12 |
| | *Building D - Blast Area* | | | | | | | | | |
| | Design New Space | | | 6 | 6 | | | | | 12 |
| | *Building E - Painting Area* | | | | | | | | | |
| | Design New Space | | | 6 | 6 | | | | | 12 |
| | *Drawings* | | | | | | | | | |
| | SD base sheets - assume 6 architectural sheets | | | 2 | 6 | | | | | 8 |
| | Site Plan | | | 2 | 12 | | | | | 14 |
| | Outline Specifications | | | 2 | 12 | | | | | 14 |
| | Statement of Probable Cost | | | | 4 | | | | | 4 |
| 3 | **Design Development** | | | | | | | | | |
| | Advance design of all drawings | | | 12 | 20 | | | | | 32 |
| | Outline Specifications | | | 4 | 12 | | | | | 16 |
| | Statement of Probable Cost | | | 4 | 4 | | | | | 8 |
| | Present package to owner | | 8 | | 4 | | | | | 12 |
| 4 | **Construction Documents** | | | | | | | | | |
| | Drawings | | | 40 | 80 | | | | | 120 |
| | Project Manual | | | 10 | 30 | | | | | 40 |
| | Specifications | | | 12 | 24 | 12 | 6 | | | 54 |
| | Statement of Probable Cost | | | 2 | 12 | | | | | 14 |
| | QA / QC - may be Dallas or Houston office | 12 | | | | | | | | 12 |
| 7 | **Permitting** | | | | | | | | | |
| | General — Levee Board | 4 | | | | 8 | 24 | 5 | | 41 |
| | LS SFM | 2 | | 10 | 10 | | | | | 22 |
| | City / Parish | 2 | | 10 | 10 | | | | | 22 |
| 5 | **Bidding and Negotiations** | | | | | | | | | |
| | Issue Plans | | | | 4 | | | | | 4 |
| | Prebid | | 6 | 6 | | 4 | | | | 16 |
| | Addendum | | | 4 | 4 | 4 | 5 | | | 17 |
| | Bid Opening | 1 | 1 | 2 | 0 | 1 | 1 | | | 6 |
| | Negotiation / Contract Prep | | 2 | 4 | | 1 | 4 | | | |

print date 1/16/2013
file:\Projects\H&E Equipment\19230000-H&E Belle Chasse - Phase 1\02 Contract\02A Request for Proposal\NH Estimate r4 021412.xls

URS 031079

NON-CERTIFIED COPY

## ARCHITECTURAL DISCIPLINE LABOR BUDGET

| PROJECT: | New Facility Renovations and Additions | | | | | | | DATE: | | 2/14/2012 |
|---|---|---|---|---|---|---|---|---|---|---|
| CLIENT: | H & E Equipment Services - Belle Chasse, LA | | | | | | | REVISION: | | |
| PROJECT DESCRIPTION | | | PROJECT IS PROJECTED TO BE: | | 8 WEEK (2MO) DESIGN | | | | | |
| | | | | | 24 WEEK (6 MO) CONSTRUCTION | | | | | |
| URS Proposal No. | | | | | | | | BY: | Neal Johnson | |

| TASK NO. | Task Name | PIC NJ $172 | PM NJ $169 | Architect TR $100 | Designer MH $75 | SR Engineer $120 | Engineer $90 | Drafting $53 | Admin LV $59 | Task Hours |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 | Construction Administration | | | | | | | | | |
| | Review Progress of Work - 6 -10 site visits | | 20 | 80 | | 20 | 10 | | | 130 |
| | Monthly Meetings (6 @ 5 hrs each) | 0 | 30 | 30 | 30 | | | | | 90 |
| | Shop Drawing Reviews | | | 32 | 60 | | | | | 92 |
| | Closeout | 0 | 4 | 24 | 12 | | | | | 40 |
| | Total Man-hours | 22 | 171 | 454 | 508 | 87 | 86 | 57 | 110 | 1,495 |
| | Total Labor | $3,894 | $28,882 | $45,241 | $38,100 | $10,440 | $6,680 | $3,591 | $6,500 | $142,528 |

| 6 | BR expenses | at | Units | | Units | | Units | | Units | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Airfare (ea round trip) | 700.00 | | | | | | | | $ - |
| | Hotel (ea night) | 120.00 | | | | | | | | $ - |
| | Food (per diem) | 40.00 | 10 | | 10 | 10 | | | | $ 1,200 |
| | Ground Trans (day) | 75.00 | 10 | | 10 | 10 | | | | $ 2,250 |
| | Misc | 500.00 | 1 | | | | | | | $ 500 |
| | Total Facilities | | | | | | | | | $146,478 |

| | | 40 MH weeks | 0.55 | 4.275 | 11.35 | 12.7 | 2.175 | 2.15 | 1.425 | 2.75 |
|---|---|---|---|---|---|---|---|---|---|---|
| 8 | | Consultants | | | | | base fee | | multiplier | |
| | Interior Design | TBD | | | | | $ 500 | | 1.1 | $ 550 |
| | Civil | URS BR - Tim Gaines | fee is calculated above | | | | $ - | | 1.1 | $ - |
| | Landscape | Benchmark | based on $25,000 allowance | | | | $ 1,250 | | 1.1 | $ 1,375 |
| | Structural | Southeast Engineers | | | | | $80,000 | | 1.1 | $ 88,000 |
| | Mechanical | Thompson Luke and Associates | | | | | $14,500 | | 1.1 | $ 15,950 |
| | Electrical | Craig Hebert Engineering | | | | | $40,000 | | 1.1 | $ 44,000 |
| | Misc | | | | | | | | | |
| | Total Consultants | | | | | | | | | $ 149,875 |
| | **Total Fee** | | | | | | | | | $296,353 |

URS 031080

NON-CERTIFIED COPY



# URS



### ATTACHMENT 1

#### TIME AND MATERIALS WORK AUTHORIZATION 09-100

In accordance with the Agreement for Consulting and Professional Services between H&E Equipment Services, Inc. ("Client"), and URS Corporation Architecture PC ("Consultant"). a North Carolina corporation, dated 08.13.09, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

        Renovations and Additions to Kenner, LA Branch
        H&E Equipment Services, Inc.

        Client Authorized
        Representative: Leonard St. Germain
        Address:      11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816

        Telephone No.:  225.298.5244

        Consultant Authorized
        Representative: Chad Herndon
        Address:      7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
        Telephone No.:  225.922.5244

<u>SERVICES</u>.  The Services shall be described in Attachment 2 to this Work Order.

<u>SCHEDULE</u>.  The Estimated Schedule shall be set forth in Attachment 2 to this Work Authorization.  Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

<u>PAYMENT</u>.  Payment of $0.00 _ is due upon signature of this Work Authorization and will be applied against the final invoice for this Work Authorization.  URS charges shall be on a "time and materials" basis and shall be in accordance with the Consultant's Schedule of Fees and Charges in effect at the time the Services are performed.  Payment provisions and the Consultant's current Schedule of Fees and Charges are attached to this Work Authorization as Attachment 3.

<u>TERMS AND CONDITIONS</u>.  The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

ACCEPTANCE of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

<u>CLIENT</u>                             <u>CONSULTANT</u>

_____      _____
Signature                             Signature

_____      _____
Typed Name/Title                  Craig W. Gardner / VP-OM
                                   Typed Name/Title

_____      _____
Date of Signature                  Date of Signature

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\FS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1

URS 031081

NON-CERTIFIED COPY



**URS**

ATTACHMENT 2

August 13, 2009

Leonard St. Germain
H&E Equipment Services
Baton Rouge, LA

Re:     Renovations and Additions to H&E Equipment – Kenner LA

Leonard:

**URS** is pleased to provide you with a proposal for professional services for assistance with determining a legitimate budget for the renovations and additions to your H&E Equipment facility located at **125 East Airline Drive in Kenner LA**. A list of work items we discussed is attached (**Attachment 2**)

As we discussed the first order of business will be to determine the existing condition of the buildings and develop drawings and sketches of the renovations. From these documents, we can obtain accurate construction estimates for the work. With this data a realistic presentation can be offered for consideration by management.

We propose to provide you these services for a total fee not to exceed amount of **$20,000.00** based on our "Standard Billing Rate Schedule" This schedule includes the cost of all project personnel associated with the project, documentation and all reimbursement costs incurred during the course of the performance of the outlined scope of work.

Thank you for considering **URS** for this opportunity. If you have any questions or require any additional information, please feel free to contact me at 225.231.6343 or cell 225.324.5848. Thank you for your consideration.

Sincerely,

URS Corporation

Neal Johnson
Principal Architect

Mike Richardson
Vice President

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031082

NON-CERTIFIED COPY

# URS

ATTACHMENT 2

Re: Renovations and Additions to H&E Equipment – Kenner LA
2 | P a g e

## SCOPE OF WORK

Based on our recent site visit the focus of the project will include:

1. Developing drawings of the existing site and buildings.
2. Review of existing truck traffic circulation including company, employee and customer vehicle parking.  Additional paving with drainage consideration will be included.
3. Evaluate the condition of all exterior roofs and walls of all buildings on the property.
4. Evaluate condition and operational status of the existing Office / Sales area with a focus on renovating the restrooms and upgrading the finishes in all other areas.  Review of the HVAC and Electrical systems to be included.
5. Evaluate circulation and storage utilization of the Parts Area.
6. Evaluate covered area west of Parts Building (existing Equipment Wash Area)
7. Develop sketches and drawings for a:
   a. New entrance for Office / Sales building.
   b. New office / tool storage and break room area to the front (east) end of the Shop Building.
   c. Demolish existing office/tool storage and break room to be used as transition area.
   d. Add a new overhead door on south side of building in this immediate area.
   e. New enclosed service bay with overhead doors to the rear (west) end of the Shop Building.
   f. New open frame bay to the rear (west) end of the Shop Building.
   g. New 40' x 70' Equipment Wash Building to be located at the rear (west) end of the site.
8. Assist in obtaining realistic budget pricing from three (3) local qualified general contractors.

## SCHEDULE

We anticipate the effort will require 3 calendar weeks to complete.

URS 031083

NON-CERTIFIED COPY

**URS**

## URS CORPORATION
## SCHEDULE OF FEES AND CHARGES
### Engineering/Environmental & Consulting Services

> The following describes the basis for compensation for services performed during the fiscal year 2009. This Schedule of Fees and Charges will be adjusted annually on January 1 of each subsequent year to reflect merit and economic salary increases, and changes in the expected level and mode of operations for the new year. The new Schedule of Fees and Charges will apply to existing and new assignments.

### PERSONNEL CHARGES

The charge for all time required in the performance of the Scope of Services, including office, field and travel time, will be at the Unit Priced Hourly Rates set forth below for the labor classifications indicated.

| Labor Classification | Hourly Rate ($) |
|---|---|
| Clerk* | 48 |
| Technical Typist/Word Processor* | 55 |
| Editor/Drafter/Designer/Illustrator* | 75 |
| Lab/Field Supervisor* | 75 |
| Technician* | 63 |
| Senior Technician | 68 |
| Graduate Staff Professional | 70 |
| Staff Professional | 82 |
| Senior Staff Professional | 93 |
| Assistant Project Professional | 99 |
| Project Professional | 115 |
| Senior Project Professional | 130 |
| Consulting/Sr. Consulting Professional | 160 |
| Principal/Sr. Principal Professional | 180 |
| Principal/Sr. Principal Professional (research / site visit/report writing) | 200 |
| Principal/ Sr. Principal Professional (depositions / testifying in court) | 300 |

Charges for contract personnel under URS supervision and using URS facilities will be made according to the hourly rate corresponding to their classification.

When staff are performing project fieldwork, a minimum daily charge of 4 hours will apply.

A maximum of eight (8) hours travel time per day will be charged for travel within the continental United States.

When URS staff appears as expert witnesses at court trials, arbitration hearings, mediation and depositions, their time will be charged at minimum $250.00 per hour.

Overtime (hours worked in excess of eight (8) hours per day) by exempt personnel will be charged at the above straight time hourly rate. Overtime by non-exempt personnel (classifications identified with an asterisk "*") will be charged at 1.5 times the above hourly rate.

### OTHER PROJECT CHARGES

#### Subcontracts and Equipment Rental
The cost of services subcontracted by URS to others and other costs incurred by URS will be charged at cost plus 10%.

#### Communications
The cost of communications for office telephone, telex, facsimile, postage, and incidental copying costs will be charged at a flat rate of 3% of total gross labor charges.

#### Vehicles and Mileage
Field vehicles (pick-ups, vans, trucks, etc.) used on project assignments will be charged at $65.00 per day. The mileage charge for personal autos will be the then current mileage rate established by the Internal Revenue Service.

#### Specialized Equipment
The use of specialized URS equipment will be the fixed rental rates set forth in the Schedule of URS Specialized Equipment Charges.

*This fee schedule contains confidential business information and is not to be copied or distributed for any purpose other than the use intended in this contract or proposal.*

I:\Proposals\Facilities\Office Practice\Contracts\2009 schedule of fees and charges.doc

URS 031084

NON-CERTIFIED COPY

**URS** 

ATTACHMENT 1

TIME AND MATERIALS WORK AUTHORIZATION 10-10

In accordance with the Agreement for Consulting and Professional Services between H&E Equipment Services, Inc. ("Client"), and URS Corporation Architecture PC ("Consultant"), a North Carolina corporation, dated 08.13.09, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

Renovations and Additions to Kenner, LA Branch
H&E Equipment Services, Inc.

Client Authorized
Representative:
Address:        11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816

Telephone No.:    225.298.5244

Consultant Authorized
Representative:  Neal Johnson
Address:        7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
Telephone No.:    225.231.6343

SERVICES. The Services shall be described in Attachment 1 to this Work Order.

SCHEDULE. The Estimated Schedule shall be set forth in Attachment 1 to this Work Authorization. Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

PAYMENT. Payment of $0.00 _ is due upon signature of this Work Authorization and will be applied against the final invoice for this Work Authorization. URS charges shall be on a "time and materials" basis and shall be in accordance with the Consultant's Schedule of Fees and Charges in effect at the time the Services are performed. Payment provisions and the Consultant's current Schedule of Fees and Charges are attached to this Work Authorization as Attachment 2.

TERMS AND CONDITIONS. The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

ACCEPTANCE of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

CLIENT                                    CONSULTANT

_____                  _____
Signature                                Signature

Frankie Wynn/Director of Facilities      WILLIAM A. STEVENSON SVP
Typed Name/Title                         Typed Name/Title

10/22/2010                               10/27/10
Date of Signature                        Date of Signature

L:\Proposals\Fee\Data\H&E Equipment Services - Kenner\Phase II\Project Management\PS-100 Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1

URS 031085

NON-CERTIFIED COPY



**ATTACHMENT 1**

October 27, 2010

Mr. Frankie Wynn
Director of Facilities
H&E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge, Louisiana 70816

Re:    H&E Kenner Branch
       125 East Airline Highway - Kenner, Louisiana

Dear Mr. Wynn:

URS is pleased to provide you with a fee proposal for the **Phase II development of the Renovations to the Kenner, Louisiana Branch Facility**. This phase of the project will be the completion of final design solutions, the construction documents, assisting in the contractor pricing, construction contract negotiations and construction administration during the construction phase to occupancy.

We propose to provide you these design services for a total fee of **$ 148,000**. The fee is not based on a construction cost. Fees will be "lump sum", billed monthly based on the percent complete of each phase.

As we discussed, our fee will not be adjusted due to the dollar cost of the project changing higher or lower.  In the event a major scope of work involves changes such as a building addition or major variation from the current program, we will reserve the right to renegotiate our fixed fee.

The time frame to complete the final Design and Construction Documents will be 8 - 10 weeks.

URS is very excited to provide you with our professional services. If you have any questions or require any additional information, please contact me at 225.231.6343 or cell 25.324.5848.

Sincerely,
URS Corporation

Neal Johnson, AIA
Principal Architect

CC:    Chad Herndon

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
Tel: 225.922.5700
Fax: 225.922.5701

