1      A.  Correct.

2      Q.  And it basically says that you approved

3  it and proceeding with the proposal, and then

4  Neal Johnson says, "We will draft the agreement

5  tomorrow."

6          Do you see that?

7      A.  Yes.

8      Q.  Then the next exhibit is Exhibit 24, H&E

9  5389, and this is another Email to you.

10         The prior one was dated August 13, '09.

11  This is the next day, August 14, and Chad

12  Herndon says he will begin putting the new

13  Professional Services Agreement and Work Order

14  together?

15     A.  Yes.

16     Q.  Now, did you discuss this with Chad

17  Herndon at all?

18     A.  Chad was involved in the project, so I

19  would assume yes.

20     Q.  The next one is Exhibit 25, and that is

21  going to be H&E 5430.  That is dated August 20

22  of '09.  And this is, again, a follow-up on the

23  Emails about approval of this proposal.

24         If you look at the top Email, it is from

25  Neal Johnson to you, dated August 20, copying

NON-CERTIFIED COPY

1   Chad Herndon.  And it says, the third line down,

2   "Attached is our new Master Agreement that we

3   discussed.  Also attached is a Work

4   Authorization and attachments."

5          Do you see that?

6      A.  Yes.

7      Q.  What did you discuss about this new

8   master agreement with Neal Johnson as of that

9   time?

10     A.  I would have sent this master agreement

11  to Ashley Moore to review.

12     Q.  Okay.  And I'm going to get to that.

13         But before you did that, what do you

14  recall, if you recall anything, about discussing

15  a new master agreement with Neal Johnson?

16     A.  I don't.

17     Q.  You don't recall?

18     A.  No.

19     Q.  You don't recall questioning why there

20  needed to be a new master agreement?

21     A.  I don't recall specifically, no.

22     Q.  So attached to this, for the Record, is

23  -- and I don't know what this is -- but it is a

24  Short Form Master Agreement for Professional

25  Services, and it is says, "...dated and

NON-CERTIFIED COPY

1    normal process.

2        Q.  So after you got this August 21, let's

3    look at the next document.

4            We are going to label this as Exhibit

5    27.  This is the Short Form Master Agreement for

6    Professional Services, dated at the top, August

7    13, 2009, executed by you.

8        A.  (Witness reviewing document.)

9        Q.  Do you see it?

10       A.  Yes.

11       Q.  And so I assume you were authorized to

12   execute this document on behalf of H&E, correct?

13       A.  Yes.

14       Q.  And I assume you vetted this with either

15   Mr. Wynn and/or Ashley Moore before you signed

16   it, correct?

17       A.  That is correct.

18       Q.  Do you recall discussing any part of

19   this agreement with anyone from URS before you

20   signed it?

21       A.  I do not.

22       Q.  And the next document I'll show you is

23   going to be labeled Exhibit 28, which URS 31081.

24           This is Attachment 1, and, if you look

25   at the top, it references the Master Agreement

NON-CERTIFIED COPY

1   or the agreement dated August 13, 2009.

2          Do you see that at the top?

3          A.  Yes.

4          Q.  Okay.  And this was signed by you,

5   correct?

6          A.  Yes.

7          Q.  On August 31, 2009?

8          A.  Yes.

9          Q.  Now, you recall the Kenner facility

10  being surveyed before construction started?

11         A.  Yes.

12         Q.  And do you recall who paid for that

13  survey?

14         A.  I don't.

15         Q.  Next I'm going to show you what I'm

16  going to label as Exhibit 29.  This is H&E 5732.

17         We are in November of 2009, and does

18  that refresh your memory as to who Hohensee was?

19         A.  Hohensee, James Hohensee.  I remember

20  now.

21         Q.  Okay.  And this is in reference to the

22  Kenner facility, and he is sending to some

23  companies drawings and pricing sheets for them

24  to look at.

25         So I assume this is in connection with

NON-CERTIFIED COPY

Page 89

1   getting pricing from the GCs, correct?

2       A.  Correct.

3       Q.  Now, these GCs were Gibbs, F.H. Myers,

4   Goutee, correct?

5       A.  Correct.

6       Q.  Was there any reason why that was

7   limited to three companies at this point?  Do

8   you recall that?

9       A.  I do not.

10      Q.  None of those became the ultimate GC on

11  Kenner, correct?

12      A.  I don't recall that either.

13      Q.  Well, let me refresh your memory.  The

14  contractor, the GC on Kenner became MAPP.

15      A.  Okay.  Okay.  I do remember that.

16      Q.  Do you remember why these three

17  companies did not become the GC?

18      A.  I do not.

19      Q.  Do you remember if there was a hiatus

20  put on development of either the Baton Rouge

21  site or the renovation to the Kenner site

22  because the economy was bad?

23      A.  Yes.

24      Q.  And do you remember what time period

25  that was?

NON-CERTIFIED COPY

1    A.  Late '08, early '09, I think.

2    Q.  And the hiatus lasted until about when?

3  2010?

4    A.  2010.  I tried to build the building

5  during that time.

6    Q.  You did?

7    A.  Yes.  I pushed -- I asked John to build

8  it because labor prices and material costs were

9  down during the recession.  He opted not to.

10    Q.  These buildings?  This is --

11    A.  The Corporate facility.

12    Q.  Oh, you wanted to go forward with the

13  Baton Rouge facility?

14    A.  The Baton Rouge facility.

15    Q.  Oh, okay.  And he opted not to because

16  of the economy?

17    A.  Uh-huh (affirmative response).

18    Q.  Could that be the reason that these

19  three companies weren't involved in the

20  resurrection of that?

21    A.  I can't speculate on that, but based on

22  the bids that James Brown got earlier, I would

23  assume for these companies, or at least some of

24  them, at the time, they were doing it on no

25  design specs.  So once we had a design, I think

NON-CERTIFIED COPY

Page 91

1    it went back out for bid and then --

2        Q.  More formally?

3        A.  More formally, correct.  Yes.

4        Q.  What is this C&C property?

5        A.  C&C is a lease property in Belle Chasse.

6        Q.  Oh, okay.

7        A.  C&C Marine owned it.

8        Q.  So the reference to C&C, actually for

9    our purposes, is the Belle Chasse site?

10       A.  That is correct.

11       Q.  Let me show you another document I'm

12   going to label as Exhibit 30.  It is H&E 3418.

13            This is from you to Brad Barber.  It is

14   referencing Belle Chasse, which is described in

15   this as the C&C property, and this is the last

16   submittals by Frank.  And who was Frank?

17       A.  Frank Arthur was the branch manager of

18   the Belle Chasse facility.

19       Q.  All right.  So around this time --

20       A.  Still is.

21       Q.  -- December of 2009, H&E is also

22   considering doing some work at the Belle Chasse

23   site?

24       A.  We were contemplating moving.  We had an

25   existing site there we needed to expand and this

NON-CERTIFIED COPY

Page 92

1  facility was available.

2      Q.  A new site --

3      A.  Yes.

4      Q.  -- basically?

5      A.  Uh-huh (affirmative response).

6      Q.  Now, this is in December of 2009.  You

7  are still involved, but you are into your

8  transition period pretty much, almost at the end

9  of your transition period?

10     A.  Yes.

11     Q.  December of 2009, right?

12     A.  Yes.  Correct.

13     Q.  The next document is Exhibit 31, H&E

14  5870.  And here in December, you still haven't

15  transitioned out yet?

16     A.  Trying.  I was trying.

17     Q.  This is in reference to Kenner, talking

18  about the Kenner branch renovation project that

19  we talked about.

20         And this says, "The Company-owned side

21  of the renovation will be completed first...,"

22  and then, "The remaining balance of the

23  renovation is owned by John Engquist."

24         Can you explain that to me, what you

25  meant by that?

NON-CERTIFIED COPY

Page 139

1  A.  For the design and scope, right.

2  Q.  Correct.

3  A.  That is the document I'm referencing.

4  Q.  Right.  Do you know that Mr. Wynn

5 executed work orders that were subject to that

6 same 2009 agreement subsequent to that?

7   MS. MINCE:

8    Object to the form.

9   THE WITNESS:

10    Not -- I would assume he would.

11 That would have been his job, yes.

12 EXAMINATION BY MR. FRANCO:

13  Q.  But you weren't involved in that?

14  A.  That is correct.  Yes.

15  Q.  What else did you discuss with Counsel?

16  A.  That was it.

17  Q.  Okay.

18   MR. FRANCO:

19    Thank you.

20    I have no further questions at this

21 time.

22 EXAMINATION BY MS. MINCE:

23  Q.  All right.  I'm going to show you

24 Exhibit 26 that you have looked at previously.

25   This is the correspondence related to

NON-CERTIFIED COPY

1    the 2009 Short Form Master Agreement, correct?

2        A.  Yes.

3        Q.  And you executed this agreement,

4    correct?

5        A.  Yes.

6        Q.  And at the time you executed this

7    agreement, did you have an understanding of what

8    this agreement covered?

9        A.  Yes.

10       Q.  Tell me what that was.

11       A.  It was the scope of work developing

12   drawings for the existing site and buildings,

13   for review of the existing truck traffic, and

14   evaluate the condition of all the exterior

15   roofs, walls, buildings and the attachment to

16   it.

17       Q.  What was the amount of the contract?

18       A.  $20,000.

19       Q.  This occurred in August of 2009.

20           As of August 2009, can you describe what

21   the transition process was between you and

22   Frankie Wynn?

23       A.  It was -- it was -- as you can see, it

24   took a pretty long amount of time trying to

25   replace my position, and we were not having much

NON-CERTIFIED COPY

## AGREEMENT FOR PROFESSIONAL SERVICES
### ("Agreement")

This Agreement between __H&E Equipment Services, Inc. 11100 Mead Road, Suite 200, Baton Rouge, LA 70816 225 298-5244__ , ("Client") and __URS Corporation Architecture, NC, PC__ , ("URS"), a __North Carolina__ corporation; __7389 Florida Blvd, Suite 300 Baton Rouge, LA 70806__("URS"), is effective as of __August 28, 2006__ . The parties agree as follows:

It is the expressed intent of the parties that this Agreement shall be made available to the subsidiaries and affiliated companies of URS. For the purposes of this Agreement, as it applies to each Work Order, the term "URS" shall mean either, __URS Corporation Architecture, NC, PC__ , or the affiliated company identified in the Work Order. The applicable Work Order shall clearly identify the legal name of the affiliate or subsidiary accepting the Work Order.

**ARTICLE I - Work Orders.** The Scope of Services ("Services"), the Time Schedule and the Charges are to be set forth in a written Work Order to this Agreement. The terms and conditions of this Agreement shall apply to each Work Order, except to the extent expressly modified by the Work Order. Where charges are "not to exceed" a specified sum, URS shall notify Client before such sum is exceeded and shall not continue to provide the Services beyond such sum unless Client authorizes an increase in the sum. If a "not to exceed" sum is broken down into budgets for specific tasks, the task budget may be exceeded without Client authorization as long as the total sum is not exceeded. Changes in conditions, including, without limitation, changes in laws or regulations occurring after the budget is established or other circumstances beyond URS control shall be a basis for equitable adjustments in the budget and schedule.

**ARTICLE II - Payment.** Unless otherwise stated in an Work Order, payment shall be on a time and materials basis under the Schedule of Fees and Charges in effect when the Services are performed. Client shall pay undisputed portions of each progress invoice within thirty (30) days of the date of the invoice. If payment is not maintained on a thirty (30) day current basis, URS may suspend further performance until payments are current. Client shall notify URS of any disputed amount within fifteen (15) days from date of the invoice, give reasons for the objection, and promptly pay the undisputed amount. Client shall pay an additional charge of one and one-half percent (1½%) per month or the maximum percentage allowed by law, whichever is the lesser, for any past due amount. In the event of a legal action for invoice amounts not paid, attorneys' fees, court costs, and other related expenses shall be paid to the prevailing party.

**ARTICLE III - Professional Responsibility.** URS is obligated to comply with applicable standards of professional care in the performance of the Services. Client recognizes that opinions relating to environmental, geologic, and geotechnical conditions are based on limited data and that actual conditions may vary from those encountered at the times and locations where the data are obtained, despite the use of due professional care. URS is not responsible for designing or advising on or otherwise taking measures to prevent or mitigate the effect of any act of terrorism or any action that may be taken in controlling, preventing, suppressing or in any way relating to an act of terrorism.

**ARTICLE IV - Responsibility for Others.** URS shall be responsible to Client for URS Services and the services of URS subcontractors. URS shall not be responsible for the acts or omissions of other parties engaged by Client nor for their construction means, methods, techniques, sequences, or procedures, or their health and safety precautions and programs.

**ARTICLE V - Risk Allocation.** The liability of URS, its employees, agents and subcontractors (referred to collectively in this Article as "URS") for Client's claims of loss, injury, death, damage, or expense, including, without limitation, Client's claims of contribution and indemnification, express or implied, with respect to third party claims relating to services rendered or obligations imposed under this Agreement, including all Work Orders, shall not exceed in the aggregate:

S7. GERMAN

EXHIBIT NO. 4

K. DONNELLY

NON-CERTIFIED COPY

(1)     The total sum of $5,000,000 for claims arising out of professional negligence, including errors, omissions, or other professional acts, and including unintentional breach of contract; and any actual or potential environmental pollution or contamination, including, without limitation, any actual or threatened release of toxic, irritant, pollutant, or waste gases, liquids, or solid materials, or failure to detect or properly evaluate the presence of such substances, except to the extent such release, threatened release, or failure to detect or evaluate is caused by the willful misconduct of URS; or

(2)     The total sum of $2,000,000 for claims arising out of negligence, breach of contract, or other causes for which URS has any legal liability, other than as limited by (1) above.

**ARTICLE VI - Insurance.**  URS agrees to maintain during the performance of the Services:  (1) statutory Workers' Compensation coverage; (2) Employer's Liability; (3) General Liability; and (4) Automobile Liability insurance coverage each in the sum of $5,000,000.

**ARTICLE VII - Consequential Damages.**  Neither Party shall be liable to the other for consequential damages, including, without limitation, loss of use or loss of profits, incurred by one another or their subsidiaries or successors, regardless of whether such damages are caused by breach of contract, willful misconduct, negligent act or omission, or other wrongful act of either of them.

**ARTICLE VIII - Client Responsibility.**  Client shall:  (1) provide URS, in writing, all information relating to Client's requirements for the project;  (2) correctly identify to URS, the location of subsurface structures, such as pipes, tanks, cables and utilities;  (3) notify URS of any potential hazardous substances or other health and safety hazard or condition known to Client existing on or near the project site;  (4) give URS prompt written notice of any suspected deficiency in the Services; and  (5) with reasonable promptness, provide required approvals and decisions. In the event that URS is requested by Client or is required by subpoena to produce documents or give testimony in any action or proceeding to which Client is a party and URS is not a party, Client shall pay URS for any time and expenses required in connection therewith, including reasonable attorney's fees.

Client shall reimburse URS for all taxes, duties and levies such as Sales, Use, Value Added Taxes, Deemed Profits Taxes, and other similar taxes which are added to or deducted from the value of URS Services.  For the purpose of this Article such taxes shall not include taxes imposed on URS net income, and employer or employee payroll taxes levied by any United States taxing authority, or the taxing authorities of the countries or any agency or subdivision thereof in which URS subsidiaries, affiliates, or divisions are permanently domiciled.  It is agreed and understood that these net income, employer or employee payroll taxes are included in the unit prices or lump sum to be paid URS under the respective Work Order.

**ARTICLE IX - Force Majeure.**  An event of "Force Majeure" occurs when an event beyond the control of the Party claiming Force Majeure prevents such Party from fulfilling its obligations.  An event of Force Majeure includes, without limitation, acts of God (including floods, hurricanes and other adverse weather), war, riot, civil disorder, acts of terrorism, disease, epidemic, strikes and labor disputes, actions or inactions of government or other authorities, law enforcement actions, curfews, closure of transportation systems or other unusual travel difficulties, or inability to provide a safe working environment for employees.

In the event of Force Majeure, the obligations of URS to perform the Services shall be suspended for the duration of the event of Force Majeure.  In such event, URS shall be equitably compensated for time expended and expenses incurred during the event of Force Majeure and the schedule shall be extended by a like number of days as the event of Force Majeure.  If Services are suspended for thirty (30) days or more, URS may, in its sole discretion, upon 5 days prior written notice, terminate this Agreement or the affected Work Order, or both.  In the case of such termination, in addition to the compensation and time extension set forth above, URS shall be compensated for all reasonable termination expenses.

**ARTICLE X - Right of Entry.**  Client grants to URS, and, if the project site is not owned by Client, warrants that permission has been granted for, a right of entry from time to time by URS, its employees, agents and subcontractors, upon the project site for the purpose of providing the Services.  Client recognizes that the use of investigative equipment and practices may unavoidably alter the existing site conditions and affect the environment in the area being studied, despite the use of reasonable care.

NON-CERTIFIED COPY

**ARTICLE XI - Documents.** Provided that URS has been paid for the Services, Client shall have the right to use the documents, maps, photographs, drawings and specifications resulting from URS efforts on the project. Reuse of any such materials by Client on any extension of this project or any other project without the written authorization of URS shall be at Client's sole risk. URS shall have the right to retain copies of all such materials. URS retains the right of ownership with respect to any patentable concepts or copyrightable materials arising from its Services.

**ARTICLE XII - Termination.** Client may terminate all or any portion of the Services for convenience, at its option, by sending a written Notice to URS. Either party can terminate this Agreement or a Work Order for cause if the other commits a material, uncured breach of this Agreement or becomes insolvent. Termination for cause shall be effective twenty (20) days after receipt of a Notice of Termination, unless a later date is specified in the Notice. The Notice of Termination for cause shall contain specific reasons for termination and both parties shall cooperate in good faith to cure the causes for termination stated in the Notice. Termination shall not be effective if reasonable action to cure the breach has been taken before the effective date of the termination. Client shall pay URS upon invoice for Services performed and charges incurred prior to termination, plus reasonable termination charges. In the event of termination for cause, the parties shall have their remedies at law as to any other rights and obligations between them, subject to the other terms and conditions of this Agreement.

**ARTICLE XIII - No Third Party Rights.** This Agreement shall not create any rights or benefits to parties other than Client and URS. No third party shall have the right to rely on URS opinions rendered in connection with the Services without the written consent of URS and the third party's agreement to be bound to the same conditions and limitations as Client.

**ARTICLE XIV - Assignments.** Neither party to this Agreement shall assign its duties and obligations hereunder without the prior written consent of the other party.

**ARTICLE XV - Hazardous Substances.** All non-hazardous samples and by-products from sampling processes in connection with the Services shall be disposed of by URS in accordance with applicable law; provided, however, that any and all such materials, including wastes, that cannot be introduced back into the environment under existing law without additional treatment, and all hazardous wastes, radioactive wastes, or hazardous substances ("Hazardous Substances") related to the Services, shall be packaged in accordance with the applicable law by URS and turned over to Client for appropriate disposal. URS shall not arrange or otherwise dispose of Hazardous Substances under this Agreement. URS, at Client's request, may assist Client in identifying appropriate alternatives for off-site treatment, storage or disposal of the Hazardous Substances, but URS shall not make any independent determination relating to the selection of a treatment, storage, or disposal facility nor subcontract such activities through transporters or others. Client shall sign all necessary manifests for the disposal of Hazardous Substances. If Client requires: (1) URS agents or employees to sign such manifests; or (2) URS to hire, for Client, the Hazardous Substances transportation, treatment, or disposal contractor, then for these two purposes, URS shall be considered to act as Client's agent so that URS will not be considered to be a generator, transporter, or disposer of such substances or considered to be the arranger for disposal of Hazardous Substances, and Client shall indemnify URS against any claim or loss resulting from such signing.

**ARTICLE XVI - Venue.** In the event of any dispute between the parties to this Agreement, the venue for the dispute resolution shall be any state or federal court in the United States having jurisdiction over the parties. The foregoing notwithstanding, if the project is located outside the United States, the laws of the State of California shall govern and in such event, any dispute under the Agreement not resolved amicably shall be resolved under the binding rules of the American Arbitration Association.

**ARTICLE XVII - Integrated Writing and Enforceability.** This Agreement constitutes the final and complete repository of the agreements between Client and URS relating to the Services and supersedes all prior or contemporaneous communications, representations, or agreements, whether oral or written. Modifications of this Agreement shall not be binding unless made in writing and signed by an Authorized Representative of each party. The provisions of this Agreement shall be enforced to the fullest extent permitted by law. If any provision of this Agreement is found to be invalid or unenforceable, the provision shall be construed and applied in a way that comes as close as possible to expressing the intention of the parties with regard to the provisions and that saves the validity and enforceability of the provision.

NON-CERTIFIED COPY

**THE PARTIES ACKNOWLEDGE** that there has been an opportunity to negotiate the terms and conditions of this Agreement and agree to be bound accordingly.

CLIENT

_____
Signature

Leonard St. Germain, V.P. Operations
Typed Name/Title

8/30/06
Date of Signature

URS

_____
Signature

Craig Gardner, Vice President, Office Manager
Typed Name/Title

8/29/06
Date of Signature

NON-CERTIFIED COPY

| | |
|---|---|
| **From:** | Leonard StGermain |
| **Sent:** | Monday, January 14, 2013 9:09 AM |
| **To:** | John Jones |
| **Subject:** | FW: Corporate HQ Phase II Proposal |
| **Attachments:** | H&E Phase II Proposal.pdf |

Leonard St. Germain
V.P. Equipment Services Group
7500 Pecue Lane
Baton Rouge, LA. 70809
Office: (225-298-5244)
Mobile: (225-324-6536)
Fax: (225-298-5377
Email:lstgermain@he-equipment.com
Website:www.he-equipment.com

-----Original Message-----
From: Chad Herndon@URSCorp.com [mailto:Chad_Herndon@URSCorp.com]
Sent: Wednesday, October 25, 2006 2:54 PM
To: Leonard StGermain
Subject: Corporate HQ Phase II Proposal

Leonard,

Per our conversation, I have attached a proposal for the next phase of your project. The next phase will consist of design development and is where we get as many questions answered as we can before moving into the last phase of the project. Please review the proposal and feel free to contact me if you have any questions, or would like to discuss anything further in detail. We appreciate this opportunity to work on your project and hope that you will favor us with your approval to continue into the next phase of this rewarding project. Thank you and have a great day!

(See attached file: H&E Phase II Proposal.pdf)

Chad Herndon
Senior Planner
URS Corporation
7389 Florida Blvd., Suite 300
Baton Rouge, LA 70806

Phone: 225.922.5856
Mobile: 501.944.7222
Email: chad_herndon@urscorp.com

S7. GERMAIN
EXHIBIT NO. 6
K. DONNELLY

1

NON-CERTIFIED COPY

This e-mail and any attachments are confidential. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

NON-CERTIFIED COPY

H&E 0007377



October 23, 2006

Mr. Leonard St. Germain
Vice President, Operations
H&E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge, Louisiana 70816

Re:    H&E Headquarters Campus
       Pecue Lane at Airline Highway

Dear Mr. St. Germain:

Per our discussion regarding the continuation of our efforts on the design of your corporate headquarters campus, URS is pleased to provide you with a proposal for the Phase II development of the new headquarters facility and equipment division office located on the corner of Pecue Lane and Airline Highway. This next phase is the Design Development phase where we answer as many of the design questions as possible before moving into the construction document phase.

During Phase I we were able to establish the site layout for the buildings and the campus. Next, we were able to develop a program based on an area analysis and a block plan which identifies total space, departmental spaces and adjacencies. Lastly we were able to develop schematic exterior elevation concepts which will now be used as a starting point for the next phase.

Phase II will allow us to take the information gained in Phase I and continue to develop it further into a more fully developed design. During this phase there will be a significant amount of interaction between the design team and your staff. This will include staff interviews, presentations, discussions and decisions. Along with this interaction we will continue with the progress meetings that have taken place to this point. This second phase of our approach will involve the following process to develop a more fully developed design:

**Proposed Phase II Scope of Work**

1. ***Develop an initial cost estimate of the project based on the Schematic Design scope.*** Now that we have worked with you to establish a basis for the design of your facilities, we can begin to establish initial cost estimates based on order of magnitude costs and an estimated cost per square foot.

2. ***Complete code analysis.*** As the design now begins to develop and we get more of the necessary questions answered, we can begin to see how applicable building codes can be incorporated into the design.

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
Tel: 225.922.5700

NON-CERTIFIED COPY

H&E 0007376



Mr. Leonard St. Germain
H&E Equipment Services, Inc.
October 23, 2006
Page 2 of 3

3. **Provide Design Development Documents.** The deliverables to you for this part of the scope will be floor plans, all exterior elevations, interior elevations, reflected ceiling plans, room finish and door schedules, a site plan and landscaping plan. The schematic design that we have now that we will begin to develop more fully is based upon the preliminary concept site development plan and the concept elevations that we have completed to date. The service building is based on the current design that H&E utilized in Houston, TX.

4. **Coordinate the selection of all materials and finishes, determine special system needs and confirm final program requirements.**

5. **Develop Outline of Performance Specifications.** An outline of Performance Specifications will be developed for structural, mechanical, electrical and plumbing. Some one line diagrams of various mechanical and electrical systems may also be included.

6. **Client reviews and approvals**. We will coordinate and facilitate all progress reviews with the H&E team and conduct a formal final approval presentation at the end of the project phase to attain approval from your team. Also included will be meetings with local building officials to review the project and determine if there are any potential issues with the design.

We plan to provide this level of detail in scope for both of the buildings that are part of this project.

Listed below is a summary of the required Phase II disciplines and fees which will be "lump sum", billed monthly based on percent complete:

| | |
|---|---|
| Architectural and Interiors DD | $55,000 |
| Program Finalization | $14,000 |
| Site / Civil and Landscape DD | $18,000 |
| Electrical Engineering DD | $17,000 |
| Mechanical Engineering DD | $28,000 |
| Structural Engineering DD | $14,000 |
| Quality Assurance | $ 2,000 |
| Project Management | $25,000 |
| Other Direct Costs | $ 7,000 |
| Total | $180,000 |

The schedule to accomplish this phase of the work will be 7-10 weeks. As you can see there will be a lot of interaction with your team and the design team to seek answers to the questions and decisions that will have to be made related to the design. Based on the interaction and timeliness of your responses and decisions during Phase I, I feel comfortable that we all can work together seamlessly to accomplish the schedule.

NON-CERTIFIED COPY

H&E 0007379



Mr. Leonard St. Germain
H&E Equipment Services, Inc.
October 23, 2006
Page 3 of 3

I speak for the entire URS design team when I say that we are very appreciative for your choosing us for this project. We recognize that you do have a choice and we value this opportunity and look forward to continuing to work with you in the development of this very important project.

If you have any questions or require any additional information, please contact me at (225) 922-5856 or cell (501) 944-7222.  Thank you for your consideration.

Sincerely,

Chad Herndon
Project Manager
URS Corporation

NON-CERTIFIED COPY

H&E 0007380

LUMP SUM WORK ORDER NO.  08-01

In accordance with the Agreement for Professional Services between  **H&E Equipment Services, Inc.**
**11100 Mead Road, Suite 200, Baton Rouge, LA 70816**  ("Client"), and  **URS Architecture PC**  ("URS").
a  **North Carolina**  corporation, dated  **August 28, 2006**  , this Work Order describes the Services,
Schedule, and Payment Conditions for URS Services on the Project known as:

> Phase III Design Services for H&E Equipment Services Corporate Headquarters and Baton
> Rouge Area Branch Facility
> Baton Rouge, Louisiana

> Client Authorized
> Representative:   Leonard St.Germain
> Address:          H&E Equipment Services, Inc. 11100 Mead Road, Suite 200
>                   Baton Rouge, Louisiana
> Telephone No.:    225.298.5244

> URS Authorized
> Representative:   Chad Herndon
> Address:          Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
> Telephone No.:    225.922.5856

**SERVICES.**  The Services included in this Work Order shall include: Design services for the preparation of
Construction Documents for the new Corporate Headquarters and Baton Rouge Area Branch Facility. See
**ATTACHMENT 1 SCOPE OF SERVICES** for a detailed listing of services.

**SCHEDULE.**  The Estimated Schedule to complete preparation of the documents will be no more than 12 –
16 weeks from the notice to proceed. Because of the uncertainties inherent in the Services, Schedules are
estimated and are subject to revision unless otherwise specifically described herein.

**PAYMENT AND EQUITABLE ADJUSTMENTS.**  This is a lump sum Work Order. Professional Services
fees will be billed monthly based on percent complete for a total sum of  **$ 490,000.00**  . URS shall give
Client prompt written notice of unanticipated conditions or conditions which are materially different from
those anticipated by URS at the time the lump sum compensation was agreed upon.  If Client wishes URS
to proceed, URS lump sum compensation shall be subject to equitable adjustment for such conditions.

**TERMS AND CONDITIONS.**  The terms and conditions of the Agreement referenced above shall apply to
this Work Order, except as expressly modified herein.

**ACCEPTANCE** of the terms of this Work Order is acknowledged by the following signatures of the
Authorized Representatives.

| CLIENT | URS |
|--------|-----|
| Signature | Signature |
| Leonard St.Germain - V.P. Operations | William A. Stevenson, Senior Vice President |
| Typed Name/Title | Typed Name/Title |
| Date of Signature  7/11/08 | Date of Signature  7/28/08 |

```
ST. GERMAIN

EXHIBIT NO. 18

K. DONNELLY
```

H&E 0037276

NON-CERTIFIED COPY

ATTACHMENT 1 SCOPE OF SERVICES

SCOPE OF SERVICES

H&E EQUIPMENT SERVICES

HEADQUARTERS AND BATON ROUGE AREA BRANCH FACILITY

BATON ROUGE, LOUISIANA

The scope of work is for URS to provide professional services during the Construction Documentation Phase which include:

**Construction Documentation Phase**

- Based on the approved Design Documents, URS will prepare, for approval by the Owner, Construction Documents consisting of Drawings and Specifications setting forth in detail the requirements for the construction of the Project and will advise the Owner of any adjustments to previous preliminary estimates of Construction Cost.

- Landscape Design for compliance with regulatory agency requirements.

- URS will assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project.

- URS will, following the Owner's approval of the Construction Documents and of the latest preliminary estimate of Construction cost, shall assist the Owner in negotiating a contract with the General Contractor to construct the Project.

- Conduct Client / Team review meetings at 50% and 85% completion

- Assist the General Contractor in updating project construction budgets at the completion of DD and at the 50% & 80% completion reviews

NON-CERTIFIED COPY

H&E 0037277

**From:**      Leonard StGermain
**Sent:**       Monday, June 22, 2009 9:06 AM
**To:**         neal_johnson@urscorp.com
**Subject:**    Estimate

We are in need of performing some pretty extensive renovations to our Kenner facility and my thoughts in doing so is to get an A&E firm to draw up plans & specs to go out for bid. Are you guys interested in this type of project? If so, let me know and we can talk about pricing and a strategy to move forward.

Thanks


**Leonard St.Germain**
**V.P. / Operations**
11100 Mead Rd., Suite 200
Baton Rouge, LA 70816
Office: (225) 298-5244
Cell:   (225) 324-6536
Fax:   (225) 298-5376
Email: lstgermain@he-equipment.com



**CONFIDENTIALITY NOTICE:** This email transmission and any accompanying document is solely for the use of the intended recipient and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosures, copying, distribution, or action taken or omitted in reliance on it is strictly prohibited. If you received this information in error, please notify the sender immediately and delete the original transmission. Thank you.



1

NON-CERTIFIED COPY



August 10, 2009

Leonard St. Germain
H&E Equipment Services
Baton Rouge, LA

Re:    Proposed Renovations and Additions to H&E Equipment – Kenner LA

Leonard:

**URS** is pleased to provide you with a proposal for professional services for assistance with determining a legitimate budget for the renovations and additions to your H&E Equipment facility located at **125 East Airline Drive in Kenner LA**.  A list of work items we discussed is attached **(Attachment 1)**

As we discussed the first order of business will be to determine the existing condition of the buildings and develop drawings and sketches of the renovations. From these documents, we can obtain accurate construction estimates for the work.  With this data a realistic presentation can be offered for consideration by management.

We propose to provide you these services for a total fee not to exceed amount of **$20,000.00** based on our "Standard Billing Rate Schedule" This schedule includes the cost of all project personnel associated with the project, documentation and all reimbursement costs incurred during the course of the performance of the outlined scope of work.

Thank you for considering **URS** for this opportunity. If you have any questions or require any additional information, please feel free to contact me at 225.231.6343 or cell 225.324.5848. Thank you for your consideration.

Sincerely,

URS Corporation

Neal Johnson
Principal Architect

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806


ST GERMAIN

EXHIBIT NO. 22

K. DONNELLY

NON-CERTIFIED COPY

H&E 0003415



**ATTACHMENT 1**

Re: Proposed Renovations and Additions to H&E Equipment – Kenner LA
2 | P a g e

## SCOPE OF WORK

Based on our recent site visit the focus of the project will include:

1. Developing drawings of the existing site and buildings.
2. Review of existing truck traffic circulation including company, employee and customer vehicle parking. Additional paving with drainage consideration will be included.
3. Evaluate the condition of all exterior roofs and walls of all buildings on the property.
4. Evaluate condition and operational status of the existing Office / Sales area with a focus on renovating the restrooms and upgrading the finishes in all other areas. Review of the HVAC and Electrical systems to be included.
5. Evaluate circulation and storage utilization of the Parts Area.
6. Evaluate covered area west of Parts Building (existing Equipment Wash Area)
7. Develop sketches and drawings for a:
   a. New entrance for Office / Sales building.
   b. New office / tool storage and break room area to the front (east) end of the Shop Building.
   c. Demolish existing office/tool storage and break room to be used as transition area.
   d. Add a new overhead door on south side of building in this immediate area.
   e. New enclosed service bay with overhead doors to the rear (west) end of the Shop Building.
   f. New open frame bay to the rear (west) end of the Shop Building.
   g. New 40' x 70' Equipment Wash Building to be located at the rear (west) end of the site.
8. Assist in obtaining realistic budget pricing from three (3) local qualified general contractors.

H&E 0003416

NON-CERTIFIED COPY

| From: | Neal_Johnson@URSCorp.com |
|---|---|
| Sent: | Thursday, August 13, 2009 4:24 PM |
| To: | Leonard StGermain |
| Cc: | chad_herndon@urscorp.com |
| Subject: | Re: Kenner Proposal |
| Attachments: | C8834841.jpg; graycol.gif; pic10030.gif; ecblank.gif; C7786530.jpg |

Thank you for the confidence
We will draft the agreement tomorrow
Talk to you soon,
Neal



**Neal Johnson, AIA**
Principal Architectural Designer

7389 Florida Boulevard,
Suite 300
Baton Rouge, LA 70806
Office  225.922.5700
Direct  225.231.6343
Cell  225.324.5848

neal_johnson@urscorp.com

**ARCHITECTS**
**ENGINEERS**
**PLANNERS**

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

"Leonard StGermain" <lst.germain@he-equipment.com>

| "Leonard StGermain" <lst.germain@he-equipment.com> | To<Neal_Johnson@URSCorp.com>, <Chad_Herndon@URSCorp.com> |
|---|---|
| 08/13/2009 04:20 PM | cc |
| | SubjectKenner Proposal |

I have approval to proceed with the proposal, let me know where we go from here.

Thanks

**Leonard St.Germain**
**V.P. / Operations**
11100 Mead Rd., Suite 200
Baton Rouge, LA 70816
Office: (225) 298-5244
Cell: (225) 324-6536
Fax: (225) 298-5376
Email: lstgermain@he-equipment.com

ST GERMAIN
EXHIBIT NO. 23
K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0005383

 **EQUIPMENT SERVICES.**

**CONFIDENTIALITY NOTICE:** This email transmission and any accompanying document is solely for the use of the intended recipient and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosures, copying, distribution, or action taken or omitted in reliance on it is strictly prohibited. If you received this information in error, please notify the sender immediately and delete the original transmission. Thank you.

NON-CERTIFIED COPY

H&E 0005384

| | |
|---|---|
| **From:** | Chad_Herndon@URSCorp.com |
| **Sent:** | Friday, August 14, 2009 7:10 AM |
| **To:** | Leonard StGermain |
| **Subject:** | Re: Kenner Proposal |
| **Attachments:** | C1548966.gif; graycol.gif; pic08252.gif; ecblank.gif; C6178103.jpg |

Thank you very much Leonard. I will begin putting the new Professional Services Agreement and Work Order together and have them ready for your review. We look forward to kicking this project off and the continued opportunity to work with you. Have a great weekend.



**Chad Herndon**
Project Manager

7389 Florida Boulevard
Suite 300
Baton Rouge, LA 70806
Office   225.922.5700
Direct   225.922.5856
Mobile   501.944.7222
chad_herndon@urscorp.com

A R C H I T E C T S
E N G I N E E R S
P L A N N E R S

This e-mail and any attachments are confidential. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

"Leonard StGermain" <lst.germain@he-equipment.com>

| | |
|---|---|
| **"Leonard StGermain"** <lst.germain@he-equipment.com> | To<Neal_Johnson@URSCorp.com>, <Chad_Herndon@URSCorp.com> |
| 08/13/2009 04:20 PM | cc |
| | SubjectKenner Proposal |

I have approval to proceed with the proposal, let me know where we go from here.

Thanks

**Leonard St.Germain**
**V.P. / Operations**
11100 Mead Rd., Suite 200
Baton Rouge, LA 70816
Office: (225) 298-5244
Cell: (225) 324-6536
Fax: (225) 298-5376
Email: lstgermain@he-equipment.com

1

*S.T. Gekman*
EXHIBIT NO. 24
K. DONNELLY

NON-CERTIFIED COPY

H&E 0005389

 EQUIPMENT SERVICES

**CONFIDENTIALITY NOTICE:** This email transmission and any accompanying document is solely for the use of the intended recipient and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosures, copying, distribution, or action taken or omitted in reliance on it is strictly prohibited. If you received this information in error, please notify the sender immediately and delete the original transmission. Thank you.

NON-CERTIFIED COPY

H&E 0005390

| | |
|---|---|
| From: | Neal_Johnson@URSCorp.com |
| Sent: | Thursday, August 20, 2009 2:34 PM |
| To: | Leonard StGermain |
| Cc: | chad_herndon@urscorp.com |
| Subject: | Re: Kenner Proposal |
| Attachments: | C1825034.jpg; graycol.gif; pic26112.gif; ecblank.gif; C4044852.jpg; PS-100 completed with attachments.pdf |

Importance:    High

Leonard
We completed our field measuring yesterday afternoon. Should have drawings on Monday and be ready to look at options mid week. Will need to coordinate a 40' lift next week to look at the roofs. Next Thursday is good for me. Can this work for you?
Attached is our new Master Agreement that we discussed. Also attached is a Work Authorization and attachments. Take a look over this and let's discuss on Monday.

*(See attached file: PS-100 completed with attachments.pdf)*
Thanks
Neal



**Neal Johnson, AIA**
Principal Architecture Director

7389 Florida Boulevard,
Suite 300
Baton Rouge, LA 70806
Office  225.922.5700
Direct  225.231.6343
Cell    225.324.5848

neal_johnson@urscorp.com

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

"Leonard StGermain" <lst.germain@he-equipment.com>

| | |
|---|---|
| **"Leonard StGermain"**<br>**<lst.germain@he-**<br>**equipment.com>** | To<Neal_Johnson@URSCorp.com>,<br><Chad_Herndon@URSCorp.com> |
| 08/13/2009 04:20 PM | cc |
| | SubjectKenner Proposal |

I have approval to proceed with the proposal, let me know where we go from here.

Thanks

**Leonard St.Germain**

1

ST. GERMAN
EXHIBIT NO. 25
K. DONNELLY

Confidential-Subject to Protective Order                                    H&E 0005430

NON-CERTIFIED COPY

**V.P. / Operations**
11100 Mead Rd., Suite 200
Baton Rouge, LA 70816
Office: (225) 298-5244
Cell: (225) 324-6536
Fax: (225) 298-5376
Email: lstgermain@he-equipment.com

 EQUIPMENT SERVICES.

CONFIDENTIALITY NOTICE: This email transmission and any accompanying document is solely for the use of the intended recipient and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosures, copying, distribution, or action taken or omitted in reliance on it is strictly prohibited. If you received this information in error, please notify the sender immediately and delete the original transmission. Thank you.

Confidential-Subject to Protective Order

H&E 0005431

NON-CERTIFIED COPY



Confidential-Subject to Protective Order

NON-CERTIFIED COPY

H&E 0005432

# URS

event shall the total cumulative aggregate liability of Consultant, its subconsultants, and their respective partners, officers, directors, shareholders, employees, and agents (referred to collectively in this Article as "Consultant") to Client resulting from, arising out of or in connection with the performance or nonperformance of any or all Services or other obligations under a Work Authorization, exceed $250,000 or ten percent (10%) of the compensation paid Consultant pursuant to such Work Authorization, whichever is greater, or extend beyond the expiration of the warranty period under Article 4 for the Services performed under the Work Authorization, regardless of the legal theory under which such liability is imposed. The remedies stated in the Agreement are Client's sole and exclusive remedies for any failure by Consultant to comply with obligations to Client, and Client hereby irrevocably waives any right to assert a claim against Consultant based on a legal theory that a remedy provided herein fails of its essential purpose.

10.    HAZARDOUS MATERIAL

10.1    Nothing in this Agreement shall be construed or interpreted as requiring Consultant to assume the status of, and Client acknowledges that Consultant does not act in the capacity nor assume the status of, Client or others as a "generator," "operator," "transporter," or "arranger" in the treatment, storage, disposal, or transportation of any hazardous substance or waste as those terms are understood within the meaning of the Resource Conservation and Recovery Act (RCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), or any other similar federal, state, or local law, regulation, or ordinance. Client acknowledges further that Consultant has played no part in and assumes no responsibility for generation or creation of any hazardous waste, pollution condition, nuisance, or chemical or industrial disposal problem, if any, which may exist at any site that may be the subject matter of any Work Authorization.

10.2    It is acknowledged by both parties that the Services do not include services related to regulated substances, pollutants, or hazardous or toxic wastes ("Hazardous Material"). In the event Consultant or any other party encounters undisclosed Hazardous Materials, Consultant shall notify Client and, to the extent required by law or regulation, the appropriate governmental officials, and Consultant may, at its option and without liability for delay, consequential or any other damages to Client, suspend performance of Services on that portion of the project affected by Hazardous Material until Client: (i) retains appropriate specialist consultant(s) or contractor(s) to identify and, as appropriate, abate, remediate, or remove the Hazardous material; and (ii) warrants that the project site is in full compliance with all applicable laws and regulations. Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, Client shall indemnify, defend and save Consultant and its affiliates, subconsultants, agents, and suppliers of any tier, and any and all employees, officers, directors of any of the foregoing, if any, from and against any and all Losses which arise out of the performance of the Services and relating to the regulation and/or protection of the environment, including, without limitation, Losses incurred in connection with characterization, handling, transportation, storage, removal, remediation, disturbance or disposal of Hazardous Material, whether above or below ground and not brought to a Client site or other proposed project site by Consultant in the performance of the Services without Client's approval.

11.    CHANGES

11.1    The Parties may from time to time by mutual agreement seek to modify, extend or enlarge the Services under a Work Authorization ("Modification"). In the event the Parties agree to a Modification to add additional Services, or to make other modifications to the Services, Consultant's compensation, the schedule and any other relevant terms and conditions of the applicable Work Authorization shall be equitably adjusted prior to performance of such Services.

12.    OWNERSHIP OF DOCUMENTS

12.1    Consultant grants to Client a transferable, irrevocable and perpetual royalty-free license to retain and use all work products delivered to Client for any purpose in connection with the project specified in each Work Authorization, upon full payment by Client for Consultant's Services. Client also may use such work product for other purposes with Consultant's written consent. Re-use of any such work product by Client on any extension of the project or on any other project without the written authorization of Consultant shall be at Client's sole risk and Client shall indemnify, defend and save Consultant and its affiliates, consultants, agents, subcontractors and suppliers of any tier, and any and all employees, officers and directors of any of the foregoing, if any, from and against any and all Losses suffered as a result of, or arising out of, or in connection with such re-use. Consultant shall have the right to retain copies of all such work product. Consultant retains the right of ownership with respect to any patentable concepts or copyrightable materials arising from its Services.

13.    TERMINATION/SUSPENSION

13.1    Client may terminate all or any portion of the Services under one or more Work Authorizations for convenience, at its option, by sending a written notice to Consultant. Either party can terminate this Agreement or a Work Authorization for cause if the other commits a material, uncured breach of this Agreement or becomes insolvent. Termination for cause shall be effective twenty (20) days after receipt of a notice of termination, unless a later date is specified in the notice. The notice of termination for cause shall contain specific reasons for termination and both parties shall cooperate in good faith to cure the causes for termination stated in the notice. Termination shall not be effective if reasonable action to cure the breach has been taken before the effective date of the termination. Client shall pay Consultant upon invoice for Services performed and charges incurred prior to termination, plus reasonable termination charges. Any suspension of Services by Client shall result in an equitable adjustment to Consultant's compensation, time for performance, or any of its other obligations under a Work Authorization.

14.    FORCE MAJEURE

14.1    Any delay or failure of Consultant in performing its required obligations hereunder shall be excused if and to the extent such delay or failure is caused by a Force Majeure Event. A "Force Majeure Event" means an event due to any cause or causes beyond the reasonable control of Consultant and shall include, but not be limited to, acts of God, strike, labor dispute fire, storm, flood, windstorm, unusually severe weather, sabotage, embargo,

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100 Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

3

Confidential-Subject to Protective Order

NON-CERTIFIED COPY

H&E 0005435



### SHORT FORM MASTER AGREEMENT FOR PROFESSIONAL SERVICES
### BETWEEN
### H&E Equipment Services, Inc.
### AND
### URS Corporation Architecture PC

THIS AGREEMENT ("Agreement") for Professional Services, (together with the attachments hereto) dated and effective as of  August 13, 2009 (the "Effective Date"), is hereby made and entered into by and between H&E Equipment Services, Inc., a Delaware corporation, (hereinafter "Client") having a place of business located at 11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816 and URS Corporation Architecture PC, a North Carolina corporation (hereinafter "Consultant") having a place of business located at 7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806 Consultant and Client are each individually referred to as a "Party" and collectively as the "Parties".

The Parties agree as follows:

**1.       WORK AUTHORIZATIONS**

1.1      Consultant agrees to undertake and perform certain consulting and professional engineering services ("Services") in accordance with the terms and conditions contained herein, as may be requested by Client from time to time.  The Services to be performed, Consultant's compensation, and the schedule for performance for each task shall be described in one or more authorizations issued to Consultant by Client, the form of which is attached hereto as Attachment 1 ("Work Authorization").  A Work Authorization shall be valid and binding upon the Parties only if accepted in writing by Client and Consultant.  Each duly executed Work Authorization shall be subject to the terms and conditions of this Agreement, except to the extent expressly modified by the Work Authorization.

1.2      It is the expressed intent of the parties that this Agreement shall be made available to subsidiaries and affiliated companies of Consultant.  For the purposes of this Agreement, as it applies to each Work Authorization, the term "Consultant" shall mean either Consultant as defined above or the subsidiary or affiliate of Consultant identified in the Work Authorization.  The applicable Work Authorization shall clearly identify the legal name of the entity accepting the Work Authorization.

**2.       PAYMENTS FOR SERVICES**

2.1      Unless otherwise stated in a Work Authorization, payment shall be on a time and materials basis under the Schedule of Fees and Charges in effect when the Services are performed.  Client shall pay undisputed portions of each progress invoice within thirty (30) days of the date of the invoice.  If payment is not received within thirty (30) days from the due date of such payment, Consultant may suspend further performance under one or more Work Authorizations until payments are current.  Client shall notify URS of any disputed amount within fifteen (15) days from date of the invoice, give reasons for the objection, and promptly pay the undisputed amount.  Client shall pay an additional charge of one percent (1%) per month or the maximum percentage allowed by law, whichever is the lesser, for any past due amount.  In the event of a legal action for invoice amounts not paid, attorneys' fees, court costs, and other related expenses shall be paid to the prevailing party.

2.2      Client shall reimburse Consultant for all taxes, duties and levies such as Sales, Use, Value Added Taxes, Deemed Profits Taxes, and other similar taxes which are added to or deducted from the value of Consultant's Services.  For the purpose of this Article such taxes shall not include taxes imposed on Consultant's net income, and employer or employee payroll taxes levied by any United States taxing authority, or the taxing authorities of the countries or any agency or subdivision thereof in which URS subsidiaries, affiliates, or divisions are permanently domiciled.  It is agreed and understood that these net income, employer or employee payroll taxes are included in the unit prices or lump sum to be paid Consultant under the applicable Work Authorization.

2.3      Where charges are "not to exceed" a specified sum, Consultant shall notify Client before such sum is exceeded and shall not continue to provide the Services beyond such sum unless Client authorizes an increase in the sum.  If a "not to exceed" sum is broken down into budgets for specific tasks, the task budget may be exceeded without Client authorization as long as the total sum is not exceeded.  Changes in conditions, including, without limitation, changes in laws or regulations occurring after the budget is established, or other circumstances beyond URS control, shall be a basis for equitable adjustments in the budget and schedule.

**3.       CONFIDENTIALITY**

3.1      For a period commencing with the disclosure of any confidential information under this Agreement and/or a Work Authorization(s) and ending on the second anniversary such disclosure was first made, Consultant and Client each agree not to disclose to third parties, including also subcontractors and vendors (unless such subcontractors and vendors have a need to know and are bound to similar obligations of confidentiality), any information that is identified as confidential in writing on the materials made available to the other Party hereunder

**4.       WARRANTY**

4.1      Consultant warrants that any consulting and professional engineering Services performed by it under a Work Authorization shall be performed in accordance with that degree of care and skill ordinarily exercised by members of Consultant's profession practicing at the same time in the same location.  Consultant's sole liability to Client for any non-conforming Services shall be to re-perform the non-conforming or defective Services, written notice of which must be promptly given by Client to Consultant.  Consultant's obligation for re-performance of non-conforming Services as set

F:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1

Confidential-Subject to Protective Order

NON-CERTIFIED COPY

# URS

forth in the preceding sentence shall extend for a term commencing at the substantial completion of such Services under a Work Authorization and ending one year later.

4.2   THE WARRANTY SET FORTH IN THIS ARTICLE 4 IS EXCLUSIVE, AND IN LIEU OF ANY AND ALL OTHER WARRANTIES RELATING TO THE SERVICES, WHETHER STATUTORY, EXPRESS OR IMPLIED, AND CONSULTANT DISCLAIMS ANY SUCH OTHER WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY AND ALL WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE AND ANY AND ALL WARRANTIES ARISING FROM COURSE OF DEALING AND/OR USAGE OF TRADE.  ANY OTHER STATEMENTS OF FACT OR DESCRIPTIONS EXPRESSED IN THE AGREEMENT OR ANY WORK AUTHORIZATION SHALL NOT BE DEEMED TO CONSTITUTE A WARRANTY OF THE SERVICES OR ANY PART THEREOF.  CONSULTANT'S REPERFORMANCE OF DEFECTIVE OR NON-CONFORMING SERVICES THROUGH THE ONE YEAR PERIOD PROVIDED FOR IN THIS ARTICLE 4 SHALL CONSTITUTE COMPLETE FULFILLMENT OF, AND CLIENT'S EXCLUSIVE REMEDY FOR, ALL THE LIABILITIES OR RESPONSIBILITIES OF CONSULTANT TO CLIENT FOR NON-CONFORMING OR DEFECTIVE SERVICES, WHETHER THE CLAIMS OF CLIENT ARE BASED ON DELAY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, WARRANTY, INDEMNITY, ERROR AND OMISSION OR ANY OTHER CAUSE WHATSOEVER.

5.   WORK BY OTHERS

5.1   The performance by Consultant of Services under a Work Authorization shall not constitute an assumption by Consultant of the obligations of Client or its other contractors.  Consultant shall not control or have charge of, and shall not be responsible for, construction means, methods, techniques, sequences, procedures of construction, health or safety programs, or precautions connected with the work of Client or its other contractors, and shall not manage, supervise, control or have charge of construction.  Client shall require Consultant to be named as an additional insured along with Client on any liability insurance policies provided by Client's construction contractors.  To the fullest extent permitted by law, Client shall defend Consultant against any claim, suit or proceeding asserted by one of its other contractors and indemnify, defend and save Consultant harmless from any and all actual or alleged claims and losses (including, without limitation, attorney's fees) sustained by such contractor in connection with the Services, regardless or whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

6.   INSURANCE

6.1   In the event Consultant performs Services under any Work Authorization in connection with a project for which Client or another party with which Client has contracted obtains all-risk or builder's risk property insurance, Client, as the case may be, shall name, or shall cause such other party to name, Consultant as an additional insured on such all risk or builder's risk property insurance.  Client acknowledges that Consultant has an insurable interest in such all risk or builder's risk property insurance.

6.2   Consultant and Client each waive all rights of recovery and subrogation against each other with respect to a loss occurring to property of the other, to the extent that such waivers do not invalidate the property insurance of either.

7.   INDEMNITY

7.1   Each Party shall indemnify, defend and save the other Party, its officers, directors, employees and affiliates harmless from any loss, cost or expense claimed by third parties, excluding employees of either Party, for property damage and/or bodily injury, including death, to the proportionate extent such loss, cost or expense arises from the negligence or willful misconduct of the indemnifying Party, its employees or affiliates in connection with the Services.

7.2   Notwithstanding any other provision contained elsewhere in this Agreement to the contrary and to the fullest extent permitted by law, Client shall be liable for and indemnify, defend and save Consultant, its officers, directors, employees and affiliates harmless from and against any and all actual or alleged claims, damages (including incidental, consequential, indirect and special damages), losses, and expenses (including, without limitation, all penalties, attorney's fees, fines and administrative or civil sanctions arising out of or related to such claim) (collectively "Losses") arising out of: (1) economic loss suffered by third parties; and/or (2) investment decisions of Client or third parties in reliance upon the results of the Services, regardless of whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

7.3   The indemnity and save harmless obligations of Consultant and Client under this Article 7 shall not apply with respect to any Hazardous Material, as Consultant's and Client's rights and obligations with respect thereto are set forth in Article 10.

8.   WAIVER OF CONSEQUENTIAL DAMAGES

8.1   Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, neither Client nor Consultant shall be liable, whether based on contract, tort, negligence, strict liability, warranty, indemnity, error and omission or any other cause whatsoever, for any consequential, special, incidental, indirect, punitive or exemplary damages, or damages arising from or in connection with loss of power, loss of use, loss of revenue or profit (actual or anticipated), loss by reason of shutdown or non-operation, increased cost of construction, cost of capital, cost of replacement power or customer claims, and Consultant hereby releases Client and Client hereby releases Consultant from any such liability.

9.   LIMITATION OF LIABILITY

9.1   Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, in no

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

2

Confidential-Subject to Protective Order

H&E 0005434

NON-CERTIFIED COPY

# URS

terrorism, energy shortage, accidents or delay in transportation, accidents in the handling and rigging of heavy equipment, explosion, riot, war, court injunction or order, delays by acts or orders of any governmental body or changes in laws or government regulations or the interpretations or application thereof or the acts or omissions of the Client or its other contractors, vendors or suppliers. In the event of a Force Majeure Event, Consultant shall receive an equitable adjustment extending Consultant's time for performance for such Services sufficient to overcome the effects of any delay, and an increase(s) to Consultant's compensation sufficient to account for any increased cost in performance or loss or damage suffered by Consultant.

## 15.   RESPONSIBILITIES OF CLIENT

15.1   Without limiting any express or implied obligations of Client under applicable law, Client shall: (1) provide Consultant, in writing, all information relating to Client's requirements for the project; (2) correctly identify to Consultant the location of subsurface structures, such as pipes, tanks, cables, and utilities; (3) notify Consultant of any potential hazardous substances or other health and safety hazard or condition known to Client existing on or near the project site; (4) give Consultant prompt written notice of any suspected deficiency in the Services; (5) with reasonable promptness, provide required approvals and decisions; and (6) furnish or cause to be furnished to Consultant full, unrestricted and legal access to, and use of, the site and all necessary rights of way and easements, in order to perform the Services.  In the event Consultant is requested by Client or is required by subpoena to produce documents or give testimony in any action or proceeding to which Client is a party and Consultant is not a party, Client shall pay Consultant for any time and expenses required in connection therewith, including reasonable attorney's fees.

15.2   Consultant may rely upon and use in the performance of any Services information supplied to it by Client without independent verification and Consultant shall not be responsible for defects in its Services attributable to its reliance upon or use of such information.

## 17.   TERM

17.1   Unless otherwise specified, the term of this Agreement shall run from the Effective Date until Consultant has completed the Services and received all payments due under the Agreement.

## 18.   GENERAL

18.1   Client and Consultant each represent and warrant that this Agreement has been duly authorized, executed and delivered and constitutes its binding agreement enforceable against it.  This Agreement and any executed Work Authorizations supersede all prior written and/or oral contracts and agreements that may have been made or entered into between Client and Consultant regarding the subject matter hereof, including but not limited to any and all proposals, oral or written, and all communications between the Parties relating to this Agreement or any Work Authorization(s), and constitute the entire agreement between the Parties hereto with respect to the subject matter hereof.

18.2   This Agreement and Work Authorization(s) may not be assigned by Consultant or Client in any way, including by operation of law, unless otherwise mutually agreed to in writing, any such attempted non-authorized assignment shall be null and void and of no force or effect.

18.3   Any cost opinions or estimates provided by Consultant will be on a basis of experience and judgment, but since Consultant has no control over market conditions or bidding procedures, Consultant cannot and does not warrant that bids, ultimate construction cost, or project economics will not vary from such opinions or estimates.  Neither this Agreement nor any of the Services provided hereunder shall constitute or provide for, and Consultant shall not be considered to have rendered, any legal or financial opinion(s) regarding the feasibility of this project or any other or regarding any other matter.  Unless otherwise expressly included in a Work Authorization, Consultant shall under no circumstances provide as part of the Services a consent, opinion or similar document, or act as a qualified person or expert, in connection with any filing by Client with the United States Securities and Exchange Commission, or similar non-United States agency, authority or commission.

18.4   Notices shall be effective hereunder as follows only if in writing and addressed to the authorized representative designated in applicable Work Authorizations: (1) upon delivery, if delivered personally to the person; (2) upon transmission, if transmitted to the facsimile number of the person; and (3) upon posting, if by first class or overnight mail (postage prepaid).

18.5   All contract issues and matters of law will be adjudicated in accordance with the laws of the state where the project is located, excluding any provisions or principles thereof which would require the application of the laws of a different jurisdiction; provided, however that if the project is located outside the United States, the laws of the State of California shall govern. Venue for any litigation shall be any state court or United States District Court having jurisdiction over the parties and subject matter.

18.6   The terms and conditions of this Agreement shall prevail, notwithstanding any variance with any purchase order or other written instrument submitted by Client whether formally rejected by Consultant or not.  This Agreement may be modified only by amendment when signed by each Party. In the event that any one or more of the provisions of this Agreement shall be found to be illegal or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect, and such term or provision shall be deemed stricken to the extent and in the jurisdictions necessary for compliance with applicable law.

18.7   Nothing in this Agreement shall be construed to give any rights or benefits to anyone other than the Client or Consultant.

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

4

Confidential-Subject to Protective Order

NON-CERTIFIED COPY

H&E 0005436

# URS

18.8    The headings in this Agreement are for convenience only, and shall not affect the interpretation hereof. The terms "hereof", "herein," "hereto" and similar words refer to the entire Agreement and not to any particular Article, Section, Attachment, Exhibit or any other subdivision of this Agreement. References to "day" or "days" shall mean calendar days unless specified otherwise.

18.9    The provisions of this Agreement which by their nature are intended to survive the termination, cancellation, completion, or expiration of the Agreement, including, but not limited to, indemnities and any expressed limitations of or releases from liability, shall continue as valid and enforceable obligations of the parties notwithstanding any such termination, cancellation, completion, or expiration.

18.10    It is understood and agreed that any delay, waiver or omission by Consultant or Client to exercise any right or power arising from any breach or default by Client or Consultant in any of the terms, provisions or covenants of this Agreement or any Work Authorization shall not be construed to be a waiver by Consultant or Client of any subsequent breach or default of the same or other terms, provisions or covenants on the part of Consultant or Client.

19.    **ATTACHMENTS AND EXHIBITS**

The following attachments and exhibits, which are attached hereto, are part of this Agreement.

Attachment 1 – Work Authorization

Attachment 2 – Fee Proposal, Scope of Work, Schedule

Attachment 3 – URS 2009 Schedule of Fees and Charges

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, effective as of the day and year first above mentioned.

**H&E Equipment Services, Inc.**

By:    _____
          (Signature)

Name:    _____
              (Printed)

Title:    _____

**URS Corporation Architecture PC**

By:    _____
          (Signature)

Name:    _____
              (Printed)

Title:    _____

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

5

Confidential-Subject to Protective Order

NON-CERTIFIED COPY

H&E 0005437

# URS

## ATTACHMENT 1

## TIME AND MATERIALS WORK AUTHORIZATION 09-100

In accordance with the Agreement for Consulting and Professional Services between **H&E Equipment Services, Inc.** ("Client"), and **URS Corporation Architecture PC** ("Consultant"). a **North Carolina** corporation, dated **08.13.09**, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

**Renovations and Additions to Kenner, LA Branch**
**H&E Equipment Services, Inc.**

Client Authorized
Representative:  Leonard St. Germain
Address:         11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816

Telephone No.:  225.298.5244

Consultant Authorized
Representative:  Chad Herndon
Address:         7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
Telephone No.:  225.922.5244

<u>SERVICES</u>.  The Services shall be described in Attachment 2 to this Work Order.

<u>SCHEDULE</u>.  The Estimated Schedule shall be set forth in Attachment 2 to this Work Authorization.  Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

<u>PAYMENT</u>.  Payment of $0.00 _ is due upon signature of this Work Authorization and will be applied against the final invoice for this Work Authorization.  URS charges shall be on a "time and materials" basis and shall be in accordance with the Consultant's Schedule of Fees and Charges in effect at the time the Services are performed.  Payment provisions and the Consultant's current Schedule of Fees and Charges are attached to this Work Authorization as Attachment 3.

<u>TERMS AND CONDITIONS</u>.  The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

<u>ACCEPTANCE</u> of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

<u>CLIENT</u>                                    <u>CONSULTANT</u>

_____              _____
Signature                                    Signature

_____              _____
Typed Name/Title                             Typed Name/Title

_____              _____
Date of Signature                            Date of Signature

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1

Confidential-Subject to Protective Order                                    H&E 0005438

NON-CERTIFIED COPY

# URS

**ATTACHMENT 2**

August 13, 2009

Leonard St. Germain
H&E Equipment Services
Baton Rouge, LA

Re:    Renovations and Additions to H&E Equipment – Kenner LA

Leonard:

**URS** is pleased to provide you with a proposal for professional services for assistance with determining a legitimate budget for the renovations and additions to your H&E Equipment facility located at **125 East Airline Drive** in **Kenner LA**.  A list of work items we discussed is attached (**Attachment 2**)

As we discussed the first order of business will be to determine the existing condition of the buildings and develop drawings and sketches of the renovations. From these documents, we can obtain accurate construction estimates for the work.  With this data a realistic presentation can be offered for consideration by management.

We propose to provide you these services for a total fee not to exceed amount of **$20,000.00** based on our "Standard Billing Rate Schedule" This schedule includes the cost of all project personnel associated with the project, documentation and all reimbursement costs incurred during the course of the performance of the outlined scope of work.

Thank you for considering **URS** for this opportunity. If you have any questions or require any additional information, please feel free to contact me at 225.231.6343 or cell 225.324.5848. Thank you for your consideration.

Sincerely,

URS Corporation

Neal Johnson                                    Mike Richardson
Principal Architect                             Vice President

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

NON-CERTIFIED COPY

# URS

**ATTACHMENT 2**

Re: Renovations and Additions to H&E Equipment – Kenner LA
2 | P a g e

## SCOPE OF WORK

Based on our recent site visit the focus of the project will include:

1. Developing drawings of the existing site and buildings.
2. Review of existing truck traffic circulation including company, employee and customer vehicle parking. Additional paving with drainage consideration will be included.
3. Evaluate the condition of all exterior roofs and walls of all buildings on the property.
4. Evaluate condition and operational status of the existing Office / Sales area with a focus on renovating the restrooms and upgrading the finishes in all other areas. Review of the HVAC and Electrical systems to be included.
5. Evaluate circulation and storage utilization of the Parts Area.
6. Evaluate covered area west of Parts Building (existing Equipment Wash Area)
7. Develop sketches and drawings for a:
   a. New entrance for Office / Sales building.
   b. New office / tool storage and break room area to the front (east) end of the Shop Building.
   c. Demolish existing office/tool storage and break room to be used as transition area.
   d. Add a new overhead door on south side of building in this immediate area.
   e. New enclosed service bay with overhead doors to the rear (west) end of the Shop Building.
   f. New open frame bay to the rear (west) end of the Shop Building.
   g. New 40' x 70' Equipment Wash Building to be located at the rear (west) end of the site.
8. Assist in obtaining realistic budget pricing from three (3) local qualified general contractors.

## SCHEDULE

We anticipate the effort will require 3 calendar weeks to complete.

Confidential-Subject to Protective Order

NON-CERTIFIED COPY

**URS**

# URS CORPORATION
## SCHEDULE OF FEES AND CHARGES
### Engineering/Environmental & Consulting Services

> The following describes the basis for compensation for services performed during the fiscal year 2009. This Schedule of Fees and Charges will be adjusted annually on January 1 of each subsequent year to reflect merit and economic salary increases, and changes in the expected level and mode of operations for the new year. The new Schedule of Fees and Charges will apply to existing and new assignments.

## PERSONNEL CHARGES

The charge for all time required in the performance of the Scope of Services, including office, field and travel time, will be at the Unit Priced Hourly Rates set forth below for the labor classifications indicated.

| Labor Classification | Hourly Rate ($) |
| --- | --- |
| Clerk* | 48 |
| Technical Typist/Word Processor* | 55 |
| Editor/Drafter/Designer/Illustrator* | 75 |
| Lab/Field Supervisor* | 75 |
| Technician* | 63 |
| Senior Technician | 68 |
| Graduate Staff Professional | 70 |
| Staff Professional | 82 |
| Senior Staff Professional | 93 |
| Assistant Project Professional | 99 |
| Project Professional | 115 |
| Senior Project Professional | 130 |
| Consulting/Sr. Consulting Professional | 160 |
| Principal/Sr. Principal Professional | 180 |
| Principal/Sr. Principal Professional (research / site visit/report writing) | 200 |
| Principal/ Sr. Principal Professional (depositions / testifying in court) | 300 |

Charges for contract personnel under URS supervision and using URS facilities will be made according to the hourly rate corresponding to their classification.

When staff are performing project fieldwork, a minimum daily charge of 4 hours will apply.

A maximum of eight (8) hours travel time per day will be charged for travel within the continental United States.

When URS staff appears as expert witnesses at court trials, arbitration hearings, mediation and depositions, their time will be charged at minimum $250.00 per hour.

Overtime (hours worked in excess of eight (8) hours per day) by exempt personnel will be charged at the above straight time hourly rate. Overtime by non-exempt personnel (classifications identified with an asterisk "*") will be charged at 1.5 times the above hourly rate.

## OTHER PROJECT CHARGES

### Subcontracts and Equipment Rental
The cost of services subcontracted by URS to others and other costs incurred by URS will be charged at cost plus 10%.

### Communications
The cost of communications for office telephone, telex, facsimile, postage, and incidental copying costs will be charged at a flat rate of 3% of total gross labor charges.

### Vehicles and Mileage
Field vehicles (pick-ups, vans, trucks, etc.) used on project assignments will be charged at $65.00 per day. The mileage charge for personal autos will be the then current mileage rate established by the Internal Revenue Service.

### Specialized Equipment
The use of specialized URS equipment will be the fixed rental rates set forth in the Schedule of URS Specialized Equipment Charges.

*This fee schedule contains confidential business information and is not to be copied or distributed for any purpose other than the use intended in this contract or proposal.*

U:\Proposals\Facilities\Office Practice\Contracts\2009 schedule of fees and charges.doc

Confidential-Subject to Protective Order

H&E 0005441

NON-CERTIFIED COPY



**URS**

## SHORT FORM MASTER AGREEMENT FOR PROFESSIONAL SERVICES
### BETWEEN
### H&E Equipment Services, Inc.
### AND
### URS Corporation Architecture PC

THIS AGREEMENT ("Agreement") for Professional Services, (together with the attachments hereto) dated and effective as of August 13, 2009 (the "Effective Date"), is hereby made and entered into by and between H&E Equipment Services, Inc., a Delaware corporation, (hereinafter "Client") having a place of business located at 11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816 and URS Corporation Architecture PC, a North Carolina corporation (hereinafter "Consultant") having a place of business located at 7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806 Consultant and Client are each individually referred to as a "Party" and collectively as the "Parties".

The Parties agree as follows:

1. **WORK AUTHORIZATIONS**

1.1  Consultant agrees to undertake and perform certain consulting and professional engineering services ("Services") in accordance with the terms and conditions contained herein, as may be requested by Client from time to time. The Services to be performed, Consultant's compensation, and the schedule for performance for each task shall be described in one or more authorizations issued to Consultant by Client, the form of which is attached hereto as Attachment 1 ("Work Authorization"). A Work Authorization shall be valid and binding upon the Parties only if accepted in writing by Client and Consultant. Each duly executed Work Authorization shall be subject to the terms and conditions of this Agreement, except to the extent expressly modified by the Work Authorization.

1.2  It is the expressed intent of the parties that this Agreement shall be made available to subsidiaries and affiliated companies of Consultant. For the purposes of this Agreement, as it applies to each Work Authorization, the term "Consultant" shall mean either Consultant as defined above or the subsidiary or affiliate of Consultant identified in the Work Authorization. The applicable Work Authorization shall clearly identify the legal name of the entity accepting the Work Authorization.

2. **PAYMENTS FOR SERVICES**

2.1  Unless otherwise stated in a Work Authorization, payment shall be on a time and materials basis under the Schedule of Fees and Charges in effect when the Services are performed. Client shall pay undisputed portions of each progress invoice within thirty (30) days of the date of the invoice. If payment is not received within thirty (30) days from the due date of such payment, Consultant may suspend further performance under one or more Work Authorizations until payments are current. Client shall notify URS of any disputed amount within fifteen (15) days from date of the invoice, give reasons for the objection, and promptly pay the undisputed amount. Client shall pay an additional charge of one percent (1%) per month or the maximum percentage allowed by law, whichever is the lesser, for any past due amount. In the event of a legal action for invoice amounts not paid, attorneys' fees, court costs, and other related expenses shall be paid to the prevailing party.

2.2  Client shall reimburse Consultant for all taxes, duties and levies such as Sales, Use, Value Added Taxes, Deemed Profits Taxes, and other similar taxes which are added to or deducted from the value of Consultant's Services. For the purpose of this Article such taxes shall not include taxes imposed on Consultant's net income, and employer or employee payroll taxes levied by any United States taxing authority, or the taxing authorities of the countries or any agency or subdivision thereof in which URS subsidiaries, affiliates, or divisions are permanently domiciled. It is agreed and understood that these net income, employer or employee payroll taxes are included in the unit prices or lump sum to be paid Consultant under the applicable Work Authorization.

2.3  Where charges are "not to exceed" a specified sum, Consultant shall notify Client before such sum is exceeded and shall not continue to provide the Services beyond such sum unless Client authorizes an increase in the sum. If a "not to exceed" sum is broken down into budgets for specific tasks, the task budget may be exceeded without Client authorization as long as the total sum is not exceeded. Changes in conditions, including, without limitation, changes in laws or regulations occurring after the budget is established, or other circumstances beyond URS control, shall be a basis for equitable adjustments in the budget and schedule.

3. **CONFIDENTIALITY**

3.1  For a period commencing with the disclosure of any confidential information under this Agreement and/or a Work Authorization(s) and ending on the second anniversary such disclosure was first made, Consultant and Client each agree not to disclose to third parties, including also subcontractors and vendors (unless such subcontractors and vendors have a need to know and are bound to similar obligations of confidentiality), any information that is identified as confidential in writing on the materials made available to the other Party hereunder

4. **WARRANTY**

4.1  Consultant warrants that any consulting and professional engineering Services performed by it under a Work Authorization shall be performed in accordance with that degree of care and skill ordinarily exercised by members of Consultant's profession practicing at the same time in the same location. Consultant's sole liability to Client for any non-conforming Services shall be to re-perform the non-conforming or defective Services, written notice of which must be promptly given by Client to Consultant. Consultant's obligation for re-performance of non-conforming Services as set

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100 Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1



EXHIBIT NO. 27
K. DONNELLY

NON-CERTIFIED COPY

# URS

forth in the preceding sentence shall extend for a term commencing at the substantial completion of such Services under a Work Authorization and ending one year later.

4.2     THE WARRANTY SET FORTH IN THIS ARTICLE 4 IS EXCLUSIVE, AND IN LIEU OF ANY AND ALL OTHER WARRANTIES RELATING TO THE SERVICES, WHETHER STATUTORY, EXPRESS OR IMPLIED, AND CONSULTANT DISCLAIMS ANY SUCH OTHER WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY AND ALL WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE AND ANY AND ALL WARRANTIES ARISING FROM COURSE OF DEALING AND/OR USAGE OF TRADE. ANY OTHER STATEMENTS OF FACT OR DESCRIPTIONS EXPRESSED IN THE AGREEMENT OR ANY WORK AUTHORIZATION SHALL NOT BE DEEMED TO CONSTITUTE A WARRANTY OF THE SERVICES OR ANY PART THEREOF. CONSULTANT'S REPERFORMANCE OF DEFECTIVE OR NON-CONFORMING SERVICES THROUGH THE ONE YEAR PERIOD PROVIDED FOR IN THIS ARTICLE 4 SHALL CONSTITUTE COMPLETE FULFILLMENT OF, AND CLIENT'S EXCLUSIVE REMEDY FOR, ALL THE LIABILITIES OR RESPONSIBILITIES OF CONSULTANT TO CLIENT FOR NON-CONFORMING OR DEFECTIVE SERVICES, WHETHER THE CLAIMS OF CLIENT ARE BASED ON DELAY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, WARRANTY, INDEMNITY, ERROR AND OMISSION OR ANY OTHER CAUSE WHATSOEVER.

5.     WORK BY OTHERS

5.1     The performance by Consultant of Services under a Work Authorization shall not constitute an assumption by Consultant of the obligations of Client or its other contractors. Consultant shall not control or have charge of, and shall not be responsible for, construction means, methods, techniques, sequences, procedures of construction, health or safety programs, or precautions connected with the work of Client or its other contractors, and shall not manage, supervise, control or have charge of construction. Client shall require Consultant to be named as an additional insured along with Client on any liability insurance policies provided by Client's construction contractors. To the fullest extent permitted by law, Client shall defend Consultant against any claim, suit or proceeding asserted by one of its other contractors and indemnify, defend and save Consultant harmless from any and all actual or alleged claims and losses (including, without limitation, attorney's fees) sustained by such contractor in connection with the Services, regardless or whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

6.     INSURANCE

6.1     In the event Consultant performs Services under any Work Authorization in connection with a project for which Client or another party with which Client has contracted obtains all-risk or builder's risk property insurance, Client, as the case may be, shall name, or shall cause such other party to name, Consultant as an additional insured on such all risk or builder's risk property insurance. Client acknowledges that Consultant has an insurable interest in such all risk or builder's risk property insurance.

6.2     Consultant and Client each waive all rights of recovery and subrogation against each other with respect to a loss occurring to property of the other, to the extent that such waivers do not invalidate the property insurance of either.

7.     INDEMNITY

7.1     Each Party shall indemnify, defend and save the other Party, its officers, directors, employees and affiliates harmless from any loss, cost or expense claimed by third parties, excluding employees of either Party, for property damage and/or bodily injury, including death, to the proportionate extent such loss, cost or expense arises from the negligence or willful misconduct of the indemnifying Party, its employees or affiliates in connection with the Services.

7.2     Notwithstanding any other provision contained elsewhere in this Agreement to the contrary and to the fullest extent permitted by law, Client shall be liable for and indemnify, defend and save Consultant, its officers, directors, employees and affiliates harmless from and against any and all actual or alleged claims, damages (including incidental, consequential, indirect and special damages), losses, and expenses (including, without limitation, all penalties, attorney's fees, fines and administrative or civil sanctions arising out of or related to such claim) (collectively "Losses") arising out of: (1) economic loss suffered by third parties; and/or (2) investment decisions of Client or third parties in reliance upon the results of the Services, regardless of whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

7.3     The indemnity and save harmless obligations of Consultant and Client under this Article 7 shall not apply with respect to any Hazardous Material, as Consultant's and Client's rights and obligations with respect thereto are set forth in Article 10.

8.     WAIVER OF CONSEQUENTIAL DAMAGES

8.1     Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, neither Client nor Consultant shall be liable, whether based on contract, tort, negligence, strict liability, warranty, indemnity, error and omission or any other cause whatsoever, for any consequential, special, incidental, indirect, punitive or exemplary damages, or damages arising from or in connection with loss of power, loss of use, loss of revenue or profit (actual or anticipated), loss by reason of shutdown or non-operation, increased cost of construction, cost of capital, cost of replacement power or customer claims, and Consultant hereby releases Client and Client hereby releases Consultant from any such liability.

9.     LIMITATION OF LIABILITY

9.1     Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, in no

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

2

NON-CERTIFIED COPY

# URS

event shall the total cumulative aggregate liability of Consultant, its subconsultants, and their respective partners, officers, directors, shareholders, employees, and agents (referred to collectively in this Article as "Consultant") to Client resulting from, arising out of or in connection with the performance or nonperformance of any or all Services or other obligations under a Work Authorization, exceed $250,000 or ten percent (10%) of the compensation paid Consultant pursuant to such Work Authorization, whichever is greater, or extend beyond the expiration of the warranty period under Article 4 for the Services performed under the Work Authorization, regardless of the legal theory under which such liability is imposed. The remedies stated in the Agreement are Client's sole and exclusive remedies for any failure by Consultant to comply with obligations to Client, and Client hereby irrevocably waives any right to assert a claim against Consultant based on a legal theory that a remedy provided herein fails of its essential purpose.

10.     HAZARDOUS MATERIAL

10.1     Nothing in this Agreement shall be construed or interpreted as requiring Consultant to assume the status of, and Client acknowledges that Consultant does not act in the capacity nor assume the status of, Client or others as a "generator," "operator," "transporter," or "arranger" in the treatment, storage, disposal, or transportation of any hazardous substance or waste as those terms are understood within the meaning of the Resource Conservation and Recovery Act (RCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), or any other similar federal, state, or local law, regulation, or ordinance. Client acknowledges further that Consultant has played no part in and assumes no responsibility for generation or creation of any hazardous waste, pollution condition, nuisance, or chemical or industrial disposal problem, if any, which may exist at any site that may be the subject matter of any Work Authorization.

10.2     It is acknowledged by both parties that the Services do not include services related to regulated substances, pollutants, or hazardous or toxic wastes ("Hazardous Material"). In the event Consultant or any other party encounters undisclosed Hazardous Materials, Consultant shall notify Client and, to the extent required by law or regulation, the appropriate governmental officials, and Consultant may, at its option and without liability for delay, consequential or any other damages to Client, suspend performance of Services on that portion of the project affected by Hazardous Material until Client: (i) retains appropriate specialist consultant(s) or contractor(s) to identify and, as appropriate, abate, remediate, or remove the Hazardous material; and (ii) warrants that the project site is in full compliance with all applicable laws and regulations. Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, Client shall indemnify, defend and save Consultant and its affiliates, subconsultants, agents, and suppliers of any tier, and any and all employees, officers, directors of any of the foregoing, if any, from and against any and all Losses which arise out of the performance of the Services and relating to the regulation and/or protection of the environment, including, without limitation, Losses incurred in connection with characterization, handling, transportation, storage, removal, remediation, disturbance or disposal of Hazardous Material, whether above or below ground and not brought to a Client site or other proposed project site by Consultant in the performance of the Services without Client's approval.

11.     CHANGES

11.1     The Parties may from time to time by mutual agreement seek to modify, extend or enlarge the Services under a Work Authorization ("Modification"). In the event the Parties agree to a Modification to add additional Services, or to make other modifications to the Services, Consultant's compensation, the schedule and any other relevant terms and conditions of the applicable Work Authorization shall be equitably adjusted prior to performance of such Services.

12.     OWNERSHIP OF DOCUMENTS

12.1     Consultant grants to Client a transferable, irrevocable and perpetual royalty-free license to retain and use all work products delivered to Client for any purpose in connection with the project specified in each Work Authorization, upon full payment by Client for Consultant's Services. Client also may use such work product for other purposes with Consultant's written consent. Re-use of any such work product by Client on any extension of the project or on any other project without the written authorization of Consultant shall be at Client's sole risk and Client shall indemnify, defend and save Consultant and its affiliates, consultants, agents, subcontractors and suppliers of any tier, and any and all employees, officers and directors of any of the foregoing, if any, from and against any and all Losses suffered as a result of, or arising out of, or in connection with such re-use. Consultant shall have the right to retain copies of all such work product. Consultant retains the right of ownership with respect to any patentable concepts or copyrightable materials arising from its Services.

13.     TERMINATION/SUSPENSION

13.1     Client may terminate all or any portion of the Services under one or more Work Authorizations for convenience, at its option, by sending a written notice to Consultant. Either party can terminate this Agreement or a Work Authorization for cause if the other commits a material, uncured breach of this Agreement or becomes insolvent. Termination for cause shall be effective twenty (20) days after receipt of a notice of termination, unless a later date is specified in the notice. The notice of termination for cause shall contain specific reasons for termination and both parties shall cooperate in good faith to cure the causes for termination stated in the notice. Termination shall not be effective if reasonable action to cure the breach has been taken before the effective date of the termination. Client shall pay Consultant upon invoice for Services performed and charges incurred prior to termination, plus reasonable termination charges. Any suspension of Services by Client shall result in an equitable adjustment to Consultant's compensation, time for performance, or any of its other obligations under a Work Authorization.

14.     FORCE MAJEURE

14.1     Any delay or failure of Consultant in performing its required obligations hereunder shall be excused if and to the extent such delay or failure is caused by a Force Majeure Event. A "Force Majeure Event" means an event due to any cause or causes beyond the reasonable control of Consultant and shall include, but not be limited to, acts of God, strike, labor dispute fire, storm, flood, windstorm, unusually severe weather, sabotage, embargo,

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100 Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

3

NON-CERTIFIED COPY

# URS

terrorism, energy shortage, accidents or delay in transportation, accidents in the handling and rigging of heavy equipment, explosion, riot, war, court injunction or order, delays by acts or orders of any governmental body or changes in laws or government regulations or the interpretations or application thereof or the acts or omissions of the Client or its other contractors, vendors or suppliers. In the event of a Force Majeure Event, Consultant shall receive an equitable adjustment extending Consultant's time for performance for such Services sufficient to overcome the effects of any delay, and an increase(s) to Consultant's compensation sufficient to account for any increased cost in performance or loss or damage suffered by Consultant.

### 15.    RESPONSIBILITIES OF CLIENT

15.1    Without limiting any express or implied obligations of Client under applicable law, Client shall: (1) provide Consultant, in writing, all information relating to Client's requirements for the project; (2) correctly identify to Consultant the location of subsurface structures, such as pipes, tanks, cables, and utilities; (3) notify Consultant of any potential hazardous substances or other health and safety hazard or condition known to Client existing on or near the project site; (4) give Consultant prompt written notice of any suspected deficiency in the Services; (5) with reasonable promptness, provide required approvals and decisions; and (6) furnish or cause to be furnished to Consultant full, unrestricted and legal access to, and use of, the site and all necessary rights of way and easements, in order to perform the Services. In the event Consultant is requested by Client or is required by subpoena to produce documents or give testimony in any action or proceeding to which Client is a party and Consultant is not a party, Client shall pay Consultant for any time and expenses required in connection therewith, including reasonable attorney's fees.

15.2    Consultant may rely upon and use in the performance of any Services information supplied to it by Client without independent verification and Consultant shall not be responsible for defects in its Services attributable to its reliance upon or use of such information.

### 17.    TERM

17.1    Unless otherwise specified, the term of this Agreement shall run from the Effective Date until Consultant has completed the Services and received all payments due under the Agreement.

### 18.    GENERAL

18.1    Client and Consultant each represent and warrant that this Agreement has been duly authorized, executed and delivered and constitutes its binding agreement enforceable against it. This Agreement and any executed Work Authorizations supersede all prior written and/or oral contracts and agreements that may have been made or entered into between Client and Consultant regarding the subject matter hereof, including but not limited to any and all proposals, oral or written, and all communications between the Parties relating to this Agreement or any Work Authorization(s), and constitute the entire agreement between the Parties hereto with respect to the subject matter hereof.

18.2    This Agreement and Work Authorization(s) may not be assigned by Consultant or Client in any way, including by operation of law, unless otherwise mutually agreed to in writing, any such attempted non-authorized assignment shall be null and void and of no force or effect.

18.3    Any cost opinions or estimates provided by Consultant will be on a basis of experience and judgment, but since Consultant has no control over market conditions or bidding procedures, Consultant cannot and does not warrant that bids, ultimate construction cost, or project economics will not vary from such opinions or estimates. Neither this Agreement nor any of the Services provided hereunder shall constitute or provide for, and Consultant shall not be considered to have rendered, any legal or financial opinion(s) regarding the feasibility of this project or any other or regarding any other matter. Unless otherwise expressly included in a Work Authorization, Consultant shall under no circumstances provide as part of the Services a consent, opinion or similar document, or act as a qualified person or expert, in connection with any filing by Client with the United States Securities and Exchange Commission, or similar non-United States agency, authority or commission.

18.4    Notices shall be effective hereunder as follows only if in writing and addressed to the authorized representative designated in applicable Work Authorizations: (1) upon delivery, if delivered personally to the person; (2) upon transmission, if transmitted to the facsimile number of the person; and (3) upon posting, if by first class or overnight mail (postage prepaid).

18.5    All contract issues and matters of law will be adjudicated in accordance with the laws of the state where the project is located, excluding any provisions or principles thereof which would require the application of the laws of a different jurisdiction; provided, however that if the project is located outside the United States, the laws of the State of California shall govern. Venue for any litigation shall be any state court or United States District Court having jurisdiction over the parties and subject matter.

18.6    The terms and conditions of this Agreement shall prevail, notwithstanding any variance with any purchase order or other written instrument submitted by Client whether formally rejected by Consultant or not. This Agreement may be modified only by amendment when signed by each Party. In the event that any one or more of the provisions of this Agreement shall be found to be illegal or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect, and such term or provision shall be deemed stricken to the extent and in the jurisdictions necessary for compliance with applicable law.

18.7    Nothing in this Agreement shall be construed to give any rights or benefits to anyone other than the Client or Consultant.

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

NON-CERTIFIED COPY

# URS

18.8    The headings in this Agreement are for convenience only, and shall not affect the interpretation hereof. The terms "hereof", "herein," "hereto" and similar words refer to the entire Agreement and not to any particular Article, Section, Attachment, Exhibit or any other subdivision of this Agreement. References to "day" or "days" shall mean calendar days unless specified otherwise.

18.9    The provisions of this Agreement which by their nature are intended to survive the termination, cancellation, completion, or expiration of the Agreement, including, but not limited to, indemnities and any expressed limitations of or releases from liability, shall continue as valid and enforceable obligations of the parties notwithstanding any such termination, cancellation, completion, or expiration.

18.10    It is understood and agreed that any delay, waiver or omission by Consultant or Client to exercise any right or power arising from any breach or default by Client or Consultant in any of the terms, provisions or covenants of this Agreement or any Work Authorization shall not be construed to be a waiver by Consultant or Client of any subsequent breach or default of the same or other terms, provisions or covenants on the part of Consultant or Client.

19.    **ATTACHMENTS AND EXHIBITS**

The following attachments and exhibits, which are attached hereto, are part of this Agreement.

Attachment 1 – Work Authorization

Attachment 2 – Fee Proposal, Scope of Work, Schedule

Attachment 3 – URS 2009 Schedule of Fees and Charges

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, effective as of the day and year first above mentioned.

**H&E Equipment Services, Inc.**

By: _____
       (Signature)

Name: _Lernard St. Germain_
          (Printed)

Title: _V.P. Operations_

**URS Corporation Architecture PC**

By: _Craig N. Sordan_
       (Signature)

Name: _Craig W. Gordner_
          (Printed)

Title: _VP/OM_

F:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

NON-CERTIFIED COPY



**URS**

### ATTACHMENT 1

### TIME AND MATERIALS WORK AUTHORIZATION 09-100

In accordance with the Agreement for Consulting and Professional Services between H&E Equipment Services, Inc. ("Client"), and URS Corporation Architecture PC ("Consultant"), a North Carolina corporation, dated 08.13.09, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

      Renovations and Additions to Kenner, LA Branch
      H&E Equipment Services, Inc.

      Client Authorized
      Representative:  Leonard St. Germain
      Address:        11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816

      Telephone No.:  225.298.5244

      Consultant Authorized
      Representative:  Chad Herndon
      Address:        7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
      Telephone No.:  225.922.5244

<u>SERVICES</u>. The Services shall be described in Attachment 2 to this Work Order.

<u>SCHEDULE</u>. The Estimated Schedule shall be set forth in Attachment 2 to this Work Authorization. Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

<u>PAYMENT</u>. Payment of $0.00 is due upon signature of this Work Authorization and will be applied against the final invoice for this Work Authorization. URS charges shall be on a "time and materials" basis and shall be in accordance with the Consultant's Schedule of Fees and Charges in effect at the time the Services are performed. Payment provisions and the Consultant's current Schedule of Fees and Charges are attached to this Work Authorization as Attachment 3.

<u>TERMS AND CONDITIONS</u>. The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

ACCEPTANCE of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

<u>CLIENT</u>                            <u>CONSULTANT</u>

_____       _____
Signature                             Signature

_____       _____
Typed Name/Title                  Craig W. Gardner / VP-OM
                                    Typed Name/Title

_____       _____
Date of Signature                  Date of Signature

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1



S7GERMAN
EXHIBIT NO. 28
K. DONNELLY

URS 031081

NON-CERTIFIED COPY

 **URS**

ATTACHMENT 2

August 13, 2009

Leonard St. Germain
H&E Equipment Services
Baton Rouge, LA

Re:    Renovations and Additions to H&E Equipment – Kenner LA

Leonard:

**URS** is pleased to provide you with a proposal for professional services for assistance with determining a legitimate budget for the renovations and additions to your H&E Equipment facility located at **125 East Airline Drive in Kenner LA**. A list of work items we discussed is attached **(Attachment 2)**

As we discussed the first order of business will be to determine the existing condition of the buildings and develop drawings and sketches of the renovations. From these documents, we can obtain accurate construction estimates for the work. With this data a realistic presentation can be offered for consideration by management.

We propose to provide you these services for a total fee not to exceed amount of **$20,000.00** based on our "Standard Billing Rate Schedule" This schedule includes the cost of all project personnel associated with the project, documentation and all reimbursement costs incurred during the course of the performance of the outlined scope of work.

Thank you for considering **URS** for this opportunity. If you have any questions or require any additional information, please feel free to contact me at 225.231.6343 or cell 225.324.5848. Thank you for your consideration.

Sincerely,

URS Corporation

Neal Johnson
Principal Architect

Mike Richardson
Vice President

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

NON-CERTIFIED COPY

**URS**

**ATTACHMENT 2**

Re: Renovations and Additions to H&E Equipment – Kenner LA
2 | P a g e

## SCOPE OF WORK

Based on our recent site visit the focus of the project will include:

1. Developing drawings of the existing site and buildings.
2. Review of existing truck traffic circulation including company, employee and customer vehicle parking. Additional paving with drainage consideration will be included.
3. Evaluate the condition of all exterior roofs and walls of all buildings on the property.
4. Evaluate condition and operational status of the existing Office / Sales area with a focus on renovating the restrooms and upgrading the finishes in all other areas. Review of the HVAC and Electrical systems to be included.
5. Evaluate circulation and storage utilization of the Parts Area.
6. Evaluate covered area west of Parts Building (existing Equipment Wash Area)
7. Develop sketches and drawings for a:
    a. New entrance for Office / Sales building.
    b. New office / tool storage and break room area to the front (east) end of the Shop Building.
    c. Demolish existing office/tool storage and break room to be used as transition area.
    d. Add a new overhead door on south side of building in this immediate area.
    e. New enclosed service bay with overhead doors to the rear (west) end of the Shop Building.
    f. New open frame bay to the rear (west) end of the Shop Building.
    g. New 40' x 70' Equipment Wash Building to be located at the rear (west) end of the site.
8. Assist in obtaining realistic budget pricing from three (3) local qualified general contractors.

## SCHEDULE

We anticipate the effort will require 3 calendar weeks to complete.

URS 031083

NON-CERTIFIED COPY

**URS**

Attachment 3

# URS CORPORATION
## SCHEDULE OF FEES AND CHARGES
### Engineering/Environmental & Consulting Services

The following describes the basis for compensation for services performed during the fiscal year 2009. This Schedule of Fees and Charges will be adjusted annually on January 1 of each subsequent year to reflect merit and economic salary increases, and changes in the expected level and mode of operations for the new year. The new Schedule of Fees and Charges will apply to existing and new assignments.

## PERSONNEL CHARGES

The charge for all time required in the performance of the Scope of Services, including office, field and travel time, will be at the Unit Priced Hourly Rates set forth below for the labor classifications indicated.

| Labor Classification | Hourly Rate ($) |
|---|---|
| Clerk* | 48 |
| Technical Typist/Word Processor* | 55 |
| Editor/Drafter/Designer/Illustrator* | 75 |
| Lab/Field Supervisor* | 75 |
| Technician* | 63 |
| Senior Technician | 68 |
| Graduate Staff Professional | 70 |
| Staff Professional | 82 |
| Senior Staff Professional | 93 |
| Assistant Project Professional | 99 |
| Project Professional | 115 |
| Senior Project Professional | 130 |
| Consulting/Sr. Consulting Professional | 160 |
| Principal/Sr. Principal Professional | 180 |
| Principal/Sr. Principal Professional (research / site visit/report writing) | 200 |
| Principal/ Sr. Principal Professional (depositions / testifying in court) | 300 |

Charges for contract personnel under URS supervision and using URS facilities will be made according to the hourly rate corresponding to their classification.

When staff are performing project fieldwork, a minimum daily charge of 4 hours will apply.

A maximum of eight (8) hours travel time per day will be charged for travel within the continental United States.

When URS staff appears as expert witnesses at court trials, arbitration hearings, mediation and depositions, their time will be charged at minimum $250.00 per hour.

Overtime (hours worked in excess of eight (8) hours per day) by exempt personnel will be charged at the above straight time hourly rate. Overtime by non-exempt personnel (classifications identified with an asterisk "*") will be charged at 1.5 times the above hourly rate.

## OTHER PROJECT CHARGES

### Subcontracts and Equipment Rental
The cost of services subcontracted by URS to others and other costs incurred by URS will be charged at cost plus 10%.

### Communications
The cost of communications for office telephone, telex, facsimile, postage, and incidental copying costs will be charged at a flat rate of 3% of total gross labor charges.

### Vehicles and Mileage
Field vehicles (pick-ups, vans, trucks, etc.) used on project assignments will be charged at $65.00 per day. The mileage charge for personal autos will be the then current mileage rate established by the Internal Revenue Service.

### Specialized Equipment
The use of specialized URS equipment will be the fixed rental rates set forth in the Schedule of URS Specialized Equipment Charges.

*This fee schedule contains confidential business information and is not to be copied or distributed for any purpose other than the use intended in this contract or proposal.*

L:\Proposals\BoilRate\Office Practice\Contract\2009 schedule of fees and charges.doc

NON-CERTIFIED COPY

# URS

### ATTACHMENT 1

### TIME AND MATERIALS WORK AUTHORIZATION 10-10

In accordance with the Agreement for Consulting and Professional Services between H&E Equipment Services, Inc. ("Client"), and URS Corporation Architecture PC ("Consultant"), a North Carolina corporation, dated 08.13.09, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

Renovations and Additions to Kenner, LA Branch
H&E Equipment Services, Inc.

Client Authorized
Representative:
Address:        11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816

Telephone No.:  225.298.5244

Consultant Authorized
Representative: Neal Johnson
Address:        7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
Telephone No.:  225.231.6343

SERVICES. The Services shall be described in Attachment 1 to this Work Order.

SCHEDULE. The Estimated Schedule shall be set forth in Attachment 1 to this Work Authorization. Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

PAYMENT. Payment of $0.00 _ is due upon signature of this Work Authorization and will be applied against the final invoice for this Work Authorization. URS charges shall be on a "time and materials" basis and shall be in accordance with the Consultant's Schedule of Fees and Charges in effect at the time the Services are performed. Payment provisions and the Consultant's current Schedule of Fees and Charges are attached to this Work Authorization as Attachment 2.

TERMS AND CONDITIONS. The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

ACCEPTANCE of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

| CLIENT | CONSULTANT |
|---|---|
| _(signature)_ | _(signature)_ |
| Signature | Signature |
| Frankie Wynn/Director of Facilities | WILLIAM A. STEVENSON, SVP |
| Typed Name/Title | Typed Name/Title |
| 10/22/2010 | 10/27/10 |
| Date of Signature | Date of Signature |

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Phase I\Project Management\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1

NON-CERTIFIED COPY

URS 031085



ATTACHMENT 1

October 27, 2010

Mr. Frankie Wynn
Director of Facilities
H&E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge, Louisiana 70816

Re:    H&E Kenner Branch
       125 East Airline Highway - Kenner, Louisiana

Dear Mr. Wynn:

URS is pleased to provide you with a fee proposal for the Phase II development of the **Renovations to the Kenner, Louisiana Branch Facility.** This phase of the project will be the completion of final design solutions, the construction documents, assisting in the contractor pricing, construction contract negotiations and construction administration during the construction phase to occupancy.

We propose to provide you these design services for a total fee of **$ 148,000.** The fee is not based on a construction cost. Fees will be "lump sum", billed monthly based on the percent complete of each phase.

As we discussed, our fee will not be adjusted due to the dollar cost of the project changing higher or lower.  In the event a major scope of work involves changes such as a building addition or major variation from the current program, we will reserve the right to renegotiate our fixed fee.

The time frame to complete the final Design and Construction Documents will be 8 - 10 weeks.

URS is very excited to provide you with our professional services. If you have any questions or require any additional information, please contact me at 225.231.6343 or cell 25.324.5848.

Sincerely,
URS Corporation

Neal Johnson, AIA
Principal Architect

CC:    Chad Herndon

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
Tel: 225.922.5700
Fax: 225.922.5704

URS 031086

NON-CERTIFIED COPY

**URS**

ATTACHMENT 1

TIME AND MATERIALS WORK AUTHORIZATION 12-10

In accordance with the Agreement for Consulting and Professional Services between H&E Equipment Services, Inc. ("Client"), and URS Corporation Architecture PC ("Consultant"), North Carolina corporation, dated August 13, 2009, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

    Relocation of Crain Reman Facility – Phase 1
    Belle Chasse, LA
    H&E Equipment Services, Inc. - Owner

    Client Authorized
    Representative: Frankie Wynn
    Address:    11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816
    Telephone No.: 225.298.5244

    Consultant Authorized
    Representative: Neal Johnson
    Address:    7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
    Telephone No.: 225.231.6343

<u>SERVICES.</u> The Services shall be described in Attachment 2 to this Work Order.

<u>SCHEDULE.</u> The Estimated Schedule shall be set forth in Attachment 2 to this Work Authorization. Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

<u>PAYMENT.</u> Payment of $0.00 is due upon signature of this Work Authorization and will be applied against the final invoice for this Work Authorization. URS charges shall be on a "time and materials" basis and shall be in accordance with the Consultant's Schedule of Fees and Charges in effect at the time the Services are performed. Payment provisions and the Consultant's current Schedule of Fees and Charges are attached to this Work Authorization as Attachment 3.

<u>TERMS AND CONDITIONS.</u> The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

ACCEPTANCE of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

<u>CLIENT</u>                        <u>CONSULTANT</u>

_____    _____
Signature                          Signature

Frankie Wynn/Director of Facilities    WILLIAM A. STEVENSON, SENIOR VP
Typed Name/Title                    Typed Name/Title

12/27/2010                       1/5/11
Date of Signature                    Date of Signature

WYNN

EXHIBIT NO. 7

K. DONNELLY

URS 031072

NON-CERTIFIED COPY

# URS

December 15, 2010

Frankie Wynn
Director of Facilities – Risk - Compliance
H&E Equipment Services
Baton Rouge, LA

Re:     Relocation of H&E Equipment Services Crain Reman Facility – Phase 1
        Belle Chasse, LA

Mr. Wynn:

URS is pleased to provide you with a proposal for professional services for assistance with the relocation of your **H&E Equipment Services Crain Reman Facility** currently located on **Engineers Road in Belle Chasse, LA** to a site across the street from your sales / management office.

As we discussed, the work will be commissioned in phases.  Phase 1 will include the determination of the existing condition of the buildings and the development of drawings and sketches of the renovations. From these documents, we can obtain accurate construction estimates for the work. With this data a realistic presentation can be offered for consideration by management.

We propose to provide you these services for a total fee not to exceed amount of **$44,000.00** based on our "Standard Billing Rate Schedule" This schedule includes the cost of all project personnel associated with the project, documentation and all reimbursement costs incurred during the course of the performance of the outlined scope of work.   A Work Authorization document (Attachment 1) is included for your signature. A Scope of Work and a Delivery Schedule is also attached (Attachment 2).

Thanks for the opportunity to continue our services to H&E Equipment Services.

Sincerely,
URS Corporation


Neal Johnson                                          Mike Richardson
Principal Architect                                   Vice President

Attachment 1    Work Authorization 12-10
Attachment 2    Scope of Work and Schedule
Attachment 3    Schedule of Fees and Charges

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031073

NON-CERTIFIED COPY

**URS**

Relocation of HILE Equipment Services Crain Raman Facility – Phase 1
Belle Chasse, LA

## SCOPE OF WORK

Based on our recent site visit the focus of the project will include:

1. Developing drawings of the existing site and buildings.
2. Review of existing crane and truck circulation including company, employee and customer vehicle parking. Additional paving with drainage consideration will be included.
3. Evaluate the condition of all exterior roofs and walls of all buildings on the new property.
4. Evaluate condition and operational status of the existing fabrication building with a focus on renovating the restrooms and upgrading the finishes in all other areas. Review of the HVAC and Electrical systems to be included.
5. Evaluate site circulation in regards to existing building and above ground utility constraints.
6. Evaluate circulation of cranes through the rehabilitation process and parts storage utilization
7. Develop sketches and drawings for:
   a. Renovation of the existing buildings to remain on site.
   b. New additions to the existing buildings to enclose certain tasks.
   c. Demolish some existing buildings.
   d. New buildings as required for new layout.
   e. Addition of new overhead doors as required for new layout.
   f. New covered service bays on existing buildings as required.
   g. New overhead cranes as required to support correct loads.
8. Assist in obtaining realistic budget pricing from three (3) local qualified general contractors.

## SCHEDULE

We anticipate the effort will require 5 calendar weeks to complete.

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031074

NON-CERTIFIED COPY

Attachment 3

# URS CORPORATION
## SCHEDULE OF FEES AND CHARGES
### Engineering/Environmental & Consulting Services

> The following describes the basis for compensation for services performed during the fiscal year 2010. This Schedule of Fees and Charges will be adjusted annually on January 1 of each subsequent year to reflect merit and economic salary increases, and changes in the expected level and mode of operations for the new year. The new Schedule of Fees and Charges will apply to existing and new assignments.

## PERSONNEL CHARGES

The charge for all time required in the performance of the Scope of Services, including office, field and travel time, will be at the Unit Priced Hourly Rates set forth below for the labor classifications indicated.

| Labor Classification | Hourly Rate ($) |
|---|---|
| Clerk* | 50 |
| Technical Typist/Word Processor* | 57 |
| Editor/Drafter/Designer/Illustrator* | 78 |
| Lab/Field Supervisor* | 78 |
| Technician* | 65 |
| Senior Technician | 70 |
| Graduate Staff Professional | 73 |
| Staff Professional | 85 |
| Senior Staff Professional | 96 |
| Assistant Project Professional | 102 |
| Project Professional | 120 |
| Senior Project Professional | 138 |
| Consulting Professional | 150 |
| Sr. Consulting Professional | 165 |
| Principal/Sr. Principal Professional | 186 |

Charges for contract personnel under URS supervision and using URS facilities will be made according to the hourly rate corresponding to their classification.

When staff are performing project fieldwork, a minimum daily charge of 4 hours will apply.

A maximum of eight (8) hours travel time per day will be charged for travel within the continental United States.

When URS staff appear as expert witnesses at court trials, arbitration hearings, mediation and depositions, their time will be charged at $250.00 per hour.

Overtime (hours worked in excess of eight (8) hours per day) by exempt personnel will be charged at the above straight time hourly rate. Overtime by non-exempt personnel (classifications identified with an asterisk "*") will be charged at 1.5 times the above hourly rate.

## OTHER PROJECT CHARGES

### Subcontracts and Equipment Rental
The cost of services subcontracted by URS to others and other costs incurred by URS will be charged at cost plus 10%.

### Communications
The cost of communications for office telephone, telex, facsimile, postage, and incidental copying costs will be charged at a flat rate of 3% of total gross labor charges.

### Vehicles and Mileage
Field vehicles (pick-ups, vans, trucks, etc.) used on project assignments will be charged at $65.00 per day. The mileage charge for personal autos will be the then current mileage rate established by the Internal Revenue Service.

### Specialized Equipment
The use of specialized URS equipment will be the fixed rental rates set forth in the Schedule of URS Specialized Equipment Charges.

### Other Direct Costs
Materials, supplies, travel expenses, and other direct costs will be billed at cost plus a 5% handling charge.

*This fee schedule contains confidential business information and is not to be copied or distributed for any purpose other than the use intended in this contract or proposal.*

**URS**

URS 031075

NON-CERTIFIED COPY

# URS

## LUMP SUM WORK AUTHORIZATION NO. 11-12

In accordance with the Agreement for Consulting and Professional Services between H&E Equipment Services, Inc. ("Client"), and URS Corporation Architecture PC ("Consultant"), North Carolina corporation, dated August 13, 2009, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

> Relocation of Crain Reman Facility – Phase II
> Belle Chasse, LA
> H&E Equipment Services, Inc. - Owner

> Client Authorized
> Representative: Frankie Wynn
> Address: 11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816
> Telephone No.: 225.298.5244

> Consultant Authorized
> Representative: Neal Johnson
> Address: 7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
> Telephone No.: 225.231.6343

SERVICES. The Services shall be described in Attachment 1 to this Work Order.

SCHEDULE. The Estimated Schedule shall be set forth in Attachment 1 to this Work Authorization. Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

PAYMENT AND EQUITABLE ADJUSTMENTS. This is a lump sum Work Authorization. Consultant's lump sum compensation and provisions for progress and final payments are specified in Attachment 1 to this Work Authorization. Payment of $0.00 is due upon signature of this Work Order and will be applied against the final invoice for this Work Authorization. Consultant shall give Client prompt written notice of unanticipated conditions or conditions which are materially different from those anticipated by Consultant at the time the lump sum compensation was agreed upon. If Client wishes Consultant to proceed, Consultant's lump sum compensation shall be subject to equitable adjustment for such conditions.

TERMS AND CONDITIONS. The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

ACCEPTANCE of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

~~CLIENT~~ CONSULTANT

Signature

_Vice President / Office Mgr._
Typed Name/Title

_2/22/12_
Date of Signature

CLIENT
~~CONSULTANT~~

Signature

_FRANKIE W. WYNN / DIR. OF FACILITIES_
Typed Name/Title

_2/17/2012_
Date of Signature

I:\Projects\H&E Equipment Services - Belle Chasse\Phase II - Lump Sum Work Order

1

NON-CERTIFIED COPY

URS 031076

**URS**

Attachment 1

February 18, 2012

Frankie Wynn
Director of Facilities – Risk - Compliance
H&E Equipment Services
Baton Rouge, LA

Re:     Relocation of H&E Equipment Services Crain Reman Facility – Phase II
        Belle Chasse, LA

Mr. Wynn:

URS is pleased to provide you with a fee proposal for the **Phase II development of the H&E Equipment Services Crain Reman Facility in Belle Chasse, LA**. This phase of the project will include the following tasks:

1. Measurement of the existing facilities,
2. Completion of final design solutions,
3. Representing H&E for all permitting activities including the Pontchatrain Levee District Board, Plaquemines Parish, the State Fire Marshal, and all other regulatory agencies.
4. All construction documents as required for permitting and hard dollar pricing,
5. Assisting in the contractor pricing and construction contract negotiations, and
6. Construction Administration during the construction phase to occupancy.

This proposal is based on the work described in the approved Project Program dated January 16, 2012.

We propose to provide you these design services for a total fee of **$ 296,353.** The fee is not based on a construction cost. Fees will be "lump sum", billed monthly based on the percent complete of each task.

A Work Order document (**Attachment 1**) is included for your signature. A Scope of Work and a Delivery Schedule is also attached (**Attachment 2**).

As we discussed, our fee will not be adjusted due to the dollar cost of the project changing higher or lower. In the event a major scope of work involves changes such as a building addition or major variation from the current program, we will reserve the right to renegotiate our fixed fee.

The time frame to complete the final Design and Construction Documents will be 8 - 10 weeks.

URS is very excited to provide you with our professional services. If you have any questions or require any additional information, please contact me at 225.231.6343 or cell 225.324.5848.

Sincerely,
URS Corporation

Neal Johnson
Principal Architect

Mike Richardson
Vice President

Attachment 1     Work Authorization 11-12
Attachment 2     Scope of Work and Schedule

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031077

NON-CERTIFIED COPY

# URS

ATTACHMENT 2

Relocation of H&E Equipment Services Crain Reman Facility – Phase II
Belle Chasse, LA
021612

## SCOPE OF WORK

Based on our recent discussion, our Phase II effort will include:

1. Developing as-built drawings of the existing buildings being renovated.
2. Develop site drainage design solution
3. Develop master demolition plan
4. Building A - Main Shop Building
   a. Master Plan Space
   b. Design new entrance doors
   c. Design new concrete apron
   d. Develop interior demolition plan
   e. Design new office area
   f. Design new break room / library / training area
   g. Design new locker / shower / restroom area
5. Building B - Welding Building
   a. Design new entrance doors
   b. Design new concrete apron
   c. Design new restroom area
6. Building C - Wash Area
   a. Design New Space
7. Building D - Blast Area
   a. Design New Space
8. Building K - Painting Area
   a. Design New Space
9. Develop documents for submittal to regulatory agencies
10. Develop bid documents to provide to invited general contractors
11. Assist H&E in obtaining construction pricing proposals
12. Prepare construction contract
13. Review progress of work during construction
14. Attend monthly progress meetings during construction
15. Assist H&E in closing out the construction project.

## SCHEDULE

We anticipate the design effort will require 8 calendar weeks to complete.
We anticipate the construction period will take 24 weeks to complete

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031078

NON-CERTIFIED COPY

## ARCHITECTURAL DISCIPLINE LABOR BUDGET

| PROJECT: | New Facility Renovations and Additions | | | | | | DATE: | | 2/14/2012 |
| CLIENT: | H & E Equipment Services - Belle Chasse, LA | | | | | | REVISION: | | |
| PROJECT DESCRIPTION: | | | PROJECT IS PROJECTED TO BE: | | | 8 WEEK (2MO) DESIGN | | | |
| | | | | | | 24 WEEK (6 MO) CONSTRUCTION | | | |
| URS Proposal No. | | | | | | BY: | Neal Johnson | | |

| TASK NO. | Task Name | PIC | PM | Architect | Designer | Sr Engineer | Engineer | Drafting | Admin | Task Hours |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | NJ | TR | NH | | | | LV | |
| | | $177 | $166 | $100 | $75 | $130 | $80 | $62 | $50 | |
| 1 | **Project Management** | | | | | | | | | |
| | Set up project | | 10 | 10 | | | | | 10 | 30 |
| | Consultant coordination | | 10 | 10 | | | | | | 20 |
| | Review meetings with H & E - 2/mo @ 2 hrs ea | | 32 | 32 | | | | | | 84 |
| | Review meetings in-house - 1/wk @ 2hrs ea | | 16 | 16 | 16 | | | | 36 | 84 |
| | Manage process - 2 hrs / week | | 32 | | | | | | 64 | 96 |
| 2 | **Schematic Design** | | | | | | | | | |
| | Data Collection | | | | | | | | | |
| | Site Measurements | | | 16 | 16 | | | | | 32 |
| | Develop existing condition drawings | | | 20 | 20 | | | | | 40 |
| | Exterior | | | | | | | | | |
| | Develop new entrances | 1 | | 4 | | 6 | 20 | 16 | | 47 |
| | Develop signage, flagpole, landscaping | | | | 8 | | | | | 8 |
| | Offsite Drainage improvements | | | 2 | 2 | 2 | 10 | 16 | | 32 |
| | Utility Plan / STP | | | 2 | | 12 | 20 | 16 | | 50 |
| | Civil Details | | | 2 | | 1 | 2 | 3 | | 8 |
| | Review / incorporate survey into project | | | 2 | 2 | | 3 | 6 | | 13 |
| | Develop master demolition plan | | | | 6 | | | | | 6 |
| | Building | | | | | | | | | |
| | Master Plan Space | | | 2 | 4 | | | | | 6 |
| | Design new entrance doors | | | 2 | 2 | | | | | 4 |
| | Design new concrete apron | | | 2 | 2 | | | | | 4 |
| | Develop interior demolition plan | | | 2 | 4 | | | | | 6 |
| | Design new office area | | | 6 | 20 | | | | | 26 |
| | Design new break room / library / training area | | | 4 | 12 | | | | | 16 |
| | Design new locker / shower / restroom area | | | 4 | 8 | | | | | 12 |
| | Building | | | | | | | | | |
| | Design new entrance doors | | | 2 | | | | | | 2 |
| | Design new concrete apron | | | 2 | | | | | | 2 |
| | Design new restroom area | | | 2 | 8 | | | | | 10 |
| | Building | | | | | | | | | |
| | Design New Space | | | 6 | 6 | | | | | 12 |
| | Building | | | | | | | | | |
| | Design New Space | | | 6 | 6 | | | | | 12 |
| | Building | | | | | | | | | |
| | Design New Space | | | 6 | 6 | | | | | 12 |
| | Construction | | | | | | | | | |
| | SD base sheets - assume 6 architectural sheets | | | 2 | 6 | | | | | 8 |
| | Site Plan | | | 2 | 12 | | | | | 14 |
| | Outline Specifications | | | 2 | 12 | | | | | 14 |
| | Statement of Probable Cost | | | | 4 | | | | | 4 |
| 3 | **Design Development** | | | | | | | | | |
| | Advance design of all drawings | | | 12 | 20 | | | | | 32 |
| | Outline Specifications | | | 4 | 12 | | | | | 16 |
| | Statement of Probable Cost | | | 4 | 4 | | | | | 8 |
| | Present package to owner | | 8 | | 4 | | | | | 12 |
| 4 | **Construction Documents** | | | | | | | | | |
| | Drawings | | | 40 | 80 | | | | | 120 |
| | Project Manual | | | 10 | 30 | | | | | 40 |
| | Specifications | | | 12 | 24 | 12 | 6 | | | 54 |
| | Statement of Probable Cost | | | 2 | 12 | | | | | 14 |
| | QA / QC - may be Dallas of Houston office | 12 | | | | | | | | 12 |
| 7 | **Permitting** | | | | | | | | | |
| | General | Levee Board | | 4 | | 8 | 24 | 5 | | 41 |
| | LS SFM | | | 2 | 10 | 10 | | | | 22 |
| | City / Parish | | | 2 | 10 | 10 | | | | 22 |
| 5 | **Bidding and Negotiations** | | | | | | | | | |
| | Issue Plans | | | | 4 | | | | | 4 |
| | Prebid | | | 8 | 6 | | 4 | | | 16 |
| | Addendum | | | 4 | 4 | 4 | 5 | | | 17 |
| | Bid Opening | 1 | 1 | 2 | 0 | 1 | 1 | | | 6 |
| | Negotiation / Contract Prep | | | 2 | 4 | | 1 | 4 | | 11 |

URS 031079

NON-CERTIFIED COPY

## ARCHITECTURAL DISCIPLINE LABOR BUDGET

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PROJECT: | New Facility Renovations and Additions | | | | | | DATE: | | 2/14/2012 | | |
| CLIENT: | H & E Equipment Services - Belle Chasse, LA | | | | | | REVISION: | | | | |
| PROJECT DESCRIPTION | | | | PROJECT IS PROJECTED TO BE: | | | 8 WEEK (2MO) DESIGN | | | | |
| | | | | | | | 24 WEEK (6 MO) CONSTRUCTION | | | | |
| URS Proposal No. | | | | | | | BY: | | Neal Johnson | | |

| TASK NO. | Task Name | PIC | PM | Architect | Designer | BR Engineer | Engineer | Drafting | Admin | Task Hours |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | MJ | TR | MH | | | | LV | |
| | | 3177 | 3166 | 2180 | 175 | 3120 | 280 | 263 | 168 | |
| 1 | Construction Administration | | | | | | | | | |
| | Review Progress of Work - 5 -10 site visits | | 20 | 80 | | 20 | 10 | | | 130 |
| | Monthly Meetings (6 @ 5 hrs each) | 0 | 30 | 30 | 30 | | | | | 90 |
| | Shop Drawing Reviews | | | 32 | 60 | | | | | 92 |
| | Closeout | 0 | 4 | 24 | 12 | | | | | 40 |
| | Total Man-hours | 22 | 171 | 454 | 508 | 87 | 86 | 57 | 110 | 1,495 |
| | Total Labor | $3,894 | $25,682 | $45,241 | $35,100 | $10,440 | $6,880 | $3,591 | $5,500 | $142,528 |
| 3 | BR expenses | | so | Units | | Units | Units | | Units | |
| | Airfare (or round trip) | 700.00 | | | | | | | | $ - |
| | Hotel (as night) | 120.00 | | | | | | | | $ - |
| | Food (per diem) | 40.00 | 10 | | 10 | 10 | | | | $ 1,200 |
| | Ground Trans (day) | 75.00 | 10 | | 10 | 10 | | | | $ 2,250 |
| | Misc | 500.00 | 1 | | | | | | | $ 500 |
| | Total Facilities | | | | | | | | | $146,478 |
| | | 40 MH weeks | 0.55 | 4.275 | 11.35 | 12.7 | 2.175 | 2.15 | 1.425 | 2.75 |
| 4 | Consultants | | | | | | base fee | multiplier | | |
| | Interior Design | TBD | | | | | $ 500 | | 1.1 | $ 550 |
| | Civil | URS BR - Tim Gaines | fee is calculated above | | | | $ - | | 1.1 | $ - |
| | Landscape | Benchmark | based on $25,000 allowance | | | | $ 1,250 | | 1.1 | $ 1,375 |
| | Structural | Southeast Engineers | | | | | $80,000 | | 1.1 | $ 88,000 |
| | Mechanical | Thompson Luke and Associates | | | | | $14,500 | | 1.1 | $ 15,950 |
| | Electrical | Craig Hebert Engineering | | | | | $40,000 | | 1.1 | $ 44,000 |
| | Misc | | | | | | | | | |
| | Total Consultants | | | | | | | | | $ 149,875 |
| | Total Fee | | | | | | | | | $296,353 |

NON-CERTIFIED COPY

URS 031080

1

<pre>
 1              19TH JUDICIAL DISTRICT COURT
                PARISH OF EAST BATON ROUGE
 2                  STATE OF LOUISIANA

 3

 4

 5
   H&E EQUIPMENT SERVICES, INC     *      DOCKET NO.
 6                                 *      626,308
   VERSUS                          *
 7                                 *      SECTION:   "D"
   URS CORPORATION ARCHITECTURE,   *
 8 P.C., URS CORPORATION, L.       *
   O'NEAL JOHNSON, AND THOMAS E.   *
 9 RYAN, III                       *
                                   *
10 *  *  *  *  *  *  *  *  *  *     *

11

12

13

14
           Deposition of NEAL JOHNSON, 668 South Foster
15 Drive, Suite 101, Baton Rouge, Louisiana, 70806, taken
   in the offices of Fishman Haygood, 201 St. Charles
16 Avenue, 46th Floor, New Orleans, Louisiana,
   70170-4600, commencing at 9:56 a.m., on Thursday, the
17 4th day of August, 2016.

18

19

20
   APPEARANCES:
21

22      FISHMAN HAYGOOD
        (By:  Brett B. Barriere, Esquire)
23      201 St. Charles Avenue
        46th Floor
24      New Orleans, Louisiana  70170-3500
           (Attorneys for the Plaintiff)
25
</pre>


NON-CERTIFIED COPY


EXHIBIT
2

(504)831-1753                    HUFFMAN & ROBINSON, INC.
433 METAIRIE ROAD, #220         CERTIFIED COURT REPORTERS

2

1    ADAMS AND REESE
     (By:  Philip A. Franco, Esquire)
2    4500 One Shell Square
     New Orleans, Louisiana  70139
3       (Attorneys for the Defendants)

4

5

6

7

8

9

10

11

12

13

14

15

16   REPORTED BY:

17       WENDY MAJORIA, CCR
         Certified Court Reporter
18       (No. 84106)
         Huffman & Robinson, Inc.
19       Suite 220, Metairie Office Tower
         433 Metairie Road
20       Metairie, Louisiana  70005
         (504) 831-1753/(800) 749-1753
21       (504) 831-1759/fax

22

23

24

25

NON-CERTIFIED COPY

3

# EXAMINATION INDEX

PAGE

EXAMINATION BY MR. BARRIERE.....................6

# EXHIBIT INDEX

Johnson Exhibit No. 1.........................52
        (E-Mail exchange between Leonard
        St. Germain and Mark Howard dated
        July 20th, 2006)

Johnson Exhibit No. 2.........................69
        (95 Percent Construction Documents
        Permit Set)

Johnson Exhibit No. 3.........................101
        ( E-Mail from Neal Johnson to Rene Borrel)

Johnson Exhibit No. 4.........................102
        (Document titled "Meeting Agenda")

Johnson Exhibit No. 5.........................106
        (E-Mail exchange between Neal Johnson
        and Joseph Poitevin dated 2/27/09)

Johnson Exhibit No. 6.........................108
        (E-Mail exchange between Neal Johnson
        and Murray McCullough dated 5/6/11)

NON-CERTIFIED COPY

4

**EXHIBITS (continued):**

Johnson Exhibit No. 7.......................114
        (E-Mail from Stephan Dorsey dated 6/6/13)

Johnson Exhibit No. 8.......................117
        (E-Mail exchange concerning executive
        wall panels)

Johnson Exhibit No. 9.......................134
        (E-Mail from Frankie Wynn dated 6/11/13

Johnson Exhibit No. 10......................159
        (E-Mails between Neal Johnson and
        Frankie Wynn in January of 2013)

Johnson Exhibit No. 11......................166
        (Addendum to Terracon report dated
        August 5th, 2011

Johnson Exhibit No. 12......................168
        (Excerpt from the construction manual
        for Kenner facility)

Johnson Exhibit No. 13......................170
        (E-Mail exchange between James Brown,
        Frankie Wynn, Neal Johnson and Tim Gaines

NON-CERTIFIED COPY

5

## S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, in accordance with law;

That the formalities of reading and signing are specifically not waived;

That the formalities of filing, sealing and certification are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

\*        \*        \*        \*

WENDY MAJORIA, Certified Court Reporter, State of Louisiana, officiated in administering the oath to the witness.

NON-CERTIFIED COPY

6

NEAL JOHNSON,

1

2 after having been first duly sworn by the above-

3 mentioned Certified Court Reporter, was examined and

4 testified as follows:

5 EXAMINATION BY MR. BARRIERE:

6      Q.    Good morning, Mr. Johnson.  We met earlier

7 in the week.  I'm Brett Barriere and I represent H&E

8 in this litigation.  I'll be taking your deposition

9 today.

10          Could you state your full name and

11 address, for the record, please, sir.

12      A.    Larry O'Neal Johnson.  Work address is 668

13 South Foster Drive, Suite 101, Baton Rouge, Louisiana,

14 70806.

15      Q.    Mr. Johnson, have you previously been

16 deposed?

17      A.    Yes.

18      Q.    So you understand this is as if you're

19 testifying in a court of law.  You're under oath.  If

20 at any point during the course of the deposition you

21 find my questions ambiguous or confusing or somehow

22 otherwise unintelligible, please advise me.  I'll

23 attempt to restate them in a clearer fashion.

24          If at some point during the course of the

25 day you need a break, please tell me and we'll attempt

NON-CERTIFIED COPY

7

1  to accommodate you.

2          By whom are you employed, sir, at this
3  time?

4      A.    I'm self-employed.  Neal Johnson, LLC.

5      Q.    What is the business of Neal Johnson, LLC?

6      A.    I am a practicing architect.  My focus is
7  primarily roofing, building envelope, commercial
8  buildings, condition assessment studies of existing
9  buildings and forensic architecture, construction
10 expert testimony, litigation work.

11     Q.    Have you acted as an expert witness in any
12 litigation?

13     A.    Yes.

14     Q.    On how many occasions?

15     A.    About ten times.

16     Q.    When did you form Neal Johnson, LLC?

17     A.    I registered with the State in 2007.

18     Q.    You were employed by URS at some point; is
19 that correct?

20     A.    Yes.

21     Q.    Over what time frame, sir?

22     A.    2007 to 2014.

23     Q.    All right.  When you left URS in 2014, did
24 you become actively involved with Neal Johnson, LLC at
25 that time?

NON-CERTIFIED COPY

56

1  written document generated for the H&E Baton Rouge

2  project?

3        A.    Not that I recall.

4        Q.    Was such a document generated for either

5  the Kenner or Belle Chasse projects?

6        A.    Yes.

7        Q.    Which one?

8        A.    Both.

9        Q.    Who was the author of that document?

10       A.    Myself and Thomas Ryan.  I'm sorry.

11  Kenner would have been myself, predominantly.  Thomas

12  Ryan and myself in Belle Chasse.

13       Q.    Do you know why a program was not prepared

14  for the Baton Rouge project?

15       MR. FRANCO:

16             Program document?

17       MR. BARRIERE:

18             Yeah.

19       A.    No.

20  EXAMINATION BY MR. BARRIERE:

21       Q.    When you came on board in 2007, what was

22  the status of the Baton Rouge project?

23       A.    Chad Herndon told me the design was

24  complete for the Baton Rouge headquarters and for the

25  Baton Rouge branch.  There was discussion that one or

NON-CERTIFIED COPY

57

1  both of the projects would go forward at some time in

2  the future, yet neither were authorized or under

3  contract with URS to go forward.

4          Q.    So the projects were basically on ice at

5  that time?

6          A.    Yes.

7          Q.    Did you have occasion, at that point when

8  you came on board, to review the design?

9      MR. FRANCO:

10             For Baton Rouge?

11     MR. BARRIERE:

12             Yes.

13         A.    No, sir.

14  EXAMINATION BY MR. BARRIERE:

15         Q.    When would have been the first time you

16  reviewed those design documents?

17         A.    Chad Herndon received a call from

18  Leonard St. Germain.  I was in the room and he said,

19  "Hey, we want to get together and talk about going

20  forward with the projects."  So before we met, I asked

21  Chad to show me where the documents were so I could

22  just, what we would call, get up to speed.

23         Q.    Did you attend that meeting?

24         A.    Yes.

25         Q.    Were you the lead man on the Baton Rouge

NON-CERTIFIED COPY

70

1    A.    Yes.

2  EXAMINATION BY MR. BARRIERE:

3    Q.    Note No. 1 says, quote:  All work shall

4  conform to the City of Baton Rouge and Parish of East

5  Baton Rouge Standard Specifications For Public Works

6  Construction, latest edition.

7        Sir, during the time you were involved in

8  the Baton Rouge project, did you have any familiarity

9  with the City of Baton Rouge and Parish of East Baton

10  Rouge Standard Specifications For Public Works

11  Construction?

12    A.    No, sir.

13    Q.    Number 2, "and to the State of Louisiana

14  Department of Transportation and Development, LADOTD,

15  Standard Specifications, latest edition," period.

16        During the time you were involved in the

17  Baton Rouge project, did you have any familiarity

18  whatsoever with the LADOTD Standard Specifications?

19    A.    No, sir.

20        (Whereupon, a recess in the proceedings

21  was taken.)

22  EXAMINATION BY MR. BARRIERE:

23    Q.    Sir, let me hand you a document we've

24  previously marked as Ryan No. 2.  It is an e-mail

25  exchange between Chad Herndon and Leonard St. Germain

NON-CERTIFIED COPY

99

1   read it to you at the top of the page.

2       MR. FRANCO:

3           I'm sorry.  Where are you?

4       MR. BARRIERE:

5           Page 11, part of Section 8.2.

6   EXAMINATION BY MR. BARRIERE:

7       Q.    "The concrete pavement should contain

8   adequate wire mesh reinforcement for structural

9   strength and to reduce temperature expansion affects.

10  Adequate joints should be provided for expansion and

11  contraction."

12          Did URS entrust to Benchmark the task for

13  designing contraction and expansion joints?

14      A.    Yes.

15      Q.    Did you personally ever review the details

16  for those joints?

17      A.    Yes.

18      Q.    In what context?

19      A.    Seeing if they had been addressed and

20  quantity of information, not quality of information.

21      Q.    Did you or anyone else from URS attempt to

22  determine whether the details for contraction and

23  expansion joints called for by Benchmark were

24  consistent with Louisiana Department of Transportation

25  specifications?

NON-CERTIFIED COPY

100

1    A.    No, sir.

2    Q.    Did you or anyone else from URS attempt to

3 determine whether those details were consistent with

4 East Baton Rouge Parish specifications?

5    A.    No.

6    Q.    Did you or anyone from URS attempt to

7 determine whether all or any part of the work designed

8 by Benchmark for the yard was compliant with Louisiana

9 Department of Transportation specifications?

10    A.    No.

11    Q.    Did you or anyone else from URS attempt to

12 determine whether all or any of the part of the work

13 for the yard designed by Benchmark was consistent with

14 East Baton Rouge Parish specifications?

15    A.    Yes.

16    Q.    What did you do in that regard?

17    A.    I inquired to Murray McCullough during the

18 permit process that he had conferred with the East

19 Baton Rouge Parish Department of Public Works

20 engineers to make sure we had the most current

21 information on the permit drawings.

22    Q.    And what did he tell you?

23    A.    Yes.

24    Q.    At the time of the punch list debate about

25 the spalling and cracking, did you or anyone else with

NON-CERTIFIED COPY

116

1    Q.    Yes, sir.

2    A.    No, sir.

3    Q.    Did you inquire of anyone at Benchmark

4 about whether it had referenced this guide in

5 connection with its work on the Baton Rouge project?

6    A.    No, sir.

7    Q.    Okay.  As I understand -- we'll get there

8 a little later in the deposition -- the design work

9 for the Kenner project was performed by someone at

10 URS; is that correct?

11    A.    Yes.

12    Q.    The yard there was designed by Mr. Gaines;

13 is that correct?

14    A.    Yes.

15    Q.    All right.  Do you have any knowledge as

16 to whether Mr. Gaines referenced this guide in

17 connection with his work?

18    A.    No.

19    Q.    Sir, do you recall there being an issue

20 with respect to the wall panels in the executive area

21 of the H&E headquarters building?

22    A.    Yes.

23    Q.    How would you describe that?  There was a

24 problem with those panels, was there not?

25    A.    There was a construction defect with the

NON-CERTIFIED COPY

117

1  installation.

2       Q.    Tell me about that.  How would you

3  describe it?

4       A.    I have to look in the documents.  It's

5  something regarding the finish.  There was natural

6  wood material, plywood-type material, very expensive

7  plywood.  And there was a stain finish.  And after the

8  stain finish was applied -- I believe the sealer on

9  top of the stain was being applied and the plywood

10  began to change shape, the laminate.  There was some

11  defect in the look of it.  And we questioned it.

12       Q.    Let me show you a document I'll mark as

13  Johnson No. 7.

14            Do you recall that e-mail exchange?

15       A.    I do.

16  MR. FRANCO:

17            You labeled this as 7?

18  MR. BARRIERE:

19            I have.

20  THE WITNESS:

21            Seven was the Dorsey e-mail.

22  MR. BARRIERE:

23            Let's take this off and put another on.

24            (Whereupon, the document as described

25  above is so marked as "Exhibit No. 8" for

NON-CERTIFIED COPY

118

1  identification.)

2      THE WITNESS:

3          Dale Phillips and Greg Gauthier.

4  EXAMINATION BY MR. BARRIERE:

5      Q.    Who are they?

6      A.    That's the two gentlemen with Womack.

7  Greg Gauthier was the quality control guy.

8      Q.    All right.  Do you recognize this to be an

9  e-mail exchange you had with Frankie Wynn and others

10 concerning those executive wall panels?

11     A.    Yes.

12     Q.    In the second-to-last e-mail, Mr. Wynn

13 writes to you on April 16, 2013.  He said, "The

14 attached would look to me like Womack is contending

15 there was a design defect.  They have said they

16 installed as designed and did not work."

17          You write back on April 16th, 2013 at

18 11:38 p.m., "At this time we have no comment."

19          Do you see where I'm referring to?

20     A.    Yes.

21     Q.    Did you ever provide him a written

22 comment?

23     A.    Yes.

24     Q.    Okay.  Can you tell us, was that in the

25 form of an e-mail or a letter?

NON-CERTIFIED COPY

119

1    A.    I'd have to review the documents.

2    Q.    Do you have any --

3    A.    It could have been on the punch list.  I'd
4  have to see the documents.  I remember it was an issue
5  and it was eventually resolved.  I don't remember all
6  the events that happened between the two without
7  seeing the documents.

8    Q.    Was there a cost involved to resolve it?

9    A.    Yes.

10    Q.    Do you recall who paid that?

11    A.    H&E.

12    Q.    As you sit here today, you believe you
13  provided a written response at some juncture as
14  requested by Mr. Wynn?

15    A.    I didn't respond directly to Mr. Wynn.  I
16  believe that we documented it in the course of our
17  normal observation reports or the punch list.  Because
18  this was at the end of the project when the office was
19  being finished out, office area, the executive suite.

20          So it would have either been in a punch
21  list or an observation report or some other document.
22  I didn't write:  Mr. Wynn, here's our answer.

23    Q.    Do you believe there was ever a writing,
24  whether an observation report or a punch list report,
25  provided to Mr. Wynn that provided a response?

NON-CERTIFIED COPY

120

1      A.    Yes.  Any of those documents would have
2   been copied to him.
3      Q.    Do you recall there being an issue that
4   arose at the time or about the time that the
5   headquarters building opened that there were an
6   inadequate number of parking spaces?
7      A.    Yes.
8      Q.    What do you recall about that?
9      A.    I received either an e-mail or a phone
10  call from Johnny Jones.  It was in the morning.  I
11  don't remember the date.  I believe it was an e-mail.
12  It said:  It appears we don't have enough parking.
13  John Engquist is going ballistic.  You need to get
14  over here.
15     Q.    John Engquist?
16     A.    Yes.
17     Q.    Did you go over there?
18     A.    I believe we met at 11 o'clock that
19  morning.
20     Q.    What did you discuss?
21     A.    I didn't discuss anything.  I sat there
22  and got my head MF'd about a hundred times.
23     Q.    About the lack of parking spaces?
24     A.    Parking was the focus of the -- I don't
25  know the right, polite choice of words, but it was not

NON-CERTIFIED COPY

134

1  your way.

2      A.   The as builts may show that.  They might

3  show that additional parking.

4      MR. BARRIERE:

5          I'm going to keep moving along.  The hour

6  grows late and the number of parking spots is going to

7  remain the same.

8          Off the record.

9          (Whereupon, there was a discussion off the

10 record.)

11 EXAMINATION BY MR. BARRIERE:

12     Q.   Let me show you what we're going to mark

13 as Exhibit No. 9 to the deposition, an e-mail string

14 commencing with Mr. Wynn's e-mail of June 6th and

15 concluding with an e-mail from you to Mr. Wynn on

16 June 11th.

17         (Whereupon, the document as described

18 above is so marked as "Exhibit No. 9" for

19 identification.)

20 EXAMINATION BY MR. BARRIERE:

21     Q.   I'll ask you if you recall this e-mail

22 exchange.

23     A.   Yes, sir.

24     Q.   Mr. Wynn writes to you, among many, on

25 June 6th enclosing the latest recommendation to remedy

NON-CERTIFIED COPY

135

1  the expansion/construction joint issues.  Unacceptable

2  to H&E for several reasons, including the cost.  He

3  goes ahead and asks for additional input as to

4  solutions to the situation.

5           Do you see what I'm referring to?

6      A.    Yes, sir.

7      Q.    Okay.  On the 6th, approximately two hours

8  later, you write back, "We will review the

9  recommendation with Benchmark Group (our civil

10  engineer of record) and request their opinion.

11  Regarding the request that URS participate in the cost

12  of this work, this request will be forwarded to URS

13  management for their directive."

14           Did I read that correctly?

15      A.    Yes, sir.

16      Q.    Tell me what you recall, if anything,

17  concerning the discussion you had with Benchmark Group

18  following your e-mail of June 6th, 2013?

19      A.    We shared with -- I shared with Murray

20  McCullough the current status of the conditions and

21  the process and procedure that H&E had chosen to, in

22  their mind, rectify the situation and asked for his

23  feedback and opinion.

24      Q.    What did he tell you?

25      A.    He provided a -- I don't remember the

NON-CERTIFIED COPY

159

1              Sure.  I will impose on you to shoot me an

2    e-mail, so that way I won't forget.

3        MR. FRANCO:

4              Okay.

5    EXAMINATION BY MR. BARRIERE:

6        Q.    Who was your principal contact at H&E for

7    the Kenner job?

8        A.    Initially, it was Leonard St. Germain and

9    then a combination of Frankie Wynn and Johnny Jones.

10       Q.    I'll show you what I have marked as

11   Exhibit No. 10.

12             (Whereupon, the document as described

13   above is so marked as "Exhibit No. 10" for

14   identification.)

15   EXAMINATION BY MR. BARRIERE:

16       Q.    This is a series of e-mails between

17   yourself and Mr. Wynn in January of 2013.  Do you

18   recall this exchange, sir?

19       A.    Yes.

20       Q.    You conclude, "Frankie:  Please find

21   attached what appears to be all current URS/H&E base

22   agreements.  Project agreements to be e-mailed

23   separately."

24             What distinguishes a base agreement from a

25   project agreement?

NON-CERTIFIED COPY

160

1          A.    URS utilized a document called PSA -- I
2    believe it stands for Professional Service
3    Agreement -- that is not project specific but does
4    spell out terms and conditions and fairly common items
5    that go in a contract between two companies.

6                Then, subsequent to that, each individual
7    project would be proposed through a letter proposal or
8    some type of document.  And upon approval or
9    agreement, which is usually the fee and the scope of
10   work, a document referred to as a work order, a WO
11   with a number, would be assigned to each individual
12   project.  And attached to that would be -- typically
13   would be the scope and fee agreement and anything
14   unique to that particular project.

15        Q.    As you understand it -- I recognize you're
16   not a lawyer.  As you understand it, we have sort of
17   this base Professional Services Agreement, which
18   spells out general terms and conditions between one
19   party and URS, and then the actual work to be
20   performed under that umbrella agreement is detailed in
21   a work order?  Is that a fair summary?

22        A.    Yes.

23        Q.    The two base agreements you attached were
24   the agreement dated August 28, 2006 and then another
25   agreement dated August 13, 2009.

NON-CERTIFIED COPY

161

1       A.    The date of the first agreement was?

2       Q.    August 6th, 2006.  I'm sorry.

3  August 28, 2006.  Correct?

4       A.    Yeah, 28 and August 13th, 2009.  Correct.

5       Q.    Was it your understanding that the

6  agreement for professional services of August 28, 2006

7  had been executed in connection with URS and H&E

8  agreeing that URS would take on the Baton Rouge

9  project?

10      A.    I don't think this particular document

11 referenced any particular project.  I wasn't there

12 when this was put together.

13      Q.    Fair enough.

14            Let me offer, if I may, to you what was

15 previously marked as Ryan 13, which is the Kick-off

16 Meeting Minutes for the Kenner project, correct?

17      A.    Yes.

18      Q.    Okay.  And listed as attendees for URS are

19 yourself, Mr. Gaines and Mr. Ryan.  Who is Bill Temple

20 and why did he attend?

21      A.    Bill Temple was a representative of

22 Southeast Engineers, who was to be the URS structural

23 engineer consultant.

24      Q.    Okay.  How about Michael Perkins?

25      A.    Michael Perkins was representative of a

NON-CERTIFIED COPY

165

1    A.    Not to my knowledge.

2    Q.    Were you and Mr. Wynn qualified to
3 evaluate whether the assumed traffic volumes used by
4 Terracon were reasonable?

5    A.    I'm not qualified.  I don't know about
6 Mr. Wynn's qualifications.

7    Q.    You'd accept his opinion as to his
8 qualifications, I assume?

9    A.    Yes, sir.

10    Q.    Down below Terracon writes, and I quote:
11 Other standard design and construction details for
12 rigid pavements as contained in ACI330R-01, Guide For
13 Design & Construction of Concrete Parking Lots, should
14 be followed in the pavement design and construction
15 process.

16         It goes to state in the final sentence, "A
17 critical aspect of concrete pavements for facilities
18 of this nature is joint spacing and related details.
19 ACI330R-01 addresses these important details."

20         Do you see where I'm reading from?

21    A.    Yes, sir.

22    Q.    To the best of your knowledge, did
23 Mr. Gaines reference that guide in connection with his
24 design of the yard?

25    A.    I have no knowledge of that.

NON-CERTIFIED COPY

1   Q.    Have you ever asked him?

2   A.    No, sir.

3   Q.    Did you do so?

4   A.    No, sir.

5   Q.    To your knowledge, did anyone else from

6 URS do so?

7   A.    No, sir.

8   Q.    I'll show you a document I'm marking as

9 Johnson 11.  It is an addendum to the Terracon report

10 dated August 5th, 2011.

11          (Whereupon, the document as described

12 above is so marked as "Johnson Exhibit No. 11" for

13 identification.)

14   A.    Yes.

15 EXAMINATION BY MR. BARRIERE:

16   Q.    Have you previously seen this addendum,

17 sir?

18   A.    Yes, sir.

19   Q.    How did you come to receive a copy of it?

20   A.    I don't recall.

21   Q.    Fair enough.

22          Would it have been approximately the time

23 it was issued?

24   A.    Yes.

25   Q.    In the first paragraph, second sentence

NON-CERTIFIED COPY

167

1  begins, "In the report," referencing the Terracon

2  report, "it was recommended to use a minimum 7-inch

3  concrete pavement thickness over a minimum 12 inches

4  of compacted river sand for the entire pavement

5  system.  Based on discussion with Mr. Tim Gaines with

6  URS Corporation, a standard duty pavement section is

7  recommended for the passenger vehicle areas in this

8  addendum report.  The standard duty pavement areas

9  should be rigid pavements constructed using a minimum

10 6-inch concrete pavement thickness over a minimum

11 12 inches of compacted river sand for the light duty

12 areas."

13         Do you see where I'm referring to?

14     A.    Yes.

15     Q.    Focusing not on the light duty areas but

16 the heavy duty areas, do you know what thickness was

17 recommended for that area?

18     A.    Seven inches.

19     Q.    Do you know what was actually constructed

20 in those areas?

21     A.    No, sir.

22     Q.    Have you ever inquired of anyone what was

23 constructed in the heavy duty areas?

24     A.    No, sir.

25     Q.    We just marked as Johnson No. 12 what has

NON-CERTIFIED COPY

169

1   Mr. Gaines?

2        A.    I do.

3        Q.    Okay.  Fair enough.

4              Let me show you next what has previously

5   been identified as Ryan No. 9.  It's an e-mail

6   exchange between Mr. Wynn and Mr. Thomas.  I believe

7   you are cc'd on both.

8              My first question is, do you recall

9   receiving that?

10       A.    Yes.

11       Q.    Mr. Wynn -- Mr. Thomas writes and suggests

12  that there be a final walkthrough.  And Mr. Wynn

13  replies on May 13th, "After reconsideration, due to

14  the unresolved issues with paving, acoustical panels

15  in the core, paneling in the Executive Area, roof

16  leaks, etc., I feel it would be fruitless to perform a

17  'final' walkthrough at this time."

18             This document may relate to Baton Rouge;

19  is that correct?

20       A.    Yes, sir.  This relates to Baton Rouge.

21       Q.    Okay.  Fair enough.

22             Was cracking and spalling a punch list

23  item in the Kenner facility?

24       A.    Yes.

25       Q.    Let me show you next a document I'll mark

NON-CERTIFIED COPY

173

1   keeping the area clean, basically; is that correct?

2        A.    Yes.

3        Q.    Anything else?

4        A.    Not that I recall.

5   MR. BARRIERE:

6            Let's go off the record.

7            (Whereupon, there was a discussion off the

8   record.)

9   EXAMINATION BY MR. BARRIERE:

10       Q.    Do you recall approximately the amount of

11  time that passed between the concrete being poured and

12  cured at Kenner and when spalling and cracking first

13  became noticeable?

14       A.    Kenner, we're talking about?

15       Q.    Yes.

16       A.    Instantly.

17       Q.    Did you discuss with anyone from MAPP why

18  spalling and cracking had appeared almost instantly?

19       A.    No.

20  MR. BARRIERE:

21           Phil, let's take two minutes, because I

22  may be done with this gentleman and I want to look at

23  my notes.

24  MR. FRANCO:

25           All right.

(504)831-1753
433 METAIRIE ROAD, #220
HUFFMAN & ROBINSON, INC.
CERTIFIED COURT REPORTERS
(800)749-1753
METAIRIE, LA 70005

NON-CERTIFIED COPY

| | |
|---|---|
| **From:** | Frankie Wynn |
| **Sent:** | Tuesday, June 11, 2013 1:25 PM |
| **To:** | John Jones; Dorsey, Stephan |
| **Subject:** | FW: H&E Equipment Services, Inc. / Expansion/Construction Joint Issues |

Frankie Wynn
Director of Facilities/Risk/Compliance Management
H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA  70809  (New Address)
Office:  225-298-5229
Mobile:  225-603-4438
Fax:  225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com

-----Original Message-----
From: Johnson, Neal [mailto:neal.johnson@urs.com]
Sent: Tuesday, June 11, 2013 12:26 PM
To: Frankie Wynn
Subject: RE: H&E Equipment Services, Inc. / Expansion/Construction Joint Issues

URS management is having a conference call this afternoon about the H&E Baton Rouge Branch pavement.
If I am directed, I will share the outcome.  If not, I will let you know that I do not know.
Neal

-----Original Message-----
From: Frankie Wynn [mailto:fwynn@he-equipment.com]
Sent: Tuesday, June 11, 2013 11:17 AM
To: Johnson, Neal
Cc: Dorsey, Stephan; Ryan, Thomas E; John Jones; Murray L. McCullough (murray@benchmarkgroupllc.com)
Subject: RE: H&E Equipment Services, Inc. / Expansion/Construction Joint Issues

Do you know when we will have an answer? We need to move forward on getting this issues addressed.

Frankie Wynn
Director of Facilities/Risk/Compliance Management H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA  70809  (New Address)
Office:  225-298-5229

1

Johnson
EXHIBIT NO. 9
HUFFMAN & ROBINSON, INC.
COURT REPORTERS

NON-CERTIFIED COPY

H&E 0033078

Mobile:  225-603-4438
Fax:  225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com


-----Original Message-----
From: Johnson, Neal [mailto:neal.johnson@urs.com]
Sent: Thursday, June 06, 2013 10:21 AM
To: Frankie Wynn
Cc: Dorsey, Stephan; Phillips, Dale (dphillips@mjwomack.com); Gauthier, Greg (ggauthier@mjwomack.com);
pbonner@mjwomack.com; Ryan, Thomas E; Sanders, Debra; John Jones; Murray L. McCullough
(murray@benchmarkgroupllc.com); Hill, Terry
Subject: RE: H&E Equipment Services, Inc. / Expansion/Construction Joint Issues

Frankie:
We will review the recommendation with Benchmark Group (our civil engineer of record) and request their
opinion
Regarding the request that URS participate in the cost of this work, this request will be forwarded to URS
management for their directive.
Sincerely,
Neal Johnson


-----Original Message-----
From: Frankie Wynn [mailto:fwynn@he-equipment.com]
Sent: Thursday, June 06, 2013 7:56 AM
To: Dorsey, Stephan; Phillips, Dale (dphillips@mjwomack.com); Gauthier, Greg (ggauthier@mjwomack.com);
pbonner@mjwomack.com; Ryan, Thomas E; Johnson, Neal; Sanders, Debra; John Jones
Subject: H&E Equipment Services, Inc. / Expansion/Construction Joint Issues

Attached is the latest recommendation to remedy the Expansion/Construction Joint issues at the H&E Baton
Rouge Branch.  This recommendation is unacceptable to H&E for several reasons, not the least of which is the
cost.  As the cause of this problem cannot be agreed upon by Womack or URS, I would suggest that both parties
agree to share the costs equally.  All parties knew well in advance of design and installation of the paved area,
the intended use.  All parties were asked throughout the project for any and all suggestions in all areas of design
and construction to voice any and all concerns and make recommendations.  I do not recall any alternatives to
the design and installation that were not followed by H&E.

As this issue will not correct itself and by its very nature grows worse each day, time is of the essence.
Let me know your solution as soon as possible.


Thank you

Frankie Wynn
Director of Facilities/Risk/Compliance Management H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA  70809  (New Address)
Office:  225-298-5229
Mobile:  225-603-4438

2

NON-CERTIFIED COPY

H&E 0033079

Fax: 225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

3

NON-CERTIFIED COPY

H&E 0033080

1

```
                19TH JUDICIAL DISTRICT COURT
            FOR THE PARISH OF EAST BATON ROUGE
                   STATE OF LOUISIANA
```

1

2

3

4  H&E EQUIPMENT SERVICES, INC.

                              DOCKET NO. 626,308

5  VERSUS

                              SECTION "D"

6  URS CORPORATION ARCHITECTURE,
   P.C., URS CORPORATION, L. O'NEAL
7  JOHNSON, AND THOMAS E. RYAN, III

8

9

10

11  Deposition of CHAD HERNDON, 18723 Manchac Highlands
   Drive, Prairieville, Louisiana 70769, taken in the
12  offices of Fishman Haygood, LLP, 201 St. Charles
   Avenue, 46th Floor, New Orleans, Louisiana 70170,
13  commencing at 9:36 a.m., on Monday, the 1st day of
   August, 2016.

14

15

16

17

18  APPEARANCES:

19

20      FISHMAN HAYGOOD, LLP
       (By:  Loretta G. Mince, Esquire)
       201 St. Charles Avenue, 46th Floor
21      New Orleans, Louisiana  70170-4600

22         ATTORNEYS FOR THE PLAINTIFF

23

24

25



EXHIBIT
3

NON-CERTIFIED COPY

2

1  APPEARANCES CONTINUED:

2

3          ADAMS AND REESE, LLP
           (By:  Philip A. Franco, Esquire)
4          701 Poydras Street, Suite 4500
           New Orleans, Louisiana  70139
5
                ATTORNEYS FOR THE DEFENDANTS
6

7

8

9

10

11

12

13

14

15

16

17  REPORTED BY:

18          Deanna Mancuso
            Certified Court Reporter
19          Huffman & Robinson, Inc.
            Suite 220, Metairie Office Tower
20          433 Metairie Road
            Metairie, Louisiana  70005
21          (504) 831-1753    (800) 749-1753

22

23

24

25

NON-CERTIFIED COPY

3

1                         I-N-D-E-X

2

3   EXAMINATION BY:                              PAGE

4     MS. MINCE                                   6

5

6

7

8

9   EXHIBITS:

10

11  Exhibit 1 ................................19
      E-mail with H&E Phase I proposal
12    Bates labeled H&E 5154 through 5157

13  Exhibit 2 ................................42
      E-mail with H&E Phase II proposal
14    Bates labeled H&E 5226 through 5229

15  Exhibit 3 ................................45
      E-mail dated February 6, 2007
16    Bates labeled H&E 5163

17  Exhibit 4 ................................50
      Letter dated July 2, 2008
18    Bates labeled H&E 6815 through 6817

19  Exhibit 5 ................................57
      E-mail dated July 23, 2008
20    Bates labeled URS 59032

21  Exhibit 6 ................................63
      Letter dated July 27, 2009
22    Bates labeled URS 38163 and 38164

23

24

25

NON-CERTIFIED COPY

4

1 | EXHIBITS CONTINUED:                          PAGE

2

3 | Exhibit 7 ...............................68
     E-mail with Short Form Agreement
4 |   for Professional Services and
     attachments Bates labeled
5 |   URS 38165 through 38174

6 | Exhibit 8 ...............................69
     Letter dated October 12, 2010
7 |   Bates labeled URS 55534

8 | Exhibit 9 ...............................73
     E-mail chain Bates labeled
9 |   H&E 65034 and 65035

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

5

1                    S-T-I-P-U-L-A-T-I-O-N

2

3            It is stipulated and agreed by and between

4   counsel for the parties hereto that the deposition

5   of the aforementioned witness is hereby being taken

6   under the Louisiana Code of Civil Procedure, Article

7   1421, et seq., for all purposes, in accordance with

8   law;

9            That the formalities of reading and

10  signing are specifically not waived;

11           That the formalities of filing, sealing,

12  and certification are specifically waived;

13           That all objections, save those as to the

14  form of the question and the responsiveness of the

15  answer, are hereby reserved until such time as this

16  deposition, or any part thereof, may be used or

17  sought to be used in evidence.

18

19             *      *      *      *

20

21           Deanna Mancuso, Certified Court Reporter,

22  in and for the State of Louisiana, officiated in

23  administering the oath to the witness.

24

25

NON-CERTIFIED COPY

6

1              CHAD HERNDON,

2 after having been first duly sworn by the above-

3 named certified court reporter, was examined and

4 testified as follows:

5 EXAMINATION BY MS. MINCE:

6      Q.    Good morning.

7      A.    Good morning.

8      Q.    We met a few minutes ago.  I'm Lori Mince.

9 I represent H&E Equipment in a lawsuit that's been

10 brought against URS.

11     A.    Okay.

12     Q.    You've been asked to appear, and thank you

13 for agreeing to appear here today.  I understand

14 you're not employed by URS anymore; is that correct?

15     A.    Correct.

16     Q.    Have you ever given a deposition before?

17     A.    Once.

18     Q.    In what kind of case?

19     A.    It was another case dealing with some

20 damage to some construction equipment.

21     Q.    Who was the plaintiff who was bringing the

22 case?

23     A.    It was a -- the company I was working for,

24 a company that sells and services construction

25 equipment.

NON-CERTIFIED COPY

7

1     Q.   Okay.  And is that Scott Equipment?

2     A.   Yes.

3     Q.   So Scott Equipment was bringing a case for

4 damage to construction equipment against who?

5     A.   A contractor that had rented it.

6     Q.   All right.  So you may remember from the

7 last time you gave your deposition, I'm just going

8 to ask a series of questions and you provide answers

9 to the best of your knowledge.  If you don't

10 understand one of my questions, just tell me that

11 and I'll try to rephrase it or give you more

12 information.  All right?

13    A.   Okay.

14    Q.   If you want to take a break at any time,

15 let me or Phil know that you want to take a break.

16    A.   Okay.

17    Q.   All right.  And if you have any questions

18 as we go through this about timing or process,

19 whatever, just let me know.

20    A.   Okay.  Will do.

21    Q.   What's your educational background?

22    A.   Attended high school and college.

23    Q.   What was your degree in in college?

24    A.   Business.

25    Q.   Where did you get that degree?

NON-CERTIFIED COPY

8

1    A.    Northeast Louisiana University.

2    Q.    And in what year?

3    A.    '99.

4    Q.    Have you had any additional formal

5 education other than that?

6    A.    No.

7    Q.    After you graduated in 1999 with your

8 business degree did you go to work?

9    A.    Yes.

10    Q.    Where?

11    A.    Scott Equipment.

12    Q.    Did you start that job in 1999?

13    A.    Yes.

14    Q.    What was your position?

15    A.    Equipment salesman.

16    Q.    And what type of equipment did you sell?

17    A.    Construction equipment.

18    Q.    Did Scott Equipment divide its sales force

19 into different types of construction equipment or

20 would you as a sales rep have the ability to sell

21 anything that Scott offered?

22    A.    They separate construction from forestry,

23 but other than that, it's within the -- that's the

24 only division.

25    Q.    And is H&E one of Scott Equipment's

NON-CERTIFIED COPY

9

1   competitors?

2       A.    Yes.

3       Q.    Are the types of equipment they -- H&E --

4   let me start over.

5             Is the type of equipment H&E sells and

6   rents very similar to the type of equipment that

7   Scott sells and rents?

8       A.    Yes.

9       Q.    How long did you hold the position of

10  salesman for Scott Equipment?

11      A.    Approximately two years.

12      Q.    And then what did you do?

13      A.    Got moved into a position as the rental

14  equipment manager.

15      Q.    Where?

16      A.    At Little Rock.

17      Q.    And what were your basic job duties as

18  rental equipment manager?

19      A.    Responsible for the operations, budgeting,

20  sales goal achievement, those that anyone that was

21  managing a department would have and managing a

22  sales force.

23      Q.    So then you took that position on in 2001?

24      A.    Approximately.

25      Q.    And how long did you have that position?

NON-CERTIFIED COPY

41

1      A.    He was hired as the principal architect in

2   the Baton Rouge office.  And this project, as you

3   can see, was divided into phases; and his starting

4   URS aligned with the start of another phase of the

5   project and so he took over the role as the

6   principal lead design architect from Mr. Van Hattum.

7      Q.    So that was after the completion of Phase

8   I?

9      A.    I don't know -- I don't recall if it was

10  after the completion of Phase I.  I don't recall

11  specifically.

12     Q.    It could have been during Phase I.  Is that

13  what you're saying?

14     A.    It could have been.  I don't -- I mean, to

15  that specific if you're asking if it was after the

16  completion of Phase I, I don't recall that.  That's

17  a specific time and everything, so I don't recall if

18  it was -- when that happened, after that or before

19  it was done, I don't recall.

20     Q.    All right.  There's a reference in this

21  proposal to a geotechnical report.  Do you have any

22  understanding of why a geotechnical report would be

23  needed for this project?

24     A.    It's a soils investigation that's required

25  to do the foundation design, the structural design.

NON-CERTIFIED COPY

45

1          Objection, asked and answered.

2          Give me a chance to object before you

3     answer.

4     THE WITNESS:

5          Okay.

6          (Exhibit 3 was marked for

7     identification.)

8 EXAMINATION BY MS. MINCE:

9     Q.   I'll show you a document I'll mark as

10 Exhibit Number 3.

11    A.   (The witness reviews.)

12    Q.   Do you recall this e-mail?

13    A.   Again, it comes -- has me listed on there,

14 so the specifics of it no, but --

15    Q.   Have you had an opportunity to discuss this

16 e-mail with anyone since it was sent in 2007?

17    A.   No.

18    Q.   The e-mail starts out, "We are working on

19 the design for the yard."

20          Who is the "we" that you're referring to

21 when you say we?

22    A.   URS.

23    Q.   Then it says we "need to know the load

24 information of the equipment to design to.  If you

25 have some general information that you usually give

NON-CERTIFIED COPY

46

1  the engineers designing your yards and could pass to

2  me, that would be great."

3       Did you receive any general information

4  that H&E gave to engineers designing their yards?

5       A.   No.

6       Q.   All right.  Then in the last paragraph --

7  or the last two sentences say, "If you just want to

8  give me the model numbers I am sure that I can find

9  the specs online.  Thank you and have a great day."

10       Does that refresh your recollection that

11  the specs for the equipment were available online?

12       A.   I can't answer with certainty that the

13  specific model numbers would have been accessible,

14  but that was an attempt by me to gain some

15  information, yes.

16       Q.   And did Mr. St. Germain or Mr. Jones, both

17  of whom are on this e-mail, did they provide you

18  with model numbers for the equipment?

19       A.   Not to my recollection, no.

20       Q.   So they might have but you don't remember

21  as you sit here today?

22       MR. FRANCO:

23            Objection, asked and answered.

24  EXAMINATION BY MS. MINCE:

25       Q.   I'm just trying to understand your answer.

NON-CERTIFIED COPY

47

1    MR. FRANCO:

2        Objection, asked and answered.

3    MS. MINCE:

4        No, I'm not trying to understand your

5    objection.  I'm trying to understand his

6    answer.

7    MR. FRANCO:

8        No, no, no.  I understand.  He

9    answered the question.

10   EXAMINATION BY MS. MINCE:

11   Q.   So you said you don't --

12   MS. MINCE:

13       Read back what his answer was.  I

14   don't want to misstate it.

15       (whereupon, the previous answer was

16   read back by the court reporter.)

17   EXAMINATION BY MS. MINCE:

18   Q.   So does that mean they might have provided

19   you with the information but you do not recall that

20   specifically as you sit here today?

21   A.   Correct.

22   Q.   You knew what equipment H&E sold and

23   rented, correct?

24   A.   In what terms?

25   Q.   You worked for their competitor, Scott

NON-CERTIFIED COPY

48

1  Equipment, for several years so you had at least

2  some familiarity with the equipment that H&E sold

3  and rented; am I right?

4      A.   Some familiarity, yes.

5      Q.   And H&E maybe sold different manufacturers

6  than Scott; is that fair?

7      A.   Different manufacturers as well as

8  different equipment.

9      Q.   What type of equipment did H&E sell and

10 rent that Scott did not?

11     A.   Cranes and many other pieces that I

12 don't -- that I don't recall specifically, but the

13 two -- they don't sell the exact kind of -- the

14 exact same equipment and that's what I'm saying.  So

15 it's not a perfect alignment.

16     Q.   Were you aware that H&E sold metal track

17 equipment?

18     A.   Yes.

19     Q.   Did you have any discussions with

20 Mr. St. Germain or Mr. Jones about this e-mail?

21     A.   What kind of discussions?

22     Q.   Let me ask this:  Do you recall receiving a

23 written response to this e-mail?

24     A.   No.

25     Q.   Do you recall having a phone conversation

NON-CERTIFIED COPY

From:       Chad_Herndon@URSCorp.com
Sent:       Tuesday, February 06, 2007 1:05 PM
To:         Leonard StGermain
Cc:         John Jones
Subject:    Equipment Yard design info request


Leonard,

We are working on the design for the yard and need to know the load information of the
equipment to design to. If you have some general information that you usually give the
engineers designing your yards and could pass to me that would be great. The main things that
we are looking for are the gross weight of the heaviest machine, spacing between tires and
tire pressures. The typical info found in specification literature. If you just want to give
me the model numbers I am sure that I can find the specs on line. Thank you and have a great
day.

Chad Herndon
Senior Planner
URS Corporation
7389 Florida Blvd., Suite 300
Baton Rouge, LA 70806

Phone: 225.922.5856
Mobile: 501.944.7222
Email: chad_herndon@urscorp.com


This e-mail and any attachments are confidential. If you receive this
message in error or are not the intended recipient, you should not retain,
distribute, disclose or use any of this information and you should destroy
the e-mail and any attachments or copies.

1



Herndon
EXHIBIT NO. 3
HUFFMAN & ROBINSON, INC.
COURT REPORTERS

NON-CERTIFIED COPY

1

1          19TH JUDICIAL DISTRICT COURT
2            PARISH OF EAST BATON ROUGE
              STATE OF LOUISIANA
3

4

5

   H&E EQUIPMENT SERVICES, INC    *    DOCKET NO.
6                                 *    626,308
   VERSUS                         *
7                                 *    SECTION:  "D"
   URS CORPORATION ARCHITECTURE,  *
8  P.C., URS CORPORATION, L.      *
   O'NEAL JOHNSON, AND THOMAS E.  *
9  RYAN, III                      *
                                  *
10 *  *  *  *  *  *  *  *  *  *    *

11

12

13

14

15          Deposition of THOMAS EDMOND RYAN, II, 37414
   Provence Point, Prairieville, Louisiana, 70769, taken
16 in the offices of Fishman Haygood, 201 St. Charles
   Avenue, 46th Floor, New Orleans, Louisiana,
17 70170-4600, commencing at 9:56 a.m., on Tuesday, the
   2nd day of August, 2016.

18

19

20

   APPEARANCES:
21

22    FISHMAN HAYGOOD
      (By:  Brent B. Barriere, Esquire)
23    201 St. Charles Avenue
      46th Floor
24    New Orleans, Louisiana  70170-3500
          (Attorneys for the Plaintiff)
25


EXHIBIT
4

NON-CERTIFIED COPY

2

1    ADAMS AND REESE
      (By:  Philip A. Franco, Esquire)
2    4500 One Shell Square
      New Orleans, Louisiana  70139
3        (Attorneys for the Defendant)

4

5

6  ALSO PRESENT:

7

    Neal Johnson

8

9

10

11

12

13

14

15

16

17

  REPORTED BY:

18

    WENDY MAJORIA, CCR
19   Certified Court Reporter
    (No. 84106)
20   Huffman & Robinson, Inc.
    Suite 220, Metairie Office Tower
21   433 Metairie Road
    Metairie, Louisiana  70005
22   (504) 831-1753/(800) 749-1753
    (504) 831-1759/fax

23

24

25

NON-CERTIFIED COPY

3

# EXAMINATION INDEX

PAGE

EXAMINATION BY MR. BARRIERE.....................7

# EXHIBIT INDEX

Ryan Exhibit No. 1..............................36
     (Document titled "Report of Geotechnical
      Investigation" done by Soil Testing Engineers)

Ryan Exhibit No. 2..............................44
     (E-mail between Chad Herndon and
      Leonard St. Germain dated February 6, 2007)

Ryan Exhibit No. 3..............................48
     (E-mail from Thomas Ryan to Murray
      McCollough dated March 4, 2011)

Ryan Exhibit No. 4..............................52
     (Revised drawings)

Ryan Exhibit No. 5..............................55
     (Project Manual)

Ryan Exhibit No. 6..............................59
     (E-mail to Leonard Gaines from Hongwei
      Zhao dated August 4, 2011)

NON-CERTIFIED COPY

4

1  EXHIBITS (continued):

2

3  Ryan Exhibit No. 7.........................60
       (E-Mail exchange between Stephan Dorsey
4       and Frankie Wynn dated October 1, 2012)

5  Ryan Exhibit No. 8.........................64
       (E-mail from Jeff Stringer to Frankie Wynn,
6       Philip Bonner, and John Jones dated
7       May 3, 2013)

8  Ryan Exhibit No. 9.........................76
       (E-Mail exchange between Thomas Ryan
9       and Frankie Wynn dated May 10th and
10      May 13, 2013)

11  Ryan Exhibit No. 10.........................80
       (E-mail from Stephan Dorsey dated
12      June 6, 2013)

13

14  Ryan Exhibit No. 11.........................92
       (E-Mail exchange between Frankie Wynn
15      and Neal Johnson dated June 24, 2013)

16  Ryan Exhibit No. 12.........................100
       (Construction drawings for Kenner project)
17                   (not attached)

18

19  Ryan Exhibit No. 13.........................102
       (Document titled "Kick-off Meeting Minutes")

20

21  Ryan Exhibit No. 14.........................104
       (Document titled "Geotechnical Engineering
22      Report" for Kenner project prepared by
        Terracon)

23

24  Ryan Exhibit No. 15.........................111
       (E-Mail exchange between Tim Gaines and Mr.
25      Barkataki)

NON-CERTIFIED COPY

5

1  EXHIBITS (continued):

2

3  Ryan Exhibit No. 16..........................112
        (E-Mail with part of construction
4        manual for Kenner project)

5
  Ryan Exhibit No. 17..........................113
6        (E-mail exchange between Thomas Ryan and
         Frankie Wynn of March 2012)
7

8  Ryan Exhibit No. 18..........................115
        (E-Mail exchange between Neal Johnson and
9        Tim Gaines dated August 3, 2012)

10
  Ryan Exhibit No. 19..........................119
11        (E-mail exchange between Ottis Seaborn and
         Frankie Wynn dated October 4, 2012)
12

13  Ryan Exhibit No. 20..........................124
         (Document titled "H&E Items of Contention")
14                    (not attached)

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

6

# STIPULATION

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, in accordance with law;

That the formalities of reading and signing are specifically not waived;

That the formalities of filing, sealing and certification are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

*    *    *    *

WENDY MAJORIA, Certified Court Reporter, State of Louisiana, officiated in administering the oath to the witness.

NON-CERTIFIED COPY

7

1                    THOMAS EDMOND RYAN, II,

2    after having been first duly sworn by the above-

3    mentioned Certified Court Reporter, was examined and

4    testified as follows:

5    EXAMINATION BY MR. BARRIERE:

6        Q.    Good morning, again, sir.  My name is Brent

7    Barriere.  I'm a partner here at Fishman Haygood, and

8    I'll be taking your deposition today on behalf of H&E

9    Equipment Services.

10             Can I have your full name and address for

11   the record, sir.

12       A.    Thomas Edmond Ryan, II, 37414 Provence

13   Point Avenue, Prairieville, Louisiana, 70769.

14       Q.    Mr. Ryan, by whom are you employed?

15       A.    I am employed by Trinity Business

16   Corporation.

17       Q.    All right.

18       A.    Trinity Business Group.

19       Q.    And how long have you been employed by

20   Trinity?

21       A.    Since November of last year.  So --

22       Q.    Okay.

23       A.    -- eight months.

24       Q.    All right.  And were you at one time

25   employed by URS?

NON-CERTIFIED COPY

19

1  office.

2      Q.    And I think you used the term "job server."

3  Did I hear you correctly?  No?

4      A.    Unh-unh (indicating negatively).  The --

5      Q.    The place you put the notes.

6      A.    Job file.

7      Q.    Job file.  Okay.

8      A.    File, right.  It was a folder on the

9  server.

10     Q.    Did you maintain or retain any documents

11 that in any way pertained to the Baton Rouge project

12 after you left URS?

13     A.    No.

14 MR. BARRIERE:

15         I am not going to attach this for obvious

16     reasons, Phil.

17 MR. FRANCO:

18         Thank you.  I appreciate it.

19 EXAMINATION BY MR. BARRIERE:

20     Q.    I hand to you what I understand to be a

21 complete set of the design drawings for the H&E Baton

22 Rouge project.

23         Can you confirm that this is the set of

24 drawings that existed at the time you came to work

25 there?

NON-CERTIFIED COPY

20

1    A.    It appears to be.

2    MR. FRANCO:

3        You don't want him to go through every one,

4    do you?

5    THE WITNESS:

6        That pretty much tells me (indicating).

7 EXAMINATION BY MR. BARRIERE:

8    Q.    And you were pointing to something that

9 tells you what?

10    A.    Just the -- the state of this or the status

11 of this.

12    MR. FRANCO:

13        For the record, he's pointing to where it

14    says in the drawings, "95 Percent Construction

15    Documents Permit Set."

16        Is that right?

17    THE WITNESS:

18        Yeah.  And -- well, yeah, and the date.

19    MR. FRANCO:

20        And the date at the bottom is

21    February 27, 2009?

22    THE WITNESS:

23        That's right.

24    MR. BARRIERE:

25        Okay.

NON-CERTIFIED COPY

33

1    Q.    Okay.  Is there anyone at --

2    A.    Well, I take that back.  Since this was

3  issued before I started working there, then, yes, they

4  were.

5    Q.    And, indeed, as we thought, this entire set

6  of plans concerning the yard was generated by

7  Benchmark?

8    A.    Uh-huh (indicating affirmatively).

9    Q.    And I think you mentioned, based on the

10  date, would have been generated sometime prior to

11  February of 2009.

12    A.    Correct.

13    Q.    Correct?

14    A.    Correct.

15    Q.    Besides Mr. McCullough, is there anyone

16  else at Benchmark with whom you interacted in

17  connection with the Baton Rouge project?

18    A.    Wes Wilburn, I think.

19    Q.    Wes Wilburn?

20    A.    Wes --

21  THE WITNESS:

22        What is Wes's last name?

23  MR. JOHNSON:

24        Wilkinson.

25  THE WITNESS:

NON-CERTIFIED COPY

36

1    those related discussions?

2        A.    The negotiations, no.

3        Q.    Mr. Ryan, I'm going to hand you what we've

4    marked as Exhibit 1.  It is the geotechnical report of

5    Soil Testing Engineers with respect to the Baton Rouge

6    project.

7            (Whereupon, the document as described

8    above is so marked as "Ryan Exhibit No. 1" for

9    identification.)

10       A.    Okay.

11           (Witness reviews document.)

12   EXAMINATION BY MR. BARRIERE:

13       Q.    First question, very simple, which is, have

14   you previously seen that document?

15       A.    Yes.

16       Q.    All right.  Were you provided a copy of

17   that after you went to work at URS but during the

18   course of your work on the Baton Rouge project?

19       A.    Yes.

20       Q.    All right.  Why did you -- as you

21   understood it, why were you provided with a copy of

22   this?

23       A.    As part of the project information that I

24   needed to -- for reference.

25       Q.    Okay.  You told us earlier that in order to

NON-CERTIFIED COPY

37

1  familiarize yourself with this project, you went back

2  to look at some of the design drawings and other

3  construction documents.

4          Would this have been among the documents

5  you reviewed at that time?

6      A.    I would say yes, but just -- yeah, it would

7  be.  Not very in-depth, but yes.

8      Q.    You anticipated my next question, I think,

9  which is, have you ever spoken with anyone at Soil

10 Testing concerning Exhibit No. 1?

11     A.    Through the life of the project?

12     Q.    Yes.

13     A.    Yes.

14     Q.    Okay.  Tell me about that.  To whom did you

15 communicate?

16     A.    I don't remember who it was.

17     Q.    Why did you communicate with that person at

18 Soil Testing?

19     A.    I think -- let's see.  This was in

20 coordination with the structural engineer for the

21 foundation of the building.  We talked to them about

22 their recommendations for the slab and pile structure.

23     Q.    Do you recall speaking with anyone at Soil

24 Testing in any way related to the yard?

25     A.    To the yard?  Not that I recall.

NON-CERTIFIED COPY

72

1 the proposed solution to those problems?

2     A.    We -- I created some observation reports,

3 our typical observation reports with notes and

4 photographs.

5     Q.    Beyond providing you assurances that the

6 DOT specifications had been complied with, did

7 Mr. McCullough provide you with any detail as to

8 compliance?

9     A.    I don't understand.

10     Q.    Let me try again.

11          Did you or, to your knowledge, anyone else

12 at URS actually walk through DOT specifications in

13 their discussions with Mr. McCullough?

14     A.    I don't recall.

15     Q.    You did not do that?

16     A.    No, I did not.

17     Q.    All right.  Indeed, based on your earlier

18 testimony, at that time you really weren't in a

19 position to do so since you weren't familiar with the

20 specifications; is that correct?

21     A.    Yes.

22     Q.    Are you familiar with those specifications

23 today?

24     A.    Yes, vaguely.

25     Q.    Okay.  Have you had -- have you been

NON-CERTIFIED COPY

76

1  staff, does it not?

2      A.    Yes.

3      Q.    All right.  And it provides civil engineer

4  services?

5      A.    Correct.

6      Q.    And, indeed, it did so in connection with

7  the Kenner project?

8      A.    Yes.

9      MR. BARRIERE:

10         Phil, remind me.  What number did we mark

11     the Stringer --

12     MR. FRANCO:

13         Eight.

14 EXAMINATION BY MR. BARRIERE:

15     Q.    Mr. Ryan, I'm going to show you what I've

16 marked as Ryan No. 9.  It's an e-mail exchange between

17 yourself and Mr. Wynn of May 10th and May 13, 2013.

18         (Whereupon, the document as described

19 above is so marked as "Ryan Exhibit No. 9" for

20 identification.)

21 EXAMINATION BY MR. BARRIERE:

22     Q.    I'll ask you if you recall that e-mail

23 exchange?

24     A.    Yes.

25     Q.    You recall receiving that document?

NON-CERTIFIED COPY

77

1    A.    Yes.

2    Q.    All right.  Mr. Wynn writes to respond to

3 your suggestion of a final walk-through and writes,

4 quote, "After reconsideration, due to the unresolved

5 issues with paving, acoustical panels in the core,

6 paneling in the Executive Area, roof leaks, etc., I

7 feel it would be fruitless to perform a 'final'

8 walkthrough at this time."

9         Do you see what I'm referring to?

10   A.    Yes.

11   Q.    All right.  What did you understand to be

12 the unresolved issues with paving referenced by

13 Mr. Wynn in this e-mail?

14   A.    The cracking joints -- cracking and

15 spalling joints.

16   Q.    All right.  So the same issue we've been

17 discussing for the last several minutes?

18   A.    Right.

19   Q.    All right.  And what did you understand to

20 be the issue with respect to the acoustical panels in

21 the core?

22   A.    There were some acoustical panels on the

23 wall around the core of the building, which was the

24 center part of the building with the conference room,

25 bathroom, that those walls were curved and the panels

NON-CERTIFIED COPY

78

1  were glued to the wall and popping off.

2      Q.    And how was that problem resolved, or was

3  it resolved?

4      A.    It was resolved.  To my recollection, they

5  screwed them onto the wall.  No.  No.  I'm sorry.

6  They screwed some edging, some metal edging onto the

7  wall to hold them in place, the contractor did.

8      Q.    The next issue addresses the paneling in

9  the executive area.  Do you know what he's referring

10  to there?

11      A.    Yes.

12      Q.    And what is that?

13      A.    That's the stained wood paneling on the

14  walls in -- in the executive office area.

15      Q.    Can you describe in any greater detail what

16  the perceived problem was as of May 2013?

17      A.    Some of the stained panels warped and

18  were -- were warped.

19      Q.    Okay.  Do you know how that problem was

20  ultimately resolved?

21      A.    I do not.

22      Q.    Okay.  Do you know who paid for the fix?

23      A.    I do not.

24      Q.    Do you know, was the fix of that perceived

25  problem a change order paid for by H&E?

NON-CERTIFIED COPY

80

1    A.    Yes.

2    Q.    Do you recall, approximately -- this e-mail

3 exchange occurs in mid-May, specifically May 13th,

4 2013.

5          Do you recall, approximately, when that

6 final walk-through occurred?

7    A.    I don't.  I would -- no, I don't.

8    Q.    To the best of your knowledge, which of the

9 issues identified in Mr. Wynn's e-mail of May 13th

10 were resolved as of the final walk-through?

11   A.    The acoustical panels and I believe the

12 paneling in the executive area.  I know the acoustical

13 panels were.

14   Q.    But not the problem with spalling and

15 cracking?

16   A.    Correct.

17   THE WITNESS:

18          Do you mind if I run to the bathroom?

19   MR. BARRIERE:

20          Please.

21          (Whereupon, a recess in the proceedings was

22    taken.)

23   MR. BARRIERE:

24          Let's turn to what we're marking as

25    Ryan No. 10, which is an e-mail authored by

NON-CERTIFIED COPY

103

1          Which project?

2     THE WITNESS:

3          I'm sorry.  That's the Kenner project.

4 EXAMINATION BY MR. BARRIERE:

5     Q.    Did you author those minutes?

6     A.    Yes.

7     Q.    Okay.  Now, who is Bill Temple?

8     A.    Temple?  I don't recall Bill Temple.

9     Q.    Okay.  You don't recall Bill Temple being

10 associated with the Kenner project?

11    A.    That name sounds familiar, but, no, I

12 don't.

13    Q.    Okay.  How about Michael Perkins?  Do you

14 recall that person?

15    A.    Yes.

16    Q.    Who is Mr. Perkins?

17    A.    Mike Perkins was with the mechanical and

18 plumbing engineering firm.

19    Q.    And how about Craig Hebert?

20    A.    Yes.  He was the electrical engineer.

21    Q.    And all of those folks remained involved

22 with the project?

23    A.    Yes.

24    Q.    All right.  So let me show you next what

25 I'll mark as Ryan No. 14 and ask if you can identify

NON-CERTIFIED COPY

104

1 this as the geotechnical report for the Kenner project

2 prepared by Terracon.  It bears a cover e-mail to you.

3         (Whereupon, the document as described above

4     is so marked as "Ryan Exhibit No. 14" for

5     identification.)

6     A.    Yes.

7 EXAMINATION BY MR. BARRIERE:

8     Q.    Correct me if I'm wrong, sir, but you had

9 been responsible for soliciting proposals from

10 ultimate parties to provide the geotechnical report?

11     A.    Yes.

12     Q.    All right.  Beyond that, what role, if any,

13 did you have with respect to the review -- the

14 obtaining of or the review and analysis of the

15 geotechnical report?

16     A.    Once we got it, I reviewed it and I relayed

17 it to the structural and civil engineers.  And I

18 discussed it with them, their -- their designs once

19 they started working.

20     Q.    If I can ask you to turn to Page 11.

21     A.    Of the report?

22     Q.    Yes, sir.

23     A.    (Witness complies.)

24     Q.    It's also Bates stamped H&E 5388.

25         Have you got it?

NON-CERTIFIED COPY

107

1       Q.    The next paragraph reads, "Based upon the
2   soil conditions at the site, rigid pavements should be
3   designed and constructed using a minimum 7-inch
4   concrete pavement thickness over a minimum 12 inches
5   of compacted river sand."

6            Did you ever discuss that recommendation
7   with Mr. Gaines?

8       A.    I don't recall.  I mean, we had many
9   discussions about the site, but that particular -- not
10  that I recall.

11      Q.    Okay.  Now, you ultimately learned or you
12  observed, I take it, that there were spalling issues
13  at Kenner --

14      A.    Correct.

15      Q.    -- correct, in the concrete yard there
16  where the heavy equipment was stored, correct?

17      A.    Right.

18      Q.    All right.  Did Terracon play any role in
19  the evaluation of the cause of those conditions?

20      A.    Terracon?  I don't recall them being
21  involved.

22      Q.    Do you recall any outside facility being
23  brought in to analyze why spalling was occurring at
24  the Kenner facility?

25      A.    No, not to my knowledge.  You know, later

NON-CERTIFIED COPY

110

1    A.    I don't recall which one, but, yeah, there
2 was reinforcement used.

3    Q.    All right.  Do you know what reinforcement
4 was actually employed?

5    A.    I don't recall, not without looking at the
6 drawings.

7    Q.    Okay.  Terracon then says, "Other standard
8 design and construction details for rigid pavements as
9 contained in ACI330R-01 "Guide for Design and
10 Construction of Concrete Parking Lots" should be
11 followed in the pavement design and construction
12 process."

13          We looked -- we can certainly go back and
14 look at that exhibit, but you'll recall we looked at
15 that publication earlier.  Did you ever review that
16 publication in connection with the Kenner facility?

17    A.    Not that I recall, no.

18    Q.    Okay.  And you're not aware of whether
19 anyone else from URS did?

20    A.    I can't say whether or not Tim Gaines did.

21    Q.    All right.  You just don't know, one way or
22 the other?

23    A.    I'm sorry.  What?

24    Q.    You just do not know, one way or the other?

25    A.    Correct.

NON-CERTIFIED COPY

119

1   control joints?

2       A.    Without looking at the drawings, I would

3   only be assuming.

4       Q.    Okay.  In order to evaluate whether or not

5   the details were correct, what materials, if any, did

6   you reference or review?

7       A.    I don't recall.  We had just discussions

8   with Tim and the soils report.

9       Q.    Okay.

10      A.    I'm sorry.  The geotechnical report.

11      Q.    Did you have sufficient expertise in order

12  to evaluate whether or not this design by Mr. Gaines

13  was correct?

14      A.    I would say no.

15  MR. FRANCO:

16          Would you read back that last question,

17      please?

18          (Whereupon, the preceding question was read

19      back by the court reporter.)

20  EXAMINATION BY MR. BARRIERE:

21      Q.    Let me show you next an exchange of e-mail

22  between Mr. Ottis Seaborn at MAPP and Frankie Wynn --

23  you're shown as a cc -- and ask you if you recall

24  receiving that.  I'll mark as Ryan No. 19 the

25  exchanges on October the 4th, 2012.

NON-CERTIFIED COPY

120

1          (Whereupon, the document as described

2     above is so marked as "Ryan Exhibit No. 19" for

3     identification.)

4     A.     Yes, I do.

5  EXAMINATION BY MR. BARRIERE:

6     Q.     Who is Mr. Seaborn?

7     A.     Ottis was the superintendent at the Kenner

8  facility for MAPP Construction.

9     Q.     Okay.  All right.  Mr. Wynn had written at

10 7:25 on 4th of October, 2012, quote, "I have seen no

11 new plan, ideas, suggestions or solutions to the

12 crumbling concrete at the joints in the paved area or

13 cracks in the slab.  Guys please understand, this is

14 not going away.  Our Region VP, John Engquish, Jr.

15 continues to ask me when this will be addressed.  I

16 need an answer for him and for me."

17        Mr. Seaborn writes, "We plan to do the

18 following, to address the concrete issues at H&E

19 (Kenner)," bullet point, "Clearly identify areas of

20 concern."  And he goes through some of the areas of

21 concern.

22        Were you a party to any meetings or

23 conferences by phone conducted to identify areas of

24 concern?

25     A.     Yes.

NON-CERTIFIED COPY

121

1    Q.    All right.  Who else participated in those?

2    A.    Ottis.  And other than that, I don't recall

3 who else.

4    Q.    Okay.

5    A.    Hold up.  Tim Gaines came with me to -- to

6 look at the extent and locations of the cracks in the

7 joints.

8    Q.    The next bullet point is "Classify & label

9 problem areas:  A) structural failure.  B) cosmetic

10 defect.  C) Design conflict/Equipment travel damaged

11 area.  D) Installation error & Product failure/under

12 performance."

13        Was the equipment yard labeled under either

14 A, B, C or D?

15    A.    Labeled?  What do you mean?  Did

16 somebody --

17    Q.    He says, "Classify & label problem areas."

18 Was that done with respect to the yard?

19    A.    I don't recall seeing that.  That's

20 something Ottis would have put together.

21    Q.    Okay.  Who was URS's person responsible for

22 addressing the spalling issues with respect to the

23 joints in Kenner?

24    A.    Me, Neal and Tim.

25    Q.    Were you ever informed whether Ottis or

NON-CERTIFIED COPY

122

1  anyone else had classified the yard area as suggested

2  by the bullet point I just read to you?

3       A.    I don't recall seeing a drawing showing

4  that.

5       Q.    Okay.  Next bullet point was, "Provide

6  options of known proven solutions."

7             Do you recall what, if anything, was

8  suggested as a known and proven solution for the

9  spalling in the yard area?

10      A.    Yeah.

11      Q.    What was that?

12      A.    There was an epoxy -- there's an epoxy

13  compound.  S-I-K-A, I think, was the name of the

14  product.  Sika, S-I-K-A.  But they suggested filling

15  the joints with this epoxy product.

16      Q.    Was that ever done?

17      A.    No.

18      Q.    Why not?

19      A.    After talking about it in our office, we

20  recommended that that's not the way that it would be

21  fixed.  The epoxy was stronger than the concrete, and

22  that would only push the cracks out and make it worse

23  down the road.

24      Q.    Was any other solution discussed?

25      A.    Yes.  There was a -- there was a solution

NON-CERTIFIED COPY

123

1  to cover the joints with a steel plate.

2         Q.    Okay.  Was that implemented?

3         A.    No.

4         Q.    Why not?

5         A.    We were told by H&E to not pursue it.

6         Q.    Who at H&E informed you?

7         A.    Frankie Wynn.

8         Q.    Did you ever price the steel plate

9  solution?

10        A.    We did not.  MAPP Construction developed --

11  or came up with a price for a test section.  I think

12  it was about a 12, maybe 15-feet long test section.

13        Q.    All right.  So this was just going to be a

14  test area.  You would find out whether this was

15  abating or retarding the spalling --

16        A.    Right.

17        Q.    -- before you did it throughout the yard?

18        A.    Correct.

19        Q.    All right.  Did MAPP ever do the test

20  section?

21        A.    No.

22        Q.    Ottis's final suggestion was to "Meet,

23  discuss & select the best solution & execute."

24              Did that ever occur?

25        A.    To my knowledge, no.

NON-CERTIFIED COPY

134

1  drawings; is that correct?

2      A.    The oil-water separator was not in the

3  drawings --

4      Q.    Okay.

5      A.    -- as far as I recall.

6      Q.    Do you recall there was a series of change

7  orders I think at the Baton Rouge facility for

8  modifications dictated by the fire marshal or the

9  Baton Rouge building inspector, life safety issues,

10 principally?

11     A.    With regard to what?

12     Q.    I've got quite a list here.  I was trying

13 to find out whether you were responsible for them

14 before we went through them.

15     A.    I remember some, yes.

16     Q.    Electrical engineer added missing duct

17 detectors during his review of first alarm shop

18 drawings.

19     A.    Correct.

20     Q.    Ceiling and stairwell was not shown in the

21 bid documents to be fire rated.

22     A.    I'm sorry.  What part of the --

23     Q.    The ceiling and the stairwell.

24     A.    Ceiling and stairwell, yeah.

25     Q.    I'm really not trying to waste your time

NON-CERTIFIED COPY

H & E 0000211

# REPORT OF

# GEOTECHNICAL INVESTIGATION
## PROPOSED H & E BUILDINGS
## PECUE LANE
## BATON ROUGE, LOUISIANA

## FOR

## URS CORPORATION
## 7389 FLORIDA BOULEVARD
## BATON ROUGE, LOUISIANA

**STE**

**Soil Testing Engineers, Inc.**

Geotechnical, Environmental & Materials Consultants

Baton Rouge, LA        New Orleans, LA

Ryan
EXHIBIT NO. 1
HUFFMAN & ROBINSON, INC.
COURT REPORTERS

NON-CERTIFIED COPY



# STE
## Soil Testing Engineers, Inc.

316 HIGHLANDIA DRIVE (70810) • P.O. BOX 83710 (70884) • BATON ROUGE, LOUISIANA
PHONE (225) 752-4790 • FAX (225) 752-4878 • www.STEofLA.com

GORDON P. BOUTWELL, JR., Ph.D.
CHAD M. POCHE, MS
KELLIE T. McNAMARA
KEITH SPAMPNETO
RICARDO de ABREU, Ph.D.

_REGISTERED PROFESSIONAL ENGINEERS_

January 11, 2007

URS Corporation
7389 Florida Boulevard
Suite 300
Baton Rouge, LA  70806
(225) 752-2490

Attn:  Ms. Suzanne McCain, P.E.

Re:   Geotechnical Investigation
      Proposed H & E Buildings
      Pecue Lane
      Baton Rouge, Louisiana
      STE File: 06-1133

Dear Suzanne:

We have completed the geotechnical investigation for this project, and our findings, together with the analyses and conclusions based on them, are submitted in the attached report. This work was authorized by your acceptance of our proposal P0601-0714, dated July 21, 2006.

We will be pleased to discuss any questions you may have concerning this report.  It has been a pleasure to work with you on this project and we look forward to serving you in the future.

Sincerely,
Soil Testing Engineers, Inc.

_Megan E. Bourgeois_

Megan E. Bourgeois, E.I.
Project Engineer

_Keith Spampneto_

Keith J. Spampneto, P.E.
Senior Engineer

STATE OF LOUISIANA
KEITH J. SPAMPNETO
License No. 30198
PROFESSIONAL ENGINEER
CIVIL ENGINEERING

MEB/KJS/meb

(1) bound original; (2) bound copies; (1) unbound copy

06-1133
H & E Buildings

GEOTECHNICAL, ENVIRONMENTAL & MATERIALS CONSULTANTS

BILOXI, MISSISSIPPI • (228) 324-2272          METAIRIE, LOUISIANA • (504) 835-2593

NON-CERTIFIED COPY

H & E 0000212



**STE**
Soil Testing Engineers, Inc.

# REPORT OF
# GEOTECHNICAL INVESTIGATION
# PROPOSED H & E BUILDINGS
# BATON ROUGE, LOUISIANA

The findings of this geotechnical investigation are presented below, together with our evaluations and conclusions. The field and laboratory procedures used in this investigation, a description of terms and symbols used on the boring logs, the boring logs, graphs of deflection vs. lateral load, swell test results, and the boring plan are included in the Appendix.

## 1.0    SITE CONDITIONS

In a geotechnical investigation of this nature, various aspects of site conditions must be taken into consideration. Subsurface conditions (soil and ground water) have been investigated by performing soil borings. An understanding of site topography and the geology of the area is based upon observations made during the soil boring program and review of information in our files. The following paragraphs provide a discussion of these various site conditions:

### 1.1    Location & Topography

The project site is located at the intersection of Pecue Lane and Airline Highway in Baton Rouge, Louisiana. The property is located on the west side of the intersection. The entire site is covered with short grass and is level with little to no change in elevation.

### 1.2    Geology

Geologically, the site is underlain by Prairie Terrace Deposits of the Pleistocene Age. These deposits consist of light gray to orange-brown clay, silty clay, and silt.

### 1.3    Soil Conditions

One 40-foot soil boring, one 24-foot soil boring, four 20-foot soil borings, and four 6-foot soil borings were drilled for this project. The borings were sampled continuously within the upper 10 feet and at 5-foot centers thereafter.

The soil conditions encountered at the boring locations consist of generally medium to very stiff silty clay and medium to hard clay.

This description is meant solely as an aid in visualizing the subsurface conditions and does not define the continuity of strata between and away from the boring locations. For details of the conditions encountered at the boring locations, refer to the individual boring logs in the Appendix.

NON-CERTIFIED COPY

H & E 0000213



**STE**
**Soil Testing Engineers, Inc.**

## 1.4    Ground Water

The soil borings were initially dry augered in order to locate ground water and observe its short-term rise characteristics. Free water was not encountered to the augered depths in any of the borings. All borings were dry augered in the upper 10 feet.

The presence of and depth to ground water can fluctuate with rainfall or other seasonal variations and should be verified prior to beginning any construction operations affected by ground water. This is particularly true if construction is performed in a season other than that during which the borings were performed.

## 2.0    PROJECT CONSIDERATIONS

This section provides information regarding the project that is pertinent to the geotechnical investigation. This information includes a description of the project as provided to this office, a statement of the limitations inherent to an investigation of this nature, and a brief statement of foundation considerations based upon our findings and the anticipated construction.

## 2.1    Project Description

This project includes the construction of a new three-story office building on a 16-acre lot at the corner of Airline Highway and Pecue Lane. The building is being constructed for H & E Equipment. The footprint of the building will be approximately 10,000 square feet. Another building will also be constructed on the property. This will be a single-story showroom and shop having a footprint of 50,000 square feet. The project also includes approximately 8 acres of pavement. No specific loading information was provided. We assume that column loads will be less than 300 kips. We understand that approximately one (1) foot of fill will be used to achieve finished floor elevation.

## 2.2    Limitations

The analyses and recommendations presented in this report are based on the aforementioned project information and the results of the investigation. While it is not too likely that conditions will differ greatly from those observed in the soil borings, it is always possible that variations can occur between and away from the boring locations. If it becomes apparent during construction that subsurface conditions differing significantly from those discussed in Sections 1.3 and 1.4 are being encountered, this office should be notified at once so that their effects can be determined and any remedial measures necessary be prescribed. Also, should the nature of the project change, these recommendations may have to be re-evaluated.

This report has been prepared for the exclusive use of URS Corporation and their consultants for the purpose of designing foundations for this project as generally described in Section 2.1 at the site described in Section 1.1. Additionally, the recommendations provided are site-specific and are not intended for use at any other site or for any other facility. This report provides recommendations for design and construction; therefore, this report should not be used as construction specifications.

NON-CERTIFIED COPY

H & E 0000214



## 3.0    SWELL POTENTIAL

Moderately to highly plastic soils were encountered at this site. Evaluating moisture content and Atterburg Limits tests provide an indication of the potential to shrink or swell. Comparing the moisture content with the plastic limit gives an indication of the degree of possible shrink or swell. In general, soils having moisture contents below or near the plastic limit have a greater potential to swell. The amount of swell can be predicted using Atterburg Limits and results from swell tests performed on selected samples.

The volume change associated with swell can cause cracking and movements to occur in building foundations, slabs-on-grade, and other lightly loaded structures in contact with these soils. The shrink/swell behavior of clays depends on the mineral composition, physical state of the soil, and environmental factors. Environmental factors include climatic conditions, type and amount of vegetation covering the site before and after construction and its proximity to the completed structure, depth to groundwater, surface drainage conditions, etc. However, the main factor controlling the shrink/swell behavior of active clay is the moisture content. If the soil moisture content stays constant, then the shrinking and swelling of these clays can not occur. As discussed, swelling is not a major concern at this site at the current moisture state. However, swelling could become an issue if the underlying soils become dry.

One swell test was performed to indicate swell potential. An active depth of ten (10) feet, dry conditions, and a surface surcharge of 200 pounds per square foot were assumed in the calculations. Based on this a potential vertical vise (PVR) on the order of 1 inch was calculated. The slab shall be designed to accommodate this movement.

Removal or reconditioning of the soils is not feasible in this case, therefore, some measures can be taken to minimize potential for moisture changes, which will reduce the potential for future volume change to occur. These include the following:

- Place paving or walkway next to building extending out at least ten (10) feet.

- Provide positive drainage away from edges of slabs and preventing water from collecting near any foundation element.

- Design roof drains to deposit water at least 5 feet from the building and direct runoff away from structures.

- Protect soil beneath exterior grade beams and footings from moisture change by placing an impermeable liner under plant beds located next to buildings.

- Keep trees and other vegetation capable of withdrawing a significant amount of moisture from the soil no closer to the buildings than about one-half of the tree's ultimate height.

NON-CERTIFIED COPY



**STE**
**Soil Testing Engineers, Inc.**

Page 4

## 4.0    SHALLOW FOUNDATIONS

Shallow foundations in the form of spread footings are commonly used where shallow subsurface conditions permit the foundations to be adequately supported without failure of the bearing strata in shear strength or by excessive displacement.

### 4.1    Bearing Capacity

Footings should bear at a depth of 2 feet below the existing grade into the natural undisturbed silty clay or clay. All footings should bear at the same elevation to minimize differential movements. Footings placed in this manner may be designed for a net allowable bearing pressure of 2,500 psf and 3,000 psf for continuous (wall) and square footings, respectively.

These are net values in which the weights of backfill and concrete below grade have already been considered. They also contain an adequate safety factor of at least 2.5 against failure of the bearing strata. Even if computations indicate that smaller footing sizes could be used, it is recommended that minimum widths of 24 inches for square and 18 inches for continuous footings be observed.

Based on the net allowable bearing pressure of 3,000 psf for square footings, the following footing induced post-construction settlements are to be expected for the corresponding footing widths.



NON-CERTIFIED COPY

H & E 0000216



Based on the net allowable bearing pressure of 2,500 psf for continuous footings, the following footing induced post-construction settlements are to be expected for the corresponding footing widths.



Adjacent footings should be spaced at least two footing widths center to center to minimize overlapping stresses which can result in additional settlement.

## 4.2    Rectangular Foundations and Overturning

Rectangular footings may be designed for a pressure computed from the formula:

$$q_r = q_w (1 + 0.2 \, B/L)$$

Where:

$q_r$ = Net Allowable Bearing Capacity for Rectangular Footings (psf)
$q_w$ = Net Allowable Bearing Capacity for Wall Footings (psf) given in Section 4.1
$B$ = Footing Width (ft)
$L$ = Footing Length (ft)

Note:

$q_r > q_w$
$L > B$

For overturning (eccentric loading), footings should be sized by considering only that portion of the footing which is centered on the force to be effective as distributing load to the soil. The dimensions B' and L' of an equivalent concentric footing should be used as follows:

$$B' = B - 2e_b$$

NON-CERTIFIED COPY

H & E 0000217


**STE**
Soil Testing Engineers, Inc.

$$L' = L - 2e_L$$

Where:     $e_b$ and $e_L$ are the eccentricities in each respective direction
                 $e$ = (overturning moment in representative direction)/(applied load)

## 4.3    Lateral Loads

Resistance to lateral loading will occur along the bottom of the footing by sliding resistance, and at the opposite side of the footing in passive soil pressure. The allowable sliding resistance over the base of the footing shall be taken as 500 psf. This value includes a safety factor of at least two.

Where incomplete bearing exists, as in the case of overturning, only the effective footing area should be considered for sliding as defined in Section 4.2.

Footings may be designed to include passive earth pressure resistance for that portion of the footing (or shear key) extending to depths greater than one foot below final grade. An allowable net passive pressure minus active pressure of 900 psf may be used in design for the portion of the foundation deeper than 1 foot and less than 3 feet below final grade.

## 4.4    Uplift

The soil's strength should not be relied upon to resist uplift forces. However, uplift forces should be resisted by the weight of the foundation and overlying soil. A density of 115 pcf is recommended for soil. In addition, a safety factor of 1.1 applied to the resisting weights is also recommended to account for variations in weight.

## 4.5    Inspection and Protection of the Bearing Surface

Inspection of footing excavations by a qualified geotechnical engineer should be performed prior to steel placement to ensure that the proper bearing surface is present. Traffic in the foundation excavations should be limited. Drainage should be provided away from the footings both during and after construction. Footing excavations should not be made during periods of inclement weather. Footings should not be allowed to stay open more than one day before concrete is placed. In the case of possible inclement weather, it is recommended that a "mudmat" consisting of lean concrete (mortar or slurry) be placed to protect the bearing surface until the structural concrete is placed.

## 5.0    FLOOR SLABS

For the building, the structural loads carried by the walls and columns will be transmitted to the supporting strata by shallow foundations. Floor loads are commonly distributed to grade (existing or finished soil grade) by a slab-on-grade; otherwise, a structural floor is used to carry the floor loads independent of the grade. Common types of slabs-on-grade are reinforced slabs with or without interior ribs and post-tensioned slabs. The ribbed slab and post-tensioned slab provide rigidity against differential movement and minimize slab cracking.

NON-CERTIFIED COPY



A reinforced concrete slab-on-grade supported on a minimum of 12 inches of structural fill can be used for the floor associated with the building. However, a ribbed slab or post tension slab is generally used on site where soil movements are expected. A sustained pressure of 200 psf over the entire floor is expected to produce less than one inch of settlement. Recommendations for a ribbed slab and a post-tensioned slab are provided in the event that they are preferred over the reinforced concrete slab. Standard construction practice of using a vapor barrier and capillary break should be included in the design of the slab.

## 5.1    Ribbed Floor Slab

The ribbed slab should be designed by a registered and qualified civil/structural engineer. The ribs should be arranged to coincide with interior walls (non-load bearing). A minimum beam width of 15 inches is recommended to allow adequate bearing area. The floor slab and interior grade beams should be a monolithic unit with no joints. If the concrete cannot be placed monolithically, it should be doweled for continuity and rigidity.

## 5.2    Post-Tensioned Floor Slab

An alternative to a reinforced ribbed slab foundation is post-tensioned reinforcement. Post-tensioning involves providing tensile steel reinforcement in the slab system by stressing high strength steel tendons after the concrete has achieved sufficient strength. A post-tensioned ribbed slab is a specialized structural design and should be designed by a qualified structural engineer.

## 6.0    DRILLED SHAFTS

As requested, allowable axial capacities for straight-sided drilled shafts are presented in subsequent sections. The capacities given are for shafts ranging in diameter from 18 inches to 30 inches and ranging in depth from 15 to 35 feet.

## 6.1    Axial Capacities (Straight-Sided Shafts)

The allowable compression and uplift capacities of straight-sided drilled shafts have been evaluated. The shafts should have minimum center-to-center spacing of at least 3 shaft diameters. Reductions from single shaft capacities for group efficiency considerations do not appear necessary for small groups or widely spaced shafts applicable to this project. All shafts for a specific structure should be placed at the same tip elevation to minimize potential differential settlements, which may be caused by placing shafts at varying tip elevations. These compression capacities have a factor of safety of 2.0 against failure at the shaft-soil interface and a factor of safety of 3.0 in end bearing capacity. These uplift capacities have a factor of safety of 3.0 against failure at the shaft-soil interface and do not include a submerged weight of the shaft. The submerged weight of the shaft can be included. A factor of safety of 1.1 should be applied to the weight of the shaft. Other sizes and depths of shafts can be evaluated upon request.

NON-CERTIFIED COPY


**STE** Soil Testing Engineers, Inc.

| Shaft Tip Embedment Below Existing Ground Surface (feet) | Allowable Single Shaft Capacity in Compression (kips)* | | |
|---|---|---|---|
| | 18" Dia. | 24" Dia. | 30" Dia. |
| 15 | 27 | 38 | 52 |
| 20 | 35 | 50 | 67 |
| 25 | 42 | 58 | 75 |
| 30 | 51 | 70 | 90 |
| 35 | 59 | 81 | 104 |

*These are soil-related capacities. The integrity of the structural member should also be considered.

| Shaft Tip Embedment Below Existing Ground Surface (feet) | Allowable Single Shaft Capacity in Uplift (kips)* | | |
|---|---|---|---|
| | 18" Dia. | 24" Dia. | 30" Dia. |
| 15 | 13 | 17 | 22 |
| 20 | 19 | 25 | 31 |
| 25 | 25 | 33 | 41 |
| 30 | 31 | 41 | 51 |
| 35 | 37 | 49 | 61 |

*These are soil-related capacities. The integrity of the structural member should also be considered

## 6.2    Settlement

Individual drilled shaft foundation settlement is anticipated to be on the order of 1 inch or less provided the shaft foundations are designed and constructed in accordance with the recommendations of this report.

## 6.3    Installation

Installation of the shaft should be carried out in accordance with Federal Highway Administration publication entitled "Drilled Shafts: Construction Procedures and Design Methods"(Pub. No. FHWA-IF-99-025, August 1999). We recommend that a geotechnical engineer or his representative observe the shaft installation to confirm the following: soil conditions are as anticipated; shafts are constructed to proper diameter, penetration, and plumbness; reinforcing is properly placed; and a tremie is properly used for concrete placement.

The concrete for the shaft should be placed as soon as possible after the excavation is completed; no excavation should be allowed to remain open for more than ½ hour. Care should be taken to ensure concrete is not allowed to drop more than five feet or to strike the sides of the shaft. Any water and soil cuttings inside the shaft should be removed prior to placing the concrete. The concrete mix (water to cement ratio) should be proportioned to achieve the necessary design strength while allowing a slump of 6 to 8 inches during concrete placement. There have been problems with both casing withdrawal and shaft integrity and capacity when concrete with a slump of less than six inches was used.

NON-CERTIFIED COPY



**STE**
Soil Testing Engineers, Inc.

Page 10

maximum dry density as determined by the modified proctor compaction test (ASTM D 1557). The crushed stone should also overlay a geotextile fabric for separation. The geotextile should be a nonwoven fabric with an apparent opening size (AOS) smaller than a U.S. No. 70 sieve.

For a 20-year design life, we estimate the number of 18-kip equivalent single axles (ESAL's) for flexible pavement in the light traffic area to be approximately 83,013. As a result of this estimate, the following thicknesses are recommended for asphaltic concrete and base course. The thicknesses are based on an assumed subgrade CBR of 3. This recommendation applies only to the light traffic parking area.

| Pavement Layer | Recommended Flexible Pavement Thickness |
|---|---|
| Asphaltic Concrete | 3 inches |
| Stone or Soil Cement Base | 8 inches |

Proper drainage during and after construction is essential to the success of flexible asphaltic pavement systems. Flexible pavements are susceptible to failures due to poor surface and subsurface drainage. Asphalt pavement generally requires surface sealing with a thin (2-inch) hot mix asphaltic concrete or an asphalt slurry seal at a 4- to 5-year interval to maintain a good pavement system because the local climate tends to weaken and oxidize the surface.

## 8.2    Rigid Pavement

Subgrade provisions are critical even though the concrete paving derives supporting capacity from the thickness, strength, and reinforcement of the concrete. Therefore, the recommendations provided in Section 8.1 should be followed for subgrade preparation.

Rigid pavement recommendations have been computed based on a modulus of subgrade reaction (k) of 65 pci. Additionally, the design presumes 3,800 psi concrete, which can be expected to develop a modulus of rupture of about 650 psi (average). The design life of the pavement system is dependent upon periodic maintenance of the pavement. This maintenance includes but is not limited to cleaning and resealing joints, sealing cracks and immediate repairs of damaged areas.

In the light traffic parking area, for a 20-year design life, we estimate the number of 18-kip equivalent single axles (ESAL's) for rigid pavement to be approximately 87,650. Based on these results, we recommend a minimum rigid pavement thickness of 5 inches.

In the heavy equipment storage area, for a 20-year design life, we estimate the number of 18-kip equivalent single axles (ESAL's) for rigid pavement to be approximately 956,028. Based on these results, we recommend a minimum rigid pavement thickness of 7 inches.

The rigid concrete should conform similarly to the requirements of LA DOTD Standard Specifications, Section 601, 2000 Edition. Proper steel reinforcement (temperature and shrinkage) joint design, and installation are essential to satisfactory pavement performance.

NON-CERTIFIED COPY

H & E 0000222



The concrete pavement should contain adequate wire mesh reinforcement for structural strength and to reduce temperature expansion affects. Adequate joints should be provided for expansion and contraction. The location and configuration of joints is important to reduce the concrete panel edge stress. In addition, adequate load transfer at all joints is necessary to reduce the concrete panel edge stress. Panel sizes should not exceed 15 feet in any direction. Key-way joints with dowel bars are recommended. Primary use of saw-cut joints is not recommended. However, occasional use of saw-cut joints may be necessary where experience indicates the potential for cracking (e.g., corner distress). If saw-cut joints are used, they should contain steel dowel bars for load transfer. All joints should be initially sealed and maintained during the life of the pavement.

The strength of the concrete should be verified prior to allowing any traffic to traverse the pavement. In addition, no construction traffic should be allowed on the light traffic pavement areas. If the strength of the concrete is less than specified, no traffic should be allowed on the pavement until the strength is reached. If the concrete does not attain its design strength after a period of 28 days, it should be removed and replaced with adequate concrete.

In addition to performing compressive strength tests, consideration should be given to performing flexural strength tests since design is based on flexural strength. The flexural strength tests consist of casting beams instead of cylinders. The beams may be tested using the third-point loading method (ASTM C 78) or center-point loading method (ASTM C 293). As with compressive strength testing, the flexural strength should be verified prior to allowing any traffic to traverse the pavement. If the concrete does not attain the design strength after a period of 28 days, it should be removed and replaced with adequate concrete.

## 9.0    EARTHWORK CONSIDERATIONS

At a minimum, the site will require earthwork associated with grading and preparation for the new soil supported structures and pavement. The following paragraphs provide pertinent recommendations associated with potential earthwork activities.

### 9.1    Site Preparation

Significant site preparation problems will develop unless good drainage is provided throughout the project duration. Proper site drainage should be maintained during and after construction. Providing drainage during the construction process will facilitate construction by reducing the potential for compaction problems. Maintaining the drainage after construction will improve the life of the structure by avoiding water softening of the foundation soils. Earthwork activities should be performed during a period of dry weather.

In order to prepare the construction areas, the site should first be stripped of topsoil, vegetation, and deleterious material. In addition, any existing underground utilities located within the structure footprints need to be removed and relocated as necessary. This may result in the partial disturbance of the near surface soils. These soils will need to be re-compacted prior to fill placement.

H & E Buildings                                                                                        06-1133

NON-CERTIFIED COPY

H & E 0000223



After the removal of these undesirable materials and re-compaction of the near surface soils as needed, the area should be proof-rolled with a heavy vehicle (e.g., a loaded 12-yard dump truck). The proof rolling should be observed by a qualified geotechnical engineer or his representative to detect pumping or yielding areas or other undesirable subgrade. Such conditions, if present, may require undercutting and replacement with more competent fill. As an alternative to undercutting, treatment with lime can be performed or use of a geogrid. The depth and amount can be determined at the time of construction.

These recommended procedures are intended to serve as an aid to construction and not as a method of providing "all weather" construction conditions. Higher treatment percentages may be necessary if soil moisture contents become elevated due to exposure during wet weather.

### 9.2    Fill Materials

Subsequent to the site preparation activities, the area should then be brought to grade using a clean, select fill material free from debris or organic matter. Cohesive fill materials, consisting of silty or sandy clay with a plasticity index of 12 to 22 and a liquid limit of 30 to 42 may be used. In this case, the material should be classified as CL in accordance with the Unified Soil Classification System (USCS).

### 9.3    Fill Placement & Compaction

Compaction of cohesive fill on the existing subgrade will be difficult during wet weather. Proper drainage should be provided in order to facilitate fill placement during both dry and wet weather construction.

Cohesive fill should be placed in 6 to 8 inch loose lifts and compacted to a dry density at least equal to the 95% of its maximum as determined by the standard Proctor compaction test (ASTM D 698) before another lift is added. Light scarification of each lift is recommended before placing soil for the next lift. This helps provide proper bonding between lifts.

### 9.4    De-Watering and Drainage Considerations

Water infiltration into excavations or prepared subgrades, which could result in the weakening of the soils, should be minimized. Therefore, surface and groundwater should not be allowed to collect in foundation excavations or prepared subgrades of the construction area both during and after construction. To account for water infiltration, undercut or excavated areas should be sloped toward a corner to allow for quick removal of groundwater or surface runoff. Positive site surface drainage should be provided to minimize infiltration of surface water around the perimeter of the structures, excavations, etc. It is believed that water accumulation into excavations can be removed with normal sump pumping. However, should excessive and uncontrolled amounts of seepage occur, the geotechnical engineer should be contacted.

### 9.5    Quality Control

The use of the correct fill material and the proper placement and compaction are critical in any earthwork where subsequent construction of structures is planned. Construction monitoring by a

NON-CERTIFIED COPY



Page 13

qualified geotechnical engineer is recommended to document that proper fill construction has been accomplished. Inspection of the bearing strata is also important.

The responsibilities of the quality control representative generally include observation of excavations, proof rolling operations, documentation of material types, and fill placement and compaction techniques. Each lift of fill should be of proper material type, placed in the required thickness, and compacted to at least the minimum density. Each lift should be tested to determine that the required compaction criteria have been met.

## 10.0   CONSULTATION

Often during final design and/or construction, questions can arise which are not specifically covered in the report. These questions can normally be handled by a brief phone call or conference with the designers.

NON-CERTIFIED COPY
H & E 0000225


**STE**
Soil Testing Engineers, Inc.

# APPENDIX

FIELD AND LABORATORY PROCEDURES

BORING PLAN (FIGURE 1)

DESCRIPTION OF TERMS AND SYMBOLS USED ON THE SOIL BORING LOGS

BORING LOGS

LATERAL DEFLECTION VS. LATERAL LOAD

SWELL TEST RESULTS

NON-CERTIFIED COPY

H & E 0000226


**STE**
Soil Testing Engineers, Inc.

## APPENDIX A
## PROPOSED H & E BUILDINGS
## FIELD AND LABORATORY PROCEDURES

The following paragraphs describe the field and laboratory procedures used for this investigation. Soil Boring Logs are included with this appendix. The boring logs provide the field and laboratory data collected.

### 1.0   FIELD EXPLORATION

Ten soil borings were drilled for this project on December 4, 2006. The boring locations were established by the project engineer and laid out in the field by a representative of STE.

### 1.1   Drilling Methods

The borings were drilled with buggy-mounted, rotary-type drilling equipment. The soil borings were initially advanced in the upper 10 feet using a 4-inch diameter short flight auger. This technique allowed the proper borehole advancement to secure the appropriate samples (see "Sampling Procedures") and allowed the observation of the presence of free water in the borehole. Rotary wash drilling methods were used below these depths. The borings were filled with grout or backfilled with soil upon completion.

### 1.2   Sampling Procedures

One 40-foot soil boring, one 24-foot soil boring, four 20-foot soil borings, and four 6-foot soil borings were drilled to obtain an understanding of the subsurface conditions. Sampling was conducted continuously within the upper 10 feet, and at 5-foot increments thereafter.

In the cohesive and semi-cohesive soils, relatively undisturbed samples were secured using a three-inch diameter, thin-wall steel tube sampler. In this sampling procedure, the borehole is advanced to the desired level, and the tube is lowered to the bottom of the boring. It is then pushed about two feet into the undisturbed soil in one continuous stroke. The sample and tube are retrieved from the borehole and detached from the drill string.

The sample is extruded by a hydraulic piston onto a rigid sample catcher to minimize disturbance. The sample is then visually classified. The classification includes description of soil color, strength estimate, identification of structural conditions (layering, seams, etc), and variations (organics, oxide inclusions, etc.). A pocket penetrometer strength test is performed. Any disturbed portions are discarded, and the sample is sealed to minimize disturbance and moisture loss during transportation to the laboratory.

### 2.0   LABORATORY PROCEDURES

Certain samples from the various strata were tested in the laboratory to determine their pertinent physical characteristics. The samples and types of tests performed were selected by a geotechnical

H & E Buildings                                                                      06-1133

NON-CERTIFIED COPY

H & E 0000227



**STE**
**Soil Testing Engineers, Inc.**

Page A-2

engineer to develop information necessary for appropriate analyses. The testing program conducted is described below:

## 2.1    Strength Tests

The strength characteristics of the various soil strata are important for geotechnical engineering analyses. Twenty-two (22) unconfined compression tests (ASTM D 2166) and two (2) triaxial-unconsolidated undrained (ASTM D 2850) were performed to develop this data. The testing procedure also includes determination of the moisture content and wet and dry density of the sample.

The results of the compression tests are tabulated in the laboratory data portion of the soil boring logs under the column heading "Compressive Strength." The moisture content and dry density data are tabulated in the subsequent two columns within the laboratory data portion of the logs.

## 2.2    Classification Tests

In order to classify the soils more definitely than can be done by field methods, nineteen (19) Atterberg limit determinations (ASTM D 4318) were made. The Atterberg limit data consist of Liquid Limit (LL), Plastic Limit (PL) and Plasticity Index (PI). The relationship among these variables is as follows:

$$PI = LL - PL$$

The Atterberg limit data are provided within the laboratory portion of the logs under the headings "LL" and "PI."

## 2.3    Swell Tests

One (1), swell potential test (ASTM D 4546) were performed to analyze the swell characteristics of the soil.

H & E Buildings

06-1133

NON-CERTIFIED COPY

H & E 0000228

| From: | Barkataki, Arin [abarkataki@terracon.com] |
|---|---|
| Sent: | Wednesday, February 09, 2011 5:57 PM |
| To: | thomas_e_ryan@urscorp.com; Frankie Wynn |
| Cc: | Donald, Victor R. |
| Subject: | H&E Renovation & Addition- Geotechnical Report |
| Attachments: | ET115001.H&E- Renovation and Addition. Geotech Report.pdf |

Importance:     High

Please find attached the geotechnical report for the above mentioned project. Any questions, please let us know.

Thanks,

**Arindam Barkataki, P.E.**
**Project Geotechnical Engineer**

**Terracon**
524 Elmwood Park Blvd, Suite 170 I Jefferson, Louisiana 70123
P [504] 818.3638 I F [504] 818.3890 I M [407] 913.4524
abarkataki@terracon.com I www.terracon.com
 There is only one Earth- Save the Planet


Terracon provides geotechnical, environmental, construction materials, and facilities consulting engineering services delivered with responsiveness, resourcefulness, and reliability.

*Private and confidential as detailed here (http://www.terracon.com/default.aspx?tabid=501). If you cannot access hyperlink, please e-mail sender.*



1

NON-CERTIFIED COPY          H&E 0065372

# Geotechnical Engineering Report

## H&E EQUIPMENT – ADDITION AND RENOVATION

### KENNER, LOUISIANA

February 9, 2011
Terracon Project No. ET115001

**Prepared for:**

H&E Equipment Services
Baton Rouge, Louisiana

**Prepared by:**

Terracon Consultants, Inc.
New Orleans, Louisiana



Offices Nationwide   Established in 1965
Employee-Owned   terracon.com

**Terracon**

Geotechnical    Environmental    Construction Materials    Facilities

Reliable ✳ Responsive ✳ Convenient ✳ Innovative                    1

NON-CERTIFIED COPY

H&E 0065373



February 9, 2011

H&E Equipment Services
11100 Mead Services. Suite 200
Baton Rouge, LA 70816

Attn: Mr. Frankie Wynn

Re:  Geotechnical Engineering Report
     H&E Equipment- Addition and Renovation
     125 E. Airline Drive
     Kenner, Louisiana
     Terracon Project Number: ET115001

Dear Mr. Wynn:

Terracon Consultants, Inc. (Terracon) has completed the geotechnical engineering services for the above-referenced project.  This study was performed in general accordance with our proposal number PET100028 dated December 29, 2010, which was approved by you on January 10, 2011.

This report presents the findings of the subsurface exploration and provides geotechnical recommendations concerning earthwork and the design and construction of foundations and pavements for the proposed project.

We appreciate the opportunity to be of service on this project.  We look forward to the opportunity to review the plans and specifications for this project and to provide Construction Materials and Engineering Testing Services during construction.  If you have any questions concerning this report, or if we may be of further service, please contact us.

Sincerely,
**Terracon Consultants, Inc.**

Arindam Barkataki, P.E.
Project Geotechnical Engineer

Victor R. Donald, P.E.
Senior Principal

Enclosures

Terracon Consultants, Inc.   524 Elmwood Park Blvd.  Suite 170   New Orleans, LA 70123
P (504) 818 2808    F (504) 818 0890   terracon.com

Geotechnical    ■    Environmental    ■    Construction Materials    ■    Facilities

NON-CERTIFIED COPY

H&E 0065374

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ⁂ Kenner, Louisiana
February 9, 2011 ⁂ Terracon Project Number ET115001



## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| EXECUTIVE SUMMARY | | III |
| 1.0 | INTRODUCTION | 1 |
| 1.1 | Purpose | 1 |
| 1.2 | Scope | 1 |
| 1.3 | Procedures | 2 |
| 2.0 | PROJECT INFORMATION | 2 |
| 2.1 | Project Description | 2 |
| 2.2 | Project Location and Description | 3 |
| 3.0 | SUBSURFACE CONDITIONS | 3 |
| 3.1 | Geology | 3 |
| 3.2 | Soil Conditions | 3 |
| 3.3 | Groundwater Conditions | 4 |
| 4.0 | RECOMMENDATIONS FOR DESIGN AND CONSTRUCTION | 4 |
| 4.1 | Geotechnical Considerations | 4 |
| 4.2 | Earthwork | 5 |
| 4.2.1 | Site Preparation | 5 |
| 4.2.2 | Excavation | 6 |
| 4.2.3 | Material Types | 6 |
| 4.2.4 | Compaction Requirements | 6 |
| 4.2.5 | Utility Trench Backfill | 7 |
| 4.2.6 | Grading and Drainage | 7 |
| 4.2.7 | Construction Considerations | 8 |
| 4.3 | Foundations | 8 |
| 4.3.1 | Axial Capacities | 8 |
| 4.3.2 | Lateral Capacity | 9 |
| 4.3.3 | Spacing and Group Efficiency | 9 |
| 4.3.4 | Settlements | 9 |
| 4.3.5 | Construction Considerations | 10 |
| 4.4 | Floor Slab Recommendations | 10 |
| 4.5 | Pavements | 11 |
| 4.5.1 | Pavement Drainage | 12 |
| 4.5.2 | Pavement Maintenance | 13 |
| 4.6 | Dry Detention Pond | 13 |
| 5.0 | QUALITY CONSIDERATIONS | 13 |
| 5.1 | Review of Plans and Specifications | 14 |
| 5.2 | Geotechnical Engineer-of-Record | 14 |
| 5.3 | Construction Materials Engineering and Testing | 15 |

FIGURES

| Figure 1 | Site Location Plan |
|---|---|
| Figure 2 | Boring Location Plan |

APPENDIX A – FIELD EXPLORATION

| Exhibit A-1 | Field Exploration Description |
|---|---|
| Borings B-1 through B-4 | Boring Logs |

⁂ Responsive ⁂ Resourceful ⁂ Reliable

i

NON-CERTIFIED COPY

H&E 0065375

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ✳ Kenner, Louisiana
February 9, 2011 ✳ Terracon Project Number ET115001



CPTs    CPT-1 through CPT-3 Cone Penetrometer logs

## APPENDIX B – LABORATORY TESTING
Exhibit    B-1                Laboratory Testing Description

## APPENDIX C – SUPPORTING DOCUMENTS
Exhibit    C-1               Soil Boring Legend
Exhibit    C-2               Cone Penetrometer Test Legend
Exhibit    C-3               Unified Soil Classification System

NON-CERTIFIED COPY

H&E 0065376

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ⚬ Kenner, Louisiana
February 9, 2011 ⚬ Terracon Project Number ET115001



## EXECUTIVE SUMMARY

A geotechnical investigation has been performed for the proposed addition to H&E Equipment to be located at 125 E. Airline Drive, in Kenner, Louisiana. Four soil borings, designated as Borings B-1 through B-4, were drilled to depths of approximately 10 to 12 feet below existing grades within the development area. Three CPT probes designated as CPT-1 through CPT-3 were advanced adjacent to the Borings B-1 to B-3 to depths of 80 feet. This report specifically addresses the recommendations for the proposed development.

Based on the information obtained from our subsurface exploration, the site can be developed for the proposed project. The following geotechnical considerations were identified:

⚬　　The proposed structures can be supported by the means of a deep foundation system. Driven treated timber piles or composite piles are both considered a viable option for this project site.

⚬　　Assuming proper site preparation and installation of piles to the recommended depths, total and differential settlement should be within tolerable limits.

⚬　　The project pavement could be supported on a rigid pavement system.

Close monitoring of the construction operations discussed herein will be critical in achieving the design subgrade support. We therefore recommend that Terracon be retained to monitor this portion of the work.

This summary should be used in conjunction with the entire report for design purposes. It should be recognized that details were not included or fully developed in this section, and the report must be read in its entirety for a comprehensive understanding of the items contained herein. The section titled **GENERAL COMMENTS** should be read for an understanding of the report limitations.

⚬ **Responsive** ⚬ **Resourceful** ⚬ **Reliable**　　　　　　　　　　　　　　　　iii

NON-CERTIFIED COPY

H&E 0065377

GEOTECHNICAL ENGINEERING REPORT
H&E EQUIPMENT- ADDITION AND RENOVATION
KENNER, LOUISIANA
Terracon Project Number ET115001
February 9, 2011

# 1.0    INTRODUCTION

H&E Equipment Services is planning to add new buildings at their existing facility at 125 East Airline Drive in Kenner, Louisiana. Specifically, the site is located at latitude 29° 58' 49.6" North and longitude 90°16' 16.1" West. A site location plan indicating the general location of the proposed addition is illustrated on attached Figure 1.

## 1.1    Purpose

Terracon Consultants, Inc. (Terracon) was retained by H&E Equipment Services to conduct a geotechnical investigation for the proposed addition to their existing facility. The purpose of these services is to provide information and geotechnical engineering recommendations relative to the proposed new addition of building, such as the following:

* soil conditions
* groundwater conditions
* site preparation
* dry detention pond

* foundation design and construction
* floor slab design and construction
* pavement

## 1.2    Scope

The geotechnical investigation conducted for this project included the following:

* Site Reconnaissance: A visual review and documentation of site conditions pertinent to the geotechnical study at the time of our field exploration.

* Soil Boring(s): Four soil borings were drilled and sampled to depths of 10 to 12 feet at the locations illustrated on Figure 2. Soil boring logs are included in Appendix A.

* Cone Penetrometer Tests: Three Cone Penetrometer Test (CPT) probes were advanced adjacent to the soil borings for the new structures. The results of the CPT testing, expressed as cone and sleeve resistance and pore pressure, are provided in Appendix A.

* Responsive * Resourceful * Reliable

1

NON-CERTIFIED COPY

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ✳ Kenner, Louisiana
February 9, 2011 ✳ Terracon Project Number ET115001



✳ Laboratory Testing: Determination of index and engineering properties of selected soil samples by performing geotechnical laboratory testing on selected soil samples.
✳ Engineering Evaluations & Reporting: Engineering analyses for pertinent design recommendations and the development of this report.

## 1.3    Procedures

This exploration followed procedures established by our firm as routine for a geotechnical study of this nature with sampling and analyses in general accordance with appropriate guidelines established by ASTM.  Appendices A and B describe the field and laboratory procedures utilized to accomplish this geotechnical study.

## 2.0    PROJECT INFORMATION

The following paragraphs present the project information that was available at the time this report was prepared.  Should this information be incorrect, or changes significantly, please contact this office so that our analysis and recommendations can be reevaluated.

## 2.1    Project Description

| Item | Description | | |
|---|---|---|---|
| Site layout | Proposed addition of 840-square foot at the front of the parts building, a 6,797-square foot addition to the front and rear of the service building and a new 3,200-square foot wash rack facility. New concrete pavement will be laid throughout the site. A dry detention pond will be built at the rear of the site. The wash rack facility has been relocated from the original proposed location as shown in figure 2 after the field exploration was over to 65 feet north from the southeast corner of the site. | | |
| Building construction | Metal frame buildings. | | |
| Finished floor elevation | To match existing building floor elevation. | | |
| Maximum loads | Columns: | 50 kips (assumed) | |
| | Walls: | 3 kips per linear foot (assumed) | |
| | Slabs: | 500 psf (by Structural Engineer) | |
| Estimated settlement | 1 inch total settlement (assumed) | | |
| | ½ inch differential settlement over 50 feet (assumed) | | |
| Grading | Minimal grading on the order of 1 foot as informed by the Architect. At the dry pond location, excavation on the order of 2 feet is anticipated. | | |

NON-CERTIFIED COPY

H&E 0065379

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ※ Kenner, Louisiana
February 9, 2011 ※ Terracon Project Number ET115001



## 2.2    Project Location and Description

| Item | Description |
|---|---|
| Location | The project site is located at 125 E. Airline Drive in Kenner, Louisiana. |
| Existing improvements | Two large building used a shop and warehouse with a small office at the front. |
| Current ground cover | Concrete slab, unpaved parking and existing dirt pile at the southeast corner of the site |
| Existing topography | Site appears to be flat except at the southeast portion where there is a dirt stockpile approximately 9 feet in height. |

## 3.0    SUBSURFACE CONDITIONS

In a geotechnical study of this nature, geologic setting and site-specific soil and groundwater conditions are important. The following paragraphs summarize our findings relative to these topics.

### 3.1    Geology

The site is in an area of Natural Levee deposits, and/or Alluvial deposits of Holocene age. These Holocene Age deposits are broadly present throughout the area and are commonly characterized by very soft to firm clays and silty clays and very loose to loose clayey silts. At greater depths, significant silt and sand layering may be present. These soils are typically normally consolidated and tend to be compressible. As a result, facilities of this nature routinely require a deep foundation system. At depths of 72 feet and greater, the Pleistocene layer was encountered in our CPT probes.

### 3.2    Soil Conditions

The soil borings indicated subsurface conditions that were considered typical for the New Orleans area. A 4-inch concrete slab was present at the location of Boring B-1. Underneath the slab firm clay (Unified Soil Classification symbol, CH) to a depth of 6 feet followed by soft silty clay (CL) to a depth of 10 feet. Borings B-2 and B-3 encountered soft to firm silty clay (CL) to clay (CH) to a depth 10 feet.  Boring B-4 performed at the proposed dry detention pond encountered stiff to very stiff silty clay (CL) followed by very soft to soft clay (CH) to the boring termination depth of 12 feet.

Below 10 feet, the CPT probe data noted the presence of very soft to soft sensitive fine grained material and clay to a depth of 60 to 65 feet followed by firm to very stiff clayey silt (ML) to silty clay (CL) to the probe termination depth of 80 feet.  The wash rack facility has been relocated to a new location once the field exploration was completed.  The lack of exploration at the specific

NON-CERTIFIED COPY

H&E 0065380

Geotechnical Engineering Report
H&E Equipment· Renovation and Addition ❊ Kenner, Louisiana
February 9, 2011 ❊ Terracon Project Number ET115001



location of the wash rack creates the potential for variable conditions there that are not known with the data collected.

The soil boring logs in Appendix A include the field and laboratory data collected and a description of soil conditions specific to each boring. The CPT logs in Appendix A provide interpretations of soil types, undrained shear strength, and standard penetration resistance based upon empirical correlations of the data.

## 3.3   Groundwater Conditions

Groundwater was encountered at a depth of 9 feet and 5 feet in Borings B-1 and B-2 respectively at the time of field exploration. After allowing the groundwater to stabilize for approximately 15 and 40 minutes for Borings B-1 and B-2 respectively, the depth to water was measured at 6 feet and 2.5 feet for Borings B-1 and B-2 respectively below the ground surface. Groundwater was not observed in the remainder of the borings while drilling or for the short duration that the boring was allowed to remain open. However, this does not necessarily mean the boring terminated above groundwater. Due to the low permeability of the soils encountered in the boring, a relatively long period of time may be necessary for a groundwater level to develop and stabilize in a borehole in these materials.   Long term observations in piezometers or observation wells sealed from the influence of surface water are often required to define groundwater levels in low permeability materials. Based upon the observations made during the field investigation and our experience in the general area, we expect that the depth to water is very near the ground surface. However, the presence of groundwater will be diminished by the low permeability clays present in the near surface.  The available groundwater information is presented on the boring logs in Appendix A.

Groundwater level fluctuations occur due to seasonal variations in the amount of rainfall, runoff, and other factors not evident at the time the borings were performed. Therefore, groundwater levels during construction or at other times in the life of the structure may be higher or lower than the levels indicated on the boring logs. The possibility of groundwater level fluctuations should be considered when developing the design and construction plans for this project.

## 4.0   RECOMMENDATIONS FOR DESIGN AND CONSTRUCTION

The information provided by the client for this project has been combined with our findings from the subsurface study to develop guideline recommendations for site preparation and foundation design. These recommendations are detailed in the following paragraphs.

### 4.1   Geotechnical Considerations

A deep foundation system is recommended for support of the building structure and slab. Driven treated timber piles or composite piles consisting of untreated timber piles with concrete

❊ Responsive ❊ Resourceful ❊ Reliable                                         4



NON-CERTIFIED COPY

H&E 0065381

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ⁂ Kenner, Louisiana
February 9, 2011 ⁂ Terracon Project Number ET115001



cans are both considered a viable option for this project site, and are a common foundation system for this region. The use of treated timber piles driven to a depth of 60 feet is considered a suitable means of supporting the anticipated loads associated with the structures. Alternatively, a 72-foot long composite piles consisting of 60-foot untreated timber piles and 12-foot concrete cans can be used to bear the piles on the competent Pleistocene layer. The 72-foot piles would exhibit less settlement because they would bear in the overconsolidated clays, but the 60-foot piles should experience tolerable settlements. The choice of the pile used for construction can be based upon cost considerations.

The encountered soil conditions at the site are considered suitable for construction of concrete pavements. Pavement recommendations are provided in **Section 4.5**.

## 4.2    Earthwork

A critical aspect of the successful construction project is the earthwork. Good earthwork is also critical to the overall performance of the foundation system(s) for the building. This section provides recommendations for site preparation, material types, compaction requirements, utility trench backfill, grading and drainage, and construction considerations.

### 4.2.1   Site Preparation

At the time of our field exploration, portion of the site had existing buildings and concrete slab. In areas where new structures would be built, objectionable materials if encountered should be removed include: roots, organic laden soil, organic matter, and any rubble or debris that may be present. Soils containing objectionable materials should not be used for backfill. A dirt stockpile was observed on the southeastern portion of the site. The suitability of the use of the stockpile material should be determined at the time of construction.

At the time of our exploration, the site was relatively flat except at the southeast corner where a dirt stockpile was observed, and drainage flow appeared to run off to the ditch on the southern boundary of the site. The upper two feet of surficial clays were considered relatively competent at the time of the exploration but are moisture sensitive. They will lose strength if exposed to construction activities during seasonal wet periods. The site contractor should be cautioned to maintain the integrity of the upper "crust" during the site preparation activities. Fill material may be needed to establish drainage superiority. If the contractor controls drainage and limits construction disturbance, these soils should remain stable. However, if an area becomes disturbed and begins to "pump" under construction traffic, the area should be properly mitigated. Mitigation may likely include limited overexcavation and backfilling.

A heavily loaded rubber-tired vehicle should be used for the proof-rolling operation. The loaded vehicle should weigh between 10 and 20 Tons. The proof-rolling operation should not be performed during or immediately following a precipitation event. If soft areas are encountered,

⁂ **Responsive** ⁂ **Resourceful** ⁂ **Reliable**

NON-CERTIFIED COPY

H&E 0065382

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ✻ Kenner, Louisiana
February 9, 2011 ✻ Terracon Project Number ET115001



they should be mitigated. If the areas are isolated, mitigation by limited overexcavation and replacement with competent soils may suffice, but should be approved by the geotechnical engineer at the time of construction.

## 4.2.2 Excavation

It is anticipated that excavations will be limited to installation of utilities and the construction of the pond. Excavations into the firm to stiff silty clay (CL) and clay (CH) to depths of less than 4 feet should remain stable with near-vertical side walls for normal construction periods. Groundwater seepage may be anticipated but should be controllable with standard sump pump techniques.

The contractor should be advised that all excavations must be made and kept in compliance with the U.S. Department of Labor, Occupational Safety and Health Administration (OSHA) regulations. These regulations require that excavations greater than 5 feet in depth be sloped, benched, sheeted, or braced to protect employees working in the excavation against the risk of cave-in. The contractor should select an excavation design/protocol that satisfies the regulations and site constraints.

## 4.2.3 Material Types

Engineering fill should meet the following material property requirements:

| Fill Type [1] | USCS Classification | Acceptable Location for Placement |
|---|---|---|
| Lean clay | CL[2] (LL<45) (8<PI<25) | All locations and elevations |
| River Sand | SM (Note that fines (defined as percent passing the No. 200 sieve should be less than 50 percent) | All locations and elevations. (This material is locally available in the New Orleans area.) |

1. Controlled, compacted fill should consist of approved materials that are free of organic matter and debris. A sample of each material type should be submitted to the geotechnical engineer for evaluation.
2. Soil classified as CL (e.g., sandy clay and silty clay) having Atterberg limits test values within the stated range, qualify as "low volume" change soils

## 4.2.4 Compaction Requirements

| Item | Description |
|---|---|
| Fill Lift Thickness | 9 inches or less in loose thickness |
| Compaction | 95 percent of the material's maximum standard Proctor dry density (ASTM |

NON-CERTIFIED COPY

H&E 0065383

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ☀ Kenner, Louisiana
February 9, 2011 ☀ Terracon Project Number ET115001



| Item | Description |
|---|---|
| Requirements [1] | D 698) |
| Moisture Content of Cohesive Soil | Within the range of 2 percent below to 4 percent above the optimum moisture content value as determined by the standard Proctor test at the time of placement and compaction. |

1. We recommend that engineering fill be tested for moisture content and compaction during placement. Should the results of the in-place density tests indicate the specified moisture or compaction limits have not been met, the area represented by the test should be reworked and retested as required until the specified moisture and compaction requirements are achieved.

## 4.2.5 Utility Trench Backfill

All trench excavations should be made with sufficient working space to permit construction including backfill placement and compaction. If utility trenches are backfilled with relatively clean granular material, they should be capped with at least 18 inches of cohesive fill in non-pavement areas to reduce the infiltration and conveyance of surface water through the trench backfill.

Utility trenches are a common source of water infiltration and migration. All utility trenches that penetrate beneath the building should be effectively sealed to restrict water intrusion and flow through the trenches that could migrate below the building. We recommend constructing an effective clay "trench plug" that extends at least 5 feet out from the face of the building exterior. The plug material should consist of clay compacted at a water content at or above the soils optimum water content. The clay fill should be placed to completely surround the utility line and be compacted in accordance with recommendations in this report.

## 4.2.6 Grading and Drainage

The contractor should limit construction traffic on the site during and immediately after rain events. It is recommended that excavations should be kept to a minimum and drains should be sloped to facilitate the prompt drainage of stormwater. If the contractor controls drainage and limits construction disturbance, these soils should remain stable. However, if an area becomes disturbed and begins to "pump" under construction traffic, the area should be properly mitigated as outlined in **Section 4.2.1**.

Final surrounding grades should be sloped away from the structure on all sides to prevent ponding of water. Gutters and downspouts that drain water a minimum of 10 feet beyond the footprint of the proposed structures are recommended. This can be accomplished through the use of splash-blocks, downspout extensions, and flexible pipes that are designed to attach to the end of the downspout. Flexible pipe should only be used if it is daylighted in such a manner that it gravity-drains collected water. Splash-blocks should also be considered below hose bibs and water spigots.

NON-CERTIFIED COPY

H&E 0065384



For the dry detention pond, it is recommended that all exposed earth slopes be seeded to provide protection against erosion. Seeded slopes should be protected with erosion mats until the vegetation is established.

## 4.2.7  Construction Considerations

Although the exposed subgrade is anticipated to be relatively stable upon initial exposure, unstable subgrade conditions could develop during general construction operations, particularly if the soils are wetted and/or subjected to repetitive construction traffic. The use of light construction equipment would aid in reducing subgrade disturbance. Should unstable subgrade conditions develop, stabilization measures will need to be employed.

Upon completion of filling and grading, care should be taken to maintain the subgrade moisture content prior to construction of floor slabs and pavements. Construction traffic over the completed subgrade should be avoided to the extent practical. The site should also be graded to prevent ponding of surface water on the prepared subgrade or in excavations. If the subgrade should become desiccated, saturated, or disturbed, the affected material should be removed or these materials should be scarified, moisture conditioned, and recompacted prior to floor slab and pavement construction.

The geotechnical engineer should be retained during the construction phase of the project to observe earthwork and to perform necessary tests and observations during subgrade preparation; proof-rolling; placement and compaction of controlled compacted fills; backfilling of excavations into the completed subgrade, and just prior to construction of building floor slabs.

## 4.3    Foundations

Due to the presence of weak and compressible soils at the site, a deep foundation system consisting of driven treated timber piles or composite piles consisting of untreated timber piles and concrete cans is recommended to support the column and wall loads and floor loads. The following paragraphs provide additional design recommendations and construction considerations for installation of a deep foundation system.

## 4.3.1  Axial Capacities

The timber piles should be installed to a minimum tip depth of 60 feet below existing grade. In the case of uplift loading, only skin friction of the pile should be considered to resist uplift loads.

| Allowable Axial Capacity at 60 Feet for Treated Timber Piles | | |
|---|---|---|
| Tip Diameter (inches) | Compression (kips) | Uplift (kips) |
| 7 | 20 | 19 |

NON-CERTIFIED COPY

H&E 0065385

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition » Kenner, Louisiana
February 9, 2011 » Terracon Project Number ET115001



| Allowable Axial Capacity at 72 Feet for Composite Piles | | |
|---|---|---|
| Tip Diameter (inches) | Compression (kips) | Uplift (kips) |
| 7 | 30 | 28 |

### 4.3.2  Lateral Capacity

We expect that the foundations will be subjected to lateral loading associated with wind forces. After design of the pile foundation, if the lateral loading at the ground line exceeds 5 kips, a lateral pile capacity analysis should be performed to estimate the deflection that can be expected by the lateral loads.

### 4.3.3  Spacing and Group Efficiency

Pile top spacing is normally set to allow for typical construction tolerances in placement and vertical alignment.  General practice in this area it to have center-to-center spacing not less than either 3 pile top diameters/dimension.  Provided there is good quality control and careful construction techniques, spacing as small as 2.5 pile top diameter/dimension is possible.  For the loads and foundation units anticipated on this project, it is estimated that group effects will not control the design other than potentially with respect to settlement considerations, and the group capacity may be considered as the sum of the individual shaft capacities.

### 4.3.4  Settlements

Piles installed below 60 feet should experience minimal settlements.  Long-term settlement of deep foundations is not anticipated to exceed 1 inch for driven piles under the expected compressive loads.  Differential settlement between major adjacent columns should not exceed 1/2 inch.  These movements are associated with the loading from the structure and would be in addition to any fill-induced settlements.

It is our understanding that the existing grades will be maintained for the new buildings. However, if grades are changed and more than two feet of fill will be placed at this site to achieve final grade, fill induced settlements may create downdrag effects on the piles and will reduce the allowable capacity of the pile.  Such fill conditions can also result in fill-induced settlements adjacent to the structure and significant settlement variations between the structure and the surrounding grades. Our office should be notified if fill in excess of two feet is planned so that we can evaluate the effect on the pile capacity, and other potential settlement related development issues.

NON-CERTIFIED COPY

H&E 0065386

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ≈ Kenner, Louisiana
February 9, 2011 ≈ Terracon Project Number ET115001



## 4.3.5  Construction Considerations

The piles should be installed using a conventional pile hammer with a minimum 15,000 ft-lb energy rating.  Pile driving should not be difficult in the upper 50 feet in these predominantly cohesive soils.   The driving criteria should be established at the time of construction based on the characteristics of the pile driving hammer used and the required pile capacity.

A field-scale load test of the pile planned for construction should be conducted. The load test results should be interpreted by this firm, and a final design capacity can be derived from the load test program.  For the pile load test program, the placement of 4 test probes in the proposed building areas should be incorporated to confirm that adequate pile bearing conditions are present across the buildings.  The test probes can be considered production piles provided they meet the project design specifications.  The pile with the lowest blow count at the time of installation should be loaded to 200 percent of the design load.

In order to insure that the piles are properly installed, it is recommended that a geotechnical engineer or qualified soils technician who is independent of the contractor perform continuous inspection during pile installation.  An accurate record should be kept of the date, depth of penetration, driving resistance and other pertinent data for each pile as well as the characteristics of the pile driver.  Such records are essential to the evaluation of the load carrying capacities of individual piles should difficulties arise.

## 4.4     Floor Slab Recommendations

Details concerning floor slab design were not available at the time of our exploration.   The following paragraphs provide design recommendations and construction considerations for the floor slab.

| ITEM | DESCRIPTION |
|---|---|
| Floor slab support | Existing compacted soil or newly placed structural fill |
| Modulus of subgrade reaction | 75 pounds per square inch per in (psi/in) for point loading conditions |
| Vapor barrier | Project Specific [1] |
| Structural considerations | Floor slabs should be structurally independent of building [2] |

NON-CERTIFIED COPY

H&E 0065387

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ⁂ Kenner, Louisiana
February 9, 2011 ⁂ Terracon Project Number ET115001



1.  The use of a vapor retarder should be considered beneath concrete slabs on grade that will be covered with wood, tile, carpet or other moisture sensitive or impervious coverings, or when the slab will support equipment sensitive to moisture. When conditions warrant the use of a vapor retarder, the slab designer should refer to ACI 302 and/or ACI 360 for procedures and cautions regarding the use and placement of a vapor retarder

2.  Floor slabs should be structurally independent of any building footings or walls to reduce the possibility of floor slab cracking caused by differential movements between the slab and foundation. Where floor slabs are tied to perimeter walls or turn-down slabs to meet structural or other construction objectives, our experience indicates that any differential movement between the walls and slabs will likely be observed in adjacent slab expansion joints or floor slab cracks that occur beyond the length of the structural dowels. The structural engineer should account for this potential differential settlement through use of sufficient control joints, appropriate reinforcing or other means.

Design considerations for floor slabs are similar to project pavements. Where appropriate, tooled or saw-cut control joints should be placed in the slab to help control the location and extent of cracking. For additional recommendations refer to ACI330R-01 *"Guide for Design and Construction of Concrete Parking Lots"*.

## 4.5    Pavements

Based on experience with similar projects and these soil conditions, a Portland cement concrete (rigid) pavement system is recommended for the proposed project. The provisions of **Section 4.2** for subgrade preparation are critical to the performance of the pavement system. Subgrade suitability within planned pavement areas is a transient condition affected by precipitation and disturbance from construction activities. A proof-roll should be performed and documented by a representative of Terracon within a maximum of 48 hours of the planned concrete placement to confirm that stability is present. It is recommended that a minimum 12 inches of imported "river" sand be installed above the existing subgrade to provide for more uniform support of the pavements. The sand should be placed in maximum 12-inch lifts and should be compacted to a minimum 95 percent of the maximum dry density as determined by ASTM D-698 or 75 percent of its relative density as determined by ASTM D 4253/4254).

Anticipated traffic volumes and loading conditions for this facility were not provided, but were assumed based on experience with similar projects. The pavements within the facility may likely be a medium to heavy duty traffic areas. Traffic estimates used in the determination of required pavement thicknesses assume a 20-year design period and are summarized in the following insert table.

NON-CERTIFIED COPY

H&E 0065388

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ※ Kenner, Louisiana
February 9, 2011 ※ Terracon Project Number ET115001



| Traffic Volumes Assumed for Analysis | |
|---|---|
| Traffic Type | Estimated Traffic (vehicles/lane/day) Medium to Heavy Duty |
| Automobiles | 200 |
| 2-axle and 3-axle Trucks | 15 |
| 4-axle Delivery Trucks | 10 |
| 5-axle Semi-Trailer Trucks | 5 |

The architect or engineer responsible for the final pavement design should review this traffic information for accuracy/applicability. If these traffic assumptions are not correct, please advise this office so that the pavement designs can be re-analyzed and revised thickness designs developed.

Based upon the soil conditions at the site, rigid pavements should be designed and constructed using a minimum 7-inch concrete pavement thickness over a minimum 12 inches of compacted river sand.

Long term differential settlement is expected to occur across the proposed pavement areas with these soil conditions. It is expected that differential movement will occur over a period of several years between the pavement panels resulting in subsequent loss of aggregate interlock at the joints. For these anticipated conditions, it has been an accepted practice to install a nominal reinforcement in the pavement consisting of minimum #3 rebar at 18-inch on-centers to maintain the joint connection. Alternatively an appropriately sized welded wire fabric can also be used. .

Other standard design and construction details for rigid pavements as contained in ACI330R-01 "*Guide for Design and Construction of Concrete Parking Lots*" should be followed in the pavement design and construction process. It is recommended that the design engineer refer to this document for more detailed information. A critical aspect of concrete pavements for facilities of this nature is joint spacing and related details. ACI330R-01 addresses these important details.

### 4.5.1  Pavement Drainage
Pavements should be sloped to provide rapid drainage of surface water. Water allowed to pond on or adjacent to the pavements could saturate the subgrade and contribute to premature pavement deterioration.

NON-CERTIFIED COPY

H&E 0065389



## 4.5.2  Pavement Maintenance

The pavement sections provided in this report represent minimum recommended thicknesses and, as such, periodic maintenance should be anticipated. Preventive maintenance should be planned and provided for through an on-going pavement management program. Preventive maintenance activities are intended to slow the rate of pavement deterioration, and to preserve the pavement investment. Preventive maintenance consists of crack and joint sealing, and patching as necessary.  Preventive maintenance is usually the first priority when implementing a planned pavement maintenance program and provides the highest return on investment for pavements. Prior to implementing any maintenance, additional engineering observation is recommended to determine the type and extent of preventive maintenance. Even with periodic maintenance, some movements and related cracking may still occur and repairs may be required.

## 4.6    Dry Detention Pond

No groundwater was observed in the boring for the short duration that the boring was allowed to remain open for the dry detention pond.  However, this does not necessarily mean the boring terminated above groundwater.   Based upon the observations made during the field investigation and our experience in the general area, we expect that the depth to water is very near the ground surface.  However, the presence of groundwater will be diminished by the low permeability clays present in the near surface.

## 5.0   QUALITY CONSIDERATIONS

The analyses and recommendations presented in this report are based upon the assumption that the soil borings made for this investigation represent the soil and groundwater conditions throughout the site.  Variations in soil or groundwater conditions may occur between or away from the boring locations.  If conditions different from those described in **SECTION 3.0** are encountered or are expected, this office should be promptly notified so that the effects of the varying conditions can be determined, and any necessary changes to these analyses and recommendations can be made.

This report has been prepared for the exclusive use of H&E Equipment Services for specific application to the project discussed and has been prepared in accordance with generally accepted geotechnical engineering practices.  No warranties, either expressed or implied, are intended or made.  Site safety, excavation support, and dewatering requirements are the responsibility of others.  This investigation program and these recommendations are intended for specific application to the project and site generally described in **SECTION 2.0**.  The data or the analyses and recommendations presented in this report are not necessarily applicable for any other project or location.  In the event that changes in the nature, design, or location of the project as outlined in this report are planned, the conclusions and recommendations contained

NON-CERTIFIED COPY

H&E 0065390

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ⚒ Kenner, Louisiana
February 9, 2011 ⚒ Terracon Project Number ET115001



in this report shall not be considered valid unless Terracon reviews the changes and either verifies or modifies the conclusions of this report in writing.

This report is issued as a preliminary design tool. Subsequent designs may alter the current assumptions regarding site construction, and recommendations of this report may not be applicable. This report contains recommendations for design and for construction. Several recommendations have been made in this report, which assume that the conditions required for the design recommendations have been provided. Certain quality considerations are essential to the satisfactory design and construction of this project.

## 5.1    Review of Plans and Specifications

This report will be used to provide data and recommendations to the project designers. During final design, questions may arise which require further review of site conditions, clarification of the recommendations provided in this report or development of more specific recommendations. We are available to resolve any questions or needs for clarification of the recommendations presented in this report.

If modifications to the construction plans are made during final design, the recommendations of this report may not apply. Terracon should review the final plans and specifications for this project prior to bidding. This review is also necessary to ensure that the recommendations of this report have been properly communicated, and that the plans and specifications adequately reflect these recommendations.

## 5.2    Geotechnical Engineer-of-Record

The construction process is an integral design component with respect to the geotechnical aspects of a project. Because geotechnical engineering is an inexact science due to the variability of natural processes and because we sample only a small portion of the soils affecting the performance of the proposed structure, unanticipated or changed conditions can be disclosed during grading and foundation construction. Proper geotechnical observation and testing during construction is required to allow the geotechnical engineer the opportunity to verify assumptions made during the design process. Therefore, Terracon should be retained during the construction to observe compliance with the design concepts and geotechnical recommendations, and to recommend design changes in the event that subsurface conditions or methods of construction differ from those assumed while completing this report.

If these services are provided by others, Terracon will cease to be the Geotechnical Engineer-of-Record at the time another consultant or testing entity is retained for monitoring the construction process, and we cannot assume responsibility for any potential claims that may arise during or after construction as a result of varying conditions, misuse or misinterpretation of our report by others.

⚒ **Responsive ⚒ Resourceful ⚒ Reliable**                                                                14

NON-CERTIFIED COPY

H&E 0065391

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ※ Kenner, Louisiana
February 9, 2011 ※ Terracon Project Number ET115001



## 5.3    Construction Materials Engineering and Testing

This report contains recommendations for construction practices.  Failure to comply with the recommendations of this report can create conditions which are detrimental to the success of the project, and an inferior product can result.  Therefore, documentation of the contractors' compliance with these practices is considered a necessity.

Construction Quality Control (the collection of field and laboratory data to document conformance with specifications) and Quality Assurance (the collection and evaluation of test results and frequencies to confirm that the objectives of construction are met) are an integral part of the successful construction project.  These quality control and quality assurance services should be provided by Terracon as the Geotechnical Engineer-of-Record.

Subsequent to our review of the project plans and specifications, we should provide a construction quality testing plan.

NON-CERTIFIED COPY
H&E 0065392

# FIGURES

NON-CERTIFIED COPY

H&E 0065393



SITE LOCATION

| Project Manager: AB | Project No. ET115001 | | SITE LOCATION PLAN | FIGURE |
| Drawn by: AB | Scale: See Above | **Terracon** | H&E EQUIPMENT -RENOVATION & ADDITION | |
| Checked by: AB | File Name: Figure 1 | | Kenner, Louisiana | 1 |
| Approved by: JRD | Date: 1/24/2011 | | | |

NON-CERTIFIED COPY

H&E 0065394

NON-CERTIFIED COPY

H&E 0063395



B-1/CPT-1

B-2/CPT-2

B-4

B-3/CPT-3

NEW BUILDING
ADDITION

EXISTING
BUILDING

NEW BUILDING
ADDITION

NEW BUILDING
ADDITION

NEW BUILDING

EAST AIRLINE DRIVE

H&E EQUIPMENT SERVICES
125 E. AIRLINE DRIVE
KENNER, LA
JEFFERSON PARISH

DIAGRAM IS FOR GENERAL LOCATION
ONLY, AND IS NOT INTENDED FOR
CONSTRUCTION PURPOSES

10' soil boring with 80' CPT
probe

10' Soil Boring
at Pond Area

| Project Manager: | AB | Project No. ET115001 | **Terracon** Consulting Engineers & Scientists 624 Elmwood Park Blvd. # 170    New Orleans, LA 70123 PH (504) 818-3636          FAX (504) 818-3890 | **BORING LOCATION PLAN** | Figure |
| Drawn by: | AB | Scale: NTS | | H&E EQUIPMENT- RENOVATION & ADDITION | **2** |
| Checked by: | AB | File Name: Figure 2 | | Kenner, Louisiana | |
| Approved by: | VRD | Date: 1/24/11 | | | |

# APPENDIX A
# FIELD EXPLORATION

NON-CERTIFIED COPY

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ⚹ Kenner, Louisiana
February 9, 2011 ⚹ Terracon Project Number ET115001



## FIELD EXPLORATION DESCRIPTION

The field exploration was conducted utilizing standard procedures developed by Terracon Consultants, Inc. (Terracon) for investigations of this nature. The information collected during the field investigation was documented by a Terracon Engineering Technician. The following paragraphs describe the field methods utilized. One or more soil borings were performed for this study. This Appendix includes detailed soil boring log(s) which present the data collected and provide a description of soil and groundwater conditions encountered. A legend that describes the terms and symbols used in the boring log(s) is included in **APPENDIX C**.

### Site Reconnaissance

The engineering technician walked the project site and documented observations that are of significance to the geotechnical investigation. Such observations include: topography, vegetation, trees, drainage, other structures, surface soil conditions, and trafficability.

These observations were reported to the project engineer in the form of field notes. The project engineer reviewed the results of the field reconnaissance with the engineering technician in a project meeting subsequent to the field investigation.

### Soil Drilling and Sampling

The soil boring(s) were advanced using our all-terrain mounted drilling rig and equipment at the approximate location(s) shown on Figure 2. The location(s) were measured from known points.

Soil Boring Advancement: The boring(s) were advanced by rotating a four-inch diameter, short-flight earth auger with the drilling rig, removing the auger from each boring, and cleaning the cuttings from the auger before sampling or reinserting the auger back into the bore hole. This technique allowed for the observation of soil cuttings and description of soil conditions encountered. This dry auger technique allows detection of free groundwater within the boring.

Below the groundwater table, the deep borings were advanced using the rotary wash boring technique by using a four-inch diameter drill bit, and circulating cuttings to the ground surface using drilling fluids injected through the drill stem. The drilling fluids stabilized the bore hole during sampling procedures and masked any further detection of groundwater.

Soil Sampling: The soil sampling program included the collection of undisturbed and disturbed soil samples. Relatively undisturbed samples were obtained by pushing a three-inch diameter, Shelby tube sampler a distance of two feet into the soil in general accordance with ASTM D1587. Depths at which these undisturbed samples were obtained are indicated by a shaded portion in the "Samples" column of the attached boring log(s).

NON-CERTIFIED COPY

H&E 0065397



**STE**
**Soil Testing Engineers, Inc.**

Page 9

Installation of the shafts is expected to be in cohesive soils. Therefore, installation should be performed with little difficulty. However, variations in soil conditions resulting in the shaft penetrating into a sand strata or deep shafts may need to be installed using the slurry method. Shafts shall be installed by qualified contractors having experience with similar soil conditions.

We also recommend cross-hole testing to verify the integrity of the shafts.

## 7.0   LATERAL CAPACITY

Lateral loads are resisted by the rigidity of the pile as well as the underlying soil conditions. Lateral load analyses for single piles were performed using the computer program LPILE PLUS Version 5.0 by Ensoft, Inc. The lateral load analysis was performed for both free and fixed head pile conditions. The pile head is assumed to be located at or near the ground surface. Cyclic loading conditions were also assumed. The concrete is assumed to have a modulus of elasticity of 3,500 psi. Each type of pile was analyzed for a minimum pile tip embedment of 15 feet unless otherwise indicated and graphs showing lateral load verses lateral deflection are presented in the Appendix. These loads are based on soil/shaft interaction. The shaft shall be structurally designed for the intended lateral loads.

## 8.0   PAVEMENT

Pavement thickness recommendations have been provided for both the heavy equipment storage area and the parking areas near the office building designated for light traffic flow. No specific traffic data were provided; therefore, pavement recommendations for this site are based upon the following assumed daily traffic frequencies. In the heavy storage area: 100 light (7-kip) trucks, two 34-kip trucks, two 46-kip trucks, and thirty 80-kip trucks per day. In the light traffic parking area: 500 light (4-kip) cars, 500 light (7-kip) trucks, two 34-kip trucks, and one 46-kip truck per day. The traffic is expected to be from rubber-tired vehicles. If the expected traffic frequencies (especially those involving heavy vehicles) are much different from these assumptions, this office should be notified so that we may re-evaluate the pavement recommendations.

Both asphalt and concrete pavement recommendations have been provided for the light traffic parking area. Regardless of the pavement type selected, good drainage and proper maintenance is always important to the longevity of a pavement system. Rigid pavement recommendations only have been provided for the heavy equipment storage area. The following paragraphs provide recommendations for flexible and rigid pavement:

### 8.1   Flexible Pavement

The subgrade should first be prepared in accordance with Section 9.1 of this report. The base course should be constructed over the prepared subgrade, and should consist of either a soil cement or crushed stone aggregate (similar to LA DOTD Standard Specifications, Sections 303 and 1003, respectively, 2000 edition).

If a crushed stone base is used, the material should be compacted to a relative density of 75% or higher according to ASTM D 4253 and ASTM D 4254, or to a dry density of 95% of its

NON-CERTIFIED COPY

H & E 0000221

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ※ Kenner, Louisiana
February 9, 2011 ※ Terracon Project Number ET115001



After the Shelby tube was removed from each boring, the sample was visually classified. Relative strength estimates of the sample were obtained by penetrometer readings. These penetrometer readings in units of tons per square foot are indicated by the symbol "(P)" in the "Field Test Results" column of each boring log. The Shelby tube was then sealed in the field to minimize moisture loss and transportation to the Terracon laboratory.

## Cone Penetrometer Testing

The field investigation included the conduct of one or more Cone Penetrometer Test (CPT) probe(s) as directed by the project engineer. The location(s) are illustrated on Figure 2.

At each designated location, a CPT test was performed by pushing a 10-square centimeter electric cone penetrometer (cylindrical probe with a cone-shaped tip, equipped with electronic load sensors) with load cells to measure tip resistance and sleeve resistance. A pressure transducer is utilized to measure pore pressure at an approximate rate of 20 millimeters/second using the hydraulic cylinders of the drilling rig. The illustration shows the forces acting on the CPT device.



The probe measures the resistance to tip and sleeve penetration, pore pressure and inclination at 50 mm intervals during penetration. These data are transferred to an on-site computer using a cable transmission system. This process allowed the ability to continuously monitor the data as the cone was advanced in order to understand the resistance and inclination of the tool in a real-time fashion.

Upon completion of the testing, the data collected were downloaded directly from the CPT device to the on-site computer. The collected data were then interpreted using software provided by the manufacturer. The software interprets the basic information related to cone and sleeve resistance, pore pressure and inclination. It also allows interpretation of apparent soil behavior properties (for example clay, silt, sand, etc.) and soil parameters, such as undrained shear strength, standard penetration resistance, overconsolidation ratio and unit weight. The conventional field data from the soil boring and the available laboratory test results (presented in Appendix A) were used to correlate the CPT interpretations for this particular site.

The testing and calibration of the CPT device was conducted in general conformance with ASTM D 5778. The Calibration Certificate for the CPT probe utilized on this project is presented in this Appendix.

The resulting CPT data are included in this Appendix. A description of the symbols and methods used as a part of the CPT effort is also provided in this Appendix.

NON-CERTIFIED COPY

H&E 0065398

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ∗ Kenner, Louisiana
February 9, 2011 ∗ Terracon Project Number ET115001



<u>Groundwater Observations:</u>    During the soil boring advancement and sampling operation, observations for free groundwater were made.  Information regarding water level observations is recorded in the "groundwater" column on the soil boring log(s).  Other information regarding water level observations has been noted under "Groundwater Level Data" at the bottom of each log.

<u>Boring Abandonment:</u>    Upon completion of the field investigation phase of this study, each boring was sealed in accordance with State regulations.

NON-CERTIFIED COPY

H&E 0065399

| PROJECT: | Geotechnical Investigation | | | | | | | | FILE: | ET115001 |
| | H&E Equipment- Addition and Renovation | | **SOIL BORING LOG** | | | | | | DATE: | January 18, 2011 |
| | Kenner, Louisiana | | **No. B-1** | | | | | | DRILLER: | L. Tolen |
| | | | | | | | | | TECH.: | J. Grissom |
| CLIENT: | H&E Equipment Services | | SHEET 1 OF 1 | | | | | | ENGINEER: | V. Donald |
| | Baton Rouge, Louisiana | | | | | | | | | |

Location: See Figure 2.
Lat: 29° 58' 52.3" N  Long: 90° 16' 18.4" W

| Depth (feet) | Samples | Groundwater Level | Field Test Results | Undrained Shear Strength (ksf) | Unit Weight (pcf) Moist | Unit Weight (pcf) Dry | Natural Moisture Content and Atterberg Limits | Plasticity Index PI | DESCRIPTION | Strata Break Depth | Soil Type |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 4-inch concrete slab | 0.3 | |
| 1 | | | 1.00 (P) | 0.88 | 119 | 86 | 39 | | Firm gray and brown CLAY (CH) - with silt pockets | | |
| 2 | | | | | | | | | | | |
| 3 | | | 1.50 (P) | | | | 24 ⊢—39—⊣ 78 | 54 | | | |
| 4 | | | | | | | | | | | |
| 5 | | | 1.00 (P) | | | | | | | | |
| 6 | | ▽ | | | | | | | | 6.0 | |
| 7 | | | 0.00 (P) | 0.36 | 99 | 60 | 64 | | Soft gray SILTY CLAY (CL) with silt pockets, organics | | |
| 8 | | | | | | | | | | | |
| 9 | | ▽ | 0.00 (P) | | | | | | | | |
| 10 | | | | | | | | | Boring Terminated at 10 Feet. | 10.0 | |
| 11 | | | | | | | | | | | |
| 12 | | | | | | | | | | | |
| 13 | | | | | | | | | | | |
| 14 | | | | | | | | | | | |
| 15 | | | | | | | | | | | |

Natural Moisture Content and Atterberg Limits scale: Plastic Limit ⊢ Moisture Content ⊣ Liquid Limit — 20 40 60 80

STRATA BOUNDARIES MAY NOT BE EXACT

| Groundwater Level Data | Advancement Method | Notes |
|---|---|---|
| ▽ First encountered at 9 feet | Short-flight Auger: 0-10' | |
| ▽ Rise to 6 feet after 15 minutes | | |
| | **Abandonment Method** | |
| | Boring was backfilled with soil cuttings after completion and patched with concrete | |

JS.ET115001.GPJ AQUATERR.GDT 2/3/11

AQ.LOG

**Terracon**

NON-CERTIFIED COPY

H&E 0065400

| PROJECT: | Geotechnical Investigation | | |
|---|---|---|---|

PROJECT: Geotechnical Investigation
H&E Equipment- Addition and Renovation
Kenner, Louisiana

CLIENT: H&E Equipment Services
Baton Rouge, Louisiana

**SOIL BORING LOG**
**No.  B-2**
SHEET  1  OF  1

FILE: ET115001
DATE: January 17, 2011
DRILLER: L. Tolen
TECH.: J. Grissom
ENGINEER: V. Donald

## FIELD DATA

## LABORATORY DATA

Location: See Figure 2.
Lat: 29° 58' 48.4" N  Long: 90° 16' 18.0" W

| Depth (feet) | Samples | Groundwater Level | Field Test Results | Undrained Shear Strength (ksf) | Unit Weight (pcf) Moist | Unit Weight (pcf) Dry | Natural Moisture Content and Atterberg Limits | PI | DESCRIPTION | Strata Break Depth | Soil Type |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | Soft to firm brown and tan **SILTY CLAY (CL)** - with tan sand, gravel pieces | | |
| 2 | | | | | | | | | | | |
| 3 | | ▽ | | | | | | | | | |
| 4 | | | | | | | | | | 4.0 | |
| 5 | | ▽ | | | | | 23 | | Soft to firm gray and brown **CLAY (CH)** - with silty sand | | |
| 6 | | | | | | | | | | | |
| 7 | | | | | | | | | | | |
| 8 | | | | | | | | | | | |
| 9 | | | | | | | | | | | |
| 10 | | | | | | | | | Boring Terminated at 10 Feet. | 10.0 | |
| 11 | | | | | | | | | | | |
| 12 | | | | | | | | | | | |
| 13 | | | | | | | | | | | |
| 14 | | | | | | | | | | | |
| 15 | | | | | | | | | STRATA BOUNDARIES MAY NOT BE EXACT | | |

Natural Moisture Content and Atterberg Limits:
Plastic Limit | Moisture Content | Liquid Limit
20  40  60  80

### Groundwater Level Data
▽ First encountered at 5 feet
▽ Rise to 2.5 feet after 40 minutes

### Advancement Method
Short-flight Auger: 0-10'

### Abandonment Method
Boring was backfilled with soil cuttings after completion and patched with concrete

### Notes
12-inch soil cement mix

.S.ET115001.GPJ  AQUATERR.GDT  2/3/11

AG LOG

**Terracon**

NON-CERTIFIED COPY

H&E 0065401

| PROJECT: | Geotechnical Investigation | | FILE: | ET115001 |
| | H&E Equipment- Addition and Renovation | **SOIL BORING LOG** | DATE: | January 17, 2011 |
| | Kenner, Louisiana | **No. B-3** | DRILLER: | L. Tolen |
| | | | TECH.: | J. Grissom |
| CLIENT: | H&E Equipment Services | SHEET 1 OF 1 | ENGINEER: | V. Donald |
| | Baton Rouge, Louisiana | | | |

Location: See Figure 2.

Lat: 29° 58' 49.6" N  Long: 90° 16' 16.1" W

| Depth (feet) | Samples | Groundwater Level | Field Test Results | Undrained Shear Strength (tsf) | Unit Weight (pcf) Moist | Unit Weight (pcf) Dry | Natural Moisture Content and Atterberg Limits | Plasticity Index PI | DESCRIPTION | Strata Break Depth | Soil Type |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | Soft to firm brown and gray SILTY CLAY (CL) - with sand and limestone aggregates | | |
| 2 | | | | | | | | | | | |
| 3 | | | 0.75 (P) | | | | | | | | |
| 4 | | | | | | | | | | 4.0 | |
| 5 | | | 0.50 (P) | 0.88 | 114 | 80 | 43 | | Soft to firm gray CLAY (CH) - with silt pockets | | |
| 6 | | | | | | | | | | | |
| 7 | | | 0.5 (P) | | | | 27⸱ ⸱53 ⸱101 ⸱74 | | | | |
| 8 | | | | | | | | | - organics at 8 feet | | |
| 9 | | | 0.00 (P) | | | | | | | | |
| 10 | | | | | | | | | **Boring Terminated at 10 Feet.** | 10.0 | |
| 11 | | | | | | | | | | | |
| 12 | | | | | | | | | | | |
| 13 | | | | | | | | | | | |
| 14 | | | | | | | | | | | |
| 15 | | | | | | | | | *STRATA BOUNDARIES MAY NOT BE EXACT* | | |

Natural Moisture Content and Atterberg Limits — Plastic Limit |— Moisture Content —| Liquid Limit: 20  40  60  80

| Groundwater Level Data | Advancement Method | Notes |
|---|---|---|
| No free water encountered during drilling to 10 feet. | Short-flight Auger: 0-10' | |
| | **Abandonment Method** | |
| | Boring was backfilled with soil cuttings after completion and patched with concrete | |

JS.ET115001.GPJ AQUATERR.GDT 2/29/11

AG LOG

**Terracon**

NON-CERTIFIED COPY

H&E 0065402

| PROJECT: | Geotechnical Investigation | | | FILE: | ET115001 |
|---|---|---|---|---|---|
| | H&E Equipment- Addition and Renovation | **SOIL BORING LOG** | | DATE: | January 18, 2011 |
| | Kenner, Louisiana | **No. B-4** | | DRILLER: | L Tolen |
| | | | | TECH.: | J. Grissom |
| CLIENT: | H&E Equipment Services | SHEET 1 OF 1 | | ENGINEER: | V. Donald |
| | Baton Rouge, Louisiana | | | | |

Location: See Figure 2.
Lat: 29° 58' 46.7" N  Long: 90° 16' 16.5" W

**FIELD DATA** | **LABORATORY DATA**

| Depth (feet) | Samples | Groundwater Level | Field Test Results | Undrained Shear Strength (ksf) | Unit Weight (pcf) Moist | Unit Weight (pcf) Dry | Natural Moisture Content and Atterberg Limits | Plasticity Index PI | DESCRIPTION | Strata Break Depth | Soil Type |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | 4.50 (P) | | | | | | Very Stiff dark gray SILTY CLAY- FILL (CL-FILL) - with gravel, shell fragments and sand | | |
| 2 | | | | | | | | | Stiff to very stiff brown and gray SILTY CLAY (CL) - with silt pockets and debris to 4 feet | 2.0 | |
| 3 | | | 2.75 (P) | | | | 27 | | | | |
| 4 | | | | | | | | | | | |
| 5 | | | 1.25 (P) | | | | 23  49  37 | 26 | | | |
| 6 | | | | | | | | | Very soft to soft brown and gray CLAY (CH) | 6.0 | |
| 7 | | | 0.50 (P) | | | | 27  49  95 | 68 | | | |
| 8 | | | | | | | | | | | |
| 9 | | | 0.25 (P) | | | | 53 | | | | |
| 10 | | | | | | | | | | | |
| 11 | | | 0.50 (P) | | | | | | | | |
| 12 | | | | | | | | | Boring Terminated at 12 Feet. | 12.0 | |
| 13 | | | | | | | | | | | |
| 14 | | | | | | | | | | | |
| 15 | | | | | | | | | | | |

Natural Moisture Content and Atterberg Limits: Plastic Limit |—  Moisture Content  — | Liquid Limit  20  40  60  80

*STRATA BOUNDARIES MAY NOT BE EXACT*

| Groundwater Level Data | Advancement Method | Notes |
|---|---|---|
| No free water encountered during drilling to 10 feet. | Short-flight Auger: 0-10' | |
| | Abandonment Method | |
| | Boring was backfilled with soil cuttings after completion and patched with concrete | |

**Terracon**

NON-CERTIFIED COPY

H&E 0065403

JS.ET115001.GPJ AQUATERR.GDT 2/5/11
AG LOG



**CONE PENETROMETER TEST LOG**
**CPT-1**

| PROJECT: | Geotechnical Investigation |
| | H&E Equipment- Addition and Renovation |
| | Kenner, Louisiana |
| CLIENT: | H&E Equipment Services |
| | Baton Rouge, Louisiana |

Associated Soil Boring:    B-1

| FILE: | ET115001 |
| DATE: | January 18, 2011 |
| DRILLER: | L. Tolen |
| TECH.: | J. Grissom |
| ENGINEER: | S. Greaber |

**Abandonment Method**
CPT backfilled with cement-bentonite grout upon retraction.

**Notes**
Upper 10 ft. of Interpreted Soil Description is taken from Laboratory Test Results and Visual Classification of soil samples as described in the associated Soil Boring Log. Below 10 ft. Soil Description is an interpreted behavior type based upon empirical correlations of cone tip and sleeve resistance.

*STRATA BOUNDARIES MAY NOT BE EXACT*

**Terracon**

SHEET 1 OF 2



**CONE PENETROMETER TEST LOG**
CPT-1

Associated Soil Boring:   B-1

PROJECT: Geotechnical Investigation
H&E Equipment- Addition and Renovation
Kenner, Louisiana
CLIENT: H&E Equipment Services
Baton Rouge, Louisiana

FILE:   ET115001
DATE:   January 18, 2011
DRILLER:   L. Tolen
TECH.:   J. Grissom
ENGINEER:   S. Greaber

Soil Descriptions:
- Clay (continued)
- Lean Clay/Silty Clay
- Clay
- Lean Clay/Silty Clay
- Clayey Silt to Silty Clay
- Lean Clay/Silty Clay
- Clayey Silt to Silty Clay
- Lean Clay/Silty Clay
- Clayey Silt to Silty Clay

CPT Terminated at 80 Feet.

**Abandonment Method**
CPT backfilled with cement-bentonite grout upon retraction.

**Notes**
Upper 10 ft. of Interpreted Soil Description is taken from Laboratory Test Results and Visual Classification of soil samples as described in the associated Soil Boring Log. Below 10 ft. Soil Description is an interpreted behavior type based upon empirical correlations of cone tip and sleeve resistance.

STRATA BOUNDARIES MAY NOT BE EXACT.

**Terracon**

SHEET 2 OF 2

NON-CERTIFIED COPY — H&E 005,05



NON-CERTIFIED COPY

H&E 006406

**PROJECT:** Geotechnical Investigation
H&E Equipment- Addition and Renovation
Kenner, Louisiana
**CLIENT:** H&E Equipment Services
Baton Rouge, Louisiana

**CONE PENETROMETER TEST LOG**
**CPT-2**

**Associated Soil Boring: B-2**

**FILE:** ET115001
**DATE:** January 17, 2011
**DRILLER:** L. Tolen
**TECH.:** J. Grissom
**ENGINEER:** S. Greaber

SOIL DESCRIPTION (See Note)

Soft to firm brown and tan SILTY CLAY (CL)
- with tan sand, gravel pieces

Soft to firm gray and brown CLAY (CH)
- with silty sand

Lean Clay/Silty Clay
Clayey Silt to Silty Clay
Sensitive Fine Grained
Lean Clay/Silty Clay
Sensitive Fine Grained

Lean Clay/Silty Clay
Clay
Lean Clay/Silty Clay
Sand to Silty Sand
Lean Clay/Silty Clay
Clay

Lean Clay/Silty Clay
Clay

Lean Clay/Silty Clay
Clay
Lean Clay/Silty Clay
Clay
Lean Clay/Silty Clay

STRATA BOUNDARIES MAY NOT BE EXACT

**Abandonment Method**
CPT backfilled with cement-bentonite grout upon retraction.

**Notes**
Upper 10 ft. of Interpreted Soil Description is taken from Laboratory Test Results and Visual Classification of soil samples as described in the associated Soil Boring Log. Below 10 ft. Soil Description is an interpreted behavior type based upon empirical correlations of cone tip and sleeve resistance.

**Terracon**

SHEET 1 OF 2

CPT-LANDSCAPE SLOGS.ET115001.GPJ AQUATERR.GDT 1/31/11



NON-CERTIFIED COPY

H&E 0005407

CONE PENETROMETER TEST LOG
CPT-2

PROJECT: Geotechnical Investigation
H&E Equipment- Addition and Renovation
Kenner, Louisiana

CLIENT: H&E Equipment Services
Baton Rouge, Louisiana

Associated Soil Boring:    B-2

FILE: ET115001
DATE: January 17, 2011
DRILLER: L. Tolen
TECH.: J. Grissom
ENGINEER: S. Greaber

Lean Clay/Silty Clay (continued)
Sandy Silt to Clayey Silt
Clayey Silt to Silty Clay
Lean Clay/Silty Clay
Clayey Silt to Silty Clay
Lean Clay/Silty Clay
Clayey Silt to Silty Clay
Sandy Silt to Clayey Silt
CPT Terminated at 80 Feet.

Abandonment Method
CPT backfilled with cement-bentonite grout upon retraction.

Notes
Upper 10 ft. of Interpreted Soil Description is taken from Laboratory Test Results and Visual Classification of soil samples as described in the associated Soil Boring Log. Below 10 ft. Soil Description is an interpreted behavior type based upon empirical correlations of cone tip and sleeve resistance.

STRATA BOUNDARIES MAY NOT BE EXACT

**Terracon**

SHEET 2 OF 2



NON-CERTIFIED COPY

SHEET 1 OF 2

NON-CERTIFIED COPY

H&E 006509



**CONE PENETROMETER TEST LOG**
**CPT-3**

PROJECT: Geotechnical Investigation
H&E Equipment- Addition and Renovation
Kenner, Louisiana
CLIENT: H&E Equipment Services
Baton Rouge, Louisiana

Associated Soil Boring:  B-3

FILE: ET115001
DATE: January 17, 2011
DRILLER: L. Tolen
TECH.: J. Grissom
ENGINEER: S. Greaber

| Abandonment Method | Notes |
|---|---|
| CPT backfilled with cement-bentonite grout upon retraction. | Upper 10 ft. of Interpreted Soil Description is taken from Laboratory Test Results and Visual Classification of soil samples as described in the associated Soil Boring Log. Below 10 ft. Soil Description is an interpreted behavior type based upon empirical correlations of cone tip and sieve resistance. |

STRATA BOUNDARIES MAY NOT BE EXACT

**Terracon**

SHEET 2 OF 2

CPT-LANDSCAPE SLOGS.ET115001.GPJ AQUATERR.GDT 1/31/11

# APPENDIX B
# LABORATORY TESTING

NON-CERTIFIED COPY

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition ※ Kenner, Louisiana
February 9, 2011 ※ Terracon Project Number ET115001



## LABORATORY TESTING DESCRIPTION

The soil samples were delivered to the Terracon laboratory for testing. The project engineer reviewed each field boring log and assigned laboratory testing on selected samples to provide the data necessary for the anticipated designs.

Laboratory testing was accomplished to determine the engineering properties of the soils encountered. These procedures are discussed below.

### Index Properties

Moisture Content: Moisture content tests were performed to better understand the classification and shrink/swell potential of the soils encountered. These tests were performed in general accordance with ASTM D 2216. The results of these tests are tabulated within the Laboratory Data section of the attached boring log(s).

Atterberg Limits: Liquid limit (LL) and plastic limit (PL) determinations were performed to assist in classification by the Unified Soil Classification System (USCS). These tests were performed in general accordance with ASTM D 4318. The plasticity index (PI) was calculated as LL - PL for each Atterberg limit determination. The results of these tests are tabulated within the Laboratory Data section of each boring log.

### Strength Tests

Unconfined Compression: The undrained shear strength of selected undisturbed soil samples was determined by means of unconfined compression tests (ASTM D 2166). In an unconfined compression test, a cylindrical sample of soil is subjected to a uniformly increasing axial strain until failure develops. For cohesive soils, the undrained shear strength, or cohesion, is taken to be equal to one-half of the maximum observed normal stress on the sample during the test.

The results of the unconfined compression tests are provided as undrained shear strength values within the Laboratory Data section of each boring log. Also shown are the natural water contents and unit dry weights determined as a part of each compression test.

NON-CERTIFIED COPY

H&E 0065411

# APPENDIX C
# SUPPORTING DOCUMENTS

NON-CERTIFIED COPY



# SOIL BORING LEGEND

| FIELD DATA | LABORATORY DATA | Location: Coordinate (North & East) | | |

Location: Coordinate (North & East)

Latitude  Longitude

Surface Elevation:  Elev.

| Depth (feet) | Samples | Groundwater Level | Field Test Results | Undrained Shear Strength (ksf) | Unit Weight (pcf) Moist | Dry | Other/ Percent Finer | Natural Moisture Content and Atterberg Limits | Plasticity Index | DESCRIPTION | Soil Type |

Natural Moisture Content and Atterberg Limits
Plastic Limit — Moisture Content — Liquid Limit
20  40  60  80  PI

**DESCRIPTION** / Soil Type:
- CONCRETE
- FILL
- CLAY
- SANDY SILT
- CLAYEY SAND
- CLAYEY SILT
- SAND
- SILTY SAND
- SILTY CLAY
- CLAYEY SILT/SILTY CLAY
- SANDY CLAY
- GRAVEL

Samples/Field Test Results column:
- Auger Sample
- Pocket penetrometer reading
- 1.00 (P)
- Shelby Tube Sample
- Standard Penetration Test (blows/foot)
- 35 b/f
- 17-17-18
- Split Spoon Sample
- No Recovery
- Rock Core Sample
- 1.00 (P)
- Probe Core Sample

Depth markers: 5, 10, 15, 20, 25

## TERMS DESCRIBING CONSISTENCY

### Noncohesive Soils
(Includes gravels, sands and silts) Consistency determined by Standard Penetration Resistance

| Descriptive Term | Standard Penetration Resistance (blows per foot) |
|---|---|
| Very Loose | less than 4 |
| Loose | 5 to 9 |
| Medium Dense | 10 to 29 |
| Dense | 30 to 50 |
| Very Dense | above 50 |

### Cohesive Soils
(includes clays) Consistency determined by laboratory shear strength testing or by field visual-manual procedures.

| Descriptive Term | Undrained Shear Strength (kips per sq. ft.) |
|---|---|
| Very Soft | less than 0.25 |
| Soft | 0.25 to 0.50 |
| Firm | 0.50 to 1.00 |
| Stiff | 1.00 to 2.00 |
| Very Stiff | 2.00 to 4.00 |
| Hard | above 4.00 |

## FIELD TESTING

| Standard Penetration Testing | Pocket Penetrometer |
|---|---|
| The penetration resistance is the number of blows required to drive the split-spoon sampler the final 12 inches of penetration. | Strength estimates of relatively undisturbed samples are obtained by penetrometer readings. The measured units are in tons per square foot (tsf). |

## NOTES REGARDING SOIL DESCRIPTION

Soil descriptions provide classifications according to ASTM D2487 - Classifications of Soils for Engineering Purposes. Where laboratory data are available for shear strength and for classification verification, the data are utilized. Where no laboratory data exist, the descriptions are based upon the field classifications as made during the exploration according to ASTM D2488 - Description and Identification of Soils (Visual - Manual Procedure).

Soil structure as described on the boring logs can be defined as follows:

*Layer:* A soil deposit with a thickness in excess of one inch
*Seam:* A soil layer with a thickness of less than one inch.
*Homogeneous:* Having the same color and appearance throughout and lacking fissures.
*Fissured:* Having definite planes of discontinuity within a soil mass.
*Slickensided:* A fissured condition with fracture planes that appear polished and glossy.
*Jointed:* A fissured condition with fracture planes that are numerous and limited in extent.
*Laminated:* Numerous thin seams of soil types which vary in texture or color.
*Calcareous:* Containing obvious quantities of calcium carbonate.
*Indurated:* Hardened by pressure or cementation.
*Friable:* Easily crumbled.
*Organic:* Containing remains of living organisms.

STRATA BOUNDARIES MAY NOT BE EXACT

| Groundwater Level Data | Advancement Method | Notes |
|---|---|---|

Water initially encountered during dry augering

Groundwater level after a specified observation period

Stabilized water level after an extended period of observation

Actual depth to water may vary from the conditions observed in the borings. The presence of groundwater is masked in borings advanced by rotary wash methods.

**Advancement Method**
Description of methodology used to advance soil boring.

**Abandonment Method**
Description of methodology used to abandon or fill the completed borehole.

**Notes**
Notes describing other laboratory tests or surface conditions.

**Terracon**

NON-CERTIFIED COPY

H&E 0065413



**CONE PENETROMETER TEST LOG**

CPT-X

Associated Soil Boring: B-X

CPT LEGEND
TERMS USED ON CPT LOG

PROJECT:
CLIENT:

FILE:
DATE:
DRILLER:
TECH.:
ENGINEER:

Interpreted Soil Description:
Very soft to soft dark gray CLAY (CH)
- with organics
- with roots from 2' - 4'
Sensitive Fine Grained
Silty Sand to Sandy Silt
Sensitive Fine Grained
Clay
Sensitive Fine Grained

STRATA BOUNDARIES MAY NOT BE EXACT

Abandonment Method
Hole backfilled with cement/bentonite grout upon retraction.

Notes
Top 10 ft. of Interpreted Soil Description taken from Laboratory Test Results and Visual Classification.
See Figure 2 for CPT Location.

**Terracon**

SHEET 1 OF 1

Geotechnical Engineering Report
H&E Equipment- Renovation and Addition » Kenner, Louisiana
February 9, 2011 » Terracon Project Number ET115001



## UNIFIED SOIL CLASSIFICATION SYSTEM

### Criteria for Assigning Group Symbols and Group Names Using Laboratory Tests[A]

| | | | | Soil Classification | |
|---|---|---|---|---|---|
| | | | | Group Symbol | Group Name[B] |
| Coarse Grained Soils More than 50% retained on No. 200 sieve | Gravels More than 50% of coarse fraction retained on No. 4 sieve | Clean Gravels Less than 5% fines[C] | $Cu \geq 4$ and $1 \leq Cc \leq 3^E$ | GW | Well-graded gravel[F] |
| | | | $Cu < 4$ and/or $1 > Cc > 3^E$ | GP | Poorly graded gravel[F] |
| | | Gravels with Fines More than 12% fines[C] | Fines classify as ML or MH | GM | Silty gravel[F,G,H] |
| | | | Fines classify as CL or CH | GC | Clayey gravel[F,G,H] |
| | Sands 50% or more of coarse fraction passes No. 4 sieve | Clean Sands Less than 5% fines[D] | $Cu \geq 6$ and $1 \leq Cc \leq 3^E$ | SW | Well-graded sand[I] |
| | | | $Cu < 6$ and/or $1 > Cc > 3^E$ | SP | Poorly graded sand[I] |
| | | Sands with Fines More than 12% fines[D] | Fines classify as ML or MH | SM | Silty sand[G,H,I] |
| | | | Fines Classify as CL or CH | SC | Clayey sand[G,H,I] |
| Fine-Grained Soils 50% or more passes the No. 200 sieve | Silts and Clays Liquid limit less than 50 | inorganic | $PI > 7$ and plots on or above "A" line[J] | CL | Lean clay[K,L,M] |
| | | | $PI < 4$ or plots below "A" line[J] | ML | Silt[K,L,M] |
| | | organic | Liquid limit - oven dried / Liquid limit - not dried $< 0.75$ | OL | Organic clay[K,L,M,N] |
| | | | | | Organic silt[K,L,M,O] |
| | Silts and Clays Liquid limit 50 or more | inorganic | PI plots on or above "A" line | CH | Fat clay[K,L,M] |
| | | | PI plots below "A" line | MH | Elastic Silt[K,L,M] |
| | | organic | Liquid limit - oven dried / Liquid limit - not dried $< 0.75$ | OH | Organic clay[K,L,M,P] |
| | | | | | Organic silt[K,L,M,Q] |
| Highly organic soils | Primarily organic matter, dark in color, and organic odor | | | PT | Peat |

[A] Based on the material passing the 3-in. (75-mm) sieve

[B] If field sample contained cobbles or boulders, or both, add "with cobbles or boulders, or both" to group name.

[C] Gravels with 5 to 12% fines require dual symbols: GW-GM well-graded gravel with silt, GW-GC well-graded gravel with clay, GP-GM poorly graded gravel with silt, GP-GC poorly graded gravel with clay.

[D] Sands with 5 to 12% fines require dual symbols: SW-SM well-graded sand with silt, SW-SC well-graded sand with clay, SP-SM poorly graded sand with silt, SP-SC poorly graded sand with clay

[E] $Cu = D_{60}/D_{10}$   $Cc = \dfrac{(D_{30})^2}{D_{10} \times D_{60}}$

[F] If soil contains $\geq 15\%$ sand, add "with sand" to group name.

[G] If fines classify as CL-ML, use dual symbol GC-GM, or SC-SM.

[H] If fines are organic, add "with organic fines" to group name.

[I] If soil contains $\geq 15\%$ gravel, add "with gravel" to group name.

[J] If Atterberg limits plot in shaded area, soil is a CL-ML, silty clay.

[K] If soil contains 15 to 29% plus No. 200, add "with sand" or "with gravel", whichever is predominant.

[L] If soil contains $\geq 30\%$ plus No. 200 predominantly sand, add "sandy" to group name.

[M] If soil contains $\geq 30\%$ plus No. 200, predominantly gravel, add "gravelly" to group name.

[N] $PI \geq 4$ and plots on or above "A" line.

[O] $PI < 4$ or plots below "A" line.

[P] PI plots on or above "A" line.

[Q] PI plots below "A" line.



NON-CERTIFIED COPY

H&E 0065415

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


```
*   *   *   *   *   *   *   *   *
                            *
H&E EQUIPMENT SERVICES      *
                            * NUMBER 626,308
VERSUS                      *
                            * DIVISION "D"
URS CORPORATION             *
ARCHITECTURE, P.C., URS     *
CORPORATION, L O'NEAL       *
JOHNSON AND THOMAS E.       *
RYAN, III                   *
                            *
*   *   *   *   *   *   *   *   *
```


Deposition of JOHN ENGQUIST, taken

on Friday, August 5, 2016, commencing at 9:59

a.m., in the offices of Adams and Reese, LLP,

Attorneys at Law, 450 Laurel Street, Suite 1900,

Baton Rouge, Louisiana, 70801.

EXHIBIT
5

NON-CERTIFIED COPY

Page 2

1                    I N D E X

2

3                                         Page

4

Caption                                   1
5    Index of Exhibits                        3
Appearances                               4
6    Agreement of Counsel                     5

7    Examination

8      PHILIP A. FRANCO, ESQ.                 6

9

                *   *   *   *   *
10

Witness' Certificate                      94
11   Reporter's Page                          95
Certificate                               96

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

1                   INDEX OF EXHIBITS

2

      Number                              Page

3

      1 Agreement for Professional        20
4         Services between H&E Equipment
          Services and URS 8/30/06

5

      2 A-4 Application Site Plan, City   27
6         of Baton Rouge October 18, 2006
          H&E 0000109-0000113

7

      3 July 10, 2008 string from         38
8         Brad Barber to John Engquist
          H&E 0002958-0002960

9

      4 Short Form Master Agreement For   40
10        Professional Services between
          H&E Equipment Services and URS
11        August 13, 2009

12    5 December 18, 2009 Email string    44
          from Leonard St. Germain to
13        Neil Favre
          H&E 0005870-0005871

14

      6 May 3, 2011 letter from Neal      46
15        Johnson to Bob Morris, et al
          H&E 0003392-0003393

16

      7 November 27, 2012 Email from Becky 52
17        Walker to Neal Johnson, et al
          H&E 0003177-0003178

18

      8 January 2, 2013 Email string from 68
19        Brad Barber to John Engquist
          H&E 0003083-0003085

20

      9 January 19, 2013 Email from Brad  71
21        Barber to John Engquist
          H&E 0003179-0003186

22

      10 February 5, 2013 Email string from  80
23         Brad Barber to John Engquist
           H&E 0003198-0003200

24

25

NON-CERTIFIED COPY

Page 4

```
 1    APPEARANCES:

 2
          Representing the Plaintiff:
 3
          FISHMAN HAYGOOD, LLP
 4        Attorneys at Law
          201 St. Charles Avenue, Suite 4600
 5        New Orleans, Louisiana  70170

 6        BY:  BRENT B. BARRIERE, ESQ.

 7

 8

 9        Representing the Defendant:

10        ADAMS AND REESE, LLP
          Attorneys at Law
11        4500 One Shell Square
          New Orleans, Louisiana  70139
12
          BY:  PHILIP A. FRANCO, ESQ.
13             KELLEN J. MATHEWS, ESQ.

14
      ALSO PRESENT:
15

16        Representing H&E Equipment Services:

17        JOHN A. BERRY, ESQ.
          Corporate Counsel
18        7500 Pecue Lane
          Baton Rouge, Louisiana  70809
19
          Neal Johnson
20
      Reported by:
21             KAY E. DONNELLY
               Certified Court Reporter
22             State of Louisiana

23

24

25
```

NON-CERTIFIED COPY

Page 5

S T I P U L A T I O N

1

2

3        It is stipulated and agreed by and between

4   counsel that the deposition of JOHN ENGQUIST is

5   hereby being taken under the Louisiana Code of

6   Civil Procedure in accordance with the Code.

7        The formalities of sealing and

8   certification are hereby waived.  The witness

9   will reserve the right to read and sign the

10  deposition.  The party responsible for service

11  of the discovery material shall retain the

12  original.

13       All objections, save those as to the form

14  of the questions, are hereby reserved until such

15  time as this deposition, or any part thereof,

16  may be used or sought to be used in evidence,

17  and are to be made in accordance with the Code

18  of Civil Procedure.

19              *   *   *   *   *

20       KAY E. DONNELLY, Certified Court Reporter,

21  in and for the State of Louisiana, officiated in

22  administering the oath to the witness.

23

24

25

NON-CERTIFIED COPY

Page 6

1          JOHN ENGQUIST, H&E Equipment Services,

2   7500 Pecue Lane, Baton Rouge, Louisiana, 70809,

3   after having been first duly sworn, testified on

4   his oath as follows:

5   EXAMINATION BY MR. FRANCO:

6       Q.  Would you state your full and mane

7   address for the Record, please?

8       A.  John Engquist, 525 Lafayette Street,

9   Apartment 912, Baton Rouge.

10      Q.  Mr. Engquist, have you ever been deposed

11  before?

12      A.  Yes.

13      Q.  So you understand the routine?

14      A.  I do.

15      Q.  All right.  If you don't understand a

16  word I am using or the question, just let me

17  know, and I'll try to rephrase that.

18          Otherwise, I'll assume that you

19  understand my --

20      A.  Sure.

21      Q.  Prior to your deposition today, did you

22  review anything to prepare for your deposition?

23      A.  I did not.

24      Q.  Did you speak to anyone in order to

25  prepare for your deposition, other than your

NON-CERTIFIED COPY

1    attorneys?

2        A.  No.

3        Q.  Can you give me your educational

4    background, sir?

5        A.  I went to high school, Baton Rouge High.

6    I went to LSU for three years, and went to work

7    at H&E Equipment.

8        Q.  Did you attain any degree?

9        A.  No.

10       Q.  And you said you went to work directly

11   to H&E?

12       A.  That is correct.

13       Q.  And what was your first position at H&E?

14       A.  Mechanic's helper.

15       Q.  And who hired you?

16       A.  The service manager.

17       Q.  What was the business of H&E at the

18   time?

19       A.  We were a heavy construction equipment

20   distributor.

21       Q.  And your father was involved?

22       A.  That is correct.  He founded the

23   business.

24       Q.  And at the time you started working

25   there, what was your father's role in the

NON-CERTIFIED COPY

Page 34

1          The site proposal that I showed you just

2     now was dated in 2006.  That is when the

3     discussion started about the development of the

4     Baton Rouge site, correct?

5          A.  I would assume that is correct.

6          Q.  All right.  And there was some work done

7     by URS in connection with the development of the

8     site contemporaneously at that time, correct?

9          A.  I couldn't argue that.  Sure.

10         Q.  That is fine.

11              There came a time when that concept of

12     developing the Baton Rouge site was put on hold

13     by H&E; is that correct?

14         A.  That is correct.

15         Q.  Do you remember what time period that

16     was?

17         A.  I am assuming.  I don't -- I don't know

18     exact -- I am assuming it was probably in '08

19     during the -- you know, during the depths of the

20     recession, and we elected to put the project on

21     hold.

22         Q.  And can you tell me the reason it was

23     put on hold?

24         A.  Yeah.  We were in the midst of a -- you

25     know, the biggest recession our sector had ever

NON-CERTIFIED COPY

1   seen, and we elected to conserve cash, as

2   opposed to proceeding with it.

3      Q.  Do you remember when it was put back on

4   the front burner?

5      A.  This is somewhat of an educated guess.

6   I think it was probably in the '11 timeframe.

7      Q.  That long of a period of --

8      A.  Yeah, I -- we wouldn't have started the

9   project in '10.  That is kind of when our sector

10  bottomed down.  So I'm assuming it was in 2011.

11     Q.  Whose decision was it, at that time, to

12  start proceeding again with it?

13     A.  Probably my decision.  Ultimately, it

14  was my decision, but there was other people

15  involved with that.

16     Q.  Okay.  Did you need board approval for

17  that?

18     A.  Whether or not I needed board approval,

19  I am sure I ran it by the board.

20     Q.  How often does H&E have board meetings?

21     A.  Quarterly.

22     Q.  Quarterly only?

23     A.  Uh-huh (affirmative response).

24     Q.  And there are minutes kept of the board

25  meetings, I presume?

NON-CERTIFIED COPY

Page 71

1          It is now, yeah.

2    EXAMINATION BY MR. FRANCO:

3       Q.  Did you have 205 staff people at that

4    time?

5       A.  I don't recall what our headcount was at

6    that time.

7       Q.  Okay.  I'm sorry.  I know my order here.

8       A.  No problem.  Are we through with this?

9       Q.  Yes.  All right.

10          MR. FRANCO:

11             Next I am going to show you a

12    document I am going to label as Exhibit 9.

13    EXAMINATION BY MR. FRANCO:

14       Q.  This is bids to put that Phase 1 of

15    parking in, correct?

16       A.  All right.

17       Q.  And it looks like the bid was from

18    Womack at $129,730.  You see that total?

19       A.  I do.

20       Q.  Did you approve that?

21       A.  I -- I assume we did, yes.

22       Q.  Now, Mr. Engquist, is it fair to say,

23    sir, that if you wanted to add 52 extra spaces

24    originally, you would have had to pay for 52

25    extra spaces?  Fair statement?

NON-CERTIFIED COPY

Page 72

1    A.  Yeah.  I don't know what the

2  relationship would have been if they had done it

3  to begin with versus having to go back and do

4  it.

5    Q.  Right.

6    A.  I mean, there is a -- there is no

7  correlation there.

8    Q.  And I understand.  I'm not going to ask

9  you about specific numbers at this point.

10        But the concept is if you believed you

11  needed 52 extra spaces, you would have had to

12  pay for that originally, wouldn't you?

13    A.  It would have cost something, yes.

14    Q.  And so this 130,000 includes some amount

15  that you would have had to pay originally.

16  Isn't that a fair statement?

17    A.  Yes.  But I am sure it wasn't anything

18  like that number.

19    Q.  Well, you really don't know if the

20  paving would have been different between

21  original and here, the addition?

22    A.  I don't understand your question.

23  Whether --

24    Q.  Okay.  There was so much extra paving

25  that had to be done for 52 spaces.  Fair

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES, INC. | * | CASE NO. C626308, SECTION D |
|---|---|---|
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON, AND THOMAS E. RYAN, III | * | PARISH OF EAST BATON ROUGE |
| | * | STATE OF LOUISIANA |

FILED: _____        _____

                                             **DEPUTY CLERK**

## AFFIDAVIT OF FRANKIE WYNN

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

NOW COMES, Frankie Wynn, who under penalty of perjury and from his own personal knowledge, states:

1.      I am over the 18 years of age and competent to give testimony in this matter.  I have personal knowledge of all facts and circumstances in this Affidavit.

2.      I submit this Affidavit in support of the Opposition to Defendants' Motion for Summary Judgment filed by H&E Equipment Services, Inc. ("H&E").

3.      I am currently the Director of Facilities/Risk/Compliance Management for H&E and am based out of H&E's Corporate Headquarters located at 7500 Pecue Lane, Baton Rouge, Louisiana.  I have held this position since May 2010, prior to which I served as H&E's Risk/Asset Manager.

4.      As H&E's Director of Facilities, I was responsible for overseeing the construction phase of the Baton Rouge, Kenner, and Belle Chase, Louisiana projects at issue in this litigation.

5.      I officially began overseeing the Baton Rouge, Kenner, and Belle Chase construction projects in 2010.  In addition, I maintain H&E's files regarding the projects and have reviewed the documents relevant to this dispute.

6.      During my involvement with the projects, I regularly communicated with L. O'Neal Johnson, Thomas E. Ryan, III, and other representatives and employees of URS Corporation Architecture, P.C. and URS Corporation (collectively, referred to as "URS"), as well as the various general contractors and subcontractors for the three projects.

7.      I am aware of two master services agreements that pertain to the Baton Rouge, Kenner, and Belle Chase projects: the Agreement for Professional Services entered into and executed by the parties on or about August 28, 2006 (the "2006 Agreement"), and the Short

-1-

NO LEC 866095 v3
2919213-000024

NON-CERTIFIED COPY

EXHIBIT

6

Form Master Agreement for Professional Services between the parties dated August 13, 2009 (the "2009 Agreement").

8.    A true and correct copy of the 2006 Agreement is attached to H&E's Opposition to Motion for Summary Judgment as Exhibit "3."

9.    A true and correct copy of the 2009 Agreement is attached to H&E's Opposition to Motion for Summary Judgment as part of Exhibit "2."

10.    There have been multiple problems associated with the work performed by URS on all three projects at issue. Among other things, during and/or around the time of substantial completion of the Baton Rouge and Kenner projects, H&E and the project contractors began to observe crumbling and spalling in the concrete constructed to URS's specifications at the facilities.

11.    H&E notified URS of the observed problems with the concrete at the Baton Rouge and Kenner sites when those problems surfaced, in hopes – and with the expectation – that the parties would work together to find a solution and remedy. But, while URS initially appeared willing to troubleshoot the problems, they ultimately refused to participate in ongoing discussions and efforts to fix the concrete pads. URS also refused to share with H&E or the project contractors information regarding its own apparent efforts to troubleshoot the problem and what it and its engineering consultant concluded about the problem.

12.    URS did not attempt or offer to re-perform its design services or provide new specifications for the concrete pads at the Baton Rouge and Kenner facilities.

13.    The concrete problems at the Baton Rouge and Kenner facilities began in or around late 2012 and early 2013 – near the time of substantial completion – and continue to worsen to this day.

Dated:    June  5 , 2015

_____
FRANKIE WYNN

SWORN TO AND SUBSCRIBED
BEFORE ME ON THIS THE
5th DAY OF JUNE, 2015.

_____
NOTARY PUBLIC

James D. Seymour, Notary Public
LA Bar Roll No.: 29418
Commissioned for East Baton Rouge, Louisiana
Qualified to act Statewide
My Commission is for Life.

-2-

NO LBC 866095 v3
3919213-000024

NON-CERTIFIED COPY

# URS

**Remittance Page**

| | |
|---|---|
| Invoice Date | 02/24/11 |
| Invoice | 4602441 |
| Project | 19228820 |
| Page | 1 |

Reference:  PSA-1 dated 08/28/06

For:   H&E Corp. HQ - Construction

Professional Services for Period Ending 02/11/11

H & E Equipment Services, Inc.
Attn: Leonard St. Germain
11100 Mead Road, Suite 200
Baton Rouge LA 70816

| | | |
|---|---|---|
| Total Due: | $24,500.00 | USD |
| Terms: | Net 30 | |

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**   URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**   URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**

| | |
|---|---|
| Account: | URS Corporation |
| Bank: | Wells Fargo Bank |
| Account No.: | 4520-086471 |
| ABA Routing No.: | 121-000-248 |
| Swift Code: | WFBIUS6S |

Remittance Information can be sent to:

| | |
|---|---|
| Email: | RemitTo@URSCorp.com |
| Fax: | (512) 419-6937   Attn:  Cash Applications |

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp
if you have any questions regarding this invoice.

**EXHIBIT**
4

NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 02/24/11 |
| Invoice | 4602441 |
| Project | 19228820 |
| Page | 2 |

H & E Equipment Services, Inc.
Attn: Leonard St. Germain
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:   PSA-1 dated 08/28/06

For:   H&E Corp. HQ - Construction

Professional Services for Period Ending 02/11/11

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job:  19228820  H&E Corp. HQ-Construction Docs | 24,500.00 | 0.00 | 24,500.00 |
| Total this job | 24,500.00 | 0.00 | 24,500.00 |
| | | | |
| TOTAL THIS INVOICE | 24,500.00 | 0.00 | $24,500.00 USD |

Project Manager: Robert C. Herndon

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

NON-CERTIFIED COPY



|  |  |
|---|---|
| Invoice Date | 02/24/11 |
| Invoice | 4602441 |
| Project | 19228820 |
| Page | 3 |

H & E Equipment Services, Inc.
Attn: Leonard St. Germain
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  PSA-1 dated 08/28/06

For:  H&E Corp. HQ - Construction

Professional Services for Period Ending 02/11/11
*Job: 19228820  H&E Corp. HQ-Construction Docs*

**LUMP SUM**

| | |
|---|---|
| Lump Sum Billing | 24,500.00 |
| **Total Lump Sum** | **24,500.00** |
| | |
| *Total due this job* | *24,500.00* |
| | |
| **TOTAL THIS INVOICE** | **$24,500.00** USD |

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

F32719806

NON-CERTIFIED COPY

# URS

**Remittance Page**

| | |
|---|---|
| Invoice Date | 04/27/11 |
| Invoice | 4666033 |
| Project | 19228820 |
| Page | 1 |

Reference:  PSA-1 dated 08/28/06

For:  H&E Corp. HQ - Construction

<u>Professional Services for Period Ending 04/15/11</u>

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

**Total Due:**  $24,500.00  USD
Terms:  Net 30

\* Make checks payable to: URS Corporation
\* Please indicate invoice number and/or project number on check
\* Please include this stub with payment

**Regular Mail (USPS):**   URS Corporation
                           P.O. Box 116183
                           Atlanta GA 30368-6183
                           US

**Overnight Courier:**   URS Corporation
                         Lock Box No. 116183
                         100 South Crest Drive
                         Stockbridge, GA  30281
                         Attention:  Atlanta Lockbox
                         (877) 786-3333

**Electronic Funds Transfer:**

| | |
|---|---|
| Account: | URS Corporation |
| Bank: | Wells Fargo Bank |
| Account No.: | 4520-086471 |
| ABA Routing No.: | 121-000-248 |
| Swift Code: | WFBIUS6S |

VENDOR _1006495_
G/L _560010_
APPROVED _7.A. 5/3/2011_
DATE
AMOUNT _$ 24,500.00_

Remittance Information can be sent to:
Email:        RemitTo@URSCorp.com
Fax:          (512) 419-6937   Attn:  Cash Applications

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

EXHIBIT
_5_

NON-CERTIFIED COPY

H & E 0001532



|  |  |
|---|---|
| Invoice Date | 04/27/11 |
| Invoice | 4666033 |
| Project | 19228820 |
| Page | 2 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  PSA-1 dated 08/28/06

For:   H&E Corp. HQ - Construction

Professional Services for Period Ending 04/15/11

|  | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job: 19228820  H&E Corp. HQ-Construction Docs | 24,500.00 | 0.00 | 24,500.00 |
| Total this job | 24,500.00 | 0.00 | 24,500.00 |
| TOTAL THIS INVOICE | 24,500.00 | 0.00 | $24,500.00 USD |

Project Manager: Robert C. Herndon

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

NON-CERTIFIED COPY

H & E 0001533



| | |
|---|---|
| Invoice Date | 04/27/11 |
| Invoice | 4666033 |
| Project | 19228820 |
| Page | 3 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  PSA-1 dated 08/28/06

For:   H&E Corp. HQ - Construction

Professional Services for Period Ending 04/15/11
*Job: 19228820  H&E Corp. HQ-Construction Docs*

**LUMP SUM**

| | |
|---|---|
| Lump Sum Billing | 24,500.00 |
| **Total Lump Sum** | **24,500.00** |
| *Total due this job* | *24,500.00* |
| **TOTAL THIS INVOICE** | **$24,500.00** USD |

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

F33575589

NON-CERTIFIED COPY

H & E 0001534

# URS

**Neal Johnson, AIA**
Principal Architect

April 26, 2011

Frankie Wynn
H & E Equipment Services Inc.
11100 Mead Road, Suite 200
Baton Rouge, Louisiana 70816

Re:    H&E Corp. HQ - Construction
       Baton Rouge, Louisiana

Mr. Wynn:

Enclosed please find invoice 4666033 for the above referenced project along with an invoice worksheet for your reference.  The invoiced amount of $24,500.00 represents work completed through 100% of construction documents phase.

Should you have any questions, please don't hesitate to call me at (225) 231-6343.

Sincerely,
URS Corporation

Neal Johnson, AIA
Principal Architect

**URS Corporation**
**7389 Florida Boulevard, Suite 300**
**Baton Rouge, LA 70806**
**225.922.5700**

NON-CERTIFIED COPY

H & E 0001535

URS Corporation Confidential                    4/27/2011                                    Page 1

# Invoice Worksheet

**URS**

Date

| | | |
|---|---|---|
| Project Name | **H&E Corp. HQ - Construction** | |
| Project No. | | |
| URS Project # | **19228820** | |

| | | |
|---|---|---|
| Schedule of Values | | $490,000.00 |
| Base Fee | | $            - |
| | TOTAL | $   490,000.00 |

| | | |
|---|---|---|
| Total Fee | | $  148,848.00 |

| | | | |
|---|---|---|---|
| Fees through Construction Documents | 100% @ | 100.00% Complete | $ 490,000.00 |
| | | Fee Earned to Date | $ 490,000.00 |
| | Less Amount Previously Paid | | $ 465,500.00 |
| | | Reimbursable Expense Due | $            - |
| | TOTAL DUE THIS PAYMENT | | **$24,500.00** |

NON-CERTIFIED COPY    H & E 0001536

# URS

**Remittance Page**

| | |
|---|---|
| Invoice Date | 05/27/11 |
| Invoice | 4691270 |
| Project | 19229736 |
| Page | 1 |

Reference:  Work Order# 02-11

For:  H & E 2011 Planning Commission
      Resubmittal

Professional Services for Period Ending 05/13/11

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

| | |
|---|---|
| Total Due: | $22,500.00  USD |
| Terms: | Net 30 |

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**    URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**    URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

VENDOR *1006495*
G/L *560010*
APPROVED *JH 6/10/2011*
DATE
AMOUNT *$22,500.00*

*CAPITAL ORDER*
*40000340*

**Electronic Funds Transfer:**
| | |
|---|---|
| Account: | URS Corporation |
| Bank: | Wells Fargo Bank |
| Account No.: | 4520-086471 |
| ABA Routing No.: | 121-000-248 |
| Swift Code: | WFBIUS6S |

Remittance Information can be sent to:
| | |
|---|---|
| Email: | RemitTo@URSCorp.com |
| Fax: | (512) 419-6937    Attn:  Cash Applications |

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

NON-CERTIFIED COPY

H & E 0001537



Invoice Date    05/27/11
Invoice         4691270
Project         19229736
Page            2

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:   Work Order# 02-11

For:   H & E 2011 Planning Commission
       Resubmittal

Professional Services for Period Ending 05/13/11

|  | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job: 19229736  H&E 2011 Planning Commisssion | 22,500.00 | 0.00 | 22,500.00 |
| **Total this job** | **22,500.00** | **0.00** | **22,500.00** |
| **TOTAL THIS INVOICE** | **22,500.00** | **0.00** | **$22,500.00** USD |

Project Manager: Neal Johnson

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

NON-CERTIFIED COPY

H & E 0001538



| | | |
|---|---|---|
| Invoice Date | | 05/27/11 |
| Invoice | | 4691270 |
| Project | | 19229736 |
| Page | | 3 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:   Work Order# 02-11

For:   H & E 2011 Planning Commission
        Resubmittal

<u>Professional Services for Period Ending 05/13/11</u>

*Job:  19229736  H&E 2011 Planning Commisssion*

**LUMP SUM**

| | | |
|---|---|---|
| Lump Sum Billing | 22,500.00 | |
| **Total Lump Sum** | | **22,500.00** |
| | | |
| *Total due this job* | | *22,500.00* |
| | | |
| **TOTAL THIS INVOICE** | | **$22,500.00** USD |

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

F33998133

NON-CERTIFIED COPY

H & E 0001539



**Neal Johnson, AIA**
Principal Architect

May 19, 2011

Frankie Wynn
H & E Equipment Services Inc.
11100 Mead Road, Suite 200
Baton Rouge, Louisiana 70816

Re:   H&E 2011 Planning Commission
       Baton Rouge, Louisiana

Mr. Wynn:

Enclosed please find invoice 4691270 for the above referenced project along with an invoice worksheet for your reference. The invoiced amount of $ 22,500.00 represents work completed through 100%.

Should you have any questions, please don't hesitate to call me at (225) 231-6343.

Sincerely,
URS Corporation

Neal Johnson, AIA
Principal Architect

**URS Corporation**
**7389 Florida Boulevard, Suite 300**
**Baton Rouge, LA 70806**
**225.922.5700**

NON-CERTIFIED COPY

H & E 0001540

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


\* \* \* \* \* \* \* \* \*
                 \*
H&E EQUIPMENT SERVICES   \*
                 \* NUMBER 626,308
VERSUS                   \*
                 \* DIVISION "D"
URS CORPORATION          \*
ARCHITECTURE, P.C., URS  \*
CORPORATION, L O'NEAL    \*
JOHNSON AND THOMAS E.    \*
RYAN, III                \*
                 \*
\* \* \* \* \* \* \* \* \*


Deposition of STEPHAN DORSEY, taken

on Wednesday, August 10, 2016, commencing at

10:03 a.m., in the offices of Adams and Reese,

LLP, Attorneys at Law, 450 Laurel Street, Suite

1900, Baton Rouge, Louisiana, 70801.

EXHIBIT

7

NON-CERTIFIED COPY

1                    I N D E X

2

3                                              Page

4

     Caption                            1
5     Index of Exhibits                  3
     Appearances                        7
6     Agreement of Counsel               8

7     Examination

8        PHILIP A. FRANCO, ESQ.          9
        ALYSSON L. MILLS, ESQ.         149
9        PHILIP A. FRANCO, ESQ.        151

10             *   *   *   *   *

11    Witness' Certificate            153
     Reporter's Page                 154
12    Certificate                     155

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 3

1                    INDEX OF EXHIBITS

2

3    Number                                Page

4    1  June 24, 2011 Email from         25
        Kim Nunez to Neal Johnson,
5        et al -- Revised
         Preconstruction Meeting
6        Minutes
         H&E 0007521-0007528

7

     2  June 15, 2011 Email string from  28
8        West Wilkerson to Thomas Ryan,
         et al
9        URS 071273-071275
                    And
10       Request for Information No. 2
         6/14/2011
11       URS 064254

12   3  AS-BUILT DRAWINGS retained by    38
         Counsel for URS

13

14   4  June 16, 2011 Email string from  43
         Thomas Ryan to S. Dorsey,
15       et al
         URS 043299-043301

16   5  December 15, 2011 Email string   44
         from Thomas Ryan to Russ
17       Randy
         URS 085618-085621

18

     6  May 31, 2012 Email string        48
19       from Neal Johnson to Tim
         Gaines
20       URS 034957-034958

21   7  August 3, 2012 Email string      50
         from Murray McCullough to
22       Neal Johnson
         URS 047322-047325

23

24

25

NON-CERTIFIED COPY

Page 4

1   (Cont.)       INDEX OF EXHIBITS

2

3      Number                                    Page

4
        8  August 7, 2012 Email string      53
5             from Thomas Ryan to Stephan
              Dorsey, et al
6             URS 087952-87955

7      9   August 16, 2012 Email string     56
              from Neal Johnson to Murray
8             McCullough, et al
              H&E 0051125
9
        10 August 22, 2012 Email string     57
10            from Thomas Ryan to Stephan
              Dorsey, et al
11            H&E 0008946

12      11 URS Change Proposal Request       59
              October 15, 2012 Baton Rouge
13            URS 049066-049067

14      12 November 19, 2012 Email string    60
              from Neal Johnson to Murray
15            McCollough, et al
              URS 057251-057253
16
        13 URS Architect's Supplemental      66
17            Instructions December 21, 2012
              Baton Rouge
18            URS 050706-050710

19      14 January 7, 2013 Email from        70
              Frankie Wynn to Neal
20            Johnson, et al
              H&E 0020725-0020727
21
        15 Milton J. Womack, Inc. Letter     74
22            of Transmittal 1/14/2013
              and Certificate of
23            Substantial Completion
              1/7/2013
24            H&E 0055262-0055307

25

NON-CERTIFIED COPY

Page 5

1   (Cont.)        INDEX OF EXHIBITS

2

3     Number                                    Page

4

      16  January 18, 2013 Email string      77
5           from Frankie Wynn to Stephan
            Dorsey, et al
6           H&E 0046612-0046621

7     17  Milton J. Womack, Inc.,            81
            Modification Request
8           1/22/2013 Parking Lot
            Addition - Phase 1
9           URS 076596-076603

10    18  Superior Millworks Estimate        84
            February 20, 2013
11          URS 031129

12    19  Womack Memo April 9, 2013          86
            re: Site paving caulking
13          issue
            URS 031122-031128

14
      20  April 10, 2013 Email string       107
15          from Frankie Wynn to Thomas
            Ryan, et al
16          URS 054724-054730

17    21  May 8, 2013 Email string          117
            from Thomas Ryan to Stephan
18          Dorsey
            URS 090662-090668

19
      22  May 13, 2013 Email string         118
20          from Frankie Wynn to Thomas
            Ryan, et al
21          H&E 0024757-0024758

22    23  June 6, 2013 Email from Frankie    122
            Wynn to Stephan Dorsey, et al
23          H&E 0032994-0032001

24

25

NON-CERTIFIED COPY

1    (Cont.)        INDEX OF EXHIBITS

2

3    Number                              Page

4      24   June 6, 2013 Email string from    123
             Stephan Dorsey to Frankie
5            Wynn, et al
             H&E 0008900-0008901
6
       25   June 10, 2013 Email string from   127
7            Frankie Wynn to Stephan
             Dorsey
8            H&E 0056606-0056607

9      26   June 13, 2013 Email string        129
             from Neal Johnson to Debra
10           Sanders
             URS 03165
11
       27   June 24, 2013 Email string      · 133
12           from Neal Johnson to Frankie
             Wynn, et al
13           H&E 0025356

14     28   June 25, 2013 Email string        134
             from Frankie Wynn to
15           Thomas Ryan, et al
             H&E 0025359-0025361
16
       29   August 13, 2013 Email from        144
17           Frankie Wynn to John Jones
             H&E 0008374-0008388
18
       30   August 14, 2013 Email string      145
19           from Frankie Wynn to
             Stephan Dorsey
20           H&E 0054903-0054904

21

22

23

24

25

NON-CERTIFIED COPY

Page 7

```
 1   APPEARANCES:

 2

         Representing the Plaintiff:
 3
         FISHMAN HAYGOOD, LLP
 4       Attorneys at Law
         201 St. Charles Avenue, Suite 4600
 5       New Orleans, Louisiana  70170

 6       BY:  ALYSSON L. MILLS, ESQ.

 7

 8

 9       Representing the Defendant:

10       ADAMS AND REESE, LLP
         Attorneys at Law
11       4500 One Shell Square
         New Orleans, Louisiana  70139
12
         BY:  PHILIP A. FRANCO, ESQ.
13            KELLEN J. MATHEWS, ESQ.

14
     ALSO PRESENT:
15

16       Representing Stephan Dorsey
         SCHUTTE, TERHOEVER, RICHARDSON, EVERSBERG,
17            CRONIN, JUDICE & BOUDREAUX, LLP
         Attorneys at Law
18       501 Louisiana Avenue
         Baton Rouge, Louisiana  70802
19
         BY:  ANDREW W. EVERSBERG, ESQ.
20
         Frankie W. Wynn
21
         Thomas E. Ryan II
22

23   Reported by:
              KAY E. DONNELLY
24            Certified Court Reporter
              State of Louisiana
25
```

NON-CERTIFIED COPY

1      A.  We actually --

2      Q.  Let me ask it a different way.

3          What did you understand happened, and

4   why did this have to be revised?

5      A.  As I understood it, the day they opened,

6   there were employees riding around looking for

7   parking spots because -- just because they

8   didn't have enough parking spots to house

9   everybody.

10     Q.  Did you participate in the discussion of

11  these construction drawings with any of the H&E

12  people before the parking lot was constructed?

13     A.  Before the new parking lot was

14  constructed?

15     Q.  Before the original parking lot was

16  constructed?

17     A.  No.  There -- there wouldn't have been

18  any reason to then.  Are you talking about prior

19  to design?  I mean, that would have been a

20  design specification.

21     Q.  Prior to construction.  In other words,

22  did you go over the construction?  Did you

23  attend any meetings when the construction

24  drawings were reviewed?

25     A.  No.  That would have been our estimating

NON-CERTIFIED COPY

Page 74

1    break to use the men's room.

2        A.  Okay.

3        Q.  And two, we need to decide what we want

4    to do about lunch because if we want to order

5    something, sandwiches or whatever, we need to do

6    that.  We are not going to finish before lunch.

7        A.  Okay.

8        Q.  So we can go off, and you can talk about

9    what you want to do.  And since you are the

10   deponent, you have got the priority to decide

11   what we are going to eat.

12       (Recess held.)

13   EXAMINATION BY MR. FRANCO:

14       Q.  All right.  The next document I want to

15   show you is Exhibit 15, and it is H&E 55261.

16       A.  Okay.

17       Q.  The first document is the transmittal

18   sheet signed by you, I presume; is that correct?

19       A.  Well, it is a girl in our office for me,

20   yes.

21       Q.  Oh, okay.  Somebody signed it for you?

22       A.  Yes.

23       Q.  All right.  But you authorized it, I

24   take it?

25       A.  Yes.

NON-CERTIFIED COPY

1    Q.  All right.  And this is the certificate

2  of substantial completion for the Baton Rouge

3  project, correct?

4    A.  Correct.

5    Q.  And, apparently, the architect, Womack,

6  and H&E all agreed that the date of substantial

7  completion was December 17, 2012, correct?

8    A.  That --

9    Q.  Look right above Frankie Wynn's

10 signature.

11   A.  Yes, that is correct.

12   Q.  Then it says "attached to this

13 document," and these were attached to that

14 certificate, these documents, correct?

15   A.  Correct.

16   Q.  All right.  It says "deficiencies to the

17 completion of the contract"?

18   A.  Correct.

19   Q.  Otherwise known as the punch list?

20   A.  Yes.

21   Q.  And on the punch list on the first page,

22 if you go about three-quarters of the way down,

23 it says mail/supply 113.  You see that?

24   A.  Okay.

25   Q.  It says install millwork, install

NON-CERTIFIED COPY

1  missing vinyl base, install missing electrical

2  cover plates.  Do you see that?

3      A.  Correct.

4      Q.  Now, do you recall that the mail slots

5  in that mailroom were also changed after they

6  were originally installed?

7      A.  Yes.

8      Q.  Do you recall if there was other changes

9  made to the mailroom other than just the size of

10  the mail slots?

11      A.  I don't recall.  I know -- I remember

12  the mail slots.

13      Q.  Okay.  If you will, look at the as-built

14  drawings and tell me if the dimensions of the

15  mail slots were shown on the construction

16  drawings.

17      A.  Let's see.  (Reviewing document.)

18      Q.  And tell me what drawing you may be

19  referring to when you do that.

20      A.  Okay.  All these drawings run together

21  after a while.  They are not -- so let's see.

22      Q.  Picture me with three different projects

23  as a lawyer.  You think you got problems.

24      A.  All right.  I'm getting somewhere.  I

25  can't really see it, but it is -- it looks like

NON-CERTIFIED COPY

Page 77

1    each slot is supposed to be nine inches.

2        Q.  You can't see it because it is too small

3    right now with those drawings.

4        A.  I mean, it is like nine inches by one

5    foot.

6        Q.  All right.  But the dimensions are

7    indicated on the drawings, are they not?

8        A.  Yes.

9        Q.  And which drawing is that?

10       A.  A-402.A.

11       Q.  I'm sorry.  Say it again, please.

12       A.  A-402.A.  Detail Number 9.

13       Q.  Right.  And that was the as-built and

14   that was subsequently changed, correct?

15       A.  Yes.

16       Q.  All right.  Just give me one second.

17       A.  Okay.

18       Q.  All right.  The next one I'm going to

19   show you is Exhibit 16, H&E 46612.

20           MR. EVERSBERG:

21               The number again?

22           MR. FRANCO:

23               46612.

24   EXAMINATION BY MR. FRANCO:

25       Q.  That is an Email from Frankie Wynn to

NON-CERTIFIED COPY

1       A.   No, it doesn't appear to be.

2       Q.   All right.  The next document I want to

3  show you is Exhibit 17, URS 76596.

4            This was the price that Womack provided

5  to H&E to construct Phase 1 of the parking lot

6  revision, correct?

7       A.   Correct.

8       Q.   Was that the actual price that was

9  charged and paid?

10      A.   Yes.

11      Q.   $125,180, correct?

12      A.   Correct.

13      Q.   And let me see if this document has it

14  on here.  How many spaces?  52, I want to say?

15      A.   I would have to see the ASI 136.  It is

16  not attached to --

17      Q.   Yeah.  Assume it added 52 spaces for me.

18      A.   Okay.

19      Q.   There would have been an original cost

20  of 52 additional parking spaces, wouldn't there

21  have been?

22      A.   If we would have -- if it would have

23  been in an original construction document?

24      Q.   Yes.

25      A.   Correct.

NON-CERTIFIED COPY

Page 84

1    them?

2        A.  Correct.  Well, some we do.

3        Q.  Some you do --

4        A.  Some --

5        Q.  -- just to keep them happy?

6        A.  Yeah.

7        Q.  But you don't have to?

8        A.  No.

9        Q.  All right.  I don't need to show you

10   this.

11           You were authorized to put in Phase 1

12   parking, and you did that?

13       A.  Correct.

14       Q.  And you got paid for that?

15       A.  Correct.

16       Q.  All right.  The next document I'm going

17   to show you is Exhibit 18, URS 31129.

18           Was this a sub of Womack?

19       A.  Yes.

20       Q.  Superior Millwork?

21       A.  Uh-huh (affirmative response).  Yes.

22       Q.  Okay.  You recall this?

23       A.  Yes.

24       Q.  All right.  This is work done in the

25   mailroom, correct?

NON-CERTIFIED COPY

Page 85

1      A.   Correct.

2      Q.   So this $13,500 was more than just

3   adding new mail slots, wasn't it?

4      A.   Yes.  It is four or five items.  Well --

5      Q.   Four items?

6      A.   Four items, yes.

7      Q.   Was there other work done other than

8   millwork changes in the mailroom, to your

9   knowledge?

10      A.   Not that I recall.

11      Q.   Do you know whether you had to rework

12   two existing walls of cabinets in order to put

13   in a different size mail slot?

14      A.   I would have to see the sketch --

15      Q.   Okay.

16      A.   -- to know if there was an ASI

17   attachment to this.

18      Q.   All right.

19      A.   I'm assuming if he wrote it in, yes.  He

20   is responding to the ASI.

21      Q.   Then it says add new base cabinet?

22      A.   Correct.

23      Q.   Do you know whether that had to be done

24   because of the mail slots or was that just a

25   change done by the owner?

NON-CERTIFIED COPY

1    your memo a few minutes ago, and we talked about

2    walking the site with Mr. Wynn?

3        A.  Yes, sir.

4        Q.  Was anybody from URS invited to walk

5    that site with you all?

6        A.  I can't say that they were invited.  I

7    think we were kind of walking by ourself, but I

8    don't know who was invited.

9        Q.  And they never attended that walk,

10    correct, that particular one?

11        A.  No.

12        Q.  All right.  The next document that I'm

13    going to show you is going to be Exhibit 20, and

14    it is URS 54724.  This is an another memo.

15            MS. MILLS:

16                Do you have a copy for me?

17            MR. FRANCO:

18                I'm sorry.  I've got to do his job,

19    too.

20    EXAMINATION BY MR. FRANCO:

21        Q.  This is an another memo from you.  I

22    believe it is dated the same day as the prior

23    memo.  Let's check it out.

24        A.  Yeah.

25        Q.  Yes, it is.  Okay.  And this is a memo

NON-CERTIFIED COPY

1   on the executive wall panel issue, regarding the

2   wall panels in the executive reception area,

3   correct?

4        A.  Correct.

5        Q.  The first bullet point says, "The wall

6   wasn't prepped with any blocking and/or plywood

7   to receive the one-quarter-inch paneling."  Do

8   you see that?

9        A.  Yes.

10       Q.  I am sorry.  You are welcome to read the

11  whole thing.  Just let me know.

12       A.  No, I think I'm good.

13       Q.  Okay.  It says, "This issue was

14  discussed with all parties present, and URS

15  advised that due to the fact that the weight of

16  the panels wasn't too substantial, they didn't

17  share the same concerns that Superior Millworks

18  had regarding the panel adherence to the drywall

19  surface 'only'."

20          Who at URS advised that?

21       A.  I don't recall specifically, but our

22  day-to-day contacts was Thomas and Neal.

23       Q.  So, it was one of those two, you think?

24       A.  Yes.

25       Q.  Okay.  As I read this, the quarter-inch

NON-CERTIFIED COPY

1    paneling was installed directly to the drywall;

2    is that correct?

3        A.   Correct.

4        Q.   How was it secured to the drywall?  Was

5    it nailed?  Was it glued?

6        A.   I think it was E-clips.

7        Q.   Say that again?

8        A.   It was E-clips.

9        Q.   What is that?

10       A.   On the -- on the panel itself, there

11   will be like some receiving members, and then

12   they clip to the wall.  So the wall has some --

13   I don't know how to describe it to you other

14   than say it was E-clipped.  It is an attaching

15   method that we use on the  --

16       Q.   All right.  So --

17       A.   -- that a lot of people use.

18       Q.   -- the drywall is bare.  And then you

19   attach some clips to the drywall, and then you

20   attach the --

21       A.   There is also some clips to the panels.

22       Q.   So they --

23       A.   So the panels marry to each other on

24   the -- between the panel and the wall.

25       Q.   So there is clips on the back of the

NON-CERTIFIED COPY

Page 110

1    wall panel and there is clips on the drywall

2    face?

3        A.   Yeah.

4        Q.   And they attach?

5        A.   Correct.

6        Q.   Is there space then between the wall

7    panel and the drywall after installation --

8        A.   No.  You --

9        Q.   -- because of the width of the clips?

10       A.   You can get pretty tight.  It depends

11   on -- I don't remember how the panels were made,

12   I mean, if the panel had a recessed back.

13           So that means that the -- whatever the

14   receiving member on the panel was would have

15   been installed in the recessed portion of the

16   panel.  So when it clips to the wall, it is a

17   pretty tight fit.

18       Q.   Well --

19       A.   I would have to see the configuration.

20   I don't remember the configuration of the panel.

21       Q.   All right.  It sounds to me like there

22   was some void between the quarter-inch wall

23   panel and the drywall.  Is that accurate or not?

24       A.   I -- I can't say.  Are you reading that

25   somewhere in the memo?

NON-CERTIFIED COPY

1    Q.  No.

2    A.  Okay.

3    Q.  I am just --

4    A.  I --

5    Q.  As a layman, I'm just saying if you have

6  got to attach it with clips, the clips aren't

7  going to be on every piece of the wall panel,

8  correct?

9    A.  Not on every piece of the wall panel,

10  no.

11    Q.  All right.  How many areas of the wall

12  panel contain the clips?

13    A.  I don't remember the layout.

14    Q.  Okay.  Was it like top and bottom?  Was

15  it --

16    A.  Sometimes it was at the top and bottom

17  and middle.

18    Q.  Okay.

19    A.  Sometimes it is three.

20    Q.  But there was space in between the clips

21  where the wall panel didn't have any particular

22  attachment to the sheetrock; is that right?

23    A.  That is right, what you are saying, but

24  I would have to -- I would have to go back and

25  look at the configuration.

NON-CERTIFIED COPY

1      Q.  Well, if they had clips in the wall

2   panel, in the center of the wall panel, then

3   there would have been some space that those

4   clips took up between the wall panel and the

5   drywall, correct?

6      A.  Again, I need to -- I would need to see

7   the configuration of the panel.

8      Q.  All right.

9      A.  Because sometimes you can install them

10  -- like I said, it depends on how the panel was

11  manufactured.  With a recess in it, you can get

12  pretty tight to the wall with it.

13     Q.  All right.  And I may have asked you

14  this.  I'm sorry.  You are like my fourth

15  deposition.

16     A.  Okay.

17     Q.  The wall panel warped, didn't it?  That

18  was the problem with it after it was installed?

19     A.  Warped?  Can I read this first?

20     Q.  Absolutely.  Please, do.

21     A.  Okay.  (Reviewing document.)

22         I am trying to remember.  I don't know

23  if it was warped.  I know that there was some

24  issues after we installed.

25         The original wall panels had a couple --

NON-CERTIFIED COPY

1    had some -- had some detailed areas.  I can't

2    remember what they all were, though.

3        Q.  Well, let me ask you this.

4        A.  Okay.

5        Q.  Superior Millworks, apparently,

6    wanted -- is it reveals?

7        A.  Correct.

8        Q.  R-E-V-E-A-L-S?

9        A.  Correct.

10       Q.  Installed on what?  On top of the

11   drywall?

12       A.  No.  They are talking about that -- can

13   I draw it for you?

14       Q.  Sure.

15       A.  The panels -- so if I'm installing ten

16   panels along the wall, there is a gap that is

17   going to have a reveal.  So if those panels --

18       Q.  Between the joints?

19       A.  At the joint.  So from panel to panel,

20   it creates a joint.  So adjoining may have a

21   reveal.  So it would give -- it would give the

22   panels an opportunity to move if they -- if they

23   need to without being tight up against each

24   other and warping, as you -- as you called it.

25       Q.  Okay.  What is a reveal?

NON-CERTIFIED COPY

Page 114

1     A.  It is -- it is a joint basically between

2  panels.

3     Q.  That is a joint?

4     A.  Yes.

5     Q.  Okay.  Got it.  Another joint.  Just

6  what we needed.  Just another joint?

7     A.  Yeah.

8     Q.  Okay.  So that problem at the joint

9  didn't have anything to do with attaching it

10  directly to the drywall, did it?

11     A.  Not necessarily, no.

12     Q.  So as a result, there was warping at the

13  joint areas?

14     A.  Where they were tight against each

15  other.

16     Q.  Yes?

17     A.  Yeah.  But I think what we are saying

18  here is that there was -- similar to the

19  concrete, there was a mockup done, and Superior

20  expressed some concerns over what they saw with

21  how this -- how the rest of this thing was going

22  to be installed.

23        So that is when they brought up the

24  reveals and the -- there was nothing that these

25  panels were hanging on other than drywall.  It

NON-CERTIFIED COPY

Page 115

1    was a gamut of things.

2        Q.  Okay.  Now, in order to fix it, that

3    drywall was removed, that quarter-inch, correct?

4        A.  The panels were removed.

5        Q.  The panels.  I'm sorry.  I said drywall.

6    The panels were removed, correct?

7        A.  Correct.  Correct.

8        Q.  And --

9        A.  It was offensive to the owner when he

10   moved into the building.

11       Q.  Right.  And the three-quarter-inch

12   panels were used to replace it?

13       A.  Correct.

14       Q.  How were the three-quarter panels put on

15   the drywall?

16       A.  I think they were attached to the

17   drywall, but I think they were -- we went to --

18   we found the studs, and they were attached

19   directly to the studs.

20       Q.  How?

21       A.  I don't remember exactly how, but it

22   would have been with E-clips.  So you -- the

23   E-clips that we would have installed with the

24   first ones would have been installed on the

25   wall.

NON-CERTIFIED COPY

Page 116

1          We found the stud and then attached the

2    panel.  So I think when the three-quarter-inch

3    material was ordered, we had to go and do a

4    layout of the existing stud locations.  Probably

5    16 inches on-center.

6          And we had to kind of marry the pattern

7    of the new panels to the layout of the studs in

8    order to make sure that they were properly

9    attached.

10    Q.  Did the clips run vertically or

11    horizontal on the --

12    A.  They should run horizontal.  So your

13    studs are running vertical.  So your clips would

14    run horizontal so that they catch --

15    Q.  All right.

16    A.  -- they catch them on something.

17    Q.  All right.  And, yet, they were still

18    attached directly to the drywall, weren't they?

19    A.  Not to the drywall.  They are attached

20    through the drywall to the -- to the studs.

21    Q.  Okay.  What did the design drawing show

22    as how to attach them, or did it even go into

23    that detail?

24    A.  I don't remember.  I would have to look

25    at the drawings or whatever we were looking at

NON-CERTIFIED COPY

1    then.  But my letter is saying it is showing

2    attach them directly to the drywall.

3        Q.  Okay.

4        A.  If this is going on -- if we are going

5    by the documents.

6        Q.  Going by the documents, it was installed

7    to the drywall, the same as the quarter-inch

8    panel was, to the drywall?

9        A.  Correct.

10       Q.  But the difference being instead of

11   being secured just to the drywall, they were

12   secured to the studs inside the drywall?

13       A.  Thicker material, yeah, through the

14   drywall to the studs.

15       Q.  All right.  Next I'm going to show you

16   Exhibit 21, which is URS 90662.

17           And at the bottom, there is an Email

18   from Philip Bonner, the project manager at

19   Womack, to you saying he needed the civil sheets

20   that contain sections through control joints and

21   expansion joints at the H&E equipment yard.  You

22   see that?

23       A.  Yes.

24       Q.  Why did he need those; do you know?

25       A.  I think that was to create that cost

NON-CERTIFIED COPY

1    It looks like --

2        Q.  Okay.

3        A.  -- it has been --

4        Q.  It looks like the punch list as of --

5    let's see.  It even says dates of observation.

6    The last date of observation was -- it says

7    revised June 24, 2013?

8        A.  Correct.

9        Q.  Correct?

10       A.  Correct.

11       Q.  So this is the punch list as of that

12   time.  On the left side, you will see "check

13   mark equals okay, Frankie Wynn," and he dates

14   it, it looks like, 6/25/2013.  Do you see that?

15       A.  Correct.  Yes.

16       Q.  All right.  So, apparently, there was a

17   walkthrough with Frankie Wynn on these items,

18   correct?

19       A.  Correct.

20       Q.  And he approved the ones with check

21   marks; is that your understanding?

22       A.  Yes.

23       Q.  He did not approve repairing the warped

24   wood wall panels, correct?  Look down about

25   three-quarters.  $1,200 value.  Look at the

NON-CERTIFIED COPY

1    $1,200 value.

2         A.  Yes, you are correct.

3         Q.  All right.  And what was the $1,200

4    value for?  Was that the amount necessary to

5    replace it?

6         A.  I don't know that that is replacement.

7    I think that is some type of repair work that

8    would have gone on the original panel.

9         Q.  I'm not following that.  That is my

10   fault.  Not yours.

11              What was that issue, Executive Entry

12   237, repair warped wood wall panels?

13        A.  I am trying to see if I remember when we

14   did the new panels.

15        Q.  Well, the wall panels that we talked

16   about earlier in the deposition were in the

17   executive entry.

18        A.  That is the same -- that is the same

19   location.

20        Q.  Same location?

21        A.  Correct.  I am trying to --

22        Q.  It seems to me that the wood wall panels

23   that were put up, some of them warped, and it

24   was costing $1,200 to fix those.  Does that help

25   refresh your memory any?

NON-CERTIFIED COPY

1    A.  No.  I would have to see the original

2  punch list.  I don't remember when -- the timing

3  of the original panels, when they were taken

4  down and the new panels were installed.

5        The new panels were installed after they

6  occupied the building.  Not -- not during the

7  original walkthrough.

8    Q.  Right.  But they started occupying the

9  building in December of 2012.  We are now into

10  June of 2013.

11    A.  But this punch list is from the original

12  before they occupied the building.  So this is

13  -- this is a reduction of the original punch

14  list items.  That is as it normally happens.

15        So I would have to see the original

16  punch list that was done in November to -- to

17  see if this item is still on there.  And I think

18  what happened was he was holding this money

19  until this issue was resolved, if I remember

20  correctly.

21    Q.  I'm going to show you what was Exhibit

22  15.

23    A.  Okay.

24    Q.  Is that the original punch list attached

25  to this Certificate of Substantial Completion?

NON-CERTIFIED COPY

1      Q.  With respect to the wall panels in the

2   executive area we talked about, did all of those

3   panels warp?

4      A.  I can't say that they all -- that they

5   all warped.

6      Q.  Do you know what percentage of them

7   warped?

8      A.  I don't recall, no.

9      Q.  Was it --

10     A.  But I -- but I think it was -- it was a

11  twofold issue, the warping, but then there was

12  detail that -- like the doors and everything

13  that they were offended by.

14         So it wasn't just the warping issue

15  that -- when he walked in there, he was offended

16  by it.  So --

17     Q.  All right.  And I have dealt with his

18  being offended in connection with the parking

19  lot.  So, I understand.

20     A.  I don't think it had the look that he

21  was looking for, is the way I took it, and there

22  were also some warping of the panels that

23  they --

24     Q.  There was some warping, but he didn't

25  like the look anyway?

NON-CERTIFIED COPY

1    A.  That is -- that is what -- that is my

2    personal opinion.  I have never heard him tell

3    me, "Stephan, I don't like this look."  I

4    just -- I know he walked in there, and I -- the

5    expression just didn't --

6    Q.  Did he blow up about it?

7    A.  Not to me, no.  Not in my presence.

8    Q.  Okay.

9    A.  I just know that after the fact we -- I

10   think I talked to Thomas, and he wasn't too

11   happy about --

12   Q.  Okay.  So your observation was it was a

13   combination of some of the wall boards warping

14   and the fact that he didn't like them in

15   addition to that?

16   A.  Correct.

17   Q.  Was this the first time you all used

18   Superior Millworks?

19   A.  No.

20   Q.  Is it the last time you used them?

21   A.  No.

22   Q.  Have you had any trouble with them?

23   A.  No.

24   Q.  All right.

25       MR. FRANCO:

NON-CERTIFIED COPY

Page 149

1          That is all the questions I have,

2   Mr. Dorsey.  Thank you very much.

3          THE WITNESS:

4              Okay.

5          MS. MILLS:

6              I have just one, if that is okay?

7          MR. FRANCO:

8              Sure.

9   EXAMINATION BY MS. MILLS:

10      Q.  Could you go to Exhibit 11?

11      A.  (Complying.)

12          MR. FRANCO:

13              Alysson, let me catch up with you.  One

14   second.

15          MS. MILLS:

16              Okay.

17          MR. FRANCO:

18              Okay.

19   EXAMINATION BY MS. MILLS:

20      Q.  And this is part of the oil/water

21   separator that was not accounted for in the

22   construction drawings.

23      A.  Okay.

24      Q.  And I believe Counsel asked you, as a

25   general proposition, if these were the things

NON-CERTIFIED COPY

1  that were discovered later, what did H&E have to

2  pay for them anyway.

3        And I just wanted to ask you a general

4  proposition.  Isn't it true that when you find

5  something late, there is an additional cost to

6  that?

7        A.  The time is -- you know, in our

8  business, time is money.  So there is -- yeah,

9  because you are sitting there waiting on it,

10  and, you know, we are out there.

11        Every day we are out there, we are

12  spending, you know, additional overhead.  So

13  yes, there was additional cost.  And from my

14  experience, when you add something to the

15  documents as a change order, you get higher

16  costs from a subcontractor, from somebody new,

17  rather than if they bid the project.  This --

18  that is how it is across the board.

19        Q.  And, actually, sometimes you have to

20  redo something that you have already done,

21  right?

22        A.  That is correct.  Depending on --

23        Q.  And so, for instance, just using this as

24  an example, the oil and water separator, I was

25  reading the attachment here, and if you look at

NON-CERTIFIED COPY

H&E EQUIPMENT SERVICES    *   SUIT NO. 626,308 DIV.: D


VERSUS                    *   19TH JUDICIAL DISTRICT COURT


URS CORPORATION           *   PARISH OF EAST BATON ROUGE
ARCHITECTURE, P.C.,
URS CORPORATION,          *   STATE OF LOUISIANA
L. O'NEAL JOHNSON AND
THOMAS E. RYAN, III



        The VIDEO CONFERENCING Deposition of
                JOHN JONES



        Date:    Monday, August 8, 2016

        Time:    9:00 a.m.

        Place:   ITR AMERICA
                 6301 NORTHWIND PARKWAY
                 HOBART, IN 46342



REPORTED BY:

Before Marie Crist, CSR
Notary Public, Porter County, Indiana






NON-CERTIFIED COPY

EXHIBIT
8

800.2
Esqu

1   VIDEO/TELEPHONIC APPEARANCES:

2

3   MS. LORETTA G. MINCE
         FISHMAN HAYGOOD LLP
4        201 ST. CHARLES AVENUE - 46TH FLOOR
         NEW ORLEANS, LA 70170
5        (504)586-5273
         lmince@fishmanhaygood.com
6
    On behalf of the Plaintiff, H&E Equipment Services;
7

8

9   MR. PHILIP A. FRANCO
    MR. KELLEN MATTHEWS
10       ADAMS AND REESE, LLP
         4500 ONE SHELL SQUARE
11       NEW ORLEANS, LA 70139
         (504)581-3234
12       philip.franco@arlaw.com

13  On behalf of the Defendants.

14

15

16

17

18  ALSO PRESENT:

19       Mr. Neal Johnson

20

21

22

23

24

25



NON-CERTIFIED COPY

1          INDEX OF EXAMINATION

2    WITNESS:  JOHN JONES

3    DIRECT EXAMINATION
     Mr. Franco                              7
4    CROSS-EXAMINATION
     Ms. Mince                             160

5


6              E  X  H  I  B  I  T  S

7    DEPOSITION                              PAGE

8    Jones 1      H&E 5158, Email from Thomas      24
                  VanHattum to John Jones and
9                 others, 12-19-06
     Jones 2      Report of Geotechnical           26
10                Investigation by STE
     Jones 3      H&E 5163, Email from Chad        30
11                Herndon to Leonard St. Germain
                  and John Jones, 2-6-07
12   Jones 4      H&E 5164, Email from Mark        31
                  Howard to Leonard St. Germain
13                and John Jones, 3-16-07
     Jones 5      H&E 5168, Email from Chad        34
14                Herndon to D. Lacombe and
                  others, 8-9-07
15   Jones 6      H&E 6682, Email from Leonard     35
                  St. Germain to James Brown,
16                3-5-08
     Jones 7      H&E 6812, Email from John Jones  36
17                to Leonard St. Germain, 7-2-08
     Jones 8      H&E 7609, Email from James       38
18                Brown to John Jones, 5-7-09
     Jones 9      H&E 7609, Email from Neal        40
19                Johnson to John Jones and
                  others, 10-13-10
20   Jones 10     H&E 65373, Geotechnical          42
                  Engineering Report for Kenner,
21                Louisiana, 2-9-11
     Jones 11     H&E 3302, Email from Frankie     46
22                Wynn to Brad Barber and John
                  Jones, 2-28-11
23   Jones 12     H&E 3887, Email from Frankie     48
                  Wynn to John Jones and Brad
24                Barber, 6-30-11

25



NON-CERTIFIED COPY

JOHN JONES
H&E EQUIPMENT ~VERSUS~ URS CORPORATION

August 08, 2016
4

1               E  X  H  I  B  I  T  S

2   DEPOSITION                                    PAGE

3

4   Jones 13      URS 41439, Project Program for       49
                  the Belle Chasse facility,
5                 7-1-11
    Jones 14      URS 68751, Email from Robert         54
6                 Lacinak, Terracon, to Frankie
                  Wynn and others, 9-6-11
7   Jones 15      H&E 10836, Email from Frankie        57
                  Wynn to James Brown and John
8                 Jones, 9-20-11
    Jones 16      H&E 3738, Email from Frankie         59
9                 Wynn to Brad Barber and others,
                  9-19-11
10  Jones 17      H&E 7534, Email from Eryn            61
                  Manint to John Jones and
11                others, attaching FF&E Phase V
                  minutes, email dated 9-27-11
12  Jones 18      H&E 11023, Email from Terracon       66
                  to Frankie Wynn and others,
13                10-3-11.  14-day break test
                  results
14  Jones 19      H&E 12665, Email from Neal           69
                  Johnson to John Jones and
15                others, 1-9-12
    Jones 20      URS 33683, Email from Neal           72
16                Johnson to James Brown, 1-27-12
    Jones 21      H&E 13163, Email from Brad           74
17                Reese at MAPP to Thomas Ryan
                  and others, 2-2-12
18  Jones 22      H&E 13163, Email from Frankie        76
                  Wynn to Thomas Ryan and others,
19                8-3-12
    Jones 23      H&E 26897, Series of emails,         78
20                August 2012
    Jones 24      H&E 27074, Email from John           81
21                Jones  to Neal Johnson, 8-3-12
    Jones 25      H&E 14429, Email from Neal           83
22                Johnson to Thomas Ryan and
                  others, 8-11-12
23  Jones 26      H&E 14772, Email from Neal           85
                  Johnson to John Jones  and
24                others, 8-13-12
    Jones 27      H&E 28382, September '12 series      91
25                of emails



NON-CERTIFIED COPY

JOHN JONES
H&E EQUIPMENT ~VERSUS~ URS CORPORATION

August 08, 2016
5

E X H I B I T S

DEPOSITION                                                    PAGE

Jones 28        H&E 16175, Email from Stephan          93
                Dorsey to Frankie Wynn, 10-1-12

Jones 29        H&E 16465, Email from Ottis            95
                Seaborn to Frankie Wynn,
                10-4-12

Jones 30        H&E 16469, Email from Brad             96
                Reese to Neal Johnson and
                Frankie Wynn and others,
                10-4-12

Jones 31        H&E 17109, Email from Ottis            97
                Seaborn to Neal Johnson,
                10-16-12, H&E Punch list
                (Kenner)

Jones 32        H&E 29709, Email from John             100
                Jones to Stephan Dorsey and
                others, 11-2-12

Jones 33        H&E 18817, Letter to Johnny            101
                Jones from Neal Johnson,
                11-20-12

Jones 34        H&E 20068, Email from John             103
                Jones to Neal Johnson and
                others, 12-17-16

Jones 35        H&E 20515, Email from Frankie          111
                Wynn to Jeff Stringer and
                others, 1-2-13

Jones 36        H&E 26857, Invoice from                113
                Benchmark dated 12-21-12

Jones 37        URS 57654, Email from Neal             114
                Johnson to Murray McCullough,
                1-18-13

Jones 38        H&E 22872, Email from John             115
                Jones to Stephan Dorsey and
                others, 1-25-13

Jones 39        H&E 22979, Email from John             119
                Jones to Frankie Wynn, 2-5-13

Jones 40        H&E 4308, Email from Brad              120
                Barber to John Jones, 2-4-13

Jones 41        H&E 4279, Email from John Jones        121
                to Brad Barber, 2-5-13

Jones 42        H&E 9038, Email from John Jones        122
                to Frankie Wynn, 2-7-13

Jones 43        H&E 23640, Letter from Neal            123
                Johnson to Johnny Jones, 3-1-13



NON-CERTIFIED COPY

JOHN JONES
H&E EQUIPMENT ~VERSUS~ URS CORPORATION

1                  E X H I B I T S

2    DEPOSITION                                              PAGE

3    Jones 44        H&E 21915, Email from Frankie           124
                     Wynn to John Jones, 3-18-13

4    Jones 45        H&E 32308, Email from Frankie           127
                     Wynn to John Jones, 3-18-13

5    Jones 46        H&E 23951, Email from Frankie           129
                     Wynn to John Jones, 3-25-13

6    Jones 47        H&E 24328, Email from Frankie           129
                     Wynn to John Jones, 4-16-13

7    Jones 48        H&E 24304, Email from Frankie           131
                     Wynn to John Jones, 4-10-13

8    Jones 49        H&E 24339, Email from Neal              133
                     Johnson to Frankie Wynn,
9                    4-17-13

     Jones 50        H&E 8900, Email from Stephan            134
10                   Dorsey to Frankie Wynn and
                     others, 6-6-13

11   Jones 51        H&E 32994, Email from Frankie           137
                     Wynn to Stephan Dorsey and
12                   others, 6-6-13

     Jones 52        URS 79175, Email from Frankie           139
13                   Wynn to John Jones and others,
                     6-12-13

14   Jones 53        H&E 25356, Email from Neal              140
                     Johnson to John Jones and
15                   Stephan Dorsey, 6-24-13

     Jones 54        H&E 25359, Email from Frankie           144
16                   Wynn to Thomas Ryan and others,
                     6-25-13

17   Jones 55        URS 54301, Email from Thomas            145
                     Ryan to Brad Reese and others,
18                   7-9-13

     Jones 56        H&E 54144, Email from Brad              148
19                   Reese to Thomas Ryan, 7-17-13

     Jones 57        H&E 21121, Email from Thomas            152
20                   Ryan to Kevin Sprehe and
                     others, 7-22-13

21   Jones 58        H&E 21671, Email from John              153
                     Jones to Frankie Wynn, 8-12-13

22   Jones 59        H&E 8042, Email from John Jones         156
                     to Jeff Stringer and others,
23                   10-30-13

     Jones 60        H&E 4381, Email from Frankie            158
24                   Wynn to Brad Barber and John
                     Jones, 11-27-13

25



NON-CERTIFIED COPY

1                 JOHN JONES,

2      Called as a witness by the Defendants, having

3      been first duly sworn or affirmed, was examined

4      and testified as follows:

5             DIRECT EXAMINATION

6   BY MR. FRANCO

7      Q.  Good morning, Mr. Jones.  My name is Phil

8   Franco.  I represent URS and the other Defendants in this

9   case.  Sir, so that the record is clear, can you state

10   your full name and address for the record?

11      A.  John David Jones, 808 Barberry Lane, Valparaiso

12   Indiana 46383.

13      Q.  And where are you presently located for this

14   deposition, sir?

15      A.  We are currently in the offices of my current

16   employer, ITR America at 6301 Northwind Parkway, Hobart,

17   Indiana 46342.

18      Q.  And you have a court reporter there with you?

19      A.  I do.

20      Q.  And you also are on a video, am I correct?

21      A.  I am.

22      Q.  Okay.  Thank you for being with us today.  I

23   appreciate you taking the time out.  We will try to do

24   this as fast as possible.  We have got some documents to

25   cover.



NON-CERTIFIED COPY

1   stations from prior discussions, am I correct?

2           MS. MINCE:  Object to form.

3       A.  Correct.

4   BY MR. FRANCO

5       Q.  And, again, what was the discussion about

6   parking for those 214 people or so?

7       A.  There were no conversations on that, past that

8   point.

9       Q.  So there were no conversations that changed the

10  concept of overflow parking that had been discussed

11  previously?

12      A.  Well, I -- again, when we talked about overflow

13  parking, I'm not quite sure what you mean by "overflow

14  parking;" so I don't recall -- there were discussions way

15  back about the size of the yard and the parking of the

16  branch employees, but not related to the corporate

17  employees.

18      Q.  All right.  Was there discussions about --

19  because you mentioned I think in your earlier testimony

20  something about discussions back when about overflow

21  parking.  What discussion were you talking about?

22      A.  About the employees at the branch.

23      Q.  Okay.  So was there any discussions that you

24  were privy to about overflow parking for anybody at the

25  headquarters building?



NON-CERTIFIED COPY

1          A.  Not that I recall.

2          Q.  Okay.  And as far as communicating about the

3    need for parking spaces, who from your -- excuse me --

4    who from H&E was responsible for communicating any -- any

5    information about the number of parking spaces that were

6    desired by H&E for the corporate headquarters building?

7               MS. MINCE:  Object to form.

8          A.  There weren't any.  That's -- again, it was

9    designed and at the end I guess no one had thought to

10   say, hey, we have now designed this building to handle

11   this many people, do we have the parking for it.

12         But that was also not forthcoming from URS as, by

13   the way, be aware of this.

14   BY MR. FRANCO

15         Q.  Okay.  And who was responsible for reviewing

16   specifications and plans for Baton Rouge still, you know,

17   on behalf of H&E?

18              MS. MINCE:  Object to form.

19         A.  That would have been at certain points in time,

20   Leonard St. Germain, Frankie and myself, but I never sat

21   there and counted the parking spots in the -- on the

22   sheet, so...

23   BY MR. FRANCO

24         Q.  I understand.  But let's just talk about you,

25   yourself.  You, yourself, were shown the construction

NON-CERTIFIED COPY

1  concrete faster than normal?

2      A.  I don't recall off the top of my head, but --

3      Q.  Okay.  Well, that's fine.  You may not have been

4  involved in that conversation.  You just don't remember.

5      Mr. Jones, the Kenner facility, so that the Jury

6  understands, was an operating facility at the time this

7  work was being done; am I correct?

8      A.  That's correct.

9      Q.  And so H&E wanted to disrupt its operations as

10  little as possible to get this work done, a fair

11  statement?

12      A.  It was designed to be done in stages, yes.

13      Q.  Okay.  So -- and that was my next question.  It

14  was designed to be done in stages so that the equipment

15  could be moved on to the site at different locations so

16  that the operations would be interrupted as little as

17  possible, correct?

18      A.  Correct.

19      Q.  All right.  Were you involved in the issue

20  involving the mail slots at the Baton Rouge facility?

21      A.  I was.

22      Q.  Okay.  Do you recall that personnel from H&E

23  were at -- were -- visited the URS office in Baton Rouge

24  and looked at the mail slots there?

25      A.  I don't recall.


NON-CERTIFIED COPY

1    Q.  Do you recall whether the design of the mail

2    slots at the Baton Rouge facility was modeled after the

3    mail slots in the URS office?

4    A.  I have no idea.

5    Q.  So you weren't actually involved in the details

6    of that, only when the problem surfaced?

7    A.  Correct.  And no --

8    Q.  And what was the problem --

9    A.  -- and I -- go ahead.

10   Q.  What was the problem with the mail slots?

11   A.  Well, the problem was, if the way the mail room

12   was designed at that corporate office had been reviewed,

13   it was expected that it would have been designed based

14   upon our -- what our past structure was, not off of what

15   the URS mail slots were designed to be.  I don't even

16   know where the URS mail slots would --

17   Q.  Were you involved -- go ahead.

18   A.  I said, I don't know where the review of the URS

19   mail room even came up, unless it was in passing --

20   Q.  And you weren't involved in those discussions?

21   A.  I don't recall any conversations related to the

22   mail slots, no.

23   Q.  Okay.  And was there something, as I understand

24   it -- let me see if I can go through this fairly

25   quickly -- the mail slots, after construction, in H&E's



NON-CERTIFIED COPY

1   view, were too small; is that a fair statement?

2        A.  That's a fair statement.  Our former design was

3   all letter size, not envelope size, because all the

4   documents were put in, and then they were packaged after.

5   They weren't letters.

6        Q.  Okay.  Okay.  So after it was constructed, that

7   issue came up --

8        A.  That's correct.

9        Q.  -- of the size, correct?

10       A.  That's correct.

11       Q.  And what was -- and did, did URS redesign the

12   mail slots to the satisfaction of H&E?

13       A.  I believe that took place, yes.

14       Q.  And were there other changes made to the mail

15   area after construction?

16       A.  Not that I can recall.

17       Q.  All right.  Let's look at -- I skipped a few

18   documents.  Look at URS 33683.  It should be dated

19   January 27, 2012.

20       A.  33683?

21       Q.  683, 33683.

22       A.  Okay.  I have it.

23            (Exhibit JONES 20 marked.)

24   BY MR. FRANCO

25       Q.  All right.  This is an email from Neal Johnson



NON-CERTIFIED COPY

1      A.  Frankie was still involved in that project,

2  also.

3      Q.  In Belle Chasse?

4      A.  Correct.

5      Q.  All right.  Let's look at the next document,

6  Mr. Jones, H&E 14429.

7      A.  Okay.

8          (Exhibit JONES 25 marked.)

9  BY MR. FRANCO

10     Q.  I'm going to label that as Exhibit 25.  And

11  that's 14429.  The top email is from Neal Johnson,

12  August 11, 2012 to Craig Duos, D-U-O-S, and it copies

13  Mr. Wynn, among other people; and it talks about

14  reviewing the foundation design for the Belle Chasse

15  facility.

16     It says, "The owner and the folks with the

17  Shuttlelift think we have tremendously overdesigned the

18  foundation."  Do you recall that issue coming up?

19     A.  I do.

20     Q.  What do you recall about that?  Was it

21  overdesigned, did you stick with the original design or

22  was it changed?

23     A.  Well, what we did --

24     Q.  That's three questions.  Let me go one question

25  at a time.  What was the result of those discussions?

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

NON-CERTIFIED COPY

1    Was it -- did the design stay the same or was it changed?

2        A.   It was changed.

3        Q.   And how so?

4        A.   Well, if I recall right, his design was, I

5    believe, saw cutting a majority of the current foundation

6    and pile driving to a higher level of load than what the

7    people at Shuttlelift indicated was required for the

8    machine we were talking about; so he had designed it for

9    the entire -- for the machine to roll throughout the

10   whole facility, when in fact it was only going through a

11   certain area.

12       Q.   And so the design was -- I should say limited

13   and therefore the expense was less; is that a fair

14   statement?

15           MS. MINCE:   Object to form.

16       A.   It was modified to meet the requirement of where

17   the machine was rolling as opposed to the entire --

18   BY MR. FRANCO

19       Q.   Which then resulted -- I'm sorry.  I thought you

20   were finished.  Go ahead.

21       A.   You can proceed.  I think I made my statement.

22       Q.   Was that -- did that result in less expense for

23   that project?

24       A.   Yes, it would have.  But, if I recall right,

25   there was also additional concrete or overlayment, so it



NON-CERTIFIED COPY

1    transitioned from more piles to more depth of concrete,

2    if I remember correctly, so I don't know what the net

3    difference was.

4        Q.  All right.  So they used less piles of thicker

5    concrete; is that what you recall?

6        A.  That's what I recall.

7        Q.  At that -- at a certain point of Belle Chasse

8    we're talking?

9        A.  Correct.

10           (Exhibit JONES 26 marked.)

11   BY MR. FRANCO

12       Q.  All right.  Let's look at the next document,

13   H&E 14772, which I'm going to label as Exhibit 26.

14       All right.  Now, I want to focus on the email at the

15   bottom of the first page.  This talks about new paving

16   for the dumpster pad at -- I would assume at Kenner; is

17   that correct?

18       A.  Yes.

19       Q.  All right.  So Tim Gaines, who is listed as

20   senior civil engineer at URS at the time tells Ottis

21   Seaborn -- and do you know who Ottis was?

22       A.  He was the project manager for MAPP, I believe.

23       Q.  All right, at Kenner.  And in the second

24   paragraph of that he is saying, "I'm also requesting that

25   the pavement be cleaned and the joints be cleaned.  One


NON-CERTIFIED COPY

1      Q.  Do you recall the reason why URS rejected those

2  joints?

3      A.  I do not.

4          MS. MINCE:  Object to form.

5      A.  I do not recall.

6  BY MR. FRANCO

7      Q.  All right.  Look at the next document,

8  H&E 17109.  Do you see that one?

9      A.  I have it.

10     Q.  All right.  Now, let's label this as Exhibit 31.

11         (Exhibit JONES 31 marked.)

12  BY MR. FRANCO

13     Q.   This is labeled as H&E's Punch list (Kenner);

14  do you see that?  I'm sorry the attachment is labeled

15  "10-16-12 H&E Punch list (Kenner.)"

16     A.  Okay.

17     Q.  Do you see that?

18     A.  I see that.

19     Q.  Look at -- you know what a punch list is, don't

20  you, sir?

21     A.  I do.

22     Q.  Can you explain to the jury your understanding

23  of what a punch list is?

24     A.  Near the completion of a project, it's a listing

25  made of any deficiencies that need to be corrected to


ESQUIRE
SOLUTIONS

NON-CERTIFIED COPY

1   complete the project.

2       Q.  Okay.  Look at Number 13 on that list on the

3   very first page.  It says, "MCC:  Repair damaged paving

4   at various locations (in process)."  Do you see that?

5       A.  I see that.

6       Q.  What area was repaired at that location; can you

7   tell us?

8       A.  I cannot.

9       Q.  And look at the next item, Number 14, It also

10  lists "MCC," which is MAPP Construction Company, correct;

11  that's what it means?

12      A.  Okay.  Yes.

13      Q.  And it says, "Address & detail cracks at slab

14  A-A & paving areas."  Do you know what that references?

15      A.  I'm not totally clear on the A-A, but in

16  general, yes.

17      Q.  When the word "slab" is used, that usually

18  indicates a foundation in a building, doesn't it, or in

19  connection with a building; is that correct?

20      A.  Probably, yes, since it's not related to the

21  paved areas.  I'm assuming that's still in the --

22      Q.  Very good, sir.  I guess my question is -- my

23  question is:  Do you know what Item 14, what area that

24  related to at Kenner?

25      A.  No.


NON-CERTIFIED COPY

1       Q.  But it was listed as a punch list for MAPP

2   Construction Company, wasn't it?

3       A.  Yes, on their punch list.

4       Q.  Yes.  Okay.  Hold on one second, for me.  All

5   right look at the photos that are attached to this punch

6   list.

7       A.  I'm doing that right now.  So Item 13 --

8       Q.  Look at page -- yeah, Item 13, repair damage to

9   paving.  Do you see the pictures that are reflected

10  there?

11          MS. MINCE:  What page number are you on?

12          MR. FRANCO:  17123.

13          MS. MINCE:  Thank you.

14      A.  All right.  So there is a drain --

15  BY MR. FRANCO

16      Q.  Do you see that, sir?

17      A.  I do.

18      Q.  That's in the area of a drain; am I correct?

19      A.  It is.

20      Q.  And that's with this -- going back to the punch

21  list, as having been done -- or, I'm sorry, is in

22  process, but it's stricken on the punch list, correct?

23      A.  Yes.

24      Q.  And then look at Item 14.  That may help us on

25  the original question of where that slab was.  Look at



NON-CERTIFIED COPY

1   Number 14, Item 14, the picture on Page 17124, it says,

2   "Address and detail cracks at slab A-A."  Do you see

3   that?

4        A.  I see the picture but I have no reference

5   points, so I have no idea where that is.

6        Q.  I'm sorry, sir.  I didn't hear you.

7        A.  I said I have no idea where that crack is at,

8   because there is no reference point.

9        Q.  Okay.  Do you know whether that slab A-A was the

10  slab we talked about before as being then subsequently

11  replaced in the back of the service building?

12       A.  I couldn't answer that, not from the photo.

13       Q.  Okay.  All right.  All right.  You can skip the

14  next document.  Look at next H&E 29709.  Which I'm going

15  to label as Exhibit 32.  Are you with me?

16       A.  I am.

17            (Exhibit JONES 32 marked.)

18  BY MR. FRANCO

19       Q.  All right.  This is from you from November 2,

20  2012, and it basically says to Womack, "The board is

21  meeting this morning and my understanding is they will

22  break for lunch and it is highly likely that they will

23  come by the site after lunch."  Did that happen?

24       A.  I have no idea if it did or not.

25       Q.  All right.  You can skip the next document, and



NON-CERTIFIED COPY

1    A.  We were not dissatisfied with their performance.

2    Q.  Okay.  All right.  Let's look at the next

3 document, H&E 20068, which I'm going to label as

4 Exhibit 34.

5          (Exhibit JONES 34 marked.)

6 BY MR. FRANCO

7    Q.  Do you have it?

8    A.  Yes.

9    Q.  All right.  This is from you to Frankie Wynn --

10 I'm sorry, excuse me, to Neal Johnson and Thomas Ryan,

11 copying Frankie Wynn.  It says "Corporate Parking."

12    "Neal, I need your presence here at that facility in

13 short order.  The executive group is very upset with the

14 parking situation.  We have 142 parking spaces including

15 the guest parking by the flagpoles and 6 handicap places

16 for a total of 148.  We currently have 153 people in the

17 office here and we are not at capacity.  We need to

18 determine some resolution quickly."  Do you see that?

19    A.  I see it.

20    Q.  All right.  On -- this is December 17, 2012, who

21 was the executive group that was very upset?

22    A.  John Engquist to be the key individual.

23    Q.  And what caused him to be upset, to your

24 knowledge?

25    A.  Well, the fact that we moved into the corporate



NON-CERTIFIED COPY

1    facility that weekend, and we were trying to get

2    everything I guess sorted out on the Monday morning, and

3    there was no place for all of the people to park.

4         Q.  Okay.  Was there a board member that tried to

5    park that day?

6         A.  No.

7         Q.  Okay.  And --

8         A.  Except, you know, John Engquist and there were

9    multiple people that were on the board there, John

10    Engquist and Brad Barber and our CFO, et cetera.

11         Q.  Okay.  They were all board members?

12         A.  They are.

13         Q.  Okay.  And you said you had currently 153 people

14    in the office and you were not at capacity, correct?

15         A.  Correct.

16         Q.  Do you know how many parking spaces it was

17    designed for?

18         A.  I assumed what we were seeing right there that I

19    just reiterated, 148 in total.

20         Q.  And how did you determine it was 148?

21         A.  Because we walked down and counted them at that

22    point.

23         Q.  Okay.  And how long had those parking spaces

24    been constructed?

25         A.  I have no idea.  It wasn't something that we had



NON-CERTIFIED COPY

1    A.  I don't recall.

2    Q.  Okay.  In January -- this is December 17 -- and

3  it's fair to say that URS came to a meeting either that

4  day or very soon the next day at H&E; am I correct?

5    A.  Again, without a document in front of me, I'm

6  not recalling every detail at this point, so...

7    Q.  All right.  Well, you requested -- you requested

8  in your email his presence at the facility in short

9  order, right?

10    A.  Correct.

11    Q.  All right.  Do you recall -- there was a meeting

12  at the facility with H&E and URS personnel about the

13  parking?

14    A.  There was one.  Exactly when, I don't recall.

15    Q.  Okay.  Do you remember Mr. Engquist being at the

16  meeting as well?

17    A.  He was there.

18    Q.  Do you remember him cursing at the meeting?

19    A.  I don't recall.

20    Q.  You don't recall him cursing URS personnel at

21  that meeting at all?

22    A.  I do not recall that.

23    Q.  All right.  Do you remember -- strike that.

24    Did Mr. Engquist advise you to stop all payments of

25  any invoices to URS as a result of that parking issue?



NON-CERTIFIED COPY

1    A.  He did.

2    Q.  And that was right about the time this problem

3 developed in December or early January?

4    A.  Correct.

5    Q.  And did you convey that to other people, that

6 invoices of URS were not to be paid?

7    A.  Well, the direction was not actually directed to

8 me, it was directed from Mr. Engquist directly to the

9 accounts payable and accounting department.

10    Q.  Okay.  Was that verbally or was that in writing;

11 to your knowledge?

12    A.  I -- I have no idea.

13    Q.  Okay.  But you were certainly aware of it at the

14 time?

15    A.  I was verbally told.

16    Q.  By Mr. Engquist or by the accounting department?

17    A.  I don't recall.  I believe it was probably by

18 the accounting department.

19    Q.  Okay.  Now, at the time were you at the facility

20 on December 17, 2012, when this issue surfaced?

21    A.  I was.

22    Q.  And did you go out and observe anybody in the

23 parking area of the headquarters building?

24    A.  I did.  It was totally packed.

25    Q.  All right.  Was there also construction going on


NON-CERTIFIED COPY

1     Q.  Okay.  But was a number given?

2     A.  There were numbers given.  I don't remember what

3  they were.  I don't have all those spreadsheets any

4  longer.

5     Q.  Okay.  And those numbers were supposed to be

6  reflected on the construction drawings, correct?

7          MS. MINCE:  Object to form.

8     A.  You would think.

9  BY MR. FRANCO

10    Q.  All right.  Look at the next document which is

11  H&E 22979, which I'm going to label as Exhibit 39.  Do

12  you have that?

13    A.  I see it.

14         (Exhibit JONES 39 marked.)

15  BY MR. FRANCO

16    Q.  All right.  Do you recall that Ms. Sanders from

17  URS offered to cover the difference in the cost of

18  building a new parking now as opposed to earlier with the

19  rest of the parking?

20    A.  I am reading it.

21    Q.  And do you recall that being -- and it's on the

22  second page -- $17,507?

23    A.  I don't recall it, but I'm reading it now, okay.

24    Q.  Okay.  And as a result of -- that was obviously

25  rejected, right, by H&E?



NON-CERTIFIED COPY

1    A.  Yes.

2    Q.  Because H&E wanted URS to pay the full $129,000

3  and-some-change as a result of the estimated cost to

4  increase the parking space; am I correct?

5    A.  That's correct.

6    Q.  And as far as you know, did you either instruct

7  or were you aware of anybody who calculated that

8  difference in cost between -- the cost to add as opposed

9  to had it been originally installed?

10    A.  Not that I'm aware of.

11    Q.  Are you aware that Brad Barker forwarded --

12  let's just look at the next exhibit, H&E 4308.

13    A.  Okay.

14        (Exhibit JONES 40 marked.)

15  BY MR. FRANCO

16    Q.  Which I will label as Exhibit 40.  And Brad

17  Barber is sending to you information that the URS Ethics

18  Hotline has received his email.

19    A.  Okay.

20    Q.  And it's referenced the "Additional parking

21  cost;" do you see it?

22    A.  I see it.

23    Q.  Are you aware that Mr. Barber made the complaint

24  to the URS Ethics Hotline about the additional parking

25  cost?



NON-CERTIFIED COPY

1    Phase 2 in Belle Chasse; do you see that at the top?

2         A.  I see it.

3         Q.  You accepted that on March 5, 2013, correct?

4         A.  It appears so, yes.

5         Q.  So you -- so after instructions were to withhold

6    invoices, you authorized URS to do additional work which

7    H&E didn't pay them for; is that right, sir?

8         A.  I assume so.

9         Q.  And that was because of the original instruction

10   from Mr. Engquist, correct?

11        A.  Correct.

12        Q.  All right.  Look at the next document, sir, if

13   you would, H&E 21915, which I'm going to label as

14   Exhibit 44.

15        A.  Okay.

16             (Exhibit JONES 44 marked.)

17   BY MR. FRANCO

18        Q.  All right.  This starts back at the back of the

19   invoicing, but if you look at Page 21917, we can focus on

20   that one; and this is, at the bottom, it's from Brad

21   Reese at MAPP to Frankie Wynn and URS personal; and it

22   says, "For your information, our subcontractor proposes

23   the following solution to the concrete areas in need of

24   repair."

25             And this is obviously MAPP, so this is Kenner; and



NON-CERTIFIED COPY

1   it says, "Concrete Joint Repairs in Paving." and it talks

2   about a recommendation, and then it says, "Crack Repairs

3   in Paving," and talks about a recommendation, and then

4   "Building Slab Transition," and it talks about a

5   proposal, and then it talks about "Expansion Joints in

6   Paving."  Do you see that?

7        A.  I see it.

8        Q.  Why weren't those fixes incorporated into the

9   project?

10       A.  I don't recall.

11       Q.  Did it have anything to do with the fact that

12   MAPP was looking to have H&E pay for those repairs?  Look

13   at the top email.

14       A.  I'm reading through them.

15       Q.  The very top of the first page.

16       A.  Well, the way I'm reading it, we ended up saying

17   that we didn't feel the cost should be attributable to

18   H&E --

19       Q.  Okay.

20       A.  -- is the way I'm reading through the email

21   chain.

22       Q.  All right.  Do you recall who you did -- who H&E

23   did attribute the cost to?

24       A.  Yeah, we never did feel that on either the Baton

25   Rouge or the Kenner project that the design of the joints



NON-CERTIFIED COPY

1  for our application was done correctly.

2      Q.  And what was the basis for your opinion that the

3  design of the joints was not done properly?

4      A.  Because of the breakage.  I mean, we had other

5  facilities that had paving with that product that didn't

6  have anything near what was happening at these two

7  operations.

8      Q.  Mr. Jones, were you at H&E when the lawsuit was

9  originally filed against URS in this case?

10     A.  I assume that I was.  I don't recall the exact

11 date.  If you can tell me the date, then I can tell you

12 if I was there.

13     Q.  November 20, 2013, it was filed.  You were still

14 at --

15     A.  I was still there.

16     Q.  -- H&E at the time; am I correct?

17     A.  I was still there.

18     Q.  Okay.  Now, you just stated what H&E's position

19 was on the joints.  Did URS have an opinion from an

20 expert at that time as to what the cause was?

21     A.  There were different guys parading around trying

22 to give opinions.  I don't recall the exact -- if there

23 was or was not.

24         THE REPORTER:  Excuse me.  Was there an

25 objection in there?



NON-CERTIFIED COPY

1   what the Sika rep said with respect to causation and

2   repair?

3       A.  I do not recall.

4       Q.  Did you know the name of the Sika rep?

5       A.  I don't.

6       Q.  All right.  You can skip the next one.  All

7   right, and let's go to H&E 25356, which I'm going to

8   label Exhibit 53.

9       A.  Okay.

10          (Exhibit JONES 53 marked.)

11  BY MR. FRANCO

12      Q.  Now, at the bottom of Page 1 -- let's start at

13  the back.  I'm sorry, Mr. Jones.  Start at the back and

14  start with an email from Steven Dorsey at Womack June 24,

15  2013; and it says, "The following list reflects the

16  outstanding items on the H&E project."

17      This is from Womack.  I'm presuming it deals with

18  Baton Rouge.  And he says, "Executive wall panels."  That

19  was a Baton Rouge issue, correct?

20      A.  Yes.

21      Q.  And if you look down, the other it looks like

22  highlighted issue is, "Site paving expansion/construction

23  joint issue."  Do you see that?

24      A.  I see it.

25      Q.  It says "Waiting on H&E's response."  Steven


NON-CERTIFIED COPY

1   Dorsey then sends that email to Frankie Wynn on June 24,

2   2013.  Do you see that?

3       A.  I see.

4       Q.  And then Frankie Wynn sends it on June 24th to

5   Thomas Ryan and Neal Johnson.  Do you see that?

6       A.  I see it.

7       Q.  Mr. Wynn says on June 24, 2013, "The only

8   controversial issue is still with the joints."  Do you

9   see that?

10      A.  I see it.

11      Q.  Do you have any reason to disagree with that?

12      A.  The -- at that point, I would agree.

13      Q.  All right.  And he says, "I need an opinion from

14  URS in regards to whether a design or installation issue.

15  I have forwarded Womack's opinion previously."  And

16  Mr. Johnson responds to that on June 24, 2013, doesn't

17  he?

18      A.  He does.

19      Q.  He says, "There are no design or engineering

20  issues - the issues with the work in place is either a

21  construction, warranty or a maintenance issue."  Do you

22  see that?

23      A.  I see it.

24      Q.  And that was copied to you as well, wasn't it?

25      A.  It was.  So what we have at this point is the


NON-CERTIFIED COPY

1  H&E 25359, which is exhibit -- I'm going to label it

2  Exhibit 54.

3        A.  Okay.

4              (Exhibit JONES 54 marked.)

5  BY MR. FRANCO

6        Q.  Okay.  Let's look at the next document.  And

7  Frankie Wynn is sending to you and other people the punch

8  list for the Baton Rouge facility.

9        A.  Okay.

10       Q.  Do you see that?

11       A.  I see it.

12       Q.  And attached is URS's "Deficiencies to the

13  Completion of the Contact," that's what it's entitled,

14  and its location is Baton Rouge; do you see that?

15       A.  I see it.

16       Q.  And at the top left of the deficiency chart,

17  there is a checkmark equal okay.  Whose initials are

18  those?

19       A.  It's Frankie Wynn's.

20       Q.  And that's dated 6-25-2013, correct?

21       A.  It does say that.

22       Q.  All right.  And when you look down at the

23  column, it says -- the way I read this, sir, is the

24  checkmarks are okay; is that the way you read this?

25       A.  That's the way I read it.


NON-CERTIFIED COPY

1    A.  -- I don't remember the specific conversation.

2    Q.  What happened -- what happened to this mock-up

3  proposal --

4    A.  I have -- I don't recall.  I don't know that it

5  was ever done.

6    Q.  Do you know why it wasn't done?

7    A.  I don't recall.

8    Q.  All right.  Let's look at the next exhibit which

9  is H&E 21121, which I will label as Exhibit 57.

10    A.  Okay.

11        (Exhibit JONES 57 marked.)

12  BY MR. FRANCO

13    Q.  It says at the top, "Kevin/Frankie, attached for

14  your review is the draft of Change Order #02 for the

15  Belle Chasse project.  The listed proposals in attachment

16  #1 are all of the open COP's that have been approved by

17  H&E."

18    Attached is a Change Order 02 - Attachment, and it's

19  for -- one of the items is "Install Additional 3-inch of

20  Concrete Topping" -- (indiscernible.)

21        THE REPORTER:  Excuse me.  Can you say that

22  again, and it's for one of the items...

23        MR. FRANCO: Yes, ma'am.

24  BY MR. FRANCO

25    Q.  It is $47,164 for "Installing Additional 3-inch



NON-CERTIFIED COPY

1    of Concrete Topping in Building A Due to Survey

2    Discrepancy."  Do you see that?

3        A.  Yes.

4        Q.  Was that change order ultimately approved?

5        A.  I can't answer that unless you've got something

6    that indicates that it was.

7        Q.  All right.  Let's look at the next exhibit which

8    is H&E 21671, which is Exhibit 58.

9        A.  Okay.

10           (Exhibit JONES 58 marked.)

11   BY MR. FRANCO

12       Q.  This is reference to Belle Chasse, "Change Order

13   Proposal Number 25 - Ramp and resteel changes," and at

14   the top you say to Frankie Wynn, "I would guess this goes

15   on our list of items that URS created additional cost for

16   us because of their lack of professional diligence."  Do

17   you see that?

18       A.  I see it.

19       Q.  Now, you said you thought, as I recall it, that

20   the problems of the spalling and the cracking in the

21   concrete was a design problem as opposed to a

22   construction problem; am I correct?

23       A.  Are we talking about pavement or are we talking

24   about the Belle Chasse shop area?

25       Q.  Talking about pavement at Baton Rouge in the


NON-CERTIFIED COPY

1          THE REPORTER: Correct.

2      A.  Yes.

3  BY MR. FRANCO

4      Q.  Was there a problem with the concrete at the

5  Belle Chasse facility that you recall?

6      A.  Only the fact that there was some items missed

7  by the survey group that we had to change some elevations

8  and -- which cost some additional charges related to some

9  steel, or something of that nature; but the concrete was

10  limited inside of the work area, so I'm not --

11      Q.  Okay.  All right.  You can skip the next

12  exhibit -- or document, I should say.  You can skip the

13  next one.  All right.  Let's look at H&E 4381.  Which I'm

14  going to label as Exhibit 60.

15      A.  Okay.

16          (Exhibit JONES 60 marked.)

17  BY MR. FRANCO

18      Q.  This is a -- at the bottom is an email from Al

19  Naquin at MPS.  Do you -- and this was ultimately sent to

20  you.  This was apparently the same MPS recommendation

21  that was being proposed on how to repair these joints.

22  Do you see that?

23      A.  I see it.

24      Q.  And it looks like at this time, if you look at

25  the last page, the expansion joint repairs were going to



NON-CERTIFIED COPY

| From: | Johnson, Neal [neal.johnson@urs.com] |
|---|---|
| Sent: | Monday, June 24, 2013 2:39 PM |
| To: | Frankie Wynn; Ryan, Thomas E |
| Cc: | John Jones; Dorsey, Stephan |
| Subject: | RE: H&E - Outstanding Items |

There are no design or engineering issues – the issues with the work in place is either a construction, warranty or a maintenance issue.
Neal Johnson



**Neal Johnson, AIA**
Program Manager – Facilities
Southeast Regional Office

7399 Florida Boulevard,
Suite 300
Baton Rouge, LA 70806
Office  225.922.5700
Direct  225.331.6343
Cell   225.324.5648

Neal.johnson@urs.com

**From:** Frankie Wynn [mailto:fwynn@he-equipment.com]
**Sent:** Monday, June 24, 2013 2:12 PM
**To:** Ryan, Thomas E; Johnson, Neal
**Cc:** John Jones; 'Dorsey, Stephan'
**Subject:** FW: H&E - Outstanding Items

See Stephan's comments below.  The only controversial issue is still with the joints.  I need an opinion from URS in regards to whether a design or installation issue.  I have forwarded Womack's opinion previously.

Frankie Wynn
Director of Facilities/Risk/Compliance Management
H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA  70809  (New Address)
Office:  225-298-5229
Mobile:  225-603-4438
Fax:  225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com

-----Original Message-----
From: Dorsey, Stephan [mailto:sdorsey@mjwomack.com]
Sent: Monday, June 24, 2013 1:47 PM

1



EXHIBIT
Jones
53
3-8-16  WC

NON-CERTIFIED COPY

H&E 0025356

To: Frankie Wynn
Subject: Fwd: H&E - Outstanding Items

Fyi

Stephan Dorsey
Project Manager
Milton J. Womack, Inc
Office: (225) 924-8050
Fax:   (225) 924-8085
Cell:   (225) 268-6014


Begin forwarded message:

From: "Dorsey, Stephan" <sdorsey@mjwomack.com<mailto:sdorsey@mjwomack.com>>
Date: June 24, 2013 8:55:30 AM CDT
To: "Hill, Terry" <thill@mjwomack.com<mailto:thill@mjwomack.com>>, "Phillips, Dale"
<dphillips@mjwomack.com<mailto:dphillips@mjwomack.com>>, "Gauthier, Greg"
<ggauthier@mjwomack.com<mailto:ggauthier@mjwomack.com>>
Cc: "Bonner, Philip" <pbonner@mjwomack.com<mailto:pbonner@mjwomack.com>>
Subject: RE: H&E - Outstanding Items

The following list reflects the outstanding items on the H&E project as of today, and the status of each one of
today:


·    Mechanical chase exposed beams – COMPLETE (Trison completed the beam fireproofing this past
Saturday)

·    Executive wall panels – In the process of getting the material finish installed and approved by H&E

·    Branch Building Water Leaks – COMPLETE

·    Drywall repair at the acoustical wall panels – COMPLETE

·    Curb repair at HQ Bldg entrance – COMPLETE

·    As-Builts – COMPLETE

·    Site Paving expansion/construction joint issue – WAITING ON H&E'S RESPONSE

·    Stairwell door hardware issue –  COMPLETE

·    Floor squeaks – COMPLETE

·    Missing carpet in Room #207 floor box – COMPLETE

·    Replace 4 pieces of carpet tile in John's office – COMPLETE

I'll update and re-send this list as each item is resolved.

2

NON-CERTIFIED COPY    H&E 0025357

Stephan Dorsey
Project Manager
Milton J. Womack, Inc.
Office: (225) 924-8050
Fax:    (225) 924-8085
Cell:   (225) 268-6014

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

NON-CERTIFIED COPY

H&E 0025358

| From: | Frankie Wynn |
|---|---|
| Sent: | Tuesday, June 25, 2013 4:43 PM |
| To: | Ryan, Thomas E; Dorsey, Stephan; John Jones; Johnson, Neal (neal.johnson@urs.com) |
| Subject: | H&E Equipment Services, Inc Corporate and Branch Punch List 6/25/2013 |
| Attachments: | 201306251637.pdf |

H&E Equipment Services, Inc Corporate and Branch Punch List 6/25/2013 Attached

Frankie Wynn
Director of Facilities/Risk/Compliance Management H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA  70809   (New Address)
Office:  225-298-5229
Mobile:  225-603-4438
Fax:  225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com

1

EXHIBIT
Jones
54
B-816

NON-CERTIFIED COPY

H&E 0025359



# Deficiencies to the Completion of the Contract

| | |
|---|---|
| Project | H&E Equipment Services - Headquarters & Branch Buildings |
| Location | Baton Rouge, LA |
| URS No. | 19229775 |
| Date of Observation | Initial Observation on 12/14/2012, Revisit on 2/6/2013, Revisit on 2/19/2013, Revisit on 3/5/2013, Revised 6/24/13 |
| Contractor | Milton J. Womack, Inc. |

The list of work below is to be considered as an observation of the work completed or not completed at the time of observation. All work contained within the Contract Documents but not indicated on this list is still the responsibility of the appropriate contractor.

| Owner Acceptance by Initial | Value | | Deficient Item | |
|---|---|---|---|---|
| ✓ =OK 7-11 | | Headquarters Building | | |
| 6/26/2013 | | GENERAL | | |
| | | ARCHITECTURAL | | |
| | | EXTERIOR | | |
| | | General | ok | |
| | | Parking Lot | ok | |
| | | INTERIOR | | |
| | | First Floor | | |
| ✓ | $50 | Lobby 100 | Clean/remove excess grout on stone veneer under lobby stair | |
| ✓ | $250 | | Repair 1 artichoke light fixture to be same color light as other 2 | |
| ✓ | $250 | Receptionist 101 | Patch/repair nail holes in receptionist desk | |
| ✓ | $200 | | Finish underside of receptionist desk (employees have gotten splinters) | |
| ✓ | $200 | | Repair scratches/scuffs and cracks in stained wood faces | |
| ✓ | $150 | Corridor 104 | Replace frayed carpet tile | |
| ✓ | $250 | Women 110 | repair vanity to not sag and separate from end splash | |
| ✓ | $250 | Coffee 111 | Adjust backsplash to close gap between counter | |
| ✓ | $50 | Storage 119 | Repair gap in ceiling tile & sprinkler head | |
| ✓ | $250 | IT 163 | install 2'x2' floor grilles to be flush with flooring | |
| | | Second Floor | | |
| ✓ | $150 | Bridge 201 | Touch-up paint on metal column | |
| ✓ | $150 | Corridor 203 | Adjust cove light reveal at wall to be recessed at end near conference room 216 | |
| ✓ | $250 | Corridor 204 | Patch/repair hole in gyp board wall at ceiling outside Training Room | |
| ✓ | $150 | Conference 207 | Adjust access floor panels to be level | |
| ✓ | $50 | Office 220 | install missing piece of ceiling grid | |
| ✓ | $50 | Office 221 | install missing base behind door | |
| ✓ | $500 | Board Room 235 | Repair frayed wallcovering edges at doors and windows | |
| ✓ | $250 | | Patch/repair holes in millwork glass doors where hinges were drilled wrong | |
| | $1,200 | Executive Entry 237 | Repair warped wood wall panels | |
| ✓ | $150 | Office 252 | Repair/replace damaged return air grille | |
| | | Civil/Landscape | | |
| ✓ | $1,000 | Civil | Clean all expansion and construction joints and re-caulk as needed | |
| ✓ | $150 | | Cut and cap PVC pipe with finished grade at water valve on E. side of HQ building | |
| | | Landscape | ok | |
| | | Mechanical | | |
| ✓ | $100 | General | Sprinkler cap needs installed -- Room 108 | |
| | | Electrical | | |
| | | ok | | |
| | | CLOSEOUT | | |
| | | ok | | |
| | | Branch Building | | |
| | | GENERAL | | |
| | | ok | | |
| | | ARCHITECTURAL | | |
| | | EXTERIOR | | ok |

NON-CERTIFIED COPY

H&E 0025360



## Deficiencies to the Completion of the Contract

| | |
|---|---|
| Project | H&E Equipment Services - Headquarters & Branch Buildings |
| Location | Baton Rouge, LA |
| URS No. | 19229775 |
| Date of Observation | Initial Observation on 12/14/2012, Revisit on 2/6/2013, Revisit on 2/19/2013, Revisit on 3/5/2013, Revised 6/24/13 |
| Contractor | Milton J. Womack, Inc. |

The list of work below is to be considered as an observation of the work completed or not completed at the time of observation. All work contained within the Contract Documents but not indicated on this list is still the responsibility of the appropriate contractor.

| Owner Acceptance by Initial | Value $ | | Deficient Item |
|---|---|---|---|
| | | **ARCHITECTURAL** | |
| | | **INTERIOR** | |
| ✓ | $150 | Entry 100 | Adjust sagging ceiling grid at door 100 |
| | | | |
| | | **Civil/Landscape** | |
| ✓ | $11,500 | Civil | Provide bituminous sealant on all joints within concrete pavement |
| ✓ | $1,200 | Landscape | Revise Landscape drainage to allow proper parking lot drainage |
| | | | |
| | | **Mechanical** | ok |
| | | | |
| | | **Electrical** | |
| ✓ | $500 | Lighting | Repair/replace 1 damaged lense for type A fixture in Conference Room |
| | | | |
| | | **CLOSEOUT** | |
| | | ok | |
| | | **SUMMARY** | |
| | $0 | General | |
| | $4,950 | Architectural | |
| | $13,850 | Civil/Landscape | |
| | $100 | Mechanical | |
| | $500 | Electrical | |
| | $0 | Closeout | |
| | $19,400 | Total | |

NON-CERTIFIED COPY

H&E 0025361

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *   *
                         *
H&E EQUIPMENT SERVICES   *
                         * NUMBER 626,308
VERSUS                   *
                         * DIVISION "D"
URS CORPORATION          *
ARCHITECTURE, P.C., URS  *
CORPORATION, L O'NEAL    *
JOHNSON AND THOMAS E.    *
RYAN, III                *
                         *
*  *  *  *  *  *  *  *   *
```

Deposition of FRANKIE WAYNE WYNN,

taken on Tuesday, August 9, 2016, commencing at

10:02 a.m., in the offices of Adams and Reese,

LLP, Attorneys at Law, 4500 One Shell Square,

New Orleans, Louisiana, 70139.

EXHIBIT
9

NON-CERTIFIED COPY

Page 2

1              I N D E X

2

3                                    Page

4
   Caption                            1
5  Index of Exhibits                  3
   Appearances                       13
6  Agreement of Counsel              14

7  Examination

8     PHILIP A. FRANCO, ESQ.         15

9           *   *   *   *   *

10
   Witness' Certificate             231
11 Reporter's Page                  232
   Certificate                      233

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 3

1                    INDEX OF EXHIBITS

2

3    Number                              Page

4    1  August 21, 2009 Email from          34
        Frankie Wynn to Leonard
5        St. Germain attaching URS
        Short Form Master Agreement
6        for Professional Services
        Renovations and Additions
7        to Kenner LA Branch
        H&E 0005236-0005246
8
     2  URS Short Form Master Agreement     36
9        for Professional Services
        Between H&E Equipment Services
10       and URS Corporation
        Architecture PC August 13,
11       2009 Effective Date

12   3  October 14, 2010 Email string       38
        from Frankie Wynn to Brad
13       Barber, et al
        H&E 0003269-0003270
14
     4  URS Attachment 1 Time and           40
15       Materials Work Authorization
        10-10 10/22/2010 and
16       October 15, 2010 Letter from
        Neal Johnson to Frankie Wynn
17       URS 038394-038395

18   5  December 8, 2010 Email string       41
        from Thomas Ryan to Frankie
19       Wynn, et al
        H&E 0007552-0007553
20
     6  December 22, 2010 Email string      43
21       from Frankie Wynn to John
        Johns and Attachment 1, Scope
22       of Work, Schedule of Fees and
        Charges and Project Program
23       H&E 0009209-0009217

24

25

NON-CERTIFIED COPY

Page 4

1  (Cont.)      INDEX OF EXHIBITS

2

3      Number                                Page

4      7  URS Attachment 1 Time and          47
          Materials Work Authorization
5          12-10 12/17/10 Belle Chasse
           URS Attachment 1 Time and
6          Materials Work Authorization
           09-100 8/31/09 Kenner
7          URS 031072-031086

8      8  January 6, 2011 Email string       50
          from Frankie Wynn to John
9          Jones, et al
           H&E 0009311-0009312
10

       9  A-4 Application Site Plan          51
11         City of Baton Rouge 1-12-11
           URS 054688-054690
12

      10  January 19, 2011 Email from        55
13         Thomas Ryan to Neal Johnson
           Kickoff Meeting Minutes
14         January 14, 2011
           URS 039196-039197
15

      11  Lump Sum Work Order                57
16         No. 02-11 2/2/2011
           H&E 0037269-0037270
17

18    12  Geotechnical Engineering Report    58
          by Terracon Consultants, Inc.
19         February 9, 2011
           URS 065986-066005
20

      13  February 22, 2011 Email string     65
21         from John Jones to Brad
           Barber, et al
22         H&E 0003300

23

24

25

NON-CERTIFIED COPY

Page 5

1    Cont.)        INDEX OF EXHIBITS

2

3    Number                                    Page

4    14  March 2, 2011 Email string        66
         from Neal Johnson to Cody
5        Lewis, et al attaching URS
         Attachment I Phase IV Scope of
6        Services February 16, 2011
         URS 030824-030826
7
         15  URS Design Development Cost    67
8            Analysis for Kenner, LA
             February 14, 2011
9            URS 059882-059884

10   16  May 3, 2011 Letter from Neal       68
         Johnson to Milton J. Womack,
11       Buquet & LeBlanc and Arrighi
         Construction
12       H&E 0003392-0003393

13   17  June 16, 2011 letter proposal      70
         from Terracon to Frankie Wynn
14       URS 041088-041097

15   18  August 5, 2011 Email string        72
         from Arin Barkataki to Tim
16       Gaines
         URS 033341-033344
17

18   19  September 8, 2011 Email string     76
         from Frankie Wynn to James
19       Brown, et al
         H&E 0003672-0003674
20
         20  September 19, 2011 Email string  78
21           from Brad Barber to Frankie
             Wynn
22           H&E 0003742-0003743

23   21  September 20, 2011 Email string    80
         from Neal Johnson to Frankie
24       Wynn, et al
         URS 055094-055097
25

NON-CERTIFIED COPY

Page 6

1    (Cont.)        INDEX OF EXHIBITS

2

3    Number                                    Page

4    22  September 27, 2011 Email from          83
            Eryn Manint to
5            Becky@tdsola.com, et al
            H&E 0007534-0007537
6
        23  October 4, 2011 Email string        85
7            from Frankie Wynn to
            John Jones
8            H&E 0011032-0011034

9    24  November 1, 2011 letter from          87
            Terracon to Frankie Wynn
10          c/o Thomas Ryan
            URS 044305-044312
11
    .25  December 16, 2011 Email string        88
12          from Frankie Wynn to
            Brad Barber, et al
13          H&E 0004073-0004078

14  26  December 29, 2011 Email string         90
            from Ottis Seaborn to Daily
15          Update, et al
            H&E 0062142-0062149
16
    27  January 9, 2012 Email string           91
17          from Neal Johnson to Frankie
            Wynn
18          H&E 0062403-0062404

19  28  January 18, 2012 Email string          93
            from Frankie Wynn to John
20          Jones
            H&E 0012783-0012784
21
    29  January 27, 2012 Email string          94
22          from Neal Johnson to James
            Brown, et al
23          URS 033683-033698

24

25

1   (Cont.)        INDEX OF EXHIBITS

2

3   Number                              Page

4   30  February 2, 2012 Email string    100
        from Brad Reese to Thomas
5       Ryan, et al
        H&E 0013163-0013164
6

    31  February 10, 2012 Email string   101
7       from Frankie Wynn to Neal
        Johnson, et al
8       URS 074030

9   32  February 9, 2012 Email string    102
        from Ottis Seaborn to Thomas
10      Ryan, et al
        URS 074031
11

    33  February 24, 2012 Email string   103
12      from Thomas Ryan to Frankie
        Wynn
13      H&E 0063708-0063716

14  34  March 12, 2012 Email string      106
        from Frankie Wynn to Neal
15      Johnson, et al
        H&E 0064270-0064271
16

    35  March 15, 2012 Email from Ottis  107
17      Seaborn to Thomas Ryan, et al
        URS 070252
18

    36  URS Project Observation Report   108
19      March 20, 2012 Kenner
        URS 034337-034346
20

    37  March 29, 2012 Email string      111
21      from Frankie Wynn to John
        Jones, et al
22      H&E 0013645

23  38  August 3, 2012 Email string      111
        from Frankie Wynn to John
24      Jones
        H&E 0013874-0013876

25

NON-CERTIFIED COPY

Page 46

1    moving, the physical moving --

2        Q.  Okay.

3        A.  -- from one facility to the other.

4        Q.  But from H&E's standpoint, H&E was

5    moving its facility across the street, I want to

6    say?

7        A.  The same side of the street, down the

8    street.

9        Q.  Down the street?

10       A.  Yes, sir.

11       Q.  And this was going to be a larger

12   facility or the same size?

13       A.  Larger.

14       Q.  Larger facility?

15       A.  Yes.

16       Q.  And this was basically to repair heavy

17   cranes, am I understanding that correctly?

18       A.  Repair and remanufacturing.

19       Q.  Heavy cranes?

20       A.  Correct.

21       Q.  Not bulldozers or the earth-moving

22   equipment?

23       A.  Correct.

24       Q.  All right.  The next document I'm going

25   to show you --

NON-CERTIFIED COPY

Page 90

1    specs," what did you understand URS was doing as

2    compared to what Terracon was doing with respect

3    to the paved areas?

4        A.  Well, Terracon was doing the actual

5    testing.  I don't believe URS did any testing of

6    any --

7        Q.  Did you understand what Terracon was

8    doing other than just testing?

9        A.  They were observing, also.  As I stated

10   earlier, they were out there before the pour was

11   made.  During the pour and after the pour.

12       Q.  When URS made a visit to the site, you

13   didn't necessarily accompany them, correct?

14       A.  No, sir.

15       Q.  I'll show you the next document which

16   will be labeled as Exhibit 26, H&E 62142.

17           This document is from Ottis Seaborn at

18   MAPP.  He is sending a daily update to a number

19   of different people, which this particular one

20   does not include you, does it?

21       A.  Yeah, I think --

22       Q.  Oh, yes.  It does include you.

23           So, do you remember receiving daily

24   updates from Mr. Seaborn about what was going on

25   at Kenner?

NON-CERTIFIED COPY

1      A.  I don't think it was -- I don't know if

2  it was every day, but we did get updates from

3  Ottis on a regular basis.

4      Q.  Okay.  Look at Page 62147.

5      A.  Okay.

6      Q.  Do you understand what that is?  Those

7  rods?  Let me ask it simpler.

8          Do you understand those to be dowel

9  rods?

10      A.  Yes.

11      Q.  At expansion joints?

12      A.  Yes, sir.

13      Q.  Can you tell whether those are smooth

14  rods or not?

15      A.  I can't tell.

16      Q.  Okay.  And part of Terracon's job was to

17  observe the installation of those rods, as well,

18  correct?

19      A.  Correct.

20      Q.  Okay.  Let's look at the next one,

21  Exhibit 27, which is H&E 62403.

22          This is another series of Emails.  At

23  the bottom, Neal Johnson tells a number of

24  people, including you, that "The concrete" --

25  and this is again at Kenner -- "is breaking at

NON-CERTIFIED COPY

1    Q.  Projects?

2    A.  -- projects.

3    Q.  What was the problem with the mail slots

4  at the Baton Rouge facility after they were

5  constructed?

6    A.  Interoffice envelopes or FedEx envelopes

7  wouldn't fit.

8    Q.  They were too large?

9    A.  The envelopes were too large, yes, sir.

10    Q.  The actual size of the mail slots, was

11  that noted on the construction drawings?

12    A.  I would assume so, yes, sir.

13    Q.  And no one at H&E raised a question

14  about the size of those mail slots before they

15  were actually constructed, to your knowledge?

16    A.  No, sir.

17    Q.  Now, after the problem arose with the

18  mail slots, did URS, to your knowledge, redesign

19  the mail slots?

20    A.  Yes, sir.

21    Q.  And were the mail slots then put in

22  according to that new design?

23    A.  I believe so, yes, sir.

24    Q.  Was anything else in the mail area or

25  mailroom changed after construction, to your

NON-CERTIFIED COPY

Page 107

1  repoured?

2      A.  Yes, sir.

3      Q.  Correct?

4      A.  Yes, sir.

5      Q.  Because the contractor had done

6  something incorrectly?

7      A.  That is what I was told, yes, sir.

8      Q.  That doesn't refresh your memory as to

9  what you are talking about here?

10      A.  I don't think that has anything to do

11  with the wash bay.

12      Q.  Do you recall any particular problem

13  with the wash bay in Kenner?

14      A.  No, sir.

15      Q.  Let me show you the next Email, which

16  I'll label as Exhibit 35, URS 70252.

17          Now, just to put this in time

18  perspective, the prior one that I just asked you

19  about was March 12.  This one is from Ottis

20  Seaborn, is March 16.  So, we are talking four

21  days later.

22      A.  Okay.

23      Q.  And it says, "Subject:  (Kenner branch)

24  successful pours."

25          Do you see that?

NON-CERTIFIED COPY

1      A.  Yes, sir.

2      Q.  And it talks about Foundation A and

3  Foundation A-A.

4          Do you recall where that was?

5      A.  No, sir.

6      Q.  It says, "All concrete work has been

7  completed at the wash rack and service warehouse

8  addition."

9          Does that help refresh your recollection

10  as to what you may have been concerned about in

11  Kenner?

12     A.  No, sir.

13         MR. FRANCO:

14             I will turn that one over.  All

15  right.

16  EXAMINATION BY MR. FRANCO:

17     Q.  Let me show you the next exhibit, which

18  is Exhibit 36.  It is URS 034337.

19         This is a Project Observation Report

20  similar to the one I showed you earlier in your

21  deposition, but I want you to look at the

22  pictures at the bottom of 34341 and 2.

23         See it says "Service bldg, rear slab

24  spalling"?

25     A.  Yes, sir.

NON-CERTIFIED COPY

Page 113

1    manufacturer.  Can you send me a spec sheet on

2    the project.  We really want to make sure this

3    is the right stuff."

4            Do you see that?

5        A.  Yes, sir.

6        Q.  Do you recall what happened on that?

7        A.  I believe that the product that was

8    specified in the original specs were used.

9        Q.  Okay.  I'm going to show you the next

10   exhibit, which is Exhibit 39.

11           Now, this is an Email that starts off

12   from your branch manager, James Brown, in Kenner

13   at the bottom of the first page.  And he is

14   attaching pictures of cracks in concrete.  And

15   he sends that to you, and you send it to Neal

16   Johnson and Thomas Ryan and Johnny Jones.

17           Do you know who took these pictures?

18       A.  No.

19       Q.  It wasn't you?

20       A.  I don't know.

21       Q.  Okay.  Do you know if these are

22   construction joints or expansion joints?

23       A.  Most, if not all of them, look like

24   expansion joints, from my understanding of what

25   an expansion joint is.

NON-CERTIFIED COPY

1   EXAMINATION BY MR. FRANCO:

2       Q.  I understand, but my point was:  Did you

3   respond that there was not rocks, bolts, etc.,

4   on the site near the cracks being wedged into

5   the joints by equipment and causing excessive

6   cracking?

7       A.  I don't --

8       Q.  Do you deny that?

9       A.  I don't understand the question.

10      Q.  Yeah.  When MAPP raised that question,

11  that issue, at the meeting, did you deny that

12  there were rocks and bolts on the site near the

13  cracks being wedged into the joints?

14      A.  No, sir.

15      Q.  You deny that?

16      A.  No, sir, I didn't.

17      Q.  Let me show you the next exhibit,

18  Exhibit 44, which is H&E 51948.

19          This is an update like we looked at

20  before from Ottis Seaborn with MAPP.  It

21  references Kenner, and I want to focus on the

22  last bullet point.

23          It says, "Concrete demo:  All Around

24  Concrete Cutting was on site today to cut out

25  the damaged areas of paving at phases B-1 seq.

NON-CERTIFIED COPY

1    2."

2          Do you have any idea where that is?

3     A.  No, sir.

4     Q.  Do you have any idea why there was

5   cutting out of damaged areas?

6     A.  No, sir.

7     Q.  Now, the reason I introduced that, the

8   slab area that we talked about before that was

9   in place, that was in A-A.  You recall that?

10    A.  Yes, sir.

11    Q.  So this is obviously a different part --

12   I should say a different location, correct?

13    A.  I would assume so, yes.

14    Q.  According to this, at least?

15    A.  Yes, sir.

16    Q.  And you don't have any recollection

17   about where on the site that was, whether that

18   was a building slab, or whether it was part of

19   the yard?

20    A.  No, sir.

21    Q.  Do you recall anything around a drain

22   having to be cut out and replaced at Kenner?

23    A.  No, sir.

24    Q.  I'm going to show you another exhibit,

25   Exhibit 45, which is H&E 28572, and this is in

NON-CERTIFIED COPY

Page 129

1    reference to Kenner.  It is a series of Emails.

2          I want to focus on the second page, and

3    it is another Email from Ottis Seaborn of MAPP,

4    October 3, 2012, and under the bullet point

5    Concrete, it says, "MCC was on site today."

6          Do you know who MCC was?

7    A.  One of the subcontractors, I assume.

8    Q.  Do you remember that it was the concrete

9    subcontractor?

10   A.  I'll agree with you if you say it is.

11   Q.  It says, "Frank had a worker start

12   breaking the bad areas of the concrete in the

13   paving areas so that they could be repoured and

14   corrected."

15         Do you know what part of the pavement

16   that referred to?

17   A.  No, sir.

18   Q.  Do you know who Frank was?

19   A.  No, sir.

20   Q.  Was it you?

21   A.  No.

22   Q.  It was somebody from MAPP, apparently?

23   A.  Well --

24   Q.  Somebody from MCC, but it wasn't you?

25   A.  It was not me.

NON-CERTIFIED COPY

1      Q.  And then look at the next page.  It says

2   "Master Punch List."

3          Do you see that?

4      A.  Yes, sir.

5      Q.  All right.  Look down at the bottom.

6   There is a bullet point that says, "Repair

7   damaged paving at various locations in process."

8          Do you see that?

9      A.  Yes, sir.

10     Q.  Do you know what paving that is

11  referring to?

12     A.  No, sir.

13     Q.  Do you know whether MAPP charged you for

14  any of that work?

15     A.  I don't recall.

16     Q.  Do you recall why the areas of the

17  concrete had to be repoured and corrected?

18     A.  No, sir.

19     Q.  Do you know who rejected that concrete?

20     A.  No, sir.

21     Q.  All right.

22         MR. FRANCO:

23             You can turn that over.

24  EXAMINATION BY MR. FRANCO:

25     Q.  The next exhibit is Exhibit 46, H&E

NON-CERTIFIED COPY

1    16469.

2        And this, again, is in reference to

3    Kenner, and this starts off with an Ottis

4    Seaborn updated on October 3, 2012.

5        It says, "Concrete."  It says "MCC was

6    on site today.  MCC doubled the workers they had

7    breaking the bad section of concrete at the

8    boxed out area of the drain basin at the main

9    drive."

10        Does that help refresh your recollection

11    about where this area was?

12    A.  Yes, sir.

13    Q.  Where was that area?

14    A.  In the main drive.

15    Q.  And was it a drain?

16    A.  That is what Ottis says it is.

17    Q.  Okay.

18    A.  I don't disagree with Ottis.

19    Q.  Do you recall that having to be

20    repoured?  Broken up and repoured?

21    A.  Not specifically, no.

22    Q.  But, apparently, that is what is being

23    referenced here, that they were breaking that

24    up, correct?

25    A.  Yes, sir.

NON-CERTIFIED COPY

1    anyone from H&E call to URS's attention that the

2    parking area should be changed before it was

3    constructed?

4        A.  No.

5        Q.  And that day that this Email was done,

6    December 17, 2012, to your memory, that is the

7    day that, apparently, John Engquist found out

8    about the parking spot issue, correct?

9        A.  Yes, sir.

10        Q.  All right.  Did you go out and look at

11    the parking lot that day?

12        A.  I saw the parking lot, yes, sir.

13        Q.  Did you see any construction workers'

14    vehicles parked on that lot at the headquarters

15    building?

16        A.  I don't think I was able to distinguish

17    between an employee's vehicle or a subcontractor

18    or a construction worker's.

19        Q.  Well, there were contractors working at

20    the site, at the Baton Rouge site that day,

21    weren't there?

22        A.  I'm not aware of that.

23            MR. BARRIERE:

24                Object to form.

25    EXAMINATION BY MR. FRANCO:

NON-CERTIFIED COPY

Page 151

1    building could have been changed.

2        Q.  How?

3        A.  Could have made it smaller, made it more

4    than two floors.

5        Q.  Okay.  And if you do more than two

6    floors, it is more expensive to go up, isn't it?

7        A.  I would assume so.

8        Q.  And one of the things that H&E was

9    concerned about throughout the process of all

10   three projects is "How much is this going to

11   cost us?"  Fair statement?

12       A.  We are always concerned about how much

13   something is going to cost.

14       Q.  All right.  We will get to the cost

15   later.

16           Now, with respect to the mailroom

17   layout --

18           MR. BARRIERE:

19               If we are going to switch topics,

20   let's take a few minutes.

21           MR. FRANCO:

22               Okay.  That is fine.

23           (Recess held.)

24   EXAMINATION BY MR. FRANCO:

25       Q.  I want to switch gears to the mailroom

NON-CERTIFIED COPY

Page 152

1    millwork.  I'm going to show you the next

2    exhibit, which is labeled as Exhibit 52.   Its

3    H&E 20538.

4         This is a series of Emails and the one I

5    wanted to focus on, this talks about the

6    redesign of the mailroom, and then at the top of

7    the second page, Brad Barber tells you, "Let URS

8    know right now they will be responsible for the

9    full cost of this mistake on their part."

10   Correct?

11      A.  Correct.

12      Q.  And you forward that to Neal and Thomas,

13   as you were directed to do, correct?

14      A.  Correct.

15      Q.  And Neal responds to both you and Johnny

16   Jones and he says, "The mailroom millwork and

17   layout design and construction documents were

18   presented and approved by H&E over two years

19   ago."

20         Is that accurate?

21      A.  I would think so, yes.

22      Q.  And it says, "...URS is currently

23   providing all redesign services to H&E for any

24   and all of the current requested modifications

25   at no charge."

NON-CERTIFIED COPY

Page 191

1    get a report from their experts that we never

2    got.

3         Q.  Now, you just said you didn't agree with

4    what I just read.  You didn't agree that it was

5    a construction issue?

6         A.  I didn't -- I didn't, and don't know

7    what it is.

8         Q.  Right.  You don't know.  It is not that

9    you didn't agree with it.  You don't know, do

10   you?

11        A.  No, I don't.  Didn't and I don't.

12        Q.  The next exhibit is Exhibit 69, which is

13   H&E 21331.

14            This is in reference to Belle Chase

15   Project Change Orders.  It is from you.  It is

16   dated July 29, 2013.  It says, "Everyone

17   involved" -- I'm reading part of it, so bear

18   with me.

19            "Everyone involved was aware of the cost

20   sensitive nature of the Belle Chase Project and

21   the need for absolute accuracy to stay within

22   the contracted amount?"

23            Do you see that?

24        A.  Yes, sir.

25        Q.  I assume you had those conversations

NON-CERTIFIED COPY

Page 192

1    with the contractor, as well as URS.  Is that a

2    fair statement?

3          MR. BARRIERE:

4               Conversations with whom?

5    EXAMINATION BY MR. FRANCO:

6        Q.  Contractor and URS.

7        A.  Well, Neal was included on the Email, so

8    I'm having the conversation with him through the

9    Email.

10       Q.  Okay.  Was the Belle Chasse project the

11   only cost sensitive project?

12       A.  They were all cost sensitive.

13       Q.  All right.  It says, "Attached are

14   examples of increases in the cost in the Belle

15   Chasse Project.  Some are admittedly unforeseen,

16   but many are due to errors in the drawings or

17   omissions.  We discovered Friday that due to an

18   existing roof and a new roof not aligning, we

19   will have to eliminate the folding door and make

20   additional changes to ductwork."

21               Are you familiar with the existing roof

22   not aligning with the new roof?

23       A.  Yes, sir.

24       Q.  And this is at Belle Chasse, correct?

25       A.  Yes, sir.

NON-CERTIFIED COPY

1      Q.  What was the reason for that?  Do you

2  know?

3      A.  I didn't do the design.  I don't know.

4      Q.  Was it an elevation issue?

5      A.  I don't know what the problem was --

6      Q.  Right.  We --

7      A.  -- but that was --

8      Q.  I'm sorry.  I thought you were finished.

9  Go ahead.

10      A.  My understanding is that the ductwork

11  wouldn't fit in the area that was allotted on

12  the plans.  That was my understanding.

13      Q.  And I understand what you just said, but

14  my question is:  Was that a result of an

15  elevation issue in the design of the new

16  building compared to what was existing at the

17  old roof?

18      A.  I don't know.

19      Q.  My question was really:  Is this related

20  to the survey that was ultimately done of the

21  elevation of any of the buildings?

22      A.  No one ever said it was a problem with

23  the survey.

24      Q.  Did they say what the problem was?

25      A.  The problem --

NON-CERTIFIED COPY

Page 194

1    Q.  Well, did they ever say what the cause

2  of the problem was?

3    A.  It was a design problem.

4    Q.  Right.  But was the design problem based

5  on the survey, is my question?  Do you know

6  that?

7    A.  I already answered that.

8    Q.  You don't know?

9    A.  What I said -- I believe what I said

10  was:  Nobody ever mentioned the survey as being

11  a part of this problem, and the fact that we had

12  to eat a $3,000 I-beam.

13    Q.  Mr. Wynn, I'm sorry if I asked you this

14  question.

15       Do you know why the mockup that we

16  talked about before was not done?

17    A.  I don't recall why we didn't do that.

18    Q.  The roof issues, Ms. Wynn, because I'm

19  not familiar with the details of the premises,

20  was that in connection with Building C?

21    A.  I think this was -- I think it was

22  Building A.

23    Q.  Were there some elevations problems in

24  connection with Building C?

25    A.  I don't recall.  I can't remember which

NON-CERTIFIED COPY

1    building was which letter.

2        Q.  Okay.  I'm going to show you a document

3    I'm going to label as Exhibit 70.  This is not

4    Bates stamped so I'm not sure where this came

5    from.  This is Kenner Project Change Orders.

6            Have you ever seen that before?

7        A.  I don't recall seeing this in this

8    particular form.  I mean if it is presented as

9    Kenner Change Orders and it came from MAPP, I'll

10   accept it as their change orders.

11       Q.  That is my understanding, but just let

12   me ask you some questions about this document.

13           This document includes -- this is Kenner

14   now, so keep that in mind.  It says, "Change

15   Order Item," and we can always verify this by

16   going through the change orders.

17           But it says No. 5, "Replace Drain Box A,

18   15,658."  That is the drain box repair we talked

19   about before?

20       A.  Okay.  I'll agree.

21       Q.  Then No. 6 says, "Elevation Conflicts

22   $13,038.  What did that have to do with?

23       A.  Could I see it?

24       Q.  Yes.  I think that is 6, I think.

25       A.  The only thing I can imagine is that

NON-CERTIFIED COPY

Page 196

1    that was the conflicts in the survey that we

2    talked about where the wrong benchmarks were

3    used.

4        Q.  Okay.  That is what I thought it was,

5    too.  All right.

6            And then on the second page, wow, there

7    was a $261,000 change order for hurricane

8    damage?

9        A.  Yes, sir.

10       Q.  Okay.

11       A.  We were lucky enough to have a hurricane

12   come through in the middle of construction, and

13   a lot of the stuff that had already been done

14   has to be redone.

15       Q.  Was that all insured?

16       A.  No, sir.

17       Q.  Was any of it insured?

18       A.  I believe our deductible was either 100

19   or -- it was over $100,000.

20       Q.  So it was taken care of subject to the

21   deductible?

22       A.  Yes, sir.

23       Q.  Which hurricane was that?  Do you

24   remember?  There has been several of them, so I

25   lose track.

NON-CERTIFIED COPY

1    A.  Me, too.

2    Q.  That is all right.

3    A.  It wasn't Katrina.

4        MR. FRANCO:

5            Off the Record.

6        (Off the Record.)

7    EXAMINATION BY MR. FRANCO:

8    Q.  On the same list, it says --

9        MR. BARRIERE:

10           Back on the Record now?

11       MR. FRANCO:

12           Yes, back on the Record.

13   EXAMINATION BY MR. FRANCO:

14   Q.  "Joint between new and existing service

15   building, $8,596."

16       What was that?

17   A.  I believe that the elevations, the

18   existing elevations in service department didn't

19   match the elevation of the new concrete that was

20   poured.

21       When they took the wall down, there was

22   a difference, and I think that is what that was

23   to create that difference in elevation.

24   Q.  That is another elevation issue probably

25   related to survey?

NON-CERTIFIED COPY

Page 198

1       A.  I don't know.  That was in a totally

2    different area.  I'm not sure if that was

3    related to the survey or not.

4       Q.  All right.  Let me show you the next

5    document, which I'll label as Exhibit 71.  This

6    does not have a Bates stamp either.

7           Now, this is from Gootee, which would

8    have involved the Belle Chasse project, correct?

9       A.  Yes, sir.

10      Q.  And it says "COP."  That is Change Order

11   Proposal, correct?

12      A.  I believe so, yes, sir.

13      Q.  All right.  Then there is a list of

14   approved, and there is a list of pending, and

15   there is a list of rejected, correct?

16      A.  Yes, sir.

17      Q.  All right.  Look at the approved change

18   order proposals.  And, again, they are

19   highlighted, and I don't know who highlighted

20   this, but it wasn't me or us.

21           And it says under Change Order 1, Item

22   No. 20 says, "Demo of Steel Plates."  Do you

23   recall what that $2,500 was for at Belle Chasse?

24      A.  I believe those steel plates were

25   actually plates that were in the existing slab

NON-CERTIFIED COPY

Page 199

1    that were removed so they could pour the new

2    concrete on top of it.  I believe that is what

3    that was.

4        Q.  Well, why was it a demo?

5        A.  Demolition.

6        Q.  Oh, okay.  I got it.

7            And the Building A, additional concrete,

8    that was because of an elevation issue?

9        A.  Yes, sir.

10       Q.  Plumbing for an icemaker cost you

11   $4,000?

12       A.  It is a nice icemaker.

13       Q.  Apparently, so.  Do they come out in

14   figures?  All right.

15           The next exhibit I'm going to show you

16   is Exhibit 72, and that is H&E 8385.

17           This looks like an invoice from Superior

18   Millworks to Womack, and this is an estimate for

19   work, looks like in the mailroom.  Is that a

20   fair statement?

21       A.  Yes, sir.

22       Q.  All right.  It says, "Add new mail slots

23   and base cabinet at 3rd wall."  So that is the

24   new mail slots that we talked about earlier,

25   correct?

NON-CERTIFIED COPY

1    remember is that we questioned the need for the

2    joint sealant material, not the actual joint

3    itself."

4           Do you see that?

5      A.  Yes, sir.

6      Q.  So Mr. Dorsey actually didn't confirm

7    your statement about the fact that the

8    construction joints should not have been cut,

9    did he?

10     A.  No, sir.

11          MR. BARRIERE:

12              Object to the form of the question.

13   EXAMINATION BY MR. FRANCO:

14     Q.  Next exhibit is Exhibit 75.  This is H&E

15   7780.

16          This is from you, October 7, 2013.  It

17   says, "During a walkthrough of the Belle Chasse

18   Project on Friday, 10/4/2013, spalling and

19   cracking of the concrete was observed in the

20   paint building (Building K).

21          "A similar condition was present at the

22   Kenner, LA project and the slab had to be

23   replaced.

24          "Please have this inspected, along with

25   the entire project for this condition.  Let me

NON-CERTIFIED COPY

Page 204

1   know the plan of action as soon as possible?"

2          What happened as a result of this?  Do

3   you recall?

4      A.  I believe because of the size of the

5   spalling in Building K, that it was agreed upon

6   that we would just leave it like it was and see

7   if it got any worse, and if it got any worse,

8   then Gootee would replace it.

9      Q.  Did it get any worse, to your knowledge?

10     A.  Not that I'm aware of.

11     Q.  So, it hasn't been replaced?

12     A.  Not that I'm aware of.

13     Q.  Did Gootee say why that condition

14  happened?

15     A.  I don't recall if they gave a reason.

16     Q.  All right.  Next exhibit is Exhibit 76.

17  This is H&E 8042.

18          This says, "Concrete cracks in yard."

19  This was from John Jones, copied to you and Jeff

20  Stringer, who is the branch manager at Kenner --

21  I'm sorry -- at Baton Rouge.

22          It says, "Jeff, this is going to end up

23  in litigation more than likely.  URS has sent a

24  supposed expert to review of which we have not

25  heard a response and we have engaged our own

NON-CERTIFIED COPY

| | |
|---|---|
| **From:** | Ottis Seaborn [oseaborn@mappconstruction.com] |
| **Sent:** | Thursday, December 29, 2011 8:11 PM |
| **To:** | Daily Update |
| **Cc:** | tim.gaines@urs.com; htadlock@he-equipment.com; rgomez@he-equipment.com; fwynn@he-equipment.com; thomas.e.ryan@urs.com; jabrown@he-equipment.com; neal_johnson@urscorp.com; Brad Reese; Leighton Dixon |
| **Subject:** | 52079 Updates for H&E kenner (completion date 05-06-11) |
| **Attachments:** | Broom finish @ soth parking of H&E.jpg; Overhead snapshot of parking area half completed during pour.jpg; Workers starting pour @ south parking.jpg; pump truck and crew looking over pour @ south parking area of phase A-1.jpg; dowel rods @ expansion joint of south parking area.jpg; Howards pre-drilling 4 feet deep @ foundation A-A.jpg; Howards driving piles @ foundation A-A.jpg |

Updates for H&E Kenner (Thursday( 12-29-11)

- **Foundation/piles:** Howards continued driving piles today @ foundation A-A . They have about 20 more piles to drive but will have to finish tomorrow due the Pile mill only having one driver during the holidays. Bill is expecting a final delivery in the morning sometime and they plan to completed driving piles sometime after noon tomorrow.

- **Site work/ foundations:** Patriot is not on site today. (Returning Jan 1st 2012)

- **Electrical:** OTE is on site... Kenny continued installing the underground rigid pipe that will power the future lighting at the rear of the property. They have completed most of the north to south run, and have trenched about half way across the rear of the property.
  Form work/concrete: pouring got started around 9:am this morning at the south parking area of H&E. The concrete trucks were emptied about 11:am and finishing got started there shortly after. Once the paving was stable, Robert scored and cut the control joints.

- **Concrete Testing & documentation:** Terracon collected 8 cylinders this morning and tested the slump at various intervals. the slump was a consistent 4 1/4 . i directed Terracon to only collect one batch of cylinders for this pour. Originally the pour was calculated to be right at 100 yards or just over. There was actually 122 yards poured today, so Terracon was concerned about not capturing a second set of cylinders. I spoke with Daren Thomas about what happened today and that my solution will be to double check the sub contractors figures and that if were close to the 100 yard mark.. we will plan to collect & test any figure over 100yards as originally designed.

**Ottis Seaborn** :: Superintendent

**MAPP** CONSTRUCTION, LLC

344 THIRD STREET :: BATON ROUGE
  Cell # 1-504-654-0594

Office #  1-225-757-0111 ::

MAPPCONSTRUCTION.COM



*WYNN*
EXHIBIT NO. 76
K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0062142



NON-CERTIFIED COPY

H&E 0062143



NON-CERTIFIED COPY

H&E 0062144



Dec 29 2011 8:10am

NON-CERTIFIED COPY

H&E 0062145



NON-CERTIFIED COPY

H&E 0062146



Dec 29 2011 7:04am

NON-CERTIFIED COPY

H&E 0062147



NON-CERTIFIED COPY

H&E 0062148



NON-CERTIFIED COPY

H&E 0062149

Message

| | |
|---|---|
| **From**: | Ottis Seaborn [oseaborn@mappconstruction.com] |
| **Sent**: | 3/16/2012 9:57:19 PM |
| **To**: | Ryan, Thomas E [/O=URS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Thomas E Ryan189b56c9] |
| **CC**: | Johnson, Neal [/O=URS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Neal Johnson013e1dc7]; craigduos@gmail.com; jabrown@he-equipment.com; fwynn@he-equipment.com; Brad Reese [breese@mappconstruction.com]; Leighton Dixon [ldixon@mappconstruction.com]; dmarks@evansequipment.com |
| **Subject**: | H&E (Kenner Branch) Sucessful pours |
| **Attachments**: | Foundation A, final finishes being tooled in... pic#3.jpg; Foundation A, final finishes being tooled in... pic#5.jpg; Foundation A, final finishes being tooled in... pic#1.jpg; Foundation A-A, concrete pour completed and final finish being tooled in...pic#1.jpg; Foundation A-A, concrete pour completed and final finish being tooled in...pic#2.jpg; Foundation A-A, concrete pour completed and final finish being tooled in...pic#3.jpg |

Team please see the attached pictures of todays pours. All concrete work has been completed at the wash-rack & service warehouse addition.


Thomas could you find out from Evans Equipment, when they plan to install the metal building at the Wash-rack!

  I contacted the Superintendent of Evans equipment (Dwayne) and let him know that we finished the foundation today.

We have some miscellaneous work for removal of the forms and tying in the discharge line.. but other than that!.. Evans can start installing the building.



NON-CERTIFIED COPY

URS 070252



# Project Observation Report

**Time / Date:**
9:30 am / March 20, 2012

**Present at Site:**

MAPP, Inc. (General Contractor):
 Ottis Seaborn, Superintendent
 Brad Reese, Project Manager
 Laborers
MCC (Paving and Foundations): Workers Present
AllType (Framing): Workers Present
OTE (Electric): Workers Present

## Conformance with Construction Schedule:

Work appears to be on schedule.

## Outstanding Submittals:

Interior Finishes

## Observations:

➢ Site paving is continuing to be formed and poured. Control and expansion joints were being cut and caulked.
➢ Parts Building addition foundation has been poured.
➢ Service Building office addition foundation has been poured and is cracking/spalling.
➢ Service building rear addition foundation is approximately 80% formed.
➢ Temporary office trailer is in place at the parts building.

## Material (Stored on Site/Not in Place):

➢ Site paving and foundation reinforcing
➢ Grading material and fill
➢ Hollow metal frames

## Comments:

Work appears to be proceeding per contract documents

## Outstanding Issues:

Service building addition foundation issue

**REPORT NUMBER**

002

**OWNER**

H&E Equipment Services

**PROJECT NAME**

Kenner Branch Renovations and Additions

**PROJECT NUMBER**

19229626

**OBSERVER**

Thomas Ryan, URS

**WEATHER CONDITIONS**

Clear
Temp. Range = 75 degrees

**SITE CONDITIONS**

■ Dry
☐ Wet/Precipitation
☐ Muddy

**PHOTO LOG**

■ Included

**DISTRIBUTION**

■ Frankie Wynn, H+E
■ James Brown, H+E
■ Neal Johnson, URS
■ Thomas Ryan, URS
■ Brad Reese, MAPP
■ Tim Gaines, URS Civil
■ Craig Duos, SE Engineers
■ Frank Thompson, TLA
■ Craig Hebert, CHE
■ Daren Thomas, Terracon

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

WYNN
EXHIBIT NO. 36
K. DONNELLY

URS 034337

NON-CERTIFIED COPY

 **URS**

# Project Observation Report

Service building corner window structural support

**Photographic Log:**

| Photo No. 1 | Date 3.20.12 |
|---|---|
| **Direction Photo Taken:** | |
| Looking east toward Pine Lane Rd | |
| **Description:** | |
| Site paving being poured. | |

| Photo No. 2 | Date 3.20.12 |
|---|---|
| **Direction Photo Taken:** | |
| Looking east toward Pine Lane Rd | |
| **Description:** | |
| Site paving being poured. | |

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY

URS 034338



# Project Observation Report

| Photo No. 3 | Date 3.20.12 |
|---|---|

**Direction Photo Taken:**

Looking southeast

**Description:**

Site paving being poured

| Photo No. 4 | Date 3.20.12 |
|---|---|

**Direction Photo Taken:**

Looking east toward Pine Lane Rd

**Description:**

New entry gate installed

**URS Corporation**
**7389 Florida Boulevard, Suite 300**
**Baton Rouge, LA 70806**
**225.922.5700**

NON-CERTIFIED COPY

URS 034339



# Project Observation

# Report

| Photo No. | Date |
|-----------|------|
| 5 | 3.20.12 |

**Direction Photo Taken:**

Looking south toward service building

**Description:**

Service bldg. front addition framing being installed



| Photo No. | Date |
|-----------|------|
| 6 | 3.20.12 |

**Direction Photo Taken:**

Looking south toward service building

**Description:**

Service bldg. front addition framing being installed

**URS Corporation**
**7389 Florida Boulevard, Suite 300**
**Baton Rouge, LA 70806**
**225.922.5700**

NON-CERTIFIED COPY

URS 034340



# Project Observation Report

| Photo No. 7 | Date 3.20.12 |
|---|---|

**Direction Photo Taken:**

Looking south at Service Bldg

**Description:**

Service bldg. front addition framing being installed



| Photo No. 8 | Date 3.20.12 |
|---|---|

**Direction Photo Taken:**

Service building rear slab

**Description:**

Service bldg. rear slab spalling



**URS Corporation**
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY

URS 034341