

# Project Observation Report

| Photo No. | Date |
|-----------|------|
| 9 | 3.20.12 |

**Direction Photo Taken:**

Service building rear slab

**Description:**

Service bldg. rear slab cracking and spalling

**URS Corporation**
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY

URS 034342



# Project Observation
# Report

| Photo No. | Date |
|---|---|
| 10 | 3.20.12 |

**Direction Photo Taken:**

Looking north at Service building rear slab

**Description:**

Service building rear slab spalling

| Photo No. | Date |
|---|---|
| 11 | 3.20.12 |

**Direction Photo Taken:**

Looking east at wash rack

**Description:**

Wash rack foundation poured and bollards in place

**URS Corporation**
**7389 Florida Boulevard, Suite 300**
**Baton Rouge, LA 70806**
**225.922.5700**

NON-CERTIFIED COPY

URS 034343



# Project Observation Report

| Photo No. | Date |
|---|---|
| 12 | 3.20.12 |

**Direction Photo Taken:**

Looking east at wash rack

**Description:**

Wash rack separator pits poured

| Photo No. | Date |
|---|---|
| 13 | 3.20.12 |

**Direction Photo Taken:**

Looking west inside service bays

**Description:**

Existing walls stripped of sheathing

**URS Corporation**
**7389 Florida Boulevard, Suite 300**
**Baton Rouge, LA 70806**
**225.922.5700**

NON-CERTIFIED COPY

URS 034344



# Project Observation Report

| Photo No. | Date |
|---|---|
| 16 | 3.20.12 |

**Direction Photo Taken:**

Looking west at parts building addition

**Description:**

New slab and CMU fire wall installed

| Photo No. | Date |
|---|---|
| 17 | 3.20.12 |

**Direction Photo Taken:**

Looking west at parts building addition

**Description:**

New slab and CMU fire wall installed and existing masonry veneer removed

**URS Corporation**
**7389 Florida Boulevard, Suite 300**
**Baton Rouge, LA 70806**
**225.922.5700**

NON-CERTIFIED COPY

URS 034346

| From: | Johnson, Neal [neal.johnson@urs.com] |
|---|---|
| Sent: | Friday, August 03, 2012 7:53 AM |
| To: | Gaines, Tim |
| Cc: | Frankie Wynn; Ryan, Thomas E; John Jones; Johnson, Neal |
| Subject: | FW: Kenner / Cracks In Concrete 004.jpg, Cracks In Concrete 005.jpg, Cracks In Concrete 006.jpg, Cracks In Concrete 001.jpg, Cracks In Concrete 002.jpg, Cracks In Concrete 003.jpg |
| Attachments: | Cracks In Concrete 004.jpg; Cracks In Concrete 005.jpg; Cracks In Concrete 006.jpg; Cracks In Concrete 001.jpg; Cracks In Concrete 002.jpg; Cracks In Concrete 003.jpg |

Tim:
Need you to take a look at these photos obtained by the Owner.  There exists considerable concern about the quality of the paving construction joints.  A progress meeting is scheduled for next Tuesday  August 7, 2012 at 9:30 AM.  It would be appreciated if you could be in attendance to look at the condition of the paving and provide your opinion.
Thanks
Neal


-----Original Message-----
From: Frankie Wynn [mailto:fwynn@he-equipment.com]
Sent: Friday, August 03, 2012 6:58 AM
To: Johnson, Neal; Ryan, Thomas E; John Jones
Subject: Kenner / Cracks In Concrete 004.jpg, Cracks In Concrete 005.jpg, Cracks In Concrete 006.jpg, Cracks In Concrete 001.jpg, Cracks In Concrete 002.jpg, Cracks In Concrete 003.jpg


Frankie Wynn
Director of Facilities/Risk/Compliance Management H&E Equipment Services, Inc.
11100 Mead Road, Ste. 200
Baton Rouge, LA  70816
Office:  225-298-5229
Mobile:  225-603-4438
Fax:  225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com


-----Original Message-----
From: James A. Brown
Sent: Thursday, August 02, 2012 5:31 PM
To: Frankie Wynn
Subject: FW: Emailing: Cracks In Concrete 004.jpg, Cracks In Concrete 005.jpg, Cracks In Concrete 006.jpg, Cracks In Concrete 001.jpg, Cracks In Concrete 002.jpg, Cracks In Concrete 003.jpg


James A Brown
Branch Manager
125 East Airline Drive
Kenner, LA  70062
Ph 504-467-5906



WYNN
EXHIBIT NO. 39
K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0013938

Cell 504-416-0684
Fax 504-467-5914
E-mail jabrown@he-equipment.com
Website: http://www.he-equipment.com


-----Original Message-----
From: Dominic P. Terrio
Sent: Thursday, August 02, 2012 5:00 PM
To: James A. Brown
Subject: Emailing: Cracks In Concrete 004.jpg, Cracks In Concrete 005.jpg, Cracks In Concrete 006.jpg, Cracks In Concrete 001.jpg, Cracks In Concrete 002.jpg, Cracks In Concrete 003.jpg


The message is ready to be sent with the following file or link attachments:

Cracks In Concrete 004.jpg
Cracks In Concrete 005.jpg
Cracks In Concrete 006.jpg
Cracks In Concrete 001.jpg
Cracks In Concrete 002.jpg
Cracks In Concrete 003.jpg


Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file attachments.  Check your e-mail security settings to determine how attachments are handled.


This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

NON-CERTIFIED COPY

H&E 0013939

NON-CERTIFIED COPY

H&E 0013940



# Project Observation Report

| Photo No. 14 | Date 3.20.12 |
|---|---|

**Direction Photo Taken:**

Looking south in service bldg.

**Description:**

Water leaking and ponding in service bldg. restroom



| Photo No. 15 | Date 3.20.12 |
|---|---|

**Direction Photo Taken:**

Looking west inside service building

**Description:**

New Service bldg. restroom plumbing



URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY

URS 034345



NON-CERTIFIED COPY

H&E 0013941

NON-CERTIFIED COPY

H&E 0013942

NON-CERTIFIED COPY

H&E 0013943

NON-CERTIFIED COPY

H&E 0013944

NON-CERTIFIED COPY

H&E 0013945

| From: | Ottis Seaborn [oseaborn@mappconstruction.com] |
|---|---|
| Sent: | Tuesday, September 25, 2012 8:26 PM |
| To: | Daily Update |
| Cc: | tim.gaines@urs.com; htadlock@he-equipment.com; rgomez@he-equipment.com; fwynn@he-equipment.com; thomas.e.ryan@urs.com; jabrown@he-equipment.com; neal_johnson@urscorp.com; Brad Reese; Vern Anderson; Debbie Stout |
| Subject: | 52079 Updates for H&E kenner  (completion date  tbd) |
| Attachments: | COntrol joint cut in & installed @ phase D, between Phase D & south edge of paving of A-2 ..pic#1.jpg; COntrol joint cut in & installed @ phase D, between Phase D & south edge of paving of A-2 ..pic#2.jpg; COntrol joint cut in & installed @ phase D, between Phase D & south edge of paving of A-2 ..pic#3.jpg; Curb dowles, cut down & ground @ north edge of phase D (Self perform) ..pic#1.jpg; Curb dowles, cut down & ground @ north edge of phase D (Self perform) ..pic#2.jpg; Curb dowles, cut down & ground @ north edge of phase D (Self perform) ..pic#3.jpg; Phase C-3 control joints caulked & sealed #1.jpg; Phase C-3 control joints caulked & sealed #2.jpg; Self perform , form boards removed & stacked & area at phase D cleaned up.jpg |

Updates for H&E Kenner Tuesday ( 9-25-12)

- **Self Perform:** We completed removing the curb dowels & grinding down the stubs @ north edge of phase D. We installed the drip caps hardware at the exterior warehouse man-doors. We also removed part of the damaged paving that was saw cut between and at transition phases B-1 seq 2 & Phase C-3 seq 1 & 2.

- **Metal Buildings:** RBI was on site today. Eric & crew continued , framing, insulating & sheeting the Parts warehouse roof. RBI has completed ¼ of the roof system of the Parts warehouse. Gino Ray & Paul Desselle was on site today, They were on site at my request to review & plan the re-roof of the service warehouse. We also walked the damaged areas of the warehouse items, to provide a complete pricing for all of the items on the Isaac list.

- **Concrete:** MCC was on site today, Jeremy & Jose arrived this afternoon to caulk, seal & detail the control joints of the new paving of Phase C-3.

- **Painting & Finishing:** Dalesandro was on site today. The crew continued painting & touch ups at the interior office spaces. Marco Dalesandro was on site today at my request to provide pricing for drywall & finish repairs due to damages from Isaac.

- **Inspections:** A city building final was scheduled for Next Monday (10-01-12) . We requested a final for a date this week, but the city is booked full for the end of this month.

- **Structural:** CCCM was on site today at our request to provide pricing  for repairs to the warehouse steel items that was damaged during Isaac. Calvin expected to have quotes ready by tomorrow. Calvin also walked the area where the 5x5  concrete step noted by the state fire marshal was requested. Calvin said he would follow up with tomorrow.

- **Flooring:** RCC flooring was contacted via E-mail to provide pricing for the flooring that was damaged due to the flooding caused by Isaac.

- **Fencing:** U.S. Fence was contacted via E-mail to provide pricing for the fencing that was damaged due to the flooding & wind caused by Isaac.

- **Tree Removal:** Brandon of Lake Ponchartraine landscaping called me today, & spoke briefly about the tree removal @ Phase C-1. Brandon said that he would get the tree removed ASAP once the temporary office trailers were moved out of the area.

- **Concrete demo:** All around concrete cutting was on site today to cut out the damaged areas of paving at phases B-1 seq 2.

**Ottis Seaborn ::**  Superintendent

504 654 0594 WIRELESS

1

WINN
EXHIBIT NO. 44
K. DONNELLY

NON-CERTIFIED COPY

H&E 0051948

**MAPP**CONSTRUCTION

344 THIRD STREET :: BATON ROUGE
P 225 757 0111 ::  F 225 757 0480

MAPPCONSTRUCTION.COM

2

NON-CERTIFIED COPY

H&E 0051949

| From: | Brad Reese [breese@mappconstruction.com] |
|---|---|
| Sent: | Thursday, October 04, 2012 12:02 PM |
| To: | Johnson, Neal; Frankie Wynn |
| Cc: | Gaines, Tim; thomas.e.ryan@urs.com; jabrown@he-equipment.com; 'neal_johnson@urscorp.com; Vern Anderson; John Jones; Thomas, Daren L. (dlthomas@terracon.com) (dlthomas@terracon.com); Vrenick, Tom A; craigduos@gmail.com; Ottis Seaborn |
| Subject: | RE: 52079 Updates for H&E kenner  (completion date  tbd) |

Neal,
As we discussed, MAPP will implement the engineer's recommended design mod/fix as soon as we receive direction.  We have placed our concrete sub on stand-by and they are ready to move forward without delay. Again, if your office requires any assistance from MAPP to expedite resolution, please let us know.


Frankie,
We do understand the urgency of this matter, and are prepared to deal with it accordingly.


thanks


**Brad Reese, LEED AP BD+C** :: Sr. Project Manager



**MAPP**CONSTRUCTION
MAPPCONSTRUCTION.COM


---

**From:** Johnson, Neal [mailto:neal.johnson@urs.com]
**Sent:** Thursday, October 04, 2012 9:52 AM
**To:** Frankie Wynn; Ottis Seaborn
**Cc:** Gaines, Tim; 'thomas.e.ryan@urs.com'; 'jabrown@he-equipment.com'; 'neal_johnson@urscorp.com'; Brad Reese; Vern Anderson; John Jones; Thomas, Daren L. (dlthomas@terracon.com) (dlthomas@terracon.com); Vrenick, Tom A; craigduos@gmail.com; Johnson, Neal
**Subject:** RE: 52079 Updates for H&E kenner (completion date tbd)
**Importance:** High

Ottis and Brad:
We need your response to your plan of correction action for this work.  As of now we will consider these joints to be rejected as installed.
Thanks,
Neal


Tim:
We need your review of MAPP's plan of correction and/or  a written recommendation on the paving cracks from you.
Thanks,
Neal


Craig
We need your review of MAPP's plan of correction and/or  a written recommendation on the slab cracks from you.
Thanks,

1

WYNN
EXHIBIT NO. 46
K. DONNELLY

H&E 0016469

NON-CERTIFIED COPY

Neal



**Neal Johnson, AIA**

7389 Florida Boulevard
Suite 300
Baton Rouge, LA 70806

Office   225.922.5700
Direct   225.231.6343
Mobile   225.324.5645

neal.johnson@urs.com

---

**From:** Frankie Wynn [mailto:fwynn@he-equipment.com]
**Sent:** Thursday, October 04, 2012 7:25 AM
**To:** 'Ottis Seaborn'
**Cc:** Gaines, Tim; 'thomas.e.ryan@urs.com'; 'jabrown@he-equipment.com'; 'neal_johnson@urscorp.com'; Brad Reese; Vern Anderson (vanderson@mappconstruction.com); John Jones
**Subject:** RE: 52079 Updates for H&E kenner (completion date tbd)

I have seen no new plan, ideas, suggestions or solutions to the crumbling concrete at the joints in the paved area or cracks in the slab. Guys please understand, this is not going away. Our Region VP, John Engquist, Jr. continues to ask me when this will be addressed. I need an answer for him and for me.

Frankie Wynn
**Director of Facilities/Risk/Compliance Management**
**H&E Equipment Services, Inc.**
**11100 Mead Road, Ste. 200**
**Baton Rouge, LA  70816**
**Office:  225-298-5229**
**Mobile:  225-603-4438**
**Fax:  225-298-5376**
fwynn@he-equipment.com
www.HE-Equipment.com

 

---

**From:** Ottis Seaborn [mailto:oseaborn@mappconstruction.com]
**Sent:** Wednesday, October 03, 2012 8:49 PM
**To:** Daily Update
**Cc:** 'Tim.gaines@urs.com'; 'htadlock@he-equipment.com'; 'rgomez@he-equipment.com'; 'fwynn@he-equipment.com'; 'thomas.e.ryan@urs.com'; 'jabrown@he-equipment.com'; 'neal_johnson@urscorp.com'; Brad Reese
**Subject:** 52079 Updates for H&E kenner (completion date tbd)

Updates for H&E Kenner Wednesday ( 10-03-12)

- **Self Perform:** Today, we undercut the door at the Mechanical room of the parts office building, installed new nickel plated hinges & strikes at the existing wood doors of the parts office's. The existing wood trusses of the parts lobby at the North end of the ceiling was trimmed out at the transition point between the storefront header & the ceiling.
- **Metal Buildings:** RBI was on site today. RBI Has completed about 50% of the new roof system of the Parts warehouse. Eric's crew continued , framing, insulating & sheeting the Parts warehouse roof.

NON-CERTIFIED COPY

H&E 0016470

- **Concrete:** MCC was on site today. MCC doubled the workers they had breaking the bad section of concrete at the Boxed out area of the drain basin at the Main drive. Mike White (MCC's PM) said they planned to pour the repair areas,& other misc. formed areas tomorrow.
- **Painting & Finishing:** Marco Dalesandro was not on site today.
- **Interior cleaning:** Today we continued our Final, final cleaning at the office areas.
- **Fire protection:** Calmar Coatings (Don) was on site today, treating the steel columns at the service warehouse rated wall assembly.


**Ottis Seaborn ::** Superintendent

504 654 0594 W I R E L E S S



**MAPP**CONSTRUCTION

344 THIRD STREET :: BATON ROUGE
P 225 757 0111 ::  F 225 757 0480

        MAPPCONSTRUCTION.COM


This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

NON-CERTIFIED COPY

H&E 0016471

**From:** Frankie Wynn
**Sent:** Monday, July 29, 2013 1:12 PM
**To:** Johnson, Neal (neal.johnson@urs.com); Ryan, Thomas E; Sooter, Jason (jason.sooter@urs.com); Sanders, Debra (debra.sanders@urs.com)
**Cc:** John Jones
**Subject:** Belle Chasse Project Change Orders
**Attachments:** 201307290833.pdf; 201307290832.pdf; Belle Chasse Bldg A Relocated Door; FW: H&E Belle Chasse RFI #29 Gate openings; Belle Chasse Revised Ductwork

During the Baton Rouge, Kenner and Belle Chasse projects we have been faced with numerous change orders due to items either overlooked, conflicts in drawings or miscommunications.

Everyone involved was aware of the cost sensitive nature of the Belle Chasse Project and the need for absolute accuracy to stay within the contracted amount.

Attached are examples of increases in the costs in the Belle Chasse Project. Some are admittedly unforeseen, but many are due to errors in the drawings or omissions. We discovered Friday, that due to an existing roof and a new roof not aligning, we will have to eliminate the folding door and make additional changes to ductwork. We also have a large bean that I need to know will be utilized or eliminated and if not used, can it be returned for credit.

We have a door in Building A that was cut where an existing wind brace is located that will have to be moved.

We had asked for an opening to be anticipated at a later date in the stairwell area in Building A. This was not communicated to the General Contractor.

A roll up door was installed without any access from the outside.

Also limestone was not included in the specs. for the driveways.

Due to lack of space, I will not include all RFI's, but there are many.

H&E would like an explanation of how these items were missed.

Thank you

Frankie Wynn
**Director** of Facilities/Risk/Compliance Management
**H&E Equipment Services, Inc.**
**7500 Pecue Lane**
**Baton Rouge, LA  70809  (New Address)**
**Office:** 225-298-5229
**Mobile:** 225-603-4438
**Fax:** 225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com


WYNN
EXHIBIT NO. 67
K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0021331

 

2

NON-CERTIFIED COPY

H&E 0021332

**Kenner Project Change Orders**

| CO Item | CPR# | Contract Item | Description | Amount |
|---|---|---|---|---|
| 1 | 1 | 560 | New Sewer Line at Front Office (Airline) 4,997.00 | 4,997.00 |
| 2 | 9 | 560 | Export & Import Unsuitable Soil 26,463.00 | 26,463.00 |
| 3 | 15 | 560 | New 2" Discharge Line (Sewer Manhole Tie-In) 29,260.00 | 29,260.00 |
| 4 | 21 | 560 | OH Door Scope Change -2,500.00 | (2,500.00) |
| | | | CO#1 | 58,220.00 |
| | | | | |
| 1 | 3 | 570 | 7 Day Concrete Mix (Phase A-1, Seq #2) 8,263.00 | 8,263.00 |
| 2 | 5 | 570 | Circular Hand Wash Station 3,071.00 | 3,071.00 |
| 3 | 11 | 570 | URS CPR #01, dated 01/11/12 (U/G Debris) 45,464.00 | 45,464.00 |
| 4 | 14 | 570 | Wash Rack Water Supply (New Water Meter) 15,604.00 | 15,604.00 |
| 5 | 20 | 570 | Replace Drain Box A (RFI #32) 15,658.00 | 15,658.00 |
| 6 | 25 | 570 | Elevation Conflicts 13,038.00 | 13,038.00 |
| | | | CO#2 | 101,098.00 |
| | | | | |
| 2 | 22 | 580 | Phase D Paving Area - Options 46,199.00 | 46,199.00 |
| 3 | 27 | 580 | Misc Framing Changes 9,829.40 | 9,829.00 |
| 4 | 28 | 580 | Failed Proofroll #3 10,792.00 | 10,792.00 |
| 5 | 29 | 580 | Failed Proofroll #4 4,040.00 | 4,040.00 |
| 6 | 30 | 580 | Revised Exterior Fixtures (ASI #16) 1,851.00 | 1,851.00 |
| 7 | 31 | 580 | Revise Wall Mount Flood Lights (Service Bldg) 4,777.00 | 4,777.00 |
| 8 | 32 | 580 | Cost to Install U/G for Pole Lights 3,417.00 | 3,417.00 |
| 9 | 33 | 580 | Added 3" Tele Conduit 3,720.00 | 3,720.00 |
| 10 | 34 | 580 | Concrete Sealer Deduct -13,811.00 | (13,811.00) |
| 11 | 35 | 580 | Signage Allowance Deduct -5,500.00 | (5,500.00) |
| 12 | 36 | 580 | Remove/Replace Existing Panels 10,183.77 | 10,183.77 |
| 13 | 37 | 580 | Offset Gas Line 7,560.48 | 7,560.48 |
| 14 | 38 | 580 | Replace Existing Service Building Roof 68,094.36 | 68,094.36 |
| 15 | 39 | 580 | Re-locate 30' of Gas Line 946.46 | 946.46 |
| 16 | 40 | 580 | Parts Building Painting 1,696.94 | 1,696.94 |
| 17 | 41 | 580 | 2nd BFP at 2" Water Line 4,231.19 | 4,231.19 |
| 18 | 44 | 580 | Failed Proofrolls #5-9 23,171.00 | 23,171.00 |
| 19 | 4 | 580 | Relocate Oil Tanks & Electrical (RFI #4) 14,881.00 | 14,881.00 |
| 20 | 43 | 580 | Door, Frame, Hardware Revisions 14,025.00 | 14,025.00 |



WYNN
EXHIBIT NO. 20
K. DONNELLY

NON-CERTIFIED COPY

| 21 | 42 | 580 | Service Mezzanine Buildout 16,471.40 | | 16,471.40 |
| | | | | CO#3 | 226,575.60 |
| | | | | | |
| 1 | 45 | 590 | Hurricane Damage 261,331.00 | | 261,331.00 |
| | | | | CO#4 | 261,331.00 |
| | | | | | |
| 1 | 47 | 600 | Misc Hardware Revisions 1,874.00 | | 1,874.00 |
| 2 | 49 | 600 | HVAC Filters 2,601.00 | | 2,601.00 |
| 3 | 50 | 600 | Revise Down Spout at Front Office Canopy Column 5,000.00 | | 5,000.00 |
| 4 | 51 | 600 | Window Treatments 2,988.00 | | 2,988.00 |
| 5 | 52 | 600 | Fire Marshal Requirements 5,139.00 | | 5,139.00 |
| 6 | 54 | 600 | **Joint between New & Existing Service Bldg 8,596.00** | | **8,596.00** |
| 7 | 55 | 600 | Service Building Rubber Base 911.00 | | 911.00 |
| 8 | 56 | 600 | Revise Server Room Outlet 1,615.00 | | 1,615.00 |
| | | | | CO#5 | 28,724.00 |
| | | | | | |
| | | | | Total | 675,948.60 |

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES, INC. | * | CASE NO. C626308, SECTION D |
|---|---|---|
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON, AND THOMAS E. RYAN, III | * | PARISH OF EAST BATON ROUGE |
|  | * | STATE OF LOUISIANA |
| FILED:_____ |  | _____ |
|  |  | DEPUTY CLERK |

## AFFIDAVIT OF FRANKIE WYNN

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

NOW COMES, Frankie Wynn, who under penalty of perjury and from his own personal knowledge, states:

1. I am over the 18 years of age and competent to give testimony in this matter. I have personal knowledge of all facts and circumstances in this Affidavit.

2. I submit this Affidavit in support of the Opposition to Defendants' Motion for Partial Summary Judgment on Reconventional Demand filed by H&E Equipment Services, Inc. ("H&E").

3. I am currently the Director of Facilities/Risk/Compliance Management for H&E and am based out of H&E's Corporate Headquarters located at 7500 Pecue Lane, Baton Rouge, Louisiana. I have held this position since May 2010, prior to which I served as H&E's Risk/Asset Manager.

4. As H&E's Director of Facilities, I was responsible for overseeing the construction phase of the Baton Rouge, Kenner, and Belle Chase, Louisiana projects at issue in this litigation.

5. I officially began overseeing the Baton Rouge, Kenner, and Belle Chase construction projects in 2010. In addition, I maintain H&E's files regarding the projects and have reviewed the documents relevant to this dispute, including the change order logs for the projects.

6. During my involvement with the projects, I regularly communicated with L. O'Neal Johnson, Thomas E. Ryan, III, and other representatives and employees of URS Corporation Architecture, P.C. and URS Corporation (collectively, referred to as "Defendants"), as well as the various general contractors and subcontractors for the three projects.

-1-



NO LEC 882965 v1
2919213-000024

NON-CERTIFIED COPY

7.     There have been multiple problems associated with the work performed by Defendants on all three projects at issue.

8.     During the course of construction, the project contractors and subcontractors observed numerous design deficiencies or design-related problems at all three H&E project sites. Typically, these issues were discussed with Defendants as the project architect and addressed – at H&E's expense. But, some problems remain outstanding even today. All problems that were addressed and remedied resulted in significant additional costs to H&E.

*Deficiencies and Problems at the*
*Baton Rouge Headquarters and Branch Facility*

9.     The Baton Rouge Headquarters and Branch Facility reached substantial completion in late 2012.

10.     Based on my involvement with the Baton Rouge projects and review of the change order log for the facilities, I am aware of numerous design deficiencies and problems that arose during construction.

11.     Most notably, during and/or around the time of substantial completion of the Baton Rouge projects, H&E and the project contractors began to observe crumbling and spalling in the concrete constructed to Defendants' specifications at the facilities.

12.     H&E notified Defendants of the observed problems with the concrete at the Baton Rouge site when the problems surfaced, in hopes – and with the expectation – that the parties would work together to find a solution and remedy. But, while Defendants initially appeared willing to troubleshoot the problem, they ultimately refused to participate in ongoing discussions and efforts to fix the concrete pads.

13.     The concrete problems at the Baton Rouge facilities continue to worsen to this day.

14.     I am also aware of numerous other problems and design deficiencies with respect to the Baton Rouge facilities that required addressing and/or remedying at H&E's expense. These include, for example:

(a)     Parking lot revisions due to Defendants' failure to design and provide for an adequate number of parking spots;

(b)     Structural steel revisions;

(c)     Waterproofing of the Headquarters' elevator pit, which was not provided for in Defendants' designs and specifications;

-2-

NON-CERTIFIED COPY

(d)    Interior modifications required for the proper routing of roof-drainage;

(e)    Provision of additional beams for the Branch Facility's loading dock due to incorrect measurements;

(f)    Installation of lintel systems and additional structural support above doorways and openings;

(g)    Upgrading of window sill materials due to the specification of inferior materials;

(h)    Replacement of wood paneling in the Headquarters' executive lobby area mid-construction due to Defendants' specification for and insistence that H&E use a thinner, inferior material;

(i)    Grading revisions at the Branch Facility;

(j)    Relocation of louvers and exhaust fans at the Branch Facility;

(k)    Revisions to the tie-in between the Branch Facility's wash-bay and the site's sewerage system; and

(l)    Multiple code-required additions not provided for in Defendants' original designs and specifications, including the addition of an oil/water separator in the service department shop, multiple railings and guardrails, and multiple fire-prevention measures.

15.    The above list is not exhaustive.

16.    Defendants often refused to take responsibility for the problems and deficiencies that arose and were brought to their attention in connection with the Baton Rouge projects. All of the revisions, changes, and additions required as a result of these problems and deficiencies were undertaken at additional expense to H&E.

### Deficiencies and Problems
### at H&E's Belle Chasse Facility

17.    The Belle Chasse project reached substantial completion in late 2013.

18.    Based on my involvement with the Belle Chasse project and review of the change order log for the facility, I am aware of numerous design deficiencies and problems that arose during construction.

19.    For example, I am aware of the following problems and deficiencies with respect to the Belle Chasse facility that required addressing and/or remedying at H&E's expense:

(a)    Significant addition of extra concrete in the facility's work area due to Defendants' incorrect elevation estimates and specification for an insufficient amount of concrete;

(b)    Removal of concrete expansion joints not anticipated or provided for by Defendants but necessitated by Defendants' concrete specifications;

NO LEC 832865 v1
2919213-000024

NON-CERTIFIED COPY

(c)    Multiple revisions occasioned by Defendants' failure to properly measure for an accordion partition in the facility's lunch room area, and H&E's purchase of custom materials that could not be used as planned and remain unused today;

(d)    Multiple revisions occasioned by Defendants' mismeasurement of roof differentials between the administration building and the tool room, including the relocation of duct work and transformers; and

(e)    Various other revisions and changes during the course of construction caused by Defendants' deficient specifications, such as the modification of exterior handrails, addition of bollards to exterior air-conditioning units, relocation of the facility's locker room, and replacement of the facility's windscreens.

20.    The above list is not exhaustive.

21.    Defendants often refused to take responsibility for the problems and deficiencies that arose and were brought to their attention in connection with the Belle Chasse project. All of the revisions, changes, and additions required as a result of these problems and deficiencies were undertaken at additional expense to H&E.

Dated:    August 21, 2015

_____
FRANKIE WYNN

SWORN TO AND SUBSCRIBED
BEFORE ME ON THIS THE
21st DAY OF AUGUST, 2015.

_____
NOTARY PUBLIC
Wesley P Hebert
LA Notary 87793
Lifetime Commission

-4-

NON-CERTIFIED COPY

1

1   **19TH JUDICIAL DISTRICT COURT**
2   **PARISH OF EAST BATON ROUGE**
    **STATE OF LOUISIANA**
3

4

5

6   H&E EQUIPMENT SERVICES, INC      *      DOCKET NO.
                                     *      626,308
7   VERSUS                          *
                                     *      SECTION:   "D"
8   URS CORPORATION ARCHITECTURE,   *
    P.C., URS CORPORATION, L.        *
    O'NEAL JOHNSON, AND THOMAS E.    *
9   RYAN, III                       *
                                     *
10  *  *  *  *  *  *  *  *  *        *

11

12

13

14

15          Deposition of DEBRA SANDERS, 12475 East Robin
    Hood Drive, Baton Rouge, Louisiana, 70815, taken in
16  the offices of Fishman Haygood, 201 St. Charles
    Avenue, 46th Floor, New Orleans, Louisiana,
17  70170-4600, commencing at 4:24 p.m., on Thursday, the
    4th day of August, 2016.

18

19

20

21  APPEARANCES:

22      FISHMAN HAYGOOD
        (By:  Brett B. Barriere, Esquire)
23      201 St. Charles Avenue
        46th Floor
24      New Orleans, Louisiana  70170-3500
           (Attorneys for the Plaintiff)
25

NON-CERTIFIED COPY



EXHIBIT

11

2

1    ADAMS AND REESE
     (By:  Philip A. Franco, Esquire)
2    4500 One Shell Square
     New Orleans, Louisiana  70139
3       (Attorneys for the Defendants)

4

5

6

7

8

9

10

11

12

13

14

15

16   REPORTED BY:

17       WENDY MAJORIA, CCR
         Certified Court Reporter
18       (No. 84106)
         Huffman & Robinson, Inc.
19       Suite 220, Metairie Office Tower
         433 Metairie Road
20       Metairie, Louisiana  70005
         (504) 831-1753/(800) 749-1753
21       (504) 831-1759/fax

22

23

24

25

NON-CERTIFIED COPY

3

# E X A M I N A T I O N   I N D E X

                                                                    PAGE

EXAMINATION BY MR. BARRIERE.....................6

# E X H I B I T   I N D E X

Sanders Exhibit No. 1.........................17
       (E-mail exchange from Brad Barber dated
        February 4th, 2013)

Sanders Exhibit No. 2.........................21
       (E-Mail exchange between Brad Barber
        and Vincent Provenza)

NON-CERTIFIED COPY

4

# S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, in accordance with law;

That the formalities of filing, reading, signing, sealing, and certification are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

*      *      *      *

WENDY MAJORIA, Certified Court Reporter, State of Louisiana, officiated in administering the oath to the witness.

NON-CERTIFIED COPY

5

1            DEBRA SANDERS,

2 after having been first duly sworn by the above-

3 mentioned Certified Court Reporter, was examined and

4 testified as follows:

5 EXAMINATION BY MR. BARRIERE:

6        Q.    Good afternoon, Ms. Sanders.  My name is

7 Brent Barriere.  We met very briefly outside.  I

8 represent H&E Equipment in connection with this

9 litigation.  I'll be taking your deposition today.

10            Could I get you to state your full name

11 and address for the record, please?

12        A.    Debra Sanders, 12475 East Robin Hood

13 Drive, Baton Rouge, Louisiana, 70815.

14        Q.    Is that your home address or business

15 address?

16        A.    Home address.

17        Q.    What is your business address?

18        A.    I don't know.

19        Q.    But you know how to get there?

20        A.    I do.  Well, I just got my real estate

21 license and started with a broker.  I officially work

22 out of my home, but I'm associated with a broker on

23 Perkins Road.  I don't know the address right offhand.

24        Q.    Am I correct in understanding you formerly

25 were employed by URS?

NON-CERTIFIED COPY

6

1      A.    Absolutely.

2      Q.    That's what brings you here today?

3      A.    Yes.

4      Q.    What years were you employed by URS?

5      A.    From -- from 1997 to 2015.

6      Q.    When in 2015 did you leave?

7      A.    June.

8      Q.    Why did you leave URS?

9      A.    I was laid off due to a buyout and

10   reorganization and my position being eliminated.

11      Q.    What was your position at the time you

12   were laid off?

13      A.    I was office manager in Baton Rouge.

14      Q.    Give me a little background.  Are you an

15   architect?

16      A.    No.

17      Q.    Are you an engineer?

18      A.    No.

19      Q.    Do you have any certifications in any

20   expertise in any construction area?

21      A.    My education is business management with

22   emphasis in construction management from LSU.  I have

23   a little bit of knowledge of construction.  I'm not

24   certified in any way.

25      Q.    You were hired by URS in 2009, is what you

NON-CERTIFIED COPY

7

1  told us?

2          A.    '97.

3          Q.    What was the position you had at the time

4  you were hired?

5          A.    I was hired as a project administrator

6  originally.

7          Q.    Can you describe, for the record, what are

8  the duties of a project administrator?

9          A.    Open new projects, keep track of all of

10  the paperwork, help with scheduling, help with

11  invoicing, collections, filing, just assisting the

12  project manager in documentation of their projects.

13          Q.    At some point, you advanced to office

14  manager of the Baton Rouge office?

15          A.    I had a number of different positions over

16  the 17 years I was there.

17          Q.    Fair enough.

18                We're going to keep ourselves focused

19  today on, because of the late hour, the time frame of

20  2012 to 2014.  Were you the office manager of the

21  Baton Rouge office throughout that time frame?

22          A.    Yes.

23          Q.    If I may, I'd like to make sure that

24  you're not involved in certain aspects of this case.

25  Did you have any involvement with URS's work for H&E

NON-CERTIFIED COPY

12

1          Ryan?

2      THE WITNESS:

3          Ryan.  Thank you.

4      MR. FRANCO:

5          You didn't mind me helping out, did you?

6      MR. BARRIERE:

7          No.  That's fine.

8      THE WITNESS:

9          It's been a year since I've seen any of

10  these people.

11  EXAMINATION BY MR. BARRIERE:

12      Q.    I understand you don't recall when the

13  first meeting occurs.  Do you have any recollection of

14  when the second visit to H&E occurred?

15      A.    I don't.

16      Q.    Do you have any recollection of the

17  approximate break in time between the first visit to

18  H&E and your second visit to H&E?  By that I mean, a

19  month, six weeks?

20      A.    It was months, but I don't know exactly.

21      Q.    Okay.  Let's go back to that first

22  meeting.  What do you recall about the issue

23  concerning the mail slots?

24      A.    Their complaint, as I remember, was that

25  the slots were not large enough.  And our discussion

NON-CERTIFIED COPY

13

1 was that this is the way they were designed based on
2 them seeing the mail slots in our URS office and they
3 liked it and they approved the plan of it and that's
4 how they were built.

5      Q.    What was the response from the
6 representatives of H&E?

7      A.    I don't recall.

8      Q.    How was that issued resolved, if it was
9 resolved?

10      A.    I don't recall that there was a
11 resolution.

12      Q.    To your knowledge, was the -- were the
13 mail slots rebuilt or renovated, altered in some way?

14      A.    I would be guessing if I said.  I don't
15 remember.

16      Q.    The second item you mentioned was the
17 paneling.  Was that the paneling in the executive
18 area?

19      A.    I only remember that there was an issue
20 with the staining of some paneling.  And I don't
21 remember anything else about that part of it.

22      Q.    Do you recall any discussion concerning
23 the cause of that issue?

24      A.    Not well enough to say, no.

25      Q.    Fair enough.

NON-CERTIFIED COPY

14

1          Finally, there was discussion of the
2 parking issue.  What do you recall that issue to be?
3      A.    They were very upset about the parking
4 issue because they had just opened the building.
5 There were a lot of people coming in to see it and so
6 forth.  And their complaint was that there was simply
7 not enough parking spaces.  However, what we told them
8 is that it was designed to code based on how many
9 people were estimated to occupy the building and so
10 forth.
11          And so that was the main complaint there,
12 that they were just appalled that we didn't build
13 enough parking spaces.
14      Q.    Do you recall any detail being offered by
15 either Mr. Wynn or Mr. Jones as to why H&E anticipated
16 more parking spaces than had been provided?
17      A.    They did say that they anticipated growth.
18 And as I recall, we had taken that into consideration.
19      Q.    In advance of this meeting, had you met
20 with other folks at URS to discuss this dispute over
21 the number of parking spaces?
22      A.    In advance of this meeting, you mean like
23 in the last month?
24      Q.    No.  The meeting at H&E.
25      A.    Yes.  I had certainly discussed the issue

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


\* \* \* \* \* \* \* \* \*
                        \*
H&E EQUIPMENT SERVICES  \*
                        \* NUMBER 626,308
VERSUS                  \*
                        \* DIVISION "D"
URS CORPORATION         \*
ARCHITECTURE, P.C., URS \*
CORPORATION, L O'NEAL   \*
JOHNSON AND THOMAS E.   \*
RYAN, III               \*
                        \*
\* \* \* \* \* \* \* \* \*


Deposition of BRADLEY W. BARBER,
taken on Friday, August 5, 2016, commencing at
12:56 p.m., in the offices of Adams and Reese,
LLP, Attorneys at Law, 450 Laurel Street, Suite
1900, Baton Rouge, Louisiana, 70801.

EXHIBIT
12

NON-CERTIFIED COPY

Page 2

1                    I N D E X

2

3                                        Page

4
    Caption                               1
5   Index of Exhibits                     3
    Appearances                           4
6   Agreement of Counsel                  7

7   Examination

8      PHILIP A. FRANCO, ESQ.             8

9
                *   *   *   *   *
10
    Witness' Certificate                169
11  Reporter's Page                     170
    Certificate                         171
12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

1                INDEX OF EXHIBITS

2

     Number                          Page

3

4     1 July 10, 2008 Email string from   31
       Leonard St. Germain to Brad
       Barber
5       H&E 0003530-0003535

6     2 September 20, 2010 Email from   39
       Frankie Wynn to Brad Barber
7       H&E 0003823-0003832

8     3 October 14, 2010 Email string from 47
       Frankie Wynn to Brad Barber,
9       et al
       H&E 0003269-0003270

10

     4 February 24, 2011 string from   55
11       Frankie Wynn to Brad Barber
       H&E 0003307-0003308

12

     5 February 28, 2011 Email from   55
13       Frankie Wynn to Brad Barber
       Facility Update February 2011
14       H&E 0003301-0003305

15     6 April 22, 2011 Email string from  58
       Frankie Wynn to Brad Barber
16       H&E 0003341-0003342

17     7 June 30, 2011 Email from Frankie  60
       Wynn to John Jones, et al
18       H&E 0003886-0003893

19     8 Affidavit of Frankie Wynn   75
       August 21, 2015
20

     9 August 22, 2011 Email from Frankie 77
21       Wynn to Brad Barber, et al
       Facility Update August 2011
22       H&E 0003650-0003652

23    10 August 29, 2011 Email string from 78
       Brad Barber to Frankie Wynn
24       H&E 0003657-0003658

25

NON-CERTIFIED COPY

1    (Cont.)         INDEX OF EXHIBITS

2

Number                                    Page

3

4    11 September 19, 2011 Email string    81
         from Frankie Wynn to Brad
5        Barber, et al
         H&E 0003737-0003740

6    12 December 12, 2011 Email string    85
         from Frankie Wynn to Brad Barber
7        H&E 0004050-0004051

8    13 December 16, 2011 Email string    85
         from Frankie Wynn to Brad
9        Barber, et al
         H&E 0004073-0004078

10

     14 December 27, 2011 Email string    86
11       from Neil Favre to Frankie Wynn,
         et al
12       H&E 0004094-0004096

13   15 January 6, 2012 Email string from    88
         Frankie Wynn to Brad Barber,
14       et al
         H&E 0004907-0004105

15

     16 December 28, 2012 Email string    104
16       from Neal Johnson to Brad Barber
         H&E 0004505-0004506

17

     17 January 2, 2013 Email from Brad    106
18       Barber to John Engquist, et al
         H&E 0003083-0003085

19

     18 January 4, 2013 Email from Neal    109
20       Johnson to Frankie Wynn, et al
         H&E 0020538-0020540

21

     19 January 16, 2013 Email from Brad    112
22       Barber to John Enguqist
         H&E 0003179-0003186

23

     20 February 4, 2013 Email string    119
24       from Debra Sanders to John Jones
         H&E 0004275-0004277

25

NON-CERTIFIED COPY

Page 5

1   (Cont.)        INDEX OF EXHIBITS

2
    Number                                    Page
3
    21 February 4, 2013 Email string          121
4      from Brad Barber to Debra
       Sanders, et al
5      H&E 0004299-0004301

6   22 February 5, 2013 Email               130
       from John Jones to Brad Barber
7      H&E 0004279

8   23 February 6, 2013 Email string        133
       from Brad Barber to John
9      Engquist
       H&E 0003201-0003205
10
    24 April 8, 2013 Email string           143
11     from Frankie Wynn to John
       Jones
12     H&E 0024303

13  25 April 8, 2013 Email string from      147
       Vincent Provenza to Brad
14     Barber, et al
       H&E 0004346
15
    26 April 8, 2013 Email string from      149
16     Brad Barber to Vincent
       Provenza
17     H&E 0004897-0004902

18  27 October 3, 2013 Email string from    154
       Toby Hawkins to Brad Barber
19     H&E 0004937-0004939

20  28 November 27, 2013 Email from         163
       Frankie Wynn to Brad Barber,
21     et al
       H&E 0004381-0004391

22

23

24

25

NON-CERTIFIED COPY

Page 6

1    APPEARANCES:

2
        Representing the Plaintiff:
3
          FISHMAN HAYGOOD, LLP
4         Attorneys at Law
          201 St. Charles Avenue, Suite 4600
5         New Orleans, Louisiana  70170

6         BY:  BRENT B. BARRIERE, ESQ.

7

8

9       Representing the Defendant:

10        ADAMS AND REESE, LLP
          Attorneys at Law
11        4500 One Shell Square
          New Orleans, Louisiana  70139
12
          BY:  PHILIP A. FRANCO, ESQ.
13             KELLEN J. MATHEWS, ESQ.

14    ALSO PRESENT:

15

16      Representing H&E Equipment Services:

17        JOHN A. BERRY, ESQ.
          Corporate Counsel
18        7500 Pecue Lane
          Baton Rouge, Louisiana  70809
19
          Neal Johnson
20
        Reported by:
21             KAY E. DONNELLY
               Certified Court Reporter
22             State of Louisiana

23

24

25

NON-CERTIFIED COPY

Page 7

S T I P U L A T I O N

1

2

3       It is stipulated and agreed by and between

4   counsel that the deposition of BRADLEY W. BARBER

5   is hereby being taken under the Louisiana Code

6   of Civil Procedure in accordance with the Code.

7       The formalities of sealing and

8   certification are hereby waived.  The witness

9   will reserve the right to read and sign the

10  deposition.  The party responsible for service

11  of the discovery material shall retain the

12  original.

13      All objections, save those as to the form

14  of the questions, are hereby reserved until such

15  time as this deposition, or any part thereof,

16  may be used or sought to be used in evidence,

17  and are to be made in accordance with the Code

18  of Civil Procedure.

19              *   *   *   *   *

20      KAY E. DONNELLY, Certified Court Reporter,

21  in and for the State of Louisiana, officiated in

22  administering the oath to the witness.

23

24

25

NON-CERTIFIED COPY

1    construction workers from parking in the parking

2    lot, did you?

3        A.  I did not personally, no.

4        Q.  All right.  Let me just cover another

5    subject real quickly.

6            MR. FRANCO:

7                Let me show you another Email that

8    I'm going to label Exhibit 18.

9    EXAMINATION BY MR. FRANCO:

10       Q.  Were you aware of the issue with the

11   mailroom millwork and layout design in --

12       A.  I was.

13       Q.  Excuse me?

14       A.  I was, yes, sir.

15       Q.  Okay.  And what was your understanding

16   of what happened?

17       A.  The mail slots were too small to fit an

18   eight-and-a-half-by-11-inch sheet of paper.

19       Q.  Okay.  And were you aware that H&E

20   personnel actually visited a URS building to

21   determine what kind of mail slots they wanted at

22   the headquarters building?

23       A.  Was I -- was I aware when?  At what

24   point in time?

25       Q.  Were you aware that --

NON-CERTIFIED COPY

1  Email.

2      Q.  To try to work it out?

3      A.  Absolutely.

4      Q.  Are you aware -- I may have asked you

5  this.

6          Are you aware they designed that at no

7  charge, the additional parking?

8      A.  I am now.

9      Q.  Are you aware of the problem with the

10  executive area wall panels?

11      A.  I am.

12      Q.  Tell me what your knowledge of that

13  issue is.

14      A.  They were warped panels.

15      Q.  Do you know whose responsibility that

16  was, whether it was a design issue or a

17  construction issue?

18      A.  I -- the only thing I know for sure is

19  they were warped panels.

20      Q.  They were warped after they were -- I

21  mean, at the end of the day, they were warped?

22      A.  They were warped.

23      Q.  And you don't know whether that is a

24  construction problem or a design problem as you

25  sit here, do you?

NON-CERTIFIED COPY

1      A.   I could speculate for you.

2      Q.   Go ahead and speculate.

3      A.   I think it was cheap, thin material, and

4   that is why it warped.  But I am not certain.  I

5   do know they were all warped.

6      Q.   And you are no expert to tell us why

7   they warped, correct?

8      A.   No.

9      Q.   Fair statement?

10     A.   Fair statement.

11     Q.   What has been your involvement in the

12   cracking or spalling of the concrete in the yard

13   area of the Baton Rouge facility?

14     A.   Only to observe it.

15     Q.   Have you had discussion with anyone at

16   H&E as to the cause of that cracking and

17   spalling?

18     A.   Anyone at H&E, I -- no specific

19   conversation I can recall.  I mean, there has

20   certainly been conversation about the poor

21   quality and the cracking --

22     Q.   Right.

23     A.   -- of the cement and the joints.

24     Q.   Right.  But has anybody at H&E shared

25   with you their opinion about whether or not that

NON-CERTIFIED COPY

Page 152

1   conclusion.  I'm asking him whether it is right

2   and fair according to what H&E does.

3   EXAMINATION BY MR. FRANCO:

4       Q.  Go ahead.

5       A.  So understanding the full circumstances,

6   yeah, I would -- I would have agreed with not

7   paying URS until they had done what we thought

8   they should have on the project and covered for

9   the errors.

10      Q.  So the answer to my question is you

11  think it is right and fair?

12      A.  I just gave you my answer.

13      Q.  So if H&E has a problem on one job for a

14  customer, do you think it is okay for that

15  customer not to pay you on all the other jobs

16  that have no such problems?

17          MR. BARRIERE:

18              Object to the form of the question.

19  Hypothetical.  It omits materials facts.

20              Subject to the objection, you can

21  answer.

22          THE WITNESS:

23              Okay.  So I can't understand that

24  because we would do the right thing.  We would

25  not leave a customer with an open problem that

NON-CERTIFIED COPY

Page 156

1      A.  That is my opinion.

2      Q.  Why?

3      A.  Based off of the way he handled the

4  messes that they had and the topic we are here

5  to talk about today.

6      Q.  And you said "on behalf of the problems

7  he caused us."  As of October 2013, what

8  problems did he cause you?

9      A.  As of that time?

10     Q.  Yes.

11     A.  It was the parking, for sure.

12     Q.  So what else was it that you attributed

13  to Mr. Johnson, other than the parking issue

14  that we have talked about pretty much in detail?

15     A.  Generally, I just viewed him as

16  incompetent and unwilling to take

17  responsibility.

18     Q.  And what did he not take responsibility

19  for, other than the parking lot that --

20     A.  That was what --

21     Q.  -- URS still felt --

22     A.  That is what I -- you are asking me

23  about this Email.  That is what I would have had

24  in mind when I orchestrated this Email.

25     Q.  Okay.  And the reason I ask you that is

NON-CERTIFIED COPY

1

<pre>
1              19TH JUDICIAL DISTRICT COURT
          FOR THE PARISH OF EAST BATON ROUGE
2                   STATE OF LOUISIANA

3

4   H&E EQUIPMENT SERVICES, INC.
                                  DOCKET NO. 626,308
5   VERSUS
                                  SECTION "D"
6   URS CORPORATION ARCHITECTURE,
    P.C., URS CORPORATION, L. O'NEAL
7   JOHNSON, AND THOMAS E. RYAN, III

8

9

10

11  Deposition of TIMOTHY GAINES, 1140 Fairwinds Avenue,
    Zachary, Louisiana 70791, taken in the offices of
12  Fishman Haygood, LLP, 201 St. Charles Avenue, 46th
    Floor, New Orleans, Louisiana 70170, commencing at
13  1:30 p.m., on Monday, the 1st day of August, 2016.

14

15

16

17

18  APPEARANCES:

19

20      FISHMAN HAYGOOD, LLP
        (By:  Loretta G. Mince, Esquire)
21      201 St. Charles Avenue, 46th Floor
        New Orleans, Louisiana  70170-4600

22          ATTORNEYS FOR THE PLAINTIFF

23

24

25
</pre>



EXHIBIT
13

NON-CERTIFIED COPY

2

1  APPEARANCES CONTINUED:

2

3          ADAMS AND REESE, LLP
           (By:  Philip A. Franco, Esquire)
4          701 Poydras Street, Suite 4500
           New Orleans, Louisiana   70139
5
               ATTORNEYS FOR THE DEFENDANTS
6

7

8

9

10

11

12

13

14

15

16

17  REPORTED BY:

18          Deanna Mancuso
            Certified Court Reporter
19          Huffman & Robinson, Inc.
            Suite 220, Metairie Office Tower
20          433 Metairie Road
            Metairie, Louisiana   70005
21          (504) 831-1753     (800) 749-1753

22

23

24

25

NON-CERTIFIED COPY

3

1                          I-N-D-E-X

2

3    EXAMINATION BY:                              PAGE

4      MS. MINCE                                     8

5

6

7

8    EXHIBITS:

9

10   Exhibit 1 .................................30
       Photocopy of aerial photograph
11
     Exhibit 2 .................................59
12     E-mail with attachment Bates
       labeled URS 33308 through 33340
13
     Exhibit 3 .................................73
14     Letter dated October 12, 2010 from
       Neal Johnson to Frankie Wynn
15     Bates labeled URS 55534

16   Exhibit 4 .................................75
       Kick-off Meeting Minutes Bates
17     labeled URS 38456 and 38457

18   Exhibit 5 .................................78
       Site Meeting Minutes Bates
19     labeled URS 38508

20   Exhibit 6 .................................81
       E-mail and Geotechnical Engineering
21     Report Bates labeled H&E 65372
       through 65415
22
     Exhibit 7 .................................86
23     E-mail with attachments Bates
       labeled URS 33145 through 33154
24

25

NON-CERTIFIED COPY

4

**EXHIBITS CONTINUED:**                        **PAGE**

Exhibit 8 ..............................102
   Drawings labeled "Construction Set"

Exhibit 9 ..............................103
   E-mail and Specifications Bates
   labeled URS 66293 through 66356

Exhibit 10 .............................109
   E-mail string with attachments Bates
   labeled URS 31731 through 31735

Exhibit 11 .............................118
   E-mail with attachment Bates labeled
   URS 33265 through 33268

Exhibit 12 .............................119
   E-mail with attachment Bates labeled
   URS 36067 through 36070

Exhibit 13 .............................121
   E-mail and attachment Bates labeled
   URS 66706 through 66709

Exhibit 14 .............................124
   E-mail with "Addendum No. 2"
   Bates labeled URS 66881 through 66893

Exhibit 15 .............................126
   URS Project Observation Report
   Number 1 Bates labeled H&E 3840
   through 3847

Exhibit 16 .............................132
   E-mail string Bates labeled
   H&E 64417 and 64418

Exhibit 17 .............................135
   URS Project Observation Report
   Number 2 Bates labeled H&E 64597
   through 64606

NON-CERTIFIED COPY

5

1    **EXHIBITS CONTINUED:**                    **PAGE**

2

3    Exhibit 18 ..............................137
     E-mail string with photocopies of
4    photographs Bates labeled H&E 13938
     through 13945

5

     Exhibit 19 ..............................138
6    E-mail with attached photocopies of
     photographs Bates labeled URS 37206
7    through 37211

8    Exhibit 20 ..............................139
     E-mail and Supplement to Agreement
9    for Services Bates labeled URS 47562
     and 47563

10

     Exhibit 21 ..............................140
11   E-mail from Ottis Seaborn Bates
     labeled H&E 52036

12

     Exhibit 22 ..............................141
13   E-mail string Bates labeled
     H&E 16465 and 16466

14

     Exhibit 23 ..............................142
15   E-mail string Bates labeled
     H&E 16467 and 16468

16

     Exhibit 24 ..............................145
17   E-mail string and Sikacrete 321
     Fact Sheet

18

     Exhibit 25 ..............................155
19   E-mail string and Sika product
     information sheets Bates labeled
20   URS 37252 through 37267

21   Exhibit 26 ..............................161
     E-mail and Change Proposal Request
22   documents Bates labeled URS 79314
     through 79323

23

24

25

NON-CERTIFIED COPY

6

1  EXHIBITS CONTINUED:                    PAGE

2

3  Exhibit 27 .............................164
      Department of Public Works
4     Concrete Pavement Details

5  Exhibit 28 .............................165
      Department of Transportation
6     Concrete Pavement Details

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

7

1                    S-T-I-P-U-L-A-T-I-O-N

2

3             It is stipulated and agreed by and between

4    counsel for the parties hereto that the deposition

5    of the aforementioned witness is hereby being taken

6    under the Louisiana Code of Civil Procedure, Article

7    1421, et seq., for all purposes, in accordance with

8    law;

9             That the formalities of reading and

10   signing are specifically not waived;

11            That the formalities of filing, sealing,

12   and certification are specifically waived;

13            That all objections, save those as to the

14   form of the question and the responsiveness of the

15   answer, are hereby reserved until such time as this

16   deposition, or any part thereof, may be used or

17   sought to be used in evidence.

18

19              *      *      *      *

20

21            Deanna Mancuso, Certified Court Reporter,

22   in and for the State of Louisiana, officiated in

23   administering the oath to the witness.

24

25

NON-CERTIFIED COPY

78

1    Q.    Do you know when Neal Johnson left URS?

2    A.    Left URS?  It was after I left.

3    Q.    Do you know where he went?

4    A.    I do not.  I mean, I say that.  He went on

5  his own as far as, I mean, what he's told me when he

6  left.  I don't know if he's gone anywhere else.

7    Q.    Under Project Discussion it says, "The

8  geotechnical report was discussed.  Thomas stated

9  that URS is currently developing a request for

10 proposals to be released to three geotechnical

11 engineers in the next week."

12          Did you participate in developing the RFP

13 to issue for the geotech report?

14   A.    I don't recall.

15   Q.    Would you typically participate in that?

16   A.    Yes.

17   Q.    I'm going to show you a document I'm going

18 to mark as Gaines 5.

19          (Exhibit 5 was marked for

20          identification.)

21 EXAMINATION BY MS. MINCE:

22   Q.    These are meeting minutes from December 16,

23 2010, so just about a week following the kick-off

24 meeting we looked at in Gaines 5.  Do you see that?

25   A.    Yes.

NON-CERTIFIED COPY

# Site Meeting Minutes



| | |
|---|---|
| Date/Time: | December 16, 2010 at 9:00am. |
| From: | Thomas Ryan |
| Project: | H&E Equipment Rental and Service Facility Renovation and Addition |
| | Kenner, Louisiana |
| URS Project Number: | 19229626 |

| Attendees: | | | |
|---|---|---|---|
| | Frankie Wynn | H&E | fwynn@he-equipment.com |
| | James Brown | H&E | |
| | Craig Duos, PE | SE | craigduos@gmail.com |
| | Bill Temple, PE | SE | btemple100@gmail.com |
| | Fletcher Luke, PE | TLA | fletcherl@tlaengineering.com |
| | Thomas Ryan | URS | thomas_e_ryan@urscorp.com |

Purpose of Meeting:    To review existing conditions.

This meeting was held at the H&E facility in Kenner, La to review and evaluate the existing site, building and equipment conditions. The meeting began with a discussion of the site plan and phasing portions of the project and Craig Duos locating on the site where the geotech borings should be. The group walked through the parts building and discussed the existing structure and elements that will need to be analyzed to ensure rigidity once added onto. Thomas inspected the existing wall construction in order to plan the best wall/roof system to use for the new structures and draw the existing plan and demo correctly.

The group then walked through the service building and discussed the existing and planned elements of this building. Craig Duos asked for the specifications for the overhead cranes that are to be extended and the weights of the equipment to be brought into the building for servicing, both of which were given to him before the meeting was over. The existing heating system in the metal buildings was discussed and it was decided to use the same type of gas fired heating units as existing in the new bays to be installed at the service building. Frankie requested an emergency shower/eye wash station be installed in the service building work area. It was determined the best location is to be near the restrooms.

The location of the temporary office trailers was discussed while on the site. James discussed the need for the trailer to be located near each building during renovation due to supervision needs. General locations were selected and everyone agreed this will need further thought as well as contractor input.

Meeting was adjourned.



Gaines

EXHIBIT NO. 5

HUFFMAN & ROBINSON, INC.
COURT REPORTERS

NON-CERTIFIED COPY

URS 038508

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


* * * * * * * * *
                  *
H&E EQUIPMENT SERVICES   *
                  * NUMBER 626,308
VERSUS            *
                  * DIVISION "D"
URS CORPORATION   *
ARCHITECTURE, P.C., URS *
CORPORATION, L O'NEAL    *
JOHNSON AND THOMAS E.    *
RYAN, III         *
                  *
* * * * * * * * *


1442 Deposition of MAPP

CONSTRUCTION, LLC, through its Representative,

BRADLEY REESE, taken on Thursday, August 11,

2016, commencing at 9:05 a.m., in the offices of

Adams and Reese, LLP, Attorneys at Law, 450

Laurel Street, Suite 1900, Baton Rouge,

Louisiana, 70801.

EXHIBIT

14

NON-CERTIFIED COPY

1                    I N D E X

2

3                                      Page

4

     Caption                            1
5    Index of Exhibits                  3
     Appearances                       10
6    Agreement of Counsel              11

7    Examination

8      PHILIP A. FRANCO, ESQ.          12
       ALYSSON L. MILLS, ESQ.         156
9      PHILIP A. FRANCO, ESQ.         151
       ERIC A. KRACHT, ESQ            170
10     PHILIP A. FRANCO, ESQ.         170

11            *   *   *   *   *

12

     Reporter's Page                  174
13   Certificate                      175

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

1                    INDEX OF EXHIBITS

2

3    Number                              Page

4      1  October 24, 2011 Email from        19
            Brad Reese to Thomas Ryan
5            re: Updated schedule with
            MAPP Phasing Plan
6            URS 072811-072814

7      2  November 28, 2011 Email string     22
            from Thomas Ryan to Brad
8            Reese, et al re: Concrete
            Mix Civil Approval
9            URS 085359-085381

10     3  December 16, 2011 Email string     25
            from Ottis Seaborn to Daily
11           Update, et al
            URS 033427
12

13     4  December 19, 2011 Email string     26
            from Brad Reese to Neal
14           Johnson, et al
            H&E 0007555-0007557

15     5  December 21, 2011 Email string     28
            from Tim Gaines to Thomas
16           Ryan, et al
            URS 03718-03719
17

18     6  January 4, 2012 Email from         29
            Ottis Seaborn to Daily Update,
            et al
19           URS 033508

20     7  February 8, 2012 Email string      32
            from Brad Reese to Thomas
21           Ryan, et al
            URS 045108-045112
22

23     8  January 7, 2012 Email from         35
            Ottis Seaborn to Daily
            Update, et al
24           URS 033536

25

NON-CERTIFIED COPY

Page 4

1  (Cont.)      INDEX OF EXHIBITS

2

3   Number                                    Page

4      9  January 12, 2012 Email string    36
             from Thomas Ryan to Brad
5          Reese, et al
           URS 085753-085765

6
       10  January 16, 2012 Email from      40
7          Ottis Seaborn to Daily
           Update, et al
8          H&E 0062636

9      11  January 18, 2012 Email string    42
             from Frankie Wynn to John
10         Jones
           H&E 0012783-0012784

11
       12  January 23, 2012 Email string    45
12           from Thomas Ryan to Brad
           Reese, et al
13         H&E 0062999-006300

14     13  January 27, 2012 Email string    47
             from Neal Johnson to James
15         Brown, et al
           URS 033683-033691

16
       14  January 31, 2012 Email from      48
17         D. Thomas with Terracon
           to Thomas Ryan, et al
18         URS 033764-033766

19     15  February 2, 2012 Email from      49
           D. Thomas with Terracon
20         to Thomas Ryan, et al
           URS 033791-033794

21
       16  February 2, 2012 Email string    52
22           from Tim Gaines to Thomas
           Ryan, et al
23         URS 036099-036102

24

25

NON-CERTIFIED COPY

Page 5

1   (Cont.)        INDEX OF EXHIBITS

2

3       Number                                    Page

4       17  February 2, 2012 Email string        56
            from Brad Reese to Thomas
5           Ryan, et al
            H&E 0013163-0013164
6                        And attaching
            February 2, 2012 Email string
7           from D. Thomas, Terracon to
            Thomas Ryan, et al attaching
8           Concrete Compressive Strength
            Test Report
9           URS 033800-33805

10      18  February 2, 2012 Email string        58
            from Thomas Ryan to D. Thomas
11          Terracon, et al
            H&E 0013161-0013162
12
13      19  February 4, 2012 Email from          60
            Ottis Seaborn to Daily Update,
            et al
14          H&E 0004205

15      20  February 10, 2012 Email from         62
            Ottis Seaborn to Neal Johnson,
16          et al
            URS 074033-074034
17
18      21  February 24 2012 Email string        64
            from Neal Johnson to Tim
19          Gaines, et al
            URS 037392-037394

20      22  URS Project Observation Report       65
            March 20, 2012 Kenner
21          URS 034337-034346

22      23  March 23, 2012 Email from Neal       72
            to Neal Johnson, et al
23          H&E 0064487

24

25

NON-CERTIFIED COPY

1  (Cont.)      INDEX OF EXHIBITS

2

3   Number                                    Page

4

    24  April 2, 2012 Email from Ottis    76
5       Seaborn to Daily Update,
        et al
6       H&E 0048141

7   25  May 17, 2012 Email string from    80
        Ottis Seaborn to Frankie
8       Wynn
        H&E 0049112-0049116

9

    26  May 30, 2012 Email from D.        83
10      Thomas Terracon to Thomas
        Ryan, et al attaching
11      Concrete Compressive
        Strength Test Report
12      URS 034949-034956

13  27  May 31, 2012 Email from          88
        Ottis Seaborn to Daily
14      Update, et al
        H&E 0049557

15

    28  July 17, 2012 Email from Brad    90
16      Reese to Thomas Ryan, et al
        July 17, 2012 OAC Meeting
17      Minutes
        H&E 0008161-0008173

18

    29  August 10, 2012 Email string     91
19      from Tim Gaines to Ottis
        Seaborn
20      URS 037217-037218

21  30  August 25, 2012 Email from Ottis 91
        Seaborn to Daily Update,
22      et al
        URS 03579

23

24

25

NON-CERTIFIED COPY

1   (Cont.)        INDEX OF EXHIBITS

2

3    Number                              Page

4    31  September 17, 2012 Email        96
         from Brad Reese to Neal
5           Johnson, et al
            URS 048217-048218
6
     32  September 19, 2012 Email from   99
7           Ottis Seaborn to Daily Update,
            et al
8           URS 03521

9    33  September 21, 2012 Meeting      104
            Minutes
10          URS 048304-048306

11   34  October 3, 2012 Email string    106
            from Ottis Seaborn to Frankie
12          Wynn, et al
            URS 048575-048576
13
     35  October 4, 2012 Email string    108
14          from Ottis Seaborn to
            Frankie Wynn, et al
15          H&E 0016465-0016466

16   36  October 16, 2012 Email from     112
            Ottis Seaborn to Neal Johnson,
17          et al re: Punch list
            H&E 0017109-7717165
18
     37  March 4, 2013 Email string      116
19          from Frankie Wynn to Brad
            Reese, et al
20          URS 054170-054174

21   38  MAPP Change Proposal Request    118
            March 12, 2013
22          URS 077527-077535

23   39  March 15, 2013 Email string     119
            from Brad Reese to Frankie
24          Wynn, et al
            H&E 0037908-0037922
25

NON-CERTIFIED COPY

1      A.  I couldn't --

2      Q.  It wouldn't show that?

3      A.  It has been a while, so I'm not going to

4  say I'm pretty confident.

5          I mean, if you've got them, I'll look,

6  but I don't -- I don't remember if it had a

7  detail in there or not.

8      Q.  As to where the 4,000 would be used or

9  where the High-Early mixture would be used?

10     A.  Correct.

11     Q.  We will look at those in a little while.

12     A.  Okay.

13     Q.  The next document I'm going to show you

14  is going to be Exhibit 7, URS 45108.

15          This is from you to Thomas Ryan, copying

16  other people.  It is a list of the outstanding

17  items as of 2/8/12.

18          It says, "All items on this list are in

19  need of a response, but I highlighted the ones

20  that are extremely critical for this job."

21          And then later it says, "PS - we still

22  need to confirm a time for the weekly conference

23  call..."

24          Did you have weekly conference calls on

25  this job?

NON-CERTIFIED COPY

1      A.  I don't recall.

2      Q.  If you will turn two pages, at the

3  bottom, Bates stamp 45111, No. 8 on that page

4  says "Does Evans have the following items

5  included in their scope of work?"

6          Who was Evans?

7      A.  They were the equipment contractor for

8  the wash area.

9      Q.  What do you mean by "equipment

10  contractor"?

11      A.  They furnished and installed the wash

12  rack equipment.

13      Q.  Okay.  As a subcontractor to MAPP?

14      A.  No.

15      Q.  Well, on whose behalf were they there?

16      A.  H&E.

17      Q.  H&E hired them directly?

18      A.  I believe so.

19      Q.  And they provided the equipment in the

20  wash rack?

21      A.  Correct.

22      Q.  And it says, "Oil Separator - yes, this

23  is in Evans' scope," meaning Evans was supposed

24  to supply the oil separator, I assume; is that

25  correct?

NON-CERTIFIED COPY

Page 34

1      A.  Yes.

2      Q.  And then it says, "Sewer Line - tying

3  into the sewer line is in Evans' scope."

4          You wrote that, didn't you?  Look at the

5  Email.

6      A.  Based on this, I believe Thomas Ryan

7  wrote that.

8      Q.  Okay.

9      A.  It says highlighted in red, but --

10     Q.  All right.  But look at the Email that

11  precedes that page.  That is from you to Thomas.

12  It says, "Thomas, I've outlined some items below

13  that we need resolved."

14     A.  Correct.  But above that, it says --

15  from Thomas Ryan, "Below are my comments/notes

16  in red for these outstanding items..."  So I

17  bullet-pointed the items, and then that is

18  Thomas' responses next to each other.

19     Q.  So it is Thomas' response that the

20  "tying into the sewer line is in Evans' scope"?

21     A.  Correct.

22     Q.  Okay.  And the "Oil Separator - yes,

23  this is in Evans' scope," that is Thomas'

24  comment, as well?

25     A.  Correct.

NON-CERTIFIED COPY

1    A.  Correct.

2    Q.  And so we can assume that was work

3  within MAPP's scope of work.  Fair statement?

4    A.  Correct.

5    Q.  But for the Record, you can't tell us

6  the locations of that?

7    A.  Correct.

8    Q.  Let me show you the next exhibit, which

9  will be Exhibit 35.  This is H&E 16465.

10       Let's look at the first Email in that

11  string from Ottis.  It is an update, and it

12  says, "Concrete:  MCC was on site today.  MCC

13  doubled the workers they had breaking the bad

14  section of concrete at the Boxed out area of the

15  drain basin at the Main drive.  Mike White

16  (MCC's PM), said they planned to pour the repair

17  areas and other miscellaneous formed areas

18  tomorrow."

19       Do you recall that there was a boxed out

20  area at the drain basin in the main drive that

21  had to be redone because it was not done

22  properly?

23    A.  I do remember it having to be redone.

24    Q.  That is a big drain that is at the site,

25  right?  It has grating on it?

NON-CERTIFIED COPY

1  so this was to fill that or provide a smooth

2  transition between slabs.

3      Q.  And what was proposed to be used as the

4  fill?

5      A.  Sika 321.

6      Q.  S-I-K-A?

7      A.  Yes.

8      Q.  Had you all used that before?

9      A.  I don't recall specifically.

10     Q.  Was that ultimately done?

11     A.  I don't recall.

12     Q.  All right.  The next document is Exhibit

13  39.  This is H&E 37908.

14          This is an Email from you at the top,

15  dated March 15, 2013.  This to URS and H&E.

16          Who was Patrick Solomon?

17     A.  He was a carpenter for MAPP.

18     Q.  And Casey --

19     A.  Ginder.

20     Q.  -- Ginder?

21     A.  He was a projet engineer for MAPP.

22     Q.  On this job?  I'm wondering why these

23  people were copied.  Why are you copying a

24  carpenter?

25     A.  I don't really -- when was the

NON-CERTIFIED COPY

1    Q.  This was for the expansion joints?

2    A.  Correct.

3    Q.  All right.  Then we have another Email

4  which is going to be Exhibit 48, which is H&E

5  54144.

6        And then you respond to that Email by

7  saying, "Last time I walked the site with

8  Frankie and Johnny, they indicated that they did

9  not want to entertain steel angle because it

10  would not be aesthetically pleasing, plus it

11  would be difficult to manage where you have

12  changes in elevation."

13        Do you see that?

14    A.  Yes.

15    Q.  Is that accurate?  Was that your

16  recollection?

17    A.  Yes.

18    Q.  And Mr. Frankie Wynn was the Frankie you

19  were referring to here, correct?

20    A.  Correct.

21    Q.  And Johnny was Johnny Jones?

22    A.  Correct.

23    Q.  And they were both with you?

24    A.  Correct.

25    Q.  Did they say what they believed was the

NON-CERTIFIED COPY

| | |
|---|---|
| **From:** | Brad Reese [breese@mappconstruction.com] |
| **Sent:** | Friday, March 15, 2013 8:51 AM |
| **To:** | Frankie Wynn; Johnson, Neal; Thomas Ryan (thomas.e.ryan@urs.com) |
| **Cc:** | Patrick Solomon; Casey Ginder |
| **Subject:** | 52079 - H&E Kenner - RFI #54 & 55 (CJ, EJ Crack Repairs) |
| **Attachments:** | RFI-54 - EJs at Concrete Paving.pdf; RFI-55 - Transition b-w New & Existing Service Warehouse Slab.pdf; pds-cpd-Sikacrete 321 FS-us.pdf; pds-cpd-Sikadur51SL-us.pdf; SIKA CRACK FIX.PDF; sikadur 55 SLV.PDF; fs-cpd-Sikacrete321FS-us.pdf |

FYI – our subcontractor proposes the following solution to the concrete areas in need of repair:

**Control Joint Repairs in Paving**

- Remove existing elastomeric sealant
- Clean joints
- Apply Sikadur 51SL to fill joints

**Crack Repairs in Paving**

- Rout cracks
- Clean cracks
- Apply Sikadur 55SLV to refusal

**Building Slab Transition (New Warehouse Slab to Existing Warehouse Slab)**

- Chip areas to a depth of +/-2" in depth
- Place Sikadur 321FS

**Expansion Joints in Paving**

- Chip areas to a depth of +/-2" in depth
- Place Sikadur 321FS

Attached is the product data for each. Please review and advise if this solution is acceptable. If so, we can perform a sample and determine which joints/cracks/etc. need the repair so that we can accurately create a formal CPR.

Feel free to contact me with any questions.

Thanks

**Brad Reese, LEED AP BD+C** :: Sr. Project Manager



**MAPP**CONSTRUCTION

MAPPCONSTRUCTION.COM

---

**From:** Brad Reese
**Sent:** Monday, March 04, 2013 10:34 AM
**To:** Frankie Wynn (fwynn@he-equipment.com); Johnson, Neal
**Cc:** Patrick Solomon; Casey Ginder
**Subject:** FW: 52079 - H&E Kenner - RFI #54 & 55

MAPP
EXHIBIT NO. 39
K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0037908

Frankie/Neal – do you have time this week to review action items for the paving joint repairs. I met with a sub that can perform the work, but would like to sit down with you to review their proposed solutions. I am available any day this week except for today and Wednesday. We can meet at the site or I can drive to Baton Rouge and meet at your office….whichever is more convenient.

Please let me know.

thanks

**Brad Reese, LEED AP BD+C** :: Sr. Project Manager



MAPPCONSTRUCTION.COM

---

**From:** Brad Reese
**Sent:** Wednesday, January 23, 2013 1:03 PM
**To:** Johnson, Neal; Thomas Ryan (thomas.e.ryan@urs.com)
**Cc:** Patrick Solomon; Casey Ginder
**Subject:** FW: 52079 - H&E Kenner - RFI #54 & 55

Neal/Thomas – have you had a chance to review this? I would like to get this work completed quickly to finish up this project for H&E.

thanks

**Brad Reese, LEED AP BD+C** :: Sr. Project Manager



MAPPCONSTRUCTION.COM

---

**From:** Brad Reese
**Sent:** Tuesday, January 15, 2013 12:32 PM
**To:** Johnson, Neal; Thomas Ryan (thomas.e.ryan@urs.com)
**Cc:** Patrick Solomon; Casey Ginder
**Subject:** 52079 - H&E Kenner - RFI #54 & 55

Neal/Thomas – please see the attached RFI's. We spoke to the concrete sub and they would feel more comfortable having something from the Architect of Record on how to make these repairs. Is this something you can handle? If you have a product/procedure in mind, we don't mind meeting with a rep or different sub to make sure the application will work as intended.

Let me know your thoughts.

thanks

NON-CERTIFIED COPY

H&E 0037909

**Brad** Reese, LEED AP BD+C :: Sr. Project Manager

504 234 9200 W I R E L E S S

**MAPP**CONSTRUCTION

601 POYDRAS ST., STE. 1715 :: NEW ORLEANS
P 504 833 6277 ::  F 504 833 6074

MAPPCONSTRUCTION.COM

3

NON-CERTIFIED COPY

H&E 0037910



**MAPP**
CONSTRUCTION, LLC

601 Poydras Street, Suite 1715
New Orleans, LA, 70130
504.833.6277
504.833.6274

RFI#    54

## *REQUEST FOR INFORMATION*

### H and E Equipment Services - Kenner
### MAPP Job 52079-

| | | | |
|---|---|---|---|
| Date: | 01/15/2013 | Drawing Ref.: | |
| Attn: | **Thomas Ryan** | Spec. Sect. Ref.: | |
| Company: | **URS Corporation** | From: | **Brad Reese** |
| Fax: | 225.922.5866 | | |

Subject:  *Expansion Joints at Concrete Paving*

---

**Question/Request:**                          **Response Required By:  *01/18/2013***

As discussed in previous OAC meetings onsite, the expansion joints in the concrete paving appear to be failing because of regular wear and debris around the lot.  Please confirm the acceptable material and methods to use for making these repairs.

**Suggestion:**

Signed:_____
                                    **Brad Reese**

---

**Response Received:**

Signed:_____
                                    **URS Corporation**

<u>Notes:</u>

<u>CC:</u>

NON-CERTIFIED COPY                  H&E 0037911



# MAPP
CONSTRUCTION, LLC

601 Poydras Street, Suite 1715
New Orleans, LA, 70130
504.833.6277
504.833.6374

RFI#   __55__

## *REQUEST FOR INFORMATION*
### H and E Equipment Services - Kenner
### MAPP Job 52079-

| | | | |
|---|---|---|---|
| Date: | 01/15/2013 | Drawing Ref.: | |
| Attn: | **Thomas Ryan** | Spec. Sect. Ref.: | |
| Company: | **URS Corporation** | From: | **Brad Reese** |
| Fax: | 225.922.5866 | | |

Subject:  *Slab Transition b/w New & Existing Service Slabs*

---

**Question/Request:**                          **Response Required By:  *01/18/2013***

As discussed in previous OAC meetings onsite, the height of the existing Service Warehouse slab is lower than the height of the new Service Warehouse slab. We mentioned possibly using a material to provide a smooth slope. Please review and advise on the preferred methods and material.


**Suggestion:**

Signed:_____

**Brad Reese**

**Response Received:**




Signed:_____

**URS Corporation**

Notes:


CC:

NON-CERTIFIED COPY   H&E 0037912

Product Data Sheet
Edition 6.22.11
Sikacrete 321 FS

# Sikacrete® 321 FS

## One-component, cementitious, pourable, rapid hardening concrete mix

| | |
|---|---|
| **Description** | Sikacrete 321 FS is a one-component, portland-cement concrete containing factory blended coarse aggregate designed for quick turnaround patching and overlay needs. |
| **Where to Use** | ■ As a structural repair material for bridges, parking facilities, industrial plants and walkways<br>■ On horizontal, vertical and overhead surfaces (formed)<br>■ On grade, above, and below grade on concrete<br>■ Full depth repairs<br>■ Filler for voids and cavities |
| **Advantages** | ■ Complies with ASTM C-928 specifications for very rapid and rapid hardening mortars<br>■ Very rapid setting structures can be opened to vehicular traffic in 2 hours<br>■ Non-gypsum based with volume stability<br>■ Compatible with coefficient of thermal expansion of concrete<br>■ Increased resistance to deicing salts<br>■ Easily applied to clean, sound substrate<br>■ Not a vapor barrier<br>■ Excellent resistance to freeze/thaw with outstanding durability<br>■ Pre-packaged coarse aggregate: Eliminates need to extend material in the field; Eliminates the risk of reactive aggregate<br>■ Formulated to compensate for shrinkage |
| **Coverage** | Approximately 0.50 ft.³/unit. Actual yield on site may vary due to surface profile, waste, and other factors. |
| **Packaging** | 65 lb. multi-wall bag; bulk bag available on request |

## Typical Data *(Material and curing conditions @ 73°F (23°C) and 50% R.H.)*

RESULTS MAY DIFFER BASED UPON STATISTICAL VARIATIONS DEPENDING UPON MIXING METHODS AND EQUIPMENT, TEMPERATURE, APPLICATION METHODS, TEST METHODS, ACTUAL SITE CONDITIONS AND CURING CONDITIONS.

| | | |
|---|---|---|
| Shelf Life | 9 months in original, unopened packaging. | |
| Storage Conditions | Store dry at 40°-95°F (4°-35°C). Condition material to 65°-75°F before using. | |
| Mixing Ratio | Mix with clean potable water at rate of up to 5 pints per bag. | |
| Application Time | Approximately 30 minutes<br>Initial Slump 7-9"<br>Slump at 15 minutes >5-7" | |
| Initial Set | 40-50 minutes | |
| Final Set | 50-60 minutes | |
| Flexural Strength (ASTM C-78) | 28 days | 700 psi (5.0 MPa) |
| Splitting Tensile Strength (ASTM C-496) | 1 day | 400 psi (2.8 MPa) |
| | 7 days | 600 psi (4.1 MPa) |
| Bond Strength* (ASTM C-882 modified) | 1 day | 2,500 psi (17.2 MPa) |
| | 7 days | 3,000 psi (20.7 MPa) |
| Direct Tensile Bond (ACI 503) | 7 days | >250 psi |
| Compressive Strength (ASTM C-39) | 2 hour | 2,500 psi (17.2 MPa) |
| | 3 hour | 3,000 psi (20.7 MPa) |
| | 1 day | 5,000 psi (34.5 MPa) |
| | 7 days | 6,000 psi (41.4 MPa) |
| | 28 days | 7,500 psi (51.7 MPa) |
| Shrinkage (ASTM C-157) | | <0.06% |
| Freeze Thaw Factor (ASTM C-666) | 300 cycles | >90% |
| Chloride ion permeability (ASTM C-1202) | 28 days | <1,500 Coloumbs |

\* Mortar scrubbed into substrate.



NON-CERTIFIED COPY

H&E 0037913

## How to Use

**Surface Preparation  Concrete:**  Remove all deteriorated concrete, dirt, oil, grease, and all bond-inhibiting materials from surface. Be sure repair area is not less than 1 inch in depth. Preparation work should be done by high pressure water blast, scabbler, or other appropriate mechanical means to obtain an exposed aggregate surface with a minimum surface profile of ±1/8 in. (CSP-7). Saturate surface with clean water. Substrate should be saturated surface dry (SSD) with no standing water during application.

**Reinforcing Steel:** Steel reinforcement should be thoroughly prepared by mechanical cleaning to remove all traces of rust. Where corrosion has occurred due to the presence of chlorides, the steel should be high-pressure washed with clean water after mechanical cleaning.

### Mixing

Place 5 pints of water in mixing container. Slowly add Sikacrete 321 FS while continuing to mix.  Mix to a uniform consistency, maximum 3 minutes. Mechanically mix with a low-speed drill (400-600 rpm) and paddle or in appropriate-size mortar mixer or concrete mixer. Some mixers will take longer than others to achieve the desired slump.

### Application & Finish

**Form and pour applications:** Pre-wet surface to SSD. Ensure good, intimate contact with the substrate is achieved. To accomplish this, material should be scrubbed into the substrate or other suitable means should be employed such as vibration of the material. Vibrate form while pouring. Finish as desired.

### Curing

As per ACI recommendations for portland cement concrete, curing is required. Moist cure with wet burlap and polyethylene, a fine mist of water or a water based* compatible curing compound. Curing compounds adversely affect the adhesion of following layers of mortar, leveling mortar or protective coatings. Moist curing should commence immediately after finishing. Protect newly applied material from direct sunlight, wind, rain and frost.
*Pretesting of curing compound is recommended.

### Limitations

- Application thickness: Minimum 1 in. (25 mm); Maximum 8 in. (200 mm)
- Minimum ambient and surface temperatures 40°F (4°C) and rising at time of application.
- Elevated temperatures will decrease working time and slump.
- Rate of strength gain will be reduced at colder temperatures. Onsite testing is recommended.
- Bonding agents like Armatec 110 and others, which cure at a slower rate than 321 FS, should not be used. If bonding agents are used, follow cure times for the bonding agents used as a guide prior to putting Sikacrete 321 FS in service. Assure suitability with the manufacturer of the bonding agent.

## Caution

### Warning

**WARNING: CORROSIVE, IRRITANT.** Avoid direct contact. Contains Silica Quartz (CAS: 14808-60-7) and Portland Cement (CAS: 65667-15-1). Corrosive to eyes/skin. Causes burns to eyes/skin. Harmful if swallowed. May cause burns to mouth, throat, and stomach. Irritating to respiratory system.

### Handling & Storage

Avoid direct contact.  Wear personal protective equipment (chemical resistant goggles/gloves/clothing) to prevent direct contact with skin and eyes.  Avoid breathing vapors.  Use only in well ventilated areas. Open doors and windows during use. Use a properly fitted NIOSH respirator if ventilation is poor. Wash thoroughly with soap and water after use. Remove contaminated clothing and launder before reuse.

### First Aid

**Eyes** – Hold eyelids apart and flush thoroughly with water for 15 minutes.  **Skin** – Remove contaminated clothing.  Wash skin thoroughly for 15 minutes with soap and water.  **Inhalation** – Remove to fresh air.  **Ingestion** – Do not induce vomiting.  Dilute with water.  Contact physician.  **In all cases, contact a physician immediately if symptoms persist.**

### Clean Up

Avoid contact.  Wear chemical resistant clothing/gloves/goggles.  In absence of adequate ventilation; use a properly fitted NIOSH respirator.  In case of spill, ventilate area and contain spill.  Collect with absorbent material.  Dispose of in accordance with current, applicable local, state, and federal regulations.

KEEP CONTAINER TIGHTLY CLOSED • KEEP OUT OF REACH OF CHILDREN • NOT FOR INTERNAL CONSUMPTION • FOR INDUSTRIAL USE ONLY

All information provided by Sika Corporation ("Sika") concerning Sika products, including but not limited to, any recommendations and advice relating to the application and use of Sika products, is given in good faith based on Sika's current experience and knowledge of its products when properly stored, handled and applied under normal conditions in accordance with Sika's instructions. In practice, the differences in materials, substrates, storage and handling conditions, actual site conditions and other factors outside of Sika's control are such that Sika assumes no liability for the provision of such information, advice, recommendations or instructions related to its products, nor shall any legal relationship be created by or arise from the provision of such information, advice, recommendations or instructions related to its products. The user of the Sika product(s) must test the product(s) for suitability for the intended application and purpose before proceeding with the full application of the products. Sika reserves the right to change the properties of its products without notice. All sales of Sika product(s) are subject to its current terms and conditions of sale which are available at www.sikausa.com or by calling 800-933-7452.

Prior to each use of any Sika product, the user must always read and follow the warnings and instructions on the product's most current Technical Data Sheet, product label and Material Safety Data Sheet which are available online at www.sikausa.com or by calling Sika's Technical Service Department at 800-933-7452.  Nothing contained in any Sika materials relieves the user of the obligation to read and follow the warnings and instruction for each Sika product as set forth in the current Technical Data Sheet, product label and Material Safety Data Sheet prior to product use.

LIMITED WARRANTY: Sika warrants this product for one year from date of installation to be free from manufacturing defects and to meet the technical properties on the current Technical Data Sheet if used as directed within shelf life. User determines suitability of product for intended use and assumes all risks. Buyer's sole remedy shall be limited to the purchase price or replacement of product exclusive of labor or cost of labor. NO OTHER WARRANTIES EXPRESS OR IMPLIED SHALL APPLY INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SIKA SHALL NOT BE LIABLE UNDER ANY LEGAL THEORY FOR SPECIAL OR CONSEQUENTIAL DAMAGES. SIKA SHALL NOT BE RESPONSIBLE FOR THE USE OF THIS PRODUCT IN A MANNER TO INFRINGE ON ANY PATENT OR ANY OTHER INTELLECTUAL PROPERTY RIGHTS HELD BY OTHERS.

Visit our website at www.sikausa.com                                                                       1-800-933-SIKA NATIONWIDE

Regional Information and Sales Centers. For the location of your nearest Sika sales office, contact your regional center.

Sika Corporation
201 Polito Avenue
Lyndhurst, NJ 07071
Phone: 800-933-7452
Fax: 201-933-6225

Sika Canada Inc.
601 Delmar Avenue
Pointe Claire
Quebec H9R 4A9
Phone: 514-697-2610
Fax: 514-694-2792

Sika Mexicana S.A. de C.V.
Carretera Libre Celaya Km. 8.5
Fracc. Industrial Balvanera
Corregidora, Queretaro
C.P. 76920
Phone: 52 442 2385800
Fax: 52 442 2250537

Sika and Sikacrete are registered trademarks. Printed in Canada.

NON-CERTIFIED COPY

H&E 0037914

Product Data Sheet
Edition 5.5.2011
Sikadur 51 SL

# Sikadur 51 SL
## Flexible epoxy control joint resin

| | |
|---|---|
| **Description** | Sikadur 51 SL is a 2-component, self-leveling 100% solids, flexible, control joint resin sealer and adhesive. |
| **Where to Use** | ■ Use to fill horizontal, non-moving, saw cut construction control joints and cracks.<br>■ Use as a flexible adhesive. |
| **Advantages** | ■ Remains flexible. Does not age-harden.<br>■ Prevents deterioration of joint edges.<br>■ Excellent adhesive properties.<br>■ Conforms to ACI 302.1R (4.10-Joint Materials).<br>■ Ideal for use with plural injection type systems.<br>■ Can be used on grades up to 15%.<br>■ Shock absorbent and durable. Withstands wheel traffic and heavy loads.<br>■ Use as a security sealant. |
| **Coverage** | 1 gal. will yield 231 cu. in. or will fill 100 lin. ft. of 1/8 in. x 1.5 in. deep joint. |
| **Packaging** | 4 gallon units |

## How to Use

| | |
|---|---|
| **Surface Preparation** | Substrate must be clean and sound. It may be dry or damp, but free of standing water. Remove dust, laitance, grease, curing compounds, bond inhibiting impregnations, waxes and any other contaminants.<br>**Concrete** - Should be cleaned and prepared to achieve a laitance and contaminant free, open textured surface by blast cleaning or equivalent mechanical means. |
| **Mixing** | **Pre-mix each component.** Proportion equal parts by volume of Component 'A' and Component 'B' into clean pail. Mix thoroughly for 3 minutes with a low-speed (400-600 rpm) drill using a Sika paddle until uniform in color. Mix only that quantity that can be applied within its pot life. |

### Typical Data (Material and curing conditions @ 73°F (23°C) and 50% R.H.)

RESULTS MAY DIFFER BASED UPON STATISTICAL VARIATIONS DEPENDING UPON MIXING METHODS AND EQUIPMENT, TEMPERATURE, APPLICATION METHODS, TEST METHODS, ACTUAL SITE CONDITIONS AND CURING CONDITIONS.

| | |
|---|---|
| **Shelf Life** | 2 years in original, unopened containers |
| **Storage Conditions** | Store dry at 40°-95°F (4°-35°C). Condition material to 65°-75° F (18°-24°C) before using. |
| **Color** | Concrete Gray |
| **Mixing Ratio** | Component 'A' : Component 'B' = 1:1 by volume. |
| **Viscosity** | Comp. 'A'  5,800 cps (5,800)<br>Comp. 'B'  7,900 cps (7,900)<br>Mixed  7,000 cps (7,000) |
| **Pot Life** | 20-25 minutes, 1 gallon (3.8 liter)<br>40 minutes, 8 fl. oz. (250 ml) |
| **Tack-Free Time** | 7-8 hours |

Tensile Properties (ASTM D-638)

| | | |
|---|---|---|
| 14 days | Tensile Strength | 570 psi (3.9 MPa) |
| | Elongation at Break | 90% |
| | Modulus of Elasticity | 2,800 psi (19.3 MPa) |
| | Tensile stress at % elongation | 2.5%  70 psi (0.48 MPa) |
| | | 5%  110 psi (0.75 MPa) |
| | | 10%  160 psi (1.10 MPa) |

**Tear Resistance (ASTM D-624)** 14 days  170 lb./in. (29.8 N/mm)

**Hardness (ASTM D-2240)** 28 days  Hardness (Shore D)  50-55

**Water Absorption (ASTM D-570)** 7 days (24 hour immersion) 1.86%



NON-CERTIFIED COPY

H&E 0037915

| | |
|---|---|
| **Application** | Pour the mixed Sikadur 51 SL into the prepared joint or use low-pressure extrusion equipment. Allow the material to flow slowly, settle and self-level filling entire depth. Strike-off level and remove any excess material where required, before it hardens. |
| **Limitations** | ■ Do not thin. Addition of solvents may prevent proper cure.<br>■ Substrate temperature should be 40°F (4°C) minimum and rising.<br>■ For best results, materials should be maintained between 65°-75°F (18°-24°C) during application.<br>■ Do not apply through standing water.<br>■ Minimum age of concrete is 28 days.<br>■ Materials are a vapor barrier after cure.<br>■ Concrete or masonry must be tested for water-vapor transmission prior to application.<br>■ Not designed for use under constant immersion in water or other liquids.<br>■ Do not use in expansion (moving) joints.<br>■ For application in non-moving joints only.<br>■ The ultimate performance of Sikadur 51 SL depends upon many factors, [i.e., proper joint design, thermally stable areas (concrete slab), etc.].<br>■ Sikadur 51 SL should be installed full depth when sealing construction/control joints.<br>■ Material should not be applied earlier than 28 days after new concrete is placed. A 60-90 day cure is recommended.<br>■ Sikadur 51 SL may change color over time, especially when exposed to ultraviolet rays, artificial heaters or intense lighting.<br>■ For applications other than sealing of joints, consult Sika Technical Service prior to use.<br>■ Not an aesthetic product. Color may alter due to variations in lighting and/or UV exposure. |
| **Caution** | **Component 'A' - Sensitizer; Irritant -** Contains epoxy resin, nonyl phenol. Eye irritant. May cause skin/respiratory irritation. Prolonged and/or repeated contact with skin may cause allergic reaction/sensitization. Chronic overexposure to nonyl phenol may cause liver injuries. Harmful if swallowed.<br>**Component 'B' - Corrosive; Sensitizer; Irritant -** Contains amines, nonyl phenol. Contact with eyes and skin may cause severe burns. May cause cornea damage and blindness. May cause severe skin irritation. Prolonged and/or repeated contact with skin may cause allergic reaction/sensitization. Chronic overexposure to nonyl phenol may cause liver injuries. May cause respiratory irritation. Harmful if aspirated into lungs or swallowed.<br>**Intentional misuse by deliberate concentration and inhalation of vapors may be harmful or fatal.** |
| **First Aid** | **Eyes:** Hold eyelids apart and flush thoroughly with water for at least 15 minutes. **Skin:** Remove contaminated clothing. Wash skin thoroughly for 15 minutes with soap and water. **Inhalation:** Remove to fresh air. **Ingestion:** Do not induce vomiting. Contact a physician.<br>**In all cases, contact a physician immediately if symptoms persist.** |
| **Handling and Storage** | Avoid direct contact with eyes and skin. Wear chemical resistant gloves/goggles/clothing. Avoid breathing vapors. Use with adequate general and local ventilation. In the absence of adequate ventilation, use a properly fitted NIOSH respirator. Wash thoroughly after handling product. Remove contaminated clothing and launder before reuse. Store product in closed container in cool, dry, well ventilated place. |
| **Clean Up** | Avoid contact. Uncured material can be removed with soap and water or solvent. Follow solvent manufacturer's instructions for use and warnings. Cured product can only be removed mechanically. Consult a physician if material cures on skin. Wear chemical resistant clothing/gloves/goggles. In the absence of adequate ventilation, use a properly fitted NIOSH respirator. In case of spill, ventilate area. Contain spill, collect with absorbent material and transfer to sealed containers. Dispose of in accordance with current, applicable local, state and federal regulations. |

KEEP CONTAINER TIGHTLY CLOSED · KEEP OUT OF REACH OF CHILDREN · NOT FOR INTERNAL CONSUMPTION · FOR INDUSTRIAL USE ONLY

All information provided by Sika Corporation ("Sika") concerning Sika products, including but not limited to, any recommendations and advice relating to the application and use of Sika products, is given in good faith based on Sika's current experience and knowledge of its products when properly stored, handled and applied under normal conditions in accordance with Sika's instructions. In practice, the differences in materials, substrates, storage and handling conditions, actual site conditions and other factors outside of Sika's control are such that Sika assumes no liability for the provision of such information, advice, recommendations or instructions related to its products, nor shall any legal relationship be created by or arise from the provision of such information, advice, recommendations or instructions related to its products. The user of the Sika product(s) must test the product(s) for suitability for the intended application and purpose before proceeding with the full application of the product(s). Sika reserves the right to change the properties of its products without notice. All sales of Sika product(s) are subject to its current terms and conditions of sale which are available at www.sikausa.com or by calling Sika's Technical Service Department at 800-933-7452.

Prior to each use of any Sika product, the user must always read and follow the warnings and instructions on the product's most current Technical Data Sheet, product label and Material Safety Data Sheet which are available online at www.sikausa.com or by calling Sika's Technical Service Department at 800-633-7452. Nothing contained in any Sika materials relieves the user of the obligation to read and follow the warnings and instruction for each Sika product as set forth in the current Technical Data Sheet, product label and Material Safety Data Sheet prior to product use.

LIMITED WARRANTY: Sika warrants this product for one year from date of installation to be free from manufacturing defects and to meet the technical properties on the current Technical Data Sheet if used as directed within shelf life. User determines suitability of product for intended use and assumes all risks. Buyer's sole remedy shall be limited to the purchase price or replacement of product exclusive of labor or cost of labor. NO OTHER WARRANTIES EXPRESS OR IMPLIED SHALL APPLY INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SIKA SHALL NOT BE LIABLE UNDER ANY LEGAL THEORY FOR SPECIAL OR CONSEQUENTIAL DAMAGES. SIKA SHALL NOT BE RESPONSIBLE FOR THE USE OF THIS PRODUCT IN A MANNER TO INFRINGE ON ANY PATENT OR ANY OTHER INTELLECTUAL PROPERTY RIGHTS HELD BY OTHERS.

Visit our website at www.sikausa.com                                                      1-800-933-SIKA NATIONWIDE
Regional Information and Sales Centers. For the location of your nearest Sika sales office, contact your regional center.

| Sika Corporation | Sika Canada Inc. | Sika Mexicana S.A. de C.V. |
|---|---|---|
| 201 Polito Avenue | 601 Delmar Avenue | Carretera Libre Celaya Km. 8.5 |
| Lyndhurst, NJ 07071 | Pointe Claire | Fracc. Industrial Balvanera |
| Phone: 800-933-7452 | Quebec H9R 4A9 | Corregidora, Queretaro |
| Fax: 201-933-6225 | Phone: 514-697-2610 | C.P. 76020 |
| | Fax: 514-694-2792 | Phone: 52 442 2385800 |
| | | Fax: 52 442 2250537 |

Sika and Sikadur are registered trademarks.
Printed in Canada.

 

NON-CERTIFIED COPY

H&E 0037916

Product Data Sheet
Edition 7.2008
Identification no. 03CF520
Sikadur Crack Fix

# Sikadur® Crack Fix

## Low-viscosity, high-strength epoxy sealing system

| | |
|---|---|
| **Description** | Sikadur Crack Fix is a 2-component, 100% solids, moisture-tolerant, low-viscosity, high-strength, multi-purpose, epoxy resin adhesive. It conforms to the current ASTM C-881 and AASHTO M-235 specifications. |
| **Where to Use** | ■ Gravity-feed of cracks in horizontal concrete and masonry.<br>■ Low pressure injection of cracks in structural concrete, masonry, wood, etc.<br>■ Grouting bolts, dowels, pins, etc. into horizontal concrete surfaces. |
| **Advantages** | ■ Formulation identical to popular, high strength adhesive Sikadur 35, Hi-Mod LV.<br>■ Five times stronger than concrete.<br>■ Convenient easy to use, single tube cartridge - fits standard caulk guns.<br>■ Deep, penetrating and tenacious bonding of cracks in structural concrete.<br>■ No mess - self-mixing. |
| **Coverage** | 1 cartridge yields approximately 10.7-11.0 cu. in. (175-180 ml) of usable epoxy resin. |
| **Packaging** | Carton contains 12 single caulk tube-style cartridges; each cartridge packaged with 2 static mixers and 2 flow restrictors. |

### Typical Data *(Material and curing conditions @ 73°F (23°C) and 50% R.H.)*

| | |
|---|---|
| **Shelf Life** | 2 years in original, unopened containers. |
| **Storage Conditions** | Store dry at 40°-95°F (4°-35°C).<br>**Condition material to 60°-75°F (15°-24°C) before using.** |
| **Color** | Clear, amber. |
| **Mixing Ratio** | Component A : Component B = 2:1 by volume. |
| **Viscosity (Mixed)** | Approximately 375 cps. |
| **Pot Life** | Approximately 25 minutes. (60 gram mass) |

| Tack Free Time | 40°F (4°C)* | 73°F (23°C)* | 90°F (32°C)* |
|---|---|---|---|
| **(3-5 mils)** | 14-16 hrs. | 3-3.5 hrs. | 1.5-2 hrs. |

**Tensile Properties (ASTM D-638)**

| 7 day | Tensile Strength | 7,000 psi (48.3 MPa) |
|---|---|---|
| | Elongation at Break | 6.9% |

**Flexural Properties (ASTM D-790)**

| 14 day | Flexural Strength (Modulus of Rupture) | 11,000 psi (75.9 MPa) |
|---|---|---|
| | Tangent Modulus of Elasticity in Bending | $3.1 \times 10^5$ psi (2,139 MPa) |

**Shear Strength (ASTM D-732)**

| 14 day | Shear Strength | 4,800 psi (33.1 MPa) |
|---|---|---|

**Heat Deflection Temperature (ASTM D-648)**

| 7 day | (fiber stress loading = 264 psi (1.8 MPa)) | 121°F (49°C) |
|---|---|---|

**Bond Strength (ASTM C-882): Hardened concrete to hardened concrete**

| 2 day | (moist cure) | Bond Strength | 1,300 psi (9.0 MPa) |
|---|---|---|---|
| 14 day | (moist cure) | Bond Strength | 1,350 psi (9.3 MPa) |

**Water Absorption (ASTM D-570)**     7 day   (24 hour immersion)     0.27%

**Compressive Properties (ASTM D-695)**

**Compressive Strength, psi (MPa)**

| | 40°F (4°C)* | 73°F (23°C)* | 90°F (32°C)* |
|---|---|---|---|
| 4 hour | - | - | - |
| 8 hour | - | 180 (1.2) | 3,200 (22.1) |
| 16 hour | - | 4,500 (31.1) | 6,300 (43.5) |
| 1 day | - | 6,000 (41.4) | 9,100 (62.8) |
| 3 day | 4,000 (27.6) | 9,000 (62.1) | 10,500 (72.5) |
| 7 day | 6,800 (46.9) | 11,000 (75.9) | 10,500 (72.5) |
| 14 day | 10,300 (71.1) | 12,000 (82.8) | 10,500 (72.5) |
| 28 day | 12,400 (85.6) | 13,000 (89.7) | 10,500 (72.5) |

**Compressive Modulus**

| 7 day | $2.9 \times 10^5$ psi (2,000 MPa) |
|---|---|

*Material cured and tested at the temperatures indicated.



NON-CERTIFIED COPY

H&E 0037917

## How to Use

| | |
|---|---|
| **Surface Preparation** | Surface must be clean, dry and sound. Remove dust from crack by brushing or by blowing clean with oil-free compressed air. |
| **Cartridge Set-Up** | Remove twist-cap and port plug from top of cartridge. Press one of enclosed "flow restrictors" into opening. Insert one of the enclosed static mixers through twist-cap and attach to threading. Insert Sikadur Crack Fix cartridge into good quality caulking gun. Point upward during initial squeeze of gun's trigger to purge any entrapped air. As mixed resin approaches end of mixer, discard rest of initial squeeze and portion of next squeeze to ensure uniform blend of adhesive components. |
| **Application** | **To gravity feed cracks** - Blow vee-notched crack clean with oil-free compressed air. Dispense Sikadur Crack Fix slowly into vee-notched crack. Continue placement until completely filled. Seal underside of slab prior to filling if cracks reflect through. |
| | **To inject cracks** - Set appropriate injection ports. Seal ports and surface of crack with Sikadur Anchor Fix-3, Sikadur 31, Hi-Mod Gel or Sikadur 33. When the epoxy adhesive seal has cured, inject Sikadur Crack Fix with slow steady pressure. Consult Technical Service for additional information. |
| **Limitations** | ■ Minimum substrate and ambient temperature 40°F (4°C). Maximum substrate temperature is 95°F (35°C). |
| | ■ Minimum age of concrete must be 21-28 days, depending on curing and drying conditions. |
| | ■ Do not apply over wet, glistening surface. |
| | ■ Not for injection of cracks subjected to osmotic or hydrostatic pressure during application. |
| | ■ Do not inject cracks greater than ¼ in. (6 mm) Consult Technical Service at 1-800-933-SIKA. |
| | ■ Not an aesthetic product.  Color may alter due to variations in lighting and/or UV exposure. |
| **Warning** | **Component 'A' – IRRITANT, SENSITIZER** – Avoid direct contact. Contains modified epoxy resin (CAS 25068-38-6), aromatic hydrocarbon blend (mixture) and Nonyl Phenol (CAS 84852-15-3). May cause eye/skin/respiratory irritations. Prolonged and/or repeated contact with skin may cause allergic reaction/sensitization. Harmful if swallowed. HMIS Hazard Rating: H-2, F-1, R-0, PPE-C |
| | **Component 'B' – CORROSIVE, IRRITANT, SENSITIZER** – Avoid direct contact. Contains amines (mixture), aromatic hydrocarbon blend (mixture), Nonyl Phenol (CAS 84852-15-3) and Benzyl Alcohol (CAS 100-51-6). Causes eye/skin/respiratory irritations. Contact with eyes cause irreversible eye damage. Contact with skin causes severe burns. Prolonged and/or repeated contact may cause allergic reaction/sensitization. Harmful if swallowed. HMIS Hazard Rating: H-3, F-1, R-0, PPE-D |
| | **Deliberate concentrations of vapors of 'A' and/or 'B' Components for purposes of inhalation are harmful and can be fatal.** |
| | VOC Content ('A' + 'B') = 22 g/L  . |
| **Handling and Storage** | Avoid direct contact with eyes and skin. Wear chemical-resistant clothing/gloves/goggles. Avoid breathing vapors. Use with adequate general and local ventilation. In absence of adequate ventilation, use a properly fitted, NIOSH-approved respirator. Wash thoroughly after handling product. Remove contaminated clothing and launder before reuse. |
| **First Aid** | **Eyes:** Hold eyelids apart and flush thoroughly with water for 15 minutes. **Skin:** Remove contaminated clothing. Wash skin thoroughly for 15 minutes with soap and water. **Inhalation:** Remove person to fresh air. **Ingestion:** Do not induce vomiting. In all cases, contact a physician immediately if symptoms persist. |
| **Clean Up** | Uncured material can be removed with approved solvent. Follow solvent manufacturer's instructions for use and warnings. Cured material (when Component 'A' combined with Component 'B') can only be removed mechanically. In case of spill, ventilate area and contain spill. Collect with absorbent material. Dispose of in accordance with current, applicable local, state and federal regulations. |

KEEP CONTAINER TIGHTLY CLOSED · KEEP OUT OF REACH OF CHILDREN · NOT FOR INTERNAL CONSUMPTION · FOR INDUSTRIAL USE ONLY

All information provided by Sika Corporation ("Sika") concerning Sika products, including but not limited to, any recommendations and advice relating to the application and use of Sika products, is given in good faith based on Sika's current experience and knowledge of its products when properly stored, handled and applied under normal conditions in accordance with Sika's instructions. In practice, the differences in materials, substrates, storage and handling conditions, actual site conditions and other factors outside of Sika's control are such that Sika assumes no liability for the provision of such information, advice, recommendations or instructions related to its products, nor shall any legal relationship be created by or arise from the provision of such information, advice, recommendations or instructions related to its products. The user of the Sika product(s) must test the product(s) for suitability for the intended application and purpose before proceeding with the full application of the product(s). Sika reserves the right to change the properties of its products without notice. All sales of Sika product(s) are subject to its current terms and conditions of sale which are available at www.sikacorp.com or by calling 800-933-7452.

Prior to each use of any Sika product, the user must always read and follow the warnings and instructions on the product's most current Technical Data Sheet, product label and Material Safety Data Sheet which are available online at www.sikaconstruction.com or by calling Sika's Technical Service Department at 800-933-7452. Nothing contained in any Sika materials relieves the user of the obligation to read and follow the warnings and instruction for each Sika product as set forth in the current Technical Data Sheet, product label and Material Safety Data Sheet prior to product use.

LIMITED WARRANTY: Sika warrants this product for one year from date of installation to be free from manufacturing defects and to meet the technical properties on the current Technical Data Sheet if used as directed within shelf life. User determines suitability of product for intended use and assumes all risks. Buyer's sole remedy shall be limited to the purchase price or replacement of product exclusive of labor or cost of labor. NO OTHER WARRANTIES EXPRESS OR IMPLIED SHALL APPLY INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SIKA SHALL NOT BE LIABLE UNDER ANY LEGAL THEORY FOR SPECIAL OR CONSEQUENTIAL DAMAGES. SIKA SHALL NOT BE RESPONSIBLE FOR THE USE OF THIS PRODUCT IN A MANNER TO INFRINGE ON ANY PATENT OR ANY OTHER INTELLECTUAL PROPERTY RIGHTS HELD BY OTHERS.

Visit our website at www.sikaconstruction.com                                                    1-800-933-SIKA NATIONWIDE
Regional Information and Sales Centers. For the location of your nearest Sika sales office, contact your regional center.

| Sika Corporation | Sika Canada Inc. | Sika Mexicana S.A. de C.V. |
|---|---|---|
| 201 Polito Avenue | 601 Delmar Avenue | Carretera Libre Celaya Km. 8.5 |
| Lyndhurst, NJ 07071 | Pointe Claire | Fracc. Industrial Balvanera |
| Phone: 800-933-7452 | Quebec H9R 4A9 | Corregidora, Queretaro |
| Fax: 201-933-6225 | Phone: 514-697-2610 | C.P. 76920 |
| | Fax: 514-694-2792 | Phone: 52 442 2385800 |
| | | Fax: 52 442 2250537 |



Sika and Sikadur are registered trademarks.
Made in USA. Printed in Canada.



®

NON-CERTIFIED COPY

H&E 0037918

Product Data Sheet
Edition 10.2.2009
Identification no. 389-35N
Sikadur 55 SLV

# Sikadur 55 SLV

## Super low-viscosity, moisture-tolerant epoxy resin, crack healer/penetrating sealer

| | |
|---|---|
| **Description** | Sikadur 55 SLV is a 2-component, 100% solids, moisture-tolerant, epoxy crack healer / penetrating sealer, having a fast tack-free time to minimize downtime. It is a super low-viscosity, high-strength adhesive formulated specifically for sealing both dry and damp cracks.  It conforms to the current ASTM C-881, Types I and II, Grade-1, Class-C* and AASHTO M-235 specifications.<br>* except for gel time |
| **Where to Use** | ■ Sikadur 55 SLV structurally repairs cracked concrete.<br>■ For interior slabs and exterior above-grade slabs.<br>■ For elevated horizontal decks, parking garages and other structures exposed to foot and pneumatic tire traffic. |
| **Advantages** | ■ Super low viscosity/low surface tension for excellent penetration into cracks.<br>■ Penetrates cracks by gravity down to 2 mils (0.002" / 0.05 mm) in width.<br>■ Prolongs life of cracked concrete.<br>■ Penetrates/seals surface of slabs from water absorption, chloride-ion intrusion, and chemical attack.<br>■ **Structurally improves concrete surface.**<br>■ Can be open to traffic in 6 hours at 73°F (23°C).<br>■ High bond strength, even in damp cracks.<br>■ **U.S. Patent No. (pending)** for ultra low viscosity healer/sealer to strengthen cracked concrete. |
| **Coverage** | 1 gal. (3.8 liters) yields 231 cu. in. (3,785 cm³)<br>Typical coverage is 150-175 sq. ft./gal. (3.7-4.3 m²/L) for surface sealing.  Coverage varies with porosity and surface profile of substrate. Higher porosity concrete will reduce coverage. For crack healing, follow Application instructions and allow to pond over cracks. |
| **Packaging** | 3 gal. (11.35 l) unit = 'A' = 2 gal. (7.6 l) + 'B' = 1 gal. (3.8 l) |

## Typical Data  [Material and curing conditions @ 73°F (23°C) and 50% R.H.]

| | |
|---|---|
| **Shelf Life** | 2 years in original, unopened containers |
| **Storage Conditions** | Store dry at 40°-95°F (4°-35°C). Condition material to 65°-75°F (18°-24°C) before using. |
| **Color** | Clear, amber |
| **Mixing Ratio** | Component 'A' : Component 'B' = 2:1 by volume |
| **Viscosity (Mixed)** | Approximately 105 cps |
| **Pot Life** | Approximately 20 minutes |

| **Tack-Free Time** | 40°F (4°C)* | 60°F (15°C)* | 73°F (23°C)* | 90°F (32°C)* |
|---|---|---|---|---|
| | > 11 hrs. | 11 hrs. | 6 hrs. | 2.5 hrs. |

**Tensile Properties (ASTM D-638)    73°F (23°C)**

| 7 day | Tensile Strength | 7,100 psi (48.9 MPa) |
|---|---|---|
| | Elongation at break | 10% |

**Bond Strength (ASTM C-882)**

| Hardened Concrete to Hardened Concrete | 2 day (moist cure) | 2,500 psi (17.2 MPa) |
|---|---|---|
| | 14 day (moist cure) | 2,500 psi (17.2 MPa) |
| Hardened Concrete to Steel | 2 day (moist cure) | 1,500 psi (10.3 MPa) |
| | 14 day (moist cure) | 1,600 psi (11.0 MPa) |

**Flexural Properties (ASTM D-790)**

| 7 day | Flexural Strength | 8,500 psi (58.6 MPa) |
|---|---|---|
| | Tangent Modulus of Elasticity | $3.2 \times 10^5$ psi (2,206 MPa) |

**Shear Strength (ASTM D-732)    7 day**    5,800 psi (40.0 MPa)

**Heat Deflection Temperature (ASTM D-648)  7 day**

[fiber stress loading = 264 psi (1.8 MPa)]        110°F (43°C)

**Water Absorption (ASTM D-570)    7 day    (24 hour immersion)    0.60%**

**Compressive Properties (ASTM D-695)**

**Compressive Strength, psi (MPa)**

| | 40°F (4°C)* | 60°F (15°C)* | 73°F (23°C)* | 90°F (32°C)* |
|---|---|---|---|---|
| 1 day | - | 320 (2.2) | 1,100 (7.6) | 4,800 (33.1) |
| 3 day | 2,000 (13.8) | 6,500 (44.8) | 8,300 (57.2) | 8,000 (55.2) |
| 7 day | 7,800 (53.8) | 10,400 (71.7) | 10,900 (75.1) | 8,300 (57.2) |
| 14 day | 9,600 (66.2) | 11,000 (75.8) | 11,800 (81.4) | 10,000 (68.9) |
| 28 day | 11,700 (80.7) | 12,000 (82.7) | 12,000 (82.7) | 10,000 (68.9) |

**Compressive Modulus        7 day        $3.0 \times 10^5$ psi (2,068 MPa)**

*Material cured and tested at the temperature indicated.




NON-CERTIFIED COPY

H&E 0037919

## How to Use

**Surface Preparation**
Substrate must be clean, sound and free of surface moisture. Remove dust, laitance, grease, oils, curing compounds, waxes, impregnations, foreign particles, coatings and disintegrated materials by mechanical means (i.e. shotblasting, sandblasting, etc.). For best results, substrate should be dry. Surfaces prepared by Low Pressure Water Cleaning or High Pressure Water Jetting methods should be allowed to dry for 24 hrs. minimum [at 73°F (23°C)].

**Mixing**
Mix 1 part Component 'B' to 2 parts Component 'A' by volume into a clean pail. Mix thoroughly for 3 minutes with Sika paddle or jiffy mixer on a low-speed (400-600 rpm) drill until uniformly blended. Mix only that quantity which can be used within its pot life.

**Application**
To gravity feed cracks: Sikadur 55 SLV is applied to horizontal surfaces by flat squeegee or broom. Spread material over area and allow to pond over cracks. Let material penetrate into cracks and substrate. Remove excess epoxy with roller leaving no visible surface film. For cracks greater than 1/8 in. (3 mm) wide, fill crack with oven-dried sand before applying Sikadur 55 SLV. Seal cracks from underside, when accessible, to prevent leakage.

A second treatment may be required on very porous substrates. Apply second treatment before broadcasting

After treatment, wait at least 20 minutes at 73°F (23°C). Cover with broadcast of an oven-dried 20/40 silica sand or similar sand. Distribute evenly over the surface to excess at a rate of 30-40 lbs./100 sq. ft. Allow to cure 6 hours minimum at 73°F (23°C). Remove any loose sand and open to traffic once epoxy has cured. Consult Sika Technical Service at 1-800-933-SIKA for additional information.

To pressure inject cracks: Use automated injection equipment. Set appropriate injection ports. Seal ports and cracks with Sikadur 31, Hi-Mod Gel, Sikadur Injection Gel or Sikadur AnchorFix-3/4. When the epoxy adhesive has cured, inject Sikadur 55 SLV with steady pressure. Consult Technical Service at 1-800-933-SIKA for additional information.

**Limitations**
- Do not thin. Addition of solvents will prevent proper cure.
- Material is a vapor barrier after cure.
- Do not apply if rain is imminent. Water exposure or humidity will affect surface appearance and may cause surface whitening.
- Not an aesthetic product. Color may alter due to variations in lighting and/or UV exposure.
- Sealed concrete surface may appear blotchy due to differential absorption.
- Allow sufficient time for the substrate to dry after rain or other inclement conditions.
- Application temperature of substrate must be minimum 5°F (3°C) above the dew point.
- Minimum ambient and substrate temperature 40°F (4°C). Maximum application temperature 95°F (35°C).
- Do not inject cracks greater than 1/4 in. (6 mm) Consult Technical Service at 1-800-933-SIKA.
- Minimum age of concrete is 21-28 days, depending on curing and drying conditions.
- Not designed to seal or inject cracks under hydrostatic pressure during application.

**WARNING**
Component 'A' - IRRITANT; SENSITIZER. Avoid direct contact. Contains modified epoxy resin and Diglycidyl Ether of Bisphenol A (CAS 25085-99-8). Causes eye irritation. May cause skin/respiratory irritations. Prolonged and/or repeated contact with skin may cause allergic reaction/sensitization. May be harmful if swallowed.
HMIS:H-2, F-1, R-0, PPE-C.
Component 'B' - CORROSIVE, IRRITANT, SENSITIZER. Contains 2,4,6-Tri(Dimethylamino methyl) phenol (90-72-2), Amines (Mixture) and Benzyl Alcohol (100-51-6). Contact with skin and eyes causes severe burns. Causes eye/skin/respiratory irritation. Prolonged and/or repeated skin contact may cause an allergic reaction/sensitization. Harmful if swallowed.
HMIS:H-3, F-1, R-0, PPE-D.
Deliberate concentrations of vapors of 'A' and/or 'B' Components for purposes of inhalation is harmful and can be fatal.

**First Aid**
Eyes: Hold eyelids apart and flush thoroughly with water for 15 minutes. Skin: Remove contaminated clothing. Wash skin thoroughly for 15 minutes with soap and water. Inhalation: Remove person to fresh air. Ingestion: Do not induce vomiting. Contact physician. In all cases, contact a physician immediately if symptoms persist.

**Handling and Storage**
Avoid direct contact with eyes and skin. Wear chemical resistant clothing/gloves/goggles. Avoid breathing vapors. Use with adequate general and local ventilation. If ventilation is poor, use a properly fitted, NIOSH-approved respirator. Wash thoroughly after handling product. Remove contaminated clothing and launder before reuse.

**Clean Up**
In case of spills ventilate area and contain spill. Collect with absorbent material. Ventilate area. Avoid contact. Dispose of in accordance with current, applicable local, state and federal regulations. Uncured material can be removed with approved solvent. Follow solvent manufacturer's instructions for use and warnings. Cured material (when component 'A' combined with Component 'B') can only be removed by mechanical means.

KEEP CONTAINER TIGHTLY CLOSED • KEEP OUT OF REACH OF CHILDREN • NOT FOR INTERNAL CONSUMPTION • FOR INDUSTRIAL USE ONLY
All information provided by Sika Corporation ("Sika") concerning Sika products, including but not limited to, any recommendations and advice relating to the application and use of Sika products, is given in good faith based on Sika's current experience and knowledge of its products when properly stored, handled and applied under normal conditions in accordance with Sika's instructions. In practice, the differences in materials, substrates, storage and handling conditions, actual site conditions and other factors outside of Sika's control are such that Sika assumes no liability for the provision of such information, advice, recommendations or instructions related to its products, nor shall any legal relationship be created by or arise from the provision of such information, advice, recommendations or instructions related to its products. The user of the Sika product(s) must test the product(s) for suitability for the intended application and purpose before proceeding with the full application of the product(s). Sika reserves the right to change the properties of its products without notice All sales of Sika product(s) are subject to its current terms and conditions of sale which are available at www.sikacorp.com or by calling 800-933-7452
Prior to each use of any Sika product, the user must always read and follow the warnings and instructions on the product's most current Technical Data Sheet, product label and Material Safety Data Sheet which are available online at www.sikaconstruction.com or by calling Sika's Technical Service Department at 800-933-7452. Nothing contained in any Sika materials relieves the user of the obligation to read and follow the warnings and instruction for each Sika product as set forth in the current Technical Data Sheet, product label and Material Safety Data Sheet prior to product use.
LIMITED WARRANTY: Sika warrants this product for one year from date of installation to be free from manufacturing defects and to meet the technical properties on the current Technical Data Sheet if used as directed within shelf life. User determines suitability of product for intended use and assumes all risks. Buyer's sole remedy shall be limited to the purchase price or replacement of product exclusive of labor or cost of labor. NO OTHER WARRANTIES EXPRESS OR IMPLIED SHALL APPLY INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SIKA SHALL NOT BE LIABLE UNDER ANY LEGAL THEORY FOR SPECIAL OR CONSEQUENTIAL DAMAGES. SIKA SHALL NOT BE RESPONSIBLE FOR THE USE OF THIS PRODUCT IN A MANNER TO INFRINGE ON ANY PATENT OR ANY OTHER INTELLECTUAL PROPERTY RIGHTS HELD BY OTHERS.

Visit our website at www.sikaconstruction.com                **1-800-933-SIKA NATIONWIDE**
Regional Information and Sales Centers. For the location of your nearest Sika sales office, contact your regional center.

| Sika Corporation | Sika Canada Inc. | Sika Mexicana S.A. de C.V. |
|---|---|---|
| 201 Polito Avenue | 601 Delmar Avenue | Carretera Libre Celaya Km 8.5 |
| Lyndhurst, NJ 07071 | Pointe Claire | Fracc. Industrial Balvanera |
| Phone: 800-933-7452 | Quebec H9R 4A9 | Corregidora, Queretaro |
| Fax: 201-933-6225 | Phone: 514-697-2610 | C.P. 76920 |
| | Fax: 514-694-2792 | Phone: 52 442 2385800 |
| | | Fax: 52 442 2250537 |



Sika and Sikadur are registered trademarks.
Made in USA. Printed in Canada.



NON-CERTIFIED COPY

H&E 0037920



NON-CERTIFIED COPY

H&E 0013941

NON-CERTIFIED COPY

H&E 0013942

NON-CERTIFIED COPY

H&E 0013943

NON-CERTIFIED COPY

H&E 0013944



# Project Observation Report

| Photo No. 14 | Date 3.20.12 |
|---|---|
| **Direction Photo Taken:** | |
| Looking south in service bldg. | |



**Description:**

Water leaking and ponding in service bldg. restroom

| Photo No. 15 | Date 3.20.12 |
|---|---|
| **Direction Photo Taken:** | |
| Looking west inside service building | |



**Description:**

New Service bldg. restroom plumbing

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY

URS 034345

NON-CERTIFIED COPY

H&E 0013945

From:           Ottis Seaborn [oseaborn@mappconstruction.com]
Sent:           Tuesday, September 25, 2012 8:26 PM
To:             Daily Update
Cc:             tim.gaines@urs.com; htadlock@he-equipment.com; rgomez@he-equipment.com;
                fwynn@he-equipment.com; thomas.e.ryan@urs.com; jabrown@he-equipment.com;
                neal_johnson@urscorp.com; Brad Reese; Vern Anderson; Debbie Stout
Subject:        52079 Updates for H&E kenner  (completion date  tbd)
Attachments:    COntrol joint cut in & installed @ phase D, between Phase D & south edge of paving of A-2
                ..pic#1.jpg; COntrol joint cut in & installed @ phase D, between Phase D & south edge of
                paving of A-2 ..pic#2.jpg; COntrol joint cut in & installed @ phase D, between Phase D &
                south edge of paving of A-2 ..pic#3.jpg; Curb dowles, cut down & ground @ north edge of
                phase D (Self perform) ..pic#1.jpg; Curb dowles, cut down & ground @ north edge of phase
                D (Self perform) ..pic#2.jpg; Curb dowles, cut down & ground @ north edge of phase D (Self
                perform) ..pic#3.jpg; Phase C-3 control joints caulked & sealed #1.jpg; Phase C-3 control
                joints caulked & sealed #2.jpg; Self perform , form boards removed & stacked & area at
                phase D cleaned up.jpg

Updates for H&E Kenner Tuesday ( 9-25-12)

- **Self Perform:** We completed removing the curb dowels & grinding down the stubs @ north edge of phase D.
  We installed the drip caps hardware at the exterior warehouse man-doors. We also removed part of the
  damaged paving that was saw cut between and at transition phases B-1 seq 2 & Phase C-3 seq 1 & 2.
- **Metal Buildings:** RBI was on site today. Eric & crew continued , framing, insulating & sheeting the Parts
  warehouse roof. RBI has completed ¼ of the roof system of the Parts warehouse. Gino Ray & Paul Desselle
  was on site today, They were on site at my request to review & plan the re-roof of the service warehouse.
  We also walked the damaged areas of the warehouse items, to provide a complete pricing for all of the
  items on the Isaac list.
- **Concrete:** MCC was on site today, Jeremy & Jose arrived this afternoon to caulk, seal & detail the control
  joints of the new paving of Phase C-3.
- **Painting & Finishing:** Dalesandro was on site today. The crew continued painting & touch ups at the interior
  office spaces. Marco Dalesandro was on site today at my request to provide pricing for drywall & finish
  repairs due to damages from Isaac.
- **Inspections:** A city building final was scheduled for Next Monday (10-01-12) . We requested a final for a date
  this week, but the city is booked full for the end of this month.
- **Structural:** CCCM was on site today at our request to provide pricing  for repairs to the warehouse steel
  items that was damaged during Isaac. Calvin expected to have quotes ready by tomorrow. Calvin also
  walked the area where the 5x5  concrete step noted by the state fire marshal was requested. Calvin said he
  would follow up with tomorrow.
- **Flooring:** RCC flooring was contacted via E-mail to provide pricing for the flooring that was damaged due to
  the flooding caused by Isaac.
- **Fencing:** U.S. Fence was contacted via E-mail to provide pricing for the fencing that was damaged due to the
  flooding & wind caused by Isaac.
- **Tree Removal:** Brandon of Lake Ponchartraine landscaping called me today, & spoke briefly about the tree
  removal @ Phase C-1. Brandon said that he would get the tree removed ASAP once the temporary office
  trailers were moved out of the area.
- **Concrete demo:** All around concrete cutting was on site today to cut out the damaged areas of paving at
  phases B-1 seq 2.

**Ottis Seaborn ::**  Superintendent

504 654 0594 W I R E L E S S

1

WYNN
EXHIBIT NO. 44
K. DONNELLY

NON-CERTIFIED COPY

H&E 0051948

**MAPP**CONSTRUCTION

344 THIRD STREET :: BATON ROUGE
P 225 757 0111 ::  F 225 757 0480

MAPPCONSTRUCTION.COM

2

NON-CERTIFIED COPY

H&E 0051949

From:           Brad Reese [breese@mappconstruction.com]
Sent:           Thursday, October 04, 2012 12:02 PM
To:             Johnson, Neal; Frankie Wynn
Cc:             Gaines, Tim; thomas.e.ryan@urs.com; jabrown@he-equipment.com;
                neal_johnson@urscorp.com; Vern Anderson; John Jones; Thomas, Daren L.
                (dlthomas@terracon.com) (dlthomas@terracon.com); Vrenick, Tom A;
                craigduos@gmail.com; Ottis Seaborn
Subject:        RE: 52079 Updates for H&E kenner  (completion date  tbd)


Neal,
As we discussed, MAPP will implement the engineer's recommended design mod/fix as soon as we receive
direction.  We have placed our concrete sub on stand-by and they are ready to move forward without delay.
Again, if your office requires any assistance from MAPP to expedite resolution, please let us know.


Frankie,
We do understand the urgency of this matter, and are prepared to deal with it accordingly.


thanks


**Brad Reese, LEED AP BD+C** :: Sr. Project Manager


**MAPP**CONSTRUCTION
MAPPCONSTRUCTION.COM


**From:** Johnson, Neal [mailto:neal.johnson@urs.com]
**Sent:** Thursday, October 04, 2012 9:52 AM
**To:** Frankie Wynn; Ottis Seaborn
**Cc:** Gaines, Tim; 'thomas.e.ryan@urs.com'; 'jabrown@he-equipment.com'; 'neal_johnson@urscorp.com'; Brad Reese;
Vern Anderson; John Jones; Thomas, Daren L. (dlthomas@terracon.com) (dlthomas@terracon.com); Vrenick, Tom A;
craigduos@gmail.com; Johnson, Neal
**Subject:** RE: 52079 Updates for H&E kenner (completion date tbd)
**Importance:** High


Ottis and Brad:
We need your response to your plan of correction action for this work.  As of now we will consider these joints to be
rejected as installed.
Thanks,
Neal


Tim:
We need your review of MAPP's plan of correction and/or  a written recommendation on the paving cracks from you.
Thanks,
Neal


Craig
We need your review of MAPP's plan of correction and/or  a written recommendation on the slab cracks from you.
Thanks,

1

WYNN
EXHIBIT NO. 46
K. DONNELLY

H&E 0016469

NON-CERTIFIED COPY

Neal



**Neal Johnson, AIA**

7389 Florida Boulevard
Suite 300
Baton Rouge, LA 70806

Office   225.922.5700
Direct   225.231.6343
Mobile  225.324.5848

neal.johnson@urs.com

---

**From:** Frankie Wynn [mailto:fwynn@he-equipment.com]
**Sent:** Thursday, October 04, 2012 7:25 AM
**To:** 'Ottis Seaborn'
**Cc:** Gaines, Tim; 'thomas.e.ryan@urs.com'; 'jabrown@he-equipment.com'; 'neal_johnson@urscorp.com'; Brad Reese; Vern Anderson (vanderson@mappconstruction.com); John Jones
**Subject:** RE: 52079 Updates for H&E kenner (completion date tbd)

I have seen no new plan, ideas, suggestions or solutions to the crumbling concrete at the joints in the paved area or cracks in the slab.  Guys please understand, this is not going away.  Our Region VP, John Engquist, Jr. continues to ask me when this will be addressed.   I need an answer for him and for me.

Frankie Wynn
Director of Facilities/Risk/Compliance Management
H&E Equipment Services, Inc.
11100 Mead Road, Ste. 200
Baton Rouge, LA  70816
**Office:  225-298-5229**
**Mobile:  225-603-4438**
**Fax:  225-298-5376**
fwynn@he-equipment.com
www.HE-Equipment.com





---

**From:** Ottis Seaborn [mailto:oseaborn@mappconstruction.com]
**Sent:** Wednesday, October 03, 2012 8:49 PM
**To:** Daily Update
**Cc:** 'Tim.gaines@urs.com'; 'htadlock@he-equipment.com'; 'rgomez@he-equipment.com'; 'fwynn@he-equipment.com'; 'thomas.e.ryan@urs.com'; 'jabrown@he-equipment.com'; 'neal_johnson@urscorp.com'; Brad Reese
**Subject:** 52079 Updates for H&E kenner (completion date tbd)

Updates for H&E Kenner Wednesday ( 10-03-12)
- **Self Perform:** Today, we undercut the door at the Mechanical room of the parts office building, installed new nickel plated hinges & strikes at the existing wood doors of the parts office's. The existing wood trusses of the parts lobby at the North end of the ceiling was trimmed out at the transition point between the storefront header & the ceiling.
- **Metal Buildings:** RBI was on site today. RBI Has completed about 50% of the new roof system of the Parts warehouse. Eric's crew continued , framing, insulating & sheeting the Parts warehouse roof.

NON-CERTIFIED COPY                H&E 0016470

- **Concrete:** MCC was on site today. MCC doubled the workers they had breaking the bad section of concrete at the Boxed out area of the drain basin at the Main drive. Mike White (MCC's PM) said they planned to pour the repair areas,& other misc. formed areas tomorrow.
- **Painting & Finishing:** Marco Dalesandro was not on site today.
- **Interior cleaning:** Today we continued our Final, final cleaning at the office areas.
- **Fire protection:** Calmar Coatings (Don) was on site today, treating the steel columns at the service warehouse rated wall assembly.

**Ottis Seaborn ::** Superintendent

504 654 0594 W I R E L E S S

**MAPP**CONSTRUCTION

344 THIRD STREET :: BATON ROUGE
P 225 757 0111 ::  F 225 757 0480

M A P P C O N S T R U C T I O N . C O M

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

NON-CERTIFIED COPY

H&E 0016471

| | |
|---|---|
| **From:** | Frankie Wynn |
| **Sent:** | Monday, July 29, 2013 1:12 PM |
| **To:** | Johnson, Neal (neal.johnson@urs.com); Ryan, Thomas E; Sooter, Jason (jason.sooter@urs.com); Sanders, Debra (debra.sanders@urs.com) |
| **Cc:** | John Jones |
| **Subject:** | Belle Chasse Project Change Orders |
| **Attachments:** | 201307290833.pdf; 201307290832.pdf; Belle Chasse Bldg A Relocated Door; FW: H&E Belle Chasse RFI #29 Gate openings; Belle Chasse Revised Ductwork |

During the Baton Rouge, Kenner and Belle Chasse projects we have been faced with numerous change orders due to items either overlooked, conflicts in drawings or miscommunications.

Everyone involved was aware of the cost sensitive nature of the Belle Chasse Project and the need for absolute accuracy to stay within the contracted amount.

Attached are examples of increases in the costs in the Belle Chasse Project. Some are admittedly unforeseen, but many are due to errors in the drawings or omissions. We discovered Friday, that due to an existing roof and a new roof not aligning, we will have to eliminate the folding door and make additional changes to ductwork. We also have a large bean that I need to know will be utilized or eliminated and if not used, can it be returned for credit.

We have a door in Building A that was cut where an existing wind brace is located that will have to be moved.

We had asked for an opening to be anticipated at a later date in the stairwell area in Building A. This was not communicated to the General Contractor.

A roll up door was installed without any access from the outside.

Also limestone was not included in the specs. for the driveways.

Due to lack of space, I will not include all RFI's, but there are many.

H&E would like an explanation of how these items were missed.

Thank you

**Frankie Wynn**
**Director of Facilities/Risk/Compliance Management**
**H&E Equipment Services, Inc.**
**7500 Pecue Lane**
**Baton Rouge, LA 70809 (New Address)**
**Office: 225-298-5229**
**Mobile: 225-603-4438**
**Fax: 225-298-5376**
**fwynn@he-equipment.com**
**www.HE-Equipment.com**



WYNN
EXHIBIT NO. 67
K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0021331

| | | | | | |
|---|---|---|---|---|---|
| 21 | 42 | 580 | Service Mezzanine Buildout 16,471.40 | | 16,471.40 |
| | | | | CO#3 | 226,575.60 |
| | | | | | |
| 1 | 45 | 590 | Hurricane Damage 261,331.00 | | 261,331.00 |
| | | | | CO#4 | 261,331.00 |
| | | | | | |
| 1 | 47 | 600 | Misc Hardware Revisions 1,874.00 | | 1,874.00 |
| 2 | 49 | 600 | HVAC Filters 2,601.00 | | 2,601.00 |
| 3 | 50 | 600 | Revise Down Spout at Front Office Canopy Column 5,000.00 | | 5,000.00 |
| 4 | 51 | 600 | Window Treatments 2,988.00 | | 2,988.00 |
| 5 | 52 | 600 | Fire Marshal Requirements 5,139.00 | | 5,139.00 |
| 6 | 54 | 600 | **Joint between New & Existing Service Bldg 8,596.00** | | **8,596.00** |
| 7 | 55 | 600 | Service Building Rubber Base 911.00 | | 911.00 |
| 8 | 56 | 600 | Revise Server Room Outlet 1,615.00 | | 1,615.00 |
| | | | | CO#5 | 28,724.00 |
| | | | | | |
| | | | | Total | 675,948.60 |

 

NON-CERTIFIED COPY

H&E 0021332

**Kenner Project Change Orders**

| CO Item | CPR# | Contract Item | Description | Amount |
|---|---|---|---|---|
| 1 | 1 | 560 | New Sewer Line at Front Office (Airline) 4,997.00 | 4,997.00 |
| 2 | 9 | 560 | Export & Import Unsuitable Soil 26,463.00 | 26,463.00 |
| 3 | 15 | 560 | New 2" Discharge Line (Sewer Manhole Tie-In) 29,260.00 | 29,260.00 |
| 4 | 21 | 560 | OH Door Scope Change -2,500.00 | (2,500.00) |
| | | | CO#1 | 58,220.00 |
| | | | | |
| 1 | 3 | 570 | 7 Day Concrete Mix (Phase A-1, Seq #2) 8,263.00 | 8,263.00 |
| 2 | 5 | 570 | Circular Hand Wash Station 3,071.00 | 3,071.00 |
| 3 | 11 | 570 | URS CPR #01, dated 01/11/12 (U/G Debris) 45,464.00 | 45,464.00 |
| 4 | 14 | 570 | Wash Rack Water Supply (New Water Meter) 15,604.00 | 15,604.00 |
| 5 | 20 | 570 | Replace Drain Box A (RFI #32) 15,658.00 | 15,658.00 |
| 6 | 25 | 570 | Elevation Conflicts 13,038.00 | 13,038.00 |
| | | | CO#2 | 101,098.00 |
| | | | | |
| 2 | 22 | 580 | Phase D Paving Area - Options 46,199.00 | 46,199.00 |
| 3 | 27 | 580 | Misc Framing Changes 9,829.40 | 9,829.40 |
| 4 | 28 | 580 | Failed Proofroll #3 10,792.00 | 10,792.00 |
| 5 | 29 | 580 | Failed Proofroll #4 4,040.00 | 4,040.00 |
| 6 | 30 | 580 | Revised Exterior Fixtures (ASI #16) 1,851.00 | 1,851.00 |
| 7 | 31 | 580 | Revise Wall Mount Flood Lights (Service Bldg) 4,777.00 | 4,777.00 |
| 8 | 32 | 580 | Cost to Install U/G for Pole Lights 3,417.00 | 3,417.00 |
| 9 | 33 | 580 | Added 3" Tele Conduit 3,720.00 | 3,720.00 |
| 10 | 34 | 580 | Concrete Sealer Deduct -13,811.00 | (13,811.00) |
| 11 | 35 | 580 | Signage Allowance Deduct -5,500.00 | (5,500.00) |
| 12 | 36 | 580 | Remove/Replace Existing Panels 10,183.77 | 10,183.77 |
| 13 | 37 | 580 | Offset Gas Line 7,560.48 | 7,560.48 |
| 14 | 38 | 580 | Replace Existing Service Building Roof 68,094.36 | 68,094.36 |
| 15 | 39 | 580 | Re-locate 30' of Gas Line 946.46 | 946.46 |
| 16 | 40 | 580 | Parts Building Painting 1,696.94 | 1,696.94 |
| 17 | 41 | 580 | 2nd BFP at 2" Water Line 4,231.19 | 4,231.19 |
| 18 | 44 | 580 | Failed Proofrolls #5-9 23,171.00 | 23,171.00 |
| 19 | 4 | 580 | Relocate Oil Tanks & Electrical (RFI #4) 14,881.00 | 14,881.00 |
| 20 | 43 | 580 | Door, Frame, Hardware Revisions 14,025.00 | 14,025.00 |



WYNN
EXHIBIT NO. 20
K. DONNELLY

NON-CERTIFIED COPY

H&E EQUIPMENT SERVICES, INC.        *    CASE NO. C626308, SECTION D

VERSUS                             *    19TH JUDICIAL DISTRICT COURT

URS CORPORATION ARCHITECTURE,       *    PARISH OF EAST BATON ROUGE
P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III    *    STATE OF LOUISIANA

FILED: _____        _____
                                        DEPUTY CLERK

### AFFIDAVIT OF FRANKIE WYNN

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

NOW COMES, Frankie Wynn, who under penalty of perjury and from his own personal knowledge, states:

1.    I am over the 18 years of age and competent to give testimony in this matter.  I have personal knowledge of all facts and circumstances in this Affidavit.

2.    I submit this Affidavit in support of the Opposition to Defendants' Motion for Partial Summary Judgment on Reconventional Demand filed by H&E Equipment Services, Inc. ("H&E").

3.    I am currently the Director of Facilities/Risk/Compliance Management for H&E and am based out of H&E's Corporate Headquarters located at 7500 Pecue Lane, Baton Rouge, Louisiana.  I have held this position since May 2010, prior to which I served as H&E's Risk/Asset Manager.

4.    As H&E's Director of Facilities, I was responsible for overseeing the construction phase of the Baton Rouge, Kenner, and Belle Chase, Louisiana projects at issue in this litigation.

5.    I officially began overseeing the Baton Rouge, Kenner, and Belle Chase construction projects in 2010.  In addition, I maintain H&E's files regarding the projects and have reviewed the documents relevant to this dispute, including the change order logs for the projects.

6.    During my involvement with the projects, I regularly communicated with L. O'Neal Johnson, Thomas E. Ryan, III, and other representatives and employees of URS Corporation Architecture, P.C. and URS Corporation (collectively, referred to as "Defendants"), as well as the various general contractors and subcontractors for the three projects.

-1-



NON-CERTIFIED COPY

7.    There have been multiple problems associated with the work performed by Defendants on all three projects at issue.

8.    During the course of construction, the project contractors and subcontractors observed numerous design deficiencies or design-related problems at all three H&E project sites. Typically, these issues were discussed with Defendants as the project architect and addressed – at H&E's expense.  But, some problems remain outstanding even today.  All problems that were addressed and remedied resulted in significant additional costs to H&E.

*Deficiencies and Problems at the*
*Baton Rouge Headquarters and Branch Facility*

9.    The Baton Rouge Headquarters and Branch Facility reached substantial completion in late 2012.

10.    Based on my involvement with the Baton Rouge projects and review of the change order log for the facilities, I am aware of numerous design deficiencies and problems that arose during construction.

11.    Most notably, during and/or around the time of substantial completion of the Baton Rouge projects, H&E and the project contractors began to observe crumbling and spalling in the concrete constructed to Defendants' specifications at the facilities.

12.    H&E notified Defendants of the observed problems with the concrete at the Baton Rouge site when the problems surfaced, in hopes – and with the expectation – that the parties would work together to find a solution and remedy.  But, while Defendants initially appeared willing to troubleshoot the problem, they ultimately refused to participate in ongoing discussions and efforts to fix the concrete pads.

13.    The concrete problems at the Baton Rouge facilities continue to worsen to this day.

14.    I am also aware of numerous other problems and design deficiencies with respect to the Baton Rouge facilities that required addressing and/or remedying at H&E's expense. These include, for example:

(a)    Parking lot revisions due to Defendants' failure to design and provide for an adequate number of parking spots;

(b)    Structural steel revisions;

(c)    Waterproofing of the Headquarters' elevator pit, which was not provided for in Defendants' designs and specifications;

-2-

NON-CERTIFIED COPY

(d)    Interior modifications required for the proper routing of roof-drainage;

(e)    Provision of additional beams for the Branch Facility's loading dock due to incorrect measurements;

(f)    Installation of lintel systems and additional structural support above doorways and openings;

(g)    Upgrading of window sill materials due to the specification of inferior materials;

(h)    Replacement of wood paneling in the Headquarters' executive lobby area mid-construction due to Defendants' specification for and insistence that H&E use a thinner, inferior material;

(i)    Grading revisions at the Branch Facility;

(j)    Relocation of louvers and exhaust fans at the Branch Facility;

(k)    Revisions to the tie-in between the Branch Facility's wash-bay and the site's sewerage system; and

(l)    Multiple code-required additions not provided for in Defendants' original designs and specifications, including the addition of an oil/water separator in the service department shop, multiple railings and guardrails, and multiple fire-prevention measures.

15.    The above list is not exhaustive.

16.    Defendants often refused to take responsibility for the problems and deficiencies that arose and were brought to their attention in connection with the Baton Rouge projects. All of the revisions, changes, and additions required as a result of these problems and deficiencies were undertaken at additional expense to H&E.

*Deficiencies and Problems*
*at H&E's Belle Chasse Facility*

17.    The Belle Chasse project reached substantial completion in late 2013.

18.    Based on my involvement with the Belle Chasse project and review of the change order log for the facility, I am aware of numerous design deficiencies and problems that arose during construction.

19.    For example, I am aware of the following problems and deficiencies with respect to the Belle Chasse facility that required addressing and/or remedying at H&E's expense:

(a)    Significant addition of extra concrete in the facility's work area due to Defendants' incorrect elevation estimates and specification for an insufficient amount of concrete;

(b)    Removal of concrete expansion joints not anticipated or provided for by Defendants but necessitated by Defendants' concrete specifications;

-3-

NO LBC 882865 v1
2919213-000024

NON-CERTIFIED COPY

(c)     Multiple revisions occasioned by Defendants' failure to properly measure for an accordion partition in the facility's lunch room area, and H&E's purchase of custom materials that could not be used as planned and remain unused today;

(d)     Multiple revisions occasioned by Defendants' mismeasurement of roof differentials between the administration building and the tool room, including the relocation of duct work and transformers; and

(e)     Various other revisions and changes during the course of construction caused by Defendants' deficient specifications, such as the modification of exterior handrails, addition of bollards to exterior air-conditioning units, relocation of the facility's locker room, and replacement of the facility's windscreens.

20.     The above list is not exhaustive.

21.     Defendants often refused to take responsibility for the problems and deficiencies that arose and were brought to their attention in connection with the Belle Chasse project. All of the revisions, changes, and additions required as a result of these problems and deficiencies were undertaken at additional expense to H&E.

Dated:       August 21, 2015

_____
FRANKIE WYNN

SWORN TO AND SUBSCRIBED
BEFORE ME ON THIS THE
21ST DAY OF AUGUST, 2015.

_____
NOTARY PUBLIC
Wesley P Hebert
LA Notary 87793
Lifetime Commission

-4-

NON-CERTIFIED COPY

1

1    19TH JUDICIAL DISTRICT COURT
2    PARISH OF EAST BATON ROUGE
     STATE OF LOUISIANA

3

4

5

6    H&E EQUIPMENT SERVICES, INC     *     DOCKET NO.
                                     *     626,308
7    VERSUS                          *
                                     *     SECTION:   "D"
8    URS CORPORATION ARCHITECTURE,   *
     P.C., URS CORPORATION, L.       *
9    O'NEAL JOHNSON, AND THOMAS E.   *
     RYAN, III                       *
                                     *
10   *  *  *  *  *  *  *  *  *  *     *

11

12

13

14

15          Deposition of DEBRA SANDERS, 12475 East Robin
     Hood Drive, Baton Rouge, Louisiana, 70815, taken in
16   the offices of Fishman Haygood, 201 St. Charles
     Avenue, 46th Floor, New Orleans, Louisiana,
17   70170-4600, commencing at 4:24 p.m., on Thursday, the
     4th day of August, 2016.

18

19

20   APPEARANCES:

21

22       FISHMAN HAYGOOD
         (By:  Brett B. Barriere, Esquire)
23       201 St. Charles Avenue
         46th Floor
24       New Orleans, Louisiana  70170-3500
            (Attorneys for the Plaintiff)

25



NON-CERTIFIED COPY

2

```
1        ADAMS AND REESE
         (By:  Philip A. Franco, Esquire)
2        4500 One Shell Square
         New Orleans, Louisiana  70139
3            (Attorneys for the Defendants)

4

5

6

7

8

9

10

11

12

13

14

15

16   REPORTED BY:

17        WENDY MAJORIA, CCR
          Certified Court Reporter
18        (No. 84106)
          Huffman & Robinson, Inc.
19        Suite 220, Metairie Office Tower
          433 Metairie Road
20        Metairie, Louisiana  70005
          (504) 831-1753/(800) 749-1753
21        (504) 831-1759/fax

22

23

24

25
```

NON-CERTIFIED COPY

3

# E X A M I N A T I O N    I N D E X

PAGE

EXAMINATION BY MR. BARRIERE......................6

# E X H I B I T    I N D E X

Sanders Exhibit No. 1.........................17
       (E-mail exchange from Brad Barber dated
        February 4th, 2013)

Sanders Exhibit No. 2.........................21
       (E-Mail exchange between Brad Barber
        and Vincent Provenza)

NON-CERTIFIED COPY

4

1           S T I P U L A T I O N

2

3

4        It is stipulated and agreed by and between

5   counsel for the parties hereto that the deposition of

6   the aforementioned witness is hereby being taken under

7   the Louisiana Code of Civil Procedure, Article 1421,

8   et seq., for all purposes, in accordance with law;

9        That the formalities of filing, reading,

10  signing, sealing, and certification are specifically

11  waived;

12       That all objections, save those as to the form

13  of the question and the responsiveness of the answer,

14  are hereby reserved until such time as this

15  deposition, or any part thereof, may be used or sought

16  to be used in evidence.

17

18              *       *       *       *

19

20       WENDY MAJORIA, Certified Court Reporter, State

21  of Louisiana, officiated in administering the oath to

22  the witness.

23

24

25

NON-CERTIFIED COPY

5

1                    DEBRA SANDERS,

2   after having been first duly sworn by the above-

3   mentioned Certified Court Reporter, was examined and

4   testified as follows:

5   EXAMINATION BY MR. BARRIERE:

6        Q.    Good afternoon, Ms. Sanders.  My name is

7   Brent Barriere.  We met very briefly outside.  I

8   represent H&E Equipment in connection with this

9   litigation.  I'll be taking your deposition today.

10            Could I get you to state your full name

11  and address for the record, please?

12       A.    Debra Sanders, 12475 East Robin Hood

13  Drive, Baton Rouge, Louisiana, 70815.

14       Q.    Is that your home address or business

15  address?

16       A.    Home address.

17       Q.    What is your business address?

18       A.    I don't know.

19       Q.    But you know how to get there?

20       A.    I do.  Well, I just got my real estate

21  license and started with a broker.  I officially work

22  out of my home, but I'm associated with a broker on

23  Perkins Road.  I don't know the address right offhand.

24       Q.    Am I correct in understanding you formerly

25  were employed by URS?

NON-CERTIFIED COPY

6

1      A.    Absolutely.

2      Q.    That's what brings you here today?

3      A.    Yes.

4      Q.    What years were you employed by URS?

5      A.    From -- from 1997 to 2015.

6      Q.    When in 2015 did you leave?

7      A.    June.

8      Q.    Why did you leave URS?

9      A.    I was laid off due to a buyout and

10 reorganization and my position being eliminated.

11     Q.    What was your position at the time you

12 were laid off?

13     A.    I was office manager in Baton Rouge.

14     Q.    Give me a little background.  Are you an

15 architect?

16     A.    No.

17     Q.    Are you an engineer?

18     A.    No.

19     Q.    Do you have any certifications in any

20 expertise in any construction area?

21     A.    My education is business management with

22 emphasis in construction management from LSU.  I have

23 a little bit of knowledge of construction.  I'm not

24 certified in any way.

25     Q.    You were hired by URS in 2009, is what you

NON-CERTIFIED COPY

7

1  told us?

2      A.    '97.

3      Q.    What was the position you had at the time

4  you were hired?

5      A.    I was hired as a project administrator

6  originally.

7      Q.    Can you describe, for the record, what are

8  the duties of a project administrator?

9      A.    Open new projects, keep track of all of

10  the paperwork, help with scheduling, help with

11  invoicing, collections, filing, just assisting the

12  project manager in documentation of their projects.

13      Q.    At some point, you advanced to office

14  manager of the Baton Rouge office?

15      A.    I had a number of different positions over

16  the 17 years I was there.

17      Q.    Fair enough.

18            We're going to keep ourselves focused

19  today on, because of the late hour, the time frame of

20  2012 to 2014.  Were you the office manager of the

21  Baton Rouge office throughout that time frame?

22      A.    Yes.

23      Q.    If I may, I'd like to make sure that

24  you're not involved in certain aspects of this case.

25  Did you have any involvement with URS's work for H&E

NON-CERTIFIED COPY

12

1            Ryan?

2      THE WITNESS:

3            Ryan.  Thank you.

4      MR. FRANCO:

5            You didn't mind me helping out, did you?

6      MR. BARRIERE:

7            No.  That's fine.

8      THE WITNESS:

9            It's been a year since I've seen any of

10   these people.

11   EXAMINATION BY MR. BARRIERE:

12      Q.    I understand you don't recall when the

13   first meeting occurs.  Do you have any recollection of

14   when the second visit to H&E occurred?

15      A.    I don't.

16      Q.    Do you have any recollection of the

17   approximate break in time between the first visit to

18   H&E and your second visit to H&E?  By that I mean, a

19   month, six weeks?

20      A.    It was months, but I don't know exactly.

21      Q.    Okay.  Let's go back to that first

22   meeting.  What do you recall about the issue

23   concerning the mail slots?

24      A.    Their complaint, as I remember, was that

25   the slots were not large enough.  And our discussion

NON-CERTIFIED COPY

13

1 was that this is the way they were designed based on

2 them seeing the mail slots in our URS office and they

3 liked it and they approved the plan of it and that's

4 how they were built.

5      Q.    What was the response from the

6 representatives of H&E?

7      A.    I don't recall.

8      Q.    How was that issued resolved, if it was

9 resolved?

10      A.    I don't recall that there was a

11 resolution.

12      Q.    To your knowledge, was the -- were the

13 mail slots rebuilt or renovated, altered in some way?

14      A.    I would be guessing if I said.  I don't

15 remember.

16      Q.    The second item you mentioned was the

17 paneling.  Was that the paneling in the executive

18 area?

19      A.    I only remember that there was an issue

20 with the staining of some paneling.  And I don't

21 remember anything else about that part of it.

22      Q.    Do you recall any discussion concerning

23 the cause of that issue?

24      A.    Not well enough to say, no.

25      Q.    Fair enough.

NON-CERTIFIED COPY

14

1              Finally, there was discussion of the
2   parking issue.  What do you recall that issue to be?
3        A.    They were very upset about the parking
4   issue because they had just opened the building.
5   There were a lot of people coming in to see it and so
6   forth.  And their complaint was that there was simply
7   not enough parking spaces.  However, what we told them
8   is that it was designed to code based on how many
9   people were estimated to occupy the building and so
10  forth.
11              And so that was the main complaint there,
12  that they were just appalled that we didn't build
13  enough parking spaces.
14        Q.    Do you recall any detail being offered by
15  either Mr. Wynn or Mr. Jones as to why H&E anticipated
16  more parking spaces than had been provided?
17        A.    They did say that they anticipated growth.
18  And as I recall, we had taken that into consideration.
19        Q.    In advance of this meeting, had you met
20  with other folks at URS to discuss this dispute over
21  the number of parking spaces?
22        A.    In advance of this meeting, you mean like
23  in the last month?
24        Q.    No.  The meeting at H&E.
25        A.    Yes.  I had certainly discussed the issue

NON-CERTIFIED COPY

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*   *   *   *   *   *   *   *   *
                            *
H&E EQUIPMENT SERVICES      *
                            * NUMBER 626,308
VERSUS                      *
                            * DIVISION "D"
URS CORPORATION             *
ARCHITECTURE, P.C., URS     *
CORPORATION, L O'NEAL       *
JOHNSON AND THOMAS E.       *
RYAN, III                   *
                            *
*   *   *   *   *   *   *   *   *
```

Deposition of BRADLEY W. BARBER,

taken on Friday, August 5, 2016, commencing at

12:56 p.m., in the offices of Adams and Reese,

LLP, Attorneys at Law, 450 Laurel Street, Suite

1900, Baton Rouge, Louisiana, 70801.

EXHIBIT

12

NON-CERTIFIED COPY

Page 2

1                 I N D E X

2

3                                          Page

4

   Caption                                1
5  Index of Exhibits                      3
   Appearances                            4
6  Agreement of Counsel                   7

7  Examination

8     PHILIP A. FRANCO, ESQ.              8

9
               *   *   *   *   *
10

   Witness' Certificate                 169
11 Reporter's Page                      170
   Certificate                          171
12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 3

1                    INDEX OF EXHIBITS

2

     Number                              Page
3

     1 July 10, 2008 Email string from    31
        Leonard St. Germain to Brad
        Barber
     5  H&E 0003530-0003535

     2 September 20, 2010 Email from    39
        Frankie Wynn to Brad Barber
        H&E 0003823-0003832

     3 October 14, 2010 Email string from  47
        Frankie Wynn to Brad Barber,
        et al
        H&E 0003269-0003270

     4 February 24, 2011 string from    55
        Frankie Wynn to Brad Barber
        H&E 0003307-0003308

     5 February 28, 2011 Email from    55
        Frankie Wynn to Brad Barber
        Facility Update February 2011
        H&E 0003301-0003305

     6 April 22, 2011 Email string from  58
        Frankie Wynn to Brad Barber
        H&E 0003341-0003342

     7 June 30, 2011 Email from Frankie  60
        Wynn to John Jones, et al
        H&E 0003886-0003893

     8 Affidavit of Frankie Wynn    75
        August 21, 2015

     9 August 22, 2011 Email from Frankie  77
        Wynn to Brad Barber, et al
        Facility Update August 2011
        H&E 0003650-0003652

     10 August 29, 2011 Email string from  78
        Brad Barber to Frankie Wynn
        H&E 0003657-0003658

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 4

1   (Cont.)          INDEX OF EXHIBITS

2

    Number                                Page

3

    11 September 19, 2011 Email string    81
4      from Frankie Wynn to Brad
       Barber, et al
5      H&E 0003737-0003740

6   12 December 12, 2011 Email string     85
       from Frankie Wynn to Brad Barber
7      H&E 0004050-0004051

8   13 December 16, 2011 Email string     85
       from Frankie Wynn to Brad
9      Barber, et al
       H&E 0004073-0004078
10

    14 December 27, 2011 Email string     86
11     from Neil Favre to Frankie Wynn,
       et al
12     H&E 0004094-0004096

13  15 January 6, 2012 Email string from  88
       Frankie Wynn to Brad Barber,
14     et al
       H&E 0004907-0004105
15

    16 December 28, 2012 Email string     104
16     from Neal Johnson to Brad Barber
       H&E 0004505-0004506
17

    17 January 2, 2013 Email from Brad    106
18     Barber to John Engquist, et al
       H&E 0003083-0003085
19

    18 January 4, 2013 Email from Neal    109
20     Johnson to Frankie Wynn, et al
       H&E 0020538-0020540
21

    19 January 16, 2013 Email from Brad   112
22     Barber to John Enguqist
       H&E 0003179-0003186
23

    20 February 4, 2013 Email string      119
24     from Debra Sanders to John Jones
       H&E 0004275-0004277
25

NON-CERTIFIED COPY

Page 5

1    (Cont.)          INDEX OF EXHIBITS

2

     Number                                    Page
3
     21 February 4, 2013 Email string          121
4        from Brad Barber to Debra
         Sanders, et al
5        H&E 0004299-0004301

6    22 February 5, 2013 Email               130
        from John Jones to Brad Barber
7        H&E 0004279

8    23 February 6, 2013 Email string         133
        from Brad Barber to John
9        Engquist
         H&E 0003201-0003205
10
     24 April 8, 2013 Email string           143
11       from Frankie Wynn to John
         Jones
12       H&E 0024303

13   25 April 8, 2013 Email string from      147
        Vincent Provenza to Brad
14       Barber, et al
         H&E 0004346
15
     26 April 8, 2013 Email string from      149
16       Brad Barber to Vincent
         Provenza
17       H&E 0004897-0004902

18   27 October 3, 2013 Email string from    154
        Toby Hawkins to Brad Barber
19       H&E 0004937-0004939

20   28 November 27, 2013 Email from         163
        Frankie Wynn to Brad Barber,
21       et al
         H&E 0004381-0004391

22

23

24

25

NON-CERTIFIED COPY

Page 6

1    APPEARANCES:

2

       Representing the Plaintiff:
3
         FISHMAN HAYGOOD, LLP
4        Attorneys at Law
         201 St. Charles Avenue, Suite 4600
5        New Orleans, Louisiana  70170

6        BY:  BRENT B. BARRIERE, ESQ.

7

8

9      Representing the Defendant:

10       ADAMS AND REESE, LLP
         Attorneys at Law
11       4500 One Shell Square
         New Orleans, Louisiana  70139
12
         BY:  PHILIP A. FRANCO, ESQ.
13            KELLEN J. MATHEWS, ESQ.

14
     ALSO PRESENT:
15

16     Representing H&E Equipment Services:

17       JOHN A. BERRY, ESQ.
         Corporate Counsel
18       7500 Pecue Lane
         Baton Rouge, Louisiana  70809
19
         Neal Johnson
20
       Reported by:
21             KAY E. DONNELLY
               Certified Court Reporter
22             State of Louisiana

23

24

25

NON-CERTIFIED COPY

Page 7

1                    S T I P U L A T I O N

2

3          It is stipulated and agreed by and between

4    counsel that the deposition of BRADLEY W. BARBER

5    is hereby being taken under the Louisiana Code

6    of Civil Procedure in accordance with the Code.

7          The formalities of sealing and

8    certification are hereby waived.  The witness

9    will reserve the right to read and sign the

10   deposition.  The party responsible for service

11   of the discovery material shall retain the

12   original.

13         All objections, save those as to the form

14   of the questions, are hereby reserved until such

15   time as this deposition, or any part thereof,

16   may be used or sought to be used in evidence,

17   and are to be made in accordance with the Code

18   of Civil Procedure.

19                    *   *   *   *   *

20         KAY E. DONNELLY, Certified Court Reporter,

21   in and for the State of Louisiana, officiated in

22   administering the oath to the witness.

23

24

25

NON-CERTIFIED COPY

1  construction workers from parking in the parking

2  lot, did you?

3      A.  I did not personally, no.

4      Q.  All right.  Let me just cover another

5  subject real quickly.

6          MR. FRANCO:

7              Let me show you another Email that

8  I'm going to label Exhibit 18.

9  EXAMINATION BY MR. FRANCO:

10     Q.  Were you aware of the issue with the

11 mailroom millwork and layout design in --

12     A.  I was.

13     Q.  Excuse me?

14     A.  I was, yes, sir.

15     Q.  Okay.  And what was your understanding

16 of what happened?

17     A.  The mail slots were too small to fit an

18 eight-and-a-half-by-11-inch sheet of paper.

19     Q.  Okay.  And were you aware that H&E

20 personnel actually visited a URS building to

21 determine what kind of mail slots they wanted at

22 the headquarters building?

23     A.  Was I -- was I aware when?  At what

24 point in time?

25     Q.  Were you aware that --

NON-CERTIFIED COPY

1    Email.

2        Q.  To try to work it out?

3        A.  Absolutely.

4        Q.  Are you aware -- I may have asked you

5    this.

6            Are you aware they designed that at no

7    charge, the additional parking?

8        A.  I am now.

9        Q.  Are you aware of the problem with the

10    executive area wall panels?

11        A.  I am.

12        Q.  Tell me what your knowledge of that

13    issue is.

14        A.  They were warped panels.

15        Q.  Do you know whose responsibility that

16    was, whether it was a design issue or a

17    construction issue?

18        A.  I -- the only thing I know for sure is

19    they were warped panels.

20        Q.  They were warped after they were -- I

21    mean, at the end of the day, they were warped?

22        A.  They were warped.

23        Q.  And you don't know whether that is a

24    construction problem or a design problem as you

25    sit here, do you?

NON-CERTIFIED COPY

1    A.  I could speculate for you.

2    Q.  Go ahead and speculate.

3    A.  I think it was cheap, thin material, and

4  that is why it warped.  But I am not certain.  I

5  do know they were all warped.

6    Q.  And you are no expert to tell us why

7  they warped, correct?

8    A.  No.

9    Q.  Fair statement?

10   A.  Fair statement.

11   Q.  What has been your involvement in the

12 cracking or spalling of the concrete in the yard

13 area of the Baton Rouge facility?

14   A.  Only to observe it.

15   Q.  Have you had discussion with anyone at

16 H&E as to the cause of that cracking and

17 spalling?

18   A.  Anyone at H&E, I -- no specific

19 conversation I can recall.  I mean, there has

20 certainly been conversation about the poor

21 quality and the cracking --

22   Q.  Right.

23   A.  -- of the cement and the joints.

24   Q.  Right.  But has anybody at H&E shared

25 with you their opinion about whether or not that

NON-CERTIFIED COPY

1    conclusion.  I'm asking him whether it is right

2    and fair according to what H&E does.

3    EXAMINATION BY MR. FRANCO:

4        Q.  Go ahead.

5        A.  So understanding the full circumstances,

6    yeah, I would -- I would have agreed with not

7    paying URS until they had done what we thought

8    they should have on the project and covered for

9    the errors.

10       Q.  So the answer to my question is you

11   think it is right and fair?

12       A.  I just gave you my answer.

13       Q.  So if H&E has a problem on one job for a

14   customer, do you think it is okay for that

15   customer not to pay you on all the other jobs

16   that have no such problems?

17       MR. BARRIERE:

18           Object to the form of the question.

19   Hypothetical.  It omits materials facts.

20           Subject to the objection, you can

21   answer.

22       THE WITNESS:

23           Okay.  So I can't understand that

24   because we would do the right thing.  We would

25   not leave a customer with an open problem that

NON-CERTIFIED COPY

1    A.  That is my opinion.

2    Q.  Why?

3    A.  Based off of the way he handled the

4  messes that they had and the topic we are here

5  to talk about today.

6    Q.  And you said "on behalf of the problems

7  he caused us."  As of October 2013, what

8  problems did he cause you?

9    A.  As of that time?

10    Q.  Yes.

11    A.  It was the parking, for sure.

12    Q.  So what else was it that you attributed

13  to Mr. Johnson, other than the parking issue

14  that we have talked about pretty much in detail?

15    A.  Generally, I just viewed him as

16  incompetent and unwilling to take

17  responsibility.

18    Q.  And what did he not take responsibility

19  for, other than the parking lot that --

20    A.  That was what --

21    Q.  -- URS still felt --

22    A.  That is what I -- you are asking me

23  about this Email.  That is what I would have had

24  in mind when I orchestrated this Email.

25    Q.  Okay.  And the reason I ask you that is

NON-CERTIFIED COPY

1

1    19TH JUDICIAL DISTRICT COURT
2    FOR THE PARISH OF EAST BATON ROUGE
     STATE OF LOUISIANA

3

4    H&E EQUIPMENT SERVICES, INC.
                                    DOCKET NO. 626,308
5    VERSUS
                                    SECTION "D"
6    URS CORPORATION ARCHITECTURE,
     P.C., URS CORPORATION, L. O'NEAL
7    JOHNSON, AND THOMAS E. RYAN, III

8

9

10

11   Deposition of TIMOTHY GAINES, 1140 Fairwinds Avenue,
     Zachary, Louisiana 70791, taken in the offices of
12   Fishman Haygood, LLP, 201 St. Charles Avenue, 46th
     Floor, New Orleans, Louisiana 70170, commencing at
13   1:30 p.m., on Monday, the 1st day of August, 2016.

14

15

16

17

18   APPEARANCES:

19

20       FISHMAN HAYGOOD, LLP
         (By:  Loretta G. Mince, Esquire)
21       201 St. Charles Avenue, 46th Floor
         New Orleans, Louisiana  70170-4600

22           ATTORNEYS FOR THE PLAINTIFF

23

24

25


EXHIBIT
13

NON-CERTIFIED COPY

2

1  APPEARANCES CONTINUED:

2

3          ADAMS AND REESE, LLP
           (By:  Philip A. Franco, Esquire)
4          701 Poydras Street, Suite 4500
           New Orleans, Louisiana  70139
5
                ATTORNEYS FOR THE DEFENDANTS
6

7

8

9

10

11

12

13

14

15

16

17  REPORTED BY:

18          Deanna Mancuso
            Certified Court Reporter
19          Huffman & Robinson, Inc.
            Suite 220, Metairie Office Tower
20          433 Metairie Road
            Metairie, Louisiana  70005
21          (504) 831-1753    (800) 749-1753

22

23

24

25

NON-CERTIFIED COPY

3

1                          I-N-D-E-X

2

3   EXAMINATION BY:                              PAGE

4     MS. MINCE                                    8

5

6

7

8   EXHIBITS:

9

10  Exhibit 1 ...............................30
      Photocopy of aerial photograph
11
    Exhibit 2 ...............................59
12    E-mail with attachment Bates
      labeled URS 33308 through 33340
13
    Exhibit 3 ...............................73
14    Letter dated October 12, 2010 from
      Neal Johnson to Frankie Wynn
15    Bates labeled URS 55534

16  Exhibit 4 ...............................75
      Kick-off Meeting Minutes Bates
17    labeled URS 38456 and 38457

18  Exhibit 5 ...............................78
      Site Meeting Minutes Bates
19    labeled URS 38508

20  Exhibit 6 ...............................81
      E-mail and Geotechnical Engineering
21    Report Bates labeled H&E 65372
      through 65415
22
    Exhibit 7 ...............................86
23    E-mail with attachments Bates
      labeled URS 33145 through 33154
24

25

NON-CERTIFIED COPY

4

**EXHIBITS CONTINUED:**                               **PAGE**

Exhibit 8 .................................102
   Drawings labeled "Construction Set"

Exhibit 9 .................................103
   E-mail and Specifications Bates
   labeled URS 66293 through 66356

Exhibit 10 ................................109
   E-mail string with attachments Bates
   labeled URS 31731 through 31735

Exhibit 11 ................................118
   E-mail with attachment Bates labeled
   URS 33265 through 33268

Exhibit 12 ................................119
   E-mail with attachment Bates labeled
   URS 36067 through 36070

Exhibit 13 ................................121
   E-mail and attachment Bates labeled
   URS 66706 through 66709

Exhibit 14 ................................124
   E-mail with "Addendum No. 2"
   Bates labeled URS 66881 through 66893

Exhibit 15 ................................126
   URS Project Observation Report
   Number 1 Bates labeled H&E 3840
   through 3847

Exhibit 16 ................................132
   E-mail string Bates labeled
   H&E 64417 and 64418

Exhibit 17 ................................135
   URS Project Observation Report
   Number 2 Bates labeled H&E 64597
   through 64606

NON-CERTIFIED COPY

5

1 **EXHIBITS CONTINUED:**                              **PAGE**

2

3 Exhibit 18 .............................137
      E-mail string with photocopies of
4    photographs Bates labeled H&E 13938
      through 13945
5
     Exhibit 19 .............................138
6      E-mail with attached photocopies of
      photographs Bates labeled URS 37206
7      through 37211
8
     Exhibit 20 .............................139
9      E-mail and Supplement to Agreement
      for Services Bates labeled URS 47562
10     and 47563
     Exhibit 21 .............................140
11     E-mail from Ottis Seaborn Bates
      labeled H&E 52036
12
     Exhibit 22 .............................141
13     E-mail string Bates labeled
      H&E 16465 and 16466
14
     Exhibit 23 .............................142
15     E-mail string Bates labeled
      H&E 16467 and 16468
16
     Exhibit 24 .............................145
17     E-mail string and Sikacrete 321
      Fact Sheet
18
     Exhibit 25 .............................155
19     E-mail string and Sika product
      information sheets Bates labeled
20     URS 37252 through 37267
21   Exhibit 26 .............................161
      E-mail and Change Proposal Request
22     documents Bates labeled URS 79314
      through 79323

23

24

25

NON-CERTIFIED COPY

6

EXHIBITS CONTINUED:                    PAGE

Exhibit 27 ..............................164
    Department of Public Works
    Concrete Pavement Details

Exhibit 28 ..............................165
    Department of Transportation
    Concrete Pavement Details

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

NON-CERTIFIED COPY

7

1                S-T-I-P-U-L-A-T-I-O-N

2

3            It is stipulated and agreed by and between

4   counsel for the parties hereto that the deposition

5   of the aforementioned witness is hereby being taken

6   under the Louisiana Code of Civil Procedure, Article

7   1421, et seq., for all purposes, in accordance with

8   law;

9            That the formalities of reading and

10  signing are specifically not waived;

11           That the formalities of filing, sealing,

12  and certification are specifically waived;

13           That all objections, save those as to the

14  form of the question and the responsiveness of the

15  answer, are hereby reserved until such time as this

16  deposition, or any part thereof, may be used or

17  sought to be used in evidence.

18

19            *      *      *      *

20

21           Deanna Mancuso, Certified Court Reporter,

22  in and for the State of Louisiana, officiated in

23  administering the oath to the witness.

24

25

NON-CERTIFIED COPY

78

1      Q.    Do you know when Neal Johnson left URS?

2      A.    Left URS?  It was after I left.

3      Q.    Do you know where he went?

4      A.    I do not.  I mean, I say that.  He went on

5    his own as far as, I mean, what he's told me when he

6    left.  I don't know if he's gone anywhere else.

7      Q.    Under Project Discussion it says, "The

8    geotechnical report was discussed.  Thomas stated

9    that URS is currently developing a request for

10   proposals to be released to three geotechnical

11   engineers in the next week."

12          Did you participate in developing the RFP

13   to issue for the geotech report?

14     A.    I don't recall.

15     Q.    Would you typically participate in that?

16     A.    Yes.

17     Q.    I'm going to show you a document I'm going

18   to mark as Gaines 5.

19          (Exhibit 5 was marked for

20          identification.)

21   EXAMINATION BY MS. MINCE:

22     Q.    These are meeting minutes from December 16,

23   2010, so just about a week following the kick-off

24   meeting we looked at in Gaines 5.  Do you see that?

25     A.    Yes.

NON-CERTIFIED COPY

# Site Meeting Minutes



| | |
|---|---|
| Date/Time: | December 16, 2010 at 9:00am. |
| From: | Thomas Ryan |
| Project: | H&E Equipment Rental and Service Facility Renovation and Addition |
| | Kenner, Louisiana |
| URS Project Number: | 19229626 |

| Attendees: | | | |
|---|---|---|---|
| | Frankie Wynn | H&E | fwynn@he-equipment.com |
| | James Brown | H&E | |
| | Craig Duos, PE | SE | craigduos@gmail.com |
| | Bill Temple, PE | SE | btemple100@gmail.com |
| | Fletcher Luke, PE | TLA | fletcherl@tlaengineering.com |
| | Thomas Ryan | URS | thomas_e_ryan@urscorp.com |

Purpose of Meeting:    To review existing conditions.

This meeting was held at the H&E facility in Kenner, La to review and evaluate the existing site, building and equipment conditions. The meeting began with a discussion of the site plan and phasing portions of the project and Craig Duos locating on the site where the geotech borings should be. The group walked through the parts building and discussed the existing structure and elements that will need to be analyzed to ensure rigidity once added onto. Thomas inspected the existing wall construction in order to plan the best wall/roof system to use for the new structures and draw the existing plan and demo correctly.

The group then walked through the service building and discussed the existing and planned elements of this building. Craig Duos asked for the specifications for the overhead cranes that are to be extended and the weights of the equipment to be brought into the building for servicing, both of which were given to him before the meeting was over. The existing heating system in the metal buildings was discussed and it was decided to use the same type of gas fired heating units as existing in the new bays to be installed at the service building. Frankie requested an emergency shower/eye wash station be installed in the service building work area. It was determined the best location is to be near the restrooms.

The location of the temporary office trailers was discussed while on the site. James discussed the need for the trailer to be located near each building during renovation due to supervision needs. General locations were selected and everyone agreed this will need further thought as well as contractor input.

Meeting was adjourned.



Gaines
EXHIBIT NO. 5
HUFFMAN & ROBINSON, INC.
COURT REPORTERS

NON-CERTIFIED COPY

URS 038508

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *  *
                         *
H&E EQUIPMENT SERVICES   *
                         * NUMBER 626,308
VERSUS                   *
                         * DIVISION "D"
URS CORPORATION          *
ARCHITECTURE, P.C., URS  *
CORPORATION, L O'NEAL    *
JOHNSON AND THOMAS E.    *
RYAN, III                *
                         *
*  *  *  *  *  *  *  *  *
```

1442 Deposition of MAPP

CONSTRUCTION, LLC, through its Representative,

BRADLEY REESE, taken on Thursday, August 11,

2016, commencing at 9:05 a.m., in the offices of

Adams and Reese, LLP, Attorneys at Law, 450

Laurel Street, Suite 1900, Baton Rouge,

Louisiana, 70801.

EXHIBIT

14

NON-CERTIFIED COPY

1            I N D E X

2

3                                    Page

4

  Caption                              1
5  Index of Exhibits                   3
  Appearances                         10
6  Agreement of Counsel               11

7  Examination

8    PHILIP A. FRANCO, ESQ.           12
    ALYSSON L. MILLS, ESQ.           156
9    PHILIP A. FRANCO, ESQ.          151
    ERIC A. KRACHT, ESQ             170
10    PHILIP A. FRANCO, ESQ.          170

11          *   *   *   *   *

12

  Reporter's Page                    174
13  Certificate                        175

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 3

1                    INDEX OF EXHIBITS

2

3    Number                                    Page

4    1  October 24, 2011 Email from          19
        Brad Reese to Thomas Ryan
5        re: Updated schedule with
         MAPP Phasing Plan
6        URS 072811-072814

7    2  November 28, 2011 Email string       22
        from Thomas Ryan to Brad
8        Reese, et al re: Concrete
         Mix Civil Approval
9        URS 085359-085381

10   3  December 16, 2011 Email string       25
        from Ottis Seaborn to Daily
11       Update, et al
         URS 033427

12

13   4  December 19, 2011 Email string       26
        from Brad Reese to Neal
         Johnson, et al
14       H&E 0007555-0007557

15   5  December 21, 2011 Email string       28
        from Tim Gaines to Thomas
16       Ryan, et al
         URS 03718-03719

17

18   6  January 4, 2012 Email from           29
        Ottis Seaborn to Daily Update,
         et al
19       URS 033508

20   7  February 8, 2012 Email string        32
        from Brad Reese to Thomas
21       Ryan, et al
         URS 045108-045112

22

23   8  January 7, 2012 Email from           35
        Ottis Seaborn to Daily
         Update, et al
24       URS 033536

25

NON-CERTIFIED COPY

Page 4

1   (Cont.)      INDEX OF EXHIBITS

2

3    Number                                    Page

4    9   January 12, 2012 Email string      36
         from Thomas Ryan to Brad
5        Reese, et al
         URS 085753-085765
6
    10   January 16, 2012 Email from        40
7        Ottis Seaborn to Daily
         Update, et al
8        H&E 0062636

9   11   January 18, 2012 Email string      42
         from Frankie Wynn to John
10       Jones
         H&E 0012783-0012784
11
    12   January 23, 2012 Email string      45
12       from Thomas Ryan to Brad
         Reese, et al
13       H&E 0062999-006300

14  13   January 27, 2012 Email string      47
         from Neal Johnson to James
15       Brown, et al
         URS 033683-033691
16
    14   January 31, 2012 Email from        48
17       D. Thomas with Terracon
         to Thomas Ryan, et al
18       URS 033764-033766

19  15   February 2, 2012 Email from        49
         D. Thomas with Terracon
20       to Thomas Ryan, et al
         URS 033791-033794
21
    16   February 2, 2012 Email string      52
22       from Tim Gaines to Thomas
         Ryan, et al
23       URS 036099-036102

24

25

NON-CERTIFIED COPY

1  (Cont.)       INDEX OF EXHIBITS

2

3    Number                              Page

4    17  February 2, 2012 Email string     56
         from Brad Reese to Thomas
5        Ryan, et al
         H&E 0013163-0013164
6                    And attaching
         February 2, 2012 Email string
7        from D. Thomas, Terracon to
         Thomas Ryan, et al attaching
8        Concrete Compressive Strength
         Test Report
9        URS 033800-33805

10   18  February 2, 2012 Email string     58
         from Thomas Ryan to D. Thomas
11       Terracon, et al
         H&E 0013161-0013162

12

13   19  February 4, 2012 Email from       60
         Ottis Seaborn to Daily Update,
14       et al
         H&E 0004205

15   20  February 10, 2012 Email from      62
         Ottis Seaborn to Neal Johnson,
16       et al
         URS 074033-074034

17

18   21  February 24 2012 Email string     64
         from Neal Johnson to Tim
19       Gaines, et al
         URS 037392-037394

20   22  URS Project Observation Report    65
         March 20, 2012 Kenner
21       URS 034337-034346

22   23  March 23, 2012 Email from Neal     72
         to Neal Johnson, et al
23       H&E 0064487

24

25

NON-CERTIFIED COPY

Page 6

1   (Cont.)      INDEX OF EXHIBITS

2

3    Number                          Page

4

    24  April 2, 2012 Email from Ottis     76
5        Seaborn to Daily Update,
         et al
6        H&E 0048141

7    25  May 17, 2012 Email string from    80
         Ottis Seaborn to Frankie
8        Wynn
         H&E 0049112-0049116

9

    26  May 30, 2012 Email from D.        83
10       Thomas Terracon to Thomas
         Ryan, et al attaching
11       Concrete Compressive
         Strength Test Report
12       URS 034949-034956

13   27  May 31, 2012 Email from          88
         Ottis Seaborn to Daily
14       Update, et al
         H&E 0049557

15

    28  July 17, 2012 Email from Brad     90
16       Reese to Thomas Ryan, et al
         July 17, 2012 OAC Meeting
17       Minutes
         H&E 0008161-0008173

18

    29  August 10, 2012 Email string      91
19       from Tim Gaines to Ottis
         Seaborn
20       URS 037217-037218

21   30  August 25, 2012 Email from Ottis  91
         Seaborn to Daily Update,
22       et al
         URS 03579

23

24

25

NON-CERTIFIED COPY

1   (Cont.)        INDEX OF EXHIBITS

2

3    Number                                    Page

4    31  September 17, 2012 Email          96
         from Brad Reese to Neal
5           Johnson, et al
            URS 048217-048218
6
     32  September 19, 2012 Email from      99
7           Ottis Seaborn to Daily Update,
            et al
8           URS 03521

9    33  September 21, 2012 Meeting        104
            Minutes
10          URS 048304-048306

11   34  October 3, 2012 Email string      106
            from Ottis Seaborn to Frankie
12          Wynn, et al
            URS 048575-048576
13
     35  October 4, 2012 Email string      108
14          from Ottis Seaborn to
            Frankie Wynn, et al
15          H&E 0016465-0016466

16   36  October 16, 2012 Email from       112
            Ottis Seaborn to Neal Johnson,
17          et al re: Punch list
            H&E 0017109-7717165
18
     37  March 4, 2013 Email string        116
19          from Frankie Wynn to Brad
            Reese, et al
20          URS 054170-054174

21   38  MAPP Change Proposal Request      118
            March 12, 2013
22          URS 077527-077535

23   39  March 15, 2013 Email string       119
            from Brad Reese to Frankie
24          Wynn, et al
            H&E 0037908-0037922
25

NON-CERTIFIED COPY

1      A.  I couldn't --

2      Q.  It wouldn't show that?

3      A.  It has been a while, so I'm not going to

4  say I'm pretty confident.

5          I mean, if you've got them, I'll look,

6  but I don't -- I don't remember if it had a

7  detail in there or not.

8      Q.  As to where the 4,000 would be used or

9  where the High-Early mixture would be used?

10     A.  Correct.

11     Q.  We will look at those in a little while.

12     A.  Okay.

13     Q.  The next document I'm going to show you

14  is going to be Exhibit 7, URS 45108.

15         This is from you to Thomas Ryan, copying

16  other people.  It is a list of the outstanding

17  items as of 2/8/12.

18         It says, "All items on this list are in

19  need of a response, but I highlighted the ones

20  that are extremely critical for this job."

21         And then later it says, "PS - we still

22  need to confirm a time for the weekly conference

23  call..."

24         Did you have weekly conference calls on

25  this job?

NON-CERTIFIED COPY

1    A.  I don't recall.

2    Q.  If you will turn two pages, at the

3  bottom, Bates stamp 45111, No. 8 on that page

4  says "Does Evans have the following items

5  included in their scope of work?"

6        Who was Evans?

7    A.  They were the equipment contractor for

8  the wash area.

9    Q.  What do you mean by "equipment

10  contractor"?

11    A.  They furnished and installed the wash

12  rack equipment.

13    Q.  Okay.  As a subcontractor to MAPP?

14    A.  No.

15    Q.  Well, on whose behalf were they there?

16    A.  H&E.

17    Q.  H&E hired them directly?

18    A.  I believe so.

19    Q.  And they provided the equipment in the

20  wash rack?

21    A.  Correct.

22    Q.  And it says, "Oil Separator - yes, this

23  is in Evans' scope," meaning Evans was supposed

24  to supply the oil separator, I assume; is that

25  correct?

NON-CERTIFIED COPY

1     A.  Yes.

2     Q.  And then it says, "Sewer Line - tying

3   into the sewer line is in Evans' scope."

4          You wrote that, didn't you?  Look at the

5   Email.

6     A.  Based on this, I believe Thomas Ryan

7   wrote that.

8     Q.  Okay.

9     A.  It says highlighted in red, but --

10    Q.  All right.  But look at the Email that

11  precedes that page.  That is from you to Thomas.

12  It says, "Thomas, I've outlined some items below

13  that we need resolved."

14    A.  Correct.  But above that, it says --

15  from Thomas Ryan, "Below are my comments/notes

16  in red for these outstanding items..."  So I

17  bullet-pointed the items, and then that is

18  Thomas' responses next to each other.

19    Q.  So it is Thomas' response that the

20  "tying into the sewer line is in Evans' scope"?

21    A.  Correct.

22    Q.  Okay.  And the "Oil Separator - yes,

23  this is in Evans' scope," that is Thomas'

24  comment, as well?

25    A.  Correct.

NON-CERTIFIED COPY

1      A.  Correct.

2      Q.  And so we can assume that was work

3  within MAPP's scope of work.  Fair statement?

4      A.  Correct.

5      Q.  But for the Record, you can't tell us

6  the locations of that?

7      A.  Correct.

8      Q.  Let me show you the next exhibit, which

9  will be Exhibit 35.  This is H&E 16465.

10         Let's look at the first Email in that

11  string from Ottis.  It is an update, and it

12  says, "Concrete:  MCC was on site today.  MCC

13  doubled the workers they had breaking the bad

14  section of concrete at the Boxed out area of the

15  drain basin at the Main drive.  Mike White

16  (MCC's PM), said they planned to pour the repair

17  areas and other miscellaneous formed areas

18  tomorrow."

19         Do you recall that there was a boxed out

20  area at the drain basin in the main drive that

21  had to be redone because it was not done

22  properly?

23      A.  I do remember it having to be redone.

24      Q.  That is a big drain that is at the site,

25  right?  It has grating on it?

NON-CERTIFIED COPY

1    so this was to fill that or provide a smooth

2    transition between slabs.

3        Q.  And what was proposed to be used as the

4    fill?

5        A.  Sika 321.

6        Q.  S-I-K-A?

7        A.  Yes.

8        Q.  Had you all used that before?

9        A.  I don't recall specifically.

10       Q.  Was that ultimately done?

11       A.  I don't recall.

12       Q.  All right.  The next document is Exhibit

13   39.  This is H&E 37908.

14           This is an Email from you at the top,

15   dated March 15, 2013.  This to URS and H&E.

16           Who was Patrick Solomon?

17       A.  He was a carpenter for MAPP.

18       Q.  And Casey --

19       A.  Ginder.

20       Q.  -- Ginder?

21       A.  He was a projet engineer for MAPP.

22       Q.  On this job?  I'm wondering why these

23   people were copied.  Why are you copying a

24   carpenter?

25       A.  I don't really -- when was the

NON-CERTIFIED COPY

1     Q.  This was for the expansion joints?

2     A.  Correct.

3     Q.  All right.  Then we have another Email

4  which is going to be Exhibit 48, which is H&E

5  54144.

6          And then you respond to that Email by

7  saying, "Last time I walked the site with

8  Frankie and Johnny, they indicated that they did

9  not want to entertain steel angle because it

10  would not be aesthetically pleasing, plus it

11  would be difficult to manage where you have

12  changes in elevation."

13          Do you see that?

14     A.  Yes.

15     Q.  Is that accurate?  Was that your

16  recollection?

17     A.  Yes.

18     Q.  And Mr. Frankie Wynn was the Frankie you

19  were referring to here, correct?

20     A.  Correct.

21     Q.  And Johnny was Johnny Jones?

22     A.  Correct.

23     Q.  And they were both with you?

24     A.  Correct.

25     Q.  Did they say what they believed was the

NON-CERTIFIED COPY

**From:**      Brad Reese [breese@mappconstruction.com]
**Sent:**      Friday, March 15, 2013 8:51 AM
**To:**        Frankie Wynn; Johnson, Neal; Thomas Ryan (thomas.e.ryan@urs.com)
**Cc:**        Patrick Solomon; Casey Ginder
**Subject:**   52079 - H&E Kenner - RFI #54 & 55 (CJ, EJ Crack Repairs)
**Attachments:**  RFI-54 - EJs at Concrete Paving.pdf; RFI-55 - Transition b-w New & Existing Service
               Warehouse Slab.pdf; pds-cpd-Sikacrete 321 FS-us.pdf; pds-cpd-Sikadur51SL-us.pdf; SIKA
               CRACK FIX.PDF; sikadur 55 SLV.PDF; fs-cpd-Sikacrete321FS-us.pdf

FYI – our subcontractor proposes the following solution to the concrete areas in need of repair:

<u>Control Joint Repairs in Paving</u>
- Remove existing elastomeric sealant
- Clean joints
- Apply Sikadur 51SL to fill joints

<u>Crack Repairs in Paving</u>
- Rout cracks
- Clean cracks
- Apply Sikadur 55SLV to refusal

<u>Building Slab Transition (New Warehouse Slab to Existing Warehouse Slab)</u>
- Chip areas to a depth of +/-2" in depth
- Place Sikadur 321FS

<u>Expansion Joints in Paving</u>
- Chip areas to a depth of +/-2" in depth
- Place Sikadur 321FS

Attached is the product data for each.  Please review and advise if this solution is acceptable.  If so, we can perform a sample and determine which joints/cracks/etc. need the repair so that we can accurately create a formal CPR.

Feel free to contact me with any questions.

Thanks

**Brad Reese, LEED AP BD+C** :: Sr. Project Manager



**MAPP**CONSTRUCTION
MAPPCONSTRUCTION.COM

---

**From:** Brad Reese
**Sent:** Monday, March 04, 2013 10:34 AM
**To:** Frankie Wynn (fwynn@he-equipment.com); Johnson, Neal
**Cc:** Patrick Solomon; Casey Ginder
**Subject:** FW: 52079 - H&E Kenner - RFI #54 & 55

1

MAPP
EXHIBIT NO. 39
K. DONNELLY

NON-CERTIFIED COPY

H&E 0037908

Frankie/Neal – do you have time this week to review action items for the paving joint repairs. I met with a sub that can perform the work, but would like to sit down with you to review their proposed solutions. I am available any day this week except for today and Wednesday. We can meet at the site or I can drive to Baton Rouge and meet at your office….whichever is more convenient.

Please let me know.

thanks

**Brad Reese, LEED AP BD+C** :: Sr. Project Manager



MAPPCONSTRUCTION.COM

---

**From:** Brad Reese
**Sent:** Wednesday, January 23, 2013 1:03 PM
**To:** Johnson, Neal; Thomas Ryan (thomas.e.ryan@urs.com)
**Cc:** Patrick Solomon; Casey Ginder
**Subject:** FW: 52079 - H&E Kenner - RFI #54 & 55

Neal/Thomas – have you had a chance to review this? I would like to get this work completed quickly to finish up this project for H&E.

thanks

**Brad Reese, LEED AP BD+C** :: Sr. Project Manager



MAPPCONSTRUCTION.COM

---

**From:** Brad Reese
**Sent:** Tuesday, January 15, 2013 12:32 PM
**To:** Johnson, Neal; Thomas Ryan (thomas.e.ryan@urs.com)
**Cc:** Patrick Solomon; Casey Ginder
**Subject:** 52079 - H&E Kenner - RFI #54 & 55

Neal/Thomas – please see the attached RFI's. We spoke to the concrete sub and they would feel more comfortable having something from the Architect of Record on how to make these repairs. Is this something you can handle? If you have a product/procedure in mind, we don't mind meeting with a rep or different sub to make sure the application will work as intended.

Let me know your thoughts.

thanks

2

NON-CERTIFIED COPY

**Brad Reese, LEED AP BD+C** :: Sr. Project Manager

504 234 9200 W I R E L E S S

**MAPP**CONSTRUCTION



601 POYDRAS ST., STE. 1715 :: NEW ORLEANS
P 504 833 6277 ::  F 504 833 6074

M A P P C O N S T R U C T I O N . C O M

3

NON-CERTIFIED COPY

H&E 0037910



**MAPP**
CONSTRUCTION, LLC

601 Poydras Street, Suite 1715
New Orleans, LA, 70130
504.833.6277
504.833.6074

RFI#    54

# *REQUEST FOR INFORMATION*
## H and E Equipment Services - Kenner
## MAPP Job 52079-

| | | | |
|---|---|---|---|
| Date | 01/15/2013 | Drawing Ref.: | |
| Attn: | **Thomas Ryan** | Spec. Sect. Ref.: | |
| Company: | **URS Corporation** | From: | **Brad Reese** |
| Fax: | 225.922.5866 | | |

Subject    *Expansion Joints at Concrete Paving*

**Question/Request:**                    **Response Required By:  01/18/2013**

As discussed in previous OAC meetings onsite, the expansion joints in the concrete paving appear to be failing because of regular wear and debris around the lot.  Please confirm the acceptable material and methods to use for making these repairs.

**Suggestion:**

Signed:_____

**Brad Reese**

**Response Received:**

Signed:_____

**URS Corporation**

<u>Notes:</u>

<u>CC:</u>

NON-CERTIFIED COPY

H&E 0037911



**MAPP**
CONSTRUCTION, LLC

RFI# ___55___

601 Poydras Street, Suite 1715
New Orleans, LA, 70130
504.833.5277
504.833.5374

## REQUEST FOR INFORMATION
### H and E Equipment Services - Kenner
### MAPP Job 52079-

| | | | |
|---|---|---|---|
| Date: | 01/15/2013 | | |
| Attn: | **Thomas Ryan** | Drawing Ref.: | |
| Company: | **URS Corporation** | Spec. Sect. Ref.: | |
| Fax: | 225.922.5866 | From: | **Brad Reese** |

Subject    *Slab Transition b/w New & Existing Service Slabs*

**Question/Request:**                    **Response Required By:  *01/18/2013***

As discussed in previous OAC meetings onsite, the height of the existing Service Warehouse slab is lower than the height of the new Service Warehouse slab. We mentioned possibly using a material to provide a smooth slope. Please review and advise on the preferred methods and material.

**Suggestion:**

Signed:_____

**Brad Reese**

**Response Received:**

Signed:_____

**URS Corporation**

<u>Notes:</u>

<u>CC:</u>

NON-CERTIFIED COPY

H&E 0037912

**Product Data Sheet**
Edition 6.22.11
Sikacrete 321 FS

# Sikacrete® 321 FS

One-component, cementitious,
pourable, rapid hardening concrete mix

| | |
|---|---|
| **Description** | Sikacrete 321 FS is a one-component, portland-cement concrete containing factory blended coarse aggregate designed for quick turnaround patching and overlay needs. |
| **Where to Use** | • As a structural repair material for bridges, parking facilities, industrial plants and walkways<br>• On horizontal, vertical and overhead surfaces (formed)<br>• On grade, above, and below grade on concrete<br>• Full depth repairs<br>• Filler for voids and cavities |
| **Advantages** | • Complies with ASTM C-928 specifications for very rapid and rapid hardening mortars<br>• Very rapid setting structures can be opened to vehicular traffic in 2 hours<br>• Non-gypsum based with volume stability<br>• Compatible with coefficient of thermal expansion of concrete<br>• Increased resistance to deicing salts<br>• Easily applied to clean, sound substrate<br>• Not a vapor barrier<br>• Excellent resistance to freeze/thaw with outstanding durability<br>• Pre-packaged coarse aggregate: Eliminates need to extend material in the field; Eliminates the risk of reactive aggregate<br>• Formulated to compensate for shrinkage |
| **Coverage** | Approximately 0.50 ft.³/unit. Actual yield on site may vary due to surface profile, waste, and other factors. |
| **Packaging** | 65 lb. multi-wall bag; bulk bag available on request |

### Typical Data *(Material and curing conditions @ 73°F (23°C) and 50% R.H.)*

RESULTS MAY DIFFER BASED UPON STATISTICAL VARIATIONS DEPENDING UPON MIXING METHODS AND EQUIPMENT, TEMPERATURE, APPLICATION METHODS, TEST METHODS, ACTUAL SITE CONDITIONS AND CURING CONDITIONS.

| | | |
|---|---|---|
| Shelf Life | 9 months in original, unopened packaging. | |
| Storage Conditions | Store dry at 40°-95°F (4°-35°C). Condition material to 65°-75°F before using. | |
| Mixing Ratio | Mix with clean potable water at rate of up to 5 pints per bag. | |
| Application Time | Approximately 30 minutes | |
| | Initial Slump 7-9" | |
| | Slump at 15 minutes >5-7" | |
| Initial Set | 40-50 minutes | |
| Final Set | 50-60 minutes | |
| Flexural Strength (ASTM C-78) | 28 days | 700 psi (5.0 MPa) |
| Splitting Tensile Strength (ASTM C-496) | 1 day | 400 psi (2.8 MPa) |
| | 7 days | 600 psi (4.1 MPa) |
| Bond Strength* (ASTM C-882 modified) | 1 day | 2,500 psi (17.2 MPa) |
| | 7 days | 3,000 psi (20.7 MPa) |
| Direct Tensile Bond (ACI 503) | 7 days | >250 psi |
| Compressive Strength (ASTM C-39) | 2 hour | 2,500 psi (17.2 MPa) |
| | 3 hour | 3,000 psi (20.7 MPa) |
| | 1 day | 5,000 psi (34.5 MPa) |
| | 7 days | 6,000 psi (41.4 MPa) |
| | 28 days | 7,500 psi (51.7 MPa) |
| Shrinkage (ASTM C-157) | | <0.06% |
| Freeze Thaw Factor (ASTM C-666) | 300 cycles | >90% |
| Chloride ion permeability (ASTM C-1202) | 28 days | <1,500 Coloumbs |

* Mortar scrubbed into substrate.



NON-CERTIFIED COPY

H&E 0037913

## How to Use

**Surface Preparation  Concrete:** Remove all deteriorated concrete, dirt, oil, grease, and all bond-inhibiting materials from surface. Be sure repair area is not less than 1 inch in depth. Preparation work should be done by high pressure water blast, scabbler, or other appropriate mechanical means to obtain an exposed aggregate surface with a minimum surface profile of ±1/8 in. (CSP-7). Saturate surface with clean water. Substrate should be saturated surface dry (SSD) with no standing water during application.

**Reinforcing Steel:** Steel reinforcement should be thoroughly prepared by mechanical cleaning to remove all traces of rust. Where corrosion has occurred due to the presence of chlorides, the steel should be high-pressure washed with clean water after mechanical cleaning.

| | |
|---|---|
| **Mixing** | Place 5 pints of water in mixing container. Slowly add Sikacrete 321 FS while continuing to mix. Mix to a uniform consistency, maximum 3 minutes. Mechanically mix with a low-speed drill (400-600 rpm) and paddle or in appropriate-size mortar mixer or concrete mixer. Some mixers will take longer than others to achieve the desired slump. |
| **Application & Finish** | Form and pour applications: Pre-wet surface to SSD. Ensure good, intimate contact with the substrate is achieved. To accomplish this, material should be scrubbed into the substrate or other suitable means should be employed such as vibration of the material. Vibrate form while pouring. Finish as desired. |
| **Curing** | As per ACI recommendations for portland cement concrete, curing is required. Moist cure with wet burlap and polyethylene, or fine mist of water or a water based* compatible curing compound. Curing compounds adversely affect the adhesion of following layers of mortar, leveling mortar or protective coatings. Moist curing should commence immediately after finishing. Protect newly applied material from direct sunlight, wind, rain and frost.<br>*Pretesting of curing compound is recommended. |
| **Limitations** | ■ Application thickness: Minimum 1 in. (25 mm); Maximum 8 in. (200 mm)<br>■ Minimum ambient and surface temperatures 40°F (4°C) and rising at time of application.<br>■ Elevated temperatures will decrease working time and slump.<br>■ Rate of strength gain will be reduced at colder temperatures. Onsite testing is recommended.<br>■ Bonding agents like Armatec 110 and others, which cure at a slower rate than 321 FS, should not be used. If bonding agents are used, follow cure times for the bonding agents used as a guide prior to putting Sikacrete 321 FS in service. Assure suitability with the manufacturer of the bonding agent. |

## Caution

| | |
|---|---|
| **Warning** | WARNING: CORROSIVE, IRRITANT. Avoid direct contact. Contains Silica Quartz (CAS: 14808-60-7) and Portland Cement (CAS: 65997-15-1). Corrosive to eyes/skin. Causes burns to eyes/skin. Harmful if swallowed. May cause burns to mouth, throat, and stomach. Irritating to respiratory system. |
| **Handling & Storage** | Avoid direct contact. Wear personal protective equipment (chemical resistant goggles/gloves/clothing) to prevent direct contact with skin and eyes. Avoid breathing vapors. Use only in well ventilated areas. Open doors and windows during use. Use a properly fitted NIOSH respirator if ventilation is poor. Wash thoroughly with soap and water after use. Remove contaminated clothing and launder before reuse. |
| **First Aid** | **Eyes** – Hold eyelids apart and flush thoroughly with water for 15 minutes. **Skin** – Remove contaminated clothing. Wash skin thoroughly for 15 minutes with soap and water. **Inhalation** – Remove to fresh air. **Ingestion** – Do not induce vomiting. Dilute with water. Contact physician. **In all cases, contact a physician immediately if symptoms persist.** |
| **Clean Up** | Avoid contact. Wear chemical resistant clothing/gloves/goggles. In absence of adequate ventilation, use a properly fitted NIOSH respirator. In case of spill, ventilate area and contain spill. Collect with absorbent material. Dispose of in accordance with current, applicable local, state, and federal regulations. |

KEEP CONTAINER TIGHTLY CLOSED • KEEP OUT OF REACH OF CHILDREN • NOT FOR INTERNAL CONSUMPTION • FOR INDUSTRIAL USE ONLY
All information provided by Sika Corporation ("Sika") concerning Sika products, including but not limited to, any recommendations and advice relating to the application and use of Sika products, is given in good faith based on Sika's current experience and knowledge of its products when properly stored, handled and applied under normal conditions in accordance with Sika's instructions. In practice, the differences in materials, substrates, storage and handling conditions, actual site conditions and other factors outside of Sika's control are such that Sika assumes no liability for the provision of such information, advice, recommendations or instructions related to its products, nor shall any legal relationship be created by or arise from the provision of such information, advice, recommendations or instructions related to its products. The user of the Sika product(s) must test the product(s) for suitability for the intended application and purpose before proceeding with the full application of the product(s). Sika reserves the right to change the properties of its products without notice. All sales of Sika product(s) are subject to its current terms and conditions of sale which are available at www.sikausa.com or by calling 800-933-7452.

Prior to each use of any Sika product, the user must always read and follow the warnings and instructions on the product's most current Technical Data Sheet, product label and Material Safety Data Sheet which are available online at www.sikausa.com or by calling Sika's Technical Service Department at 800-933-7452. Nothing contained in any Sika materials relieves the user of the obligation to read and follow the warnings and instruction for each Sika product as set forth in the current Technical Data Sheet, product label and Material Safety Data Sheet prior to product use.

LIMITED WARRANTY: Sika warrants this product for one year from date of installation to be free from manufacturing defects and to meet the technical properties on the current Technical Data Sheet if used as directed within shelf life. User determines suitability of product for intended use and assumes all risks. Buyer's sole remedy shall be limited to the purchase price or replacement of product exclusive of labor or cost of labor. NO OTHER WARRANTIES EXPRESS OR IMPLIED SHALL APPLY INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SIKA SHALL NOT BE LIABLE UNDER ANY LEGAL THEORY FOR SPECIAL OR CONSEQUENTIAL DAMAGES. SIKA SHALL NOT BE RESPONSIBLE FOR THE USE OF THIS PRODUCT IN A MANNER TO INFRINGE ON ANY PATENT OR ANY OTHER INTELLECTUAL PROPERTY RIGHTS HELD BY OTHERS.

Visit our website at www.sikausa.com                                                                    1-800-933-SIKA NATIONWIDE
Regional Information and Sales Centers. For the location of your nearest Sika sales office, contact your regional center.

**Sika Corporation**
201 Polito Avenue
Lyndhurst, NJ 07071
Phone: 800-933-7452
Fax: 201-933-6225

**Sika Canada Inc.**
601 Delmar Avenue
Pointe Claire
Quebec H9R 4A9
Phone: 514-697-2610
Fax: 514-694-2792

**Sika Mexicana S.A. de C.V.**
Carretera Libre Celaya Km. 8.5
Fracc. Industrial Balvanera
Corregidora, Queretaro
C.P. 76920
Phone: 52 442 2385800
Fax: 52 442 2250537

 

Sika and Sikacrete are registered trademarks. Printed in Canada

NON-CERTIFIED COPY

H&E 0037914

Product Data Sheet
Edition 5.5.2011
Sikadur 51 SL

# Sikadur 51 SL
## Flexible epoxy control joint resin

| | |
|---|---|
| **Description** | Sikadur 51 SL is a 2-component, self-leveling 100% solids, flexible, control joint resin sealer and adhesive. |
| **Where to Use** | ■ Use to fill horizontal, non-moving, saw cut construction control joints and cracks.<br>■ Use as a flexible adhesive. |
| **Advantages** | ■ Remains flexible. Does not age-harden.<br>■ Prevents deterioration of joint edges.<br>■ Excellent adhesive properties.<br>■ Conforms to ACI 302.1R (4.10-Joint Materials).<br>■ Ideal for use with plural injection type systems.<br>■ Can be used on grades up to 15%.<br>■ Shock absorbent and durable. Withstands wheel traffic and heavy loads.<br>■ Use as a security sealant. |
| **Coverage** | 1 gal. will yield 231 cu. in. or will fill 100 lin. ft. of 1/8 in. x 1.5 in. deep joint. |
| **Packaging** | 4 gallon units |

## How to Use

| | |
|---|---|
| **Surface Preparation** | Substrate must be clean and sound. It may be dry or damp, but free of standing water. Remove dust, laitance, grease, curing compounds, bond inhibiting impregnations, waxes and any other contaminants.<br>**Concrete** - Should be cleaned and prepared to achieve a laitance and contaminant free, open textured surface by blast cleaning or equivalent mechanical means. |
| **Mixing** | **Pre-mix each component.** Proportion equal parts by volume of Component 'A' and Component 'B' into clean pail. Mix thoroughly for 3 minutes with a low-speed (400-600 rpm) drill using a Sika paddle until uniform in color. Mix only that quantity that can be applied within its pot life. |

### Typical Data (*Material and curing conditions @ 73°F (23°C) and 50% R.H.*)

RESULTS MAY DIFFER BASED UPON STATISTICAL VARIATIONS DEPENDING UPON MIXING METHODS AND EQUIPMENT, TEMPERATURE, APPLICATION METHODS, TEST METHODS, ACTUAL SITE CONDITIONS AND CURING CONDITIONS.

| | |
|---|---|
| Shelf Life | 2 years in original, unopened containers |
| Storage Conditions | Store dry at 40°-95°F (4°-35°C). Condition material to 65°-75° F (18°-24°C) before using. |
| Color | Concrete Gray |
| Mixing Ratio | Component 'A' : Component 'B' = 1:1 by volume. |
| Viscosity | Comp. 'A'    5,800 cps (5,800)<br>Comp. 'B'    7,900 cps (7,900)<br>Mixed        7,000 cps (7,000) |
| Pot Life | 20-25 minutes, 1 gallon (3.8 liter)<br>40 minutes, 8 fl. oz. (250 ml) |
| Tack-Free Time | 7-8 hours |

Tensile Properties (ASTM D-638)

| 14 days | | |
|---|---|---|
| Tensile Strength | 570 psi (3.9 MPa) | |
| Elongation at Break | 90% | |
| Modulus of Elasticity | 2,800 psi (19.3 MPa) | |
| Tensile stress at % elongation | 2.5% | 70 psi (0.48 MPa) |
| | 5% | 110 psi (0.75 MPa) |
| | 10% | 160 psi (1.10 MPa) |

| | | |
|---|---|---|
| Tear Resistance (ASTM D-624) 14 days | 170 lb./in. (29.8 N/mm) | |
| Hardness (ASTM D-2240) 28 days | Hardness (Shore D) | 50-55 |
| Water Absorption (ASTM D-570) | 7 days (24 hour immersion) | 1.86% |



NON-CERTIFIED COPY

H&E 0037915

| | |
|---|---|
| **Application** | Pour the mixed Sikadur 51 SL into the prepared joint or use low-pressure extrusion equipment. Allow the material to flow slowly, settle and self-level filling entire depth. Strike-off level and remove any excess material where required, before it hardens. |
| **Limitations** | ■ Do not thin. Addition of solvents may prevent proper cure.<br>■ Substrate temperature should be 40°F (4°C) minimum and rising.<br>■ For best results, materials should be maintained between 65°-75°F (18°-24°C) during application.<br>■ Do not apply through standing water.<br>■ Minimum age of concrete is 28 days.<br>■ Materials are a vapor barrier after cure.<br>■ Concrete or masonry must be tested for water-vapor transmission prior to application.<br>■ Not designed for use under constant immersion in water or other liquids.<br>■ Do not use in expansion (moving) joints.<br>■ For application in non-moving joints only.<br>■ The ultimate performance of Sikadur 51 SL depends upon many factors, [i.e., proper joint design, thermally stable areas (concrete slab), etc.].<br>■ Sikadur 51 SL should be installed full depth when sealing construction/control joints.<br>■ Material should not be applied earlier than 28 days after new concrete is placed. A 60-90 day cure is recommended.<br>■ Sikadur 51 SL may change color over time, especially when exposed to ultraviolet rays, artificial heaters or intense lighting.<br>■ For applications other than sealing of joints, consult Sika Technical Service prior to use.<br>■ Not an aesthetic product. Color may alter due to variations in lighting and/or UV exposure. |
| **Caution** | **Component 'A' - Sensitizer; Irritant** - Contains epoxy resin, nonyl phenol. Eye irritant. May cause skin/respiratory irritation. Prolonged and/or repeated contact with skin may cause allergic reaction/sensitization. Chronic overexposure to nonyl phenol may cause liver injuries. Harmful if swallowed.<br>**Component 'B' - Corrosive; Sensitizer; Irritant** - Contains amines, nonyl phenol. Contact with eyes and skin may cause severe burns. May cause cornea damage and blindness. May cause severe skin irritation. Prolonged and/or repeated contact with skin may cause allergic reaction/sensitization. Chronic overexposure to nonyl phenol may cause liver injuries. May cause respiratory irritation. Harmful if aspirated into lungs or swallowed.<br>**Intentional misuse by deliberate concentration and inhalation of vapors may be harmful or fatal.** |
| **First Aid** | **Eyes:** Hold eyelids apart and flush thoroughly with water for at least 15 minutes. **Skin:** Remove contaminated clothing. Wash skin thoroughly for 15 minutes with soap and water. **Inhalation:** Remove to fresh air. **Ingestion:** Do not induce vomiting. Contact a physician.<br>**In all cases, contact a physician immediately if symptoms persist.** |
| **Handling and Storage** | Avoid direct contact with eyes and skin. Wear chemical resistant gloves/goggles/clothing. Avoid breathing vapors. Use with adequate general and local ventilation. In the absence of adequate ventilation, use a properly fitted NIOSH respirator. Wash thoroughly after handling product. Remove contaminated clothing and launder before reuse. Store product in closed container in cool, dry, well ventilated place. |
| **Clean Up** | Avoid contact. Uncured material can be removed with soap and water or solvent. Follow solvent manufacturer's instructions for use and warnings. Cured product can only be removed mechanically. Consult a physician if material cures on skin. Wear chemical resistant clothing/gloves/goggles. In the absence of adequate ventilation, use a properly fitted NIOSH respirator. In case of spill, ventilate area. Contain spill, collect with absorbent material and transfer to sealed containers. Dispose of in accordance with current, applicable local, state and federal regulations. |

KEEP CONTAINER TIGHTLY CLOSED · KEEP OUT OF REACH OF CHILDREN · NOT FOR INTERNAL CONSUMPTION · FOR INDUSTRIAL USE ONLY

All information provided by Sika Corporation ("Sika") concerning Sika products, including but not limited to, any recommendations and advice relating to the application and use of Sika products, is given in good faith based on Sika's current experience and knowledge of its products when properly stored, handled and applied under normal conditions in accordance with Sika's instructions. In practice, the differences in materials, substrates, storage and handling conditions, actual site conditions and other factors outside of Sika's control are such that Sika assumes no liability for the provision of such information, advice, recommendations or instructions related to its products, nor shall any legal relationship be created by or arise from the provision of such information, advice, recommendations or instructions related to its products. The user of the Sika product(s) must test the product(s) for suitability for the intended application and purpose before proceeding with the full application of the product(s). Sika reserves the right to change the properties of its products without notice. All sales of Sika product(s) are subject to its current terms and conditions of sale which are available at www.sikausa.com or by calling 800-933-7452.

Prior to each use of any Sika product, the user must always read and follow the warnings and instructions on the product's most current Technical Data Sheet, product label and Material Safety Data Sheet which are available online at www.sikausa.com or by calling Sika's Technical Service Department at 800-933-7452. Nothing contained in any Sika materials relieves the user of the obligation to read and follow the warnings and instruction for each Sika product as set forth in the current Technical Data Sheet, product label and Material Safety Data Sheet prior to product use.

LIMITED WARRANTY: Sika warrants this product for one year from date of installation to be free from manufacturing defects and to meet the technical properties on the current Technical Data Sheet if used as directed within shelf life. User determines suitability of product for intended use and assumes all risks. Buyer's sole remedy shall be limited to the purchase price or replacement of product exclusive of labor or cost of labor. NO OTHER WARRANTIES EXPRESS OR IMPLIED SHALL APPLY INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SIKA SHALL NOT BE LIABLE UNDER ANY LEGAL THEORY FOR SPECIAL OR CONSEQUENTIAL DAMAGES. SIKA SHALL NOT BE RESPONSIBLE FOR THE USE OF THIS PRODUCT IN A MANNER TO INFRINGE ON ANY PATENT OR ANY OTHER INTELLECTUAL PROPERTY RIGHTS HELD BY OTHERS.

Visit our website at www.sikausa.com                                                          1-800-933-SIKA NATIONWIDE
Regional Information and Sales Centers. For the location of your nearest Sika sales office, contact your regional center.

Sika Corporation
201 Polito Avenue
Lyndhurst, NJ 07071
Phone: 800-933-7452
Fax: 201-933-6225

Sika Canada Inc.
601 Delmar Avenue
Pointe Claire
Quebec H9R 4A9
Phone: 514-697-2610
Fax: 514-694-2792

Sika Mexicana S.A. de C.V.
Carretera Libre Celaya Km. 8.5
Fracc. Industrial Balvanera
Corregidora, Queretaro
C.P. 76920
Phone: 52 442 2385800
Fax: 52 442 2250537




Sika and Sikadur are registered trademarks.
Printed in Canada.



NON-CERTIFIED COPY

H&E 0037916

Product Data Sheet
Edition 7.2008
Identification no. 03CF520
Sikadur Crack Fix

# Sikadur® Crack Fix

## Low-viscosity, high-strength epoxy sealing system

| | |
|---|---|
| **Description** | Sikadur Crack Fix is a 2-component, 100% solids, moisture-tolerant, low-viscosity, high-strength, multi-purpose, epoxy resin adhesive. It conforms to the current ASTM C-881 and AASHTO M-235 specifications. |
| **Where to Use** | ■ Gravity-feed of cracks in horizontal concrete and masonry.<br>■ Low pressure injection of cracks in structural concrete, masonry, wood, etc.<br>■ Grouting bolts, dowels, pins, etc. into horizontal concrete surfaces. |
| **Advantages** | ■ Formulation identical to popular, high strength adhesive Sikadur 35, Hi-Mod LV.<br>■ Five times stronger than concrete.<br>■ Convenient easy to use, single tube cartridge - fits standard caulk guns.<br>■ Deep, penetrating and tenacious bonding of cracks in structural concrete.<br>■ No mess - self-mixing. |
| **Coverage** | 1 cartridge yields approximately 10.7-11.0 cu. in. (175-180 ml) of usable epoxy resin. |
| **Packaging** | Carton contains 12 single caulk tube-style cartridges; each cartridge packaged with 2 static mixers and 2 flow restrictors. |

### Typical Data *(Material and curing conditions @ 73°F (23°C) and 50% R.H.)*

| | |
|---|---|
| **Shelf Life** | 2 years in original, unopened containers. |
| **Storage Conditions** | Store dry at 40°-95°F (4°-35°C).<br>Condition material to 60°-75°F (15°-24°C) before using. |
| **Color** | Clear, amber. |
| **Mixing Ratio** | Component A : Component B = 2:1 by volume. |
| **Viscosity (Mixed)** | Approximately 375 cps. |
| **Pot Life** | Approximately 25 minutes. (60 gram mass) |

| **Tack Free Time** | 40°F (4°C)* | 73°F (23°C)* | 90°F (32°C)* |
|---|---|---|---|
| (3-5 mils) | 14-16 hrs. | 3-3.5 hrs. | 1.5-2 hrs. |

**Tensile Properties (ASTM D-638)**

| | | |
|---|---|---|
| 7 day | Tensile Strength | 7,000 psi (48.3 MPa) |
| | Elongation at Break | 6.9% |

**Flexural Properties (ASTM D-790)**

| | | |
|---|---|---|
| 14 day | Flexural Strength (Modulus of Rupture) | 11,000 psi (75.9 MPa) |
| | Tangent Modulus of Elasticity in Bending | $3.1 \times 10^5$ psi (2,139 MPa) |

**Shear Strength (ASTM D-732)**

| | | |
|---|---|---|
| 14 day | Shear Strength | 4,800 psi (33.1 MPa) |

**Heat Deflection Temperature (ASTM D-648)**

| | | |
|---|---|---|
| 7 day | (fiber stress loading = 264 psi (1.8 MPa)) | 121°F (49°C) |

**Bond Strength (ASTM C-882); Hardened concrete to hardened concrete**

| | | | |
|---|---|---|---|
| 2 day | (moist cure) | Bond Strength | 1,300 psi (9.0 MPa) |
| 14 day | (moist cure) | Bond Strength | 1,350 psi (9.3 MPa) |

**Water Absorption (ASTM D-570)**     7 day (24 hour immersion)     0.27%

**Compressive Properties (ASTM D-695)**

**Compressive Strength, psi (MPa)**

| | 40°F (4°C)* | 73°F (23°C)* | 90°F (32°C)* |
|---|---|---|---|
| 4 hour | - | - | - |
| 8 hour | - | 180 (1.2) | 3,200 (22.1) |
| 16 hour | - | 4,500 (31.1) | 6,300 (43.5) |
| 1 day | - | 6,000 (41.4) | 9,100 (62.8) |
| 3 day | 4,000 (27.6) | 9,000 (62.1) | 10,500 (72.5) |
| 7 day | 6,800 (46.9) | 11,000 (75.9) | 10,500 (72.5) |
| 14 day | 10,300 (71.1) | 12,000 (82.8) | 10,500 (72.5) |
| 28 day | 12,400 (85.6) | 13,000 (89.7) | 10,500 (72.5) |

**Compressive Modulus**

| | |
|---|---|
| 7 day | $2.9 \times 10^5$ psi (2,000 MPa) |

*Material cured and tested at the temperatures indicated.



NON-CERTIFIED COPY

## How to Use

**Surface Preparation**  Surface must be clean, dry and sound. Remove dust from crack by brushing or by blowing clean with oil-free compressed air.

**Cartridge Set-Up**  Remove twist-cap and port plug from top of cartridge. Press one of enclosed "flow restrictors" into opening. Insert one of the enclosed static mixers through twist-cap and attach to threading. Insert Sikadur Crack Fix cartridge into good quality caulking gun. Point upward during initial squeeze of gun's trigger to purge any entrapped air. As mixed resin approaches end of mixer, discard rest of initial squeeze and portion of next squeeze to ensure uniform blend of adhesive components.

**Application**  **To gravity feed cracks** - Blow vee-notched crack clean with oil-free compressed air. Dispense Sikadur Crack Fix slowly into vee-notched crack. Continue placement until completely filled. Seal underside of slab prior to filling if cracks reflect through.

**To inject cracks** - Set appropriate injection ports. Seal ports and surface of crack with Sikadur Anchor Fix-3, Sikadur 31, Hi-Mod Gel or Sikadur 33. When the epoxy adhesive seal has cured, inject Sikadur Crack Fix with slow steady pressure. Consult Technical Service for additional information.

**Limitations**
- Minimum substrate and ambient temperature 40°F (4°C). Maximum substrate temperature is 95°F (35°C).
- Minimum age of concrete must be 21-28 days, depending on curing and drying conditions.
- Do not apply over wet, glistening surface.
- Not for injection of cracks subjected to osmotic or hydrostatic pressure during application.
- Do not inject cracks greater than ¼ in. (6 mm) Consult Technical Service at 1-800-933-SIKA.
- Not an aesthetic product. Color may alter due to variations in lighting and/or UV exposure.

**Warning**  **Component 'A' – IRRITANT, SENSITIZER** – Avoid direct contact. Contains modified epoxy resin (CAS 25068-38-6), aromatic hydrocarbon blend (mixture) and Nonyl Phenol (CAS 84852-15-3). May cause eye/skin/respiratory irritations. Prolonged and/or repeated contact with skin may cause allergic reaction/sensitization. Harmful if swallowed. **HMIS Hazard Rating: H-2, F-1, R-0, PPE-C**

**Component 'B' – CORROSIVE, IRRITANT, SENSITIZER** – Avoid direct contact. Contains amines (mixture), aromatic hydrocarbon blend (mixture), Nonyl Phenol (CAS 84852-15-3) and Benzyl Alcohol (CAS 100-51-6). Causes eye/skin/respiratory irritations. Contact with eyes cause irreversible eye damage. Contact with skin causes severe burns. Prolonged and/or repeated contact may cause allergic reaction/sensitization. Harmful if swallowed. **HMIS Hazard Rating: H-3, F-1, R-0, PPE-D**

**Deliberate concentrations of vapors of 'A' and/or 'B' Components for purposes of inhalation are harmful and can be fatal.**

VOC Content ('A' + 'B') = 22 g/L .

**Handling and Storage**  Avoid direct contact with eyes and skin. Wear chemical-resistant clothing/gloves/goggles. Avoid breathing vapors. Use with adequate general and local ventilation. In absence of adequate ventilation, use a properly fitted, NIOSH-approved respirator. Wash thoroughly after handling product. Remove contaminated clothing and launder before reuse.

**First Aid**  **Eyes:** Hold eyelids apart and flush thoroughly with water for 15 minutes. **Skin:** Remove contaminated clothing. Wash skin thoroughly for 15 minutes with soap and water. **Inhalation:** Remove person to fresh air. **Ingestion:** Do not induce vomiting. In all cases, **contact a physician immediately if symptoms persist.**

**Clean Up**  Uncured material can be removed with approved solvent. Follow solvent manufacturer's instructions for use and warnings. Cured material (when Component 'A' combined with Component 'B') can only be removed mechanically. In case of spill, ventilate area and contain spill. Collect with absorbent material. Dispose of in accordance with current, applicable local, state and federal regulations.

KEEP CONTAINER TIGHTLY CLOSED · KEEP OUT OF REACH OF CHILDREN · NOT FOR INTERNAL CONSUMPTION · FOR INDUSTRIAL USE ONLY

All information provided by Sika Corporation ("Sika") concerning Sika products, including but not limited to, any recommendations and advice relating to the application and use of Sika products, is given in good faith based on Sika's current experience and knowledge of its products when properly stored, handled and applied under normal conditions in accordance with Sika's instructions. In practice, the differences in materials, substrates, storage and handling conditions, actual site conditions and other factors outside of Sika's control are such that Sika assumes no liability for the provision of such information, advice, recommendations or instructions related to its products, nor shall any legal relationship be created by or arise from the provision of such information, advice, recommendations or instructions related to its products. The user of the Sika product(s) must test the product(s) for suitability for the intended application and purpose before proceeding with the full application of the product(s). Sika reserves the right to change the properties of its products without notice. All sales of Sika product(s) are subject to its current terms and conditions of sale which are available at www.sikacorp.com or by calling 800-933-7452.

Prior to each use of any Sika product, the user must always read and follow the warnings and instructions on the product's most current Technical Data Sheet, product label and Material Safety Data Sheet which are available online at www.sikaconstruction.com or by calling Sika's Technical Service Department at 800-933-7452. Nothing contained in any Sika materials relieves the user of the obligation to read and follow the warnings and instruction for each Sika product as set forth in the current Technical Data Sheet, product label and Material Safety Data Sheet prior to product use.

LIMITED WARRANTY: Sika warrants this product for one year from date of installation to be free from manufacturing defects and to meet the technical properties on the current Technical Data Sheet if used as directed within shelf life. User determines suitability of product for intended use and assumes all risks. Buyer's sole remedy shall be limited to the purchase price or replacement of product exclusive of labor or cost of labor. NO OTHER WARRANTIES EXPRESS OR IMPLIED SHALL APPLY INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SIKA SHALL NOT BE LIABLE UNDER ANY LEGAL THEORY FOR SPECIAL OR CONSEQUENTIAL DAMAGES. SIKA SHALL NOT BE RESPONSIBLE FOR THE USE OF THIS PRODUCT IN A MANNER TO INFRINGE ON ANY PATENT OR ANY OTHER INTELLECTUAL PROPERTY RIGHTS HELD BY OTHERS.

Visit our website at **www.sikaconstruction.com**    **1-800-933-SIKA NATIONWIDE**
Regional Information and Sales Centers. For the location of your nearest Sika sales office, contact your regional center.

| Sika Corporation | Sika Canada Inc. | Sika Mexicana S.A. de C.V. |
|---|---|---|
| 201 Polito Avenue | 601 Delmar Avenue | Carretera Libre Celaya Km. 8.5 |
| Lyndhurst, NJ 07071 | Pointe Claire | Fracc. Industrial Balvanera |
| Phone: 800-933-7452 | Quebec H9R 4A9 | Corregidora, Queretaro |
| Fax: 201-933-6225 | Phone: 514-697-2610 | C.P. 76920 |
| | Fax: 514-694-2792 | Phone: 52 442 2385800 |
| | | Fax: 52 442 2250537 |



Sika and Sikadur are registered trademarks.
Made in USA. Printed in Canada.

NON-CERTIFIED COPY

H&E 0037918

Product Data Sheet
Edition 10.2.2009
Identification no. 389-35N
Sikadur 55 SLV

# Sikadur 55 SLV

## Super low-viscosity, moisture-tolerant epoxy resin, crack healer/penetrating sealer

| | |
|---|---|
| **Description** | Sikadur 55 SLV is a 2-component, 100% solids, moisture-tolerant, epoxy crack healer / penetrating sealer, having a fast tack-free time to minimize downtime. It is a super low-viscosity, high-strength adhesive formulated specifically for sealing both dry and damp cracks. It conforms to the current ASTM C-881, Types I and II, Grade-1, Class-C* and AASHTO M-235 specifications. <br> * except for gel time |
| **Where to Use** | ▪ Sikadur 55 SLV structurally repairs cracked concrete. <br> ▪ For interior slabs and exterior above-grade slabs. <br> ▪ For elevated horizontal decks, parking garages and other structures exposed to foot and pneumatic tire traffic. |
| **Advantages** | ▪ Super low viscosity/low surface tension for excellent penetration into cracks. <br> ▪ Penetrates cracks by gravity down to 2 mils (0.002" / 0.05 mm) in width. <br> ▪ Prolongs life of cracked concrete. <br> ▪ Penetrates/seals surface of slabs from water absorption, chloride-ion intrusion, and chemical attack. <br> ▪ **Structurally improves concrete surface.** <br> ▪ Can be open to traffic in 6 hours at 73°F (23°C). <br> ▪ High bond strength, even in damp cracks. <br> ▪ **U.S. Patent No. (pending)** for ultra low viscosity healer/sealer to strengthen cracked concrete. |
| **Coverage** | 1 gal. (3.8 liters) yields 231 cu. in. (3,785 cm³) <br> Typical coverage is 150-175 sq. ft./gal. (3.7-4.3 m²/L) for surface sealing. Coverage varies with porosity and surface profile of substrate. Higher porosity concrete will reduce coverage. For crack healing, follow Application instructions and allow to pond over cracks. |
| **Packaging** | 3 gal. (11.35 l) unit = 'A' = 2 gal. (7.6 l) + 'B' = 1 gal. (3.8 l) |

## Typical Data *[Material and curing conditions @ 73°F (23°C) and 50% R.H.]*

| | |
|---|---|
| **Shelf Life** | 2 years in original, unopened containers |
| **Storage Conditions** | Store dry at 40°-95°F (4°-35°C). Condition material to 65°-75°F (18°-24°C) before using. |
| **Color** | Clear, amber |
| **Mixing Ratio** | Component 'A' : Component 'B' = 2:1 by volume |
| **Viscosity (Mixed)** | Approximately 105 cps |
| **Pot Life** | Approximately 20 minutes |

**Tack-Free Time**

| | 40°F (4°C)* | 60°F (15°C)* | 73°F (23°C)* | 90°F (32°C)* |
|---|---|---|---|---|
| | > 11 hrs. | 11 hrs. | 6 hrs. | 2.5 hrs. |

**Tensile Properties (ASTM D-638)    73°F (23°C)**

| | | |
|---|---|---|
| 7 day | Tensile Strength | 7,100 psi (48.9 MPa) |
| | Elongation at break | 10% |

**Bond Strength (ASTM C-882)**

| | | |
|---|---|---|
| Hardened Concrete to Hardened Concrete | 2 day (moist cure) | 2,500 psi (17.2 MPa) |
| | 14 day (moist cure) | 2,500 psi (17.2 MPa) |
| Hardened Concrete to Steel | 2 day (moist cure) | 1,500 psi (10.3 MPa) |
| | 14 day (moist cure) | 1,800 psi (11.0 MPa) |

**Flexural Properties (ASTM D-790)**

| | | |
|---|---|---|
| 7 day | Flexural Strength | 8,500 psi (58.6 MPa) |
| | Tangent Modulus of Elasticity | 3.2 x 10⁵ psi (2,206 MPa) |

**Shear Strength (ASTM D-732)    7 day**      5,800 psi (40.0 MPa)

**Heat Deflection Temperature (ASTM D-648)  7 day**

(fiber stress loading = 264 psi (1.8 MPa)        110°F (43°C)

**Water Absorption (ASTM D-570)   7 day**   (24 hour immersion)   0.60%

**Compressive Properties (ASTM D-695)**

**Compressive Strength, psi (MPa)**

| | 40°F (4°C)* | 60°F (15°C)* | 73°F (23°C)* | 90°F (32°C)* |
|---|---|---|---|---|
| 1 day | - | 320 (2.2) | 1,100 (7.6) | 4,800 (33.1) |
| 3 day | 2,000 (13.8) | 8,500 (44.8) | 8,300 (57.2) | 8,000 (55.2) |
| 7 day | 7,800 (53.8) | 10,400 (71.7) | 10,900 (75.1) | 8,300 (57.2) |
| 14 day | 9,600 (66.2) | 11,000 (75.8) | 11,800 (81.4) | 10,000 (68.9) |
| 28 day | 11,700 (80.7) | 12,000 (82.7) | 12,000 (82.7) | 10,000 (68.9) |

**Compressive Modulus      7 day      3.0 x 10⁵ psi (2,068 MPa)**

*Material cured and tested at the temperature indicated.



NON-CERTIFIED COPY

H&E 0037919

## How to Use

**Surface Preparation**  Substrate must be clean, sound and free of surface moisture. Remove dust, laitance, grease, oils, curing compounds, waxes, impregnations, foreign particles, coatings and disintegrated materials by mechanical means (i.e. shotblasting, sandblasting, etc.). For best results, substrate should be dry. Surfaces prepared by Low Pressure Water Cleaning or High Pressure Water Jetting methods should be allowed to dry for 24 hrs. minimum [at 73°F (23°C)].

**Mixing**  Mix 1 part Component 'B' to 2 parts Component 'A' by volume into a clean pail. Mix thoroughly for 3 minutes with Sika paddle or jiffy mixer on a low-speed (400-600 rpm) drill until uniformly blended. Mix only that quantity which can be used within its pot life.

**Application**  To gravity feed cracks: Sikadur 55 SLV is applied to horizontal surfaces by flat squeegee or broom. Spread material over area and allow to pond over cracks. Let material penetrate into cracks and substrate. Remove excess epoxy with roller leaving no visible surface film. For cracks greater than 1/8 in. (3 mm) wide, fill crack with oven-dried sand before applying Sikadur 55 SLV. Seal cracks from underside, when accessible, to prevent leakage.

A second treatment may be required on very porous substrates. Apply second treatment before broadcasting

After treatment, wait at least 20 minutes at 73°F (23°C). Cover with broadcast of an oven-dried 20/40 silica sand or similar sand. Distribute evenly over the surface to excess at a rate of 30-40 lbs./100 sq. ft.. Allow to cure 6 hours minimum at 73°F (23°C). Remove any loose sand and open to traffic once epoxy has cured. Consult Sika Technical Service at 1-800-933-SIKA for additional information.

To pressure inject cracks: Use automated injection equipment. Set appropriate injection ports. Seal ports and cracks with Sikadur 31, Hi-Mod Gel, Sikadur Injection Gel or Sikadur AnchorFix-3/4. When the epoxy adhesive has cured, inject Sikadur 55 SLV with steady pressure. Consult Technical Service at 1-800-933-SIKA for additional information.

**Limitations**
- Do not thin. Addition of solvents will prevent proper cure.
- Material is a vapor barrier after cure.
- Do not apply if rain is imminent. Water exposure or humidity will affect surface appearance and may cause surface whitening.
- Not an aesthetic product. Color may alter due to variations in lighting and/or UV exposure.
- Sealed concrete surface may appear blotchy due to differential absorption.
- Allow sufficient time for the substrate to dry after rain or other inclement conditions.
- Application temperature of substrate must be minimum 5°F (3°C) above the dew point.
- Minimum ambient and substrate temperature 40°F (4°C). Maximum application temperature 95°F (35°C).
- Do not inject cracks greater than 1/4 in. (6 mm) Consult Technical Service at 1-800-933-SIKA.
- Minimum age of concrete is 21-28 days, depending on curing and drying conditions.
- Not designed to seal or inject cracks under hydrostatic pressure during application.

**WARNING**  Component 'A' - IRRITANT; SENSITIZER. Avoid direct contact. Contains modified epoxy resin and Diglycidyl Ether of Bisphenol A (CAS 25085-99-8). Causes eye irritation. May cause skin/respiratory irritations. Prolonged and/or repeated contact with skin may cause allergic reaction/sensitization. May be harmful if swallowed. HMIS:H-2, F-1, R-0, PPE-C.
Component 'B' - CORROSIVE, IRRITANT, SENSITIZER. Contains 2,4,6-Tri(Dimethylamino methyl) phenol (90-72-2), Aminos (Mixture) and Benzyl Alcohol (100-51-6). Contact with skin and eyes causes severe burns. Causes eye/skin/respiratory irritation. Prolonged and/or repeated skin contact may cause an allergic reaction/sensitization. Harmful if swallowed. HMIS:H-3, F-1, R-0, PPE-D.
Deliberate concentrations of vapors of 'A' and/or 'B' Components for purposes of inhalation is harmful and can be fatal.

**First Aid**  Eyes: Hold eyelids apart and flush thoroughly with water for 15 minutes. Skin: Remove contaminated clothing. Wash skin thoroughly for 15 minutes with soap and water. Inhalation: Remove person to fresh air. Ingestion: Do not induce vomiting. Contact physician. In all cases, contact a physician immediately if symptoms persist.

**Handling and Storage**  Avoid direct contact with eyes and skin. Wear chemical resistant clothing/gloves/goggles. Avoid breathing vapors. Use with adequate general and local ventilation. If ventilation is poor, use a properly fitted, NIOSH-approved respirator. Wash thoroughly after handling product. Remove contaminated clothing and launder before reuse.

**Clean Up**  In case of spills ventilate area and contain spill. Collect with absorbent material. Ventilate area. Avoid contact. Dispose of in accordance with current, applicable local, state and federal regulations. Uncured material can be removed with approved solvent. Follow solvent manufacturer's instructions for use and warnings. Cured material (when component 'A' combined with Component 'B') can only be removed by mechanical means.

KEEP CONTAINER TIGHTLY CLOSED • KEEP OUT OF REACH OF CHILDREN • NOT FOR INTERNAL CONSUMPTION • FOR INDUSTRIAL USE ONLY
All information provided by Sika Corporation ('Sika') concerning Sika products, including but not limited to, any recommendations and advice relating to the application and use of Sika products, is given in good faith based on Sika's current experience and knowledge of its products when properly stored, handled and applied under normal conditions in accordance with Sika's instructions. In practice, the differences in materials, substrates, storage and handling conditions, actual site conditions and other factors outside of Sika's control are such that Sika assumes no liability for the provision of such information, advice, recommendations or instructions related to its products, nor shall any legal relationship be created by or arise from the provision of such information, advice, recommendations or instructions related to its products. The user of the Sika product(s) must test the product(s) for suitability for the intended application and purpose before proceeding with the full application of the product(s). Sika reserves the right to change the properties of its products without notice. All sales of Sika product(s) are subject to its current terms and conditions of sale which are available at www.sikacorp.com or by calling 800-933-7452.

Prior to each use of any Sika product, the user must always read and follow the warnings and instructions on the product's most current Technical Data Sheet, product label and Material Safety Data Sheet which are available online at www.sikaconstruction.com or by calling Sika's Technical Service Department at 800-933-7452. Nothing contained in any Sika materials relieves the user of the obligation to read and follow the warnings and instruction for each Sika product as set forth in the current Technical Data Sheet, product label and Material Safety Data Sheet prior to product use.

LIMITED WARRANTY: Sika warrants this product for one year from date of installation to be free from manufacturing defects and to meet the technical properties on the current Technical Data Sheet if used as directed within shelf life. User determines suitability of product for intended use and assumes all risks. Buyer's sole remedy shall be limited to the purchase price or replacement of product exclusive of labor or cost of labor. NO OTHER WARRANTIES EXPRESS OR IMPLIED SHALL APPLY INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SIKA SHALL NOT BE LIABLE UNDER ANY LEGAL THEORY FOR SPECIAL OR CONSEQUENTIAL DAMAGES. SIKA SHALL NOT BE RESPONSIBLE FOR THE USE OF THIS PRODUCT IN A MANNER TO INFRINGE ON ANY PATENT OR ANY OTHER INTELLECTUAL PROPERTY RIGHTS HELD BY OTHERS.

Visit our website at www.sikaconstruction.com                    1-800-933-SIKA NATIONWIDE
Regional Information and Sales Centers. For the location of your nearest Sika sales office, contact your regional center.



Sika Corporation
201 Polito Avenue
Lyndhurst, NJ 07071
Phone: 800-933-7452
Fax: 201-933-6225

Sika Canada Inc.
601 Delmar Avenue
Pointe Claire
Quebec H9R 4A9
Phone: 514-697-2610
Fax: 514-694-2792

Sika Mexicana S.A. de C.V.
Carretera Libre Celaya Km. 8.5
Fracc. Industrial Balvanera
Corregidora, Queretaro
C.P. 76920
Phone: 52 442 2385800
Fax: 52 442 2250537

Sika and Sikadur are registered trademarks.
Made in USA. Printed in Canada

NON-CERTIFIED COPY

H&E 0037920

## Product Information



# Sikacrete® 321 FS

One-component, cementitious, pourable,
rapid hardening concrete mix



NON-CERTIFIED COPY

H&E 0037921

# Product Information

## APPLICATIONS

- As a structural repair material for bridges, parking facilities, industrial plants and walkways
- On horizontal, vertical and overhead surfaces (formed)
- On grade, above, and below grade on concrete
- Full depth repairs
- Filler for voids and cavities

## ADVANTAGES

- Complies with ASTM C-928 specifications for very rapid and rapid hardening mortars
- Very rapid setting structures can be opened to vehicular traffic in 2 hours
- Non-gypsum based with volume stability
- Increased resistance to deicing salts
- Excellent resistance to freeze/thaw with outstanding durability
- Pre-packaged coarse aggregate: Eliminates need to extend material in the field; Eliminates the risk of reactive aggregate

## TYPICAL DATA

- **Initial Set**
  40-50 minutes
- **Final Set**
  50-60 minutes
- **Application Time**
  Approximately 30 minutes

  Initial Slump 7-9"

  Slump at 15 minutes >5-7"

- **Flexural Strength (ASTM C-78)** 28 days 700 psi (5.0 MPa)
- **Splitting Tensile Strength (ASTM C-496)**
  1 day  400 psi (2.8 MPa)
  7 days  600 psi (4.1 MPa)
- **Bond Strength* (ASTM C-882 modified)**
  1 day  2,500 psi (17.2 MPa)
  7 days  3,000 psi (20.7 MPa)
- **Direct Tensile Bond (ACI 503)** 7 days >250 psi
- **Compressive Strength (ASTM C-39)**
  2 hour  2,500 psi (17.2 MPa)
  3 hour  3,000 psi (20.7 MPa)
  1 day  5,000 psi (34.5 MPa)
  7 days  6,000 psi (41.4 MPa)
  28 days  7,500 psi (51.7 MPa)
- **Shrinkage (ASTM C-157)**  <0.06%
- **Chloride Ion Permeability (ASTM C-1202)**
  28 days <1,500 Coloumbs
- **Freeze Thaw Resistance (ASTM C-666)**  300 cycles >90%

## Sikacrete® 321 FS






1. Place 5 pints of water in mixing container.

2. Slowly add Sikacrete 321 FS while continuing to mix. Mix to a uniform consistency, maximum 3 minutes.

3. Mechanically mix with a low-speed drill (400-600 rpm) and paddle or in appropriate-size mortar mixer or concrete mixer.

4. Some mixers will take longer than others to achieve the desired slump.

Contact Sika at:
Phone: 1-800-933-SIKA (Nationwide)
Website: www.sikaconstruction.com




**Sika Corporation**
*201 Polito Avenue*
*Lyndhurst, NJ 07071*
*Phone: 201-933-8800*
*Fax: 201-933-6225*

**Sika Canada Inc.**
*601 Delmar Avenue*
*Pointe Claire*
*Quebec H9R 4A9*
*Phone: 514-697-2610*
*Fax: 514-694-2792*

**Sika Mexicana S.A. de C.V.**
*Carretera Libre Celaya Km. 8.5*
*Fracc. Industrial Balvanera*
*Corregidora, Queretaro*
*C.P. 76920*
*Phone: 52 442 2385800*
*Fax: 52 442 2250537*

Sika. One Name. One Source. Worldwide℠

NON-CERTIFIED COPY

H&E 0037922

| | |
|---|---|
| **From:** | Brad Reese [breese@mappconstruction.com] |
| **Sent:** | Wednesday, July 17, 2013 9:35 PM |
| **To:** | Ryan, Thomas E |
| **Subject:** | RE: H&E Kenner CPR #53 |
| **Attachments:** | CPR 53 Epoxy Joint fill Mock-up.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Do you have a preference/detail on material?  Last time I walked the site with Frankie and Johnny, they indicated that they did not want to entertain steel angle because it would not be aesthetically pleasing, plus it would be difficult to manage where you have changes in elevation.

Thanks

BRR

**Brad Reese, LEED AP BD+C** :: Sr. Project Manager


**MAPP**CONSTRUCTION
MAPPCONSTRUCTION.COM

---

**From:** Ryan, Thomas E [mailto:thomas.e.ryan@urs.com]
**Sent:** Tuesday, July 16, 2013 12:57 PM
**To:** Brad Reese
**Subject:** H&E Kenner CPR #53

Brad,
Attached is CPR #53 for the H&E Kenner project signed by Frankie.

He also wants a proposal for a mock-up of the steel plate joint cover as we discussed.

Thank you,



Thomas E. Ryan

7389 Florida Boulevard
Suite 300
Baton Rouge, LA 70806
Office    225.922.5700
Direct   225.922.5759
Cell     225.802.8300

Thomas.e.ryan@urs.com


MAPP
EXHIBIT NO.
K. DONNELLY

1

NON-CERTIFIED COPY

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

2

NON-CERTIFIED COPY

H&E 0054145

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

\* \* \* \* \* \* \* \* \* \*
                          \*
H&E EQUIPMENT SERVICES    \*
                          \* NUMBER 626,308
VERSUS                    \*
                          \* DIVISION "D"
URS CORPORATION           \*
ARCHITECTURE, P.C., URS   \*
CORPORATION, L. O'NEAL    \*
JOHNSON AND THOMAS E. RYAN,\*
III                       \*
                          \*
\* \* \* \* \* \* \* \* \* \*

Article 1442 Deposition of RYAN GOOTEE

GENERAL CONTRACTORS, LLC, through its corporate

representative KEVIN T. SPREHE, taken on

Thursday, August 11, 2016, commencing at 3:05

p.m., in the offices of ADAMS AND REESE, LLP,

Attorneys at Law, 701 Poydras Street, Suite

4500, New Orleans, Louisiana 70139.

EXHIBIT
15

NON-CERTIFIED COPY

1                    I N D E X

2

3                                          Page

4

5    Caption                              1

6    Exhibits                             3

7    Appearances                          5

8    Agreement of Counsel                 6

9

10   Examination

11

12      KELLEN J. MATHEWS                 7

13      LORETTA G. MINCE                  97

14      KELLEN J. MATHEWS                 105

15

16                    *   *   *   *   *

17

18

19   Reporter's Page                      110

20   Certificate                          111

21

22

23

24

25

NON-CERTIFIED COPY

Page 3

1    EXHIBITS:

2        Gootee No. 1                          14
            Amended Notice of 1442 Deposition
3
         Gootee No. 2                          21
4            Schematic

5        Gootee No. 3                          23
            E-mail dated May 6, 2013
6
         Gootee No. 4                          24
7            E-mail dated May 8, 2013

8        Gootee No. 5                          28
            E-mail dated May 28, 2013
9
         Gootee No. 6                          33
10           E-mail dated June 11,2013

11       Gootee No. 7                          40
            E-mail dated June 18, 2013
12
         Gootee No. 8                          42
13           E-mail dated August 13, 2013

14       Gootee No. 9                          52
            E-mail dated June 26, 2013
15
         Gootee No. 10                         54
16           E-mail dated June 27, 2013

17       Gootee No. 11                         55
            E-mail dated June 27, 2013
18
         Gootee No. 12                         57
19           H&E Equipment Services -- Belle Chasse
            Progress Meeting #5 -- Meeting Minutes
20
         Gootee No. 13                         65
21           E-mail dated September 12, 2013

22       Gootee No. 14                         69
            E-mail dated September 13, 2013
23
         Gootee No. 15                         70
24           E-mail dated September 13, 2013

25

NON-CERTIFIED COPY

1   EXHIBITS:  (Continued)

2   Gootee No. 16                        71
      H&E Equipment Services -- Belle Chasse
3     Progress Meeting #11 -- Meeting Minutes

4   Gootee No. 17                        79
      E-mail dated October 8, 2013
5
    Gootee No. 18                        82
6     E-mail dated November 8, 2013

7   Gootee No. 19                        84
      E-mail dated November 11, 2013
8
    Gootee No. 20                        90
9     E-mail dated November 11, 2013

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 5

```
 1   APPEARANCES:

 2      Representing H&E Equipment Services:

 3         FISHMAN HAYGOOD LLP
           Attorneys at Law
 4         201 St. Charles Avenue
           Suite 4600
 5         New Orleans, Louisiana 70170

 6         BY:  LORETTA G. MINCE

 7

 8      Representing URS Corporation Architecture,
        P.C., URS Corporation, L. O'Neal Johnson and
 9      Thomas E. Ryan, III:

10         ADAMS AND REESE, LLP
           Attorneys at Law
11         701 Poydras Street
           Suite 4500
12         New Orleans, Louisiana 70139

13         BY:  KELLEN J. MATHEWS

14

15

16

17

18

19

20

21

22

23   Reported by:
                     KATHRYN L. KOVACEVICH
24                   Certified Court Reporter
                     Registered Professional Reporter
25                   State of Louisiana
```

NON-CERTIFIED COPY

Page 6

1              S T I P U L A T I O N

2

3        It is stipulated and agreed by and between

4   counsel that the Article 1442 Deposition of RYAN

5   GOOTEE GENERAL CONTRACTORS, LLC, through its

6   corporate representative KEVIN T. SPREHE is

7   hereby being taken under the Louisiana Code of

8   Civil Procedure in accordance with the Code.

9        The formalities of reading and signing,

10  sealing and certification are hereby waived.

11  The party responsible for service of the

12  discovery material shall retain the original.

13       All objections are to be made in

14  accordance with the Louisiana Code of Civil

15  Procedure.

16               *   *   *   *   *

17       KATHRYN L. KOVACEVICH, Certified Court

18  Reporter, Registered Professional Reporter, in

19  and for the State of Louisiana, officiated in

20  administering the oath to the witness.

21

22

23

24

25

NON-CERTIFIED COPY

Page 7

1          KEVIN T. SPREHE, 108 HELIOS AVENUE,

2    METAIRIE, LOUISIANA 70005, after having been

3    first duly sworn, testified on his oath as

4    follows:

5    EXAMINATION BY MR. MATHEWS:

6        Q.  Good afternoon, Mr. Sprehe.

7        A.  Good afternoon.

8        Q.  And that's how I pronounce it; right?  I

9    was -- in my head that is not how I was

10   pronouncing it the whole time.

11       A.  Most people get it incorrect.  So yes,

12   that is correct.

13       Q.  Good.  For the record, can you go ahead

14   and state your full name?

15       A.  Kevin Timothy Sprehe.

16       Q.  Mr. Sprehe, what is your address?

17       A.  108 Helios Avenue, Metairie, Louisiana

18   70005.

19       Q.  Mr. Sprehe, where are you employed?

20       A.  Excuse me?

21       Q.  Where do you work?

22       A.  I work for Ryan Gootee General

23   Contractors.

24       Q.  What do you do for Ryan Gootee?

25       A.  I am a project manager.

NON-CERTIFIED COPY

Page 28

1          MR. MATHEWS:

2          This is Exhibit 4, URS 90647.

3    BY MR. MATHEWS:

4     Q.  I'm going to hand you what I'm going to

5    mark as Exhibit 5.  It is H&E 40918.

6          This is an E-mail dated May 28th, 2013

7    from you to Thomas Ryan with URS.  And in this

8    E-mail you state to Thomas you're sending him an

9    RFI.  You said this issue is critical as it

10   affects the work we are currently doing at

11   Buildings K and C.  And request a response by

12   tomorrow.  So, I guess, you don't have to stop

13   your concrete subs from working in these area.

14          And if you turn the page, we've got RFI

15   Number 14.

16          So what are you asking here?

17    A.  I'm just rereading it real quick, so I

18   can recall.

19    Q.  Sure.

20    A.  So prior to pouring any foundations, we

21   require our superintendents on site to verify

22   elevations.  Sometimes we'll actually hire

23   professional surveying company types to actually

24   do that for us.

25          But when we did that, the elevations we

NON-CERTIFIED COPY

1    came up with at Building A did not match what

2    was on the survey provided to us from URS.  And

3    so the difference was -- and it varied I think

4    between -- yeah, on here two-and-a-half to three

5    inches of concrete -- I'm sorry, two-and-a-half

6    to three inches of varying in elevation.

7            So they -- if I'm not mistaken, they

8    responded telling us that we needed to match the

9    final elevation that they had given us.  And I

10   believe in turn we actually ended up sending in

11   a change order for that additional concrete

12   across all of Building A, which was the large

13   building that we mainly worked in.

14       Q.  I know you mentioned that your

15   superintendents on site sometimes took these --

16   they measured the elevations.

17           In this case, do you remember if it was

18   the superintendent or some third party?

19       A.  I don't recall.  I'm pretty sure we had

20   a -- I know we had a professional surveyor on

21   site for portions of the project.  I can't

22   recall if they were -- if they specifically gave

23   us elevations for this.

24       Q.  Do you know what company was this --

25       A.  I think we used Linfield, Hunter and

NON-CERTIFIED COPY

1    Junius to do our surveying.  We use them for

2    probably 90 percent of our surveying.  So I

3    would guess that's who we used.

4        Q.  Do you know who provided the survey?

5            I think you referenced it as URS's

6    survey.  Do you know who provided that survey?

7        A.  I do not.  It would be on the drawings

8    that they provided, though.

9        Q.  I think you mentioned ultimately to

10   address the issue that you raised here, there

11   was an addition of some concrete?

12       A.  Correct.  So, again, I mentioned that

13   they wanted to add concrete -- one of the

14   primary reasons they wanted to add concrete was

15   to eliminate flooding in that building.  Anyway

16   with the elevations that we came up with, they

17   would have potentially still had issues.  So

18   that two-and-a-half to three inches was very

19   important to H&E.

20           So they ended up asking us to send a

21   change order for that additional concrete that

22   had to be provided.

23           So as part of that, we were asking, if

24   we use the elevations that were actually on

25   site, did we need to adjust some of the other

NON-CERTIFIED COPY

Page 31

1    work we were doing outside the building, which

2    is kind of the second half of that RFI.

3          So we could have potentially lowered the

4    elevations of the other work we were doing, but

5    -- and I see there's no response actually on

6    this RFI.  But if I recall, the conclusion was,

7    that would not have solved the problem of water

8    potentially flooding Building A.  So they had to

9    maintain that elevation.  So we actually kept

10   the elevation of those other items up higher

11   than what the drawings had called for.

12        Q.  So ultimately what ended up being

13   installed, was it different from what was in the

14   drawings?

15        A.  So the change what we ended up doing was

16   providing an additional two-and-a-half to three

17   inches of concrete.  Pretty much, if I'm not

18   mistaken, across all of Building A, which was a

19   fairly large building.

20        Q.  Now, had this height of concrete been

21   shown in the original design, this is something

22   that H&E would have had to pay for; correct?

23        A.  If this was something that was shown in

24   the original design, it would have been included

25   within our contract.

NON-CERTIFIED COPY

1    Q.  Do you remember how this item was

2    handled, as far as payment?

3    A.  I can't say for certain.  I'm pretty

4    sure it ended up being a change order with H&E

5    and H&E paid us for that additional work.

6    Q.  And for the jury, which is often going

7    to mean me, can you explain what a change order

8    is?

9    A.  A change order, so if there is something

10   that requires additional cost, that is something

11   that we should not have -- that we would not

12   have known on the original drawings or it may be

13   something that the owner requests, we will send

14   in a change order proposal, which then is

15   reviewed by owners, architects, engineers.  And

16   then they approve it, which then will change it.

17   We'll make it a change order to the contract.

18   Q.  So it somewhat amends the contract to

19   include this work?

20   A.  Yeah.  So we end up doing an AIA

21   Contract Amendment, which would then adjust the

22   contract total cost.

23   Q.  You believe that's what happened in this

24   instance?

25   A.  Yes.  I know we ended up doing a change

NON-CERTIFIED COPY

1      A.  I only vaguely remember this during the

2  project.  Typically, what we'll do -- I mean, we

3  put it in the structural engineer's hands

4  ultimately; and it would be up to him to

5  determine if what's provided will be acceptable.

6          I'm not a concrete expert.  I'm not a

7  structural engineer.  So I certainly can't tell

8  you the ins and outs.  But I know there are a

9  lot of different things that go into it.  I

10  honestly don't recall ever getting anything back

11  after this from the engineer, once the final

12  compressive strengths were provided.

13      Q.  I have some things that are going to

14  speak to that later on.

15      A.  Sure.  That's fine.  I mean, I do

16  remember getting this at one point.

17          Yeah, I don't recall ultimately what

18  came of this in particular.

19      Q.  Do you recall there being a partition

20  that was supposed to go in the Belle Chasse

21  facility's lunch room?

22      A.  Yes.

23      Q.  Do you recall if the partition actually

24  wasn't put in place?

25      A.  It was not put in place.

NON-CERTIFIED COPY

1      Q.  Do you remember what happened there?

2      A.  Not necessarily in detail.  But I do

3  recall going through when we were constructing

4  -- the building itself is -- we either had

5  issues with some elevations or just how it tied

6  into the existing building.  And it ultimately

7  led to a question about installing that

8  partition and how it would work with the design.

9          And there was a beam specifically that

10 had to be provided and installed for that

11 partition to hang on.  Anyway, if I recall, it

12 got to a point where it simply just wasn't going

13 to work.  And we had already installed the steel

14 beam, and I know we ended up giving a credit

15 back to H&E for the partition itself.

16         But at that point, a beam had already

17 been installed that had -- that was installed

18 specifically for that partition that basically

19 was useless.  I mean, it served no purpose.

20     Q.  Which building was that?

21     A.  That would have been the new addition on

22 Building A.  I can show you on the map.  That

23 would have been this little dark-clouded area

24 right (indicating) there is where that was.

25         MR. MATHEWS:

NON-CERTIFIED COPY

1          Just for the record, we're pointing to

2    Gootee 2; and he's pointing to the little

3    dark-shaded area, the front of Building A.

4    BY MR. MATHEWS:

5        Q.  How is the process -- you mentioned that

6    Gootee credited H&E for the partition.

7          How does that process work?

8        A.  So it was part of the original plans and

9    specs, so it was part of the original pricing we

10   provided to them.  When the issue had arisen, we

11   had not yet ordered the partition.  We hadn't

12   needed to at that point in the project.

13         So we were able to get whatever that

14   total cost was for that partition we put in a

15   change order proposal; sent it to H&E and URS

16   for review so that they could say, yes, this

17   looks correct; and they will approve it; and it

18   would become a change order of the project which

19   actually would then reduce our overall cost of

20   the project.

21       Q.  To your knowledge was there anything

22   else -- you mentioned the beam.  I'm guessing,

23   is the beam still there to your knowledge?

24       A.  Absolutely.

25       Q.  Is there anything else relative to the

NON-CERTIFIED COPY

1  installation of that partition system that would

2  still be in place?

3      A.  I mean the framing, any drywall around

4  it, I don't know if it was framing and drywall

5  or if it was an acoustical ceiling.  Without

6  looking at the plans, I couldn't tell you for

7  sure.

8         I don't know if there were columns that

9  supported that beam potentially that may or may

10  not have been necessary.  That would probably be

11  about it.

12      Q.  But the beam is the only thing you

13  remember for certain?

14      A.  The beam for certain.  Again, I'd have

15  to look at the drawings.  I mean, there may have

16  been columns supporting that beam that were

17  specific to that beam.

18      Q.  Did H&E request a credit for the beam as

19  well?

20      A.  Yes.  I remember them asking for it; and

21  at that point, I'm fairly certain it had already

22  been installed.  So we asked them, do you want

23  to pay for us to take it down and they said --

24  I'm pretty sure they said, either leave it in

25  place or -- yeah, I think we left it in place.

NON-CERTIFIED COPY

Page 40

1          THE WITNESS:

2          The option was provided.  I mean, no

3    cost was ever provided.  I'm pretty sure they

4    just said leave it.

5    BY MR. MATHEWS:

6      Q.  I'm going to hand you what's going to be

7    Number 7.  It is H&E 25088.  This is a -- the

8    top of the document is an E-mail from Thomas

9    Ryan to Frankie Wynn and Frank Arthur.  It's

10   dated June 18th of 2013.

11         I just want you to look to the second

12   page of the document?

13     A.  (Witness complying.)

14     Q.  An E-mail from Frank Arthur to Frankie

15   Wynn and John Jones.  And then it says, Frankie,

16   Elevation difference between Building A and

17   modified portion of Building A.  Columns for the

18   new section of Building A are too long.  And

19   then it asks, Do we need to huddle with

20   URS/Gootee.

21         From looking at that document, can you

22   tell me kind of what's going on there?

23     A.  Honestly, no.  I actually don't know.

24     Q.  You were not copied on this.  This was

25   internal H&E.

NON-CERTIFIED COPY

1      A.  I mean, I see that Thomas says he spoke

2   to Kevin at Gootee.  I can honestly say I don't

3   remember what this is about.

4      Q.  Thomas mentions it appears the metal

5   building manufacturer made an eight-inch error

6   in their field measurements.

7           Does that ring a bell?

8      A.  It kind of rings a bell.  I, honestly

9   can't tell you.  I can't remember what this is

10  about.  I feel like I would have to have more

11  documentation.

12          I'm sure if I had more documentation, I

13  could tell you what this is about.  But just

14  looking at this --

15     Q.  That's fine.

16     A.  I honestly can't tell you what this is

17  about.

18     Q.  There's a good possibility that I have

19  more.

20     A.  I mean the only thing I can think of, I

21  remember having an issue where the new metal

22  building -- this is in the same area where that

23  steel beam for the partition was, the way that

24  it matched up to an existing roof, it didn't

25  line up.

NON-CERTIFIED COPY

1  pavement repair estimate -- well, that's a

2  separate issue.

3        And you look at the second document,

4  it's a spreadsheet; and there's the -- what I'm

5  taking to be the Ryan Gootee Contractors' logo?

6    A.  Correct.  Yeah.  This is something that

7  we put together, that we keep in-house

8  internally and give to owners and architects at

9  meetings just as a record of change order

10  proposals and change orders that have been

11  accepted.

12    Q.  Let's go to the ones that are

13  highlighted.  And I'm not sure who applied this

14  highlighting.  I'll say that.

15        The first one I see is Ramp and resteel

16  changes.  It's the second line.

17    A.  Uh-huh.  (Affirmative response.)

18    Q.  Does that -- just the description of the

19  change ring a bell?

20    A.  If I recall -- I'm just looking at these

21  other ones here real quick.  Just so I'm --

22  making sure I'm correct.

23        But if I recall that COP 25, Ramp and

24  resteel changes, there was a ramp that they

25  wanted -- that we wanted to have outside of

NON-CERTIFIED COPY

1    Building A, next to an overhead door.  And the

2    overhead door was a new overhead door; and we

3    asked the question at one point -- there was

4    maybe a 2 foot or 3 foot elevation difference

5    from the outside to that overhead door.  It

6    might look like a typical, you know, delivery

7    area where somebody might pull up to it.

8         Anyway, there was no ramp; and then I

9    know H&E had asked URS at one point about adding

10   that -- a ramp in there.  I don't know any

11   details beyond that.

12        So anyway, the structural engineer gave

13   us further details after that; and we provided

14   costs -- a change order proposal to install the

15   new ramp with the additional resteel to be

16   included in that.

17      Q.  So this was something that would have

18   not been in the initial design plans?

19      A.  It was not in the initial design plans,

20   no.

21      Q.  It was added at the owner's request?

22      A.  Yes.  I'm trying to remember.  I feel

23   like there was more to it than that.  I feel

24   like at one point, there's either a drawing that

25   shows like there was supposed to be a ramp

NON-CERTIFIED COPY

Page 45

1    potentially there; or there was discussion

2    that -- I don't know if H&E had said they

3    requested URS to include one there.

4            But all that being said, there was not

5    one on the drawings or no details for it.  So,

6    yes, H&E had asked us to price it and to include

7    it.

8        Q.  Gootee sent it as a change order

9    proposal?

10       A.  Yes, sir.

11       Q.  Do you recall if this change order

12   proposal was ultimately approved?

13       A.  I believe it was, yes.

14       Q.  I know we kind of talked about it.  You

15   were not sure whether this would have been

16   something that was instructed to be in.  We know

17   it wasn't in the initial plans.

18           Had it been in the initial plans, would

19   this be something that H&E would have had to pay

20   for?

21       A.  If it was in the initial plans, we would

22   have included the cost in our contract, if it

23   had been shown on the plans.

24       Q.  Right there under the Ramp and resteel

25   changes, we see COP 26; and it's the Operable

NON-CERTIFIED COPY

1    Partition credit.

2              Is that the credit that we just

3    discussed?

4        A.  Correct.

5        Q.  Down to the next highlighted one, I have

6    COP 7, RFI Number 10, Building A expansion

7    joint.

8              Do you see that?

9        A.  Yes, sir.

10       Q.  Is that the expansion joint that we

11   talked about earlier?

12       A.  Yes, it is.

13       Q.  Then looking down, another highlighted

14   area, is COP 17, Building A additional concrete?

15       A.  Uh-huh.  (Affirmative response.)  I see

16   that.

17       Q.  Is that the concrete, the additional

18   concrete that we talked about earlier?

19       A.  Yes, sir, it is.

20       Q.  Again, this was something that was

21   submitted as a change order proposal?

22       A.  Yes, it was.

23       Q.  It was ultimately approved?

24       A.  Yes, sir.

25       Q.  Again, is this something that had it

NON-CERTIFIED COPY

1    been in the drawings initially, exactly as it

2    went in, it would have had this additional price

3    tag?

4        A.  I would say if the survey had been

5    accurate, it would have been included, yes.

6        Q.  This one is a little less

7    self-explanatory, COP 18.  ASI Number 13, Room

8    120 and 121 changes.

9            Does that mean anything to you?  Because

10   it's Greek to me.

11       A.  Yes.  So that was a result of the

12   elevation, same elevation issues that were part

13   of COP 17, resulted in elevation issues, which

14   were -- became COP 18.  And so they provided ASI

15   Number 13, just supplemental information to

16   address the elevation difference in Rooms 120

17   and 121, which are also in Building A, which

18   then ultimately ended up adding steps and a

19   handrail, in both of those rooms to accommodate

20   the elevation issues.

21       Q.  Describe for me the steps and the

22   handrails, between two rooms?  How is it --

23       A.  There were two rooms side-by-side

24   separated by a demising wall.  One of those

25   rooms was an electrical room, and the other room

NON-CERTIFIED COPY

Page 48

1   was either going to be a small office or a

2   storage room.

3          And they were part of the same Building

4   A; but again, they were separate rooms.  And

5   instead of putting additional concrete in there,

6   they decided to just add steps, handrails.

7   There may have been a couple other things along

8   with that.  But that was the primary thing that

9   was included.

10     Q.  Was there any consideration of the

11  flooding concern that you mentioned earlier with

12  respect to the slab?

13     A.  I don't know what they decided with

14  those rooms.  Those are on the side -- I don't

15  know north, south, east, west necessarily; but

16  those are the side of the building, I think, the

17  property is sloping away from that area pretty

18  well.  If I'm not mistaken, they weren't as

19  concerned about flooding in that specific area.

20     Q.  All right.  The next one is COP 19,

21  Additional pressure washing.

22          What was going on there?

23     A.  So the plans before we poured the --

24  before we poured the concrete in all of Building

25  A, called for us to broom sweep and clean the

NON-CERTIFIED COPY

1   existing concrete, just for adhesion purposes of

2   concrete to the existing concrete.  The

3   structural engineer came out and said, We also

4   need to pressure wash it.  And so we put a

5   proposal together for pressure washing a very

6   large building and submitted that for review and

7   they decided that, I guess, that needed to be

8   done.

9       Q.  So this is something that, it wasn't in

10  the plans, it was called for by the engineer

11  upon, I guess, viewing the site?

12      A.  Yes.

13      Q.  The next thing is COP 20, Demo of steel

14  plates.

15          What happened there?

16      A.  That also came from the structural

17  engineer, also in Building A.  He came out to

18  the site prior to us starting the work for

19  pouring this additional concrete in Building A.

20  And there were these existing steel plates,

21  these strips of steel; and it was not called out

22  on the demolition plan to pull them out.  He

23  said he felt that they needed to come out.

24          So we, at his direction and after

25  submitting this proposal pulled them out and

NON-CERTIFIED COPY

1  disposed of them.

2      Q.  Number 21, Building B and Building C,

3  OH door.  Is that the over- --

4      A.  Overhead door.

5      Q.  What were you doing with the overhead

6  door?  It's not a very big ticket item there.

7      A.  If I'm not mistaken, the way that the

8  operation was detailed of the overhead doors,

9  was for them to be operated from the inside; and

10  they're -- at least at Building B, maybe

11  Building C,  I can't recall, there is no access

12  from the inside, so they had to be operated from

13  the outside, which meant a change in the design

14  from the overhead door company, which meant

15  different components, et cetera, to make that

16  possible.

17          So that was the additional cost to

18  change the design to make them operable from the

19  outside and not inside.

20      Q.  Mr. Sprehe, does Gootee rent from H&E?

21      A.  Occasionally.  Yeah, I mean, we usually

22  just call around, whoever is going to give us

23  the best price for that day is who we rent from.

24  So we rent from them occasionally.

25      Q.  Now, for this particular job, did Gootee

NON-CERTIFIED COPY

1    through these things again.

2        A.   Yeah.

3        Q.   Is the italicized portion your note from

4    this particular meeting?

5        A.   Correct.   So, obviously, those are old

6    business items.   So items that were discussed in

7    prior meetings and then the italicized area are

8    the new notes for those meeting items and then

9    obviously as you get on to Page 4 you see new

10   business.   So these were new items that had not

11   been previously discussed.

12       Q.   Mr. Sprehe, I'd like to direct you back

13   to Exhibit 8.   If we could look again at, I

14   guess, COP 20.   We talked about this was an

15   issue where the engineer directed the steel

16   plates to be removed.

17           Where were these steel plates, like in

18   the scheme of the building?

19       A.   They were embedded in the concrete

20   throughout Building A, maybe in three, four,

21   maybe up to five locations.

22           I mean they were kind of -- I feel like

23   they were pretty evenly spaced throughout the

24   area.

25       Q.   Were these serving as joints for the

NON-CERTIFIED COPY

1    concrete?

2        A.  I honestly don't know what they were

3    used for previously.  They weren't connected to

4    anything that I recall.  So unless H&E had used

5    them for some purpose in the past, I really

6    don't know what they were for.

7        Q.  Now, were the plates on top of the

8    concrete; or were they --

9        A.  They were kind of embedded, flush even

10   with the concrete if I recall.

11       Q.  We see here that this change order was

12   to remove them?

13       A.  Correct.

14       Q.  So you would have seen what was under

15   them.  Was their concrete under the plates?

16       A.  Yeah.  They were embedded in the

17   concrete.  So when we got out there, I don't

18   know what kind of equipment they used to pull

19   them out.  I didn't watch them do it.  But I

20   know when I came out there, there was a good

21   V-shape where they pulled it out.  So I'm

22   guessing it probably had little pegs on the

23   bottom of it that held it under the concrete.

24   So when they pulled it out, it pulled out a good

25   chunk of concrete with it.

NON-CERTIFIED COPY

1    Q.  So I guess in addition to removing the

2    plates, you would have had to install or pour

3    some new concrete to cover where the plates had

4    been?

5    A.  It would have been filled in when we

6    poured the topping slab at that point.

7    Q.  Do you recall why the engineer wanted

8    them to be removed?

9    A.  I honestly -- I don't.  He was the one

10    who brought it up, honestly, as far as I

11    remember.

12    Q.  Had this additional demo been in the

13    plans, this would have been something that would

14    have been in your pricing?

15    A.  Correct.  If he had shown us to remove

16    them, we would have included it, yes.

17    Q.  I'm going to hand you what is going to

18    be Number 13.  It is H&E 8304.

19            This is an E-mail from you to Frankie

20    Wynn and Thomas Ryan, and it's -- that's the

21    first E-mail.  But I'm going to ask you to flip

22    to the second page?

23    A.  (Witness complying.)

24    Q.  It's an E-mail dated September 12th,

25    2013 from a Scott Israel.

NON-CERTIFIED COPY

1    Building K and torn windscreens at Building D.

2         Obviously, it's his term there; but

3    we've already talked about the concrete at

4    Building K; correct?

5    A.  Uh-huh.  (Affirmative response.)  Yes,

6    that's correct.

7    Q.  It's your recollection that Gootee just

8    put this topping on to address the issues as a

9    preventative measure?

10   A.  Correct.  At the recommendation -- we

11   provided the product data, and it was approved

12   by the engineer and URS as a solution to the

13   issue.

14   Q.  Would this have generated a formal

15   project modification document?

16   A.  Unless there was a change order

17   involved, no.

18   Q.  And, again, you told me that this was

19   something that Gootee paid for?

20   A.  We paid for it, because we didn't -- we

21   felt like it wasn't something worth arguing, and

22   we wanted to try to keep our client happy.

23   Q.  And the other issue is the torn

24   windscreen at Building D.

25        What was the issue there?

NON-CERTIFIED COPY

1       A.   The windscreen that was put up -- it

2  said Building D.  I actually think that was at

3  Building K as well ultimately.

4          They approved the windscreen that we

5  submitted.  We put it up, installed it; and

6  within a month, two months, it was already

7  tearing.  So they came back, relooked at what we

8  submitted, and said this actually doesn't meet

9  the specifications.

10         We won't get into all of that.  We ended

11  up putting new windscreens in, though.  And I

12  don't know how long they lasted, but they met

13  the specifications at that point.  And so the

14  windscreens we put in, I believe satisfied H&E

15  and URS at that point.

16      Q.   So let's back up.  You told me a lot.

17  You said the windscreens that were installed,

18  you said they.  Was this URS that you were

19  dealing with as far as the specs?

20      A.   Yes.

21      Q.   The windscreens installed were not

22  submitted to specs?

23      A.   Correct.

24      Q.   And you said ultimately you went ahead

25  and installed these new windscreens?

NON-CERTIFIED COPY

1    A.  So they had approved what we submitted.

2    So we went ahead and ordered them and installed

3    them.  Then they ripped and they came back and

4    said, Oh, never mind, these don't meet the

5    specs.

6          And there was -- they were correct in

7    that there was, like, one item that it didn't

8    meet.  So, again, I think it was an item where

9    we said, we're not going to argue with it.

10   Rather keep our client happy.  So we got a

11   windscreen that matched what they wanted and

12   installed it.

13         I'm trying to remember -- I don't

14   remember the details.  I don't know if there was

15   a change order ever involved with that one.

16   There were certainly some debated parts with the

17   windscreen.

18         But I do know that we ended up putting

19   the correct -- the windscreens in that URS

20   wanted us to put in.

21   Q.  Do you know if Gootee paid to put those

22   windscreens in?

23   A.  That's what I can't remember.  I feel

24   like I would need to go back and look.  I mean,

25   there were a lot of change orders on that

NON-CERTIFIED COPY

1    given substantial completion.

2         But I do remember talking with either

3    Frankie Wynn or Frank Arthur and we kind of

4    consented and said there's no reason you can't

5    be using it.  But at the same time, your

6    architect is withholding substantial completion

7    from us, yet you guys are using the building.

8         Which, again, at that point, wasn't

9    really a big deal in that we were basically done

10   working minus these two items, which really only

11   affected really just one area.

12        That's what that had to do with.

13   Q.  Do you recall a change order relative to

14   the addition of bollards to air conditioning

15   units?

16   A.  I do remember adding bollards.  Yes, I

17   do.  I do.

18   Q.  Do you remember how that came about?

19   A.  After we installed the air conditioning

20   units, I don't remember who but there was

21   concern about where they were located and the

22   possibility of some equipment or a car hitting

23   them.  And so they came back and asked that we

24   price up and put bollards in around them.

25   Q.  Do you remember who came and asked?

NON-CERTIFIED COPY

1    Would it have been H&E or URS?

2        A.  I know H&E brought up the concern about

3    it.  They initially got upset with us, asking

4    why we put the air conditioners where we put

5    them.

6            But H&E -- it was either Frankie Wynn or

7    Frank -- Frank Arthur actually I think brought

8    up the concern of where they were located and

9    said we needed to do something about it.  So we

10    had proposed putting just bollards around them.

11    And I remember pricing and them approving

12    putting bollards around where the air

13    conditioning units were located.

14        Q.  If those bollards had been included in

15    the initial design drawings, there would have

16    been a cost associated with installing them;

17    correct?

18        A.  Correct.

19        Q.  Is there a different cost from putting

20    them in when you did versus had they been

21    included in the initial design drawings?

22        A.  Hard to say.  I mean, there's always the

23    argument that change orders cost more then if it

24    was included in the original project.  But I

25    can't actually prove that.

NON-CERTIFIED COPY

1         I mean, I think really the only thing

2    that could have been done is if the air

3    conditioning units had been put at a different

4    location you may not have even needed the

5    bollards.  Which I think that was why H&E was

6    ultimately upset when they brought that up,

7    because that was right at the end of the

8    project.

9        Q.  Do you remember an issue with the

10    modification of handrails?

11        A.  I do recall that at Building A, and we

12    were required to add either -- it was either a

13    metal bracket or a metal angle at the bottom,

14    because it was a handicap access ramp and there

15    has to be some way for -- if somebody in a

16    wheelchair is coming up or going down the ramp

17    for the wheels to not fall off the edge,

18    basically.  So we had to come back and add a

19    piece of metal at the bottom for code

20    compliance.

21        Q.  But similarly, if it had been included

22    in the drawings, there would have been a cost

23    associated with it still?

24        A.  If it had been included in the drawings,

25    we would have included whatever their design

NON-CERTIFIED COPY

1    was.

2        Q.  Another one, do you recall anything

3    about a relocation of the locker room hand wash

4    sink?

5        A.  Yes, I do.

6        Q.  What happened there?

7        A.  Where the hand wash sink was shown to be

8    located, was very close to the door going into

9    the locker room, the bathroom.

10           And once it was installed, I don't

11    remember who but they asked why it was installed

12    there.  We showed them on the drawings why we

13    installed it where we did; and they came back

14    and said it needs to be moved, because anybody

15    who opens that door is going to hit somebody

16    standing at the wash sink.

17           So we ended up moving it 2 or 3 feet,

18    which meant pulling tile out, pulling the whole

19    hand wash sink out, and redoing that whole area

20    pretty much.  Replumbing it.

21        Q.  Did you see the hand wash sink when it

22    was installed initially?

23        A.  Did I see it installed?

24        Q.  Yes.  Did you get to observe it

25    installed and, I guess, see how it operated with

NON-CERTIFIED COPY

1    the door?

2        A.  Once it was installed, yes, I saw the

3    issue.

4        Q.  Do you recall an item for the removal of

5    expansion joints?

6        A.  Removal of expansion joints?

7        Q.  Perhaps in the shop area.

8        A.  That doesn't ring a bell.

9        Q.  COP Number 7.

10       A.  I know we added expansion joints.  Oh,

11   removing -- in the shop area, what was that?

12           It kind of rings a bell now.  But I'm

13   not recalling what it specifically was for.

14       Q.  Let me look through my notes.  I think I

15   might be done.

16           I don't have anything further.

17       MS. MINCE:

18           I have just a few things, but it won't

19   take me very long at all.

20   EXAMINATION BY MS. MINCE:

21       Q.  Let's look at Exhibit Number 6?

22       A.  (Witness complying.)

23       Q.  You were asked some questions about

24   Exhibit No. 6 and in particular the slump

25   testing that was done by Terracon.

NON-CERTIFIED COPY

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *  *
                        *
H&E EQUIPMENT SERVICES  *
                        * NUMBER 626,308
VERSUS                  *
                        * DIVISION "D"
URS CORPORATION         *
ARCHITECTURE, P.C., URS *
CORPORATION, L O'NEAL   *
JOHNSON AND THOMAS E.   *
RYAN, III               *
                        *
*  *  *  *  *  *  *  *  *
```

Deposition of JAMES R. BAILEY,

Ph.D., P.E., taken on Thursday, September 22,

2016, commencing at 9:43 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.

EXHIBIT

16

NON-CERTIFIED COPY

1                    I N D E X

2

3                                              Page

4

        Caption                          1
5       Index of Exhibits                3
        Appearances                      7
6       Agreement of Counsel             8

7       Examination

8          PHILIP A. FRANCO, ESQ.          9

9


10              *   *   *   *   *

11      Witness' Certificate            215
        Reporter's Page              ·  216
12      Certificate                     217

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

1              INDEX OF EXHIBITS

2

3    Number                                Page

4    1  July 29, 2016 James R. Bailey,    26
        Ph.D., P.E., Exponent, Inc.,
5       Investigation of Damaged
        Concrete Pavements at H&E
6       Equipment Facilities

7    2  Field Notes of James R. Bailey,    53
        Ph.D., P.E., Exponent, Inc.

8

     3  Concrete Pavement Details         148
9       January 18, 2008, Baton Rouge

10   4  January 18, 2013 Email string     149
        from Frankie Wynn to Stephan
11      Dorsey, et al, attaching
        photographs
12      H&E 0022314-0022324

13   5  February 8, 2007 Email from       150
        Chad Herndon to Leonard
14      St. Germain, et al
        H&E 0005163

15

     6  November 13, 2012 Benchmark       152
16      Field Report No. 1 (Branch
        Office) Wesley Wilkerson
17      URS 049989

18   7  1/27/2014 Portland Cement         154
        Concrete Pavement Details
19      H&E 072388-072390

20   8  August 26, 2016 Supplemental      155
        Report by James R. Bailey,
21      Ph.D., P.E., Exponent, Inc.

22   9  July 27, 2016 Email string from   161
        Frankie Wynn to Jeff Stringer,
23      et al re: Vehicle Traffic at
        Baton Rouge
24      H&E 072397-072399

25

NON-CERTIFIED COPY

Page 4

1   (Cont.)       INDEX OF EXHIBITS

2

3    Number                                Page

4    10  July 27, 2016 Email string      165
          from Bob Bailey to Frankie
5         Wynn
          H&E 072402-072403

6

     11  Joints in Concrete Construction  169
7         Reported by ACI Committee 224
          ACI 224.3R-95 (Reapproved
8         2001)
          H&E 072541-072584

9

     12  Photograph                       177
10        H&E 073577

11   13  Photograph                       177
          H&E 073580

12

     14  Photograph                       178
13        H&E 073586

14   15  Photograph                       178
          H&E 073590

15

     16  Photograph                       179
16        H&E 073595

17   17  Photograph                       182
          H&E 073610

18

     18  Photograph                       183
19        H&E 073617

20   19  Photograph                       184
          H&E 073618

21

     20  Photograph                       188
22        H&E 073622

23   21  Photograph                       189
          H&E 073631

24

25

NON-CERTIFIED COPY

Page 5

1   (Cont.)        INDEX OF EXHIBITS

2

3    Number                              Page

4
        22   Photograph                  191
5            H&E 073632

6    23   Photograph                     193
             H&E 073633
7
        24   Photograph                  194
8            H&E 073643

9    25   Photograph                     195
             H&E 073651
10
        26   Photograph                  195
11           H&E 073654

12   27   Photograph                     196
             H&E 073661
13
        28   Photograph                  196
14           H&E 073702

15   29   Photograph                     196
             H&E 073703
16
        30   Photograph                  197
17           H&E 073705

18   31   Photograph                     198
             H&E 073719
19
        32   Photograph                  198
20           H&E 073428

21   33   Photograph                     201
             H&E 073441
22
        34   Photograph                  202
23           H&E 073443

24

25

NON-CERTIFIED COPY

1   (Cont.)       INDEX OF EXHIBITS

2

3    Number                                    Page

4

5        35   Photograph                       203
               H&E 073478

6        36   Photograph                       203
               H&E 073479
7
         37   Photograph                       203
8              H&E 073522

9        38   Photograph                       205
               H&E 073523
10
         39   Photograph                       205
11             H&E 073536

12       40   Photograph                       206
               H&E 073562
13
         41   Photograph                       207
14             H&E 073855

15       42   Photograph                       208
               H&E 073861
16
         43   Photograph                       209
17             H&E 073920

18       44   Photograph                       209
               H&E 073921
19
         45   Photograph                       209
20             H&E 073933

21       46   Photograph                       211
               H&E 073955
22
         47   Photograph                       211
23             H&E 074022

24       48   Photograph                       212
               H&E 074026

25

NON-CERTIFIED COPY

Page 7

1    APPEARANCES:

2

     Representing the Plaintiff:
3
       FISHMAN HAYGOOD, LLP
4      Attorneys at Law
       201 St. Charles Avenue, Suite 4600
5      New Orleans, Louisiana   70170

6      BY:  BRENT B. BARRIERE, ESQ.
            LORETTA G. MINCE, ESQ.
7

8

9
     Representing the Defendant:
10
       ADAMS AND REESE, LLP
11     Attorneys at Law
       4500 One Shell Square
12     New Orleans, Louisiana   70139

13     BY:  PHILIP A. FRANCO, ESQ.

14
     Reported by:
15            KAY E. DONNELLY
              Certified Court Reporter
16            State of Louisiana

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 26

1      Q.  Okay.  Dr. Bailey, I'm looking at the

2   Appendix A to your report.

3          MR. FRANCO:

4              We can label your report as Exhibit

5   A and we will -- I'm sorry.  Exhibit 1.  We'll

6   call it Exhibit 1.

7   EXAMINATION BY MR. FRANCO:

8      Q.  And if you have a copy, that is fine.

9   If not, we will get a good copy while we take a

10  break.

11     A.  I have one.

12     Q.  Okay.  Is that something we can use?

13     A.  I see no reason why not.  It's printed

14  in original color.

15     Q.  Okay.  I assume you have several of them

16  or available.

17     A.  Yes, this is the only one I have today.

18     Q.  Right.

19     A.  But, yes, that is fine.

20     Q.  Okay.  The second paragraph of the

21  Professional Profile says that, "Dr. Bailey's

22  primary area of expertise is determining the

23  risk exposure of residential, commercial and

24  industrial properties to hazards associated with

25  hurricanes, tornadoes and flooding."  That is

NON-CERTIFIED COPY

*Failure Analysis Associates*

# E$^x$ponent

## Investigation of Damaged Concrete Pavements at H&E Equipment Facilities



BAILEY

EXHIBIT NO. 1

K. DONNELLY

NON-CERTIFIED COPY

# Investigation of Damaged Concrete Pavements at H&E Equipment Facilities

Prepared for

Loretta G. Mince, Esq.
Fishman Haygood, L.L.P.
201 St. Charles Avenue
46th Floor
New Orleans, Louisiana 70170

Prepared by

James R. (Bob) Bailey, Ph.D., P.E.
Senior Managing Engineer
Exponent, Inc.
10850 Richmond Avenue, Suite 175
Houston, Texas 77042
Louisiana Firm No. EF.0003375

July 29, 2016

© Exponent, Inc.



1306663.001 7845

NON-CERTIFIED COPY

# Contents

|  | Page |
|---|---|
| List of Figures | ii |
| Executive Summary | 1 |
| Limitations | 2 |
| Introduction | 3 |
| Background | 4 |
| Discussion | 5 |
|    Pavement Surface Condition | 5 |
|    Pavement Design Features | 7 |
|    Baton Rouge Site | 8 |
|    Kenner Site | 10 |
| Remedies | 14 |
|    Pavement Surface | 14 |
|    Pavement Design | 15 |
| Findings | 16 |
| Appendix A    Curriculum Vita of James R. Bailey, Ph.D., P.E. | 29 |
| Appendix B    Documents Reviewed | 37 |

NON-CERTIFIED COPY

# List of Figures

Page

Figure 1.  Various Perspectives of Baton Rouge Site                                      17

Figure 2.  Various Perspectives of Kenner Site                                          18

Figure 3.  Concrete Pavement at Baton Rouge Site                                        19

Figure 4.  Concrete Pavement at Kenner Site                                             22

Figure 5.  Pavement Details and Note for Baton Rouge Site                               25

Figure 6.  Designated Area for Heavy Duty Pavement at Baton Rouge Site                  26

Figure 7.  Dowel Sizing and Spacing Requirements                                       27

Figure 8.  Pavement Details and Note for Kenner Site                                    28

NON-CERTIFIED COPY

# Executive Summary

Fishman Haygood, L.L.P., on behalf of the plaintiff, retained Dr. James R. Bailey, Ph.D., P.E., of Exponent, Inc., to evaluate the cause of damage to concrete pavements at two separate facilities operated by H+E Equipment. The two facilities are located in Louisiana, one facility in Baton Rouge and the other facility in Kenner (near New Orleans). URS Architects Engineers Planners designed the pavements. My scope of work included on-site surveys, review of architectural and engineering drawings, review of photos taken of the subject property, review of emails and other produced documents, engineering analyses, and preparation of this report which summarizes my findings.

I am the Project Manager. I am a licensed Professional Engineer in nine states and a Fellow of the American Society of Civil Engineers. As a Senior Managing Engineer in Exponent's Building & Structures practice, I have expertise in several areas of Civil Engineering, including construction materials, structural analysis and design, and materials testing. My Curriculum Vitae, including my recent testifying experience and my billing rate, is provided in Appendix A. A list of the documents reviewed by me is provided in Appendix B. My findings presented herein are made to a reasonable degree of engineering certainty.

Surface degradation of the concrete pavements is widespread and increasing at both sites. Large cracks have formed beyond the joints, an indication of improper sizing and/or placement of steel reinforcement. Repairs including replacement of the existing pavements will be necessary to allow for extensive use of heavy equipment over these paved areas during the 20-year design life without inducing the same level and extent of damage.

My current understanding is that H+E Equipment clearly communicated to URS the type of equipment that would travel across the pavements. Moreover, representatives of URS reportedly visited two H+E Equipment sites in Louisiana and one site in Houston. According to H+E Equipment during these site visits URS viewed the equipment, including the heavy metal tracked equipment. The pavements as currently designed and constructed are not adequate to perform for their intended use as required by H+E Equipment. In my opinion URS did not exhibit the appropriate standard of care when designing the concrete pavements constructed at the two sites in accordance with applicable specifications, standards, and guidelines.

Methods are available to extend the life of concrete pavements and joints. These methods include the application of specialty aggregate toppings; increasing the design compressive strength; increasing the pavement thickness; increasing the dowel bar sizes; properly spacing dowel bars; and installing metal edge guards along the expansion joints.

NON-CERTIFIED COPY

# Limitations

This report has been prepared to address evaluation of concrete pavement damage at the subject properties. Exponent's investigation focused on determination of causation mechanisms for physical damages at the exterior concrete paved areas. The scope of services performed during this investigation may not adequately address the needs of other users, and any re-use of this report or the findings, conclusions, or recommendations presented herein is at the sole risk of the user.

Exponent's objective is to accurately assess observed conditions and consider all relevant data. The findings presented herein are made to a reasonable degree of engineering certainty. I reserve the right to supplement this report and to expand or modify my opinions based on review of additional material as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others.

NON-CERTIFIED COPY

# Introduction

At the request of Fishman Haygood, L.L.P. on behalf of H+E Equipment, as a Senior Managing Engineer for Exponent Failure Analysis Associates (Exponent), I conducted an investigation to determine the nature, mechanism(s), and extent of damage to concrete pavements at two separate facilities operated by H+E Equipment.   The two facilities are located in Louisiana, one facility in Baton Rouge and the other facility in Kenner (near New Orleans).  I also investigated what aspects of the damage (if any) are attributable to flaws in the design, construction, or usage conditions of the pavements.

The scope of my work included the following:

- Site surveys on 23 September 2013, 12 and 13 August 2014, and 07 July 2016;
- Review of architectural and engineering drawings;
- Review of photos taken of the subject property;
- Review of emails and other produced documents;
- Engineering analyses; and
- Preparation and submittal of this report.

NON-CERTIFIED COPY

# Background

H+E Equipment uses the facilities located at Baton Rouge and Kenner as distribution centers for heavy construction equipment.  Some of this equipment moves on different types of metal tracked systems.  The heavy construction equipment travels across and is parked on concrete pavements recently constructed at the two facilities.  URS Architects Engineers Planners[1] (herein referred to as URS) designed the pavements.  Exponent conducted site surveys of each facility on 23 September 2013, 12 and 13 August 2014, and 07 July 2016[2].  Various perspectives of the Baton Rouge and Kenner sites are shown in Figure 1 and Figure 2, respectively.

During our site surveys we observed cracking; spalling of concrete edges at expansion, construction, and control joints[3]; and varying degrees of surface erosion in several areas of the concrete pavements at each facility.  The damage was particularly evident in areas where heavy tracked equipment had travelled and was subsequently parked.  Various perspectives of the concrete pavements are shown in Figure 3 and Figure 4 for the Baton Rouge and Kenner sites, respectively.  The pavements at both facilities are constructed of reinforced Portland cement concrete and were poured during the first half of 2012, meaning they are approximately four years old.

---

[1] A division of URS Corporation which was acquired by AECOM in 2014.
[2] Photos, drawings, calculations, and other related information related to our investigation are available upon request.
[3] As defined on architectural and engineering drawings produced by URS.

NON-CERTIFIED COPY

# Discussion

## Pavement Surface Condition

Surface damage was observed on pavements in parking areas designated for heavy trucks and equipment, tractor trailers, and tracked equipment at both facilities. The observed surface damage to the concrete pavements is consistent with the type of damage one would expect to observe to the type of concrete specified when exposed to high levels of stress and friction, or abrasion, acting at or near the concrete surface. Surface cracks not associated with damage at joints or abraded areas were also observed during the three site visits. These surface cracks appear to be the result of ineffectiveness of the control joints rather than a response to external effects. Little or no surface damage was observed at either facility on pavements in parking areas designed for cars and light trucks.

Loads imposed by tracked equipment depend on the contact surface. Tracks in heavy construction equipment are typically comprised of a belt system of adaptable links with keys on them. The intention is that these keys will penetrate the surface where the vehicle is moving, thus increasing the level of effective friction and therefore allowing the equipment to move in what typically are soft soil conditions. As these keys are meant to fully penetrate the soil, it is generally assumed that the weight of the equipment is distributed on the full surface of the track system, and then transferred to the supporting soil. The resulting pressure from the tracks to the soil is typically labeled "ground pressure" on catalogs provided by the manufactures of this type of equipment. Exponent was able to obtain such information from a local distributor.

One of the performance features of the track is that it be sufficiently flexible to spool around the wheels of the vehicle, effectively forming a belt around each set of wheels. This feature, in turn, requires the belt to be somewhat flexible. To achieve this flexibility and still maintain sufficient in-plane stiffness and strength, the belt is typically made of metal "links" that can adjust with respect to each other. This linkage results in a condition where, only after the keys have penetrated the soil, the weight of the vehicle is fully distributed on the track and not just on the wheel sections alone. It also means that if the keys have not penetrated the surface, then the weight is likely to be transferred in most part in the areas immediately under the wheels or spools of the track.

On hard surfaces like concrete, these tracks and their keys do not easily penetrate the bearing surface, thus forcing transfer of the full weight of the equipment to the supporting surface by the area under the keys alone. Furthermore, the weight of the equipment is being transferred mostly by the keys directly under the wheels in this condition. The keys in this condition are therefore

NON-CERTIFIED COPY

effectively narrow bands of pressure applied to an unbounded in plane surface resulting in a notable stress increase.

Exponent approximated this expected stress increase using an elastic estimation of contact pressure between two surfaces. The resulting increase in stress was estimated to be on the order of four times the applied stress by the key. Applying this level of stress in areas adjacent to a free surface, like an expansion joint, would result in stresses higher than the expected capacity of the specified 4,000 psi concrete. Such an outcome would cause the types of damage like shear cracking and spalling observed by Exponent at the two H+E Equipment sites as shown in Figure 3 and Figure 4. I also observed the absence of steel edge guards along the length of the expansion joints. It is my opinion that installation of steel edge guards at the expansion joints where heavy tracked construction equipment crossed would have significantly reduced the spalling and cracking at these joints.

Given an understanding of the types of loads imposed by heavy tracked vehicles on concrete pavements, Exponent then conducted a literature review to identify codes, standards, guidelines, or other publications that address concrete design for such conditions. We could not identify any specification in the United States related directly to the design of concrete surfaces under tracked vehicles. Some references are available for the design of concrete pavements under heavy loads, specifically, at airports and with some industrial applications. However, these references do not address metal wheel types or tracks directly, nor do they give guidance on what load to design the pavement for in these cases.

Countries like New Zealand recognize the effect of metal wheels and their resulting abrasion in their standards[4], requiring more attention to finishes and proper selection of concrete strengths. However, it only addresses metal wheels directly and not tracked vehicles. It does indicate that for cases where high abrasion is to be expected, concrete strengths are likely to be 40 MPa or higher (6,000 psi) and that special attention should be given to flooring finishing techniques and selection.

In my opinion a prudent designer for this type of project should have researched and consulted such readily available literature to ensure the types of damages being observed to the concrete pavements, based on its intended use, would be minimized. Based on documents produced at the time of this report, to my knowledge URS made no such effort. If they made such an effort, then URS evidently did not communicate to H+E Equipment the potential for heavy tracked equipment causing such damage to concrete pavements being designed by them for the two sites.

---

[4] NZS-3101 Part 1 Table 3.8

NON-CERTIFIED COPY

## Pavement Design Features

Based on conversations with H+E Equipment[5], URS was aware that they should design concrete pavements at both sites to allow parking of all types of heavy equipment, including tracked equipment, anywhere on the pavements. Indeed, URS made no distinction on their drawings regarding where certain types of heavy equipment were to be parked[6]. Given this requirement, all pavement areas designed for heavy equipment may be subject to traffic from all types of such equipment, and therefore should be designed to accommodate all of them accordingly.

A publication by the American Concrete Institute titled *ACI 330R-01 Guide for the Design and Construction of Concrete Parking Lots* provides designers current knowledge and practices for the design, construction, and maintenance of concrete parking lots. ACI 330R-01 was issued in October 2001 and was available at the time of the design of the pavements at the two facilities. The guide was revised and subsequently reissued in June 2008 as ACI 330R-08.

ACI 330R-01 enables a designer to select a pavement thickness based on the Traffic Category, Modulus of Subgrade Reaction ($k$), and Modulus of Rupture ($M_R$) of the concrete. In my opinion a proper interpretation of ACI 330R-01 for both sites would result in the selection of Traffic Category C for parking areas and interior lanes, and Traffic Category D for entrance and exterior lanes. The Modulus of Rupture equals approximately 600 psi assuming a 28-day concrete compressive strength of 4000 psi[7]. The Modulus of Subgrade Reaction depends on the soil conditions as indicated in the geotechnical report produced for each site.

Both ACI 330R-01 and ACI 330R-08 state that distributed steel reinforcement can be used to control the opening of intermediate cracks between the joints. The sole function of distributed steel reinforcement is to hold the fracture faces together if cracks form. This use becomes more obvious in cases where uncontrollable subgrade conditions are liable to provide non-uniform support. ACI 330R-01 states that distributed steel reinforcement "is needed" in pavements with transverse joints spaced more than 30 times the slab thickness, while ACI330R-08 states that it "may be needed." When used, the distributed steel reinforcement is interrupted at the contraction joints because such joints by design should be free to open.

According to ACI 330R-01 and ACI 330R-08 pavements designed for truck traffic typically require load-transfer dowels for large joint spacing. A larger joint spacing results from increased spacing between joints which, in turn, increase joint openings and reduce aggregate interlock load transfer. ACI 330R-01 specifies diameters for smooth round dowels of 3/4", 7/8", 1", and 1-1/8" for slab depths (i.e., thicknesses) of 6", 7", 8", and 9", respectively.

---

[5] Frankie Wynn, Director of Facilities/Risk/Compliance Management, H&E Equipment Services, Inc.
[6] For example, see URS Drawing AS-101 for the Baton Rouge site.
[7] $M_r = 2.3 f'_c{}^{2/3}$; regarding ACI330R-08 the values for the Traffic Category would be the same, while $M_r$ would range from approximately 500 psi to 630 psi depending on the aggregate texture and shape.

NON-CERTIFIED COPY

ACI330 R-08 specifies diameters for smooth round dowels of 1", 1-1/4", and 1-1/4" for slab depths of 7", 8", and 9", respectively. All dowels are spaced at 12" centers. Dowel embedment is 6" on each side of a joint with a total dowel length of 14" to allow for joint openings and minor errors in dowel positioning. Correct alignment and lubrication is cited in both versions of ACI 330R as essential for proper joint function.

Given the operating conditions stated by H+E Equipment, in my opinion it was reasonable and prudent for URS to require distributed steel reinforcement in the concrete pavements at both sites to control the opening of intermediate cracks between the joints. It was also reasonable and prudent for URS to require dowels at the expansion joints to provide vertical load transfer while permitting the joints to expand. However, as indicated in the sections to follow URS did not design the dowels in accordance with recognized specifications and guidelines related to concrete pavement design.

## Baton Rouge Site

A review of engineering drawings for the Baton Rouge site indicate that heavy equipment, including tracked equipment, was to travel and park around the north, south, and west sides of the single story Branch Building in an area designated as "Inventory Storage".[8] This same area is labeled "Concrete Parking" and in my opinion should be associated with the design of "Heavy Duty Pavement" given the type of equipment moving in the area[9]. Figure 5 shows pavement details from the architectural and engineering drawings created by URS for the Baton Rouge site.

Regarding rigid pavement design a geotechnical report produced to URS for the Baton Rouge site[10] states,

> "No specific traffic data were provided; therefore, pavement recommendations for this site are based upon the following assumed daily traffic frequencies. In the heavy storage area: 100 light (7-kip) trucks, two 34-kip trucks, two 46-kip trucks, and thirty 80-kip trucks per day."

> "The traffic is expected to be from rubber-tired vehicles. If the expected traffic frequencies (especially those involving heavy vehicles) are much different from these assumptions, this office should be notified so that we may re-evaluate the pavement recommendations."

[Page 9; Section 8.0]

---

[8] URS Drawing AS-101; for the purposes of this report the front of the Branch Building is assumed to face east.
[9] URS Drawings C-202, C-205, and C-206; pavement in front of the building where cars and light trucks park is labeled "Concrete Driving Parking"; URS Drawing C-501 Detail 1.
[10] Soil Testing Engineers, Inc., 316 Highland Park Drive, Baton Rouge, Louisiana, 70810; report dated January 11, 2007.

NON-CERTIFIED COPY

"Rigid pavement recommendations have been computed based on a modulus of subgrade reaction (k) of 65 pci. Additionally, the design presumes 3,800 psi concrete, which can be expected to develop a modulus of rupture of about 650 psi (average). The design life of the pavement system is dependent upon periodic maintenance of the pavement. This maintenance includes but is not limited to cleaning and resealing joints, sealing cracks and immediate repairs of damaged areas."

"In the heavy equipment storage area, for a 20-year design life, we estimate the number of 18-kip equivalent single axles (ESAL's) for rigid pavement to be approximately 956,028. Based on these results, we recommend a minimum rigid pavement thickness of 7 inches."

"The rigid concrete should conform similarly to the requirements of LA DOTD Standard Specifications, Section 601, 2000 Edition. Proper steel reinforcement (temperature and shrinkage) joint design, and installation are essential to satisfactory pavement performance."

[Page 10; Section 8.2]

My interpretation of ACI 330R-01 Table 2.4 for this case would result in the selection of a 20-year design thickness of 6.5 inches for Traffic Category C (parking areas and interior lanes) and 9.0 inches for Traffic Category D (entrance and exterior lanes). The same selection results using ACI 330R-08 Table 3.4 with the exception that for Category D when dowels are used in transverse joints the thickness can be reduced one inch to 8.0 inches.

The thickness for heavy duty pavement shown on the URS design drawings (see Figure 5) is 8.0 inches. However, according to the URS drawings[11] as illustrated in Figure 6 this heavy duty pavement is limited to the immediate area surrounding the Branch Building. The remaining portion of the concrete pavement beyond the Branch Building is designated by URS as standard duty pavement which by design is 6.0 inches thick. This thickness is less than what was recommended in the geotechnical report and what would be required in accordance with ACI 330R-01 for heavy types of equipment, including tracked equipment. As indicated earlier, H+E Equipment reportedly told URS to design the pavement surrounding the Branch Building in a manner that allowed the movement and parking of all types of equipment anywhere on the pavement.

The engineering drawings for the Baton Rouge site also deviated from good design practice in definition of the contraction joint[12] depth (see Figure 5). The drawing detail for the contraction joint shows a note stating "Saw-Cut Joint ½" Depth". The minimum depth of a contraction joint

---

[11] URS Drawings C-302 and C-305; the legend states "Proposed 8" Concrete".
[12] The drawing labels this detail as a construction joint.

NON-CERTIFIED COPY

should be one-fourth of the slab thickness, or approximately 1.5 inches for a six-inch thick slab and 2.0 inches for an eight-inch thick slab[13]. However, during my surveys I measured the contraction joints at the Baton Rouge site and they were no more than ½ inch deep.

ACI 330R-01 recommends dowel diameters of 3/4" and 1" for slab thicknesses of 6" and 8", respectively. The Department of Public Works for the City of Baton Rouge and Parish East of Baton Rouge specifies dowel diameters of 1" and 1-1/4" for slab thicknesses of 6" and 8", respectively. The Louisiana Department of Transportation (LDOT) specifies a dowel diameter of 1-1/4" for a slab thickness of 8". All three documents require the spacing to be 12 inches. Figure 7 shows the tables from each of these sources including ACI 330R-08. The URS drawing (see Figure 5) shows a #4 smooth bar, meaning a ½" diameter bar, spaced 18 inches on center. This design is notably less in terms of the amount of steel per unit area than what is recommended by ACI and specified by the Department of Public Works and LDOT.

Diagonal cracking was observed at the intersection of some expansion joints at the Baton Rouge site (see Figure 3). High stress concentrations form at the corners of square pavement sections due to curling and warping of the pavement section caused by moisture and temperature differentials, and uneven loading across the pavement surface. According to ACI 330R-08,

> "Dowels should not be placed closer than 12 in. (300 mm) to a joint intersection to minimize the potential for corner cracking."
>
> [Page 9; Section 3.8.2]

The presence of corner cracking at some of the expansion joints intersections suggests that improper spacing of dowels near the corners may have occurred. I did not identify a detail or note on the URS drawings indicating a minimum distance from the joint intersection for dowel placement.

## Kenner Site

A review of engineering drawings for the Kenner site indicate that heavy equipment, including tracked equipment, was to travel and park virtually anywhere on the site, including along the main entryway and around all sides of the Service Building[14]. These areas were designated as "Heavy Duty Pavement". Only a few select areas in front of the office and toward the back of site were designated as "Light Duty Pavement" for cars and light trucks. Figure 8 shows

---

[13] Specification for Unreinforced Concrete Parking Lots ACI 330.1-04 published by the American Concrete Institute.
[14] URS Drawing C1.0.

NON-CERTIFIED COPY

pavement details from the architectural and engineering drawings created by URS for the Kenner site[15].

Regarding rigid pavement design a geotechnical report produced to URS for the Kenner site[16] states,

> "Anticipated traffic volumes and loading conditions for this facility were not provided, but were assumed based on experience with similar projects. The pavements within the facility may likely be a medium to heavy duty traffic areas. Traffic estimates used in the determination of required pavement thicknesses assume a 20-year design period and are summarized in the following table." [Table omitted for brevity.]

> "The architect or engineer responsible for the final pavement design should review this traffic information for accuracy/applicability. If these traffic assumptions are not correct, please advise this office so that the pavement designs can be re-analyzed and revised thickness designs developed."

> "Based upon the soil conditions at the site, rigid pavements should be designed and constructed using a minimum 7-inch concrete pavement thickness over a minimum 12 inches of compacted river sand."

> "Long term differential settlement is expected to occur across the proposed pavement areas with these soil conditions. It is expected that differential movement will occur over a period of several years between the pavement panels resulting in subsequent loss of aggregate interlock at the joints. For these anticipated conditions, it has been an accepted practice to install a nominal reinforcement in the pavement consisting of minimum #3 rebar at 18-inch on-centers to maintain the joint connection. Alternatively an appropriately sized welded wire fabric can also be used."

> "Other standard design and construction details for rigid pavements as contained in ACI 330R-01 'Guide for Design and Construction of Concrete Parking Lots' should be followed in the pavement design and construction process. *It is recommended that the design engineer refer to this document for more detailed information* [emphasis added]. A critical aspect of concrete pavements for facilities of this nature is joint spacing and related details. ACI 330R-01 addresses these important details."

[Pages 11-12; Section 4.5]

---

[15] URS Drawing C7.0.
[16] Terracon Consultants, Inc., 316 Highland Park Drive, Baton Rouge, Louisiana, 70810; report dated February 9, 2011.

NON-CERTIFIED COPY

The Modulus of Subgrade Reaction was reported as 75 psi/in[17]. My interpretation of ACI 330R-01 Table 2.4 for this case would result in the selection of a 20-year design thickness of 6.5 inches for Traffic Category C (parking areas and interior lanes) and 9.0 inches for Traffic Category D (entrance and exterior lanes). These section depths are consistent with ACI 330R-08 Table 3.4 with the exception that for Category D when dowels are used in transverse joints the thickness can be reduced one inch to 8.0 inches.

The thickness for heavy duty pavement shown on the URS design drawings (see Figure 8) is 7.0 inches[18]. This thickness is consistent with the recommendation made in the geotechnical report. Surface degradation issues aside, in my opinion a 7.0 inch thickness is the proper value for Traffic Category C where equipment is parked or traveling along the interior of the site. However, for the entrance and exterior lanes along the perimeter of the site, i.e., Traffic Category D, the 7.0 inch thickness is less than what is recommended per ACI 330R-01 for heavy types of equipment, including tracked equipment. As indicated earlier, H+E Equipment reportedly told URS to design the pavement surrounding the Service Building in a manner that allowed the movement and parking of all types of equipment anywhere on the pavement.

A review of engineering drawings for the Kenner site also revealed a discrepancy in the definition of the contraction joint[19] depth (see Figure 8). A drawing detail for the contraction joint shows a note stating "Saw-Cut ¼ Slab Thickness" meaning the joint depth should be one-fourth of the slab thickness. The same detail also shows a dimension labeled "¼" Depth of Concrete" which could be interpreted as a depth of ¼ (0.25) inches. The correct depth of a contraction joint should be one-fourth of the slab thickness, or approximately 1.75 inches for a seven-inch thick slab[20]. During my surveys I also measured contraction joint depths at the Kenner site. They were no more than ½ inch deep.

As shown in Figure 7, ACI 330R-01 recommends a 7/8" dowel diameter for a 7" slab thickness. ACI 330R-08 recommends a 1" dowel diameter for a 7" slab thickness. LDOT specifies a dowel diameter of 1-1/4" for a slab thickness of 8"[21]. All three documents require the spacing to be 12 inches. The URS drawing (see Figure 8) shows a #4 smooth bar, meaning a ½" diameter bar, spaced 18 inches on center. This design is notably less in terms of the amount of steel per unit area than what is recommended by ACI and as specified by LDOT. Severe degradation of an expansion joint at the Kenner site (see Figure 4) resulted in exposure of a dowel bar. The exposed dowel bar diameter is ½ inch.

---

[17] Page 10 Section 4.4; the topic pertains to details concerning floor slabs, but is assumed applicable to pavement design.
[18] Terracon issued a letter dated August 5, 2011, stating that a 6-inch thick concrete pavement thickness would be acceptable for standard duty pavement.
[19] The drawing labels this detail as a control joint.
[20] Specification for Unreinforced Concrete Parking Lots ACI 330.1-04 published by the American Concrete Institute.
[21] 8" is the minimum slab thickness cited on the LDOT drawings.

NON-CERTIFIED COPY

The URS drawings state that in regards to "pavement preparation and construction" the recommended specifications from the geotechnical report shall govern. As indicated earlier, the geotechnical report issued for the Kenner site states that the standard design and construction details for rigid pavements as contained in ACI 330R-01 should be followed by URS in the pavement design and construction process. In my opinion URS did not follow the ACI 330R-01 guidelines regarding slab thicknesses for Traffic Category D conditions and for dowel bar details at the Kenner site.

Diagonal cracking was also observed at the intersection of some expansion joints at the Kenner site (see Figure 4). As indicated earlier regarding the Baton Rouge site, per ACI 330R-08 dowels should not be placed closer than 12 in. (300 mm) to a joint intersection to minimize the potential for corner cracking. The presence of corner cracking at some of the expansion joint intersections suggests that improper spacing of dowels near the corners may have occurred. I did not identify a detail or note on the URS drawings indicating a minimum distance from the joint intersection for dowel placement.

NON-CERTIFIED COPY

# Remedies

## Pavement Surface

Exponent conducted a literature review of specialty construction materials for use in applications where heavy industrial and construction equipment is present. This effort resulted in identification of several products from different manufacturers designed to mitigate the abrasive effects of loads imposed by industrial equipment like heavy tracked vehicles on concrete pavements. These products can be used as part of new construction, or as a modification/retrofit method for an existing pavement. The common aspect of these materials is the use of special aggregates and other additives in the mix to provide a surface that has both high abrasion resistance and high overall strength.

Because impacts are expected on concrete pavements with heavy tracked equipment moving across them, providing a higher strength concrete mix alone would not be sufficient to ensure long term durability. As the strength of concrete goes up, its susceptibility to impact damage also increases as the mix becomes more brittle, making it prone to failures such as the failures observed at the H+E Equipment sites. The long-term approach is to provide a malleable, but strong, surface for these types of vehicles to move over. According to the consulted manufacturers, this approach has already proven effective in applications similar to the concrete pavements at the H+E Equipment sites.

Specialty aggregates are often prescribed and supplied by manufacturers of specialty slab finishes. One example is an iron filled aggregate. Along with properly executed curing and finishing techniques, this special aggregate will provide a more resistant surface for the movement of heavy metal tracked equipment. Several manufacturers offer products for this application. Exponent strongly recommends that the ultimate choice of a product be made in conjunction with a manufacturer's technical representative to ensure the product is used in a proper application and to identify appropriate quality measures during the execution.

The cost of applying specialty aggregate toppings, including preparation and application, varies with the manufacturer and selected installer. The manufacturer's technical representative can verify whether any special considerations will need to be given at existing joint locations where these products are to be applied.

1306663.001 7845

14

NON-CERTIFIED COPY

## Pavement Design

To correct design deficiencies due to insufficient slab thickness, improper placement of distributed steel reinforcement and dowels, and/or improper sizing of dowels will require removal of the affected pavement areas. As stated in ACI 330R-01,

> "The most effective repair method for badly cracked and deteriorated pavement panels is full or partial replacement. It is important to determine and correct the cause of the slab failure before starting repairs. Localized subgrade problems should be corrected. If the pavement panels failed because of heavier than anticipated loads, replacement panels should be thickened to provide additional load-carrying capacity."

[Page 16; Section 6.4]

The presence of heavy track equipment poses a unique challenge to the short- and long-term performance of concrete pavements. In addition to applying a specialty aggregate topping on lanes where tracked equipment is likely to travel, other options for improving the short- and long-term performance of concrete pavements under such conditions include: increasing the design compressive strength; increasing the pavement thickness; and installing metal edge guards along the expansion joints[22]. Dowels should also be designed and installed in accordance with the most recent ACI publications pertaining to concrete pavement design.

---

[22] Examples where edge guards are installed in reinforced concrete include warehouse loading docks, bridge expansion joints, and stairwells.

NON-CERTIFIED COPY

# Findings

My findings presented in this report are made to a reasonable degree of engineering certainty. Based on my on-site surveys, review of architectural and engineering reports, review of photos taken of the subject property, review of emails and other produced documents, and engineering analyses, in my opinion concrete pavements at the Baton Rouge and Kenner sites were not properly designed to account for the degrading effects and high loads imposed by the heavy construction equipment, particularly tracked equipment, operating across the pavements.

My current understanding is that H+E Equipment clearly communicated to the designer the type of equipment that would travel across the pavements. Moreover, representatives of URS reportedly visited the two sites and according to H+E Equipment viewed the equipment, including the heavy metal tracked equipment. Given these understandings, it is my opinion that URS did not exhibit the appropriate standard of care when designing the concrete pavements constructed at the two H+E Equipment sites.

Sufficient information was available to determine loads acting on the concrete pavements, and to design the pavements in a way to withstand these loads and high levels of stress and abrasion acting at or near the concrete surface. In my opinion damage observed on the concrete surfaces could have been controlled and minimized by the use of proper materials selection and implementation during the design phase. Given the pavement design as presented to the owner prior to construction, at a minimum URS should have informed H+E Equipment of the likelihood of near-term progressive damage to the concrete pavement resulting from the movement of tracked vehicles, and that such damage may necessitate periodic replacement of affected pavement sections. To my knowledge URS did not inform H+E Equipment of the likelihood of near-term progressive damage.

In my opinion the concrete pavements at both sites as currently designed are not adequate to perform for their intended use as required by H+E Equipment. Surface degradation is widespread and increasing at both sites. Large cracks have formed beyond the joints, an indication of an insufficient amount of or an improper placement of steel reinforcement. Repairs to the existing pavements will be necessary to allow for extensive use of heavy equipment over these paved areas during the 20-year design life without inducing the same level and extent of damage.

Steps can be taken to extend the life of concrete pavements including the application of specialty aggregate toppings; increasing the design compressive strength; increasing the pavement thickness; increasing the dowel bar sizes; and installing metal edge guards along the expansion joints.

1306663.001 7845                              16

NON-CERTIFIED COPY



Aerial View (Source: Google Earth™)

Looking West Beyond South Entryway

Looking East Toward the Branch Building

Figure 1.  Various Perspectives of Baton Rouge Site.

NON-CERTIFIED COPY



Figure 2.  Various Perspectives of Kenner Site.

NON-CERTIFIED COPY



Figure 3.  Concrete Pavement at Baton Rouge Site (source: Exponent).

NON-CERTIFIED COPY



Figure 3.  (Continued)

NON-CERTIFIED COPY



Figure 3. (Continued)

NON-CERTIFIED COPY



Figure 4.  Concrete Pavement at Kenner Site (source: Exponent).

NON-CERTIFIED COPY



Figure 4.  (Continued)

NON-CERTIFIED COPY



07 July 2016

07 July 2016

07 July 2016

07 July 2016

07 July 2016

07 July 2016

Figure 4.  (Continued)

NON-CERTIFIED COPY



Figure 5.  Pavement Details and Note for Baton Rouge Site
(Source: URS Drawings C-501 and C-509).

1306663.001 7845          NON-CERTIFIED COPY



Figure 6.  Designated Area for Heavy Duty Pavement at Baton Rouge Site
(Source: URS Drawings C-302 and C-305).

NON-CERTIFIED COPY

**Table 2.6—Dowel size** [*]

| Slab depth, in. (mm) | Dowel diameter, in. (mm) | Dowel embedment, in. (mm)[†] | Total dowel length, in. (mm)[‡] |
|---|---|---|---|
| 5 (125) | 5/8 (16) | 5 (125) | 12 (300) |
| 6 (150) | 3/4 (19) | 6 (150) | 14 (360) |
| 7 (180) | 7/8 (22) | 6 (150) | 14 (360) |
| 8 (200) | 1 (25) | 6 (150) | 14 (360) |
| 9 (230) | 1-1/8 (29) | 7 (180) | 16 (400) |

[*]All dowels spaced at 12 in. (300 mm) centers.
[†]On each side of joint.
[‡]Allowance made for joint openings and for minor errors in positioning dowels.

ACI 330R-01

**Table 3.6—Sizes of smooth, round dowels** [*]

| Slab thickness, in. (mm) | Dowel diameter, in. (mm) |
|---|---|
| 7 (180) | 1 (25) |
| 8 (200) | 1-1/4 (32) |
| 9 (230) | 1-1/4 (32) |

[*]All dowels spaced at 12 in. (300 mm) centers, with minimum total length of 14 in. (360 mm) and minimum embedment length of 6 in. (150 mm) on each side of joint, with allowance made for joint openings and for minor errors in positioning dowels.

ACI 330R-08

**TABLE 1**
(ALL DIMENSIONS ARE IN INCHES)

| PAVEMENT THICKNESS | DOWEL BARS ⊗ | | | MINIMUM DEPTH OF JOINT | |
|---|---|---|---|---|---|
| | SIZE | LENGTH | SPACING | C.J. & D.J. | L.J. |
| 6 | 1 | 18 | 12 | 2 | 2 |
| 8 | 1 1/4 | 18 | 12 | 3 | 3 |
| 9 | 1 1/4 | 18 | 12 | 3 | 3 1/2 |
| 10 | 1 1/4 | 18 | 12 | 3 1/2 | 4 |

Parish of East Baton Rouge

**TABLE I**
(ALL DIMENSIONS ARE IN INCHES)

| PAVEMENT THICKNESS "T" | SMOOTH DOWEL BARS ⊗ | | | DEF. TIE BARS ▤ | | | KEYWAY ▨ | |
|---|---|---|---|---|---|---|---|---|
| | SIZE | LENGTH | SPACING | SIZE | LENGTH | SPACING | | |
| 8 | 1¼ | 18 | 12 | ½ | 24 | 24 | 2⅛ | 1¼ |
| 9 | 1¼ | 18 | 12 | ½ | 24 | 24 | 2⅛ | 1¼ |
| 10 | 1¼ | 18 | 12 | ½ | 24 | 24 | 2⅛ | 1¼ |
| 11 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 2⅛ | 1¼ |
| 12 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 3 | 1⅛ |
| 13 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 3 | 1⅛ |
| 14 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 3 | 1⅛ |

LDOT

Figure 7.  Dowel Sizing and Spacing Requirements.

1306663.001 7845

NON-CERTIFIED COPY



Figure 8.  Pavement Details and Note for Kenner Site
(Source: URS Drawing C7.0).

NON-CERTIFIED COPY

Appendix A

Curriculum Vita of Dr. James R. Bailey, Ph.D., P.E.

NON-CERTIFIED COPY

E<sup>x</sup>ponent®

*Failure Analysis Associates®*

Exponent
10850 Richmond Avenue
Suite 175
Houston, TX 77042

telephone 832-325-5700
facsimile 832-325-5799
www.exponent.com

## James R. (Bob) Bailey, Ph.D., P.E., F. ASCE
**Senior Managing Engineer**
**Houston Office Director**

### Professional Profile

Dr. James R. (Bob) Bailey is a licensed Professional Engineer in nine states and a Fellow of the American Society of Civil Engineers. For over 30 years, Dr. Bailey has served as a technical consultant, project manager, and researcher for private industry, universities, and government. As a Senior Managing Engineer in Exponent's Building & Structures practice, he brings specialized expertise to areas related to civil engineering; including wind engineering, construction materials, solid mechanics, dynamics, numerical analysis, structural analysis and design, and materials testing.

Dr. Bailey's primary area of expertise is determining the risk exposure of residential, commercial, and industrial properties to hazards associated with hurricanes, tornadoes, and flooding. He has conducted hurricane risk assessments and developed mitigation programs for various types of health, industrial, educational, and offshore energy facilities. Over the years he has surveyed and documented storm damage in the aftermath of numerous storm event, including hurricanes Irene (1999), Charley (2004), Francis (2004), Katrina (2005), Rita (2005), Wilma (2005), Ike (2008), and Sandy (2012), Tropical Storm Allison (2001), the Oklahoma City Tornado (1999), and the April-May 2011 Tornado Outbreak. He has investigated numerous building envelope systems, and has conducted investigations of both steep and low-slope roofing systems for damage caused by hail, wind, and construction errors. In 2011 he directed analysis of the storm surge risk posed to the South Texas Project Electric Generating Station using advanced hydrodynamic modeling techniques.

Dr. Bailey's past work at ExxonMobil included wind load analyses on drilling, semi-submersible, and floating, production, storage, and offloading (FPSO) structures; developing conceptual designs of gravity-based structures for arctic offshore environments; and conducting research and teaching classes on well cementing. He also has expertise in the area of well completions and workovers. Dr. Bailey has served as a lecturer in the private sector and at the university level on subjects related to civil and petroleum engineering. He also has been responsible for the design of test facilities and the development of test programs related to construction and energy. Dr. Bailey is currently the Presiding Officer of a five member expert panel, appointed by the Texas Department of Insurance in 2013, whose purpose is to develop ways of determining whether a loss to TWIA-insured property was caused by wind, waves, or tidal surges. He is also a member of the ASCE 7-16 Wind Load Subcommittee. He is past Chair of the ASCE Petrochemical Wind Load Task Committee, and served on an API 4F sub-committee assigned to revise specifications and guidelines for determining wind loads on onshore and offshore drilling structures.

30

NON-CERTIFIED COPY

**Academic Credentials and Professional Honors**

Ph.D., Civil Engineering, Texas Tech University, 1989
M.S., Civil Engineering, Texas Tech University, 1984
B.S., Civil Engineering, Texas Tech University, 1982

American Society of Civil Engineers (ASCE)
American Petroleum Institute (API) Spec 4F Wind Engineering Subcommittee
ASCE Wind Loads on Petrochemical Structures Task Committee
ASCE 7-16 Wind Load Subcommittee
Texas Tech University Civil Engineering Advisory Council (2007–2012)

Recipient of the Stephen D. Bechtel, Jr. Energy Award from ASCE (2016)

**Licenses and Certificates**

Professional Engineer, State of Florida, #67773
Professional Engineer, State of Georgia, #PE033027
Professional Engineer, State of Hawaii, #12820
Professional Engineer, State of Louisiana, #33830
Professional Engineer, State of Mississippi, #26488
Professional Engineer, State of South Carolina, #26408
Professional Engineer, State of Tennessee, #114185
Professional Engineer, State of Texas, #74911
Professional Engineer, State of Wisconsin, #42337-6

**Publications and Reports**

Bailey JR, Shrestha PL, et al.  Analysis of maximum probable storm surge at the South Texas Project site.  Proceedings, ASCE EWRI Conference, Seattle, WA, June 2014.

Bailey, JR.  Hurricane risk assessment of a planned carbon capture facility located in Southeast Texas operated by NRG Energy, Inc., Report prepared for a California-based risk management company, February 2014.

Bailey, JR.  Hurricane risk assessments of five electrical power plants located in the Caribbean and Hawaii operated by the AES Corporation, Report prepared for a California-based risk management company, November 2012.

Bailey JR.  Feasibility study of an Alaskan LNG plant.  Report prepared for an Asian-based consortium of companies, March 2012.

Bailey JR, et al.  Wind loads for petrochemical and other industrial facilities.  American Society of Civil Engineers, September 2011.

James R. Bailey, Ph.D., P.E.
07/16

NON-CERTIFIED COPY

Bailey, JR.  Hurricane risk assessment of two wind farms located in South Texas operated by EoN Climate and Renewable.  Report prepared for a California-based risk management company, June 2011.

Bailey JR.  Wind risk assessment of the ThyssenKrupp steel plant located in Mississippi.  Report prepared for a California-based risk management company, November 2010.

Bailey JR, Cantor R, et al.  An approach to business vulnerability and risk assessments related to climate change.  SPE International Conference on Health, Safety & Environment, Rio de Janeiro, Brazil, April 2010.

Bailey JR.  A hurricane risk assessment and mitigation plan for CHRISTUS hospitals located in Texas and Louisiana.  Report prepared for CHRISTUS Health, July 2009.

Bailey JR.  Study of Major Revenue Interruption Risks in the Gulf of Mexico.  Report prepared for a major oil and gas operator headquartered in the United States, July 2009.

Bailey JR, Gilbert RT, et al.  Wind load considerations for existing petrochemical structures.  Structures Congress, American Society of Civil Engineers (ASCE), Austin, TX, May 2009.

Bailey JR, Levitan ML.  Lessons learned and mitigation options for hurricanes.  Process Safety Progress, American Institute of Chemical Engineers (AIChE), 2008.

Bailey JR.  Finding the breaking point.  Report documenting window performance following the 2004 Florida hurricanes.  Prepared in conjunction with the Protecting People First Foundation, Wickford, RI, April 2005.

Bailey JR.  Flood hazard assessment of critical NASA assets at the Johnson Space Center.  Report prepared for NASA management by ABS Consulting, July 2004.

Bailey JR.  Wind hazard assessment of critical NASA assets at the Johnson Space Center.  Report prepared for NASA management by ABS Consulting, February 2001.

Bailey JR.  Vulnerability assessment of Harris County to hurricane winds.  Report prepared for the Harris County Commissioners Court by EQE International, June 2000.

Bailey JR.  Wind and flood hazard assessment of Critical NASA assets at the Kennedy Space Center.  Report prepared for NASA management by EQE International, June 2000.

Bailey JR, Vallabahn CVG, et al.  Experimental verification of the theoretical solution of laminated glass units.  Proceedings, Advanced Composites Materials in Civil Engineering Structures Materials Division, American Society of Civil Engineers, Las Vegas, NV, 1991 (paper awarded Best of Session, Spring 1991, by the Texas Section of the American Society of Civil Engineers).

$Ex$

NON-CERTIFIED COPY

Bailey JR, Minor JE.  Structural glazing tests show wind pressure effects.  Glass Digest 1989 Oct; 68–76.

Bailey JR, Minor JE, Tock RW.  Response of structurally glazed insulating glass units to wind pressures," Proceedings, 6th U.S. Conference on Wind Engineering, Houston, TX, March 8–10, 1989.

Bailey JR, McDonald JR.  Impact Resistance of masonry walls to tornado-generated missiles.  Proceedings, 3rd North American Masonry Conference, Arlington, TX, June 3–5.

**Presentations**

Bailey JR, Shrestha PL, et al.  Analysis of maximum probable storm surge at the South Texas Project site.  ASCE EWRI Conference, Seattle, WA, June 2014.

Bailey JR.  Presentation of evidence—How to keep the jury interested.  Cooper & Scully 8th Annual Construction Symposium, Dallas, TX, February 1, 2013.

Bailey JR.  Winds and rain a-comin—Hurricanes, structures and potential risks.  Texas Association of Defense Council, Spring Meeting, Santa Fe, NM, April 27, 2012.

Bailey JR.  Preparing for the worst—Is the nation prepared for natural disasters?  American Bar Association Tort Trial & Insurance Practice Section Spring Leadership Meeting, Charleston, SC, May 17, 2012.

Bailey JR.  Probable maximum surge and seiche flooding at a coastal nuclear power plant located in the United States, Advisory Committee on Reactor Safeguards (ACRS), Nuclear Regulatory Commission, Rockville, MD, November 30, 2010.

Bailey JR, Griffith M.  Natural hazard risk assessment and mitigation for nuclear facilities.  WebEx presentation, March 2, 2010.

Bailey JR.  Lessons learned and mitigation options for hurricanes.  Spring National Meeting, American Institute of Chemical Engineers (AIChE), April 2008.

Bailey JR.  Vulnerability of industrial facilities.  Reinsurance Association of America Cat Modeling 2006 Conference, Tampa, FL, February 23, 2006.

Bailey JR.  Safe haven considerations at industrial sites.  The Private Industry Workshop, National Hurricane Conference, New Orleans, LA, March 22, 2005.

Bailey JR.  Finding the breaking point.  International Code Council, Tampa, FL, February 12, 2005.

Bailey JR.  Identifying protective areas for people in buildings.  International Conference on Wind Engineering, Texas Tech University, June 2, 2003.

NON-CERTIFIED COPY

Bailey JR.  Assessment of extreme wind effects on industrial facilities.  The Private Industry Workshop, National Hurricane Conference, New Orleans, LA, April 17, 2003.

Bailey JR.  Assessing the impacts of hurricanes and earthquakes.  Association for Facilities Engineering Conference, Las Vegas, NV, September 25, 2001.

Bailey JR.  Using Digital Physics$^{TM}$ to calculate wind loads on structures.  ASCE Structures Conference, Washington, DC, May 2001.

Bailey JR.  Don't let your critical assets blow away.  Houston Chapter of the Risk and Insurance Management Society (RIMS), October 18, 2000.

Bailey JR.  Impact resistance of wood products subjected to simulated tornado missiles.  International Timber Engineering Conference, Seattle, WA, 1988.

## Patents

Patent No. 5,309,995:  Well Treatment Using Ball Sealers, issued May 10, 1994.

Patent No. 5,485,882: Low-density Ball Sealer for Use as a Diverting Agent in Hostile Environment Wells, issued January 23, 1996.

Patent No. 5,582,251:  Downhole Mixer, issued December 19, 1996.

## Prior Professional Experience

- Manager, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 2004–2006
- Senior Project Engineer, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 2001–2004
- Project Engineer, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 1998–2001
- Engineering Specialist, Offshore Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1994–1998
- Senior Project Engineer, Drilling and Completions Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1992–1994
- Project Engineer, Drilling and Completions Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1990–1992
- Lecturer and Research Associate, Civil Engineering Department, Texas Tech University, 1989–1990

James R. Bailey, Ph.D., P.E.
07/16

34

E$^{x}$™

NON-CERTIFIED COPY

**Civil Case Experience**

Deposition – INEOS USA L.L.C., v. BP Products North America, Inc., American Arbitration Association, No. 13 158 Y 01929 06, Houston, TX, November 2008.

Deposition – GG&A Central Mall Partners, L.P., Dillard's, Inc., Dillard Texas, LLC, and Dillard Texas Operating Limited Partnership, v. Duro-Last, Inc., Jaco Construction, Inc., and Schrader Roofing, Inc, District Court of Jefferson County, Texas, 58th Judicial District, January 2010.

Testimony – Appraisal Hearing, Beechnut Village Shopping Center v. Nationwide Insurance Co., Judge John Coselli – Umpire, appointed by Judge Gray Miller, United States District Judge, Southern District of Texas, University of Houston Law School, Houston, Texas, December 2010.

Expert Witness Statement – Canadian Natural Resources Limited and Highwood Limited v. Oil Insurance Limited, submitted to the Board of Arbitration under the provisions of the Arbitration Act of 1996, London, England, March 2011.

Testimony – Appraisal Hearing, Cause No; 1:11-cv-00207; Timothy Nolan and Ermelinda Nolan v. GeoVera Specialty Insurance Company, Donald Summey and James Perfetti; Judge James W. Mehaffy – Umpire, appointed by Magistrate Judge Keith F. Giblin, United States District Court for the Eastern District of Texas, Beaumont Division, Houston, Texas, September 2012.

Deposition – David S. Gronik, Jr. and Mary K. Gronik, S.C.G., M.A.G., David S. Gronik, Jr. Living Trust, Opio Boat Moon, LLC, Plaintiffs, v. Susan Balthasar and Susan M. Balthasar, as Personal Representative of The Estate of Norman J. Balthasar, Defendants; and Shorewest Realtors, Inc., Continental Casualty Company, and Anne Schwartz, Third-Party Defendants, and Opio Boat Moon, LLC, and David S. Gronik, Jr., Plaintiffs, Chubb Indemnity Insurance Company, Defendant, United States District Court for The Eastern District Of Wisconsin, November 2012.

Deposition – Jerome S. Tannenbaum and Deborah M. Tannenbaum, v. Federal Insurance Company, United States District Court for the Middle District of Tennessee, Nashville Division, February 2013.

Testimony – Jerome S. Tannenbaum and Deborah M. Tannenbaum, v. Federal Insurance Company, United States District Court for the Middle District of Tennessee, Nashville Division, November 2013.

Deposition – Intrepid Ship Management, Inc., Vessel Management Services, Inc., and Crowley Maritime Corp., v. Ocean Prospector and Plant Recovery Company, United States District Court, Southern District of Texas, Galveston Division, September 2014.

James R. Bailey, Ph.D., P.E.
07/16

NON-CERTIFIED COPY

Deposition – Northrop Grumman Corporation, vs. AON Risk Insurance Services West, Inc., Superior Court of the State of California, County of Los Angeles, May 2015.

Deposition – Edie Housel, et al, v. The Home Depot U.S.A., Inc., et al, United States District Court for the Western District of Missouri, Southwestern Division, February 2016.

Deposition – Metro Hospitality Partners, LTD., d/b/a Crowne Plaza Hotel, v. Lexington Insurance Company,   United States District Court, Southern District of Texas, Houston Division, June 2016.

## Consulting and Testimony Billing Rate

Two hundred ninety dollars per hour (calendar year 2016).

NON-CERTIFIED COPY

# Appendix B

# Documents Reviewed

NON-CERTIFIED COPY

| Name | Date modified | Type | Size |
|---|---|---|---|
| C-302.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 880 KB |
| C-304.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 548 KB |
| C-305.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 716 KB |
| C-306.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 2,784 KB |
| C-307.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 864 KB |
| H+E Belle Chasse Bid Set 5-22-12.pdf | 5/31/2012 12:42 PM | Adobe Acrobat D... | 32,517 KB |
| Concrete Specs for Baton Rouge Site.pdf | 9/12/2014 4:53 PM | Adobe Acrobat D... | 122 KB |
| Pavement Spec for Baton Rouge Site.pdf | 9/12/2014 4:50 PM | Adobe Acrobat D... | 72 KB |
| 2013-11-20 H&E Petition and First Set of Discovery to Defendants.PDF | 4/3/2014 5:24 PM | Adobe Acrobat D... | 2,322 KB |
| 2014-2-19 H&E Answer and Affirmative Defenses to URS Reconventional Demand.pdf | 4/3/2014 5:27 PM | Adobe Acrobat D... | 157 KB |
| 2015-03-27 H&E's Motion to Compel.pdf | 3/27/2015 3:24 PM | Adobe Acrobat D... | 1,911 KB |
| 2015-08-24 H&E's Opposition to Defendants Motion for Partial Summary Judgment.pdf | 2/1/2016 12:49 PM | Adobe Acrobat D... | 1,736 KB |
| Baton Rouge Project Change Orders.xls | 7/16/2014 6:47 PM | Microsoft Excel 97... | 60 KB |
| H&E Belle Chasse COP Log.xls | 7/16/2014 6:47 PM | Microsoft Excel 97... | 138 KB |
| Kenner Project Change Orders 08-2013.xlsx | 7/16/2014 6:47 PM | Microsoft Excel W... | 13 KB |
| URS 31020-93139.pdf | 6/27/2016 10:35 AM | Adobe Acrobat D... | 328,781 KB |
| S02-01_Concrete_Pavement_Details.pdf | 6/24/2016 2:54 PM | Adobe Acrobat D... | 348 KB |
| S2079 - PM RFI Log - MAPP.pdf | 7/12/2016 10:09 AM | Adobe Acrobat D... | 165 KB |
| CP-01 (1 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 454 KB |
| CP-01 (2 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 487 KB |
| CP-01 (3 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 575 KB |
| H & E 0000211-0000259.pdf | 6/24/2016 2:55 PM | Adobe Acrobat D... | 8,076 KB |
| Ardaman report re Baton Rouge Detention Pond.msg | 7/5/2016 11:41 AM | Outlook Item | 3,653 KB |
| Ardaman proposal Baton Rouge.msg | 7/5/2016 11:41 AM | Outlook Item | 1,287 KB |
| Baton Rouge GeoTech Report.pdf | 7/27/2016 6:31 PM | Adobe Acrobat D... | 7,849 KB |
| Email re Density testing Baton Rouge.msg | 7/5/2016 11:41 AM | Outlook Item | 376 KB |
| Request for additional geotech work in BR.msg | 7/5/2016 11:41 AM | Outlook Item | 202 KB |
| Email re post pour testing Kenner.msg | 7/5/2016 11:49 AM | Outlook Item | 461 KB |
| Kenner GeoTech Report.pdf | 7/5/2016 11:46 AM | Adobe Acrobat D... | 8,272 KB |
| Kenner Geotech Scope letter.msg | 7/5/2016 11:49 AM | Outlook Item | 2,059 KB |
| Revision to Kenner Geotech Report.msg | 7/5/2016 11:49 AM | Outlook Item | 513 KB |
| H & E 0000211-0000259.pdf | 7/26/2016 10:27 AM | Adobe Acrobat D... | 8,076 KB |
| H & E 0022314.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 4,151 KB |
| H&E 0005236_.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 617 KB |
| HE0005154.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 124 KB |
| HE0005155.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 483 KB |
| HE0005163_VOL001.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 102 KB |
| HE0006815_VOL001.pdf | 7/26/2016 10:19 AM | Adobe Acrobat D... | 552 KB |
| URS 033308.pdf | 7/26/2016 10:20 AM | Adobe Acrobat D... | 9,562 KB |
| URS 038807.pdf | 7/26/2016 10:22 AM | Adobe Acrobat D... | 874 KB |
| URS 039466.pdf | 7/26/2016 10:24 AM | Adobe Acrobat D... | 16,555 KB |
| URS 067952.pdf | 7/26/2016 10:25 AM | Adobe Acrobat D... | 743 KB |
| URS040311_image.pdf | 7/26/2016 10:25 AM | Adobe Acrobat D... | 180 KB |
| URS040655_image_.pdf | 7/26/2016 10:26 AM | Adobe Acrobat D... | 637 KB |
| URS049086_image.pdf | 7/26/2016 10:27 AM | Adobe Acrobat D... | 765 KB |

NON-CERTIFIED COPY

| File | Date | Type | Size |
|---|---|---|---|
| H&E 0003840.pdf | 7/26/2016 10:44 AM | Adobe Acrobat D... | 2,572 KB |
| H&E 0004244.pdf | 7/26/2016 10:47 AM | Adobe Acrobat D... | 1,996 KB |
| H&E 0013874.pdf | 7/27/2016 2:06 PM | Adobe Acrobat D... | 318 KB |
| H&E 0013938.pdf | 7/26/2016 10:49 AM | Adobe Acrobat D... | 849 KB |
| H&E 0063316.pdf | 7/26/2016 10:51 AM | Adobe Acrobat D... | 268 KB |
| H&E 0063319.pdf | 7/26/2016 10:52 AM | Adobe Acrobat D... | 350 KB |
| H&E 0064507.pdf | 7/26/2016 10:53 AM | Adobe Acrobat D... | 2,929 KB |
| H&E 0065372.pdf | 7/26/2016 10:55 AM | Adobe Acrobat D... | 8,306 KB |
| URS 031731.pdf | 7/26/2016 10:57 AM | Adobe Acrobat D... | 2,400 KB |
| URS 033145.pdf | 7/26/2016 10:58 AM | Adobe Acrobat D... | 21,048 KB |
| URS 038163.pdf | 7/26/2016 11:00 AM | Adobe Acrobat D... | 271 KB |
| URS 055534.pdf | 7/26/2016 11:00 AM | Adobe Acrobat D... | 2,391 KB |
| URS 059506.pdf | 7/26/2016 11:01 AM | Adobe Acrobat D... | 150 KB |
| URS 066293.pdf | 7/26/2016 11:01 AM | Adobe Acrobat D... | 10,649 KB |
| URS 066657.pdf | 7/26/2016 10:33 AM | Adobe Acrobat D... | 2,228 KB |
| URS 066706.pdf | 7/26/2016 10:36 AM | Adobe Acrobat D... | 2,263 KB |
| URS 066880.pdf | 7/26/2016 10:39 AM | Adobe Acrobat D... | 5,059 KB |
| URS 066908.pdf | 7/26/2016 10:41 AM | Adobe Acrobat D... | 229 KB |
| URS 0336067.pdf | 7/26/2016 10:42 AM | Adobe Acrobat D... | 2,765 KB |
| 201308131556a.pdf | 8/11/2014 2:11 PM | Adobe Acrobat D... | 388 KB |
| 201308131556b.pdf | 8/11/2014 2:11 PM | Adobe Acrobat D... | 34 KB |
| 201308131556c.pdf | 8/11/2014 2:11 PM | Adobe Acrobat D... | 167 KB |
| 201308241548.pdf | 9/24/2013 3:54 PM | Adobe Acrobat D... | 2,680 KB |
| Baton Rouge Project Change Orders.xls | 8/11/2014 2:11 PM | Microsoft Excel 97... | 60 KB |
| C 5.0 REVISED per RFI #26_.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 745 KB |
| C1.0 site plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 293 KB |
| C2.0 Demolition plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 367 KB |
| C3.0 Geometric plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 363 KB |
| C3.1 Joint layout plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 236 KB |
| C4.0 drainage plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 937 KB |
| C5.0 grading plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 317 KB |
| C6.0 Utility plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 340 KB |
| C7.0 details.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 926 KB |
| C8.0 FENCE details.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 56 KB |
| C9.0 FENCE details 2.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 770 KB |
| C-101.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 390 KB |
| C-102.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 818 KB |
| C-201.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 523 KB |
| C-202.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 666 KB |
| C-203.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 601 KB |
| C-204.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 371 KB |
| C-205.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 354 KB |
| C-206.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 308 KB |
| C-405.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 449 KB |
| C-406.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 2,577 KB |
| C-407.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 709 KB |
| C-501.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 670 KB |
| C-502.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 651 KB |
| C-503.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 808 KB |
| C-504.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 692 KB |
| C-505.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 558 KB |
| C-506.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 591 KB |
| C-507.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 407 KB |
| C-508.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 923 KB |
| C-509.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 779 KB |

NON-CERTIFIED COPY

| | | | |
|---|---|---|---|
| Cement Concrete Pavement - Kenner, LA.PDF | 9/17/2013 4:36 PM | Adobe Acrobat D... | 1,699 KB |
| Concrete Work - Headquarters and Branch Buildings.pdf | 9/17/2013 4:36 PM | Adobe Acrobat D... | 1,305 KB |
| Crane Remanufacturing Center Relocation - Belle Chasse, LA.PDF | 9/17/2013 4:35 PM | Adobe Acrobat D... | 1,305 KB |
| G-001.pdf | 7/5/2011 10:39 AM | Adobe Acrobat D... | 1,988 KB |
| G-002.pdf | 7/5/2011 10:33 AM | Adobe Acrobat D... | 1,536 KB |
| H&E Belle Chasse COP Log.xls | 8/11/2014 2:11 PM | Microsoft Excel 97... | 138 KB |
| H+E Kenner G-001.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 7,512 KB |
| Kenner Project Change Orders 08-2013.xlsx | 8/11/2014 2:11 PM | Microsoft Excel W... | 13 KB |
| Missing Page Request_02751.pdf | 9/25/2013 5:45 PM | Adobe Acrobat D... | 1,104 KB |
| Missing Page Request_08300.pdf | 9/25/2013 5:46 PM | Adobe Acrobat D... | 190 KB |
| S100.pdf | 3/27/2013 11:49 AM | Adobe Acrobat D... | 920 KB |
| S110.pdf | 3/27/2013 11:58 AM | Adobe Acrobat D... | 853 KB |
| S200.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 1,315 KB |
| S210.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 704 KB |
| S220.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 843 KB |
| S300.pdf | 3/27/2013 12:09 PM | Adobe Acrobat D... | 1,890 KB |
| S310.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 744 KB |
| S320.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 672 KB |
| S400.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 760 KB |
| S410.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 588 KB |
| S420.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 573 KB |
| S430.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 714 KB |
| alum_nosing_a_b-1.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-1sp.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-5.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-16a.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-31a.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| anchoring.gif | 10/2/2014 2:32 PM | GIF image | 29 KB |
| b-3.jpg | 10/2/2014 2:32 PM | JPEG image | 3 KB |
| back_to_top.jpg | 10/2/2014 2:32 PM | JPEG image | 2 KB |
| backs.gif | 10/2/2014 2:32 PM | GIF image | 15 KB |
| barry.css | 10/2/2014 2:32 PM | Cascading Style S... | 7 KB |
| button_cad.gif | 10/2/2014 2:32 PM | GIF image | 1 KB |
| button_dwg.gif | 10/2/2014 2:32 PM | GIF image | 1 KB |
| cast_iron_b-16.jpg | 10/2/2014 2:32 PM | JPEG image | 16 KB |
| cast_iron_cast_aluminum.jpg | 10/2/2014 2:32 PM | JPEG image | 21 KB |
| curb_bar_cb-15a.gif | 10/2/2014 2:32 PM | GIF image | 5 KB |
| curb_bar_cb-25a.gif | 10/2/2014 2:32 PM | GIF image | 5 KB |
| noses.gif | 10/2/2014 2:32 PM | GIF image | 15 KB |
| nosings_b-1.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| nosings_b-1sp.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-2.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-16.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-16a.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-100.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-110.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| nosings_b-120.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| pic_products.jpg | 10/2/2014 2:32 PM | JPEG image | 37 KB |
| CAT - Success Story.pdf | 10/21/2013 1:58 PM | Adobe Acrobat D... | 223 KB |
| CAT Aurora, IL Projects II.ppt | 10/24/2012 7:51 PM | Microsoft PowerP... | 9,556 KB |
| CAT Project References.pdf | 10/21/2013 1:58 PM | Adobe Acrobat D... | 89 KB |
| IMG_0894.MOV | 10/25/2013 6:36 AM | QuickTime Movie | 724 KB |
| Kobelco - Success Story.pdf | 10/21/2013 1:58 PM | Adobe Acrobat D... | 131 KB |
| 123header.jpg | 10/2/2014 3:04 PM | JPEG image | 5 KB |
| Grey-Diamond-Plate.jpg | 10/2/2014 3:04 PM | JPEG image | 18 KB |
| Grey-Diamond-Plate_LIGHT.jpg | 10/2/2014 3:04 PM | JPEG image | 4 KB |
| LINE_2.gif | 10/2/2014 3:04 PM | GIF image | 1 KB |
| logo_non_ani.jpg | 10/2/2014 3:04 PM | JPEG image | 6 KB |
| redbut.jpg | 10/2/2014 3:04 PM | JPEG image | 1 KB |

NON-CERTIFIED COPY

| | | | |
|---|---|---|---|
| 330R_08.pdf | 6/30/2016 6:11 PM | Adobe Acrobat D... | 819 KB |
| ACI 2243r_95 Expansion joint.pdf | 11/11/2013 10:54 ... | Adobe Acrobat D... | 887 KB |
| ACI 3021R_04.pdf | 11/11/2013 10:56 ... | Adobe Acrobat D... | 971 KB |
| ACI-330_Design_Guide_for_Concrete_Parking_Lots.pdf | 6/30/2016 5:53 PM | Adobe Acrobat D... | 652 KB |
| Barry Pattern & Foundry - BarryCraft - Cast Abrasive Nosings & Treads.htm | 10/2/2014 2:32 PM | HTML Document | 29 KB |
| Baton Rouge.png | 7/29/2016 1:22 PM | PNG image | 1,998 KB |
| CAT Aurora, IL Projects II.ppt | 10/24/2013 7:51 PM | Microsoft PowerP... | 9,556 KB |
| Concrete Slab Surface Defect Repairs.pdf | 9/23/2014 2:49 PM | Adobe Acrobat D... | 4,381 KB |
| IMG_0894.MOV | 10/25/2013 6:36 AM | QuickTime Movie | 724 KB |
| Kenner.png | 7/29/2016 1:23 PM | PNG image | 1,740 KB |
| Multi-Fab - Curb Angles.htm | 10/2/2014 3:04 PM | HTML Document | 41 KB |
| nzs 3101.1 2006.pdf | 10/17/2013 10:23 ... | Adobe Acrobat D... | 5,995 KB |
| nzs 3101.2 2006.pdf | 10/17/2013 10:22 ... | Adobe Acrobat D... | 8,202 KB |
| Page 9_330R-08.pdf | 7/27/2016 11:36 AM | Adobe Acrobat D... | 97 KB |
| URS 31020-93139.pdf | 6/27/2016 10:35 AM | Adobe Acrobat D... | 328,781 KB |

NON-CERTIFIED COPY

# E$^{x}$ponent

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *
                        *
H&E EQUIPMENT SERVICES  *
                        * NUMBER 626,308
VERSUS                  *
                        * DIVISION "D"
URS CORPORATION         *
ARCHITECTURE, P.C., URS *
CORPORATION, L O'NEAL   *
JOHNSON AND THOMAS E.   *
RYAN, III               *
                        *
*  *  *  *  *  *  *  *  *
```

          Deposition of WALLACE C. DRENNAN

III, taken on Wednesday, September 21, 2016,

commencing at 9:44 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.

EXHIBIT
17

NON-CERTIFIED COPY

Page 2

1               I N D E X

2

3                                        Page

4
   Caption                                1
5  Index of Exhibits                      3
   Appearances                            5
6  Agreement of Counsel                   6

7  Examination

8     PHILIP A. FRANCO, ESQ.              7
      LORETTA G. MINCE, ESQ             180
9     PHILIP A. FRANCO, ESQ.            183

10
            *    *    *    *    *
11
   Witness' Certificate                 207
12 Reporter's Page                      208
   Certificate                          209

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

1                    INDEX OF EXHIBITS

2

3    Number                              Page

4    1   July 28, 2016 Wallace C.          21
           Drennan III report
5

     2   January 11, 2007 STE             42
6            Report of Geotechnical
             Investigation Proposed
7            H&E Buildings, Pecue Lane,
             Baton Rouge, Louisiana
8            H&E 0000211-0000244

9    3   February 9, 2011 Terracon        90
             Geotechnical Engineering
10           Report H&E Equipment -
             Addition and Renovation,
11           Kenner, Louisiana
             H&E 0065373-0065415
12

     4   Wallace C. Drennan, Inc.        140
13           Cost Detail H&E Concrete
             Replacement Baton Rouge
14           8" and 6" concrete
             H&E 074065-074075
15

     5   Wallace C. Drennan, Inc.        141
16           Cost Detail H&E Concrete
             Replacement Baton Rouge
17           All 8" concrete
             H&E 074057-074064
18

19   6   Wallace C. Drennan, Inc.        151
             Cost Detail H&E Concrete
20           Replacement Kenner
             7" and 6" concrete
21           H&E 074085-074096

22   7   Wallace C. Drennan, Inc.        151
             Cost Detail H&E Concrete
23           Replacement Kenner
             All 8"
24           H&E 074076-074084

25

NON-CERTIFIED COPY

Page 4

1    (Cont.)        INDEX OF EXHIBITS

2

3        Number                                    Page

4        8   Photograph                    155
               H&E 074103

5
         9   Photograph                    157
6              H&E 074106

7       10   Photograph                    161
               H&E 074108

8
        11   Photograph                    164
9              H&E 074136

10      12   Photograph                    166
               H&E 074162

11
        13   Photograph                    167
12             H&E 074186

13      14   Photograph                    170
               H&E 074236

14
        15   Photograph                    173
15             H&E 074261

16      16   Photograph                    175
               H&E 074299

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 5

1    APPEARANCES:

2

     Representing the Plaintiff:
3
        FISHMAN HAYGOOD, LLP
4       Attorneys at Law
        201 St. Charles Avenue, Suite 4600
5       New Orleans, Louisiana  70170

6       BY:  LORETTA G. MINCE, ESQ.

7

8

9    Representing the Defendant:

10      ADAMS AND REESE, LLP
        Attorneys at Law
11      4500 One Shell Square
        New Orleans, Louisiana  70139

12      BY:  PHILIP A. FRANCO, ESQ.

13

14   ALSO PRESENT:
        James R. Bailey, Ph.D., P.E.
15      Exponent, Inc.

16

     Reported by:
17               KAY E. DONNELLY
                 Certified Court Reporter
18               State of Louisiana

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 6

1                   S T I P U L A T I O N

2

3          It is stipulated and agreed by and between

4    counsel that the deposition of WALLACE C.

5    DRENNAN III is hereby being taken under the

6    Louisiana Code of Civil Procedure in accordance

7    with the Code.

8          The formalities of sealing and

9    certification are hereby waived.  The witness

10   will reserve the right to read and sign the

11   deposition.  The party responsible for service

12   of the discovery material shall retain the

13   original.

14         All objections, save those as to the form

15   of the questions, are hereby reserved until such

16   time as this deposition, or any part thereof,

17   may be used or sought to be used in evidence,

18   and are to be made in accordance with the Code

19   of Civil Procedure.

20                   *   *   *   *   *

21         KAY E. DONNELLY, Certified Court Reporter,

22   in and for the State of Louisiana, officiated in

23   administering the oath to the witness.

24

25

NON-CERTIFIED COPY

1        WALLACE C. DRENNAN, Wallace C. Drennan,

2    Inc., P.O. Box 15438, New Orleans, Louisiana,

3    70175, after having been first duly sworn,

4    testified on his oath as follows:

5    EXAMINATION BY MR. FRANCO:

6        Q.  Good morning, Mr. Drennan.  My name is

7    Phil Franco, and I represent URS and the other

8    defendants in this case.

9            Have you ever been deposed before, sir?

10       A.  Yes.

11       Q.  About how many times have you been

12   deposed?

13       A.  More than ten.

14       Q.  Okay.  So you understand the process?

15       A.  Yes.

16       Q.  If you don't understand a word that I'm

17   using or my question, would you please let me

18   know, and I will try to rephrase that for you so

19   that you can understand it.

20       A.  Yes.

21       Q.  Otherwise, I will assume that you

22   understand my question.

23           Would you state your full name and

24   address for the Record, please?

25       A.  Wallace C. Drennan III, 2225 Chestnut

NON-CERTIFIED COPY

Page 21

1    EXAMINATION BY MR. FRANCO:

2       Q.  Okay.  Actually, Mr. Drennan, I am going

3    to label a copy of your report dated July 28,

4    2016, as Exhibit 1, and we will get a clean copy

5    attached.

6           Did you have any help in drafting this

7    report?

8       A.  No.

9       Q.  You did this all yourself?

10      A.  My office -- yeah, I did it all myself.

11      Q.  I mean, you didn't have any help with

12   gathering any of the documents or any

13   discussions?  You didn't talk to anybody about

14   this other than maybe Counsel?

15      A.  I talked to some people in my office who

16   have, you know, experience.

17      Q.  Okay.

18      A.  I have a couple of engineers working for

19   me.

20      Q.  All right.  And for the Record, you're

21   not an engineer, correct?

22      A.  No.

23      Q.  And you're not licensed as an engineer

24   in any state, correct?

25      A.  No.

NON-CERTIFIED COPY

LA CONTRACTORS

LICENSE NO. 1033

WCD

(SM) euooo
FAX

(SN) 836-2939

Wallace C.

# Drennan, Inc.

### General Contractors
#### P.O. BOX 16438
##### 70175-6438

NEW ORLEANS, LA

July 28, 2016

E-MAIL

Fishman Haygood, L.L.P.
201 St. Charles Ave., 40 Floor
New Orleans, La. 70170
Attention: Lori Mince

Re: H&E Equipment Services, Inc. v. URS Corporation Architecture, P.C., et al., Suit No. 626,308, 1ʰ JDC, Parish ofEast Baton Rouge, State ofLouisiana

Dear Ms. Mince:

Fishman Haygood, L.L.P. has asked Wallace C. Drennan, Inc. ("WCD") to prepare a report addressing issues related to cracking and spalling of concrete pavement at the H&E Equipment Services ("H&E") facilities in Baton Rouge and Kenner, Louisiana. This report is in response to Fishman Haygood's request and summarizes my opinions.

For this assignment, I relied on the following materials provided to me:

H&EBaton Rouge Facility

1. As-Built Plans sheet nos. C-201, C-202, C-203, C-204, C-205, C-206, C-207, C-301, C-302, C-303, C-304, C-305, C-306 and C-501.

2. STE Geotechnical Investigation Proposed H & E Buildings Pecue Lane, Baton Rouge, Louisiana dated January 1 1, 2007. (H&E 0000211 to 0000259).

3. URS Project Specifications - Project Manual Sec. 2516 (URS 062010062242).



DRENNAN

EXHIBIT NO. 1

K. DONNELLY

NON-CERTIFIED COPY

including the CJ (see detail no. 4 as shown plan sheet no. C-501) and EJ (see detail no. 3 as shown plan sheet no. C-501). The design of the pavement for the Baton Rouge facility is defective in numerous respects, including the following:

1. The design of the CJ does not include smooth dowels and it is defective. This omission is not in conformance with the following:

   a. Louisianan Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet nos. 1, 2 and 3.

   b. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

   c. City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 1 8, 2008, 502-01, sheet nos. l, 2 and 3.

   d. STE Geotechnical Investigation Proposed H & E Buildings Pecue Lane, Baton Rouge, Louisiana dated January 1 1, 2007. (H&E 0000211 to 0000259).
      Wfically, it is not in compliance with section no. 8.2 "Rigid Pavement" of this

2. The plans (see detail no. I & 2 as shown on plan sheet no. C-501) reflect #3 rebar running across the CJs. This is not consistent with standards promulgated in nos. I .a., 1 b. and 1 c. in the paragraph above. Additionally, using this design does not permit the CJs to contract. Therefore, it is not a functioning CJ and is defective.

3. The design of the typical CJ (see detail no. 4 as shown plan sheet no. C-501) reflects a saw cut joint of h inch depth. This depth is not in accordance with standards promulgated nos. l.a,, 1b. and lc. above. Additionally, based on my professional experience, this depth hinders the functioning of the CJ and is inadequate. Table 1, as shown on the City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01 , sheet no. 1, calls for a "MINIMUM DEPTH OF JOINT" of 2 inches for 6 inch PCCP thickness and 3 inches for 8 inch PCCP thickness.

4. The design of the EJ contained in the plans reflects the use of #4 (1/2") smooth dowels spaced at 18 inch on center. The size and placement of these dowel bars is not in accordance with standards promulgated nos. l.a., 1b. and lc. above. In my opinion the dowel bars are too small and should be spaced on 12 inch center not 18 inch. Table 1, as shown on City of Baton Rouge, Parish Of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 1 8, 2008, 502-01, sheet no. 1, calls for a (#8) smooth dowels for 6 inch PCCP thickness and 1 1/4 inch smooth dowels for 8 inch PCCP thickness both on 12 inch center. Also, Table l, as shown on the Louisiana Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet no. 1 calls for 1 1/4" (#10) smooth dowels for 8 inch PCCP thickness on 12 inch center.

The design defects referred to above are consistent with random cracking across panels of PCCP and diagonal comer cracking at the intersections of Joints (CJ and CJ/CJ and EJ).

NON-CERTIFIED COPY

does not permit the CJs to contract. Therefore, it is not a functioning CJ and is defective.

3. The CJ shows a saw-cut of 1/4" depth of concrete. This depth is not in accordance with standards promulgated by LADOTD. Additionally, based on my professional experience, this depth is inadequate.

4. The design of the typical transverse expansion joint contained in the plans reflects the use of #4 (1/2") smooth dowels spaced at 18 inch on center. The size and placement of these dowel bars is not in accordance with specifications for the ACI or the DOTD. In my opinion, the dowel bars are too small and should be spaced on 12 inch center not 18 inch.

The design defects referred to above are consistent with random cracking across panels of PCCP and diagonal corner cracking at the intersections of joints (CJ and CJ/CJ and EJ).

In addition to the foregoing, the design of the concrete calls for 7" of concrete. Given the extremely poor soils conditions in Kenner, based on my professional experience, a minimum of 8" of thickness is required in areas where heavy equipment is used.

Due to the nature of concrete, and its thermal expansion and contraction, it cracks without proper crack control. Properly designed CJs and EJs, reinforcement, and proper pavement thickness, are important to insuring the integrity of the concrete and preventing excess cracking and failure. The design deficiencies outlined above are consistent with the cracking observed at both the Baton Rouge and Kenner facilities. In both situations, had the joints been saw cut 2 inches deep for 6 inch PCCP and 3 inches deep for 8 inch PCCP, the #3 rebar crossing the joints stiff prohibited the CJs from contracting. Thus, the concrete was left to crack at areas of least resistance resulting in Diagonal Corner Cracking and Random Cracking.

In addition to the foregoing, the operation of metal track equipment across the pavement has resulted in spalling observed along the surface of the joints. It was foreseeable that the operation of H&E's equipment across the joints would cause spalling along the joints. URS should have recommended a design that would offer additional protection for the joints.

The estimated cost of removing and replacing the Concrete to correct the deficiencies in the CJs and FJs outlined above is one million six hundred fifty six thousand dollars ($1,656,000) The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJ and EJs and increase the concrete thickness to 8 inches in all areas is one million seven hundred sixteen thousand dollars ($1,716,000). All estimated costs are rounded to the nearest thousand dollars. estimated costs do not include any contingency costs which normally to 20% of the estimated costs. The estimated costs include 8% for engineering costs. According to the State of Louisiana Facility Planning & Control ME Consulting Fees Spreadsheet for a project of this size, the Fee % is 7.7%. The estimated costs do not include the costs of a testing laboratory. Add for testing.

NON-CERTIFIED COPY

1

```
1              19th JUDICIAL DISTRICT COURT
               PARISH OF EAST BATON ROUGE
2                   STATE OF LOUISIANA

3

4

5   H&E EQUIPMENT SERVICES,      *    DOCKET NO.
    INC.                         *    626,308
6                                *
    VERSUS                       *
7                                *    SECTION: "D"
    URS CORPORATION              *
8   ARCHITECTURE, P.C., URS      *
    CORPORATION, L. O'NEAL       *
9   JOHNSON, AND THOMAS E.       *
    RYAN, III                    *
10
       *   *   *   *   *   *   *   *   *   *
11

12

13

14              Deposition of GARY LEE ANDERTON,
    Ph.D., 200 Newitt Vick Drive, Vicksburg,
15  Mississippi  39183, taken in the Law Offices of
    ADAMS and REESE, LLP, Suite 4500, One Shell
16  Square, 701 Poydras Street, New Orleans,
    Louisiana  70139, commencing at 10:04 o'clock
17  a.m., on Tuesday, the 27th day of September 2016.

18

19  APPEARANCES:

20

21       FISHMAN HAYGOOD, L.L.P.
         Attorneys at Law
22       (By:  LORETTA G. (LORI) MINCE, Esquire
         lmince@fishmanhaygood.com
23       Suite 4600
         201 St. Charles Avenue
24       New Orleans, Louisiana  70170-4600
         (Attorneys for the Plaintiff,
25        H&E Equipment Services, Inc.)
```



EXHIBIT
18

NON-CERTIFIED COPY

2

1  APPEARANCES CONTINUED:

2        LAW OFFICES OF ADAMS and REESE
         (By:  PHILIP A. FRANCO, Esquire)
3        philip.franco@arlaw.com
         Suite 4500
4        One Shell Square
         701 Poydras Street
5        New Orleans, Louisiana  70139
         (Attorneys for the Defendants,
6         URS Corporation Architecture, P.C.,
          URS Corporation, L. O'Neal Johnson,
7         and Thomas E. Ryan, III)

8

9


10  REPORTED BY:

11
         JANET GILLEN ROBINSON, CCR
12       Certified Court Reporter
         HUFFMAN & ROBINSON, INC.
13       Suite 220, Metairie Office Tower
         433 Metairie Road
14       Metairie, Louisiana  70005
         (504) 831-1753 / (800) 749-1753
15       www.huffrob.com

16

17

18
              E X A M I N A T I O N    I N D E X
19

20

21                                          PAGE

22
    EXAMINATION BY MS. MINCE...................6
23

24

25

NON-CERTIFIED COPY

3

1               E X H I B I T   I N D E X

2

3    Anderton Exhibit Number 1..................8
          (Document entitled "Concrete Pavement
4          Condition Analysis of H&E Equipment
           Locations at Baton Rouge and Kenner,
5          Louisiana, dated September 7, 2016.")

6    Anderton Exhibit Number 2.................21
          (Document entitled
7           "PLAINTIFF'S REQUEST PRODUCTION")

8    Anderton Exhibit Number 3.................66
          (URS Drawing C-501)
9
     Anderton Exhibit Number 4.................69
10         (Photograph)

11   Anderton Exhibit Number 5.................78
          (Drawing C-3.1
12         Bates Stamp Number H & E 0002799)

13   Anderton Exhibit Number 6.................88
          (Photograph entitled "Figure 1.
14         Various Perspectives of
           Baton Rouge Site.")
15
     Anderton Exhibit Number 7................102
16         (STE Report, dated January 11, 2007,
           with attachments
17         Bates Stamp Number URS - 094355
           through Bates Stamp Number 094388)
18
     Anderton Exhibit Number 8................106
19         (Terracon Consultants, Inc. Report,
           dated February 9, 2011, with
20         attachments
           Bates Stamp Number URS - 094548 through
21         Bates Stamp Number URS - 094590)

22   Anderton Exhibit Number 9................131
          (Document entitled "Section 601
23         Portland Cement Concrete Pavement.")

24   Anderton Exhibit Number 10...............131
          (Document entitled "PORTLAND CEMENT
25         CONCRETE PAVEMENT DETAILS,

NON-CERTIFIED COPY

4

1   Anderton Exhibit Number 11.................131
2        (Document entitled "STATE OF
         LOUISIANA CONCRETE PAVEMENT
3        DETAILS 502-1," with attachments.)

4   Anderton Exhibit Number 12.................132
         (Document entitled "GENERAL
5        CONSTRUCTION NOTES:  C-509.")

6   Anderton Exhibit Number 13.................159
         (Document entitled "Guide to Design
7        of Slabs-on-Ground, ACI 360R-10.")

8   Anderton Exhibit Number 14.................184
         (Document entitled "Guide for Design
9        and Construction of Concrete Parking
         Lots," ACI 330R-01, with attachments
10       Bates Stamp Number URS 033309 through
         Bates Stamp Number URS 033340)
11
    Anderton Exhibit Number 15.................186
12       (E-mail From:  Chad Herndon To:
         Leonard St. Germain, dated
13       February 6, 2007
         Bates Stamp Number H&E 0005163)
14
    Anderton Exhibit Number 16.................200
15       (Document entitled "Guide for the
         Design and Construction of
16       Concrete Parking Lots, ACI 330R-08."

17  Anderton Exhibit Number 17.................205
         (E-mail String, Bates Stamp Number
18       H&E 0025353through Bates
         Stamp Number H&E 0025355)

19

20

21

22

23

24

25

NON-CERTIFIED COPY

5

# S T I P U L A T I O N

It is stipulated and agreed by and between Counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken, pursuant to notice, under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, including use at trial, in accordance with law;

That the formalities of reading and signing are not waived;

That the formalities of filing, sealing and certification are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

It is further stipulated that Janet Gillen Robinson, in her capacity as a Certified Court Reporter in the State of Louisiana, may administer the oath to the witness.

NON-CERTIFIED COPY

6

1            GARY LEE ANDERTON, Ph.D.,

2  200 Newitt Vick Drive, Vicksburg, Mississippi

3  39183, after having been first duly sworn by the

4  above-mentioned Certified Court Reporter, did

5  testify as follows:

6  EXAMINATION BY MS. MINCE:

7        Q.    Good morning.

8        A.    Good morning.

9        Q.    We met a few minutes ago.  I'm Lori

10  Mince.  I represent H&E Equipment in a lawsuit

11  that H&E has brought against URS.

12             We're going to take your deposition

13  today, mostly regarding the contents of a report

14  that you prepared in connection with this

15  litigation.

16             Have you ever given your deposition

17  before?

18        A.    I have.

19        Q.    How many times?

20        A.    Once.

21        Q.    And tell me about that case.

22        A.    It's been maybe two years ago,

23  serving as an expert in a pavements-related case.

24  I was deposed by a lawyer for the plaintiff.

25        Q.    Were you retained by the defendant

NON-CERTIFIED COPY

7

1   in that case?

2        A.    I was.

3        Q.    And what was the name of that

4   defendant?

5        A.    Well, the law firm was Mitchell,

6   McNutt and Sams.

7        Q.    Do you remember the names of the

8   parties in that lawsuit?

9        A.    Jones Electric was the main party I

10  was defending -- excuse me.

11       Q.    And what was the name of the

12  plaintiff?

13       A.    Brewer -- David Brewer.  He was the

14  developer.

15       Q.    And can you just summarize what the

16  claims were in that case?

17       A.    There was a claim that electric

18  trenches done at a residential site caused

19  subsidence, and failure, in an asphalt pavement

20  near by.

21       Q.    This was a residential subdivision?

22       A.    Yes.

23       Q.    All right.  So since you've done

24  this just once before, you kind of understand how

25  this goes.  I ask a series of questions, and you

NON-CERTIFIED COPY

56

1  cause, and, in my opinion, no, for the main

2  reason, these failures are isolated, and not

3  widespread.

4      Q.    Tell me what you consider to be

5  isolated versus widespread?

6      A.    Less than five or ten percent of the

7  total pavement area -- not all the area in the

8  heavily trafficked areas of the parking lot.

9      Q.    And we're still talking about the

10  D-cracking right now?

11     A.    Yes.

12     Q.    All right.  I want to talk about --

13  you make a reference here on Page 4 to

14  construction joints cut not deep enough.

15         And did you make any observations

16  about the depth of the saw cuts in the control

17  joints?

18     A.    I witnessed others during the August

19  site visit making some measurements.

20     Q.    Did you make any measurements?

21     A.    I did not.

22     Q.    Did the others making the

23  measurements share the measurements with, or do

24  you know what the measurements were?

25     A.    Just verbally.

NON-CERTIFIED COPY

57

1      Q.    And what did they tell you?

2      A.    Just various depths, from a

3 half-inch, to three-quarters of an inch.

4      Q.    And you would agree with me that

5 that's not deep enough for a saw cut control

6 joint; correct?

7      A.    Correct.

8      Q.    And is there a standard that the

9 industry follows for the proper depth of a saw

10 cut control joint?

11      A.    Generally speaking, a third to a

12 fourth of the slab depth -- inches.

13      Q.    Meaning, if you have an 8-inch slab,

14 you would be looking for a 2-inch --

15      A.    Initial saw cut.

16      Q.    -- a 2-inch saw cut?

17      A.    Yes.

18      Q.    And the reason you want the control

19 joints to be sawed the appropriate depth, is

20 what?

21      A.    To create a weak enough plane to

22 cause the shrinkage cracking to occur in a

23 straight line.

24      Q.    All right.  Right.  And so the

25 normal -- you said that you observed what you

NON-CERTIFIED COPY

146

1 could go up and down the highway, the designer

2 doesn't care.  They only care about how many

3 trucks are going down, because in terms of load

4 fatigue damage, it takes well over a hundred

5 passenger cars, to equate to trucks, so if you

6 design to handle the proper number of trucks,

7 then, you can run, essentially, unlimited

8 passenger vehicles, so you don't even consider

9 that in the structural design.

10                That's the same case as we have

11 here.  If the parking lot did not have truck

12 traffic, then, you would be more concerned with

13 the weight of the other vehicles on there.

14                But because there's truck traffic

15 there, you design it to handle structurally truck

16 traffic, and, then, everything else is taken care

17 of.

18        Q.    So if you were designing the H&E

19 facility in Baton Rouge, you would recommend that

20 they use 8-inch pavement, no dowels, or 7-inch

21 pavement with dowels, in any area where they

22 expected heavy truck traffic?

23        A.    Yes.

24        Q.    All right.  Is the same true for

25 Kenner?

NON-CERTIFIED COPY

CUSTOMARK

19TH JUDICIAL DISTRICT COURT

JAN 3 0 2017

PARISH OF EAST BATON ROUGE

BY _____
DY CLERK OF COURT

STATE OF LOUISIANA

DOCKET NO.: 626,308                    SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS                      POSTED

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____    _____

                                   DEPUTY CLERK

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT ON
## RECONVENTIONAL DEMAND

**MAY IT PLEASE THE COURT**:

Plaintiff H&E Equipment Services, Inc. ("H&E"), respectfully submits this opposition to the Motion for Summary Judgment on Reconventional Demand by defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III (collectively "URS").

### INTRODUCTION

In this case, H&E seeks damages from URS related to URS's services in connection with the design of three H&E facilities located in Baton Rouge, Kenner, and Belle Chasse, Louisiana from 2006 to 2013. In response to H&E's petition, URS filed a reconventional demand for unpaid fees in connection with the three projects, all issued in and after December 2012. H&E denied the allegations, disputed that any fees were owed, and asserted its right to offset and/or credit against any fees found to be due. URS's present motion requests summary judgment on its reconventional demand. URS argues that it is entitled to payment of invoices totaling $232,939 because H&E did not timely dispute the invoices or provide sufficient notice of the deficiencies in URS's work. URS's motion asks the Court to accept its heavily edited facts and ignore the reality of the parties' relationship. The Court should decline the invitation and deny the motion.

### SUMMARY OF ARGUMENT

H&E's dispute with URS is not limited to individual, one-off tasks, but to URS's performance of services over a seven year period on all three projects. Those services were



NON-CERTIFIED COPY

1160947v.1

REC'D C.P.

JAN 3 1 2017

defective in numerous respects.  H&E has already paid URS substantial fees for those defective services.  URS should not be allowed to collect any additional fees allegedly due until it is judicially determined that the fees are owed and H&E's claim for damages arising from URS's defective design work is fully adjudicated.

As H&E's dispute with URS is not limited to individual tasks but concerns URS's entire performance on all projects, the contractual provisions governing the procedure to dispute portions of invoices are simply inapplicable.  And by January 2013, URS was acutely aware of H&E's dissatisfaction with its performance and had clear and unambiguous notice that H&E was withholding payment on every future invoice issued thereafter.  Also from December 2012 until the filing of this lawsuit in November 2013, H&E provided notice of, and URS acknowledged, the ongoing disputes concerning URS's defective services in writing, punch-lists, and correspondences.  During the same time, URS made some attempts, but ultimately failed, to remedy its deficient services.

URS also waived its sole remedy under the contractual provisions, namely to suspend further services until H&E's payments were current.  Instead, URS continued working on all three projects for months after December 2012, presumably because URS acknowledged that H&E was actively disputing all invoices.

URS's blanket assertion that the invoices are unrelated to defective services is also disputed by the facts.  Invoices from the Baton Rouge and Kenner projects, issued after both projects reached substantial completion, primarily concern URS's attempts to remedy prior defective design work.  Invoices from the Belle Chasse project directly concern URS's defective services in creating designs and construction documents that omitted essential features, as well as costly change orders that resulted from URS's omission.

Summary judgment is further inappropriate because URS does not have a liquidated claim.  A disputed claim is by its very nature not liquidated.  URS's claim for unpaid invoices cannot be liquidated because H&E disputes that URS is entitled to any fees for its defective services.  Finally, while H&E's defenses of offset or compensation are not available at this time, those doctrines may be applicable if and when H&E's claims and URS's reconventional demand are reduced to judgments.

URS's motion should be denied.

1160947\1

NON-CERTIFIED COPY

## FACTUAL OVERVIEW

I.    **URS's motion provides an incomplete history of the contractual relationship between the parties.**

    a.    **Baton Rouge project and the 2006 Agreement**

URS and H&E's relationship began with discussions in 2006 regarding the construction of a new corporate headquarters and branch facility in Baton Rouge, Louisiana.[1]  In anticipation of the Baton Rouge project, H&E entered into the 2006 Agreement with URS on or about August 28, 2006.[2]  The agreement was to govern URS's performance of services via a series of work orders that specified scopes of services and compensation.[3]  Pursuant to the 2006 Agreement, URS agreed to furnish all design-related and construction administration-related services for the project.[4]

URS's work on the Baton Rouge project occurred in multiple phases for a number of years.[5]  In Phase I, URS established the site layout for the buildings and developed a program and elevation concept.[6]  In Phase II, URS used the information gathered in Phase I to develop "a more fully developed design."[7]  By July 2008, the project had progressed to Phase III in which URS prepared complete construction documents.[8]

Shortly after the construction documents were created, the development of the Baton Rouge facility was put on hold due to poor general economic conditions.[9]

    b.    **Kenner and the 2009 Agreement**

In mid-2009, URS was engaged to provide services related to the renovation of H&E's branch office in Kenner, Louisiana.[10]  In August 2009, URS provided a proposal which quoted $20,000 to help H&E develop a budget for possible renovations.[11]  In connection with this limited proposal, URS asked H&E to sign the 2009 Agreement, which specifically referenced the

---

[1] Deposition of Leonard St. Germain, attached hereto as Exhibit 1, at 25:11-26:20.

[2] *See* 2006 Professional Service Agreement, Exhibit 4 to Deposition of Leonard St. Germain at 34:2-13.

[3] Deposition of Neal Johnson, attached hereto as Exhibit 2, at 159:16-161:4 ("URS utilized a document called PSA – I believe it stands for Professional Service Agreement – that is not project specific but does spell out terms and conditions and fairly common items that go into a contract between two companies. Then, subsequently to that, each individual project would be proposed through a letter proposal or some type of document. And upon approval or agreement, which is usually the fee and scope of work, a document referred to as a work order, a WO with a number, would be assigned to each individual project. And attached to that would be – typically would be the scope and fee arrangement and anything unique to that particular project.").

[4] *See* 2006 Professional Service Agreement, Exhibit 4 to Deposition of Leonard St. Germain at 34:2-13.

[5] Deposition of Leonard St. Germain at 42:4-18 (testifying about different phases of Baton Rouge projects); Deposition of Chad Herndon, attached hereto as Exhibit 3, at 41:1-6 (testifying that the project was divided into phases).

[6] October 23, 2006 Proposal Letter, Exhibit 6 to Deposition of Leonard St. Germain at 42:4-18.

[7] *Id.*

[8] Lump Sum Work Order No. 08-01, Exhibit 18 to Deposition of Leonard St. Germain at 71:3-11.

[9] Deposition of John Engquist, attached hereto as Exhibit 4, at 34:1-35:10.

[10] Deposition of Leonard St. Germain at 76:21-77:16.

[11] *Id.* at 77:17-21; August 2009 Proposal by Neal Johnson, Exhibit 21 to Deposition of Leonard St. Germain at 77:1-7.

1160947v.1    NON-CERTIFIED COPY

Kenner project and incorporated as attachments the proposal and the $20,000 scope of work.[12] The parties understood that the 2006 Agreement would continue to govern the portion of work, including the design of the concrete pavement, for the Baton Rouge project. After the execution of the 2009 Agreement, URS continued to regard the 2006 Agreement as governing the Baton Rouge project. Defendant Neal Johnson, the URS lead architect on the projects, testified at his deposition that H&E and URS's relationship with respect to the three projects was generally governed by both agreements.[13] URS also continued to issue invoices for work on the Baton Rouge project after the 2009 Agreement that specifically referenced and incorporated the 2006 Agreement.[14] And Leonard St. Germain testified that when he signed the 2009 Agreement on behalf of H&E, he believed that the agreement would only apply to the budgeting phase of the Kenner project.[15]

In sum, URS's motion presumes that only the 2009 Agreement governs the parties' relationship with respect to the three projects. As shown above, that is not correct.

## II.   Deficiencies and problems at the Baton Rouge, Kenner, and Belle Chasse facilities.

### a.   Baton Rouge projects

H&E resumed the Baton Rouge project in late 2010.[16] Construction of the Baton Rouge Branch Building was substantially completed on November 21, 2012, and construction of the Headquarters Building was substantially completed on December 14, 2012.[17]

Near or around the time of substantial completion, various problems involving the concrete pavement were observed including crumbling and spalling of the concrete.[18] Among other things, the punch lists for the project identified cracking, spalling, cracking and other signs of deterioration in the newly constructed concrete pavement.[19] Additional design issues that emerged at the Baton Rouge facility included:

---

[12] Deposition of Leonard St. Germain at 83:10-15; 2009 Agreement, Exhibit 27 to Deposition of Leonard St. Germain at 87:4-13.
[13] Deposition of Neal Johnson at 159:16-161:4 (testifying that the 2006 and 2009 Agreements were the base agreements that governed the three projects).
[14] See, e.g., Invoice No. 4602441, dated 2/24/11 (URS 09289) and Invoice No. 4666033, dated 4/27/11 (H&E 0001532), Exhibits 4, 5 to June 5, 2015 Affidavit of Frankie Wynn attached hereto as Exhibit 5.
[15] Deposition of Leonard St. Germain at 139:23-140:18 (testifying that when he signed the 2009 Agreement, he believed that it covered "the scope of developing drawings for the existing site and buildings, for review of the existing truck traffic, and evaluate the condition of all the exterior roofs, buildings and the attachment to it.").
[16] Deposition of John Engquist at 35:3-6; Deposition of Leonard St. Germain at 89:19-90:24 (testifying that hiatus due to economic conditions resumed in 2010).
[17] Petition ¶ 10.
[18] June 5, 2015 Affidavit of Frankie Wynn, at ¶ 10.
[19] Deposition of Stephen Dorsey, attached hereto as 6, at 74:13-75:18 (testifying about the December 17, 2012 punch list); June 24, 2013 Baton Rouge Punch List, Exhibit 53 to Deposition of John Jones, attached hereto as Exhibit 7, at 140:6-141:23; June 25, 2013 Deficiencies to the Completion of the Contract, Exhibit 54 to Deposition of John Jones at 144:2-21.

4

NON-CERTIFIED COPY

- Parking lot revisions due to URS's failure to design and provide for an adequate number of parking spots at the Baton Rouge headquarters;[20]

- Structural steel revisions;[21]

- Waterproofing of the Headquarters' elevator pit, which was not provided for in URS's design and specifications;[22]

- Interior modifications required for the proper routing of roof-drainage;[23]

- Installation of additional beams for the Branch Facility's loading dock due to the URS's incorrect measurements;[24]

- Installation of lintel systems and additional structural support above doorways and openings, which were not provided for in URS's original specifications;[25]

- Upgrading of window sill materials due to the specifications of inferior materials;[26]

- Replacement of wood paneling in the Headquarters' executive lobby area mid-construction due to URS's specification for – and insistence that – H&E use a thinner, inferior material;[27]

- Grading revisions at the Branch Facility;[28]

- Relocations of louver sand exhaust fans at the Branch Facility;[29]

- Revisions to the tie-in between the Branch Facility's wash-bay and the site's sewage system;[30]

- Multiple code-required additions not provided for in the URS's original designs and specifications, including the addition of an oil/water separator in the service department shop, multiple railings and guardrails, and multiple fire-prevention measures;[31] and

- Additional mill work in mail room due to defective design of the mail slots in the mailroom.[32]

The foregoing resulted in significant additional costs to H&E.[33]  URS often refused to take responsibility for the problems and deficiencies that arose and were brought to its attention.

---

[20] Deposition of Stephen Dorsey at 67:2-20; 81:2-12; Deposition of John Jones at 64:23-65:13; 103:2-104:22; 106:2-17, 107:19-24; 119:10-120:5 (URS's vice president, Debra Sanders, offered $17,507 for the parking lot; H&E wanted URS to pay the full $129,000); Deposition of Neal Johnson at 120:1-14 (Mr. Johnson received email or call from John Jones about the lack of parking shortly after December 17, 2012); Deposition of Debra Sanders, attached hereto as Exhibit 8, at 14:1-13; Deposition of Frankie Wynn, attached hereto as Exhibit 9, at 144:5-12 (parking lot issue was discovered on December 17, 2012 when H&E moved in); August 21, 2015 Affidavit of Frankie Wynn, attached hereto as Exhibit 11 at ¶ 14(a).

[21] Deposition of Stephen Dorsey at 12:19-13:9; 13:21-14:2; Deposition of Thomas Ryan, attached hereto as Exhibit 10, at 129:6-23 (admitting that the structural engineer left out steel items in the contractor's bid price); August 21, 2015 Affidavit of Frankie Wynn at ¶ 14(b).

[22] August 21, 2015 Affidavit of Frankie Wynn at ¶ 14(c).

[23] Id. at ¶ 14(d).

[24] Id. at ¶ 14(e).

[25] Id. at ¶ 14(f).

[26] Id. at ¶ 14(g).

[27] Deposition of Stephen Dorsey at 107:20-117:14; 135:11-137:20; 147:1-148:16; Deposition of Neal Johnson at 116:19-117:11;117:23-119:11 (acknowledging that Womack, the subcontractor of the Baton Rouge facility, contended that the executive wall issue was a design issue and the issue was resolved at the cost to H&E); Deposition of Debra Sanders, attached hereto at 13:16-21; Deposition of Brad Barber, attached hereto as Exhibit 12 at 138:9-139:5; August 21, 2015 Affidavit of Frankie Wynn at ¶ 14(h).

[28] August 21, 2015 Affidavit of Frankie Wynn at ¶ 14(i).

[29] Id. at ¶ 14(j).

[30] Deposition of Stephen Dorsey at 15:8-16:10; Deposition of Thomas Ryan at 131:25-134:5 (acknowledging that URS designs left out oil-water separator and that the retention pond issue was a result of omissions in the design); August 21, 2015 Affidavit of Frankie Wynn at ¶ 14(k).

[31] Deposition of Thomas Ryan at 134:6-24 (acknowledging multiple code issues); August 21, 2015 Affidavit of Frankie Wynn at ¶ 14(l).

[32] Deposition of Stephen Dorsey at 75:21-77:15; 84:16-85:22; Deposition of John Jones at 70:19-72:13; Deposition of Debra Sanders at 12:21-13:11; Deposition of Brad Barber at 109:4-18; Deposition of Frankie Wynn at 99:2-20; 151:25-152:14 (testifying to emails where H&E informs URS that URS will be responsible for the full cost of the mail slot mistake).

[33] Deposition of Stephen Dorsey at 149:24-150:18 (testifying that as a general proposition, change orders result in late service and additional cost to the client).

5

1160947v.1

NON-CERTIFIED COPY

H&E notified URS of the observed problems when the problems surfaced in the hopes that the parties would work together to find a solution and remedy.[34]  Subcontractors informed URS on numerous occasions during this period, including in June 2013, that the pavement issue was not faulty construction but URS's defective design because the subcontractors followed URS's design.[35]  While URS initially appeared willing to troubleshoot the problems with the pavement, it ultimately refused to participate in ongoing discussion and efforts to repair the concrete.[36]  As of May 2013, there were so many unresolved issues with the Baton Rouge projects that H&E informed URS that a final inspection and walkthrough was useless.[37]

### b.  Kenner project

Like the Baton Rouge project, the Kenner project was paused temporarily due to poor economic conditions.  The Kenner project resumed in mid-2010[38] and proceeded to Phase II during which URS completed the design of the renovations, prepared the construction documents, assisted in contractor pricing and construction contract negotiations, and provided construction administration.[39]

Construction, including the pouring of concrete for the new pavement, began in December 2011.[40]  Concrete continued to be poured throughout 2012.[41]  Problems with the concrete pavement in the form of cracking and spalling appeared almost immediately.[42]  H&E first became aware of the issue in March 2012.[43]  Towards the end of March 2012 and continuing until March 5, 2013, portions of the pavement where cracking and spalling occurred were removed and re-poured, resulting in substantial delays and additional costs to H&E.[44]  Punch lists for the Kenner project identified apparent cracking, spalling, and other signs of deterioration

---

[34] August 21, 2015 Affidavit of Frankie Wynn at ¶ 11.

[34] Deposition of Thomas Ryan 80:24-84:4.

[3] June 11, 2013 Email from Neal Johnson to Frankie Wynn, Exhibit 9 to Deposition of Neal Johnson at 134:12-135:13 (H&E requests answer and solution to pavement and URS responds that it will review the recommendation with its civil engineer and request an opinion).

[3] Deposition of Thomas Ryan 76:15-78:23; 80:8-16 (acknowledging that as of May 2013, there were numerous unresolved issues and H&E believed that a final inspection/walk-through was useless; acknowledges problems including paving, acoustical panels, paneling in the Executive Area at the Baton Rouge facility.)

[38] Deposition of Leonard St. Germain at 89:19-90:24.

[ ] Time and Materials Work Authorization 10-10, Exhibit 28 to Deposition of Leonard St. Germain at 87:22-88:8.

[40] December 29, 2011 Email from MAPP to URS and H&E, Exhibit 26 to Deposition of Frankie Wynn at 90:15-91:3.

[41] March 16, 2012 Email from MAPP to URS and H&E, Exhibit 35 to Deposition of Frankie Wynn at 107:15-108:1.

[ ] Deposition of Neal Johnson at 173:10-16 (concrete at Kenner started to crack and spall instantly after being poured).

[ ] March 20, 2012 Project Observation Report, Exhibit 36 to Deposition of Frankie Wynn at 108:17-25.

[44] August 3, 2012 Internal URS Email, Exhibit 39 to Deposition of Frankie Wynn at 113:9-25 ("Tim: Need you to take a look at these photos obtained by the Owner. There exists considerable concern about the quality of the paving construction joints"); September 25, 2012 Email from MAPP to URS and H&E, Exhibit 44 to Deposition of Frankie Wynn at 127:17-128:23 (detailing re-pours of concrete); March 4, 2013 Email from MAPP to H&E and URS, Exhibit 39 to Deposition of Brad Reese, attached hereto as Exhibit 13, at 119:12-21 (requesting URS input on "action items for paving joint repairs. . . . would like to sit down with you to review their proposed solutions").

6

NON-CERTIFIED COPY

in the newly constructed concrete pavement where the heavy construction equipment would be stored.[45]

In addition, several other problems and design deficiencies arose during the course of the Kenner project, including but not limited to:

- Drainage issues with a wash rack in the back of the facility and the failure of URS to tie the drain water into the main sewer which required changes that should have been included in the design;[46]
- Design changes relating to a drain box which affected storm drainage;[47] and
- Significant omissions in the construction documents resulting in additional change orders.[48]

As early as October 2012, H&E and the contractor contacted URS to have URS recommend appropriate repairs.[49] URS acknowledged the issues and initially worked with H&E to find solutions.[50] As with the Baton Rouge project, however, URS ultimately refused to take responsibility for the design deficiencies.

### a. Belle Chasse

In August 2009, H&E retained URS to provide professional design and construction administration services in connection with the renovation and relocation of H&E's "Crane Remanufacturing Facility" located in Belle Chasse, Louisiana.[51] The Belle Chasse project was paused and then resumed in December 2010.[52] The project involved the relocation and renovation of an existing H&E facility to an adjacent and larger facility.[53] By late January 2012, the project proceeded to Phase II involving the completion of design, construction documents, permitting, contract negotiations, and construction administration.

---

[45] Deposition of Frankie Wynn at 128:24-130:9 (testifying that the punch list for the Kenner project identified repair of the pavement as an item); Deposition of John Jones at 97:13-100:12 (testifying that October 16, 2012 punch list stated that among the items that needed to be repaired was pavement at various locations); 124:12-126:3 (testifying about improper pavement joints); Deposition of Neal Johnson at 169:3-24 (testifying that the cracking and spalling at the Kenner site was on the punch list); 173:10-16 (concrete at Kenner started to crack and spall instantly after being poured).
[46] Deposition of Brad Reese at 32:13-34:21; List of Kenner Project Change Orders, Exhibit 70 to Deposition of Frankie Wynn at 195:2-196:3 (Change Order Proposals 3, 4, and 5).
[47] Deposition of Brad Reese at 108:8-23; Change Order Proposal 6; *see* List of Kenner Project Change Orders, Exhibit 70 to Deposition of Frankie Wynn at 195:2-196:3.
[48] Deposition of Frankie Wynn at 195:2-196:3; 197:13-23 (testifying as to multiple change orders related to the Kenner facility); Change Order Proposal 9 (URS's design did not account for new conduits despite the fact that existing conduits were too old to carry necessary data); Change Order Proposal 17 (URS's design did not account for a back-flow preventer); Change Order Proposal 6 (URS's design did not account for a slip joint system).
[49] Deposition of Thomas Ryan at 119:21-123:25 (testifying that in October 2012, MAPP wanted to find a solution to the spalling and cracking at the Kenner site and wanted to meet with URS to discuss solution but URS did not meet or participate at that time); October 4, 2012 Email from MAPP to URS and H&E, Exhibit 46 to Deposition of Frankie Wynn at 130:25-131:12 ("MAPP will implement the engineer's recommended design mod/fix as soon as we receive direction. We have placed our concrete sub on stand-by and they are ready to move forward without delay").
[50] March 4, 2013 Email from MAPP to H&E and URS, Exhibit 39 to Deposition of Brad Reese at 119:12-21 (working out solutions to repair pavement at Kenner facility); July 17, 2013 Email from MAPP to URS, Exhibit 48 to Deposition of Brad Reese at 147:3-17 (same).
[51] Deposition of Leonard St. Germain at 91:21-92:3.
[52] Deposition of John Engquist at 35:3-6; Deposition of Leonard St. Germain at 89:19-90:24 (testifying that hiatus due to economic conditions resumed in 2010).
[53] Deposition of Frankie Wynn at 46:4-13.

7

NON-CERTIFIED COPY

The Belle Chasse project was substantially completed in late 2013.[54]  The Belle Chasse project did not include concrete pavement like those in the Baton Rouge and Kenner facilities. But numerous other problems occasioned by URS's deficient designs and specifications required addressing and remedying at H&E's expense.[55]  Those included:

- The additional need for pressure washing prior to the laying of concrete;[56]
- The addition and installation of a significant amount of extra concrete in the facility's work area due to URS's incorrect elevation estimates and specifications for an insufficient amount of concrete;[57]
- The removal of concrete expansion joints not anticipated or provided for by URS but necessitated by URS's concrete specifications;[58]
- Multiple revisions occasioned by URS's failure to properly measure for an accordion partition in the facility's lunch room area, and H&E's purchase of custom materials that could not be used as planned and remained unused today;[59]
- Multiple revisions occasioned by URS's measurement of roof differentials between the administration building and the tool room, including relocation of duct work and transformers;[60]
- Various other revisions and changes during the course of construction caused by URS's deficient specifications, such as the modification of exterior handrails, addition of bollards to exterior air-conditioning units, relocation of the facility's locker rooms, and replacement of the facility's windscreens;[61]

    As with the Baton Rouge and Kenner projects, URS refused to take responsibility for the problems and deficiencies that arose and were brought to its attention.[62]

### III.    H&E withholds payment of URS invoices after December 2012 because of defective services.

In December 17, 2012, H&E moved into the Baton Rouge Headquarters facility.[63] Immediately, H&E discovered that URS's design provided insufficient parking spaces for its employees.[64]  H&E contacted URS that day to arrange a meeting to discuss H&E's immense

---

[54] Deposition of Frankie Wynn at 203:13-204:15 (testifying that during an October 2013 walk through of the Belle Chasse facility there were still numerous observed issues).
[55] Id. at 191:24-194:12 (testifying to emails dated July 2013 to URS about additional design defects with the Belle Chasse project such as roof alignment, folding door, and ductwork); 198:4-199:14 (testifying to numerous change order proposals for items left out by URS).
[56] Deposition of Kevin Sprehe, attached hereto as Exhibit 14 at 48:20-49:12.
[57] Deposition of John Jones at 152:8-153:18; 158:4-10; Deposition of Kevin Sprehe at 28:4-32:5; 46:13-24 (testifying to Change Order Proposal 17 regarding the need for additional concrete for building A); 47:11-48:9 (testifying to Change Order Proposal 17 and 18); 46:5-12 (testifying to Change Order Proposal 7 regarding the materials left out in design concerning the expansion joints); 26:3-23 (same); August 21, 2015 Affidavit of Frankie Wynn at ¶ 19(a).
[58] Deposition of John Jones at 83:10-85:9; Deposition of Kevin Sprehe at 49:13-50:1(testifying to Change Order Proposal 20); 63:12-65:16 (same); August 21, 2015 Affidavit of Frankie Wynn at ¶ 19(b).
[59] Deposition of Kevin Sprehe at 35:19-38:25; August 21, 2015 Affidavit of Frankie Wynn at ¶ 19(c).
[60] Deposition of Kevin Sprehe at 40:5-41:25; 74:17-75:22; August 21, 2015 Affidavit of Frankie Wynn at ¶ 19(d).
[61] Deposition of Kevin Sprehe at 47:11-48:9 (handrails); 85:23-87:12 (windscreen); 96:2-97:3 (locker room); 93:13-94:13; 95:9-20 (handrails); 43:20-45:10 (testifying to Change Order Proposal 25 regarding ramp and re-steel changes and the overhead door); 50:2-19 (testifying to Change Order Proposal 21 regarding overhead doors); August 21, 2015 Affidavit of Frankie Wynn at ¶ 19(e).
[62] July 29, 2013 Email from H&E to URS, Exhibit 69 to Deposition of Frankie Wynn at 191:12-194:12 (bringing attention to numerous change orders and requesting explanation of how numerous items at the Belle Chasse site were overlooked).
[63] Deposition of Frankie Wynn at 144:5-12 (parking lot issue was discovered on December 17, 2012 when H&E moved in).
[64] Id.

8

NON-CERTIFIED COPY

dissatisfaction with URS's service.[65]  Shortly after the meeting, H&E's Chief Executive Officer John Engquist issued a stop payment order on all future H&E invoices.[66]  Mr. Johnson testified that URS received actual and written notice shortly after the December 2012 meeting that H&E would not pay future invoices on the projects.[67]  H&E representatives have testified that the withholding of payments was not limited to the issues experienced at the Baton Rouge facility, but with URS's performance of services as a whole.[68]  Notwithstanding its refusal to pay payments of URS invoices due to URS's defective design work, H&E directly paid the contractors and subcontractors for work done on the three facilities.[69]

## LAW AND ARGUMENT

### I.    Standard for Summary Judgment.

Summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law.[70]  The burden remains on the movant, and any reasonable doubt must be resolved against the moving party.[71]  In the context of contractual disputes, summary judgment is appropriate only where the words of a contract are clear, unambiguous, and do not lead to absurd consequences; where a contract is ambiguous and/or the intent of the parties becomes a question of fact, summary judgment is not appropriate.[72]

---

[65] December 17, 2012 Email from H&E to URS, Exhibit 50 to Deposition of Frankie Wynn at 138:9-139:19 (requesting meeting with URS about issues); Deposition of Brad Barber at 99:7-23 (testifying that there was an immediate meeting following the December 17, 2012 parking lot situation).

[66] Deposition of John Engquist at 77:2-9 ("Q. Now, around that same time [December 2012], did you give an order to your people not to pay any further URS invoices? A. I did. Q. And what was that based on? A. It was based on all of the problems we had with their design and with the parking and all of the above."); Deposition of Brad Barber at 130:21-131:15 (testifying as to the decision to hold URS payments); Deposition of Frankie Wynn at 222:25-225:2 (testifying that there was a decision to hold URS payments).

[67] Deposition of Neal Johnson at 127:6-18.

[68] Deposition of John Engquist at 71:24-72:12 ("Q. Mr. Engquist, when we were talking about your order to stop paying invoices of URS about the problem with the parking and the problems with the design, did you say problems with design? A. I may have. Q. What problems in January of 2013, sir, were you aware of with respect to design problems by URS? A. There was a lot of – there was a lot of things like the paneling and –or, you know, executive office suites and stuff like that, which had to be replaced."); Deposition of Brad Barber at 152:5-9; 156:6-17 (H&E viewed Neal Johnson as generally incompetent and unwilling to take responsibility; H&E had issues with multiple problems, not just the parking lot issue).

[69] Deposition of Brad Barber at 149:14-150:10 (H&E advised URS that H&E will pay subcontractors directly); Deposition of Frankie Wynn at 155:23-156:18 (H&E paid the contractor for the Kenner project, MAPP, all amounts they claimed due); 159:7-10 (H&E paid the contractor for the Baton Rouge projects, Womack, all amounts that Womack claimed due); 175:12-18 (money was held out because of punch list items on the Baton Rouge and Kenner projects, but H&E paid contractors on those projects); Deposition of Kevin Sprehe at 28:4-32:5 (testifying that H&E paid the contractor for the Belle Chasse project for additional change orders that were a result of URS's omissions).

[70] La. Code Civ. Proc. art. 966; *see also, e.g., Rager v. Bourgeois*, 2006-0322, p. 5 (La. App. 1st Cir. 2006); 961 So. 2d 330, 333; *Carter v. BRMAP*, 591 So. 2d 1184, 1187 (La. App. 1st Cir. 1991).

[71] *See, e.g., Rager*, 961 So. 2d at 333; *Carter*, 591 So. 2d at 1187.

[72] *See, e.g., Carter*, 591 So. 2d at 1187.

9

NON-CERTIFIED COPY

II.  **Disputed issues of material fact make summary judgment inappropriate.**

   a.  **Paragraph 2.1 has no application to H&E's justified refusal to pay URS invoices and H&E provided clear and unambiguous notice.**

URS contends that it is entitled to payment of unpaid invoices because H&E breached the notice requirement contained in Paragraph 2.1 of the 2009 Agreement.[73]  It is wrong because the procedure contemplated in Paragraph 2.1 has no application to H&E's justified refusal to pay those invoices and because H&E provided clear and unambiguous notice.

Paragraph 2.1 requires H&E to pay any undisputed portions of invoices within 30 days of the invoice and to notify and provide reasons for disputed amounts within 15 days:

> [P]ay undisputed portions of each progress invoice within thirty (30) days of the date of the invoice. If payment is not received within thirty (30) days from the due date of such payment, [URS] may suspend further performance under one or more Work Authorizations until payments are current. [H&E] shall notify URS of any disputed amount within fifteen (15) days from date of the invoice, give reasons for objection, and promptly pay the undisputed amount.[74]

It is undisputed that all of the unpaid invoices were issued in or after December 2012.  As shown above, by late 2012, numerous and serious issues relating to URS's defective services arose in all three projects, and H&E provided clear and unambiguous notice that it would not pay any further URS invoices.  Not only did H&E provide notice of its dissatisfaction of URS's defective services as a whole,[75] URS also had actual and written notice that H&E would not pay any future URS invoice from January 2013 onwards.  Mr. Johnson testified that shortly after a December 17, 2012 meeting between H&E and URS about the defective parking lot design matter, URS "had been told, and then [URS] had an e-mail follow-up that all outstanding balances owed to URS would be suspended on all projects."[76]

Also URS's suggestion that H&E's dispute is limited to design services or specific projects must be rejected.  H&E contracted with URS to provide comprehensive services including design, negotiating and bidding, and construction administration.[77]  And H&E's

---

[73] URS's motion presumes that only the 2009 Agreement governs the parties' relationship and the three projects. As shown above, that is not correct. URS fails to even mention the existence of the 2006 Agreement. Again which agreement governs which project and/or phase is a disputed issue that is simultaneously before the Court on URS's Motion for Summary Judgment. Because the 2006 Agreement contains a similar notice requirement, however, which agreement governs is not material to this Motion.

[74] See 2006 Professional Service Agreement, Exhibit 4 to Deposition of Leonard St. Germain at 34:2-13.

[75] Deposition of John Engquist at 71:24-72:12 ("Q. Mr. Engquist, when we were talking about your order to stop paying invoices of URS about the problem with the parking and the problems with the design, did you say problems with design? A. I may have. Q. What problems in January of 2013, sir, were you aware of with respect to design problems by URS? A. There was a lot of – there was a lot of things like the paneling and –or, you know, executive office suites and stuff like that, which had to be replaced."); Deposition of Brad Barber at 152:5-9; 156:6-17 (H&E viewed Neal Johnson as generally incompetent and unwilling to take responsibility; H&E had issues with multiple problems, not just the parking lot issue).

[76] Deposition of Neal Johnson at 127:6-18.

[77] See 2006 Professional Service Agreement, Exhibit 4 to Deposition of Leonard St. Germain at 34:2-13.

1160947v.1

NON-CERTIFIED COPY

withholding of payments was not limited to the issues experienced at the Baton Rouge facility or to URS's design services, but with URS's performance of professional services as a whole.[78]

In sum, because H&E's dispute with URS is not limited to individual tasks on specific projects but to URS's entire performance on all projects, and also because H&E provided clear notice, H&E did not breach Paragraph 2.1. URS's motion should be denied.

**b. URS waived its sole remedy under Paragraph 2.1**

URS's argument that H&E breached Paragraph 2.1 is further belied by its own actions in choosing to not follow the procedures set forth in that provision. URS's sole remedy for H&E's failure to pay undisputed portions of invoices after 30 days was to "suspend further performance under one or more Work Authorizations until payments are current."[79] But URS did not suspend further performance or threaten to suspend further performance. Instead, it continued to provide services for months after December 2012 on all three projects, presumably because URS acknowledged that H&E actively disputed all URS invoices. Thus, URS waived its sole remedy under Paragraph 2.1 and its belated arguments that H&E breached the provision should be rejected.

**c. H&E provided timely notice to URS of its defective services.**

URS also argues that H&E failed to provide prompt written notice of any suspected deficiencies in services under Paragraph 15.1 of the 2009 Agreement.[80] Its argument overlooks the reality of the parties' interactions and the facts.

According to URS, H&E internally decided that it was displeased with URS's services due to the parking lot issue at the Baton Rouge Headquarters and arbitrarily withheld payment of all URS invoices for all projects in and after December 2012 for this reason alone. The facts say otherwise. From December 2012 to the filing of the lawsuit in November 2013, URS had actual, constructive, and written notice of numerous deficiencies with its services in all three projects. Below is a sampling of the parties' written correspondences during this time period:

- December 17, 2012 Email from H&E to URS regarding the Baton Rouge parking lot issue: "Neal [Johnson] I need your presence here at the facility in short order. The

---

[78] Deposition of John Engquist at 71:24-72:12 ("Q. Mr. Engquist, when we were talking about your order to stop paying invoices of URS about the problem with the parking and the problems with the design, did you say problems with design? A. I may have. Q. What problems in January of 2013, sir, were you aware of with respect to design problems by URS? A. There was a lot of -- there was a lot of things like the paneling and –or, you know, executive office suites and stuff like that, which had to be replaced."); Deposition of Brad Barber at 152:5-9; 156:6-17 (H&E viewed Neal Johnson as generally incompetent and unwilling to take responsibility; H&E had issues with multiple problems, not just the parking lot issue).

[79] See 2006 Professional Service Agreement, Exhibit 4 to Deposition of Leonard St. Germain at 34:2-13.

[80] The 2006 Agreement also has a similar provision.

11

1160947v.1                    NON-CERTIFIED COPY

executive group is very upset with the parking situation . . . .We need to determine some resolution quickly."[81]

- January 18, 2013 Email from H&E Frankie Wynn to Womack and URS about sinking/separation issues with the pavement at the Baton Rouge facility.[82]

- In February 2013, H&E representative Brad Barber sent an email to URS about H&E proceeding with its complaint about URS services.[83]  After February 2013, H&E corresponded in writing with URS on several occasions to work out problems to no avail.[84]

- May 13, 2013 Email from H&E to URS regarding H&E's refusal to accept the work done at the Baton Rouge facility: "After reconsideration, due to the unresolved issues with paving, acoustical panels in the core, paneling in the Executive Area, roof leaks, etc., I feel it would be fruitless to perform a 'final' walkthrough at this time."[85]

- July 29, 2013 Email from H&E to URS regarding change orders on all three projects due to URS's omissions: "During the Baton Rouge, Kenner and Belle Chasse projects we have been faced with numerous change orders due to items either overlooked, conflicts in drawings or miscommunications."[86]

URS acknowledged the ongoing issues from December 2012 to the filing of the litigation with the Kenner and Baton Rouge projects in writing, punch-lists, and correspondences.[87] During the same time, URS made some attempts, but ultimately failed, to remedy its deficient services.[88]  Also during this time, URS was well aware of the problems at the Belle Chasse facility occasioned by URS's deficient designs and specifications.[89]

---

[81] December 17, 2012 Email from H&E to URS, Exhibit 50 to Deposition of Frankie Wynn at 138:9-139:19.

[82] January 18, 2013 Email from H&E to Womack and URS, Exhibit 56 to Deposition of Frankie Wynn at 160:20-161:7.

[83] Deposition of Brad Barber at 133:5-23.

[84] Id. at 137:18-138:3.

[85] May 13, 2013 Email from H&E to URS, Exhibit 63 to Deposition of Frankie Wynn at 173:18-174:25.

[86] July 29, 2013 Email from H&E to URS, Exhibit 69 to Deposition of Frankie Wynn at 191:12-194:12.

[87] Deposition of Stephen Dorsey, at 74:13-75:18 (testifying about the December 17, 2012 punch list for the Baton Rouge projects); June 24, 2013 Baton Rouge Punch List, Exhibit 53 to Deposition of John Jones at 140:6-141:23 (June 24, 2013 punch list for Baton Rouge projects); June 25, 2013 Deficiencies to the Completion of Contract, Exhibit 54 to Deposition of John Jones at 144:2-21 (June 25, 2013 "Deficiencies to the Completion of the Contract"); March 20, 2012 Project Observation Report, Exhibit 36 to Deposition of Frankie Wynn at 108:17-25 (URS notifying H&E of the problems with the Kenner site); Deposition of Frankie Wynn at 128:24-130:9 (testifying that the punch list for the Kenner project identified repair of the pavement as an item); Deposition of John Jones at 97:13-100:12 (testifying that October 16, 2012 punch list stated that among the items that needed to be repaired was pavement at various locations); 124:12-126:7 (testifying about improper pavement joints); Deposition of Neal Johnson at 169:3-24 (testifying that the cracking and spalling at the Kenner site was on the punch list); 173:10-16 (concrete at Kenner started to crack and spall instantly after being poured).

[88] Deposition of Thomas Ryan 80:24-84:4; August 3, 2012 Internal URS Email, Exhibit 39 to Deposition of Frankie Wynn at 113:9-25 ("Tim: Need you to take a look at these photos obtained by the Owner. There exists considerable concern about the quality of the paving construction joints"); September 25, 2012 Email from MAPP to URS and H&E, Exhibit 44 to Deposition of Frankie Wynn at 127:17-128:23 (detailing re-pours of concrete); March 4, 2013 Email from MAPP to H&E and URS, Exhibit 39 to Deposition of Brad Reese at 119:12-21 (requesting URS input on "action items for paving joint repairs. . . . would like to sit down with you to review their proposed solutions"); Deposition of Thomas Ryan at 119:21-123:25 (testifying that in October 2012, MAPP wanted to find a solution to the spalling and cracking at the Kenner site and wanted to meet with URS to discuss solution but URS did not meet or participate at that time); October 4, 2012 Email from MAPP to URS and H&E, Exhibit 46 to Deposition of Frankie Wynn at 130:25-131:12 ("MAPP will implement the engineer's recommended design mod/fix as soon as we receive direction. We have placed our concrete sub on stand-by and they are ready to move forward without delay").

[89] Deposition of Frankie Wynn at 181:24-184:12 (testifying to emails dated July 2013 to URS about additional design defects with the Belle Chasse project such as roof alignment, folding door, and ductwork); 198:4-199:14 (testifying to numerous change order proposals for items left out by URS).

12

NON-CERTIFIED COPY

### d. Disputed invoices concern defective services.

URS's blanket assertion that the unpaid invoices bear no relation to its defective professional services is also materially disputed by the facts. Again URS's argument ignores that, as of December 2012, its performance of professional services, as a whole, was disputed. URS's suggestion that H&E's dispute is limited to design services or only the Baton Rouge project is simply incorrect. H&E contracted with URS to provide comprehensive services including design, negotiating and bidding, and construction administration. And H&E's withholding of payments was not limited to the issues experienced at the Baton Rouge facility or to URS's design services, but concern URS's performance of professional services as a whole.[90]

The invoices at issue implicate multiple design deficiencies. For example, four Baton Rouge invoices directly list tasks of "Design/Construction Documents,"[91] five explicitly state that the invoices are "For: H&E Design Changes,"[92] and nine charged H&E work done by an URS architect.[93] During this time period, URS's professional services at the Baton Rouge and Kenner facilities were clearly related to its efforts to address prior defective work:

- January 4, 2013 Email from URS to H&E: URS addresses the mail room design issues at the Baton Rouge facility and states that "URS is currently providing all redesign services to H&E for any and all of the current requested modifications."[94]

- January 9, 2013 Email from URS to Womack providing revisions to parking situation.[95]

- January 10, 2013 Email from MAPP to H&E and URS stating that it is actively working on "remaining items at H&E Kenner."[96]

- January 18, 2013 Email from H&E to Womack and URS with photographs of pavement that is "sinking/separation from the drain" at the Baton Rouge yard.[97]

- April 16, 2013 Email between H&E and URS addressing the executive wall panel issue.[98]

- June 24, 2013 Email from Womack addressing outstanding items on the Baton Rouge project.[99]

URS's attempts to remedy its design defects were charged to H&E on invoices as construction administration services at both the Baton Rouge and Kenner sites.[100] It follows that URS's

---

[90] Deposition of John Engquist at 71:24-72:12; Deposition of Brad Barber at 152:5-9; 156:6-17 (H&E viewed Neal Johnson as generally incompetent and unwilling to take responsibility; H&E had issues with multiple problems, not just the parking lot issue).
[91] These invoices are 5357943, 344197, 5555428, 5565894. *See* Invoice Overview Sheet, Exhibit 15.
[92] These invoices are 5357943, 5555403, 5565894, 5588906, 5681317. *Id.*
[93] These invoices are 5357943, 3424197, 5555403, 5555428, 5565894, 5588906, 5588931, 5681317, 5681338. *Id.*
[94] January 4, 2013 Email from URS to H&E, Exhibit 52 to Deposition of Frankie Wynn at 152:1-14.
[95] January 9, 2013 Email from URS to Womack, Exhibit 51 to Deposition of Frankie Wynn at 150:10-22.
[96] January 10, 2013 Email from MAPP to H&E and URS, Exhibit 54 to Deposition of Frankie Wynn at 154:15-155:9.
[97] January 18, 2013 Email from H&E to Womack and URS, Exhibit 56 to Deposition of Frankie Wynn at 160:20-161:7.
[98] April 16, 2013 Email between H&E and URS, Exhibit 60 to Deposition of Frankie Wynn at 168:4-21.
[99] June 24, 2013 Email from Womack, Exhibit 67 to Deposition of Frankie Wynn at 188:7-189:17.

NON-CERTIFIED COPY

failure to address problems like the spalling and cracking of pavement during the course of construction administration is related to its original defective design services.  H&E should not have to pay for work, including for construction administration, performed by URS in its attempts to cure prior defective design services.

In addition, three Baton Rouge invoices reference work done pursuant to work orders issued to address change orders at the Baton Rouge facilities and were billed as lump sum amounts.[101]   Six invoices reference the scope of interior design such as the furnishing of furniture, fixtures, and equipment.[102]  These implicate design problems that arose with the Baton Rouge project such as the proper routing of roof-damage, the upgrading of window sills, the replacement of wood paneling in the executive lobby area, etc.  All of these revisions, changes, and additions were occasioned by URS's failure to perform according to its professional duty of care and were undertaken at H&E's expense.

Invoices from the Belle Chasse project in and after December 2012 were all billed as "Project Management" tasks and directly relate to URS's defective services in designs that omitted essential features and costly change orders that resulted from URS's omission.[103]

These issues of material fact render summary judgment inappropriate.

### III.    URS's claim is unliquidated and H&E will be entitled to a defense of offset and/or compensation.

URS argues that its reconventional demand for alleged unpaid fees is a liquidated claim payable immediately and not subject to offset, now or in the future.  URS also contends that H&E cannot offset claims regarding various deficiencies against alleged unpaid fees for services not related to those deficiencies.  It is wrong.

As set forth above, the entirety of URS's performance of professional services is at issue.  Louisiana doctrines of offset and compensation do not require that the debts or claims in question arise from the same transaction project, or set of services.[104]   While offset or compensation is not applicable at this time because H&E's claim and URS's reconventional

---

[101] Both Kenner invoices charge for "Project Management" services for work during this time period. *See* Invoice Overview Sheet, Exhibit 15.

[102] These invoices are 5357940, 5456789, and 566064. *Id.*

[103] These invoices are 5357991, 5357942, 3424197, 5555428, 5588931, and 5681338. *Id.*

[104] Deposition of Frankie Wynn at 181:24-184:12 (testifying to emails dated July 2013 to URS about additional design defects with the Belle Chasse project such as roof alignment, folding door, and ductwork); 198:4-199:14 (testifying to numerous change order proposals for items left out by URS); *See* Invoice Overview Sheet, Exhibit 15.

[105] *See* La. Code Civ. Art 1893 ("Compensation takes place by operation of law when two persons owe to each other sums of money or quantities of fungible things identical in kind, and these sums or quantities are liquidated and presently due. In such a case, compensation extinguishes both obligations to the extent of the lesser amount."); *Nat'l Glass & Glazing v. Grimaldi Constr., Inc.,* 96-121, (La. App. 5 Cir. 7/20/96), 680 So. 2d 56, 62 (acknowledging permissible set-off of claim arising from one project against a claim arising from another project, though court disallowed the set-off because the claims were not equally and contemporaneously liquidated).

NON-CERTIFIED COPY

demand are both unliquidated, those doctrines may be applicable if and when the claims are reduced to judgments.

In any event, URS's claim for alleged unpaid fees is **not** a liquidated claim, which forecloses summary judgment. A claim is liquidated when its correctness is "admitted by the debtor" or when the debt is for an amount "capable of ascertainment by mere calculation in accordance with accepted legal standards."[105] A disputed debt or claim — whether disputed as to the amount agreed upon and due or as to performance that engenders a dispute as to the amount due — is by its very nature not liquidated.[106]

Plainly, URS's claim for unpaid fees is not a liquidated claim because URS's right to the alleged fees is contested. H&E contracted with URS to provide comprehensive professional services in accordance with a certain level of professional care. As URS did not perform in accordance with that duty of care, any amounts that URS claim for those services are disputed, and any claims it may have for unpaid fees are not liquidated.

## CONCLUSION

For the above stated reasons, URS's motion should be denied.

Respectfully submitted,

_____

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by facsimile, email and/or by placing same in the United States mail, postage prepaid and properly addressed, this 30th day of January, 2017.

_____

Rebecca Sha

FILED
2017 JAN 30  PH 4: 28
DEPUTY CLERK OF COURT

---

[105] *See Sims v. Hays,* 521 So. 2d 730, 733 (La. App. 2d Cir. 1988); *Coburn v. Comm'l Nat'l Bank,* 453 So.2d 597 (La. App. 2d Cir. 1984); *Olinde Hardware & Supply v. Ramsey,* 98 So.2d 835 (La. App. 1st Cir. 1957)).

[106] *Savoie v. Lirette,* 230 So.2d 392 (La. App. 1st Cir. 1970); *see also, Linda Mercantile Corp. v. Bowers,* 230 So. 2d 392, 306 (La. App. 1st Cir. 1970) (notwithstanding specific contract price, reasonable and bona fide dispute as to the quality of work involved engendered dispute as to the amount due and made claim unliquidated).

15

1160947v.1    NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                        SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____        _____

                                                    DEPUTY CLERK

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT**:

Plaintiff, H&E Equipment Services, Inc. ("H&E"), respectfully submits this opposition to the Motion for Summary Judgment filed by defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III (collectively, "URS").

## INTRODUCTION

URS provides architectural, engineering, and other related services. In this case, H&E seeks damages from URS arising from URS's work on three H&E facilities located in Baton Rouge, Kenner, and Belle Chasse, Louisiana from 2006 to 2013. The largest issue in the case relates to URS's design of the pavement at the Baton Rouge and Kenner facilities.[1] As will be proven at trial, URS's design for the pavement at both locations violated the standard of care in numerous respects. Among other problems, URS's designs do not comply with the pavement design requirements promulgated by the Louisiana Department of Transportation and Development and the East Baton Rouge Department of Public Works. The designs are also at odds with guidelines promulgated by the American Concrete Institute and the recommendations of geotechnical engineering reports commissioned by URS. In addition to the defective pavement design issue, each of the three construction projects—Baton Rouge, Kenner, and Belle Chasse—was riddled with problems arising from the design and construction documents that URS prepared. For each project, URS omitted essential measurements or necessary components. These omissions were discovered only later, after construction had commenced, and thus necessitated costly change orders.

_____

[1] The Baton Rouge pavement was designed by a subcontractor hired by URS, Benchmark. The Kenner pavement was designed by a URS engineer, Tim Gaines. URS signed off on, and is responsible for, both de...

NON-CERTIFIED COPY