URS's motion asks the Court to dismiss H&E's claims for damages without a trial based on language contained in one of two agreements that govern the parties' relationship. Specifically, URS contends that one of the two contracts signed by H&E purports to essentially absolve URS of liability for defective work by limiting H&E to the remedy of requiring URS to "re-do" the defective construction drawings. Of course, this remedy would be meaningless since the work on all three projects has been completed. As set forth below, URS's motion should be denied for multiple independent reasons.

## SUMMARY OF ARGUMENT

URS's motion relies entirely on a 2009 Short Form Master Agreement for Professional Services signed by URS and H&E, and in particular, a provision contained in that Agreement purporting to limit URS's liability for defective work. However, the 2009 Agreement applies to only a portion of the work performed by URS. In fact, the evidence demonstrates that the 2009 Agreement was only intended to apply to work on the Kenner project. A separate Professional Services Agreement signed by the parties in 2006 governs a substantial part of the services provided by URS, including URS's defective work on the Baton Rouge facility. The provision on which URS's motion is based is not in the 2006 Agreement. In sum, significant disputes of material fact exist as to the parties' intent with respect to the scope of the 2009 Agreement which, on their own, foreclose summary judgment.

Additionally, the provisions contained in the 2009 Agreement on which URS relies are of no effect as a matter of law. URS did not re-perform the work within one-year even though H&E timely notified URS of the numerous defects in URS's work.

The provisions on which URS relies are also unenforceable because they are not written in clear and unambiguous terms. And under Article 2004 of the Louisiana Civil Code, the provisions cannot limit liability from URS's intentional, reckless, and grossly negligent conduct.

Finally, public policy prevents URS from enforcing the limitation provision on which it relies because it would leave H&E with no meaningful remedy for URS's breaches of their professional duties as design professionals, which are imposed by law. Re-performance of the work, that is, simply allowing URS to give H&E the pavement design that URS should have provided in the first place, would not cure the pavement problems that URS's defective designs and specifications have caused.

The Court should deny the motion.

2

11611172v.1

NON-CERTIFIED COPY

## FACTUAL OVERVIEW

As set forth below, URS's motion provides an incomplete, and in some cases inaccurate, history of the events giving rise to this suit.

### I.     The Baton Rouge project and the 2006 Agreement

URS and H&E's relationship began with discussions in 2006 regarding the construction of a new corporate headquarters and branch facility in Baton Rouge, Louisiana.[2]  In anticipation of the Baton Rouge project, H&E entered into the 2006 Agreement with URS on or about August 28, 2006.[3]  The agreement was to govern URS's performance of services via a series of work orders that specified scopes of services, timelines for completion, and compensation.[4]  Pursuant to the 2006 Agreement, URS proposed to furnish all design-related and construction administration-related services for the Baton Rouge project.[5]

URS's work on the Baton Rouge project occurred in multiple phases.[6]  In Phase I, URS established the site layout for the buildings and developed a program and elevation concept.[7]  In Phase II, URS used the information gathered in Phase I to develop "a more fully developed design."[8]  Throughout the Phase II design process, URS was well aware of H&E's business, namely the sale and rental of heavy construction equipment.  The URS project manager in charge of the Baton Rouge project, Chad Herndon, formerly worked as a sales consultant for one of H&E's largest competitors, Scott Equipment.[9]  As such, Mr. Herndon was very familiar with the types of equipment sold and leased by H&E.[10]  In February 2007, Mr. Herndon specifically requested details about the requirements for the equipment yard, including "load information of the equipment to design to" and the "gross weight of the heaviest machine, spacing between the tires and tire pressures."[11]  In response, H&E provided Mr. Herndon with information regarding

---

[2] Deposition of Leonard St. Germain, attached hereto as Exhibit 1, at 25:11-26:20.
[3] See 2006 Professional Service Agreement, Exhibit 4 to Deposition of Leonard St. Germain at 34:2-13.
[4] Deposition of Neal Johnson, attached hereto as Exhibit 2, at 159:16-161:4 ("URS utilized a document called PSA – I believe it stands for Professional Service Agreement – that is not project specific but does spell out terms and conditions and fairly common items that go into a contract between two companies. Then, subsequently to that, each individual project would be proposed through a letter proposal or some type of document. And upon approval or agreement, which is usually the fee and scope of work, a document referred to as a work order, a WO with a number, would be assigned to each individual project. And attached to that would be – typically would be the scope and fee arrangement and anything unique to that particular project.").
[5] See 2006 Professional Service Agreement, Exhibit 4 to Deposition of Leonard St. Germain at 34:2-13.
[6] Deposition of Leonard St. Germain at 42:4-18 (testifying about different phases of Baton Rouge projects); Deposition of Chad Herndon, attached hereto as Exhibit 3, at 41:1-6 (testifying that the project was divided into phases).
[7] October 23, 2006 Proposal Letter, Exhibit 6 to Deposition of Leonard St. Germain at 42:4-18.
[8] Id.
[9] Deposition of Chad Herndon at 8:25-9:8 ("Q. And is H&E one of Scott Equipment's competitors? A. Yes. Q. . . . Is the type of equipment H&E sells and rents very similar to the type of equipment that Scott sells and rents? A. Yes.").
[10] Deposition of Chad Herndon at 47:22-48:4.
[11] February 6, 2007 Email, Exhibit 3 to Deposition of Chad Herndon at 45:9-47:21.

3

NON-CERTIFIED COPY

1161472v.1

the largest equipment handled by H&E, and directed him to the manufacturers' website for detailed specifications.[12]

Also in January 2007, URS commissioned a geotechnical investigation of the proposed construction project.[13]  For the pavement for the heavy equipment storage area, the geotechnical report recommended, among other things, a minimum rigid pavement thickness of 7 inches.[14]

By July 2008, the project had progressed to Phase III in which URS prepared complete construction documents.[15]  By February 2009, URS completed the plans and specifications for the project.[16]  Shortly after the construction documents were created, the development of the Baton Rouge facility was temporarily put on hold due to poor general economic conditions.[17]

H&E resumed work on the Baton Rouge project in late 2010.[18]  Construction of the Baton Rouge Branch Building was substantially completed on November 21, 2012, and construction of the Headquarters Building was substantially completed on December 14, 2012.[19]

Near or around the time of substantial completion, various problems involving the concrete pavement were observed including crumbling and spalling of the concrete.[20]  Among other things, the punch lists for the project identified cracking, spalling, cracking and other signs of deterioration in the newly constructed concrete pavement.[21]  Additional design issues emerged at the Baton Rouge facility, including but not limited to, the parking lot, mail slots, and the executive lobby area.[22]  All of the revisions, changes, and additions resulted in significant additional costs to H&E.[23]

URS often refused to take responsibility for the problems and deficiencies that arose and were brought to their attention.  H&E notified URS of the observed problems when the problems

---

[12] Deposition of Leonard St. Germain at 46:18-47:25.
[13] Geotechnical Report of Soil Testing Engineers, Exhibit 1 to Deposition of Thomas Ryan, attached hereto as Exhibit 4 at 36:3-37:7.
[14] Id.
[15] Lump Sum Work Order No. 08-01, Exhibit 18 to Deposition of Leonard St. Germain at 71:3-11.
[16] Deposition of Thomas Ryan at 19:20-20:23; 33:5-12; Deposition of Neal Johnson at 56:21-57:6.
[17] Deposition of John Enquist, attached hereto as Exhibit 5, at 34:1-35:10.
[18] Id. at 35:3-6; Deposition of Leonard St. Germain at 89:19-90 (testifying that hiatus due to economic conditions resumed in 2010).
[19] Petition ¶ 10.
[20] June 5, 2015 Affidavit of Frankie Wynn, attached hereto as Exhibit 6, at ¶ 10.
[21] Deposition of Stephen Dorsey, attached hereto as 7 at 74:13-75:18 (testifying about the December 17, 2012 punch list): June 24, 2013 Baton Rouge Punch List, Exhibit 53 to Deposition of John Jones, attached hereto as Exhibit 8, at 140:6-141:23; June 25, 2013 Deficiencies to the Completion of the Contract, Exhibit 54 to Deposition of John Jones at 144:2-21.
[22] Deposition of Neal Johnson at 116:19-117:11; 117:23-119:11 (acknowledging that Womack, the subcontractor of the Baton Rouge facility, contended that the executive wall issue was a design issue and  the issue was resolved at the cost to H&E); Id. at 120:1-14 (Mr. Johnson received email or call from John Jones about the lack of parking shortly after December 17, 2012); Deposition of Frankie Wynn, attached hereto as Exhibit 9, at 99:2-20; 151:25-152:14 (testifying to emails where H&E informs URS that they will be responsible for the full cost of the mail slot mistake).
[23] Deposition of Stephen Dorsey at 149:24-150:18 (testifying that as a general proposition, change orders result in late service and additional cost to the client).

4

NON-CERTIFIED COPY

surfaced in the hopes that the parties would work together to find a solution and remedy.[24]  With respect to the pavement, URS initially appeared willing to troubleshoot the problems, but it ultimately refused to participate in ongoing discussion and efforts to repair the concrete.[25]  In addition, URS refused to share with H&E information regarding their own apparent efforts to evaluate the problem, including what their own engineering consultant concluded about the problem.[26]  The pavement degradation continues to worsen to the present.

URS's defective work on the Baton Rouge project was not limited to the design of the pavement.  The parking lot of the headquarters facility had to be revised due to URS's failure to design and provide for an adequate number of parking spots.[27]  Additional mill work was needed for the mail room due to URS's deficient design of the mail slots.[28]  The wood paneling in the headquarters facility's executive lobby area had to be replaced due to the use of inferior materials.[29]  There were also numerous code-required additions that were not provided for in URS's designs and specifications.[30]

As of May 2013, there were so many unresolved issues with the Baton Rouge project that H&E informed URS that a final inspection and walkthrough was useless.[31]

## II.    The Kenner project and the 2009 Agreement

In mid-2009, URS was engaged to provide certain services related to the renovation of H&E's branch office in Kenner, Louisiana.[32]  In August 2009, URS provided a proposal under which URS would perform preliminary work on a possible renovation of the facility in exchange

---

[24] August 21, 2015 Affidavit of Frankie Wynn, attached hereto as Exhibit 10, at ¶ 11.

[25] June 11, 2013 Email from Neal Johnson to Frankie Wynn, Exhibit 9 to Deposition of Neal Johnson at 134:12-135:13 (H&E requests answer and solution to pavement and URS responds that it will review the recommendation with its civil engineer and request an opinion).

[26] August 21, 2015 Affidavit of Frankie Wynn at ¶ 11.

[27] Deposition of Stephen Dorsey at 67:2-20; 81:2-12; Deposition of John Jones at 64:23-65:13; 103:2-104:22; 106:2-17; 107:19-24; 119:10-120:5 (URS's vice president, Debra Sanders, offered $17,507 for the parking lot; H&E wanted URS to pay the full $129,000); Deposition of Neal Johnson at 120:1-14 (Mr. Johnson received email or call from John Jones about the lack of parking shortly after December 17, 2012); Deposition of Debra Sanders, attached hereto as Exhibit 11, at 14:1-13; Deposition of Frankie Wynn at 144:5-12 (parking lot issue was discovered on December 17, 2012 when H&E moved in); August 21, 2015 Affidavit of Frankie Wynn at ¶ 14(a).

[28] Deposition of Stephen Dorsey at 75:21-77:15; 84:16-85:22; Deposition of John Jones at 70:19-72:13; Deposition of Debra Sanders at 12:21-13:11; Deposition of Brad Barber, attached hereto as Exhibit 12, at 109:4-18; Deposition of Frankie Wynn at 99:2-20; 151:25-152:14 (testifying to emails where H&E informs URS that URS will be responsible for the full cost of the mail slot mistake).

[29] Deposition of Stephen Dorsey at 107:20-117:14; 135:11-137:20; 147:1-148:16; Deposition of Neal Johnson at 116:19-117:11; 117:23-119:11 (acknowledging that Womack, the subcontractor of the Baton Rouge facility, contended that the executive wall issue was a design issue and the issue was resolved at the cost to H&E); Deposition of Debra Sanders at 13:16-21; Deposition of Brad Barber at 138:9-139:5; August 21, 2015 Affidavit of Frankie Wynn at ¶ 14(h).

[30] Deposition of Thomas Ryan at 134:6-24 (acknowledging multiple code issues); August 21, 2015 Affidavit of Frankie Wynn dated at ¶ 14(l).

[31] Deposition of Thomas Ryan 76:15-78:23; 80:8-16 (acknowledging that as of May 2013, there were numerous unresolved issues and H&E believed that a final inspection/walk-through was useless; acknowledges problems including paving, acoustical panels, and paneling in the Executive Area at the Baton Rouge facility).

[32] Deposition of Leonard St. Germain at 76:21-77:16.

5

NON-CERTIFIED COPY

for a $20,000 fee.[33]  In connection with this limited proposal, URS asked H&E to sign a Short Form Master Agreement for Professional Services ("the 2009 Agreement").  The 2009 Agreement specifically referenced the Kenner project and incorporated as attachments the proposal and the $20,000 scope of work.[34]

Contrary to URS's litigation position, it is clear that the 2009 Agreement was not intended to replace the 2006 Agreement governing URS's work on the Baton Rouge project. URS's design work on the Baton Rouge project – including its defective design of the pavement – was substantially completed well before the 2009 Agreement was presented to H&E.[35] Further, as presented to H&E, the 2009 Agreement only applied to the preliminary budgeting phase for the renovation of the Kenner facility.[36]  Leonard St. Germain testified that when he signed the 2009 Agreement, he believed that the Agreement would only apply to the budgeting phase of the Kenner project.[37]  In addition, the 2009 Agreement's document identifier – "I:\Proposals\Facilities\H&E Equipment Services – Kenner\Proposal\PS-100 Short Form Master Agreement for Professional Services (Rev. 03-2009).doc," as well as the correspondence and attachments accompanying the 2009 Agreement support that the agreement was intended by URS to govern only work performed in helping H&E develop a budget for the Kenner project.[38]

Furthermore, the evidence suggests that after the execution of the 2009 Agreement, URS continued to regard the 2006 Agreement as governing the Baton Rouge project.  Defendant Neal Johnson, the lead architect on the projects, testified at his deposition that H&E and URS's relationship with respect to the three projects was generally governed by both agreements.[39]  And

---

[33] Deposition of Leonard St. Germain at 77:17-21; August 2009 Proposal by Neal Johnson, Exhibit 21 to Deposition of Leonard St. Germain at 77:1-7.

[34] Deposition of Leonard St. Germain at 83:10-15; 2009 Agreement, Exhibit 27 to Deposition of Leonard St. Germain at 87:4-13.

[35] Deposition of Thomas Ryan at 19:20-20:23; 33:5-12; Deposition of Neal Johnson at 56:21-57:6 (testifying that when Mr. Johnson became involved with the H&E projects, the design for the Baton Rouge project was complete but the project was put on hold).

[36] Deposition of Leonard St. Germain at 83:10-84:18.

[37] Id. at 139:23-140:18 (testifying that when he signed the 2009 Agreement, he believed that it covered "the scope of developing drawings for the existing site and buildings, for review of the existing truck traffic, and evaluate the condition of all the exterior roofs, buildings and the attachment to it.").

[38] See Letter dated August 10, 2009, Exhibit 22 to the Deposition of Leonard St. Germain at 77:8-21(detailing $20,000 proposal for Kenner Project); August 13, 2009 Email from St. Germain, Exhibit 23 to Deposition of Leonard St. Germain at 82:21-83:7 (stating approval to proceed with the $20,000 proposal); Email from Chad Herndon, Exhibit 24 to Deposition of Leonard St. Germain at 83:8-15 (URS project manager Chad Herndon putting together a new professional service agreement to kick off the Kenner project); August 20, 2009 Email from Neal Johnson, Exhibit 25 to the Deposition of Leonard St. Germain at 83:20-84:6 (Neal Johnson forwards the 2009 Agreement and attachments to Mr. St. Germain for his signature and references just the Kenner proposal).

[39] Deposition of Neal Johnson at 159:16-161:4 (testifying that the 2006 and 2009 Agreements were the base agreements that governed the three projects).

6

NON-CERTIFIED COPY

URS issued invoices for work on the Baton Rouge project *after* the 2009 Agreement was signed that specifically referenced and incorporated the 2006 Agreement.[40]

Like the Baton Rouge project, the Kenner project was paused temporarily due to poor economic conditions. The Kenner project resumed in mid-2010[41] and proceeded to Phase II during which URS completed the design of the renovations, prepared the construction documents, assisted in contractor pricing and construction contract negotiations, and provided construction administration.[42]

During the course of preparing the design and construction documents, URS was well aware that the design requirements for the Kenner facility were similar to that of the Baton Rouge facility as both locations handled heavy construction equipment. In mid-December, URS representatives conducted a site visit of the facility to evaluate the "site, building, and equipment conditions."[43] At the meeting, URS representative Craig Duos, requested and was provided information regarding the specifications for the type of heavy construction equipment and the weight of the equipment expected to be stored and used at the facility.[44]

Terracon Consultants, Inc. ("Terracon") was engaged to provide the geotechnical engineering services for the Kenner project. In its geotechnical report, Terracon recommended a minimum rigid pavement thickness of 7 inches over 12 inches of compacted river sand as well as other specifications for the pavement at the Kenner facility.[45] Terracon also recommended for the design engineer to refer to the ACI330R-01 "Guide for Design and Construction of Concrete Parking Lots" and noted that "[a] critical aspect of concrete pavements for facilities of this nature is joint spacing and related details."[46]

Construction, including the pouring of concrete for the new pavement, began in December 2011.[47] Concrete continued to be poured throughout 2012.[48] Problems with the concrete pavement in the form of cracking and spalling appeared almost immediately.[49] H&E

---

[40] *See, e.g.,* Invoice No. 4602441, dated 2/24/11 (URS 09289) and Invoice No. 4666033, dated 4/27/11 (H&E 0001532), Exhibits 4, 5 to June 5, 2015 Affidavit of Frankie Wynn, Exhibit 6.
[41] Deposition of Leonard St. Germain at 89:19-90:24.
[42] Time and Materials Work Authorization 10-10, Exhibit 28 to Deposition of Leonard St. Germain at 87:22-88:8.
[43] December 16, 2010 Site Meeting Minute, Exhibit 5 to Deposition of Timothy Gaines, attached hereto as Exhibit 13 at 78:17-25.
[44] *Id.*
[45] Terracon Geotechnical Report, Exhibit 14 to Deposition of Thomas Ryan at 103:24-104:19; 107:1-10.
[46] *Id.*; Deposition of Thomas Ryan at 110:7-25.
[47] December 29, 2011 Email from MAPP to URS and H&E, Exhibit 26 to Deposition of Frankie Wynn at 90:15-91:3.
[48] March 16, 2012 Email from MAPP to URS and H&E, Exhibit 35 to Deposition of Frankie Wynn at 107:15-108:1.
[49] Deposition of Neal Johnson at 173:10-16 (concrete at Kenner started cracking and spalling instantly after being poured).

7

NON-CERTIFIED COPY

first became aware of the issue in March 2012.[50] Towards the end of March 2012 and continuing thereafter, portions of the pavement where cracking and spalling occurred were removed and re-poured, resulting in substantial delays and additional costs to H&E.[51] Punch lists for the Kenner project identified apparent cracking, spalling, and other signs of deterioration in the newly constructed concrete pavement where the heavy construction equipment would be stored.[52]

As with the Baton Rouge project, numerous other problems and design deficiencies arose during the course of the Kenner project, including but not limited to drainage issues with a wash rack and significant omissions in the construction documents resulting in additional change orders.[53]

As early as October 2012, H&E and the contractor contacted URS to have URS recommend appropriate repairs.[54] URS acknowledged the issues and initially worked with H&E to find solutions.[55] As with the Baton Rouge project, however, URS ultimately refused to take responsibility for the design deficiencies.

### III.    The Belle Chasse project

In August 2009, H&E retained URS to provide professional design and construction administration services in connection with the renovation and relocation of H&E's "Crane Remanufacturing Facility" located in Belle Chasse, Louisiana.[56] The Belle Chasse project was

---

[50] March 20, 2012 Project Observation Report, Exhibit 36 to Deposition of Frankie Wynn at 108:17-25.

[51] August 3, 2012 Internal URS Email, Exhibit 39 to Deposition of Frankie Wynn at 113:9-25 ("Tim: Need you to take a look at these photos obtained by the Owner. There exists considerable concern about the quality of the paving construction joints."); September 25, 2012 Email from MAPP to URS and H&E, Exhibit 44 to Deposition of Frankie Wynn at 127:17-128:23 (detailing re-pours of concrete); March 4, 2013 Email from MAPP to H&E and URS, Exhibit 39 to Deposition of Brad Reese, attached hereto as Exhibit 14, at 119:12-21 (requesting URS input on "action items for paving joint repairs. . . . would like to sit down with you to review their proposed solutions").

[52] Deposition of Frankie Wynn at 128:24-130:9 (testifying the punch list for the Kenner project identified repair of the pavement as an item); Deposition of John Jones at 97:13-100:12 (testifying that October 16, 2012 punch list stated that among the items that needed to be repaired was pavement at various locations); 124:12-126:7 (testifying about improper pavement joints); Deposition of Neal Johnson at 169:3-24 (testifying that the cracking and spalling at the Kenner site was on the punch list); 173:10-16 (concrete at Kenner started cracking and spalling instantly after being poured).

[53] Deposition of Brad Reese at 32:13-34:21;108:8-23; List of Kenner Project Change Orders, Exhibit 70 to Deposition of Frankie Wynn at 195:2-196:3 (Change Order Proposals 3, 4, 5 and 6); 197:13-23 (testifying as to multiple change orders related to the Kenner facility); Change Order Proposal 9 (URS's design did not account for new conduits despite the fact that existing conduits were too old to carry necessary data); Change Order Proposal 17 (URS's design did not account for a back-flow preventer); Change Order Proposal 6 (URS's design did not account for a slip joint system).

[54] Deposition of Thomas Ryan at 119:21-123:25 (testifying that, in October 2012, MAPP wanted to find a solution to the spalling and cracking at the Kenner site and wanted to meet with URS to discuss solution but URS did not meet or participate at that time); October 4, 2012 Email from MAPP to URS and H&E, Exhibit 46 to Deposition of Frankie Wynn at 130:25-131:12 ("MAPP will implement the engineer's recommended design mod/fix as soon as we receive direction. We have placed our concrete sub on stand-by and they are ready to move forward without delay[.]").

[55] March 4, 2013 Email from MAPP to H&E and URS, Exhibit 39 to Deposition of Brad Reese at 119:12-21 (working out solutions to repair pavement at Kenner facility); July 17, 2013 Email from MAPP to URS, Exhibit 48 to Deposition of Brad Reese at 147:3-17 (same).

[56] Deposition of Leonard St. Germain at 91:21-92:3.

8

116 1772.1

NON-CERTIFIED COPY

paused and then resumed in December 2010.[57]    The project involved the relocation and renovation of an existing H&E facility to an adjacent and larger facility.[58]  By late January 2012, the project proceeded to Phase II involving the completion of design, construction documents, permitting, contract negotiations, and construction administration.

The Belle Chasse project was substantially completed in late 2013, after H&E filed its Petition.[59]  The Belle Chasse project did not include concrete pavement like those in the Baton Rouge and Kenner facilities.   But numerous other problems occasioned by URS's deficient designs and specifications required addressing and remedying at H&E's expense.[60]   Those included:

- The additional need for pressure washing prior to the laying of concrete;[61]
- The addition and installation of a significant amount of extra concrete in the facility's work area due to URS's incorrect elevation estimates and specifications for an insufficient amount of concrete;[62]
- The removal of concrete expansion joints not anticipated or provided for by URS but necessitated by URS's concrete specifications;[63]
- Multiple revisions occasioned by URS's failure to properly measure for an accordion partition in the facility's lunch room area, and H&E's purchase of custom materials that could not be used as planned and remained unused today;[64]
- Multiple revisions occasioned by URS's measurement of roof differentials between the administration building and the tool room, including relocation of duct work and transformers;[65] and
- Various other revisions and changes during the course of construction caused by URS's deficient specifications, such as the modification of exterior handrails, addition of bollards to exterior air-conditioning units, relocation of the facility's locker rooms, and replacement of the facility's windscreens.[66]

---

[57] Deposition of John Engquist at 35:3-6; Deposition of Leonard St. Germain at 89:19-90:24 (testifying that hiatus due to economic conditions resumed in 2010).

[58] Deposition of Frankie Wynn at 46:4-13.

[59] *Id.* at 203:13-204:15 (testifying that during an October 2013 walk through of the Belle Chasse facility there were still numerous observed issues).

[60] *Id.* at 191:24-194:12 (testifying to emails dated July 2013 to URS about additional design defects with the Belle Chasse project such as roof alignment, folding door, and ductwork); 198:4-199:14 (testifying to numerous change order proposals for items left out by URS).

[61] Deposition of Kevin Sprehe, attached hereto as Exhibit 15 at 48:20-49:12.

[62] Deposition of John Jones at 152:8-153:18; 158:4-10; Deposition of Kevin Sprehe at 28:4-32:5; 46:13-24 (testifying to Change Order Proposal 17 regarding the need for additional concrete for building A); 47:11-48:9 (testifying to Change Order Proposal 17 and 18); 46:5-12 (testifying to Change Order Proposal 7 regarding the materials left out in design concerning the expansion joints): 26:3-23 (same); August 21, 2015 Affidavit of Frankie Wynn at ¶ 19(a).

[63] Deposition of John Jones at 83:10-85:9; Deposition of Kevin Sprehe at 49:13-50:1 (testifying to Change Order Proposal 20); 63:12-65:16 (same); August 21, 2015 Affidavit of Frankie Wynn at ¶ 19(b).

[64] Deposition of Kevin Sprehe at 35:19-38:25; August 21, 2015 Affidavit of Frankie Wynn at ¶ 19(c).

[65] Deposition of Kevin Sprehe at 40:5-41:25; 74:17-75:22; August 21, 2015 Affidavit of Frankie Wynn at ¶ 19(d).

[66] Deposition of Kevin Sprehe at 47:11-48:9 (handrails); 85:23-87:12 (windscreen); 96:2-97:3 (locker room); 93:13-94:13; 95:9-20 (handrails); 43:20-45:10 (testifying to Change Order Proposal 25 regarding ramp and re-steel changes and the overhead door); 50:2-19 (testifying to Change Order Proposal 21 regarding overhead doors); August 21, 2015 Affidavit of Frankie Wynn at ¶ 19(e).

9

NON-CERTIFIED COPY

As with the Baton Rouge and Kenner projects, URS often refused to take responsibility for the problems and deficiencies that arose and were brought to their attention.[67]

### IV.    Pavement defects at the Baton Rouge and Kenner facility.

As described above, the pavement at the Baton Rouge and Kenner facilities is by far the largest issue in this litigation.  The pavement at both sites began to show signs of deterioration almost immediately.  The observed damage to the pavement included pervasive cracking across panels of concrete and at intersections of construction and expansion joints and spalling of construction and expansion sites.[68]

As set forth in expert reports tendered by H&E, the pavement design for the Baton Rouge facility is grossly defective in numerous respects including:

- the omission in design of smooth dowel bars at construction joints;[69]
- the improper design of #3 rebar across construction joints;[70]
- the design of saw cut joints of 1/2 inch depth for construction joints;[71]
- the design of the expansion joints with improper usage of #4 smooth dowels and spacing;[72] and
- the design of concrete of inadequate thickness.[73]

The design deficiencies detailed above are at odds with the standards promulgated by the Louisiana Department of Transportation and Developments ("LADOTD"),[74] the City of Baton Rouge Department of Public Works,[75] and the American Concrete Institute,[76] as well as the standards recommended by a geotechnical engineering report commissioned by URS.[77]  Notably, URS's own expert agreed that certain aspects of URS's design were deficient, including the design of saw cut joints of improper minimum depth and the minimum thickness of concrete.[78]

---

[67] July 29, 2013 Email from H&E to URS, Exhibit 69 to Deposition of Frankie Wynn at 191:12-194:12 (bringing attention to numerous change orders and requesting explanation of how numerous items at the Belle Chasse site were overlooked).
[68] Exponent Expert Report, Exhibit 1 to Deposition of James R. Bailey, attached hereto as Exhibit 16, at 26:4-11 at pgs 4-6.
[69] Expert Report of Wallace C. Drennan, Exhibit 1 to Deposition of Wallace C. Drennan, attached hereto as Exhibit 17. at 21:1-10, at pg. 3.
[70] Id.
[71] Exponent Expert Report, Exhibit 1 to Deposition of James R. Bailey at 26:4-11 at pgs. 9-10.
[72] Id at 10.
[73] Id at 9.
[74] Id.
[75] Expert Report of Wallace C. Drennan, Exhibit 1 to Deposition of Wallace C. Drennan at 21:1-10, at pg. 3.
[76] Exponent Expert Report, Exhibit 1 to Deposition of James R. Bailey at 26:4-11 at pgs. 7-8.
[77] Expert Report of Wallace C. Drennan, Exhibit 1 to Deposition of Wallace C. Drennan at 21:1-10, at pg. 3.
[78] Deposition of Gary Anderton, attached hereto as Exhibit 18, at 56:12-57:17 ("Q. And did you make any observations about the depth of the saw cuts in the control joints? A. I witness others during the August site visit making some measurements. . . . Q. And what did they tell you? A. Just various depths, from a half-inch, to three-quarters of an inch. Q. And you would agree with me that that's not deep enough for a saw cut control joint; correct? A. Correct. Q. And is there a standard that the industry follows for the proper depth of a saw cut control joint? A. Generally speaking, a third to a fourth of the slab depth – inches. Q. Meaning, if you have an 8-inch slab, you would be looking for a 2-inch – A. Initial saw cut. Q. – a 2-inch saw cut? A. Yes."); 146:18-23 ("Q. So if you were designing the H&E facility in Baton Rouge, you would recommend that they use 8-inch pavement, no dowels, or 7-inch pavement with dowels, in any area where they expected heavy truck traffic? A. Yes.").

10

NON-CERTIFIED COPY

The design of the pavement at the Kenner facility is similarly defective in numerous respects including:

- the omission in design of smooth dowel bars at construction joints;[79]
- the improper design of #3 rebar across construction joints;[80]
- the design of saw cut joints of 1/4 inch depth for construction joints;[81]
- the design of expansion joints with improper usage of #4 smooth dowels and spacing;[82] and
- the design of concrete of inadequate thickness.[83]

As with the design of the Baton Rouge pavement, the design deficiencies detailed above violated the standards promulgated by the LADOTD,[84] and the American Concrete Institute, and the standards recommended by the Terracon geotechnical report commissioned by URS.[85] Again, URS's own expert acknowledged that certain aspects of URS's design were deficient, including the design of saw cut joints.[86]

At both of the facilities, it was foreseeable that the operation of H&E equipment across the joints would cause spalling, and URS was grossly negligent in designing the pavement at both locations.[87]

Neal Johnson and Thomas Ryan, the URS architects in charge of the Baton Rouge and Kenner projects testified that they did **nothing** to ensure that the pavement designs, provided by their civil engineers, complied with those standards. Mr. Johnson, testified that despite the fact that the specifications for the Baton Rouge facility created by their civil engineer, Benchmark, required compliance with LADOTD and the East Baton Rouge Department of Public Works, he had no familiarity with those standards nor did he or anyone from URS attempt to determine whether the pavement specifications were consistent with those established standards.[88]

---

[79] Expert Report of Wallace C. Drennan, Exhibit 1 to Deposition of Wallace C. Drennan at 21:1-10, at pg. 5.
[80] Id.
[81] Exponent Expert Report, Exhibit 1 to Deposition of James R. Bailey at 26:4-11 at pg. 12.
[82] Id. at pgs. 12-13.
[83] Expert Report of Wallace C. Drennan, Exhibit 1 to Deposition of Wallace C. Drennan at 21:1-10, at pg. 5.
[84] Id. at pg. 4.
[85] Exponent Expert Report, Exhibit 1 to Deposition of James R. Bailey at 26:4-11 at pg. 11; Expert Report of Wallace C. Drennan, Exhibit 1 to Deposition of Wallace C. Drennan at 21:1-10, at pg. 4.
[86] Deposition of Gary Anderton at 56:12-57:17.
[87] Exponent Expert Report, Exhibit 1 to Deposition of James R. Bailey at 26:4-11 at pg. 8 ("[I]n my opinion it was reasonable and prudent for URS to require distributed steel reinforcement in the concrete pavements at both sites to control the opening of intermediate cracks between the joints. It was also reasonable and prudent for URS to require dowels at the expansion joints to provide vertical load transfer while permitting the joints to expand. However, as indicated in the sections to follow URS did not design the dowels in accordance with recognized specifications and guidelines related to concrete pavement design[.]"); Expert Report of Wallace C. Drennan, Exhibit 1 to Deposition of Wallace C. Drennan at 21:1-10, at pg. 5 ("the operation of metal track equipment across the pavement has resulted in spalling observed along the surface of the joints. It was foreseeable that the operation of H&E's equipment across the joints would cause spalling along the joints. URS should have recommended a design that would offer additional protections for the joints.").
[88] Deposition of Neal Johnson at 70:3-19 ("Q. Note No. 1 says, quote: All work shall conform to the City of Baton Rouge and Parish of East Baton Rouge Standard Specifications for Public Works Construction, latest edition. Sir, during the time you were involved in the Baton Rouge project, did you have any familiarity with the City of Baton Rouge and Parish of East Baton Rouge Standard Specifications for Public Works Construction? A. No, sir. Q. Number 2, 'and to the State of Louisiana Department of Transportation and Development, LADOTD, Standard

11

NON-CERTIFIED COPY

Similarly, with respect to the Kenner facility, Mr. Johnson testified that even though the geotechnical engineering report created by Terracon recommended compliance with the pavement standards promulgated by the American Concrete Institute, neither he nor anyone at URS referenced the guide in connection with the design of the pavement.[89]  Mr. Johnson also testified that despite the fact that the Terracon report recommended a minimum thickness of concrete for heavy duty areas of pavement, he did not know nor ask what thickness was actually constructed.[90]  Likewise, Mr. Ryan testified that at the time the pavement was constructed, he had no familiarity with the specifications of the pavement created by Benchmark, and that neither he nor anyone else at URS verified whether the pavement designs conformed to the LADOTD requirements.[91]

In sum, there is substantial evidence that the design of the pavement for the Baton Rouge and Kenner facilities prepared by URS and its subcontractor, Benchmark, was a gross deviation from the standard of care.

## LAW AND ARGUMENT

I.     **Standard for Summary Judgment.**

Summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law.[92]  The burden remains on the movant, and any reasonable doubt must be resolved against the moving party.[93]  In the context of contractual disputes, summary judgment is appropriate only where the words of a contract are clear, unambiguous, and do not lead to absurd consequences; where a

---

Specifications, latest edition,' period.  During the time you were involved in the Baton Rouge project, did you have any familiarity whatsoever with the LADOTD Standard Specifications? A. No, sir."); 99:21-100:10 ("Q. Did you or anyone else from URS attempt to determine whether the details for construction and expansion joints called for by Benchmark were consistent with Louisiana Department of Transportation specifications? A. No, sir. Q. Did you or anyone else from URS attempt to determine whether those details were consistent with East Baton Rouge Parish specifications? A. No. Q. Did you or anyone from URS attempt to determine whether all or any part of the work designed by Benchmark for the yard was compliant with Louisiana Department of Transportation specifications?A. No.").

[89] *Id.* at 165:10-166:4 ("Q. Down below Terracon writes, and I quote: Other standard design and construction details for rigid pavements as contained in ACI330R-01, Guide for Design & Construction for Concrete Parking Lots, should be followed in the pavement design and construction process. It goes to state in the final sentence, 'A critical aspect of the concrete pavements for facilities of this nature is joint spacing and related details. ACSI330R-01 addresses these important details.' Do you see where I am reading from? A. Yes, sir. Q. To the best of your knowledge, did Mr. [Timothy] Gaines reference that guide in connection with his design of the yard? A. I have no knowledge of that.  Q. Have you ever asked him? A. No, sir. Q. Did you do so? A. No, sir.Q. To your knowledge, did anyone else from URS do so? A. No, sir.").

[90] *Id.* at 166:8-167:24.

[91] Deposition of Thomas Ryan at 72:10-21 ("Q. Did you or, to your knowledge, anyone else at URS actually walk through DOT specifications in their discussions with [Benchmark]? A. I don't recall. Q. You did not do that? A. No, I did not. Q. All right. Indeed, based on your earlier testimony, at that time you really weren't in a position to do so since you weren't familiar with the specifications; is that correct? A. Yes.").

[92] La. Code Civ. P. art. 966; *see also, e.g.*, *Rager v. Bourgeois*, 2006-0322, p. 5 (La. App. 1st Cir. 2006); 961 So. 2d 330, 333; *Carter v. BRMAP*, 591 So. 2d 1184, 1187 (La. App. 1st Cir. 1991).

[93] *See, e.g.*, *Rager*, 961 So. 2d at 333; *Carter*, 591 So. 2d at 1187.

1161172v.1     NON-CERTIFIED COPY

contract is ambiguous and/or the intent of the parties becomes a question of fact, summary judgment is not appropriate.[94]  Summary judgment is rarely appropriate for determinations based on subjective facts such as intent, motive, malice, knowledge, or good faith.[95]

## II.   The 2009 Agreement does not apply to all of H&E's claims against URS.

As an initial matter, URS's motion is predicated entirely on the 2009 Agreement, and in particular, a provision contained in that Agreement purporting to limit URS's liability for defective work.  URS argues in its motion that the 2009 Agreement applies to all of H&E's claims.  URS is wrong.

As discussed above, the parties also operated under the 2006 Agreement, which does not contain the limitation of liability provisions cited by URS.[96]

Significantly, the 2006 Agreement controls all rights and responsibilities for work performed in connection with the design development and preparation of construction documents for the Baton Rouge facility.[97]  Work orders primarily at issue in this litigation, concerning the design development and preparation of construction documents for the Baton Rouge projects, explicitly reference the 2006 Agreement, as do final invoices related to that work dated in 2011.[98]  And while URS makes much out of the fact that the "final, stamped design plans. . . for the Baton Rouge Project" were "provided by URS in 2011,"[99] the facts reveal that URS designed the defective pavement for the Baton Rouge facility – and received payment for that defective design – prior to 2009.[100]

Additionally, the 2009 Agreement on which URS relies is limited.  The parties intended the 2009 Agreement to narrowly apply to budgeting for H&E's Kenner facility renovations. Leonard St. Germain who signed the 2009 Agreement for H&E testified that he believed that the scope of the 2009 Agreement was limited to "developing drawings for the existing site and buildings, for review of the existing truck traffic, and evaluate the conditions of all the exterior roofs, walls, buildings and the attachment to it."[101]  This is bolstered by the 2009 Agreement which states:

---

[94] *See, e.g., Carter*, 591 So. 2d at 1187.
[95] *Id.*
[96] *Id.*
[97] 2006 Professional Service Agreement, Exhibit 4 to Deposition of Leonard St. Germain at 34:2-13.
[98] *See, e.g.,* Invoice No. 4602441, dated 2/24/11 (URS 09289) and Invoice No. 4666033, dated 4/27/11 (H&E 0001532), Exhibits 4, 5 to June 5, 2015 Affidavit of Frankie Wynn, Exhibit 6.
[99] URS's Memorandum in Support of Motion for Summary Judgment at 13.
[100] Deposition of Thomas Ryan at 19:20-20:23; 33:5-12; Deposition of Neal Johnson at 56:21-57:6 (testifying that when Mr. Johnson became involved with the H&E projects, the design for the Baton Rouge project was complete but the project was put on hold).
[101] Deposition of Leonard St. Germain at 139:23-140:18.

13

NON-CERTIFIED COPY

THIS AGREEMENT ("Agreement") for Professional Services, (**together with the attachments hereto**) dated and effective as of August 13, 2009 (the "Effective Date"), is hereby made and entered into by and between H&E Services. . . .[102]

There were three attachments to the 2009 Agreement, including work authorization 09-100 which specifically referenced the Kenner project and incorporated as attachments the proposal and the $20,000 scope of work.[103]

Clearly, the parties did not intend for the 2009 Agreement to apply to the portions of the Baton Route project for which URS already prepared designs and specifications. Indeed, various Baton Rouge invoices submitted after 2009 specifically referenced the 2006 Agreement.[104] The lead URS architect for the projects, Neal Johnson, also testified that both agreements governed the parties' relationship with respect to the three projects.[105]

Notwithstanding the foregoing, URS argues that the 2009 Agreement's integration clause nullifies the 2006 Agreement. This is incorrect. The clause states: "This Agreement constitutes the final and complete repository of the agreements between [H&E] and [URS] relating to the Services and supersedes all prior or contemporaneous communications, representations, or agreements."[106] But a plain reading of the clause and the attachments incorporated to the 2009 Agreement demonstrate that the 2009 Agreement integrates and memorializes the parties' full agreement as to the specific subject matter of URS's work: helping H&E develop a budget for renovations to its Kenner facility. Nothing in the 2009 Agreement makes it apply retroactively to defective work previously performed by URS. Instead, the Agreement is made "effective as of August 13, 2009."[107] In addition, Section 17 of the 2009 Agreement states that the agreement runs from the effective date:

> 17. TERM "17.1 Unless otherwise specified, the term of this Agreement shall run from the Effective Date until Consultant has completed the Services and received all payments due under the Agreement."[108]

Thus the 2009 Agreement has no application to the substantial work performed by URS under the 2006 Agreement. At a minimum, significant disputes of material fact regarding the

---

[102] 2009 Agreement, Exhibit 27 to Deposition of Leonard St. Germain at 87:4-13 (emphasis added).
[103] Deposition of Leonard St. Germain at 83:10-15; 2009 Agreement, Exhibit 27 to Deposition of Leonard St. Germain at 87:4-13.
[104] *See, e.g.,* Invoice No. 4602441, dated 2/24/11 (URS 09289) and Invoice No. 4666033, dated 4/27/11 (H&E 0001532), Exhibits 4, 5 to June 5, 2015 Affidavit of Frankie Wynn, Exhibit 6.
[105] Deposition of Neal Johnson at 159:16-161:4.
[106] 2009 Agreement, Exhibit 27 to Deposition of Leonard St. Germain at 87:4-13.
[107] *Id.*
[108] *Id.*

14

NON-CERTIFIED COPY

scope of the 2009 Agreement and the intent of the parties are sufficient, on their own, to deny URS's motion.[109]

**III.    The 2009 Agreement's "waiver" provisions are ineffective.**

In addition to the fact that the 2009 Agreement has no application to a large portion of the defective work performed by URS, the provisions in the 2009 Agreement on which URS relies are of no effect by virtue of Louisiana law and URS's own conduct.

Section 4.1 of the 2009 Agreement includes the following "waiver" provision:

> [URS] warrants that any consulting and professional engineering Services performed by it under a Work Authorization shall be performed in accordance with that degree of care and skill ordinarily exercised by members of [URS's] professional practicing at the same time in the same location. [URS's] sole liability to [H&E] for any non-conforming Services shall be to re-perform the non-conforming or defective Services, written notice of which must be promptly given by [H&E] to [URS]. [URS's] obligation for re-performance of non-conforming Services as set forth in the preceding sentence shall extend for a term commencing at the substantial completion of such Services under a Work Authorization and ending one year later.[110]

URS contend that this provision, along with Section 4.2, which states that H&E must give prompt, written, notice of defects, waives H&E's rights to recoverable damages and limits H&E's remedies to the sole remedy of re-performance of defective work within one year of substantial completion. They are wrong.

Louisiana law imposes strict requirements on contract provisions purporting to limit a party's liability. If a party wishes to limit or waive an implied warranty and/or limit their liability, the waiver must be: (1) written in clear and unambiguous terms; (2) contained in the contract; and (3) brought to the attention of and explained to the party against whom it is to be enforced.[111] The party seeking to enforce the waiver or limitation has the burden of showing that all three requirements are satisfied.[112] Further, even if these requirements are met, a waiver is still unenforceable if it purports to exclude or limit liability for damages caused by intentional or gross fault.[113]

---

[109] *See Carter*, 591 So. 2d at 1189 (stating that "in motions for summary judgment where a contract is ambiguous and the intent of the parties becomes a question of fact, very often there are conflicting affidavits concerning the intent of the parties and granting a summary judgment is not appropriate").
[110] 2009 Agreement, Exhibit 27 to Deposition of Leonard St. Germain at 87:4-13.
[111] *Prince v. Pared Pontiac Co.*, 281 So. 2d 112, 117 (La. 1973); *Fontenot v. F. Hollier & Sons*, 478 So. 2d 1379, 1386 (La. Ct. App. 3d 1985) (extending *Prince* test to warranty provisions that limit liability or recoverable damages); *Harvey v. Mosaic Fertilizer*, LLC, No. 06-9510, 2009 WL 3112144, *5 (W.D. La. September 25, 2009) (same).
[112] *See, e.g., Southwest La. Hosp. Assoc. v. BASF Constr. Chemicals, LLC*, 947 F. Supp. 2d 661, 670 (W.D. La. 2013).
[113] *See La.* Civ. Code art. 2004; *see also, e.g., Conmaco/Rector L.P. v. L&A Contracting Co.*, No. 12-2337, 2013 WL 5881576, *4 (E.D. La. October 30, 2013).

15

1161172v.1                    NON-CERTIFIED COPY

a. **URS failed to re-perform non-conforming services within a year from the date of substantial completion.**

While URS now insists that it is only obligated to re-perform its defective services, URS did not attempt to re-perform (or even assert their alleged right to re-perform) the defective services within one year of substantial completion, despite the fact that URS was on notice of the "non-conforming Services."

As the facts show, H&E notified URS of their deficient services including the cracking and spalling pavement at the Baton Rouge and Kenner sites, when those problems surfaced, in hopes that the parties might work together to find a remedy.[114] The spalling and cracking of the pavement were thoroughly noted in the punch lists of both projects.[115] H&E also notified URS of other design deficiencies when they occurred.[116] URS simply refused to participate in ongoing discussions and efforts to remedy the design deficiencies or share with H&E information regarding their own internal efforts to troubleshoot the pavement problems and what they and their engineering consultant concluded about the problems.[117]

In other words, URS did not "re-perform the nonconforming or defective Services," as required by the provision on which URS rely. As such, even assuming arguendo that section 4.1 applied, URS is precluded from relying on it to avoid liability to H&E.

b. **The "waiver" provision in the 2009 Agreement is not written in clear and unambiguous terms because other provisions contemplate damages.**

Additionally, the waiver provision on which URS relies conflicts with other provisions in the 2009 Agreement. "Each provision of a contract must be interpreted in light of the other provisions, and

---

[114] June 11, 2013 Email from Neal Johnson to Frankie Wynn, Exhibit 9 to Deposition of Neal Johnson at 134:12-135:13 (H&E requests answer and solution to pavement and URS responds that they will review the recommendation with its civil engineer and request an opinion); August 21, 2015 Affidavit of Frankie Wynn at ¶ 11.
[115] Deposition of Stephen Dorsey at 74:13-75:18 (testifying about the December 17, 2012 punch list); June 24, 2013 Baton Rouge Punch List, Exhibit 53 to Deposition of John Jones, at 140:6-141:23; June 25, 2013 Deficiencies to the Completion of the Contract, Exhibit 54 to Deposition of John Jones at 144:2-21; Deposition of Frankie Wynn at 128:24-130:9 (testifying that the punch list for the Kenner project identified repair of the pavement as an item); Deposition of John Jones at 97:13-100:12 (testifying that October 16, 2012 punch list stated that among the items that needed to be repaired was pavement at various locations); 124:12-126:7 (testifying about improper pavement joints); Deposition of Neal Johnson at 169:3-24 (testifying that the cracking and spalling at the Kenner site was on the punch list); 173:10-16 (concrete at Kenner started cracking and spalling instantly after being poured).
[116] Deposition of John Engquist at 71:24-72:12 ("Q. Mr. Engquist, when we were talking about your order to stop paying invoices of URS about the problem with the parking and the problems with the design, did you say problems with design? A. I may have. Q. What problems in January of 2013, sir, were you aware of with respect to design problems by URS? A. There was a lot of – there was a lot of things like the paneling and –or, you know, executive office suites and stuff like that, which had to be replaced."); Deposition of Brad Barber at 152:5-9; 156:6-17 (H&E viewed Neal Johnson as generally incompetent and unwilling to take responsibility; H&E had issue with multiple problems, not just the parking lot issue); Deposition of Frankie Wynn at 191:24-194:12 (testifying to emails dated July 2013 to URS about additional design defects with the Belle Chasse project such as roof alignment, folding door, and ductwork); 198:4-199:14 (testifying to numerous change order proposals for items left out by URS).
[117] August 21, 2015 Affidavit of Frankie Wynn at ¶ 11.

16

NON-CERTIFIED COPY

a provision susceptible of different meanings must be interpreted with a meaning that renders it effective rather than one which renders it ineffective."[118]

Among other things, the 2009 Agreement also includes a provision that purports to limit URS's liability to H&E for deficiencies "resulting from, arising out of or in connection with the performance of nonperformance of any or all Services or other obligations under a Work Authorization [to] $250,000 or ten percent (10%) of the compensation paid [URS] pursuant to such Work Authorization, whichever is greater."[119] The inclusion of this provision by URS indicates that even URS contemplated the recovery of damages for URS's failure to perform design services in accordance with their professional duty of care.

Plainly, if the waiver provisions meant, as URS contends, that URS would only have to re-perform their defective work, then a cap on their limitation to pay money damages would be unnecessary and meaningless. The presence of these conflicting limitations in the 2009 Agreement renders the waiver of recoverable damages in the warranty provision, at the very least, ambiguous.[120]

In sum, the 2009 Agreement does not, as URS contends, unambiguously limit H&E's sole remedy to re-performance of URS's services.

### c. The warranty provisions cannot apply to URS's intentional, reckless, and grossly negligent conduct.

The waiver provisions also cannot exclude or limit liability for damages caused by URS's intentional or gross fault. "Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party."[121] Whether or not a conduct is grossly negligent or a gross deviation below the standard of care is a question of fact for the jury to determine.[122]

H&E has both alleged,[123] and the facts developed in this case have revealed, that URS acted intentionally, recklessly, and in a grossly faulty fashion with respect to the design of pavement at the Baton Rouge and Kenner facilities. URS utterly failed to ensure that their designs and specifications complied with well-established design standards or the

---

[118] *Lis v. Hamilton*, 652 So. 3d 1327, 1330 (La.1995) (citations omitted).

[119] 2009 Agreement, Exhibit 27 to Deposition of Leonard St. Germain at 87:4-13.

[120] *Lis*, 652 So. 3d at 1330.

[121] La. Civ. Code art. 2004;*Wilson v. Two SD, LLC*, 2015-0959 (La. App. 1 Cir. 12/23/15), 186 So. 3d 103, 109, *reh'g denied* (Feb. 22, 2016) ("contractual provisions are valid to eliminate or limit liability for losses due to negligence, but not for losses caused by intentional acts or gross fault").

[122] *Cameron v. Bruce*, 42,873 (La. App. 2 Cir. 4/23/08), 981 So. 2d 204, 208, *writ denied*, 2008-1127 (La. 9/19/08), 992 So. 2d 940 (holding that whether a home inspection company performing an inspection "was done or performed so inadequately as to be gross negligence" was a "question of fact"); *State v. Douget*, 507 So. 2d 283, 288 (La. App. 3d Cir. 1987), *writ denied*, 513 So. 2d 288 (La. 1987) (holding that whether a party's "actions still might be a gross deviation below the standard of care. . . is a question of fact for the jury to determine");

[123] *See* Petition at ¶¶18-20 (Alleging that URS, Mr. Johnson, and Mr. Ryan "owed H&E a professional duty to exercise a special degree of skill, care and diligence exercised by other architects in the same or similar circumstances. [They], however, knowingly, recklessly and/or grossly failed to exercise the required standard of care in performing [their] professional services on the Projects.").

17

NON-CERTIFIED COPY

recommendations of geotechnical reports that they commissioned.[124] Both URS architects, Mr. Johnson and Mr. Ryan, testified that they did nothing to ensure that the pavement designs provided by their civil engineers complied with those well-established standards.[125] URS's own experts testified that the pavement designs at both facilities were deficient in numerous respects.[126] And H&E's experts have testified that the damage caused by URS's deficient designs to the joints of the pavement was foreseeable to URS and that URS's designs deviated from the standard of care in many respects.[127]

In light of URS's intentional, reckless, and grossly negligent conduct, summary judgment is inappropriate.

### d.  Public policy considerations require rejection of URS's motion.

H&E spent in excess of fifteen million dollars building/remodeling the facilities that URS designed.  Because of URS's breach of its duty of care, H&E must spend many millions of dollars ripping out portions of the facilities and replacing them.  According to URS, it has no obligation to pay for this work.  According to URS, no matter how defective their drawings are, H&E's sole remedy is to get new drawings prepared by URS.  Plainly, this remedy is hollow.

Public policy prevents URS's interpretation.   It is well established that stipulated damages provisions that are manifestly unreasonable may be set aside as against public policy.[128] URS's professional duties of care are imposed, not merely by contract, but by law.[129] No statute or

---

[124] Exponent Expert Report, Exhibit 1 to Deposition of James R. Bailey at 26:4-11 at pgs. 4-10; Expert Report of Wallace C. Drennan, Exhibit 1 to Deposition of Wallace C. Drennan at 21:1-10, at pgs. 2-5.

[125] Deposition of Neal Johnson at 70:3-19; 165:10-166:4; 166:8-167:24; Deposition of Thomas Ryan at 72:10-21.

[126] Deposition of Gary Anderton at 56:12-57:17 ("Q. And did you make any observations about the depth of the saw cuts in the control joints? A. I witness others during the August site visit making some measurements. . . . Q. And what did they tell you? A. Just various depths, from a half-inch, to three-quarters of an inch. Q. And you would agree with me that that's not deep enough for a saw cut control joint; correct? A. Correct. Q. And is there a standard that the industry follows for the proper depth of a saw cut control joint? A. Generally speaking, a third to a fourth of the slab depth – inches. Q. Meaning, if you have an 8-inch slab, you would be looking for a 2-inch – A. Initial saw cut. Q. – a 2-inch saw cut? A. Yes."); 146:18-23 ("Q. So if you were designing the H&E facility in Baton Rouge, you would recommend that they use 8-inch pavement, no dowels, or 7-inch pavement with dowels, in any area where they expected heavy truck traffic? A. Yes.").

[127] Exponent Expert Report, Exhibit 1 to Deposition of James R. Bailey at 26:4-11 at pg. 8 ("[I]n my opinion it was reasonable and prudent for URS to require distributed steel reinforcement in the concrete pavements at both sites to control the opening of intermediate cracks between the joints. It was also reasonable and prudent for URS to require dowels at the expansion joints to provide vertical load transfer while permitting the joints to expand. However, as indicated in the sections to follow URS did not design the dowels in accordance with recognized specifications and guidelines related to concrete pavement design[.]"); Expert Report of Wallace C. Drennan, Exhibit 1 to Deposition of Wallace C. Drennan at 21:1-10, at pg. 5 ("[T]he operation of metal track equipment across the pavement has resulted in spalling observed along the surface of the joints. It was foreseeable that the operation of H&E's equipment across the joints would cause spalling along the joints. URS should have recommended a design that would offer additional protections for the joints.").

[128] Lombardo v. Deshotel, 94-1172, (La. 11/30/94), 647 So. 2d 1086; see also Keiser v. Catholic Diocese of Shreveport, Inc., 880 So. 2d 230, 236 (La. App. 2 Cir. 2004) (stipulated damages provisions that do not approximate actual damages but are rather purely penal in nature violate public policy and are thus void and enforceable); Am. Leasing Co. of Monroe v. Lannon E. Miller & Son, Gen. Contracting, Inc., 469 So. 2d 325, 328-29 (La. App. 2d Cir. 1985) (same).

[129] La. Rev. Stat. § 9:5607 (establishing a cause of action against a professional engineer, surveyor, professional interior designer, architect, real estate developer and defining peremptive periods);see, e.g., Calandro Development, Inc. v. R.M. Butler Contractors, Inc., 249 So.2d 254, 265 (La. App. 1st Cir. 1971).

18

NON-CERTIFIED COPY

jurisprudence allow a professional such as an architect or engineer to effectively eliminate liability for breaches of professional duties as URS proposes it has done here. Taken to its logical conclusion, URS's interpretation of the warranty provision would abrogate any rights or remedies that a party may have for design defects and provide no relief for a design professional's errors.

URS does not cite to any contrary authority. For example, URS cites to only one case, *City of Shreveport v. SGB Architects, LLP*, for the proposition that courts have applied limitation of liability in contracts involving professional services.[130] But that case involved an architect seeking to set aside a limitation of liability provision contained in its contract with a subcontractor, not a contract for professional services with a client.[131] The *City of Shreveport* case contains no discussion about whether such a limitation may apply to the professional duties of a design professional to the client and has no application to this case.

URS also relies on other case law regarding warranty provisions and waivers of liability in the context of contracts for the sale of goods for the proposition that contracts limiting liability generally are enforceable under Louisiana law. That analogy is inapplicable to this case. The client of an engineer or architect who has already completed construction according to faulty designs cannot be "made whole" by the design professional's simply re-doing of those designs as a consumer can be made whole by a seller's re- provision of a product.

For this additional reason, summary judgment is inappropriate.

## CONCLUSION

For the above stated reasons, URS's motion for summary judgment should be denied.

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*



FILED
DEPUTY CLERK OF COURT
2017 JAN 30 PM 4:31

---

[130] 45, 458 (La. App. 2 Cir. 9/22/10), 47 So.3d 1105.
[131] *Id.*

19

1161172v.1                                    NON-CERTIFIED COPY

## **C E R T I F I C A T E**

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by facsimile, email and/or by placing same in the United States mail, postage prepaid and properly addressed, this 30th day of January, 2017.

_____
Loretta G. Mince

20

NON-CERTIFIED COPY

19ᵀᴴ JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                        SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____        _____
                                                         DEPUTY CLERK
**APPENDIX TO OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT ON RECONVENTIONAL DEMAND**

1. Exhibit 1 – **Deposition of Leonard St. Germain**
   a. Exhibit 4 to deposition – 2006 Professional Service Agreement
   b. Exhibit 6 to deposition – October 23, 2006 Proposal Letter
   c. Exhibit 18 to deposition – Lump Sum Order No. 08-01
   d. Exhibit 21 to deposition – August 2009 Proposal
   e. Exhibit 27 to deposition – 2009 Agreement
   f. Exhibit 28 to deposition – Time and Materials Work Authorization 10-10
2. Exhibit 2 – **Deposition of Neal Johnson**
   a. Exhibit 9 to deposition – June 11, 2013 Email from Neal Johnson to Frankie
      Wynn
3. Exhibit 3 – **Deposition of Chad Herndon**
4. Exhibit 4 – **Deposition of John Engquist**
5. Exhibit 5 – **June 5, 2015 Affidavit of Frankie Wynn**
   a. Exhibit 4 to affidavit – Invoice No. 4602441, dated 2/24/11 (URS 09289)
   b. Exhibit 5 to affidavit – Invoice No. 4666033, dated 4/27/11 (H&E 0001532)
6. Exhibit 6 – **Deposition of Stephen Dorsey**
7. Exhibit 7 – **Deposition of John Jones**
   a. Exhibit 53 to deposition – June 24, 2013 Baton Rouge Punch List
   b. Exhibit 54 to deposition – June 25, 2013 Deficiencies to the Completion of
      Contract
8. Exhibit 8 – **Deposition of Debra Sanders**
9. Exhibit 9 – **Deposition of Frankie Wynn**
   a. Exhibit 26 to deposition – December 29, 2011 Email from MAPP to URS and
      H&E
   b. Exhibit 35 to deposition – March 16, 2012 Email from MAPP to URS and H&E
   c. Exhibit 36 to deposition – March 20, 2012 Project Observation Report
   d. Exhibit 39 to deposition – August 3, 2012 Internal URS Email
   e. Exhibit 44 to deposition – September 25, 2012 Email from MAPP to URS and
      H&E
   f. Exhibit 46 to deposition – October 4, 2012 Email from MAPP to URS and H&E
   g. Exhibit 50 to deposition – December 17, 2012 Email from H&E to URS
   h. Exhibit 51 to deposition – January 9, 2013 Email from URS to Womack
   i. Exhibit 52 to deposition – January 4, 2013 Email from URS to H&E
   j. Exhibit 54 to deposition – January 10, 2013 Email from MAPP to H&E and URS
   k. Exhibit 56 to deposition – January 18, 2013 Email from H&E to Womack and
      URS
   l. Exhibit 60 to deposition – April 16, 2013 Email between H&E and URS
   m. Exhibit 63 to deposition – May 13, 2013 Email from H&E to URS
   n. Exhibit 67 to deposition – June 24, 2013 Email from Womack
   o. Exhibit 69 to deposition – July 29, 2013 Email from H&E to URS
   p. Exhibit 70 to deposition – List of Kenner Project Change Orders

CLERK OF COURT
FILE COPY
CASE ID
FILING DATE

DEPUTY CLERK



EBR3988141

1

NON-CERTIFIED COPY

10. Exhibit 10 -- **August 21, 2015 Affidavit of Frankie Wynn**
11. Exhibit 11 – **Deposition of Thomas Ryan**
12. Exhibit 12 – **Deposition of Brad Barber**
13. Exhibit 13 – **Deposition of Brad Reese**
    a. Exhibit 39 to deposition – March 4, 2013 Email from MAPP to H&E and URS
    b. Exhibit 48 to deposition – July 17, 2013 Email from MAPP to URS
14. Exhibit 14 – **Deposition of Kevin Sprehe**
15. Exhibit 15 – **Invoice Overview Sheet**

1162712v.1

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *
                      *
H&E EQUIPMENT SERVICES  *
                      * NUMBER 626,308
VERSUS                *
                      * DIVISION "D"
URS CORPORATION       *
ARCHITECTURE, P.C., URS *
CORPORATION, L O'NEAL *
JOHNSON AND THOMAS E.  *
RYAN, III             *
                      *
*  *  *  *  *  *  *  *
```

Deposition of LEONARD C. ST.

GERMAIN, taken on Wednesday, August 31, 2016,

commencing at 10:06 a.m., in the offices of

Adams and Reese, LLP, Attorneys at Law, 450

Laurel Street, Suite 1900, Baton Rouge,

Louisiana, 70801.

EXHIBIT

1

NON-CERTIFIED COPY

1            I N D E X

2

3                                              Page

4

   Caption                              1
5  Index of Exhibits                    3
   Appearances                         10
6  Agreement of Counsel                11

7  Examination

8    PHILIP A. FRANCO, ESQ.            12
     LORETTA G. MINCE, ESQ            139
9    PHILIP A. FRANCO, ESQ.           141

10

            *   *   *   *   *
11

   Witness' Certificate              144
12 Reporter's Page                   145
   Certificate                       146
13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

1                    INDEX OF EXHIBITS

2

3    Number                                    Page

4    1  July 20, 2006 Email from        25
        Mark Howard to Leonard
5        St. Germain attaching URS
        July 20, 2006 proposal to
6        Leonard St. Germain
        H&E 0005192-0005195
7
     2  August 16, 2006 letter from     31
8        J. Ashley Moore to Leonard
        St. Germain re: Agreement for
9        Professional Services
        H&E 0005198
10
     3  August 22, 206 Email string     33
11       from Mark Howard to Leonard
        St. Germain
12       H&E 0005196-0005107

13   4  Agreement for Professional      34
        Services Between H&E
14       Equipment Services, Inc. and
        URS Corporation Architecture,
15       NC, PC, effective August 28,
        2006
16
     5  A-4 Application Site Plan City  39
17       of Baton Rouge/Parish of East
        Baton Rouge 10/18/06
18       H&E 0000109-0000111

19   6  January 14, 2013 Email string   42
        from Leonard St. Germain to
20       John Jones
        H&E 0007376-0007380

21

22

23

24

25

NON-CERTIFIED COPY

Page  4

1  (Cont.)        INDEX OF EXHIBITS

2

3    Number                              Page

4      7  Lump Sum Work Order NO. 06-03     45
          between H&E Equipment
5          Services, Inc. And URS
           Corporation Architecture,
6          NC, PC, dated November 8,
           2006 with Attachment 1,
7          Phase II
           H&E 0000025-0000026

8
       8  January 6, 2011 Email from       46
9          John Herndon to Leonard
           St. Germain, et al
10         H&E 0005163

11     9  H&E Equipment Baton Rouge        49
           Design Development Manual,
12         Headquarters and Service
           Building, February 9, 2007
13         by URS
           URS 038649-038681

14
      10  February 13, 2007 Email from     53
15         Chad Herndon to Leonard
           St. Germain, et al attaching
16         H&E Site Plan 13.FEB.07
           H&E 0005216-0005217

17
      11  March 15, 2007 Email from Mark   56
18         Howard to Leonard St. Germain,
           et al re: Site Issues Path
19         Forward
           H&E 0005164-0005165

20

21    12  August 9, 2007 Email from Chad   58
           Herndon to Leonard St. Germain,
22         et al Re: Attaching elevations,
           floor plans and site plan
23         H&E 0005168-0005175

24

25

NON-CERTIFIED COPY

1  (Cont.)      INDEX OF EXHIBITS

2

3   Number                                    Page

4    13  March 5, 2008 Email string from      62
         Leonard St. Germain to James
5        Brown Re: Facility repair
         estimates
6        H&E 0006682-0006683

7    14  June 30, 2008 Email string from      63
         Chad Herndon to Leonard St.
8        Germain, et al
         H&E 0006783-0006784

9

     15  July 10, 2008 Email string from      66
10       Leonard St. Germain to Brad
         Barber Re: Plan cost
11       Attachment includes
         Confidential H&E Equipment
12       Services New Facility Cost
         Comparison
13       H&E 0003530-0003535

14   16  July 10, 2008 Email string from      69
         Bard Barber to John Engquist
15       re: FW: Plan cost
         (Last page attached is H&E
16       0002957)
         H&E 0002958-0002960

17

     17  July 11, 2008 Email from Leonard     70
18       St. Germain to Chad Herndon
         re: URS Work Order 08-01
19       H&E 0006843-0006844

20   18  Lump Sum Work Order NO. 08-01        71
         between H&E Equipment
21       Services, Inc. And URS
         Corporation Architecture,
22       NC, PC, dated July 11, 2008
         with Attachment 1 Scope of
23       Services
         H&E 0037276-0037277

24

25

NON-CERTIFIED COPY

Page 6

1    (Cont.)        INDEX OF EXHIBITS

2

3     Number                                   Page

4

5     19  January 19, 2009 Email string     71
          from Neal Johnson to Leonard
6         St. Germain
          H&E 0005230-0005231

7     20  May 7, 2009 Email string          74
          from James Brown to John Jones
8         Re: Repairs Option 1 Kenner
          Facility (Attachment of
9         calculations not bates stamped)
          H&E 0007609-0007610

10

11    21  June 22, 2009 Email from          77
          Leonard St. Germain to Neal
12        Johnson Re: Estimate .
          H&E 0005268

13    22  August 10, 2009 letter from Neal  77
          Johnson to Leonard St. Germain
14        Re: Proposed Renovations and
          Additions to H&E Equipment -
15        Kenner, LA with Attachment 1
          Scope of Work
16        H&E 0003415-0003416

17    23  August 13, 2009 Email string      82
          from Neal Johnson to Leonard
18        St. Germain, et al
          H&E 0005383-0005383

19

20    24  August 14, 2009 Email string      83
          from Chad Herndon to Leonard
21        St. Germain Re: Kenner
          Proposal
          H&E 0005389-0005390

22

23

24

25

NON-CERTIFIED COPY

1   (Cont.)        INDEX OF EXHIBITS

2

3   Number                                         Page

4    25  August 20, 2009 Email string          83
             from Neal Johnson to Leonard
5            St. Germain, et al with
             attachments of Kenner
6            Proposal, Master Agreement,
             with Attachments 1, 2 and 3
7            H&E 0005430-0005441

8    26  August 21, 2009 Email string          85
             from Frankie Wynn to Leonard
9            St. Germain Re: URS Short Form
             Master Agreement For
10           Professional Services
             Renovations and Additions to
11           Kenner LA Branch with
             Attachments 1, 2 and 3
12           H&E 0005236-0005246

13   27  Short form Master Agreement for       87
             Professional Services Between
14           H&E Equipment Services, Inc.
             and URS Corporation
15           Architecture, NC, PC,
             effective August 13, 2009

16
     28  URS Attachment 1, Time and            87
17           Materials Work Authorization
             09-100 8/31/09
18           Attachments 1, 2 and 3
             URS 031081-URS 031084

19
         URS Attachment 1, Time and            87
20           Materials Work Authorization
             10-10 10/22/2010
21           URS 031085-URS 031086

22       URS Attachment 1, Time and            87
             Materials Work Authorization
23           12-10 12/27/2010
             Attachments 1, 2 and 3
24           URS 031072-URS 031075

25

NON-CERTIFIED COPY

Page 25

1      Q.  We are going to go through some

2   documents.  I'm going to focus on some

3   particular parts.  You have the right to read

4   the whole document.

5      A.  Okay.

6      Q.  And maybe the easiest way to do it is

7   for me to focus you after you have a chance to

8   look at it briefly, and then if you want to read

9   more, you just tell me.  Okay?

10     A.  Okay.

11     Q.  The first document I'm going to show

12  you is an Email from Mark Howard at URS to you,

13  July 20, 2005.

14         Do you see that?

15     A.  Uh-huh (affirmative response).

16     Q.  And this is a design proposal?

17     A.  (Witness reviewing document.)

18     Q.  I know it has been a long time, but do

19  you briefly recall this?

20     A.  Yes.

21     MR. FRANCO:

22         For the Record, this is H&E 5192,

23  et seq, Exhibit 1.

24  EXAMINATION BY MR. FRANCO:

25     Q.  How did it come about that you were, in

NON-CERTIFIED COPY

Page 26

1   fact, dealing with URS?

2       A.  I have a real good of friend mine that

3   was an engineer for URS.  He lived in my

4   neighborhood.

5       Q.  And who was that?

6       A.  Randy Babin.

7       Q.  He was in Baton Rouge?

8       A.  Yes.

9       Q.  And that is how you got basically

10  connected with URS?

11      A.  Yeah.  Yeah.  We were having a

12  conversation, you know, with us getting ready to

13  design and build a new facility, and I was

14  looking for an architectural and engineering

15  firm that I could join together, instead of

16  going through an architect and a separate

17  engineering company.

18          And he referred me, and Mark Howard

19  reached out to me.  And that is how the

20  relationship started.

21      Q.  And at this point, it is fair to say you

22  were the principal one at H&E dealing with URS?

23      A.  Yes.

24      Q.  Now, this first proposal was in

25  connection with, or at least the thought process

NON-CERTIFIED COPY

Page 34

1       A.  Correct.

2       Q.  And the next document I'm going to show

3    you is the Agreement for Professional Services,

4    which is going to be labeled Exhibit 4.  This

5    doesn't have a Bates stamp.

6            And if you look at Article V, Roman

7    numeral V, you will see that that number of

8    limitation was actually 5 million, 2 million, as

9    she had requested, correct?

10      A.  Correct.

11      Q.  And if I'm not mistaken, this bears your

12   signature?

13      A.  Yes, it does.

14      Q.  So you were satisfied that you had run

15   it past Counsel and you signed it --

16      A.  Yes.

17      Q.  -- on behalf of the Company?

18      A.  Yes.

19      Q.  And you were authorized to do so?

20      A.  Yes.  I have a Corporate resolution.

21      Q.  Did you see the Corporate resolution

22   recently?

23      A.  Not recently.  I have a copy of it.

24      Q.  You do?  Because that wasn't produced to

25   us.

NON-CERTIFIED COPY

Page 42

1    document that was signed, so I would have to say

2    "yes."

3        Q.  All right.

4            The next document I'm going to show you

5    is Exhibit 6, and is H&E 7376.

6            This string of Emails starts off from

7    Chad Herndon at URS to you, and he is sending

8    you the proposal for the next phase of the

9    project.

10           Do you recall dealing with Mr. Herndon?

11       A.  Yes.

12       Q.  And then you send this on to Johnny

13   Jones?

14       A.  Right.

15       Q.  This second phase was in October of

16   2006, and this actually dealt with design

17   development, correct?

18       A.  Correct.

19       Q.  And as it says here, in the first

20   paragraph, the last sentence, "...we answer as

21   many of the design questions as possible before

22   moving into the construction document phase."

23           Do you see that?

24       A.  Second paragraph --

25       Q.  First paragraph, on the October 23, 2006

NON-CERTIFIED COPY

1  right?

2      A.  Yes.

3      Q.  Just for the Record, why don't we attach

4  as a separate Exhibit 18, the Lump Sum Work

5  Order 08-01, with the attachment for the scope

6  of services for the construction documentation

7  phase?  That is the 490,000 we just talked

8  about, correct?

9      A.  Correct.

10      Q.  So Exhibit 18 is 37276 and 7.  And then

11  we are still in July of 2008.

12          All right.  Next I'm going to show you

13  Exhibit 19, which is H&E 7052.

14          Now, this is in reference to the H&E

15  headquarters building, and it is talking about

16  some issues at the building.

17          But I want to focus, if you will, on the

18  first page, the bottom Email, from you to Jodi

19  Rusca, R-U-S-C-A, at URS, copying Neal Johnson

20  and Chad Herndon.  And you are answering some of

21  their questions.  Your answers --

22      MS. MINCE:

23          Stop.  You lost me.  I don't --

24      THE WITNESS:

25          It is not on this document.

NON-CERTIFIED COPY

Page 76

1    Kenner in May of 2009, correct?

2        A.  Based on this Email, yes.

3        Q.  Because he gives these to you, copies to

4    you in September of 2008, and y'all sending this

5    to Johnny Jones in May of 2009.  So you are

6    resurrecting the concept that, apparently, you

7    all needed to do something at Kenner?

8        MS. MINCE:

9            Object to form.

10       MR. FRANCO:

11           What is the objection?

12       MS. MINCE:

13           The Email in May of 2009 is from

14   James Brown to Johnny Jones, and the plans are

15   on that Email.  So James Brown is sending this

16   to Johnny Jones in May of 2009.  You said "you

17   are sending."

18       MR. FRANCO:

19           I said "y'all."

20   EXAMINATION BY MR. FRANCO:

21       Q.  The concept is H&E is resurrecting the

22   concept in May of 2009 that "we needed to do

23   something at the Kenner facility."  Fair

24   statement?

25       A.  Fair statement.

NON-CERTIFIED COPY

1     Q.  Okay.  Next is Exhibit 21, and this is

2     H&E 5268.  We are in June of 2009.  This is from

3     you to Neal Johnson, telling him that you need

4     to do pretty extensive renovations to Kenner,

5     and asking if URS is interested in assisting on

6     that at that site, correct?

7     A.  Correct.

8     Q.  All right.  And then I'm going to snow

9     you the next exhibit, which is Exhibit 22, H&E

10    3415.

11          So as a follow-up, you are asking if

12    they are interested in June of '09, and in

13    August of '09, Neal Johnson is sending you a

14    proposal to assist with budget and renovations

15    and additions at Kenner, correct?

16    A.  Correct.

17    Q.  And this proposal was for $20,000 to

18    develop basically existing site drawings and

19    then develop sketches to try to figure out what

20    you all wanted to do with that site, right?

21    A.  Yes.

22    Q.  And if you look at No. 7 on that

23    Attachment 1, it lists develop sketches and

24    drawings for a new entrance, new office,

25    demolish an existing office, talks about new

NON-CERTIFIED COPY

1    A.  Correct.

2    Q.  And it basically says that you approved

3  it and proceeding with the proposal, and then

4  Neal Johnson says, "We will draft the agreement

5  tomorrow."

6        Do you see that?

7    A.  Yes.

8    Q.  Then the next exhibit is Exhibit 24, H&E

9  5389, and this is another Email to you.

10        The prior one was dated August 13, '09.

11  This is the next day, August 14, and Chad

12  Herndon says he will begin putting the new

13  Professional Services Agreement and Work Order

14  together?

15    A.  Yes.

16    Q.  Now, did you discuss this with Chad

17  Herndon at all?

18    A.  Chad was involved in the project, so I

19  would assume yes.

20    Q.  The next one is Exhibit 25, and that is

21  going to be H&E 5430.  That is dated August 20

22  of '09.  And this is, again, a follow-up on the

23  Emails about approval of this proposal.

24        If you look at the top Email, it is from

25  Neal Johnson to you, dated August 20, copying

NON-CERTIFIED COPY

1    normal process.

2        Q.  So after you got this August 21, let's

3    look at the next document.

4            We are going to label this as Exhibit

5    27.  This is the Short Form Master Agreement for

6    Professional Services, dated at the top, August

7    13, 2009, executed by you.

8        A.  (Witness reviewing document.)

9        Q.  Do you see it?

10       A.  Yes.

11       Q.  And so I assume you were authorized to

12    execute this document on behalf of H&E, correct?

13       A.  Yes.

14       Q.  And I assume you vetted this with either

15    Mr. Wynn and/or Ashley Moore before you signed

16    it, correct?

17       A.  That is correct.

18       Q.  Do you recall discussing any part of

19    this agreement with anyone from URS before you

20    signed it?

21       A.  I do not.

22       Q.  And the next document I'll show you is

23    going to be labeled Exhibit 28, which URS 31081.

24            This is Attachment 1, and, if you look

25    at the top, it references the Master Agreement

NON-CERTIFIED COPY

Page 88

1    or the agreement dated August 13, 2009.

2         Do you see that at the top?

3    A.  Yes.

4    Q.  Okay.  And this was signed by you,

5    correct?

6    A.  Yes.

7    Q.  On August 31, 2009?

8    A.  Yes.

9    Q.  Now, you recall the Kenner facility

10   being surveyed before construction started?

11   A.  Yes.

12   Q.  And do you recall who paid for that

13   survey?

14   A.  I don't.

15   Q.  Next I'm going to show you what I'm

16   going to label as Exhibit 29.  This is H&E 5732.

17        We are in November of 2009, and does

18   that refresh your memory as to who Hohensee was?

19   A.  Hohensee, James Hohensee.  I remember

20   now.

21   Q.  Okay.  And this is in reference to the

22   Kenner facility, and he is sending to some

23   companies drawings and pricing sheets for them

24   to look at.

25        So I assume this is in connection with

NON-CERTIFIED COPY

1   getting pricing from the GCs, correct?

2      A.  Correct.

3      Q.  Now, these GCs were Gibbs, F.H. Myers,

4   Goutee, correct?

5      A.  Correct.

6      Q.  Was there any reason why that was

7   limited to three companies at this point?  Do

8   you recall that?

9      A.  I do not.

10      Q.  None of those became the ultimate GC on

11   Kenner, correct?

12      A.  I don't recall that either.

13      Q.  Well, let me refresh your memory.  The

14   contractor, the GC on Kenner became MAPP.

15      A.  Okay.  Okay.  I do remember that.

16      Q.  Do you remember why these three

17   companies did not become the GC?

18      A.  I do not.

19      Q.  Do you remember if there was a hiatus

20   put on development of either the Baton Rouge

21   site or the renovation to the Kenner site

22   because the economy was bad?

23      A.  Yes.

24      Q.  And do you remember what time period

25   that was?

NON-CERTIFIED COPY

1    A.  Late '08, early '09, I think.

2    Q.  And the hiatus lasted until about when?

3  2010?

4    A.  2010.  I tried to build the building

5  during that time.

6    Q.  You did?

7    A.  Yes.  I pushed -- I asked John to build

8  it because labor prices and material costs were

9  down during the recession.  He opted not to.

10    Q.  These buildings?  This is --

11    A.  The Corporate facility.

12    Q.  Oh, you wanted to go forward with the

13  Baton Rouge facility?

14    A.  The Baton Rouge facility.

15    Q.  Oh, okay.  And he opted not to because

16  of the economy?

17    A.  Uh-huh (affirmative response).

18    Q.  Could that be the reason that these

19  three companies weren't involved in the

20  resurrection of that?

21    A.  I can't speculate on that, but based on

22  the bids that James Brown got earlier, I would

23  assume for these companies, or at least some of

24  them, at the time, they were doing it on no

25  design specs.  So once we had a design, I think

NON-CERTIFIED COPY

Page 91

1    it went back out for bid and then --

2        Q.  More formally?

3        A.  More formally, correct.  Yes.

4        Q.  What is this C&C property?

5        A.  C&C is a lease property in Belle Chasse.

6        Q.  Oh, okay.

7        A.  C&C Marine owned it.

8        Q.  So the reference to C&C, actually for

9    our purposes, is the Belle Chasse site?

10        A.  That is correct.

11        Q.  Let me show you another document I'm

12    going to label as Exhibit 30.  It is H&E 3418.

13            This is from you to Brad Barber.  It is

14    referencing Belle Chasse, which is described in

15    this as the C&C property, and this is the last

16    submittals by Frank.  And who was Frank?

17        A.  Frank Arthur was the branch manager of

18    the Belle Chasse facility.

19        Q.  All right.  So around this time --

20        A.  Still is.

21        Q.  -- December of 2009, H&E is also

22    considering doing some work at the Belle Chasse

23    site?

24        A.  We were contemplating moving.  We had an

25    existing site there we needed to expand and this

NON-CERTIFIED COPY

1    facility was available.

2        Q.  A new site --

3        A.  Yes.

4        Q.  -- basically?

5        A.  Uh-huh (affirmative response).

6        Q.  Now, this is in December of 2009.  You

7    are still involved, but you are into your

8    transition period pretty much, almost at the end

9    of your transition period?

10       A.  Yes.

11       Q.  December of 2009, right?

12       A.  Yes.  Correct.

13       Q.  The next document is Exhibit 31, H&E

14   5870.  And here in December, you still haven't

15   transitioned out yet?

16       A.  Trying.  I was trying.

17       Q.  This is in reference to Kenner, talking

18   about the Kenner branch renovation project that

19   we talked about.

20           And this says, "The Company-owned side

21   of the renovation will be completed first...,"

22   and then, "The remaining balance of the

23   renovation is owned by John Engquist."

24           Can you explain that to me, what you

25   meant by that?

NON-CERTIFIED COPY

Page 139

1        A.  For the design and scope, right.

2        Q.  Correct.

3        A.  That is the document I'm referencing.

4        Q.  Right.  Do you know that Mr. Wynn

5    executed work orders that were subject to that

6    same 2009 agreement subsequent to that?

7            MS. MINCE:

8                Object to the form.

9            THE WITNESS:

10                Not -- I would assume he would.

11    That would have been his job, yes.

12    EXAMINATION BY MR. FRANCO:

13        Q.  But you weren't involved in that?

14        A.  That is correct.  Yes.

15        Q.  What else did you discuss with Counsel?

16        A.  That was it.

17        Q.  Okay.

18            MR. FRANCO:

19                Thank you.

20                I have no further questions at this

21    time.

22    EXAMINATION BY MS. MINCE:

23        Q.  All right.  I'm going to show you

24    Exhibit 26 that you have looked at previously.

25                This is the correspondence related to

NON-CERTIFIED COPY

1    the 2009 Short Form Master Agreement, correct?

2        A.  Yes.

3        Q.  And you executed this agreement,

4    correct?

5        A.  Yes.

6        Q.  And at the time you executed this

7    agreement, did you have an understanding of what

8    this agreement covered?

9        A.  Yes.

10       Q.  Tell me what that was.

11       A.  It was the scope of work developing

12   drawings for the existing site and buildings,

13   for review of the existing truck traffic, and

14   evaluate the condition of all the exterior

15   roofs, walls, buildings and the attachment to

16   it.

17       Q.  What was the amount of the contract?

18       A.  $20,000.

19       Q.  This occurred in August of 2009.

20           As of August 2009, can you describe what

21   the transition process was between you and

22   Frankie Wynn?

23       A.  It was -- it was -- as you can see, it

24   took a pretty long amount of time trying to

25   replace my position, and we were not having much

NON-CERTIFIED COPY

## AGREEMENT FOR PROFESSIONAL SERVICES
### ("Agreement")

This Agreement between __H&E Equipment Services, Inc. 11100 Mead Road, Suite 200, Baton Rouge, LA 70816 225 298-5244__ , ("Client") and __URS Corporation Architecture, NC, PC__ ("URS"), a __North Carolina__ corporation; __7389 Florida Blvd. Suite 300 Baton Rouge, LA 70806__("URS"), is effective as of __August 28, 2006__ . The parties agree as follows:

It is the expressed intent of the parties that this Agreement shall be made available to the subsidiaries and affiliated companies of URS. For the purposes of this Agreement, as it applies to each Work Order, the term "URS" shall mean either, __URS Corporation Architecture, NC, PC__ , or the affiliated company identified in the Work Order. The applicable Work Order shall clearly identify the legal name of the affiliate or subsidiary accepting the Work Order.

**ARTICLE I - Work Orders.** The Scope of Services ("Services"), the Time Schedule and the Charges are to be set forth in a written Work Order to this Agreement. The terms and conditions of this Agreement shall apply to each Work Order, except to the extent expressly modified by the Work Order. Where charges are "not to exceed" a specified sum, URS shall notify Client before such sum is exceeded and shall not continue to provide the Services beyond such sum unless Client authorizes an increase in the sum. If a "not to exceed" sum is broken down into budgets for specific tasks, the task budget may be exceeded without Client authorization as long as the total sum is not exceeded. Changes in conditions, including, without limitation, changes in laws or regulations occurring after the budget is established or other circumstances beyond URS control shall be a basis for equitable adjustments in the budget and schedule.

**ARTICLE II - Payment.** Unless otherwise stated in an Work Order, payment shall be on a time and materials basis under the Schedule of Fees and Charges in effect when the Services are performed. Client shall pay undisputed portions of each progress Invoice within thirty (30) days of the date of the Invoice. If payment is not maintained on a thirty (30) day current basis, URS may suspend further performance until payments are current. Client shall notify URS of any disputed amount within fifteen (15) days from date of the invoice, give reasons for the objection, and promptly pay the undisputed amount. Client shall pay an additional charge of one and one-half percent (1½%) per month or the maximum percentage allowed by law, whichever is the lesser, for any past due amount. In the event of a legal action for invoice amounts not paid, attorneys' fees, court costs, and other related expenses shall be paid to the prevailing party.

**ARTICLE III - Professional Responsibility.** URS is obligated to comply with applicable standards of professional care in the performance of the Services. Client recognizes that opinions relating to environmental, geologic, and geotechnical conditions are based on limited data and that actual conditions may vary from those encountered at the times and locations where the data are obtained, despite the use of due professional care. URS is not responsible for designing or advising on or otherwise taking measures to prevent or mitigate the effect of any act of terrorism or any action that may be taken in controlling, preventing, suppressing or in any way relating to an act of terrorism.

**ARTICLE IV - Responsibility for Others.** URS shall be responsible to Client for URS Services and the services of URS subcontractors. URS shall not be responsible for the acts or omissions of other parties engaged by Client nor for their construction means, methods, techniques, sequences, or procedures, or their health and safety precautions and programs.

**ARTICLE V - Risk Allocation.** The liability of URS, its employees, agents and subcontractors (referred to collectively in this Article as "URS"), for Client's claims of loss, injury, death, damage, or expense, including, without limitation, Client's claims of contribution and indemnification, express or implied, with respect to third party claims relating to services rendered or obligations imposed under this Agreement, including all Work Orders, shall not exceed in the aggregate:

S7. GEROMIA

EXHIBIT NO. 4

K. DONNELLY

NON-CERTIFIED COPY

(1)     The total sum of $5,000,000 for claims arising out of professional negligence, including errors, omissions, or other professional acts, and including unintentional breach of contract; and any actual or potential environmental pollution or contamination, including, without limitation, any actual or threatened release of toxic, irritant, pollutant, or waste gases, liquids, or solid materials, or failure to detect or properly evaluate the presence of such substances, except to the extent such release, threatened release, or failure to detect or evaluate is caused by the willful misconduct of URS; or

(2)     The total sum of $2,000,000 for claims arising out of negligence, breach of contract, or other causes for which URS has any legal liability, other than as limited by (1) above.

**ARTICLE VI - Insurance.** URS agrees to maintain during the performance of the Services: (1) statutory Workers' Compensation coverage; (2) Employer's Liability; (3) General Liability; and (4) Automobile Liability insurance coverage each in the sum of $5,000,000.

**ARTICLE VII - Consequential Damages.** Neither Party shall be liable to the other for consequential damages, including, without limitation, loss of use or loss of profits, incurred by one another or their subsidiaries or successors, regardless of whether such damages are caused by breach of contract, willful misconduct, negligent act or omission, or other wrongful act of either of them.

**ARTICLE VIII - Client Responsibility.** Client shall: (1) provide URS, in writing, all information relating to Client's requirements for the project; (2) correctly identify to URS, the location of subsurface structures, such as pipes, tanks, cables and utilities; (3) notify URS of any potential hazardous substances or other health and safety hazard or condition known to Client existing on or near the project site; (4) give URS prompt written notice of any suspected deficiency in the Services; and (5) with reasonable promptness, provide required approvals and decisions. In the event that URS is requested by Client or is required by subpoena to produce documents or give testimony in any action or proceeding to which Client is a party and URS is not a party, Client shall pay URS for any time and expenses required in connection therewith, including reasonable attorney's fees.

Client shall reimburse URS for all taxes, duties and levies such as Sales, Use, Value Added Taxes, Deemed Profits Taxes, and other similar taxes which are added to or deducted from the value of URS Services. For the purpose of this Article such taxes shall not include taxes imposed on URS net income, and employer or employee payroll taxes levied by any United States taxing authority, or the taxing authorities of the countries or any agency or subdivision thereof in which URS subsidiaries, affiliates, or divisions are permanently domiciled. It is agreed and understood that these net income, employer or employee payroll taxes are included in the unit prices or lump sum to be paid URS under the respective Work Order.

**ARTICLE IX - Force Majeure.** An event of "Force Majeure" occurs when an event beyond the control of the Party claiming Force Majeure prevents such Party from fulfilling its obligations. An event of Force Majeure includes, without limitation, acts of God (including floods, hurricanes and other adverse weather), war, riot, civil disorder, acts of terrorism, disease, epidemic, strikes and labor disputes, actions or inactions of government or other authorities, law enforcement actions, curfews, closure of transportation systems or other unusual travel difficulties, or inability to provide a safe working environment for employees.

In the event of Force Majeure, the obligations of URS to perform the Services shall be suspended for the duration of the event of Force Majeure. In such event, URS shall be equitably compensated for time expended and expenses incurred during the event of Force Majeure and the schedule shall be extended by a like number of days as the event of Force Majeure. If Services are suspended for thirty (30) days or more, URS may, in its sole discretion, upon 5 days prior written notice, terminate this Agreement or the affected Work Order, or both. In the case of such termination, in addition to the compensation and time extension set forth above, URS shall be compensated for all reasonable termination expenses.

**ARTICLE X - Right of Entry.** Client grants to URS, and, if the project site is not owned by Client, warrants that permission has been granted for, a right of entry from time to time by URS, its employees, agents and subcontractors, upon the project site for the purpose of providing the Services. Client recognizes that the use of investigative equipment and practices may unavoidably alter the existing site conditions and affect the environment in the area being studied, despite the use of reasonable care.

NON-CERTIFIED COPY

**ARTICLE XI - Documents.** Provided that URS has been paid for the Services, Client shall have the right to use the documents, maps, photographs, drawings and specifications resulting from URS efforts on the project. Reuse of any such materials by Client on any extension of this project or any other project without the written authorization of URS shall be at Client's sole risk. URS shall have the right to retain copies of all such materials. URS retains the right of ownership with respect to any patentable concepts or copyrightable materials arising from its Services.

**ARTICLE XII - Termination.** Client may terminate all or any portion of the Services for convenience, at its option, by sending a written Notice to URS. Either party can terminate this Agreement or a Work Order for cause if the other commits a material, uncured breach of this Agreement or becomes insolvent. Termination for cause shall be effective twenty (20) days after receipt of a Notice of Termination, unless a later date is specified in the Notice. The Notice of Termination for cause shall contain specific reasons for termination and both parties shall cooperate in good faith to cure the causes for termination stated in the Notice. Termination shall not be effective if reasonable action to cure the breach has been taken before the effective date of the termination. Client shall pay URS upon invoice for Services performed and charges incurred prior to termination, plus reasonable termination charges. In the event of termination for cause, the parties shall have their remedies at law as to any other rights and obligations between them, subject to the other terms and conditions of this Agreement.

**ARTICLE XIII - No Third Party Rights.** This Agreement shall not create any rights or benefits to parties other than Client and URS. No third party shall have the right to rely on URS opinions rendered in connection with the Services without the written consent of URS and the third party's agreement to be bound to the same conditions and limitations as Client.

**ARTICLE XIV - Assignments.** Neither party to this Agreement shall assign its duties and obligations hereunder without the prior written consent of the other party.

**ARTICLE XV - Hazardous Substances.** All non-hazardous samples and by-products from sampling processes in connection with the Services shall be disposed of by URS in accordance with applicable law; provided, however, that any and all such materials, including wastes, that cannot be introduced back into the environment under existing law without additional treatment, and all hazardous wastes, radioactive wastes, or hazardous substances ("Hazardous Substances") related to the Services, shall be packaged in accordance with the applicable law by URS and turned over to Client for appropriate disposal. URS shall not arrange or otherwise dispose of Hazardous Substances under this Agreement. URS, at Client's request, may assist Client in identifying appropriate alternatives for off-site treatment, storage or disposal of the Hazardous Substances, but URS shall not make any independent determination relating to the selection of a treatment, storage, or disposal facility nor subcontract such activities through transporters or others. Client shall sign all necessary manifests for the disposal of Hazardous Substances. If Client requires: (1) URS agents or employees to sign such manifests; or (2) URS to hire, for Client, the Hazardous Substances transportation, treatment, or disposal contractor, then for these two purposes, URS shall be considered to act as Client's agent so that URS will not be considered to be a generator, transporter, or disposer of such substances or considered to be the arranger for disposal of Hazardous Substances, and Client shall indemnify URS against any claim or loss resulting from such signing.

**ARTICLE XVI - Venue.** In the event of any dispute between the parties to this Agreement, the venue for the dispute resolution shall be any state or federal court in the United States having jurisdiction over the parties. The foregoing notwithstanding, if the project is located outside the United States, the laws of the State of California shall govern and in such event, any dispute under the Agreement not resolved amicably shall be resolved under the binding rules of the American Arbitration Association.

**ARTICLE XVII - Integrated Writing and Enforceability.** This Agreement constitutes the final and complete repository of the agreements between Client and URS relating to the Services and supersedes all prior or contemporaneous communications, representations, or agreements, whether oral or written. Modifications of this Agreement shall not be binding unless made in writing and signed by an Authorized Representative of each party. The provisions of this Agreement shall be enforced to the fullest extent permitted by law. If any provision of this Agreement is found to be invalid or unenforceable, the provision shall be construed and applied in a way that comes as close as possible to expressing the intention of the parties with regard to the provisions and that saves the validity and enforceability of the provision.

NON-CERTIFIED COPY

**THE PARTIES ACKNOWLEDGE** that there has been an opportunity to negotiate the terms and conditions of this Agreement and agree to be bound accordingly.

CLIENT

_____
Signature

Leonard St. Germain, V.P. Operations
Typed Name/Title

8/30/06
Date of Signature

URS

_____
Signature

Craig Gardner, Vice President, Office Manager

_____
Typed Name/Title

8/29/06
Date of Signature

NON-CERTIFIED COPY

| | |
|---|---|
| **From:** | Leonard StGermain |
| **Sent:** | Monday, January 14, 2013 9:09 AM |
| **To:** | John Jones |
| **Subject:** | FW: Corporate HQ Phase II Proposal |
| **Attachments:** | H&E Phase II Proposal.pdf |

Leonard St. Germain
V.P. Equipment Services Group
7500 Pecue Lane
Baton Rouge, LA. 70809
Office: (225-298-5244)
Mobile: (225-324-6536)
Fax: (225-298-5377
Email:lstgermain@he-equipment.com
Website:www.he-equipment.com


-----Original Message-----
From: Chad Herndon@URSCorp.com [mailto:Chad Herndon@URSCorp.com]
Sent: Wednesday, October 25, 2006 2:54 PM
To: Leonard StGermain
Subject: Corporate HQ Phase II Proposal


Leonard,

Per our conversation, I have attached a proposal for the next phase of your project. The next
phase will consist of design development and is where we get as many questions answered as we
can before moving into the last phase of the project. Please review the proposal and feel
free to contact me if you have any questions, or would like to discuss anything further in
detail. We appreciate this opportunity to work on your project and hope that you will favor
us with your approval to continue into the next phase of this rewarding project. Thank you
and have a great day!

(See attached file: H&E Phase II Proposal.pdf)

Chad Herndon
Senior Planner
URS Corporation
7389 Florida Blvd., Suite 300
Baton Rouge, LA 70806

Phone: 225.922.5856
Mobile: 501.944.7222
Email: chad herndon@urscorp.com

S7. GERMAN
EXHIBIT NO. 6
K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0007376

This e-mail and any attachments are confidential. If you receive this
message in error or are not the intended recipient, you should not retain,
distribute, disclose or use any of this information and you should destroy
the e-mail and any attachments or copies.

2

NON-CERTIFIED COPY

H&E 0007377



October 23, 2006

Mr. Leonard St. Germain
Vice President, Operations
H&E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge, Louisiana 70816

Re:     H&E Headquarters Campus
        Pecue Lane at Airline Highway

Dear Mr. St. Germain:

Per our discussion regarding the continuation of our efforts on the design of your corporate headquarters campus, URS is pleased to provide you with a proposal for the Phase II development of the new headquarters facility and equipment division office located on the corner of Pecue Lane and Airline Highway. This next phase is the Design Development phase where we answer as many of the design questions as possible before moving into the construction document phase.

During Phase I we were able to establish the site layout for the buildings and the campus. Next, we were able to develop a program based on an area analysis and a block plan which identifies total space, departmental spaces and adjacencies. Lastly we were able to develop schematic exterior elevation concepts which will now be used as a starting point for the next phase.

Phase II will allow us to take the information gained in Phase I and continue to develop it further into a more fully developed design. During this phase there will be a significant amount of interaction between the design team and your staff. This will include staff interviews, presentations, discussions and decisions. Along with this interaction we will continue with the progress meetings that have taken place to this point. This second phase of our approach will involve the following process to develop a more fully developed design:

**Proposed Phase II Scope of Work**

1.  ***Develop an initial cost estimate of the project based on the Schematic Design scope.*** Now that we have worked with you to establish a basis for the design of your facilities, we can begin to establish initial cost estimates based on order of magnitude costs and an estimated cost per square foot.

2.  ***Complete code analysis.*** As the design now begins to develop and we get more of the necessary questions answered, we can begin to see how applicable building codes can be incorporated into the design.

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
Tel 225.922.5700

NON-CERTIFIED COPY



Mr. Leonard St. Germain
H&E Equipment Services, Inc.
October 23, 2006
Page 2 of 3

3. **Provide Design Development Documents.** The deliverables to you for this part
   of the scope will be floor plans, all exterior elevations, interior elevations, reflected
   ceiling plans, room finish and door schedules, a site plan and landscaping plan.
   The schematic design that we have now that we will begin to develop more fully is
   based upon the preliminary concept site development plan and the concept
   elevations that we have completed to date. The service building is based on the
   current design that H&E utilized in Houston, TX.

4. **Coordinate the selection of all materials and finishes, determine special
   system needs and confirm final program requirements.**

5. **Develop Outline of Performance Specifications.** An outline of Performance
   Specifications will be developed for structural, mechanical, electrical and plumbing.
   Some one line diagrams of various mechanical and electrical systems may also be
   included.

6. **Client reviews and approvals**. We will coordinate and facilitate all progress
   reviews with the H&E team and conduct a formal final approval presentation at the
   end of the project phase to attain approval from your team. Also included will be
   meetings with local building officials to review the project and determine if there are
   any potential issues with the design.

We plan to provide this level of detail in scope for both of the buildings that are part of
this project.

Listed below is a summary of the required Phase II disciplines and fees which will be
"lump sum", billed monthly based on percent complete:

| | | |
|---|---|---|
| Architectural and Interiors DD | | $55,000 |
| Program Finalization | | $14,000 |
| Site / Civil and Landscape DD | | $18,000 |
| Electrical Engineering DD | | $17,000 |
| Mechanical Engineering DD | | $28,000 |
| Structural Engineering DD | | $14,000 |
| Quality Assurance | | $ 2,000 |
| Project Management | | $25,000 |
| Other Direct Costs | | $ 7,000 |
| | Total | $180,000 |

The schedule to accomplish this phase of the work will be 7-10 weeks. As you can see
there will be a lot of interaction with your team and the design team to seek answers to
the questions and decisions that will have to be made related to the design. Based on
the interaction and timeliness of your responses and decisions during Phase I, I feel
comfortable that we all can work together seamlessly to accomplish the schedule.

NON-CERTIFIED COPY

H&E 0007379



Mr. Leonard St. Germain
H&E Equipment Services, Inc.
October 23, 2006
Page 3 of 3

I speak for the entire URS design team when I say that we are very appreciative for your choosing us for this project. We recognize that you do have a choice and we value this opportunity and look forward to continuing to work with you in the development of this very important project.

If you have any questions or require any additional information, please contact me at (225) 922-5856 or cell (501) 944-7222.  Thank you for your consideration.

Sincerely,

Chad Herndon
Project Manager
URS Corporation

NON-CERTIFIED COPY

H&E 0007380

LUMP SUM WORK ORDER NO.  08-01

In accordance with the Agreement for Professional Services between  **H&E Equipment Services, Inc.**
**11100 Mead Road, Suite 200, Baton Rouge, LA 70816**  ("Client"), and  **URS Architecture PC**  ("URS").
a  **North Carolina**  corporation, dated  **August 28, 2006**, this Work Order describes the Services,
Schedule, and Payment Conditions for URS Services on the Project known as:

> **Phase III Design Services for H&E Equipment Services Corporate Headquarters and Baton**
> **Rouge Area Branch Facility**
> **Baton Rouge, Louisiana**

Client Authorized
Representative:     **Leonard St.Germain**
Address:            **H&E Equipment Services, Inc. 11100 Mead Road, Suite 200**
                    **Baton Rouge, Louisiana**
Telephone No.:      **225.298.5244**

URS Authorized
Representative:     **Chad Herndon**
Address:            **Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806**
Telephone No.:      **225.922.5856**

**SERVICES.**  The Services included in this Work Order shall include: Design services for the preparation of
Construction Documents for the new Corporate Headquarters and Baton Rouge Area Branch Facility. See
**ATTACHMENT 1 SCOPE OF SERVICES** for a detailed listing of services.

**SCHEDULE.**  The Estimated Schedule to complete preparation of the documents will be no more than 12 –
16 weeks from the notice to proceed. Because of the uncertainties inherent in the Services, Schedules are
estimated and are subject to revision unless otherwise specifically described herein.

**PAYMENT AND EQUITABLE ADJUSTMENTS.**  This is a lump sum Work Order. Professional Services
fees will be billed monthly based on percent complete for a total sum of  **$ 490,000.00**  . URS shall give
Client prompt written notice of unanticipated conditions or conditions which are materially different from
those anticipated by URS at the time the lump sum compensation was agreed upon. If Client wishes URS
to proceed, URS lump sum compensation shall be subject to equitable adjustment for such conditions.

**TERMS AND CONDITIONS.**  The terms and conditions of the Agreement referenced above shall apply to
this Work Order, except as expressly modified herein.

**ACCEPTANCE** of the terms of this Work Order is acknowledged by the following signatures of the
Authorized Representatives.

**CLIENT**                                          **URS**

_____                         _____
Signature                                           Signature
Leonard St.Germain - V.P. Operations                William A. Stevenson, Senior Vice President
Typed Name/Title                                    Typed Name/Title

7/11/08                                             7/28/08
Date of Signature                                   Date of Signature



ST. GERMAIN

EXHIBIT NO. 18

K. DONNELLY

NON-CERTIFIED COPY

H&E 0037276

ATTACHMENT 1 SCOPE OF SERVICES

SCOPE OF SERVICES

H&E EQUIPMENT SERVICES

HEADQUARTERS AND BATON ROUGE AREA BRANCH FACILITY

BATON ROUGE, LOUISIANA

The scope of work is for URS to provide professional services during the Construction Documentation Phase which include:

## Construction Documentation Phase

- Based on the approved Design Documents, URS will prepare, for approval by the Owner, Construction Documents consisting of Drawings and Specifications setting forth in detail the requirements for the construction of the Project and will advise the Owner of any adjustments to previous preliminary estimates of Construction Cost.

- Landscape Design for compliance with regulatory agency requirements.

- URS will assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project.

- URS will, following the Owner's approval of the Construction Documents and of the latest preliminary estimate of Construction cost, shall assist the Owner in negotiating a contract with the General Contractor to construct the Project.

- Conduct Client / Team review meetings at 50% and 85% completion

- Assist the General Contractor in updating project construction budgets at the completion of DD and at the 50% & 80% completion reviews

NON-CERTIFIED COPY

H&E 0037277

| | |
|---|---|
| From: | Leonard StGermain |
| Sent: | Monday, June 22, 2009 9:06 AM |
| To: | neal_johnson@urscorp.com |
| Subject: | Estimate |

We are in need of performing some pretty extensive renovations to our Kenner facility and my thoughts in doing so is to get an A&E firm to draw up plans & specs to go out for bid. Are you guys interested in this type of project? If so, let me know and we can talk about pricing and a strategy to move forward.

Thanks


**Leonard St.Germain**
**V.P. / Operations**
11100 Mead Rd., Suite 200
Baton Rouge, LA 70816
Office: (225) 298-5244
Cell:   (225) 324-6536
Fax:    (225) 298-5376
Email: lstgermain@he-equipment.com



**CONFIDENTIALITY NOTICE:** This email transmission and any accompanying document is solely for the use of the intended recipient and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law.  If you are not the intended recipient, you are hereby notified that any disclosures, copying, distribution, or action taken or omitted in reliance on it is strictly prohibited.  If you received this information in error, please notify the sender immediately and delete the original transmission. Thank you.

1



NON-CERTIFIED COPY

H&E 0005268



# URS

## SHORT FORM MASTER AGREEMENT FOR PROFESSIONAL SERVICES
### BETWEEN
### H&E Equipment Services, Inc.
### AND
### URS Corporation Architecture PC

THIS AGREEMENT ("Agreement") for Professional Services, (together with the attachments hereto) dated and effective as of August 13, 2009 (the "Effective Date"), is hereby made and entered into by and between H&E Equipment Services, Inc., a Delaware corporation, (hereinafter "Client") having a place of business located at 11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816 and URS Corporation Architecture PC, a North Carolina corporation (hereinafter "Consultant") having a place of business located at 7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806 Consultant and Client are each individually referred to as a "Party" and collectively as the "Parties".

The Parties agree as follows:

**1.    WORK AUTHORIZATIONS**

1.1    Consultant agrees to undertake and perform certain consulting and professional engineering services ("Services") in accordance with the terms and conditions contained herein, as may be requested by Client from time to time. The Services to be performed, Consultant's compensation, and the schedule for performance for each task shall be described in one or more authorizations issued to Consultant by Client, the form of which is attached hereto as Attachment 1 ("Work Authorization"). A Work Authorization shall be valid and binding upon the Parties only if accepted in writing by Client and Consultant. Each duly executed Work Authorization shall be subject to the terms and conditions of this Agreement, except to the extent expressly modified by the Work Authorization.

1.2    It is the expressed intent of the parties that this Agreement shall be made available to subsidiaries and affiliated companies of Consultant. For the purposes of this Agreement, as it applies to each Work Authorization, the term "Consultant" shall mean either Consultant as defined above or the subsidiary or affiliate of Consultant identified in the Work Authorization. The applicable Work Authorization shall clearly identify the legal name of the entity accepting the Work Authorization.

**2.    PAYMENTS FOR SERVICES**

2.1    Unless otherwise stated in a Work Authorization, payment shall be on a time and materials basis under the Schedule of Fees and Charges in effect when the Services are performed. Client shall pay undisputed portions of each progress invoice within thirty (30) days of the date of the invoice. If payment is not received within thirty (30) days from the due date of such payment, Consultant may suspend further performance under one or more Work Authorizations until payments are current. Client shall notify URS of any disputed amount within fifteen (15) days from date of the invoice, give reasons for the objection, and promptly pay the undisputed amount. Client shall pay an additional charge of one percent (1%) per month or the maximum percentage allowed by law, whichever is the lesser, for any past due amount. In the event of a legal action for invoice amounts not paid, attorneys' fees, court costs, and other related expenses shall be paid to the prevailing party.

2.2    Client shall reimburse Consultant for all taxes, duties and levies such as Sales, Use, Value Added Taxes, Deemed Profits Taxes, and other similar taxes which are added to or deducted from the value of Consultant's Services. For the purpose of this Article such taxes shall not include taxes imposed on Consultant's net income, and employer or employee payroll taxes levied by any United States taxing authority, or the taxing authorities of the countries or any agency or subdivision thereof in which URS subsidiaries, affiliates, or divisions are permanently domiciled. It is agreed and understood that these net income, employer or employee payroll taxes are included in the unit prices or lump sum to be paid Consultant under the applicable Work Authorization.

2.3    Where charges are "not to exceed" a specified sum, Consultant shall notify Client before such sum is exceeded and shall not continue to provide the Services beyond such sum unless Client authorizes an increase in the sum. If a "not to exceed" sum is broken down into budgets for specific tasks, the task budget may be exceeded without Client authorization as long as the total sum is not exceeded. Changes in conditions, including, without limitation, changes in laws or regulations occurring after the budget is established, or other circumstances beyond URS control, shall be a basis for equitable adjustments in the budget and schedule.

**3.    CONFIDENTIALITY**

3.1    For a period commencing with the disclosure of any confidential information under this Agreement and/or a Work Authorization(s) and ending on the second anniversary such disclosure was first made, Consultant and Client each agree not to disclose to third parties, including also subcontractors and vendors (unless such subcontractors and vendors have a need to know and are bound to similar obligations of confidentiality), any information that is identified as confidential in writing on the materials made available to the other Party hereunder

**4.    WARRANTY**

4.1    Consultant warrants that any consulting and professional engineering Services performed by it under a Work Authorization shall be performed in accordance with that degree of care and skill ordinarily exercised by members of Consultant's profession practicing at the same time in the same location. Consultant's sole liability to Client for any non-conforming Services shall be to re-perform the non-conforming or defective Services, written notice of which must be promptly given by Client to Consultant. Consultant's obligation for re-performance of non-conforming Services as set

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1



ST. GERMAIN
EXHIBIT NO. 27
K. DONNELLY

NON-CERTIFIED COPY

# URS

forth in the preceding sentence shall extend for a term commencing at the substantial completion of such Services under a Work Authorization and ending one year later.

4.2    THE WARRANTY SET FORTH IN THIS ARTICLE 4 IS EXCLUSIVE, AND IN LIEU OF ANY AND ALL OTHER WARRANTIES RELATING TO THE SERVICES, WHETHER STATUTORY, EXPRESS OR IMPLIED, AND CONSULTANT DISCLAIMS ANY SUCH OTHER WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY AND ALL WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE AND ANY AND ALL WARRANTIES ARISING FROM COURSE OF DEALING AND/OR USAGE OF TRADE. ANY OTHER STATEMENTS OF FACT OR DESCRIPTIONS EXPRESSED IN THE AGREEMENT OR ANY WORK AUTHORIZATION SHALL NOT BE DEEMED TO CONSTITUTE A WARRANTY OF THE SERVICES OR ANY PART THEREOF. CONSULTANT'S REPERFORMANCE OF DEFECTIVE OR NON-CONFORMING SERVICES THROUGH THE ONE YEAR PERIOD PROVIDED FOR IN THIS ARTICLE 4 SHALL CONSTITUTE COMPLETE FULFILLMENT OF, AND CLIENT'S EXCLUSIVE REMEDY FOR, ALL THE LIABILITIES OR RESPONSIBILITIES OF CONSULTANT TO CLIENT FOR NON-CONFORMING OR DEFECTIVE SERVICES, WHETHER THE CLAIMS OF CLIENT ARE BASED ON DELAY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, WARRANTY, INDEMNITY, ERROR AND OMISSION OR ANY OTHER CAUSE WHATSOEVER.

## 5.    WORK BY OTHERS

5.1    The performance by Consultant of Services under a Work Authorization shall not constitute an assumption by Consultant of the obligations of Client or its other contractors. Consultant shall not control or have charge of, and shall not be responsible for, construction means, methods, techniques, sequences, procedures of construction, health or safety programs, or precautions connected with the work of Client or its other contractors, and shall not manage, supervise, control or have charge of construction. Client shall require Consultant to be named as an additional insured along with Client on any liability insurance policies provided by Client's construction contractors. To the fullest extent permitted by law, Client shall defend Consultant against any claim, suit or proceeding asserted by one of its other contractors and indemnify, defend and save Consultant harmless from any and all actual or alleged claims and losses (including, without limitation, attorney's fees) sustained by such contractor in connection with the Services, regardless or whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

## 6.    INSURANCE

6.1    In the event Consultant performs Services under any Work Authorization in connection with a project for which Client or another party with which Client has contracted obtains all-risk or builder's risk property insurance, Client, as the case may be, shall name, or shall cause such other party to name, Consultant as an additional insured on such all risk or builder's risk property insurance. Client acknowledges that Consultant has an insurable interest in such all risk or builder's risk property insurance.

6.2    Consultant and Client each waive all rights of recovery and subrogation against each other with respect to a loss occurring to property of the other, to the extent that such waivers do not invalidate the property insurance of either.

## 7.    INDEMNITY

7.1    Each Party shall indemnify, defend and save the other Party, its officers, directors, employees and affiliates harmless from any loss, cost or expense claimed by third parties, excluding employees of either Party, for property damage and/or bodily injury, including death, to the proportionate extent such loss, cost or expense arises from the negligence or willful misconduct of the indemnifying Party, its employees or affiliates in connection with the Services.

7.2    Notwithstanding any other provision contained elsewhere in this Agreement to the contrary and to the fullest extent permitted by law, Client shall be liable for and indemnify, defend and save Consultant, its officers, directors, employees and affiliates harmless from and against any and all actual or alleged claims, damages (including incidental, consequential, indirect and special damages), losses, and expenses (including, without limitation, all penalties, attorney's fees, fines and administrative or civil sanctions arising out of or related to such claim) (collectively "Losses") arising out of: (1) economic loss suffered by third parties; and/or (2) investment decisions of Client or third parties in reliance upon the results of the Services, regardless of whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

7.3    The indemnity and save harmless obligations of Consultant and Client under this Article 7 shall not apply with respect to any Hazardous Material, as Consultant's and Client's rights and obligations with respect thereto are set forth in Article 10.

## 8.    WAIVER OF CONSEQUENTIAL DAMAGES

8.1    Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, neither Client nor Consultant shall be liable, whether based on contract, tort, negligence, strict liability, warranty, indemnity, error and omission or any other cause whatsoever, for any consequential, special, incidental, indirect, punitive or exemplary damages, or damages arising from or in connection with loss of power, loss of use, loss of revenue or profit (actual or anticipated), loss by reason of shutdown or non-operation, increased cost of construction, cost of capital, cost of replacement power or customer claims, and Consultant hereby releases Client and Client hereby releases Consultant from any such liability.

## 9.    LIMITATION OF LIABILITY

9.1    Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, in no

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

NON-CERTIFIED COPY

# URS

event shall the total cumulative aggregate liability of Consultant, its subconsultants, and their respective partners, officers, directors, shareholders, employees, and agents (referred to collectively in this Article as "Consultant") to Client resulting from, arising out of or in connection with the performance or nonperformance of any or all Services or other obligations under a Work Authorization, exceed $250,000 or ten percent (10%) of the compensation paid Consultant pursuant to such Work Authorization, whichever is greater, or extend beyond the expiration of the warranty period under Article 4 for the Services performed under the Work Authorization, regardless of the legal theory under which such liability is imposed. The remedies stated in the Agreement are Client's sole and exclusive remedies for any failure by Consultant to comply with obligations to Client, and Client hereby irrevocably waives any right to assert a claim against Consultant based on a legal theory that a remedy provided herein fails of its essential purpose.

10.     HAZARDOUS MATERIAL

10.1    Nothing in this Agreement shall be construed or interpreted as requiring Consultant to assume the status of, and Client acknowledges that Consultant does not act in the capacity nor assume the status of, Client or others as a "generator," "operator," "transporter," or "arranger" in the treatment, storage, disposal, or transportation of any hazardous substance or waste as those terms are understood within the meaning of the Resource Conservation and Recovery Act (RCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), or any other similar federal, state, or local law, regulation, or ordinance. Client acknowledges further that Consultant has played no part in and assumes no responsibility for generation or creation of any hazardous waste, pollution condition, nuisance, or chemical or industrial disposal problem, if any, which may exist at any site that may be the subject matter of any Work Authorization.

10.2    It is acknowledged by both parties that the Services do not include services related to regulated substances, pollutants, or hazardous or toxic wastes ("Hazardous Material"). In the event Consultant or any other party encounters undisclosed Hazardous Materials, Consultant shall notify Client and, to the extent required by law or regulation, the appropriate governmental officials, and Consultant may, at its option and without liability for delay, consequential or any other damages to Client, suspend performance of Services on that portion of the project affected by Hazardous Material until Client: (i) retains appropriate specialist consultant(s) or contractor(s) to identify and, as appropriate, abate, remediate, or remove the Hazardous material; and (ii) warrants that the project site is in full compliance with all applicable laws and regulations. Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, Client shall indemnify, defend and save Consultant and its affiliates, subconsultants, agents, and suppliers of any tier, and any and all employees, officers, directors of any of the foregoing, if any, from and against any and all Losses which arise out of the performance of the Services and relating to the regulation and/or protection of the environment, including, without limitation, Losses incurred in connection with characterization, handling, transportation, storage, removal, remediation, disturbance or disposal of Hazardous Material, whether above or below ground and not brought to a Client site or other proposed project site by Consultant in the performance of the Services without Client's approval.

11.     CHANGES

11.1    The Parties may from time to time by mutual agreement seek to modify, extend or enlarge the Services under a Work Authorization ("Modification"). In the event the Parties agree to a Modification to add additional Services, or to make other modifications to the Services, Consultant's compensation, the schedule and any other relevant terms and conditions of the applicable Work Authorization shall be equitably adjusted prior to performance of such Services.

12.     OWNERSHIP OF DOCUMENTS

12.1    Consultant grants to Client a transferable, irrevocable and perpetual royalty-free license to retain and use all work products delivered to Client for any purpose in connection with the project specified in each Work Authorization, upon full payment by Client for Consultant's Services. Client also may use such work product for other purposes with Consultant's written consent. Re-use of any such work product by Client on any extension of the project or on any other project without the written authorization of Consultant shall be at Client's sole risk and Client shall indemnify, defend and save Consultant and its affiliates, consultants, agents, subcontractors and suppliers of any tier, and any and all employees, officers and directors of any of the foregoing, if any, from and against any and all Losses suffered as a result of, or arising out of, or in connection with such re-use. Consultant shall have the right to retain copies of all such work product. Consultant retains the right of ownership with respect to any patentable concepts or copyrightable materials arising from its Services.

13.     TERMINATION/SUSPENSION

13.1    Client may terminate all or any portion of the Services under one or more Work Authorizations for convenience, at its option, by sending a written notice to Consultant. Either party can terminate this Agreement or a Work Authorization for cause if the other commits a material, uncured breach of this Agreement or becomes insolvent. Termination for cause shall be effective twenty (20) days after receipt of a notice of termination, unless a later date is specified in the notice. The notice of termination for cause shall contain specific reasons for termination and both parties shall cooperate in good faith to cure the causes for termination stated in the notice. Termination shall not be effective if reasonable action to cure the breach has been taken before the effective date of the termination. Client shall pay Consultant upon invoice for Services performed and charges incurred prior to termination, plus reasonable termination charges. Any suspension of Services by Client shall result in an equitable adjustment to Consultant's compensation, time for performance, or any of its other obligations under a Work Authorization.

14.     FORCE MAJEURE

14.1    Any delay or failure of Consultant in performing its required obligations hereunder shall be excused if and to the extent such delay or failure is caused by a Force Majeure Event. A "Force Majeure Event" means an event due to any cause or causes beyond the reasonable control of Consultant and shall include, but not be limited to, acts of God, strike, labor dispute fire, storm, flood, windstorm, unusually severe weather, sabotage, embargo,

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

3

NON-CERTIFIED COPY

# URS

terrorism, energy shortage, accidents or delay in transportation, accidents in the handling and rigging of heavy equipment, explosion, riot, war, court injunction or order, delays by acts or orders of any governmental body or changes in laws or government regulations or the interpretations or application thereof or the acts or omissions of the Client or its other contractors, vendors or suppliers. In the event of a Force Majeure Event, Consultant shall receive an equitable adjustment extending Consultant's time for performance for such Services sufficient to overcome the effects of any delay, and an increase(s) to Consultant's compensation sufficient to account for any increased cost in performance or loss or damage suffered by Consultant.

## 15.    RESPONSIBILITIES OF CLIENT

15.1    Without limiting any express or implied obligations of Client under applicable law, Client shall: (1) provide Consultant, in writing, all information relating to Client's requirements for the project; (2) correctly identify to Consultant the location of subsurface structures, such as pipes, tanks, cables, and utilities; (3) notify Consultant of any potential hazardous substances or other health and safety hazard or condition known to Client existing on or near the project site; (4) give Consultant prompt written notice of any suspected deficiency in the Services; (5) with reasonable promptness, provide required approvals and decisions; and (6) furnish or cause to be furnished to Consultant full, unrestricted and legal access to, and use of, the site and all necessary rights of way and easements, in order to perform the Services. In the event Consultant is requested by Client or is required by subpoena to produce documents or give testimony in any action or proceeding to which Client is a party and Consultant is not a party, Client shall pay Consultant for any time and expenses required in connection therewith, including reasonable attorney's fees.

15.2    Consultant may rely upon and use in the performance of any Services information supplied to it by Client without independent verification and Consultant shall not be responsible for defects in its Services attributable to its reliance upon or use of such information.

## 17.    TERM

17.1    Unless otherwise specified, the term of this Agreement shall run from the Effective Date until Consultant has completed the Services and received all payments due under the Agreement.

## 18.    GENERAL

18.1    Client and Consultant each represent and warrant that this Agreement has been duly authorized, executed and delivered and constitutes its binding agreement enforceable against it. This Agreement and any executed Work Authorizations supersede all prior written and/or oral contracts and agreements that may have been made or entered into between Client and Consultant regarding the subject matter hereof, including but not limited to any and all proposals, oral or written, and all communications between the Parties relating to this Agreement or any Work Authorization(s), and constitute the entire agreement between the Parties hereto with respect to the subject matter hereof.

18.2    This Agreement and Work Authorization(s) may not be assigned by Consultant or Client in any way, including by operation of law, unless otherwise mutually agreed to in writing, any such attempted non-authorized assignment shall be null and void and of no force or effect.

18.3    Any cost opinions or estimates provided by Consultant will be on a basis of experience and judgment, but since Consultant has no control over market conditions or bidding procedures, Consultant cannot and does not warrant that bids, ultimate construction cost, or project economics will not vary from such opinions or estimates. Neither this Agreement nor any of the Services provided hereunder shall constitute or provide for, and Consultant shall not be considered to have rendered, any legal or financial opinion(s) regarding the feasibility of this project or any other or regarding any other matter. Unless otherwise expressly included in a Work Authorization, Consultant shall under no circumstances provide as part of the Services a consent, opinion or similar document, or act as a qualified person or expert, in connection with any filing by Client with the United States Securities and Exchange Commission, or similar non-United States agency, authority or commission.

18.4    Notices shall be effective hereunder as follows only if in writing and addressed to the authorized representative designated in applicable Work Authorizations: (1) upon delivery, if delivered personally to the person; (2) upon transmission, if transmitted to the facsimile number of the person; and (3) upon posting, if by first class or overnight mail (postage prepaid).

18.5    All contract issues and matters of law will be adjudicated in accordance with the laws of the state where the project is located, excluding any provisions or principles thereof which would require the application of the laws of a different jurisdiction; provided, however that if the project is located outside the United States, the laws of the State of California shall govern. Venue for any litigation shall be any state court or United States District Court having jurisdiction over the parties and subject matter.

18.6    The terms and conditions of this Agreement shall prevail, notwithstanding any variance with any purchase order or other written instrument submitted by Client whether formally rejected by Consultant or not. This Agreement may be modified only by amendment when signed by each Party. In the event that any one or more of the provisions of this Agreement shall be found to be illegal or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect, and such term or provision shall be deemed stricken to the extent and in the jurisdictions necessary for compliance with applicable law.

18.7    Nothing in this Agreement shall be construed to give any rights or benefits to anyone other than the Client or Consultant.

I \Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

4

NON-CERTIFIED COPY

# URS

18.8    The headings in this Agreement are for convenience only, and shall not affect the interpretation hereof. The terms "hereof", "herein," "hereto" and similar words refer to the entire Agreement and not to any particular Article, Section, Attachment, Exhibit or any other subdivision of this Agreement. References to "day" or "days" shall mean calendar days unless specified otherwise.

18.9    The provisions of this Agreement which by their nature are intended to survive the termination, cancellation, completion, or expiration of the Agreement, including, but not limited to, indemnities and any expressed limitations of or releases from liability, shall continue as valid and enforceable obligations of the parties notwithstanding any such termination, cancellation, completion, or expiration.

18.10    It is understood and agreed that any delay, waiver or omission by Consultant or Client to exercise any right or power arising from any breach or default by Client or Consultant in any of the terms, provisions or covenants of this Agreement or any Work Authorization shall not be construed to be a waiver by Consultant or Client of any subsequent breach or default of the same or other terms, provisions or covenants on the part of Consultant or Client.

19.    **ATTACHMENTS AND EXHIBITS**

The following attachments and exhibits, which are attached hereto, are part of this Agreement.

Attachment 1 – Work Authorization

Attachment 2 – Fee Proposal, Scope of Work, Schedule

Attachment 3 – URS 2009 Schedule of Fees and Charges

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, effective as of the day and year first above mentioned.

**H&E Equipment Services, Inc.**

By: _____
    (Signature)

Name: _Lennard Sr. Germald_
    (Printed)

Title: _V.P. operations_

**URS Corporation Architecture PC**

By: _Craig W. Gordon_
    (Signature)

Name: _Craig W. Gordnor_
    (Printed)

Title: _VP/OM_

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

NON-CERTIFIED COPY

**URS**



ATTACHMENT 1

TIME AND MATERIALS WORK AUTHORIZATION 09-100

In accordance with the Agreement for Consulting and Professional Services between H&E Equipment Services, Inc. ("Client"), and URS Corporation Architecture PC ("Consultant"). a North Carolina corporation, dated 08.13.09, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

      Renovations and Additions to Kenner, LA Branch
      H&E Equipment Services, Inc.

      Client Authorized
      Representative:  Leonard St. Germain
      Address:       11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816

      Telephone No.:  225.298.5244

      Consultant Authorized
      Representative:  Chad Herndon
      Address:       7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
      Telephone No.:  225.922.5244

SERVICES. The Services shall be described in Attachment 2 to this Work Order.

SCHEDULE. The Estimated Schedule shall be set forth in Attachment 2 to this Work Authorization. Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

PAYMENT. Payment of $0.00 is due upon signature of this Work Authorization and will be applied against the final invoice for this Work Authorization. URS charges shall be on a "time and materials" basis and shall be in accordance with the Consultant's Schedule of Fees and Charges in effect at the time the Services are performed. Payment provisions and the Consultant's current Schedule of Fees and Charges are attached to this Work Authorization as Attachment 3.

TERMS AND CONDITIONS. The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

ACCEPTANCE of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

| CLIENT | CONSULTANT |
|---|---|
| Signature | Signature |
| _Leonard St. Germain_ | _Craig W. Gardner / VP-am_ |
| Typed Name/Title | Typed Name/Title |
| 8/31/09 | 9/03/09 |
| Date of Signature | Date of Signature |

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1



S7GERMAIN

EXHIBIT NO. 25

K. DONNELLY

URS 031081

NON-CERTIFIED COPY

 **URS**                                                    **ATTACHMENT 2**

August 13, 2009

Leonard St. Germain
H&E Equipment Services
Baton Rouge, LA

Re:    Renovations and Additions to H&E Equipment – Kenner LA

Leonard:

URS is pleased to provide you with a proposal for professional services for assistance
with determining a legitimate budget for the renovations and additions to your H&E
Equipment facility located at **125 East Airline Drive** in **Kenner LA**.  A list of work items
we discussed is attached (**Attachment 2**)

As we discussed the first order of business will be to determine the existing condition of
the buildings and develop drawings and sketches of the renovations. From these
documents, we can obtain accurate construction estimates for the work.  With this data a
realistic presentation can be offered for consideration by management.

We propose to provide you these services for a total fee not to exceed amount of
**$20,000.00** based on our "Standard Billing Rate Schedule" This schedule includes the
cost of all project personnel associated with the project, documentation and all
reimbursement costs incurred during the course of the performance of the outlined
scope of work.

Thank you for considering URS for this opportunity. If you have any questions or require
any additional information, please feel free to contact me at 225.231.6343 or cell
225.324.5848. Thank you for your consideration.

Sincerely,

URS Corporation

Neal Johnson                                         Mike Richardson
Principal Architect                                  Vice President

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031082

NON-CERTIFIED COPY

# URS

**ATTACHMENT 2**

Re: Renovations and Additions to H&E Equipment – Kenner LA
**2 | P a g e**

## SCOPE OF WORK

Based on our recent site visit the focus of the project will include:

1. Developing drawings of the existing site and buildings.
2. Review of existing truck traffic circulation including company, employee and customer vehicle parking. Additional paving with drainage consideration will be included.
3. Evaluate the condition of all exterior roofs and walls of all buildings on the property.
4. Evaluate condition and operational status of the existing Office / Sales area with a focus on renovating the restrooms and upgrading the finishes in all other areas. Review of the HVAC and Electrical systems to be included.
5. Evaluate circulation and storage utilization of the Parts Area.
6. Evaluate covered area west of Parts Building (existing Equipment Wash Area)
7. Develop sketches and drawings for a:
   a. New entrance for Office / Sales building.
   b. New office / tool storage and break room area to the front (east) end of the Shop Building.
   c. Demolish existing office/tool storage and break room to be used as transition area.
   d. Add a new overhead door on south side of building in this immediate area.
   e. New enclosed service bay with overhead doors to the rear (west) end of the Shop Building.
   f. New open frame bay to the rear (west) end of the Shop Building.
   g. New 40' x 70' Equipment Wash Building to be located at the rear (west) end of the site.
8. Assist in obtaining realistic budget pricing from three (3) local qualified general contractors.

## SCHEDULE

We anticipate the effort will require 3 calendar weeks to complete.

URS 031083

NON-CERTIFIED COPY

**URS**                                                                                    Attachment 3

## URS CORPORATION
## SCHEDULE OF FEES AND CHARGES
### Engineering/Environmental & Consulting Services

> The following describes the basis for compensation for services performed during the fiscal year 2009. This Schedule of Fees and Charges will be adjusted annually on January 1 of each subsequent year to reflect merit and economic salary increases, and changes in the expected level and mode of operations for the new year. The new Schedule of Fees and Charges will apply to existing and new assignments.

### PERSONNEL CHARGES

The charge for all time required in the performance of the Scope of Services, including office, field and travel time, will be at the Unit Priced Hourly Rates set forth below for the labor classifications indicated.

| Labor Classification | Hourly Rate ($) |
|---|---|
| Clerk* | 48 |
| Technical Typist/Word Processor* | 55 |
| Editor/Drafter/Designer/Illustrator* | 75 |
| Lab/Field Supervisor* | 75 |
| Technician* | 63 |
| Senior Technician | 68 |
| Graduate Staff Professional | 70 |
| Staff Professional | 82 |
| Senior Staff Professional | 93 |
| Assistant Project Professional | 99 |
| Project Professional | 115 |
| Senior Project Professional | 130 |
| Consulting/Sr. Consulting Professional | 160 |
| Principal/Sr. Principal Professional | 180 |
| Principal/Sr. Principal Professional (research / site visit/report writing) | 200 |
| Principal/ Sr. Principal Professional (depositions / testifying in court) | 300 |

Charges for contract personnel under URS supervision and using URS facilities will be made according to the hourly rate corresponding to their classification.

When staff are performing project fieldwork, a minimum daily charge of 4 hours will apply.

A maximum of eight (8) hours travel time per day will be charged for travel within the continental United States.

When URS staff appears as expert witnesses at court trials, arbitration hearings, mediation and depositions, their time will be charged at minimum $250.00 per hour.

Overtime (hours worked in excess of eight (8) hours per day) by exempt personnel will be charged at the above straight time hourly rate. Overtime by non-exempt personnel (classifications identified with an asterisk "*") will be charged at 1.5 times the above hourly rate.

### OTHER PROJECT CHARGES

#### Subcontracts and Equipment Rental
The cost of services subcontracted by URS to others and other costs incurred by URS will be charged at cost plus 10%.

#### Communications
The cost of communications for office telephone, telex, facsimile, postage, and incidental copying costs will be charged at a flat rate of 3% of total gross labor charges.

#### Vehicles and Mileage
Field vehicles (pick-ups, vans, trucks, etc.) used on project assignments will be charged at $65.00 per day. The mileage charge for personal autos will be the then current mileage rate established by the Internal Revenue Service.

#### Specialized Equipment
The use of specialized URS equipment will be the fixed rental rates set forth in the Schedule of URS Specialized Equipment Charges.

*This fee schedule contains confidential business information and is not to be copied or distributed for any purpose other than the use intended in this contract or proposal.*

L:\Proposals\Facilities\Office Practice\Contracts\2009  schedule of fees and charges.doc

NON-CERTIFIED COPY

URS 031084

# URS

## ATTACHMENT 1

### TIME AND MATERIALS WORK AUTHORIZATION 10-10

In accordance with the Agreement for Consulting and Professional Services between H&E Equipment Services, Inc. ("Client"), and URS Corporation Architecture PC ("Consultant"), a North Carolina corporation, dated 08.13.09, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

Renovations and Additions to Kenner, LA Branch
H&E Equipment Services, Inc.

Client Authorized
Representative:
Address:    11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816

Telephone No.:  225.298.5244

Consultant Authorized
Representative:  Neal Johnson
Address:    7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
Telephone No.:  225.231.6343

SERVICES.  The Services shall be described in Attachment 1 to this Work Order.

SCHEDULE.  The Estimated Schedule shall be set forth in Attachment 1 to this Work Authorization. Because of the uncertainties inherent in this Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

PAYMENT.  Payment of $0.00 _ is due upon signature of this Work Authorization and will be applied against the final invoice for this Work Authorization. URS charges shall be on a "time and materials" basis and shall be in accordance with the Consultant's Schedule of Fees and Charges in effect at the time the Services are performed. Payment provisions and the Consultant's current Schedule of Fees and Charges are attached to this Work Authorization as Attachment 2.

TERMS AND CONDITIONS.  The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

ACCEPTANCE of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

CLIENT                                          CONSULTANT

_____                  _____
Signature                                        Signature

Frankie Wynn/Director of Facilities      WILLIAM A. STEVENSON, SVP
Typed Name/Title                                 Typed Name/Title

10/22/2010                                       10/27/10
Date of Signature                                Date of Signature

I:\Proposals\Fees\Rifot\H&E Equipment Services - Kenner\Phase 1B\Project Management\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1

NON-CERTIFIED COPY

URS 031085

**URS**                                                                    **ATTACHMENT 1**

October 27, 2010

Mr. Frankie Wynn
Director of Facilities
H&E Equipment Services, Inc.
11100 Mead Road, Suite 200
Baton Rouge, Louisiana 70816

Re:    H&E Kenner Branch
       125 East Airline Highway - Kenner, Louisiana

Dear Mr. Wynn:

URS is pleased to provide you with a fee proposal for the Phase II development of the Renovations to the Kenner, Louisiana Branch Facility. This phase of the project will be the completion of final design solutions, the construction documents, assisting in the contractor pricing, construction contract negotiations and construction administration during the construction phase to occupancy.

We propose to provide you these design services for a total fee of $ 148,000. The fee is not based on a construction cost. Fees will be "lump sum", billed monthly based on the percent complete of each phase.

As we discussed, our fee will not be adjusted due to the dollar cost of the project changing higher or lower. In the event a major scope of work involves changes such as a building addition or major variation from the current program, we will reserve the right to renegotiate our fixed fee.

The time frame to complete the final Design and Construction Documents will be 8 - 10 weeks.

URS is very excited to provide you with our professional services. If you have any questions or require any additional information, please contact me at 225.231.6343 or cell 25.324.5848.

Sincerely,
URS Corporation

Neal Johnson, AIA
Principal Architect

CC:    Chad Herndon

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
Tel: 225.922.5700
Fax: 225.922.5701

NON-CERTIFIED COPY

URS 031086

# URS

**ATTACHMENT 1**

**TIME AND MATERIALS WORK AUTHORIZATION 12-10**

In accordance with the Agreement for Consulting and Professional Services between H&E Equipment Services, Inc. ("Client"), and URS Corporation Architecture PC ("Consultant"), North Carolina corporation, dated August 13, 2009, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

    Relocation of Crain Reman Facility – Phase 1
    Belle Chasse, LA
    H&E Equipment Services, Inc. - Owner

    Client Authorized
    Representative: Frankie Wynn
    Address:    11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816
    Telephone No.:    225.298.5244

    Consultant Authorized
    Representative: Neal Johnson
    Address:    7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
    Telephone No.:    225.231.6343

**SERVICES.** The Services shall be described in Attachment 2 to this Work Order.

**SCHEDULE.** The Estimated Schedule shall be set forth in Attachment 2 to this Work Authorization. Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

**PAYMENT.** Payment of $0.00 is due upon signature of this Work Authorization and will be applied against the final invoice for this Work Authorization. URS charges shall be on a "time and materials" basis and shall be in accordance with the Consultant's Schedule of Fees and Charges in effect at the time the Services are performed. Payment provisions and the Consultant's current Schedule of Fees and Charges are attached to this Work Authorization as Attachment 3.

**TERMS AND CONDITIONS.** The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

**ACCEPTANCE** of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

CLIENT                              CONSULTANT

_Signature_                                  _Signature_

Frankie Wynn/Director of Facilities      WILLIAM A. STEVENSON, SENIOR VP
Typed Name/Title                           Typed Name/Title

12/27/2010                        1/5/11
Date of Signature                          Date of Signature

I:\Proposals\Facilities\H&E Equipment Services - Belle Chasse\Phase 1 Proposal

1



WYNN
EXHIBIT NO. 7
K. DONNELLY

NON-CERTIFIED COPY

URS 031072

# URS

December 15, 2010

Frankie Wynn
Director of Facilities – Risk - Compliance
H&E Equipment Services
Baton Rouge, LA

Re:     Relocation of H&E Equipment Services Crain Reman Facility – Phase 1
        Belle Chasse, LA

Mr. Wynn:

URS is pleased to provide you with a proposal for professional services for assistance with the relocation of your **H&E Equipment Services Crain Reman Facility** currently located on **Engineers Road in Belle Chasse, LA** to a site across the street from your sales / management office.

As we discussed, the work will be commissioned in phases. Phase 1 will include the determination of the existing condition of the buildings and the development of drawings and sketches of the renovations. From these documents, we can obtain accurate construction estimates for the work. With this data a realistic presentation can be offered for consideration by management.

We propose to provide you these services for a total fee not to exceed amount of **$44,000.00** based on our "Standard Billing Rate Schedule." This schedule includes the cost of all project personnel associated with the project, documentation and all reimbursement costs incurred during the course of the performance of the outlined scope of work.   A Work Authorization document (Attachment 1) is included for your signature. A Scope of Work and a Delivery Schedule is also attached (Attachment 2).

Thanks for the opportunity to continue our services to H&E Equipment Services.

Sincerely,
URS Corporation

Neal Johnson                                          Mike Richardson
Principal Architect                                   Vice President

Attachment 1    Work Authorization 12-10
Attachment 2    Scope of Work and Schedule
Attachment 3    Schedule of Fees and Charges

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031073

NON-CERTIFIED COPY

# URS

Relocation of H&E Equipment Services Crain Raman Facility – Phase 1
Belle Chasse, LA

## SCOPE OF WORK

Based on our recent site visit the focus of the project will include:

1. Developing drawings of the existing site and buildings.
2. Review of existing crane and truck circulation including company, employee and customer vehicle parking. Additional paving with drainage consideration will be included.
3. Evaluate the condition of all exterior roofs and walls of all buildings on the new property.
4. Evaluate condition and operational status of the existing fabrication building with a focus on renovating the restrooms and upgrading the finishes in all other areas. Review of the HVAC and Electrical systems to be included.
5. Evaluate site circulation in regards to existing building and above ground utility constraints.
6. Evaluate circulation of cranes through the rehabilitation process and parts storage utilization
7. Develop sketches and drawings for:
   a. Renovation of the existing buildings to remain on site.
   b. New additions to the existing buildings to enclose certain tasks.
   c. Demolish some existing buildings.
   d. New buildings as required for new layout.
   e. Addition of new overhead doors as required for new layout.
   f. New covered service bays on existing buildings as required.
   g. New overhead cranes as required to support correct loads.
8. Assist in obtaining realistic budget pricing from three (3) local qualified general contractors.

## SCHEDULE

We anticipate the effort will require 5 calendar weeks to complete.

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031074

NON-CERTIFIED COPY

Attachment 3

# URS CORPORATION
## SCHEDULE OF FEES AND CHARGES
### Engineering/Environmental & Consulting Services

> The following describes the basis for compensation for services performed during the fiscal year 2010. This Schedule of Fees and Charges will be adjusted annually on January 1 of each subsequent year to reflect merit and economic salary increases, and changes in the expected level and mode of operations for the new year. The new Schedule of Fees and Charges will apply to existing and new assignments.

## PERSONNEL CHARGES

The charge for all time required in the performance of the Scope of Services, including office, field and travel time, will be at the Unit Priced Hourly Rates set forth below for the labor classifications indicated.

| Labor Classification | Hourly Rate ($) |
|---|---|
| Clerk* | 50 |
| Technical Typist/Word Processor* | 57 |
| Editor/Drafter/Designer/Illustrator* | 78 |
| Lab/Field Supervisor* | 78 |
| Technician* | 65 |
| Senior Technician | 70 |
| Graduate Staff Professional | 73 |
| Staff Professional | 85 |
| Senior Staff Professional | 96 |
| Assistant Project Professional | 102 |
| Project Professional | 120 |
| Senior Project Professional | 138 |
| Consulting Professional | 150 |
| Sr. Consulting Professional | 165 |
| Principal/Sr. Principal Professional | 186 |

Charges for contract personnel under URS supervision and using URS facilities will be made according to the hourly rate corresponding to their classification.

When staff are performing project fieldwork, a minimum daily charge of 4 hours will apply.

A maximum of eight (8) hours travel time per day will be charged for travel within the continental United States.

When URS staff appear as expert witnesses at court trials, arbitration hearings, mediation and depositions, their time will be charged at $250.00 per hour.

Overtime (hours worked in excess of eight (8) hours per day) by exempt personnel will be charged at the above straight time hourly rate. Overtime by non-exempt personnel (classifications identified with an asterisk "*") will be charged at 1.5 times the above hourly rate.

## OTHER PROJECT CHARGES

### Subcontracts and Equipment Rental
The cost of services subcontracted by URS to others and other costs incurred by URS will be charged at cost plus 10%.

### Communications
The cost of communications for office telephone, telex, facsimile, postage, and incidental copying costs will be charged at a flat rate of 3% of total gross labor charges.

### Vehicles and Mileage
Field vehicles (pick-ups, vans, trucks, etc.) used on project assignments will be charged at $65.00 per day. The mileage charge for personal autos will be the then current mileage rate established by the Internal Revenue Service.

### Specialized Equipment
The use of specialized URS equipment will be the fixed rental rates set forth in the Schedule of URS Specialized Equipment Charges.

### Other Direct Costs
Materials, supplies, travel expenses, and other direct costs will be billed at cost plus a 5% handling charge.

*This fee schedule contains confidential business information and is not to be copied or distributed for any purpose other than the use intended in this contract or proposal.*

**URS**

L:\PROJECIALS\FACILITIES\ME EQUIPMENT SERVICES - BELL\X CHARRIS\PROPOSAL\10 FEE SCHEDULE (ATTACHMENT 3).DOC

URS 031075

NON-CERTIFIED COPY

# URS

## LUMP SUM WORK AUTHORIZATION NO. 11-12

In accordance with the Agreement for Consulting and Professional Services between H&E Equipment Services, Inc. ("Client"), and URS Corporation Architecture PC ("Consultant"), North Carolina corporation, dated August 13, 2009, this Work Authorization describes the Services, Schedule, and Payment Conditions for Consultant's Services on the Project known as:

> Relocation of Crain Reman Facility – Phase II
> Belle Chasse, LA
> H&E Equipment Services, Inc. - Owner

> Client Authorized
> Representative:   Frankie Wynn
> Address:          11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816
> Telephone No.:    225.298.5244

> Consultant Authorized
> Representative:   Neal Johnson
> Address:          7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806
> Telephone No.:    225.231.6343

**SERVICES.** The Services shall be described in Attachment 1 to this Work Order.

**SCHEDULE.** The Estimated Schedule shall be set forth in Attachment 1 to this Work Authorization. Because of the uncertainties inherent in the Services, Schedules are estimated and are subject to revision unless otherwise specifically described herein.

**PAYMENT AND EQUITABLE ADJUSTMENTS.** This is a lump sum Work Authorization. Consultant's lump sum compensation and provisions for progress and final payments are specified in Attachment 1 to this Work Authorization. Payment of $0.00 is due upon signature of this Work Order and will be applied against the final invoice for this Work Authorization. Consultant shall give Client prompt written notice of unanticipated conditions or conditions which are materially different from those anticipated by Consultant at the time the lump sum compensation was agreed upon. If Client wishes Consultant to proceed, Consultant's lump sum compensation shall be subject to equitable adjustment for such conditions.

**TERMS AND CONDITIONS.** The terms and conditions of the Agreement referenced above shall apply to this Work Authorization, except as expressly modified herein.

**ACCEPTANCE** of the terms of this Work Authorization is acknowledged by the following signatures of the Authorized Representatives.

~~CLIENT~~ CONSULTANT

_Signature_

Vice President/Office Mgr.
Typed Name/Title

2/22/12
Date of Signature

CLIENT
~~CONSULTANT~~

_Signature_

FRANKIE W. WYNN / DIR. OF FACILITIES
Typed Name/Title

2/17/2012
Date of Signature

I:\Projects\H&E Equipment Services - Belle Chasse\Phase II - Lump Sum Work Order

1

URS 031076

NON-CERTIFIED COPY

**URS**

Attachment 1

February 18, 2012

Frankie Wynn
Director of Facilities – Risk - Compliance
H&E Equipment Services
Baton Rouge, LA

Re:    Relocation of H&E Equipment Services Crain Reman Facility – Phase II
       Belle Chasse, LA

Mr. Wynn:

URS is pleased to provide you with a fee proposal for the **Phase II development of the H&E Equipment Services Crain Reman Facility in Belle Chasse, LA.** This phase of the project will include the following tasks:

1.  Measurement of the existing facilities,
2.  Completion of final design solutions,
3.  Representing H&E for all permitting activities including the Pontchatrain Levee District Board, Plaquemines Parish, the State Fire Marshal, and all other regulatory agencies.
4.  All construction documents as required for permitting and hard dollar pricing,
5.  Assisting in the contractor pricing and construction contract negotiations, and
6.  Construction Administration during the construction phase to occupancy.

This proposal is based on the work described in the approved Project Program dated January 16, 2012.

We propose to provide you these design services for a total fee of **$ 296,353.** The fee is not based on a construction cost. Fees will be "lump sum", billed monthly based on the percent complete of each task.

A Work Order document **(Attachment 1)** is included for your signature. A Scope of Work and a Delivery Schedule is also attached **(Attachment 2).**

As we discussed, our fee will not be adjusted due to the dollar cost of the project changing higher or lower. In the event a major scope of work involves changes such as a building addition or major variation from the current program, we will reserve the right to renegotiate our fixed fee.

The time frame to complete the final Design and Construction Documents will be 8 - 10 weeks.

URS is very excited to provide you with our professional services. If you have any questions or require any additional information, please contact me at 225.231.6343 or cell 225.324.5848.

Sincerely
URS Corporation

Neal Johnson
Principal Architect

Mike Richardson
Vice President

Attachment 1    Work Authorization 11-12
Attachment 2    Scope of Work and Schedule

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031077

NON-CERTIFIED COPY

# URS

ATTACHMENT 2

Relocation of H&E Equipment Services Crain Reman Facility – Phase II
Belle Chasse, LA
021612

## SCOPE OF WORK

Based on our recent discussion, our Phase II effort will include:

1. Developing as-built drawings of the existing buildings being renovated.
2. Develop site drainage design solution
3. Develop master demolition plan
4. Building A - Main Shop Building
   a. Master Plan Space
   b. Design new entrance doors
   c. Design new concrete apron
   d. Develop interior demolition plan
   e. Design new office area
   f. Design new break room / library / training area
   g. Design new locker / shower / restroom area
5. Building B - Welding Building
   a. Design new entrance doors
   b. Design new concrete apron
   c. Design new restroom area
6. Building C - Wash Area
   a. Design New Space
7. Building D - Blast Area
   a. Design New Space
8. Building K - Painting Area
   a. Design New Space
9. Develop documents for submittal to regulatory agencies
10. Develop bid documents to provide to invited general contractors
11. Assist H&E in obtaining construction pricing proposals
12. Prepare construction contract
13. Review progress of work during construction
14. Attend monthly progress meetings during construction
15. Assist H&E in closing out the construction project.

## SCHEDULE

We anticipate the design effort will require 8 calendar weeks to complete.
We anticipate the construction period will take 24 weeks to complete

URS Corporation Architecture PC
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806

URS 031078

NON-CERTIFIED COPY

# ARCHITECTURAL DISCIPLINE LABOR BUDGET

| PROJECT: | New Facility Renovations and Additions | | DATE: | 2/14/2012 |
|---|---|---|---|---|
| CLIENT: | H & E Equipment Services - Belle Chasse, LA | | REVISION: | |
| PROJECT DESCRIPTION: | | PROJECT IS PROJECTED TO BE: | 6 WEEK (2MO) DESIGN | |
| | | | 24 WEEK (6 MO) CONSTRUCTION | |
| URS Proposal No. | | | BY: | Neal Johnson |

| TASK NO. | Task Name | PIC NJ $177 | PM NJ $169 | Architect TR $100 | Designer MH $75 | SR Engineer $120 | Engineer $80 | Drafting $65 | Admin LV $50 | Task Hours |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Project Management** | | | | | | | | | |
| | Set up project | 10 | 10 | | | | | | 10 | 30 |
| | Consultant coordination | 10 | 10 | | | | | | | 20 |
| | Review meetings with H & E - 2/mo @ 2 hrs ea | 32 | 32 | | | | | | | 64 |
| | Review meetings in-house - 1/wk @ 2hrs ea | 16 | 16 | 16 | | | | 36 | | 84 |
| | Manage process - 2 hrs / week | 32 | | | | | | 64 | | 96 |
| 2 | **Schematic Design** | | | | | | | | | |
| | (redacted) | | | | | | | | | |
| | Site Measurements | | | 16 | 16 | | | | | 32 |
| | Develop existing condition drawings | | | 20 | 20 | | | | | 40 |
| | (redacted) | | | | | | | | | |
| | Develop new entrances | 1 | | 4 | | 6 | 20 | 16 | | 47 |
| | Develop signage, flagpole, landscaping | | | | 8 | | | | | 8 |
| | Offsite Drainage improvements | | | 2 | 2 | 2 | 10 | 16 | | 32 |
| | Utility Plan / SITP | | | 2 | | 12 | 20 | 16 | | 50 |
| | Civil Details | | | 2 | | 1 | 2 | 3 | | 8 |
| | Review / Incorporate survey into project | | | 2 | 2 | | 3 | 6 | | 13 |
| | Develop master demolition plan | | | | 6 | | | | | 6 |
| | (redacted) | | | | | | | | | |
| | Master Plan Space | | | 2 | 4 | | | | | 6 |
| | Design new entrance doors | | | 2 | 2 | | | | | 4 |
| | Design new concrete apron | | | 2 | 2 | | | | | 4 |
| | Develop interior demolition plan | | | 2 | 4 | | | | | 6 |
| | Design new office area | | | 6 | 20 | | | | | 26 |
| | Design new break room / library / training area | | | 4 | 12 | | | | | 16 |
| | Design new locker / shower / restroom area | | | 4 | 8 | | | | | 12 |
| | (redacted) | | | | | | | | | |
| | Design new entrance doors | | | 2 | | | | | | 2 |
| | Design new concrete apron | | | 2 | | | | | | 2 |
| | Design new restroom area | | | 2 | 8 | | | | | 10 |
| | (redacted) | | | | | | | | | |
| | Design New Space | | | 6 | 6 | | | | | 12 |
| | (redacted) | | | | | | | | | |
| | Design New Space | | | 6 | 6 | | | | | 12 |
| | (redacted) | | | | | | | | | |
| | Design New Space | | | 6 | 6 | | | | | 12 |
| | (redacted) | | | | | | | | | |
| | SD base sheets - assume 6 architectural sheets | | | 2 | 6 | | | | | 8 |
| | Site Plan | | | 2 | 12 | | | | | 14 |
| | (redacted) | | | 2 | 12 | | | | | 14 |
| | (redacted) | | | | 4 | | | | | 4 |
| 3 | **Design Development** | | | | | | | | | |
| | Advance design of all drawings | | | 12 | 20 | | | | | 32 |
| | Outline Specifications | | | 4 | 12 | | | | | 16 |
| | Statement of Probable Cost | | | 4 | 4 | | | | | 8 |
| | Present package to owner | | 8 | 4 | | | | | | 12 |
| 4 | **Construction Documents** | | | | | | | | | |
| | Drawings | | | 40 | 80 | | | | | 120 |
| | Project Manual | | | 10 | 30 | | | | | 40 |
| | Specifications | | | 12 | 24 | 12 | 6 | | | 54 |
| | Statement of Probable Cost | | | 2 | 12 | | | | | 14 |
| | QA / QC - may be Dallas of Houston office | 12 | | | | | | | | 12 |
| 7 | **Permitting** | | | | | | | | | |
| | General | Levee Board | 4 | | | 8 | 24 | 5 | | | 41 |
| | LS SFM | 2 | | 10 | 10 | | | | | 22 |
| | City / Parish | 2 | | 10 | 10 | | | | | 22 |
| 5 | **Bidding and Negotiations** | | | | | | | | | |
| | Issue Plans | | | | 4 | | | | | 4 |
| | Prebid | | 8 | 8 | | 4 | | | | 16 |
| | Addendum | | | 4 | 4 | 4 | 5 | | | 17 |
| | Bid Opening | 1 | 1 | 2 | 0 | 1 | 1 | | | 6 |
| | Negotiation / Contract Prep | | 2 | 4 | | 1 | 4 | | | 11 |

NON-CERTIFIED COPY

URS 031079

## ARCHITECTURAL DISCIPLINE LABOR BUDGET

| PROJECT: | New Facility Renovations and Additions | | | | | | | | DATE: | | 2/14/2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CLIENT: | H & E Equipment Services - Belle Chasse, LA | | | | | | | | REVISION: | | |
| PROJECT DESCRIPTION: | | | | PROJECT IS PROJECTED TO BE: | | | | | 8 WEEK (2MO) DESIGN | | |
| | | | | | | | | | 24 WEEK (6 MO) CONSTRUCTION | | |
| URS Proposal No. | | | | | | | | | BY: | Neal Johnson | |

| TASK NO. | Task Name | PIC | PM | Architect | Designer | BR Engineer | Engineer | Drafting | Admin | Task Hours |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | NJ | 7R | MH | | | | LV | |
| | | $177 | $188 | $166 | $76 | $120 | $90 | $67 | $60 | |
| 8 | Construction Administration | | | | | | | | | |
| | Review Progress of Work - 5 -10 site visits | | 20 | 80 | | 20 | 10 | | | 130 |
| | Monthly Meetings (6 @ 5 hrs each) | 0 | 30 | 30 | 30 | | | | | 90 |
| | Shop Drawing Reviews | | | 32 | 60 | | | | | 92 |
| | Closeout | 0 | 4 | 24 | 12 | | | | | 40 |
| | Total Man-hours | 22 | 171 | 454 | 508 | 87 | 86 | 57 | 110 | 1,495 |
| | Total Labor | $3,894 | $26,882 | $45,241 | $38,100 | $10,440 | $6,880 | $3,591 | $5,500 | $142,528 |
| 9 | BR expenses | ea | | Units | | Units | | Units | | |
| | Airfare (per round trip) | 700.00 | | | | | | | | $ - |
| | Hotel (ea night) | 130.00 | | | | | | | | $ - |
| | Food (per diem) | 40.00 | 10 | | 10 | 10 | | | | $ 1,200 |
| | Ground Trans (day) | 75.00 | 10 | | 10 | 10 | | | | $ 2,250 |
| | Misc | 500.00 | 1 | | | | | | | $ 500 |
| | Total Facilities | | | | | | | | | $146,478 |
| | | 40 MH weeks | 0.55 | 4.275 | 11.35 | 12.7 | 2.175 | 2.15 | 1.425 | 2.75 | |
| 5 | Consultants | | | | | | base fee | | multiplier | |
| | Interior Design | TBD | | | | | | $ 500 | 1.1 | $ 550 |
| | Civil | URS BR - Tim Gaines | fee is calculated above | | | | | $ - | 1.1 | $ - |
| | Landscape | Benchmark | based on $25,000 allowance | | | | | $ 1,250 | 1.1 | $ 1,375 |
| | Structural | Southeast Engineers | | | | | | $80,000 | 1.1 | $ 88,000 |
| | Mechanical | Thompson Luke and Associates | | | | | | $14,500 | 1.1 | $ 15,950 |
| | Electrical | Craig Hebert Engineering | | | | | | $40,000 | 1.1 | $ 44,000 |
| | Misc | | | | | | | | | |
| | Total Consultants | | | | | | | | | $ 149,875 |
| | Total Fee | | | | | | | | | $296,353 |

URS 031080

NON-CERTIFIED COPY

1

1   **19TH JUDICIAL DISTRICT COURT**
2       **PARISH OF EAST BATON ROUGE**
        **STATE OF LOUISIANA**
3

4

5

6   H&E EQUIPMENT SERVICES, INC       *       DOCKET NO.
                                      *       626,308
    VERSUS                            *
7                                     *       SECTION:  "D"
    URS CORPORATION ARCHITECTURE,     *
8   P.C., URS CORPORATION, L.         *
    O'NEAL JOHNSON, AND THOMAS E.     *
9   RYAN, III                         *
                                      *
10  *   *   *   *   *   *   *   *   *   *

11

12

13

14

15          Deposition of NEAL JOHNSON, 668 South Foster
    Drive, Suite 101, Baton Rouge, Louisiana, 70806, taken
16  in the offices of Fishman Haygood, 201 St. Charles
    Avenue, 46th Floor, New Orleans, Louisiana,
17  70170-4600, commencing at 9:56 a.m., on Thursday, the
    4th day of August, 2016.

18

19

20

21  APPEARANCES:

22

23      FISHMAN HAYGOOD
        (By:  Brett B. Barriere, Esquire)
24      201 St. Charles Avenue
        46th Floor
25      New Orleans, Louisiana  70170-3500
            (Attorneys for the Plaintiff)



EXHIBIT
2

NON-CERTIFIED COPY

2

1    ADAMS AND REESE
      (By:  Philip A. Franco, Esquire)
2    4500 One Shell Square
      New Orleans, Louisiana  70139
3          (Attorneys for the Defendants)

4

5

6

7

8

9

10

11

12

13

14

15

16   REPORTED BY:

17          WENDY MAJORIA, CCR
            Certified Court Reporter
18          (No. 84106)
            Huffman & Robinson, Inc.
19          Suite 220, Metairie Office Tower
            433 Metairie Road
20          Metairie, Louisiana  70005
            (504) 831-1753/(800) 749-1753
21          (504) 831-1759/fax

22

23

24

25

NON-CERTIFIED COPY

3

# EXAMINATION INDEX

PAGE

EXAMINATION BY MR. BARRIERE....................6

# EXHIBIT INDEX

Johnson Exhibit No. 1........................52
    (E-Mail exchange between Leonard
    St. Germain and Mark Howard dated
    July 20th, 2006)

Johnson Exhibit No. 2........................69
    (95 Percent Construction Documents
    Permit Set)

Johnson Exhibit No. 3.......................101
    ( E-Mail from Neal Johnson to Rene Borrel)

Johnson Exhibit No. 4.......................102
    (Document titled "Meeting Agenda")

Johnson Exhibit No. 5.......................106
    (E-Mail exchange between Neal Johnson
    and Joseph Poitevin dated 2/27/09)

Johnson Exhibit No. 6.......................108
    (E-Mail exchange between Neal Johnson
    and Murray McCullough dated 5/6/11)

NON-CERTIFIED COPY

4

1   EXHIBITS (continued):

2

Johnson Exhibit No. 7.......................114
3         (E-Mail from Stephan Dorsey dated 6/6/13)

4

Johnson Exhibit No. 8.......................117
5         (E-Mail exchange concerning executive
           wall panels)
6

7   Johnson Exhibit No. 9.......................134
           (E-Mail from Frankie Wynn dated 6/11/13
8

9   Johnson Exhibit No. 10......................159
           (E-Mails between Neal Johnson and
10          Frankie Wynn in January of 2013)

11

Johnson Exhibit No. 11......................166
12         (Addendum to Terracon report dated
            August 5th, 2011
13

14  Johnson Exhibit No. 12......................168
           (Excerpt from the construction manual
15          for Kenner facility)

16

Johnson Exhibit No. 13......................170
17         (E-Mail exchange between James Brown,
            Frankie Wynn, Neal Johnson and Tim Gaines

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

5

1                   S T I P U L A T I O N

2

3

4        It is stipulated and agreed by and between

5   counsel for the parties hereto that the deposition of

6   the aforementioned witness is hereby being taken under

7   the Louisiana Code of Civil Procedure, Article 1421,

8   et seq., for all purposes, in accordance with law;

9        That the formalities of reading and signing are

10  specifically not waived;

11       That the formalities of filing, sealing and

12  certification are specifically waived;

13       That all objections, save those as to the form

14  of the question and the responsiveness of the answer,

15  are hereby reserved until such time as this

16  deposition, or any part thereof, may be used or sought

17  to be used in evidence.

18

19                *       *       *       *

20

21     WENDY MAJORIA, Certified Court Reporter, State

22  of Louisiana, officiated in administering the oath to

23  the witness.

24

25

NON-CERTIFIED COPY

6

1                  NEAL JOHNSON,

2  after having been first duly sworn by the above-

3  mentioned Certified Court Reporter, was examined and

4  testified as follows:

5  EXAMINATION BY MR. BARRIERE:

6        Q.    Good morning, Mr. Johnson.  We met earlier

7  in the week.  I'm Brett Barriere and I represent H&E

8  in this litigation.  I'll be taking your deposition

9  today.

10             Could you state your full name and

11  address, for the record, please, sir.

12        A.    Larry O'Neal Johnson.  Work address is 668

13  South Foster Drive, Suite 101, Baton Rouge, Louisiana,

14  70806.

15        Q.    Mr. Johnson, have you previously been

16  deposed?

17        A.    Yes.

18        Q.    So you understand this is as if you're

19  testifying in a court of law.  You're under oath.  If

20  at any point during the course of the deposition you

21  find my questions ambiguous or confusing or somehow

22  otherwise unintelligible, please advise me.  I'll

23  attempt to restate them in a clearer fashion.

24             If at some point during the course of the

25  day you need a break, please tell me and we'll attempt

NON-CERTIFIED COPY

7

1  to accommodate you.

2          By whom are you employed, sir, at this

3  time?

4      A.    I'm self-employed.  Neal Johnson, LLC.

5      Q.    What is the business of Neal Johnson, LLC?

6      A.    I am a practicing architect.  My focus is

7  primarily roofing, building envelope, commercial

8  buildings, condition assessment studies of existing

9  buildings and forensic architecture, construction

10  expert testimony, litigation work.

11      Q.    Have you acted as an expert witness in any

12  litigation?

13      A.    Yes.

14      Q.    On how many occasions?

15      A.    About ten times.

16      Q.    When did you form Neal Johnson, LLC?

17      A.    I registered with the State in 2007.

18      Q.    You were employed by URS at some point; is

19  that correct?

20      A.    Yes.

21      Q.    Over what time frame, sir?

22      A.    2007 to 2014.

23      Q.    All right.  When you left URS in 2014, did

24  you become actively involved with Neal Johnson, LLC at

25  that time?

NON-CERTIFIED COPY

116

1    Q.    Yes, sir.

2    A.    No, sir.

3    Q.    Did you inquire of anyone at Benchmark

4  about whether it had referenced this guide in

5  connection with its work on the Baton Rouge project?

6    A.    No, sir.

7    Q.    Okay.  As I understand -- we'll get there

8  a little later in the deposition -- the design work

9  for the Kenner project was performed by someone at

10  URS; is that correct?

11    A.    Yes.

12    Q.    The yard there was designed by Mr. Gaines;

13  is that correct?

14    A.    Yes.

15    Q.    All right.  Do you have any knowledge as

16  to whether Mr. Gaines referenced this guide in

17  connection with his work?

18    A.    No.

19    Q.    Sir, do you recall there being an issue

20  with respect to the wall panels in the executive area

21  of the H&E headquarters building?

22    A.    Yes.

23    Q.    How would you describe that?  There was a

24  problem with those panels, was there not?

25    A.    There was a construction defect with the

NON-CERTIFIED COPY

117

1 installation.

2      Q.   Tell me about that.  How would you

3 describe it?

4      A.   I have to look in the documents.  It's

5 something regarding the finish.  There was natural

6 wood material, plywood-type material, very expensive

7 plywood.  And there was a stain finish.  And after the

8 stain finish was applied -- I believe the sealer on

9 top of the stain was being applied and the plywood

10 began to change shape, the laminate.  There was some

11 defect in the look of it.  And we questioned it.

12      Q.   Let me show you a document I'll mark as

13 Johnson No. 7.

14           Do you recall that e-mail exchange?

15      A.   I do.

16 MR. FRANCO:

17           You labeled this as 7?

18 MR. BARRIERE:

19           I have.

20 THE WITNESS:

21           Seven was the Dorsey e-mail.

22 MR. BARRIERE:

23           Let's take this off and put another on.

24           (Whereupon, the document as described

25 above is so marked as "Exhibit No. 8" for

NON-CERTIFIED COPY

118

1  identification.)

2       THE WITNESS:

3           Dale Phillips and Greg Gauthier.

4  EXAMINATION BY MR. BARRIERE:

5       Q.    Who are they?

6       A.    That's the two gentlemen with Womack.

7  Greg Gauthier was the quality control guy.

8       Q.    All right.  Do you recognize this to be an

9  e-mail exchange you had with Frankie Wynn and others

10 concerning those executive wall panels?

11      A.    Yes.

12      Q.    In the second-to-last e-mail, Mr. Wynn

13 writes to you on April 16, 2013.  He said, "The

14 attached would look to me like Womack is contending

15 there was a design defect.  They have said they

16 installed as designed and did not work."

17           You write back on April 16th, 2013 at

18 11:38 p.m., "At this time we have no comment."

19           Do you see where I'm referring to?

20      A.    Yes.

21      Q.    Did you ever provide him a written

22 comment?

23      A.    Yes.

24      Q.    Okay.  Can you tell us, was that in the

25 form of an e-mail or a letter?

NON-CERTIFIED COPY

119

1      A.    I'd have to review the documents.

2      Q.    Do you have any --

3      A.    It could have been on the punch list.  I'd

4  have to see the documents.  I remember it was an issue

5  and it was eventually resolved.  I don't remember all

6  the events that happened between the two without

7  seeing the documents.

8      Q.    Was there a cost involved to resolve it?

9      A.    Yes.

10     Q.    Do you recall who paid that?

11     A.    H&E.

12     Q.    As you sit here today, you believe you

13  provided a written response at some juncture as

14  requested by Mr. Wynn?

15     A.    I didn't respond directly to Mr. Wynn.  I

16  believe that we documented it in the course of our

17  normal observation reports or the punch list.  Because

18  this was at the end of the project when the office was

19  being finished out, office area, the executive suite.

20          So it would have either been in a punch

21  list or an observation report or some other document.

22  I didn't write:  Mr. Wynn, here's our answer.

23     Q.    Do you believe there was ever a writing,

24  whether an observation report or a punch list report,

25  provided to Mr. Wynn that provided a response?

NON-CERTIFIED COPY

120

1      A.    Yes.  Any of those documents would have
2 been copied to him.
3      Q.    Do you recall there being an issue that
4 arose at the time or about the time that the
5 headquarters building opened that there were an
6 inadequate number of parking spaces?
7      A.    Yes.
8      Q.    What do you recall about that?
9      A.    I received either an e-mail or a phone
10 call from Johnny Jones.  It was in the morning.  I
11 don't remember the date.  I believe it was an e-mail.
12 It said:  It appears we don't have enough parking.
13 John Engquist is going ballistic.  You need to get
14 over here.
15      Q.    John Engquist?
16      A.    Yes.
17      Q.    Did you go over there?
18      A.    I believe we met at 11 o'clock that
19 morning.
20      Q.    What did you discuss?
21      A.    I didn't discuss anything.  I sat there
22 and got my head MF'd about a hundred times.
23      Q.    About the lack of parking spaces?
24      A.    Parking was the focus of the -- I don't
25 know the right, polite choice of words, but it was not

NON-CERTIFIED COPY

127

1  at URS whether anyone, prior to your arrival, had

2  received instructions from H&E concerning its parking

3  needs or had otherwise had any discussion with anyone

4  at H&E concerning H&E's perceived parking?

5       A.    No.

6       Q.    Now, at some point as this parking debate

7  was ongoing, did you remove yourself from that debate

8  and let someone else take over on behalf of URS?

9       A.    No.  I involved Thomas Ryan, but I stayed

10  involved.

11       Q.    Did Debra Sanders get involved?

12       A.    She was made immediately aware of it as

13  protocol in the office, also due to the fact that we

14  had been told, and then we had an e-mail follow-up,

15  that all outstanding balances owed to URS would be

16  suspended on all of the projects.  I have an

17  obligation to tell my boss that.  At that time, she

18  was my boss.

19       Q.    Prior to that eruption, had Ms. Sanders

20  had any involvement in the Baton Rouge project?

21       A.    Prior to --

22       Q.    The blowup over the parking.

23       A.    Just in management oversight of the

24  financial records for URS in-house, tracking the

25  projects, project expenses and costs and profits or

NON-CERTIFIED COPY

134

1 your way.

2      A.    The as builts may show that.  They might

3 show that additional parking.

4      MR. BARRIERE:

5          I'm going to keep moving along.  The hour

6 grows late and the number of parking spots is going to

7 remain the same.

8              Off the record.

9              (Whereupon, there was a discussion off the

10 record.)

11 EXAMINATION BY MR. BARRIERE:

12      Q.    Let me show you what we're going to mark

13 as Exhibit No. 9 to the deposition, an e-mail string

14 commencing with Mr. Wynn's e-mail of June 6th and

15 concluding with an e-mail from you to Mr. Wynn on

16 June 11th.

17              (Whereupon, the document as described

18 above is so marked as "Exhibit No. 9" for

19 identification.)

20 EXAMINATION BY MR. BARRIERE:

21      Q.    I'll ask you if you recall this e-mail

22 exchange.

23      A.    Yes, sir.

24      Q.    Mr. Wynn writes to you, among many, on

25 June 6th enclosing the latest recommendation to remedy

NON-CERTIFIED COPY

135

1 the expansion/construction joint issues.  Unacceptable

2 to H&E for several reasons, including the cost.  He

3 goes ahead and asks for additional input as to

4 solutions to the situation.

5         Do you see what I'm referring to?

6     A.    Yes, sir.

7     Q.    Okay.  On the 6th, approximately two hours

8 later, you write back, "We will review the

9 recommendation with Benchmark Group (our civil

10 engineer of record) and request their opinion.

11 Regarding the request that URS participate in the cost

12 of this work, this request will be forwarded to URS

13 management for their directive."

14         Did I read that correctly?

15     A.    Yes, sir.

16     Q.    Tell me what you recall, if anything,

17 concerning the discussion you had with Benchmark Group

18 following your e-mail of June 6th, 2013?

19     A.    We shared with -- I shared with Murray

20 McCullough the current status of the conditions and

21 the process and procedure that H&E had chosen to, in

22 their mind, rectify the situation and asked for his

23 feedback and opinion.

24     Q.    What did he tell you?

25     A.    He provided a -- I don't remember the

(504)831-1753
433 METAIRIE ROAD, #220
HUFFMAN & ROBINSON, INC.
CERTIFIED COURT REPORTERS
(800)749-1753
METAIRIE, LA  70005

NON-CERTIFIED COPY

159

1          Sure.  I will impose on you to shoot me an

2    e-mail, so that way I won't forget.

3         MR. FRANCO:

4              Okay.

5    EXAMINATION BY MR. BARRIERE:

6         Q.    Who was your principal contact at H&E for

7    the Kenner job?

8         A.    Initially, it was Leonard St. Germain and

9    then a combination of Frankie Wynn and Johnny Jones.

10        Q.    I'll show you what I have marked as

11   Exhibit No. 10.

12              (Whereupon, the document as described

13   above is so marked as "Exhibit No. 10" for

14   identification.)

15   EXAMINATION BY MR. BARRIERE:

16        Q.    This is a series of e-mails between

17   yourself and Mr. Wynn in January of 2013.  Do you

18   recall this exchange, sir?

19        A.    Yes.

20        Q.    You conclude, "Frankie:  Please find

21   attached what appears to be all current URS/H&E base

22   agreements.  Project agreements to be e-mailed

23   separately."

24              What distinguishes a base agreement from a

25   project agreement?

NON-CERTIFIED COPY

160

1    A.    URS utilized a document called PSA -- I
2 believe it stands for Professional Service
3 Agreement -- that is not project specific but does
4 spell out terms and conditions and fairly common items
5 that go in a contract between two companies.

6              Then, subsequent to that, each individual
7 project would be proposed through a letter proposal or
8 some type of document.  And upon approval or
9 agreement, which is usually the fee and the scope of
10 work, a document referred to as a work order, a WO
11 with a number, would be assigned to each individual
12 project.  And attached to that would be -- typically
13 would be the scope and fee agreement and anything
14 unique to that particular project.

15    Q.    As you understand it -- I recognize you're
16 not a lawyer.  As you understand it, we have sort of
17 this base Professional Services Agreement, which
18 spells out general terms and conditions between one
19 party and URS, and then the actual work to be
20 performed under that umbrella agreement is detailed in
21 a work order?  Is that a fair summary?

22    A.    Yes.

23    Q.    The two base agreements you attached were
24 the agreement dated August 28, 2006 and then another
25 agreement dated August 13, 2009.

NON-CERTIFIED COPY

161

1      A.    The date of the first agreement was?

2      Q.    August 6th, 2006.  I'm sorry.

3 August 28, 2006.  Correct?

4      A.    Yeah, 28 and August 13th, 2009.  Correct.

5      Q.    Was it your understanding that the

6 agreement for professional services of August 28, 2006

7 had been executed in connection with URS and H&E

8 agreeing that URS would take on the Baton Rouge

9 project?

10     A.    I don't think this particular document

11 referenced any particular project.  I wasn't there

12 when this was put together.

13     Q.    Fair enough.

14         Let me offer, if I may, to you what was

15 previously marked as Ryan 13, which is the Kick-off

16 Meeting Minutes for the Kenner project, correct?

17     A.    Yes.

18     Q.    Okay.  And listed as attendees for URS are

19 yourself, Mr. Gaines and Mr. Ryan.  Who is Bill Temple

20 and why did he attend?

21     A.    Bill Temple was a representative of

22 Southeast Engineers, who was to be the URS structural

23 engineer consultant.

24     Q.    Okay.  How about Michael Perkins?

25     A.    Michael Perkins was representative of a

NON-CERTIFIED COPY

1   Mr. Gaines?

2        A.    I do.

3        Q.    Okay.  Fair enough.

4              Let me show you next what has previously

5   been identified as Ryan No. 9.  It's an e-mail

6   exchange between Mr. Wynn and Mr. Thomas.  I believe

7   you are cc'd on both.

8              My first question is, do you recall

9   receiving that?

10       A.    Yes.

11       Q.    Mr. Wynn -- Mr. Thomas writes and suggests

12  that there be a final walkthrough.  And Mr. Wynn

13  replies on May 13th, "After reconsideration, due to

14  the unresolved issues with paving, acoustical panels

15  in the core, paneling in the Executive Area, roof

16  leaks, etc., I feel it would be fruitless to perform a

17  'final' walkthrough at this time."

18             This document may relate to Baton Rouge;

19  is that correct?

20       A.    Yes, sir.  This relates to Baton Rouge.

21       Q.    Okay.  Fair enough.

22             Was cracking and spalling a punch list

23  item in the Kenner facility?

24       A.    Yes.

25       Q.    Let me show you next a document I'll mark

NON-CERTIFIED COPY

173

1  keeping the area clean, basically; is that correct?

2      A.    Yes.

3      Q.    Anything else?

4      A.    Not that I recall.

5      MR. BARRIERE:

6          Let's go off the record.

7          (Whereupon, there was a discussion off the

8  record.)

9  EXAMINATION BY MR. BARRIERE:

10      Q.    Do you recall approximately the amount of

11  time that passed between the concrete being poured and

12  cured at Kenner and when spalling and cracking first

13  became noticeable?

14      A.    Kenner, we're talking about?

15      Q.    Yes.

16      A.    Instantly.

17      Q.    Did you discuss with anyone from MAPP why

18  spalling and cracking had appeared almost instantly?

19      A.    No.

20      MR. BARRIERE:

21          Phil, let's take two minutes, because I

22  may be done with this gentleman and I want to look at

23  my notes.

24      MR. FRANCO:

25          All right.

NON-CERTIFIED COPY

| | |
|---|---|
| **From:** | Frankie Wynn |
| **Sent:** | Tuesday, June 11, 2013 1:25 PM |
| **To:** | John Jones; Dorsey, Stephan |
| **Subject:** | FW: H&E Equipment Services, Inc. / Expansion/Construction Joint Issues |

Frankie Wynn
Director of Facilities/Risk/Compliance Management
H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA 70809 (New Address)
Office: 225-298-5229
Mobile: 225-603-4438
Fax: 225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com

-----Original Message-----
From: Johnson, Neal [mailto:neal.johnson@urs.com]
Sent: Tuesday, June 11, 2013 12:26 PM
To: Frankie Wynn
Subject: RE: H&E Equipment Services, Inc. / Expansion/Construction Joint Issues

URS management is having a conference call this afternoon about the H&E Baton Rouge Branch pavement. If I am directed, I will share the outcome. If not, I will let you know that I do not know.
Neal

-----Original Message-----
From: Frankie Wynn [mailto:fwynn@he-equipment.com]
Sent: Tuesday, June 11, 2013 11:17 AM
To: Johnson, Neal
Cc: Dorsey, Stephan; Ryan, Thomas E; John Jones; Murray L. McCullough (murray@benchmarkgroupllc.com)
Subject: RE: H&E Equipment Services, Inc. / Expansion/Construction Joint Issues

Do you know when we will have an answer? We need to move forward on getting this issues addressed.

Frankie Wynn
Director of Facilities/Risk/Compliance Management H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA 70809 (New Address)
Office: 225-298-5229

1

Johnson
EXHIBIT NO. 9
HUFFMAN & ROBINSON, INC.
COURT REPORTERS

NON-CERTIFIED COPY

H&E 0033078

Mobile: 225-603-4438
Fax: 225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com


-----Original Message-----
From: Johnson, Neal [mailto:neal.johnson@urs.com]
Sent: Thursday, June 06, 2013 10:21 AM
To: Frankie Wynn
Cc: Dorsey, Stephan; Phillips, Dale (dphillips@mjwomack.com); Gauthier, Greg (ggauthier@mjwomack.com);
pbonner@mjwomack.com; Ryan, Thomas E; Sanders, Debra; John Jones; Murray L. McCullough
(murray@benchmarkgroupllc.com); Hill, Terry
Subject: RE: H&E Equipment Services, Inc. / Expansion/Construction Joint Issues

Frankie:
We will review the recommendation with Benchmark Group (our civil engineer of record) and request their
opinion.
Regarding the request that URS participate in the cost of this work, this request will be forwarded to URS
management for their directive.
Sincerely,
Neal Johnson


-----Original Message-----
From: Frankie Wynn [mailto:fwynn@he-equipment.com]
Sent: Thursday, June 06, 2013 7:56 AM
To: Dorsey, Stephan; Phillips, Dale (dphillips@mjwomack.com); Gauthier, Greg (ggauthier@mjwomack.com);
pbonner@mjwomack.com; Ryan, Thomas E; Johnson, Neal; Sanders, Debra; John Jones
Subject: H&E Equipment Services, Inc. / Expansion/Construction Joint Issues

Attached is the latest recommendation to remedy the Expansion/Construction Joint issues at the H&E Baton
Rouge Branch. This recommendation is unacceptable to H&E for several reasons, not the least of which is the
cost. As the cause of this problem cannot be agreed upon by Womack or URS, I would suggest that both parties
agree to share the costs equally. All parties knew well in advance of design and installation of the paved area,
the intended use. All parties were asked throughout the project for any and all suggestions in all areas of design
and construction to voice any and all concerns and make recommendations. I do not recall any alternatives to
the design and installation that were not followed by H&E.

As this issue will not correct itself and by its very nature grows worse each day, time is of the essence.
Let me know your solution as soon as possible.

Thank you

Frankie Wynn
Director of Facilities/Risk/Compliance Management H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA  70809  (New Address)
Office: 225-298-5229
Mobile: 225-603-4438

2

NON-CERTIFIED COPY

Fax: 225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

3

NON-CERTIFIED COPY

H&E 0033080

1

1    19TH JUDICIAL DISTRICT COURT
2    FOR THE PARISH OF EAST BATON ROUGE
     STATE OF LOUISIANA

3

4    H&E EQUIPMENT SERVICES, INC.
                              DOCKET NO. 626,308
5    VERSUS
                              SECTION "D"
6    URS CORPORATION ARCHITECTURE,
     P.C., URS CORPORATION, L. O'NEAL
7    JOHNSON, AND THOMAS E. RYAN, III

8

9

10

11   Deposition of CHAD HERNDON, 18723 Manchac Highlands
     Drive, Prairieville, Louisiana 70769, taken in the
12   offices of Fishman Haygood, LLP, 201 St. Charles
     Avenue, 46th Floor, New Orleans, Louisiana 70170,
13   commencing at 9:36 a.m., on Monday, the 1st day of
     August, 2016.

14

15

16

17

18   APPEARANCES:

19

20       FISHMAN HAYGOOD, LLP
         (By:  Loretta G. Mince, Esquire)
21       201 St. Charles Avenue, 46th Floor
         New Orleans, Louisiana  70170-4600

22           ATTORNEYS FOR THE PLAINTIFF

23

24

25



EXHIBIT
3

(504)831-1753                 HUFFMAN & ROBINSON, INC.
433 METAIRIE ROAD, #220       CERTIFIED COURT REPORTERS

NON-CERTIFIED COPY

2

1    APPEARANCES CONTINUED:

2

3            ADAMS AND REESE, LLP
             (By:  Philip A. Franco, Esquire)
4            701 Poydras Street, Suite 4500
             New Orleans, Louisiana  70139
5
                     ATTORNEYS FOR THE DEFENDANTS
6

7

8

9

10

11

12

13

14

15

16

17   REPORTED BY:

18            Deanna Mancuso
              Certified Court Reporter
19            Huffman & Robinson, Inc.
              Suite 220, Metairie Office Tower
20            433 Metairie Road
              Metairie, Louisiana  70005
21            (504) 831-1753   (800) 749-1753

22

23

24

25

NON-CERTIFIED COPY

3

```
1                        I-N-D-E-X

2

3    EXAMINATION BY:                          PAGE

4      MS. MINCE                                6

5

6

7

8

9    EXHIBITS:

10

11   Exhibit 1 .............................19
       E-mail with H&E Phase I proposal
12     Bates labeled H&E 5154 through 5157

13   Exhibit 2 .............................42
       E-mail with H&E Phase II proposal
14     Bates labeled H&E 5226 through 5229

15   Exhibit 3 .............................45
       E-mail dated February 6, 2007
16     Bates labeled H&E 5163

17   Exhibit 4 .............................50
       Letter dated July 2, 2008
18     Bates labeled H&E 6815 through 6817

19   Exhibit 5 .............................57
       E-mail dated July 23, 2008
20     Bates labeled URS 59032

21   Exhibit 6 .............................63
       Letter dated July 27, 2009
22     Bates labeled URS 38163 and 38164

23

24

25
```

NON-CERTIFIED COPY

4

1  EXHIBITS CONTINUED:                          PAGE

2

3  Exhibit 7 ..............................68
       E-mail with Short Form Agreement
4      for Professional Services and
       attachments Bates labeled
5      URS 38165 through 38174

6  Exhibit 8 ..............................69
       Letter dated October 12, 2010
7      Bates labeled URS 55534

8  Exhibit 9 ..............................73
       E-mail chain Bates labeled
9      H&E 65034 and 65035

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

5

1                 S-T-I-P-U-L-A-T-I-O-N

2

3             It is stipulated and agreed by and between

4    counsel for the parties hereto that the deposition

5    of the aforementioned witness is hereby being taken

6    under the Louisiana Code of Civil Procedure, Article

7    1421, et seq., for all purposes, in accordance with

8    law;

9             That the formalities of reading and

10   signing are specifically not waived;

11            That the formalities of filing, sealing,

12   and certification are specifically waived;

13            That all objections, save those as to the

14   form of the question and the responsiveness of the

15   answer, are hereby reserved until such time as this

16   deposition, or any part thereof, may be used or

17   sought to be used in evidence.

18

19             *        *        *        *

20

21            Deanna Mancuso, Certified Court Reporter,

22   in and for the State of Louisiana, officiated in

23   administering the oath to the witness.

24

25

NON-CERTIFIED COPY

6

1                    CHAD HERNDON,

2  after having been first duly sworn by the above-

3  named certified court reporter, was examined and

4  testified as follows:

5  EXAMINATION BY MS. MINCE:

6        Q.    Good morning.

7        A.    Good morning.

8        Q.    We met a few minutes ago.  I'm Lori Mince.

9  I represent H&E Equipment in a lawsuit that's been

10 brought against URS.

11       A.    Okay.

12       Q.    You've been asked to appear, and thank you

13 for agreeing to appear here today.  I understand

14 you're not employed by URS anymore; is that correct?

15       A.    Correct.

16       Q.    Have you ever given a deposition before?

17       A.    Once.

18       Q.    In what kind of case?

19       A.    It was another case dealing with some

20 damage to some construction equipment.

21       Q.    Who was the plaintiff who was bringing the

22 case?

23       A.    It was a -- the company I was working for,

24 a company that sells and services construction

25 equipment.

NON-CERTIFIED COPY

7

1      Q.    Okay.  And is that Scott Equipment?

2      A.    Yes.

3      Q.    So Scott Equipment was bringing a case for

4  damage to construction equipment against who?

5      A.    A contractor that had rented it.

6      Q.    All right.  So you may remember from the

7  last time you gave your deposition, I'm just going

8  to ask a series of questions and you provide answers

9  to the best of your knowledge.  If you don't

10  understand one of my questions, just tell me that

11  and I'll try to rephrase it or give you more

12  information.  All right?

13      A.    Okay.

14      Q.    If you want to take a break at any time,

15  let me or Phil know that you want to take a break.

16      A.    Okay.

17      Q.    All right.  And if you have any questions

18  as we go through this about timing or process,

19  whatever, just let me know.

20      A.    Okay.  Will do.

21      Q.    What's your educational background?

22      A.    Attended high school and college.

23      Q.    What was your degree in in college?

24      A.    Business.

25      Q.    Where did you get that degree?

NON-CERTIFIED COPY

41

1      A.    He was hired as the principal architect in

2  the Baton Rouge office.   And this project, as you

3  can see, was divided into phases; and his starting

4  URS aligned with the start of another phase of the

5  project and so he took over the role as the

6  principal lead design architect from Mr. Van Hattum.

7      Q.    So that was after the completion of Phase

8  I?

9      A.    I don't know -- I don't recall if it was

10  after the completion of Phase I.   I don't recall

11  specifically.

12      Q.    It could have been during Phase I.   Is that

13  what you're saying?

14      A.    It could have been.   I don't -- I mean, to

15  that specific if you're asking if it was after the

16  completion of Phase I, I don't recall that.   That's

17  a specific time and everything, so I don't recall if

18  it was -- when that happened, after that or before

19  it was done, I don't recall.

20      Q.    All right.   There's a reference in this

21  proposal to a geotechnical report.   Do you have any

22  understanding of why a geotechnical report would be

23  needed for this project?

24      A.    It's a soils investigation that's required

25  to do the foundation design, the structural design.

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


* * * * * * * * *
                          *
H&E EQUIPMENT SERVICES    *
                          * NUMBER 626,308
VERSUS                    *
                          * DIVISION "D"
URS CORPORATION           *
ARCHITECTURE, P.C., URS   *
CORPORATION, L O'NEAL     *
JOHNSON AND THOMAS E.     *
RYAN, III                 *
                          *
* * * * * * * * *




            Deposition of JOHN ENGQUIST, taken

on Friday, August 5, 2016, commencing at 9:59

a.m., in the offices of Adams and Reese, LLP,

Attorneys at Law, 450 Laurel Street, Suite 1900,

Baton Rouge, Louisiana, 70801.

NON-CERTIFIED COPY

EXHIBIT

4

1                    I N D E X

2

3                                        Page

4

   Caption                              1
5  Index of Exhibits                    3
   Appearances                          4
6  Agreement of Counsel                 5

7  Examination

8     PHILIP A. FRANCO, ESQ.            6

9

              *   *   *   *   *
10

   Witness' Certificate               94
11 Reporter's Page                    95
   Certificate                        96
12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 3

1                INDEX OF EXHIBITS

2

Number                                    Page

3

    1 Agreement for Professional          20
4       Services between H&E Equipment
        Services and URS 8/30/06
5

    2 A-4 Application Site Plan, City     27
6       of Baton Rouge October 18, 2006
        H&E 0000109-0000113
7

    3 July 10, 2008 string from           38
8       Brad Barber to John Engquist
        H&E 0002958-0002960
9

    4 Short Form Master Agreement For     40
10      Professional Services between
        H&E Equipment Services and URS
11      August 13, 2009

12  5 December 18, 2009 Email string      44
        from Leonard St. Germain to
13      Neil Favre
        H&E 0005870-0005871
14

    6 May 3, 2011 letter from Neal        46
15      Johnson to Bob Morris, et al
        H&E 0003392-0003393
16

    7 November 27, 2012 Email from Becky  52
17      Walker to Neal Johnson, et al
        H&E 0003177-0003178
18

    8 January 2, 2013 Email string from   68
19      Brad Barber to John Engquist
        H&E 0003083-0003085
20

    9 January 19, 2013 Email from Brad    71
21      Barber to John Engquist
        H&E 0003179-0003186
22

    10 February 5, 2013 Email string from 80
23       Brad Barber to John Engquist
         H&E 0003198-0003200
24

25

NON-CERTIFIED COPY

Page 4

1    APPEARANCES:

2

        Representing the Plaintiff:
3
        FISHMAN HAYGOOD, LLP
4       Attorneys at Law
        201 St. Charles Avenue, Suite 4600
5       New Orleans, Louisiana  70170

6       BY:  BRENT B. BARRIERE, ESQ.

7

8

9       Representing the Defendant:

10      ADAMS AND REESE, LLP
        Attorneys at Law
11      4500 One Shell Square
        New Orleans, Louisiana  70139
12
        BY:  PHILIP A. FRANCO, ESQ.
13           KELLEN J. MATHEWS, ESQ.

14
     ALSO PRESENT:
15

16      Representing H&E Equipment Services:

17      JOHN A. BERRY, ESQ.
        Corporate Counsel
18      7500 Pecue Lane
        Baton Rouge, Louisiana  70809
19
        Neal Johnson
20
     Reported by:
21            KAY E. DONNELLY
              Certified Court Reporter
22            State of Louisiana

23

24

25

NON-CERTIFIED COPY

Page 5

1                    S T I P U L A T I O N

2

3          It is stipulated and agreed by and between

4    counsel that the deposition of JOHN ENGQUIST is

5    hereby being taken under the Louisiana Code of

6    Civil Procedure in accordance with the Code.

7          The formalities of sealing and

8    certification are hereby waived.  The witness

9    will reserve the right to read and sign the

10   deposition.  The party responsible for service

11   of the discovery material shall retain the

12   original.

13         All objections, save those as to the form

14   of the questions, are hereby reserved until such

15   time as this deposition, or any part thereof,

16   may be used or sought to be used in evidence,

17   and are to be made in accordance with the Code

18   of Civil Procedure.

19                    *   *   *   *   *

20         KAY E. DONNELLY, Certified Court Reporter,

21   in and for the State of Louisiana, officiated in

22   administering the oath to the witness.

23

24

25

NON-CERTIFIED COPY

Page 6

1          JOHN ENGQUIST, H&E Equipment Services,

2     7500 Pecue Lane, Baton Rouge, Louisiana, 70809,

3     after having been first duly sworn, testified on

4     his oath as follows:

5     EXAMINATION BY MR. FRANCO:

6          Q.  Would you state your full and mane

7     address for the Record, please?

8          A.  John Engquist, 525 Lafayette Street,

9     Apartment 912, Baton Rouge.

10         Q.  Mr. Engquist, have you ever been deposed

11    before?

12         A.  Yes.

13         Q.  So you understand the routine?

14         A.  I do.

15         Q.  All right.  If you don't understand a

16    word I am using or the question, just let me

17    know, and I'll try to rephrase that.

18             Otherwise, I'll assume that you

19    understand my --

20         A.  Sure.

21         Q.  Prior to your deposition today, did you

22    review anything to prepare for your deposition?

23         A.  I did not.

24         Q.  Did you speak to anyone in order to

25    prepare for your deposition, other than your

NON-CERTIFIED COPY

Page 7

1    attorneys?

2        A.  No.

3        Q.  Can you give me your educational

4    background, sir?

5        A.  I went to high school, Baton Rouge High.

6    I went to LSU for three years, and went to work

7    at H&E Equipment.

8        Q.  Did you attain any degree?

9        A.  No.

10       Q.  And you said you went to work directly

11   to H&E?

12       A.  That is correct.

13       Q.  And what was your first position at H&E?

14       A.  Mechanic's helper.

15       Q.  And who hired you?

16       A.  The service manager.

17       Q.  What was the business of H&E at the

18   time?

19       A.  We were a heavy construction equipment

20   distributor.

21       Q.  And your father was involved?

22       A.  That is correct.  He founded the

23   business.

24       Q.  And at the time you started working

25   there, what was your father's role in the

NON-CERTIFIED COPY

Page 34

1          The site proposal that I showed you just

2     now was dated in 2006.  That is when the

3     discussion started about the development of the

4     Baton Rouge site, correct?

5          A.  I would assume that is correct.

6          Q.  All right.  And there was some work done

7     by URS in connection with the development of the

8     site contemporaneously at that time, correct?

9          A.  I couldn't argue that.  Sure.

10         Q.  That is fine.

11              There came a time when that concept of

12    developing the Baton Rouge site was put on hold

13    by H&E; is that correct?

14         A.  That is correct.

15         Q.  Do you remember what time period that

16    was?

17         A.  I am assuming.  I don't -- I don't know

18    exact -- I am assuming it was probably in '08

19    during the -- you know, during the depths of the

20    recession, and we elected to put the project on

21    hold.

22         Q.  And can you tell me the reason it was

23    put on hold?

24         A.  Yeah.  We were in the midst of a -- you

25    know, the biggest recession our sector had ever

NON-CERTIFIED COPY

1  seen, and we elected to conserve cash, as

2  opposed to proceeding with it.

3      Q.  Do you remember when it was put back on

4  the front burner?

5      A.  This is somewhat of an educated guess.

6  I think it was probably in the '11 timeframe.

7      Q.  That long of a period of --

8      A.  Yeah, I -- we wouldn't have started the

9  project in '10.  That is kind of when our sector

10 bottomed down.  So I'm assuming it was in 2011.

11     Q.  Whose decision was it, at that time, to

12 start proceeding again with it?

13     A.  Probably my decision.  Ultimately, it

14 was my decision, but there was other people

15 involved with that.

16     Q.  Okay.  Did you need board approval for

17 that?

18     A.  Whether or not I needed board approval,

19 I am sure I ran it by the board.

20     Q.  How often does H&E have board meetings?

21     A.  Quarterly.

22     Q.  Quarterly only?

23     A.  Uh-huh (affirmative response).

24     Q.  And there are minutes kept of the board

25 meetings, I presume?

NON-CERTIFIED COPY

Page 71

1              It is now, yeah.

2    EXAMINATION BY MR. FRANCO:

3       Q.  Did you have 205 staff people at that

4    time?

5       A.  I don't recall what our headcount was at

6    that time.

7       Q.  Okay.  I'm sorry.  I know my order here.

8       A.  No problem.  Are we through with this?

9       Q.  Yes.  All right.

10         MR. FRANCO:

11              Next I am going to show you a

12    document I am going to label as Exhibit 9.

13    EXAMINATION BY MR. FRANCO:

14       Q.  This is bids to put that Phase 1 of

15    parking in, correct?

16       A.  All right.

17       Q.  And it looks like the bid was from

18    Womack at $129,730.  You see that total?

19       A.  I do.

20       Q.  Did you approve that?

21       A.  I -- I assume we did, yes.

22       Q.  Now, Mr. Engquist, is it fair to say,

23    sir, that if you wanted to add 52 extra spaces

24    originally, you would have had to pay for 52

25    extra spaces?  Fair statement?

NON-CERTIFIED COPY

1    A.  Yeah.  I don't know what the

2  relationship would have been if they had done it

3  to begin with versus having to go back and do

4  it.

5    Q.  Right.

6    A.  I mean, there is a -- there is no

7  correlation there.

8    Q.  And I understand.  I'm not going to ask

9  you about specific numbers at this point.

10        But the concept is if you believed you

11  needed 52 extra spaces, you would have had to

12  pay for that originally, wouldn't you?

13    A.  It would have cost something, yes.

14    Q.  And so this 130,000 includes some amount

15  that you would have had to pay originally.

16  Isn't that a fair statement?

17    A.  Yes.  But I am sure it wasn't anything

18  like that number.

19    Q.  Well, you really don't know if the

20  paving would have been different between

21  original and here, the addition?

22    A.  I don't understand your question.

23  Whether --

24    Q.  Okay.  There was so much extra paving

25  that had to be done for 52 spaces.  Fair

NON-CERTIFIED COPY

Page 77

1    don't recall that.

2         Q.  Now, around that same time, did you give

3    an order to your people not to pay any further

4    URS invoices?

5         A.  I did.

6         Q.  And what was that based on?

7         A.  It was based on all of the problems we

8    had with their design and with the parking and

9    all of the above.

10        Q.  Do you recall whether that order was in

11   January of 2013?

12        A.  I -- I couldn't tell you the date on it.

13        Q.  I assume it came after URS declined to

14   pay for the full $130,000 for the addition.  Is

15   that a fair statement?

16        A.  I don't recall the timing of it, but I

17   certainly issued a stop payment.

18        Q.  There was a stop payment on all invoices

19   no matter what the invoices were for?

20        A.  I don't -- I don't recall that

21   specific -- I would have to go back and look.

22        Q.  Are you aware that there was work done

23   by URS after that time period?

24        A.  I am not aware of that, no.

25        Q.  But your order never changed, did it?

NON-CERTIFIED COPY

H&E EQUIPMENT SERVICES, INC.     \* CASE NO. C626308, SECTION D

VERSUS     \* 19TH JUDICIAL DISTRICT COURT

URS CORPORATION ARCHITECTURE,   \* PARISH OF EAST BATON ROUGE
P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III   \* STATE OF LOUISIANA

FILED:_____    _____
                                 DEPUTY CLERK

## AFFIDAVIT OF FRANKIE WYNN

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

     NOW COMES, Frankie Wynn, who under penalty of perjury and from his own personal knowledge, states:

     1.     I am over the 18 years of age and competent to give testimony in this matter. I have personal knowledge of all facts and circumstances in this Affidavit.

     2.     I submit this Affidavit in support of the Opposition to Defendants' Motion for Summary Judgment filed by H&E Equipment Services, Inc. ("H&E").

     3.     I am currently the Director of Facilities/Risk/Compliance Management for H&E and am based out of H&E's Corporate Headquarters located at 7500 Pecue Lane, Baton Rouge, Louisiana. I have held this position since May 2010, prior to which I served as H&E's Risk/Asset Manager.

     4.     As H&E's Director of Facilities, I was responsible for overseeing the construction phase of the Baton Rouge, Kenner, and Belle Chase, Louisiana projects at issue in this litigation.

     5.     I officially began overseeing the Baton Rouge, Kenner, and Belle Chase construction projects in 2010. In addition, I maintain H&E's files regarding the projects and have reviewed the documents relevant to this dispute.

     6.     During my involvement with the projects, I regularly communicated with L. O'Neal Johnson, Thomas E. Ryan, III, and other representatives and employees of URS Corporation Architecture, P.C. and URS Corporation (collectively, referred to as "URS"), as well as the various general contractors and subcontractors for the three projects.

     7.     I am aware of two master services agreements that pertain to the Baton Rouge, Kenner, and Belle Chasse projects: the Agreement for Professional Services entered into and executed by the parties on or about August 28, 2006 (the "2006 Agreement"), and the Short

NO LEC 866095 v3
2919213-000024

NON-CERTIFIED COPY

EXHIBIT
5

Form Master Agreement for Professional Services between the parties dated August 13, 2009 (the "2009 Agreement").

8.    A true and correct copy of the 2006 Agreement is attached to H&E's Opposition to Motion for Summary Judgment as Exhibit "3."

9.    A true and correct copy of the 2009 Agreement is attached to H&E's Opposition to Motion for Summary Judgment as part of Exhibit "2."

10.    There have been multiple problems associated with the work performed by URS on all three projects at issue. Among other things, during and/or around the time of substantial completion of the Baton Rouge and Kenner projects, H&E and the project contractors began to observe crumbling and spalling in the concrete constructed to URS's specifications at the facilities.

11.    H&E notified URS of the observed problems with the concrete at the Baton Rouge and Kenner sites when those problems surfaced, in hopes – and with the expectation – that the parties would work together to find a solution and remedy. But, while URS initially appeared willing to troubleshoot the problems, they ultimately refused to participate in ongoing discussions and efforts to fix the concrete pads. URS also refused to share with H&E or the project contractors information regarding its own apparent efforts to troubleshoot the problem and what it and its engineering consultant concluded about the problem.

12.    URS did not attempt or offer to re-perform its design services or provide new specifications for the concrete pads at the Baton Rouge and Kenner facilities.

13.    The concrete problems at the Baton Rouge and Kenner facilities began in or around late 2012 and early 2013 – near the time of substantial completion – and continue to worsen to this day.

Dated:    June _5_, 2015

_____
FRANKIE WYNN

SWORN TO AND SUBSCRIBED
BEFORE ME ON THIS THE
_5th_ DAY OF JUNE, 2015.

_____
NOTARY PUBLIC

James D. Seymour, Notary Public
LA Bar Roll No.: 29418
Commissioned for East Baton Rouge, Louisiana
Qualified to act Statewide
My Commission is for Life.

-2-

NO LBC 866095 v3
2919213-000024

NON-CERTIFIED COPY

 **URS**

**Remittance Page**

| | |
|---|---|
| Invoice Date | 02/24/11 |
| Invoice | 4602441 |
| Project | 19228820 |
| Page | 1 |

Reference:  PSA-1 dated 08/28/06

For:  H&E Corp. HQ - Construction

Professional Services for Period Ending 02/11/11

H & E Equipment Services, Inc.
Attn: Leonard St. Germain
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Total Due:  $24,500.00  USD
Terms:  Net 30

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**   URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**   URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**
Account:         URS Corporation
Bank:            Wells Fargo Bank
Account No.:     4520-086471
ABA Routing No.: 121-000-248
Swift Code:      WFBIUS6S

Remittance Information can be sent to:
Email:         RemitTo@URSCorp.com
Fax:           (512) 419-6937    Attn: Cash Applications

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

EXHIBIT
4

NON-CERTIFIED COPY



| Invoice Date | 02/24/11 |
|---|---|
| Invoice | 4602441 |
| Project | 19228820 |
| Page | 2 |

H & E Equipment Services, Inc.
Attn: Leonard St. Germain
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:   PSA-1 dated 08/28/06

For:   H&E Corp. HQ - Construction

Professional Services for Period Ending 02/11/11

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job:  19228820  H&E Corp. HQ-Construction Docs | 24,500.00 | 0.00 | 24,500.00 |
| Total this job | 24,500.00 | 0.00 | 24,500.00 |
| TOTAL THIS INVOICE | 24,500.00 | 0.00 | $24,500.00 USD |

Project Manager: Robert C. Herndon

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

NON-CERTIFIED COPY



| | |
|---|---|
| Invoice Date | 02/24/11 |
| Invoice | 4602441 |
| Project | 19228820 |
| Page | 3 |

H & E Equipment Services, Inc.
Attn: Leonard St. Germain
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference.  PSA-1 dated 08/28/06

For:   H&E Corp. HQ - Construction

Professional Services for Period Ending 02/11/11
**Job: *19228820  H&E Corp. HQ-Construction Docs***

**LUMP SUM**

| | |
|---|---:|
| Lump Sum Billing | 24,500.00 |
| **Total Lump Sum** | **24,500.00** |
| | |
| ***Total due this job*** | ***24,500.00*** |
| | |
| **TOTAL THIS INVOICE** | **$24,500.00** USD |

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

F32719806

NON-CERTIFIED COPY



**Remittance Page**

| | |
|---|---|
| Invoice Date | 04/27/11 |
| Invoice | 4666033 |
| Project | 19228820 |
| Page | 1 |

Reference: PSA-1 dated 08/28/06

For: H&E Corp. HQ - Construction

Professional Services for Period Ending 04/15/11

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

| | |
|---|---|
| Total Due: | $24,500.00  USD |
| Terms: | Net 30 |

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**  URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**  URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention: Atlanta Lockbox
(877) 786-3333

**Electronic Funds Transfer:**
| | |
|---|---|
| Account: | URS Corporation |
| Bank: | Wells Fargo Bank |
| Account No.: | 4520-086471 |
| ABA Routing No.: | 121-000-248 |
| Swift Code: | WFBIUS6S |

VENDOR *1006495*
G/L *560010*
APPROVED *~ 5/3/2011*
DATE
AMOUNT *$ 24,500.00*

Remittance Information can be sent to:
| | |
|---|---|
| Email: | RemitTo@URSCorp.com |
| Fax: | (512) 419-6937   Attn: Cash Applications |

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

EXHIBIT
5

NON-CERTIFIED COPY

H & E 0001532



| | |
|---|---|
| Invoice Date | 04/27/11 |
| Invoice | 4666033 |
| Project | 19228820 |
| Page | 2 |

H & E Equipment Services, Inc.
Attn  Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  PSA-1 dated 08/28/06

For:  H&E Corp. HQ - Construction

Professional Services for Period Ending 04/15/11

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job: 19228820  H&E Corp. HQ-Construction Docs | 24,500.00 | 0.00 | 24,500.00 |
| **Total this job** | 24,500.00 | 0.00 | 24,500.00 |
| **TOTAL THIS INVOICE** | 24,500.00 | 0.00 | $24,500.00 USD |

Project Manager: Robert C. Herndon

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

NON-CERTIFIED COPY

H & E 0001533



| | |
|---|---|
| Invoice Date | 04/27/11 |
| Invoice | 4666033 |
| Project | 19228820 |
| Page | 3 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:  PSA-1 dated 08/28/06

For:   H&E Corp. HQ - Construction

Professional Services for Period Ending 04/15/11
*Job: 19228820  H&E Corp. HQ-Construction Docs*

**LUMP SUM**

| | |
|---|---|
| Lump Sum Billing | 24,500.00 |
| **Total Lump Sum** | **24,500.00** |
| *Total due this job* | ***24,500.00*** |
| **TOTAL THIS INVOICE** | **$24,500.00** USD |

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

F33575589

NON-CERTIFIED COPY

H & E 0001534

# URS

**Neal Johnson, AIA**
Principal Architect

April 26, 2011

Frankie Wynn
H & E Equipment Services Inc.
11100 Mead Road, Suite 200
Baton Rouge, Louisiana 70816

Re:    H&E Corp. HQ - Construction
       Baton Rouge, Louisiana

Mr. Wynn:

Enclosed please find invoice 4666033 for the above referenced project along with an invoice worksheet for your reference.  The invoiced amount of $24,500.00 represents work completed through 100% of construction documents phase.

Should you have any questions, please don't hesitate to call me at (225) 231-6343.

Sincerely,
URS Corporation

Neal Johnson, AIA
Principal Architect

**URS Corporation**
**7389 Florida Boulevard, Suite 300**
**Baton Rouge, LA 70806**
**225.922.5700**

NON-CERTIFIED COPY

H & E 0001535

URS Corporation Confidential                    4/27/2011                                   Page 1

# URS

## Invoice Worksheet

Date

| Project Name | **H&E Corp. HQ - Construction** |
| Project No. | |
| URS Project # | **19228820** |

| Schedule of Values | | |
|---|---|---|
| Base Fee | | **$490,000.00** |
| | | $           - |
| | TOTAL | **$   490,000.00** |

| Total Fee | | **$  148,848.00** |

| Fees through Construction Documents | 100% @ | 100.00% Complete | $ 490,000.00 |
| | | Fee Earned to Date | $ 490,000.00 |

| | Less Amount Previously Paid | | $ 465,500.00 |
| | | Reimbursable Expense Due | $           - |
| | TOTAL DUE THIS PAYMENT | | **$24,500.00** |

NON-CERTIFIED COPY

H & E 0001536

# URS

**Remittance Page**

| | |
|---|---|
| Invoice Date | 05/27/11 |
| Invoice | 4691270 |
| Project | 19229736 |
| Page | 1 |

Reference:  Work Order# 02-11

For:  H & E 2011 Planning Commission
Resubmittal

<u>Professional Services for Period Ending 05/13/11</u>

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

| | |
|---|---|
| Total Due: | $22,500.00  USD |
| Terms: | Net 30 |

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**   URS Corporation
P.O. Box 116183
Atlanta GA 30368-6183
US

**Overnight Courier:**   URS Corporation
Lock Box No. 116183
100 South Crest Drive
Stockbridge, GA  30281
Attention:  Atlanta Lockbox
(877) 786-3333

VENDOR *1006495*
G/L *560610*
APPROVED *7 M  6/10/2011*
DATE
AMOUNT  *$22,500.00*

*CAPITAL ORDER*
*40000340*

**Electronic Funds Transfer:**
Account:      URS Corporation
Bank:         Wells Fargo Bank
Account No.:  4520-086471
ABA Routing No.:  121-000-248
Swift Code:    WFBIUS6S

Remittance Information can be sent to:
Email:      RemitTo@URSCorp.com
Fax:        (512) 419-6937    Attn:  Cash Applications

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

NON-CERTIFIED COPY

H & E 0001537



| | |
|---|---|
| Invoice Date | 05/27/11 |
| Invoice | 4691270 |
| Project | 19229736 |
| Page | 2 |

H & E Equipment Services, Inc.
Attr: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:   Work Order# 02-11

For:   H & E 2011 Planning Commission
       Resubmittal

<u>Professional Services for Period Ending 05/13/11</u>

| | SERVICES | EXPENSES | TOTAL |
|---|---|---|---|
| Job: 19229736  H&E 2011 Planning Commisssion | 22,500.00 | 0.00 | 22,500.00 |
| **Total this job** | **22,500.00** | **0.00** | **22,500.00** |
| **TOTAL THIS INVOICE** | **22,500.00** | **0.00** | **$22,500.00 USD** |

Project Manager: Neal Johnson

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

NON-CERTIFIED COPY

H & E 0001538



|  | Invoice Date | 05/27/11 |
|---|---|---|
|  | Invoice | 4691270 |
|  | Project | 19229736 |
|  | Page | 3 |

H & E Equipment Services, Inc.
Attn: Frankie Wynn
11100 Mead Road, Suite 200
Baton Rouge LA 70816

Reference:   Work Order# 02-11

For:    H & E 2011 Planning Commission
        Resubmittal

Professional Services for Period Ending 05/13/11

*Job: 19229736  H&E 2011 Planning Commisssion*

**LUMP SUM**

| | |
|---|---|
| Lump Sum Billing | 22,500.00 |
| **Total Lump Sum** | **22,500.00** |
| *Total due this job* | *22,500.00* |
| **TOTAL THIS INVOICE** | **$22,500.00** USD |

Please contact Carlene D Gibson at 512 419-6115 or via email at Carlene_Gibson@urscorp.com
if you have any questions regarding this invoice.

F33998133

NON-CERTIFIED COPY

H & E 0001539

**URS**

Neal Johnson, AIA
Principal Architect

May 19, 2011

Frankie Wynn
H & E Equipment Services Inc.
11100 Mead Road, Suite 200
Baton Rouge, Louisiana 70816

Re:    H&E 2011 Planning Commission
       Baton Rouge, Louisiana

Mr. Wynn:

Enclosed please find invoice 4691270 for the above referenced project along with an
invoice worksheet for your reference.  The invoiced amount of $ 22,500.00 represents
work completed through 100%.

Should you have any questions, please don't hesitate to call me at (225) 231-6343.

Sincerely,
URS Corporation

Neal Johnson, AIA
Principal Architect

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY

H & E 0001540

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


```
*  *  *  *  *  *  *  *   *
                         *
H&E EQUIPMENT SERVICES   *
                         * NUMBER 626,308
VERSUS                   *
                         * DIVISION "D"
URS CORPORATION          *
ARCHITECTURE, P.C., URS  *
CORPORATION, L O'NEAL    *
JOHNSON AND THOMAS E.    *
RYAN, III                *
                         *
*  *  *  *  *  *  *  *   *
```


Deposition of STEPHAN DORSEY, taken

on Wednesday, August 10, 2016, commencing at

10:03 a.m., in the offices of Adams and Reese,

LLP, Attorneys at Law, 450 Laurel Street, Suite

1900, Baton Rouge, Louisiana, 70801.

EXHIBIT

6

NON-CERTIFIED COPY

Page 2

```
 1                    I N D E X

 2

 3                                          Page

 4
        Caption                              1
 5      Index of Exhibits                    3
        Appearances                          7
 6      Agreement of Counsel                 8

 7      Examination

 8         PHILIP A. FRANCO, ESQ.            9
           ALYSSON L. MILLS, ESQ.          149
 9         PHILIP A. FRANCO, ESQ.          151

10              *   *   *   *   *

11      Witness' Certificate              153
        Reporter's Page                   154
12      Certificate                       155

13

14

15

16

17

18

19

20

21

22

23

24

25
```

NON-CERTIFIED COPY

Page 3

1                    INDEX OF EXHIBITS

2

3    Number                                    Page

4    1  June 24, 2011 Email from              25
        Kim Nunez to Neal Johnson,
5       et al -- Revised
        Preconstruction Meeting
6       Minutes
        H&E 0007521-0007528

7

8    2  June 15, 2011 Email string from      28
        West Wilkerson to Thomas Ryan,
        et al
9       URS 071273-071275
                    And
10      Request for Information No. 2
        6/14/2011
11      URS 064254

12   3  AS-BUILT DRAWINGS retained by        38
        Counsel for URS

13

14   4  June 16, 2011 Email string from      43
        Thomas Ryan to S. Dorsey,
        et al
15      URS 043299-043301

16   5  December 15, 2011 Email string       44
        from Thomas Ryan to Russ
17      Randy
        URS 085618-085621

18

19   6  May 31, 2012 Email string            48
        from Neal Johnson to Tim
        Gaines
20      URS 034957-034958

21   7  August 3, 2012 Email string          50
        from Murray McCullough to
22      Neal Johnson
        URS 047322-047325

23

24

25

NON-CERTIFIED COPY

Page 4

1    Cont.)        INDEX OF EXHIBITS

2

3    Number                              Page

4

      8  August 7, 2012 Email string      53
5         from Thomas Ryan to Stephan
          Dorsey, et al
6         URS 087952-87955

7      9  August 16, 2012 Email string    56
          from Neal Johnson to Murray
8         McCullough, et al
          H&E 0051125
9

      10  August 22, 2012 Email string    57
10         from Thomas Ryan to Stephan
           Dorsey, et al
11         H&E 0008946

12     11  URS Change Proposal Request     59
           October 15, 2012 Baton Rouge
13         URS 049066-049067

14     12  November 19, 2012 Email string  60
           from Neal Johnson to Murray
15         McCollough, et al
           URS 057251-057253
16

      13  URS Architect's Supplemental    66
17         Instructions December 21, 2012
           Baton Rouge
18         URS 050706-050710

19     14  January 7, 2013 Email from      70
           Frankie Wynn to Neal
20         Johnson, et al
           H&E 0020725-0020727
21

      15  Milton J. Womack, Inc. Letter   74
22         of Transmittal 1/14/2013
           and Certificate of
23         Substantial Completion
           1/7/2013
24         H&E 0055262-0055307

25

NON-CERTIFIED COPY

Page 5

1  (Cont.)      INDEX OF EXHIBITS

2

3    Number                              Page

4

   16  January 18, 2013 Email string    77
5       from Frankie Wynn to Stephan
       Dorsey, et al
6       H&E 0046612-0046621

7    17  Milton J. Womack, Inc.,          81
       Modification Request
8       1/22/2013 Parking Lot
       Addition - Phase 1
9       URS 076596-076603

10   18  Superior Millworks Estimate      84
       February 20, 2013
11      URS 031129

12   19  Womack Memo April 9, 2013        86
       re: Site paving caulking
13      issue
       URS 031122-031128
14

   20  April 10, 2013 Email string     107
15      from Frankie Wynn to Thomas
       Ryan, et al
16      URS 054724-054730

17   21  May 8, 2013 Email string        117
       from Thomas Ryan to Stephan
18      Dorsey
       URS 090662-090668
19

   22  May 13, 2013 Email string       118
20      from Frankie Wynn to Thomas
       Ryan, et al
21      H&E 0024757-0024758

22   23  June 6, 2013 Email from Frankie  122
       Wynn to Stephan Dorsey, et al
23      H&E 0032994-0032001

24

25

NON-CERTIFIED COPY

Page 6

1   (Cont.)        INDEX OF EXHIBITS

2

3   Number                                    Page

4   24  June 6, 2013 Email string from    123
        Stephan Dorsey to Frankie
5       Wynn, et al
        H&E 0008900-0008901
6
    25  June 10, 2013 Email string from   127
7       Frankie Wynn to Stephan
        Dorsey
8       H&E 0056606-0056607

9   26  June 13, 2013 Email string       129
        from Neal Johnson to Debra
10      Sanders
        URS 03165
11
    27  June 24, 2013 Email string       133
12      from Neal Johnson to Frankie
        Wynn, et al
13      H&E 0025356

14  28  June 25, 2013 Email string       134
        from Frankie Wynn to
15      Thomas Ryan, et al
        H&E 0025359-0025361
16
    29  August 13, 2013 Email from       144
17      Frankie Wynn to John Jones
        H&E 0008374-0008388
18
    30  August 14, 2013 Email string     145
19      from Frankie Wynn to
        Stephan Dorsey
20      H&E 0054903-0054904

21

22

23

24

25

NON-CERTIFIED COPY

Page 7

1    APPEARANCES:

2

        Representing the Plaintiff:
3
         FISHMAN HAYGOOD, LLP
4        Attorneys at Law
         201 St. Charles Avenue, Suite 4600
5        New Orleans, Louisiana  70170

6        BY:  ALYSSON L. MILLS, ESQ.

7

8

9     Representing the Defendant:

10       ADAMS AND REESE, LLP
         Attorneys at Law
11       4500 One Shell Square
         New Orleans, Louisiana  70139
12
         BY:  PHILIP A. FRANCO, ESQ.
13            KELLEN J. MATHEWS, ESQ.

14
     ALSO PRESENT:
15

16    Representing Stephan Dorsey
         SCHUTTE, TERHOEVER, RICHARDSON, EVERSBERG,
17           CRONIN, JUDICE & BOUDREAUX, LLP
         Attorneys at Law
18       501 Louisiana Avenue
         Baton Rouge, Louisiana  70802
19
         BY:  ANDREW W. EVERSBERG, ESQ.
20
         Frankie W. Wynn
21
         Thomas E. Ryan II
22

23    Reported by:
              KAY E. DONNELLY
24            Certified Court Reporter
              State of Louisiana
25

NON-CERTIFIED COPY

Page 12

1   related to something that was owner-related,

2   owner requested, or if they were something I was

3   missing from the design or the documents.

4       Q.  And do you remember what particular

5   modification requests you talked about?  Was

6   there three or four or 50 or a hundred?

7       A.  Probably three or four big -- big ticket

8   items.  I would say there was structural steel.

9   There was -- let's see -- stormwater sewer

10  collector, if you will.  I think that was the

11  biggest two.

12       I think we may have talked about two or

13  three more, but I don't -- I would have to look

14  at a list to remember what they were.

15      Q.  We are going to talk about those.

16       Did you talk about anything in

17  connection with the concrete?

18      A.  No.  We strictly talked about the MRs.

19      Q.  All right.  And the structural steel, I

20  understand that structural steel was left out of

21  the Womack bid originally.  Is that a fair

22  statement?

23      A.  No.  I think a fair statement is that we

24  bid the documents as they were presented to us.

25  So if there was steel left out, then we wouldn't

NON-CERTIFIED COPY

1  have known until during construction.

2      Q.  Okay.  So some structural steel

3  apparently --

4      A.  Had to be added to the project.

5      Q.  Because it was not in the original

6  drawings --

7      A.  Correct.

8      Q.  -- or specs?

9      A.  Correct.

10     Q.  That structural steel, though, would

11  have been necessary from the beginning anyway,

12  correct?

13     A.  It would be necessary.

14     Q.  So in other words, from our perspective,

15  if it was added later, they would have had to

16  pay for it originally anyway; is that correct or

17  not?

18     A.  That is a correct statement.  But if I

19  can add on to that?

20     Q.  Sure.

21     A.  I think that if it was left out of the

22  original design as it was and by the time we

23  found out that it was left out, we had -- I

24  remember having to wait for some of the

25  structural steel lintels to be fabricated --

NON-CERTIFIED COPY

Page 14

1    well, designed, fabricated, and delivered to the

2    job site.

3        Q.  So that is.

4            A delay issue?

5        A.  I mean, that -- yeah, I mean --

6        Q.  But as far as -- and I'm not an

7    engineer, and I'm not an architect.

8        A.  I understand.

9        Q.  So bear with me.

10       A.  But the cost --

11       Q.  I'm learning a lot.

12       A.  Perhaps.

13       Q.  But --

14       A.  The cost of the material, you are

15   correct.  If that -- it was in the original

16   design, they would have had to pay for that

17   anyway.

18       Q.  Now, the modification request in

19   connection with the structural steel, did it

20   include anything other than the cost of the

21   structural steel?

22       A.  It could.  It can include a design

23   fabrication, as I can remember.  I would have to

24   go look at each one, but --

25       Q.  All right.  I guess my question is:

NON-CERTIFIED COPY

1   What did it include in a modification request

2   that wouldn't have been there in cost

3   originally?

4        A.  Just based on memory, probably nothing

5   else other than --

6        Q.  All right.

7        A.  -- the bid.

8        Q.  And then the stormwater sewer collector,

9   can you tell me what that is?

10       A.  This is -- as I understand it, it was a

11  tank that -- a separator.  It was a -- it was an

12  oil and water separator, if I am not mistaken.

13           And there is a wash bay in the back of

14  the property that when you wash the big

15  equipment, the stormwater goes through this

16  oil/water separator to be filtered, if you will,

17  to be dispersed into the sanitary sewer system.

18           That wasn't in the drawing, and I am

19  pretty sure, if I remember correctly, Mr. Johnny

20  Jones is the one who discovered that, that it

21  needed to be there and added it into the

22  project.

23       Q.  So in other words, from a layman's point

24  of view --

25       A.  Right.

NON-CERTIFIED COPY

Page 16

1      Q.  -- when they wash these pieces of heavy

2   equipment down --

3      A.  Uh-huh.

4      Q.  -- that water has to go through an oil

5   and water separator before it goes into the

6   retention pond?

7      A.  Correct.

8      Q.  And the actual oil/water separator was

9   missing from the original documents?

10      A.  Correct.

11      Q.  All right.  And, again, with that, what

12   cost was involved in the modification request

13   other than the cost that would have been

14   incurred had it been in there originally?

15      A.  Without looking at it, I'm just going to

16   say --

17          MS. MILLS:

18              Objection.

19          THE WITNESS:

20              -- it is probably the cost.

21          MS. MILLS:

22              Objection to the form.  There are

23   documents that --

24          MR. FRANCO:

25              I understand.

NON-CERTIFIED COPY

Page 67

1      A.  We actually --

2      Q.  Let me ask it a different way.

3          What did you understand happened, and

4   why did this have to be revised?

5      A.  As I understood it, the day they opened,

6   there were employees riding around looking for

7   parking spots because -- just because they

8   didn't have enough parking spots to house

9   everybody.

10     Q.  Did you participate in the discussion of

11  these construction drawings with any of the H&E

12  people before the parking lot was constructed?

13     A.  Before the new parking lot was

14  constructed?

15     Q.  Before the original parking lot was

16  constructed?

17     A.  No.  There -- there wouldn't have been

18  any reason to then.  Are you talking about prior

19  to design?  I mean, that would have been a

20  design specification.

21     Q.  Prior to construction.  In other words,

22  did you go over the construction?  Did you

23  attend any meetings when the construction

24  drawings were reviewed?

25     A.  No.  That would have been our estimating

NON-CERTIFIED COPY

Page 74

1    break to use the men's room.

2        A.  Okay.

3        Q.  And two, we need to decide what we want

4    to do about lunch because if we want to order

5    something, sandwiches or whatever, we need to do

6    that.  We are not going to finish before lunch.

7        A.  Okay.

8        Q.  So we can go off, and you can talk about

9    what you want to do.  And since you are the

10   deponent, you have got the priority to decide

11   what we are going to eat.

12          (Recess held.)

13   EXAMINATION BY MR. FRANCO:

14       Q.  All right.  The next document I want to

15   show you is Exhibit 15, and it is H&E 55261.

16       A.  Okay.

17       Q.  The first document is the transmittal

18   sheet signed by you, I presume; is that correct?

19       A.  Well, it is a girl in our office for me,

20   yes.

21       Q.  Oh, okay.  Somebody signed it for you?

22       A.  Yes.

23       Q.  All right.  But you authorized it, I

24   take it?

25       A.  Yes.

NON-CERTIFIED COPY

1      Q.  All right.  And this is the certificate

2  of substantial completion for the Baton Rouge

3  project, correct?

4      A.  Correct.

5      Q.  And, apparently, the architect, Womack,

6  and H&E all agreed that the date of substantial

7  completion was December 17, 2012, correct?

8      A.  That --

9      Q.  Look right above Frankie Wynn's

10  signature.

11      A.  Yes, that is correct.

12      Q.  Then it says "attached to this

13  document," and these were attached to that

14  certificate, these documents, correct?

15      A.  Correct.

16      Q.  All right.  It says "deficiencies to the

17  completion of the contract"?

18      A.  Correct.

19      Q.  Otherwise known as the punch list?

20      A.  Yes.

21      Q.  And on the punch list on the first page,

22  if you go about three-quarters of the way down,

23  it says mail/supply 113.  You see that?

24      A.  Okay.

25      Q.  It says install millwork, install

NON-CERTIFIED COPY

Page 76

1    missing vinyl base, install missing electrical

2    cover plates.  Do you see that?

3        A.  Correct.

4        Q.  Now, do you recall that the mail slots

5    in that mailroom were also changed after they

6    were originally installed?

7        A.  Yes.

8        Q.  Do you recall if there was other changes

9    made to the mailroom other than just the size of

10   the mail slots?

11       A.  I don't recall.  I know -- I remember

12   the mail slots.

13       Q.  Okay.  If you will, look at the as-built

14   drawings and tell me if the dimensions of the

15   mail slots were shown on the construction

16   drawings.

17       A.  Let's see.  (Reviewing document.)

18       Q.  And tell me what drawing you may be

19   referring to when you do that.

20       A.  Okay.  All these drawings run together

21   after a while.  They are not -- so let's see.

22       Q.  Picture me with three different projects

23   as a lawyer.  You think you got problems.

24       A.  All right.  I'm getting somewhere.  I

25   can't really see it, but it is -- it looks like

NON-CERTIFIED COPY

Page 77

1    each slot is supposed to be nine inches.

2        Q.  You can't see it because it is too small

3    right now with those drawings.

4        A.  I mean, it is like nine inches by one

5    foot.

6        Q.  All right.  But the dimensions are

7    indicated on the drawings, are they not?

8        A.  Yes.

9        Q.  And which drawing is that?

10       A.  A-402.A.

11       Q.  I'm sorry.  Say it again, please.

12       A.  A-402.A.  Detail Number 9.

13       Q.  Right.  And that was the as-built and

14   that was subsequently changed, correct?

15       A.  Yes.

16       Q.  All right.  Just give me one second.

17       A.  Okay.

18       Q.  All right.  The next one I'm going to

19   show you is Exhibit 16, H&E 46612.

20           MR. EVERSBERG:

21               The number again?

22           MR. FRANCO:

23               46612.

24   EXAMINATION BY MR. FRANCO:

25       Q.  That is an Email from Frankie Wynn to

NON-CERTIFIED COPY

Page 81

1      A.   No, it doesn't appear to be.

2      Q.   All right.  The next document I want to

3   show you is Exhibit 17, URS 76596.

4           This was the price that Womack provided

5   to H&E to construct Phase 1 of the parking lot

6   revision, correct?

7      A.   Correct.

8      Q.   Was that the actual price that was

9   charged and paid?

10     A.   Yes.

11     Q.   $125,180, correct?

12     A.   Correct.

13     Q.   And let me see if this document has it

14   on here.  How many spaces?  52, I want to say?

15     A.   I would have to see the ASI 136.  It is

16   not attached to --

17     Q.   Yeah.  Assume it added 52 spaces for me.

18     A.   Okay.

19     Q.   There would have been an original cost

20   of 52 additional parking spaces, wouldn't there

21   have been?

22     A.   If we would have -- if it would have

23   been in an original construction document?

24     Q.   Yes.

25     A.   Correct.

NON-CERTIFIED COPY

1   them?

2       A.  Correct.  Well, some we do.

3       Q.  Some you do --

4       A.  Some --

5       Q.  -- just to keep them happy?

6       A.  Yeah.

7       Q.  But you don't have to?

8       A.  No.

9       Q.  All right.  I don't need to show you

10  this.

11          You were authorized to put in Phase 1

12  parking, and you did that?

13      A.  Correct.

14      Q.  And you got paid for that?

15      A.  Correct.

16      Q.  All right.  The next document I'm going

17  to show you is Exhibit 18, URS 31129.

18          Was this a sub of Womack?

19      A.  Yes.

20      Q.  Superior Millwork?

21      A.  Uh-huh (affirmative response).  Yes.

22      Q.  Okay.  You recall this?

23      A.  Yes.

24      Q.  All right.  This is work done in the

25  mailroom, correct?

NON-CERTIFIED COPY

Page 85

1    A.  Correct.

2    Q.  So this $13,500 was more than just

3  adding new mail slots, wasn't it?

4    A.  Yes.  It is four or five items.  Well --

5    Q.  Four items?

6    A.  Four items, yes.

7    Q.  Was there other work done other than

8  millwork changes in the mailroom, to your

9  knowledge?

10    A.  Not that I recall.

11    Q.  Do you know whether you had to rework

12  two existing walls of cabinets in order to put

13  in a different size mail slot?

14    A.  I would have to see the sketch --

15    Q.  Okay.

16    A.  -- to know if there was an ASI

17  attachment to this.

18    Q.  All right.

19    A.  I'm assuming if he wrote it in, yes.  He

20  is responding to the ASI.

21    Q.  Then it says add new base cabinet?

22    A.  Correct.

23    Q.  Do you know whether that had to be done

24  because of the mail slots or was that just a

25  change done by the owner?

NON-CERTIFIED COPY

Page 107

1    your memo a few minutes ago, and we talked about

2    walking the site with Mr. Wynn?

3        A.  Yes, sir.

4        Q.  Was anybody from URS invited to walk

5    that site with you all?

6        A.  I can't say that they were invited.  I

7    think we were kind of walking by ourself, but I

8    don't know who was invited.

9        Q.  And they never attended that walk,

10   correct, that particular one?

11       A.  No.

12       Q.  All right.  The next document that I'm

13   going to show you is going to be Exhibit 20, and

14   it is URS 54724.  This is an another memo.

15           MS. MILLS:

16              Do you have a copy for me?

17           MR. FRANCO:

18              I'm sorry.  I've got to do his job,

19   too.

20   EXAMINATION BY MR. FRANCO:

21       Q.  This is an another memo from you.  I

22   believe it is dated the same day as the prior

23   memo.  Let's check it out.

24       A.  Yeah.

25       Q.  Yes, it is.  Okay.  And this is a memo

NON-CERTIFIED COPY

1  on the executive wall panel issue, regarding the

2  wall panels in the executive reception area,

3  correct?

4      A.  Correct.

5      Q.  The first bullet point says, "The wall

6  wasn't prepped with any blocking and/or plywood

7  to receive the one-quarter-inch paneling."  Do

8  you see that?

9      A.  Yes.

10     Q.  I am sorry.  You are welcome to read the

11  whole thing.  Just let me know.

12     A.  No, I think I'm good.

13     Q.  Okay.  It says, "This issue was

14  discussed with all parties present, and URS

15  advised that due to the fact that the weight of

16  the panels wasn't too substantial, they didn't

17  share the same concerns that Superior Millworks

18  had regarding the panel adherence to the drywall

19  surface 'only'."

20         Who at URS advised that?

21     A.  I don't recall specifically, but our

22  day-to-day contacts was Thomas and Neal.

23     Q.  So, it was one of those two, you think?

24     A.  Yes.

25     Q.  Okay.  As I read this, the quarter-inch

NON-CERTIFIED COPY

1    paneling was installed directly to the drywall;

2    is that correct?

3        A.  Correct.

4        Q.  How was it secured to the drywall?  Was

5    it nailed?  Was it glued?

6        A.  I think it was E-clips.

7        Q.  Say that again?

8        A.  It was E-clips.

9        Q.  What is that?

10       A.  On the -- on the panel itself, there

11   will be like some receiving members, and then

12   they clip to the wall.  So the wall has some --

13   I don't know how to describe it to you other

14   than say it was E-clipped.  It is an attaching

15   method that we use on the  --

16       Q.  All right.  So --

17       A.  -- that a lot of people use.

18       Q.  -- the drywall is bare.  And then you

19   attach some clips to the drywall, and then you

20   attach the --

21       A.  There is also some clips to the panels.

22       Q.  So they --

23       A.  So the panels marry to each other on

24   the -- between the panel and the wall.

25       Q.  So there is clips on the back of the

NON-CERTIFIED COPY

1  wall panel and there is clips on the drywall

2  face?

3      A.  Yeah.

4      Q.  And they attach?

5      A.  Correct.

6      Q.  Is there space then between the wall

7  panel and the drywall after installation --

8      A.  No.  You --

9      Q.  -- because of the width of the clips?

10     A.  You can get pretty tight.  It depends

11 on -- I don't remember how the panels were made,

12 I mean, if the panel had a recessed back.

13         So that means that the -- whatever the

14 receiving member on the panel was would have

15 been installed in the recessed portion of the

16 panel.  So when it clips to the wall, it is a

17 pretty tight fit.

18     Q.  Well --

19     A.  I would have to see the configuration.

20 I don't remember the configuration of the panel.

21     Q.  All right.  It sounds to me like there

22 was some void between the quarter-inch wall

23 panel and the drywall.  Is that accurate or not?

24     A.  I -- I can't say.  Are you reading that

25 somewhere in the memo?

NON-CERTIFIED COPY

1      Q.  No.

2      A.  Okay.

3      Q.  I am just --

4      A.  I --

5      Q.  As a layman, I'm just saying if you have

6   got to attach it with clips, the clips aren't

7   going to be on every piece of the wall panel,

8   correct?

9      A.  Not on every piece of the wall panel,

10  no.

11     Q.  All right.  How many areas of the wall

12  panel contain the clips?

13     A.  I don't remember the layout.

14     Q.  Okay.  Was it like top and bottom?  Was

15  it --

16     A.  Sometimes it was at the top and bottom

17  and middle.

18     Q.  Okay.

19     A.  Sometimes it is three.

20     Q.  But there was space in between the clips

21  where the wall panel didn't have any particular

22  attachment to the sheetrock; is that right?

23     A.  That is right, what you are saying, but

24  I would have to -- I would have to go back and

25  look at the configuration.

NON-CERTIFIED COPY

1    Q.  Well, if they had clips in the wall

2  panel, in the center of the wall panel, then

3  there would have been some space that those

4  clips took up between the wall panel and the

5  drywall, correct?

6    A.  Again, I need to -- I would need to see

7  the configuration of the panel.

8    Q.  All right.

9    A.  Because sometimes you can install them

10  -- like I said, it depends on how the panel was

11  manufactured.  With a recess in it, you can get

12  pretty tight to the wall with it.

13    Q.  All right.  And I may have asked you

14  this.  I'm sorry.  You are like my fourth

15  deposition.

16    A.  Okay.

17    Q.  The wall panel warped, didn't it?  That

18  was the problem with it after it was installed?

19    A.  Warped?  Can I read this first?

20    Q.  Absolutely.  Please, do.

21    A.  Okay.  (Reviewing document.)

22        I am trying to remember.  I don't know

23  if it was warped.  I know that there was some

24  issues after we installed.

25        The original wall panels had a couple --

NON-CERTIFIED COPY

Page 113

1    had some -- had some detailed areas.  I can't

2    remember what they all were, though.

3         Q.  Well, let me ask you this.

4         A.  Okay.

5         Q.  Superior Millworks, apparently,

6    wanted -- is it reveals?

7         A.  Correct.

8         Q.  R-E-V-E-A-L-S?

9         A.  Correct.

10        Q.  Installed on what?  On top of the

11   drywall?

12        A.  No.  They are talking about that -- can

13   I draw it for you?

14        Q.  Sure.

15        A.  The panels -- so if I'm installing ten

16   panels along the wall, there is a gap that is

17   going to have a reveal.  So if those panels --

18        Q.  Between the joints?

19        A.  At the joint.  So from panel to panel,

20   it creates a joint.  So adjoining may have a

21   reveal.  So it would give -- it would give the

22   panels an opportunity to move if they -- if they

23   need to without being tight up against each

24   other and warping, as you -- as you called it.

25        Q.  Okay.  What is a reveal?

NON-CERTIFIED COPY

1       A.  It is -- it is a joint basically between

2   panels.

3       Q.  That is a joint?

4       A.  Yes.

5       Q.  Okay.  Got it.  Another joint.  Just

6   what we needed.  Just another joint?

7       A.  Yeah.

8       Q.  Okay.  So that problem at the joint

9   didn't have anything to do with attaching it

10  directly to the drywall, did it?

11      A.  Not necessarily, no.

12      Q.  So as a result, there was warping at the

13  joint areas?

14      A.  Where they were tight against each

15  other.

16      Q.  Yes?

17      A.  Yeah.  But I think what we are saying

18  here is that there was -- similar to the

19  concrete, there was a mockup done, and Superior

20  expressed some concerns over what they saw with

21  how this -- how the rest of this thing was going

22  to be installed.

23          So that is when they brought up the

24  reveals and the -- there was nothing that these

25  panels were hanging on other than drywall.  It

NON-CERTIFIED COPY

1  was a gamut of things.

2      Q.  Okay.  Now, in order to fix it, that

3  drywall was removed, that quarter-inch, correct?

4      A.  The panels were removed.

5      Q.  The panels.  I'm sorry.  I said drywall.

6  The panels were removed, correct?

7      A.  Correct.  Correct.

8      Q.  And --

9      A.  It was offensive to the owner when he

10  moved into the building.

11      Q.  Right.  And the three-quarter-inch

12  panels were used to replace it?

13      A.  Correct.

14      Q.  How were the three-quarter panels put on

15  the drywall?

16      A.  I think they were attached to the

17  crywall, but I think they were -- we went to --

18  we found the studs, and they were attached

19  directly to the studs.

20      Q.  How?

21      A.  I don't remember exactly how, but it

22  would have been with E-clips.  So you -- the

23  E-clips that we would have installed with the

24  first ones would have been installed on the

25  wall.

NON-CERTIFIED COPY

Page 116

1          We found the stud and then attached the

2    panel.  So I think when the three-quarter-inch

3    material was ordered, we had to go and do a

4    layout of the existing stud locations.   Probably

5    16 inches on-center.

6          And we had to kind of marry the pattern

7    of the new panels to the layout of the studs in

8    order to make sure that they were properly

9    attached.

10         Q.  Did the clips run vertically or

11   horizontal on the --

12         A.  They should run horizontal.  So your

13   studs are running vertical.  So your clips would

14   run horizontal so that they catch --

15         Q.  All right.

16         A.  -- they catch them on something.

17         Q.  All right.  And, yet, they were still

18   attached directly to the drywall, weren't they?

19         A.  Not to the drywall.  They are attached

20   through the drywall to the -- to the studs.

21         Q.  Okay.  What did the design drawing show

22   as how to attach them, or did it even go into

23   that detail?

24         A.  I don't remember.  I would have to look

25   at the drawings or whatever we were looking at

NON-CERTIFIED COPY

Page 117

1   then.  But my letter is saying it is showing

2   attach them directly to the drywall.

3       Q.  Okay.

4       A.  If this is going on -- if we are going

5   by the documents.

6       Q.  Going by the documents, it was installed

7   to the drywall, the same as the quarter-inch

8   panel was, to the drywall?

9       A.  Correct.

10      Q.  But the difference being instead of

11  being secured just to the drywall, they were

12  secured to the studs inside the drywall?

13      A.  Thicker material, yeah, through the

14  drywall to the studs.

15      Q.  All right.  Next I'm going to show you

16  Exhibit 21, which is URS 90662.

17          And at the bottom, there is an Email

18  from Philip Bonner, the project manager at

19  Womack, to you saying he needed the civil sheets

20  that contain sections through control joints and

21  expansion joints at the H&E equipment yard.  You

22  see that?

23      A.  Yes.

24      Q.  Why did he need those; do you know?

25      A.  I think that was to create that cost

NON-CERTIFIED COPY

Page 135

1     It looks like --

2         Q.   Okay.

3         A.   -- it has been --

4         Q.   It looks like the punch list as of --

5     Let's see.   It even says dates of observation.

6     The last date of observation was -- it says

7     revised June 24, 2013?

8         A.   Correct.

9         Q.   Correct?

10        A.   Correct.

11        Q.   So this is the punch list as of that

12    time.   On the left side, you will see "check

13    mark equals okay, Frankie Wynn," and he dates

14    it, it looks like, 6/25/2013.   Do you see that?

15        A.   Correct.   Yes.

16        Q.   All right.   So, apparently, there was a

17    walkthrough with Frankie Wynn on these items,

18    correct?

19        A.   Correct.

20        Q.   And he approved the ones with check

21    marks; is that your understanding?

22        A.   Yes.

23        Q.   He did not approve repairing the warped

24    wood wall panels, correct?   Look down about

25    three-quarters.   $1,200 value.   Look at the

NON-CERTIFIED COPY

1  $1,200 value.

2      A.  Yes, you are correct.

3      Q.  All right.  And what was the $1,200

4  value for?  Was that the amount necessary to

5  replace it?

6      A.  I don't know that that is replacement.

7  I think that is some type of repair work that

8  would have gone on the original panel.

9      Q.  I'm not following that.  That is my

10  fault.  Not yours.

11          What was that issue, Executive Entry

12  237, repair warped wood wall panels?

13      A.  I am trying to see if I remember when we

14  did the new panels.

15      Q.  Well, the wall panels that we talked

16  about earlier in the deposition were in the

17  executive entry.

18      A.  That is the same -- that is the same

19  location.

20      Q.  Same location?

21      A.  Correct.  I am trying to --

22      Q.  It seems to me that the wood wall panels

23  that were put up, some of them warped, and it

24  was costing $1,200 to fix those.  Does that help

25  refresh your memory any?

NON-CERTIFIED COPY

Page 137

1      A.  No.  I would have to see the original

2   punch list.  I don't remember when -- the timing

3   of the original panels, when they were taken

4   down and the new panels were installed.

5          The new panels were installed after they

6   occupied the building.  Not -- not during the

7   original walkthrough.

8      Q.  Right.  But they started occupying the

9   building in December of 2012.  We are now into

10  June of 2013.

11     A.  But this punch list is from the original

12  before they occupied the building.  So this is

13  -- this is a reduction of the original punch

14  list items.  That is as it normally happens.

15         So I would have to see the original

16  punch list that was done in November to -- to

17  see if this item is still on there.  And I think

18  what happened was he was holding this money

19  until this issue was resolved, if I remember

20  correctly.

21     Q.  I'm going to show you what was Exhibit

22  15.

23     A.  Okay.

24     Q.  Is that the original punch list attached

25  to this Certificate of Substantial Completion?

NON-CERTIFIED COPY

Page 147

1      Q.  With respect to the wall panels in the

2  executive area we talked about, did all of those

3  panels warp?

4      A.  I can't say that they all -- that they

5  all warped.

6      Q.  Do you know what percentage of them

7  warped?

8      A.  I don't recall, no.

9      Q.  Was it --

10     A.  But I -- but I think it was -- it was a

11  twofold issue, the warping, but then there was

12  detail that -- like the doors and everything

13  that they were offended by.

14         So it wasn't just the warping issue

15  that -- when he walked in there, he was offended

16  by it.  So --

17     Q.  All right.  And I have dealt with his

18  being offended in connection with the parking

19  lot.  So, I understand.

20     A.  I don't think it had the look that he

21  was looking for, is the way I took it, and there

22  were also some warping of the panels that

23  they --

24     Q.  There was some warping, but he didn't

25  like the look anyway?

NON-CERTIFIED COPY

Page 148

1     A.  That is -- that is what -- that is my

2  personal opinion.  I have never heard him tell

3  me, "Stephan, I don't like this look."  I

4  just -- I know he walked in there, and I -- the

5  expression just didn't --

6     Q.  Did he blow up about it?

7     A.  Not to me, no.  Not in my presence.

8     Q.  Okay.

9     A.  I just know that after the fact we -- I

10 think I talked to Thomas, and he wasn't too

11 happy about --

12    Q.  Okay.  So your observation was it was a

13 combination of some of the wall boards warping

14 and the fact that he didn't like them in

15 addition to that?

16    A.  Correct.

17    Q.  Was this the first time you all used

18 Superior Millworks?

19    A.  No.

20    Q.  Is it the last time you used them?

21    A.  No.

22    Q.  Have you had any trouble with them?

23    A.  No.

24    Q.  All right.

25        MR. FRANCO:

NON-CERTIFIED COPY

1          That is all the questions I have,

2  Mr. Dorsey.  Thank you very much.

3          THE WITNESS:

4              Okay.

5          MS. MILLS:

6              I have just one, if that is okay?

7          MR. FRANCO:

8              Sure.

9  EXAMINATION BY MS. MILLS:

10     Q.  Could you go to Exhibit 11?

11     A.  (Complying.)

12         MR. FRANCO:

13         Alysson, let me catch up with you.  One

14  second.

15         MS. MILLS:

16             Okay.

17         MR. FRANCO:

18             Okay.

19  EXAMINATION BY MS. MILLS:

20     Q.  And this is part of the oil/water

21  separator that was not accounted for in the

22  construction drawings.

23     A.  Okay.

24     Q.  And I believe Counsel asked you, as a

25  general proposition, if these were the things

NON-CERTIFIED COPY

Page 150

1    that were discovered later, what did H&E have to

2    pay for them anyway.

3           And I just wanted to ask you a general

4    proposition.  Isn't it true that when you find

5    something late, there is an additional cost to

6    that?

7        A.  The time is -- you know, in our

8    business, time is money.  So there is -- yeah,

9    because you are sitting there waiting on it,

10   and, you know, we are out there.

11          Every day we are out there, we are

12   spending, you know, additional overhead.  So

13   yes, there was additional cost.  And from my

14   experience, when you add something to the

15   documents as a change order, you get higher

16   costs from a subcontractor, from somebody new,

17   rather than if they bid the project.  This --

18   that is how it is across the board.

19       Q.  And, actually, sometimes you have to

20   redo something that you have already done,

21   right?

22       A.  That is correct.  Depending on --

23       Q.  And so, for instance, just using this as

24   an example, the oil and water separator, I was

25   reading the attachment here, and if you look at

NON-CERTIFIED COPY

**URS**

## Deficiencies to the Completion of the Contract

| | |
|---|---|
| Project | H&E Equipment Services - Headquarters & Branch Buildings |
| Location | Baton Rouge, LA |
| URS No. | 19229775 |
| | |
| Date of Observation | Initial Observation on 12/14/2012, Revisit on 2/6/2013, Revisit on 2/19/2013, Revisit on 3/5/2013, Revised 6/24/13 |
| | |
| Contractor | Milton J. Womack, Inc. |

The list of work below is to be considered as an observation of the work completed or not completed at the time of observation. All work contained within the Contract Documents but not indicated on this list is still the responsibility of the appropriate contractor.

| Owner Acceptance by Initial | Value | | Deficient Item |
|---|---|---|---|
| | | ARCHITECTURAL | |
| | | INTERIOR | |
| ✓ | $150 | Entry 100 | Adjust sagging ceiling grid at door 100 |
| | | | |
| | | Civil/Landscape | |
| ✓ | $11,500 | Civil | Provide bituminous sealant on all joints within concrete pavement |
| ✓ | $1,200 | Landscape | Revise Landscape drainage to allow proper parking lot drainage |
| | | | |
| | | Mechanical | ok |
| | | | |
| | | Electrical | |
| ✓ | $500 | Lighting | Repair/replace 1 damaged lense for type A fixture in Conference Room |
| | | | |
| | | CLOSEOUT | |
| | | ok | |
| | | SUMMARY | |
| | $0 | General | |
| | $4,950 | Architectural | |
| | $13,850 | Civil/Landscape | |
| | $100 | Mechanical | |
| | $500 | Electrical | |
| | $0 | Closeout | |
| | $19,400 | Total | |

print date: 6/25/2013
file name: HQ & Branch List of Deficiencies 6-25-13 - Final

NON-CERTIFIED COPY

H&E 0025361

H&E EQUIPMENT SERVICES    *   SUIT NO. 626,308 DIV.: D


VERSUS                    *   19TH JUDICIAL DISTRICT COURT


URS CORPORATION           *   PARISH OF EAST BATON ROUGE
ARCHITECTURE, P.C.,
URS CORPORATION,          *   STATE OF LOUISIANA
L. O'NEAL JOHNSON AND
THOMAS E. RYAN, III


            The VIDEO CONFERENCING Deposition of
                    JOHN JONES



        Date:   Monday, August 8, 2016

        Time:   9:00 a.m.

        Place:  ITR AMERICA
                6301 NORTHWIND PARKWAY
                HOBART, IN 46342



REPORTED BY:

Before Marie Crist, CSR
Notary Public, Porter County, Indiana

ESQUIRE
SOLUTIONS

800.211.
EsquireS

EXHIBIT
7

NON-CERTIFIED COPY

1  VIDEO/TELEPHONIC APPEARANCES:

2

3  MS. LORETTA G. MINCE
       FISHMAN HAYGOOD LLP
4      201 ST. CHARLES AVENUE - 46TH FLOOR
       NEW ORLEANS, LA 70170
5      (504)586-5273
       lmince@fishmanhaygood.com
6
   On behalf of the Plaintiff, H&E Equipment Services;
7

8

9  MR. PHILIP A. FRANCO
   MR. KELLEN MATTHEWS
10     ADAMS AND REESE, LLP
       4500 ONE SHELL SQUARE
11     NEW ORLEANS, LA 70139
       (504)581-3234
12     philip.franco@arlaw.com

13 On behalf of the Defendants.

14

15

16

17

18 ALSO PRESENT:

19     Mr. Neal Johnson

20

21

22

23

24

25


NON-CERTIFIED COPY

JOHN JONES
H&E EQUIPMENT ~VERSUS~ URS CORPORATION

August 08, 2016
3

1            INDEX OF EXAMINATION

2  WITNESS:  JOHN JONES

3  DIRECT EXAMINATION
   Mr. Franco                          7
4  CROSS-EXAMINATION
   Ms. Mince                         160
5

6              E X H I B I T S

7  DEPOSITION                              PAGE

8  Jones 1      H&E 5158, Email from Thomas    24
               VanHattum to John Jones and
9              others, 12-19-06
   Jones 2      Report of Geotechnical         26
10             Investigation by STE
   Jones 3      H&E 5163, Email from Chad      30
11             Herndon to Leonard St. Germain
               and John Jones, 2-6-07
12 Jones 4      H&E 5164, Email from Mark      31
               Howard to Leonard St. Germain
13             and John Jones, 3-16-07
   Jones 5      H&E 5168, Email from Chad      34
14             Herndon to D. Lacombe and
               others, 8-9-07
15 Jones 6      H&E 6682, Email from Leonard   35
               St. Germain to James Brown,
16             3-5-08
   Jones 7      H&E 6812, Email from John Jones 36
17             to Leonard St. Germain, 7-2-08
   Jones 8      H&E 7609, Email from James     38
18             Brown to John Jones, 5-7-09
   Jones 9      H&E 7609, Email from Neal      40
19             Johnson to John Jones and
               others, 10-13-10
20 Jones 10     H&E 65373, Geotechnical        42
               Engineering Report for Kenner,
21             Louisiana, 2-9-11
   Jones 11     H&E 3302, Email from Frankie   46
22             Wynn to Brad Barber and John
               Jones, 2-28-11
23 Jones 12     H&E 3887, Email from Frankie   48
               Wynn to John Jones and Brad
24             Barber, 6-30-11

25



800.211.DEPO (3376)
EsquireSolutions.com

NON-CERTIFIED COPY

JOHN JONES                                    August 08, 2016
H&E EQUIPMENT ~VERSUS~ URS CORPORATION                      4

```
 1              E  X  H  I  B  I  T  S

 2    DEPOSITION                                    PAGE

 3

 4    Jones 13      URS 41439, Project Program for    49
                    the Belle Chasse facility,
 5                  7-1-11

 6    Jones 14      URS 68751, Email from Robert      54
                    Lacinak, Terracon, to Frankie
                    Wynn and others, 9-6-11

 7    Jones 15      H&E 10836, Email from Frankie     57
                    Wynn to James Brown and John
 8                  Jones, 9-20-11

      Jones 16      H&E 3738, Email from Frankie      59
 9                  Wynn to Brad Barber and others,
                    9-19-11

10    Jones 17      H&E 7534, Email from Eryn         61
                    Manint to John Jones and
11                  others, attaching FF&E Phase V
                    minutes, email dated 9-27-11

12    Jones 18      H&E 11023, Email from Terracon    66
                    to Frankie Wynn and others,
13                  10-3-11.  14-day break test
                    results

14    Jones 19      H&E 12665, Email from Neal        69
                    Johnson to John Jones and
15                  others, 1-9-12

      Jones 20      URS 33683, Email from Neal        72
16                  Johnson to James Brown, 1-27-12

      Jones 21      H&E 13163, Email from Brad        74
17                  Reese at MAPP to Thomas Ryan
                    and others, 2-2-12

18    Jones 22      H&E 13163, Email from Frankie     76
                    Wynn to Thomas Ryan and others,
19                  8-3-12

      Jones 23      H&E 26897, Series of emails,      78
20                  August 2012

      Jones 24      H&E 27074, Email from John        81
21                  Jones  to Neal Johnson, 8-3-12

      Jones 25      H&E 14429, Email from Neal        83
22                  Johnson to Thomas Ryan and
                    others, 8-11-12

23    Jones 26      H&E 14772, Email from Neal        85
                    Johnson to John Jones  and
24                  others, 8-13-12

      Jones 27      H&E 28382, September '12 series   91
25                  of emails
```



JOHN JONES
H&E EQUIPMENT ~VERSUS~ URS CORPORATION

August 08, 2016
5

```
1              E X H I B I T S

2    DEPOSITION                                      PAGE

3

4    Jones 28    H&E 16175, Email from Stephan        93
                 Dorsey to Frankie Wynn, 10-1-12
5    Jones 29    H&E 16465, Email from Ottis          95
                 Seaborn to Frankie Wynn,
6                10-4-12
     Jones 30    H&E 16469, Email from Brad           96
7                Reese to Neal Johnson and
                 Frankie Wynn and others,
8                10-4-12
     Jones 31    H&E 17109, Email from Ottis          97
9                Seaborn to Neal Johnson,
                 10-16-12, H&E Punch list
10               (Kenner)
     Jones 32    H&E 29709, Email from John          100
11               Jones to Stephan Dorsey and
                 others, 11-2-12
12   Jones 33    H&E 18817, Letter to Johnny         101
                 Jones from Neal Johnson,
13               11-20-12
     Jones 34    H&E 20068, Email from John          103
14               Jones to Neal Johnson and
                 others, 12-17-16
15   Jones 35    H&E 20515, Email from Frankie       111
                 Wynn to Jeff Stringer and
16               others, 1-2-13
     Jones 36    H&E 26857, Invoice from             113
17               Benchmark dated 12-21-12
     Jones 37    URS 57654, Email from Neal          114
18               Johnson to Murray McCullough,
                 1-18-13
19   Jones 38    H&E 22872, Email from John          115
                 Jones to Stephan Dorsey and
20               others, 1-25-13
     Jones 39    H&E 22979, Email from John          119
21               Jones to Frankie Wynn, 2-5-13
     Jones 40    H&E 4308, Email from Brad           120
22               Barber to John Jones, 2-4-13
     Jones 41    H&E 4279, Email from John Jones     121
23               to Brad Barber, 2-5-13
     Jones 42    H&E 9038, Email from John Jones     122
24               to Frankie Wynn, 2-7-13
     Jones 43    H&E 23640, Letter from Neal         123
25               Johnson to Johnny Jones, 3-1-13
```



NON-CERTIFIED COPY

JOHN JONES
H&E EQUIPMENT ~VERSUS~ URS CORPORATION

August 08, 2016
6

```
 1              E X H I B I T S

 2   DEPOSITION                                    PAGE

 3   Jones 44    H&E 21915, Email from Frankie      124
                 Wynn to John Jones, 3-18-13
 4   Jones 45    H&E 32308, Email from Frankie      127
                 Wynn to John Jones, 3-18-13
 5   Jones 46    H&E 23951, Email from Frankie      129
                 Wynn to John Jones, 3-25-13
 6   Jones 47    H&E 24328, Email from Frankie      129
                 Wynn to John Jones, 4-16-13
 7   Jones 48    H&E 24304, Email from Frankie      131
                 Wynn to John Jones, 4-10-13
 8   Jones 49    H&E 24339, Email from Neal         133
                 Johnson to Frankie Wynn,
 9               4-17-13
     Jones 50    H&E 8900, Email from Stephan       134
10               Dorsey to Frankie Wynn and
                 others, 6-6-13
11   Jones 51    H&E 32994, Email from Frankie      137
                 Wynn to Stephan Dorsey and
12               others, 6-6-13
     Jones 52    URS 79175, Email from Frankie      139
13               Wynn to John Jones and others,
                 6-12-13
14   Jones 53    H&E 25356, Email from Neal         140
                 Johnson to John Jones and
15               Stephan Dorsey, 6-24-13
     Jones 54    H&E 25359, Email from Frankie      144
16               Wynn to Thomas Ryan and others,
                 6-25-13
17   Jones 55    URS 54301, Email from Thomas       145
                 Ryan to Brad Reese and others,
18               7-9-13
     Jones 56    H&E 54144, Email from Brad         148
19               Reese to Thomas Ryan, 7-17-13
     Jones 57    H&E 21121, Email from Thomas       152
20               Ryan to Kevin Sprehe and
                 others, 7-22-13
21   Jones 58    H&E 21671, Email from John         153
                 Jones to Frankie Wynn, 8-12-13
22   Jones 59    H&E 8042, Email from John Jones    156
                 to Jeff Stringer and others,
23               10-30-13
     Jones 60    H&E 4381, Email from Frankie       158
24               Wynn to Brad Barber and John
                 Jones, 11-27-13
25
```



ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com

NON-CERTIFIED COPY

JOHN JONES
H&E EQUIPMENT ~VERSUS~ URS CORPORATION

August 08, 2016
7

1           JOHN JONES,

2    Called as a witness by the Defendants, having

3    been first duly sworn or affirmed, was examined

4    and testified as follows:

5           DIRECT EXAMINATION

6  BY MR. FRANCO

7    Q.  Good morning, Mr. Jones.  My name is Phil

8  Franco.  I represent URS and the other Defendants in this

9  case.  Sir, so that the record is clear, can you state

10 your full name and address for the record?

11    A.  John David Jones, 808 Barberry Lane, Valparaiso

12 Indiana 46383.

13    Q.  And where are you presently located for this

14 deposition, sir?

15    A.  We are currently in the offices of my current

16 employer, ITR America at 6301 Northwind Parkway, Hobart,

17 Indiana 46342.

18    Q.  And you have a court reporter there with you?

19    A.  I do.

20    Q.  And you also are on a video, am I correct?

21    A.  I am.

22    Q.  Okay.  Thank you for being with us today.  I

23 appreciate you taking the time out.  We will try to do

24 this as fast as possible.  We have got some documents to

25 cover.



NON-CERTIFIED COPY

1    stations from prior discussions, am I correct?

2         MS. MINCE:  Object to form.

3    A.  Correct.

4    BY MR. FRANCO

5    Q.  And, again, what was the discussion about

6    parking for those 214 people or so?

7    A.  There were no conversations on that, past that

8    point.

9    Q.  So there were no conversations that changed the

10   concept of overflow parking that had been discussed

11   previously?

12   A.  Well, I -- again, when we talked about overflow

13   parking, I'm not quite sure what you mean by "overflow

14   parking;" so I don't recall -- there were discussions way

15   back about the size of the yard and the parking of the

16   branch employees, but not related to the corporate

17   employees.

18   Q.  All right.  Was there discussions about --

19   because you mentioned I think in your earlier testimony

20   something about discussions back when about overflow

21   parking.  What discussion were you talking about?

22   A.  About the employees at the branch.

23   Q.  Okay.  So was there any discussions that you

24   were privy to about overflow parking for anybody at the

25   headquarters building?



NON-CERTIFIED COPY

1        A.  Not that I recall.

2        Q.  Okay.  And as far as communicating about the

3   need for parking spaces, who from your -- excuse me --

4   who from H&E was responsible for communicating any -- any

5   information about the number of parking spaces that were

6   desired by H&E for the corporate headquarters building?

7            MS. MINCE:  Object to form.

8        A.  There weren't any.  That's -- again, it was

9   designed and at the end I guess no one had thought to

10  say, hey, we have now designed this building to handle

11  this many people, do we have the parking for it.

12       But that was also not forthcoming from URS as, by

13  the way, be aware of this.

14  BY MR. FRANCO

15       Q.  Okay.  And who was responsible for reviewing

16  specifications and plans for Baton Rouge still, you know,

17  on behalf of H&E?

18            MS. MINCE:  Object to form.

19       A.  That would have been at certain points in time,

20  Leonard St. Germain, Frankie and myself, but I never sat

21  there and counted the parking spots in the -- on the

22  sheet, so...

23  BY MR. FRANCO

24       Q.  I understand.  But let's just talk about you,

25  yourself.  You, yourself, were shown the construction



NON-CERTIFIED COPY

1    concrete faster than normal?

2        A.  I don't recall off the top of my head, but --

3        Q.  Okay.  Well, that's fine.  You may not have been

4    involved in that conversation.  You just don't remember.

5        Mr. Jones, the Kenner facility, so that the Jury

6    understands, was an operating facility at the time this

7    work was being done; am I correct?

8        A.  That's correct.

9        Q.  And so H&E wanted to disrupt its operations as

10   little as possible to get this work done, a fair

11   statement?

12       A.  It was designed to be done in stages, yes.

13       Q.  Okay.  So -- and that was my next question.  It

14   was designed to be done in stages so that the equipment

15   could be moved on to the site at different locations so

16   that the operations would be interrupted as little as

17   possible, correct?

18       A.  Correct.

19       Q.  All right.  Were you involved in the issue

20   involving the mail slots at the Baton Rouge facility?

21       A.  I was.

22       Q.  Okay.  Do you recall that personnel from H&E

23   were at -- were -- visited the URS office in Baton Rouge

24   and looked at the mail slots there?

25       A.  I don't recall.



NON-CERTIFIED COPY

1    Q.  Do you recall whether the design of the mail

2  slots at the Baton Rouge facility was modeled after the

3  mail slots in the URS office?

4    A.  I have no idea.

5    Q.  So you weren't actually involved in the details

6  of that, only when the problem surfaced?

7    A.  Correct.  And no --

8    Q.  And what was the problem --

9    A.  -- and I -- go ahead.

10    Q.  What was the problem with the mail slots?

11    A.  Well, the problem was, if the way the mail room

12  was designed at that corporate office had been reviewed,

13  it was expected that it would have been designed based

14  upon our -- what our past structure was, not off of what

15  the URS mail slots were designed to be.  I don't even

16  know where the URS mail slots would --

17    Q.  Were you involved -- go ahead.

18    A.  I said, I don't know where the review of the URS

19  mail room even came up, unless it was in passing --

20    Q.  And you weren't involved in those discussions?

21    A.  I don't recall any conversations related to the

22  mail slots, no.

23    Q.  Okay.  And was there something, as I understand

24  it -- let me see if I can go through this fairly

25  quickly -- the mail slots, after construction, in H&E's



NON-CERTIFIED COPY

1    view, were too small; is that a fair statement?

2         A.  That's a fair statement.  Our former design was

3    all letter size, not envelope size, because all the

4    documents were put in, and then they were packaged after.

5    They weren't letters.

6         Q.  Okay.  Okay.  So after it was constructed, that

7    issue came up --

8         A.  That's correct.

9         Q.  -- of the size, correct?

10        A.  That's correct.

11        Q.  And what was -- and did, did URS redesign the

12   mail slots to the satisfaction of H&E?

13        A.  I believe that took place, yes.

14        Q.  And were there other changes made to the mail

15   area after construction?

16        A.  Not that I can recall.

17        Q.  All right.  Let's look at -- I skipped a few

18   documents.  Look at URS 33683.  It should be dated

19   January 27, 2012.

20        A.  33683?

21        Q.  683, 33683.

22        A.  Okay.  I have it.

23             (Exhibit JONES 20 marked.)

24   BY MR. FRANCO

25        Q.  All right.  This is an email from Neal Johnson



NON-CERTIFIED COPY

1          A.   Frankie was still involved in that project,

2     also.

3          Q.   In Belle Chasse?

4          A.   Correct.

5          Q.   All right.  Let's look at the next document,

6     Mr. Jones, H&E 14429.

7          A.   Okay.

8               (Exhibit JONES 25 marked.)

9     BY MR. FRANCO

10         Q.   I'm going to label that as Exhibit 25.  And

11    that's 14429.  The top email is from Neal Johnson,

12    August 11, 2012 to Craig Duos, D-U-O-S, and it copies

13    Mr. Wynn, among other people; and it talks about

14    reviewing the foundation design for the Belle Chasse

15    facility.

16         It says, "The owner and the folks with the

17    Shuttlelift think we have tremendously overdesigned the

18    foundation."  Do you recall that issue coming up?

19         A.   I do.

20         Q.   What do you recall about that?  Was it

21    overdesigned, did you stick with the original design or

22    was it changed?

23         A.   Well, what we did --

24         Q.   That's three questions.  Let me go one question

25    at a time.  What was the result of those discussions?



NON-CERTIFIED COPY

JOHN JONES                                                      August 08, 2016
H&E EQUIPMENT ~VERSUS~ URS CORPORATION                                      84

1    Was it -- did the design stay the same or was it changed?

2         A.  It was changed.

3         Q.  And how so?

4         A.  Well, if I recall right, his design was, I

5    believe, saw cutting a majority of the current foundation

6    and pile driving to a higher level of load than what the

7    people at Shuttlelift indicated was required for the

8    machine we were talking about; so he had designed it for

9    the entire -- for the machine to roll throughout the

10   whole facility, when in fact it was only going through a

11   certain area.

12        Q.  And so the design was -- I should say limited

13   and therefore the expense was less; is that a fair

14   statement?

15            MS. MINCE:  Object to form.

16        A.  It was modified to meet the requirement of where

17   the machine was rolling as opposed to the entire --

18   BY MR. FRANCO

19        Q.  Which then resulted -- I'm sorry.  I thought you

20   were finished.  Go ahead.

21        A.  You can proceed.  I think I made my statement.

22        Q.  Was that -- did that result in less expense for

23   that project?

24        A.  Yes, it would have.  But, if I recall right,

25   there was also additional concrete or overlayment, so it



NON-CERTIFIED COPY

1    transitioned from more piles to more depth of concrete,

2    if I remember correctly, so I don't know what the net

3    difference was.

4        Q.  All right.  So they used less piles of thicker

5    concrete; is that what you recall?

6        A.  That's what I recall.

7        Q.  At that -- at a certain point of Belle Chasse

8    we're talking?

9        A.  Correct.

10           (Exhibit JONES 26 marked.)

11   BY MR. FRANCO

12       Q.  All right.  Let's look at the next document,

13   H&E 14772, which I'm going to label as Exhibit 26.

14       All right.  Now, I want to focus on the email at the

15   bottom of the first page.  This talks about new paving

16   for the dumpster pad at -- I would assume at Kenner; is

17   that correct?

18       A.  Yes.

19       Q.  All right.  So Tim Gaines, who is listed as

20   senior civil engineer at URS at the time tells Ottis

21   Seaborn -- and do you know who Ottis was?

22       A.  He was the project manager for MAPP, I believe.

23       Q.  All right, at Kenner.  And in the second

24   paragraph of that he is saying, "I'm also requesting that

25   the pavement be cleaned and the joints be cleaned.  One


NON-CERTIFIED COPY

1    Q.  Do you recall the reason why URS rejected those

2  joints?

3    A.  I do not.

4       MS. MINCE:  Object to form.

5    A.  I do not recall.

6  BY MR. FRANCO

7    Q.  All right.  Look at the next document,

8  H&E 17109.  Do you see that one?

9    A.  I have it.

10   Q.  All right.  Now, let's label this as Exhibit 31.

11      (Exhibit JONES 31 marked.)

12  BY MR. FRANCO

13   Q.   This is labeled as H&E's Punch list (Kenner);

14  do you see that?  I'm sorry the attachment is labeled

15  "10-16-12 H&E Punch list (Kenner.)"

16   A.  Okay.

17   Q.  Do you see that?

18   A.  I see that.

19   Q.  Look at -- you know what a punch list is, don't

20  you, sir?

21   A.  I do.

22   Q.  Can you explain to the jury your understanding

23  of what a punch list is?

24   A.  Near the completion of a project, it's a listing

25  made of any deficiencies that need to be corrected to



1  complete the project.

2      Q.  Okay.  Look at Number 13 on that list on the

3  very first page.  It says, "MCC:  Repair damaged paving

4  at various locations (in process)."  Do you see that?

5      A.  I see that.

6      Q.  What area was repaired at that location; can you

7  tell us?

8      A.  I cannot.

9      Q.  And look at the next item, Number 14, It also

10  lists "MCC," which is MAPP Construction Company, correct;

11  that's what it means?

12     A.  Okay.  Yes.

13     Q.  And it says, "Address & detail cracks at slab

14  A-A & paving areas."  Do you know what that references?

15     A.  I'm not totally clear on the A-A, but in

16  general, yes.

17     Q.  When the word "slab" is used, that usually

18  indicates a foundation in a building, doesn't it, or in

19  connection with a building; is that correct?

20     A.  Probably, yes, since it's not related to the

21  paved areas.  I'm assuming that's still in the --

22     Q.  Very good, sir.  I guess my question is -- my

23  question is:  Do you know what Item 14, what area that

24  related to at Kenner?

25     A.  No.


NON-CERTIFIED COPY

1      Q.  But it was listed as a punch list for MAPP

2  Construction Company, wasn't it?

3      A.  Yes, on their punch list.

4      Q.  Yes.  Okay.  Hold on one second, for me.  All

5  right look at the photos that are attached to this punch

6  list.

7      A.  I'm doing that right now.  So Item 13 --

8      Q.  Look at page -- yeah, Item 13, repair damage to

9  paving.  Do you see the pictures that are reflected

10  there?

11          MS. MINCE:  What page number are you on?

12          MR. FRANCO:  17123.

13          MS. MINCE:  Thank you.

14      A.  All right.  So there is a drain --

15  BY MR. FRANCO

16      Q.  Do you see that, sir?

17      A.  I do.

18      Q.  That's in the area of a drain; am I correct?

19      A.  It is.

20      Q.  And that's with this -- going back to the punch

21  list, as having been done -- or, I'm sorry, is in

22  process, but it's stricken on the punch list, correct?

23      A.  Yes.

24      Q.  And then look at Item 14.  That may help us on

25  the original question of where that slab was.  Look at



NON-CERTIFIED COPY

1    Number 14, Item 14, the picture on Page 17124, it says,

2    "Address and detail cracks at slab A-A."  Do you see

3    that?

4         A.  I see the picture but I have no reference

5    points, so I have no idea where that is.

6         Q.  I'm sorry, sir.  I didn't hear you.

7         A.  I said I have no idea where that crack is at,

8    because there is no reference point.

9         Q.  Okay.  Do you know whether that slab A-A was the

10   slab we talked about before as being then subsequently

11   replaced in the back of the service building?

12        A.  I couldn't answer that, not from the photo.

13        Q.  Okay.  All right.  All right.  You can skip the

14   next document.  Look at next H&E 29709.  Which I'm going

15   to label as Exhibit 32.  Are you with me?

16        A.  I am.

17             (Exhibit JONES 32 marked.)

18   BY MR. FRANCO

19        Q.  All right.  This is from you from November 2,

20   2012, and it basically says to Womack, "The board is

21   meeting this morning and my understanding is they will

22   break for lunch and it is highly likely that they will

23   come by the site after lunch."  Did that happen?

24        A.  I have no idea if it did or not.

25        Q.  All right.  You can skip the next document, and



1      A.  We were not dissatisfied with their performance.

2      Q.  Okay.  All right.  Let's look at the next

3  document, H&E 20068, which I'm going to label as

4  Exhibit 34.

5          (Exhibit JONES 34 marked.)

6  BY MR. FRANCO

7      Q.  Do you have it?

8      A.  Yes.

9      Q.  All right.  This is from you to Frankie Wynn --

10  I'm sorry, excuse me, to Neal Johnson and Thomas Ryan,

11  copying Frankie Wynn.  It says "Corporate Parking."

12      "Neal, I need your presence here at that facility in

13  short order.  The executive group is very upset with the

14  parking situation.  We have 142 parking spaces including

15  the guest parking by the flagpoles and 6 handicap places

16  for a total of 148.  We currently have 153 people in the

17  office here and we are not at capacity.  We need to

18  determine some resolution quickly."  Do you see that?

19      A.  I see it.

20      Q.  All right.  On -- this is December 17, 2012, who

21  was the executive group that was very upset?

22      A.  John Engquist to be the key individual.

23      Q.  And what caused him to be upset, to your

24  knowledge?

25      A.  Well, the fact that we moved into the corporate



NON-CERTIFIED COPY

JOHN JONES                                           August 08, 2016
H&E EQUIPMENT ~VERSUS~ URS CORPORATION                        104

1    facility that weekend, and we were trying to get

2    everything I guess sorted out on the Monday morning, and

3    there was no place for all of the people to park.

4        Q.  Okay.  Was there a board member that tried to

5    park that day?

6        A.  No.

7        Q.  Okay.  And --

8        A.  Except, you know, John Engquist and there were

9    multiple people that were on the board there, John

10   Engquist and Brad Barber and our CFO, et cetera.

11       Q.  Okay.  They were all board members?

12       A.  They are.

13       Q.  Okay.  And you said you had currently 153 people

14   in the office and you were not at capacity, correct?

15       A.  Correct.

16       Q.  Do you know how many parking spaces it was

17   designed for?

18       A.  I assumed what we were seeing right there that I

19   just reiterated, 148 in total.

20       Q.  And how did you determine it was 148?

21       A.  Because we walked down and counted them at that

22   point.

23       Q.  Okay.  And how long had those parking spaces

24   been constructed?

25       A.  I have no idea.  It wasn't something that we had



NON-CERTIFIED COPY

1    A.  I don't recall.

2    Q.  Okay.  In January -- this is December 17 -- and

3 it's fair to say that URS came to a meeting either that

4 day or very soon the next day at H&E; am I correct?

5    A.  Again, without a document in front of me, I'm

6 not recalling every detail at this point, so...

7    Q.  All right.  Well, you requested -- you requested

8 in your email his presence at the facility in short

9 order, right?

10    A.  Correct.

11    Q.  All right.  Do you recall -- there was a meeting

12 at the facility with H&E and URS personnel about the

13 parking?

14    A.  There was one.  Exactly when, I don't recall.

15    Q.  Okay.  Do you remember Mr. Engquist being at the

16 meeting as well?

17    A.  He was there.

18    Q.  Do you remember him cursing at the meeting?

19    A.  I don't recall.

20    Q.  You don't recall him cursing URS personnel at

21 that meeting at all?

22    A.  I do not recall that.

23    Q.  All right.  Do you remember -- strike that.

24    Did Mr. Engquist advise you to stop all payments of

25 any invoices to URS as a result of that parking issue?



NON-CERTIFIED COPY

JOHN JONES
H&E EQUIPMENT ~VERSUS~ URS CORPORATION

August 08, 2016
107

1        A.  He did.

2        Q.  And that was right about the time this problem

3   developed in December or early January?

4        A.  Correct.

5        Q.  And did you convey that to other people, that

6   invoices of URS were not to be paid?

7        A.  Well, the direction was not actually directed to

8   me, it was directed from Mr. Engquist directly to the

9   accounts payable and accounting department.

10       Q.  Okay.  Was that verbally or was that in writing;

11   to your knowledge?

12       A.  I -- I have no idea.

13       Q.  Okay.  But you were certainly aware of it at the

14   time?

15       A.  I was verbally told.

16       Q.  By Mr. Engquist or by the accounting department?

17       A.  I don't recall.  I believe it was probably by

18   the accounting department.

19       Q.  Okay.  Now, at the time were you at the facility

20   on December 17, 2012, when this issue surfaced?

21       A.  I was.

22       Q.  And did you go out and observe anybody in the

23   parking area of the headquarters building?

24       A.  I did.  It was totally packed.

25       Q.  All right.  Was there also construction going on



NON-CERTIFIED COPY

1        Q.  Okay.  But was a number given?

2        A.  There were numbers given.  I don't remember what

3   they were.  I don't have all those spreadsheets any

4   longer.

5        Q.  Okay.  And those numbers were supposed to be

6   reflected on the construction drawings, correct?

7            MS. MINCE:  Object to form.

8        A.  You would think.

9   BY MR. FRANCO

10       Q.  All right.  Look at the next document which is

11  H&E 22979, which I'm going to label as Exhibit 39.  Do

12  you have that?

13       A.  I see it.

14           (Exhibit JONES 39 marked.)

15  BY MR. FRANCO

16       Q.  All right.  Do you recall that Ms. Sanders from

17  URS offered to cover the difference in the cost of

18  building a new parking now as opposed to earlier with the

19  rest of the parking?

20       A.  I am reading it.

21       Q.  And do you recall that being -- and it's on the

22  second page -- $17,507?

23       A.  I don't recall it, but I'm reading it now, okay.

24       Q.  Okay.  And as a result of -- that was obviously

25  rejected, right, by H&E?


ESQUIRE

NON-CERTIFIED COPY

1        A.  Yes.

2        Q.  Because H&E wanted URS to pay the full $129,000

3    and-some-change as a result of the estimated cost to

4    increase the parking space; am I correct?

5        A.  That's correct.

6        Q.  And as far as you know, did you either instruct

7    or were you aware of anybody who calculated that

8    difference in cost between -- the cost to add as opposed

9    to had it been originally installed?

10        A.  Not that I'm aware of.

11        Q.  Are you aware that Brad Barker forwarded --

12    let's just look at the next exhibit, H&E 4308.

13        A.  Okay.

14            (Exhibit JONES 40 marked.)

15    BY MR. FRANCO

16        Q.  Which I will label as Exhibit 40.  And Brad

17    Barber is sending to you information that the URS Ethics

18    Hotline has received his email.

19        A.  Okay.

20        Q.  And it's referenced the "Additional parking

21    cost;" do you see it?

22        A.  I see it.

23        Q.  Are you aware that Mr. Barber made the complaint

24    to the URS Ethics Hotline about the additional parking

25    cost?




NON-CERTIFIED COPY

1    Phase 2 in Belle Chasse; do you see that at the top?

2          A.  I see it.

3          Q.  You accepted that on March 5, 2013, correct?

4          A.  It appears so, yes.

5          Q.  So you -- so after instructions were to withhold

6    invoices, you authorized URS to do additional work which

7    H&E didn't pay them for; is that right, sir?

8          A.  I assume so.

9          Q.  And that was because of the original instruction

10   from Mr. Engquist, correct?

11         A.  Correct.

12         Q.  All right.  Look at the next document, sir, if

13   you would, H&E 21915, which I'm going to label as

14   Exhibit 44.

15         A.  Okay.

16             (Exhibit JONES 44 marked.)

17   BY MR. FRANCO

18         Q.  All right.  This starts back at the back of the

19   invoicing, but if you look at Page 21917, we can focus on

20   that one; and this is, at the bottom, it's from Brad

21   Reese at MAPP to Frankie Wynn and URS personal; and it

22   says, "For your information, our subcontractor proposes

23   the following solution to the concrete areas in need of

24   repair."

25             And this is obviously MAPP, so this is Kenner; and



NON-CERTIFIED COPY

1  it says, "Concrete Joint Repairs in Paving." and it talks

2  about a recommendation, and then it says, "Crack Repairs

3  in Paving," and talks about a recommendation, and then

4  "Building Slab Transition," and it talks about a

5  proposal, and then it talks about "Expansion Joints in

6  Paving."  Do you see that?

7       A.  I see it.

8       Q.  Why weren't those fixes incorporated into the

9  project?

10       A.  I don't recall.

11       Q.  Did it have anything to do with the fact that

12  MAPP was looking to have H&E pay for those repairs?  Look

13  at the top email.

14       A.  I'm reading through them.

15       Q.  The very top of the first page.

16       A.  Well, the way I'm reading it, we ended up saying

17  that we didn't feel the cost should be attributable to

18  H&E --

19       Q.  Okay.

20       A.  -- is the way I'm reading through the email

21  chain.

22       Q.  All right.  Do you recall who you did -- who H&E

23  did attribute the cost to?

24       A.  Yeah, we never did feel that on either the Baton

25  Rouge or the Kenner project that the design of the joints



1    for our application was done correctly.

2         Q.  And what was the basis for your opinion that the

3    design of the joints was not done properly?

4         A.  Because of the breakage.  I mean, we had other

5    facilities that had paving with that product that didn't

6    have anything near what was happening at these two

7    operations.

8         Q.  Mr. Jones, were you at H&E when the lawsuit was

9    originally filed against URS in this case?

10        A.  I assume that I was.  I don't recall the exact

11   date.  If you can tell me the date, then I can tell you

12   if I was there.

13        Q.  November 20, 2013, it was filed.  You were still

14   at --

15        A.  I was still there.

16        Q.  -- H&E at the time; am I correct?

17        A.  I was still there.

18        Q.  Okay.  Now, you just stated what H&E's position

19   was on the joints.  Did URS have an opinion from an

20   expert at that time as to what the cause was?

21        A.  There were different guys parading around trying

22   to give opinions.  I don't recall the exact -- if there

23   was or was not.

24             THE REPORTER:  Excuse me.  Was there an

25   objection in there?



NON-CERTIFIED COPY

1    what the Sika rep said with respect to causation and

2    repair?

3        A.  I do not recall.

4        Q.  Did you know the name of the Sika rep?

5        A.  I don't.

6        Q.  All right.  You can skip the next one.  All

7    right, and let's go to H&E 25356, which I'm going to

8    label Exhibit 53.

9        A.  Okay.

10            (Exhibit JONES 53 marked.)

11   BY MR. FRANCO

12       Q.  Now, at the bottom of Page 1 -- let's start at

13   the back.  I'm sorry, Mr. Jones.  Start at the back and

14   start with an email from Steven Dorsey at Womack June 24,

15   2013; and it says, "The following list reflects the

16   outstanding items on the H&E project."

17       This is from Womack.  I'm presuming it deals with

18   Baton Rouge.  And he says, "Executive wall panels."  That

19   was a Baton Rouge issue, correct?

20       A.  Yes.

21       Q.  And if you look down, the other it looks like

22   highlighted issue is, "Site paving expansion/construction

23   joint issue."  Do you see that?

24       A.  I see it.

25       Q.  It says "Waiting on H&E's response."  Steven



1    Dorsey then sends that email to Frankie Wynn on June 24,

2    2013.  Do you see that?

3        A.  I see.

4        Q.  And then Frankie Wynn sends it on June 24th to

5    Thomas Ryan and Neal Johnson.  Do you see that?

6        A.  I see it.

7        Q.  Mr. Wynn says on June 24, 2013, "The only

8    controversial issue is still with the joints."  Do you

9    see that?

10       A.  I see it.

11       Q.  Do you have any reason to disagree with that?

12       A.  The -- at that point, I would agree.

13       Q.  All right.  And he says, "I need an opinion from

14   URS in regards to whether a design or installation issue.

15   I have forwarded Womack's opinion previously."  And

16   Mr. Johnson responds to that on June 24, 2013, doesn't

17   he?

18       A.  He does.

19       Q.  He says, "There are no design or engineering

20   issues - the issues with the work in place is either a

21   construction, warranty or a maintenance issue."  Do you

22   see that?

23       A.  I see it.

24       Q.  And that was copied to you as well, wasn't it?

25       A.  It was.  So what we have at this point is the


NON-CERTIFIED COPY

```
 1  H&E 25359, which is exhibit -- I'm going to label it

 2  Exhibit 54.

 3       A.  Okay.

 4            (Exhibit JONES 54 marked.)

 5  BY MR. FRANCO

 6       Q.  Okay.  Let's look at the next document.  And

 7  Frankie Wynn is sending to you and other people the punch

 8  list for the Baton Rouge facility.

 9       A.  Okay.

10       Q.  Do you see that?

11       A.  I see it.

12       Q.  And attached is URS's "Deficiencies to the

13  Completion of the Contact," that's what it's entitled,

14  and its location is Baton Rouge; do you see that?

15       A.  I see it.

16       Q.  And at the top left of the deficiency chart,

17  there is a checkmark equal okay.  Whose initials are

18  those?

19       A.  It's Frankie Wynn's.

20       Q.  And that's dated 6-25-2013, correct?

21       A.  It does say that.

22       Q.  All right.  And when you look down at the

23  column, it says -- the way I read this, sir, is the

24  checkmarks are okay; is that the way you read this?

25       A.  That's the way I read it.
```

JOHN JONES
H&E EQUIPMENT ~VERSUS~ URS CORPORATION

August 08, 2016
152

1      A.  -- I don't remember the specific conversation.

2      Q.  What happened -- what happened to this mock-up

3  proposal --

4      A.  I have -- I don't recall.  I don't know that it

5  was ever done.

6      Q.  Do you know why it wasn't done?

7      A.  I don't recall.

8      Q.  All right.  Let's look at the next exhibit which

9  is H&E 21121, which I will label as Exhibit 57.

10      A.  Okay.

11          (Exhibit JONES 57 marked.)

12  BY MR. FRANCO

13      Q.  It says at the top, "Kevin/Frankie, attached for

14  your review is the draft of Change Order #02 for the

15  Belle Chasse project.  The listed proposals in attachment

16  #1 are all of the open COP's that have been approved by

17  H&E."

18      Attached is a Change Order 02 - Attachment, and it's

19  for -- one of the items is "Install Additional 3-inch of

20  Concrete Topping" -- (indiscernible.)

21          THE REPORTER:  Excuse me.  Can you say that

22  again, and it's for one of the items...

23          MR. FRANCO: Yes, ma'am.

24  BY MR. FRANCO

25      Q.  It is $47,164 for "Installing Additional 3-inch



NON-CERTIFIED COPY

1    of Concrete Topping in Building A Due to Survey

2    Discrepancy."  Do you see that?

3        A.  Yes.

4        Q.  Was that change order ultimately approved?

5        A.  I can't answer that unless you've got something

6    that indicates that it was.

7        Q.  All right.  Let's look at the next exhibit which

8    is H&E 21671, which is Exhibit 58.

9        A.  Okay.

10            (Exhibit JONES 58 marked.)

11   BY MR. FRANCO

12       Q.  This is reference to Belle Chasse, "Change Order

13   Proposal Number 25 - Ramp and resteel changes," and at

14   the top you say to Frankie Wynn, "I would guess this goes

15   on our list of items that URS created additional cost for

16   us because of their lack of professional diligence."  Do

17   you see that?

18       A.  I see it.

19       Q.  Now, you said you thought, as I recall it, that

20   the problems of the spalling and the cracking in the

21   concrete was a design problem as opposed to a

22   construction problem; am I correct?

23       A.  Are we talking about pavement or are we talking

24   about the Belle Chasse shop area?

25       Q.  Talking about pavement at Baton Rouge in the



NON-CERTIFIED COPY

1              THE REPORTER: Correct.

2         A.  Yes.

3   BY MR. FRANCO

4         Q.  Was there a problem with the concrete at the

5   Belle Chasse facility that you recall?

6         A.  Only the fact that there was some items missed

7   by the survey group that we had to change some elevations

8   and -- which cost some additional charges related to some

9   steel, or something of that nature; but the concrete was

10  limited inside of the work area, so I'm not --

11        Q.  Okay.  All right.  You can skip the next

12  exhibit -- or document, I should say.  You can skip the

13  next one.  All right.  Let's look at H&E 4381.  Which I'm

14  going to label as Exhibit 60.

15        A.  Okay.

16             (Exhibit JONES 60 marked.)

17  BY MR. FRANCO

18        Q.  This is a -- at the bottom is an email from Al

19  Naquin at MPS.  Do you -- and this was ultimately sent to

20  you.  This was apparently the same MPS recommendation

21  that was being proposed on how to repair these joints.

22  Do you see that?

23        A.  I see it.

24        Q.  And it looks like at this time, if you look at

25  the last page, the expansion joint repairs were going to



NON-CERTIFIED COPY

| From: | Johnson, Neal [neal.johnson@urs.com] |
|---|---|
| Sent: | Monday, June 24, 2013 2:39 PM |
| To: | Frankie Wynn; Ryan, Thomas E |
| Cc: | John Jones; Dorsey, Stephan |
| Subject: | RE: H&E - Outstanding Items |

There are no design or engineering issues – the issues with the work in place is either a construction, warranty or a maintenance issue.

Neal Johnson



**Neal Johnson, AIA**
Program Manager – Facilities
Maximus, South Central Group

7389 Florida Boulevard,
Suite 300
Baton Rouge, LA 70806
Office 225.922.5700
Direct 225.331.6343
Cell 225.324.5848

Neal.johnson@urs.com

**From:** Frankie Wynn [mailto:fwynn@he-equipment.com]
**Sent:** Monday, June 24, 2013 2:12 PM
**To:** Ryan, Thomas E; Johnson, Neal
**Cc:** John Jones; 'Dorsey, Stephan'
**Subject:** FW: H&E - Outstanding Items

See Stephan's comments below. The only controversial issue is still with the joints. I need an opinion from URS in regards to whether a design or installation issue. I have forwarded Womack's opinion previously.

Frankie Wynn
Director of Facilities/Risk/Compliance Management
H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA 70809 (New Address)
Office: 225-298-5229
Mobile  225-603-4438
Fax: 225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com


-----Original Message-----
From: Dorsey, Stephan [mailto:sdorsey@mjwomack.com]
Sent: Monday, June 24, 2013 1:47 PM

1


EXHIBIT
Jones
53
8-8-16

NON-CERTIFIED COPY

H&E 0025356

To: Frankie Wynn
Subject: Fwd: H&E - Outstanding Items

Fyi

Stephan Dorsey
Project Manager
Milton J. Womack, Inc
Office: (225) 924-8050
Fax:    (225) 924-8085
Cell:    (225) 268-6014


Begin forwarded message:

From: "Dorsey, Stephan" <sdorsey@mjwomack.com<mailto:sdorsey@mjwomack.com>>
Date: June 24, 2013 8:55:30 AM CDT
To: "Hill, Terry" <thill@mjwomack.com<mailto:thill@mjwomack.com>>, "Phillips, Dale"
<dphillips@mjwomack.com<mailto:dphillips@mjwomack.com>>, "Gauthier, Greg"
<ggauthier@mjwomack.com<mailto:ggauthier@mjwomack.com>>
Cc: "Bonner, Philip" <pbonner@mjwomack.com<mailto:pbonner@mjwomack.com>>
Subject: RE: H&E - Outstanding Items

The following list reflects the outstanding items on the H&E project as of today, and the status of each one of.
today:


·    Mechanical chase exposed beams – COMPLETE (Trison completed the beam fireproofing this past
Saturday)

·    Executive wall panels – In the process of getting the material finish installed and approved by H&E.

·    Branch Building Water Leaks – COMPLETE

·    Drywall repair at the acoustical wall panels – COMPLETE

·    Curb repair at HQ Bldg entrance – COMPLETE

·    As-Builts – COMPLETE

·    Site Paving expansion/construction joint issue – WAITING ON H&E'S RESPONSE

·    Stairwell door hardware issue –  COMPLETE

·    Floor squeaks – COMPLETE

·    Missing carpet in Room #207 floor box – COMPLETE

·    Replace 4 pieces of carpet tile in John's office – COMPLETE

I'll update and re-send this list as each item is resolved.

2

NON-CERTIFIED COPY

H&E 0025357

Stephan Dorsey
Project Manager
Milton J. Womack, Inc.
Office: (225) 924-8050
Fax:    (225) 924-8085
Cell:   (225) 268-6014

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

NON-CERTIFIED COPY

H&E 0025358

| From: | Frankie Wynn |
|---|---|
| Sent: | Tuesday, June 25, 2013 4:43 PM |
| To: | Ryan, Thomas E; Dorsey, Stephan; John Jones; Johnson, Neal (neal.johnson@urs.com) |
| Subject: | H&E Equipment Services, Inc Corporate and Branch Punch List 6/25/2013 |
| Attachments: | 201306251637.pdf |

H&E Equipment Services, Inc Corporate and Branch Punch List 6/25/2013 Attached

Frankie Wynn
Director of Facilities/Risk/Compliance Management H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA  70809   (New Address)
Office:  225-298-5229
Mobile:  225-603-4438
Fax:  225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com

EXHIBIT
Jones
54
B816
NON-CERTIFIED COPY     H&E 0025359



# Deficiencies to the Completion of the Contract

| | |
|---|---|
| Project | H&E Equipment Services - Headquarters & Branch Buildings |
| Location | Baton Rouge, LA |
| URS No. | 19229775 |
| | |
| Date of Observation | Initial Observation on 12/14/2012, Revisit on 2/6/2013, Revisit on 2/19/2013, Revisit on 3/5/2013, Revised 6/24/13 |
| Contractor | Milton J. Womack, Inc. |
| | The list of work below is to be considered as an observation of the work completed or not completed at the time of observation. All work contained within the Contract Documents but not indicated on this list is still the responsibility of the appropriate contractor. |

| Owner Acceptance by Initial | Value | | Deficient Item |
|---|---|---|---|
| ✓=OK 7/31 | | Headquarters Building | |
| 6/26/2013 | | GENERAL | |
| | | ARCHITECTURAL | |
| | | EXTERIOR | |
| | | General | ok |
| | | Parking Lot | ok |
| | | | |
| | | INTERIOR | |
| ✓ | | First Floor | |
| ✓ | $50 | Lobby 100 | Clean/remove excess grout on stone veneer under lobby stair |
| ✓ | $250 | | Repair 1 artichoke light fixture to be same color light as other 2 |
| ✓ | $250 | Receptionist 101 | Patch/repair nail holes in receptionist desk |
| ✓ | $200 | | Finish underside of receptionist desk (employees have gotten splinters) |
| ✓ | $200 | | Repair scratches/scuffs and cracks in stained wood faces |
| ✓ | $150 | Corridor 104 | Replace frayed carpet tile |
| ✓ | $250 | Women 110 | repair vanity to not sag and separate from end splash |
| ✓ | $250 | Coffee 111 | Adjust backsplash to close gap between counter |
| ✓ | $50 | Storage 119 | Repair gap in ceiling tile & sprinkler head |
| ✓ | $250 | IT 163 | install 2'x2' floor grilles to be flush with flooring |
| | | | |
| ✓ | | Second Floor | |
| ✓ | $150 | Bridge 201 | Touch-up paint on metal column |
| ✓ | $150 | Corridor 203 | Adjust cove light reveal at wall to be recessed at end near conference room 216 |
| ✓ | $250 | Corridor 204 | Patch/repair hole in gyp board wall at ceiling outside Training Room |
| ✓ | $150 | Conference 207 | Adjust access floor panels to be level |
| ✓ | $50 | Office 220 | Install missing piece of ceiling grid |
| ✓ | $50 | Office 221 | Install missing base behind door |
| ✓ | $500 | Board Room 235 | Repair frayed wallcovering edges at doors and windows |
| ✓ | $250 | | Patch/repair holes in millwork glass doors where hinges were drilled wrong |
| | $1,200 | Executive Entry 237 | Repair warped wood wall panels |
| ✓ | $150 | Office 252 | Repair/replace damaged return air grille |
| | | | |
| | | Civil/Landscape | |
| ✓ | $1,000 | Civil | Clean all expansion and construction joints and re-caulk as needed |
| ✓ | $150 | | Cut and cap PVC pipe with finished grade at water valve on E. side of HQ building |
| | | Landscape | ok |
| | | Mechanical | |
| ✓ | $100 | General | Sprinkler cap needs installed – Room 108 |
| | | Electrical | |
| | | | ok |
| | | | |
| | | CLOSEOUT | |
| | | | ok |
| | | | |
| | | Branch Building | |
| | | GENERAL | |
| | | | ok |
| | | | |
| | | ARCHITECTURAL | |
| | | EXTERIOR | ok |

print date: 6/25/2013
file name: HQ & Branch List of Deficiencies 6-25-13 - Final

page 1 of 2

 NON-CERTIFIED COPY

H&E 0025360

1

```
 1                19TH JUDICIAL DISTRICT COURT
                   PARISH OF EAST BATON ROUGE
 2                     STATE OF LOUISIANA

 3

 4

 5
    H&E EQUIPMENT SERVICES, INC    *     DOCKET NO.
 6                                 *     626,308
                                   *
    VERSUS                         *
 7                                 *     SECTION:   "D"
    URS CORPORATION ARCHITECTURE,  *
 8  P.C., URS CORPORATION, L.      *
    O'NEAL JOHNSON, AND THOMAS E.  *
 9  RYAN, III                      *
                                   *
10  *   *   *   *   *   *   *   *   *   *

11

12

13

14
            Deposition of DEBRA SANDERS, 12475 East Robin
15  Hood Drive, Baton Rouge, Louisiana, 70815, taken in
    the offices of Fishman Haygood, 201 St. Charles
16  Avenue, 46th Floor, New Orleans, Louisiana,
    70170-4600, commencing at 4:24 p.m., on Thursday, the
17  4th day of August, 2016.

18

19

20
    APPEARANCES:
21

22        FISHMAN HAYGOOD
          (By:  Brett B. Barriere, Esquire)
23        201 St. Charles Avenue
          46th Floor
24        New Orleans, Louisiana  70170-3500
             (Attorneys for the Plaintiff)
25
```



EXHIBIT

8

NON-CERTIFIED COPY

2

```
 1        ADAMS AND REESE
          (By:  Philip A. Franco, Esquire)
 2        4500 One Shell Square
          New Orleans, Louisiana  70139
 3            (Attorneys for the Defendants)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16   REPORTED BY:

17        WENDY MAJORIA, CCR
          Certified Court Reporter
18        (No. 84106)
          Huffman & Robinson, Inc.
19        Suite 220, Metairie Office Tower
          433 Metairie Road
20        Metairie, Louisiana  70005
          (504) 831-1753/(800) 749-1753
21        (504) 831-1759/fax

22

23

24

25
```

NON-CERTIFIED COPY

3

1              E X A M I N A T I O N    I N D E X

2

3                                                PAGE

4

5    EXAMINATION BY MR. BARRIERE.....................6

6

7

8

9                  E X H I B I T    I N D E X

10

11
     Sanders Exhibit No. 1.........................17
12        (E-mail exchange from Brad Barber dated
            February 4th, 2013)
13

14   Sanders Exhibit No. 2.........................21
          (E-Mail exchange between Brad Barber
15          and Vincent Provenza)

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

4

1                    S T I P U L A T I O N

2

3

4        It is stipulated and agreed by and between

5   counsel for the parties hereto that the deposition of

6   the aforementioned witness is hereby being taken under

7   the Louisiana Code of Civil Procedure, Article 1421,

8   et seq., for all purposes, in accordance with law;

9        That the formalities of filing, reading,

10  signing, sealing, and certification are specifically

11  waived;

12       That all objections, save those as to the form

13  of the question and the responsiveness of the answer,

14  are hereby reserved until such time as this

15  deposition, or any part thereof, may be used or sought

16  to be used in evidence.

17

18                  *       *       *       *

19

20       WENDY MAJORIA, Certified Court Reporter, State

21  of Louisiana, officiated in administering the oath to

22  the witness.

23

24

25

NON-CERTIFIED COPY

5

1                DEBRA SANDERS,

2 after having been first duly sworn by the above-

3 mentioned Certified Court Reporter, was examined and

4 testified as follows:

5 EXAMINATION BY MR. BARRIERE:

6        Q.    Good afternoon, Ms. Sanders.  My name is

7 Brent Barriere.  We met very briefly outside.  I

8 represent H&E Equipment in connection with this

9 litigation.  I'll be taking your deposition today.

10             Could I get you to state your full name

11 and address for the record, please?

12        A.    Debra Sanders, 12475 East Robin Hood

13 Drive, Baton Rouge, Louisiana, 70815.

14        Q.    Is that your home address or business

15 address?

16        A.    Home address.

17        Q.    What is your business address?

18        A.    I don't know.

19        Q.    But you know how to get there?

20        A.    I do.  Well, I just got my real estate

21 license and started with a broker.  I officially work

22 out of my home, but I'm associated with a broker on

23 Perkins Road.  I don't know the address right offhand.

24        Q.    Am I correct in understanding you formerly

25 were employed by URS?

NON-CERTIFIED COPY

6

1    A.    Absolutely.

2    Q.    That's what brings you here today?

3    A.    Yes.

4    Q.    What years were you employed by URS?

5    A.    From -- from 1997 to 2015.

6    Q.    When in 2015 did you leave?

7    A.    June.

8    Q.    Why did you leave URS?

9    A.    I was laid off due to a buyout and

10   reorganization and my position being eliminated.

11   Q.    What was your position at the time you

12   were laid off?

13   A.    I was office manager in Baton Rouge.

14   Q.    Give me a little background.  Are you an

15   architect?

16   A.    No.

17   Q.    Are you an engineer?

18   A.    No.

19   Q.    Do you have any certifications in any

20   expertise in any construction area?

21   A.    My education is business management with

22   emphasis in construction management from LSU.  I have

23   a little bit of knowledge of construction.  I'm not

24   certified in any way.

25   Q.    You were hired by URS in 2009, is what you

NON-CERTIFIED COPY

7

1 told us?

2      A.     '97.

3      Q.     What was the position you had at the time

4 you were hired?

5      A.     I was hired as a project administrator

6 originally.

7      Q.     Can you describe, for the record, what are

8 the duties of a project administrator?

9      A.     Open new projects, keep track of all of

10 the paperwork, help with scheduling, help with

11 invoicing, collections, filing, just assisting the

12 project manager in documentation of their projects.

13      Q.     At some point, you advanced to office

14 manager of the Baton Rouge office?

15      A.     I had a number of different positions over

16 the 17 years I was there.

17      Q.     Fair enough.

18            We're going to keep ourselves focused

19 today on, because of the late hour, the time frame of

20 2012 to 2014.  Were you the office manager of the

21 Baton Rouge office throughout that time frame?

22      A.     Yes.

23      Q.     If I may, I'd like to make sure that

24 you're not involved in certain aspects of this case.

25 Did you have any involvement with URS's work for H&E

NON-CERTIFIED COPY

12

1               Ryan?

2       THE WITNESS:

3               Ryan.  Thank you.

4       MR. FRANCO:

5               You didn't mind me helping out, did you?

6       MR. BARRIERE:

7               No.  That's fine.

8       THE WITNESS:

9               It's been a year since I've seen any of

10  these people.

11  EXAMINATION BY MR. BARRIERE:

12      Q.    I understand you don't recall when the

13  first meeting occurs.  Do you have any recollection of

14  when the second visit to H&E occurred?

15      A.    I don't.

16      Q.    Do you have any recollection of the

17  approximate break in time between the first visit to

18  H&E and your second visit to H&E?  By that I mean, a

19  month, six weeks?

20      A.    It was months, but I don't know exactly.

21      Q.    Okay.  Let's go back to that first

22  meeting.  What do you recall about the issue

23  concerning the mail slots?

24      A.    Their complaint, as I remember, was that

25  the slots were not large enough.  And our discussion

NON-CERTIFIED COPY

13

1  was that this is the way they were designed based on

2  them seeing the mail slots in our URS office and they

3  liked it and they approved the plan of it and that's

4  how they were built.

5      Q.    What was the response from the

6  representatives of H&E?

7      A.    I don't recall.

8      Q.    How was that issued resolved, if it was

9  resolved?

10     A.    I don't recall that there was a

11 resolution.

12     Q.    To your knowledge, was the -- were the

13 mail slots rebuilt or renovated, altered in some way?

14     A.    I would be guessing if I said.  I don't

15 remember.

16     Q.    The second item you mentioned was the

17 paneling.  Was that the paneling in the executive

18 area?

19     A.    I only remember that there was an issue

20 with the staining of some paneling.  And I don't

21 remember anything else about that part of it.

22     Q.    Do you recall any discussion concerning

23 the cause of that issue?

24     A.    Not well enough to say, no.

25     Q.    Fair enough.

NON-CERTIFIED COPY

14

1           Finally, there was discussion of the

2   parking issue.  What do you recall that issue to be?

3           A.    They were very upset about the parking

4   issue because they had just opened the building.

5   There were a lot of people coming in to see it and so

6   forth.  And their complaint was that there was simply

7   not enough parking spaces.  However, what we told them

8   is that it was designed to code based on how many

9   people were estimated to occupy the building and so

10  forth.

11          And so that was the main complaint there,

12  that they were just appalled that we didn't build

13  enough parking spaces.

14          Q.    Do you recall any detail being offered by

15  either Mr. Wynn or Mr. Jones as to why H&E anticipated

16  more parking spaces than had been provided?

17          A.    They did say that they anticipated growth.

18  And as I recall, we had taken that into consideration.

19          Q.    In advance of this meeting, had you met

20  with other folks at URS to discuss this dispute over

21  the number of parking spaces?

22          A.    In advance of this meeting, you mean like

23  in the last month?

24          Q.    No.  The meeting at H&E.

25          A.    Yes.  I had certainly discussed the issue

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*   *   *   *   *   *   *   *   *
                                *
H&E EQUIPMENT SERVICES          *
                                *  NUMBER 626,308
VERSUS                          *
                                *  DIVISION "D"
URS CORPORATION                 *
ARCHITECTURE, P.C., URS         *
CORPORATION, L O'NEAL           *
JOHNSON AND THOMAS E.           *
RYAN, III                       *
                                *
*   *   *   *   *   *   *   *   *
```

Deposition of FRANKIE WAYNE WYNN,

taken on Tuesday, August 9, 2016, commencing at

10:02 a.m., in the offices of Adams and Reese,

LLP, Attorneys at Law, 4500 One Shell Square,

New Orleans, Louisiana, 70139.

EXHIBIT
9

NON-CERTIFIED COPY

Page 2

```
 1                  I N D E X

 2

 3                                      Page

 4
        Caption                          1
 5      Index of Exhibits                3
        Appearances                     13
 6      Agreement of Counsel            14

 7      Examination

 8        PHILIP A. FRANCO, ESQ.        15

 9              *   *   *   *   *

10
        Witness' Certificate           231
11      Reporter's Page                232
        Certificate                   · 233
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

NON-CERTIFIED COPY

Page 3

```
 1              INDEX OF EXHIBITS

 2


 3    Number                              Page

 4      1  August 21, 2009 Email from      34
              Frankie Wynn to Leonard
 5            St. Germain attaching URS
              Short Form Master Agreement
 6            for Professional Services
              Renovations and Additions
 7            to Kenner LA Branch
              H&E 0005236-0005246
 8
        2  URS Short Form Master Agreement  36
 9            for Professional Services
              Between H&E Equipment Services
10            and URS Corporation
              Architecture PC August 13,
11            2009 Effective Date

12      3  October 14, 2010 Email string    38
              from Frankie Wynn to Brad
13            Barber, et al
              H&E 0003269-0003270
14
        4  URS Attachment 1 Time and        40
15            Materials Work Authorization
              10-10 10/22/2010 and
16            October 15, 2010 Letter from
              Neal Johnson to Frankie Wynn
17            URS 038394-038395

18      5  December 8, 2010 Email string    41
              from Thomas Ryan to Frankie
19            Wynn, et al
              H&E 0007552-0007553
20
        6  December 22, 2010 Email string   43
21            from Frankie Wynn to John
              Johns and Attachment 1, Scope
22            of Work, Schedule of Fees and
              Charges and Project Program
23            H&E 0009209-0009217

24

25
```

NON-CERTIFIED COPY

Page 4

1    (Cont.)      INDEX OF EXHIBITS

2

3     Number                                    Page

4      7   URS Attachment 1 Time and           47
               Materials Work Authorization
5              12-10 12/17/10 Belle Chasse
               URS Attachment 1 Time and
6              Materials Work Authorization
               09-100 8/31/09 Kenner
7              URS 031072-031086

8      8   January 6, 2011 Email string        50
               from Frankie Wynn to John
9              Jones, et al
               H&E 0009311-0009312
10

       9   A-4 Application Site Plan           51
11             City of Baton Rouge 1-12-11
               URS 054688-054690
12

      10   January 19, 2011 Email from         55
13             Thomas Ryan to Neal Johnson
               Kickoff Meeting Minutes
14             January 14, 2011
               URS 039196-039197
15

      11   Lump Sum Work Order                 57
16             No. 02-11 2/2/2011
               H&E 0037269-0037270
17

18    12   Geotechnical Engineering Report     58
               by Terracon Consultants, Inc.
19             February 9, 2011
               URS 065986-066005
20

      13   February 22, 2011 Email string      65
21             from John Jones to Brad
               Barber, et al
22             H&E 0003300

23

24

25

NON-CERTIFIED COPY

Page 5

1    (Cont.)      INDEX OF EXHIBITS

2

3    Number                              Page

4    14  March 2, 2011 Email string        66
           from Neal Johnson to Cody
5          Lewis, et al attaching URS
           Attachment I Phase IV Scope of
6          Services February 16, 2011
           URS 030824-030826
7
     15  URS Design Development Cost        67
8          Analysis for Kenner, LA
           February 14, 2011
9          URS 059882-059884

10   16  May 3, 2011 Letter from Neal       68
           Johnson to Milton J. Womack,
11         Buquet & LeBlanc and Arrighi
           Construction
12         H&E 0003392-0003393

13   17  June 16, 2011 letter proposal      70
           from Terracon to Frankie Wynn
14         URS 041088-041097

15   18  August 5, 2011 Email string        72
           from Arin Barkataki to Tim
16         Gaines
           URS 033341-033344
17
18   19  September 8, 2011 Email string     76
           from Frankie Wynn to James
19         Brown, et al
           H&E 0003672-0003674
20
     20  September 19, 2011 Email string    78
21         from Brad Barber to Frankie
           Wynn
22         H&E 0003742-0003743

23   21  September 20, 2011 Email string    80
           from Neal Johnson to Frankie
24         Wynn, et al
           URS 055094-055097
25

NON-CERTIFIED COPY

Page 6

1   (Cont.)      INDEX OF EXHIBITS

2

3   Number                                    Page

4    22  September 27, 2011 Email from      83
             Eryn Manint to
5            Becky@tdsola.com, et al
             H&E 0007534-0007537

6

7    23  October 4, 2011 Email string      85
             from Frankie Wynn to
8            John Jones
             H&E 0011032-0011034

9    24  November 1, 2011 letter from      87
             Terracon to Frankie Wynn
10           c/o Thomas Ryan
             URS 044305-044312

11

12   25  December 16, 2011 Email string    88
             from Frankie Wynn to
13           Brad Barber, et al
             H&E 0004073-0004078

14   26  December 29, 2011 Email string    90
             from Ottis Seaborn to Daily
15           Update, et al
             H&E 0062142-0062149

16

17   27  January 9, 2012 Email string      91
             from Neal Johnson to Frankie
18           Wynn
             H&E 0062403-0062404

19   28  January 18, 2012 Email string     93
             from Frankie Wynn to John
20           Jones
             H&E 0012783-0012784

21

22   29  January 27, 2012 Email string     94
             from Neal Johnson to James
23           Brown, et al
             URS 033683-033698

24

25

NON-CERTIFIED COPY

Page 7

1    (Cont.)      INDEX OF EXHIBITS

2

3    Number                                  Page

4    30  February 2, 2012 Email string       100
              from Brad Reese to Thomas
5             Ryan, et al
              H&E 0013163-0013164
6
7    31  February 10, 2012 Email string      101
              from Frankie Wynn to Neal
              Johnson, et al
8             URS 074030

9    32  February 9, 2012 Email string       102
              from Ottis Seaborn to Thomas
10            Ryan, et al
              URS 074031
11
12   33  February 24, 2012 Email string      103
              from Thomas Ryan to Frankie
              Wynn
13            H&E 0063708-0063716

14   34  March 12, 2012 Email string         106
              from Frankie Wynn to Neal
15            Johnson, et al
              H&E 0064270-0064271
16
17   35  March 15, 2012 Email from Ottis     107
              Seaborn to Thomas Ryan, et al
              URS 070252
18
19   36  URS Project Observation Report      108
              March 20, 2012 Kenner
              URS 034337-034346
20
21   37  March 29, 2012 Email string         111
              from Frankie Wynn to John
              Jones, et al
22            H&E 0013645

23   38  August 3, 2012 Email string         111
              from Frankie Wynn to John
24            Jones
              H&E 0013874-0013876
25

NON-CERTIFIED COPY

Page 46

1    moving, the physical moving --

2        Q.  Okay.

3        A.  -- from one facility to the other.

4        Q.  But from H&E's standpoint, H&E was

5    moving its facility across the street, I want to

6    say?

7        A.  The same side of the street, down the

8    street.

9        Q.  Down the street?

10       A.  Yes, sir.

11       Q.  And this was going to be a larger

12   facility or the same size?

13       A.  Larger.

14       Q.  Larger facility?

15       A.  Yes.

16       Q.  And this was basically to repair heavy

17   cranes, am I understanding that correctly?

18       A.  Repair and remanufacturing.

19       Q.  Heavy cranes?

20       A.  Correct.

21       Q.  Not bulldozers or the earth-moving

22   equipment?

23       A.  Correct.

24       Q.  All right.  The next document I'm going

25   to show you --

NON-CERTIFIED COPY

Page 90

1    specs," what did you understand URS was doing as

2    compared to what Terracon was doing with respect

3    to the paved areas?

4        A.  Well, Terracon was doing the actual

5    testing.  I don't believe URS did any testing of

6    any --

7        Q.  Did you understand what Terracon was

8    doing other than just testing?

9        A.  They were observing, also.  As I stated

10   earlier, they were out there before the pour was

11   made.  During the pour and after the pour.

12       Q.  When URS made a visit to the site, you

13   didn't necessarily accompany them, correct?

14       A.  No, sir.

15       Q.  I'll show you the next document which

16   will be labeled as Exhibit 26, H&E 62142.

17            This document is from Ottis Seaborn at

18   MAPP.  He is sending a daily update to a number

19   of different people, which this particular one

20   does not include you, does it?

21       A.  Yeah, I think --

22       Q.  Oh, yes.  It does include you.

23            So, do you remember receiving daily

24   updates from Mr. Seaborn about what was going on

25   at Kenner?

NON-CERTIFIED COPY

1      A.  I don't think it was -- I don't know if

2  it was every day, but we did get updates from

3  Ottis on a regular basis.

4      Q.  Okay.  Look at Page 62147.

5      A.  Okay.

6      Q.  Do you understand what that is?  Those

7  rods?  Let me ask it simpler.

8          Do you understand those to be dowel

9  rods?

10      A.  Yes.

11      Q.  At expansion joints?

12      A.  Yes, sir.

13      Q.  Can you tell whether those are smooth

14  rods or not?

15      A.  I can't tell.

16      Q.  Okay.  And part of Terracon's job was to

17  observe the installation of those rods, as well,

18  correct?

19      A.  Correct.

20      Q.  Okay.  Let's look at the next one,

21  Exhibit 27, which is H&E 62403.

22          This is another series of Emails.  At

23  the bottom, Neal Johnson tells a number of

24  people, including you, that "The concrete" --

25  and this is again at Kenner -- "is breaking at

NON-CERTIFIED COPY

Page 99

1    Q.  Projects?

2    A.  -- projects.

3    Q.  What was the problem with the mail slots

4   at the Baton Rouge facility after they were

5   constructed?

6    A.  Interoffice envelopes or FedEx envelopes

7   wouldn't fit.

8    Q.  They were too large?

9    A.  The envelopes were too large, yes, sir.

10    Q.  The actual size of the mail slots, was

11   that noted on the construction drawings?

12    A.  I would assume so, yes, sir.

13    Q.  And no one at H&E raised a question

14   about the size of those mail slots before they

15   were actually constructed, to your knowledge?

16    A.  No, sir.

17    Q.  Now, after the problem arose with the

18   mail slots, did URS, to your knowledge, redesign

19   the mail slots?

20    A.  Yes, sir.

21    Q.  And were the mail slots then put in

22   according to that new design?

23    A.  I believe so, yes, sir.

24    Q.  Was anything else in the mail area or

25   mailroom changed after construction, to your

NON-CERTIFIED COPY

1  repoured?

2      A.  Yes, sir.

3      Q.  Correct?

4      A.  Yes, sir.

5      Q.  Because the contractor had done

6  something incorrectly?

7      A.  That is what I was told, yes, sir.

8      Q.  That doesn't refresh your memory as to

9  what you are talking about here?

10      A.  I don't think that has anything to do

11  with the wash bay.

12      Q.  Do you recall any particular problem

13  with the wash bay in Kenner?

14      A.  No, sir.

15      Q.  Let me show you the next Email, which

16  I'll label as Exhibit 35, URS 70252.

17          Now, just to put this in time

18  perspective, the prior one that I just asked you

19  about was March 12.  This one is from Ottis

20  Seaborn, is March 16.  So, we are talking four

21  days later.

22      A.  Okay.

23      Q.  And it says, "Subject:  (Kenner branch)

24  successful pours."

25          Do you see that?

NON-CERTIFIED COPY

Page 108

1    A.  Yes, sir.

2    Q.  And it talks about Foundation A and

3  Foundation A-A.

4        Do you recall where that was?

5    A.  No, sir.

6    Q.  It says, "All concrete work has been

7  completed at the wash rack and service warehouse

8  addition."

9        Does that help refresh your recollection

10  as to what you may have been concerned about in

11  Kenner?

12    A.  No, sir.

13        MR. FRANCO:

14            I will turn that one over.  All

15  right.

16  EXAMINATION BY MR. FRANCO:

17    Q.  Let me show you the next exhibit, which

18  is Exhibit 36.  It is URS 034337.

19        This is a Project Observation Report

20  similar to the one I showed you earlier in your

21  deposition, but I want you to look at the

22  pictures at the bottom of 34341 and 2.

23        See it says "Service bldg, rear slab

24  spalling"?

25    A.  Yes, sir.

NON-CERTIFIED COPY

Page 113

1    manufacturer.  Can you send me a spec sheet on

2    the project.  We really want to make sure this

3    is the right stuff."

4              Do you see that?

5         A.  Yes, sir.

6         Q.  Do you recall what happened on that?

7         A.  I believe that the product that was

8    specified in the original specs were used.

9         Q.  Okay.  I'm going to show you the next

10   exhibit, which is Exhibit 39.

11             Now, this is an Email that starts off

12   from your branch manager, James Brown, in Kenner

13   at the bottom of the first page.  And he is

14   attaching pictures of cracks in concrete.  And

15   he sends that to you, and you send it to Neal

16   Johnson and Thomas Ryan and Johnny Jones.

17             Do you know who took these pictures?

18        A.  No.

19        Q.  It wasn't you?

20        A.  I don't know.

21        Q.  Okay.  Do you know if these are

22   construction joints or expansion joints?

23        A.  Most, if not all of them, look like

24   expansion joints, from my understanding of what

25   an expansion joint is.

NON-CERTIFIED COPY

1    EXAMINATION BY MR. FRANCO:

2        Q.  I understand, but my point was:  Did you

3    respond that there was not rocks, bolts, etc.,

4    on the site near the cracks being wedged into

5    the joints by equipment and causing excessive

6    cracking?

7        A.  I don't --

8        Q.  Do you deny that?

9        A.  I don't understand the question.

10       Q.  Yeah.  When MAPP raised that question,

11   that issue, at the meeting, did you deny that

12   there were rocks and bolts on the site near the

13   cracks being wedged into the joints?

14       A.  No, sir.

15       Q.  You deny that?

16       A.  No, sir, I didn't.

17       Q.  Let me show you the next exhibit,

18   Exhibit 44, which is H&E 51948.

19           This is an update like we looked at

20   before from Ottis Seaborn with MAPP.  It

21   references Kenner, and I want to focus on the

22   last bullet point.

23           It says, "Concrete demo:  All Around

24   Concrete Cutting was on site today to cut out

25   the damaged areas of paving at phases B-1 seq.

NON-CERTIFIED COPY

Page 128

1   2."

2        Do you have any idea where that is?

3        A.  No, sir.

4        Q.  Do you have any idea why there was

5   cutting out of damaged areas?

6        A.  No, sir.

7        Q.  Now, the reason I introduced that, the

8   slab area that we talked about before that was

9   in place, that was in A-A.  You recall that?

10       A.  Yes, sir.

11       Q.  So this is obviously a different part --

12   I should say a different location, correct?

13       A.  I would assume so, yes.

14       Q.  According to this, at least?

15       A.  Yes, sir.

16       Q.  And you don't have any recollection

17   about where on the site that was, whether that

18   was a building slab, or whether it was part of

19   the yard?

20       A.  No, sir.

21       Q.  Do you recall anything around a drain

22   having to be cut out and replaced at Kenner?

23       A.  No, sir.

24       Q.  I'm going to show you another exhibit,

25   Exhibit 45, which is H&E 28572, and this is in

NON-CERTIFIED COPY

Page 129

1    reference to Kenner.  It is a series of Emails.

2          I want to focus on the second page, and

3    it is another Email from Ottis Seaborn of MAPP,

4    October 3, 2012, and under the bullet point

5    Concrete, it says, "MCC was on site today."

6          Do you know who MCC was?

7      A.  One of the subcontractors, I assume.

8      Q.  Do you remember that it was the concrete

9    subcontractor?

10     A.  I'll agree with you if you say it is.

11     Q.  It says, "Frank had a worker start

12   breaking the bad areas of the concrete in the

13   paving areas so that they could be repoured and

14   corrected."

15          Do you know what part of the pavement

16   that referred to?

17     A.  No, sir.

18     Q.  Do you know who Frank was?

19     A.  No, sir.

20     Q.  Was it you?

21     A.  No.

22     Q.  It was somebody from MAPP, apparently?

23     A.  Well --

24     Q.  Somebody from MCC, but it wasn't you?

25     A.  It was not me.

NON-CERTIFIED COPY

Page 130

1      Q.  And then look at the next page.  It says

2  "Master Punch List."

3          Do you see that?

4      A.  Yes, sir.

5      Q.  All right.  Look down at the bottom.

6  There is a bullet point that says, "Repair

7  damaged paving at various locations in process."

8          Do you see that?

9      A.  Yes, sir.

10     Q.  Do you know what paving that is

11  referring to?

12     A.  No, sir.

13     Q.  Do you know whether MAPP charged you for

14  any of that work?

15     A.  I don't recall.

16     Q.  Do you recall why the areas of the

17  concrete had to be repoured and corrected?

18     A.  No, sir.

19     Q.  Do you know who rejected that concrete?

20     A.  No, sir.

21     Q.  All right.

22         MR. FRANCO:

23             You can turn that over.

24  EXAMINATION BY MR. FRANCO:

25     Q.  The next exhibit is Exhibit 46, H&E

NON-CERTIFIED COPY

Page 131

1    16469.

2         And this, again, is in reference to

3    Kenner, and this starts off with an Ottis

4    Seaborn updated on October 3, 2012.

5         It says, "Concrete."  It says "MCC was

6    on site today.  MCC doubled the workers they had

7    breaking the bad section of concrete at the

8    boxed out area of the drain basin at the main

9    drive."

10         Does that help refresh your recollection

11   about where this area was?

12        A.  Yes, sir.

13        Q.  Where was that area?

14        A.  In the main drive.

15        Q.  And was it a drain?

16        A.  That is what Ottis says it is.

17        Q.  Okay.

18        A.  I don't disagree with Ottis.

19        Q.  Do you recall that having to be

20   repoured?  Broken up and repoured?

21        A.  Not specifically, no.

22        Q.  But, apparently, that is what is being

23   referenced here, that they were breaking that

24   up, correct?

25        A.  Yes, sir.

NON-CERTIFIED COPY

Page 138

1      Q.  In the tests that were questioned, do

2  you know whether those tests, any of those tests

3  were more than 500 psi below 4,000 psi?

4      A.  No.

5      Q.  Do you know whether every average of any

6  of the consecutive compressive tests equals or

7  exceeds 4,000 psi?

8      A.  No.

9      Q.  All right.  Now we come to December of

10  2012.  I'm going to show you the next exhibit,

11  which is Exhibit 50, H&E 20068.

12          This is from Johnny Jones and it copies

13  you, to Neal and Thomas Ryan.  It says, "Neal, I

14  need your presence here in the facility in short

15  order.  The executive group is very upset with

16  the parking situation.  We have 142 parking

17  spaces, including the guest parking by the

18  flagpoles and 6 handicap places for a total of

19  148.  We currently have 153 people in the office

20  here...  we need to determine some resolution

21  quickly."

22          Do you see that?

23      A.  Yes, sir.

24      Q.  What happened?  What generated this?

25      A.  What generated it?

NON-CERTIFIED COPY

1    Q.  Yes.

2    A.  I don't understand the question.

3    Q.  Okay.  What was the reason Johnny Jones

4 sent this Email?  What happened?

5    A.  Because we ran out of parking spots for

6 the people.

7    Q.  Who raised that issue?

8    A.  I wasn't finished answering the

9 question.

10    Q.  Sorry about that.

11    A.  We ran out of parking spots and we had

12 more employees with no place to park.

13    Q.  Who raised that issue for the first time

14 at H&E?

15    A.  I think John Engquist did.

16    Q.  And how did he raise it?

17    A.  How did he raise it?

18    Q.  Was he upset?

19    A.  Absolutely.

20    Q.  Did he curse?

21    A.  I don't recall what he said.

22    Q.  You don't?

23    A.  No, sir.

24    Q.  Was he angry at anyone at H&E?

25    A.  He was angry at anybody that got in his

NON-CERTIFIED COPY

Page 144

1    anyone from H&E call to URS's attention that the

2    parking area should be changed before it was

3    constructed?

4        A.  No.

5        Q.  And that day that this Email was done,

6    December 17, 2012, to your memory, that is the

7    day that, apparently, John Engquist found out

8    about the parking spot issue, correct?

9        A.  Yes, sir.

10       Q.  All right.  Did you go out and look at

11   the parking lot that day?

12       A.  I saw the parking lot, yes, sir.

13       Q.  Did you see any construction workers'

14   vehicles parked on that lot at the headquarters

15   building?

16       A.  I don't think I was able to distinguish

17   between an employee's vehicle or a subcontractor

18   or a construction worker's.

19       Q.  Well, there were contractors working at

20   the site, at the Baton Rouge site that day,

21   weren't there?

22       A.  I'm not aware of that.

23           MR. BARRIERE:

24               Object to form.

25   EXAMINATION BY MR. FRANCO:

NON-CERTIFIED COPY

Page 150

1      Q.  Right.  And I believe the additional

2   parking that was added was 52 spaces?  Let's

3   see.  Let's make sure of that.  All right.

4          I am going through the Emails that says

5   this will not work and this will not work and

6   this will not work, so just bear with me a

7   second.  All right.

8          H&E 20851 -- yes.  Go all the way to

9   20851, January 8, 2013.

10         I'm going to show you the next exhibit,

11  Exhibit 51, which is H&E 20851.  And this

12  appears to be the final plan.  If you look at

13  20853, Page 1, page 2.

14         So 52 new parking spaces were added

15  according to Page 1.

16     A.  Okay.

17     Q.  Is that accurate, to the best of your

18  knowledge?

19     A.  Yes, sir.

20     Q.  Now, those new 52 spaces took up space,

21  obviously, at the site, didn't they?

22     A.  Yes, sir.

23     Q.  They would have taken up space if they

24  were originally there, wouldn't they have?

25     A.  Well, the footprint of the Corporate

NON-CERTIFIED COPY

Page 151

```
1   building could have been changed.

2       Q.  How?

3       A.  Could have made it smaller, made it more

4   than two floors.

5       Q.  Okay.  And if you do more than two

6   floors, it is more expensive to go up, isn't it?

7       A.  I would assume so.

8       Q.  And one of the things that H&E was

9   concerned about throughout the process of all

10  three projects is "How much is this going to

11  cost us?"  Fair statement?

12      A.  We are always concerned about how much

13  something is going to cost.

14      Q.  All right.  We will get to the cost

15  later.

16          Now, with respect to the mailroom

17  layout --

18          MR. BARRIERE:

19              If we are going to switch topics,

20  let's take a few minutes.

21          MR. FRANCO:

22              Okay.  That is fine.

23      (Recess held.)

24  EXAMINATION BY MR. FRANCO:

25      Q.  I want to switch gears to the mailroom
```

NON-CERTIFIED COPY

Page 152

1    millwork.  I'm going to show you the next

2    exhibit, which is labeled as Exhibit 52.   Its

3    H&E 20538.

4           This is a series of Emails and the one I

5    wanted to focus on, this talks about the

6    redesign of the mailroom, and then at the top of

7    the second page, Brad Barber tells you, "Let URS

8    know right now they will be responsible for the

9    full cost of this mistake on their part."

10   Correct?

11       A.  Correct.

12       Q.  And you forward that to Neal and Thomas,

13   as you were directed to do, correct?

14       A.  Correct.

15       Q.  And Neal responds to both you and Johnny

16   Jones and he says, "The mailroom millwork and

17   layout design and construction documents were

18   presented and approved by H&E over two years

19   ago."

20           Is that accurate?

21       A.  I would think so, yes.

22       Q.  And it says, "...URS is currently

23   providing all redesign services to H&E for any

24   and all of the current requested modifications

25   at no charge."

NON-CERTIFIED COPY

Page 154

1    Q.  Let me show you another exhibit, which I

2  will label as Exhibit 53.  It is H&E 22251.

3        Johnny Jones says at the top, "...we

4  should have counted the slots and determined

5  what is required...."

6        Do you know what he meant by that?

7    A.  No, sir.

8    Q.  Let me show you the next exhibit.

9    MR. BARRIERE:

10        Bear with me one second.

11    MR. FRANCO:

12        Sure.

13    (Off the Record.)

14  EXAMINATION BY MR. FRANCO:

15    Q.  I'll show you the next exhibit, Exhibit

16  54, which is H&E 21025.

17        At the bottom of the first page is an

18  Email from Brad Reese at MAPP to you and Neal,

19  and then you forward this to Johnny Jones about

20  Kenner remaining items, correct?

21    A.  Yes.

22    Q.  Now, on this list of remaining items, if

23  you look at the middle of the first page, it

24  says "Punch," and that is Punch List Item 54,

25  55, 56, 57.  Do you see that?

NON-CERTIFIED COPY

1      A.  Yes, sir.

2      Q.  And it says, "Detailed expansion joint

3   at..." and there is different locations for

4   those four entries.

5          Do you see that?

6      A.  Yes, sir.

7      Q.  What had to be done at those expansion

8   joints according to this punch list, in your

9   understanding?

10      A.  I don't know.

11      Q.  Was any work ultimately done on those

12   expansion joints as a result of this punch list?

13      A.  I don't know.

14      Q.  Did H&E, to your knowledge, pay MAPP for

15   the amounts MAPP claimed were due as a result of

16   the Kenner project?

17      A.  Yes.

18      Q.  Despite the fact that there were certain

19   items in the punch list that were not remedied?

20      A.  For example?

21      Q.  Expansion joints or concrete?

22      A.  Yes.

23      Q.  Why did H&E pay MAPP despite the fact

24   that there were items involving the concrete

25   that remained on the punch list?

NON-CERTIFIED COPY

Page 156

1        A.   I would assume that we paid what URS

2    recommend we pay.

3        Q.   Do you know that?

4        A.   That was the procedure that we used,

5    that we paid the general contractors what URS

6    recommended.

7        Q.   Okay.  And if URS recommended

8    contractors be paid, what happened to the punch

9    list items that remained?  Was that not an item

10   that URS said had to be completed?

11       A.   I don't recall.

12       Q.   In the normal course of these projects,

13   it was your understanding that if it was on a

14   punch list, that it had to be remedied.  Fair

15   statement?

16       A.   I'm not sure if every single item on

17   every project on a punch list was satisfied.

18   Some of them were just accepted.

19       Q.   All right.  With all respect, that

20   wasn't my question, so let me make sure you

21   understand.

22       A.   Okay.

23       Q.   What is the normal purpose of the punch

24   list?

25       A.   To detail items that aren't complete.

NON-CERTIFIED COPY

Page 159

1      Q.  All right.  That is my fault for not

2  including the whole document.

3            That date of December 17, 2012, happens

4  to be the same date that the issue of the

5  parking lot came up.  Do you recall that?

6      A.  Yeah, those are the same dates.

7      Q.  Did H&E pay Womack for all amounts that

8  Womack claimed were due?

9      A.  We paid Womack what URS recommended we

10  pay.

11      Q.  And, again, it is the same question.

12            As I understand it, Mr. Wynn, tell me if

13  this is the way it went:  You would get a

14  certificate of substantial completion, which the

15  architect and the contractor would sign off on,

16  present it to you for signature, and after

17  confirming with the architect, you would sign

18  it, correct?

19      A.  If they recommended it, yes, sir.

20      Q.  But attached to this to be done, even

21  though there was substantial completion, is

22  normally a punch list, isn't there?

23            Isn't that what substantial completion

24  is, substantially complete, and then there are

25  punch list items that are necessary usually to

NON-CERTIFIED COPY

Page 160

1    be done after substantial completion?  That is

2    the normal way it works, right?

3        A.  I agree.

4        Q.  So there is an amount in this document

5    to be paid subject to completion of the punch

6    list.  That is the normal way it works, right?

7        A.  I agree.

8        Q.  Now, I showed you a punch list for

9    Kenner involving expansion joints, and as you

10   sit here, you don't know whether any of that

11   work on the expansion joints was done, correct?

12       A.  I don't recall.

13       Q.  And you can't tell me if there was any

14   work on the punch list items at either Kenner or

15   Baton Rouge or Belle Chasse, for that matter,

16   which have not yet been completed, can you --

17       A.  No.

18       Q.  -- as you sit here?

19       A.  No.

20       Q.  Let me show you the next exhibit, which

21   is Exhibit 56, which is H&E 22314.

22           You are attaching some photos, sending

23   them to Stephan Dorsey at Womack in reference to

24   Baton Rouge, correct?

25       A.  Yes, sir.

NON-CERTIFIED COPY

Page 168

1      Q.  And then you tell Johnny Jones, "MAPP

2   says they installed per specs," correct?

3      A.  Correct.

4      Q.  Let me show you the next document I'll

5   label as Exhibit 60.  It is URS 51379.

6         I'm going to focus on -- this is a

7   letter to you from MAPP, and it obviously

8   references the Kenner project.

9         And it says at the end of the first

10  paragraph, "...we have reviewed the punch list

11  and have the following comments and

12  clarifications."

13         Do you see it says "Site & Paving"?

14      A.  Yes, sir.

15      Q.  No. 3 says, "The catch basin was

16  installed per the contract documents."

17         Do you see that?

18      A.  Yes, sir.

19      Q.  The catch basin had to be redone, didn't

20  it?

21      A.  I believe so.

22      Q.  And that was redone at the expense of

23  whom, do you know?

24      A.  I don't recall.

25      Q.  It also says, "The joints and concrete

NON-CERTIFIED COPY

Page 173

1       A.  I'm okay with that.

2       Q.  Just by coincidence, I'll get to the

3  next exhibit, which is Exhibit 62, H&E 4354.

4           And this is an Email from Brad Barber to

5  URS people copying you, and it says, "We have

6  had more than one vendor URS contracted with

7  come to us and ask for direct payment.  Why is

8  URS not paying the vendors they used on our

9  project?"

10          Do you know the answer to that?

11      A.  They weren't paying the subcontractors

12 because we weren't paying them, was my

13 understanding.

14          MR. FRANCO:

15              Skip the next one.  Skip the next

16 one.

17 EXAMINATION BY MR. FRANCO:

18      Q.  Let's do the next one.  Exhibit 63 will

19 be H&E 24757.

20          This is at the top an Email from you to

21 Womack and URS, and it says, basically, "...it

22 would be fruitless to perform a 'final'

23 walkthrough at this time," correct?

24      A.  Yes, sir.

25      Q.  And this is in connection with the Baton

NON-CERTIFIED COPY

Page 161

1       Q.  And this is the drain area.  I assume

2    there is that more than one drain area at the

3    Baton Rouge site?

4       A.  Yes, sir.

5       Q.  So this is one of the drain areas at the

6    Baton Rouge site, correct?

7       A.  Yes, sir.

8       Q.  What was your conclusion as to why this

9    cracking appeared at that location?

10      A.  I have no idea.

11      Q.  Okay.  Did anyone tell you what they

12   thought the reason for this cracking and

13   separation was?

14      A.  I don't recall if there was an

15   explanation.

16      Q.  Was that area redone in Baton Rouge, to

17   your knowledge?

18      A.  Yes, I believe so, if -- I think this

19   was the first drain that we saw some problems

20   with.  It was -- it was redone more than once.

21      Q.  Okay.  And I'm sorry.  I forgot what you

22   just told me.

23          Was there more than one drain?

24      A.  Yes, sir.

25      Q.  Was the work that was done more than

NON-CERTIFIED COPY

Page 174

1    Rouge project, obviously, because it involves

2    Womack, right?

3        A.  Yes, sir.

4        Q.  Did you talk to anybody else at H&E

5    about that position before you conveyed it on,

6    or was that simply your decision?

7        A.  I don't recall that.  I would have

8    assumed that I would have a conversation with

9    probably Johnny Jones, and Johnny would have had

10   a conversation with Brad or John Engquist.

11       Q.  All right.  And what is normally the

12   reason for the final walkthrough?

13       A.  To complete the project.

14       Q.  To see if the punch list items were

15   completed; is that correct?

16       A.  Yes, sir.

17       Q.  So did you ever do a final walkthrough?

18   I mean, this says it would be fruitless, so my

19   follow-up question is:

20           Did you ever do a final walkthrough on

21   the headquarters Baton Rouge project?

22       A.  I don't recall.

23       Q.  But you pay Womack what Womack

24   requested?

25       A.  If it was approved by URS, yes, sir.

NON-CERTIFIED COPY

Page 175

1    Q.  Now, URS approves, that is a completion,

2  correct?

3    A.  Yes, sir.

4    Q.  They don't make a subsequent approval

5  after the punch list items, do they, for paying

6  any money?

7      MR. BARRIERE:

8        Object to the form of the question.

9      THE WITNESS:

10        I don't recall.

11  EXAMINATION BY MR. FRANCO:

12    Q.  Do you recall if any money was held out

13  because of punch list items on the Baton Rouge

14  or Kenner projects?

15    A.  Yes, I believe it was.

16    Q.  Do you recall if that money was paid

17  over to Womack or MAPP?

18    A.  It eventually was, yes, sir.

19    Q.  Did that have URS sign off on it?

20    A.  I don't recall.

21    Q.  The epoxy that was used at the

22  transition joint by the service area, was that

23  in Baton Rouge or Kenner?

24    A.  Kenner.

25    Q.  In Kenner.

NON-CERTIFIED COPY

Page 181

1          Who communicated with the Sika rep to

2    set up this meeting?

3       A.  I probably communicated with the rep,

4    but I don't recall who gave me his name.

5       Q.  Was this the same product that we saw

6    earlier that has been recommended by MAPP --

7       A.  I don't believe.

8       Q.  -- this possible product?

9       A.  I don't believe so.

10      Q.  It is a different product?

11      A.  Yes, sir.

12      Q.  And was it an epoxy product?  Let me ask

13   a better question.

14          Did the meeting take place?

15      A.  Yes.

16      Q.  Who attended?

17      A.  I don't recall.

18      Q.  Were you there?

19      A.  Yes, sir.

20      Q.  And I assume a Sika representative was

21   there?

22      A.  Yes, sir.

23      Q.  What were his thoughts on causation and

24   repair at the Baton Rouge branch?

25      A.  I don't recall what his suggestion was

NON-CERTIFIED COPY

Page 182

1    as to what caused it.  It seemed like that -- I

2    think -- that his recommendation was to recut

3    the joints and refill that area with concrete

4    that had metal filings in it that would make it

5    stronger.  I think that was his representation.

6        Q.  Metal filings, F-I-L-I-N-G-S?

7        A.  Yes.

8        Q.  You don't recall what he said about

9    causation?

10       A.  No, sir.

11       Q.  Had he, to your knowledge, ever run

12   across this same issue at other locations using

13   heavy-track equipment on pavement?

14       A.  I don't know.

15       Q.  You don't recall that discussion at all?

16       A.  No, sir.

17       Q.  What was the result of that suggestion?

18   What happened?

19       A.  We never -- we never moved on it one way

20   or the other.

21       Q.  Did he give you a price?

22       A.  I don't recall if he ever gave us a

23   price or not.  I don't think that we were

24   impressed with his presentation, if I remember

25   correctly.

NON-CERTIFIED COPY

Page 183

1      Q.  And he wasn't, at that point,

2   recommending taking up all the concrete and

3   re-laying all the concrete at Baton Rouge, was

4   he?

5      A.  I don't recall.

6      Q.  Well, if he is talking about cutting out

7   joints, that wouldn't be replacing all the

8   concrete, would it?

9      A.  No, not in -- not in this Email.

10     Q.  Okay.  Well, this wasn't an Email.  I'm

11  talking about the discussion that took place.

12     A.  Correct.

13        MR. FRANCO:

14           Take the next two out.

15  EXAMINATION BY MR. FRANCO:

16     Q.  Well, let's see.  Let's do this.  The

17  next exhibit is Exhibit 65, and this is H&E

18  52765.

19        This is from Jack Groves dated June 18,

20  2013, to you copying, Kevin Bohannon.

21        Do you know who Kevin Bohannon is?

22     A.  No.

23     Q.  All right.  Jack Groves is apparently

24  from Coastal Corrosion Enterprises.  Do you see

25  that?

NON-CERTIFIED COPY

Page 184

1       A.  Yes, sir.

2       Q.  Was he the guy that you had this meeting

3  with, the Sika rep?

4       A.  I don't recall.

5       Q.  Let's do this:  It says, "Thank you for

6  inviting me to attend Thursday's meeting to

7  discuss concrete 'joint deterioration' at your

8  new facility on Pecue Lane."

9           This is dated on Tuesday, the 18th.  The

10  prior Thursday would have been 17, 16, 15, 14,

11  the 13th, which happens to coincide with your

12  prior Email that there was going to be a meeting

13  on June 13 at 7:30.

14       A.  Yes, sir.

15       Q.  Fair statement?

16       A.  Yes, sir.

17       Q.  All right.  So this is, apparently, the

18  guy you met with?

19       A.  Okay.

20       Q.  It says, "The base reason for joint

21  deterioration is the inability for regular

22  concrete to stand up to the heavy-tracked

23  vehicles operated on it."

24           Do you see that?

25       A.  Yes, sir.

NON-CERTIFIED COPY

Page 188

1    Page 79318.  It says "Mock UP of Expansion Joint

2    Repairs."  Right in the center, page 79318.

3              Do you see that?

4        A.  Yes, sir.

5        Q.  Do you recall rejecting this mockup?

6        A.  No, I do not.

7        Q.  All right.  Let's see.  Let's look at

8    Exhibit 67.  This is H&E 25356.

9              I want to focus on the first Email.

10   This is on the second page, I think.  It is from

11   Womack to all Womack people, and then it was

12   forwarded to you.  And it says that, The

13   following list reflects the outstanding items on

14   the H&E project as of today..."

15             This is June of 2013, and this is the

16   Baton Rouge site.  And you will see two

17   highlights there in gray.  I don't know where

18   they came from, but they are highlighted.

19             One is executive wall panels and the

20   other is site paving expansion and construction

21   joint issue.  It says, "Waiting on H&E's

22   response."

23             Do you see that?

24       A.  Yes, sir.

25       Q.  And then you send that to Thomas Ryan

NON-CERTIFIED COPY

Page 189

1    and Neal Johnson, and you say, "See Stephan's

2    comments below." And it says, "The only

3    controversial issue is still with the joints.  I

4    need an opinion from URS in regards to whether a

5    design or installation issue.  I have forwarded

6    Womack's opinion previously."

7         And Mr. Neal Johnson responds to you,

8    correct?

9         A.  Yes.

10        Q.  And he says, "There are no design or

11   engineering issues.  The issues with the work in

12   place is either a construction, warranty or a

13   maintenance issue."

14        Do you see that?

15        A.  Yes, sir.

16        Q.  So he responded to you, didn't he?

17        A.  Yes, sir.

18        Q.  Let's look at Exhibit 68, H&E 25349.

19        This is another Email chain, of course,

20   and I want to focus on the middle Email.  It is

21   from Thomas Ryan to you, Johnny Jones and Neal

22   Thompson.

23        And it says, "Corporate and Branch Punch

24   List," so this refers to Baton Rouge.  And it

25   says, "Frankie, Just to clarify, you have signed

NON-CERTIFIED COPY

Page 191

1    get a report from their experts that we never

2    got.

3        Q.  Now, you just said you didn't agree with

4    what I just read.  You didn't agree that it was

5    a construction issue?

6        A.  I didn't -- I didn't, and don't know

7    what it is.

8        Q.  Right.  You don't know.  It is not that

9    you didn't agree with it.  You don't know, do

10    you?

11        A.  No, I don't.  Didn't and I don't.

12        Q.  The next exhibit is Exhibit 69, which is

13    H&E 21331.

14            This is in reference to Belle Chase

15    Project Change Orders.  It is from you.  It is

16    dated July 29, 2013.  It says, "Everyone

17    involved" -- I'm reading part of it, so bear

18    with me.

19            "Everyone involved was aware of the cost

20    sensitive nature of the Belle Chase Project and

21    the need for absolute accuracy to stay within

22    the contracted amount?"

23            Do you see that?

24        A.  Yes, sir.

25        Q.  I assume you had those conversations

NON-CERTIFIED COPY

Page 192

1    with the contractor, as well as URS.  Is that a

2    fair statement?

3          MR. BARRIERE:

4                Conversations with whom?

5    EXAMINATION BY MR. FRANCO:

6        Q.  Contractor and URS.

7        A.  Well, Neal was included on the Email, so

8    I'm having the conversation with him through the

9    Email.

10       Q.  Okay.  Was the Belle Chasse project the

11   only cost sensitive project?

12       A.  They were all cost sensitive.

13       Q.  All right.  It says, "Attached are

14   examples of increases in the cost in the Belle

15   Chasse Project.  Some are admittedly unforeseen,

16   but many are due to errors in the drawings or

17   omissions.  We discovered Friday that due to an

18   existing roof and a new roof not aligning, we

19   will have to eliminate the folding door and make

20   additional changes to ductwork."

21             Are you familiar with the existing roof

22   not aligning with the new roof?

23       A.  Yes, sir.

24       Q.  And this is at Belle Chasse, correct?

25       A.  Yes, sir.

NON-CERTIFIED COPY

1      Q.  What was the reason for that?  Do you

2  know?

3      A.  I didn't do the design.  I don't know.

4      Q.  Was it an elevation issue?

5      A.  I don't know what the problem was --

6      Q.  Right.  We --

7      A.  -- but that was --

8      Q.  I'm sorry.  I thought you were finished.

9  Go ahead.

10     A.  My understanding is that the ductwork

11  wouldn't fit in the area that was allotted on

12  the plans.  That was my understanding.

13     Q.  And I understand what you just said, but

14  my question is:  Was that a result of an

15  elevation issue in the design of the new

16  building compared to what was existing at the

17  old roof?

18     A.  I don't know.

19     Q.  My question was really:  Is this related

20  to the survey that was ultimately done of the

21  elevation of any of the buildings?

22     A.  No one ever said it was a problem with

23  the survey.

24     Q.  Did they say what the problem was?

25     A.  The problem --

NON-CERTIFIED COPY

Page 194

1      Q.  Well, did they ever say what the cause

2  of the problem was?

3      A.  It was a design problem.

4      Q.  Right.  But was the design problem based

5  on the survey, is my question?  Do you know

6  that?

7      A.  I already answered that.

8      Q.  You don't know?

9      A.  What I said -- I believe what I said

10  was:  Nobody ever mentioned the survey as being

11  a part of this problem, and the fact that we had

12  to eat a $3,000 I-beam.

13      Q.  Mr. Wynn, I'm sorry if I asked you this

14  question.

15          Do you know why the mockup that we

16  talked about before was not done?

17      A.  I don't recall why we didn't do that.

18      Q.  The roof issues, Ms. Wynn, because I'm

19  not familiar with the details of the premises,

20  was that in connection with Building C?

21      A.  I think this was -- I think it was

22  Building A.

23      Q.  Were there some elevations problems in

24  connection with Building C?

25      A.  I don't recall.  I can't remember which

NON-CERTIFIED COPY

Page 195

1    building was which letter.

2        Q.  Okay.  I'm going to show you a document

3    I'm going to label as Exhibit 70.  This is not

4    Bates stamped so I'm not sure where this came

5    from.  This is Kenner Project Change Orders.

6        Have you ever seen that before?

7        A.  I don't recall seeing this in this

8    particular form.  I mean if it is presented as

9    Kenner Change Orders and it came from MAPP, I'll

10   accept it as their change orders.

11       Q.  That is my understanding, but just let

12   me ask you some questions about this document.

13       This document includes -- this is Kenner

14   now, so keep that in mind.  It says, "Change

15   Order Item," and we can always verify this by

16   going through the change orders.

17       But it says No. 5, "Replace Drain Box A,

18   15,658."  That is the drain box repair we talked

19   about before?

20       A.  Okay.  I'll agree.

21       Q.  Then No. 6 says, "Elevation Conflicts

22   $13,038.  What did that have to do with?

23       A.  Could I see it?

24       Q.  Yes.  I think that is 6, I think.

25       A.  The only thing I can imagine is that

NON-CERTIFIED COPY

1    that was the conflicts in the survey that we

2    talked about where the wrong benchmarks were

3    used.

4        Q.  Okay.  That is what I thought it was,

5    too.  All right.

6            And then on the second page, wow, there

7    was a $261,000 change order for hurricane

8    damage?

9        A.  Yes, sir.

10       Q.  Okay.

11       A.  We were lucky enough to have a hurricane

12   come through in the middle of construction, and

13   a lot of the stuff that had already been done

14   has to be redone.

15       Q.  Was that all insured?

16       A.  No, sir.

17       Q.  Was any of it insured?

18       A.  I believe our deductible was either 100

19   or -- it was over $100,000.

20       Q.  So it was taken care of subject to the

21   deductible?

22       A.  Yes, sir.

23       Q.  Which hurricane was that?  Do you

24   remember?  There has been several of them, so I

25   lose track.

NON-CERTIFIED COPY

1    A.  Me, too.

2    Q.  That is all right.

3    A.  It wasn't Katrina.

4        MR. FRANCO:

5           Off the Record.

6    (Off the Record.)

7  EXAMINATION BY MR. FRANCO:

8    Q.  On the same list, it says --

9        MR. BARRIERE:

10          Back on the Record now?

11       MR. FRANCO:

12         Yes, back on the Record.

13  EXAMINATION BY MR. FRANCO:

14    Q.  "Joint between new and existing service

15  building, $8,596."

16       What was that?

17    A.  I believe that the elevations, the

18  existing elevations in service department didn't

19  match the elevation of the new concrete that was

20  poured.

21       When they took the wall down, there was

22  a difference, and I think that is what that was

23  to create that difference in elevation.

24    Q.  That is another elevation issue probably

25  related to survey?

NON-CERTIFIED COPY

Page 198

1       A.  I don't know.  That was in a totally

2    different area.  I'm not sure if that was

3    related to the survey or not.

4       Q.  All right.  Let me show you the next

5    document, which I'll label as Exhibit 71.  This

6    does not have a Bates stamp either.

7           Now, this is from Gootee, which would

8    have involved the Belle Chasse project, correct?

9       A.  Yes, sir.

10      Q.  And it says "COP."  That is Change Order

11   Proposal, correct?

12      A.  I believe so, yes, sir.

13      Q.  All right.  Then there is a list of

14   approved, and there is a list of pending, and

15   there is a list of rejected, correct?

16      A.  Yes, sir.

17      Q.  All right.  Look at the approved change

18   order proposals.  And, again, they are

19   highlighted, and I don't know who highlighted

20   this, but it wasn't me or us.

21          And it says under Change Order 1, Item

22   No. 20 says, "Demo of Steel Plates."  Do you

23   recall what that $2,500 was for at Belle Chasse?

24      A.  I believe those steel plates were

25   actually plates that were in the existing slab

NON-CERTIFIED COPY

Page 199

1    that were removed so they could pour the new

2    concrete on top of it.  I believe that is what

3    that was.

4         Q.  Well, why was it a demo?

5         A.  Demolition.

6         Q.  Oh, okay.  I got it.

7              And the Building A, additional concrete,

8    that was because of an elevation issue?

9         A.  Yes, sir.

10        Q.  Plumbing for an icemaker cost you

11   $4,000?

12        A.  It is a nice icemaker.

13        Q.  Apparently, so.  Do they come out in

14   figures?  All right.

15             The next exhibit I'm going to show you

16   is Exhibit 72, and that is H&E 8385.

17             This looks like an invoice from Superior

18   Millworks to Womack, and this is an estimate for

19   work, looks like in the mailroom.  Is that a

20   fair statement?

21        A.  Yes, sir.

22        Q.  All right.  It says, "Add new mail slots

23   and base cabinet at 3rd wall."  So that is the

24   new mail slots that we talked about earlier,

25   correct?

NON-CERTIFIED COPY

Page 203

1    remember is that we questioned the need for the

2    joint sealant material, not the actual joint

3    itself."

4            Do you see that?

5        A.  Yes, sir.

6        Q.  So Mr. Dorsey actually didn't confirm

7    your statement about the fact that the

8    construction joints should not have been cut,

9    did he?

10       A.  No, sir.

11           MR. BARRIERE:

12               Object to the form of the question.

13   EXAMINATION BY MR. FRANCO:

14       Q.  Next exhibit is Exhibit 75.  This is H&E

15   7780.

16           This is from you, October 7, 2013.  It

17   says, "During a walkthrough of the Belle Chasse

18   Project on Friday, 10/4/2013, spalling and

19   cracking of the concrete was observed in the

20   paint building (Building K).

21           "A similar condition was present at the

22   Kenner, LA project and the slab had to be

23   replaced.

24           "Please have this inspected, along with

25   the entire project for this condition.  Let me

NON-CERTIFIED COPY

Page 204

1    know the plan of action as soon as possible?"

2            What happened as a result of this?  Do

3    you recall?

4        A.  I believe because of the size of the

5    spalling in Building K, that it was agreed upon

6    that we would just leave it like it was and see

7    if it got any worse, and if it got any worse,

8    then Gootee would replace it.

9        Q.  Did it get any worse, to your knowledge?

10       A.  Not that I'm aware of.

11       Q.  So, it hasn't been replaced?

12       A.  Not that I'm aware of.

13       Q.  Did Gootee say why that condition

14   happened?

15       A.  I don't recall if they gave a reason.

16       Q.  All right.  Next exhibit is Exhibit 76.

17   This is H&E 8042.

18           This says, "Concrete cracks in yard."

19   This was from John Jones, copied to you and Jeff

20   Stringer, who is the branch manager at Kenner --

21   I'm sorry -- at Baton Rouge.

22           It says, "Jeff, this is going to end up

23   in litigation more than likely.  URS has sent a

24   supposed expert to review of which we have not

25   heard a response and we have engaged our own

NON-CERTIFIED COPY

Page 222

1   the possession of H&E?

2       A.  If we own the equipment and the

3   equipment has the manual in it, then, yes.

4       Q.  What about the equipment, the

5   heavy-track equipment that H&E sells?  Do they

6   have owner's manuals with that equipment that

7   they pass on to the buyer?

8       A.  Yes, sir.

9       Q.  Have you ever read those owner's

10  manuals?

11      A.  I have read some of the owner's manuals

12  in regard to an incident.

13      Q.  Okay.

14          MR. BARRIERE:

15              In regard to what?

16          THE WITNESS:

17              Incidents, accidents.

18          MR. BARRIERE:

19              Oh, incidents.

20  EXAMINATION BY MR. FRANCO:

21      Q.  Do you know whether there is any

22  provision in the owner's manuals with respect to

23  the use of that equipment on concrete?

24      A.  Not that I'm aware of.

25      Q.  I'm going to hand you a group of

NON-CERTIFIED COPY

Page 223

1    documents at this point in time, and we are

2    going to label them in globo as Exhibit 80.  And

3    the first one begins with H&E 1679, and I think

4    these go all the way through 1727.

5            Now, looking at the first one, this is a

6    January 21, 2013 invoice from URS to your

7    attention at H&E, correct?

8        A.  Correct.

9        Q.  And there is a stamp on this document,

10   and it says "Approved."  Whose initials are

11   those?

12       A.  Those are mine.

13       Q.  And you approved that on 2/20/2013?

14       A.  Yes, sir.

15       Q.  In the amount of $9,852.02.  That is how

16   I read this.  Is that correct?

17       A.  That is correct.

18       Q.  And for the Record, you did that on the

19   February 19th, 2013 invoice, too, correct?

20       A.  There is different dates and different

21   amounts, but it is approved.

22       Q.  And that was your responsibility to

23   approve these invoices at the time, I take it?

24       A.  Yes.

25       Q.  And you approved the March 14, 2013

NON-CERTIFIED COPY

Page 224

1    invoice that is attached 4/2/13, correct?

2        A.  Yes, sir.

3        Q.  And you approved the June 12, 2013

4    invoice on July 1, 2013, correct?

5        A.  Yes, sir.

6        Q.  And you approved the June 12, 2013

7    invoice on 7/1/2013, correct?

8        A.  That is correct.

9        Q.  There were two different invoices dated

10   that same day, correct?

11       A.  That is correct.

12       Q.  And in spite of the fact that you

13   approved these invoices, why weren't they paid?

14       A.  Per John Engquist's instructions if they

15   have not been paid.

16       Q.  Now, I will represent to you that none

17   of these invoices that I just showed to you --

18   and you can look at them if you want to -- dealt

19   with the parking spaces.

20           Did you understand that only invoices

21   related to parking spaces were supposed to not

22   be paid, or all invoices were not supposed to be

23   paid after John Engquist gave his instructions?

24       A.  I'm not sure what he told the Accounting

25   Department, but it was my understanding there

NON-CERTIFIED COPY

Page 225

1    was nothing to be paid from whatever date that

2    he instructed them.

3        Q.  Regardless of whether it was related to

4    the parking spaces?

5        A.  I don't think -- as far as I know, he

6    didn't make any distinction.

7        Q.  All right.

8        MR. FRANCO:

9            If you will give me some time, we

10   may be finished.

11       MR. BARRIERE:

12           Excellent.

13       (Off the Record.)

14       MR. FRANCO:

15           I have some further questions.

16   EXAMINATION BY MR. FRANCO:

17       Q.  Mr. Wynn, in connection with this

18   litigation, there were Interrogatories that were

19   sent out, written questions about the condition

20   of the paved areas at other locations, and we

21   received responses about the condition of those

22   other locations from H&E.

23           Were you involved in responding to those

24   Interrogatories about the conditions of the

25   other sites?  And when I say "other sites,"

NON-CERTIFIED COPY

| | |
|---|---|
| **From:** | Ottis Seaborn [oseaborn@mappconstruction.com] |
| **Sent:** | Thursday, December 29, 2011 8:11 PM |
| **To:** | Daily Update |
| **Cc:** | tim.gaines@urs.com; htadlock@he-equipment.com; rgomez@he-equipment.com; fwynn@he-equipment.com; thomas.e.ryan@urs.com; jabrown@he-equipment.com; neal_johnson@urscorp.com; Brad Reese; Leighton Dixon |
| **Subject:** | 52079 Updates for H&E kenner (completion date 05-06-11) |
| **Attachments:** | Broom finish @ soth parking of H&E.jpg; Overhead snapshot of parking area half completed during pour.jpg; Workers starting pour @ south parking.jpg; pump truck and crew looking over pour @ south parking area of phase A-1.jpg; dowel rods @ expansion joint of south parking area.jpg; Howards pre-drilling 4 feet deep @ foundation A-A.jpg; Howards driving piles @ foundation A-A.jpg |

Updates for H&E Kenner (Thursday( 12-29-11)

- **Foundation/piles:** Howards continued driving piles today @ foundation A-A . They have about 20 more piles to drive but will have to finish tomorrow due the Pile mill only having one driver during the holidays. Bill is expecting a final delivery in the morning sometime and they plan to completed driving piles sometime after noon tomorrow.
- **Site work/ foundations:** Patriot is not on site today. (Returning Jan 1st 2012)
- **Electrical:** OTE is on site... Kenny continued installing the underground rigid pipe that will power the future lighting at the rear of the property. They have completed most of the north to south run, and have trenched about half way across the rear of the property.
  Form work/concrete: pouring got started around 9:am this morning at the south parking area of H&E. The concrete trucks were emptied about 11:am and finishing got started there shortly after. Once the paving was stable, Robert scored and cut the control joints.
- **Concrete Testing & documentation:** Terracon collected 8 cylinders this morning and tested the slump at various intervals. the slump was a consistent 4 1/4 . I directed Terracon to only collect one batch of cylinders for this pour. Originally the pour was calculated to be right at 100 yards or just over. There was actually 122 yards poured today, so Terracon was concerned about not capturing a second set of cylinders. I spoke with Daren Thomas about what happened today and that my solution will be to double check the sub contractors figures and that if were close to the 100 yard mark.. we will plan to collect & test any figure over 100yards as originally designed.

**Ottis Seaborn** :: Superintendent

**MAPP** CONSTRUCTION, LLC

344 THIRD STREET :: BATON ROUGE
Cell # 1-504-654-0594

Office # 1-225-757-0111 ::

MAPPCONSTRUCTION.COM



*WYNN*

EXHIBIT NO. _76_

K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0062142



NON-CERTIFIED COPY

H&E 0062143



Dec 22 2011 9:07am

NON-CERTIFIED COPY

H&E 0062144



Dec 29 2011 8:10am

NON-CERTIFIED COPY

H&E 0062145



NON-CERTIFIED COPY

H&E 0062146



Dec 29 2011 7:04am

NON-CERTIFIED COPY

H&E 0062147



NON-CERTIFIED COPY

H&E 0062148



NON-CERTIFIED COPY

H&E 0062149

Message

| | |
|---|---|
| **From:** | Ottis Seaborn [oseaborn@mappconstruction.com] |
| **Sent:** | 3/16/2012 9:57:19 PM |
| **To:** | Ryan, Thomas E [/O=URS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Thomas E Ryan189b56c9] |
| **CC:** | Johnson, Neal [/O=URS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Neal Johnson013e1dc7]; craigduos@gmail.com; jabrown@he-equipment.com; fwynn@he-equipment.com; Brad Reese [breese@mappconstruction.com]; Leighton Dixon [ldixon@mappconstruction.com]; dmarks@evansequipment.com |
| **Subject:** | H&E (Kenner Branch) Sucessful pours |
| **Attachments:** | Foundation A, final finishes being tooled in... pic#3.jpg; Foundation A, final finishes being tooled in... pic#5.jpg; Foundation A, final finishes being tooled in... pic#1.jpg; Foundation A-A, concrete pour completed and final finish being tooled in...pic#1.jpg; Foundation A-A, concrete pour completed and final finish being tooled in...pic#2.jpg; Foundation A-A, concrete pour completed and final finish being tooled in...pic#3.jpg |

Team please see the attached pictures of todays pours. All concrete work has been completed at the wash-rack & service warehouse addition.

Thomas could you find out from Evans Equipment, when they plan to install the metal building at the Wash-rack!

I contacted the Superintendent of Evans equipment (Dwayne) and let him know that we finished the foundation today.

We have some miscellaneous work for removal of the forms and tying in the discharge line.. but other than that!.. Evans can start installing the building.



WYNN

EXHIBIT NO. 33

K. DONNELLY

NON-CERTIFIED COPY



# Project Observation Report

**Time / Date:**
9:30 am / March 20, 2012

**Present at Site:**

MAPP, Inc. (General Contractor):
    Ottis Seaborn, Superintendent
    Brad Reese, Project Manager
    Laborers
MCC (Paving and Foundations): Workers Present
AllType (Framing): Workers Present
OTE (Electric): Workers Present

## Conformance with Construction Schedule:

Work appears to be on schedule.

## Outstanding Submittals:

Interior Finishes

## Observations:

➢ Site paving is continuing to be formed and poured. Control and expansion joints were being cut and caulked.
➢ Parts Building addition foundation has been poured.
➢ Service Building office addition foundation has been poured and is cracking/spalling.
➢ Service building rear addition foundation is approximately 80% formed.
➢ Temporary office trailer is in place at the parts building.

## Material (Stored on Site/Not in Place):

➢ Site paving and foundation reinforcing
➢ Grading material and fill
➢ Hollow metal frames

## Comments:

Work appears to be proceeding per contract documents

## Outstanding Issues:

Service building addition foundation issue

**REPORT NUMBER**

002

**OWNER**

H&E Equipment Services

**PROJECT NAME**

Kenner Branch Renovations and Additions

**PROJECT NUMBER**

19229626

**OBSERVER**

Thomas Ryan, URS

**WEATHER CONDITIONS**

Clear
Temp. Range = 75 degrees

**SITE CONDITIONS**

■ Dry
☐ Wet/Precipitation
☐ Muddy

**PHOTO LOG**

■ Included

**DISTRIBUTION**

■ Frankie Wynn, H+E
■ James Brown, H+E
■ Neal Johnson, URS
■ Thomas Ryan, URS
■ Brad Reese, MAPP
■ Tim Gaines, URS Civil
■ Craig Duos, SE Engineers
■ Frank Thompson, TLA
■ Craig Hebert, CHE
■ Daren Thomas, Terracon

**URS Corporation**
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700



WYNN

EXHIBIT NO. 36

K. DONNELLY

NON-CERTIFIED COPY

URS 034337



# Project Observation Report

Service building corner window structural support

**Photographic Log:**

| Photo No. 1 | Date 3.20.12 |
|---|---|
| **Direction Photo Taken:** Looking east toward Pine Lane Rd | |
| **Description:** Site paving being poured. | |

| Photo No. 2 | Date 3.20.12 |
|---|---|
| **Direction Photo Taken:** Looking east toward Pine Lane Rd | |
| **Description:** Site paving being poured. | |

**URS Corporation**
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY

URS 034338



# Project Observation Report

| Photo No. | Date |
|---|---|
| 3 | 3.20.12 |

**Direction Photo Taken:**

Looking southeast



**Description:**

Site paving being poured

| Photo No. | Date |
|---|---|
| 4 | 3.20.12 |

**Direction Photo Taken:**

Looking east toward Pine Lane Rd

**Description:**

New entry gate installed

**URS Corporation**
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY

URS 034339



# Project Observation
# Report

| Photo No. | Date |
|---|---|
| 7 | 3.20.12 |

**Direction Photo Taken:**

Looking south at Service Bldg

**Description:**

Service bldg. front addition framing being installed



| Photo No. | Date |
|---|---|
| 8 | 3.20.12 |

**Direction Photo Taken:**

Service building rear slab

**Description:**

Service bldg. rear slab spalling



**URS Corporation**
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY

URS 034341



# Project Observation Report

| Photo No. | Date |
|---|---|
| 9 | 3.20.12 |

**Direction Photo Taken:**

Service building rear slab

**Description:**

Service bldg. rear slab cracking and spalling



**URS Corporation**
**7389 Florida Boulevard, Suite 300**
**Baton Rouge, LA 70806**
**225.922.5700**

NON-CERTIFIED COPY

URS 034342



# Project Observation Report

| Photo No. | Date |
|---|---|
| 10 | 3.20.12 |

**Direction Photo Taken:**

Looking north at Service building rear slab

**Description:**

Service building rear slab spalling



| Photo No. | Date |
|---|---|
| 11 | 3.20.12 |

**Direction Photo Taken:**

Looking east at wash rack

**Description:**

Wash rack foundation poured and bollards in place



**URS Corporation**
**7389 Florida Boulevard, Suite 300**
**Baton Rouge, LA 70806**
**225.922.5700**

NON-CERTIFIED COPY

URS 034343



# Project Observation Report

| Photo No. 12 | Date 3.20.12 |
|---|---|

**Direction Photo Taken:**

Looking east at wash rack

**Description:**

Wash rack separator pits poured

| Photo No. 13 | Date 3.20.12 |
|---|---|

**Direction Photo Taken:**

Looking west inside service bays

**Description:**

Existing walls stripped of sheathing

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY

URS 034344



# Project Observation Report

| Photo No. 14 | Date 3.20.12 |
|---|---|

**Direction Photo Taken:**

Looking south in service bldg.

**Description:**

Water leaking and ponding in service bldg. restroom



| Photo No. 15 | Date 3.20.12 |
|---|---|

**Direction Photo Taken:**

Looking west inside service building

**Description:**

New Service bldg. restroom plumbing



**URS Corporation**
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY

URS 034345



# Project Observation Report

| Photo No. | Date |
|---|---|
| 16 | 3.20.12 |

**Direction Photo Taken:**

Looking west at parts building addition

**Description:**

New slab and CMU fire wall installed



| Photo No. | Date |
|---|---|
| 17 | 3.20.12 |

**Direction Photo Taken:**

Looking west at parts building addition

**Description:**

New slab and CMU fire wall installed and existing masonry veneer removed



**URS Corporation**
**7389 Florida Boulevard, Suite 300**
**Baton Rouge, LA 70806**
**225.922.5700**

NON-CERTIFIED COPY

URS 034346

| | |
|---|---|
| From: | Johnson, Neal [neal.johnson@urs.com] |
| Sent: | Friday, August 03, 2012 7:53 AM |
| To: | Gaines, Tim |
| Cc: | Frankie Wynn; Ryan, Thomas E; John Jones; Johnson, Neal |
| Subject: | FW: Kenner / Cracks In Concrete 004.jpg, Cracks In Concrete 005.jpg, Cracks In Concrete 006.jpg, Cracks In Concrete 001.jpg, Cracks In Concrete 002.jpg, Cracks In Concrete 003.jpg |
| Attachments: | Cracks In Concrete 004.jpg; Cracks In Concrete 005.jpg; Cracks In Concrete 006.jpg; Cracks In Concrete 001.jpg; Cracks In Concrete 002.jpg; Cracks In Concrete 003.jpg |

Tim:
Need you to take a look at these photos obtained by the Owner.  There exists considerable
concern about the quality of the paving construction joints.  A progress meeting is scheduled
for next Tuesday  August 7, 2012 at 9:30 AM.  It would be appreciated if you could be in
attendance to look at the condition of the paving and provide your opinion.
Thanks
Neal


-----Original Message-----
From: Frankie Wynn [mailto:fwynn@he-equipment.com]
Sent: Friday, August 03, 2012 6:58 AM
To: Johnson, Neal; Ryan, Thomas E; John Jones
Subject: Kenner / Cracks In Concrete 004.jpg, Cracks In Concrete 005.jpg, Cracks In Concrete
006.jpg, Cracks In Concrete 001.jpg, Cracks In Concrete 002.jpg, Cracks In Concrete 003.jpg


Frankie Wynn
Director of Facilities/Risk/Compliance Management H&E Equipment Services, Inc.
11100 Mead Road, Ste. 200
Baton Rouge, LA  70816
Office:  225-298-5229
Mobile:  225-603-4438
Fax:  225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com


-----Original Message-----
From: James A. Brown
Sent: Thursday, August 02, 2012 5:31 PM
To: Frankie Wynn
Subject: FW: Emailing: Cracks In Concrete 004.jpg, Cracks In Concrete 005.jpg, Cracks In
Concrete 006.jpg, Cracks In Concrete 001.jpg, Cracks In Concrete 002.jpg, Cracks In Concrete
003.jpg


James A Brown
Branch Manager
125 East Airline Drive
Kenner, LA  70062
Ph 504-467-5906



WYNN

EXHIBIT NO. 39

K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0013938

Cell 504-416-0684
Fax 504-467-5914
E-mail jabrown@he-equipment.com
Website: http://www.he-equipment.com


-----Original Message-----
From: Dominic P. Terrio
Sent: Thursday, August 02, 2012 5:00 PM
To: James A. Brown
Subject: Emailing: Cracks In Concrete 004.jpg, Cracks In Concrete 005.jpg, Cracks In Concrete
006.jpg, Cracks In Concrete 001.jpg, Cracks In Concrete 002.jpg, Cracks In Concrete 003.jpg


The message is ready to be sent with the following file or link attachments:

Cracks In Concrete 004.jpg
Cracks In Concrete 005.jpg
Cracks In Concrete 006.jpg
Cracks In Concrete 001.jpg
Cracks In Concrete 002.jpg
Cracks In Concrete 003.jpg


Note: To protect against computer viruses, e-mail programs may prevent sending or receiving
certain types of file attachments.  Check your e-mail security settings to determine how
attachments are handled.


This e-mail and any attachments contain URS Corporation confidential information that may be
proprietary or privileged. If you receive this message in error or are not the intended
recipient, you should not retain, distribute, disclose or use any of this information and you
should destroy the e-mail and any attachments or copies.

2

NON-CERTIFIED COPY

H&E 0013939

NON-CERTIFIED COPY

H&E 0013940



# Project Observation Report

| Photo No. 5 | Date 3.20.12 |
| --- | --- |
| **Direction Photo Taken:** | |
| Looking south toward service building | |



**Description:**

Service bldg. front addition framing being installed

| Photo No. 6 | Date 3.20.12 |
| --- | --- |
| **Direction Photo Taken:** | |
| Looking south toward service building | |



**Description:**

Service bldg. front addition framing being installed

**URS Corporation**
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY

URS 034340

NON-CERTIFIED COPY

H&E 0013941

NON-CERTIFIED COPY

H&E 0013942

NON-CERTIFIED COPY

H&E 0013943

NON-CERTIFIED COPY

H&E 0013944

NON-CERTIFIED COPY

H&E 0013945

| | |
|---|---|
| **From:** | Ottis Seaborn [oseaborn@mappconstruction.com] |
| **Sent:** | Tuesday, September 25, 2012 8:26 PM |
| **To:** | Daily Update |
| **Cc:** | tim.gaines@urs.com; htadlock@he-equipment.com; rgomez@he-equipment.com; fwynn@he-equipment.com; thomas.e.ryan@urs.com; jabrown@he-equipment.com; neal_johnson@urscorp.com; Brad Reese; Vern Anderson; Debbie Stout |
| **Subject:** | 52079 Updates for H&E kenner  (completion date  tbd) |
| **Attachments:** | COntrol joint cut in & installed @ phase D, between Phase D & south edge of paving of A-2 ..pic#1.jpg; COntrol joint cut in & installed @ phase D, between Phase D & south edge of paving of A-2 ..pic#2.jpg; COntrol joint cut in & installed @ phase D, between Phase D & south edge of paving of A-2 ..pic#3.jpg; Curb dowles, cut down & ground @ north edge of phase D (Self perform) ..pic#1.jpg; Curb dowles, cut down & ground @ north edge of phase D (Self perform) ..pic#2.jpg; Curb dowles, cut down & ground @ north edge of phase D (Self perform) ..pic#3.jpg; Phase C-3 control joints caulked & sealed #1.jpg; Phase C-3 control joints caulked & sealed #2.jpg; Self perform , form boards removed & stacked & area at phase D cleaned up.jpg |

Updates for H&E Kenner Tuesday ( 9-25-12)

- **Self Perform:** We completed removing the curb dowels & grinding down the stubs @ north edge of phase D. We installed the drip caps hardware at the exterior warehouse man-doors. We also removed part of the damaged paving that was saw cut between and at transition phases B-1 seq 2 & Phase C-3 seq 1 & 2.
- **Metal Buildings:** RBI was on site today. Eric & crew continued , framing, insulating & sheeting the Parts warehouse roof. RBI has completed ¼ of the roof system of the Parts warehouse. Gino Ray & Paul Desselle was on site today, They were on site at my request to review & plan the re-roof of the service warehouse. We also walked the damaged areas of the warehouse items, to provide a complete pricing for all of the items on the Isaac list.
- **Concrete:** MCC was on site today, Jeremy & Jose arrived this afternoon to caulk, seal & detail the control joints of the new paving of Phase C-3.
- **Painting & Finishing:** Dalesandro was on site today. The crew continued painting & touch ups at the interior office spaces. Marco Dalesandro was on site today at my request to provide pricing for drywall & finish repairs due to damages from Isaac.
- **Inspections:** A city building final was scheduled for Next Monday (10-01-12) . We requested a final for a date this week, but the city is booked full for the end of this month.
- **Structural:** CCCM was on site today at our request to provide pricing  for repairs to the warehouse steel items that was damaged during Isaac. Calvin expected to have quotes ready by tomorrow. Calvin also walked the area where the 5x5  concrete step noted by the state fire marshal was requested. Calvin said he would follow up with tomorrow.
- **Flooring:** RCC flooring was contacted via E-mail to provide pricing for the flooring that was damaged due to the flooding caused by Isaac.
- **Fencing:** U.S. Fence was contacted via E-mail to provide pricing for the fencing that was damaged due to the flooding & wind caused by Isaac.
- **Tree Removal:** Brandon of Lake Ponchartraine landscaping called me today, & spoke briefly about the tree removal @ Phase C-1. Brandon said that he would get the tree removed ASAP once the temporary office trailers were moved out of the area.
- **Concrete demo:** All around concrete cutting was on site today to cut out the damaged areas of paving at phases B-1 seq 2.

**Ottis Seaborn ::** Superintendent

504 654 0594 W I R E L E S S

1

WYNN

EXHIBIT NO. 44

K. DONNELLY

NON-CERTIFIED COPY

H&E 0051948

**MAPP**CONSTRUCTION

344 THIRD STREET :: BATON ROUGE
P 225 757 0111 :: F 225 757 0480

   MAPPCONSTRUCTION.COM

2

NON-CERTIFIED COPY

H&E 0051949

| From: | Brad Reese [breese@mappconstruction.com] |
|---|---|
| Sent: | Thursday, October 04, 2012 12:02 PM |
| To: | Johnson, Neal; Frankie Wynn |
| Cc: | Gaines, Tim; thomas.e.ryan@urs.com; jabrown@he-equipment.com; neal_johnson@urscorp.com; Vern Anderson; John Jones; Thomas, Daren L. (dlthomas@terracon.com) (dlthomas@terracon.com); Vrenick, Tom A; craigduos@gmail.com; Ottis Seaborn |
| Subject: | RE: 52079 Updates for H&E kenner  (completion date  tbd) |

Neal,
As we discussed, MAPP will implement the engineer's recommended design mod/fix as soon as we receive direction.  We have placed our concrete sub on stand-by and they are ready to move forward without delay.  Again, if your office requires any assistance from MAPP to expedite resolution, please let us know.


Frankie,
We do understand the urgency of this matter, and are prepared to deal with it accordingly.


thanks


**Brad Reese, LEED AP BD+C** :: Sr. Project Manager



**MAPP**CONSTRUCTION
MAPPCONSTRUCTION.COM


**From:** Johnson, Neal [mailto:neal.johnson@urs.com]
**Sent:** Thursday, October 04, 2012 9:52 AM
**To:** Frankie Wynn; Cttis Seaborn
**Cc:** Gaines, Tim; 'thomas.e.ryan@urs.com'; 'jabrown@he-equipment.com'; 'neal_johnson@urscorp.com'; Brad Reese; Vern Anderson; John Jones; Thomas, Daren L. (dlthomas@terracon.com) (dlthomas@terracon.com); Vrenick, Tom A; craigduos@gmail.com; Johnson, Neal
**Subject:** RE: 52079 Updates for H&E kenner (completion date tbd)
**Importance:** High

Ottis and Brad:
We need your response to your plan of correction action for this work.  As of now we will consider these joints to be rejected as installed.
Thanks,
Neal


Tim:
We need your review of MAPP's plan of correction and/or  a written recommendation on the paving cracks from you.
Thanks,
Neal


Craig
We need your review of MAPP's plan of correction and/or  a written recommendation on the slab cracks from you.
Thanks,

1

WYNN
EXHIBIT NO. 76
K. DONNELLY

H&E 0016469

NON-CERTIFIED COPY

Neal



**Neal Johnson, AIA**

7389 Florida Boulevard
Suite 300
Baton Rouge, LA 70806

Office   225.932.5709
Direct   225.231.6343
Mobile  225.324.5848

neal.johnson@urs.com

---

**From:** Frankie Wynn [mailto:fwynn@he-equipment.com]
**Sent:** Thursday, October 04, 2012 7:25 AM
**To:** 'Ottis Seaborn'
**Cc:** Gaines, Tim; 'thomas.e.ryan@urs.com'; 'jabrown@he-equipment.com'; 'neal_johnson@urscorp.com'; Brad Reese;
Vern Anderson (vanderson@mappconstruction.com); John Jones
**Subject:** RE: 52079 Updates for H&E kenner (completion date tbd)

I have seen no new plan, ideas, suggestions or solutions to the crumbling concrete at the joints in the paved area
or cracks in the slab.  Guys please understand, this is not going away.  Our Region VP, John Engquist, Jr.
continues to ask me when this will be addressed.   I need an answer for him and for me.

Frankie Wynn
**Director of Facilities/Risk/Compliance Management**
H&E Equipment Services, Inc.
11100 Mead Road, Ste. 200
Baton Rouge, LA  70816
**Office:  225-298-5229**
**Mobile:  225-603-4438**
**Fax:  225-298-5376**
fwynn@he-equipment.com
www.HE-Equipment.com

 

---

**From:** Ottis Seaborn [mailto:oseaborn@mappconstruction.com]
**Sent:** Wednesday, October 03, 2012 8:49 PM
**To:** Daily Update
**Cc:** 'Tim.gaines@urs.com'; 'htadlock@he-equipment.com'; 'rgomez@he-equipment.com'; 'fwynn@he-equipment.com';
'thomas.e.ryan@urs.com'; 'jabrown@he-equipment.com'; 'neal_johnson@urscorp.com'; Brad Reese
**Subject:** 52079 Updates for H&E kenner (completion date tbd)

Updates for H&E Kenner Wednesday ( 10-03-12)
- **Self Perform:** Today, we undercut the door at the Mechanical room of the parts office building, installed
  new nickel plated hinges & strikes at the existing wood doors of the parts office's. The existing wood trusses
  of the parts lobby at the North end of the ceiling was trimmed out at the transition point between the
  storefront header & the ceiling.
- **Metal Buildings:** RBI was on site today. RBI Has completed about 50% of the new roof system of the Parts
  warehouse. Eric's crew continued , framing, insulating & sheeting the Parts warehouse roof.

NON-CERTIFIED COPY

H&E 0016470

- **Concrete:** MCC was on site today. MCC doubled the workers they had breaking the bad section of concrete at the Boxed out area of the drain basin at the Main drive. Mike White (MCC's PM) said they planned to pour the repair areas,& other misc. formed areas tomorrow.
- **Painting & Finishing:** Marco Dalesandro was not on site today.
- **Interior cleaning:** Today we continued our Final, final cleaning at the office areas.
- **Fire protection:** Calmar Coatings (Don) was on site today, treating the steel columns at the service warehouse rated wall assembly.

**Ottis Seaborn ::** Superintendent

504 654 0594 W I R E L E S S



**MAPP**CONSTRUCTION

344 THIRD STREET :: BATON ROUGE
P 225 757 0111 ::  F 225 757 0480

M A P P C O N S T R U C T I O N . C O M

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

3

NON-CERTIFIED COPY

H&E 0016471

**From:** John Jones
**Sent:** Monday, December 17, 2012 9:12 AM
**To:** Johnson, Neal (neal.johnson@urs.com); Ryan, Thomas E (thomas.e.ryan@urs.com)
**Cc:** Frankie Wynn
**Subject:** Corporate Parking

**Importance:** High

Neal I need your presence here at the facility in short order. The executive group is very upset with the parking situation. We have 142 parking spaces including the guest parking by the flagpoles and 6 handicap places for a total of 148 spaces. We currently have 153 people in the office here and we are not at capacity. We need to determine some resolution quickly.

**John Jones**
**Vice President- Corporate Services**
11100 Mead Road, Suite 200
Baton Rouge, LA 70816
225-298-5223 Office
225-978-7660 Mobile
225-298-5376 Fax
jjones@he-equipment.com

 


WYNN
EXHIBIT NO. 522
K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0020068

**From:**        Ryan, Thomas E [thomas.e.ryan@urs.com]
**Sent:**        Wednesday, January 09, 2013 10:24 AM
**To:**          Dorsey, Stephan (sdorsey@mjwomack.com)
**Cc:**          Frankie Wynn; John Jones; Johnson, Neal; Phillips, Dale; pbonner@mjwomack.com
**Subject:**     H&E HQ ASI #136 - Parking Revisions
**Attachments:** ASI #136 Parking Revisions Rev 1.pdf

Stephan,
Attached is ASI #136 showing the final layout of the parking revisions for the H&E HQ building.

Should you have any questions, please contact me.

Thank you,



**Thomas E. Ryan**
Senior Architect

7389 Florida Boulevard
Suite 300
Baton Rouge, LA 70806

Office    225.922.5700
Direct    225.922.5759
Cell      225.932.8300

Thomas.e.ryan@urs.com

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.



WYNN

EXHIBIT NO. 51

K. DONNELLY

H&E 0020851

NON-CERTIFIED COPY

# URS

# Architect's Supplemental Instructions

|  |  |  |
|---|---|---|
| Project: | H&E Equipment Services | Frankie Wynn: ☒ |
|  | New Headquarters & Branch Building | Stephan Dorsey: ☒ |
|  | Baton Rouge, Louisiana | Thomas Ryan: ☒ |
| URS Project No.: | 19229775 | Neal Johnson: ☒ |
| Contractor: | Milton J. Womack |  |
| ASI No.: | **136** |  |
| Date of Issuance: | January 9, 2013 |  |

The work shall be carried out in accordance with the following supplemental instructions issued in accordance with the Contract Documents without change in Contract Sum or Contract Time. Proceeding with the Work in accordance with these instructions indicates your acknowledgement that there will be no change in the Contract Sum or the Contract Time.

Description of Modifications to be included within this Supplemental Instructions:

1. Revise parking layout, drainage, lighting and landscaping per the attached REVISED sheets. Pricing is to be obtained for Phase 1 only at this time.

Please feel free to contact me if you have any questions or need any additional information.

**Attachments**
SK-75, SK 76, SK 77, L-101

**URS Corporation,**

Thomas Ryan
Senior Architect, AIA

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY

H&E 0020852



EXISTING DUMPSTER ENCLOSURE TO REMAIN
EXISTING LIGHT POLE TO REMAIN (V.O.I.)
EXISTING FENCING TO BE RELOCATED (V.O.I.)
RELOCATED CHAIN LINK FENCING
EDGE OF EXISTING PAVING TO REMAIN, MODIFY AS REQUIRED FOR NEW PAVING CONNECTION
NEW PARKING SPACE STRIPING TO MATCH EXISTING (TYP)
EXISTING DRAINS TO REMAIN, MODIFY AS REQUIRED TO BE FLUSH WITH NEW CONCRETE PAVING
NEW WHEEL STOPS TO MATCH EXISTING (TYP) RE: 17C-501
EXISTING CURB TO BE REMOVED, PATCH/REPAIR CONCRETE TO REMAIN
EXISTING CATCH BASIN TO REMAIN
NEW 6" CONCRETE PAVING TO MATCH EXISTING AT HATCHED AREA (TYP)
EXISTING CURB TO BE REMOVED, PATCH/REPAIR CONCRETE TO REMAIN
EXISTING CURB AND WALK TO BE REMOVED, PATCH/REPAIR CONCRETE TO REMAIN
NEW 6" CONCRETE PAVING TO MATCH EXISTING AT HATCHED AREA (TYP)
EXISTING CURB AND WALK TO BE REMOVED, PATCH/REPAIR CONCRETE TO REMAIN
PHASE 1
52 NEW PARKING SPACES
PHASE 2
26 NEW PARKING SPACES
NEW CURB TO MATCH EXISTING ALIGN WITH EXISTING
EXISTING LIGHT POLE TO REMAIN
PARKING COUNTS:
153 - EXISTING
+52 - PHASE 1
205 - TOTAL
+26 - PHASE 2
231 - TOTAL
NOTES:
1. ALL NEW CONCRETE PAVING TO HAVE CALCIUM SULFATE BASE. RE: 2 C-00*
2. NEW PAVING TO MATCH EXISTING GRADING
BRANCH BUILDING
PARTIAL ARCHITECTURAL SITE PLAN
27
10
11

URS

ASI #136 - ADDITIONAL PARKING

**H&E NEW HEADQUARTERS AND BRANCH BUILDINGS**

7508 PECUE LANE BATON ROUGE, LA 70809

DATE: | ISSUED FOR:

ISSUED: 12/20/12

PROJECT NUMBER: 1922 8820

© 2009 BY: URS Corporation

NEW PARKING LAYOUT

ARCHITECTURAL SITE PLAN

**SK-75**

H&E 0020853

NON-CERTIFIED COPY

H&E 0020854

NON-CERTIFIED COPY



NON-CERTIFIED COPY

H&E 0020855

NON-CERTIFIED COPY

H&E 0020856

| | |
|---|---|
| **From:** | Johnson, Neal [neal.johnson@urs.com] |
| **Sent:** | Friday, September 07, 2012 7:35 AM |
| **To:** | Dorsey, Stephan; Ryan, Thomas E |
| **Cc:** | Phillips, Dale; Frankie Wynn; Frank Thompson (frank@tlaengineering.com); Craig Hebert (craig.hebert@chengineering.net) |
| **Subject:** | RE: REVISED Change Order Request for Change Proposal #17 |

Stephan:

Disregard the below email request. I had not seen your email with your subcontractor's data before I sent my email.

Thanks

Neal



**Neal Johnson, AIA**

7389 Florida Boulevard
Suite 300
Baton Rouge, LA 70506

Office    225.922.5700
Direct    225.231.6343
Mobile   225.324.5848
neal.johnson@urs.com

**From:** Johnson, Neal
**Sent:** Thursday, September 06, 2012 7:14 PM
**To:** 'Dorsey, Stephan'; Ryan, Thomas E
**Cc:** Phillips, Dale; Frankie Wynn (fwynn@he-equipment.com); Frank Thompson (frank@tlaengineering.com); Craig Hebert (craig.hebert@chengineering.net); Johnson, Neal
**Subject:** RE: REVISED Change Order Request for Change Proposal #17

Stephan:

Our engineers have also determined that the requested 146 additional sprinkler heads require detail documentation. Let us know when this information is available.

Thanks

Neal



**Neal Johnson, AIA**

7389 Florida Boulevard
Suite 300
Baton Rouge, LA 70506

Office    225.922.5700
Direct    225.231.6343
Mobile   225.324.5848
neal.johnson@urs.com

**From:** Johnson, Neal
**Sent:** Tuesday, September 04, 2012 11:58 AM
**To:** 'Dorsey, Stephan'; Ryan, Thomas E
**Cc:** Phillips, Dale; Frankie Wynn (fwynn@he-equipment.com); Frank Thompson (frank@tlaengineering.com); Craig

1

NON-CERTIFIED COPY

H&E 0051587

Hebert (craig.hebert@chengineering.net); Johnson, Neal
**Subject:** RE: REVISED Change Order Request for Change Proposal #17

Stephan:
We do not understand the need for an additional 146 new sprinkler heads.  In the base contract had a fully sprinklered system and a previous change order added additional sprinkler heads.  You are requested to provide detail documentation as to why this required.  A meeting with our engineers will be required to help us all understand this requested work.
Let us know when the information is available and we will schedule the meeting.
Thanks
Neal



Neal Johnson, AIA

7389 Florida Boulevard
Suite 300
Baton Rouge, LA 70806

Office    225.922.5700
Direct    225.231.6343
Mobile  225.324.5648
mail johnson@urs.com

**From:** Dorsey, Stephan [mailto:sdorsey@mjwomack.com]
**Sent:** Friday, August 31, 2012 2:34 PM
**To:** Ryan, Thomas E
**Cc:** Johnson, Neal
**Subject:** FW: REVISED Change Order Request for Change Proposal #17
**Importance:** High

Thomas,
As we've previously discussed, our sprinkler subcontractor submitted the attached change proposal request for the revision to his scope of work that resulted from CPR#017.  I've asked him for a detailed synopsis of his scope revision, but in a nutshell, he's advising that the layout of the demising walls in CPR#017 is different than that shown in the 'for construction' documents.  As soon as I receive the requested information, I'll forward it to you.

**From:** Rob Rubel [mailto:rrubel@firetechsystems.com]
**Sent:** Wednesday, August 29, 2012 10:59 AM
**To:** Dorsey, Stephan
**Subject:** REVISED Change Order Request for Change Proposal #17

Mr. Dorsey,

Please see attached change to our COR from earlier. After further review of the documents we have realized there will be more sprinkler heads added than we anticipated. Sorry for any confusion.

Sincerely,

Rob Rubel
Fire Sprinkler Sales

*Fire Tech Systems, Inc.*
www.firetechsystems.com
(318) 688-8834 Direct Line

2

NON-CERTIFIED COPY

H&E 0051588

(318) 208-1884 Mobile
(318) 588-8844 Fax



This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

NON-CERTIFIED COPY

H&E 0051589

| From: | Johnson, Neal [neal.johnson@urs.com] |
| --- | --- |
| Sent: | Friday, January 04, 2013 10:18 AM |
| To: | Frankie Wynn; John Jones |
| Cc: | Ryan, Thomas E |
| Subject: | RE: H&E HQ ASI #137 Millwork Changes / Mailroom |

Frankie and Johnny:

What mistake was made? The mailroom millwork and layout design and construction documents was presented and approved by H&E over two years ago.

As we discussed yesterday URS is currently providing all redesign services to H&E for any and all of the current requested modifications at no charge.

Neal



Neal Johnson, AIA

7389 Florida Boulevard
Suite 300
Baton Rouge, LA 70806

Office  225.922.5700
Direct  225.231.6343
Mobile  225.324.5848

neal.johnson@urs.com

---

**From:** Frankie Wynn [mailto:fwynn@he-equipment.com]
**Sent:** Friday, January 04, 2013 9:56 AM
**To:** Johnson, Neal; Ryan, Thomas E
**Cc:** John Jones
**Subject:** FW: H&E HQ ASI #137 Millwork Changes / Mailroom

Please see below.

**Frankie Wynn**
**Director of Facilities/Risk/Compliance Management**
**H&E Equipment Services, Inc.**
**7500 Pecue Lane**
**Baton Rouge, LA 70809 (New Address)**
**Office: 225-298-5229**
**Mobile: 225-603-4438**
**Fax: 225-298-5376**
**fwynn@he-equipment.com**
**www.HE-Equipment.com**



---

**From:** Brad Barber
**Sent:** Friday, January 04, 2013 9:53 AM
**To:** Frankie Wynn

WYNN
EXHIBIT NO. 52
K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0020538

**Cc:** John Jones
**Subject:** RE: H&E HQ ASI #137 Millwork Changes / Mailroom

Let URS know right now they will be responsible for the full cost of this mistake on their part.

**Brad Barber**
President, Chief Operating Officer
7500 Pecue Lane
Baton Rouge, LA 70809
(225) 298-5269 Office
(225) 298-5382 Fax
(225) 939-9673 Mobile
bbarber@he-equipment.com
WWW.HE-equipment.com

 

---

**From:** Frankie Wynn
**Sent:** Friday, January 04, 2013 9:42 AM
**To:** Brad Barber
**Cc:** John Jones
**Subject:** FW: H&E HQ ASI #137 Millwork Changes / Mailroom

This is the new design for the mailroom .  Waiting on pricing.

Frankie Wynn
**Director of Facilities/Risk/Compliance Management**
**H&E Equipment Services, Inc.**
**7500 Pecue Lane**
**Baton Rouge, LA  70809  (New Address)**
**Office:  225-298-5229**
**Mobile:  225-603-4438**
**Fax:  225-298-5376**
fwynn@he-equipment.com
www.HE-Equipment.com

 

---

**From:** Ryan, Thomas E [mailto:thomas.e.ryan@urs.com]
**Sent:** Thursday, December 27, 2012 5:15 PM
**To:** Johnson, Neal; Frankie Wynn
**Subject:** H&E HQ ASI #137 Millwork Changes

Neal/Frankie,
Attached is ASI #137 showing the changes to the headquarters building first floor mailroom millwork as we discussed. please review and let me know if there are any changes that need to be made and I will finalize and send to Womack.

Thank you,

2

NON-CERTIFIED COPY

H&E 0020539



**Thomas E. Ryan**
Senior Architect

7389 Florida Boulevard
Suite 300
Baton Rouge, LA 70806
Office    225.922.5700
Direct    225.922.5759
Cell      225.802.8300

Thomas.e.ryan@urs.com

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

3

NON-CERTIFIED COPY

| | |
|---|---|
| **From:** | Frankie Wynn |
| **Sent:** | Friday, January 11, 2013 7:16 AM |
| **To:** | John Jones |
| **Subject:** | FW: 52079 - H&E Kenner - Remaining Items |
| **Attachments:** | 52079 - H&E RWL updated_13.01.10.pdf |

**Frankie Wynn**
**Director of Facilities/Risk/Compliance Management**
**H&E Equipment Services, Inc.**
**7500 Pecue Lane**
**Baton Rouge, LA  70809  (New Address)**
**Office:  225-298-5229**
**Mobile:  225-603-4438**
**Fax:  225-298-5376**
fwynn@he-equipment.com
www.HE-Equipment.com

 

**From:** Brad Reese [mailto:breese@mappconstruction.com]
**Sent:** Thursday, January 10, 2013 4:54 PM
**To:** Frankie Wynn; Johnson, Neal
**Cc:** Patrick Solomon
**Subject:** 52079 - H&E Kenner - Remaining Items

Frankie/Neal – as we discussed on Tuesday, see the attached form that we are using to track the remaining items at H&E Kenner.

If you have any questions, please let me know.  Myself, Patrick and Casey have this project as top priority to get completed.

thanks

**Brad Reese, LEED AP BD+C** :: Sr. Project Manager

504 234 9200 W I R E L E S S

**MAPP**CONSTRUCTION

601 POYDRAS ST., STE. 1715 :: NEW ORLEANS
P 504 833 6277 ::  F 504 833 6074

MAPPCONSTRUCTION.COM



WYNN

EXHIBIT NO. 54

K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0021025



NON-CERTIFIED COPY

H&E 0021026



# MAPP
CONSTRUCTION

**Remaining Work List**
**# 52079 H&E Kenner, LA**

Report Date:    1/10/2013

| RWL Item # | Location | Date Originated Opened | Description of Remaining Work | Responsibility | Status | Sub/Vendor | Target Completion Date | Days Left To Compl. | Date Closed | MAPPie | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52079-001 | Parts | | Clean under side of roof panels @ rafters, left over insulation, tape & building debris | RBI | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-002 | Parts | | Tape & repair wall insulation tears & seams | RBI | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-003 | Parts | | Complete trim at warehouse doors | RBI | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-004 | Parts | | Downspouts need adjusted at new paving | RBI | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-005 | Parts | | Downspout leaking in gutter above Bay-door | RBI | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-006 | Parts | | Ceiling insulation is leaking at seam- SE corner above storage rack | RBI | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-007 | Service | | Service warehouse, south gable wall, top of wall needs terminated to roof & trimmed | RBI | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-008 | Service | | Trim at all pipe penetrations/ seal | RBI | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-009 | Service | | Framing @ eves/ translucent panel termination points @ South end | RBI | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-010 | Service | | Detail joints at service shop floor between new paving & new warehouse slab | Mike Carson | OPEN | | 25-Jan-13 | 15.00 | | B. Reese | CPR - MAPP to submit RFI to confirm solution |
| 52079-011 | Service | | Cut off anchor studs of old service wall | MAPP | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-012 | Site | | Detail sprawled areas at broken expansion joints at paving | Mike Carson | OPEN | | 25-Jan-13 | 15.00 | | P. Solomon | CPR - MAPP to submit RFI to confirm solution |
| 52079-013 | Punch #54 | | Detail expansion joint at Phase B-1 sequence 1 | Mike Carson | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-014 | Punch #55 | | Detail expansion joint at Phase A-3 | Mike Carson | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-015 | Punch #56 | | Detail expansion joint at Phase A-1 sequence 1 | Mike Carson | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-016 | Punch #57 | | Detail expansion joint at Phase B-1 sequence 2 | Mike Carson | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-017 | Parts | | Re-route down spout to the inside of column | Roofing Solutions | OPEN | | 18-Jan-13 | 8.00 | | B. Reese | CPR - MAPP to submit RFI to confirm solution |
| 52079-018 | Parts | | Re-route downspout at East CMU wall of Parts office to North side of Man door | Roofing Solutions | OPEN | | 18-Jan-13 | 8.00 | | B. Reese | CPR - MAPP to submit RFI to confirm solution |
| 52079-019 | Punch #06 | | Exterior Parts office P-104, canopy outside of door, flashing/trim has milled edge & needs profiled or replaced. | Roofing Solutions | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-020 | Punch #73 | | Install Trim with consistent reveal at top of column wall (Parts wall north facade) | Roofing Solutions | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-021 | Punch #92 | | Tile cut square @ round hole. Holes exposed at corner of squares under sink drains (all RestRooms) | RCC | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-022 | Punch #101 | | Clean floor drain & excess grout @ s 107 | RCC | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-023 | Service | | Install wall cables @ wind load zone above bay doors. | A1 | OPEN | | 01-Feb-13 | 22.00 | | B. Reese | |
| 52079-024 | Service | | Tighten roof cables at wind load zones. | A1 | OPEN | | 01-Feb-13 | 22.00 | | B. Reese | |
| 52079-025 | Service | | Install flange angle braces @ south end of Service bldg | A1 | OPEN | | 01-Feb-13 | 22.00 | | B. Reese | |
| 52079-026 | Service | | Install end frame "C" channel @ end wall eves, East & West sides of the south end | A1 | OPEN | | 01-Feb-13 | 22.00 | | B. Reese | |
| 52079-027 | Service | | Install Sag bracing service warehouse | A1 | OPEN | | 01-Feb-13 | 22.00 | | B. Reese | |
| 52079-028 | Service | | Install remaining column braces @ supports under center crane rails | A1 | OPEN | | 01-Feb-13 | 22.00 | | B. Reese | |
| 52079-029 | Service | | Complete Storm Repairs | A1 | OPEN | | 01-Feb-13 | 22.00 | | B. Reese | |
| 52079-030 | Punch #46 | | Building A-A (Service warehouse addition) – Install fire extinguishers as shown on plans | All-Type | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-031 | Punch #60 | | Adjust door so bottom does not rub @ S-114C | All-Type | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-032 | Punch #63 | | Repair door P-130 at latch area | All-Type | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-033 | Punch #65 | | Adjust strike & passage hardware, install correctly | All-Type | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-034 | Punch #80 | | P108 Remove shipping bar tips at bottom of jamb | All-Type | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-035 | Punch #81 | | Install Key Cabinet at room P138 | All-Type | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-036 | Punch #87 | | Install threshold @ S109B | All-Type | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-037 | Service | | Complete Service shop lighting rough-in @ overhead conduits | Oak Tree | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-038 | Site | | Install GFI outlet at back fence | Oak Tree | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |



**MAPP**
CONSTRUCTION

Remaining Work List
# 52079 H&E Kenner, LA

Report Date:        1/10/2013



| RWL Item # | Location | Date Originated Opened | Description of Remaining Work | Responsibility | Status | Signed Off By: (Enter Names) Sub/Vendor | Target Completion Date | Days Left To Compl. | Date Closed | MAPPie | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52079-039 | Service | | Complete Storm Repairs (Re-Install Overhead Lighting) | Oak Tree | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-040 | Punch #66 | | Install floor box assembly as shown per plans on page (E-3 per note #2) | Oak Tree | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-041 | Punch #86 | | Repair / tighten GFI outlet at S-3 | Oak Tree | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-042 | Parts | 08-Jan-13 | Adjust flush valve at Women's Restroom | BruMar | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-043 | CPR | 19-Nov-12 | Breakdown Hurricane CPR cost by Building | MAPP | OPEN | | 14-Jan-13 | 4.00 | | B. Reese | |
| 52079-044 | Site | 14-Nov-13 | Install additional fencing around site (particulary in the back area) to eliminate gap between existing grade and bottom of fence. | US Fence | OPEN | | 18-Jan-13 | 8.00 | | B. Reese | CPR |
| 52079-045 | Roof | 10-Jan-13 | Confirm that Metal Roofs are complete and ready for Architect Inspection. | RBI | OPEN | | 16-Jan-13 | 6.00 | | B. Reese | |
| 52079-046 | Service | 08-Jan-13 | Add rubber base (same as other colors) the the Shaft wall separating the office from the shop | RCC | OPEN | | 18-Jan-13 | 8.00 | | B. Reese | CPR |
| 52079-047 | Service | 08-Jan-13 | Add angle iron at double door threshold of mezzanine doors. | H&E | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | James Brown indicated that H&E will take care of it. |
| 52079-048 | Parts | 08-Jan-13 | Cost to rebuild the break room | MAPP | OPEN | | 15-Jan-13 | 5.00 | | B. Reese | CPR to be created and submitted |
| 52079-049 | Site | 08-Jan-13 | Landscaping & Irrigation | Pontchartrain | OPEN | | 01-Feb-13 | 22.00 | | J. Brown | |
| 52079-050 | Parts | 08-Jan-13 | Provide shut-off valve keys | BruMar | OPEN | | 16-Jan-13 | 6.00 | | P. Solomon | |
| 52079-051 | Parts | 08-Jan-13 | Stained ceiling tiles in Mechanical Room - confirm the source of the leak and replace the tiles. | MAPP | OPEN | | 11-Jan-13 | 1.00 | | P. Solomon | |
| 52079-052 | Service | 08-Jan-13 | Drinking Fountains not Working | BruMar | OPEN | | 15-Jan-13 | 5.00 | | P. Solomon | |
| 52079-053 | Service | 08-Jan-13 | Paint plywood at Stairs | M. Dalesandro | OPEN | | 18-Jan-13 | 8.00 | | B. Reese | CPR |
| 52079-054 | Service | 08-Jan-13 | PVC clean-out at the Condensor Pad needs to be cut flush with the concrete. | BruMar | OPEN | | 18-Jan-13 | 8.00 | | P. Solomon | |
| 52079-055 | Document | 08-Jan-13 | Submit all Closeout Docs to URS | MAPP | OPEN | | 18-Jan-13 | 8.00 | | C. Ginder | |

NON-CERTIFIED COPY

H&E 0021027

| | |
|---|---|
| **From:** | Frankie Wynn |
| **Sent:** | Friday, January 18, 2013 3:50 PM |
| **To:** | Dorsey, Stephan; pbonner@mjwomack.com |
| **Cc:** | Johnson, Neal (neal.johnson@urs.com); Ryan, Thomas E; John Jones; Phillips, Dale (dphillips@mjwomack.com); Gauthier, Greg (ggauthier@mjwomack.com); Jeff Stringer |
| **Subject:** | H&E Equipment Services, Inc. : concrete at branch / Paved Equipment yard |
| **Attachments:** | phone jan 17 2013 055.JPG; phone jan 17 2013 056.JPG; phone jan 17 2013 057.JPG; phone jan 17 2013 058.JPG; phone jan 17 2013 059.JPG; phone jan 17 2013 060.JPG; phone jan 17 2013 061.JPG; phone jan 17 2013 062.JPG; phone jan 17 2013 054.JPG |

Stephan, attached are the photos of the area we viewed.  Looks like the paving is sinking/separating from the drain.

Frankie Wynn
Director of Facilities/Risk/Compliance Management
H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA  70809  (New Address)
Office:  225-298-5229
Mobile:  225-603-4438
Fax:  225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com

 

---

**From:** Jeff Stringer
**Sent:** Friday, January 18, 2013 3:32 PM
**To:** Frankie Wynn; John Jones
**Subject:** concrete at branch

See attached

*Jeff Stringer*
**Branch Manager**
**7502 Old Pecue Ln.**
**Baton Rouge, LA 70809**
**Office:  (225) 356-6113**
**Cell:  (225) 939-9672**
**Fax:  (225) 214-4517**
**Email:  jstringer@he-equipment.com**

WYNN
EXHIBIT NO. 56
K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0022314

 

2

H&E 0022315

NON-CERTIFIED COPY