

H&E 0022316

NON-CERTIFIED COPY



NON-CERTIFIED COPY

H&E 0022317



NON-CERTIFIED COPY

H&E 0022318



NON-CERTIFIED COPY

H&E 0022319



NON-CERTIFIED COPY

H&E 0022320



NON-CERTIFIED COPY



H&E 0022323

NON-CERTIFIED COPY



H&E 0022324

NON-CERTIFIED COPY



**MAPP**
CONSTRUCTION

601 Poydras St., Ste 1715
New Orleans, LA 70130
PHONE: 504.933.6277
FAX: 504.835.6074
MAPPconstruction.com

BATON ROUGE • NEW ORLEANS • DALLAS • ORLANDO • HOUSTON

March 27, 2013

Via E-mail @ *fwynn@he-equipment.com*

Frankie Wynn-Director of Facilities
H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA. 70809

Re:   H&E Equipment Services- Renovations and Additions
      Kenner, Louisiana
      URS Project #19229626

Dear Mr. Wynn

We are in receipt of URS' letter (attached for reference), dated March 19, 2013 regarding payment application #13 for the H&E Equipment Services project in Kenner, LA. MAPP submitted payment application #13 on January 22, 2013. URS's letter decreases the payment application by $80,000.00 for their punchlist, which was performed by Thomas Ryan on Wednesday, March 6, 2013. This is the first that we have seen or heard about this punchlist. However, we have reviewed the punchlist and have the following comments and clarifications:

Site & Paving
1. This is change order work that is being taken care of by MAPP. Work to be completed by Wednesday, April 3, 2013.
2. Work to be completed by Tuesday, April 2, 2013.
3. The catch basin was installed per the contract documents.
4. The joints and concrete paving were installed per the contract documents.
5. Work to be completed by Tuesday, April 2, 2013.

Parts Building
1. Work is complete.
2. Work is complete.
3. Work is complete.
4. Work is complete.
5. Work is complete.

Service Building
1. No issue. Translucent panels are installed per the contract documents.
2. Work is complete.
3. Work is complete.
4. Work is complete.
5. Work is complete.



WYNN
EXHIBIT NO. 60
K. DONNELLY

NON-CERTIFIED COPY

URS 051379



**MAPP**
CONSTRUCTION

661 Poydras St., Ste 1745
New Orleans, LA 70130
PHONE: 504.833.8277
FAX: 504.833.8274
MAPPconstruction.com

BATON ROUGE • NEW ORLEANS • DALLAS • ORLANDO • HOUSTON

6. Work is complete.
7. Work is complete. This was done prior to occupancy.
8. The stains are not caused by construction.
9. Work is complete.

Interior Service Building
1. Work is complete.
2. This is CPR #054 which has not been approved.
3. Work is complete. This is CPR #055.
4. Not a construction issue. H&E was going to complete this item.

Closeout
1. Will be delivered by Friday, March 29, 2013.
2. Will be delivered by Friday, March 29, 2013.
3. Will be delivered by Friday, March 29, 2013.

Based on the details of payment application #13 and MAPP's response to the punchlist, we do not feel it is acceptable to withhold $80,000.00 from payment application #13. Please release the balance of these funds so that we can pay our subcontractors and vendors.

In addition to the above, payment applications #14 and #15 were submitted to URS on March 8, 2013. Payment application #14 is for 100% completion and payment application #15 is for retainage. We still have outstanding Change Proposal Requests (CPR's) which need to be turned into change orders so that we can bill. These CPR's are as follows:

1. Work Approved and Complete
   a. CPR #047 – $1,874.00        Misc. Hardware Revisions
   b. CPR #049 – $2,601.00        HVAC Filters
   c. CPR #050 – $8,208.00        Revise Downspout at Front Office Canopy Column
   d. CPR #051 – $2,988.00        Window treatments
   e. CPR #052 – $5,139.00        Fire Marshal Requirements
   f. CPR #055 – $911.00          Service Building Rubber Base

2. Work Not Approved, nor Complete
   a. CPR #048 – $39,742.00       Break Room Buildout – submitted to URS/H&E
   b. CPR #053 – $TBD             Concrete Paving Expansion Joints (RFI #54) – pending
                                  URS/H&E indication of areas to repair for pricing
                                  purposes.
   c. CPR #054 – $11,163.00       Joint Between New and Existing Service Building Slab–
                                  submitted to URS.
   d. CPR #056 – $1,615.00        Server Room Outlet – pending H&E approval.
   e. CPR #057 – $TBD             Sign Permit – pending cost from Electrician.
   f. CPR #058 – $TBD             Added Fence Closure – will submit once work is
                                  completed.

NON-CERTIFIED COPY



801 Poydras St., Ste 1715
New Orleans, LA 70130
PHONE 504.833.6277
FAX 504.833.6074
MAPPconstruction.com

BATON ROUGE • NEW ORLEANS • DALLAS • ORLANDO • HOUSTON

In summary, please review and let us know about the following items:

1. Release of the $80,000.00 from payment application #13.
2. Payment date for payment application #14.
3. Payment date for payment application #15.
4. Creation of change order #5 which covers all outstanding CPR's.
5. Determine extent of repair work as discussed in RFI #54 and CPR #053.

As we discussed, let's schedule an onsite meeting the week of April 1, 2013. Please confirm which day and time works best for you.

Feel free to contact me with any questions.

Sincerely,

MAPP CONSTRUCTION

Brad Reese,
Senior Project Manager

cc: 52079-File
    Vern Anderson- MAPP Construction
    Neal Johnson-URS
    Thomas Ryan-URS
    Field

NON-CERTIFIED COPY

URS 051381



March 19, 2013

Mr. Frankie Wynn - Director of Facilities
H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, Louisiana 70809

Re:    H&E Equipment Services – Renovations and Additions
       Kenner, Louisiana
       URS Project #19229626

Dear Mr. Wynn:

Please accept the two notarized and certified Contractor's Application and Certificate for Payment No. 13 received on January 22, 2013.

This approval is based on the aggregate amount requested. We have reviewed the contractors work completed and material stored on site to the application for the period ending January 22, 2013. We recommend payment for the total amount as marked up of $136,820.78 which constitutes 98.34% of the total project complete to date.

If you need any further information, please feel free to contact our office.

Sincerely,
URS Corporation

Thomas Ryan
Senior Architect

*MAPP*

copy:   Lee Vampran, URS w/ attachment
        Brad Reese, MAPP w/o attachment

VENDOR   *1010144*
G/L      *560,010*
APPROVED *TR 3/19/2013*
DATE
AMOUNT   *$ 136,820.78*

*CAPITAL ORDER*
*4000341*

URS Corporation
7389 Florida Boulevard, Suite 300
Baton Rouge, LA 70806
225.922.5700

NON-CERTIFIED COPY    URS 051382

URS 051383

NON-CERTIFIED COPY

# APPLICATION AND CERTIFICATE FOR PAYMENT

Invoice #:  52079-13

| To Owner: | H&E Equipment Services<br>11100 Mead Road Suite 200<br><br>Baton Rouge, LA 70816 | Project: | 52079- H&E Equipment Services<br>125 East Airline Highway<br>Kenner, LA 70062 |
|---|---|---|---|

| From Contractor: | Mapp Construction , LLC -NO Division<br>601 Poydras Street, Suite 1715<br>New Orleans, LA  70130 | Via (Architect): | URS Corporation<br>7389 Florida Blvd Ste 300<br>Baton Rouge, LA  70806 |
|---|---|---|---|

Application No. :  13
Period From:  12/9/2012
Period To:  1/22/2013

Project NOS:  19229626

Distribution to:
☐ Owner
☐ Architect
☐ Contractor

Contract For:

Contract Date:  10/14/2011

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet is attached.

| | |
|---|---|
| 1. Original Contract Sum | $3,188,420.00 |
| 2. Net Change By Change Order | $647,225.00 |
| 3. Contract Sum To Date | 3,835,645.00 |
| 4. Total Completed and Stored To Date | $3,772,049.88 |
| 5. Retainage : | |
|   5.02% of Completed Work | $189,229.63 |
| 6.  0.00% of Stored Material | $0.00 |
| Total Retainage | $189,229.63 |
| 6. Total Earned Less Retainage | 3,582,820.25 |
| Less Punchlist    $50,000.00 | |
| 7. Less Previous Certificates For Payments | 3,385,999.47 |
| 8. Current Payment Due | $136,820.78 ~~$186,820.78~~ |
| 9. Balance To Finish, Plus Retainage | $332,824.79 ~~$252,824.76~~ |

| CHANGE ORDER SUMMARY | Additions | Deductions |
|---|---|---|
| Total changes approved in previous months by Owner | $385,894.00 | $0.00 |
| Total Approved this Month | 261,331.00 | 0.00 |
| TOTALS | $647,225.00 | $0.00 |
| Net Changes By Change Order | $647,225.00 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information, and belief the work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:    MAPP Construction, LLC

By: _____    Date: 1-22-13

Brad Reese

State of:  Louisiana    County of:  East Baton Rouge
Subscribed and sworn to before me this    22nd    day of    January
Notary Public:  Brian Van Parker #92740
My Commission expires:    at death

BRIAN PARKER
NOTARY PUBLIC
EAST BATON ROUGE PARISH
STATE OF LOUISIANA
# 92740
COMMISSION EXP. AT DEATH

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising the above application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information, and belief, the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ............ $136,820.78

(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)

ARCHITECT:

By: _____    Date: 03.19.12

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment, and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.



**URS**

## Deficiencies to the Completion of the Contract - Exterior

| | |
|---|---|
| Project | H&E Equipment Services - Renovations and Additions |
| Location | Kenner, LA |
| URS No. | 19229626 |
| Date of Observation | Wednesday, March 8, 2013 |
| Contractor | MAPP Construction |

The list of work below is to be considered as an observation of the work completed or not completed at the time of observation. All work contained within the Contract Documents but not indicated on this list is still the responsibility of the appropriate contractor.

| Value | | Deficient Item |
|---|---|---|
| | **GENERAL** | |
| | | |
| | **ARCHITECTURAL** | |
| | **EXTERIOR** | |
| $3,500 | Site & Paving | Close gaps at bottom of fenceline along west, south and east property lines |
| $150 | | Fill in large hole at south fence line at electrical conduits |
| $2,500 | | Repair/replace damaged concrete catch basin A-4 |
| $35,000 | | Repair all broken/spalling concrete paving at construction and control joints |
| $500 | | Install GFI outlet at rear fence |
| | | |
| $3,500 | Parts Building | Remove downspout at freestanding column and install roof drain to drain through column |
| $250 | | Repaint CMU wall on east side of office area where downspout was re-routed |
| $250 | | Correct re-routed downspout outflow to drain properly |
| $500 | | Provide shut-off valve keys |
| $850 | | Fix gutters joints above overhead and personnel door at east elevation where leaking |
| | | |
| $500 | Service Building | Replace different color translucent panels near open bay and on west side to match others |
| $1,200 | | Repair/replace damaged metal siding and corner trim at southeast corner of service bays |
| $350 | | Patch metal siding at beam penetrations at southeast corner of service bays |
| $250 | | Clean beams at exterior bay |
| $650 | | Repair/repaint service bays overhead door frames head and jambs to match existing |
| $150 | | Clean metal siding at translucent panels on east side near office area |
| $100 | | Clean storefront framing and glass at Office 101 |
| $350 | | Clean stucco mildew stains on north side of office area |
| $2,500 | | Trim/seal all pipe penetrations |
| | | |
| | **ARCHITECTURAL** | |
| | **INTERIOR** | |
| | **Parts Building** | |
| | | |
| | **INTERIOR** | |
| | **Service Building** | |
| $500 | Service Bays | Patch seams and tears in vinyl faced insulation (wall and roof) inside service bays |
| $9,500 | | Cut out concrete slab uneven edges at new service bay slab connection and infill to make flush |
| $750 | | Install rubber base at the new shelf wall |
| $450 | | Install angle iron at threshold of mezzanine double-door |
| | | |
| | **CLOSEOUT** | |
| $5,000 | | Provide Operation and Maintenance Manuals |
| $1,500 | | Provide Warranties for Equipment |
| $2,500 | | Provide As-built drawings |
| | | |
| | **SUMMARY** | |
| $0 | General | |
| $63,050 | Architectural | |
| $6,500 | Mechanical | |
| $1,450 | Electrical | |
| $9,000 | Closeout | |
| $80,000 | Total | |

NON-CERTIFIED COPY

URS 051384

**From:** Frankie Wynn
**Sent:** Monday, May 13, 2013 8:01 AM
**To:** Ryan, Thomas E; Dorsey, Stephan (sdorsey@mjwomack.com)
**Cc:** Johnson, Neal; Sooter, Jason; John Jones
**Subject:** RE: H&E HQ Final Punchlist Review

After reconsideration, due to the unresolved issues with paving, acoustical panels in the core, paneling in the Executive Area, roof leaks, etc., I feel it would be fruitless to perform a "final" walkthrough at this time.

Frankie Wynn
Director of Facilities/Risk/Compliance Management
H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA 70809 (New Address)
Office: 225-298-5229
Mobile: 225-603-4438
Fax: 225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com

 

---

**From:** Ryan, Thomas E [mailto:thomas.e.ryan@urs.com]
**Sent:** Friday, May 10, 2013 11:07 AM
**To:** Frankie Wynn; Dorsey, Stephan (sdorsey@mjwomack.com)
**Cc:** Johnson, Neal; Sooter, Jason
**Subject:** H&E HQ Final Punchlist Review

Frankie/Stephan,
In order to process the final pay app, we need to do a final walk through and verify the punchlist items are complete. When would be a good time Monday or Tuesday for the 3 of us to meet at H&E to do this? I'm available any time after 9:30 am Monday and all day Tuesday.

Thank you,



Thomas E. Ryan
Senior Architect

7389 Florida Boulevard
Suite 300
Baton Rouge, LA 70806
Office   225.922.5700
Direct   225.922.5759
Cell     225.802.8300

Thomas.e.ryan@urs.com



WYNN

EXHIBIT NO. 62

K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0024757

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

H&E 0024758

NON-CERTIFIED COPY

**From:**            Johnson, Neal [neal.johnson@urs.com]
**Sent:**            Monday, June 24, 2013 2:39 PM
**To:**            Frankie Wynn; Ryan, Thomas E
**Cc:**            John Jones; Dorsey, Stephan
**Subject:**            RE: H&E - Outstanding Items

There are no design or engineering issues – the issues with the work in place is either a construction, warranty or a maintenance issue.
Neal Johnson



**Neal Johnson, AIA**
Project Manager - Facilities
Southern Bank Critical Group

7389 Florida Boulevard,
Suite 300
Baton Rouge, LA 70806
Office: 225.922.5700
Direct: 225.231.6343
Cell: 225.324.5646

Neal.johnson@urs.com

**From:** Frankie Wynn [mailto:fwynn@he-equipment.com]
**Sent:** Monday, June 24, 2013 2:12 PM
**To:** Ryan, Thomas E; Johnson, Neal
**Cc:** John Jones; 'Dorsey, Stephan'
**Subject:** FW: H&E - Outstanding Items

See Stephan's comments below.  The only controversial issue is still with the joints.  I need an opinion from URS in regards to whether a design or installation issue.  I have forwarded Womack's opinion previously.

Frankie Wynn
Director of Facilities/Risk/Compliance Management
H&E Equipment Services, Inc.
7500 Pecue Lane
Baton Rouge, LA  70809  (New Address)
Office:  225-298-5229
Mobile:  225-603-4438
Fax:  225-298-5376
fwynn@he-equipment.com
www.HE-Equipment.com

-----Original Message-----
From: Dorsey, Stephan [mailto:sdorsey@mjwomack.com]
Sent: Monday, June 24, 2013 1:47 PM



WYNN

EXHIBIT NO. 62

K. DONNELLY

1

NON-CERTIFIED COPY

H&E 0025356

To: Frankie Wynn
Subject: Fwd: H&E - Outstanding Items

Fyi

Stephan Dorsey
Project Manager
Milton J. Womack, Inc
Office: (225) 924-8050
Fax:   (225) 924-8085
Cell:   (225) 268-6014


Begin forwarded message:

From: "Dorsey, Stephan" <sdorsey@mjwomack.com<mailto:sdorsey@mjwomack.com>>
Date: June 24, 2013 8:55:30 AM CDT
To: "Hill, Terry" <thill@mjwomack.com<mailto:thill@mjwomack.com>>, "Phillips, Dale"
<dphillips@mjwomack.com<mailto:dphillips@mjwomack.com>>, "Gauthier, Greg"
<ggauthier@mjwomack.com<mailto:ggauthier@mjwomack.com>>
Cc: "Bonner, Philip" <pbonner@mjwomack.com<mailto:pbonner@mjwomack.com>>
Subject: RE: H&E - Outstanding Items

The following list reflects the outstanding items on the H&E project as of today, and the status of each one of
today:


·    Mechanical chase exposed beams – COMPLETE (Trison completed the beam fireproofing this past
Saturday)

·    Executive wall panels – In the process of getting the material finish installed and approved by H&E.

·    Branch Building Water Leaks – COMPLETE

·    Drywall repair at the acoustical wall panels – COMPLETE

·    Curb repair at HQ Bldg entrance – COMPLETE

·    As-Builts – COMPLETE

·    Site Paving expansion/construction joint issue – WAITING ON H&E'S RESPONSE

·    Stairwell door hardware issue –  COMPLETE

·    Floor squeaks – COMPLETE

·    Missing carpet in Room #207 floor box – COMPLETE

·    Replace 4 pieces of carpet tile in John's office – COMPLETE

I'll update and re-send this list as each item is resolved.

2

NON-CERTIFIED COPY

H&E 0025357

Stephan Dorsey
Project Manager
Milton J. Womack, Inc.
Office: (225) 924-8050
Fax:    (225) 924-8085
Cell:   (225) 268-6014

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

3

NON-CERTIFIED COPY

H&E 0025358

**From:**       Frankie Wynn
**Sent:**       Monday, July 29, 2013 1:12 PM
**To:**         Johnson, Neal (neal.johnson@urs.com); Ryan, Thomas E; Sooter, Jason
                (jason.sooter@urs.com); Sanders, Debra (debra.sanders@urs.com)
**Cc:**         John Jones
**Subject:**    Belle Chasse Project Change Orders
**Attachments:** 201307290833.pdf; 201307290832.pdf; Belle Chasse Bldg A Relocated Door; FW: H&E
                Belle Chasse RFI #29 Gate openings; Belle Chasse Revised Ductwork

During the Baton Rouge, Kenner and Belle Chasse projects we have been faced with numerous change orders
due to items either overlooked, conflicts in drawings or miscommunications.

Everyone involved was aware of the cost sensitive nature of the Belle Chasse Project and the need for absolute
accuracy to stay within the contracted amount.

Attached are examples of increases in the costs in the Belle Chasse Project.  Some are admittedly unforeseen,
but many are due to errors in the drawings or omissions. We discovered Friday, that due to an existing roof and
a new roof not aligning, we will have to eliminate the folding door and make additional changes to ductwork.
We also have a large bean that I need to know will be utilized or eliminated and if not used, can it be returned
for credit.

We have a door in Building A that was cut where an existing wind brace is located that will have to be moved.

We had asked for an opening to be anticipated at a later date in the stairwell area in Building A.  This was not
communicated to the General Contractor.

A roll up door was installed without any access from the outside.

Also limestone was not included in the specs. for the driveways.

Due to lack of space, I will not include all RFI's, but there are many.

H&E would like an explanation of how these items were missed.

Thank you

Frankie Wynn
**Director of Facilities/Risk/Compliance Management**
**H&E Equipment Services, Inc.**
7500 Pecue Lane
Baton Rouge, LA 70809  (New Address)
**Office:  225-298-5229**
**Mobile:  225-603-4438**
**Fax:  225-298-5376**
fwynn@he-equipment.com
www.HE-Equipment.com



WYNN
EXHIBIT NO. 69

K. DONNELLY

1

NON-CERTIFIED COPY

 

2

NON-CERTIFIED COPY

H&E 0021332

**Kenner Project Change Orders**

| CO Item | CPR# | Contract Item | Description | Amount |
|---|---|---|---|---|
| 1 | 1 | 560 | New Sewer Line at Front Office (Airline) 4,997.00 | 4,997.00 |
| 2 | 9 | 560 | Export & Import Unsuitable Soil 26,463.00 | 26,463.00 |
| 3 | 15 | 560 | New 2" Discharge Line (Sewer Manhole Tie-In) 29,260.00 | 29,260.00 |
| 4 | 21 | 560 | OH Door Scope Change -2,500.00 | (2,500.00) |
| | | | CO#1 | 58,220.00 |
| | | | | |
| 1 | 3 | 570 | 7 Day Concrete Mix (Phase A-1, Seq #2) 8,263.00 | 8,263.00 |
| 2 | 5 | 570 | Circular Hand Wash Station 3,071.00 | 3,071.00 |
| 3 | 11 | 570 | URS CPR #01, dated 01/11/12 (U/G Debris) 45,464.00 | 45,464.00 |
| 4 | 14 | 570 | Wash Rack Water Supply (New Water Meter) 15,604.00 | 15,604.00 |
| 5 | 20 | 570 | Replace Drain Box A (RFI #32) 15,658.00 | 15,658.00 |
| 6 | 25 | 570 | Elevation Conflicts 13,038.00 | 13,038.00 |
| | | | CO#2 | 101,098.00 |
| | | | | |
| 2 | 22 | 580 | Phase D Paving Area - Options 46,199.00 | 46,199.00 |
| 3 | 27 | 580 | Misc Framing Changes 9,829.40 | 9,829.40 |
| 4 | 28 | 580 | Failed Proofroll #3 10,792.00 | 10,792.00 |
| 5 | 29 | 580 | Failed Proofroll #4 4,040.00 | 4,040.00 |
| 6 | 30 | 580 | Revised Exterior Fixtures (ASI #16) 1,851.00 | 1,851.00 |
| 7 | 31 | 580 | Revise Wall Mount Flood Lights (Service Bldg) 4,777.00 | 4,777.00 |
| 8 | 32 | 580 | Cost to Install U/G for Pole Lights 3,417.00 | 3,417.00 |
| 9 | 33 | 580 | Added 3" Tele Conduit 3,720.00 | 3,720.00 |
| 10 | 34 | 580 | Concrete Sealer Deduct -13,811.00 | (13,811.00) |
| 11 | 35 | 580 | Signage Allowance Deduct -5,500.00 | (5,500.00) |
| 12 | 36 | 580 | Remove/Replace Existing Panels 10,183.77 | 10,183.77 |
| 13 | 37 | 580 | Offset Gas Line 7,560.48 | 7,560.48 |
| 14 | 38 | 580 | Replace Existing Service Building Roof 68,094.36 | 68,094.36 |
| 15 | 39 | 580 | Re-locate 30' of Gas Line 946.46 | 946.46 |
| 16 | 40 | 580 | Parts Building Painting 1,696.94 | 1,696.94 |
| 17 | 41 | 580 | 2nd BFP at 2" Water Line 4,231.19 | 4,231.19 |
| 18 | 44 | 580 | Failed Proofrolls #5-9 23,171.00 | 23,171.00 |
| 19 | 4 | 580 | Relocate Oil Tanks & Electrical (RFI #4) 14,881.00 | 14,881.00 |
| 20 | 43 | 580 | Door, Frame, Hardware Revisions 14,025.00 | 14,025.00 |



NON-CERTIFIED COPY

| 21 | 42 | 580 | Service Mezzanine Buildout 16,471.40 | | 16,471.40 |
| | | | | CO#3 | 226,575.60 |
| | | | | | |
| 1 | 45 | 590 | Hurricane Damage 261,331.00 | | 261,331.00 |
| | | | | CO#4 | 261,331.00 |
| | | | | | |
| 1 | 47 | 600 | Misc Hardware Revisions 1,874.00 | | 1,874.00 |
| 2 | 49 | 600 | HVAC Filters 2,601.00 | | 2,601.00 |
| 3 | 50 | 600 | Revise Down Spout at Front Office Canopy Column 5,000.00 | | 5,000.00 |
| 4 | 51 | 600 | Window Treatments 2,988.00 | | 2,988.00 |
| 5 | 52 | 600 | Fire Marshal Requirements 5,139.00 | | 5,139.00 |
| 6 | 54 | 600 | **Joint between New & Existing Service Bldg 8,596.00** | | **8,596.00** |
| 7 | 55 | 600 | Service Building Rubber Base 911.00 | | 911.00 |
| 8 | 56 | 600 | Revise Server Room Outlet 1,615.00 | | 1,615.00 |
| | | | | CO#5 | 28,724.00 |
| | | | | | |
| | | | | Total | 675,948.60 |

NON-CERTIFIED COPY

H&E EQUIPMENT SERVICES, INC.    *    CASE NO. C626308, SECTION D

VERSUS    *    19TH JUDICIAL DISTRICT COURT

URS CORPORATION ARCHITECTURE,    *    PARISH OF EAST BATON ROUGE
P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III    *    STATE OF LOUISIANA

FILED: _____    _____
                                            DEPUTY CLERK

## AFFIDAVIT OF FRANKIE WYNN

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

NOW COMES, Frankie Wynn, who under penalty of perjury and from his own personal knowledge, states:

1.    I am over the 18 years of age and competent to give testimony in this matter.  I have personal knowledge of all facts and circumstances in this Affidavit.

2.    I submit this Affidavit in support of the Opposition to Defendants' Motion for Partial Summary Judgment on Reconventional Demand filed by H&E Equipment Services, Inc. ("H&E").

3.    I am currently the Director of Facilities/Risk/Compliance Management for H&E and am based out of H&E's Corporate Headquarters located at 7500 Pecue Lane, Baton Rouge, Louisiana.  I have held this position since May 2010, prior to which I served as H&E's Risk/Asset Manager.

4.    As H&E's Director of Facilities, I was responsible for overseeing the construction phase of the Baton Rouge, Kenner, and Belle Chase, Louisiana projects at issue in this litigation.

5.    I officially began overseeing the Baton Rouge, Kenner, and Belle Chase construction projects in 2010.  In addition, I maintain H&E's files regarding the projects and have reviewed the documents relevant to this dispute, including the change order logs for the projects.

6.    During my involvement with the projects, I regularly communicated with L. O'Neal Johnson, Thomas E. Ryan, III, and other representatives and employees of URS Corporation Architecture, P.C. and URS Corporation (collectively, referred to as "Defendants"), as well as the various general contractors and subcontractors for the three projects.

-1-



EXHIBIT
10

NON-CERTIFIED COPY

7.      There have been multiple problems associated with the work performed by Defendants on all three projects at issue.

8.      During the course of construction, the project contractors and subcontractors observed numerous design deficiencies or design-related problems at all three H&E project sites. Typically, these issues were discussed with Defendants as the project architect and addressed – at H&E's expense. But, some problems remain outstanding even today. All problems that were addressed and remedied resulted in significant additional costs to H&E.

*Deficiencies and Problems at the*
*Baton Rouge Headquarters and Branch Facility*

9.      The Baton Rouge Headquarters and Branch Facility reached substantial completion in late 2012.

10.     Based on my involvement with the Baton Rouge projects and review of the change order log for the facilities, I am aware of numerous design deficiencies and problems that arose during construction.

11.     Most notably, during and/or around the time of substantial completion of the Baton Rouge projects, H&E and the project contractors began to observe crumbling and spalling in the concrete constructed to Defendants' specifications at the facilities.

12.     H&E notified Defendants of the observed problems with the concrete at the Baton Rouge site when the problems surfaced, in hopes – and with the expectation – that the parties would work together to find a solution and remedy. But, while Defendants initially appeared willing to troubleshoot the problem, they ultimately refused to participate in ongoing discussions and efforts to fix the concrete pads.

13.     The concrete problems at the Baton Rouge facilities continue to worsen to this day.

14.     I am also aware of numerous other problems and design deficiencies with respect to the Baton Rouge facilities that required addressing and/or remedying at H&E's expense. These include, for example:

     (a)    Parking lot revisions due to Defendants' failure to design and provide for an adequate number of parking spots;

     (b)    Structural steel revisions;

     (c)    Waterproofing of the Headquarters' elevator pit, which was not provided for in Defendants' designs and specifications;

-2-

NON-CERTIFIED COPY

(d)    Interior modifications required for the proper routing of roof-drainage;

(e)    Provision of additional beams for the Branch Facility's loading dock due to incorrect measurements;

(f)    Installation of lintel systems and additional structural support above doorways and openings;

(g)    Upgrading of window sill materials due to the specification of inferior materials;

(h)    Replacement of wood paneling in the Headquarters' executive lobby area mid-construction due to Defendants' specification for and insistence that H&E use a thinner, inferior material;

(i)    Grading revisions at the Branch Facility;

(j)    Relocation of louvers and exhaust fans at the Branch Facility;

(k)    Revisions to the tie-in between the Branch Facility's wash-bay and the site's sewerage system; and

(l)    Multiple code-required additions not provided for in Defendants' original designs and specifications, including the addition of an oil/water separator in the service department shop, multiple railings and guardrails, and multiple fire-prevention measures.

15.    The above list is not exhaustive.

16.    Defendants often refused to take responsibility for the problems and deficiencies that arose and were brought to their attention in connection with the Baton Rouge projects. All of the revisions, changes, and additions required as a result of these problems and deficiencies were undertaken at additional expense to H&E.

### Deficiencies and Problems
### at H&E's Belle Chasse Facility

17.    The Belle Chasse project reached substantial completion in late 2013.

18.    Based on my involvement with the Belle Chasse project and review of the change order log for the facility, I am aware of numerous design deficiencies and problems that arose during construction.

19.    For example, I am aware of the following problems and deficiencies with respect to the Belle Chasse facility that required addressing and/or remedying at H&E's expense:

(a)    Significant addition of extra concrete in the facility's work area due to Defendants' incorrect elevation estimates and specification for an insufficient amount of concrete;

(b)    Removal of concrete expansion joints not anticipated or provided for by Defendants but necessitated by Defendants' concrete specifications;

-3-

NON-CERTIFIED COPY

(c)     Multiple revisions occasioned by Defendants' failure to properly measure for an accordion partition in the facility's lunch room area, and H&E's purchase of custom materials that could not be used as planned and remain unused today;

(d)     Multiple revisions occasioned by Defendants' mismeasurement of roof differentials between the administration building and the tool room, including the relocation of duct work and transformers; and

(e)     Various other revisions and changes during the course of construction caused by Defendants' deficient specifications, such as the modification of exterior handrails, addition of bollards to exterior air-conditioning units, relocation of the facility's locker room, and replacement of the facility's windscreens.

20.     The above list is not exhaustive.

21.     Defendants often refused to take responsibility for the problems and deficiencies that arose and were brought to their attention in connection with the Belle Chasse project. All of the revisions, changes, and additions required as a result of these problems and deficiencies were undertaken at additional expense to H&E.

Dated:      August 21, 2015

_____
FRANKIE WYNN

SWORN TO AND SUBSCRIBED
BEFORE ME ON THIS THE
21ˢᵗ DAY OF AUGUST, 2015.

_____
NOTARY PUBLIC
Wesley P Hebert
LA Notary 87793
Lifetime Commission

-4-

NON-CERTIFIED COPY

1

1   19TH JUDICIAL DISTRICT COURT
2       PARISH OF EAST BATON ROUGE
        STATE OF LOUISIANA

3

4

5

6   H&E EQUIPMENT SERVICES, INC    *    DOCKET NO.
                                   *    626,308
7   VERSUS                         *
                                   *    SECTION:   "D"
8   URS CORPORATION ARCHITECTURE,  *
    P.C., URS CORPORATION, L.       *
9   O'NEAL JOHNSON, AND THOMAS E.  *
    RYAN, III                       *
                                   *
10  *  *  *  *  *  *  *  *  *  *    *

11

12

13

14
            Deposition of THOMAS EDMOND RYAN, II, 37414
15  Provence Point, Prairieville, Louisiana, 70769, taken
    in the offices of Fishman Haygood, 201 St. Charles
16  Avenue, 46th Floor, New Orleans, Louisiana,
    70170-4600, commencing at 9:56 a.m., on Tuesday, the
17  2nd day of August, 2016.

18

19

20
    APPEARANCES:
21

22      FISHMAN HAYGOOD
        (By:  Brent B. Barriere, Esquire)
23      201 St. Charles Avenue
        46th Floor
24      New Orleans, Louisiana  70170-3500
            (Attorneys for the Plaintiff)
25



EXHIBIT

11

NON-CERTIFIED COPY

2

ADAMS AND REESE
(By:  Philip A. Franco, Esquire)
4500 One Shell Square
New Orleans, Louisiana  70139
        (Attorneys for the Defendant)




ALSO PRESENT:


    Neal Johnson

REPORTED BY:

    WENDY MAJORIA, CCR
    Certified Court Reporter
    (No. 84106)
    Huffman & Robinson, Inc.
    Suite 220, Metairie Office Tower
    433 Metairie Road
    Metairie, Louisiana  70005
    (504) 831-1753/(800) 749-1753
    (504) 831-1759/fax

NON-CERTIFIED COPY

3

# E X A M I N A T I O N    I N D E X

PAGE

EXAMINATION BY MR. BARRIERE.....................7

# E X H I B I T    I N D E X

Ryan Exhibit No. 1.............................36
    (Document titled "Report of Geotechnical
     Investigation" done by Soil Testing Engineers)

Ryan Exhibit No. 2.............................44
    (E-mail between Chad Herndon and
     Leonard St. Germain dated February 6, 2007)

Ryan Exhibit No. 3.............................48
    (E-mail from Thomas Ryan to Murray
     McCollough dated March 4, 2011)

Ryan Exhibit No. 4.............................52
    (Revised drawings)

Ryan Exhibit No. 5.............................55
    (Project Manual)

Ryan Exhibit No. 6.............................59
    (E-mail to Leonard Gaines from Hongwei
     Zhao dated August 4, 2011)

NON-CERTIFIED COPY

4

1 | EXHIBITS (continued):

2

3 | Ryan Exhibit No. 7.........................60
        (E-Mail exchange between Stephan Dorsey
         and Frankie Wynn dated October 1, 2012)

4

5 | Ryan Exhibit No. 8.........................64
        (E-mail from Jeff Stringer to Frankie Wynn,
6        Philip Bonner, and John Jones dated
         May 3, 2013)

7

8 | Ryan Exhibit No. 9.........................76
        (E-Mail exchange between Thomas Ryan
9        and Frankie Wynn dated May 10th and
         May 13, 2013)

10

11 | Ryan Exhibit No. 10........................80
        (E-mail from Stephan Dorsey dated
12       June 6, 2013)

13

14 | Ryan Exhibit No. 11........................92
        (E-Mail exchange between Frankie Wynn
         and Neal Johnson dated June 24, 2013)

15

16 | Ryan Exhibit No. 12.......................100
        (Construction drawings for Kenner project)
17                (not attached)

18

19 | Ryan Exhibit No. 13.......................102
        (Document titled "Kick-off Meeting Minutes")

20

21 | Ryan Exhibit No. 14.......................104
        (Document titled "Geotechnical Engineering
         Report" for Kenner project prepared by
22       Terracon)

23

24 | Ryan Exhibit No. 15.......................111
        (E-Mail exchange between Tim Gaines and Mr.
         Barkataki)

25

NON-CERTIFIED COPY

5

1  EXHIBITS (continued):

2

3  Ryan Exhibit No. 16...........................112
        (E-Mail with part of construction
4        manual for Kenner project)

5

   Ryan Exhibit No. 17...........................113
6        (E-mail exchange between Thomas Ryan and
         Frankie Wynn of March 2012)
7

8  Ryan Exhibit No. 18...........................115
        (E-Mail exchange between Neal Johnson and
9        Tim Gaines dated August 3, 2012)

10

   Ryan Exhibit No. 19...........................119
11        (E-mail exchange between Ottis Seaborn and
         Frankie Wynn dated October 4, 2012)
12

13  Ryan Exhibit No. 20...........................124
        (Document titled "H&E Items of Contention")
14                       (not attached)

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

6

# S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, in accordance with law;

That the formalities of reading and signing are specifically not waived;

That the formalities of filing, sealing and certification are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

\*       \*       \*       \*

WENDY MAJORIA, Certified Court Reporter, State of Louisiana, officiated in administering the oath to the witness.

NON-CERTIFIED COPY

7

1                    THOMAS EDMOND RYAN, II,

2  after having been first duly sworn by the above-

3  mentioned Certified Court Reporter, was examined and

4  testified as follows:

5  EXAMINATION BY MR. BARRIERE:

6        Q.    Good morning, again, sir.  My name is Brent

7  Barriere.  I'm a partner here at Fishman Haygood, and

8  I'll be taking your deposition today on behalf of H&E

9  Equipment Services.

10             Can I have your full name and address for

11  the record, sir.

12        A.    Thomas Edmond Ryan, II, 37414 Provence

13  Point Avenue, Prairieville, Louisiana, 70769.

14        Q.    Mr. Ryan, by whom are you employed?

15        A.    I am employed by Trinity Business

16  Corporation.

17        Q.    All right.

18        A.    Trinity Business Group.

19        Q.    And how long have you been employed by

20  Trinity?

21        A.    Since November of last year.  So --

22        Q.    Okay.

23        A.    -- eight months.

24        Q.    All right.  And were you at one time

25  employed by URS?

NON-CERTIFIED COPY

76

1  staff, does it not?

2      A.    Yes.

3      Q.    All right.  And it provides civil engineer

4  services?

5      A.    Correct.

6      Q.    And, indeed, it did so in connection with

7  the Kenner project?

8      A.    Yes.

9  MR. BARRIERE:

10         Phil, remind me.  What number did we mark

11     the Stringer --

12  MR. FRANCO:

13         Eight.

14  EXAMINATION BY MR. BARRIERE:

15     Q.    Mr. Ryan, I'm going to show you what I've

16  marked as Ryan No. 9.  It's an e-mail exchange between

17  yourself and Mr. Wynn of May 10th and May 13, 2013.

18         (Whereupon, the document as described

19  above is so marked as "Ryan Exhibit No. 9" for

20  identification.)

21  EXAMINATION BY MR. BARRIERE:

22     Q.    I'll ask you if you recall that e-mail

23  exchange?

