

| | |
|---|---|
| 07 July 2016 | 07 July 2016 |
| 07 July 2016 | 07 July 2016 |
| 07 July 2016 | 07 July 2016 |

Figure 3.  (Continued)

NON-CERTIFIED COPY



Figure 4. Concrete Pavement at Kenner Site (source: Exponent).

NON-CERTIFIED COPY



Figure 4.  (Continued)

NON-CERTIFIED COPY



Figure 4. (Continued)

Exhibit A

NON-CERTIFIED COPY



Figure 5.  Pavement Details and Note for Baton Rouge Site
(Source: URS Drawings C-501 and C-509).

NON-CERTIFIED COPY



Figure 6.  Designated Area for Heavy Duty Pavement at Baton Rouge Site
(Source: URS Drawings C-302 and C-305).

NON-CERTIFIED COPY

**Table 2.6—Dowel size**[*]

| Slab depth, in. (mm) | Dowel diameter, in. (mm) | Dowel embedment, in. (mm)[†] | Total dowel length, in. (mm)[‡] |
|---|---|---|---|
| 5 (125) | 5/8 (16) | 5 (125) | 12 (300) |
| 6 (150) | 3/4 (19) | 6 (150) | 14 (360) |
| 7 (180) | 7/8 (22) | 6 (150) | 14 (360) |
| 8 (200) | 1 (25) | 6 (150) | 14 (360) |
| 9 (230) | 1-1/8 (29) | 7 (180) | 16 (400) |

[*]All dowels spaced at 12 in. (300 mm) centers.
[†]On each side of joint.
[‡]Allowance made for joint openings and for minor errors in positioning dowels.

ACI 330R-01

**Table 3.6—Sizes of smooth, round dowels**[*]

| Slab thickness, in. (mm) | Dowel diameter, in. (mm) |
|---|---|
| 7 (180) | 1 (25) |
| 8 (200) | 1-1/4 (32) |
| 9 (230) | 1-1/4 (32) |

[*]All dowels spaced at 12 in. (300 mm) centers, with minimum total length of 14 in. (360 mm) and minimum embedment length of 6 in. (150 mm) on each side of joint, with allowance made for joint openings and for minor errors in positioning dowels.

ACI 330R-08

**TABLE 1**
(ALL DIMENSIONS ARE IN INCHES)

| PAVEMENT THICKNESS | DOWEL BARS ⊗ | | | MINIMUM DEPTH OF JOINT | |
|---|---|---|---|---|---|
| | SIZE | LENGTH | SPACING | C.J. & D.J. | L.J. |
| 6 | 1 | 18 | 12 | 2 | 2 |
| 8 | 1 1/4 | 18 | 12 | 3 | 3 |
| 9 | 1 1/4 | 18 | 12 | 3 | 3 1/2 |
| 10 | 1 1/4 | 18 | 12 | 3 1/2 | 4 |

Parish of East Baton Rouge

**TABLE I**
(ALL DIMENSIONS ARE IN INCHES)

| PAVEMENT THICKNESS "T" | SMOOTH DOWEL BARS ⊗ | | | DEF. TIE BARS ⊠ | | | KEYWAY⊕ | |
|---|---|---|---|---|---|---|---|---|
| | SIZE | LENGTH | SPACING | SIZE | LENGTH | SPACING | A ⊕3/4" | B ⊕3/4" |
| 8 | 1¼ | 18 | 12 | ½ | 24 | 24 | 2½ | 1¼ |
| 9 | 1¼ | 18 | 12 | ½ | 24 | 24 | 2½ | 1¼ |
| 10 | 1½ | 18 | 12 | ½ | 24 | 24 | 2½ | 1¼ |
| 11 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 2½ | 1¼ |
| 12 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 3 | 1½ |
| 13 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 3 | 1½ |
| 14 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 3 | 1½ |

LDOT

Figure 7.  Dowel Sizing and Spacing Requirements.

NON-CERTIFIED COPY



Figure 8. Pavement Details and Note for Kenner Site
(Source: URS Drawing C7.0).

28

Exhibit A

NON-CERTIFIED COPY

**Appendix A**

**Curriculum Vita of Dr. James R. Bailey, Ph.D., P.E.**

Exhibit A

NON-CERTIFIED COPY

EX*ponent*

*Failure Analysis Associates*

Exponent
10850 Richmond Avenue
Suite 175
Houston, TX 77042

telephone 832-325-5700
facsimile 832-325-5799
www.exponent.com

**James R. (Bob) Bailey, Ph.D., P.E., F. ASCE**
**Senior Managing Engineer**
**Houston Office Director**

**Professional Profile**

Dr. James R. (Bob) Bailey is a licensed Professional Engineer in nine states and a Fellow of the American Society of Civil Engineers. For over 30 years, Dr. Bailey has served as a technical consultant, project manager, and researcher for private industry, universities, and government. As a Senior Managing Engineer in Exponent's Building & Structures practice, he brings specialized expertise to areas related to civil engineering; including wind engineering, construction materials, solid mechanics, dynamics, numerical analysis, structural analysis and design, and materials testing.

Dr. Bailey's primary area of expertise is determining the risk exposure of residential, commercial, and industrial properties to hazards associated with hurricanes, tornadoes, and flooding. He has conducted hurricane risk assessments and developed mitigation programs for various types of health, industrial, educational, and offshore energy facilities. Over the years he has surveyed and documented storm damage in the aftermath of numerous storm event, including hurricanes Irene (1999), Charley (2004), Francis (2004), Katrina (2005), Rita (2005), Wilma (2005), Ike (2008), and Sandy (2012), Tropical Storm Allison (2001), the Oklahoma City Tornado (1999), and the April-May 2011 Tornado Outbreak. He has investigated numerous building envelope systems, and has conducted investigations of both steep and low-slope roofing systems for damage caused by hail, wind, and construction errors. In 2011 he directed analysis of the storm surge risk posed to the South Texas Project Electric Generating Station using advanced hydrodynamic modeling techniques.

Dr. Bailey's past work at ExxonMobil included wind load analyses on drilling, semi-submersible, and floating, production, storage, and offloading (FPSO) structures; developing conceptual designs of gravity-based structures for arctic offshore environments; and conducting research and teaching classes on well cementing. He also has expertise in the area of well completions and workovers. Dr. Bailey has served as a lecturer in the private sector and at the university level on subjects related to civil and petroleum engineering. He also has been responsible for the design of test facilities and the development of test programs related to construction and energy. Dr. Bailey is currently the Presiding Officer of a five member expert panel, appointed by the Texas Department of Insurance in 2013, whose purpose is to develop ways of determining whether a loss to TWIA-insured property was caused by wind, waves, or tidal surges. He is also a member of the ASCE 7-16 Wind Load Subcommittee. He is past Chair of the ASCE Petrochemical Wind Load Task Committee, and served on an API 4F sub-committee assigned to revise specifications and guidelines for determining wind loads on onshore and offshore drilling structures.

Exhibit A

NON-CERTIFIED COPY

## Academic Credentials and Professional Honors

Ph.D., Civil Engineering, Texas Tech University, 1989
M.S., Civil Engineering, Texas Tech University, 1984
B.S., Civil Engineering, Texas Tech University, 1982

American Society of Civil Engineers (ASCE)
American Petroleum Institute (API) Spec 4F Wind Engineering Subcommittee
ASCE Wind Loads on Petrochemical Structures Task Committee
ASCE 7-16 Wind Load Subcommittee
Texas Tech University Civil Engineering Advisory Council (2007–2012)

Recipient of the Stephen D. Bechtel, Jr. Energy Award from ASCE (2016)

## Licenses and Certificates

Professional Engineer, State of Florida, #67773
Professional Engineer, State of Georgia, #PE033027
Professional Engineer, State of Hawaii, #12820
Professional Engineer, State of Louisiana, #33830
Professional Engineer, State of Mississippi, #26488
Professional Engineer, State of South Carolina, #26408
Professional Engineer, State of Tennessee, #114185
Professional Engineer, State of Texas, #74911
Professional Engineer, State of Wisconsin, #42337-6

## Publications and Reports

Bailey JR, Shrestha PL, et al. Analysis of maximum probable storm surge at the South Texas Project site. Proceedings, ASCE EWRI Conference, Seattle, WA, June 2014.

Bailey, JR. Hurricane risk assessment of a planned carbon capture facility located in Southeast Texas operated by NRG Energy, Inc., Report prepared for a California-based risk management company, February 2014.

Bailey, JR. Hurricane risk assessments of five electrical power plants located in the Caribbean and Hawaii operated by the AES Corporation, Report prepared for a California-based risk management company, November 2012.

Bailey JR. Feasibility study of an Alaskan LNG plant. Report prepared for an Asian-based consortium of companies, March 2012.

Bailey JR, et al. Wind loads for petrochemical and other industrial facilities. American Society of Civil Engineers, September 2011.

James R. Bailey, Ph.D., P.E.
07/16

31

Exhibit A

NON-CERTIFIED COPY

Bailey, JR.  Hurricane risk assessment of two wind farms located in South Texas operated by EoN Climate and Renewable.  Report prepared for a California-based risk management company, June 2011.

Bailey JR.  Wind risk assessment of the ThyssenKrupp steel plant located in Mississippi.  Report prepared for a California-based risk management company, November 2010.

Bailey JR, Cantor R, et al.  An approach to business vulnerability and risk assessments related to climate change.  SPE International Conference on Health, Safety & Environment, Rio de Janeiro, Brazil, April 2010.

Bailey JR.  A hurricane risk assessment and mitigation plan for CHRISTUS hospitals located in Texas and Louisiana.  Report prepared for CHRISTUS Health, July 2009.

Bailey JR.  Study of Major Revenue Interruption Risks in the Gulf of Mexico.  Report prepared for a major oil and gas operator headquartered in the United States, July 2009.

Bailey JR, Gilbert RT, et al.  Wind load considerations for existing petrochemical structures.  Structures Congress, American Society of Civil Engineers (ASCE), Austin, TX, May 2009.

Bailey JR, Levitan ML. Lessons learned and mitigation options for hurricanes.  Process Safety Progress, American Institute of Chemical Engineers (AIChE), 2008.

Bailey JR.  Finding the breaking point.  Report documenting window performance following the 2004 Florida hurricanes.  Prepared in conjunction with the Protecting People First Foundation, Wickford, RI, April 2005.

Bailey JR.  Flood hazard assessment of critical NASA assets at the Johnson Space Center.  Report prepared for NASA management by ABS Consulting, July 2004.

Bailey JR.  Wind hazard assessment of critical NASA assets at the Johnson Space Center.  Report prepared for NASA management by ABS Consulting, February 2001.

Bailey JR.  Vulnerability assessment of Harris County to hurricane winds.  Report prepared for the Harris County Commissioners Court by EQE International, June 2000.

Bailey JR.  Wind and flood hazard assessment of Critical NASA assets at the Kennedy Space Center.  Report prepared for NASA management by EQE International, June 2000.

Bailey JR, Vallabahn CVG, et al.  Experimental verification of the theoretical solution of laminated glass units.  Proceedings, Advanced Composites Materials in Civil Engineering Structures Materials Division, American Society of Civil Engineers, Las Vegas, NV, 1991 (paper awarded Best of Session, Spring 1991, by the Texas Section of the American Society of Civil Engineers).

NON-CERTIFIED COPY

Bailey JR, Minor JE.  Structural glazing tests show wind pressure effects.  Glass Digest 1989 Oct; 68–76.

Bailey JR, Minor JE, Tock RW.  Response of structurally glazed insulating glass units to wind pressures," Proceedings, 6[th] U.S. Conference on Wind Engineering, Houston, TX, March 8–10, 1989.

Bailey JR, McDonald JR.  Impact Resistance of masonry walls to tornado-generated missiles.  Proceedings, 3rd North American Masonry Conference, Arlington, TX, June 3–5.

**Presentations**

Bailey JR, Shrestha PL, et al.  Analysis of maximum probable storm surge at the South Texas Project site.  ASCE EWRI Conference, Seattle, WA, June 2014.

Bailey JR.  Presentation of evidence—How to keep the jury interested.  Cooper & Scully 8th Annual Construction Symposium, Dallas, TX, February 1, 2013.

Bailey JR.  Winds and rain a-comin—Hurricanes, structures and potential risks.  Texas Association of Defense Council, Spring Meeting, Santa Fe, NM, April 27, 2012.

Bailey JR.  Preparing for the worst—Is the nation prepared for natural disasters?  American Bar Association Tort Trial & Insurance Practice Section Spring Leadership Meeting, Charleston, SC, May 17, 2012.

Bailey JR.  Probable maximum surge and seiche flooding at a coastal nuclear power plant located in the United States, Advisory Committee on Reactor Safeguards (ACRS), Nuclear Regulatory Commission, Rockville, MD, November 30, 2010.

Bailey JR, Griffith M.  Natural hazard risk assessment and mitigation for nuclear facilities.  WebEx presentation, March 2, 2010.

Bailey JR.  Lessons learned and mitigation options for hurricanes.  Spring National Meeting, American Institute of Chemical Engineers (AIChE), April 2008.

Bailey JR.  Vulnerability of industrial facilities.  Reinsurance Association of America Cat Modeling 2006 Conference, Tampa, FL, February 23, 2006.

Bailey JR.  Safe haven considerations at industrial sites.  The Private Industry Workshop, National Hurricane Conference, New Orleans, LA, March 22, 2005.

Bailey JR.  Finding the breaking point.  International Code Council, Tampa, FL, February 12, 2005.

Bailey JR.  Identifying protective areas for people in buildings.  International Conference on Wind Engineering, Texas Tech University, June 2, 2003.

NON-CERTIFIED COPY

Bailey JR.  Assessment of extreme wind effects on industrial facilities.  The Private Industry Workshop, National Hurricane Conference, New Orleans, LA, April 17, 2003.

Bailey JR.  Assessing the impacts of hurricanes and earthquakes.  Association for Facilities Engineering Conference, Las Vegas, NV, September 25, 2001.

Bailey JR.  Using Digital Physics$^{TM}$ to calculate wind loads on structures.  ASCE Structures Conference, Washington, DC, May 2001.

Bailey JR.  Don't let your critical assets blow away.  Houston Chapter of the Risk and Insurance Management Society (RIMS), October 18, 2000.

Bailey JR.  Impact resistance of wood products subjected to simulated tornado missiles. International Timber Engineering Conference, Seattle, WA, 1988.

## Patents

Patent No. 5,309,995:  Well Treatment Using Ball Sealers, issued May 10, 1994.

Patent No. 5,485,882: Low-density Ball Sealer for Use as a Diverting Agent in Hostile Environment Wells, issued January 23, 1996.

Patent No. 5,582,251:  Downhole Mixer, issued December 19, 1996.

## Prior Professional Experience

- Manager, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 2004–2006
- Senior Project Engineer, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 2001–2004
- Project Engineer, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 1998–2001
- Engineering Specialist, Offshore Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1994–1998
- Senior Project Engineer, Drilling and Completions Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1992–1994
- Project Engineer, Drilling and Completions Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1990–1992
- Lecturer and Research Associate, Civil Engineering Department, Texas Tech University, 1989–1990

NON-CERTIFIED COPY

**Civil Case Experience**

Deposition – INEOS USA L.L.C., v. BP Products North America, Inc., American Arbitration Association, No. 13 158 Y 01929 06, Houston, TX, November 2008.

Deposition – GG&A Central Mall Partners, L.P., Dillard's, Inc., Dillard Texas, LLC, and Dillard Texas Operating Limited Partnership, v. Duro-Last, Inc., Jaco Construction, Inc., and Schrader Roofing, Inc, District Court of Jefferson County, Texas, 58th Judicial District, January 2010.

Testimony – Appraisal Hearing, Beechnut Village Shopping Center v. Nationwide Insurance Co., Judge John Coselli – Umpire, appointed by Judge Gray Miller, United States District Judge, Southern District of Texas, University of Houston Law School, Houston, Texas, December 2010.

Expert Witness Statement – Canadian Natural Resources Limited and Highwood Limited v. Oil Insurance Limited, submitted to the Board of Arbitration under the provisions of the Arbitration Act of 1996, London, England, March 2011.

Testimony – Appraisal Hearing, Cause No; 1:11-cv-00207; Timothy Nolan and Ermelinda Nolan v. GeoVera Specialty Insurance Company, Donald Summey and James Perfetti; Judge James W. Mehaffy – Umpire, appointed by Magistrate Judge Keith F. Giblin, United States District Court for the Eastern District of Texas, Beaumont Division, Houston, Texas, September 2012.

Deposition – David S. Gronik, Jr. and Mary K. Gronik, S.C.G., M.A.G., David S. Gronik, Jr. Living Trust, Opio Boat Moon, LLC, Plaintiffs, v. Susan Balthasar and Susan M. Balthasar, as Personal Representative of The Estate of Norman J. Balthasar, Defendants; and Shorewest Realtors, Inc., Continental Casualty Company, and Anne Schwartz, Third-Party Defendants, and Opio Boat Moon, LLC, and David S. Gronik, Jr., Plaintiffs, Chubb Indemnity Insurance Company, Defendant, United States District Court for The Eastern District Of Wisconsin, November 2012.

Deposition – Jerome S. Tannenbaum and Deborah M. Tannenbaum, v. Federal Insurance Company, United States District Court for the Middle District of Tennessee, Nashville Division, February 2013.

Testimony – Jerome S. Tannenbaum and Deborah M. Tannenbaum, v. Federal Insurance Company, United States District Court for the Middle District of Tennessee, Nashville Division, November 2013.

Deposition – Intrepid Ship Management, Inc., Vessel Management Services, Inc., and Crowley Maritime Corp., v. Ocean Prospector and Plant Recovery Company, United States District Court, Southern District of Texas, Galveston Division, September 2014.

James R. Bailey, Ph.D., P.E.
07/16

35

Exhibit A E$^{x}$

NON-CERTIFIED COPY

Deposition – Northrop Grumman Corporation, vs. AON Risk Insurance Services West, Inc., Superior Court of the State of California, County of Los Angeles, May 2015.

Deposition – Edie Housel, et al, v. The Home Depot U.S.A., Inc., et al, United States District Court for the Western District of Missouri, Southwestern Division, February 2016.

Deposition – Metro Hospitality Partners, LTD., d/b/a Crowne Plaza Hotel, v. Lexington Insurance Company,   United States District Court, Southern District of Texas, Houston Division, June 2016.

**Consulting and Testimony Billing Rate**

Two hundred ninety dollars per hour (calendar year 2016).

James R. Bailey, Ph.D., P.E.
07/16

Exhibit A

NON-CERTIFIED COPY

**Appendix B**

**Documents Reviewed**

Exhibit A

NON-CERTIFIED COPY

| Name | Date modified | Type | Size |
|------|---------------|------|------|
| C-302.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 680 KB |
| C-304.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 648 KB |
| C-305.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 716 KB |
| C-306.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 2,784 KB |
| C-307.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 984 KB |
| H+E Belle Chasse Bid Set 5-22-12.pdf | 5/31/2012 12:42 PM | Adobe Acrobat D... | 22,517 KB |
| Concrete Specs for Baton Rouge Site.pdf | 9/12/2014 4:50 PM | Adobe Acrobat D... | 122 KB |
| Pavement Spec for Baton Rouge Site.pdf | 9/12/2014 4:50 PM | Adobe Acrobat D... | 72 KB |
| 2013-11-20 H&E Petition and First Set of Discovery to Defendants.PDF | 4/3/2014 5:24 PM | Adobe Acrobat D... | 2,322 KB |
| 2014-2-19 H&E Answer and Affirmative Defenses to URS Reconventional Demand.pdf | 4/3/2014 5:27 PM | Adobe Acrobat D... | 157 KB |
| 2015-03-27 H&E's Motion to Compel.pdf | 3/27/2015 3:24 PM | Adobe Acrobat D... | 1,911 KB |
| 2015-08-24 H&E's Opposition to Defendants Motion for Partial Summary Judgment.pdf | 2/1/2016 12:49 PM | Adobe Acrobat D... | 1,736 KB |
| Baton Rouge Project Change Orders.xls | 7/16/2014 6:47 PM | Microsoft Excel 97... | 60 KB |
| H&E Belle Chasse COP Log.xls | 7/16/2014 6:47 PM | Microsoft Excel 97... | 128 KB |
| Kenner Project Change Orders 08-2013.xlsx | 7/16/2014 6:47 PM | Microsoft Excel W... | 13 KB |
| URS 31020-93139.pdf | 6/27/2016 10:35 AM | Adobe Acrobat D... | 228,781 KB |
| 502-01_Concrete_Pavement_Details.pdf | 6/24/2016 2:54 PM | Adobe Acrobat D... | 348 KB |
| 52079 - PM RFI Log - MAPP.pdf | 7/13/2018 10:39 AM | Adobe Acrobat D... | 165 KB |
| CP-01 (1 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 454 KB |
| CP-01 (2 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 487 KB |
| CP-01 (3 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 575 KB |
| H & E 0000211-0000259.pdf | 6/24/2016 2:55 PM | Adobe Acrobat D... | 8,076 KB |
| Ardaman report re Baton Rouge Detention Pond.msg | 7/5/2016 11:41 AM | Outlook Item | 3,653 KB |
| Ardaman proposal Baton Rouge.msg | 7/5/2016 11:41 AM | Outlook Item | 1,287 KB |
| Baton Rouge GeoTech Report.pdf | 7/27/2016 6:31 PM | Adobe Acrobat D... | 7,848 KB |
| Email re Density testing Baton Rouge.msg | 7/5/2016 11:41 AM | Outlook Item | 376 KB |
| Request for additional geotech work in BR.msg | 7/5/2016 11:41 AM | Outlook Item | 302 KB |
| Email re post pour testing Kenner.msg | 7/5/2016 11:49 AM | Outlook Item | 461 KB |
| Kenner GeoTech Report.pdf | 7/5/2016 11:46 AM | Adobe Acrobat D... | 6,272 KB |
| Kenner Geotech Scope letter.msg | 7/5/2016 11:49 AM | Outlook Item | 2,059 KB |
| Revision to Kenner Geotech Report.msg | 7/5/2016 11:49 AM | Outlook Item | 513 KB |
| H & E 0000211-0000259.pdf | 7/26/2016 10:27 AM | Adobe Acrobat D... | 8,976 KB |
| H & E 0022314.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 4,151 KB |
| H&E 0005226_.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 617 KB |
| HE0005154.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 124 KB |
| HE0005155.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 483 KB |
| HE0005163_VOL001.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 102 KB |
| HE0006815_VOL001.pdf | 7/26/2016 10:19 AM | Adobe Acrobat D... | 553 KB |
| URS 033308.pdf | 7/26/2016 10:29 AM | Adobe Acrobat D... | 9,562 KB |
| URS 038807.pdf | 7/26/2016 10:22 AM | Adobe Acrobat D... | 874 KB |
| URS 039466.pdf | 7/26/2016 10:24 AM | Adobe Acrobat D... | 16,555 KB |
| URS 087952.pdf | 7/26/2016 10:25 AM | Adobe Acrobat D... | 743 KB |
| URS040311_image.pdf | 7/26/2016 10:25 AM | Adobe Acrobat D... | 190 KB |
| URS040655_image_.pdf | 7/26/2016 10:26 AM | Adobe Acrobat D... | 637 KB |
| URS049986_image.pdf | 7/26/2016 10:27 AM | Adobe Acrobat D... | 765 KB |

NON-CERTIFIED COPY

| File | Date | Type | Size |
|---|---|---|---|
| H&E 0003840.pdf | 7/26/2016 11:44 AM | Adobe Acrobat D... | 2,572 KB |
| H&E 0004244.pdf | 7/26/2016 11:47 AM | Adobe Acrobat D... | 1,996 KB |
| H&E 0013874.pdf | 7/27/2016 2:36 PM | Adobe Acrobat D... | 815 KB |
| H&E 0013938.pdf | 7/26/2016 11:49 AM | Adobe Acrobat D... | 439 KB |
| H&E 0063316.pdf | 7/26/2016 11:51 AM | Adobe Acrobat D... | 369 KB |
| H&E 0063319.pdf | 7/26/2016 11:52 AM | Adobe Acrobat D... | 354 KB |
| H&E 0064597.pdf | 7/26/2016 11:57 AM | Adobe Acrobat D... | 1,029 KB |
| H&E 0065372.pdf | 7/26/2016 11:59 AM | Adobe Acrobat D... | 3,306 KB |
| URS 031731.pdf | 7/26/2016 12:57 AM | Adobe Acrobat D... | 2,410 KB |
| URS 033145.pdf | 7/26/2016 10:59 AM | Adobe Acrobat D... | 21,048 KB |
| URS 038163.pdf | 7/26/2016 11:00 AM | Adobe Acrobat D... | 271 KB |
| URS 055534.pdf | 7/26/2016 11:00 AM | Adobe Acrobat D... | 2,394 KB |
| URS 059506.pdf | 7/26/2016 11:01 AM | Adobe Acrobat D... | 190 KB |
| URS 066293.pdf | 7/26/2016 11:01 AM | Adobe Acrobat D... | 17,440 KB |
| URS 066657.pdf | 7/26/2016 10:33 AM | Adobe Acrobat D... | 2,236 KB |
| URS 066706.pdf | 7/26/2016 10:36 AM | Adobe Acrobat D... | 1,293 KB |
| URS 066880.pdf | 7/26/2016 10:39 AM | Adobe Acrobat D... | 5,094 KB |
| URS 066908.pdf | 7/26/2016 10:41 AM | Adobe Acrobat D... | 209 KB |
| URS 0336067.pdf | 7/26/2016 12:42 AM | Adobe Acrobat D... | 1,765 KB |
| 201308131556a.pdf | 8/11/2014 1:01 PM | Adobe Acrobat D... | 265 KB |
| 201308131556b.pdf | 8/11/2014 1:10 PM | Adobe Acrobat D... | 345 KB |
| 201308131556c.pdf | 8/11/2014 2:11 PM | Adobe Acrobat D... | 567 KB |
| 201309241548.pdf | 9/24/2013 3:54 PM | Adobe Acrobat D... | 1,660 KB |
| Baton Rouge Project Change Orders.xls | 8/11/2014 2:11 PM | Microsoft Excel 97... | 60 KB |
| C 5.0 REVISED per RFI #26_.pdf | 9/25/2013 10:50 AM | Adobe Acrobat D... | 745 KB |
| C1.0 site plan.pdf | 9/25/2013 11:50 AM | Adobe Acrobat D... | 290 KB |
| C2.0 Demolition plan.pdf | 9/25/2013 11:00 AM | Adobe Acrobat D... | 967 KB |
| C3.0 Geometric plan.pdf | 9/25/2013 10:58 AM | Adobe Acrobat D... | 365 KB |
| C3.1 Joint layout plan.pdf | 9/25/2013 10:59 AM | Adobe Acrobat D... | 238 KB |
| C4.0 drainage plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 927 KB |
| C5.0 grading plan.pdf | 9/25/2013 10:06 AM | Adobe Acrobat D... | 217 KB |
| C6.0 Utility plan.pdf | 9/25/2013 10:04 AM | Adobe Acrobat D... | 340 KB |
| C7.0 details.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 920 KB |
| C8.0 FENCE details.pdf | 9/25/2013 10:09 AM | Adobe Acrobat D... | 56 KB |
| C9.0 FENCE details 2.pdf | 9/25/2013 10:30 AM | Adobe Acrobat D... | 770 KB |
| C-101.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 394 KB |
| C-102.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 518 KB |
| C-201.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 522 KB |
| C-202.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 666 KB |
| C-203.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 691 KB |
| C-204.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 371 KB |
| C-205.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 554 KB |
| C-206.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 273 KB |
| C-405.pdf | 7/7/2011 10:49 AM | Adobe Acrobat D... | 449 KB |
| C-406.pdf | 7/7/2011 10:41 AM | Adobe Acrobat D... | 1,077 KB |
| C-407.pdf | 7/7/2011 19:47 AM | Adobe Acrobat D... | 709 KB |
| C-501.pdf | 7/7/2011 10:47 AM | Adobe Acrobat D... | 479 KB |
| C-502.pdf | 7/7/2011 10:47 AM | Adobe Acrobat D... | 651 KB |
| C-503.pdf | 7/7/2011 10:47 AM | Adobe Acrobat D... | 939 KB |
| C-504.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 692 KB |
| C-505.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 658 KB |
| C-506.pdf | 7/7/2011 10:41 AM | Adobe Acrobat D... | 551 KB |
| C-507.pdf | 7/7/2011 10:43 AM | Adobe Acrobat D... | 497 KB |
| C-508.pdf | 7/7/2011 10:43 AM | Adobe Acrobat D... | 921 KB |
| C-509.pdf | 7/7/2011 10:41 AM | Adobe Acrobat D... | 772 KB |

1306663.001 7845

Exhibit A

NON-CERTIFIED COPY

| Name | Date | Type | Size |
|---|---|---|---|
| Cement Concrete Pavement - Kenner, LA.PDF | 9/17/2013 4:35 PM | Adobe Acrobat D... | 1,639 KB |
| Concrete Work - Headquarters and Branch Buildings.pdf | 9/17/2013 4:36 PM | Adobe Acrobat D... | 1,205 KB |
| Crane Remanufacturing Center Relocation - Belle Chasse, LA.PDF | 9/17/2013 4:35 PM | Adobe Acrobat D... | 1,205 KB |
| G-001.pdf | 7/5/2011 1:59 AM | Adobe Acrobat D... | 1,963 KB |
| G-002.pdf | 7/5/2011 1:50 AM | Adobe Acrobat D... | 1,596 KB |
| H&E Belle Chasse COP Log.xls | 8/11/2014 2:11 PM | Microsoft Excel 97... | 138 KB |
| H+E Kenner G-001.pdf | 9/25/2013 11:50 AM | Adobe Acrobat D... | 7,512 KB |
| Kenner Project Change Orders 08-2013.xlsx | 8/11/2014 2:11 PM | Microsoft Excel D... | 12 KB |
| Missing Page Request_02751.pdf | 9/25/2013 5:45 PM | Adobe Acrobat D... | 1,104 KB |
| Missing Page Request_03300.pdf | 9/25/2013 5:46 PM | Adobe Acrobat D... | 193 KB |
| S100.pdf | 3/27/2013 11:49 AM | Adobe Acrobat D... | 927 KB |
| S110.pdf | 3/27/2013 11:52 AM | Adobe Acrobat D... | 853 KB |
| S200.pdf | 11/15/2011 10:42... | Adobe Acrobat D... | 1,205 KB |
| S210.pdf | 11/15/2011 10:41... | Adobe Acrobat D... | 704 KB |
| S220.pdf | 11/15/2011 10:41... | Adobe Acrobat D... | 849 KB |
| S300.pdf | 3/27/2013 12:09 PM | Adobe Acrobat D... | 1,396 KB |
| S310.pdf | 11/15/2011 10:41... | Adobe Acrobat D... | 744 KB |
| S320.pdf | 11/15/2011 10:41... | Adobe Acrobat D... | 471 KB |
| S400.pdf | 11/15/2011 10:41... | Adobe Acrobat D... | 767 KB |
| S410.pdf | 11/15/2011 10:41... | Adobe Acrobat D... | 566 KB |
| S420.pdf | 11/15/2011 10:41... | Adobe Acrobat D... | 573 KB |
| S430.pdf | 11/15/2011 10:41... | Adobe Acrobat D... | 714 KB |
| alum_nosing_a_b-1.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-1sp.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-5.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-16a.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-31a.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| anchoring.gif | 10/2/2014 2:32 PM | GIF image | 25 KB |
| b-3.jpg | 10/2/2014 2:32 PM | JPEG image | 3 KB |
| back_to_top.jpg | 10/2/2014 2:32 PM | JPEG image | 2 KB |
| backs.gif | 10/2/2014 2:32 PM | GIF image | 16 KB |
| barry.css | 10/2/2014 2:32 PM | Cascading Style S... | 7 KB |
| button_cad.gif | 10/2/2014 2:32 PM | GIF image | 1 KB |
| button_dwg.gif | 10/2/2014 2:32 PM | GIF image | 1 KB |
| cast_iron_b-16.jpg | 10/2/2014 2:32 PM | JPEG image | 16 KB |
| cast_iron_cast_aluminum.jpg | 10/2/2014 2:32 PM | JPEG image | 21 KB |
| curb_bar_cb-15a.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| curb_bar_cb-25a.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| noses.gif | 10/2/2014 2:32 PM | GIF image | 15 KB |
| nosings_b-1.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| nosings_b-1sp.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-2.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-16.gif | 10/2/2014 2:32 PM | GIF image | 1 KB |
| nosings_b-16a.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| nosings_b-100.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-110.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| nosings_b-120.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| pic_products.jpg | 10/2/2014 2:32 PM | JPEG image | 37 KB |
| CAT - Success Story.pdf | 10/21/2013 1:58 PM | Adobe Acrobat D... | 223 KB |
| CAT Aurora, IL Projects II.ppt | 10/24/2013 7:51 PM | Microsoft PowerP... | 9,556 KB |
| CAT Project References.pdf | 10/21/2013 1:58 PM | Adobe Acrobat D... | 89 KB |
| IMG_0894.MOV | 10/25/2013 6:06 AM | QuickTime Movie | 724 KB |
| Kobelco - Success Story.pdf | 10/21/2013 1:58 PM | Adobe Acrobat D... | 101 KB |
| 123header.jpg | 10/2/2014 3:04 PM | JPEG image | 9 KB |
| Grey-Diamond-Plate.jpg | 10/2/2014 3:04 PM | JPEG image | 19 KB |
| Grey-Diamond-Plate_LIGHT.jpg | 10/2/2014 3:04 PM | JPEG image | 1 KB |
| LINE_2.gif | 10/2/2014 3:04 PM | GIF image | 1 KB |
| logo_non_ani.jpg | 10/2/2014 3:04 PM | JPEG image | 9 KB |
| redbut.jpg | 10/2/2014 3:04 PM | JPEG image | 1 KB |

Exhibit A

NON-CERTIFIED COPY

| | | | |
|---|---|---|---|
| 330R_08.pdf | 6/29/2016 5:11 PM | Adobe Acrobat D... | 819 KB |
| ACI 2243r_95 Expansion joint.pdf | 11/11/2013 10:34 ... | Adobe Acrobat D... | 667 KB |
| ACI 3021R_04.pdf | 11/11/2013 10:50 ... | Adobe Acrobat D... | 971 KB |
| ACI-330_Design_Guide_for_Concrete_Parking_Lots.pdf | 9/29/2010 5:51 PM | Adobe Acrobat D... | 662 KB |
| Barry Pattern & Foundry - BarryCraft - Cast Abrasive Nosings & Treads.htm | 10/2/2014 2:02 PM | HTML Document | 29 KB |
| Baton Rouge.png | 7/20/2016 1:12 PM | PNG image | 1,993 KB |
| CAT Aurora, IL Projects II.ppt | 10/24/2013 7:51 PM | Microsoft PowerP... | 3,956 KB |
| Concrete Slab Surface Defect Repairs.pdf | 9/29/2014 2:49 PM | Adobe Acrobat D... | 4,381 KB |
| IMG_0894.MOV | 10/25/2012 6:06 AM | QuickTime Movie | 724 KB |
| Kenner.png | 7/20/2016 1:23 PM | PNG image | 1,749 KB |
| Multi-Fab - Curb Angles.htm | 10/2/2014 3:04 PM | HTML Document | 41 KB |
| nzs 3101.1.2006.pdf | 10/17/2013 10:25 ... | Adobe Acrobat D... | 5,995 KB |
| nzs 3101.2.2006.pdf | 10/17/2013 10:22 ... | Adobe Acrobat D... | 9,352 KB |
| Page 9_330R-08.pdf | 7/17/2016 11:36 AM | Adobe Acrobat D... | 97 KB |
| URS 31020-93139.pdf | 6/27/2016 10:05 AM | Adobe Acrobat D... | 328,731 KB |

NON-CERTIFIED COPY

E*ponent®

NON-CERTIFIED COPY

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *  *
                         *
H&E EQUIPMENT SERVICES   *
                         * NUMBER 626,308
VERSUS                   *
                         * DIVISION "D"
URS CORPORATION          *
ARCHITECTURE, P.C., URS  *
CORPORATION, L O'NEAL    *
JOHNSON AND THOMAS E.    *
RYAN, III                *
                         *
*  *  *  *  *  *  *  *  *
```

Deposition of JAMES R. BAILEY,

Ph.D., P.E., taken on Thursday, September 22,

2016, commencing at 9:43 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.

Exhibit B

NON-CERTIFIED COPY

Page 7

```
 1   APPEARANCES:

 2
        Representing the Plaintiff:
 3
        FISHMAN HAYGOOD, LLP
 4      Attorneys at Law
        201 St. Charles Avenue, Suite 4600
 5      New Orleans, Louisiana  70170

 6      BY:  BRENT B. BARRIERE, ESQ.
             LORETTA G. MINCE, ESQ.
 7

 8

 9
        Representing the Defendant:
10
        ADAMS AND REESE, LLP
11      Attorneys at Law
        4500 One Shell Square
12      New Orleans, Louisiana  70139

13      BY:  PHILIP A. FRANCO, ESQ.

14
     Reported by:
15             KAY E. DONNELLY
               Certified Court Reporter
16             State of Louisiana

17

18

19

20

21

22

23

24

25
```

Exhibit B

NON-CERTIFIED COPY

Page 68

1    A.   Sure.

2    Q.   To look at what you're looking at.

3    A.   (Reviewing document.)   As indicated in

4  my report in Figure 5, it's Detail 1 on the

5  drawing C501.

6    Q.   Okay.   That is a drawing of the

7  eight-inch and the six-inch pavement, correct?

8    A.   Detail 2 is of the six-inch pavement.

9    Q.   Okay.   And where is the drawings for the

10  actual joints, sir?

11    A.   That is shown, as I indicated in my

12  report.   I believe it is Detail 4 on that Sheet

13  5, C501.

14    Q.   Okay.   Does the detail of the typical

15  transverse construction joint No. 4, does that

16  show any rebars through the joints, sir?

17    A.   No.

18    Q.   And you didn't do any coring to find out

19  whether there was any rebar through any of the

20  contraction joints at either site, did you?

21    A.   I considered it and offered it as a

22  possibility, an option as part of my work, but

23  was instructed, at this time, not to do that.

24    Q.   You thought it was prudent to do that,

25  didn't you?

Exhibit B

NON-CERTIFIED COPY

Page 69

1      A.  It can help verify and clarify, yes.

2      Q.  The coring would also tell you the

3  thickness of concrete that was laid actually,

4  wouldn't it?

5      A.  Yes.

6      Q.  Did you offer that, as well?

7      A.  Yes.

8      Q.  And, yet, that was rejected at this

9  time?

10     A.  At this time, yes.

11     Q.  Who rejected that?

12     A.  Ms. Mince.

13     Q.  Okay.  Now, you also referred to, in

14  that same paragraph, Doctor, you say, "Repairs,

15  including replacement of the existing pavements,

16  will be necessary to allow the extensive use of

17  heavy equipment over these paved areas..."

18         Is it your opinion that all the existing

19  pavements need to be replaced?

20     A.  In my opinion, it proves that improper

21  sizing and placement of steel reinforcement and

22  pouring a slab in terms of its thickness is

23  insufficient.  It might well warrant complete

24  replacement for heavy equipment in use, what

25  areas are designated for use by heavy equipment.

Exhibit B

NON-CERTIFIED COPY

Page 85

```
1      A.  Correct.

2      Q.  Can you eliminate construction causes

3   for these problems, as you sit here today?

4      A.  I am not sure I could -- you say

5   eliminate.  That is pretty strict.

6      Q.  Yeah.  It's very strict.  That is the

7   way it's meant.

8      A.  Right.  I don't think that is the reason

9   for the problems, but to eliminate, no.

10         I mean, certainly, if something was

11  uncovered to suggest otherwise, then I certainly

12  might would consider that, and, if necessary,

13  amend my findings accordingly.

14     Q.  And did you investigate lack of

15  maintenance as potential causes for the problems

16  that you saw?

17     A.  Insofar as the observations I made on

18  the site and my understanding while at the site

19  of their maintenance operations, yes.

20     Q.  Okay.  You don't mention anything about

21  maintenance in your entire report, do you?

22     A.  Correct.

23     Q.  Why is that?

24     A.  I didn't think it was an issue.

25     Q.  You -- when you focus on determination
```

Exhibit B

NON-CERTIFIED COPY

Page 156

1   letter, correct?

2       A.  Correct.

3       Q.  Did you actually -- this is in reference

4   to the change orders in this case, correct?

5       A.  Correct.

6       Q.  Did you review the change orders?

7       A.  Yes.

8       Q.  Okay.  And who made this calculation

9   using the cost of change versus time model?  Who

10  did that?

11      A.  That particular part cited in this

12  letter was done by Matt.

13      Q.  Okay.  So are you familiar with the cost

14  of change versus time model that he's talking

15  about?

16      A.  Yes.  He is -- he shared that with me.

17      Q.  Well, wait.  Was that your first

18  exposure to that time model?

19      A.  I've heard of it.

20      Q.  You've heard of it, but was this your

21  first exposure in this case to dealing with that

22  particular model?

23      A.  In this case, yes.

24      Q.  So you've never used it before this

25  case?

Exhibit B

NON-CERTIFIED COPY

$E^x$ponent®

*Failure Analysis Associates*

Exponent
475 14th Street, Suite 4--
Oakland, CA 94612

telephone 510-268-5000
facsimile 510-268-5099
www.exponent.com

August 26, 2016

Loretta G. Mince, Esq.
Fishman Haygood, L.L.P.
201 St. Charles Avenue
46th Floor
New Orleans, Louisiana 70170

Subject:   H&E Equipment Facilities
           Exponent Project No. 1306663.001

Dear Ms. Mince:

I reviewed the Change Order (CO) documents related to the construction of the H&E Equipment facilities at Baton Rouge, Kenner, and Belle Chasse.   Based on the CO documents produced by URS, and my education, training, and 28 years of experience in the construction industry, the added project costs could have been mitigated.   Using the Cost of Change v. Time model, the cost of work added to the scope by change order can be estimated  to be 1.5 to 2 times greater than the cost otherwise would have been had the scope of work been included in the contract documents prior to bidding the project.

If you have any questions or require additional information, please do not hesitate to contact me at 510-268-5083.

Sincerely,

Matt Vail, P.E.
Senior Manager
Construction Consulting Practice
Exponent, Inc.

James R. (Bob) Bailey, Ph.D., P.E.
Senior Managing Engineer
Exponent, Inc.

1306663.001 - 6908

Exhibit C $E^x$

NON-CERTIFIED COPY

PHONE
(504) 828-8000
FAX
(504) 836-2939

# WCD

## Wallace C. Drennan, Inc.

### General Contractors
P.O. BOX 15438
NEW ORLEANS, LA 70175-5438

LA CONTRACTOR'S
LICENSE NO. 1033



July 28, 2016

**E-MAIL**



Fishman Haygood, L.L.P.
201 St. Charles Ave., 46th Floor
New Orleans, La. 70170
Attention: Lori Mince

> Re:  *H&E Equipment Services, Inc. v. URS Corporation Architecture, P.C., et al., Suit No. 626,308, 19th JDC, Parish of East Baton Rouge, State of Louisiana*

Dear Ms. Mince:

Fishman Haygood, L.L.P. has asked Wallace C. Drennan, Inc. ("WCD") to prepare a report addressing issues related to cracking and spalling of concrete pavement at the H&E Equipment Services ("H&E") facilities in Baton Rouge and Kenner, Louisiana. This report is in response to Fishman Haygood's request and summarizes my opinions.

For this assignment, I relied on the following materials provided to me:

H&E Baton Rouge Facility

1. As-Built Plans sheet nos. C-201, C-202, C-203, C-204, C-205, C-206, C-207, C-301, C-302, C-303, C-304, C-305, C-306 and C-501.

2. STE Geotechnical Investigation Proposed H & E Buildings Pecue Lane, Baton Rouge, Louisiana dated January 11, 2007. (H&E 0000211 to 0000259).

3. URS Project Specifications - Project Manual Sec. 2516 (URS 062010-062242).

H&E Kenner Facility

1. MAPP As-Built Plans sheet nos. C3.1, C7.0, C5.0, C6.0, C7.0, C8.0 and C9.0.


EBR4104858

**CONSTRUCTING FOR OVER 50 YEARS**

Exhibit A

NON-CERTIFIED COPY

Page 2

2. Terracon Geotechnical Engineering Report H&E Equipment-Addition and Renovation Kenner, Louisiana dated February 9, 2011. (H&E 0009535 to 0009577).

3. Terracon Geotechnical Report – Pavement Addendum dated August 5, 2011 (URS 033265 to 033267).

4. URS Specifications for Kenner (URS 066295-066356).

During the course of my review and evaluation, I also referred to the following sources:

1. Louisianan Department of Transportation and Developments ("LADOTD") Standard Plans CP-01, sheet nos. 1, 2 and 3.

2. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

3. City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01, sheet nos. 1, 2 and 3.

4. WCD Photographs taken during site visits June 30, 2016 and July 7, 2016.

In addition, I conducted site inspections on June 30, 2016 at both the Baton Rouge and Kenner, Louisiana facilities. On July 7, 2017, I conducted a follow-up site visit to the Kenner facility.

## DISCUSSION

The observed damage to the concrete pavement at both facilities includes the following:

1. Random Cracking across panels of PCCP.

2. Diagonal Corner Cracking at the intersections of Joints (CJ and CJ/CJ and EJ/EJ and EJ).

3. Joint Spalling (breaking off and chipping of joint edges) of either side of the PCCP Control/Contraction/Construction Joints ('CJ') and Expansion Joints ("EJ").

## BATON ROUGE

I have reviewed the plans and specifications prepared by URS Corporation for the Baton Rouge facility. The plans for the Baton Rouge facility include design details for the PCCP including the CJ (see detail no. 4 as shown plan sheet no. C-501) and EJ (see detail no. 3 as shown plan sheet no. C-501). The design of the pavement for the Baton Rouge facility is

Exhibit A

NON-CERTIFIED COPY

Page 3

defective in numerous respects, including the following:

1. The design of the CJ does not include smooth dowels and it is defective. This omission is not in conformance with the following:

   a. Louisianan Department of Transportation and Developments ("LADOTD") Standard Plans CP-01, sheet nos. 1, 2 and 3.

   b. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

   c. City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01, sheet nos. 1, 2 and 3.

   d. The STE Geotechnical Investigation Proposed H & E Buildings Pecue Lane, Baton Rouge, Louisiana dated January 11, 2007. (H&E 0000211 to 0000259). Specifically, it is not in compliance with section no. 8.2 "Rigid Pavement" of this report.

2. The plans (see detail no. 1 & 2 as shown on plan sheet no. C-501) reflect #3 rebar running across the CJs. This is not consistent with standards promulgated in nos. 1.a., 1b. and 1c. in the paragraph above. Additionally, using this design does not permit the CJs to contract. Therefore, it is not a functioning CJ and is defective.

3. The design of the typical CJ (see detail no. 4 as shown plan sheet no. C-501) reflects a saw cut joint of ½ inch depth. This depth is not in accordance with standards promulgated nos. 1.a., 1b. and 1c. above. Additionally, based on my professional experience, this depth hinders the functioning of the CJ and is inadequate. Table 1, as shown on the City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01, sheet no. 1, calls for a "MINIMUM DEPTH OF JOINT" of 2 inches for 6 inch PCCP thickness and 3 inches for 8 inch PCCP thickness.

4. The design of the EJ contained in the plans reflects the use of #4 (1/2") smooth dowels spaced at 18 inch on center. The size and placement of these dowel bars is not in accordance with standards promulgated nos. 1.a., 1b. and 1c. above. In my opinion the dowel bars are too small and should be spaced on 12 inch center not 18 inch. Table 1, as shown on City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01, sheet no. 1, calls for a 1" (#8) smooth dowels for 6 inch PCCP thickness and 1 ¼ inch smooth dowels for 8 inch PCCP thickness both on 12 inch center. Also, Table 1, as shown on the Louisiana Department of Transportation and Developments ("LADOTD") Standard Plans CP-01, sheet no. 1 calls for 1 ¼" (#10) smooth dowels for 8 inch PCCP thickness on 12 inch center.

Exhibit A

NON-CERTIFIED COPY

Page 4

The design defects referred to above are consistent with random cracking across panels of PCCP and diagonal corner cracking at the intersections of Joints (CJ and CJ/CJ and EJ).

In addition to the foregoing, the design of the concrete calls for 8 inch pavement in the area immediately surrounding the branch office and 6 inch pavement in all other areas. In areas where H&E operates its equipment (*i.e.* all parts of the facility other than the parking lot in front of the office building), it is my opinion that 6 inch thickness is inadequate. Based on my professional experience, the standard in the industry is minimum of 7 inches and preferably 8 inches or greater in areas where heavy equipment will be operated.

The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJs and EJs outlined above is three million three hundred seventy thousand dollars ($3,370,000). The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJs and EJs and increase the concrete thickness to 8 inches in all areas is three million six hundred ninety thousand dollars ($3,690,000). All estimated costs are rounded to the nearest thousand dollars. The estimated costs do not include any contingency costs which are normally 10% to 20% of the estimated costs. The estimated costs include 8% for engineering costs. According to the State of Louisiana Facility Planning & Control A/E Consulting Fees Spreadsheet for a project of this size, the Fee % is 7.7%. The estimated costs do not include the costs of a testing laboratory. Add 1% for testing.

## KENNER

I have also reviewed the plans and specifications prepared by URS Corporation for the Kenner facility. As with the Baton Rouge facility, the plans for the Kenner facility include design details for the PCCP including the CJ (see details plan sheet no. C-7.0) and EJ (see details plan sheet no. C-7.0) as well as various general notes regarding the pavement. The plans and specifications for the Kenner facility are deficient in numerous respects, including the following:

1. The design of the CJ does not include smooth dowels and it is defective. This omission is not in conformance with the following:

   a. Louisiana Department of Transportation and Developments ("LADOTD") Standard Plans CP-01, sheet nos. 1, 2 and 3.

   b. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

   c. Terracon Geotechnical Engineering Report H&E Equipment-Addition and Renovation Kenner, Louisiana dated February 9, 2011. (H&E 0009535 to 0009577).

2. The plans and specifications reflect #3 rebar running across the CJs. This is not consistent with standards promulgated by LADOTD. Additionally, using this design

Exhibit A

NON-CERTIFIED COPY

Page 5

does not permit the CJs to contract.   Therefore, it is not a functioning CJ and is defective.

3. The CJ shows a saw-cut of ¼" depth of concrete. This depth is not in accordance with standards promulgated by LADOTD.   Additionally, based on my professional experience, this depth is inadequate.

4. The design of the typical transverse expansion joint contained in the plans reflects the use of #4 (1/2") smooth dowels spaced at 18 inch on center.  The size and placement of these dowel bars is not in accordance with specifications for the ACI or the DOTD. In my opinion, the dowel bars are too small and should be spaced on 12 inch center not 18 inch.

The design defects referred to above are consistent with random cracking across panels of PCCP and diagonal corner cracking at the intersections of joints (CJ and CJ/CJ and EJ).

In addition to the foregoing, the design of the concrete calls for 7" of concrete.  Given the extremely poor soils conditions in Kenner, based on my professional experience, a minimum of 8" of thickness is required in areas where heavy equipment is used.

Due to the nature of concrete, and its thermal expansion and contraction, it cracks without proper crack control.   Properly designed CJs and EJs, reinforcement, and proper pavement thickness, are important to insuring the integrity of the concrete and preventing excess cracking and failure.  The design deficiencies outlined above are consistent with the cracking observed at both the Baton Rouge and Kenner facilities. In both situations, had the joints been saw cut 2 inches deep for 6 inch PCCP and 3 inches deep for 8 inch PCCP, the #3 rebar crossing the joints still prohibited the CJs from contracting.  Thus, the concrete was left to crack at areas of least resistance resulting in Diagonal Corner Cracking and Random Cracking.

In addition to the foregoing, the operation of metal track equipment across the pavement has resulted in spalling observed along the surface of the joints.  It was foreseeable that the operation of H&E's equipment across the joints would cause spalling along the joints.  URS should have recommended a design that would offer additional protection for the joints.

The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJs and EJs outlined above is one million six hundred fifty six thousand dollars ($1,656,000). The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJ and EJs and increase the concrete thickness to 8 inches in all areas is one million seven hundred sixteen thousand dollars ($1,716,000).  All estimated costs are rounded to the nearest thousand dollars.  The estimated costs do not include any contingency costs which are normally 10% to 20% of the estimated costs.  The estimated costs include 8% for engineering costs.  According to the State of Louisiana Facility Planning & Control A/E Consulting Fees Spreadsheet for a project of this size, the Fee % is 7.7%.  The estimated costs do not include the costs of a testing laboratory.  Add 1% for testing.

Exhibit A

Page 6

## QUALIFICATIONS

| From | To | Description |
|------|------|-------------|
| 1979 | 1981 | Tulane University |
| 1981 | 1983 | University of Alabama |
| 1983 | 1988 | Wallace C. Drennan, Inc. Concrete Paving Laborer, Equipment Operator and Foreman. Sewer Installation Foreman. Project Manager. |
| 1988 | 1991 | Wallace C. Drennan, Inc. Secretary Treasurer, Estimator, Project Manager, Concrete Paving Equipment Operator |
| 1991 | Present | Wallace C. Drennan, Inc. President. Associated Builders and Contractors (ABC) Board of Directors 1994-2000, President 1997 and 1998. |

Attached please find a listing of representative projects completed by Wallace C. Drennan, Inc.

## COMPENSATION

I am being compensated at the rate of $350.00 per hour for my work in this matter.

## PRIOR TESTIMONY AND PUBLICATIONS

I have not testified as an expert witness in any matter during the last 4 years. I have not authored any publications within the last 10 years.

Sincerely,

**Wallace C. Drennan, Inc.**

**Wallace C. Drennan III, President**

Enclosure

Exhibit A

NON-CERTIFIED COPY

PHONE
(504) 828-8000
FAX
(504) 836-2939

LA CONTRACTOR'S
LICENSE NO. 1033

# WCD
## Wallace C.
# Drennan, Inc.

### General Contractors
P.O. BOX 15438
NEW ORLEANS, LA 70175-5438

October 13, 2016

Ms. Lori Mince
Fishman Haygood LLP
201 St. Charles Ave., 46th Floor
New Orleans, LA 70170

Re: Head and Enquist Baton Rouge

Dear Lori,

    During my deposition, I testified that the estimate prepared for the removal and replacement of concrete at the Baton Rouge site included the entire site. Following my deposition, I confirmed that the square footage reflected in the estimate does not include the parking area adjacent to the office building.

    Additionally, during my deposition, counsel for URS inquired about the cost of demolishing eight inches of pavement verses demolishing six inches of pavement and removing two inches of fill. Following my deposition, I reviewed this and determined that the difference in the price for removal of eight inches of concrete verses removal of six inches plus two inches of fill for the entire project would be $0.42 per square yard.

    If there are any questions please feel free to contact me.

Sincerely,

Wallace C. Drennan, III
President

**CONSTRUCTING FOR OVER 50 YEARS**

Exhibit B

NON-CERTIFIED COPY



SHORT FORM MASTER AGREEMENT FOR PROFESSIONAL SERVICES
BETWEEN
**H&E Equipment Services, Inc.**
AND
**URS Corporation Architecture PC**

**THIS AGREEMENT** ("Agreement") for Professional Services, (together with the attachments hereto) dated and effective as of August 13, 2009 (the "Effective Date"), is hereby made and entered into by and between H&E Equipment Services, Inc., a Delaware corporation, (hereinafter "Client") having a place of business located at 11100 Mead Road, Suite 200, Baton Rouge, Louisiana 70816 and URS Corporation Architecture PC, a North Carolina corporation (hereinafter "Consultant") having a place of business located at 7389 Florida Blvd, Suite 300, Baton Rouge, Louisiana, 70806 Consultant and Client are each individually referred to as a "Party" and collectively as the "Parties".

The Parties agree as follows:

1.      **WORK AUTHORIZATIONS**

1.1     Consultant agrees to undertake and perform certain consulting and professional engineering services ("Services") in accordance with the terms and conditions contained herein, as may be requested by Client from time to time.  The Services to be performed, Consultant's compensation, and the schedule for performance for each task shall be described in one or more authorizations issued to Consultant by Client, the form of which is attached hereto as Attachment 1 ("Work Authorization").  A Work Authorization shall be valid and binding upon the Parties only if accepted in writing by Client and Consultant.  Each duly executed Work Authorization shall be subject to the terms and conditions of this Agreement, except to the extent expressly modified by the Work Authorization.

1.2     It is the expressed intent of the parties that this Agreement shall be made available to subsidiaries and affiliated companies of Consultant.  For the purposes of this Agreement, as it applies to each Work Authorization, the term "Consultant" shall mean either Consultant as defined above or the subsidiary or affiliate of Consultant identified in the Work Authorization.  The applicable Work Authorization shall clearly identify the legal name of the entity accepting the Work Authorization.

2.      **PAYMENTS FOR SERVICES**

2.1     Unless otherwise stated in a Work Authorization, payment shall be on a time and materials basis under the Schedule of Fees and Charges in effect when the Services are performed.  Client shall pay undisputed portions of each progress invoice within thirty (30) days of the date of the invoice.  If payment is not received within thirty (30) days from the due date of such payment, Consultant may suspend further performance under one or more Work Authorizations until payments are current.  Client shall notify URS of any disputed amount within fifteen (15) days from date of the invoice, give reasons for the objection, and promptly pay the undisputed amount.  Client shall pay an additional charge of one percent (1%) per month or the maximum percentage allowed by law, whichever is the lesser, for any past due amount.  In the event of a legal action for invoice amounts not paid, attorneys' fees, court costs, and other related expenses shall be paid to the prevailing party.

2.2     Client shall reimburse Consultant for all taxes, duties and levies such as Sales, Use, Value Added Taxes, Deemed Profits Taxes, and other similar taxes which are added to or deducted from the value of Consultant's Services.  For the purpose of this Article such taxes shall not include taxes imposed on Consultant's net income, and employer or employee payroll taxes levied by any United States taxing authority, or the taxing authorities of the countries or any agency or subdivision thereof in which URS subsidiaries, affiliates, or divisions are permanently domiciled.  It is agreed and understood that these net income, employer or employee payroll taxes are included in the unit prices or lump sum to be paid Consultant under the applicable Work Authorization.

2.3     Where charges are "not to exceed" a specified sum, Consultant shall notify Client before such sum is exceeded and shall not continue to provide the Services beyond such sum unless Client authorizes an increase in the sum.  If a "not to exceed" sum is broken down into budgets for specific tasks, the task budget may be exceeded without Client authorization as long as the total sum is not exceeded.  Changes in conditions, including, without limitation, changes in laws or regulations occurring after the budget is established, or other circumstances beyond URS control, shall be a basis for equitable adjustments in the budget and schedule.

3.      **CONFIDENTIALITY**

3.1     For a period commencing with the disclosure of any confidential information under this Agreement and/or a Work Authorization(s) and ending on the second anniversary such disclosure was first made, Consultant and Client each agree not to disclose to third parties, including also subcontractors and vendors (unless such subcontractors and vendors have a need to know and are bound to similar obligations of confidentiality), any information that is identified as confidential in writing on the materials made available to the other Party hereunder

4.      **WARRANTY**

4.1     Consultant warrants that any consulting and professional engineering Services performed by it under a Work Authorization shall be performed in accordance with that degree of care and skill ordinarily exercised by members of Consultant's profession practicing at the same time in the same location.  Consultant's sole liability to Client for any non-conforming Services shall be to re-perform the non-conforming or defective Services, written notice of which must be promptly given by Client to Consultant.  Consultant's obligation for re-performance of non-conforming Services as set

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

1

Exhibit C

Attachment 1

NON-CERTIFIED COPY

# URS

forth in the preceding sentence shall extend for a term commencing at the substantial completion of such Services under a Work Authorization and ending one year later.

4.2   THE WARRANTY SET FORTH IN THIS ARTICLE 4 IS EXCLUSIVE, AND IN LIEU OF ANY AND ALL OTHER WARRANTIES RELATING TO THE SERVICES, WHETHER STATUTORY, EXPRESS OR IMPLIED, AND CONSULTANT DISCLAIMS ANY SUCH OTHER WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY AND ALL WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE AND ANY AND ALL WARRANTIES ARISING FROM COURSE OF DEALING AND/OR USAGE OF TRADE.  ANY OTHER STATEMENTS OF FACT OR DESCRIPTIONS EXPRESSED IN THE AGREEMENT OR ANY WORK AUTHORIZATION SHALL NOT BE DEEMED TO CONSTITUTE A WARRANTY OF THE SERVICES OR ANY PART THEREOF.  CONSULTANT'S REPERFORMANCE OF DEFECTIVE OR NON-CONFORMING SERVICES THROUGH THE ONE YEAR PERIOD PROVIDED FOR IN THIS ARTICLE 4 SHALL CONSTITUTE COMPLETE FULFILLMENT OF, AND CLIENT'S EXCLUSIVE REMEDY FOR, ALL THE LIABILITIES OR RESPONSIBILITIES OF CONSULTANT TO CLIENT FOR NON-CONFORMING OR DEFECTIVE SERVICES, WHETHER THE CLAIMS OF CLIENT ARE BASED ON DELAY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, WARRANTY, INDEMNITY, ERROR AND OMISSION OR ANY OTHER CAUSE WHATSOEVER.

5.   WORK BY OTHERS

5.1   The performance by Consultant of Services under a Work Authorization shall not constitute an assumption by Consultant of the obligations of Client or its other contractors.  Consultant shall not control or have charge of, and shall not be responsible for, construction means, methods, techniques, sequences, procedures of construction, health or safety programs, or precautions connected with the work of Client or its other contractors, and shall not manage, supervise, control or have charge of construction.  Client shall require Consultant to be named as an additional insured along with Client on any liability insurance policies provided by Client's construction contractors.  To the fullest extent permitted by law, Client shall defend Consultant against any claim, suit or proceeding asserted by one of its other contractors and indemnify, defend and save Consultant harmless from any and all actual or alleged claims and losses (including, without limitation, attorney's fees) sustained by such contractor in connection with the Services, regardless or whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

6.   INSURANCE

6.1   In the event Consultant performs Services under any Work Authorization in connection with a project for which Client or another party with which Client has contracted obtains all-risk or builder's risk property insurance, Client, as the case may be, shall name, or shall cause such other party to name, Consultant as an additional insured on such all risk or builder's risk property insurance.  Client acknowledges that Consultant has an insurable interest in such all risk or builder's risk property insurance.

6.2   Consultant and Client each waive all rights of recovery and subrogation against each other with respect to a loss occurring to property of the other, to the extent that such waivers do not invalidate the property insurance of either.

7.   INDEMNITY

7.1   Each Party shall indemnify, defend and save the other Party, its officers, directors, employees and affiliates harmless from any loss, cost or expense claimed by third parties, excluding employees of either Party, for property damage and/or bodily injury, including death, to the proportionate extent such loss, cost or expense arises from the negligence or willful misconduct of the indemnifying Party, its employees or affiliates in connection with the Services.

7.2   Notwithstanding any other provision contained elsewhere in this Agreement to the contrary and to the fullest extent permitted by law, Client shall be liable for and indemnify, defend and save Consultant, its officers, directors, employees and affiliates harmless from and against any and all actual or alleged claims, damages (including incidental, consequential, indirect and special damages), losses, and expenses (including, without limitation, all penalties, attorney's fees, fines and administrative or civil sanctions arising out of or related to such claim) (collectively "Losses") arising out of: (1) economic loss suffered by third parties; and/or (2) investment decisions of Client or third parties in reliance upon the results of the Services, regardless of whether or not any of the foregoing arose out of the negligent acts or omissions of Consultant.

7.3   The indemnity and save harmless obligations of Consultant and Client under this Article 7 shall not apply with respect to any Hazardous Material, as Consultant's and Client's rights and obligations with respect thereto are set forth in Article 10.

8.   WAIVER OF CONSEQUENTIAL DAMAGES

8.1   Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, neither Client nor Consultant shall be liable, whether based on contract, tort, negligence, strict liability, warranty, indemnity, error and omission or any other cause whatsoever, for any consequential, special, incidental, indirect, punitive or exemplary damages, or damages arising from or in connection with loss of power, loss of use, loss of revenue or profit (actual or anticipated), loss by reason of shutdown or non-operation, increased cost of construction, cost of capital, cost of replacement power or customer claims, and Consultant hereby releases Client and Client hereby releases Consultant from any such liability.

9.   LIMITATION OF LIABILITY

9.1   Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, in no

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

Exhibit C

Attachment 1

NON-CERTIFIED COPY

URS

event shall the total cumulative aggregate liability of Consultant, its subconsultants, and their respective partners, officers, directors, shareholders, employees, and agents (referred to collectively in this Article as "Consultant") to Client resulting from, arising out of or in connection with the performance or nonperformance of any or all Services or other obligations under a Work Authorization, exceed $250,000 or ten percent (10%) of the compensation paid Consultant pursuant to such Work Authorization, whichever is greater, or extend beyond the expiration of the warranty period under Article 4 for the Services performed under the Work Authorization, regardless of the legal theory under which such liability is imposed. The remedies stated in the Agreement are Client's sole and exclusive remedies for any failure by Consultant to comply with obligations to Client, and Client hereby irrevocably waives any right to assert a claim against Consultant based on a legal theory that a remedy provided herein fails of its essential purpose.

10. HAZARDOUS MATERIAL

10.1 Nothing in this Agreement shall be construed or interpreted as requiring Consultant to assume the status of, and Client acknowledges that Consultant does not act in the capacity nor assume the status of, Client or others as a "generator," "operator," "transporter," or "arranger" in the treatment, storage, disposal, or transportation of any hazardous substance or waste as those terms are understood within the meaning of the Resource Conservation and Recovery Act (RCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), or any other similar federal, state, or local law, regulation, or ordinance. Client acknowledges further that Consultant has played no part in and assumes no responsibility for generation or creation of any hazardous waste, pollution condition, nuisance, or chemical or industrial disposal problem, if any, which may exist at any site that may be the subject matter of any Work Authorization.

10.2 It is acknowledged by both parties that the Services do not include services related to regulated substances, pollutants, or hazardous or toxic wastes ("Hazardous Material"). In the event Consultant or any other party encounters undisclosed Hazardous Materials, Consultant shall notify Client and, to the extent required by law or regulation, the appropriate governmental officials, and Consultant may, at its option and without liability for delay, consequential or any other damages to Client, suspend performance of Services on that portion of the project affected by Hazardous Material until Client: (i) retains appropriate specialist consultant(s) or contractor(s) to identify and, as appropriate, abate, remediate, or remove the Hazardous material; and (ii) warrants that the project site is in full compliance with all applicable laws and regulations. Notwithstanding any other provision to the contrary in this Agreement or a Work Authorization and to the fullest extent permitted by law, Client shall indemnify, defend and save Consultant and its affiliates, subconsultants, agents, and suppliers of any tier, and any and all employees, officers, directors of any of the foregoing, if any, from and against any and all Losses which arise out of the performance of the Services and relating to the regulation and/or protection of the environment, including, without limitation, Losses incurred in connection with characterization, handling, transportation, storage, removal, remediation, disturbance or disposal of Hazardous Material, whether above or below ground and not brought to a Client site or other proposed project site by Consultant in the performance of the Services without Client's approval.

11. CHANGES

11.1 The Parties may from time to time by mutual agreement seek to modify, extend or enlarge the Services under a Work Authorization ("Modification"). In the event the Parties agree to a Modification to add additional Services, or to make other modifications to the Services, Consultant's compensation, the schedule and any other relevant terms and conditions of the applicable Work Authorization shall be equitably adjusted prior to performance of such Services.

12. OWNERSHIP OF DOCUMENTS

12.1 Consultant grants to Client a transferable, irrevocable and perpetual royalty-free license to retain and use all work products delivered to Client for any purpose in connection with the project specified in each Work Authorization, upon full payment by Client for Consultant's Services. Client also may use such work product for other purposes with Consultant's written consent. Re-use of any such work product by Client on any extension of the project or on any other project without the written authorization of Consultant shall be at Client's sole risk and Client shall indemnify, defend and save Consultant and its affiliates, consultants, agents, subcontractors and suppliers of any tier, and any and all employees, officers and directors of any of the foregoing, if any, from and against any and all Losses suffered as a result of, or arising out of, or in connection with such re-use. Consultant shall have the right to retain copies of all such work product. Consultant retains the right of ownership with respect to any patentable concepts or copyrightable materials arising from its Services.

13. TERMINATION/SUSPENSION

13.1 Client may terminate all or any portion of the Services under one or more Work Authorizations for convenience, at its option, by sending a written notice to Consultant. Either party can terminate this Agreement or a Work Authorization for cause if the other commits a material, uncured breach of this Agreement or becomes insolvent. Termination for cause shall be effective twenty (20) days after receipt of a notice of termination, unless a later date is specified in the notice. The notice of termination for cause shall contain specific reasons for termination and both parties shall cooperate in good faith to cure the causes for termination stated in the notice. Termination shall not be effective if reasonable action to cure the breach has been taken before the effective date of the termination. Client shall pay Consultant upon invoice for Services performed and charges incurred prior to termination, plus reasonable termination charges. Any suspension of Services by Client shall result in an equitable adjustment to Consultant's compensation, time for performance, or any of its other obligations under a Work Authorization.

14. FORCE MAJEURE

14.1 Any delay or failure of Consultant in performing its required obligations hereunder shall be excused if and to the extent such delay or failure is caused by a Force Majeure Event. A "Force Majeure Event" means an event due to any cause or causes beyond the reasonable control of Consultant and shall include, but not be limited to, acts of God, strike, labor dispute fire, storm, flood, windstorm, unusually severe weather, sabotage, embargo,

Exhibit C

Attachment 1

NON-CERTIFIED COPY

# URS

terrorism, energy shortage, accidents or delay in transportation, accidents in the handling and rigging of heavy equipment, explosion, riot, war, court injunction or order, delays by acts or orders of any governmental body or changes in laws or government regulations or the interpretations or application thereof or the acts or omissions of the Client or its other contractors, vendors or suppliers. In the event of a Force Majeure Event, Consultant shall receive an equitable adjustment extending Consultant's time for performance for such Services sufficient to overcome the effects of any delay, and an increase(s) to Consultant's compensation sufficient to account for any increased cost in performance or loss or damage suffered by Consultant.

## 15.    RESPONSIBILITIES OF CLIENT

15.1    Without limiting any express or implied obligations of Client under applicable law, Client shall: (1) provide Consultant, in writing, all information relating to Client's requirements for the project; (2) correctly identify to Consultant the location of subsurface structures, such as pipes, tanks, cables, and utilities; (3) notify Consultant of any potential hazardous substances or other health and safety hazard or condition known to Client existing on or near the project site; (4) give Consultant prompt written notice of any suspected deficiency in the Services; (5) with reasonable promptness, provide required approvals and decisions; and (6) furnish or cause to be furnished to Consultant full, unrestricted and legal access to, and use of, the site and all necessary rights of way and easements, in order to perform the Services. In the event Consultant is requested by Client or is required by subpoena to produce documents or give testimony in any action or proceeding to which Client is a party and Consultant is not a party, Client shall pay Consultant for any time and expenses required in connection therewith, including reasonable attorney's fees.

15.2    Consultant may rely upon and use in the performance of any Services information supplied to it by Client without independent verification and Consultant shall not be responsible for defects in its Services attributable to its reliance upon or use of such information.

## 17.    TERM

17.1    Unless otherwise specified, the term of this Agreement shall run from the Effective Date until Consultant has completed the Services and received all payments due under the Agreement.

## 18.    GENERAL

18.1    Client and Consultant each represent and warrant that this Agreement has been duly authorized, executed and delivered and constitutes its binding agreement enforceable against it. This Agreement and any executed Work Authorizations supersede all prior written and/or oral contracts and agreements that may have been made or entered into between Client and Consultant regarding the subject matter hereof, including but not limited to any and all proposals, oral or written, and all communications between the Parties relating to this Agreement or any Work Authorization(s), and constitute the entire agreement between the Parties hereto with respect to the subject matter hereof.

18.2    This Agreement and Work Authorization(s) may not be assigned by Consultant or Client in any way, including by operation of law, unless otherwise mutually agreed to in writing, any such attempted non-authorized assignment shall be null and void and of no force or effect.

18.3    Any cost opinions or estimates provided by Consultant will be on a basis of experience and judgment, but since Consultant has no control over market conditions or bidding procedures, Consultant cannot and does not warrant that bids, ultimate construction cost, or project economics will not vary from such opinions or estimates. Neither this Agreement nor any of the Services provided hereunder shall constitute or provide for, and Consultant shall not be considered to have rendered, any legal or financial opinion(s) regarding the feasibility of this project or any other or regarding any other matter. Unless otherwise expressly included in a Work Authorization, Consultant shall under no circumstances provide as part of the Services a consent, opinion or similar document, or act as a qualified person or expert, in connection with any filing by Client with the United States Securities and Exchange Commission, or similar non-United States agency, authority or commission.

18.4    Notices shall be effective hereunder as follows only if in writing and addressed to the authorized representative designated in applicable Work Authorizations: (1) upon delivery, if delivered personally to the person; (2) upon transmission, if transmitted to the facsimile number of the person; and (3) upon posting, if by first class or overnight mail (postage prepaid).

18.5    All contract issues and matters of law will be adjudicated in accordance with the laws of the state where the project is located, excluding any provisions or principles thereof which would require the application of the laws of a different jurisdiction; provided, however that if the project is located outside the United States, the laws of the State of California shall govern. Venue for any litigation shall be any state court or United States District Court having jurisdiction over the parties and subject matter.

18.6    The terms and conditions of this Agreement shall prevail, notwithstanding any variance with any purchase order or other written instrument submitted by Client whether formally rejected by Consultant or not. This Agreement may be modified only by amendment when signed by each Party. In the event that any one or more of the provisions of this Agreement shall be found to be illegal or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect, and such term or provision shall be deemed stricken to the extent and in the jurisdictions necessary for compliance with applicable law.

18.7    Nothing in this Agreement shall be construed to give any rights or benefits to anyone other than the Client or Consultant.

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

4

Exhibit C

Attachment 1

NON-CERTIFIED COPY

# URS

18.8    The headings in this Agreement are for convenience only, and shall not affect the interpretation hereof. The terms "hereof", "herein," "hereto" and similar words refer to the entire Agreement and not to any particular Article, Section, Attachment, Exhibit or any other subdivision of this Agreement. References to "day" or "days" shall mean calendar days unless specified otherwise.

18.9    The provisions of this Agreement which by their nature are intended to survive the termination, cancellation, completion, or expiration of the Agreement, including, but not limited to, indemnities and any expressed limitations of or releases from liability, shall continue as valid and enforceable obligations of the parties notwithstanding any such termination, cancellation, completion, or expiration.

18.10    It is understood and agreed that any delay, waiver or omission by Consultant or Client to exercise any right or power arising from any breach or default by Client or Consultant in any of the terms, provisions or covenants of this Agreement or any Work Authorization shall not be construed to be a waiver by Consultant or Client of any subsequent breach or default of the same or other terms, provisions or covenants on the part of Consultant or Client.

19.    **ATTACHMENTS AND EXHIBITS**

The following attachments and exhibits, which are attached hereto, are part of this Agreement.

Attachment 1 – Work Authorization

Attachment 2 – Fee Proposal, Scope of Work, Schedule

Attachment 3 – URS 2009 Schedule of Fees and Charges

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, effective as of the day and year first above mentioned.

**H&E Equipment Services, Inc.**

By: _____
      (Signature)

Name: _Lemord Sr. Fiermold_
      (Printed)

Title: _V.P. operations_

**URS Corporation Architecture PC**

By: _Craig W. Gordon_
      (Signature)

Name: _Craig W. Gordon_
      (Printed)

Title: _VP/OM_

I:\Proposals\Facilities\H&E Equipment Services - Kenner\Proposal\PS-100  Short Form Master Agreement for Professional Services (Rev. 03-2009).doc

5

Exhibit C

Attachment 1

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


* * * * * * * * *
                          *
H&E EQUIPMENT SERVICES    *
                          * NUMBER 626,308
VERSUS                    *
                          * DIVISION "D"
URS CORPORATION           *
ARCHITECTURE, P.C., URS   *
CORPORATION, L O'NEAL     *
JOHNSON AND THOMAS E.     *
RYAN, III                 *
                          *
* * * * * * * * *


         Deposition of WALLACE C. DRENNAN

III, taken on Wednesday, September 21, 2016,

commencing at 9:44 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.

Exhibit D

NON-CERTIFIED COPY

Page 5

```
 1   APPEARANCES:

 2

     Representing the Plaintiff:
 3

       FISHMAN HAYGOOD, LLP
 4     Attorneys at Law
       201 St. Charles Avenue, Suite 4600
 5     New Orleans, Louisiana  70170

 6     BY:  LORETTA G. MINCE, ESQ.

 7

 8

 9   Representing the Defendant:

10     ADAMS AND REESE, LLP
       Attorneys at Law
11     4500 One Shell Square
       New Orleans, Louisiana  70139
12
       BY:  PHILIP A. FRANCO, ESQ.
13

14   ALSO PRESENT:
       James R. Bailey, Ph.D., P.E.
15     Exponent, Inc.

16

     Reported by:
17             KAY E. DONNELLY
               Certified Court Reporter
18             State of Louisiana

19

20

21

22

23

24

25
```

Exhibit D

NON-CERTIFIED COPY

Page 12

1    Q.  Okay.  So today, you didn't meet with

2    anybody prior to your deposition to talk about

3    your deposition?

4    A.  In Lori Mince's office for 15 minutes

5    when I got here.

6    Q.  Okay.  Let's go through your educational

7    background for me, please.

8         What is your most recent educational

9    accomplishment?

10   A.  I went to Tulane University.  I majored

11   in computer science, and then I went to the

12   University of Alabama, civil engineering, and I

13   didn't graduate.

14   Q.  From either?

15   A.  No.

16   Q.  So, no degrees?

17   A.  No degrees.

18   Q.  Have you had any formal education since

19   then?

20   A.  Other than a seminar or so, no.

21   Q.  How long were you at Alabama studying

22   civil engineering?

23   A.  Year, year and a half.

24   Q.  Was that before Tulane or after?

25   A.  After.

Exhibit D

NON-CERTIFIED COPY

Page 13

1    Q.  All right.  And after you went to

2  Alabama, I assume you went to work?

3    A.  Yes, I did.

4    Q.  Where did you go to work?

5    A.  Wallace C. Drennan, Incorporated.

6    Q.  And that was a company owned by your

7  father?

8    A.  My father --

9    Q.  Or your grandfather?

10   A.  My father, yes.

11   Q.  Your father.

12       And what did you do at Walter C.

13  Drennan, Incorporated?

14   A.  I was a laborer.

15   Q.  Out of college?

16   A.  What?

17   Q.  Out of college?

18   A.  After Alabama --

19   Q.  After college?

20   A.  After I left Alabama, I was a laborer.

21   Q.  Okay.  And then what?

22   A.  I became an operator, foreman,

23  estimator.

24       Then in 1991, my father passed away.  I

25  became the president of Wallace C. Drennan,

Exhibit D

NON-CERTIFIED COPY

Page 18

1    other than your dad and brothers and you?

2        A.  His father.  And when I got divorced

3    from my ex-wife, she got some money in there.

4        Q.  But, otherwise, it's a family-owned

5    company?

6        A.  Yes.

7        Q.  Has been for a while?

8        A.  Yes.  It has always been a family-owned

9    company.

10       Q.  What is the primary business of Walter

11   C. Drennan, Inc.?

12           MS. MINCE:

13               Wallace.

14           MR. FRANCO:

15               I keep saying Walter.  I'm sorry.  I

16   apologize.

17   EXAMINATION BY MR. FRANCO:

18       Q.  Let me rephrase that.

19       A.  I'll answer you, and I'll just say

20   Walter, and that will really confuse the

21   deposition.

22       Q.  Well, we can change the name after this

23   deposition.

24           What is the primary business of Wallace

25   C. Drennan, Inc.?

Exhibit D

NON-CERTIFIED COPY

Page 19

1     A.  We are a general contractor specializing

2  in concrete paving, sewerage, water, drainage,

3  sewer lift stations, electrical duct banks, a

4  bridge here, a bridge there, here or there,

5  mostly for entities like the City of New

6  Orleans, the Sewerage & Water Board, the DOTD,

7  Jefferson Parish.

8     Q.  Mostly for public entities?

9     A.  Yes.

10     Q.  Okay.  Mr. Drennan, have you ever been

11  qualified as an expert before in connection with

12  any litigation?

13     A.  No.

14     Q.  Have you ever been disqualified as an

15  expert in any litigation?

16     A.  No.

17     Q.  So, this is your first rodeo?

18     A.  Yes.

19     Q.  And who contacted you in order to serve

20  as an expert in this case?

21     A.  Ms. Mince.

22     Q.  What was your relationship with

23  Ms. Mince?

24     A.  Ms. Mince handles my construction

25  litigation.

Exhibit D

NON-CERTIFIED COPY

Page 21

1    EXAMINATION BY MR. FRANCO:

2        Q.   Okay.  Actually, Mr. Drennan, I am going

3    to label a copy of your report dated July 28,

4    2016, as Exhibit 1, and we will get a clean copy

5    attached.

6            Did you have any help in drafting this

7    report?

8        A.   No.

9        Q.   You did this all yourself?

10       A.   My office -- yeah, I did it all myself.

11       Q.   I mean, you didn't have any help with

12   gathering any of the documents or any

13   discussions?  You didn't talk to anybody about

14   this other than maybe Counsel?

15       A.   I talked to some people in my office who

16   have, you know, experience.

17       Q.   Okay.

18       A.   I have a couple of engineers working for

19   me.

20       Q.   All right.  And for the Record, you're

21   not an engineer, correct?

22       A.   No.

23       Q.   And you're not licensed as an engineer

24   in any state, correct?

25       A.   No.

Exhibit D

NON-CERTIFIED COPY

Page 22

1    Q.  Have you ever given an engineering

2  opinion before this report?

3    A.  I've never given an engineering opinion.

4    Q.  You report states that you've actually

5  made two visits to the Kenner facility; is that

6  correct?

7    A.  Yes.

8    Q.  Why was that?

9    A.  The first time was to conduct my site

10  inspections.  The second time was really just to

11  meet Mr. Bailey at the site and look around a

12  little bit again.

13    Q.  All right.  So let me ask you this:

14        Your first visit was June 30 to Baton

15  Rouge; is that correct?  And both.  Both of

16  them.  You went to both on June 30, correct?

17    A.  Yes.

18    Q.  When were you contacted to serve as an

19  expert in this case?

20    A.  Shoot.  I really don't recall.

21    Q.  It wasn't too much earlier than June 30,

22  was it?

23    A.  I don't think so.  It could have been a

24  couple weeks before.  I really cannot recall.

25    Q.  And when you were contacted, what were

Exhibit D

NON-CERTIFIED COPY

Page 25

1     Q.  How long did you spend at Kenner on July

2     7th?

3     A.  Maybe an hour.

4     Q.  Okay.  Now, did you do any coring while

5     you were out there?

6     A.  No.

7     Q.  Did you do any investigation of the

8     foundations while you were out at the sites?

9     A.  Specifically foundations for what?

10    Q.  For the paved areas.

11    A.  I'm not sure -- I'm not familiar with

12    the term "foundations" for a paved area.

13    Q.  Okay.  What's underneath the pavement at

14    Baton Rouge?

15    A.  Base material.

16    Q.  Did you do any investigation of the base

17    material at Baton Rouge when you were out there?

18    A.  No.

19    Q.  Did you do any investigation of the base

20    material at Kenner while you were out there?

21    A.  No.

22    Q.  Is it fair to say that while you were

23    out there, you basically walked around and took

24    pictures; is that right?

25    A.  Walked around, took pictures, looked

Exhibit D

NON-CERTIFIED COPY

Page 51

1      Q.  What was the psi concrete at Baton Rouge

2  designed for?

3      A.  I think I saw two different numbers,

4  4,000, but then if you go back to DOTD, you are

5  apt to use like less than 4,000, like 3,800,

6  maybe.  So between 3,800 and 4,000 psi.

7      Q.  Okay.  This also says that the design

8  life of the pavement system is dependent upon

9  periodic maintenance of the pavement.

10          Do you agree with that statement?

11      A.  Yes.

12      Q.  What periodic maintenance are you aware

13  of that took place in Baton Rouge?

14      A.  Only really when I witnessed -- when I

15  was at my site visits and they had $120,000

16  sweepers sweeping up the debris in the parking

17  lots.

18          That's the only thing I actually saw.  I

19  don't have any other knowledge of that.

20      Q.  Okay.  When you saw sweepers, you mean

21  more than one sweeper in Baton Rouge, or just

22  one?

23      A.  I saw a sweeper in Baton Rouge and a

24  sweeper in Kenner.

25      Q.  Do you know what the purpose of those

Exhibit D

NON-CERTIFIED COPY

Page 56

1    A.  Right.

2    Q.  You agree with that statement?

3    A.  I agree with the statement.

4    Q.  Okay.  Look at the second page, the next

5    page of the report, sir.

6        It says about halfway down, "Panel sizes

7    should not exceed 15 feet in any direction."

8        Do you see that?

9    A.  Uh-huh (affirmative response).

10   Q.  Do you agree with that?

11   A.  Uh-huh (affirmative response).

12       Do I agree with it?  I think that's a

13   safe number.  The DOTD says that you can't go

14   any wider than 16 foot by 20 foot long, so it's

15   within that parameter.

16   Q.  Are you aware that there's some panels

17   at Baton Rouge that exceed 15 feet in any

18   direction, sir?

19   A.  I think I may have read that in an

20   expert report, but I don't know how many panels

21   there are.

22       I think in Kenner there's only one panel

23   that's longer than 15 feet.

24   Q.  And, sir, it's fair to say you've never

25   designed pavement; is that true?

Exhibit D

NON-CERTIFIED COPY

Page 76

1    weakest area to crack, and usually that means

2    that it's looking for an area that's -- it's

3    less material than it has to pull apart.

4           In case of these corners, if you have

5    four panels meeting each other, and you have

6    rebar 24 inches on center, it's possible there's

7    actually no rebar in that -- in the area inside

8    the corner crack because of the spacing, and

9    that becomes one of the weakest areas of the

10   slab, and corners are already weak.  And this

11   just exacerbates the problem to create that

12   corner crack.

13       Q.  Did you investigate whether the

14   contractor actually installed the pavement at

15   the correct thickness?

16       A.  I did not see any core information.

17       Q.  So the answer is "no"?

18       A.  The answer is "no."  I have no core

19   information, no.

20       Q.  Did you investigate, especially in

21   connection with any random cracking across the

22   panels, did you investigate any other cause for

23   that other than design?

24           MS. MINCE:

25               Object to form.

Exhibit D

NON-CERTIFIED COPY




POSTED

JUN 1 9 2017

H&E EQUIPMENT SERVICES   *   SUIT NO. 626,308   DIV.: D

  *   19TH JUDICIAL DISTRICT COURT

VERSUS   *

  *   PARISH OF EAST BATON ROUGE

URS CORPORATION
ARCHITECTURE, P.C., URS   *   STATE OF LOUISIANA
CORPORATION, L. O'NEAL
JOHNSON AND THOMAS E. RYAN,   *
III

RECD C.P.
REG'D C.P.
JUN 16 2017
JUN 19 2017

COST $1630.00

JUN 16 2017

BY

D. CLERK OF COURT

---

## MOTION IN LIMINE TO STRIKE EXPERT REPORTS AND TO EXCLUDE PROPOSED TESTIMONY OF WALLACE C. DRENNAN, III



NOW INTO COURT, through undersigned counsel, come Defendants, URS

Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas Ryan,

III (collectively referenced herein as "Defendants") which hereby move this Court in

limine to exclude the testimony, opinion and reports of Plaintiff's expert, WALLACE C.

DRENNAN, III, on the ground that they fail to satisfy the reliability and relevancy

threshold requirements of Louisiana Code of Evidence Article 702, *Daubert v. Merrel*

*Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993) and *State v. Foret*, 628 So.2d 1116 (La. 1993),

as more fully set forth in the memorandum in support of this motion and exhibits

thereto which are attached hereto.

As set forth more fully in Defendants' memorandum, Mr. Drennan, lacks

expertise in the relevant field and is thus not qualified to offer expert opinion as to the

standard of care for a civil engineer with respect to the design of paved areas housing

heavy-tracked equipment, an issue which is at the heart of this case. Moreover, Mr.

Drennan's opinions are unreliable because of his failure to consider other potential

causes of the alleged damage to the pavement at H&E's Baton Rouge and Kenner sites,

such as construction defects or lack of maintenance.

RECD C.P.

JUN 23 2017

1

NON-CERTIFIED COPY

WHEREFORE, based on the foregoing and the attached memorandum in support and exhibits attached thereto, Defendants pray that this Court grant their Motion in Limine and exclude the testimony of Wallace C. Drennan, III.

Respectfully submitted,

ADAMS AND REESE, LLP

_____

Philip A. Franco    (Bar #5819), TA
Ron Sholes          (Bar # 14436)
Kellen J. Mathews   (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210

**ATTORNEYS FOR DEFENDANTS, URS CORPORATION ARCHITECTURE, P.C.; URS CORPORATION; L. O'NEAL RYAN AND THOMAS E. RYAN, III**



2

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been served upon all counsel of record via United States mail, properly addressed, and first class postage prepaid and via email, this the 16th day of June, 2017.

Kellen J. Mathews



3

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308      DIV.: D |
|---|---|---|
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON AND THOMAS E. RYAN, III | * | STATE OF LOUISIANA |

## RULE TO SHOW CAUSE

Considering the foregoing Motion in Limine to Strike Expert Reports and to Exclude Proposed Testimony of Wallace C. Drennan, III, and Memorandum in Support of Motion in Limine filed by Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III:

**IT IS HEREBY ORDERED,** that Plaintiff be made to appear and show cause, if any, on the ___6___ day of ___July___, 2017 at ___9__:__30__ __A__.m. why the Motion in Limine to Strike Expert Reports and to Exclude Proposed Testimony of James R. ("Bob") Bailey, filed on behalf of Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III, should not be granted and why Wallace C. Drennan, III's expert reports and testimony should not be excluded.

THUS DONE AND SIGNED this ___21___ day of ___June___, 2017, at Baton Rouge, Louisiana.

_____
**HON. JANICE CLARK**
Judge, 19th Judicial District Court

1

NON-CERTIFIED COPY

**PLEASE SERVE:**

H&E Equipment Services, Inc.
Through its Attorney of Record
Brent B. Barriere
Lori Mince
Rebecca Sha
Alysson Mills
Fishman Haygood, LLP
201 St. Charles Ave., Ste. 4600
New Orleans, LA 70170

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308      DIV.: D |
| | * | |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA |
| CORPORATION, L. O'NEAL | * | |
| JOHNSON AND THOMAS E. RYAN, | * | |
| III | * | |
| | * | |

---

## MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO STRIKE EXPERT REPORTS AND TO EXCLUDE PROPOSED TESTIMONY OF WALLACE C. DRENNAN, III

**MAY IT PLEASE THE COURT:**

Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas Ryan, III (collectively referenced herein as "Defendants") submit this Memorandum in Support of their Motion in Limine, as follows:

### I.    INTRODUCTION

This Court should exclude the purported expert testimony and opinions of Plaintiff's expert, Wallace Drennan, III, because Mr. Drennan, a contractor, simply is not qualified to offer expert opinion as to the standard of care for a civil engineer with respect to the design of paved areas housing heavy-tracked equipment, an issue which is at the heart of this case. Mr. Drennan's opinions fail to satisfy the threshold of admissible expert testimony as required by Louisiana Code of Evidence art. 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993; *State v. Foret*, No. 93-0246 (La. 11/30/93), 628 So. 2d 1116 and their progeny.

In addition to the aforementioned impediment to Mr. Drennan rendering an expert opinion in this matter, Mr. Drennan's opinions are unreliable because of his inadequate consideration of other potential causes of cracking, spalling and

1

NON-CERTIFIED COPY
EPR4104857

deterioration of the pavement at H&E's Baton Rouge and Kenner sites. As set forth more fully herein, Mr. Drennan's opinions will not assist the trier of fact and as such are not the types of opinions provided for under Article 702 and should therefore be excluded.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, H&E Equipment Services, Inc. ("H&E") contracted with URS Corporation Architecture, P.C. and its affiliates or subsidiaries ("URS") to perform consulting and professional engineering services in connection with construction and renovation at H&E's Baton Rouge, Kenner and Belle Chase locations (collectively referenced herein as "the Projects").

In November, 2013, H&E filed the instant lawsuit asserting a breach of the standard of care on the part of URS in connection with the Projects. H&E's claims primarily pertain to alleged defects in the design of "major portions of the concrete parking aprons and staging areas for H&E's heavy equipment" at its Baton Rouge and Kenner locations.[1] H&E complains that these paved areas "began experiencing a substantial and unanticipated amount of cracking, spalling and deterioration" as a result of "errors and defects in the design of the parking and staging areas."[2] H&E specifically avers that "the design deficiencies relate to the defective and negligent design of the concrete pad, the expansion joints, the control joints, the specified concrete strength, and/or the specified surface of the parking and staging areas."[3]

Accordingly, in its Petition for Damages H&E asserts, *inter alia*, that:

- "design deficiencies in the plans and specifications for each of the respective Projects began to manifest themselves, which required

---

[1] Pltff. Pet. at ¶13.
[2] *Id.*
[3] *Id.*

2

NON-CERTIFIED COPY

additional and/or changed work by the contractors and for which H&E
incurred significant additional costs."[4]

- "URS has breached its agreement with H&E by... failing to design the
  Projects in accordance with appropriate industry standards and/or in
  accordance with the required standard of care ordinarily exercised by
  others in the same profession."[5]

- Defendants' "negligent acts and/or omissions constitute a direct and
  proximate cause of damages to H&E."[6]

After being admitted as H&E's third counsel on this matter, present counsel for
H&E sought and obtained leave of this Court to identify an additional expert, Wallace
Drennan, III, after the deadline for identifying experts had expired and over
Defendants' objection.  H&E subsequently submitted the reports of its experts, James R.
"Bob" Bailey (who was timely identified) and Mr. Drennan, on July 29, 2016.  In his
report, Drennan opined that the designs of the pavement for the Baton Rouge and
Kenner facilities were "defective in numerous respects."[7]  Drennan submits that the
"design defects" that he lists "are consistent with random cracking across panels of the
[pavement] and diagonal corner cracking at the intersections of Joints."[8]  Defendants
subsequently submitted rebuttal expert reports on August 31, 2016, which negate the
alleged design deficiencies in the pavement, as well as other alleged deficiencies.

Subsequently, on October 20, 2016, H&E belatedly submitted another report
from Mr. Drennan wherein Drennan attempts to address discrepancies between his

---

[4] Pltff. Pet. at ¶11.
[5] Pltff. Pet. at ¶16.
[6] Pltff. Pet. at ¶18-20.
[7] **Exhibit "A"- Drennan Report, 2016 at p, 2-3;4.**
[8] *Id.* at p. 4-5.

3

NON-CERTIFIED COPY

deposition testimony and earlier, timely report.[9]  This report came well after the

deadline agreed to by counsel for H&E, and imposed by Court order for both

identification of experts and expert reports.  On October 27, 2016, Defendants filed an

objection to this report as well as other post discovery cutoff activities by H&E.  To date,

there has been no ruling on Defendants' objection to this untimely report by Mr.

Drennan.

### III.  LAW & ARGUMENT

### A. STANDARD FOR MOTION TO EXCLUDE EXPERT TESTIMONY.

The party seeking to have the district court admit expert testimony has the

burden of demonstrating that "the expert's findings and conclusions are based on the

scientific method, and therefore, are reliable."  *Moore v. Ashland Chemical, Inc.*, 151 F.3d

269, 276 (5th Cir. 1998); *Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 515 (E.D. La.

2002).  *See also Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999) .

Louisiana Code of Evidence Article 702 provides that:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training or education, may
> testify thereto in the form of an opinion or otherwise.

While Article 702 permits expert opinion testimony, where appropriate, to assist the

trier of fact, in *State v. Foret*, No. 93-0246 (La. 11/30/93), 628 So. 2d 1116, the Louisiana

Supreme Court made clear that the proponent of such testimony must satisfy the trial

court that the expert's proposed testimony is both reliable and relevant, adopting the

standard for admissibility of expert testimony established by the United State Supreme

Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.

---

[9]  **Exhibit "B"- Drennan Report, October 13, 2016.**

4

NON-CERTIFIED COPY

Ed.2d 469 (1993).[10]  In *Daubert*, the Supreme Court explained that Rule 702 assigns to district courts a gatekeeping function to ensure that expert testimony is both reliable and relevant.   509 U.S. at 597, 113 S. Ct. at 2799.   In performing this gatekeeping function, courts generally employ a two-part analysis.  Courts first determine whether the proffered testimony is reliable, which requires courts to assess whether the reasoning or methodology underlying the testimony is scientifically valid.  Courts then determine whether the proffered testimony is relevant to a fact at issue in the case. *See Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999).

*Daubert* established a list of four questions meant to establish reliability: (1) does the methodology test the technique or theory "to see if they can be falsified;" (2) has the technique or theory been published and peer reviewed; (3) what is the rate of error of the methodology; and (4) has the technique or theory been generally accepted in the relevant scientific community. *Daubert,supra.* 113 S. Ct. at 2796-97.  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed.2d 238 (1999), the United States Supreme Court extended the *Daubert* analysis to experts purporting to testify on the basis of "experience." 119 S. Ct. at 1175 76[11]

In *Cheairs v. State*, 03-0680 (La. 12/03/03), 861 So. 2d 536, 542 the Louisiana Supreme Court, recognizing that Daubert does not address all of the issues pertinent to the decision of whether to admit expert testimony adopted a three-prong inquiry previously set forth in *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548 (11th Cir. 1998), in which that court stated that the admission of expert testimony is proper only if all three of the following things are true: (1) the expert is qualified to testify competently

---

[10] La. Code Evid. Art 102 at cmt. 1. "[T]he adoption of this Code facilitates the movement towards a uniform national law of evidence.  Thus, especially where the language of the Louisiana Code is identical or virtually identical with that used by other states or in the federal rules, Louisiana courts now have available a body of persuasive authority which may be instructive in interpreting the Louisiana." *See also State v. Foret*, 628 So. 2d 1116, 1122. "

[11] *State v. Foret*, 628 So. 2d at 1177-1178.

5

NON-CERTIFIED COPY

regarding the matters he intends to address; (2) the methodology by which the expert

reaches his conclusions is sufficiently reliable as determined by the sort of inquiry

mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the

application of scientific, technical, or specialized expertise, to understand the evidence

or to determine a fact in issue.

### B. DRENNAN IS NOT A CIVIL ENGINEER AND OTHERWISE LACKS EXPERTISE NECESSARY TO OPINE ON THE STANDARD OF CARE OF A CIVIL ENGINEER.

Here, the standard of care required of URS in its performance of the design work

at issue is set forth in the language of the contract between H&E and URS: it is the care

and skill ordinarily exercised by engineers in designing a parking lot for heavy-tracked

equipment.[12]  Specifically, in Section 4.1 of the Contract "[URS] warrants that any

consulting and professional engineering Services performed by it under a Work

Authorization shall be performed in accordance with that degree of care and skill

ordinarily exercised by members of [URS's] profession practicing at the same time in

the same location."[13]  There is no dispute that Mr. Drennan is a contractor, not a civil

engineer.  As such, Mr. Drennan is by no means a member of URS's profession, and

under the clear and unambiguous language of the Contract he is not competent to

address the standard of care of a civil engineer.

In addition to being unqualified to provide opinion as to the standard of care of a

civil engineer under the terms of the Contract, Mr. Drennan is not qualified to provide

such expert opinion in light of Louisiana law and jurisprudence.  In *Maldonado v. Kiewit

La. Co.*, 2012-1868 (La. App. 1 Cir 05/30/14), 152 So.3d 909, 933-34 the First Circuit noted

that "the ___expert testimony of another civil engineer, familiar with the practice of civil___

---

[12] Exhibit "C"- August 13, 2009, Short Form Master Agreement for Professional Services at p 1.
[13] Exh. C. (*emphasis added*).

NON-CERTIFIED COPY

*engineering in Louisiana, was needed to establish the requisite standard of care and*

*skill* against which [defendant, engineering firm's] safety studies and recommendations

were to be judged."[14] *Maldonado, supra, (citing Carter v. Deitz,* 556 So.2d 842, 843 (La. App

4 Cir.), *writs denied,* 566 So.2d 960, 992 and 993 (La. 1990)) **(emphasis added)**. *See also,*

*Charles Carter & Co. v. Baton Rouge,* 344 So. 2d 431, 433 (La. App. 1 Cir. 1977) (It is well

*established in Louisiana jurisprudence that expert testimony is needed to establish the lack of*

*care and resulting negligence on the part of architects and engineers). Sams v. Kendall Constr.*

*Co.,* 499 So. 2d 370, 374 (La. App. 4 Cir. 1986) *(To establish the standards of care and skill*

*against which an architect's performance is judged, it is necessary to produce expert witnesses*

*who can testify as to what those standards are.)*

Mr. Drennan admits that he is *not an engineer*.[15]  (Indeed, Mr. Drennan's formal

education does not include a college degree.[16])  Moreover, Mr. Drennan has "*never*

*designed pavement*" for any purpose, let alone pavement intended to house heavy-

tracked equipment.[17]  Mr. Drennan further testified that he has "*never given an*

*engineering opinion*."[18]  Since leaving college in 1983, Mr. Drennan has worked for his

family's business, Wallace C. Drennan, Incorporated, which is a general contractor.[19]

Mr. Drennan has certainly worked in various capacities, as a laborer, operator, foreman

and estimator until he became the president of the company in 1991 following his

father's death.[20]

---

[14] In *Carter v. Deitz,*  556 So.2d 842, 843 a professional engineering firm, conducted bridge safety studies on the Greater New Orleans Bridge and recommended that a bridge safety barrier not be installed. After an automobile accident occurred, M&M was sued for professional negligence for failing to recommend installation of the barrier.
[15] Exhibit "D"- Dep.of Wallace C. Drennan, III at p. 21, l.l. 20-22.
[16] *Id*. at p. 12, l.l. 16-17; Mr. Drennan attended both Tulane University and the University of Alabama, but failed to obtain a degree from either institution. *Id*. at 8-15.
[17] *Id*. at p. 56, l. 24 - p. 57, l.l.
[18] *Id*. at p. 22, l.l. 1-3.
[19] *Id*.
[20] *Id*. at p. 13, l.l. 20-25.

NON-CERTIFIED COPY

Mr. Drennan has completed no formal study in the field of engineering.  He has never designed pavement, and he has never provided engineering opinions.  It should also be noted that Drennan has never been qualified as an expert in connection with a lawsuit.[21]  Based on the foregoing, the Court should exercise its gatekeeping role and exclude the purported expert testimony of Mr. Wallace C. Drennan, III, as to the standard of care of a civil engineer for pavement design for heavy-tracked equipment.

## C. DRENNAN'S OPINIONS ARE FURTHER UNRELIABLE BECAUSE OF HIS FALURE TO CONSIDER, IN ANY MANNER, OTHER POTENTIAL CAUSES.

Drennan's testimony further lacks the reliability demanded by *Daubert* since Mr. Drennan has, by his own admission, failed to exclude alternative causes of the cracking, spalling and deterioration allegedly experienced in the paved surfaces at the H&E facilities located in Baton Rouge and Kenner such as construction defects or inadequate maintenance.  Thus, additional grounds exist for this Court to exclude Mr. Drennan's testimony.

Courts have repeatedly made clear that "***the exclusion of alternative causes is necessary for a reliable causation opinion***." *Lee Green v. LA. Dep't of Pub. Safety & Corr.*, No. 2:06 CV 1018, 2010 U.S. Dist. LEXIS 39182, at *14 (W.D. La. Apr. 20, 2010) (*citing Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2000) (*emphasis added*)).  And "***the inadequate treatment of other potential causes necessarily undermines the reliability of an expert's opinion.***" *Lee Green, supra*, (*citing Brown v. Parker-Hannifin Corp.*, 919 F.2d 308, 311-312 (5th Cir. 1990) (*emphasis added*)); *see also Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) (*Expert's* testimony was inadmissible where though he admitted that the plaintiff's symptoms had several potential causes, the court found he simply

---

[21] *Id.* at p. 19, l.l. 10-18.

8

NON-CERTIFIED COPY

picked the cause most advantageous to plaintiff's claims).

In *Lee Green, supra,* the plaintiff's expert's testimony was excluded due to its unreliability where the expert in his report did not mention or exclude any alternative causes for [decedent's] death." *Id.* at *15.   The court there found that where the plaintiff's expert failed to consider alternate causes for the injuries alleged his "methodology is flawed and his testimony is unreliable." *Id.* at *17.   In a case cited by the court in *Lee Green, supra,* the Fifth Circuit found that without some basis to establish which of two possible theories was the more likely cause of the failure, the plaintiff's expert's testimony amounted to speculation, was of no assistance to the jury and failed to establish causation. *Brown v. Parker-Hannifin Corp.,* 919 F.2d 308, 311-312 (5th Cir. 1990).   The court noted that while either of the two theories advanced by plaintiff's expert were possibilities:

> "other theories explain the failure equally well. As [Plaintiff's expert] admitted in his deposition, corrosion, abuse, or normal wear and tear could have caused the failure. Without some basis to establish that one of his theories is the most likely cause of the failure on this occasion, his testimony amounts to speculation and is of no assistance to the jury. The trial court properly excluded the testimony."
>
> *Brown v. Parker-Hannifin Corp.,* 919 F.2d at 312.

H&E has asked Mr. Drennan to opine on the cause of the cracking, spalling and deterioration allegedly existing in the paved areas for heavy-tracked equipment at its facilities in Baton Rouge and Kenner.   But, Mr. Drennan's expert report is silent as to any potential causes other than alleged defects in URS' design.   He does not discuss potential construction causes, and he does not consider whether H&E's lack of maintenance may have given rise to the cracking and spalling of which H&E complains.

9

NON-CERTIFIED COPY

Mr. Drennan admits that in his investigation of the paved areas at the H&E sites, he did nothing to determine what, if any, maintenance H&E performed.[22]  Likewise, Mr. Drennan did nothing to determine how the pavement had actually been installed by the contractors on each of the Projects.   Specifically, Drennan did not do coring or investigation of the base material at the H&E sites.[23]  Without conducting core sampling or other destructive testing it is impossible for H&E and its expert(s) to know what the contractors actually installed vis-à-vis the paved surfaces at the Baton Rouge and Kenner sites.  Despite the fact that he acknowledged that he was not able to assess whether the concrete was installed at the correct thickness without core testing (which to date has not been done), Drennan has inexplicably not included construction as one of the potential causes of the pavement issues.[24]

Having failed to conduct this testing, it is impossible for Mr. Drennan to rule out construction defects as a potential cause of the cracking, spalling and deterioration of the pavement at H&E's Baton Rouge and Kenner locations.  Likewise, Drennan did not consider what, if any, maintenance H&E performed with regard to the pavement at the Baton Rouge and Kenner locations, and is thus in no position to rule these items out as potential causes.  Thus, Drennan has given inadequate treatment of other potential causes necessarily, thereby undermining the reliability of his proffered opinion. *Lee Green, supra.* at *14.  Due to these failures, Drennan has failed to produce a reliable opinion and his testimony should be excluded.

Even on the issue of the cost of remedying the perceived deficiencies in the paved surfaces at the H&E facilities in Baton Rouge and Kenner, Mr. Drennan has failed to provide a reliable opinion that can assist the trier of fact.  Mr. Drennan, without

[22] Exh. D at p. 51, l.l. 12-19.
[23] *Id.* at p. 25, l.l. 1-21.
[24] Exh. D at p. 76, L.L. 13-19.

10

NON-CERTIFIED COPY

identifying any support whatsoever, provides; Drennan simply produces calculations for complete replacement of the paved surfaces at the H&E facilities in Baton Rouge and Kenner.[25]  Drennan's report is devoid of any indication as to why the pavement, as it exists at H&E's facilities, needs to be replaced altogether.  This methodology is plainly inconsistent with the United States Supreme Court's decision in *GE v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 519 (1997), where the Supreme Court advised that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Here, Drennan provides no discussion as to why the concrete, *which H&E has used continuously since its installation*, must now be replaced altogether.  Drennan's opinions are premised only on his *ipse dixit*, i.e. the fact that he himself said it and nothing more; under *Gen. Elec. Co. v. Joiner, supra*, this Court need not accept such testimony.  There is simply too great an analytical gap between the data relative to the condition of the paved surfaces and Drennan's conclusory opinion regarding replacement and as such, Mr. Drennan's testimony should be excluded.

### IV.    CONCLUSION

H&E's proffered expert, Mr. Drennan, a contractor, clearly lacks the expertise and qualifications to opine on the standard of care for design applicable to a civil engineer.  As noted above, Louisiana courts have made it clear that an engineering expert would be required to opine as to the applicable standard of care for an engineer.  Moreover, Mr. Drennan offers opinions that are based upon willful blindness with regard to multiple alternative causes of the issues of which H&E complains.  These opinions are inherently unreliable and will not assist the trier of fact, and based on the

---

[25] Exh. A at p. 4-5.

11

NON-CERTIFIED COPY

jurisprudence cited above are inadmissible.   Likewise, Mr. Drennan's opinions with

respect to the cost of repairs are based on the same incomplete and thus faulty data and

Drennan has failed to provide any support for the notion that all paved surfaces must

be replaced.   Accordingly, Defendants' Motion in Limine should be granted and the

reports and testimony of Mr. Drennan should be stricken and excluded at trial,

respectively.

<div style="margin-left: 40%;">

Respectfully submitted,

ADAMS AND REESE, LLP

_____
Philip A. Franco    (Bar #5819), TA
Ron Sholes          (Bar # 14436)
Kellen J. Mathews   (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210

**ATTORNEYS FOR DEFENDANTS, URS
CORPORATION ARCHITECTURE, P.C.;
URS CORPORATION; L. O'NEAL RYAN
AND THOMAS E. RYAN, III**

</div>



12

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been served upon all counsel of record via United States mail, properly addressed, and first class postage prepaid and via email, this the 16th day of June, 2017.

_____
Kellen J. Mathews



13

NON-CERTIFIED COPY

6801-17-001610



# CIVIL SUBPOENA

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE PC ET AL**
(Defendant)

**NUMBER**    C626308 **Division D**

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

TO:    **TIMOTHY GAINES**
        **1140 FAIRWINDS AVE.**
        ~~BATON ROUGE~~, LA.   70791
        *Zachary*

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at 9:30 o'clock **AM**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **REBECCA SHA**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **13-JUN-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

### SERVICE INFORMATION:

Received on the 19 day of June, 20 17 and on the 20 day of Jun, 20 17, served on the above named party as follows:

**PERSONAL SERVICE:**  On the party herein named at _____

**DOMICILIARY SERVICE:**  On the within named Timothy Gaines, by leaving the same at his domicile in this parish in the hands of Holly Gaines - wife, a person of suitable age and discretion residing in the said domicile at 1140 Fairwinds

**DUE AND DILIGENT:**  After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of East Baton Rouge, this 20 day of Jun, 20 17.

SERVICE:       $_____
MILEAGE       $_____          *D Kwan 013L*
TOTAL:         $_____                  Deputy Sheriff

EBR4047856

NON-CERTIFIED COPY
EBR4177339



**ADAMS AND REESE LLP** ®

**Attorneys at Law**
Alabama
Florida
Georgia
**Louisiana**
Mississippi
South Carolina
Tennessee
Texas
Washington, DC

June 21, 2017

Honorable Doug Welborn
Clerk of Court, 19th Judicial District Court
East Baton Rouge Parish
300 North Boulevard
Baton Rouge, LA 70801

**POSTED**
JUN 23 2017

W

COST OK $ 255

**Kellen J. Mathews**
Direct: 225.378.3243
E-Fax: 225.336.5115
kellen.mathews@arlaw.com

JUN 2 1 2017
CH 055482 A
DEPUTY CLERK OF COURT

RE:    H&E Equipment Services v. URS Corporation, et al
       19th JDC No. 626308(D)
       Our File No. 25240-3

Dear Mr. Welborn:

Please issue trial subpoenas on behalf of URS Corporation for the following witnesses to appear for trial in the above matter commencing on August 16, 2017, at 9:30 a.m. before Judge Janice Clark, Division D, Room 10A, Baton Rouge, LA:



1.  John Engquist       *1362311*      Or       525 Lafayette Street
    H&E Equipment Services                      Apartment 912
    7500 Pecue Lane                             Baton Rouge, LA 70802
    Baton Rouge, LA 70809

                        *1362312*

2.  Leonard St. Germain              Or       17534 Lake Vista Drive
    H&E Equipment Services                     Greenwell Springs, LA 70739
    7500 Pecue Lane
    Baton Rouge, LA 70809       *1362313*

3.  Brad Barber                      Or       12850 Bayou Pierre
    H&E Equipment Services                     Maurepas, LA 70449       **REC'D C.P.**
    7500 Pecue Lane
    Baton Rouge, LA 70809                                              **JUN 23 2017**

450 Laurel Street, Suite 1900 | Baton Rouge, Louisiana 70801 | 225.336.5200 | Fax 225.336.5220
www.adamsandreese.com

NON-CERTIFIED COPY



Page 2
Honorable Doug Welborn
June 21, 2017            1362314

4.      Frank Wynn                    Or         19347 North Trent Jones Drive
        H&E Equipment Services                   Baton Rouge, LA 70810
        7500 Pecue Lane
        Baton Rouge, LA 70809


                          Sincerely,

                          ADAMS AND REESE, LLP


                          Kellen J. Mathews

/tdw

NON-CERTIFIED COPY

6801-17-001611

# CIVIL SUBPOENA

H&E EQUIPMENT SERVICES INC
(Plaintiff)

vs.

URS CORPORATION ARCHITECTURE PC
ET AL
(Defendant)

NUMBER    C626308 Division D

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

TO:    MURRAY MCCULLOUGH
       17622 GRAY MOSS AVE.
       BATON ROUGE, LA.  70817

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on AUGUST 16, 2017, at 9:30 o'clock AM, Courtroom No. 10-A, Judge JANICE CLARK.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination. (Ordered by REBECCA SHA, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on 13 JUN 2017, Baton Rouge, Louisiana.

_____
Deputy Clerk of Court for
Doug Welborn, Clerk of Court

## SERVICE INFORMATION:

Received on the 22 day of June, 20 17 and on the 3 day of June, 20 17, served on the above named party as follows:

PERSONAL SERVICE: On the party herein named at _____

DOMICILIARY SERVICE: On the within named Murray McCullough, by leaving the same at his domicile in this parish in the hands of Ellen McCullough a person of suitable age and discretion residing in the said domicile at 17622 Gray Moss Dr.

DUE AND DILIGENT: After diligent search and inquiry was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

RETURNED: Parish of East Baton Rouge, this 22 day of June, 20 17.

E. Gaspard 1107
_____
Deputy Sheriff

SERVICE:    $_____
MILEAGE    $_____
TOTAL:      $_____

6-22-17  D/5  1138 Am
served  Ellen McCullough  (Wife)

DY. E. GASPARD 0922
PHONE# 225-803-1671

**DOMICILIARY**



CERTIFIED COPY

EBR4086130

EBR4177341

# DOUG WELBORN, CLERK OF COURT
## 19th Judicial District Court
## Parish of East Baton Rouge
## 300 North Boulevard
## Baton Rouge, LA 70801
## Phone  (225)389-3960

NO.    C626308 Division D            26-JUN-2017


TO:    ORLEANS PARISH SHERIFFS OFFICE
       CIVIL DEPARTMENT
       421 LOYOLA AVE
       NEW ORLEANS, LA 70112

Please find attached RULE NISI  to be served in your parish for the above numbered suit.

Kindly make your return(s) on the duplicate(s) enclosed, and

   X     note the enclosed check for payment of service;

        send us your bill for service;

        note that this is a pauper suit and no funds are available; or

        note that this is a government suit and no funds are necessary.

Thank You,

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

Requesting Attorney:  PHILIP ANTHONY FRANCO

---

REPLY:                           DATE:_____

_____

_____

_____

_____

_____

By:_____

Deputy Sheriff, Parish of _____


**Letter to Out Of Parish Sheriff - 5213**



EBR4081964

NON-CERTIFIED COPY

6801-17-001655

# CIVIL SUBPOENA

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**NUMBER**    C626308 Division D

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

TO:    **BRAD BARBER**
    **H&E EQUIPMENT SERVICES**
    **7500 PECUE LANE**
    **BATON ROUGE, LA.   70809**

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **26-JUN-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

### SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:**  On the party herein named at _____.

**DOMICILIARY SERVICE:**  On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**  After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of East Baton Rouge, this _____ day of _____, 20_____.

| | |
|---|---|
| SERVICE:    $_____ | |
| MILEAGE    $_____ | _____ |
| TOTAL:    $_____ | Deputy Sheriff |

EBR4187453

NON-CERTIFIED COPY

6801-17-001656

# CIVIL SUBPOENA

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE PC ET AL**
(Defendant)

NUMBER    **C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

TO:    **FRANK WYNN**                **OR**
       **H&E EQUPMENT SERVICE**
       **7500 PECUE LANE**
       **BATON ROUGE, LA.  70809**

**19347 NORTH TRENT JONES DRIVE**
**BATON ROUGE, LA.  70810**

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at 9:30 o'clock **AM,** Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **26-JUN-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

## SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____ , served on the above named party as follows:

**PERSONAL SERVICE:**  On the party herein named at _____ .

**DOMICILIARY SERVICE:**  On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____ .

**DUE AND DILIGENT:**  After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:**  Parish of East Baton Rouge, this _____ day of _____, 20_____ .

SERVICE:     $_____
MILEAGE     $_____         _____
TOTAL:      $_____                    Deputy Sheriff

EBR4187454

NON-CERTIFIED COPY

6801-17-001653

# CIVIL SUBPOENA

| | |
|---|---|
| **H&E EQUIPMENT SERVICES INC** <br> (Plaintiff) | **NUMBER**    C626308 Division D |
| vs. | **19th JUDICIAL DISTRICT COURT** |
| **URS CORPORATION ARCHITECTURE PC ET AL** <br> (Defendant) | **PARISH OF EAST BATON ROUGE** <br><br> **STATE OF LOUISIANA** |

TO:    JOHN ENGQUIST               OR        525 LAFAYETTE ST.
       H&E EQUIPMENT SERVICES                 APARTNEBT 912
       7500 PECUE LANE                        BATON ROUGE, LA.   70802
       BATON ROUGE, LA.   70809

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **26-JUN-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

### SERVICE INFORMATION:

Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:**  On the party herein named at _____.

**DOMICILIARY SERVICE:**  On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**   After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of East Baton Rouge, this _____ day of _____, 20_____.

SERVICE:     $_____
MILEAGE    $_____                    _____
TOTAL:       $_____                                Deputy Sheriff

EBR4187451   NON-CERTIFIED COPY

6801-17-001654

# CIVIL SUBPOENA

| | |
|---|---|
| **H&E EQUIPMENT SERVICES INC**<br>(Plaintiff) | **NUMBER**    C626308 Division D |
| | |
| vs. | **19th JUDICIAL DISTRICT COURT** |
| | |
| **URS CORPORATION ARCHITECTURE PC<br>ET AL**<br>(Defendant) | **PARISH OF EAST BATON ROUGE**<br><br>**STATE OF LOUISIANA** |

TO:    LEONARD ST. GERMAIN      OR      17534 LAKE VISTA DRIVE
        H&E EQUIPMENT SERVICES            GREENWELL SPRINGS, LA. 70739
        7500 PECUE LANE
        BATON ROUGE, LA. 70809

       You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM,** Courtroom No. **10-A**, Judge **JANICE CLARK**.

       You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination. (Ordered by **KELLEN J MATHEWS**, Attorney.)

       IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

       Ordered by the Court on **26-JUN-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

## SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of East Baton Rouge, this _____ day of _____, 20_____.

SERVICE:    $_____
MILEAGE    $_____
TOTAL:     $_____

                          Deputy Sheriff

EBR4187452

NON-CERTIFIED COPY

6801-17-001653

220

# CIVIL SUBPOENA

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE PC ET AL**
(Defendant)

**NUMBER**    C626308 Division D

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

TO:    **JOHN ENGQUIST**              OR         **525 LAFAYETTE ST.**
       **H&E EQUIPMENT SERVICES**                 **APARTNEBT 912**
       **7500 PECUE LANE**                        **BATON ROUGE, LA.  70802**
       **BATON ROUGE, LA.  70809**

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination. (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **26-JUN-2017**, Baton Rouge, Louisiana.

_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

---

**SERVICE INFORMATION:**                                    @ 10:21

Received on the 28 day of June , 20 17 and on the 28 day of June , 20 17 , served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at WES Hebert .

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of East Baton Rouge, this 28 day of June , 20 17 .

Painter 2654
Deputy Sheriff

SERVICE:    $_____
MILEAGE    $_____
TOTAL:     $_____



NON CERTIFIED COPY
EBR4048613
EBR4187451

6801-17-001656

# CIVIL SUBPOENA

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE PC ET AL**
(Defendant)

**NUMBER    C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

TO:  **FRANK WYNN**              OR      **19347 NORTH TRENT JONES DRIVE**
     **H&E EQUPMENT SERVICE**            **BATON ROUGE, LA.  70810**
     **7500 PECUE LANE**
     **BATON ROUGE, LA.  70809**

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination. (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **26-JUN-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

**SERVICE INFORMATION:**

Received on the 28 day of June, 20 17 and on the 28 day of June, 20 17, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at Wes Hebert

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of East Baton Rouge, this 28 day of June, 20 17.

SERVICE:   $_____
MILEAGE:   $_____          Deputy Sheriff
TOTAL:     $_____


EBR404614

NON CERTIFIED COPY

EBR4187454

6801-17-001654

6411K

220

# CIVIL SUBPOENA

H&E EQUIPMENT SERVICES INC
(Plaintiff)

vs.

URS CORPORATION ARCHITECTURE PC
ET AL
(Defendant)

NUMBER    C626308 Division D

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

TO:    LEONARD ST. GERMAIN          OR    17534 LAKE VISTA DRIVE
       H&E EQUIPMENT SERVICES              GREENWELL SPRINGS, LA.  70739
       7500 PECUE LANE
       BATON ROUGE, LA.  70809

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM, Courtroom No. 10-A,** Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination. (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **26-JUN-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

**SERVICE INFORMATION:**                    @ 10.21

Received on the 28 day of June, 2017 and on the 28 day of June, 2017, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at Wes Hebert .

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of East Baton Rouge, this 27 day of June, 2017.

D Rainwater 2054
Deputy Sheriff

SERVICE:    $_____
MILEAGE     $_____
TOTAL:      $_____

EBR404816

NON CERTIFIED COPY

EBR4187452

# FISHMAN HAYGOOD, L.L.P.
201 ST. CHARLES AVENUE
46TH FLOOR
NEW ORLEANS, LA 70170
PHONE: (504) 586-5252
FAX: (504) 586-5250

## FAX

**TO:**   Clerk, 19th JDC    **FAX NUMBER:** 225-389-3392
            Parish of East Baton Rouge

**FROM:** Loretta G. Mince    **DIRECT DIAL NO:** 504-586-5273

**DATE:** June 28, 2017    **FILE NO.** 3107-04

We are sending **52** pages (including this page)

If there are any problems, please contact Carla at 586-5246.

Re:   *H&E Equipment Services, Inc. v URS Corporation Architecture, P.C., et al*
       19th JDC, Doc. No. 626,308, Sec. "D"

Dear Clerk:

Attached please find a Memorandum in Opposition to Motion to Continue Trial filed by Plaintiff H&E Equipment Services. Please confirm *via* facsimile the cost for **fax and filing fees** for the attached document. As required, the original document will be forwarded for filing within seven (7) days along with a check to cover the fees for filing by fax.

Thanking you in advance for your assistance.

Respectfully,

*Carla Cooper Mayer*
Carla Cooper Mayer
Legal Assistant Loretta G. Mince

cc:   Philip A. Franco, Esq. (*via* Philip.franco@arlaw.com)

859269v.1

NON-CERTIFIED COPY
EBR4184170

19TH JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

DOCKET NO.: 626,308                                    SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____          _____
                                                    DEPUTY CLERK

**MEMORANDUM IN OPPOSITION TO MOTION TO CONTINUE TRIAL**

**MAY IT PLEASE THE COURT:**

Plaintiff H&E Equipment Services, Inc. respectfully submits this Memorandum in Opposition to Motion to Continue Trial filed by Defendants YRS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III (hereafter "Defendants").

After requesting that the Court set this matter for trial, Defendants now seek to continue the trial of this matter currently sent to begin on August 16, 2017. In support of their motion, Defendants offer three arguments. First, Defendants claim that their lead trial counsel, Philip Franco, has a trial set in Iberville Parish during the same week. Second, Defendants contend that their motion for protective order remains pending. Third, Defendants observe that their Application for Supervisory Writs seeking review of this court's Judgment of April 5, 2017, remains pending. As set forth below, none of the arguments offered by Defendants warrants a continuance of the trial.

With respect to Defendants' claim that their lead trial counsel is scheduled to be in trial in Iberville Parish in *Entergy v. Lapeze* (Case No. 76,690) during the week of August 15, H&E responds that there are several other lawyers enrolled for Entergy in that case. *See* Ex. "A." Additionally, H&E notes that this case was filed in 2013; *Entergy v. Lapeze* was filed in March 2017, and no answer has even been filed yet. Finally, counsel for the Defendants in *Entergy v. Lapeze*, John Wilbert, III, has advised undersigned counsel that his expert will not be finished with his analysis until October 2017 and that as a result, he does not believe that the case will be ready for trial in August.

1204619v.1

NON-CERTIFIED COPY

Defendants argument that the trial should be continued because their motion for protective order remains pending is also unavailing.  As set forth in H&E's opposition to Defendants motion for protective order, URS's experts issued reports in September 2016 in which they questioned whether the pavement at H&E's Baton Rouge and Kenner facilities was installed in accordance with the defective drawings prepared by URS.  In an effort to resolve this issue, H&E scheduled ground penetrating radar testing at both locations and invited URS to attend.  URS did attend the testing, and H&E provided URS with the results of the testing.  As a result, URS has not been prejudiced in its trial preparation.

Finally, Defendants claim that the trial should be continued because their Application for Supervisory Writs seeking review of this Court's April 5, 2017 ruling on Defendants' motion for summary judgment has not been ruled upon by the First Circuit.  However, when Defendants filed their Writ Application, they did not seek a stay of this case from this Court or from the First Circuit Court of Appeal.  Moreover, URS has notified the First Circuit Court of Appeal of the trial setting in this case. *See* Ex. "B".  Accordingly, there is no basis for requesting a continuance of the trial on the basis of the pendency of Defendants' Writ Application.

For the foregoing reasons, Defendants' Motion to Continue should be denied.

Respectfully submitted,

_____

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile:  (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

## CERTIFICATE

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by facsimile, email and/or by placing same in the United States mail, postage prepaid and properly addressed, this __28__ day of June, 2017.

_____
Loretta G. Mince

2

1204619v.1

NON-CERTIFIED COPY

18th JUDICIAL DISTRICT COURT FOR THE PARISH OF IBERVILLE

STATE OF LOUISIANA

No. 76,690                                    DIVISION "C"

ENTERGY LOUISIANA, LLC

versus

JOSEPHINE LAPEZE DAVIS AS THE SUCCESSION REPRESENTATIVE FOR THE
SUCCESSION OF JOSEPHINE R. LAPEZE, CANOVA PROPERTIES L.L.C., AND
ROBERT BREAUX

FILED:_____        _____

                                          DEPUTY CLERK

## PETITION FOR EXPROPRIATION
## OF PERSONAL SERVITUDE OF RIGHT OF USE

NOW INTO COURT, through undersigned counsel, comes plaintiff, Entergy Louisiana,

LLC ("Entergy Louisiana") who respectfully represents:

1.

Entergy Louisiana is a Texas limited liability company having its registered office in

Jefferson Parish, Louisiana.

2.

Entergy Louisiana was created for the purpose of generating, transmitting and

distributing electricity and thereby has the power to expropriate needed property, including

servitudes, pursuant to La. R.S. 19:1, et seq.

3.

Plaintiff brings this proceeding pursuant to La. R.S. 19:2(7) & (11) to expropriate a

servitude of right of use pursuant to La. C.C. Art. 639, et seq to locate, construct, operate and

maintain power lines to be constructed on a single line of structures on and over the defendants'

property.

4.

Made defendants in this action are the owners of four tracts of land situated in Iberville

Parish, Louisiana, hereinafter referred to as Tract Nos. 25, 29, 37, and 61, to correspond to the

number provided on the survey plats attached hereto as Exhibits "A" through "D" over, under,

upon, and across which the Plaintiff seeks servitudes to locate, construct, operate, and maintain

power lines. The servitudes Entergy Louisiana needs to acquire are more fully depicted on the

EXHIBIT

A

NON-CERTIFIED COPY

survey plats attached hereto as Exhibits "A" through "D" and made a part hereof. Entergy Louisiana has acquired servitudes on 17 other tracts that are needed for the transmission lines that Entergy Louisiana intends to locate within the servitudes sought in this suit.

5.

The following landowners are named defendants herein:

A. The owner of Tract 25:

Carol Lapeze Davis as the Succession Representative for the Succession of Josephine R. Lapeze, who is domiciled and residing in West Baton Rouge Parish, Louisiana. The heirs of the Succession are as follows:  Carol Lapeze Davis, Executrix and Succession Representative, Brenda Lapeze, Elizabeth Lapeze, and Ernest Lapeze

B. The owner of Tract 29 and 37

Canova Properties L.L.C. a Louisiana limited liability company with its principal place of business in Iberville Parish, Louisiana.

C. The owner of Tract 61:

Robert Breaux, a person of the age of majority domiciled and residing in Iberville Parish, Louisiana.

6.

Venue is proper in the 18th Judicial District Court for the Parish of Iberville pursuant to La. R.S. 19:2.1(A)(1).

7.

Entergy Louisiana delivers electrical service to customers in Louisiana, including customers in Iberville Parish and other parishes in south Louisiana, through a system consisting of electrical transmission lines that carry electricity from the generating plants across long distances to substations, and distribution lines that carry electricity from substations to end use customers, including residential, commercial, industrial and governmental customers (sometimes referred to as "lines").

8.

Entergy Louisiana is currently engaged in a portfolio of projects designed to alleviate congestion in the industrial corridor and facilitate the flow of lower cost electricity into the area.

2

NON-CERTIFIED COPY

06/28/2017 14:47          No.: R053 L1                    P.005/012

9.

The four components of the portfolio include (1) construction of a new substation at Richardson, Louisiana and the construction of a new 230 kilovolt ("kV") line from that new substation to the existing Iberville substation; (2) cut-in of the existing Bagatelle to Sorrento 230 kV line in to the existing Panama 230 kV substation; (3) the now completed upgrading the line bay bus at the existing Romeville substation to increase the ampacity on the Wilton to Romeville bus; and (4) adding a second 500/230 kV autotransformer at the existing Coly substation.

10.

All four components of the portfolio are necessary to address the congestion and make the economic power available to Entergy Louisiana's customers.

11.

As stated, Entergy Louisiana proposes to build a 230 kilovolt ("kV") transmission line, approximately 11 miles long, from the newly constructed substations referred to as Richardson to the existing Iberville substation.

12.

This project was designed to produce economic benefits for the Entergy Louisiana's customers by reducing the production cost of the electric system. This production cost benefit was projected to result from a 300 megawatt ("MW") relative improvement in the import capability into the Amite South load pocket. The ability to import more power into the Amite South load pocket allows for the system to reduce reliance on energy produced by less-efficient legacy generators in the Amite South load pocket and allow for more economic energy to flow into the region, thus benefiting customers. In addition, the project provides new sources of power at the Boxwood Substation and the Brittany Substation. The new line will also enable existing or potential industrial customers in the Geismer Industrial corridor the ability to build or expand their plants in the future, thus aiding in the economic development of southeast Louisiana.

13.

The new transmission line will be placed on a single line of structures within the servitudes sought herein. The width of the servitude that Plaintiff needs to acquire over the Defendants' property is based upon the National Electric Safety Code guidelines and Plaintiff's internal design standards, which provide that power line servitudes must be sufficiently wide to allow for blowout (the side to side sway of power lines that occurs due to high winds during

NON-CERTIFIED COPY

storms), to ensure that the power lines will not come into contact with any other power lines, and to reduce the risk that the lines will come in contact with other structures because of the power lines' or the other structures' falling or being blown down, and to comply with clearance requirements relative to surrounding trees or foliage. The width is also intended to achieve electric service reliability requirements formulated by or under the authority of the Federal Energy Regulatory Commission.

14.

The transmission line for which the Plaintiff needs to obtain the servitude will be located, constructed, operated, and maintained so as not to be dangerous to persons or property nor interfere with the use of other wire using companies or, more than is necessary, with the convenience of the landowners.

15.

In April 2015, Plaintiff sought certification from the Louisiana Public Service Commission that the public convenience and necessity would be served by the construction of a portfolio of projects that included the transmission line. After reviewing Plaintiff's request pursuant to the Transmission Certification General Order, the Commission issued Order No. U-33605 dated January 1, 2016 certifying that Plaintiff's construction of the transmission line is in the public interest.

16.

At least 30 days prior to filing suit against the persons made defendant herein, Plaintiff had the defendants' property surveyed to the extent it was able to do so, valued the just compensation for the purposes of a servitude over the property based on an independent appraisal, and sent a letter to each defendant by certified mail, return receipt requested, which set forth in detail the following:

A. The basis upon which Plaintiff exercises its power of expropriation;

B. The purpose, terms, and conditions of the proposed acquisition;

C. The compensation to be paid for the rights acquired;

D. A complete copy of all appraisals of, or including, the subject property previously obtained by the Plaintiff, which included the following information, as required by La. R.S. 19:2.2(A):

1)   The name, address, and qualifications of the person or persons who

4

NON-CERTIFIED COPY

prepared the appraisal or evaluation of the value of the servitude;

2) The amount of compensation estimated in the appraisal or evaluation; and

3) A description of the methodology used in the appraisal or evaluation.

E. A plat of survey signed by a Louisiana licensed surveyor illustrating the proposed location and boundary of the proposed acquisition, and any temporary servitudes or work spaces, if the Plaintiff was unable to obtain access to the property for formal surveying, then it provided a plat that fairly identifies the boundary of the proposed acquisition;

F. A description and proposed location of any proposed above ground facilities to be located on the property;

G. A description by Entergy Louisiana of considerations for the proposed route or area to be acquired.

17.

Subsequent to Plaintiff's initial contact and negotiations with Defendants, the Louisiana Legislature enacted Act 108 of the 2016 Legislative Session, which became effective January 1, 2017 (after the documents referenced in Paragraph 15 herein were sent to defendants), amending La. Rev. Stat. 19:2.2 and adding requirements in what is now La. Rev. Stat. 19:2.2(B). Prior to instituting this action and prior to January 1, 2017, Entergy Louisiana provided Defendants with notice now required by La. Rev. Stat. 19:2.2(B) including the following:

A. A statement that the property owner is entitled to receive just compensation for the property to be acquired to the fullest extent allowed by law.

B. A statement that the property may be expropriated only by an authority authorized by law to do so.

C. A statement that the property owner is entitled to receive from the expropriating authority a written appraisal or evaluation of the amount of compensation due.

D. A statement identifying the website of the expropriating authority where the property owner can read the expropriation statutes upon which the expropriating authority relies or a copy of the expropriation statutes upon which the expropriating authority relies.

E. A statement offering to provide upon request of the property owner a copy of the expropriation statutes upon which the expropriating authority relies.

5

NON-CERTIFIED COPY

F. A statement identifying an agency responsible for regulating the expropriating authority, including the name, website, and telephone number of the agency.

G. A statement that the property owner may hire an agent or attorney to negotiate with the expropriating authority and an attorney to represent the property owner in any legal proceedings involving the expropriation.

18.

Prior to filing suit, Plaintiff attempted in good faith to acquire by purchase the servitude from the Defendants by offering to compensate the defendants in a specific amount, not less than the lowest appraisal for the proposed servitude.

19.

The Defendants have thus far not agreed to accept the amount of just compensation offered by Plaintiff.

20.

The proposed Transmission Lines are being constructed for a public and necessary purpose. To construct the lines, it is necessary for Plaintiff to acquire by expropriation proceedings and to expropriate by a judgment of this Honorable Court and according to law a personal servitude of right of use over the Defendants' property.

21.

There are no cemeteries or graveyards situated wholly or partly within the needed servitude.

22.

To construct the power line or lines, Plaintiff will need to install a pole or poles on some of the Defendants' property. The proposed locations of such poles have been disclosed to the defendants prior to filing suit.

23.

Because Plaintiff is a limited liability company engaged in generating, transmitting, and distributing electricity, it is entitled to expropriate the above described personal servitude of right of use in the manner authorized by La R.S. 19:1 *et seq.*

NON-CERTIFIED COPY

24.

Pursuant to La. R.S. 19:8, expropriation suits should be tried by preference and conducted with the greatest possible dispatch.

25.

Pursuant to La. R.S. 19:5(A), the trial court should issue an order fixing the time of the trial of the suit which shall not be less than sixty days from the filing of the suit.

26.

Pursuant to La. R.S. 19:5(B), the clerk of court shall issue to the Defendants, at least sixty days before the time fixed for trial, a notice, accompanied by a certified copy of the petition, copies of all exhibits, and a certified copy of the order for trial.

27.

Pursuant to La. R.S. 19:5 (C), the notice signed by the clerk and issued to the Defendants shall contain:

A.    The date of issuance,

B.    The title of the cause,

C.    The name of the person to whom it is addressed,

D.    The title and location of the court issuing it,

E.    The date fixed for trial, and

F.    A statement that the Defendants must file an answer, exception, or other responsive pleading within the thirty day period after service of citation and that failure to do so within the thirty day period constitutes a waiver by the Defendant of all defenses to the suit except claims for compensation.

28.

ENTERGY LOUISIANA requests a trial by jury to determine just compensation.

WHEREFORE, Plaintiff prays that:

1.    The Defendants be cited and served with a copy of the notice, certified copy of this Petition, and certified copy of the order required by La. R.S. 19:5(A-C);

2.    After all due proceedings are had, judgment be rendered in favor of Plaintiff that the above-described personal servitude of right of use over the Defendants' property be adjudicated to Plaintiff, with just compensation paid to the Defendants, with all costs to be paid by the owners of the property who are made Defendant herein; and

7

NON-CERTIFIED COPY

3. For all general and equitable relief as this Court deems just and proper.

Respectfully submitted:

PHILIP A. FRANCO, #5819, T.A.
MARSHALL A. HEVRON #32501
ADAMS AND REESE LLP
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone:    (504) 581-3234
Facsimile:    (504) 566-0210

F. BARRY MARIONNEAUX #09277
23615 Railroad Avenue
Plaquemine, Louisiana 70764
Telephone:  (225) 687-6884
Facsimile:   (225) 687-6886

SEAN D. MOORE, #20303
Entergy Services, Inc. Legal Department
639 Loyola Avenue
26th Floor
New Orleans, Louisiana 70113
Telephone:    (504) 576-7048
Facsimile:    (504) 576-4150

*Attorneys for Plaintiff, Entergy Louisiana, LLC*

**PLEASE SERVE:**

Succession of Josephine R. Lapeze
C/o Carol Davis—Executrix and Succession Representative
2314 Oak Alley
Port Allen, LA 70767

Canova Properties L.L.C.
Through its Agent for Service of Process
Dorothy C. Blanchard
57730 Cardinal St
Plaquemine, LA 70764
225-755-8843

Robert Breaux
23630 Church St
Plaquemine, LA 70764

FILED

2017 MAR -7  9: 55

BY CLERK, EX OFFICIAL
IBERVILLE LOUISIANA

8

NON-CERTIFIED COPY

06/28/2017 14:48         No.: R053 L1              P.011/012



# ADAMS AND REESE LLP

Attorneys at Law
Alabama
Florida
Georgia
Louisiana
Mississippi
South Carolina
Tennessee
Texas
Washington, DC

Philip A. France
Also admitted in Texas
and the District of Columbia
(504) 585-0291
E-Fax (504) 553-9760
philip.franco@arlaw.com

June 8, 2017

*Via E-Filing*

Mr. Rodd Naquin
Clerk of Court
Court of Appeal, First Circuit
P. O. Box 4408
Baton Rouge, LA 70821

RE:    Trial Set for August 16, 2017
No. 2017-CW-0476
*H&E Equipment Services, Inc. v. URS Corporation Architecture, P.C.,*
*URS Corporation, L. O'Neal Johnson and Thomas Ryan, III,* Application

Dear Mr. Naquin,

Pursuant to Uniform Rule 4-5(D), Defendants-Applicants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas Ryan, III (collectively referenced herein as "URS") write to advise that by notice received June 2, 2017, Judge Janice Clark of 19th JDC set this matter for a jury trial to begin on August 16, 2017.

As advised by your office, we are e-filing an original and three copies of this letter so that it can be attached to each copy of the Application for Supervisory Writ filed by URS on April 7, 2017. URS applied to this Court for review of Judge Clark's summary judgment ruling relating to the interpretation of contracts at issue in this case. A favorable ruling for URS on its application to this Court will effectively end this litigation, eliminating the need for the August 16 trial.

A copy of this letter has been sent to all counsel of record via electronic mail.

Sincerely,

**ADAMS AND REESE LLP**

/s/ Philip A. Franco
Philip A. Franco

PAF//tdw
cc:    All Counsel of Record via e-mail

One Shell Square | 701 Poydras Street, Suite 4500 | New Orleans, Louisiana 70139 | 504.581.3234 | Fax 504.566.0210
www.adamsandreese.com


EXHIBIT
B

NON-CERTIFIED COPY



# DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept.

P.O Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

## FAX RECEIPT

NUMBER C626308  Division D                          Date:   28-JUN-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:   LORETTA G MINCE
      CORRERO FISHMAN HAYGOOD ET AL
      201 ST CHARLES AVE 46TH FL
      NEW ORLEANS LA 70170-4600

Item(s) Received: MEMO IN OPPOSITION ✓  YRG Corp. (12 pg.)

Total Amount Due (includes all applicable fees below) $ 86.00

The Clerk of Court's office has received, by facsimile transmission dated **06-28-17**, documents in the above referenced case.  In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)      A transmission fee of five dollars
13:841(A)(2)(a)   First page of each pleading, six dollars
13:841(A)(2)(b)   Each subsequent page, four dollars
13:841(A)(2)(c)   Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)   Issuing document without notice of service, fifteen dollars (Receipt generation fee)

### NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.

### SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING. SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.

### IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED. IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT



NON-CERTIFIED COPY

## ** Transmit Conf.Report **

P.1
EBR CLERK OF COURT    Fax 2253893392                    Jun 29 2017 04:33pm

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 915045865250 | Normal | 29:04:32pm | 0'37" | 1 | # O K | |



## DOUG WELBORN
### CLERK OF COURT

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

PARISH OF EAST BATON ROUGE

### FAX RECEIPT

NUMBER C626308  Division D                          Date:    28-JUN-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: MEMO IN OPPOSITION  ✓  YRb Corp. (12 pg.)

Total Amount Due (includes all applicable fees below) $ 86.00

The Clerk of Court's office has received, by facsimile transmission dated 06-28-17, documents in the above referenced case.  In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee. The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)       A transmission fee of five dollars
13:841(A)(2)(a)  First page of each pleading, six dollars
13:841(A)(2)(b)  Each subsequent page, four dollars
13:841(A)(2)(c)  Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)  Issuing document without notice of service, fifteen dollars (Receipt generation fee)

**NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.**

**SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.**

**IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.**

*DeNay H. Johnson*
Deputy Clerk of Court for
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT



NON-CERTIFIED COPY

## ** Transmit Conf.Report **

P.1                                                              Jun 29 2017 11:14am
EBR CLERK OF COURT      Fax 2253893392

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 915045865250 | Normal | 29:11:13am | 0'34" | 1 | * O K | |



**DOUG WELBORN**
**CLERK OF COURT**

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

PARISH OF EAST BATON ROUGE

### FAX RECEIPT

NUMBER C626308  Division D                    Date:   28-JUN-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: MEMO IN OPPOSITION

Total Amount Due (includes all applicable fees below) $ 86.00

The Clerk of Court's office has received, by facsimile transmission dated 06-28-17, documents in the above referenced case. In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee. The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)     A transmission fee of five dollars
13:841(A)(2)(a)  First page of each pleading, six dollars
13:841(A)(2)(b)  Each subsequent page, four dollars
13:841(A)(2)(c)  Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)  Issuing document without notice of service, fifteen dollars (Receipt generation fee)

**NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT**
**UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.**

**SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.**
**SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.**

**IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.**
**IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.**

*DeNay H. Johnson*
*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

                                    S249 – LTR / FAX RECT


NON-CERTIFIED COPY



# DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392

www.ebrclerkofcourt.org

---

## FAX RECEIPT

NUMBER C626308  Division D                     Date:    28-JUN-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL


To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: MEMO IN OPPOSITION  / YRS Corp. (12 pg.)

Total Amount Due (includes all applicable fees below) **$ 86.00**

The Clerk of Court's office has received, by facsimile transmission dated **06-28-17**, documents in the above referenced case.  In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)     A transmission fee of five dollars
13:841(A)(2)(a)  First page of each pleading, six dollars
13:841(A)(2)(b)  Each subsequent page, four dollars
13:841(A)(2)(c)  Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)  Issuing document without notice of service, fifteen dollars (Receipt generation fee)

**NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT
UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.**

**SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.**

**IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.**


*DeNay H. Johnson*

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

                    5249 – LTR / FAX RECT



NON-CERTIFIED COPY

# FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue
46th Floor
New Orleans, LA 70170
Phone: (504) 586-5252
Fax: (504) 586-5250

# FAX

**TO:** Clerk, 19th JDC
Parish of East Baton Rouge

**FAX NUMBER:** 225-389-3392

**FROM:** Loretta G. Mince

**DIRECT DIAL NO:** 504-586-5273

**DATE:** June 28, 2017

**FILE NO.** 3107-04

We are sending 52 pages (including this page)

If there are any problems, please contact Carla at 586-5246.

**Re:** *H&E Equipment Services, Inc. v URS Corporation Architecture, P.C., et al*
19th JDC, Doc. No. 626,308, Sec. "D"

Dear Clerk:

Attached please find a Memorandum in Opposition to (1) Motion in Limine to Strike Expert Reports and to Exclude Proposed Testimony of Wallace. C. Drennan, III and (2) Motion in Limine to Strike Expert Reports and to Exclude Proposed Testimony of James R. Bailey, Ph.D filed by Plaintiff H&E Equipment Services. Please confirm *via* facsimile the cost for fax and filing fees for the attached document. As required, the original document will be forwarded for filing within seven (7) days along with a check to cover the fees for filing by fax.

Thanking you in advance for your assistance.

Respectfully,

Carla Cooper Mayer
Legal Assistant Loretta G. Mince

cc:     Philip A. Franco, Esq. (*via* Philip.franco@arlaw.com)

EBR4184157

859269v.1

NON-CERTIFIED COPY

ADAMS AND REESE LLP

**Attorneys at Law**
Alabama
Florida
Georgia
**Louisiana**
Mississippi
South Carolina
Tennessee
Texas
Washington, DC

June 30, 2017

POSTED

JUL 03 2017

Kellen J. Mathews
Direct:  225.378.3243
E-Fax:  225.336.5115
kellen.mathews@arlaw.com

Honorable Doug Welborn
Clerk of Court, 19th Judicial District Court
East Baton Rouge Parish
300 North Boulevard
Baton Rouge, LA 70801

COST OK Amt 424
055 495
JUN 30 2017
BY _____
DY CLERK OF COURT

RE:    H&E Equipment Services v. URS Corporation, et al
       19th JDC No. 626308(D)
       Our File No. 25240-3

Dear Mr. Welborn:

Please issue trial subpoenas on behalf of URS Corporation for the following witnesses to appear for trial in the above matter commencing on August 16, 2017, at 9:30 a.m. before Judge Janice Clark, Division D, Room 10A, Baton Rouge, LA:

1.    Stephan Dorsey            Or      5227 Riverbend Boulevard
      Milton Womack, Inc.               Baton Rouge, LA 70820
      8400 Jefferson Highway
      Baton Rouge, LA 70809

2.    Andre M. Rodrigue         Or      5134 Riverbend Boulevard
      Stantec Consulting Services       Baton Rouge, LA 70820
      500 Main Street
      Baton Rouge, LA 70801

3.    Kevin Sprehe              Or      108 Helios Avenue
      Ryan Gootee Gen. Contractors      Metairie, LA 70005
      1100 Ridgewood Drive
      Metairie, LA 70001

EBR4192994

NON-CERTIFIED COPY

4.    Brad Reese                        Or          6737 Gen. Haig
      Mapp Construction, LLC                         New Orleans, LA 70124
      601 Poydras Street, Suite 1715
      New Orleans, LA 70130

                              Sincerely,

                              **ADAMS AND REESE, LLP**

                              Kellen J. Mathews

/tdw

NON-CERTIFIED COPY

CLERK OF COURT

FILE COPY

1

CASE ID

ON DATE

ATTORNEY

NO. PAGES: 40

1  19TH JUDICIAL DISTRICT COURT
2  PARISH OF EAST BATON ROUGE
   STATE OF LOUISIANA

3

4                                    HMENT TO:
                                 ☐  M        MARY JDGMT
5  H&E EQUIPMENT SERVICES,        ☐  PETI
   INC.                          ☐  * MF       DOCKET NO.
6                                ☐  * OTHER   626,308
   VERSUS                            *
7                                    *
   URS CORPORATION                   *
8  ARCHITECTURE, P.C., URS           *     SECTION: "D"
   CORPORATION, L. O'NEAL            *
9  JOHNSON, AND THOMAS E.            *
   RYAN, III                        *
10                                   *
   *  *  *  *  *  *  *  *  *  *

11

12

13

14          Deposition of MURRAY LEE McCULLOUGH,
   P.E., 17622 Gray Moss Avenue, Baton Rouge,
   Louisiana 70817, taken in the Law Offices of
15 ADAMS & REESE, L.L.P., Suite 4500, One Shell
   Square, 701 Poydras Street, New Orleans,
16 Louisiana 70139, commencing at 10:13 o'clock
   a.m., on Tuesday, the 4th day of October 2016.

17

18

19 APPEARANCES:

20      FISHMAN HAYGOOD, L.L.P.
        Attorneys at Law
21      (By:  LORETTA G. (LORI) MINCE, ESQUIRE)
        lmince@fishmanhaygood.com
22      Suite 4600
        201 St. Charles Avenue
23      New Orleans, Louisiana  70170-4600
        (Attorneys for the Plaintiff,
24          H&E Equipment Services, Inc.)

25

EXHIBIT

A



NON-CERTIFIED COPY

2

1  APPEARANCES (continued):

2      ADAMS & REESE, L.L.P.
       Attorneys at Law
3      (By:  PHILIP A. FRANCO, ESQUIRE
             KELLEN J. MATHEWS, ESQUIRE,
4            telephonically)
       philip.franco@arlaw.com
5      kellen.mathews@arlaw.com
       Suite 4500
6      One Shell Square
       701 Poydras Street
7      New Orleans, Louisiana   70139
       (Attorneys for the Defendants,
8            URS Corporation Architecture,
             P.C., URS Corporation,
9            L. O'Neal Johnson and
             Thomas E. Ryan, III)
10

11     KEOGH, COX & WILSON, LTD.
       Attorneys at Law
12     (By:  MARY ANNE WOLF, P.E., J.D.)
       mwolf@keoghcox.com
13     701 Main Street
       Baton Rouge, Louisiana   70802
14     (Attorneys for the Defendants,
             Benchmark Group, L.L.C.
15           and Murray Lee McCullough,
             P.E.)
16

17
   REPORTED BY:
18
       JANET GILLEN ROBINSON, CCR
19     Certified Court Reporter
       HUFFMAN & ROBINSON, INC.
20     Suite 220, Metairie Office Tower
       433 Metairie Road
21     Metairie, Louisiana  70005
       (504) 831-1753 / (800) 749-1753
22     www.huffrob.com

23

24

25

NON-CERTIFIED COPY

3

1         E X A M I N A T I O N    I N D E X

2

3                                           PAGE

4    EXAMINATION BY MS. MINCE....................9

5

6

7            E X H I B I T    I N D E X

8    McCullough Exhibit Number 1.................60
             (Letter addressed to Mr. Chad Herndon
9             from Murray L. McCullough, P.E.,
              dated March 16, 2007, Bates numbered
10            BENCHMARK 001062 and 001063)

11   McCullough Exhibit Number 2.................63
             (E-mail string from Murray McCullough
12            to Neal Johnson, dated November 27,
              2007, Bates numbered BENCHMARK
13            001293 and 001294)

14   McCullough Exhibit Number 3.................67
             (Letter addressed to Mr. Neal Johnson,
15            A.I.A., from Murray L. McCullough,
              P.E., dated July 2, 2008, Bates
16            numbered BENCHMARK 000093 through
              000101)

17

18   McCullough Exhibit Number 4.................71
             (Document entitled "WORK ORDER NO.
19            193238.US," Bates numbered
              BENCHMARK 000084 through 000087)

20   McCullough Exhibit Number 5.................77
             (Document entitled "REPORT OF
21            GEOTECHNICAL INVESTIGATION PROPOSED
              H & E BUILDINGS, PECUE LANE, BATON
22            ROUGE, LOUISIANA FOR URS CORPORATION,
              7389 FLORIDA BOULEVARD, BATON ROUGE,
23            LOUISIANA," Bates numbered H & E
              0000211 through 0000259)

24

25

NON-CERTIFIED COPY

4

```
 1  McCullough Exhibit Number 6.................81
 2       (E-mail from Chad Herndon to Leonard
          St. Germain, dated February 06,
 3        2007, Bates numbered H&E 0005163)

 4  McCullough Exhibit Number 7.................82
         (Drawings dated 4-10-07, Bates
 5        numbered BENCHMARK 001231 through
          001233)
 6
    McCullough Exhibit Number 8.................83
 7       (Drawing dated 7-10-07, Bates
          numbered BENCHMARK 000633)
 8
    McCullough Exhibit Number 9.................86
 9       (Drawing labeled "NEW FACILITIES FOR
          H&E EQUIPMENT SERVICES," Bates
10        numbered BENCHMARK 000153 through
          000157)
11
    McCullough Exhibit Number 10................91
12       (E-mail from Neal Johnson to
          pberniard@groupcontractors.com,
13        dated January 13, 2009, Bates
          numbered H&E 0007283 through
14        0007294)

15  McCullough Exhibit Number 11................92
         (Document entitled "H & E Team
16        Meeting Agenda," dated January 15,
          2009, Bates numbered BENCHMARK
17        001234 and 001235)

18  McCullough Exhibit Number 12................96
         (E-mail from Jody Rusca to Richard
19        Graeser, et al, dated January 26,
          2009, with attachment, Bates
20        numbered BENCHMARK 002035 through
          002042)
21
    McCullough Exhibit Number 13................97
22       (Handwritten notes entitled
          "Meeting with URS," dated 2-10-09,
23        Bates numbered BENCHMARK 000207
          and 000208)
24

25
```

NON-CERTIFIED COPY

5

1  McCullough Exhibit Number 14...............104
        (E-mail from Murray McCullough to
2       Neal Johnson, dated November 10,
        2010, Bates numbered BENCHMARK
3       000043 and 000044)

4  McCullough Exhibit Number 15...............107
        (E-mail string from Neal Johnson to
5       Murray McCullough, dated January 13,
        2011, Bates numbered BENCHMARK
6       001700 through 001708, and BENCHMARK
        001693 through 001696)
7
   McCullough Exhibit Number 16...............110
8       (Document entitled "SITE PLAN
        SUBMITTAL PACKAGE FOR H & E
9       EQUIPMENT, INC.," dated January 12,
        2011, Bates numbered BENCHMARK
10      000678 through 000688)

11 McCullough Exhibit Number 17...............117
        (E-mail string from Murray
12      McCullough to Wes Wilkerson, dated
        January 18, 2011, Bates numbered
13      BENCHMARK 001992 through 001995)

14 McCullough Exhibit Number 18...............120
        (E-mail from Wes Wilkerson to Bert
15      Moore, dated January 26, 2011, with
        attachments, Bates numbered
16      BENCHMARK 001611 through 001614)

17 McCullough Exhibit Number 19...............121
        (E-mail from Thomas E. Ryan to
18      Murray McCullough, dated March 4,
        2011, Bates numbered BENCHMARK
19      001574 through 001600)

20 McCullough Exhibit Number 20...............125
        (Drawings entitled "H & E EQUIPMENT
21      SERVICES NEW HEADQUARTERS AND
        BRANCH BUILDINGS," Bates numbered
22      BENCHMARK 000761 through 000785)

23 McCullough Exhibit Number 21...............127
        (Drawings entitled "H & E EQUIPMENT
24      SERVICES NEW HEADQUARTERS AND
        BRANCH BUILDINGS," Bates numbered
25      BENCHMARK 000729 through 000757)

NON-CERTIFIED COPY

21

1          Q.    And, in particular, the design of

2    the pavement at that facility; correct?

3          A.    Correct.

4          Q.    All right.  Tell me what experience

5    you have had that you would consider to be

6    similar to the scope of the pavement design work

7    at the H&E Baton Rouge facility.

8          A.    I designed a number of parking

9    facilities that -- for heavy loading conditions

10   for both private and industrial facilities.

11         Q.    Can you name some of them?

12         A.    If you'll give me a moment, I'll

13   think about it.

14               Exxon, Motiva in Convent, Motiva --

15   I'm sorry -- Shell Chemical in Geismar, Motiva in

16   Norco, Shell Chemical in Norco, and a number of

17   commercial projects.  I just can't put my mind on

18   them right this second.

19         Q.    All right.  You are aware that one

20   of the issues in this case concerns the decision

21   to use 8-inch pavement in certain portions of the

22   H&E facility, and 6-inch pavement in other

23   portions; correct?

24         A.    Correct.

25         Q.    All right.  Tell me what you know

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *  *
                        *
H&E EQUIPMENT SERVICES  *
                        * NUMBER 626,308
VERSUS                  *
                        * DIVISION "D"
URS CORPORATION         *
ARCHITECTURE, P.C., URS *
CORPORATION, L O'NEAL   *
JOHNSON AND THOMAS E.   *
RYAN, III               *
                        *
*  *  *  *  *  *  *  *  *
```

Deposition of JAMES R. BAILEY,

Ph.D., P.E., taken on Thursday, September 22,

2016, commencing at 9:43 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.



EXHIBIT
B

NON-CERTIFIED COPY

Page 2

1                    I N D E X

2

3                                            Page

4
       Caption                         1
5      Index of Exhibits               3
       Appearances                     7
6      Agreement of Counsel            8

7      Examination

8         PHILIP A. FRANCO, ESQ.           9

9

10              *   *   *   *   *

11     Witness' Certificate          215
       Reporter's Page               216
12     Certificate                   217

13

14

15

16

17

18

19

20

21

22

23

24

25

NON-CERTIFIED COPY

Page 3

1                    INDEX OF EXHIBITS

2

3      Number                              Page

4      1   July 29, 2016 James R. Bailey,     26
           Ph.D., P.E., Exponent, Inc.,
5          Investigation of Damaged
           Concrete Pavements at H&E
6          Equipment Facilities

7      2   Field Notes of James R. Bailey,    53
           Ph.D., P.E., Exponent, Inc.
8

       3   Concrete Pavement Details         148
9          January 18, 2008, Baton Rouge

10     4   January 18, 2013 Email string     149
           from Frankie Wynn to Stephan
11         Dorsey, et al, attaching
           photographs
12         H&E 0022314-0022324

13     5   February 8, 2007 Email from       150
           Chad Herndon to Leonard
14         St. Germain, et al
           H&E 0005163
15

       6   November 13, 2012 Benchmark       152
16         Field Report No. 1 (Branch
           Office) Wesley Wilkerson
17         URS 049989

18     7   1/27/2014 Portland Cement         154
           Concrete Pavement Details
19         H&E 072388-072390

20     8   August 26, 2016 Supplemental      155
           Report by James R. Bailey,
21         Ph.D., P.E., Exponent, Inc.

22     9   July 27, 2016 Email string from   161
           Frankie Wynn to Jeff Stringer,
23         et al re: Vehicle Traffic at
           Baton Rouge
24         H&E 072397-072399

25

NON-CERTIFIED COPY

Page 4

1   (Cont.)      INDEX OF EXHIBITS

2

3    Number                              Page

4    10  July 27, 2016 Email string     165
         from Bob Bailey to Frankie
5        Wynn
         H&E 072402-072403
6
     11  Joints in Concrete Construction 169
7        Reported by ACI Committee 224
         ACI 224.3R-95 (Reapproved
8        2001)
         H&E 072541-072584
9
     12  Photograph                     177
10       H&E 073577

11   13  Photograph                     177
         H&E 073580
12
     14  Photograph                     178
13       H&E 073586

14   15  Photograph                     178
         H&E 073590
15
     16  Photograph                     179
16       H&E 073595

17   17  Photograph                     182
         H&E 073610
18
     18  Photograph                     183
19       H&E 073617

20   19  Photograph                     184
         H&E 073618
21
     20  Photograph                     188
22       H&E 073622

23   21  Photograph                     189
         H&E 073631
24

25

NON-CERTIFIED COPY

1    (Cont.)        INDEX OF EXHIBITS

2

3     Number                              Page

4
         22   Photograph                  191
5              H&E 073632

6        23   Photograph                  193
               H&E 073633
7
         24   Photograph                  194
8              H&E 073643

9        25   Photograph                  195
               H&E 073651
10
         26   Photograph                  195
11             H&E 073654

12       27   Photograph                  196
               H&E 073661
13
         28   Photograph                  196
14             H&E 073702

15       29   Photograph                  196
               H&E 073703
16
         30   Photograph                  197
17             H&E 073705

18       31   Photograph                  198
               H&E 073719
19
         32   Photograph                  198
20             H&E 073428

21       33   Photograph                  201
               H&E 073441
22
         34   Photograph                  202
23             H&E 073443

24

25

NON-CERTIFIED COPY

1   (Cont.)      INDEX OF EXHIBITS

2

3    Number                              Page

4
      35   Photograph                    203
5          H&E 073478

6     36   Photograph                    203
           H&E 073479
7
      37   Photograph                    203
8          H&E 073522

9     38   Photograph                    205
           H&E 073523
10
      39   Photograph                    205
11         H&E 073536

12    40   Photograph                    206
           H&E 073562
13
      41   Photograph                    207
14         H&E 073855

15    42   Photograph                    208
           H&E 073861
16
      43   Photograph                    209
17         H&E 073920

18    44   Photograph                    209
           H&E 073921
19
      45   Photograph                    209
20         H&E 073933

21    46   Photograph                    211
           H&E 073955
22
      47   Photograph                    211
23         H&E 074022

24    48   Photograph                    212
           H&E 074026
25

NON-CERTIFIED COPY

Page 23

1    Exxon.

2        Q.  So this was your first full-time job?

3        A.  Outside of the university, yes.

4        Q.  Okay.  In your jobs at Exxon or Exponent

5    or ABS, did you ever design concrete pavement

6    for heavy-tracked equipment?

7        A.  I've conducted design reviews, but I

8    have not designed from scratch such pavements.

9        Q.  I am sorry.  You said you conducted

10   design reviews?

11       A.  Correct.

12       Q.  And what kind of design reviews did you

13   conduct?

14       A.  Okay.  By way of example, back in 2001,

15   we had a severe tropical storm flooding in

16   Houston, Tropical Storm Allison.

17          And during a three-year period while

18   working at ABS/EQE I was retained on behalf of

19   FEMA to assist with development of mitigation

20   programs within the Texas Medical Center

21   involving flood barriers.

22          And the clients would produce drawings

23   for these programs for installation of gates,

24   walls, and some of these included redoing the

25   pavements where they have trucks that back up

NON-CERTIFIED COPY

Page 24

1    into this -- the hospitals and other buildings.

2            And it was a complete rework.  So we --

3    they would submit those drawings, and we would

4    -- our team would review them and comment

5    accordingly.

6        Q.  Okay.  These were basically delivery

7    trucks for the Medical Center?

8        A.  Well, they were large vehicles.  I mean,

9    some of these were tractor-trailer, you know,

10   18-wheeler type vehicles.

11           Some were special purpose vehicles for

12   medical equipment, mobile MRIs, for example.

13   Things of this nature.

14       Q.  Okay.  Did those trucks deliver

15   heavy-tracked equipment?

16       A.  If they did, I didn't witness it or

17   observe it.  If that were the case, it might

18   have been for certain construction projects

19   onsite where they accept deliveries of that kind

20   of equipment.

21       Q.  But, certainly, that wasn't the focus of

22   what you were looking at?

23       A.  Yeah.  It wasn't the driver, correct.

24       Q.  And you didn't look at it from the

25   viewpoint of these -- any heavy-tracked

NON-CERTIFIED COPY

Page 25

1    equipment utilizing the concrete area?

2        A.  Not exactly, no.

3        Q.  Other than that one instance, have you

4    ever been involved in the design of concrete for

5    heavy-tracked equipment?

6        A.  There was work I did my last year at

7    Texas Tech, as I was completing my doctoral

8    work, where -- it's now a former Air Force base.

9            Reese Air Force Base, we had a research

10   project where we had different pavement designs

11   where we were installing strain gage dowels in

12   different configurations.

13           And we were measuring the settlement

14   displacement under various loads, including

15   heavy equipment out of that base, which included

16   tracked equipment.

17       Q.  So were you actually involved in the

18   design?

19       A.  Yes.

20       Q.  How so?

21       A.  In terms of sizing the bars, the spacing

22   of the bars, the placement of the bars and the

23   pavement thickness.

24       Q.  Were you the lead?

25       A.  No.

NON-CERTIFIED COPY

Page 57

1    Q.  Okay.  And you say here, "A&E firm claim

2    problem is due to maintenance."  Do you see

3    that?

4    A.  Yes.

5    Q.  What did you think about the maintenance

6    of the facility when you were out there, sir?

7    A.  In that visit and my subsequent two

8    visits to the site, by and large, I thought the

9    maintenance was reasonable.

10          The site was, for the most part, clear

11   or clean of debris.  There was some aggregate,

12   some soil in some areas, but nothing struck me

13   as particularly unusual or to a degree that it

14   exhibited, you know, a lack of maintenance.

15   Q.  And then you have here under this third

16   page "was designed acceptable," correct?

17   A.  Correct.

18   Q.  Were you familiar with the design when

19   you went out to look at it?

20   A.  At that time, no.

21   Q.  Who told you it was six inches thick?

22   A.  Mr. Wynn.  I'm pretty confident that is

23   who I spoke with for the most part.

24          There were one or two other people at

25   the site that we -- you know, we would

NON-CERTIFIED COPY

1   areas."  See that?

2      A.  Yes.

3      Q.  What potential causes did you

4   investigate other than design?

5      A.  I took into consideration material and

6   construction.

7      Q.  All right.  Let's talk about

8   construction.

9           What potential causes related to

10  construction did you investigate?

11     A.  Well, to the extent that I could from

12  what was either shared with me or was produced

13  in documents, simply trying to discern if there

14  was any indication that something wasn't done

15  right, was reported, observed and, therefore,

16  warranted a change.  I didn't uncover such

17  items.

18           I also, as I didn't get to do earlier,

19  proposed some nondestructive and destructive

20  means to measure steel placement and slab

21  thickness.

22     Q.  Which did not occur?

23     A.  Not yet.

24     Q.  So, they didn't occur at the time you

25  reached your opinion, did they?

NON-CERTIFIED COPY

1    A.  Correct.

2    Q.  Can you eliminate construction causes

3  for these problems, as you sit here today?

4    A.  I am not sure I could -- you say

5  eliminate.  That is pretty strict.

6    Q.  Yeah.  It's very strict.  That is the

7  way it's meant.

8    A.  Right.  I don't think that is the reason

9  for the problems, but to eliminate, no.

10        I mean, certainly, if something was

11  uncovered to suggest otherwise, then I certainly

12  might would consider that, and, if necessary,

13  amend my findings accordingly.

14    Q.  And did you investigate lack of

15  maintenance as potential causes for the problems

16  that you saw?

17    A.  Insofar as the observations I made on

18  the site and my understanding while at the site

19  of their maintenance operations, yes.

20    Q.  Okay.  You don't mention anything about

21  maintenance in your entire report, do you?

22    A.  Correct.

23    Q.  Why is that?

24    A.  I didn't think it was an issue.

25    Q.  You -- when you focus on determination

NON-CERTIFIED COPY

PHONE
(504) 828-8000
FAX
(504) 836-2939

**WCD**

Wallace C.
# Drennan, Inc.

General Contractors
P.O. BOX 15438
NEW ORLEANS, LA 70175-5438

LA CONTRACTOR'S
LICENSE NO. 1033

July 28, 2016

<u>E-MAIL</u>

Fishman Haygood, L.L.P.
201 St. Charles Ave., 46th Floor
New Orleans, La. 70170
Attention: Lori Mince

     *Re:    H&E Equipment Services, Inc. v. URS Corporation Architecture, P.C., et al., Suit*
         *No. 626,308, 19th JDC, Parish of East Baton Rouge, State of Louisiana*

Dear Ms. Mince:

     Fishman Haygood, L.L.P. has asked Wallace C. Drennan, Inc. ("WCD") to prepare a report addressing issues related to cracking and spalling of concrete pavement at the H&E Equipment Services ("H&E") facilities in Baton Rouge and Kenner, Louisiana. This report is in response to Fishman Haygood's request and summarizes my opinions.

     For this assignment, I relied on the following materials provided to me:

     H&E Baton Rouge Facility

        1.  As-Built Plans sheet nos. C-201, C-202, C-203, C-204, C-205, C-206, C-207, C-301, C-302, C-303, C-304, C-305, C-306 and C-501.

        2.  STE Geotechnical Investigation Proposed H & E Buildings Pecue Lane, Baton Rouge, Louisiana dated January 11, 2007. (H&E 0000211 to 0000259).

        3.  URS Project Specifications - Project Manual Sec. 2516 (URS 062010-062242).

     H&E Kenner Facility

        1.  MAPP As-Built Plans sheet nos. C3.1, C7.0, C5.0, C6.0, C7.0, C8.0 and C9.0.

**CONSTRUCTING FOR OVER 50 YEARS**



EXHIBIT
*C*

NON-CERTIFIED COPY

Page 2

    2.  Terracon Geotechnical Engineering Report H&E Equipment-Addition and Renovation Kenner, Louisiana dated February 9, 2011. (H&E 0009535 to 0009577).

    3.  Terracon Geotechnical Report – Pavement Addendum dated August 5, 2011 (URS 033265 to 033267).

    4.  URS Specifications for Kenner (URS 066295-066356).

During the course of my review and evaluation, I also referred to the following sources:

1. Louisianan Department of Transportation and Developments ("LADOTD") Standard Plans CP-01, sheet nos. 1, 2 and 3.

2. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

3. City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01, sheet nos. 1, 2 and 3.

4. WCD Photographs taken during site visits June 30, 2016 and July 7, 2016.

In addition, I conducted site inspections on June 30, 2016 at both the Baton Rouge and Kenner, Louisiana facilities. On July 7, 2017, I conducted a follow-up site visit to the Kenner facility.

## DISCUSSION

The observed damage to the concrete pavement at both facilities includes the following:

1. Random Cracking across panels of PCCP.

2. Diagonal Corner Cracking at the intersections of Joints (CJ and CJ/CJ and EJ/EJ and EJ).

3. Joint Spalling (breaking off and chipping of joint edges) of either side of the PCCP Control/Contraction/Construction Joints ("CJ") and Expansion Joints ("EJ").

## BATON ROUGE

I have reviewed the plans and specifications prepared by URS Corporation for the Baton Rouge facility. The plans for the Baton Rouge facility include design details for the PCCP including the CJ (see detail no. 4 as shown plan sheet no. C-501) and EJ (see detail no. 3 as shown plan sheet no. C-501). The design of the pavement for the Baton Rouge facility is

NON-CERTIFIED COPY

Page 3

defective in numerous respects, including the following:

1. The design of the CJ does not include smooth dowels and it is defective. This omission is not in conformance with the following:

   a. Louisianan Department of Transportation and Developments ("LADOTD") Standard Plans CP-01, sheet nos. 1, 2 and 3.

   b. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

   c. City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01, sheet nos. 1, 2 and 3.

   d. The STE Geotechnical Investigation Proposed H & E Buildings Pecue Lane, Baton Rouge, Louisiana dated January 11, 2007. (H&E 0000211 to 0000259). Specifically, it is not in compliance with section no. 8.2 "Rigid Pavement" of this report.

2. The plans (see detail no. 1 & 2 as shown on plan sheet no. C-501) reflect #3 rebar running across the CJs. This is not consistent with standards promulgated in nos. 1.a., 1b. and 1c. in the paragraph above. Additionally, using this design does not permit the CJs to contract. Therefore, it is not a functioning CJ and is defective.

3. The design of the typical CJ (see detail no. 4 as shown plan sheet no. C-501) reflects a saw cut joint of ½ inch depth. This depth is not in accordance with standards promulgated nos. 1.a., 1b. and 1c. above. Additionally, based on my professional experience, this depth hinders the functioning of the CJ and is inadequate. Table 1, as shown on the City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01, sheet no. 1, calls for a "MINIMUM DEPTH OF JOINT" of 2 inches for 6 inch PCCP thickness and 3 inches for 8 inch PCCP thickness.

4. The design of the EJ contained in the plans reflects the use of #4 (1/2") smooth dowels spaced at 18 inch on center. The size and placement of these dowel bars is not in accordance with standards promulgated nos. 1.a., 1b. and 1c. above. In my opinion the dowel bars are too small and should be spaced on 12 inch center not 18 inch. Table 1, as shown on City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01, sheet no. 1, calls for a 1" (#8) smooth dowels for 6 inch PCCP thickness and 1 ¼ inch smooth dowels for 8 inch PCCP thickness both on 12 inch center. Also, Table 1, as shown on the Louisiana Department of Transportation and Developments ("LADOTD") Standard Plans CP-01, sheet no. 1 calls for 1 ¼" (#10) smooth dowels for 8 inch PCCP thickness on 12 inch center.

NON-CERTIFIED COPY

Page 4

The design defects referred to above are consistent with random cracking across panels of PCCP and diagonal corner cracking at the intersections of Joints (CJ and CJ/CJ and EJ).

In addition to the foregoing, the design of the concrete calls for 8 inch pavement in the area immediately surrounding the branch office and 6 inch pavement in all other areas.  In areas where H&E operates its equipment (*i.e.* all parts of the facility other than the parking lot in front of the office building), it is my opinion that 6 inch thickness is inadequate.  Based on my professional experience, the standard in the industry is minimum of 7 inches and preferably 8 inches or greater in areas where heavy equipment will be operated.

The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJs and EJs outlined above is three million three hundred seventy thousand dollars ($3,370,000).  The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJs and EJs and increase the concrete thickness to 8 inches in all areas is three million six hundred ninety thousand dollars ($3,690,000).  All estimated costs are rounded to the nearest thousand dollars. The estimated costs do not include any contingency costs which are normally 10% to 20% of the estimated costs.  The estimated costs include 8% for engineering costs.  According to the State of Louisiana Facility Planning & Control A/E Consulting Fees Spreadsheet for a project of this size, the Fee % is 7.7%.  The estimated costs do not include the costs of a testing laboratory.  Add 1% for testing.

### KENNER

I have also reviewed the plans and specifications prepared by URS Corporation for the Kenner facility. As with the Baton Rouge facility, the plans for the Kenner facility include design details for the PCCP including the CJ (see details plan sheet no. C-7.0) and EJ (see details plan sheet no. C-7.0) as well as various general notes regarding the pavement.   The plans and specifications for the Kenner facility are deficient in numerous respects, including the following:

1.  The design of the CJ does not include smooth dowels and it is defective.  This omission is not in conformance with the following:

    a.  Louisiana Department of Transportation and Developments ("LADOTD") Standard Plans CP-01, sheet nos. 1, 2 and 3.

    b.  LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

    c.  Terracon Geotechnical Engineering Report H&E Equipment-Addition and Renovation Kenner, Louisiana dated February 9, 2011. (H&E 0009535 to 0009577).

2.  The plans and specifications reflect #3 rebar running across the CJs.  This is not consistent with standards promulgated by LADOTD.  Additionally, using this design

NON-CERTIFIED COPY

does not permit the CJs to contract.    Therefore, it is not a functioning CJ and is defective.

3.  The CJ shows a saw-cut of ¼" depth of concrete. This depth is not in accordance with standards promulgated by LADOTD.    Additionally, based on my professional experience, this depth is inadequate.

4.  The design of the typical transverse expansion joint contained in the plans reflects the use of #4 (1/2") smooth dowels spaced at 18 inch on center.  The size and placement of these dowel bars is not in accordance with specifications for the ACI or the DOTD. In my opinion, the dowel bars are too small and should be spaced on 12 inch center not 18 inch.

The design defects referred to above are consistent with random cracking across panels of PCCP and diagonal corner cracking at the intersections of joints (CJ and CJ/CJ and EJ).

In addition to the foregoing, the design of the concrete calls for 7" of concrete.  Given the extremely poor soils conditions in Kenner, based on my professional experience, a minimum of 8" of thickness is required in areas where heavy equipment is used.

Due to the nature of concrete, and its thermal expansion and contraction, it cracks without proper crack control.  Properly designed CJs and EJs, reinforcement, and proper pavement thickness, are important to insuring the integrity of the concrete and preventing excess cracking and failure.  The design deficiencies outlined above are consistent with the cracking observed at both the Baton Rouge and Kenner facilities.  In both situations, had the joints been saw cut 2 inches deep for 6 inch PCCP and 3 inches deep for 8 inch PCCP, the #3 rebar crossing the joints still prohibited the CJs from contracting.  Thus, the concrete was left to crack at areas of least resistance resulting in Diagonal Corner Cracking and Random Cracking.

In addition to the foregoing, the operation of metal track equipment across the pavement has resulted in spalling observed along the surface of the joints.  It was foreseeable that the operation of H&E's equipment across the joints would cause spalling along the joints.  URS should have recommended a design that would offer additional protection for the joints.

The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJs and EJs outlined above is one million six hundred fifty six thousand dollars ($1,656,000). The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJ and EJs and increase the concrete thickness to 8 inches in all areas is one million seven hundred sixteen thousand dollars ($1,716,000).  All estimated costs are rounded to the nearest thousand dollars.  The estimated costs do not include any contingency costs which are normally 10% to 20% of the estimated costs.  The estimated costs include 8% for engineering costs.  According to the State of Louisiana Facility Planning & Control A/E Consulting Fees Spreadsheet for a project of this size, the Fee % is 7.7%.  The estimated costs do not include the costs of a testing laboratory.  Add 1% for testing.

NON-CERTIFIED COPY

Page 6

## QUALIFICATIONS

| From | To | Description |
|------|----|-------------|
| 1979 | 1981 | Tulane University |
| 1981 | 1983 | University of Alabama |
| 1983 | 1988 | Wallace C. Drennan, Inc. Concrete Paving Laborer, Equipment Operator and Foreman. Sewer Installation Foreman. Project Manager. |
| 1988 | 1991 | Wallace C. Drennan, Inc. Secretary Treasurer, Estimator, Project Manager, Concrete Paving Equipment Operator |
| 1991 | Present | Wallace C. Drennan, Inc. President. Associated Builders and Contractors (ABC) Board of Directors 1994-2000, President 1997 and 1998. |

Attached please find a listing of representative projects completed by Wallace C. Drennan, Inc.

## COMPENSATION

I am being compensated at the rate of $350.00 per hour for my work in this matter.

## PRIOR TESTIMONY AND PUBLICATIONS

I have not testified as an expert witness in any matter during the last 4 years. I have not authored any publications within the last 10 years.

Sincerely,

**Wallace C. Drennan, Inc.**

**Wallace C. Drennan III, President**

Enclosure

NON-CERTIFIED COPY

## WALLACE C. DRENNAN, INC.

| WCD Job # | Owner | Contract Amount | Description of Project |
|---|---|---|---|
| 3266 | City of Covington | $369,689.20 | CCE 114-107:  South Jahncke Avenue Water Line Improvements (City of Covington) |
| 3265 | Sewerage and Water Board of New Orleans | $1,666,300.00 | Contract 8144:  Repairg Open Cuts in Streets, DWs, SW, resulting from the Repair to the S&WB of New Orleans Underground Utilitites (S&WB of New Orleans) |
| 3264 | Plaquemines Parish | $253,280.00 | Repair of Dalcour Lift Stationns 9 & 9A & Braithwaite Lift Station, and the Braithwaite Pakage Plant (Barowka & Bonura Engineers & Consultants, LLC) |
| 3263 | Plaquemines Parish | $292,740.00 | Repair of Myrtle Grove Sewer Pumping Stations No. 281-289 (Barowka & Bonura Engineers & Consultants, LLC) |
| 3261 | City of New Orleans | $4,244,143.00 | DPW-2000-B-01 - Gravier St. (S. Galvez St. - S. Broad St.) (ECM Consultants, Inc.) |
| 3260 | Sewerage and Water Board of New Orleans | $4,277,481.00 | Contract 30016:  Restoration of Existing Gravity Flow Sanitary Sewers by Excavation and Replacement from MH to MH, CIPP Lining MH to MH, CIPP Lining of Service Laterals & Point Repair at Various Sites throughout the City of New Orlenas (S&WB of New Orleans) |
| 3257 | Sewerage and Water Board of New Orleans | $797,625.00 | Contract 3737:  Carrollton Area Sewer Rehabilitation Mistletoe Street 18" Sewer Line Replacement (S&WB of New Orleans) |
| 3256 | Town of Lafitte | $2,396,612.00 | 20-1122C, Lafite Vicinity - Town Streets (Meyer Engineers, LTD) |
| 3255 | Orleans Levee District | $36,800.00 | OLD 22814:  St. Claude Bridge Drainage Repair |
| 3254 | Orleans Levee District | $16,749.00 | OLD 21421:  Remove Bus Pads at Hayne Blvd. |
| 3253 | Sewerage and Water Board of New Orleans | $3,197,190.00 | Contract 2111:  Water Main Point Repair, Water Service Connection, Water Valve & Fire Hydrant Replacement at Various Sites throughout Orleans Parish (S&WB of New Orleans) |
| 3252 | Sewerage and Water Board of New Orleans | $988,150.00 | Contract 2110:  Water Main Line Replacements and Extensions at Scattered Sites throughout Orleans Parish (S&WB of New Orleans) |
| 3251 | Sewerage and Water Board of New Orleans | $1,988,550.00 | Contract 30015: Restoration of Existing Gravity Sewer by Point Repair & CIPP Lining of Sewer Mains at Various Sites throughout Orleans Parish (S&WB of New Orleans) |
| 3250 | Plaquemines Parish | $1,693,920.00 | 12-11-02B:  Belle Chasse Waterline (Russell Dr. to Cedar Grove) (Kyle Associates, LLC) |
| 3248 | City of New Orleans | $1,197,165.00 | DPW-2005-A02, Cherokee Street (Hampson Street to Freret Street) (Julien Engineering & Consulting) |
| 3247 | City of Mandeville | $677,495.00 | PW-CMA004F Isaac Recovery Fire Hydrant Replaceme (Principal Engineering, Inc) |
| 3244 | Sewerage and Water Board of New Orleans | $2,088,008.00 | Contract 30009:  Restoration of Existing Gravity Sewer Mains by Excavation and Replacement from MH to MH at Various Sites Throughout Orleans Parish (S&WB of New Orleans) |
| 3243 | Louisiana  DOTD | $268,426.50 | S.P. No. H.010327, LA 45 Tusa Dr. - Oak Forest Blvd (LA DOTD) |
| 3240 | Jefferson Parish | $1,441,550.00 | River Road Waterline Relocation (Rivet Blvd. to Parish Line) (Digital Engineering, Inc.) |
| 3239 | Sewerage and Water Board of New Orleans | $4,333,769.00 | Contract 30006:  Restoration of Existing Gravity Sewer by Point Repair and CIPP Lining Sewer Mains at Various sites Throughout Orleans Parish (S&WB of New Orleans) |
| 3238 | St. Bernard Parish | $1,438,076.00 | Riverbend Oxidation pond Wetlands Assimilation Project (Waldemar S. Nelson) |
| 3234 | Sewerage and Water Board of New Orleans | $944,700.00 | Emergency 54" Sewer Force main Florida Ave. (Spain to Music) (S&WB of New Orleans) |
| 3231 | St. Tammany Parish | $6,866.00 | Magnolia Gardens Bridge Repair (St. Tammany Parish) |
| 3227 | Sewerage and Water Board of New Orleans | $1,577,000.00 | Contract 30008:  Restoration of Existing Gravity Sewer by Point Repair and CIPP Lining Sewer Mains at Various sites Throughout Orleans Parish (S&WB of New Orleans) |
| 3226 | Sewerage and Water Board of New Orleans | $4,777,625.00 | Contract 30000: Restoration of Existing Gravity Sewer Mains Damaged by Hurricane Katrina by Excavation and Replacement from MH to MH, CIPP Lining from MH to MH and Point Repairs at Various sites throughout Orleans Parish (S&WB of New Orleans) |

NON-CERTIFIED COPY

## WALLACE C. DRENNAN, INC.

| WCD Job # | Owner | Contract Amount | Description of Project |
|---|---|---|---|
| 3225 | Sewerage and Water Board of New Orleans | $2,967,900.00 | Contract 2101: Water Main Point Repair, Water Service Connection, Water Valve and Fire Hydrant Replacement at Various sites throughout Orleans Parish **(S&WB of New Orleans)** |
| 3222 | Non-Flood Protection Asset Management Authority | $1,288,024.42 | Hurricane Katrina Damage Repair of the Mardi Gras Fountain **(Design Engineering)** |
| 3220 | Consolidated Waterworks District No. 1 - Terrebonne Parish | $544,750.00 | Houma Valve Replacement Program, TGMC (CB & I) |
| 3219 | Orleans Levee District | $144,732.00 | Debris Removal Maxent/Paris Road Levees **(Orleans Levee District)** |
| 3218 | St. Bernard Parish | $2,598,000.00 | Dravo/Munster Forcemain Replacement Project (CDM Smith) |
| 3215 | Sewerage and Water Board of New Orleans | $2,336,300.00 | Contract 3698: Restoration of Existing Gravity Sewer Mains by Excavation and Replacement from Manhole to Manhole at Various Sites throughout Orleans Parish **(S&WB of New Orleans)** |
| 3212 | City of Slidell | $377,065.20 | FY 10/11 Inflow & Infiltration Program **(MWH)** |
| 3204 | St. Charles Parish | $1,077,600.00 | Canal #10 Drainage Improvements **(Professional Engineers Consultants)** |
| 3202 | Sewerage and Water Board of New Orleans | $3,437,487.00 | Contract 3984: Lower Ninth Ward Area Rehabilitation Project Sewer rehabilitation No. 3 **(S&WB of New Orleans)** |
| 3200 | City of Mandeville | $277,000.00 | Project No. 20-0743B: North Causeway Approach Sewerage Improvements Lift Station Relocation **(Meyer Engineers, Ltd.)** |
| 3198 | Sewerage and Water Board of New Orleans | $2,948,990.00 | Contract 2099: Water Main Point Repair, Water Service Connection, Water Valve and Fire Hydrant Replacement at Various Sites throughout Orleans Parish **(S&WB of New Orleans)** |
| 3197 | Sewerage and Water Board of New Orleans | $1,242,800.00 | Contract 3683: Furnishing and Installation of Temporary electric and Diesel Pumps at Various Sewage Pumping Station **(S&WB of New Orleans)** |
| 3196 | City of New Orleans | $3,330,072.60 | Project No. DPW-2005-C05, Urquhart Street (Elysian Fields Ave. to Franklin Ave.) **(C&S Consultants)** |
| 3195 | Jefferson Parish | $1,013,402.52 | PW Project No. 2009-045-DR- Drainage Improvements to Cuddihy Dr.**(Linfield, Hunter Junius)** |
| 3194 | City of New Orleans | $8,388,874.68 | Project No. DPW-31-F-09B, VA Medical Centre Infrastructure Improvements **(N-Y Associates)** |
| 3191 | City of Kenner | $466,394.00 | Chateau Magdelaine Lift Station **(Stuart Consulting)** |
| 3189 | Louisiana Land Trust | $712,810.60 | LLT Bid Package #28 - Slab Demolitions, St. Bernard Parish **(Camp Dresser McGee)** |
| 3188 | Louisiana Land Trust | $996,881.00 | LLT Bid Package #12 - Slab Demolitions, St. Bernard Parish **(Camp Dresser McGee)** |
| 3187 | City of Mandeville | $697,800.00 | North Causeway Approach Sewerage Improvements - Phs I **(Meyer Engineers, Ltd.)** |
| 3184 | Plaquemines Parish | $1,719,000.00 | Re-routing of the Lift Station No. 4 Discharge Force Main, Belle Chasse, LA **(Linfield Hunter & Junius)** |
| 3183 | Sewerage and Water Board of New Orleans | $2,333,690.00 | Contract 2096: Water Main Point Repair, Water Service Connection, Water Valve and Fire Hydrant Replacement at Various Sites Throughout Orleans Parish **(S&WB of New Orleans)** |
| 3182 | Louisiana Land Trust | $149,045.00 | LLT Bid Package #19 - Slab Demolitions, Plaquemines Parish **(Camp Dresser McGee)** |
| 3181 | Louisiana Land Trust | $147,720.00 | LLT Bid Package #18 - Slab Demolitions, Plaquemines Parish **(Camp Dresser McGee)** |
| 3180 | Louisiana Land Trust | $197,100.00 | LLT Bid Package #17 - Slab Demolitions, Plaquemines Parish **(Camp Dresser McGee)** |
| 3177 | Sewerage and Water Board of New Orleans | $574,314.00 | Contract 3655: Restoration of Existing Gravity Sewer by Point Repair and CIPP Lining of Sewer Mains at Various Sties Throughout Orleans Parish **(S&WB of New Orleans and MWH Global)** |
| 3175 | Jefferson Parish | $893,429.40 | Avenue "D" Drainage Improvements. between Fourth St and Sixth St. **(URS Corporation)** |
| 3171 | Sewerage and Water Board of New Orleans | $1,833,160.00 | Contract 3650: Restoration of Existing Gravity Sewer by Point Repair and CIPP Lining of Sewer Mains at Various Sites Throughout Orleans Parish **(S&WB of New Orleans)** |
| 3168 | City of New Orleans N-Y Associates | $4,688,935.00 | Project No: DPW-2000-D01, Desire Street (N. Roman to N. Dorgenois)**(N-Y Associates, Inc.)** |
| 3165 | Plaquemines Parish | $1,988,750.00 | Lake Hermitage Waterline, Deer Range, LA **(Linfield Hunter & Junius)** |
| 3164 | Sewerage and Water Board of New Orleans | $892,380.00 | Contract 3649: Additional Sewer and Water Mains and House Connections at Scattered Sites throughout Orleans Parish **(S&WB of New Orleans)** |

NON-CERTIFIED COPY

# WALLACE C. DRENNAN, INC.

| WCD Job # | Owner | Contract Amount | Description of Project |
|---|---|---|---|
| 3162 | City of New Orleans<br>Urban Systems, Inc. | $4,585,262.00 | Project No: DPW-2000-E02, Redwood Street (Grant St. - Dwyer Canal) and Sandalwood Street (Hammond St. - Dwyer Canal) **(Urban Systems, Inc.)** |
| 3161 | St. Bernard Parish | $1,439,691.00 | Project No. 04020: Heights Drive Sewer Pump Station and Force Main **(N-Y Associates, Inc.)** |
| 3156 | Sewerage and Water Board of New Orleans | $3,434,343.00 | Contract 2092:  Water Main Point Repair, Water Service Connection, Water Valve and Fire Hydrant Replacement at Various Sites Throughout Orleans Parish **(S&WB on New Orleans)** |
| 3155 | St. Bernard Parish | $149,950.00 | Project No. 07-835A:  St. Bernard Urban Rapid Transit ADA Walkway Project Curb Cuts & Sidewalks - Phase I **(Barowka & Bonura Engineering & Consultants, Inc.)** |
| 3154 | Orleans Levee District | $5,466,028.50 | Project No. 9527804: Lakeshore Dr. Hurricane Katrina Damage Repairs Reach 1, 3, 4 & 5 **(Design Engineering, Inc.)** |
| 3150 | City of New Orleans | $3,938,055.80 | Project DPW-2000-E01-A, Papania Dr., (Chef Menteur Hwy to Dwyer Canal) **(Digital Engineering & Imaging, Inc.)** |
| 3148 | Orleans Levee District | $1,967,243.00 | Project No. 9527803: Lakeshore Dr. Hurricane Katrina Damage Repairs Reach 2 (Orleans Canal to Bayou St. John) **(Design Engineering, Inc.)** |
| 3145 | St. Bernard Parish | $4,177,026.00 | Sewer force Main, Munster to Violet Waste Water Treatment Plant **(CDM)** |
| 3140 | City of New Orleans | $1,997,350.00 | Drainage Maintenance Services |
| 3139 | Jefferson Parish | $298,807.15 | Peters Road Sewer Extension (Between Brinker and 8th Street) **(Meyers Engineers)** |
| 3136 | Sewerage and Water Board of New Orleans | $2,993,804.25 | Contract 3648:  Point Repairs & CIP Lining at Various Sites throughout Orleans Parish **(S&WB on New Orleans)** |
| 3135 | Orleans Levee District | $942,770.00 | OLD #9535001-Seabrook Boat Launch & Fishing Pier, #9530004-NO Lakefront Airport Entrance, #9525902-Stars & Stripes Blvd.**(Orleans Levee District)** |
| 3132 | Orleans Levee District | $996,971.50 | OLD #9576805:  Lakefront Airport Drainage Repairs **Orleans Levee District)** |
| 3131 | City of New Orleans | $4,396,477.50 | Project No. DPW-2000-01:Kabel Dr. (Gen. DeGaulle -MacArthur) **(C&S Consultants)** |
| 3124 | Sewerage and Water Board of New Orleans | $644,000.00 | Emergency Contract Installation of Emergency Discharge Connections to SPS Damaged by Hurricane Katrina **(S&WB of New Orleans)** |
| 3121 | Sewerage and Water Board of New Orleans | $777,666.00 | Emergency Letter Bid to Provide Generators at 21 Sewer Pump Stations **(S&WB of New Orleans)** |
| 3119 | Sewerage and Water Board of New Orleans | $3,750,000.00 | Emergency Letter Bid Water Line Repairs **(Post Katrina) (S&WB of New Orleans)** |
| 3118 | Sewerage and Water Board of New Orleans | $8,210,000.00 | Emergency Letter Bid Sewer Line Repairs **(Post Katrina) (S&WB of New Orleans)** |
| 3117 | Sewerage and Water Board of New Orleans | $677,039.50 | Contract 3643:  Furnishing all Material and Installing Sewer and Water Mains and House Connections at Scattered Sites in the City of New Orleans **(S&WB of New Orleans)** |
| 3114 | City of Kenner | $18,066.00 | Repairs to Laketown Fishing Pier **(All South Consulting Engineers, LLC)** |
| 3111 | Durr Construction Co., LLC | $1,358,130.00 | HANO:  Guste Low Rise Housing Development Phase I **(N-Y Associates)** |
| 3108 | City of New Orleans | $2,966,323.00 | Project No. 95-15-01D, Clematis Street (Gentilly-Humanity) **(Richard C. Lambert Consultants, LLC)** |
| 3104 | Sewerage and Water Board of New Orleans | $2,797,385.00 | Contract 3960:  Mid-City Area Sewer Rehabilitation Point Repair No. 4 **(Montgomery Watson Harza)** |
| 3100 | Plaquemine Parish Government | $1,277,463.00 | East Bank Sewerage Extensions, Pointe-a-la-hache to Bohemia, Parish Project No. 01-01-02 **(Linfield, Hunter & Junius)** |
| 3097 | Sewerage and Water Board of New Orleans | $1,240,210.00 | Contract 3849:  East Bank Gravity Sewer Interconnections **(Montgomery Watson Harza)** |
| 3096 | Sewerage and Water Board of New Orleans | $276,173.00 | Contract 3956:  Mid-City Area Sewer Rehabilitation Point Repair No. 2 **(Montgomery Watson Harza)** |
| 3094 | Barriere Construction Co., LLC | $957,181.00 | City of New Orleans Project #95-15-02D, Charlton, Chatham, Chase & Chamberlain **(Schrenk & Peterson)** |
| 3093 | Sewerage and Water Board of New Orleans | $2,284,688.00 | Contract 3948:  Uptown Area Sewer Rehabilitation Sewer Main Replacement #3 **(Montgomery Watson Harza)** |
| 3091 | Sewerage and Water Board of New Orleans | $2,294,946.00 | Contract 6228:  Construction of a New Underground Electrical Ductbank from Northline Street to the Carrollton Power Plant **(S&WB of New Orleans)** |

NON-CERTIFIED COPY

**WALLACE C. DRENNAN, INC.**

| WCD Job # | Owner | Contract Amount | Description of Project |
|---|---|---|---|
| 3089 | Barriere Construction Co., LLC | $402,700.00 | City of New Orleans Project #91-ST-06, State Project #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, Earhart Blvd. - Segment III (State Street to Dupre Street) (URS Corporation) |
| 3086 | Sewerage and Water Board of New Orleans | $179,500.00 | Contract 3604: Installation of Pumping Equipment at Paris Road Sewerage Pumping Station (S&WB of New Orleans) |
| 3083 | Sewerage and Water Board of New Orleans | $2,888,525.00 | Contract 3949: Uptown Area Sewer Rehabilitation Lining/Excavated Point Repairs/Manhole Repairs #1 (Montgomery Watson Harza) |
| 3079 | Sewerage and Water Board of New Orleans | $2,434,650.00 | Contract 3944: Uptown Area Sewer Rehabilitation Sewer Main Replacement #1 (Montgomery Watson Harza) |
| 3077 | Ernest N. Morial New Orleans Exhibition Hall Authority | $133,000.00 | 2nd Floor Service Corridor Concrete Floor (Part IIIA)) (Shrenk & Peterson Consulting Engineers) |
| 3075 | Sewerage and Water Board of New Orleans | $1,448,087.98 | Contract 3942: Uptown Area Sewer Rehabilitation Excavated Point Repair #1 (Montgomery Watson Harza) |
| 3073 | Entergy Services, Inc. | $52,840.00 | Construction of Manhole and conduit System - Staybridge Hotel, 501 Tchoupitoulas Street (Entergy) |
| 3067 | Sewerage and Water Board of New Orleans | $933,123.00 | Contract 3939: Gentilly Area Sewer Rehabilitation Sewer main Replacement #2 (Montgomery Watson harza) |
| 3065 | Plaquemines Parish Government | $82,800.00 | 48" CMP - Planters Canal Road Drainage (Plaquemines Parish Government) |
| 3060 | City of Kenner | $247,599.00 | Sewer Repair Program Lift Station Improvements, #4318 (Loyola Drive), Pontchartrain Center Lift Station Loop Road Relocations (Buchart-Horn, Inc.) |
| 3058 | Jefferson Parish | $192,440.00 | Water Improvements (Kyle Associates, Inc.) |
| 3055 | Ernest N. Morial New Orleans Exhibition Hall Authority | $154,694.93 | 2nd Floor Service Corridor Concrete Floor (2nd portion) (Shrenk & Peterson Consulting Engineers) |
| 3053 | City of New Orleans | $3,288,869.60 | Prytania St. (Jefferson Ave. to Napoleon Ave.) Removal of existing roadways and constructing of new pavement (concrete or asphalt) with new curbs (or curb and gutter), base geotextile and geogrid, installation/replacement of sanitary sewer lines, water lines and drain lines; construction of new sidewalks, driveways and handicap ramps, and all work incidental to the project as shown on the plans. (Linfield, Hunter & Junius) |
| 3051 | City of Kenner | $98,102.59 | 6" Sewer Force Main - East Louisiana State , 10" Force Main - California Avenue and 12" Force Main - 39th Street (Consoer Townsend Envirodyne Engineers, Inc.) |
| 3042 | City of New Orleans | $1,446,082.60 | Touro Street (St. Claude Ave. to N. Claiborne Ave.) Removal of existing roadways and constructing of new pavement (concrete or asphalt) with new curbs (or curb and gutter), base geotextile and geogrid, installation/replacement of sanitary sewer lines, water lines and drain lines; construction of new sidewalks, driveways and handicap ramps, and all work incidental to the project as shown on the plans. (Urban Systems, Inc.) |
| 3036 | Sewerage and Water Board of New Orleans | $1,342,480.00 | Construction of New Underground Electrical Ductbank Between DPS No. 2 and DPS No. 4 (S&WB of NO) |
| 3034 | Ernest N. Morial New Orleans Exhibition Hall Authority | $97,000.00 | 2nd Floor Service Corridor Concrete Floor - Phase I (Shrenk & Peterson Consulting Engineers) |
| 3031 | Ernest N. Morial New Orleans Exhibition Hall Authority | $58,866.00 | Phase I Entrance Ramp and Roadway Replacement (Shrenk & Peterson Consulting Engineers) |
| 3023 | Entergy Louisiana, Inc. | $109,450.00 | Derbigny Substation Exit System Manhole and Conduit Construction (Entergy) |
| 3013 | Entergy Louisiana, Inc. | $337,000.00 | 2001 Convention Center Phase IV Installation of Manholes and 15 Way Duct Bank - New Orleans Convention Center Truck Marshalling Yard (Entergy) |
| 3010 | Sewerage and Water Board of New Orleans | $1,867,399.12 | Gentilly Area Sewer Rehabilitation Point Repair No. 1 (Montgomery Watson Harza) |
| 2986 | City of New Orleans | $2,787,919.00 | Almonaster Avenue (Franklin Ave. - Law Street) Removal of existing roadways and constructing of new pavement (concrete or asphalt) with new curbs (or curb and gutter), base geotextile and geogrid, installation/replacement of sanitary sewer lines, water lines and drain lines; construction of new sidewalks, driveways and handicap ramps, and all work incidental to the project as shown on the plans. (General Consulting Engineers) |
| 2979 | Johnson Brothers Corporation | $1,099,327.00 | U. S. Army Corps of Engineers, DACW29-00-C-0045 South Claiborne Ave. Manifold Canal Jena Street to Louisiana AveOrleans Parish, S & WB Contract No. 4169 CE |

NON-CERTIFIED COPY

## WALLACE C. DRENNAN, INC.

| WCD Job # | Owner | Contract Amount | Description of Project |
|---|---|---|---|
| 2975 | Sewerage and Water Board of New Orleans | $2,796,000.00 | Construction of New Underground Electrical Ductbank and new feeders 204 and 304, between DPS No. 1 (S&WB of NO) |
| 2972 | Westbank Theaters          and Wal-Mart Stores | $709,169.00 | Drainage, asphalt roadway, concrete curb and gutter, and traffic control systems. (Innovative Construction Services, Inc.) |
| 2956 | Louisiana Department of Transportation & Development          and City of New Orleans | $5,140,053.21 | Louisiana Avenue Parkway Improvements (Phase II) (S. Claiborne Ave. - S. Broad St.)  Grading, drainage structures, class II base course, asphaltic concrete pavement, portland cement concrete pavement, water system, sewer system, and related work.  (Richard C. Lambert Consulting Engineers) |
| 2945 | Plaquemines Parish | $368,785.00 | Empire Doullut Canal. Install 1200' of 12" waterline and tie-in new water line and services from old waterline. (Plaquemines Parish Government) |
| 2942 | Louisiana Department of Transportation & Development | $3,565,319.58 | Mississippi River Bridge and Approaches. Beautification and Joint Land Use Development(Peters Road to Terry Parkway Area 2) Install new drain, multi-use path(bicycles and pedestrians), sidewalks, pre-cast pavers, electrical lighting, traffic signals, emergency call boxes, irrigation and landscaping. 70,000 Trees, shrubs and ground covers for both jobs combined. (LA DOTD) |
| 2938 | Louisiana Department of Transportation & Development | $2,357,615.59 | Mississippi River Bridge and Approaches. Beautification and Joint Land Use Development(Westwood Drive to Destrehan Avenue Area 3)  Install new drain, multi-use path(bicycles and pedestrians), sidewalks, pre-cast pavers, electrical lighting, traffic signals, emergency call boxes, irrigation and landscaping. 70,000 Trees, shrubs and ground covers for both jobs combined.(LA DOTD) |
| 2933 | Lockheed Martin | $912,704.00 | Firewater Systems for Bldgs. 100 & 400. Install 2800', 450', 1200' and 1200' of 12", 10", 8" and 6" waterline respectively. (Lockheed Martin) |
| 2930 | Lockheed Martin | $818,141.59 | Firewater Systems for Bldgs. 200 & 400.  Install 6000', 500', 5000' and 1000' of 12", 10", 8" and 6" waterline respectively.  (Lockheed Martin) |
| 2920 | Barriere Construction | $1,646,206.66 | Tchoupitoulas (Henry Clay to Napoleon) 44,000 SY of concrete roadway 11" thick (13,000 cubic yards of concrete) |
| 2902 | City of New Orleans | $7,798,349.69 | Earhart Blvd. (S. Dupre to Magnolia)  Install new sewer, water (5000' of 42" welded steel waterline), drain(15", 18", 24", 30", 36" & 42" RCP 2243', 2012', 2197', 2547', 1108' & 756' respectively), electrical ductbank and new concrete roadway 9" thick ( 12,000 cubic yards of concrete) (City of NO & LA DOTD) |
| 2875 | City of New Orleans | $3,934,865.49 | Conrad Street (Lakeview) - Removal of existing roadways and constructing of new pavement (concrete or asphalt) with new curbs (or curb and gutter), base geotextile and geogrid, installation/replacement of sanitary sewer lines, water lines and drain lines; construction of new sidewalks, driveways and handicap ramps, and all work incidental to the project as shown on the plans.(Rahman & Associates) |
| 2866 | City of New Orleans | $2,238,571.31 | Onzaga Street - Removal of existing roadways and constructing of new pavement (concrete or asphalt) with new curbs (or curb and gutter), base geotextile and geogrid, installation/replacement of sanitary sewer lines, water lines and drain lines; construction of new sidewalks, driveways and handicap ramps, and all work incidental to the project as shown on the plans.(Rahman & Associates) |
| 2852 | UNO | $2,766,355.68 | Infrastructure for Research Park (Old Pontchartrain Beach Site) Install new sewer, water, drain, electrical ductbank, concrete roadway, irrigation and landscaping. (State of Louisiana Dept. of Facility & Planning) |
| 2841 | City of New Orleans | $1,028,519.50 | Convention Center Blvd.(Henderson St. to Crescent City Connection Transit Ramp)  Install new sewer, water, drain and concrete roadway in front of new Convention Center. |
| 2831 | City of New Orleans | $1,628,607.31 | Tennessee, Andry & Piety Streets - Removal of existing roadways and constructing of new pavement (concrete or asphalt) with new curbs (or curb and gutter), base geotextile and geogrid, installation/replacement of sanitary sewer lines, water lines and drain lines; construction of new sidewalks, driveways and handicap ramps, and all work incidental to the project as shown on the plans.(Hartman Engineering, Inc.) |

NON-CERTIFIED COPY

**WALLACE C. DRENNAN, INC.**

| WCD Job # | Owner | Contract Amount | Description of Project |
|---|---|---|---|
| 2809 | City of New Orleans | $1,804,816.58 | Tennessee / Tricou Streets - Removal of existing roadways and constructing of new pavement (concrete or asphalt) with new curbs (or curb and gutter), base geotextile and geogrid, installation/replacement of sanitary sewer lines, water lines and drain lines; construction of new sidewalks, driveways and handicap ramps, and all work incidental to the project as shown on the plans. (City of New Orleans) |
| 2808 | City of New Orleans | $2,106,388.27 | David Street - Removal of existing roadways and constructing of new pavement (concrete or asphalt) with new curbs (or curb and gutter), base geotextile and geogrid, installation/replacement of sanitary sewer lines, water lines and drain lines; construction of new sidewalks, driveways and handicap ramps, and all work incidental to the project as shown on the plans.(Linfield, Hunter and Junius, Inc.) |

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA


```
*  *  *  *  *  *  *  *  *
                         *
H&E EQUIPMENT SERVICES   *
                         * NUMBER 626,308
VERSUS                   *
                         * DIVISION "D"
URS CORPORATION          *
ARCHITECTURE, P.C., URS  *
CORPORATION, L O'NEAL    *
JOHNSON AND THOMAS E.    *
RYAN, III                *
                         *
*  *  *  *  *  *  *  *  *
```

             Deposition of WALLACE C. DRENNAN

III, taken on Wednesday, September 21, 2016,

commencing at 9:44 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.

EXHIBIT
D

NON-CERTIFIED COPY

```
 1              I N D E X

 2

 3                                    Page

 4
        Caption                        1
 5      Index of Exhibits              3
        Appearances                    5
 6      Agreement of Counsel           6

 7      Examination

 8        PHILIP A. FRANCO, ESQ.        7
          LORETTA G. MINCE, ESQ       180
 9        PHILIP A. FRANCO, ESQ.      183

10

                  *   *   *   *   *
11

12      Witness' Certificate         207
        Reporter's Page              208
        Certificate                  209
13

14

15

16

17

18

19

20

21

22

23

24

25
```

NON-CERTIFIED COPY

```
 1              INDEX OF EXHIBITS

 2

 3     Number                              Page

 4       1  July 28, 2016 Wallace C.         21
                Drennan III report
 5
         2  January 11, 2007 STE             42
 6              Report of Geotechnical
                Investigation Proposed
 7              H&E Buildings, Pecue Lane,
                Baton Rouge, Louisiana
 8              H&E 0000211-0000244

 9       3  February 9, 2011 Terracon        90
                Geotechnical Engineering
10              Report H&E Equipment -
                Addition and Renovation,
11              Kenner, Louisiana
                H&E 0065373-0065415
12
         4  Wallace C. Drennan, Inc.        140
13              Cost Detail H&E Concrete
                Replacement Baton Rouge
14              8" and 6" concrete
                H&E 074065-074075
15
         5  Wallace C. Drennan, Inc.        141
16              Cost Detail H&E Concrete
                Replacement Baton Rouge
17              All 8" concrete
                H&E 074057-074064
18
19       6  Wallace C. Drennan, Inc.        151
                Cost Detail H&E Concrete
20              Replacement Kenner
                7" and 6" concrete
21              H&E 074085-074096

22       7  Wallace C. Drennan, Inc.        151
                Cost Detail H&E Concrete
23              Replacement Kenner
                All 8"
24              H&E 074076-074084

25
```

NON-CERTIFIED COPY

```
 1   (Cont.)        INDEX OF EXHIBITS

 2

 3      Number                                    Page

 4        8   Photograph                          155
                 H&E 074103
 5
          9   Photograph                          157
 6               H&E 074106

 7       10   Photograph                          161
                 H&E 074108
 8
         11   Photograph                          164
 9               H&E 074136

10       12   Photograph                          166
                 H&E 074162
11
         13   Photograph                          167
12               H&E 074186

13       14   Photograph                          170
                 H&E 074236
14
         15   Photograph                          173
15               H&E 074261

16       16   Photograph                          175
                 H&E 074299
17

18

19

20

21

22

23

24

25
```

NON-CERTIFIED COPY

```
 1   APPEARANCES:

 2
        Representing the Plaintiff:
 3
        FISHMAN HAYGOOD, LLP
 4      Attorneys at Law
        201 St. Charles Avenue, Suite 4600
 5      New Orleans, Louisiana  70170

 6      BY:  LORETTA G. MINCE, ESQ.

 7

 8

 9      Representing the Defendant:

10      ADAMS AND REESE, LLP
        Attorneys at Law
11      4500 One Shell Square
        New Orleans, Louisiana  70139
12
        BY:  PHILIP A. FRANCO, ESQ.
13

14   ALSO PRESENT:
        James R. Bailey, Ph.D., P.E.
15      Exponent, Inc.

16
     Reported by:
17             KAY E. DONNELLY
               Certified Court Reporter
18             State of Louisiana

19

20

21

22

23

24

25
```

NON-CERTIFIED COPY

Page 6

```
1                S T I P U L A T I O N

2

3          It is stipulated and agreed by and between

4    counsel that the deposition of WALLACE C.

5    DRENNAN III is hereby being taken under the

6    Louisiana Code of Civil Procedure in accordance

7    with the Code.

8          The formalities of sealing and

9    certification are hereby waived.  The witness

10   will reserve the right to read and sign the

11   deposition.  The party responsible for service

12   of the discovery material shall retain the

13   original.

14         All objections, save those as to the form

15   of the questions, are hereby reserved until such

16   time as this deposition, or any part thereof,

17   may be used or sought to be used in evidence,

18   and are to be made in accordance with the Code

19   of Civil Procedure.

20               *    *    *    *    *

21         KAY E. DONNELLY, Certified Court Reporter,

22   in and for the State of Louisiana, officiated in

23   administering the oath to the witness.

24

25
```

NON-CERTIFIED COPY

1       A.   We are a general contractor specializing

2   in concrete paving, sewerage, water, drainage,

3   sewer lift stations, electrical duct banks, a

4   bridge here, a bridge there, here or there,

5   mostly for entities like the City of New

6   Orleans, the Sewerage & Water Board, the DOTD,

7   Jefferson Parish.

8       Q.   Mostly for public entities?

9       A.   Yes.

10      Q.   Okay.  Mr. Drennan, have you ever been

11  qualified as an expert before in connection with

12  any litigation?

13      A.   No.

14      Q.   Have you ever been disqualified as an

15  expert in any litigation?

16      A.   No.

17      Q.   So, this is your first rodeo?

18      A.   Yes.

19      Q.   And who contacted you in order to serve

20  as an expert in this case?

21      A.   Ms. Mince.

22      Q.   What was your relationship with

23  Ms. Mince?

24      A.   Ms. Mince handles my construction

25  litigation.

NON-CERTIFIED COPY

1      Q.  What was the psi concrete at Baton Rouge

2  designed for?

3      A.  I think I saw two different numbers,

4  4,000, but then if you go back to DOTD, you are

5  apt to use like less than 4,000, like 3,800,

6  maybe.  So between 3,800 and 4,000 psi.

7      Q.  Okay.  This also says that the design

8  life of the pavement system is dependent upon

9  periodic maintenance of the pavement.

10         Do you agree with that statement?

11     A.  Yes.

12     Q.  What periodic maintenance are you aware

13  of that took place in Baton Rouge?

14     A.  Only really when I witnessed -- when I

15  was at my site visits and they had $120,000

16  sweepers sweeping up the debris in the parking

17  lots.

18         That's the only thing I actually saw.  I

19  don't have any other knowledge of that.

20     Q.  Okay.  When you saw sweepers, you mean

21  more than one sweeper in Baton Rouge, or just

22  one?

23     A.  I saw a sweeper in Baton Rouge and a

24  sweeper in Kenner.

25     Q.  Do you know what the purpose of those

NON-CERTIFIED COPY

1    sweepers are, according to the testimony of H&E?

2        A.  I assume it's to clean up debris.

3    That's what sweepers do.

4        Q.  Would you be surprised if the testimony

5    was it was to keep the dust out of the

6    neighborhoods?

7        A.  That's one possibility, yes.

8        Q.  Let me ask you something.  Are you

9    familiar with how the heavy-tracked equipment is

10   unloaded at the sites?

11       A.  I know how I unload equipment and load

12   heavy equipment, but I don't know how they do

13   it.

14       Q.  You are aware it comes off pretty dirty

15   sometimes, aren't you?

16       A.  It's possible, but when someone loads a

17   piece of equipment onto a truck to bring back to

18   another location, it pretty much needs to be

19   shovel cleaned to avoid any rocks and debris

20   flying off the trucks.

21           That's when -- one of my pieces of

22   equipment, because I have bulldozers and

23   excavators just like, and I acquired some from

24   H&E, the machine needs to be clean, clean enough

25   so it's not going to create any damage to any

NON-CERTIFIED COPY

Page 74

1    too far apart?

2        A.  Well, now, I guess you could put 2-inch

3    smooth dowels on 18 inches center to make up for

4    the difference, but it's too far -- it's too far

5    apart for half-inch smooth bars.

6        Q.  So 18 inches could be the distance if it

7    was a thicker dowel?

8        A.  Yes.  For instance, the DOTD puts dowels

9    in some places where they give you a choice.

10   You can put one in every foot, and it's a No. 4

11   bar, or you could put one every two foot, and

12   it's a No. 9 bar.

13       Q.  Okay.  And so what's a No. 3 bar?

14   What's the diameter of the No. 3 bar?

15       A.  Three-eighths of an inch.

16       Q.  And there's a big difference between the

17   effect of a No. 3 bar and a No. 4 bar?

18       A.  One-eighth of an inch.

19       Q.  Yes, sir.  A big difference in the

20   effect of that?

21       A.  Some.  It's relative.

22       Q.  Okay.  And so did you investigate what

23   the causes of the problems were that you saw in

24   Baton Rouge?

25       A.  Did I investigate it?

NON-CERTIFIED COPY

Page 75

1    Q.  Yes.

2    A.  Sure.  Yeah, I investigated it.

3    Q.  Okay.  And you say here, "The design

4    defects referred to above are consistent with

5    random cracking across panels of PCCP and

6    diagonal comer cracking at the intersections of

7    the joints...," both joints, contraction joints

8    and expansion joints, right?

9    A.  So you say if because of this design,

10   that's consistent with the kind of cracking you

11   saw across the panels and the comer cracking,

12   right?  Correct.

13   Q.  What other possible causes did you

14   investigate for the corner cracking?

15   A.  I considered that it could be a base

16   issue.  The base is pretty substantial on this

17   design.

18        To me, if it was a base issue, you would

19   have had a total collapse of the corner.  The

20   corner is inward because it would be creating a

21   void underneath there.  I didn't see any of

22   that.

23        And, you know, what happens when the

24   contraction joints or expansion joints don't

25   work is that the concrete looks for the next

NON-CERTIFIED COPY



# DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

## FAX RECEIPT

NUMBER C626308  Division D          Date:    28-JUN-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: MEMORANDUM IN OPPOSITION - URS Corp. (62 pg.)

Total Amount Due (includes all applicable fees below) $ 237.00

The Clerk of Court's office has received, by facsimile transmission dated 06-28-17, documents in the above referenced case.  In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)     A transmission fee of five dollars
13:841(A)(2)(a)  First page of each pleading, six dollars
13:841(A)(2)(b)  Each subsequent page, four dollars
13:841(A)(2)(c)  Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)  Issuing document without notice of service, fifteen dollars (Receipt generation fee)

### NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.

### SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING. SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.

### IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED. IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.

_Deray H. Johnson_
Deputy Clerk of Court for
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT



NON-CERTIFIED COPY

## ** Transmit Conf.Report **

P.1
EBR CLERK OF COURT    Fax 2253893392

Jun 29 2017 04:34pm

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 915045865250 | Normal | 29:04:33pm | 0'39" | 1 | # O K | |



## DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

### FAX RECEIPT

NUMBER C626308  Division D
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

Date:    28-JUN-2017

To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: MEMORANDUM IN OPPOSITION ~ URS Corp. (62 pg.)

Total Amount Due (includes all applicable fees below) $ 237.00

The Clerk of Court's office has received, by facsimile transmission dated 06-28-17, documents in the above referenced case.  In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)       A transmission fee of five dollars
13:841(A)(2)(a)   First page of each pleading, six dollars
13:841(A)(2)(b)   Each subsequent page, four dollars
13:841(A)(2)(c)   Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)   Issuing document without notice of service, fifteen dollars (Receipt generation fee)

#### NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.

#### SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING. SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.

#### IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED. IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.

*DeRay H. Johnson*

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

S249 – LTR / FAX RECT



NON-CERTIFIED COPY



# DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392

www.ebrclerkofcourt.org

---

## FAX RECEIPT

NUMBER C626308  Division D                    Date:    28-JUN-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: MEMORANDUM IN OPPOSITION ~ URS Corp. (62 pg.)

Total Amount Due (includes all applicable fees below) **$ 237.00**

The Clerk of Court's office has received, by facsimile transmission dated <u>06-28-17</u>, documents in the above referenced case.  In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)    A transmission fee of five dollars
13:841(A)(2)(a)  First page of each pleading, six dollars
13:841(A)(2)(b)  Each subsequent page, four dollars
13:841(A)(2)(c)  Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)  Issuing document without notice of service, fifteen dollars (Receipt generation fee)

<u>NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT
UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.</u>

<u>SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.</u>

<u>IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.</u>

*DeRay H. Johnson*
_____
*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT



NON-CERTIFIED COPY

## ** Transmit Conf.Report **

P.1
EBR CLERK OF COURT    Fax 2253893392

Jun 29 2017 12:29pm

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 915045865250 | Normal | 29:12:28pm | 0'00" | 0 | D.0.7 | |
| ↑ No response. | | | Check condition of remote fax. | | | |



# DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax (225) 389-3392
www.ebrclerkofcourt.org

### FAX RECEIPT

NUMBER C626308  Division D                                    Date:    28-JUN-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: MEMORANDUM IN OPPOSITION

Total Amount Due (includes all applicable fees below) $ 237.00

The Clerk of Court's office has received, by facsimile transmission dated 06-28-17, documents in the above referenced case.  In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)       A transmission fee of five dollars
13:841(A)(2)(a)    First page of each pleading, six dollars
13:841(A)(2)(b)    Each subsequent page, four dollars
13:841(A)(2)(c)    Paper exhibits, attachments, transcripts and depositions -- per page, two dollars
13:841(A)(4)(b)    Issuing document without notice of service, fifteen dollars (Receipt generation fee)

NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT
UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.

SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.

IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.

_DeRoy H. Johnson_
Deputy Clerk of Court for
**Doug Welborn, Clerk of Court**

S249 – LTR / FAX RECT


NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

DOCKET NO.: 626,308                                      SECTION: "D"

H&E EQUIPMENT SERVICES, INC          **POSTED**

VERSUS                               JUL 03 2017

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____          _____
                                              DEPUTY CLERK

**MEMORANDUM IN OPPOSITION TO (1) MOTION IN LIMINE TO STRIKE EXPERT
REPORTS AND TO EXCLUDE PROPOSED TESTIMONY OF WALLACE C.
DRENNAN, III AND (2) MOTION IN LIMINE TO STRIKE EXPERT REPORTS AND
TO EXCLUDE PROPOSED TESTIMONY OF JAMES R. BAILEY, PH.D.**

**MAY IT PLEASE THE COURT:**

Plaintiff H&E Equipment Services, Inc. respectfully submits this Memorandum in

Opposition to the Motions in Limine filed by Defendants URS Corporation Architecture PC,

URS Corporation, L. O'Neal Johnson and Thomas Ryan, III (collectively referenced herein

"URS"). As set forth herein, URS's motions, which seek to exclude the reports and testimony of

Wallace C. Drennan, III and James R. Bailey, should be denied.

<u>OVERVIEW</u>

H&E sells, services, and rents industrial equipment. URS provides architectural,

engineering, and other related services, and touts itself as "the world's No. 1-ranked engineering

design firm." In this case, H&E seeks damages from URS arising from URS's design and

construction management work on three H&E facilities located in Baton Rouge, Kenner, and

Belle Chasse, Louisiana. The principle issue in the case relates to URS's grossly defective

design of the concrete pavement at H&E's Baton Rouge and Kenner facilities. As alleged in the

petition and confirmed in discovery, URS's services were performed in a grossly deficient

manner. Almost immediately after construction, the pavement at both facilities began cracking,

spalling, and visibly deteriorating. As it turns out, and unbeknownst to H&E, the rapid

degradation of the concrete pavement was inevitable because URS's designs failed to comply

with the pavement design requirements promulgated by established government and industry

groups. The designs also failed to comply with the recommendations of the geotechnical

engineering reports commissioned by URS. Indeed, as revealed in discovery, URS did nothing

NON-CERTIFIED COPY

1204670v.1

to confirm that its designs complied with these recognized standards (despite express written requirements for compliance) and, in fact, the designs were plainly substandard.

At the trial of this matter, H&E will offer the testimony of two experts: (1) Dr. James "Bob" Bailey, an engineer with a Ph. D. in Civil Engineering who is licensed in nine states, including Louisiana; and (2) Wallace Drennan, a general contractor with more than 30 years' experience in construction, including in particular, the installation of more than hundreds of thousands of square yards of pavement. Dr. Bailey and Mr. Drennan will testify regarding the topics covered in their reports including that the pavement designed by URS does not meet the minimum standards promulgated by the Louisiana Department of Transportation and Development, the East Baton Rouge Parish of Public Works, and the American Concrete Institute. Dr. Bailey and Mr. Drennan will further opine that URS failed to follow the recommendations set forth in the geotechnical engineering reports prepared for the projects. Additionally, Mr. Drennan will offer testimony regarding the cost to correct the deficiencies in the pavement resulting from URS's negligence.

URS has filed motions in limine to exclude Dr. Bailey and Mr. Drennan. In its motions, URS makes three arguments. First, URS argues that Dr. Bailey has never designed pavement for metal tracked equipment (e.g., bulldozers). Second, URS argues that Mr. Drennan is not a licensed engineer. Third, URS argues that Dr. Bailey and Mr. Drennan failed to adequately consider alternative causes of the pavement failures at the Baton Rouge and Kenner facilities. These may well be proper grounds for cross examination at trial; URS, which has made plain its view that this case should never proceed to trial, insists that these unquestionably qualified experts be excluded.[1]

In addition to the above arguments, URS re-urges arguments previously presented to this Court in their motion for protective order regarding Dr. Bailey's supplemental expert report of August 26, 2016. As set forth in H&E's opposition to URS's motion for protective order, URS has demonstrated no prejudice as a result of Dr. Bailey's supplemental report.

## DISCUSSION

### I.    Legal Standard

Louisiana Code of Evidence article 702 sets the following standard for admissibility of expert testimony:

---
[1] The Court may defer its ruling on the admissibility of an expert witness's testimony until trial and H&E urges that it do so.

2

NON-CERTIFIED COPY

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

La. Code of Evid. art. 702.

Expert testimony is properly admitted if:

(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Cheairs v. State ex rel. Dep't of Transp. & Dev,* 2003-0680 (La. 12/3/03), 861 So. 2d 536, 542;

*Guardia v. Lakeview Reg'l Med. Ctr.*, 2008-1369 (La. App. 1 Cir. 5/8/09), 13 So. 3d 625, 630

(same). The "determination of the admissibility of expert testimony under La. Code of Civ. Proc.

art. 702 'turns upon whether it would assist the trier of fact to understand the evidence or to

determine a fact in issue.'" *Cheairs*, 861 So. 2d at 541–42.

**II.      Dr. Bailey is qualified to offer opinions regarding the design of pavement.**

Dr. Bailey holds a Ph.D. in Civil Engineering.[2]  He is Senior Managing Engineer in

Exponent's Building & Structures practice, and has specialized expertise in structural analysis

and design.[3]  He is a licensed professional engineer in nine states, including Louisiana.[4]  He has

been accepted as an expert witness on multiple occasions.[5]

Notwithstanding these credentials, Defendants argue that Dr. Bailey should be excluded

as an expert because he has never designed pavement for heavy metal tracked equipment.

Defendants' argument shows a misunderstanding of H&E's claims.  H&E claims that it was

URS's duty to design the pavement in accordance with applicable industry and governmental

standards.  In order to do that, URS was required to account for the fact that H&E is in the

business of renting and selling heavy equipment, and to consider the loading conditions that

would be present at the Baton Rouge and Kenner facilities.  Every piece of equipment has its

own weight, and the distribution of that weight on the pavement depends on whether the

equipment runs on rubber tires, metal tracks, or some other footing.  But issues of load

---

[2] *See* Exhibit A to URS's Motion in Limine to Strike Expert Reports and to Exclude Proposed Testimony of James R. Bailey at pgs. 1, 31-32.
[3] *Id*. at pg. 1.
[4] *Id*. at pg. 32.
[5] *Id*. at pgs. 35-36.

3

1204670v.1                    NON-CERTIFIED COPY

distribution are presented in every construction project, and a civil engineer is qualified to address issues of load distribution regardless of the specific business of the client.

Indeed, the engineer who designed the pavement for the Baton Rouge facility testified that he believed he had the appropriate experience to design the H&E facility because he had designed parking lots at a number of petroleum and chemical plants.[6]

URS's reliance on *Reynolds Metals Co. v. Schofield*, 98-0460 (La. App. 1 Cir. 4/1/99), 733 So. 2d 671, 672 is misplaced. In *Reynolds Metals Co.*, the court affirmed the district court's determination that a chemical engineer lacked any experience in a highly specialized process of calcining petroleum coke to create aluminum. Here, by contrast, Dr. Bailey has ample experience in civil and structural engineering, including the evaluation of loading conditions.

The sole remaining case cited by URS, *Sittig v. Louisville Ladder Grp. LLC,* 136 F. Supp. 2d 610 (W.D. La. 2001), actually supports the admissibility of Dr. Bailey's testimony. In *Sittig,* the Court observed:

> Although an expert need not have specialization in every area in which he will be called to testify, Rule 702 nonetheless requires that the expert be qualified in the relevant field. In this case, a review of the Drs. Scott and George's depositions shows a lack of qualifications in the field of ladder design.

*Id.* at 616.

Other case law likewise supports the admissibility of Dr. Bailey's testimony.

Courts do not require an expert to have narrow specializations and have found experts qualified based upon a broad range of experiences and expertise. For example, in *Cheairs v. State ex rel. Department of Transp. and Development*, the Louisiana Supreme Court held that a traffic accident reconstructionist was qualified to testify as an expert on the standards set forth in the Manual of Uniform Traffic Control Devices even though he was not a traffic engineer and the manual stated that "qualified engineers are needed to exercise the engineering judgment inherent in the selection of traffic control devices." 861 So.2d at 544. The Court found that the expert's work experience in development of traffic control plans, implementation of plans, among other things, were sufficient to qualify him as an expert on the applicable standards. *Id.*

In *Precht v. Case Corp.*, the court held that a mechanical engineer who had no experience designing tractors for tractor manufacturers and was not an expert in agricultural engineering

---

[6] Deposition of Murray McCullough, attached hereto as Exhibit 1, at 21:4-18: ("Q. . . . Tell me what experience you have had that you would consider to be similar to the scope of the pavement design work at the H&E Baton Rouge facility. A. I designed a number of parking facilities that – for heavy loading conditions for both private and industrial facilities. Q. Can you name some of them? A . . . Exxon, Motiva in Covent . . . Shell Chemical in Geismar, Motiva in Norco, Shell Chemical in Norco, and a number of commercial projects. . .").

4

1204670v.1    NON-CERTIFIED COPY

was qualified as an expert witness in a products liability case concerning an agricultural tractor fire. 1999-1296 (La. App. 3 Cir. 2/16/00); 756 So.2d 488, *writ denied* 761 So.2d 546; 2000-0791 (La. 5/5/00). The court found that the engineer's experience designing tractor equipment for individuals was sufficient to allow him to testify to engineering principals as they pertained to safety and tractors. *Id.* at 496.

Similarly in *Darbonne v. Wal-Mart Stores, Inc.*, the court found that a mechanical engineer who had no formal expertise in battery design or manufacture was qualified to testify about battery design and manufacture in a products liability action brought against a car battery manufacturer for a car battery explosion incident. 2000-551 (La. App. 3 Cir. 11/2/00); 774 So. 2d 1022, 1028. The court held that the expert's background in mechanical engineering, explosions, and investigation of hazards and accidents was sufficient. *Id.*

Here, the relevant field is civil engineering and pavement design, and Dr. Bailey has ample experience in that area. For example, Dr. Bailey testified that he has been involved in evaluating the pavement design at multiple industrial facilities.[7] And Dr. Bailey further testified that part of his doctoral work involved the evaluation of pavement at an Air Force Base.[8] Counsel for defendants questioned Dr. Bailey for more than 20 pages regarding his experience, and that testimony makes clear that Dr. Bailey has extensive experience in the areas for which he is being proffered.

Defendants disingenuously suggest that Dr. Bailey conceded his lack of expertise when he noted in his report and testimony that there are no codes published in the United States specifically governing the design of pavement to be used for heavy tracked equipment. Dr. Bailey made the observation only to demonstrate that, in the absence of any published code dealing directly with the design of pavement for heavy tracked equipment, generally applicable industry and government standards related to the design of pavement provide the appropriate minimum standard.[9] Defendants' designs for the Baton Rouge and Kenner facilities did not comply with these minimum standards.

In sum, Dr. Bailey is qualified to testify regarding the design of the pavement at the Baton Rouge and Kenner facilities.

---

[7] *See* Deposition of James R. Bailey, attached hereto as Exhibit B at 23-25.
[8] *Id.*
[9] Notably, URS has never suggested that this sort of specific codes exists in this State or elsewhere.

5

NON-CERTIFIED COPY

1204670v.1

## III. Mr. Drennan is qualified to provide testimony regarding whether the pavement designed by URS complies with governmental and industry requirements, and regarding the probable cost of correcting the deficiencies in the pavement.

Mr. Drennan is the president of Wallace C. Drennan, Inc., a general contracting firm specializing in concrete paving, sewerage, water and drainage. As the list of representative projects attached to Mr. Drennan's report illustrates, Wallace C. Drennan, Inc. routinely performs large paving, sewerage and drainage contracts for public and private entities.[10] In that capacity, Mr. Drennan is well-versed in the following regulations governing the installation of pavement in Louisiana:

1. Louisianan Department of Transportation and Developments ("LADOTD") Standard Plans CP-01, sheet nos. 1, 2 and 3.

2. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

3. City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01, sheet nos. 1, 2 and 3.

Mr. Drennan also regularly reviews plans and specifications calling for the installation of concrete pavement.

"Generally, the test for determining an expert's competency is the expert's knowledge of the subject about which he is called upon to express an opinion." *State v. Ferguson*, 2009–1422, p. 25 (La. App. 4 Cir. 12/15/10), 54 So.3d 152, 166*; see also State v. Sherer*, 411 So.2d 1050 (La.1982). Furthermore, "[e]xperience alone is normally sufficient to qualify a witness as an expert." *Cheairs*, 861 So.2d at 554; *Becnel v. Lafayette Ins. Co.*, 1999-2966 (La. App. 4 Cir. 11/15/00); 773 So. 2d 247, 251, *writ denied*, 2000-3458 (La. 2/9/01); 785 So. 2d 827 ("Formal education or training in a particular field is not always necessary to qualify as an expert in a particular field. Experience alone is sufficient.") (*citing Mistich v. Volkswagen of Germany, Inc.*, 95-0939 (La. 1/29/96), 666 So.2d 1073, 1079 and *Aaron v. Bankers and Shippers Ins. Co. of New York*, 475 So. 2d 379 (La. App. 1st Cir. 1985)). Indeed, Louisiana Code of Evidence article 702 confirms that an expert may be qualified "by knowledge, skill, experience, training, or education." La. Code Evid. Art. 702.

Given Mr. Drennan's extensive experience, it is clear that Mr. Drennan is competent to testify regarding the pavement designed by Defendants. Mr. Drennan reviewed the plans and specifications prepared by the Defendants for the pavement at the Baton Rouge and Kenner

[10] *See* Expert Report of Wallace C. Drennan, III and Project List, attached hereto as Exhibit C; Deposition of Wallace C. Drennan, III, attached hereto as Exhibit D at pg. 19.

NON-CERTIFIED COPY

facilities.  He identified several aspects of the plans and specifications prepared by Defendants that violate the minimum requirements of the regulations and industry standards governing the design of concrete pavement.    Mr. Drennan additionally observed that the plans and specifications prepared by Defendants failed to comply with the geotechnical report prepared for the projects.

Mr. Drennan physically visited both sites and observed extensive pavement failures in the form of uncontrolled cracking in the pavement, and diagonal cracking at the intersections of contraction and expansion joints.  Based upon his experiences as a general contractor, Mr. Drennan has knowledge that the cracking he observed is consistent with the issues he identified in Defendants' plans and specifications.

Mr. Drennan is plainly qualified to offer testimony regarding governmental requirements and the consequences of failure to follow those requirements based on his extensive experience. *See, e.g., Mount Mariah Baptist Church in v Pannell's Association Electric, Inc.*, 36, 361 (La. App. 2d Cir. 12/20/02); 835 So. 2d 880, 888 (noting that general contractor had been accepted as expert to testify that deflections in the load bearing beams in a church were caused by design defects).  Given his extensive experience in bidding and pricing work, including pavement work, Mr. Drennan is also qualified to provide testimony regarding the cost to correct the pavement deficiencies at the Baton Rouge and Kenner facilities.

IV.      **Dr. Bailey and Mr. Drennan did not fail to consider alternative causes.**

URS incorrectly argues that Dr. Bailey and Mr. Drennan should be stricken because they failed to consider alternative causes such as "construction defects or inadequate maintenance" and their alleged failures render their opinion unreliable.

Louisiana law does not require an expert witness to rule out all possible causes in order for his opinion to be reliable and accepted into evidence.  The Louisiana First Circuit Court of Appeals rejected this argument in *Breitenbach v. Stroud*, 2006-0918 (La. App. 1 Cir. 2/9/07); 959 So. 2d 926, 936.  In *Breitenbach*, the plaintiff argued that in order for the defendant's expert's opinions to be reliable under *Daubert*, he would have had to have seen the patient and made a differential diagnosis – considering and ruling out alternative causes of a patient's condition.  *Id.*  The court denied the motion to strike the expert testimony and stated "we reject plaintiff's blanket contention that an expert medical witness must physically examine the

7

NON-CERTIFIED COPY

plaintiff and make a 'differential diagnosis' for his opinion testimony to be admissible under the standards set forth in *Daubert*." *Id.* at 937.

Importantly, H&E's burden of proof at trial is to establish that URS's design defects caused the damage to H&E's pavement "by a preponderance of the evidence, that is, whether it is more likely than not that the harm was caused by the tortious conduct of" URS. *Gaspard v. Safeway Ins. Co.*, 2014-1676 (La. App. 1 Cir. 6/5/15);174 So. 3d 692, 694, *reh'g denied* (July 28, 2015), *writ denied*, 2015-1588 (La. 10/23/15); 184 So. 3d 18. In other words, H&E does not need to "rule out" every single cause, just that URS's design defects more likely than not caused the damage to H&E's pavement.

Moreover, Dr. Bailey and Mr. Drennan did consider alternative causes to the pavement problems. For example, Dr. Bailey testified that from observations he made during site visits, he believed that H&E's maintenance of the facilities was "reasonable" and did not believe that its lack of maintenance was an issue.[11] Further, when asked about whether he "eliminated" construction causes for the pavement problems, he testified that he did consider whether construction was a cause and after reviewing construction materials and documentation concluded that construction issues was not the reason for the pavement problems.[12] Similarly, Mr. Drennan testified that when he visited the facilities during site visits, he observed sweepers at both facilities as part of H&E's maintenance program.[13] Mr. Drennan also testified that he considered whether the base of the pavement at the Baton Rouge site may have been a cause of the problems, but he ruled it out as a cause.[14] Dr. Bailey and Mr. Drennan plainly considered other possible causes but ultimately concluded that URS's design defect was the mostly likely cause.

In support of its misplaced position, URS cites an unpublished federal court opinion, *Lee Green v. LA. Dep't of Pub. Safety & Corr.*, No. 06-1018, 2010 WL 1628769, at *5 (W.D. La. Apr. 20, 2010). In *Lee Green*, the plaintiff, mother to the decedent, alleged that his constitutional rights against cruel and unusual punishment were violated because he was subject to chemical weapons while he was confined to a prison cell which caused him pneumonia and death. *Id.* at *1. The Court found that the expert's testimony was not based upon sufficient data or reliable

---

[11] Deposition of James Bailey at 57:1-14; 85:14-19 ("A. And did you investigate lack of maintenance as potential causes for the problems that you saw? A. Insofar as the observations I made on the site and my understanding while at the site of the maintenance operation, yes. Q. . . . You didn't mention anything about maintenance in your entire report, do you? A. Correct. Q. Why is that? A. I didn't think it was an issue.").
[12] *Id.* at 84:5-85:13.
[13] Deposition of Wallace C. Drennan, III, at 51:7-52:3.
[14] *Id.* at 74:22-75:22.

1204670v.1    NON-CERTIFIED COPY

methodology where the expert failed to consider other, equally probable causes of death, such as the fact that the decedent was a chronic smoker and that certain symptoms he suffered, such as hoarseness, may be due to yelling. *Id.* at *5. But as shown above, both Dr. Bailey and Mr. Drennan clearly considered other possible causes but did not find them to be the reason for the pavement problems.

Also, unlike in *Lee Green* where the court found that other causes of the decedent's death were as likely as the use of chemical weapons, URS has presented nothing but rank speculation that construction or maintenance issues are the likely causes for the pavement problems. By illustration, all of the project managers of the facilities who handled the construction testified that they constructed to URS's specifications and designs. It bears mentioning that URS was present at the all of the construction of the pavement and responsible for overseeing the construction.

**V.       Defendants' re-urged objection to Dr. Bailey's supplemental report should be denied.**

Finally, Defendants re-urge their complaints regarding Dr. Bailey's supplemental expert report of August 26, 2016. Defendants have shown absolutely no prejudice and their objections should be rejected.

On August 26, 2016, two weeks **before** URS tendered their experts' reports, H&E provided URS with a one page supplement to Dr. Bailey's report. The supplemental report was signed by Dr. Bailey and a colleague who worked with him on the report. During Dr. Bailey's deposition, URS's counsel questioned Dr. Bailey extensively regarding the supplement and the supplement was included as an exhibit to his deposition.

URS can show no prejudice. Dr. Bailey's report was supplemented two weeks before URS tendered their expert reports. Furthermore, URS questioned Dr. Bailey about his opinions in the supplemental report in his deposition.

URS's objection to the inclusion of an additional signatory on Dr. Bailey's supplemental report is also unfounded. The supplemental report was signed by Dr. Bailey and a colleague, Matt Vail, who works with him at the same company, Exponent. There is no significance in multiple people from the same company signing an expert report. And, ironically, one of URS's expert reports was also signed by multiple individuals, only one of whom was designated as an expert. Specifically, while URS only disclosed one expert, Carl Larosche, from Wiss, Janney,

9

NON-CERTIFIED COPY

Elstner Associates, Inc., that report had two additional signatories, neither of whom was previously disclosed.

**VI.    The Court may defer its ruling on the admissibility of an expert's testimony to trial.**

Finally, the Court does not need to rule on URS's motions in limine immediately and may defer its ruling to trial on the merits. *See Terrebonne v. Floyd*, 1999-1036 (La. App. 1 Cir. 5/23/00), 767 So. 2d 754, 758 (holding that it was in the district court's "wide discretion in this area" to "defer the Daubert hearing until the morning of the trial on the merits"); *Keener v. Mid-Continent Cas.*, 01-1357 (La. App. 5 Cir. 4/30/02), 817 So. 2d 347, 351, *writ denied*, 2002-1498 (La. 9/20/02), 825 So. 2d 1175 (district court did not err where it denied an initial motion in limine after hearing and found that the question of the expert's qualifications would be decided at the time of the witness's voir dire to qualify him as an expert).

URS have provided a litany of issues which they may seek to pursue through cross examination. That is their right. What they are plainly not entitled to is to strike two highly qualified experts. URS's Motions in Limine should be denied.

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by facsimile, email and/or by placing same in the United States mail, postage prepaid and properly addressed, this 28th day of June, 2017.

Loretta G. Mince

10

NON-CERTIFIED COPY

1204670v.1

CLERK OF COURT
FILE COPY

CASE ID:_____
FILING DATE_____
ATTORNEY_____
NO. PAGES_____ 9

18th JUDICIAL DISTRICT COURT FOR THE PARISH OF IBERVILLE

STATE OF LOUISIANA

No. 76,690

ENTERGY LOUISIANA, LLC

versus

JOSEPHINE LAPEZE DAVIS AS THE SUCCESSION REPRESENTATIVE FOR THE
SUCCESSION OF JOSEPHINE R. LAPEZE, CANOVA PROPERTIES L.L.C., AND
ROBERT BREAUX

☐ DIVISION "           ☐ SARY JDGMT
☐ PET...
☐ MEM...
☐ OTHER...

FILED:_____                    _____
                                                 DEPUTY CLERK

PETITION FOR EXPROPRIATION
OF PERSONAL SERVITUDE OF RIGHT OF USE

NOW INTO COURT, through undersigned counsel, comes plaintiff, Entergy Louisiana,

LLC ("Entergy Louisiana") who respectfully represents:

1.

Entergy Louisiana is a Texas limited liability company having its registered office in

Jefferson Parish, Louisiana.

2.

Entergy Louisiana was created for the purpose of generating, transmitting and

distributing electricity and thereby has the power to expropriate needed property, including

servitudes, pursuant to La. R.S. 19:1, *et seq.*

3.

Plaintiff brings this proceeding pursuant to La. R.S. 19:2(7) & (11) to expropriate a

servitude of right of use pursuant to La. C.C. Art. 639, *et seq* to locate, construct, operate and

maintain power lines to be constructed on a single line of structures on and over the defendants'

property.

4.

Made defendants in this action are the owners of four tracts of land situated in Iberville

Parish, Louisiana, hereinafter referred to as Tract Nos. 25, 29, 37, and 61, to correspond to the

number provided on the survey plats attached hereto as Exhibits "A" through "D" over, under,

upon, and across which the Plaintiff seeks servitudes to locate, construct, operate, and maintain

power lines. The servitudes Entergy Louisiana needs to acquire are more fully depicted on the

EBR4193070

EXHIBIT
A

NON-CERTIFIED COPY

survey plats attached hereto as Exhibits "A" through "D" and made a part hereof.  Entergy

Louisiana has acquired servitudes on 17 other tracts that are needed for the transmission lines

that Entergy Louisiana intends to locate within the servitudes sought in this suit.

5.

The following landowners are named defendants herein:

A.  The owner of Tract 25:

Carol Lapeze Davis as the Succession Representative for the Succession of Josephine R.

Lapeze, who is domiciled and residing in West Baton Rouge Parish, Louisiana. The heirs

of the Succession are as follows:   Carol Lapeze Davis, Executrix and Succession

Representative, Brenda Lapeze, Elizabeth Lapeze, and Ernest Lapeze

B.  The owner of Tract 29 and 37

Canova Properties L.L.C. a Louisiana limited liability company with its principal place of

business in Iberville Parish, Louisiana.

C.  The owner of Tract 61:

Robert Breaux, a person of the age of majority domiciled and residing in Iberville Parish,

Louisiana.

6.

Venue is proper in the 18th Judicial District Court for the Parish of Iberville pursuant to

La. R.S. 19:2.1(A)(1).

7.

Entergy Louisiana delivers electrical service to customers in Louisiana, including

customers in Iberville Parish and other parishes in south Louisiana, through a system consisting

of electrical transmission lines that carry electricity from the generating plants across long

distances to substations, and distribution lines that carry electricity from substations to end use

customers, including residential, commercial, industrial and governmental customers (sometimes

referred to as "lines").

8.

Entergy Louisiana is currently engaged in a portfolio of projects designed to alleviate

congestion in the industrial corridor and facilitate the flow of lower cost electricity into the area.

2

NON-CERTIFIED COPY

9.

The four components of the portfolio include (1) construction of a new substation at Richardson, Louisiana and the construction of a new 230 kilovolt ("kV") line from that new substation to the existing Iberville substation; (2) cut-in of the existing Bagatelle to Sorrento 230 kV line in to the existing Panama 230 kV substation; (3) the now completed upgrading the line bay bus at the existing Romeville substation to increase the ampacity on the Wilton to Romeville bus; and (4) adding a second 500/230 kV autotransformer at the existing Coly substation.

10.

All four components of the portfolio are necessary to address the congestion and make the economic power available to Entergy Louisiana's customers.

11.

As stated, Entergy Louisiana proposes to build a 230 kilovolt ("kV") transmission line, approximately 11 miles long, from the newly constructed substations referred to as Richardson to the existing Iberville substation.

12.

This project was designed to produce economic benefits for the Entergy Louisiana's customers by reducing the production cost of the electric system. This production cost benefit was projected to result from a 300 megawatt ("MW") relative improvement in the import capability into the Amite South load pocket. The ability to import more power into the Amite South load pocket allows for the system to reduce reliance on energy produced by less-efficient legacy generators in the Amite South load pocket and allow for more economic energy to flow into the region, thus benefiting customers. In addition, the project provides new sources of power at the Boxwood Substation and the Brittany Substation. The new line will also enable existing or potential industrial customers in the Geismer Industrial corridor the ability to build or expand their plants in the future, thus aiding in the economic development of southeast Louisiana.

13.

The new transmission line will be placed on a single line of structures within the servitudes sought herein. The width of the servitude that Plaintiff needs to acquire over the Defendants' property is based upon the National Electric Safety Code guidelines and Plaintiff's internal design standards, which provide that power line servitudes must be sufficiently wide to allow for blowout (the side to side sway of power lines that occurs due to high winds during

NON-CERTIFIED COPY

storms), to ensure that the power lines will not come into contact with any other power lines, and to reduce the risk that the lines will come in contact with other structures because of the power lines' or the other structures' falling or being blown down, and to comply with clearance requirements relative to surrounding trees or foliage. The width is also intended to achieve electric service reliability requirements formulated by or under the authority of the Federal Energy Regulatory Commission.

14.

The transmission line for which the Plaintiff needs to obtain the servitude will be located, constructed, operated, and maintained so as not to be dangerous to persons or property nor interfere with the use of other wire using companies or, more than is necessary, with the convenience of the landowners.

15.

In April 2015, Plaintiff sought certification from the Louisiana Public Service Commission that the public convenience and necessity would be served by the construction of a portfolio of projects that included the transmission line. After reviewing Plaintiff's request pursuant to the Transmission Certification General Order, the Commission issued Order No. U-33605 dated January 1, 2016 certifying that Plaintiff's construction of the transmission line is in the public interest.

16.

At least 30 days prior to filing suit against the persons made defendant herein, Plaintiff had the defendants' property surveyed to the extent it was able to do so, valued the just compensation for the purposes of a servitude over the property based on an independent appraisal, and sent a letter to each defendant by certified mail, return receipt requested, which set forth in detail the following:

A. The basis upon which Plaintiff exercises its power of expropriation;

B. The purpose, terms, and conditions of the proposed acquisition;

C. The compensation to be paid for the rights acquired;

D. A complete copy of all appraisals of, or including, the subject property previously obtained by the Plaintiff, which included the following information, as required by La. R.S. 19:2.2(A):

     1)     The name, address, and qualifications of the person or persons who

4

NON-CERTIFIED COPY

prepared the appraisal or evaluation of the value of the servitude;

    2)    The amount of compensation estimated in the appraisal or evaluation; and

    3)    A description of the methodology used in the appraisal or evaluation.

E. A plat of survey signed by a Louisiana licensed surveyor illustrating the proposed location and boundary of the proposed acquisition, and any temporary servitudes or work spaces, if the Plaintiff was unable to obtain access to the property for formal surveying, then it provided a plat that fairly identifies the boundary of the proposed acquisition;

F. A description and proposed location of any proposed above ground facilities to be located on the property;

G. A description by Entergy Louisiana of considerations for the proposed route or area to be acquired.

17.

Subsequent to Plaintiff's initial contact and negotiations with Defendants, the Louisiana Legislature enacted Act 108 of the 2016 Legislative Session, which became effective January 1, 2017 (after the documents referenced in Paragraph 15 herein were sent to defendants), amending La. Rev. Stat. 19:2.2 and adding requirements in what is now La. Rev. Stat. 19:2.2(B). Prior to instituting this action and prior to January 1, 2017, Entergy Louisiana provided Defendants with notice now required by La. Rev. Stat. 19:2.2(B) including the following:

A. A statement that the property owner is entitled to receive just compensation for the property to be acquired to the fullest extent allowed by law.

B. A statement that the property may be expropriated only by an authority authorized by law to do so.

C. A statement that the property owner is entitled to receive from the expropriating authority a written appraisal or evaluation of the amount of compensation due.

D. A statement identifying the website of the expropriating authority where the property owner can read the expropriation statutes upon which the expropriating authority relies or a copy of the expropriation statutes upon which the expropriating authority relies.

E. A statement offering to provide upon request of the property owner a copy of the expropriation statutes upon which the expropriating authority relies.

5

NON-CERTIFIED COPY

F. A statement identifying an agency responsible for regulating the expropriating authority, including the name, website, and telephone number of the agency.

G. A statement that the property owner may hire an agent or attorney to negotiate with the expropriating authority and an attorney to represent the property owner in any legal proceedings involving the expropriation.

18.

Prior to filing suit, Plaintiff attempted in good faith to acquire by purchase the servitude from the Defendants by offering to compensate the defendants in a specific amount, not less than the lowest appraisal for the proposed servitude.

19.

The Defendants have thus far not agreed to accept the amount of just compensation offered by Plaintiff.

20.

The proposed Transmission Lines are being constructed for a public and necessary purpose. To construct the lines, it is necessary for Plaintiff to acquire by expropriation proceedings and to expropriate by a judgment of this Honorable Court and according to law a personal servitude of right of use over the Defendants' property.

21.

There are no cemeteries or graveyards situated wholly or partly within the needed servitude.

22.

To construct the power line or lines, Plaintiff will need to install a pole or poles on some of the Defendants' property. The proposed locations of such poles have been disclosed to the defendants prior to filing suit.

23.

Because Plaintiff is a limited liability company engaged in generating, transmitting, and distributing electricity, it is entitled to expropriate the above described personal servitude of right of use in the manner authorized by La R.S. 19:1 *et seq.*

6

NON-CERTIFIED COPY

24.

Pursuant to La. R.S. 19:8, expropriation suits should be tried by preference and conducted with the greatest possible dispatch.

25.

Pursuant to La. R.S. 19:5(A), the trial court should issue an order fixing the time of the trial of the suit which shall not be less than sixty days from the filing of the suit.

26.

Pursuant to La. R.S. 19:5(B), the clerk of court shall issue to the Defendants, at least sixty days before the time fixed for trial, a notice, accompanied by a certified copy of the petition, copies of all exhibits, and a certified copy of the order for trial.

27.

Pursuant to La. R.S. 19:5 (C), the notice signed by the clerk and issued to the Defendants shall contain:

A.    The date of issuance,

B.    The title of the cause,

C.    The name of the person to whom it is addressed,

D.    The title and location of the court issuing it,

E.    The date fixed for trial, and

F.    A statement that the Defendants must file an answer, exception, or other responsive pleading within the thirty day period after service of citation and that failure to do so within the thirty day period constitutes a waiver by the Defendant of all defenses to the suit except claims for compensation.

28.

ENTERGY LOUISIANA requests a trial by jury to determine just compensation.

**WHEREFORE,** Plaintiff prays that:

1.    The Defendants be cited and served with a copy of the notice, certified copy of this Petition, and certified copy of the order required by La. R.S. 19:5(A-C);

2.    After all due proceedings are had, judgment be rendered in favor of Plaintiff that the above-described personal servitude of right of use over the Defendants' property be adjudicated to Plaintiff, with just compensation paid to the Defendants, with all costs to be paid by the owners of the property who are made Defendant herein; and

NON-CERTIFIED COPY

3.     For all general and equitable relief as this Court deems just and proper.

Respectfully submitted:

PHILIP A. FRANCO, #5819, T.A.
MARSHALL A. HEVRON #32501
ADAMS AND REESE LLP
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone:     (504) 581-3234
Facsimile:     (504) 566-0210

F. BARRY MARIONNEAUX #09277
23615 Railroad Avenue
Plaquemine, Louisiana 70764
Telephone: (225) 687-6884
Facsimile:   (225) 687-6886

SEAN D. MOORE, #20303
Entergy Services, Inc. Legal Department
639 Loyola Avenue
26th Floor
New Orleans, Louisiana 70113
Telephone:     (504) 576-7048
Facsimile:     (504) 576-4150

*Attorneys for Plaintiff, Entergy Louisiana, LLC*

**PLEASE SERVE:**

Succession of Josephine R. Lapeze
C/o Carol Davis—Executrix and Succession Representative
2314 Oak Alley
Port Allen, LA  70767

Canova Properties L.L.C.
Through its Agent for Service of Process
Dorothy C. Blanchard
57730 Cardinal St
Plaquemine, LA 70764
225-755-8843

Robert Breaux
23630 Church St
Plaquemine, LA 70764

FILED

NON-CERTIFIED COPY
Case Number: 076690 Transaction Date: 3/7/2017 Seq: 103 Page Sequence: 8

# ADAMS AND REESE LLP ®

**Attorneys at Law**
Alabama
Florida
Georgia
**Louisiana**
Mississippi
South Carolina
Tennessee
Texas
Washington, DC

June 8, 2017

**Philip A. Franco**
Also admitted in Texas
and the District of Columbia
(504) 585-0291
E-Fax (504) 553-9780
philip.franco@arlaw.com

_Via E-Filing_

Mr. Rodd Naquin
Clerk of Court
Court of Appeal, First Circuit
P. O. Box 4408
Baton Rouge, LA 70821

RE:  Trial Set for August 16, 2017
No. 2017-CW-0476
_H&E Equipment Services, Inc. v. URS Corporation Architecture, P.C.,_
_URS Corporation, L. O'Neal Johnson and Thomas Ryan, III_, Application

Dear Mr. Naquin,

Pursuant to Uniform Rule 4-5(D), Defendants-Applicants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas Ryan, III (collectively referenced herein as "URS") write to advise that by notice received June 2, 2017, Judge Janice Clark of 19th JDC set this matter for a jury trial to begin on August 16, 2017.

As advised by your office, we are e-filing an original and three copies of this letter so that it can be attached to each copy of the Application for Supervisory Writ filed by URS on April 7, 2017. URS applied to this Court for review of Judge Clark's summary judgment ruling relating to the interpretation of contracts at issue in this case. A favorable ruling for URS on its application to this Court will effectively end this litigation, eliminating the need for the August 16 trial.

A copy of this letter has been sent to all counsel of record via electronic mail.

Sincerely,

**ADAMS AND REESE LLP**

_/s/ Philip A. Franco_
Philip A. Franco

PAF//tdw
cc:    All Counsel of Record via e-mail

EXHIBIT
B

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

DOCKET NO.: 626,308                                    SECTION: "D"

H&E EQUIPMENT SERVICES, INC                            **POSTED**

VERSUS                                                 JUL 03 2017

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

                                                       COST OK $  86
                                                              7/6 3(
FILED: _____        _____    JUN 3 0 2017
                                    DEPUTY CLERK

**MEMORANDUM IN OPPOSITION TO MOTION TO CONTINUE TRIAL**

**MAY IT PLEASE THE COURT:**

Plaintiff H&E Equipment Services, Inc. respectfully submits this Memorandum in

Opposition to Motion to Continue Trial filed by Defendants YRS Corporation Architecture, P.C.,

URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III (hereafter "Defendants").

After requesting that the Court set this matter for trial, Defendants now seek to continue

the trial of this matter currently sent to begin on August 16, 2017. In support of their motion,

Defendants offer three arguments. First, Defendants claim that their lead trial counsel, Philip

Franco, has a trial set in Iberville Parish during the same week. Second, Defendants contend that

their motion for protective order remains pending. Third, Defendants observe that their

Application for Supervisory Writs seeking review of this court's Judgment of April 5, 2017,

remains pending. As set forth below, none of the arguments offered by Defendants warrants a

continuance of the trial.

With respect to Defendants' claim that their lead trial counsel is scheduled to be in trial in

Iberville Parish in *Entergy v. Lapeze* (Case No. 76,690) during the week of August 15, H&E

responds that there are several other lawyers enrolled for Entergy in that case. *See* Ex. "A."

Additionally, H&E notes that this case was filed in 2013; *Entergy v. Lapeze* was filed in March

2017, and no answer has even been filed yet. Finally, counsel for the Defendants in *Entergy v.*

*Lapeze*, John Wilbert, III, has advised undersigned counsel that his expert will not be finished

with his analysis until October 2017 and that as a result, he does not believe that the case will be

ready for trial in August.

FAX COPY FILED 6-28-17
ORIGINAL FILED 7-30-17

EBR4193069

1204619v.1                          NON-CERTIFIED COPY

Defendants argument that the trial should be continued because their motion for protective order remains pending is also unavailing.  As set forth in H&E's opposition to Defendants motion for protective order, URS's experts issued reports in September 2016 in which they questioned whether the pavement at H&E's Baton Rouge and Kenner facilities was installed in accordance with the defective drawings prepared by URS.  In an effort to resolve this issue, H&E scheduled ground penetrating radar testing at both locations and invited URS to attend.  URS did attend the testing, and H&E provided URS with the results of the testing.  As a result, URS has not been prejudiced in its trial preparation.

Finally, Defendants claim that the trial should be continued because their Application for Supervisory Writs seeking review of this Court's April 5, 2017 ruling on Defendants' motion for summary judgment has not been ruled upon by the First Circuit.  However, when Defendants filed their Writ Application, they did not seek a stay of this case from this Court or from the First Circuit Court of Appeal.  Moreover, URS has notified the First Circuit Court of Appeal of the trial setting in this case. *See* Ex. "B".  Accordingly, there is no basis for requesting a continuance of the trial on the basis of the pendency of Defendants' Writ Application.

For the foregoing reasons, Defendants' Motion to Continue should be denied.

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile:  (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by facsimile, email and/or by placing same in the United States mail, postage prepaid and properly addressed, this 2̲8̲ day of June, 2017.

Loretta G. Mince

2

NON-CERTIFIED COPY

1204619v.1

Regular Session, 2008

SENATE BILL NO. 308

BY SENATOR DONAHUE

# ACT No. 787

ENROLLED

1                        AN ACT

2   To amend and reenact Code of Civil Procedure Article 1425(C) and to enact Code of Civil

3          Procedure Article 1425(F), relative to discovery and experts; to provide for a pre-

4          trial hearing regarding the qualifications and admissibility of testimony of an expert

5          witness; to provide procedures for conducting the hearing and appeal of the decision

6          of the judge; and to provide for related matters.

7   Be it enacted by the Legislature of Louisiana:

8          Section 1. Code of Civil Procedure Art. 1425(C) is hereby amended and reenacted

9   and Code of Civil Procedure Art. 1425(F) is hereby enacted to read as follows:

10         Art. 1425. Experts; pre-trial disclosures; scope of discovery

11                       *     *     *

12         C. The disclosures of Paragraph B of this Article shall be made at the times

13          and in the sequence directed by the court. In the absence of other directions from the

14          court or stipulation by the parties, the disclosures required pursuant to Paragraph B

15          of this Article shall be made at least ninety days before the trial date ~~or the date the~~

            ~~case is to be ready for trial~~ or, if the evidence is intended solely to contradict or rebut

            evidence on the same subject matter identified by another party under Paragraph B

            **of this Article**, within thirty days after the disclosure made by the other party. The

            parties shall supplement these disclosures when required by Article 1428.

20                       *     *     *

21         **F. (1) Any party may file a motion for a pretrial hearing to determine**

22          **whether a witness qualifies as an expert or whether the methodologies employed**

23          **by such witness are reliable under Articles 702 through 705 of the Louisiana**

24          **Code of Evidence. The motion shall be filed not later than sixty days prior to**

Coding: Words which are ~~struck through~~ are deletions from existing law;
words in **boldface type and underscored** are additions.

Exhibit A

NON-CERTIFIED COPY

SB NO. 308                                                    <u>ENROLLED</u>

1    <u>trial and shall set forth sufficient allegations showing the necessity for these</u>

2    <u>determinations by the court.</u>

3        <u>(2) The court shall hold a contradictory hearing and shall rule on the</u>

4    <u>motion not later than thirty days prior to the trial. At the hearing, the court</u>

5    <u>shall consider the qualifications and methodologies of the proposed witness</u>

6    <u>based upon the provisions of Articles 104(A) and 702 through 705 of the</u>

7    <u>Louisiana Code of Evidence.  For good cause shown, the court may allow live</u>

8    <u>testimony at the contradictory hearing.</u>

9        <u>(3) If the ruling of the court is made at the conclusion of the hearing, the</u>

10   <u>court shall recite orally its findings of fact, conclusions of law, and reasons for</u>

11   <u>judgment. If the matter is taken under advisement, the court shall render its</u>

12   <u>ruling and provide written findings of fact, conclusions of law, and reasons for</u>

13   <u>judgment not later than five days after the hearing.</u>

14       <u>(4) The findings of facts, conclusions of law, and reasons for judgment</u>

15   <u>shall be made part of the record of the proceedings. The findings of facts,</u>

16   <u>conclusions of law, and reasons for judgment shall specifically include and</u>

17   <u>address:</u>

18       <u>(a) The elements required to be satisfied for a person to testify under</u>

19   <u>Articles 702 through 705 of the Louisiana Code of Evidence.</u>

20       <u>(b) The evidence presented at the hearing to satisfy the requirements of</u>

21   <u>Articles 702 through 705 of the Louisiana Code of Evidence at trial.</u>

22       <u>(c) A decision by the judge as to whether or not a person shall be allowed</u>

23   <u>to testify under Articles 702 through 705 of the Louisiana Code of Evidence at</u>

24   <u>trial.</u>

25       <u>(d) The reasons of the judge detailing in law and fact why a person shall</u>

26   <u>be allowed or disallowed to testify under Articles 702 through 705 of the</u>

27   <u>Louisiana Code of Evidence.</u>

28       <u>(5) A ruling of the court pursuant to a hearing held in accordance with</u>

29   <u>the provisions of this Subsection shall be subject to appellate review as provided</u>

30   <u>by law.</u>

Coding: Words which are ~~struck through~~ are deletions from existing law;
words in **boldface type and underscored** are additions.

**Exhibit A**

NON-CERTIFIED COPY

SB NO. 308                                                      **ENROLLED**

1        **(6) Notwithstanding the time limitations in Subparagraphs (1), (2), and**

2    **(3) of this Paragraph, by unanimous consent of the parties, and with approval**

3    **by the court, a motion under this Subsection may be filed, heard, and ruled**

4    **upon by the court at any time prior to trial. The ruling by the court on such**

5    **motion shall include findings of fact, conclusions of law, and reasons for**

6    **judgment complying with the provisions of Subparagraph (4) of this Paragraph.**

7        **(7) The provisions of this Paragraph shall not apply to testimony in an**

8    **action for divorce or annulment of marriage, or to a separation in a covenant**

9    **marriage, to a property partition, or to an administration of a succession, or to**

10   **testimony in any incidental or ancillary proceedings or matters arising from**

11   **such actions.**

12       **(8) All or a portion of the court costs, including reasonable expert**

13   **witness fees and costs, incurred when a motion is filed in accordance with this**

14   **Paragraph may, in the discretion of the court, be assessed to the non-prevailing**

15   **party as taxable costs at the conclusion of the hearing on the motion.**

16       Section 2. The provisions of this Act shall not apply to any action filed for the

17   recovery of any covered losses, in accordance with a homeowners insurance policy or

18   business owners insurance policy, which occurred as a result of hurricanes Katrina or Rita.

19       Section 3. This Act shall become effective January 1, 2009; however if an action has

20   been set for trial between January 1, 2009, and April 1, 2009, the provisions of this Act shall

21   become effective as to those actions on April 1, 2009.

22

_____
PRESIDENT OF THE SENATE


_____
SPEAKER OF THE HOUSE OF REPRESENTATIVES


_____
GOVERNOR OF THE STATE OF LOUISIANA


APPROVED: _____

Coding: Words which are ~~struck through~~ are deletions from existing law;
words in **boldface type and underscored** are additions.

Exhibit A

NON-CERTIFIED COPY



NON-CERTIFIED COPY

Exhibit B

NON-CERTIFIED COPY

Exhibit B



DETAILS "A-F"

DETAIL "E" — TRANSVERSE JOINT AT CATCH BASIN

DETAIL "F"

JOINT FILLER DETAIL FOR INTEGRAL CONCRETE CURB (MOUNTABLE OR BARRIER TYPE)

DETAIL SHOWING JOINTS IN CONCRETE CURB AND GUTTER (EXTEND ALL TCJ THROUGH CURB & GUTTER)

SECTION K-K

SECTION L-L (WITH CONCRETE SHOULDER)

SECTION M-M (SLEEPER SLAB NOT SHOWN)

(BARRIER TYPE)    (MOUNTABLE TYPE)

MODIFIED BARRIER OR MOUNTABLE CURB THRU DRIVEWAY

BAR DETAIL

NON INTEGRAL CURB DETAILS

PLAN - BASE DRAIN OUTLET AT 4" E.J. EJ-4" JOINTS

DETAIL "G" - EJ-4" BASE DRAIN OUTLET

NOT TO SCALE

PORTLAND CEMENT CONCRETE PAVEMENT DETAILS

CP-01 - STANDARD PLAN

ROAD DESIGN

NON-CERTIFIED COPY

Exhibit B



NOT TO SCALE

PORTLAND CEMENT
CONCRETE PAVEMENT
DETAILS

ROAD
DESIGN

# PART IX -- PORTLAND CEMENT CONCRETE

**Section No.**                                      **Page No.**

901    Portland Cement Concrete........................................................  724

723

Exhibit C

NON-CERTIFIED COPY

# Section 901
# Portland Cement Concrete

**901.01  GENERAL.**  This section specifies requirements for portland cement concrete, including methods and equipment for handling and storing materials, and mixing and transporting concrete to the site.

Structural concrete is designated by class and pavement concrete by type.

No concrete shall be mixed, placed or finished when natural light is insufficient, unless an approved artificial lighting system is provided.  No concrete shall be placed on a frozen subgrade nor shall frozen aggregates be used in concrete.

Portland cement concrete shall conform to the requirements of Table 901-3, Master Proportion Table for Portland Cement Concrete.  It shall be a mixture of portland cement, portland-pozzolan cement, or portland blast-furnace slag cement, fine aggregate, coarse aggregate, water and, when specified or allowed, approved admixtures.  Fly ash or ground granulated blast furnace slag will be permitted as a partial replacement for portland cement in accordance with Subsection 901.08.

Portland cement concrete shall require a Department approved mix design, be produced from a Department certified plant and be transported in Department certified trucks.  The design, control and transportation of concrete mixtures in accordance with these specifications shall be the responsibility of the contractor.

Sufficient plant capacity and transporting apparatus to ensure delivery at the required rate shall be provided.  Rate of concrete delivery during concreting operations shall provide for proper handling, placing and finishing of concrete and maintaining a workable surface.

Methods of delivery and handling concrete shall facilitate placing with a minimum of rehandling and without damage to the structure or concrete.

Approved laboratory facilities and testing equipment necessary to sample, test, and control concrete mixtures shall be provided by the contractor.  These facilities will not be required for plants producing only minor structure concrete complying with Table 901-3.  A laboratory conforming to Section 722 shall be located at an approved location at the plant site. The laboratory shall be for quality assurance purposes.

Quality assurance requirements shall be as specified in the latest edition of the Department's publication entitled "Application of Quality Assurance

724

Exhibit C

NON-CERTIFIED COPY

901.03

Specifications for Portland Cement Concrete Pavement and Structures" or "Application of Quality Assurance Specifications for Precast-Prestressed Concrete Plants."

**901.02  MATERIALS.**   Materials shall comply with the following Subsections:

| | |
|---|---|
| Portland Cement | 1001.01 |
| Portland-Pozzolan Cement | 1001.02 |
| Masonry Cement | 1001.03 |
| Aggregates | 1003.01 & 1003.02 |
| Admixtures | 1011.02 |
| Water | 1018.01 |
| Fly Ash | 1018.15 |
| Portland Blast-Furnace Slag Cement | 1001.04 |
| Ground Granulated Blast Furnace Slag | 1018.27 |
| Microsilica (Silica Fumes) | 1018.28 |

Cement, fly ash, ground granulated blast furnace slag and microsilica shall be certified by the manufacturer in accordance with the Department's current procedures.

The contractor shall keep accurate records of cement, fly ash, ground granulated blast furnace slag, and microsilica deliveries and their use in the work.  Copies of these records shall be furnished to the engineer in such form as required.

**901.03  TRANSPORTATION AND STORAGE OF CEMENTITIOUS MATERIALS AND MICROSILICA.**  Cement, fly ash, ground granulated blast furnace slag, and microsilica shall be transported in watertight conveyances and stored in separate approved facilities so that cement, fly ash, ground granulated blast furnace slag, and microsilica will be protected from dampness or water intrusion.   Material that is contaminated, is partially set, or contains lumps of caked material will be rejected.  When the use of bagged cement, fly ash, ground granulated blast furnace slag or microsilica is permitted, the handling and storage will be as directed.

Different brands or types or the same brand or type from different mills, shall not be mixed or used alternately unless authorized by the DOTD Materials Engineer Administrator.  This requirement may be waived in case of plant breakdown during production to allow concrete conforming to the requirements of Subsection 901.01 to be furnished from another plant to finish the placement in progress.

725

Exhibit C

NON-CERTIFIED COPY

901.04

**901.04 HANDLING AND STORAGE OF AGGREGATES.**
Equipment and methods for stockpiling aggregates shall be such that no
detrimental degradation or segregation of aggregate will result; no
appreciable amount of foreign material will be incorporated into aggregate;
and there will be no intermingling of stockpiled materials. Stockpiles of
aggregates shall be well drained and shall have uniform moisture content.
Material shall not be added to working faces of the stockpiles during
continuous operations.

When specified, coarse aggregate shall be separated into two or more
sizes to ensure greater uniformity of the concrete mixture. Different grades
and types of aggregates shall be stored in separate stockpiles separated by
bulkheads or sufficiently separated from each other to prevent material at
edges of piles from intermingling. When segregation occurs in the
processing and handling of Grade D coarse aggregate, the aggregate shall
be separated at the 1-inch (25 mm) sieve into two stockpiles. The
stockpiled material shall be reproportioned to meet the gradation
requirements of Grade D. Activity that results in contamination or
intermingling of aggregates, including overhead handling for the loading of
bins or building of stockpiles, will not be permitted.

Aggregates shall be handled from stockpiles or other sources to the
batch plant so as to secure uniform grading of material. Aggregates that
have become segregated or contaminated shall not be used. Aggregates
processed or handled by hydraulic methods, and washed aggregates, shall
be stockpiled or placed in bins for adequate drainage. Transport containers
will be accepted as an adequate bin when adequate drainage is provided.
Drainage of aggregates shall meet the approval of the engineer prior to
batching. The engineer may require water sprinkling of coarse aggregates
in stockpiles that have dried to the extent that the aggregates absorb mixing
water. Such sprinkling shall continue until aggregates are saturated.

**901.05 SAMPLING AND TESTING.** Sampling and testing will be
done in accordance with the Department's Materials Sampling Manual and
the Department's Testing Procedures Manuals. The contractor shall furnish
necessary materials for testing at no direct pay.

**901.06 QUALITY CONTROL OF CONCRETE.** The contractor shall
be responsible for quality control of materials during handling,
proportioning, mixing, and placement operations; for initial determination
and necessary subsequent adjustments in proportioning of materials used to
produce the specified concrete; and for providing suitable equipment for

726

Exhibit C

NON-CERTIFIED COPY

determination of aggregate gradation, moisture, air content, slump, unit weight (mass), temperature, and trial mixes as necessary. Testing and analysis of the mix for quality control purposes, the setting of dials, gages, scales or meters, adjusting batch weights, and accurate batching shall be the responsibility of the contractor.

The contractor shall have a Certified Concrete Technician present at the plant or job site to make adjustments in batch weights for moisture content, perform necessary adjustments in proportioning materials to produce the specified concrete, and perform tests necessary for control of the concrete mix within specifications requirements. Daily plant operations shall not begin unless the Certified Concrete Technician is at the plant to determine that gradations, moisture contents, and adjusted batch weights are within specifications limits. If a Certified Concrete Technician is not available at the job site, an Authorized Concrete Field Tester is allowed to perform the job site control tests for slump, air content, and mix temperature and report the results to the Certified Concrete Technician. The use of an Authorized Concrete Field Tester at the job site will not relieve the Certified Concrete Technician from performing the remaining duties as outlined in these specifications.

The contractor's Certified Concrete Technician and Authorized Concrete Field Tester shall be certified or authorized upon satisfactory completion of the Department's requirements.

**(a) Mix Design:**  Mixtures shall produce concrete of suitable workability. Slumps shall be within the ranges shown in Table 901-3 or as specified when tested in accordance with DOTD TR 207. The engineer may authorize an increase in maximum slump, by use of water reducers, for concrete used in the construction of walls and diaphragms less than 8 inches (200 mm) thick, and where the engineer considers necessary provided the water-cement ratio is not exceeded and conventional forms are used.

Concrete mixes shall be formulated to produce concrete which, when molded and cured in accordance with DOTD TR 226 and tested in accordance with DOTD TR 230, shall show an average compressive strength not less than as shown in Table 901-3. Class P, Class P(M) and Class P(X) concrete cylinders for compressive strength tests shall be cured by the same methods used in curing the members they represent.

The contractor's Certified Concrete Technician shall submit a proposed concrete mix design on a form provided by the Department giving the intended sources of materials and the mix design for concrete to be furnished. No work shall be started until the portland cement concrete mix

Exhibit C

NON-CERTIFIED COPY

**901.06**

design has been reviewed and accepted.  Review and acceptance of this mix design does not release the contractor from the responsibility of producing concrete that meets the minimum requirements of the specifications.

Proportioning for volume of coarse aggregates in concrete mixes, excluding concrete pipe, Types B and D pavement, and minor structure concrete shall be in accordance with Table 901-1 below.  An example of proportioning of coarse aggregate is shown in the Department's publication entitled "Application of Quality Assurance Specifications for Portland Cement Concrete Pavement and Structures".

**Table 901-1**
**Volume of Coarse Aggregate Per Unit of Volume of Concrete**

| Maximum Size of Aggregate, Inches (mm) | Volume of Dry-Rodded Coarse Aggregate Per Unit Volume of Concrete for Different Fineness Moduli of Fine Aggregate[1] | | | | |
|---|---|---|---|---|---|
| | 2.20 | 2.40 | 2.60 | 2.80 | 3.00 |
| 3/8 (9.50) | 0.52 | 0.50 | 0.48 | 0.46 | 0.44 |
| 1/2 (12.5) | 0.61 | 0.59 | 0.57 | 0.55 | 0.53 |
| 3/4 (19.0) | 0.68 | 0.66 | 0.64 | 0.62 | 0.60 |
| 1 (25.0) | 0.73 | 0.71 | 0.69 | 0.67 | 0.65 |
| 1 1/2 (37.5) | 0.77 | 0.75 | 0.73 | 0.71 | 0.69 |
| 2 (50.0) | 0.80 | 0.78 | 0.76 | 0.74 | 0.72 |
| 3 (75.0) | 0.84 | 0.82 | 0.80 | 0.78 | 0.76 |

[1]Volumes are based on aggregates in dry-rodded condition as described in AASHTO T19, Unit Weight of Aggregate.  These volumes are selected from empirical relationships to produce concrete with a degree of workability suitable for usual reinforced concrete construction.  For less workable concrete such as required for concrete pavement construction, they may be increased up to 10 %.  For more workable concrete, as may be required for pumping, they may be reduced up to 10%.

In developing mix designs for portland cement concrete pavement Types B and D, the proportions of the aggregate sizes to be used shall meet the requirements of Subsection 1003.02(c).

Trial mixes are required to demonstrate the mix performance and the compatibility of mix components for the following:

      (1) Fly Ash
      (2) Ground Granulated Blast Furnace Slag
      (3) Microsilica
      (4) Heavyweight Concrete
      (5) Flexural Strength (when required)
      (6) Unusual Materials and Applications

Exhibit C

NON-CERTIFIED COPY

For the above trial mixes the contractor shall submit test results for slump, unit weight (mass), air content, set times, and compressive strength (flexural strength for pavements) at 3, 7, and 28 days. The contractor shall furnish materials to the Department for verification of trial mixes.

When requested by the contractor, the Department will determine gradation, unit weight (mass), specific gravity and absorption factor of the aggregates.

Trial mixes may be waived in writing by the District Laboratory Engineer for previously accepted mix designs.

The minimum cement factors may be waived in writing by the District Laboratory Engineer provided the contractor's mix design meets the average compressive strengths in Table 901-3 plus the over-design compressive strengths in Table 901-4.

**(b)  Quality Control Tests:** The contractor shall be responsible for determining gradation and moisture content of fine and coarse aggregates used in the concrete mixture and for testing the mixture at the job site for slump, unit weight (mass), temperature, and air content (when used). The contractor shall conduct operations to produce a mix complying with the reviewed and accepted mix design, except that variations will be permitted within specified control limits for individual samples. Test results for gradation, slump, unit weight (mass), and air content shall be plotted on control charts for individual samples. These control charts shall be submitted to the engineer.

Times at which to obtain control test samples shall be set by the contractor using random number tables in accordance with DOTD S 605 or by random selection. Gradation control limits of aggregates shall be as shown in Subsection 1003.02. When required, additional test samples shall be taken as directed for slump, concrete temperature, and air content.

The minimum number of quality control tests to be performed by the contractor for structural and pavement concrete shall be in accordance with the Materials Sampling Manual. For minor structure concrete only, the contractor will not be required to have a Certified Concrete Technician or Authorized Concrete Field Tester, but shall implement a quality control testing program to ensure that the concrete meets the requirements of these specifications.

When producing concrete for Types B and D pavements, gradations shall be determined daily on each stockpile of aggregate to be used. All gradation calculations shall be based on percent of dry weight (mass). Upon determination of the gradation of each stockpile, the percent of the total aggregates retained shall be determined mathematically based on the

Exhibit C

NON-CERTIFIED COPY

901.06

proportions of the combined aggregate blend, and checked for conformance with Table 1003-1A.

**(c)  Mix Adjustments:**  With prior notification given to the engineer, the contractor may adjust the ratio of fine to coarse aggregate as reviewed and accepted, by no more than 5 percent. In no case shall it be adjusted so as to materially affect the volume of concrete.  If the proportions of the aggregate sizes used do not satisfy the gradation requirements of Subsection 1003.02(c) due to changes in the gradation of one or more stockpiles, the proportions shall be adjusted to bring the combined aggregates back within specification limits.  These minor adjustments for gradation will not require a new mix design.  The mix produced shall be uniform, workable and within the specification limits of Table 901-3.  When plant operations do not produce a uniform and workable mix, plant operations shall cease and corrective action shall be taken prior to restart.

When tendency of individual slump, air content, concrete temperature, or gradation measurements, as plotted on control charts, indicates that the mix is not uniform and may fall outside tolerance limits, the contractor shall immediately make adjustments to keep the mix within specified limits.  If the contractor fails to make proper adjustments and the mix deviates from specification requirements or if the mix is obviously defective, the mix will be rejected.

For workability properties only, changes in mix proportions will be permitted provided the water-cement ratio is not exceeded, minimum cement factor is maintained, proper batch adjustments are made, and prior notification is given to the engineer.

No changes in source of materials or percentage of cement, fly ash, ground granulated blast furnace slag, or microsilica shall be made until a new Mix Design form showing the new material or adjusted proportions has been submitted by the contractor and approved.

**(d)  Acceptance and Verification for Types B and D Pavements:**  Sampling and testing for acceptance and verification for concrete for Types B and D pavements shall be in accordance with the provisions of the Materials Sampling Manual, except as follows:

(1) Gradation testing for acceptance will not be required.

(2) Verification tests will be performed by the District Laboratory to assure conformance to the gradation of the total combined aggregates shown in Table 1003-1A at the frequency of one sample per aggregate size per lot, with a maximum of one sample per aggregate size per day. Samples are to be obtained from the aggregate feed (conveyor) belt as

Exhibit C

NON-CERTIFIED COPY

**901.07**

described in the Materials Sampling Manual, DOTD Designation S101, Aggregates and Aggregate Mixtures.

(3) Upon determination of the gradation of each aggregate size sampled, the percent retained based on the dry weight (mass) of the total combined aggregates will be determined mathematically based on the proportions of the combined aggregate blend, and checked for conformance with Table 1003-1A.

(4) If the results of the verification sample indicate that the combination of aggregates being used does not meet the requirements of Subsection 1003.02(c), the aggregates shall be re-sampled and tested again. If the results of the second verification sample indicate that the combination of aggregates being used does not meet the requirements of Subsection 1003.02(c), the contractor will be notified and required to make adjustments to his operations to produce a mix meeting these specifications. No concrete from this plant shall be placed on DOTD projects until the adjustments are made and approved by the District Laboratory Engineer. An additional verification sample may be required prior to resuming operations.

**901.07  SUBSTITUTIONS.** Mixtures may be substituted with approval in accordance with Table 901-2.

731

Exhibit C

NON-CERTIFIED COPY

901.07

### Table 901-2
### Portland Cement Concrete Mixture Substitutions

| Structural Class[1] | Substitute |
|---|---|
| AA (M) | No Substitutions |
| AA | AA(M) |
| A(M) | AA(M), AA |
| A | AA(M), AA, A(M) |
| D | No Substitutions |
| F | No Substitutions |
| P(X) | No Substitutions |
| P(M) | No Substitutions |
| P | P(M) |
| S | No Substitutions |
| Minor Structure Class[1] | |
| M | AA(M), AA, A(M), A, B |
| R | AA(M), AA, A(M), A, B, M |
| Y | No Substitutions |
| Pavement Type[1, 2] | |
| B | D |
| D | B |
| E | No Substitutions |

[1]The mixture being substituted shall meet the requirements of Table 901-3 and the mix design for its class or type. The compressive strength of the substituted mix shall meet the strength requirements of the original mixture specified.

[2]When justified in writing and approved by the engineer, small irregular areas of paving projects using Types B or D concrete may be substituted with Class A concrete.

## 901.08 COMPOSITION OF CONCRETE. Type of cement and composition of concrete shall be in accordance with the requirements of this subsection and Table 901-3.

**(a) Cement:** Allowable types of cement are as follows:

| Use | Allowable Cement Types |
|---|---|
| General Construction (Structural Class Concrete and Minor Structure Class Concrete) | Type I or II portland cement; Type IP portland-pozzolan cement; Type IS portland blast-furnace slag cement |
| Concrete Pavement | Type I or II portland cement; Type IP portland-pozzolan cement; Type IS portland blast-furnace slag cement |
| Prestressed or Precast Concrete | Type I, II or III portland cement; Type IP portland-pozzolan cement; Type IS portland blast-furnace slag cement |

732

Exhibit C

NON-CERTIFIED COPY

901.08

For concrete placements having a least dimension of 48 inches (1200 mm) or greater or if designated on the plans or the project specifications as being mass concrete, the allowable cement type shall be Type II portland cement, Type IP portland-pozzolan cement, or Type IS portland blast-furnace slag cement. The cement, or combination of cement and fly ash or ground granulated blast furnace slag, shall be certified to generate a heat of hydration of not more than 70 calories/gram (290 kJ/kg) at 7 days.

Due to the gradation of aggregate or other conditions, additional cement may be required to achieve minimum compressive strength.

When using only Types I or II portland cement in concrete mixes, fly ash conforming to Subsection 1018.15 or grades 100 or 120 ground granulated blast-furnace slag conforming to Subsection 1018.27 may be partially substituted for portland cement on a pound (kilogram) for pound (kilogram) basis. The contractor may use a maximum of 25 percent fly ash by weight (mass) of cement for concrete pipe, up to 20 percent fly ash by weight (mass) of cement for other minor structures and concrete pavement, and up to 15 percent fly ash by weight (mass) of cement for structural concrete. In lieu of fly ash, the contractor may use grade 100 or grade 120 ground granulated blast-furnace slag up to 50 percent by weight (mass) of cement. The combination of slag and fly ash will not be allowed as a partial substitution for cement.

**(b) Chemical Admixtures:** An air-entraining admixture will be required in paving concrete when placed by slip-form methods or when a central mixing plant or non-agitating haul trucks are used.

Air-entraining and water-reducing admixtures will be required in Class AA, F or AA(M) concrete. When an air-entraining admixture is used, the total air content of the concrete mix shall be tested in accordance with DOTD TR 202, and shall be as specified in Table 901-3.

A water-reducing admixture will be required for mass concrete.

When the ambient air temperature is 70°F (20°C) or below, the water-reducing admixture shall be the normal-set type. When the ambient air temperature is above 70°F (20°C) and below 85°F (30°C), the water-reducing admixture may be either the normal-set type or the set-retarding type. When the ambient air temperature is 85°F (30°C) or above, the water-reducing admixture shall be the set-retarding type, except for concrete containing fly ash or ground granulated blast furnace slag where this choice is optional. Set-retarding admixtures shall be used in an amount sufficient to produce the necessary retardation; however, the amount used shall not be less than is necessary to comply with Subsection 1011.02.

733

Exhibit C

NON-CERTIFIED COPY

**901.08**

The contractor shall consider the influence of different materials and job conditions, including local weather on setting characteristics. With approval of the mix design, the contractor may use approved admixtures other than as stated above in order to control setting characteristics.

Admixtures shall comply with Subsection 1011.02 and be listed on QPL 58.

Water contents for superplasticized concrete mixes shall not be reduced to levels that will restrict cement hydration. The amount of water in the superplasticizer shall be included as a part of required mixing water. The dosage of superplasticizer may be adjusted depending on the consistency of the mix.

Final slump of superplasticized concrete shall be appropriate for its application. It shall not exhibit excessive bleeding or segregation of aggregates as determined by the project engineer.

The method of adding and mixing the superplasticizer to the mix shall be as recommended by the manufacturer.

When multiple admixtures are used, the admixtures shall be manufactured by the same company and shall be compatible.

The use of admixtures in other classes or types of concrete will be optional with the contractor with written approval.

**(c) Water:** The total amount of water in the mixture, including admixtures and free water, shall not exceed the maximum water-cement ratio specified in Table 901-3. Free water shall include all water entering the mix with the aggregates, except water absorbed by the aggregate.

Because of the absorptive nature of lightweight aggregate and the inability to obtain a true saturated surface dry condition for determining free moisture, a maximum amount of water cannot be specified for Class Y concrete. The slump requirement of Table 901-3 or as specified will be the governing factor in determining maximum allowable water.

**(d) Aggregate:** All aggregates for use in portland cement concrete shall meet the requirements of Subsection 1003.01.

**(1) Coarse Aggregate:** Coarse aggregate, except for gradations for Types B and D pavements, shall be the grade specified in Table 901-3 and shall comply with the requirements of Subsection 1003.02(b).

**(2) Fine Aggregate:** Fine aggregate, except for gradations for Types B and D pavements, shall comply with the requirements of Subsection 1003.02(a).

**(3) Aggregates for Types B and D Pavements:** Aggregates shall comply with the requirements of Subsection 1003.02(c).

Exhibit C

NON-CERTIFIED COPY

## 901.09  EQUIPMENT.

**(a)  General:** Sufficient plant capacity and transporting equipment to ensure delivery at the required rate shall be provided.  Rate of concrete delivery during concreting operations shall provide for proper handling, placing and finishing of concrete and maintain a workable surface. Methods of delivering and handling concrete shall facilitate placing with a minimum of rehandling and without damage to the structure or concrete.

**(b)  Plant Equipment:** Batch plants shall include approved storage, weigh hoppers, and measuring devices.  Equipment shall be properly sealed and vented to minimize dusting and loss of material.

Materials shall be incorporated into the mix by methods that will ensure uniform distribution.  The amount of each material used in the mix shall be recorded and certified by the contractor's authorized representative.

The plant shall be equipped with adequate water storage and a device for automatically controlling the amount of water used in each batch.

For plants using direct-fill elevating weigh hoppers, computer controlled indicator lights may be used as an indication of aggregate weights but shall not be the sole means of control for aggregate proportioning.  Means of control shall be provided so that, as the quantity desired in the weigh hopper is approached, material may be added slowly and shut off with precision.  Weigh hoppers shall be constructed as to eliminate accumulation of materials and to discharge completely.  Suitable provisions shall be made for removal of overload from the hopper by the operator.  Approved radio communication shall be provided between the concrete batcher and front-end loader operator.  Actual weights of material batched each time shall be entered on the Batch Certification Form.  The plant shall demonstrate satisfactory performance by producing consistent concrete with adequate compressive strengths.

**(1)  Storage Bins and Silos:** For plants with overhead storage bins, which feed directly into the weigh hopper, or storage bins with belt feed to the weigh hopper, the bins shall have adequate separate compartments for fine aggregate and each size of coarse aggregate.  Each compartment shall be designed to discharge efficiently and freely into the weigh hopper.  Means of control shall be provided so that, as the quantity desired in the weigh hopper is approached, material shall be added slowly and shut off with precision.

Silos shall be weatherproof, sealed, free of holes, and shall prevent contamination.  Silos shall be designed to freely discharge and shall be equipped with vibrators to maintain flow of material and prevent accumulation.  Silos shall be designed with sufficient capacity for the

735

Exhibit C

NON-CERTIFIED COPY

**901.09**

operation.  Silos shall be provided with a positive means of shut off without leaking into the weigh hopper.  A separate silo shall be used for each dry bulk material added to the mix.  If a silo is divided into compartments for cement, fly ash, ground granulated blast furnace slag and microsilica, a positive means of separation shall be provided.

   **(2) Measuring Devices:**    Materials shall be measured by weighing except where other methods are authorized.

   Batch plants may be equipped to proportion materials by approved automatic weighing devices.  Moisture probes can be used to determine the moisture content of aggregates for batch adjustment provided the accuracy is confirmed by the engineer to be within 0.5 percent of the results obtained by the Certified Concrete Technician in accordance with DOTD TR 106.

   Fine aggregate and each size of coarse aggregate from separate bins shall be weighed either separately or cumulatively on scales in the weigh hopper. The allowable quantities of bulk fly ash, bulk ground granulated blast furnace slag, or bulk microsilica may be weighed cumulatively in the same hopper with the cement, provided the cement is weighed first and the scale system is separate from that used for the aggregates.

   Weigh hoppers shall be constructed to eliminate accumulation of materials and to discharge completely.  Suitable provisions shall be made for removal of an overload from the hopper by the operator.

   Scales shall be accurate to 0.5 percent throughout the range of use. Maximum graduation on scales shall be 0.1 percent of the rated scale capacity.  When beam type scales are used, poises shall be designed to be locked in any position to prevent accidental change of position, and the weigh beam and a telltale device shall be in view of the operator.  Plant and laboratory measuring devices shall be subject to approval and shall be tested, inspected, and certified by a qualified independent scale service or the Weights and Measures Division of the Louisiana Department of Agriculture and Forestry at no cost to the Department every 90 calendar days, and more often when the engineer deems it necessary to assure their accuracy.

   Individual aggregates shall be batched within 2 percent, and the total weight (mass) of aggregate shall be within 1 percent of the required weight (mass).

   Cement, fly ash, ground granulated blast furnace slag, and microsilica shall be within 1 percent of the required weight (mass).  Cement in standard bags need not be weighed; however, when used, they shall be used in full bag increments and the quantities of other materials shall be

Exhibit C

NON-CERTIFIED COPY

adjusted accordingly. Bagged fly ash and bagged ground granulated blast furnace slag will not be allowed.

Mixing water shall be measured by volume or weight (mass). Water measuring devices shall be accurate to 1 percent at 1/2 the maximum allowable water per batch and the maximum graduation shall be 1 gallon (4 L).

Approved methods and equipment for adding air-entraining admixtures or other admixtures into the batch shall be used. The quantity of admixtures shall be measured into the mixer with an accuracy of 3 percent. Admixtures shall be mechanically dispensed in a liquid state with the mixing water. A separate dispensing device shall be provided for each admixture.

**(3) Ticket Printer System:** Certified concrete plants may be equipped with an approved automatic ticket printer system for recording required batching information. When an automatic ticket printer system is not used, quantities and batching information shall be determined by visual observation, recorded, and certified correct by the contractor's authorized representative.

The approved ticket printer system shall be tamper-proof and shall print time of batching, amount of water, batch weights, moisture content of aggregates, and quantities of admixtures. The Certified Concrete Technician may add moisture content of aggregates or quantities of admixtures to the printed ticket when the automatic system does not have these capabilities. During a breakdown, quantities shall be determined by visual observation and certified as stated above.

All records of batches shall show batch number, day, month, year, and time of day to the nearest minute for each batch. The maximum quantity of water that can be added at the jobsite shall be shown on the batch ticket. The engineer shall be provided with a legible copy of all batch records identified with lot number and mix design number.

**(c) Hauling Equipment:** Hauling equipment shall be watertight and shall be capable of discharging concrete at a satisfactorily controlled rate without segregation.

**(1) Truck Mixer:** Truck mixers shall be the revolving drum type, equipped with pressurized, calibrated tanks for carrying a portion of the mixing water.

Pick-up and throw-over blades in the mixing drum shall be replaced when worn beyond the limit recommended by the manufacturer. The contractor shall have available a copy of the manufacturer's design,

Exhibit C

NON-CERTIFIED COPY

**901.09**

showing dimensions and arrangements of blades in reference to original height and depth.

Only the prescribed and verifiable amount of water is permitted in the tank unless the tank is equipped with a device by which the quantity of water added can be readily verified.

Truck mixers shall be equipped with electrically or mechanically actuated revolution counters, which display the number of revolutions. Counters shall be located to provide safe and convenient inspection.

Each truck mixer shall have attached thereto in a prominent place a metal plate on which is plainly marked the uses for which the equipment is designed, the maximum rated capacity of the drum in terms of concrete volume and rotation speed for both agitating and mixing speeds.

Truck mixers shall be equipped with means for accurately measuring the amount of water used in each batch.

**(2) Agitator Hauling Equipment:** Agitators shall be supplied with adequate mixing blades or paddles to agitate the mix and prevent segregation.  Covers shall be provided when directed.

Each agitator shall have attached thereto in a prominent place a metal plate on which is plainly marked the uses for which the equipment is designed, the maximum rated capacity in terms of concrete volume, and agitation speed.

**(3) Non-Agitator Hauling Equipment:**   The bodies of nonagitating hauling equipment shall be smooth, metal, and mortar tight containers.  Covers shall be provided when directed.

**(d) Portable Mixers:**   Portable mixers shall have a minimum capacity of one cubic yard (cu m) and shall be capable of uniformly mixing and discharging concrete without segregation.

## 901.10  BATCHING AND MIXING.

**(a) General:**  Concrete shall be thoroughly mixed in a mixer of an approved size and type, which will ensure uniform distribution of materials through the mass.

Pick-up and throw-over blades or mixing paddles in the mixing drum or mixing unit shall be replaced when worn beyond the limit recommended by the manufacturer.   The contractor shall have available a copy of the manufacturer's design, showing dimensions and arrangements of blades in reference to original height and depth.

Mixing operations shall begin within 30 minutes after addition of cement to the aggregates.  When cement is charged into a mixer drum containing surface-wet aggregate and the ambient temperature is above

Exhibit C

NON-CERTIFIED COPY

90°F (32°C), or when high early strength cement is used, this limit shall be reduced to 15 minutes. When there is an interruption to the mixing operations, the mixer shall be thoroughly cleaned. The entire contents of the mixer shall be removed from the drum before materials for a succeeding batch are placed therein. Materials composing a batch shall be deposited simultaneously in an operating mixer. A portion of mixing water shall enter in advance of cement and aggregates. No mixer having a rated capacity of less than one cubic yard (cu m) shall be used nor shall a mixer be charged in excess of its rated capacity. The minimum size batch shall be one cubic yard (cu m). Mixers with worn blades or excessive build-up will be rejected. Concrete exposed to salt water or a corrosive environment shall be mixed for 2 minutes and the water content of the mixture shall be carefully controlled.

(b) **Central Plant and Site Mixing:** Concrete shall be mixed for at least 50 seconds. Mixing time shall begin after all materials, including water, are in the mixer. Mixing time ends when the discharge chute opens. The mixer shall be equipped with an approved timing device, which will automatically lock the discharge lever when the drum has been charged and release it at the end of the mixing period. During mixing, the mixer shall be operated at a drum speed for which it has been designed as shown on the manufacturer's name plate on the mixer.

(c) **Truck Mixing:** Aggregates, cement, fly ash, ground granulated blast furnace slag and microsilica for concrete shall be measured in accordance with Subsection 901.09 and charged into the drum at the proportioning plant.

Size of batch in truck mixers shall not exceed the maximum rated mixing capacity of the mixer as stated by the manufacturer and stamped on a metal plate on the mixer. When a truck mixer is used for complete mixing, each batch shall be mixed for not less than 70 nor more than 130 revolutions of the mixer drum at the rate of rotation designated as the mixing speed by the equipment manufacturer on the metal plate on the mixer. Any additional mixing shall be at the speed designated by the equipment manufacturer as the agitating speed. All materials, including mixing water, shall be in the mixer drum before actuating the revolution counter or taking an initial reading.

When the prescribed amount of water is added at the batch plant and slump is on the low side at the jobsite it will be permissible to add a minimum of 75 percent of the mixing water at the time cement and aggregates are added at the batch plant and the remaining mixing water at the job site prior to discharging concrete into forms. Water added at the

Exhibit C

NON-CERTIFIED COPY

901.10

job site may be added in 1 or 2 increments with additional mixing within the range of 20 to 30 revolutions at designated mixer speed for each increment; however, the total of 130 revolutions shall not be exceeded. Water added at the jobsite shall not cause the maximum allowable water-cement ratio or slump of the batch to be exceeded.

If water or superplasticizer is allowed to be added to a partial load, only a proportional amount will be added. The method of adding and mixing superplasticizer to the mix shall be in accordance with the manufacturer's recommendation. When the slump is more than the maximum specification limit, the batch will be rejected; additional mixing or agitation to reduce the slump will not be allowed even though the maximum time limit or number of revolutions have not been exceeded.

Slump tests, unit weight (mass), acceptance cylinders, and temperature measurements will not be made until all mixing water has been added to the batch.

(d) **Partial Mixing at Central Plant:** When partial mixing is allowed at a central plant, the mixing time at the central plant may be reduced to 30 seconds. Additional required mixing shall be completed in a truck mixer at mixing speed. Mixing time in the truck mixer shall be a minimum of 10 and a maximum of 70 revolutions.

(e) **Time Limitations:** The maximum allowable time from the addition of cement to the mix to complete discharge of the concrete shall be 90 minutes or a maximum of 300 revolutions, whichever may occur first. When transport is by non-agitator truck, the maximum allowable time from the addition of cement to the mix to complete discharge of the concrete shall be 45 minutes. In hot weather or any other conditions contributing to rapid loss of plasticity or uniformity of concrete, maximum allowable time may be reduced by the engineer.

(f) **Hauling Equipment:** Wet batches of concrete may be transported in a truck mixer, agitator or other approved equipment. Non-agitator trucks will not be allowed for structural concrete, but will be permitted for pavement concrete when air-entrainment admixture is used. Maximum volume of mixed concrete transported in an agitator truck at agitation speed shall be in accordance with the manufacturer's specified rating.

(g) **Portable Mixing:** Portable mixers shall be approved in writing for mixing one cubic yard (cu m) of concrete or less per day for minor structure concrete.

(h) **Delivery:** Sufficient plant capacity and transporting apparatus to insure delivery at the required rate shall be provided. Rate of concrete

Exhibit C

NON-CERTIFIED COPY

901.11

delivery during concreting operations shall be such as to provide for proper handling, placing and finishing of concrete and maintain a workable surface. Methods of delivering and handling concrete shall be such as will facilitate placing with a minimum of handling and without damage to the structure or concrete.

## 901.11 TEMPERATURE LIMITATIONS.

(a) **General:**  Air temperature and mix temperature shall be determined at the point of placement in the shade away from artificial heat.

(b) **Hot Weather Limitations:** Hot weather limitations shall apply to concrete for:

(1) **Bridge Decks, Approach Slabs, and Mass Concrete:** Hot weather concreting practices will be required when the job site temperature in the shade and away from artificial heat is 80°F (27°C) and rising. When internal temperature of plastic concrete reaches 85°F (30°C), the contractor shall prevent the temperature of succeeding batches from going beyond 90°F (32°C) by approved methods. If necessary, forms shall be precooled by approved methods immediately prior to concrete placement.

(2) **Pavement Concrete:**  Internal temperature of the plastic concrete shall not exceed 95°F (35°C) at the time of placement.

(c) **Cold Weather Limitations:**  Mixing and concreting operations for concrete mixes not containing ground granulated blast-furnace slag or Type IS cement shall be discontinued when a descending air temperature in the shade and away from artificial heat reaches 40°F (5°C), and shall not be resumed until an ascending air temperature in the shade and away from artificial heat reaches 35°F (2°C) provided the high temperature forecasted by the U.S. Weather Service is above 40°F (5°C).  For concrete mixes containing ground granulated blast-furnace slag or Type IS cement, operations shall be discontinued at a descending air temperature in the shade and away from artificial heat of 55°F (13°C) and can resume at a temperature of 50°F (10°C) and rising provided the high temperature forecasted by the U.S. Weather Service is above 55°F (13°C). Production shall not begin until the temperature at the point of placement is within the above limitations. Concrete shall not be placed if the U.S. Weather Service forecasts the temperature to be less than 35°F (2°C) within the 24 hour period following placement unless authorized in writing.

When concrete placement at lower air temperatures is authorized in writing, aggregates may be heated by either steam or dry heat prior to being placed in the mixer.  The apparatus used shall heat the mass

Exhibit C

NON-CERTIFIED COPY

**901.11**

uniformly and shall be arranged to prevent occurrence of overheated areas. If the air temperature is less than 35°F (2°C) at the time of placing concrete, the engineer may require water or aggregates to be heated to not less than 70°F (20°C) nor more than 150°F (65°C). After placement, the concrete shall be protected by additional covering, insulating materials, or other methods approved by the engineer.

**901.12  ACCEPTANCE AND PAYMENT SCHEDULE.** Acceptance and payment schedules in Table 901-5 will apply to all cast-in-place structural portland cement concrete. Acceptance and payment schedules in Table 901-6 will apply to all minor structure portland cement concrete. Acceptance and payment schedules for portland cement concrete pavement are shown in Table 601-1 of Section 601. These schedules do not apply to precast concrete.

Exhibit C

NON-CERTIFIED COPY

NON-CERTIFIED COPY

743

Exhibit C

Table 901-3
Master Proportion Table for Portland Cement Concrete

| | Average Compressive Strength, psi (MPa) at 28 days | Grade of Coarse Aggregate | Min. Cement, lb/yd³ (kg/m³) of Concrete [9,14] | Maximum Water/Cement ratio, lb/lb (kg/kg) [1,9] | Total Air Content (Percent by volume) [4] | Slump Range [10], inches (mm) | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Non-Vibrated | Vibrated | Slip Form Paving [2] |
| **Structural Class [11]** | | | | | | | | |
| AA(M) | 4400 (30.4) | A, P | 560 (332) | 0.44 | 5±1 | 2-5 (50-125) | 2-4 (50-100) | N.A. |
| AA | 4200 (29.0) | A, P | 560 (332) | 0.44 | 5±1 | 2-5 (50-125) | 2-4 (50-100) | N.A. |
| A(M) | 4400 (30.4) | A, P | 510 (302) | 0.53 | 5±2 | 2-5 (50-125) | 2-4 (50-100) | N.A. |
| A | 3800 (26.2) | A, F [8], P | 510 (302) | 0.53 | 5±2 | 2-5 (50-125) | 2-4 (50-100) | 1-2.5 (25-65) |
| D | 3300 (22.8) | A, B, D, P | 420 (249) | 0.58 | 5±2 | 2-5 (50-125) | 1-3 (25-75) | N.A. |
| F | 3400 (23.5) [5] | A,P | 460 (273) | 0.44 | 5±1 | 2-5 (50-125) | 2-4 (50-100) | N.A. |
| P(X) | 7500 (51.7) [5] | A, F [8], P | 700 (415) | 0.40 | 5±2 | N.A. | 2-10 (50-250) | N.A. |
| P(M) | 6000 (41.4) [5] | A, F [8], P | 600 (356) | 0.44 | 5±2 | N.A. | 2-6 (50-150) [7] | N.A. |
| P | 5000 (34.5) [5] | A, F [8], P | 560 (332) | 0.44 | 5±2 | N.A. | 2-6 (50-150) [7] | N.A. |
| S | 3800 (26.2) | A,P | 650 (385) | 0.53 | 5±2 | 6-8 (150-200) | N.A. | N.A. |
| **Minor Structure Class [11]** | | | | | | | | |
| M | 3000 (20.7) | A, B, P | 470 (279) | 0.56 | 5±2 | 2-5 (50-125) | 2-4 (50-100) | 1-2.5 (25-65) |
| R | 1800 (12.4) | A, B, D, P | 370 (219) | 0.70 | 5±2 | 2-5 (50-125) | 2-4 (50-100) | N.A. |
| Y | 3000 (20.7) | Y | 560 (332) | [3] | 6-9 | N.A. | 1-3 (25-75) | N.A. |
| **Pavement Type [11]** | | | | | | | | |
| B | 4000 (27.6) [6] | N/A [13] | 475 (282) | 0.53 | 5±2 | N.A. | 2-4 (50-100) | 1-2.5 (25-65) |
| D | 4000 (27.6) [6] | N/A [13] | 450 (267) | 0.53 | 5±2 | N.A. | 2-4 (50-100) | 1-2.5 (25-65) |
| E | 4000 (27.6) [6] | A, F [12], P | 600 (356) | 0.40 | 5±2 | N.A. | 2-4 (50-100) | 1-2.5 (25-65) |

N.A. – Not Applicable
[1] Except for Class AA, AA(M), or F concrete, the maximum volume of water; gal. (L), shall be reduced 5 percent when a water-reducing admixture is used, and 10 percent when an air-entraining admixture, or air-entraining and water-reducing admixtures, is used.  When the coarse aggregate portion of the mix is 100 percent crushed aggregate, the water may be increased by 5 percent provided the maximum water listed in Table 901-3 is not exceeded.
[2] Also slump range for other concrete placed by extrusion methods.
[3] Refer to Subsection 901.08(c).
[4] Total air content ranges when air-entrainment is allowed or specified.  Air content shall be designed at midrange.  See Subsection 901.08(b).
[5] Values shown represent the minimum compressive strengths allowed.
[6] Average compressive strengths for Pavement Type concrete shall be 3600 psi (25.0 MPa) when air-entrainment is used.
[7] No more than a 2 inch (50 mm) slump differential for any design pour.
[8] Grade F coarse aggregate shall be used only when specified or permitted.  The minimum cement content shall be increased when this aggregate is used.
[9] For mixes including partial replacement of cement with fly ash or ground granulated blast furnace slag, the minimum cement and maximum water contents shown apply to the total cement and fly ash or ground granulated blast furnace slag content of the mix.  Additional cement may be required to achieve minimum compressive strength.
[10] When a slump range is specified in other sections, that range shall govern.
[11] See Subsection 901.08(a) for allowable types of cement.
[12] For use in partial depth patching.
[13] Aggregate grading shall comply with the requirements of Subsection 1003.02(c).
[14] The minimum cement factors may be waived in writing by the District Laboratory Engineer in accordance with Subsection 901.06(a).

**Table 901-4**
**Over-Design to Meet Compressive Strength Requirements[1]**

| Number[2,3,5] of Tests | Standard Deviation, psi (MPa)[4] | | | | |
|---|---|---|---|---|---|
| | 300 (2.1) | 400 (2.8) | 500 (3.4) | 600 (4.1) | 700 (4.8) |
| | Additional Compressive Strength, psi (MPa) | | | | |
| 15-19 | 470 (3.2) | 620 (4.3) | 850 (5.9) | 1,120 (7.7) | 1,390 (9.6) |
| 20-29 | 430 (3.0) | 580 (4.0) | 760 (5.2) | 1,010 (7.0) | 1,260 (8.7) |
| 30 or More | 400 (2.8) | 530 (3.7) | 670 (4.6) | 900 (6.2) | 1,130 (7.8) |

[1]When designing the mix, add the tabulated amounts to the average compressive strength at 28 days shown in Table 901-3.

[2]Number of tests of a concrete mixture used to estimate the standard deviation of a concrete production facility. Test of another mix within 1,000 psi (6.9 MPa) of the specified strength may be used.

[3]If less than 15 prior tests are available the over-design should be 1,000 psi (6.9 MPa) for specified strength less than 3,000 psi (20.7 MPa), 1,200 psi (8.3 MPa) for specified strengths from 3,000 to 5,000 psi (20.7 to 34.5 MPa) and 1,400 psi (9.7 MPa) for specified strengths greater than 5,000 psi (34.5 MPa).

[4]Interpolation between standard deviations is required.

[5]A strength test result is defined as the average strength of all specimens of the same age, fabricated from a sample taken from a single batch of concrete. A strength test cannot be based on only one cylinder; a minimum of two cylinders is required for each test.

Exhibit C

NON-CERTIFIED COPY

**Table 901-5E**
**Acceptance and Payment Schedules**
**Cast-In-Place Structural Concrete**

| Average Compressive Strength per Lot, psi (28 to 31 days) | | | | | |
|---|---|---|---|---|---|
| Class A or S | Class AA | Class A(M) or AA(M) | Class D | Class F | Percent of Contract Price[1] |
| 3800 & above | 4200 & above | 4400 & above | 3300 & above | 3400 & above | 100 |
| 3400-3799 | 3800-4199 | 4200-4399 | 3000-3299 | --- | 98 |
| 3000-3399 | 3500-3799 | 4000-4199 | 2500-2999 | --- | 90 |
| below 3000 | Below 3500 | below 4000 | below 2500 | below 3400 | 50 or remove and replace[2] |

**Table 901-5M**
**Acceptance and Payment Schedules**
**Cast-In-Place Structural Concrete**

| Average Compressive Strength per Lot, MPa (28 to 31 days) | | | | | |
|---|---|---|---|---|---|
| Class A or S | Class AA | Class A(M) or AA(M) | Class D | Class F | Percent of Contract Price[1] |
| 26.2 & above | 29.0 & above | 30.4 & above | 22.8 & above | 23.5 & above | 100 |
| 23.5- 26.1 | 26.2-28.9 | 29.0-30.3 | 20.7-22.7 | --- | 98 |
| 20.7-23.4 | 24.1-26.1 | 27.6-28.9 | 17.2-20.6 | --- | 90 |
| Below 20.7 | below 24.1 | below 27.6 | below 17.2 | below 23.5 | 50 or remove and replace[2] |

[1]When concrete is part of an item or not a direct pay item, lot sizes, sampling and acceptance testing for the required quantities will be in accordance with Subsection 805.18. The value for each cubic yard (cu m) required will be assessed at $350 ($460) for the purpose of applying payment adjustment percentages. The amount of payment adjustment for the quantity of concrete involved will be deducted from payment.

Acceptance and payment schedules shall apply to the contract item itself for cast-in-place piling.

[2]When the average compressive strength of **any batch in a lot** is less than 4000 psi (27.6 MPa) for Class A(M) or AA(M), less than 3500 psi (24.1 MPa) for Class AA, less than 3000 psi (20.7 MPa) for Class A or S, less than 2500 psi (17.2 MPa) for Class D, or less than 3400 psi (23.5 MPa) for Class F, an investigation will be made. If concrete is allowed to remain in place, payment will be based on the average compressive strength for the lot. If concrete is not allowed to remain in place, the identifiable deficient areas shall be removed and replaced at no direct pay.

When the average compressive strength for a **lot** is less than 4000 psi (27.6 MPa) for Class A(M) or AA(M), less than 3500 psi (24.1 MPa) for Class AA, less than 3000 psi (20.7 MPa) for Class A or S, less than 2500 psi (17.2 MPa) for Class D, or less than 3400 psi (23.5 MPa) for Class F, an investigation will be made. If concrete is allowed to remain in place, payment for the lot will be based on 50 percent of the contract price.

Any cores obtained in these investigations will be used for evaluation purposes only and payment will be based on original acceptance samples.

745

Exhibit C

NON-CERTIFIED COPY

**Table 901-6E**
**Acceptance and Payment Schedules**
**Cast-In-Place Minor Structure Concrete**

| Average Compressive Strength, psi (28 to 31 days) | | |
|---|---|---|
| Class M or Y | Class R | Percent of Contract Price [1] |
| 3000 & Above<br>Below 3000 | 1800 & Above<br>Below 1800 | 100<br>50 or Remove [2] |

**Table 901-6M**
**Acceptance and Payment Schedules**
**Cast-In-Place Minor Structure Concrete**

| Average Compressive Strength, MPa (28 to 31 days) | | |
|---|---|---|
| Class M or Y | Class R | Percent of Contract Price [1] |
| 20.7 & Above<br>Below 20.7 | 12.4 & Above<br>Below 12.4 | 100<br>50 or Remove [2] |

[1]When concrete is part of an item or not a direct pay item, sampling and acceptance testing for the required quantities shall be in accordance with this section. The value for each cubic yard (cu m) of concrete required will be assessed at $350 ($460) for the purpose of applying payment adjustment percentages. The amount of payment adjustment for the quantity of concrete involved will be deducted from payment.

[2]When the average compressive strength is less than 3,000 psi (20.7 MPa) for Class M or Y, and 1,800 psi (12.4 MPa) for Class R, an investigation will be made. If concrete is allowed to remain in place, payment will be based on 50 percent of the contract price.

Any cores obtained in these investigations will be used for evaluation purposes only. Payment will be based on original acceptance samples.

746

Exhibit C

NON-CERTIFIED COPY




NON-CERTIFIED COPY

Exhibit D

NON-CERTIFIED COPY

Exhibit D



NON-CERTIFIED COPY

Exhibit D



Regular Session, 2008     **ACT No. 787**     <u>**ENROLLED**</u>

SENATE BILL NO. 308

BY SENATOR DONAHUE

1                      AN ACT

2   To amend and reenact Code of Civil Procedure Article 1425(C) and to enact Code of Civil

3        Procedure Article 1425(F), relative to discovery and experts; to provide for a pre-

4        trial hearing regarding the qualifications and admissibility of testimony of an expert

5        witness; to provide procedures for conducting the hearing and appeals of the decision

6        of the judge; and to provide for related matters.

7   Be it enacted by the Legislature of Louisiana:

8        Section 1. Code of Civil Procedure Art. 1425(C) is hereby amended and reenacted

9   and Code of Civil Procedure Art. 1425(F) is hereby enacted to read as follows:

10        Art. 1425. Experts; pre-trial disclosures; scope of discovery

11                     \*     \*     \*

12        C. The disclosures of Paragraph B of this Article shall be made at the times

13        and in the sequence directed by the court. In the absence of other directions from the

14        court or stipulation by the parties, the disclosures required pursuant to Paragraph B

15        of this Article shall be made at least ninety days before the trial date ~~or the date the~~

16        ~~case is to be ready for trial~~ or, if the evidence is intended solely to contradict or rebut

17        evidence on the same subject matter identified by another party under Paragraph B

18        **of this Article**, within thirty days after the disclosure made by the other party. The

19        parties shall supplement these disclosures when required by Article 1428.

20                     \*     \*     \*

21        **F. (1) Any party may file a motion for a pretrial hearing to determine**

22        **whether a witness qualifies as an expert or whether the methodologies employed**

23        **by such witness are reliable under Articles 702 through 705 of the Louisiana**

24        **Code of Evidence. The motion shall be filed not later than sixty days prior to**

Coding: Words which are ~~struck through~~ are deletions from existing law;
words in **boldface type and underscored** are additions.

Exhibit A

NON-CERTIFIED COPY

SB NO. 308                                                    <u>ENROLLED</u>

1    <u>trial and shall set forth sufficient allegations showing the necessity for these</u>

2    <u>determinations by the court.</u>

3    <u>(2) The court shall hold a contradictory hearing and shall rule on the</u>

4    <u>motion not later than thirty days prior to the trial. At the hearing, the court</u>

5    <u>shall consider the qualifications and methodologies of the proposed witness</u>

6    <u>based upon the provisions of Articles 104(A) and 702 through 705 of the</u>

7    <u>Louisiana Code of Evidence.  For good cause shown, the court may allow live</u>

8    <u>testimony at the contradictory hearing.</u>

9    <u>(3) If the ruling of the court is made at the conclusion of the hearing, the</u>

10   <u>court shall recite orally its findings of fact, conclusions of law, and reasons for</u>

11   <u>judgment. If the matter is taken under advisement, the court shall render its</u>

12   <u>ruling and provide written findings of fact, conclusions of law, and reasons for</u>

13   <u>judgment not later than five days after the hearing.</u>

14   <u>(4) The findings of facts, conclusions of law, and reasons for judgment</u>

15   <u>shall be made part of the record of the proceedings. The findings of facts,</u>

16   <u>conclusions of law, and reasons for judgment shall specifically include and</u>

17   <u>address:</u>

18   <u>(a) The elements required to be satisfied for a person to testify under</u>

19   <u>Articles 702 through 705 of the Louisiana Code of Evidence.</u>

20   <u>(b) The evidence presented at the hearing to satisfy the requirements of</u>

21   <u>Articles 702 through 705 of the Louisiana Code of Evidence at trial.</u>

22   <u>(c) A decision by the judge as to whether or not a person shall be allowed</u>

23   <u>to testify under Articles 702 through 705 of the Louisiana Code of Evidence at</u>

24   <u>trial.</u>

25   <u>(d) The reasons of the judge detailing in law and fact why a person shall</u>

26   <u>be allowed or disallowed to testify under Articles 702 through 705 of the</u>

27   <u>Louisiana Code of Evidence.</u>

28   <u>(5) A ruling of the court pursuant to a hearing held in accordance with</u>

29   <u>the provisions of this Subsection shall be subject to appellate review as provided</u>

30   <u>by law.</u>

Page 2 of 3
Coding: Words which are ~~struck through~~ are deletions from existing law;
words in **<u>boldface type and underscored</u>** are additions.

**Exhibit A**

NON-CERTIFIED COPY

SB NO. 308                                                    ENROLLED

1        (6) Notwithstanding the time limitations in Subparagraphs (1), (2), and

2    (3) of this Paragraph, by unanimous consent of the parties, and with approval

3    by the court, a motion under this Subsection may be filed, heard, and ruled

4    upon by the court at any time prior to trial. The ruling by the court on such

5    motion shall include findings of fact, conclusions of law, and reasons for

6    judgment complying with the provisions of Subparagraph (4) of this Paragraph.

7        (7) The provisions of this Paragraph shall not apply to testimony in an

8    action for divorce or annulment of marriage, or to a separation in a covenant

9    marriage, to a property partition, or to an administration of a succession, or to

10   testimony in any incidental or ancillary proceedings or matters arising from

11   such actions.

12       (8)  All or a portion of the court costs, including reasonable expert

13   witness fees and costs, incurred when a motion is filed in accordance with this

14   Paragraph may, in the discretion of the court, be assessed to the non-prevailing

15   party as taxable costs at the conclusion of the hearing on the motion.

16       Section 2.  The provisions of this Act shall not apply to any action filed for the

17   recovery of any covered losses, in accordance with a homeowners insurance policy or

18   business owners insurance policy, which occurred as a result of hurricanes Katrina or Rita.

19       Section 3.  This Act shall become effective January 1, 2009; however if an action has

20   been set for trial between January 1, 2009, and April 1, 2009, the provisions of this Act shall

21   become effective as to those actions on April 1, 2009.

22


_____
PRESIDENT OF THE SENATE


_____
SPEAKER OF THE HOUSE OF REPRESENTATIVES


_____
GOVERNOR OF THE STATE OF LOUISIANA


APPROVED: _____


Page 3 of 3
Coding: Words which are ~~struck through~~ are deletions from existing law;
words in **boldface type and underscored** are additions.

Exhibit A

NON-CERTIFIED COPY

NON-CERTIFIED COPY

Exhibit B





NON-CERTIFIED COPY

Exhibit B



# PART IX -- PORTLAND CEMENT CONCRETE

**Section No.**                                             **Page No.**

901    Portland Cement Concrete.......................................................  724

Exhibit C

NON-CERTIFIED COPY

# Section 901
# Portland Cement Concrete

**901.01  GENERAL.**  This section specifies requirements for portland cement concrete, including methods and equipment for handling and storing materials, and mixing and transporting concrete to the site.

Structural concrete is designated by class and pavement concrete by type.

No concrete shall be mixed, placed or finished when natural light is insufficient, unless an approved artificial lighting system is provided.  No concrete shall be placed on a frozen subgrade nor shall frozen aggregates be used in concrete.

Portland cement concrete shall conform to the requirements of Table 901-3, Master Proportion Table for Portland Cement Concrete.  It shall be a mixture of portland cement, portland-pozzolan cement, or portland blast-furnace slag cement, fine aggregate, coarse aggregate, water and, when specified or allowed, approved admixtures.  Fly ash or ground granulated blast furnace slag will be permitted as a partial replacement for portland cement in accordance with Subsection 901.08.

Portland cement concrete shall require a Department approved mix design, be produced from a Department certified plant and be transported in Department certified trucks.  The design, control and transportation of concrete mixtures in accordance with these specifications shall be the responsibility of the contractor.

Sufficient plant capacity and transporting apparatus to ensure delivery at the required rate shall be provided.  Rate of concrete delivery during concreting operations shall provide for proper handling, placing and finishing of concrete and maintaining a workable surface.

Methods of delivery and handling concrete shall facilitate placing with a minimum of rehandling and without damage to the structure or concrete.

Approved laboratory facilities and testing equipment necessary to sample, test, and control concrete mixtures shall be provided by the contractor.  These facilities will not be required for plants producing only minor structure concrete complying with Table 901-3.  A laboratory conforming to Section 722 shall be located at an approved location at the plant site. The laboratory shall be for quality assurance purposes.

Quality assurance requirements shall be as specified in the latest edition of the Department's publication entitled "Application of Quality Assurance

724

Exhibit C

NON-CERTIFIED COPY

901.03

Specifications for Portland Cement Concrete Pavement and Structures" or "Application of Quality Assurance Specifications for Precast-Prestressed Concrete Plants."

**901.02  MATERIALS.**   Materials shall comply with the following Subsections:

| | |
|---|---|
| Portland Cement | 1001.01 |
| Portland-Pozzolan Cement | 1001.02 |
| Masonry Cement | 1001.03 |
| Aggregates | 1003.01 & 1003.02 |
| Admixtures | 1011.02 |
| Water | 1018.01 |
| Fly Ash | 1018.15 |
| Portland Blast-Furnace Slag Cement | 1001.04 |
| Ground Granulated Blast Furnace Slag | 1018.27 |
| Microsilica (Silica Fumes) | 1018.28 |

Cement, fly ash, ground granulated blast furnace slag and microsilica shall be certified by the manufacturer in accordance with the Department's current procedures.

The contractor shall keep accurate records of cement, fly ash, ground granulated blast furnace slag, and microsilica deliveries and their use in the work.  Copies of these records shall be furnished to the engineer in such form as required.

**901.03  TRANSPORTATION AND STORAGE OF CEMENTITIOUS MATERIALS AND MICROSILICA.**  Cement, fly ash, ground granulated blast furnace slag, and microsilica shall be transported in watertight conveyances and stored in separate approved facilities so that cement, fly ash, ground granulated blast furnace slag, and microsilica will be protected from dampness or water intrusion.   Material that is contaminated, is partially set, or contains lumps of caked material will be rejected.  When the use of bagged cement, fly ash, ground granulated blast furnace slag or microsilica is permitted, the handling and storage will be as directed.

Different brands or types or the same brand or type from different mills, shall not be mixed or used alternately unless authorized by the DOTD Materials Engineer Administrator.  This requirement may be waived in case of plant breakdown during production to allow concrete conforming to the requirements of Subsection 901.01 to be furnished from another plant to finish the placement in progress.

Exhibit C

NON-CERTIFIED COPY

901.04

**901.04 HANDLING AND STORAGE OF AGGREGATES.**
Equipment and methods for stockpiling aggregates shall be such that no
detrimental degradation or segregation of aggregate will result; no
appreciable amount of foreign material will be incorporated into aggregate;
and there will be no intermingling of stockpiled materials. Stockpiles of
aggregates shall be well drained and shall have uniform moisture content.
Material shall not be added to working faces of the stockpiles during
continuous operations.

When specified, coarse aggregate shall be separated into two or more
sizes to ensure greater uniformity of the concrete mixture. Different grades
and types of aggregates shall be stored in separate stockpiles separated by
bulkheads or sufficiently separated from each other to prevent material at
edges of piles from intermingling. When segregation occurs in the
processing and handling of Grade D coarse aggregate, the aggregate shall
be separated at the 1-inch (25 mm) sieve into two stockpiles. The
stockpiled material shall be reproportioned to meet the gradation
requirements of Grade D. Activity that results in contamination or
intermingling of aggregates, including overhead handling for the loading of
bins or building of stockpiles, will not be permitted.

Aggregates shall be handled from stockpiles or other sources to the
batch plant so as to secure uniform grading of material. Aggregates that
have become segregated or contaminated shall not be used. Aggregates
processed or handled by hydraulic methods, and washed aggregates, shall
be stockpiled or placed in bins for adequate drainage. Transport containers
will be accepted as an adequate bin when adequate drainage is provided.
Drainage of aggregates shall meet the approval of the engineer prior to
batching. The engineer may require water sprinkling of coarse aggregates
in stockpiles that have dried to the extent that the aggregates absorb mixing
water. Such sprinkling shall continue until aggregates are saturated.

**901.05 SAMPLING AND TESTING.** Sampling and testing will be
done in accordance with the Department's Materials Sampling Manual and
the Department's Testing Procedures Manuals. The contractor shall furnish
necessary materials for testing at no direct pay.

**901.06 QUALITY CONTROL OF CONCRETE.** The contractor shall
be responsible for quality control of materials during handling,
proportioning, mixing, and placement operations; for initial determination
and necessary subsequent adjustments in proportioning of materials used to
produce the specified concrete; and for providing suitable equipment for

726

Exhibit C

NON-CERTIFIED COPY

901.06

determination of aggregate gradation, moisture, air content, slump, unit weight (mass), temperature, and trial mixes as necessary. Testing and analysis of the mix for quality control purposes, the setting of dials, gages, scales or meters, adjusting batch weights, and accurate batching shall be the responsibility of the contractor.

The contractor shall have a Certified Concrete Technician present at the plant or job site to make adjustments in batch weights for moisture content, perform necessary adjustments in proportioning materials to produce the specified concrete, and perform tests necessary for control of the concrete mix within specifications requirements. Daily plant operations shall not begin unless the Certified Concrete Technician is at the plant to determine that gradations, moisture contents, and adjusted batch weights are within specifications limits. If a Certified Concrete Technician is not available at the job site, an Authorized Concrete Field Tester is allowed to perform the job site control tests for slump, air content, and mix temperature and report the results to the Certified Concrete Technician. The use of an Authorized Concrete Field Tester at the job site will not relieve the Certified Concrete Technician from performing the remaining duties as outlined in these specifications.

The contractor's Certified Concrete Technician and Authorized Concrete Field Tester shall be certified or authorized upon satisfactory completion of the Department's requirements.

(a) **Mix Design:** Mixtures shall produce concrete of suitable workability. Slumps shall be within the ranges shown in Table 901-3 or as specified when tested in accordance with DOTD TR 207. The engineer may authorize an increase in maximum slump, by use of water reducers, for concrete used in the construction of walls and diaphragms less than 8 inches (200 mm) thick, and where the engineer considers necessary provided the water-cement ratio is not exceeded and conventional forms are used.

Concrete mixes shall be formulated to produce concrete which, when molded and cured in accordance with DOTD TR 226 and tested in accordance with DOTD TR 230, shall show an average compressive strength not less than as shown in Table 901-3. Class P, Class P(M) and Class P(X) concrete cylinders for compressive strength tests shall be cured by the same methods used in curing the members they represent.

The contractor's Certified Concrete Technician shall submit a proposed concrete mix design on a form provided by the Department giving the intended sources of materials and the mix design for concrete to be furnished. No work shall be started until the portland cement concrete mix

Exhibit C

NON-CERTIFIED COPY

**901.06**

design has been reviewed and accepted.  Review and acceptance of this mix design does not release the contractor from the responsibility of producing concrete that meets the minimum requirements of the specifications.

Proportioning for volume of coarse aggregates in concrete mixes, excluding concrete pipe, Types B and D pavement, and minor structure concrete shall be in accordance with Table 901-1 below.  An example of proportioning of coarse aggregate is shown in the Department's publication entitled "Application of Quality Assurance Specifications for Portland Cement Concrete Pavement and Structures".

**Table 901-1**
**Volume of Coarse Aggregate Per Unit of Volume of Concrete**

| Maximum Size of Aggregate, Inches (mm) | Volume of Dry-Rodded Coarse Aggregate Per Unit Volume of Concrete for Different Fineness Moduli of Fine Aggregate[1] | | | | |
|---|---|---|---|---|---|
| | 2.20 | 2.40 | 2.60 | 2.80 | 3.00 |
| 3/8 (9.50) | 0.52 | 0.50 | 0.48 | 0.46 | 0.44 |
| 1/2 (12.5) | 0.61 | 0.59 | 0.57 | 0.55 | 0.53 |
| 3/4 (19.0) | 0.68 | 0.66 | 0.64 | 0.62 | 0.60 |
| 1 (25.0) | 0.73 | 0.71 | 0.69 | 0.67 | 0.65 |
| 1 1/2 (37.5) | 0.77 | 0.75 | 0.73 | 0.71 | 0.69 |
| 2 (50.0) | 0.80 | 0.78 | 0.76 | 0.74 | 0.72 |
| 3 (75.0) | 0.84 | 0.82 | 0.80 | 0.78 | 0.76 |

[1]Volumes are based on aggregates in dry-rodded condition as described in AASHTO T19, Unit Weight of Aggregate.  These volumes are selected from empirical relationships to produce concrete with a degree of workability suitable for usual reinforced concrete construction.  For less workable concrete such as required for concrete pavement construction, they may be increased up to 10 %.  For more workable concrete, as may be required for pumping, they may be reduced up to 10%.

In developing mix designs for portland cement concrete pavement Types B and D, the proportions of the aggregate sizes to be used shall meet the requirements of Subsection 1003.02(c).

Trial mixes are required to demonstrate the mix performance and the compatibility of mix components for the following:

        (1) Fly Ash
        (2) Ground Granulated Blast Furnace Slag
        (3) Microsilica
        (4) Heavyweight Concrete
        (5) Flexural Strength (when required)
        (6) Unusual Materials and Applications

Exhibit C

NON-CERTIFIED COPY

For the above trial mixes the contractor shall submit test results for slump, unit weight (mass), air content, set times, and compressive strength (flexural strength for pavements) at 3, 7, and 28 days. The contractor shall furnish materials to the Department for verification of trial mixes.

When requested by the contractor, the Department will determine gradation, unit weight (mass), specific gravity and absorption factor of the aggregates.

Trial mixes may be waived in writing by the District Laboratory Engineer for previously accepted mix designs.

The minimum cement factors may be waived in writing by the District Laboratory Engineer provided the contractor's mix design meets the average compressive strengths in Table 901-3 plus the over-design compressive strengths in Table 901-4.

**(b) Quality Control Tests:** The contractor shall be responsible for determining gradation and moisture content of fine and coarse aggregates used in the concrete mixture and for testing the mixture at the job site for slump, unit weight (mass), temperature, and air content (when used). The contractor shall conduct operations to produce a mix complying with the reviewed and accepted mix design, except that variations will be permitted within specified control limits for individual samples. Test results for gradation, slump, unit weight (mass), and air content shall be plotted on control charts for individual samples. These control charts shall be submitted to the engineer.

Times at which to obtain control test samples shall be set by the contractor using random number tables in accordance with DOTD S 605 or by random selection. Gradation control limits of aggregates shall be as shown in Subsection 1003.02. When required, additional test samples shall be taken as directed for slump, concrete temperature, and air content.

The minimum number of quality control tests to be performed by the contractor for structural and pavement concrete shall be in accordance with the Materials Sampling Manual. For minor structure concrete only, the contractor will not be required to have a Certified Concrete Technician or Authorized Concrete Field Tester, but shall implement a quality control testing program to ensure that the concrete meets the requirements of these specifications.

When producing concrete for Types B and D pavements, gradations shall be determined daily on each stockpile of aggregate to be used. All gradation calculations shall be based on percent of dry weight (mass). Upon determination of the gradation of each stockpile, the percent of the total aggregates retained shall be determined mathematically based on the

Exhibit C

NON-CERTIFIED COPY

901.06

proportions of the combined aggregate blend, and checked for conformance with Table 1003-1A.

**(c) Mix Adjustments:** With prior notification given to the engineer, the contractor may adjust the ratio of fine to coarse aggregate as reviewed and accepted, by no more than 5 percent. In no case shall it be adjusted so as to materially affect the volume of concrete. If the proportions of the aggregate sizes used do not satisfy the gradation requirements of Subsection 1003.02(c) due to changes in the gradation of one or more stockpiles, the proportions shall be adjusted to bring the combined aggregates back within specification limits. These minor adjustments for gradation will not require a new mix design. The mix produced shall be uniform, workable and within the specification limits of Table 901-3. When plant operations do not produce a uniform and workable mix, plant operations shall cease and corrective action shall be taken prior to restart.

When tendency of individual slump, air content, concrete temperature, or gradation measurements, as plotted on control charts, indicates that the mix is not uniform and may fall outside tolerance limits, the contractor shall immediately make adjustments to keep the mix within specified limits. If the contractor fails to make proper adjustments and the mix deviates from specification requirements or if the mix is obviously defective, the mix will be rejected.

For workability properties only, changes in mix proportions will be permitted provided the water-cement ratio is not exceeded, minimum cement factor is maintained, proper batch adjustments are made, and prior notification is given to the engineer.

No changes in source of materials or percentage of cement, fly ash, ground granulated blast furnace slag, or microsilica shall be made until a new Mix Design form showing the new material or adjusted proportions has been submitted by the contractor and approved.

**(d) Acceptance and Verification for Types B and D Pavements:** Sampling and testing for acceptance and verification for concrete for Types B and D pavements shall be in accordance with the provisions of the Materials Sampling Manual, except as follows:

(1) Gradation testing for acceptance will not be required.

(2) Verification tests will be performed by the District Laboratory to assure conformance to the gradation of the total combined aggregates shown in Table 1003-1A at the frequency of one sample per aggregate size per lot, with a maximum of one sample per aggregate size per day. Samples are to be obtained from the aggregate feed (conveyor) belt as

Exhibit C

NON-CERTIFIED COPY

described in the Materials Sampling Manual, DOTD Designation S101, Aggregates and Aggregate Mixtures.

(3) Upon determination of the gradation of each aggregate size sampled, the percent retained based on the dry weight (mass) of the total combined aggregates will be determined mathematically based on the proportions of the combined aggregate blend, and checked for conformance with Table 1003-1A.

(4) If the results of the verification sample indicate that the combination of aggregates being used does not meet the requirements of Subsection 1003.02(c), the aggregates shall be re-sampled and tested again. If the results of the second verification sample indicate that the combination of aggregates being used does not meet the requirements of Subsection 1003.02(c), the contractor will be notified and required to make adjustments to his operations to produce a mix meeting these specifications. No concrete from this plant shall be placed on DOTD projects until the adjustments are made and approved by the District Laboratory Engineer. An additional verification sample may be required prior to resuming operations.

**901.07  SUBSTITUTIONS.** Mixtures may be substituted with approval in accordance with Table 901-2.

Exhibit C

NON-CERTIFIED COPY

901.07

**Table 901-2**
**Portland Cement Concrete Mixture Substitutions**

| Structural Class[1] | Substitute |
|---|---|
| AA (M) | No Substitutions |
| AA | AA(M) |
| A(M) | AA(M), AA |
| A | AA(M), AA, A(M) |
| D | No Substitutions |
| F | No Substitutions |
| P(X) | No Substitutions |
| P(M) | No Substitutions |
| P | P(M) |
| S | No Substitutions |
| Minor Structure Class[1] | |
| M | AA(M), AA, A(M), A, B |
| R | AA(M), AA, A(M), A, B, M |
| Y | No Substitutions |
| Pavement Type[1, 2] | |
| B | D |
| D | B |
| E | No Substitutions |

[1]The mixture being substituted shall meet the requirements of Table 901-3 and the mix design for its class or type. The compressive strength of the substituted mix shall meet the strength requirements of the original mixture specified.
[2]When justified in writing and approved by the engineer, small irregular areas of paving projects using Types B or D concrete may be substituted with Class A concrete.

**901.08 COMPOSITION OF CONCRETE.** Type of cement and composition of concrete shall be in accordance with the requirements of this subsection and Table 901-3.

**(a) Cement:** Allowable types of cement are as follows:

| Use | Allowable Cement Types |
|---|---|
| General Construction (Structural Class Concrete and Minor Structure Class Concrete) | Type I or II portland cement; Type IP portland-pozzolan cement; Type IS portland blast-furnace slag cement |
| Concrete Pavement | Type I or II portland cement; Type IP portland-pozzolan cement; Type IS portland blast-furnace slag cement |
| Prestressed or Precast Concrete | Type I, II or III portland cement; Type IP portland-pozzolan cement; Type IS portland blast-furnace slag cement |

732

Exhibit C

NON-CERTIFIED COPY

901.08

For concrete placements having a least dimension of 48 inches (1200 mm) or greater or if designated on the plans or the project specifications as being mass concrete, the allowable cement type shall be Type II portland cement, Type IP portland-pozzolan cement, or Type IS portland blast-furnace slag cement. The cement, or combination of cement and fly ash or ground granulated blast furnace slag, shall be certified to generate a heat of hydration of not more than 70 calories/gram (290 kJ/kg) at 7 days.

Due to the gradation of aggregate or other conditions, additional cement may be required to achieve minimum compressive strength.

When using only Types I or II portland cement in concrete mixes, fly ash conforming to Subsection 1018.15 or grades 100 or 120 ground granulated blast-furnace slag conforming to Subsection 1018.27 may be partially substituted for portland cement on a pound (kilogram) for pound (kilogram) basis. The contractor may use a maximum of 25 percent fly ash by weight (mass) of cement for concrete pipe, up to 20 percent fly ash by weight (mass) of cement for other minor structures and concrete pavement, and up to 15 percent fly ash by weight (mass) of cement for structural concrete. In lieu of fly ash, the contractor may use grade 100 or grade 120 ground granulated blast-furnace slag up to 50 percent by weight (mass) of cement. The combination of slag and fly ash will not be allowed as a partial substitution for cement.

**(b) Chemical Admixtures:** An air-entraining admixture will be required in paving concrete when placed by slip-form methods or when a central mixing plant or non-agitating haul trucks are used.

Air-entraining and water-reducing admixtures will be required in Class AA, F or AA(M) concrete. When an air-entraining admixture is used, the total air content of the concrete mix shall be tested in accordance with DOTD TR 202, and shall be as specified in Table 901-3.

A water-reducing admixture will be required for mass concrete.

When the ambient air temperature is 70°F (20°C) or below, the water-reducing admixture shall be the normal-set type. When the ambient air temperature is above 70°F (20°C) and below 85°F (30°C), the water-reducing admixture may be either the normal-set type or the set-retarding type. When the ambient air temperature is 85°F (30°C) or above, the water-reducing admixture shall be the set-retarding type, except for concrete containing fly ash or ground granulated blast furnace slag where this choice is optional. Set-retarding admixtures shall be used in an amount sufficient to produce the necessary retardation; however, the amount used shall not be less than is necessary to comply with Subsection 1011.02.

733

Exhibit C

NON-CERTIFIED COPY

**901.08**

The contractor shall consider the influence of different materials and job conditions, including local weather on setting characteristics.    With approval of the mix design, the contractor may use approved admixtures other than as stated above in order to control setting characteristics.

Admixtures shall comply with Subsection 1011.02 and be listed on QPL 58.

Water contents for superplasticized concrete mixes shall not be reduced to levels that will restrict cement hydration.   The amount of water in the superplasticizer shall be included as a part of required mixing water.   The dosage of superplasticizer may be adjusted depending on the consistency of the mix.

Final slump of superplasticized concrete shall be appropriate for its application.   It shall not exhibit excessive bleeding or segregation of aggregates as determined by the project engineer.

The method of adding and mixing the superplasticizer to the mix shall be as recommended by the manufacturer.

When multiple admixtures are used, the admixtures shall be manufactured by the same company and shall be compatible.

The use of admixtures in other classes or types of concrete will be optional with the contractor with written approval.

**(c) Water:**   The total amount of water in the mixture, including admixtures and free water, shall not exceed the maximum water-cement ratio specified in Table 901-3.   Free water shall include all water entering the mix with the aggregates, except water absorbed by the aggregate.

Because of the absorptive nature of lightweight aggregate and the inability to obtain a true saturated surface dry condition for determining free moisture, a maximum amount of water cannot be specified for Class Y concrete. The slump requirement of Table 901-3 or as specified will be the governing factor in determining maximum allowable water.

**(d) Aggregate:**   All aggregates for use in portland cement concrete shall meet the requirements of Subsection 1003.01.

**(1) Coarse Aggregate:**   Coarse aggregate, except for gradations for Types B and D pavements, shall be the grade specified in Table 901-3 and shall comply with the requirements of Subsection 1003.02(b).

**(2) Fine Aggregate:**  Fine aggregate, except for gradations for Types B and D pavements, shall comply with the requirements of Subsection 1003.02(a).

**(3) Aggregates for Types B and D Pavements:** Aggregates shall comply with the requirements of Subsection 1003.02(c).

734

Exhibit C

NON-CERTIFIED COPY

## 901.09  EQUIPMENT.

**(a)  General:**  Sufficient plant capacity and transporting equipment to ensure delivery at the required rate shall be provided.  Rate of concrete delivery during concreting operations shall provide for proper handling, placing and finishing of concrete and maintain a workable surface. Methods of delivering and handling concrete shall facilitate placing with a minimum of rehandling and without damage to the structure or concrete.

**(b)  Plant Equipment:**  Batch plants shall include approved storage, weigh hoppers, and measuring devices.  Equipment shall be properly sealed and vented to minimize dusting and loss of material.

Materials shall be incorporated into the mix by methods that will ensure uniform distribution.  The amount of each material used in the mix shall be recorded and certified by the contractor's authorized representative.

The plant shall be equipped with adequate water storage and a device for automatically controlling the amount of water used in each batch.

For plants using direct-fill elevating weigh hoppers, computer controlled indicator lights may be used as an indication of aggregate weights but shall not be the sole means of control for aggregate proportioning.  Means of control shall be provided so that, as the quantity desired in the weigh hopper is approached, material may be added slowly and shut off with precision.  Weigh hoppers shall be constructed as to eliminate accumulation of materials and to discharge completely.  Suitable provisions shall be made for removal of overload from the hopper by the operator.  Approved radio communication shall be provided between the concrete batcher and front-end loader operator.  Actual weights of material batched each time shall be entered on the Batch Certification Form.  The plant shall demonstrate satisfactory performance by producing consistent concrete with adequate compressive strengths.

**(1)  Storage Bins and Silos:**  For plants with overhead storage bins, which feed directly into the weigh hopper, or storage bins with belt feed to the weigh hopper, the bins shall have adequate separate compartments for fine aggregate and each size of coarse aggregate.  Each compartment shall be designed to discharge efficiently and freely into the weigh hopper.  Means of control shall be provided so that, as the quantity desired in the weigh hopper is approached, material shall be added slowly and shut off with precision.

Silos shall be weatherproof, sealed, free of holes, and shall prevent contamination.  Silos shall be designed to freely discharge and shall be equipped with vibrators to maintain flow of material and prevent accumulation.  Silos shall be designed with sufficient capacity for the

735

Exhibit C

NON-CERTIFIED COPY

**901.09**

operation.  Silos shall be provided with a positive means of shut off without leaking into the weigh hopper.  A separate silo shall be used for each dry bulk material added to the mix.  If a silo is divided into compartments for cement, fly ash, ground granulated blast furnace slag and microsilica, a positive means of separation shall be provided.

(2) **Measuring Devices:**    Materials shall be measured by weighing except where other methods are authorized.

Batch plants may be equipped to proportion materials by approved automatic weighing devices.  Moisture probes can be used to determine the moisture content of aggregates for batch adjustment provided the accuracy is confirmed by the engineer to be within 0.5 percent of the results obtained by the Certified Concrete Technician in accordance with DOTD TR 106.

Fine aggregate and each size of coarse aggregate from separate bins shall be weighed either separately or cumulatively on scales in the weigh hopper. The allowable quantities of bulk fly ash, bulk ground granulated blast furnace slag, or bulk microsilica may be weighed cumulatively in the same hopper with the cement, provided the cement is weighed first and the scale system is separate from that used for the aggregates.

Weigh hoppers shall be constructed to eliminate accumulation of materials and to discharge completely.  Suitable provisions shall be made for removal of an overload from the hopper by the operator.

Scales shall be accurate to 0.5 percent throughout the range of use. Maximum graduation on scales shall be 0.1 percent of the rated scale capacity.  When beam type scales are used, poises shall be designed to be locked in any position to prevent accidental change of position, and the weigh beam and a telltale device shall be in view of the operator.  Plant and laboratory measuring devices shall be subject to approval and shall be tested, inspected, and certified by a qualified independent scale service or the Weights and Measures Division of the Louisiana Department of Agriculture and Forestry at no cost to the Department every 90 calendar days, and more often when the engineer deems it necessary to assure their accuracy.

Individual aggregates shall be batched within 2 percent, and the total weight (mass) of aggregate shall be within 1 percent of the required weight (mass).

Cement, fly ash, ground granulated blast furnace slag, and microsilica shall be within 1 percent of the required weight (mass).  Cement in standard bags need not be weighed; however, when used, they shall be used in full bag increments and the quantities of other materials shall be

Exhibit C

NON-CERTIFIED COPY

adjusted accordingly. Bagged fly ash and bagged ground granulated blast furnace slag will not be allowed.

Mixing water shall be measured by volume or weight (mass). Water measuring devices shall be accurate to 1 percent at 1/2 the maximum allowable water per batch and the maximum graduation shall be 1 gallon (4 L).

Approved methods and equipment for adding air-entraining admixtures or other admixtures into the batch shall be used. The quantity of admixtures shall be measured into the mixer with an accuracy of 3 percent. Admixtures shall be mechanically dispensed in a liquid state with the mixing water. A separate dispensing device shall be provided for each admixture.

(3) **Ticket Printer System:** Certified concrete plants may be equipped with an approved automatic ticket printer system for recording required batching information. When an automatic ticket printer system is not used, quantities and batching information shall be determined by visual observation, recorded, and certified correct by the contractor's authorized representative.

The approved ticket printer system shall be tamper-proof and shall print time of batching, amount of water, batch weights, moisture content of aggregates, and quantities of admixtures. The Certified Concrete Technician may add moisture content of aggregates or quantities of admixtures to the printed ticket when the automatic system does not have these capabilities. During a breakdown, quantities shall be determined by visual observation and certified as stated above.

All records of batches shall show batch number, day, month, year, and time of day to the nearest minute for each batch. The maximum quantity of water that can be added at the jobsite shall be shown on the batch ticket. The engineer shall be provided with a legible copy of all batch records identified with lot number and mix design number.

(c) **Hauling Equipment:** Hauling equipment shall be watertight and shall be capable of discharging concrete at a satisfactorily controlled rate without segregation.

(1) **Truck Mixer:** Truck mixers shall be the revolving drum type, equipped with pressurized, calibrated tanks for carrying a portion of the mixing water.

Pick-up and throw-over blades in the mixing drum shall be replaced when worn beyond the limit recommended by the manufacturer. The contractor shall have available a copy of the manufacturer's design,

Exhibit C

NON-CERTIFIED COPY

**901.09**

showing dimensions and arrangements of blades in reference to original height and depth.

Only the prescribed and verifiable amount of water is permitted in the tank unless the tank is equipped with a device by which the quantity of water added can be readily verified.

Truck mixers shall be equipped with electrically or mechanically actuated revolution counters, which display the number of revolutions. Counters shall be located to provide safe and convenient inspection.

Each truck mixer shall have attached thereto in a prominent place a metal plate on which is plainly marked the uses for which the equipment is designed, the maximum rated capacity of the drum in terms of concrete volume and rotation speed for both agitating and mixing speeds.

Truck mixers shall be equipped with means for accurately measuring the amount of water used in each batch.

**(2) Agitator Hauling Equipment:**  Agitators shall be supplied with adequate mixing blades or paddles to agitate the mix and prevent segregation.  Covers shall be provided when directed.

Each agitator shall have attached thereto in a prominent place a metal plate on which is plainly marked the uses for which the equipment is designed, the maximum rated capacity in terms of concrete volume, and agitation speed.

**(3) Non-Agitator Hauling Equipment:**   The bodies of nonagitating hauling equipment shall be smooth, metal, and mortar tight containers.  Covers shall be provided when directed.

**(d) Portable Mixers:**   Portable mixers shall have a minimum capacity of one cubic yard (cu m) and shall be capable of uniformly mixing and discharging concrete without segregation.

## 901.10  BATCHING AND MIXING.

**(a) General:**  Concrete shall be thoroughly mixed in a mixer of an approved size and type, which will ensure uniform distribution of materials through the mass.

Pick-up and throw-over blades or mixing paddles in the mixing drum or mixing unit shall be replaced when worn beyond the limit recommended by the manufacturer.  The contractor shall have available a copy of the manufacturer's design, showing dimensions and arrangements of blades in reference to original height and depth.

Mixing operations shall begin within 30 minutes after addition of cement to the aggregates.  When cement is charged into a mixer drum containing surface-wet aggregate and the ambient temperature is above

738

Exhibit C

NON-CERTIFIED COPY

90°F (32°C), or when high early strength cement is used, this limit shall be reduced to 15 minutes. When there is an interruption to the mixing operations, the mixer shall be thoroughly cleaned.  The entire contents of the mixer shall be removed from the drum before materials for a succeeding batch are placed therein.  Materials composing a batch shall be deposited simultaneously in an operating mixer.  A portion of mixing water shall enter in advance of cement and aggregates.  No mixer having a rated capacity of less than one cubic yard (cu m) shall be used nor shall a mixer be charged in excess of its rated capacity.  The minimum size batch shall be one cubic yard (cu m).  Mixers with worn blades or excessive build-up will be rejected.  Concrete exposed to salt water or a corrosive environment shall be mixed for 2 minutes and the water content of the mixture shall be carefully controlled.

   **(b)  Central Plant and Site Mixing:**  Concrete shall be mixed for at least 50 seconds.  Mixing time shall begin after all materials, including water, are in the mixer.  Mixing time ends when the discharge chute opens.  The mixer shall be equipped with an approved timing device, which will automatically lock the discharge lever when the drum has been charged and release it at the end of the mixing period.  During mixing, the mixer shall be operated at a drum speed for which it has been designed as shown on the manufacturer's name plate on the mixer.

   **(c)  Truck Mixing:**  Aggregates, cement, fly ash, ground granulated blast furnace slag and microsilica for concrete shall be measured in accordance with Subsection 901.09 and charged into the drum at the proportioning plant.

   Size of batch in truck mixers shall not exceed the maximum rated mixing capacity of the mixer as stated by the manufacturer and stamped on a metal plate on the mixer.  When a truck mixer is used for complete mixing, each batch shall be mixed for not less than 70 nor more than 130 revolutions of the mixer drum at the rate of rotation designated as the mixing speed by the equipment manufacturer on the metal plate on the mixer.  Any additional mixing shall be at the speed designated by the equipment manufacturer as the agitating speed.  All materials, including mixing water, shall be in the mixer drum before actuating the revolution counter or taking an initial reading.

   When the prescribed amount of water is added at the batch plant and slump is on the low side at the jobsite it will be permissible to add a minimum of 75 percent of the mixing water at the time cement and aggregates are added at the batch plant and the remaining mixing water at the job site prior to discharging concrete into forms.  Water added at the

Exhibit C

NON-CERTIFIED COPY

**901.10**

job site may be added in 1 or 2 increments with additional mixing within the range of 20 to 30 revolutions at designated mixer speed for each increment; however, the total of 130 revolutions shall not be exceeded. Water added at the jobsite shall not cause the maximum allowable water-cement ratio or slump of the batch to be exceeded.

If water or superplasticizer is allowed to be added to a partial load, only a proportional amount will be added. The method of adding and mixing superplasticizer to the mix shall be in accordance with the manufacturer's recommendation. When the slump is more than the maximum specification limit, the batch will be rejected; additional mixing or agitation to reduce the slump will not be allowed even though the maximum time limit or number of revolutions have not been exceeded.

Slump tests, unit weight (mass), acceptance cylinders, and temperature measurements will not be made until all mixing water has been added to the batch.

**(d) Partial Mixing at Central Plant:** When partial mixing is allowed at a central plant, the mixing time at the central plant may be reduced to 30 seconds. Additional required mixing shall be completed in a truck mixer at mixing speed. Mixing time in the truck mixer shall be a minimum of 10 and a maximum of 70 revolutions.

**(e) Time Limitations:** The maximum allowable time from the addition of cement to the mix to complete discharge of the concrete shall be 90 minutes or a maximum of 300 revolutions, whichever may occur first. When transport is by non-agitator truck, the maximum allowable time from the addition of cement to the mix to complete discharge of the concrete shall be 45 minutes. In hot weather or any other conditions contributing to rapid loss of plasticity or uniformity of concrete, maximum allowable time may be reduced by the engineer.

**(f) Hauling Equipment:** Wet batches of concrete may be transported in a truck mixer, agitator or other approved equipment. Non-agitator trucks will not be allowed for structural concrete, but will be permitted for pavement concrete when air-entrainment admixture is used. Maximum volume of mixed concrete transported in an agitator truck at agitation speed shall be in accordance with the manufacturer's specified rating.

**(g) Portable Mixing:** Portable mixers shall be approved in writing for mixing one cubic yard (cu m) of concrete or less per day for minor structure concrete.

**(h) Delivery:** Sufficient plant capacity and transporting apparatus to insure delivery at the required rate shall be provided. Rate of concrete

Exhibit C

NON-CERTIFIED COPY

delivery during concreting operations shall be such as to provide for proper handling, placing and finishing of concrete and maintain a workable surface. Methods of delivering and handling concrete shall be such as will facilitate placing with a minimum of handling and without damage to the structure or concrete.

## 901.11 TEMPERATURE LIMITATIONS.

(a) **General:**   Air temperature and mix temperature shall be determined at the point of placement in the shade away from artificial heat.

(b) **Hot Weather Limitations:**  Hot weather limitations shall apply to concrete for:

(1) **Bridge Decks, Approach Slabs, and Mass Concrete:** Hot weather concreting practices will be required when the job site temperature in the shade and away from artificial heat is 80°F (27°C) and rising. When internal temperature of plastic concrete reaches 85°F (30°C), the contractor shall prevent the temperature of succeeding batches from going beyond 90°F (32°C) by approved methods. If necessary, forms shall be precooled by approved methods immediately prior to concrete placement.

(2) **Pavement Concrete:**   Internal temperature of the plastic concrete shall not exceed 95°F (35°C) at the time of placement.

(c) **Cold Weather Limitations:**  Mixing and concreting operations for concrete mixes not containing ground granulated blast-furnace slag or Type IS cement shall be discontinued when a descending air temperature in the shade and away from artificial heat reaches 40°F (5°C), and shall not be resumed until an ascending air temperature in the shade and away from artificial heat reaches 35°F (2°C) provided the high temperature forecasted by the U.S. Weather Service is above 40°F (5°C). For concrete mixes containing ground granulated blast-furnace slag or Type IS cement, operations shall be discontinued at a descending air temperature in the shade and away from artificial heat of 55°F (13°C) and can resume at a temperature of 50°F (10°C) and rising provided the high temperature forecasted by the U.S. Weather Service is above 55°F (13°C). Production shall not begin until the temperature at the point of placement is within the above limitations. Concrete shall not be placed if the U.S. Weather Service forecasts the temperature to be less than 35°F (2°C) within the 24 hour period following placement unless authorized in writing.

When concrete placement at lower air temperatures is authorized in writing, aggregates may be heated by either steam or dry heat prior to being placed in the mixer. The apparatus used shall heat the mass

Exhibit C

NON-CERTIFIED COPY

**901.11**

uniformly and shall be arranged to prevent occurrence of overheated areas. If the air temperature is less than 35°F (2°C) at the time of placing concrete, the engineer may require water or aggregates to be heated to not less than 70°F (20°C) nor more than 150°F (65°C). After placement, the concrete shall be protected by additional covering, insulating materials, or other methods approved by the engineer.

**901.12  ACCEPTANCE AND PAYMENT SCHEDULE.**  Acceptance and payment schedules in Table 901-5 will apply to all cast-in-place structural portland cement concrete.  Acceptance and payment schedules in Table 901-6 will apply to all minor structure portland cement concrete. Acceptance and payment schedules for portland cement concrete pavement are shown in Table 601-1 of Section 601.  These schedules do not apply to precast concrete.

742

Exhibit C

NON-CERTIFIED COPY


Table 901-3
Master Proportion Table for Portland Cement Concrete

| | Average Compressive Strength, psi (MPa) at 28 days | Grade of Coarse Aggregate | Min. Cement, lb/yd³ (kg/m³) of Concrete [9,14] | Maximum Water/Cement ratio, lb/lb (kg/kg) [1,9] | Total Air Content (Percent by volume) [4] | Slump Range [10], inches (mm) | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Non-Vibrated | Vibrated | Slip Form Paving [2] |
| **Structural Class [11]** | | | | | | | | |
| AA(M) | 4400 (30.4) | A, P | 560 (332) | 0.44 | 5±1 | 2-5 (50-125) | 2-4 (50-100) | N.A. |
| AA | 4200 (29.0) | A, P | 560 (332) | 0.44 | 5±1 | 2-5 (50-125) | 2-4 (50-100) | N.A. |
| A(M) | 4400 (30.4) | A, P | 510 (302) | 0.53 | 5±2 | 2-5 (50-125) | 2-4 (50-100) | N.A. |
| A | 3800 (26.2) | A, F [8], P | 510 (302) | 0.53 | 5±2 | 2-5 (50-125) | 2-4 (50-100) | 1-2.5 (25-65) |
| D | 3300 (22.8) | A, B, D, P | 420 (249) | 0.58 | 5±2 | 2-5 (50-125) | 1-3 (25-75) | N.A. |
| F | 3400 (23.5)[5] | A, P | 460 (273) | 0.44 | 5±1 | 2-5 (50-125) | 2-4 (50-100) | N.A. |
| P(X) | 7500 (51.7)[5] | A, F [8], P | 700 (415) | 0.40 | 5±2 | N.A. | 2-10 (50-250) | N.A. |
| P(M) | 6000 (41.4)[5] | A, F [8], P | 600 (356) | 0.44 | 5±2 | N.A. | 2-6 (50-150)[7] | N.A. |
| P | 5000 (34.5)[5] | A, F [8], P | 560 (332) | 0.44 | 5±2 | N.A. | 2-6 (50-150)[7] | N.A. |
| S | 3800 (26.2) | A, P | 650 (385) | 0.53 | 5±2 | 6-8 (150-200) | N.A. | N.A. |
| **Minor Structure Class [11]** | | | | | | | | |
| M | 3000 (20.7) | A, B, P | 470 (279) | 0.56 | 5±2 | 2-5 (50-125) | 2-4 (50-100) | 1-2.5 (25-65) |
| R | 1800 (12.4) | A, B, D, P | 370 (219) | 0.70 | 5±2 | 2-5 (50-125) | 2-4 (50-100) | N.A. |
| Y | 3000 (20.7) | Y | 560 (332) | [3] | 6-9 | N.A. | 1-3 (25-75) | N.A. |
| **Pavement Type [11]** | | | | | | | | |
| B | 4000 (27.6)[6] | N/A [13] | 475 (282) | 0.53 | 5±2 | N.A. | 2-4 (50-100) | 1-2.5 (25-65) |
| D | 4000 (27.6)[6] | N/A [13] | 450 (267) | 0.53 | 5±2 | N.A. | 2-4 (50-100) | 1-2.5 (25-65) |
| E | 4000 (27.6)[6] | A, F [12], P | 600 (356) | 0.40 | 5±2 | N.A. | 2-4 (50-100) | 1-2.5 (25-65) |

N.A. – Not Applicable

[1] Except for Class AA, AA(M), or F concrete, the maximum volume of water; gal. (L), shall be reduced 5 percent when a water-reducing admixture is used, and 10 percent when an air-entraining admixture, or air-entraining and water-reducing admixtures, is used.  When the coarse aggregate portion of the mix is 100 percent crushed aggregate, the water may be increased by 5 percent provided the maximum water listed in Table 901-3 is not exceeded.

[2] Also slump range for other concrete placed by extrusion methods.

[3] Refer to Subsection 901.08(c).

[4] Total air content ranges when air-entrainment is allowed or specified.  Air content shall be designed at midrange.  See Subsection 901.08(b).

[5] Values shown represent the minimum compressive strengths allowed.

[6] Average compressive strengths for Pavement Type concrete shall be 3600 psi (25.0 MPa) when air-entrainment is used.

[7] No more than a 2 inch (50 mm) slump differential for any design pour.

[8] Grade F coarse aggregate shall be used only when specified or permitted.  The minimum cement content shall be increased when this aggregate is used.

[9] For mixes including partial replacement of cement with fly ash or ground granulated blast furnace slag, the minimum cement and maximum water contents shown apply to the total cement and fly ash or ground granulated blast furnace slag content of the mix.  Additional cement may be required to achieve minimum compressive strength.

[10] When a slump range is specified in other sections, that range shall govern.

[11] See Subsection 901.08(a) for allowable types of cement.

[12] For use in partial depth patching.

[13] Aggregate grading shall comply with the requirements of Subsection 1003.02(c).

[14] The minimum cement factors may be waived in writing by the District Laboratory Engineer in accordance with Subsection 901.06(a).

NON-CERTIFIED COPY

743

Exhibit C

**Table 901-4**
**Over-Design to Meet Compressive Strength Requirements[1]**

| Number[2,3,5] of Tests | Standard Deviation, psi (MPa)[4] | | | | |
|---|---|---|---|---|---|
| | 300 (2.1) | 400 (2.8) | 500 (3.4) | 600 (4.1) | 700 (4.8) |
| | Additional Compressive Strength, psi (MPa) | | | | |
| 15-19 | 470 (3.2) | 620 (4.3) | 850 (5.9) | 1,120 (7.7) | 1,390 (9.6) |
| 20-29 | 430 (3.0) | 580 (4.0) | 760 (5.2) | 1,010 (7.0) | 1,260 (8.7) |
| 30 or More | 400 (2.8) | 530 (3.7) | 670 (4.6) | 900 (6.2) | 1,130 (7.8) |

[1]When designing the mix, add the tabulated amounts to the average compressive strength at 28 days shown in Table 901-3.

[2]Number of tests of a concrete mixture used to estimate the standard deviation of a concrete production facility. Test of another mix within 1,000 psi (6.9 MPa) of the specified strength may be used.

[3]If less than 15 prior tests are available the over-design should be 1,000 psi (6.9 MPa) for specified strength less than 3,000 psi (20.7 MPa), 1,200 psi (8.3 MPa) for specified strengths from 3,000 to 5,000 psi (20.7 to 34.5 MPa) and 1,400 psi (9.7 MPa) for specified strengths greater than 5,000 psi (34.5 MPa).

[4]Interpolation between standard deviations is required.

[5]A strength test result is defined as the average strength of all specimens of the same age, fabricated from a sample taken from a single batch of concrete. A strength test cannot be based on only one cylinder; a minimum of two cylinders is required for each test.

744

Exhibit C

NON-CERTIFIED COPY

**Table 901-5E**
**Acceptance and Payment Schedules**
**Cast-In-Place Structural Concrete**

| Average Compressive Strength per Lot, psi (28 to 31 days) | | | | | |
|---|---|---|---|---|---|
| Class A or S | Class AA | Class A(M) or AA(M) | Class D | Class F | Percent of Contract Price[1] |
| 3800 & above | 4200 & above | 4400 & above | 3300 & above | 3400 & above | 100 |
| 3400-3799 | 3800-4199 | 4200-4399 | 3000-3299 | --- | 98 |
| 3000-3399 | 3500-3799 | 4000-4199 | 2500-2999 | --- | 90 |
| below 3000 | Below 3500 | below 4000 | below 2500 | below 3400 | 50 or remove and replace[2] |

**Table 901-5M**
**Acceptance and Payment Schedules**
**Cast-In-Place Structural Concrete**

| Average Compressive Strength per Lot, MPa (28 to 31 days) | | | | | |
|---|---|---|---|---|---|
| Class A or S | Class AA | Class A(M) or AA(M) | Class D | Class F | Percent of Contract Price[1] |
| 26.2 & above | 29.0 & above | 30.4 & above | 22.8 & above | 23.5 & above | 100 |
| 23.5- 26.1 | 26.2-28.9 | 29,0-30.3 | 20.7-22.7 | --- | 98 |
| 20.7-23.4 | 24.1-26.1 | 27.6-28.9 | 17.2-20.6 | --- | 90 |
| Below 20.7 | below 24.1 | below 27.6 | below 17.2 | below 23.5 | 50 or remove and replace[2] |

[1]When concrete is part of an item or not a direct pay item, lot sizes, sampling and acceptance testing for the required quantities will be in accordance with Subsection 805.18. The value for each cubic yard (cu m) required will be assessed at $350 ($460) for the purpose of applying payment adjustment percentages. The amount of payment adjustment for the quantity of concrete involved will be deducted from payment.

Acceptance and payment schedules shall apply to the contract item itself for cast-in-place piling.

[2]When the average compressive strength of **any batch in a lot** is less than 4000 psi (27.6 MPa) for Class A(M) or AA(M), less than 3500 psi (24.1 MPa) for Class AA, less than 3000 psi (20.7 MPa) for Class A or S, less than 2500 psi (17.2 MPa) for Class D, or less than 3400 psi (23.5 MPa) for Class F, an investigation will be made. If concrete is allowed to remain in place, payment will be based on the average compressive strength for the lot. If concrete is not allowed to remain in place, the identifiable deficient areas shall be removed and replaced at no direct pay.

When the average compressive strength for a **lot** is less than 4000 psi (27.6 MPa) for Class A(M) or AA(M), less than 3500 psi (24.1 MPa) for Class AA, less than 3000 psi (20.7 MPa) for Class A or S, less than 2500 psi (17.2 MPa) for Class D, or less than 3400 psi (23.5 MPa) for Class F, an investigation will be made. If concrete is allowed to remain in place, payment for the lot will be based on 50 percent of the contract price.

Any cores obtained in these investigations will be used for evaluation purposes only and payment will be based on original acceptance samples.

745

Exhibit C

NON-CERTIFIED COPY

### Table 901-6E
### Acceptance and Payment Schedules
### Cast-In-Place Minor Structure Concrete

| Average Compressive Strength, psi (28 to 31 days) | | |
|---|---|---|
| Class M or Y | Class R | Percent of Contract Price [1] |
| 3000 & Above | 1800 & Above | 100 |
| Below 3000 | Below 1800 | 50 or Remove [2] |

### Table 901-6M
### Acceptance and Payment Schedules
### Cast-In-Place Minor Structure Concrete

| Average Compressive Strength, MPa (28 to 31 days) | | |
|---|---|---|
| Class M or Y | Class R | Percent of Contract Price [1] |
| 20.7 & Above | 12.4 & Above | 100 |
| Below  20.7 | Below 12.4 | 50 or Remove [2] |

[1]When concrete is part of an item or not a direct pay item, sampling and acceptance testing for the required quantities shall be in accordance with this section.  The value for each cubic yard (cu m) of concrete required will be assessed at $350 ($460) for the purpose of applying payment adjustment percentages.  The amount of payment adjustment for the quantity of concrete involved will be deducted from payment.

[2]When the average compressive strength is less than 3,000 psi (20.7 MPa) for Class M or Y, and 1,800 psi (12.4 MPa) for Class R, an investigation will be made.  If concrete is allowed to remain in place, payment will be based on 50 percent of the contract price.

Any cores obtained in these investigations will be used for evaluation purposes only.  Payment will be based on original acceptance samples.

746

Exhibit C

NON-CERTIFIED COPY

NON-CERTIFIED COPY

Exhibit D



NON-CERTIFIED COPY

Exhibit D



NON-CERTIFIED COPY

Exhibit D



POSTED

JUL - 5 2017

COST OK Amt. _____

JUL 03 2017

BY _____
DY CLERK OF COURT

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308    DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | PARISH OF EAST BATON ROUGE |
| | * | |
| URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON AND THOMAS E. RYAN, III | * | STATE OF LOUISIANA |
| | * | |
| | * | |
| | * | |



### REPLY MEMORANDUM IN SUPPORT OF MOTION TO CONTINUE TRIAL

MAY IT PLEASE THE COURT:

Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas Ryan, III (collectively referenced herein as "Defendants") respectfully submit this Reply Memorandum in Support of their Motion to Continue Trial, as follows:

On June 9, 2017, Defendants filed a Motion to Continue Trial based on three main grounds: (1) a previously scheduled trial date for lead trial counsel, Philip A. Franco that directly conflicts with the August 16, 2017 trial date in this matter; (2) Defendants' pending motion for protective order which seeks to prevent the use of testing conducted after the discovery cutoff without leave of court; and (3) URS's pending writ application relative to its motion for summary judgment which is before the First Circuit.

H&E responded that it disagrees with Defendants' reasons for a continuance, but, importantly, H&E has not indicated that it would, in any way be, prejudiced by the reasonable continuance requested by Defendants. On the contrary, a continuance would help all parties to, *inter alia*, assure that they do not expend the resources

REC'D C.P.

JUL 1 0 2017

1

REC'D C.P.

JUL - 5 2017

NON-CERTIFIED COPY

necessary to try a matter when any verdict could potentially be upset by the First Circuit's decision on URS's pending writ application.

In response to Defendants' assertion that lead trial counsel Philip A. Franco has a pre-existing, conflicting trial date in the *Entergy v. Lapeze* matter, H&E complains that this suit filed in 2013, while *Entergy v. Lapeze*, an expropriation case, was filed in March 2017.[1] But this argument ignores that expropriation cases are required by statute to go to trial almost immediately. Under La. R.S. 19:5, "upon the institution of a suit for expropriation, the trial court shall issue an order fixing the time of the trial of the suit which shall not be less than sixty days from the filing of the suit." As such, the comparison of this ordinary proceeding and the *Entergy v. Lapeze*, an expropriation matter is misguided. Additionally, the trial date in *Entergy v. Lapeze* should take priority because it was established before this Court set a trial date in this matter.

Furthermore, while H&E's cites the *belief* of opposing counsel that the trial in *Entergy v. Lapeze* will be continued, there has been no agreement to extend the trial date in that matter. Notably, at the time of filing of this Reply Memorandum, no continuance has been sought in *Entergy v. Lapeze*, and it is thus scheduled to proceed on the conflicting August trial date(s).

Next, H&E argues that Defendants have not been prejudiced by H&E's late Ground Penetrating Radar (GPR) testing that forms part of the basis for Defendants' Motion for Protective Order, which has yet to be decided. But H&E cannot brazenly violate this Court's scheduling order with impunity by insisting (incorrectly) that there is no prejudice to the other side. Clearly, H&E knows that leave of Court is required to relax a deadline. That is why H&E previously sought leave to add an expert after the

---

[1] Pltff. Opp. to Mot to Cont. at p.1.

2

NON-CERTIFIED COPY

deadline for so doing had passed.    Additionally, contrary to H&E's self-serving

statement, its use of the untimely GPR testing at trial would be prejudicial to

Defendants, particularly if Defendants are not permitted to obtain experts to analyze

and provide opinions as to the data from the GPR testing.  This would likely necessitate

additional expert reports and depositions, which, would be very difficult to schedule

given the impending trial date.

Finally, in response to Defendants' argument that the pending writ application

with respect to URS's motion for summary judgment has yet to be decided by the First

Circuit, H&E notes that Defendants did not seek a stay in the writ application.  But it

was unnecessary, and would have been inappropriate, to request a stay at the time that

the writ application was filed because at that time there was not yet a trial date in this

case.  As H&E noted, Defendants properly notified the First Circuit of the trial setting.

It is inappropriate to rush towards trial in a case in which a trial will be unnecessary if

the First Circuit grants the relief sought by Defendants.[2]

Accordingly, Defendants' Motion to Continue Trial should be granted.

Respectfully submitted,

**ADAMS AND REESE, LLP**

Philip A. Franco    (Bar #5819), TA
Ron Sholes        (Bar # 14436)
Kellen J. Mathews    (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210

**ATTORNEYS FOR DEFENDANTS, URS
CORPORATION ARCHITECTURE, P.C.;
URS CORPORATION; L. O'NEAL RYAN
AND THOMAS E. RYAN, III**

FILED
EAST BATON ROUGE PARISH, LA
2017 JUL -3  PM 3: 36
DEPUTY CLERK OF COURT

---

[2] To the extent this Court believes that the proper relief to be afforded under the circumstances is a stay
of the litigation rather than a continuance, Defendants do not object to stay of this matter until the First
Circuit has ruled on URS's pending writ application.

3

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been served upon all counsel of record via United States mail, properly addressed, and first class postage prepaid and via email, this the 3rd day of July, 2017.

_____
Kellen J. Mathews

FILED
EAST BATON ROUGE PARISH, LA
2017 JUL -3 PH 3: 36
DEPUTY CLERK OF COURT

4

NON-CERTIFIED COPY

**FishmanHaygood**

Fishman Haygood LLP
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170
fishmanhaygood.com

LORETTA G. MINCE
PARTNER
(504) 586-5273
LMINCE@FISHMANHAYGOOD.COM

**POSTED**

July 6, 2017

JUL - 7 2017

File No. 3107-04

COST OK $ _150.⁰⁰ + 3200.⁰⁰_
CH 71638 + 71639
JUL 07 2017

DEPUTY CLERK OF COURT

___Via__ Federal Express_

The Hon. J. Douglas Welborn
Clerk, 19th JDC, East Baton Rouge
300 North Blvd.
Baton Rouge, Louisiana 70801

Re:    *H&E Equipment Services, Inc. v. URS Corporation Architecture, P.C., et al*
       19th JDC, Parish of East Baton Rouge, Docket No. 626308, Sec. "D"

Dear Mr. Welborn:

Enclosed please find our firm's checks for jury trial deposit (1) in the amount of $150.00 as "Juror filing fees" and (2) in the amount of $3,200.00 for the estimate of a four day jury trial.

Also enclosed, is a copy of the Notice of Jury Trial and Jury Order dated May 24, 2017 regarding the above subject matter.

Respectfully,

Lori Mince

LGM/ccm
cc: Philip A. Franco, Esq. (*via* philip.franco@arlaw.com)


DEPUTY CLERK OF COURT

EBR4187694

1

1207123v.1

NON-CERTIFIED COPY

ORIGIN ID:NEWA      (504) 586-5252
LORETTA G. MINCE
FISHMAN HAYGOOD, L.L.P.
201 SAINT CHARLES AVE
STE 4600
NEW ORLEANS, LA 70170
UNITED STATES US

SHIP DATE: 06JUL17
ACTWGT: 0.50 LB
CAD: 5347965/INET3850

BILL SENDER

TO  THE HONORABLE DOUG WELBORN
    19TH JUDICIAL DISTRICT COURT
    300 NORTH BLVD

    BATON ROUGE LA 70801
    (504) 586-5297          REF. 3107-04
    INV
    PO                          DEPT.




FedEx
Express

FRI - 07 JUL 3:00P
STANDARD OVERNIGHT

TRK#
0201   7795 7326 0492

42 OPLA          70801
          LA-US   MSY



NON-CERTIFIED COPY

*Cal'd*

**19TH JUDICIAL DISTRICT COURT**
**PARISH OF EAST BATON ROUGE**
**STATE OF LOUISIANA**

**24-MAY-2017**

TO:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS, LA 70170-4600

**H&E EQUIPMENT SRVCS VS URS CORP ARCHITECTURE ETAL**

**CASE NUMBER:** C626308

**JUDGE:** JANICE CLARK

**DIVISION:** Division D **ROOM:** 10A

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING ACTION FOR THE

AFOREMENTIONED CASE ON 16-AUG-2017 AT

09:30:00 AM FOR JURY TRIAL.

COMMENTS: 3 DAY JURY TRIAL - SECOND SETTING.  JURY ORDER ENCLOSED.
SPECIAL JURY CHARGES/VERDICT FORMS DUE 8/1/17.

                    TYPE YOUR NAME
                    JUDICIAL ASSISTANT TO JUDGE
                    JANICE CLARK

NOTIFIED:
ATY - ROY CLIFTON CHEATWOOD
ATY - PHILIP ANTHONY FRANCO
ATY - ANNE DERBES WITTMANN
ATY - M DAVID KURTZ
ATY - LORETTA G MINCE
ATY - EDWARD J LAPEROUSE
JDG - JANICE CLARK
ATY - LAURA E CARLISLE
ATY - KELLEN J MATHEWS
ATY - REBECCA SHA

Form 4501

NON-CERTIFIED COPY

# 19TH JUDICIAL DISTRICT COURT

# THE PARISH OF EAST BATON ROUGE

# STATE OF LOUISIANA

NUMBER: 626,308     DIV. D

H + E

VERSUS

URS

# JURY ORDER

CONSIDERING the above and foregoing application, in accordance with LSA-R.S.13:3049, LSA-C.C.P. 1734 and LSA-C.C.P. 1734.1:

IT IS ORDERED that movers for the jury trial deposit an amount of $150.00 cash as "Juror filing fees" and $2,000.00 cash for the first day and $400.00 cash for each day the trial is estimated to last, for a minimum four (4) day jury trial.

IT IS FURTHER ORDERED that said cash deposits shall be deposited with the Clerk of Court no later than 30 days prior to trial. The receipt for the deposit shall be presented to the Court immediately thereafter. If the deposit is not timely made, any other party shall have an additional ten (10) days to make the required deposit. Failure to post cash deposits shall constitute a waiver of a trial by jury.

Baton Rouge, Louisiana, this 24 day of May, 2017.

JUDGE JANICE CLARK

PLEASE SERVE ALL PARTIES

NON-CERTIFIED COPY

6801-17-001690



# CIVIL SUBPOENA

| | |
|---|---|
| **H&E EQUIPMENT SERVICES INC**<br>(Plaintiff) | **NUMBER    C626308 Division D** |
| | **19th JUDICIAL DISTRICT COURT** |
| **vs.** | **PARISH OF EAST BATON ROUGE** |
| **URS CORPORATION ARCHITECTURE PC ET AL**<br>(Defendant) | **STATE OF LOUISIANA** |

TO:    STEPHAN DORSEY          OR      5227 RIVERBEND BLVD.
        MILTON WOMACK, INC.                        BATON ROUGE, LA.  70820
        8400 JEFFERSON HIGHWAY
        BATON ROUGE, LA.  70809

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM,** Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **07-JUL-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

## SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**  After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of East Baton Rouge, this _____ day of _____, 20_____.

SERVICE:      $_____
MILEAGE       $_____                        _____
TOTAL:         $_____                        Deputy Sheriff

JUL 1 3 2017

I made service on the named party

by tendering a copy of this document to

*Mark Gallegos    (Admin)*
*B James 0283*

**Deputy Sheriff, Parish of East Baton Rouge, Louisiana**

EBR4048535

EBR4209542

NON-CERTIFIED COPY

6801-17-001690

# CIVIL SUBPOENA

| | |
|---|---|
| **H&E EQUIPMENT SERVICES INC**<br>(Plaintiff)<br><br>vs.<br><br> **URS CORPORATION ARCHITECTURE PC ET AL**<br>(Defendant) | **NUMBER**    C626308 **Division D**<br><br>**19th JUDICIAL DISTRICT COURT**<br><br>**PARISH OF EAST BATON ROUGE**<br><br>**STATE OF LOUISIANA** |

TO:    **STEPHAN DORSEY**          OR        **5227 RIVERBEND BLVD.**
        **MILTON WOMACK, INC.**                  **BATON ROUGE, LA.  70820**
        **8400 JEFFERSON HIGHWAY**
        **BATON ROUGE, LA.  70809**

      You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

      You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **KELLEN J MATHEWS**, Attorney.)

      IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

      Ordered by the Court on **07-JUL-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

**SERVICE INFORMATION:**

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:**  On the party herein named at _____.

**DOMICILIARY SERVICE:**  On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**   After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of East Baton Rouge, this _____ day of _____, 20_____.

| | |
|---|---|
| SERVICE:     $_____ | |
| MILEAGE    $_____ | _____ |
| TOTAL:       $_____ | Deputy Sheriff |

EBR4209542

NON-CERTIFIED COPY

H&E EQUIPMENT SERVICES          *       SUIT NO. 626,308      DIV.: D

                                    *       19TH JUDICIAL DISTRICT COURT

VERSUS                          *

                                    *       PARISH OF EAST BATON ROUGE

URS CORPORATION                 *
ARCHITECTURE, P.C., URS                 STATE OF LOUISIANA
CORPORATION, L. O'NEAL          *
JOHNSON AND THOMAS E. RYAN,     *
III                             *

COST OK Amt. 440
JUL 07 2017
BY _____
DY CLERK OF COURT

DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION TO STAY
FURTHER PROCEEDINGS

MAY IT PLEASE THE COURT:

Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal

Johnson and Thomas E. Ryan, III (collectively referenced herein as "Defendants"),

respectfully submit this Memorandum in Support of their Motions to Stay Further

Proceedings, as follows:

<div align="center">SUMMARY</div>

Defendants move this Court to stay the above-captioned proceedings, pending a

ruling by the Louisiana First Circuit Court of Appeal on Defendants' pending

application for a supervisory writ bearing No. 2017-CW-0476 relative to Defendants'

motion for summary judgment.  At issue in the pending writ application is a matter of

law: whether the Short Form Master Agreement for Professional Services Between H&E

Equipment Services, Inc. and URS Corporation Architecture PC (the "2009 Contract")

applies to the Baton Rouge and Belle Chasse sites, in addition to the Kenner site as this

Court already held.  A decision by the First Circuit that the 2009 Contract applies to all

three H&E facilities would obviate the need for trial altogether since Sections 4.1 and 4.2

of the 2009 Contract clearly and unambiguously limit H&E's remedy against URS to re-



NON-CERTIFIED COPY

performance of design services and, here, H&E only seeks monetary damages. Thus, if this matter is allowed to proceed to trial without a decision by the First Circuit on Defendants' writ application, there is a considerable risk of an unnecessary waste of judicial resources trying a case that should have been decided as a matter of law.

Likewise, Defendants seek a stay of the above-captioned proceedings, pending a ruling by the Louisiana First Circuit Court of Appeal on the applications for supervisory writs with respect to the Court's July 6, 2017 denying Defendants' Motion to Continue and Motions in Limine to Strike Expert Reports and to Exclude Proposed Testimony of James R. ("Bob") Bailey and Wallace C. Drennan, III. Defendants will also request expedited consideration of these writ applications. The First Circuit's decision with respect to the Motions in Limine could alter the complexion of the trial dramatically, and, as such, a stay pending the outcome of the same is in order.

Additionally, a stay is appropriate pending this Court's decision on Defendants' Motion for Protective Order seeking to prohibit the use of ground penetrating radar testing ("GPR testing") on the Baton Rouge and Kenner sites at issue, which were conducted by Plaintiff after all applicable deadlines set by this Court had passed and after all expert opinions and reports were prepared and expert depositions had been taken[1]. As such, Defendants have been prejudiced based on the uncertainty as to whether the Court will permit H&E to introduce, at trial, the untimely GPR testing. Allowing use of this untimely GPR testing would in turn require additional expert discovery including re-evaluation of opinions previously rendered by experts in light of the GPR test data, the exchange of further expert reports and depositions; essentially a complete re-set of expert discovery.

---

[1] Promptly upon being apprised of H&E's intent to conduct the GPR testing, on October 27, 2016, Defendants sought an order excluding this untimely testing, but to date has yet to receive a ruling from the Court. Then, immediately upon the setting of this matter for trial, Defendants filed a motion to continue the trial based, *inter alia*, on the need for a ruling on the October 27, 2016 motion for protective order and to enforce case management order.

2

NON-CERTIFIED COPY

## LAW & ARGUMENT

Louisiana district courts "possess inherently all of the power necessary for the exercise of its jurisdiction even though not granted expressly by law." La. Code Civ. Proc. art. 191. Moreover, "[t]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Transamerica Ins. Co. v. Whitney Nat. Bank of New Orleans*, 251 La. 800, 809, 206 So.2d 500, 503 (La. 1968), *quoting Landis v. North American Co.*, 299 U.S. 248, 57 S.Ct. 163, 81 L. Ed. 153 (1936). Under La. Ct. App. Unif. R. 4-4, "When an application for writs is sought, further proceedings may be stayed at the trial court's discretion."

Here, as noted above, Defendants have made a timely application for supervisory writs, which is currently pending before the First Circuit Court of Appeal. Here, judicial economy clearly favors a stay of these proceedings pending the First Circuit's decision. As noted above, if the First Circuit grants Defendants' writ application and determines that the 2009 Contract applies to H&E's Baton Rouge and Belle Chasse locations in addition to the Kenner location, the limitation of liability language in the 2009 Contract bars any remedy other than re-performance. This would foreclose all of the remedies sought by H&E in this case, which remedies are expressly limited to monetary damages. Should the trial of this matter commence before the First Circuit issues its decision on Defendants' writ application, the trial could consist of the presentation of evidence that may be rendered immaterial by the First Circuit, thereby wasting the judicial resources of this Court. Defendants and H&E likewise will have

NON-CERTIFIED COPY

been prejudiced in the preparation and presentation of their cases to the extent they will be forced to litigate issues that may be mooted by the First Circuit.

Likewise, Defendants will be filing applications for supervisory writs with respect to this Court's July 6, 2017 denial of Defendants' Motion to Continue and Motions in Limine to Strike Expert Reports and to Exclude Proposed Testimony of James R. ("Bob") Bailey and Wallace C. Drennan, III.  Defendants will also request consideration of these writ applications on an expedited basis.  It would be practical to await a decision by the First Circuit on these writ applications since a ruling here could result in exclusion of one or both of H&E's experts.

Absent a stay and continuance of the trial date, Defendants will further be prejudiced to the extent this case proceeds to trial without a ruling on Defendants' Motion for Protective Order, which asks this Court to bar H&E from introducing at trial the results of its untimely GPR testing.  A stay of this these proceedings (including the trial date) will allow the Court sufficient time to consider and rule on this motion. Without such a ruling, Defendants will be left with no  guidance as to whether H&E will be permitted to introduce the untimely GPR testing at trial and whether further expert discovery must be undertaken -including the consideration of the GPR testing results by experts, exchange of reports and taking of expert depositions-  in preparation for the August 16th trial date.

H&E, in contrast, will not be prejudiced by a stay.  First, the ruling on Defendants' writ applications would provide certainty as to the issues, evidence and testimony properly before the trier of fact for trial, thereby ensuring that neither party, including H&E, expends resources preparing for and litigating issues that ultimately may be mooted by the First Circuit's decision.

4

NON-CERTIFIED COPY

In accordance with La. Ct. App. Unif. R. 4-4, Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III, respectfully move for a stay of these proceedings, including the August 16, 2017 trial date, until the First Circuit Court of Appeal has rendered a decision on Defendants' applications for supervisory writs, and until this Court renders a decision as to whether H&E will be permitted to present the GPR testing at issue in Defendants' motion for protective order.

## CONCLUSION

Defendants seek a stay of further proceedings in this matter, including the August 16, 2017 trial date, until the First Circuit renders its decision on Defendants' writ application with respect to Defendants' motion for summary judgment and on the applications for supervisory writs with respect to Defendants' Motion to Continue and Motions in Limine to Strike Expert Reports and to Exclude Proposed Testimony of James R. ("Bob") Bailey and Wallace C. Drennan, III. Additionally, Defendants seek a stay of further proceedings until after this Court has ruled on whether H&E will be permitted to rely on its GPR testing at trial. Resolution of these issues will have a direct and very significant impact on the entire complexion of this case. Proceeding without decisions on these issues would not be in the interest of judicial economy, nor would it be in the personal interest of either party to this action. Finally, Defendants note that in keeping with the interests of judicial economy and avoidance of prejudice to the parties, Defendants intend to seek expedited consideration of all writ applications.

NON-CERTIFIED COPY

Respectfully submitted,

ADAMS AND REESE, LLP

Philip A. Franco      (Bar #5819), TA
Ron Sholes           (Bar # 14436)
Kellen J. Mathews    (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210

**ATTORNEYS FOR DEFENDANTS, URS CORPORATION ARCHITECTURE, P.C.; URS CORPORATION; L. O'NEAL RYAN AND THOMAS E. RYAN, III**

FILED
EAST BATON ROUGE PARISH LA
2017 JUL -7  AM 11: 29
DEPUTY CLERK OF COURT

6

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been served upon all counsel of record via United States mail, properly addressed, and first class postage prepaid and/or via email, this the 7th day of July, 2017.

Kellen J. Mathews

FILED
EAST BATON ROUGE PARISH, LA

2017 JUL -7  AM 11: 29

DEPUTY CLERK OF COURT

7

NON-CERTIFIED COPY

COST OK Amt. _____

JUL 07 2017

BY_____
DY CLERK OF COURT

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308    DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | STATE OF LOUISIANA |
| ARCHITECTURE, P.C., URS | | |
| CORPORATION, L. O'NEAL | * | |
| JOHNSON AND THOMAS E. RYAN, | * | |
| III | | |

## DEFENDANTS' NOTICE OF INTENT TO SEEK SUPERVISORY WRIT

TO:    Honorable Janice G. Clark
       District Judge, 19th Judicial District Court
       Parish of East Baton Rouge
       300 North Boulevard
       Baton Rouge, LA  70802

       **H&E Equipment Services, Inc.**
       Through its Counsel of Record
       Brent B. Barriere
       Loretta G. Mince
       Rebecca Sha
       Fishman Haygood LLP
       201 St. Charles Avenue – 46th Floor
       New Orleans, LA 70170

       Pursuant to Rule 4-2 of the Uniform Rules of Louisiana Courts of Appeal,

defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson

and Thomas E. Ryan, III (collectively referenced herein as "Defendants"), hereby give

notice of their intention to apply to the Court of Appeal, First Circuit, for a supervisory

writ seeking review of this Court's July 6, 2017 ruling in open court, which DENIED

Defendants' Motion In Limine to Strike Expert Reports and to Exclude Proposed

Testimony of Wallace C. Drennan, III.

1

NON-CERTIFIED COPY

In accordance with La. Ct. App. Unif. R. 4-3, Defendants request that this Court

set a return date of July 11, 2017 by which the application is to be filed in the Court of

Appeal.

July 7, 2017.

Respectfully submitted,

ADAMS AND REESE, LLP

_____

Philip A. Franco    (Bar #5819), TA
Ron Sholes    (Bar # 14436)
Kellen J. Mathews    (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210

**ATTORNEYS FOR DEFENDANTS, URS CORPORATION ARCHITECTURE, P.C.; URS CORPORATION; L. O'NEAL RYAN AND THOMAS E. RYAN, III**



FILED
EAST BATON ROUGE PARISH, LA

2017 JUL -7 AM 11: 35

DEPUTY CLERK OF COURT

2

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been served upon all counsel of record via United States mail, properly addressed, and first class postage prepaid and/or via email, this the 7th day of July, 2017.

_____
Kellen J. Mathews



3

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308     DIV.: D |
|---|---|---|
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA |
| CORPORATION, L. O'NEAL | * | |
| JOHNSON AND THOMAS E. RYAN, | * | |
| III | * | |

## ORDER

Considering the Notice Of Intent to Seek a Supervisory Writ filed on behalf of defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III, this Court hereby sets a return date of July 11, 2017, by which the application for a supervisory writ is to be filed in the Court of Appeal.

Baton Rouge, Louisiana, July 10, 2017.

HONORABLE JANICE CLARK, JUDGE
19th Judicial District Court

I hereby certify that on this day a notice of the above judgement was mailed by me, with sufficient postage affixed, to: Chestwood, Franco, Wittmann, Mince;
'Done and signed on 7-12-17
Kirsty Laperouse, Corleste
Matthews, the Jo Knight
Deputy Clerk of Court

FILED
EAST BATON ROUGE PARISH, LA
2017 JUL -7 AM 11: 35
DEPUTY CLERK OF COURT

1

NON-CERTIFIED COPY

**19TH JUDICIAL DISTRICT COURT**
**PARISH OF EAST BATON ROUGE**
**STATE OF LOUISIANA**

**11-JUL-2017**

TO:    HON JANICE CLARK
       19TH JUDICIAL DISTRICT COURT
       300 NORTH BLVD, RM 10A
       BATON ROUGE, LA 70802


H&E EQUIPMENT SRVCS VS URS CORP ARCHITECTURE ETAL

**CASE NUMBER:** C626308

**JUDGE:** JANICE CLARK

**DIVISION:** Division D


YOU ARE HEREBY NOTIFIED OF THE FOLLOWING ACTION FOR THE

AFOREMENTIONED CASE: THREE ORDERS ON DEFENDANTS' NOTICE OF INTENT
TO SEEK SUPERVISORY WRITS ENCLOSED


                          EILEEN KNIGHT
                          JUDICIAL ASSISTANT TO JUDGE
                          JANICE CLARK


NOTIFIED:

ATY - ROY CLIFTON CHEATWOOD
ATY - PHILIP ANTHONY FRANCO
ATY - ANNE DERBES WITTMANN
ATY - M DAVID KURTZ
ATY - LORETTA G MINCE
ATY - EDWARD J LAPEROUSE
JDG - JANICE CLARK
ATY - LAURA E CARLISLE
ATY - KELLEN J MATHEWS
ATY - REBECCA SHA


Form 4522

NON-CERTIFIED COPY

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308     DIV.: D |
| | * | |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| | * | |
| URS CORPORATION | * | PARISH OF EAST BATON ROUGE |
| ARCHITECTURE, P.C., URS | * | |
| CORPORATION, L. O'NEAL | * | STATE OF LOUISIANA |
| JOHNSON AND THOMAS E. RYAN, | * | |
| III | * | |

## DEFENDANTS' MOTION FOR EXPEDITED CONSIDERATION OF MOTION TO STAY FURTHER PROCEEDINGS

NOW INTO COURT through undersigned counsel come, Defendants, URS Corporation Architecture, P. C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III (collectively referred to as "Defendants"), who move this Court for expedited consideration of their motion to stay further proceedings, as follows:

1.

Defendants filed this motion to stay further proceedings, including the August 16, 2017 trial date, in the above-captioned matter pending a ruling by the Louisiana First Circuit Court of Appeal on Defendants' pending application for a supervisory writ bearing No. 2017-CW-0476 relative to Defendants' motion for summary judgment.

2.

As noted in the motion to stay, a final decision on the issues currently before the First Circuit could obviate the need for presentation of many of the issues in this case to a jury, and as such if the matter proceeds to trial there is a considerable risk of an unnecessary waste of judicial resources and prejudice to the parties.

3.

Additionally, Defendants seek a stay in order to allow the First Circuit Court of Appeal to address the applications for supervisory writs that Defendants will file with

1

REC'D C.P.
JUL 13 2017

NON-CERTIFIED COPY

respect to the Court's July 6, 2017 rulings denying Defendants Motion to Continue and Motions in Limine to Strike Expert Reports and to Exclude Proposed Testimony of James R. ("Bob") Bailey and Wallace C. Drennan, III.  Defendants will also request expedited consideration of these writ applications.

4.

Finally, a stay is further appropriate pending this Court's decision on Defendants' Motion for Protective Order seeking to prohibit the use of ground penetrating radar testing ("GPR testing") on the Baton Rouge and Kenner H&E sites at issue in this case, which were conducted by Plaintiff after all applicable deadlines set by this Court had passed and after all expert opinions and reports were prepared and expert depositions had been taken.  Thus, Defendants have potentially been prejudiced due to the uncertainty as to whether the Court will permit H&E to use the untimely GPR testing, which would in turn require additional discovery (including the further evaluation of prior expert opinions in light of GPR testing data, exchange of expert reports and taking of depositions); essentially a complete re-set of expert discovery in the waning days before trial.

5.

Given the impending August 16, 2017 trial date, URS requests expedited consideration of this motion to stay further proceedings in order to avoid the unnecessary fees and expenses associated with preparing for and trying a case that could be completely altered at any moment by the First Circuit's decision on Defendants' application for supervisory writs and/or this Court's ruling on Defendants' Motion for Protective Order.

2

NON-CERTIFIED COPY

WHEREFORE, Defendants, URS Corporation Architecture, P. C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III, respectfully pray that, based upon the foregoing Motion that this Court grant expedited consideration of Defendants' Motion to Stay Further Proceedings.

Respectfully submitted,

ADAMS AND REESE, LLP

Philip A. Franco      (Bar #5819), TA
Ron Sholes           (Bar # 14436)
Kellen J. Mathews    (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Fax: (504) 566-0210

**ATTORNEYS FOR DEFENDANTS, URS CORPORATION ARCHITECTURE, P.C.; URS CORPORATION; L. O'NEAL RYAN AND THOMAS E. RYAN, III**

FILED
EAST BATON ROUGE PARISH, LA
2017 JUL -7 AM 11: 29
DEPUTY CLERK OF COURT

3

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been served upon all counsel of record via United States mail, properly addressed, and first class postage prepaid or via email, this the 7th day of July, 2017.

Kellen J. Mathews

FILED
EAST BATON ROUGE PARISH, LA
2017 JUL -7 AM 11: 29

DEPUTY CLERK OF COURT

4

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308      DIV.: D |
| | * | |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| | * | |
| URS CORPORATION | * | PARISH OF EAST BATON ROUGE |
| ARCHITECTURE, P.C., URS | * | |
| CORPORATION, L. O'NEAL | * | STATE OF LOUISIANA |
| JOHNSON AND THOMAS E. RYAN, | * | |
| III | * | |

## ORDER

Considering the foregoing Motion for Expedited Consideration of the Motion to Stay Further Proceedings filed by Defendants, URS Corporation Architecture, P. C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III (collectively referred to as "Defendants"):

**IT IS HEREBY ORDERED** that Defendants' Motion for Expedited Consideration is **GRANTED**, and Defendants' Motion to Stay Further Proceedings shall be heard on an expedited basis on the _13_ day of _July_, 2017 at _11:30_ a.m./p.m.

**THUS DONE AND SIGNED** in Baton Rouge, Louisiana, this _10_ day of _July_, 2017.

_____
HONORABLE JANICE CLARK, JUDGE
19th Judicial District Court

FILED
EAST BATON ROUGE PARISH, LA
2017 JUL -7 AM 11: 29
DEPUTY CLERK OF COURT

**PLEASE SERVE:**

**H&E EQUIPMENT SERVICES, INC.**
Through its Counsel of Record
Brent Barriere
Loretta G. Mince
Rebecca Sha
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308    DIV.: D |
|---|---|---|
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | PARISH OF EAST BATON ROUGE |
| | * | |
| URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON AND THOMAS E. RYAN, III | * | STATE OF LOUISIANA |
| | * | |
| | * | |
| | * | |

## DEFENDANTS' NOTICE OF INTENT TO SEEK SUPERVISORY WRIT

TO:    Honorable Janice G. Clark
District Judge, 19th Judicial District Court
Parish of East Baton Rouge
300 North Boulevard
Baton Rouge, LA   70802

**H&E Equipment Services, Inc.**
Through its Counsel of Record
Brent B. Barriere
Loretta G. Mince
Rebecca Sha
Fishman Haygood LLP
201 St. Charles Avenue – 46th Floor
New Orleans, LA 70170

Pursuant to Rule 4-2 of the Uniform Rules of Louisiana Courts of Appeal, defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III (collectively referenced herein as "Defendants"), hereby give notice of their intention to apply to the Court of Appeal, First Circuit, for a supervisory writ seeking review of this Court's July 6, 2017 ruling in open court, which DENIED Defendants' Motion In Limine to Strike Expert Report and to Exclude Proposed Testimony of James R. ("Bob") Bailey.

1

REC'D C.P.
JUL 13 2017

NON-CERTIFIED COPY

EBR4205343

In accordance with La. Ct. App. Unif. R. 4-3, Defendants request that this Court

set a return date of July 11, 2017 by which the application is to be filed in the Court of

Appeal.

July 7, 2017.

Respectfully submitted,

ADAMS AND REESE, LLP

Philip A. Franco        (Bar #5819), TA
Ron Sholes              (Bar # 14436)
Kellen J. Mathews       (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210

**ATTORNEYS FOR DEFENDANTS, URS
CORPORATION ARCHITECTURE, P.C.;
URS CORPORATION; L. O'NEAL RYAN
AND THOMAS E. RYAN, III**



EAST BATON ROUGE PARISH, LA
FILED
2017 JUL -7 AM 11: 35
DEPUTY CLERK OF COURT

2

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been served upon all counsel of record via United States mail, properly addressed, and first class postage prepaid and/or via email, this the 7th day of July, 2017.

_____
Kellen J. Mathews



3

NON-CERTIFIED COPY

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308      DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA |
| CORPORATION, L. O'NEAL | * | |
| JOHNSON AND THOMAS E. RYAN, | * | |
| III | | |

## ORDER

Considering the Notice Of Intent to Seek a Supervisory Writ filed on behalf of defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III, this Court hereby sets a return date of July 11, 2017, by which the application for a supervisory writ is to be filed in the Court of Appeal.

Baton Rouge, Louisiana, July _10_, 2017.

HONORABLE JANICE CLARK, JUDGE
19th Judicial District Court

I hereby certify that on this day a notice of the above judgement was mailed by me, with sufficient postage affixed to: _Cheatwood, Franco, Wittmann,_
_Keating, Mince,_
Done and signed on ___ 7-12-17
_Laperouse,_
_Carlisle, Mathews, Lea_ Deputy Clerk of Court

FILED
EAST BATON ROUGE PARISH, LA
2017 JUL -7 AM 11: 36
DEPUTY CLERK OF COURT

1

NON-CERTIFIED COPY

| | | |
|---|---|---|
| **H&E EQUIPMENT SERVICES** | * | **SUIT NO. 626,308      DIV.: D** |
| | * | **19TH JUDICIAL DISTRICT COURT** |
| **VERSUS** | * | **PARISH OF EAST BATON ROUGE** |
| | * | |
| **URS CORPORATION** | * | **STATE OF LOUISIANA** |
| **ARCHITECTURE, P.C., URS** | | |
| **CORPORATION, L. O'NEAL** | * | |
| **JOHNSON AND THOMAS E. RYAN,** | * | |
| **III** | | |

---

### DEFENDANTS' NOTICE OF INTENT TO SEEK SUPERVISORY WRIT

---

TO:     Honorable Janice G. Clark
        District Judge, 19th Judicial District Court
        Parish of East Baton Rouge
        300 North Boulevard
        Baton Rouge, LA  70802

        **H&E Equipment Services, Inc.**
        Through its Counsel of Record
        Brent B. Barriere
        Loretta G. Mince
        Rebecca Sha
        Fishman Haygood LLP
        201 St. Charles Avenue – 46th Floor
        New Orleans, LA 70170

Pursuant to Rule 4-2 of the Uniform Rules of Louisiana Courts of Appeal,

defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson

and Thomas E. Ryan, III (collectively referenced herein as "Defendants"), hereby give

notice of their intention to apply to the Court of Appeal, First Circuit, for a supervisory

writ seeking review of this Court's July 6, 2017 ruling in open court, which Denied

Defendants' Motion to Continue the August 16, 2017 trial date.

1

NON-CERTIFIED COPY

EBR420S341

In accordance with La. Ct. App. Unif. R. 4-3, Defendants request that this Court

set a return date of July 10, 2017 by which the application is to be filed in the Court of

Appeal.

July 7, 2017.

Respectfully submitted,

ADAMS AND REESE, LLP

Philip A. Franco    (Bar #5819), TA
Ron Sholes          (Bar # 14436)
Kellen J. Mathews   (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210

**ATTORNEYS FOR DEFENDANTS, URS
CORPORATION ARCHITECTURE, P.C.;
URS CORPORATION; L. O'NEAL RYAN
AND THOMAS E. RYAN, III**



FILED
EAST BATON ROUGE PARISH, LA
2017 JUL -7 AM 11: 33
DEPUTY CLERK OF COURT

2

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been served upon all counsel of record via United States mail, properly addressed, and first class postage prepaid and/or via email, this the 7th day of July, 2017.

_____
Kellen J. Mathews

FILED
EAST BATON ROUGE PARISH, LA
2017 JUL -7 AM 11: 33

DEPUTY CLERK OF COURT

3

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308     DIV.: D |
|---|---|---|
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | PARISH OF EAST BATON ROUGE |
| | * | |
| URS CORPORATION | * | STATE OF LOUISIANA |
| ARCHITECTURE, P.C., URS | | |
| CORPORATION, L. O'NEAL | * | |
| JOHNSON AND THOMAS E. RYAN, | * | |
| III | | |

## ORDER

Considering the Notice Of Intent to Seek a Supervisory Writ filed on behalf of

defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson

and Thomas E. Ryan, III, this Court hereby sets a return date of July 10, 2017, by which

the application for a supervisory writ is to be filed in the Court of Appeal.

Baton Rouge, Louisiana, July _10_, 2017.

_(signature)_

HONORABLE JANICE CLARK, JUDGE
19th Judicial District Court

I hereby certify that on this day a notice of the
above judgement was mailed by me, with sufficient
postage affixed, to _Chestwood, Franco, Wittmann,_
Done and signed on _7-12-17_
_Kent, Mincz, LeKnight_
_Lapeyrouse, Carlisle,_ _____, Deputy Clerk of Court
_Mathews, Sha_

FILED
EAST BATON ROUGE PARISH, LA
2017 JUL -7 AM 11: 33
DEPUTY CLERK OF COURT

1

NON-CERTIFIED COPY

# DOUG WELBORN, CLERK OF COURT
## 19th Judicial District Court
## Parish of East Baton Rouge
## 300 North Boulevard
## Baton Rouge, LA 70801
## Phone  (225)389-3960

NO.    C626308 Division D                    10-JUL-2017


TO:    JEFFERSON PARISH SHERIFFS OFFICE
       PO BOX 277
       GRETNA, LA 70054


Please find attached CIVIL SUBPOENA  to be served in your parish for the above numbered suit.

Kindly make your return(s) on the duplicate(s) enclosed, and

   X        note the enclosed check for payment of service;

            send us your bill for service;

            note that this is a pauper suit and no funds are available; or

            note that this is a government suit and no funds are necessary.

                                   Thank You,

                                   Deputy Clerk of Court for
                                   Doug Welborn, Clerk of Court

Requesting Attorney:  KELLEN J MATHEWS


_____

REPLY:                          DATE:_____

_____

_____

_____

_____

_____

                          By:_____

                          Deputy Sheriff, Parish of _____


**Letter to Out Of Parish Sheriff - 5213**



EBR4082128

NON-CERTIFIED COPY

# DOUG WELBORN, CLERK OF COURT
## 19th Judicial District Court
## Parish of East Baton Rouge
## 300 North Boulevard
## Baton Rouge, LA 70801
## Phone (225)389-3960

NO.    **C626308 Division D**                    **10-JUL-2017**

TO:    **ORLEANS PARISH SHERIFFS OFFICE**
       **CIVIL DEPARTMENT**
       **421 LOYOLA AVE**
       **NEW ORLEANS, LA 70112**

Please find attached CIVIL SUBPOENA to be served in your parish for the above numbered suit.

Kindly make your return(s) on the duplicate(s) enclosed, and

    **X**        note the enclosed check for payment of service;

    ڤ        send us your bill for service;

    ڤ        note that this is a pauper suit and no funds are available; or

    ڤ        note that this is a government suit and no funds are necessary.

Thank You,

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

**Requesting Attorney:  KELLEN J MATHEWS**

---

**REPLY:**                                **DATE:**_____

_____

_____

_____

_____

_____

By:_____

Deputy Sheriff, Parish of _____

**Letter to Out Of Parish Sheriff - 5213**


EBR4082129

NON-CERTIFIED COPY

6801-17-001693

# CIVIL SUBPOENA

| | |
|---|---|
| **H&E EQUIPMENT SERVICES INC**<br>(Plaintiff) | **NUMBER    C626308 Division D** |
| | |
| vs. | **19th JUDICIAL DISTRICT COURT** |
| | |
| **URS CORPORATION ARCHITECTURE PC ET AL**<br>(Defendant) | **PARISH OF EAST BATON ROUGE**<br><br>**STATE OF LOUISIANA** |

**TO:    ANDRE M RODRIGUE**
        **STANTEC CONSULTING SERVICES**    **OR**    **5134 RIVERBEND BLVD.**
        **500 MAIN STREET**                                **BATON ROUGE, LA.  70820**
        **BATON ROUGE, LA.  70801**

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **10-JUL-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

### SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**  After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of East Baton Rouge, this _____ day of _____, 20_____.

| | |
|---|---|
| SERVICE: $_____ | |
| MILEAGE $_____ | _____ |
| TOTAL: $_____ | Deputy Sheriff |

EBR4209708

NON-CERTIFIED COPY

6801-17-001693

161

# CIVIL SUBPOENA

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE PC ET AL**
(Defendant)

**NUMBER**    C626308 Division D

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

TO:    **ANDRE M RODRIGUE**
       **STANTEC CONSULTING SERVICES**        OR    **5134 RIVERBEND BLVD.**
       **500 MAIN STREET**                              **BATON ROUGE, LA. 70820**
       **BATON ROUGE, LA. 70801**

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM,** Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination. (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **10-JUL-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

**SERVICE INFORMATION:**

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of East Baton Rouge, this _____ day of _____, 20____.

SERVICE:    $_____
MILEAGE    $_____        _____
TOTAL:     $_____                Deputy Sheriff

Tendering a copy of this document to



*Amy*

**JUL 1 9 2017**

*Dy. S. Derosin*
Deputy Sheriff, Parish of East Baton Rouge, Louisiana



EL-R4120214

EBR4209708

NON-CERTIFIED COPY

6701-17-000897

# CIVIL SUBPOENA

H&E EQUIPMENT SERVICES INC
(Plaintiff)

**NUMBER**   C626308 Division D

vs.

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

URS CORPORATION ARCHITECTURE PC
ET AL
(Defendant)

**STATE OF LOUISIANA**

TO:   BRAD REESE
      MAPP CONSTRUCTION, LLC        **OR**    6737 GEN. HAIG
      601 POYDRAS STREET, STE. 1715          NEW ORLEANS, LA.  70124
      NEW ORLEANS, LA.  70130

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination. (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **10-JUL-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

## SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20_____.

SERVICE:   $_____
MILEAGE   $_____      _____
TOTAL:     $_____              Deputy Sheriff

CIVIL SUBPOENA – OOP - 6701



NON-CERTIFIED COPY

EBR4209716

6701-17-000896

# CIVIL SUBPOENA

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**vs.**

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**NUMBER**    C626308 Division D

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**


**TO:**    **KEVIN SPREHE**
          **RYAN GOOTEE GEN. CONTRACTORS**          **OR**    **108 HELIOS AVE.**
          **1100 RIDGEWOOD DRIVE**                           **METAIRIE, LA.  70005**
          **METAIRIE, LA.  70001**


You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM**, Courtroom No. **10-A**, Judge **JANICE CLARK**.


You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **10-JUL-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

**SERVICE INFORMATION:**

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20_____.


SERVICE:     $_____
MILEAGE      $_____          _____
TOTAL:       $_____                    Deputy Sheriff

**CIVIL SUBPOENA – OOP - 6701**



EBR4209711

NON-CERTIFIED COPY

## FISHMAN HAYGOOD, L.L.P.

201 ST. CHARLES AVENUE
46TH FLOOR
NEW ORLEANS, LA 70170
PHONE: (504) 586-5252
FAX: (504) 586-5250

# FAX

**TO:** Clerk, 19th JDC
Parish of East Baton Rouge

**FAX NUMBER:** 225-389-3392

**FROM:** Loretta G. Mince

**DIRECT DIAL NO:** 504-586-5273

**DATE:** July 10, 2017

**FILE NO.** 3107-04

We are sending 3 pages (including this page)

If there are any problems, please contact Carla at 586-5246.

---

Re:     *H&E Equipment Services, Inc. v URS Corporation Architecture, P.C., et al*
19th JDC, Doc. No. 626,308, Sec. "D"

Dear Clerk:

Attached please find the Judgment on Motion to Continue Trial, Motion in Limine to Strike and Exclude Proposed Testimony of Wallace C. Drennan, III, and Motion in Limine to Strike and Exclude Proposed Testimony of James R. Bailey. Please confirm *via* facsimile the cost for **fax and filing fees** for the attached document. As required, the original document will be forwarded for filing within seven (7) days along with a check to cover the fees for filing by fax.

Thanking you in advance for your assistance.

Respectfully,

Carla Cooper Mayer
Legal Assistant Loretta G. Mince

cc:     Philip A. Franco, Esq. (*via* Philip.franco@arlaw.com)



EBR4195093

859269v.1

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                    SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____        _____
                                                              DEPUTY CLERK

**JUDGMENT ON MOTION TO CONTINUE TRIAL,
MOTION IN LIMINE TO STRIKE AND EXCLUDE PROPOSED TESTIMONY OF
WALLACE C. DRENNAN, III, AND MOTION IN LIMINE TO STRIKE AND
EXCLUDE PROPOSED TESTIMONY OF JAMES R. BAILEY**

This matter came on for hearing on July 6, 2017 on Defendants' Motion to Continue

Trial, Motion in Limine to Strike and Exclude Proposed Testimony of Wallace C. Drennan, III,

and Motion in Limine to Strike and Exclude Proposed Testimony of James R. Bailey.  Present in

Court were:

Philip A. Franco and Kellen J. Mathews
Attorneys for Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal
Johnson, and Thomas E. Ryan, III

Loretta G. Mince
Attorney for Plaintiff H&E Equipment Services, Inc.

Considering the evidence, pleadings, and the arguments of counsel,

**IT IS ORDERED, ADJUDGED, AND DECREED**, that the Motion to Continue Trial

filed by Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson,

and Thomas E. Ryan, III is **DENIED** for the reasons orally assigned at the hearing. Defendants

have three (3) days to seek a supervisory writ on this decision;

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED**, that the Motion in

Limine to Strike and Exclude Proposed Testimony of Wallace C. Drennan, III filed by

Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and

1206946v.1

NON-CERTIFIED COPY

Thomas E. Ryan, III is **DENIED** for the reasons orally assigned at the hearing. Defendants have

five (5) days to seek a supervisory writ on this decision;

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that the Motion in

Limine to Strike and Exclude Proposed Testimony of James R. Bailey filed by Defendants URS

Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III

is **DENIED** for the reasons orally assigned at the hearing. Defendants have five (5) days to seek

a supervisory writ on this decision.

Baton Rouge, Louisiana this ____ day of July 2017.


_____
JUDGE-19[th] Judicial District Court
The Honorable Janice Clark


## RULE 9.5 CERTIFICATE

I certify that I circulated this proposed judgment to counsel for defendants URS

Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III

by electronic mail on July 7, 2017. Defendants have consented to the form of judgment.


_____
Loretta G. Mince



1206946v.1

2

NON-CERTIFIED COPY

## ** Transmit Conf.Report **

P.1
EBR CLERK OF COURT    Fax 2253893392

Jul 11 2017 01:32pm

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 915045865250 | Normal | 11:01:32pm | 0'35" | 1 | * O K | |



# DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

---

### FAX RECEIPT

NUMBER C626308  Division D

Date:    10-JUL-2017

H&E EQUIPMENT SERVICES INC

VS

URS CORPORATION ARCHITECTURE PC ET AL

To:    LORETTA G MINCE
        CORRERO FISHMAN HAYGOOD ET AL
        201 ST CHARLES AVE 46TH FL
        NEW ORLEANS LA 70170-4600

Item(s) Received: JUDGMENT OF MOTION TO CONTINUE TRIAL, MOTION IN LIMINE TO STRIKE ANDEXCLUDED PROPOSED TESTIMONY OF WALLACE C. DRENNAN, III AND MOTION IN LIMINE TO STRIKED AND EXCLUDE PROPOSED TESTIMONY OF JAMES R. BAILEY

Total Amount Due (includes all applicable fees below) $ 50.00

The Clerk of Court's office has received, by facsimile transmission dated 07-10-17, documents in the above referenced case. In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee. The fax transmission fee is also required of forma paupers filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)        A transmission fee of five dollars
13:841(A)(2)(a)    First page of each pleading, six dollars
13:841(A)(2)(b)    Each subsequent page, four dollars
13:841(A)(2)(c)    Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)    Issuing document without notice of service, fifteen dollars (Receipt generation fee)

### NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.

### SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
### SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.

### IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
### IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.

*DeRay H. Gehron*

Deputy Clerk of Court for
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT



NON-CERTIFIED COPY

## ** Transmit Conf.Report **

P.1
EBR CLERK OF COURT    Fax 2253893392                    Jul 11 2017 12:56pm

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 915045885250 | Normal | 11:12:56pm | 0'00" | 0 | D.0.7 | |
| ↑ No response. | | Check condition of remote fax. | | | | |



# DOUG WELBORN
## CLERK OF COURT

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-5982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

PARISH OF EAST BATON ROUGE

### FAX RECEIPT

NUMBER C626308  Division D                              Date:    10-JUL-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: JUDGMENT OF MOTION TO CONTINUE TRIAL, MOTION IN LIMINE TO STRIKE
ANDEXCLUDED PROPOSED TESTIMONY OF WALLACE C. DRENNAN, III AND MOTION IN LIMINE TO
STRIKED AND EXCLUDE PROPOSED TESTIMONY OF JAMES R. BAILEY

Total Amount Due (includes all applicable fees below) $ 50.00

The Clerk of Court's office has received, by facsimile transmission dated 07-10-17, documents in the above referenced case.  In
accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the
original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings
and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)      A transmission fee of five dollars
13:841(A)(2)(a)  First page of each pleading, six dollars
13:841(A)(2)(b)  Each subsequent page, four dollars
13:841(A)(2)(c)  Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)  Issuing document without notice of service, fifteen dollars (Receipt generation fee)

**NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT
UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.**

**SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.**

**IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.**

_DeRay H. Johnson_
*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

                              5249 – LTR / FAX RECT





# DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

## FAX RECEIPT

NUMBER C626308  Division D
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

Date:    10-JUL-2017

To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: JUDGMENT OF MOTION TO CONTINUE TRIAL, MOTION IN LIMINE TO STRIKE ANDEXCLUDED PROPOSED TESTIMONY OF WALLACE C. DRENNAN, III AND MOTION IN LIMINE TO STRIKED AND EXCLUDE PROPOSED TESTIMONY OF JAMES R. BAILEY

Total Amount Due (includes all applicable fees below) **$ 50.00**

The Clerk of Court's office has received, by facsimile transmission dated **07-10-17**, documents in the above referenced case.  In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)        A transmission fee of five dollars
13:841(A)(2)(a)    First page of each pleading, six dollars
13:841(A)(2)(b)    Each subsequent page, four dollars
13:841(A)(2)(c)    Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)    Issuing document without notice of service, fifteen dollars (Receipt generation fee)

<u>NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT</u>
<u>UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.</u>

<u>SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.</u>
<u>SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.</u>

<u>IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.</u>
<u>IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.</u>

_DeLay H. Johnson_
_____
*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT





# DOUG WELBORN
## CLERK OF COURT

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel. (225) 389-3982
Fax (225) 389-3392
www.ebrclerkofcourt.org

PARISH OF EAST BATON ROUGE

### FAX RECEIPT

NUMBER C626308  Division D
H&E EQUIPMENT SERVICES INC                          Date:    10-JUL-2017
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: JUDGMENT OF MOTION TO CONTINUE TRIAL, MOTION IN LIMINE TO STRIKE
ANDEXCLUDED PROPOSED TESTIMONY OF WALLACE C. DRENNAN, III AND MOTION IN LIMINE TO
STRIKED AND EXCLUDE PROPOSED TESTIMONY OF JAMES R. BAILEY

Total Amount Due (includes all applicable fees below) $ 50.00

The Clerk of Court's office has received, by facsimile transmission dated 07-10-17, documents in the above referenced case.  In
accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the
original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings
and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)      A transmission fee of five dollars
13:841(A)(2)(a)   First page of each pleading, six dollars
13:841(A)(2)(b)   Each subsequent page, four dollars
13:841(A)(2)(c)   Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)   Issuing document without notice of service, fifteen dollars (Receipt generation fee)

### NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT
### UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.

### SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
### SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.

### IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
### IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.

_DeRay H. Johnson_
_____
_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT



3107.04

NON-CERTIFIED COPY

# FISHMAN HAYGOOD, L.L.P.

201 ST. CHARLES AVENUE
46TH FLOOR
NEW ORLEANS, LA 70170
PHONE: (504) 586-5252
FAX: (504) 586-5250

# FAX

**TO:**   Clerk, 19th JDC          **FAX NUMBER:** 225-389-3392
         Parish of East Baton Rouge

**FROM:** Loretta G. Mince         **DIRECT DIAL NO:** 504-586-5273

**DATE:** July 10, 2017            **FILE NO.** 3107-04

We are sending 3 pages (including this page)

If there are any problems, please contact Carla at 586-5246.

Re:    *H&E Equipment Services, Inc. v URS Corporation Architecture, P.C., et al*
       19th JDC, Doc. No. 626,308, Sec. "D"

Dear Clerk:

Attached please find a Memorandum in Opposition To Motion To Stay Further
Proceedings on behalf of H&E Equipment Services, Inc. Please confirm *via* facsimile the cost
for **fax and filing fees** for the attached document. As required, the original document will be
forwarded for filing within seven (7) days along with a check to cover the fees for filing by fax.

Thanking you in advance for your assistance.

Respectfully,

Carla Cooper Mayer
Legal Assistant Loretta G. Mince



cc:   Philip A. Franco, Esq. (*via* Philip.franco@arlaw.com)

859269v.1


NON-CERTIFIED COPY

Received
Jul 12 2017 11:45am
# 27   4

19TH JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

DOCKET NO.: 626,308                          SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____          _____
                                              DEPUTY CLERK

## MEMORANDUM IN OPPOSITION TO
## MOTION TO STAY FURTHER PROCEEDINGS

**MAY IT PLEASE THE COURT:**

Plaintiff H&E Equipment Services, Inc. respectfully submits this Memorandum in Opposition to the Motion to Stay Further Proceedings filed by Defendants URS Corporation Architecture PC, URS Corporation, L. O'Neal Johnson and Thomas Ryan, III (collectively referenced herein "Defendants"). As set forth herein, the motion should be denied.

### OVERVIEW

H&E filed its complaint almost four years ago in November 2013. After requesting that the matter be set for trial, Defendants now request a stay of all proceedings, including the trial scheduled to commence on August 16, 2017, pending the First Circuit Court of Appeal's ruling on Defendants' applications for supervisory writs challenging the Court's denial of its Motion for Summary Judgment, Motion to Continue Trial, and Motions in Limine to Strike Expert Reports and to Exclude Proposed Testimony of James R. ("Bob") Bailey and Wallace C. Drennan, III, as well as, this Court's ruling on URS's Motion for Protective Order.

For the reasons further stated below, Defendants' motion to stay should be denied.

### ARGUMENT

"[T]he decision to stay a Louisiana suit rests in the sound discretion of the trial court." *Sw. Elec. Power Co. v. Amax, Inc.*, 621 So.2d 615, 615 (La. 1993); La. Ct. App. Unif. R. 4-4 ("When an application for writs is sought, further proceedings may be stayed at the trial court's discretion"). The mere filing of "a writ application does not stay further proceedings unless the trial court or appellate court expressly orders otherwise." La. Ct. App. Unif. R. 4-4.

A stay is not warranted here.

1207388v.1

NON-CERTIFIED COPY

First, as to Defendants' pending writ applications, Defendants have not shown that their writ applications are likely to prevail. Moreover, the exercise of supervisory review is plainly unwarranted because Defendants have a sufficient remedy on appeal,[1] and the relief sought in their writ applications will not terminate the litigation as to all or even some of their claims. *See Herlitz Construction Company, Inc. v. Hotel Investors of New Iberia, Inc.*, 396 So.2d 878 (La. 1981) (holding that where adequate relief is available on appeal, an application for supervisory writs should be considered only when the trial court judgment was arguably incorrect, a reversal would terminate the litigation (in whole or in part), and there is no dispute of fact to be resolved). Defendants will also not suffer any irreparable harm absent a stay. Finally, an indeterminable stay pending the First Circuit's review of URS's writ application will prejudice Plaintiff by further delaying its right to prosecute its claims and would not serve the public interest of ensuring speedy resolution of claims.

A stay is also not warranted with respect to Defendants' pending motion for protective order seeking to prohibit the use of ground penetrating radar testing performed at the Baton Rouge and Kenner sites. This Court has no obligation to decide evidentiary matters in advance of trial and may consider them at any time. Defendants erroneously argue that they are prejudiced because the radar testing was "impermissibly obtained without the approval of this Court and after all discovery had been completed and all discovery deadlines had passed."[2] Defendants also suggest that if the testing is admitted the parties need to do "a complete re-set of expert discovery."[3] For the reasons stated in H&E's opposition to the motion for protective order, Defendants' arguments should be rejected. H&E performed non-invasive testing on its own properties to resolve a fact issue *raised by Defendants* in expert discovery. The testing occurred nine months ago, Defendants attended the testing, and H&E provided Defendants with the written results of the testing more than six months ago. Thus, Defendants' claim that they have been prejudiced in their trial preparations rings hollow. To the extent Defendants intend to defend their defective design on the basis that no testing was performed to confirm the pavement was installed as designed, the testing results are plainly relevant, and Defendants have been provided with ample advance notice of same.

---

[1] Denial of motions for summary judgment and evidentiary motions are interlocutory and may be corrected on appeal after final judgment. *See Smith v. Metro. Prop. & Cas. Ins. Co.*, 2003-0223 (La. App. 1 Cir. 11/7/03), 868 So. 2d 57, 60, *writ denied*, 2003-3338 (La. 2/13/04), 867 So 2d 693; *Augmon v. City of Morgan City*, 2004-1746 (La. App. 1 Cir. 9/23/05); 914 So. 2d 583, 585.
[2] Defendants' Motion at pg. 1.
[3] *Id.* at pg. 2.

2

1207388v 1

NON-CERTIFIED COPY

## CONCLUSION

For the reasons stated above, Defendants' motion to stay should be denied.

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile:  (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by facsimile, email and/or by placing same in the United States mail, postage prepaid and properly addressed, this 12 day of July, 2017.

Loretta G. Mince

3

1207388v 1

NON-CERTIFIED COPY



# DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

## FAX RECEIPT

NUMBER C626308  Division **D**                                  Date:    12-JUL-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: MEMORANDUM IN OPPOSITION

Total Amount Due (includes all applicable fees below) $ 58.00

The Clerk of Court's office has received, by facsimile transmission dated 07-12-17, documents in the above referenced case. In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee. The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)        A transmission fee of five dollars
13:841(A)(2)(a)     First page of each pleading, six dollars
13:841(A)(2)(b)     Each subsequent page, four dollars
13:841(A)(2)(c)     Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)     Issuing document without notice of service, fifteen dollars (Receipt generation fee)

### NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT
### UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.

### SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
### SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.

### IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
### IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.

*DeRay H. Johnson*
_____
*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT



NON-CERTIFIED COPY

## ** Transmit Conf.Report **

P.1
EBR CLERK OF COURT    Fax 2253893392                    Jul 13 2017 01:06pm

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 915045865250 | Normal | 13:01:06pm | 0'34" | 1 | * O K | |



# DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

### FAX RECEIPT

NUMBER C626308  Division D                    Date:   12-JUL-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:   LORETTA G MINCE
      CORRERO FISHMAN HAYGOOD ET AL
      201 ST CHARLES AVE 46TH FL
      NEW ORLEANS LA 70170-4600

Item(s) Received: MEMORANDUM IN OPPOSITION

Total Amount Due (includes all applicable fees below) $ 58.00

The Clerk of Court's office has received, by facsimile transmission dated 07-12-17, documents in the above referenced case. In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee. The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)       A transmission fee of five dollars
13:841(A)(2)(a)    First page of each pleading, six dollars
13:841(A)(2)(b)    Each subsequent page, four dollars
13:841(A)(2)(c)    Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)    Issuing document without notice of service, fifteen dollars (Receipt generation fee)

NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT
UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.

SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.

IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT





# DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392

www.ebrclerkofcourt.org

---

## FAX RECEIPT

NUMBER C626308  Division D                                    Date:    12-JUL-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: MEMORANDUM IN OPPOSITION

Total Amount Due (includes all applicable fees below) $ 58.00

The Clerk of Court's office has received, by facsimile transmission dated 07-12-17, documents in the above referenced case.  In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)    A transmission fee of five dollars
13:841(A)(2)(a)  First page of each pleading, six dollars
13:841(A)(2)(b)  Each subsequent page, four dollars
13:841(A)(2)(c)  Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)  Issuing summon without notice of service, fifteen dollars (Receipt generation fee)

### NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT
### UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.

### SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
### SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.

### IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
### IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.

*DeRay H. Johnson*

---
*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

                              5249 – LTR / FAX RECT



NON-CERTIFIED COPY

## ** Transmit Conf.Report **

P.1
EBR CLERK OF COURT    Fax 2253893392                    Jul 13 2017 09:25am

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 915045885250 | Normal | 13:09:24am | 0'00" | 0 | D.0.7 | |
| ↑ No response. | | | Check condition of remote fax. | | | |

*504-586-5250*



# DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel.: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

### FAX RECEIPT

NUMBER C626308  Division D                          Date:   12-JUL-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: MEMORANDUM IN OPPOSITION

Total Amount Due (includes all applicable fees below) $ 58.00

The Clerk of Court's office has received, by facsimile transmission dated 07-12-17, documents in the above referenced case.  In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)     A transmission fee of five dollars
13:841(A)(2)(a)  First page of each pleading, six dollars
13:841(A)(2)(b)  Each subsequent page, four dollars
13:841(A)(2)(c)  Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)  Issuing document without notice of service, fifteen dollars (Receipt generation fee)

**NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT
UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.**

**SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.**

**IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.**

*DeLory H. Johnson*
Deputy Clerk of Court for
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT



NON-CERTIFIED COPY

**** Transmit Conf. Report ****

P.1
EBR CLERK OF COURT Fax 2253893392

Jul 12 2017 05:20pm

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 915045885250 | Normal | 12:05:20pm | 0'00" | 0 | D.0.7 | |
| ↑ No response. | | Check condition of remote fax. | | | | |

# DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

**FAX RECEIPT**

NUMBER C626308 Division D
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

Date: 12-JUL-2017

To: LORETTA G MINCE
CORRERO FISHMAN HAYGOOD ET AL
201 ST CHARLES AVE 46TH FL
NEW ORLEANS LA 70170-4600

Item(s) Received: MEMORANDUM IN OPPOSITION

Total Amount Due (includes all applicable fees below) $ 58.00

The Clerk of Court's office has received, by facsimile transmission dated 07-12-17, documents in the above referenced case. In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee. The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3) A transmission fee of five dollars
13:841(A)(2)(a) First page of each pleading, six dollars
13:841(A)(2)(b) Each subsequent page, four dollars
13:841(A)(2)(c) Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b) Issuing document without notice of service, fifteen dollars (Receipt generation fee)

NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT
UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.

SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.

IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.

DeNay H. Johnson

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT

NON-CERTIFIED COPY

6801-17-00170

# CIVIL SUBPOENA

**H&E EQUIPMENT SERVICES INC.**
(Plaintiff)

**vs.**

**URS CORPORATION ARCHITECTURE, PC, ET AL**
(Defendant)

**NUMBER**     C626308 **Division D**

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

TO:     **THOMAS VRENICK**
        **TERRACON CONSULTANTS**
        **2822 O'NEAL LANE**
        **BATON ROUGE, LOUISIANA  70816**
OR  AT:
        **6913 LANGSTON COURT**
        **BATON ROUGE, LOUISIANA  70818**

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **A.M.**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.
(Ordered by **KELLEN J. MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **12-JUL-2017**, Baton Rouge, Louisiana.



_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

---

**SERVICE INFORMATION:**

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:**  On the party herein named at _____.

**DOMICILIARY SERVICE:**  On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**  After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:**  Parish of East Baton Rouge, this _____ day of _____, 20_____.

SERVICE:      $_____
MILEAGE       $_____        _____
TOTAL:        $_____               Deputy Sheriff

**CIVIL SUBPOENA – 6801**


EBR4262252

NON-CERTIFIED COPY



ADAMS AND REESE LLP

Attorneys at Law
Alabama
Florida
Georgia
**Louisiana**
Mississippi
South Carolina
Tennessee
Texas
Washington, DC

Kellen J. Mathews
Direct: 225.378.3243
E-Fax: 225.336.5115
kellen.mathews@arlaw.com

July 12, 2017

Honorable Doug Welborn
Clerk of Court, 19th Judicial District Court
East Baton Rouge Parish
300 North Boulevard
Baton Rouge, LA 70801

COST OK Amt. 80
554aa
JUL 12 2017
BY _____
DY CLERK OF COURT

RE:     H&E Equipment Services v. URS Corporation, et al
        19th JDC No. 626308(D)
        Our File No. 25240-3

Dear Mr. Welborn:

Please issue a trial subpoena on behalf of URS Corporation for the following witnesses to appear for trial in the above matter commencing on August 16, 2017, at 9:30 a.m. before Judge Janice Clark, Division D, Room 10A, Baton Rouge, LA:

Thomas Vrenick                Or          6913 Langston Court
Terracon Consultants                      Baton Rouge, LA 70818
2822 O'Neal Lane
Baton Rouge, LA 70816

Sincerely,

ADAMS AND REESE, LLP

Kellen J. Mathews

/tdw

NON-CERTIFIED COPY
EBR4204962

6709-17-000225

# RULE NISI

H&E EQUIPMENT SERVICES INC
(Plaintiff)

                         **NUMBER  C626308 Division D**

vs.

                         **19th JUDICIAL DISTRICT COURT**

URS CORPORATION ARCHITECTURE PC
ET AL
(Defendant)

                         **PARISH OF EAST BATON ROUGE**

                         **STATE OF LOUISIANA**

**TO:**  **H&E EQUIPMENT SERVICES INC**
       **THRU BRENT BARRIERE, LORETTA G. MINCE**
       **201 ST CHARLES AVE., STE. 4600**
       **NEW ORLEANS, LA.  70170**

                                     WGB ENTERED
                                       PAPER           RETURN
                                       15 / 9106 / 01
                                     SERIAL NO.  DEPUTY  PARISH

      The Mover in this case filed a petition which the Court granted.  Certified copies of this document
and the Court's Order are attached.

       **MOTION TO CONTINUE TRIAL AND INCROPORATED MEMORANDUM IN
SUPPORT   WITH REQUEST FOR EXPEDITED HEARING**

      You MUST come to Court at 9:30 AM, on JULY 6, 2017 in Room 10-A , 300 North Boulevard,
Baton Rouge, Louisiana, and show cause why:

                   **\* \* \* \* \* SEE ATTACHED ORDER \* \* \* \* \***

       **YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A
BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

      This Rule was issued by the Clerk of Court for East Baton Rouge Parish on **26-JUN-2017**.

                                             *Deputy Clerk of Court for*
                                           **Doug Welborn, Clerk of Court**

Requesting Attorney:
PHILIP ANTHONY FRANCO

---

                              **SERVICE INFORMATION:**

Received on the __29__ day of __June__, 20_17_ and on the __30__ day of __June__, 20_17_, served on the above named party as
follows:

**PERSONAL SERVICE:**  On the party herein named at _201 St Charles thru Karla_

**DOMICILIARY SERVICE:**  On the within named _____, by leaving the same at his domicile in this parish in the hands of
_____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**    After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone
legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20____.

SERVICE:$_____
MILEAGE:$_____
TOTAL:  $_____
                         Deputy Sheriff
                         Parish of __Orleans__

                         **RULE NISI (OOP) - 6709**

EBR4048279

EBR4187471

NON-CERTIFIED COPY

6801-17-001701

# CIVIL SUBPOENA

**H&E EQUIPMENT SERVICES INC.**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE, PC, ET AL**
(Defendant)

NUMBER    C626308 Division D

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

TO:    THOMAS VRENICK
       TERRACON CONSULTANTS
       2822 O'NEAL LANE
       BATON ROUGE, LOUISIANA 70816
OR AT:
       6913 LANGSTON COURT
       BATON ROUGE, LOUISIANA 70818

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **A.M.**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.
(Ordered by **KELLEN J. MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **12-JUL-2017**, Baton Rouge, Louisiana.



*Sharon Zito*

_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

---

## SERVICE INFORMATION:

Received on the _13_ day of _July_, 20_17_ and on the _13_ day of _July_, 20_17_, served on the above named party as follows:

_Terracon Consultants_

**PERSONAL SERVICE:** On the party herein named at _2822 ONeal Ln_
_thru Adm. Manager Lisa Fehael With Permission of Vrenior_

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of East Baton Rouge, this _13_ day of _July_, 20_17_.

| | |
|---|---|
| SERVICE: | $_____ |
| MILEAGE: | $_____ |
| TOTAL: | $_____ |

_Thomas Wall_
Deputy Sheriff

CIVIL SUBPOENA – 6801

EBR4048266

EBR4262252

NON-CERTIFIED COPY

**POSTED**

JUL 17 2017

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

COST OK $ 50

JUL 14 2017
DEPUTY CLERK OF COURT

DOCKET NO.: 626,308                                      SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____     _____
                                            DEPUTY CLERK

**JUDGMENT ON MOTION TO CONTINUE TRIAL,
MOTION IN LIMINE TO STRIKE AND EXCLUDE PROPOSED TESTIMONY OF
WALLACE C. DRENNAN, III, AND MOTION IN LIMINE TO STRIKE AND
EXCLUDE PROPOSED TESTIMONY OF JAMES R. BAILEY**

This matter came on for hearing on July 6, 2017 on Defendants' Motion to Continue
Trial, Motion in Limine to Strike and Exclude Proposed Testimony of Wallace C. Drennan, III,
and Motion in Limine to Strike and Exclude Proposed Testimony of James R. Bailey. Present in
Court were:

Philip A. Franco and Kellen J. Mathews
Attorneys for Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal
Johnson, and Thomas E. Ryan, III

Loretta G. Mince
Attorney for Plaintiff H&E Equipment Services, Inc.

Considering the evidence, pleadings, and the arguments of counsel,

**IT IS ORDERED, ADJUDGED, AND DECREED**, that the Motion to Continue Trial
filed by Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson,
and Thomas E. Ryan, III is **DENIED** for the reasons orally assigned at the hearing. Defendants
have three (3) days to seek a supervisory writ on this decision;

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED**, that the Motion in
Limine to Strike and Exclude Proposed Testimony of Wallace C. Drennan, III filed by
Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and



FAX COPY FILED 7/10/17
ORIGINAL FILED 7/14/17

REC'D C.P.
JUL 24 2017

REC'D C.P.
JUL 17 2017

1206946v.1

Thomas E. Ryan, III is **DENIED** for the reasons orally assigned at the hearing. Defendants have five (5) days to seek a supervisory writ on this decision;

      **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED**, that the Motion in Limine to Strike and Exclude Proposed Testimony of James R. Bailey filed by Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III is **DENIED** for the reasons orally assigned at the hearing. Defendants have five (5) days to seek a supervisory writ on this decision.

      Baton Rouge, Louisiana this _19_ day of July 2017.

                    JUDGE-19th Judicial District Court
                    The Honorable Janice Clark


## RULE 9.5 CERTIFICATE

      I certify that I circulated this proposed judgment to counsel for defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III by electronic mail on July 7, 2017.  Defendants have consented to the form of judgment.

                    Loretta G. Mince



I hereby certify that on this day a notice of the above judgement was mailed by me, with sufficient postage affixed, to: _Mince, Matthews, Franco_
Done and signed on _7-20-17_

                    Deputy Clerk of Court

2

1206946v.1

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

DOCKET NO.: 626,308                                    POSTED SECTION: "D"

H&E EQUIPMENT SERVICES, INC    JUL 17 2017

VERSUS                                                              COST OK $ 58

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL    JUL 14 2017
JOHNSON, AND THOMAS E. RYAN, III                                  CH 21646 A
                                                                 DEPUTY CLERK OF COURT

FILED: _____          _____
                                              DEPUTY CLERK

## MEMORANDUM IN OPPOSITION TO
## MOTION TO STAY FURTHER PROCEEDINGS

**MAY IT PLEASE THE COURT:**

Plaintiff H&E Equipment Services, Inc. respectfully submits this Memorandum in Opposition to the Motion to Stay Further Proceedings filed by Defendants URS Corporation Architecture PC, URS Corporation, L. O'Neal Johnson and Thomas Ryan, III (collectively referenced herein "Defendants").  As set forth herein, the motion should be denied.

### OVERVIEW

H&E filed its complaint almost four years ago in November 2013.  After requesting that the matter be set for trial, Defendants now request a stay of all proceedings, including the trial scheduled to commence on August 16, 2017, pending the First Circuit Court of Appeal's ruling on Defendants' applications for supervisory writs challenging the Court's denial of its Motion for Summary Judgment, Motion to Continue Trial, and Motions in Limine to Strike Expert Reports and to Exclude Proposed Testimony of James R. ("Bob") Bailey and Wallace C. Drennan, III, as well as, this Court's ruling on URS's Motion for Protective Order.

For the reasons further stated below, Defendants' motion to stay should be denied.

### ARGUMENT

"[T]he decision to stay a Louisiana suit rests in the sound discretion of the trial court." *Sw. Elec. Power Co. v. Amax, Inc.*, 621 So.2d 615, 615 (La. 1993); La. Ct. App. Unif. R. 4-4 ("When an application for writs is sought, further proceedings may be stayed at the trial court's discretion").  The mere filing of "a writ application does not stay further proceedings unless the trial court or appellate court expressly orders otherwise."  La. Ct. App. Unif. R. 4-4.  REC'D C.P.

A stay is not warranted here.                              JUL 17 2017

FAX COPY FILED    7/13/17
ORIGINAL FILED    7/14/17

EBR4193226

NON-CERTIFIED COPY

First, as to Defendants' pending writ applications, Defendants have not shown that their writ applications are likely to prevail.  Moreover, the exercise of supervisory review is plainly unwarranted because Defendants have a sufficient remedy on appeal,[1] and the relief sought in their writ applications will not terminate the litigation as to all or even some of their claims. *See Herlitz Construction Company, Inc. v. Hotel Investors of New Iberia, Inc.*, 396 So.2d 878 (La. 1981) (holding that where adequate relief is available on appeal, an application for supervisory writs should be considered only when the trial court judgment was arguably incorrect, a reversal would terminate the litigation (in whole or in part), and there is no dispute of fact to be resolved). Defendants will also not suffer any irreparable harm absent a stay.  Finally, an indeterminable stay pending the First Circuit's review of URS's writ application will prejudice Plaintiff by further delaying its right to prosecute its claims and would not serve the public interest of ensuring speedy resolution of claims.

A stay is also not warranted with respect to Defendants' pending motion for protective order seeking to prohibit the use of ground penetrating radar testing performed at the Baton Rouge and Kenner sites.  This Court has no obligation to decide evidentiary matters in advance of trial and may consider them at any time.  Defendants erroneously argue that they are prejudiced because the radar testing was "impermissibly obtained without the approval of this Court and after all discovery had been completed and all discovery deadlines had passed."[2] Defendants also suggest that if the testing is admitted the parties need to do "a complete re-set of expert discovery."[3]  For the reasons stated in H&E's opposition to the motion for protective order, Defendants' arguments should be rejected.  H&E performed non-invasive testing on its own properties to resolve a fact issue *raised by Defendants* in expert discovery.  The testing occurred nine months ago, Defendants attended the testing, and H&E provided Defendants with the written results of the testing more than six months ago.  Thus, Defendants' claim that they have been prejudiced in their trial preparations rings hollow.  To the extent Defendants intend to defend their defective design on the basis that no testing was performed to confirm the pavement was installed as designed, the testing results are plainly relevant, and Defendants have been provided with ample advance notice of same.

---

[1]  Denial of motions for summary judgment and evidentiary motions are interlocutory and may be corrected on appeal after final judgment. *See Smith v. Metro. Prop. & Cas. Ins. Co.*, 2003-0223 (La. App. 1 Cir. 11/7/03), 868 So. 2d 57, 60, *writ denied*, 2003-3338 (La. 2/13/04), 867 So. 2d 693; *Augman v. City of Morgan City*, 2004-1746 (La. App. 1 Cir. 9/23/05); 914 So. 2d 583, 585.
[2] Defendants' Motion at pg. 1.
[3] *Id*. at pg. 2.

2

NON-CERTIFIED COPY

## CONCLUSION

For the reasons stated above, Defendants' motion to stay should be denied.

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile:  (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel

of record by facsimile, email and/or by placing same in the United States mail, postage prepaid

and properly addressed, this __12__ day of July, 2017.

Loretta G. Mince



3

1207388v.1

NON-CERTIFIED COPY

6709-17-000224



# RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**NUMBER  C626308 Division D**

vs.

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**STATE OF LOUISIANA**

TO:   PLAINTIFFS,
       H&E EQUIPMENT SERVICE INC.
       THROUGH BRENT B BARRIERE, LORI MINCE ,
       REBECCA SHA, QALYSSON MILLS
       201 ST CHARLES AVD., STE. 4600
       NEW ORLEANS, LA.  70170

W/GB ENTERED
PAPER            RETURN
14 / 9106/ 01
SERIAL NO.  DEPUTY  PARISH

The Mover in this case filed a petition which the Court granted.  Certified copies of this document
and the Court's Order are attached.

### MOTION IN LIMINE TO STRIKE EXPERT REPORTS AND TO EXCLUDE
PROPOSED
TESTIMONY OF WALLACE C DRENNAN, III

You MUST come to Court at 9:30 AM, on JULY 6, 2017 in Room 10-A , 300 North Boulevard,
Baton Rouge, Louisiana, and show cause why:

### * * * * * SEE ATTACHED ORDER * * * * *

### YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A
BENCH WARRANT MAY ISSUE FOR YOUR ARREST.

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on 26-JUN-2017.

_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

Requesting Attorney:
KELLEN J MATHEWS

---

**SERVICE INFORMATION:**

Received on the _29_ day of _June_, 20_17_ and on the _30_ day of _Jun_, 20_17_, served on the above named party as
follows:

**PERSONAL SERVICE:** On the party herein named at _201 St Chasle  thru Kush_

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of
_____, a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:**     After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone
legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20____.

SERVICE:$_____
M _____
_____

_Deputy Sheriff_
Parish of _Bala_

**RULE NISI (OOP) - 6709**

EBR4187466

NON-CERTIFIED COPY

EBR4048278

# DOUG WELBORN, CLERK OF COURT

## 19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE — STATE OF LOUISIANA

**POSTED**

JUL 19 2017

CIVIL EVIDENCE

NUMBER _____626308_____ DIV. _D_

H & E Services

(URS Corporation) Architecture, et al

DATE FILED IN EVIDENCE: _____7-6-17_____ BY COURT REPORTER: _Lori Acker_

LIST EXHIBITS: HE-1 thru globe — General Construction Notes ; Exce
from Depo of Murray Lee McCullough ; Excerpt from Depo of
Timothy Gaines

EVID-17-000803

EBR4254010

DO NOT WRITE IN SHADED AREA

INFORMATION BELOW THIS LINE SHALL BE FILLED IN BY A DEPUTY CLERK FROM THE CIVIL SUIT
DEPARTMENT AT THE TIME THE EVIDENCE IS CHECKED IN.
DELIVERED TO CIVIL SUIT RECORDS BY: _____

_____
(Signature)

_____
(Print Name)

DATE RECEIVED IN CIVIL SUIT RECORDS: _July 17, 2017_

BY DEPUTY CLERK: _____

NON-CERTIFIED COPY

# ADAMS AND REESE LLP



**Attorneys at Law**
Alabama
Florida
Georgia
**Louisiana**
Mississippi
South Carolina
Tennessee
Texas
Washington, DC

July 19, 2017

**POSTED**

JUL 20 2017

*MC*

**Kellen J. Mathews**
Direct:  225.378.3243
E-Fax:  225.336.5115
kellen.mathews@arlaw.com

<u>*VIA HAND DELIVERY*</u>

Honorable Doug Welborn
Clerk of Court, 19th Judicial District Court
East Baton Rouge Parish
300 North Boulevard
Baton Rouge, LA 70801



COST OK Amt. *127*
JUL 19 2017
BY
DY CLERK OF COURT

RE:     H&E Equipment Services v. URS Corporation, et al
        19th JDC No. 626308(D)
        Our File No. 25240-3

Dear Mr. Welborn:

Please issue a trial subpoena on an **expedited basis** on behalf of URS Corporation for the following witnesses to appear for trial in the above matter commencing on August 16, 2017, at 9:30 a.m. before Judge Janice Clark, Division D, Room 10A, Baton Rouge, LA:

*1370519*

        Brad Reese
        6737 General Haig
        New Orleans, LA 70124

Thank you and please don't hesitate to contact us if you have any questions.

Sincerely,
**ADAMS AND REESE, LLP**

RECD C.P.
JUL 20 2017

Victoria L. Zellers
Legal Secretary to Kellen J. Mathews

EBR4253746

NON-CERTIFIED COPY

450 Laurel Street, Suite 1900 | Baton Rouge, Louisiana  70801 | 225.336.5200 | Fax 225.336.5220
www.adamsandreese.com

# DOUG WELBORN, CLERK OF COURT
## 19th Judicial District Court
## Parish of East Baton Rouge
## 300 North Boulevard
## Baton Rouge, LA 70801
## Phone  (225)389-3960

NO.    **C626308 Division D**              24-JUL-2017


TO:    **ORLEANS PARISH SHERIFFS OFFICE**
       **CIVIL DEPARTMENT**
       **421 LOYOLA AVE**
       **NEW ORLEANS, LA 70112**

Please find attached CIVIL SUBPOENA  to be served in your parish for the above numbered suit.

Kindly make your return(s) on the duplicate(s) enclosed, and

X       note the enclosed check for payment of service;

ٿ       send us your bill for service;

ٿ       note that this is a pauper suit and no funds are available; or

ٿ       note that this is a government suit and no funds are necessary.

                          Thank You,

                          _Deputy Clerk of Court for_
                          **Doug Welborn, Clerk of Court**

**Requesting Attorney:  KELLEN J MATHEWS**

---

**REPLY:**                    **DATE:**_____

_____

_____

_____

_____

_____

                    By:_____

                    Deputy Sheriff, Parish of _____


**Letter to Out Of Parish Sheriff - 5213**



EBR4226679

NON-CERTIFIED COPY

6701-17-000942

# CIVIL SUBPOENA

| | |
|---|---|
| **H&E EQUIPMENT SERVICES INC**<br>(Plaintiff) | **NUMBER**   C626308 Division D |
| | **19th JUDICIAL DISTRICT COURT** |
| **vs.** | |
| | **PARISH OF EAST BATON ROUGE** |
| **URS CORPORATION ARCHITECTURE PC**<br>**ET AL**<br>(Defendant) | **STATE OF LOUISIANA** |

TO:    **BRAD REESE**
       **6737 GENERAL HAIG**
       **NEW ORLEANS, LA.  70124**

You must come to Court at 300 North Boulevard, on **AUGUST 16, 2017**, at **9:30** o'clock **AM**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **24-JUL-2017**, Baton Rouge, Louisiana.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

**SERVICE INFORMATION:**

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:**  On the party herein named at _____.

**DOMICILIARY SERVICE:**  On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**   After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20_____.

| | | |
|---|---|---|
| SERVICE: | $_____ | |
| MILEAGE | $_____ | Deputy Sheriff |
| TOTAL: | $_____ | |

CIVIL SUBPOENA – OOP - 6701



EBR4271893

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

DOCKET NO.: 626,308                                          SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____          _____
                                                              DEPUTY CLERK

### MEMORANDUM IN SUPPORT OF MOTION IN LIMINE
### TO EXCLUDE EVIDENCE REGARDING OTHER FACILITIES

**MAY IT PLEASE THE COURT:**

Plaintiff H&E Equipment Services, Inc. ("H&E") respectfully submits this Memorandum

in Support of its Motion in Limine to Exclude Evidence Regarding Other Facilities.

### OVERVIEW

H&E sells, services, and rents industrial equipment from 78 branch offices in 22 states.[2]

While H&E owns some of its facilities, including its corporate headquarters and branch office in

Baton Rouge and its branch office in Kenner, H&E leases the vast majority of its branch offices

from third parties.[3]

Defendant URS provides architectural, engineering, and other related services.  In this

case, H&E seeks damages from Defendants arising from Defendants' grossly defective design of

the pavement at H&E's facilities located in Baton Rouge and Kenner.[4]

During discovery, Defendants requested information relating to numerous other H&E

facilities around the country.  Some of the facilities are paved, some are unpaved, and many have

a combination of paved and unpaved areas.  In support of its discovery requests, Defendants

claimed that "URS is entitled to information from H&E to show that this same design is used at

---

[2] Ex. A (Excerpt from H&E's 2016 10-K).
[3] *Id.*
[4] H&E also seeks damages arising from other acts and omissions by Defendants, but the
evidence at issue in this motion relates exclusively to H&E's pavement claims.

1208787v.1

NON-CERTIFIED COPY

EBR4253435

other H&E facilities for unloading and storing its heavy tracked equipment and such evidence is relevant to show the standard of care."[5]

H&E objected to the discovery as overbroad and not reasonably designed to lead to the discovery of admissible evidence. After Defendants filed a motion to compel, H&E agreed to provide discovery responses identifying and providing details on fourteen (14) facilities that have concreted paved services and operations involving the routine traversal of heavy tracked equipment.[6] H&E also identified eleven (11) facilities owned or leased by H&E that do not have paved surfaces but have operations involving the routine traversal of heavy tracked equipment.[7]

As discussed in more detail, *infra*, the information provided by H&E revealed significant differences between H&E's Baton Rouge and Kenner facilities and the other facilities identified in discovery. H&E owns the facilities at issue in this case, and it hired URS to design pavement that would be suitable for H&E's business operations. By contrast, the other facilities are all leased by H&E from third parties and were constructed at varying times by varying people. Additionally, the facilities are located in different geographic locations with varying soil conditions. And importantly, contrary to Defendants' claim that it was entitled to discover information regarding H&E's other facilities to that "to show that this same design is used at other H&E facilities," there are significant variations in the design of the pavement at each facility. Indeed, as URS's own expert, Wayne Sledge, stated in his report: "These facilities represent a mix of design elements and a mix of results."[8] Mr. Sledge further noted that the thickness of the pavement, the joint construction and the joint spacing varied across the facilities.[9]

Nonetheless, H&E anticipates that Defendants will seek to introduce evidence of these other H&E facilities at trial. Defendants should be barred from doing so. "Facts" regarding H&E's other facilities have no relevance to H&E's claims against Defendants, and the

---

[5] Ex. B (Defendants' 5/11/15 Memorandum in Support of Motion to Compel at p. 11).

[6] Ex. C. The 14 facilities identified are located in (1) Alexandria, Louisiana; (2) Lake Charles/Sulphur, Louisiana; (3) Shreveport Hi-Lift, Louisiana; (4) Charlotte, North Carolina; (5) Raleigh, North Carolina; (6) Winston Salem, North Carolina; (7) Albuquerque, New Mexico; (8) New Orleans, Louisiana; (9) Columbia, South Carolina; (10) Corpus Christi, Texas; (11) Houston Hi-Lift, Texas; (12) Jackson, Mississippi; (13) Shreveport, Louisiana; and (14) Baltimore, Maryland.

[7] Ex. C. The 11 facilities identified are located in: (1) Little Rock, Arkansas; (2) Springdale, Arkansas; (3) Nashville, Tennessee; (4) Ashland, Virginia; (5) Norfolk, Virginia; (6) Roanoke, Virginia; (7) Warrenton, Virginia; (8) Memphis, Tennessee; (9) Jessup, Maryland; (10) Denver, Colorado; and (11) Arden, North Carolina.

[8] *See* Ex. D (Report of Wayne Sledge at p. 14)

[9] *Id.*

2

NON-CERTIFIED COPY

presentation of such information at trial will be highly prejudicial to H&E by confusing the issues and misleading the jury under Articles 401 through 403 of the Louisiana Code of Evidence.  Presentation of this sort of comparison evidence also flies in the face of established jurisprudence that "[e]vidence of other accidents occurring at substantially different places or under different circumstances or conditions is irrelevant and inadmissible."[10]  For these reasons, such evidence should be excluded.

## DISCUSSION

### I.    Legal Standard

A motion in *limine* serves to preclude prejudicial or objectionable evidence before it is presented to the jury.[11]  "The primary advantage of the motion is to avoid the futile attempt of trying to undo the harm done where jurors have been exposed to damaging evidence, even where stricken by the court."[12]  Determination of the admissibility of evidence is generally governed by the following three-part test under Articles 401-403 of the Louisiana Code of Evidence:

> (1) Is the evidence relevant to the issues before the court, as required by La. C.E. art. 402? (2) Does the evidence pass the "balancing test," established by La. C.E. art. 403? and (3) Do any of the exceptions established by La. C.E. art. 404(B) apply.[13]

"Evidence that is not relevant is not admissible."[14]  La. Code. Evid. art. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[15]  Additionally, under La. Code Evid. art. 403, evidence should be excluded where "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."[16]  In other words, "relevant evidence may be excluded if, among other things, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

---

[10] *Lee v. K-Mart Corp.*, 483 So.2d 609, 613 (La. App. 1st Cir. 1985), *writ denied*, 484 So.2d 661 (La. 1986).
[11] *Shelton v. Hair*, 939 So. 2d 685, 689 (La. App. 3d Cir. 2006) (motion in limine provides method for having court decide evidentiary matters prior to trial); 23 La. Civ. L. Treatise, Motions in Limine § 1:1.
[12] 23 La. Civ. L. Treatise, Motions in Limine § 1:1.
[13] *Glapion v. Bergeaux*, 2001-1865 (La. App. 4 Cir. 12/No. 11/02), 834 So. 2d No. 1141, No. 1144 (citing *In re Cerniglia v. French*, 2000-2768, 2000-2769, p. 5 (La.App. 4 Cir. 4/3/02), 816 So.2d 319, 323).
[14] *Schexnayder v. Bridges*, 2015-0786 (La. App. 1 Cir. 2/26/16); 190 So.3d 764, 770.
[15] *Bergeaux*, 834 So. 2d at No. 1145.
[16] La. Code. Evid. art. 403 (emphasis added).

3

1208787v.1   NON-CERTIFIED COPY

issues, or misleading the jury."[17]

**II.    The other H&E facilities differ significantly from the Baton Rouge and Kenner facilities.**

As noted above, in response to Defendants' discovery requests, H&E identified fourteen (14) facilities with paved (concrete) surfaces and eleven (11) facilities with non-paved (gravel, limestone, etc.) surfaces.  It goes without saying that facilities that are not paved have no relevance in this case.  Furthermore, of the eleven unpaved facilities identified, none are located in Louisiana.[18]

H&E also identified 14 facilities with paved surfaces.[19]  None of these is owned by H&E, none were designed by Defendants, and importantly, none were designed to serve as H&E's corporate headquarters to showcase H&E's equipment.  Additionally, as URS's own expert observed, each of H&E's facilities has features that differ from H&E's Baton Rouge and Kenner facilities.[20]  Many of them have a combination of paved areas and unpaved areas (where stone, limestone or aggregate is used).  And given that soil conditions vary from site to site, it is unsurprising that the thickness of the paved areas varies from site to site:  In Albuquerque, it's 7-inches;[21] in Baltimore, Memphis and Raleigh, it's 8 inches;[22] in Corpus Christie, it's 6-1/2 inches.[23]  Pavement thickness is generally governed by the specific recommendations of a geotechnical engineer.  For the Baton Rouge facility, the geotechnical engineer recommended a minimum pavement thickness of 7-inches, and yet the majority of the pavement designed by URS at Baton Rouge is only 6-inches thick.  Given the recommendation of the geotechnical engineer, URS's design of the pavement to be only 6-inches thick is patently defective.  The thickness of pavement at other H&E facilities (which is presumably based on geotechnical reports prepared for each of those facilities) is wholly irrelevant to this fact.

---

[17] *Schexnayder*, 190 So.3d at 770.
[18] *See* FN 5, *supra.*
[19] *See* FN 6, *supra.*
[20] *See* Ex. D (Report of Wayne Sledge at p. 14)
[21] See Ex. E.
[22] See Ex. F, G and H.
[23] See Ex. I.

4

1208787v.1    NON-CERTIFIED COPY

The design of the expansion and contraction joints also varies. For example, on the plans showing the depth of the contraction joints, each mandates that the joints be either 2-inches deep, or ¼ of the total depth of the pavement.[24]  Defendants' design of the pavement at H&E's Baton Rouge and Kenner facilities reflects control joints that are only ¼" to ½" deep.

In addition to the foregoing, three of the facilities were originally used for hi-lift (aerial platform) equipment.[25]  Nine of the fourteen are located outside of Louisiana in North Carolina, South Carolina, New Mexico, Texas, and Maryland.

**III.     Evidence of other H&E facilities should be excluded pursuant to Articles 401-403 and *Lee v. K-Mart Corp.***

Under the standards articulated in La. Code Evid. arts. 401-403, Defendants should be barred from presenting evidence regarding H&E facilities not at issue in this case. As shown above, because there are significant differences between the other facilities and the Baton Rouge and Kenner facilities, evidence from the other facilities would have no probative value under La. Code Evid. art. 401. Stated simply, facts relating to the other facilities are not relevant because they do not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. Code Evid. art. 401.

Defendants previously claimed that they were entitled to obtain evidence regarding other facilities to show that their design of the Baton Rouge and Kenner pavement was consistent with the design of the pavement at other H&E facilities. As discussed above, the evidence shows the opposite. And to the extent Defendants seek to offer evidence that the pavement at other H&E facilities has experienced spalling or cracking, such evidence would be improper under established Louisiana jurisprudence. In *Lee v. K–Mart Corp.,* 483 So.2d 609, 613 (La. App. 1st Cir.1985), *writ denied,* 484 So.2d 661 (La.1986), the First Circuit held that evidence of other accidents is only relevant where such accidents are closely related in circumstances to the accident, injury or hazard at issue in the instant case:

> To be relevant, the other accident should occur at substantially the same place and under substantially the same conditions and must be caused by the same or a similar defect, danger, act or omission. Evidence of other accidents occurring at substantially different places or under different circumstances or conditions is irrelevant and inadmissible.

---

[24] See, e.g., Ex. I, J, K.
[25] Those facilities are the Shreveport Hi-Lift, the Houston Hi-Lift and Charlotte Hi-Lift. Hi-Lift aerial equipment has rubber tires and is generally lighter.

1208787v.1

NON-CERTIFIED COPY

*Id.* Courts have repeatedly applied the above rule to prevent such irrelevant and prejudicial comparison evidence from reaching the jury. For example, in *Maldonado v. Kiewit Louisiana Co.*, the First Circuit held that a report prepared in connection with "an industry-wide study on rebar cage installation" conducted after the instant case and containing "information about three accidents that had occurred more than ten years before the instant accident" were not sufficiently similar to be relevant to the instant case involving injuries caused by a rebar cage collapsed during a bridge-widening project. 2012-1868 (La. App. 1 Cir. 5/30/14); 152 So.3d 909, 925, *writ denied,* 2014-2246 (La. 1/16/15); 157 So.3d 1129. Similarly, in *Schexnayder v. Bridges*, the First Circuit held that a ten-year-old unrelated administrative complaint against a physician relating to a personal injury suit "in another state and involving other patients" had no probative value to the case at hand relating to the same physician's surgical treatment of the plaintiff. 2015-0786 (La. App. 1 Cir. 2/26/16); 190 So.3d 764, 771; *see also Bates v. Denney*, 563 So. 2d 298, 300 (La. App. 1st Cir. 1990), *writ denied*, 566 So. 2d 961 (La. 1990) (evidence of prior lawsuit involving "different plaintiff and other named defendants in addition to [physician], a different patient; occurred several years prior to the instant case; and arose under different circumstances" was not relevant).

The above jurisprudence requires the exclusion of evidence relating to other H&E facilities. As discussed above, there are significant differences between the other facilities and the Baton Rouge and Kenner facilities. By illustration, an H&E facility located in Charlotte, North Carolina that was constructed as a Hi-Lift facility over 15 years ago and designed by another architect/engineer has no bearing on Defendants' grossly defective work on the Baton Rouge and Kenner facilities.[26]

Finally, even if evidence regarding H&E's other facilities was relevant (and it is not), the admission of such evidence would be contrary to La. Code Evid. art. 403. Article 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." Here, the presentation of evidence regarding facilities constructed at different times, in different locations, and incorporating different designs would confuse the issues in the case and potentially mislead the jury, while simultaneously wasting their time and that of the Court.

---

[26] *See* Ex. L.

6

1208787v.1

NON-CERTIFIED COPY

## CONCLUSION

For the foregoing reasons, the H&E respectfully pray that this Court grant their motion *in limine* and enter an order excluding evidence regarding H&E facilities other than the ones at issue in this case.

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile:  (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*


## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by facsimile, email and/or by placing same in the United States mail, postage prepaid and properly addressed, this 24th day of July, 2017.

Loretta G. Mince



1208787v.1

NON-CERTIFIED COPY

Item 2.    Properties

As of February 16, 2017, we had a network of 78 full-service facilities, serving approximately 38,800 customers across 22 states in the West Coast, Intermountain, Southwest, Gulf Coast, Southeast and Mid-Atlantic regions of the United States. In our facilities, we rent, display and sell equipment, including tools and supplies, and provide maintenance and basic repair work. Of the 78 total facilities, we own 11 of our locations and lease 67 locations. Our leases typically provide for varying terms and renewal options. The following table provides data on our locations and the number of multiple branch locations in each city is indicated by parenthesies:

| City/State | Leased/Owned | City/State | Leased/Owned |
|---|---|---|---|
| **Alabama (2)** | | **Montana (2)** | |
| Birmingham | Leased | Belgrade | Leased |
| Huntsville | Leased | Billings | Leased |
| **Arizona (2)** | | **New Mexico (1)** | |
| Phoenix | Owned | Albuquerque | Leased |
| Tucson | Owned | **Nevada (2)** | |
| **Arkansas (2)** | | Las Vegas | Leased |
| Little Rock | Owned | Reno | Leased |
| Springdale | Owned | **North Carolina (4)** | |
| **California (9)** | | Arden | Leased |
| Bakersfield | Leased | Charlotte | Leased |
| Benicia | Leased | Raleigh | Leased |
| Fontana | Leased | Winston-Salem | Leased |
| La Mirada | Leased | **Oklahoma (2)** | |
| Sacramento | Leased | Oklahoma City | Leased |
| San Diego | Leased | Tulsa | Leased |
| San Jose | Leased | **South Carolina (3)** | |
| Santa Fe Springs | Owned | Charleston | Leased |
| Union City | Leased | Columbia | Leased |
| **Colorado (2)** | | Greenville | Leased |
| Colorado Springs | Leased | **Tennessee (3)** | |
| Denver | Owned | Chattanooga | Leased |
| **Florida (5)** | | Memphis | Leased |
| Fort Myers | Leased | Nashville | Leased |
| Jacksonville | Leased | **Texas (15)** | |
| Orlando | Leased | Austin | Leased |
| Pompano Beach | Leased | Beaumont | Leased |
| Tampa | Leased | Corpus Christi | Leased |
| **Georgia (3)** | | Dallas(2) | Leased(1) Owned(1) |
| Atlanta | Leased | Fort Worth | Leased |
| Savannah | Leased | Freeport | Leased |
| Suwannee | Leased | Houston(2) | Leased(2) |
| **Idaho (2)** | | Katy | Leased |
| Boise | Leased | Lubbock | Leased |
| Coeur d'Alene | Leased | Mesquite | Leased |
| **Louisiana (9)** | | Midland | Leased |
| Alexandria | Leased | Pasadena | Leased |
| Baton Rouge | Owned | San Antonio | Leased |
| Belle Chasse | Leased | **Utah (2)** | |
| Kenner | Owned | Salt Lake City | Leased |
| Lafayette | Leased | St. George | Leased |
| Lake Charles | Leased | **Virginia (4)** | |
| New Orleans | Leased | Ashland | Owned |
| Shreveport(2) | Leased(2) | Chesapeake | Leased |
| **Maryland (2)** | | Roanoke | Owned |
| Baltimore | Leased | Warrenton | Leased |
| Forestville | Leased | **Washington(1)** | |
| **Mississippi (1)** | | Seattle | Leased |
| ▪kson | Leased | | |





NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308     DIV. D |
|---|---|---|
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL | * | PARISH OF EAST BATON ROUGE |
| JOHNSON AND THOMAS E. RYAN, III | * | STATE OF LOUISIANA |

---

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO COMPEL DISCOVERY RESPONSES

---

MAY IT PLEASE THE COURT:

Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III (collectively referenced herein as "Defendants"), respectfully submit this Memorandum in Support of their Motion to Compel Discovery Responses from Plaintiff, H&E Equipment Services, Inc.   As is set forth more fully herein, Plaintiff has failed and/or refused to provide responses or produce documents responsive to Defendants' reasonable Interrogatories and Requests for Production of Documents and as such, Defendants are entitled to an Order of this Court compelling discovery pursuant to La. Code Civ. Proc. art. 1469, including attorney's fees and costs associated with this Motion to Compel.

### I.     INTRODUCTION

Plaintiff seeks damages for what it asserts were "deficient designs and specifications prepared by URS for the construction and renovation of H&E facilities in Baton Rouge, Kenner, and Belle Chase, Louisiana between 2006 and 2013."[1]  Plaintiff has pleaded that Defendants breached a duty to design the several H&E projects to "appropriate industry standards and/or in accordance with the required standard of care ordinarily exercised by others in the same profession."[2]  Defendants propounded

---

[1] Pltff. Mem in Supp. of Mot. to Compel at p.1.
[2] Pltff. Pet. at. ¶16.

1

NON-CERTIFIED COPY

EXHIBIT
B

Interrogatories and Requests for Production germane to the issues set forth in Plaintiff's Petition and Defendants' defenses, yet Defendants have been denied information and responsive materials relative to key components of Plaintiff's claims and the respective defenses thereto.

## II.    FACTUAL BACKGROUND & PROCEDURAL HISTORY

Plaintiff, H&E Equipment Services, Inc. ("H&E") contracted with URS Corporation Architecture, P.C. and its affiliates or subsidiaries ("URS") to perform consulting and professional engineering services in connection with construction and renovation at H&E's Baton Rouge, Kenner and Belle Chase locations (collectively referenced herein as "the Projects"). In November, 2013, H&E filed the instant lawsuit asserting a breach of standards of care on the part of URS in connection with the Projects.

*H&E's Allegations*

H&E in its Petition for Damages essentially asserts, *inter alia*, that:

- "URS has breached its agreement with H&E by… failing to design the Projects in accordance with appropriate industry standards and/or in accordance with the required standard of care ordinarily exercised by others in the same profession."[3]

- "URS … failed to exercise the ordinary skill, care and diligence in designing, and managing the construction of the Projects"."[4]

H&E's claims are primarily rooted in issues allegedly experienced with regard to "major portions of the concrete parking aprons and staging areas for H&E's heavy equipment" at its Baton Rouge and Kenner locations.[5] H&E complains that these areas "at both facilities began experiencing a substantial and unanticipated amount of cracking, spalling and deterioration" as a result of "errors and defects in the design of

---

[3] Pltff. Pet. at ¶16.
[4] Pltff. Pet. at ¶18.
[5] Pltff. Pet. at ¶13.

2

NON-CERTIFIED COPY

the parking and staging areas."[6]   H&E specifically avers that "the design deficiencies relate to the defective and negligent design of the concrete pad, the expansion joints, the control joints, the specified concrete strength, and/or the specified surface of the parking and staging areas."[7]

*Defendants' Defenses and Reconventional Demand*

Defendants assert that they did not deficiently design the plans and specifications.  With respect to the primary allegations concerning the concrete staging area for H&E's heavy tracked equipment, Defendants assert, among other defenses, that concrete, rather than limestone, was required by zoning regulations for the staging area for H&E's heavy tracked equipment; that the design was pursuant to appropriate industry standards; that any damages were caused by H&E's lack of proper maintenance and normal wear and tear; that H&E failed to mitigate any damages; and that H&E is not entitled to damages by virtue of the express terms of the Agreement between these sophisticated public companies.

Defendant, URS Corporation Architecture, P.C. (URS), has also asserted a reconventional demand against H&E for over $200,000.00 past due for URS's services rendered pursuant to the Agreement between these parties.  URS also asserts that H&E has been unjustly enriched by using all the facilities constructed pursuant to the design and specifications provided by URS without fully paying URS for the services provided.

*Defendants' Reasonable Discovery Requests*

Defendants propounded their First Set of Requests for Production on Plaintiff through its counsel of record on November 14, 2014.  Defendants' discovery requests were calculated to elicit the production of materials relevant to H&E's claims and Defendants' defenses.[8]  Subsequently, on April 17, 2015, Defendants propounded their

---

[6] *Id.*
[7] *Id.*
[8] Exhibit "A"- Def. 1st Set of Req. for Prod at Req. No. 5; Req. No. 32(g); and Req. No. 36.

NON-CERTIFIED COPY

First Set of Interrogatories on Plaintiff through its counsel of record.[9]  Here again, Defendants' Interrogatories were calculated to elicit the production of information relevant to H&E's claims and Defendants' defenses.

### H&E has Refused and/or Failed to Provide the Requested Documents

On December 23, 2014 Plaintiff provided written responses to Defendants' Requests for Production.[10]  Plaintiff, in its written responses to Defendants' Requests for Production, objected outright and refused to produce documents with regard to several Requests for Production.

Upon receipt of Plaintiff's responses and review of the same, defense counsel contacted Plaintiff's counsel to schedule a discovery conference to address Plaintiff's deficient responses to eighteen (18) distinct Requests for Production.    A discovery conference was held on January 7, 2015 wherein counsel for both parties participated and addressed the outstanding discovery issues.  Plaintiff maintained its objection to several of the Requests and also agreed to provide a Protective Order to facilitate the exchange of documents.   To date, Plaintiff has failed to produce documents responsive to Defendants' Requests for Production Numbers 5, 6, 18, 20 and 36.

### H&E has Refused and/or Failed to Provide Responses to the Interrogatories

On May 4, 2015, Plaintiff produced its responses to Defendants' Interrogatories.[11] Because these responses consisted of objections to all but one of Defendants' reasonable Interrogatories, counsel for Defendants scheduled a discovery conference, with Plaintiff's counsel's consent, for May 8, 2015.   In this discovery conference, Plaintiff maintained its objections to all but one of Defendants' Interrogatories and has refused to provide substantive responses to the same.

---

[9] Exhibit "B"- Def. 1ˢᵗ Set of Interrog.
[10] Exhibit "C"- Pltff.'s Resp. to Req. for Prod.
[11] Exhibit "D"- Pltff. Resp. to Def. 1ˢᵗ Set of Interrog.

4

NON-CERTIFIED COPY

## III. LAW & ARGUMENT

### A. *Legal Standard on Motion to Compel*

Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party.[13] Although the information may not be admissible at trial, it is discoverable so long as it appears reasonably calculated to lead to the discovery of admissible evidence.[14]

It is well-settled that Courts must liberally and broadly construe discovery statutes to achieve their intended objectives.[15] These objectives include: (1) to afford all parties a fair opportunity to obtain facts pertinent to the litigation, (2) to discover the true facts and compel disclosure of these facts wherever they may be found, (3) to assist litigants in preparing their cases for trial, (4) to narrow and clarify the basic issues between the parties, and (5) to facilitate and expedite the legal process by encouraging settlement or abandonment of less than meritorious claims.[16]

Pursuant to Article 1462 of the Louisiana Code of Civil Procedure, the "party submitting the request may move for an order under Article 1469 with respect to any objection to or other failure to respond to the request, or any part thereof, or any failure to permit inspection as requested."

Article 1469 of the Louisiana Code of Civil Procedure, provides in pertinent part:

A party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling discovery as follows:

***(2) If a deponent fails to answer a question propounded or submitted under Articles 1437 or 1448, or a corporation or other entity fails to make a designation under Articles 1442 or 1448, or a party fails to answer an interrogatory submitted under Article 1457, *or if a party, in response to a request for inspection submitted under Article 1461, fails to respond that inspection will be permitted as requested or*

---

[13] La. Code. Civ. Proc. art. 1422.

[14] *Id.*

[15] *Testa Distributing Co., Inc. v. Tarver*, 584 So.2d 300 (La.App. 1 Cir.1991).

[16] *Hodges v. Southern Farm Bureau Casualty Insurance Company*, 433 So.2d 125 (La.1983); *Cantrelle Fence and Supply Co., Inc. v. Allstate Insurance Company*, 550 So.2d 1306 (La.App. 1st Cir.1989).

NON-CERTIFIED COPY

*fails to permit inspection as requested, the discovering party may move for an order compelling an answer, or a designation, or an order compelling inspection in accordance with the request…*

\*\*\*

*(4) If the motion is granted, the court shall, after opportunity for hearing, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees,* unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.

    B.    *The Documents Sought in the Requests for Production Are Relevant and Reasonably Calculated to Lead to the Discovery of Admissable Evidence.*

    1.  *Requests No. 5 and 36*

H&E objected to the production of documents in response to Defendants'

Requests for Production No. 5 and No. 36 which provide as follows:

    <u>REQUEST FOR PRODUCTION NO. 5:</u> Please produce copies of any and all Documents concerning communications relating to alternative designs considered by You for the Projects.

    <u>RESPONSE TO REQUEST FOR PRODUCTION NO. 5:</u> H&E objects to Request for Production No. 5 as overbroad and vague in its request for communications and information regarding undefined "alternative designs." H&E further objects to the extent this request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, as "alternative" designs are irrelevant to the claims in this litigation. That said, to the extent that there were any communications regarding "alternative designs," such communications would have been with URS, and to that extent, URS is referred to H&E's objections and response to Request for Production No. 1.

    <u>REQUEST FOR PRODUCTION NO. 36:</u> Please provide copies of any and all Documents relating to any and all alternatives to the design, engineering or construction of the Paved Surfaces including alternatives considered: (1) during the design and engineering stage, (2) during the construction of the Paved Surfaces, (3) upon completion and (4) prior to discovery of problems or deficiencies in the Paved Surfaces; and (5) at any time since the discovery of problems and deficiencies in the Paved Surfaces.

    <u>RESPONSE TO REQUEST FOR PRODUCTION NO. 36:</u> Please see H&E's objections and responses to Request for Production No. 1, 13, and 14.

In the discovery conference on January 7, 2015, the parties discussed these responses

and clarified that Requests No. 5 and No. 36 were limited to alternative designs relative

to the paved areas at issue and included H&E's discussions with URS as well as other

6

NON-CERTIFIED COPY

persons.[17]  H&E indicated that it anticipated that materials exchanged with URS or contractors following the beginning of construction on the projects responsive to Request No. 5 should be included in H&E's production of project files and all non-privileged information relative to the Projects.[18]  However, with respect to any of what counsel for H&E termed "pre-construction" documents relative to alternative designs in connection with the Projects, H&E maintained its objection as to relevance.[19]

H&E essentially claims in this suit that Defendants should have used alternative designs or specifications.  It is, therefore, relevant to determine what alternative designs or specifications were considered by H&E at any time.  Such alternative designs or specifications are relevant to the standard of care.  Communications that involved H&E regarding any alternative designs or specifications are relevant regardless of when such communications took place.  The objection to pre-construction communications is meritless.

2.  *Request No. 6*

H&E objected to the production of documents in response to Defendants' Request for Production No. 6 which provides as follows:

REQUEST FOR PRODUCTION NO. 6: Please produce copies of any and all Documents concerning communications relating to budgeting for the Projects.

RESPONSE TO REQUEST FOR PRODUCTION NO. 6:  H&E objects to Request for Production No. 6 as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admission evidence.  H&E's "budgeting" for the Projects is irrelevant to the claims in this litigation.

Essentially, H&E asserts that a different design or specification should have been used in the concrete staging area, and that more parking spaces should have been provided.  Both would have cost more money for H&E in original construction.  Consequently, it is relevant for Defendants to be able to show that such increased costs

---

[17] Exhibit "D"- Jan 7, 2015 E-mail regarding Discovery Conference.
[18] *Id.*
[19] *Id.*

7

NON-CERTIFIED COPY

would have exceeded H&E's budget for the Projects. In other words, it is relevant to show that H&E now wants a Cadillac when it only budgeted for a Chevy.

> 3. *Request No. 18*

H&E objected to the production of documents in response to Defendants' Request for Production No. 18 which provides as follows:

> **REQUEST FOR PRODUCTION NO. 18:** Please produce copies of any and all Documents including but not limited to reports, letters, correspondence, journals, treatises, memoranda, or materials with regard to the "industry standards" and/or "required standard of care" referenced in Paragraph 16 of your Petition or any other standard of care that you contend is applicable in this case.

> **RESPONSE TO REQUEST FOR PRODUCTION NO. 18:** H&E objects to Request for Production No. 18 as premature and insofar as it seeks information protected from disclosure by the attorney-client privilege and/or work product doctrine. Subject to and without waiving this objection and the General Objections above, H&E will produce its expert report(s) and any other documents responsive to this request in accordance with the scheduling order(s) entered by the Court in this case.

H&E claims it is premature to find out what "industry standard" or "standard of care" it referenced or asserted applied in Paragraph 16 of its Petition when it filed suit. Defendants are entitled to know what H&E relied on to assert the applicable standard of care or industry standard when H&E filed suit against Defendants. How can it be premature to find out what standard H&E alleged was not met when it filed this suit?

If H&E had information on such industry standard, then Defendants are entitled to such information to defend this suit. If H&E had no such information when it filed this suit, then to make such an allegation without a basis goes to H&E's credibility.

> 4. *Request No. 20*

H&E objected to the production of documents in response to Defendants' Request for Production No. 20 which provides as follows:

> **REQUEST FOR PRODUCTION NO. 20:** Please produce a copy of any and all Documents in your possession that you contend establish or illustrate the "negligent acts and/or omissions" that you attribute to URS in Paragraph 18 of your Petition.

NON-CERTIFIED COPY

<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 20:</u>  Please see H&E's
objections and responses to Request for Production Nos. 1 and 18.

H&E claimed when it filed this suit that URS was guilty of "negligent acts and/or

omissions." Yet, H&E claims it is premature for URS to find out what facts or standards

H&E relied on when it made the allegations in this suit.  Again, how can it be

premature to find out what facts and standards H&E relied on to file this suit?  If H&E

had information on which to base its allegation of negligent breach of a standard,

Defendants are entitled to know such information in order to defend this suit.  If H&E

had no such information of a standard or breach thereof, then to make such allegation

without a basis goes to H&E's credibility.

*C. The Information Sought by Way of Defendants' Interrogatories Is Relevant
and Reasonably Calculated to Lead to the Discovery of Admissible Evidence.*

In response to Interrogatories No. 2 through 5, Plaintiff responded with

objections of overbroadness and irrelevance which provide as follows:

<u>INTERROGATORY NO.2:</u>  Please Identify any and all locations or sites that
have been owned or leased by H&E, other than Baton Rouge or Kenner, with
Paved Surfaces on which the types of equipment identified in Interrogatory No.
1 have been operated, loaded, unloaded, stored or parked, and for each such
location please Identify the period of time H&E has owned or leased said
location or site.

<u>RESPONSE TO INTERROGATORY NO. 2:</u>
H&E objects to Interrogatory No. 2 as overbroad and as seeking information that
is neither relevant nor reasonably calculated to lead to the discovery of
admissible evidence. Information regarding other H&E —owned or —leased
facilities not at issue in this litigation is irrelevant to the claims in this litigation.

<u>INTERROGATORY NO. 3:</u>
With regard to each and every location or site identified in your response to
Interrogatory No. 2 above, please Identify:
(a)    the type(s) of tracked equipment that have been operated, loaded,
unloaded, stored or parked on these Paved Surfaces;
(b)    the date when the Paved Surface was first installed at each respective
location;
(c)    the entity or person(s) who designed the Paved Surfaces at each
respective location;
(d)    the entity or person(s) who constructed the Paved Surfaces at each
respective location;
(e)    the cost of construction of the Paved Surfaces at each respective location;
(f)    the status and condition of the Paved Surfaces at each respective location;

9

NON-CERTIFIED COPY

(g)    the types of expansion/construction joints existing in these Paved Surfaces;

(h)    whether any of the expansion/construction joints have reinforced or armored joints and, if so, Describe such reinforcement or armor applicable at each location or site:

(i)    the status and condition of the expansion/construction joints in these Paved Surfaces;

(j)    any problems or deficiencies noted with regard to the expansion/construction joints in these Paved Surfaces;

(k)    any maintenance program applicable to the expansion/construction joints and/or these Paved Surfaces;

(1)    any and all repairs, replacements or maintenance made with regard to the Paved Surfaces, including the expansion/construction joints in the same;

(m)    the dates of any and all repairs, replacements or maintenance conducted with regard to the Paved Surfaces, including the expansion/construction joints in the same;

(n)    the results of any such repairs, replacements or maintenance;

(o)    the cost of any such repairs, replacements or maintenance.

## RESPONSE TO INTERROGATORY NO. 3:

H&E objects to Interrogatory No. 3, including subparts (a) — (o), as overbroad and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Information regarding other H&E —owned or —leased facilities not at issue in this litigation is irrelevant to the claims in this litigation.

## INTERROGATORY NO.4:

Please Identify the reasons for the decisions to repair, replace or maintain the Paved Surfaces, including the expansion/construction joints in the same, as indicated in your response to Interrogatory No. 3(i) above, and the person or person(s) responsible for the decision(s) to make these repairs, replacements or maintenance.

## RESPONSE TO INTERROGATORY NO. 4:

Please see response and objections to Interrogatory No. 3.

## INTERROGATORY NO. 5:

Please Identify any and all locations or sites that have been owned or leased by H&E, other than Baton Rouge or Kenner, with Paved Surfaces on which the types of equipment identified in Interrogatory No. 1 have been operated, loaded, unloaded, stored or parked on surfaces that are not paved with concrete (hereinafter, "Unpaved Surfaces"), and for each such location please Identify:

(a)    the types of tracked equipment that have been operated, loaded, unloaded, stored or parked on the Unpaved Surfaces;

(b)    the types of surfaces that have been in place where such equipment has been operated, loaded, unloaded, stored or parked at these locations; the reasons this surface was used instead of a Paved Surface;

(c)    the person or persons responsible for the design that called for an Unpaved Surface rather than a Paved Surface;

(d)    any maintenance program applicable to these Unpaved Surfaces;

(e)    any and all repairs, replacements or maintenance conducted with regard to these Unpaved Surfaces;

10

NON-CERTIFIED COPY

(f)    the dates of any and all repairs, replacements or maintenance conducted with regard to these Unpaved Surfaces;

(g)    the results of any such repairs, replacements or maintenance; and

(h)    the cost of any such repairs, replacements or maintenance.

<u>RESPONSE TO INTERROGATORY NO. 5:</u>

H&E objects to Interrogatory No. 5, including subparts (a) — (i), as overbroad and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Information regarding other H&E —owned or —leased facilities not at issue in this litigation is irrelevant to the claims in this litigation.

Plaintiff's objections to these Interrogatories are misplaced where Plaintiff asserts that "[i]nformation regarding other H&E —owned or —leased facilities not at issue in this litigation is irrelevant to the claims in this litigation."   This assertion ignores the plain language of La. Code Civ. Proc. art. 1422 which provides that parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim *or defense of the party seeking discovery* or to the claim or defense of any other party…"*(emphasis added)*.

In this suit, H&E claims that URS should have used a different design for the paved area in which it unloads and stores its heavy tracked equipment.  H&E claims that the design used by URS did not meet the standard of care.  URS is entitled to information from H&E to show that this same design is used at other H&E facilities for unloading and storing its heavy tracked equipment and such evidence is relevant to show the standard of care.  Such evidence is also relevant to show what maintenance or repairs may be employed at such other facilities which may not be employed at the locations which are the subject of this suit to prevent damage.  Finally, URS is entitled to information from H&E on what unpaved designs are used at its other facilities for unloading and storing its heavy tracked equipment which is relevant to the standard of care, including the reasons why such other surfaces are used at those locations, the advantages and disadvantages of such other surfaces, and the maintenance and repairs of such other surfaces which may not be employed at the locations at issue in this suit.  Accordingly, Defendants seek an Order compelling Plaintiff to provide responses to

11

NON-CERTIFIED COPY

Interrogatories 2 through 5 which is relevant and may lead to the discovery of admissible information that will further support Defendants' defenses.

### D. The Remaining Documents Should Be Produced Without Further Delay.

With regard to the remainder of the Requests for Production, H&E has agreed to produce documents. At the discovery conference on January 7, 2015, counsel for H&E anticipated that they would circulate search terms to facilitate the identification and exchange of electronically stored discovery materials within roughly two weeks following the conference. H&E took over three months after the discovery conference to circulate proposed search terms it agreed to circulate in order to facilitate the exchange of documents. Defendants recently received proposed search terms and H&E has advised that a draft Protective Order would be forthcoming as of the filing of this Motion. Plaintiff has not, as of the time of the filing of this Motion, produced any documents. Defendants therefore move this Honorable Court to the extent necessary for an Order directing H&E to take whatever remaining steps are necessary so that any and all materials responsive to Defendants' requests that are not otherwise privileged can be produced.

## IV. CONCLUSION

For the foregoing reasons, Defendants seek an Order from this Honorable Court compelling Plaintiff, H&E Equipment Services, Inc. to produce complete responses to Defendants' Interrogatories No. 2 to 5 propounded on April 17, 2015 and Requests for Production of Documents Numbers 5, 6, 18, 20 and 36 propounded on November 14, 2014, and to take all necessary steps to produce documents as agreed, as well as an award of reasonable attorneys' fees and costs associated with the filing of this motion pursuant to La. Code Civ. Proc. art. 1469(4).

NON-CERTIFIED COPY

Respectfully submitted,

ADAMS AND REESE, LLP

_____
Philip A. Franco      (Bar #5819), TA
Ron Sholes            (Bar # 14436)
Kellen J. Mathews     (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210

ATTORNEYS FOR DEFENDANTS, URS
CORPORATION ARCHITECTURE, P.C.;
URS CORPORATION; L. O'NEAL RYAN
AND THOMAS E. RYAN, III

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been served

upon all counsel of record via United States mail, properly addressed, and first class

postage prepaid and via email, this the _____ day of May, 2015.

_____
Kellen J. Mathews

13

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURTPARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                          SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____       _____
                                                    DEPUTY CLERK

### AMENDED AND SUPPLEMENTAL RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES ON BEHALF OF H&E EQUIPMENT SERVICES, INC.

H&E Equipment Services, Inc. (hereinafter referred to as "H&E") hereby provides the following amended and supplemental responses to the first set of interrogatories issued by defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III (collectively, "URS"):

### GENERAL OBJECTIONS

H&E incorporates as if stated herein the same General Objections stated in its original responses to URS's first set of interrogatories.

### INTERROGATORIES

#### INTERROGATORY NO. 2:

Please Identify any and all locations or sites that have been owned or leased by H&E, other than Baton Rouge or Kenner, with Paved Surfaces on which the types of equipment identified in Interrogatory No. 1 have been operated, loaded, unloaded, stored or parked, and for each such location please Identify the period of time H&E has owned or leased said location or site.

#### RESPONSE TO INTERROGATORY NO. 2:

H&E objects to Interrogatory No. 2 on the basis that it is overbroad and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Information regarding other H&E owned or leased facilities, not at issue in this litigation, is irrelevant to the claims in this litigation.

Subject to these objections, H&E responds that it has identified the following facilities as having concrete Paved Surfaces where operations similar to those conducted at H&E's Baton

1103082v.1



NON-CERTIFIED COPY

Rouge and Kenner facilities, *i.e.*, operations involving the routine traversal of heavy tracked equipment, are conducted[1]:

1. Alexandria, Louisiana

2. Lake Charles/Sulphur, Louisiana

3. Shreveport Hi-Lift, Louisiana[2]

4. Charlotte, North Carolina

5. Raleigh, North Carolina

6. Winston Salem, North Carolina[3]

7. Albuquerque, New Mexico

8. New Orleans, Louisiana

9. Columbia, South Carolina

10. Corpus Christi, Texas

11. Houston Hi-Lift, Texas

12. Jackson, Mississippi

13. Shreveport, Louisiana[4]

14. Baltimore, Maryland

**INTERROGATORY NO. 3:**

With regard to each and every location or site identified in your response to Interrogatory No. 2 above, please Identify:

    (a)   the type(s) of tracked equipment that have been operated, loaded, unloaded, stored or parked on these Paved Surfaces;

    (b)   the date when the Paved Surface was first installed at each respective location;

    (c)   the entity or person(s) who designed the Paved Surfaces at each respective location;

    (d)   the entity or person(s) who constructed the Paved Surfaces at each respective location;

    (e)   the cost of construction of the Paved Surfaces at each respective location;

    (f)   the status and condition of the Paved Surfaces at each respective location;

---

[1] For the purposes of determining whether the similar equipment were regularly operated, loaded, unloaded, stored or parked, we identified sites that have ten or more pieces of similar equipment.
[2] H&E's facility refers to the one located on 3775 Old Shed Rd. Bossier City, LA 70111.
[3] H&E's August 24, 2015 Amended and Supplemental Interrogatory Response identified Dallas, Texas located in Grand Prairie as a facility with concrete Paved Surfaces where operations involving the routine traversal of heavy tracked equipment were conducted. Further investigation revealed that the Dallas, Texas facility does not have the same operations involving the routine traversal of heavy tracked equipment; the facility is primarily a crane operation.
[4] This H&E facility refers to the one located on 5908 Industrial Dr. Bossier City, LA, 71112.

2

1103082v.1

NON-CERTIFIED COPY

(g)     the types of expansion/construction joints existing in these Paved Surfaces;

(h)     whether any of the expansion/construction joints have reinforced or armored joints and, if so, Describe such reinforcement or armor applicable at each location or site;

(i)     the status and location of the expansion/construction joints in these Paved Surfaces;

(j)     any problems or deficiencies noted with regard to the expansion/construction joints in these Paved Surfaces;

(k)     any maintenance program applicable to the expansion/construction joints and/or these Paved Surfaces;

(l)     any and all repairs, replacements or maintenance made with regard to the Paved Surfaces, including the expansion/construction joints in the same;

(m)     the dates of any and all repairs, replacements or maintenance conducted with regard to the Paved Surfaces, including the expansion/construction joints in the same;

(n)     the results of any such repairs, replacements or maintenance;

(o)     the cost of any such repairs, replacements or maintenance.

## RESPONSE TO INTERROGATORY NO. 3:

H&E amends and supplements its previous response to Interrogatory No. 3 as follows:

1.  Alexandria, Louisiana

    a.  Tracked equipment consisting of excavator and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces, which account for approximately 80% of the equipment yard and/or aprons at the facility.

    b.  The Paved Surfaces were installed in or around September 2008.

    c.  V and V Builders LLC
        1223 MacArthur Drive
        Alexandria, Louisiana 71303
        (318) 473-8344

    d.  Progressive Construction
        705 McKeithen Drive
        Alexandria, Louisiana 71303
        (318) 473-9522

    e.  Unknown.

    f.  The Paved Surfaces are in generally good condition, except for some edges that are broken due to the Paved Surfaces not meeting up perfectly with adjacent limestone. The Paved Surfaces show signs of cracking and spalling in some areas.

    g.  The expansion joints consist of cuts in the Paved Surfaces filled with a rubber-like material; they are not armored.

3

NON-CERTIFIED COPY

    h.  Please see above response.

    i.  Please see above response. The expansions joints are otherwise in good condition.

    j.  Please see above response.

    k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

    l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

    m.  Please see above response.

    n.  Please see above response.

    o.  Please see above response.

2.  Lake Charles/Sulphur, Louisiana

    a.  Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on the Paved Surfaces.

    b.  The Paved Surfaces were installed in or around January 2014; tracked equipment was operated, loaded, unloaded, stored, and/or parked on the Paved Surfaces starting in or around June 2014

    c.  Gary Babineaux

    d.  Gary Babineaux

    e.  The cost of construction for the Paved Surfaces was approximately $1.3 million.

    f.  The Paved Surfaces are in good condition, with no observed cracks or spalling.

    g.  The Paved Surfaces are supported by expansion joints. The expansion joints consist of cuts in the concrete; they are not armored. *See* document bates-numbered H & E 0001827-0001876 at H&E 001869, H&E 001872.

    h.  Please see above response.

    i.  The expansion joints in the Paved Surfaces are in good condition, with no observed problems.

    j.  Please see above response.

    k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

    l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

1103082v.1

NON-CERTIFIED COPY

    m. Please see above response.

    n. Please see above response.

    o. Please see above response.

3. Shreveport Hi-Lift, Louisiana[5]

    a. Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on the Paved Surfaces, which make up a portion of the equipment yard and apron at this facility. The facility also has limestone, rock, and soil cement surfaces.

    b. The Paved Surfaces were designed in 2007 and installed in or around 2008-2009; approximately 411 square feet of the Paved Surface on the apron was resurfaced in or around 2012.

    c. Unknown.

    d. Unknown.

    e. Unknown; approximately $57,700 for the replacement of approximately 411 square feet of Paved Surface on apron in or around 2012.

    f. The Paved Surfaces show signs of cracking and spalling. H&E further responds that the concrete at this location was poured approximately six inches deep.

    g. The expansion joints consist of cuts in the Paved Surfaces; they are not armored.

    h. Please see above response.

    i. Please see above response. The expansion joints are otherwise in good condition, and the expansion joints in the more recently constructed portion of the apron are in good to perfect condition.

    j. Please see above response.

    k. There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

    l. There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces other than the replacement of approximately 411 square feet on the apron in or around 2012.

    m. Please see above response.

    n. Please see above response.

---

[5] This H&E facility refers to the one located on 3775 Old Shed Rd. Bossier City, LA 70111

5

NON-CERTIFIED COPY

1103082v.1

    o.  Please see above response.

4.  Charlotte, North Carolina

    a.  Tracked equipment consisting of excavator and dozers has been operated, unloaded, stored or parked on the Paved Surfaces.

    b.  The Paved Surfaces were installed in or around 2002.

    c.  Clary Architects, Inc.

    d.  Choate Construction.

    e.  Unknown.

    f.  The Paved Surfaces show signs of wear and spalling near or around the construction and/or expansion joints in the concrete.

    g.  The expansion joints consist of cuts in the Paved Surfaces filled with a composite material; they are not armored. *See* documents bates-numbered H & E 0001974-0002014 at H&E 0001977, 0001990.

    h.  Please see above response.

    i.  Please see above response. The expansion joints are otherwise in good condition.

    j.  Please see above response.

    k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

    l.  There have been no repairs, replacement or maintenance made with respect to the Paved Surfaces.

    m.  Please see above response.

    n.  Please see above response.

    o.  Please see above response.

5.  Raleigh, North Carolina

    a.  Tracked Equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on the Paved Surfaces.

    b.  The Paved Surfaces were originally constructed in or around 2010. Additional Paved Surfaces totaling approximately 31,120 square feet was constructed in or around February 2015.

    c.  Weeks Turner Architecture, P.A. as to original Paved Surfaces; H&E Facilities Group as to additional Paved Surfaces.

6

NON-CERTIFIED COPY

    d.  Structural Visions, Inc. as to original Paved Surfaces; Ruston Paving as to additional Paved Surfaces.

    e.  Unknown as to original construction; approximately $233,550.00 for approximately 31,120 square feet for additional Paved Surfaces.

    f.  The Paved Surfaces show signs of cracking and spalling; the older, original Paved Surfaces shows deterioration near and around the construction and/or expansion joints.

    g.  The expansion joints consist of cuts in the Paved Surfaces; they are not armored. The expansion joints in the older, original portions of the pavement are filled with wood strips. *See* documents bates-numbered H&E 0001728-0001826 at H&E 001822, 001825.

    h.  Please see above response.

    i.  Please see above response. The expansion joints are otherwise in good condition.

    j.  Please see above response.

    k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

    l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

    m.  Please see above response.

    n.  Please see above response.

    o.  Please see above response.

6.  Winston Salem, North Carolina

    a.  Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on the Paved Surfaces, which account for approximately 95% of the equipment yard and/or apron at the facility.

    b.  Unknown.

    c.  Unknown.

    d.  Unknown.

    e.  Unknown.

    f.  The Paved Surfaces are in generally good shape, with only an isolated spot of racking and/or spalling.

7

1103082v.1

NON-CERTIFIED COPY

g.  The expansion joints consist of cuts in the concrete protected by armored plates.

h.  Please see above response.

i.  Please see above response. The expansion/construction joints in the Paved Surfaces are otherwise in good condition, with no observed programs.

j.  Please see above response.

k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

m.  Please see above response.

n.  Please see above response.

o.  Please see above response.

7.  Albuquerque, New Mexico

a.  Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces.

b.  The Paved Surfaces were installed in or around February 2016.

c.  Stantec

d.  G&H Construction

e.  Approximately $634,000

f.  The Paved Surfaces are in excellent/like new condition.

g.  The Paved Surfaces are supported by expansion joints. The expansion joints consist of cuts in the Paved Surfaces filled with a pre-molded material; they are not armored. *See* documents bates-numbered H&E 068122-068124 at H&E 068123.

h.  None.

i.  The expansion joints are in good condition with no observed problems.

j.  There have been no observed problems or deficiencies noted with regard to the expansion/construction joints.

k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

8

NON-CERTIFIED COPY

l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

m.  Please see above response.

n.  Please see above response.

o.  Please see above response.

8.  New Orleans, Louisiana

a.  Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces, which account for a significant percentage of the equipment yard and/or aprons at the facility.

b.  The Paved Surfaces were installed in or around October 2015.

c.  Stantec

d.  Ikon Construction

e.  Approximately $826,000

f.  The Paved Surfaces are in good condition with some cracking due to normal shrinkage of concrete.

g.  The Paved Surfaces are supported by expansion joints. The expansion joints consist of cuts in the Paved Surfaces filled with a pre-molded material; they are not armored. *See* documents bates-numbered H&E 068134-068137 at H&E 068137.

h.  None.

i.  The conditions of the joints are mixed depending on the location. Some of the expansion joints are spalling/cracking.

j.  There are issues with Stantec on the design of the expansion joints and the caulking material that was added to the expansion joints.

k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

m.  Not applicable

n.  Not applicable

o.  Not applicable

9

NON-CERTIFIED COPY

9. Columbia, South Carolina

    a.  Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces. A portion of the H&E Columbia facility's equipment yard is composed of gravel.

    b.  The Paved Surfaces were installed in or around October 2015.

    c.  Stantec

    d.  W. Construction

    e.  Approximately $400,000

    f.  The Paved Surfaces are in excellent/like new condition.

    g.  The Paved Surfaces are supported by expansion joints. The expansion joints consist of cuts in the Paved Surfaces filled with a pre-molded material; they are not armored. *See* documents bates-numbered H&E 068125-068127 at H&E 068127.

    h.  None.

    i.  The joints in the Paved Surfaces are in good condition with no observed problems.

    j.  There have been no observed problems or deficiencies with regard to the expansion/construction joints.

    k.  There is no maintenance program applicable to the maintenance/construction joints and/or the Paved Surfaces in place.

    l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

    m.  Please see above response.

    n.  Please see above response.

    o.  Please see above response.

10. Corpus Christi, Texas

    a.  Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces. A portion of the H&E Corpus Christi facility's equipment yard is composed of crushed concrete.

    b.  The Paved Surfaces were installed in or around September 2014.

    c.  Unknown designer. The design build was by Embree Construction.

NON-CERTIFIED COPY

d. Unknown.

e. Approximately $400,000.

f. The Paved Surfaces are in excellent condition, with no observed problems.

g. The Paved Surfaces are supported by expansion joints consisting of pre-molded material and saw joints. *See* documents bates-numbered H&E 068128-068130 at 068130.

h. None.

i. The joints are in excellent condition, with no observed problems.

j. There have been no observed problems or deficiencies noted with regard to the expansion/construction joints.

k. There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

l. There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

m. Please see above response.

n. Please see above response.

o. Please see above response.

11. Houston Hi-Lift, Texas

a. Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces.

b. The original Paved Surfaces were installed in approximately 2000 pursuant to a design/build contract. The Paved Surfaces were replaced in or around November 2015.

c. Unknown of the original; Morgan Concrete for the replacement.

d. Unknown for the original; Morgan Concrete for the replacement.

e. Unknown for the original; approximately $860,000 for the replacement.

f. The original Paved Surfaces were in poor condition due to the specification/design of the concrete and age/wear. The original Paved Surfaces was composed of 4" of non-reinforced concrete. The replacement Paved Surfaces are in excellent/like new condition.

11

NON-CERTIFIED COPY

g.  The original Paved Surfaces were not supported by joints. The replacement Paved Surfaces are supported by expansion joints of redwood material.

h.  None

i.  The joints for the original Paved Surfaces were not sealed. The expansion joints for the replacement Paved Surfaces are in good condition.

j.  There were problems with the unsealed joints for the original Paved Surfaces. There have been no observed problems or deficiencies noted with regard to the expansion/construction joints for the replacement Paved Surfaces.

k.  There was no maintenance program applicable to the expansion/construction joints and/or the original or replacement Paved Surfaces.

l.  The original Paved Surfaces were replaced.

m.  The Paved Surfaces were replaced in or around November 2015.

n.  The replacement Paved Surfaces are in excellent/like new condition.

o.  Approximately $860,000.

12. Jackson, Mississippi

a.  Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces.

b.  The Paved Surfaces were installed in or around 2006-2008.

c.  JWH Properties.

d.  JWH Properties.

e.  Unknown.

f.  The Paved Surfaces are in good condition.

g.  The Paved Surfaces are supported by expansion joints, control joints, and saw joints.

h.  None.

i.  The joints are in average condition with age and wear. There is some separation and reveling of the joints.

j.  Please see above response.

k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

12

NON-CERTIFIED COPY

l.   There have been no repairs, replacements, or maintenance made with respect to the Paved Surfaces.

m.  Please see above response.

n.   Please see above response.

o.   Please see above response.

13. Shreveport, Louisiana

a.   Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces.

b.   The original Paved Surfaces were installed in or around 1985.  The replacement Paved Surfaces were installed in 2016.

c.   Unknown for the original Paved Surfaces.

d.   Unknown for the original Paved Surfaces; H&H Contracting Co., Inc. for the replacement Paved Surfaces.

e.   Unknown for the original Paved Surfaces.

f.   The original Paved Surfaces were in poor condition due to age and wear. The replacement Paved Surfaces are in excellent/like new condition.

g.   The original Paved Surfaces were supported by expansion joints; the replacement Paved Surfaces are supported by expansion joints.

h.   None.

i.   The joints in the original Paved Surface were in poor condition due to age and wear.

j.   There were problems with the original Paved Surfaces due to age and wear. There have been no observed problems or deficiencies noted with regard to the expansion/construction joints with the replacement Paved Surfaces.

k.   There was no maintenance program applicable to the expansion/construction joints and/or the original or replacement Paved Surfaces.

l.   The original Paved Surfaces were replaced.

m.  The original Paved Surfaces were replaced in 2016.

n.   The replacement Paved Surfaces are in excellent/like new condition.

o.   Approximately $530,000.

14. Baltimore, Maryland

13

1103082v.1

NON-CERTIFIED COPY

a. Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces.

b. The Paved Surfaces were installed in or around 2014.

c. Richardson Engineering, LLC

d. Steel Building Specialists, Inc.

e. Unknown.

f. The Paved Surfaces are in good condition.

g. The Paved Surfaces are supported by expansion joints composed of a pre-molded material. *See* H&E 068122-068140 at H&E 068140.

h. None.

i. The expansion joints are in good condition with no observed problems.

j. Please see above response.

k. There was no maintenance program applicable to the expansion/construction joints and/or the original or replacement Paved Surfaces.

l. There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

m. Please see above response.

n. Please see above response.

o. Please see above response.

**INTERROGATORY NO. 5:**

Please Identify any and all locations or sites that have been owned or leased by H&E, on which the types of equipment identified in Interrogatory No. 1 have been operated, loaded, unloaded, stored or parked on surfaces that are not paved with concrete (hereinafter, "Unpaved Surfaces"), and for each such location please Identify:

(a) the types of tracked equipment that have been operated, loaded, unloaded, stored or parked on the Unpaved Surfaces;

(b) the types of surfaces that have been in place where such equipment has been operated, loaded, unloaded, stored or parked at these locations;

(c) the reasons this surface was used instead of a Paved Surface;

(d) the person or persons responsible for the design that called for an Unpaved Surface rather than a Paved Surface;

(e) any maintenance program applicable to these Unpaved Surfaces;

14

NON-CERTIFIED COPY

    (f)    any and all repairs, replacements or maintenance conducted with regard to these Unpaved Surfaces;

    (g)    the dates of any and all repairs, replacements or maintenance conducted with regard to these Unpaved Surfaces;

    (h)    the results of any such repairs, replacements or maintenance; and

    (i)    the cost of any such repairs, replacements or maintenance.

**RESPONSE TO INTERROGATORY NO. 5:**

H&E objects to Interrogatory No. 5, including subparts (a) – (i), on the basis that it is overbroad and seeks that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Information regarding other H&E-owned or – leased facilities not at issue in this litigation is irrelevant to the claims in this litigation.

Subject to these objections, the following other facilities are owned and/or operated by H&E and have surfaces other than concrete Paved Surfaces as defined in Defendants' First Set of Interrogatories whereupon similar operations involving the routine traversal of heavy tracked equipment are conducted:

1. Little Rock, Arkansas

2. Springdale, Arkansas

3. Nashville, Tennessee

4. Ashland, Virginia

5. Norfolk, Virginia

6. Roanoke, Virginia

7. Warrenton, Virginia

8. Memphis, Tennessee

9. Jessup, Maryland[6]

10. Denver, Colorado

11. Arden, North Carolina

---

[6] H&E no longer conducts business at the Jessup, Maryland location

15

NON-CERTIFIED COPY

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile:  (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel

of record by facsimile, email and/or by placing same in the United States mail, postage prepaid

and properly addressed, this 30th day of August, 2016.

Loretta G. Mince

16

NON-CERTIFIED COPY

# Civil Engineering Expert Report

H&E EQUIPMENT SERVICES, INC.

VERSUS

URS CORPORATION ARCHITECTURE, P.C.,
URS CORPORATION, L. O'NEAL JOHNSON,
AND THOMAS E. RYAN, III

SUIT NO. 626,308, DIVISION D
19th JUDICIAL DISTRICT COURT
EAST BATON ROUGE PARISH, LA
STATE OF LOUISIANA

**SEPTEMBER, 2016**





GWS Engineering, Inc.
Engineering Consultants – Land Surveyors

7520 Perkins Rd. ♦ Suite 290 ♦ Baton Rouge, LA    70808



EXHIBIT
D

NON-CERTIFIED COPY

## I.     INTRODUCTION

On August 25, 2015, GWS Engineering, Inc. (hereinafter referred to as **"GWS"**) was contacted by Ms. Mary Anne Wolf, Esq, with Keogh, Cox and Wilson, LTD. concerning GWS, and specifically its Owner, G. Wayne Sledge, P.E., P.L.S., EXW℠ to serve as an expert witness in the case of H & E Equipment Services, Inc. (hereinafter referred to as **"H&E"**) and URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, II (hereinafter referred to collectively as **"URS"**), Suit No. 626,308, Division D,19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana.  We were requested to provide expertise in the field of Civil Engineering (and Land Surveying, if necessary) regarding the captioned lawsuit involving the project known as the H & E Equipment Services Site, in Baton Rouge, Louisiana on behalf of Benchmark Group, LLC, (hereinafter referred to as **"BM"**).

The description of the services requested was for GWS to review various documents, pleadings, letter agreements, contracts, depositions, construction plans, discovery responses, etc. and prepare an expert report to address claims included in the Citation of November 20, 2013, as well as any supplemental allegations made by the Plaintiff during the discovery process.  More specifically, this review included the following:

A.     Expert Report of James R. (Bob) Bailey, Ph.D., P.E.;

B.     Expert Report of Wallace C. Drennan, III;

C.     Construction Plans prepared by Benchmark Group, LLC, dated 07/01/11;

D.     Original Citation, dated November 20, 2013;

E.     Geotechnical Report prepared by Soil Testing Engineers, Inc. dated January 11, 2007;

F.     Project Manual for New Facilities for H & E Equipment Services, prepared by URS, dated March 16, 2011;

G.     H & E Equipment Services, Inc.'s Responses to Defendants' First Set of Requests of Admission, dated January 21, 2016;

H.     H & E Equipment Services, Inc.'s Supplemental Responses to Defendants' Second Set of Interrogatories, dated January 19, 2016;

I.     Amended and Supplemental Responses to Defendant's First Set of Interrogatories on behalf of H & E Equipment Services, Inc., dated September 25, 2015;

J.     All Discovery Documents;

K.     Standard Specifications for Public Works Construction by the East Baton Rouge Parish Department of Public Works;

L.     The State of Louisiana Department of Transportation and Development (LA DOTD) Standard Specifications;

M.     Various Project Photographs;

N.     Discussions with the Murray L. McCullough, P.E., Benchmark Group, LLC;

NON-CERTIFIED COPY

O.    Site visits on January 22, 2016, and August 24, 2016;

P.    Concrete Compressive Strength Summary Report (pages 1-15), dated 10/02/12 by Terracon;

Q.    Mix Designs Submittal by Heck Industries, Inc., date unknown;

R.    Site construction plans for H & E facilities located in Bossier City, Louisiana, Grand Prairie, Texas, Houston, Texas, Sulfur, Louisiana, Atlanta, Georgia, Alexandria, Louisiana, and Charlotte, North Carolina;

S.    Amended and Supplemental Responses to Defendant's First Set of Interrogatories on behalf of H & E Equipment Services, Inc., dated May 18, 2016;

T.    Highway Engineering Handbook, Second Edition, McGraw-Hill, 2003;

U.    Proposal for Engineering and Landscape Architectural Services, H & E Corporate Facility - Pecue Lane at Airline, by Benchmark Group, L.L.C., dated July 2, 2008;

V.    Aggregate Test Reports provided by LA Testing and Heck Industries, dated 2010;

W.    Deposition of Mr. Leonard St. Germain, H&E Equipment Services, Inc.;

X.    H & E Equipment Services, Inc.'s Supplemental Responses to Defendants' First Set of Interrogatories, dated August 30, 2016; and

Y.    Deposition of Mr. Chad Herndon, Ex-Employee, URS


## II.    PETITION

In response to the request, what follows is a listing of the allegations included in the original Petition as well the Supplemental Response:

### A.    Issue.

In the original petition, it was alleged by H&E that certain design deficiencies in the plans and specifications began to manifest themselves during the course of construction of the Baton Rouge facility.  More specifically, these deficiencies included:

1.    Design deficiencies to the parking lot.

2.    Major portions of the concrete parking aprons and staging areas for H&E heavy equipment began experiencing a substantial and unanticipated amount of cracking, spalling and deterioration as a result of errors and defects in the design of the parking and staging areas.

3.    The design deficiencies relate to the defective and negligent design of the concrete pad, the expansion joints, the control joints, the specified concrete strength, and/or the specified surface of the parking and staging areas.

Page 2

NON-CERTIFIED COPY

4.      Failed to design the project in accordance with appropriate industry standards and/or in accordance with the required standard of care ordinarily exercised by others in the same profession.

5.      Defendant failed to address and remedy observed crumbling and spalling in the concrete.

6.      H&E suffered damages consisting of the anticipated costs of removing and replacing and/or repairing the concrete pads showing signs of spalling and cracking as a result of Defendants' deficient designs and specifications.

## III.    OVERVIEW

On or about August, 2006, H&E and URS entered into an agreement for Professional Services wherein, among other things, URS was to furnish professional design and construction administration services to H&E in connection with the construction of a new headquarters building and dealership facility to be located on Pecue Lane, Baton Rouge, LA.  In a subsequent agreement, URS contracted with BM to provide the necessary civil design services for the parking areas, parking lot drives, equipment storage areas, landscaping and retention pond.

My review found that the construction plans and specifications prepared by BM for the Baton Rouge facility were appropriate for the project and the design complied with the standard of care for such a facility.  Overall the pavement is in good condition and does not warrant total replacement.  The limited area of cracking and spalling is most likely caused by deficiencies occurring in the construction and by lack of routine care and appropriate maintenance.

It was apparent from our review of the aforementioned documents that the allegations were not supported by documented evidence but are based upon the theory that the project was constructed in accordance with the plans and specifications.  No evidence has been presented to confirm that assumption.  The lack  of any expert report in direct support of the allegations supporting the claims, the lack of evidence among the documents supporting the various claims, the lack of evidence showing BM caused compensable damages, and the lack of details and documentation on specific problems (joint issues) creates a situation of various claims and pleadings without providing the necessary foundation or documentation in support.

NON-CERTIFIED COPY

The original pleadings and the expert reports prepared by Bailey and Drennan, point only to design deficiencies as the cause of the pavement damage. However, there are numerous other possibilities for what is occurring at the site. Other possibilities include:

- pavement thickness not as specified (construction defect);
- delay in joint sawing (construction defect);
- failure to saw cut joints continuously through curb (construction defect);
- improper concrete mix design (construction defect);
- excessive slump of the concrete (construction defect);
- failure of the contractor to comply with the plans and specifications;
- construction methods (construction defect);
- failure to construct joints as designed;
- failure to properly seal joints;
- non-spec concrete delivered to the site (construction defect);
- spalling/scaling due to heavy equipment use/misuse beyond design capacity;
- inadequate inspection and quality control by inspection contractor; and
- inadequate or improper maintenance of the pavement/joints upon acceptance by the Owner.

It is important to note that none of these other "alternatives" were investigated by the plaintiff or their experts. Our findings, based upon actual evidence, indicates that one of more of these potential causes is actually creating the current conditions. Furthermore, our peer review of the BM plans and specifications indicated that the design met and/or exceeded the standard of care for the industry in the local area. These findings will be explained in further detail later in this report.

It is readily apparent based upon the pleadings and expert reports, that there were numerous issues requiring considerable interface between the various parties and contractors. However, it is our opinion that based upon the evidence reviewed that BM was not negligent and did not breach the standard of care in the design of the paved areas. To the contrary, the record indicates standard procedures, normal and customary field adjustments and the contractual obligations were followed in the site design as regards to the Civil Engineering Consultant. Projects like this are "living entities" which require updating as conditions and situations arise, and interfacing with the client or his representatives. The actions taken by BM, based upon my review of the available documents, are consistent with the standard of care that one would expect from a Civil Engineering Consultant on such a project. Accordingly, the various allegations outlined in the petition are, in my opinion, unsubstantiated and without basis. Had supporting documentation or evidence been provided, a more substantive review of the claims could have been performed on an allegation by allegation basis, but such information was not presented in the records reviewed. What was presented was a theoretical exercise amounting only to speculation in attempting to place fault on the plans and specifications for a project which has not been shown to have been built utilizing the aforementioned plans and specifications.

NON-CERTIFIED COPY

As regards to the negligence allegation, the review of the documents (specifically the expert reports of Bailey and Drennan) does not indicate that BM was negligent in performing its services but suggests only one alternative when there are many more - many of which have empirical data to support the position that the construction phase was the most likely cause of the issues. This analysis was based upon the review of actual data and testing reports and not a theoretical exercise simply assigning blame to the designer. Having been involved in the design of hundreds of paving projects during my 40+ year career, it is my opinion that the design of the project by BM was prepared in accordance with sound engineering principles used for similar projects in the area as well as other similar H&E projects throughout the United States.

IV.    H & E EXPERT REPORTS

A.    Wallace C. Drennan, III.

On July 28, 2016, Wallace C. Drennan, III, prepared and submitted a report to Ms. Lori Mince, with Fishman Haygood, L.L.P. in connection with this litigation matter. He was requested to "prepare a report addressing issues related to cracking and spalling of concrete pavement at the H&E Equipment Services facilities in Baton Rouge....". As Mr. Drennan is not a professional engineer, he would have insufficient design knowledge or design experience to critique a professional engineer's judgement and design. Mr. Drennan indicates in the report that he is in the construction business in New Orleans, LA. Having read his report, the following are my comments, observations and opinions regarding same:

1.    I am personally not aware of true "as-built plans" as indicated in the report. In fact, no evidence has been presented which detailed exactly what was built on the project site.

2.    Mr. Drennan made no review of any of the available testing reports.

3.    Mr. Drennan made no review of Sheet C-509 of the "For Construction" plans for the project. This particular sheet contained the General Construction Notes and included references to specifications, etc.

4.    Contrary to Mr. Drennan's opinion, smooth dowel bars are not required for all Construction Joints. It is, and always has been, the site engineer's option to detail the type of joint he feels is appropriate for the design condition. BM has extensive design experience in concrete pavement construction and has developed the expertise necessary to make an independent evaluation of the joint design for each project. Thus was the case in this particular

Page 5

NON-CERTIFIED COPY

instance.    This use of professional judgement is what separates professionals from laymen in the ability/authority to make such design considerations.

5.    The plans on Details 1 & 2 (sheet C-501) do not reflect #3 rebar running across the CJs.  Those particular details are pavement sections which have nothing to do with the CJs.  Mr. Drennan's entire statement on this matter is factually inaccurate.

6.    As a non professional, Mr. Drennan's opinion as to the appropriate size of the rebars is unqualified.  The design professional has the authority vested upon him by the Louisiana State Board of Engineering and Land Surveying to use "professional judgement" in his designs.  BM has such firm authority as does Murray McCullough, P.E..  In discussions with Mr. McCullough, he indicated that this particular joint design has been in use by his firm for many years and has always been successfully used.  A statement by a non licensee that a professional deviation from any standard plan is inappropriate and without standing.

7.    No foundation or basis was provided for the cost to correct the alleged deficiencies, thus the estimated cost provided is unfounded and unsubstantiated.  Based upon my two site visits in January and August, 2016, total replacement is obviously not warranted throughout the project site.  The entire paved area is serviceable and in use by the Owner.  A large portion of the paved areas have no signs of excessive cracking.

8.    This report provided no explanation for the spalling or cracking of the concrete.  The report as was written essentially described the joint designs in several governmental publications.  Any cause and effect correlation between the joints and the pavement condition was not provided nor explained.

In summary, Mr. Drennan, a Contractor, expressed many opinions which should be reserved for a licensed professional engineer.  In several cases he misinterpreted the construction documents thus arriving at unfounded and inaccurate statements and personal opinions.  His reporting and evaluation on this litigation matter is inappropriate and erroneous.  In particular, he expressed no cause and effect correlation between the joint details and the spalling and cracking and any alleged design defects.  In addition, he was silent on the many other potential causes of such pavement issues mentioned in the Overview.

NON-CERTIFIED COPY

B.     **James R. Bailey, Ph.D, P.E.**

On July 29, 2016, James R. (Bob) Bailey, PhD., P.E., prepared and submitted a report to Ms. Loretta G. Mince, Esq., with Fishman Haygood, L.L.P. in connection with this litigation matter. He was requested to "evaluate the cause of damage to concrete pavements at two separate facilities operated by H&E Equipment". These facilities are in Baton Rouge, LA and Kenner, LA. Having read his report, the following are my comments, observations and opinions regarding the Baton Rouge site:

1.     Dr. Bailey stated that he conducted an investigation to determine the nature, mechanism(s) and extent of damage at the two facilities. This report only involved site visits, reviewing architectural and engineering drawings, photos, e-mails and performing an engineering analysis. What is noteworthy is this investigation did not investigate the actual measurables at the site (pavement thickness, joints construction, dowel bars sizes, etc.) but was only a theoretical analysis based upon only certain, selected documents and details.

2.     Dr. Bailey observed the absence of steel edge guards along the length of the expansion joints, yet he could not identify any specification in the United States related directly to their use in the design of concrete surfaces under tracked vehicles. In addition, apparently no request was made to URS or BM by H&E to investigate such issues. A review of all the H&E equipment yards studied will indicate that with one exception, they do not use such steel edge guards. The Owner has and continues to reject this option as well as the protective coating suggested in his report. Further discussions on this fact will follow later in the report.

3.     Contrary to Dr. Bailey's opinion, the design provided by BM met or exceeded the standard of care customarily employed by other Civil Engineers in the same general area. To state that research in New Zealand was necessary for the proper design of this facility when H&E operates similar facilities without edge guards throughout the southern portion of the United States far exceeds such standard of care requirements. If H&E sites were experiencing pavement problems, that is information that should have been brought forth to the design team at the onset of the project. The Owner (H&E) was not an uninformed or unknowledgeable user of such a facility.

NON-CERTIFIED COPY

4.  This report quotes extensively from the American Concrete Institute Manual titled ACI 330R-0 but this manual is not a substitute for engineering judgement. The plans and specifications clearly and repeatedly referred to similar public documents in common use in the local area. These included the Standard Specifications for Public Works Construction by the East Baton Rouge Parish Department of Public Works, and The State of Louisiana Department of Transportation and Development (LA DOTD) Standard Specifications. These documents were referenced in the plans and supplemented the Project Manual prepared for this particular project by licensed Professional Engineers and Architects familiar with the local area and its typical design parameters.

5.  Contrary to Dr. Bailey's assertion that the distributed steel reinforcement was appropriate but missing from the concrete pavement, a close examination of Details 1 and 2, Sheet C-501 of the Construction Plans, clearly shows that #3 rebars at 24" each way were specified to be placed within the concrete panels. The details for the expansion joints also shown on Sheet C-501 clearly show appropriate dowels which is also contrary to Dr. Bailey's report. McCullough indicated that this particular joint design has been in use by his firm for many years and has always been used successfully. The construction document Dr. Bailey was apparently reviewing was not the document for the Contractor to use for the construction of the project. Dr. Bailey's entire statement on this matter is factually inaccurate.

6.  Dr. Bailey correctly repeats from the STE report that "the design life of the pavement system is dependent upon periodic maintenance of the pavement. This maintenance includes but is not limited to cleaning and resealing joints, sealing cracks and immediate repairs of damaged areas". To date, I am not aware of H&E providing any of these maintenance services deem "dependent" by Dr. Bailey's quote. Furthermore, according to the final punch list, the Contractor did not seal the joints adequately resulting in lack of care being a probable cause for the four years the facility has been operational (H&E 001043).

7.  Dr. Baileys discussion of 6" pavement is theoretical only and irrelevant. He conducted no testing to determine the actual concrete depth in the affected areas. If the Contractor did not meet the thickness specified, this would increase the likelihood of excessive cracking.

NON-CERTIFIED COPY

8.    In my 40+ years as a site design professional, I have never been presented with evidence that corner cracking at some of the expansion joints suggest that improper spacing of dowels near the corners may have occurred. To the contrary, according to the Highway Engineering Handbook, Second Edition, McGraw-Hill, 2003, Sec. 3.56, "...Corner breaks are cracks found at the corner of the slab." "...and are generally the result of loss of support under the corner of the slab." The hypothesis suggesting this occurs as a result of dowel placement is an interesting theory, but no proof was presented in the report, and is merely speculation.

9.    In Dr. Bailey's report on "Pavement Surfaces", he states that several products are available that can be used for new construction to provide a surface that has both high abrasion resistance and high overall strength. Such "add ons" are outside the standard of care for the area and has never been used by any of the numerous facilities owned and operated by H&E to my knowledge.

10.   The examples provide by Dr. Bailey for the use of metal edge guards are not inclusive of heavy equipment yards thus such a suggestion is, again, outside the normal standard of care.

11.   H&E has decades of experience using heavy equipment sites. Contrary to Dr. Baileys assertion, it is H&E who should have informed URS of any likelihood of near-term progressive damage to the concrete pavement resulting from the movement of tracked vehicles. According to documents I have reviewed, H&E Equipment operates numerous such sites across the United States. H&E is not uninformed or unfamiliar with such operations and if there were any such possibilities of unusual pavement issues, it was encumbered upon H&E to advise the design professions, not the reverse.

12.   Dr. Bailey was silent on the many other potential causes of such pavement issues addressed in this report.

In summary, Dr. Bailey's resume' shows him to be well educated and experienced engineer with multiple professional licenses in many states. However, a close review of his resume' does not reflect a career spent as a design professional on projects such as the H&E facility. His expertise, according to his Curriculum Vita, includes storm surges, hurricane risk management, wind loads, wind risk assessment, revenue interruption risks, vulnerability assessments to hurricane winds, experimental verification of the theoretical solution of laminated glass units, well research, lecturing storm damage assessment, building envelope systems, soil mechanics, numerical analysis, structural analysis and design, materials testing, etc. - but not Civil Site design. In fact his designing of such a parking, storage facility is not mentioned in his CV.

Page 9

NON-CERTIFIED COPY

The single minded approach to the analysis reflects a lack of a comprehensive understanding of the complex design considerations which go into the actual design and construction of such a facility. These designs are not theoretical exercises. It is real concrete, real steel, and real decisions have to be made which affect the Owner, the Owners construction budget, and contractor requirements/needs addressed, local regulatory agency requirements and the multitude of other issues that must be identified and addressed solely based on experience. For Dr. Baily to dismiss the many other potential causes of these issues: pavement thickness not as specified, delay in joint sawing, failure to timely saw cut joints, improper concrete mix design, the excessive slump of the concrete, failure of the Contractor to comply with the plans and specifications, construction methods, failure to construct joints as designed, failure to properly seal joints, non spec concrete delivered to the site, spalling due to heavy equipment use/misuse, inadequate inspection and quality control by the inspection contractor and inadequate or improper maintenance to the pavement after completion by the Owner indicates a fundamental failure to understand the many issues involved with such a project.

Taking selective examples from suggested guidelines without any direct evidence in support, and to not include and acknowledge the necessary component of engineering judgement is totally inappropriate in this case. Dr. Bailey has no expertise in the issues involving the pavement design at such a facility as the H&E facility in Baton Rouge. Engineering judgement by experienced engineers has not influenced his only working theory of inadequate design, as it should. In addition, his basis to establish the "standard of care" for the local area is totally without a foundation in either fact or experience. Dr. Baily's report reflects that of a theorist rather than a design engineer with appropriate experience in this particular matter.

## V.    Other H&E Equipment Yard Locations

In documents provide by H&E in conjunction with this case, ten (10) other sites have been identified as having equipment yards similar to the one located in Baton Rouge, Louisiana. These sites are as follows: Alexandria, LA, Lake Charles (Sulfur), LA, Shreveport, LA, Charlotte, NC, Raleigh, NC, Winston Salem, NC, Dallas (Grande Prairie), TX, Baltimore, MD, Corpus Christie, TX, and Houston, TX.

In responses to Interrogatories, and the deposition of Leonard St. Germain, H&E provided information on the pavement conditions for those sites. Their responses are summarized for each site as follows:

NON-CERTIFIED COPY

A.    **Alexandria, LA**

    1.    Signs of cracks and spalling in some areas.
    2.    **Expansion Joints not armored.**
    3.    Expansion joints otherwise in good condition.
    4.    50-60% paved per St. Germain.  80% paved per interrogatory response.
    5.    Aggregate areas for storage.
    6.    Distribution store.
    7.    No routine sweeping - as needed.
    8.    No maintenance program applicable to the expansion/construction joints and /or paved surfaces.
    9.    No repairs with respect to paved surfaces.

B.    **Lake Charles (Sulfur), LA**

    1.    Expansion joints consist of cuts in concrete.
    2.    **Expansion joints not armored**.
    3.    Distribution store.
    4.    8" concrete at 4000 psi.
    5.    Paved and aggregate.
    6    No maintenance program applicable to the expansion/construction joints and/or paved surfaces.
    7.    No repairs with respect to paved surfaces.

C.    **Shreveport (Bossier), LA**

    1.    Paved surfaces show signs of cracking and spalling.
    2.    Concrete reportedly 6" thick.
    3.    Expansion joints consist of cuts in concrete.
    4.    **Expansion joints not armored**.
    5.    Expansion joints otherwise in good condition.
    6.    Distribution store.
    7.    Certain pavement replaced in 2015 due to cracking and spalling.
    8.    Paved and aggregate.
    9.    More recently constructed areas are in good to perfect condition.
    10.    No maintenance program applicable to the expansion/construction joints and/or paved surfaces.
    11.    No repairs with respect to paved surfaces, except 411 sq ft. on the apron.

NON-CERTIFIED COPY

D.    **Charlotte, NC**

    1.    Paved surface shows signs of wear and spalling near and around construction and/or expansion joints.
    2.    Expansion joints consist of cuts in paved surface.
    3.    **Expansion joints not armored**.
    4.    Expansion joints otherwise in good condition.
    5.    3600 psi concrete.
    6.    Hi-lift store.
    7.    No maintenance program applicable to the expansion/construction joints and/or paved surfaces.
    8.    No repairs with respect to paved surfaces.

E.    **Raleigh, NC**

    1.    Paved surface shows some signs of cracking and spalling.
    2.    Originally installed concrete shows deterioration near and around construction and/or construction joints.
    3.    **Expansion joints are not armored**.
    4.    Expansion joints otherwise in good condition.
    5.    8 inch pavement at 4000 psi concrete.
    6.    Distribution store.
    7.    Cracking and spalling of concrete with no repair.
    8.    No maintenance program applicable to the expansion/construction joints and/or paved surfaces.
    9.    No repairs with respect to paved surfaces.

F.    **Winston Salem, NC**

    1.    Paved surface in generally good shape with only isolated spots of cracking and spalling. Paving accounts for 95% of the equipment yare and/or apron.
    2.    Expansion joints consist of cuts in concrete protected by armored plates.
    3.    Expansion/construction joints otherwise in good condition.
    4.    No maintenance program applicable to the expansion/construction joints and/or paved surfaces.
    5.    No repairs with respect to paved surfaces.

NON-CERTIFIED COPY

G. **Dallas (Grande Prairie), TX**

1. Paved surfaces show signs of cracking and spalling in and around construction and/or expansion joints.
2. 6 inch pavement at 4000 psi (heavy duty) around building. 6 inch pavement at 3000 psi in parking area. 8 inch pavement at 4000 psi at entrance.
3. Expansion joints consist of cuts in paved surface.
4. **Expansion joints not armored**.
5. Expansion joints otherwise in good condition.
6. Crane facility only.

H. **Baltimore, MD**

1. No observed problem with the paved section including no observed cracking or spalling at or around expansion joints of new paved areas.
2. There is no maintenance program applicable to the expansion/construction joints and/or these paved surfaces in place.
3. Distribution store.
4. 8 inch pavement with 6x6 wwf.
5. **Expansion joints not armored**.
6. No maintenance program applicable to the expansion/construction joints and/or paved surfaces.
7. No repairs with respect to paved surfaces.

I. **Corpus Christie, TX**

1. No observed problem with the paved section including no observed cracking or spalling at or around expansion joints.
2. Distribution store.
3. 4000 psi concrete.
4. 6½ inch thick concrete.
5. **Expansion joints not armored**.
6. Mostly Hi-lift equipment.
7. No maintenance program applicable to the expansion/construction joints and/or paved surfaces.
8. No repairs with respect to paved surfaces.

Page 13

NON-CERTIFIED COPY

J.    **Houston, TX**

1.    Original paved surfaces were in poor condition.  Original paved surfaces composed of 4" non-reinforced concrete.
2.    6 inch concrete pavement.
3.    Original paved surfaces not supported by joints.
4.    Original paved surfaces were not sealed.
5.    The original paved surfaces were replaced.
6.    The replacement paved surfaces are in excellent/like new condition.
7.    **Expansion joints not armored**.
8.    No maintenance program applicable to the expansion/construction joints and/or paved surfaces.
9.    No repairs with respect to paved surfaces.

A review of the above will indicate that similar problems as described in this litigation, such as spalling and cracking, is occurring at the majority of the H&E sites reviewed.  Such occurrences are normal and expected as indicated by the above information furnished by H&E on their own sites.  In addition, this provided information clearly reflects that there is no "industry standard" or requirement for the use of armored joints.  Of particular note, the facility recently constructed in New Orleans, Louisiana (after the commencement of this litigation) does not have armored joints. Additionally, it reportedly has 8" thick pavement.  In the August 24, 2016, site visit I observed spalling occurring at both the expansion joints and contraction joints.

These facilities represent a mix of design elements and a mix of results.  However, all pavement areas appear to be in full use for their intended purposes.  Importantly, with only one exception, armored joints are not in use and special protective coatings are not in use at any location. Furthermore, 6 inch pavement is in use at some facilities.  Other design elements such as joint construction and joint spacing varies as to each site.  This empirical evidence indicates that a variety of designs are acceptable and within the standard of care and that no single design element is likely a cause of excessive cracking and spalling.  Instead, quality of construction and installation methods and the Owner's maintenance and care program are the more likely impacting factors in the pavement performance.  As stated elsewhere in the report, at the Baton Rouge site, the concrete appearance and performance varied throughout the site, indicating poor concrete mix and nonconformance to the plans and specifications in some areas.

Page 14

NON-CERTIFIED COPY

## VI.    Site Visits

On January 22, 2016 and August 24, 2016 site visits were made to the Baton Rouge site. No consequential differences between the two sites visits were noted so the comments that follow are applicable to both visits.  The site visits indicated that the pavement sections were in overall good condition and that the entire paved area was serviceable, in full use, and was being used for its intended purposes (Photos A, B, and C). Limited areas of excessive cracking and spalling were noted as was the lack of maintenance.  Small, minimal cracks were noted in certain panels which were too small to repair.  The placement of certain heavy equipment with outriggers that were noted to be unblocked at the extreme corners of the concrete panels.  It was also noted that saw cuts of the concrete panels were not extended thru the curbing which resulted in cracking at locations never intended in the design.  Additionally, the concrete panels were, in many cases, larger than that shown on the construction plans.  Many of the spalled areas revealed minimal larger rock and only small aggregate at the surface of the pavement.  This indicated that the cohesiveness of the concrete is most likely a cause of the spalling.  No deflection of the panels was noted with the exception of several areas about drainage boxes.  Routine maintenance, repairs, etc. were not noted during either site visit.

## VII.    Findings

Plaintiff alleges deficiencies in the pavement design and plaintiff's experts point solely to theoretical design issues as the cause of the cracking and spalling in the pavement. What was left unstated was that there are numerous other possibilities for what is occurring at the site.  The following (A-K) will identify potential more likely causes of the deficiencies and their applicability to this case:

### A.    Pavement Thickness Conformance

No evidence has been presented which indicates what thickness was actually poured and where.  Accordingly, the question of both the adequacy and as-built thickness being less than specified for the concrete remains a potential cause.

### B.    Delay in Joint Sawing/Incomplete Saw Cuts

Delay in the joint sawing by the contractor after the concrete pour can result in pavement cracking at locations other than the joint location.  Accordingly, the question of the timing of the saw cutting of the joints remains a potential cause for

Page 15

NON-CERTIFIED COPY

the cracking in the panels. Furthermore, the Contractor failed to follow the detail requiring a full saw cut through the curbs resulting in curing failures outside the intended joint locations. (Photo D.)

C.    **Improper Concrete Mix Design by Supplier**

The aggregate mix for the concrete is a representation of the distribution of the coarse aggregates used in the make up of the concrete mix. The specifications for this project called for compliance with the LA DOTD Specifications and the East Baton Rouge Parish Department of Public Works Specifications and the Project Manual referred to ASTM C-33. The LA DOTD and the East Baton Rouge Specifications matched as to the specified gradation, the ASTM C-33, specification utilized a mix of somewhat smaller aggregate. Of particular note is that the test reports indicate the mix tested was essentially within the specifications for the ASTM C-33 but outside of the LA DOTD and East Baton Rouge Specifications as regards to the aggregates. The lack of the larger aggregates as required under the latter specifications was apparent when the scaling areas of the Baton Rouge site were visited. It was apparent from a visual inspection that the larger aggregates were not in the upper part of the concrete exposed for viewing (Photo E and F). Such lack of the larger rock to hold the concrete together results in the concrete being susceptible to breakage under loadings due to the lack of cohesive strength. This is exactly what is occurring at the expansion joints. Of additional note, the test reports were prepared approximately one (1) year before the concrete was poured according the compression tests furnished this office. This matter calls into question if the Mix Design submitted was actually used approximately one year later.

D.    **Excessive Slump in the Poured Concrete**

Slump is a measure of the "workability" of concrete and is the measure of plasticity and placeability. In most applications, slump should be the least that is compatible under the conditions of the work. In this particular project for H&E, the specifications directed that the slump was to be in the range of 2-4" for all the paving areas.

NON-CERTIFIED COPY

On October 2, 2012, Terracon, an independent testing laboratory, produced a fifteen page summary entitled Concrete Compressive Strength Summary Report (H&E 0001076-0001089) for the captioned project. The data provided included sample location, average concrete compressive strength at 7 and 28 days, test date, actual slump, various temperatures along with other miscellaneous data. Of the one hundred and seventy-six (176) sample locations, a total of 85 have been identified as having to do with the concrete paving operation.

A review of this test data indicated several trends concerning the compressive strength of the concrete and the actual slump of the concrete. The review of the compressive strength obtained by the various samples at 28 days reflected that essentially all of the sampling was well in excess of the 3,800/4,000 psi requirement for 28 days as specified in both the plans and specifications.

The Project Manual states that the contractor shall "have the lowest slump compatible with the placement requirement" and "In general, improve workability by adjusting grading rather than by adding water". The Project Manual further states in Section 03300, Part 1.7 (A) (1) "Have the lowest slump compatible with the placement requirements. Out of the 85 tests taken on the paving area, 0% were below the 4" maximum, 31% were 4-6", 53% were 6-8", and 16% were above 8". All slump tests failed. Although the concrete passed the compressive strength requirements, the slump did not pass the specifications set forth in the documents. When slump is excessive, several issues can occur affecting the durability of the pavement. These issues created by excessive slump can include lamination of the surface of the pavement, a higher water-cement ratio than desired, and aggregate settlement to the bottom of the pour due to the high plasticity of the concrete mix created by the excessive sump. As indicated above, not a single sample taken by the independent testing lab complied with the specifications regarding slump. In fact, approximately 50% of the samples taken had almost doubled the allowable slump and 12% had excess of that amount, approaching 2.5 times the maximum specified. Further evidence of this non compliance is that the Mix Design submitted for 4000 psi concrete by Heck Industries, Inc., dated May 17, 2011, indicates a 4" slump. A <4" slump was never used on the paving portion of the job site according to the test reports. In the EBR Standard Specifications, Sec. 1005-5 ©, it states "When slump, mix temperature, or gradation measurements indicates that the mix may fall outside of tolerance limits, the Contractor shall immediately make adjustments to keep the mix within specified limits. Such was not the case in this paving project. Accordingly, the failed slump tests indicates that this is a major contributing factor in the existing pavement issues.

Page 17

NON-CERTIFIED COPY

Based upon my detailed review, no action was taken during construction to address this obvious and serious deviation from the project specifications.


E.    **Joint Locations**

A review of the construction plans by BM indicating the joint locations were reviewed and found to be appropriate for the design conditions. It is my professional opinion that BM was not negligent in their actions and maintained the appropriate standard of care in providing the proposed joint locations to the H&E Equipment Services facilities on Pecue Lane in Baton Rouge, Louisiana. Verification to determine if the joint locations constructed were as indicated by the construction plans was not verified for this report, however, it was noted during the two site inspections that the joint spacing was not as indicated on the construction plans. The joint spacing in many locations exceeded that shown on the construction plans which could contribute to cracking.


F.    **Joint Design**

It was argued in the Plantiff's expert reports that the joint designs shown on the construction plans were faulty. My reviews of this matter included discussions with Mr. McCullough who indicated that this particular joint design has been in use by his firm for many years and has always been successfully used. The joint designs in the LA DOTD and EBR details are simply alternative designs not necessarily superior to that indicated by BM. The joint design indicated for this project met the appropriate standard of care for such construction in the local area. What has not been determined is exactly what joint detail was actually constructed for this project. No information has been located to show the actual correlation between the design joints and the constructed joints.

In addition, no differential settlement of any significance was noted during the site inspections indicating the proper functioning of the joints/dowels and base.

NON-CERTIFIED COPY

G.    **Construction Methods**

The question of the methods and procedures of the Contractor in constructing the project according to the plans and specifications remains a potential cause. The site inspections revealed various deviations from the details shown on the construction plans. For example, saw cut joints did not extend through curbs resulting in uncontrolled cracking, non-confirming concrete mix, excessive slump, delayed saw cutting of the joints, panel sizes larger than indicated in the design documents, etc.

H.    **Non Specification Concrete Delivered to the Site**

A review of the available testing reports indicated that excessive slump was noted on each one of the test cylinders taken on the concrete used for paving during the construction of the project. In addition, the mix design submitted was done approximately one (1) year before concrete was poured which creates the possibility of the mix design being supplied not in accordance with the submitted mix. From visual inspections made of the project in January, 2016, and again in August 2016, it is my opinion that sufficient large aggregate was missing from the concrete poured at the site. The presence of the small aggregate is conducive of both scaling and spalling as the concrete has less cohesive strength. Accordingly, these findings indicate that this is more likely than not a contributing factor in the existing pavement distress.

I.    **Spalling/Scaling Due to Heavy Equipment**

No evidence has been presented to show a direct nexus between the use of heavy equipment on the site and the spalling/scaling that is occurring. When visually examined, what was found is essentially the same as found in parking lots through out the region which does not have heavy equipment use. Accordingly, my findings neither dismiss or accept the premise that the heavy equipment is the cause of the spalling/scaling, thus this remains a potential, but not a definitive cause. The spalling/scaling exhibited on the site is typical to many other various concrete pavement projects, including H&E's other sites. However, the most evident cause of the spalling is deficient concrete mix and slump,

NON-CERTIFIED COPY

J.     **Contractor's Failure to Build in Accordance with the Plans and Specifications**

In both Mr. Drennan's and Dr. Bailey's reports, the premise brought forth was that the construction design was inappropriate and is the sole cause of the site related issues to this litigation.  What is missing from their position is the lack of evidence that the project was indeed built per the plans and specifications.  As previously discussed, there are a multitude of potential causes for the conditions at the site. Failure to construct the project in accordance with the plans and specifications is paramount to the long term success of the project.  Yet, no evidence regarding the finished product has been presented, thus the concept of blaming the design conveniently forgets the impact the Contractor has on every job.    Unless constructed by the Contractor according to the design, the theoretical design itself is irrelevant.

Our review of the information provided found only limited evidence on how the project was constructed.  As the findings in the testing reports reviewed indicated certain important aspects outside the specifications and the joint spacing noted being in excess of that shown on the plans, the failure to be built in accordance with the plans and specifications is a potential and more likely cause.

K.     **Inadequate or Improper Maintenance to the Pavement/Joints Upon Acceptance by the Owner**

As mentioned previously, Dr. Bailey correctly repeats from the STE report that "the design life of the pavement system is dependent upon periodic maintenance of the pavement.  This maintenance includes but is not limited to cleaning and resealing joints, sealing cracks and immediate repairs of damaged areas".  To date, I am not aware of H&E providing any of these maintenance services deem "dependent" by Dr. Bailey.  Accordingly, the Response to Interrogatories provided by the Plaintiff, Baltimore, Maryland and Corpus Christie, Texas, are described as follows: "There is no maintenance program applicable to the expansion/construction joints and/or these paved surfaces in place."  During his deposition on August 31, 2016, the Owner's representative, Mr. Leonard St. Germain, testified that the Owner does not have a maintenance program for the pavement at the Baton Rouge site. Specifically, he stated that there is no joint maintenance program in place at the site.  On the site visits attended in January and August of 2016, no evidence of programmed maintenance was found to be ongoing on either the paving or the joints in the site.  This lack of maintenance results in joints becoming unprotected from the weather, aggregate and other foreign materials entering into the joints preventing their proper function, distressed pavement around inlets and panels were

NON-CERTIFIED COPY

not being repaired or replace. Such lack of maintenance serves to exacerbate the deterioration of the paved area and result in costly repairs which could have been prevented by an appropriate maintenance program. No such maintenance was noted during the site visits to Baton Rouge nor were described in the responses provided in the Interrogatories. As such, this lack of adequate or proper maintenance is a very likely cause of much of the visual distress noted in the paved areas.

L.    **Pavement Thickness**

The site construction plans show the use of 6 inch thick concrete pavement in the parking lot adjacent to both of the office buildings and in the rear and perimeter of the equipment yard. It also shows 8 inch pavement in the equipment driveway, display area and the area immediately surrounding the maintenance building. Plaintiff's expert calls into question the use of 6 inch pavement in the equipment yard. According to Mr. Murray McCullough, the Project Site Engineer for Benchmark, the decision about where to use the 6 and 8 inch pavement was presumably dictated and approved by the Owner. The apparent basis would be to use the thicker pavement in heavier use areas and reduce the thickness in other areas to reduce construction costs. The evidence regarding the history of the design development for the Baton Rouge site supports this position and is as follows:

- In 2006, URS began preliminary design of the civil site work, which included client review meetings to obtain the Owner's requirements for the site. H&E's final approval was required for each design element to establish the basis for the site design. (H&E 00026, 000133-135, 000147, 00174.)

- URS subsequently prepared a construction estimate in November 2008 reflecting the Owner's approval of the basis for design. The URS "Statement of Probable Cost" included line items of 290,000 sq. ft. of 6 inch pavement and 67,000 sq. ft. of 8 inch pavement (H&E 0001031-1039). These quantities correspond to the pavement areas shown on the design plan. The use of 6 inch in lieu of 8 inch concrete pavement would, according to the Statement of Probable Cost, result in the Owner saving 35-40% percent of the concrete pavement costs for each square foot of the concrete pavement that was reduced from 8 inch to 6 inch for the project. This clearly shows that the Owner was advised of and approved the use of 6 inch and 8 inch pavement in the above quantities for the Baton Rouge, Louisiana site.

Page 21

NON-CERTIFIED COPY

- Mr. Chad Herndon testified during his deposition that although requested, he did not recall H&E providing any technical literature to assist in the design of the concrete pavement to support the weight of the heaviest piece of equipment. He further stated that "They did not give us a technical spec on a weight of equipment. They had just – - they referenced the thickness of concrete that they had used on other projects.... and that should be adequate for this project". In addition, he stated "...we never got a specific weight. We were – there was some discussion and we were provided that thickness that they had used on the design of other branches or other projects that they had. That was the final resolution. That was the answer we got". (Herndon Deposition Pgs. 32-34.) This testimony shows that the Owner supplied the decision on the pavement thickness and its location.

Although pavement thickness is a factor in the overall performance of pavement, it is only one of several factors. As stated elsewhere in this report, the concrete in some areas was obviously substandard quality. Furthermore, the joints throughout the Baton Rouge site did not indicate proper or routine maintenance. In addition heavy unblocked point loads were placed on their corner of concrete panels by some of the equipment which would create excess weight at the corners of the concrete panels thus creating cracking.


## VIII.    CONCLUSIONS

On August 24, 2016, a site visit was made to the Baton Rouge location to review the current status of the pavement and joints in the heavy equipment area. It was readily apparent from the site visit that the entirely of the "rear yard" was functioning as intended and that no areas had restricted access. Significant portions of the site had minimal or no cracking/spalling requiring repair or replacement beyond routine maintenance. In other areas, in particular directly behind the main building, an area was noted to have cracking and spalling beyond what would be normal and customary for such a paved area. It was noted during the site visit that no significant deflection was noted in the pavement either at joints or at other portions of the panels. Where cracking existed, no evidence or sign of any deflection were noted. In addition, minimal separation of the panels at the cracking was noted as they are held together by the grid of bars indicated by the design section. It is my professional opinion that BM was not negligent in their actions and maintained the appropriate standard of care in providing their professional services to the H&E Equipment Services facilities on Pecue Lane in Baton Rouge, Louisiana.

NON-CERTIFIED COPY

In the original Petition and the Supplemental Response there was a listing of certain allegations regarding this project which formed much of the basis for this litigation. What follows are my conclusions and opinions regarding each of these allegations:

A.     **Design Deficiencies to the Parking Lot**

In the expert reports prepared by Mr. Drennan and Dr. Bailey it was alleged that the sole cause of the cracking/spalling issues at the site were caused by design deficiencies. As previously noted in this report, no empirical data was presented in support of this position. To the contrary, only theoretical discussion points were made to support the improper design position but no basis was provided for their opinions directly related to the design vs. what was constructed. What their reports fail to convey is that the documents they referred to were simply guidelines and is not a substitute for engineering judgement for projects such as the H&E facility in Baton Rouge, LA. The plans and specifications clearly and repeatedly referred to similar public documents in common use in the local area. These included the Standard Specifications for Public Works Construction by the East Baton Rouge Parish Department of Public Works, and The State of Louisiana Department of Transportation and Development (LA DOTD) Standard Specifications. These documents were referenced in the plans and supplemented the Project Manual prepared for this particular project by licensed Professional Engineers and Architects familiar with the local area and its typical design parameters. It is our professional opinion that BM was not negligent in their actions and maintained the appropriate standard of care in providing their professional services to the H&E Equipment Services facilities on Pecue Lane in Baton Rouge, Louisiana. What was left unstated in the Petition, and the expert reports is that there are numerous other possibilities for what is occurring at the site. Other more likely causes previously discussed include:

- pavement thickness not as specified (construction defect);
- delay in joint sawing (construction defect);
- failure to saw cut joints continuously through curb;
- improper concrete mix design (construction defect);
- excessive slump of the concrete (construction defect);
- failure of the contractor to comply with the plans and specifications;
- construction methods (construction defect);
- failure to construct joints as designed;
- failure to properly seal joints;
- non-spec concrete delivered to the site;

NON-CERTIFIED COPY

- spalling/scaling due to heavy equipment use/misuse beyond design capacity;
- inadequate inspection and quality control by inspection contractor;
- Owner's use of the facility varied from original plan for intended use; and
- inadequate or improper maintenance of the pavement/joints upon acceptance by the Owner.

B.    **Substantial and Unanticipated Amount of Cracking, Spalling and Deterioration**

During the site visits of both January 22, 2016 and August 24, 2016, major portions of the parking aprons and staging area were not found to be experiencing a substantial and unanticipated amount of cracking, spalling and deterioration. To the contrary the entire project site was functioning as intended and that no areas had restricted access. Only a small percentage (approx.15%) of the paved area was experiencing such events and that is after four years of continuous use. The vast majority of the site had minimal or no cracking/spalling requiring repair or replacement beyond routine maintenance. As discussed in "Findings", the more probable causes of the noted issues are one or more of the following:

1.  Pavement thickness no installed per design in certain areas.
2.  Delay in joint sawing.
3.  Concrete Mix design data submitted one year before the actual construction commenced.
4.  Concrete mix delivered to site of poor quality.
5.  Excessive slump in poured concrete.
6.  Joint locations not in accordance with the construction plans.
7.  No empirical data on details of joints actually constructed vs. design.
8.  Inadequate maintenance and/or repair.

C.    **Defective and Negligent Design of the Concrete Pad, the Expansion Joints, the Control Joints, and the Specified Concrete Strength**

There is no visible evidence showing that the facility is not functioning or in use for its intended purposes. Although cracks exists in some of the concrete panels, the majority are insignificant and have no impact on the life expectancy (20 years) of the paved area. In noting the cracking pattern, only in a very limited number where the cracks close enough to joints to indicate a joint failure in providing an intended cracking location.

Page 24

NON-CERTIFIED COPY

It is, and always has been, the site engineer's option to detail the type of joint he feels is appropriate for the design condition. BM has extensive design experience in concrete pavement construction and has developed the expertise necessary to make an independent evaluation of the joint design for each project. Thus was the case in this particular instance.

In addition, no deflection in the pavement on either side of the any joint was noted which would indicate inadequate dowel bar size or base failure. The site visit also indicated that the joint spacing in many instances exceed those indicated on the construction plans. Regarding the concrete strength, the specified concrete strength was recommended by the independent Testing Lab, was similar to other H&E locations and designs, and most importantly, empirical test data showed that the concrete compressive strength significantly exceeded the specifications significantly in almost every instance.

**D.    Failed to Design the Project in Accordance with Appropriate Industry Standards and/or in Accordance with the Required Standard of Care Ordinarily Exercised by Others in the Same Profession.**

No empirical data was presented in support of this position. To the contrary, only theoretical discussion points were made to support the improper design position but no basis was provided for their opinions directly related to the design vs. what was actually constructed. What their expert reports fail to convey is that the documents they referred to were simply guidelines and not a substitute for engineering judgement. The plans and specifications clearly and repeatedly referred to similar public documents in common use in the local area. These included the Standard Specifications for Public Works Construction by the East Baton Rouge Parish Department of Public Works, and The State of Louisiana Department of Transportation and Development (LA DOTD) Standard Specifications. These documents were referenced in the plans and supplemented the Project Manual prepared for this particular project by licensed Professional Engineers and Architects familiar with the local area and its typical design parameters. It is our professional opinion that BM was not negligent in their actions and maintained the appropriate standard of care in providing their professional services.

Plaintiff's expert admits that joint edge guards (armored plates) and protective coatings are outside the standard of care for such a facility. Furthermore, the Owner representative, Mr. Leonard St. Germain ,testified during his deposition that H&E never considered the use of armored plates as they did not think they were needed.

Page 25

NON-CERTIFIED COPY

E.    **Defendant Failed to Address and Remedy Observed Crumbling and Spalling in the Concrete.**

The facts in this matter were found to clearly establish that there is no routine maintenance being performed on the Baton Rouge (or others) by the Owner, H&E. This fact was readily apparent during the site visits of January 22, 2016 and August 24, 2016. In addition, in responses to Interrogatories, H&E provided information on the pavement maintenance program for several of their sites as follows: there is no maintenance program applicable to the expansion/construction joints and/or these paved surfaces in place. The Owner is the maintaining entity for the project and should have addressed any repair or maintenance needs promptly to avoid further issues. Any deterioration in the pavement is likely caused by the Owner's failure to properly maintain its condition.

F.    **H&E Suffered Damages Consisting of the Anticipated Costs of Removing and Replacing and/or Repairing the Concrete Pads Showing Signs of Spalling and Cracking as a Result of Defendants' Deficient Designs and Specifications.**

No specific details have been provided by the Plaintiff in regards to the amount, location, type of anticipated repair nor cost associated with what is alleged to be in need of remedial action. Full replacement value is not justified and the cost estimate was unsupported and, in my professional opinion, grossly inflated. To the contrary, it was readily apparent from the most recent site visit that the entirely of the parking lot and equipment areas were functioning as intended and that no areas had restricted access. Significant portions of the site had minimal or no cracking/spalling requiring repair or replacement beyond routine maintenance. Where cracking existed, no evidence or sign of any deflection were noted. In addition, minimal separation of the panels at the cracking was noted as they are held together by the grid of bars indicated by the design section. .

NON-CERTIFIED COPY

## IX.   SUMMARY

It was apparent from our review of the project documents that the allegations contained in the Petition were not supported by documented evidence but are based solely upon a theory of only design deficiencies.  No evidence has been presented to show the project was even constructed according to the plans and specifications and whether it complied with all the aspects of the design. The lack of any expert report in direct support of the allegations supporting the claims, the lack of evidence among the documents supporting the various claims, the lack of evidence showing BM

caused compensable damages, and the lack of details and documentation on specific problems (joint issues) creates a situation of various claims and pleadings without providing the necessary foundation or documentation in support.

Alternatives to their claim of only deficient design were not investigated by the Plaintiff or their experts.  Our findings, based upon actual evidence, indicates that one of more of these other potential causes is actually creating the current conditions and that the design met and/or exceeded the standard of care for the industry in the local area.

In summary, the various allegations contained in the petition were found to be generalized in form and not substantiated by any expert report, any documentation or any specific detail.  We did not find substantiated fault of the design by Benchmark Group, LLC and no empirical evidence was provided to support the claim.  On the basis of our review of the evidence presented, it is our professional opinion that BM was not negligent in their actions and maintained the appropriate standard of care in providing their professional services to the H&E Equipment Services facilities on Pecue Lane in Baton Rouge, Louisiana.

NON-CERTIFIED COPY



NON-CERTIFIED COPY

EXHIBIT

E

C-3.0

PAVING AND JOINT
LAYOUT



NON-CERTIFIED COPY

EXHIBIT

F

SITE & GRADING PLAN

PARCEL "A"
NORTH POINT INDUSTRIAL CENTER
17 CHRISTINA COURT

15TH ELECTION DISTRICT    BALTIMORE COUNTY, MARYLAND



NON-CERTIFIED COPY



NON-CERTIFIED COPY

EXHIBIT

H

H&E 001731



**HANDICAP SIGN**
SCALE: N.T.S.

**STOP SIGN**
SCALE 3/8"=1'

**SIDEWALK, CURB & GUTTER NOTES**

**SIDEWALK SECTION**
SCALE: None

**CRUSHED CONCRETE PAVEMENT**

**CONCRETE PAVEMENT**

**PAVEMENT SECTION**
SCALE 3/8"=1'



**PARKING**
SCALE 1"=1'



**FRONT**

**WHEEL STOP**

**CURB DETAIL**
SCALE 1"=1'

**EXPANSION JOINT TYPE A**

**LONGITUDINAL CONSTRUCTION JOINT TYPE B**

**CONTRACTION JOINT — TYPE D LONGITUDINAL OR TRANSVERSE**

**CONCRETE JOINTS**

**CONCRETE & JOINT NOTES**

1. EXPANSION JOINTS (TYPE A) TO BE LOCATED AS SHOWN. LONGITUDINAL JOINTS (TYPE B) SHALL BE USED TO DELINEATE A DAYS PLACEMENT OF PAVEMENT. ALL OTHER JOINTS SHALL BE (TYPE D).

2. CONTRACTOR SHALL SUBMIT PROPOSED PAVEMENT CONSTRUCTION SCENARIO FOR APPROVAL.

3. CONTRACTOR TO BRING SUB GRADE TO ELEVATION DENSITY AND MOISTURE CONTENT, AND MAINTAIN UNTIL CONCRETE IS PLACED.

4. SAWING OF (TYPE D) JOINTS SHALL COMMENCE WITHIN (8) HOURS OF PLACEMENT OF CONCRETE AND CONTINUE, UNINTERRUPTED, UNTIL COMPLETE.

5. (TYPE A) JOINTS TO BE PLACED AROUND ALL ISLANDS.

6. ALL REINFORCING SHALL BE MINIMUM GRADE 40.

7. ALL CONCRETE SHALL HAVE A MINIMUM COMPRESSIVE STRENGTH AT 28 DAYS OF 4000 PSI.

**STANDARD SPECIFICATIONS & NOTES**

1. THE CONTRACTOR SHALL NOTIFY THE CITY'S INSPECTION DEPARTMENT AT 361-880-3555 AND PROVIDE AT LEAST (1) WORKING DAYS NOTICE OF THE ANTICIPATED CONSTRUCTION.

2. CONTRACTOR SHALL OBTAIN SPECIAL SERVICES ENGINEERING PERMIT FOR ANY CONNECTIONS ONTO A CITY UTILITY SERVICE LINE AND/OR ANY WORK WITHIN A CITY UTILITY EASEMENT OR WITHIN ANY PUBLIC RIGHTS-OF-WAYS.

3. THESE SPECIFICATIONS ARE THE CITY OF CORPUS CHRISTI STANDARDS AND THERE WILL BE REFERENCES TO CITY, CITY ENGINEER AND POSSIBLY JEFF LEBINGER. ANY REFERENCE TO CITY SHALL BE INTERPRETED AS THE "OWNER". ENGINEER SHALL BE INTERPRETED AS "BASS & WELSH ENGINEERING" THE SPECIFICATIONS ARE AVAILABLE ON THE CITY OF CORPUS CHRISTI WEBSITE AT http://www.cctexas.com/government/development-services/-room-information/design-standards/standard-specifications/index

NON-CERTIFIED COPY

BASS & WELSH ENGINEERING
CONSULTING ENGINEERS AND SURVEYORS
3000 S. ALAMEDA ST. SUITE B
P.O. BOX 6397, 78466-6397
PH. 361 991-8550 FAX 361 993-7569
(FAX361) 993-7569
TEXAS REG. ENGINEERING FIRM F-52

DETAILS
LOT 8, BLOCK 2, SUNTIDE INDUSTRIAL TRACTS
NE-CORPUS CHRISTI, TX-1-UT, LLC
CORPUS CHRISTI, NUECES COUNTY, TEXAS

SHEET NO.
**C-8**
OF 11 SHEETS

EXHIBIT
I



**DETAIL - BARRIER CURB**
SCALE: N.T.S.



**DETAIL - ISOLATION JOINT (IJ)**
SCALE: N.T.S.



**SECTION**
SCALE: N.T.S.



**DETAIL - CONSTRUCTION JOINT (CJ)**
SCALE: N.T.S.



**DETAIL - ISOLATION JOINT @ STRUCTURE**
SCALE: N.T.S.



**DETAIL - EXPANSION JOINT (EJ)**
SCALE: N.T.S.




**DETAIL - CONSTRUCTION or BUTT JOINT (BJ)**
SCALE: N.T.S.
NOTE: BUTT JOINT IS PREFERRED CONSTRUCTION JOINT




**DETAIL - #4 BAR DOWELS**
SCALE: N.T.S.



**DETAIL - SAW CUT JOINT**
SCALE: N.T.S.



**DETAIL - ALT. CONSTRUCTION JOINT**
SCALE: N.T.S.



**EXHIBIT J**



C-3.1

EXHIBIT
K
tabbies®

