NON-CERTIFIED COPY











NON-CERTIFIED COPY

A NEW SALES & SERVICE FACILITY FOR

# H & E HI-LIFT BUILDING

### CHARLOTTE, NORTH CAROLINA



INDEX OF DRAWINGS

APPENDIX B — BUILDING CODE SUMMARY

**ARCHITECTURAL**

**CIVIL**

**STRUCTURAL**

**MECHANICAL**

**ELECTRICAL**

**PLUMBING**

VICINITY MAP

ARCHITECTURAL ABBREVIATIONS

SYMBOL LEGEND

EXHIBIT L

COST OK $ 340.00

#92241

JUL 24 2017

DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

DOCKET NO.: 626,308

SECTION "D"

POSTED

JUL 25 2017

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____          _____
                                                              DEPUTY CLERK

## MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING OTHER FACILITIES

NOW INTO COURT, through undersigned counsel, comes Plaintiff, H&E Equipment

Services, Inc. ("H&E"), and respectfully brings this motion *in limine*, requesting an order from

the Court excluding evidence relating to H&E facilities not at issue in this case.

H&E sells, services, and rents industrial equipment from 78 branch offices in 22 states.

Defendants provide architectural, engineering, and other related services.  In this case, H&E

seeks damages from Defendants arising from Defendants' defective design of the pavement at

H&E's facilities located in Baton Rouge and Kenner.[1]

H&E owns some of its facilities, including its headquarters and branch office in Baton

Rouge and its branch office in Kenner, but the vast majority of its branch offices are leased from

third parties.   Furthermore, there are significant variations in the facilities, and in the design of

the pavement at each facility.

Nonetheless, Defendants have indicated that they will seek to introduce evidence

regarding the design of the pavement at other H&E facilities, and the condition of that pavement.

For the reasons set forth fully in the accompanying memorandum, evidence regarding other H&E

facilities is irrelevant, unduly prejudicial, will confuse the issues, will mislead the jury, and

should be excluded at trial pursuant to Louisiana Code of Evidence articles 401, 402, and 403.



---

[1]  H&E also seeks damages arising from other acts and omissions by Defendants, but the
evidence at issue in this motion relates exclusively to H&E's pavement claims.

NON-CERTIFIED COPY

H&E does not anticipate live testimony on the matters in this motion. This matter is set for a jury trial on August 16, 2017.

**WHEREFORE**, Plaintiff H&E prays that this Court grant its motion *in limine* and exclude evidence relating to other H&E facilities.

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by facsimile, email and/or by placing same in the United States mail, postage prepaid and properly addressed, this 24th day of July, 2017.

Loretta G. Mince



2

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

DOCKET NO.: 626,308                                          SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____          _____
                                                  DEPUTY CLERK

## RULE TO SHOW CAUSE

**CONSIDERING THE FOREGOING** Motion *in Limine* to Exclude Evidence

Regarding Other Facilities filed by Plaintiff H&E Equipment Services, Inc. ("H&E");

**IT IS ORDERED** that Defendants, URS Corporation Architecture, P.C., URS

Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III, show cause on the 16th day of

August at 9:00 A.M. why the relief prayed in the H&E's Motion should not be granted.

Baton Rouge, Louisiana, this ___26___ day of ___July___, 2017.

_____
DISTRICT JUDGE

**PLEASE SERVE:**

URS Corporation Architecture, P.C.;
URS Corporation; L. O'Neal Ryan
and Thomas E. Ryan, III
through their attorneys of record:
Phil Franco
Kellen Mathews
Ronald Sholes
Jeff Richardson
Adams & Reese, LLP
4500 One Shell Square
New Orleans, LA 70139



1208787v.    NON CERTIFIED COPY

## 19TH JUDICIAL DISTRICT COURT
## PARISH OF EAST BATON ROUGE
## STATE OF LOUISIANA

**26-JUL-2017**

TO:    HON JANICE CLARK
       19TH JUDICIAL DISTRICT COURT
       300 NORTH BLVD, RM 10A
       BATON ROUGE, LA 70802

**H&E EQUIPMENT SRVCS VS URS CORP ARCHITECTURE ETAL**

**CASE NUMBER:** C626308

**JUDGE:** JANICE CLARK

**DIVISION:** Division D **ROOM:** 10A

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING ACTION FOR THE

AFOREMENTIONED CASE ON 16-AUG-2017 AT

09:30:00 AM SET FOR JURY TRIAL.

**COMMENTS:** ADD:  MOTION IN LIMINE OBO H&E

**NOTE:** MEMO IN OPPOSITION TO BE SUBMITTED TO THE JUDGE NO LATER THAN EIGHT (8) DAYS PRIOR TO HEARING.

                    EILEEN KNIGHT
                    JUDICIAL ASSISTANT TO JUDGE
                    JANICE CLARK

NOTIFIED:



ATY - ROY CLIFTON CHEATWOOD
ATY - PHILIP ANTHONY FRANCO
ATY - ANNE DERBES WITTMANN
ATY - M DAVID KURTZ
ATY - LORETTA G MINCE
ATY - EDWARD J LAPEROUSE
JDG - JANICE CLARK
ATY - LAURA E CARLISLE
ATY - KELLEN J MATHEWS
ATY - REBECCA SHA

Form 4501A

NON-CERTIFIED COPY

6709-17-000246

# RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**NUMBER  C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

vs.

**PARISH OF EAST BATON ROUGE**

**URS CORPORATION ARCHITECTURE PC**
**ET AL**
(Defendant)

**STATE OF LOUISIANA**

TO:    **URS CORPORATION ARCHITECTURE PC**
       **URS CORPORATION, L.O'NEAL RYAN**
       **AND THOMAS E RYAN, III**
       **THRU PHIL FRANCO, KELLEN MATHEWS, RONALD SHOLES**
       **AND JEFF RICHARDSON**
       **4500 ONE SHELL SQUARE**
       **NEW ORLEANS, LA.  70139**

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

## MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING OTHER FACILITIES

You MUST come to Court at 9:00 AM, on AUGUST 16, 2017 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

### * * * * * SEE ATTACHED ORDER * * * * *

**YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on **27-JUL-2017**.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

Requesting Attorney:
LORETTA G MINCE

---

### SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:**  On the party herein named at _____.

**DOMICILIARY SERVICE:**  On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**    After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20_____.

SERVICE:$_____
MILEAGE$_____            _____
TOTAL:  $_____                    Deputy Sheriff
                                       Parish of _____

**RULE NISI (OOP) - 6709**



EBR4280494

NON-CERTIFIED COPY

# DOUG WELBORN, CLERK OF COURT
## 19th Judicial District Court
## Parish of East Baton Rouge
## 300 North Boulevard
## Baton Rouge, LA 70801
## Phone  (225)389-3960

NO.   **C626308 Division D**                     27-JUL-2017

TO:   **ORLEANS PARISH SHERIFFS OFFICE**
      **CIVIL DEPARTMENT**
      **421 LOYOLA AVE**
      **NEW ORLEANS, LA 70112**

Please find attached RULE NISI to be served in your parish for the above numbered suit.

Kindly make your return(s) on the duplicate(s) enclosed, and

**X**      note the enclosed check for payment of service;

ﻗ      send us your bill for service;

ﻗ      note that this is a pauper suit and no funds are available; or

ﻗ      note that this is a government suit and no funds are necessary.

Thank You,

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

**Requesting Attorney:  LORETTA G MINCE**

---

**REPLY:**                          **DATE:**_____

_____

_____

_____

_____

_____

By:_____

Deputy Sheriff, Parish of _____

**Letter to Out Of Parish Sheriff - 5213**



EBR4226704

NON-CERTIFIED COPY

6701-17-000896



# CIVIL SUBPOENA

18/14

| | |
|---|---|
| **H&E EQUIPMENT SERVICES INC**<br>(Plaintiff) | **NUMBER**   C626308 Division D |
| | **19th JUDICIAL DISTRICT COURT** |
| vs. | |
| | **PARISH OF EAST BATON ROUGE** |
| **URS CORPORATION ARCHITECTURE PC**<br>**ET AL**<br>(Defendant) | **STATE OF LOUISIANA** |

19/9/10 M

**TO:**   KEVIN SPREHE
**RYAN GOOTEE GEN. CONTRACTORS**          OR       **108 HELIOS AVE.**
**1100 RIDGEWOOD DRIVE**                              **METAIRIE, LA.   70005**
**METAIRIE, LA.   70001**

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017**, at **9:30** o'clock **AM**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **10-JUL-2017**, Baton Rouge, Louisiana.

_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

## SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**  After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20____.

| | | |
|---|---|---|
| SERVICE: | $_____ | |
| MILEAGE | $_____ | Deputy Sheriff |
| TOTAL: | $_____ | |

**CIVIL SUBPOENA – OOP - 6701**





EBR4209711

NON-CERTIFIED COPY

EBR4120094

DATE RECEIVED _7-18-17_ DATE RETD _7-19-17_
DATE SERVED _7-19-17_
X SERVICE AFFECTED OR REASON UNSERVED:
X PERSONAL - - - -DOMICILARY THRU _____
___ THRU / OTHER _____
___ NOT AT THIS ADDRESS PER - _____
___ UNABLE TO SERVE AFTER MAKING _____ ATTEMPTS

ED KNIGHT _____ #. _116377_
Deputy Sheriff of Jefferson Parish

NON-CERTIFIED COPY

# DOUG WELBORN, CLERK OF COURT
## 19th Judicial District Court
## Parish of East Baton Rouge
## 300 North Boulevard
## Baton Rouge, LA 70801
## Phone (225)389-3960

NO.    C626308 Division D                    31-JUL-2017


TO:    ORLEANS PARISH SHERIFFS OFFICE
       CIVIL DEPARTMENT
       421 LOYOLA AVE
       NEW ORLEANS, LA 70112


Please find attached (1) CIVIL SUBPOENA to be served in your parish for the above numbered suit.

Kindly make your return(s) on the duplicate(s) enclosed, and

X       note the enclosed check for payment of service;

        send us your bill for service;

        note that this is a pauper suit and no funds are available; or

        note that this is a government suit and no funds are necessary.

                                    Thank You,

                                    Sharon Zito
                                    _____
                                    *Deputy Clerk of Court for*
                                    **Doug Welborn, Clerk of Court**

**Requesting Attorney:  KELLEN J. MATHEWS**

---

**REPLY:**                    DATE:_____

_____

_____

_____

_____

_____

                    By:_____

                    Deputy Sheriff, Parish of _____


**Letter to Out Of Parish Sheriff - 5213**



EBR4226430

NON-CERTIFIED COPY

6701-17-000963

# CIVIL SUBPOENA

H&E EQUIPMENT SERVICES INC.
(Plaintiff)

vs.

URS CORPORATION ARCHITECTURE PC,
ET AL
(Defendant)

NUMBER    C626308 Division D

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

TO:    BRAD REESE
6737 GENERAL HAIG
NEW ORLEANS, LOUISIANA  70124

You must come to Court at 300 North Boulevard, on **AUGUST 16, 2017**, at **9:30** o'clock **A.M.**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.
(Ordered by **KELLEN J. MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **31-JUL-2017**, Baton Rouge, Louisiana.



_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

---

## SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____._____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**  After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20_____.

SERVICE:      $_____
MILEAGE      $_____              _____
TOTAL:         $_____                        Deputy Sheriff

**CIVIL SUBPOENA – OOP - 6701**



EBR4281293

NON-CERTIFIED COPY

# FishmanHaygood

Fishman Haygood LLP
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170
fishmanhaygood.com

LORETTA MINCE
(504) 586-5273
LMINCE@FISHMANHAYGOOD.COM

July 31, 2017

*Via* **Federal Express**

**POSTED**

AUG 2 2017

File No. 3107-04

Clerk of Court
19th JDC, Parish of East Baton Rouge
300 North Boulevard
Baton Rouge, Louisiana  70802

Re:    *H&E Equipment Services, Inc. v URS Corporation Architecture, P.C., et al*
       Docket No. 626308, Sec. "D"

Dear Ms. Welborn:

Please find enclosed a Judgment in conformity with the Court's ruling and July 28, 2017 minute entry on the Motion for Summary Judgment and a Rule 9.5 Certificate on behalf of Plaintiff, H&E Equipment Services, Inc.

Respectfully,

Loretta Mince

LGM
Enclosures
cc:    Phil Franco (w/encs.) (via email)
       Kellen Matthews (w/encs.) (via email)

EBR424246

AUG 02 2017

1217278v.1

NON-CERTIFIED COPY



ORIGIN ID:NEWA      (504) 586-5252
LORETTA G. MINCE
FISHMAN HAYGOOD, L.L.P.
201 SAINT CHARLES AVE
STE 4600
NEW ORLEANS, LA 70170
UNITED STATES US

SHIP DATE: 31JUL17
ACTWGT: 1.00 LB
CAD: 5347965/INET3920

BILL SENDER

TO  **CLERK OF COURT DOUG WELBORN**
    **19TH JUDICIAL DISTRICT COURTHOUSE**
    **300 NORTH BLVD**

**BATON ROUGE LA 70801**
(225) 389-3960
INV              REF 3107-04
PO
                        DEPT

FedEx
Express

E

TRK#  7797 7510 0779
0201

TUE - 01 AUG 10:30A
PRIORITY OVERNIGHT

**42 OPLA**           **70801**
                  LA-US **MSY**

NON-CERTIFIED COPY

# ADAMS AND REESE LLP

**Attorneys at Law**
Alabama
Florida
Georgia
**Louisiana**
Mississippi
South Carolina
Tennessee
Texas
Washington, DC

**Kellen J. Mathews**
Direct: 225.378.3243
E-Fax: 225.336.5115
kellen.mathews@arlaw.com

July 31, 2017

**_VIA HAND DELIVERY_**

Honorable Doug Welborn
Clerk of Court, 19th Judicial District Court
East Baton Rouge Parish
300 North Boulevard
Baton Rouge, LA 70801

COST OK $ _127_
_55502_
JUL 3 1 2017
DEPUTY CLERK OF COURT

RE:    H&E Equipment Services v. URS Corporation, et al
        19th JDC No. 626308(D)
        Our File No. 25240-3

Dear Mr. Welborn:

Please issue a trial subpoena on an **expedited basis** on behalf of URS Corporation for the following witnesses to appear for trial in the above matter commencing on August 16, 2017, at 9:30 a.m. before Judge Janice Clark, Division D, Room 10A, Baton Rouge, LA:

Brad Reese
6737 General Haig
New Orleans, LA 70124

Also enclosed please find our firm check in the amount of $127.00 for your issuing fee. Thank you and please don't hesitate to contact us if you have any questions.

Sincerely,

**ADAMS AND REESE, LLP**

Kellen J. Mathews

NON-CERTIFIED COPY

# FISHMAN HAYGOOD, L.L.P.

201 St. Charles Avenue
46th Floor
New Orleans, LA 70170
Phone: (504) 586-5252
Fax: (504) 586-5250

# FAX

**TO:**  Clerk, 19th JDC  
Parish of East Baton Rouge

**FAX NUMBER:** 225-389-3392

**FROM:** Loretta G. Mince

**DIRECT DIAL NO:** 504-586-5273

**DATE:** August 1, 2017

**FILE NO.** 3107-04

We are sending 37 pages (including this page)

If there are any problems, please contact Carla at 586-5246.

Re:  *H&E Equipment Services, Inc. v URS Corporation Architecture, P.C., et al*  
19th JDC, Doc. No. 626,308, Sec. "D"

Dear Clerk:

Attached please find Plaintiff's Proposed Jury Instructions and Jury Interrogatories to be filed on behalf of H&E Equipment Services, Inc.  Please confirm *via* facsimile the cost for fax **and filing fees** for the attached document.  As required, the original document will be forwarded for filing within seven (7) days along with a check to cover the fees for filing by fax.

Thanking you in advance for your assistance.

Respectfully,

Carla Cooper Mayer  
Legal Assistant Loretta G. Mince

cc:  Philip A. Franco, Esq. (*via* Philip.franco@arlaw.com w/o attachments)



859269v. 1

NON-CERTIFIED COPY

## 19TH JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE
## STATE OF LOUISIANA

DOCKET NO.: 626,308 SECTION: "D"

### H&E EQUIPMENT SERVICES, INC

### VERSUS

### URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON, AND THOMAS E. RYAN, III

FILED: _____         _____
                                          DEPUTY CLERK

### **PLAINTIFF'S PROPOSED JURY INSTRUCTIONS**

1

NON-CERTIFIED COPY

## GENERAL CASE OVERVIEW FOR VOIR DIRE

The following narrative provides a very broad overview of this case. It discusses some, but certainly not all, facts, claims and defenses asserted by the parties:

Plaintiff, H&E Equipment Services, Inc., is a business headquartered in Baton Rouge that sells, services, and rents construction equipment. Plaintiff will be referred to as either "H&E" or "Plaintiff." H&E owns and operates facilities in various locations in Louisiana and around the United States. At issue in this lawsuit are H&E's facilities in Baton Rouge, Kenner, and Belle Chasse, Louisiana.

H&E is represented by Brent Barriere, Lori Mince and Rebecca Sha of the firm Fishman Haygood.

Defendants URS Corporation Architecture, P.C. and URS Corporation are, together, an architectural and engineering design firm that provides program management, planning, engineering, architectural design, environmental, and construction services to a wide range of commercial and industrial clients worldwide. URS Corporation Architecture, P.C. will be referred to as "URS."

Defendant L. O'Neal Johnson is a registered professional architect licensed by the State of Louisiana and, during all pertinent times in this lawsuit, was employed by URS.

Defendant Thomas E. Ryan is a registered professional architect licensed by the State of Louisiana and, during all pertinent times in this lawsuit, was employed by URS.

Defendants are represented by Phil Franco, Ron Sholes, Kellen Mathews, Don McKinney and Jeffrey Richardson of the law firm of Adams & Reese.

H&E contracted with URS to furnish professional design and construction administration services to H&E in connection with the construction of its new headquarters building and dealership facility Baton Rouge. H&E also contracted with URS to provide professional design and construction administration services to H&E in connection with the renovation and additions to H&E's facilities located in Kenner, Louisiana and Belle Chasse, Louisiana.

URS agreed to furnish various design and construction services for each of the Projects. Defendant O'Neal Johnson served as the lead architect on the projects that are subject to this lawsuit. Defendant Thomas Ryan also provided architectural services on the projects.

H&E filed this suit claiming that the design and construction services provided by URS and its subcontractors and employees were defective. According to H&E, the largest issue

2

1216267v.1

NON-CERTIFIED COPY

relates to URS's faulty design of the pavement in the Baton Rouge and Kenner facilities. Shortly after completion of the Baton Rouge and Kenner project, major portions of the concrete parking apron and staging areas for H&E's industrial equipment at both facilities experienced substantial cracking, spalling, and deterioration. H&E contends that URS's designs for the pavement were grossly deficient and did not comply with local and industry requirements and the recommendations of consultants commissioned by URS. H&E contends that the removal and replacement of the pavement at the Baton Rouge and Kenner facilities is necessary to correct the issues.

In addition to the defective pavement design, H&E contends that each of the three construction projects for which URS was responsible—Baton Rouge, in Kenner, and in Belle Chasse—was riddled with problems arising from the construction documents that URS prepared. For each project, H&E asserts that URS omitted from the construction documents essential measurements or necessary components. These omissions were discovered only later, after construction had commenced, and thus necessitated costly change orders.

As to the pavement issues, Defendants contend that their design services were not defective. They argue that other factors including the Plaintiff's failure to maintain the pavement and negligence of the contractors caused the problems. Defendants also argue that a complete replacement of the pavement at the Kenner and Baton Rouge facilities is not necessary and instead, the cracks can be filled in and that the spalling can be repaired only in places where it is severe.

As to the other design services, Defendants contend that their drawings were satisfactory and that to the extent change orders were required, H&E would have had to pay for the work whether it was included in the original drawings or added by change order.

1216267v.1

NON-CERTIFIED COPY

# OPENING JURY INSTRUCTIONS

## Respective Roles of Jurors and Judge

Members of the jury:

You have been chosen as jurors for this case, and you have taken an oath to decide the facts fairly. As we begin the trial, I am going to give you some instructions to help you understand what will take place and what your role is. When you think about my instructions, both now and at the end of the case, consider them as a whole. Don't single out any individual sentence or idea and ignore the others.

As members of the jury, you will decide the facts. As the judge, I will decide all questions of law and courtroom procedure. When you have listened to all of the evidence, I will give you some closing instructions, including the rules of law that you must follow in making your decision.

Keep an open mind throughout the trial. Don't decide any fact until you have considered all of the evidence and my final instructions, and then only after you have had a chance to share your views with the other members of the jury and hear their views as well.

Because you are to decide the facts, you must pay close attention to the testimony which the witnesses will give and to the other evidence that you may see, such as documents or photographs. You will have to rely on your memory of what was said in the courtroom. Although exhibits which have been allowed into evidence will be available to you for further study during your deliberations, you should concentrate on the evidence as it is being presented.

The court staff will give you a pen and notebook to take notes if you want to do that, but you don't have to. If you do take notes, just be careful not to get so involved in your note-taking that you become distracted and miss part of the testimony. When we take breaks during the day, you can leave your notes on your chair. No one will disturb them or look at them. When we finish for the day, the court staff will take up your notebooks and then return them to you the next day. The staff will not read your notes, but we do this to be sure that your notes remain confidential. When all of the evidence has been presented, you will be able to take your notebooks into the jury room with you. After you return your verdict, the notes will be destroyed.

When you begin your deliberations, I will give you a copy of the opening and closing instructions, and any special instructions that I might have given you, if you ask for them.

Because it is so important to all of us that you listen to and understand the evidence presented to you, if you can't hear what someone is saying, please raise your hand and I will see

NON-CERTIFIED COPY

that the situation is corrected. If you have any other issues, such as needing to take a break, just raise your hand, and I will deal with your request.

### Some Definitions of Terms

Some of the terms that you'll hear in the courtroom might be new to you, so let me just tell you ahead of time what they mean. The party who files a lawsuit is called the plaintiff; in this case, the plaintiff is H&E Equipment Services, Inc.

The party who defends against the plaintiff's law suit is called the defendant; in this case, there are multiple defendants. The defendants are URS Corporation Architecture, P.C., URS Corporation, L O'Neal Johnson, and Thomas E. Ryan, III. Sometimes, we refer to the plaintiff and the defendants as the "parties" to the lawsuit.

You will sometimes hear me refer to "counsel." That's just another word for "lawyer" or "attorney". I will sometimes refer to myself as "the Court" and this chair that I'm sitting in as "the bench." The courtroom staff that you see are the "court reporter," the "minute clerk," the "law clerk" and the "bailiff," who is in charge of keeping order in the courtroom.

You will also hear us refer to an "exhibit," which is a type of evidence other than testimony by a witness. An exhibit might be a document or a physical piece of evidence that may be shown to you.

### Courtroom Procedure

Every now and then, a lawyer may "object" to a particular question asked to a witness or to a particular exhibit. The lawyer is doing that because there are rules of evidence that limit the evidence that can be presented. The law does not impose those limitations to hide anything from you; the rules are intended to make sure that the evidence is the most reliable evidence that is available. I might "sustain," or agree with an objection; or I might "overrule" or disagree with it. If I "sustain" it, then I'm excluding the evidence because I have to under the rules of evidence. If I do sustain an objection to a question and don't permit the witness to answer it, ignore the question altogether and don't speculate as to what the witness might have said in response. If I "overrule" a lawyer's objection that means that I'm allowing that evidence to be presented.

Don't attach any importance to the fact that a lawyer has objected, or to my ruling. The lawyer is only doing his or her job, and I'm only applying the rules of evidence. When I rule on an objection, I'm not expressing an opinion on the merits, or favoring one side or the other. I don't favor one side or the other.

5

NON-CERTIFIED COPY

Under Louisiana law, I'm not allowed to comment or express any opinion about the evidence. If it seems to you that I've expressed any opinion during the trial, you should ignore that opinion. But also remember that I'm the judge of the law and in charge of courtroom procedure, and you will have to follow the rules of law that I give you whether you agree with them or not.

The arguments that the lawyers will make to you in opening and closing statements aren't evidence. Your decision on the facts must be based on the testimony and the evidence that you hear and see.

Louisiana law doesn't allow you to ask questions of the witnesses or the lawyers or to make any comments during the presentation of evidence.

During the trial, I might have to confer with the lawyers here at the bench on matters of law or courtroom procedure that you don't need to hear. Some people call these "side-bar" conversations. These "side-bars" might be initiated by me, or one of the lawyers may ask me if he or she can "approach the bench" for such a discussion. At times, you'll simply stay in your seats and when we are finished, the presentation of evidence will resume. At other times, I may excuse you from the courtroom for a short break. I will try to limit these interruptions as much as I can.

I may have to caution one of the lawyers who, out of zeal in representing his or her client, does something that's not in keeping with the rules of evidence or procedure. Don't hold that against the lawyer or the client; again, he or she is just trying to do his or her best for the client.

### Rules for Jurors to Follow

The law requires that you decide the facts on the basis of what you hear and see in this courtroom—and nothing else. In order to do that, there are some basic common-sense rules that you have to follow, especially in today's world where there are so many sources of information available to you. Please be sure that you follow these rules, which will help you do your job of deciding the facts on the basis of what happens in this courtroom and concentrating on what occurs here:

1) Don't conduct your own research about this case, either by yourself or as a group. This means that you shouldn't "Google" or otherwise search for information about the case or the people involved in the case, including the lawyers and the judge. The information that you get about the case in this courtroom will be the most reliable information to help you do your job.

(2) Don't use dictionaries, other books, the Internet or any other resources such as Facebook or similar social networks to gather information about the issues.

6

1216267v.1

NON-CERTIFIED COPY

(3) Don't try to get any special knowledge about the case other than what you hear and see in this courtroom.

(4) Don't use cell phones, I-phones, laptops or any similar devices in the courtroom or in the jury room during your deliberations. I'll give you breaks from time to time to allow you to make any necessary contacts that you need to make.

(5) Don't read, watch or listen to anything about this case from any source outside this courtroom, because your decision must be based solely on what you hear and see in the courtroom. It wouldn't be fair for you to base your decision on some reporter's opinion or on information that you get from a source that your fellow jurors didn't have or that can't be questioned or cross-examined by the parties.

(6) Don't visit or look at the scene of any event or place involved in this case.

(7) Obviously, don't consume any alcohol or use any drugs that could affect your ability to stay alert or to hear and understand the evidence that will be presented.

### Limitations on Communications about Case

To be sure that you reach your decision only on the basis of what you see and hear in this courtroom, the law also requires you to limit your communications with others about the case and to be free of any communications from them to you. So I have to tell you some additional things that you must do about your discussions from now until the end of the trial:

(1) Don't talk to anyone else about what you hear about this case. That means your family, your friends, the parties, their lawyers, any of the witnesses, or members of the media. You can tell people that you are a juror, but don't tell them anything else about the case. If anyone tries to talk to you about this case, tell the bailiff or me immediately. The reason for these restrictions is that in talking about the case to others and hearing what they may have to say, you might be influenced to form an opinion about the case. This would compromise the right of the parties to have a verdict rendered only by you and based only on the evidence you hear and see in this courtroom. You might come into contact with the lawyers, parties or witnesses in the hallway or in the elevator. Though it is a normal human tendency to chat with people in those circumstances, please don't, during the time you serve on this jury, talk to any of the parties or their attorneys or witnesses, whether you are in or out of the courtroom. Not only don't talk to them about the case, but don't talk to them at all, even to pass the time of day. They are under strict instructions not to talk to you about anything, even if it doesn't concern the case. Please don't feel offended if they don't exchange

7

1216267v.1

NON-CERTIFIED COPY

normal pleasantries with you. After you are discharged as a juror, you may talk to anyone you wish about this case. Until that time, I ask you to control your natural desire to discuss the case here, at home, or anywhere else.

(2) Don't communicate in any other way about this case with anyone. You may not post information about this case on the Internet or share it in any way, including text messages, e-mail, chat rooms, blogs, or social websites, such as Facebook, MySpace or Twitter or any brand new social networking device.

(3) Don't discuss the case with the other members of the jury during the trial. At the end of the trial, I will give you instructions, and then you will deliberate with your fellow jurors. That is the time when you will discuss the case, and the evidence you have seen and heard, with your fellow jurors.

I want you to understand why all of these rules that I have given you are important. Only you have taken an oath to be fair—no one else has made that promise. All of the rules I've given you are intended to help us be sure that there is a fair trial—which you have all agreed to do and which we have a responsibility to help you do. I know that you intend to give these parties a fair trial, and in accord with your oath, I know you will do that.

### Certain "Advance" Closing Instructions

I think it would be helpful if I told you before we start the trial a few additional things that I will almost certainly tell you again when you have heard all of the evidence. These things will help you understand better what is happening and what your role is.

Some of the evidence that may be presented will be in the form of what lawyers call a "deposition." A deposition is the written transcript or a video of a question-and-answer session with a witness that took place before this trial, when the witness was under oath and responded to questions from the lawyers about the case. Although it is testimony outside the courtroom, the law permits you to consider it under certain circumstances. You may consider and evaluate this testimony just as you would if it were being given live in front of you today.

Sometimes a deposition might be used to ask a witness who is here testifying whether he might have given prior answers which seem inconsistent with his testimony here in the courtroom. A lawyer may read from a deposition and ask the witness whether what he said in his deposition is different from what he is saying now. We allow this to help you evaluate the credibility of his testimony before you. Whether or not the prior statements by the witness are inconsistent with his

8

1216267v.1

NON-CERTIFIED COPY

live testimony is entirely for you to decide.

One of the first things for you to keep in mind as the trial begins is that the plaintiff has to prove his case by what the law calls a "preponderance of the evidence." The term preponderance means just over half. In other words, 50.00001% would be preponderance. To establish by a preponderance of the evidence means to prove that something is more likely so than not so. In other words, a preponderance of the evidence in this case means such evidence as when considered and compared with that opposed to it has more convincing force and produces in your mind belief that what is sought to be proved is more likely true than not true. If the plaintiff does not convince you of that, then you will have to conclude that the plaintiff has failed to prove his case sufficiently to be entitled to win. The law does not presume that simply because the plaintiff has brought this suit, he is necessarily entitled to win.

"Preponderance of the evidence" is different from a burden of proof described as "beyond a reasonable doubt." Proof beyond a reasonable doubt applies in criminal cases, but not in a civil case such as this one.

The evidence which you will be considering consists of the testimony of the witnesses, and the documents and other physical evidence which will be admitted into evidence, as well as any reasonable inferences or conclusions that you can draw from the evidence presented to you. The arguments by the lawyers, as well as any comment or ruling I may make during the trial, are not part of the evidence.

A fact may be proven either by direct evidence or circumstantial evidence, or perhaps by both. Direct evidence is testimony by a witness as to what he or she saw or heard, or physical evidence of the fact itself. Circumstantial evidence is proof of certain circumstances from which you are entitled to conclude that another fact is true. The law treats direct evidence and circumstantial evidence as equally reliable; it does not prefer one over the other.

Another important thing for you to remember as the trial takes place is that a major portion of your role is to judge the credibility of a witness who is testifying. The law presumes that a witness is telling the truth about facts that are within his knowledge. But this presumption may be overcome by contradictory evidence, by the manner in which the witness testifies, by the character of his testimony, or by evidence that tells you about his motives.

When you are weighing the credibility of a witness, you should consider the interest, if any, that the witness may have in the outcome of this case. You should consider the ability of the

9

NON-CERTIFIED COPY

witness to know, remember and tell the facts to you. You should consider his or her manner of testifying, as to sincerity and frankness. And you should consider how reasonable the witness's testimony seems to be in light of all of the other evidence.

You don't have to accept all of the testimony of a witness as being true or false. You might accept and believe those parts of the testimony that you consider logical and reasonable, and you may reject those parts that seem impossible or unlikely.

I like to say that witnesses are weighed and not counted. By that I mean that you are not required to decide any fact according to the number of witnesses presented to you on that particular point. Your role is always to determine the facts and you don't do that by counting noses. The test is not which party brings forward the most witnesses or presents the greater quantity of evidence. The test is which witnesses and which evidence appeals to your mind as being the most accurate and the most convincing.

Some of the witnesses that you will hear are called "expert witnesses." Unlike ordinary witnesses who must testify only about facts within their knowledge and cannot offer opinions about assumed or hypothetical situations, expert witnesses are allowed to express opinions because I have decided that their education or expertise in a particular field or on a particular subject may be helpful to you. You should consider their opinions, and give them the weight that you think they deserve. If you decide that the opinion of an expert witness is not based on sufficient education and experience or that the reasons given in support of the opinion are not sound, or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely—even though I have permitted the person to testify.

You must decide the facts without emotion, sympathy, or prejudice for or against any party. You should consider the case as an action between people of equal standing in the community. Every person stands equal before the law, and every person is to be dealt with as an equal in this court. A business or an insurance company is entitled to the same fair trial as a private individual.

### Order of Proceeding

Finally, I want to give you an idea of how the trial will be conducted. In just a minute, the lawyers for each of the parties will be allowed to make an opening statement. After those opening statements, the plaintiff will go forward with the calling of witnesses and presentation of evidence during what we call the plaintiff's "case in chief." When the plaintiff finishes, or "rests" as we say in the law, the defendants will then go forward with the calling of witnesses and the presentation of

10

1216267v.1

NON-CERTIFIED COPY

evidence. After that, the plaintiff may be allowed to again call witnesses or present evidence in what we call the "rebuttal" phase of the trial. The plaintiff proceeds first, and may rebut at the end, because the law places the burden of proof on the plaintiff. When the evidence portion of the trial is finished, the lawyers will then be permitted to make their closing arguments, and after that, I will give you instructions on the applicable law and you will then begin your deliberations.

We are now ready for the opening arguments by the lawyers, with the plaintiff's side to go first. Remember that the statements that the lawyers make now, as well as their closing arguments, are not evidence and they are not the instructions on the law that I have told you I will give you at the end of the trial. But they are intended to help you understand the issues you are going to hear about, the evidence that you will probably hear and the positions that the parties have in this case. Statements by any of the lawyers expressing a view about what dollar amounts should be awarded for pain and suffering or similar claims are also not evidence and you should not consider them. The decision about damages, if any, is solely your job; and your decision must be based upon competent evidence, not on amounts suggested by an attorney.[1]

---

[1] *See* Civil Law Treatise: Civil Jury Instructions § 1:1 (2d ed.) (modified).

11

1216267v.1

NON-CERTIFIED COPY

## CLOSING INSTRUCTIONS

Members of the jury, it is now time for me to tell you the law that applies to this case. As I mentioned at the beginning of the trial, you must follow the law as I state it to you.

Before I tell you the law, however, let me remind you of your responsibility as jurors. I told you some of this at the beginning of the trial. You have been chosen from the community to decide the facts. What the community expects of you, and what I expect of you, is the same thing that you would expect if you were a party to this suit: an impartial deliberation and conclusion based upon all the evidence presented in this case, and on nothing else.

You must decide the facts without emotion, sympathy, or prejudice for or against any party. You should consider the case as an action between people of equal standing in the community. Every person stands equal before the law, and every person is to be dealt with as an equal in this court. Above all, the community wants you to try to achieve justice. You will succeed in doing that if you are willing to seek the truth from the same evidence presented to all of you, and to reach a verdict by applying the same rules of law, as I give them to you.

If I have said or done anything during this trial which has suggested to you that I favor the claims or position of either party, you should disregard it. If I have indicated in any way that I have any opinion as to what the facts in this case are or should be, you should disregard that. I am not the judge of the facts. You are.

Before I tell you about the law, you should understand several things about my remarks. As I mentioned earlier, you must follow the law as I state it to you. You should not be concerned with the wisdom of any rule of law that I may tell you about.

When you think about my instructions, consider them as a whole. Don't single out any individual sentence or idea and ignore the others.

As I mentioned to you at the start of the trial, the plaintiff has to prove his case by a preponderance of the evidence. This means that the plaintiff must convince you that when you have considered all of the evidence, the facts that plaintiff is trying to prove are more probably true than not true. If the plaintiff does not convince you of that, then you will have to conclude that the plaintiff has failed to prove his case sufficiently to be entitled to win. The law does not presume that simply because the plaintiff has brought this suit, he is necessarily entitled to win. As I told you at the beginning, preponderance means just over half. In other words, 50.00001 % would be preponderance. "Preponderance of the evidence" is different from a burden of proof

12

1216267v.1

NON-CERTIFIED COPY

described as "beyond a reasonable doubt." Proof beyond a reasonable doubt applies in criminal cases, but not in a civil case such as this one.

The evidence which you will be considering consists of the testimony of the witnesses, and the documents and other physical evidence that have been admitted into evidence, as well as any reasonable inferences or conclusions that you can draw from the evidence presented to you. The arguments by the lawyers, as well as any comment or ruling I made during the trial, are not part of the evidence.

A fact may be proven either by direct evidence or circumstantial evidence, or perhaps by both. Direct evidence is testimony by a witness as to what he or she saw or heard, or physical evidence of the fact itself. Circumstantial evidence is proof of certain circumstances from which you are entitled to conclude that another fact is true. The law treats direct evidence and circumstantial evidence as equally reliable; it does not prefer one over the other.

Another important thing for you to remember is that a major portion of your role is to judge the credibility of a witness who is testifying. The law presumes that a witness is telling the truth about facts that are within his knowledge. But this presumption may be overcome by contradictory evidence, by the manner in which the witness testifies, by the character of his testimony, or by evidence that tells you about his motives.

When you are weighing the credibility of a witness, you should consider the interest, if any, that the witness may have in the outcome of this case. You should consider the ability of the witness to know, remember and tell the facts to you. You should consider his or her manner of testifying, as to sincerity and frankness. And you should consider how reasonable the witness's testimony seems to be in light of all of the other evidence.

You don't have to accept all of the testimony of a witness as being true or false. You might accept and believe those parts of the testimony that you consider logical and reasonable, and you may reject those parts that seem impossible or unlikely.

I like to say that witnesses are weighed and not counted. By that I mean that you are not required to decide any fact according to the number of witnesses presented to you on that particular point. Your role is always to determine the facts and you don't do that by counting noses. The test is not which party brings forward the most witnesses or presents the greater quantity of evidence. The test is which witnesses and which evidence appeals to your mind as being the most accurate and the most convincing.

13

1216267v.1

NON-CERTIFIED COPY

Some of the witnesses that you have heard are called "expert witnesses." Unlike ordinary witnesses who must testify only about facts within their knowledge and cannot offer opinions about assumed or hypothetical situations, expert witnesses are allowed to express opinions because I have decided that their education or expertise in a particular field or on a particular subject may be helpful to you. You should consider their opinions, and give them the weight that you think they deserve. If you decide that the opinion of an expert witness is not based on sufficient education and experience or that the reasons given in support of the opinion are not sound, or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely—even though I have permitted the person to testify.[2]

---

[2] *See* Civil Law Treatise: Civil Jury Instructions § 2.2 (2d ed.).

14

1216267v.1

NON-CERTIFIED COPY

## CONSIDERATION OF THE EVIDENCE AND WITNESSES

As jurors, there are certain guidelines which you should follow in resolving the issues of fact, in determining the credibility or believability of the witnesses, the weight given to their testimony, and in arriving at what the facts are in this case:

First, you are to consider only the evidence which has been offered and admitted during the trial and such inferences as you may logically and reasonably draw from the evidence.

Second, you must not be influenced by sympathy, passion, or prejudice in favor of any party or against any of the party.

Third, if testimony on any point is not contradicted, you should treat it as proving that fact unless the testimony seems to you to be impossible or very improbable, or unless the witness has shown by his or her testimony or it is shown by the other evidence in the case to be unworthy of belief. When testimony conflicts, you should determine the truth by weighing the testimony of one witness against that of the others, by considering the witness's interest or lack of interest in the outcome of the case, the partiality or fairness of the witness, the witness's knowledge of the facts about which he or she has testified, the witness's conduct or behavior on the witness stand, and the other evidence in the case.

You need not accept all of the testimony of a witness as being true or false; you may accept and believe those parts of a witness's testimony that you consider logical and reasonable and reject those parts of the testimony that seem impossible or improbable.

Fourth, if the testimony of a witness is inconsistent with a prior statement, it is your duty to determine if the testimony of the witness should be discredited. If you decide that the in court testimony of the witness has been discredited, then you are to decide what weight, if any, to give to that testimony. If you should find that a witness has testified falsely as to a material fact, then you have the right to reject the entire testimony of the witness or reject only part of the testimony, based upon your impression of the witness' truthfulness.

Fifth, you should consider the quality and not necessarily the quantity or number of witnesses who testify. That is, you should weigh the testimony of the witnesses rather than merely count which side has produced the most witnesses and find in favor of the side with the most witnesses.

15

NON-CERTIFIED COPY

08/01/2017 17:36        No.: R558 L1        P.016/037

Using these tests, you should determine the credibility or believability of the witnesses and the weight of their testimony and thereby arrive at the facts of this case.[3]

---

[3] *See* Civil Law Treatise: Civil Jury Instructions §§ 2:4; 2:6 (3d ed.).

16

1216267v.1

NON-CERTIFIED COPY

## DEPOSITION TESTIMONY

Certain testimony was presented to you through a deposition. A deposition is the sworn, recorded answers to questions asked a witness in advance of the trial. Sometime before this trial, attorneys representing the parties in this case questioned this witness under oath. A court reporter was present and recorded the testimony. You should listen to the reading of the deposition just as though the witness was here in person testifying before you.[4]

---

[4] *See* Civil Law Treatise: Civil Jury Instructions § 1:1 (3d ed.) (modified); Pattern Civil Jury Instructions 5th Circuit § 2.23 (2009).

17

1216267v.1

NON-CERTIFIED COPY

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

Proof by direct or circumstantial evidence is sufficient to constitute a preponderance of the evidence when, taking the evidence as a whole, such proof shows the fact to be proved is more probable than not.   A fact may be proven either by direct evidence or circumstantial evidence, or perhaps by both. Direct evidence is testimony by a witness as to what he or she saw or heard, or physical evidence of the fact itself. Circumstantial evidence is proof of certain circumstances from which you are entitled to conclude that another fact is true. The law treats direct evidence and circumstantial evidence as equally reliable; it does not prefer one over the other.[5]

---

[5] *See* Civil Law Treatise, Civil Jury Instructions § 2:1 (3d ed.); *Jordan v. Travelers Ins. Co.*, 257 La. 995, 245 So. 2d 151, 155 (La. 1971); *Rey v. Cuccia*, 298 So. 2d 840, 843 (La. 1974).

18

1216267v.1

NON-CERTIFIED COPY

## WHAT IS NOT EVIDENCE

Certain things are not to be considered as evidence. First, if I have told you to disregard any testimony or exhibits, such testimony or exhibits are not evidence and cannot be considered. Second, questions, objections, and comments made by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper. You should not be influenced by any objection, and you should not infer from any of my rulings that I have any view as to how you should decide this case. Finally, the lawyers' opening and closing statements are not evidence. The purpose of these statements is to discuss the issues and the evidence. If the evidence as you remember it differs from what the lawyer said, your memory is what counts.

19

1216267v.1

NON-CERTIFIED COPY

## BURDEN OF PROOF

In this case, H&E must prove every element of its claims by a preponderance of the evidence. In determining whether any facts at issue have been proved by a preponderance of the evidence in this case, you the jury should consider the testimony of all the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them.

It is proper for you, the jury, to find that H&E has succeeded in carrying its burden of proof of an issue of fact if after consideration of all the evidence in the case, you the jurors, believe that what H&E is seeking to prove is more likely true than not true.

URS and the other defendants must prove all defenses asserted by a preponderance of evidence, i.e., more probable than not. Proof which establishes only possibility, speculation, or unsupported probability does not suffice to establish a defense by a preponderance of the evidence.[6]

---

[6] *See* Civil Law Treatise: Civil Jury Instructions §§ 2.1; 2.4 (3d ed.) (modified); *Crescent Cigarette Vending Corp.* v. *Toca,* 271 So. 2d 53 (La. App. 4 Cir. 1972); *Todd v. State,* 96-3090 (La. 9/9/97); 699 So. 2d 35, 43.

20

1216267v.1

NON-CERTIFIED COPY

# NEGLIGENCE

The basic law in Louisiana on this kind of case states that "every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The word "fault" is a key word. "Fault" means doing something you should not have done or failing to do something which you should have done. The law regards those actions as being below the standard which applies to the defendants' conduct.

Your job will then be to decide whether the plaintiff has proved that it is more likely true than not true that the defendants' actions fell below the applicable standard of care. In legal terms, that would mean that the defendant is "at fault."

But this is only one part of the plaintiff's case. The other parts of the plaintiff's case are:

(1) that the injury which he says he suffered was caused in whole or in part by the conduct of the defendant; and

(2) that there was damage to the plaintiff's person or his property.[7]

The plaintiff must establish that all of these essential parts of his case are more likely true than not true. Questions addressed to all of these parts of the case will be given to you in the "verdict form" that you will receive and that you will take with you to fill out as a part of your deliberations. When I say that the plaintiff has to prove that the defendant's actions were a cause of his injury, I don't mean that the law recognizes only one cause of an injury.

You will have to decide whether the plaintiff would have suffered injury if the defendant had not done what he did. If, more likely than not, the plaintiff would have suffered injury no matter what the defendant did or did not do, then you should decide that the injury was not caused by the defendant, and render a verdict for the defendant. If, on the other hand, the plaintiff more likely than not suffered injury as a result of what the defendant did or did not do, then you should decide that the defendant's conduct did play a part in the plaintiff's injury and you should proceed to the next part of the plaintiff's case.[8]

---

[7] *See* Civil Law Treatise, Civil Jury Instructions § 3.1 (2d ed.); *Langlois v. Allied Chemical Corp.*, 258 La. 1067, 249 So. 2d 133 (1971); *see also Pence v. Ketchum*, 326 So. 2d 831 (La. 1976) and Weiland v. King, 281 So. 2d 688 (La. 1973).
[8] *See Aucoin v. Lodrigues*, 252 So. 2d 758 (La. App. 1st Cir. 1971); *Larkin v. U. S. Fidelity & Guaranty Co.*, 258 So. 2d 132 (La. App. 2d Cir. 1972); *Cooksey v. Central Louisiana Elec. Co., Inc.*, 279 So. 2d 242 (La. App. 3d Cir. 1973).

21

1216267v.1

NON-CERTIFIED COPY

# GROSS NEGLIGENCE

Gross negligence is the absence of even slight care and diligence.  Gross negligence requires proof of conduct which is beyond ordinary negligence or carelessness, and consists of utter disregard of ordinary prudence, amounting to complete neglect of the rights of others.[9]

---

[9] *See* Civil Law Treatise, Civil Jury Instructions § 3.13 (2d ed.).

22

1216267v.1

NON-CERTIFIED COPY

## NEGLIGENCE/GROSS NEGLIGENCE OF
## PROFESSIONAL ARCHITECTS AND ENGINEERS

In an action such as this, plaintiff claims that defendants were negligent in the performance of their professional duties. As with other professionals, architects and engineers are required to exercise that degree of professional care and skill customarily employed by other architects and engineers in a similar community under similar circumstances. In order to prove negligence on the part of the defendants, plaintiff must demonstrate that the defendants did not have customary degree of skill or care, or failed to exercise it, and that plaintiff was damaged as a result.[10]

Plaintiff also claims defendants were grossly negligent. In order to prove gross negligence, plaintiff must prove that the defendants' conduct showed an utter disregard of ordinary prudence in the performance of their work, and that plaintiff was damaged as a result.[11]

Normally, a party seeking to prove an architect or engineer's negligence or gross negligence must establish a deviation from the standard of care and skill by expert testimony.[12] However, there is an exception to this general rule: "When the matter in question is one that can typically be understood without assistance from an expert, when a lay person can infer negligence, then expert testimony is not required."[13]

---

[10] *See* Civil Law Treatise, Civil Jury Instructions § 3.11 (2d ed.); *Seiler v. Ostarly*, 525 So. 2d 1207 (La. App. 5th Cir. 1988); *Sams v. Kendall Const. Co.*, 499 So. 2d 370 (La. App. 4th Cir. 1986); *Maloney v. Oak Builders, Inc.*, 224 So. 2d 161 (La. Ct. App. 4th Cir. 1969), *reversed on other grounds*, 256 La. 85, 235 So.2d 386 (1970); *Emond v. Tyler Building and Const. Co., Inc.*, 438 So. 2d 681 (La. App. 2d Cir. 1983); *Calandro Development, Inc. v. R. M. Butler Contractors, Inc.*, 249 So. 2d 254 (La. App. 1st Cir. 1971).
[11] *See* Civil Law Treatise, Civil Jury Instructions § 3.13 (2d ed.).
[12] *Milton J. Womack, Inc. v. House of Representatives*, 509 So.2d 62, 64 (La. App. 1st Cir.), writs denied, 513 So.2d 1208, 1211 (La.1987).
[13] *Womack*, 509 So.2d at 66.

23

1216267v.1

NON-CERTIFIED COPY

## VICARIOUS LIABILITY

Normally one person is not responsible for the conduct of another person who may have caused damage to someone. But in certain situations, the law imposes responsibility upon a person or entity for the conduct of another, if they are in a relationship which can serve as an appropriate basis for imposing such responsibility.

The law calls this "vicarious liability," which simply means that one person may be liable for the acts of another even though that first person is not himself at fault. You may also have heard this concept called "respondent superior," which simply means "let the person higher up respond."[14]

---

[14] *See* Civil Law Treatise, Civil Jury Instructions § 16:1 (3d ed.).

24

1216267v.1

NON-CERTIFIED COPY

## SERVANT/MASTER RELATIONSHIP

A master is liable for the damages caused by the fault of his servant, if the incident occurs in the course and scope of the servant's duties as the master's servant.

In order to recover against the master, the plaintiff must prove by a preponderance of the evidence:

(1) the tortfeasor was a servant of the defendant;

(2) the servant was at fault; and

(3) the tort occurred during the exercise of the functions for which the servant was engaged.[15]

---

[15] *See* Civil Law Treatise, Civil Jury Instructions §§ 16:2-16.4 (3d ed.) (modified); *LeBrane v. Lewis*, 292 So. 2d 216, 217-18 (La. 1974); *Rowell v. Carter Mobile Homes, Inc.*, 500 So. 2d 748, 751 (La. 1987).

25

1216267v.1

NON-CERTIFIED COPY

# BREACH OF CONTRACT

The plaintiff has also claimed that the defendants breached their contracts with the plaintiff. In order to prove a breach of contract against the defendants, the plaintiff must prove by a preponderance of the evidence that the defendant undertook an obligation to the plaintiff, that the defendants failed to perform the obligation, resulting in a breach, and that the failure to perform resulted in damages to the plaintiff.[16]

Under Louisiana law, a contract between two parties has the force of law as to them. You are called upon to interpret the contract between these two parties, and thus to determine the meaning and consequences of the law which they have written for themselves. You are to interpret the contract according to the following rules.[17]

In interpreting this contract, you must determine what the common intent of the parties was. If the words of the contract are clear and do not lead to absurd results which the parties could not possibly have intended, you do not need to do any further interpretation to find their common intent.[18]

The words in this contract must be given the meaning which they generally have in everyday use. If a word is a term of art or has a technical meaning within the context of this contract, you should give it that special meaning.

If a word may have several meanings, you should interpret it as having the meaning which is most in line with the objective of the contract.

Also, if a provision in the contract has different meanings and one of those meanings would make the provision effective and one would not, you should give it the meaning which would make it effective, since we assume the parties wanted their contract to be effective.[19]

You should not interpret a contractual provision standing alone, but rather you should interpret it in light of the other contractual provisions so that each provision will be given the meaning which is suggested by the contract as a whole.[20]

If, after applying the general principles of interpretation which I have given you, you still believe that a contractual provision's meaning is doubtful, you should consider as well the nature of the contract as a whole, elementary fairness, custom, the conduct of the parties in dealing with

---

[16] *Denham Homes, L.L.C. v. Teche Fed. Bank,* 2014-1576 (La. App. 1 Cir. 9/18/15); 182 So. 3d 108, 119.
[17] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:1 (3d ed.)
[18] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:2 (3d ed.)
[19] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:3 (3d ed.)
[20] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:4 (3d ed.)

1216267v.1

NON-CERTIFIED COPY

the contract both before and after it was signed, and any other similar contracts they may have signed.[21]

When I say "elementary fairness," or equity, I mean the principle that no one is allowed to take unfair advantage of another and no one is allowed to enrich himself unjustly at the expense of another.[22] When I say "custom," I mean a practice which is regularly observed in affairs of a nature which are similar to those which are the subject of the contract which you are called upon to interpret.[23]

---

[21] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:6 (3d ed.)
[22] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:7 (3d ed.)
[23] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:8 (3d ed.)

27

1216267v.1

NON-CERTIFIED COPY

# DAMAGES

If you decide that H&E has established the other elements of its case by a preponderance of the evidence, and that the defendants have failed to establish a defense which would prevent H&E from recovering an award for its injuries, you must decide the amount of damage caused by the defendants.

Your award should be designed to fully and fairly compensate H&E for its injury. These damages must be established by a preponderance of the evidence. This means, on the one hand, that you are not entitled to award speculative damages for injuries which you think the H&E might have suffered or might suffer in the future. On the other hand, it means that you may approximate the damages which H&E has proved are more probable than not, even though they cannot be computed with mathematical certainty.

Finally, let me say that the fact that I have given you these statements about the law of damages does not in any way imply or suggest that I feel or do not feel that any damages are due in this case. Whether or not damages are due is solely for you to determine.[24]

---

[24] *See* Civil Law Treatise, Civil Jury Instructions § 18:1 (3d ed.) (modified).

28

1216267v.1

NON-CERTIFIED COPY

## DELIBERATIONS

You will remember that I told you at the beginning of the trial that you were not to discuss the case amongst yourselves. That restriction is now removed. It is now your duty to consult with one another to reach an agreement. Each of you must decide the case for yourself, but you should do so only after a consideration of the case with your fellow jurors and you should not hesitate to change your opinion when you are convinced that you are wrong. However, you should not change your opinion merely for the purpose of returning a verdict that your fellow jurors agree with and you don't.

The final test of the quality of your service will lie in the verdict which you return to the Court, not in the opinions any of you hold as you go to the jury room. Your contribution to the judicial system will be to arrive at a just and proper verdict.

If you decide to return a verdict for Rouses then you will make an appropriate award of damages according to the instructions which I have given you.

Louisiana law requires that nine of you agree in order to render a verdict for either side. When nine of you are of the same opinion about the verdict, that ends your deliberation and that opinion becomes your verdict.

You are being asked to return a verdict on the form which I will supply to you.

{SPECIAL VERDICT FORM IS READ TO THE JURY}

You will note that the form contains several questions. Nine of the twelve of you must be in agreement as to the answer of each question. In the space provided below each question, you will find directions that instruct you either to answer the next question, to proceed to some other question or to stop and return to the Courtroom with your verdict. You must carefully follow these directions as you complete the form.

If you want to communicate with me, you may send a note by the bailiff. You should not attempt to communicate with me by any means other than in writing, and I will not communicate with any member of the jury on any subject touching on the merits of the case other than in writing, or orally in open court. I will always disclose your question and my response to the attorneys before I answer any of your questions.

The first thing you should do when you retire to the jury deliberation room is to choose from amongst you a person to represent you in signing the verdict form. This person will be the foreperson. When you have reached a verdict, the foreperson will sign and date the verdict form.

29

1216267v.1

NON-CERTIFIED COPY

Once you have reached a verdict, you will return to the courtroom and be asked by the court at the appropriate time to make known your verdict.

Bear in mind that you are never to reveal to any person – not even to the Court – how the jury stands, numerically or otherwise, on the questions before you, until you have reached a verdict.

Finally, I remind you again that you represent our community in the determination of this dispute. The community appreciates your service on this jury and at the same time expects you to reach a fair and impartial verdict.

Members of the Jury, you will now retire to consider your verdict. Thank you for your time and attention.[25]

---

[25] *See* Civil Law Treatise: Civil Jury Instructions §§ 2.1; 2.2 (3d ed.) (modified).

1216267v.1

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

DOCKET NO.: 626,308                                    SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____        _____
                                              DEPUTY CLERK

**PLAINTIFF'S PROPOSED JURY INTERROGATORIES**

NOW INTO COURT, through undersigned counsel, comes H&E Equipment Services,

Inc. which respectfully submits the following proposed jury interrogatories in this case:

**SECTION I—BATON ROUGE: THE FOLLOWING INTERROGATORIES PERTAIN
TO H&E'S CLAIMS AGAINST DEFENDANTS REGARDING THE BATON ROUGE
FACILITY ONLY.**

**INTERROGATORY NO. 1:**   Do you find by a preponderance of the evidence that the
Defendants (or anyone for whom the Defendants were
responsible) were negligent in performing their professional
services with respect to the Baton Rouge facility?

YES: _____    NO: _____

**INTERROGATORY NO. 2:**   Do you find by a preponderance of the evidence that the
Defendants (or anyone for whom the Defendants were
responsible) were grossly negligent in performing their
professional services with respect to the Baton Rouge facility?

YES: _____    NO: _____

**INTERROGATORY NO. 3:**   Do you find by a preponderance of the evidence that Defendant
URS breached its contract with H&E with respect to the Baton
Rouge facility?

YES: _____    NO: _____

*If you answered "no" to all three of the above Interrogatories, go to SECTION II—KENNER.*

*If you answered "yes" to one or more of the above Interrogatories, go to Interrogatory No. 4.*

**INTERROGATORY NO. 4:**   Do you find by a preponderance of the evidence that H&E
sustained damages as a result of any of the Defendants'
conduct?

YES: _____    NO: _____

31

1216267v.1

NON-CERTIFIED COPY

*If you answered "no" to Interrogatory No. 4, go to SECTION II—KENNER. If you answered*

*"yes" to Interrogatory No. 4, go to Interrogatory No. 5.*

**INTERROGATORY NO. 5:**   Were any of the following also responsible, in part, for H&E's damages:

> H&E: YES: _____ NO: _____
> Womack: YES: _____ NO: _____

*If you indicated "no" to each of the entities listed in Interrogatory No. 5, skip Interrogatory*

*No. 6 and answer Interrogatory No. 7. If you indicated "yes" for one or more of the entities*

*listed in Interrogatory No. 5, answer Interrogatory No. 6 and Interrogatory No. 7.*

**INTERROGATORY NO. 6:**   Compare the fault of the following persons and find a percentage for each. *The total of the percentages must equal 100%, but the percentage for any one or more of the persons named may be zero if you find that such person was not responsible for any of H&E's damages.*

> Defendants _____%
> H&E _____%
> Womack _____%
> **Total 100%**

**INTERROGATORY NO. 7:**   Please state the amount of damages sustained by H&E with respect to the Baton Rouge facility. *In determining the amount of damages, do not make any reduction because of the fault of people or entities other than Defendants. If you found that someone other than Defendants was also at fault, the court in entering judgment will make an appropriate reduction in the damages awarded.*

> $_____

**SECTION II—KENNER: THE FOLLOWING INTERROGATORIES PERTAIN TO**

**H&E'S CLAIMS AGAINST DEFENDANTS REGARDING THE KENNER FACILITY**

**ONLY.**

**INTERROGATORY NO. 1:**   Do you find by a preponderance of the evidence that the Defendants (or anyone for whom the Defendants were responsible) were negligent in performing their professional services with respect to the Kenner facility?

> YES: _____        NO: _____

**INTERROGATORY NO. 2:**   Do you find by a preponderance of the evidence that the Defendants (or anyone for whom the Defendants were responsible) were grossly negligent in performing their professional services with respect to the Kenner facility?

> YES: _____        NO: _____

32

1216267v.1

NON-CERTIFIED COPY

**INTERROGATORY NO. 3:**    Do you find by a preponderance of the evidence that Defendant URS breached its contract with H&E with respect to the Kenner facility?

YES: _____          NO: _____

*If you answered "no" to all three of the above Interrogatories, go to SECTION III—BELLE*

*CHASSE. If you answered "yes" to one or more of the above Interrogatories, go to*

*Interrogatory No. 4.*

**INTERROGATORY NO. 4:**    Do you find by a preponderance of the evidence that H&E sustained damages as a result of any of the Defendants' conduct?

YES: _____          NO: _____

*If you answered "no" to Interrogatory No. 4, go to SECTION III—BELLE CHASSE. If you*

*answered "yes" to Interrogatory No. 4, go to Interrogatory No. 5.*

**INTERROGATORY NO. 5:**    Were any of the following also responsible, in part, for H&E's damages:

H&E: YES: _____ NO: _____
Mapp: YES: _____ NO: _____

*If you indicated "no" to each of the entities listed in Interrogatory No. 5, skip Interrogatory*

*No. 6 and answer Interrogatory No. 7.   If you indicated "yes" for one or more of the entities*

*listed in Interrogatory No. 5, answer Interrogatory No. 6 and Interrogatory No. 7.*

**INTERROGATORY NO. 6:**    Compare the fault of the following persons and find a percentage for each. *The total of the percentages must equal 100%, but the percentage for any one or more of the persons named may be zero if you find that such person was not responsible for any of H&E's damages.*

Defendants _____%
H&E _____%
Mapp _____%
**Total 100%**

**INTERROGATORY NO. 7:**    Please state the amount of damages sustained by H&E with respect to the Kenner facility. *In determining the amount of damages, do not make any reduction because of the fault of people or entities other than Defendants.  If you found that someone other than Defendants was also at fault, the court in entering judgment will make an appropriate reduction in the damages awarded.*

$_____

33

1216267v.1

NON-CERTIFIED COPY

**SECTION III—BELLE CHASSE: THE FOLLOWING INTERROGATORIES PERTAIN TO H&E'S CLAIMS AGAINST DEFENDANTS REGARDING THE BELLE CHASSE FACILITY ONLY.**

**INTERROGATORY NO. 1:**    Do you find by a preponderance of the evidence that the Defendants (or anyone for whom the Defendants were responsible) were negligent in performing their professional services with respect to the Benne Chasse facility?

YES: _____         NO: _____

**INTERROGATORY NO. 2:**    Do you find by a preponderance of the evidence that the Defendants (or anyone for whom the Defendants were responsible) were grossly negligent in performing their professional services with respect to the Belle Chasse facility?

YES: _____         NO: _____

**INTERROGATORY NO. 3:**    Do you find by a preponderance of the evidence that Defendant URS breached its contract with H&E with respect to the Belle Chasse facility?

YES: _____         NO: _____

*If you answered "no" to all three of the above Interrogatories, go to SECTION IV—URS CLAIMS. If you answered "yes" to one or more of the above Interrogatories, go to Interrogatory No. 4.*

**INTERROGATORY NO. 4:**    Do you find by a preponderance of the evidence that H&E sustained damages as a result of any of the Defendants' conduct?

YES: _____         NO: _____

*If you answered "no" to Interrogatory No. 4, go to SECTION IV—URS CLAIMS. If you answered "yes" to Interrogatory No. 4, go to Interrogatory No. 5.*

**INTERROGATORY NO. 5:**    Were any of the following also responsible, in part, for H&E's damages:

H&E: YES: _____ NO: _____
Ryan Goottee: YES: _____ NO: _____

*If you indicated "no" to each of the entities listed in Interrogatory No. 5, skip Interrogatory No. 6 and answer Interrogatory No. 7. If you indicated "yes" for one or more of the entities listed in Interrogatory No. 5, answer Interrogatory No. 6 and Interrogatory No. 7.*

**INTERROGATORY NO. 6:**    Compare the fault of the following persons and find a percentage for each. *The total of the percentages must equal 100%, but the percentage for any one or more of the persons named may be zero if you find that such person was not responsible for any of H&E's damages.*

34

1216267v.1

NON-CERTIFIED COPY

Defendants _____%
H&E _____%
Ryan Gootee _____%
**Total 100%**

**INTERROGATORY NO. 7:** Please state the amount of damages sustained by H&E with respect to the Belle Chasse facility. *In determining the amount of damages, do not make any reduction because of the fault of people or entities other than Defendants. If you find that someone other than Defendants was also at fault, the court in entering judgment will make an appropriate reduction in the damages awarded.*

$_____

*Go to Section IV—URS CLAIMS*

**SECTION IV—URS CLAIMS: THE FOLLOWING INTERROGATORIES PERTAIN TO URS'S CLAIMS AGAINST H&E.**

**INTERROGATORY NO. 1:** Do you find by a preponderance of the evidence that H&E is indebted to URS for any services rendered by URS?

YES: _____ NO: _____

*If you answered "no" to Interrogatory No. 1, return this form to the Courtroom Deputy. If you answered "yes" to Interrogatory No. 1, go to Interrogatory No. 2.*

**INTERROGATORY NO. 7:** Please state the amount you find H&E owes to URS for services rendered by URS.

$_____

**RETURN THIS FORM TO THE COURTROOM DEPUTY.**

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

FILED

01 2017

DEP

35

1216267v.1

NON-CERTIFIED COPY

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by facsimile, email and/or by placing same in the United States mail, postage prepaid and properly addressed, this 1st day of August, 2017.

_____
Loretta G. Mince

FILED

AUG 0 1 2017

DEPUTY CLERK OF COURT

36

1216267v.1

NON-CERTIFIED COPY

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308    DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA    JUL 31 2017 |
| CORPORATION, L. O'NEAL | * | |
| JOHNSON AND THOMAS E. RYAN, | * | DEPUTY CLERK OF COURT |
| III | | |

## MOTION TO ENROLL ADDITIONAL COUNSEL OF RECORD

Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III (collectively referenced herein as "Defendants"), who requests of this Honorable Court that Don S. McKinney (Louisiana Bar Roll No. 26685) and Jeffrey E. Richardson (Louisiana Bar Roll No. 23273) of the law firm Adams and Reese LLP be enrolled as additional counsel of record for URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson and Thomas E. Ryan, III in the above-captioned matter.

Respectfully submitted,

ADAMS AND REESE, LLP

Philip A. Franco    (Bar #5819), TA
Ron Sholes          (Bar # 14436)
Kellen J. Mathews   (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Fax: (504) 566-0210

**ATTORNEYS FOR DEFENDANTS, URS CORPORATION ARCHITECTURE, P.C.; URS CORPORATION; L. O'NEAL RYAN AND THOMAS E. RYAN, III**

2017 JUL 31 PM 3:55
DEPUTY CLERK OF COURT

EBR4207634

REC'D C.P.
AUG 04 2017

1

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been served upon all counsel of record via United States mail, properly addressed, and first class postage prepaid and/or via email, this the 31st day of July, 2017.

_____

Kellen J. Mathews



2

NON-CERTIFIED COPY

| | | |
|---|---|---|
| **H&E EQUIPMENT SERVICES** | * | **SUIT NO. 626,308    DIV.: D** |
| | * | **19TH JUDICIAL DISTRICT COURT** |
| **VERSUS** | * | |
| | * | **PARISH OF EAST BATON ROUGE** |
| **URS CORPORATION** | * | |
| **ARCHITECTURE, P.C., URS** | | **STATE OF LOUISIANA** |
| **CORPORATION, L. O'NEAL** | * | |
| **JOHNSON AND THOMAS E. RYAN,** | * | |
| **III** | * | |

---

### ORDER

---

Considering the foregoing Motion to Enroll Additional Counsel:

IT IS ORDERED that Don S. McKinney and Jeffrey E. Richardson of the law firm of

Adams and Reese LLP, be and are hereby enrolled as additional counsel of record for

Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson

and Thomas E. Ryan, III in the above-captioned matter.

Baton Rouge, Louisiana, _____ day of _____, 2017.

_____
HONORABLE JANICE CLARK, JUDGE
19th Judicial District Court



NON-CERTIFIED COPY

# STATE OF LOUISIANA

# COURT OF APPEAL, FIRST CIRCUIT

H&E EQUIPMENT SERVICES, INC.

VERSUS

URS CORPORATION
ARCHITECTURE, PC, URS
CORPORATION, L. O'NEAL
JOHNSON AND THOMAS E. RYAN,
III

NO.   2017 CW 0964

**POSTED**

AUG - 2 2017

JUL 2 4 2017

---

In Re:    URS Corporation Architecture, PC, URS Corporation, L.
O'Neal Johnson and Thomas Ryan, III, applying for
supervisory writs, 19th Judicial District Court,
Parish of East Baton Rouge, No. 626308.

---

**BEFORE:   THERIOT, CHUTZ AND PENZATO, JJ.**

   **WRIT DENIED AS MOOT.**

                              AHP
                              MRT
                              WRC



COURT OF APPEAL, FIRST CIRCUIT

_____
        DEPUTY CLERK OF COURT
           FOR THE COURT

A TRUE COPY:

_____
CLERK OR DEPUTY CLERK
COURT OF APPEAL, FIRST CIRCUIT
STATE OF LOUISIANA

DATE July 24, 2017

NON-CERTIFIED COPY



Office Of The Clerk

# Court of Appeal, First Circuit
State of Louisiana
www.la-fcca.org

**Rodd Naquin**
**Clerk of Court**

Post Office Box 4408
Baton Rouge, LA
70821-4408
(225) 382-3000

### Notice of Judgment and Disposition

July 24, 2017

Docket Number:  2017 - CW - 0954

H&E Equipment Services, Inc.
         versus
URS Corporation Architecture, P.C., URS Corporation, L.
O'Neal Johnson and Thomas E. Ryan, II

TO:   Brent B. Barriere
201 St. Charles Avenue
46th Floor
New Orleans, LA
70170-4600

Philip Anthony Franco
ADAMS AND REESE, LLP
701 Poydras Street, Ste. 450
New Orleans, LA 70139
philip.franco@arlaw.com

Kellen J. Mathews
450 Laurel Street
Suite 1900
Baton Rouge, LA 70801
kellen.mathews@arlaw.com

Alysson L. Mills
201 St. Charles Ave.
Suite 4600
New Orleans, LA 70170
amills@fishmanhaygood.com

Loretta G. Mince
FISHMAN HAYGOOD PHELI
201 St. Charles Ave., Ste. 46
New Orleans, LA
70170-4600
lmince@fishmanhaygood.cor

Jeffrey Edward Richardson  E
701 Poydras St.
Suite 4500
New Orleans, LA 70139
jeff.richardson@arlaw.com

Ronald J. Sholes
4500 One Shell Square
New Orleans, LA 70139

Hon. Janice G. Clark
300 North Boulevard
Suite 10101
Baton Rouge, LA 70801

Douglas  Welborn
Parish of East Baton Rouge
P. O. Box 1991
Baton Rouge, LA
70821-1991

In accordance with Local Rule 6 of the Court of Appeal, First Circuit, I hereby certify that this notice of judgment and disposition and the attached disposition were transmitted this date to the trial judge or equivalent, all counsel of record, and all parties not represented by counsel.

RODD NAQUIN
CLERK OF COURT

NON-CERTIFIED COPY

# STATE OF LOUISIANA

# COURT OF APPEAL, FIRST CIRCUIT

H&E EQUIPMENT SERVICES, INC.                    NO.  2017 CW 0476

VERSUS

URS CORPORATION                                 **POSTED**
ARCHITECTURE, P.C., URS
CORPORATION, L. O'NEAL                           AUG - 2 2017
JOHNSON, AND THOMAS E. RYAN,            JUL 2 4 2017
II

---

In Re:    URS Corporation Architecture, P.C., URS Corporation,
          L. O'Neal Johnson and Thomas Ryan, applying for
          supervisory writs, 19th Judicial District Court,
          Parish of East Baton Rouge, No. 626308.

---

**BEFORE:    THERIOT, CHUTZ AND PENZATO, JJ.**

   **WRIT DENIED.**

                         **MRT**
                         **WRC**
                         **AHP**

EBR4246080

COURT OF APPEAL, FIRST CIRCUIT

_____
DEPUTY CLERK OF COURT
     FOR THE COURT

A TRUE COPY:

CLERK OR DEPUTY CLERK
COURT OF APPEAL, FIRST CIRCUIT
STATE OF LOUISIANA

DATE July 24, 2017

NON-CERTIFIED COPY



Office Of The Clerk

# Court of Appeal, First Circuit

State of Louisiana
www.la-fcca.org

Rodd Naquin
Clerk of Court

Post Office Box 4408
Baton Rouge, LA
70821-4408
(225) 382-3000

## Notice of Judgment and Disposition

July 24, 2017

Docket Number:  2017 - CW - 0476

H&E Equipment Services, Inc.
     versus
URS Corporation Architecture, P.C., URS Corporation, L.
O'Neal Johnson and Thomas E. Ryan, II

TO:    Brent B. Barriere
201 St. Charles Avenue
46th Floor
New Orleans, LA
70170-4600

Philip Anthony Franco
450 Laurel St., Ste. 1900
Baton Rouge, LA 70801
philip.franco@arlaw.com

Kellen J. Mathews
450 Laurel Street
Suite 1900
Baton Rouge, LA 70801
kellen.mathews@arlaw.com

Alysson L. Mills
201 St. Charles Ave.
Suite 4600
New Orleans, LA 70170
amills@fishmanhaygood.com

Loretta G. Mince
FISHMAN HAYGOOD PHELI
201 St. Charles Ave., Ste. 46
New Orleans, LA
70170-4600
lmince@fishmanhaygood.cor

Jeffrey Edward Richardson  E
4500 One Shell Square
New Orleans, LA 70139
jeff.richardson@arlaw.com

Ronald J. Sholes
4500 One Shell Square
New Orleans, LA 70139

Hon. Janice G. Clark
300 North Boulevard
Suite 10101
Baton Rouge, LA 70801

Douglas  Welborn
Parish of East Baton Rouge
P. O. Box 1991
Baton Rouge, LA
70821-1991

In accordance with Local Rule 6 of the Court of Appeal, First Circuit, I hereby certify that this notice of judgment and disposition and the attached disposition were transmitted this date to the trial judge or equivalent, all counsel of record, and all parties not represented by counsel.

RODD NAQUIN
CLERK OF COURT

NON-CERTIFIED COPY

COST OK $ ✓

AUG 01 2017

DEPUTY CLERK OF COURT

19ᵀᴴ JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                    SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____          _____

DEPUTY CLERK

### JUDGMENT ON MOTION FOR SUMMARY JUDGMENT

This matter came on for hearing on 13ᵗʰ of February 2017 on Defendants' Motion for

Summary Judgment. Present in Court were:

Ronald J. Sholes, Philip A. Franco, and Kellen J. Mathews
Attorneys for Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal
Johnson, and Thomas E. Ryan, III

Loretta G. Mince and Brent B. Barriere
Attorneys for Plaintiff H&E Equipment Services, Inc.

Considering the pleadings and the argument of counsel, **IT IS ORDERED,**

**ADJUDGED, AND DECREED**, that the Motion for Summary Judgment filed by Defendants

URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E.

Ryan, III is **DENIED** for the reasons stated in the Court's July 28, 2017 Minute Entry.

Baton Rouge, Louisiana this _2 4_ day of _Aug_ 2017.

*Janice Clark*

JUDGE-19ᵗʰ Judicial District Court
The Honorable Janice Clark



I hereby certify that on this day a notice of the
above judgement was mailed by me, with sufficient
postage affixed, to _Redwood, Franco, Wittmann, Kirby,_
_Mince, Laperouse,_
Done and signed on _8-25-17_
_Carlisle,_
_Matthews, LeKnight_                        REC'D C.P.
_fu_
_____ Deputy Clerk of Court
                                            AUG 02 2017

EBR4246247

NON-CERTIFIED COPY

1217121v.1

**RULE 9.5 CERTIFICATE**

I certify that I circulated this proposed judgment to counsel for defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III by electronic mail on July 28, 2017 and received no objection.

Loretta G. Mince



1217121v.1

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES, INC. | * | SUIT NO. 626,308          DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |

H&E EQUIPMENT SERVICES, INC.        *     SUIT NO. 626,308          DIV.: D

                                                           *      19TH JUDICIAL DISTRICT COURT

VERSUS                                        *      PARISH OF EAST BATON ROUGE

URS CORPORATION                   *      STATE OF LOUISIANA
ARCHITECTURE, P.C., URS
CORPORATION, L. O'NEAL
JOHNSON AND THOMAS E. RYAN,
III

---

### DEFENDANTS' MEMORANDUM IN SUPPORT OF
### MOTION IN LIMINE TO EXCLUDE EXPERT OPINIONS
### NOT CONTAINED IN THAT EXPERT'S REPORT

---

Defendants URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON and THOMAS E. RYAN, III ask this Court to enter an order prohibiting Plaintiff, H&E Equipment Services, Inc., from introducing any evidence at trial regarding an opinion of an expert witness which was not contained in that expert's report.

On March 14, 2016, this Court signed the Joint Proposed Amended Case Management Order in this case, ordering that expert reports be filed in this case. *See, e.g.*, Expert Report of Wallace C. Drennan dated July 28, 2016; Expert Report of Dr. James R. Bailey dated July 29, 2016.

When a trial court enters an order requiring expert witnesses to submit an expert report, the expert witness is required to put all of his opinions in his report. "The report shall contain a complete statement of __all__ opinions to be expressed and the basis and reasons therefor and the data or other information considered by the witness in forming the opinions." La. C.C.P. art. 1425(B) (emphasis added). Thus, this Court should rule that H&E is prohibited from introducing any evidence of an opinion of an expert that is not contained in the expert's report.

For example, in *Maddox v. Bailey*, 13-0564 (La. App. 1 Cir. 3/19/14), 146 So. 3d 590, the First Circuit explained that an expert witness cannot be allowed to present a new opinion at trial:

> This type of unfair trial proceeding is prohibited by [LSA-]C.C.P. Article 1425, which declares that "the subject matter on which the expert is expected to testify, and ... the substance of the facts to which the expert is expected to testify" must be disclosed through interrogatories and depositions. Case law has interpreted this provision to "protect a party from prejudicial surprise at trial by the introduction of evidence not previously known by him to exist, and against which he could not therefore have prepared a rebuttal."

1

NON-CERTIFIED COPY

*Id.*, pp. 9-10, 146 So. 3d at 597-98 (quoting *Williams v. General Motors Corp.*, 93-0287 (La.

App. 4th Cir. 6/15/94), 639 So.2d 275, 288 (on rehearing) (other quotations omitted).  Because

the trial court in *Maddox* had allowed an expert witness to provide a new opinion at trial, the

First Circuit held that "the trial court abused its discretion in allowing Dr. Messina to testify at

trial to a totally different theory concerning Maddox's left shoulder ...." *Id.* p. 13, 146 So. 3d at

599.

<u>**CONCLUSION**</u>

For the reasons set forth above, this Court should enter an order excluding any evidence

at trial regarding an opinion of an expert witness which was not contained in that expert's report.

**WHEREFORE**, Defendants pray that this Court order that H&E is prohibited from

introducing any evidence at trial regarding an opinion of an expert witness which was not

contained in that expert's report.

Respectfully submitted,

**ADAMS AND REESE LLP**

Philip A. Franco (Bar #5819), TA
Ron Sholes (Bar #14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,**
**URS Corporation Architecture, P.C.;**
**URS Corporation; L. O'Neal Johnson**
**and Thomas E. Ryan, III**



FILED
EAST BATON ROUGE PARISH, LA
2017 AUG -1  PM 3: 14

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon all counsel of record via e-mail and/or United States Mail, postage prepaid and properly addressed, this 1st day of August, 2017.

_____
Kellen J. Mathews



3

NON-CERTIFIED COPY

8-16

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES, INC. | * | SUIT NO. 626,308          DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA |
| CORPORATION, L. O'NEAL | | |
| JOHNSON AND THOMAS E. RYAN, | | |
| III | | |

COST OK $

AUG 0 1 2017

DEPUTY CLERK OF COURT

---

### DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EXPERT OPINIONS
### NOT CONTAINED IN THAT EXPERT'S REPORT

---

Defendants URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION,

L. O'NEAL JOHNSON and THOMAS E. RYAN, III ask this Court to enter an order prohibiting

Plaintiff, H&E Equipment Services, Inc., from introducing any evidence at trial regarding an

opinion of an expert witness which was not contained in that expert's report, for the reasons

contained in the attached Memorandum.

**WHEREFORE**, Defendants pray that this Court order that H&E is prohibited from

introducing any evidence at trial regarding an opinion of an expert witness which was not

contained in that expert's report.

Respectfully submitted,

**ADAMS AND REESE LLP**

Philip A. Franco (Bar #5819), TA
Ron Sholes (Bar # 14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,**
**URS Corporation Architecture, P.C.;**
**URS Corporation; L. O'Neal Johnson**
**and Thomas E. Ryan, III**

FILED
EAST BATON ROUGE PARISH, LA
2017 AUG -1  PM 3: 14

1

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon all counsel of record via e-mail and/or United States Mail, postage prepaid and properly addressed, this 1st day of August, 2017.

_____
Kellen J. Mathews



2

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES, INC. | * | SUIT NO. 626,308    DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA |
| CORPORATION, L. O'NEAL | | |
| JOHNSON AND THOMAS E. RYAN, | | |
| III | | |

## RULE TO SHOW CAUSE

**CONSIDERING** Defendants' Motion in Limine to Exclude Expert Opinions Not Contained in That Expert's Report,

**IT IS HEREBY ORDERED** that Plaintiff H&E Equipment Services, Inc.be made to appear and show cause, if any, on the 16th day of August, 2017 at 9:30 a.m. why Defendants' Motion in Limine should not be granted.

Signed this 3 day of August, 2017 at Baton Rouge, Louisiana.

Hon. Janice Clark, Judge, 19th Judicial District Court

**PLEASE SERVE:**
H&E Equipment Services, Inc.
through its attorney of record
Brent B. Barriere
Loretta G. Mince
Alysson L. Mills
Rebecca Sha
Fishman Haygood LLP
201 St. Charles Ave., 46th Floor
New Orleans, LA 70170-4600
Tel: (504) 586-5252
Fax: (504) 586-5250

1

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES, INC. | * | SUIT NO. 626,308        DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON AND THOMAS E. RYAN, III | * | STATE OF LOUISIANA |

---

### DEFENDANTS' MEMORANDUM IN SUPPORT OF
### MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING
### DEFENDANTS' LIABILITY FOR AND DAMAGES AT KENNER FACILITY

---

Defendants URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON and THOMAS E. RYAN, III ask this Court to enter an order prohibiting Plaintiff H&E Equipment Services, Inc. from introducing any evidence at trial regarding Defendants' liability for any damages at H&E's Kenner facility because to do so would violate this Court's prior judgment, would inject irrelevant evidence into the record, would unfairly prejudice Defendants, and would unnecessarily prolong this trial.

On April 5, 2017, this Court signed its Judgment on Motion for Summary Judgment. This Court "GRANTED IN PART AND DENIED IN PART" a motion for summary judgment filed by Defendants, and this Court stated: "The 2009 Agreement applies only to the Kenner Project and thus summary judgment is granted only as to the Kenner Project." Accordingly, pursuant to the application of the 2009 Agreement to the Kenner Project, Defendants cannot be held liable for damages at the Kenner facility, and instead URS's liability is limited to redesign, as more fully explained in URS's prior motion for summary judgment. Thus, the jury should not be asked to consider at trial whether Defendants are liable for any damages at the Kenner facility.

"Evidence which is not relevant is not admissible." La. C.E. art. 402. To be relevant, evidence must "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. C.E. art. 401. Because this Court has already granted summary judgment to Defendants with regards to the

1

NON-CERTIFIED COPY

Kenner facility, any suggestion that Defendants are liable for any damage to the Kenner facility is not an issue of consequence to the issues to be tried in this case.

Additionally and independently, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La. C.E. art. 403. Allowing the jury to hear evidence alleging that Defendants are responsible for damage at the Kenner facility may confuse the jury about which facilities are at issue in this case, and may prejudice Defendants if the jury finds liability and awards damages because of the Kenner facility. *See, e.g.*, *Matranga v. Par. Anesthesia of Jefferson, LLC*, 14-448, p. 20 (La. App. 5 Cir. 5/14/15), 170 So. 3d 1077, 1092 (reversing jury verdict when trial court admitted into evidence a medical review panel report on informed consent, but informed consent was no longer an issue in the case after the parties reached a stipulation).

Finally, it would waste valuable time available for the trial of this matter for H&E to introduce irrelevant evidence, and for Defendants to then have to respond to evidence, regarding an issue that has already been decided in this litigation on a motion for summary judgment and will not be the subject of the jury verdict. Moreover, to litigate the issue of damages relative to the Kenner facility at the trial of this matter would be completely counter to the notion that "[t]he summary judgment procedure is expressly favored in the law and is designed to secure the just, speedy, and inexpensive determination of non-domestic civil actions." *Quality Envtl. Processes, Inc. v. Energy Dev. Corp.,* 16-0171, p. 13 (La. App. 1 Cir 4/12/17), 218 So. 3d 1045 (citing La. C.C.P. art. 966(A)(2)). This Court has already rendered summary judgment which resolved Plaintiff's damage claims regarding Kenner, thereby obviating the need for evidence regarding this facility.

## CONCLUSION

For the reasons set forth above, evidence as to liability for and damages at the Kenner facility should be excluded as irrelevant, prejudicial, potentially confusing to the jury, and serving only to further extend the trial.

NON-CERTIFIED COPY

**WHEREFORE**, Defendants pray that this Court order that H&E is prohibited from introducing any evidence at trial regarding Defendants' liability for any damages at H&E's Kenner facility.

Respectfully submitted,

**ADAMS AND REESE LLP**



Philip A. Franco (Bar #5819), TA
Ron Sholes (Bar #14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,**
**URS Corporation Architecture, P.C.;**
**URS Corporation; L. O'Neal Johnson**
**and Thomas E. Ryan, III**

FILED
EAST BATON ROUGE PARISH, LA
2017 AUG - 1  PM 3: 12

3

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon all counsel of record via e-mail and/or United States Mail, postage prepaid and properly addressed, this 1st day of August, 2017.

_____
Kellen J. Mathews



4

NON-CERTIFIED COPY

**19TH JUDICIAL DISTRICT COURT**
**PARISH OF EAST BATON ROUGE**
**STATE OF LOUISIANA**

**03-AUG-2017**

TO:    HON JANICE CLARK
        19TH JUDICIAL DISTRICT COURT
        300 NORTH BLVD, RM 10A
        BATON ROUGE, LA 70802

**H&E EQUIPMENT SRVCS VS URS CORP ARCHITECTURE ETAL**

**CASE NUMBER:** C626308

**JUDGE:** JANICE CLARK

**DIVISION**: Division D **ROOM**: 10A

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING ACTION FOR THE

AFOREMENTIONED CASE ON 16-AUG-2017 AT

09:30:00 AM FOR JURY TRIAL.

COMMENTS: ADD:  MOTIONS IN LIMINE OBO URS CORP.

                        EILEEN KNIGHT
                        JUDICIAL ASSISTANT TO JUDGE
                        JANICE CLARK

NOTIFIED:
ATY - ROY CLIFTON CHEATWOOD
ATY - PHILIP ANTHONY FRANCO
ATY - ANNE DERBES WITTMANN
ATY - M DAVID KURTZ
ATY - LORETTA G MINCE
ATY - EDWARD J LAPEROUSE
JDG - JANICE CLARK
ATY - LAURA E CARLISLE
ATY - KELLEN J MATHEWS
ATY - REBECCA SHA

Form 4501

NON-CERTIFIED COPY

$8^{-16}$

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES, INC. | * | SUIT NO. 626,308      DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA |
| CORPORATION, L. O'NEAL | | |
| JOHNSON AND THOMAS E. RYAN, | | |
| III | | |

COST OK $ 330 ~~445~~

**AUG 0 1 2017**

DEPUTY CLERK OF COURT

---

**DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING
DEFENDANTS' LIABILITY FOR AND DAMAGES AT KENNER FACILITY**

---

Defendants URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION,

L. O'NEAL JOHNSON and THOMAS E. RYAN, III ask this Court to enter an order prohibiting

Plaintiff H&E Equipment Services, Inc. from introducing any evidence at trial regarding

Defendants' liability for any damages at H&E's Kenner facility because to do so would violate

this Court's prior judgment, would inject irrelevant evidence into the record, would unfairly

prejudice Defendants, and would unnecessarily prolong this trial, as is more fully explained in

the attached Memorandum.

**WHEREFORE**, Defendants pray that this Court order that H&E is prohibited from

introducing any evidence at trial regarding Defendants' liability for any damages at H&E's

Kenner facility.



Respectfully submitted,

**ADAMS AND REESE LLP**

Philip A. Franco (Bar #5819), TA
Ron Sholes (Bar # 14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,
URS Corporation Architecture, P.C.;
URS Corporation; L. O'Neal Johnson
and Thomas E. Ryan, III**

RECD C.P.
AUG 0 4 2017

1

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon all counsel of record via e-mail and/or United States Mail, postage prepaid and properly addressed, this 1st day of August, 2017.

Kellen J. Mathews

FILED
EAST BATON ROUGE PARISH, LA

2017 AUG -1 PM 3:42

2

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES, INC. | * | SUIT NO. 626,308        DIV.: D |
|---|---|---|
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA |
| CORPORATION, L. O'NEAL | | |
| JOHNSON AND THOMAS E. RYAN, | | |
| III | | |

---

## RULE TO SHOW CAUSE

---

**CONSIDERING** Defendants' Motion in Limine to Exclude Evidence Regarding Defendants' Liability for and Damages at Kenner Facility,

**IT IS HEREBY ORDERED** that Plaintiff H&E Equipment Services, Inc. be made to appear and show cause, if any, on the 16th day of August, 2017 at 9:30 a.m. why Defendants' Motion in Limine should not be granted.

Signed this ___ day of August, 2017 at Baton Rouge, Louisiana.

_____
Hon. Janice Clark, Judge, 19th Judicial District Court

**PLEASE SERVE:**
H&E Equipment Services, Inc.
through its attorney of record
Brent B. Barriere
Loretta G. Mince
Alysson L. Mills
Rebecca Sha
Fishman Haygood LLP
201 St. Charles Ave., 46th Floor
New Orleans, LA  70170-4600
Tel: (504) 586-5252
Fax: (504) 586-5250

FILED
EAST BATON ROUGE PARISH, L...
2017 AUG -1  PM 3: 12
...PUTY CLERK OF COURT

1

NON-CERTIFIED COPY

POSTED

AUG - 2 2017

**H&E EQUIPMENT SERVICES, INC.**    *    **SUIT NO.: 626,308**    **DIV.: D**

           *    **19TH JUDICIAL DISTRICT COURT**

**VERSUS**            *

           *    **PARISH OF EAST BATON ROUGE**

**URS CORPORATION**
**ARCHITECTURE, P.C., URS**      *    **STATE OF LOUISIANA**
**CORPORATION, L. O'NEAL**                COST OK $_____
**JOHNSON AND THOMAS E. RYAN,**
**III**

AUG 0 1 2017

DEPUTY CLERK OF COURT

---

### DEFENDANTS' PROPOSED JURY CHARGES

---

    **NOW INTO COURT,** through undersigned counsel, come URS CORPORATION

ARCHITECTURE, P.C. ("URS Architecture"), URS CORPORATION ("URS Corporation"),

L. O'NEAL JOHNSON ("Johnson") and THOMAS E. RYAN, III, ("Ryan") (all collectively

referred to hereinafter as "Defendants"), who respectfully submit the following proposed Jury

Charge Instructions, which they request be given to the jury at the trial of this case. Defendants

submit this based upon their current understanding of how this case is to be tried—in light of

prior rulings of this Court and the applicable law—and specifically reserve the right to submit

amendments, changes, and/or additions to these Proposed Jury Charges as warranted by the

further proceedings before and during trial.



EBR4246068

1

NON-CERTIFIED COPY

## OPENING INSTRUCTIONS

**Proposed Jury Instruction No. 1**

<u>Respective Roles of Jurors and Judge</u>

You've been chosen as jurors for this case, and you've taken an oath to decide the facts in an impartial manner. As we begin the trial, I'm going to give you instructions to help you understand what will take place and what your role is. When you think about my instructions, both now and at the end of the case, consider them together. Don't single out any individual sentence or idea and ignore the others.

As members of the jury, you will decide the facts. As the judge, I will decide all questions of law and courtroom procedure. When you've listened to all of the evidence, I'll give you closing instructions, including the rules of law that you must follow in making your decision.

Keep an open mind throughout the trial. Don't decide any fact until you have considered all of the evidence and my final instructions. You will do this in what we call deliberations at the end of the trial, and then only when all of you are together in the jury room. That is when you'll have a chance to share your views with the other members of the jury and hear their views as well.

Because you are to decide the facts, you must pay close attention to the testimony and to the other evidence that you may see, such as documents or photographs. You will have to rely on your memory of what was said in the courtroom and on any notes you may take. Although exhibits which have been allowed into evidence will be available to you for further study during your deliberations, you should concentrate on the evidence as it is being presented.

You've been given a pen and notebook to take notes if you want to do that, but you don't have to. If you do take notes, just be careful not to get so involved in your note-taking that you become distracted and miss part of the testimony. When we take breaks during the day, you can leave your notes on your chair. No one will disturb them or look at them. When we finish for the day, the court staff will take up your notebooks and then return them to you the next day. No one will read your notes. They will remain confidential. When all of the evidence has been

2

NON-CERTIFIED COPY

presented, you will be able to take your notebooks into the jury room with you.  After you return

your verdict, the notes will be destroyed.

When you begin your deliberations, I will give you a copy of the opening and closing

instructions, and any special instructions I might have given you, if you ask for them.

Because it is so important to all of us that you listen to and understand the evidence

presented to you, if you can't hear what someone is saying, please raise your hand and I will see

that the situation is corrected.  If you have any other issues, such as needing to take a break, just

raise your hand, and I will consider your request.

<u>Some Definitions of Terms</u>

Some of the terms that you'll hear in the courtroom might be new to you, so let me just

tell you ahead of time what they mean.  The person who files a law suit is called the plaintiff; in

this case, the plaintiff is H&E Equipment Services, Inc.  The people who defend against the

plaintiff's law suit are called the defendants.  URS Corporation Architecture, P.C. and URS

Corporation are both defendants in this case, and I will sometimes just say "URS" to refer to

both of those companies.  The other two defendants are Mr. Larry O'Neal Johnson, and Mr.

Thomas Ryan, III.  Sometimes, we refer to the plaintiff and the defendants as the "parties" to the

law suit.

You'll sometimes hear me refer to "counsel." That's just another word for "lawyer" or

"attorney." I'll sometimes refer to myself as "the Court" and this chair that I'm sitting in as "the

bench." The courtroom staff that you see are the "court reporter," the "minute clerk" and the

"bailiff," who is in charge of keeping order in the courtroom.

You'll also hear us refer to an "exhibit," which if admitted is a type of evidence other

than testimony by a witness.  An exhibit might be a document or a physical piece of evidence

that may be shown to you; some lawyers may say that they want to "publish" an exhibit to the

jury, but that's just a fancy word for showing the exhibit to you.

<u>Courtroom Procedure</u>

Every now and then, a lawyer may "object" to a particular question asked to a witness or

to a particular exhibit.  The lawyer is doing that because there are rules that control the evidence

that can be presented.  These rules are designed to make sure that the evidence is the most

3

NON-CERTIFIED COPY

reliable evidence that is available.  If I agree with an objection to a question, I will sustain the objection and not permit the witness to answer it.  You should ignore the question altogether and don't speculate as to what the witness might have said.  If I disagree with an objection, I will overrule it and that means that I'm allowing that evidence to be presented.

Sometimes, I may say that certain evidence that has been presented should now be kept out or "stricken from the record." The rules of evidence require that you not consider that evidence, because your decision can only be based on evidence that is properly admissible.

Don't attach any importance to the fact that a lawyer has objected, or to my ruling.  The lawyer is only doing his or her job, and I'm only applying the rules of evidence.  When I rule on an objection, I'm not expressing an opinion on the merits, or favoring one side or the other.  I don't favor one side or the other.

Under Louisiana law, I'm not allowed to comment or express any opinion about the evidence.  If it seems to you that I've expressed any opinion during the trial, don't consider that in your decision.  But also remember that I'm the judge of the law and in charge of courtroom procedure, and you will have to follow the rules of law that I give you whether you agree with them or not.

The arguments that the lawyers will make to you in opening and closing statements aren't evidence.  Your decision on the facts must be based on the testimony and the evidence that you hear and see.

During the trial, I might have to confer with the lawyers here at the bench on matters of law or courtroom procedure that you don't need to hear.  Some people call these "side-bar" conversations, or the lawyer might ask me if he can "approach the bench" for such a discussion. At times, you'll simply stay in your seats and when we are finished, the presentation of evidence will resume.  At other times, I may excuse you from the courtroom for a short break.  I will try to limit these interruptions as much as I can.

I may have to caution one of the lawyers who, out of zeal in representing his or her client, does something that's not in keeping with the rules of evidence or procedure.  Don't hold that against the lawyer or the client; again, he or she is just trying to do the best for the client.

NON-CERTIFIED COPY

Louisiana law doesn't allow you to ask questions of the witnesses or the lawyers or to make any comments during the presentation of evidence.

## Rules for Jurors to Follow

The law requires that you decide the facts on the basis of what you hear and see in this courtroom. In order to do that, there are some basic common-sense rules that you have to follow, especially in today's world where there are so many sources of information available to you. Please be sure that you follow these rules, which will help you do your job of deciding the facts on the basis of what happens in this courtroom and concentrating on what occurs here:

(1) Don't conduct your own research about this case, either by yourself or as a group. This means that you are prohibited from using Google or any other search mechanism to look for information about the case or the people involved in the case, including the lawyers and the judge. These sources are not reliable and could lead you to an unfair verdict. The information that you get about the case in this courtroom will be the most reliable information to help you do your job.

(2) Don't use dictionaries, other books, the Internet or any other resources such as Facebook, Twitter or similar social networks to gather information about the issues. And don't get other people to do that for you. Don't allow your spouse, family member, friend or anyone else to do something for you that you are prohibited from doing yourself. For example, you may not ask your friend to conduct research about this case and tell you about the results.

(3) Don't try to get any special knowledge about the case other than what you hear and see in this courtroom.

(4) Don't accept any help in deciding the case from any source outside this courtroom. You and your fellow jurors have to do this work together, without outside help.

(5) Don't use cell phones, smart phones, laptops or any similar devices in the courtroom or in the jury room during your discussions. I'll give you breaks from time to time to allow you to make any necessary contacts that you need to make.

(6) Don't read, watch or listen to anything about this case from any source outside this courtroom. Your decision must be based solely on what you hear and see in this courtroom. It wouldn't be fair for you to base your decision on some reporter's opinion or on information that

5

NON-CERTIFIED COPY

you get from a source that your fellow jurors didn't have or that can't be questioned or cross-examined by the parties.

(7) Don't visit or look at the scene of any event involved in this case, because we can't be sure that the place will be in the same condition that it was in on the day of the events in this case.

(8) Obviously, don't consume any alcohol or use any drugs that could affect your ability to stay alert or to hear and understand the evidence that will be presented.

<u>Limitations on Communications about Case</u>

To be sure that you reach your decision only on the basis of what you see and hear in this courtroom, the law also requires you to limit your communications with others about the case and to be free of any communications from them to you. So I have to tell you some additional things that you must do about your discussions from now until the end of the trial:

(1) Don't talk to anyone else about this case, including others who are a part of the pool of potential jurors. That means your family, your friends, the parties, their lawyers, any of the witnesses, or members of the media. You can tell people that you are a juror, but don't tell them anything else about the case. If anyone tries to talk to you about this case, tell the bailiff or me immediately. You might come into contact with the lawyers, parties or witnesses in the hallway or in the elevator. Though it is a normal human tendency to chat with people in those circumstances, during the time you serve on this jury, please don't talk to any of the parties or their attorneys or witnesses, whether you are in or out of the courtroom. Not only don't talk to them about the case, but don't talk to them at all, even to pass the time of day. They are under strict instructions not to talk to you about anything, even if it doesn't concern the case. Please don't feel offended if they don't exchange the pleasantries of saying hello or discussing the weather, sports or food with you. The reason for these restrictions is that in talking about the case to others and hearing what they may have to say, you might be influenced to form an opinion about the case. This would compromise the right of the parties to have a verdict rendered only by you and based only on the evidence you hear and see in this courtroom. After you are discharged as a juror, you may talk to anyone you wish about this case. Until that time, I ask you to control your natural desire to discuss the case here, at home, or anywhere else.

6

NON-CERTIFIED COPY

(2) Don't communicate in any other way about this case with anyone.  You may not post information about this case on the Internet or share it in any way, including text messages, e-mail, chat rooms, blogs, or social websites, such as Facebook, Twitter or any brand new social network that may be created while we are actually in trial.

(3) You may only discuss the case with the other members of the jury when you begin deliberations on your verdict and all other members of the jury are present.  Until you reach a verdict at the end of the trial, don't communicate about your discussions with anyone else.

I want you to understand why all of these rules that I have given you are important.  Only you have taken an oath to be fair—no one else has made that promise.  All of the rules I've given you are intended to help us be sure that there is a fair trial—which you have all agreed to do and which we have a responsibility to help you do.  I know that you intend to give these parties a fair trial, and in accord with your oath, I know you will do that.

Certain "Advance" Closing Instructions

Before we start the trial, I think it would be helpful if I told you certain things that I will almost certainly tell you again when you have heard all of the evidence.  These things will help you understand better what is happening and what your role is.

Some of the evidence that may be presented will be in the form of what lawyers call a "deposition." A deposition is the written transcript or a video of a question-and-answer session with a witness that took place before this trial, when the witness was under oath and responded to questions from the lawyers about the case.  Although it is testimony outside the courtroom, the law permits you to consider it under certain circumstances.  You may consider and evaluate this testimony just as you would if it were being given live in front of you today.

Sometimes a deposition might be used to ask a witness who is here testifying whether he might have given prior answers which seem different from his testimony here in the courtroom. A lawyer may read from a deposition and ask the witness whether what he said in his deposition is different from what he is saying now.  We allow this to help you evaluate the credibility of his testimony before you.  Whether or not the prior statements by the witness are different from his live testimony is entirely for you to decide.

NON-CERTIFIED COPY

One of the first things for you to keep in mind as the trial begins is that the plaintiff has to prove his case by what the law calls a "preponderance of the evidence." This means that the evidence shows that the facts the plaintiff is seeking to prove are more likely true than not true.

"Preponderance of the evidence" is different from a standard of proof described as "beyond a reasonable doubt." Proof beyond a reasonable doubt applies in criminal cases, but not in civil cases such as this one.

The evidence which you will be considering consists of the facts that the parties have agreed are true (which the law calls "stipulated facts"), the testimony of the witnesses, and the documents, if any, that will be admitted into evidence, as well as any reasonable inferences or conclusions that you can draw from the evidence presented to you.  The arguments by the lawyers, as well as any comment or ruling I may make during the trial, are not part of the evidence.

A fact may be proven either by direct evidence or by circumstantial evidence, or perhaps by both.  Direct evidence is testimony by a witness as to what he or she saw or heard, or physical evidence of the fact itself.  Circumstantial evidence is proof of certain circumstances from which you are entitled to conclude that another fact is true.  For example, if the weather in a certain area was rainy at a time close to an accident and the road surface is wet, you might conclude that rain made the road surface wet.  The law treats direct evidence and circumstantial evidence as equally reliable.

An important part of your role is to judge the credibility of a witness who is testifying. The law presumes that a witness is telling the truth about facts that are within his knowledge. But this presumption may be overcome by contradictory evidence, by the manner in which the witness testifies, by the character of his testimony, or by evidence that tells you about his motives.

When you are weighing the credibility of a witness, you should consider the interest, if any, that the witness may have in the outcome of this case.  You should consider the ability of the witness to know, remember and tell the facts to you.  You should consider his or her manner of testifying, as to sincerity and frankness.  And you should consider how reasonable the witness's testimony seems to be in light of all of the other evidence.

8

NON-CERTIFIED COPY

You don't have to accept all of the testimony of a witness as being true or false. You might accept and believe those parts of the testimony that you consider logical and reasonable, and you may choose not to believe those parts that seem impossible or unlikely.

I like to say that witnesses are weighed and not counted. By that I mean that you are not required to decide any fact according to the number of witnesses presented to you on that particular point. The test is not which party brings forward the most witnesses or presents the greater quantity of evidence. The test is which witnesses and which evidence appeal to your mind as being the most accurate and the most persuasive.

Some of the witnesses that you will hear are called "expert witnesses." Unlike ordinary witnesses who must testify only about facts within their knowledge and cannot offer opinions about assumed or hypothetical situations, expert witnesses are allowed to express opinions because their education, expertise or experience in a particular field or on a particular subject might be helpful to you. You should consider their opinions, and give them the weight that you think they deserve. If you decide that the opinion of an expert witness is not based on sufficient education, expertise or experience or that the reasons given in support of the opinion are not sound, or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely—even though I have permitted the person to testify.

You must decide the facts without emotion or prejudice for or against any party. You should consider the case as an action between people of equal standing in the community. Every party stands equal before the law, and every party is to be dealt with as an equal in this court. A private citizen and a business or insurance company are equally entitled to a fair trial. In deciding this case, you shouldn't consider or speculate about whether any party has insurance. Deciding whether a party has insurance isn't part of your role as a juror.

Supreme Court of Louisiana, Rule XLIV (enacted Oct. 15, 2014).

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 2**

Brief Overview of the Nature of this Case and the Verdict Form

I find it helpful to tell you even before we start just a little bit about this case so you can keep it in mind as we proceed.

The plaintiff in this case, H&E Equipment Services, Inc., is a public company which sells, services, and rents heavy equipment such as metal cleated bulldozers and excavators used on construction and industrial projects. H&E owns and operates numerous facilities around the United States, including the two Louisiana facilities that you will hear about in this lawsuit, which are located in Baton Rouge and Belle Chasse.

The defendant URS is a public company which provides professional architectural and engineering services. Defendants Larry O'Neal Johnson and Thomas E. Ryan, III are architects who were employed by URS.

H&E and URS entered into a contract for URS to provide consulting and professional engineering services in connection with H&E's construction and renovation of its Baton Rouge and Belle Chasse facilities. H&E sells services and rents heavy metal cleated equipment at its Baton Rouge and Belle Chasse facilities.

H&E filed this lawsuit against the defendants for alleged damages at these two facilities, primarily problems with the concrete parking lots at the Baton Rouge facility, which H&E claims resulted from deficiencies in the design work of the defendants.

URS, in turn, asserts that H&E failed to pay invoices totaling $232,939.14 for services entirely unrelated to the design services of which H&E complains. When a defendant is sued, the defendant has a right to assert any claim that he may have against the plaintiff. Louisiana law calls this a reconventional demand. You the jury will make a decision in this case on URS's reconventional demand against H&E.

The basic law in Louisiana on this kind of case states that "every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The word "fault" is a key word. "Fault" means acting as you should not have acted or failing to do something which you should have done. The law regards those actions as being below the standard which applies to the defendants' activities.

10

NON-CERTIFIED COPY

As with other professionals, an architect or engineer is required to exercise that degree of professional care and skill customarily employed by other architects or engineers in a similar community under similar circumstances. In order to prove fault on the part of the defendants, H&E has the burden to prove that the defendants did not exercise that customary degree of skill or care and that H&E was damaged as a result.

Your job will then be to decide whether H&E has fulfilled its burden to prove that it is more likely true than not true that the defendants' actions fell below the standards of care. In legal terms, that would mean that a defendant is "at fault."

But this is only one part of H&E's case. The other parts of the H&E's case are:

(1) that the injury which H&E says that it suffered was caused in whole or in part by the conduct of the defendants; and

(2) that there was damage to H&E's property.

H&E has the burden to prove that all of these essential parts of its case are more likely true than not true. Questions addressed to all of these parts of the case will be given to you in the "verdict form" that you will receive at the end of the case and that you will take with you to fill out as a part of your deliberations.

When I say that H&E has to prove that the defendants' actions were a cause of its injury, I don't mean that the law recognizes only one cause of an injury.

You will have to decide, as to each defendant, whether that defendant's conduct was a contributing factor in causing the alleged injury. To make this determination, you should consider whether it is more likely than not that each defendant's conduct created a force or series of forces which remain in continuous and active operation up to the time of the harm.

Another part of H&E's burden is to prove property damage, and you will hear some evidence about that. I will tell you more about that part of the H&E's case at the end of the trial and there will be questions on the verdict form to allow you to decide whether you will choose to award any amount to H&E, and, if so, how much. Whether or not any amount should be awarded is solely for you to decide. A decision about damages is entirely up to you, and your decision should be based on the evidence, not solely on amounts of money suggested by any of the lawyers in closing arguments.

NON-CERTIFIED COPY

Supreme Court of Louisiana, Rule XLIV (enacted Oct. 15, 2014).

La. C.C.P. art. 1061.

18 H. Alston Johnson, III, *Louisiana Civil Law Treatise, Civil Jury Instructions* § 3:11.  (3d ed. 2011) (Specific duties—Architects and engineers).

*Nicholson & Loup, Inc. v. Carl E. Woodward, Inc.*, 596 So. 2d 374, 381 (La. App. 4 Cir. 1992) ("The general standard of care applicable to all professionals, including engineers, is that the services be performed 'with the same degree of skill and care exercised by others in the same profession in the same general area.'  The plaintiff ordinarily has the burden of proving a breach of the above standard.") (citation omitted).

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 3**

Order of Proceeding

I want to give you an idea of how the trial will be conducted. In just a minute, the lawyers for each of the parties will be allowed to make an opening statement. After those opening statements, H&E's lawyer will call witnesses and present evidence. When H&E finishes, or "rests" as we say in the law, the lawyer for the defendants will then call witnesses and present evidence. After that, H&E may be allowed to call additional witnesses or present additional evidence in rebuttal. H&E proceeds first, and may reply at the end, because H&E has the burden of proof. When the evidence portion of the trial is finished, the lawyers will make their closing arguments. After that, I will instruct you on the law and you will then begin your deliberations.

Remember that just because you think one defendant is at fault, that does not mean that you have to conclude that all of the defendants are at fault.

We are now ready for the lawyers to make opening arguments. Remember that the statements that the lawyers make now, as well as their closing arguments, are not evidence and they are not the instructions on the law that I have told you I will give you at the end of the trial. They are intended to help you understand the issues you are going to hear about, the evidence that you will probably hear and the positions that the parties have in this case. Statements by any of the lawyers expressing a view about what amount should or should not be given are also not evidence. The decision about an amount to be given, if any, is solely your job; and your decision must be based upon the evidence presented to you.

Supreme Court of Louisiana, Rule XLIV (enacted Oct. 15, 2014).

13

NON-CERTIFIED COPY

# CLOSING INSTRUCTIONS

**Proposed Jury Instruction No. 4**

## General Closing Instructions

Members of the jury, it is now time for me to tell you the law that applies to this case. As I mentioned at the beginning of the trial, you must follow the law as I state it to you.

You've been chosen from the community to decide the facts. What the community expects of you, and what I expect of you, is the same thing that you would expect if you were a party to this suit: an impartial deliberation and conclusion based on all the evidence, and on nothing else.

You must decide the facts without emotion or prejudice for or against any party. You should consider the case as an action between people of equal standing in the community. Every party stands equal before the law, and every party is to be dealt with as an equal in this court. A private citizen and a business or insurance company are equally entitled to a fair trial. In deciding this case, don't consider or speculate about whether any party has insurance. Deciding whether a party has insurance isn't part of your role as a juror.

Above all, the community wants you to achieve justice. You'll succeed in doing that if all of you seek the truth from the evidence presented in this courtroom, and reach a verdict using the rules of law that I give to you.

If I have said or done anything during this trial which has suggested to you that I favor the claims or position of either party, you should disregard it. If I have indicated in any way that I have any opinion as to what the facts in this case are or should be, you should disregard that. I am not the judge of the facts. You are.

Before I tell you about the law, you should understand several things about these instructions. As I mentioned earlier, you must follow the law as I state it to you, whether or not you agree with it.

When you think about my instructions, consider them together. Don't single out any individual sentence or idea and ignore the others.

As I mentioned to you at the start of the trial, the plaintiff has the burden to prove its case by a preponderance of the evidence. Preponderance of the evidence means that the evidence

14

NON-CERTIFIED COPY

shows that the facts the plaintiff is seeking to prove are more likely true than not true.  But remember: "preponderance of the evidence" is different from a standard of proof described as "beyond a reasonable doubt."  Proof beyond a reasonable doubt applies in criminal cases, but not in civil cases such as this one.

A fact may be proven either by direct evidence or by circumstantial evidence, or perhaps by both.  Direct evidence is testimony by a witness as to what he or she saw or heard, or physical evidence of the fact itself.  Circumstantial evidence is proof of certain circumstances from which you are entitled to conclude that another fact is true.  The law treats direct evidence and circumstantial evidence as equally reliable.

An important part of your role is to judge the credibility of a witness who has testified. The law presumes that a witness is telling the truth about facts that are within his knowledge. But this presumption may be overcome by contradictory evidence, by the manner in which the witness testifies, by the character of his testimony or by evidence that tells you about his motives.

When you are weighing the credibility of a witness, you should consider the interest, if any, that the witness may have in the outcome of this case.  You should consider the ability of the witness to know, remember and tell the facts to you.  You should consider his or her manner of testifying, as to sincerity and frankness.

And you should consider how reasonable the witness's testimony seems to be in light of all of the other evidence.

You don't have to accept all of the testimony of a witness as being true or false.  You might accept and believe those parts of the testimony that you consider logical and reasonable, and you may choose not to believe those parts that seem impossible or unlikely.

I like to say that witnesses are weighed and not counted.  By that I mean that you are not required to decide any fact according to the number of witnesses presented to you on that particular point.  The test is not which party brings forward the most witnesses or presents the greater quantity of evidence.  The test is which witnesses and which evidence appeal to your mind as being the most accurate and the most persuasive.

15

NON-CERTIFIED COPY

Some of the witnesses that you have heard are called "expert witnesses." Unlike ordinary witnesses who must testify only about facts within their knowledge and cannot offer opinions about assumed or hypothetical situations, expert witnesses are allowed to express opinions because their education, expertise or experience in a particular field or on a particular subject might be helpful to you. You should consider their opinions and give them the weight that you think they deserve. If you decide that the opinion of an expert witness is not based on sufficient education, expertise or experience or that the reasons given in support of the opinion are not sound, or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely—even though I have permitted the person to testify.

Supreme Court of Louisiana, Rule XLIV (enacted Oct. 15, 2014).

16

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 5**

Witness Bias

The credibility of a witness may be attacked by any party.  A party may question any witness as to his relationship to the parties or his interest in the lawsuit.  In weighing the testimony of any fact or expert witness, you should consider the bias, if any, of the witness regarding the parties to the litigation and regarding the issues that may affect the outcome of the case.

La. C.E. art. 607.

*La Louisiane Bakery Co. v. Lafayette Ins. Co.*, 09-825, p. 28 (La. App. 5 Cir. 2/8/11), 61 So. 3d 17, 34 (jury properly "weighed the credibility of the experts and considered any alleged bias.")

*Rowe v. State Farm Mutual Automobile Ins. Co.,* 95-669, p. 10 (La. App. 3 Cir. 3/6/96), 670 So. 2d 718, 725 (litigants are entitled "to discover an expert's bias by discovery or subpoena, to present evidence of such bias to the trier of fact and, in extreme cases, to have the expert's testimony declared inadmissible.").

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 6**

<u>Different Prior Statements</u>

If the testimony of a witness in court is different from a prior statement he has made, you have to decide if the testimony of the witness in court should be rejected because it is different from his prior statements.  If you decide that the testimony has been discredited, then you must decide what weight, if any, to give to the testimony.  If you find that a witness has testified falsely as to a material fact, then you have the right to reject the entire testimony of the witness or to reject only part of the testimony, based upon how much you are impressed with the truthfulness of the witness.

Supreme Court of Louisiana, Rule XLIV (enacted Oct. 15, 2014).

18

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 7**

Contracts

Under Louisiana law, a contract between two parties has the force of law as to them. You are called upon to interpret the contract between these two parties, and thus to determine the meaning and consequences of the law which they have written for themselves. You are to interpret the contract according to the following rules.

If the words of the contract are clear and do not lead to absurd results, you do not need to do any further interpretation to find the parties' intent.

The words in this contract must be given the meaning which they generally have in everyday use. If a word is a term of art or has a technical meaning within the context of this contract, you should give it that special meaning.

If a word may have several meanings, you should interpret it as having the meaning which is most in line with the objective of the contract.

Also, if a provision in the contract has different meanings and one of those meanings would make the provision effective and one would not, you should give it the meaning which would make it effective, since we assume the parties wanted their contract to be effective.

18 H. Alston Johnson, III, *Louisiana Civil Law Treatise, Civil Jury Instructions* § 17:1 (3d ed. 2011) (General rules of interpretation)

18 H. Alston Johnson, III, *Louisiana Civil Law Treatise, Civil Jury Instructions* § 17:3 (3d ed. 2011) (Meaning of words in contract)

La. C.C. arts. 1983, 2045, 2046, 2047, 2048, 2049.

19

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 8**

<u>Situation to Which the Contract Applies</u>

When the parties intend a contract of general scope but, to eliminate doubt, include a provision that describes a specific situation, interpretation must not restrict the scope of the contract to that situation alone.


La. C.C. art. 2052.

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 9**

<u>Limitation of Liability</u>

A clause in a contract which limits the liability of a party is valid and is not against public

policy.

*Bonfiglio v. Bellsouth Advert. & Pub. Corp.*, 619 So. 2d 135, 136 (La. App. 1st Cir. 1993) (it is
"well settled in our jurisprudence that limitation of liability clauses" are "valid and not against
public policy.").

*City of Shreveport v. SGB Architects, L.L.P.*, 45,458, p. 6 (La. App. 2 Cir. 9/22/10), 47 So. 3d
1105, 1108-09.

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 10**

Contents of Contracts

You must presume that persons engaged in business are aware of the contents of the agreements they sign. A sophisticated business is presumed to know the terms of a contract, including a warranty waiver, and is bound by the terms of a contract when it signs a contract.

*Louisiana Nat. Leasing Corp. v. ADF Serv., Inc.*, 377 So. 2d 92, 96 (La. 1979).

*Capitol City Leasing Corp. v. Hill*, 394 So. 2d 1264, 1267 (La. App. 1st Cir. 1981) ("one must presume that persons engaged in business are aware of the contents of the agreements they sign.").

*Anderson v. Bohn Ford, Inc.*, 291 So. 2d 786, 791 (La. App. 4th Cir. 1973) ("The fact that the dealer signed the document and acknowledged by his signature that he accepts the conditions contained in the agreement are sufficient to meet the test that the waiver was brought to the dealer's attention. To conclude otherwise would destroy the stability of contracts. Presumably, persons established in business, as the dealer in this case and the manufacturer, are aware of the contents of the agreement between them.").

*California Union Ins. Co. v. Bechtel Corp.*, 473 So. 2d 861, 866-67 (La. App. 4th Cir. 1985) ("The contract under consideration was a commercial undertaking between two highly sophisticated parties. While courts are reluctant to enforce warranty limitations on consumers they recognize that parties such as Bechtel (acting for GSU) and Westinghouse are free to bargain as they see fit and are bound by their contracts.")

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 11**

<u>Integration Clause</u>

A contract provision stating that the contract replaces any prior contracts is sometimes called an integration clause.  An integration clause is enforceable in Louisiana and precludes any prior agreements which are not set forth in the contract.

*Driver Pipeline Co. v. Cadeville Gas Storage, LLC*, 49,375, p. 17 (La. App. 2 Cir. 10/1/14), 150 So. 3d 492, 502 ("An integration clause, such as that found in Article VI of the contract in this case, precludes any prior or contemporaneous agreements which are not set forth in the contract.").

*Henning Const., Inc. v. First E. Bank & Trust Co.*, 92-0435 (La. App. 4 Cir. 3/15/94), 635 So. 2d 273, 276.

23

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 12**

<u>Fault</u>

The basic law in Louisiana on this kind of case states that "every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The word "fault" is a key word. "Fault" means acting as you should not have acted or failing to do something which you should have done. The law regards those actions as being below the standard which applies to the defendant's activities.

As with other professionals, an architect or engineer is required to exercise that degree of professional care and skill customarily employed by other architects or engineers in a similar community under similar circumstances. In order to prove fault on the part of the defendants, H&E has the burden to prove that each defendant failed to exercise that customary degree of skill or care and that H&E was damaged as a result.

Your job will then be to decide whether H&E has fulfilled its burden to prove that it is more likely true than not true that the defendants' actions fell below the standards of care. In legal terms, that would mean the defendants are "at fault."

But this is only one part of H&E's case. The other parts of the H&E's case are:

(1) that the injury which H&E says that it suffered was caused in whole or in part by the conduct of the defendants; and

(2) that there was damage to H&E's property.

H&E has the burden to prove that all of these essential parts of his case are more likely true than not true. Questions addressed to all of these parts of the case will be given to you in the "verdict form" that you will take with you to fill out as a part of your deliberations.

When I say that H&E has to prove that each defendant's actions were a cause of its injury, I don't mean that the law recognizes only one cause of injury.

You will have to decide, as to each defendant, whether that defendant's conduct was a contributing factor in causing the alleged injury. To make this determination, you should consider whether it is more likely than not that the defendant's conduct created a force or series of forces which remain in continuous and active operation up to the time of the harm.

24

NON-CERTIFIED COPY

Supreme Court of Louisiana, Rule XLIV (enacted Oct. 15, 2014).

18 H. Alston Johnson, III, *Louisiana Civil Law Treatise, Civil Jury Instructions* § 3:11 (3d ed. 2011) (Specific duties—Architects and engineers).

*Nicholson & Loup, Inc. v. Carl E. Woodward, Inc.*, 596 So. 2d 374, 381 (La. App. 4 Cir. 1992) ("The general standard of care applicable to all professionals, including engineers, is that the services be performed 'with the same degree of skill and care exercised by others in the same profession in the same general area.' The plaintiff ordinarily has the burden of proving a breach of the above standard.") (citation omitted).

25

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 13**

Expert Testimony Required on Standard of Care

An architect or engineer is required to exercise that degree of professional care and skill customarily employed by other architects or engineers in a similar community under similar circumstances. Expert testimony is required to establish that an architect or engineer did not exercise the requisite standard of care. If you find that there was not qualified and reliable expert testimony that the defendants did not exercise the requisite standard of care, then you may not find that the defendants were "at fault." And even if you find that there was such qualified and reliable expert testimony, H&E is still required to prove the other elements of its claim against the defendants before H&E can recover in this lawsuit.

*Milke v. Ratcliff Animal Hosp., Inc. ex rel. Ratcliff*, 48,130, p. 15 (La. App. 2 Cir. 7/10/13), 120 So. 3d 343, 351 ("an expert is needed to establish whether the protocols asserted [by the plaintiff] are required by the local standard of care.").

*Charles Carter & Co. v. City of Baton Rouge*, 344 So. 2d 431, 433 (La. App. 1 Cir. 1977) ("It is well established in Louisiana jurisprudence that expert testimony is needed to establish the lack of care and resulting negligence on the part of architects and engineers.").

*City of Alexandria v. Ratcliffe Const. Co., LLC*, 11-1200, p. 4 (La. App. 3 Cir. 2/8/12), 95 So. 3d 1076, 1079 ("Failure to submit expert testimony to prove the standard of care is a 'fatal omission.'") (quoting *Greenhouse v. C.F. Kenner Associates Ltd. Partnership*, 98-496, p. 5 (La. App. 4 Cir. 11/10/98), 723 So. 2d 1004, 1008, and *Carter v. Deitz*, 556 So. 2d 842, 843 (La. App. 4 Cir. 1990)).

26

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 14**

<u>Gross Negligence</u>

Gross negligence is the entire absence of care and the utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others. Additionally, gross negligence is an extreme departure from ordinary care or the want of even scant care. Gross negligence has been described as willful, wanton, or reckless conduct.

You will have to decide whether H&E has proved that it is more likely true than not true that each of the defendants committed gross negligence. If you find that H&E has failed to prove by a preponderance of the evidence that a defendant committed gross negligence, then you should return a verdict for the defendant on the gross negligence claim. And even if you find that H&E has proved gross negligence, H&E is still required to prove the other elements of its claim against the defendants before H&E can recover in this lawsuit.

*Ambrose v. New Orleans Police Dept. Ambulance Serv.*, 93-3099, p. 5 (La. 7/5/94), 639 So. 2d 216, 219-20 ("Gross negligence has also been termed the 'entire absence of care' and the 'utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others.' Additionally, gross negligence has been described as an 'extreme departure from ordinary care or the want of even scant care.'") (citations omitted)

*Rabalais v. Nash*, 06-0999, p. 6 (La. 03/09/07), 952 So. 2d 653, 658 ("There is often no clear distinction between such [willful, wanton, or reckless] conduct and 'gross' negligence, and the two have tended to merge and take on the same meaning.") (quoting *Falkowski v. Maurus*, 637 So. 2d 522 (La. App. 1st Cir.), which quoted W. Page Keeton, et. al., Prosser & Keeton on the Law of Torts, § 34, at 214 (5th ed. 1984)).

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 15**

### Expert Testimony Required on Gross Negligence

In order for you to find gross negligence by a defendant, expert testimony is required to establish that an architect or engineer went beyond ordinary negligence or carelessness. Expert testimony must establish that the defendant acted with the entire absence of care and skill customarily employed by other architects or engineers in a similar community under similar circumstances and utterly disregarded the dictates of prudence, amounting to complete neglect of the rights of others, and an extreme departure from ordinary care or the want of even scant care.

If find that there was not expert testimony of gross negligence, then you must find that H&E has not met its burden of proof on a gross negligence claim. And even if you find that there was such qualified and reliable expert testimony of gross negligence, H&E is still required to prove the other elements of its claim against the defendants before H&E can recover in this lawsuit.

*Ambrose v. New Orleans Police Dept. Ambulance Serv.*, 93-3099, p. 5 (La. 7/5/94), 639 So. 2d 216, 219-20 ("Gross negligence has also been termed the 'entire absence of care' and the 'utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others.' Additionally, gross negligence has been described as an 'extreme departure from ordinary care or the want of even scant care.'") (citations omitted)

*Rabalais v. Nash*, 06-0999, p. 6 (La. 03/09/07), 952 So. 2d 653, 658 ("There is often no clear distinction between such [willful, wanton, or reckless] conduct and 'gross' negligence, and the two have tended to merge and take on the same meaning.") (quoting *Falkowski v. Maurus*, 637 So. 2d 522 (La. App. 1st Cir.), which quoted W. Page Keeton, et. al., Prosser & Keeton on the Law of Torts, § 34, at 214 (5th ed. 1984)).

*Milke v. Ratcliff Animal Hosp., Inc. ex rel. Ratcliff*, 48,130, p. 15 (La. App. 2 Cir. 7/10/13), 120 So. 3d 343, 351 ("an expert is needed to establish whether the protocols asserted [by the plaintiff] are required by the local standard of care.").

*Charles Carter & Co. v. City of Baton Rouge*, 344 So. 2d 431, 433 (La. App. 1st Cir. 1977) ("It is well established in Louisiana jurisprudence that expert testimony is needed to establish the lack of care and resulting negligence on the part of architects and engineers.").

*City of Alexandria v. Ratcliffe Const. Co., LLC*, 11-1200, p. 4 (La. App. 3 Cir. 2/8/12), 95 So. 3d 1076, 1079 ("Failure to submit expert testimony to prove the standard of care is a 'fatal omission.'") (quoting *Greenhouse v. C.F. Kenner Associates Ltd. Partnership*, 98-496, p. 5 (La. App. 4 Cir. 11/10/98), 723 So. 2d 1004, 1008, and *Carter v. Deitz*, 556 So. 2d 842, 843 (La. App. 4 Cir. 1990)).

NON-CERTIFIED COPY

**<u>Proposed Jury Instruction No. 16</u>**

Comparative Fault

At the close of these instructions, I will be giving you a list of questions to be answered. My staff and I have prepared these questions with the help of the lawyers.

Among the questions that we will be asking you to answer are some which concern the allocation of fault.  Louisiana law requires that you determine the degrees or percentages of fault (which add up to 100%) for all persons causing or contributing to the loss, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency or ability to pay.  This allocation of fault is required as to any claim for recovery of damages asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability. This allocation also includes any contributory fault on the part of H&E itself.

So, my questions will be asking you to assign a percentage of fault, if any, to:

(1) H&E;

(2) each of the defendants; and

(3) any other person or entity involved, even though not sued as a defendant.

18 H. Alston Johnson, III, *Louisiana Civil Law Treatise, Civil Jury Instructions* § 15:1 (3d ed. 2011) (Multiple party instructions—Solidarity problems).

La. C.C. art. 2323.

29

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 17**

<u>Damages—General instruction</u>

If you decide that H&E has fulfilled its burden to prove all the other elements of its case by a preponderance of the evidence, and the defendants have failed to establish a defense which would prevent H&E from recovering an award for its damages, you must decide the question of whether there has been injury to H&E and if so, the amount that would fairly compensation H&E for that injury.

In this regard, I recall to your attention the words of Article 2315 of our Civil Code: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

This article, and our law, suggest simple reparation, a just and adequate compensation for injuries. It suggests no idea of revenge or punishment. Accordingly, our law does not permit the awarding of damages to punish the defendant, or make an example of the defendant to prevent other accidents, and you should include no such amount in your award. Your award should be designed to fully and fairly compensate H&E for its injury, if you find injury has occurred, and should not go beyond such reparation.

Like other parts of H&E's case, H&E has the burden to establish these damages by a preponderance of the evidence. This means that you cannot award speculative damages which you think H&E might have suffered or might suffer in the future.

In reaching a verdict on the question of H&E's damages, I caution you not to include anything for the payment of court costs and attorney fees; the law does not consider these as damages suffered by H&E. If you decide to make an award, follow the instructions I have given you, and do not add or subtract from that award on account of federal or state income taxes. In other words, if you find that H&E is entitled to damages, the amount which you award should be the sum that you think will fully and fairly compensate H&E, without regard to what H&E may pay its attorney or the amount that you might think would be paid in income taxes.

Finally, let me say that the fact that I have given you these statements about the law of damages does not in any way imply or suggest that I feel or do not feel that any damages are due in this case. Whether or not damages are due is solely for you to determine.

NON-CERTIFIED COPY

18 H. Alston Johnson, III, *Louisiana Civil Law Treatise, Civil Jury Instructions* § 15:1 (3d ed. 2011) (Damages—General instruction) (removing the parts which refer to a personal injury).

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 18**

<u>Mitigation of Damages</u>

A plaintiff, such as H&E, must make reasonable efforts to mitigate or reduce the damage,

if any, caused by a defendant's fault.  When a plaintiff fails to make these efforts, the damages

accordingly should be reduced.  Thus, if you find that H&E did not make every reasonable effort

to mitigate or reduce damages, then you should reduce the amount of its damages by the amount

H&E could have realized if it had taken advantage of such opportunity to mitigate.

La. C.C. art. 2002.

*Aisole v. Dean,* 574 So. 2d 1248, 1254 (La.  1991) ("the victim has an affirmative responsibility
to make every reasonable effort to mitigate damages.").

*Barsavage v. State ex rel. Dep't of Transp. & Dev.*, 96-0688 (La. App. 1 Cir. 12/20/96), 686
So. 2d 957, 963 ("An injured party is required to take reasonable steps to exercise ordinary
prudence to minimize the damage.")

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 19**

<u>No Damages for Loss of Use or Loss Profits</u>

Pursuant to the agreement of the parties, neither party is liable to the other for consequential damages including, without limitation, loss of use, loss of revenue or profits, or loss by reason of shutdown or non-operation. Therefore, you may not award any damages in this case for either H&E's loss of use of its facilities, if any, or H&E's loss of revenue or profits, if any.

2009 Contract, Article 8.1 (and, to the extent necessary, 2006 Contract, Article VII).

33

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 20**

Payment of Invoices

Pursuant to the contract between H&E and URS, you are instructed that H&E was required to pay undisputed portions of each progress invoice from URS within thirty (30) days of the date of the invoice.  If payment was not maintained on a thirty (30) day current basis, URS was allowed to suspend further performance until payments were current.  H&E was required to notify URS of any disputed amount within fifteen (15) days from date of the invoice, give reasons for the objection, and promptly pay the undisputed amount.  H&E is required to pay an additional charge of one and one-half percent (1½ %) per month or the maximum percentage allowed by law, whichever is the lesser, for any past due amount.

2009 Contract, Article 2.1 (and, to the extent necessary, 2006 Contract, Article II).

34

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 21**

Attorneys' Fees on Reconventional Demand

If you find in favor of URS on its reconventional demand against H&E for invoice amounts not paid, then H&E must pay URS's attorneys' fees, court costs, and other related expenses.

**THIS JURY INSTRUCTION IS REQUESTED TO THE EXTENT NEEDED. HOWEVER, DEFENDANTS REQUEST THAT THE ISSUE OF ATTORNEYS' FEES BE TRIED BY THE JUDGE AFTER THE OTHER ISSUES ARE TRIED TO THE JURY.**

2009 Contract, Article 2.1 (and, to the extent necessary, 2006 Contract, Article II).

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 22**

Enrichment Without Cause

A person who has been enriched without cause at the expense of another person is bound

to compensate that person.  In this case, URS claims, in the alternative, that H&E has been

enriched without cause because H&E received a valuable benefit from URS in the form of

professional services rendered and yet H&E failed to pay the full amount due for those

professional services.  To prove that H&E has been enriched without cause, URS must prove that

H&E was enriched, URS was impoverished, there is a connection between the enrichment and

the impoverishment, and there is an absence of justification or cause for the enrichment and the

impoverishment.  A person is enriched when his assets increase, without adequate compensation,

or his liabilities diminish.  Conversely, one is impoverished when assets are diminished, a

justified expectation of gain is prevented, or liabilities increased.


*Coastal Envtl. Specialists, Inc. v. Chem-Lig Int'l, Inc.*, 00-1936, p. 9 (La. App. 1 Cir. 11/9/01),
818 So. 2d 12, 18 ("A person who has been enriched without cause at the expense of another
person is bound to compensate that person.").

*Gulfstream Servs. v. Hot Energy Servs.*, 04-1223, pp. 6-7 (La. App. 1 Cir. 3/24/05), 907 So. 2d
96, 101 ("To prove a case of enrichment without cause, the plaintiff must demonstrate: (1) an
enrichment; (2) an impoverishment; (3) a connection between the enrichment and
impoverishment; (4) the absence of justification or cause for the enrichment and
impoverishment; and, (5) the lack of any other remedy at law.  A person is enriched when his
assets increase, without adequate compensation, or his liabilities diminish.  Conversely, one is
impoverished when assets are diminished, a 'justified expectation of gain' is prevented, or
liabilities increased.") (citations omitted)

36

NON-CERTIFIED COPY

**Proposed Jury Instruction No. 23**

<u>Final Instructions Prior to Deliberation</u>

This completes my remarks on the applicable law.  In summary, let me remind you of the essence of my remarks, many of which have just been given to you or were given to you in my opening instructions.

H&E has the burden of proving the following elements by a preponderance of the evidence, which means that the facts H&E is seeking to prove are more likely true than not true. H&E has to demonstrate, as to each of the defendants:

(1) that the injury which H&E says it suffered was caused in whole or in part by the conduct of the defendant;

(2) that the conduct of the defendant` was below the standards customarily employed by other architects or engineers in a similar community under similar circumstances; and

(3) that there was damage to H&E's property.

If you believe that H&E has established that these three elements are more likely true than not true as to a defendant, then H&E is entitled to recover against that defendant and you should return a verdict for H&E.  If H&E has failed to establish that any one of these three elements are more likely true than not true, then you should return a verdict for the defendants.

On H&E's gross negligence claim, H&E has the burden of proving that the conduct of each defendant was beyond ordinary fault and that each defendant acted with the entire absence of care and the utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others—an extreme departure from ordinary care or the want of even scant care.  Gross negligence has been described as willful, wanton, or reckless conduct.  If H&E has not proven gross negligence by a preponderance of the evidence (i.e., more likely than not likely), then you may not return a verdict for H&E on the gross negligence claim.

If you find that H&E has fulfilled its burden by proving all of the elements of its claim as to a defendant, then you must assign the percentage of fault, if any, to H&E, to any or all of the defendants, and to any of the non-parties listed on the verdict form.  The total of all of the percentages must be 100%.  If you're persuaded by the defendants' evidence that the only reason H&E suffered property damage was because of H&E's own sub-standard conduct, you must

37

NON-CERTIFIED COPY

return a verdict for the defendants in response to the questions on the verdict form by assigning 100% fault to H&E.

If you decide to return a verdict for H&E, then you should award an appropriate amount of money to H&E according to the instructions which I have given you on the subject of damages.

You may not decide on a percentage of fault or an amount of damages by agreeing in advance to an average of various amounts suggested by individual jurors. You must reach these conclusions by your own independent consideration and judgment. Nine of you must ultimately agree on the percentage, the amount in question, or on a denial of an award altogether.

Finally, you will be asked to decide URS's reconventional demand based on URS's claim that H&E failed to pay invoices totaling $232,939.14 for services entirely unrelated to the design services of which H&E complains.

Remember that I told you at the beginning of the trial that you—and not I—are the judges of the facts. I've told you the law that you must use to decide this case. You should not treat my instructions as indicating which party is entitled to a verdict in this case.

When you leave the courtroom to deliberate, you may take with you, if you wish, a complete copy of all of my instructions to you, or you may ask for a copy to be sent to you later. You may also ask to have in the jury room any document or object that has been admitted into evidence, if a physical examination of that document or object will help you reach a verdict.

Remember that I told you at the beginning of the trial that you were not to discuss the case among yourselves. I now remove that restriction. You should now consult with one another and deliberate with a view toward reaching agreement on a fair and impartial verdict. You each must decide the case for yourself. But you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when you are convinced that you're wrong. However, don't be influenced to vote in any way on any issue by the fact that a majority of your fellow jurors favor a certain point of view. In other words, don't surrender your honest convictions for the mere purpose of returning a verdict or solely because of the opinion of the other jurors.

NON-CERTIFIED COPY

It's usually not a good idea for you as a juror, when you first enter the jury room, to make an emphatic expression of your opinion on the case or announce a determination to hold out for a certain verdict.  When you do that at the outset, your sense of pride may be at issue, and you may hesitate to back down from an announced position, even if you're shown to be wrong. Remember that you aren't advocates in this matter, but rather you're judges.  The final test of the quality of your service will be in the verdict which you return, not in the opinions any of you may hold as you go to the jury room.  Your contribution to the judicial system will be to arrive at an impartial verdict.  To that end, I remind you that in your deliberations there can be no triumph except to find and declare the truth.

You are being asked to return a verdict in this case by answering certain specific questions which will be posed to you.

**The verdict form should be explained here.**

Louisiana law requires that nine or more of you agree in order to answer a question on this jury verdict form.  When nine or more of you agree about a question you have to answer, that should end your deliberation on that question.  You should consider each question separately.  The same nine jurors do not have to agree on every question, but nine of you do have to agree on each separate question.  When you have answered all the questions, your job is done.

Each of you should keep the jury verdict forms that you have been given and should record your own vote on each question, since I may decide to "poll" the jury to find out how each of you voted on each question.

The first thing you should do when you go to the jury room is to choose a person to represent you in returning the verdict.  When you have reached a verdict, your representative will record that verdict in its entirety on the appropriate form.  He or she should then sign the form, date it and notify the bailiff that you have reached a verdict.

If you recess during your deliberations, or if your deliberations should last more than one day, you must follow all of the instructions that I have given you about your conduct during the trial.  Don't discuss the case with anyone outside of the jury room, even another juror.  Discuss the case with your fellow jurors only in the jury room and only when all of your fellow jurors are present.  If you want to send a message to me at any time, give a written message or question to

39

NON-CERTIFIED COPY

the bailiff, who will be nearby, and he will bring it to me. I will then respond as promptly as possible by having you come back into the courtroom. I have to tell the lawyers what your message or question is and what my reply is going to be before I answer your question.

The community appreciates your service on this jury, and at the same time expects you to reach an impartial verdict. At this time, I dismiss the alternate jurors who are not allowed to participate in deliberations, and I thank them very much for their service.

Members of the jury, you will now retire to deliberate. Please follow the directions of the bailiff and other court employees as you leave.


Supreme Court of Louisiana, Rule XLIV (enacted Oct. 15, 2014).

*Ambrose v. New Orleans Police Dept. Ambulance Serv.*, 93-3099, p. 5 (La. 7/5/94), 639 So. 2d 216, 219-20 ("Gross negligence has also been termed the 'entire absence of care' and the 'utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others.' Additionally, gross negligence has been described as an 'extreme departure from ordinary care or the want of even scant care.'") (citations omitted)

*Rabalais v. Nash*, 06-0999, p. 6 (La. 03/09/07), 952 So. 2d 653, 658 ("There is often no clear distinction between such [willful, wanton, or reckless] conduct and 'gross' negligence, and the two have tended to merge and take on the same meaning.") (quoting *Falkowski v. Maurus*, 637 So. 2d 522 (La. App. 1st Cir.), which quoted W. Page Keeton, et. al., Prosser & Keeton on the Law of Torts, § 34, at 214 (5th ed. 1984)).

NON-CERTIFIED COPY

Respectfully submitted,

**ADAMS AND REESE LLP**

_____
Philip A. Franco (Bar #5819), TA
Ron Sholes (Bar # 14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,**
**URS Corporation Architecture, P.C.;**
**URS Corporation; L. O'Neal Johnson**
**and Thomas E. Ryan, III**



41

NON-CERTIFIED COPY

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon

all counsel of record via e-mail and/or United States Mail, postage prepaid and properly

addressed, this 1st day of August, 2017.

_____
Kellen J. Mathews



NON-CERTIFIED COPY

POSTED

AUG - 2 2017



| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES, INC. | * | SUIT NO. 626,308    DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA |
| CORPORATION, L. O'NEAL | | COST OK $_____ |
| JOHNSON AND THOMAS E. RYAN, III | | |

AUG 0 1 2017

DEPUTY CLERK OF COURT

## DEFENDANTS' PROPOSED JURY VERDICT FORM

**NOW INTO COURT,** through undersigned counsel, come URS CORPORATION

ARCHITECTURE, P.C. ("URS Architecture"), URS CORPORATION ("URS Corporation"), L.

O'NEAL JOHNSON ("Johnson") and THOMAS E. RYAN, III, ("Ryan") (all collectively

referred to hereinafter as "Defendants"), who respectfully submit the following proposed Jury

Verdict Form, which they request be given to the jury at the trial of this case. Defendants submit

this based upon their current understanding of how this case is to be tried—in light of prior

rulings of this Court and the applicable law—and specifically reserve the right to submit

amendments, changes, and/or additions to this Proposed Jury Verdict Form as warranted by the

further proceedings before and during trial.



NON-CERTIFIED COPY

**H&E's Claims against Defendants Regarding the Baton Rouge Facility**

1.    Do you find that the 2009 Agreement applies to the services alleged to be deficient with regards to the Baton Rouge facility?

YES _____          NO _____

2.    Do you find that the defendants were at fault for breaching the applicable standards of professional care in the performance of services with regards to the Baton Rouge facility?

| | | |
|---|---|---|
| URS: | YES _____ | NO _____ |
| Mr. Johnson: | YES _____ | NO _____ |
| Mr. Ryan: | YES _____ | NO _____ |

*If you answered Question No. 2 "No" for all defendants, go to Question No. 8. Otherwise, go to Question No. 3.*

3.    Do you find that the defendants were grossly negligent with regards to the Baton Rouge facility?

| | | |
|---|---|---|
| URS: | YES _____ | NO _____ |
| Mr. Johnson: | YES _____ | NO _____ |
| Mr. Ryan: | YES _____ | NO _____ |

*If you answered Question No. 1 "Yes" and if you also answered Question No. 3 "No" for all defendants, go to Question No. 8. Otherwise, go to Question No. 4.*

4.    Do you find that H&E suffered an injury at the Baton Rouge facility?

YES _____          NO _____

*If you answered Question No. 4 "No", go to Question No. 8. Otherwise, go to Question No. 5.*

2

NON-CERTIFIED COPY

5.    Do you find that one or more of the following caused or contributed to the injury to H&E at the Baton Rouge facility?

| | | |
|---|---|---|
| URS: | YES _____ | NO _____ |
| Mr. Johnson: | YES _____ | NO _____ |
| Mr. Ryan: | YES _____ | NO _____ |
| H&E: | YES _____ | NO _____ |
| Benchmark Group, L.L.C.: | YES _____ | NO _____ |
| Milton J. Womack, Inc.: | YES _____ | NO _____ |
| Terracon Consultants, Inc. | YES _____ | NO _____ |

*If you answered Question No. 5 "No" for URS, Mr. Johnson and Mr. Ryan, go to Question No. 8.  Otherwise, go to Question No. 6.*

6.    Please state the percentage of fault, if any, attributable to each of the following regarding the Baton Rouge facility.  *The total of your percentages must be 100%.*

| | |
|---|---|
| H&E: | _____% |
| URS: | _____% |
| Mr. Johnson: | _____% |
| Mr. Ryan: | _____% |
| Benchmark Group, L.L.C.: | _____% |
| Milton J. Womack, Inc.: | _____% |
| Terracon Consultants, Inc. | _____% |

*If your answer to Question No. 6 was 0% for URS, 0% for Mr. Johnson and 0% for Mr. Ryan, go to Question No. 8.  Otherwise, go to Question No. 7.*

7.    Without deducting any sums for the percentage of fault, if any, which you have assigned above to H&E, please state what sum of money, if any, would reasonably and fairly compensate H&E for injury caused at the Baton Rouge facility:

$_____

3

NON-CERTIFIED COPY

**H&E's Claims against Defendants Regarding the Belle Chasse Facility**

8.    Do you find that the 2009 Agreement applies to the services alleged to be deficient with regards to the Belle Chasse facility?

        YES _____          NO _____

9.    Do you find that the defendants were at fault for breaching the applicable standards of professional care in the performance of services with regards to the Belle Chasse facility?

        URS:               YES _____          NO _____

        Mr. Johnson:      YES _____          NO _____

        Mr. Ryan:        YES _____          NO _____

*If you answered Question No. 9 "No" for all defendants, go to Question No. 15. Otherwise, go to Question No. 10.*

10.    Do you find that the defendants were grossly negligent with regards to the Belle Chasse facility?

        URS:               YES _____          NO _____

        Mr. Johnson:      YES _____          NO _____

        Mr. Ryan:        YES _____          NO _____

*If you answered Question No. 8 "Yes" and if you also answered Question No. 10 "No" for all defendants, go to Question No. 15. Otherwise, go to Question No. 9.*

11.    Do you find that H&E suffered an injury at the Belle Chasse facility?

        YES _____          NO _____

*If you answered Question No. 11 "No", go to Question No. 15. Otherwise, go to Question No. 12.*

NON-CERTIFIED COPY

12.    Do you find that one or more of the following caused or contributed to the injury to H&E at the Belle Chasse facility?

| | | |
|---|---|---|
| URS: | YES _____ | NO _____ |
| Mr. Johnson: | YES _____ | NO _____ |
| Mr. Ryan: | YES _____ | NO _____ |
| H&E: | YES _____ | NO _____ |
| Benchmark Group, L.L.C.: | YES _____ | NO _____ |
| Ryan Gootee General Contractors, L.L.C.: | YES _____ | NO _____ |
| Riverlands Surveying Co.: | YES _____ | NO _____ |

*If you answered Question No. 12 "No" for URS, Mr. Johnson and Mr. Ryan, go to Question No. 15.  Otherwise, go to Question No. 13.*

13.    Please state the percentage of fault, if any, attributable to each of the following regarding the Belle Chasse facility.  *The total of your percentages must be 100%.*

| | |
|---|---|
| H&E: | _____% |
| URS: | _____% |
| Mr. Johnson: | _____% |
| Mr. Ryan: | _____% |
| Benchmark Group, L.L.C.: | _____% |
| Milton J. Womack, Inc.: | _____% |
| Terracon Consultants, Inc. | _____% |

*If your answer to Question No. 13 was 0% for URS, 0% for Mr. Johnson and 0% for Mr. Ryan, go to Question No. 15.  Otherwise, go to Question No. 14.*

14.    Without deducting any sums for the percentage of fault, if any, which you have assigned above to H&E, please state what sum of money, if any, would reasonably and fairly compensate H&E for injury caused at the Belle Chasse facility:

$_____

5

NON-CERTIFIED COPY

**URS's Claim against H&S Regarding Unpaid Invoices:**

15.     How much, if any, does H&E owe URS for unpaid invoices?

$_____

16.     What do you find to be the amount of URS's reasonable attorney fees for the prosecution and collection of the claim for unpaid invoices?

$_____

**QUESTION NO. 16 IS REQUESTED TO THE EXTENT NEEDED.  HOWEVER, DEFENDANTS REQUEST THAT THE ISSUE OF ATTORNEYS' FEES BE TRIED BY THE JUDGE AFTER THE OTHER ISSUES ARE TRIED TO THE JURY.**

*Please have the jury foreperson sign and return the verdict form.*

_____
JURY FOREPERSON

_____
DATE

NON-CERTIFIED COPY

Respectfully submitted,

**ADAMS AND REESE LLP**

Philip A. Franco (Bar #5819), TA
Ron Sholes (Bar # 14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,**
**URS Corporation Architecture, P.C.;**
**URS Corporation; L. O'Neal Johnson**
**and Thomas E. Ryan, III**



7

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon all counsel of record via e-mail and/or United States Mail, postage prepaid and properly addressed, this 1st day of August, 2017.

_____
Kellen J. Mathews



8

NON-CERTIFIED COPY

6709-17-000248

## RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**NUMBER  C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

TO:    **H&E EQUIPMENT SERVICES INC
THRU BRENT B BARRIERE
LORETTA G MINCE, ALYSSON L MILLS
REBECCA SHA
201S ST. CHARLES  AVE., 46TH FLOOR
NEW ORLEANS, LA.  70170-4600**

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

**DEFENDANTS MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING DEFENDATS LIABILITY FOR AND DAMAGES AT KENNER FACILITY & MEMORANDUM**

You MUST come to Court at 9:30 AM, on AUGUST 16, 2017 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

### * * * * * SEE ATTACHED ORDER * * * * *

**YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on **08-AUG-2017**.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

Requesting Attorney:
KELLEN J MATHEWS

---

**SERVICE INFORMATION:**

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**    After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20_____.

SERVICE:$_____
MILEAGE:$_____                    _____
TOTAL:   $_____                        Deputy Sheriff
                                                          Parish of _____

**RULE NISI (OOP) - 6709**



NON-CERTIFIED COPY

EBR4282690

6709-17-000249

# RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**NUMBER  C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

TO:    **H&E EQUIPMENT SERVICES INC
THRU BRENT B BARRIERE
LORETTA G MINCE, ALYSSON L MILLS
REBECCA SHA
201S ST. CHARLES  AVE., 46TH FLOOR
NEW ORLEANS, LA.  70170-4600**

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

**DEFENDANTS MOTION IN LIMINE TO EXCLUDE EXPERT OPINIONS NOT CONTAINED IN THAT EXPERT'S REPORT  & MEMORANDUM**

You MUST come to Court at 9:30 AM, on AUGUST 16, 2017 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

### * * * * * SEE ATTACHED ORDER * * * * *

**YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on **08-AUG-2017**.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

Requesting Attorney:
KELLEN J MATHEWS

---

### SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**      After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20_____.

SERVICE:$_____
MILEAGE$_____                     _____
TOTAL:  $_____                                    Deputy Sheriff
                                                          Parish of _____

### RULE NISI (OOP) - 6709



EBR4282694

NON-CERTIFIED COPY

6709-17-000249

# RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**NUMBER  C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

**vs.**

**PARISH OF EAST BATON ROUGE**

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**STATE OF LOUISIANA**

TO:   **H&E EQUIPMENT SERVICES INC
      THRU BRENT B BARRIERE
      LORETTA G MINCE, ALYSSON L MILLS
      REBECCA SHA
      201S ST. CHARLES  AVE., 46TH FLOOR
      NEW ORLEANS, LA.  70170-4600**

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

**DEFENDANTS MOTION IN LIMINE TO EXCLUDE EXPERT OPINIONS NOT CONTAINED IN THAT EXPERT'S REPORT  & MEMORANDUM**

You MUST come to Court at 9:30 AM, on AUGUST 16, 2017 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

### * * * * * SEE ATTACHED ORDER * * * * *

**YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on **08-AUG-2017**.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

Requesting Attorney:
KELLEN J MATHEWS

---

### SERVICE INFORMATION:

Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**      After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20_____.

SERVICE:$_____
MILEAGE$_____          _____
TOTAL:  $_____               Deputy Sheriff
                                 Parish of _____

**RULE NISI (OOP) - 6709**



EBR4282694

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

DOCKET NO.: 626,308                                    SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____        _____
                                                DEPUTY CLERK

**PLAINTIFF'S PROPOSED JURY INTERROGATORIES**

NOW INTO COURT, through undersigned counsel, comes H&E Equipment Services, Inc. which respectfully submits the following proposed jury interrogatories in this case:

**SECTION I—BATON ROUGE: THE FOLLOWING INTERROGATORIES PERTAIN TO H&E'S CLAIMS AGAINST DEFENDANTS REGARDING THE BATON ROUGE FACILITY ONLY.**

**INTERROGATORY NO. 1:**     Do you find by a preponderance of the evidence that the Defendants (or anyone for whom the Defendants were responsible) were negligent in performing their professional services with respect to the Baton Rouge facility?

                            YES: _____        NO: _____

**INTERROGATORY NO. 2:**     Do you find by a preponderance of the evidence that the Defendants (or anyone for whom the Defendants were responsible) were grossly negligent in performing their professional services with respect to the Baton Rouge facility?

                            YES: _____        NO: _____

**INTERROGATORY NO. 3:**     Do you find by a preponderance of the evidence that Defendant URS breached its contract with H&E with respect to the Baton Rouge facility?

                            YES: _____        NO: _____

*If you answered "no" to <u>all</u> three of the above Interrogatories, go to SECTION II—KENNER.*

*If you answered "yes" to one or more of the above Interrogatories, go to Interrogatory No. 4.*

**INTERROGATORY NO. 4:**     Do you find by a preponderance of the evidence that H&E sustained damages as a result of any of the Defendants' conduct?

                            YES: _____        NO: _____

31

1216267v.1        NON-CERTIFIED COPY

*If you answered "no" to Interrogatory No. 4, go to SECTION II—KENNER. If you answered*

*"yes" to Interrogatory No. 4, go to Interrogatory No. 5.*

**INTERROGATORY NO. 5:**    Were any of the following also responsible, in part, for H&E's damages:

H&E: YES: _____   NO: _____
Womack: YES: _____   NO: _____

*If you indicated "no" to each of the entities listed in Interrogatory No. 5, skip Interrogatory*

*No. 6 and answer Interrogatory No. 7.  If you indicated "yes" for one or more of the entities*

*listed in Interrogatory No. 5, answer Interrogatory No. 6 and Interrogatory No. 7.*

**INTERROGATORY NO. 6:**    Compare the fault of the following persons and find a percentage for each. *The total of the percentages must equal 100%, but the percentage for any one or more of the persons named may be zero if you find that such person was not responsible for any of H&E's damages.*

Defendants _____%
H&E _____%
Womack _____%
**Total 100%**

**INTERROGATORY NO. 7:**    Please state the amount of damages sustained by H&E with respect to the Baton Rouge facility. *In determining the amount of damages, do not make any reduction because of the fault of people or entities other than Defendants.  If you found that someone other than Defendants was also at fault, the court in entering judgment will make an appropriate reduction in the damages awarded.*

$_____

**SECTION II—KENNER: THE FOLLOWING INTERROGATORIES PERTAIN TO**

**H&E'S CLAIMS AGAINST DEFENDANTS REGARDING THE KENNER FACILITY**

**ONLY.**

**INTERROGATORY NO. 1:**    Do you find by a preponderance of the evidence that the Defendants (or anyone for whom the Defendants were responsible) were negligent in performing their professional services with respect to the Kenner facility?

YES: _____        NO: _____

**INTERROGATORY NO. 2:**    Do you find by a preponderance of the evidence that the Defendants (or anyone for whom the Defendants were responsible) were grossly negligent in performing their professional services with respect to the Kenner facility?

YES: _____        NO: _____

32

1216267v.1

NON-CERTIFIED COPY

**INTERROGATORY NO. 3:**    Do you find by a preponderance of the evidence that Defendant URS breached its contract with H&E with respect to the Kenner facility?

YES: _____        NO: _____

*If you answered "no" to all three of the above Interrogatories, go to SECTION III—BELLE CHASSE. If you answered "yes" to one or more of the above Interrogatories, go to Interrogatory No. 4.*

**INTERROGATORY NO. 4:**    Do you find by a preponderance of the evidence that H&E sustained damages as a result of any of the Defendants' conduct?

YES: _____        NO: _____

*If you answered "no" to Interrogatory No. 4, go to SECTION III—BELLE CHASSE. If you answered "yes" to Interrogatory No. 4, go to Interrogatory No. 5.*

**INTERROGATORY NO. 5:**    Were any of the following also responsible, in part, for H&E's damages:

H&E: YES: _____  NO: _____
Mapp: YES: _____  NO: _____

*If you indicated "no" to each of the entities listed in Interrogatory No. 5, skip Interrogatory No. 6 and answer Interrogatory No. 7. If you indicated "yes" for one or more of the entities listed in Interrogatory No. 5, answer Interrogatory No. 6 and Interrogatory No. 7.*

**INTERROGATORY NO. 6:**    Compare the fault of the following persons and find a percentage for each. *The total of the percentages must equal 100%, but the percentage for any one or more of the persons named may be zero if you find that such person was not responsible for any of H&E's damages.*

Defendants _____%
H&E _____%
Mapp _____%
**Total 100%**

**INTERROGATORY NO. 7:**    Please state the amount of damages sustained by H&E with respect to the Kenner facility. *In determining the amount of damages, do not make any reduction because of the fault of people or entities other than Defendants. If you found that someone other than Defendants was also at fault, the court in entering judgment will make an appropriate reduction in the damages awarded.*

$_____

33

1216267v.1          NON-CERTIFIED COPY

**SECTION III—BELLE CHASSE: THE FOLLOWING INTERROGATORIES PERTAIN TO H&E'S CLAIMS AGAINST DEFENDANTS REGARDING THE BELLE CHASSE FACILITY ONLY.**

**INTERROGATORY NO. 1:**   Do you find by a preponderance of the evidence that the Defendants (or anyone for whom the Defendants were responsible) were negligent in performing their professional services with respect to the Benne Chasse facility?

YES: _____        NO: _____

**INTERROGATORY NO. 2:**   Do you find by a preponderance of the evidence that the Defendants (or anyone for whom the Defendants were responsible) were grossly negligent in performing their professional services with respect to the Belle Chasse facility?

YES: _____        NO: _____

**INTERROGATORY NO. 3:**   Do you find by a preponderance of the evidence that Defendant URS breached its contract with H&E with respect to the Belle Chasse facility?

YES: _____        NO: _____

*If you answered "no" to __all__ three of the above Interrogatories, go to SECTION IV—URS CLAIMS. If you answered "yes" to one or more of the above Interrogatories, go to Interrogatory No. 4.*

**INTERROGATORY NO. 4:**   Do you find by a preponderance of the evidence that H&E sustained damages as a result of any of the Defendants' conduct?

YES: _____        NO: _____

*If you answered "no" to Interrogatory No. 4, go to SECTION IV—URS CLAIMS. If you answered "yes" to Interrogatory No. 4, go to Interrogatory No. 5.*

**INTERROGATORY NO. 5:**   Were any of the following also responsible, in part, for H&E's damages:

H&E: YES: _____ NO: _____
Ryan Goottee: YES: _____ NO: _____

*If you indicated "no" to each of the entities listed in Interrogatory No. 5, skip Interrogatory No. 6 and answer Interrogatory No. 7. If you indicated "yes" for one or more of the entities listed in Interrogatory No. 5, answer Interrogatory No. 6 and Interrogatory No. 7.*

**INTERROGATORY NO. 6:**   Compare the fault of the following persons and find a percentage for each. *The total of the percentages must equal 100%, but the percentage for any one or more of the persons named may be zero if you find that such person was not responsible for any of H&E's damages.*

34

NON-CERTIFIED COPY

Defendants _____%
H&E _____%
Ryan Gootee _____%
**Total 100%**

**INTERROGATORY NO. 7:** Please state the amount of damages sustained by H&E with respect to the Belle Chasse facility. *In determining the amount of damages, do not make any reduction because of the fault of people or entities other than Defendants. If you find that someone other than Defendants was also at fault, the court in entering judgment will make an appropriate reduction in the damages awarded.*

$_____

*Go to Section IV—URS CLAIMS*

**SECTION IV—URS CLAIMS: THE FOLLOWING INTERROGATORIES PERTAIN TO URS'S CLAIMS AGAINST H&E.**

**INTERROGATORY NO. 1:** Do you find by a preponderance of the evidence that H&E is indebted to URS for any services rendered by URS?

YES: _____     NO: _____

*If you answered "no" to Interrogatory No. 1, return this form to the Courtroom Deputy. If you answered "yes" to Interrogatory No. 1, go to Interrogatory No. 2.*

**INTERROGATORY NO. 7:** Please state the amount you find H&E owes to URS for services rendered by URS.

$_____

**RETURN THIS FORM TO THE COURTROOM DEPUTY.**

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

35

1216267v.1    NON-CERTIFIED COPY

**C E R T I F I C A T E**

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by facsimile, email and/or by placing same in the United States mail, postage prepaid and properly addressed, this 1st day of August, 2017.

_____
Loretta G. Mince



36

1216267v.1    NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

DOCKET NO.: 626,308

SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

**POSTED**

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____

_____
DEPUTY CLERK

### PLAINTIFF'S PROPOSED JURY INSTRUCTIONS

EBR4234870

FAX COPY FILED _____
ORIGINAL FILED _____

1216267v.1

1

NON-CERTIFIED COPY

## GENERAL CASE OVERVIEW FOR VOIR DIRE

The following narrative provides a very broad overview of this case. It discusses some, but certainly not all, facts, claims and defenses asserted by the parties:

Plaintiff, H&E Equipment Services, Inc., is a business headquartered in Baton Rouge that sells, services, and rents construction equipment. Plaintiff will be referred to as either "H&E" or "Plaintiff." H&E owns and operates facilities in various locations in Louisiana and around the United States. At issue in this lawsuit are H&E's facilities in Baton Rouge, Kenner, and Belle Chasse, Louisiana.

H&E is represented by Brent Barriere, Lori Mince and Rebecca Sha of the firm Fishman Haygood.

Defendants URS Corporation Architecture, P.C. and URS Corporation are, together, an architectural and engineering design firm that provides program management, planning, engineering, architectural design, environmental, and construction services to a wide range of commercial and industrial clients worldwide. URS Corporation Architecture, P.C. will be referred to as "URS."

Defendant L. O'Neal Johnson is a registered professional architect licensed by the State of Louisiana and, during all pertinent times in this lawsuit, was employed by URS.

Defendant Thomas E. Ryan is a registered professional architect licensed by the State of Louisiana and, during all pertinent times in this lawsuit, was employed by URS.

Defendants are represented by Phil Franco, Ron Sholes, Kellen Mathews, Don McKinney and Jeffrey Richardson of the law firm of Adams & Reese.

H&E contracted with URS to furnish professional design and construction administration services to H&E in connection with the construction of its new headquarters building and dealership facility Baton Rouge. H&E also contracted with URS to provide professional design and construction administration services to H&E in connection with the renovation and additions to H&E's facilities located in Kenner, Louisiana and Belle Chasse, Louisiana.

URS agreed to furnish various design and construction services for each of the Projects. Defendant O'Neal Johnson served as the lead architect on the projects that are subject to this lawsuit. Defendant Thomas Ryan also provided architectural services on the projects.

H&E filed this suit claiming that the design and construction services provided by URS and its subcontractors and employees were defective. According to H&E, the largest issue

2

NON-CERTIFIED COPY

relates to URS's faulty design of the pavement in the Baton Rouge and Kenner facilities. Shortly after completion of the Baton Rouge and Kenner project, major portions of the concrete parking apron and staging areas for H&E's industrial equipment at both facilities experienced substantial cracking, spalling, and deterioration. H&E contends that URS's designs for the pavement were grossly deficient and did not comply with local and industry requirements and the recommendations of consultants commissioned by URS. H&E contends that the removal and replacement of the pavement at the Baton Rouge and Kenner facilities is necessary to correct the issues.

In addition to the defective pavement design, H&E contends that each of the three construction projects for which URS was responsible—Baton Rouge, in Kenner, and in Belle Chasse—was riddled with problems arising from the construction documents that URS prepared. For each project, H&E asserts that URS omitted from the construction documents essential measurements or necessary components. These omissions were discovered only later, after construction had commenced, and thus necessitated costly change orders.

As to the pavement issues, Defendants contend that their design services were not defective. They argue that other factors including the Plaintiff's failure to maintain the pavement and negligence of the contractors caused the problems. Defendants also argue that a complete replacement of the pavement at the Kenner and Baton Rouge facilities is not necessary and instead, the cracks can be filled in and that the spalling can be repaired only in places where it is severe.

As to the other design services, Defendants contend that their drawings were satisfactory and that to the extent change orders were required, H&E would have had to pay for the work whether it was included in the original drawings or added by change order.

1216267v.1

NON-CERTIFIED COPY

## OPENING JURY INSTRUCTIONS

### Respective Roles of Jurors and Judge

Members of the jury:

You have been chosen as jurors for this case, and you have taken an oath to decide the facts fairly. As we begin the trial, I am going to give you some instructions to help you understand what will take place and what your role is. When you think about my instructions, both now and at the end of the case, consider them as a whole. Don't single out any individual sentence or idea and ignore the others.

As members of the jury, you will decide the facts. As the judge, I will decide all questions of law and courtroom procedure. When you have listened to all of the evidence, I will give you some closing instructions, including the rules of law that you must follow in making your decision.

Keep an open mind throughout the trial. Don't decide any fact until you have considered all of the evidence and my final instructions, and then only after you have had a chance to share your views with the other members of the jury and hear their views as well.

Because you are to decide the facts, you must pay close attention to the testimony which the witnesses will give and to the other evidence that you may see, such as documents or photographs. You will have to rely on your memory of what was said in the courtroom. Although exhibits which have been allowed into evidence will be available to you for further study during your deliberations, you should concentrate on the evidence as it is being presented.

The court staff will give you a pen and notebook to take notes if you want to do that, but you don't have to. If you do take notes, just be careful not to get so involved in your note-taking that you become distracted and miss part of the testimony. When we take breaks during the day, you can leave your notes on your chair. No one will disturb them or look at them. When we finish for the day, the court staff will take up your notebooks and then return them to you the next day. The staff will not read your notes, but we do this to be sure that your notes remain confidential. When all of the evidence has been presented, you will be able to take your notebooks into the jury room with you. After you return your verdict, the notes will be destroyed.

When you begin your deliberations, I will give you a copy of the opening and closing instructions, and any special instructions that I might have given you, if you ask for them.

Because it is so important to all of us that you listen to and understand the evidence presented to you, if you can't hear what someone is saying, please raise your hand and I will see

4

NON-CERTIFIED COPY

that the situation is corrected. If you have any other issues, such as needing to take a break, just raise your hand, and I will deal with your request.

### Some Definitions of Terms

Some of the terms that you'll hear in the courtroom might be new to you, so let me just tell you ahead of time what they mean. The party who files a lawsuit is called the plaintiff; in this case, the plaintiff is H&E Equipment Services, Inc.

The party who defends against the plaintiff's law suit is called the defendant; in this case, there are multiple defendants. The defendants are URS Corporation Architecture, P.C., URS Corporation, L O'Neal Johnson, and Thomas E. Ryan, III. Sometimes, we refer to the plaintiff and the defendants as the "parties" to the lawsuit.

You will sometimes hear me refer to "counsel." That's just another word for "lawyer" or "attorney". I will sometimes refer to myself as "the Court" and this chair that I'm sitting in as "the bench." The courtroom staff that you see are the "court reporter," the "minute clerk," the "law clerk" and the "bailiff," who is in charge of keeping order in the courtroom.

You will also hear us refer to an "exhibit," which is a type of evidence other than testimony by a witness. An exhibit might be a document or a physical piece of evidence that may be shown to you.

### Courtroom Procedure

Every now and then, a lawyer may "object" to a particular question asked to a witness or to a particular exhibit. The lawyer is doing that because there are rules of evidence that limit the evidence that can be presented. The law does not impose those limitations to hide anything from you; the rules are intended to make sure that the evidence is the most reliable evidence that is available. I might "sustain," or agree with an objection; or I might "overrule" or disagree with it. If I "sustain" it, then I'm excluding the evidence because I have to under the rules of evidence. If I do sustain an objection to a question and don't permit the witness to answer it, ignore the question altogether and don't speculate as to what the witness might have said in response. If I "overrule" a lawyer's objection that means that I'm allowing that evidence to be presented.

Don't attach any importance to the fact that a lawyer has objected, or to my ruling. The lawyer is only doing his or her job, and I'm only applying the rules of evidence. When I rule on an objection, I'm not expressing an opinion on the merits, or favoring one side or the other. I don't favor one side or the other.

1216267v.1

NON-CERTIFIED COPY

Under Louisiana law, I'm not allowed to comment or express any opinion about the evidence. If it seems to you that I've expressed any opinion during the trial, you should ignore that opinion. But also remember that I'm the judge of the law and in charge of courtroom procedure, and you will have to follow the rules of law that I give you whether you agree with them or not.

The arguments that the lawyers will make to you in opening and closing statements aren't evidence. Your decision on the facts must be based on the testimony and the evidence that you hear and see.

Louisiana law doesn't allow you to ask questions of the witnesses or the lawyers or to make any comments during the presentation of evidence.

During the trial, I might have to confer with the lawyers here at the bench on matters of law or courtroom procedure that you don't need to hear. Some people call these "side-bar" conversations. These "side-bars" might be initiated by me, or one of the lawyers may ask me if he or she can "approach the bench" for such a discussion. At times, you'll simply stay in your seats and when we are finished, the presentation of evidence will resume. At other times, I may excuse you from the courtroom for a short break. I will try to limit these interruptions as much as I can.

I may have to caution one of the lawyers who, out of zeal in representing his or her client, does something that's not in keeping with the rules of evidence or procedure. Don't hold that against the lawyer or the client; again, he or she is just trying to do his or her best for the client.

### Rules for Jurors to Follow

The law requires that you decide the facts on the basis of what you hear and see in this courtroom—and nothing else. In order to do that, there are some basic common-sense rules that you have to follow, especially in today's world where there are so many sources of information available to you. Please be sure that you follow these rules, which will help you do your job of deciding the facts on the basis of what happens in this courtroom and concentrating on what occurs here:

1) Don't conduct your own research about this case, either by yourself or as a group. This means that you shouldn't "Google" or otherwise search for information about the case or the people involved in the case, including the lawyers and the judge. The information that you get about the case in this courtroom will be the most reliable information to help you do your job.

(2) Don't use dictionaries, other books, the Internet or any other resources such as Facebook or similar social networks to gather information about the issues.

6

1216267v.1

NON-CERTIFIED COPY

(3) Don't try to get any special knowledge about the case other than what you hear and see in this courtroom.

(4) Don't use cell phones, I-phones, laptops or any similar devices in the courtroom or in the jury room during your deliberations. I'll give you breaks from time to time to allow you to make any necessary contacts that you need to make.

(5) Don't read, watch or listen to anything about this case from any source outside this courtroom, because your decision must be based solely on what you hear and see in the courtroom. It wouldn't be fair for you to base your decision on some reporter's opinion or on information that you get from a source that your fellow jurors didn't have or that can't be questioned or cross-examined by the parties.

(6) Don't visit or look at the scene of any event or place involved in this case.

(7) Obviously, don't consume any alcohol or use any drugs that could affect your ability to stay alert or to hear and understand the evidence that will be presented.

### Limitations on Communications about Case

To be sure that you reach your decision only on the basis of what you see and hear in this courtroom, the law also requires you to limit your communications with others about the case and to be free of any communications from them to you. So I have to tell you some additional things that you must do about your discussions from now until the end of the trial:

(1) Don't talk to anyone else about what you hear about this case. That means your family, your friends, the parties, their lawyers, any of the witnesses, or members of the media. You can tell people that you are a juror, but don't tell them anything else about the case. If anyone tries to talk to you about this case, tell the bailiff or me immediately. The reason for these restrictions is that in talking about the case to others and hearing what they may have to say, you might be influenced to form an opinion about the case. This would compromise the right of the parties to have a verdict rendered only by you and based only on the evidence you hear and see in this courtroom. You might come into contact with the lawyers, parties or witnesses in the hallway or in the elevator. Though it is a normal human tendency to chat with people in those circumstances, please don't, during the time you serve on this jury, talk to any of the parties or their attorneys or witnesses, whether you are in or out of the courtroom. Not only don't talk to them about the case, but don't talk to them at all, even to pass the time of day. They are under strict instructions not to talk to you about anything, even if it doesn't concern the case. Please don't feel offended if they don't exchange

1216267v.1

NON-CERTIFIED COPY

normal pleasantries with you. After you are discharged as a juror, you may talk to anyone you wish about this case. Until that time, I ask you to control your natural desire to discuss the case here, at home, or anywhere else.

(2) Don't communicate in any other way about this case with anyone. You may not post information about this case on the Internet or share it in any way, including text messages, e-mail, chat rooms, blogs, or social websites, such as Facebook, MySpace or Twitter or any brand new social networking device.

(3) Don't discuss the case with the other members of the jury during the trial.  At the end of the trial, I will give you instructions, and then you will deliberate with your fellow jurors.  That is the time when you will discuss the case, and the evidence you have seen and heard, with your fellow jurors.

I want you to understand why all of these rules that I have given you are important. Only you have taken an oath to be fair—no one else has made that promise. All of the rules I've given you are intended to help us be sure that there is a fair trial—which you have all agreed to do and which we have a responsibility to help you do. I know that you intend to give these parties a fair trial, and in accord with your oath, I know you will do that.

### Certain "Advance" Closing Instructions

I think it would be helpful if I told you before we start the trial a few additional things that I will almost certainly tell you again when you have heard all of the evidence. These things will help you understand better what is happening and what your role is.

Some of the evidence that may be presented will be in the form of what lawyers call a "deposition." A deposition is the written transcript or a video of a question-and-answer session with a witness that took place before this trial, when the witness was under oath and responded to questions from the lawyers about the case. Although it is testimony outside the courtroom, the law permits you to consider it under certain circumstances. You may consider and evaluate this testimony just as you would if it were being given live in front of you today.

Sometimes a deposition might be used to ask a witness who is here testifying whether he might have given prior answers which seem inconsistent with his testimony here in the courtroom. A lawyer may read from a deposition and ask the witness whether what he said in his deposition is different from what he is saying now. We allow this to help you evaluate the credibility of his testimony before you. Whether or not the prior statements by the witness are inconsistent with his

8

NON-CERTIFIED COPY

live testimony is entirely for you to decide.

One of the first things for you to keep in mind as the trial begins is that the plaintiff has to prove his case by what the law calls a "preponderance of the evidence." The term preponderance means just over half. In other words, 50.00001% would be preponderance. To establish by a preponderance of the evidence means to prove that something is more likely so than not so. In other words, a preponderance of the evidence in this case means such evidence as when considered and compared with that opposed to it has more convincing force and produces in your mind belief that what is sought to be proved is more likely true than not true. If the plaintiff does not convince you of that, then you will have to conclude that the plaintiff has failed to prove his case sufficiently to be entitled to win. The law does not presume that simply because the plaintiff has brought this suit, he is necessarily entitled to win.

"Preponderance of the evidence" is different from a burden of proof described as "beyond a reasonable doubt." Proof beyond a reasonable doubt applies in criminal cases, but not in a civil case such as this one.

The evidence which you will be considering consists of the testimony of the witnesses, and the documents and other physical evidence which will be admitted into evidence, as well as any reasonable inferences or conclusions that you can draw from the evidence presented to you. The arguments by the lawyers, as well as any comment or ruling I may make during the trial, are not part of the evidence.

A fact may be proven either by direct evidence or circumstantial evidence, or perhaps by both. Direct evidence is testimony by a witness as to what he or she saw or heard, or physical evidence of the fact itself. Circumstantial evidence is proof of certain circumstances from which you are entitled to conclude that another fact is true. The law treats direct evidence and circumstantial evidence as equally reliable; it does not prefer one over the other.

Another important thing for you to remember as the trial takes place is that a major portion of your role is to judge the credibility of a witness who is testifying. The law presumes that a witness is telling the truth about facts that are within his knowledge. But this presumption may be overcome by contradictory evidence, by the manner in which the witness testifies, by the character of his testimony, or by evidence that tells you about his motives.

When you are weighing the credibility of a witness, you should consider the interest, if any, that the witness may have in the outcome of this case. You should consider the ability of the

9

NON-CERTIFIED COPY

witness to know, remember and tell the facts to you. You should consider his or her manner of testifying, as to sincerity and frankness. And you should consider how reasonable the witness's testimony seems to be in light of all of the other evidence.

You don't have to accept all of the testimony of a witness as being true or false. You might accept and believe those parts of the testimony that you consider logical and reasonable, and you may reject those parts that seem impossible or unlikely.

I like to say that witnesses are weighed and not counted. By that I mean that you are not required to decide any fact according to the number of witnesses presented to you on that particular point. Your role is always to determine the facts and you don't do that by counting noses. The test is not which party brings forward the most witnesses or presents the greater quantity of evidence. The test is which witnesses and which evidence appeals to your mind as being the most accurate and the most convincing.

Some of the witnesses that you will hear are called "expert witnesses." Unlike ordinary witnesses who must testify only about facts within their knowledge and cannot offer opinions about assumed or hypothetical situations, expert witnesses are allowed to express opinions because I have decided that their education or expertise in a particular field or on a particular subject may be helpful to you. You should consider their opinions, and give them the weight that you think they deserve. If you decide that the opinion of an expert witness is not based on sufficient education and experience or that the reasons given in support of the opinion are not sound, or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely—even though I have permitted the person to testify.

You must decide the facts without emotion, sympathy, or prejudice for or against any party. You should consider the case as an action between people of equal standing in the community. Every person stands equal before the law, and every person is to be dealt with as an equal in this court. A business or an insurance company is entitled to the same fair trial as a private individual.

### Order of Proceeding

Finally, I want to give you an idea of how the trial will be conducted. In just a minute, the lawyers for each of the parties will be allowed to make an opening statement. After those opening statements, the plaintiff will go forward with the calling of witnesses and presentation of evidence during what we call the plaintiff's "case in chief." When the plaintiff finishes, or "rests" as we say in the law, the defendants will then go forward with the calling of witnesses and the presentation of

10

NON-CERTIFIED COPY

evidence. After that, the plaintiff may be allowed to again call witnesses or present evidence in what we call the "rebuttal" phase of the trial. The plaintiff proceeds first, and may rebut at the end, because the law places the burden of proof on the plaintiff. When the evidence portion of the trial is finished, the lawyers will then be permitted to make their closing arguments, and after that, I will give you instructions on the applicable law and you will then begin your deliberations.

We are now ready for the opening arguments by the lawyers, with the plaintiff's side to go first. Remember that the statements that the lawyers make now, as well as their closing arguments, are not evidence and they are not the instructions on the law that I have told you I will give you at the end of the trial. But they are intended to help you understand the issues you are going to hear about, the evidence that you will probably hear and the positions that the parties have in this case. Statements by any of the lawyers expressing a view about what dollar amounts should be awarded for pain and suffering or similar claims are also not evidence and you should not consider them. The decision about damages, if any, is solely your job; and your decision must be based upon competent evidence, not on amounts suggested by an attorney.[1]

---

[1] *See* Civil Law Treatise: Civil Jury Instructions § 1:1 (2d ed.) (modified).

11

NON-CERTIFIED COPY

## CLOSING INSTRUCTIONS

Members of the jury, it is now time for me to tell you the law that applies to this case. As I mentioned at the beginning of the trial, you must follow the law as I state it to you.

Before I tell you the law, however, let me remind you of your responsibility as jurors. I told you some of this at the beginning of the trial. You have been chosen from the community to decide the facts. What the community expects of you, and what I expect of you, is the same thing that you would expect if you were a party to this suit: an impartial deliberation and conclusion based upon all the evidence presented in this case, and on nothing else.

You must decide the facts without emotion, sympathy, or prejudice for or against any party. You should consider the case as an action between people of equal standing in the community. Every person stands equal before the law, and every person is to be dealt with as an equal in this court. Above all, the community wants you to try to achieve justice. You will succeed in doing that if you are willing to seek the truth from the same evidence presented to all of you, and to reach a verdict by applying the same rules of law, as I give them to you.

If I have said or done anything during this trial which has suggested to you that I favor the claims or position of either party, you should disregard it. If I have indicated in any way that I have any opinion as to what the facts in this case are or should be, you should disregard that. I am not the judge of the facts. You are.

Before I tell you about the law, you should understand several things about my remarks. As I mentioned earlier, you must follow the law as I state it to you. You should not be concerned with the wisdom of any rule of law that I may tell you about.

When you think about my instructions, consider them as a whole. Don't single out any individual sentence or idea and ignore the others.

As I mentioned to you at the start of the trial, the plaintiff has to prove his case by a preponderance of the evidence. This means that the plaintiff must convince you that when you have considered all of the evidence, the facts that plaintiff is trying to prove are more probably true than not true. If the plaintiff does not convince you of that, then you will have to conclude that the plaintiff has failed to prove his case sufficiently to be entitled to win. The law does not presume that simply because the plaintiff has brought this suit, he is necessarily entitled to win. As I told you at the beginning, preponderance means just over half.  In other words, 50.00001 % would be preponderance.  "Preponderance of the evidence" is different from a burden of proof

12

1216267v.1

NON-CERTIFIED COPY

described as "beyond a reasonable doubt." Proof beyond a reasonable doubt applies in criminal cases, but not in a civil case such as this one.

The evidence which you will be considering consists of the testimony of the witnesses, and the documents and other physical evidence that have been admitted into evidence, as well as any reasonable inferences or conclusions that you can draw from the evidence presented to you. The arguments by the lawyers, as well as any comment or ruling I made during the trial, are not part of the evidence.

A fact may be proven either by direct evidence or circumstantial evidence, or perhaps by both. Direct evidence is testimony by a witness as to what he or she saw or heard, or physical evidence of the fact itself. Circumstantial evidence is proof of certain circumstances from which you are entitled to conclude that another fact is true. The law treats direct evidence and circumstantial evidence as equally reliable; it does not prefer one over the other.

Another important thing for you to remember is that a major portion of your role is to judge the credibility of a witness who is testifying. The law presumes that a witness is telling the truth about facts that are within his knowledge. But this presumption may be overcome by contradictory evidence, by the manner in which the witness testifies, by the character of his testimony, or by evidence that tells you about his motives.

When you are weighing the credibility of a witness, you should consider the interest, if any, that the witness may have in the outcome of this case. You should consider the ability of the witness to know, remember and tell the facts to you. You should consider his or her manner of testifying, as to sincerity and frankness. And you should consider how reasonable the witness's testimony seems to be in light of all of the other evidence.

You don't have to accept all of the testimony of a witness as being true or false. You might accept and believe those parts of the testimony that you consider logical and reasonable, and you may reject those parts that seem impossible or unlikely.

I like to say that witnesses are weighed and not counted. By that I mean that you are not required to decide any fact according to the number of witnesses presented to you on that particular point. Your role is always to determine the facts and you don't do that by counting noses. The test is not which party brings forward the most witnesses or presents the greater quantity of evidence. The test is which witnesses and which evidence appeals to your mind as being the most accurate and the most convincing.

13

1216267v.1

NON-CERTIFIED COPY

Some of the witnesses that you have heard are called "expert witnesses." Unlike ordinary witnesses who must testify only about facts within their knowledge and cannot offer opinions about assumed or hypothetical situations, expert witnesses are allowed to express opinions because I have decided that their education or expertise in a particular field or on a particular subject may be helpful to you. You should consider their opinions, and give them the weight that you think they deserve. If you decide that the opinion of an expert witness is not based on sufficient education and experience or that the reasons given in support of the opinion are not sound, or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely—even though I have permitted the person to testify.[2]

---

[2] *See* Civil Law Treatise: Civil Jury Instructions § 2.2 (2d ed.).

14

1216267v.1

NON-CERTIFIED COPY

## CONSIDERATION OF THE EVIDENCE AND WITNESSES

As jurors, there are certain guidelines which you should follow in resolving the issues of fact, in determining the credibility or believability of the witnesses, the weight given to their testimony, and in arriving at what the facts are in this case:

First, you are to consider only the evidence which has been offered and admitted during the trial and such inferences as you may logically and reasonably draw from the evidence.

Second, you must not be influenced by sympathy, passion, or prejudice in favor of any party or against any of the party.

Third, if testimony on any point is not contradicted, you should treat it as proving that fact unless the testimony seems to you to be impossible or very improbable, or unless the witness has shown by his or her testimony or it is shown by the other evidence in the case to be unworthy of belief. When testimony conflicts, you should determine the truth by weighing the testimony of one witness against that of the others, by considering the witness's interest or lack of interest in the outcome of the case, the partiality or fairness of the witness, the witness's knowledge of the facts about which he or she has testified, the witness's conduct or behavior on the witness stand, and the other evidence in the case.

You need not accept all of the testimony of a witness as being true or false; you may accept and believe those parts of a witness's testimony that you consider logical and reasonable and reject those parts of the testimony that seem impossible or improbable.

Fourth, if the testimony of a witness is inconsistent with a prior statement, it is your duty to determine if the testimony of the witness should be discredited. If you decide that the in court testimony of the witness has been discredited, then you are to decide what weight, if any, to give to that testimony. If you should find that a witness has testified falsely as to a material fact, then you have the right to reject the entire testimony of the witness or reject only part of the testimony, based upon your impression of the witness' truthfulness.

Fifth, you should consider the quality and not necessarily the quantity or number of witnesses who testify. That is, you should weigh the testimony of the witnesses rather than merely count which side has produced the most witnesses and find in favor of the side with the most witnesses.

1216267v.1

NON-CERTIFIED COPY

Using these tests, you should determine the credibility or believability of the witnesses and the weight of their testimony and thereby arrive at the facts of this case.[3]

---

[3] *See* Civil Law Treatise: Civil Jury Instructions §§ 2:4; 2:6 (3d ed.).

16

1216267v.1

NON-CERTIFIED COPY

## DEPOSITION TESTIMONY

Certain testimony was presented to you through a deposition. A deposition is the sworn, recorded answers to questions asked a witness in advance of the trial. Sometime before this trial, attorneys representing the parties in this case questioned this witness under oath. A court reporter was present and recorded the testimony. You should listen to the reading of the deposition just as though the witness was here in person testifying before you.[4]

---

[4] *See* Civil Law Treatise: Civil Jury Instructions § 1:1 (3d ed.) (modified); Pattern Civil Jury Instructions 5th Circuit § 2.23 (2009).

17

1216267v.1

NON-CERTIFIED COPY

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

Proof by direct or circumstantial evidence is sufficient to constitute a preponderance of the evidence when, taking the evidence as a whole, such proof shows the fact to be proved is more probable than not. A fact may be proven either by direct evidence or circumstantial evidence, or perhaps by both. Direct evidence is testimony by a witness as to what he or she saw or heard, or physical evidence of the fact itself. Circumstantial evidence is proof of certain circumstances from which you are entitled to conclude that another fact is true. The law treats direct evidence and circumstantial evidence as equally reliable; it does not prefer one over the other.[5]

---

[5] *See* Civil Law Treatise, Civil Jury Instructions § 2:1 (3d ed.); *Jordan v. Travelers Ins. Co.*, 257 La. 995, 245 So. 2d 151, 155 (La. 1971); *Rey v. Cuccia*, 298 So. 2d 840, 843 (La. 1974).

1216267v.1

NON-CERTIFIED COPY

## WHAT IS NOT EVIDENCE

Certain things are not to be considered as evidence. First, if I have told you to disregard any testimony or exhibits, such testimony or exhibits are not evidence and cannot be considered. Second, questions, objections, and comments made by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper. You should not be influenced by any objection, and you should not infer from any of my rulings that I have any view as to how you should decide this case. Finally, the lawyers' opening and closing statements are not evidence. The purpose of these statements is to discuss the issues and the evidence. If the evidence as you remember it differs from what the lawyer said, your memory is what counts.

1216267v.1

NON-CERTIFIED COPY

## BURDEN OF PROOF

In this case, H&E must prove every element of its claims by a preponderance of the evidence. In determining whether any facts at issue have been proved by a preponderance of the evidence in this case, you the jury should consider the testimony of all the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them.

It is proper for you, the jury, to find that H&E has succeeded in carrying its burden of proof of an issue of fact if after consideration of all the evidence in the case, you the jurors, believe that what H&E is seeking to prove is more likely true than not true.

URS and the other defendants must prove all defenses asserted by a preponderance of evidence, i.e., more probable than not. Proof which establishes only possibility, speculation, or unsupported probability does not suffice to establish a defense by a preponderance of the evidence. [6]

---

[6] *See* Civil Law Treatise: Civil Jury Instructions §§ 2.1; 2.4 (3d ed.) (modified); *Crescent Cigarette Vending Corp. v. Toca*, 271 So. 2d 53 (La. App. 4 Cir. 1972); *Todd v. State*, 96-3090 (La. 9/9/97); 699 So. 2d 35, 43.

1216267v.1

NON-CERTIFIED COPY

## NEGLIGENCE

The basic law in Louisiana on this kind of case states that "every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The word "fault" is a key word. "Fault" means doing something you should not have done or failing to do something which you should have done. The law regards those actions as being below the standard which applies to the defendants' conduct.

Your job will then be to decide whether the plaintiff has proved that it is more likely true than not true that the defendants' actions fell below the applicable standard of care. In legal terms, that would mean that the defendant is "at fault."

But this is only one part of the plaintiff's case. The other parts of the plaintiff's case are:

(1) that the injury which he says he suffered was caused in whole or in part by the conduct of the defendant; and

(2) that there was damage to the plaintiff's person or his property.[7]

The plaintiff must establish that all of these essential parts of his case are more likely true than not true. Questions addressed to all of these parts of the case will be given to you in the "verdict form" that you will receive and that you will take with you to fill out as a part of your deliberations. When I say that the plaintiff has to prove that the defendant's actions were a cause of his injury, I don't mean that the law recognizes only one cause of an injury.

You will have to decide whether the plaintiff would have suffered injury if the defendant had not done what he did. If, more likely than not, the plaintiff would have suffered injury no matter what the defendant did or did not do, then you should decide that the injury was not caused by the defendant, and render a verdict for the defendant. If, on the other hand, the plaintiff more likely than not suffered injury as a result of what the defendant did or did not do, then you should decide that the defendant's conduct did play a part in the plaintiff's injury and you should proceed to the next part of the plaintiff's case.[8]

---

[7] *See* Civil Law Treatise, Civil Jury Instructions § 3.1 (2d ed.); *Langlois v. Allied Chemical Corp.*, 258 La. 1067, 249 So. 2d 133 (1971); *see also Pence v. Ketchum*, 326 So. 2d 831 (La. 1976) and Weiland v. King, 281 So. 2d 688 (La. 1973).

[8] *See Aucoin v. Lodrigues*, 252 So. 2d 758 (La. App. 1st Cir. 1971); *Larkin v. U. S. Fidelity & Guaranty Co.*, 258 So. 2d 132 (La. App. 2d Cir. 1972); *Cooksey v. Central Louisiana Elec. Co., Inc.*, 279 So. 2d 242 (La. App. 3d Cir. 1973).

21

1216267v.1

NON-CERTIFIED COPY

## GROSS NEGLIGENCE

Gross negligence is the absence of even slight care and diligence.   Gross negligence requires proof of conduct which is beyond ordinary negligence or carelessness, and consists of utter disregard of ordinary prudence, amounting to complete neglect of the rights of others.[9]

---

[9] *See* Civil Law Treatise, Civil Jury Instructions § 3.13 (2d ed.).

22

1216267v.1

NON-CERTIFIED COPY

## NEGLIGENCE/GROSS NEGLIGENCE OF
## PROFESSIONAL ARCHITECTS AND ENGINEERS

In an action such as this, plaintiff claims that defendants were negligent in the performance of their professional duties. As with other professionals, architects and engineers are required to exercise that degree of professional care and skill customarily employed by other architects and engineers in a similar community under similar circumstances. In order to prove negligence on the part of the defendants, plaintiff must demonstrate that the defendants did not have customary degree of skill or care, or failed to exercise it, and that plaintiff was damaged as a result.[10]

Plaintiff also claims defendants were grossly negligent. In order to prove gross negligence, plaintiff must prove that the defendants' conduct showed an utter disregard of ordinary prudence in the performance of their work, and that plaintiff was damaged as a result.[11]

Normally, a party seeking to prove an architect or engineer's negligence or gross negligence must establish a deviation from the standard of care and skill by expert testimony.[12] However, there is an exception to this general rule: "When the matter in question is one that can typically be understood without assistance from an expert, when a lay person can infer negligence, then expert testimony is not required."[13]

---

[10] See Civil Law Treatise, Civil Jury Instructions § 3.11 (2d ed.); *Seiler v. Ostarly*, 525 So. 2d 1207 (La. App. 5th Cir. 1988); *Sams v. Kendall Const. Co.*, 499 So. 2d 370 (La. App. 4th Cir. 1986); *Maloney v. Oak Builders, Inc.*, 224 So. 2d 161 (La. Ct. App. 4th Cir. 1969), *reversed on other grounds*, 256 La. 85, 235 So.2d 386 (1970); *Emond v. Tyler Building and Const. Co., Inc.*, 438 So. 2d 681 (La. App. 2d Cir. 1983); *Calandro Development, Inc. v. R. M. Butler Contractors, Inc.*, 249 So. 2d 254 (La. App. 1st Cir. 1971).

[11] See Civil Law Treatise, Civil Jury Instructions § 3.13 (2d ed.).

[12] *Milton J. Womack, Inc. v. House of Representatives*, 509 So.2d 62, 64 (La. App. 1st Cir.), writs denied, 513 So.2d 1208, 1211 (La.1987).

[13] *Womack*, 509 So.2d at 66.

1216267v.1

NON-CERTIFIED COPY

## VICARIOUS LIABILITY

Normally one person is not responsible for the conduct of another person who may have caused damage to someone. But in certain situations, the law imposes responsibility upon a person or entity for the conduct of another, if they are in a relationship which can serve as an appropriate basis for imposing such responsibility.

The law calls this "vicarious liability," which simply means that one person may be liable for the acts of another even though that first person is not himself at fault. You may also have heard this concept called "respondent superior," which simply means "let the person higher up respond."[14]

---

[14] *See* Civil Law Treatise, Civil Jury Instructions § 16:1 (3d ed.).

24

NON-CERTIFIED COPY

## SERVANT/MASTER RELATIONSHIP

A master is liable for the damages caused by the fault of his servant, if the incident occurs in the course and scope of the servant's duties as the master's servant.

In order to recover against the master, the plaintiff must prove by a preponderance of the evidence:

(1) the tortfeasor was a servant of the defendant;

(2) the servant was at fault; and

(3) the tort occurred during the exercise of the functions for which the servant was engaged.[15]

---

[15] *See* Civil Law Treatise, Civil Jury Instructions §§ 16:2-16.4 (3d ed.) (modified); *LeBrane v. Lewis*, 292 So. 2d 216, 217-18 (La. 1974); *Rowell v. Carter Mobile Homes, Inc.*, 500 So. 2d 748, 751 (La. 1987).

1216267v.1

NON-CERTIFIED COPY

## BREACH OF CONTRACT

The plaintiff has also claimed that the defendants breached their contracts with the plaintiff. In order to prove a breach of contract against the defendants, the plaintiff must prove by a preponderance of the evidence that the defendant undertook an obligation to the plaintiff, that the defendants failed to perform the obligation, resulting in a breach, and that the failure to perform resulted in damages to the plaintiff.[16]

Under Louisiana law, a contract between two parties has the force of law as to them. You are called upon to interpret the contract between these two parties, and thus to determine the meaning and consequences of the law which they have written for themselves. You are to interpret the contract according to the following rules.[17]

In interpreting this contract, you must determine what the common intent of the parties was. If the words of the contract are clear and do not lead to absurd results which the parties could not possibly have intended, you do not need to do any further interpretation to find their common intent.[18]

The words in this contract must be given the meaning which they generally have in everyday use. If a word is a term of art or has a technical meaning within the context of this contract, you should give it that special meaning.

If a word may have several meanings, you should interpret it as having the meaning which is most in line with the objective of the contract.

Also, if a provision in the contract has different meanings and one of those meanings would make the provision effective and one would not, you should give it the meaning which would make it effective, since we assume the parties wanted their contract to be effective.[19]

You should not interpret a contractual provision standing alone, but rather you should interpret it in light of the other contractual provisions so that each provision will be given the meaning which is suggested by the contract as a whole.[20]

If, after applying the general principles of interpretation which I have given you, you still believe that a contractual provision's meaning is doubtful, you should consider as well the nature of the contract as a whole, elementary fairness, custom, the conduct of the parties in dealing with

---

[16] *Denham Homes, L.L.C. v. Teche Fed. Bank,* 2014-1576 (La. App. 1 Cir. 9/18/15); 182 So. 3d 108, 119.
[17] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:1 (3d ed.)
[18] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:2 (3d ed.)
[19] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:3 (3d ed.)
[20] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:4 (3d ed.)

1216267v.1
NON-CERTIFIED COPY

the contract both before and after it was signed, and any other similar contracts they may have signed.[21]

When I say "elementary fairness," or equity, I mean the principle that no one is allowed to take unfair advantage of another and no one is allowed to enrich himself unjustly at the expense of another.[22] When I say "custom," I mean a practice which is regularly observed in affairs of a nature which are similar to those which are the subject of the contract which you are called upon to interpret.[23]

---

[21] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:6 (3d ed.)
[22] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:7 (3d ed.)
[23] 18 La. Civ. L. Treatise, Civil Jury Instructions § 17:8 (3d ed.)

27

NON-CERTIFIED COPY

1216267v.1

## DAMAGES

If you decide that H&E has established the other elements of its case by a preponderance of the evidence, and that the defendants have failed to establish a defense which would prevent H&E from recovering an award for its injuries, you must decide the amount of damage caused by the defendants.

Your award should be designed to fully and fairly compensate H&E for its injury. These damages must be established by a preponderance of the evidence. This means, on the one hand, that you are not entitled to award speculative damages for injuries which you think the H&E might have suffered or might suffer in the future. On the other hand, it means that you may approximate the damages which H&E has proved are more probable than not, even though they cannot be computed with mathematical certainty.

Finally, let me say that the fact that I have given you these statements about the law of damages does not in any way imply or suggest that I feel or do not feel that any damages are due in this case. Whether or not damages are due is solely for you to determine.[24]

---

[24] *See* Civil Law Treatise, Civil Jury Instructions § 18:1 (3d ed.) (modified).

28

1216267v.1    NON-CERTIFIED COPY

## DELIBERATIONS

You will remember that I told you at the beginning of the trial that you were not to discuss the case amongst yourselves. That restriction is now removed. It is now your duty to consult with one another to reach an agreement. Each of you must decide the case for yourself, but you should do so only after a consideration of the case with your fellow jurors and you should not hesitate to change your opinion when you are convinced that you are wrong. However, you should not change your opinion merely for the purpose of returning a verdict that your fellow jurors agree with and you don't.

The final test of the quality of your service will lie in the verdict which you return to the Court, not in the opinions any of you hold as you go to the jury room. Your contribution to the judicial system will be to arrive at a just and proper verdict.

If you decide to return a verdict for Rouses then you will make an appropriate award of damages according to the instructions which I have given you.

Louisiana law requires that nine of you agree in order to render a verdict for either side. When nine of you are of the same opinion about the verdict, that ends your deliberation and that opinion becomes your verdict.

You are being asked to return a verdict on the form which I will supply to you.

{SPECIAL VERDICT FORM IS READ TO THE JURY}

You will note that the form contains several questions. Nine of the twelve of you must be in agreement as to the answer of each question. In the space provided below each question, you will find directions that instruct you either to answer the next question, to proceed to some other question or to stop and return to the Courtroom with your verdict. You must carefully follow these directions as you complete the form.

If you want to communicate with me, you may send a note by the bailiff. You should not attempt to communicate with me by any means other than in writing, and I will not communicate with any member of the jury on any subject touching on the merits of the case other than in writing, or orally in open court. I will always disclose your question and my response to the attorneys before I answer any of your questions.

The first thing you should do when you retire to the jury deliberation room is to choose from amongst you a person to represent you in signing the verdict form. This person will be the foreperson. When you have reached a verdict, the foreperson will sign and date the verdict form.

1216267v.1

NON-CERTIFIED COPY

Once you have reached a verdict, you will return to the courtroom and be asked by the court at the appropriate time to make known your verdict.

Bear in mind that you are never to reveal to any person – not even to the Court – how the jury stands, numerically or otherwise, on the questions before you, until you have reached a verdict.

Finally, I remind you again that you represent our community in the determination of this dispute. The community appreciates your service on this jury and at the same time expects you to reach a fair and impartial verdict.

Members of the Jury, you will now retire to consider your verdict. Thank you for your time and attention.[25]

---

[25] *See* Civil Law Treatise: Civil Jury Instructions §§ 2.1; 2.2 (3d ed.) (modified).

1216267v.1

NON-CERTIFIED COPY



# DOUG WELBORN
## CLERK OF COURT

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

PARISH OF EAST BATON ROUGE

### FAX RECEIPT

NUMBER C626308  Division D                          Date:   01-AUG-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:   LORETTA G MINCE
      CORRERO FISHMAN HAYGOOD ET AL
      201 ST CHARLES AVE 46TH FL
      NEW ORLEANS LA 70170-4600

Item(s) Received: PLAINTIFF PROPOSED JURY INSTRUCTION AND JURY INTERROGATORIES

Total Amount Due (includes all applicable fees below) $ 334.00

The Clerk of Court's office has received, by facsimile transmission dated 08-01-17, documents in the above referenced case.  In
accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the
original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings
and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)        A transmission fee of five dollars
13:841(A)(2)(a)     First page of each pleading, six dollars
13:841(A)(2)(b)     Each subsequent page, four dollars
13:841(A)(2)(c)     Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)     Issuing document without notice of service, fifteen dollars (Receipt generation fee)

NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT
UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.

SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.

IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.

*DeRay H. Johnson*

Deputy Clerk of Court for
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT



NON-CERTIFIED COPY



TO REUSE: Cover or mark through any previous shipping in

ORIGIN ID:NEWA    (504) 586-5252
LORETTA G. MINCE
FISHMAN HAYGOOD, L.L.P.
201 SAINT CHARLES AVE
STE 4600
NEW ORLEANS, LA 70170
UNITED STATES US

SHIP DATE: 03AUG17
ACTWGT: 1.00 LB
CAD: 5347965/INET3920

BILL SENDER

TO  **THE HONORABLE DOUG WELBORN**
    **19TH JUDICIAL DISTRICT COURT**
    **300 NORTH BLVD**

    **BATON ROUGE LA 70801**
    (504) 586-5297            REF 3701-04
    INV
    PO                        DEPT

**FedEx**
Express

**E**

FRI - 04 AUG 10:30A
**PRIORITY OVERNIGHT**

TRK#
0201  **7798 0472 3342**

**70801**
LA-US  **MSY**

**42 OPLA**

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURTPARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                    SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____          _____
                                                    DEPUTY CLERK

### AMENDED AND SUPPLEMENTAL RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES ON BEHALF OF H&E EQUIPMENT SERVICES, INC.

H&E Equipment Services, Inc. (hereinafter referred to as "H&E") hereby provides the following amended and supplemental responses to the first set of interrogatories issued by defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III (collectively, "URS"):

### GENERAL OBJECTIONS

H&E incorporates as if stated herein the same General Objections stated in its original responses to URS's first set of interrogatories.

### INTERROGATORIES

**INTERROGATORY NO. 2:**

Please Identify any and all locations or sites that have been owned or leased by H&E, other than Baton Rouge or Kenner, with Paved Surfaces on which the types of equipment identified in Interrogatory No. 1 have been operated, loaded, unloaded, stored or parked, and for each such location please Identify the period of time H&E has owned or leased said location or site.

**RESPONSE TO INTERROGATORY NO. 2:**

H&E objects to Interrogatory No. 2 on the basis that it is overbroad and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  Information regarding other H&E owned or leased facilities, not at issue in this litigation, is irrelevant to the claims in this litigation.

Subject to these objections, H&E responds that it has identified the following facilities as having concrete Paved Surfaces where operations similar to those conducted at H&E's Baton

CLERK OF COURT
FILE COPY
CASE ID: _____
FILING DATE: _____
ATTORNEY: _____
NO. PAGES: 10

EXHIBIT ATTACHMENT TO:
☐   MOTION SUMMARY JUDGMENT
☐   PETITION
☐   MEMORANDUM
☐   OTHER_____

DEPUTY CLERK OF COURT

1103082v.1

Exhibit A

EBR4258407

NON-CERTIFIED COPY

Rouge and Kenner facilities, *i.e.*, operations involving the routine traversal of heavy tracked equipment, are conducted[1]:

1. Alexandria, Louisiana

2. Lake Charles/Sulphur, Louisiana

3. Shreveport Hi-Lift, Louisiana[2]

4. Charlotte, North Carolina

5. Raleigh, North Carolina

6. Winston Salem, North Carolina[3]

7. Albuquerque, New Mexico

8. New Orleans, Louisiana

9. Columbia, South Carolina

10. Corpus Christi, Texas

11. Houston Hi-Lift, Texas

12. Jackson, Mississippi

13. Shreveport, Louisiana[4]

14. Baltimore, Maryland

**INTERROGATORY NO. 3:**

With regard to each and every location or site identified in your response to Interrogatory No. 2 above, please Identify:

(a) the type(s) of tracked equipment that have been operated, loaded, unloaded, stored or parked on these Paved Surfaces;

(b) the date when the Paved Surface was first installed at each respective location;

(c) the entity or person(s) who designed the Paved Surfaces at each respective location;

(d) the entity or person(s) who constructed the Paved Surfaces at each respective location;

(e) the cost of construction of the Paved Surfaces at each respective location;

(f) the status and condition of the Paved Surfaces at each respective location;

---

[1] For the purposes of determining whether the similar equipment were regularly operated, loaded, unloaded, stored or parked, we identified sites that have ten or more pieces of similar equipment.
[2] This H&E facility refers to the one located on 3775 Old Shed Rd. Bossier City, LA 70111.
[3] H&E's August 24, 2015 Amended and Supplemental Interrogatory Response identified Dallas, Texas located in Grand Prairie as a facility with concrete Paved Surfaces where operations involving the routine traversal of heavy tracked equipment were conducted. Further investigation revealed that the Dallas, Texas facility does not have the same operations involving the routine traversal of heavy tracked equipment; the facility is primarily a crane operation.
[4] This H&E facility refers to the one located on 5908 Industrial Dr. Bossier City, LA, 71112.

1103082v.1

**Exhibit A**

NON-CERTIFIED COPY

    (g)    the types of expansion/construction joints existing in these Paved Surfaces;

    (h)    whether any of the expansion/construction joints have reinforced or armored joints and, if so, Describe such reinforcement or armor applicable at each location or site;

    (i)    the status and location of the expansion/construction joints in these Paved Surfaces;

    (j)    any problems or deficiencies noted with regard to the expansion/construction joints in these Paved Surfaces;

    (k)    any maintenance program applicable to the expansion/construction joints and/or these Paved Surfaces;

    (l)    any and all repairs, replacements or maintenance made with regard to the Paved Surfaces, including the expansion/construction joints in the same;

    (m)    the dates of any and all repairs, replacements or maintenance conducted with regard to the Paved Surfaces, including the expansion/construction joints in the same;

    (n)    the results of any such repairs, replacements or maintenance;

    (o)    the cost of any such repairs, replacements or maintenance.

**RESPONSE TO INTERROGATORY NO. 3:**

    H&E amends and supplements its previous response to Interrogatory No. 3 as follows:

1. Alexandria, Louisiana

    a.    Tracked equipment consisting of excavator and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces, which account for approximately 80% of the equipment yard and/or aprons at the facility.

    b.    The Paved Surfaces were installed in or around September 2008.

    c.    V and V Builders LLC
        1223 MacArthur Drive
        Alexandria, Louisiana 71303
        (318) 473-8344

    d.    Progressive Construction
        705 McKeithen Drive
        Alexandria, Louisiana 71303
        (318) 473-9522

    e.    Unknown.

    f.    The Paved Surfaces are in generally good condition, except for some edges that are broken due to the Paved Surfaces not meeting up perfectly with adjacent limestone. The Paved Surfaces show signs of cracking and spalling in some areas.

    g.    The expansion joints consist of cuts in the Paved Surfaces filled with a rubber-like material; they are not armored.

1103082v.1

**Exhibit A**

NON-CERTIFIED COPY

h.  Please see above response.

i.  Please see above response. The expansions joints are otherwise in good condition.

j.  Please see above response.

k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

m.  Please see above response.

n.  Please see above response.

o.  Please see above response.

2.  Lake Charles/Sulphur, Louisiana

a.  Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on the Paved Surfaces.

b.  The Paved Surfaces were installed in or around January 2014; tracked equipment was operated, loaded, unloaded, stored, and/or parked on the Paved Surfaces starting in or around June 2014

c.  Gary Babineaux

d.  Gary Babineaux

e.  The cost of construction for the Paved Surfaces was approximately $1.3 million.

f.  The Paved Surfaces are in good condition, with no observed cracks or spalling.

g.  The Paved Surfaces are supported by expansion joints. The expansion joints consist of cuts in the concrete; they are not armored. *See* document bates-numbered H & E 0001827-0001876 at H&E 001869, H&E 001872.

h.  Please see above response.

i.  The expansion joints in the Paved Surfaces are in good condition, with no observed problems.

j.  Please see above response.

k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

4

**Exhibit A**

NON-CERTIFIED COPY

    m.  Please see above response.

    n.  Please see above response.

    o.  Please see above response.

3.  Shreveport Hi-Lift, Louisiana[5]

    a.  Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on the Paved Surfaces, which make up a portion of the equipment yard and apron at this facility. The facility also has limestone, rock, and soil cement surfaces.

    b.  The Paved Surfaces were designed in 2007 and installed in or around 2008-2009; approximately 411 square feet of the Paved Surface on the apron was resurfaced in or around 2012.

    c.  Unknown.

    d.  Unknown.

    e.  Unknown; approximately $57,700 for the replacement of approximately 411 square feet of Paved Surface on apron in or around 2012.

    f.  The Paved Surfaces show signs of cracking and spalling. H&E further responds that the concrete at this location was poured approximately six inches deep.

    g.  The expansion joints consist of cuts in the Paved Surfaces; they are not armored.

    h.  Please see above response.

    i.  Please see above response. The expansion joints are otherwise in good condition, and the expansion joints in the more recently constructed portion of the apron are in good to perfect condition.

    j.  Please see above response.

    k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

    l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces other than the replacement of approximately 411 square feet on the apron in or around 2012.

    m.  Please see above response.

    n.  Please see above response.

---

[5] This H&E facility refers to the one located on 3775 Old Shed Rd. Bossier City, LA 70111.

5

1103082v.1

NON-CERTIFIED COPY

Exhibit A

      o.  Please see above response.

4.  Charlotte, North Carolina

    a.  Tracked equipment consisting of excavator and dozers has been operated, unloaded, stored or parked on the Paved Surfaces.

    b.  The Paved Surfaces were installed in or around 2002.

    c.  Clary Architects, Inc.

    d.  Choate Construction.

    e.  Unknown.

    f.  The Paved Surfaces show signs of wear and spalling near or around the construction and/or expansion joints in the concrete.

    g.  The expansion joints consist of cuts in the Paved Surfaces filled with a composite material; they are not armored. *See* documents bates-numbered H & E 0001974-0002014 at H&E 0001977, 0001990.

    h.  Please see above response.

    i.  Please see above response. The expansion joints are otherwise in good condition.

    j.  Please see above response.

    k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

    l.  There have been no repairs, replacement or maintenance made with respect to the Paved Surfaces.

    m.  Please see above response.

    n.  Please see above response.

    o.  Please see above response.

5.  Raleigh, North Carolina

    a.  Tracked Equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on the Paved Surfaces.

    b.  The Paved Surfaces were originally constructed in or around 2010. Additional Paved Surfaces totaling approximately 31,120 square feet was constructed in or around February 2015.

    c.  Weeks Turner Architecture, P.A. as to original Paved Surfaces; H&E Facilities Group as to additional Paved Surfaces.

6

**Exhibit A**

NON-CERTIFIED COPY

d. Structural Visions, Inc. as to original Paved Surfaces; Ruston Paving as to additional Paved Surfaces.

e. Unknown as to original construction; approximately $233,550.00 for approximately 31,120 square feet for additional Paved Surfaces.

f. The Paved Surfaces show signs of cracking and spalling; the older, original Paved Surfaces shows deterioration near and around the construction and/or expansion joints.

g. The expansion joints consist of cuts in the Paved Surfaces; they are not armored. The expansion joints in the older, original portions of the pavement are filled with wood strips. *See* documents bates-numbered H&E 0001728-0001826 at H&E 001822, 001825.

h. Please see above response.

i. Please see above response. The expansion joints are otherwise in good condition.

j. Please see above response.

k. There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

l. There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

m. Please see above response.

n. Please see above response.

o. Please see above response.

6. Winston Salem, North Carolina

a. Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on the Paved Surfaces, which account for approximately 95% of the equipment yard and/or apron at the facility.

b. Unknown.

c. Unknown.

d. Unknown.

e. Unknown.

f. The Paved Surfaces are in generally good shape, with only an isolated spot of racking and/or spalling.

7

Exhibit A

NON-CERTIFIED COPY

g.  The expansion joints consist of cuts in the concrete protected by armored plates.

h.  Please see above response.

i.  Please see above response. The expansion/construction joints in the Paved Surfaces are otherwise in good condition, with no observed programs.

j.  Please see above response.

k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

m.  Please see above response.

n.  Please see above response.

o.  Please see above response.

7.  Albuquerque, New Mexico

a.  Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces.

b.  The Paved Surfaces were installed in or around February 2016.

c.  Stantec

d.  G&H Construction

e.  Approximately $634,000

f.  The Paved Surfaces are in excellent/like new condition.

g.  The Paved Surfaces are supported by expansion joints. The expansion joints consist of cuts in the Paved Surfaces filled with a pre-molded material; they are not armored. *See* documents bates-numbered H&E 068122-068124 at H&E 068123.

h.  None.

i.  The expansion joints are in good condition with no observed problems.

j.  There have been no observed problems or deficiencies noted with regard to the expansion/construction joints.

k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

1103082v.1

Exhibit A

NON-CERTIFIED COPY

l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

m.  Please see above response.

n.  Please see above response.

o.  Please see above response.

8.  New Orleans, Louisiana

a.  Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces, which account for a significant percentage of the equipment yard and/or aprons at the facility.

b.  The Paved Surfaces were installed in or around October 2015.

c.  Stantec

d.  Ikon Construction

e.  Approximately $826,000

f.  The Paved Surfaces are in good condition with some cracking due to normal shrinkage of concrete.

g.  The Paved Surfaces are supported by expansion joints. The expansion joints consist of cuts in the Paved Surfaces filled with a pre-molded material; they are not armored. *See* documents bates-numbered H&E 068134-068137 at H&E 068137.

h.  None.

i.  The conditions of the joints are mixed depending on the location. Some of the expansion joints are spalling/cracking.

j.  There are issues with Stantec on the design of the expansion joints and the caulking material that was added to the expansion joints.

k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

m.  Not applicable

n.  Not applicable

o.  Not applicable

9

**Exhibit A**

NON-CERTIFIED COPY

9. Columbia, South Carolina

   a. Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces. A portion of the H&E Columbia facility's equipment yard is composed of gravel.

   b. The Paved Surfaces were installed in or around October 2015.

   c. Stantec

   d. W. Construction

   e. Approximately $400,000

   f. The Paved Surfaces are in excellent/like new condition.

   g. The Paved Surfaces are supported by expansion joints. The expansion joints consist of cuts in the Paved Surfaces filled with a pre-molded material; they are not armored. *See* documents bates-numbered H&E 068125-068127 at H&E 068127.

   h. None.

   i. The joints in the Paved Surfaces are in good condition with no observed problems.

   j. There have been no observed problems or deficiencies with regard to the expansion/construction joints.

   k. There is no maintenance program applicable to the maintenance/construction joints and/or the Paved Surfaces in place.

   l. There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

   m. Please see above response.

   n. Please see above response.

   o. Please see above response.

10. Corpus Christi, Texas

   a. Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces. A portion of the H&E Corpus Christi facility's equipment yard is composed of crushed concrete.

   b. The Paved Surfaces were installed in or around September 2014.

   c. Unknown designer. The design build was by Embree Construction.

10

**Exhibit A**

NON-CERTIFIED COPY

    d.  Unknown.

    e.  Approximately $400,000.

    f.  The Paved Surfaces are in excellent condition, with no observed problems.

    g.  The Paved Surfaces are supported by expansion joints consisting of pre-molded material and saw joints. *See* documents bates-numbered H&E 068128-068130 at 068130.

    h.  None.

    i.  The joints are in excellent condition, with no observed problems.

    j.  There have been no observed problems or deficiencies noted with regard to the expansion/construction joints.

    k.  There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

    l.  There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

    m.  Please see above response.

    n.  Please see above response.

    o.  Please see above response.

11. Houston Hi-Lift, Texas

    a.  Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces.

    b.  The original Paved Surfaces were installed in approximately 2000 pursuant to a design/build contract. The Paved Surfaces were replaced in or around November 2015.

    c.  Unknown of the original; Morgan Concrete for the replacement.

    d.  Unknown for the original; Morgan Concrete for the replacement.

    e.  Unknown for the original; approximately $860,000 for the replacement.

    f.  The original Paved Surfaces were in poor condition due to the specification/design of the concrete and age/wear. The original Paved Surfaces was composed of 4" of non-reinforced concrete. The replacement Paved Surfaces are in excellent/like new condition.

11

Exhibit A

NON-CERTIFIED COPY

g. The original Paved Surfaces were not supported by joints. The replacement Paved Surfaces are supported by expansion joints of redwood material.

h. None

i. The joints for the original Paved Surfaces were not sealed. The expansion joints for the replacement Paved Surfaces are in good condition.

j. There were problems with the unsealed joints for the original Paved Surfaces. There have been no observed problems or deficiencies noted with regard to the expansion/construction joints for the replacement Paved Surfaces.

k. There was no maintenance program applicable to the expansion/construction joints and/or the original or replacement Paved Surfaces.

l. The original Paved Surfaces were replaced.

m. The Paved Surfaces were replaced in or around November 2015.

n. The replacement Paved Surfaces are in excellent/like new condition.

o. Approximately $860,000.

12. Jackson, Mississippi

a. Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces.

b. The Paved Surfaces were installed in or around 2006-2008.

c. JWH Properties.

d. JWH Properties.

e. Unknown.

f. The Paved Surfaces are in good condition.

g. The Paved Surfaces are supported by expansion joints, control joints, and saw joints.

h. None.

i. The joints are in average condition with age and wear. There is some separation and reveling of the joints.

j. Please see above response.

k. There is no maintenance program applicable to the expansion/construction joints and/or the Paved Surfaces in place.

12

Exhibit A

NON-CERTIFIED COPY

l.   There have been no repairs, replacements, or maintenance made with respect to the Paved Surfaces.

m.   Please see above response.

n.   Please see above response.

o.   Please see above response.

13. Shreveport, Louisiana

a.   Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces.

b.   The original Paved Surfaces were installed in or around 1985. The replacement Paved Surfaces were installed in 2016.

c.   Unknown for the original Paved Surfaces.

d.   Unknown for the original Paved Surfaces; H&H Contracting Co., Inc. for the replacement Paved Surfaces.

e.   Unknown for the original Paved Surfaces.

f.   The original Paved Surfaces were in poor condition due to age and wear. The replacement Paved Surfaces are in excellent/like new condition.

g.   The original Paved Surfaces were supported by expansion joints; the replacement Paved Surfaces are supported by expansion joints.

h.   None.

i.   The joints in the original Paved Surface were in poor condition due to age and wear.

j.   There were problems with the original Paved Surfaces due to age and wear. There have been no observed problems or deficiencies noted with regard to the expansion/construction joints with the replacement Paved Surfaces.

k.   There was no maintenance program applicable to the expansion/construction joints and/or the original or replacement Paved Surfaces.

l.   The original Paved Surfaces were replaced.

m.   The original Paved Surfaces were replaced in 2016.

n.   The replacement Paved Surfaces are in excellent/like new condition.

o.   Approximately $530,000.

14. Baltimore, Maryland

13

Exhibit A

NON-CERTIFIED COPY

a. Tracked equipment consisting of excavators and dozers has been operated, loaded, unloaded, stored or parked on Paved Surfaces.

b. The Paved Surfaces were installed in or around 2014.

c. Richardson Engineering, LLC

d. Steel Building Specialists, Inc.

e. Unknown.

f. The Paved Surfaces are in good condition.

g. The Paved Surfaces are supported by expansion joints composed of a pre-molded material. *See* H&E 068122-068140 at H&E 068140.

h. None.

i. The expansion joints are in good condition with no observed problems.

j. Please see above response.

k. There was no maintenance program applicable to the expansion/construction joints and/or the original or replacement Paved Surfaces.

l. There have been no repairs, replacements or maintenance made with respect to the Paved Surfaces.

m. Please see above response.

n. Please see above response.

o. Please see above response.

**INTERROGATORY NO. 5:**

Please Identify any and all locations or sites that have been owned or leased by H&E, on which the types of equipment identified in Interrogatory No. 1 have been operated, loaded, unloaded, stored or parked on surfaces that are not paved with concrete (hereinafter, "Unpaved Surfaces"), and for each such location please Identify:

(a)    the types of tracked equipment that have been operated, loaded, unloaded, stored or parked on the Unpaved Surfaces;

(b)    the types of surfaces that have been in place where such equipment has been operated, loaded, unloaded, stored or parked at these locations;

(c)    the reasons this surface was used instead of a Paved Surface;

(d)    the person or persons responsible for the design that called for an Unpaved Surface rather than a Paved Surface;

(e)    any maintenance program applicable to these Unpaved Surfaces;

14

**Exhibit A**

NON-CERTIFIED COPY

(f)    any and all repairs, replacements or maintenance conducted with regard to these Unpaved Surfaces;

(g)    the dates of any and all repairs, replacements or maintenance conducted with regard to these Unpaved Surfaces;

(h)    the results of any such repairs, replacements or maintenance; and

(i)    the cost of any such repairs, replacements or maintenance.

**RESPONSE TO INTERROGATORY NO. 5:**

H&E objects to Interrogatory No. 5, including subparts (a) – (i), on the basis that it is overbroad and seeks that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Information regarding other H&E-owned or – leased facilities not at issue in this litigation is irrelevant to the claims in this litigation.

Subject to these objections, the following other facilities are owned and/or operated by H&E and have surfaces other than concrete Paved Surfaces as defined in Defendants' First Set of Interrogatories whereupon similar operations involving the routine traversal of heavy tracked equipment are conducted:

1. Little Rock, Arkansas

2. Springdale, Arkansas

3. Nashville, Tennessee

4. Ashland, Virginia

5. Norfolk, Virginia

6. Roanoke, Virginia

7. Warrenton, Virginia

8. Memphis, Tennessee

9. Jessup, Maryland[6]

10. Denver, Colorado

11. Arden, North Carolina

---

[6] H&E no longer conducts business at the Jessup, Maryland location.

15

1103082v.1

**Exhibit A**

NON-CERTIFIED COPY

Respectfully submitted,

_____

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel

of record by facsimile, email and/or by placing same in the United States mail, postage prepaid

and properly addressed, this 30th day of August, 2016.

_____
Loretta G. Mince

16

1103082v.1

Exhibit A

NON-CERTIFIED COPY

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *  *
                        *
H&E EQUIPMENT SERVICES  *
                        * NUMBER 626,308
VERSUS                  *
                        * DIVISION "D"
URS CORPORATION         *
ARCHITECTURE, P.C., URS *
CORPORATION, L. O'NEAL  *
JOHNSON AND THOMAS E.   *
RYAN, III               *
                        *
*  *  *  *  *  *  *  *  *
```

VOLUME II

Continuation of the 1442 Deposition

of H&E EQUIPMENT SERVICES, through its

Representative, LEONARD C. ST. GERMAIN, taken on

Wednesday, August 31, 2016, commencing at 1:57

p.m., in the offices of Adams and Reese, LLP,

Attorneys at Law, 450 Laurel Street, Suite 1900,

Baton Rouge, Louisiana, 70801.

Exhibit B

NON-CERTIFIED COPY

Page 19

1                    S T I P U L A T I O N

2

3         It is stipulated and agreed by and between

4    counsel that the continuation of the 1442

5    deposition of H&E EQUIPMENT SERVICES, through

6    its Representative, LEONARD C. ST. GERMAIN, is

7    hereby being taken under the Louisiana Code of

8    Civil Procedure in accordance with the Code.

9         The formalities of sealing and

10   certification are hereby waived.  The witness

11   will reserve the right to read and sign the

12   deposition.  The party responsible for service

13   of the discovery material shall retain the

14   original.

15        All objections, save those as to the form

16   of the questions, are hereby reserved until such

17   time as this deposition, or any part thereof,

18   may be used or sought to be used in evidence,

19   and are to be made in accordance with the Code

20   of Civil Procedure.

21                    *   *   *   *   *

22        KAY E. DONNELLY, Certified Court Reporter,

23   in and for the State of Louisiana, officiated in

24   administering the oath to the witness.

25

**Exhibit B**

NON-CERTIFIED COPY

Page 26

1    construction and expansion joints on those

2    drawings.

3            Off the Record.

4        (Off-the-Record discussion.)

5        MR. FRANCO:

6            I'm sorry.  Lori, I'm sitting here

7    with drawings right now.  I have them.

8        MS. MINCE:

9            Okay.

10       MR. FRANCO:

11           But we only have some drawings.

12   That is what --

13       MR. MATHEWS:

14           This is all we have.

15   EXAMINATION BY MR. FRANCO:

16     Q.  What I have handed you was a set of

17   drawings that were produced to us, Bates stamp

18   H&E 1877, and they go through 1895.

19           This is going to take me more time.  All

20   right.  According to this, these interrogatory

21   answers, at Alexandria, that was in place in

22   September of 2008.  I presume the concrete was

23   in place September 2008.

24           It says the paved area is showing signs

25   of cracking and spalling in some areas.  Can you

**Exhibit B**

NON-CERTIFIED COPY

Page 27

1    tell me which areas the cracking and spalling

2    was in?

3         A.  I cannot.

4         Q.  No one from H&E can tell us that?

5         A.  I'm sure the facility manager could.

6         Q.  Did anybody happen to tell you that it

7    is an obligation of H&E to provide people that

8    can give me those answers?

9         MS. MINCE:

10             Object to the form of the question.

11   I'm going to instruct him not to answer that.

12        MR. FRANCO:

13             Well, then, I am going to ask

14   Counsel.

15             I asked for the deposition of H&E.

16   If there is a branch manager that knows the

17   answer to that, then he needs to be here.

18        MS. MINCE:

19             I don't think that is correct.

20        MR. FRANCO:

21             Really?

22        MS. MINCE:

23             If your suggestion is that I need to

24   have somebody with the most knowledge about the

25   condition of the pavement at each of these

**Exhibit B**

NON-CERTIFIED COPY

Page 43

1    That is the one on Old Shed Road, and then there

2    is also another site.

3         MR. FRANCO:

4              All right.  So Shreveport Hi-lift is

5    on Page 5.  Mr. St. Germain just said that.

6    EXAMINATION BY MR. FRANCO:

7         Q.  Where is the other Shreveport one?

8         A.  13.

9         Q.  13.  Okay.  So let's take a look at five

10   first.

11        A.  Well, this --

12        Q.  Page 5.  All right.  So was this a

13   leased facility?

14        A.  Yes.

15        Q.  Is this a Hi-lift facility?

16        A.  It was designed as a Hi-lift facility,

17   yes.

18        Q.  And, subsequently, it became a facility

19   that is utilized by the earth-moving equipment?

20        A.  Yes.

21        Q.  And it was designed Hi-lift because this

22   was leased by the owner?

23        A.  No.  It was designed Hi-lift because of

24   our business model at the time.

25        Q.  So, H&E designed it?

**Exhibit B**

NON-CERTIFIED COPY

Page 46

1    A.  Yes.

2    Q.  That is not a lot of square feet?

3    A.  No.  It is like a little drying area in

4  the back.

5    Q.  It says the paved surfaces show signs of

6  cracking and spalling.  Can you tell me where in

7  the paved surfaces it is cracking and spalling?

8    A.  I cannot.

9    Q.  When you hear the word or use the word

10  spalling, doesn't that necessarily indicate

11  around joints?

12    A.  I can't comment on that.

13    Q.  Okay.  So you participated in these

14  answers, didn't you, the ones we were looking

15  at?

16    A.  I only briefly clarified the confusion

17  with the two facilities, was my involvement in

18  this.

19    Q.  All right.  So who gave the information

20  that the expansion joints are otherwise in good

21  condition at this site?

22    A.  I do not know.

23    Q.  If they were otherwise in good

24  condition, what part of them wasn't in good

25  condition?

**Exhibit B**

NON-CERTIFIED COPY

Page 57

1    A.  That site is owned.

2    Q.  Okay.

3    A.  So, it was leased for many, many years.

4    It belonged to John, and I think we recently

5    purchased it and then did a renovation.

6    Q.  And you say the original surfaces were

7    in approximately 1985?

8    A.  Yes.

9    Q.  And so the paved surfaces were replaced

10   in 2016?

11   A.  Yes.

12   Q.  Why was that?

13   A.  Just an upgrade and a remodel.  Total

14   remodel.

15   Q.  All right.  Did they need to be

16   replaced?

17   A.  Yes.

18   Q.  What was the condition of them?

19   A.  I don't know specifically, you know.

20   Q.  Can we say in general there was cracking

21   and spalling?

22   A.  In general, yes, one could assume that.

23   Q.  And the new area was designed by H&H

24   Contracting Company?

25   A.  Yes.

**Exhibit B**

NON-CERTIFIED COPY

Page 58

1      Q.  Is that an engineering or an

2   architectural company or just a contractor?

3      A.  I don't know their capacities.  I know

4   they are a contractor for sure.

5      Q.  Were you involved in that?

6      A.  I was not.

7      Q.  And do you have any idea how many acres

8   were paved?

9      A.  No, I don't.

10     Q.  Does this site have the pretty much

11  standard paved area around the apron with

12  aggregate involved, as well?

13     A.  Yes.  It has -- it has a larger apron in

14  the rear and then aggregate and raw land.

15     Q.  And so the typical use is what we talked

16  about before, the apron is for moving in and out

17  of the service area and the storage is on the

18  aggregate?

19     A.  Yes.

20     Q.  And this also uses earth-moving

21  equipment?

22     A.  Yes.

23     Q.  Do you know how thick the pavement is?

24     A.  I do not.

25     Q.  Do you know anything about construction

Exhibit B

NON-CERTIFIED COPY

Page 60

1    A.  Leased.

2    Q.  And is the construction generally the

3  same with the paved area around the apron with

4  aggregate elsewhere?

5    A.  This was designed as a Hi-lift store, so

6  it has more paved area.

7    Q.  And has it been used strictly for

8  Hi-lift?

9    A.  No.

10   Q.  So, again, you used that for

11 heavy-track?

12   A.  Yes.

13   Q.  When I say heavy-track, earth-moving?

14   A.  Earth-moving, right.

15   Q.  Let's look at the plans.  If you look at

16 this page of the plans with notes on it, it is

17 S1.

18       Actually, you know what, before we go to

19 that one, I skipped that.  All right.  Go to P1,

20 which is near the end.

21   A.  Okay.

22   Q.  From that, can you tell me the thickness

23 of the paved area?  It is blown up.

24       MS. MINCE:

25           What is  --

Exhibit B

NON-CERTIFIED COPY

Page 64

1    Q.  All right.  Now, according to the

2   interrogatory answers on this one, it says the

3   paved -- look here.  You can look at mine.  I'll

4   save you some time.

5        The paved surfaces show signs of wear

6   and spalling near and around the construction

7   and/or expansion joints in the concrete.

8    A.  Which says this?

9    Q.  This is supplemental answers that were

10  dated -- hold on.  Bear with me here.

11   A.  Oh, okay.

12   Q.  9/25/2015.  Do you have any reason to

13  disagree with that statement?

14   A.  Can you repeat it?

15   Q.  Yes.  The paved surfaces show signs of

16  wear and spalling near and around the

17  construction and/or expansion joints in the

18  concrete?

19   A.  I can't comment.

20   Q.  And the same thing where it says the

21  expansion joints are otherwise in good

22  condition, you can't tell us how they are not in

23  good condition, can you?

24   A.  I cannot.

25   Q.  And even though it says there is wear

NON-CERTIFIED COPY

**Exhibit B**

1    and spalling near and around the construction

2    and/or expansion joints, there have been no

3    repairs of that according to --

4         A.  No.  L.

5         Q.  -- L, correct?

6         A.  As far as I know, no.

7         Q.  All right.  Now, for Charlotte I am

8    going to show you a document --  you are going

9    to have to use mine.  I will mark it as Exhibit

10   8.  I am going to show you H&E 6262.

11        A.  (Reviewing document.)

12        Q.  And this is May of 2010 from Marty Emigh

13   to you.  I ask you if you recognize that?

14        A.  Yes.

15        Q.  Okay.  Can I share that with you for a

16   second?

17        A.  Sure.

18        Q.  I'll just come over there.

19        MS. MINCE:

20             You can just give it back to him

21   because we have a --

22        THE WITNESS:

23             Yes, it was in the previous

24   deposition.

25        MR. FRANCO:

NON-CERTIFIED COPY

Exhibit B

Page 66

1           That is what I was looking for.

2      THE WITNESS:

3           Yeah.  Okay.

4      MS. MINCE:

5           It was clipped to the --

6      MR. FRANCO:

7           That is fine.  Okay.  That is

8  labeled Exhibit 8.  And this packet is from 6262

9  to 6281.

10  EXAMINATION BY MR. FRANCO:

11      Q.  These are the pictures of the Charlotte

12  site apparently, correct?

13      A.  Correct.

14      Q.  And there is a statement from Frank

15  Efird.  "We are in the process of fixing several

16  leak areas on the roof which is our

17  responsibility...also took pictures of concrete

18  walk, curb, and parking area which fall under

19  your care...notice some cracking in several

20  areas...it would minimize cost to seal these

21  cracks now before the water freeze and cause

22  more damage."

23           Marty Emigh says, "These guys have been

24  very fair with us.  This is the second time they

25  have requested us to be proactive on the

NON-CERTIFIED COPY

Exhibit B

Page 67

1    concrete.  Please get someone out to give us a

2    quote."

3         Does this help to refresh your

4    recollection as to where these cracks are that

5    are shown in this concrete?

6        A.  Not specific to the location.

7        Q.  Is it in the apron?

8        A.  I can't tell by the photographs.

9        Q.  You don't have any independent

10   recollection of where these cracks were?

11       A.  I do not.

12       Q.  Do you recall whether they were

13   repaired?

14       A.  I do not.

15       Q.  Okay.  I'm going to show you what I'm

16   going to label as Exhibit 9.

17        It is some more photos.  You have that

18   there in your package.  Exhibit 9, this is

19   labeled Charlotte photos produced by H&E.  Can

20   you tell me where those cracks are?

21       A.  It looks to be in the driveway, and the

22   other one --

23       Q.  The first one is the driveway.  Where is

24   the other one?

25       A.  It looks at the edge of the apron.

**Exhibit B**

NON-CERTIFIED COPY

Page 68

1     Q.  It is in the apron outside of the

2  service area, correct?

3     A.  Yes.

4     Q.  You have seen the cracking and spalling

5  at the Baton Rouge site?

6     A.  Yes.

7     Q.  Does this look similar?

8     A.  Not to this degree.

9     Q.  So this is much worse than what you saw

10  at Baton Rouge, isn't it?

11     A.  Yes.

12     Q.  And that hasn't been repaired, to your

13  knowledge?

14     A.  Not to my knowledge.

15     Q.  Do you know the difference between a

16  contraction joint and expansion joint?

17     A.  Somewhat.

18     Q.  Can you tell me in this picture that I

19  just identified as part of Exhibit 9 whether

20  those cracks are at both an expansion joint and

21  the contraction joint, or just at an expansion

22  joint?

23     A.  I can't tell here.  It looks like

24  expansion joints to me.

25     Q.  Moving from city to city, let's go to

**Exhibit B**

NON-CERTIFIED COPY

1    Q.  Okay.

2    A.  Quarter wide by one-inch deep.

3    Q.  So how deep is the sawcut joint

4  according to the construction drawings?

5  One-inch; is that correct?

6    A.  Yes.

7    Q.  It also has a metal keyway in it,

8  doesn't it, the construction joint according to

9  the construction drawings?

10    A.  Yes.

11    Q.  What is a metal keyway; do you know?

12    A.  That is this keyway (indicating).

13    Q.  Tell the Jury what a keyway is.

14    A.  It is just a pre-formed metal piece that

15  is in -- in between the concrete.

16    Q.  Do you know what the purpose of the

17  keyway is?

18    A.  It is to control the crack.

19    Q.  And how deep is the keyway?

20    A.  It looks to be depth of concrete, less

21  the quarter-inch.  Or, less one inch to seven

22  inches.

23    Q.  Okay.  Now, the interrogatory answers

24  say that at Raleigh -- let's see.  On the

25  September 25, 2015, supplemental answers, it

Exhibit B

NON-CERTIFIED COPY

Page 74

1    says the paved surfaces show signs of cracking

2    and spalling.  The older, originally installed

3    concrete shows deterioration near and around the

4    construction and the expansion joints.  Do you

5    see that?

6        A.  Yes.

7        Q.  You have no reason to disagree with

8    that, do you?

9        A.  I do not.

10       Q.  And when it says the older, originally

11   installed concrete, that is the concrete that

12   was installed in 2010, correct?

13       A.  Correct.

14       Q.  All right.  And then apparently in

15   February of 2015, there was 31,120 square feet

16   of paved area added; is that right?

17       A.  Correct.

18       Q.  Where was that added to?

19       A.  Behind the shop, and I think here maybe

20   (indicating).

21       Q.  What was it added for?

22       A.  I do not know specifically.

23       Q.  All right.  And you say behind the shop?

24       A.  Yeah, this area (indicating).

25       Q.  It was added in front of the truck wash?

**Exhibit B**

NON-CERTIFIED COPY

Page 75

1       A.  To the side of the truck wash.

2       Q.  To the side?

3       A.  Yes.  Next to it, yeah.

4       Q.  The entrance to the truck wash, is it

5   aggregate?

6       A.  Concrete.

7       Q.  Concrete now?

8       A.  It was then, too.

9       Q.  It was then, too?

10      A.  Yeah.  In the original design, it was.

11      Q.  So they didn't replace concrete.  They

12  added concrete in 2015, correct?

13      A.  That is correct.

14      Q.  And tell us who designed that.

15      A.  I don't know for sure.

16      Q.  H&E Facilities Group, are you familiar

17  with that group?

18      A.  No.

19      Q.  Let's see where that was referenced.  I

20  think that is in --

21          MR. MATHEWS:

22              Page 6.

23          MR. FRANCO:

24              -- Page 6.

25  EXAMINATION BY MR. FRANCO:

NON-CERTIFIED COPY

**Exhibit B**

Page 76

1     Q.  Look at Page 6 of the most recent

2   supplemental interrogatory answers that you

3   looked at before your deposition under Raleigh,

4   North Carolina.

5     A.  Okay.

6     Q.  It says the paved surfaces were

7   originally constructed in or around 2010, which

8   we verified.  Additional paved surfaces that

9   totalled approximately 31,120 square feet were

10  constructed in and around February 2015.

11        And the next question is, Who designed

12  it?  Weeks Turner designed the original paved

13  surfaces.  And we just saw what that was, eight

14  inches, 4,000 psi?

15    A.  Right.

16    Q.  And it says H&E Facilities Group

17  designed the additional paved surfaces.  Who the

18  heck is H&E Facilities Group?

19    A.  I don't know specifically, but I could

20  tell you I don't -- they had -- they didn't

21  design anything.  So if that is -- that is

22  inaccurate.

23    Q.  Do you know who supplied this?

24    A.  I do not.

25    Q.  Do you know what the design is of the

NON-CERTIFIED COPY

Exhibit B

Page 77

1    added square footage?

2        A.  I do not.

3        Q.  You can't tell us the thickness or the

4    psi?

5        A.  I cannot.

6        Q.  What we do know is the eight-inch, 4,000

7    psi experienced cracking and spalling at the

8    contraction and expansion joints, right?

9        A.  Based on these responses, yes.

10       Q.  And these responses also reflect that

11   none of that has been repaired?

12       A.  That is correct.

13       Q.  Let's move on to Dallas.  We are having

14   a rural tour here today.

15           THE WITNESS:

16               That was not the supplemental,

17   right?

18           MS. MINCE:

19               Yeah.  As reflected in the amended

20   supplemental responses, we determined that is a

21   site that does not regularly handle track

22   equipment.  I'm not sure why it was originally

23   included in the answers.

24           MR. FRANCO:

25               Okay.

NON-CERTIFIED COPY

**Exhibit B**

Page 79

1      A.  That is right.  Time is --

2      Q.  I hear you.  Very valuable.

3      A.  Yes.

4      Q.  Okay.  Winston-Salem.  I don't have much

5  on Winston-Salem.  Let's first identify if this

6  is an aerial of Winston-Salem?

7      A.  Yes.

8      Q.  All right.

9          MR. FRANCO:

10             Let's label that as Exhibit 11.

11  EXAMINATION BY MR. FRANCO:

12      Q.  All right.  Now, is that leased or

13  owned?

14      A.  Not sure.

15      Q.  Okay.  And this one says that the

16  expansion joints are armored.  Is that your

17  understanding?

18      A.  I do not know.

19      Q.  So better stated, do you have any reason

20  to disagree?

21          Let's see.  At first, there were two

22  sets of interrogatory answers.  So let's take a

23  look at the first one.  The first one says the

24  paved surface is about 95 percent of the yard

25  and/or apron.  Is that your recollection?

**Exhibit B**

NON-CERTIFIED COPY

Page 80

1      A.  I've only been there once, but that was

2   not my recollection, no.

3      Q.  All right.  Is this a Hi-lift?

4      A.  No.  It is a -- this facility, I think,

5   was acquired in the J.W. Burris transaction in

6   2007.

7      Q.  So it was acquired with the J.W.

8   Burris --

9      A.  Yes.  I think we own it.  I think we do,

10  but I'm not a hundred percent.

11     Q.  All right.  So I take it that you all

12  haven't done anything at this facility according

13  to this --

14     A.  No.

15     Q.  -- right?

16     A.  No.  That is correct.

17     Q.  But it is utilized for earth-moving

18  equipment?

19     A.  Yes.

20     Q.  And you don't recall it being 95 percent

21  paved?

22     A.  I do not.

23     Q.  Let's look at the aerial.

24     A.  I see that.  I see, yeah, the aerial.  I

25  can't tell from what I'm looking at now.

**Exhibit B**

NON-CERTIFIED COPY

Page 81

1      Q.  You can't tell?

2      A.  No.

3      Q.  It is not that big of a facility, is it?

4      A.  No, it is not.  It is a very small

5  facility.

6      Q.  That doesn't look like the paved area

7  ends and the cloudy part begins right here?

8      A.  It looks to me be almost an apron and

9  then an area around here (indicating).

10     Q.  Right.

11     A.  Like an apron on the shop and an apron

12  behind it.

13     Q.  Right.  Which would not be 95 percent

14  paved?

15     A.  No.

16     Q.  That is why you are saying that?

17     A.  That is correct.

18     Q.  Is this your recollection generally of

19  what you saw?

20     A.  Yeah.

21     Q.  Where is the wash room on here?

22     A.  I think this is it back here

23  (indicating).

24     Q.  All right.  And this one, according to

25  the answers to interrogatories, the supplemental

Exhibit B

NON-CERTIFIED COPY

Page 82

1    answers of 9/25/15, say they have isolated spots

2    of cracking and/or spalling.  You see that?

3        A.  Yes.

4        Q.  Do you have any reason to disagree with

5    that?

6        A.  I do not.

7        Q.  All right.  And it says expansion joints

8    are protected by armored plates.  Do you have

9    any reason to disagree with that?

10       A.  I do not.

11       Q.  When was this site acquired?  When was

12   that company acquired?

13       A.  September of 2007.

14       Q.  So it is fair to say that as of

15   September of 2007, H&E had a site with armored

16   plates at the paved areas, correct?

17       A.  Yes.

18       Q.  Do you recall seeing those armored

19   plates?

20       A.  I do not.

21       Q.  Did you participate in any discussions

22   involving Baton Rouge or Kenner involving the

23   use of armored plates at expansion joints?

24       A.  Not that I recall, no.

25       Q.  Even subsequent to problems being

**Exhibit B**

NON-CERTIFIED COPY

Page 83

1    experienced?

2        A.  No, sir.

3        Q.  Did you overhear any such conversations

4    to that effect?

5        A.  No, sir.

6        Q.  This is the only site that you are aware

7    of that H&E operates that has armored plates?

8        A.  I wasn't aware of it until a few minutes

9    ago.

10       Q.  You would acknowledge that armored

11   plates over all the joints are a fairly

12   expensive --

13       A.  Yeah.

14       Q.  -- routine --

15       A.  Yes.

16       Q.  -- correct?

17       A.  Yes.

18       Q.  In any of the projects that you were

19   involved in for H&E involving paved areas, did

20   you consider the use of armored plates?

21       A.  I did not.

22       Q.  Why is that?

23       A.  I never thought it needed them.

24       Q.  Let's talk about Lake Charles.  Is Lake

25   Charles and Sulphur the same --

NON-CERTIFIED COPY

Exhibit B

Page 94

1    A.  Yes.

2    Q.  All right.  And then I already got four

3    supplements to this one.  And this one just came

4    online.  It is just basically two years old?

5    A.  Yes.  Or less, yes.

6    Q.  And there are no problems with the

7    expansion joints?

8    A.  Not that I am aware of.

9    Q.  Now, in your earlier testimony today --

10   and I can't remember, quite frankly, if it was

11   the individual testimony or the 1442

12   testimony -- you made reference to the fact that

13   sometimes you pulled foundation plans for some

14   locations and gave them to people who were

15   designing a location for you, correct?

16   A.  Correct.

17   Q.  Did you do that in connection with Baton

18   Rouge or Kenner?

19   A.  Not that I recall.

20   Q.  Was there any particular reason why you

21   didn't do that for Baton Rouge or Kenner?

22   A.  Well, in most cases on dealing with a

23   developer, he has his own A&E, where I was

24   dealing with an A&E firm on those locations.

25   Q.  Did you not consider the fact that it

**Exhibit B**

NON-CERTIFIED COPY

Page 95

1    may be helpful to the A&E firm to know what your

2    foundations were at other locations?

3        A.  No.

4        Q.  Do you consider the design of paved

5    areas for heavy-track equipment routine?

6            MS. MINCE:

7                Object to the form.

8            THE WITNESS:

9                No.

10           MR. FRANCO:

11               Off the Record.

12           (Off-the-Record discussion held.)

13   EXAMINATION BY MR. FRANCO:

14       Q.  All right.  Corpus Christi, leased or

15   owned?

16       A.  Leased.

17       Q.  Same routine?

18       A.  Yes.

19       Q.  Owner design?

20       A.  Yes.

21       Q.  That one is relatively new.  It came on

22   April through August of 2014?

23       A.  Yes.

24       Q.  Let's take a look at that.  This is

25   paved, as well as aggregate, am I correct --

**Exhibit B**

NON-CERTIFIED COPY

Page 96

1       A.  Yes.

2       Q.  -- in the yard?

3       A.  Yes.

4       Q.  So let's take a look and get an aerial

5    of this one.  All right.  This is the package

6    here.  You have this one?

7       A.  I got this.  Yeah, I got that.

8          MS. MINCE:

9              Oh, I don't know -- yeah, here we

10   go.

11         THE WITNESS:

12             Yeah.

13   EXAMINATION BY MR. FRANCO:

14      Q.  Got it?

15      A.  Yeah.

16      Q.  Is that an aerial of that facility?

17      A.  Yes.

18      Q.  All right.

19         MR. FRANCO:

20             Let's label that package as 13.

21   EXAMINATION BY MR. FRANCO:

22      Q.  That shows a pretty large area of

23   unpaved, as well as paved --

24      A.  Yes.

25      Q.  -- am I correct?

Exhibit B

NON-CERTIFIED COPY

Page 97

1    A.  That is correct.

2    Q.  Is this an earth-moving equipment

3  location, as well?

4    A.  It is a rental location only.  It

5  would -- it is comprised of earth-moving rental,

6  yes.

7    Q.  And is there a particular reason why

8  there is such a large area of unpaved?

9    A.  I do not know.

10    Q.  Okay.  It looks like a pretty big

11  facility?

12    A.  Yeah.

13    Q.  How does this compare in size to Baton

14  Rouge, roughly?

15    A.  This is probably half the size.

16    Q.  Of Baton Rouge?

17    A.  Yes.  I think it is a --

18    Q.  All right.  And what I'm showing, if you

19  look at the design drawings, I am showing 4,000

20  psi, six-and-a-half inches thick.  Tell me if

21  you see that.  Look at C8.

22    A.  Okay.

23    Q.  All right.  And let me steal this back

24  from you for a second.

25    A.  All right.

NON-CERTIFIED COPY

Exhibit B

Page 98

```
1        Q.  And then I'll give it to you, if you

2   need it.

3            All right.  I am showing at the bottom

4   left the pavement section --

5            Do you need this?

6        A.  I can see it.

7        Q.  -- six-and-a-half inches at 4,000 psi;

8   is that right?

9        A.  Yes.

10       Q.  And at six-and-a-half inches at 4,000

11  psi, there is no problems with the paved area;

12  is that right?

13       A.  Yes.

14       Q.  And that is a large section of paved

15  area?

16       A.  Yeah.

17       Q.  It goes beyond just the apron, doesn't

18  it?

19       A.  Yes.

20       Q.  All right.

21       A.  It is more of a Hi-lift store, is what

22  it is, with a sprinkling of earth-moving

23  equipment, is what the design was for.

24       Q.  Well, when you say that is what the

25  design is for, how do you know that because
```

**Exhibit B**

NON-CERTIFIED COPY

1    the --

2         A.  Because of the nature of our business

3    and where we are a dealer designed for

4    earth-moving, altogether we have a bunch of

5    stores that have zero dirt equipment.

6              So this facility was designed for AWP,

7    and then we sprinkled in for a need, because

8    there would be a need.  So I would think they

9    would have a fairly low quantity of earth-moving

10   there anyway.

11        Q.  Right now?

12        A.  Right.  Correct.

13        Q.  For the future, you have the ability to

14   use that for earth-moving equipment?

15        A.  Correct.  Yes, we do.

16        Q.  When you say it was designed for

17   Hi-lift, what is the difference in the design?

18        A.  Just a lighter version.

19        Q.  A lighter version of what?

20        A.  Of everything.

21        Q.  Of --

22        A.  Shop floor, no overhead cranes,

23   different wash area.

24        Q.  Okay.

25        A.  Just a lot of different things.

**Exhibit B**

NON-CERTIFIED COPY

Page 116

1  paved surfaces which had been attributed to

2  design issues.  Do you see that?

3      A.  Where are you?

4      Q.  F.

5      A.  That must be the first -- it is not the

6  revised.

7      Q.  Okay.

8          MS. MINCE:

9              Here (indicating).

10  EXAMINATION BY MR. FRANCO:

11      Q.  All right.  Let's look at the new and

12  improved supplemental ones.

13          According to Page 9, Number 8, New

14  Orleans -- and I assume that is primarily

15  earth-moving equipment, correct, that site?

16      A.  No, it is a -- it is a combination of

17  both.

18      Q.  All right.

19      A.  That is the rental facility only.

20      Q.  Okay.

21      A.  So, yes, it would be a combination.

22      Q.  Do you know which is primary there?

23      A.  No.

24      Q.  Okay.  Look at F.  It says the paved

25  surfaces are in good condition with some

NON-CERTIFIED COPY

**Exhibit B**

Page 117

1    cracking due to normal shrinkage of concrete.

2    Do you see that?

3        A.  Yes.

4        Q.  So, you are aware and H&E is aware,

5    obviously because these are H&E's answers, that

6    there is some cracking that is due to normal

7    shrinkage of concrete, right?

8        A.  Yes.

9        Q.  Then look at I.  The conditions of the

10   joints are mixed depending on the location.

11   Some of the expansion joints are spalling and

12   cracking, correct?

13       A.  Correct.

14       Q.  Where?

15       A.  I cannot tell you.

16       Q.  And it says there are issues with

17   Stantec on the design of the expansion joints

18   and the caulking material that was added to the

19   expansion joints.  You see that?

20       A.  Yes.

21       Q.  What issues are there with Stantec on

22   the design of the expansion joints?

23       A.  I do not know.

24       Q.  Are you aware that as of about two weeks

25   ago, Stantec knew nothing about any design

**Exhibit B**

NON-CERTIFIED COPY

Page 127

1    right?

2         A.  Correct.

3         Q.  And at that location, you are not having

4    any trouble with the expansion or contraction

5    joints or the pavement?

6         A.  Not that I'm aware of.

7         Q.  And what is the primary use of that

8    facility?

9         A.  It is a rental.  It is an earth-moving

10   and aerial.

11        Q.  Combination?

12        A.  Combination, yes.

13        Q.  We said the Houston Hi-lift was not

14   earth-moving, correct?

15        A.  No.  That is correct.

16        Q.  Jackson, Mississippi.  That is an older

17   facility?

18        A.  2006 to '08, somewhere in that

19   neighborhood.

20        Q.  Leased or owned?

21        A.  Leased.

22        Q.  Owner designed?

23        A.  Yes.

24        Q.  Do we have any drawings for this one?

25             MS. MINCE:

Exhibit B

NON-CERTIFIED COPY

Page 128

1                I don't believe we do.

2    EXAMINATION BY MR. FRANCO:

3        Q.  So you can't tell me the thickness of

4    the pavement on this one, can you?

5        A.  I cannot.

6        Q.  Or the psi?

7        A.  I cannot.

8        Q.  But, apparently, somebody has said that

9    there is some separation and revelling of the

10   joints, correct?

11       A.  Correct.

12       Q.  What does revelling of the joints mean?

13   That is a new one on me.

14       A.  It is a new one on me, too.

15       Q.  You don't know what that means?

16       A.  I do not.

17       Q.  Revelling almost suggests celebration to

18   me.

19       A.  I was going to say in the French

20   Quarter.  Yes.

21       Q.  All right.  Revelling of the joints?

22           MR. MATHEWS:

23               It should be ravelling.

24           MS. MINCE:

25               Ravelling.

**Exhibit B**

NON-CERTIFIED COPY

```
 1        THE WITNESS:

 2            Ravelling.

 3        MS. MINCE:

 4            That is what I think.

 5   EXAMINATION BY MR. FRANCO:

 6      Q.  All right.  If it was ravelling, what

 7   would that be?  Is that similar to spalling?

 8      A.  I couldn't answer that.

 9      Q.  You didn't provide these?

10      A.  No, sir.

11      Q.  Do you know who did?

12      A.  I do not.

13      Q.  And what is the primary use of that

14   facility?

15      A.  It is a mix.

16      Q.  My memory is not going to be as good as

17   yours, obviously, but of all the sites that we

18   have talked about today, which sites have yards

19   that are only paved without any aggregate other

20   than Kenner and New Orleans?

21        MS. MINCE:

22            Wait.  I'm sorry.  Repeat the

23   question one more time.

24        THE WITNESS:

25            Yeah.
```

**Exhibit B**

NON-CERTIFIED COPY

Page 132

1      Q.  Let me try it again.

2      A.  Okay.

3      Q.  New Orleans has only paved yard space,

4   correct?

5      A.  Correct.

6      Q.  What other site does H&E have that only

7   has paved yard space?

8      A.  Baton Rouge, Kenner.

9      Q.  Baton Rouge, Kenner?

10      A.  Right.

11      Q.  That is the only two sites that you can

12   think of?

13      A.  That we discussed today, yes.

14      Q.  Can you think of any sites that we

15   didn't discuss?

16      A.  I can't.

17      Q.  Is it fair to say that of all the sites

18   that we went through today, that there is

19   different thicknesses of pavement at different

20   sites?

21      A.  Fair to say, yes.

22      Q.  And even though those sites all use to

23   some extent heavy-track steel earth-moving

24   equipment?

25      A.  Yes.

**Exhibit B**

NON-CERTIFIED COPY

Page 133

1      Q.  Is it also true that some of those areas

2    that use heavy-track steel equipment also have a

3    different psi?

4      A.  Some did, yes.

5      Q.  Okay.

6         MR. FRANCO:

7            Let's take a break.  And actually,

8    if you all could let us use this room, we may be

9    finished.

10           (Recess held.)

11        MR. FRANCO:

12           Mr. St. Germain, at this time, I

13   don't have any other questions because

14   unfortunately you can't answer some of the

15   questions that I asked you before in reference

16   to some of these interrogatory answers about

17   where cracks and where spalling occurred at

18   different locations.

19           So subject to that, my position is

20   going to be this 1442 deposition has not been

21   complied with in terms of our request.  It has

22   nothing to do with you, personally.  I hope you

23   understand that.

24           So we are going to have to leave

25   this open.  Subject to that, Lori, I tender the

Exhibit B

NON-CERTIFIED COPY

Page 136

1    H&E contract for the design or construction of

2    any of those sites?

3        A.  No.

4        Q.  With respect to the leased sites, did

5    H&E dictate the prescribed pavement thickness?

6            MR. FRANCO:

7                Objection to form.  Leading.  You

8    can answer.

9            THE WITNESS:

10               No.

11   EXAMINATION BY MS. MINCE:

12       Q.  Did H&E provide any direction to the

13   owner regarding the psi strength of the

14   concrete?

15       A.  Yes.

16       Q.  What did they provide?

17       A.  Just previous plans as earlier

18   discussed, and we would supply a set of plans on

19   a facility that -- on a facility that we built

20   in the past and hand that as an example from a

21   starting point.

22       Q.  Did H&E prescribe or dictate the design

23   of the control or expansion joints at any of the

24   leased facilities?

25       A.  No.

**Exhibit B**

NON-CERTIFIED COPY

Page 138

1           That is all I have.

2           MR. FRANCO:

3               I have some follow-ups here,

4    unfortunately.

5    EXAMINATION BY MR. FRANCO:

6       Q.  When you reviewed the interrogatories,

7    could you have learned more information about

8    the interrogatory answers from branch managers?

9       A.  Yes.

10      Q.  When the leased sites were in the

11   process of design, did H&E have the ability to

12   have any input or comments on the design?

13      A.  Yes.

14      Q.  Were any of those design plans actually

15   shared with H&E prior to construction of those

16   sites?

17      A.  Repeat that, please.

18      Q.  Yes.

19          Were the design plans actually shared

20   with H&E for comment prior to construction at

21   those sites?

22      A.  Yes.

23      Q.  And the design plans for Baton Rouge and

24   Kenner were shared with H&E for comment prior to

25   construction at those sites, as well, correct?

NON-CERTIFIED COPY

Exhibit B

Page 139

1     A.  Yes.

2     Q.  And you had the ability to comment on

3  the thickness of the pavement, correct?

4     A.  Yes.

5     Q.  And the psi of the pavement, correct?

6     A.  Yes.

7     Q.  And the reinforcement of the pavement,

8  correct?

9     A.  Yes.

10     Q.  And is it fair to say that you were

11  involved with that, as well as Mr. Jones, as

12  well as Mr. Wynn at certain points in time?

13     A.  Certain points in time, yes.

14     Q.  Do you recall providing any plans for

15  design of any prior facilities to URS in

16  connection with either Kenner or Baton Rouge?

17     A.  I do not.

18     Q.  But you had done that with some of the

19  leased properties that we talked about in

20  connection with this?

21     A.  Correct.

22        MR. FRANCO:

23           That is all the questions I have.

24  Thank you, Mr. St. Germain.

25        MS. MINCE:

Exhibit B

NON-CERTIFIED COPY

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

* * * * * * * * * *
                             *
H&E EQUIPMENT SERVICES    *
                             * NUMBER 626,308
VERSUS                    *
                             * DIVISION "D"
URS CORPORATION           *
ARCHITECTURE, P.C., URS *
CORPORATION, L O'NEAL     *
JOHNSON AND THOMAS E.     *
RYAN, III                 *
                             *
* * * * * * * * * *

        1442 Deposition of STANTEC

CONSULTING SERVICES, INC., through its

Representative, ANDRÉ RODRIGUE, taken on

Wednesday, August 10, 2016, commencing at 2:27

p.m., in the offices of Adams and Reese, LLP,

Attorneys at Law, 450 Laurel Street, Suite 1900,

Baton Rouge, Louisiana, 70801.

Exhibit C

NON-CERTIFIED COPY

Page 6

1                    S T I P U L A T I O N

2

3          It is stipulated and agreed by and between

4     counsel that the 1442 deposition of STANTEC

5     CONSULTING SERVICES, INC., through its

6     Representative, ANDRÉ RODRIGUE, is hereby being

7     taken under the Louisiana Code of Civil

8     Procedure in accordance with the Code.

9          The formalities of sealing and

10    certification are hereby waived.  The witness

11    will reserve the right to read and sign the

12    deposition.  The party responsible for service

13    of the discovery material shall retain the

14    original.

15         All objections, save those as to the form

16    of the questions, are hereby reserved until such

17    time as this deposition, or any part thereof,

18    may be used or sought to be used in evidence,

19    and are to be made in accordance with the Code

20    of Civil Procedure.

21                    *   *   *   *   *

22         KAY E. DONNELLY, Certified Court Reporter,

23    in and for the State of Louisiana, officiated in

24    administering the oath to the witness.

25

Exhibit C

NON-CERTIFIED COPY

Page 65

1    A.  This is from a contractor who was trying

2   to finish out his punch list and he started

3   observing some of the joints were starting to

4   spall at the edges.

5    Q.  All right.  So start off at the bottom

6   Email.  It is from Craig Castrinos, from the

7   contractor, to Robert Worsham.  Who is that?

8    A.  He was an engineer intern that worked

9   for us.

10    Q.  Okay.

11    A.  That --

12    Q.  He says, Please see attached pictures of

13   area where the tracks are breaking the concrete.

14   I want to make sure we don't cause a bigger

15   issue when we remove the caulk and leave it 3/4

16   inches below finish floor.  Let me know your

17   thoughts."

18        "Where are the photos taken?" in the

19   next Email, and then a response.  "This is

20   happening all over this site, but I think these

21   pictures were taken from the two areas I marked

22   on the attached drawing.  Let me know if you

23   need anything else."

24        So the attached pictures show spalling

25   at the expansion joints after they started

Exhibit C

NON-CERTIFIED COPY

1   occupying the facility?

2      A.  Correct.

3      Q.  And he says it is happening all over

4   paved areas, correct?

5      A.  That is what he says in here.

6      Q.  And he is the contractor?

7      A.  Correct.

8      Q.  And he is just illustrating on the

9   diagram where those particular pictures were

10  taken?

11     A.  Correct.

12     Q.  Which is between the service building

13  and the wash room, basically, right?

14     A.  Yep.

15     Q.  Okay.  Now, that is spalling at the

16  expansion joints over eight-inch deep concrete

17  with smooth dowel bars 12 inches apart?

18     A.  Yep.

19     Q.  7/8-inch diameter?

20     A.  Correct.

21     Q.  All right.  Let's look at the next

22  document.  I assume it is a follow-up?

23     A.  Yes.

24     Q.  Okay.  We will label the next document

25  as Exhibit 16.

Exhibit C

NON-CERTIFIED COPY

Page 70

1    Q.  What is being removed?

2    A.  The sealant itself, and the intent --

3  what we are telling him here is that it needs to

4  be at the bottom of that chamfer.

5    Q.  Now, as I'm looking at this drawing of

6  the expansion joints, the edges of the concrete

7  are not 90 degrees?

8    A.  Correct.

9    Q.  They were angled?

10    A.  Chamfered.

11    Q.  Chamfered is your --

12    A.  Correct.

13    Q.  -- word for that?

14    A.  Correct.

15    Q.  And, yet, they were still spalling?

16    A.  Correct.

17    Q.  Okay.  And that also shows the dowel,

18  right?

19    A.  Yes.  It is taking our expansion joint

20  and just clarifying where that sealant needs to

21  be.

22    Q.  All right.  And then that was dated

23  March 2 of 2016.

24        Then the next Email is April 21, 2016.

25  I'll label that as Exhibit 18.

**Exhibit C**

NON-CERTIFIED COPY

Page 71

1        MR. FRANCO:

2            Off the Record.

3        (Off-the-Record discussion held.)

4    EXAMINATION BY MR. FRANCO:

5        Q.  All right.  Marty Emigh sends this to

6    the contractor and you?

7        A.  Uh-huh (affirmative response).

8        Q.  It says, "Please see the attached

9    pictures and advise."  And are these expansion

10   joints on the first page?

11       A.  Yes.  These are all expansion joints.

12       Q.  All expansion joints.  And I'm looking,

13   and I see sealant still in the joint?

14       A.  Yes.

15       Q.  And, yet, they are spalling?

16       A.  Yes.

17       Q.  And I assume this is throughout the

18   paved area, not specific to one particular area?

19       A.  Yes, I think that is correct.

20       Q.  Okay.

21       A.  I think it -- if I would have to say, I

22   think it was happening more on the east side of

23   the building that is near their stone yard than

24   it is on the west side.

25       Q.  Is that where most of the activity is?

Exhibit C

NON-CERTIFIED COPY

Page 72

1    A.  I would assume that is where they

2    operate and store most of their larger

3    equipment.

4        Q.  All right.  Just a second.

5            The next document is H&E Build-to-Suit

6    Program title.  Or am I --

7        A.  Yeah.  This is our -- we had weekly

8    calls to go over all our projects, and this is

9    kind of a conclusion of where we left

10   everything.

11       Q.  All right.

12           MR. FRANCO:

13               Let's label that as Exhibit 19.

14   EXAMINATION BY MR. FRANCO:

15       Q.  All right.  So for --

16       A.  The New Orleans, Louisiana, that is

17   where we have the discussion there.  And when we

18   looked at it and the sealant and the joints and

19   they were -- basically, that is it.  We will

20   move on.

21       Q.  I'm sorry.  But I don't understand that.

22       A.  They accepted as is.

23       Q.  Who did?

24       A.  H&E, Marty, and CPRT.

25       Q.  H&E accepted it as is?

Exhibit C

NON-CERTIFIED COPY

Page 73

1     A.  Yep.

2     Q.  When did they do that?

3     A.  As of this phone call that we had on

4  here.  This --

5     Q.  On May 5, 2016?

6     A.  Yeah.  And so there has been no further

7  discussion since then.

8     Q.  And everybody has been paid?

9     A.  I believe so.

10    Q.  So at New Orleans, the first bullet

11 point says, "Response from B&L local engineer,

12 Fox-Nesbitt, promised next week."  What is that?

13    A.  I think that was relating to a canopy

14 issue with the contractor.  He is --

15    Q.  Not --

16    A.  Not with the pavement.

17    Q.  All right.  The next bullet point

18 references the André and Geo inspected joint

19 caulking.  Who is André?

20    A.  That is me.

21    Q.  Oh.  And who is Geo?

22    A.  I believe he is referring to Terracon.

23    Q.  Okay.  "Not sure what else to do," that

24 was your conclusion?

25    A.  That was not mine.  That was CPRT.  And

Exhibit C

NON-CERTIFIED COPY

Page 74

1   these are their notes from the Record of the

2   call.

3       Q.  "Similar symptoms showing up on all

4   joint types at other sites."  Where did that

5   information come from?

6       A.  That is what they discussed.  That is,

7   again, what CPRT came up with and noted.

8       Q.  And when you say they accepted, do you

9   mean CPRT, or do you mean H&E, or both?

10      A.  Everyone that was on the call.

11      Q.  What did they say?

12      A.  They said, "okay," I believe, and that

13  was it.

14      Q.  Has there been any claim --

15      A.  No.

16      Q.  -- asserted?

17      A.  No.

18      Q.  And this has been since May of 2016,

19  correct?

20      A.  Correct.

21      Q.  I'm sorry.  I asked this question, and I

22  don't remember what you answered.

23          Where did the information come from that

24  says "similar symptoms showing up on all joint

25  types at other sites"?

**Exhibit C**

NON-CERTIFIED COPY

Page 75

1       A.  I believe it was a statement that was

2   made by CPRT and just written down.  I don't

3   know who said it specifically, but they were --

4   CPRT was the one that kept the minutes.

5       Q.  It was either CPRT or H&E?

6       A.  It wasn't -- yeah, I don't know.  I

7   don't know who specifically said it.

8       Q.  All right.  At these other sites, is

9   there anything about the concrete --

10      A.  No, there is --

11      Q.  -- on the other sites?

12      A.  From my recollection of the other sites,

13  we don't have any of these issues of expansion

14  joints spalling.

15      Q.  That is contrary to that statement?

16      A.  I don't -- I have not seen any expansion

17  joints.  I don't know if they are talking --

18  what they are talking about as far as other

19  joints.

20      Q.  Well, I'm a little confused.  I took

21  that to mean similar symptoms showing up at all

22  joint types at other sites, meaning the other

23  sites that CPRT is involved in, Oklahoma, San

24  Antonio, Columbia, Greer.  Is that how you

25  understood it?

Exhibit C

NON-CERTIFIED COPY

Page 79

1    those areas, as well?

2        A.  No guarantees, yeah.

3        Q.  Is it fair to say, based on your

4    knowledge, that the other sites that you talked

5    about, San Antonio, Oklahoma City, Atlanta,

6    Albuquerque, Columbia, and Greer, to the extent

7    that those locations had paved areas for the

8    heavy-track equipment, that the same design was

9    used at those facilities as was used at the New

10   Orleans facility?

11       A.  Generally, yes.  The difference would be

12   the geotechnical recommendations of the pavement

13   base, pavement section, thickness.  As far as

14   the seal --

15       Q.  Can I stop you there?

16       A.  Yes.

17       Q.  The thickness would depend on the soil

18   conditions?

19       A.  Yes.

20       Q.  That is why it would change?

21       A.  Yes, for the most part.

22       Q.  Correct?

23       A.  Yes.

24       Q.  Do you recall any of those sites

25   being more than eight inches thick?

**Exhibit C**

NON-CERTIFIED COPY

Page 80

1      A.  I -- I don't.  I don't recall.

2      Q.  But the concept of those sites was the

3   same.  The paved area would be a limited area

4   around the building and the wash room, and there

5   would be a separate limestone area for storage

6   of the heavy equipment, correct?

7      A.  Correct.

8      Q.  And I interrupted you, and I apologize

9   for that.

10         You were saying what other differences

11  would there have been in the design of the paved

12  areas other than because of the geotech report

13  on the thickness?

14     A.  That is primarily one of the guiding

15  things, was what is the subgrade going down

16  below there.

17     Q.  As far as the dowels and the diameter of

18  the dowels, the fact that they were 12 inches

19  apart, the fact that they were smooth --

20     A.  Uh-huh.

21     Q.  -- the fact that you had smooth dowels

22  under the sawcut joints, that all sounds pretty

23  similar --

24     A.  Correct.

25     Q.  -- with all these other paved locations?

Exhibit C

NON-CERTIFIED COPY

Page 86

1       A.   They invited me to come over and talk

2   about the projects, and while I was there --

3       Q.   Oh, okay.

4       A.   -- I went around and they showed me,

5   "This is what we do."

6       Q.   I see.  And was that before there was

7   the spalling at the joints at the New Orleans

8   site?

9       A.   Yes.

10      Q.   Have you been back to the Baton Rouge

11  site since?

12      A.   Since?  I've been there, I think, two or

13  three times.  And that, I believe, was all

14  before the New Orleans facility.

15      Q.   In response to some written questions

16  that we asked H&E in this case, with respect to

17  the New Orleans facility, they said, "There has

18  been some cracking and spalling observed at or

19  near expansion joints in the paved surfaces,

20  which has been attributed to design issues."

21          And that is the basis for my earlier

22  question.  Nobody said anything to you about the

23  spalling and cracking being attributed to design

24  issues, correct?

25      A.   No.  All that I can say is that the

Exhibit C

NON-CERTIFIED COPY

Page 87

1   section of pavement details that we had, the

2   chamfer edges was intended -- it was an element

3   of design that we put in there to intentionally

4   try to defer those cleats from hitting those

5   point loads.

6        Q.  Which didn't work, apparently?

7        A.  Yeah.  Yeah.

8        Q.  Was there a sweeper at the New Orleans

9   site, to your knowledge?

10       A.  Probably so, but I -- I don't recall

11   ever seeing it at the site.

12       Q.  Did you see any of the equipment being

13   unloaded at the New Orleans site?

14       A.  No.

15       Q.  Let's see.  Corpus Christi is in here,

16   too.

17       A.  I had nothing to do with that one.

18       Q.  Nothing.  All right.

19       MR. FRANCO:

20           Give me a minute.

21       (Recess held.)

22       MR. FRANCO:

23           All right.  Mr. Rodrigue, that is

24   all the questions I have, sir.  I do want to

25   make sure we get that program guide.  I'm

Exhibit C

NON-CERTIFIED COPY

COST OK $ 200

AUG – 8 2017

CI-D.55308 A

DEPUTY CLERK OF COURT

| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308    DIV.: D |
| | * | |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| | * | |
| URS CORPORATION | * | STATE OF LOUISIANA |
| ARCHITECTURE, P.C., URS | | |
| CORPORATION, L. O'NEAL | | |
| JOHNSON AND THOMAS E. RYAN, | | |
| III | | |

---

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO
### MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING OTHER FACILITIES

---

Defendants URS CORPORATION ARCHITECTURE, P.C., URS

CORPORATION, L. O'NEAL JOHNSON and THOMAS E. RYAN, III ("Defendants" or

"URS") submit this memorandum in opposition to H&E's Motion in Limine to Exclude

Evidence Regarding Other Facilities.

Earlier in this litigation, Defendants requested discovery from H&E on other

H&E facilities. H&E resisted, and as a result, Defendants were forced to file a motion to

compel. On July 9, 2015, this Court granted the motion to compel and ordered H&E to

respond to discovery. H&E subsequently identified 14 of its facilities "having concrete

Paved Surfaces where operations **similar** to those conducted at H&E's Baton Rouge and

Kenner facilities, i.e. operations involving the routine traversal of heavy tracked

equipment, are conducted." Amended and Supp. Resp. to Def. First Set of Interrog. of

H&E Equipment Services, Inc., Response to Interrog. No. 2 (dated Aug. 30, 2016)

(attached as Exhibit A) (emphasis added).

All relevant evidence is admissible. La. C.E. art. 402. The standard of relevance

is not very demanding. "'Relevant evidence' means evidence having **any tendency** to

make the existence of any fact that is of consequence to the determination of the action

REC'D C.P.

AUG 28 2017

1

NON-CERTIFIED COPY

more probable or less probable than it would be without the evidence." La. C.E. art 401 (emphasis added). Evidence regarding concrete paved surfaces at the other H&E facilities that have similar operations to the Baton Rouge facilities—i.e., operations involving the routine travel of heavy-tracked equipment—is directly relevant to several of the issues at trial in this case for at least five, independent reasons.

1.    **Evidence of concrete design at other facilities is relevant to the standard of care.**

H&E's primary claim in this case is that URS designed the concrete parking area used for H&E's heavy-tracked equipment below the standard of care, resulting in cracking, spalling and deterioration. (Petition ¶ 13.) Evidence regarding concrete paved surfaces at other H&E facilities is relevant to the standard of care imposed on Defendants in this case because it shows how other engineers have designed concrete parking areas used for H&E's heavy-tracked equipment.

For example, Defendants expect that H&E will attempt to present expert testimony that the thickness at the Baton Rouge facility should have been eight inches. Evidence that H&E's other facilities with concrete parking areas used for heavy-tracked equipment have a thickness of less than eight inches is evidence tending to show that H&E's expert witnesses are in error regarding the standard of care exercised by engineers designing concrete parking areas used for heavy-tracked equipment. H&E's Vice-President, Leonard St. Germain, admitted that the thickness of pavement varies at the different sites used by H&E for heavy-track steel earth-moving equipment, and that these areas of the concrete further vary in their respective compressive strengths.[1] This includes sites that were specifically designed for earth-moving equipment. Evidence that there is no single standard of care for concrete thickness is highly relevant and

---

[1] Depo. of Mr. St. Germain (1442 deposition), Aug. 31, 2016, at 132-33, attached as Exhibit B.

2

NON-CERTIFIED COPY

directly contradicts H&E's expert witnesses' testimony. Thus, evidence of the thickness and strength of concrete at H&E's other facilities is admissible, and Defendants should be allowed to present this evidence to the jury.

Similarly, H&E may introduce expert testimony at trial that armored plates should have been used to protect expansion joints in the H&E concrete parking areas used for heavy-tracked equipment. However, theother facilities evidence will show that none of H&E's other facilities except for its Winston-Salem, North Carolina facility are equipped with armored plates. Indeed, H&E's Vice-President, Leonard St. Germain, testified in his deposition that H&E did not ask to have the Winston-Salem facility designed with armored plates; they were already there when H&E acquired the facility in 2007. He further admitted that armored plates are too expensive and he did not think that they were needed at any other facilities.[2] The jury needs to hear this evidence to understand why there were no armored plates for the Baton Rouge and Kenner facilities. Additionally, this evidence will contradict H&E's argument that failing to use armored plates to protect expansion joints departs from the standard of care; to the contrary, the evidence will show that engineers do not typically use armored plates to protect expansion joints at concrete parking areas used for heavy-tracked equipment. In addition, this evidence demonstrates that, regardless of whether required by the standard of care, H&E was unwilling to pay for the use of armored plates

H&E s argues that none of this matters because the other facilities are not owned by H&E. But who owns a facility has absolutely no bearing on the standard of care to be exercised by engineers in designing concrete parking areas used for heavy-tracked equipment.

---

[2] *Id.* at 79-83.

NON-CERTIFIED COPY

H&E also argues that the other facilities have both paved and unpaved areas and have different soil conditions, some facilities have slight differences in construction, and one of the two Shreveport facilities and the Houston facility were also used for aerial platform equipment. This all goes to the weight of the evidence and not whether, at the outset, the evidence is admissible under La. C.E. art. 402. Accordingly, H&E can point out to the jury the differences between the other facilities and the Kenner and Baton Rouge facilities. H&E can try to dispute the similarities of the design and use of these facilities. And try to explain to the jury why it uses heavy tracked cleated equipment on these sites, as they do in Baton Rouge and Kenner. But H&E is not entitled to an order barring the introduction of this evidence at the outset.

2. **Evidence of cracking and spalling in concrete at other facilities is relevant to show that H&E's lack of proper maintenance is the cause of H&E's damages in this case.**

Evidence of other facilities is also relevant because evidence of cracking and spalling in the concrete at other facilities bears directly on H&E's burden of proof on causation. H&E asserts that the only cause of cracking and spalling in the concrete at the Baton Rouge facility is Defendants' design. However, Defendants can show that there is also cracking and spalling at other facilities in concrete parking areas used for heavy-tracked equipment that were *not* designed by Defendants. Such evidence clearly supports Defendants' theory that there is a different cause of the cracking and spalling unrelated to Defendants' design. Tellingly, the deposition of H&E Vice-President Leonard St. Germain reveals that there is ample evidence that cracking and spalling occurred in the concrete parking areas used for heavy-tracked equipment at numerous other H&E facilities including Alexandria, Louisiana,[3] Shreveport, Louisiana,[4] a second

---

[3] *Id.* at 26-27.
[4] *Id.* at 46.

4

NON-CERTIFIED COPY

Shreveport facility,[5] Charlotte, North Carolina,[6] Raleigh, North Carolina,[7] and Winston-Salem, North Carolina.[8]  There is also evidence of raveling of the joints at the site in Jackson, Mississippi.[9]  There is even evidence of cracking in the concrete at H&E's newest facility, the one in New Orleans, which was built *after* the facilities at issue in this case.[10]

Defendants believe that the true cause of many of the damages alleged by H&E is not Defendants' design, but instead is H&E's improper maintenance.  Defendants can present evidence to prove that H&E did not properly maintain the concrete paved surfaces not only at the facilities at issue in this litigation but also at other H&E facilities.  Evidence that there were problems with the concrete at multiple facilities improperly maintained by H&E—not only the facilities designed by Defendants but also at other facilities not designed by Defendants—means that H&E has not sustained its burden of proof on causation, and the evidence is therefore admissible.  La. C.E. art 401.

H&E argues that these other facilities were not owned by H&E.  Again, it makes no difference whether H&E or some other entity was responsible for performing the maintenance at those other facilities.  It is the failure to conduct proper maintenance that is relevant to this matter.  Simply stated, if anyone failed to perform proper maintenance, and that caused the same types of problems that are at issue in this case, then evidence of those other facilities has a tendency to make it more probable than not that improper maintenance was a cause of the similar damage at issue in this case.

---

[5] *Id.* at 57-58.
[6] *Id.* at 64-68.
[7] *Id.* at 73-77.
[8] *Id.* at 79-82.
[9] *Id.* at 127-29.
[10] *Id.* at 116-17.

NON-CERTIFIED COPY

### 3. Evidence of cracking and spalling in concrete at other facilities is relevant to the standard of care.

The evidence of cracking and spalling in the concrete at H&E's other facilities is not only relevant to causation, it is also relevant to the standard of care. H&E will argue that URS should have used a different thickness of concrete, or a different compressive strength, or some other alternative design at the Baton Rouge facility. However, Defendants can provide evidence that H&E has other facilities which were designed for heavy tracked cleated equipment and yet these other facilities experienced the same damages that H&E alleges at the Baton Rouge facility (and the Kenner facility).

Indeed, the design used for the New Orleans facility is particularly relevant to this case. H&E hired Stantec Consulting Services, Inc. to design the New Orleans facility, and H&E will argue at trial that the design used for the New Orleans facility is what H&E should have designed for the Baton Rouge facility and is what H&E has used for other facilities. However, Andre Rodrigue, a project engineer for Stantec acknowledged that there has been cracking and spalling at the New Orleans facility designed by Stantec.[11]

Thus, this evidence has the tendency to show that H&E's expert witness is in error regarding the standard of care that should have been used to avoid cracking and spalling in concrete parking areas used for heavy-tracked equipment. Such evidence is relevant and admissible. La. C.E. art. 401.

### 4. Evidence of cracking and spalling in concrete at other facilities is relevant to damages.

H&E asserts that the cracking and spalling of the concrete at the Baton Rouge site requires that Defendants pay to replace the entire concrete. But H&E's own actions at

---

[11] Deposition of Mr. Rodrigue at 65-66, 70-75, 86-87, attached as Exhibit C.

6

NON-CERTIFIED COPY

other facilities is direct evidence that this simply is not true.  H&E's actions with respect to its other facilities clearly show that it has no intention of replacing cracked or spalled concrete.  For example, when H&E's Vice President Leonard St. Germain was asked in his deposition about cracking and spalling in the concrete at its Charlotte, North Carolina facility, he admitted that it was much worse than the cracking and spalling at the Baton Rouge site that is at issue in this trial, and yet H&E continues to use that concrete without fixing it.[12]  Similarly, he confirmed that H&E continues to use, without fixing, the concrete with cracking and spalling at the Raleigh, North Carolina site.[13] Similarly, Mr. Rodrigue of Stantec confirmed that despite the cracking and spalling at the New Orleans facility designed by Stantec, H&E has not made any claim against Stantec.[14]

Moreover, the evidence will also show that there are facilities including the Charlotte, North Carolina, Corpus Christi, Texas, and Shreveport, Louisiana facilities which were originally designed for Hi-Lift equipment but H&E has now decided to use them for earth-moving equipment.[15]  This is significant because, as H&E Vice-President Leonard St. Germain testified in his deposition, everything at a facility designed for Hi-Lift is lighter, and the concrete can be thinner.[16]  The fact that H&E uses earth-moving equipment on concrete that was not designed for it even though that will surely cause cracking and spalling on that concrete is further evidence that H&E does not actually have a need to replace concrete at a site that has cracking and spalling.

---

[12] Depo. of Mr. St. Germain (1442 deposition), at 64-68 (attached as Exhibit B).
[13] *Id.* at 73-77.
[14] Deposition of Mr. Rodrigue at 79-80 (attached as Exhibit C)
[15] Depo. of Mr. St. Germain (1442 deposition at 43, 60, 96-100 (attached as Exhibit B).
[16] *Id.* at 99-100.

7

NON-CERTIFIED COPY

Thus, evidence of cracking and spalling at other H&E facilities is relevant to prove that H&E has not sustained its burden of proof on the extent of damages, and is therefore admissible.  La. C.E. art 401.

5.  **Evidence of H&E's input into the design of the concrete at other facilities is relevant to H&E's comparative fault.**

The jury will have to determine at trial how much fault to assign to H&E for the damages at the facilities at issue in this case.  In addition to lack of maintenance, there is evidence that H&E had the ability to provide input and comments on the design of all of its facilities, including facilities owned by others and also including the Baton Rouge and Kenner facilities that are the subject of H&E's Petition in this case.  The evidence will also show that, for some other H&E facilities, H&E provided sample foundation plans from prior locations to the engineer tasked with designing the concrete to assist in the design desired by H&E.  However, for the Baton Rouge and Kenner facilities designed by URS, H&E did not provide any such plans.[17]

This evidence is plainly relevant to the jury's determination of how much responsibility to place on H&E in this case.  La. C.E. art 401.

6.  **H&E's citation of the law on prior accidents is irrelevant.**

Ignoring all five of these independent reasons that this evidence is relevant, H&E argues that evidence of H&E's other facilities cannot be used as evidence of prior accidents, citing the First Circuit's statement in *Lee v. K-Mart Corp.* that "[e]vidence of other accidents occurring at substantially different places or under different circumstances or conditions is irrelevant and inadmissible."  *Lee v. K-Mart Corp.*, 483 So. 2d 609, 613 (La. App. 1 Cir. 1985).  But that holding only applies when a party is seeking "to show whether a thing or place which caused injury was dangerous and/or whether

---

[17] *Id.* at 94-95, 136, 138-39.

8

NON-CERTIFIED COPY

the defendant had knowledge of the dangerous condition." *Id.* at 612. Thus, those cases have nothing to do with the numerous grounds for relevance noted above, none of which have anything to do with prior accidents at the same locale.

While this is enough reason that this jurisprudence is inapplicable, these cases are also inapplicable because H&E has not shown that its other facilities are "substantially different." *Id.* at 613. Indeed, H&E itself identifies these other facilities as "having concrete Paved Surfaces where operations **similar** to those conducted at H&E's Baton Rouge and Kenner facilities, i.e. operations involving the routine traversal of heavy tracked equipment, are conducted." Amended and Supp. Resp. to Def. First Set of Interrog. of H&E Equipment Services, Inc., Response to Interrog. No. 2 (dated Aug. 30, 2016) (attached as Exhibit A) (emphasis added). After identifying these locations as having similar operations to those in Baton Rouge and Kenner, it is disingenuous to argue that these other sites are *substantially* different from the parking areas at issue in this case. Regardless, the purported differences identified by H&E, as described above, do not undermine the relevance of this other facilities evidence.

Moreover, as shown above, H&E admitted that H&E voluntarily provided prior designs used at other H&E facilities for engineers to use in designing new H&E facilities.[18] Thus, there is evidence that H&E itself considered these different facilities designed at different times in various parts of the country sufficiently similar that the concrete designs used at prior facilities were relevant to the concrete design to be used at newer facilities.

## CONCLUSION

Evidence of the concrete parking areas used for H&E's heavy-tracked equipment at other facilities that H&E itself identified as similar in function to Baton Rouge and

---

[18] *Id.* at 94-95, 136, 138-39.

9

NON-CERTIFIED COPY

Kenner is relevant to numerous issues in this case including the standard of care, causation, damages and comparative fault. Relevance to any one issue would be enough to deny H&E's motion in limine. This evidence meets the minimal standards of relevance contained in La. C.E. arts. 401 and 402.

Respectfully submitted,

ADAMS AND REESE LLP

Philip A. Franco (Bar #5819), TA
Ron Sholes (Bar # 14436)
Jeffrey E. Richardson (Bar # 23273)
Don S. McKinney (Bar # 26685)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,**
**URS Corporation Architecture, P.C.;**
**URS Corporation; L. O'Neal Johnson**
**and Thomas E. Ryan, III**

10

NON-CERTIFIED COPY

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon all counsel of record via e-mail and/or United States Mail, postage prepaid and properly addressed, this 8th day of August, 2017.

Kellen J. Mathews



NON-CERTIFIED COPY

## FishmanHaygood

Fishman Haygood LLP
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170
fishmanhaygood.com

REBECCA SHA
ASSOCIATE
(504) 556-5530
RSHA@FISHMANHAYGOOD.COM

August 8, 2017

File No. 3107-04

***VIA FACSIMILE* AND U.S. MAIL**

Clerk of Court
19th JDC, Parish of East Baton Rouge
300 North Boulevard
Baton Rouge, LA 70802

POSTED

AUG 1 1 2017

Re:    *H&E Equipment Services, Inc. v. URS Corporation Architecture, P.C., et al*
19th JDC for the Parish of East Baton Rouge, Docket No. 626308, Sec. "D"

Dear Ms. Welborn:

Please find enclosed two motions to be filed on behalf of the Plaintiff, H&E Equipment Services, Inc.: Opposition to Motion in Limine to Exclude Expert Opinions Not Contained in That Expert's Report and the Opposition to Motion in Limine to Exclude Evidence Regarding Defendants' Liability for Damages at Kenner Facility.

The original pleadings will be sent by U.S. Mail, please return a stamped copy for our file in the enclosed stamped envelope.

Sincerely,

Rebecca Sha

RS/dob
Enclosures
cc:    Philip A. Franco (w/encs.) (via email)
Kellen J. Matthews (w/encs.) (via email)
Lori Mince (w/encs.) (via email)
Brent Barriere (w/encs.) (via email)
Alysson Mills (w/encs.) (via email)

REC'D C.P.
AUG 1 1 2017



1219503v.1

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                      SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____         _____
                                        DEPUTY CLERK

**OPPOSITION TO MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING
DEFENDANTS' LIABLITY FOR AND DAMAGES AT KENNER FACILITY**

**MAY IT PLEASE THE COURT:**

Plaintiff, H&E Equipment Services, Inc. ("H&E"), respectfully submits this opposition to
the Motion in Limine to Exclude Evidence Regarding Defendants' Liability for and Damages at
Kenner Facility filed by defendants, URS Corporation Architecture, P.C., URS Corporation, L.
O'Neal Johnson, and Thomas E. Ryan, III (collectively, "URS").

URS's motion in limine, which seeks to exclude any evidence regarding Defendants'
liability for and damages related to the renovation of H&E's Kenner facility, should be denied.
URS incorrectly argues that introduction of such evidence at trial "would violate this Court's
prior judgment" and that the evidence is irrelevant, prejudicial, and would prolong the trial.[1]

The introduction of evidence regarding URS's liability for and damages related to the
renovation of H&E's Kenner facility does not violate the Court's April 5, 2017 Judgment on
URS's motion for summary judgment. In its motion for summary judgment, URS argued that a
2009 Agreement between H&E and URS applied to all three H&E projects – *i.e.*, Baton Rouge,
Kenner, and Belle Chasse. URS further argued that the 2009 Agreement contained a clause
mandating that, in the event URS's work was defective, H&E's right to recover was limited to
forcing URS to re-perform the work. Citing the limitation of liability clause in the 2009
Agreement, URS sought dismissal of H&E's claims.

---

[1] Defendants' Memorandum in Support of Motion in Limine to Exclude Evidence Regarding Defendants' Liability
for and Damages at Kenner Facility.

1219117v.1



NON-CERTIFIED COPY

This Court held that URS's motion was granted in part and denied in part. The Court explained that: "The 2009 Agreement applies only to the Kenner Project and thus summary judgment is granted only as to the Kenner Project."[2]

Contrary to URS's argument, the Court did not dismiss H&E's claims with respect to the Kenner project. Nor could it have done so. Article 2004 of the Louisiana Civil Code prevents the enforcement of any contractual limitation of liability where the defendant's conduct is intentional, reckless, or grossly negligent. Applying Article 2004 – and this Court's holding that the 2009 Agreement and its limitation of liability provision apply to the Kenner Project – H&E must demonstrate intentional, reckless, or grossly negligent conduct in order to recover damages from URS related to the Kenner Project.

The Court's action, granting summary judgment as to one but not all of the issues raised in URS's motion, is well within the bounds of Article 966(E) of the Louisiana Code of Civil Procedure which states:

> A summary judgment may be rendered dispositive of a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties, even though the granting of the summary judgment does not dispose of the entire case as to that party or parties.[3]

In sum, because H&E may still recover for URS's gross negligence for the Kenner Project, such evidence of URS's liability and damages is plainly relevant and URS's remaining grounds for its motion (prejudice and prolonged trial) simply do not apply.

## CONCLUSION

For the above stated reasons, URS's motion in limine should be denied.

Respectfully submitted,



Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

---

[2] *See* April 5, 2017 Judgment.
[3] La. Code Civ. Proc. art. 966.

2

NON-CERTIFIED COPY

1219117v.1

## <u>C E R T I F I C A T E</u>

    I hereby certify that a copy of the above and foregoing has been served upon all counsel

of record by facsimile, email and/or by placing same in the United States mail, postage prepaid

and properly addressed, this 8th day of August, 2017.



3

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                   SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____        _____

                                              DEPUTY CLERK

**OPPOSITION TO MOTION IN LIMINE TO EXCLUDE EXPERT OPINIONS
NOT CONTAINED IN THAT EXPERT'S REPORT**

**MAY IT PLEASE THE COURT**:

Plaintiff, H&E Equipment Services, Inc. ("H&E"), respectfully submits this opposition to
the Motion in Limine to Exclude Expert Opinions Not Contained in that Expert's Report filed by
defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and
Thomas E. Ryan, III (collectively, "URS").

URS's motion should be denied for two reasons.  First, the motion is impermissibly
vague.  It requests the Court enter a ruling that "H&E is prohibited from introducing any
evidence of an opinion of an expert that is not contained in the expert's report."[1]  But URS does
not identify which expert, whether that expert is one designated by H&E or URS or some other
person, what opinion is not contained in the unnamed expert's report, or what opinion should be
excluded.  Without knowing what URS seeks to exclude, H&E cannot fully respond.

Second, the motion must be denied because the only authorities cited within, Rule 1425
of the Louisiana Code of Civil Procedure and *Maddox v. Bailey*, 13-0564 (La. App. 1 Cir.
3/19/14); 146 So.3d 590, do not support the broad relief URS seeks.  Rule 1425 plainly extends
an expert's testimony to "facts known or opinions held" that are disclosed "through
interrogatories, deposition, and a request for documents and tangible things." La. C.C.P. art.
1425(D)(1).  Similarly, the court in *Maddox* explained that an expert may be permitted to testify
as to the subject matter and the substance of facts that are disclosed through interrogatories and
depositions:

---

[1] Defendants' Memorandum in Support of Motion in Limine to Exclude Expert Opinions Not Contained in that
Expert's Report at pg. 1.

NON-CERTIFIED COPY

1219119v.1

> This type of unfair trial proceeding is prohibited by [LSA-]C.C.P. Article 1425, which declares that the subject matter on which the expert is expected to testify, and . . . the substance of the facts to which the expert is expected to testify **must be disclosed through interrogatories and depositions**. Case law has interpreted this provision to protect a party from prejudicial surprise at trial by the introduction of evidence not previously known by him to exist, and against which he could not therefore have prepared a rebuttal.

146 So.3d at 597-98 (quoting *Williams v. General Motors Corp.*, 93-0287 (La. App. 4th Cir. 6/15/94); 639 So.2d 275, 288-89 (emphasis added) (internal quotation marks omitted). Applying this principle, the *Maddox* court found that the trial court erred by allowing the expert to testify about "a theory that was **drastically different from deposition testimony he had given just two weeks earlier**." 146 So.3d at 596 (emphasis added).

Louisiana jurisprudence clearly provides that district courts are afforded broad discretion on whether or not expert testimony should be excluded based upon the sufficiency of disclosure of the expert opinion, but that "any doubt must be resolved in favor of receiving the testimony." *Jordan v. Intercontinental Bulktank Corp.*, 90-2146 (La. App. 1 Cir. 2/19/93); 621 So.3d 1141, 1152 ("The trial judge has great discretion in deciding whether to receive or refuse the testimony objected to on the grounds of failure to abide by the statutory mandate, but any doubt must be resolved in favor of receiving the testimony"); *Broussard v. Stack*, 95-2508 (La. App. 1 Cir. 9/27/96); 680 So. 2d 771, 782 (same). "The power to disallow the testimony should be exercised only when the ends of justice dictate the exclusion of the testimony." *Jordan*, 621 So. 2d at 1152. Similarly, courts in Louisiana interpreting the stricter federal statute on expert disclosure, Rule 26 of the Federal Rules of Civil Procedure, allow experts to testify at trial regarding matters that are beyond the scope of their reports but disclosed in expert depositions.[2]

Thus, neither Rule 1425 nor *Maddox* support the granting of a blanket pre-trial order limiting testimony of an expert witness to only what is contained in his report.

## CONCLUSION

For the above stated reasons, URS's motion in limine should be denied.

---

[2] *S. Pac. Transp. Co. v. Builders Transp., Inc.*, No. CIV. A. 90-3177, 1993 WL 185620, at *16 (E.D. La. May 25, 1993) (holding that an expert's deposition testimony on new matters obtained after submission of written report may expand the scope of the formal expert report); *Avondale Industries, Inc. v. Tyco Valves and Controls, Inc. et al.*, No. 01-2923, 2003 WL 23894914 (E.D. La. Sep. 9, 2003) (same).

NON-CERTIFIED COPY

1219119v.1

Respectfully submitted,

_____

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing has been served upon all counsel

of record by facsimile, email and/or by placing same in the United States mail, postage prepaid

and properly addressed, this 8th day of August, 2017.

_____



1219119v.1    NON-CERTIFIED COPY

6701-17-000897



# CIVIL SUBPOENA

H&E EQUIPMENT SERVICES INC
(Plaintiff)

vs.

URS CORPORATION ARCHITECTURE PC
ET AL
(Defendant)

NUMBER    C626308 Division D

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

TO:    BRAD REESE
MAPP CONSTRUCTION, LLC                  OR       6737 GEN. HAIG
601 POYDRAS STREET, STE. 1715                    NEW ORLEANS, LA. 70124
NEW ORLEANS, LA. 70130

You must come to Court at 300 North Boulevard, Baton Rouge, Louisiana, on **AUGUST 16, 2017,** at **9:30** o'clock **AM,** Courtroom No. **10-A,** Judge **JANICE CLARK.**

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **KELLEN J MATHEWS,** Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **10-JUL-2017,** Baton Rouge, Louisiana.

_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

---

### SERVICE INFORMATION:

Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**  After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20_____.

SERVICE: _____ $ _____
MILEAGE: _____ $ _____              _____
TOTAL: _____ $ _____                          Deputy Sheriff

**CIVIL SUBPOENA – OOP - 6701**

NON-CERTIFIED COPY
EBR4119762
EBR4209716

POSTED

AUG 1 4 2017



| | | |
|---|---|---|
| **H&E EQUIPMENT SERVICES, INC.** | * | **SUIT NO. 626,308    DIV.: D** |
| | * | |
| | * | **19TH JUDICIAL DISTRICT COURT** |
| **VERSUS** | * | |
| | * | **PARISH OF EAST BATON ROUGE** |
| **URS CORPORATION** | * | |
| **ARCHITECTURE, P.C., URS** | * | **STATE OF LOUISIANA** |
| **CORPORATION, L. O'NEAL** | | |
| **JOHNSON AND THOMAS E. RYAN,** | | |
| **III** | | |

COST OK $ ✓

AUG 1 4 2017

DEPUTY CLERK OF COURT

---

### DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING DEFENDANTS' LIABILITY FOR AND DAMAGES AT KENNER FACILITY

H&E concedes that summary judgment has been granted in Defendants' favor, dismissing H&E's negligence claims regarding the Kenner facility. However, H&E argues that it can still proceed to trial on gross negligence claims against Defendants. H&E is incorrect for three reasons.

1. **This Court granted the motion for summary judgment as requested by Defendants regarding the Kenner facility.**

H&E raised a gross negligence defense when it opposed Defendants' motion for summary judgment as to the Kenner facility.[1] This Court's judgment states that "summary judgment is granted" as to the Kenner Project. Judgment dated April 5, 2017. Judgment could not have been granted if the Court had found that H&E had raised a genuine issue for the trier of fact.

Additionally, in granting summary judgment, this Court ruled that the 2009 Agreement "applies" to the Kenner project. *Id.* This Court could not have found the limitation of liability provision in the 2009 Agreement applies to the Kenner project if the 2009 Agreement was not enforceable.

Importantly, Defendants filed a writ application with the First Circuit challenging this Court's denial of motion for summary judgment as to the Baton Rouge and Belle Chasse facilities, but H&E failed to file a writ application challenging summary judgment as to the Kenner facility. Accordingly, this Court's summary judgment in Defendants' favor, dismissing all of H&E's claims as to the Kenner facility, is final.

---

[1] *See* H&E's Opposition to Motion for Summary Judgment dated June 5, 2015 at 9.

1



EBR4236146

NON-CERTIFIED COPY

2.    **H&E waived any gross negligence argument as to the Kenner facility.**

Second, it is too late for H&E to argue gross negligence now.

When H&E opposed Defendants' motion for summary judgment, H&E included in its opposition only a single sentence regarding gross negligence: "Further, even if these requirements are met, a waiver is still null if it purports to exclude or limit liability for damages caused by intentional or gross fault."[2] Thus, H&E did no more than assert what the law is; H&E did not point to any facts that would make that law applicable to this case. Specifically, as pointed out in Defendants' Reply,[3] H&E did not identify any material facts in dispute that would support any argument of gross negligence.

The Code of Civil Procedure provides: "When a motion for summary judgment is made and supported as provided above, an adverse party **may not rest on the mere allegations** or denials of his pleading, but his response, by affidavits or as otherwise provided above, **must set forth specific facts** showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him." La. C.C.P. art. 967(B) (emphasis added).

Similarly, District Court Rule 9.10 states that any memorandum in opposition to a motion for summary judgment must contain a "list of the material facts that the opponent contents are genuinely disputed" and a "reference to the document proving that each such fact is genuinely disputed, with the pertinent part designated." *See* La. Dist. Ct. R. 9.10(b) (formerly La. Dist. Ct. R. 9.10(c)). Although H&E filed a "Response to Statement of Undisputed Material Fact Submitted in Support of Defendants' Motion for Summary Judgment" on June 5, 2015, H&E failed to identify any material facts which might support an argument of gross negligence, nor did it reference any document proving that any such fact is genuinely disputed.

Because H&E failed to submit any material facts which might support an argument of gross negligence at the time that this Court decided Defendants' motion for summary judgment, H&E waived any argument that there is evidence in this case that might support an argument of gross negligence. Now that summary judgment has been granted in Defendants' favor, it is too

---

[2] *See* H&E's Opposition to Motion for Summary Judgment dated June 5, 2015 at 9.
[3] *See* Defendants' Reply Memorandum in Support of Motion for Summary Judgment dated June 11, 2015 at 5.

NON-CERTIFIED COPY

late for H&E to make any such argument now. *See Hall v. J.E. Merit Constructors, Inc.*, 02-2648, p. 6 (La. App. 1 Cir. 11/07/03), 861 So. 2d 224, 228 (affirming summary judgment when plaintiff "failed to adequately oppose her employer's motion for summary judgment with material facts that would allow a trier of fact to conclude that an accident had occurred, and summary judgment was proper"); *Slaid v. Evergreen Indem.*, 32363, pp. 4-5 (La. App. 2 Cir. 10/27/99), 745 So. 2d 793, 797 ("the party opposing summary judgment cannot rest on the mere allegations or denials of his pleadings, but must present specific facts showing that material facts are still at issue"); *Estate of Shelvin v. Neustrom*, 15-63, p. 4 (La. App. 3 Cir. 10/07/15), 179 So. 3d 707, 711 (summary judgment properly granted when opponent identified disputed facts but made "no references to any documents that potentially proved their statement of disputed facts").

    **3.**      **The facts do not rise to the level required for gross negligence.**

There is no factual support for a gross negligence argument in this case. Indeed, gross negligence is not even mentioned in any of the reports from H&E's expert witnesses. Gross negligence is nothing more than a last-ditch afterthought to oppose Defendants' motion for summary judgment on the Kenner facility when this Court has already granted. There is no evidentiary support in this case for any such claim because the facts do not rise to the level required for gross negligence.

There is no dispute in this case that Louisiana law "uniformly holds" that the duty of a professional such as an engineer or architect is that exercised by others of the same profession. *Greater Lafourche Port Comm'n v. James Constr. Grp., L.L.C.*, 11-1548, p. 8 (La. App. 1 Cir. 9/21/12), 104 So. 3d 84, 89. (This same duty is also set forth in Section 4.1 of the 2009 Contract.) For there to be evidence that an engineer or architect has violated this duty, either in a negligent or a grossly negligent way, any such evidence would need to come from expert testimony. When a negligence claim is against a professional, the standard of care turns upon the "standards or practices of a profession," and thus "an expert is needed to establish whether the protocols asserted [by the plaintiff] are required by the local standard of care." *Milke v. Ratcliff Animal Hosp., Inc. ex rel. Ratcliff*, 48,130, p. 15 (La. App. 2 Cir. 7/10/13), 120 So. 3d 343, 351.

As the First Circuit has ruled: "It is well established in Louisiana jurisprudence that expert testimony is needed to establish the lack of care and resulting negligence on the part of

NON-CERTIFIED COPY

architects and engineers." *Charles Carter & Co. v. City of Baton Rouge*, 344 So. 2d 431, 433 (La. App. 1st Cir. 1977). "Failure to submit expert testimony to prove the standard of care is a 'fatal omission.'" *City of Alexandria v. Ratcliffe Const. Co., LLC*, 11-1200, p. 4 (La. App. 3 Cir. 2/8/12), 95 So. 3d 1076, 1079 (quoting *Greenhouse v. C.F. Kenner Associates Ltd. Partnership*, 98-496, p. 5 (La. App. 4 Cir. 11/10/98), 723 So. 2d 1004, 1008, and *Carter v. Deitz*, 556 So.2d 842, 843 (La. App. 4th Cir. 1990)).

    A claim of gross negligence must be supported by evidence of willful, wanton or reckless conduct. *Rabalais v. Nash*, 06-0999, p. 6 (La. 03/09/07), 952 So. 2d 653, 658 ("There is often no clear distinction between such [willful, wanton, or reckless] conduct and 'gross' negligence, and the two have tended to merge and take on the same meaning.") (brackets in original) (quoting *Falkowski v. Maurus*, 637 So. 2d 522 (La. App. 1st Cir.), which quoted W. Page Keeton, et. al., Prosser & Keeton on the Law of Torts, § 34, at 214 (5th ed. 1984). A claim of gross negligence must be supported by evidence of the "'entire absence of care' and the 'utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others.'" *Ambrose v. New Orleans Police Dept. Ambulance Serv.*, 93-3099, p. 5 (La. 7/5/94), 639 So. 2d 216, 219-20, quoting W. Page Keeton, et al, *Prosser & Keeton on the Law of Torts*, § 34, at 211 (5th ed. 1984). "Gross negligence has been defined as the 'want of even slight care and diligence' and the "want of that diligence which even careless men are accustomed to exercise.'" *Id.*, quoting *State v. Vinzant*, 200 La. 301, 7 So. 2d 917 (La. 1942). *See also Conmaco/Rector L.P. v. L&A Contracting Co.*, No. 12-2337 (E.D. La. 10/30/13), 2013 WL 5881576, 2013 U.S. Dist. LEXIS 155644 ("Louisiana courts have defined 'gross fault' for purposes of article 2004 as 'that which proceeds from inexcusable negligence or ignorance; it is considered as nearly equal to fraud.'") (citations omitted).

    Neither of H&E's expert witnesses has opined, in either an expert report or a deposition, that Defendants acted intentionally to harm H&E or that Defendants' actions were "nearly equal to fraud." There is not a single allegation that any discrepancy in Defendants' work constitutes an "entire absence of care," or that URS's actions were below even that of a "careless" engineer, as is required by Louisiana law.

4

NON-CERTIFIED COPY

This case is similar to *Conmaco/Rector L.P., supra*. In that case, there was a lease agreement between two companies which included a waiver of damages. The court noted that "[u]nder Louisiana law, parties may contract to limit or waive recoverable damages." *Id.* at *3. The court found that the wavier in the lease was enforceable because "the equipment lease in this matter was between two commercial actors," citing the Louisiana Supreme Court's *Louisiana Nat. Leasing Corp.* decision, *supra. Id.* at *4. The court also noted that the waivers were underlined and in capital letters. *Id.* The court next rejected the argument that the waiver did not apply because of gross negligence. The court noted that gross negligence is nearly equal to fraud and "[a]t most, L&A alleges Conmaco should have known of the defect in the Hammer. Such garden-variety negligence claims clearly do not rise to the high level of fault contemplated by article 2004." *Id.* at *5. "Accordingly, the Court finds that the waiver of damages is valid and enforceable." *Id.* Similarly, here, the facts actually pleaded by H&E in this matter amount to, at best, garden-variety negligence claims; well below the standard required to set forth gross a negligence claim.

## CONCLUSION

This Court granted summary judgment as a requested by Defendants as to the Kenner facility. Moreover, H&E has waived any gross negligence argument by failing to identify any specific facts showing gross negligence. Nor could H&E point to any such facts because its experts did not find any evidence of gross negligence, as evidenced by their expert reports. Finally, the facts of this case do not rise to the level of gross negligence. For any of these reasons, evidence as to liability for and damages at the Kenner facility should be excluded as irrelevant, prejudicial, potentially confusing to the jury, and serving only to further extend the trial.

NON-CERTIFIED COPY

Respectfully submitted,

**ADAMS AND REESE LLP**

Philip A. Franco (Bar #5819), TA
Ron Sholes (Bar #14436)
Jeffrey E. Richardson (Bar # 23273)
Don S. McKinney (Bar # 26685)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,**
**URS Corporation Architecture, P.C.;**
**URS Corporation; L. O'Neal Johnson**
**and Thomas E. Ryan, III**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon

all counsel of record via e-mail and/or United States Mail, postage prepaid and properly

addressed, this 14th day of August, 2017.

Kellen J. Mathews



NON-CERTIFIED COPY

POSTED

AUG 1 4 2017

| | | |
|---|---|---|
| **H&E EQUIPMENT SERVICES, INC.** | * | **SUIT NO. 626,308      DIV.: D** |
| | * | **19TH JUDICIAL DISTRICT COURT** |
| **VERSUS** | * | |
| | * | **PARISH OF EAST BATON ROUGE** |
| **URS CORPORATION** | * | **STATE OF LOUISIANA** |
| **ARCHITECTURE, P.C., URS** | | |
| **CORPORATION, L. O'NEAL** | | |
| **JOHNSON AND THOMAS E. RYAN,** | | |
| **III** | | |

COST OK $ _____

AUG 1 4 2017

DEPUTY CLERK OF COURT

---

### DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE EXPERT OPINIONS NOT CONTAINED IN THAT EXPERT'S REPORT

---

H&E has only two arguments against Defendants' motion in limine. First, H&E feigns confusion over which experts would be subject to the motion in limine. But the motion in limine is clearly directed as to **both** of H&E's experts.

Second, H&E argues, citing Code of Civil Procedure Article 1425(D)(1), that expert witnesses should be allowed to testify at trial as to an opinion that was expressed in a deposition even if it was not in the expert report. H&E is focusing on the wrong part of Article 1425. Article 1425(D) is merely a discovery rule; it states that "a party may ... discover" opinions held by an expert in a deposition. In contrast, Article 1425(B) provides that in a case such as this one in which there is an order requiring expert reports, the report "**shall** contain a complete statement of **all** opinions to be expressed ...." La. C.C.P. art. 1425(B) (emphasis added).

H&E also argues that in *Maddox v. Bailey*, 13-0564 (La. App. 1 Cir. 3/19/14), 146 So. 3d 590, the court stated that an expert's testimony at trial is limited to what is disclosed in depositions. That is true in a case in which there is no expert report requirement, but as noted above, there is an expert report requirement in this case and thus Article 1425(B) applies. The *Maddox* case does not mention expert reports or Article 1425(B), and it does not appear that there was any trial court requirement of expert reports in *Maddox*.

What *Maddox* does confirm however is that an expert witness cannot testify at trial as to any opinion which was not previously disclosed during discovery—regardless of whether there was also an expert report obligation in the case. *Maddox* certainly prohibits an expert from

EBR4236147

NON-CERTIFIED COPY

REC'D C.P.
AUG 1 4 2017

REC'D C.P.
AUG 17 2017

1

testifying beyond opinions expressed in an expert's deposition. H&E does not even attempt to argue to the contrary.

## CONCLUSION

In light of Article 1425(B), this Court should enter an order excluding any evidence at trial from either of H&E's expert witnesses which was not contained in that expert's report.

In the alternative, and at the very least, this Court should enter an order excluding any evidence at trial from either of H&E's expert witnesses which was not contained in either that expert's report or that expert's deposition testimony.

Respectfully submitted,

**ADAMS AND REESE LLP**

Philip A. Franco (Bar #5819), TA
Ron Sholes (Bar #14436)
Jeffrey E. Richardson (Bar # 23273)
Don S. McKinney (Bar # 26685)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,**
**URS Corporation Architecture, P.C.;**
**URS Corporation; L. O'Neal Johnson**
**and Thomas E. Ryan, III**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon all counsel of record via e-mail and/or United States Mail, postage prepaid and properly addressed, this 14th day of August, 2017.

Kellen J. Mathews

NON-CERTIFIED COPY

2



Office Of The Clerk

# Court of Appeal, First Circuit
State of Louisiana
www.la-fcca.org

Rodd Naquin
Clerk of Court

Post Office Box 4408
Baton Rouge, LA
70821-4408
(225) 382-3000

### Notice of Judgment and Disposition
August 14, 2017

**POSTED**

AUG 16 2017

RECEIVED

AUG 16 2017

DEPUTY CLERK OF COURT

Docket Number: 2017 - CW - 0955

H&E Equipment Services, Inc.
    versus
URS Corporation Architecture, P.C., URS Corporation, L.
O'Neal Johnson and Thomas E. Ryan, II

TO:

Jeffrey Edward Richardson  E
701 Poydras St.
Suite 4500
New Orleans, LA 70139
jeff.richardson@arlaw.com

Kellen J. Mathews
450 Laurel Street
Suite 1900
Baton Rouge, LA 70801
kellen.mathews@arlaw.com

Philip Anthony Franco
ADAMS AND REESE, LLP
701 Poydras Street, Ste. 450
New Orleans, LA 70139
philip.franco@arlaw.com

Ronald J. Sholes
4500 One Shell Square
New Orleans, LA 70139

Alysson L. Mills
201 St. Charles Ave.
Suite 4600
New Orleans, LA 70170
amills@fishmanhaygood.com

Brent B. Barriere
201 St. Charles Avenue
46th Floor
New Orleans, LA
70170-4600

Loretta G. Mince
FISHMAN HAYGOOD PHELI
201 St. Charles Ave., Ste. 46
New Orleans, LA
70170-4600
lmince@fishmanhaygood.cor

Hon. Janice G. Clark
300 North Boulevard
Suite 10101
Baton Rouge, LA 70801

In accordance with Local Rule 6 of the Court of Appeal, First Circuit, I hereby certify that this notice of judgment and
disposition and the attached disposition were transmitted this date to the trial judge or equivalent, all counsel of record,
and all parties not represented by counsel.

*Elizabeth D. Nauta*

RODD NAQUIN
CLERK OF COURT



EBR4236396

NON-CERTIFIED COPY

# STATE OF LOUISIANA

# COURT OF APPEAL, FIRST CIRCUIT

H&E EQUIPMENT SERVICES, INC.                     NO.   2017 CW 0955

VERSUS

URS CORPORATION
ARCHITECTURE, PC, URS
CORPORATION, L. O'NEAL
JOHNSON AND THOMAS E. RYAN,                      AUG 1 4 2017
II

---

In Re:    URS Corporation Architecture, P.C., URS Corporation,
          L. O'Neal Johnson and Thomas Ryan, III, applying for
          supervisory writs, 19th Judicial District Court,
          Parish of East Baton Rouge, No. 626308.

---

BEFORE:    WHIPPLE, C.J., HOLDRIDGE AND PENZATO, JJ.

**WRIT GRANTED IN PART WITH ORDER.** From the writ application,
it appears that the trial court did not comply with the
requirements of La. C.C.P. art. 1425(F) in denying the motions
in limine filed by URS Corporation Architecture, P.C., URS
Corporation, L. O'Neal Johnson, and Thomas Ryan, II, in which
they sought to exclude the testimony of two potential experts.
Because of this legal error, we vacate the rulings of the trial
court that denied the motions, and we remand this matter to the
trial court to conduct hearings and to provide all information
as required under La. C.C.P. art. 1425(F).

                                AHP
                                VGW

        **Holdridge, J.,** concurs.

COURT OF APPEAL, FIRST CIRCUIT

_Elizabeth D. Nauta_
DEPUTY CLERK OF COURT
FOR THE COURT

A TRUE COPY
Elizabeth D. Nauta
August 14, 2017

NON-CERTIFIED COPY

6701-17-000942

# CIVIL SUBPOENA

H&E EQUIPMENT SERVICES INC
(Plaintiff)

vs.

URS CORPORATION ARCHITECTURE PC
ET AL
(Defendant)

NUMBER     C626308 Division D

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

TO:   BRAD REESE
      6737 GENERAL HAIG
      NEW ORLEANS, LA.  70124

SERIAL NO.    DEPUTY    PARISH

You must come to Court at 300 North Boulevard, on **AUGUST 16, 2017**, at **9:30** o'clock **AM**, Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth, to the best of your knowledge, in this case, under DIRECT/CROSS examination.  (Ordered by **KELLEN J MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **24-JUL-2017**, Baton Rouge, Louisiana.

_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

---

**SERVICE INFORMATION:**

Received on the _2_ day of _Aug_, 20 _17_ and on the _3_ day of _Aug_, 20 _17_, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____

**DOMICILIARY SERVICE:** On the within named _Brad Reese_, by leaving the same at his domicile in this parish in the hands of _Wife = Jessica_, a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _Orleans_, this _3_ day of _Aug_ 20 _17_.

SERVICE:    $_____
MILEAGE    $_____            _Deana 148_
TOTAL:      $_____           Deputy Sheriff

CIVIL SUBPOENA – OOP - 6701

EBR411979783

EBR4271893

NON-CERTIFIED COPY

| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308        DIV.: D |
|---|---|---|
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA  COST OK $ ✓ |
| CORPORATION, L. O'NEAL | | |
| JOHNSON AND THOMAS E. RYAN, | | AUG 21 2017 |
| III | | DEPUTY CLERK OF COURT |

---

### ORDER

---

Considering the foregoing Motion to Set Trial Date filed by Defendants, URS Corporation Architecture, P. C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III (collectively referred to as "Defendants"):

**IT IS HEREBY ORDERED** that Plaintiff, H&E Equipment Services, Inc., appear and show cause, if any, on the _6_ day of _Nov._ 2017 at _1:00_ a.m./p.m. why Defendants' Motion to Set Trial Date should not be granted as prayed for.

**THUS DONE AND SIGNED** in Baton Rouge, Louisiana, this _11_ day of _Sept_, 2017.

_Janice Clark_
HONORABLE JANICE CLARK, JUDGE
19th Judicial District Court



**PLEASE SERVE:**
**H&E EQUIPMENT SERVICES, INC.**
*Through its Counsel of Record*
Brent B. Barriere
Loretta G. Mince
Rebecca Sha
Fishman Haygood, LLP
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170

NON-CERTIFIED COPY

6709-17-000246

## RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**NUMBER  C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

TO:    URS CORPORATION ARCHITECTURE PC
URS CORPORATION, L.O'NEAL RYAN
AND THOMAS E RYAN, III
THRU PHIL FRANCO, KELLEN MATHEWS, RONALD SHOLES
AND JEFF RICHARDSON
4500 ONE SHELL SQUARE
NEW ORLEANS, LA.  70139

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

### MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING OTHER FACILITIES

You MUST come to Court at 9:00 AM, on AUGUST 16, 2017 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

### * * * * * SEE ATTACHED ORDER * * * * *

**YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on **27-JUL-2017.**

| | ENTERED | |
|---|---|---|
| PAPER | | RETURN |
| 17, 9105, | | A1 |
| SERIAL NO. | DEPUTY | PARISH |

_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

Requesting Attorney:
LORETTA G MINCE

---

**SERVICE INFORMATION:**

Received on the ____ day of _Aug_ , 20 _17_ and on the _2_ day of _Aug_ , 20 _17_ , served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at *701 Poydras St #4500 (served Gwizer Booth)

**DOMICILIARY SERVICE:** On the within named _____ , by leaving the same at his domicile in this parish in the hands of _____ , a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:**    After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____ , this ____ day of _____ , 20 ____ .

SERVICE:$ _____
MILEAGE:$ _____
TOTAL:  $ _____

_R Jordan 8VJ_
Deputy Sheriff
Parish of _____

**RULE NISI (OOP) - 6709**

EBR4119870

EBR4280494

NON-CERTIFIED COPY

6701-17-000963

# CIVIL SUBPOENA

H&E EQUIPMENT SERVICES INC.  
(Plaintiff)

vs.

URS CORPORATION ARCHITECTURE PC,  
ET AL  
(Defendant)

NUMBER    C626308 Division D

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

TO:    BRAD REESE  
6737 GENERAL HAIG  
NEW ORLEANS, LOUISIANA  70124

You must come to Court at 300 North Boulevard, on **AUGUST 16, 2017, at 9:30** o'clock A.M., Courtroom No. **10-A**, Judge **JANICE CLARK**.

You must remain in Court until discharged by the Judge. You must testify to the truth to the best of your knowledge, in this case, under DIRECT/CROSS examination.  
(Ordered by **KELLEN J. MATHEWS**, Attorney.)

IF YOU DO NOT APPEAR, YOU WILL BE VIOLATING THE LAW AND MAY BE SUBJECT TO PENALTIES.

Ordered by the Court on **31-JUL-2017**, Baton Rouge, Louisiana.

_Sharon Zito_  
_Deputy Clerk of Court for_  
**Doug Welborn, Clerk of Court**

PAPER ENTERED    RETURN    NO  
SERIAL NO.    DEPUTY    PARISH

---

**SERVICE INFORMATION:**

Received on the __2__ day of __Aug__, 20 _17_ and on the __3__ day of __Aug__, 20 _17_, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____

**DOMICILIARY SERVICE:** On the within named _Brad Reese_, by leaving the same at his domicile in this parish in the hands of _WIFE = JESSICA_, a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _Orleans_, this __3__ day of __Aug__, 20 _17_.

SERVICE  
MILEAGE  
TOTAL

_G. Deano 148_  
Deputy Sheriff

**CIVIL SUBPOENA – OOP - 6701**

EBR4119867

EBR4281293

NON-CERTIFIED COPY

**POSTED**

SEP 1 1 2017

*mc*

H&E EQUIPMENT SERVICES    *    SUIT NO. 626,308    DIV.: D

       *    19TH JUDICIAL DISTRICT COURT

VERSUS        *    PARISH OF EAST BATON ROUGE

       * 

URS CORPORATION        *    STATE OF LOUISIANA COST OK $_____ ✓
ARCHITECTURE, P.C., URS
CORPORATION, L. O'NEAL
JOHNSON AND THOMAS E. RYAN,      SEP - 8 2017
III

                   DEPUTY CLERK OF COURT

---

### DEFENDANTS' EX PARTE MOTION TO SET HEARING
### ON MOTION TO SET TRIAL DATE

---

Defendants URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION,

L. O'NEAL JOHNSON and THOMAS E. RYAN, III ("Defendants") move this Court to

set a hearing on their previously filed Motion to Set Trial Date, as follows:

1. On August 18, 2017, Defendants filed a Motion to Set Trial Date wherein

   Defendants requested that this Court set a new jury trial date in this matter.

2. Additionally on August 21, 2017, Defendants filed a corresponding Rule to

   Show Cause requesting the Motion to Set Trial Date for hearing.

3. As of the filing of the instant motion, Defendants' Motion to Set Trial Date

   has not been set for hearing.

4. Accordingly, Defendants hereby move this Honorable Court to set

   Defendants' Motion to Set Trial Date for hearing so that the matter can be set

   for a jury trial date consistent with the considerations set forth in Defendants'

   Motion to Set Trial Date and incorporated memorandum in support thereof.

**WHEREFORE**, Defendants, URS Corporation Architecture, P.C., URS

Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III, respectfully request that this





REC'D C.P.
SEP 1 1 2017

1

NON-CERTIFIED COPY

Honorable Court grant their Ex Parte Motion to Set Hearing on Motion to Set Trial Date

in order to reset this matter for a jury trial as prayed for.

Respectfully submitted,

ADAMS AND REESE LLP

Philip A. Franco (Bar #5819), TA
Ron Sholes (Bar # 14436)
Jeffrey E. Richardson (Bar # 23273)
Don S. McKinney (Bar # 26685)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,
URS Corporation Architecture, P.C.;
URS Corporation; L. O'Neal Johnson
and Thomas E. Ryan, III**



FILED
EAST BATON ROUGE PARISH, LA
2017 SEP -8  PM 12: 19
DEPUTY CLERK OF COURT

2

NON-CERTIFIED COPY

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon all counsel of record via e-mail and/or United States Mail, postage prepaid and properly addressed, this 8th day of September, 2017.

_____
Kellen J. Mathews



3

NON-CERTIFIED COPY

19TH JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

12-SEP-2017

TO:    HON JANICE CLARK
       19TH JUDICIAL DISTRICT COURT
       300 NORTH BLVD, RM 10A
       BATON ROUGE, LA 70802

**H&E EQUIPMENT SRVCS VS URS CORP ARCHITECTURE ETAL**

**CASE NUMBER:** C626308

**JUDGE:** JANICE CLARK

**DIVISION:** Division D **ROOM:** 10A

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING ACTION FOR THE

AFOREMENTIONED CASE ON 06-NOV-2017 AT

01:00:00 PM SET FOR MOTION.

**COMMENTS:** HEARING ON DEFENDANTS' MOTION TO SET TRIAL DATE

**NOTE:** MEMO IN OPPOSITION TO BE SUBMITTED TO THE JUDGE NO LATER THAN EIGHT (8) DAYS PRIOR TO HEARING.

                    EILEEN KNIGHT
                    JUDICIAL ASSISTANT TO JUDGE
                    JANICE CLARK

NOTIFIED:

ATY - ROY CLIFTON CHEATWOOD
ATY - PHILIP ANTHONY FRANCO
ATY - ANNE DERBES WITTMANN
ATY - M DAVID KURTZ
ATY - LORETTA G MINCE
ATY - EDWARD J LAPEROUSE
JDG - JANICE CLARK
ATY - LAURA E CARLISLE
ATY - KELLEN J MATHEWS
ATY - REBECCA SHA

Form 4501A

NON-CERTIFIED COPY

# DOUG WELBORN, CLERK OF COURT
## 19th Judicial District Court
### Parish of East Baton Rouge
### 300 North Boulevard
### Baton Rouge, LA 70801
### Phone  (225)389-3960

NO.    C626308 Division D            13-SEP-2017

TO:    ORLEANS PARISH SHERIFFS OFFICE
       CIVIL DEPARTMENT
       421 LOYOLA AVE
       NEW ORLEANS, LA 70112

Please find attached RULE NISI  to be served in your parish for the above numbered suit.

Kindly make your return(s) on the duplicate(s) enclosed, and

X       note the enclosed check for payment of service;

        send us your bill for service;

        note that this is a pauper suit and no funds are available; or

        note that this is a government suit and no funds are necessary.

                                        Thank You,

                                        Deputy Clerk of Court for
                                        Doug Welborn, Clerk of Court

Requesting Attorney:  KELLEN J MATHEWS

---

REPLY:                          DATE:_____

_____

_____

_____

_____

_____

                                By:_____

                                Deputy Sheriff, Parish of _____

Letter to Out Of Parish Sheriff - 5213



EBR4230055    NON-CERTIFIED COPY

6709-17-000271

## RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

NUMBER  C626308 Division D

19th JUDICIAL DISTRICT COURT

**vs.**

PARISH OF EAST BATON ROUGE

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

STATE OF LOUISIANA

TO:    H&E EQUIPMENT SERVICES INC
       THRU BRENT B BARRIERE
       LORETTA G. MINCE, REBECCA SHA
       FISHMAN HAYGOOD, LLP
       201 ST CHARLES AVE., STE. 4600
       NEW ORLEANS, LA.  70170

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

DEFENDANTS' MOTION TO SET TRIAL DATE

You MUST come to Court at 1:00 PM, on NOVEMBER 6, 2017 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

## * * * * * SEE ATTACHED ORDER * * * * *

**YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on **13-SEP-2017**.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

Requesting Attorney:
KELLEN J MATHEWS

---

**SERVICE INFORMATION:**

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:**    After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20_____.

SERVICE $_____
MILEAGE$_____          _____
TOTAL:  $_____               Deputy Sheriff
                                 Parish of _____

**RULE NISI (OOP) - 6709**



NON-CERTIFIED COPY

EBR4340999

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                                    SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____          _____

                                                    DEPUTY CLERK

**RULE TO SHOW CAUSE**

**IT IS ORDERED** that Plaintiff, H&E Equipment Services, Inc., appear before this

Honorable Court on the 6th day of November, 2017 at 1:00 P.M. and show cause why the Court

should not grant the relief prayed for in the Motions in Limine to Exclude the Report and

Testimony of Mr. Wallace C. Drennan, III, and Dr. James R. Bailey filed by Defendants, URS

Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III.

Baton Rouge, Louisiana, this _____20_____ day of _____Sept_____, 2017.

_____
DISTRICT JUDGE

**PLEASE SERVE:**

URS Corporation Architecture, P.C.;
URS Corporation; L. O'Neal Ryan
and Thomas E. Ryan, III
through their attorneys of record:
Phil Franco
Kellen Mathews
Ronald Sholes
Jeff Richardson
Adams & Reese, LLP
4500 One Shell Square
New Orleans, LA 70139

Respectfully submitted,

_____
Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for H&E Equipment Services, Inc*

1231606v.1

NON-CERTIFIED COPY

| | |
|---|---|
| H&E EQUIPMENT SERVICES | * SUIT NO. 626,308    DIV.: D |
| | * 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * |
| | * PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * STATE OF LOUISIANA   COST OK $ 250 |
| ARCHITECTURE, P.C., URS | |
| CORPORATION, L. O'NEAL | |
| JOHNSON AND THOMAS E. RYAN, | SEP 21 2017 |
| III | C# 055909 A |
| | DEPUTY CLERK OF COURT |

## RULE TO SHOW CAUSE

IT IS ORDERED that Plaintiff's Motion in Limine to Exclude Evidence Regarding Other

Facilities, Defendants' Motions in Limine to Exclude the Report and Testimony of Wallace C.

Drennan, III and Dr. James R. Bailey; Defendants' Motion in Limine to Limit Expert's Opinions

Not Contained in that Expert's Report; and Defendants' Motion in Limine to Exclude Evidence

Regarding Defendants' Liability and Damages at Kenner Facility be set for hearing on the

6th day of _____Nov._____, 20 17.

1:00 PM

Baton Rouge, Louisiana, this 27 day of ____Sept____, 2017.



_Jamie Clark_
19th Judicial District Court Judge

**PLEASE SERVE:**
H&E Equipment Services, Inc.
Through its Counsel of Record
Brent B. Barrier
Loretta G. Mince
Alysson L. Mills
Fishman Haygood
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170

URS Corporation Architecture, P.C.,
URS Corporation, L. O'Neal Johnson
and Thomas E. Ryan, III
Through their Counsel of Record
Philip A. Franco
Ron Sholes
Kellen J. Matthews
Jeffrey Richardson
Adams and Reese, LLP
701 Poydras Street, Suite 4500
New Orleans, LA 70139

1

NON-CERTIFIED COPY

6709-17-000248

## RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**NUMBER  C626308 Division D**

**vs.**

**19th JUDICIAL DISTRICT COURT**

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

TO:   H&E EQUIPMENT SERVICES INC
       THRU BRENT B BARRIERE
       LORETTA G MINCE, ALYSSON L MILLS
       REBECCA SHA
       201S ST. CHARLES  AVE., 46TH FLOOR
       NEW ORLEANS, LA.  70170-4600

       The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

       **DEFENDANTS MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING DEFENDATS LIABILITY FOR AND DAMAGES AT KENNER FACILITY & MEMORANDUM**

       You MUST come to Court at 9:30 AM, on AUGUST 16, 2017 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

       * * * * * SEE ATTACHED ORDER * * * * *

       YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST.

       The Rule was issued by the Clerk of Court for East Baton Rouge Parish on **08-AUG-2017.**

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

Requesting Attorney:
KELLEN J MATHEWS

---

**SERVICE INFORMATION:**

Received on the _15_ day of _Aug_ , 20 _17_ and on the _16_ day of _Aug_ , 20 _17_ , served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _201 # Charles  thru Kaplan_

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:**        After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20____ .

SERVICE:$_____
MILEAGES$_____
TOTAL:  $_____

_Deputy Sheriff_
Parish of _____

**RULE NISI (OOP) - 6709**

NON-CERTIFIED COPY

EBR4196285

EBR4282690

6709-17-000249



# RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**NUMBER  C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

vs.

**PARISH OF EAST BATON ROUGE**

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**STATE OF LOUISIANA**

TO:    **H&E EQUIPMENT SERVICES INC
THRU BRENT B BARRIERE
LORETTA G MINCE, ALYSSON L MILLS
REBECCA SHA
201S ST. CHARLES  AVE., 46TH FLOOR
NEW ORLEANS, LA.  70170-4600**

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

**DEFENDANTS MOTION IN LIMINE TO EXCLUDE EXPERT OPINIONS NOT
CONTAINED IN THAT EXPERT'S REPORT  & MEMORANDUM**

You MUST come to Court at 9:30 AM, on AUGUST 16, 2017 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

**\* \* \* \* \* SEE ATTACHED ORDER \* \* \* \* \***

**YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A
BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on **08-AUG-2017**.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

Requesting Attorney:
KELLEN J MATHEWS

---

**SERVICE INFORMATION:**

Received on the 15 day of Aug , 20 17 and on the 16 day of Aug , 20 17 served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at 201 st Charles thru Karl

**DOMICILIARY SERVICE:** On the within named _____ by leaving the same at his domicile in this parish in the hands of _____ a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20____.

SERVICE: $ _____
GES _____
: $ _____
Deputy Sheriff
Parish of _____

**RULE NISI (OOP) - 6709**

NON-CERTIFIED COPY



EBR4196286

EBR4282694

# DOUG WELBORN, CLERK OF COURT
## 19th Judicial District Court
### Parish of East Baton Rouge
### 300 North Boulevard
### Baton Rouge, LA 70801
### Phone (225)389-3960

NO.    C626308 Division D          03-OCT-2017

TO:    ORLEANS PARISH SHERIFFS OFFICE
       CIVIL DEPARTMENT
       421 LOYOLA AVE
       NEW ORLEANS, LA 70112

Please find attached TWO NOTICE OF SERVICE'S to be served in your parish for the above numbered suit.

Kindly make your return(s) on the duplicate(s) enclosed, and

X    note the enclosed check for payment of service;

ﺽ    send us your bill for service;

ﺽ    note that this is a pauper suit and no funds are available; or

ﺽ    note that this is a government suit and no funds are necessary.

Thank You,

Deputy Clerk of Court for
**Doug Welborn, Clerk of Court**

Requesting Attorney:  **KELLEN J MATHEWS**

REPLY: _____    DATE:_____

_____

_____

_____

_____

_____

By:_____

Deputy Sheriff, Parish of _____

**Letter to Out Of Parish Sheriff - 5213**



EBR4229847    NON-CERTIFIED COPY

5901-17-001220

# NOTICE OF SERVICE

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**vs.**

**URS CORPORATION ARCHITECTURE PC ET AL**
(Defendant)

NUMBER  C626308 Division D

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

**TO:    H&E EQUIPMENT SERVICES INC
THRU BRENT B BARRIER
LORETTA G MINCE
ALYSSON L MILLS
FISHMAN HAYGOOD
201 ST CHARLES AVE., 46TH FLOOR
NEW ORLEANS, LA.   70170**

GREETINGS:

You are hereby served with **RULE TO SHOW CAUSE, SET FOR NOVEMBER 6, 2017**

AT  1: 00 PM IN ROOM 10-A .  A certified copy is attached hereto, as requested by **KELLEN J**

**MATHEWS**, Attorney.

This Notice was issued by the Clerk of Court for East Baton Rouge Parish on **03-OCT-2017**.



*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

**SERVICE INFORMATION:**

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____, served
on the above named party as follows:

**PERSONAL SERVICE:**  On the party herein named at _____

**DOMICILIARY SERVICE:**  On the within named _____, by leaving the same at his domicile
in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at
_____

**DUE AND DILIGENT:**   After diligent search and inquiry, was unable to find the within named _____ or
his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20____.

SERVICE:      $_____            _____
MILEAGE      $_____                      Deputy Sheriff
TOTAL:         $_____

NOTICE OF SERVICE –OOP–5901



EBR4392254

NON-CERTIFIED COPY

5901-17-001221

# NOTICE OF SERVICE

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

vs.

**URS CORPORATION ARCHITECTURE PC ET AL**
(Defendant)

NUMBER  C626308 Division D

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

TO:    URS CORPORATION ARCHITECTURE, P.C.
       URS CORPORATION, L. O' NEAL JOHNSON
       AND THOMAS E RYAN, III
       THRU PHILIP A FRANCO , RON SHOLES
       KELLEN J MATTHEWS , JEFFREY RICHARDSON
       701 POYDRAS STREET, STE. 4500
       NEW ORLEANS, LA.   70139

GREETINGS:

You are hereby served with **RULE TO SHOW CAUSE, SET FOR NOVEMBER 6, 2017**

**AT  1: 00 PM IN ROOM 10-A** .  A certified copy is attached hereto, as requested by **KELLEN J**

**MATHEWS**, Attorney.

This Notice was issued by the Clerk of Court for East Baton Rouge Parish on **03-OCT-2017**.

*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

---

## SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20_____ , served
on the above named party as follows:

**PERSONAL SERVICE:**  On the party herein named at _____ .

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile
in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at
_____ .

**DUE AND DILIGENT:**  After diligent search and inquiry, was unable to find the within named _____ or
his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20_____ .

SERVICE:    $_____
MILEAGE   $_____     _____
TOTAL:      $_____          Deputy Sheriff

**NOTICE OF SERVICE –OOP–5901**



EBR4392256

NON-CERTIFIED COPY



**19TH JUDICIAL DISTRICT COURT**
**PARISH OF EAST BATON ROUGE**
**STATE OF LOUISIANA**

**27-SEP-2017**

TO:    HON JANICE CLARK
       19TH JUDICIAL DISTRICT COURT
       300 NORTH BLVD, RM 10A
       BATON ROUGE, LA 70802

**H&E EQUIPMENT SRVCS VS URS CORP ARCHITECTURE ETAL**

**CASE NUMBER:** C626308

**JUDGE:** JANICE CLARK

**DIVISION:** Division D **ROOM:** 10A

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING ACTION FOR THE

AFOREMENTIONED CASE ON 06-NOV-2017 AT

01:00:00 PM SET FOR MOTION.

**COMMENTS:** ADD:  ALL MOTIONS FILED WILL BE HEARD ON THE ABOVE DATE

**NOTE:** MEMO IN OPPOSITION TO BE SUBMITTED TO THE JUDGE NO LATER THAN
EIGHT (8) DAYS PRIOR TO HEARING.

                    EILEEN KNIGHT
                    JUDICIAL ASSISTANT TO JUDGE
                    JANICE CLARK

NOTIFIED:



ATY - ROY CLIFTON CHEATWOOD
ATY - PHILIP ANTHONY FRANCO
ATY - ANNE DERBES WITTMANN
ATY - M DAVID KURTZ
ATY - LORETTA G MINCE
ATY - EDWARD J LAPEROUSE
JDG - JANICE CLARK
ATY - LAURA E CARLISLE
ATY - KELLEN J MATHEWS
ATY - REBECCA SHA

Form 4501A

NON-CERTIFIED COPY

**DOUG WELBORN, CLERK OF COURT**
19th Judicial District Court
Parish of East Baton Rouge
300 North Boulevard
Baton Rouge, LA 70801
Phone (225)389-3960

NO.   C626308 Division D          03-OCT-2017

TO:   ORLEANS PARISH SHERIFFS OFFICE
      CIVIL DEPARTMENT
      421 LOYOLA AVE
      NEW ORLEANS, LA 70112

Please find attached RULE NISI to be served in your parish for the above numbered suit.

Kindly make your return(s) on the duplicate(s) enclosed, and

    X    note the enclosed check for payment of service;

        send us your bill for service;

        note that this is a pauper suit and no funds are available; or

        note that this is a government suit and no funds are necessary.

Thank You,

Deputy Clerk of Court for
**Doug Welborn, Clerk of Court**

**Requesting Attorney: LORETTA G MINCE**

REPLY:           DATE:_____

_____

_____

_____

_____

_____

By:_____

Deputy Sheriff, Parish of _____

Letter to Out Of Parish Sheriff - 5213



EBR4229833

NON-CERTIFIED COPY


6709-17-000284

## RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**NUMBER  C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

**vs.**

**PARISH OF EAST BATON ROUGE**

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**STATE OF LOUISIANA**

**TO:    URS CORPORATION ARCHITECTURE , P.C.
URS CORPORATION, L/O'NEAL RYAN
THROUGH THOMAS E RYAN, III
PHIL FRANCO, KELLEN MATHEWS
RONALD SHOLES, JEFF RICHARDSON
4500 ONE SHELL SQUARE
NEW ORLEANS, LA.   70139**

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

### RULE TO SHOW CAUSE

You MUST come to Court at 1:00 PM, on NOVEMBER 6, 2017 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

### * * * * * SEE ATTACHED ORDER * * * * *

**YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on **03-OCT-2017**.

_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

Requesting Attorney:
LORETTA G MINCE

---

### SERVICE INFORMATION:

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20____, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____.

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**    After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20____.

SERVICE $_____
MILEAGE $_____          _____
TOTAL:   $_____                  Deputy Sheriff
                                Parish of _____

**RULE NISI (OOP) - 6709**



EBR4392264

NON-CERTIFIED COPY

6709-17-000271

## RULE NISI

H&E EQUIPMENT SERVICES INC
(Plaintiff)

vs.

URS CORPORATION ARCHITECTURE PC
ET AL
(Defendant)

NUMBER C626308 Division D

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

TO:    H&E EQUIPMENT SERVICES INC
       THRU BRENT B BARRIERE
       LORETTA G. MINCE, REBECCA SHA
       FISHMAN HAYGOOD, LLP
       201 ST CHARLES AVE., STE. 4600
       NEW ORLEANS, LA.  70170

*WGB* PAPER   ENTERED   RETURN

24 / 91061 / 01
SERIAL NO.   DEPUTY   PARISH

The Mover in this case filed a petition which the Court granted. Certified copies of this document and the Court's Order are attached.

DEFENDANTS' MOTION TO SET TRIAL DATE

You MUST come to Court at 1:00 PM, on NOVEMBER 6, 2017 in Room 10-A, 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

* * * * * SEE ATTACHED ORDER * * * * *

**YOU ARE ORDERED TO APPEAR IN COURT. IF YOU FAIL TO APPEAR, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on 13-SEP-2017.

_____
Deputy Clerk of Court for
**Doug Welborn, Clerk of Court**

Requesting Attorney:
KELLEN J MATHEWS

---

SERVICE INFORMATION:

Received on the 18 day of Sept 20 17 and on the 19 day of Sept 20 17, served on the above named party as follows:

PERSONAL SERVICE: On the party herein named at 201 St Charles thru Karly

DOMICILIARY SERVICE: On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

DUE AND DILIGENT: After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

RETURNED: Parish of _____, this _____ day of _____, 20____.

SERVICE:$_____
MILEAGES_____
TOTAL: $_____

_____
Deputy Sheriff
Parish of Orleans

RULE NISI (OOP) - 6709

EBR4202428

EBR4340999

NON-CERTIFIED COPY

# FishmanHaygood

Fishman Haygood LLP
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170
fishmanhaygood.com



LORETTA MINCE
(504) 586-5273
LMINCE@FISHMANHAYGOOD.COM

September 19, 2017

File No. 3107-04

*Via* **Federal Express**

The Honorable Janice G. Clark
District Court Judge, Division "D"
19th JDC, Parish of East Baton Rouge
300 North Boulevard
Baton Rouge, Louisiana 70802

    Re:   *H&E Equipment Services, Inc. v URS Corporation Architecture, P.C., et al*
          Docket No. 626308, Sec. "D"

Dear Judge Clark:



    I write regarding the setting of a hearing date for motions in limine filed by Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III.

    As the Court is aware, on August 14, 2017, the Louisiana First Circuit Court of Appeal, granted a writ application filed by Defendants that vacated this Court's ruling denying the motions in limine relating to Plaintiff H&E's experts, Mr. Wallace C. Drennan, III and Dr. James R. Bailey, and remanded the matter to the trial court to conduct hearings and to provide additional information pursuant to Louisiana Code of Civil Procedure article 1425(F).

    Defendants recently filed a Motion to Set Trial Date. The Court set the hearing on Defendants' Motion to Set Trial Date on November 6, 2017 at 1:00 PM. In the interest of convenience and judicial economy, Plaintiff requests this Court to set the hearing date for Defendants' motions in limine relating to Plaintiff's experts also on November 6, 2017 at 1:00 PM. A proposed Rule to Show Cause is enclosed.

                Respectfully,

                Loretta Mince

LGM
Enclosures
cc:    Phil Franco (w/encs.) (via email)
       Kellen Matthews (w/encs.) (via email)

1231604v.1

NON-CERTIFIED COPY

EBR4232215

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
* * * * * * * * *
                  *
H&E EQUIPMENT SERVICES  *
                  * NUMBER 626,308
VERSUS            *
                  * DIVISION "D"
URS CORPORATION   *
ARCHITECTURE, P.C., URS *
CORPORATION, L O'NEAL  *
JOHNSON AND THOMAS E.  *
RYAN, III         *
                  *
* * * * * * * * *
```

**CLERK OF COURT**
FILE COPY

CASE ID._____
FILING DATE:_____
ATTORNEY_____
NO. PAGES:_____ 115

**EXHIBIT ATTACHMENT TO:**
☐  MOTION SUMMARY JUDGMENT
☐  PETITION
☐  MEMORANDUM
☐  OTHER_____

**DEPUTY CLERK OF COURT**

Deposition of WALLACE C. DRENNAN

III, taken on Wednesday, September 21, 2016,

commencing at 9:44 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.

EXHIBIT
A

NON-CERTIFIED COPY

Page 12

1    Q.  Okay.  So today, you didn't meet with

2  anybody prior to your deposition to talk about

3  your deposition?

4    A.  In Lori Mince's office for 15 minutes

5  when I got here.

6    Q.  Okay.  Let's go through your educational

7  background for me, please.

8        What is your most recent educational

9  accomplishment?

10    A.  I went to Tulane University.  I majored

11  in computer science, and then I went to the

12  University of Alabama, civil engineering, and I

13  didn't graduate.

14    Q.  From either?

15    A.  No.

16    Q.  So, no degrees?

17    A.  No degrees.

18    Q.  Have you had any formal education since

19  then?

20    A.  Other than a seminar or so, no.

21    Q.  How long were you at Alabama studying

22  civil engineering?

23    A.  Year, year and a half.

24    Q.  Was that before Tulane or after?

25    A.  After.

NON-CERTIFIED COPY

1    A.  We are a general contractor specializing

2  in concrete paving, sewerage, water, drainage,

3  sewer lift stations, electrical duct banks, a

4  bridge here, a bridge there, here or there,

5  mostly for entities like the City of New

6  Orleans, the Sewerage & Water Board, the DOTD,

7  Jefferson Parish.

8    Q.  Mostly for public entities?

9    A.  Yes.

10    Q.  Okay.  Mr. Drennan, have you ever been

11  qualified as an expert before in connection with

12  any litigation?

13    A.  No.

14    Q.  Have you ever been disqualified as an

15  expert in any litigation?

16    A.  No.

17    Q.  So, this is your first rodeo?

18    A.  Yes.

19    Q.  And who contacted you in order to serve

20  as an expert in this case?

21    A.  Ms. Mince.

22    Q.  What was your relationship with

23  Ms. Mince?

24    A.  Ms. Mince handles my construction

25  litigation.

NON-CERTIFIED COPY

Page 20

1    Q.  So, she is your lawyer, basically?

2    A.  One of them, yes.

3    Q.  And how long has that been the case?

4    A.  2005, '06.

5    Q.  Have you ever been asked to serve as an

6    expert by Ms. Mince before this case?

7    A.  No.

8    Q.  Okay.  I assume you have a copy of your

9    report with you?

10   A.  No, I don't.

11       MR. FRANCO:

12           Can you show him a copy of his

13   report so we can be on the same page?

14       THE WITNESS:

15           I have a copy in your office.

16       MS. MINCE:

17           I think the one that I have here has

18   writing on it, so I probably need to get one for

19   him.

20       MR. FRANCO:

21           That's fine.

22       MS. MINCE:

23           Can we go off the Record for a

24   minute?

25           (Off the Record.)

NON-CERTIFIED COPY

Page 21

1    EXAMINATION BY MR. FRANCO:

2        Q.  Okay.  Actually, Mr. Drennan, I am going

3    to label a copy of your report dated July 28,

4    2016, as Exhibit 1, and we will get a clean copy

5    attached.

6            Did you have any help in drafting this

7    report?

8        A.  No.

9        Q.  You did this all yourself?

10       A.  My office -- yeah, I did it all myself.

11       Q.  I mean, you didn't have any help with

12   gathering any of the documents or any

13   discussions?  You didn't talk to anybody about

14   this other than maybe Counsel?

15       A.  I talked to some people in my office who

16   have, you know, experience.

17       Q.  Okay.

18       A.  I have a couple of engineers working for

19   me.

20       Q.  All right.  And for the Record, you're

21   not an engineer, correct?

22       A.  No.

23       Q.  And you're not licensed as an engineer

24   in any state, correct?

25       A.  No.

NON-CERTIFIED COPY

Page 22

1      Q.  Have you ever given an engineering

2  opinion before this report?

3      A.  I've never given an engineering opinion.

4      Q.  You report states that you've actually

5  made two visits to the Kenner facility; is that

6  correct?

7      A.  Yes.

8      Q.  Why was that?

9      A.  The first time was to conduct my site

10  inspections.  The second time was really just to

11  meet Mr. Bailey at the site and look around a

12  little bit again.

13      Q.  All right.  So let me ask you this:

14          Your first visit was June 30 to Baton

15  Rouge; is that correct?  And both.  Both of

16  them.  You went to both on June 30, correct?

17      A.  Yes.

18      Q.  When were you contacted to serve as an

19  expert in this case?

20      A.  Shoot.  I really don't recall.

21      Q.  It wasn't too much earlier than June 30,

22  was it?

23      A.  I don't think so.  It could have been a

24  couple weeks before.  I really cannot recall.

25      Q.  And when you were contacted, what were

NON-CERTIFIED COPY

Page 25

1    Q.  How long did you spend at Kenner on July

2    7th?

3    A.  Maybe an hour.

4    Q.  Okay.  Now, did you do any coring while

5    you were out there?

6    A.  No.

7    Q.  Did you do any investigation of the

8    foundations while you were out at the sites?

9    A.  Specifically foundations for what?

10    Q.  For the paved areas.

11    A.  I'm not sure -- I'm not familiar with

12    the term "foundations" for a paved area.

13    Q.  Okay.  What's underneath the pavement at

14    Baton Rouge?

15    A.  Base material.

16    Q.  Did you do any investigation of the base

17    material at Baton Rouge when you were out there?

18    A.  No.

19    Q.  Did you do any investigation of the base

20    material at Kenner while you were out there?

21    A.  No.

22    Q.  Is it fair to say that while you were

23    out there, you basically walked around and took

24    pictures; is that right?

25    A.  Walked around, took pictures, looked

NON-CERTIFIED COPY

Page 26

1   extensively at the paving, and I pretty much

2   covered -- you know, I walked the panels, you

3   know, the whole site.  I measured a few joints.

4   Kind of got down on my knees and looked at

5   certain things.

6        Q.  Did you walk every panel in Baton Rouge?

7        A.  I don't think I -- I may not have

8   touched every panel, but I walked 75 percent of

9   them.

10       Q.  What about at Kenner?

11       A.  The same thing.

12       Q.  Did every panel in Baton Rouge have

13  damage?

14       A.  I can't say every panel had damage.

15       Q.  What about in Kenner?  The same thing?

16       A.  Let me back up.

17           If every panel has -- are you talking

18  about visual damage on top?

19       Q.  Yes.

20       A.  No.  Not every panel had visual damage

21  on top.

22       Q.  Okay.  How do you tell if there's damage

23  below?  You can't?

24       A.  Damage below what?  The paving?

25       Q.  I don't know.  You just said they had

NON-CERTIFIED COPY

Page 27

1    damage on top.  As compared to what?  As

2    compared to not being on top, right?

3        A.  Yes, not being on top, right.

4        Q.  So I think my question was:  "Did every

5    panel have damage?"  And you said, "Not every

6    panel."

7        A.  Not every panel, no.

8        Q.  Right?  At both sites, correct?

9        A.  Both sites, correct.

10        Q.  Can you tell me what percentage of the

11    panels at Baton Rouge had visible damage?

12        A.  No.  Not at this time.

13        Q.  What about at Kenner?

14        A.  No.  I can't tell you an exact, specific

15    number, no.

16        Q.  Can you give me a percentage at either

17    site?

18        A.  50 to 75.

19        Q.  Okay.  50 to 75 --

20        A.  Percent.

21        Q.  -- didn't have --

22        A.  Visible damage on top.

23        Q.  At which location?

24        A.  At which location?

25        Q.  At which location?  At both?

NON-CERTIFIED COPY

Page 28

1    A.  You just said Kenner.

2    Q.  I did?

3    A.  You said Kenner, yes.  I think you said

4  Kenner.

5    Q.  Okay.  I'm sorry.

6        50 to 75 percent had visible damage at

7  Kenner?

8    A.  Yes.

9    Q.  What about at Baton Rouge?

10   A.  Probably more towards 75 percent.

11   Q.  Was there a particular area where the

12  damage was more prominent than other areas at

13  Kenner?

14   A.  I don't believe so.

15   Q.  Okay.  Was there a particular area that

16  had more visible damage in the panels of Baton

17  Rouge?

18   A.  I don't believe so.  You know, I didn't

19  quantify it in that way.

20   Q.  Looking at your report, at the Baton

21  Rouge site, you say, "The design of the pavement

22  for the Baton Rouge facility is defective in

23  numerous respects..."

24       Do you see that?

25   A.  Would you tell me where that is?

NON-CERTIFIED COPY

Page 38

1      A.  I can't say that 100 percent.  I mean,

2   they poured a parking lot for -- they poured

3   their own parking lots for their own facilities.

4   They could have written those specifications.

5   I've never bid one of those, though.

6      Q.  The Louisiana Department of

7   Transportation & Development, are they engaged

8   in private parking lots?  Not government parking

9   lots.  Private parking lots, are they engaged in

10  any of that?

11     A.  I don't know.

12     Q.  Okay.  Is there anything in those

13  specifications that deal with parking lots for

14  heavy-tracked steel equipment?

15     A.  I don't know.

16     Q.  Okay.  Let's talk about the City of

17  Baton Rouge Standard Plans.

18         The City of Baton Rouge is not engaged

19  in any private parking lots, is it?

20     A.  I don't know.

21     Q.  And those are primarily for roads and

22  highways and bridges in the Parish of East Baton

23  Rouge, isn't it?

24     A.  If that's what it says it's for, yes.

25     Q.  The Specifications for Roads and Bridges

NON-CERTIFIED COPY

Page 50

1    A.  I think five inches -- and this is just

2   my opinion -- five inches compared to what I

3   poured for a residential City of New Orleans

4   driveway, for a residence of Jefferson Parish

5   driveway, the standard driveway I think is six

6   inches for automobiles.

7          And I don't think I've -- I don't think

8   I've poured a roadway in the City of New Orleans

9   less than seven inches.  The   standard's either

10   eight or nine or even 11 inches.

11          In fact, when we poured Tchoupitoulas

12   for the DOTD, we had 11-inch thick concrete, so

13   I don't agree with the thicknesses.  That's just

14   based on my personal experience.

15    Q.  So, basically, you don't agree with all

16   of what's in 8.2, do you?

17    A.  I don't think the thicknesses are

18   adequate for the paving.

19    Q.  Is that a "yes" or a "no"?

20    A.  No, I don't agree with everything that's

21   there.

22    Q.  Okay.  And here it says the design

23   presumes 3,800 psi concrete.

24          Do you see that?

25    A.  Yes, I do.

NON-CERTIFIED COPY

Page 51

1     Q.  What was the psi concrete at Baton Rouge

2  designed for?

3     A.  I think I saw two different numbers,

4  4,000, but then if you go back to DOTD, you are

5  apt to use like less than 4,000, like 3,800,

6  maybe.  So between 3,800 and 4,000 psi.

7     Q.  Okay.  This also says that the design

8  life of the pavement system is dependent upon

9  periodic maintenance of the pavement.

10        Do you agree with that statement?

11     A.  Yes.

12     Q.  What periodic maintenance are you aware

13  of that took place in Baton Rouge?

14     A.  Only really when I witnessed -- when I

15  was at my site visits and they had $120,000

16  sweepers sweeping up the debris in the parking

17  lots.

18        That's the only thing I actually saw.  I

19  don't have any other knowledge of that.

20     Q.  Okay.  When you saw sweepers, you mean

21  more than one sweeper in Baton Rouge, or just

22  one?

23     A.  I saw a sweeper in Baton Rouge and a

24  sweeper in Kenner.

25     Q.  Do you know what the purpose of those

NON-CERTIFIED COPY

Page 55

1   other concrete, and that did lead me to believe

2   that it was a repair.  But other that, I don't

3   have any, like, firsthand knowledge of that area

4   of repair, no.

5       Q.  It's fair to say that you saw a lot of

6   areas that were not repaired; isn't that true?

7       A.  I saw a lot of areas that were not -- I

8   saw a lot of areas that were damaged.

9       Q.  That were not repaired, am I correct?

10      A.  Yes.

11      Q.  All right.  Do you agree with the

12  statement in the geotech report that maintenance

13  includes, but not limited to, cleaning and

14  resealing joints, sealing cracks and immediate

15  repairs of damaged areas?

16      A.  Say that again, please?

17      Q.  Do you agree with the statement in the

18  geotech report that maintenance of the pavement

19  includes, but is not limited to, cleaning and

20  resealing joints, sealing cracks and immediate

21  repairs of damaged areas?

22      A.  Yes.  But in this case, I mean, the

23  joints aren't working.

24      Q.  Okay.  I just asked you if you -- and

25  you said, "yes," right?

NON-CERTIFIED COPY

Page 56

1      A.  Right.

2      Q.  You agree with that statement?

3      A.  I agree with the statement.

4      Q.  Okay.  Look at the second page, the next

5  page of the report, sir.

6          It says about halfway down, "Panel sizes

7  should not exceed 15 feet in any direction."

8          Do you see that?

9      A.  Uh-huh (affirmative response).

10     Q.  Do you agree with that?

11     A.  Uh-huh (affirmative response).

12         Do I agree with it?  I think that's a

13  safe number.  The DOTD says that you can't go

14  any wider than 16 foot by 20 foot long, so it's

15  within that parameter.

16     Q.  Are you aware that there's some panels

17  at Baton Rouge that exceed 15 feet in any

18  direction, sir?

19     A.  I think I may have read that in an

20  expert report, but I don't know how many panels

21  there are.

22         I think in Kenner there's only one panel

23  that's longer than 15 feet.

24     Q.  And, sir, it's fair to say you've never

25  designed pavement; is that true?

NON-CERTIFIED COPY

1    A.  No, I've never designed pavement.

2    Q.  And are you aware that this geotech

3  report also -- the design in this geotech report

4  also depends on frequency of traffic?

5    A.  This report, I didn't -- I didn't notice

6  that, no.

7    Q.  All right.  Look at 8.0 for me.

8    A.  (Witness complying.)

9    Q.  It says, "No specific traffic data were

10  provided; therefore, pavement recommendations

11  for this site are based upon the following

12  assumed daily traffic frequencies."

13        Do you see that?

14    A.  Uh-huh (affirmative response).

15    Q.  You see that?

16    A.  Yes.  I see that.

17    Q.  The design of paved area depends on the

18  frequency of traffic, doesn't it, Mr. Drennan?

19    A.  In this case, it does, yes.

20    Q.  I'm talking about any case.  Doesn't it?

21    A.  To me, it depends on the load, which I

22  guess can take into account frequency.

23    Q.  So you don't know, or you can't tell me,

24  sir, that the design of pavement for equipment

25  depends on frequency of traffic?

NON-CERTIFIED COPY

Page 69

1    to concrete areas and they just score the

2    concrete for decoration.  Sometimes they saw all

3    the way through it.  They just do what you tell

4    them to do.

5        Q.  But that's contrary to what you said

6    just now about the standard being a quarter of

7    the thickness of the pavement, isn't it?  There

8    is a standard, isn't there?

9        A.  I believe we're talking about two

10   different things.

11           Concrete sawcut subcontractors just

12   don't saw joints.  I would say the majority of

13   what they do is saw a full depth for the removal

14   of roadways.

15           And they just do what you tell them to

16   do, do what the plans show.  In fact, they tell

17   you you have to lay out the joints for them,

18   where they go.

19       Q.  Mr. Drennan, what is the standard of

20   care for this design?  Where is that standard of

21   care?

22           MS. MINCE:

23               Object to form.

24   EXAMINATION BY MR. FRANCO:

25       Q.  The design of the concrete at Baton

NON-CERTIFIED COPY

Page 70

1   Rouge, where is that standard of care laid out?

2          MS. MINCE:

3              Same.

4          THE WITNESS:

5              I don't know what you are talking

6   about, "standard of care."

7   EXAMINATION BY MR. FRANCO:

8       Q.  You don't know anything about standard

9   of care?

10      A.  I'm not familiar with design --

11      Q.  Is it your opinion that the design in

12  Baton Rouge didn't meet the standard of care?

13      A.  I don't think it's adequate, no.

14      Q.  My question is:  Is it your opinion that

15  the design in Baton Rouge didn't meet the

16  standard of care for the engineer?

17         MS. MINCE:

18             Object to form.

19         THE WITNESS:

20             I don't believe -- I don't believe

21  the design is adequate.

22  EXAMINATION BY MR. FRANCO:

23      Q.  That's not an answer to my question,

24  with all due respect.

25             Do you believe that it met the standard

NON-CERTIFIED COPY

Page 71

1    of care for an engineer in the community?

2        A.  You need to define "standard of care"

3    for me to be able to answer that question.

4        Q.  That's my question to you.

5            What is the standard of care?  Where is

6    the standard of care indicated for the design of

7    the pavement in Baton Rouge?

8        MS. MINCE:

9            Object to form.

10   EXAMINATION BY MR. FRANCO:

11       Q.  Where is that standard?

12       A.  To be able to look for it, you've got to

13   tell me what the definition of it is in this

14   case.

15       Q.  You can't tell me the definition?

16       A.  No.

17       Q.  Now, is the depth of the joint indicated

18   in the East Baton Rouge plans the exact same as

19   what's noted in the Department of Transportation

20   specifications or plans?

21       A.  I believe they differ slightly.

22       Q.  So even those plans differ as to how far

23   the depth is supposed to be cut, correct?

24       A.  I'd have to compare whether it's maybe

25   one set of plans doesn't address -- one set of

NON-CERTIFIED COPY

Page 76

1    weakest area to crack, and usually that means

2    that it's looking for an area that's -- it's

3    less material than it has to pull apart.

4         In case of these corners, if you have

5    four panels meeting each other, and you have

6    rebar 24 inches on center, it's possible there's

7    actually no rebar in that -- in the area inside

8    the corner crack because of the spacing, and

9    that becomes one of the weakest areas of the

10   slab, and corners are already weak.  And this

11   just exacerbates the problem to create that

12   corner crack.

13       Q.  Did you investigate whether the

14   contractor actually installed the pavement at

15   the correct thickness?

16       A.  I did not see any core information.

17       Q.  So the answer is "no"?

18       A.  The answer is "no."  I have no core

19   information, no.

20       Q.  Did you investigate, especially in

21   connection with any random cracking across the

22   panels, did you investigate any other cause for

23   that other than design?

24       MS. MINCE:

25           Object to form.

NON-CERTIFIED COPY

Page 77

1        THE WITNESS:

2            I just said basically -- did I

3    invest -- I considered a base cause, and that

4    was it.

5    EXAMINATION BY MR. FRANCO:

6        Q.  Okay.  So you didn't look at improper

7    concrete mix design, did you?

8        A.  No.  I have not seen the concrete mixes

9    on it.  I've asked for it, but I don't know if

10   we've gotten it or not yet.

11       Q.  You didn't investigate excessive slump,

12   did you?

13       A.  I looked at all the testing lab reports.

14   Slump is a very imprecise measurement depending

15   on what's in the mix design, so -- and

16   throughout, what you could see in a mix design,

17   I couldn't tell you if this slump --

18       Q.  But you didn't -- so the answer -- I'm

19   sorry.  I interrupted you.  Go ahead.

20       A.  I looked at the slumps on all the

21   concrete tickets, but without having further

22   information as to the mix design -- but, slump,

23   again -- slump is extremely imprecise.

24           It's just a general guideline of the

25   flowability of the concrete.  And as long as the

NON-CERTIFIED COPY

1     Q.  A corner --

2     A.  If it was a corner crack and there was a

3  base failure, the pavement would be down.  It

4  would just collapse (indicating).

5     Q.  So none of the corner cracks in your

6  opinion have anything to do with the base?

7     A.  No.

8     Q.  Not one of them?

9     A.  None that I recall, no.

10     Q.  And any other of the random cracking

11  across the panels has nothing do with the base?

12     A.  No.

13     Q.  Or the thickness?

14     A.  Or the thickness of what?

15     Q.  Of the concrete.

16     A.  Like I said, I did not investigate the

17  thickness, but I do not believe it does.

18     Q.  So if the contractor only laid five

19  inches of that, instead of the six or eight

20  inches that was specified, that wouldn't be a

21  reason for cracking across the panel?

22     A.  It could be more of a weakened plane,

23  but the panel wouldn't crack if it had the right

24  joint.

25     Q.  So it wouldn't crack even if it had five

NON-CERTIFIED COPY

Page 84

1   could be less.

2       Q.  What is the purpose of the tracks on

3   tracked equipment?

4       A.  What is the purpose of the track?

5       Q.  Yes, sir.

6       A.  The purpose of the track is to actually

7   spread the load out and allow the vehicle to

8   operate on the top of the dirt without getting

9   stuck.

10      Q.  So, in other words, the purpose, one of

11  the purposes is to spread the load, whereas, on

12  rubber-tired equipment, the load is concentrated

13  where the rubber tire is.  Fair statement?

14      A.  Yes.

15      Q.  So what's the standard in the industry

16  for concrete for heavy-tracked equipment?

17  What's the thickness?

18      A.  I'm not aware of any industry standard

19  for heavy equipment, but I do know that the

20  vehicles are substantially lighter than a

21  50,000-pound backhoe.

22      Q.  When you said there was no industry

23  standard for heavy equipment, you meant

24  heavy-tracked equipment?

25      A.  Heavy-tracked equipment and heavy

NON-CERTIFIED COPY

Page 85

1    rubber-tired equipment.

2        Q.  Well, there is an industry standard for

3    heavy rubber-tired equipment, isn't there, on

4    concrete?

5        A.  Yes.  I mean, heavy loads on concrete,

6    yes.

7        Q.  All right.  So I want to make sure I

8    understood your prior statement.

9            You said there was no industry standard

10   for heavy-tracked equipment on concrete.  Fair

11   statement?

12       A.  I'm not aware of one, no.

13       Q.  Let's talk a little bit about Kenner.

14           On Page 5 of your report, you say the

15   contraction joint shows a sawcut of one-quarter

16   inch depth of concrete.

17           Do you see that?

18       A.  Yes, I do.

19       Q.  Have you looked at that same drawing

20   recently, Mr. Drennan?

21       A.  I don't recall the last time I saw it.

22       Q.  The drawing that you referred to, sir --

23   I thought I had -- would you put my other

24   drawing back again?  Would you put those back

25   together for me so we don't get them all screwed

NON-CERTIFIED COPY

1   actually in the ground or in the pavement, do

2   you, as you sit here?

3       A.  To my knowledge, it was the No. 3 rebar,

4   but I do not -- I did not demolish the concrete

5   to determine what was in there.

6       Q.  That's my question.

7           You don't know, as you sit here,

8   actually what reinforcement was used and

9   installed at Kenner?

10      A.  No, I did not see it.

11      Q.  We can cover this individually, but

12  let's see if we can summarize it.

13          It's fair to say that all the things

14  that I asked you, whether you checked into as

15  alternate causes at Baton Rouge, the testimony

16  here would be the same with respect to Kenner.

17  Is that a fair statement?

18      A.  Yes.

19      Q.  And the same questions on maintenance

20  that I asked about Baton Rouge would apply to

21  Kenner, correct?

22      A.  Yes.

23      Q.  And the same testimony on repairs that I

24  asked you about at Baton Rouge, would apply to

25  Kenner, as well, correct, the repairs that would

NON-CERTIFIED COPY

Page 100

1    equipment.

2        Q.  All of what you just said, obviously,

3    increases the costs, doesn't it?

4        A.  Yes, it does.

5        Q.  Are you aware that H&E rejected armored

6    joints?

7        A.  I have no knowledge of that.

8            MS. MINCE:

9                Object to the form.

10   EXAMINATION BY MR. FRANCO:

11       Q.  Okay.  I'm looking at your list of

12   projects, Mr. Drennan, and --

13       A.  I do not have that.

14       Q.  Okay.  Well, I'm not sure you are going

15   to need it, but if you do, you can look at my

16   copy.

17           Is there any project on here where your

18   company did a concrete area for heavy-tracked

19   steel equipment?

20       A.  No.

21       Q.  And so, consistent with your earlier

22   testimony, it looks to me like you do a lot of

23   street work for public entities.  Fair

24   statement?

25       A.  Yes.

NON-CERTIFIED COPY

Page 102

1    there's about 20 or so general definitions of

2    specifications.  And so it's referred to -- it's

3    somewhere in my specs on pouring concrete.

4        Q.  In your mind, are specifications for the

5    highways and roads and bridges the same as

6    specifications for a private parking lot?

7            MS. MINCE:

8                Object to the form.

9            THE WITNESS:

10               It can be.

11   EXAMINATION BY MR. FRANCO:

12       Q.  Well, what's the standard?

13           MS. MINCE:

14               Object to form.

15           THE WITNESS:

16               It depends on who the engineer is.

17               Engineers tend to use what is out

18   there for specifications, and sometimes they do

19   it in accordance with DOTD.

20               But they have their own special

21   specs, and their specs say, "Here's the item,

22   then do it, go to the DOTD."

23               And you can do stuff as according to

24   the DOTD and ACI at the same time.

25   EXAMINATION BY MR. FRANCO:

NON-CERTIFIED COPY

1    Q.  And you could also do it based on your

2    experience as an engineer, can't you?

3    A.  Yes, you can.  Yeah.

4    Q.  Now, Mr. Drennan, we talked about your

5    visits to the sites, both sites, Kenner and

6    Baton Rouge.

7         Is the entire paved area at both of

8    those sites serviceable or not?

9    A.  What does "serviceable" mean?

10    Q.  Is the Company able to use the pavement

11    for the work that the Company does?

12    A.  I mean, they can store heavy equipment

13    on it, yeah.

14    Q.  Is there anything that indicates to you

15    that they have not been able to move heavy

16    equipment on the concrete pavements at either

17    Kenner or Baton Rouge?

18    A.  I have no knowledge of where -- where or

19    why they are putting equipment in certain areas

20    or when.

21         For some reason, in Baton Rouge, it

22    appears that there was a cluster of equipment in

23    the center, and I don't know why that was.

24    Q.  Okay.  Do you have your estimates with

25    you?

NON-CERTIFIED COPY

1    A.  The layout of the joints is -- you know,

2    they have a layout on the plans, but you have to

3    kind of, I guess, make sure all the joints work,

4    if that makes any sense.

5    Q.  Okay.  Is there any protection to the

6    expansion joints, any extra protection?  Are

7    they cambered, are they protected with armored

8    plates?  Any protection to the joints?

9    A.  You keep saying the word "camber."

10    Q.  Chamfer --

11    A.  Camfer and camber are --

12    Q.  Chamfer.  Sorry.

13    A.  Except for a radius arm, you know, when

14    you finish the joint up, there's no protection

15    on the expansion joints.

16        Now, the sealant on expansion joints is

17    installed -- anchored joints -- contraction

18    joints is installed below the top of the joint.

19    Q.  Okay.  So what is going to prevent the

20    spalling of the expansion joints and contraction

21    joints by the use of heavy-tracked earth-moving

22    equipment?

23    A.  I did not address these in these

24    estimates -- I did not address that issue.

25    Q.  All right.  So it's fair to say you

NON-CERTIFIED COPY

Page 116

1    Q.  That's your target?

2    A.  Yes.

3    Q.  And this estimate replaces even those

4    paved areas that don't have any damage at all,

5    correct?

6    A.  The entire site.

7    Q.  The answer is "yes"?

8    A.  Yes.  This is the entire -- this

9    replaces the entire site.  I just want to be

10   clear on that.

11   Q.  I want to be clear --

12   A.  Whether damaged or not, it replaces the

13   entire site.

14   Q.  Okay.  Did you do this estimate?

15   A.  No.  This estimate was done -- well, yes

16   and no.  This estimate was done according to our

17   normal procedure on how we bid jobs.  Was

18   treated like that.

19        I have a full-time estimator, Tim

20   Morgan, who basically does a hundred percent of

21   our estimating, and then after he is complete

22   and we're ready to put the -- you know, finish

23   the bid, he and I sit down together and we go

24   over the bid pretty much in its entirety.

25        And I double-check things.  I'm normally

NON-CERTIFIED COPY

1    A.  Yes.

2    Q.  About 2.8 million; is that correct, or

3  not?

4    A.  I'm not -- I'm not adding it up.

5    Q.  Let me see.  Hold on.  11, 15 -- I get

6  about 2,100,000.  You can't tell me whether

7  that's correct or not?

8    A.  No, I can't.

9    Q.  You are aware that H&E bid out the

10  original contract for Baton Rouge?

11    A.  Not -- no, not really.  I'm not aware of

12  that in Baton Rouge.

13    Q.  Are you a customer of H&E?

14    A.  Yes, I am.

15    Q.  To what extent?  You buy or you rent

16  from them, or both?

17    A.  We could rent, but mostly we buy

18  Komatsus, Komatsu excavators.

19    Q.  And can you tell me approximately how

20  much you've bought in terms of dollars in the

21  last two or three years?

22    A.  We buy about 400 to $500,000 of

23  equipment a year across all people, so I would

24  say H&E is maybe $200,000 a year.

25        They didn't even know I was a customer.

NON-CERTIFIED COPY

1    Nobody put two and two together when I went and

2    visited the sites --

3        Q.  Okay.

4        A.  -- when I introduced myself.

5            MR. FRANCO:

6                Let's take a little break.  We might

7    be close to finishing.

8            (Brief recess held.)

9    EXAMINATION BY MR. FRANCO:

10       Q.  Mr. Drennan, during the break, did you

11   talk about this case?

12       A.  A little bit.

13       Q.  To who or with who?

14       A.  Brent, Lori, me and Bob.

15       Q.  Okay.  What did you discuss?

16       A.  Concrete cores, how come we don't have

17   certain documents.

18       Q.  Say again.  I didn't hear that.

19       A.  How come we didn't get certain

20   documents.  That's really -- just kind of

21   general stuff.

22       Q.  Okay.  What about concrete cores?  What

23   did you discuss?

24       A.  That -- I looked over the Terracon

25   testing laboratory reports, report summary --

NON-CERTIFIED COPY

1   and other reports, too, but the summary, and I

2   was wondering why there's no reference to why

3   anyone didn't core the concrete after it was

4   poured to check the thickness.

5        Q.  By whom?  Who would core that?

6        A.  It would be Terracon, I would think, or

7   -- I don't know.

8        Q.  Are you suggesting that's what is

9   normally done?

10       A.  I tried -- I looked for some coring

11  information in the specifications.  I didn't see

12  anything.

13           It just says testing in accordance with

14  these standards, and I didn't go any further.

15  That is what is normally done on anything bigger

16  than a driveway, in my business, and cores get

17  done.

18           And there's a penalty for

19  underthickness.  And so if it's under -- just an

20  example.  If it's underthickness by a quarter

21  inch, it's no penalty.  A half an inch, it's a

22  10 percent penalty.  And if it's more than that,

23  it's "Take it out, put it back because it's not

24  functional."

25       Q.  More than how much?  An inch?

NON-CERTIFIED COPY

1          I'd like to see that.  I mentioned

2     earlier in my testimony that I don't know if the

3     water/cement ratio was exceeded or not by slump.

4     I'd like to see what other add mixtures they had

5     in there because it's going to be a recipe of

6     what's in that load of concrete.

7          Q.  Okay.  And, again, you want to see the

8     concrete tickets.  Again, that's in reference to

9     what the contractor's actually putting down,

10    correct?  To see what the contractor's actually

11    putting down in concrete, isn't it?

12         A.  Yes.  And I think one of the experts in

13    one of the reports mentioned something about

14    while the concrete met requirements of the DOTD,

15    it didn't meet the requirements for ACI or STE.

16    I don't know which one.

17         And I was just trying to verify that

18    fact, if it did or didn't meet those

19    requirements.  And I can't do that unless I see

20    the batch weight where he took the mix design.

21         That's another thing.  I don't have a

22    copy of the approved mix design for the

23    concrete.

24         Q.  When we broke for lunch, did you discuss

25    changing any of your prior testimony?

NON-CERTIFIED COPY

1    see a lot of that.

2        Q.  Okay.  Well, you answered my question.

3            You can't eliminate that possibility

4    that the spalling occurred first and allowed

5    moisture in and it deteriorated the --

6        A.  No, I don't know if the chicken came

7    before the egg.

8        Q.  All right.  You can put that one aside.

9            Now I'm going to show you Photo 74106,

10   which we will label as Exhibit 9.

11           What kind of crack is that?

12       A.  This is a corner crack only on one

13   corner.

14       Q.  Okay.

15       A.  And looks to be at the intersection of

16   an expansion joint and a contraction joint.

17       Q.  All right.

18       A.  There's kind of an issue with expansion

19   joints for when the slab expands, but since the

20   slab is all bound together with rebar on both

21   sides of the expansion joint, the only place it

22   can contract is at expansion joints, which is

23   basically more movement than would be if it

24   could crack every 15 foot over the saw joints.

25           So there's a lot going on in the

NON-CERTIFIED COPY

Page 158

1    expansion joint that's not normally there --

2    normally occurs.

3        Q.  Okay.  But you see a lot of spalling in

4    this photo, as well, don't you?

5        A.  Yes, you do see spalling along the

6    joint.

7        Q.  Okay.  And --

8        A.  And interesting, though, the spalling is

9    mostly on the photograph on the left side of the

10   joint and not the right side of the joint,

11   except for one instance.

12       Q.  And what does that indicate to you?

13       A.  That whatever is going on, more is going

14   on on the left side than the right side.

15       Q.  That's all it indicates to you.  Is it

16   possible --

17       A.  Actually, I take that back.  The right

18   side could be causing what's happening on the

19   left side.

20       Q.  Okay.  And it's also possible that with

21   that kind of spalling, that moisture and water

22   gets in that and could have caused that corner

23   cracking; isn't that true, sir?

24       A.  It's true.  But if it was, in fact, just

25   wet base course doesn't really mean that the

NON-CERTIFIED COPY

1   base is going to fail.

2          If the base failed, that means there

3   would be a void underneath this piece of

4   concrete.  And if you were running heavy

5   equipment on top this piece of concrete, it

6   would have moved up or down.  It's just not

7   going to hang up in the air by itself.

8       Q.  What's the reason you seal expansion

9   joints and contraction joints, Mr. Drennan?

10      A.  The reason you seal them?

11      Q.  Yes, sir.  What's the reason you seal

12  them?

13      A.  Is to stop the water from going down the

14  joints.

15      Q.  Okay.

16      A.  In a lot of cases, we don't really have

17  it here, but they have what they call

18  freeze-thaw, and so when water gets in there and

19  it freezes, it really expands, and can cause

20  this kind of damage, but we don't have that case

21  here.

22      Q.  Why do we do it here?

23      A.  To stop the water from getting into the

24  joint.

25      Q.  And what happens when the water gets

NON-CERTIFIED COPY

Page 163

1    up an hour later.  I don't know.  I mean, it had

2    to spend a certain amount of time on top of the

3    concrete.

4        Q.  Not if you wash it off before it comes

5    off the truck, correct?

6            Not in your facility, it doesn't, does

7    it?

8        A.  No.  We wash it off on the job sites.

9        Q.  Okay.  So it doesn't come on your

10   concrete where you store your track equipment,

11   does it?

12       A.  I don't have any concrete where I store

13   my track equipment.

14       Q.  Why is that?

15       A.  Because concrete is very expensive.

16       Q.  And it's also -- and that kind of

17   equipment damages concrete pretty readily,

18   doesn't it?

19       A.  Some of it does, yes.

20       Q.  Okay.  Heavy-tracked steel equipment

21   damages concrete, doesn't it?

22       A.  Yeah.  Mainly, bulldozers.

23       Q.  Right.  And if bulldozers run over those

24   rocks, it causes additional stress at that point

25   in the concrete, doesn't it?

NON-CERTIFIED COPY

1    depending on the type of trailers and trucks

2    that this company has, if it's a lowboy, to get

3    the piece of equipment off, you actually drop

4    the trailer from the truck, lower the trailer to

5    the ground and move the truck out the way.

6          You have to have room enough around all

7    that stuff to drop the trailer, put the truck --

8    pull the truck away and then have him drive off

9    from it.

10         So if you have more than one trailer in

11   there, in a washroom, the next one could be, you

12   know, a hundred feet over.  The driver's going

13   to stay way clear of this guy for safety

14   reasons, for all kind of stuff.

15         But, yes, in an operable situation, when

16   nothing else is in the way, you want to get as

17   close to the washroom as you can, but the truck

18   can't get close because he can't make that last

19   turn and he would stay even further away.  You

20   just --

21     Q.  It's difficult to prevent damage to

22   concrete when bulldozers are using it.  Isn't

23   that a fair statement?

24     A.  Bulldozers specifically, yes, with metal

25   tracks on them.

NON-CERTIFIED COPY

1      A.   It depends on what kind of rock it is.

2    I mean, you have -- this looks to be some kind

3    of gray rock, but if it's Mexican limestone,

4    which is more of a yellowish color, you can cut

5    it with your pocketknife and it wouldn't hurt

6    the pavement at all.  Just crushes it and makes

7    it a powder, almost do it with your foot.

8      Q.   That's not what we're looking at here,

9    though, is it?

10     A.   I don't know what these rocks are.

11     Q.   So you can't tell us if heavy-tracked

12   equipment ran over that whether it would cause

13   additional stress at that part of the pavement,

14   could you?

15     A.   No.

16     Q.   All right.  I'm going to show you the

17   next exhibit, which is Exhibit 11, H&E 74136.

18          Okay.  Take a look at that.

19     A.   (Witness complying.)

20     Q.   Tell me what that looks like, what that

21   metal bar is.  What is that?

22     A.   This is a No. 3 rebar that appears to

23   have been put into the slab and somehow it was

24   put in extremely high -- I mentioned this

25   earlier, that I saw a piece of rebar on the top

NON-CERTIFIED COPY

Page 165

1    of the slab.  It appeared to go across the

2    existing joint.  I mean, that's this piece of

3    rebar.

4        Q.  And you can see cracking that seems to

5    emanate from that exposed piece of rebar.  Is

6    that a fair statement?

7        A.  Some, yes.

8        Q.  All right.  That's not the location the

9    rebar was supposed to be installed, is it,

10   depthwise?

11       A.  No, it's not.

12       Q.  That's a contractor problem, isn't it?

13       A.  Yes.  It's a contractor problem unless

14   some kind of -- I've seen some rebar come to the

15   top with some slabs in different kinds of

16   structures where the stress is in them that I

17   don't really understand, as far as being an

18   engineer.  So I don't know if there were some

19   kind of stresses on this to cause it to do this.

20       Q.  All right.  But it's pretty clear that

21   that's not installed at the depth it's specified

22   to be installed.  Fair statement for that rebar?

23       A.  Again, I don't know if something caused

24   it to move as far as some other forces going on,

25   but the rebar should be installed at half the

NON-CERTIFIED COPY

Page 167

1    A.  I see a little smattering of rocks --

2    Q.  Right.

3    A.  -- going left to right.

4    Q.  Okay.

5    A.  I mean, while I was at this site and

6    even while I was at the other site, both the

7    sweepers were running.

8        Q.  And you still have rocks on the

9    concrete, don't you?

10   A.  That's correct.  But you are going to

11   have rocks on the concrete until it gets swept

12   up.

13       Q.  And you can't sweep them up while the

14   piece of equipment is running with gravel and

15   rocks in the treads, can you?

16   A.  No.

17       Q.  Let me show you the next exhibit, which

18   is Exhibit 13.  This is 74186, photograph.

19          Now, we're still in Baton Rouge?

20   A.  That's a good one.

21       Q.  What kind of joint is this?

22   A.  It appears to be a contraction joint.  I

23   don't know which location this came from.

24       Q.  Okay.  Well --

25   A.  I don't recall the picture.

NON-CERTIFIED COPY

1      Q.  I accept that.

2          That joint is covered with dirt, isn't

3  it?  Completely covered with dirt in some part.

4      A.  Which joint?  There's one going left to

5  right and one going up and down.

6      Q.  Well, I only see one going up and down,

7  so let's talk about that one first.

8      A.  Some of it is covered --

9      Q.  Is the joint going up and down --

10     A.  In this picture, 50 percent of it is

11  covered with dirt.

12     Q.  Okay.  And you are suggesting there's

13  another joint running right to left or left to

14  right?

15     A.  Yes.

16     Q.  Where is that?

17     A.  Well, if you look at the grass line --

18     Q.  There's grass growing out of that joint?

19     A.  Yes.  It happens all the time.

20     Q.  Is that proper maintenance of a joint?

21     A.  No.  But I don't see it causing any

22  problems.

23     Q.  You don't see it causing any problems?

24  You don't see that joint spalling?

25     A.  Not where the grass is.

NON-CERTIFIED COPY

Page 170

1      A.  No.  It could have been right on the

2  side of the joint.

3      Q.  Okay.  Which is even worse, because then

4  that's even more pressure that causes spalling,

5  correct?

6      A.  It could have.  I mean, the corners are

7  the weakest spots in the concrete.

8      Q.  Let me show you this picture, which I'm

9  going to label as Exhibit 14.  I'm sorry.  The

10  Bates stamp is 74236; is that right?

11      A.  Correct.  74236.

12      Q.  Again, you can't tell me particularly

13  what location this is, can you?

14      A.  I'm pretty sure this is at Baton Rouge.

15      Q.  Okay.

16      A.  On the side of -- no, wait, wait, wait.

17  I can't tell you positively.

18      Q.  That's okay.  It's okay.

19      A.  You know what I can -- it's -- it is

20  Kenner, because I can tell by the aggregate

21  type.

22      Q.  What could you tell about the aggregate

23  type at Kenner, as opposed to Baton Rouge?

24      A.  Baton Rouge is gravel, and this is some

25  kind of whitish stone, Mexican limestone or

NON-CERTIFIED COPY

Page 171

1   fluorite.  That was something I call fluorite.

2      Q.  Okay.  What are those bars that we see

3   protruding through the concrete?

4      A.  Half-inch smooth dowels.

5      Q.  All right.  And what does that indicate?

6   What depth were those dowels supposed to be at?

7   Strike that.

8          This is an expansion joint, am I

9   correct?

10     A.  Correct.

11     Q.  Okay.  These were the dowels that were

12  supposed to be at what depth of the concrete?

13     A.  I think half.

14     Q.  Does that indicate that those dowels

15  were at half the depth, sir, when you see them

16  like that?

17     A.  I don't -- with the dowels coming out of

18  the concrete, clearly, it's not at half the

19  depth.  I don't know how much it goes down from

20  there to the joint, and this is another one of

21  those, I want to say, busy expansion joints.

22          There's something going on here to cause

23  this joint.  It's acting as a contraction and

24  expansion, and there must be a lot of movement

25  or stress around it to do all of that.

NON-CERTIFIED COPY

1      Q.  You can't eliminate the fact that these

2   dowels were not installed properly by the

3   contractor at the proper depth, can you?

4      A.  No, I can't eliminate that.

5      Q.  And if they are not installed at the

6   proper depth, then they don't operate properly,

7   do they?

8      A.  That's incorrect.

9      Q.  If they are not installed at the proper

10  depth, what's the consequence of that?

11     A.  They are just shallower than they are

12  supposed to be.

13     Q.  And what happens?

14     A.  But they still -- they still allow the

15  concrete to expand and contract.

16     Q.  And what happens to the load?

17     A.  The concrete has -- the load's the same,

18  but the bar doesn't have enough -- doesn't have

19  as much concrete to, I want to say, support it.

20     Q.  There's a reason why the dowels are

21  installed or supposed to be installed at half

22  the depth, isn't there?

23     A.  Yes.

24     Q.  Okay.  And this indicates they were not

25  installed at the proper depth.  Fair statement?

NON-CERTIFIED COPY

1    A.  Again, where it's coming out the ground,

2  clearly that's not the proper depth.  I don't

3  know at what depth the bar's installed at the

4  joint itself.

5    Q.  Is that water that I see to the right

6  top of this picture?

7    A.  Yes.

8    Q.  Okay.  And you can see where the water's

9  actually in one of the cracks near the joint.

10  Do you see that?

11    A.  Yes.

12    Q.  You also see grass growing on the

13  concrete, don't you?

14    A.  Yeah.  A little bit in the corner on the

15  right.

16    Q.  Does that indicate proper maintenance to

17  you?

18    A.  No.

19    Q.  Okay.  Let me show you the next exhibit,

20  which will be No. 15, which is 74261.

21        Now, this one shows water over one of

22  the joints and some cracks, am I correct?

23    A.  Yes.  That's what's going to happens

24  when it rains.

25    Q.  Okay.  And that's why you want your

NON-CERTIFIED COPY

1  do you?

2      A.  No, but I'm sure they got some kind of

3  schedule for their sweeping.

4      Q.  Are you aware the testimony is there is

5  no schedule for sweeping?

6      A.  I haven't -- I have no knowledge.

7      Q.  Let me show you the next exhibit, which

8  is Exhibit 16, H&E 74299.  What does this show

9  you?

10     A.  Two joints -- looks like two contraction

11  joints that intercept each other.

12     Q.  Okay.  And you see that track mark right

13  over those joints?

14     A.  The rusty one or the other one?

15     Q.  The other one.  There's two tract joints

16  actually, but one is sort of almost diagonal to

17  the joint.

18     A.  Yes, I see that one.

19     Q.  Okay.  That's a track mark from a piece

20  of equipment, isn't it?

21     A.  Yes, it is.

22     Q.  What did it cause at that joint?

23     A.  It caused that vertical -- the vertical

24  corners to ravel.

25     Q.  This is not a spalling, this situation.

NON-CERTIFIED COPY

1    EXAMINATION BY MR. FRANCO:

2        Q.  When you read the DOTD specs, do you

3    read anything about parking lots?

4            MS. MINCE:

5                Object to form.

6            THE WITNESS:

7                I read something about Portland

8    Cement Concrete Paving, and that's what we have

9    here.

10   EXAMINATION BY MR. FRANCO:

11       Q.  Is that a "yes" or a "no"?

12       A.  I do not see anything about the words

13   "parking lot."

14       Q.  Okay.  Do you see anything in the DOTD

15   specs about tracked equipment?

16       A.  I don't believe so, no.

17       Q.  Do you see anything in the DOTD specs

18   about tracked equipment with teeth?

19       A.  I'm sorry.  Teeth are the things on the

20   end of the bucket, on a piece of equipment on an

21   excavator.

22       Q.  Do you want to go back and --

23       A.  We can talk about --

24       Q.  Do you want to pull up the testimony

25   where you described them as teeth?

NON-CERTIFIED COPY

1          MS. MINCE:

2              Cleats.

3          THE WITNESS:

4              Cleats.

5     EXAMINATION BY MR. FRANCO:

6        Q.  Cleats.  I'm sorry.  Cleats.

7        A.  Okay.

8        Q.  Do you see anything in the DOTD specs

9     for heavy-tracked equipment with cleats?

10       A.  No, I don't.

11       Q.  And you can't tell us, as you sit here,

12    a difference in load between a rubber-tired

13    piece of equipment with the same weight as a

14    piece of tracked equipment?  You can't tell us

15    the difference in load, can you?

16         MS. MINCE:

17             Object to form.

18         THE WITNESS:

19             I mean, you have a piece of

20    rubber-tired equipment that has, say, four

21    tires.

22             So whatever its weight divided by

23    four, and how much tire is touching the ground

24    is how much load it's putting on four points.

25             And on a bulldozer, it's spread

NON-CERTIFIED COPY

Page 193

1   across all the cleats that are touching the

2   ground.

3   EXAMINATION BY MR. FRANCO:

4        Q.  Which means the load is spread?

5        A.  It's spread.  It's spread.  But it is --

6   the cleats are -- you know, if one panel of a

7   track is 6 inches wide by 2 feet across the

8   machine, the cleat may be half to 3 inches thick

9   at the bottom by, you know, the things we've

10  had, 24 inches.  So just that little piece is

11  touching right there, not the whole track or

12  pad.

13           I want to say something else about the

14  standard specifications for the DOTD.

15           I keep asking -- being asked questions

16  about design.  The standard specifications and

17  the standard plans, they do not tell anybody how

18  to design the work.  The are not design

19  guidelines.  They are construction guidelines.

20           The DOTD has manuals for design.

21  They've got manuals for everything.  They've got

22  papers on how to do this and how to do that, and

23  I'm not referring to those manuals.

24           The standard specs are the results of a

25  design, but it does not tell you what thickness

NON-CERTIFIED COPY

Page 194

1   of concrete to put on a roadway.  In fact, Item

2   601 is concrete, and then it tells you to use a

3   letter designation for what different

4   thicknesses the designer wants to design.

5           Those guidelines on how to design that

6   are in different books and different manuals of

7   DOTD.  They are not in the Standard

8   Specifications For Roads and Bridges.

9       Q.  So in your report, you are not talking

10  about defective designs, are you?

11      A.  What I'm saying is --

12      Q.  Yes or no?

13          MS. MINCE:

14              He doesn't have to say "yes" or

15  "no."

16          MR. FRANCO:

17              Oh, yes, he does.  If it can be

18  answered "yes" or "no," he has to say "yes" or

19  "no."  Then he can explain it unless he says he

20  can't answer it "yes" or "no."  That's the law.

21          THE WITNESS:

22              All right.  So "yes" or "no."  What

23  I'm saying is --

24          MR. FRANCO:

25              Hold on.  Give me my question back,

NON-CERTIFIED COPY

LA CONTRACTORS
LICENSE NO. 1033

(5M) euooo              WCD
FAX

(SN) 836-2939            Wallace C.

# Drennan, Inc.

### General Contractors
P.O. BOX 16438

**70175-6438**

NEW ORLEANS, LA

July 28, 2016

<u>E-MAIL</u>

Fishman Haygood, L.L.P.
201 St. Charles Ave., 40 Floor
New Orleans, La. 70170
Attention: Lori Mince

Re: H&E Equipment Services, Inc. v. URS Corporation Architecture, P.C., et al., Suit No.
626,308, 1th JDC, Parish of East Baton Rouge, State of Louisiana

Dear Ms. Mince:

Fishman Haygood, L.L.P. has asked Wallace C. Drennan, Inc. ("WCD") to prepare a report addressing issues related to cracking and spalling of concrete pavement at the H&E Equipment Services ("H&E") facilities in Baton Rouge and Kenner, Louisiana. This report is in response to Fishman Haygood's request and summarizes my opinions.

For this assignment, I relied on the following materials provided to me:

H&E Baton Rouge Facility

1. As-Built Plans sheet nos. C-201, C-202, C-203, C-204, C-205, C-206, C-207, C-301, C-302, C-303, C-304, C-305, C-306 and C-501.

2. STE Geotechnical Investigation Proposed H & E Buildings Pecue Lane, Baton Rouge, Louisiana dated January 11, 2007. (H&E 0000211 to 0000259).

3. URS Project Specifications - Project Manual Sec. 2516 (URS 062010062242).



EXHIBIT
B

DRENNAN
EXHIBIT NO. 1
K. DONNELLY

NON-CERTIFIED COPY

H&E Kenner Facility

    1. MAPP As-Built Plans sheet nos. 0.1, C7.o, C5.o, C6.o, C7.o, C8.o and C9.0.

CONSTRUCTING FOR OVER 50 YEARS

2. Terracon Geotechnical Engineering Report H&E Equipment-Addition and Renovation Kenner, Louisiana dated February 9, 2011. (H&E 0009535 to 0009577).

3. Terracon Geotechnical Report — Pavement Addendum dated August 5, 2011 (URS 033265 to 033267).

4. URS Specifications for Kenner (URS 066295-066356).

During the course of my review and evaluation, I also referred to the following sources:

1. Louisianan Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet nos. 1, 2 and 3.

2. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

3. City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01, sheet nos. 1, 2 and 3.

4. WCD Photographs taken during site visits June 30, 2016 and July 7, 2016.

In addition, I conducted site inspections on June 30, 2016 at both the Baton Rouge and Kenner, Louisiana facilities. On July 7, 2017, I conducted a follow-up site visit to the Kenner facility.

## DISCUSSION

The observed damage to the concrete pavement at both facilities includes the following:

1. Random Cracking across panels of PCCP.

2. Diagonal Corner Cracking at the intersections of Joints (CJ and CJ/CJ and EJ/EJ and EJ).

3. Joint Spalling (breaking off and chipping of joint edges) of either side of the PCCP Control/Contraction/Construction Joints ('CJ") and Expansion Joints ("EJ").

## BATON ROUGE

I have reviewed the plans and specifications prepared by URS Corporation for the Baton Rouge facility. The plans for the Baton Rouge facility include design details for the PCCP

NON-CERTIFIED COPY

including the CJ (see detail no. 4 as shown plan sheet no. C-501) and EJ (see detail no. 3 as shown plan sheet no. C-501). The design of the pavement for the Baton Rouge facility is defective in numerous respects, including the following:

1. The design of the CJ does not include smooth dowels and it is defective. This omission is not in conformance with the following:

   a. Louisianan Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet nos. 1, 2 and 3.

   b. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

   c. City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 1 8, 2008, 502-01, sheet nos. l, 2 and 3.

   d. STE Geotechnical Investigation Proposed H & E Buildings Pecue Lane, Baton Rouge, Louisiana dated January 1 1, 2007. (H&E 0000211 to 0000259).
       Wfically, it is not in compliance with section no. 8.2 "Rigid Pavement" of this

2. The plans (see detail no. I & 2 as shown on plan sheet no. C-501) reflect #3 rebar running across the CJs. This is not consistent with standards promulgated in nos. I .a., 1 b. and 1 c. in the paragraph above. Additionally, using this design does not permit the CJs to contract. Therefore, it is not a functioning CJ and is defective.

3. The design of the typical CJ (see detail no. 4 as shown plan sheet no. C-501) reflects a saw cut joint of h inch depth. This depth is not in accordance with standards promulgated nos. l.a,, 1b. and lc. above. Additionally, based on my professional experience, this depth hinders the functioning of the CJ and is inadequate. Table 1, as shown on the City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01 , sheet no. 1, calls for a "MINIMUM DEPTH OF JOINT" of 2 inches for 6 inch PCCP thickness and 3 inches for 8 inch PCCP thickness.

4. The design of the EJ contained in the plans reflects the use of #4 (1/2") smooth dowels spaced at 18 inch on center. The size and placement of these dowel bars is not in accordance with standards promulgated nos. l.a., 1b. and lc. above. In my opinion the dowel bars are too small and should be spaced on 12 inch center not 18 inch. Table 1, as shown on City of Baton Rouge, Parish Of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 1 8, 2008, 502-01, sheet no. 1, calls for a (#8) smooth dowels for 6 inch PCCP thickness and 1 1/4 inch smooth dowels for 8 inch PCCP thickness both on 12 inch center. Also, Table l, as shown on the Louisiana Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet no. 1 calls for 1 1/4" (#10) smooth dowels for 8 inch PCCP thickness on 12 inch center.

The design defects referred to above are consistent with random cracking across panels of PCCP and diagonal comer cracking at the intersections of Joints (CJ and CJ/CJ and EJ).

NON-CERTIFIED COPY

Page 4

In addition to the foregoing, the design of the concrete calls for 8 inch pavement in the area immediately surrounding the branch office and 6 inch pavement in all other areas. In areas where H&E operates its equipment (i.e. all parts of the facility other than the parking lot in front of the office building), it is my opinion that 6 inch thickness is inadequate. Based on my professional experience, the standard in the industry is minimum of 7 inches and preferably 8 inches or greater in areas where heavy equipment will be operated.

The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJs and EJs outlined above is three million three hundred seventy thousand dollars ($3,370,000), The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJs and EJs and increase the concrete thickness to 8 inches in all areas is three million six hundred ninety thousand dollars ($3,690,000). All estimated costs are rounded to the nearest thousand dollars. The estimated costs do not include any contingency costs which are normally 100/0 to 20% of the estimated costs. The estimated costs include 8% for engineering costs. According to the State of Louisiana Facility Planning & Control A/E Consulting Fees Spreadsheet for a project of this size, the Fee % is 7.7%. The estimated costs do not include the costs of a testing laboratory. Add 1% for testing.

<u>KENNER</u>

I have also reviewed the plans and specifications prepared by URS Corporation for the Kenner facility. As with the Baton Rouge facility, the plans for the Kenner facility include design details for the PCCP including the CJ (see details plan sheet no. C-7.0) and EJ (see details plan sheet no. C-7.0) as well as various general notes regarding the pavement. The plans and specifications for the Kenner facility are deficient in numerous respects, including the following:

1. The design of the CJ does not include smooth dowels and it is defective. This omission is not in conformance with the following:

   a. Louisiana Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet nos. 1, 2 and 3.

   b. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

   c. Terracon Geotechnical Engineering Report Equipment-Addition and Renovation Kenner, Louisiana dated February 9, 2011. (H&E 0009535 to 0009577).

2. The plans and specifications reflect #3 rebar running across the CJs. This is not consistent with standards promulgated by LADOTD. Additionally, using this design

NON-CERTIFIED COPY

does not permit the CJs to contract. Therefore, it is not a functioning CJ and is defective.

3. The CJ shows a saw-cut of 1/4" depth of concrete. This depth is not in accordance with standards promulgated by LADOTD. Additionally, based on my professional experience, this depth is inadequate.

4. The design of the typical transverse expansion joint contained in the plans reflects the use of #4 (1/2") smooth dowels spaced at 18 inch on center. The size and placement of these dowel bars is not in accordance with specifications for the ACI or the DOTD. In my opinion, the dowel bars are too small and should be spaced on 12 inch center not 18 inch.

The design defects referred to above are consistent with random cracking across panels of PCCP and diagonal corner cracking at the intersections of joints (CJ and CJ/CJ and EJ).

In addition to the foregoing, the design of the concrete calls for 7" of concrete. Given the extremely poor soils conditions in Kenner, based on my professional experience, a minimum of 8" of thickness is required in areas where heavy equipment is used.

Due to the nature of concrete, and its thermal expansion and contraction, it cracks without proper crack control. Properly designed CJs and EJs, reinforcement, and proper pavement thickness, are important to insuring the integrity of the concrete and preventing excess cracking and failure. The design deficiencies outlined above are consistent with the cracking observed at both the Baton Rouge and Kenner facilities. In both situations, had the joints been saw cut 2 inches deep for 6 inch PCCP and 3 inches deep for 8 inch PCCP, the #3 rebar crossing the joints stiff prohibited the CJs from contracting. Thus, the concrete was left to crack at areas of least resistance resulting in Diagonal Corner Cracking and Random Cracking.

In addition to the foregoing, the operation of metal track equipment across the pavement has resulted in spalling observed along the surface of the joints. It was foreseeable that the operation of H&E's equipment across the joints would cause spalling along the joints. URS should have recommended a design that would offer additional protection for the joints.

The estimated cost of removing and replacing the Concrete to correct the deficiencies in the CJs and FJs outlined above is one million six hundred fifty six thousand dollars ($1,656,000) The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJ and EJs and increase the concrete thickness to 8 inches in all areas is one million seven hundred sixteen thousand dollars ($1,716,000). All estimated costs are rounded to the nearest thousand dollars. estimated costs do not include any contingency costs which normally to 20% of the estimated costs. The estimated costs include 8% for engineering costs. According to the State of Louisiana Facility Planning & Control ME Consulting Fees Spreadsheet for a project of this size, the Fee % is 7.7%. The estimated costs do not include the costs of a testing laboratory. Add for testing.

NON-CERTIFIED COPY

Page 6

## QUALIFICATIONS

| From | To | Descri tion |
|------|------|------|
| 1979 | 1981 | Tulane Universit |
| 1981 | 1983 | Universi of Alabama |
| 1983 | 1988 | Wallace C. Drennan, Inc. Concrete Paving Laborer, Equipment Operator and Foreman. Sewer Installation Foreman. Pro•ect Mana er. |
| 1988 | 1991 | Wallace C. Drennan, Inc. Secretary Treasurer, Estimator, Project Manager, Concrete Pavin E ui ment O erator |
| 1991 | Present | Wallace C. Drennan, Inc. President. Associated Builders and Contractors (ABC Board of Directors 1994-2000, President 1997 and 1998. |

Attached please find a listing of representative projects completed by Wallace C. Drennan, Inc.

## COMPENSATION

I am being compensated at the rate of $350.00 per hour for my work in this matter.

## PRIOR TESTIMONY AND PUBLICATIONS

I have not testified as an expert witness in any matter during the last 4 years. I have not authored any publications within the last 10 years.

Sincerely,

Wallace C. Drennan, Inc.

**Wallace C. Drennan III, President**

Enclosure

NON-CERTIFIED COPY



EXHIBIT

C

DRENNAN
EXHIBIT NO. 9
K. DONNELLY

NON-CERTIFIED COPY



EXHIBIT

D

DRENNAN

EXHIBIT NO. 11

K. DONNELLY

NON-CERTIFIED COPY



DRENNAN
EXHIBIT NO. 14
K. DONNELLY

NON-CERTIFIED COPY





EXHIBIT

F

DRENNAN

EXHIBIT NO. 6

K. DONNELLY

NON-CERTIFIED COPY





NON-CERTIFIED COPY