URS 031086

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *  *
                        *
H&E EQUIPMENT SERVICES  *
                        * NUMBER 626,308
VERSUS                  *
                        * DIVISION "D"
URS CORPORATION         *
ARCHITECTURE, P.C., URS *
CORPORATION, L O'NEAL   *
JOHNSON AND THOMAS E.   *
RYAN, III               *
                        *
*  *  *  *  *  *  *  *  *
```

Deposition of WALLACE C. DRENNAN

III, taken on Wednesday, September 21, 2016,

commencing at 9:44 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.



EXHIBIT
D

NON-CERTIFIED COPY

Page 21

1    EXAMINATION BY MR. FRANCO:

2        Q.  Okay.  Actually, Mr. Drennan, I am going

3    to label a copy of your report dated July 28,

4    2016, as Exhibit 1, and we will get a clean copy

5    attached.

6            Did you have any help in drafting this

7    report?

8        A.  No.

9        Q.  You did this all yourself?

10       A.  My office -- yeah, I did it all myself.

11       Q.  I mean, you didn't have any help with

12   gathering any of the documents or any

13   discussions?  You didn't talk to anybody about

14   this other than maybe Counsel?

15       A.  I talked to some people in my office who

16   have, you know, experience.

17       Q.  Okay.

18       A.  I have a couple of engineers working for

19   me.

20       Q.  All right.  And for the Record, you're

21   not an engineer, correct?

22       A.  No.

23       Q.  And you're not licensed as an engineer

24   in any state, correct?

25       A.  No.

NON-CERTIFIED COPY

LA CONTRACTORS
LICENSE NO. 1033

(5M) euooo
FAX

WCD

(5N) 836-2939

Wallace C.

# Drennan, Inc.

## General Contractors

P.O. BOX 16438

70175-6436

NEW ORLEANS, LA

July 28, 2016

<u>E-MAIL</u>

Fishman Haygood, L.L.P.
201 St. Charles Ave., 40 Floor
New Orleans, La. 70170
Attention: Lori Mince

Re: H&E Equipment Services, Inc. v. URS Corporation Architecture, P.C., et al., Suit No. 626,308, 1"ʰ JDC, Parish of East Baton Rouge, State of Louisiana

Dear Ms. Mince:

Fishman Haygood, L.L.P. has asked Wallace C. Drennan, Inc. ("WCD") to prepare a report addressing issues related to cracking and spalling of concrete pavement at the H&E Equipment Services ("H&E") facilities in Baton Rouge and Kenner, Louisiana. This report is in response to Fishman Haygood's request and summarizes my opinions.

For this assignment, I relied on the following materials provided to me:

H&E Baton Rouge Facility

1. As-Built Plans sheet nos. C-201, C-202, C-203, C-204, C-205, C-206, C-207, C-301, C-302, C-303, C-304, C-305, C-306 and C-501.

2. STE Geotechnical Investigation Proposed H & E Buildings Pecue Lane, Baton Rouge, Louisiana dated January 1 1, 2007. (H&E 0000211 to 0000259).

3. URS Project Specifications - Project Manual Sec. 2516 (URS 062010062242).



EXHIBIT
D-1

DRENNAN
EXHIBIT NO. 1
K. DONNELLY

H&E Kenner Facility

1. MAPP As-Built Plans sheet nos. 0.1, C7.o, C5.o, C6.o, C7.o, C8.o and C9.0.

CONSTRUCTING FOR OVER 50 YEARS

2. Terracon Geotechnical Engineering Report H&E Equipment-Addition and Renovation Kenner, Louisiana dated February 9, 2011. (H&E 0009535 to 0009577).

3. Terracon Geotechnical Report — Pavement Addendum dated August 5, 2011 (URS 033265 to 033267).

4. URS Specifications for Kenner (URS 066295-066356).

During the course of my review and evaluation, I also referred to the following sources:

1. Louisianan Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet nos. 1, 2 and 3.

2. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

3. City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01, sheet nos. 1, 2 and 3.

4. WCD Photographs taken during site visits June 30, 2016 and July 7, 2016.

In addition, I conducted site inspections on June 30, 2016 at both the Baton Rouge and Kenner, Louisiana facilities. On July 7, 2017, I conducted a follow-up site visit to the Kenner facility.

<u>DISCUSSION</u>

The observed damage to the concrete pavement at both facilities includes the following:

1. Random Cracking across panels of PCCP.

2. Diagonal Comer Cracking at the intersections of Joints (CJ and CJ/CJ and EJ/EJ and EJ).

3. Joint Spalling (breaking off and chipping of joint edges) of either side of the PCCP Control/Contraction/Construction Joints ('CJ") and Expansion Joints ("EJ").

<u>BATON ROUGE</u>

I have reviewed the plans and specifications prepared by URS Corporation for the Baton Rouge facility. The plans for the Baton Rouge facility include design details for the PCCP


NON-CERTIFIED COPY

including the CJ (see detail no. 4 as shown plan sheet no. C-501) and EJ (see detail no. 3 as shown plan sheet no. C-501). The design of the pavement for the Baton Rouge facility is defective in numerous respects, including the following:

l. The design of the CJ does not include smooth dowels and it is defective. This omission is not in conformance with the following:

   a. Louisianan Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet nos. 1, 2 and 3.

   b. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

   c. City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 1 8, 2008, 502-01, sheet nos. l, 2 and 3.

   d. STE Geotechnical Investigation Proposed H & E Buildings Pecue Lane, Baton Rouge, Louisiana dated January 1 1, 2007. (H&E 0000211 to 0000259).
      Wfically, it is not in compliance with section no. 8.2 "Rigid Pavement" of this

2. The plans (see detail no. I & 2 as shown on plan sheet no. C-501) reflect #3 rebar running across the CJs. This is not consistent with standards promulgated in nos. I .a., 1 b. and 1 c. in the paragraph above. Additionally, using this design does not permit the CJs to contract. Therefore, it is not a functioning CJ and is defective.

3. The design of the typical CJ (see detail no. 4 as shown plan sheet no. C-501) reflects a saw cut joint of h inch depth. This depth is not in accordance with standards promulgated nos. l.a,, 1b. and lc. above. Additionally, based on my professional experience, this depth hinders the functioning of the CJ and is inadequate. Table 1, as shown on the City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01 , sheet no. 1, calls for a "MINIMUM DEPTH OF JOINT" of 2 inches for 6 inch PCCP thickness and 3 inches for 8 inch PCCP thickness.

4. The design of the EJ contained in the plans reflects the use of #4 (1/2") smooth dowels spaced at 18 inch on center. The size and placement of these dowel bars is not in accordance with standards promulgated nos. l.a., 1b. and lc. above. In my opinion the dowel bars are too small and should be spaced on 12 inch center not 18 inch. Table 1, as shown on City of Baton Rouge, Parish Of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 1 8, 2008, 502-01, sheet no. 1, calls for a (#8) smooth dowels for 6 inch PCCP thickness and 1 1/4 inch smooth dowels for 8 inch PCCP thickness both on 12 inch center. Also, Table l, as shown on the Louisiana Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet no. 1 calls for 1 1/4" (#10) smooth dowels for 8 inch PCCP thickness on 12 inch center.

The design defects referred to above are consistent with random cracking across panels of PCCP and diagonal comer cracking at the intersections of Joints (CJ and CJ/CJ and EJ).

NON-CERTIFIED COPY

Page 4

In addition to the foregoing, the design of the concrete calls for 8 inch pavement in the area immediately surrounding the branch office and 6 inch pavement in all other areas. In areas where H&E operates its equipment (i.e. all parts of the facility other than the parking lot in front of the office building), it is my opinion that 6 inch thickness is inadequate. Based on my professional experience, the standard in the industry is minimum of 7 inches and preferably 8 inches or greater in areas where heavy equipment will be operated.

The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJs and EJs outlined above is three million three hundred seventy thousand dollars ($3,370,000), The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJs and EJs and increase the concrete thickness to 8 inches in all areas is three million six hundred ninety thousand dollars ($3,690,000). All estimated costs are rounded to the nearest thousand dollars. The estimated costs do not include any contingency costs which are normally 100/0 to 20% of the estimated costs. The estimated costs include 8% for engineering costs. According to the State of Louisiana Facility Planning & Control A/E Consulting Fees Spreadsheet for a project of this size, the Fee % is 7.7%. The estimated costs do not include the costs of a testing laboratory. Add 1% for testing.

<u>KENNER</u>

I have also reviewed the plans and specifications prepared by URS Corporation for the Kenner facility. As with the Baton Rouge facility, the plans for the Kenner facility include design details for the PCCP including the CJ (see details plan sheet no. C-7.0) and EJ (see details plan sheet no. C-7.0) as well as various general notes regarding the pavement. The plans and specifications for the Kenner facility are deficient in numerous respects, including the following:

1. The design of the CJ does not include smooth dowels and it is defective. This omission is not in conformance with the following:

    a. Louisiana Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet nos. 1, 2 and 3.

    b. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

    c. Terracon Geotechnical Engineering Report Equipment-Addition and Renovation Kenner, Louisiana dated February 9, 2011. (H&E 0009535 to 0009577).

2. The plans and specifications reflect #3 rebar running across the CJs. This is not consistent with standards promulgated by LADOTD. Additionally, using this design

NON-CERTIFIED COPY

does not permit the CJs to contract. Therefore, it is not a functioning CJ and is defective.

3. The CJ shows a saw-cut of 1/4" depth of concrete. This depth is not in accordance with standards promulgated by LADOTD. Additionally, based on my professional experience, this depth is inadequate.

4. The design of the typical transverse expansion joint contained in the plans reflects the use of #4 (1/2") smooth dowels spaced at 18 inch on center. The size and placement of these dowel bars is not in accordance with specifications for the ACI or the DOTD. In my opinion, the dowel bars are too small and should be spaced on 12 inch center not 18 inch.

The design defects referred to above are consistent with random cracking across panels of PCCP and diagonal corner cracking at the intersections of joints (CJ and CJ/CJ and EJ).

In addition to the foregoing, the design of the concrete calls for 7" of concrete. Given the extremely poor soils conditions in Kenner, based on my professional experience, a minimum of 8" of thickness is required in areas where heavy equipment is used.

Due to the nature of concrete, and its thermal expansion and contraction, it cracks without proper crack control. Properly designed CJs and EJs, reinforcement, and proper pavement thickness, are important to insuring the integrity of the concrete and preventing excess cracking and failure. The design deficiencies outlined above are consistent with the cracking observed at both the Baton Rouge and Kenner facilities. In both situations, had the joints been saw cut 2 inches deep for 6 inch PCCP and 3 inches deep for 8 inch PCCP, the #3 rebar crossing the joints stiff prohibited the CJs from contracting. Thus, the concrete was left to crack at areas of least resistance resulting in Diagonal Corner Cracking and Random Cracking.

In addition to the foregoing, the operation of metal track equipment across the pavement has resulted in spalling observed along the surface of the joints. It was foreseeable that the operation of H&E's equipment across the joints would cause spalling along the joints. URS should have recommended a design that would offer additional protection for the joints.

The estimated cost of removing and replacing the Concrete to correct the deficiencies in the CJs and FJs outlined above is one million six hundred fifty six thousand dollars ($1,656,000) The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJ and EJs and increase the concrete thickness to 8 inches in all areas is one million seven hundred sixteen thousand dollars ($1,716,000). All estimated costs are rounded to the nearest thousand dollars. estimated costs do not include any contingency costs which normally to 20% of the estimated costs. The estimated costs include 8% for engineering costs. According to the State of Louisiana Facility Planning & Control ME Consulting Fees Spreadsheet for a project of this size, the Fee % is 7.7%. The estimated costs do not include the costs of a testing laboratory. Add for testing.

NON-CERTIFIED COPY

Page 6

## QUALIFICATIONS

| From | To | Description |
|------|------|-------------|
| 1979 | 1981 | Tulane Universit |
| 1981 | 1983 | Universi of Alabama |
| 1983 | 1988 | Wallace C. Drennan, Inc. Concrete Paving Laborer, Equipment Operator and Foreman. Sewer Installation Foreman. Pro•ect Mana er. |
| 1988 | 1991 | Wallace C. Drennan, Inc. Secretary Treasurer, Estimator, Project Manager, Concrete Pavin E ui ment O erator |
| 1991 | Present | Wallace C. Drennan, Inc. President. Associated Builders and Contractors (ABC Board of Directors 1994-2000, President 1997 and 1998. |

Attached please find a listing of representative projects completed by Wallace C. Drennan, Inc.

## COMPENSATION

I am being compensated at the rate of $350.00 per hour for my work in this matter.

## PRIOR TESTIMONY AND PUBLICATIONS

I have not testified as an expert witness in any matter during the last 4 years. I have not authored any publications within the last 10 years.

Sincerely,

Wallace C. Drennan, Inc.

**Wallace C. Drennan III, President**

Enclosure

NON-CERTIFIED COPY



After the removal of these undesirable materials and re-compaction of the near surface soils as needed, the area should be proof-rolled with a heavy vehicle (e.g., a loaded 12-yard dump truck). The proof rolling should be observed by a qualified geotechnical engineer or his representative to detect pumping or yielding areas or other undesirable subgrade. Such conditions, if present, may require undercutting and replacement with more competent fill. As an alternative to undercutting, treatment with lime can be performed or use of a geogrid. The depth and amount can be determined at the time of construction.

These recommended procedures are intended to serve as an aid to construction and not as a method of providing "all weather" construction conditions. Higher treatment percentages may be necessary if soil moisture contents become elevated due to exposure during wet weather.

## 9.2    Fill Materials

Subsequent to the site preparation activities, the area should then be brought to grade using a clean, select fill material free from debris or organic matter. Cohesive fill materials, consisting of silty or sandy clay with a plasticity index of 12 to 22 and a liquid limit of 30 to 42 may be used. In this case, the material should be classified as CL in accordance with the Unified Soil Classification System (USCS).

## 9.3    Fill Placement & Compaction

Compaction of cohesive fill on the existing subgrade will be difficult during wet weather. Proper drainage should be provided in order to facilitate fill placement during both dry and wet weather construction.

Cohesive fill should be placed in 6 to 8 inch loose lifts and compacted to a dry density at least equal to the 95% of its maximum as determined by the standard Proctor compaction test (ASTM D 698) before another lift is added. Light scarification of each lift is recommended before placing soil for the next lift. This helps provide proper bonding between lifts.

## 9.4    De-Watering and Drainage Considerations

Water infiltration into excavations or prepared subgrades, which could result in the weakening of the soils, should be minimized. Therefore, surface and groundwater should not be allowed to collect in foundation excavations or prepared subgrades of the construction area both during and after construction. To account for water infiltration, undercut or excavated areas should be sloped toward a corner to allow for quick removal of groundwater or surface runoff. Positive site surface drainage should be provided to minimize infiltration of surface water around the perimeter of the structures, excavations, etc. It is believed that water accumulation into excavations can be removed with normal sump pumping. However, should excessive and uncontrolled amounts of seepage occur, the geotechnical engineer should be contacted.

## 9.5    Quality Control

The use of the correct fill material and the proper placement and compaction are critical in any earthwork where subsequent construction of structures is planned. Construction monitoring by a

H & E Buildings                                    06-1153

H & E 0000224

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *  *
                        *
H&E EQUIPMENT SERVICES  *
                        * NUMBER 626,308
VERSUS                  *
                        * DIVISION "D"
URS CORPORATION         *
ARCHITECTURE, P.C., URS *
CORPORATION, L O'NEAL   *
JOHNSON AND THOMAS E.   *
RYAN, III               *
                        *
*  *  *  *  *  *  *  *  *
```

Deposition of JAMES R. BAILEY,

Ph.D., P.E., taken on Thursday, September 22,

2016, commencing at 9:43 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.



EXHIBIT
E

NON-CERTIFIED COPY

Page 26

1      Q.  Okay.  Dr. Bailey, I'm looking at the

2  Appendix A to your report.

3         MR. FRANCO:

4             We can label your report as Exhibit

5  A and we will -- I'm sorry.  Exhibit 1.  We'll

6  call it Exhibit 1.

7  EXAMINATION BY MR. FRANCO:

8      Q.  And if you have a copy, that is fine.

9  If not, we will get a good copy while we take a

10  break.

11     A.  I have one.

12     Q.  Okay.  Is that something we can use?

13     A.  I see no reason why not.  It's printed

14  in original color.

15     Q.  Okay.  I assume you have several of them

16  or available.

17     A.  Yes, this is the only one I have today.

18     Q.  Right.

19     A.  But, yes, that is fine.

20     Q.  Okay.  The second paragraph of the

21  Professional Profile says that, "Dr. Bailey's

22  primary area of expertise is determining the

23  risk exposure of residential, commercial and

24  industrial properties to hazards associated with

25  hurricanes, tornadoes and flooding."  That is

NON-CERTIFIED COPY

*Failure Analysis Associates*

# E*x*ponent

## Investigation of Damaged Concrete Pavements at H&E Equipment Facilities

BAILEY

EXHIBIT NO. 1

K. DONNELLY

EXHIBIT

E-1

NON-CERTIFIED COPY

# Investigation of Damaged Concrete Pavements at H&E Equipment Facilities

Prepared for

Loretta G. Mince, Esq.
Fishman Haygood, L.L.P.
201 St. Charles Avenue
46th Floor
New Orleans, Louisiana 70170

Prepared by

James R. (Bob) Bailey, Ph.D., P.E.
Senior Managing Engineer
Exponent, Inc.
10850 Richmond Avenue, Suite 175
Houston, Texas 77042
Louisiana Firm No. EF.0003375

July 29, 2016

© Exponent, Inc.



1306663.001 7845

NON-CERTIFIED COPY

# Contents

|  | Page |
|---|---|
| List of Figures | ii |
| Executive Summary | 1 |
| Limitations | 2 |
| Introduction | 3 |
| Background | 4 |
| Discussion | 5 |
|     Pavement Surface Condition | 5 |
|     Pavement Design Features | 7 |
|     Baton Rouge Site | 8 |
|     Kenner Site | 10 |
| Remedies | 14 |
|     Pavement Surface | 14 |
|     Pavement Design | 15 |
| Findings | 16 |
| Appendix A    Curriculum Vita of James R. Bailey, Ph.D., P.E. | 29 |
| Appendix B    Documents Reviewed | 37 |

NON-CERTIFIED COPY

# List of Figures

|  |  | Page |
|---|---|---|
| Figure 1. | Various Perspectives of Baton Rouge Site | 17 |
| Figure 2. | Various Perspectives of Kenner Site | 18 |
| Figure 3. | Concrete Pavement at Baton Rouge Site | 19 |
| Figure 4. | Concrete Pavement at Kenner Site | 22 |
| Figure 5. | Pavement Details and Note for Baton Rouge Site | 25 |
| Figure 6. | Designated Area for Heavy Duty Pavement at Baton Rouge Site | 26 |
| Figure 7. | Dowel Sizing and Spacing Requirements | 27 |
| Figure 8. | Pavement Details and Note for Kenner Site | 28 |

NON-CERTIFIED COPY

# Executive Summary

Fishman Haygood, L.L.P., on behalf of the plaintiff, retained Dr. James R. Bailey, Ph.D., P.E., of Exponent, Inc., to evaluate the cause of damage to concrete pavements at two separate facilities operated by H+E Equipment. The two facilities are located in Louisiana, one facility in Baton Rouge and the other facility in Kenner (near New Orleans). URS Architects Engineers Planners designed the pavements. My scope of work included on-site surveys, review of architectural and engineering drawings, review of photos taken of the subject property, review of emails and other produced documents, engineering analyses, and preparation of this report which summarizes my findings.

I am the Project Manager. I am a licensed Professional Engineer in nine states and a Fellow of the American Society of Civil Engineers. As a Senior Managing Engineer in Exponent's Building & Structures practice, I have expertise in several areas of Civil Engineering, including construction materials, structural analysis and design, and materials testing. My Curriculum Vitae, including my recent testifying experience and my billing rate, is provided in Appendix A. A list of the documents reviewed by me is provided in Appendix B. My findings presented herein are made to a reasonable degree of engineering certainty.

Surface degradation of the concrete pavements is widespread and increasing at both sites. Large cracks have formed beyond the joints, an indication of improper sizing and/or placement of steel reinforcement. Repairs including replacement of the existing pavements will be necessary to allow for extensive use of heavy equipment over these paved areas during the 20-year design life without inducing the same level and extent of damage.

My current understanding is that H+E Equipment clearly communicated to URS the type of equipment that would travel across the pavements. Moreover, representatives of URS reportedly visited two H+E Equipment sites in Louisiana and one site in Houston. According to H+E Equipment during these site visits URS viewed the equipment, including the heavy metal tracked equipment. The pavements as currently designed and constructed are not adequate to perform for their intended use as required by H+E Equipment. In my opinion URS did not exhibit the appropriate standard of care when designing the concrete pavements constructed at the two sites in accordance with applicable specifications, standards, and guidelines.

Methods are available to extend the life of concrete pavements and joints. These methods include the application of specialty aggregate toppings; increasing the design compressive strength; increasing the pavement thickness; increasing the dowel bar sizes; properly spacing dowel bars; and installing metal edge guards along the expansion joints.

1306663.001 7845

1

NON-CERTIFIED COPY

## Limitations

This report has been prepared to address evaluation of concrete pavement damage at the subject properties.  Exponent's investigation focused on determination of causation mechanisms for physical damages at the exterior concrete paved areas.  The scope of services performed during this investigation may not adequately address the needs of other users, and any re-use of this report or the findings, conclusions, or recommendations presented herein is at the sole risk of the user.

Exponent's objective is to accurately assess observed conditions and consider all relevant data. The findings presented herein are made to a reasonable degree of engineering certainty.  I reserve the right to supplement this report and to expand or modify my opinions based on review of additional material as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others.

NON-CERTIFIED COPY

# Introduction

At the request of Fishman Haygood, L.L.P. on behalf of H+E Equipment, as a Senior Managing Engineer for Exponent Failure Analysis Associates (Exponent), I conducted an investigation to determine the nature, mechanism(s), and extent of damage to concrete pavements at two separate facilities operated by H+E Equipment. The two facilities are located in Louisiana, one facility in Baton Rouge and the other facility in Kenner (near New Orleans). I also investigated what aspects of the damage (if any) are attributable to flaws in the design, construction, or usage conditions of the pavements.

The scope of my work included the following:

- Site surveys on 23 September 2013, 12 and 13 August 2014, and 07 July 2016;
- Review of architectural and engineering drawings;
- Review of photos taken of the subject property;
- Review of emails and other produced documents;
- Engineering analyses; and
- Preparation and submittal of this report.

NON-CERTIFIED COPY

# Background

H+E Equipment uses the facilities located at Baton Rouge and Kenner as distribution centers for heavy construction equipment. Some of this equipment moves on different types of metal tracked systems. The heavy construction equipment travels across and is parked on concrete pavements recently constructed at the two facilities. URS Architects Engineers Planners[1] (herein referred to as URS) designed the pavements. Exponent conducted site surveys of each facility on 23 September 2013, 12 and 13 August 2014, and 07 July 2016[2]. Various perspectives of the Baton Rouge and Kenner sites are shown in Figure 1 and Figure 2, respectively.

During our site surveys we observed cracking; spalling of concrete edges at expansion, construction, and control joints[3]; and varying degrees of surface erosion in several areas of the concrete pavements at each facility. The damage was particularly evident in areas where heavy tracked equipment had travelled and was subsequently parked. Various perspectives of the concrete pavements are shown in Figure 3 and Figure 4 for the Baton Rouge and Kenner sites, respectively. The pavements at both facilities are constructed of reinforced Portland cement concrete and were poured during the first half of 2012, meaning they are approximately four years old.

---

[1] A division of URS Corporation which was acquired by AECOM in 2014.
[2] Photos, drawings, calculations, and other related information related to our investigation are available upon request.
[3] As defined on architectural and engineering drawings produced by URS.

NON-CERTIFIED COPY

# Discussion

## Pavement Surface Condition

Surface damage was observed on pavements in parking areas designated for heavy trucks and equipment, tractor trailers, and tracked equipment at both facilities. The observed surface damage to the concrete pavements is consistent with the type of damage one would expect to observe to the type of concrete specified when exposed to high levels of stress and friction, or abrasion, acting at or near the concrete surface. Surface cracks not associated with damage at joints or abraded areas were also observed during the three site visits. These surface cracks appear to be the result of ineffectiveness of the control joints rather than a response to external effects. Little or no surface damage was observed at either facility on pavements in parking areas designed for cars and light trucks.

Loads imposed by tracked equipment depend on the contact surface. Tracks in heavy construction equipment are typically comprised of a belt system of adaptable links with keys on them. The intention is that these keys will penetrate the surface where the vehicle is moving, thus increasing the level of effective friction and therefore allowing the equipment to move in what typically are soft soil conditions. As these keys are meant to fully penetrate the soil, it is generally assumed that the weight of the equipment is distributed on the full surface of the track system, and then transferred to the supporting soil. The resulting pressure from the tracks to the soil is typically labeled "ground pressure" on catalogs provided by the manufactures of this type of equipment. Exponent was able to obtain such information from a local distributor.

One of the performance features of the track is that it be sufficiently flexible to spool around the wheels of the vehicle, effectively forming a belt around each set of wheels. This feature, in turn, requires the belt to be somewhat flexible. To achieve this flexibility and still maintain sufficient in-plane stiffness and strength, the belt is typically made of metal "links" that can adjust with respect to each other. This linkage results in a condition where, only after the keys have penetrated the soil, the weight of the vehicle is fully distributed on the track and not just on the wheel sections alone. It also means that if the keys have not penetrated the surface, then the weight is likely to be transferred in most part in the areas immediately under the wheels or spools of the track.

On hard surfaces like concrete, these tracks and their keys do not easily penetrate the bearing surface, thus forcing transfer of the full weight of the equipment to the supporting surface by the area under the keys alone. Furthermore, the weight of the equipment is being transferred mostly by the keys directly under the wheels in this condition. The keys in this condition are therefore

NON-CERTIFIED COPY

effectively narrow bands of pressure applied to an unbounded in plane surface resulting in a notable stress increase.

Exponent approximated this expected stress increase using an elastic estimation of contact pressure between two surfaces. The resulting increase in stress was estimated to be on the order of four times the applied stress by the key. Applying this level of stress in areas adjacent to a free surface, like an expansion joint, would result in stresses higher than the expected capacity of the specified 4,000 psi concrete. Such an outcome would cause the types of damage like shear cracking and spalling observed by Exponent at the two H+E Equipment sites as shown in Figure 3 and Figure 4. I also observed the absence of steel edge guards along the length of the expansion joints. It is my opinion that installation of steel edge guards at the expansion joints where heavy tracked construction equipment crossed would have significantly reduced the spalling and cracking at these joints.

Given an understanding of the types of loads imposed by heavy tracked vehicles on concrete pavements, Exponent then conducted a literature review to identify codes, standards, guidelines, or other publications that address concrete design for such conditions. We could not identify any specification in the United States related directly to the design of concrete surfaces under tracked vehicles. Some references are available for the design of concrete pavements under heavy loads, specifically, at airports and with some industrial applications. However, these references do not address metal wheel types or tracks directly, nor do they give guidance on what load to design the pavement for in these cases.

Countries like New Zealand recognize the effect of metal wheels and their resulting abrasion in their standards[4], requiring more attention to finishes and proper selection of concrete strengths. However, it only addresses metal wheels directly and not tracked vehicles. It does indicate that for cases where high abrasion is to be expected, concrete strengths are likely to be 40 MPa or higher (6,000 psi) and that special attention should be given to flooring finishing techniques and selection.

In my opinion a prudent designer for this type of project should have researched and consulted such readily available literature to ensure the types of damages being observed to the concrete pavements, based on its intended use, would be minimized. Based on documents produced at the time of this report, to my knowledge URS made no such effort. If they made such an effort, then URS evidently did not communicate to H+E Equipment the potential for heavy tracked equipment causing such damage to concrete pavements being designed by them for the two sites.

---

[4] NZS-3101 Part 1 Table 3.8

1306663.001 7845

NON-CERTIFIED COPY

## Pavement Design Features

Based on conversations with H+E Equipment[5], URS was aware that they should design concrete pavements at both sites to allow parking of all types of heavy equipment, including tracked equipment, anywhere on the pavements. Indeed, URS made no distinction on their drawings regarding where certain types of heavy equipment were to be parked[6]. Given this requirement, all pavement areas designed for heavy equipment may be subject to traffic from all types of such equipment, and therefore should be designed to accommodate all of them accordingly.

A publication by the American Concrete Institute titled *ACI 330R-01 Guide for the Design and Construction of Concrete Parking Lots* provides designers current knowledge and practices for the design, construction, and maintenance of concrete parking lots. ACI 330R-01 was issued in October 2001 and was available at the time of the design of the pavements at the two facilities. The guide was revised and subsequently reissued in June 2008 as ACI 330R-08.