24     A.    Yes.

25     Q.    You recall receiving that document?

NON-CERTIFIED COPY

77

1    A.    Yes.

2    Q.    All right.  Mr. Wynn writes to respond to

3  your suggestion of a final walk-through and writes,

4  quote, "After reconsideration, due to the unresolved

5  issues with paving, acoustical panels in the core,

6  paneling in the Executive Area, roof leaks, etc., I

7  feel it would be fruitless to perform a 'final'

8  walkthrough at this time."

9         Do you see what I'm referring to?

10    A.    Yes.

11    Q.    All right.  What did you understand to be

12  the unresolved issues with paving referenced by

13  Mr. Wynn in this e-mail?

14    A.    The cracking joints -- cracking and

15  spalling joints.

16    Q.    All right.  So the same issue we've been

17  discussing for the last several minutes?

18    A.    Right.

19    Q.    All right.  And what did you understand to

20  be the issue with respect to the acoustical panels in

21  the core?

22    A.    There were some acoustical panels on the

23  wall around the core of the building, which was the

24  center part of the building with the conference room,

25  bathroom, that those walls were curved and the panels

NON-CERTIFIED COPY

78

1  were glued to the wall and popping off.

2      Q.     And how was that problem resolved, or was

3  it resolved?

4      A.     It was resolved.  To my recollection, they

5  screwed them onto the wall.  No.  No.  I'm sorry.

6  They screwed some edging, some metal edging onto the

7  wall to hold them in place, the contractor did.

8      Q.     The next issue addresses the paneling in

9  the executive area.  Do you know what he's referring

10  to there?

11      A.     Yes.

12      Q.     And what is that?

13      A.     That's the stained wood paneling on the

14  walls in -- in the executive office area.

15      Q.     Can you describe in any greater detail what

16  the perceived problem was as of May 2013?

17      A.     Some of the stained panels warped and

18  were -- were warped.

19      Q.     Okay.  Do you know how that problem was

20  ultimately resolved?

21      A.     I do not.

22      Q.     Okay.  Do you know who paid for the fix?

23      A.     I do not.

24      Q.     Do you know, was the fix of that perceived

25  problem a change order paid for by H&E?

NON-CERTIFIED COPY

80

1      A.    Yes.

2      Q.    Do you recall, approximately -- this e-mail

3   exchange occurs in mid-May, specifically May 13th,

4   2013.

5            Do you recall, approximately, when that

6   final walk-through occurred?

7      A.    I don't.  I would -- no, I don't.

8      Q.    To the best of your knowledge, which of the

9   issues identified in Mr. Wynn's e-mail of May 13th

10  were resolved as of the final walk-through?

11     A.    The acoustical panels and I believe the

12  paneling in the executive area.  I know the acoustical

13  panels were.

14     Q.    But not the problem with spalling and

15  cracking?

16     A.    Correct.

17  THE WITNESS:

18            Do you mind if I run to the bathroom?

19  MR. BARRIERE:

20            Please.

21            (Whereupon, a recess in the proceedings was

22       taken.)

23  MR. BARRIERE:

24            Let's turn to what we're marking as

25       Ryan No. 10, which is an e-mail authored by

NON-CERTIFIED COPY

81

1      Stephan Dorsey -- you were among the many

2      addressees, I believe.  Yes -- dated

3      June 6, 2013.

4           (Whereupon, the document as described

5      above is so marked as "Ryan Exhibit No. 10" for

6      identification.)

7  EXAMINATION BY MR. BARRIERE:

8      Q.    Do you recall receiving this e-mail, sir?

9      A.    Yes.

10     Q.    Okay.  Mr. Dorsey writes -- and I'm focused

11  now on the second paragraph -- "As we've also

12  discussed, since we've installed the pavement and

13  joint systems in accordance with the construction

14  documents (plans and specifications) on the project,

15  we feel we have fulfilled our contractural obligation;

16  therefore, we are not in agreement with your

17  suggestion that we participate in the cost to resolve

18  this issue.  In our opinion, the intended use of the

19  equipment yard was something that would have been

20  discussed and addressed during the programming phase

21  of the design process; therefore, when we received the

22  construction documents, it was assumed that all

23  programming issues had been resolved and

24  incorporated."

25           Do you see where I'm referring to?

NON-CERTIFIED COPY

82

1     A.    Yes.

2     Q.    All right.  Do you recall discussion in

3 approximately this time frame, June of 2013,

4 concerning programming issues, as that term is used

5 here by Mr. Dorsey?

6     A.    No.

7     Q.    Do you recall any discussion that the -- to

8 the effect that the yard had not been designed to

9 support equipment of the type and weight used by H&E?

10    A.    Yes.

11 MR. FRANCO:

12        I'm sorry.  I didn't -- I was reading this.

13    Can you just repeat that question?

14        (whereupon, the preceding question was read

15    back by the court reporter.)

16 EXAMINATION BY MR. BARRIERE:

17    Q.    I think you said "yes"?

18    A.    Yes.

19    Q.    Tell me about those discussions.

20    A.    I -- it was -- as I recall, it was based

21 on -- based on the use of track equipment on the

22 concrete.  And that was their intended use for it.

23    Q.    At the time you got on the team, URS team,

24 did you understand that track equipment would be used

25 at the yard?

NON-CERTIFIED COPY

83

1       A.      Yes.

2       Q.      And you were told that by Mr. Johnson; is

3  that correct?

4       A.      Yes.

5       Q.      Did anyone else confirm that for you at

6  that time?

7       A.      Frankie Wynn did, Johnny Jones.

8       Q.      I think you told me earlier -- correct me

9  if I'm wrong -- you did not visit H&E sites other than

10 those in which you worked on, correct?

11      A.      Correct.

12      Q.      All right.  But you did go to the Kenner

13 site; is that correct?

14      A.      Yes.

15      Q.      All right.  The Kenner site was not a newly

16 built site.  It was a site under renovation; is that

17 correct?

18      A.      Correct.

19      Q.      All right.  And H&E equipment was stored

20 there?

21      A.      Yes.

22      Q.      All right.  Did that include track

23 equipment?

24      A.      Yes.

25      Q.      All right.  Would you agree that the

NON-CERTIFIED COPY

84

1  equipment at the Kenner site was of like type and

2  weight to that which was stored in the Baton Rouge

3  facility?

4          A.    I would say yeah.

5          Q.    Okay.  And when did you first go to the

6  Kenner site?

7          A.    I don't recall.

8          Q.    Would it have been within, say, three or

9  four months of your arriving at URS?

10         A.    I would say within six months.

11         Q.    Okay.  Would you have visited the Kenner

12 site while you were engaged in helping out the

13 production of the Project Manual?

14         A.    No.

15         Q.    It was after that?

16         A.    After that.

17         Q.    Okay.  Was it before the start of

18 construction in Baton Rouge?

19         A.    It was probably approximately around the

20 time of the start of construction, yeah.

21         Q.    Were you, to your knowledge, the first URS

22 employee to go to the Kenner facility?

23         A.    No, I was not.

24         Q.    Okay.  Do you know who that would have

25 been?

NON-CERTIFIED COPY

119

1  control joints?

2      A.    Without looking at the drawings, I would

3  only be assuming.

4      Q.    Okay.  In order to evaluate whether or not

5  the details were correct, what materials, if any, did

6  you reference or review?

7      A.    I don't recall.  We had just discussions

8  with Tim and the soils report.

9      Q.    Okay.

10      A.    I'm sorry.  The geotechnical report.

11      Q.    Did you have sufficient expertise in order

12  to evaluate whether or not this design by Mr. Gaines

13  was correct?

14      A.    I would say no.

15  MR. FRANCO:

16          Would you read back that last question,

17      please?

18          (Whereupon, the preceding question was read

19      back by the court reporter.)

20  EXAMINATION BY MR. BARRIERE:

21      Q.    Let me show you next an exchange of e-mail

22  between Mr. Ottis Seaborn at MAPP and Frankie Wynn --

23  you're shown as a cc -- and ask you if you recall

24  receiving that.  I'll mark as Ryan No. 19 the

25  exchanges on October the 4th, 2012.

NON-CERTIFIED COPY

120

1          (whereupon, the document as described

2     above is so marked as "Ryan Exhibit No. 19" for

3     identification.)

4     A.     Yes, I do.

5  EXAMINATION BY MR. BARRIERE:

6     Q.     who is Mr. Seaborn?

7     A.     Ottis was the superintendent at the Kenner

8  facility for MAPP Construction.

9     Q.     Okay.  All right.  Mr. Wynn had written at

10  7:25 on 4th of October, 2012, quote, "I have seen no

11  new plan, ideas, suggestions or solutions to the

12  crumbling concrete at the joints in the paved area or

13  cracks in the slab.  Guys please understand, this is

14  not going away.  Our Region VP, John Engquish, Jr.

15  continues to ask me when this will be addressed.  I

16  need an answer for him and for me."

17          Mr. Seaborn writes, "We plan to do the

18  following, to address the concrete issues at H&E

19  (Kenner)," bullet point, "Clearly identify areas of

20  concern."  And he goes through some of the areas of

21  concern.

22          Were you a party to any meetings or

23  conferences by phone conducted to identify areas of

24  concern?

25     A.     Yes.

NON-CERTIFIED COPY

121

1      Q.    All right.  Who else participated in those?

2      A.    Ottis.  And other than that, I don't recall

3 who else.

4      Q.    Okay.

5      A.    Hold up.  Tim Gaines came with me to -- to

6 look at the extent and locations of the cracks in the

7 joints.

8      Q.    The next bullet point is "Classify & label

9 problem areas:  A) structural failure.  B) cosmetic

10 defect.  C) Design conflict/Equipment travel damaged

11 area.  D) Installation error & Product failure/under

12 performance."

13          Was the equipment yard labeled under either

14 A, B, C or D?

15      A.    Labeled?  What do you mean?  Did

16 somebody --

17      Q.    He says, "Classify & label problem areas."

18 Was that done with respect to the yard?

19      A.    I don't recall seeing that.  That's

20 something Ottis would have put together.

21      Q.    Okay.  Who was URS's person responsible for

22 addressing the spalling issues with respect to the

23 joints in Kenner?

24      A.    Me, Neal and Tim.

25      Q.    Were you ever informed whether Ottis or

NON-CERTIFIED COPY

122
1 anyone else had classified the yard area as suggested
2 by the bullet point I just read to you?
3      A.    I don't recall seeing a drawing showing
4 that.
5      Q.    Okay.  Next bullet point was, "Provide
6 options of known proven solutions."
7           Do you recall what, if anything, was
8 suggested as a known and proven solution for the
9 spalling in the yard area?
10      A.    Yeah.
11      Q.    What was that?
12      A.    There was an epoxy -- there's an epoxy
13 compound.  S-I-K-A, I think, was the name of the
14 product.  Sika, S-I-K-A.  But they suggested filling
15 the joints with this epoxy product.
16      Q.    Was that ever done?
17      A.    No.
18      Q.    Why not?
19      A.    After talking about it in our office, we
20 recommended that that's not the way that it would be
21 fixed.  The epoxy was stronger than the concrete, and
22 that would only push the cracks out and make it worse
23 down the road.
24      Q.    Was any other solution discussed?
25      A.    Yes.  There was a -- there was a solution

NON-CERTIFIED COPY

123

1   to cover the joints with a steel plate.

2        Q.    Okay.   Was that implemented?

3        A.    No.

4        Q.    Why not?

5        A.    We were told by H&E to not pursue it.

6        Q.    Who at H&E informed you?

7        A.    Frankie Wynn.

8        Q.    Did you ever price the steel plate

9   solution?

10       A.    We did not.  MAPP Construction developed --

11  or came up with a price for a test section.  I think

12  it was about a 12, maybe 15-feet long test section.

13       Q.    All right.  So this was just going to be a

14  test area.  You would find out whether this was

15  abating or retarding the spalling --

16       A.    Right.

17       Q.    -- before you did it throughout the yard?

18       A.    Correct.

19       Q.    All right.  Did MAPP ever do the test

20  section?

21       A.    No.

22       Q.    Ottis's final suggestion was to "Meet,

23  discuss & select the best solution & execute."

24             Did that ever occur?

25       A.    To my knowledge, no.

NON-CERTIFIED COPY

129

1      MR. FRANCO:

2          80018 through 20.

3      MR. BARRIERE:

4          It's actually 80018.  Pardon me.

5   EXAMINATION BY MR. BARRIERE:

6      Q.    All right.  Mr. Ryan, were you involved in

7   a dispute between URS and H&E with respect to whether

8   or not H&E was responsible for payment of a number of

9   additional charges for steel?

10     A.    For steel, yes.

11     Q.    All right.  What can you tell me about

12  that?

13          This is with respect to the Baton Rouge

14  project, correct?

15     A.    Correct.

16     Q.    Okay.

17     A.    There were some miscellaneous steel items

18  that were not taken into account in the contractor's

19  bid price, construction price.  And, during the course

20  of construction, they sent change order requests to

21  include those steel items.

22     Q.    Why were those items not identified in the

23  bid package?

24     A.    Some of them were left out by the

25  structural engineer.

NON-CERTIFIED COPY

131

1  amount of change orders attributable to additional

2  steel necessitated by simply oversight of the

3  contractor?

4      A.    You mean like a dollar amount?

5      Q.    Yes.

6      A.    I don't recall actual numbers.

7      Q.    Who would have that information?

8      A.    They're in the change order documents.

9      Q.    Okay.  Do you recall a change order or set

10 of change orders required for the Baton Rouge site,

11 originally connected to the Baton Rouge project,

12 permitting discharge of unclean water into the sewer

13 system?

14     A.    Yes.  Yes.

15     Q.    Okay.  What can you tell me about that?

16     A.    From what I recall -- I'm going to have to

17 go back and look at it to know exactly the process,

18 but -- I mean, which part of the building -- which

19 part of the site are you talking about?

20     MR. FRANCO:

21         Of which site are we talking?

22     MR. BARRIERE:

23         This is Baton Rouge.

24 EXAMINATION BY MR. BARRIERE:

25     Q.    Let's see.  This is a code that required

NON-CERTIFIED COPY

132

1  oil-water separator and additional floor drains.  You

2  had to discharge into -- you could not discharge into

3  the retention pond but actually had to go in the sewer

4  system.

5          Is any of that ringing a bell with you?

6      A.    Yes.  The oil-water separator --

7      Q.    Yeah.

8      A.    -- was required by the City/State -- the

9  City.

10     Q.    Okay.

11     A.    And, I believe, from what I recall, it was

12 left off of the drawings.

13     MR. FRANCO:

14          I'm a little confused.  That's different

15          than discharging unclean water into sewer system?

16 EXAMINATION BY MR. BARRIERE:

17     Q.    Well, you can explain, but I think what

18 you're -- if I understood your answer correctly, it

19 was there had to be a separator, which then permitted

20 discharge into the --

21     A.    Into the sewer.

22     Q.    -- into the sewer.  So the two were part

23 and parcel of the same issue.

24     A.    Right.

25     Q.    Correct?

NON-CERTIFIED COPY

1    A.    Right.

2    Q.    Okay.  And that was required by the Baton

3  Rouge code?

4    A.    Well, there's two different parts to it.

5  The wash bay on the site out by the branch building,

6  there was some -- during the permit process, there was

7  some back and forth as to whether we could tie into

8  the storm sewer or it had to go into the city sewer.

9        The oil-water separator -- I want to say

10  the oil-water separator had to do with the

11  headquarters building.  I'd have to look back at the

12  documents.

13    Q.    In any event --

14  MR. FRANCO:

15        Just so you know, Neal is whispering in my

16    ear that those are two separate issues.

17  MR. BARRIERE:

18        Okay.

19  EXAMINATION BY MR. BARRIERE:

20    Q.    Which I take it you have a dim recollection

21  as to either?

22    A.    Yeah, it all happened at the same time,

23  pretty much.

24    Q.    And these devices or practices -- these

25  protocols and the related devices were not on the

NON-CERTIFIED COPY

134

1   drawings; is that correct?

2        A.    The oil-water separator was not in the

3   drawings --

4        Q.    Okay.

5        A.    -- as far as I recall.

6        Q.    Do you recall there was a series of change

7   orders I think at the Baton Rouge facility for

8   modifications dictated by the fire marshal or the

9   Baton Rouge building inspector, life safety issues,

10  principally?

11       A.    With regard to what?

12       Q.    I've got quite a list here.  I was trying

13  to find out whether you were responsible for them

14  before we went through them.

15       A.    I remember some, yes.

16       Q.    Electrical engineer added missing duct

17  detectors during his review of first alarm shop

18  drawings.

19       A.    Correct.

20       Q.    Ceiling and stairwell was not shown in the

21  bid documents to be fire rated.

22       A.    I'm sorry.  What part of the --

23       Q.    The ceiling and the stairwell.

24       A.    Ceiling and stairwell, yeah.

25       Q.    I'm really not trying to waste your time

NON-CERTIFIED COPY

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


* * * * * * * * *
                        *
H&E EQUIPMENT SERVICES  *
                        * NUMBER 626,308
VERSUS                  *
                        * DIVISION "D"
URS CORPORATION         *
ARCHITECTURE, P.C., URS *
CORPORATION, L O'NEAL   *
JOHNSON AND THOMAS E.   *
RYAN, III               *
                        *
* * * * * * * * *


            Deposition of BRADLEY W. BARBER,

taken on Friday, August 5, 2016, commencing at

12:56 p.m., in the offices of Adams and Reese,

LLP, Attorneys at Law, 450 Laurel Street, Suite

1900, Baton Rouge, Louisiana, 70801.



EXHIBIT
12

NON-CERTIFIED COPY

Page 2

1                         I N D E X

2

3                                               Page

4

   Caption                                    1
5  Index of Exhibits                          3
   Appearances                                4
6  Agreement of Counsel                       7

7  Examination

8     PHILIP A. FRANCO, ESQ.                   8

9

              *   *   *   *   *
10

   Witness' Certificate                     169
11 Reporter's Page                          170
   Certificate                             171
12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

1              INDEX OF EXHIBITS

2

         Number                        Page

3

         1 July 10, 2008 Email string from     31
4            Leonard St. Germain to Brad
             Barber
5            H&E 0003530-0003535

6        2 September 20, 2010 Email from      39
             Frankie Wynn to Brad Barber
7            H&E 0003823-0003832

8        3 October 14, 2010 Email string from 47
             Frankie Wynn to Brad Barber,
9            et al
             H&E 0003269-0003270

10

11       4 February 24, 2011 string from       55
             Frankie Wynn to Brad Barber
             H&E 0003307-0003308

12

13       5 February 28, 2011 Email from        55
             Frankie Wynn to Brad Barber
             Facility Update February 2011
14           H&E 0003301-0003305

15       6 April 22, 2011 Email string from    58
             Frankie Wynn to Brad Barber
16           H&E 0003341-0003342

17       7 June 30, 2011 Email from Frankie    60
             Wynn to John Jones, et al
18           H&E 0003886-0003893

19       8 Affidavit of Frankie Wynn           75
             August 21, 2015

20

21       9 August 22, 2011 Email from Frankie  77
             Wynn to Brad Barber, et al
             Facility Update August 2011
22           H&E 0003650-0003652

23       10 August 29, 2011 Email string from  78
             Brad Barber to Frankie Wynn
24           H&E 0003657-0003658

25

NON-CERTIFIED COPY



NON-CERTIFIED COPY

Page 4

1   (Cont.)          INDEX OF EXHIBITS

2

        Number                              Page
3

        11 September 19, 2011 Email string      81
4             from Frankie Wynn to Brad
              Barber, et al
5             H&E 0003737-0003740

6       12 December 12, 2011 Email string       85
              from Frankie Wynn to Brad Barber
7             H&E 0004050-0004051

8       13 December 16, 2011 Email string       85
              from Frankie Wynn to Brad
9             Barber, et al
              H&E 0004073-0004078
10
        14 December 27, 2011 Email string       86
11            from Neil Favre to Frankie Wynn,
              et al
12            H&E 0004094-0004096

13      15 January 6, 2012 Email string from    88
              Frankie Wynn to Brad Barber,
14            et al
              H&E 0004907-0004105
15
        16 December 28, 2012 Email string      104
16            from Neal Johnson to Brad Barber
              H&E 0004505-0004506
17
        17 January 2, 2013 Email from Brad     106
18            Barber to John Engquist, et al
              H&E 0003083-0003085
19
        18 January 4, 2013 Email from Neal     109
20            Johnson to Frankie Wynn, et al
              H&E 0020538-0020540
21
        19 January 16, 2013 Email from Brad    112
22            Barber to John Enguqist
              H&E 0003179-0003186
23
        20 February 4, 2013 Email string       119
24            from Debra Sanders to John Jones
              H&E 0004275-0004277
25

NON-CERTIFIED COPY

1  (Cont.)        INDEX OF EXHIBITS

2

   Number                              Page
3
   21 February 4, 2013 Email string     121
4      from Brad Barber to Debra
       Sanders, et al
5      H&E 0004299-0004301

6  22 February 5, 2013 Email           130
       from John Jones to Brad Barber
7      H&E 0004279

8  23 February 6, 2013 Email string    133
       from Brad Barber to John
9      Engquist
       H&E 0003201-0003205
10
   24 April 8, 2013 Email string       143
11     from Frankie Wynn to John
       Jones
12     H&E 0024303

13 25 April 8, 2013 Email string from  147
       Vincent Provenza to Brad
14     Barber, et al
       H&E 0004346
15
   26 April 8, 2013 Email string from  149
16     Brad Barber to Vincent
       Provenza
17     H&E 0004897-0004902

18 27 October 3, 2013 Email string from 154
       Toby Hawkins to Brad Barber
19     H&E 0004937-0004939

20 28 November 27, 2013 Email from     163
       Frankie Wynn to Brad Barber,
21     et al
       H&E 0004381-0004391
22

23

24

25

Page 6

```
 1   APPEARANCES:

 2
         Representing the Plaintiff:
 3
           FISHMAN HAYGOOD, LLP
 4         Attorneys at Law
           201 St. Charles Avenue, Suite 4600
 5         New Orleans, Louisiana  70170

 6         BY:  BRENT B. BARRIERE, ESQ.

 7

 8

 9       Representing the Defendant:

10         ADAMS AND REESE, LLP
           Attorneys at Law
11         4500 One Shell Square
           New Orleans, Louisiana  70139
12
           BY:  PHILIP A. FRANCO, ESQ.
13              KELLEN J. MATHEWS, ESQ.

14
     ALSO PRESENT:
15

16       Representing H&E Equipment Services:

17         JOHN A. BERRY, ESQ.
           Corporate Counsel
18         7500 Pecue Lane
           Baton Rouge, Louisiana  70809
19
           Neal Johnson
20
     Reported by:
21              KAY E. DONNELLY
                Certified Court Reporter
22              State of Louisiana

23

24

25
```

NON-CERTIFIED COPY

1                S T I P U L A T I O N

2

3        It is stipulated and agreed by and between

4   counsel that the deposition of BRADLEY W. BARBER

5   is hereby being taken under the Louisiana Code

6   of Civil Procedure in accordance with the Code.

7        The formalities of sealing and

8   certification are hereby waived.  The witness

9   will reserve the right to read and sign the

10  deposition.  The party responsible for service

11  of the discovery material shall retain the

12  original.

13       All objections, save those as to the form

14  of the questions, are hereby reserved until such

15  time as this deposition, or any part thereof,

16  may be used or sought to be used in evidence,

17  and are to be made in accordance with the Code

18  of Civil Procedure.

19                *   *   *   *   *

20       KAY E. DONNELLY, Certified Court Reporter,

21  in and for the State of Louisiana, officiated in

22  administering the oath to the witness.

23

24

25

NON-CERTIFIED COPY

1      A.  I did not.

2      Q.  Was there ever a sign erected, to your

3  knowledge, that said the construction workers

4  were not allowed to park in the parking at the

5  headquarters?

6      A.  Not that I'm aware of.

7      Q.  Now, without going through all the

8  ramifications, Mr. Barber -- and we can if we

9  need to.

10         Before we get there, an immediate

11  meeting was requested of URS when that problem

12  came up, right?

13     A.  Yes, sir.  That is my recollection.

14     Q.  Who requested that meeting of URS?

15     A.  I don't recall if it was myself or

16  Johnny Jones or some other individual.

17     Q.  And you attended that meeting?

18     A.  I attended a meeting with regard to the

19  parking situation, yes, sir.

20     Q.  All right.  That occurred within a day

21  or so after the problem developed; is that

22  correct?

23     A.  It occurred quickly.

24     Q.  Okay.  And Mr. Engquist was at that

25  meeting?

NON-CERTIFIED COPY

1   construction workers from parking in the parking

2   lot, did you?

3       A.  I did not personally, no.

4       Q.  All right.  Let me just cover another

5   subject real quickly.

6           MR. FRANCO:

7               Let me show you another Email that

8   I'm going to label Exhibit 18.

9   EXAMINATION BY MR. FRANCO:

10      Q.  Were you aware of the issue with the

11  mailroom millwork and layout design in --

12      A.  I was.

13      Q.  Excuse me?

14      A.  I was, yes, sir.

15      Q.  Okay.  And what was your understanding

16  of what happened?

17      A.  The mail slots were too small to fit an

18  eight-and-a-half-by-11-inch sheet of paper.

19      Q.  Okay.  And were you aware that H&E

20  personnel actually visited a URS building to

21  determine what kind of mail slots they wanted at

22  the headquarters building?

23      A.  Was I -- was I aware when?  At what

24  point in time?

25      Q.  Were you aware that --

NON-CERTIFIED COPY

Page 130

1      A.  That is correct.

2      Q.  It was months, if not years ago?

3      A.  That is correct.

4      Q.  Fair statement?

5      A.  Fair statement.

6      Q.  Did you report that to the URS Ethics

7  Hotline?

8      A.  I did not.

9      Q.  Why not?

10     A.  Well, since we didn't make any progress

11 with this announcement to them, I saw no reason

12 to.

13     Q.  So you thought it was significant enough

14 to report 52 parking spaces, but not sufficient

15 enough to report cracking and spalling at two

16 different sites?

17     A.  I don't think that is the issue at all.

18     Q.  We will see.  Thank you, sir.

19         MR. FRANCO:

20             Let me show you the next exhibit,

21 Exhibit 22.

22 EXAMINATION BY MR. FRANCO:

23     Q.  And this is H&E 4279 by itself.  This is

24 simply an Email from John Jones to you on

25 February 5, 2013, after the parking lot issue

NON-CERTIFIED COPY

Page 131

1    surfaced.  And it says, "URS - on hold payments

2    - $99,000."  What is this about?

3        A.  I don't specifically recall other than

4    what the title is.

5        Q.  You don't recall that Mr. Engquist

6    instructed that URS not be paid any more

7    invoices as a result of parking lot issues, sir?

8        A.  I do recall that.

9        Q.  So you recall him instructing -- was it

10   you and then you made that instruction down the

11   line?

12       A.  I don't recall.

13       Q.  Okay.  But the instructions came from

14   Mr. Engquist do not pay any more URS invoices?

15       A.  That is correct.

16       Q.  And that continued from that point for

17   the rest of the relationship with URS, correct?

18       A.  I am not sure of the duration.

19       Q.  Did you ever receive any order to the

20   contrary from Mr. Engquist?

21       A.  Not that I recall.

22       Q.  Are you aware that URS was providing

23   additional services after that time, February

24   2013, for which they have invoiced and not been

25   paid?

NON-CERTIFIED COPY

1            I've been on that side of the table.

2   All right.  The next exhibit.

3        MR. BARRIERE:

4            We are on 23, are we not?

5        MR. FRANCO:

6            Yes, Exhibit 23.

7   EXAMINATION BY MR. FRANCO:

8        Q.  It begins H&E 3201.  All right.  And

9   this is your Email to Vincent Provenza, February

10  6, 2013.  We are still talking about the parking

11  lot issue, correct?

12       A.  Yes, sir.

13       Q.  And you sent this to John Engquist for

14  his information?

15       A.  I did.

16       Q.  Letting him know that you were on this,

17  I guess, right?

18       A.  I was letting him know that I was

19  proceeding with our complaint, yes, sir.

20       Q.  Okay.  The second sentence says, "I am

21  really at a loss as to how URS could take such a

22  position based on the obvious oversight of your

23  employee Neal Johnson."  You see that?

24       A.  I do.

25       Q.  How do you know it was an oversight by

NON-CERTIFIED COPY

1      Q.  Yes, sir.

2      A.  A hundred percent?  No, we have not run

3  out of 100 percent of yard space.

4      Q.  And you dealt directly with Vincent

5  Provenza to try to resolve this parking issue,

6  as well, correct?

7      A.  Via Email, and I may have spoken to him

8  on the phone once.

9      Q.  Right.  But I meant by Email.  You have

10  dealt with him primarily by Email to try to

11  resolve this dispute, as well, correct?

12      A.  (Nods yes.)  In --

13      Q.  You shook your head.

14      A.  Yes.  I was going to refer -- I thought

15  you had -- we had already gone over an Email

16  from where I Emailed Vincent, right?

17      Q.  I may have.

18      A.  Yes.  That is what we were just looking

19  at, Exhibit 23.  So that is why I was confused

20  by your question.

21      Q.  All right.  But there is not just one

22  Email.  You have had a couple or so Emails with

23  Mr. Provenza, correct?  I just don't want to

24  have to show them to you.

25      A.  I had correspondence with Vincent via

NON-CERTIFIED COPY

1    Email.

2         Q.  To try to work it out?

3         A.  Absolutely.

4         Q.  Are you aware -- I may have asked you

5    this.

6              Are you aware they designed that at no

7    charge, the additional parking?

8         A.  I am now.

9         Q.  Are you aware of the problem with the

10   executive area wall panels?

11        A.  I am.

12        Q.  Tell me what your knowledge of that

13   issue is.

14        A.  They were warped panels.

15        Q.  Do you know whose responsibility that

16   was, whether it was a design issue or a

17   construction issue?

18        A.  I -- the only thing I know for sure is

19   they were warped panels.

20        Q.  They were warped after they were -- I

21   mean, at the end of the day, they were warped?

22        A.  They were warped.

23        Q.  And you don't know whether that is a

24   construction problem or a design problem as you

25   sit here, do you?

NON-CERTIFIED COPY

Page 139

1      A.  I could speculate for you.

2      Q.  Go ahead and speculate.

3      A.  I think it was cheap, thin material, and

4   that is why it warped.  But I am not certain.  I

5   do know they were all warped.

6      Q.  And you are no expert to tell us why

7   they warped, correct?

8      A.  No.

9      Q.  Fair statement?

10      A.  Fair statement.

11      Q.  What has been your involvement in the

12   cracking or spalling of the concrete in the yard

13   area of the Baton Rouge facility?

14      A.  Only to observe it.

15      Q.  Have you had discussion with anyone at

16   H&E as to the cause of that cracking and

17   spalling?

18      A.  Anyone at H&E, I -- no specific

19   conversation I can recall.  I mean, there has

20   certainly been conversation about the poor

21   quality and the cracking --

22      Q.  Right.

23      A.  -- of the cement and the joints.

24      Q.  Right.  But has anybody at H&E shared

25   with you their opinion about whether or not that

NON-CERTIFIED COPY

Page 149

1    your Email below, please be advised that our

2    standard agreement with subcontractors calls for

3    'pay when paid' terms."  You see that?

4       A.  I do.

5       Q.  And it continues on and says, "Inasmuch

6    as we have not been paid, we are not in a

7    position to pay them."  You see that?

8       A.  I do.

9       Q.  Did that cause any reconsideration of

10   paying URS at H&E?

11      A.  Not that I'm aware of.

12      Q.  Okay.  All right.  Let's take a look at

13   this one.

14          MR. FRANCO:

15             Exhibit 26.

16   EXAMINATION BY MR. FRANCO:

17      Q.  It begins H&E 4897.  Feel free to read

18   it all.  I'm going to ask you about the Email at

19   the top of the first page, Mr. Barber.

20      A.  Okay.  I'll read that portion of --

21      Q.  Sure.  And I'll ask you about the third

22   paragraph.

23      A.  (Reviewing document.)  Okay.

24      Q.  All right.  Mr. Barber, in the third

25   paragraph, you say, "Since H&E makes its

NON-CERTIFIED COPY

Page 150

1    decisions on what is right and fair, I will get

2    guidance from our attorney and find out if we

3    can make payment directly to the vendors for the

4    work they were hired by URS to do."  And I

5    assume you did that; is that correct?

6        A.  I hope so.  I don't recall specifically.

7        Q.  Okay.  "If not, I will keep telling them

8    why you have not been paid in full."  Do you see

9    that?

10       A.  Okay.  I do.

11       Q.  What did you tell the subcontractors as

12   to why URS had not been paid?

13       A.  I don't think I told any subcontractor.

14       Q.  Okay.

15       A.  But that is what I put in the statement

16   to Vincent.

17       Q.  All right.  And did you think it was

18   right and fair for URS not to be paid for work

19   at Belle Chasse because of a parking lot issue

20   at Baton Rouge?

21       A.  I guess so.  I was not aware of that, as

22   I indicated earlier in the deposition.  But,

23   yes, I wasn't aware of that.

24       Q.  Okay.  But my question is a little

25   different.

NON-CERTIFIED COPY

Page 152

1    conclusion.  I'm asking him whether it is right

2    and fair according to what H&E does.

3    EXAMINATION BY MR. FRANCO:

4        Q.  Go ahead.

5        A.  So understanding the full circumstances,

6    yeah, I would -- I would have agreed with not

7    paying URS until they had done what we thought

8    they should have on the project and covered for

9    the errors.

10       Q.  So the answer to my question is you

11   think it is right and fair?

12       A.  I just gave you my answer.

13       Q.  So if H&E has a problem on one job for a

14   customer, do you think it is okay for that

15   customer not to pay you on all the other jobs

16   that have no such problems?

17       MR. BARRIERE:

18           Object to the form of the question.

19   Hypothetical.  It omits materials facts.

20           Subject to the objection, you can

21   answer.

22       THE WITNESS:

23           Okay.  So I can't understand that

24   because we would do the right thing.  We would

25   not leave a customer with an open problem that

NON-CERTIFIED COPY

1      A.  That is my opinion.

2      Q.  Why?

3      A.  Based off of the way he handled the

4  messes that they had and the topic we are here

5  to talk about today.

6      Q.  And you said "on behalf of the problems

7  he caused us."  As of October 2013, what

8  problems did he cause you?

9      A.  As of that time?

10      Q.  Yes.

11      A.  It was the parking, for sure.

12      Q.  So what else was it that you attributed

13  to Mr. Johnson, other than the parking issue

14  that we have talked about pretty much in detail?

15      A.  Generally, I just viewed him as

16  incompetent and unwilling to take

17  responsibility.

18      Q.  And what did he not take responsibility

19  for, other than the parking lot that --

20      A.  That was what --

21      Q.  -- URS still felt --

22      A.  That is what I -- you are asking me

23  about this Email.  That is what I would have had

24  in mind when I orchestrated this Email.

25      Q.  Okay.  And the reason I ask you that is

NON-CERTIFIED COPY

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


* * * * * * * * *
                             *
H&E EQUIPMENT SERVICES       *
                             * NUMBER 626,308
VERSUS                       *
                             * DIVISION "D"
URS CORPORATION              *
ARCHITECTURE, P.C., URS      *
CORPORATION, L O'NEAL        *
JOHNSON AND THOMAS E.        *
RYAN, III                    *
                             *
* * * * * * * * *



1442 Deposition of MAPP

CONSTRUCTION, LLC, through its Representative,

BRADLEY REESE, taken on Thursday, August 11,

2016, commencing at 9:05 a.m., in the offices of

Adams and Reese, LLP, Attorneys at Law, 450

Laurel Street, Suite 1900, Baton Rouge,

Louisiana, 70801.