ACI 330R-01 enables a designer to select a pavement thickness based on the Traffic Category, Modulus of Subgrade Reaction ($k$), and Modulus of Rupture ($M_R$) of the concrete. In my opinion a proper interpretation of ACI 330R-01 for both sites would result in the selection of Traffic Category C for parking areas and interior lanes, and Traffic Category D for entrance and exterior lanes. The Modulus of Rupture equals approximately 600 psi assuming a 28-day concrete compressive strength of 4000 psi[7]. The Modulus of Subgrade Reaction depends on the soil conditions as indicated in the geotechnical report produced for each site.

Both ACI 330R-01 and ACI 330R-08 state that distributed steel reinforcement can be used to control the opening of intermediate cracks between the joints. The sole function of distributed steel reinforcement is to hold the fracture faces together if cracks form. This use becomes more obvious in cases where uncontrollable subgrade conditions are liable to provide non-uniform support. ACI 330R-01 states that distributed steel reinforcement "is needed" in pavements with transverse joints spaced more than 30 times the slab thickness, while ACI330R-08 states that it "may be needed." When used, the distributed steel reinforcement is interrupted at the contraction joints because such joints by design should be free to open.

According to ACI 330R-01 and ACI 330R-08 pavements designed for truck traffic typically require load-transfer dowels for large joint spacing. A larger joint spacing results from increased spacing between joints which, in turn, increase joint openings and reduce aggregate interlock load transfer. ACI 330R-01 specifies diameters for smooth round dowels of 3/4", 7/8", 1", and 1-1/8" for slab depths (i.e., thicknesses) of 6", 7", 8", and 9", respectively.

---

[5] Frankie Wynn, Director of Facilities/Risk/Compliance Management, H&E Equipment Services, Inc.
[6] For example, see URS Drawing AS-101 for the Baton Rouge site.
[7] $M_r = 2.3 f_c'^{2/3}$; regarding ACI330R-08 the values for the Traffic Category would be the same, while $M_r$ would range from approximately 500 psi to 630 psi depending on the aggregate texture and shape.

NON-CERTIFIED COPY

ACI330 R-08 specifies diameters for smooth round dowels of 1", 1-1/4", and 1-1/4" for slab depths of 7", 8", and 9", respectively. All dowels are spaced at 12" centers. Dowel embedment is 6" on each side of a joint with a total dowel length of 14" to allow for joint openings and minor errors in dowel positioning. Correct alignment and lubrication is cited in both versions of ACI 330R as essential for proper joint function.

Given the operating conditions stated by H+E Equipment, in my opinion it was reasonable and prudent for URS to require distributed steel reinforcement in the concrete pavements at both sites to control the opening of intermediate cracks between the joints. It was also reasonable and prudent for URS to require dowels at the expansion joints to provide vertical load transfer while permitting the joints to expand. However, as indicated in the sections to follow URS did not design the dowels in accordance with recognized specifications and guidelines related to concrete pavement design.

**Baton Rouge Site**

A review of engineering drawings for the Baton Rouge site indicate that heavy equipment, including tracked equipment, was to travel and park around the north, south, and west sides of the single story Branch Building in an area designated as "Inventory Storage".[8] This same area is labeled "Concrete Parking" and in my opinion should be associated with the design of "Heavy Duty Pavement" given the type of equipment moving in the area[9]. Figure 5 shows pavement details from the architectural and engineering drawings created by URS for the Baton Rouge site.

Regarding rigid pavement design a geotechnical report produced to URS for the Baton Rouge site[10] states,

> "No specific traffic data were provided; therefore, pavement recommendations for this site are based upon the following assumed daily traffic frequencies. In the heavy storage area: 100 light (7-kip) trucks, two 34-kip trucks, two 46-kip trucks, and thirty 80-kip trucks per day."

> "The traffic is expected to be from rubber-tired vehicles. If the expected traffic frequencies (especially those involving heavy vehicles) are much different from these assumptions, this office should be notified so that we may re-evaluate the pavement recommendations."

[Page 9; Section 8.0]

---

[8] URS Drawing AS-101; for the purposes of this report the front of the Branch Building is assumed to face east.
[9] URS Drawings C-202, C-205, and C-206; pavement in front of the building where cars and light trucks park is labeled "Concrete Driving Parking"; URS Drawing C-501 Detail 1.
[10] Soil Testing Engineers, Inc., 316 Highland Park Drive, Baton Rouge, Louisiana, 70810; report dated January 11, 2007.

NON-CERTIFIED COPY

"Rigid pavement recommendations have been computed based on a modulus of subgrade reaction (k) of 65 pci. Additionally, the design presumes 3,800 psi concrete, which can be expected to develop a modulus of rupture of about 650 psi (average). The design life of the pavement system is dependent upon periodic maintenance of the pavement. This maintenance includes but is not limited to cleaning and resealing joints, sealing cracks and immediate repairs of damaged areas."

"In the heavy equipment storage area, for a 20-year design life, we estimate the number of 18-kip equivalent single axles (ESAL's) for rigid pavement to be approximately 956,028. Based on these results, we recommend a minimum rigid pavement thickness of 7 inches."

"The rigid concrete should conform similarly to the requirements of LA DOTD Standard Specifications, Section 601, 2000 Edition. Proper steel reinforcement (temperature and shrinkage) joint design, and installation are essential to satisfactory pavement performance."

[Page 10; Section 8.2]

My interpretation of ACI 330R-01 Table 2.4 for this case would result in the selection of a 20-year design thickness of 6.5 inches for Traffic Category C (parking areas and interior lanes) and 9.0 inches for Traffic Category D (entrance and exterior lanes). The same selection results using ACI 330R-08 Table 3.4 with the exception that for Category D when dowels are used in transverse joints the thickness can be reduced one inch to 8.0 inches.

The thickness for heavy duty pavement shown on the URS design drawings (see Figure 5) is 8.0 inches. However, according to the URS drawings[11] as illustrated in Figure 6 this heavy duty pavement is limited to the immediate area surrounding the Branch Building. The remaining portion of the concrete pavement beyond the Branch Building is designated by URS as standard duty pavement which by design is 6.0 inches thick. This thickness is less than what was recommended in the geotechnical report and what would be required in accordance with ACI 330R-01 for heavy types of equipment, including tracked equipment. As indicated earlier, H+E Equipment reportedly told URS to design the pavement surrounding the Branch Building in a manner that allowed the movement and parking of all types of equipment anywhere on the pavement.

The engineering drawings for the Baton Rouge site also deviated from good design practice in definition of the contraction joint[12] depth (see Figure 5). The drawing detail for the contraction joint shows a note stating "Saw-Cut Joint ½" Depth". The minimum depth of a contraction joint

---

[11] URS Drawings C-302 and C-305; the legend states "Proposed 8" Concrete".
[12] The drawing labels this detail as a construction joint.

NON-CERTIFIED COPY

should be one-fourth of the slab thickness, or approximately 1.5 inches for a six-inch thick slab and 2.0 inches for an eight-inch thick slab[13]. However, during my surveys I measured the contraction joints at the Baton Rouge site and they were no more than ½ inch deep.

ACI 330R-01 recommends dowel diameters of 3/4" and 1" for slab thicknesses of 6" and 8", respectively. The Department of Public Works for the City of Baton Rouge and Parish East of Baton Rouge specifies dowel diameters of 1" and 1-1/4" for slab thicknesses of 6" and 8", respectively. The Louisiana Department of Transportation (LDOT) specifies a dowel diameter of 1-1/4" for a slab thickness of 8". All three documents require the spacing to be 12 inches. Figure 7 shows the tables from each of these sources including ACI 330R-08. The URS drawing (see Figure 5) shows a #4 smooth bar, meaning a ½" diameter bar, spaced 18 inches on center. This design is notably less in terms of the amount of steel per unit area than what is recommended by ACI and specified by the Department of Public Works and LDOT.

Diagonal cracking was observed at the intersection of some expansion joints at the Baton Rouge site (see Figure 3). High stress concentrations form at the corners of square pavement sections due to curling and warping of the pavement section caused by moisture and temperature differentials, and uneven loading across the pavement surface. According to ACI 330R-08,

> "Dowels should not be placed closer than 12 in. (300 mm) to a joint intersection to minimize the potential for corner cracking."
>
> [Page 9; Section 3.8.2]

The presence of corner cracking at some of the expansion joints intersections suggests that improper spacing of dowels near the corners may have occurred. I did not identify a detail or note on the URS drawings indicating a minimum distance from the joint intersection for dowel placement.

**Kenner Site**

A review of engineering drawings for the Kenner site indicate that heavy equipment, including tracked equipment, was to travel and park virtually anywhere on the site, including along the main entryway and around all sides of the Service Building[14]. These areas were designated as "Heavy Duty Pavement". Only a few select areas in front of the office and toward the back of site were designated as "Light Duty Pavement" for cars and light trucks. Figure 8 shows

---

[13] Specification for Unreinforced Concrete Parking Lots ACI 330.1-04 published by the American Concrete Institute.
[14] URS Drawing C1.0.

NON-CERTIFIED COPY

pavement details from the architectural and engineering drawings created by URS for the Kenner site[15].

Regarding rigid pavement design a geotechnical report produced to URS for the Kenner site[16] states,

> "Anticipated traffic volumes and loading conditions for this facility were not provided, but were assumed based on experience with similar projects. The pavements within the facility may likely be a medium to heavy duty traffic areas. Traffic estimates used in the determination of required pavement thicknesses assume a 20-year design period and are summarized in the following table." [Table omitted for brevity.]

> "The architect or engineer responsible for the final pavement design should review this traffic information for accuracy/applicability. If these traffic assumptions are not correct, please advise this office so that the pavement designs can be re-analyzed and revised thickness designs developed."

> "Based upon the soil conditions at the site, rigid pavements should be designed and constructed using a minimum 7-inch concrete pavement thickness over a minimum 12 inches of compacted river sand."

> "Long term differential settlement is expected to occur across the proposed pavement areas with these soil conditions. It is expected that differential movement will occur over a period of several years between the pavement panels resulting in subsequent loss of aggregate interlock at the joints. For these anticipated conditions, it has been an accepted practice to install a nominal reinforcement in the pavement consisting of minimum #3 rebar at 18-inch on-centers to maintain the joint connection. Alternatively an appropriately sized welded wire fabric can also be used."

> "Other standard design and construction details for rigid pavements as contained in ACI 330R-01 'Guide for Design and Construction of Concrete Parking Lots' should be followed in the pavement design and construction process. *It is recommended that the design engineer refer to this document for more detailed information* [emphasis added]. A critical aspect of concrete pavements for facilities of this nature is joint spacing and related details. ACI 330R-01 addresses these important details."

> [Pages 11-12; Section 4.5]

---

[15] URS Drawing C7.0.
[16] Terracon Consultants, Inc., 316 Highland Park Drive, Baton Rouge, Louisiana, 70810; report dated February 9, 2011.

1306663.001 7845                                    11

NON-CERTIFIED COPY

The Modulus of Subgrade Reaction was reported as 75 psi/in[17]. My interpretation of ACI 330R-01 Table 2.4 for this case would result in the selection of a 20-year design thickness of 6.5 inches for Traffic Category C (parking areas and interior lanes) and 9.0 inches for Traffic Category D (entrance and exterior lanes). These section depths are consistent with ACI 330R-08 Table 3.4 with the exception that for Category D when dowels are used in transverse joints the thickness can be reduced one inch to 8.0 inches.

The thickness for heavy duty pavement shown on the URS design drawings (see Figure 8) is 7.0 inches[18]. This thickness is consistent with the recommendation made in the geotechnical report. Surface degradation issues aside, in my opinion a 7.0 inch thickness is the proper value for Traffic Category C where equipment is parked or traveling along the interior of the site. However, for the entrance and exterior lanes along the perimeter of the site, i.e., Traffic Category D, the 7.0 inch thickness is less than what is recommended per ACI 330R-01 for heavy types of equipment, including tracked equipment. As indicated earlier, H+E Equipment reportedly told URS to design the pavement surrounding the Service Building in a manner that allowed the movement and parking of all types of equipment anywhere on the pavement.

A review of engineering drawings for the Kenner site also revealed a discrepancy in the definition of the contraction joint[19] depth (see Figure 8). A drawing detail for the contraction joint shows a note stating "Saw-Cut ¼ Slab Thickness" meaning the joint depth should be one-fourth of the slab thickness. The same detail also shows a dimension labeled "¼ Depth of Concrete" which could be interpreted as a depth of ¼ (0.25) inches. The correct depth of a contraction joint should be one-fourth of the slab thickness, or approximately 1.75 inches for a seven-inch thick slab[20]. During my surveys I also measured contraction joint depths at the Kenner site. They were no more than ½ inch deep.

As shown in Figure 7, ACI 330R-01 recommends a 7/8" dowel diameter for a 7" slab thickness. ACI 330R-08 recommends a 1" dowel diameter for a 7" slab thickness. LDOT specifies a dowel diameter of 1-1/4" for a slab thickness of 8"[21]. All three documents require the spacing to be 12 inches. The URS drawing (see Figure 8) shows a #4 smooth bar, meaning a ½" diameter bar, spaced 18 inches on center. This design is notably less in terms of the amount of steel per unit area than what is recommended by ACI and as specified by LDOT. Severe degradation of an expansion joint at the Kenner site (see Figure 4) resulted in exposure of a dowel bar. The exposed dowel bar diameter is ½ inch.

---

[17] Page 10 Section 4.4; the topic pertains to details concerning floor slabs, but is assumed applicable to pavement design.
[18] Terracon issued a letter dated August 5, 2011, stating that a 6-inch thick concrete pavement thickness would be acceptable for standard duty pavement.
[19] The drawing labels this detail as a control joint.
[20] Specification for Unreinforced Concrete Parking Lots ACI 330.1-04 published by the American Concrete Institute.
[21] 8" is the minimum slab thickness cited on the LDOT drawings.

NON-CERTIFIED COPY

The URS drawings state that in regards to "pavement preparation and construction" the recommended specifications from the geotechnical report shall govern. As indicated earlier, the geotechnical report issued for the Kenner site states that the standard design and construction details for rigid pavements as contained in ACI 330R-01 should be followed by URS in the pavement design and construction process. In my opinion URS did not follow the ACI 330R-01 guidelines regarding slab thicknesses for Traffic Category D conditions and for dowel bar details at the Kenner site.

Diagonal cracking was also observed at the intersection of some expansion joints at the Kenner site (see Figure 4). As indicated earlier regarding the Baton Rouge site, per ACI 330R-08 dowels should not be placed closer than 12 in. (300 mm) to a joint intersection to minimize the potential for corner cracking. The presence of corner cracking at some of the expansion joint intersections suggests that improper spacing of dowels near the corners may have occurred. I did not identify a detail or note on the URS drawings indicating a minimum distance from the joint intersection for dowel placement.

NON-CERTIFIED COPY

# Remedies

## Pavement Surface

Exponent conducted a literature review of specialty construction materials for use in applications where heavy industrial and construction equipment is present. This effort resulted in identification of several products from different manufacturers designed to mitigate the abrasive effects of loads imposed by industrial equipment like heavy tracked vehicles on concrete pavements. These products can be used as part of new construction, or as a modification/retrofit method for an existing pavement. The common aspect of these materials is the use of special aggregates and other additives in the mix to provide a surface that has both high abrasion resistance and high overall strength.

Because impacts are expected on concrete pavements with heavy tracked equipment moving across them, providing a higher strength concrete mix alone would not be sufficient to ensure long term durability. As the strength of concrete goes up, its susceptibility to impact damage also increases as the mix becomes more brittle, making it prone to failures such as the failures observed at the H+E Equipment sites. The long-term approach is to provide a malleable, but strong, surface for these types of vehicles to move over. According to the consulted manufacturers, this approach has already proven effective in applications similar to the concrete pavements at the H+E Equipment sites.

Specialty aggregates are often prescribed and supplied by manufacturers of specialty slab finishes. One example is an iron filled aggregate. Along with properly executed curing and finishing techniques, this special aggregate will provide a more resistant surface for the movement of heavy metal tracked equipment. Several manufacturers offer products for this application. Exponent strongly recommends that the ultimate choice of a product be made in conjunction with a manufacturer's technical representative to ensure the product is used in a proper application and to identify appropriate quality measures during the execution.

The cost of applying specialty aggregate toppings, including preparation and application, varies with the manufacturer and selected installer. The manufacturer's technical representative can verify whether any special considerations will need to be given at existing joint locations where these products are to be applied.

NON-CERTIFIED COPY

## Pavement Design

To correct design deficiencies due to insufficient slab thickness, improper placement of distributed steel reinforcement and dowels, and/or improper sizing of dowels will require removal of the affected pavement areas.  As stated in ACI 330R-01,

> "The most effective repair method for badly cracked and deteriorated pavement panels is full or partial replacement.  It is important to determine and correct the cause of the slab failure before starting repairs.  Localized subgrade problems should be corrected.  If the pavement panels failed because of heavier than anticipated loads, replacement panels should be thickened to provide additional load-carrying capacity."

[Page 16; Section 6.4]

The presence of heavy track equipment poses a unique challenge to the short- and long-term performance of concrete pavements.  In addition to applying a specialty aggregate topping on lanes where tracked equipment is likely to travel, other options for improving the short- and long-term performance of concrete pavements under such conditions include: increasing the design compressive strength; increasing the pavement thickness; and installing metal edge guards along the expansion joints[22].  Dowels should also be designed and installed in accordance with the most recent ACI publications pertaining to concrete pavement design.

---

[22] Examples where edge guards are installed in reinforced concrete include warehouse loading docks, bridge expansion joints, and stairwells.

NON-CERTIFIED COPY

# Findings

My findings presented in this report are made to a reasonable degree of engineering certainty. Based on my on-site surveys, review of architectural and engineering reports, review of photos taken of the subject property, review of emails and other produced documents, and engineering analyses, in my opinion concrete pavements at the Baton Rouge and Kenner sites were not properly designed to account for the degrading effects and high loads imposed by the heavy construction equipment, particularly tracked equipment, operating across the pavements.

My current understanding is that H+E Equipment clearly communicated to the designer the type of equipment that would travel across the pavements. Moreover, representatives of URS reportedly visited the two sites and according to H+E Equipment viewed the equipment, including the heavy metal tracked equipment. Given these understandings, it is my opinion that URS did not exhibit the appropriate standard of care when designing the concrete pavements constructed at the two H+E Equipment sites.

Sufficient information was available to determine loads acting on the concrete pavements, and to design the pavements in a way to withstand these loads and high levels of stress and abrasion acting at or near the concrete surface. In my opinion damage observed on the concrete surfaces could have been controlled and minimized by the use of proper materials selection and implementation during the design phase. Given the pavement design as presented to the owner prior to construction, at a minimum URS should have informed H+E Equipment of the likelihood of near-term progressive damage to the concrete pavement resulting from the movement of tracked vehicles, and that such damage may necessitate periodic replacement of affected pavement sections. To my knowledge URS did not inform H+E Equipment of the likelihood of near-term progressive damage.

In my opinion the concrete pavements at both sites as currently designed are not adequate to perform for their intended use as required by H+E Equipment. Surface degradation is widespread and increasing at both sites. Large cracks have formed beyond the joints, an indication of an insufficient amount of or an improper placement of steel reinforcement. Repairs to the existing pavements will be necessary to allow for extensive use of heavy equipment over these paved areas during the 20-year design life without inducing the same level and extent of damage.

Steps can be taken to extend the life of concrete pavements including the application of specialty aggregate toppings; increasing the design compressive strength; increasing the pavement thickness; increasing the dowel bar sizes; and installing metal edge guards along the expansion joints.

NON-CERTIFIED COPY



Aerial View (Source: Google Earth™)

Looking West Beyond South Entryway

Looking East Toward the Branch Building

Figure 1.  Various Perspectives of Baton Rouge Site.

NON-CERTIFIED COPY



Figure 2. Various Perspectives of Kenner Site.

NON-CERTIFIED COPY



Figure 3.  Concrete Pavement at Baton Rouge Site (source: Exponent).

NON-CERTIFIED COPY



Figure 3. (Continued)

NON-CERTIFIED COPY



07 July 2016

07 July 2016

07 July 2016

07 July 2016

07 July 2016

07 July 2016

Figure 3.  (Continued)

21

NON-CERTIFIED COPY



Figure 4.  Concrete Pavement at Kenner Site (source: Exponent).

NON-CERTIFIED COPY



Figure 4.  (Continued)

NON-CERTIFIED COPY



Figure 4.  (Continued)

NON-CERTIFIED COPY



Figure 5.  Pavement Details and Note for Baton Rouge Site
(Source: URS Drawings C-501 and C-509).

NON-CERTIFIED COPY



Figure 6.  Designated Area for Heavy Duty Pavement at Baton Rouge Site
(Source: URS Drawings C-302 and C-305).

NON-CERTIFIED COPY

### Table 2.6—Dowel size[*]

| Slab depth, in. (mm) | Dowel diameter, in. (mm) | Dowel embedment, in. (mm)[†] | Total dowel length, in. (mm)[‡] |
|---|---|---|---|
| 5 (125) | 5/8 (16) | 5 (125) | 12 (300) |
| 6 (150) | 3/4 (19) | 6 (150) | 14 (360) |
| 7 (180) | 7/8 (22) | 6 (150) | 14 (360) |
| 8 (200) | 1 (25) | 6 (150) | 14 (360) |
| 9 (230) | 1-1/8 (29) | 7 (180) | 16 (400) |

[*]All dowels spaced at 12 in. (300 mm) centers.
[†]On each side of joint.
[‡]Allowance made for joint openings and for minor errors in positioning dowels.

ACI 330R-01

### Table 3.6—Sizes of smooth, round dowels[*]

| Slab thickness, in. (mm) | Dowel diameter, in. (mm) |
|---|---|
| 7 (180) | 1 (25) |
| 8 (200) | 1-1/4 (32) |
| 9 (230) | 1-1/4 (32) |

[*]All dowels spaced at 12 in. (300 mm) centers, with minimum total length of 14 in. (360 mm) and minimum embedment length of 6 in. (150 mm) on each side of joint, with allowance made for joint openings and for minor errors in positioning dowels.