EXHIBIT
13

NON-CERTIFIED COPY

1              I N D E X

2

3                                    Page

4

       Caption                        1
5      Index of Exhibits              3
       Appearances                   10
6      Agreement of Counsel          11

7      Examination

8        PHILIP A. FRANCO, ESQ.      12
         ALYSSON L. MILLS, ESQ.     156
9        PHILIP A. FRANCO, ESQ.     151
         ERIC A. KRACHT, ESQ        170
10       PHILIP A. FRANCO, ESQ.     170

11              *   *   *   *   *

12

       Reporter's Page             174
13     Certificate                 175

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 3

1                    INDEX OF EXHIBITS

2

3      Number                              Page

4      1  October 24, 2011 Email from        19
          Brad Reese to Thomas Ryan
5          re: Updated schedule with
           MAPP Phasing Plan
6          URS 072811-072814

7      2  November 28, 2011 Email string     22
          from Thomas Ryan to Brad
8          Reese, et al re: Concrete
           Mix Civil Approval
9          URS 085359-085381

10     3  December 16, 2011 Email string     25
          from Ottis Seaborn to Daily
11         Update, et al
           URS 033427

12

       4  December 19, 2011 Email string     26
13         from Brad Reese to Neal
           Johnson, et al
14         H&E 0007555-0007557

15     5  December 21, 2011 Email string     28
          from Tim Gaines to Thomas
16         Ryan, et al
           URS 03718-03719

17

       6  January 4, 2012 Email from         29
18         Ottis Seaborn to Daily Update,
           et al
19         URS 033508

20     7  February 8, 2012 Email string      32
          from Brad Reese to Thomas
21         Ryan, et al
           URS 045108-045112

22

       8  January 7, 2012 Email from         35
23         Ottis Seaborn to Daily
           Update, et al
24         URS 033536

25

NON-CERTIFIED COPY

Page 4

1    (Cont.)        INDEX OF EXHIBITS

2

3     Number                                    Page

4      9  January 12, 2012 Email string     36
          from Thomas Ryan to Brad
5         Reese, et al
          URS 085753-085765

6

       10  January 16, 2012 Email from      40
7          Ottis Seaborn to Daily
           Update, et al
8          H&E 0062636

9      11  January 18, 2012 Email string    42
           from Frankie Wynn to John
10         Jones
           H&E 0012783-0012784

11

       12  January 23, 2012 Email string    45
12         from Thomas Ryan to Brad
           Reese, et al
13         H&E 0062999-006300

14     13  January 27, 2012 Email string    47
           from Neal Johnson to James
15         Brown, et al
           URS 033683-033691

16

       14  January 31, 2012 Email from      48
17         D. Thomas with Terracon
           to Thomas Ryan, et al
18         URS 033764-033766

19     15  February 2, 2012 Email from      49
           D. Thomas with Terracon
20         to Thomas Ryan, et al
           URS 033791-033794

21

       16  February 2, 2012 Email string    52
22         from Tim Gaines to Thomas
           Ryan, et al
23         URS 036099-036102

24

25

NON-CERTIFIED COPY

Page 5

1   (Cont.)      INDEX OF EXHIBITS

2

3    Number                            Page

4    17  February 2, 2012 Email string    56
         from Brad Reese to Thomas
5        Ryan, et al
         H&E 0013163-0013164
6                   And attaching
         February 2, 2012 Email string
7        from D. Thomas, Terracon to
         Thomas Ryan, et al attaching
8        Concrete Compressive Strength
         Test Report
9        URS 033800-33805

10   18  February 2, 2012 Email string    58
         from Thomas Ryan to D. Thomas
11       Terracon, et al
         H&E 0013161-0013162
12
         19  February 4, 2012 Email from    60
13       Ottis Seaborn to Daily Update,
         et al
14       H&E 0004205

15   20  February 10, 2012 Email from    62
         Ottis Seaborn to Neal Johnson,
16       et al
         URS 074033-074034
17
         21  February 24 2012 Email string    64
18       from Neal Johnson to Tim
         Gaines, et al
19       URS 037392-037394

20   22  URS Project Observation Report    65
         March 20, 2012 Kenner
21       URS 034337-034346

22   23  March 23, 2012 Email from Neal    72
         to Neal Johnson, et al
23       H&E 0064487

24

25

NON-CERTIFIED COPY

1   (Cont.)       INDEX OF EXHIBITS

2

3    Number                              Page

4

5     24  April 2, 2012 Email from Ottis    76
          Seaborn to Daily Update,
6         et al
          H&E 0048141

7     25  May 17, 2012 Email string from    80
          Ottis Seaborn to Frankie
8         Wynn
          H&E 0049112-0049116

9

      26  May 30, 2012 Email from D.        83
10        Thomas Terracon to Thomas
          Ryan, et al attaching
11        Concrete Compressive
          Strength Test Report
12        URS 034949-034956

13    27  May 31, 2012 Email from          88
          Ottis Seaborn to Daily
14        Update, et al
          H&E 0049557

15

      28  July 17, 2012 Email from Brad    90
16        Reese to Thomas Ryan, et al
          July 17, 2012 OAC Meeting
17        Minutes
          H&E 0008161-0008173

18

      29  August 10, 2012 Email string     91
19        from Tim Gaines to Ottis
          Seaborn
20        URS 037217-037218

21    30  August 25, 2012 Email from Ottis 91
          Seaborn to Daily Update,
22        et al
          URS 03579

23

24

25

NON-CERTIFIED COPY

Page 7

1  (Cont.)        INDEX OF EXHIBITS

2

3    Number                              Page

4    31  September 17, 2012 Email          96
         from Brad Reese to Neal
5          Johnson, et al
           URS 048217-048218

6

     32  September 19, 2012 Email from     99
7          Ottis Seaborn to Daily Update,
           et al
8          URS 03521

9    33  September 21, 2012 Meeting       104
           Minutes
10         URS 048304-048306

11   34  October 3, 2012 Email string    106
           from Ottis Seaborn to Frankie
12         Wynn, et al
           URS 048575-048576

13

     35  October 4, 2012 Email string    108
14         from Ottis Seaborn to
           Frankie Wynn, et al
15         H&E 0016465-0016466

16   36  October 16, 2012 Email from     112
           Ottis Seaborn to Neal Johnson,
17         et al re: Punch list
           H&E 0017109-7717165

18

     37  March 4, 2013 Email string      116
19         from Frankie Wynn to Brad
           Reese, et al
20         URS 054170-054174

21   38  MAPP Change Proposal Request    118
           March 12, 2013
22         URS 077527-077535

23   39  March 15, 2013 Email string     119
           from Brad Reese to Frankie
24         Wynn, et al
           H&E 0037908-0037922

25

NON-CERTIFIED COPY

1     A.  I couldn't --

2     Q.  It wouldn't show that?

3     A.  It has been a while, so I'm not going to

4  say I'm pretty confident.

5         I mean, if you've got them, I'll look,

6  but I don't -- I don't remember if it had a

7  detail in there or not.

8     Q.  As to where the 4,000 would be used or

9  where the High-Early mixture would be used?

10    A.  Correct.

11    Q.  We will look at those in a little while.

12    A.  Okay.

13    Q.  The next document I'm going to show you

14  is going to be Exhibit 7, URS 45108.

15        This is from you to Thomas Ryan, copying

16  other people.  It is a list of the outstanding

17  items as of 2/8/12.

18        It says, "All items on this list are in

19  need of a response, but I highlighted the ones

20  that are extremely critical for this job."

21        And then later it says, "PS - we still

22  need to confirm a time for the weekly conference

23  call..."

24        Did you have weekly conference calls on

25  this job?

NON-CERTIFIED COPY

1      A.  I don't recall.

2      Q.  If you will turn two pages, at the

3  bottom, Bates stamp 45111, No. 8 on that page

4  says "Does Evans have the following items

5  included in their scope of work?"

6          Who was Evans?

7      A.  They were the equipment contractor for

8  the wash area.

9      Q.  What do you mean by "equipment

10  contractor"?

11      A.  They furnished and installed the wash

12  rack equipment.

13      Q.  Okay.  As a subcontractor to MAPP?

14      A.  No.

15      Q.  Well, on whose behalf were they there?

16      A.  H&E.

17      Q.  H&E hired them directly?

18      A.  I believe so.

19      Q.  And they provided the equipment in the

20  wash rack?

21      A.  Correct.

22      Q.  And it says, "Oil Separator - yes, this

23  is in Evans' scope," meaning Evans was supposed

24  to supply the oil separator, I assume; is that

25  correct?

NON-CERTIFIED COPY

Page 34

1    A.  Yes.

2    Q.  And then it says, "Sewer Line - tying

3  into the sewer line is in Evans' scope."

4        You wrote that, didn't you?  Look at the

5  Email.

6    A.  Based on this, I believe Thomas Ryan

7  wrote that.

8    Q.  Okay.

9    A.  It says highlighted in red, but --

10    Q.  All right.  But look at the Email that

11  precedes that page.  That is from you to Thomas.

12  It says, "Thomas, I've outlined some items below

13  that we need resolved."

14    A.  Correct.  But above that, it says --

15  from Thomas Ryan, "Below are my comments/notes

16  in red for these outstanding items..."  So I

17  bullet-pointed the items, and then that is

18  Thomas' responses next to each other.

19    Q.  So it is Thomas' response that the

20  "tying into the sewer line is in Evans' scope"?

21    A.  Correct.

22    Q.  Okay.  And the "Oil Separator - yes,

23  this is in Evans' scope," that is Thomas'

24  comment, as well?

25    A.  Correct.

NON-CERTIFIED COPY

Page 108

1    A.  Correct.

2    Q.  And so we can assume that was work

3    within MAPP's scope of work.  Fair statement?

4    A.  Correct.

5    Q.  But for the Record, you can't tell us

6    the locations of that?

7    A.  Correct.

8    Q.  Let me show you the next exhibit, which

9    will be Exhibit 35.  This is H&E 16465.

10        Let's look at the first Email in that

11   string from Ottis.  It is an update, and it

12   says, "Concrete:  MCC was on site today.  MCC

13   doubled the workers they had breaking the bad

14   section of concrete at the Boxed out area of the

15   drain basin at the Main drive.  Mike White

16   (MCC's PM), said they planned to pour the repair

17   areas and other miscellaneous formed areas

18   tomorrow."

19        Do you recall that there was a boxed out

20   area at the drain basin in the main drive that

21   had to be redone because it was not done

22   properly?

23   A.  I do remember it having to be redone.  .

24   Q.  That is a big drain that is at the site,

25   right?  It has grating on it?

NON-CERTIFIED COPY

1   so this was to fill that or provide a smooth

2   transition between slabs.

3        Q.  And what was proposed to be used as the

4   fill?

5        A.  Sika 321.

6        Q.  S-I-K-A?

7        A.  Yes.

8        Q.  Had you all used that before?

9        A.  I don't recall specifically.

10       Q.  Was that ultimately done?

11       A.  I don't recall.

12       Q.  All right.  The next document is Exhibit

13   39.  This is H&E 37908.

14           This is an Email from you at the top,

15   dated March 15, 2013.  This to URS and H&E.

16           Who was Patrick Solomon?

17       A.  He was a carpenter for MAPP.

18       Q.  And Casey --

19       A.  Ginder.

20       Q.  -- Ginder?

21       A.  He was a projet engineer for MAPP.

22       Q.  On this job?  I'm wondering why these

23   people were copied.  Why are you copying a

24   carpenter?

25       A.  I don't really -- when was the

NON-CERTIFIED COPY

Page 147

1      Q.  This was for the expansion joints?

2      A.  Correct.

3      Q.  All right.  Then we have another Email

4  which is going to be Exhibit 48, which is H&E

5  54144.

6          And then you respond to that Email by

7  saying, "Last time I walked the site with

8  Frankie and Johnny, they indicated that they did

9  not want to entertain steel angle because it

10 would not be aesthetically pleasing, plus it

11 would be difficult to manage where you have

12 changes in elevation."

13         Do you see that?

14     A.  Yes.

15     Q.  Is that accurate?  Was that your

16 recollection?

17     A.  Yes.

18     Q.  And Mr. Frankie Wynn was the Frankie you

19 were referring to here, correct?

20     A.  Correct.

21     Q.  And Johnny was Johnny Jones?

22     A.  Correct.

23     Q.  And they were both with you?

24     A.  Correct.

25     Q.  Did they say what they believed was the

NON-CERTIFIED COPY

| | |
|---|---|
| **From:** | Brad Reese [breese@mappconstruction.com] |
| **Sent:** | Friday, March 15, 2013 8:51 AM |
| **To:** | Frankie Wynn; Johnson, Neal; Thomas Ryan (thomas.e.ryan@urs.com) |
| **Cc:** | Patrick Solomon; Casey Ginder |
| **Subject:** | 52079 - H&E Kenner - RFI #54 & 55 (CJ, EJ Crack Repairs) |
| **Attachments:** | RFI-54 - EJs at Concrete Paving.pdf; RFI-55 - Transition b-w New & Existing Service Warehouse Slab.pdf; pds-cpd-Sikacrete 321 FS-us.pdf; pds-cpd-Sikadur51SL-us.pdf; SIKA CRACK FIX.PDF; sikadur 55 SLV.PDF; fs-cpd-Sikacrete321FS-us.pdf |

FYI – our subcontractor proposes the following solution to the concrete areas in need of repair:

**Control Joint Repairs in Paving**
- Remove existing elastomeric sealant
- Clean joints
- Apply Sikadur 51SL to fill joints

**Crack Repairs in Paving**
- Rout cracks
- Clean cracks
- Apply Sikadur 55SLV to refusal

**Building Slab Transition (New Warehouse Slab to Existing Warehouse Slab)**
- Chip areas to a depth of +/-2" in depth
- Place Sikadur 321FS

**Expansion Joints in Paving**
- Chip areas to a depth of +/-2" in depth
- Place Sikadur 321FS

Attached is the product data for each. Please review and advise if this solution is acceptable. If so, we can perform a sample and determine which joints/cracks/etc. need the repair so that we can accurately create a formal CPR.

Feel free to contact me with any questions.

Thanks


**Brad Reese, LEED AP BD+C** :: Sr. Project Manager



**MAPP** CONSTRUCTION
MAPPCONSTRUCTION.COM


----

**From:** Brad Reese
**Sent:** Monday, March 04, 2013 10:34 AM
**To:** Frankie Wynn (fwynn@he-equipment.com); Johnson, Neal
**Cc:** Patrick Solomon; Casey Ginder
**Subject:** FW: 52079 - H&E Kenner - RFI #54 & 55

MAPP
EXHIBIT NO. 39
K. DONNELLY

NON-CERTIFIED COPY

H&E 0037908

Frankie/Neal – do you have time this week to review action items for the paving joint repairs. I met with a sub that can perform the work, but would like to sit down with you to review their proposed solutions. I am available any day this week except for today and Wednesday. We can meet at the site or I can drive to Baton Rouge and meet at your office....whichever is more convenient.

Please let me know.

thanks

**Brad Reese, LEED AP BD+C** :: Sr. Project Manager


MAPP CONSTRUCTION
MAPPCONSTRUCTION.COM

---

**From:** Brad Reese
**Sent:** Wednesday, January 23, 2013 1:03 PM
**To:** Johnson, Neal; Thomas Ryan (thomas.e.ryan@urs.com)
**Cc:** Patrick Solomon; Casey Ginder
**Subject:** FW: 52079 - H&E Kenner - RFI #54 & 55

Neal/Thomas – have you had a chance to review this? I would like to get this work completed quickly to finish up this project for H&E.

thanks

**Brad Reese, LEED AP BD+C** :: Sr. Project Manager


MAPP CONSTRUCTION
MAPPCONSTRUCTION.COM

---

**From:** Brad Reese
**Sent:** Tuesday, January 15, 2013 12:32 PM
**To:** Johnson, Neal; Thomas Ryan (thomas.e.ryan@urs.com)
**Cc:** Patrick Solomon; Casey Ginder
**Subject:** 52079 - H&E Kenner - RFI #54 & 55

Neal/Thomas – please see the attached RFI's. We spoke to the concrete sub and they would feel more comfortable having something from the Architect of Record on how to make these repairs. Is this something you can handle? If you have a product/procedure in mind, we don't mind meeting with a rep or different sub to make sure the application will work as intended.

Let me know your thoughts.

thanks

2

NON-CERTIFIED COPY

H&E 0037909

**Brad Reese, LEED AP BD+C** :: Sr. Project Manager

504 234 9200 W I R E L E S S

**MAPP**CONSTRUCTION

601 POYDRAS ST., STE. 1715 :: NEW ORLEANS
P 504 833 6277 :: F 504 833 6074

MAPPCONSTRUCTION.COM

3

NON-CERTIFIED COPY

H&E 0037910



**MAPP**
CONSTRUCTION, LLC

601 Poydras Street, Suite 1715
New Orleans, LA, 70130
504.833.0277
504.833.0274

RFI#  __54__

# REQUEST FOR INFORMATION
### H and E Equipment Services - Kenner
### MAPP Job 52079-

Date:        01/15/2013

Attn:        **Thomas Ryan**                          Drawing Ref.:  _____

Company:  **URS Corporation**                    Spec. Sect. Ref.:  _____

Fax:         225.922.5866                             From:          **Brad Reese**

Subject:  *Expansion Joints at Concrete Paving*

---

**Question/Request:**                         **Response Required By:  01/18/2013**

As discussed in previous OAC meetings onsite, the expansion joints in the concrete paving appear to be failing because of regular wear and debris around the lot.  Please confirm the acceptable material and methods to use for making these repairs.


**Suggestion:**

_____

                                    Signed:_____
                                                        **Brad Reese**

---

**Response Received:**



                                    Signed:_____
                                                        **URS Corporation**

<u>Notes:</u>

<u>CC:</u>

NON-CERTIFIED COPY

H&E 0037911



**MAPP**
CONSTRUCTION, LLC

RFI# ___55___

601 Poydras Street, Suite 1715
New Orleans, LA, 70130
504.833.6277
504.833.6974

## REQUEST FOR INFORMATION
### H and E Equipment Services - Kenner
### MAPP Job 52079-

| | | | |
|---|---|---|---|
| Date: | 01/15/2013 | | |
| Attn: | **Thomas Ryan** | Drawing Ref.: | |
| Company | **URS Corporation** | Spec. Sect. Ref.: | |
| Fax: | 225.922.5866 | From: | **Brad Reese** |

Subject: *Slab Transition b/w New & Existing Service Slabs*

---

**Question/Request:**                                    **Response Required By:  01/18/2013**

---

As discussed in previous OAC meetings onsite, the height of the existing Service Warehouse slab is lower than the height of the new Service Warehouse slab. We mentioned possibly using a material to provide a smooth slope. Please review and advise on the preferred methods and material.

**Suggestion:**

Signed:_____

**Brad Reese**

**Response Received:**

Signed:_____

**URS Corporation**

<u>Notes:</u>

<u>CC:</u>

NON-CERTIFIED COPY

Product Data Sheet
Edition 6.22.11
Sikacrete 321 FS

# Sikacrete® 321 FS

One-component, cementitious,
pourable, rapid hardening concrete mix

| | |
|---|---|
| **Description** | Sikacrete 321 FS is a one-component, portland-cement concrete containing factory blended coarse aggregate designed for quick turnaround patching and overlay needs. |
| **Where to Use** | ■ As a structural repair material for bridges, parking facilities, industrial plants and walkways<br>■ On horizontal, vertical and overhead surfaces (formed)<br>■ On grade, above, and below grade on concrete<br>■ Full depth repairs<br>■ Filler for voids and cavities |
| **Advantages** | ■ Complies with ASTM C-928 specifications for very rapid and rapid hardening mortars<br>■ Very rapid setting structures can be opened to vehicular traffic in 2 hours<br>■ Non-gypsum based with volume stability<br>■ Compatible with coefficient of thermal expansion of concrete<br>■ Increased resistance to deicing salts<br>■ Easily applied to clean, sound substrate<br>■ Not a vapor barrier<br>■ Excellent resistance to freeze/thaw with outstanding durability<br>■ Pre-packaged coarse aggregate: Eliminates need to extend material in the field; Eliminates the risk of reactive aggregate<br>■ Formulated to compensate for shrinkage |
| **Coverage** | Approximately 0.50 ft.³/unit. Actual yield on site may vary due to surface profile, waste, and other factors. |
| **Packaging** | 65 lb. multi-wall bag; bulk bag available on request |

## Typical Data (Material and curing conditions @ 73°F (23°C) and 50% R.H.)

RESULTS MAY DIFFER BASED UPON STATISTICAL VARIATIONS DEPENDING UPON MIXING METHODS AND EQUIPMENT, TEMPERATURE, APPLICATION METHODS, TEST METHODS, ACTUAL SITE CONDITIONS AND CURING CONDITIONS.

| | | |
|---|---|---|
| Shelf Life | 9 months in original, unopened packaging. | |
| Storage Conditions | Store dry at 40°-95°F (4°-35°C). Condition material to 65°-75°F before using. | |
| Mixing Ratio | Mix with clean potable water at rate of up to 5 pints per bag. | |
| Application Time | Approximately 30 minutes<br>Initial Slump 7-9"<br>Slump at 15 minutes >5-7" | |
| Initial Set | 40-50 minutes | |
| Final Set | 50-60 minutes | |
| Flexural Strength (ASTM C-78) | 28 days | 700 psi (5.0 MPa) |
| Splitting Tensile Strength (ASTM C-496) | 1 day | 400 psi (2.8 MPa) |
| | 7 days | 600 psi (4.1 MPa) |
| Bond Strength* (ASTM C-882 modified) | 1 day | 2,500 psi (17.2 MPa) |
| | 7 days | 3,000 psi (20.7 MPa) |
| Direct Tensile Bond (ACI 503) | 7 days | >250 psi |
| Compressive Strength (ASTM C-39) | 2 hour | 2,500 psi (17.2 MPa) |
| | 3 hour | 3,000 psi (20.7 MPa) |
| | 1 day | 5,000 psi (34.5 MPa) |
| | 7 days | 6,000 psi (41.4 MPa) |
| | 28 days | 7,500 psi (51.7 MPa) |
| Shrinkage (ASTM C-157) | | <0.06% |
| Freeze Thaw Factor (ASTM C-666) | 300 cycles | >90% |
| Chloride ion permeability (ASTM C-1202) | 28 days | <1,500 Coloumbs |

* Mortar scrubbed into substrate

NON-CERTIFIED COPY

## How to Use

**Surface Preparation  Concrete:**  Remove all deteriorated concrete, dirt, oil, grease, and all bond-inhibiting materials from surface. Be sure repair area is not less than 1 inch in depth. Preparation work should be done by high pressure water blast, scabbler, or other appropriate mechanical means to obtain an exposed aggregate surface with a minimum surface profile of ±1/8 in. (CSP-7). Saturate surface with clean water. Substrate should be saturated surface dry (SSD) with no standing water during application.

**Reinforcing Steel:** Steel reinforcement should be thoroughly prepared by mechanical cleaning to remove all traces of rust. Where corrosion has occurred due to the presence of chlorides, the steel should be high-pressure washed with clean water after mechanical cleaning.

| | |
|---|---|
| **Mixing** | Place 5 pints of water in mixing container. Slowly add Sikacrete 321 FS while continuing to mix.  Mix to a uniform consistency, maximum 3 minutes. Mechanically mix with a low-speed drill (400-600 rpm) and paddle or in appropriate-size mortar mixer or concrete mixer. Some mixers will take longer than others to achieve the desired slump. |
| **Application & Finish** | **Form and pour applications:** Pre-wet surface to SSD. Ensure good, intimate contact with the substrate is achieved. To accomplish this, material should be scrubbed into the substrate or other suitable means should be employed such as vibration of the material. Vibrate form while pouring. Finish as desired. |
| **Curing** | As per ACI recommendations for portland cement concrete, curing is required. Moist cure with wet burlap and polyethylene, a fine mist of water or a water based* compatible curing compound. Curing compounds adversely affect the adhesion of following layers of mortar, leveling mortar or protective coatings. Moist curing should commence immediately after finishing. Protect newly applied material from direct sunlight, wind, rain and frost.<br>*Pretesting of curing compound is recommended. |
| **Limitations** | ■ Application thickness: Minimum 1 in. (25 mm); Maximum 8 in. (200 mm)<br>■ Minimum ambient and surface temperatures 40°F (4°C) and rising at time of application.<br>■ Elevated temperatures will decrease working time and slump.<br>■ Rate of strength gain will be reduced at colder temperatures. Onsite testing is recommended.<br>■ Bonding agents like Armatec 110 and others, which cure at a slower rate than 321 FS, should not be used. If bonding agents are used, follow cure times for the bonding agents used as a guide prior to putting Sikacrete 321 FS in service. Assure suitability with the manufacturer of the bonding agent. |

## Caution

| | |
|---|---|
| **Warning** | **WARNING: CORROSIVE, IRRITANT.** Avoid direct contact. Contains Silica Quartz (CAS: 14808-60-7) and Portland Cement (CAS: 65667-15-1). Corrosive to eyes/skin. Causes burns to eyes/skin. Harmful if swallowed. May cause burns to mouth, throat, and stomach. Irritating to respiratory system. |
| **Handling & Storage** | Avoid direct contact.  Wear personal protective equipment (chemical resistant goggles/gloves/clothing) to prevent direct contact with skin and eyes. Avoid breathing vapors.  Use only in well ventilated areas. Open doors and windows during use. Use a properly fitted NIOSH respirator if ventilation is poor. Wash thoroughly with soap and water after use. Remove contaminated clothing and launder before reuse. |
| **First Aid** | **Eyes** – Hold eyelids apart and flush thoroughly with water for 15 minutes.  **Skin** – Remove contaminated clothing. Wash skin thoroughly for 15 minutes with soap and water.  **Inhalation** – Remove to fresh air.  **Ingestion** – Do not induce vomiting.  Dilute with water.  Contact physician.  **In all cases, contact a physician immediately if symptoms persist.** |
| **Clean Up** | Avoid contact.  Wear chemical resistant clothing/gloves/goggles.  In absence of adequate ventilation; use a properly fitted NIOSH respirator.  In case of spill, ventilate area and contain spill.  Collect with absorbent material.  Dispose of in accordance with current, applicable local, state, and federal regulations. |

KEEP CONTAINER TIGHTLY CLOSED • KEEP OUT OF REACH OF CHILDREN • NOT FOR INTERNAL CONSUMPTION • FOR INDUSTRIAL USE ONLY
All information provided by Sika Corporation ("Sika") concerning Sika products, including but not limited to, any recommendations and advice relating to the application and use of Sika products, is given in good faith based on Sika's current experience and knowledge of its products when properly stored, handled and applied under normal conditions in accordance with Sika's instructions. In practice, the differences in materials, substrates, storage and handling conditions, actual site conditions and other factors outside of Sika's control are such that Sika assumes no liability for the provision of such information, advice, recommendations or instructions related to its products, nor shall any legal relationship be created by or arise from the provision of such information, advice, recommendations or instructions related to its products. The user of the Sika product(s) must test the product(s) for suitability for the intended application and purpose before proceeding with the full application of the product(s). Sika reserves the right to change the properties of its products without notice. All sales of Sika product(s) are subject to its current terms and conditions of sale which are available at www.sikausa.com or by calling 800-933-7452.

Prior to each use of any Sika product, the user must always read and follow the warnings and instructions on the product's most current Technical Data Sheet, product label and Material Safety Data Sheet which are available online at www.sikausa.com or by calling Sika's Technical Service Department at 800-933-7452. Nothing contained in any Sika materials relieves the user of the obligation to read and follow the warnings and instruction for each Sika product as set forth in the current Technical Data Sheet, product label and Material Safety Data Sheet prior to product use.

LIMITED WARRANTY: Sika warrants this product for one year from date of installation to be free from manufacturing defects and to meet the technical properties on the current Technical Data Sheet if used as directed within shelf life. User determines suitability of product for intended use and assumes all risks. Buyer's sole remedy shall be limited to the purchase price or replacement of product exclusive of labor or cost of labor. NO OTHER WARRANTIES EXPRESS OR IMPLIED SHALL APPLY INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SIKA SHALL NOT BE LIABLE UNDER ANY LEGAL THEORY FOR SPECIAL OR CONSEQUENTIAL DAMAGES. SIKA SHALL NOT BE RESPONSIBLE FOR THE USE OF THIS PRODUCT IN A MANNER TO INFRINGE ON ANY PATENT OR ANY OTHER INTELLECTUAL PROPERTY RIGHTS HELD BY OTHERS.

Visit our website at www.sikausa.com                                     1-800-933-SIKA NATIONWIDE
Regional Information and Sales Centers. For the location of your nearest Sika sales office, contact your regional center.

| Sika Corporation | Sika Canada Inc. | Sika Mexicana S.A. de C.V. |
|---|---|---|
| 201 Polito Avenue | 601 Delmar Avenue | Carretera Libre Celaya Km 8.5 |
| Lyndhurst, NJ 07071 | Pointe Claire | Fracc. Industrial Balvanera |
| Phone: 800-933-7452 | Quebec H9R 4A9 | Corregidora, Queretaro |
| Fax: 201-933-6225 | Phone: 514-697-2610 | C.P. 76920 |
| | Fax: 514-694-2792 | Phone: 52 442 2385800 |
| | | Fax: 52 442 2250537 |

Sika and Sikacrete are registered trademarks. Printed in Canada.

  

NON-CERTIFIED COPY

H&E 0037914

Product Data Sheet
Edition 5.5.2011
Sikadur 51 SL

# Sikadur 51 SL

Flexible epoxy control joint resin

| | |
|---|---|
| **Description** | Sikadur 51 SL is a 2-component, self-leveling 100% solids, flexible, control joint resin sealer and adhesive. |
| **Where to Use** | ■ Use to fill horizontal, non-moving, saw cut construction control joints and cracks.<br>■ Use as a flexible adhesive. |
| **Advantages** | ■ Remains flexible. Does not age-harden.<br>■ Prevents deterioration of joint edges.<br>■ Excellent adhesive properties.<br>■ Conforms to ACI 302.1R (4.10-Joint Materials).<br>■ Ideal for use with plural injection type systems.<br>■ Can be used on grades up to 15%.<br>■ Shock absorbent and durable. Withstands wheel traffic and heavy loads.<br>■ Use as a security sealant. |
| **Coverage** | 1 gal. will yield 231 cu. in. or will fill 100 lin. ft. of 1/8 in. x 1.5 in. deep joint. |
| **Packaging** | 4 gallon units |

## How to Use

| | |
|---|---|
| **Surface Preparation** | Substrate must be clean and sound. It may be dry or damp, but free of standing water. Remove dust, laitance, grease, curing compounds, bond inhibiting impregnations, waxes and any other contaminants.<br>**Concrete** - Should be cleaned and prepared to achieve a laitance and contaminant free, open textured surface by blast cleaning or equivalent mechanical means. |
| **Mixing** | **Pre-mix each component.** Proportion equal parts by volume of Component 'A' and Component 'B' into clean pail. Mix thoroughly for 3 minutes with a low-speed (400-600 rpm) drill using a Sika paddle until uniform in color. Mix only that quantity that can be applied within its pot life. |

### Typical Data (Material and curing conditions @ 73°F (23°C) and 50% R.H.)

RESULTS MAY DIFFER BASED UPON STATISTICAL VARIATIONS DEPENDING UPON MIXING METHODS AND EQUIPMENT, TEMPERATURE, APPLICATION METHODS, TEST METHODS, ACTUAL SITE CONDITIONS AND CURING CONDITIONS.

| | |
|---|---|
| Shelf Life | 2 years in original, unopened containers |
| Storage Conditions | Store dry at 40°-95°F (4°-35°C). Condition material to 65°-75° F (18°-24°C) before using. |
| Color | Concrete Gray |
| Mixing Ratio | Component 'A': Component 'B' = 1:1 by volume. |
| Viscosity | Comp. 'A'    5,800 cps (5,800)<br>Comp. 'B'    7,900 cps (7,900)<br>Mixed    7,000 cps (7,000) |
| Pot Life | 20-25 minutes, 1 gallon (3.8 liter)<br>40 minutes, 8 fl. oz. (250 ml) |
| Tack-Free Time | 7-8 hours |

Tensile Properties (ASTM D-638)

| 14 days | | |
|---|---|---|
| Tensile Strength | 570 psi (3.9 MPa) | |
| Elongation at Break | 90% | |
| Modulus of Elasticity | 2,800 psi (19.3 MPa) | |
| Tensile stress at % elongation | 2.5% | 70 psi (0.48 MPa) |
| | 5% | 110 psi (0.75 MPa) |
| | 10% | 160 psi (1.10 MPa) |

Tear Resistance (ASTM D-624)  14 days    170 lb./in. (29.8 N/mm)

Hardness (ASTM D-2240)  28 days    Hardness (Shore D)    50-55

Water Absorption (ASTM D-570)    7 days  (24 hour immersion)  1.86%



NON-CERTIFIED COPY

| Application | Pour the mixed Sikadur 51 SL into the prepared joint or use low-pressure extrusion equipment. Allow the material to flow slowly, settle and self-level filling entire depth. Strike-off level and remove any excess material where required, before it hardens. |
| --- | --- |
| Limitations | ■ Do not thin. Addition of solvents may prevent proper cure.<br>■ Substrate temperature should be 40°F (4°C) minimum and rising.<br>■ For best results, materials should be maintained between 65°-75°F (18°-24°C) during application.<br>■ Do not apply through standing water.<br>■ Minimum age of concrete is 28 days.<br>■ Materials are a vapor barrier after cure.<br>■ Concrete or masonry must be tested for water-vapor transmission prior to application.<br>■ Not designed for use under constant immersion in water or other liquids.<br>■ Do not use in expansion (moving) joints.<br>■ For application in non-moving joints only.<br>■ The ultimate performance of Sikadur 51 SL depends upon many factors, (i.e., proper joint design, thermally stable areas (concrete slab), etc.).<br>■ Sikadur 51 SL should be installed full depth when sealing construction/control joints.<br>■ Material should not be applied earlier than 28 days after new concrete is placed. A 60-90 day cure is recommended.<br>■ Sikadur 51 SL may change color over time, especially when exposed to ultraviolet rays, artificial heaters or intense lighting.<br>■ For applications other than sealing of joints, consult Sika Technical Service prior to use.<br>■ Not an aesthetic product. Color may alter due to variations in lighting and/or UV exposure. |

## Caution

**Component 'A' - Sensitizer; Irritant** - Contains epoxy resin, nonyl phenol. Eye irritant. May cause skin/respiratory irritation. Prolonged and/or repeated contact with skin may cause allergic reaction/sensitization. Chronic overexposure to nonyl phenol may cause liver injuries. Harmful if swallowed.

**Component 'B' - Corrosive; Sensitizer; Irritant** - Contains amines, nonyl phenol. Contact with eyes and skin may cause severe burns. May cause cornea damage and blindness. May cause severe skin irritation. Prolonged and/or repeated contact with skin may cause allergic reaction/sensitization. Chronic overexposure to nonyl phenol may cause liver injuries. May cause respiratory irritation. Harmful if aspirated into lungs or swallowed.

**Intentional misuse by deliberate concentration and inhalation of vapors may be harmful or fatal.**

| First Aid | **Eyes:** Hold eyelids apart and flush thoroughly with water for at least 15 minutes. **Skin:** Remove contaminated clothing. Wash skin thoroughly for 15 minutes with soap and water. **Inhalation:** Remove to fresh air. **Ingestion:** Do not induce vomiting. Contact a physician.<br>**In all cases, contact a physician immediately if symptoms persist.** |
| --- | --- |
| Handling and Storage | Avoid direct contact with eyes and skin. Wear chemical resistant gloves/goggles/clothing. Avoid breathing vapors. Use with adequate general and local ventilation. In the absence of adequate ventilation, use a properly fitted NIOSH respirator. Wash thoroughly after handling product. Remove contaminated clothing and launder before reuse. Store product in closed container in cool, dry, well ventilated place. |
| Clean Up | Avoid contact. Uncured material can be removed with soap and water or solvent. Follow solvent manufacturer's instructions for use and warnings. Cured product can only be removed mechanically. Consult a physician if material cures on skin. Wear chemical resistant clothing/gloves/goggles. In the absence of adequate ventilation, use a properly fitted NIOSH respirator. In case of spill, ventilate area. Contain spill, collect with absorbent material and transfer to sealed containers. Dispose of in accordance with current, applicable local, state and federal regulations. |

**KEEP CONTAINER TIGHTLY CLOSED • KEEP OUT OF REACH OF CHILDREN • NOT FOR INTERNAL CONSUMPTION • FOR INDUSTRIAL USE ONLY**
All information provided by Sika Corporation ("Sika") concerning Sika products, including but not limited to, any recommendations and advice relating to the application and use of Sika products, is given in good faith based on Sika's current experience and knowledge of its products when properly stored, handled and applied under normal conditions in accordance with Sika's instructions. In practice, the differences in materials, substrates, storage and handling conditions, actual site conditions and other factors outside of Sika's control are such that Sika assumes no liability for the provision of such information, advice, recommendations or instructions related to its products, nor shall any legal relationship be created by or arise from the provision of such information, advice, recommendations or instructions related to its products. The user of the Sika product(s) must test the product(s) for suitability for the intended application and purpose before proceeding with the full application of the product(s). Sika reserves the right to change the properties of its products without notice. All sales of Sika product(s) are subject to its current terms and conditions of sale which are available at www.sikausa.com or by calling 800-933-7452.

Prior to each use of any Sika product, the user must always read and follow the warnings and instructions on the product's most current Technical Data Sheet, product label and Material Safety Data Sheet which are available online at www.sikausa.com or by calling Sika's Technical Service Department at 800-933-7452. Nothing contained in any Sika materials relieves the user of the obligation to read and follow the warnings and instruction for each Sika product as set forth in the current Technical Data Sheet, product label and Material Safety Data Sheet prior to product use.

LIMITED WARRANTY: Sika warrants this product for one year from date of installation to be free from manufacturing defects and to meet the technical properties on the current Technical Data Sheet if used as directed within shelf life. User determines suitability of product for intended use and assumes all risks. Buyer's sole remedy shall be limited to the purchase price or replacement of product exclusive of labor or cost of labor. NO OTHER WARRANTIES EXPRESS OR IMPLIED SHALL APPLY INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SIKA SHALL NOT BE LIABLE UNDER ANY LEGAL THEORY FOR SPECIAL OR CONSEQUENTIAL DAMAGES. SIKA SHALL NOT BE RESPONSIBLE FOR THE USE OF THIS PRODUCT IN A MANNER TO INFRINGE ON ANY PATENT OR ANY OTHER INTELLECTUAL PROPERTY RIGHTS HELD BY OTHERS.

Visit our website at www.sikausa.com                                    1-800-933-SIKA NATIONWIDE
Regional Information and Sales Centers. For the location of your nearest Sika sales office, contact your regional center.

| Sika Corporation | Sika Canada Inc. | Sika Mexicana S.A. de C.V. |
| --- | --- | --- |
| 201 Polito Avenue | 601 Delmar Avenue | Carretera Libre Celaya Km. 8.5 |
| Lyndhurst, NJ 07071 | Pointe Claire | Fracc. Industrial Balvanera |
| Phone: 800-933-7452 | Quebec H9R 4A9 | Corregidora, Queretaro |
| Fax: 201-933-6225 | Phone: 514-697-2610 | C.P. 76920 |
| | Fax: 514-694-2792 | Phone: 52 442 2385600 |
| | | Fax: 52 442 2250537 |

Sika and Sikadur are registered trademarks.
Printed in Canada.