ACI 330R-08

### TABLE 1
(ALL DIMENSIONS ARE IN INCHES)

| PAVEMENT THICKNESS | DOWEL BARS ⊗ | | | MINIMUM DEPTH OF JOINT | |
|---|---|---|---|---|---|
| | SIZE | LENGTH | SPACING | C.J. & D.J. | L.J. |
| 6 | 1 | 18 | 12 | 2 | 2 |
| 8 | 1 1/4 | 18 | 12 | 3 | 3 |
| 9 | 1 1/4 | 18 | 12 | 3 | 3 1/2 |
| 10 | 1 1/4 | 18 | 12 | 3 1/2 | 4 |

Parish of East Baton Rouge

### TABLE I
(ALL DIMENSIONS ARE IN INCHES)

| PAVEMENT THICKNESS "T" | SMOOTH DOWEL BARS ⊗ | | | DEF. TIE BARS | | | KEYWAY | |
|---|---|---|---|---|---|---|---|---|
| | SIZE | LENGTH | SPACING | SIZE | LENGTH | SPACING | a | b |
| 8 | 1¼ | 18 | 12 | ½ | 24 | 24 | 2½ | 1¼ |
| 9 | 1¼ | 18 | 12 | ½ | 24 | 24 | 2½ | 1¼ |
| 10 | 1½ | 18 | 12 | ½ | 24 | 24 | 2½ | 1¼ |
| 11 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 2½ | 1¼ |
| 12 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 3 | 1½ |
| 13 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 3 | 1½ |
| 14 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 3 | 1½ |

LDOT

Figure 7.  Dowel Sizing and Spacing Requirements.

NON-CERTIFIED COPY



Figure 8.  Pavement Details and Note for Kenner Site
(Source: URS Drawing C7.0).

NON-CERTIFIED COPY

Appendix A

**Curriculum Vita of Dr. James R. Bailey, Ph.D., P.E.**

NON-CERTIFIED COPY

# E$^x$ponent®
*Failure Analysis Associates®*

Exponent
10850 Richmond Avenue
Suite 175
Houston, TX 77042

telephone 832-325-5700
facsimile 832-325-5799
www.exponent.com

## James R. (Bob) Bailey, Ph.D., P.E., F. ASCE
**Senior Managing Engineer**
**Houston Office Director**

### Professional Profile

Dr. James R. (Bob) Bailey is a licensed Professional Engineer in nine states and a Fellow of the American Society of Civil Engineers. For over 30 years, Dr. Bailey has served as a technical consultant, project manager, and researcher for private industry, universities, and government. As a Senior Managing Engineer in Exponent's Building & Structures practice, he brings specialized expertise to areas related to civil engineering; including wind engineering, construction materials, solid mechanics, dynamics, numerical analysis, structural analysis and design, and materials testing.

Dr. Bailey's primary area of expertise is determining the risk exposure of residential, commercial, and industrial properties to hazards associated with hurricanes, tornadoes, and flooding. He has conducted hurricane risk assessments and developed mitigation programs for various types of health, industrial, educational, and offshore energy facilities. Over the years he has surveyed and documented storm damage in the aftermath of numerous storm event, including hurricanes Irene (1999), Charley (2004), Francis (2004), Katrina (2005), Rita (2005), Wilma (2005), Ike (2008), and Sandy (2012), Tropical Storm Allison (2001), the Oklahoma City Tornado (1999), and the April-May 2011 Tornado Outbreak. He has investigated numerous building envelope systems, and has conducted investigations of both steep and low-slope roofing systems for damage caused by hail, wind, and construction errors. In 2011 he directed analysis of the storm surge risk posed to the South Texas Project Electric Generating Station using advanced hydrodynamic modeling techniques.

Dr. Bailey's past work at ExxonMobil included wind load analyses on drilling, semi-submersible, and floating, production, storage, and offloading (FPSO) structures; developing conceptual designs of gravity-based structures for arctic offshore environments; and conducting research and teaching classes on well cementing. He also has expertise in the area of well completions and workovers. Dr. Bailey has served as a lecturer in the private sector and at the university level on subjects related to civil and petroleum engineering. He also has been responsible for the design of test facilities and the development of test programs related to construction and energy. Dr. Bailey is currently the Presiding Officer of a five member expert panel, appointed by the Texas Department of Insurance in 2013, whose purpose is to develop ways of determining whether a loss to TWIA-insured property was caused by wind, waves, or tidal surges. He is also a member of the ASCE 7-16 Wind Load Subcommittee. He is past Chair of the ASCE Petrochemical Wind Load Task Committee, and served on an API 4F sub-committee assigned to revise specifications and guidelines for determining wind loads on onshore and offshore drilling structures.

NON-CERTIFIED COPY

**Academic Credentials and Professional Honors**

Ph.D., Civil Engineering, Texas Tech University, 1989
M.S., Civil Engineering, Texas Tech University, 1984
B.S., Civil Engineering, Texas Tech University, 1982

American Society of Civil Engineers (ASCE)
American Petroleum Institute (API) Spec 4F Wind Engineering Subcommittee
ASCE Wind Loads on Petrochemical Structures Task Committee
ASCE 7-16 Wind Load Subcommittee
Texas Tech University Civil Engineering Advisory Council (2007–2012)

Recipient of the Stephen D. Bechtel, Jr. Energy Award from ASCE (2016)

**Licenses and Certificates**

Professional Engineer, State of Florida, #67773
Professional Engineer, State of Georgia, #PE033027
Professional Engineer, State of Hawaii, #12820
Professional Engineer, State of Louisiana, #33830
Professional Engineer, State of Mississippi, #26488
Professional Engineer, State of South Carolina, #26408
Professional Engineer, State of Tennessee, #114185
Professional Engineer, State of Texas, #74911
Professional Engineer, State of Wisconsin, #42337-6

**Publications and Reports**

Bailey JR, Shrestha PL, et al. Analysis of maximum probable storm surge at the South Texas Project site. Proceedings, ASCE EWRI Conference, Seattle, WA, June 2014.

Bailey, JR. Hurricane risk assessment of a planned carbon capture facility located in Southeast Texas operated by NRG Energy, Inc., Report prepared for a California-based risk management company, February 2014.

Bailey, JR. Hurricane risk assessments of five electrical power plants located in the Caribbean and Hawaii operated by the AES Corporation, Report prepared for a California-based risk management company, November 2012.

Bailey JR. Feasibility study of an Alaskan LNG plant. Report prepared for an Asian-based consortium of companies, March 2012.

Bailey JR, et al. Wind loads for petrochemical and other industrial facilities. American Society of Civil Engineers, September 2011.

NON-CERTIFIED COPY

Bailey, JR.  Hurricane risk assessment of two wind farms located in South Texas operated by EoN Climate and Renewable.  Report prepared for a California-based risk management company, June 2011.

Bailey JR.  Wind risk assessment of the ThyssenKrupp steel plant located in Mississippi.  Report prepared for a California-based risk management company, November 2010.

Bailey JR, Cantor R, et al.  An approach to business vulnerability and risk assessments related to climate change.  SPE International Conference on Health, Safety & Environment, Rio de Janeiro, Brazil, April 2010.

Bailey JR.  A hurricane risk assessment and mitigation plan for CHRISTUS hospitals located in Texas and Louisiana.  Report prepared for CHRISTUS Health, July 2009.

Bailey JR.  Study of Major Revenue Interruption Risks in the Gulf of Mexico.  Report prepared for a major oil and gas operator headquartered in the United States, July 2009.

Bailey JR, Gilbert RT, et al.  Wind load considerations for existing petrochemical structures.  Structures Congress, American Society of Civil Engineers (ASCE), Austin, TX, May 2009.

Bailey JR, Levitan ML. Lessons learned and mitigation options for hurricanes.  Process Safety Progress, American Institute of Chemical Engineers (AIChE), 2008.

Bailey JR.  Finding the breaking point.  Report documenting window performance following the 2004 Florida hurricanes.  Prepared in conjunction with the Protecting People First Foundation, Wickford, RI, April 2005.

Bailey JR.  Flood hazard assessment of critical NASA assets at the Johnson Space Center.  Report prepared for NASA management by ABS Consulting, July 2004.

Bailey JR.  Wind hazard assessment of critical NASA assets at the Johnson Space Center.  Report prepared for NASA management by ABS Consulting, February 2001.

Bailey JR.  Vulnerability assessment of Harris County to hurricane winds.  Report prepared for the Harris County Commissioners Court by EQE International, June 2000.

Bailey JR.  Wind and flood hazard assessment of Critical NASA assets at the Kennedy Space Center.  Report prepared for NASA management by EQE International, June 2000.

Bailey JR, Vallabahn CVG, et al.  Experimental verification of the theoretical solution of laminated glass units.  Proceedings, Advanced Composites Materials in Civil Engineering Structures Materials Division, American Society of Civil Engineers, Las Vegas, NV, 1991 (paper awarded Best of Session, Spring 1991, by the Texas Section of the American Society of Civil Engineers).

Bailey JR, Minor JE.  Structural glazing tests show wind pressure effects.  Glass Digest 1989 Oct; 68–76.

Bailey JR, Minor JE, Tock RW.  Response of structurally glazed insulating glass units to wind pressures," Proceedings, 6[th] U.S. Conference on Wind Engineering, Houston, TX, March 8–10, 1989.

Bailey JR, McDonald JR.  Impact Resistance of masonry walls to tornado-generated missiles. Proceedings, 3rd North American Masonry Conference, Arlington, TX, June 3–5.

**Presentations**

Bailey JR, Shrestha PL, et al.  Analysis of maximum probable storm surge at the South Texas Project site.  ASCE EWRI Conference, Seattle, WA, June 2014.

Bailey JR.  Presentation of evidence—How to keep the jury interested.  Cooper & Scully 8th Annual Construction Symposium, Dallas, TX, February 1, 2013.

Bailey JR.  Winds and rain a-comin—Hurricanes, structures and potential risks.  Texas Association of Defense Council, Spring Meeting, Santa Fe, NM, April 27, 2012.

Bailey JR.  Preparing for the worst—Is the nation prepared for natural disasters?  American Bar Association Tort Trial & Insurance Practice Section Spring Leadership Meeting, Charleston, SC, May 17, 2012.

Bailey JR.  Probable maximum surge and seiche flooding at a coastal nuclear power plant located in the United States, Advisory Committee on Reactor Safeguards (ACRS), Nuclear Regulatory Commission, Rockville, MD, November 30, 2010.

Bailey JR, Griffith M.  Natural hazard risk assessment and mitigation for nuclear facilities. WebEx presentation, March 2, 2010.

Bailey JR.  Lessons learned and mitigation options for hurricanes.  Spring National Meeting, American Institute of Chemical Engineers (AIChE), April 2008.

Bailey JR.  Vulnerability of industrial facilities.  Reinsurance Association of America Cat Modeling 2006 Conference, Tampa, FL, February 23, 2006.

Bailey JR.  Safe haven considerations at industrial sites.  The Private Industry Workshop, National Hurricane Conference, New Orleans, LA, March 22, 2005.

Bailey JR.  Finding the breaking point.  International Code Council, Tampa, FL, February 12, 2005.

Bailey JR.  Identifying protective areas for people in buildings.  International Conference on Wind Engineering, Texas Tech University, June 2, 2003.

NON-CERTIFIED COPY

Bailey JR.  Assessment of extreme wind effects on industrial facilities.  The Private Industry Workshop, National Hurricane Conference, New Orleans, LA, April 17, 2003.

Bailey JR.  Assessing the impacts of hurricanes and earthquakes.  Association for Facilities Engineering Conference, Las Vegas, NV, September 25, 2001.

Bailey JR.  Using Digital Physics$^{TM}$ to calculate wind loads on structures.  ASCE Structures Conference, Washington, DC, May 2001.

Bailey JR.  Don't let your critical assets blow away.  Houston Chapter of the Risk and Insurance Management Society (RIMS), October 18, 2000.

Bailey JR.  Impact resistance of wood products subjected to simulated tornado missiles. International Timber Engineering Conference, Seattle, WA, 1988.

## Patents

Patent No. 5,309,995:  Well Treatment Using Ball Sealers, issued May 10, 1994.

Patent No. 5,485,882: Low-density Ball Sealer for Use as a Diverting Agent in Hostile Environment Wells, issued January 23, 1996.

Patent No. 5,582,251:  Downhole Mixer, issued December 19, 1996.

## Prior Professional Experience

- Manager, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 2004–2006
- Senior Project Engineer, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 2001–2004
- Project Engineer, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 1998–2001
- Engineering Specialist, Offshore Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1994–1998
- Senior Project Engineer, Drilling and Completions Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1992–1994
- Project Engineer, Drilling and Completions Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1990–1992
- Lecturer and Research Associate, Civil Engineering Department, Texas Tech University, 1989–1990

NON-CERTIFIED COPY

## Civil Case Experience

Deposition – INEOS USA L.L.C., v. BP Products North America, Inc., American Arbitration Association, No. 13 158 Y 01929 06, Houston, TX, November 2008.

Deposition – GG&A Central Mall Partners, L.P., Dillard's, Inc., Dillard Texas, LLC, and Dillard Texas Operating Limited Partnership, v. Duro-Last, Inc., Jaco Construction, Inc., and Schrader Roofing, Inc, District Court of Jefferson County, Texas, 58th Judicial District, January 2010.

Testimony – Appraisal Hearing, Beechnut Village Shopping Center v. Nationwide Insurance Co., Judge John Coselli – Umpire, appointed by Judge Gray Miller, United States District Judge, Southern District of Texas, University of Houston Law School, Houston, Texas, December 2010.

Expert Witness Statement – Canadian Natural Resources Limited and Highwood Limited v. Oil Insurance Limited, submitted to the Board of Arbitration under the provisions of the Arbitration Act of 1996, London, England, March 2011.

Testimony – Appraisal Hearing, Cause No; 1:11-cv-00207; Timothy Nolan and Ermelinda Nolan v. GeoVera Specialty Insurance Company, Donald Summey and James Perfetti; Judge James W. Mehaffy – Umpire, appointed by Magistrate Judge Keith F. Giblin, United States District Court for the Eastern District of Texas, Beaumont Division, Houston, Texas, September 2012.

Deposition – David S. Gronik, Jr. and Mary K. Gronik, S.C.G., M.A.G., David S. Gronik, Jr. Living Trust, Opio Boat Moon, LLC, Plaintiffs, v. Susan Balthasar and Susan M. Balthasar, as Personal Representative of The Estate of Norman J. Balthasar, Defendants; and Shorewest Realtors, Inc., Continental Casualty Company, and Anne Schwartz, Third-Party Defendants, and Opio Boat Moon, LLC, and David S. Gronik, Jr., Plaintiffs, Chubb Indemnity Insurance Company, Defendant, United States District Court for The Eastern District Of Wisconsin, November 2012.

Deposition – Jerome S. Tannenbaum and Deborah M. Tannenbaum, v. Federal Insurance Company, United States District Court for the Middle District of Tennessee, Nashville Division, February 2013.

Testimony – Jerome S. Tannenbaum and Deborah M. Tannenbaum, v. Federal Insurance Company, United States District Court for the Middle District of Tennessee, Nashville Division, November 2013.

Deposition – Intrepid Ship Management, Inc., Vessel Management Services, Inc., and Crowley Maritime Corp., v. Ocean Prospector and Plant Recovery Company, United States District Court, Southern District of Texas, Galveston Division, September 2014.

NON-CERTIFIED COPY

Deposition – Northrop Grumman Corporation, vs. AON Risk Insurance Services West, Inc., Superior Court of the State of California, County of Los Angeles, May 2015.

Deposition – Edie Housel, et al, v. The Home Depot U.S.A., Inc., et al, United States District Court for the Western District of Missouri, Southwestern Division, February 2016.

Deposition – Metro Hospitality Partners, LTD., d/b/a Crowne Plaza Hotel, v. Lexington Insurance Company,   United States District Court, Southern District of Texas, Houston Division, June 2016.

**Consulting and Testimony Billing Rate**

Two hundred ninety dollars per hour (calendar year 2016).

NON-CERTIFIED COPY

**Appendix B**

**Documents Reviewed**

NON-CERTIFIED COPY

| Name | Date modified | Type | Size |
|------|---------------|------|------|
| C-302.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 880 KB |
| C-304.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 548 KB |
| C-305.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 716 KB |
| C-306.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 2,784 KB |
| C-307.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 864 KB |
| H+E Belle Chasse Bid Set 5-22-12.pdf | 5/31/2012 12:42 PM | Adobe Acrobat D... | 32,517 KB |
| Concrete Specs for Baton Rouge Site.pdf | 9/12/2014 4:53 PM | Adobe Acrobat D... | 122 KB |
| Pavement Spec for Baton Rouge Site.pdf | 9/12/2014 4:50 PM | Adobe Acrobat D... | 72 KB |
| 2013-11-20 H&E Petition and First Set of Discovery to Defendants.PDF | 4/3/2014 5:24 PM | Adobe Acrobat D... | 2,322 KB |
| 2014-2-19 H&E Answer and Affirmative Defenses to URS Reconventional Demand.pdf | 4/3/2014 5:27 PM | Adobe Acrobat D... | 157 KB |
| 2015-03-27 H&E's Motion to Compel.pdf | 3/27/2015 3:24 PM | Adobe Acrobat D... | 1,911 KB |
| 2015-08-24 H&E's Opposition to Defendants Motion for Partial Summary Judgment.pdf | 2/1/2016 12:49 PM | Adobe Acrobat D... | 1,736 KB |
| Baton Rouge Project Change Orders.xls | 7/16/2014 6:47 PM | Microsoft Excel 97... | 60 KB |
| H&E Belle Chasse COP Log.xls | 7/16/2014 6:47 PM | Microsoft Excel 97... | 138 KB |
| Kenner Project Change Orders 08-2013.xlsx | 7/16/2014 6:47 PM | Microsoft Excel W... | 13 KB |
| URS 31020-93139.pdf | 6/27/2016 10:35 AM | Adobe Acrobat D... | 328,781 KB |
| 502-01_Concrete_Pavement_Details.pdf | 6/24/2016 2:54 PM | Adobe Acrobat D... | 348 KB |
| 52079 - PM RFI Log - MAPP.pdf | 7/12/2016 10:09 AM | Adobe Acrobat D... | 165 KB |
| CP-01 (1 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 454 KB |
| CP-01 (2 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 487 KB |
| CP-01 (3 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 575 KB |
| H & E 0000211-0000259.pdf | 6/24/2016 2:55 PM | Adobe Acrobat D... | 8,076 KB |
| Ardaman report re Baton Rouge Detention Pond.msg | 7/5/2016 11:41 AM | Outlook Item | 3,653 KB |
| Ardaman proposal Baton Rouge.msg | 7/5/2016 11:41 AM | Outlook Item | 1,287 KB |
| Baton Rouge GeoTech Report.pdf | 7/27/2016 6:31 PM | Adobe Acrobat D... | 7,849 KB |
| Email re Density testing Baton Rouge.msg | 7/5/2016 11:41 AM | Outlook Item | 376 KB |
| Request for additional geotech work in BR.msg | 7/5/2016 11:41 AM | Outlook Item | 202 KB |
| Email re post pour testing Kenner.msg | 7/5/2016 11:49 AM | Outlook Item | 461 KB |
| Kenner GeoTech Report.pdf | 7/5/2016 11:46 AM | Adobe Acrobat D... | 8,272 KB |
| Kenner Geotech Scope letter.msg | 7/5/2016 11:49 AM | Outlook Item | 2,059 KB |
| Revision to Kenner Geotech Report.msg | 7/5/2016 11:49 AM | Outlook Item | 513 KB |
| H & E 0000211-0000259.pdf | 7/26/2016 10:27 AM | Adobe Acrobat D... | 8,076 KB |
| H & E 0022314.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 4,151 KB |
| H&E 0005226_.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 617 KB |
| HE0005154.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 124 KB |
| HE0005155.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 483 KB |
| HE0005163_VOL001.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 102 KB |
| HE0006815_VOL001.pdf | 7/26/2016 10:19 AM | Adobe Acrobat D... | 553 KB |
| URS 033308.pdf | 7/26/2016 10:20 AM | Adobe Acrobat D... | 9,562 KB |
| URS 038807.pdf | 7/26/2016 10:22 AM | Adobe Acrobat D... | 874 KB |
| URS 039466.pdf | 7/26/2016 10:24 AM | Adobe Acrobat D... | 16,555 KB |
| URS 087952.pdf | 7/26/2016 10:25 AM | Adobe Acrobat D... | 743 KB |
| URS040311_image.pdf | 7/26/2016 10:25 AM | Adobe Acrobat D... | 180 KB |
| URS040655_image_.pdf | 7/26/2016 10:26 AM | Adobe Acrobat D... | 637 KB |
| URS049986_image.pdf | 7/26/2016 10:27 AM | Adobe Acrobat D... | 765 KB |

NON-CERTIFIED COPY

| File | Date | Type | Size |
|---|---|---|---|
| H&E 0003840.pdf | 7/26/2016 10:44 AM | Adobe Acrobat D... | 2,572 KB |
| H&E 0004244.pdf | 7/26/2016 10:47 AM | Adobe Acrobat D... | 1,996 KB |
| H&E 0013874.pdf | 7/27/2016 2:06 PM | Adobe Acrobat D... | 318 KB |
| H&E 0013838.pdf | 7/26/2016 10:49 AM | Adobe Acrobat D... | 849 KB |
| H&E 0063316.pdf | 7/26/2016 10:51 AM | Adobe Acrobat D... | 268 KB |
| H&E 0063319.pdf | 7/26/2016 10:52 AM | Adobe Acrobat D... | 350 KB |
| H&E 0064597.pdf | 7/26/2016 10:53 AM | Adobe Acrobat D... | 2,929 KB |
| H&E 0065372.pdf | 7/26/2016 10:55 AM | Adobe Acrobat D... | 8,306 KB |
| URS 031731.pdf | 7/26/2016 10:57 AM | Adobe Acrobat D... | 2,400 KB |
| URS 033145.pdf | 7/26/2016 10:58 AM | Adobe Acrobat D... | 21,048 KB |
| URS 038163.pdf | 7/26/2016 11:00 AM | Adobe Acrobat D... | 271 KB |
| URS 055534.pdf | 7/26/2016 11:00 AM | Adobe Acrobat D... | 2,391 KB |
| URS 059506.pdf | 7/26/2016 11:01 AM | Adobe Acrobat D... | 150 KB |
| URS 066293.pdf | 7/26/2016 11:01 AM | Adobe Acrobat D... | 10,649 KB |
| URS 066657.pdf | 7/26/2016 10:33 AM | Adobe Acrobat D... | 2,228 KB |
| URS 066706.pdf | 7/26/2016 10:36 AM | Adobe Acrobat D... | 2,263 KB |
| URS 066880.pdf | 7/26/2016 10:39 AM | Adobe Acrobat D... | 5,059 KB |
| URS 066908.pdf | 7/26/2016 10:41 AM | Adobe Acrobat D... | 229 KB |
| URS 0336067.pdf | 7/26/2016 10:42 AM | Adobe Acrobat D... | 2,765 KB |
| 201308131556a.pdf | 8/11/2014 2:11 PM | Adobe Acrobat D... | 388 KB |
| 201308131556b.pdf | 8/11/2014 2:11 PM | Adobe Acrobat D... | 34 KB |
| 201308131556c.pdf | 8/11/2014 2:11 PM | Adobe Acrobat D... | 167 KB |
| 201309241548.pdf | 9/24/2013 3:54 PM | Adobe Acrobat D... | 2,680 KB |
| Baton Rouge Project Change Orders.xls | 8/11/2014 2:11 PM | Microsoft Excel 97... | 60 KB |
| C 5.0 REVISED per RFI #26_.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 745 KB |
| C1.0 site plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 293 KB |
| C2.0 Demolition plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 367 KB |
| C3.0 Geometric plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 363 KB |
| C3.1 Joint layout plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 236 KB |
| C4.0 drainage plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 937 KB |
| C5.0 grading plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 317 KB |
| C6.0 Utility plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 340 KB |
| C7.0 details.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 926 KB |
| C8.0 FENCE details.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 56 KB |
| C9.0 FENCE details 2.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 770 KB |
| C-101.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 390 KB |
| C-102.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 818 KB |
| C-201.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 523 KB |
| C-202.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 666 KB |
| C-203.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 601 KB |
| C-204.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 371 KB |
| C-205.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 354 KB |
| C-206.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 308 KB |
| C-405.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 449 KB |
| C-406.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 2,577 KB |
| C-407.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 709 KB |
| C-501.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 670 KB |
| C-502.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 651 KB |
| C-503.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 808 KB |
| C-504.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 692 KB |
| C-505.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 558 KB |
| C-506.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 591 KB |
| C-507.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 407 KB |
| C-508.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 923 KB |
| C-509.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 779 KB |