NON-CERTIFIED COPY

H&E 0037916

Product Data Sheet
Edition 7.2008
Identification no. 03CF520
Sikadur Crack Fix

# Sikadur® Crack Fix

## Low-viscosity, high-strength epoxy sealing system

| | |
|---|---|
| **Description** | Sikadur Crack Fix is a 2-component, 100% solids, moisture-tolerant, low-viscosity, high-strength, multi-purpose, epoxy resin adhesive. It conforms to the current ASTM C-881 and AASHTO M-235 specifications. |
| **Where to Use** | ▪ Gravity-feed of cracks in horizontal concrete and masonry.<br>▪ Low pressure injection of cracks in structural concrete, masonry, wood, etc.<br>▪ Grouting bolts, dowels, pins, etc. into horizontal concrete surfaces. |
| **Advantages** | ▪ Formulation identical to popular, high strength adhesive Sikadur 35, Hi-Mod LV.<br>▪ Five times stronger than concrete.<br>▪ Convenient easy to use, single tube cartridge - fits standard caulk guns.<br>▪ Deep, penetrating and tenacious bonding of cracks in structural concrete.<br>▪ No mess - self-mixing. |
| **Coverage** | 1 cartridge yields approximately 10.7-11.0 cu. in. (175-180 ml) of usable epoxy resin. |
| **Packaging** | Carton contains 12 single caulk tube-style cartridges; each cartridge packaged with 2 static mixers and 2 flow restrictors. |

### Typical Data *(Material and curing conditions @ 73°F (23°C) and 50% R.H.)*

| | |
|---|---|
| Shelf Life | 2 years in original, unopened containers. |
| Storage Conditions | Store dry at 40°-95°F (4°-35°C).<br>Condition material to 60°-75°F (15°-24°C) before using. |
| Color | Clear, amber. |
| Mixing Ratio | Component A : Component B = 2:1 by volume. |
| Viscosity (Mixed) | Approximately 375 cps. |
| Pot Life | Approximately 25 minutes. (60 gram mass) |

**Tack Free Time**

| | 40°F (4°C)* | 73°F (23°C)* | 90°F (32°C)* |
|---|---|---|---|
| (3-5 mils) | 14-16 hrs. | 3-3.5 hrs. | 1.5-2 hrs. |

**Tensile Properties (ASTM D-638)**

| 7 day | Tensile Strength | 7,000 psi (48.3 MPa) |
|---|---|---|
| | Elongation at Break | 6.9% |

**Flexural Properties (ASTM D-790)**

| 14 day | Flexural Strength (Modulus of Rupture) | 11,000 psi (75.9 MPa) |
|---|---|---|
| | Tangent Modulus of Elasticity in Bending | 3.1 x 10⁵ psi (2,139 MPa) |

**Shear Strength (ASTM D-732)**

| 14 day | Shear Strength | 4,800 psi (33.1 MPa) |
|---|---|---|

**Heat Deflection Temperature (ASTM D-648)**

| 7 day | (fiber stress loading = 264 psi (1.8 MPa)) | 121°F (49°C) |
|---|---|---|

**Bond Strength (ASTM C-882): Hardened concrete to hardened concrete**

| 2 day | (moist cure) | Bond Strength | 1,300 psi (9.0 MPa) |
|---|---|---|---|
| 14 day | (moist cure) | Bond Strength | 1,350 psi (9.3 MPa) |

**Water Absorption (ASTM D-570)**   7 day   (24 hour immersion)   0.27%

**Compressive Properties (ASTM D-695)**

**Compressive Strength, psi (MPa)**

| | 40°F (4°C)* | 73°F (23°C)* | 90°F (32°C)* |
|---|---|---|---|
| 4 hour | - | - | - |
| 8 hour | - | 180 (1.2) | 3,200 (22.1) |
| 16 hour | - | 4,500 (31.1) | 6,300 (43.5) |
| 1 day | - | 6,000 (41.4) | 9,100 (62.8) |
| 3 day | 4,000 (27.6) | 9,000 (62.1) | 10,500 (72.5) |
| 7 day | 6,800 (46.9) | 11,000 (75.9) | 10,500 (72.5) |
| 14 day | 10,300 (71.1) | 12,000 (82.8) | 10,500 (72.5) |
| 28 day | 12,400 (85.6) | 13,000 (89.7) | 10,500 (72.5) |

**Compressive Modulus**

| 7 day | 2.9 X 10⁵ psi (2,000 MPa) |
|---|---|

*Material cured and tested at the temperatures indicated.



NON-CERTIFIED COPY

H&E 0037917

## How to Use

**Surface Preparation**   Surface must be clean, dry and sound. Remove dust from crack by brushing or by blowing clean with oil-free compressed air.

**Cartridge Set-Up**   Remove twist-cap and port plug from top of cartridge. Press one of enclosed "flow restrictors" into opening. Insert one of the enclosed static mixers through twist-cap and attach to threading. Insert Sikadur Crack Fix cartridge into good quality caulking gun. Point upward during initial squeeze of gun's trigger to purge any entrapped air. As mixed resin approaches end of mixer, discard rest of initial squeeze and portion of next squeeze to ensure uniform blend of adhesive components.

**Application**   **To gravity feed cracks** - Blow vee-notched crack clean with oil-free compressed air. Dispense Sikadur Crack Fix slowly into vee-notched crack. Continue placement until completely filled. Seal underside of slab prior to filling if cracks reflect through.

**To inject cracks** - Set appropriate injection ports. Seal ports and surface of crack with Sikadur Anchor Fix-3, Sikadur 31, Hi-Mod Gel or Sikadur 33. When the epoxy adhesive seal has cured, inject Sikadur Crack Fix with slow steady pressure. Consult Technical Service for additional information.

**Limitations**
- Minimum substrate and ambient temperature 40°F (4°C). Maximum substrate temperature is 95°F (35°C).
- Minimum age of concrete must be 21-28 days, depending on curing and drying conditions.
- Do not apply over wet, glistening surface.
- Not for injection of cracks subjected to osmotic or hydrostatic pressure during application.
- Do not inject cracks greater than ¼ in. (6 mm) Consult Technical Service at 1-800-933-SIKA.
- Not an aesthetic product. Color may alter due to variations in lighting and/or UV exposure.

**Warning**   **Component 'A' – IRRITANT, SENSITIZER** – Avoid direct contact. Contains modified epoxy resin (CAS 25068-38-6), aromatic hydrocarbon blend (mixture) and Nonyl Phenol (CAS 84852-15-3). May cause eye/skin/respiratory irritations. Prolonged and/or repeated contact with skin may cause allergic reaction/sensitization. Harmful if swallowed. HMIS Hazard Rating: H-2, F-1, R-0, PPE-C

**Component 'B' – CORROSIVE, IRRITANT, SENSITIZER** – Avoid direct contact. Contains amines (mixture), aromatic hydrocarbon blend (mixture), Nonyl Phenol (CAS 84852-15-3) and Benzyl Alcohol (CAS 100-51-6). Causes eye/skin/respiratory irritations. Contact with eyes cause irreversible eye damage. Contact with skin causes severe burns. Prolonged and/or repeated contact may cause allergic reaction/sensitization. Harmful if swallowed. HMIS Hazard Rating: H-3, F-1, R-0, PPE-D

**Deliberate concentrations of vapors of 'A' and/or 'B' Components for purposes of inhalation are harmful and can be fatal.**

VOC Content ('A' + 'B') = 22 g/L

**Handling and Storage**   Avoid direct contact with eyes and skin. Wear chemical-resistant clothing/gloves/goggles. Avoid breathing vapors. Use with adequate general and local ventilation. In absence of adequate ventilation, use a properly fitted, NIOSH-approved respirator. Wash thoroughly after handling product. Remove contaminated clothing and launder before reuse.

**First Aid**   **Eyes:** Hold eyelids apart and flush thoroughly with water for 15 minutes. **Skin:** Remove contaminated clothing. Wash skin thoroughly for 15 minutes with soap and water. **Inhalation:** Remove person to fresh air. **Ingestion:** Do not induce vomiting. In all cases, **contact a physician immediately if symptoms persist.**

**Clean Up**   Uncured material can be removed with approved solvent. Follow solvent manufacturer's instructions for use and warnings. Cured material (when Component 'A' combined with Component 'B') can only be removed mechanically. In case of spill, ventilate area and contain spill. Collect with absorbent material. Dispose of in accordance with current, applicable local, state and federal regulations.

KEEP CONTAINER TIGHTLY CLOSED • KEEP OUT OF REACH OF CHILDREN • NOT FOR INTERNAL CONSUMPTION • FOR INDUSTRIAL USE ONLY

All information provided by Sika Corporation ("Sika") concerning Sika products, including but not limited to, any recommendations and advice relating to the application and use of Sika products, is given in good faith based on Sika's current experience and knowledge of its products when properly stored, handled and applied under normal conditions in accordance with Sika's instructions. In practice, the differences in materials, substrates, storage and handling conditions, actual site conditions and other factors outside of Sika's control are such that Sika assumes no liability for the provision of such information, advice, recommendations or instructions related to its products, nor shall any legal relationship be created by or arise from the provision of such information, advice, recommendations or instructions related to its products. The user of the Sika product(s) must test the product(s) for suitability for the intended application and purpose before proceeding with the full application of the product(s). Sika reserves the right to change the properties of its products without notice. All sales of Sika product(s) are subject to its current terms and conditions of sale which are available at www.sikacorp.com or by calling 800-933-7452.

Prior to each use of any Sika product, the user must always read and follow the warnings and instructions on the product's most current Technical Data Sheet, product label and Material Safety Data Sheet which are available online at www.sikaconstruction.com or by calling Sika's Technical Service Department at 800-933-7452. Nothing contained in any Sika materials relieves the user of the obligation to read and follow the warnings and instruction for each Sika product as set forth in the current Technical Data Sheet, product label and Material Safety Data Sheet prior to product use.

LIMITED WARRANTY: Sika warrants this product for one year from date of installation to be free from manufacturing defects and to meet the technical properties on the current Technical Data Sheet if used as directed within shelf life. User determines suitability of product for intended use and assumes all risks. Buyer's sole remedy shall be limited to the purchase price or replacement of product exclusive of labor or cost of labor. NO OTHER WARRANTIES EXPRESS OR IMPLIED SHALL APPLY INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SIKA SHALL NOT BE LIABLE UNDER ANY LEGAL THEORY FOR SPECIAL OR CONSEQUENTIAL DAMAGES. SIKA SHALL NOT BE RESPONSIBLE FOR THE USE OF THIS PRODUCT IN A MANNER TO INFRINGE ON ANY PATENT OR ANY OTHER INTELLECTUAL PROPERTY RIGHTS HELD BY OTHERS.

Visit our website at www.sikaconstruction.com                                                 1-800-933-SIKA NATIONWIDE
Regional Information and Sales Centers. For the location of your nearest Sika sales office, contact your regional center.



| Sika Corporation | Sika Canada Inc. | Sika Mexicana S.A. de C.V. |
|---|---|---|
| 201 Polito Avenue | 601 Delmar Avenue | Carretera Libre Celaya Km. 8.5 |
| Lyndhurst, NJ 07071 | Pointe Claire | Fracc. Industrial Balvanera |
| Phone: 800-933-7452 | Quebec H9R 4A9 | Corregidora, Queretaro |
| Fax: 201-933-6225 | Phone: 514-697-2610 | C.P. 76920 |
|  | Fax: 514-694-2792 | Phone: 52 442 2385800 |
|  |  | Fax: 52 442 2250537 |

Sika and Sikadur are registered trademarks.
Made in USA. Printed in Canada.

NON-CERTIFIED COPY

H&E 0037918

Product Data Sheet
Edition 10.2.2009
Identification no. 389-35N
Sikadur 55 SLV

# Sikadur 55 SLV

Super low-viscosity, moisture-tolerant epoxy resin,
crack healer/penetrating sealer

| | |
|---|---|
| **Description** | Sikadur 55 SLV is a 2-component, 100% solids, moisture-tolerant, epoxy crack healer / penetrating sealer, having a fast tack-free time to minimize downtime. It is a super low-viscosity, high-strength adhesive formulated specifically for sealing both dry and damp cracks. It conforms to the current ASTM C-881, Types I and II, Grade-1, Class-C* and AASHTO M-235 specifications.<br>\* except for gel time |
| **Where to Use** | ▪ Sikadur 55 SLV structurally repairs cracked concrete.<br>▪ For interior slabs and exterior above-grade slabs.<br>▪ For elevated horizontal decks, parking garages and other structures exposed to foot and pneumatic tire traffic. |
| **Advantages** | ▪ Super low viscosity/low surface tension for excellent penetration into cracks.<br>▪ Penetrates cracks by gravity down to 2 mils (0.002" / 0.05 mm) in width.<br>▪ Prolongs life of cracked concrete.<br>▪ Penetrates/seals surface of slabs from water absorption, chloride-ion intrusion, and chemical attack.<br>▪ **Structurally improves concrete surface.**<br>▪ Can be open to traffic in 6 hours at 73°F (23°C).<br>▪ High bond strength, even in damp cracks.<br>▪ **U.S. Patent No. (pending)** for ultra low viscosity healer/sealer to strengthen cracked concrete. |
| **Coverage** | 1 gal. (3.8 liters) yields 231 cu. in. (3,785 cm³)<br>Typical coverage is 150-175 sq. ft./gal. (3.7-4.3 m²/L) for surface sealing. Coverage varies with porosity and surface profile of substrate. Higher porosity concrete will reduce coverage. For crack healing, follow Application instructions and allow to pond over cracks. |
| **Packaging** | 3 gal. (11.35 l) unit = 'A' = 2 gal. (7.6 l) + 'B' = 1 gal. (3.8 l) |

## Typical Data [Material and curing conditions @ 73°F (73°C) and 50% R.H.]

| | |
|---|---|
| **Shelf Life** | 2 years in original, unopened containers |
| **Storage Conditions** | Store dry at 40°-95°F (4°-35°C). Condition material to 65°-75°F (18°-24°C) before using. |
| **Color** | Clear, amber |
| **Mixing Ratio** | Component 'A' : Component 'B' = 2:1 by volume |
| **Viscosity (Mixed)** | Approximately 105 cps |
| **Pot Life** | Approximately 20 minutes |

**Tack-Free Time**

| 40°F (4°C)* | 60°F (15°C)* | 73°F (23°C)* | 90°F (32°C)* |
|---|---|---|---|
| > 11 hrs. | 11 hrs. | 6 hrs. | 2.5 hrs. |

**Tensile Properties (ASTM D-638)  73°F (23°C)**

| 7 day | Tensile Strength | 7,100 psi (48.9 MPa) |
|---|---|---|
| | Elongation at break | 10% |

**Bond Strength (ASTM C-882)**

| Hardened Concrete to Hardened Concrete | 2 day (moist cure) | 2,500 psi (17.2 MPa) |
|---|---|---|
| | 14 day (moist cure) | 2,500 psi (17.2 MPa) |
| Hardened Concrete to Steel | 2 day (moist cure) | 1,500 psi (10.3 MPa) |
| | 14 day (moist cure) | 1,600 psi (11.0 MPa) |

**Flexural Properties (ASTM D-790)**

| 7 day | Flexural Strength | 8,500 psi (58.6 MPa) |
|---|---|---|
| | Tangent Modulus of Elasticity | $3.2 \times 10^5$ psi (2,206 MPa) |

**Shear Strength (ASTM D-732)  7 day** — 5,800 psi (40.0 MPa)

**Heat Deflection Temperature (ASTM D-648)  7 day**

[fiber stress loading = 264 psi (1.8 MPa)]  110°F (43°C)

**Water Absorption (ASTM D-570)  7 day**  (24 hour immersion)  0.60%

**Compressive Properties (ASTM D-695)**

**Compressive Strength, psi (MPa)**

| | 40°F (4°C)* | 60°F (15°C)* | 73°F (23°C)* | 90°F (32°C)* |
|---|---|---|---|---|
| 1 day | - | 320 (2.2) | 1,100 (7.6) | 4,800 (33.1) |
| 3 day | 2,000 (13.8) | 6,500 (44.8) | 8,300 (57.2) | 8,000 (55.2) |
| 7 day | 7,800 (53.8) | 10,400 (71.7) | 10,900 (75.1) | 8,300 (57.2) |
| 14 day | 9,600 (66.2) | 11,000 (75.8) | 11,800 (81.4) | 10,000 (68.9) |
| 28 day | 11,700 (80.7) | 12,000 (82.7) | 12,000 (82.7) | 10,000 (68.9) |

**Compressive Modulus**  7 day  $3.0 \times 10^5$ psi (2,068 MPa)

\*Material cured and tested at the temperature indicated.

NON-CERTIFIED COPY

H&E 0037919

## How to Use

**Surface Preparation**  Substrate must be clean, sound and free of surface moisture. Remove dust, laitance, grease, oils, curing compounds, waxes, impregnations, foreign particles, coatings and disintegrated materials by mechanical means (i.e. shotblasting, sandblasting, etc.). For best results, substrate should be dry. Surfaces prepared by Low Pressure Water Cleaning or High Pressure Water Jetting methods should be allowed to dry for 24 hrs. minimum [at 73°F (23°C)].

**Mixing**  Mix 1 part Component 'B' to 2 parts Component 'A' by volume into a clean pail. Mix thoroughly for 3 minutes with Sika paddle or jiffy mixer on a low-speed (400-600 rpm) drill until uniformly blended. Mix only that quantity which can be used within its pot life,

**Application**  To gravity feed cracks: Sikadur 55 SLV is applied to horizontal surfaces by flat squeegee or broom. Spread material over area and allow to pond over cracks. Let material penetrate into cracks and substrate. Remove excess epoxy with roller leaving no visible surface film. For cracks greater than 1/8 in. (3 mm) wide, fill crack with oven-dried sand before applying Sikadur 55 SLV. Seal cracks from underside, when accessible, to prevent leakage.

A second treatment may be required on very porous substrates. Apply second treatment before broadcasting

After treatment, wait at least 20 minutes at 73°F (23°C). Cover with broadcast of an oven-dried 20/40 silica sand or similar sand. Distribute evenly over the surface to excess at a rate of 30-40 lbs./100 sq. ft. Allow to cure 6 hours minimum at 73°F (23°C). Remove any loose sand and open to traffic once epoxy has cured. Consult Sika Technical Service at 1-800-933-SIKA for additional information.

**To pressure inject cracks:** Use automated injection equipment. Set appropriate injection ports. Seal ports and cracks with Sikadur 31, Hi-Mod Gel, Sikadur Injection Gel or Sikadur AnchorFix-3/4. When the epoxy adhesive has cured, inject Sikadur 55 SLV with steady pressure. Consult Technical Service at 1-800-933-SIKA for additional information.

**Limitations**
- Do not thin. Addition of solvents will prevent proper cure.
- Material is a vapor barrier after cure.
- Do not apply if rain is imminent. Water exposure or humidity will affect surface appearance and may cause surface whitening.
- Not an aesthetic product. Color may alter due to variations in lighting and/or UV exposure.
- Sealed concrete surface may appear blotchy due to differential absorption.
- Allow sufficient time for the substrate to dry after rain or other inclement conditions.
- Application temperature of substrate must be minimum 5°F (3°C) above the dew point.
- Minimum ambient and substrate temperature 40°F (4°C). Maximum application temperature 95°F (35°C).
- Do not inject cracks greater than 1/4 in. (6 mm) Consult Technical Service at 1-800-933-SIKA.
- Minimum age of concrete is 21-28 days, depending on curing and drying conditions.
- Not designed to seal or inject cracks under hydrostatic pressure during application.

**WARNING**  Component 'A' - IRRITANT; SENSITIZER. Avoid direct contact. Contains modified epoxy resin and Diglycidyl Ether of Bisphenol A (CAS 25065-99-8). Causes eye irritation. May cause skin/respiratory irritations. Prolonged and/or repeated contact with skin may cause allergic reaction/sensitization. May be harmful if swallowed. HMIS:H-2, F-1, R-0, PPE-C.
Component 'B' - CORROSIVE, IRRITANT, SENSITIZER. Contains 2,4,6-Tri(Dimethylamino methyl) phenol (90-72-2), Amines (Mixture) and Benzyl Alcohol (100-51-6). Contact with skin and eyes causes severe burns. Causes eye/skin/respiratory irritation. Prolonged and/or repeated skin contact may cause an allergic reaction/sensitization. Harmful if swallowed. HMIS:H-3, F-1, R-0, PPE-D.
Deliberate concentrations of vapors of 'A' and/or 'B' Components for purposes of inhalation is harmful and can be fatal.

**First Aid**  Eyes: Hold eyelids apart and flush thoroughly with water for 15 minutes. Skin: Remove contaminated clothing. Wash skin thoroughly for 15 minutes with soap and water. Inhalation: Remove person to fresh air. Ingestion: Do not induce vomiting. Contact physician. In all cases, contact a physician immediately if symptoms persist.

**Handling and Storage**  Avoid direct contact with eyes and skin. Wear chemical resistant clothing/gloves/goggles. Avoid breathing vapors. Use with adequate general and local ventilation. If ventilation is poor, use a properly fitted, NIOSH-approved respirator. Wash thoroughly after handling product. Remove contaminated clothing and launder before reuse.

**Clean Up**  In case of spills ventilate area and contain spill. Collect with absorbent material. Ventilate area. Avoid contact. Dispose of in accordance with current, applicable local, state and federal regulations. Uncured material can be removed with approved solvent. Follow solvent manufacturer's instructions for use and warnings. Cured material (when component 'A' combined with Component 'B') can only be removed by mechanical means.

KEEP CONTAINER TIGHTLY CLOSED • KEEP OUT OF REACH OF CHILDREN • NOT FOR INTERNAL CONSUMPTION • FOR INDUSTRIAL USE ONLY
All information provided by Sika Corporation ("Sika") concerning Sika products, including but not limited to, any recommendations and advice relating to the application and use of Sika products, is given in good faith based on Sika's current experience and knowledge of its products when properly stored, handled and applied under normal conditions in accordance with Sika's instructions. In practice, the differences in materials, substrates, storage and handling conditions, actual site conditions and other factors outside of Sika's control are such that Sika assumes no liability for the provision of such information, advice, recommendations or instructions related to its products, nor shall any legal relationship be created by or arise from the provision of such information, advice, recommendations or instructions related to its products. The user of the Sika product(s) must test the product(s) for suitability for the intended application and purpose before proceeding with the full application of the product(s). Sika reserves the right to change the properties of its products without notice. All sales of Sika product(s) are subject to its current terms and conditions of sale which are available at www.sikacorp.com or by calling 800-933-7452.
Prior to each use of any Sika product, the user must always read and follow the warnings and instructions on the product's most current Technical Data Sheet, product label and Material Safety Data Sheet which are available online at www.sikaconstruction.com or by calling Sika's Technical Service Department at 800-933-7452. Nothing contained in any Sika materials relieves the user of the obligation to read and follow the warnings and instruction for each Sika product as set forth in the current Technical Data Sheet, product label and Material Safety Data Sheet prior to product use.
LIMITED WARRANTY: Sika warrants this product for one year from date of installation to be free from manufacturing defects and to meet the technical properties on the current Technical Data Sheet if used as directed within shelf life. User determines suitability of product for intended use and assumes all risks. Buyer's sole remedy shall be limited to the purchase price or replacement of product exclusive of labor or cost of labor. NO OTHER WARRANTIES EXPRESS OR IMPLIED SHALL APPLY INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SIKA SHALL NOT BE LIABLE UNDER ANY LEGAL THEORY FOR SPECIAL OR CONSEQUENTIAL DAMAGES. SIKA SHALL NOT BE RESPONSIBLE FOR THE USE OF THIS PRODUCT IN A MANNER TO INFRINGE ON ANY PATENT OR ANY OTHER INTELLECTUAL PROPERTY RIGHTS HELD BY OTHERS.
Visit our website at www.sikaconstruction.com                1-800-933-SIKA NATIONWIDE
Regional Information and Sales Centers. For the location of your nearest Sika sales office, contact your regional center.

**Sika Corporation**
201 Polito Avenue
Lyndhurst, NJ 07071
Phone: 800-933-7452
Fax: 201-933-6225

**Sika Canada Inc.**
601 Delmar Avenue
Pointe Claire
Quebec H9R 4A9
Phone: 514-697-2610
Fax: 514-694-2792

**Sika Mexicana S.A. de C.V.**
Carretera Libre Celaya Km 8.5
Fracc. Industrial Balvanera
Corregidora, Queretaro
C.P. 76920
Phone: 52 442 2385800
Fax: 52 442 2250537



Sika and Sikadur are registered trademarks.
Made in USA. Printed in Canada

NON-CERTIFIED COPY

H&E 0037920

# Product Information

## APPLICATIONS

▲ As a structural repair material for bridges, parking facilities, industrial plants and walkways
▲ On horizontal, vertical and overhead surfaces (formed)
▲ On grade, above, and below grade on concrete
▲ Full depth repairs
▲ Filler for voids and cavities

## ADVANTAGES

▲ Complies with ASTM C-928 specifications for very rapid and rapid hardening mortars
▲ Very rapid setting structures can be opened to vehicular traffic in 2 hours
▲ Non-gypsum based with volume stability
▲ Increased resistance to deicing salts
▲ Excellent resistance to freeze/thaw with outstanding durability
▲ Pre-packaged coarse aggregate: Eliminates need to extend material in the field; Eliminates the risk of reactive aggregate

## TYPICAL DATA

▲ Initial Set
    40-50 minutes
▲ Final Set
    50-60 minutes
▲ Application Time
    Approximately 30 minutes
    Initial Slump 7-9"
    Slump at 15 minutes >5-7"

| | | |
|---|---|---|
| ▲ Flexural Strength (ASTM C-78) | 28 days | 700 psi (5.0 MPa) |
| ▲ Splitting Tensile Strength (ASTM C-496) | | |
| | 1 day | 400 psi (2.8 MPa) |
| | 7 days | 600 psi (4.1 MPa) |
| ▲ Bond Strength* (ASTM C-882 modified) | | |
| | 1 day | 2,500 psi (17.2 MPa) |
| | 7 days | 3,000 psi (20.7 MPa) |
| ▲ Direct Tensile Bond (ACI 503) | 7 days | >250 psi |
| ▲ Compressive Strength (ASTM C-39) | | |
| | 2 hour | 2,500 psi (17.2 MPa) |
| | 3 hour | 3,000 psi (20.7 MPa) |
| | 1 day | 5,000 psi (34.5 MPa) |
| | 7 days | 6,000 psi (41.4 MPa) |
| | 28 days | 7,500 psi (51.7 MPa) |
| ▲ Shrinkage (ASTM C-157) | | <0.06% |
| ▲ Chloride Ion Permeability (ASTM C-1202) | | |
| | 28 days | <1,500 Coloumbs |
| ▲ Freeze Thaw Resistance (ASTM C-666) | 300 cycles | >90% |

## Sikacrete® 321 FS






1. Place 5 pints of water in mixing container.

2. Slowly add Sikacrete 321 FS while continuing to mix.  Mix to a uniform consistency, maximum 3 minutes.

3. Mechanically mix with a low-speed drill (400-600 rpm) and paddle or in appropriate-size mortar mixer or concrete mixer.

4. Some mixers will take longer than others to achieve the desired slump.

Contact Sika at:
Phone: 1-800-933-SIKA (Nationwide)
Website: www.sikaconstruction.com




ISO 9000:2000

Responsible Care'
Good Chemistry at Work

**Sika Corporation**
*201 Polito Avenue*
*Lyndhurst, NJ 07071*
*Phone: 201-933-8800*
*Fax: 201-933-6225*

**Sika Canada Inc.**
*601 Delmar Avenue*
*Pointe Claire*
*Quebec H9R 4A9*
*Phone: 514-697-2610*
*Fax: 514-694-2792*

**Sika Mexicana S.A. de C.V.**
*Carretera Libre Celaya Km. 8.5*
*Fracc. Industrial Balvanera*
*Corregidora, Queretaro*
*C.P. 76920*
*Phone: 52 442 2385800*
*Fax: 52 442 2250537*

Sika. One Name. One Source. Worldwide[SM]

NON-CERTIFIED COPY

| | |
|---|---|
| **From:** | Brad Reese [breese@mappconstruction.com] |
| **Sent:** | Wednesday, July 17, 2013 9:35 PM |
| **To:** | Ryan, Thomas E |
| **Subject:** | RE: H&E Kenner CPR #53 |
| **Attachments:** | CPR 53 Epoxy Joint fill Mock-up.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Do you have a preference/detail on material?  Last time I walked the site with Frankie and Johnny, they indicated that they did not want to entertain steel angle because it would not be aesthetically pleasing, plus it would be difficult to manage where you have changes in elevation.

Thanks

BRR

**Brad Reese, LEED AP BD+C ::** Sr. Project Manager

 MAPP CONSTRUCTION
MAPPCONSTRUCTION.COM

**From:** Ryan, Thomas E [mailto:thomas.e.ryan@urs.com]
**Sent:** Tuesday, July 16, 2013 12:57 PM
**To:** Brad Reese
**Subject:** H&E Kenner CPR #53

Brad,
Attached is CPR #53 for the H&E Kenner project signed by Frankie.

He also wants a proposal for a mock-up of the steel plate joint cover as we discussed.

Thank you,



Thomas E. Ryan

7389 Florida Boulevard
Suite 300
Baton Rouge, LA 70806

Office    225.922.5700
Direct    225.922.5759
Cell      225.802.8300

Thomas.e.ryan@urs.com

1



NON-CERTIFIED COPY

H&E 0054144

This e-mail and any attachments contain URS Corporation confidential information that may be proprietary or privileged. If you receive this message in error or are not the intended recipient, you should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or copies.

2

NON-CERTIFIED COPY

H&E 0054145

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
~  *  *  *  *  *  *  *  *   *
                           *
H&E EQUIPMENT SERVICES      *
                           * NUMBER 626,308
VERSUS                      *
                           * DIVISION "D"
URS CORPORATION            *
ARCHITECTURE, P.C., URS    *
CORPORATION, L. O'NEAL     *
JOHNSON AND THOMAS E. RYAN,*
III                         *
                           *
*  *  *  *  *  *  *  *  *   *
```

Article 1442 Deposition of RYAN GOOTEE

GENERAL CONTRACTORS, LLC, through its corporate

representative KEVIN T. SPREHE, taken on

Thursday, August 11, 2016, commencing at 3:05

p.m., in the offices of ADAMS AND REESE, LLP,

Attorneys at Law, 701 Poydras Street, Suite

4500, New Orleans, Louisiana 70139.

EXHIBIT

14

NON-CERTIFIED COPY

1                    I N D E X

2

3                                          Page

4

5     Caption                              1

6     Exhibits                             3

7     Appearances                          5

8     Agreement of Counsel                 6

9

10    Examination

11

12       KELLEN J. MATHEWS                 7

13       LORETTA G. MINCE                  97

14       KELLEN J. MATHEWS                 105

15

16                    *   *   *   *   *

17

18

19    Reporter's Page                      110

20    Certificate                          111

21

22

23

24

25

NON-CERTIFIED COPY

Page 3

1    EXHIBITS:

2    Gootee No. 1                                14
       Amended Notice of 1442 Deposition
3
       Gootee No. 2                             21
4       Schematic

5    Gootee No. 3                               23
       E-mail dated May 6, 2013
6
       Gootee No. 4                             24
7       E-mail dated May 8, 2013

8    Gootee No. 5                               28
       E-mail dated May 28, 2013
9
       Gootee No. 6                             33
10      E-mail dated June 11, 2013

11   Gootee No. 7                               40
       E-mail dated June 18, 2013
12
       Gootee No. 8                             42
13      E-mail dated August 13, 2013

14   Gootee No. 9                               52
       E-mail dated June 26, 2013
15
       Gootee No. 10                            54
16      E-mail dated June 27, 2013

17   Gootee No. 11                              55
       E-mail dated June 27, 2013
18
       Gootee No. 12                            57
19      H&E Equipment Services -- Belle Chasse
       Progress Meeting #5 -- Meeting Minutes
20
       Gootee No. 13                            65
21      E-mail dated September 12, 2013

22   Gootee No. 14                              69
       E-mail dated September 13, 2013
23
       Gootee No. 15                            70
24      E-mail dated September 13, 2013

25

NON-CERTIFIED COPY

Page 4

1   EXHIBITS:  (Continued)

2   Gootee No. 16                          71
        H&E Equipment Services -- Belle Chasse
3       Progress Meeting #11 -- Meeting Minutes

4   Gootee No. 17                          79
        E-mail dated October 8, 2013
5
    Gootee No. 18                          82
6       E-mail dated November 8, 2013

7   Gootee No. 19                          84
        E-mail dated November 11, 2013
8
    Gootee No. 20                          90
9       E-mail dated November 11, 2013

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

```
1    APPEARANCES:

2      Representing H&E Equipment Services:

3         FISHMAN HAYGOOD LLP
           Attorneys at Law
4          201 St. Charles Avenue
           Suite 4600
5          New Orleans, Louisiana 70170

6         BY:  LORETTA G. MINCE

7

8      Representing URS Corporation Architecture,
       P.C., URS Corporation, L. O'Neal Johnson and
9      Thomas E. Ryan, III:

10        ADAMS AND REESE, LLP
           Attorneys at Law
11         701 Poydras Street
           Suite 4500
12         New Orleans, Louisiana 70139