NON-CERTIFIED COPY

| | | | |
|---|---|---|---|
| Cement Concrete Pavement - Kenner, LA.PDF | 9/17/2013 4:36 PM | Adobe Acrobat D... | 1,699 KB |
| Concrete Work - Headquarters and Branch Buildings.pdf | 9/17/2013 4:36 PM | Adobe Acrobat D... | 1,305 KB |
| Crane Remanufacturing Center Relocation - Belle Chasse, LA.PDF | 9/17/2013 4:35 PM | Adobe Acrobat D... | 1,305 KB |
| G-001.pdf | 7/5/2011 10:39 AM | Adobe Acrobat D... | 1,988 KB |
| G-002.pdf | 7/5/2011 10:33 AM | Adobe Acrobat D... | 1,536 KB |
| H&E Belle Chasse COP Log.xls | 8/11/2014 2:11 PM | Microsoft Excel 97... | 138 KB |
| H+E Kenner G-001.pdf | 9/25/2014 10:00 AM | Adobe Acrobat D... | 7,512 KB |
| Kenner Project Change Orders 08-2013.xlsx | 8/11/2014 2:11 PM | Microsoft Excel W... | 13 KB |
| Missing Page Request_02751.pdf | 9/25/2013 5:45 PM | Adobe Acrobat D... | 1,104 KB |
| Missing Page Request_03300.pdf | 9/25/2013 5:46 PM | Adobe Acrobat D... | 190 KB |
| S100.pdf | 3/27/2013 11:49 AM | Adobe Acrobat D... | 920 KB |
| S110.pdf | 3/27/2013 11:58 AM | Adobe Acrobat D... | 853 KB |
| S200.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 1,315 KB |
| S210.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 704 KB |
| S220.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 843 KB |
| S300.pdf | 3/27/2013 12:09 PM | Adobe Acrobat D... | 1,890 KB |
| S310.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 744 KB |
| S320.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 672 KB |
| S400.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 760 KB |
| S410.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 588 KB |
| S420.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 573 KB |
| S430.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 714 KB |
| alum_nosing_a_b-1.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-1sp.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-5.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-16a.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-31a.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| anchoring.gif | 10/2/2014 2:32 PM | GIF image | 29 KB |
| b-3.jpg | 10/2/2014 2:32 PM | JPEG image | 3 KB |
| back_to_top.jpg | 10/2/2014 2:32 PM | JPEG image | 2 KB |
| backs.gif | 10/2/2014 2:32 PM | GIF image | 15 KB |
| barry.css | 10/2/2014 2:32 PM | Cascading Style S... | 7 KB |
| button_cad.gif | 10/2/2014 2:32 PM | GIF image | 1 KB |
| button_dwg.gif | 10/2/2014 2:32 PM | GIF image | 1 KB |
| cast_iron_b-16.jpg | 10/2/2014 2:32 PM | JPEG image | 16 KB |
| cast_iron_cast_aluminum.jpg | 10/2/2014 2:32 PM | JPEG image | 21 KB |
| curb_bar_cb-15a.gif | 10/2/2014 2:32 PM | GIF image | 5 KB |
| curb_bar_cb-25a.gif | 10/2/2014 2:32 PM | GIF image | 5 KB |
| noses.gif | 10/2/2014 2:32 PM | GIF image | 15 KB |
| nosings_b-1.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| nosings_b-1sp.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-2.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-16.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-16a.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-100.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-110.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| nosings_b-120.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| pic_products.jpg | 10/2/2014 2:32 PM | JPEG image | 37 KB |
| CAT - Success Story.pdf | 10/21/2013 1:58 PM | Adobe Acrobat D... | 223 KB |
| CAT Aurora, IL Projects II.ppt | 10/24/2013 7:51 PM | Microsoft PowerP... | 9,556 KB |
| CAT Project References.pdf | 10/21/2013 1:58 PM | Adobe Acrobat D... | 89 KB |
| IMG_0894.MOV | 10/25/2013 6:36 AM | QuickTime Movie | 724 KB |
| Kobelco - Success Story.pdf | 10/21/2013 1:58 PM | Adobe Acrobat D... | 131 KB |
| 123header.jpg | 10/2/2014 3:04 PM | JPEG image | 5 KB |
| Grey-Diamond-Plate.jpg | 10/2/2014 3:04 PM | JPEG image | 18 KB |
| Grey-Diamond-Plate_LIGHT.jpg | 10/2/2014 3:04 PM | JPEG image | 4 KB |
| LINE_2.gif | 10/2/2014 3:04 PM | GIF image | 1 KB |
| logo_non_ani.jpg | 10/2/2014 3:04 PM | JPEG image | 6 KB |
| redbut.jpg | 10/2/2014 3:04 PM | JPEG image | 1 KB |

NON-CERTIFIED COPY

| | | | |
|---|---|---|---|
| 330R_08.pdf | 6/30/2016 6:11 PM | Adobe Acrobat D... | 819 KB |
| ACI 224.3r_95 Expansion joint.pdf | 11/11/2013 10:54 ... | Adobe Acrobat D... | 887 KB |
| ACI 302.1R_04.pdf | 11/11/2013 10:56 ... | Adobe Acrobat D... | 971 KB |
| ACI-330_Design_Guide_for_Concrete_Parking_Lots.pdf | 6/30/2016 5:53 PM | Adobe Acrobat D... | 652 KB |
| Barry Pattern & Foundry - BarryCraft - Cast Abrasive Nosings & Treads.htm | 10/2/2014 2:32 PM | HTML Document | 29 KB |
| Baton Rouge.png | 7/29/2016 1:22 PM | PNG image | 1,998 KB |
| CAT Aurora, IL Projects II.ppt | 10/24/2013 7:51 PM | Microsoft PowerP... | 9,536 KB |
| Concrete Slab Surface Defect Repairs.pdf | 9/23/2014 2:49 PM | Adobe Acrobat D... | 4,381 KB |
| IMG_0894.MOV | 10/25/2013 6:36 AM | QuickTime Movie | 724 KB |
| Kenner.png | 7/29/2016 1:23 PM | PNG image | 1,740 KB |
| Multi-Fab - Curb Angles.htm | 10/2/2014 3:04 PM | HTML Document | 41 KB |
| nzs.3101.1.2006.pdf | 10/17/2013 10:23 ... | Adobe Acrobat D... | 5,995 KB |
| nzs.3101.2.2006.pdf | 10/17/2013 10:22 ... | Adobe Acrobat D... | 8,202 KB |
| Page 9_330R-08.pdf | 7/27/2016 11:36 AM | Adobe Acrobat D... | 97 KB |
| URS 31.020-93139.pdf | 6/27/2016 10:35 AM | Adobe Acrobat D... | 328,781 KB |

NON-CERTIFIED COPY

E<sup>x</sup>ponent

NON-CERTIFIED COPY

| | | |
|---|---|---|
| **H&E EQUIPMENT SERVICES, INC.** | * | **SUIT NO. 626,308    DIV.: D** |
| | * | **19TH JUDICIAL DISTRICT COURT** |
| **VERSUS** | * | |
| | * | **PARISH OF EAST BATON ROUGE** |
| **URS CORPORATION** | * | |
| **ARCHITECTURE, P.C., URS** | * | **STATE OF LOUISIANA** |
| **CORPORATION, L. O'NEAL** | | |
| **JOHNSON AND THOMAS E. RYAN, III** | | |

---

### AFFIDAVIT

**STATE OF LOUISIANA**

**PARISH OF EAST BATON ROUGE**

BEFORE ME, a duly authorized notary in the aforementioned State and Parish, personally

came and appeared:

MURRAY L. MCCULLOUGH

who, after being duly sworn, did depose and state as follows:

1) He is a person of the full age of majority and a resident of the City of Baton Rouge, Parish of East Baton Rouge, State of Louisiana.

2) He is and has been a professional engineer licensed in Louisiana since 1985.

3) LSA-R.S. 37:696 provides the Professional Engineering and Land Surveyor Board with the authority to adopt rules and regulations relative to the use of seals and stamps.

4) As a licensed professional engineer in Louisiana, I am required by the regulation of La. Admin Code. tit. 46, pt. LXI, § 2701(A)(4)(a)(i) to affix my seal, sign my name and date all engineering documents that I issue to a client as completed work.

5) I was the professional engineer who provided the civil engineering drawings for the concrete work at the H&E Equipment Services Baton Rouge site.

6) Consequently, on July 1, 2011, I, as a licensed professional engineer, affixed my seal, signed and dated the engineering "C" drawings identified as Exhibit 1 hereto as completed work for use in construction at the H&E Equipment Services site in Baton Rouge.



EXHIBIT
F

NON-CERTIFIED COPY

7)  At no time prior to July 1, 2011, were any engineering drawings provided by me or on my behalf as completed work to be used for construction at the H&E Equipment Services site in Baton Rouge.

8)  Further Affiant sayeth not.

MURRAY L. MCCULLOUGH

SWORN TO AND SUBSCRIBED BEFORE
ME THIS ___9th___ DAY OF DECEMBER, 2016.

NOTARY PUBLIC
NAME: Chelsea A Payne
LA. NOTARIAL ID NO. 35952
MY COMMISSION EXPIRES: @ death