13        BY:  KELLEN J. MATHEWS

14

15

16

17

18

19

20

21

22

23   Reported by:
                    KATHRYN L. KOVACEVICH
24                  Certified Court Reporter
                    Registered Professional Reporter
25                  State of Louisiana
```

NON-CERTIFIED COPY

Page 6

1                    S T I P U L A T I O N

2

3        It is stipulated and agreed by and between

4  counsel that the Article 1442 Deposition of RYAN

5  GOOTEE GENERAL CONTRACTORS, LLC, through its

6  corporate representative KEVIN T. SPREHE is

7  hereby being taken under the Louisiana Code of

8  Civil Procedure in accordance with the Code.

9        The formalities of reading and signing,

10  sealing and certification are hereby waived.

11  The party responsible for service of the

12  discovery material shall retain the original.

13        All objections are to be made in

14  accordance with the Louisiana Code of Civil

15  Procedure.

16                    *   *   *   *   *

17        KATHRYN L. KOVACEVICH, Certified Court

18  Reporter, Registered Professional Reporter, in

19  and for the State of Louisiana, officiated in

20  administering the oath to the witness.

21

22

23

24

25

NON-CERTIFIED COPY

Page 7

1          KEVIN T. SPREHE, 108 HELIOS AVENUE,

2   METAIRIE, LOUISIANA 70005, after having been

3   first duly sworn, testified on his oath as

4   follows:

5   EXAMINATION BY MR. MATHEWS:

6          Q.  Good afternoon, Mr. Sprehe.

7          A.  Good afternoon.

8          Q.  And that's how I pronounce it; right?  I

9   was -- in my head that is not how I was

10  pronouncing it the whole time.

11         A.  Most people get it incorrect.  So yes,

12  that is correct.

13         Q.  Good.  For the record, can you go ahead

14  and state your full name?

15         A.  Kevin Timothy Sprehe.

16         Q.  Mr. Sprehe, what is your address?

17         A.  108 Helios Avenue, Metairie, Louisiana

18  70005.

19         Q.  Mr. Sprehe, where are you employed?

20         A.  Excuse me?

21         Q.  Where do you work?

22         A.  I work for Ryan Gootee General

23  Contractors.

24         Q.  What do you do for Ryan Gootee?

25         A.  I am a project manager.

NON-CERTIFIED COPY

**Fact Sheet**

## Product Information



# Sikacrete® 321 FS

One-component, cementitious, pourable, rapid hardening concrete mix




NON-CERTIFIED COPY

H&E 0037921


Page 26

1    led us to sending an RFI, and this (indicating)

2    obviously was their response.

3        Q.  You mention in there, that there would

4    be additional concrete poured, is it to tie-in a

5    new slab to an old slab?

6        A.  If I recall, they wanted to raise the

7    slab, because it was having a lot of flooding

8    issues previously.  I'm pretty sure that was the

9    main reason they wanted to raise it.

10       Q.  In the reply -- that would be the

11   portion from the URS -- they reply that an

12   expansion joint is required to allow for

13   expansion around the perimeter between the new

14   concrete overlay and existing concrete and

15   columns.

16           So they accepted your --

17       A.  Correct.  Their response was basically

18   saying that, yes, we need to add an expansion

19   joint around the perimeter and then also around

20   steel columns.

21       Q.  Am I correct that this would have been

22   something that was not in the plans initially?

23       A.  Correct.

24       Q.  Is it something that you expected to see

25   in the plans or was this just something that was

NON-CERTIFIED COPY

1          MR. MATHEWS:

2          This is Exhibit 4, URS 90647.

3     BY MR. MATHEWS:

4          Q.  I'm going to hand you what I'm going to

5     mark as Exhibit 5.  It is H&E 40918.

6          This is an E-mail dated May 28th, 2013

7     from you to Thomas Ryan with URS.  And in this

8     E-mail you state to Thomas you're sending him an

9     RFI.  You said this issue is critical as it

10    affects the work we are currently doing at

11    Buildings K and C.  And request a response by

12    tomorrow.  So, I guess, you don't have to stop

13    your concrete subs from working in these area.

14          And if you turn the page, we've got RFI

15    Number 14.

16          So what are you asking here?

17          A.  I'm just rereading it real quick, so I

18    can recall.

19          Q.  Sure.

20          A.  So prior to pouring any foundations, we

21    require our superintendents on site to verify

22    elevations.  Sometimes we'll actually hire

23    professional surveying company types to actually

24    do that for us.

25          But when we did that, the elevations we

NON-CERTIFIED COPY

Page 29

1  came up with at Building A did not match what

2  was on the survey provided to us from URS.  And

3  so the difference was -- and it varied I think

4  between -- yeah, on here two-and-a-half to three

5  inches of concrete -- I'm sorry, two-and-a-half

6  to three inches of varying in elevation.

7      So they -- if I'm not mistaken, they

8  responded telling us that we needed to match the

9  final elevation that they had given us.  And I

10  believe in turn we actually ended up sending in

11  a change order for that additional concrete

12  across all of Building A, which was the large

13  building that we mainly worked in.

14      Q.  I know you mentioned that your

15  superintendents on site sometimes took these --

16  they measured the elevations.

17      In this case, do you remember if it was

18  the superintendent or some third party?

19      A.  I don't recall.  I'm pretty sure we had

20  a -- I know we had a professional surveyor on

21  site for portions of the project.  I can't

22  recall if they were -- if they specifically gave

23  us elevations for this.

24      Q.  Do you know what company was this --

25      A.  I think we used Linfield, Hunter and

NON-CERTIFIED COPY

1    Junius to do our surveying.  We use them for

2    probably 90 percent of our surveying.  So I

3    would guess that's who we used.

4        Q.  Do you know who provided the survey?

5            I think you referenced it as URS's

6    survey.  Do you know who provided that survey?

7        A.  I do not.  It would be on the drawings

8    that they provided, though.

9        Q.  I think you mentioned ultimately to

10   address the issue that you raised here, there

11   was an addition of some concrete?

12       A.  Correct.  So, again, I mentioned that

13   they wanted to add concrete -- one of the

14   primary reasons they wanted to add concrete was

15   to eliminate flooding in that building.  Anyway

16   with the elevations that we came up with, they

17   would have potentially still had issues.  So

18   that two-and-a-half to three inches was very

19   important to H&E.

20           So they ended up asking us to send a

21   change order for that additional concrete that

22   had to be provided.

23           So as part of that, we were asking, if

24   we use the elevations that were actually on

25   site, did we need to adjust some of the other

NON-CERTIFIED COPY

1    work we were doing outside the building, which

2    is kind of the second half of that RFI.

3        So we could have potentially lowered the

4    elevations of the other work we were doing, but

5    -- and I see there's no response actually on

6    this RFI.  But if I recall, the conclusion was,

7    that would not have solved the problem of water

8    potentially flooding Building A.  So they had to

9    maintain that elevation.  So we actually kept

10   the elevation of those other items up higher

11   than what the drawings had called for.

12       Q.  So ultimately what ended up being

13   installed, was it different from what was in the

14   drawings?

15       A.  So the change what we ended up doing was

16   providing an additional two-and-a-half to three

17   inches of concrete.  Pretty much, if I'm not

18   mistaken, across all of Building A, which was a

19   fairly large building.

20       Q.  Now, had this height of concrete been

21   shown in the original design, this is something

22   that H&E would have had to pay for; correct?

23       A.  If this was something that was shown in

24   the original design, it would have been included

25   within our contract.

NON-CERTIFIED COPY

Page 32

1      Q.  Do you remember how this item was

2  handled, as far as payment?

3      A.  I can't say for certain.  I'm pretty

4  sure it ended up being a change order with H&E

5  and H&E paid us for that additional work.

6      Q.  And for the jury, which is often going

7  to mean me, can you explain what a change order

8  is?

9      A.  A change order, so if there is something

10 that requires additional cost, that is something

11 that we should not have -- that we would not

12 have known on the original drawings or it may be

13 something that the owner requests, we will send

14 in a change order proposal, which then is

15 reviewed by owners, architects, engineers.  And

16 then they approve it, which then will change it.

17 We'll make it a change order to the contract.

18     Q.  So it somewhat amends the contract to

19 include this work?

20     A.  Yeah.  So we end up doing an AIA

21 Contract Amendment, which would then adjust the

22 contract total cost.

23     Q.  You believe that's what happened in this

24 instance?

25     A.  Yes.  I know we ended up doing a change

NON-CERTIFIED COPY

1    A.  I only vaguely remember this during the

2  project.  Typically, what we'll do -- I mean, we

3  put it in the structural engineer's hands

4  ultimately; and it would be up to him to

5  determine if what's provided will be acceptable.

6       I'm not a concrete expert.  I'm not a

7  structural engineer.  So I certainly can't tell

8  you the ins and outs.  But I know there are a

9  lot of different things that go into it.  I

10  honestly don't recall ever getting anything back

11  after this from the engineer, once the final

12  compressive strengths were provided.

13    Q.  I have some things that are going to

14  speak to that later on.

15    A.  Sure.  That's fine.  I mean, I do

16  remember getting this at one point.

17       Yeah, I don't recall ultimately what

18  came of this in particular.

19    Q.  Do you recall there being a partition

20  that was supposed to go in the Belle Chasse

21  facility's lunch room?

22    A.  Yes.

23    Q.  Do you recall if the partition actually

24  wasn't put in place?

25    A.  It was not put in place.

NON-CERTIFIED COPY

Page 36

1     Q.  Do you remember what happened there?

2     A.  Not necessarily in detail.  But I do

3  recall going through when we were constructing

4  -- the building itself is -- we either had

5  issues with some elevations or just how it tied

6  into the existing building.  And it ultimately

7  led to a question about installing that

8  partition and how it would work with the design.

9         And there was a beam specifically that

10  had to be provided and installed for that

11  partition to hang on.  Anyway, if I recall, it

12  got to a point where it simply just wasn't going

13  to work.  And we had already installed the steel

14  beam, and I know we ended up giving a credit

15  back to H&E for the partition itself.

16         But at that point, a beam had already

17  been installed that had -- that was installed

18  specifically for that partition that basically

19  was useless.  I mean, it served no purpose.

20     Q.  Which building was that?

21     A.  That would have been the new addition on

22  Building A.  I can show you on the map.  That

23  would have been this little dark-clouded area

24  right (indicating) there is where that was.

25         MR. MATHEWS:

NON-CERTIFIED COPY

1          Just for the record, we're pointing to

2    Gootee 2; and he's pointing to the little

3    dark-shaded area, the front of Building A.

4    BY MR. MATHEWS:

5       Q.  How is the process -- you mentioned that

6    Gootee credited H&E for the partition.

7          How does that process work?

8       A.  So it was part of the original plans and

9    specs, so it was part of the original pricing we

10   provided to them.  When the issue had arisen, we

11   had not yet ordered the partition.  We hadn't

12   needed to at that point in the project.

13         So we were able to get whatever that

14   total cost was for that partition we put in a

15   change order proposal; sent it to H&E and URS

16   for review so that they could say, yes, this

17   looks correct; and they will approve it; and it

18   would become a change order of the project which

19   actually would then reduce our overall cost of

20   the project.

21      Q.  To your knowledge was there anything

22   else -- you mentioned the beam.  I'm guessing,

23   is the beam still there to your knowledge?

24      A.  Absolutely.

25      Q.  Is there anything else relative to the

NON-CERTIFIED COPY

Page 38

1    installation of that partition system that would

2    still be in place?

3        A.  I mean the framing, any drywall around

4    it, I don't know if it was framing and drywall

5    or if it was an acoustical ceiling.  Without

6    looking at the plans, I couldn't tell you for

7    sure.

8            I don't know if there were columns that

9    supported that beam potentially that may or may

10   not have been necessary.  That would probably be

11   about it.

12       Q.  But the beam is the only thing you

13   remember for certain?

14       A.  The beam for certain.  Again, I'd have

15   to look at the drawings.  I mean, there may have

16   been columns supporting that beam that were

17   specific to that beam.

18       Q.  Did H&E request a credit for the beam as

19   well?

20       A.  Yes.  I remember them asking for it; and

21   at that point, I'm fairly certain it had already

22   been installed.  So we asked them, do you want

23   to pay for us to take it down and they said --

24   I'm pretty sure they said, either leave it in

25   place or -- yeah, I think we left it in place.

NON-CERTIFIED COPY

1          THE WITNESS:

2          The option was provided.  I mean, no

3     cost was ever provided.  I'm pretty sure they

4     just said leave it.

5     BY MR. MATHEWS:

6        Q.  I'm going to hand you what's going to be

7     Number 7.  It is H&E 25088.  This is a -- the

8     top of the document is an E-mail from Thomas

9     Ryan to Frankie Wynn and Frank Arthur.  It's

10    dated June 18th of 2013.

11          I just want you to look to the second

12    page of the document?

13       A.  (Witness complying.)

14       Q.  An E-mail from Frank Arthur to Frankie

15    Wynn and John Jones.  And then it says, Frankie,

16    Elevation difference between Building A and

17    modified portion of Building A.  Columns for the

18    new section of Building A are too long.  And

19    then it asks, Do we need to huddle with

20    URS/Gootee.

21          From looking at that document, can you

22    tell me kind of what's going on there?

23       A.  Honestly, no.  I actually don't know.

24       Q.  You were not copied on this.  This was

25    internal H&E.

NON-CERTIFIED COPY

1    A.   I mean, I see that Thomas says he spoke

2   to Kevin at Gootee.   I can honestly say I don't

3   remember what this is about.

4    Q.   Thomas mentions it appears the metal

5   building manufacturer made an eight-inch error

6   in their field measurements.

7        Does that ring a bell?

8    A.   It kind of rings a bell.   I, honestly

9   can't tell you.   I can't remember what this is

10   about.   I feel like I would have to have more

11   documentation.

12        I'm sure if I had more documentation, I

13   could tell you what this is about.   But just

14   looking at this --

15    Q.   That's fine.

16    A.   I honestly can't tell you what this is

17   about.

18    Q.   There's a good possibility that I have

19   more.

20    A.   I mean the only thing I can think of, I

21   remember having an issue where the new metal

22   building -- this is in the same area where that

23   steel beam for the partition was, the way that

24   it matched up to an existing roof, it didn't

25   line up.

NON-CERTIFIED COPY

1    pavement repair estimate -- well, that's a

2    separate issue.

3         And you look at the second document,

4    it's a spreadsheet; and there's the -- what I'm

5    taking to be the Ryan Gootee Contractors' logo?

6    A.  Correct.  Yeah.  This is something that

7    we put together, that we keep in-house

8    internally and give to owners and architects at

9    meetings just as a record of change order

10   proposals and change orders that have been

11   accepted.

12   Q.  Let's go to the ones that are

13   highlighted.  And I'm not sure who applied this

14   highlighting.  I'll say that.

15        The first one I see is Ramp and resteel

16   changes.  It's the second line.

17   A.  Uh-huh.  (Affirmative response.)

18   Q.  Does that -- just the description of the

19   change ring a bell?

20   A.  If I recall -- I'm just looking at these

21   other ones here real quick.  Just so I'm --

22   making sure I'm correct.

23        But if I recall that COP 25, Ramp and

24   resteel changes, there was a ramp that they

25   wanted -- that we wanted to have outside of

NON-CERTIFIED COPY

Page 44

1    Building A, next to an overhead door.  And the

2    overhead door was a new overhead door; and we

3    asked the question at one point -- there was

4    maybe a 2 foot or 3 foot elevation difference

5    from the outside to that overhead door.  It

6    might look like a typical, you know, delivery

7    area where somebody might pull up to it.

8          Anyway, there was no ramp; and then I

9    know H&E had asked URS at one point about adding

10   that -- a ramp in there.  I don't know any

11   details beyond that.

12         So anyway, the structural engineer gave

13   us further details after that; and we provided

14   costs -- a change order proposal to install the

15   new ramp with the additional resteel to be

16   included in that.

17   Q.  So this was something that would have

18   not been in the initial design plans?

19   A.  It was not in the initial design plans,

20   no.

21   Q.  It was added at the owner's request?

22   A.  Yes.  I'm trying to remember.  I feel

23   like there was more to it than that.  I feel

24   like at one point, there's either a drawing that

25   shows like there was supposed to be a ramp

NON-CERTIFIED COPY

Page 45

1  potentially there; or there was discussion

2  that -- I don't know if H&E had said they

3  requested URS to include one there.

4         But all that being said, there was not

5  one on the drawings or no details for it.  So,

6  yes, H&E had asked us to price it and to include

7  it.

8         Q.  Gootee sent it as a change order

9  proposal?

10         A.  Yes, sir.

11         Q.  Do you recall if this change order

12  proposal was ultimately approved?

13         A.  I believe it was, yes.

14         Q.  I know we kind of talked about it.  You

15  were not sure whether this would have been

16  something that was instructed to be in.  We know

17  it wasn't in the initial plans.

18         Had it been in the initial plans, would

19  this be something that H&E would have had to pay

20  for?

21         A.  If it was in the initial plans, we would

22  have included the cost in our contract, if it

23  had been shown on the plans.

24         Q.  Right there under the Ramp and resteel

25  changes, we see COP 26; and it's the Operable

NON-CERTIFIED COPY

Page 46

1    Partition credit.

2            Is that the credit that we just

3    discussed?

4        A.  Correct.

5        Q.  Down to the next highlighted one, I have

6    COP 7, RFI Number 10, Building A expansion

7    joint.

8            Do you see that?

9        A.  Yes, sir.

10       Q.  Is that the expansion joint that we

11   talked about earlier?

12       A.  Yes, it is.

13       Q.  Then looking down, another highlighted

14   area, is COP 17, Building A additional concrete?

15       A.  Uh-huh.  (Affirmative response.)  I see

16   that.

17       Q.  Is that the concrete, the additional

18   concrete that we talked about earlier?

19       A.  Yes, sir, it is.

20       Q.  Again, this was something that was

21   submitted as a change order proposal?

22       A.  Yes, it was.

23       Q.  It was ultimately approved?

24       A.  Yes, sir.

25       Q.  Again, is this something that had it

NON-CERTIFIED COPY

1    been in the drawings initially, exactly as it

2    went in, it would have had this additional price

3    tag?

4        A.  I would say if the survey had been

5    accurate, it would have been included, yes.

6        Q.  This one is a little less

7    self-explanatory, COP 18.  ASI Number 13, Room

8    120 and 121 changes.

9            Does that mean anything to you?  Because

10   it's Greek to me.

11       A.  Yes.  So that was a result of the

12   elevation, same elevation issues that were part

13   of COP 17, resulted in elevation issues, which

14   were -- became COP 18.  And so they provided ASI

15   Number 13, just supplemental information to

16   address the elevation difference in Rooms 120

17   and 121, which are also in Building A, which

18   then ultimately ended up adding steps and a

19   handrail, in both of those rooms to accommodate

20   the elevation issues.

21       Q.  Describe for me the steps and the

22   handrails, between two rooms?  How is it --

23       A.  There were two rooms side-by-side

24   separated by a demising wall.  One of those

25   rooms was an electrical room, and the other room

NON-CERTIFIED COPY

1    was either going to be a small office or a

2    storage room.

3         And they were part of the same Building

4    A; but again, they were separate rooms.  And

5    instead of putting additional concrete in there,

6    they decided to just add steps, handrails.

7    There may have been a couple other things along

8    with that.  But that was the primary thing that

9    was included.

10    Q.  Was there any consideration of the

11    flooding concern that you mentioned earlier with

12    respect to the slab?

13    A.  I don't know what they decided with

14    those rooms.  Those are on the side -- I don't

15    know north, south, east, west necessarily; but

16    those are the side of the building, I think, the

17    property is sloping away from that area pretty

18    well.  If I'm not mistaken, they weren't as

19    concerned about flooding in that specific area.

20    Q.  All right.  The next one is COP 19,

21    Additional pressure washing.

22         What was going on there?

23    A.  So the plans before we poured the --

24    before we poured the concrete in all of Building

25    A, called for us to broom sweep and clean the

NON-CERTIFIED COPY

Page 49

1    existing concrete, just for adhesion purposes of

2    concrete to the existing concrete.  The

3    structural engineer came out and said, We also

4    need to pressure wash it.  And so we put a

5    proposal together for pressure washing a very

6    large building and submitted that for review and

7    they decided that, I guess, that needed to be

8    done.

9        Q.  So this is something that, it wasn't in

10   the plans, it was called for by the engineer

11   upon, I guess, viewing the site?

12       A.  Yes.

13       Q.  The next thing is COP 20, Demo of steel

14   plates.

15           What happened there?

16       A.  That also came from the structural

17   engineer, also in Building A.  He came out to

18   the site prior to us starting the work for

19   pouring this additional concrete in Building A.

20   And there were these existing steel plates,

21   these strips of steel; and it was not called out

22   on the demolition plan to pull them out.  He

23   said he felt that they needed to come out.

24           So we, at his direction and after

25   submitting this proposal pulled them out and

NON-CERTIFIED COPY

Page 50

1    disposed of them.

2        Q.  Number 21, Building B and Building C,

3    OH door.  Is that the over- --

4        A.  Overhead door.

5        Q.  What were you doing with the overhead

6    door?  It's not a very big ticket item there.

7        A.  If I'm not mistaken, the way that the

8    operation was detailed of the overhead doors,

9    was for them to be operated from the inside; and

10   they're -- at least at Building B, maybe

11   Building C,  I can't recall, there is no access

12   from the inside, so they had to be operated from

13   the outside, which meant a change in the design

14   from the overhead door company, which meant

15   different components, et cetera, to make that

16   possible.

17           So that was the additional cost to

18   change the design to make them operable from the

19   outside and not inside.

20       Q.  Mr. Sprehe, does Gootee rent from H&E?

21       A.  Occasionally.  Yeah, I mean, we usually

22   just call around, whoever is going to give us

23   the best price for that day is who we rent from.

24   So we rent from them occasionally.

25       Q.  Now, for this particular job, did Gootee

NON-CERTIFIED COPY

1   through these things again.

2      A.  Yeah.

3      Q.  Is the italicized portion your note from

4   this particular meeting?

5      A.  Correct.  So, obviously, those are old

6   business items.  So items that were discussed in

7   prior meetings and then the italicized area are

8   the new notes for those meeting items and then

9   obviously as you get on to Page 4 you see new

10  business.  So these were new items that had not

11  been previously discussed.

12     Q.  Mr. Sprehe, I'd like to direct you back

13  to Exhibit 8.  If we could look again at, I

14  guess, COP 20.  We talked about this was an

15  issue where the engineer directed the steel

16  plates to be removed.

17          Where were these steel plates, like in

18  the scheme of the building?

19     A.  They were embedded in the concrete

20  throughout Building A, maybe in three, four,

21  maybe up to five locations.

22          I mean they were kind of -- I feel like

23  they were pretty evenly spaced throughout the

24  area.

25     Q.  Were these serving as joints for the

NON-CERTIFIED COPY

Page 64

1 concrete?

2  A.  I honestly don't know what they were

3 used for previously.  They weren't connected to

4 anything that I recall.  So unless H&E had used

5 them for some purpose in the past, I really

6 don't know what they were for.

7  Q.  Now, were the plates on top of the

8 concrete; or were they --

9  A.  They were kind of embedded, flush even

10 with the concrete if I recall.

11  Q.  We see here that this change order was

12 to remove them?

13  A.  Correct.

14  Q.  So you would have seen what was under

15 them.  Was their concrete under the plates?

16  A.  Yeah.  They were embedded in the

17 concrete.  So when we got out there, I don't

18 know what kind of equipment they used to pull

19 them out.  I didn't watch them do it.  But I

20 know when I came out there, there was a good

21 V-shape where they pulled it out.  So I'm

22 guessing it probably had little pegs on the

23 bottom of it that held it under the concrete.

24 So when they pulled it out, it pulled out a good

25 chunk of concrete with it.

NON-CERTIFIED COPY

1    Q.  So I guess in addition to removing the

2  plates, you would have had to install or pour

3  some new concrete to cover where the plates had

4  been?

5    A.  It would have been filled in when we

6  poured the topping slab at that point.

7    Q.  Do you recall why the engineer wanted

8  them to be removed?

9    A.  I honestly -- I don't.  He was the one

10  who brought it up, honestly, as far as I

11  remember.

12    Q.  Had this additional demo been in the

13  plans, this would have been something that would

14  have been in your pricing?

15    A.  Correct.  If he had shown us to remove

16  them, we would have included it, yes.

17    Q.  I'm going to hand you what is going to

18  be Number 13.  It is H&E 8304.

19      This is an E-mail from you to Frankie

20  Wynn and Thomas Ryan, and it's -- that's the

21  first E-mail.  But I'm going to ask you to flip

22  to the second page?

23    A.  (Witness complying.)

24    Q.  It's an E-mail dated September 12th,

25  2013 from a Scott Israel.

NON-CERTIFIED COPY

1    an updated schedule, an RFI log, a submittal

2    log, change order proposal log, that's typically

3    what we provide with every meeting; and then we

4    use meeting minutes from prior meetings as sort

5    of a check list.  So we'll go through each

6    meeting item that were in meeting minutes

7    previously just to make sure we cover every

8    point, that we don't miss anything that was

9    discussed previously, and we leave it open until

10   it's completely closed, that there's nothing

11   else to discuss with it.

12          So then when we send out meeting

13   minutes, we attach that whole agenda.  So you've

14   got your new meeting minutes, plus the agenda

15   that we had for that whole meeting.  So that's

16   what the full packet is.

17      Q.  If I could direct you to URS 53807.

18   It's Page 2 of your September 11, 2013 meeting,

19   meeting minutes?

20      A.  Okay.

21      Q.  Item 5.04, it indicates you submitted

22   RFI Number 20 on June 27 of 2013 regarding the

23   eave height at Building A admin area and the tie

24   in to the tool room roof.  The installer

25   believes that the connections may cause an issue

NON-CERTIFIED COPY

1    structurally and has requested the structural

2    engineer review the situation.

3         And rather than me reading this, if you

4    could just read it and tell us what --

5    A.  Yeah.  I'm reading through it real

6    quick.  So this is in regards to the steel it

7    looks like for the operable partition, which

8    this is saying remove the operable partition

9    from the project, don't install the steel.

10        So I'm wondering -- I'm trying to

11   remember maybe we didn't install the steel.  I

12   know that we had the steel on site for certain.

13   Q.  Is this the beam or something other than

14   the beam?

15   A.  This would have been the beam; and if

16   there were columns associated with it, again,

17   Frankie Wynn, Remove the operable partition from

18   the project and don't install the steel.

19        So we may not have installed the steel.

20   But I know for a fact the steel was on site.  We

21   were prepared to install it.

22        Let's see, A new column will need to be

23   installed -- there's kind of a couple of things

24   going on here.

25        This might be the other thing that was

NON-CERTIFIED COPY

1    Building K and torn windscreens at Building D.

2         Obviously, it's his term there; but

3    we've already talked about the concrete at

4    Building K; correct?

5         A.  Uh-huh.  (Affirmative response.)  Yes,

6    that's correct.

7         Q.  It's your recollection that Gootee just

8    put this topping on to address the issues as a

9    preventative measure?

10        A.  Correct.  At the recommendation -- we

11   provided the product data, and it was approved

12   by the engineer and URS as a solution to the

13   issue.

14        Q.  Would this have generated a formal

15   project modification document?

16        A.  Unless there was a change order

17   involved, no.

18        Q.  And, again, you told me that this was

19   something that Gootee paid for?

20        A.  We paid for it, because we didn't -- we

21   felt like it wasn't something worth arguing, and

22   we wanted to try to keep our client happy.

23        Q.  And the other issue is the torn

24   windscreen at Building D.

25             What was the issue there?

NON-CERTIFIED COPY

Page 86

1        A.  The windscreen that was put up -- it

2   said Building D.  I actually think that was at

3   Building K as well ultimately.

4           They approved the windscreen that we

5   submitted.  We put it up, installed it; and

6   within a month, two months, it was already

7   tearing.  So they came back, relooked at what we

8   submitted, and said this actually doesn't meet

9   the specifications.

10          We won't get into all of that.  We ended

11  up putting new windscreens in, though.  And I

12  don't know how long they lasted, but they met

13  the specifications at that point.  And so the

14  windscreens we put in, I believe satisfied H&E

15  and URS at that point.

16      Q.  So let's back up.  You told me a lot.

17  You said the windscreens that were installed,

18  you said they.  Was this URS that you were

19  dealing with as far as the specs?

20      A.  Yes.

21      Q.  The windscreens installed were not

22  submitted to specs?

23      A.  Correct.

24      Q.  And you said ultimately you went ahead

25  and installed these new windscreens?

NON-CERTIFIED COPY

1      A.  So they had approved what we submitted.

2   So we went ahead and ordered them and installed

3   them.  Then they ripped and they came back and

4   said, Oh, never mind, these don't meet the

5   specs.

6          And there was -- they were correct in

7   that there was, like, one item that it didn't

8   meet.  So, again, I think it was an item where

9   we said, we're not going to argue with it.

10  Rather keep our client happy.  So we got a

11  windscreen that matched what they wanted and

12  installed it.

13         I'm trying to remember -- I don't

14  remember the details.  I don't know if there was

15  a change order ever involved with that one.

16  There were certainly some debated parts with the

17  windscreen.

18         But I do know that we ended up putting

19  the correct -- the windscreens in that URS

20  wanted us to put in.

21     Q.  Do you know if Gootee paid to put those

22  windscreens in?

23     A.  That's what I can't remember.  I feel

24  like I would need to go back and look.  I mean,

25  there were a lot of change orders on that

NON-CERTIFIED COPY

1   given substantial completion.

2           But I do remember talking with either

3   Frankie Wynn or Frank Arthur and we kind of

4   consented and said there's no reason you can't

5   be using it.  But at the same time, your

6   architect is withholding substantial completion

7   from us, yet you guys are using the building.

8           Which, again, at that point, wasn't

9   really a big deal in that we were basically done

10  working minus these two items, which really only

11  affected really just one area.

12          That's what that had to do with.

13      Q.  Do you recall a change order relative to

14  the addition of bollards to air conditioning

15  units?

16      A.  I do remember adding bollards.  Yes, I

17  do.  I do.

18      Q.  Do you remember how that came about?

19      A.  After we installed the air conditioning

20  units, I don't remember who but there was

21  concern about where they were located and the

22  possibility of some equipment or a car hitting

23  them.  And so they came back and asked that we

24  price up and put bollards in around them.

25      Q.  Do you remember who came and asked?

NON-CERTIFIED COPY

Page 94

1    Would it have been H&E or URS?

2        A.  I know H&E brought up the concern about

3    it.  They initially got upset with us, asking

4    why we put the air conditioners where we put

5    them.

6            But H&E -- it was either Frankie Wynn or

7    Frank -- Frank Arthur actually I think brought

8    up the concern of where they were located and

9    said we needed to do something about it.  So we

10   had proposed putting just bollards around them.

11   And I remember pricing and them approving

12   putting bollards around where the air

13   conditioning units were located.

14       Q.  If those bollards had been included in

15   the initial design drawings, there would have

16   been a cost associated with installing them;

17   correct?

18       A.  Correct.

19       Q.  Is there a different cost from putting

20   them in when you did versus had they been

21   included in the initial design drawings?

22       A.  Hard to say.  I mean, there's always the

23   argument that change orders cost more then if it

24   was included in the original project.  But I

25   can't actually prove that.

NON-CERTIFIED COPY

1        I mean, I think really the only thing

2   that could have been done is if the air

3   conditioning units had been put at a different

4   location you may not have even needed the

5   bollards.  Which I think that was why H&E was

6   ultimately upset when they brought that up,

7   because that was right at the end of the

8   project.

9        Q.  Do you remember an issue with the

10   modification of handrails?

11        A.  I do recall that at Building A, and we

12   were required to add either -- it was either a

13   metal bracket or a metal angle at the bottom,

14   because it was a handicap access ramp and there

15   has to be some way for -- if somebody in a

16   wheelchair is coming up or going down the ramp

17   for the wheels to not fall off the edge,

18   basically.  So we had to come back and add a

19   piece of metal at the bottom for code

20   compliance.

21        Q.  But similarly, if it had been included

22   in the drawings, there would have been a cost

23   associated with it still?

24        A.  If it had been included in the drawings,

25   we would have included whatever their design

NON-CERTIFIED COPY

Page 96

1   was.

2       Q.   Another one, do you recall anything

3   about a relocation of the locker room hand wash

4   sink?

5       A.   Yes, I do.

6       Q.   What happened there?

7       A.   Where the hand wash sink was shown to be

8   located, was very close to the door going into

9   the locker room, the bathroom.

10          And once it was installed, I don't

11  remember who but they asked why it was installed

12  there.  We showed them on the drawings why we

13  installed it where we did; and they came back

14  and said it needs to be moved, because anybody

15  who opens that door is going to hit somebody

16  standing at the wash sink.

17          So we ended up moving it 2 or 3 feet,

18  which meant pulling tile out, pulling the whole

19  hand wash sink out, and redoing that whole area

20  pretty much.  Replumbing it.

21      Q.   Did you see the hand wash sink when it

22  was installed initially?

23      A.   Did I see it installed?

24      Q.   Yes.  Did you get to observe it

25  installed and, I guess, see how it operated with

NON-CERTIFIED COPY

1  the door?

2      A.  Once it was installed, yes, I saw the

3  issue.

4      Q.  Do you recall an item for the removal of

5  expansion joints?

6      A.  Removal of expansion joints?

7      Q.  Perhaps in the shop area.

8      A.  That doesn't ring a bell.

9      Q.  COP Number 7.

10     A.  I know we added expansion joints.  Oh,

11 removing -- in the shop area, what was that?

12         It kind of rings a bell now.  But I'm

13 not recalling what it specifically was for.

14     Q.  Let me look through my notes.  I think I

15 might be done.

16         I don't have anything further.

17      MS. MINCE:

18         I have just a few things, but it won't

19 take me very long at all.

20 EXAMINATION BY MS. MINCE:

21     Q.  Let's look at Exhibit Number 6?

22     A.  (Witness complying.)

23     Q.  You were asked some questions about

24 Exhibit No. 6 and in particular the slump

25 testing that was done by Terracon.

NON-CERTIFIED COPY

**Invoice Overview Sheet**

**Baton Rouge Invoices**

| Invoice No. | Date | Amount | Notes: |
|---|---|---|---|
| 5357940 | 12/19/2012 | $66,001.45 | Work Order 01-11<br>• States that URS is "requesting a modification to our contract for additional bidding/negotiating and construction administration services on the above project. . . based on the following factors: . . . "Seven (7) Change Orders (CO) to date some required for modifications to the document."<br>"For: H&E Phase IV BN & CA"<br>"Professional Services for Period Ending 12/07/2012"<br>Lump Sum Billing |
| 5357943 | 12/19/2012 | $3,487.50 | Work Order 11-11<br>• States that scope of work included "Update Permit Documents: Submit modifications to LA State Fire Marshal and EBR Parish Permit office. Pricing Coordination: Issue Change Proposal Request to contractor and negotiate pricing, prepare Change Order documentation."<br>"For: H&E Design Changes"<br>"Professional Services for Period Ending 12/07/2012"<br>Tasks included: "Project Management," "Design/Construction Documents," and "Pricing Coordination:<br>Work done by Architect Thomas E. Ryan |
| 5357991 | 12/19/2012 | $858.75 | Work Order 10-12<br>• Attached labor work sheet of scope of work includes "interior modifications coordination," and "prepare change order or contract"<br>"For: H&E BR HQ Interior Design"<br>"Professional Services for Period Ending 12/07/2012"<br>Tasks included: "Project Management" |
| 5357942 | 1/14/2013 | $28,882.00 | Work Order 07-11<br>"For: H&E HQ & BR Branch – Phase V"<br>• "This phase of the work will develop a furniture, fixture, and equipment (FFE) interior and signage bid package. This effort will deliver the project from the final interior |

EXHIBIT

15

NON-CERTIFIED COPY

| | | | |
|---|---|---|---|
| | | | design to occupancy."<br>"Professional Services for Period Ending 12/07/2012"<br>Lump Sum Billing<br>• "billed monthly, based on percent of phase complete" |
| 3424197 | 2/25/2013 | $6,605.00 | Work Order 10-12<br>"For: H&E HQ Interior Design"<br>"Professional Services for Period Ending 02/08/2013"<br>Tasks included: "Project Management" and "Design/Construction Documents"<br>Work done by Architect Thomas E. Ryan |
| 5456789 | 3/21/2013 | $2,100.55 | Work Order Number 01-11<br>"For: H&E Phase IV BN & CA"<br>"Professional Services for Period Ending 03/08/2013"<br>Lump Sum Billing |
| 5555403 | 6/19/2013 | $975.00 | Work Order Number 11-11<br>"For: H&E Design Changes"<br>"Professional Services for Period Ending 06/07/2013"<br>Task of "Project Management"<br>Work done by Architect Thomas E. Ryan |
| 5555428 | 6/19/2013 | $5,190.00 | Work Order 10-12<br>"For: H&E BR HQ Interior Design"<br>"Professional Services for Period Ending 06/07/2013"<br>Tasks included "Project Management" and "Design/Construction Documents"<br>Work done by Architect Thomas E. Ryan |
| 5565894 | 6/25/2013 | $1,202.50 | Work Order 11-11<br>"For: H&E Design Changes"<br>"Professional Services for Period Ending 1/11/2013"<br>Tasks included "Project Management" and "Design/Construction Documents"<br>Work done by Architect John B. Miller |
| 5588906 | 07/24/2013 | $2,450.00 | Work Order No. 11-11<br>"For: H&E Design Changes"<br>"Professional Services for Period Ending 07/12/2013"<br>Task included "Project Management"<br>Work done by Architect Thomas E. Ryan |
| 5588931 | 07/25/2013 | $3,050.00 | Work Order 10-12<br>"For: H&E BR HQ Interior Design"<br>"Professional Services for Period Ending |

NON-CERTIFIED COPY

| | | | |
|---|---|---|---|
| | | | 07/12/2013"<br>Tasks included "Project Management"<br>Work done by Architect Thomas E. Ryan |
| 5626064 | 08/21/2013 | $8,618.22 | Work Order 01-11<br> "For: H&E Phase IV BN & CA"<br>"Professional Services for Period Ending 8/16/2013"<br>Lump Sum Billing |
| 5681317 | 10/24/2013 | $950.00 | Work Order 11-11<br> "For: H&E Design Changes"<br>"Professional    Services    for    Period    Ending 10/11/2013"<br>Task include "Project Management"<br>Work done by Architect Thomas E. Ryan |
| 5681338 | 10/24/2013 | $550.00 | Work Order 10-12<br> "For: H&E BR HQ Interior Design"<br>"Professional    Services    For    Period    Ending 10/11/2013"<br>Task include "Project Management"<br>Work done by Architect Thomas E. Ryan |

1162713v.1

NON-CERTIFIED COPY

## Belle Chasse Invoices

| Invoice No. | Date | Amount | Notes: |
|---|---|---|---|
| 5531264 | 05/24/2013 | $11,854.12 | Work Order 11-12<br>• "Measurement of the existing facilities," "Completion of final design solutions," "Representing H&E for all permitting activities including . . . the State Fire Marshal, and all other regulatory agencies," "All construction documents as required for permitting and hard dollar pricing," and "Construction Administration during the construction phase to occupancy."<br>"For: Belle Chasse Phase II"<br>"Professional Services for Period Ending 05/10/2013"<br>Task included "Construction Admin Phase." |
| 5563141 | 06/19/2013 | $10,668.71 | Work Order 11-12<br>"For: Belle Chasse Phase II"<br>"Professional Services for Period Ending 06/07/2013"<br>Task included "Construction Admin Phase" |
| 5599459 | 07/29/2013 | $40,043.22 | Work Order 11-12<br>"For: Belle Chasse Phase II"<br>"Professional Services for Period Ending 07/12/2013"<br>Task included "Construction Admin Phase" |