NON-CERTIFIED COPY





NON-CERTIFIED COPY



NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *  *
                         *
H&E EQUIPMENT SERVICES   *
                         * NUMBER 626,308
VERSUS                   *
                         * DIVISION "D"
URS CORPORATION          *
ARCHITECTURE, P.C., URS  *
CORPORATION, L O'NEAL    *
JOHNSON AND THOMAS E.    *
RYAN, III                *
                         *
*  *  *  *  *  *  *  *  *
```

Deposition of LEONARD C. ST.

GERMAIN, taken on Wednesday, August 31, 2016,

commencing at 10:06 a.m., in the offices of

Adams and Reese, LLP, Attorneys at Law, 450

Laurel Street, Suite 1900, Baton Rouge,

Louisiana, 70801.



EXHIBIT

G

NON-CERTIFIED COPY

Page 18

1     A.  I started transitioning in August of

2   2009.

3     Q.  What did you transition from?

4     A.  Vice President of Operations.

5     Q.  How did your duties change from Vice

6   President of Operations?

7     A.  Operations, I was with -- I did safety,

8   safety environmental, facilities, legal, among a

9   few other things.

10    Q.  What do you mean by "legal"?

11    A.  I was just kind of -- before we had

12  in-house counsel, we would -- I was the liaison

13  between our attorneys we used in the different

14  -- in a variety of suits.

15    Q.  You were liaison with outside counsel?

16    A.  Correct.

17    Q.  What was the reason you moved from Vice

18  President of Operations to Vice President of

19  Equipment Services Group?

20    A.  It started because we had -- the

21  gentleman that was doing the used equipment side

22  of our business was retiring, and the president

23  approached me and asked me to take on that

24  position.

25          And then with my background, to open up

NON-CERTIFIED COPY

Page 26

1    fact, dealing with URS?

2        A.  I have a real good of friend mine that

3    was an engineer for URS.  He lived in my

4    neighborhood.

5        Q.  And who was that?

6        A.  Randy Babin.

7        Q.  He was in Baton Rouge?

8        A.  Yes.

9        Q.  And that is how you got basically

10   connected with URS?

11       A.  Yeah.  Yeah.  We were having a

12   conversation, you know, with us getting ready to

13   design and build a new facility, and I was

14   looking for an architectural and engineering

15   firm that I could join together, instead of

16   going through an architect and a separate

17   engineering company.

18           And he referred me, and Mark Howard

19   reached out to me.  And that is how the

20   relationship started.

21       Q.  And at this point, it is fair to say you

22   were the principal one at H&E dealing with URS?

23       A.  Yes.

24       Q.  Now, this first proposal was in

25   connection with, or at least the thought process

NON-CERTIFIED COPY

Page 31

1   paragraph.

2       A.  (Witness reviewing document.)

3           Yes.

4       Q.  The next document I'm going to show you

5   is labeled Exhibit 2 and is H&E 5198.

6           All right.  This is a letter dated

7   August 16, 2006, addressed to you by Ashley

8   Moore.  Do you see that?

9       A.  Uh-huh (affirmative response).  Yes.

10      Q.  And this references an agreement for

11  professional services, apparently, that URS

12  sent, correct?

13      A.  Correct.

14      Q.  And she was telling you that she didn't

15  like the risk allocations in Article V.

16      A.  It is a he, but --

17      Q.  Oh, I'm sorry.  You are right.  It is a

18  he.  The first time I saw it, I thought it was a

19  she, too, and then I realized later it is a he.

20      A.  It is a he.

21      Q.  I would have used my first name.  Okay.

22          Let's go back to that question again.

23      A.  Okay.

24      Q.  This was a comment by outside Counsel on

25  the Agreement For Professional Services that URS

NON-CERTIFIED COPY

Page 32

1   sent to you, correct?

2       A.  Correct.

3       Q.  And, obviously, you sent this to her for

4   comment?

5       A.  Him.  Correct.

6       Q.  To him for comment?

7       A.  Correct.

8       Q.  Because you were the liaison between

9   outside counsel?

10      A.  Correct.

11      Q.  The Company didn't have an in-house

12  counsel at that time?

13      A.  No, sir.

14      Q.  Okay.  And she had a --

15      A.  He.

16          MR. FRANCO:

17              Whenever I say "she," just make it

18  he.

19          THE WITNESS:

20              John Ashley Moore.

21  EXAMINATION BY MR. FRANCO:

22      Q.  So he had a problem with Article V

23  dealing with risk allocation, correct?

24      A.  Yes.

25      Q.  He had an issue with it?

NON-CERTIFIED COPY

Page 33

1        A.  Yes.

2        Q.  And he passed that on to you, correct?

3        A.  Correct.

4        Q.  And for the Record, he thought the risk

5    allocation number, the limitation was too low?

6        A.  Yes.

7        Q.  Correct?

8        A.  Yes.

9        Q.  All right.  Let's look at the next

10   document, which would be Exhibit 3, which is H&E

11   5196.

12           And you will see here at the second page

13   of this string, the beginning of the string, you

14   are actually sending this document, this August

15   16 document, from Ashley Moore to Mark Howard at

16   URS, correct?

17       A.  Correct.

18       Q.  And, basically, you are telling Mr.

19   Howard you spoke to your corporate legal

20   counsel.  I'm assuming you meant outside

21   counsel, correct?

22       A.  Correct.

23       Q.  And she recommended extending that

24   limitation of liability under Article V to

25   $5 million and $2 million?

NON-CERTIFIED COPY

Page 34

1     A.  Correct.

2     Q.  And the next document I'm going to show

3  you is the Agreement for Professional Services,

4  which is going to be labeled Exhibit 4.  This

5  doesn't have a Bates stamp.

6         And if you look at Article V, Roman

7  numeral V, you will see that that number of

8  limitation was actually 5 million, 2 million, as

9  she had requested, correct?

10     A.  Correct.

11     Q.  And if I'm not mistaken, this bears your

12  signature?

13     A.  Yes, it does.

14     Q.  So you were satisfied that you had run

15  it past Counsel and you signed it --

16     A.  Yes.

17     Q.  -- on behalf of the Company?

18     A.  Yes.

19     Q.  And you were authorized to do so?

20     A.  Yes.  I have a Corporate resolution.

21     Q.  Did you see the Corporate resolution

22  recently?

23     A.  Not recently.  I have a copy of it.

24     Q.  You do?  Because that wasn't produced to

25  us.

NON-CERTIFIED COPY

Page 35

1          MR. FRANCO:

2              Can we get a copy of that Corporate

3    resolution, please?

4          MS. MINCE:

5              I'm not sure whether that would fall

6    into one of the prior requests or not, but I'll

7    be happy to obtain that and provide it to you.

8          MR. FRANCO:

9              Well, we can check, but if you are

10   happy to, it is not really an issue.  Okay?

11         MS. MINCE:

12             Right.

13         MR. FRANCO:

14             I believe we asked for any Board

15   minutes or resolutions at one point.

16         MR. MATHEWS:

17             I think in our first ones, but,

18   yes --

19         MS. MINCE:

20             I'll look.

21         MR. FRANCO:

22             All right.

23   EXAMINATION BY MR. FRANCO:

24      Q.  Around the same time, either shortly

25   before or shortly after this agreement was

NON-CERTIFIED COPY

Page 74

1    budget number?

2        A.  I'm sure there was a budget number prior

3    to this Email, and whether it was 15 million, I

4    don't really recall that.

5        Q.  H&E was a public company at this point,

6    right?

7        A.  2009, yes.

8        Q.  When did you go public?

9        A.  I think in '06.

10       Q.  I assume at some point in time, H&E, as

11   a public company, established some kind of

12   official budget; is that right or not?

13       A.  I would assume so, yes.

14       Q.  Were you involved in that?

15       A.  Not in the establishment of working on

16   it.

17       Q.  You wouldn't have been involved in

18   that --

19       A.  No.

20       Q.  -- during this same time period, and we

21   are in 2009 now, in January of 2009?

22       A.  No.

23       Q.  Let me show you another document,

24   Exhibit 20, which is H&E 7609.  This is from

25   James Brown -- I assume he is not the singer,

NON-CERTIFIED COPY

Page 83

1    A.  Correct.

2    Q.  And it basically says that you approved

3  it and proceeding with the proposal, and then

4  Neal Johnson says, "We will draft the agreement

5  tomorrow."

6         Do you see that?

7    A.  Yes.

8    Q.  Then the next exhibit is Exhibit 24, H&E

9  5389, and this is another Email to you.

10         The prior one was dated August 13, '09.

11  This is the next day, August 14, and Chad

12  Herndon says he will begin putting the new

13  Professional Services Agreement and Work Order

14  together?

15    A.  Yes.

16    Q.  Now, did you discuss this with Chad

17  Herndon at all?

18    A.  Chad was involved in the project, so I

19  would assume yes.

20    Q.  The next one is Exhibit 25, and that is

21  going to be H&E 5430.  That is dated August 20

22  of '09.  And this is, again, a follow-up on the

23  Emails about approval of this proposal.

24         If you look at the top Email, it is from

25  Neal Johnson to you, dated August 20, copying

NON-CERTIFIED COPY

Page 84

1    Chad Herndon.  And it says, the third line down,

2    "Attached is our new Master Agreement that we

3    discussed.  Also attached is a Work

4    Authorization and attachments."

5         Do you see that?

6    A.  Yes.

7    Q.  What did you discuss about this new

8    master agreement with Neal Johnson as of that

9    time?

10   A.  I would have sent this master agreement

11   to Ashley Moore to review.

12   Q.  Okay.  And I'm going to get to that.

13        But before you did that, what do you

14   recall, if you recall anything, about discussing

15   a new master agreement with Neal Johnson?

16   A.  I don't.

17   Q.  You don't recall?

18   A.  No.

19   Q.  You don't recall questioning why there

20   needed to be a new master agreement?

21   A.  I don't recall specifically, no.

22   Q.  So attached to this, for the Record, is

23   -- and I don't know what this is -- but it is a

24   Short Form Master Agreement for Professional

25   Services, and it is says, "...dated and

NON-CERTIFIED COPY

Page 85

1    effective date as of August 13, 2009..."

2           Do you see that?  It is the very first

3    line.

4       A.  Yes.

5       Q.  And then it also has an attachment work

6    order, Authorization 09-100, and Attachment 2 to

7    that and Attachment 3, right?

8       A.  Yes.

9       Q.  Now, you said you sent this to outside

10   counsel, Ashley --

11      A.  Moore.

12      Q.  -- Moore?

13      A.  Yes.

14      Q.  The same guy that you had sent the

15   previous agreement to, correct?

16      A.  Correct.

17      Q.  And what firm is he with?

18      A.  Taylor, Porter, Brooks & Phillips.

19      Q.  I'm going to show you the next exhibit,

20   which is Exhibit 26, which is H&E 5236.

21          This is an Email from Frankie Wynn to

22   you, dated the next day after Neal Johnson sends

23   you this new Master Agreement.  So, apparently,

24   you had sent it to Frankie Wynn, as well?

25      A.  This was during my transition period.

NON-CERTIFIED COPY

Page 86

1    This is about the time I started transitioning

2    into another position.

3        Q.  Okay.

4        A.  Yes, I would have sent it to Frankie.

5        Q.  Okay.  And Frankie listed some concerns

6    he had with this new Master Agreement, correct?

7    Read the very first sentence.

8        A.  Yes, I see that.

9        Q.  And if you look at those concerns, look

10   at the second page.  I want you to look at what

11   he has labeled right above Paragraph No. 9.  See

12   it?

13       A.  Yes.

14       Q.  And he says, "Are you okay with the

15   $250,000 liability limitation?"

16           Do you see that?

17       A.  Yes.

18       Q.  So he actually questions certain

19   paragraphs.  And what did you do about that?

20       A.  I don't recall.  I would -- you know,

21   again, I think that this would have had to have

22   been reviewed by Ashley Moore.

23       Q.  That would have been your normal

24   process, right?

25       A.  Yes.  Yes, that would have been the

NON-CERTIFIED COPY

Page 87

1    normal process.

2         Q.  So after you got this August 21, let's

3    look at the next document.

4              We are going to label this as Exhibit

5    27.  This is the Short Form Master Agreement for

6    Professional Services, dated at the top, August

7    13, 2009, executed by you.

8         A.  (Witness reviewing document.)

9         Q.  Do you see it?

10        A.  Yes.

11        Q.  And so I assume you were authorized to

12   execute this document on behalf of H&E, correct?

13        A.  Yes.

14        Q.  And I assume you vetted this with either

15   Mr. Wynn and/or Ashley Moore before you signed

16   it, correct?

17        A.  That is correct.

18        Q.  Do you recall discussing any part of

19   this agreement with anyone from URS before you

20   signed it?

21        A.  I do not.

22        Q.  And the next document I'll show you is

23   going to be labeled Exhibit 28, which URS 31081.

24              This is Attachment 1, and, if you look

25   at the top, it references the Master Agreement

NON-CERTIFIED COPY

Page 88

1   or the agreement dated August 13, 2009.

2           Do you see that at the top?

3       A.  Yes.

4       Q.  Okay.  And this was signed by you,

5   correct?

6       A.  Yes.

7       Q.  On August 31, 2009?

8       A.  Yes.

9       Q.  Now, you recall the Kenner facility

10  being surveyed before construction started?

11      A.  Yes.

12      Q.  And do you recall who paid for that

13  survey?

14      A.  I don't.

15      Q.  Next I'm going to show you what I'm

16  going to label as Exhibit 29.  This is H&E 5732.

17          We are in November of 2009, and does

18  that refresh your memory as to who Hohensee was?

19      A.  Hohensee, James Hohensee.  I remember

20  now.

21      Q.  Okay.  And this is in reference to the

22  Kenner facility, and he is sending to some

23  companies drawings and pricing sheets for them

24  to look at.

25          So I assume this is in connection with

NON-CERTIFIED COPY

Page 136

1     Q.  And you say you have never been to the

2  New Orleans site?

3     A.  No.

4     Q.  How many paved facilities, yard

5  facilities, does H&E have?

6        MS. MINCE:

7           Object to the form.

8        THE WITNESS:

9           I don't know.

10  EXAMINATION BY MR. FRANCO:

11     Q.  Is it over 50?

12        Let me go back and ask it this way:  How

13  many facilities, yard facilities does H&E have?

14     A.  Around 76.

15     Q.  That is what I recall.

16     A.  Yeah.

17     Q.  And of those facilities, do you know how

18  many of those roughly involved paved facilities

19  at the apron or yard?

20     A.  "Paved" meaning concrete --

21     Q.  Yes.

22     A.  -- or asphalt?

23     Q.  Paved, concrete.

24     A.  Concrete, I do not know specifically.

25     Q.  You wouldn't even know a range?  Is it

NON-CERTIFIED COPY

NINETEENTH JUDICIAL DISTRICT COURT

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES, INC. | : | NUMBER: 626,308 |
| | : | |
| Plaintiff, | : | DIVISION: D |
| | : | |
| VERSUS | : | |
| | : | |
| URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON, AND THOMAS E. RYAN, II | : | |
| | : | |
| Defendants | : | |
| | : | |

### H&E EQUIPMENT SERVICES, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO RECONVENTIONAL DEMAND

**NOW INTO COURT**, through undersigned counsel, comes H&E Equipment Services, Inc. ("H&E") who files this Answer and Affirmative Defenses to the Reconventional Demand of URS Corporation Architecture, P.C. ("URS Architecture"), URS Corporation ("URS Corp."), O'Neal Johnson ("Johnson") and Thomas E. Ryan ("Ryan") (hereinafter collectively referred to as "Defendants"), and respectfully represents as follows:

1.

The allegations contained in paragraph I of the Reconventional Demand are admitted with respect to name and domicile.

2.

The allegations contained in paragraph II of the Reconventional Demand are denied as written.

3.

The allegations contained in paragraph III of the Reconventional Demand are denied as written.

4.

The allegations contained in paragraph IV of the Reconventional Demand are admitted as to the fact that H&E has made no payments to URS Architecture since December 2012, but denies that the "2009 Agreement" as defined in the Reconventional Demand is the "applicable agreement," to the extent such allegation is being asserted in this paragraph. Furthermore, H&E states that no payments were due URS Architecture, or URS Corp. for that matter, and, in fact,

663991.1


EXHIBIT
H

NON-CERTIFIED COPY

such entities are liable to H&E for damages, and/or offsets and credits, as a result of URS Architecture's and/or URS Corp.'s breach of contract, breach of warranty, negligence and/or other tortious misconduct.

5.

The allegations contained in paragraph V of the Reconventional Demand are denied.

6.

The allegations contained in paragraph VI of the Reconventional Demand are denied.

7.

The allegations contained in paragraph VII of the Reconventional Demand are denied.

8.

The allegations contained in paragraph VIII of the Reconventional Demand are denied.

9.

The allegations contained in paragraph IX of the Reconventional Demand are denied to the extent a response is required.

10.

The allegations contained in paragraph X of the Reconventional Demand are denied.

11.

The allegations contained in paragraph XI of the Reconventional Demand are denied to the extent a response is required.

12.

The allegations contained in paragraph XII (and the immediately following un-numbered paragraphs) of the Reconventional Demand are denied.

13.

The allegations contained in paragraph XIII of the Reconventional Demand are denied to the extent a response is required.

14.

The allegations contained in paragraph XIV of the Reconventional Demand are admitted.

15.

The allegations contained in paragraph XV of the Reconventional Demand are denied.

16.

The allegations contained in paragraph XVI of the Reconventional Demand are denied.

2

NON-CERTIFIED COPY

## AFFIRMATIVE DEFENSES

### 17.

In further response to the Reconventional Demand, H&E avers, alleges, and pleads as follows:

H&E has denied liability to URS Architecture and URS Corp. on their claims in this lawsuit against H&E for, among other things, open account, breach of contract and enrichment without cause as alleged. However, out of an abundance of caution, H&E further pleads the following affirmative defenses. Furthermore, H&E reserves the right to amend this Answer to assert additional affirmative defenses and claims as may be appropriate upon further investigation and discovery.

### 18.

### FIRST DEFENSE

H&E pleads that URS Architecture breached its contract(s) with H&E.

### 19.

### SECOND DEFENSE

By way of further defense, if such be necessary, H&E pleads that URS Architecture breached its express and/or implied warranties to H&E to perform its services in a reasonable and prudent manner, and in a professional manner.

### 20.

### THIRD DEFENSE

By way of further defense, if such be necessary, H&E pleads that URS Architecture, URS Corp., Johnson and/or Thomas breached their professional duties to provide architectural and engineering services to H&E with the appropriate level of care.

### 21.

### FOURTH DEFENSE

By way of further defense, if such be necessary, H&E pleads offsets and credits.

### 22.

### FIFTH DEFENSE

By way of further defense, if such be necessary, H&E pleads negligence, gross negligence and/or professional negligence on the part of URS Architecture, URS Corp., Johnson and/or Thomas.

3

663991.1

NON-CERTIFIED COPY

23.

## SIXTH DEFENSE

By way of further defense, if such be necessary, H&E pleads URS Architecture's and URS Corp.'s claims are barred in whole or in part by the equitable doctrines of unclean hands, laches, waiver, and estoppel.

24.

## SEVENTH DEFENSE

By way of further defense, if such be necessary, H&E pleads failure of consideration.

25.

## EIGHTH DEFENSE

By way of further defense, if such be necessary, H&E pleads that Defendants' claims are barred in whole or in part by vice of consent.

26.

## NINTH DEFENSE

By way of further defense, if such be necessary, H&E pleads extinguishment of obligation.

27.

## TENTH DEFENSE

By way of further defense, if such be necessary, H&E pleads violations of the Louisiana Unfair Trade Practices Act by the Defendants, the specifics of which are contained in Plaintiff's Petition for Damages.

28.

## ELEVENTH DEFENSE

By way of further defense, if such be necessary, H&E pleads that URS Corporation has no cause of action and/or right of action against H&E on its Reconventional Demand.

## **PRAYER**

**WHEREFORE**, Plaintiff/Defendant-in-Reconvention, H&E Equipment Services, Inc. prays that its Answer to the Reconventional Demand of Defendants, URS Corporation Architecture, PC, URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, II, be deemed good and sufficient and that after due proceedings are had, there be judgment entered in its favor

4

663991.1

NON-CERTIFIED COPY

and against the Defendants, dismissing their Reconventional Demand with prejudice, and at the cost of Defendants.

**TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.**

BY: _____

Edward J. Laperouse, II, #29310
Eugene R. Groves, #6358
John Ashley Moore, #9635
L. Adam Thames, #32722
Megan F. Bice, #35042
451 Florida Street, 8th Floor (70801)
P. O. Box 2471
Baton Rouge, LA 70821
Telephone: (225) 387-3221
Facsimile: (225) 346-8049
Email: ted.laperouse@taylorporter.com
Email: eugene.groves.@taylorporter.com
Email: ashley.moore@taylorporter.com
Email: adam.thames@taylorporter.com
Email: megan.bice@taylorporter.com

*Attorneys for Plaintiff, H&E Equipment Services, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served by e-mail and/or U.S. Mail, this 19th day of February, 2014 on the following:

Philip A. Franco
Adams and Reese LLP
701 Poydras Street
Suite 4500
New Orleans, LA 70139
philip.franco@arlaw.com

Kellen J. Mathews
Adams and Reese LLP
450 Laurel Street
Suite 1900
Baton Rouge, LA 70801
kellen.mathews@arlaw.com

Edward J. Laperouse II

663991.1

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES, INC. | * | SUIT NO. 626,308    DIV.: D |
|---|---|---|
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | PARISH OF EAST BATON ROUGE |
| | * | |
| URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON AND THOMAS E. RYAN, III | * | STATE OF LOUISIANA |

---

### DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III (collectively referenced herein as "Defendants"), file this Memorandum in Support of their Motion for Summary Judgment in the action against them by Plaintiff, H&E Equipment Services, Inc. ("Plaintiff" or "H&E"). This motion replaces the motion for summary judgment previously filed on April 6, 2015. This motion is based on discovery conducted subsequent to the prior motion. Discovery is now complete.

I.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

A.    The 2009 Contract Between Two Sophisticated Public Companies.

Plaintiff, H&E, sells, services, and rents heavy equipment used on construction and industrial projects. H&E owns and operates about 76 facilities around the United States, including the Louisiana facilities that are at issue in this lawsuit in Baton Rouge, Kenner and Belle Chase.[1] H&E is a public company, a sophisticated business entity, and the seventh or eighth largest rental business in the United States. About 35% of the company is rentals, and the rest is distribution, various components related to

---

[1]    Petition filed Nov. 20, 2013 at ¶ 4 (attached as Exhibit A); Deposition of Leonard C. St. Germain dated August 31, 2016 at 136 (attached as Exhibit G).

NON-CERTIFIED COPY

distribution, new equipment sales, used equipment sales, parts and services.[2]  Capital

expenditures alone at H&E are $400 million a year.[3]

Defendants URS Corporation Architecture, P.C. and its affiliates or subsidiaries

("URS") provide consulting and professional engineering services.[4]  In August of 2006,

H&E decided to build a new headquarters building and dealership facility in Baton

Rouge.  Leonard St. Germain, who is a Vice President at H&E, was put in charge of the

project.[5]  St. Germain, on behalf of H&E, negotiated with URS to provide services in

connection with the construction.  The parties negotiated a draft of a contract, and even

changed, at St. Germain's request, terms of the contract regarding limitations of liability

to make them more favorable to H&E.[6]  The parties then signed an Agreement for

Professional Services (the "2006 Agreement"), with St. Germain having the authority to

sign for H&E.[7]  However, because of the recession in the late 2000s, H&E decided to

conserve cash and put the Baton Rouge project on hold.[8]

On August 13, 2009, H&E and URS executed a new contract called the Short

Form Master Agreement for Professional Services Between H&E Equipment Services,

Inc. and URS Corporation Architecture PC (the "2009 Agreement").[9]   The 2009

Agreement is attached as Exhibit B-2.[10]   Again, St. Germain signed the contract on

behalf of H&E.[11]

---

[2]   Deposition of John Engquist dated Aug. 5, 2016 at 13-14 (attached as Exhibit B).
[3]   Engquist Depo. at 38; St. Germain Depo. at 74.
[4]   Petition at ¶ 5.  Defendants Larry O'Neal Johnson and Thomas E. Ryan, III are URS employees who provided architectural services in the course and scope of their employment pursuant to the contract between H&E and URS.  *Id.*
[5]   Engquist Depo. at 15-16; St. Germain Depo. at 26.
[6]   St. Germain Depo. at 31-34.
[7]   Engquist Depo. at 19-21; 2006 Agreement (attached as Exhibit B-1); St. Germain Depo. at 87-88.
[8]   Engquist Depo. at 34-35.
[9]   Petition at ¶ 7.
[10]   *See also* Engquist Depo. at 40-44.
[11]   Engquist Depo. at 40-44; St. Germain Depo. at 87.

NON-CERTIFIED COPY

The 2009 Agreement states that it applies to the "consulting and professional engineering services" performed by URS and "described in one or more authorizations issued to" URS by H&E "as may be requested by [H&E] from time to time."[12] The 2009 Agreement provides that it "**supersede[s] all prior written** and/or oral contracts and **agreements** that may have been made or entered into between" H&E and URS "including but not limited to any and all proposals, oral or written, and all communications between the Parties relating to this Agreement **or any Work Authorization(s)**, and constitute the **entire agreement** between the Parties hereto with respect to the subject matter hereof."[13]

Article 4 of the 2009 Agreement is called "Warranty." It begins on the very first page of this five-page contract. In Section 4.1, the parties agreed that URS's sole liability to H&E is to re-perform any non-conforming or defect work. Section 4.1 includes this language:

> [URS] warrants that any consulting and professional engineering Services performed by it under a Work Authorization shall be performed in accordance with that degree of care and skill ordinarily exercised by members of [URS's] profession practicing at the same time in the same location. [URS's] **sole liability** to [H&E] for any non-conforming Services shall be to **re-perform** the non-conforming or defective Services, written notice of which must be promptly given by [H&E] to [URS]. (emphasis added)

The next section, Section 4.2 is in bold, capital letters. In the first part of Section 4.2, the parties agree that the warranty set forth in Sections 4.1 and 4.2 is exclusive and in lieu or any other warranty relating to services provided by URS to H&E:

> **THE WARRANTY SET FORTH IN THIS ARTICLE 4 IS EXCLUSIVE, AND IN LIEU OF ANY AND ALL OTHER WARRANTIES RELATING TO THE SERVICES,**

---

[12]  2009 Agreement, Section 1.1 (Exhibit B-2).
[13]  2009 Agreement, Section 18.1 (Exhibit B-2) (emphasis added).

3

NON-CERTIFIED COPY

WHETHER STATUTORY, EXPRESS OR IMPLIED, AND [URS] DISCLAIMS ANY SUCH OTHER WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY AND ALL WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE AND ANY AND ALL WARRANTIES ARISING FROM COURSE OF DEALING AND/OR USAGE OF TRADE. ANY OTHER STATEMENTS OF FACT OR DESCRIPTIONS EXPRESSED IN THE AGREEMENT OR ANY WORK AUTHORIZATION SHALL NOT BE DEEMED TO CONSTITUTE A WARRANTY OF THE SERVICES OR ANY PART THEREOF. **(underlining added)**

The second part of Section 4.2 emphasizes that the parties agreed that the only warranty provided by URS to H&E is reperformance of services, emphasizing that this is H&E's sole recourse for any allegation of defective or non-confirming consulting and professional engineering services:

[URS'S] <u>REPERFORMANCE</u> OF DEFECTIVE OR NON-CONFORMING SERVICES THROUGH THE ONE YEAR PERIOD PROVIDED FOR IN THIS ARTICLE 4 SHALL CONSTITUTE COMPLETE FULFILLMENT OF, AND [H&E's] <u>EXCLUSIVE REMEDY</u> FOR, ALL THE LIABILITIES OR RESPONSIBILITIES OF [URS] TO [H&E] FOR NON-CONFORMING OR DEFECTIVE SERVICES, WHETHER THE CLAIMS OF [H&E] ARE BASED ON DELAY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, WARRANTY, INDEMNITY, ERROR AND OMISSION OR ANY OTHER CAUSE WHATSOEVER. **(underlining added)**

Thus, under both Section 4.1 and Section 4.2, H&E and URS specifically agreed that URS's reperformance of any defective or non-confirming services would be H&E's exclusive remedy against URS in contract, tort, or otherwise, and H&E and URS agreed that this remedy controlled over any prior remedy under any prior work order that may have existed.[14]

Discovery revealed that H&E had ample opportunity to review the terms in the 2009 Agreement before signing, and that it did in fact do so. Before the 2009 Agreement

---

[14] Exhibit B-2.

4

NON-CERTIFIED COPY

was signed it was reviewed by H&E's lawyer.[15]  Also, before the 2009 Agreement was signed by St. Germain on behalf of H&E, St. Germain received an email from Frankie Wynn, H&E's Director of Facilities, Compliance and Risk Management.  Wynn's job included reviewing contracts for H&E every single day.[16]  Wynn's email identified numerous concerns that he had with the contract language and specifically asked St. Germain whether he was okay with the liability limitation.[17]  Notwithstanding the concerns raised in Wynn's email about the liability limitation, St. Germain decided to sign the 2009 Agreement on behalf of H&E.[18]  And when John Engquist, the President and CEO of H&E, was asked about the 2009 Agreement in his deposition, he acknowledged that it is H&E's policy to comply with its contracts.[19]

After the 2009 Agreement was signed, H&E hired URS to provide services in connection with the construction of its facilities in Kenner and Belle Chase.[20]  H&E also resumed the Baton Rouge project in 2011, and final, stamped design plans for Baton Rouge were delivered by URS for H&E to use in 2011.[21]

One of URS's responsibilities was to design the concrete parking and staging areas at the Baton Rouge and Kenner locations.  H&E alleges that, shortly after the completion of the Baton Rouge and Kenner facilities in 2012, the portion of the concrete parking area used for H&E's heavy equipment at those facilities began to experience

---

[15]  Engquist Depo. at 20, 41; St. Germain Depo. at 83-87.  St. Germain's job duties included working as H&E's liaison with outside counsel. St. Germain Depo. at 18.

[16]  Deposition of Frankie Wynn dated 8/9/16 (attached as Exhibit C) at 21-23.

[17]  Wynn Depo. at 34-36; *see also* Exhibit C-1 (August 21, 2009 email which was Exhibit 1 to the Wynn Depo.).

[18]  St. Germain Depo. at 87.

[19]  Engquist Depo. at 42.

[20]  Petition at ¶¶ 7-8.

[21]  Engquist Depo. at 34-35; Affidavit of Murray McCullough, attached as Exhibit F and excerpts of the stamped plans attached as Exhibit F-1.  The 2009 Agreement was explicitly referenced in post-2009 work orders for the Baton Rouge, Kenner and Belle Chase facilities.  *See* Wynn Depo. at 47-50 (identifying work orders, which were Exhibit 7 to the deposition) and work orders attached hereto as Exhibit C-2 (which were Exhibit 7 to the Wynn deposition).

5

NON-CERTIFIED COPY