| 5624795 | 08/20/2013 | $20,412.79 | Work Order 11-12<br>"For: Belle Chasse Phase II"<br>"Professional Services for Period Ending 08/09/2013"<br>Task included "Construction Admin Phase" |
| 5657774 | 09/25/2013 | $15,967.40 | Work Order 11-12<br>"For: Belle Chasse Phase II"<br>"Professional Services for Period Ending 09/06/2013"<br>Task included "Construction Admin Phase" |
| 5688671 | 10/24/2013 | $13,987.96 | Work Order 11-12<br>"For: Belle Chasse Phase II"<br>"Professional Services for Period Ending 10/11/2013"<br>Task included "Construction Admin Phase" |
| 5713825 | 11/18/2013 | $5,607.00 | Work Order 11-12<br>"For: Belle Chasse Phase II"<br>"Professional Services for Period Ending 11/08/2013"<br>Task included "Construction Admin Phase" |

1162713v.1

NON-CERTIFIED COPY

**Kenner Invoices**

| Invoice No. | Date | Amount | Notes: |
|---|---|---|---|
| 5591796 | 07/29/2013 | $231.48 | Reference: PS 100<br>"For: H&E Kenner Phase II"<br>• "the completion of final design solutions, the construction documents, assisting in the contractor pricing, construction contract negotiations and construction administration during the construction phase to occupancy."<br>"Professional Services for Period Ending 02/08/2013"<br>Tasks included "Project Management" and "Site Civil"<br>Work done by Engineer Timothy F. Gaines |
| 5744512 | 12/23/2013 | $481.93 | Reference: PS 100<br>"For H&E Kenner Phase II"<br>"Professional Services for Period Ending 12/13/2013"<br>Tasks included "Project Management" and "Site Civil"<br>Work done by Engineer Timothy F. Gaines |

1162713v.1

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                    SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____          _____
                                               DEPUTY CLERK

## RESPONSE TO STATEMENT OF DISPUTED MATERIAL FACTS SUBMITTED IN SUPPORT OF URS'S MOTION FOR SUMMARY JUDGMENT ON RECONVENTIONAL DEMAND

Plaintiff, H&E Equipment Services, Inc. ("H&E") respectfully submits this response to the Statement of Undisputed Material Facts submitted in support of the Motion for Summary Judgment on Reconventional Demand filed by defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III (collectively, "URS").

1. H&E objects to Statement 1 on the grounds that the referenced Short Form Master Agreement for Professional Services (the "2009 Agreement") is the best evidence of its contents and terms.  Subject to that objection, Statement 1 is admitted.

2. H&E objects to Statement 2 on the grounds that Leonard St. Germain was authorized and believed that he was signing an agreement that would only apply to the budgeting phase of the Kenner project.[1]  In August 2009, URS provided a proposal which quoted $20,000 to help H&E develop a budget for possible renovations.[2]  In connection with this limited proposal, URS requested H&E to sign the 2009 Agreement which specifically referenced the Kenner project and incorporated as attachments the proposal and the $20,000 scope of work.[3]

3. H&E objects to Statement 3 on the grounds that the referenced 2009 Agreement is the best evidence of its contents and terms.  *See also* H&E's response to Statement 2.



---

[1] Deposition of Leonard St. Germain, attached hereto as Exhibit 1, at 139:23-140:18 (testifying that when he signed the 2009 Agreement, he believed that it covered "the scope of developing drawings for the existing site and buildings, for review of the existing truck traffic, and evaluate the condition of all the exterior roofs, buildings and the attachment to it.").
[2] Deposition of Leonard St. Germain at 77:17-21; August 2009 Proposal by Neal Johnson, Exhibit 21 to Deposition of Leonard St. Germain at 77:1-7.
[3] Deposition of Leonard St. Germain at 83:10-15; 2009 Agreement, Exhibit 27 to Deposition of Leonard St. Germain at 87:4-13.

1161099v.1

NON-CERTIFIED COPY

4.  H&E objects to Statement 4.  H&E denies that the 2009 Agreement governs the entirety of the work performed by URS.  H&E and URS also entered into a 2006 Agreement on or about August 28, 2016.[4]  The agreement was to govern URS's performance of services via a series of work orders that specified scopes of services, timelines for completion and compensation.[5]  Pursuant to the 2006 Agreement, URS agreed to furnish all design-related and construction administration-related services for the Baton Rouge project.[6] The parties also had an understanding that the 2006 Agreement would continue to govern the work, including the design of the concrete pavement, for the Baton Rouge project.  After the execution of the 2009 Agreement, URS continued to regard the 2006 Agreement as governing the Baton Rouge project.  Defendant Neal Johnson, the lead URS architect on the projects, testified at his deposition that H&E and URS's relationship with respect to the three projects was generally governed by both agreements.[7]  URS also continued to issue invoices after the 2009 Agreement that specifically referenced and incorporated the 2006 Agreement.[8]  Leonard St. Germain testified that when he signed the 2009 Agreement on behalf of H&E, he believed that the agreement would only apply to the budgeting phase of the Kenner project.[9]

5.  H&E objects to Statement 5 on the grounds that the referenced 2009 Agreement is the best evidence of its contents and terms.

6.  H&E objects to Statement 6 on the grounds that the referenced 2009 Agreement is the best evidence of its contents and terms.

7.  H&E admits that John Engquist was upset with URS in December 2012 because of URS's defective services in connection with the design of the parking lot at the Baton Rouge headquarters building.

---

[4] See 2006 Professional Service Agreement, Exhibit 4 to Deposition of Leonard St. Germain at 34:2-13.

[5] Deposition of Neal Johnson, attached hereto as Exhibit 2, at 159:16-161:4 ("URS utilized a document called PSA – I believe it stands for Professional Service Agreement – that is not project specific but does spell out terms and conditions and fairly common items that go into a contract between two companies. Then, subsequently to that, each individual project would be proposed through a letter proposal or some type of document. And upon approval or agreement, which is usually the fee and scope of work, a document referred to as a work order, a WO with a number, would be assigned to each individual project. And attached to that would be – typically would be the scope and fee arrangement and anything unique to that particular project.").

[6] See 2006 Professional Service Agreement, Exhibit 4 to Deposition of Leonard St. Germain at 34:2-13.

[7] Deposition of Neal Johnson at 159:16-161:4 (testifying that the 2006 and 2009 Agreements were the base agreements that governed the three projects).

[8] See, e.g., Invoice No. 4602441, dated 2/24/11 (URS 09289) and Invoice No. 4666033, dated 4/27/11 (H&E 0001532), Exhibits 4, 5 to June 5, 2015 Affidavit of Frankie Wynn attached hereto as Exhibit 5.

[9] Deposition of Leonard St. Germain at 139:23-140:18 (testifying that when he signed the 2009 Agreement, he believed that it covered "the scope of developing drawings for the existing site and buildings, for review of the existing truck traffic, and evaluate the condition of all the exterior roofs, buildings and the attachment to it.").

2

NON-CERTIFIED COPY

8.   H&E objects to Statement 8 as written.  H&E admits that Mr. Engquist directed that no

URS invoices be paid after December 2012.  On December 17, 2012, H&E moved into

the Baton Rouge Headquarters facility.[10]   Immediately, H&E discovered that URS's

design provided insufficient parking spaces for its employees.[11]   H&E contacted URS

that day to arrange a meeting to discuss H&E's immense dissatisfaction with URS's

service.[12]   Shortly after the meeting, H&E's Chief Executive Officer John Engquist

issued a stop payment order on all future H&E invoices.[13]   Mr. Johnson testified that

URS received written notice after the December 2012 meeting that H&E would not pay

future invoices.[14]   H&E representatives have testified that the withholding of payments

was not limited to the issues experienced at the Baton Rouge facility, but with URS's

performance of services as a whole.[15]

From December 2012 to the filing of the lawsuit in November 2013, URS had

actual, constructive, and written notice of numerous deficiencies with its services on all

three projects.[16]   URS acknowledged the ongoing issues from December 2012 to the

filing of the litigation with the Kenner and Baton Rouge projects in writing, punch-lists,

and correspondences.[17]   During the same time, URS made some attempts, but ultimately

---

[10]  Deposition of Frankie Wynn, attached hereto as Exhibit 9, at 144:5-12 (parking lot issue was discovered on December 17, 2012 when H&E moved in).

[11]  *Id.*

[12]  December 17, 2012 Email from H&E to URS, Exhibit 50 to Deposition of Frankie Wynn at 138:9-139:19 (requesting meeting with URS about issues); Deposition of Brad Barber, attached hereto as Exhibit 12, at 99:7-23 (testifying that there was an immediate meeting following the December 17, 2012 parking lot situation).

[13]  Deposition of John Engquist, attached hereto as Exhibit 4, at 77:2-9 ("Q. Now, around that same time [December 2012], did you give an order to your people not to pay any further URS invoices? A. I did. Q. And what was that based on? A. It was based on all of the problems we had with their design and with the parking and all of the above."); Deposition of Brad Barber, attached hereto as Exhibit 12, at 130:21-131:15 (testifying as to the decision to hold URS payments); Deposition of Frankie Wynn at 222:25-225:2 (testifying that there was a decision to hold URS payments).

[14]  Deposition of Neal Johnson at 127:6-18.

[15]  Deposition of John Engquist at 71:24-72:12 ("Q. Mr. Engquist, when we were talking about your order to stop paying invoices of URS about the problem with the parking and the problems with the design, did you say problems with design? A. I may have. Q. What problems in January of 2013, sir, were you aware of with respect to design problems by URS? A. There was a lot of – there was a lot of things like the paneling and –or, you know, executive office suites and stuff like that, which had to be replaced."); Deposition of Brad Barber at 152:5-9; 156:6-17 (H&E viewed Neal Johnson as generally incompetent and unwilling to take responsibility; H&E had issues with multiple problems, not just the parking lot issue).

[16]  December 17, 2012 Email from H&E to URS, Exhibit 50 to Deposition of Frankie Wynn at 138:9-139:19; Deposition of Brad Barber at 133:5-23; 137:18-138:3; May 13, 2013 Email from H&E to URS, Exhibit 63 to Deposition of Frankie Wynn at 173:18-174:25; July 29, 2013 Email from H&E to URS, Exhibit 69 to Deposition of Frankie Wynn at 191:12-194:12.

[17]  Deposition of Stephen Dorsey, attached hereto as Exhibit 6, at 74:13-75:18 (testifying about the December 17, 2012 punch list for the Baton Rouge projects); June 24, 2013 Baton Rouge Punch List, Exhibit 53 to Deposition of John Jones, attached hereto as Exhibit 7, at 140:6-141:23 (June 24, 2013 punch list for Baton Rouge projects); June 25, 2013 Deficiencies to the Completion of Contract, Exhibit 54 to Deposition of John Jones at 144:2-21 (June 25, 2013 "Deficiencies to the Completion of the Contract"); Deposition of Neal Johnson at 173:10-16 (concrete at Kenner starting to crack and spall instantly after being poured); March 20, 2012 Project Observation Report, Exhibit 36 to Deposition of Frankie Wynn at 108:17-25 (URS notifying H&E of the problems with the Kenner site); Deposition of Frankie Wynn at 128:24-130:9 (testifying that the punch list for the Kenner project identified repair of the pavement as an item); Deposition of John Jones at 97:13-100:12 (testifying that October 16, 2012 punch list stated that among the items that needed to be repaired was pavement at various locations); 124:12-126:7 (testifying about improper pavement joints); Deposition of Neal Johnson at 169:3-24 (testifying that the cracking and spalling

3

NON-CERTIFIED COPY

1161099v.1

failed, to remedy its deficient services.[18]  Also during this time, URS was well aware of

the problems at the Belle Chasse facility occasioned by URS's deficient designs and

specifications.[19]

9.   H&E objects to Statement 9.  As detailed in H&E's response to Statement 4, H&E denies

that the 2009 Agreement governs the entirety of the work performed by URS.   H&E also

disputes that the services provided were properly billed under either Agreement.

10.   H&E objects to Statement 10.  See H&E's Responses to Statements 8 and 9.

Also, the invoices at issue implicate multiple design deficiencies.  For example,

four Baton Rouge invoices directly list tasks of "Design/Construction Documents,"[20] five

explicitly state that the invoices are "For: H&E Design Changes,"[21] and nine charged

H&E work done by an URS architect.[22]  In addition, three Baton Rouge invoices

reference work done pursuant to work orders issued to address change orders at the Baton

Rouge facilities and were billed as lump sum amounts.[23]  Six invoices reference scope of

interior design such as furnishing of furniture, fixtures, and equipment.[24]

From December 2012 to the filing of this lawsuit in November 2013, URS's

professional services at the Baton Rouge and Kenner facilities were related to its efforts

to address prior defective work:

- January 4, 2013 Email from URS to H&E: URS addresses the mail room design issues at the Baton Rouge facility and states that "URS is currently providing all redesign services to H&E for any and all of the current requested modifications."[25]

- January 9, 2013 Email from URS to Womack providing revisions to parking situation.[26]

---

at the Kenner site was on the punch list); 173:10-16 (concrete at Kenner started to crack and spall instantly after being poured).
[18] Deposition of Thomas Ryan, attached hereto as Exhibit 11, 80:24-84:4; August 3, 2012 Internal URS Email, Exhibit 39 to Deposition of Frankie Wynn at 113:9-25 ("Tim: Need you to take a look at these photos obtained by the Owner. There exists considerable concern about the quality of the paving construction joints"); September 25, 2012 Email from MAPP to URS and H&E, Exhibit 44 to Deposition of Frankie Wynn at 127:17-128:23 (detailing re-pours of concrete); March 4, 2013 Email from MAPP to H&E and URS, Exhibit 39 to Deposition of Brad Reese at 119:12-21 (requesting URS input on "action items for paving joint repairs. . . . would like to sit down with you to review their proposed solutions"); Deposition of Thomas Ryan at 119:21-123:25 (testifying that in October 2012, MAPP wanted to find a solution to the spalling and cracking at the Kenner site and wanted to meet with URS to discuss solution but URS did not meet or participate at that time); October 4, 2012 Email from MAPP to URS and H&E, Exhibit 46 to Deposition of Frankie Wynn at 130:25-131:12 ("MAPP will implement the engineer's recommended design mod/fix as soon as we receive direction. We have placed our concrete sub on stand-by and they are ready to move forward without delay[.]").
[19] Deposition of Frankie Wynn at 181:24-184:12 (testifying to emails dated July 2013 to URS about additional design defects with the Belle Chasse project such as roof alignment, folding door, and ductwork); 198:4-199:14 (testifying to numerous change order proposals for items left out by URS).
[20] These invoices are 5357943, 344197, 5555428, 5565894. *See* Invoice Overview Sheet, attached hereto as Exhibit 15.
[21] These invoices are 5357943, 5555403, 5565894, 5588906, 5681317. *Id.*
[22] These invoices are 5357943, 3424197, 5555403, 5555428, 5565894, 5588906, 5588931, 5681317, 5681338. *Id.*
[23] These invoices are 5357940, 5456789, and 566064. *Id*
[24] These invoices are 5357991, 5357942, 3424197, 5555428, 5588931, and 5681338. *Id.*
[25] January 4, 2013 Email from URS to H&E, Exhibit 52 to Deposition of Frankie Wynn at 152:1-14.

4

NON-CERTIFIED COPY

- January 10, 2013 Email from MAPP to H&E and URS stating that it is actively working on "remaining items at H&E Kenner."[27]

- January 18, 2013 Email from H&E to Womack and URS with photographs of pavement that is "sinking/separation from the drain" at the Baton Rouge yard.[28]

- April 16, 2013 Email between H&E and URS addressing the executive wall panel issue.[29]

- June 24, 2013 Email from Womack addressing outstanding items on the Baton Rouge project.[30]

   And during this time, URS's professional services at the Belle Chasse facility were directly related to its defective services in designs that omitted essential features and resulted in costly change orders.[31]

11. H&E objects to Statement 11 on the grounds that the individual invoices are the best evidence of their contents and terms.

12. H&E objects to Statement 12 on the grounds that whether or not the Belle Chasse invoices relate to the Baton Rouge headquarters building is immaterial because H&E's dispute with URS is not limited to individual, one-off tasks, but to URS's performance of services as a whole on all three projects.

13. H&E objects to Statement 13 on the grounds that the individual invoices are the best evidence of their contents and terms.

14. H&E objects to Statement 14 on the grounds that whether or not the Kenner invoices relate to the Baton Rouge headquarters building is immaterial because H&E's dispute with URS is not limited to individual, one-off tasks, but to URS's performance of services as a whole on all three projects.

15. H&E objects to Statement 15 on the grounds that H&E representatives have testified that the withholding of payments was not limited to the issues experienced at the Baton Rouge facility, but with URS's performance of services as a whole.[32]

---

[26] January 9, 2013 Email from URS to Womack, Exhibit 51 to Deposition of Frankie Wynn at 150:10-22.
[27] January 10, 2013 Email from MAPP to H&E and URS, Exhibit 54 to Deposition of Frankie Wynn at 154:15-155:9.
[28] January 18, 2013 Email from H&E to Womack and URS, Exhibit 56 to Deposition of Frankie Wynn at 160:20-161:7.
[29] April 16, 2013 Email between H&E and URS, Exhibit 60 to Deposition of Frankie Wynn at 168:4-21.
[30] Exhibit 67 to Deposition of Frankie Wynn at 188:7-189:17.
[31] June 24, 2013 Email from Womack, Deposition of Frankie Wynn at 181:24-184:12 (testifying to emails dated July 2013 to URS about additional design defects with the Belle Chasse project such as roof alignment, folding door, and ductwork); 198:4-199:14 (testifying to numerous change order proposals for items left out by URS); *see* Invoice Overview Sheet, Exhibit 15.
[32] *See e.g.,* Deposition of John Engquist at 71:24-72:12 ("Q. Mr. Engquist, when we were talking about your order to stop paying invoices of URS about the problem with the parking and the problems with the design, did you say problems with design? A. I may have. Q. What problems in January of 2013, sir, were you aware of with respect to design problems by URS? A. There was a lot of – there was a lot of things like the paneling and –or, you know, executive office suites and stuff like that, which had to be replaced."); Deposition of Brad Barber at 152:5-9; 156:6-

5

NON-CERTIFIED COPY

16. H&E objects to Statement 16 on the grounds that the individual invoices are the best evidence of their contents and terms.

17. H&E objects to Statement 17 on the grounds that the Baton Rouge invoices relate to URS's defective work for the reasons stated in its response to Statement 10.

18. H&E objects to Statement 18 on the grounds that the approval by Frankie Wynn has no impact on H&E's active dispute of the invoices and URS's notice of H&E's dispute for the reasons stated in its response to Statement 8. Additionally, Mr. Wynn has no authority to override Mr. Engquist's decision.

19. H&E objects to Statement 19 for the reasons stated in its response to Statement 8 and on the grounds that H&E's dispute with URS is not limited to individual, one-off tasks, but to URS's performance of services as a whole on all three projects.  Also, H&E provided notice to URS in January 2013 that it would pay no further invoices issued by URS.[33]

20. H&E objects to Statement 20 for the reasons stated in its responses to Statements 9 and 19.

21. H&E objects to Statement 21 for the reasons stated in its responses to Statements 8 and 19.

22. H&E objects to Statement 22 for the reasons stated in its response to Statement 19.

23. H&E objects to Statement 23 for the reasons stated in its response to Statement 8.

24. H&E admits Statement 24.

25. H&E objects to Statement 25 on the grounds that the individual invoices are the best evidence of their contents and terms.

26. H&E objects to Statement 26 on the grounds that the referenced 2009 Agreement is the best evidence of its contents and terms.

27. H&E objects to Statement 27 on the grounds that the referenced 2009 Agreement is the best evidence of its contents and terms.

---

17 (H&E viewed Neal Johnson as generally incompetent and unwilling to take responsibility; H&E had issues with multiple problems, not just the parking lot issue).

[33] Deposition of Neal Johnson at 127:6-18 ("Q. Now, at some point as this parking debate was ongoing, did you remove yourself from that debate and let someone else take over on behalf of URS? A. No. I involved Thomas Ryan, but I stayed involved. Q. Did Debra Sanders get involved? A. She was made immediately aware of it as protocol in the office, also due to the fact that we had been told, and then we had an e-mail follow-up that all outstanding balances owed to URS would be suspended on all of the projects. I have an obligation to tell my boss that. At that time, she was my boss.").

6

NON-CERTIFIED COPY

1161099v.1

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile:  (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel

of record by facsimile, email and/or by placing same in the United States mail, postage prepaid

and properly addressed, this 30th day of January, 2017.

Rebecca Sha

FILED
2017 JAN 30  PM 4: 28

DEPUTY CLERK OF COURT

7

NON-CERTIFIED COPY

1161099v.1

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                    SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____        _____
                                              DEPUTY CLERK

**RESPONSE TO STATEMENT OF DISPUTED MATERIAL FACTS SUBMITTED IN
SUPPORT OF URS'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, H&E Equipment Services, Inc. respectfully submits this response to the
Statement of Undisputed Material Facts submitted in support of the Motion for Summary
Judgment filed by defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal
Johnson, and Thomas E. Ryan, III (collectively, "URS").

1.  H&E objects to Statement 1 on the grounds that the referenced Short Form Master
    Agreement for Professional Services (the "2009 Agreement") is the best evidence of its
    contents and terms.

2.  H&E objects to the characterizations contained in Statement 2. Subject to that objection,
    Statement 2 is admitted.

3.  Statement 3 is admitted.

4.  H&E objects to Statement 4.

In August 2009, URS provided a proposal under which URS would perform preliminary
work on a possible renovation of the facility in exchange for a $20,000 fee.[1] In connection with
this limited proposal, URS asked H&E to sign a Short Form Master Agreement for Professional
Services ("the 2009 Agreement"). The 2009 Agreement specifically referenced the Kenner
project and incorporated as attachments the proposal and the $20,000 scope of work.[2]

Contrary to URS's litigation position, it is clear that the 2009 Agreement was not
intended to replace the 2006 Agreement governing URS's work on the Baton Rouge project.

---

[1] Deposition of Leonard St. Germain at 77:17-21; August 2009 Proposal by Neal Johnson, Exhibit 21 to Deposition
of Leonard St. Germain at 77:1-7.
[2] Deposition of Leonard St. Germain at 83:10-15; 2009 Agreement, Exhibit 27 to Deposition of Leonard St.
Germain at 87:4-13.

1161295v.1

NON-CERTIFIED COPY

URS's design work on the Baton Rouge project – including its defective design of the pavement was substantially completed well before the 2009 Agreement was presented to H&E.[3]  Further, as presented to H&E, the 2009 Agreement only applied to the preliminary budgeting phase for the renovation of the Kenner facility.[4]  Leonard St. Germain testified that when he signed the 2009 Agreement, he believed that the Agreement would only apply to the budgeting phase of the Kenner project.[5]  In addition, the 2009 Agreement's document identifier – "I:\Proposals\Facilities\H&E Equipment Services – Kenner\Proposal\PS-100 Short Form Master Agreement for Professional Services (Rev. 03-2009).doc," as well as the correspondence and attachments accompanying the 2009 Agreement support that the agreement was intended by URS to govern only work performed in helping H&E develop a budget for the Kenner project.[6]

Furthermore, the evidence suggests that after the execution of the 2009 Agreement, URS continue to regard the 2006 Agreement as governing the Baton Rouge project.  Defendant Neal Johnson, the lead architect on the projects, testified at his deposition that H&E and URS's relationship with respect to the three projects were generally governed by both agreements.[7]  And URS issued invoices for work on the Baton Rouge project *after* the 2009 Agreement was signed that specifically referenced and incorporated the 2006 Agreement.[8]

H&E objects to Statement 5 for the same reasons stated in its response to Statement 4.

5.  Statement 6 is admitted.

6.  H&E objects to Statement 7 on the grounds that the referenced work orders are the best evidence of their contents and terms.  H&E further objects to Statement 7 on the basis that the 2006 Agreement is also referenced in work orders after 2009.[9]  *See also* H&E's response to Statement 4.

---

[3] Deposition of Thomas Ryan, attached hereto as Exhibit 4, at 19:20-20:23; 33:5-12; Deposition of Neal Johnson, attached hereto as Exhibit 2, at 56:21-57:6 (testifying that when Mr. Johnson became involved with the H&E projects, the design for the Baton Rouge project was complete but the project was put on hold).

[4] Deposition of Leonard St. Germain at 83:10-84:18.

[5] *Id.* at 139:23-140:18 (testifying that when he signed the 2009 Agreement, he believed that it covered "the scope of developing drawings for the existing site and buildings, for review of the existing truck traffic, and evaluate the condition of all the exterior roofs, buildings and the attachment to it.").

[6] *See* Letter dated August 10, 2009, detailing $20,000 proposal for Kenner Project, Exhibit 22 to the Deposition of Leonard St. Germain at 77:8-21; August 13, 2009 Email from St. Germain, stating approval to proceed with the $20,000 proposal, Exhibit 23 to Deposition of Leonard St. Germain at 82:21-83:7; Email from Chad Herndon, Exhibit 24 to Deposition of Leonard St. Germain at 83:8-15 (URS project manager Chad Herndon putting together a new professional service agreement to kick off the Kenner project); August 20, 2009 Email from Neal Johnson, Exhibit 25 to the Deposition of Leonard St. Germain at 83:20-84:6 (Neal Johnson forwards the 2009 Agreement and attachments to Mr. St. Germain for his signature and references just the Kenner proposal).

[7] Deposition of Neal Johnson at 159:16-161:4 (testifying that the 2006 and 2009 Agreements were the base agreements that governed the three projects).

[8] *See, e.g.,* Invoice No. 4602441, dated 2/24/11 (URS 09289) and Invoice No. 4666033, dated 4/27/11 (H&E 0001532), Exhibits 4, 5 to June 5, 2015 Affidavit of Frankie Wynn, attached hereto as Exhibit 6.

[9] *See, e.g.,* Invoice No. 4602441, dated 2/24/11 (URS 09289) and Invoice No. 4666033, dated 4/27/11 (H&E 0001532), Exhibits 4, 5 to June 5, 2015 Affidavit of Frankie Wynn, attached hereto as Exhibit 6.

2

NON-CERTIFIED COPY

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone:  (504) 586-5252
Facsimile:  (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by facsimile, email and/or by placing same in the United States mail, postage prepaid and properly addressed, this 30th day of January, 2017.

Rebecca Sha



1161295v.1    NON-CERTIFIED COPY

COST CK Amt ✓

FEB - 8 2017

BY_____
DY CLERK OF COURT

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308   DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA **POSTED** |
| CORPORATION, L. O'NEAL | * | |
| JOHNSON AND | * | FEB - 8 2017 |
| THOMAS E. RYAN, III | * | MC |

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON RECONVENTIONAL DEMAND

**MAY IT PLEASE THE COURT:**

Defendant, URS Corporation (hereinafter "URS") respectfully submits this Reply Memorandum in Support of its Motion for Summary Judgment on the Reconventional Demand.[1]

### SUMMARY

The negotiated provisions in the Short Form Master Agreement for Professional Services ("Agreement")[2] require prompt written notice as to each invoice of exactly what amount was disputed, and exactly what deficiency existed with the particular services rendered. H&E Equipment Services, Inc. (hereinafter "H&E") would simply have the Court ignore these negotiated provisions. These provisions were in the Agreement in order to prohibit exactly what H&E now attempts to do in its opposition to this motion. H&E has belatedly tried to conjure up excuses for not paying these invoices when the real reason these invoices were not paid was an emotional instruction by H&E's CEO

---

[1] At the outset, URS notes that H&E failed to file and serve its Opposition "not less than fifteen days prior to the hearing on the motion" as required under La. Code Civ. Proc. art. 966. As such, H&E's Opposition should not be considered and H&E should be barred from arguing at the hearing.

[2] As even H&E acknowledges, whether the 2009 or 2006 Agreement governs is immaterial to this Motion since both versions contain the identical provision relative to Payment for Services. *See*, Pltff. Opp. to Mot. for Summ. Judg. on Reconv. Dmd. at p. 10, fn.73.

REC'D C.P.                    REC'D C.P.

1

FEB 10 2017                   FEB 0 9 2017

NON-CERTIFIED COPY

EBR3976831

not to pay any future invoices- *before* services were rendered and *before* the invoices issued- in response to the parking space design at the Baton Rouge headquarters. It is undisputed that the parking space design occurred prior to, and had nothing to do with these unpaid invoices. H&E would simply have this court ignore the fact that it had instructions not to pay these invoices even before the work was done or invoices were issued based on the wholly unrelated parking space design at the Baton Rouge Headquarters.

H&E has presented only after-the-fact excuses contrary to the Agreement's requirement of prompt written notice as to each disputed invoice, which was never given. H&E has no such evidence. This sort of antics by H&E are precisely what the negotiated Agreement prohibits. H&E seeks to have the Court read out the clear and unambiguous contractual language that H&E, a sophisticated, publicly-traded entity armed with the advice of counsel, freely entered into. Finally, URS's claim is liquidated because it was not disputed pursuant to the negotiated terms of the Agreement. H&E also ignores the fact that invoices were approved for payment subsequent to the CEOs instructions not to pay them by the person who was in charge of these projects. Based on the foregoing, and as set forth further below URS's Motion for Summary Judgment on its Reconventional Demand should be granted.

<u>ARGUMENT</u>

1. **H&E ceased paying all URS invoices based on a directive from its CEO which pre-dated the work and invoices at issue.**

The real reason the invoices at issue were not paid was a preemptive directive by H&E's CEO not to pay any future URS invoices - even before the services or work had been performed - based on his reaction to issues with the parking space design at the Baton Rouge headquarters. This directive was made irrespective of whether H&E had

2

NON-CERTIFIED COPY

any issues with the subsequent work by URS, and was unsupported by the Agreement or the laws of this State. Nonetheless, H&E contends that "not only did H&E provide notice of its dissatisfaction as a whole, URS also had actual written notice that H&E would not pay any future URS invoice from January 2013 onwards."[3] Tellingly, however, H&E did not present the e-mail that it points to as "actual written notice" in the stack of unrelated documents that it attached in connection with its Opposition. This is because H&E recognizes that this e-mail could not possibly suffice as the notice required under the Agreement since the e-mail and the directive not to pay that it references both predate the work and invoices at issue. The notion that H&E could satisfy the notice requirements of the Agreement with a preemptive, blanket statement that it would not pay future invoices for work that had yet to be performed flies in the face of logic and the negotiated language of the Agreement, which required prompt notice and reasons for any disputed amounts.

In its Opposition, H&E offers a raft of excuses for not paying URS's invoices, which, in addition to being unrelated to the invoices, were likewise not conveyed in the manner and time required under the Agreement. H&E has no support under the Agreement or Louisiana law for the notion that it can cavalierly disregard the requirements of the Agreement on a whim. Conversely, the plain language of Paragraph 2.1 of the Agreement is in place to manage the scope of disputes between the parties where H&E was required to pay all undisputed portions and promptly present perceived deficiencies to URS's attention. H&E failed to avail itself to this process, and now, years later, presents a preemptive directive not to pay and a list of after –the-fact, unrelated, alleged deficiencies as its reason for disputing the invoices, many of which

---

[3] Pltff. Opp. to Mot. for Summ. Judg. on Reconv. Dmd. At p.10

3

NON-CERTIFIED COPY

were approved by H&E's Director of Facilities whose responsibility it was to approve invoices for payment.

There is no logic to H&E's position that somehow the requirements of the Agreement that it entered into, after review by its counsel, should be ignored or somehow relaxed because its CEO was dissatisfied with certain aspects of URS's performance wholly unrelated to the invoices at issue. It is axiomatic under Louisiana law that **"contracts have the effect of law for the parties..."**[4] If the terms of a contract "are clear, the court will enforce the contract as written, provided the agreement is not contrary to good morals or public policy."[5]  H&E failed to avail itself to the process provided for in the Agreement and is thus now unable to dispute the invoices.

### 2.  URS has not waived any remedy against H&E for its failure to pay invoices.

H&E, in its Opposition makes the fatally flawed argument that URS has "waived its sole remedy under Paragraph 2.1."[6]  First, nothing in the Agreement indicates that URS's "sole remedy" for H&E's failure to comply with the terms of Paragraph 2.1 is to suspend performance.  There simply is no language to suggest that this is the case. Conversely, the provision to which H&E alludes states that "Consultant *may* suspend further performance under one or more Work Authorizations until payments are current"[7] thus clearly signaling that this remedy was permissive unlike H&E's obligation to provide notice and reason for its refusal to pay, which is clearly mandatory.[8] The notion that suspension of performance by URS was its sole remedy is belied even further by language in Paragraph 2.1 that clearly contemplates "legal action

---

[4] La. Civ. Code art. 1983 *(emphasis added)*.

[5] *Buck's Run Enterprises, Inc. v. Mapp Const., Inc.,* 1999-3054 (La. App. 1 Cir. 2/16/01), 808 So. 2d 428, 432.

[6] Pltff. Opp. to Mot. for Summ. Judg. on Reconv. Dmd. at p.11.

[7] Agreement at ¶2.1.

[8] *Id.* "**Client *shall* notify URS** of any disputed amount within fifteen (15) days from date of the invoice, give reasons for the objection, and promptly pay the undisputed amount."

4

NON-CERTIFIED COPY

for invoice amounts not paid."[9]   As such, H&E's waiver argument is utterly without merit.  Conversely, however, H&E, by failing to comply with its *mandatory duty* under the Agreement to pay promptly and to advise URS of disputed invoice items and provide reason therefor, has lost any right to dispute the invoices at issue here.

### 3.  URS's claim on the unpaid invoices is liquidated.

The invoices at issue are liquidated because these amounts have not been disputed by H&E, and cannot now be disputed pursuant to the terms of the contract between the parties.  Additionally, invoices were approved by H&E's Director of Facilities, Frankie Wynn.   Accordingly, H&E's assertion that URS's claim is unliquidated is intellectually dishonest.  It is well-settled that a claim is liquidated when it is capable of ascertainment by mere calculation.[10]  As noted above, H&E failed to dispute the invoices at issue as was mandated by Paragraph 2.1 of the Agreement, and it approved payment for many of the invoices at issue.  Therefore, despite the laundry list of after-the-fact excuses for not paying the invoices, the facts and law dictate that H&E has no right to dispute these amounts pursuant to the Agreement, i.e. the law between the parties.    Thus, URS's claim for TWO HUNDRED THIRTY-TWO THOUSAND NINE HUNDRED THIRTY-NINE AND 14/100 ($232,939.14) DOLLARS due on the outstanding invoices made subject of this Motion is a liquidated debt capable of ascertainment by mere calculation.  Notably, H&E even acknowledges that its claims is not subject to offset or compensation at this time.[11]

H&E's attempts to dispute the invoices in the course of this litigation are not sufficient under the clear and unambiguous terms of the Agreement which constitutes the law between the parties.  H&E had 15 days from each invoice to dispute the charges

---

[9] *Id.*
[10] *Buck's Run Enterprises, Inc., supra,* at 432.
[11] Pltff. Opp. to Mot. for Summ. Judg. on Reconv. Dmd. At p.14-15.

5

NON-CERTIFIED COPY

and provide reasons therefor. It failed to do this with regard to any of the invoices at issue. Thus, regardless of how many e-mails, affidavits or other documents H&E provides where it allegedly complained about URS's work, it has not availed itself to the payment dispute resolution to which it agreed, and, as such, cannot now dispute these invoices. Accordingly, since H&E admittedly did not pay these invoices, and has provided no evidence of a valid notice of dispute as contemplated in Paragraph 2.1, H&E is clearly liable to URS for the amounts of these unpaid invoices as well as the penalties and attorneys' fees, court costs, and other related expenses provided for under the Agreement.

## CONCLUSION

H&E has failed to present any grounds for the denial of URS's Motion for Summary Judgment relative to its Reconventional Demand. This is because it cannot do so. H&E ceased paying URS's invoices based on a directive from its CEO to withhold payment before any services were rendered and before any of the invoices actually issued. H&E failed to comply with the provisions of the Agreement that mandate prompt notice with reasons of disputed invoice payments, and is thus - under the express terms of the Agreement, which forms the law between the parties - precluded from now challenging these invoices. URS's damages are clearly liquidated since H&E has failed to dispute these invoices in accordance with the Agreement, and is unable to do so now. Thus, arriving at the measure of URS's damage is a mere matter of calculation. Accordingly, based on the foregoing, URS is entitled to summary judgment on its Reconventional Demand since there are no genuine issues of material fact.

6

NON-CERTIFIED COPY

Respectfully submitted,

**ADAMS AND REESE, LLP**

Philip A. Franco (Bar #5819), T.A.
Ronald J. Sholes (Bar # 14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone:    (504) 581-3234
Fax:               (504) 566-0210

*Attorneys for Defendants, URS Corporation*

7

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served

upon all counsel of record via e-mail and/or United States Mail, postage prepaid and

properly addressed, this 8th day of February, 2017.

_____
Kellen J. Mathews

FILED
EAST BATON ROUGE PARISH, LA
2017 FEB -8 PM 1:18

DEPUTY CLERK OF COURT

8

NON-CERTIFIED COPY

COST OK Amt. ✓

FEB - 8 2017

BY_____

DY CLERK OF COURT

19TH JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

CIVIL NO. 626,308                                          DIVISION "D"

H&E EQUIPMENT SERVICES                    **POSTED**

VERSUS

FEB - 8 2017

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION,
L. O'NEAL JOHNSON and THOMAS E. RYAN, III

FILED:_____          _____

DEPUTY CLERK

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III (collectively referenced herein as "Defendants"), file this Reply Memorandum in Support of their Motion for Summary Judgment.

**I.      H&E IS A SOPHISTICATED PARTY AND THEREFORE IS BOUND TO ALL CONTRACT TERMS, INCLUDING THE LIMITATION OF REMEDIES.**

Defendants presented facts that both parties are sophisticated businesses. H&E admits this, so these facts are undisputed.[1]  This concession is critical. H&E did not deny—indeed, did not even respond to—the numerous cases cited by Defendants' in their initial Memorandum explaining that there are two rules that apply to a breach of contract case between two sophisticated parties. Thus, there is no dispute that the following two rules apply to this motion for summary judgment.

First, **H&E is presumed to have known all of the terms of the 2009 contract, including the terms of the limitation of liability, at that time that H&E agreed to the contract**. *Louisiana Nat. Leasing Corp. v. ADF Serv., Inc.*, 377 So. 2d 92, 96 (La. 1979); *Capitol City Leasing Corp. v. Hill*, 394 So. 2d 1264, 1267 (La. App. 1st Cir. 1981) ("one must presume that persons engaged in business are aware of the contents of the agreements they

REC'D C.P.

FEB 10 2017

---

[1] *See* H&E Response to Statement of Disputed Material Facts Submitted in Support of URS's Motion for Summary Judgment, No. 2. Also, in H&E's Memorandum in Opposition, no evidence is cited to disagree that both parties are sophisticated business entities.

REC'D C.P.

1                                                        FEB 0 9 2017

NON-CERTIFIED COPY
EBR3976830

sign"); *Datamatic, Inc. v. Int'l Business Machines Corp.*, 795 F.2d 458, 465 (5th Cir. 1986) ("the buyer's signature is evidence that its terms and conditions were brought to his attention").

Second, **as a sophisticated party to a contract, H&E is bound to all contract terms, including any limitation of remedies** contained in the 2009 contract. "[T]hat they did not avail themselves of the opportunity to carefully read the lease which they signed is not a cause to annul the waiver provision." *Louisiana Nat. Leasing Corp.*, 377 So. 2d at 96; *Copelco Capital, Inc. v. Gautreaux*, No. CIV. A. 99-850, 1999 WL 1034740, at *4 (E.D. La. Nov. 10, 1999) (the law "requires a finding that the waiver is valid under the more stringent Louisiana law, as well as under New Jersey law") "To conclude otherwise would destroy the stability of contracts." *California Union Ins. Co. v. Bechtel Corp.*, 473 So. 2d 861, 866-67 (La. App. 4th Cir. 1985).

## II.    THE LIABILITY LIMITATION IN THE 2009 CONTRACT APPLIES TO ALL THREE PROJECTS.

H&E argues that the 2009 Contract was intended to apply to only a single project (the Kenner project), and even then only to a small part of the total project. This interpretation must be rejected because it would render much of the 2009 Contract meaningless.

H&E admits that the 2009 Contract contains an integration clause in Section 18.1 which provides that the 2009 Contract "supersede[s] all prior written and/or oral contracts and agreements that may have been made or entered into between Client and Consultant regarding the subject matter hereof" and constitutes "the entire agreement between the Parties hereto with respect to the subject matter hereof." There is no dispute that an integration clause is enforceable in Louisiana and "precludes any prior or contemporaneous agreements which are not set forth in the contract." *Driver Pipeline Co. v. Cadeville Gas Storage, LLC*, 49,375, p. 17 (La. App. 2 Cir. 10/1/14), 150 So. 3d 492, 502. *See also Henning Const., Inc. v. First E. Bank & Trust Co.*, 92-0435 (La. App. 4 Cir. 3/15/94), 635 So. 2d 273, 27.

The subject matter of the 2009 Contract is set forth on the first page of the contract. The title states that it is a contract "for professional services between H&E Equipment Services, Inc. and URS Corporation Architecture PC." The subject matter is further explained in the very first section of the document, Section 1.1, where it states that the contract concerns the agreement of URS "to undertake and perform certain consulting and professional engineering services