cracking, spalling and deterioration.[22]  As for the Belle Chase location, H&E's Petition

alleges deficiencies in the site elevation and roof misalignment.[23]

### B.   Procedural History.

In December of 2012, H&E ceased paying amounts invoiced to it by URS, and

this is the subject of a separate motion for summary judgment pending herein.[24]

Instead, H&E filed suit against URS in 2013 seeking over $3 million in damages.[25]

H&E's Petition acknowledges that H&E and URS executed the 2009 Agreement, but

makes no reference to the provision in the 2009 Agreement stating that reperformance

of non-confirming or defective services is the sole remedy allowed, nor does the Petition

reference the waiver of consequential damages in the 2009 Agreement.  The only

remedy requested in H&E's Petition is money damages; there is no request or demand

for URS to reperform its work.

On April 6, 2015, Defendants filed a motion for summary judgment seeking the

same relief sought in this motion.  H&E opposed the motion, and argued that the

motion was premature because discovery was incomplete.  This Court heard oral

argument, but has not ruled.  Since that time, the parties have completed discovery in

this case, and the deadline for expert reports has now passed.  With the discovery

relevant to this motion for summary judgment now complete, Defendants file this

motion for summary judgment, which replaces the prior motion.

---

[22]  Petition at ¶ 13. *See also* Deposition of Wallace Drennan (H&E's expert witness) dated Sept. 21, 2016 at 21 (attached as Exhibit D) and Expert Report of Mr. Drennan (exhibit 1 to the deposition and attached as Exhibit D-1); Deposition of Dr. James Bailey (H&E's expert witness) dated Sept. 22, 2016 at 26 (attached as Exhibit E) and Expert Report of Dr. Bailey (exhibit 1 to the deposition and attached as Exhibit E-1).

[23]  Petition at ¶ 12.  H&E has not named any expert witnesses to testify as to any deficiencies at the Belle Chase location.

[24]  H&E's Answer and Affirmative Defenses to Reconventional Demand (attached as Exhibit H) at 2.

[25]  Petition at ¶ 21.

6

NON-CERTIFIED COPY

## II.    SUMMARY JUDGMENT STANDARD

Article 966 of the Louisiana Code of Civil Procedure allows a party to obtain a summary judgment at any time after adequate discovery when "there is no genuine issue as to material fact and … the mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(A)(3). Summary judgments are favored and as such the rules of summary judgment are construed to secure the "just, speedy and inexpensive determination of every action" other than a petition for divorce. La. C.C.P. art. 966(A)(2). Although the burden of proof is generally on the mover in a motion for summary judgment, "if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense." La. C.C.P. art. 966(D)(1).

Because the 2009 Agreement can be construed from the terms in the contract, the question of contractual interpretation is answered as a matter of law, and can be decided on a motion for summary judgment. *Olympia Minerals, LLC v. HS Res., Inc.*, 13-2637, p. 19 (La. 10/15/14), 171 So. 3d 878, 891.

## III.    RULE 9.10 LIST

In compliance with Uniform District Court Rule 9.10(b), the material facts that URS contends are not genuinely disputed are as follows:

1.    The 2009 Agreement is a written contract between H&E and URS. *See* 2009 Agreement (Exhibit B-2); Engquist Depo. at 40-44; St. Germain Depo. at 87-88; Petition at ¶ 7.

7

NON-CERTIFIED COPY

2.      H&E in a public company and owns and operates approximately 76 facilities around the United States, including the Louisiana facilities that are at issue in this lawsuit in Baton Rouge, Kenner and Belle Chase. H&E is a sophisticated business entity, and is the seventh or eighth largest rental business in the United States. About 35% of the company is rentals, and the rest is distribution, various components related to distribution, new equipment sales, used equipment sales, parts and services. Capital expenditures alone at H&E are $400 million a year. *See* Petition at ¶ 4; Engquist Depo. at 13-14, 38; St. Germain Depo. at 74.

3.      URS provides consulting and professional engineering services. Petition at ¶ 5.

4.      In 2006, H&E decided to build a new headquarters building and dealership facility in Baton Rouge. St. Germain, a Vice President at H&E, was in charge of the project. He signed the 2006 Agreement and the 2009 Agreement on behalf of H&E, and had authority to do so. Because of the recession in the late 2000s, H&E put the Baton Rouge project on hold. Engquist Depo. at 15-21, 34-35; St. Germain Depo. at 26, 31-35.

5.      H&E had ample opportunity to review the terms of the 2009 Agreement before signing it, and did in fact do so. A draft of the 2009 Agreement was reviewed by H&E's lawyer and also by Frankie Wynn, H&E's Director of Facilities, Compliance and Risk Management. Wynn sent an email to St. Germain, specifically identifying numerous concerns that he had with the contract language, and specifically asked St. Germain whether he was okay with the liability limitation. Notwithstanding the concerns raised in Wynn's email about the liability limitation, St. Germain decided to

NON-CERTIFIED COPY

sign the 2009 Agreement on behalf of H&E.  Engquist Depo. at 20, 41, Wynn Depo. at 21, 34-36; St. Germain Depo. at 18, 31-35, 83-87.

6.    When H&E signs a contract, it intends to comply with its contract. Engquist Depo. at 42.

7.    After the 2009 Agreement was signed, H&E hired URS to provide services in connection with the construction of its Kenner facility and its Belle Chase facility. H&E resumed the Baton Rouge project in 2011 and the final stamped design plans for Baton Rouge were delivered by URS for H&E to use in 2011.  The 2009 Agreement was also explicitly referenced in the work orders for the Baton Rouge, Kenner and Belle Chase facilities after the 2009 Agreement.  Petition at ¶¶ 7-8; Engquist Depo. at 34-35; McCullough Affidavit; Design Plans (Exhibit F-1); Wynn Depo. at 47-50 and work orders discussed in those pages attached hereto as Exhibit C-2.

## IV.   ARGUMENT

### A.   H&E's Sole Remedy Against URS is Reperformance of Any Nonconforming Services.

The Civil Code mandates that a contract between two parties establishes the law between those parties.  "Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law."  La. C.C. art. 1983.  And as the First Circuit has recognized, it is "well settled in our jurisprudence that limitation of liability clauses" are "valid and not against public policy."  *Bonfiglio v. Bellsouth Advert. & Pub. Corp.*, 619 So. 2d 135, 136 (La. App. 1st Cir. 1993).

For example, in *Bonfiglio*, a chiropractor contracted with Bellsouth to purchase a three-quarter page ad in the yellow pages in the "Chiropractors" section.  Instead, Bellsouth published the ad in the "Clinics" section, and as a result the chiropractor

NON-CERTIFIED COPY

suffered a $40,000 decrease in income plus additional lost profits. The chiropractor sued Bellsouth, but Bellsouth pointed out that the contract between the parties limited Bellsouth's liability to a refund of what had been paid for the advertisement, which Bellsouth had provided. Bellsouth filed a motion for summary judgment. The trial court denied the motion, but the First Circuit reversed, explaining: "Because the limitation of liability clause is valid and the charges were refunded to Mr. Bonfiglio as provided in the contract, we find that there were no genuine issues as to material fact and BAPCO was entitled to summary judgment as a matter of law on the cause of action based on the contract." *Id.* at 136.

Courts have also applied limitations of liability in contracts involving professional services. For example, in *City of Shreveport v. SGB Architects, L.L.P.*, 45,458 (La. App. 2 Cir. 9/22/10), 47 So. 3d 1105, the court enforced a limitation of liability provision printed on the reverse side of a signed contract between an architect and its subconsultant limiting the subconsultant's liability to $2,860, the total compensation received under the agreement.

In this lawsuit, H&E alleges that URS was negligent because it provided substandard plans for the concrete parking and staging areas at the Baton Rouge and Kenner facilities. URS denies this claim of negligence, but regardless of whether this is true, H&E's only remedy against URS is reperformance of the allegedly defective services because the 2009 Agreement is the contract between H&E and URS and it establishes the law between those parties. The parties agreed in Section 4.1 that the "sole liability" of URS to H&E "for any non-conforming Services shall be to re-perform the non-conforming or defective Services."[26] Moreover, the parties agreed in Section 4.2 that URS's "reperformance of defective or non-conforming services ... shall constitute

---

[26]    Exhibit C-1, Section 4.1.

NON-CERTIFIED COPY

complete fulfillment of, and [H&E's] exclusive remedy for, all the liabilities or responsibilities of [URS] to [H&E] for non-conforming or defective services ...."[27] And this is true regardless of the legal theory of H&E's claim against URS, regardless of whether the claim is "based on delay, contract, tort, negligence, strict liability, warranty, indemnity, error and omission or any other cause whatsoever."[28]

The language in Sections 4.1 and 4.2 is clear and obvious. Section 4.1 is on the first page of the 2009 Agreement, and Section 4.2 uses **BOLD CAPITAL LETTERS**.

More importantly, Louisiana Supreme Court law holds that a sophisticated business such as H&E is **presumed** to know the terms of a contract and is bound by the terms of a contract, including a warranty waiver, when it signs a contract. *Louisiana Nat. Leasing Corp. v. ADF Serv., Inc.*, 377 So. 2d 92, 96 (La. 1979). This is especially true when block letters are used to draw attention to terms. As the Supreme Court has held:

> It must be presumed that persons engaged in business, as the ADF representatives in this case, one of whom is an attorney, were aware of the contents of the lease agreement which they signed. The phrase in block letters on the face of the lease that called attention to the terms and conditions on the reverse side, combined with the signatures of the ADF representatives, is sufficient evidence to find that the waiver was brought to the lessee's attention; that they did not avail themselves of the opportunity to carefully read the lease which they signed is not a cause to annul the waiver provision.

*Id.* at 96. Accordingly, the Court held that "we find no substance to ADF's contention that the waiver was ineffective" even if the party was not made aware of the waiver of warranty clause. In the case at bar, we know absolutely that H&E read this contract and identified issues before executing the contract.[29] H&E is a large, multi-million dollar

---

27  *Id.*, Section 4.2.
28  *Id.*, Section 4.2.
29  Wynn Depo. at 34-36; *see also* Exhibit C-1 (August 21, 2009 email which was Exhibit 1 to the Wynn Depo.).

11

NON-CERTIFIED COPY

public company, with numerous offices around the country.  Sophisticated businesses

are bound by the terms of their contracts.

Numerous courts have applied *Louisiana Nat. Leasing Corp.* and have held that

businesses are bound by the terms in their contracts, regardless of whether they read

the contract or whether particular provisions were brought to their attention.  As the

First Circuit has held, "one must presume that persons engaged in business are aware

of the contents of the agreements they sign."  *Capitol City Leasing Corp. v. Hill*, 394 So. 2d

1264, 1267 (La. App. 1st Cir. 1981).  The federal Fifth Circuit applied this holding in

*Datamatic, Inc. v. Int'l Business Machines Corp.*, 795 F.2d 458 (5th Cir. 1986), holding that

the parties to the contract were "commercially sophisticated parties" who under

Louisiana law are "held to a higher standard than an unknowledgeable consumer." *Id.*

at 465.  Thus, "the buyer's signature is evidence that its terms and conditions were

brought to his attention." *Id.  See also Copelco Capital, Inc. v. Gautreaux*, No. CIV. A. 99-

850, 1999 WL 1034740, at *4 (E.D. La. Nov. 10, 1999) ("the bold face, unambiguous print

of the waiver, combined with the cornerstone of our system that a party to a contract is

presumed to have read and understood the provisions of that contract, requires a

finding that the waiver is valid under the more stringent Louisiana law, as well as

under New Jersey law."); *Anderson v. Bohn Ford, Inc.*, 291 So. 2d 786, 791 (La. App. 4th

Cir. 1973) ("The fact that the dealer signed the document and acknowledged by his

signature that he accepts the conditions contained in the agreement are sufficient to

meet the test that the waiver was brought to the dealer's attention.  **To conclude**

**otherwise would destroy the stability of contracts**.  Presumably, persons established in

business, as the dealer in this case and the manufacturer, are aware of the contents of

the agreement between them.") (emphasis added). *California Union Ins. Co. v. Bechtel*

12

NON-CERTIFIED COPY

*Corp.*, 473 So. 2d 861, 866-67 (La. App. 4th Cir. 1985) ("The contract under consideration was a commercial undertaking between two highly sophisticated parties. While courts are reluctant to enforce warranty limitations on consumers they recognize that parties such as Bechtel (acting for GSU) and Westinghouse are free to bargain as they see fit and are bound by their contracts.") Accordingly, Sections 4.1 and 4.2 in Article 4 of the 2009 Agreement are enforceable. URS's sole liability to H&E is reperformance of services.

**B.     The 2009 Agreement Applies to the Baton Rouge, Kenner and Belle Chase Projects.**

The 2009 Agreement applies to the work done by URS for the Baton Rouge, Kenner and Belle Chase locations. This includes the final, stamped design plans provided by URS in 2011 to H&E for the Baton Rouge project. This is clear from the plain text of the 2009 Agreement, which explicitly states that it replaces all prior agreements between H&E and URS:

> This Agreement and any executed Work Authorizations **supersede all prior written and/or oral contracts and agreements** that may have been made or entered into between Client and Consultant regarding the subject matter hereof, including but not limited to any and all proposals, oral or written, and all communications between the Parties relating to this Agreement or **any Work Authorization(s)**, and **constitute the entire agreement between the Parties hereto** with respect to the subject matter hereof.

2009 Agreement, Section 18.1 (emphasis added).

If the 2009 Agreement were a new contract only governing new work assignments, then the language in the contract stating that it supersedes prior written contracts would be unnecessary surplusage. This alone is reason to reject any argument that it does not apply to the Baton Rouge work. As the Supreme Court has noted, it is a "cardinal rule in the construction of contracts is that the contract must be viewed as a

13

NON-CERTIFIED COPY

whole and, if possible, practical effect given to all its parts, according to each the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage." *Lambert v. Maryland Cas. Co.*, 418 So. 2d 553, 559 (La. 1982); *see also* La. C.C. arts. 2049, 2050.

For example, in *Firstar Commc'ns of Louisiana, L.L.P. v. Tele-Publ'g, Inc.*, 00-2219 (La. App. 4 Cir. 8/29/01), 798 So. 2d 1032, the issue was whether a 1994 contract had automatically renewed and was therefore still in effect when a 1995 contract was signed. The 1995 contract stated that it "replaces any other Agreements previously signed by the parties," and the court ruled that this language in the 1995 contract would be meaningless if there was not still a contract in place between the two parties. Thus, the court rejected an interpretation of the 1994 contract that would have meant that the 1994 contract did not renew because that interpretation would make language in the 1995 contract mere surplusage. *Id.* p. 8, 798 So. 2d 1032, 1037.

Moreover, the 2009 Agreement itself makes it clear that it governs all work that URS performs for H&E. As noted above, Section 18.1 states that the 2009 Agreement, along with the specific work authorization, "constitute the entire agreement between the Parties hereto with respect to the subject matter hereof." The "subject matter hereof" of the 2009 Agreement is identified in Section 1.1, which states that the contract applies to the "consulting and professional engineering services" performed by URS and "described in one or more authorizations issued to" URS by H&E "as may be requested by [H&E] from time to time." Section 1.1 then goes on to make it clear that the 2009 Agreement applies to every work authorization: "Each duly executed Work Authorization shall be subject to the terms and conditions of this Agreement, except to the extent expressly modified by the Work Authorization."

14

NON-CERTIFIED COPY

The 2009 Agreement states that it is "effective as of August 13, 2009." This simply reflects that the terms of the parties' agreement changed, going forward, on August 13, 2009 when the 2009 Agreement was signed. From that date forward, for any claim made by H&E against URS, the exclusive remedy was reperformance. H&E's lawsuit was filed on November 20, 2013, long after that date. The 2009 Agreement does not contain any exception for the Baton Rouge project. To the contrary, the 2009 Agreement says that it **shall** apply to **each** work authorization.

Because it is clear from the terms of the 2009 Agreement itself that it applies to the Baton Rouge project, Louisiana law does not permit looking to external evidence, outside of the terms of the contract, to decide whether the 2009 Agreement applies to the Baton Rouge project. Article 2046 states: "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." Accordingly, "[w]hen the terms of a written contract are clear, unambiguous, and lead to no absurd consequences, parol evidence cannot be used to vary or explain the contract terms, and the parties meaning or intent must be determined from the four corners of the contract." *Steier v. Heller*, 31,733, p. 9 (La. App. 2 Cir. 5/5/99), 732 So. 2d 787, 792. As noted above, the subject matter of the 2009 Agreement is spelled out in the 2009 Agreement itself. Thus, the law does not permit looking at extrinsic evidence regarding the subject matter of the 2009 Agreement.

However, even if the law did permit looking at extrinsic evidence, the evidence further demonstrates that the 2009 Agreement applies to the Baton Rouge work. The Louisiana Administrative Code requires that a licensed professional engineer affix his seal, sign his name, and date all engineering documents that are issued to a client as completed work. La. Admin. Code tit. 46, pt. LXI, § 2701(A)(4)(a)(i); *see also* Affidavit of

15

NON-CERTIFIED COPY

Murray L. McCullough, attached as Exhibit F. The design plans that URS provided to H&E in 2011 were signed, dated and stamped by Murray McCullough on July 1, 2011. *Id.* Before the final, stamped plans were provided in 2011, H&E could not use the plans for the construction of the concrete at the H&E site in Baton Rouge. *Id.* Thus, the plans that are the subject of H&E's claim in this lawsuit were provided long after the 2009 Agreement was agreed to by the parties.

Second, work orders which were issued subsequent to the signing of the 2009 Agreement reference the 2009 Agreement. This includes work orders for the Baton Rouge, Kenner and Belle Chase locations.[30]

## V.    CONCLUSION

The parties agreed that H&E's only remedy would be to ask for reperformance by URS. H&E is a sophisticated and public company, and under settled Louisiana law, it is bound by the terms of its agreement. H&E could have insisted upon some other remedy when H&E read and executed this contract in 2009, but it did not. And importantly, URS understood that there was agreement that its sole liability was to reperform any deficient services. What matters most for this motion for summary judgment is that the contract establishes the law between the parties, and under the contract, the only remedy sought by H&E in this lawsuit—money damages—are not allowed as a matter of law. Accordingly, summary judgment in Defendants' favor is warranted.

**WHEREFORE**, Defendants pray that this Motion for Summary Judgment be granted and that this Court render a judgment in favor of Defendants, dismissing all of Plaintiff's claims.

---

[30]    *See* Wynn Depo. at 47-50 (identifying work orders, which were Exhibit 7 to the deposition) and work orders attached hereto as Exhibit C-2 (which were Exhibit 7 to the Wynn deposition).

16

NON-CERTIFIED COPY

Respectfully submitted,

Philip A. Franco (#5819)
Ron Sholes (#14436)
Kellen J. Mathews (#31860)
**ADAMS AND REESE LLP**
701 Poydras Street, Suite 4500
New Orleans, LA 70139
Tel:  (504) 581-3234
Fax:  (504) 566-0210
E-mail: Phil.franco@arlaw.com
          Ron.sholes@arlaw.com
          Kellen.Mathews@arlaw.com

*Attorneys for Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III*



17

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served on all counsel of record by electronic mail and/or U.S. Mail, postage prepaid and properly addressed, this 27th day of December, 2016.

Kellen J. Mathews

NON-CERTIFIED COPY

18

2-13

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES, INC. | * | SUIT NO. 626,308    DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | PARISH OF EAST BATON ROUGE |
| | * | |
| URS CORPORATION | * | STATE OF LOUISIANA    COST OK $ 577.° |
| ARCHITECTURE, P.C., URS | | |
| CORPORATION, L. O'NEAL | | DEC 27 2016 |
| JOHNSON AND THOMAS E. RYAN, | | CH 055295 AY |
| III | | DEPUTY CLERK OF COURT |

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

**NOW INTO COURT,** through undersigned counsel, come URS CORPORATION ARCHITECTURE, P.C. ("URS Architecture"), URS CORPORATION ("URS"), L. O'NEAL JOHNSON ("Johnson") AND THOMAS E. RYAN, III, ("Ryan") (all collectively referred to hereinafter as "Defendants"), and move this Honorable Court, pursuant to Article 966 of the Louisiana Code of Civil Procedure, to render summary judgment in their favor as to Plaintiff's claims against Defendants in the above-captioned matter. Defendants are entitled to a judgment, as a matter of law; because, as is more fully set forth in the attached Memorandum and the evidence cited therein and attached thereto, there exists no genuine issue of material fact with regard to the issues set forth therein and Defendants are entitled to a Judgment as a matter of law, dismissing the claims of Plaintiff, H&E Equipment Services, Inc.

This matter is not currently set for trial. Defendants do not intend to offer live testimony at the hearing on this matter. URS's Motion for Summary Judgment on its Reconventional Demand filed November 17, 2016 is currently set for hearing on

REC'D C.P.

JAN 03 20

1

NON-CERTIFIED COPY

February 13, 2017. In the interest of judicial economy Defendants respectfully request that the instant Motion be set for hearing on the same date.

    **WHEREFORE**, Defendants pray that this Motion for Summary Judgment be served upon the Plaintiff; set for hearing; and that after due proceedings are held, this Court render a judgment in favor of Defendants granting their Motion for Summary Judgment and dismissing Plaintiff's claims accordingly.

Respectfully submitted,

ADAMS AND REESE, LLP

Philip A. Franco (Bar # 5819), TA
Ron Sholes (Bar # 14436)
Kellen J. Mathews (Bar # 31860)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
E-mail: Phil.franco@arlaw.com
      Ron.sholes@arlaw.com
      Kellen.Mathews@arlaw.com

*Attorneys for Defendants, URS Corporation Architecture, P.C.; URS Corporation; L. O'Neal Johnson and Thomas E. Ryan, III*



EAST BATON ROUGE PARISH
2016 DEC 27 AM 11: 35
DEPUTY CLERK OF COURT

2

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon all counsel of record via e-mail and/or United States Mail, postage prepaid and properly addressed, this 27th day of December, 2016.

_____
Kellen J. Mathews



3

NON-CERTIFIED COPY

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308     DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON AND THOMAS E. RYAN, III | * | STATE OF LOUISIANA |

---

## ORDER

Considering the foregoing Motion for Summary Judgment, Statement of Undisputed Material Facts and Memorandum in Support filed by Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III:

**IT IS HEREBY ORDERED,** that Plaintiff is hereby directed to appear and show cause, if any, on the 13th day of February, 2017 at 1:00p.m. why the Motion for Summary Judgment filed on behalf of Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III, should not be Granted and why Plaintiff's claims should not be dismissed accordingly .

THUS DONE AND SIGNED this **29** day of _____Dec_____, 20 _16_, at Baton Rouge, Louisiana.

_____
HON. JANICE CLARK
Judge, 19th Judicial District Court

FILED
EAST BATON ROUGE PARISH, LA.
2016 DEC 27   AM 11: 35
DEPUTY CLERK OF COURT

**PLEASE SERVE:**

H&E EQUIPMENT SERVICES, INC.
*Through its Counsel of Record*
Brent B. Barriere
Loretta G. Mince
Rebecca Sha
Fishman Haygood, LLP
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170

NON-CERTIFIED COPY

6709-17-000132

# RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**NUMBER  C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

vs.

**PARISH OF EAST BATON ROUGE**

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**STATE OF LOUISIANA**

TO:  **H&E EQUIPMENT SERVICES INC
THRU BRENT B. BARRIERE
LORETTA G. MINCE
REBECCA SHA
201 ST. CHARLES AVE., STE. 4600
NEW ORLEANS, LA.  70170**

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

DEFENDANTS MOTION FOR SUMMARY JUDGMENT, MEMORANDUM
AND ATTACHMENTS

You MUST come to Court at 1:00 PM, on FEBRUARY 13, 2017 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

### * * * * * SEE ATTACHED ORDER * * * * *

**YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A
BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on **04-JAN-2017**

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

Requesting Attorney:
KELLEN J MATHEWS

---

### SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____ .

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____ .

**DUE AND DILIGENT:**      After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20_____.

SERVICE:$_____
MILEAGE$_____          _____
TOTAL:  $_____                  Deputy Sheriff
                                                     Parish of _____

### RULE NISI (OOP) - 6709



EBR3957024

NON-CERTIFIED COPY

# DOUG WELBORN, CLERK OF COURT
## 19th Judicial District Court
## Parish of East Baton Rouge
### 300 North Boulevard
### Baton Rouge, LA 70801
### Phone  (225)389-3960

**NO.**   C626308 Division D                   **05-JAN-2017**

**TO:**   ORLEANS PARISH SHERIFFS OFFICE
CIVIL DEPARTMENT
421 LOYOLA AVE
NEW ORLEANS, LA 70112

Please find attached RULE NISI to be served in your parish for the above numbered suit.

Kindly make your return(s) on the duplicate(s) enclosed, and

X   note the enclosed check for payment of service;

ف   send us your bill for service;

ف   note that this is a pauper suit and no funds are available; or

ف   note that this is a government suit and no funds are necessary.

Thank You,

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

**Requesting Attorney:  KELLEN J MATHEWS**

**REPLY:**                             DATE:_____

_____

_____

_____

_____

_____

By:_____

Deputy Sheriff, Parish of _____

**Letter to Out Of Parish Sheriff - 5213**



EBR3848317
NON-CERTIFIED COPY

6709-17-000132

# RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**NUMBER  C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

vs.

**PARISH OF EAST BATON ROUGE**

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**STATE OF LOUISIANA**

TO:  **H&E EQUIPMENT SERVICES INC
THRU BRENT B. BARRIERE
LORETTA G. MINCE
REBECCA SHA
201 ST. CHARLES AVE., STE. 4600
NEW ORLEANS, LA.  70170**

PAPER _____ ENTERED _____ RETURN

SERIAL NO. _____ DEPUTY _____ PARISH

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

DEFENDANTS MOTION FOR SUMMARY JUDGMENT, MEMORANDUM
AND ATTACHMENTS

You MUST come to Court at 1:00 PM, on FEBRUARY 13, 2017 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

### * * * * * SEE ATTACHED ORDER * * * * *

**YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule is issued by the Clerk of Court for East Baton Rouge Parish on **04-JAN-2017**.

_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

Requesting Attorney:
KELLEN J MATHEWS

---

**SERVICE INFORMATION:**

Received on the __9__ day of __Jan__, 20_17_ and on the __10__ day of __Jan__, 20_17_, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _201 St Charles thru Rhonda_

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:**    After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20 ____.

SERVICE: S_____
EAGES_____
AL: S_____

Deputy Sheriff
Parish of _Orleans_

**RULE NISI (OOP) - 6709**

EBR3716370

EBR3957024

NON-CERTIFIED COPY



19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                              SECTION: "D"

H&E EQUIPMENT SERVICES, INC.   DEPUTY CLERK

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____          _____
                                                    DEPUTY CLERK

**APPENDIX TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1. Exhibit 1 – **Deposition of Leonard St. Germain**
    a. Exhibit 4 to deposition – 2006 Professional Service Agreement
    b. Exhibit 6 to deposition – October 23, 2006 Proposal Letter
    c. Exhibit 18 to deposition – Lump Sum Order No. 08-01
    d. Exhibit 21 to deposition – August 2009 Proposal
    e. Exhibit 22 to deposition – Letter dated August 10, 2009
    f. Exhibit 23 to deposition – August 13, 2009 Email from St. Germain
    g. Exhibit 24 to deposition – Email from Chad Herndon
    h. Exhibit 25 to deposition – August 20, 2009 Email from Neal Johnson
    i. Exhibit 27 to deposition – 2009 Agreement
    j. Exhibit 28 to deposition – Time and Materials Work Authorization 10-10
2. Exhibit 2 – **Deposition of Neal Johnson**
    a. Exhibit 9 to deposition – June 11, 2013 Email from Neal Johnson to Frankie
       Wynn
3. Exhibit 3 – **Deposition of Chad Herndon**
    a. Exhibit 3 to Deposition – February 6, 2007 Email
4. Exhibit 4 – **Deposition of Thomas Ryan**
    a. Exhibit 1 to deposition – Geotechnical Report of Soil Testing Engineers
    b. Exhibit 14 to deposition – Terracon Geotechnical Report
5. Exhibit 5 – **Deposition of John Engquist**
6. Exhibit 6 – **June 5, 2015 Affidavit of Frankie Wynn**
    a. Exhibit 4 to affidavit – Invoice No. 4602441, dated 2/24/11 (URS 09289)
    b. Exhibit 5 to affidavit – Invoice No. 4666033, dated 4/27/11 (H&E 0001532)
7. Exhibit 7 – **Deposition of Stephen Dorsey**
8. Exhibit 8 – **Deposition of John Jones**
    a. Exhibit 53 to deposition – June 24, 2013 Baton Rouge Punch List
    b. Exhibit 54 to deposition – June 25, 2013 Deficiencies to the Completion of
       Contract
9. Exhibit 9 – **Deposition of Frankie Wynn**
    a. Exhibit 26 to deposition – December 29, 2011 Email from MAPP to URS and
       H&E
    b. Exhibit 35 to deposition – March 16, 2012 Email from MAPP to URS and H&E
    c. Exhibit 36 to deposition – March 20, 2012 Project Observation Report
    d. Exhibit 39 to deposition – August 3, 2012 Internal URS Email
    e. Exhibit 44 to deposition – September 25, 2012 Email from MAPP to URS and
       H&E
    f. Exhibit 46 to deposition – October 4, 2012 Email from MAPP to URS and H&E
    g. Exhibit 69 to deposition – July 29, 2013 Email from H&E to URS
    h. Exhibit 70 to deposition – List of Kenner Project Change Orders
10. Exhibit 10 – **August 21, 2015 Affidavit of Frankie Wynn**
11. Exhibit 11 – **Deposition of Debra Sanders**
12. Exhibit 12 – **Deposition of Brad Barber**

1162714v.1        NON-CERTIFIED COPY

EBR3988138

13. Exhibit 13 – **Deposition of Timothy Gaines**
    a.  Exhibit 5 to deposition – December 16, 2010 Site Meeting Minute
14. Exhibit 14 – **Deposition of Brad Reese**
    a.  Exhibit 39 to deposition – March 4, 2013 Email from MAPP to H&E and URS
    b.  Exhibit 48 to deposition – July 17, 2013 Email from MAPP to URS
15. Exhibit 15 – **Deposition of Kevin Sprehe**
16. Exhibit 16 – **Deposition of James R. Bailey**
    a.  Exhibit 1 to deposition – Exponent Expert Report
17. Exhibit 17 – **Deposition of Wallace C. Drennan**
    a.  Exhibit 1 to deposition – Expert Report of Wallace C. Drennan
18. Exhibit 18 – **Deposition of Gary Anderton**

1162714v.1

NON-CERTIFIED COPY

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