2

NON-CERTIFIED COPY

('Services') in accordance with the terms and conditions contained herein, as may be requested by [H&E] from time to time" and as "described in one or more authorizations issued to Consultant by Client, the form of which is attached hereto as Attachment I ('Work Authorization')." Section 1.1 makes it clear that the 2009 Contract's scope is not limited to merely a single work authorization, but instead applies to all work authorizations "as may be requested by [H&E] from time to time." Attachment 1 to the 2009 Contract is a work authorization for the Kenner project, but Section 1.1 specifically designates Attachment 1 as a "form." The use of the term "form" can only mean that the 2009 Contract was intended to apply to **multiple** work authorizations similar to Attachment 1, and was not limited to the specific work referenced in Attachment 1 itself.

There is additional language in the contract which also mandates this conclusion. Section 1.2 refers to "each Work Authorization," Section 2.1 refers to "one or more Work Authorizations," Section 2.2 refers to "the applicable Work Authorization," Section 6.1 refers to services performed "under any Work Authorization," Section 10.1 refers to "any Work Authorization," Section 11.1 refers to "the applicable Work Authorization," Section 12.1 refers to "each Work Authorization," Section 13.1 refers to "one or more Work Authorizations," Section 18.1 refers to "any executed Work Authorizations," Section 18.4 refers to "applicable Work Authorizations," and Section 18.10 refers to "any Work Authorization." None of those phrases would make any sense if H&E's interpretation were correct and the 2009 Contract was only intended to apply to a single work authorization between the parties.

Additionally, multiple times throughout the 2009 Contract, the word "a" is used before the phrase "Work Authorization." At no point does the contract ever use the word "the" before the phrase "Work Authorization." Again, the use of the word "a" instead of "the" would make no sense if the 2009 Contract was intended to apply to only the Kenner work authorization and not the other work authorizations between the parties.

H&E goes one step farther by arguing not only should the 2009 Contract be read as if it is limited to the Kenner work authorization, but also that the 2009 Contract should be read as if it applies only to the budgeting portion of the work authorization. The only support cited by H&E is a letter attached to the 2009 Contract which references determining a budget for the total work

3

NON-CERTIFIED COPY

authorization, and then goes on to list all of the work that would be done pursuant to the work authorization.  But nothing in that letter purports to limit the scope of the work authorization to only budgeting, nor does anything in that letter purport to change the language in the 2009 Contract.  Indeed, H&E's overly narrow interpretation would render much of the 2009 Contract meaningless, such as the statements in Sections 1.1 and 4.1 that H&E was to provide engineering services.  For example, Section 4.1 includes a warranty that URS's "professional engineering Services" would be "performed in accordance with that degree of care and skill ordinarily exercised by members of Consultant's profession," a warranty that is meaningless if H&E was not agreeing to do any engineering work.  References to engineering work would be contradicted and would have no meaning if the 2009 Contract was only intended to be a contract for budgeting for the Kenner project.

When there are two possible ways to interpret a contract, and the first interpretation renders meaningless parts of the contract while the second interpretation gives meaning to all of the contract, Louisiana law requires courts to adopt the second interpretation of the contract.  La. C.C. art. 2049 ("A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.").  "A contract provision that is susceptible to different meanings must be interpreted with a meaning that renders the provision effective, and not with one that renders it ineffective." *Amend v. McCabe*, 95-0316, p. 8 (La. 12/1/95), 664 So.2d 1183, 1187.  Thus, contracts must be interpreted in a way "to avoid neutralizing or ignoring" any contract provisions.  *Clovley Oil Co., LLC v. Midstates Petroleum Co., LLC*, 12-2055, p. 6 (La. 3/19/13), 112 So. 3d 187, 192 (quoting *John Bailey Contractor, Inc. v. State, DOTD*, 439 So. 2d 1055, 1058 (La.1983)).

Here, H&E's overly narrow interpretation of the 2009 Contract should be rejected because it is unreasonable.  But the even more obvious reason that H&E's interpretation must be rejected is that it renders part of the 2009 Contract meaningless.  Accepting H&E's interpretation—that the 2009 Contract was only intended to apply to the Kenner work order, and even then just to preparing a budget—would render meaningless the references to multiple work orders in Sections 1.1, 1.2, 2.1, 6.1, 10.1, 11.1, 12.1, 13.1, 18.4 and 18.10 and the references to engineering work in Sections 1.1 and 4.1.  Defendants' interpretation—that the 2009 Contract

4

NON-CERTIFIED COPY

applies to all work orders because it says that it supersedes all prior contracts, including the 2006 Contract—gives meaning to every provision in the contract.

Finally, there are two more reasons to reject the interpretation offered in H&E's Opposition, both of which were argued in Defendants' original Memorandum and both of which H&E ignores because it has no response. First, as Defendants stated before, any argument by H&E that the 2009 Contract only governed the Kenner project would mean that the 2006 Contract remained in effect and continued to govern the Baton Rouge project, but that would render as unnecessary surplusage the language in Section 18.1 of the 2009 Contract saying that it supersedes all prior written contracts. If the 2006 Contract was only for the Baton Rouge project, and if the 2009 Contract was only for the Kenner project, then there would have been no reason for the 2009 Contract to include language saying that it superseded the prior contract. Defendants cited *Lambert v. Maryland Cas. Co.*, 418 So. 2d 553 (La. 1982), in which the Supreme Court said that it was a "cardinal rule in the construction of contracts" that parts of a contract should be interpreted in a way "so as to avoid neutralizing or ignoring any of them or treating them as surplusage." *Id.* at 559. Defendants also cited *Firstar Commc'ns of Louisiana, L.L.P. v. Tele-Publ'g, Inc.*, 00-2219 (La. App. 4 Cir. 8/29/01), 798 So. 2d 1032, a case in which the court specifically rejected a narrow interpretation of 1994 and 1995 contracts because that narrow interpretation would render meaningless the language in a 1995 contract saying that it replaced earlier contracts. *See also* La. C.C. arts. 2049, 2050. H&E has no way to escape from this law, and thus decided to completely ignore all of this law in its Opposition Memorandum.

Second, while there is no reason to go beyond the plain language of the contract itself to reject H&E's arguments, even if one were to consider extrinsic evidence, Defendants pointed out in their original Memorandum that work orders issued for the Belle Chase locations reference the 2009 Contract. These work orders were included in Exhibit C2. If the 2009 Contract were limited to just budgeting the Kenner project as H&E pretends, then the 2009 Contract would not have been referenced in work orders for the Belle Chase project. Moreover, Exhibit C2 contains multiple work orders for the Kenner project, including one for the final design and construction documents for the Kenner location. This too is flatly inconsistent with H&E's suggestion that the 2009 Contract was limited to just budgeting the Kenner project. H&E itself takes the

5

NON-CERTIFIED COPY

position that "the referenced work orders are the best evidence of their contents and terms." H&E Response to Statement of Disputed Material Facts Submitted in Support of URS's Motion for Summary Judgment at 2. This "best evidence" completely disproves H&E's interpretation of the scope of the 2009 Contract.

Given all of this, it is clear that H&E's interpretation must be rejected. Even if H&E had offered a reasonable alternative interpretation of the 2009 Contract—and it has not—Louisiana law requires that Defendants' interpretation be adopted because it is the interpretation that gives effect to all provisions of the 2009 Contract and does not render any part of the 2009 Contract as mere surplusage. La. C.C. art. 2049; La. C.C. art. 2050; *Clovley Oil Co., LLC*, p. 6, 112 So. 3d at 192; *Lambert*, 418 So. 2d at 559. Accordingly, this Court should reject H&E's narrow interpretation and should conclude that the subject matter of the 2009 Contract includes any work authorization between the parties.

## III.    THE LIABILITY LIMITATION IS ENFORCEABLE

H&E next argues that even if the 2009 Contract does apply to all of the work performed, this Court should decline to enforce the liability limitation. Each of H&E's arguments for ignoring this contractual language is flawed under Louisiana law.

### A.    The Liability Limitation Does Not Contradict the Damages Limitation.

H&E first argues that the liability limitations in Sections 4.1 and 4.2 are vague and ambiguous and therefore unenforceable. Notably, H&E does not assert that there is anything vague or ambiguous about the language in those two sections. The language is in bold, capital letters and uses clear language to provide that URS's "sole liability" to H&E is to "re-perform the non-conforming or defective Services...."[2]

Instead, H&E only makes a narrow argument that the language in those two sections should be considered ambiguous because they contradict the damages limitation in Section 9.1. But as noted above, courts reject an interpretation of a contract under which a contractual provision would be contradicted by another part of the contract and thus "neutralized" when

---

[2] 2009 Agreement, Section 4.1 (Exhibit B-2).

6

NON-CERTIFIED COPY

there is another interpretation of the contract which gives effect to each part of the contract. *Clovley Oil Co., LLC*, p. 6, 112 So. 3d at 192.

Here, there is an interpretation of this contract that renders effective all provisions of the 2009 Contract without making it self-contradictory. Sections 4.1 and 4.2 limit H&E's remedy to a request for specific performance. If H&E had demanded re-performance and URS had refused to perform because it denied liability, H&E's remedy would be to sue for re-performance. If URS was unable to re-perform, then H&E could sue for damages, but this claim for damages would be based upon the failure to re-perform, which is the only obligation under the contract. On any such claim for damages, Section 9.1 would apply, limiting any such damages to no more than $250,000 or 10% of the compensation paid under the Work Authorization. Thus, there is no contradiction between Sections 4.1, 4.2 and 9.1, and instead they all work together to limit the total liability of URS.

Defendants believe that this is the only reasonable interpretation of the contract, but even if H&E had presented an alternative reasonable interpretation of the contract, that would not matter. When there are multiple possible readings of a contract, if there is one reading that gives effect to all provisions of the contract, then that is the interpretation that controls and there is no ambiguity in the contract. Accordingly, Sections 4.1 and 4.2 in Article 4 of the 2009 Agreement are enforceable. URS's sole liability to H&E is re-performance of services.

**B.    The Liability Limitation is Not Voided for Failure to Re-Perform After Demand Was Made.**

H&E next argues that even if Sections 4.1 and 4.2 did limit liability to an obligation to re-preform, because URS has not yet re-preformed, those sections of the contract can be ignored. This argument is wrong for two, independent reasons.

First, H&E has never demanded that URS re-perform. H&E cites deposition testimony indicating that the parties discussed problems at the Baton Rouge and Kenner sites, but at no time did H&E ever demand that URS re-perform its engineering services. Instead, H&E has only demanded that URS pay for damages, which URS has not agreed to do because any such relief is barred by Sections 4.1 and 4.2 and because URS disagrees that any designs were

NON-CERTIFIED COPY

defective.  The Petition for Damages in this very case takes the same approach—it seeks a damages judgment, but never once prays for re-performance.

But in any event, even if H&E had demanded re-performance and URS had refused to do so, which is not what happened here, even that would not give H&E the right to sue for damages for the alleged negligence.  H&E cites no law holding that when the contract limits the remedy to re-performance, a plaintiff can instead sue for damages.  As noted above, the only possible claim for damages would be if URS was unable to re-perform, and even then it would be claim for damages because of the failure to re-perform, not a claim for damages because of the alleged negligence.

C.      H&E's Expert Reports Contain No Evidence of Gross Negligence.

H&E next argues that even if the 2009 Agreement applies and is enforceable, it only applies to H&E's negligence claims against Defendants, and H&E can still pursue a gross negligence claim because Civil Code Article 2004 provides that a clause that excludes liability for gross fault is unenforceable.  It is true that a valid gross negligence claim cannot be waived in advance by contract, but that does not help H&E in this case because the discovery phase of this case is over, Plaintiff's expert reports are finished, and there is no part of any expert report provided by Plaintiff which addresses gross negligence.

If there were any evidence of gross negligence in this case, it would have to come from expert testimony.  When a negligence claim is against a professional, the standard of care turns upon the "standards or practices of a profession," and thus "an expert is needed to establish whether the protocols asserted [by the plaintiff] are required by the local standard of care." *Milke v. Ratcliff Animal Hosp., Inc. ex rel. Ratcliff*, 48,130, p. 15 (La. App. 2 Cir. 7/10/13), 120 So. 3d 343, 351.  Accordingly, as the First Circuit has held: "It is well established in Louisiana jurisprudence that expert testimony is needed to establish the lack of care and resulting negligence on the part of architects and engineers." *Charles Carter & Co. v. City of Baton Rouge*, 344 So. 2d 431, 433 (La. App. 1st Cir. 1977).[3]  "Failure to submit expert testimony to

---

[3] The only possible exception is in cases in which the deviation from the standard of care would be obvious to a lay person.  *See, e.g., Milton J. Womack, Inc. v. House of Representatives of State*, 509 So. 2d 62, 66 (La. App. 1st Cir. 1987).  But here, H&E cannot possibly argue that lay persons would already know the care and skill ordinarily exercised by architects and engineers in designing a parking lot for heavy equipment; even Dr. Bailey had to research this issue. *See Carter v. Deitz*, 556 So. 2d 842, 868 (La. App. 4th Cir. 1990) ("Both *Hogan* and *Womack*

NON-CERTIFIED COPY

prove the standard of care is a 'fatal omission.'" *City of Alexandria v. Ratcliffe Const. Co., LLC*, 11-1200, p. 4 (La. App. 3 Cir. 2/8/12), 95 So. 3d 1076, 1079 (quoting *Greenhouse v. C.F. Kenner Associates Ltd. Partnership*, 98–496, p. 5 (La. App. 4 Cir. 11/10/98), 723 So.2d 1004, 1008, and *Carter v. Deitz*, 556 So.2d 842, 843 (La. App. 4th Cir. 1990)).

Additionally, any such expert testimony would have to support a finding of **gross** negligence, and not mere negligence.  The Supreme Court has held that an allegation of gross negligence requires evidence of the "'entire absence of care' and the 'utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others.'" *Ambrose v. New Orleans Police Dept. Ambulance Serv.*, 93-3099, p. 5 (La. 7/5/94), 639 So. 2d 216, 219-20, quoting W. Page Keeton, et al, *Prosser & Keeton on the Law of Torts*, § 34, at 211 (5th ed. 1984).  "Gross negligence has been defined as the 'want of even slight care and diligence' and the "want of that diligence which even careless men are accustomed to exercise.'" *Id.*, quoting *State v. Vinzant*, 200 La. 301, 7 So. 2d 917 (La. 1942).

Here, the duty owed by URS to H&E is set forth in the contract itself, and it is the care and skill ordinarily exercised by architects and engineers in designing a parking lot for heavy equipment.  Section 4.1 of the 2009 Contract provides:  "[URS] warrants that any consulting and professional engineering Services performed by it under a Work Authorization shall be performed in accordance with that degree of care and skill ordinarily exercised by members of [URS's] profession practicing at the same time in the same location."  To show gross negligence, H&E would need to first present evidence of the care and skill ordinarily exercised by architects and engineers in this same location in designing a parking lot for heavy equipment, and then would have to present evidence of such gross departure from that standard of care that there was an "entire absence of care," and that URS's actions were below even that of a "careless" architect or engineer. *Ambrose*, p. 5, 639 So. 2d at 219-20.

H&E asserts in its Opposition that there is evidence of gross negligence, and cites expert reports from its two expert witnesses: Wallace Drennan and Dr. James Bailey.  H&E Opp. at 18

---

involve an exception to the rule requiring expert testimony to prove an engineer's professional negligence where the negligence is an obvious act.  Whether an engineer has rendered his professional judgment unskillfully is not an obvious act of negligence such as when the *Hogan* defendant drilled a well on the wrong site.  And it is not the sort of commission or omission from which a layman could readily infer professional negligence without the testimony of an expert witness").

NON-CERTIFIED COPY

n.124.  Pursuant to La. C.C.P. art. 966(D)(2), Defendants object to the consideration of these expert reports as evidence of gross negligence.  Defendants object to the expert report of Mr. Drennan because, as just noted, Section 4.1 of the 2009 Contract says that the duty of care can only be established by members of URS's profession.  Mr. Drennan is neither an engineer nor even an architect, and instead is merely a general contractor.  Defendants also object to the expert report of Dr. Bailey because Section 4.1 also says that the duty of care must be of those members of the profession practicing in the same location.  Dr. Bailey is an engineer in Houston and does not practice in Southern Louisiana.

In the alternative, even if these two expert reports could be considered, neither expert report contains any assertion of *gross* deviation from any standard of care.  An expert report must contain "a complete statement of all opinions to be expressed" by the expert witness.  La. C.C.P. art. 1425(B).  Because there is no assertion of gross negligence in the expert reports and the reports contain all opinions to be expressed, there can be no new opinions of gross negligence at trial.

Instead of alleging gross negligence, Mr. Drennan's report merely asserts negligence, such as using 6" or 7" concrete in some areas where he believes that 8" concrete should have been used.[4]  There is not a single allegation that this, or any other, discrepancy constitutes an "entire absence of care," or that URS's actions were below even that of a "careless" engineer, as is required by Louisiana law.

Similarly, Dr. Bailey candidly admitted that he had to research the applicable standard in the profession and that he was unable to identify any specification in the United States for the design of concrete surfaces under heavy-tracked equipment.[5]  Thus, he does not provide an opinion on the care and skill ordinarily exercised by architects and engineers in designing a parking lot for heavy equipment.  Moreover, even as to his suggestion that the general standards of the American Concrete Institute could be looked to by analogy and his opinion that therefore the concrete should have been 8 inches thick,[6] at no point does he provide an opinion that the use

---

[4] Report of Wallace Drennan dated July 28, 2016, attached to Drennan's deposition (attached as Exhibit D1); *see also* Drennan Depo. at 185-86.
[5] Deposition of Dr. James Bailey dated Sept. 22, 2016 at 23, 106-07 (Exhibit E); *see also* Expert Report of Dr. Bailey at 6 (attached as Exhibit E1).
[6] Dr. Bailey's Expert Report at 9-13; Dr. Baily Depo. at 74-81, 117-20.

NON-CERTIFIED COPY

of a different thickness in some parts of the parking lot, or any of the other actions of URS, show an "entire absence of care," or that URS's actions were below even that of a "careless" engineer.

In H&E's opposition, even H&E cannot point to any evidence of gross negligence in either report. Instead, H&E says that its experts assert that the damage "was foreseeable" and that URS's design "deviates from the standard of care in many respects." H&E Opp. at 18. That is a textbook negligence claim. It is not gross negligence.

This case is similar to *Conmaco/Rector L.P. v. L&A Contracting Co.*, No. 12-2337 (E.D. La. 10/30/13), 2013 WL 5881576. In that case, there was a lease agreement between two companies which included a waiver of damages. The court noted that "[u]nder Louisiana law, parties may contract to limit or waive recoverable damages." *Id.* at *3. The court found that the wavier in the lease was enforceable because "the equipment lease in this matter was between two commercial actors," citing the Louisiana Supreme Court's *Louisiana Nat. Leasing Corp.* decision, *supra*. *Id.* at *4. The court also noted that the waivers were underlined and in capital letters. *Id.* The court next rejected the argument that the waiver did not apply because of gross negligence. The court noted that gross negligence is nearly equal to fraud and "[a]t most, L&A alleges Conmaco should have known of the defect in the Hammer. Such garden-variety negligence claims clearly do not rise to the high level of fault contemplated by article 2004." *Id.* at *5. "Accordingly, the Court finds that the waiver of damages is valid and enforceable." *Id.*

Thus, H&E has no expert evidence of gross negligence as to the Baton Rouge and Kenner projects. And H&E's experts do not even discuss the Belle Chase project, where H&E simply alleges deficiencies in the site elevation and roof misalignment. Summary judgment is warranted because discovery is finished in this case and the expert reports are finished, H&E has the burden or presenting expert testimony to support gross negligence, but the expert reports provide no such testimony. *See* La. C.C.P.. art. 966(D)(1) (summary judgment is required when a defendant can "point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense.").

**D.    The Limitation of Liability Does Not Violate Public Policy**

In *Lombardo v. Deshotel*, 94-1172, p. 6 (La. 11/30/94), 647 So.2d 1086, 1090 the Supreme Court stated, citing Civil Code Article 2012: "Stipulated damages may not be modified

11

NON-CERTIFIED COPY

by the court unless they are so manifestly unreasonable as to be contrary to public policy." H&E cites that statement and says that the liability limitation in this case should be ignored because unreasonable stipulated damages provisions may be set aside as a matter of public policy.

Sections 4.1 and 4.2 of the 2009 Contract do not contain a stipulated damages provision. There is no statement determining the amount of damages. To the contrary, Sections 4.1 and 4.2 of the 2009 Contract limit damages to re-performance, a remedy that entails no award of any damages. As *Lombardo* explained, a stipulated damages provision is an agreement by the parties, in advance of performance, of the amount to be awarded as damages. *Id.*, citing La. C.C. art. 2005. *See, e.g., Hussain v. Khan*, 14-0065, p. 5 (La. App. 5 Cir. 5/21/14), 142 So. 3d 281, 283 ("A stipulated damages clause is designed to fix the measure of damages in advance and to help ease the burden of proving loss with certainty, and therefore no showing of pecuniary or other actual damage is required to enforce the clause."). Thus, H&E's public policy argument does not apply to Sections 4.1 and 4.2 of the 2009 Contract. Indeed, a remedy of specific performance is favored by the law. "For breach of contract, specific performance is the preferred remedy." *Olympia Minerals, LLC v. HS Res., Inc.*, 13-2637, p. 37 (La. 10/15/14), 171 So. 3d 878, 901. Moreover, courts have held that it is "well settled in our jurisprudence that limitation of liability clauses" are "valid and not against public policy." *Bonfiglio v. Bellsouth Advert. & Pub. Corp.*, 619 So.2d 135, 136 (La. App. 1st Cir. 1993).

Section 9.1's provision that damages are limited to $250,000 or 10% of the compensation paid under the Work Authorization could be considered a form of stipulated damages. But damages limitations between sophisticated parties are enforceable. Defendants cited as an example in their original brief the case *City of Shreveport v. SGB Architects, L.L.P.*, 45,458 (La. App. 2 Cir. 9/22/10), 47 So.3d 1105. H&E argues that this case is distinguishable because it involved a "contract with a subcontractor, not a contract for professional services with a client." H&E Opp. at 19. But H&E doesn't even attempt to explain why that distinction matters. The point is that these were sophisticated companies in a contractual relationship—indeed, companies in an architecture and construction context, similar to this case—in which the court ruled that a $50,000 liability limitation was enforceable.

12

NON-CERTIFIED COPY

Moreover, H&E never articulates an argument as to why the specific limitation here is against public policy, other than H&E's assertion that actual damages will be in excess of $250,000. But sophisticated parties to a contract will sometimes come to regret a provision that has proven costly to them. And yet the provision is still enforceable. "Parties may not repudiate a contract because it is uneconomic or imprudent." *Med. Adjustment Bureau, Inc. v. Garrett*, 420 So. 2d 223, 225 (La. App. 3d Cir. 1982). "Louisiana courts have a tradition of deferring to the parties' stipulations on damages where the contract is freely negotiated, **regardless of whether they approximate actual damages suffered**." *Am. Totalisator Co., Inc. v. Fair Grounds Corp.*, 3 F.3d 810, 815 (5th Cir. 1993). *See also Maloney v. Oak Builders, Inc.*, 256 La. 85, 97, 235 So.2d 386, 390 (1970) ("It is a fixed rule of law that where the parties have the capacity to stipulate for liquidated damages, and when agreed upon, courts will not inquire whether the actual damage suffered equaled or approximated the agreed amount."). As the Supreme Court has explained: "Courts are not created to relieve men of their bad bargains made." *Leenerts Farms, Inc. v. Rogers*, 421 So. 2d 216, 218 (La.1982).

H&E has not come close to meeting its burden of proving that the limitations on damages in the 2009 Contract are so manifestly unreasonably that they must be found to be in violation of public policy and therefore void. To the contrary, courts have routinely enforced contractual provisions between sophisticated parties, including liability limitations.

## IV.    CONCLUSION

The 2009 Contract was intended to apply to multiple work orders, not just the Kenner work order. All of the 2009 Contract is enforceable because the contract is between sophisticated business entities. Thus, H&E's only remedy was to seek re-performance, and because H&E does not seek that remedy in this case, this Court should grant the motion for summary judgment and dismiss all of H&E's claims.

NON-CERTIFIED COPY

Respectfully submitted,

**ADAMS AND REESE LLP**

Philip A. Franco (#5819)
Ron Sholes (#14436)
Kellen J. Matthews (#31860)
701 Poydras Street, Suite 4500
New Orleans, LA 70139
Tel:  (504) 581-3234
Fax: (504) 566-0210

*Attorneys for Defendants URS Corporation*
*Architecture, P.C., URS Corporation, L.*
*O'Neal Johnson and Thomas E. Ryan, III*



FILED
2017 FEB -8  PM 1: 19
DEPUTY CLERK OF COURT

14

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served on all counsel of record by electronic mail and/or U.S. Mail, postage prepaid and properly addressed, this ___8th___ day of February, 2017.

Kellen J. Mathews

FILED
2017 FEB -8 PM 1:19
DEPUTY CLERK OF COURT

15

NON-CERTIFIED COPY

**FishmanHaygood**

Fishman Haygood LLP
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170
fishmanhaygood.com

LORETTA MINCE
(504) 586-5273
LMINCE@FISHMANHAYGOOD.COM

March 20, 2017

File No. 3107-04

**POSTED**

_Via_ **Federal Express**

MAR 2 1 2017

Clerk of Court
19th JDC, Parish of East Baton Rouge
300 North Boulevard
Baton Rouge, Louisiana  70802

Re:     _H&E Equipment Services, Inc. v URS Corporation Architecture, P.C., et al_
        Docket No. 626308, Sec. "D"

Dear Ms. Welborn:

Please find enclosed a Judgment in conformity with the Court's ruling and March 9, 2017 minute entry on the Motion for Summary Judgment and a Rule 9.5 Certificate on behalf of Plaintiff, H&E Equipment Services, Inc.   Also enclosed is a letter from Defendants, URS Corporation Architecture, P.C., et. al. stating their objections to Plaintiff's proposed judgment and enclosing an alternative judgment.

Respectfully,

Loretta Mince

LGM/dob
Enclosures
cc:     Phil Franco (w/encs.) (via email)
        Kellen Matthews (w/encs.) (via email)

1173246v.1

NON-CERTIFIED COPY



ADAMS AND REESE LLP

Attorneys at Law
Alabama
Florida
Louisiana
Mississippi
South Carolina
Tennessee
Texas
Washington, DC

Kellen J. Mathews
Direct: 225.378.3243
E-Fax: 225.336.5115
kellen.mathews@arlaw.com

March 16, 2017

*VIA U.S. MAIL & EMAIL:* lmince@fishmanhaygood.com

Lori Mince
Fishman Haygood, LLP
201 St. Charles Avenue, Suite 4600
New Orleans LA 70170

Re:     *H&E Equipment Services, Inc. v. URS Corporation Architecture, PC,
        et al.* No. 626,308, Div. D, 19th Judicial District Court
        Our File No.: 23067-1

Dear Lori:

We are in receipt of your proposed Judgment, and we oppose the submission of the same. H&E's proposed Judgment should not be submitted because it is inconsistent with the Court's March 9, 2017 minute entry. Specifically, the Court stated: "The Court finds that the 2009 Agreement applies only to the Kenner Project." H&E's proposed judgment would deny the motion for summary judgment even as to the Kenner Project, which is the exact opposite of what the Court ruled. To be consistent with the minute entry, the Judgment should instead state that the motion for summary judgment is granted in part and denied in part, and that more specifically it is granted as to the Kenner Project and it is denied as to the Baton Rouge Project and the Belle Chasse Project.

We have attached an alternative proposed Judgment which is consistent with the minute entry, and ask that you please submit this proposed Judgment to the Court at the same time that you submit H&E's proposed Judgment along with an indication in the Rule 9.5 Certificate that Defendants object to H&E's proposed Judgment for the reasons set forth in this letter.

Please do not hesitate to contact us should you have any questions.

Respectfully submitted,
ADAMS AND REESE LLP

By:
Philip A. Franco
Ronald J. Sholes
Kellen J. Mathews

REC'D C.P.

APR 1 2 2017


EBR4032140

450 Laurel Street, Suite 1900 | Baton Rouge, Louisiana 70801 | 225.336.5200 | Fax 225.336.5220
www.adamsandreese.com

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                         SECTION: "D"

H&E EQUIPMENT SERVICES, INC                    COST OK $ _____

VERSUS                                                      MAR 21 2017

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL     DEPUTY CLERK OF COURT
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____          _____
                                                    DEPUTY CLERK

## JUDGMENT ON MOTION FOR SUMMARY JUDGMENT

This matter came on for hearing on 13th of February 2017 on Defendants' Motion for

Summary Judgment. Present in Court were:

Ronald J. Sholes, Philip A. Franco, and Kellen J. Mathews
Attorneys for Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal
Johnson, and Thomas E. Ryan, III

Loretta G. Mince and Brent B. Barriere
Attorneys for Plaintiff H&E Equipment Services, Inc.

Considering the pleadings and the argument of counsel, **IT IS ORDERED,**

**ADJUDGED, AND DECREED**, that the Motion for Summary Judgment filed by Defendants

URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E.

Ryan, III is **DENIED** for the reasons stated in the Court's March 9, 2017 Minute Entry.

**IT IS FURTHER ORDERED** that any application for supervisory writs from this

judgment shall be filed with the First Circuit Court of Appeal within five (5) days from the

notice of the signing of this Judgment pursuant to Louisiana Code of Civil Procedure article

1914.

Baton Rouge, Louisiana this _____ day of _____ 2017.



_____
JUDGE-19th Judicial District Court
The Honorable Janice Clark

EBR4032139

1171809v.1

1

NON-CERTIFIED COPY

## **RULE 9.5 CERTIFICATE**

I certify that I circulated this proposed judgment to counsel for defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III by electronic mail on March 15, 2017. As set forth in the attached correspondence, counsel for defendants objects to the form of the judgment and has requested the submission of an alternative proposed judgment.

_____
Loretta G. Mince



1171809v.1

NON-CERTIFIED COPY

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308       DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | PARISH OF EAST BATON ROUGE |
| | * | |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA |
| CORPORATION, L. O'NEAL | * | |
| JOHNSON AND THOMAS E. | * | |
| RYAN, III | * | |

COST BK $ _____

APR – 6 2017

DEPUTY CLERK OF COURT

## DEFENDANTS' NOTICE OF INTENT TO SEEK SUPERVISORY WRIT

TO:    Honorable Janice G. Clark
       District Judge, 19th Judicial District Court
       Parish of East Baton Rouge
       300 North Boulevard
       Baton Rouge, LA  70802

       H&E Equipment Services, Inc.
       Through its Counsel of Record
       Brent B. Barriere
       Loretta G. Mince
       Rebecca Sha
       Fishman Haygood LLP
       201 St. Charles Avenue – 46th Floor
       New Orleans, LA 70170

       Pursuant to Rule 4-2 of the Uniform Rules of Louisiana Courts of Appeal,

defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson

and Thomas E. Ryan, III (collectively referenced herein as "Defendants"), hereby give

notice of their intention to apply to the Court of Appeal, First Circuit, for a supervisory

writ seeking partial review of this Court's March 9, 2017 minute entry, notice of which

was provided to the parties via a March 10, 2017 e-mail, and this Court's April 5, 2017

Judgment, to the extent that it denied Defendants' Motion for Summary Judgment and

EBR4065289

REC'D C.P.

APR 1 1 2017

1

NON-CERTIFIED COPY

found that the 2009 Agreement for Professional Services between H&E and URS Corporation applies only to the Kenner Project.

In accordance with La. Ct. App. Unif. R. 4-3, Defendants request that this Court set a return date of April 10, 2017 by which the application is to be filed in the Court of Appeal.

April 6, 2017.

Respectfully submitted,

ADAMS AND REESE LLP

Philip A. Franco (#5819)
Ron Sholes (#14436)
Kellen J. Mathews (#31860)
701 Poydras Street, Suite 4500
New Orleans, LA 70139
Tel:  (504) 581-3234
Fax: (504) 566-0210

*Attorneys for Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III*



2

NON-CERTIFIED COPY

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the above and foregoing pleading has been served on all counsel of record by electronic mail and/or U.S. Mail, postage prepaid and properly addressed, this 6th day of April, 2017.



_____

Kellen J. Mathews

3

NON-CERTIFIED COPY

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308   DIV.: D |
| | * | |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| | * | |
| URS CORPORATION | * | PARISH OF EAST BATON ROUGE |
| ARCHITECTURE, P.C., URS | * | |
| CORPORATION, L. O'NEAL | * | STATE OF LOUISIANA |
| JOHNSON AND THOMAS E. | * | |
| RYAN, III | * | |

## ORDER

Considering the Notice of Intent to Seek a Supervisory Writ filed on behalf of defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III, this Court hereby sets a return date of April 10, 2017, by which the application for a supervisory writ is to be filed in the Court of Appeal.

Baton Rouge, Louisiana, April 7, 2017.

_____
Hon. Janice Clark
Judge, 19th JDC

I hereby certify that on this day a notice of the
above judgement was mailed by me, with sufficient
postage affixed, to: Chatwood, Franco, Wittmann,
Rutty, Nance,
Done and signed on _____4-10-17_____

Laperouse,
Carlisle,                    _____
Mathews, Sha                 Deputy Clerk of Court

2017 APR -6 PM 12: 13

1

NON-CERTIFIED COPY



POSTED

APR 1 0 2017

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                         SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____        _____

                                                    DEPUTY CLERK

## JUDGMENT ON MOTION FOR SUMMARY JUDGMENT

This matter came on for hearing on 13th of February 2017 on Defendants' Motion for

Summary Judgment. Present in Court were:

Ronald J. Sholes, Philip A. Franco, and Kellen J. Mathews
Attorneys for Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal
Johnson, and Thomas E. Ryan, III

Loretta G. Mince and Brent B. Barriere
Attorneys for Plaintiff H&E Equipment Services, Inc.

Considering the pleadings and the argument of counsel, **IT IS ORDERED,**

**ADJUDGED, AND DECREED,** that the Motion for Summary Judgment filed by Defendants

URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan,

III is **GRANTED IN PART AND DENIED IN PART**. The 2009 Agreement applies only to

the Kenner Project and thus summary judgment is granted only as to the Kenner Project.

Summary Judgment is denied as to the Baton Rouge and Belle Chasse Projects.

**IT IS FURTHER ORDERED** that any application for supervisory writs from this

judgment shall be filed with the First Circuit Court of Appeal within five (5) days from the notice

of the signing of this Judgment pursuant to Louisiana Code of Civil Procedure article 1914.

Baton Rouge, Louisiana, this __5__ day of __April__, 2017

_____
JUDGE – 19th Judicial District Court
The Honorable Janice Clark

I hereby certify that on this day a notice of the
above judgement was mailed by me, with sufficient
postage affixed, to: *Matthews, Chestwood, Franco,*

Done and signed on __4-6-17__

*Wittman, Kurtz*
*Mince, Lapeyrouse,*
*Carlisle, Sea*           _____
                          Deputy Clerk of Court

REC'D C.P.

APR 1 2 2017

FILED

MAR 2 1 2017

DEPUTY CLERK OF COURT

EBR4036110

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT

THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NUMBER: 626308    DIV. D

H + E

VERSUS

URS

POSTED

## JURY ORDER

CONSIDERING the above and foregoing application, in accordance with LSA-R.S.13:3049, LSA-C.C.P. 1734 and LSA-C.C.P. 1734.1:

IT IS ORDERED that movers for the jury trial deposit an amount of $150.00 cash as "Juror filing fees" and $2,000.00 cash for the first day and $400.00 cash for each day the trial is estimated to last, for a minimum four (4) day jury trial.

IT IS FURTHER ORDERED that said cash deposits shall be deposited with the Clerk of Court no later than 30 days prior to trial. The receipt for the deposit shall be presented to the Court immediately thereafter. If the deposit is not timely made, any other party shall have an additional ten (10) days to make the required deposit. Failure to post cash deposits shall constitute a waiver of a trial by jury.

Baton Rouge, Louisiana, this 24 day of May, 2017.

REC'D C.P.
MAY 30 2017

Janice Clark
JUDGE JANICE CLARK

FILED
MAY 2 4 2017
DEPUTY CLERK OF COURT

EBR4081816

NON-CERTIFIED COPY

**FishmanHaygood**

Fishman Haygood LLP
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170
fishmanhaygood.com

REBECCA SHA
ASSOCIATE
(504) 556-5530
RSHA@FISHMANHAYGOOD.COM

June 7, 2017

POSTED
JUN 09 2017

File No. 3107-04

_**VIA FEDERAL EXPRESS**_

The Honorable Doug Welborn
Clerk of Court, 19th JDC
300 North Blvd.
Baton Rouge, Louisiana 70801

Re:  _H&E Equipment Services, Inc. v URS Corporation Architecture, P.C., et al_
Docket No. 626308, Sec. "D"

Dear Mr. Welborn:

Please issue _trial subpoenas_ on behalf of H&E Equipment Services through undersigned counsel for the following two witnesses to appear for a trial commencing on August 16, 2017 at 9:30 a.m. at 19th Judicial District Court, Parish of East Baton Rouge, 222 St. Louis Street, Judge Janice Clark, Division D, Room 10A, Baton Rouge, LA  70802:

1.  Timothy Gaines
    1140 Fairwinds Avenue
    Zachary, LA  70791

2.  Murray McCullough
    17622 Gray Moss Avenue
    Baton Rouge, LA  70817

Enclosed is our check in the amount of $242.00 for the issuance and service of the trial subpoenas by the sheriff.  Please feel free to call me should you have any questions.

Sincerely,

Rebecca Sha

REC'D C.P.
JUN 09 2017

RS/dob
Enclosures
cc:  Lori Mince (via email)
     Brent Barriere (via email)
     Alysson Mills (via email)

1194505v.1

NON-CERTIFIED COPY

POSTED

JUN 12 2017

MC

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308     DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA   COST OK $ ____✓____ |
| CORPORATION, L. O'NEAL | | |
| JOHNSON AND THOMAS E. RYAN, | | JUN 12 2017 |
| III | | _____ |
| | | DEPUTY CLERK OF COURT |

---

### MOTION TO CONTINUE TRIAL AND INCORPORATED
### MEMORANDUM IN SUPPORT WITH REQUEST FOR EXPEDITED HEARING

---

**NOW INTO COURT,** through undersigned counsel, come URS CORPORATION ARCHITECTURE, P.C. ("URS Architecture"), URS CORPORATION ("URS Corporation"), L. O'NEAL JOHNSON ("Johnson") AND THOMAS E. RYAN, III, ("Ryan") (all collectively referred to hereinafter as "Defendants"), who respectfully move this Honorable Court to continue the jury trial of this matter recently set to begin on August 16, 2017 for the reasons that follow. Given the approaching trial date, Defendants ask that this motion be set for hearing on an expedited basis.

Defendants' lead trial counsel, Philip A. Franco, has a previously set trial in the 18th Judicial District Court beginning on August 15, 2017 in *Entergy Louisiana, LLC v. Josephine Lapeze Davis as the succession representative for the Succession of Josephine R. Lapeze, Canova Properties, L.L.C., and Robert Breaux*, 18th Judicial District Court, No. 76-690, Division "C". Mr. Franco is also lead trial counsel in this expropriation proceeding which has been set for trial on an expedited basis. The expropriation proceeding is scheduled for four days.

Additionally, on October 27, 2016, Defendants filed a Motion for Protective Order seeking to prohibit the use of ground penetrating radar testing ("GPR testing")

REC'D C.P.

JUN 12 2017.

1

REC'D C.P.

JUN 23 2017

NON-CERTIFIED COPY

EBR4062957

on the two sites at issue conducted by Plaintiff after all applicable deadlines ordered by the Court had passed and after all expert opinions and reports were prepared and expert depositions had been taken.  The use of GPR testing could require essentially restarting this case by necessitating Defendants to retain new experts concerning the reliability of GPR testing as well as new expert opinions from existing experts. The motion was orally argued before the Court on February 13, 2017, but the Court has not yet ruled on the motion for protective order or determined how to allow Defendants to adequately defend such testing if allowed to be used at trial.

Finally, on April 7, 2017, Defendants filed an Application for Supervisory Writ with the First Circuit Court of Appeal, No. 2017-CW-0476, seeking review of the legal issues associated with the application of the contracts at issue in this matter. Disposition by that court could be dispositive of legal issues in this case that would eventually obviate the need for trial, and Defendants request the trial be continued to a date to allow the First Circuit Court of Appeal to rule on the pending writ application.

Undersigned counsel attempted to contact counsel for H&E Equipment Services to obtain consent to this motion but has not received a response as of the time of filing.

WHEREFORE, Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III,   respectfully request that this Honorable Court set this motion for hearing on an expedited basis, grant their Motion to Continue Trial and issue a Supplemental Scheduling Order for the remaining pretrial

NON-CERTIFIED COPY

procedure and setting a trial date in coordination with counsel for the parties.

Respectfully submitted,

**ADAMS AND REESE, LLP**

_____
Philip A. Franco (Bar #5819), TA