```
*  *  *  *  *  *  *  *  *
                         *
H&E EQUIPMENT SERVICES   *
                         * NUMBER 626,308
VERSUS                   *
                         * DIVISION "D"
URS CORPORATION          *
ARCHITECTURE, P.C., URS  *
CORPORATION, L O'NEAL    *
JOHNSON AND THOMAS E.    *
RYAN, III                *
                         *
*  *  *  *  *  *  *  *  *
```

Deposition of LEONARD C. ST.

GERMAIN, taken on Wednesday, August 31, 2016,

commencing at 10:06 a.m., in the offices of

Adams and Reese, LLP, Attorneys at Law, 450

Laurel Street, Suite 1900, Baton Rouge,

Louisiana, 70801.

**EXHIBIT**

1

NON-CERTIFIED COPY

Page 2

1                    I N D E X

2

3                                        Page

4

    Caption                              1
5   Index of Exhibits                    3
    Appearances                          10
6   Agreement of Counsel                 11

7   Examination

8      PHILIP A. FRANCO, ESQ.            12
       LORETTA G. MINCE, ESQ             139
9      PHILIP A. FRANCO, ESQ.            141

10

           *   *   *   *   *

11

    Witness' Certificate                144
12  Reporter's Page                      145
    Certificate                          146

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

1                    INDEX OF EXHIBITS

2

3    Number                                    Page

4      1  July 20, 2006 Email from        25
          Mark Howard to Leonard
5         St. Germain attaching URS
          July 20, 2006 proposal to
6         Leonard St. Germain
          H&E 0005192-0005195
7

       2  August 16, 2006 letter from     31
8         J. Ashley Moore to Leonard
          St. Germain re: Agreement for
9         Professional Services
          H&E 0005198
10

       3  August 22, 206 Email string     33
11        from Mark Howard to Leonard
          St. Germain
12        H&E 0005196-0005107

13     4  Agreement for Professional      34
          Services Between H&E
14        Equipment Services, Inc. and
          URS Corporation Architecture,
15        NC, PC, effective August 28,
          2006
16

       5  A-4 Application Site Plan City  39
17        of Baton Rouge/Parish of East
          Baton Rouge 10/18/06
18        H&E 0000109-0000111

19     6  January 14, 2013 Email string   42
          from Leonard St. Germain to
20        John Jones
          H&E 0007376-0007380

21

22

23

24

25

NON-CERTIFIED COPY

Page 4

1   (Cont.)        INDEX OF EXHIBITS

2

3    Number                                        Page

4    7  Lump Sum Work Order NO. 06-03        45
            between H&E Equipment
5            Services, Inc. And URS
             Corporation Architecture,
6            NC, PC, dated November 8,
             2006 with Attachment 1,
7            Phase II
             H&E 0000025-0000026

8

      8  January 6, 2011 Email from          46
9            John Herndon to Leonard
             St. Germain, et al
10           H&E 0005163

11    9  H&E Equipment Baton Rouge            49
             Design Development Manual,
12           Headquarters and Service
             Building, February 9, 2007
13           by URS
             URS 038649-038681

14

      10  February 13, 2007 Email from        53
15            Chad Herndon to Leonard
              St. Germain, et al attaching
16            H&E Site Plan 13.FEB.07
              H&E 0005216-0005217

17

      11  March 15, 2007 Email from Mark      56
18            Howard to Leonard St. Germain,
              et al re: Site Issues Path
19            Forward
              H&E 0005164-0005165

20

21    12  August 9, 2007 Email from Chad      58
              Herndon to Leonard St. Germain,
22            et al Re: Attaching elevations,
              floor plans and site plan
23            H&E 0005168-0005175

24

25

NON-CERTIFIED COPY

Page 5

1   (Cont.)      INDEX OF EXHIBITS

2

3    Number                              Page

4    13  March 5, 2008 Email string from    62
         Leonard St. Germain to James
5        Brown Re: Facility repair
         estimates
6        H&E 0006682-0006683

7    14  June 30, 2008 Email string from    63
         Chad Herndon to Leonard St.
8        Germain, et al
         H&E 0006783-0006784

9

     15  July 10, 2008 Email string from    66
10       Leonard St. Germain to Brad
         Barber Re: Plan cost
11       Attachment includes
         Confidential H&E Equipment
12       Services New Facility Cost
         Comparison
13       H&E 0003530-0003535

14   16  July 10, 2008 Email string from    69
         Bard Barber to John Engquist
15       re: FW: Plan cost
         (Last page attached is H&E
16       0002957)
         H&E 0002958-0002960

17

     17  July 11, 2008 Email from Leonard   70
18       St. Germain to Chad Herndon
         re: URS Work Order 08-01
19       H&E 0006843-0006844

20   18  Lump Sum Work Order NO. 08-01      71
         between H&E Equipment
21       Services, Inc. And URS
         Corporation Architecture,
22       NC, PC, dated July 11, 2008
         with Attachment 1 Scope of
23       Services
         H&E 0037276-0037277

24

25

NON-CERTIFIED COPY

Page 6

1    (Cont.)        INDEX OF EXHIBITS

2

3    Number                                    Page

4

     19   January 19, 2009 Email string        71
5         from Neal Johnson to Leonard
          St. Germain
6         H&E 0005230-0005231

7    20   May 7, 2009 Email string             74
          from James Brown to John Jones
8         Re: Repairs Option 1 Kenner
          Facility (Attachment of
9         calculations not bates stamped)
          H&E 0007609-0007610

10

     21   June 22, 2009 Email from             77
11        Leonard St. Germain to Neal
          Johnson Re: Estimate
12        H&E 0005268

13   22   August 10, 2009 letter from Neal     77
          Johnson to Leonard St. Germain
14        Re: Proposed Renovations and
          Additions to H&E Equipment -
15        Kenner, LA with Attachment 1
          Scope of Work
16        H&E 0003415-0003416

17   23   August 13, 2009 Email string         82
          from Neal Johnson to Leonard
18        St. Germain, et al
          H&E 0005383-0005383

19

     24   August 14, 2009 Email string         83
20        from Chad Herndon to Leonard
          St. Germain Re: Kenner
21        Proposal
          H&E 0005389-0005390

22

23

24

25

NON-CERTIFIED COPY

Page 7

1    (Cont.)        INDEX OF EXHIBITS

2

3    Number                                    Page

4    25  August 20, 2009 Email string        83
             from Neal Johnson to Leonard
5            St. Germain, et al with
             attachments of Kenner
6            Proposal, Master Agreement,
             with Attachments 1, 2 and 3
7            H&E 0005430-0005441

8    26  August 21, 2009 Email string        85
             from Frankie Wynn to Leonard
9            St. Germain Re: URS Short Form
             Master Agreement For
10           Professional Services
             Renovations and Additions to
11           Kenner LA Branch with
             Attachments 1, 2 and 3
12           H&E 0005236-0005246

13   27  Short form Master Agreement for     87
             Professional Services Between
14           H&E Equipment Services, Inc.
             and URS Corporation
15           Architecture, NC, PC,
             effective August 13, 2009

16

17   28  URS Attachment 1, Time and          87
             Materials Work Authorization
18           09-100 8/31/09
             Attachments 1, 2 and 3
             URS 031081-URS 031084

19

20       URS Attachment 1, Time and          87
             Materials Work Authorization
21           10-10 10/22/2010
             URS 031085-URS 031086

22       URS Attachment 1, Time and          87
             Materials Work Authorization
23           12-10 12/27/2010
             Attachments 1, 2 and 3
24           URS 031072-URS 031075

25

NON-CERTIFIED COPY

1      Q.  We are going to go through some

2  documents.  I'm going to focus on some

3  particular parts.  You have the right to read

4  the whole document.

5      A.  Okay.

6      Q.  And maybe the easiest way to do it is

7  for me to focus you after you have a chance to

8  look at it briefly, and then if you want to read

9  more, you just tell me.  Okay?

10     A.  Okay.

11     Q.  The first document I'm going to show

12  you is an Email from Mark Howard at URS to you,

13  July 20, 2005.

14         Do you see that?

15     A.  Uh-huh (affirmative response).

16     Q.  And this is a design proposal?

17     A.  (Witness reviewing document.)

18     Q.  I know it has been a long time, but do

19  you briefly recall this?

20     A.  Yes.

21         MR. FRANCO:

22             For the Record, this is H&E 5192,

23  et seq, Exhibit 1.

24  EXAMINATION BY MR. FRANCO:

25     Q.  How did it come about that you were, in

NON-CERTIFIED COPY

1  fact, dealing with URS?

2      A.  I have a real good of friend mine that

3  was an engineer for URS.  He lived in my

4  neighborhood.

5      Q.  And who was that?

6      A.  Randy Babin.

7      Q.  He was in Baton Rouge?

8      A.  Yes.

9      Q.  And that is how you got basically

10  connected with URS?

11      A.  Yeah.  Yeah.  We were having a

12  conversation, you know, with us getting ready to

13  design and build a new facility, and I was

14  looking for an architectural and engineering

15  firm that I could join together, instead of

16  going through an architect and a separate

17  engineering company.

18          And he referred me, and Mark Howard

19  reached out to me.  And that is how the

20  relationship started.

21      Q.  And at this point, it is fair to say you

22  were the principal one at H&E dealing with URS?

23      A.  Yes.

24      Q.  Now, this first proposal was in

25  connection with, or at least the thought process

NON-CERTIFIED COPY

1      A.   Correct.

2      Q.   And the next document I'm going to show

3  you is the Agreement for Professional Services,

4  which is going to be labeled Exhibit 4.   This

5  doesn't have a Bates stamp.

6           And if you look at Article V, Roman

7  numeral V, you will see that that number of

8  limitation was actually 5 million, 2 million, as

9  she had requested, correct?

10     A.   Correct.

11     Q.   And if I'm not mistaken, this bears your

12  signature?

13     A.   Yes, it does.

14     Q.   So you were satisfied that you had run

15  it past Counsel and you signed it --

16     A.   Yes.

17     Q.   -- on behalf of the Company?

18     A.   Yes.

19     Q.   And you were authorized to do so?

20     A.   Yes.   I have a Corporate resolution.

21     Q.   Did you see the Corporate resolution

22  recently?

23     A.   Not recently.   I have a copy of it.

24     Q.   You do?   Because that wasn't produced to

25  us.

NON-CERTIFIED COPY

Page 42

1    document that was signed, so I would have to say

2    "yes."

3         Q.  All right.

4             The next document I'm going to show you

5    is Exhibit 6, and is H&E 7376.

6             This string of Emails starts off from

7    Chad Herndon at URS to you, and he is sending

8    you the proposal for the next phase of the

9    project.

10            Do you recall dealing with Mr. Herndon?

11        A.  Yes.

12        Q.  And then you send this on to Johnny

13   Jones?

14        A.  Right.

15        Q.  This second phase was in October of

16   2006, and this actually dealt with design

17   development, correct?

18        A.  Correct.

19        Q.  And as it says here, in the first

20   paragraph, the last sentence, "...we answer as

21   many of the design questions as possible before

22   moving into the construction document phase."

23            Do you see that?

24        A.  Second paragraph --

25        Q.  First paragraph, on the October 23, 2006

NON-CERTIFIED COPY

1  coordinate and facilitate progress review

2  meetings with the H&E project team and conduct a

3  formal final approval presentation at the end of

4  the project phase to attain approval from the

5  H&E project team."

6          Do you see that?

7      A.  Yes.

8      Q.  Who was the H&E project team at that

9  point?

10      A.  It was the executive managers, John

11  Engquist, Brad Barber, John Jones, Leslie Magee,

12  myself, Scott Madison.

13      Q.  And all of those people were involved in

14  meetings and discussions about approval of

15  certain things as it went along.  Fair

16  statement?

17      A.  Yes.  Fair statement.

18      Q.  All right.  The next document I'm going

19  to show you is going to be Exhibit 8, and this

20  is from Chad Herndon at URS to you, February 6th

21  of 2007.  And at this point, he is asking you

22  for load information of the equipment to design

23  to.

24          Do you see that?

25      A.  Yes.

NON-CERTIFIED COPY

1      Q.  Do you recall providing any load

2  information to Mr. Herndon as a result of this

3  Email?

4      A.  I recall corresponding to this Email in

5  a verbal fashion, yes.

6      Q.  Verbally only?

7      A.  Yes.

8      Q.  And verbally, do you recall what you

9  told him?

10      A.  Yes.  Based on Chad's background, Chad

11  worked for a similar company to ours, came from

12  Scott Construction Equipment.

13          And my conversation was very similar to

14  what all of the equipment companies do, and what

15  we have, gave him a range of potential equipment

16  in our fleet, from the smallest to the largest.

17          And then he was going to take and look

18  at some typical specifications on the Internet

19  on the various manufacturers.

20      Q.  You all didn't have that load

21  information available readily?  When I say "you

22  all," I mean H&E.

23      A.  I mean, we had brochures and things of

24  that nature that, you know, were available on

25  the Internet.

NON-CERTIFIED COPY

1    right?

2        A.  Yes.

3        Q.  Just for the Record, why don't we attach

4    as a separate Exhibit 18, the Lump Sum Work

5    Order 08-01, with the attachment for the scope

6    of services for the construction documentation

7    phase?  That is the 490,000 we just talked

8    about, correct?

9        A.  Correct.

10       Q.  So Exhibit 18 is 37276 and 7.  And then

11   we are still in July of 2008.

12           All right.  Next I'm going to show you

13   Exhibit 19, which is H&E 7052.

14           Now, this is in reference to the H&E

15   headquarters building, and it is talking about

16   some issues at the building.

17           But I want to focus, if you will, on the

18   first page, the bottom Email, from you to Jodi

19   Rusca, R-U-S-C-A, at URS, copying Neal Johnson

20   and Chad Herndon.  And you are answering some of

21   their questions.  Your answers --

22       MS. MINCE:

23           Stop.  You lost me.  I don't --

24       THE WITNESS:

25           It is not on this document.

NON-CERTIFIED COPY

1   Kenner in May of 2009, correct?

2       A.  Based on this Email, yes.

3       Q.  Because he gives these to you, copies to

4   you in September of 2008, and y'all sending this

5   to Johnny Jones in May of 2009.  So you are

6   resurrecting the concept that, apparently, you

7   all needed to do something at Kenner?

8           MS. MINCE:

9               Object to form.

10          MR. FRANCO:

11              What is the objection?

12          MS. MINCE:

13              The Email in May of 2009 is from

14  James Brown to Johnny Jones, and the plans are

15  on that Email.  So James Brown is sending this

16  to Johnny Jones in May of 2009.  You said "you

17  are sending."

18          MR. FRANCO:

19              I said "y'all."

20  EXAMINATION BY MR. FRANCO:

21      Q.  The concept is H&E is resurrecting the

22  concept in May of 2009 that "we needed to do

23  something at the Kenner facility."  Fair

24  statement?

25      A.  Fair statement.

NON-CERTIFIED COPY

Page 77

1    Q.  Okay.  Next is Exhibit 21, and this is

2  H&E 5268.  We are in June of 2009.  This is from

3  you to Neal Johnson, telling him that you need

4  to do pretty extensive renovations to Kenner,

5  and asking if URS is interested in assisting on

6  that at that site, correct?

7    A.  Correct.

8    Q.  All right.  And then I'm going to snow

9  you the next exhibit, which is Exhibit 22, H&E

10  3415.

11      So as a follow-up, you are asking if

12  they are interested in June of '09, and in

13  August of '09, Neal Johnson is sending you a

14  proposal to assist with budget and renovations

15  and additions at Kenner, correct?

16    A.  Correct.

17    Q.  And this proposal was for $20,000 to

18  develop basically existing site drawings and

19  then develop sketches to try to figure out what

20  you all wanted to do with that site, right?

21    A.  Yes.

22    Q.  And if you look at No. 7 on that

23  Attachment 1, it lists develop sketches and

24  drawings for a new entrance, new office,

25  demolish an existing office, talks about new

NON-CERTIFIED COPY

1    Q.  Okay.

2    A.  That is correct.

3    Q.  Well, then, the prior existing Kenner

4  facility was even smaller than what is there

5  now?

6    A.  That is correct.  That is correct.

7    Q.  That was a very small facility then.

8    A.  I don't recall acreage, but it was five

9  or six acres, I think.

10    Q.  What was the yard area at Kenner

11  composed of?

12    A.  It was concrete and some aggregate and

13  then some raw -- raw land.

14    Q.  And before I forget to ask you this, the

15  yard area is now all paved, correct?

16    A.  Yes.

17    Q.  And was that a request of the Company,

18  as it had been in Baton Rouge, or was that a

19  function of Zoning?

20    A.  The function of Zoning there.

21    Q.  All right.  Let me show you the next

22  exhibit, which will be Exhibit 23.  That is H&E

23  5383.

24        This follows this $20,000 proposal we

25  just looked at?

NON-CERTIFIED COPY