Ron Sholes (Bar # 14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,**
**URS Corporation Architecture, P.C.;**
**URS Corporation; L. O'Neal Johnson**
**and Thomas E. Ryan, III**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served

upon all counsel of record via e-mail and/or United States Mail, postage prepaid and

properly addressed, this 9th day of June, 2017.

_____
Philip A. Franco

2017 JUN 12  PH 12: 30
DEPUTY CLERK OF COURT

3

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308      DIV.: D |
|---|---|---|
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | PARISH OF EAST BATON ROUGE |
| | * | |
| URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON AND THOMAS E. RYAN, III | * | STATE OF LOUISIANA |

## RULE TO SHOW CAUSE

Considering the foregoing Motion to Continue Trial with Request for Expedited Hearing filed by Defendants, URS Corporation Architecture, P. C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III (collectively referred to as "Defendants"):

**IT IS HEREBY ORDERED** that Plaintiff, H&E Equipment Services, Inc., appear and show cause, if any, on the _6_ day of _July_, 2017 at _9:30_ a.m./p.m. why Defendants' Motion Continue Trial should not be granted.

**THUS DONE AND SIGNED** in Baton Rouge, Louisiana, this _15_ day of _June_, 2017.

_Janice Clark_

HONORABLE JANICE CLARK, JUDGE
19th Judicial District Court

**PLEASE SERVE:**

H&E EQUIPMENT SERVICES, INC.
Through its Counsel of Record
Brent Barriere
Loretta G. Mince
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170

2017 JUN 12  PM 12: 30

DEPUTY CLERK OF COURT

4

NON-CERTIFIED COPY

6801-17-001611

# CIVIL SUBPOENA

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**NUMBER**    C626308 Division D

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

**TO:    MURRAY MCCULLOUGH
17622 GRAY MOSS AVE.
BATON ROUGE, LA.  70817**

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on , at  o'clock **,**
Courtroom No. , Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of
your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **REBECCA SHA**,
Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT
TO PENALTIES.

Ordered by the Court on **13-JUN-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn/Clerk of Court**

---

### SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served
on the above named party as follows:

**PERSONAL SERVICE:**  On the party herein named at _____.

**DOMICILIARY SERVICE:**  On the within named _____, by leaving the same at his domicile
in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at
_____.

**DUE AND DILIGENT:**   After diligent search and inquiry, was unable to find the within named _____ or
his domicile, or anyone legally authorized to represent him.

**RETURNED:**  Parish of East Baton Rouge, this _____ day of _____, 20_____.

SERVICE:        $_____
MILEAGE       $_____              _____
TOTAL:          $_____                        Deputy Sheriff

EBR4177341

NON-CERTIFIED COPY

6801-17-001611

# CIVIL SUBPOENA

H&E EQUIPMENT SERVICES INC
(Plaintiff)

vs.

URS CORPORATION ARCHITECTURE PC
ET AL
(Defendant)

NUMBER    C626308 Division D

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

TO:    MURRAY MCCULLOUGH
       17622 GRAY MOSS AVE.
       BATON ROUGE, LA.  70817

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on AUGUST 16, 2017, at 9:30 o'clock AM, Courtroom No. 10-A, Judge JANICE CLARK.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination. (Ordered by REBECCA SHA, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on 13 JUN 2017, Baton Rouge, Louisiana.

_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

## SERVICE INFORMATION:

Received on the _____ day of _____ 20____ and on the _____ day of _____, 20____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____; a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:** After diligent search and inquiry was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of East Baton Rouge, this _____ day of _____ 20____.

SERVICE:   $_____
MILEAGE    $_____          _____
TOTAL:     $_____                   Deputy Sheriff

NON CERTIFIED COPY

EBR4177341

6801-17-001610

# CIVIL SUBPOENA

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**NUMBER    C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

TO:    **TIMOTHY GAINES
1140 FAIRWINDS AVE.
BATON ROUGE, LA.  70791**

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM,** Courtroom No. **10-A,** Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **REBECCA SHA**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **13-JUN-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

## SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:**  On the party herein named at _____.

**DOMICILIARY SERVICE:**  On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**   After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:**  Parish of East Baton Rouge, this _____ day of _____, 20_____.

SERVICE:      $_____
MILEAGE     $_____                    _____
TOTAL:        $_____                              Deputy Sheriff

EBR4177339

NON-CERTIFIED COPY

*Failure Analysis Associates*

# E*x*ponent®

## Investigation of Damaged Concrete Pavements at H&E Equipment Facilities

EBR4104861

Exhibit A

NON-CERTIFIED COPY

# Investigation of Damaged Concrete Pavements at H&E Equipment Facilities

Prepared for

Loretta G. Mince, Esq.
Fishman Haygood, L.L.P.
201 St. Charles Avenue
46th Floor
New Orleans, Louisiana 70170

Prepared by

James R. (Bob) Bailey, Ph.D., P.E.
Senior Managing Engineer
Exponent, Inc.
10850 Richmond Avenue, Suite 175
Houston, Texas 77042
Louisiana Firm No. EF.0003375

July 29, 2016

© Exponent, Inc.



1306663.001 7845

Exhibit A

NON-CERTIFIED COPY

# Contents

                                                                        Page

List of Figures                                                           ii

Executive Summary                                                          1

Limitations                                                                2

Introduction                                                               3

Background                                                                 4

Discussion                                                                 5

   Pavement Surface Condition                              5

   Pavement Design Features                                 7

   Baton Rouge Site                                         8

   Kenner Site                                             10

Remedies                                                                  14

   Pavement Surface                                        14

   Pavement Design                                         15

Findings                                                                  16


Appendix A    Curriculum Vita of James R. Bailey, Ph.D., P.E.            29

Appendix B    Documents Reviewed                                         37

Exhibit A

NON-CERTIFIED COPY

# List of Figures

Page

Figure 1.  Various Perspectives of Baton Rouge Site                                      17

Figure 2.  Various Perspectives of Kenner Site                                           18

Figure 3.  Concrete Pavement at Baton Rouge Site                                         19

Figure 4.  Concrete Pavement at Kenner Site                                              22

Figure 5.  Pavement Details and Note for Baton Rouge Site                                25

Figure 6.  Designated Area for Heavy Duty Pavement at Baton Rouge Site                   26

Figure 7.  Dowel Sizing and Spacing Requirements                                         27

Figure 8.  Pavement Details and Note for Kenner Site                                      28

1306663.001 7845

ii

Exhibit A

NON-CERTIFIED COPY

# Executive Summary

Fishman Haygood, L.L.P., on behalf of the plaintiff, retained Dr. James R. Bailey, Ph.D., P.E., of Exponent, Inc., to evaluate the cause of damage to concrete pavements at two separate facilities operated by H+E Equipment. The two facilities are located in Louisiana, one facility in Baton Rouge and the other facility in Kenner (near New Orleans). URS Architects Engineers Planners designed the pavements. My scope of work included on-site surveys, review of architectural and engineering drawings, review of photos taken of the subject property, review of emails and other produced documents, engineering analyses, and preparation of this report which summarizes my findings.

I am the Project Manager. I am a licensed Professional Engineer in nine states and a Fellow of the American Society of Civil Engineers. As a Senior Managing Engineer in Exponent's Building & Structures practice, I have expertise in several areas of Civil Engineering, including construction materials, structural analysis and design, and materials testing. My Curriculum Vitae, including my recent testifying experience and my billing rate, is provided in Appendix A. A list of the documents reviewed by me is provided in Appendix B. My findings presented herein are made to a reasonable degree of engineering certainty.

Surface degradation of the concrete pavements is widespread and increasing at both sites. Large cracks have formed beyond the joints, an indication of improper sizing and/or placement of steel reinforcement. Repairs including replacement of the existing pavements will be necessary to allow for extensive use of heavy equipment over these paved areas during the 20-year design life without inducing the same level and extent of damage.

My current understanding is that H+E Equipment clearly communicated to URS the type of equipment that would travel across the pavements. Moreover, representatives of URS reportedly visited two H+E Equipment sites in Louisiana and one site in Houston. According to H+E Equipment during these site visits URS viewed the equipment, including the heavy metal tracked equipment. The pavements as currently designed and constructed are not adequate to perform for their intended use as required by H+E Equipment. In my opinion URS did not exhibit the appropriate standard of care when designing the concrete pavements constructed at the two sites in accordance with applicable specifications, standards, and guidelines.

Methods are available to extend the life of concrete pavements and joints. These methods include the application of specialty aggregate toppings; increasing the design compressive strength; increasing the pavement thickness; increasing the dowel bar sizes; properly spacing dowel bars; and installing metal edge guards along the expansion joints.

Exhibit A

NON-CERTIFIED COPY

# Limitations

This report has been prepared to address evaluation of concrete pavement damage at the subject properties. Exponent's investigation focused on determination of causation mechanisms for physical damages at the exterior concrete paved areas. The scope of services performed during this investigation may not adequately address the needs of other users, and any re-use of this report or the findings, conclusions, or recommendations presented herein is at the sole risk of the user.

Exponent's objective is to accurately assess observed conditions and consider all relevant data. The findings presented herein are made to a reasonable degree of engineering certainty. I reserve the right to supplement this report and to expand or modify my opinions based on review of additional material as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others.

Exhibit A

NON-CERTIFIED COPY

# Introduction

At the request of Fishman Haygood, L.L.P. on behalf of H+E Equipment, as a Senior Managing Engineer for Exponent Failure Analysis Associates (Exponent), I conducted an investigation to determine the nature, mechanism(s), and extent of damage to concrete pavements at two separate facilities operated by H+E Equipment.  The two facilities are located in Louisiana, one facility in Baton Rouge and the other facility in Kenner (near New Orleans).  I also investigated what aspects of the damage (if any) are attributable to flaws in the design, construction, or usage conditions of the pavements.

The scope of my work included the following:

- Site surveys on 23 September 2013, 12 and 13 August 2014, and 07 July 2016;
- Review of architectural and engineering drawings;
- Review of photos taken of the subject property;
- Review of emails and other produced documents;
- Engineering analyses; and
- Preparation and submittal of this report.

Exhibit A

NON-CERTIFIED COPY

# Background

H+E Equipment uses the facilities located at Baton Rouge and Kenner as distribution centers for heavy construction equipment. Some of this equipment moves on different types of metal tracked systems. The heavy construction equipment travels across and is parked on concrete pavements recently constructed at the two facilities. URS Architects Engineers Planners[1] (herein referred to as URS) designed the pavements. Exponent conducted site surveys of each facility on 23 September 2013, 12 and 13 August 2014, and 07 July 2016[2]. Various perspectives of the Baton Rouge and Kenner sites are shown in Figure 1 and Figure 2, respectively.

During our site surveys we observed cracking; spalling of concrete edges at expansion, construction, and control joints[3]; and varying degrees of surface erosion in several areas of the concrete pavements at each facility. The damage was particularly evident in areas where heavy tracked equipment had travelled and was subsequently parked. Various perspectives of the concrete pavements are shown in Figure 3 and Figure 4 for the Baton Rouge and Kenner sites, respectively. The pavements at both facilities are constructed of reinforced Portland cement concrete and were poured during the first half of 2012, meaning they are approximately four years old.

---

[1] A division of URS Corporation which was acquired by AECOM in 2014.
[2] Photos, drawings, calculations, and other related information related to our investigation are available upon request.
[3] As defined on architectural and engineering drawings produced by URS.

Exhibit A

NON-CERTIFIED COPY

# Discussion

## Pavement Surface Condition

Surface damage was observed on pavements in parking areas designated for heavy trucks and equipment, tractor trailers, and tracked equipment at both facilities. The observed surface damage to the concrete pavements is consistent with the type of damage one would expect to observe to the type of concrete specified when exposed to high levels of stress and friction, or abrasion, acting at or near the concrete surface. Surface cracks not associated with damage at joints or abraded areas were also observed during the three site visits. These surface cracks appear to be the result of ineffectiveness of the control joints rather than a response to external effects. Little or no surface damage was observed at either facility on pavements in parking areas designed for cars and light trucks.

Loads imposed by tracked equipment depend on the contact surface. Tracks in heavy construction equipment are typically comprised of a belt system of adaptable links with keys on them. The intention is that these keys will penetrate the surface where the vehicle is moving, thus increasing the level of effective friction and therefore allowing the equipment to move in what typically are soft soil conditions. As these keys are meant to fully penetrate the soil, it is generally assumed that the weight of the equipment is distributed on the full surface of the track system, and then transferred to the supporting soil. The resulting pressure from the tracks to the soil is typically labeled "ground pressure" on catalogs provided by the manufactures of this type of equipment. Exponent was able to obtain such information from a local distributor.

One of the performance features of the track is that it be sufficiently flexible to spool around the wheels of the vehicle, effectively forming a belt around each set of wheels. This feature, in turn, requires the belt to be somewhat flexible. To achieve this flexibility and still maintain sufficient in-plane stiffness and strength, the belt is typically made of metal "links" that can adjust with respect to each other. This linkage results in a condition where, only after the keys have penetrated the soil, the weight of the vehicle is fully distributed on the track and not just on the wheel sections alone. It also means that if the keys have not penetrated the surface, then the weight is likely to be transferred in most part in the areas immediately under the wheels or spools of the track.

On hard surfaces like concrete, these tracks and their keys do not easily penetrate the bearing surface, thus forcing transfer of the full weight of the equipment to the supporting surface by the area under the keys alone. Furthermore, the weight of the equipment is being transferred mostly by the keys directly under the wheels in this condition. The keys in this condition are therefore

Exhibit A

NON-CERTIFIED COPY

effectively narrow bands of pressure applied to an unbounded in plane surface resulting in a notable stress increase.

Exponent approximated this expected stress increase using an elastic estimation of contact pressure between two surfaces. The resulting increase in stress was estimated to be on the order of four times the applied stress by the key. Applying this level of stress in areas adjacent to a free surface, like an expansion joint, would result in stresses higher than the expected capacity of the specified 4,000 psi concrete. Such an outcome would cause the types of damage like shear cracking and spalling observed by Exponent at the two H+E Equipment sites as shown in Figure 3 and Figure 4. I also observed the absence of steel edge guards along the length of the expansion joints. It is my opinion that installation of steel edge guards at the expansion joints where heavy tracked construction equipment crossed would have significantly reduced the spalling and cracking at these joints.

Given an understanding of the types of loads imposed by heavy tracked vehicles on concrete pavements, Exponent then conducted a literature review to identify codes, standards, guidelines, or other publications that address concrete design for such conditions. We could not identify any specification in the United States related directly to the design of concrete surfaces under tracked vehicles. Some references are available for the design of concrete pavements under heavy loads, specifically, at airports and with some industrial applications. However, these references do not address metal wheel types or tracks directly, nor do they give guidance on what load to design the pavement for in these cases.

Countries like New Zealand recognize the effect of metal wheels and their resulting abrasion in their standards[4], requiring more attention to finishes and proper selection of concrete strengths. However, it only addresses metal wheels directly and not tracked vehicles. It does indicate that for cases where high abrasion is to be expected, concrete strengths are likely to be 40 MPa or higher (6,000 psi) and that special attention should be given to flooring finishing techniques and selection.

In my opinion a prudent designer for this type of project should have researched and consulted such readily available literature to ensure the types of damages being observed to the concrete pavements, based on its intended use, would be minimized. Based on documents produced at the time of this report, to my knowledge URS made no such effort. If they made such an effort, then URS evidently did not communicate to H+E Equipment the potential for heavy tracked equipment causing such damage to concrete pavements being designed by them for the two sites.

---

[4] NZS-3101 Part 1 Table 3.8

Exhibit A

NON-CERTIFIED COPY

**Pavement Design Features**

Based on conversations with H+E Equipment[5], URS was aware that they should design concrete pavements at both sites to allow parking of all types of heavy equipment, including tracked equipment, anywhere on the pavements. Indeed, URS made no distinction on their drawings regarding where certain types of heavy equipment were to be parked[6]. Given this requirement, all pavement areas designed for heavy equipment may be subject to traffic from all types of such equipment, and therefore should be designed to accommodate all of them accordingly.

A publication by the American Concrete Institute titled *ACI 330R-01 Guide for the Design and Construction of Concrete Parking Lots* provides designers current knowledge and practices for the design, construction, and maintenance of concrete parking lots. ACI 330R-01 was issued in October 2001 and was available at the time of the design of the pavements at the two facilities. The guide was revised and subsequently reissued in June 2008 as ACI 330R-08.

ACI 330R-01 enables a designer to select a pavement thickness based on the Traffic Category, Modulus of Subgrade Reaction ($k$), and Modulus of Rupture ($M_R$) of the concrete. In my opinion a proper interpretation of ACI 330R-01 for both sites would result in the selection of Traffic Category C for parking areas and interior lanes, and Traffic Category D for entrance and exterior lanes. The Modulus of Rupture equals approximately 600 psi assuming a 28-day concrete compressive strength of 4000 psi[7]. The Modulus of Subgrade Reaction depends on the soil conditions as indicated in the geotechnical report produced for each site.

Both ACI 330R-01 and ACI 330R-08 state that distributed steel reinforcement can be used to control the opening of intermediate cracks between the joints. The sole function of distributed steel reinforcement is to hold the fracture faces together if cracks form. This use becomes more obvious in cases where uncontrollable subgrade conditions are liable to provide non-uniform support. ACI 330R-01 states that distributed steel reinforcement "is needed" in pavements with transverse joints spaced more than 30 times the slab thickness, while ACI330R-08 states that it "may be needed." When used, the distributed steel reinforcement is interrupted at the contraction joints because such joints by design should be free to open.

According to ACI 330R-01 and ACI 330R-08 pavements designed for truck traffic typically require load-transfer dowels for large joint spacing. A larger joint spacing results from increased spacing between joints which, in turn, increase joint openings and reduce aggregate interlock load transfer. ACI 330R-01 specifies diameters for smooth round dowels of 3/4", 7/8", 1", and 1-1/8" for slab depths (i.e., thicknesses) of 6", 7", 8", and 9", respectively.

---

[5] Frankie Wynn, Director of Facilities/Risk/Compliance Management, H&E Equipment Services, Inc.
[6] For example, see URS Drawing AS-101 for the Baton Rouge site.
[7] $M_r = 2.3 f'_c{}^{2/3}$; regarding ACI330R-08 the values for the Traffic Category would be the same, while $M_r$ would range from approximately 500 psi to 630 psi depending on the aggregate texture and shape.

Exhibit A

NON-CERTIFIED COPY

ACI330 R-08 specifies diameters for smooth round dowels of 1", 1-1/4", and 1-1/4" for slab depths of 7", 8", and 9", respectively. All dowels are spaced at 12" centers. Dowel embedment is 6" on each side of a joint with a total dowel length of 14" to allow for joint openings and minor errors in dowel positioning. Correct alignment and lubrication is cited in both versions of ACI 330R as essential for proper joint function.

Given the operating conditions stated by H+E Equipment, in my opinion it was reasonable and prudent for URS to require distributed steel reinforcement in the concrete pavements at both sites to control the opening of intermediate cracks between the joints. It was also reasonable and prudent for URS to require dowels at the expansion joints to provide vertical load transfer while permitting the joints to expand. However, as indicated in the sections to follow URS did not design the dowels in accordance with recognized specifications and guidelines related to concrete pavement design.

## Baton Rouge Site

A review of engineering drawings for the Baton Rouge site indicate that heavy equipment, including tracked equipment, was to travel and park around the north, south, and west sides of the single story Branch Building in an area designated as "Inventory Storage".[8] This same area is labeled "Concrete Parking" and in my opinion should be associated with the design of "Heavy Duty Pavement" given the type of equipment moving in the area[9]. Figure 5 shows pavement details from the architectural and engineering drawings created by URS for the Baton Rouge site.

Regarding rigid pavement design a geotechnical report produced to URS for the Baton Rouge site[10] states,

> "No specific traffic data were provided; therefore, pavement recommendations for this site are based upon the following assumed daily traffic frequencies. In the heavy storage area: 100 light (7-kip) trucks, two 34-kip trucks, two 46-kip trucks, and thirty 80-kip trucks per day."

> "The traffic is expected to be from rubber-tired vehicles. If the expected traffic frequencies (especially those involving heavy vehicles) are much different from these assumptions, this office should be notified so that we may re-evaluate the pavement recommendations."

> [Page 9; Section 8.0]

---

[8] URS Drawing AS-101; for the purposes of this report the front of the Branch Building is assumed to face east.
[9] URS Drawings C-202, C-205, and C-206; pavement in front of the building where cars and light trucks park is labeled "Concrete Driving Parking"; URS Drawing C-501 Detail 1.
[10] Soil Testing Engineers, Inc., 316 Highland Park Drive, Baton Rouge, Louisiana, 70810; report dated January 11, 2007.

1306663.001 7845

8

Exhibit A

NON-CERTIFIED COPY

"Rigid pavement recommendations have been computed based on a modulus of subgrade reaction (k) of 65 pci. Additionally, the design presumes 3,800 psi concrete, which can be expected to develop a modulus of rupture of about 650 psi (average). The design life of the pavement system is dependent upon periodic maintenance of the pavement. This maintenance includes but is not limited to cleaning and resealing joints, sealing cracks and immediate repairs of damaged areas."

"In the heavy equipment storage area, for a 20-year design life, we estimate the number of 18-kip equivalent single axles (ESAL's) for rigid pavement to be approximately 956,028. Based on these results, we recommend a minimum rigid pavement thickness of 7 inches."

"The rigid concrete should conform similarly to the requirements of LA DOTD Standard Specifications, Section 601, 2000 Edition. Proper steel reinforcement (temperature and shrinkage) joint design, and installation are essential to satisfactory pavement performance."

[Page 10; Section 8.2]

My interpretation of ACI 330R-01 Table 2.4 for this case would result in the selection of a 20-year design thickness of 6.5 inches for Traffic Category C (parking areas and interior lanes) and 9.0 inches for Traffic Category D (entrance and exterior lanes). The same selection results using ACI 330R-08 Table 3.4 with the exception that for Category D when dowels are used in transverse joints the thickness can be reduced one inch to 8.0 inches.

The thickness for heavy duty pavement shown on the URS design drawings (see Figure 5) is 8.0 inches. However, according to the URS drawings[11] as illustrated in Figure 6 this heavy duty pavement is limited to the immediate area surrounding the Branch Building. The remaining portion of the concrete pavement beyond the Branch Building is designated by URS as standard duty pavement which by design is 6.0 inches thick. This thickness is less than what was recommended in the geotechnical report and what would be required in accordance with ACI 330R-01 for heavy types of equipment, including tracked equipment. As indicated earlier, H+E Equipment reportedly told URS to design the pavement surrounding the Branch Building in a manner that allowed the movement and parking of all types of equipment anywhere on the pavement.

The engineering drawings for the Baton Rouge site also deviated from good design practice in definition of the contraction joint[12] depth (see Figure 5). The drawing detail for the contraction joint shows a note stating "Saw-Cut Joint ½" Depth". The minimum depth of a contraction joint

---

[11] URS Drawings C-302 and C-305; the legend states "Proposed 8" Concrete".
[12] The drawing labels this detail as a construction joint.

Exhibit A

NON-CERTIFIED COPY

should be one-fourth of the slab thickness, or approximately 1.5 inches for a six-inch thick slab and 2.0 inches for an eight-inch thick slab[13]. However, during my surveys I measured the contraction joints at the Baton Rouge site and they were no more than ½ inch deep.

ACI 330R-01 recommends dowel diameters of 3/4" and 1" for slab thicknesses of 6" and 8", respectively. The Department of Public Works for the City of Baton Rouge and Parish East of Baton Rouge specifies dowel diameters of 1" and 1-1/4" for slab thicknesses of 6" and 8", respectively. The Louisiana Department of Transportation (LDOT) specifies a dowel diameter of 1-1/4" for a slab thickness of 8". All three documents require the spacing to be 12 inches. Figure 7 shows the tables from each of these sources including ACI 330R-08. The URS drawing (see Figure 5) shows a #4 smooth bar, meaning a ½" diameter bar, spaced 18 inches on center. This design is notably less in terms of the amount of steel per unit area than what is recommended by ACI and specified by the Department of Public Works and LDOT.

Diagonal cracking was observed at the intersection of some expansion joints at the Baton Rouge site (see Figure 3). High stress concentrations form at the corners of square pavement sections due to curling and warping of the pavement section caused by moisture and temperature differentials, and uneven loading across the pavement surface. According to ACI 330R-08,

> "Dowels should not be placed closer than 12 in. (300 mm) to a joint intersection to minimize the potential for corner cracking."
>
> [Page 9; Section 3.8.2]

The presence of corner cracking at some of the expansion joints intersections suggests that improper spacing of dowels near the corners may have occurred. I did not identify a detail or note on the URS drawings indicating a minimum distance from the joint intersection for dowel placement.

## Kenner Site

A review of engineering drawings for the Kenner site indicate that heavy equipment, including tracked equipment, was to travel and park virtually anywhere on the site, including along the main entryway and around all sides of the Service Building[14]. These areas were designated as "Heavy Duty Pavement". Only a few select areas in front of the office and toward the back of site were designated as "Light Duty Pavement" for cars and light trucks. Figure 8 shows

---

[13] Specification for Unreinforced Concrete Parking Lots ACI 330.1-04 published by the American Concrete Institute.
[14] URS Drawing C1.0.

Exhibit A

NON-CERTIFIED COPY

pavement details from the architectural and engineering drawings created by URS for the Kenner site[15].

Regarding rigid pavement design a geotechnical report produced to URS for the Kenner site[16] states,

> "Anticipated traffic volumes and loading conditions for this facility were not provided, but were assumed based on experience with similar projects.  The pavements within the facility may likely be a medium to heavy duty traffic areas.  Traffic estimates used in the determination of required pavement thicknesses assume a 20-year design period and are summarized in the following table." [Table omitted for brevity.]

> "The architect or engineer responsible for the final pavement design should review this traffic information for accuracy/applicability.  If these traffic assumptions are not correct, please advise this office so that the pavement designs can be re-analyzed and revised thickness designs developed."

> "Based upon the soil conditions at the site, rigid pavements should be designed and constructed using a minimum 7-inch concrete pavement thickness over a minimum 12 inches of compacted river sand."

> "Long term differential settlement is expected to occur across the proposed pavement areas with these soil conditions.  It is expected that differential movement will occur over a period of several years between the pavement panels resulting in subsequent loss of aggregate interlock at the joints.  For these anticipated conditions, it has been an accepted practice to install a nominal reinforcement in the pavement consisting of minimum #3 rebar at 18-inch on-centers to maintain the joint connection.  Alternatively an appropriately sized welded wire fabric can also be used."

> "Other standard design and construction details for rigid pavements as contained in ACI 330R-01 'Guide for Design and Construction of Concrete Parking Lots' should be followed in the pavement design and construction process.  *It is recommended that the design engineer refer to this document for more detailed information* [emphasis added].  A critical aspect of concrete pavements for facilities of this nature is joint spacing and related details.  ACI 330R-01 addresses these important details."

[Pages 11-12; Section 4.5]

---

[15] URS Drawing C7.0.
[16] Terracon Consultants, Inc., 316 Highland Park Drive, Baton Rouge, Louisiana, 70810; report dated February 9, 2011.

Exhibit A

NON-CERTIFIED COPY

The Modulus of Subgrade Reaction was reported as 75 psi/in[17].  My interpretation of ACI 330R-01 Table 2.4 for this case would result in the selection of a 20-year design thickness of 6.5 inches for Traffic Category C (parking areas and interior lanes) and 9.0 inches for Traffic Category D (entrance and exterior lanes).  These section depths are consistent with ACI 330R-08 Table 3.4 with the exception that for Category D when dowels are used in transverse joints the thickness can be reduced one inch to 8.0 inches.

The thickness for heavy duty pavement shown on the URS design drawings (see Figure 8) is 7.0 inches[18].  This thickness is consistent with the recommendation made in the geotechnical report.  Surface degradation issues aside, in my opinion a 7.0 inch thickness is the proper value for Traffic Category C where equipment is parked or traveling along the interior of the site.  However, for the entrance and exterior lanes along the perimeter of the site, i.e., Traffic Category D, the 7.0 inch thickness is less than what is recommended per ACI 330R-01 for heavy types of equipment, including tracked equipment.  As indicated earlier, H+E Equipment reportedly told URS to design the pavement surrounding the Service Building in a manner that allowed the movement and parking of all types of equipment anywhere on the pavement.

A review of engineering drawings for the Kenner site also revealed a discrepancy in the definition of the contraction joint[19] depth (see Figure 8).  A drawing detail for the contraction joint shows a note stating "Saw-Cut ¼ Slab Thickness" meaning the joint depth should be one-fourth of the slab thickness.  The same detail also shows a dimension labeled "¼ Depth of Concrete" which could be interpreted as a depth of ¼ (0.25) inches.  The correct depth of a contraction joint should be one-fourth of the slab thickness, or approximately 1.75 inches for a seven-inch thick slab[20].  During my surveys I also measured contraction joint depths at the Kenner site.  They were no more than ½ inch deep.

As shown in Figure 7, ACI 330R-01 recommends a 7/8" dowel diameter for a 7" slab thickness. ACI 330R-08 recommends a 1" dowel diameter for a 7" slab thickness.  LDOT specifies a dowel diameter of 1-1/4" for a slab thickness of 8"[21].  All three documents require the spacing to be 12 inches.  The URS drawing (see Figure 8) shows a #4 smooth bar, meaning a ½" diameter bar, spaced 18 inches on center.  This design is notably less in terms of the amount of steel per unit area than what is recommended by ACI and as specified by LDOT.  Severe degradation of an expansion joint at the Kenner site (see Figure 4) resulted in exposure of a dowel bar.  The exposed dowel bar diameter is ½ inch.

---

[17] Page 10 Section 4.4; the topic pertains to details concerning floor slabs, but is assumed applicable to pavement design.
[18] Terracon issued a letter dated August 5, 2011, stating that a 6-inch thick concrete pavement thickness would be acceptable for standard duty pavement.
[19] The drawing labels this detail as a control joint.
[20] Specification for Unreinforced Concrete Parking Lots ACI 330.1-04 published by the American Concrete Institute.
[21] 8" is the minimum slab thickness cited on the LDOT drawings.

Exhibit A

NON-CERTIFIED COPY

The URS drawings state that in regards to "pavement preparation and construction" the recommended specifications from the geotechnical report shall govern. As indicated earlier, the geotechnical report issued for the Kenner site states that the standard design and construction details for rigid pavements as contained in ACI 330R-01 should be followed by URS in the pavement design and construction process. In my opinion URS did not follow the ACI 330R-01 guidelines regarding slab thicknesses for Traffic Category D conditions and for dowel bar details at the Kenner site.

Diagonal cracking was also observed at the intersection of some expansion joints at the Kenner site (see Figure 4). As indicated earlier regarding the Baton Rouge site, per ACI 330R-08 dowels should not be placed closer than 12 in. (300 mm) to a joint intersection to minimize the potential for corner cracking. The presence of corner cracking at some of the expansion joint intersections suggests that improper spacing of dowels near the corners may have occurred. I did not identify a detail or note on the URS drawings indicating a minimum distance from the joint intersection for dowel placement.

Exhibit A

NON-CERTIFIED COPY

# Remedies

### Pavement Surface

Exponent conducted a literature review of specialty construction materials for use in applications where heavy industrial and construction equipment is present. This effort resulted in identification of several products from different manufacturers designed to mitigate the abrasive effects of loads imposed by industrial equipment like heavy tracked vehicles on concrete pavements. These products can be used as part of new construction, or as a modification/retrofit method for an existing pavement. The common aspect of these materials is the use of special aggregates and other additives in the mix to provide a surface that has both high abrasion resistance and high overall strength.

Because impacts are expected on concrete pavements with heavy tracked equipment moving across them, providing a higher strength concrete mix alone would not be sufficient to ensure long term durability. As the strength of concrete goes up, its susceptibility to impact damage also increases as the mix becomes more brittle, making it prone to failures such as the failures observed at the H+E Equipment sites. The long-term approach is to provide a malleable, but strong, surface for these types of vehicles to move over. According to the consulted manufacturers, this approach has already proven effective in applications similar to the concrete pavements at the H+E Equipment sites.

Specialty aggregates are often prescribed and supplied by manufacturers of specialty slab finishes. One example is an iron filled aggregate. Along with properly executed curing and finishing techniques, this special aggregate will provide a more resistant surface for the movement of heavy metal tracked equipment. Several manufacturers offer products for this application. Exponent strongly recommends that the ultimate choice of a product be made in conjunction with a manufacturer's technical representative to ensure the product is used in a proper application and to identify appropriate quality measures during the execution.

The cost of applying specialty aggregate toppings, including preparation and application, varies with the manufacturer and selected installer. The manufacturer's technical representative can verify whether any special considerations will need to be given at existing joint locations where these products are to be applied.

Exhibit A

NON-CERTIFIED COPY

## Pavement Design

To correct design deficiencies due to insufficient slab thickness, improper placement of distributed steel reinforcement and dowels, and/or improper sizing of dowels will require removal of the affected pavement areas.  As stated in ACI 330R-01,

> "The most effective repair method for badly cracked and deteriorated pavement panels is full or partial replacement.  It is important to determine and correct the cause of the slab failure before starting repairs.  Localized subgrade problems should be corrected.  If the pavement panels failed because of heavier than anticipated loads, replacement panels should be thickened to provide additional load-carrying capacity."

[Page 16; Section 6.4]

The presence of heavy track equipment poses a unique challenge to the short- and long-term performance of concrete pavements.  In addition to applying a specialty aggregate topping on lanes where tracked equipment is likely to travel, other options for improving the short- and long-term performance of concrete pavements under such conditions include: increasing the design compressive strength; increasing the pavement thickness; and installing metal edge guards along the expansion joints[22].  Dowels should also be designed and installed in accordance with the most recent ACI publications pertaining to concrete pavement design.

---

[22] Examples where edge guards are installed in reinforced concrete include warehouse loading docks, bridge expansion joints, and stairwells.

Exhibit A

NON-CERTIFIED COPY

# Findings

My findings presented in this report are made to a reasonable degree of engineering certainty. Based on my on-site surveys, review of architectural and engineering reports, review of photos taken of the subject property, review of emails and other produced documents, and engineering analyses, in my opinion concrete pavements at the Baton Rouge and Kenner sites were not properly designed to account for the degrading effects and high loads imposed by the heavy construction equipment, particularly tracked equipment, operating across the pavements.

My current understanding is that H+E Equipment clearly communicated to the designer the type of equipment that would travel across the pavements. Moreover, representatives of URS reportedly visited the two sites and according to H+E Equipment viewed the equipment, including the heavy metal tracked equipment. Given these understandings, it is my opinion that URS did not exhibit the appropriate standard of care when designing the concrete pavements constructed at the two H+E Equipment sites.

Sufficient information was available to determine loads acting on the concrete pavements, and to design the pavements in a way to withstand these loads and high levels of stress and abrasion acting at or near the concrete surface. In my opinion damage observed on the concrete surfaces could have been controlled and minimized by the use of proper materials selection and implementation during the design phase. Given the pavement design as presented to the owner prior to construction, at a minimum URS should have informed H+E Equipment of the likelihood of near-term progressive damage to the concrete pavement resulting from the movement of tracked vehicles, and that such damage may necessitate periodic replacement of affected pavement sections. To my knowledge URS did not inform H+E Equipment of the likelihood of near-term progressive damage.

In my opinion the concrete pavements at both sites as currently designed are not adequate to perform for their intended use as required by H+E Equipment. Surface degradation is widespread and increasing at both sites. Large cracks have formed beyond the joints, an indication of an insufficient amount of or an improper placement of steel reinforcement. Repairs to the existing pavements will be necessary to allow for extensive use of heavy equipment over these paved areas during the 20-year design life without inducing the same level and extent of damage.

Steps can be taken to extend the life of concrete pavements including the application of specialty aggregate toppings; increasing the design compressive strength; increasing the pavement thickness; increasing the dowel bar sizes; and installing metal edge guards along the expansion joints.

Exhibit A

NON-CERTIFIED COPY



N →

Aerial View (Source: Google Earth™)

Looking West Beyond South Entryway | Looking East Toward the Branch Building

Figure 1.  Various Perspectives of Baton Rouge Site.

NON-CERTIFIED COPY



Figure 2.  Various Perspectives of Kenner Site.

Exhibit A

NON-CERTIFIED COPY



Figure 3.  Concrete Pavement at Baton Rouge Site (source: Exponent).

19

Exhibit A

NON-CERTIFIED COPY



Figure 3.  (Continued)

1306663.001 7845

Exhibit A

NON-CERTIFIED COPY