Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
* * * * * * * * *
                *
H&E EQUIPMENT SERVICES  *
                * NUMBER 626,308
VERSUS          *
                * DIVISION "D"
URS CORPORATION *
ARCHITECTURE, P.C., URS *
CORPORATION, L O'NEAL *
JOHNSON AND THOMAS E. *
RYAN, III       *
                *
* * * * * * * * *
```

**CLERK OF COURT**
FILE COPY

CASE ID: _____
FILING DATE: _____
ATTORNEY: _____
NO. PAGES ___ |D|

**EXHIBIT ATTACHMENT TO:**
☐ MOTION SUMMARY JUDGMENT
☐ PETITION
☐ MEMORANDUM
☐ OTHER _____

**DEPUTY CLERK OF COURT**

Deposition of JAMES R. BAILEY,

Ph.D., P.E., taken on Thursday, September 22,

2016, commencing at 9:43 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.


EXHIBIT
A

NON-CERTIFIED COPY

EBR4326195

Page 15

1   your report today?  What area of civil

2   engineering would you characterize that to be

3   in?

4       A.  I viewed it from the standpoint of

5   structural engineering.

6       Q.  Structural engineering?

7       A.  Yes.

8       Q.  I am under the impression that

9   structural engineering deals more with buildings

10  and the inside of buildings and the foundation

11  of buildings, and civil is on the outside.  Am I

12  incorrect about that?

13      A.  Yeah.  That might be a general way of

14  viewing it, but when we are dealing with

15  anything outside of a buildings that is

16  resisting a load, then I would consider that

17  within the realm of structural.  But there is

18  overlap between the two subject areas.

19      Q.  Okay.  All right.  We will get into more

20  of that.

21          Let's get some of your background.

22  Let's get your formal education.  What is the

23  extent of your formal education?

24      A.  I earned a Bachelor's of Science in

25  Civil Engineering from Texas Tech University in

NON-CERTIFIED COPY

Page 16

1    1982.  A Master's of Science in Civil

2    Engineering, also from Texas Tech University in

3    1984.  And then I completed my Ph.D. in Civil

4    Engineering also at Texas Tech University in

5    1989.

6        Q.  Now, again, when you say civil

7    engineering, does that encompass both structural

8    and civil engineering, those degrees?

9        A.  Yes.  Structural engineering is

10   considered a subset of the general field of

11   civil engineering.  It also includes subject

12   areas like geotechanical engineering,

13   bio-environmental engineering, water resources

14   engineering.

15       Q.  Okay.  And where are you currently

16   employed?

17       A.  Exponent.

18       Q.  And what is your position at Exponent?

19       A.  I am currently a senior managing

20   engineer and office director.

21       Q.  And how long have you been in that

22   position?

23       A.  I have been at both positions since

24   2008.

25       Q.  What is the business of Exponent?

NON-CERTIFIED COPY

Page 23

1    Exxon.

2         Q.  So this was your first full-time job?

3         A.  Outside of the university, yes.

4         Q.  Okay.  In your jobs at Exxon or Exponent

5    or ABS, did you ever design concrete pavement

6    for heavy-tracked equipment?

7         A.  I've conducted design reviews, but I

8    have not designed from scratch such pavements.

9         Q.  I am sorry.  You said you conducted

10   design reviews?

11        A.  Correct.

12        Q.  And what kind of design reviews did you

13   conduct?

14        A.  Okay.  By way of example, back in 2001,

15   we had a severe tropical storm flooding in

16   Houston, Tropical Storm Allison.

17             And during a three-year period while

18   working at ABS/EQE I was retained on behalf of

19   FEMA to assist with development of mitigation

20   programs within the Texas Medical Center

21   involving flood barriers.

22             And the clients would produce drawings

23   for these programs for installation of gates,

24   walls, and some of these included redoing the

25   pavements where they have trucks that back up

NON-CERTIFIED COPY

Page 24

1    into this -- the hospitals and other buildings.

2            And it was a complete rework.  So we --

3    they would submit those drawings, and we would

4    -- our team would review them and comment

5    accordingly.

6        Q.  Okay.  These were basically delivery

7    trucks for the Medical Center?

8        A.  Well, they were large vehicles.  I mean,

9    some of these were tractor-trailer, you know,

10   18-wheeler type vehicles.

11           Some were special purpose vehicles for

12   medical equipment, mobile MRIs, for example.

13   Things of this nature.

14       Q.  Okay.  Did those trucks deliver

15   heavy-tracked equipment?

16       A.  If they did, I didn't witness it or

17   observe it.  If that were the case, it might

18   have been for certain construction projects

19   onsite where they accept deliveries of that kind

20   of equipment.

21       Q.  But, certainly, that wasn't the focus of

22   what you were looking at?

23       A.  Yeah.  It wasn't the driver, correct.

24       Q.  And you didn't look at it from the

25   viewpoint of these -- any heavy-tracked

NON-CERTIFIED COPY

1    Q.  Okay.  Dr. Bailey, I'm looking at the

2    Appendix A to your report.

3        MR. FRANCO:

4            We can label your report as Exhibit

5    A and we will -- I'm sorry.  Exhibit 1.  We'll

6    call it Exhibit 1.

7    EXAMINATION BY MR. FRANCO:

8    Q.  And if you have a copy, that is fine.

9    If not, we will get a good copy while we take a

10   break.

11   A.  I have one.

12   Q.  Okay.  Is that something we can use?

13   A.  I see no reason why not.  It's printed

14   in original color.

15   Q.  Okay.  I assume you have several of them

16   or available.

17   A.  Yes, this is the only one I have today.

18   Q.  Right.

19   A.  But, yes, that is fine.

20   Q.  Okay.  The second paragraph of the

21   Professional Profile says that, "Dr. Bailey's

22   primary area of expertise is determining the

23   risk exposure of residential, commercial and

24   industrial properties to hazards associated with

25   hurricanes, tornadoes and flooding."  That is

NON-CERTIFIED COPY

Page 27

1    accurate, correct?

2        A.  Yes.

3        Q.  And then the next paragraph talks about

4    your past work at Exxon included wind load

5    analysis.  That's what you did primarily for

6    Exxon?

7        A.  Not primarily.

8        Q.  Okay.  You did wind load analysis.  You

9    did designs of gravity-based structures,

10   correct?

11       A.  Correct.

12       Q.  And you conducted research on well

13   cement, correct?

14       A.  Correct.

15       Q.  None of what I just talked about at

16   Exxon involves the subject that we are here for

17   today, does it?

18       A.  Some of the work I was involved with at

19   Exxon in the Drilling and Completions Division

20   included field operations where you had natural

21   gas distribution that included turbine

22   generating buildings.  And one aspect of our

23   assessments in the field was the performance of

24   those -- that type of equipment.

25            And it included slab analysis because of

NON-CERTIFIED COPY

Page 34

1    presented.

2        Q.  Okay.  And after the review, what did

3    you do about it?

4        A.  To the extent there was any concerns

5    related to its performance -- and there

6    weren't -- as it pertains to anything that might

7    undermine the foundation or supporting -- soil

8    supporting it.

9        Q.  Okay.  Anything else on Page 32?

10       A.  Well, I'm still on 31.

11       Q.  Okay.

12       A.  Similar thing, third one, for AES Corp.

13       Q.  Uh-huh.

14       A.  Five electrical power plants in the

15   Caribbean.  Again, same thing; same idea.

16       Q.  Did any parts of your reports or

17   publications deal with the standards for

18   designing the concrete paved areas for

19   heavy-tracked cleated equipment?

20       A.  We rely on such standards in our

21   reviews.  We only typically will explicitly cite

22   them if there is an issue that we find through

23   the course of such investigations.  And in this

24   case with respect to the pavements, no.

25       Q.  Okay.  Go ahead.

NON-CERTIFIED COPY

Page 37

```
1        A.  It is a different type of load, yes.

2        Q.  Is it -- you're not looking at the load

3   analysis on the concrete.  You're looking at the

4   affect of the event on the concrete, aren't you?

5        A.  And the supporting base -- subbase, yes.

6        Q.  But you're looking at the affect of the

7   hurricane and the storm surge on the concrete?

8        A.  Yes.  In other words, as the storm

9   approaches, what can it do to undermine any

10  component at the site.

11       Q.  Okay.  Go ahead.  What else?

12       A.  Further down, the Johnson Space Center

13  and the Kennedy Space Center, same thing.

14           And at the Kennedy Space Center,

15  arguably the largest tracked mover in the world

16  is the one, of course, that moves the shuttle

17  and its predecessor and Saturn Rocket.  You've

18  seen it.

19       Q.  You list that Dr. Bailey as a wind

20  hazard assessment, don't you?

21       A.  Correct.

22       Q.  That's different than what you're doing

23  in this case, isn't it?

24       A.  This case is more focused.

25       Q.  Okay.  All these things that you are
```

NON-CERTIFIED COPY

Page 38

1    talking about are more wind and storm risk

2    assessments, not similar to what you're doing in

3    this case; isn't that true?

4        A.  They're bordering contents, yes.

5        Q.  Any of the presentations that you made

6    deal with the same design analysis that you're

7    making in this case of the design of the

8    concrete paved parking areas?

9        A.  Yeah.  I'm sorry.  Repeat that again.

10       Q.  Any of the presentations that you made

11   deal with the design of concrete paved parking

12   areas?

13       A.  Explicitly, no.

14       Q.  Okay.  In fact, you wrote a presentation

15   about how to keep the Jury interested, am I

16   correct?

17       A.  Yes.

18       Q.  Okay.  Is that because you are involved

19   a lot in litigation?

20       A.  No.

21       Q.  Why did you write that then?  How did

22   that relate to civil engineering and your work

23   as a civil engineer?

24       A.  It relates to the work I and my

25   colleagues in our various practices conduct from

NON-CERTIFIED COPY

Page 45

1      Q.  Were you qualified as an expert in that

2   case?

3      A.  Yes.

4      Q.  In what area?

5      A.  In this case, it had to do with damage

6   to a roof following Hurricane Ike.

7      Q.  All right.  In the second testimony

8   appraisal hearing, what were you qualified to

9   testify in connection with?

10     A.  A very similar case involving Hurricane

11  Rita and damage to a roof in Beaumont.

12     Q.  In the third testimony listing the

13  Tannenbaum case, what were you qualified to

14  testify to?

15     A.  Damage to a home owned by Mr. and Mrs.

16  Tannenbaum in Wisconsin.

17     Q.  Okay.  So you've never been qualified as

18  an expert to testify in a case regarding the

19  design of concrete pavement parking area

20  utilizing heavy-tracked cleated equipment?

21     A.  Correct.

22     Q.  Okay.

23         MR. BARRIERE:

24             When you're in a convenient moment,

25  I need to walk down the hall and get my

NON-CERTIFIED COPY

Page 48

1      A.  Yes.

2      Q.  And did you visit both Baton Rouge and

3   the Kenner sites?

4      A.  Yes.

5      Q.  Now, I take it that some of the photos

6   you listed and produced in your documents, some

7   of those photos were from your first visits and

8   some of those photos were for subsequent visits.

9   Is that a fair statement?

10     A.  Correct.

11     Q.  All right.  And we will get into those.

12         Did you rely on any notes that you made

13   of those visits?

14     A.  I took some field notes and relied in

15   part on them, yes.

16     Q.  Did you produce the field notes?

17     A.  Yes.

18     Q.  And where are those field notes listed

19   in this list of documents that you produced to

20   us?

21         You have got your own list in front of

22   you, or is this -- you can use mine.

23     A.  Yeah.  Let's see.

24     Q.  (Complying.)

25     A.  (Reviewing document.)

NON-CERTIFIED COPY

Page 68

1    A.  Sure.

2    Q.  To look at what you're looking at.

3    A.  (Reviewing document.)  As indicated in

4  my report in Figure 5, it's Detail 1 on the

5  drawing C501.

6    Q.  Okay.  That is a drawing of the

7  eight-inch and the six-inch pavement, correct?

8    A.  Detail 2 is of the six-inch pavement.

9    Q.  Okay.  And where is the drawings for the

10  actual joints, sir?

11    A.  That is shown, as I indicated in my

12  report.  I believe it is Detail 4 on that Sheet

13  5, C501.

14    Q.  Okay.  Does the detail of the typical

15  transverse construction joint No. 4, does that

16  show any rebars through the joints, sir?

17    A.  No.

18    Q.  And you didn't do any coring to find out

19  whether there was any rebar through any of the

20  contraction joints at either site, did you?

21    A.  I considered it and offered it as a

22  possibility, an option as part of my work, but

23  was instructed, at this time, not to do that.

24    Q.  You thought it was prudent to do that,

25  didn't you?

NON-CERTIFIED COPY

Page 69

1    A.   It can help verify and clarify, yes.

2    Q.   The coring would also tell you the

3 thickness of concrete that was laid actually,

4 wouldn't it?

5    A.   Yes.

6    Q.   Did you offer that, as well?

7    A.   Yes.

8    Q.   And, yet, that was rejected at this

9 time?

10   A.   At this time, yes.

11   Q.   Who rejected that?

12   A.   Ms. Mince.

13   Q.   Okay.  Now, you also referred to, in

14 that same paragraph, Doctor, you say, "Repairs,

15 including replacement of the existing pavements,

16 will be necessary to allow the extensive use of

17 heavy equipment over these paved areas..."

18       Is it your opinion that all the existing

19 pavements need to be replaced?

20   A.   In my opinion, it proves that improper

21 sizing and placement of steel reinforcement and

22 pouring a slab in terms of its thickness is

23 insufficient.  It might well warrant complete

24 replacement for heavy equipment in use, what

25 areas are designated for use by heavy equipment.

NON-CERTIFIED COPY

Page 75

1    this testimony yesterday -- Louisiana Department

2    of Transportation deals with roads, highways and

3    bridges, correct?

4        A.  Correct.

5        Q.  They don't deal with parking lots, do

6    they?

7        A.  Exclusively with respect to parking

8    lots, no.

9        Q.  Okay.  What about the East Baton Rouge

10   standards?  Those are for roads and highways and

11   bridges, too, aren't they?

12       A.  Correct.

13       Q.  And that's why you were looking

14   primarily to the ACI documents; is that correct?

15       A.  Primarily.

16       Q.  To set the standard?

17       A.  Primarily, yes.

18       Q.  Okay.  And then you say in the final

19   paragraph -- I am sorry -- final paragraph of

20   Page 1, I should say, "Methods are available to

21   extend the life of concrete pavements and

22   joints."

23           And you mention these methods:

24   increasing compressive strength, increasing

25   thickness, increasing dowel bar size, use proper

NON-CERTIFIED COPY

Page 84

1   areas."  See that?

2       A.  Yes.

3       Q.  What potential causes did you

4   investigate other than design?

5       A.  I took into consideration material and

6   construction.

7       Q.  All right.  Let's talk about

8   construction.

9           What potential causes related to

10  construction did you investigate?

11      A.  Well, to the extent that I could from

12  what was either shared with me or was produced

13  in documents, simply trying to discern if there

14  was any indication that something wasn't done

15  right, was reported, observed and, therefore,

16  warranted a change.  I didn't uncover such

17  items.

18          I also, as I didn't get to do earlier,

19  proposed some nondestructive and destructive

20  means to measure steel placement and slab

21  thickness.

22      Q.  Which did not occur?

23      A.  Not yet.

24      Q.  So, they didn't occur at the time you

25  reached your opinion, did they?

NON-CERTIFIED COPY

1    A.  Correct.

2    Q.  Can you eliminate construction causes

3  for these problems, as you sit here today?

4    A.  I am not sure I could -- you say

5  eliminate.  That is pretty strict.

6    Q.  Yeah.  It's very strict.  That is the

7  way it's meant.

8    A.  Right.  I don't think that is the reason

9  for the problems, but to eliminate, no.

10        I mean, certainly, if something was

11  uncovered to suggest otherwise, then I certainly

12  might would consider that, and, if necessary,

13  amend my findings accordingly.

14    Q.  And did you investigate lack of

15  maintenance as potential causes for the problems

16  that you saw?

17    A.  Insofar as the observations I made on

18  the site and my understanding while at the site

19  of their maintenance operations, yes.

20    Q.  Okay.  You don't mention anything about

21  maintenance in your entire report, do you?

22    A.  Correct.

23    Q.  Why is that?

24    A.  I didn't think it was an issue.

25    Q.  You -- when you focus on determination

NON-CERTIFIED COPY

Page 86

1   of causation, isn't it appropriate to list the

2   fact that you've eliminated certain other

3   causes?

4          MR. BARRIERE:

5               Object to the form of the question.

6          THE WITNESS:

7               You could.

8   EXAMINATION BY MR. FRANCO:

9      Q.  And so with reference to my prior

10  questions, can you eliminate lack of maintenance

11  as a cause of any of the problems you saw?

12     A.  I don't think it is the reason, but I --

13  absent additional information, I couldn't

14  strictly eliminate it.

15     Q.  You say here in the second paragraph,

16  "Exponent's objective is to accurately assess

17  observed conditions and consider all relevant

18  data."  You see that?

19     A.  Correct.

20     Q.  All relevant data or information would

21  include actual construction at the site,

22  wouldn't it?

23     A.  Yeah.  Could you expound on that a

24  little bit?  Yeah.

25     Q.  In other words, all relevant data would

NON-CERTIFIED COPY

Page 88

1     Q.  But you, as we said before, you didn't

2   get it cored?

3     A.  Correct.

4     Q.  So, you don't know?

5     A.  In the context of -- well, coring would

6   provide in the way of that kind of information,

7   correct.

8     Q.  And you don't know if the foundation was

9   laid properly at every part of the site either,

10  do you, as you sit here?

11    A.  I saw no evidence to suggest otherwise

12  it wasn't.

13    Q.  But in answer to my question, you didn't

14  analyze the exact laying of the foundation as it

15  was laid, did you, because you couldn't?

16    A.  Yeah, I guess I am not quite clear of

17  the nature of your question.

18    Q.  Do you know if the foundation actually

19  laid at the site was as specified?  Can you

20  opine on that?

21    A.  Yeah.  Well, absent any additional

22  nondestructive or destructive testing.

23    Q.  Yeah.

24    A.  Yeah, relying solely on what has been

25  produced and comments in the absence thereof

NON-CERTIFIED COPY

1    regarding its construction.

2        Q.  Right.  That would be part of the coring

3    you would want to see?

4        A.  I think it would be valuable.

5        Q.  You didn't actually check the actual

6    joint construction itself inside the pavement,

7    did you?

8        A.  When you say check the joint

9    construction --

10       Q.  Yes.  You don't know if the construction

11   of the joints was done according to the design

12   plans, do you?

13       A.  Again, I have no evidence to indicate

14   otherwise.

15       Q.  Right.  You don't know at what level the

16   dowel bars were installed in the concrete as you

17   sit here, do you?

18       A.  Other than what was produced in the

19   drawings and presumably the understanding that

20   the contractor follows drawings.

21       Q.  Okay.  The answer to my question is

22   "no," isn't it?

23       A.  In absent -- no.  The only other

24   additional information would be if you did

25   forensic work --

NON-CERTIFIED COPY

Page 90

1    Q.  Right.

2    A.  -- coring and scans.

3    Q.  So the Jury understands, you don't know

4  if the dowel bars were laid at the proper level

5  of the concrete, do you?

6    A.  I was not there when it was done.

7  Correct.

8    Q.  And you don't know, as we sit here?

9    A.  I don't know from observation during the

10  construction.

11   Q.  And if the joints weren't constructed as

12  they were designed or the dowel bars weren't

13  placed as they were designed or the thickness

14  wasn't the thickness that was specified, that

15  could affect the problems that are being

16  observed out there at the site, couldn't it?

17   A.  Correct.

18   Q.  And during your investigation, sir, do I

19  understand, even up to today, that nobody has

20  advised you that H&E was experiencing similar

21  problems that they have at Baton Rouge and

22  Kenner at their other sites that have concrete

23  with heavy-tracked cleated equipment?

24      MR. BARRIERE:

25         Object to the form of the question.

NON-CERTIFIED COPY

Page 94

1    mix, so I can't say for certain.

2        Q.  Right.

3        A.  No.

4        Q.  Did you determine whether the joints

5    were properly sealed?

6        A.  I observed the sealing of the joints

7    during my onsite surveys.

8        Q.  And did you determine whether they were

9    properly sealed?

10       A.  I would say, for the most part, they

11   were, though, certainly there were some

12   instances I observed where it appeared that the

13   sealant had been compromised in a few of the

14   locations, particularly the expansion joints.

15       Q.  And remained unrepaired?

16       A.  In part, yes.

17       Q.  And what happens when the sealing -- the

18   seal at a joint is unrepaired?  What does that

19   allow to happen?

20       A.  In long-term, it could allow water to

21   flow through and to the subgrade.

22           Now we have to keep in mind that even

23   though your seal may be missing, you still have

24   your backer material or other filler material.

25   So, there is still some restriction --

NON-CERTIFIED COPY

Page 95

1      Q.  But --

2      A.  -- absent -- absent the sealant.  But

3  that said, it still will allow some moisture

4  through the joint.

5      Q.  And that will affect the foundation

6  eventually, won't it?

7      A.  Long-term, it could.  A properly

8  compacted foundation with proper water content

9  during prep can take some of that as expected.

10         But long-term, it certainly -- there is

11  a possibility to undermine.

12      Q.  And you haven't been able to determine

13  whether the foundation was properly -- actually

14  properly compacted?

15      A.  Correct.

16      Q.  Now, you saw some -- and let's talk

17  about Baton Rouge.  You saw in Baton Rouge some,

18  I would call, curing cracks, am I correct?

19      A.  Correct.

20      Q.  And so the Jury understands what I mean

21  by curing cracks, it's cracks that happen fairly

22  soon after the concrete is laid while the

23  concrete is curing, correct?

24      A.  Correct.

25      Q.  And that is a normal situation, correct?

NON-CERTIFIED COPY

Page 106

1    clarify.  There is load and there's pressure.

2        Q.  Okay.

3        A.  The load in any one section of the track

4    with the cleat is the same, but the bearing

5    surface is different.  And, therefore, the

6    pressure is force divided by area.

7            And if I have a key bearing on that is

8    one-fourth what it normally would be.  If I

9    fully penetrate the surface, then my pressure is

10   four times as much.

11       Q.  Oh, but it's still a lot less than the

12   pressure of a rubber-tired vehicle at that same

13   location, isn't it?

14       A.  The same weights.  And, again, it kind

15   of depends on the design of the wheel.  You need

16   to keep that -- on the rubberized wheel, we need

17   to keep that in mind.  But it can be, yes.

18       Q.  All right.  I am looking at Page 6 of

19   your report, the second full paragraph.

20           And you admit certainly, Doctor, that

21   you could not identify any specification in the

22   United States related directly to the design of

23   concrete surfaces under tracked vehicles.  Am I

24   correct?

25       A.  Correct.

NON-CERTIFIED COPY

Page 107

1      Q.  In fact, the ACI documents that you

2   referred to in connection with what we talked

3   about as the standard of care, does not identify

4   or directly relate to the design of concrete

5   surfaces under tracked vehicles, does it?

6      A.  No.  Explicitly, no.

7      Q.  You're not suggesting that some

8   publication in New Zealand establishes the

9   standard of care in Baton Rouge, Louisiana, do

10  you?

11     A.  I don't -- I didn't suggest that in my

12  report.  I just --

13     Q.  I didn't ask you whether you suggested

14  it in your report.  I am just asking you:  Do

15  you suggest that?

16     A.  I do not suggest that.

17     Q.  Okay.  And even that New Zealand report

18  only -- it does not address tracked vehicles,

19  does it?

20     A.  Correct.

21     Q.  You also say in your report on Page 6

22  that URS did not communicate to H&E the

23  potential for heavy-tracked equipment causing

24  such damage to concrete pavements.  You see

25  that?

NON-CERTIFIED COPY

Page 108

1    A.  Yeah.  I'm sorry.  Say that again.  The

2  very bottom of Page 6?

3    Q.  The last line.  The last two lines.

4    A.  The last line.  (Reviewing document.)

5  Okay.  Here we go.  (Reviewing document.)

6  Correct.

7    Q.  No one made you aware that H&E was

8  experiencing damage to concrete pavements at

9  their other sites from heavy-tracked equipment?

10    A.  No.

11    Q.  Am I the first who has made you aware of

12  that?

13    A.  I mean, I wouldn't be surprised if they

14  were.  I mean, you know, in fact, reinforced

15  concrete pavements of a similar design with

16  similar types of equipment, it wouldn't surprise

17  me at all.

18        But it wasn't something that I explored

19  because, in this case, my focus was simply this

20  facility, a new facility from the ground up by

21  design.

22        And that relationship that URS had is

23  the architect and engineer of record with their

24  client, in this case H&E.

25    Q.  Let's take a look at ACI 330R-01.

NON-CERTIFIED COPY

Page 109

1      A.  R-01.

2      Q.  Do you have that in front of you?

3      A.  I am sorry.

4      Q.  330R-01.

5      A.  Yes.

6      Q.  Let's look at Section 1.2.

7      A.  (Complying.)  Okay.

8      Q.  Do you see in the very first paragraph

9   where it says "this guide is not a standard"?

10  Do you see that?

11     A.  Yes.

12     Q.  But you are characterizing it as the

13  standard of care in this case, aren't you?

14     A.  Yes.

15     Q.  Look at 2.3.

16     A.  (Complying.)

17     Q.  In terms of pavement design, it says "to

18  determine the pavement thickness, the designer

19  needs to know the types of vehicles that will be

20  used for pavement."  You agree with that,

21  correct?

22     A.  Yes.

23     Q.  "The number of trips for each vehicle

24  type," you see that?

25     A.  Yes.

NON-CERTIFIED COPY

Page 112

1     A.  And, certainly, URS is a recognized

2  national engineering firm that I'm sure over the

3  years has been involved with numerous designs

4  that involved pavements and roadways.

5     Q.  So experience is important, other than

6  just looking at the specifications.  Fair

7  statement?

8     A.  Yes.

9     Q.  Did you make your calculations of

10  thickness based on 330R-01 or 330R-08?

11     A.  Both.

12     Q.  Both?  And those are different?

13     A.  In -- with regard I believe to the heavy

14  duty or the Class D --

15     Q.  Uh-huh.

16     A.  -- or Category D, I believe there was a

17  difference.  Yes, sir.

18     Q.  Did you make the calculation for heavy

19  duty, as well as standard or light duty?

20     A.  No.  They were both for --

21     Q.  Just heavy duty?

22     A.  They were for heavy duty, but they

23  involved two different areas.  But, yes, heavy

24  duty.

25     Q.  Okay.  So your calculation was only for

NON-CERTIFIED COPY

Page 117

1    Q.  Okay.  And what is the average daily

2  truck traffic that your calculation of Category

3  D at the entrance and exit lanes are based on?

4    A.  I just simply relied on the single value

5  provided in the table of 700.

6    Q.  Seven hundred.  So your calculation is

7  based on the fact that 700 trucks travel over

8  that concrete --

9    A.  Correct.

10    Q.  -- per day?

11    A.  Correct.

12    Q.  Do you have any idea whether 700 trucks

13  travel over the Baton Rouge concrete?

14    A.  Let me see.  In the case of Baton Rouge,

15  no.

16    Q.  Okay.  Are you familiar with the fact

17  that their average daily truck traffic is 30 to

18  40?

19    A.  No.

20      MR. BARRIERE:

21          Object to the form.

22  EXAMINATION BY MR. FRANCO:

23    Q.  And so what did your calculation come

24  out to for the entrance and exterior lanes in

25  Category D with dowels with 700 trucks per day?

NON-CERTIFIED COPY

Page 126

1  strictly speaking, it's a little bit of

2  difference.

3      Q.  Okay.  But it's not a one point load.

4  Those point loads are spread among all the

5  cleats that contact the concrete?

6      A.  Right.

7      Q.  Am I correct?

8      A.  Correct.

9      Q.  And that is at certainly a larger

10 distance than a rubber tire, isn't it?

11     A.  It is spread out over a longer distance,

12 that is correct.

13     Q.  Okay.

14     A.  Sorry.  I don't think I answered your

15 question.  I mean, you asked about the Kenner

16 site.

17     Q.  Yes.

18     A.  And I went through the same -- you asked

19 about how I --

20     Q.  What did you get?

21     A.  Let me find it for you.  (Reviewing

22 document.)  Okay.

23         For Kenner, I got 6.5 inches for

24 Category C, and nine inches for D.  But when you

25 apply the one-inch reduction using the dowel for

NON-CERTIFIED COPY

Page 127

1    D, that reduces it to eight inches.

2        Q.  So eight inches for heavy?

3        A.  Yes.

4        Q.  And --

5        A.  6.5 for --

6        Q.  Parking area?

7        A.  We will call it parking area, right.

8        Q.  And, again, that is based on the same

9    frequency we talked about --

10       A.  Correct.

11       Q.  -- just a few minutes ago?

12       A.  That is correct.

13       Q.  Yours is based on 700 trucks?

14       A.  Correct.  For D.  That is correct.

15       Q.  You have no issue with the concrete

16   strength of 4,000 psi at either site, correct?

17       A.  No.

18       Q.  The diameters of the dowels, let's talk

19   about that and ACI.  Does ACI 330R-01 have --

20   let me rephrase that.

21           With respect to the thickness of the

22   dowels, does ACI 330R-08 have the same thickness

23   as 330R-01 had or did they change it?

24       A.  I believe they made a change on one of

25   the dowels for one of the thicknesses.  If -- I

NON-CERTIFIED COPY

Page 143

1    applied kind of coatings throughout the U.S.

2        Q.  Was this interior or exterior?

3        A.  Both.

4        Q.  And you would consider that within the

5    standard of care, these coatings?

6        A.  If I were designing -- if I was asked to

7    design a facility like the H&E facility in Baton

8    Rouge or Kenner, to accommodate the kind of

9    equipment and operations as I have observed, I

10   certainly would consider that as part of the

11   standard of care, at least to the extent I would

12   present it to the client.

13       Q.  Two questions:  Number one, you have

14   never been asked to design a concrete pavement

15   for heavy-tracked equipment, correct?

16       A.  Correct.

17       Q.  Number two, that is a cost issue for the

18   client, isn't it?

19       MR. BARRIERE:

20           Object to the form of the question.

21       THE WITNESS:

22           It could be for the client, I mean.

23   EXAMINATION BY MR. FRANCO:

24       Q.  It could be?

25       A.  Well --

NON-CERTIFIED COPY

Page 144

1    Q. It's not a cost consideration?

2    A. Well, sure.  I mean, it's going to

3    consider the cost with any option you present.

4    And that's not the only option, but, yes.

5    Q. Okay.  Are you familiar with anyone who

6    has used an iron filled aggregate in this type

7    of situation?

8    A. Well, I've seen those applications in

9    some power plants and industrial facilities.

10    Q. Not for heavy-tracked cleated equipment?

11    A. I don't know if they ran heavy-tracked

12    cleated on it or not.  Certainly, with some

13    heavy equipment present, but whether it was

14    cleated track, I don't know.

15    Q. And, sir, you talk about the pavement

16    surface.  And the wear and tear on the pavement

17    surface is a lot different with cleated-tracked

18    equipment, than it is for tracked equipment that

19    is flat, isn't that true?

20    A. Yes.

21    Q. All right.  Look at Page 15 of your

22    report.

23    A. (Complying.)

24    Q. You cite ACI 330R-01 for the following.

25    "It is important to determine and correct the

NON-CERTIFIED COPY

Page 145

1   cause of the slab failure before starting

2   repairs."  You agree with that, don't you?

3       A.  Yes.

4       Q.  And you haven't been able to determine

5   whether any construction issues are the cause of

6   slab failures at Baton Rouge or Kenner, have

7   you?

8       A.  I haven't identified any to date.

9       Q.  But you haven't investigated them, have

10  you?

11      A.  But to the extent what has been done, as

12  we discussed earlier, certainly absent some

13  additional forensic testing to, you know,

14  validate what we're assuming was the case.  You

15  know, we wouldn't know until that was done.

16      Q.  My point is, as of the time of your

17  report and all the way up to that point in time,

18  you have not determined whether there is

19  construction causes for any of the pavement

20  problems, have you?

21      A.  In my opinion, there aren't any, but I

22  haven't determined them absolutely.

23      Q.  Well, it's important to determine those.

24  Right here it says that?

25      A.  And that is part of it.  Sure.

NON-CERTIFIED COPY

Page 146

1    Q.  And to correct them?

2    A.  If they exist.  If it is

3  construction-related, yes.

4    Q.  The first thing you have to do is

5  determine whether there is any maintenance

6  causes or whether there is any construction

7  causes, correct?

8    A.  Or design or anything else.  Correct.

9    Q.  All right.  And then further on, you

10  say, "The presence of heavy-tracked equipment

11  poses a unique challenge to the short- and

12  long-term performance of concrete pavements..."

13        That is your words, or is that a quote

14  from something else?

15    A.  It's my words.

16    Q.  Okay.  Why is it a unique challenge?

17    A.  Because of the nature by which loads are

18  transferred by tracked equipment to pavements.

19    Q.  It is fair to say that the use of

20  heavy-tracked cleated equipment on concrete is

21  not a very ordinary use, is it?

22        MR. BARRIERE:

23            Object to the form of the question.

24        THE WITNESS:

25            It is not common, correct.

NON-CERTIFIED COPY

Page 155

1    A.  (Reviewing document.)

2    Q.  You've referred to that in your report,

3  haven't you?

4    A.  Correct.

5    Q.  All right.  Would you, for the Record,

6  read the title of that at the top?  What I have

7  highlighted, what does it say?

8    A.  "Roadway showing joints."

9    Q.  Thank you.

10        Okay.  Let's cover this issue first.

11  Mr. Bailey, I'm going to label for the next

12  exhibit, as Exhibit 8, a copy of that August 26,

13  2016 letter from you to Ms. Mince.  Can you

14  identify that for me?

15    A.  (Reviewing document.)

16    Q.  What is that?

17    A.  Yes.  This is a letter addressed to Ms.

18  Mince from me and one of my colleagues, Matt

19  Vail, with Exponent, dated August 26, 2016,

20  regarding questions pertaining to change order

21  documents.

22    Q.  Okay.  Now, Mr. Matt Vail signed this

23  letter, correct?

24    A.  Correct.

25    Q.  And then you put your stamp on this

NON-CERTIFIED COPY

Page 156

1    letter, correct?

2        A.  Correct.

3        Q.  Did you actually -- this is in reference

4    to the change orders in this case, correct?

5        A.  Correct.

6        Q.  Did you review the change orders?

7        A.  Yes.

8        Q.  Okay.  And who made this calculation

9    using the cost of change versus time model?  Who

10   did that?

11       A.  That particular part cited in this

12   letter was done by Matt.

13       Q.  Okay.  So are you familiar with the cost

14   of change versus time model that he's talking

15   about?

16       A.  Yes.  He is -- he shared that with me.

17       Q.  Well, wait.  Was that your first

18   exposure to that time model?

19       A.  I've heard of it.

20       Q.  You've heard of it, but was this your

21   first exposure in this case to dealing with that

22   particular model?

23       A.  In this case, yes.

24       Q.  So you've never used it before this

25   case?

NON-CERTIFIED COPY

Page 157

1      A.  In this case, no.

2      Q.  Okay.  I'm sorry.  You have never used

3   it before this case?

4      A.  Oh, before this case?  No.  There has

5   been these kind of cost versus change time

6   models.

7      Q.  Have you ever given an expert opinion on

8   the cost of change versus time model before this

9   case?

10     A.  An expert opinion, no.

11     Q.  Okay.  And whose model is that?

12     A.  Oh, it's one that was -- it's a

13  published model.  I can't recall specifically

14  the author of it.  It has been cited, but we --

15  we have used -- and I say we, our consulting

16  practice has used --

17     Q.  So --

18     A.  -- this with assisting the claims.

19     Q.  So let me get this straight.  Matt Vail

20  did this calculation.  You didn't do the

21  calculation, correct?

22     A.  Well, to clarify, it was my opinion when

23  asked by Ms. Mince what I thought the impact

24  would be due to change orders versus if it had

25  been done during the construction.

NON-CERTIFIED COPY

Page 161

1          MR. FRANCO:

2              Okay.

3     EXAMINATION BY MR. FRANCO:

4      Q.  I'm going to show you the next exhibit,

5     which will be Exhibit 9, which is a string of

6     E-mails from -- the top one is from Frankie

7     Wynn, July 27, 2016.  It is H&E 72397, et

8     cetera.

9              This came out of your documents, sir.

10    Okay.  It starts off with an Email by you back

11    on July 27, 2016, which was after your -- what

12    is the date of your report?

13     A.  It is dated July 29.

14     Q.  Okay.  So this is just before your

15    report is issued, correct?

16     A.  Correct.

17     Q.  And here you are referring to the

18    geotechnical report on Baton Rouge that no

19    specific traffic data was provided.

20              And so you asked some questions about

21    that, right?

22     A.  Correct.

23     Q.  And so you asked whether a total of 134

24    vehicles per day seemed reasonable around the

25    branch building area.  Why did you ask that

NON-CERTIFIED COPY

Page 162

1    question?

2        A.  Just trying to get some idea of the

3    frequency for these types of vehicles at the

4    site.

5        Q.  Did you get an answer?

6        A.  You know, they were -- yeah, in this

7    string, no.

8        Q.  You didn't get an answer to that in this

9    string, did you?

10       A.  That is correct.  That is correct.

11       Q.  And you were asking that because the

12   design depends on the amount of vehicles per

13   day, doesn't it?

14       A.  In part, yes.

15       Q.  Part of the calculation, as we talked

16   about earlier, depends on the weight, as well as

17   the frequency of the vehicles, correct?

18       A.  Correct.

19       Q.  And they didn't give you an answer, did

20   they?

21       A.  They did not.

22       Q.  Then you asked whether -- and what is,

23   for the Jury's sake, what does K-I-P mean?

24       A.  That is --

25       Q.  What is that an acronym for?

NON-CERTIFIED COPY

Page 194

1    being close up.  I mean, it could be a limestone

2    or --

3        Q.  Crushed into the concrete?

4        A.  Crushed on top of it, yes.

5        Q.  Okay.  And you can't tell if it actually

6    affected that concrete below because you can't

7    see it because the rock is on top, right?

8        A.  If you were to sweep it, you would get

9    some.

10       Q.  This is 73643 and is Exhibit 24.  That

11   is what you saw when you were out there in terms

12   of condition of the pavement, correct?

13       A.  Correct.

14       Q.  And I see a lot of aggregate around this

15   part of the concrete, including the joint.  Is

16   that a fair statement?

17       A.  (Reviewing document.)  I am not -- I am

18   not necessarily sure what you mean by a lot.  I

19   mean, most of it -- from this view, most of that

20   surface doesn't have any on it, but there is

21   some on it.  Yes.

22       Q.  And these tracks are right over the

23   aggregate in this area right here, isn't it?

24       A.  (Reviewing document.)  That is correct.

25       Q.  I'm going to circle that.  This is

NON-CERTIFIED COPY

1    bottom in the foreground.

2        Q.  Exhibit 27 will be 73661.

3            This is 73702 and will be Exhibit 28.

4    What is that I see growing out of the joint?

5        A.  It looks like grass.  Maybe weeds.

6        Q.  Does that look like proper maintenance

7    to you?

8            MR. BARRIERE:

9                Object to the form of the question.

10           THE WITNESS:

11               Yeah.  Kind of hard to tell if it --

12   in the foreground, that is the -- next to the

13   joint, that is hard to tell without pulling

14   whether it's actually in the joint or growing

15   above it.

16               But either case, yeah, obviously,

17   there is enough soil there to allow that to

18   happen.

19   EXAMINATION BY MR. FRANCO:

20       Q.  So?

21       A.  And I would say, no, that should be

22   removed.

23       Q.  Same thing with 73703, which will be

24   Exhibit 29.  There is grass growing on top of --

25   and, certainly, mud covering this joint here.

NON-CERTIFIED COPY

Page 198

1    deterioration of the base, doesn't it?

2        A.  It -- well, it provides a means for

3    water, you know, to get to the base.

4        Q.  Which has not been repaired, apparently.

5        A.  Apparently, in this case, no.

6        Q.  Okay.  All right.  I'm going to show you

7    73719, which will be Exhibit 31.  And that is a

8    picture of one of the pieces of equipment at the

9    Baton Rouge facility in the service building,

10   correct?

11       A.  Correct.

12       Q.  And what is the condition of what is in

13   the tracks?  What is in the tracks?

14       A.  On -- okay.  On the left side, as we

15   view the photo, some of the tracks appear to

16   have some soil.  Again, some minerals, perhaps

17   even some small gravel embedded in it.

18       Q.  All right.  And, obviously, it had to

19   travel on the concrete in order to get into the

20   service building in that condition.  Fair

21   statement?

22       A.  Correct.

23       Q.  Okay.  We are still on Baton Rouge.

24   This is 73428, which will be Exhibit 32.

25       A.  So this is Baton Rouge?

NON-CERTIFIED COPY

Page 199

1      Q.  Yes.

2      A.  Oh, I see.

3      Q.  Yeah.  That's Kenner over there.

4      A.  Got you.  Okay.

5      Q.  According to the way I understand it.

6          There is clearly parts of concrete and

7   rock near the joints.  Near this joint, am I

8   correct?

9      A.  Correct.

10         Q.  Does that indicate proper maintenance to

11  you?

12         MR. BARRIERE:

13             Object to the form of the question.

14         THE WITNESS:

15             Yeah.  On this one, it's hard to

16  tell how much of that was due to the degradation

17  that occurred and the pebbles that appear from

18  that, or if it came from a tread, either a

19  rubber or metal track.

20             The seal still seems to be largely

21  intact in this one case.  But, certainly, I'm

22  sure it got swept up later that day or the next

23  day whenever they did.

24  EXAMINATION BY MR. FRANCO:

25      Q.  Well, in this area that I'm going to

NON-CERTIFIED COPY

1    circle, the -- there is aggregate actually

2    inside this contraction or -- contraction joint.

3    Am I correct?

4        A.  Correct.

5        Q.  That is going to cause it problems and

6    spalling near that joint, isn't it?

7        A.  Oh, yeah.  You definitely want as part

8    of your maintenance to remove that.

9        Q.  All right.  So regardless of whether it

10   came from the track or whether it came from the

11   concrete itself, you should be cleaning that up

12   so it doesn't cause more damage, correct?

13       A.  They may have an hour after I took that

14   picture.

15       Q.  But you don't know that?

16       A.  They may have on one day when I was in

17   Kenner.  One thing you need to keep in mind --

18       Q.  This is Baton Rouge.

19       A.  Or Baton Rouge.  Either one.

20          One thing to keep in mind there is a

21   time element to all of this.  Okay?  There is

22   going to be debris deposits, period.  It's --

23   and everyone knows that.

24          It doesn't mean when debris is deposited

25   and the vehicle travels over it an hour later

NON-CERTIFIED COPY

Page 202

1    A.  In this case.  That is correct.

2    Q.  And yet there is still spalling?

3    A.  Correct.

4    Q.  What does that indicate to you?

5    A.  That given the width of that joint.

6  That the cleats when they travel across here.

7  And arguably it could even be rubberized.  But I

8  think more than likely it's the cleats that --

9    Q.  The cleats that are causing the

10  spalling?

11    A.  Yes.  As it travels across that joint.

12    Q.  This is 73443, which will be Exhibit 34.

13  This shows clearly grass growing on top of an

14  expansion joint.  Am I correct?

15    A.  Correct.

16    Q.  Would that be occurring if it has been

17  swept daily?

18    A.  It could.  I don't know if a sweeper

19  would necessarily remove that.

20    Q.  So if the sweeper doesn't remove it,

21  somebody should be removing it, right?

22    A.  Correct.

23    MR. BARRIERE:

24       Object to the form of the question.

25  EXAMINATION BY MR. FRANCO:

NON-CERTIFIED COPY

Page 211

1      Q.  Do you know whether any of the equipment

2  is parked at the site for storage purposes

3  before it is washed in the wash room?

4           MR. BARRIERE:

5                Object to the form.

6           THE WITNESS:

7                I don't know.

8           MR. FRANCO:

9                Okay.

10          THE WITNESS:

11               I always understood that one of the

12  first things they do when they bring it in is to

13  wash it.  But is that always the case?  I don't

14  know.

15  EXAMINATION BY MR. FRANCO:

16      Q.  All right.  I'm going to you 73955,

17  which will be Exhibit 46.

18               And this shows again grass growing out

19  of a joint area around the drain.  Am I -- is

20  that a fair statement?

21      A.  In a certain portion of that joint, yes.

22  I mean, it's limited, but, yes, there is grass

23  growing in there.

24      Q.  This is 74022, which will be Exhibit 47.

25  That looks like a piece of equipment that is

NON-CERTIFIED COPY

*Failure Analysis Associates*

# E$^x$ponent

**Investigation of Damaged Concrete Pavements at H&E Equipment Facilities**



*BAILEY*

EXHIBIT NO. 1

K. DONNELLY



**EXHIBIT**

B

NON-CERTIFIED COPY

# Investigation of Damaged Concrete Pavements at H&E Equipment Facilities

Prepared for

Loretta G. Mince, Esq.
Fishman Haygood, L.L.P.
201 St. Charles Avenue
46th Floor
New Orleans, Louisiana 70170

Prepared by

James R. (Bob) Bailey, Ph.D., P.E.
Senior Managing Engineer
Exponent, Inc.
10850 Richmond Avenue, Suite 175
Houston, Texas 77042
Louisiana Firm No. EF.0003375

July 29, 2016

© Exponent, Inc.



1306663.001 7845

NON-CERTIFIED COPY

# Contents

|  |  | Page |
|---|---|---|
| List of Figures |  | ii |
| Executive Summary |  | 1 |
| Limitations |  | 2 |
| Introduction |  | 3 |
| Background |  | 4 |
| Discussion |  | 5 |
| Pavement Surface Condition |  | 5 |
| Pavement Design Features |  | 7 |
| Baton Rouge Site |  | 8 |
| Kenner Site |  | 10 |
| Remedies |  | 14 |
| Pavement Surface |  | 14 |
| Pavement Design |  | 15 |
| Findings |  | 16 |
| Appendix A | Curriculum Vita of James R. Bailey, Ph.D., P.E. | 29 |
| Appendix B | Documents Reviewed | 37 |

NON-CERTIFIED COPY

## List of Figures

|  |  | Page |
|---|---|---|
| Figure 1. | Various Perspectives of Baton Rouge Site | 17 |
| Figure 2. | Various Perspectives of Kenner Site | 18 |
| Figure 3. | Concrete Pavement at Baton Rouge Site | 19 |
| Figure 4. | Concrete Pavement at Kenner Site | 22 |
| Figure 5. | Pavement Details and Note for Baton Rouge Site | 25 |
| Figure 6. | Designated Area for Heavy Duty Pavement at Baton Rouge Site | 26 |
| Figure 7. | Dowel Sizing and Spacing Requirements | 27 |
| Figure 8. | Pavement Details and Note for Kenner Site | 28 |

NON-CERTIFIED COPY

# Executive Summary

Fishman Haygood, L.L.P., on behalf of the plaintiff, retained Dr. James R. Bailey, Ph.D., P.E., of Exponent, Inc., to evaluate the cause of damage to concrete pavements at two separate facilities operated by H+E Equipment. The two facilities are located in Louisiana, one facility in Baton Rouge and the other facility in Kenner (near New Orleans). URS Architects Engineers Planners designed the pavements. My scope of work included on-site surveys, review of architectural and engineering drawings, review of photos taken of the subject property, review of emails and other produced documents, engineering analyses, and preparation of this report which summarizes my findings.

I am the Project Manager. I am a licensed Professional Engineer in nine states and a Fellow of the American Society of Civil Engineers. As a Senior Managing Engineer in Exponent's Building & Structures practice, I have expertise in several areas of Civil Engineering, including construction materials, structural analysis and design, and materials testing. My Curriculum Vitae, including my recent testifying experience and my billing rate, is provided in Appendix A. A list of the documents reviewed by me is provided in Appendix B. My findings presented herein are made to a reasonable degree of engineering certainty.

Surface degradation of the concrete pavements is widespread and increasing at both sites. Large cracks have formed beyond the joints, an indication of improper sizing and/or placement of steel reinforcement. Repairs including replacement of the existing pavements will be necessary to allow for extensive use of heavy equipment over these paved areas during the 20-year design life without inducing the same level and extent of damage.

My current understanding is that H+E Equipment clearly communicated to URS the type of equipment that would travel across the pavements. Moreover, representatives of URS reportedly visited two H+E Equipment sites in Louisiana and one site in Houston. According to H+E Equipment during these site visits URS viewed the equipment, including the heavy metal tracked equipment. The pavements as currently designed and constructed are not adequate to perform for their intended use as required by H+E Equipment. In my opinion URS did not exhibit the appropriate standard of care when designing the concrete pavements constructed at the two sites in accordance with applicable specifications, standards, and guidelines.

Methods are available to extend the life of concrete pavements and joints. These methods include the application of specialty aggregate toppings; increasing the design compressive strength; increasing the pavement thickness; increasing the dowel bar sizes; properly spacing dowel bars; and installing metal edge guards along the expansion joints.

1306663.001 7845

1

NON-CERTIFIED COPY

## Limitations

This report has been prepared to address evaluation of concrete pavement damage at the subject properties. Exponent's investigation focused on determination of causation mechanisms for physical damages at the exterior concrete paved areas. The scope of services performed during this investigation may not adequately address the needs of other users, and any re-use of this report or the findings, conclusions, or recommendations presented herein is at the sole risk of the user.

Exponent's objective is to accurately assess observed conditions and consider all relevant data. The findings presented herein are made to a reasonable degree of engineering certainty. I reserve the right to supplement this report and to expand or modify my opinions based on review of additional material as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others.

NON-CERTIFIED COPY

# Introduction

At the request of Fishman Haygood, L.L.P. on behalf of H+E Equipment, as a Senior Managing Engineer for Exponent Failure Analysis Associates (Exponent), I conducted an investigation to determine the nature, mechanism(s), and extent of damage to concrete pavements at two separate facilities operated by H+E Equipment. The two facilities are located in Louisiana, one facility in Baton Rouge and the other facility in Kenner (near New Orleans). I also investigated what aspects of the damage (if any) are attributable to flaws in the design, construction, or usage conditions of the pavements.

The scope of my work included the following:

- Site surveys on 23 September 2013, 12 and 13 August 2014, and 07 July 2016;
- Review of architectural and engineering drawings;
- Review of photos taken of the subject property;
- Review of emails and other produced documents;
- Engineering analyses; and
- Preparation and submittal of this report.

NON-CERTIFIED COPY

# Background

H+E Equipment uses the facilities located at Baton Rouge and Kenner as distribution centers for heavy construction equipment. Some of this equipment moves on different types of metal tracked systems. The heavy construction equipment travels across and is parked on concrete pavements recently constructed at the two facilities. URS Architects Engineers Planners[1] (herein referred to as URS) designed the pavements. Exponent conducted site surveys of each facility on 23 September 2013, 12 and 13 August 2014, and 07 July 2016[2]. Various perspectives of the Baton Rouge and Kenner sites are shown in Figure 1 and Figure 2, respectively.

During our site surveys we observed cracking; spalling of concrete edges at expansion, construction, and control joints[3]; and varying degrees of surface erosion in several areas of the concrete pavements at each facility. The damage was particularly evident in areas where heavy tracked equipment had travelled and was subsequently parked. Various perspectives of the concrete pavements are shown in Figure 3 and Figure 4 for the Baton Rouge and Kenner sites, respectively. The pavements at both facilities are constructed of reinforced Portland cement concrete and were poured during the first half of 2012, meaning they are approximately four years old.

---

[1] A division of URS Corporation which was acquired by AECOM in 2014.
[2] Photos, drawings, calculations, and other related information related to our investigation are available upon request.
[3] As defined on architectural and engineering drawings produced by URS.

NON-CERTIFIED COPY

# Discussion

## Pavement Surface Condition

Surface damage was observed on pavements in parking areas designated for heavy trucks and equipment, tractor trailers, and tracked equipment at both facilities. The observed surface damage to the concrete pavements is consistent with the type of damage one would expect to observe to the type of concrete specified when exposed to high levels of stress and friction, or abrasion, acting at or near the concrete surface. Surface cracks not associated with damage at joints or abraded areas were also observed during the three site visits. These surface cracks appear to be the result of ineffectiveness of the control joints rather than a response to external effects. Little or no surface damage was observed at either facility on pavements in parking areas designed for cars and light trucks.

Loads imposed by tracked equipment depend on the contact surface. Tracks in heavy construction equipment are typically comprised of a belt system of adaptable links with keys on them. The intention is that these keys will penetrate the surface where the vehicle is moving, thus increasing the level of effective friction and therefore allowing the equipment to move in what typically are soft soil conditions. As these keys are meant to fully penetrate the soil, it is generally assumed that the weight of the equipment is distributed on the full surface of the track system, and then transferred to the supporting soil. The resulting pressure from the tracks to the soil is typically labeled "ground pressure" on catalogs provided by the manufactures of this type of equipment. Exponent was able to obtain such information from a local distributor.

One of the performance features of the track is that it be sufficiently flexible to spool around the wheels of the vehicle, effectively forming a belt around each set of wheels. This feature, in turn, requires the belt to be somewhat flexible. To achieve this flexibility and still maintain sufficient in-plane stiffness and strength, the belt is typically made of metal "links" that can adjust with respect to each other. This linkage results in a condition where, only after the keys have penetrated the soil, the weight of the vehicle is fully distributed on the track and not just on the wheel sections alone. It also means that if the keys have not penetrated the surface, then the weight is likely to be transferred in most part in the areas immediately under the wheels or spools of the track.

On hard surfaces like concrete, these tracks and their keys do not easily penetrate the bearing surface, thus forcing transfer of the full weight of the equipment to the supporting surface by the area under the keys alone. Furthermore, the weight of the equipment is being transferred mostly by the keys directly under the wheels in this condition. The keys in this condition are therefore

NON-CERTIFIED COPY

effectively narrow bands of pressure applied to an unbounded in plane surface resulting in a notable stress increase.

Exponent approximated this expected stress increase using an elastic estimation of contact pressure between two surfaces. The resulting increase in stress was estimated to be on the order of four times the applied stress by the key. Applying this level of stress in areas adjacent to a free surface, like an expansion joint, would result in stresses higher than the expected capacity of the specified 4,000 psi concrete. Such an outcome would cause the types of damage like shear cracking and spalling observed by Exponent at the two H+E Equipment sites as shown in Figure 3 and Figure 4. I also observed the absence of steel edge guards along the length of the expansion joints. It is my opinion that installation of steel edge guards at the expansion joints where heavy tracked construction equipment crossed would have significantly reduced the spalling and cracking at these joints.

Given an understanding of the types of loads imposed by heavy tracked vehicles on concrete pavements, Exponent then conducted a literature review to identify codes, standards, guidelines, or other publications that address concrete design for such conditions. We could not identify any specification in the United States related directly to the design of concrete surfaces under tracked vehicles. Some references are available for the design of concrete pavements under heavy loads, specifically, at airports and with some industrial applications. However, these references do not address metal wheel types or tracks directly, nor do they give guidance on what load to design the pavement for in these cases.

Countries like New Zealand recognize the effect of metal wheels and their resulting abrasion in their standards[4], requiring more attention to finishes and proper selection of concrete strengths. However, it only addresses metal wheels directly and not tracked vehicles. It does indicate that for cases where high abrasion is to be expected, concrete strengths are likely to be 40 MPa or higher (6,000 psi) and that special attention should be given to flooring finishing techniques and selection.

In my opinion a prudent designer for this type of project should have researched and consulted such readily available literature to ensure the types of damages being observed to the concrete pavements, based on its intended use, would be minimized. Based on documents produced at the time of this report, to my knowledge URS made no such effort. If they made such an effort, then URS evidently did not communicate to H+E Equipment the potential for heavy tracked equipment causing such damage to concrete pavements being designed by them for the two sites.

---

[4] NZS-3101 Part 1 Table 3.8

1306663.001 7845                                        6

NON-CERTIFIED COPY

**Pavement Design Features**

Based on conversations with H+E Equipment[5], URS was aware that they should design concrete pavements at both sites to allow parking of all types of heavy equipment, including tracked equipment, anywhere on the pavements. Indeed, URS made no distinction on their drawings regarding where certain types of heavy equipment were to be parked[6]. Given this requirement, all pavement areas designed for heavy equipment may be subject to traffic from all types of such equipment, and therefore should be designed to accommodate all of them accordingly.

A publication by the American Concrete Institute titled *ACI 330R-01 Guide for the Design and Construction of Concrete Parking Lots* provides designers current knowledge and practices for the design, construction, and maintenance of concrete parking lots. ACI 330R-01 was issued in October 2001 and was available at the time of the design of the pavements at the two facilities. The guide was revised and subsequently reissued in June 2008 as ACI 330R-08.

ACI 330R-01 enables a designer to select a pavement thickness based on the Traffic Category, Modulus of Subgrade Reaction ($k$), and Modulus of Rupture ($M_R$) of the concrete. In my opinion a proper interpretation of ACI 330R-01 for both sites would result in the selection of Traffic Category C for parking areas and interior lanes, and Traffic Category D for entrance and exterior lanes. The Modulus of Rupture equals approximately 600 psi assuming a 28-day concrete compressive strength of 4000 psi[7]. The Modulus of Subgrade Reaction depends on the soil conditions as indicated in the geotechnical report produced for each site.

Both ACI 330R-01 and ACI 330R-08 state that distributed steel reinforcement can be used to control the opening of intermediate cracks between the joints. The sole function of distributed steel reinforcement is to hold the fracture faces together if cracks form. This use becomes more obvious in cases where uncontrollable subgrade conditions are liable to provide non-uniform support. ACI 330R-01 states that distributed steel reinforcement "is needed" in pavements with transverse joints spaced more than 30 times the slab thickness, while ACI330R-08 states that it "may be needed." When used, the distributed steel reinforcement is interrupted at the contraction joints because such joints by design should be free to open.

According to ACI 330R-01 and ACI 330R-08 pavements designed for truck traffic typically require load-transfer dowels for large joint spacing. A larger joint spacing results from increased spacing between joints which, in turn, increase joint openings and reduce aggregate interlock load transfer. ACI 330R-01 specifies diameters for smooth round dowels of 3/4", 7/8", 1", and 1-1/8" for slab depths (i.e., thicknesses) of 6", 7", 8", and 9", respectively.

---

[5] Frankie Wynn, Director of Facilities/Risk/Compliance Management, H&E Equipment Services, Inc.

[6] For example, see URS Drawing AS-101 for the Baton Rouge site.

[7] $M_r = 2.3 f'_c{}^{2/3}$; regarding ACI330R-08 the values for the Traffic Category would be the same, while $M_r$ would range from approximately 500 psi to 630 psi depending on the aggregate texture and shape.

NON-CERTIFIED COPY

ACI330 R-08 specifies diameters for smooth round dowels of 1", 1-1/4", and 1-1/4" for slab depths of 7", 8", and 9", respectively. All dowels are spaced at 12" centers. Dowel embedment is 6" on each side of a joint with a total dowel length of 14" to allow for joint openings and minor errors in dowel positioning. Correct alignment and lubrication is cited in both versions of ACI 330R as essential for proper joint function.

Given the operating conditions stated by H+E Equipment, in my opinion it was reasonable and prudent for URS to require distributed steel reinforcement in the concrete pavements at both sites to control the opening of intermediate cracks between the joints. It was also reasonable and prudent for URS to require dowels at the expansion joints to provide vertical load transfer while permitting the joints to expand. However, as indicated in the sections to follow URS did not design the dowels in accordance with recognized specifications and guidelines related to concrete pavement design.

**Baton Rouge Site**

A review of engineering drawings for the Baton Rouge site indicate that heavy equipment, including tracked equipment, was to travel and park around the north, south, and west sides of the single story Branch Building in an area designated as "Inventory Storage".[8] This same area is labeled "Concrete Parking" and in my opinion should be associated with the design of "Heavy Duty Pavement" given the type of equipment moving in the area[9]. Figure 5 shows pavement details from the architectural and engineering drawings created by URS for the Baton Rouge site.

Regarding rigid pavement design a geotechnical report produced to URS for the Baton Rouge site[10] states,

> "No specific traffic data were provided; therefore, pavement recommendations for this site are based upon the following assumed daily traffic frequencies. In the heavy storage area: 100 light (7-kip) trucks, two 34-kip trucks, two 46-kip trucks, and thirty 80-kip trucks per day."

> "The traffic is expected to be from rubber-tired vehicles. If the expected traffic frequencies (especially those involving heavy vehicles) are much different from these assumptions, this office should be notified so that we may re-evaluate the pavement recommendations."

[Page 9; Section 8.0]

---

[8] URS Drawing AS-101; for the purposes of this report the front of the Branch Building is assumed to face east.
[9] URS Drawings C-202, C-205, and C-206; pavement in front of the building where cars and light trucks park is labeled "Concrete Driving Parking"; URS Drawing C-501 Detail 1.
[10] Soil Testing Engineers, Inc., 316 Highland Park Drive, Baton Rouge, Louisiana, 70810; report dated January 11, 2007.

1306663.001 7845

8

NON-CERTIFIED COPY

"Rigid pavement recommendations have been computed based on a modulus of subgrade reaction (k) of 65 pci. Additionally, the design presumes 3,800 psi concrete, which can be expected to develop a modulus of rupture of about 650 psi (average). The design life of the pavement system is dependent upon periodic maintenance of the pavement. This maintenance includes but is not limited to cleaning and resealing joints, sealing cracks and immediate repairs of damaged areas."

"In the heavy equipment storage area, for a 20-year design life, we estimate the number of 18-kip equivalent single axles (ESAL's) for rigid pavement to be approximately 956,028. Based on these results, we recommend a minimum rigid pavement thickness of 7 inches."

"The rigid concrete should conform similarly to the requirements of LA DOTD Standard Specifications, Section 601, 2000 Edition. Proper steel reinforcement (temperature and shrinkage) joint design, and installation are essential to satisfactory pavement performance."

[Page 10; Section 8.2]

My interpretation of ACI 330R-01 Table 2.4 for this case would result in the selection of a 20-year design thickness of 6.5 inches for Traffic Category C (parking areas and interior lanes) and 9.0 inches for Traffic Category D (entrance and exterior lanes). The same selection results using ACI 330R-08 Table 3.4 with the exception that for Category D when dowels are used in transverse joints the thickness can be reduced one inch to 8.0 inches.

The thickness for heavy duty pavement shown on the URS design drawings (see Figure 5) is 8.0 inches. However, according to the URS drawings[11] as illustrated in Figure 6 this heavy duty pavement is limited to the immediate area surrounding the Branch Building. The remaining portion of the concrete pavement beyond the Branch Building is designated by URS as standard duty pavement which by design is 6.0 inches thick. This thickness is less than what was recommended in the geotechnical report and what would be required in accordance with ACI 330R-01 for heavy types of equipment, including tracked equipment. As indicated earlier, H+E Equipment reportedly told URS to design the pavement surrounding the Branch Building in a manner that allowed the movement and parking of all types of equipment anywhere on the pavement.

The engineering drawings for the Baton Rouge site also deviated from good design practice in definition of the contraction joint[12] depth (see Figure 5). The drawing detail for the contraction joint shows a note stating "Saw-Cut Joint ½" Depth". The minimum depth of a contraction joint

---

[11] URS Drawings C-302 and C-305; the legend states "Proposed 8" Concrete".

[12] The drawing labels this detail as a construction joint.

NON-CERTIFIED COPY

should be one-fourth of the slab thickness, or approximately 1.5 inches for a six-inch thick slab and 2.0 inches for an eight-inch thick slab[13]. However, during my surveys I measured the contraction joints at the Baton Rouge site and they were no more than ½ inch deep.

ACI 330R-01 recommends dowel diameters of 3/4" and 1" for slab thicknesses of 6" and 8", respectively. The Department of Public Works for the City of Baton Rouge and Parish East of Baton Rouge specifies dowel diameters of 1" and 1-1/4" for slab thicknesses of 6" and 8", respectively. The Louisiana Department of Transportation (LDOT) specifies a dowel diameter of 1-1/4" for a slab thickness of 8". All three documents require the spacing to be 12 inches. Figure 7 shows the tables from each of these sources including ACI 330R-08. The URS drawing (see Figure 5) shows a #4 smooth bar, meaning a ½" diameter bar, spaced 18 inches on center. This design is notably less in terms of the amount of steel per unit area than what is recommended by ACI and specified by the Department of Public Works and LDOT.

Diagonal cracking was observed at the intersection of some expansion joints at the Baton Rouge site (see Figure 3). High stress concentrations form at the corners of square pavement sections due to curling and warping of the pavement section caused by moisture and temperature differentials, and uneven loading across the pavement surface. According to ACI 330R-08,

> "Dowels should not be placed closer than 12 in. (300 mm) to a joint intersection to minimize the potential for corner cracking."

[Page 9; Section 3.8.2]

The presence of corner cracking at some of the expansion joints intersections suggests that improper spacing of dowels near the corners may have occurred. I did not identify a detail or note on the URS drawings indicating a minimum distance from the joint intersection for dowel placement.

## Kenner Site

A review of engineering drawings for the Kenner site indicate that heavy equipment, including tracked equipment, was to travel and park virtually anywhere on the site, including along the main entryway and around all sides of the Service Building[14]. These areas were designated as "Heavy Duty Pavement". Only a few select areas in front of the office and toward the back of site were designated as "Light Duty Pavement" for cars and light trucks. Figure 8 shows

---

[13] Specification for Unreinforced Concrete Parking Lots ACI 330.1-04 published by the American Concrete Institute.
[14] URS Drawing C1.0.

NON-CERTIFIED COPY

pavement details from the architectural and engineering drawings created by URS for the Kenner site[15].

Regarding rigid pavement design a geotechnical report produced to URS for the Kenner site[16] states,

> "Anticipated traffic volumes and loading conditions for this facility were not provided, but were assumed based on experience with similar projects. The pavements within the facility may likely be a medium to heavy duty traffic areas. Traffic estimates used in the determination of required pavement thicknesses assume a 20-year design period and are summarized in the following table." [Table omitted for brevity.]

> "The architect or engineer responsible for the final pavement design should review this traffic information for accuracy/applicability. If these traffic assumptions are not correct, please advise this office so that the pavement designs can be re-analyzed and revised thickness designs developed."

> "Based upon the soil conditions at the site, rigid pavements should be designed and constructed using a minimum 7-inch concrete pavement thickness over a minimum 12 inches of compacted river sand."

> "Long term differential settlement is expected to occur across the proposed pavement areas with these soil conditions. It is expected that differential movement will occur over a period of several years between the pavement panels resulting in subsequent loss of aggregate interlock at the joints. For these anticipated conditions, it has been an accepted practice to install a nominal reinforcement in the pavement consisting of minimum #3 rebar at 18-inch on-centers to maintain the joint connection. Alternatively an appropriately sized welded wire fabric can also be used."

> "Other standard design and construction details for rigid pavements as contained in ACI 330R-01 'Guide for Design and Construction of Concrete Parking Lots' should be followed in the pavement design and construction process. *It is recommended that the design engineer refer to this document for more detailed information* [emphasis added]. A critical aspect of concrete pavements for facilities of this nature is joint spacing and related details. ACI 330R-01 addresses these important details."

> [Pages 11-12; Section 4.5]

---

[15] URS Drawing C7.0.
[16] Terracon Consultants, Inc., 316 Highland Park Drive, Baton Rouge, Louisiana, 70810; report dated February 9, 2011.

NON-CERTIFIED COPY

The Modulus of Subgrade Reaction was reported as 75 psi/in[17]. My interpretation of ACI 330R-01 Table 2.4 for this case would result in the selection of a 20-year design thickness of 6.5 inches for Traffic Category C (parking areas and interior lanes) and 9.0 inches for Traffic Category D (entrance and exterior lanes). These section depths are consistent with ACI 330R-08 Table 3.4 with the exception that for Category D when dowels are used in transverse joints the thickness can be reduced one inch to 8.0 inches.

The thickness for heavy duty pavement shown on the URS design drawings (see Figure 8) is 7.0 inches[18]. This thickness is consistent with the recommendation made in the geotechnical report. Surface degradation issues aside, in my opinion a 7.0 inch thickness is the proper value for Traffic Category C where equipment is parked or traveling along the interior of the site. However, for the entrance and exterior lanes along the perimeter of the site, i.e., Traffic Category D, the 7.0 inch thickness is less than what is recommended per ACI 330R-01 for heavy types of equipment, including tracked equipment. As indicated earlier, H+E Equipment reportedly told URS to design the pavement surrounding the Service Building in a manner that allowed the movement and parking of all types of equipment anywhere on the pavement.

A review of engineering drawings for the Kenner site also revealed a discrepancy in the definition of the contraction joint[19] depth (see Figure 8). A drawing detail for the contraction joint shows a note stating "Saw-Cut ¼ Slab Thickness" meaning the joint depth should be one-fourth of the slab thickness. The same detail also shows a dimension labeled "¼" Depth of Concrete" which could be interpreted as a depth of ¼ (0.25) inches. The correct depth of a contraction joint should be one-fourth of the slab thickness, or approximately 1.75 inches for a seven-inch thick slab[20]. During my surveys I also measured contraction joint depths at the Kenner site. They were no more than ½ inch deep.

As shown in Figure 7, ACI 330R-01 recommends a 7/8" dowel diameter for a 7" slab thickness. ACI 330R-08 recommends a 1" dowel diameter for a 7" slab thickness. LDOT specifies a dowel diameter of 1-1/4" for a slab thickness of 8"[21]. All three documents require the spacing to be 12 inches. The URS drawing (see Figure 8) shows a #4 smooth bar, meaning a ½" diameter bar, spaced 18 inches on center. This design is notably less in terms of the amount of steel per unit area than what is recommended by ACI and as specified by LDOT. Severe degradation of an expansion joint at the Kenner site (see Figure 4) resulted in exposure of a dowel bar. The exposed dowel bar diameter is ½ inch.

---

[17] Page 10 Section 4.4; the topic pertains to details concerning floor slabs, but is assumed applicable to pavement design.
[18] Terracon issued a letter dated August 5, 2011, stating that a 6-inch thick concrete pavement thickness would be acceptable for standard duty pavement.
[19] The drawing labels this detail as a control joint.
[20] Specification for Unreinforced Concrete Parking Lots ACI 330.1-04 published by the American Concrete Institute.
[21] 8" is the minimum slab thickness cited on the LDOT drawings.

NON-CERTIFIED COPY

The URS drawings state that in regards to "pavement preparation and construction" the recommended specifications from the geotechnical report shall govern. As indicated earlier, the geotechnical report issued for the Kenner site states that the standard design and construction details for rigid pavements as contained in ACI 330R-01 should be followed by URS in the pavement design and construction process. In my opinion URS did not follow the ACI 330R-01 guidelines regarding slab thicknesses for Traffic Category D conditions and for dowel bar details at the Kenner site.

Diagonal cracking was also observed at the intersection of some expansion joints at the Kenner site (see Figure 4). As indicated earlier regarding the Baton Rouge site, per ACI 330R-08 dowels should not be placed closer than 12 in. (300 mm) to a joint intersection to minimize the potential for corner cracking. The presence of corner cracking at some of the expansion joint intersections suggests that improper spacing of dowels near the corners may have occurred. I did not identify a detail or note on the URS drawings indicating a minimum distance from the joint intersection for dowel placement.

NON-CERTIFIED COPY

# Remedies

### Pavement Surface

Exponent conducted a literature review of specialty construction materials for use in applications where heavy industrial and construction equipment is present. This effort resulted in identification of several products from different manufacturers designed to mitigate the abrasive effects of loads imposed by industrial equipment like heavy tracked vehicles on concrete pavements. These products can be used as part of new construction, or as a modification/retrofit method for an existing pavement. The common aspect of these materials is the use of special aggregates and other additives in the mix to provide a surface that has both high abrasion resistance and high overall strength.

Because impacts are expected on concrete pavements with heavy tracked equipment moving across them, providing a higher strength concrete mix alone would not be sufficient to ensure long term durability. As the strength of concrete goes up, its susceptibility to impact damage also increases as the mix becomes more brittle, making it prone to failures such as the failures observed at the H+E Equipment sites. The long-term approach is to provide a malleable, but strong, surface for these types of vehicles to move over. According to the consulted manufacturers, this approach has already proven effective in applications similar to the concrete pavements at the H+E Equipment sites.

Specialty aggregates are often prescribed and supplied by manufacturers of specialty slab finishes. One example is an iron filled aggregate. Along with properly executed curing and finishing techniques, this special aggregate will provide a more resistant surface for the movement of heavy metal tracked equipment. Several manufacturers offer products for this application. Exponent strongly recommends that the ultimate choice of a product be made in conjunction with a manufacturer's technical representative to ensure the product is used in a proper application and to identify appropriate quality measures during the execution.

The cost of applying specialty aggregate toppings, including preparation and application, varies with the manufacturer and selected installer. The manufacturer's technical representative can verify whether any special considerations will need to be given at existing joint locations where these products are to be applied.

NON-CERTIFIED COPY

## Pavement Design

To correct design deficiencies due to insufficient slab thickness, improper placement of distributed steel reinforcement and dowels, and/or improper sizing of dowels will require removal of the affected pavement areas.  As stated in ACI 330R-01,

> "The most effective repair method for badly cracked and deteriorated pavement panels is full or partial replacement.  It is important to determine and correct the cause of the slab failure before starting repairs.  Localized subgrade problems should be corrected.  If the pavement panels failed because of heavier than anticipated loads, replacement panels should be thickened to provide additional load-carrying capacity."

[Page 16; Section 6.4]

The presence of heavy track equipment poses a unique challenge to the short- and long-term performance of concrete pavements.  In addition to applying a specialty aggregate topping on lanes where tracked equipment is likely to travel, other options for improving the short- and long-term performance of concrete pavements under such conditions include: increasing the design compressive strength; increasing the pavement thickness; and installing metal edge guards along the expansion joints[22].  Dowels should also be designed and installed in accordance with the most recent ACI publications pertaining to concrete pavement design.

---

[22] Examples where edge guards are installed in reinforced concrete include warehouse loading docks, bridge expansion joints, and stairwells.

NON-CERTIFIED COPY

## Findings

My findings presented in this report are made to a reasonable degree of engineering certainty. Based on my on-site surveys, review of architectural and engineering reports, review of photos taken of the subject property, review of emails and other produced documents, and engineering analyses, in my opinion concrete pavements at the Baton Rouge and Kenner sites were not properly designed to account for the degrading effects and high loads imposed by the heavy construction equipment, particularly tracked equipment, operating across the pavements.

My current understanding is that H+E Equipment clearly communicated to the designer the type of equipment that would travel across the pavements. Moreover, representatives of URS reportedly visited the two sites and according to H+E Equipment viewed the equipment, including the heavy metal tracked equipment. Given these understandings, it is my opinion that URS did not exhibit the appropriate standard of care when designing the concrete pavements constructed at the two H+E Equipment sites.

Sufficient information was available to determine loads acting on the concrete pavements, and to design the pavements in a way to withstand these loads and high levels of stress and abrasion acting at or near the concrete surface. In my opinion damage observed on the concrete surfaces could have been controlled and minimized by the use of proper materials selection and implementation during the design phase. Given the pavement design as presented to the owner prior to construction, at a minimum URS should have informed H+E Equipment of the likelihood of near-term progressive damage to the concrete pavement resulting from the movement of tracked vehicles, and that such damage may necessitate periodic replacement of affected pavement sections. To my knowledge URS did not inform H+E Equipment of the likelihood of near-term progressive damage.

In my opinion the concrete pavements at both sites as currently designed are not adequate to perform for their intended use as required by H+E Equipment. Surface degradation is widespread and increasing at both sites. Large cracks have formed beyond the joints, an indication of an insufficient amount of or an improper placement of steel reinforcement. Repairs to the existing pavements will be necessary to allow for extensive use of heavy equipment over these paved areas during the 20-year design life without inducing the same level and extent of damage.

Steps can be taken to extend the life of concrete pavements including the application of specialty aggregate toppings; increasing the design compressive strength; increasing the pavement thickness; increasing the dowel bar sizes; and installing metal edge guards along the expansion joints.

1306663.001 7845

16

NON-CERTIFIED COPY



Figure 1. Various Perspectives of Baton Rouge Site.

NON-CERTIFIED COPY



Figure 2.  Various Perspectives of Kenner Site.

NON-CERTIFIED COPY



Figure 3. Concrete Pavement at Baton Rouge Site (source: Exponent).

NON-CERTIFIED COPY



Figure 3.  (Continued)

NON-CERTIFIED COPY



Figure 3.  (Continued)

1306663.001 7845

21

NON-CERTIFIED COPY



Figure 4.  Concrete Pavement at Kenner Site (source: Exponent).

NON-CERTIFIED COPY



13 August 2014

13 August 2014

13 August 2014

13 August 2014

13 August 2014

13 August 2014

Figure 4.  (Continued)

NON-CERTIFIED COPY



Figure 4.  (Continued)

NON-CERTIFIED COPY



Figure 5.  Pavement Details and Note for Baton Rouge Site
(Source: URS Drawings C-501 and C-509).

NON-CERTIFIED COPY



**N →**

Figure 6.  Designated Area for Heavy Duty Pavement at Baton Rouge Site
(Source: URS Drawings C-302 and C-305).

NON-CERTIFIED COPY

**Table 2.6—Dowel size** *

| Slab depth, in. (mm) | Dowel diameter, in. (mm) | Dowel embedment, in. (mm)† | Total dowel length, in. (mm)‡ |
|---|---|---|---|
| 5 (125) | 5/8 (16) | 5 (125) | 12 (300) |
| 6 (150) | 3/4 (19) | 6 (150) | 14 (360) |
| 7 (180) | 7/8 (22) | 6 (150) | 14 (360) |
| 8 (200) | 1 (25) | 6 (150) | 14 (360) |
| 9 (230) | 1-1/8 (29) | 7 (180) | 16 (400) |

*All dowels spaced at 12 in. (300 mm) centers.
†On each side of joint.
‡Allowance made for joint openings and for minor errors in positioning dowels.

ACI 330R-01

**Table 3.6—Sizes of smooth, round dowels** *

| Slab thickness, in. (mm) | Dowel diameter, in. (mm) |
|---|---|
| 7 (180) | 1 (25) |
| 8 (200) | 1-1/4 (32) |
| 9 (230) | 1-1/4 (32) |

*All dowels spaced at 12 in. (300 mm) centers, with minimum total length of 14 in. (360 mm) and minimum embedment length of 6 in. (150 mm) on each side of joint, with allowance made for joint openings and for minor errors in positioning dowels.

ACI 330R-08

**TABLE 1**
*(ALL DIMENSIONS ARE IN INCHES)*

| PAVEMENT THICKNESS | DOWEL BARS ⊚ | | | MINIMUM DEPTH OF JOINT | | |
|---|---|---|---|---|---|---|
| | SIZE | LENGTH | SPACING | C.J. & D.J. | | L.J. |
| 6 | 1 | 18 | 12 | 2 | | 2 |
| 8 | 1 1/4 | 18 | 12 | 3 | | 3 |
| 9 | 1 1/4 | 18 | 12 | 3 | | 3 1/2 |
| 10 | 1 1/4 | 18 | 12 | 3 1/2 | | 4 |

Parish of East Baton Rouge

**TABLE I**
*(ALL DIMENSIONS ARE IN INCHES)*

| PAVEMENT THICKNESS | SMOOTH DOWEL BARS ⊚ | | | DEF. TIE BARS ▦ | | | KEYWAY ⊚ | |
|---|---|---|---|---|---|---|---|---|
| | SIZE | LENGTH | SPACING | SIZE | LENGTH | SPACING | ⁵⁄₁₆ | ⁹⁄₁₆ |
| 8 | 1¼ | 18 | 12 | ½ | 24 | 24 | 2¾ | 1¼ |
| 9 | 1¼ | 18 | 12 | ½ | 24 | 24 | 2¾ | 1¼ |
| 10 | 1¼ | 18 | 12 | ½ | 24 | 24 | 2¾ | 1¼ |
| 11 | 1½ | 18 | 12 | ⅝ | 24 | 24 | 2¾ | 1½ |
| 12 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 3 | 1½ |
| 13 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 3 | 1½ |
| 14 | 1½ | 18 | 12 | ⅝ | 30 | 24 | 3 | 1½ |

LDOT

Figure 7. Dowel Sizing and Spacing Requirements.

NON-CERTIFIED COPY



Figure 8.  Pavement Details and Note for Kenner Site
(Source: URS Drawing C7.0).

NON-CERTIFIED COPY

Appendix A

Curriculum Vita of Dr. James R. Bailey, Ph.D., P.E.

NON-CERTIFIED COPY

E$^x$ponent®
*Failure Analysis Associates®*

Exponent
10850 Richmond Avenue
Suite 175
Houston, TX 77042

telephone 832-325-5700
facsimile 832-325-5799
www.exponent.com

## James R. (Bob) Bailey, Ph.D., P.E., F. ASCE
**Senior Managing Engineer**
**Houston Office Director**

### Professional Profile

Dr. James R. (Bob) Bailey is a licensed Professional Engineer in nine states and a Fellow of the American Society of Civil Engineers. For over 30 years, Dr. Bailey has served as a technical consultant, project manager, and researcher for private industry, universities, and government. As a Senior Managing Engineer in Exponent's Building & Structures practice, he brings specialized expertise to areas related to civil engineering; including wind engineering, construction materials, solid mechanics, dynamics, numerical analysis, structural analysis and design, and materials testing.

Dr. Bailey's primary area of expertise is determining the risk exposure of residential, commercial, and industrial properties to hazards associated with hurricanes, tornadoes, and flooding. He has conducted hurricane risk assessments and developed mitigation programs for various types of health, industrial, educational, and offshore energy facilities. Over the years he has surveyed and documented storm damage in the aftermath of numerous storm event, including hurricanes Irene (1999), Charley (2004), Francis (2004), Katrina (2005), Rita (2005), Wilma (2005), Ike (2008), and Sandy (2012), Tropical Storm Allison (2001), the Oklahoma City Tornado (1999), and the April-May 2011 Tornado Outbreak. He has investigated numerous building envelope systems, and has conducted investigations of both steep and low-slope roofing systems for damage caused by hail, wind, and construction errors. In 2011 he directed analysis of the storm surge risk posed to the South Texas Project Electric Generating Station using advanced hydrodynamic modeling techniques.

Dr. Bailey's past work at ExxonMobil included wind load analyses on drilling, semi-submersible, and floating, production, storage, and offloading (FPSO) structures; developing conceptual designs of gravity-based structures for arctic offshore environments; and conducting research and teaching classes on well cementing. He also has expertise in the area of well completions and workovers. Dr. Bailey has served as a lecturer in the private sector and at the university level on subjects related to civil and petroleum engineering. He also has been responsible for the design of test facilities and the development of test programs related to construction and energy. Dr. Bailey is currently the Presiding Officer of a five member expert panel, appointed by the Texas Department of Insurance in 2013, whose purpose is to develop ways of determining whether a loss to TWIA-insured property was caused by wind, waves, or tidal surges. He is also a member of the ASCE 7-16 Wind Load Subcommittee. He is past Chair of the ASCE Petrochemical Wind Load Task Committee, and served on an API 4F sub-committee assigned to revise specifications and guidelines for determining wind loads on onshore and offshore drilling structures.

30

NON-CERTIFIED COPY

**Academic Credentials and Professional Honors**

Ph.D., Civil Engineering, Texas Tech University, 1989
M.S., Civil Engineering, Texas Tech University, 1984
B.S., Civil Engineering, Texas Tech University, 1982

American Society of Civil Engineers (ASCE)
American Petroleum Institute (API) Spec 4F Wind Engineering Subcommittee
ASCE Wind Loads on Petrochemical Structures Task Committee
ASCE 7-16 Wind Load Subcommittee
Texas Tech University Civil Engineering Advisory Council (2007–2012)

Recipient of the Stephen D. Bechtel, Jr. Energy Award from ASCE (2016)

**Licenses and Certificates**

Professional Engineer, State of Florida, #67773
Professional Engineer, State of Georgia, #PE033027
Professional Engineer, State of Hawaii, #12820
Professional Engineer, State of Louisiana, #33830
Professional Engineer, State of Mississippi, #26488
Professional Engineer, State of South Carolina, #26408
Professional Engineer, State of Tennessee, #114185
Professional Engineer, State of Texas, #74911
Professional Engineer, State of Wisconsin, #42337-6

**Publications and Reports**

Bailey JR, Shrestha PL, et al. Analysis of maximum probable storm surge at the South Texas Project site. Proceedings, ASCE EWRI Conference, Seattle, WA, June 2014.

Bailey, JR. Hurricane risk assessment of a planned carbon capture facility located in Southeast Texas operated by NRG Energy, Inc., Report prepared for a California-based risk management company, February 2014.

Bailey, JR. Hurricane risk assessments of five electrical power plants located in the Caribbean and Hawaii operated by the AES Corporation, Report prepared for a California-based risk management company, November 2012.

Bailey JR. Feasibility study of an Alaskan LNG plant. Report prepared for an Asian-based consortium of companies, March 2012.

Bailey JR, et al. Wind loads for petrochemical and other industrial facilities. American Society of Civil Engineers, September 2011.

NON-CERTIFIED COPY

Bailey, JR.  Hurricane risk assessment of two wind farms located in South Texas operated by EoN Climate and Renewable.  Report prepared for a California-based risk management company, June 2011.

Bailey JR.  Wind risk assessment of the ThyssenKrupp steel plant located in Mississippi. Report prepared for a California-based risk management company, November 2010.

Bailey JR, Cantor R, et al.  An approach to business vulnerability and risk assessments related to climate change.  SPE International Conference on Health, Safety & Environment, Rio de Janeiro, Brazil, April 2010.

Bailey JR.  A hurricane risk assessment and mitigation plan for CHRISTUS hospitals located in Texas and Louisiana.  Report prepared for CHRISTUS Health, July 2009.

Bailey JR.  Study of Major Revenue Interruption Risks in the Gulf of Mexico.  Report prepared for a major oil and gas operator headquartered in the United States, July 2009.

Bailey JR, Gilbert RT, et al.  Wind load considerations for existing petrochemical structures. Structures Congress, American Society of Civil Engineers (ASCE), Austin, TX, May 2009.

Bailey JR, Levitan ML. Lessons learned and mitigation options for hurricanes.  Process Safety Progress, American Institute of Chemical Engineers (AIChE), 2008.

Bailey JR.  Finding the breaking point.  Report documenting window performance following the 2004 Florida hurricanes.  Prepared in conjunction with the Protecting People First Foundation, Wickford, RI, April 2005.

Bailey JR.  Flood hazard assessment of critical NASA assets at the Johnson Space Center. Report prepared for NASA management by ABS Consulting, July 2004.

Bailey JR.  Wind hazard assessment of critical NASA assets at the Johnson Space Center. Report prepared for NASA management by ABS Consulting, February 2001.

Bailey JR.  Vulnerability assessment of Harris County to hurricane winds.  Report prepared for the Harris County Commissioners Court by EQE International, June 2000.

Bailey JR.  Wind and flood hazard assessment of Critical NASA assets at the Kennedy Space Center.  Report prepared for NASA management by EQE International, June 2000.

Bailey JR, Vallabahn CVG, et al.  Experimental verification of the theoretical solution of laminated glass units.  Proceedings, Advanced Composites Materials in Civil Engineering Structures Materials Division, American Society of Civil Engineers, Las Vegas, NV, 1991 (paper awarded Best of Session, Spring 1991, by the Texas Section of the American Society of Civil Engineers).

E$^x$ ™

NON-CERTIFIED COPY

Bailey JR, Minor JE.  Structural glazing tests show wind pressure effects.  Glass Digest 1989 Oct; 68–76.

Bailey JR, Minor JE, Tock RW.  Response of structurally glazed insulating glass units to wind pressures," Proceedings, 6[th] U.S. Conference on Wind Engineering, Houston, TX, March 8–10, 1989.

Bailey JR, McDonald JR.  Impact Resistance of masonry walls to tornado-generated missiles.  Proceedings, 3rd North American Masonry Conference, Arlington, TX, June 3–5.

**Presentations**

Bailey JR, Shrestha PL, et al.  Analysis of maximum probable storm surge at the South Texas Project site.  ASCE EWRI Conference, Seattle, WA, June 2014.

Bailey JR.  Presentation of evidence—How to keep the jury interested.  Cooper & Scully 8th Annual Construction Symposium, Dallas, TX, February 1, 2013.

Bailey JR.  Winds and rain a-comin—Hurricanes, structures and potential risks.  Texas Association of Defense Council, Spring Meeting, Santa Fe, NM, April 27, 2012.

Bailey JR.  Preparing for the worst—Is the nation prepared for natural disasters?  American Bar Association Tort Trial & Insurance Practice Section Spring Leadership Meeting, Charleston, SC, May 17, 2012.

Bailey JR.  Probable maximum surge and seiche flooding at a coastal nuclear power plant located in the United States, Advisory Committee on Reactor Safeguards (ACRS), Nuclear Regulatory Commission, Rockville, MD, November 30, 2010.

Bailey JR, Griffith M.  Natural hazard risk assessment and mitigation for nuclear facilities.  WebEx presentation, March 2, 2010.

Bailey JR.  Lessons learned and mitigation options for hurricanes.  Spring National Meeting, American Institute of Chemical Engineers (AIChE), April 2008.

Bailey JR.  Vulnerability of industrial facilities.  Reinsurance Association of America Cat Modeling 2006 Conference, Tampa, FL, February 23, 2006.

Bailey JR.  Safe haven considerations at industrial sites.  The Private Industry Workshop, National Hurricane Conference, New Orleans, LA, March 22, 2005.

Bailey JR.  Finding the breaking point.  International Code Council, Tampa, FL, February 12, 2005.

Bailey JR.  Identifying protective areas for people in buildings.  International Conference on Wind Engineering, Texas Tech University, June 2, 2003.

Bailey JR.  Assessment of extreme wind effects on industrial facilities.  The Private Industry Workshop, National Hurricane Conference, New Orleans, LA, April 17, 2003.

Bailey JR.  Assessing the impacts of hurricanes and earthquakes.  Association for Facilities Engineering Conference, Las Vegas, NV, September 25, 2001.

Bailey JR.  Using Digital Physics$^{TM}$ to calculate wind loads on structures.  ASCE Structures Conference, Washington, DC, May 2001.

Bailey JR.  Don't let your critical assets blow away.  Houston Chapter of the Risk and Insurance Management Society (RIMS), October 18, 2000.

Bailey JR.  Impact resistance of wood products subjected to simulated tornado missiles. International Timber Engineering Conference, Seattle, WA, 1988.

**Patents**

Patent No. 5,309,995:  Well Treatment Using Ball Sealers, issued May 10, 1994.

Patent No. 5,485,882: Low-density Ball Sealer for Use as a Diverting Agent in Hostile Environment Wells, issued January 23, 1996.

Patent No. 5,582,251:  Downhole Mixer, issued December 19, 1996.

**Prior Professional Experience**

- Manager, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 2004–2006
- Senior Project Engineer, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 2001–2004
- Project Engineer, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 1998–2001
- Engineering Specialist, Offshore Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1994–1998
- Senior Project Engineer, Drilling and Completions Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1992–1994
- Project Engineer, Drilling and Completions Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1990–1992
- Lecturer and Research Associate, Civil Engineering Department, Texas Tech University, 1989–1990

NON-CERTIFIED COPY

**Civil Case Experience**

Deposition – INEOS USA L.L.C., v. BP Products North America, Inc., American Arbitration Association, No. 13 158 Y 01929 06, Houston, TX, November 2008.

Deposition – GG&A Central Mall Partners, L.P., Dillard's, Inc., Dillard Texas, LLC, and Dillard Texas Operating Limited Partnership, v. Duro-Last, Inc., Jaco Construction, Inc., and Schrader Roofing, Inc, District Court of Jefferson County, Texas, 58th Judicial District, January 2010.

Testimony – Appraisal Hearing, Beechnut Village Shopping Center v. Nationwide Insurance Co., Judge John Coselli – Umpire, appointed by Judge Gray Miller, United States District Judge, Southern District of Texas, University of Houston Law School, Houston, Texas, December 2010.

Expert Witness Statement – Canadian Natural Resources Limited and Highwood Limited v. Oil Insurance Limited, submitted to the Board of Arbitration under the provisions of the Arbitration Act of 1996, London, England, March 2011.

Testimony – Appraisal Hearing, Cause No; 1:11-cv-00207; Timothy Nolan and Ermelinda Nolan v. GeoVera Specialty Insurance Company, Donald Summey and James Perfetti; Judge James W. Mehaffy – Umpire, appointed by Magistrate Judge Keith F. Giblin, United States District Court for the Eastern District of Texas, Beaumont Division, Houston, Texas, September 2012.

Deposition – David S. Gronik, Jr. and Mary K. Gronik, S.C.G., M.A.G., David S. Gronik, Jr. Living Trust, Opio Boat Moon, LLC, Plaintiffs, v. Susan Balthasar and Susan M. Balthasar, as Personal Representative of The Estate of Norman J. Balthasar, Defendants; and Shorewest Realtors, Inc., Continental Casualty Company, and Anne Schwartz, Third-Party Defendants, and Opio Boat Moon, LLC, and David S. Gronik, Jr., Plaintiffs, Chubb Indemnity Insurance Company, Defendant, United States District Court for The Eastern District Of Wisconsin, November 2012.

Deposition – Jerome S. Tannenbaum and Deborah M. Tannenbaum, v. Federal Insurance Company, United States District Court for the Middle District of Tennessee, Nashville Division, February 2013.

Testimony – Jerome S. Tannenbaum and Deborah M. Tannenbaum, v. Federal Insurance Company, United States District Court for the Middle District of Tennessee, Nashville Division, November 2013.

Deposition – Intrepid Ship Management, Inc., Vessel Management Services, Inc., and Crowley Maritime Corp., v. Ocean Prospector and Plant Recovery Company, United States District Court, Southern District of Texas, Galveston Division, September 2014.

James R. Bailey, Ph.D., P.E.
07/16

NON-CERTIFIED COPY

Deposition – Northrop Grumman Corporation, vs. AON Risk Insurance Services West, Inc., Superior Court of the State of California, County of Los Angeles, May 2015.

Deposition – Edie Housel, et al, v. The Home Depot U.S.A., Inc., et al, United States District Court for the Western District of Missouri, Southwestern Division, February 2016.

Deposition – Metro Hospitality Partners, LTD., d/b/a Crowne Plaza Hotel, v. Lexington Insurance Company,   United States District Court, Southern District of Texas, Houston Division, June 2016.

**Consulting and Testimony Billing Rate**

Two hundred ninety dollars per hour (calendar year 2016).

NON-CERTIFIED COPY

**Appendix B**

**Documents Reviewed**

NON-CERTIFIED COPY

| Name | Date modified | Type | Size |
|------|---------------|------|------|
| C-302.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 880 KB |
| C-304.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 548 KB |
| C-305.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 716 KB |
| C-306.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 2,784 KB |
| C-307.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 864 KB |
| H+E Belle Chasse Bid Set 5-22-12.pdf | 5/31/2012 12:42 PM | Adobe Acrobat D... | 32,517 KB |
| Concrete Specs for Baton Rouge Site.pdf | 9/12/2014 4:53 PM | Adobe Acrobat D... | 122 KB |
| Pavement Spec for Baton Rouge Site.pdf | 9/12/2014 4:50 PM | Adobe Acrobat D... | 72 KB |
| 2013-11-20 H&E Petition and First Set of Discovery to Defendants.PDF | 4/3/2014 5:24 PM | Adobe Acrobat D... | 2,322 KB |
| 2014-2-19 H&E Answer and Affirmative Defenses to URS Reconventional Demand.pdf | 4/3/2014 5:27 PM | Adobe Acrobat D... | 157 KB |
| 2015-03-27 H&E's Motion to Compel.pdf | 3/27/2015 3:24 PM | Adobe Acrobat D... | 1,911 KB |
| 2015-08-24 H&E's Opposition to Defendants Motion for Partial Summary Judgment.pdf | 2/1/2016 12:49 PM | Adobe Acrobat D... | 1,736 KB |
| Baton Rouge Project Change Orders.xls | 7/16/2014 6:47 PM | Microsoft Excel 97... | 60 KB |
| H&E Belle Chasse COP Log.xls | 7/16/2014 6:47 PM | Microsoft Excel 97... | 138 KB |
| Kenner Project Change Orders 08-2013.xlsx | 7/16/2014 6:47 PM | Microsoft Excel W... | 13 KB |
| URS 31020-69139.pdf | 6/27/2016 10:25 AM | Adobe Acrobat D... | 328,781 KB |
| 502-01_Concrete_Pavement_Details.pdf | 6/24/2016 2:54 PM | Adobe Acrobat D... | 348 KB |
| 52079 - PM RFI Log - MAPP.pdf | 7/12/2016 10:09 AM | Adobe Acrobat D... | 165 KB |
| CP-01 (1 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 454 KB |
| CP-01 (2 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 487 KB |
| CP-01 (3 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 575 KB |
| H & E 0000211-0000259.pdf | 6/24/2016 2:55 PM | Adobe Acrobat D... | 8,076 KB |
| Ardaman report re Baton Rouge Detention Pond.msg | 7/5/2016 11:41 AM | Outlook Item | 3,653 KB |
| Ardaman proposal Baton Rouge.msg | 7/5/2016 11:41 AM | Outlook Item | 1,287 KB |
| Baton Rouge GeoTech Report.pdf | 7/27/2016 6:31 PM | Adobe Acrobat D... | 7,849 KB |
| Email re Density testing Baton Rouge.msg | 7/5/2016 11:41 AM | Outlook Item | 376 KB |
| Request for additional geotech work in BR.msg | 7/5/2016 11:41 AM | Outlook Item | 202 KB |
| Email re post pour testing Kenner.msg | 7/5/2016 11:49 AM | Outlook Item | 461 KB |
| Kenner GeoTech Report.pdf | 7/5/2016 11:46 AM | Adobe Acrobat D... | 8,272 KB |
| Kenner Geotech Scope letter.msg | 7/5/2016 11:49 AM | Outlook Item | 2,059 KB |
| Revision to Kenner Geotech Report.msg | 7/5/2016 11:49 AM | Outlook Item | 513 KB |
| H & E 0000211-0000259.pdf | 7/26/2016 10:27 AM | Adobe Acrobat D... | 8,076 KB |
| H & E 0022314.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 4,151 KB |
| H&E 0005228_.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 617 KB |
| HE0005154.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 124 KB |
| HE0005155.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 433 KB |
| HE0005163_VOL001.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 102 KB |
| HE0000815_VOL001.pdf | 7/26/2016 10:19 AM | Adobe Acrobat D... | 553 KB |
| URS 033308.pdf | 7/26/2016 10:20 AM | Adobe Acrobat D... | 9,562 KB |
| URS 038807.pdf | 7/26/2016 10:22 AM | Adobe Acrobat D... | 874 KB |
| URS 039466.pdf | 7/26/2016 10:24 AM | Adobe Acrobat D... | 16,555 KB |
| URS 087952.pdf | 7/26/2016 10:25 AM | Adobe Acrobat D... | 743 KB |
| URS040311_image.pdf | 7/26/2016 10:25 AM | Adobe Acrobat D... | 180 KB |
| URS040655_image_.pdf | 7/26/2016 10:26 AM | Adobe Acrobat D... | 637 KB |
| URS049986_image.pdf | 7/26/2016 10:27 AM | Adobe Acrobat D... | 765 KB |

NON-CERTIFIED COPY

| File | Date | Type | Size |
|---|---|---|---|
| H&E 0003840.pdf | 7/26/2016 10:44 AM | Adobe Acrobat D... | 2,572 KB |
| H&E 0004244.pdf | 7/26/2016 10:47 AM | Adobe Acrobat D... | 1,996 KB |
| H&E 0013874.pdf | 7/27/2016 2:06 PM | Adobe Acrobat D... | 318 KB |
| H&E 0013938.pdf | 7/26/2016 10:49 AM | Adobe Acrobat D... | 849 KB |
| H&E 0063316.pdf | 7/26/2016 10:51 AM | Adobe Acrobat D... | 268 KB |
| H&E 0063319.pdf | 7/26/2016 10:52 AM | Adobe Acrobat D... | 350 KB |
| H&E 0064597.pdf | 7/26/2016 10:53 AM | Adobe Acrobat D... | 2,929 KB |
| H&E 0065372.pdf | 7/26/2016 10:55 AM | Adobe Acrobat D... | 8,306 KB |
| URS 031731.pdf | 7/26/2016 10:57 AM | Adobe Acrobat D... | 2,400 KB |
| URS 033145.pdf | 7/26/2016 10:58 AM | Adobe Acrobat D... | 21,048 KB |
| URS 038163.pdf | 7/26/2016 11:00 AM | Adobe Acrobat D... | 271 KB |
| URS 055534.pdf | 7/26/2016 11:00 AM | Adobe Acrobat D... | 2,391 KB |
| URS 058506.pdf | 7/26/2016 11:01 AM | Adobe Acrobat D... | 150 KB |
| URS 066293.pdf | 7/26/2016 11:01 AM | Adobe Acrobat D... | 10,649 KB |
| URS 066657.pdf | 7/26/2016 10:33 AM | Adobe Acrobat D... | 2,228 KB |
| URS 066706.pdf | 7/26/2016 10:36 AM | Adobe Acrobat D... | 2,363 KB |
| URS 066680.pdf | 7/26/2016 10:39 AM | Adobe Acrobat D... | 5,059 KB |
| URS 066808.pdf | 7/26/2016 10:41 AM | Adobe Acrobat D... | 229 KB |
| URS 0336067.pdf | 7/26/2016 10:42 AM | Adobe Acrobat D... | 2,765 KB |
| 20130813155fea.pdf | 8/11/2014 2:11 PM | Adobe Acrobat D... | 388 KB |
| 20130813155eb.pdf | 8/11/2014 2:11 PM | Adobe Acrobat D... | 34 KB |
| 20130813156c.pdf | 8/11/2014 2:11 PM | Adobe Acrobat D... | 167 KB |
| 20130924l548.pdf | 9/24/2013 3:54 PM | Adobe Acrobat D... | 2,680 KB |
| Baton Rouge Project Change Orders.xls | 8/11/2014 2:11 PM | Microsoft Excel 97... | 60 KB |
| C 5.0 REVISED per RFI #26_.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 745 KB |
| C1.0 site plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 293 KB |
| C2.0 Demolition plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 367 KB |
| C3.0 Geometric plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 363 KB |
| C3.1 Joint layout plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 236 KB |
| C4.0 drainage plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 937 KB |
| C5.0 grading plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 317 KB |
| C6.0 Utility plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 340 KB |
| C7.0 details.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 936 KB |
| C8.0 FENCE details.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 56 KB |
| C9.0 FENCE details 2.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 770 KB |
| C-101.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 390 KB |
| C-102.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 818 KB |
| C-201.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 523 KB |
| C-202.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 666 KB |
| C-203.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 601 KB |
| C-204.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 371 KB |
| C-205.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 354 KB |
| C-206.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 308 KB |
| C-405.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 449 KB |
| C-406.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 2,577 KB |
| C-407.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 709 KB |
| C-501.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 670 KB |
| C-502.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 651 KB |
| C-503.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 808 KB |
| C-504.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 692 KB |
| C-505.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 558 KB |
| C-506.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 591 KB |
| C-507.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 407 KB |
| C-508.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 923 KB |
| C-509.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 779 KB |

NON-CERTIFIED COPY

| Name | Date | Type | Size |
|---|---|---|---|
| Cement Concrete Pavement - Kenner, LA.PDF | 9/17/2013 4:36 PM | Adobe Acrobat D... | 1,699 KB |
| Concrete Work - Headquarters and Branch Buildings.pdf | 9/17/2013 4:36 PM | Adobe Acrobat D... | 1,305 KB |
| Crane Remanufacturing Center Relocation - Belle Chasse, LA.PDF | 9/17/2013 4:35 PM | Adobe Acrobat D... | 1,305 KB |
| G-001.pdf | 7/5/2011 10:39 AM | Adobe Acrobat D... | 1,988 KB |
| G-002.pdf | 7/5/2011 10:33 AM | Adobe Acrobat D... | 1,536 KB |
| H&E Belle Chasse COP Log.xls | 8/11/2014 2:11 PM | Microsoft Excel 97... | 138 KB |
| H+E Kenner G-001.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 7,512 KB |
| Kenner Project Change Orders 08-2013.xlsx | 8/11/2014 2:11 PM | Microsoft Excel W... | 13 KB |
| Missing Page Request_02751.pdf | 9/25/2013 5:45 PM | Adobe Acrobat D... | 1,104 KB |
| Missing Page Request_03300.pdf | 9/25/2013 5:46 PM | Adobe Acrobat D... | 190 KB |
| S100.pdf | 3/27/2013 11:49 AM | Adobe Acrobat D... | 920 KB |
| S210.pdf | 3/27/2013 11:58 AM | Adobe Acrobat D... | 853 KB |
| S200.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 1,315 KB |
| S210.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 704 KB |
| S220.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 843 KB |
| S300.pdf | 3/27/2013 12:09 PM | Adobe Acrobat D... | 1,890 KB |
| S310.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 744 KB |
| S320.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 672 KB |
| S400.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 760 KB |
| S410.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 588 KB |
| S420.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 573 KB |
| S430.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 714 KB |
| alum_nosing_a_b-1.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-1sp.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-5.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-16a.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-31a.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| anchoring.gif | 10/2/2014 2:32 PM | GIF image | 29 KB |
| b-3.jpg | 10/2/2014 2:32 PM | JPEG image | 3 KB |
| back_to_top.jpg | 10/2/2014 2:32 PM | JPEG image | 2 KB |
| backs.gif | 10/2/2014 2:32 PM | GIF image | 15 KB |
| berry.css | 1/9/2014 2:32 PM | Cascading Style S... | 7 KB |
| button_cad.gif | 10/2/2014 2:32 PM | GIF image | 1 KB |
| button_dwg.gif | 10/2/2014 2:32 PM | GIF image | 1 KB |
| cast_iron_b-16.jpg | 10/2/2014 2:32 PM | JPEG image | 16 KB |
| cast_iron_cast_aluminum.jpg | 10/2/2014 2:32 PM | JPEG image | 21 KB |
| curb_bar_cb-15a.gif | 10/2/2014 2:32 PM | GIF image | 5 KB |
| curb_bar_cb-25a.gif | 10/2/2014 2:32 PM | GIF image | 5 KB |
| noses.gif | 10/2/2014 2:32 PM | GIF image | 15 KB |
| nosings_b-1.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| nosings_b-1sp.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-2.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-16.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-16a.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-100.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-110.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| nosings_b-120.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| pic_products.jpg | 10/2/2014 2:32 PM | JPEG image | 37 KB |
| CAT - Success Story.pdf | 10/21/2013 1:58 PM | Adobe Acrobat D... | 223 KB |
| CAT Aurora, IL Projects II.ppt | 10/24/2013 7:51 PM | Microsoft PowerP... | 9,556 KB |
| CAT Project References.pdf | 10/21/2013 1:58 PM | Adobe Acrobat D... | 89 KB |
| IMG_0894.MOV | 10/25/2013 6:36 AM | QuickTime Movie | 724 KB |
| Kobelco - Success Story.pdf | 10/21/2013 1:58 PM | Adobe Acrobat D... | 131 KB |
| 123header.jpg | 10/2/2014 3:04 PM | JPEG image | 5 KB |
| Grey-Diamond-Plate.jpg | 10/2/2014 3:04 PM | JPEG image | 18 KB |
| Grey-Diamond-Plate_LIGHT.jpg | 10/2/2014 3:04 PM | JPEG image | 4 KB |
| LINE_2.gif | 10/2/2014 3:04 PM | GIF image | 1 KB |
| logo_non_ani.jpg | 10/2/2014 3:04 PM | JPEG image | 6 KB |
| redbut.jpg | 10/2/2014 3:04 PM | JPEG image | 1 KB |

NON-CERTIFIED COPY

| File | Date | Type | Size |
|---|---|---|---|
| 330R_08.pdf | 6/30/2016 6:11 PM | Adobe Acrobat D... | 819 KB |
| ACI 2243r_95 Expansion joint.pdf | 11/11/2013 10:54 ... | Adobe Acrobat D... | 887 KB |
| ACI 3021R_04.pdf | 11/11/2013 10:56 ... | Adobe Acrobat D... | 971 KB |
| ACI-330_Design_Guide_for_Concrete_Parking_Lots.pdf | 6/30/2016 5:53 PM | Adobe Acrobat D... | 652 KB |
| Barry Pattern & Foundry - BarryCraft - Cast Abrasive Nosings & Treads.htm | 10/2/2014 2:32 PM | HTML Document | 29 KB |
| Baton Rouge.png | 7/29/2016 1:22 PM | PNG image | 1,998 KB |
| CAT Aurora, IL Projects II.ppt | 10/24/2013 7:51 PM | Microsoft PowerP... | 9,556 KB |
| Concrete Slab Surface Defect Repairs.pdf | 9/23/2014 2:49 PM | Adobe Acrobat D... | 4,381 KB |
| IMG_0894.MOV | 10/25/2013 6:36 AM | QuickTime Movie | 724 KB |
| Kenner.png | 7/29/2016 1:23 PM | PNG image | 1,740 KB |
| Multi-Fab - Curb Angles.htm | 10/2/2014 3:04 PM | HTML Document | 41 KB |
| rzs.3301.1.2006.pdf | 10/17/2013 10:23 ... | Adobe Acrobat D... | 5,995 KB |
| rzs.3101.2.2006.pdf | 10/17/2013 10:22 ... | Adobe Acrobat D... | 8,202 KB |
| Page 9_330R-08.pdf | 7/27/2016 11:36 AM | Adobe Acrobat D... | 97 KB |
| URS 31020-93139.pdf | 6/27/2016 10:35 AM | Adobe Acrobat D... | 328,781 KB |

NON-CERTIFIED COPY

E$^x$ponent

NON-CERTIFIED COPY



EXHIBIT

C

NON-CERTIFIED COPY

NON-CERTIFIED COPY

NON-CERTIFIED COPY

BAILEY
EXHIBIT NO. 16
K. DONNELLY

NON-CERTIFIED COPY

NON-CERTIFIED COPY

EXHIBIT

D

BAILEY

EXHIBIT NO. 30

K. DONNELLY

EXHIBIT

_E_

BAILEY

EXHIBIT NO. 24

K. DONNELLY

NON-CERTIFIED COPY

NON-CERTIFIED COPY

Exponent®

*Failure Analysis Associates*

Exponent
475 14th Street, Suite 400
Oakland, CA 94612

telephone 510-268-5000
facsimile 510-268-5099
www.exponent.com

August 26, 2016

Loretta G. Mince, Esq.
Fishman Haygood, L.L.P.
201 St. Charles Avenue
46th Floor
New Orleans, Louisiana 70170

Subject:    H&E Equipment Facilities
            Exponent Project No. 1306663.001

Dear Ms. Mince:

I reviewed the Change Order (CO) documents related to the construction of the H&E Equipment facilities at Baton Rouge, Kenner, and Belle Chasse.  Based on the CO documents produced by URS, and my education, training, and 28 years of experience in the construction industry, the added project costs could have been mitigated.  Using the Cost of Change v. Time model, the cost of work added to the scope by change order can be estimated  to be 1.5 to 2 times greater than the cost otherwise would have been had the scope of work been included in the contract documents prior to bidding the project.

If you have any questions or require additional information, please do not hesitate to contact me at 510-268-5083.

Sincerely,

Matt Vail, P.E.
Senior Manager
Construction Consulting Practice
Exponent, Inc.

STATE OF LOUISIANA
JAMES R. BAILEY
License No. 33830
PROFESSIONAL ENGINEER

James R. (Bob) Bailey, Ph.D., P.E.
Senior Managing Engineer
Exponent, Inc.

BAILEY
EXHIBIT NO. 8
K. DONNELLY

1306663.001-6998



EXHIBIT
F



Ex

NON-CERTIFIED COPY

H&E EQUIPMENT SERVICES       \*       SUIT NO. 626,308      DIV.: D

                                     \*       19ᵀᴴ JUDICIAL DISTRICT COURT

VERSUS                           \*

                                       \*       PARISH OF EAST BATON ROUGE

URS CORPORATION              \*
ARCHITECTURE, P.C., URS              STATE OF LOUISIANA    COST OK $ 100
CORPORATION, L. O'NEAL
JOHNSON AND THOMAS E. RYAN,
III

OCT 16 2017

CHD55913

DEPUTY CLERK OF COURT

---

**DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
MOTION TO EXCLUDE PROPOSED TESTIMONY OF WALLACE DRENNAN**

---

**MAY IT PLEASE THE COURT:**

     Defendants, URS CORPORATION ARCHITECTURE, P.C., URS

CORPORATION, L. O'NEAL JOHNSON and THOMAS E. RYAN, III ("Defendants"),

respectfully submit this Supplemental Memorandum to assist this Court in resolving

Defendants' Motion to Strike Expert Reports and to Exclude Proposed Testimony of

Wallace C. Drennan, III by providing detailed citations from the deposition testimony

of Mr. Drennan.

     Mr. Drennan is a general contractor.[1]  He attended two colleges, but did not

obtain a college degree.[2]  He is not an engineer, and before this case he has never given

an engineering opinion.[3]

     Mr. Drennan's company has constructed many streets for public entities, but

these streets are constructed for rubber tired vehicles.  He has never constructed a

concrete paved area for heavy cleated equipment.[4]

---

[1]      Deposition of Wallace Drennan dated Sept. 21, 2016 at pp. 18-19 (attached as
Exhibit A).
[2]      *Id.* at 12.
[3]      *Id.* at 21-22.

1

REC'D C.P.

DEC 1


NON-CERTIFIED COPY

Mr. Drennan has never designed concrete pavement.[5]  When asked about the standard of care for the design of the concrete pavement at the Baton Rouge site, Mr. Drennan could not answer because he did not even know what a "standard of care" was.[6]  Moreover, he admitted that he is not aware of any industry standard for heavy cleated equipment on concrete.[7]  Mr. Drennan agreed the standard for a design depends on the engineer who does the design, that engineers have their own special specifications, and that engineers can design based on their own experience as an engineer.[8]

Mr. Drennan's company is a customer of H&E Equipment.  For the last few years, his company has spent about $200,000 per year buying excavators from H&E.[9]  Mr. Drennan has never been qualified as an expert before.  He was hired in this case by Ms. Mince, an attorney for H&E, who has represented Mr. Drennan in his construction litigation since 2005 or 2006.[10]

Mr. Drennan identified three documents that he relied on in forming his opinion in this case:  (1) Louisiana Department of Transportation & Development (hereinafter "LDOTD") Standard Plans and Specifications for Roads and Bridges, (2) City of Baton Rouge Department of Public Works Standard Plans and (3) Geotechnical Reports for Baton Rouge and Kenner.[11]

Mr. Drennan was asked about each of these documents in his deposition.  When asked about the LDTOD Plans and Specifications, he admitted that they do not contain

---

| | |
|---|---|
| 4 | *Id.* at 100. |
| 5 | *Id.* at 56-57. |
| 6 | *Id.* at 69-71. |
| 7 | *Id.* at 84-85. |
| 8 | *Id.* at 102-03. |
| 9 | *Id.* at 134. |
| 10 | *Id.* at 19-20. |
| 11 | Expert report of Mr. Drennan at 1-3 (attached as Exhibit B). |

NON-CERTIFIED COPY

anything that deals with heavy cleated equipment. Moreover, he admits that these are merely construction guidelines, not design guidelines, so they do not tell anyone how to design work.[12] When asked about the City of Baton Rouge Standard Plans, he admitted that they are for roads and bridges.[13] Mr. Drennan admitted that he did not know if these plans contain any reference to heavy cleated equipment,[14] and it is clear from the face of these plans that they are for roads and bridges.[15] And when asked about the Geotechnical reports, Mr. Drennan acknowledged that he does not agree with everything recommended in those reports.[16]

Mr. Drennan admitted that in coming up with his opinions in this case, he never determined what was actually installed under the surface level of the concrete pavement at the Baton Rouge site or the Kenner site.[17] For example, he did not investigate the thickness of the concrete pavement at the Baton Rouge site or the Kenner site to see if it had been constructed according to the design plans.[18] Similarly, he did not investigate the base material under the concrete pavement at the Baton Rouge site or the Kenner site to see if it had been constructed according to the design plans.[19] And he admitted that in coming up with his opinions in this case, he did not see any coring testing done at the Baton Rouge site or the Kenner site, and he even wondered why coring testing had not been done because it is usually done by the owner to check whether the concrete pavement was laid according to the design plans.[20]

---

[12]    Mr. Drennan depo. at 191-94.
[13]    *Id.* at 38.
[14]    *Id.*
[15]    City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard plans dated 1-18-08.
[16]    Mr. Drennan depo. at 50.
[17]    *Id.* at 94.
[18]    *Id.* at 76, 81.
[19]    *Id.* at 25.
[20]    *Id.* at 76, 135-36.

3

NON-CERTIFIED COPY

Mr. Drennan also admitted that he did not see the concrete mixes at the Baton Rouge site or the Kenner site to investigate whether the concrete provided by the contractors was according to the design plans.  He asked for the concrete mix information, but it was not given to him to review.[21]  Similarly, he did not investigate whether there was excessive slump when the concrete at the Baton Rouge site or the Kenner site was laid by the contractor; he had requested that information but it was not provided to him for review.[22]

Mr. Drennan acknowledged that heavy cleated equipment, like bulldozers, damages concrete pavement, and it is difficult to prevent damage to concrete pavement when the pavement is used by bulldozers with metal cleats.[23]  He agrees that the life of concrete pavement depends on periodic maintenance of the pavement, which includes cleaning and resealing joints, sealing cracks, and immediate repairs of the damaged areas.[24]

When Mr. Drennan visited the Baton Rouge and Kenner sites, he saw many areas that had not been repaired.[25]  He took pictures of the concrete pavement during his visit, and these pictures show spalling at the joints which had not been sealed or repaired.[26]  His pictures also show exposed rebar and dowels that were not installed in the concrete pursuant to the plans.[27]  His pictures show grass growing out of the joints

---

[21]    *Id.* at 77, 139.

[22]    *Id.* at 77.

[23]    *Id.* at 163, 179.

[24]    *Id.* at 51, 55.

[25]    *Id.* at 55.

[26]    *Id.* at 25-26, 157-59; *see also* pictures taken by Mr. Drennan attached as Exhibit C (which was deposition exhibit 9).

[27]    Mr. Drennan depo. at 164-165, 170-172; *see also* pictures taken by Mr. Drennan attached as Exhibit D (which were deposition exhibits 11 and 14).

NON-CERTIFIED COPY

covered with dirt, rocks and gravel, which he admits is not proper maintenance.[28]  And his pictures also show track marks at the joints in the concrete that cause spalling at the joints.[29]

Mr. Drennan admits that about 25% of the concrete at the Baton Rouge site is not damaged, and that between 25% and 50% of the concrete at the Kenner site is not damaged.[30]  And notwithstanding any damage, Mr. Drennan admits that H&E has been able to use all the concrete pavement yards at Baton Rouge and Kenner since they were installed in 2012.[31]  Nevertheless, Mr. Drennan is calling for the replacement of the entire concrete pavement in the equipment yards at Baton Rouge and Kenner regardless of whether an area is damaged.[32]  And Mr. Drennan's estimate to replace all the concrete does not include anything that would prevent future spalling at the joints from the heavy cleated equipment.[33]

Accordingly, Mr. Drennan is not qualified to testify to the standard of care of a civil engineer.  In addition, his methodology is flawed and his testimony is unreliable, which amounts to speculation which will not assist the jury.  Based on the facts above and law cited in Defendants' original memorandum submitted in support of this

---

[28]    Mr. Drennan depo. at 167-168, 173; *see* also pictures taken by Mr. Drennan attached as Exhibit E (which was deposition exhibit 13).

[29]    Mr. Drennan depo. at 175; *see* also pictures taken by Mr. Drennan attached as Exhibit F (which was deposition exhibit 16).

[30]    Mr. Drennan depo. at 27-28.

[31]    *Id.* at 103.

[32]    *Id.* at 116; see also pictures taken by Dr. Bailey attached as Exhibit G (which were Bailey deposition exhibits 13 and 17).

[33]    *Id.* at 114.

NON-CERTIFIED COPY

Motion, the Motion to Exclude his testimony should be granted and Mr. Drennan should not be allowed to testify as an expert in this case.

Respectfully submitted,

ADAMS AND REESE, LLP

Philip A. Franco (Bar #5819), TA
Ron Stoles (Bar # 14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,**
**URS Corporation Architecture, P.C.;**
**URS Corporation; L. O'Neal Johnson**
**and Thomas E. Ryan, III**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon all counsel of record via e-mail and/or United States Mail, postage prepaid and properly addressed, this ___16th___ day of October, 2017.



2017 OCT 16 AM 9: 34

DEPUTY CLERK OF COURT

NON-CERTIFIED COPY

H&E EQUIPMENT SERVICES    *    SUIT NO. 626,308    DIV.: D

                              *    19ᵀᴴ JUDICIAL DISTRICT COURT

VERSUS                    *    PARISH OF EAST BATON ROUGE

                              *

URS CORPORATION          *    STATE OF LOUISIANA    COST OK $ 238°⁰
ARCHITECTURE, P.C., URS
CORPORATION, L. O'NEAL                                    OCT 16 2017
JOHNSON AND THOMAS E. RYAN,                               CH D5549 A M
III                                               DEPUTY CLERK OF COURT

## DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF JAMES BAILEY

**MAY IT PLEASE THE COURT:**

     Defendants, URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON and THOMAS E. RYAN, III ("Defendants"), respectfully submit this Supplemental Memorandum to assist this Court in resolving Defendants' Motion to Strike Expert Reports and to Exclude Proposed Testimony of James R. ("Bob") Bailey by providing detailed citations from the deposition testimony of Dr. Bailey.

     Dr. Bailey is a civil engineer, and his primary area of expertise is wind hazard assessments—specifically, determining the risk of properties to hurricanes, tornadoes, and flooding.[1] Dr. Bailey has never designed concrete pavement for heavy cleated equipment.[2] Nor has Dr. Bailey ever been qualified as an expert in any case in any court to testify to the design of concrete pavement for heavy cleated equipment.[3] And although Dr. Bailey has many publications and presentations, none of them deal with

---

[1]      Deposition of Bailey dated Sept. 22, 2016, attached as Exhibit A, at 15-16, 26-27, 37-38.

[2]      *Id.* at 23.

[3]      *Id.* at 45.

NON-CERTIFIED COPY

the standard of care for the design of concrete paved areas for heavy cleated equipment.[4]

Because Dr. Bailey has never made a design of concrete pavement for heavy cleated equipment, to come up with his opinion in this case, Dr. Bailey conducted a review of codes, standards, guidelines and other publications that address concrete pavement design for heavy cleated equipment, and discovered that there is no specification for concrete pavement design for heavy cleated equipment.[5]  As he wrote in his report:  "We could not identify any specification in the United States related directly to the design of concrete surfaces under tracked vehicles."[6]

Dr. Bailey admits that the use of heavy cleated equipment on concrete is not an ordinary use and therefore poses a unique challenge.[7]  Thus, Dr. Bailey decided to rely on American Concrete Institution (ACI) guides as the standard of care in this case.[8]  However, Dr. Bailey admits that these ACI guides do not directly relate to the design of concrete surfaces under cleated vehicles.[9]  Moreover, Dr. Bailey admits that the specific ACI guides on which Dr. Bailey relies, ACI 330R-01 and ACI 330R-08, specifically state that these guides are not a standard or a specification.[10]

Additionally, Dr. Bailey concedes that ACI 330R-01 and ACI 330R-08 require a designer to know the number of trips for each vehicle type to design concrete pavement thickness.  Thus, before preparing his report, Dr. Bailey asked H&E the amount of truck traffic per day at the site.  However, H&E provided Dr. Bailey with no such

---

[4]      *Id.* at 34, 38.
[5]      Expert Report of Dr. Bailey (Exhibit 1 to Dr. Bailey's deposition and attached as Exhibit B) at 6; *see also* Bailey Depo. at 23-24, 106.
[6]      Expert Report of Dr. Bailey at 6.
[7]      Bailey Depo. at 146.
[8]      *Id.* at 75, 108-09.
[9]      *Id.* at 106-07.
[10]     *Id.* at 108-09.

2

NON-CERTIFIED COPY

information, so instead Dr. Bailey assumed an average daily truck traffic of 700 trucks per day and used that number to perform his calculation of pavement thickness required by these ACI guidelines. Dr. Bailey admits that he has no idea whether 700 trucks travel over the concrete pavement at Baton Rouge every day.[11]

Dr. Bailey agrees that experience is important for designing concrete pavement other than just looking at an ACI guide. Dr. Bailey admits that he himself has no such experience designing concrete pavement for heavy cleated equipment.[12]

Dr. Bailey also agrees that it is important to determine the correct cause of any pavement failure, and this includes determining whether the problems were caused by improper maintenance or improper construction.[13] However, Dr. Bailey's final report makes no mention of maintenance or construction deficiencies as a possible cause of any of the concrete problems in this case.[14]

Indeed, to investigate improper construction as a potential cause of damages, Dr. Bailey wanted to do some testing at the Baton Rouge site and the Kenner site.[15] For example, Dr. Bailey thought it was prudent to do coring testing, which could determine construction deficiencies, and he proposed that this testing be done. But Dr. Bailey's request was rejected by counsel for H&E, and thus coring testing was not done before Dr. Bailey rendered his final report and opinion in this case.[16] Even after his final report, Dr. Bailey specifically requested that H&E do coring testing.[17] Dr. Bailey's request was rejected by counsel for H&E.[18]

---

[11]   *Id.* at 109, 117, 126-27, 161-62.
[12]   *Id.* at 112, 143.
[13]   *Id.* at 144-46.
[14]   *Id.* at 84-85.
[15]   *Id.* at 68-69, 84.
[16]   *Id.*
[17]   *Id.* at p. 69.
[18]   *Id.*

3

NON-CERTIFIED COPY

Dr. Bailey claims that in coming up with his opinion, his objective was to consider all relevant data.[19]  And yet, at the time of Dr. Bailey's final report, opinion, and deposition, he admits that he did not know (1) if the foundation was actually laid as designed, (2) if the joints were actually constructed as designed, (3) if the reinforcement in the concrete was installed as designed or (4) if the dowel bars were actually installed as designed.  And Dr. Bailey admits that if any of these four items were not constructed as designed, that could affect the problems Dr. Bailey observed at the Baton Rouge site and the Kenner site.[20]  Accordingly, Dr. Bailey admitted that he could not eliminate construction deficiencies as causes of the concrete problems at the Baton Rouge site or the Kenner site.[21]

Similarly, Dr. Bailey admits that he could not eliminate lack of maintenance by H&E as a cause of the concrete problems at Baton Rouge or Kenner, even though maintenance is not mentioned in his expert report.[22]  Indeed, Dr. Bailey admits that he saw signs of lack of maintenance.  For example, at both sites he saw that sealant was damaged at some of the expansion joints and had not been repaired.[23]  Dr. Bailey also saw that none of the spalling at the joints was repaired, and he admits that, left unrepaired by H&E, these unrepaired joints could allow water infiltration which can eventually affect the foundation under the pavement.[24]  Dr. Bailey said that he has not determined if the foundation has been affected.[25]

---

[19]    *Id.* at 86.
[20]    *Id.* at 88-90.
[21]    *Id.* at 85.
[22]    *Id.* at 85-86.
[23]    *Id.* at 94.
[24]    *Id.* at 94-95.
[25]    *Id.* at 95.

4

NON-CERTIFIED COPY

Dr. Bailey also admits that it constitutes improper maintenance to allow grass or weeds to grow out of the expansion joints.[26] Dr. Bailey took photographs of both sites, and he admits that his pictures show grass or weeds growing out of the expansion joints, and that this is improper maintenance.[27] These pictures also show a hole in the concrete at the expansion joint which was not repaired by H&E and which allows water to get into the foundation.[28] These pictures also show rocks or aggregate in the joints which cause spalling at the joints, which Dr. Bailey admits should be cleaned as part of proper maintenance.[29]

Finally, in Dr. Bailey's deposition, he was asked about a letter that he submitted after his final report which references a cost versus time model used to add costs to a change order. However, Dr. Bailey admits that he did not make that calculation; it was made by Matt Vail.[30] And Dr. Bailey admits that he has never used the cost versus time model before, nor has he ever before given an expert opinion on the cost versus time model, and thus his first exposure to the model was this case.[31]

Accordingly, Dr. Bailey is not qualified in the relevant field, his methodology is flawed, and his testimony is unreliable, which amounts to speculation which will not assist the jury. Based on the facts above and the law contained in Defendants' original Memorandum submitted in support of this Motion, the Motion to Exclude his

---

[26]     *Id.* at 196.
[27]     *Id.* at 48, 196, 202, 211.  *See also* photographs attached as Exhibit C (which are exhibits 28, 29, 34, and 46 to his deposition).
[28]     Dr. Bailey depo. at 198.  *See also* photographs attached as Exhibit D (which is exhibit 30 to his deposition).
[29]     Dr. Bailey depo. at 194, 198-200.  *See also* photographs attached as Exhibit E (which are exhibits 24 and 32 to his deposition).
[30]     Dr. Bailey depo. at 155-56.  *See also* letter attached as Exhibit F (which is exhibit 8 to his deposition).
[31]     Dr. Bailey depo at 156-57.

5

NON-CERTIFIED COPY

testimony should be granted and Dr. Bailey should not be allowed to testify as an expert in this case.

Respectfully submitted,

ADAMS AND REESE, LLP

Philip A. Franco (Bar #5819), TA
Ron Sholes (Bar # 14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,**
**URS Corporation Architecture, P.C.;**
**URS Corporation; L. O'Neal Johnson**
**and Thomas E. Ryan, III**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon all counsel of record via e-mail and/or United States Mail, postage prepaid and properly addressed, this 16th day of October, 2017.



2017 OCT 16 AM 9: 32
DEPUTY CLERK OF COURT

6

NON-CERTIFIED COPY

5901-17-001221

# NOTICE OF SERVICE

H&E EQUIPMENT SERVICES INC
(Plaintiff)

vs.

 URS CORPORATION ARCHITECTURE PC
ET AL
(Defendant)

NUMBER  C626308 Division D

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

TO:    URS CORPORATION ARCHITECTURE, P.C.
       URS CORPORATION, L. O' NEAL JOHNSON
       AND THOMAS E RYAN, III
       THRU PHILIP A FRANCO , RON SHOLES
       KELLEN J MATTHEWS , JEFFREY RICHARDSON
       701 POYDRAS STREET, STE. 4500
       NEW ORLEANS, LA.  70139

GREETINGS:

       You are hereby served with **RULE TO SHOW CAUSE, SET FOR NOVEMBER 6, 2017**

**AT  1: 00 PM IN ROOM 10-A** . A certified copy is attached hereto, as requested by **KELLEN J**

**MATHEWS**, Attorney.

       This Notice was issued by the Clerk of Court for East Baton Rouge Parish on 03-OCT-2017.

_A Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

---

**SERVICE INFORMATION:**

Received on the ____ day of _____ 20 ____ and on the ____ day of _____ 20 17 , served
on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____

**DOMICILIARY SERVICE:** On the within named _____ , by leaving the same at his domicile
in this parish in the hands of _____ , a person of suitable age and discretion residing in the said domicile at
_____

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or
his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____ , this _____ day of _____ , 20 ___ .

SERVICE:      $_____
MILEAGE       $_____
TOTAL:        $_____                    _____
                                             _Deputy Sheriff_

**NOTICE OF SERVICE –OOP–5901**

NON-CERTIFIED COPY

EBR4219025

EBR4392256

5901-17-001220

# NOTICE OF SERVICE

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**vs.**

**URS CORPORATION ARCHITECTURE PC ET AL**
(Defendant)

NUMBER  C626308 Division D

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

TO:   H&E EQUIPMENT SERVICES INC
      THRU BRENT B BARRIER
      LORETTA G MINCE
      ALYSSON L MILLS
      FISHMAN HAYGOOD
      201 ST CHARLES AVE., 46TH FLOOR
      NEW ORLEANS, LA.  70170

GREETINGS:

You are hereby served with **RULE TO SHOW CAUSE, SET FOR NOVEMBER 6, 2017**

**AT  1: 00 PM IN ROOM 10-A**.  A certified copy is attached hereto, as requested by **KELLEN J**

**MATHEWS**, Attorney.

This Notice was issued by the Clerk of Court for East Baton Rouge Parish on 03-OCT-2017.

_____
Deputy Clerk of Court for
**Doug Welborn, Clerk of Court**

**SERVICE INFORMATION:**

Received on the _____ day of _____, 20___ and on the _____ day of _____, 20___, served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _____

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____

**DUE AND DILIGENT:** After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _____, this _____ day of _____, 20____.

SERVICE:    $_____
MILEAGE     $_____
TOTAL:      $_____

_____
Deputy Sheriff

**NOTICE OF SERVICE –OOP–5901**

EBR4219035

EBR4392254

NON-CERTIFIED COPY

6709-17-000284

## RULE NISI

**H&E EQUIPMENT SERVICES INC**
(Plaintiff)

**NUMBER  C626308 Division D**

**19th JUDICIAL DISTRICT COURT**

**vs.**

**PARISH OF EAST BATON ROUGE**

**URS CORPORATION ARCHITECTURE PC
ET AL**
(Defendant)

**STATE OF LOUISIANA**

TO:    URS CORPORATION ARCHITECTURE , P.C.
       URS CORPORATION, L/O'NEAL RYAN
       THROUGH THOMAS E RYAN, III
       PHIL FRANCO, KELLEN MATHEWS
       RONALD SHOLES, JEFF RICHARDSON
       4500 ONE SHELL SQUARE
       NEW ORLEANS, LA.  70139

The Mover in this case filed a petition which the Court granted.  Certified copies of this document and the Court's Order are attached.

**RULE TO SHOW CAUSE**

You MUST come to Court at 1:00 P.M. on NOVEMBER 13 2017 in Room 10-A , 300 North Boulevard, Baton Rouge, Louisiana, and show cause why:

**\* \* \* SEE ATTACHED ORDER \* \* \***

**IF YOU ARE ORDERED TO APPEAR IN COURT.  IF YOU FAIL TO APPEAR, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST.**

This Rule was issued by the Clerk of Court for East Baton Rouge Parish on 03-OCT-2017.

_____
Deputy Clerk of Court for
**Doug Welborn, Clerk of Court**

Requesting Attorney
LORETTA G RINGS

### SERVICE INFORMATION:

Received on the _____ day of _OCT_ , 20_17_ and on the _11_ day of _OCT_ , 20 _17_ served on the above named party as follows:

**PERSONAL SERVICE:** On the party herein named at _GINGER ARDEN(x2)_

**DOMICILIARY SERVICE:** On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

**DUE AND DILIGENT:**    After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

**RETURNED:** Parish of _ORLEANS_, this _11_ day of _OCT_, 20 _17_

SERVICE:$_____
\GES_____
L: $_____

_____
(Deputy Sheriff)
Parish of _ORLEANS_

**RULE NISI (OOP) - 6709**

EBR4392264

NON-CERTIFIED COPY

# FISHMAN HAYGOOD, L.L.P.

201 St. Charles Avenue
46th Floor
New Orleans, LA 70170
Phone: (504) 586-5252
Fax: (504) 586-5250

## FAX

**TO:**  Clerk, 19th JDC             **FAX NUMBER:** 225-389-3392
Parish of East Baton Rouge

**FROM:** Loretta G. Mince          **DIRECT DIAL NO:** 504-586-5273

**DATE:** November 16, 2017          **FILE NO.** 3107-04

We are sending ___11___ pages (including this page)

If there are any problems, please contact Carla at 586-5246.

Re:    *H&E Equipment Services, Inc. v URS Corporation Architecture, P.C., et al*
19th JDC, Doc. No. 626,308, Sec. "D"

Dear Clerk:

    Attached please find Plaintiff's Proposed Findings of Fact and Conclusions of Law and Judgement to be filed on behalf of H&E Equipment Services, Inc. Please confirm *via* facsimile the cost for **fax and filing fees** for the attached document. As required, the original document will be forwarded for filing within seven (7) days along with a check to cover the fees for filing by fax.

    Thanking you in advance for your assistance.

Respectfully,

Carla Cooper Mayer
Legal Assistant Loretta G. Mince



cc:    Philip A. Franco, Esq. (*via* Philip.franco@arlaw.com)

659269v.1


NON-CERTIFIED COPY

Received     Nov 16 2017 02:14pm

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO.: 626,308                          SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____          _____

                                                    DEPUTY CLERK

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

    Plaintiff, H&E Equipment Services, Inc. ("H&E) respectfully submits these Proposed
Findings of Facts and Conclusions of Law in connection with the hearing held on November 9,
2017 on the Motions in Limine to Exclude Plaintiff's Experts Wallace C. Drennan and James R.
Bailey filed by Defendants URS Corporation Architecture, P.C., URS Corporation, L. O'Neal
Johnson, and Thomas E. Ryan, III (together, "URS").[1]

OVERVIEW

    H&E contracted with URS to furnish professional design and construction administration
services to H&E in connection with the construction of its new headquarters building and
dealership facility in Baton Rouge. H&E also contracted with URS to provide professional
design and construction administration services to H&E in connection with the renovation and
additions to H&E's facilities located in Kenner, Louisiana and Belle Chasse, Louisiana.

    H&E filed this suit claiming that the design and construction services provided by URS
and its subcontractors and employees were defective. According to H&E, the largest sustained
resulted from URS's faulty design of the pavement in the Baton Rouge and Kenner facilities.
Shortly after completion of the Baton Rouge and Kenner project, major portions of the concrete
parking and staging areas for H&E's industrial equipment at both facilities experienced
substantial cracking, spalling, and deterioration. H&E contends that URS's designs for the
pavement were grossly deficient and did not comply with state, local and industry requirements

---

[1] At the conclusion of the hearing on Defendants' Motions on November 9, 2017, and with the agreement of the
parties, the Court ordered that Proposed Findings of Fact and Conclusions of Law be submitted within five days, and
that the Court's ruling would be issued in due course following those submissions.

1245611v.1

NON-CERTIFIED COPY

and the recommendations of consultants commissioned by URS. H&E contends that the removal and replacement of the pavement at the Baton Rouge and Kenner facilities is necessary to correct the defects.

In addition to the pavement design, H&E contends that each of the three construction projects for which URS was responsible—H&E facilities in Baton Rouge, in Kenner, and in Belle Chasse—was riddled with problems arising from the construction documents that URS, or its subcontractors, prepared. For each project, H&E claims that URS omitted from the construction documents essential measurements or necessary components. H&E claims that these omissions resulted in costly change orders.

At the trial of this matter, H&E seeks to offer the testimony of two experts, Dr. James "Bob" Bailey and Wallace Drennan. Dr. Bailey, an engineer with a Ph. D. in Civil Engineering who is licensed in nine states (including Louisiana), is offered as an expert in the area of civil engineering and pavement analysis. Additionally, with respect to H&E's claim that URS's errors and omissions in the drawings resulted in increased costs, Dr. Bailey is offered as an expert on increased costs attributable to changes in the scope of work made during construction. Mr. Drennan, a general contractor with more than 30 years experience in construction, including in particular, the installation of more than 200,000 cubic yards of concrete pavement, is offered as an expert in the construction of Portland Cement Concrete Pavement and construction estimating.

H&E submits that the testimony of Dr. Bailey and Mr. Drennan will assist the trier of fact to determine the issues in this case, including whether URS was negligent or grossly negligent in its performance of design and construction administration services for H&E, whether H&E sustained damages as a result of URS's conduct, and the amount of those damages.

URS has filed motions in limine to exclude Dr. Bailey and Mr. Drennan. A hearing was held on November 9, 2017 on the motions filed by Defendants URS. Live testimony of Mr. Wallace C. Drennan, Jr. and Dr. James R. Bailey was presented at the hearing.

2

1245611v.1

NON-CERTIFIED COPY

## FINDINGS OF FACT

Based upon Dr. Bailey's and Mr. Drennan's live testimony, as well as the pleadings and exhibits submitted by the parties, the Court makes the following findings of fact regarding Dr. Bailey and Mr. Drennan in accordance with Article 1425(f) of the Louisiana Code of Civil Procedure.

**(A) James R. Bailey, Ph.D.**

1. Dr. Bailey obtained his bachelor degree in civil engineering from Texas Tech University in 1982. He also obtained his master's degree in civil engineering from Texas Tech University in 1984. He then obtained his Ph.D. in civil engineering from Texas Tech University in 1989.

2. Dr. Bailey took and passed the Fundamentals of Engineering Exam and Principles and Practice of Engineering Exam. These exams are prerequisites to becoming a Professional Engineer. Dr. Bailey's specialty was structures, including geotech and transportation.

3. Dr. Bailey is a licensed engineer in nine states, including Louisiana.

4. Dr. Bailey currently serves as Senior Managing Engineer for Exponent Failure Analysis Associates.

5. Dr. Bailey has performed assessments of industrial and commercial facilities involving reinforced concrete designs in Louisiana and in other states, including recent work related to an industrial facility in Donaldsonville, Louisiana where heavy equipment is operated on a reinforced concrete slab.

6. As reflected in Dr. Bailey's curriculum vitae, he has offered expert testimony in numerous state and federal courts.

7. Dr. Bailey offers opinions on behalf of H&E relating to whether the design of pavement reflected in URS's drawings was defective, whether the pavement failures experienced at H&E's facilities were likely caused by deficiencies in URS's designs, and the standard of care of an engineer as applied to the facts of this case.

8. In formulating his opinions, Dr. Bailey reviewed drawings and specifications for the design of pavement promulgated by the American Concrete Institute, the Louisiana Department of Transportation and Development ("LDOTD"), the Department of Public Works for the City of Baton Rouge, and the Jefferson Parish Department of Engineering. Dr. Bailey also reviewed the geotechnical reports commissioned by URS.

3

NON-CERTIFIED COPY

9. Dr. Bailey also performed four site visits from 2013-2016 of the H&E facilities in Kenner and Baton Rouge.

10. Dr. Bailey analyzed whether the design as reflected in URS's drawings complied with the applicable governmental and industry requirements.

11. Dr. Bailey also considered whether the deficiencies in the URS designs amount to a deviation and/or a gross deviation from the standard of care of engineers.

12. Dr. Bailey further reviewed whether the design defects he identified in URS's drawings were consistent with the random cracking and other pavement failures that were observed and reported at H&E's facilities.

13. Additionally, with respect to H&E's claim that URS's errors and omissions in the drawings resulted in increased costs, Dr. Bailey submitted an opinion regarding increased costs attributable to changes in the scope of work made during construction.

14. In connection with this opinion, Dr. Bailey relied on his professional experience. He further consulted with his colleague, Matt Vale, at Exponent to validate his opinion.

**(B) Wallace C. Drennan, Jr.**

1. Mr. Wallace C. Drennan, Jr. is the president of Wallace C. Drennan, Inc., a general contracting company in Louisiana.

2. Mr. Drennan began working full time for Wallace C. Drennan, Inc. in the early 1980's as a laborer in a concrete crew. Mr. Drennan later worked as an equipment operator, and operated slip-form concrete machines. Mr. Drennan also attended pavement school.

3. Mr. Drennan has worked in other positions within the company as well, including performing estimating.

4. Mr. Drennan became the president of Wallace C. Drennan, Inc. in the early 1990's.

5. Mr. Drennan has worked on a variety of concrete pavement projects, including roadways, sidewalks, and parking lots. Mr. Drennan has poured and/or overseen the construction of concrete for various owners, including the State of Louisiana, the City of New Orleans, Jefferson Parish, the Corps of Engineer, the Sewerage & Water Board, and several private entities. Mr. Drennan estimated that he has been involved in pouring over 200,000 cubic yards of concrete.

6. Mr. Drennan was one of a handful of contractors who assisted the LDOTD in revising section 601 of the Standard Specifications for Roads and Bridges pertaining to Portland Cement Concrete Pavement. He also served on a committee of contractors, engineers, and current and

4

NON-CERTIFIED COPY

retired City personnel to revise the City of New Orleans' standard specifications, including the City's specifications for concrete pavement.

7.    In the course of his work, Mr. Drennan has reviewed hundreds of sets of construction plans.  He has also observed first-hand the failure of concrete pavement which was not constructed with proper expansion and contraction joints.

8.    Mr. Drennan has prepared more than 100 construction estimates that included the pouring of concrete pavement.

9.    Mr. Drennan submitted opinions on behalf of Plaintiff, H&E Equipment Services, Inc. on whether the design of the pavement at H&E's Baton Rouge and Kenner facilities deviated from relevant governmental and industry specifications and requirements, whether the failures he observed in the pavement at H&E's facilities were consistent with the deviations he identified, and the cost to cure the deficiencies in the pavement.

10.    In formulating his opinions, Mr. Drennan referred to drawings and specifications promulgated by the LDOTD, the Department of Public Works for the City of Baton Rouge, the Jefferson Parish Department of Engineering, and the American Concrete Institute ("ACI").  Mr. Drennan also reviewed the geotechnical reports prepared for the projects at issue.

11.    Mr. Drennan testified that LDOTD drawings and specifications are regularly referred to in construction plans and specifications, and that they, along with other government and industry specifications, were referenced in the plans and specifications prepared by URS and the geotechnical reports commissioned by URS.

12.    Mr. Drennan also performed three site visits to H&E facilities in Kenner and Baton Rouge, Louisiana to perform visual inspections of the pavement.

13.    Mr. Drennan analyzed whether the design reflected in URS's drawings complied with the above mentioned governmental and industry specifications.

14.    Mr. Drennan further considered whether the deficiencies he identified in URS's drawings were consistent with the random cracking and other concrete pavement failures that were observed and reported at H&E's facilities.

15.    Mr. Drennan calculated the cost to replace the pavement at the Kenner and Baton Rouge facilities with pavement that met the minimum requirements of the LDOTD standards assuming two different pavement thicknesses.

5

NON-CERTIFIED COPY

Received                    Nov 16 2017 02:15pm

## CONCLUSIONS OF LAW

Based upon Mr. Drennan and Dr. Bailey's testimony as well as the pleadings and exhibits submitted by the parties, the Court makes the following conclusions of law regarding Mr. Drennan and Dr. Bailey in accordance with Article 1425(f) of the Louisiana Code of Civil Procedure.

1. La. Code Evid. art. 702 provides:

   > If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

2. An expert's opinion is properly admitted if:

   > (1) the expert is qualified to testify competently regarding the matters he intends to address;
   >
   > (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
   >
   > (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

   *Cheairs v. State ex rel. Dep't of Transp. & Dev*, 2003-0680 (La. 12/3/03); 861 So. 2d 536, 542.

3. The "determination of the admissibility of expert testimony under La. Code of Civ. Proc. art. 702 'turns upon whether it would assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Cheairs*, 861 So.2d at 541-42.

4. "Generally, the test for determining an expert's competency is the expert's knowledge of the subject about which he is called upon to express an opinion." *State v. Ferguson*, 2009–1422, (La. App. 4 Cir. 12/15/10); 54 So.3d 152, 166.

5. "Experience alone is normally sufficient to qualify a witness as an expert." *Cheairs*, 861 So.2d at 554.

6. Under Articles 702-705 of the Louisiana Code of Evidence, Dr. Bailey may testify at trial on whether the design of pavement reflected in URS's drawings was defective, the standard of care of an engineer as applied to the facts of this case, and the increased cost attributable to changes in the scope of work.

7. Under Article 702 of the Louisiana Code of Evidence, Dr. Bailey is qualified as an expert in these areas based upon his education, training, knowledge, and work experience.

8. Dr. Bailey is competent to testify on the above subject matters. Dr. Bailey has over 35 years of experience in engineering. Dr. Bailey has a Ph.D. in civil engineering and passed the

6

1245611v.1

NON-CERTIFIED COPY

Received
Nov 16 2017 02:15pm

Fundamentals of Engineering Exam and the Principles and Practice of Engineering Exam where his specialty was structures, including geotech and transportation.

9.     Dr. Bailey is also a licensed engineer in nine states, including in Louisiana.  Dr. Bailey also has work experience performing assessments of industrial and commercial facilities involving reinforced concrete in Louisiana and other states.

10.     As a licensed civil engineer with experience with reinforced concrete, Dr. Bailey is competent to opine as to the standard of care and whether the deficiencies in URS's design amount to a deviation and/or a gross deviation from the standard of care.

11.     Dr. Bailey is also competent to testify as to the increased costs attributable to changes in the scope of work.  His opinion on this topic is based on his own professional experience, and his opinion was validated by his colleague at Exponent.

12.     Under Article 703 of the Louisiana Code of Evidence, Dr. Bailey's opinion is reliable. Based upon his testimony, he reviewed URS's designs and performed multiple site visits.  In forming his opinions, Dr. Bailey referred to standard specifications and requirements promulgated state and local governments on pavement as well as industry specifications.  The same specifications were referred to in URS's drawings and geotechnical reports commissioned by URS. The standards used by Dr. Bailey are reliable.

13.     Dr. Bailey's testimony will assist the trier of fact, through his specialized expertise based upon his training as a civil engineer and work experience as a licensed engineer, to determine whether URS's pavement designs were in fact defective.

14.     Dr. Bailey's testimony on standard of care of an engineer will assist the trier of fact, through his training and work as a licensed civil engineer, to determine whether URS breached their standard of care and whether URS's breach constituted a gross deviation from the standard of care.

15.     Finally, Dr. Bailey's testimony on the increased costs attributable to changes in a scope of work will assist the trier of fact, through his specialized understanding of the cost versus time model, to determine the extent of damages, if any, that H&E suffered as a result of URS's changes in the scope of other design work.

16.     Under Articles 702-705 of the Louisiana Code of Evidence, Mr. Drennan may testify at trial on whether the design of the pavement at H&E's Baton Rouge and Kenner facilities deviated from relevant governmental and industry specifications and requirements and whether

7

1245611v.1

NON-CERTIFIED COPY

the failures he observed in the pavement at H&E's facilities were consistent with the deviations he identified. Mr. Drennan may further testify at trial regarding the cost to repair the pavement at H&E's Kenner and Baton Rouge facilities.

17.     Under Article 702 of the Louisiana Code of Evidence, Mr. Drennan is qualified as an expert in these areas based upon his knowledge and work experience. *See Cheairs*, 861 So.2d at 554.

18.     Mr. Drennan is competent to testify as to the above subject matters. Mr. Drennan has over 30 years of experience with concrete pavement, including pouring concrete pavement, overseeing the pouring of concrete pavement, managing projects with concrete pavement, and estimating projects with concrete pavement. Further, Mr. Drennan has also participated in the revision of standards for concrete pavement including standards promulgated by the LDOTD and City of New Orleans. Finally, in the course of his work, Mr. Drennan has observed firsthand the failure of pavement from a number of causes, including failure that occurs when it the pavement does not have properly designed contraction and expansion joints.

19.     Under Article 703 of the Louisiana Code of Evidence, Mr. Drennan's opinion is reliable. Based upon Mr. Drennan's testimony, he reviewed URS's designs and performed multiple site visits. In forming his opinions, Mr. Drennan referred to standard specifications used by state and local governments as well as industry standards for pavement construction. The same standards were referred to in URS's plans and specifications and the geotechnical reports. The standards used by Mr. Drennan are reliable.

20.     Mr. Drennan's testimony will assist the trier of fact in determining (1) whether URS's pavement designs were defective, (2) whether the cracking and other pavement failures were likely caused by the defective designs, and (3) the cost to repair the pavement at H&E's Kenner and Baton Rouge facilities.

Respectfully submitted,

Brent B. Barriere, La. Bar No. 2818
Loretta G. Mince, La. Bar No. 25796
Alysson L. Mills, La. Bar No. 32904
Rebecca Sha, La. Bar No. 35317
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for H&E Equipment Services, Inc.*

8

NON-CERTIFIED COPY

<u>C E R T I F I C A T E</u>

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by facsimile, email and/or by placing same in the United States mail, postage prepaid and properly addressed, this 16 day of November, 2017.



_____
Loretta G. Mince

1245611v.1

NON-CERTIFIED COPY

19ᵀᴴ JUDICIAL DISTRICT COURTPARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

DOCKET NO.: 626,308                                      SECTION: "D"

H&E EQUIPMENT SERVICES, INC

VERSUS

URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL
JOHNSON, AND THOMAS E. RYAN, III

FILED: _____        _____
                                              DEPUTY CLERK

## JUDGMENT

This matter came on for hearing before the Honorable Janice G. Clark on November 9,

2017 on the Motion in Limine to Strike Expert Reports and to Exclude Proposed Testimony of

Wallace C. Drennan and Motion in Limine to Strike Expert Reports and to Exclude Proposed

Testimony of James R. ("Bob") Bailey filed by Defendants URS Corporation Architecture, P.C.,

URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III.

**PRESENT:** Loretta G. Mince and Rebecca Sha, for Plaintiff H&E Equipment
Services, Inc.; and

Philip A. Franco and Kellen J. Mathews, for Defendants URS Corporation Architecture,
P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III.

At the conclusion of the hearing, and with the agreement of the parties, the Court ordered

that Proposed Findings of Fact and Conclusions of Law be submitted within five days and that

the Court's ruling would be issued in due course following those submissions. The Court now

renders Judgment as follows:

Considering the motion and memoranda submitted by the parties, the argument of

counsel, and the evidence presented at the hearing, and for the reasons set forth in the Court's

Findings and Fact and Conclusions of Law rendered herewith,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Defendants'

Motions are DENIED.

Baton Rouge, Louisiana, this _____ day of November, 2017.

_____
JUDGE JANICE G. CLARK

1089598v.2

NON-CERTIFIED COPY

** Transmit Conf.Report **

P.1
EBR CLERK OF COURT    Fax 2253893392                    Nov 16 2017 04:20pm

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 915045865250 | Normal | 16:04:20pm | 0'26" | 1 | # O K | |



**DOUG WELBORN**
**CLERK OF COURT**

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

PARISH OF EAST BATON ROUGE

**FAX RECEIPT**

NUMBER C626308  Division D                              Date:  16-NOV-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:   LORETTA G MINCE
      CORRERO FISHMAN HAYGOOD ET AL
      201 ST CHARLES AVE 46TH FL
      NEW ORLEANS LA 70170-4600

Item(s) Received: PLAINTIFFS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Total Amount Due (includes all applicable fees below) $ 131.00

The Clerk of Court's office has received, by facsimile transmission dated 11/16/17, documents in the above referenced case.  In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)      A transmission fee of five dollars
13:841(A)(2)(a)   First page of each pleading, six dollars
13:841(A)(2)(b)   Each subsequent page, four dollars
13:841(A)(2)(c)   Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)   Issuing document without notice of service, fifteen dollars (Receipt generation fee)

**NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT
UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.**

**SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.**

**IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.**



*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT

**  **

NON-CERTIFIED COPY



# DOUG WELBORN
## CLERK OF COURT

PARISH OF EAST BATON ROUGE

Suit Accounting Dept.

P.O. Box 1991
Baton Rouge, LA 70821-1991
Tel: (225) 389-3982
Fax: (225) 389-3392
www.ebrclerkofcourt.org

---

## FAX RECEIPT

NUMBER C626308  Division D                                    Date:    16-NOV-2017
H&E EQUIPMENT SERVICES INC
VS
URS CORPORATION ARCHITECTURE PC ET AL

To:    LORETTA G MINCE
       CORRERO FISHMAN HAYGOOD ET AL
       201 ST CHARLES AVE 46TH FL
       NEW ORLEANS LA 70170-4600

Item(s) Received: PLAINTIFFS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Total Amount Due (includes all applicable fees below) $ **131.00**

The Clerk of Court's office has received, by facsimile transmission dated **11/16/17**, documents in the above referenced case.  In accordance with R.S. 13:850 (B), within seven days, exclusive of holidays, the party filing the document shall forward to the clerk the original signed document, applicable fees and a transmission fee.  The fax transmission fee is also required of forma pauperis filings and filing by state/political subdivisions.

Applicable fees are established in accordance with law as follows:
13:850(B)(3)       A transmission fee of five dollars
13:841(A)(2)(a)    First page of each pleading, six dollars
13:841(A)(2)(b)    Each subsequent page, four dollars
13:841(A)(2)(c)    Paper exhibits, attachments, transcripts and depositions – per page, two dollars
13:841(A)(4)(b)    Issuing document without notice of service, fifteen dollars (Receipt generation fee)

### NO FURTHER ACTION WILL BE TAKEN REGARDING THIS DOCUMENT UNTIL ALL FEES ARE RECEIVED IN THIS OFFICE.

### SERVICE/SUBPOENA REQUESTS WILL NOT BE ISSUED FROM FAX FILING.
### SERVICE WILL BE ISSUED AS A RESULT OF THE FILING OF THE ORIGINAL DOCUMENTS.

### IF MAILING ORIGINAL DOCUMENT(S), PLEASE ATTACH THIS RECEIPT TO THE DOCUMENT(S) TO BE FILED.
### IF FILING THE ORIGINAL DOCUMENTS IN PERSON, PLEASE NOTIFY THE FILING CLERK OF THE PREVIOUS FAX FILING.



*Deputy Clerk of Court for*
**Doug Welborn, Clerk of Court**

5249 – LTR / FAX RECT

**\* \***

NON-CERTIFIED COPY

| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES | * | SUIT NO. 626,308    DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA |
| CORPORATION, L. O'NEAL | | |
| JOHNSON AND THOMAS E. RYAN, | | |
| III | | |

COST OK $ _____

NOV 17 2017

DEPUTY CLERK OF COURT

---

## ORDER

---

This matter came for hearing on November 9, 2017, on the Motion in Limine to Strike

Expert Reports and to Exclude Proposed Testimony of Wallace C. Drennan, III, filed by

Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and

Thomas E. Ryan, III (all collectively referred to hereinafter as "Defendants");

**PRESENT WERE** : Mr. Philip A. Franco
Mr. Kellen J. Mathews
For Defendants, URS Corporation Architecture, P.C.,
URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III

Ms. Loretta G. Mince
Ms. Rebecca Sha
For Plaintiff, H&E Equipment Services, Inc. ("H&E")

The Court having reviewed the memoranda submitted by the parties and exhibits attached

thereto and having considered the qualifications and methodologies of the proposed witness,

Wallace C. Drennan, III, based upon the provisions of Articles 104(A) and 702 through 705 of

the Louisiana Code of Evidence;

**IT IS HEREBY ORDERED,** that Defendants' Motion in Limine to Strike Expert

Reports and to Exclude Proposed Testimony of Wallace C. Drennan, III is **GRANTED**.

**IT IS FURTHER ORDERED** that pursuant to La. Code Civ. Proc. art. 1425(F) the

Court's Findings of Facts, Conclusions of Law, and Reasons for Judgment, attached hereto, are

hereby made part of the record of the proceedings in the above-captioned matter.

**THUS DONE AND SIGNED** in Baton Rouge, Louisiana, this _____ day of

_____, 2017.

_____
**HONORABLE JANICE CLARK, JUDGE**
**19th Judicial District Court**

NON-CERTIFIED COPY

EBR4463545

| | |
|---|---|
| H&E EQUIPMENT SERVICES | * SUIT NO. 626,308    DIV.: D |
| | * 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * |
| | * PARISH OF EAST BATON ROUGE |
| URS CORPORATION ARCHITECTURE, P.C., URS CORPORATION, L. O'NEAL JOHNSON AND THOMAS E. RYAN, III | * STATE OF LOUISIANA |

COST OK $ _____

NOV 1 7 2017

DEPUTY CLERK OF COURT

EBR4433544

## ORDER

This matter came for hearing on November 9, 2017, on the Motion in Limine to Strike Expert Reports and to Exclude Proposed Testimony of James. R. "Bob" Bailey, filed by Defendants, URS Corporation Architecture, P.C., URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III (all collectively referred to hereinafter as "Defendants");

**PRESENT WERE** : Mr. Philip A. Franco
Mr. Kellen J. Mathews
For Defendants, URS Corporation Architecture, P.C.,
URS Corporation, L. O'Neal Johnson, and Thomas E. Ryan, III

Ms. Loretta G. Mince
Ms. Rebecca Sha
For Plaintiff, H&E Equipment Services, Inc. ("H&E")

The Court having reviewed the memoranda submitted by the parties and exhibits attached thereto and having considered the qualifications and methodologies of the proposed witness, James R. "Bob" Bailey, based upon the provisions of Articles 104(A) and 702 through 705 of the Louisiana Code of Evidence;

**IT IS HEREBY ORDERED,** that Defendants' Motion in Limine to Strike Expert Reports and to Exclude Proposed Testimony of James R. "Bob" Bailey is **GRANTED**.

**IT IS FURTHER ORDERED** that pursuant to La. Code Civ. Proc. art. 1425(F) the Court's Findings of Facts, Conclusions of Law, and Reasons for Judgment, attached hereto, are hereby made part of the record of the proceedings in the above-captioned matter.

**THUS DONE AND SIGNED** in Baton Rouge, Louisiana, this ___ day of
_____, 2017.

HONORABLE JANICE CLARK, JUDGE
Judicial District Court

NON-CERTIFIED COPY

Page 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *  *
                         *
H&E EQUIPMENT SERVICES   *
                         * NUMBER 626,308
VERSUS                   *
                         * DIVISION "D"
URS CORPORATION          *
ARCHITECTURE, P.C., URS  *
CORPORATION, L O'NEAL    *
JOHNSON AND THOMAS E.    *
RYAN, III                *
                         *
*  *  *  *  *  *  *  *  *
```

Deposition of JAMES R. BAILEY,

Ph.D., P.E., taken on Thursday, September 22,

2016, commencing at 9:43 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.





EXHIBIT
A

NON-CERTIFIED COPY

1    your report today?  What area of civil

2    engineering would you characterize that to be

3    in?

4        A.  I viewed it from the standpoint of

5    structural engineering.

6        Q.  Structural engineering?

7        A.  Yes.

8        Q.  I am under the impression that

9    structural engineering deals more with buildings

10   and the inside of buildings and the foundation

11   of buildings, and civil is on the outside.  Am I

12   incorrect about that?

13       A.  Yeah.  That might be a general way of

14   viewing it, but when we are dealing with

15   anything outside of a buildings that is

16   resisting a load, then I would consider that

17   within the realm of structural.  But there is

18   overlap between the two subject areas.

19       Q.  Okay.  All right.  We will get into more

20   of that.

21           Let's get some of your background.

22   Let's get your formal education.  What is the

23   extent of your formal education?

24       A.  I earned a Bachelor's of Science in

25   Civil Engineering from Texas Tech University in

NON-CERTIFIED COPY

Page 16

1    1982.  A Master's of Science in Civil

2    Engineering, also from Texas Tech University in

3    1984.  And then I completed my Ph.D. in Civil

4    Engineering also at Texas Tech University in

5    1989.

6        Q.  Now, again, when you say civil

7    engineering, does that encompass both structural

8    and civil engineering, those degrees?

9        A.  Yes.  Structural engineering is

10   considered a subset of the general field of

11   civil engineering.  It also includes subject

12   areas like geotechanical engineering,

13   bio-environmental engineering, water resources

14   engineering.

15       Q.  Okay.  And where are you currently

16   employed?

17       A.  Exponent.

18       Q.  And what is your position at Exponent?

19       A.  I am currently a senior managing

20   engineer and office director.

21       Q.  And how long have you been in that

22   position?

23       A.  I have been at both positions since

24   2008.

25       Q.  What is the business of Exponent?

NON-CERTIFIED COPY

1    Exxon.

2        Q.  So this was your first full-time job?

3        A.  Outside of the university, yes.

4        Q.  Okay.  In your jobs at Exxon or Exponent

5    or ABS, did you ever design concrete pavement

6    for heavy-tracked equipment?

7        A.  I've conducted design reviews, but I

8    have not designed from scratch such pavements.

9        Q.  I am sorry.  You said you conducted

10   design reviews?

11       A.  Correct.

12       Q.  And what kind of design reviews did you

13   conduct?

14       A.  Okay.  By way of example, back in 2001,

15   we had a severe tropical storm flooding in

16   Houston, Tropical Storm Allison.

17            And during a three-year period while

18   working at ABS/EQE I was retained on behalf of

19   FEMA to assist with development of mitigation

20   programs within the Texas Medical Center

21   involving flood barriers.

22            And the clients would produce drawings

23   for these programs for installation of gates,

24   walls, and some of these included redoing the

25   pavements where they have trucks that back up

NON-CERTIFIED COPY

1    into this -- the hospitals and other buildings.

2         And it was a complete rework.  So we --

3    they would submit those drawings, and we would

4    -- our team would review them and comment

5    accordingly.

6    Q.  Okay.  These were basically delivery

7    trucks for the Medical Center?

8    A.  Well, they were large vehicles.  I mean,

9    some of these were tractor-trailer, you know,

10   18-wheeler type vehicles.

11        Some were special purpose vehicles for

12   medical equipment, mobile MRIs, for example.

13   Things of this nature.

14   Q.  Okay.  Did those trucks deliver

15   heavy-tracked equipment?

16   A.  If they did, I didn't witness it or

17   observe it.  If that were the case, it might

18   have been for certain construction projects

19   onsite where they accept deliveries of that kind

20   of equipment.

21   Q.  But, certainly, that wasn't the focus of

22   what you were looking at?

23   A.  Yeah.  It wasn't the driver, correct.

24   Q.  And you didn't look at it from the

25   viewpoint of these -- any heavy-tracked

NON-CERTIFIED COPY

Page 26

1    Q.  Okay.  Dr. Bailey, I'm looking at the

2  Appendix A to your report.

3       MR. FRANCO:

4          We can label your report as Exhibit

5  A and we will -- I'm sorry.  Exhibit 1.  We'll

6  call it Exhibit 1.

7  EXAMINATION BY MR. FRANCO:

8    Q.  And if you have a copy, that is fine.

9  If not, we will get a good copy while we take a

10  break.

11    A.  I have one.

12    Q.  Okay.  Is that something we can use?

13    A.  I see no reason why not.  It's printed

14  in original color.

15    Q.  Okay.  I assume you have several of them

16  or available.

17    A.  Yes, this is the only one I have today.

18    Q.  Right.

19    A.  But, yes, that is fine.

20    Q.  Okay.  The second paragraph of the

21  Professional Profile says that, "Dr. Bailey's

22  primary area of expertise is determining the

23  risk exposure of residential, commercial and

24  industrial properties to hazards associated with

25  hurricanes, tornadoes and flooding."  That is

NON-CERTIFIED COPY

1    accurate, correct?

2        A.  Yes.

3        Q.  And then the next paragraph talks about

4    your past work at Exxon included wind load

5    analysis.  That's what you did primarily for

6    Exxon?

7        A.  Not primarily.

8        Q.  Okay.  You did wind load analysis.  You

9    did designs of gravity-based structures,

10   correct?

11       A.  Correct.

12       Q.  And you conducted research on well

13   cement, correct?

14       A.  Correct.

15       Q.  None of what I just talked about at

16   Exxon involves the subject that we are here for

17   today, does it?

18       A.  Some of the work I was involved with at

19   Exxon in the Drilling and Completions Division

20   included field operations where you had natural

21   gas distribution that included turbine

22   generating buildings.  And one aspect of our

23   assessments in the field was the performance of

24   those -- that type of equipment.

25            And it included slab analysis because of

NON-CERTIFIED COPY

Page 34

1    presented.

2        Q.  Okay.  And after the review, what did

3    you do about it?

4        A.  To the extent there was any concerns

5    related to its performance -- and there

6    weren't -- as it pertains to anything that might

7    undermine the foundation or supporting -- soil

8    supporting it.

9        Q.  Okay.  Anything else on Page 32?

10       A.  Well, I'm still on 31.

11       Q.  Okay.

12       A.  Similar thing, third one, for AES Corp.

13       Q.  Uh-huh.

14       A.  Five electrical power plants in the

15   Caribbean.  Again, same thing; same idea.

16       Q.  Did any parts of your reports or

17   publications deal with the standards for

18   designing the concrete paved areas for

19   heavy-tracked cleated equipment?

20       A.  We rely on such standards in our

21   reviews.  We only typically will explicitly cite

22   them if there is an issue that we find through

23   the course of such investigations.  And in this

24   case with respect to the pavements, no.

25       Q.  Okay.  Go ahead.

NON-CERTIFIED COPY

Page 37

1    A.  It is a different type of load, yes.

2    Q.  Is it -- you're not looking at the load

3    analysis on the concrete.  You're looking at the

4    affect of the event on the concrete, aren't you?

5    A.  And the supporting base -- subbase, yes.

6    Q.  But you're looking at the affect of the

7    hurricane and the storm surge on the concrete?

8    A.  Yes.  In other words, as the storm

9    approaches, what can it do to undermine any

10   component at the site.

11   Q.  Okay.  Go ahead.  What else?

12   A.  Further down, the Johnson Space Center

13   and the Kennedy Space Center, same thing.

14       And at the Kennedy Space Center,

15   arguably the largest tracked mover in the world

16   is the one, of course, that moves the shuttle

17   and its predecessor and Saturn Rocket.  You've

18   seen it.

19   Q.  You list that Dr. Bailey as a wind

20   hazard assessment, don't you?

21   A.  Correct.

22   Q.  That's different than what you're doing

23   in this case, isn't it?

24   A.  This case is more focused.

25   Q.  Okay.  All these things that you are

NON-CERTIFIED COPY

1  talking about are more wind and storm risk

2  assessments, not similar to what you're doing in

3  this case; isn't that true?

4      A.  They're bordering contents, yes.

5      Q.  Any of the presentations that you made

6  deal with the same design analysis that you're

7  making in this case of the design of the

8  concrete paved parking areas?

9      A.  Yeah.  I'm sorry.  Repeat that again.

10     Q.  Any of the presentations that you made

11 deal with the design of concrete paved parking

12 areas?

13     A.  Explicitly, no.

14     Q.  Okay.  In fact, you wrote a presentation

15 about how to keep the Jury interested, am I

16 correct?

17     A.  Yes.

18     Q.  Okay.  Is that because you are involved

19 a lot in litigation?

20     A.  No.

21     Q.  Why did you write that then?  How did

22 that relate to civil engineering and your work

23 as a civil engineer?

24     A.  It relates to the work I and my

25 colleagues in our various practices conduct from

NON-CERTIFIED COPY

Page 45

1    Q.  Were you qualified as an expert in that

2    case?

3    A.  Yes.

4    Q.  In what area?

5    A.  In this case, it had to do with damage

6    to a roof following Hurricane Ike.

7    Q.  All right.  In the second testimony

8    appraisal hearing, what were you qualified to

9    testify in connection with?

10   A.  A very similar case involving Hurricane

11   Rita and damage to a roof in Beaumont.

12   Q.  In the third testimony listing the

13   Tannenbaum case, what were you qualified to

14   testify to?

15   A.  Damage to a home owned by Mr. and Mrs.

16   Tannenbaum in Wisconsin.

17   Q.  Okay.  So you've never been qualified as

18   an expert to testify in a case regarding the

19   design of concrete pavement parking area

20   utilizing heavy-tracked cleated equipment?

21   A.  Correct.

22   Q.  Okay.

23       MR. BARRIERE:

24            When you're in a convenient moment,

25   I need to walk down the hall and get my

NON-CERTIFIED COPY

Page 48

1      A.  Yes.

2      Q.  And did you visit both Baton Rouge and

3  the Kenner sites?

4      A.  Yes.

5      Q.  Now, I take it that some of the photos

6  you listed and produced in your documents, some

7  of those photos were from your first visits and

8  some of those photos were for subsequent visits.

9  Is that a fair statement?

10     A.  Correct.

11     Q.  All right.  And we will get into those.

12         Did you rely on any notes that you made

13  of those visits?

14     A.  I took some field notes and relied in

15  part on them, yes.

16     Q.  Did you produce the field notes?

17     A.  Yes.

18     Q.  And where are those field notes listed

19  in this list of documents that you produced to

20  us?

21         You have got your own list in front of

22  you, or is this -- you can use mine.

23     A.  Yeah.  Let's see.

24     Q.  (Complying.)

25     A.  (Reviewing document.)

NON-CERTIFIED COPY

Page 68

1    A.  Sure.

2    Q.  To look at what you're looking at.

3    A.  (Reviewing document.)  As indicated in

4  my report in Figure 5, it's Detail 1 on the

5  drawing C501.

6    Q.  Okay.  That is a drawing of the

7  eight-inch and the six-inch pavement, correct?

8    A.  Detail 2 is of the six-inch pavement.

9    Q.  Okay.  And where is the drawings for the

10 actual joints, sir?

11    A.  That is shown, as I indicated in my

12 report.  I believe it is Detail 4 on that Sheet

13 5, C501.

14    Q.  Okay.  Does the detail of the typical

15 transverse construction joint No. 4, does that

16 show any rebars through the joints, sir?

17    A.  No.

18    Q.  And you didn't do any coring to find out

19 whether there was any rebar through any of the

20 contraction joints at either site, did you?

21    A.  I considered it and offered it as a

22 possibility, an option as part of my work, but

23 was instructed, at this time, not to do that.

24    Q.  You thought it was prudent to do that,

25 didn't you?

NON-CERTIFIED COPY

Page 69

1    A.  It can help verify and clarify, yes.

2    Q.  The coring would also tell you the

3  thickness of concrete that was laid actually,

4  wouldn't it?

5    A.  Yes.

6    Q.  Did you offer that, as well?

7    A.  Yes.

8    Q.  And, yet, that was rejected at this

9  time?

10    A.  At this time, yes.

11    Q.  Who rejected that?

12    A.  Ms. Mince.

13    Q.  Okay.  Now, you also referred to, in

14  that same paragraph, Doctor, you say, "Repairs,

15  including replacement of the existing pavements,

16  will be necessary to allow the extensive use of

17  heavy equipment over these paved areas..."

18      Is it your opinion that all the existing

19  pavements need to be replaced?

20    A.  In my opinion, it proves that improper

21  sizing and placement of steel reinforcement and

22  pouring a slab in terms of its thickness is

23  insufficient.  It might well warrant complete

24  replacement for heavy equipment in use, what

25  areas are designated for use by heavy equipment.

NON-CERTIFIED COPY

1    this testimony yesterday -- Louisiana Department

2    of Transportation deals with roads, highways and

3    bridges, correct?

4        A.  Correct.

5        Q.  They don't deal with parking lots, do

6    they?

7        A.  Exclusively with respect to parking

8    lots, no.

9        Q.  Okay.  What about the East Baton Rouge

10   standards?  Those are for roads and highways and

11   bridges, too, aren't they?

12       A.  Correct.

13       Q.  And that's why you were looking

14   primarily to the ACI documents; is that correct?

15       A.  Primarily.

16       Q.  To set the standard?

17       A.  Primarily, yes.

18       Q.  Okay.  And then you say in the final

19   paragraph -- I am sorry -- final paragraph of

20   Page 1, I should say, "Methods are available to

21   extend the life of concrete pavements and

22   joints."

23           And you mention these methods:

24   increasing compressive strength, increasing

25   thickness, increasing dowel bar size, use proper

NON-CERTIFIED COPY

Page 84

1  areas." See that?

2     A. Yes.

3     Q. What potential causes did you

4  investigate other than design?

5     A. I took into consideration material and

6  construction.

7     Q. All right. Let's talk about

8  construction.

9        What potential causes related to

10  construction did you investigate?

11     A. Well, to the extent that I could from

12  what was either shared with me or was produced

13  in documents, simply trying to discern if there

14  was any indication that something wasn't done

15  right, was reported, observed and, therefore,

16  warranted a change. I didn't uncover such

17  items.

18        I also, as I didn't get to do earlier,

19  proposed some nondestructive and destructive

20  means to measure steel placement and slab

21  thickness.

22     Q. Which did not occur?

23     A. Not yet.

24     Q. So, they didn't occur at the time you

25  reached your opinion, did they?

NON-CERTIFIED COPY

Page 85

1    A.  Correct.

2    Q.  Can you eliminate construction causes

3  for these problems, as you sit here today?

4    A.  I am not sure I could -- you say

5  eliminate.  That is pretty strict.

6    Q.  Yeah.  It's very strict.  That is the

7  way it's meant.

8    A.  Right.  I don't think that is the reason

9  for the problems, but to eliminate, no.

10        I mean, certainly, if something was

11  uncovered to suggest otherwise, then I certainly

12  might would consider that, and, if necessary,

13  amend my findings accordingly.

14    Q.  And did you investigate lack of

15  maintenance as potential causes for the problems

16  that you saw?

17    A.  Insofar as the observations I made on

18  the site and my understanding while at the site

19  of their maintenance operations, yes.

20    Q.  Okay.  You don't mention anything about

21  maintenance in your entire report, do you?

22    A.  Correct.

23    Q.  Why is that?

24    A.  I didn't think it was an issue.

25    Q.  You -- when you focus on determination

NON-CERTIFIED COPY

Page 86

1    of causation, isn't it appropriate to list the

2    fact that you've eliminated certain other

3    causes?

4         MR. BARRIERE:

5              Object to the form of the question.

6         THE WITNESS:

7              You could.

8    EXAMINATION BY MR. FRANCO:

9         Q.  And so with reference to my prior

10   questions, can you eliminate lack of maintenance

11   as a cause of any of the problems you saw?

12        A.  I don't think it is the reason, but I --

13   absent additional information, I couldn't

14   strictly eliminate it.

15        Q.  You say here in the second paragraph,

16   "Exponent's objective is to accurately assess

17   observed conditions and consider all relevant

18   data."  You see that?

19        A.  Correct.

20        Q.  All relevant data or information would

21   include actual construction at the site,

22   wouldn't it?

23        A.  Yeah.  Could you expound on that a

24   little bit?  Yeah.

25        Q.  In other words, all relevant data would

NON-CERTIFIED COPY

Page 88

1    Q.  But you, as we said before, you didn't

2  get it cored?

3    A.  Correct.

4    Q.  So, you don't know?

5    A.  In the context of -- well, coring would

6  provide in the way of that kind of information,

7  correct.

8    Q.  And you don't know if the foundation was

9  laid properly at every part of the site either,

10  do you, as you sit here?

11    A.  I saw no evidence to suggest otherwise

12  it wasn't.

13    Q.  But in answer to my question, you didn't

14  analyze the exact laying of the foundation as it

15  was laid, did you, because you couldn't?

16    A.  Yeah, I guess I am not quite clear of

17  the nature of your question.

18    Q.  Do you know if the foundation actually

19  laid at the site was as specified?  Can you

20  opine on that?

21    A.  Yeah.  Well, absent any additional

22  nondestructive or destructive testing.

23    Q.  Yeah.

24    A.  Yeah, relying solely on what has been

25  produced and comments in the absence thereof

NON-CERTIFIED COPY

Page 89

1    regarding its construction.

2        Q.  Right.  That would be part of the coring

3    you would want to see?

4        A.  I think it would be valuable.

5        Q.  You didn't actually check the actual

6    joint construction itself inside the pavement,

7    did you?

8        A.  When you say check the joint

9    construction --

10       Q.  Yes.  You don't know if the construction

11   of the joints was done according to the design

12   plans, do you?

13       A.  Again, I have no evidence to indicate

14   otherwise.

15       Q.  Right.  You don't know at what level the

16   dowel bars were installed in the concrete as you

17   sit here, do you?

18       A.  Other than what was produced in the

19   drawings and presumably the understanding that

20   the contractor follows drawings.

21       Q.  Okay.  The answer to my question is

22   "no," isn't it?

23       A.  In absent -- no.  The only other

24   additional information would be if you did

25   forensic work --

NON-CERTIFIED COPY

1    Q.  Right.

2    A.  -- coring and scans.

3    Q.  So the Jury understands, you don't know

4  if the dowel bars were laid at the proper level

5  of the concrete, do you?

6    A.  I was not there when it was done.

7  Correct.

8    Q.  And you don't know, as we sit here?

9    A.  I don't know from observation during the

10  construction.

11    Q.  And if the joints weren't constructed as

12  they were designed or the dowel bars weren't

13  placed as they were designed or the thickness

14  wasn't the thickness that was specified, that

15  could affect the problems that are being

16  observed out there at the site, couldn't it?

17    A.  Correct.

18    Q.  And during your investigation, sir, do I

19  understand, even up to today, that nobody has

20  advised you that H&E was experiencing similar

21  problems that they have at Baton Rouge and

22  Kenner at their other sites that have concrete

23  with heavy-tracked cleated equipment?

24    MR. BARRIERE:

25        Object to the form of the question.

NON-CERTIFIED COPY

1    mix, so I can't say for certain.

2         Q.  Right.

3         A.  No.

4         Q.  Did you determine whether the joints

5    were properly sealed?

6         A.  I observed the sealing of the joints

7    during my onsite surveys.

8         Q.  And did you determine whether they were

9    properly sealed?

10        A.  I would say, for the most part, they

11   were, though, certainly there were some

12   instances I observed where it appeared that the

13   sealant had been compromised in a few of the

14   locations, particularly the expansion joints.

15        Q.  And remained unrepaired?

16        A.  In part, yes.

17        Q.  And what happens when the sealing -- the

18   seal at a joint is unrepaired?  What does that

19   allow to happen?

20        A.  In long-term, it could allow water to

21   flow through and to the subgrade.

22             Now we have to keep in mind that even

23   though your seal may be missing, you still have

24   your backer material or other filler material.

25   So, there is still some restriction --

NON-CERTIFIED COPY

1      Q.  But --

2      A.  -- absent -- absent the sealant.  But

3   that said, it still will allow some moisture

4   through the joint.

5      Q.  And that will affect the foundation

6   eventually, won't it?

7      A.  Long-term, it could.  A properly

8   compacted foundation with proper water content

9   during prep can take some of that as expected.

10         But long-term, it certainly -- there is

11   a possibility to undermine.

12      Q.  And you haven't been able to determine

13   whether the foundation was properly -- actually

14   properly compacted?

15      A.  Correct.

16      Q.  Now, you saw some -- and let's talk

17   about Baton Rouge.  You saw in Baton Rouge some,

18   I would call, curing cracks, am I correct?

19      A.  Correct.

20      Q.  And so the Jury understands what I mean

21   by curing cracks, it's cracks that happen fairly

22   soon after the concrete is laid while the

23   concrete is curing, correct?

24      A.  Correct.

25      Q.  And that is a normal situation, correct?

NON-CERTIFIED COPY

Page 106

1    clarify.  There is load and there's pressure.

2        Q.  Okay.

3        A.  The load in any one section of the track

4    with the cleat is the same, but the bearing

5    surface is different.  And, therefore, the

6    pressure is force divided by area.

7            And if I have a key bearing on that is

8    one-fourth what it normally would be.  If I

9    fully penetrate the surface, then my pressure is

10   four times as much.

11       Q.  Oh, but it's still a lot less than the

12   pressure of a rubber-tired vehicle at that same

13   location, isn't it?

14       A.  The same weights.  And, again, it kind

15   of depends on the design of the wheel.  You need

16   to keep that -- on the rubberized wheel, we need

17   to keep that in mind.  But it can be, yes.

18       Q.  All right.  I am looking at Page 6 of

19   your report, the second full paragraph.

20           And you admit certainly, Doctor, that

21   you could not identify any specification in the

22   United States related directly to the design of

23   concrete surfaces under tracked vehicles.  Am I

24   correct?

25       A.  Correct.

NON-CERTIFIED COPY

Page 107

1      Q.  In fact, the ACI documents that you

2   referred to in connection with what we talked

3   about as the standard of care, does not identify

4   or directly relate to the design of concrete

5   surfaces under tracked vehicles, does it?

6      A.  No.  Explicitly, no.

7      Q.  You're not suggesting that some

8   publication in New Zealand establishes the

9   standard of care in Baton Rouge, Louisiana, do

10  you?

11     A.  I don't -- I didn't suggest that in my

12  report.  I just --

13     Q.  I didn't ask you whether you suggested

14  it in your report.  I am just asking you:  Do

15  you suggest that?

16     A.  I do not suggest that.

17     Q.  Okay.  And even that New Zealand report

18  only -- it does not address tracked vehicles,

19  does it?

20     A.  Correct.

21     Q.  You also say in your report on Page 6

22  that URS did not communicate to H&E the

23  potential for heavy-tracked equipment causing

24  such damage to concrete pavements.  You see

25  that?

NON-CERTIFIED COPY

1      A.  Yeah.  I'm sorry.  Say that again.  The

2   very bottom of Page 6?

3      Q.  The last line.  The last two lines.

4      A.  The last line.  (Reviewing document.)

5   Okay.  Here we go.  (Reviewing document.)

6   Correct.

7      Q.  No one made you aware that H&E was

8   experiencing damage to concrete pavements at

9   their other sites from heavy-tracked equipment?

10     A.  No.

11     Q.  Am I the first who has made you aware of

12  that?

13     A.  I mean, I wouldn't be surprised if they

14  were.  I mean, you know, in fact, reinforced

15  concrete pavements of a similar design with

16  similar types of equipment, it wouldn't surprise

17  me at all.

18          But it wasn't something that I explored

19  because, in this case, my focus was simply this

20  facility, a new facility from the ground up by

21  design.

22          And that relationship that URS had is

23  the architect and engineer of record with their

24  client, in this case H&E.

25     Q.  Let's take a look at ACI 330R-01.

NON-CERTIFIED COPY

Page 109

1     A.  R-01.

2     Q.  Do you have that in front of you?

3     A.  I am sorry.

4     Q.  330R-01.

5     A.  Yes.

6     Q.  Let's look at Section 1.2.

7     A.  (Complying.)  Okay.

8     Q.  Do you see in the very first paragraph

9  where it says "this guide is not a standard"?

10  Do you see that?

11    A.  Yes.

12    Q.  But you are characterizing it as the

13  standard of care in this case, aren't you?

14    A.  Yes.

15    Q.  Look at 2.3.

16    A.  (Complying.)

17    Q.  In terms of pavement design, it says "to

18  determine the pavement thickness, the designer

19  needs to know the types of vehicles that will be

20  used for pavement."  You agree with that,

21  correct?

22    A.  Yes.

23    Q.  "The number of trips for each vehicle

24  type," you see that?

25    A.  Yes.

NON-CERTIFIED COPY

Page 112

1    A.  And, certainly, URS is a recognized

2  national engineering firm that I'm sure over the

3  years has been involved with numerous designs

4  that involved pavements and roadways.

5    Q.  So experience is important, other than

6  just looking at the specifications.  Fair

7  statement?

8    A.  Yes.

9    Q.  Did you make your calculations of

10  thickness based on 330R-01 or 330R-08?

11    A.  Both.

12    Q.  Both?  And those are different?

13    A.  In -- with regard I believe to the heavy

14  duty or the Class D --

15    Q.  Uh-huh.

16    A.  -- or Category D, I believe there was a

17  difference.  Yes, sir.

18    Q.  Did you make the calculation for heavy

19  duty, as well as standard or light duty?

20    A.  No.  They were both for --

21    Q.  Just heavy duty?

22    A.  They were for heavy duty, but they

23  involved two different areas.  But, yes, heavy

24  duty.

25    Q.  Okay.  So your calculation was only for

NON-CERTIFIED COPY

Page 117

1      Q.  Okay.  And what is the average daily

2   truck traffic that your calculation of Category

3   D at the entrance and exit lanes are based on?

4      A.  I just simply relied on the single value

5   provided in the table of 700.

6      Q.  Seven hundred.  So your calculation is

7   based on the fact that 700 trucks travel over

8   that concrete --

9      A.  Correct.

10     Q.  -- per day?

11     A.  Correct.

12     Q.  Do you have any idea whether 700 trucks

13  travel over the Baton Rouge concrete?

14     A.  Let me see.  In the case of Baton Rouge,

15  no.

16     Q.  Okay.  Are you familiar with the fact

17  that their average daily truck traffic is 30 to

18  40?

19     A.  No.

20        MR. BARRIERE:

21            Object to the form.

22  EXAMINATION BY MR. FRANCO:

23     Q.  And so what did your calculation come

24  out to for the entrance and exterior lanes in

25  Category D with dowels with 700 trucks per day?

NON-CERTIFIED COPY

Page 126

```
 1   strictly speaking, it's a little bit of

 2   difference.

 3        Q.  Okay.  But it's not a one point load.

 4   Those point loads are spread among all the

 5   cleats that contact the concrete?

 6        A.  Right.

 7        Q.  Am I correct?

 8        A.  Correct.

 9        Q.  And that is at certainly a larger

10   distance than a rubber tire, isn't it?

11        A.  It is spread out over a longer distance,

12   that is correct.

13        Q.  Okay.

14        A.  Sorry.  I don't think I answered your

15   question.  I mean, you asked about the Kenner

16   site.

17        Q.  Yes.

18        A.  And I went through the same -- you asked

19   about how I --

20        Q.  What did you get?

21        A.  Let me find it for you.  (Reviewing

22   document.)  Okay.

23            For Kenner, I got 6.5 inches for

24   Category C, and nine inches for D.  But when you

25   apply the one-inch reduction using the dowel for
```

NON-CERTIFIED COPY

Page 127

1   D, that reduces it to eight inches.

2       Q.  So eight inches for heavy?

3       A.  Yes.

4       Q.  And --

5       A.  6.5 for --

6       Q.  Parking area?

7       A.  We will call it parking area, right.

8       Q.  And, again, that is based on the same

9   frequency we talked about --

10      A.  Correct.

11      Q.  -- just a few minutes ago?

12      A.  That is correct.

13      Q.  Yours is based on 700 trucks?

14      A.  Correct.  For D.  That is correct.

15      Q.  You have no issue with the concrete

16  strength of 4,000 psi at either site, correct?

17      A.  No.

18      Q.  The diameters of the dowels, let's talk

19  about that and ACI.  Does ACI 330R-01 have --

20  let me rephrase that.

21          With respect to the thickness of the

22  dowels, does ACI 330R-08 have the same thickness

23  as 330R-01 had or did they change it?

24      A.  I believe they made a change on one of

25  the dowels for one of the thicknesses.  If -- I

NON-CERTIFIED COPY

Page 143

1    applied kind of coatings throughout the U.S.

2        Q.  Was this interior or exterior?

3        A.  Both.

4        Q.  And you would consider that within the

5    standard of care, these coatings?

6        A.  If I were designing -- if I was asked to

7    design a facility like the H&E facility in Baton

8    Rouge or Kenner, to accommodate the kind of

9    equipment and operations as I have observed, I

10   certainly would consider that as part of the

11   standard of care, at least to the extent I would

12   present it to the client.

13       Q.  Two questions:  Number one, you have

14   never been asked to design a concrete pavement

15   for heavy-tracked equipment, correct?

16       A.  Correct.

17       Q.  Number two, that is a cost issue for the

18   client, isn't it?

19           MR. BARRIERE:

20               Object to the form of the question.

21           THE WITNESS:

22               It could be for the client, I mean.

23   EXAMINATION BY MR. FRANCO:

24       Q.  It could be?

25       A.  Well --

NON-CERTIFIED COPY

Page 144

1    Q.  It's not a cost consideration?

2    A.  Well, sure.  I mean, it's going to

3    consider the cost with any option you present.

4    And that's not the only option, but, yes.

5    Q.  Okay.  Are you familiar with anyone who

6    has used an iron filled aggregate in this type

7    of situation?

8    A.  Well, I've seen those applications in

9    some power plants and industrial facilities.

10    Q.  Not for heavy-tracked cleated equipment?

11    A.  I don't know if they ran heavy-tracked

12    cleated on it or not.  Certainly, with some

13    heavy equipment present, but whether it was

14    cleated track, I don't know.

15    Q.  And, sir, you talk about the pavement

16    surface.  And the wear and tear on the pavement

17    surface is a lot different with cleated-tracked

18    equipment, than it is for tracked equipment that

19    is flat, isn't that true?

20    A.  Yes.

21    Q.  All right.  Look at Page 15 of your

22    report.

23    A.  (Complying.)

24    Q.  You cite ACI 330R-01 for the following.

25    "It is important to determine and correct the

NON-CERTIFIED COPY

1    cause of the slab failure before starting

2    repairs."  You agree with that, don't you?

3        A.  Yes.

4        Q.  And you haven't been able to determine

5    whether any construction issues are the cause of

6    slab failures at Baton Rouge or Kenner, have

7    you?

8        A.  I haven't identified any to date.

9        Q.  But you haven't investigated them, have

10   you?

11       A.  But to the extent what has been done, as

12   we discussed earlier, certainly absent some

13   additional forensic testing to, you know,

14   validate what we're assuming was the case.  You

15   know, we wouldn't know until that was done.

16       Q.  My point is, as of the time of your

17   report and all the way up to that point in time,

18   you have not determined whether there is

19   construction causes for any of the pavement

20   problems, have you?

21       A.  In my opinion, there aren't any, but I

22   haven't determined them absolutely.

23       Q.  Well, it's important to determine those.

24   Right here it says that?

25       A.  And that is part of it.  Sure.

NON-CERTIFIED COPY

Page 146

1    Q.  And to correct them?

2    A.  If they exist.  If it is

3  construction-related, yes.

4    Q.  The first thing you have to do is

5  determine whether there is any maintenance

6  causes or whether there is any construction

7  causes, correct?

8    A.  Or design or anything else.  Correct.

9    Q.  All right.  And then further on, you

10  say, "The presence of heavy-tracked equipment

11  poses a unique challenge to the short- and

12  long-term performance of concrete pavements..."

13       That is your words, or is that a quote

14  from something else?

15    A.  It's my words.

16    Q.  Okay.  Why is it a unique challenge?

17    A.  Because of the nature by which loads are

18  transferred by tracked equipment to pavements.

19    Q.  It is fair to say that the use of

20  heavy-tracked cleated equipment on concrete is

21  not a very ordinary use, is it?

22       MR. BARRIERE:

23            Object to the form of the question.

24       THE WITNESS:

25            It is not common, correct.

NON-CERTIFIED COPY

Page 155

1     A.  (Reviewing document.)

2     Q.  You've referred to that in your report,

3  haven't you?

4     A.  Correct.

5     Q.  All right.  Would you, for the Record,

6  read the title of that at the top?  What I have

7  highlighted, what does it say?

8     A.  "Roadway showing joints."

9     Q.  Thank you.

10        Okay.  Let's cover this issue first.

11  Mr. Bailey, I'm going to label for the next

12  exhibit, as Exhibit 8, a copy of that August 26,

13  2016 letter from you to Ms. Mince.  Can you

14  identify that for me?

15     A.  (Reviewing document.)

16     Q.  What is that?

17     A.  Yes.  This is a letter addressed to Ms.

18  Mince from me and one of my colleagues, Matt

19  Vail, with Exponent, dated August 26, 2016,

20  regarding questions pertaining to change order

21  documents.

22     Q.  Okay.  Now, Mr. Matt Vail signed this

23  letter, correct?

24     A.  Correct.

25     Q.  And then you put your stamp on this

NON-CERTIFIED COPY

Page 156

1   letter, correct?

2       A.  Correct.

3       Q.  Did you actually -- this is in reference

4   to the change orders in this case, correct?

5       A.  Correct.

6       Q.  Did you review the change orders?

7       A.  Yes.

8       Q.  Okay.  And who made this calculation

9   using the cost of change versus time model?  Who

10  did that?

11      A.  That particular part cited in this

12  letter was done by Matt.

13      Q.  Okay.  So are you familiar with the cost

14  of change versus time model that he's talking

15  about?

16      A.  Yes.  He is -- he shared that with me.

17      Q.  Well, wait.  Was that your first

18  exposure to that time model?

19      A.  I've heard of it.

20      Q.  You've heard of it, but was this your

21  first exposure in this case to dealing with that

22  particular model?

23      A.  In this case, yes.

24      Q.  So you've never used it before this

25  case?

NON-CERTIFIED COPY

Page 157

1      A.  In this case, no.

2      Q.  Okay.  I'm sorry.  You have never used

3  it before this case?

4      A.  Oh, before this case?  No.  There has

5  been these kind of cost versus change time

6  models.

7      Q.  Have you ever given an expert opinion on

8  the cost of change versus time model before this

9  case?

10     A.  An expert opinion, no.

11     Q.  Okay.  And whose model is that?

12     A.  Oh, it's one that was -- it's a

13  published model.  I can't recall specifically

14  the author of it.  It has been cited, but we --

15  we have used -- and I say we, our consulting

16  practice has used --

17     Q.  So --

18     A.  -- this with assisting the claims.

19     Q.  So let me get this straight.  Matt Vail

20  did this calculation.  You didn't do the

21  calculation, correct?

22     A.  Well, to clarify, it was my opinion when

23  asked by Ms. Mince what I thought the impact

24  would be due to change orders versus if it had

25  been done during the construction.

NON-CERTIFIED COPY

Page 161

1        MR. FRANCO:

2            Okay.

3    EXAMINATION BY MR. FRANCO:

4        Q.  I'm going to show you the next exhibit,

5    which will be Exhibit 9, which is a string of

6    E-mails from -- the top one is from Frankie

7    Wynn, July 27, 2016.  It is H&E 72397, et

8    cetera.

9            This came out of your documents, sir.

10   Okay.  It starts off with an Email by you back

11   on July 27, 2016, which was after your -- what

12   is the date of your report?

13       A.  It is dated July 29.

14       Q.  Okay.  So this is just before your

15   report is issued, correct?

16       A.  Correct.

17       Q.  And here you are referring to the

18   geotechnical report on Baton Rouge that no

19   specific traffic data was provided.

20           And so you asked some questions about

21   that, right?

22       A.  Correct.

23       Q.  And so you asked whether a total of 134

24   vehicles per day seemed reasonable around the

25   branch building area.  Why did you ask that

NON-CERTIFIED COPY

Page 162

1    question?

2        A.  Just trying to get some idea of the

3    frequency for these types of vehicles at the

4    site.

5        Q.  Did you get an answer?

6        A.  You know, they were -- yeah, in this

7    string, no.

8        Q.  You didn't get an answer to that in this

9    string, did you?

10       A.  That is correct.  That is correct.

11       Q.  And you were asking that because the

12   design depends on the amount of vehicles per

13   day, doesn't it?

14       A.  In part, yes.

15       Q.  Part of the calculation, as we talked

16   about earlier, depends on the weight, as well as

17   the frequency of the vehicles, correct?

18       A.  Correct.

19       Q.  And they didn't give you an answer, did

20   they?

21       A.  They did not.

22       Q.  Then you asked whether -- and what is,

23   for the Jury's sake, what does K-I-P mean?

24       A.  That is --

25       Q.  What is that an acronym for?

NON-CERTIFIED COPY

1   being close up.  I mean, it could be a limestone

2   or --

3       Q.  Crushed into the concrete?

4       A.  Crushed on top of it, yes.

5       Q.  Okay.  And you can't tell if it actually

6   affected that concrete below because you can't

7   see it because the rock is on top, right?

8       A.  If you were to sweep it, you would get

9   some.

10      Q.  This is 73643 and is Exhibit 24.  That

11  is what you saw when you were out there in terms

12  of condition of the pavement, correct?

13      A.  Correct.

14      Q.  And I see a lot of aggregate around this

15  part of the concrete, including the joint.  Is

16  that a fair statement?

17      A.  (Reviewing document.)  I am not -- I am

18  not necessarily sure what you mean by a lot.  I

19  mean, most of it -- from this view, most of that

20  surface doesn't have any on it, but there is

21  some on it.  Yes.

22      Q.  And these tracks are right over the

23  aggregate in this area right here, isn't it?

24      A.  (Reviewing document.)  That is correct.

25      Q.  I'm going to circle that.  This is

NON-CERTIFIED COPY

1   bottom in the foreground.

2       Q.  Exhibit 27 will be 73661.

3           This is 73702 and will be Exhibit 28.

4   What is that I see growing out of the joint?

5       A.  It looks like grass.  Maybe weeds.

6       Q.  Does that look like proper maintenance

7   to you?

8           MR. BARRIERE:

9               Object to the form of the question.

10          THE WITNESS:

11              Yeah.  Kind of hard to tell if it --

12  in the foreground, that is the -- next to the

13  joint, that is hard to tell without pulling

14  whether it's actually in the joint or growing

15  above it.

16              But either case, yeah, obviously,

17  there is enough soil there to allow that to

18  happen.

19  EXAMINATION BY MR. FRANCO:

20      Q.  So?

21      A.  And I would say, no, that should be

22  removed.

23      Q.  Same thing with 73703, which will be

24  Exhibit 29.  There is grass growing on top of --

25  and, certainly, mud covering this joint here.

NON-CERTIFIED COPY

Page 198

1    deterioration of the base, doesn't it?

2        A.  It -- well, it provides a means for

3    water, you know, to get to the base.

4        Q.  Which has not been repaired, apparently.

5        A.  Apparently, in this case, no.

6        Q.  Okay.  All right.  I'm going to show you

7    73719, which will be Exhibit 31.  And that is a

8    picture of one of the pieces of equipment at the

9    Baton Rouge facility in the service building,

10   correct?

11       A.  Correct.

12       Q.  And what is the condition of what is in

13   the tracks?  What is in the tracks?

14       A.  On -- okay.  On the left side, as we

15   view the photo, some of the tracks appear to

16   have some soil.  Again, some minerals, perhaps

17   even some small gravel embedded in it.

18       Q.  All right.  And, obviously, it had to

19   travel on the concrete in order to get into the

20   service building in that condition.  Fair

21   statement?

22       A.  Correct.

23       Q.  Okay.  We are still on Baton Rouge.

24   This is 73428, which will be Exhibit 32.

25       A.  So this is Baton Rouge?

NON-CERTIFIED COPY

Page 199

1     Q.  Yes.

2     A.  Oh, I see.

3     Q.  Yeah.  That's Kenner over there.

4     A.  Got you.  Okay.

5     Q.  According to the way I understand it.

6          There is clearly parts of concrete and

7  rock near the joints.  Near this joint, am I

8  correct?

9     A.  Correct.

10     Q.  Does that indicate proper maintenance to

11  you?

12          MR. BARRIERE:

13              Object to the form of the question.

14          THE WITNESS:

15              Yeah.  On this one, it's hard to

16  tell how much of that was due to the degradation

17  that occurred and the pebbles that appear from

18  that, or if it came from a tread, either a

19  rubber or metal track.

20              The seal still seems to be largely

21  intact in this one case.  But, certainly, I'm

22  sure it got swept up later that day or the next

23  day whenever they did.

24  EXAMINATION BY MR. FRANCO:

25     Q.  Well, in this area that I'm going to

NON-CERTIFIED COPY

1    circle, the -- there is aggregate actually

2    inside this contraction or -- contraction joint.

3    Am I correct?

4        A.  Correct.

5        Q.  That is going to cause it problems and

6    spalling near that joint, isn't it?

7        A.  Oh, yeah.  You definitely want as part

8    of your maintenance to remove that.

9        Q.  All right.  So regardless of whether it

10   came from the track or whether it came from the

11   concrete itself, you should be cleaning that up

12   so it doesn't cause more damage, correct?

13       A.  They may have an hour after I took that

14   picture.

15       Q.  But you don't know that?

16       A.  They may have on one day when I was in

17   Kenner.  One thing you need to keep in mind --

18       Q.  This is Baton Rouge.

19       A.  Or Baton Rouge.  Either one.

20           One thing to keep in mind there is a

21   time element to all of this.  Okay?  There is

22   going to be debris deposits, period.  It's --

23   and everyone knows that.

24           It doesn't mean when debris is deposited

25   and the vehicle travels over it an hour later

NON-CERTIFIED COPY

1    A.  In this case.  That is correct.

2    Q.  And yet there is still spalling?

3    A.  Correct.

4    Q.  What does that indicate to you?

5    A.  That given the width of that joint.

6  That the cleats when they travel across here.

7  And arguably it could even be rubberized.  But I

8  think more than likely it's the cleats that --

9    Q.  The cleats that are causing the

10  spalling?

11    A.  Yes.  As it travels across that joint.

12    Q.  This is 73443, which will be Exhibit 34.

13  This shows clearly grass growing on top of an

14  expansion joint.  Am I correct?

15    A.  Correct.

16    Q.  Would that be occurring if it has been

17  swept daily?

18    A.  It could.  I don't know if a sweeper

19  would necessarily remove that.

20    Q.  So if the sweeper doesn't remove it,

21  somebody should be removing it, right?

22    A.  Correct.

23        MR. BARRIERE:

24            Object to the form of the question.

25  EXAMINATION BY MR. FRANCO:

NON-CERTIFIED COPY

1      Q.  Do you know whether any of the equipment

2  is parked at the site for storage purposes

3  before it is washed in the wash room?

4          MR. BARRIERE:

5              Object to the form.

6          THE WITNESS:

7              I don't know.

8          MR. FRANCO:

9              Okay.

10          THE WITNESS:

11              I always understood that one of the

12  first things they do when they bring it in is to

13  wash it.  But is that always the case?  I don't

14  know.

15  EXAMINATION BY MR. FRANCO:

16      Q.  All right.  I'm going to you 73955,

17  which will be Exhibit 46.

18              And this shows again grass growing out

19  of a joint area around the drain.  Am I -- is

20  that a fair statement?

21      A.  In a certain portion of that joint, yes.

22  I mean, it's limited, but, yes, there is grass

23  growing in there.

24      Q.  This is 74022, which will be Exhibit 47.

25  That looks like a piece of equipment that is

NON-CERTIFIED COPY



*Failure Analysis Associates*

## Investigation of Damaged Concrete Pavements at H&E Equipment Facilities



BAILEY

EXHIBIT NO. 1

K. DONNELLY



**EXHIBIT**

B

NON-CERTIFIED COPY

# Investigation of Damaged Concrete Pavements at H&E Equipment Facilities

Prepared for

Loretta G. Mince, Esq.
Fishman Haygood, L.L.P.
201 St. Charles Avenue
46th Floor
New Orleans, Louisiana 70170


Prepared by

James R. (Bob) Bailey, Ph.D., P.E.
Senior Managing Engineer
Exponent, Inc.
10850 Richmond Avenue, Suite 175
Houston, Texas 77042
Louisiana Firm No. EF.0003375


July 29, 2016


© Exponent, Inc.



STATE OF LOUISIANA
JAMES R. BAILEY
License No. 33830
PROFESSIONAL ENGINEER
CIVIL ENGINEERING

NON-CERTIFIED COPY

# Contents

|                                          | Page |
|------------------------------------------|------|
| List of Figures                          | ii   |
| Executive Summary                        | 1    |
| Limitations                              | 2    |
| Introduction                             | 3    |
| Background                               | 4    |
| Discussion                               | 5    |
|    Pavement Surface Condition | 5 |
|    Pavement Design Features | 7 |
|    Baton Rouge Site       | 8    |
|    Kenner Site            | 10   |
| Remedies                                 | 14   |
|    Pavement Surface       | 14   |
|    Pavement Design        | 15   |
| Findings                                 | 16   |
| Appendix A   Curriculum Vita of James R. Bailey, Ph.D., P.E. | 29 |
| Appendix B   Documents Reviewed | 37 |

NON-CERTIFIED COPY

# List of Figures

|  | Page |
|---|---|
| Figure 1.  Various Perspectives of Baton Rouge Site | 17 |
| Figure 2.  Various Perspectives of Kenner Site | 18 |
| Figure 3.  Concrete Pavement at Baton Rouge Site | 19 |
| Figure 4.  Concrete Pavement at Kenner Site | 22 |
| Figure 5.  Pavement Details and Note for Baton Rouge Site | 25 |
| Figure 6.  Designated Area for Heavy Duty Pavement at Baton Rouge Site | 26 |
| Figure 7.  Dowel Sizing and Spacing Requirements | 27 |
| Figure 8.  Pavement Details and Note for Kenner Site | 28 |

NON-CERTIFIED COPY

# Executive Summary

Fishman Haygood, L.L.P., on behalf of the plaintiff, retained Dr. James R. Bailey, Ph.D., P.E., of Exponent, Inc., to evaluate the cause of damage to concrete pavements at two separate facilities operated by H+E Equipment. The two facilities are located in Louisiana, one facility in Baton Rouge and the other facility in Kenner (near New Orleans). URS Architects Engineers Planners designed the pavements. My scope of work included on-site surveys, review of architectural and engineering drawings, review of photos taken of the subject property, review of emails and other produced documents, engineering analyses, and preparation of this report which summarizes my findings.

I am the Project Manager. I am a licensed Professional Engineer in nine states and a Fellow of the American Society of Civil Engineers. As a Senior Managing Engineer in Exponent's Building & Structures practice, I have expertise in several areas of Civil Engineering, including construction materials, structural analysis and design, and materials testing. My Curriculum Vitae, including my recent testifying experience and my billing rate, is provided in Appendix A. A list of the documents reviewed by me is provided in Appendix B. My findings presented herein are made to a reasonable degree of engineering certainty.

Surface degradation of the concrete pavements is widespread and increasing at both sites. Large cracks have formed beyond the joints, an indication of improper sizing and/or placement of steel reinforcement. Repairs including replacement of the existing pavements will be necessary to allow for extensive use of heavy equipment over these paved areas during the 20-year design life without inducing the same level and extent of damage.

My current understanding is that H+E Equipment clearly communicated to URS the type of equipment that would travel across the pavements. Moreover, representatives of URS reportedly visited two H+E Equipment sites in Louisiana and one site in Houston. According to H+E Equipment during these site visits URS viewed the equipment, including the heavy metal tracked equipment. The pavements as currently designed and constructed are not adequate to perform for their intended use as required by H+E Equipment. In my opinion URS did not exhibit the appropriate standard of care when designing the concrete pavements constructed at the two sites in accordance with applicable specifications, standards, and guidelines.

Methods are available to extend the life of concrete pavements and joints. These methods include the application of specialty aggregate toppings; increasing the design compressive strength; increasing the pavement thickness; increasing the dowel bar sizes; properly spacing dowel bars; and installing metal edge guards along the expansion joints.

NON-CERTIFIED COPY

## Limitations

This report has been prepared to address evaluation of concrete pavement damage at the subject properties. Exponent's investigation focused on determination of causation mechanisms for physical damages at the exterior concrete paved areas. The scope of services performed during this investigation may not adequately address the needs of other users, and any re-use of this report or the findings, conclusions, or recommendations presented herein is at the sole risk of the user.

Exponent's objective is to accurately assess observed conditions and consider all relevant data. The findings presented herein are made to a reasonable degree of engineering certainty. I reserve the right to supplement this report and to expand or modify my opinions based on review of additional material as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others.

NON-CERTIFIED COPY

# Introduction

At the request of Fishman Haygood, L.L.P. on behalf of H+E Equipment, as a Senior Managing Engineer for Exponent Failure Analysis Associates (Exponent), I conducted an investigation to determine the nature, mechanism(s), and extent of damage to concrete pavements at two separate facilities operated by H+E Equipment.   The two facilities are located in Louisiana, one facility in Baton Rouge and the other facility in Kenner (near New Orleans).  I also investigated what aspects of the damage (if any) are attributable to flaws in the design, construction, or usage conditions of the pavements.

The scope of my work included the following:

- Site surveys on 23 September 2013, 12 and 13 August 2014, and 07 July 2016;
- Review of architectural and engineering drawings;
- Review of photos taken of the subject property;
- Review of emails and other produced documents;
- Engineering analyses; and
- Preparation and submittal of this report.

NON-CERTIFIED COPY

# Background

H+E Equipment uses the facilities located at Baton Rouge and Kenner as distribution centers for heavy construction equipment. Some of this equipment moves on different types of metal tracked systems. The heavy construction equipment travels across and is parked on concrete pavements recently constructed at the two facilities. URS Architects Engineers Planners[1] (herein referred to as URS) designed the pavements. Exponent conducted site surveys of each facility on 23 September 2013, 12 and 13 August 2014, and 07 July 2016[2]. Various perspectives of the Baton Rouge and Kenner sites are shown in Figure 1 and Figure 2, respectively.

During our site surveys we observed cracking; spalling of concrete edges at expansion, construction, and control joints[3]; and varying degrees of surface erosion in several areas of the concrete pavements at each facility. The damage was particularly evident in areas where heavy tracked equipment had travelled and was subsequently parked. Various perspectives of the concrete pavements are shown in Figure 3 and Figure 4 for the Baton Rouge and Kenner sites, respectively. The pavements at both facilities are constructed of reinforced Portland cement concrete and were poured during the first half of 2012, meaning they are approximately four years old.

---

[1] A division of URS Corporation which was acquired by AECOM in 2014.
[2] Photos, drawings, calculations, and other related information related to our investigation are available upon request.
[3] As defined on architectural and engineering drawings produced by URS.

NON-CERTIFIED COPY

# Discussion

## Pavement Surface Condition

Surface damage was observed on pavements in parking areas designated for heavy trucks and equipment, tractor trailers, and tracked equipment at both facilities. The observed surface damage to the concrete pavements is consistent with the type of damage one would expect to observe to the type of concrete specified when exposed to high levels of stress and friction, or abrasion, acting at or near the concrete surface. Surface cracks not associated with damage at joints or abraded areas were also observed during the three site visits. These surface cracks appear to be the result of ineffectiveness of the control joints rather than a response to external effects. Little or no surface damage was observed at either facility on pavements in parking areas designed for cars and light trucks.

Loads imposed by tracked equipment depend on the contact surface. Tracks in heavy construction equipment are typically comprised of a belt system of adaptable links with keys on them. The intention is that these keys will penetrate the surface where the vehicle is moving, thus increasing the level of effective friction and therefore allowing the equipment to move in what typically are soft soil conditions. As these keys are meant to fully penetrate the soil, it is generally assumed that the weight of the equipment is distributed on the full surface of the track system, and then transferred to the supporting soil. The resulting pressure from the tracks to the soil is typically labeled "ground pressure" on catalogs provided by the manufactures of this type of equipment. Exponent was able to obtain such information from a local distributor.

One of the performance features of the track is that it be sufficiently flexible to spool around the wheels of the vehicle, effectively forming a belt around each set of wheels. This feature, in turn, requires the belt to be somewhat flexible. To achieve this flexibility and still maintain sufficient in-plane stiffness and strength, the belt is typically made of metal "links" that can adjust with respect to each other. This linkage results in a condition where, only after the keys have penetrated the soil, the weight of the vehicle is fully distributed on the track and not just on the wheel sections alone. It also means that if the keys have not penetrated the surface, then the weight is likely to be transferred in most part in the areas immediately under the wheels or spools of the track.

On hard surfaces like concrete, these tracks and their keys do not easily penetrate the bearing surface, thus forcing transfer of the full weight of the equipment to the supporting surface by the area under the keys alone. Furthermore, the weight of the equipment is being transferred mostly by the keys directly under the wheels in this condition. The keys in this condition are therefore

NON-CERTIFIED COPY

effectively narrow bands of pressure applied to an unbounded in plane surface resulting in a notable stress increase.

Exponent approximated this expected stress increase using an elastic estimation of contact pressure between two surfaces. The resulting increase in stress was estimated to be on the order of four times the applied stress by the key. Applying this level of stress in areas adjacent to a free surface, like an expansion joint, would result in stresses higher than the expected capacity of the specified 4,000 psi concrete. Such an outcome would cause the types of damage like shear cracking and spalling observed by Exponent at the two H+E Equipment sites as shown in Figure 3 and Figure 4. I also observed the absence of steel edge guards along the length of the expansion joints. It is my opinion that installation of steel edge guards at the expansion joints where heavy tracked construction equipment crossed would have significantly reduced the spalling and cracking at these joints.

Given an understanding of the types of loads imposed by heavy tracked vehicles on concrete pavements, Exponent then conducted a literature review to identify codes, standards, guidelines, or other publications that address concrete design for such conditions. We could not identify any specification in the United States related directly to the design of concrete surfaces under tracked vehicles. Some references are available for the design of concrete pavements under heavy loads, specifically, at airports and with some industrial applications. However, these references do not address metal wheel types or tracks directly, nor do they give guidance on what load to design the pavement for in these cases.

Countries like New Zealand recognize the effect of metal wheels and their resulting abrasion in their standards[4], requiring more attention to finishes and proper selection of concrete strengths. However, it only addresses metal wheels directly and not tracked vehicles. It does indicate that for cases where high abrasion is to be expected, concrete strengths are likely to be 40 MPa or higher (6,000 psi) and that special attention should be given to flooring finishing techniques and selection.

In my opinion a prudent designer for this type of project should have researched and consulted such readily available literature to ensure the types of damages being observed to the concrete pavements, based on its intended use, would be minimized. Based on documents produced at the time of this report, to my knowledge URS made no such effort. If they made such an effort, then URS evidently did not communicate to H+E Equipment the potential for heavy tracked equipment causing such damage to concrete pavements being designed by them for the two sites.

---

[4] NZS-3101 Part 1 Table 3.8

NON-CERTIFIED COPY

## Pavement Design Features

Based on conversations with H+E Equipment[5], URS was aware that they should design concrete pavements at both sites to allow parking of all types of heavy equipment, including tracked equipment, anywhere on the pavements. Indeed, URS made no distinction on their drawings regarding where certain types of heavy equipment were to be parked[6]. Given this requirement, all pavement areas designed for heavy equipment may be subject to traffic from all types of such equipment, and therefore should be designed to accommodate all of them accordingly.

A publication by the American Concrete Institute titled *ACI 330R-01 Guide for the Design and Construction of Concrete Parking Lots* provides designers current knowledge and practices for the design, construction, and maintenance of concrete parking lots. ACI 330R-01 was issued in October 2001 and was available at the time of the design of the pavements at the two facilities. The guide was revised and subsequently reissued in June 2008 as ACI 330R-08.

ACI 330R-01 enables a designer to select a pavement thickness based on the Traffic Category, Modulus of Subgrade Reaction ($k$), and Modulus of Rupture ($M_R$) of the concrete. In my opinion a proper interpretation of ACI 330R-01 for both sites would result in the selection of Traffic Category C for parking areas and interior lanes, and Traffic Category D for entrance and exterior lanes. The Modulus of Rupture equals approximately 600 psi assuming a 28-day concrete compressive strength of 4000 psi[7]. The Modulus of Subgrade Reaction depends on the soil conditions as indicated in the geotechnical report produced for each site.

Both ACI 330R-01 and ACI 330R-08 state that distributed steel reinforcement can be used to control the opening of intermediate cracks between the joints. The sole function of distributed steel reinforcement is to hold the fracture faces together if cracks form. This use becomes more obvious in cases where uncontrollable subgrade conditions are liable to provide non-uniform support. ACI 330R-01 states that distributed steel reinforcement "is needed" in pavements with transverse joints spaced more than 30 times the slab thickness, while ACI330R-08 states that it "may be needed." When used, the distributed steel reinforcement is interrupted at the contraction joints because such joints by design should be free to open.

According to ACI 330R-01 and ACI 330R-08 pavements designed for truck traffic typically require load-transfer dowels for large joint spacing. A larger joint spacing results from increased spacing between joints which, in turn, increase joint openings and reduce aggregate interlock load transfer. ACI 330R-01 specifies diameters for smooth round dowels of 3/4", 7/8", 1", and 1-1/8" for slab depths (i.e., thicknesses) of 6", 7", 8", and 9", respectively.

---

[5] Frankie Wynn, Director of Facilities/Risk/Compliance Management, H&E Equipment Services, Inc.

[6] For example, see URS Drawing AS-101 for the Baton Rouge site.

[7] $M_r = 2.3f'_c{}^{2/3}$; regarding ACI330R-08 the values for the Traffic Category would be the same, while $M_r$ would range from approximately 500 psi to 630 psi depending on the aggregate texture and shape.

NON-CERTIFIED COPY

ACI330 R-08 specifies diameters for smooth round dowels of 1", 1-1/4", and 1-1/4" for slab depths of 7", 8", and 9", respectively. All dowels are spaced at 12" centers. Dowel embedment is 6" on each side of a joint with a total dowel length of 14" to allow for joint openings and minor errors in dowel positioning. Correct alignment and lubrication is cited in both versions of ACI 330R as essential for proper joint function.

Given the operating conditions stated by H+E Equipment, in my opinion it was reasonable and prudent for URS to require distributed steel reinforcement in the concrete pavements at both sites to control the opening of intermediate cracks between the joints. It was also reasonable and prudent for URS to require dowels at the expansion joints to provide vertical load transfer while permitting the joints to expand. However, as indicated in the sections to follow URS did not design the dowels in accordance with recognized specifications and guidelines related to concrete pavement design.

**Baton Rouge Site**

A review of engineering drawings for the Baton Rouge site indicate that heavy equipment, including tracked equipment, was to travel and park around the north, south, and west sides of the single story Branch Building in an area designated as "Inventory Storage".[8] This same area is labeled "Concrete Parking" and in my opinion should be associated with the design of "Heavy Duty Pavement" given the type of equipment moving in the area[9]. Figure 5 shows pavement details from the architectural and engineering drawings created by URS for the Baton Rouge site.

Regarding rigid pavement design a geotechnical report produced to URS for the Baton Rouge site[10] states,

> "No specific traffic data were provided; therefore, pavement recommendations for this site are based upon the following assumed daily traffic frequencies. In the heavy storage area: 100 light (7-kip) trucks, two 34-kip trucks, two 46-kip trucks, and thirty 80-kip trucks per day."

> "The traffic is expected to be from rubber-tired vehicles. If the expected traffic frequencies (especially those involving heavy vehicles) are much different from these assumptions, this office should be notified so that we may re-evaluate the pavement recommendations."

[Page 9; Section 8.0]

---

[8] URS Drawing AS-101; for the purposes of this report the front of the Branch Building is assumed to face east.
[9] URS Drawings C-202, C-205, and C-206; pavement in front of the building where cars and light trucks park is labeled "Concrete Driving Parking"; URS Drawing C-501 Detail 1.
[10] Soil Testing Engineers, Inc., 316 Highland Park Drive, Baton Rouge, Louisiana, 70810; report dated January 11, 2007.

NON-CERTIFIED COPY

"Rigid pavement recommendations have been computed based on a modulus of subgrade reaction (k) of 65 pci. Additionally, the design presumes 3,800 psi concrete, which can be expected to develop a modulus of rupture of about 650 psi (average). The design life of the pavement system is dependent upon periodic maintenance of the pavement. This maintenance includes but is not limited to cleaning and resealing joints, sealing cracks and immediate repairs of damaged areas."

"In the heavy equipment storage area, for a 20-year design life, we estimate the number of 18-kip equivalent single axles (ESAL's) for rigid pavement to be approximately 956,028. Based on these results, we recommend a minimum rigid pavement thickness of 7 inches."

"The rigid concrete should conform similarly to the requirements of LA DOTD Standard Specifications, Section 601, 2000 Edition. Proper steel reinforcement (temperature and shrinkage) joint design, and installation are essential to satisfactory pavement performance."

[Page 10; Section 8.2]

My interpretation of ACI 330R-01 Table 2.4 for this case would result in the selection of a 20-year design thickness of 6.5 inches for Traffic Category C (parking areas and interior lanes) and 9.0 inches for Traffic Category D (entrance and exterior lanes). The same selection results using ACI 330R-08 Table 3.4 with the exception that for Category D when dowels are used in transverse joints the thickness can be reduced one inch to 8.0 inches.

The thickness for heavy duty pavement shown on the URS design drawings (see Figure 5) is 8.0 inches. However, according to the URS drawings[11] as illustrated in Figure 6 this heavy duty pavement is limited to the immediate area surrounding the Branch Building. The remaining portion of the concrete pavement beyond the Branch Building is designated by URS as standard duty pavement which by design is 6.0 inches thick. This thickness is less than what was recommended in the geotechnical report and what would be required in accordance with ACI 330R-01 for heavy types of equipment, including tracked equipment. As indicated earlier, H+E Equipment reportedly told URS to design the pavement surrounding the Branch Building in a manner that allowed the movement and parking of all types of equipment anywhere on the pavement.

The engineering drawings for the Baton Rouge site also deviated from good design practice in definition of the contraction joint[12] depth (see Figure 5). The drawing detail for the contraction joint shows a note stating "Saw-Cut Joint ½" Depth". The minimum depth of a contraction joint

---

[11] URS Drawings C-302 and C-305; the legend states "Proposed 8" Concrete".
[12] The drawing labels this detail as a construction joint.

NON-CERTIFIED COPY

should be one-fourth of the slab thickness, or approximately 1.5 inches for a six-inch thick slab and 2.0 inches for an eight-inch thick slab[13]. However, during my surveys I measured the contraction joints at the Baton Rouge site and they were no more than ½ inch deep.

ACI 330R-01 recommends dowel diameters of 3/4" and 1" for slab thicknesses of 6" and 8", respectively. The Department of Public Works for the City of Baton Rouge and Parish East of Baton Rouge specifies dowel diameters of 1" and 1-1/4" for slab thicknesses of 6" and 8", respectively. The Louisiana Department of Transportation (LDOT) specifies a dowel diameter of 1-1/4" for a slab thickness of 8". All three documents require the spacing to be 12 inches. Figure 7 shows the tables from each of these sources including ACI 330R-08. The URS drawing (see Figure 5) shows a #4 smooth bar, meaning a ½" diameter bar, spaced 18 inches on center. This design is notably less in terms of the amount of steel per unit area than what is recommended by ACI and specified by the Department of Public Works and LDOT.

Diagonal cracking was observed at the intersection of some expansion joints at the Baton Rouge site (see Figure 3). High stress concentrations form at the corners of square pavement sections due to curling and warping of the pavement section caused by moisture and temperature differentials, and uneven loading across the pavement surface. According to ACI 330R-08,

> "Dowels should not be placed closer than 12 in. (300 mm) to a joint intersection to minimize the potential for corner cracking."

[Page 9; Section 3.8.2]

The presence of corner cracking at some of the expansion joints intersections suggests that improper spacing of dowels near the corners may have occurred. I did not identify a detail or note on the URS drawings indicating a minimum distance from the joint intersection for dowel placement.

### Kenner Site

A review of engineering drawings for the Kenner site indicate that heavy equipment, including tracked equipment, was to travel and park virtually anywhere on the site, including along the main entryway and around all sides of the Service Building[14]. These areas were designated as "Heavy Duty Pavement". Only a few select areas in front of the office and toward the back of site were designated as "Light Duty Pavement" for cars and light trucks. Figure 8 shows

---

[13] Specification for Unreinforced Concrete Parking Lots ACI 330.1-04 published by the American Concrete Institute.
[14] URS Drawing C1.0.

NON-CERTIFIED COPY

pavement details from the architectural and engineering drawings created by URS for the Kenner site[15].

Regarding rigid pavement design a geotechnical report produced to URS for the Kenner site[16] states,

> "Anticipated traffic volumes and loading conditions for this facility were not provided, but were assumed based on experience with similar projects. The pavements within the facility may likely be a medium to heavy duty traffic areas. Traffic estimates used in the determination of required pavement thicknesses assume a 20-year design period and are summarized in the following table." [Table omitted for brevity.]

> "The architect or engineer responsible for the final pavement design should review this traffic information for accuracy/applicability. If these traffic assumptions are not correct, please advise this office so that the pavement designs can be re-analyzed and revised thickness designs developed."

> "Based upon the soil conditions at the site, rigid pavements should be designed and constructed using a minimum 7-inch concrete pavement thickness over a minimum 12 inches of compacted river sand."

> "Long term differential settlement is expected to occur across the proposed pavement areas with these soil conditions. It is expected that differential movement will occur over a period of several years between the pavement panels resulting in subsequent loss of aggregate interlock at the joints. For these anticipated conditions, it has been an accepted practice to install a nominal reinforcement in the pavement consisting of minimum #3 rebar at 18-inch on-centers to maintain the joint connection. Alternatively an appropriately sized welded wire fabric can also be used."

> "Other standard design and construction details for rigid pavements as contained in ACI 330R-01 'Guide for Design and Construction of Concrete Parking Lots' should be followed in the pavement design and construction process. *It is recommended that the design engineer refer to this document for more detailed information* [emphasis added]. A critical aspect of concrete pavements for facilities of this nature is joint spacing and related details. ACI 330R-01 addresses these important details."

> [Pages 11-12; Section 4.5]

---

[15] URS Drawing C7.0.
[16] Terracon Consultants, Inc., 316 Highland Park Drive, Baton Rouge, Louisiana, 70810; report dated February 9, 2011.

NON-CERTIFIED COPY

The Modulus of Subgrade Reaction was reported as 75 psi/in[17]. My interpretation of ACI 330R-01 Table 2.4 for this case would result in the selection of a 20-year design thickness of 6.5 inches for Traffic Category C (parking areas and interior lanes) and 9.0 inches for Traffic Category D (entrance and exterior lanes). These section depths are consistent with ACI 330R-08 Table 3.4 with the exception that for Category D when dowels are used in transverse joints the thickness can be reduced one inch to 8.0 inches.

The thickness for heavy duty pavement shown on the URS design drawings (see Figure 8) is 7.0 inches[18]. This thickness is consistent with the recommendation made in the geotechnical report. Surface degradation issues aside, in my opinion a 7.0 inch thickness is the proper value for Traffic Category C where equipment is parked or traveling along the interior of the site. However, for the entrance and exterior lanes along the perimeter of the site, i.e., Traffic Category D, the 7.0 inch thickness is less than what is recommended per ACI 330R-01 for heavy types of equipment, including tracked equipment. As indicated earlier, H+E Equipment reportedly told URS to design the pavement surrounding the Service Building in a manner that allowed the movement and parking of all types of equipment anywhere on the pavement.

A review of engineering drawings for the Kenner site also revealed a discrepancy in the definition of the contraction joint[19] depth (see Figure 8). A drawing detail for the contraction joint shows a note stating "Saw-Cut ¼ Slab Thickness" meaning the joint depth should be one-fourth of the slab thickness. The same detail also shows a dimension labeled "¼" Depth of Concrete" which could be interpreted as a depth of ¼ (0.25) inches. The correct depth of a contraction joint should be one-fourth of the slab thickness, or approximately 1.75 inches for a seven-inch thick slab[20]. During my surveys I also measured contraction joint depths at the Kenner site. They were no more than ½ inch deep.

As shown in Figure 7, ACI 330R-01 recommends a 7/8" dowel diameter for a 7" slab thickness. ACI 330R-08 recommends a 1" dowel diameter for a 7" slab thickness. LDOT specifies a dowel diameter of 1-1/4" for a slab thickness of 8"[21]. All three documents require the spacing to be 12 inches. The URS drawing (see Figure 8) shows a #4 smooth bar, meaning a ½" diameter bar, spaced 18 inches on center. This design is notably less in terms of the amount of steel per unit area than what is recommended by ACI and as specified by LDOT. Severe degradation of an expansion joint at the Kenner site (see Figure 4) resulted in exposure of a dowel bar. The exposed dowel bar diameter is ½ inch.

---

[17] Page 10 Section 4.4; the topic pertains to details concerning floor slabs, but is assumed applicable to pavement design.
[18] Terracon issued a letter dated August 5, 2011, stating that a 6-inch thick concrete pavement thickness would be acceptable for standard duty pavement.
[19] The drawing labels this detail as a control joint.
[20] Specification for Unreinforced Concrete Parking Lots ACI 330.1-04 published by the American Concrete Institute.
[21] 8" is the minimum slab thickness cited on the LDOT drawings.

NON-CERTIFIED COPY

The URS drawings state that in regards to "pavement preparation and construction" the recommended specifications from the geotechnical report shall govern. As indicated earlier, the geotechnical report issued for the Kenner site states that the standard design and construction details for rigid pavements as contained in ACI 330R-01 should be followed by URS in the pavement design and construction process. In my opinion URS did not follow the ACI 330R-01 guidelines regarding slab thicknesses for Traffic Category D conditions and for dowel bar details at the Kenner site.

Diagonal cracking was also observed at the intersection of some expansion joints at the Kenner site (see Figure 4). As indicated earlier regarding the Baton Rouge site, per ACI 330R-08 dowels should not be placed closer than 12 in. (300 mm) to a joint intersection to minimize the potential for corner cracking. The presence of corner cracking at some of the expansion joint intersections suggests that improper spacing of dowels near the corners may have occurred. I did not identify a detail or note on the URS drawings indicating a minimum distance from the joint intersection for dowel placement.

NON-CERTIFIED COPY

# Remedies

## Pavement Surface

Exponent conducted a literature review of specialty construction materials for use in applications where heavy industrial and construction equipment is present. This effort resulted in identification of several products from different manufacturers designed to mitigate the abrasive effects of loads imposed by industrial equipment like heavy tracked vehicles on concrete pavements. These products can be used as part of new construction, or as a modification/retrofit method for an existing pavement. The common aspect of these materials is the use of special aggregates and other additives in the mix to provide a surface that has both high abrasion resistance and high overall strength.

Because impacts are expected on concrete pavements with heavy tracked equipment moving across them, providing a higher strength concrete mix alone would not be sufficient to ensure long term durability. As the strength of concrete goes up, its susceptibility to impact damage also increases as the mix becomes more brittle, making it prone to failures such as the failures observed at the H+E Equipment sites. The long-term approach is to provide a malleable, but strong, surface for these types of vehicles to move over. According to the consulted manufacturers, this approach has already proven effective in applications similar to the concrete pavements at the H+E Equipment sites.

Specialty aggregates are often prescribed and supplied by manufacturers of specialty slab finishes. One example is an iron filled aggregate. Along with properly executed curing and finishing techniques, this special aggregate will provide a more resistant surface for the movement of heavy metal tracked equipment. Several manufacturers offer products for this application. Exponent strongly recommends that the ultimate choice of a product be made in conjunction with a manufacturer's technical representative to ensure the product is used in a proper application and to identify appropriate quality measures during the execution.

The cost of applying specialty aggregate toppings, including preparation and application, varies with the manufacturer and selected installer. The manufacturer's technical representative can verify whether any special considerations will need to be given at existing joint locations where these products are to be applied.

NON-CERTIFIED COPY

## Pavement Design

To correct design deficiencies due to insufficient slab thickness, improper placement of distributed steel reinforcement and dowels, and/or improper sizing of dowels will require removal of the affected pavement areas.  As stated in ACI 330R-01,

> "The most effective repair method for badly cracked and deteriorated pavement panels is full or partial replacement.  It is important to determine and correct the cause of the slab failure before starting repairs.  Localized subgrade problems should be corrected.  If the pavement panels failed because of heavier than anticipated loads, replacement panels should be thickened to provide additional load-carrying capacity."

[Page 16; Section 6.4]

The presence of heavy track equipment poses a unique challenge to the short- and long-term performance of concrete pavements.  In addition to applying a specialty aggregate topping on lanes where tracked equipment is likely to travel, other options for improving the short- and long-term performance of concrete pavements under such conditions include: increasing the design compressive strength; increasing the pavement thickness; and installing metal edge guards along the expansion joints[22].  Dowels should also be designed and installed in accordance with the most recent ACI publications pertaining to concrete pavement design.

---

[22] Examples where edge guards are installed in reinforced concrete include warehouse loading docks, bridge expansion joints, and stairwells.

NON-CERTIFIED COPY

# Findings

My findings presented in this report are made to a reasonable degree of engineering certainty. Based on my on-site surveys, review of architectural and engineering reports, review of photos taken of the subject property, review of emails and other produced documents, and engineering analyses, in my opinion concrete pavements at the Baton Rouge and Kenner sites were not properly designed to account for the degrading effects and high loads imposed by the heavy construction equipment, particularly tracked equipment, operating across the pavements.

My current understanding is that H+E Equipment clearly communicated to the designer the type of equipment that would travel across the pavements. Moreover, representatives of URS reportedly visited the two sites and according to H+E Equipment viewed the equipment, including the heavy metal tracked equipment. Given these understandings, it is my opinion that URS did not exhibit the appropriate standard of care when designing the concrete pavements constructed at the two H+E Equipment sites.

Sufficient information was available to determine loads acting on the concrete pavements, and to design the pavements in a way to withstand these loads and high levels of stress and abrasion acting at or near the concrete surface. In my opinion damage observed on the concrete surfaces could have been controlled and minimized by the use of proper materials selection and implementation during the design phase. Given the pavement design as presented to the owner prior to construction, at a minimum URS should have informed H+E Equipment of the likelihood of near-term progressive damage to the concrete pavement resulting from the movement of tracked vehicles, and that such damage may necessitate periodic replacement of affected pavement sections. To my knowledge URS did not inform H+E Equipment of the likelihood of near-term progressive damage.

In my opinion the concrete pavements at both sites as currently designed are not adequate to perform for their intended use as required by H+E Equipment. Surface degradation is widespread and increasing at both sites. Large cracks have formed beyond the joints, an indication of an insufficient amount of or an improper placement of steel reinforcement. Repairs to the existing pavements will be necessary to allow for extensive use of heavy equipment over these paved areas during the 20-year design life without inducing the same level and extent of damage.

Steps can be taken to extend the life of concrete pavements including the application of specialty aggregate toppings; increasing the design compressive strength; increasing the pavement thickness; increasing the dowel bar sizes; and installing metal edge guards along the expansion joints.

NON-CERTIFIED COPY



Figure 1.  Various Perspectives of Baton Rouge Site.

NON-CERTIFIED COPY



Figure 2.  Various Perspectives of Kenner Site.

NON-CERTIFIED COPY



Figure 3.  Concrete Pavement at Baton Rouge Site (source: Exponent).

NON-CERTIFIED COPY



Figure 3.  (Continued)

NON-CERTIFIED COPY



07 July 2016

07 July 2016

07 July 2016

07 July 2016

07 July 2016

07 July 2016

Figure 3.  (Continued)

NON-CERTIFIED COPY



Figure 4. Concrete Pavement at Kenner Site (source: Exponent).

NON-CERTIFIED COPY



13 August 2014

13 August 2014

13 August 2014

13 August 2014

13 August 2014

13 August 2014

Figure 4.  (Continued)

NON-CERTIFIED COPY



07 July 2016

07 July 2016

07 July 2016

07 July 2016

07 July 2016

07 July 2016

Figure 4.  (Continued)

NON-CERTIFIED COPY



Figure 5.  Pavement Details and Note for Baton Rouge Site
(Source: URS Drawings C-501 and C-509).

NON-CERTIFIED COPY



Figure 6.  Designated Area for Heavy Duty Pavement at Baton Rouge Site
(Source: URS Drawings C-302 and C-305).

NON-CERTIFIED COPY

**Table 2.6—Dowel size***

| Slab depth, in. (mm) | Dowel diameter, in. (mm) | Dowel embedment, in. (mm)[†] | Total dowel length, in. (mm)[§] |
|---|---|---|---|
| 5 (125) | 5/8 (16) | 5 (125) | 12 (300) |
| 6 (150) | 3/4 (19) | 6 (150) | 14 (360) |
| 7 (180) | 7/8 (22) | 6 (150) | 14 (360) |
| 8 (200) | 1 (25) | 6 (150) | 14 (360) |
| 9 (230) | 1-1/8 (29) | 7 (180) | 16 (400) |

*All dowels spaced at 12 in. (300 mm) centers.
[†]On each side of joint.
[§]Allowance made for joint openings and for minor errors in positioning dowels.

ACI 330R-01

**Table 3.6—Sizes of smooth, round dowels***

| Slab thickness, in. (mm) | Dowel diameter, in. (mm) |
|---|---|
| 7 (180) | 1 (25) |
| 8 (200) | 1-1/4 (32) |
| 9 (230) | 1-1/4 (32) |

*All dowels spaced at 12 in. (300 mm) centers, with minimum total length of 14 in. (360 mm) and minimum embedment length of 6 in. (150 mm) on each side of joint, with allowance made for joint openings and for minor errors in positioning dowels.

ACI 330R-08

**TABLE 1**
(ALL DIMENSIONS ARE IN INCHES)

| PAVEMENT THICKNESS "T" | DOWEL BARS | | | MINIMUM DEPTH OF JOINT | |
|---|---|---|---|---|---|
| | SIZE | LENGTH | SPACING | C.J. & D.J. | L.J. |
| 8 | 1 | 18 | 12 | 2 | 2 |
| 8 | 1 1/4 | 18 | 12 | 3 | 3 |
| 9 | 1 1/4 | 18 | 12 | 3 | 3 1/2 |
| 10 | 1 1/4 | 18 | 12 | 3 1/2 | 4 |

Parish of East Baton Rouge

**TABLE I**
(ALL DIMENSIONS ARE IN INCHES)

| PAVEMENT THICKNESS "T" | SMOOTH DOWEL BARS | | | DEF. TIE BARS | | | KEYWAY | |
|---|---|---|---|---|---|---|---|---|
| | SIZE | LENGTH | SPACING | SIZE | LENGTH | SPACING | a/4 | a/2 |
| 8 | 1 1/4 | 18 | 12 | 1/2 | 24 | 24 | 2 1/2 | 1 1/4 |
| 9 | 1 1/4 | 18 | 12 | 1/2 | 24 | 24 | 2 1/2 | 1 1/4 |
| 10 | 1 1/4 | 18 | 12 | 1/2 | 24 | 24 | 2 1/2 | 1 1/4 |
| 11 | 1 1/4 | 18 | 12 | 5/8 | 30 | 24 | 2 1/2 | 1 1/4 |
| 12 | 1 1/4 | 18 | 12 | 5/8 | 30 | 24 | 3 | 1 1/2 |
| 13 | 1 1/4 | 18 | 12 | 5/8 | 30 | 24 | 3 | 1 1/2 |
| 14 | 1 1/4 | 18 | 12 | 5/8 | 30 | 24 | 3 | 1 1/2 |

LDOT

Figure 7.  Dowel Sizing and Spacing Requirements.

NON-CERTIFIED COPY

1306663.001 7845



Figure 8.  Pavement Details and Note for Kenner Site
(Source: URS Drawing C7.0).

NON-CERTIFIED COPY

Appendix A

**Curriculum Vita of Dr. James R. Bailey, Ph.D., P.E.**

NON-CERTIFIED COPY

E$^{x}$ponent®

*Failure Analysis Associates®*

Exponent
10850 Richmond Avenue
Suite 175
Houston, TX 77042

telephone 832-325-5700
facsimile 832-325-5799
www.exponent.com

## James R. (Bob) Bailey, Ph.D., P.E., F. ASCE
**Senior Managing Engineer**
**Houston Office Director**

### Professional Profile

Dr. James R. (Bob) Bailey is a licensed Professional Engineer in nine states and a Fellow of the American Society of Civil Engineers. For over 30 years, Dr. Bailey has served as a technical consultant, project manager, and researcher for private industry, universities, and government. As a Senior Managing Engineer in Exponent's Building & Structures practice, he brings specialized expertise to areas related to civil engineering; including wind engineering, construction materials, solid mechanics, dynamics, numerical analysis, structural analysis and design, and materials testing.

Dr. Bailey's primary area of expertise is determining the risk exposure of residential, commercial, and industrial properties to hazards associated with hurricanes, tornadoes, and flooding. He has conducted hurricane risk assessments and developed mitigation programs for various types of health, industrial, educational, and offshore energy facilities. Over the years he has surveyed and documented storm damage in the aftermath of numerous storm event, including hurricanes Irene (1999), Charley (2004), Francis (2004), Katrina (2005), Rita (2005), Wilma (2005), Ike (2008), and Sandy (2012), Tropical Storm Allison (2001), the Oklahoma City Tornado (1999), and the April-May 2011 Tornado Outbreak. He has investigated numerous building envelope systems, and has conducted investigations of both steep and low-slope roofing systems for damage caused by hail, wind, and construction errors. In 2011 he directed analysis of the storm surge risk posed to the South Texas Project Electric Generating Station using advanced hydrodynamic modeling techniques.

Dr. Bailey's past work at ExxonMobil included wind load analyses on drilling, semi-submersible, and floating, production, storage, and offloading (FPSO) structures; developing conceptual designs of gravity-based structures for arctic offshore environments; and conducting research and teaching classes on well cementing. He also has expertise in the area of well completions and workovers. Dr. Bailey has served as a lecturer in the private sector and at the university level on subjects related to civil and petroleum engineering. He also has been responsible for the design of test facilities and the development of test programs related to construction and energy. Dr. Bailey is currently the Presiding Officer of a five member expert panel, appointed by the Texas Department of Insurance in 2013, whose purpose is to develop ways of determining whether a loss to TWIA-insured property was caused by wind, waves, or tidal surges. He is also a member of the ASCE 7-16 Wind Load Subcommittee. He is past Chair of the ASCE Petrochemical Wind Load Task Committee, and served on an API 4F sub-committee assigned to revise specifications and guidelines for determining wind loads on onshore and offshore drilling structures.

NON-CERTIFIED COPY

**Academic Credentials and Professional Honors**

Ph.D., Civil Engineering, Texas Tech University, 1989
M.S., Civil Engineering, Texas Tech University, 1984
B.S., Civil Engineering, Texas Tech University, 1982

American Society of Civil Engineers (ASCE)
American Petroleum Institute (API) Spec 4F Wind Engineering Subcommittee
ASCE Wind Loads on Petrochemical Structures Task Committee
ASCE 7-16 Wind Load Subcommittee
Texas Tech University Civil Engineering Advisory Council (2007–2012)

Recipient of the Stephen D. Bechtel, Jr. Energy Award from ASCE (2016)

**Licenses and Certificates**

Professional Engineer, State of Florida, #67773
Professional Engineer, State of Georgia, #PE033027
Professional Engineer, State of Hawaii, #12820
Professional Engineer, State of Louisiana, #33830
Professional Engineer, State of Mississippi, #26488
Professional Engineer, State of South Carolina, #26408
Professional Engineer, State of Tennessee, #114185
Professional Engineer, State of Texas, #74911
Professional Engineer, State of Wisconsin, #42337-6

**Publications and Reports**

Bailey JR, Shrestha PL, et al. Analysis of maximum probable storm surge at the South Texas Project site. Proceedings, ASCE EWRI Conference, Seattle, WA, June 2014.

Bailey, JR. Hurricane risk assessment of a planned carbon capture facility located in Southeast Texas operated by NRG Energy, Inc., Report prepared for a California-based risk management company, February 2014.

Bailey, JR. Hurricane risk assessments of five electrical power plants located in the Caribbean and Hawaii operated by the AES Corporation, Report prepared for a California-based risk management company, November 2012.

Bailey JR. Feasibility study of an Alaskan LNG plant. Report prepared for an Asian-based consortium of companies, March 2012.

Bailey JR, et al. Wind loads for petrochemical and other industrial facilities. American Society of Civil Engineers, September 2011.

NON-CERTIFIED COPY

Bailey, JR. Hurricane risk assessment of two wind farms located in South Texas operated by EoN Climate and Renewable. Report prepared for a California-based risk management company, June 2011.

Bailey JR. Wind risk assessment of the ThyssenKrupp steel plant located in Mississippi. Report prepared for a California-based risk management company, November 2010.

Bailey JR, Cantor R, et al. An approach to business vulnerability and risk assessments related to climate change. SPE International Conference on Health, Safety & Environment, Rio de Janeiro, Brazil, April 2010.

Bailey JR. A hurricane risk assessment and mitigation plan for CHRISTUS hospitals located in Texas and Louisiana. Report prepared for CHRISTUS Health, July 2009.

Bailey JR. Study of Major Revenue Interruption Risks in the Gulf of Mexico. Report prepared for a major oil and gas operator headquartered in the United States, July 2009.

Bailey JR, Gilbert RT, et al. Wind load considerations for existing petrochemical structures. Structures Congress, American Society of Civil Engineers (ASCE), Austin, TX, May 2009.

Bailey JR, Levitan ML. Lessons learned and mitigation options for hurricanes. Process Safety Progress, American Institute of Chemical Engineers (AIChE), 2008.

Bailey JR. Finding the breaking point. Report documenting window performance following the 2004 Florida hurricanes. Prepared in conjunction with the Protecting People First Foundation, Wickford, RI, April 2005.

Bailey JR. Flood hazard assessment of critical NASA assets at the Johnson Space Center. Report prepared for NASA management by ABS Consulting, July 2004.

Bailey JR. Wind hazard assessment of critical NASA assets at the Johnson Space Center. Report prepared for NASA management by ABS Consulting, February 2001.

Bailey JR. Vulnerability assessment of Harris County to hurricane winds. Report prepared for the Harris County Commissioners Court by EQE International, June 2000.

Bailey JR. Wind and flood hazard assessment of Critical NASA assets at the Kennedy Space Center. Report prepared for NASA management by EQE International, June 2000.

Bailey JR, Vallabahn CVG, et al. Experimental verification of the theoretical solution of laminated glass units. Proceedings, Advanced Composites Materials in Civil Engineering Structures Materials Division, American Society of Civil Engineers, Las Vegas, NV, 1991 (paper awarded Best of Session, Spring 1991, by the Texas Section of the American Society of Civil Engineers).

NON-CERTIFIED COPY

Bailey JR, Minor JE.  Structural glazing tests show wind pressure effects.  Glass Digest 1989 Oct; 68–76.

Bailey JR, Minor JE, Tock RW.  Response of structurally glazed insulating glass units to wind pressures," Proceedings, 6[th] U.S. Conference on Wind Engineering, Houston, TX, March 8–10, 1989.

Bailey JR, McDonald JR.  Impact Resistance of masonry walls to tornado-generated missiles.  Proceedings, 3rd North American Masonry Conference, Arlington, TX, June 3–5.

**Presentations**

Bailey JR, Shrestha PL, et al.  Analysis of maximum probable storm surge at the South Texas Project site.  ASCE EWRI Conference, Seattle, WA, June 2014.

Bailey JR.  Presentation of evidence—How to keep the jury interested.  Cooper & Scully 8th Annual Construction Symposium, Dallas, TX, February 1, 2013.

Bailey JR.  Winds and rain a-comin—Hurricanes, structures and potential risks.  Texas Association of Defense Council, Spring Meeting, Santa Fe, NM, April 27, 2012.

Bailey JR.  Preparing for the worst—Is the nation prepared for natural disasters?  American Bar Association Tort Trial & Insurance Practice Section Spring Leadership Meeting, Charleston, SC, May 17, 2012.

Bailey JR.  Probable maximum surge and seiche flooding at a coastal nuclear power plant located in the United States, Advisory Committee on Reactor Safeguards (ACRS), Nuclear Regulatory Commission, Rockville, MD, November 30, 2010.

Bailey JR, Griffith M.  Natural hazard risk assessment and mitigation for nuclear facilities.  WebEx presentation, March 2, 2010.

Bailey JR.  Lessons learned and mitigation options for hurricanes.  Spring National Meeting, American Institute of Chemical Engineers (AIChE), April 2008.

Bailey JR.  Vulnerability of industrial facilities.  Reinsurance Association of America Cat Modeling 2006 Conference, Tampa, FL, February 23, 2006.

Bailey JR.  Safe haven considerations at industrial sites.  The Private Industry Workshop, National Hurricane Conference, New Orleans, LA, March 22, 2005.

Bailey JR.  Finding the breaking point.  International Code Council, Tampa, FL, February 12, 2005.

Bailey JR.  Identifying protective areas for people in buildings.  International Conference on Wind Engineering, Texas Tech University, June 2, 2003.

Bailey JR.  Assessment of extreme wind effects on industrial facilities.  The Private Industry Workshop, National Hurricane Conference, New Orleans, LA, April 17, 2003.

Bailey JR.  Assessing the impacts of hurricanes and earthquakes.  Association for Facilities Engineering Conference, Las Vegas, NV, September 25, 2001.

Bailey JR.  Using Digital Physics$^{TM}$ to calculate wind loads on structures.  ASCE Structures Conference, Washington, DC, May 2001.

Bailey JR.  Don't let your critical assets blow away.  Houston Chapter of the Risk and Insurance Management Society (RIMS), October 18, 2000.

Bailey JR.  Impact resistance of wood products subjected to simulated tornado missiles. International Timber Engineering Conference, Seattle, WA, 1988.

**Patents**

Patent No. 5,309,995:  Well Treatment Using Ball Sealers, issued May 10, 1994.

Patent No. 5,485,882: Low-density Ball Sealer for Use as a Diverting Agent in Hostile Environment Wells, issued January 23, 1996.

Patent No. 5,582,251:  Downhole Mixer, issued December 19, 1996.

**Prior Professional Experience**

- Manager, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 2004–2006
- Senior Project Engineer, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 2001–2004
- Project Engineer, Extreme Loads and Structural Risk Division, ABS Consulting (formerly EQE International), 1998–2001
- Engineering Specialist, Offshore Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1994–1998
- Senior Project Engineer, Drilling and Completions Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1992–1994
- Project Engineer, Drilling and Completions Division, ExxonMobil Upstream Research Center (formerly Exxon Production Research Company), 1990–1992
- Lecturer and Research Associate, Civil Engineering Department, Texas Tech University, 1989–1990

NON-CERTIFIED COPY

**Civil Case Experience**

Deposition – INEOS USA L.L.C., v. BP Products North America, Inc., American Arbitration Association, No. 13 158 Y 01929 06, Houston, TX, November 2008.

Deposition – GG&A Central Mall Partners, L.P., Dillard's, Inc., Dillard Texas, LLC, and Dillard Texas Operating Limited Partnership, v. Duro-Last, Inc., Jaco Construction, Inc., and Schrader Roofing, Inc, District Court of Jefferson County, Texas, 58th Judicial District, January 2010.

Testimony – Appraisal Hearing, Beechnut Village Shopping Center v. Nationwide Insurance Co., Judge John Coselli – Umpire, appointed by Judge Gray Miller, United States District Judge, Southern District of Texas, University of Houston Law School, Houston, Texas, December 2010.

Expert Witness Statement – Canadian Natural Resources Limited and Highwood Limited v. Oil Insurance Limited, submitted to the Board of Arbitration under the provisions of the Arbitration Act of 1996, London, England, March 2011.

Testimony – Appraisal Hearing, Cause No; 1:11-cv-00207; Timothy Nolan and Ermelinda Nolan v. GeoVera Specialty Insurance Company, Donald Summey and James Perfetti; Judge James W. Mehaffy – Umpire, appointed by Magistrate Judge Keith F. Giblin, United States District Court for the Eastern District of Texas, Beaumont Division, Houston, Texas, September 2012.

Deposition – David S. Gronik, Jr. and Mary K. Gronik, S.C.G., M.A.G., David S. Gronik, Jr. Living Trust, Opio Boat Moon, LLC, Plaintiffs, v. Susan Balthasar and Susan M. Balthasar, as Personal Representative of The Estate of Norman J. Balthasar, Defendants; and Shorewest Realtors, Inc., Continental Casualty Company, and Anne Schwartz, Third-Party Defendants, and Opio Boat Moon, LLC, and David S. Gronik, Jr., Plaintiffs, Chubb Indemnity Insurance Company, Defendant, United States District Court for The Eastern District Of Wisconsin, November 2012.

Deposition – Jerome S. Tannenbaum and Deborah M. Tannenbaum, v. Federal Insurance Company, United States District Court for the Middle District of Tennessee, Nashville Division, February 2013.

Testimony – Jerome S. Tannenbaum and Deborah M. Tannenbaum, v. Federal Insurance Company, United States District Court for the Middle District of Tennessee, Nashville Division, November 2013.

Deposition – Intrepid Ship Management, Inc., Vessel Management Services, Inc., and Crowley Maritime Corp., v. Ocean Prospector and Plant Recovery Company, United States District Court, Southern District of Texas, Galveston Division, September 2014.

$Ex^{™}$

NON-CERTIFIED COPY

Deposition – Northrop Grumman Corporation, vs. AON Risk Insurance Services West, Inc., Superior Court of the State of California, County of Los Angeles, May 2015.

Deposition – Edie Housel, et al, v. The Home Depot U.S.A., Inc., et al, United States District Court for the Western District of Missouri, Southwestern Division, February 2016.

Deposition – Metro Hospitality Partners, LTD., d/b/a Crowne Plaza Hotel, v. Lexington Insurance Company,   United States District Court, Southern District of Texas, Houston Division, June 2016.

**Consulting and Testimony Billing Rate**

Two hundred ninety dollars per hour (calendar year 2016).

NON-CERTIFIED COPY

**Appendix B**

**Documents Reviewed**

NON-CERTIFIED COPY

| Name | Date modified | Type | Size |
|------|---------------|------|------|
| C-302.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 880 KB |
| C-304.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 548 KB |
| C-305.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 716 KB |
| C-306.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 2,784 KB |
| C-307.pdf | 7/7/2011 10:37 AM | Adobe Acrobat D... | 864 KB |
| H+E Belle Chasse Bid Set 5-22-12.pdf | 5/31/2012 12:42 PM | Adobe Acrobat D... | 32,917 KB |
| Concrete Specs for Baton Rouge Site.pdf | 9/12/2014 4:53 PM | Adobe Acrobat D... | 122 KB |
| Pavement Spec for Baton Rouge Site.pdf | 9/12/2014 4:50 PM | Adobe Acrobat D... | 72 KB |
| 2013-11-20 H&E Petition and First Set of Discovery to Defendants.PDF | 4/3/2014 5:24 PM | Adobe Acrobat D... | 2,322 KB |
| 2014-2-59 H&E Answer and Affirmative Defenses to URS Reconventional Demand.pdf | 4/3/2014 5:27 PM | Adobe Acrobat D... | 157 KB |
| 2015-03-27 H&E's Motion to Compel.pdf | 3/27/2015 3:24 PM | Adobe Acrobat D... | 1,951 KB |
| 2015-06-24 H&E's Opposition to Defendants Motion for Partial Summary Judgment.pdf | 2/1/2016 12:49 PM | Adobe Acrobat D... | 1,736 KB |
| Baton Rouge Project Change Orders.xls | 7/16/2014 6:47 PM | Microsoft Excel 97... | 60 KB |
| H&E Belle Chasse COP Log.xls | 7/16/2014 6:47 PM | Microsoft Excel 97... | 138 KB |
| Kenner Project Change Orders 08-2013.xlsx | 7/16/2014 6:47 PM | Microsoft Excel W... | 13 KB |
| URS 31020-931391.pdf | 6/27/2016 10:35 AM | Adobe Acrobat D... | 328,781 KB |
| 902-01_Concrete_Pavement_Details.pdf | 6/24/2016 2:54 PM | Adobe Acrobat D... | 348 KB |
| 52079 - PM RFI Log - MAPP.pdf | 7/12/2016 10:09 AM | Adobe Acrobat D... | 165 KB |
| CP-01 (1 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 454 KB |
| CP-01 (2 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 487 KB |
| CP-01 (3 of 3).pdf | 6/24/2016 2:24 PM | Adobe Acrobat D... | 575 KB |
| H & E 0000211-0000250.pdf | 6/24/2016 2:55 PM | Adobe Acrobat D... | 8,076 KB |
| Ardaman report re Baton Rouge Detention Pond.msg | 7/5/2016 11:41 AM | Outlook Item | 3,653 KB |
| Ardaman proposal Baton Rouge.msg | 7/5/2016 11:41 AM | Outlook Item | 1,287 KB |
| Baton Rouge GeoTech Report.pdf | 7/27/2016 6:31 PM | Adobe Acrobat D... | 7,849 KB |
| Email re Density testing Baton Rouge.msg | 7/5/2016 11:41 AM | Outlook Item | 376 KB |
| Request for additional geotech work in BR.msg | 7/5/2016 11:41 AM | Outlook Item | 202 KB |
| Email re post pour testing Kenner.msg | 7/5/2016 11:40 AM | Outlook Item | 461 KB |
| Kenner GeoTech Report.pdf | 7/5/2016 11:46 AM | Adobe Acrobat D... | 2,772 KB |
| Kenner Geotech Scope letter.msg | 7/5/2016 11:49 AM | Outlook Item | 2,059 KB |
| Revision to Kenner Geotech Report.msg | 7/5/2016 11:49 AM | Outlook Item | 513 KB |
| H & E 0000211-0000259.pdf | 7/26/2016 10:27 AM | Adobe Acrobat D... | 8,076 KB |
| H & E 0022314.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 4,151 KB |
| H&E 0005226_.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 617 KB |
| HE0005154.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 124 KB |
| HE0005155.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 433 KB |
| HE0005163_VOL001.pdf | 7/26/2016 10:28 AM | Adobe Acrobat D... | 102 KB |
| HE0006815_VOL001.pdf | 7/26/2016 10:19 AM | Adobe Acrobat D... | 553 KB |
| URS 033308.pdf | 7/26/2016 10:20 AM | Adobe Acrobat D... | 9,562 KB |
| URS 038807.pdf | 7/26/2016 10:22 AM | Adobe Acrobat D... | 874 KB |
| URS 039466.pdf | 7/26/2016 10:24 AM | Adobe Acrobat D... | 16,555 KB |
| URS 067952.pdf | 7/26/2016 10:25 AM | Adobe Acrobat D... | 743 KB |
| URS040311_image.pdf | 7/26/2016 10:25 AM | Adobe Acrobat D... | 180 KB |
| URS040655_image_.pdf | 7/26/2016 10:26 AM | Adobe Acrobat D... | 637 KB |
| URS049986_image.pdf | 7/26/2016 10:27 AM | Adobe Acrobat D... | 765 KB |

NON-CERTIFIED COPY

| | | | |
|---|---|---|---|
| H&E 0003840.pdf | 7/26/2016 10:44 AM | Adobe Acrobat D... | 2,572 KB |
| H&E 0004244.pdf | 7/26/2016 10:47 AM | Adobe Acrobat D... | 1,996 KB |
| H&E 0013874.pdf | 7/27/2016 2:06 PM | Adobe Acrobat D... | 318 KB |
| H&E 0013938.pdf | 7/26/2016 10:49 AM | Adobe Acrobat D... | 849 KB |
| H&E 0063316.pdf | 7/26/2016 10:51 AM | Adobe Acrobat D... | 268 KB |
| H&E 0063319.pdf | 7/26/2016 10:52 AM | Adobe Acrobat D... | 350 KB |
| H&E 0064597.pdf | 7/26/2016 10:53 AM | Adobe Acrobat D... | 2,929 KB |
| H&E 0065372.pdf | 7/26/2016 10:55 AM | Adobe Acrobat D... | 8,306 KB |
| URS 031731.pdf | 7/26/2016 10:57 AM | Adobe Acrobat D... | 2,400 KB |
| URS 033145.pdf | 7/26/2016 10:58 AM | Adobe Acrobat D... | 21,048 KB |
| URS 030163.pdf | 7/26/2016 11:00 AM | Adobe Acrobat D... | 271 KB |
| URS 055534.pdf | 7/26/2016 11:00 AM | Adobe Acrobat D... | 2,391 KB |
| URS 059506.pdf | 7/26/2016 11:01 AM | Adobe Acrobat D... | 150 KB |
| URS 066293.pdf | 7/26/2016 11:01 AM | Adobe Acrobat D... | 10,649 KB |
| URS 066657.pdf | 7/26/2016 10:33 AM | Adobe Acrobat D... | 2,228 KB |
| URS 066704.pdf | 7/26/2016 10:36 AM | Adobe Acrobat D... | 2,363 KB |
| URS 066880.pdf | 7/26/2016 10:39 AM | Adobe Acrobat D... | 5,059 KB |
| URS 066906.pdf | 7/26/2016 10:41 AM | Adobe Acrobat D... | 229 KB |
| URS 0030067.pdf | 7/26/2016 10:42 AM | Adobe Acrobat D... | 2,765 KB |
| 20130081315568.pdf | 8/11/2014 2:11 PM | Adobe Acrobat D... | 388 KB |
| 20130081315568a.pdf | 8/11/2014 2:11 PM | Adobe Acrobat D... | 34 KB |
| 20130081315568c.pdf | 8/11/2014 2:11 PM | Adobe Acrobat D... | 167 KB |
| 20130093041548.pdf | 9/24/2013 3:54 PM | Adobe Acrobat D... | 2,680 KB |
| Baton Rouge Project Change Orders.xls | 8/11/2014 2:11 PM | Microsoft Excel 97... | 60 KB |
| C 5.0 REVISED per RFI 428_.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 745 KB |
| C1.0 site plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 293 KB |
| C2.0 Demolition plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 367 KB |
| C3.0 Geometric plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 363 KB |
| C3.1 Joint layout plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 236 KB |
| C4.0 drainage plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 937 KB |
| C5.0 grading plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 317 KB |
| C6.0 Utility plan.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 340 KB |
| C7.0 details.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 936 KB |
| C8.0 FENCE details.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 56 KB |
| C9.0 FENCE details 2.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 770 KB |
| C-101.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 390 KB |
| C-102.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 818 KB |
| C-201.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 523 KB |
| C-202.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 666 KB |
| C-203.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 601 KB |
| C-204.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 371 KB |
| C-205.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 354 KB |
| C-206.pdf | 10/1/2013 12:59 PM | Adobe Acrobat D... | 308 KB |
| C-405.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 449 KB |
| C-406.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 2,577 KB |
| C-407.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 709 KB |
| C-501.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 670 KB |
| C-502.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 651 KB |
| C-503.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 806 KB |
| C-504.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 692 KB |
| C-505.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 558 KB |
| C-506.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 591 KB |
| C-507.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 497 KB |
| C-508.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 923 KB |
| C-509.pdf | 7/7/2011 10:40 AM | Adobe Acrobat D... | 779 KB |

NON-CERTIFIED COPY

| Name | Date | Type | Size |
|---|---|---|---|
| Cement Concrete Pavement - Kenner, LA.PDF | 9/17/2013 4:36 PM | Adobe Acrobat D... | 1,690 KB |
| Concrete Work - Headquarters and Branch Buildings.pdf | 9/17/2013 4:36 PM | Adobe Acrobat D... | 1,305 KB |
| Crane Remanufacturing Center Relocation - Belle Chasse, LA.PDF | 9/17/2013 4:35 PM | Adobe Acrobat D... | 1,305 KB |
| G-001.pdf | 7/5/2011 10:39 AM | Adobe Acrobat D... | 1,988 KB |
| G-002.pdf | 7/5/2011 10:33 AM | Adobe Acrobat D... | 1,536 KB |
| H&E Belle Chasse COP Log.xls | 8/11/2014 2:31 PM | Microsoft Excel 97... | 138 KB |
| H+E Kenner G-001.pdf | 9/25/2013 10:00 AM | Adobe Acrobat D... | 7,512 KB |
| Kenner Project Change Orders 08-2013.xlsx | 8/11/2014 2:31 PM | Microsoft Excel W... | 13 KB |
| Missing Page Request_02751.pdf | 9/25/2013 5:45 PM | Adobe Acrobat D... | 1,104 KB |
| Missing Page Request_03300.pdf | 9/25/2013 5:46 PM | Adobe Acrobat D... | 190 KB |
| S100.pdf | 3/27/2013 11:49 AM | Adobe Acrobat D... | 920 KB |
| S110.pdf | 3/27/2013 11:58 AM | Adobe Acrobat D... | 853 KB |
| S200.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 1,315 KB |
| S210.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 704 KB |
| S220.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 843 KB |
| S300.pdf | 3/27/2013 12:00 PM | Adobe Acrobat D... | 1,890 KB |
| S310.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 744 KB |
| S320.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 672 KB |
| S400.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 760 KB |
| S410.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 588 KB |
| S420.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 573 KB |
| S430.pdf | 11/15/2011 10:41 ... | Adobe Acrobat D... | 714 KB |
| alum_nosing_a_b-1.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-1sp.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-5.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-16a.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| alum_nosing_a_b-31a.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| anchoring.gif | 10/2/2014 2:32 PM | GIF image | 29 KB |
| b-3.jpg | 10/2/2014 2:32 PM | JPEG image | 3 KB |
| back_to_top.jpg | 10/2/2014 2:32 PM | JPEG image | 2 KB |
| backs.gif | 10/2/2014 2:32 PM | GIF image | 15 KB |
| berry.css | 10/2/2014 2:32 PM | Cascading Style S... | 7 KB |
| button_cad.gif | 10/2/2014 2:32 PM | GIF image | 1 KB |
| button_dwg.gif | 10/2/2014 2:32 PM | GIF image | 1 KB |
| cast_iron_b-16.jpg | 10/2/2014 2:32 PM | JPEG image | 16 KB |
| cast_iron_cast_aluminum.jpg | 10/2/2014 2:32 PM | JPEG image | 21 KB |
| curb_bar_cb-15a.gif | 10/2/2014 2:32 PM | GIF image | 5 KB |
| curb_bar_cb-25a.gif | 10/2/2014 2:32 PM | GIF image | 5 KB |
| noses.gif | 10/2/2014 2:32 PM | GIF image | 15 KB |
| nosings_b-1.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| nosings_b-1sp.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-2.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-16.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-16a.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-100.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| nosings_b-110.gif | 10/2/2014 2:32 PM | GIF image | 2 KB |
| nosings_b-120.gif | 10/2/2014 2:32 PM | GIF image | 3 KB |
| pic_products.jpg | 10/2/2014 2:32 PM | JPEG image | 37 KB |
| CAT - Success Story.pdf | 10/21/2013 1:53 PM | Adobe Acrobat D... | 223 KB |
| CAT Aurora, IL Projects II.ppt | 10/24/2013 7:51 PM | Microsoft Power... | 9,556 KB |
| CAT Project References.pdf | 10/21/2013 1:58 PM | Adobe Acrobat D... | 89 KB |
| IMG_0894.MOV | 10/25/2013 6:36 AM | QuickTime Movie | 724 KB |
| Kobelco - Success Story.pdf | 10/21/2013 1:56 PM | Adobe Acrobat D... | 131 KB |
| 123header.jpg | 10/2/2014 3:04 PM | JPEG image | 5 KB |
| Grey-Diamond-Plate.jpg | 10/2/2014 3:04 PM | JPEG image | 18 KB |
| Grey-Diamond-Plate_LIGHT.jpg | 10/2/2014 3:04 PM | JPEG image | 4 KB |
| LINE_2.gif | 10/2/2014 3:04 PM | GIF image | 1 KB |
| logo_non_ani.jpg | 10/2/2014 3:04 PM | JPEG image | 6 KB |
| redbut.jpg | 10/2/2014 3:04 PM | JPEG image | 1 KB |

NON-CERTIFIED COPY

| | | | |
|---|---|---|---|
| 330R_08.pdf | 6/30/2016 6:11 PM | Adobe Acrobat D... | 819 KB |
| ACI 224.1r_95 Expansion joint.pdf | 11/11/2013 10:54 ... | Adobe Acrobat D... | 887 KB |
| ACI 302.1R_04.pdf | 11/11/2013 10:56 ... | Adobe Acrobat D... | 971 KB |
| ACI-330_Design_Guide_for_Concrete_Parking_Lots.pdf | 6/30/2016 5:53 PM | Adobe Acrobat D... | 652 KB |
| Barry Pattern & Foundry - BarryCraft - Cast Abrasive Nosings & Treads.htm | 10/2/2014 2:32 PM | HTML Document | 29 KB |
| Baton Rouge.png | 7/29/2016 1:22 PM | PNG image | 1,998 KB |
| CAT Aurora, IL Projects II.ppt | 10/24/2013 7:51 PM | Microsoft PowerP... | 9,556 KB |
| Concrete Slab Surface Defect Repairs.pdf | 9/23/2014 2:49 PM | Adobe Acrobat D... | 4,381 KB |
| IMG_0094.MOV | 10/25/2013 6:36 AM | QuickTime Movie | 724 KB |
| Kenner.png | 7/29/2016 1:23 PM | PNG image | 1,740 KB |
| Multi-Fab - Curb Angles.htm | 10/2/2014 3:04 PM | HTML Document | 41 KB |
| nzs-3101.1.2006.pdf | 10/17/2013 10:23 ... | Adobe Acrobat D... | 5,905 KB |
| nzs-3101.2.2006.pdf | 10/17/2013 10:22 ... | Adobe Acrobat D... | 8,202 KB |
| Page 9_330R-08.pdf | 7/27/2016 11:36 AM | Adobe Acrobat D... | 97 KB |
| URS 31020-93139.pdf | 6/27/2016 10:35 AM | Adobe Acrobat D... | 328,781 KB |

1306663.001 7845

NON-CERTIFIED COPY

# E<sup>x</sup>ponent

NON-CERTIFIED COPY



NON-CERTIFIED COPY

EXHIBIT
C

*BAILEY*
EXHIBIT NO. 28
K. DONNELLY



BAILEY
EXHIBIT NO. 29
K. DONNELLY

NON-CERTIFIED COPY



BAILEY
EXHIBIT NO. 34

K. DONNELLY

NON-CERTIFIED COPY



NON-CERTIFIED COPY

BAILEY
EXHIBIT NO. 76

K. DONNELLY



NON-CERTIFIED COPY



NON-CERTIFIED COPY

EXHIBIT

*E*

*BAILEY*
EXHIBIT NO. *24*

K. DONNELLY



NON-CERTIFIED COPY

**Exponent**
*Failure Analysis Associates*

Exponent
475 14th Street, Suite 400
Oakland, CA 94612

telephone 510-268-5000
facsimile 510-268-1694
www.exponent.com

August 26, 2016

Loretta G. Mince, Esq.
Fishman Haygood, L.L.P.
201 St. Charles Avenue
46th Floor
New Orleans, Louisiana 70170

Subject:    H&E Equipment Facilities
            Exponent Project No. 1306663.001

Dear Ms. Mince:

I reviewed the Change Order (CO) documents related to the construction of the H&E Equipment facilities at Baton Rouge, Kenner, and Belle Chasse.  Based on the CO documents produced by URS, and my education, training, and 28 years of experience in the construction industry, the added project costs could have been mitigated.  Using the Cost of Change v. Time model, the cost of work added to the scope by change order can be estimated to be 1.5 to 2 times greater than the cost otherwise would have been had the scope of work been included in the contract documents prior to bidding the project.

If you have any questions or require additional information, please do not hesitate to contact me at 510-268-5083.

Sincerely,

Matt Vail, P.E.
Senior Manager
Construction Consulting Practice
Exponent, Inc.



STATE OF LOUISIANA
JAMES R. BAILEY
License No. 33890
PROFESSIONAL ENGINEER
CIVIL ENGINEERING

*BAILEY*
EXHIBIT NO. 6
K. DONNELLY

James R. (Bob) Bailey, Ph.D., P.E.
Senior Managing Engineer
Exponent, Inc.

1306663.001 - 6908

**EXHIBIT**
F

NON-CERTIFIED COPY

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

```
*  *  *  *  *  *  *  *  *
                         *
H&E EQUIPMENT SERVICES   *
                         * NUMBER 626,308
VERSUS                   *
                         * DIVISION "D"
URS CORPORATION          *
ARCHITECTURE, P.C., URS  *
CORPORATION, L O'NEAL    *
JOHNSON AND THOMAS E.    *
RYAN, III                *
                         *
*  *  *  *  *  *  *  *  *
```

Deposition of WALLACE C. DRENNAN

III, taken on Wednesday, September 21, 2016,

commencing at 9:44 a.m., in the offices of

Fishman Haygood, LLP, Attorneys at Law, 201 St.

Charles Avenue, 46th Floor, New Orleans,

Louisiana, 70170.





EXHIBIT
A

NON-CERTIFIED COPY

1    Q.  Okay.  So today, you didn't meet with

2  anybody prior to your deposition to talk about

3  your deposition?

4    A.  In Lori Mince's office for 15 minutes

5  when I got here.

6    Q.  Okay.  Let's go through your educational

7  background for me, please.

8        What is your most recent educational

9  accomplishment?

10    A.  I went to Tulane University.  I majored

11  in computer science, and then I went to the

12  University of Alabama, civil engineering, and I

13  didn't graduate.

14    Q.  From either?

15    A.  No.

16    Q.  So, no degrees?

17    A.  No degrees.

18    Q.  Have you had any formal education since

19  then?

20    A.  Other than a seminar or so, no.

21    Q.  How long were you at Alabama studying

22  civil engineering?

23    A.  Year, year and a half.

24    Q.  Was that before Tulane or after?

25    A.  After.

NON-CERTIFIED COPY

1      A.  We are a general contractor specializing

2   in concrete paving, sewerage, water, drainage,

3   sewer lift stations, electrical duct banks, a

4   bridge here, a bridge there, here or there,

5   mostly for entities like the City of New

6   Orleans, the Sewerage & Water Board, the DOTD,

7   Jefferson Parish.

8      Q.  Mostly for public entities?

9      A.  Yes.

10     Q.  Okay.  Mr. Drennan, have you ever been

11  qualified as an expert before in connection with

12  any litigation?

13     A.  No.

14     Q.  Have you ever been disqualified as an

15  expert in any litigation?

16     A.  No.

17     Q.  So, this is your first rodeo?

18     A.  Yes.

19     Q.  And who contacted you in order to serve

20  as an expert in this case?

21     A.  Ms. Mince.

22     Q.  What was your relationship with

23  Ms. Mince?

24     A.  Ms. Mince handles my construction

25  litigation.

NON-CERTIFIED COPY

1    Q.  So, she is your lawyer, basically?

2    A.  One of them, yes.

3    Q.  And how long has that been the case?

4    A.  2005, '06.

5    Q.  Have you ever been asked to serve as an

6    expert by Ms. Mince before this case?

7    A.  No.

8    Q.  Okay.  I assume you have a copy of your

9    report with you?

10   A.  No, I don't.

11       MR. FRANCO:

12           Can you show him a copy of his

13   report so we can be on the same page?

14       THE WITNESS:

15           I have a copy in your office.

16       MS. MINCE:

17           I think the one that I have here has

18   writing on it, so I probably need to get one for

19   him.

20       MR. FRANCO:

21           That's fine.

22       MS. MINCE:

23           Can we go off the Record for a

24   minute?

25           (Off the Record.)

NON-CERTIFIED COPY

Page 21

1    EXAMINATION BY MR. FRANCO:

2        Q.  Okay.  Actually, Mr. Drennan, I am going

3    to label a copy of your report dated July 28,

4    2016, as Exhibit 1, and we will get a clean copy

5    attached.

6            Did you have any help in drafting this

7    report?

8        A.  No.

9        Q.  You did this all yourself?

10       A.  My office -- yeah, I did it all myself.

11       Q.  I mean, you didn't have any help with

12   gathering any of the documents or any

13   discussions?  You didn't talk to anybody about

14   this other than maybe Counsel?

15       A.  I talked to some people in my office who

16   have, you know, experience.

17       Q.  Okay.

18       A.  I have a couple of engineers working for

19   me.

20       Q.  All right.  And for the Record, you're

21   not an engineer, correct?

22       A.  No.

23       Q.  And you're not licensed as an engineer

24   in any state, correct?

25       A.  No.

NON-CERTIFIED COPY

Page 22

1      Q.  Have you ever given an engineering

2   opinion before this report?

3      A.  I've never given an engineering opinion.

4      Q.  You report states that you've actually

5   made two visits to the Kenner facility; is that

6   correct?

7      A.  Yes.

8      Q.  Why was that?

9      A.  The first time was to conduct my site

10  inspections.  The second time was really just to

11  meet Mr. Bailey at the site and look around a

12  little bit again.

13     Q.  All right.  So let me ask you this:

14         Your first visit was June 30 to Baton

15  Rouge; is that correct?  And both.  Both of

16  them.  You went to both on June 30, correct?

17     A.  Yes.

18     Q.  When were you contacted to serve as an

19  expert in this case?

20     A.  Shoot.  I really don't recall.

21     Q.  It wasn't too much earlier than June 30,

22  was it?

23     A.  I don't think so.  It could have been a

24  couple weeks before.  I really cannot recall.

25     Q.  And when you were contacted, what were

NON-CERTIFIED COPY

1    Q.  How long did you spend at Kenner on July

2    7th?

3    A.  Maybe an hour.

4    Q.  Okay.  Now, did you do any coring while

5    you were out there?

6    A.  No.

7    Q.  Did you do any investigation of the

8    foundations while you were out at the sites?

9    A.  Specifically foundations for what?

10    Q.  For the paved areas.

11    A.  I'm not sure -- I'm not familiar with

12    the term "foundations" for a paved area.

13    Q.  Okay.  What's underneath the pavement at

14    Baton Rouge?

15    A.  Base material.

16    Q.  Did you do any investigation of the base

17    material at Baton Rouge when you were out there?

18    A.  No.

19    Q.  Did you do any investigation of the base

20    material at Kenner while you were out there?

21    A.  No.

22    Q.  Is it fair to say that while you were

23    out there, you basically walked around and took

24    pictures; is that right?

25    A.  Walked around, took pictures, looked

NON-CERTIFIED COPY

Page 26

1   extensively at the paving, and I pretty much

2   covered -- you know, I walked the panels, you

3   know, the whole site.  I measured a few joints.

4   Kind of got down on my knees and looked at

5   certain things.

6       Q.  Did you walk every panel in Baton Rouge?

7       A.  I don't think I -- I may not have

8   touched every panel, but I walked 75 percent of

9   them.

10      Q.  What about at Kenner?

11      A.  The same thing.

12      Q.  Did every panel in Baton Rouge have

13  damage?

14      A.  I can't say every panel had damage.

15      Q.  What about in Kenner?  The same thing?

16      A.  Let me back up.

17          If every panel has -- are you talking

18  about visual damage on top?

19      Q.  Yes.

20      A.  No.  Not every panel had visual damage

21  on top.

22      Q.  Okay.  How do you tell if there's damage

23  below?  You can't?

24      A.  Damage below what?  The paving?

25      Q.  I don't know.  You just said they had

NON-CERTIFIED COPY

Page 27

1   damage on top.  As compared to what?  As

2   compared to not being on top, right?

3       A.  Yes, not being on top, right.

4       Q.  So I think my question was:  "Did every

5   panel have damage?"  And you said, "Not every

6   panel."

7       A.  Not every panel, no.

8       Q.  Right?  At both sites, correct?

9       A.  Both sites, correct.

10      Q.  Can you tell me what percentage of the

11  panels at Baton Rouge had visible damage?

12      A.  No.  Not at this time.

13      Q.  What about at Kenner?

14      A.  No.  I can't tell you an exact, specific

15  number, no.

16      Q.  Can you give me a percentage at either

17  site?

18      A.  50 to 75.

19      Q.  Okay.  50 to 75 --

20      A.  Percent.

21      Q.  -- didn't have --

22      A.  Visible damage on top.

23      Q.  At which location?

24      A.  At which location?

25      Q.  At which location?  At both?

NON-CERTIFIED COPY

Page 28

1    A.  You just said Kenner.

2    Q.  I did?

3    A.  You said Kenner, yes.  I think you said

4  Kenner.

5    Q.  Okay.  I'm sorry.

6        50 to 75 percent had visible damage at

7  Kenner?

8    A.  Yes.

9    Q.  What about at Baton Rouge?

10    A.  Probably more towards 75 percent.

11    Q.  Was there a particular area where the

12  damage was more prominent than other areas at

13  Kenner?

14    A.  I don't believe so.

15    Q.  Okay.  Was there a particular area that

16  had more visible damage in the panels of Baton

17  Rouge?

18    A.  I don't believe so.  You know, I didn't

19  quantify it in that way.

20    Q.  Looking at your report, at the Baton

21  Rouge site, you say, "The design of the pavement

22  for the Baton Rouge facility is defective in

23  numerous respects..."

24        Do you see that?

25    A.  Would you tell me where that is?

NON-CERTIFIED COPY

1      A.  I can't say that 100 percent.  I mean,

2   they poured a parking lot for -- they poured

3   their own parking lots for their own facilities.

4   They could have written those specifications.

5   I've never bid one of those, though.

6      Q.  The Louisiana Department of

7   Transportation & Development, are they engaged

8   in private parking lots?  Not government parking

9   lots.  Private parking lots, are they engaged in

10  any of that?

11     A.  I don't know.

12     Q.  Okay.  Is there anything in those

13  specifications that deal with parking lots for

14  heavy-tracked steel equipment?

15     A.  I don't know.

16     Q.  Okay.  Let's talk about the City of

17  Baton Rouge Standard Plans.

18          The City of Baton Rouge is not engaged

19  in any private parking lots, is it?

20     A.  I don't know.

21     Q.  And those are primarily for roads and

22  highways and bridges in the Parish of East Baton

23  Rouge, isn't it?

24     A.  If that's what it says it's for, yes.

25     Q.  The Specifications for Roads and Bridges

NON-CERTIFIED COPY

Page 50

1      A.  I think five inches -- and this is just

2    my opinion -- five inches compared to what I

3    poured for a residential City of New Orleans

4    driveway, for a residence of Jefferson Parish

5    driveway, the standard driveway I think is six

6    inches for automobiles.

7           And I don't think I've -- I don't think

8    I've poured a roadway in the City of New Orleans

9    less than seven inches.  The   standard's either

10   eight or nine or even 11 inches.

11          In fact, when we poured Tchoupitoulas

12   for the DOTD, we had 11-inch thick concrete, so

13   I don't agree with the thicknesses.  That's just

14   based on my personal experience.

15     Q.  So, basically, you don't agree with all

16   of what's in 8.2, do you?

17     A.  I don't think the thicknesses are

18   adequate for the paving.

19     Q.  Is that a "yes" or a "no"?

20     A.  No, I don't agree with everything that's

21   there.

22     Q.  Okay.  And here it says the design

23   presumes 3,800 psi concrete.

24          Do you see that?

25     A.  Yes, I do.

NON-CERTIFIED COPY

1      Q.  What was the psi concrete at Baton Rouge

2   designed for?

3      A.  I think I saw two different numbers,

4   4,000, but then if you go back to DOTD, you are

5   apt to use like less than 4,000, like 3,800,

6   maybe.  So between 3,800 and 4,000 psi.

7      Q.  Okay.  This also says that the design

8   life of the pavement system is dependent upon

9   periodic maintenance of the pavement.

10        Do you agree with that statement?

11     A.  Yes.

12     Q.  What periodic maintenance are you aware

13  of that took place in Baton Rouge?

14     A.  Only really when I witnessed -- when I

15  was at my site visits and they had $120,000

16  sweepers sweeping up the debris in the parking

17  lots.

18        That's the only thing I actually saw.  I

19  don't have any other knowledge of that.

20     Q.  Okay.  When you saw sweepers, you mean

21  more than one sweeper in Baton Rouge, or just

22  one?

23     A.  I saw a sweeper in Baton Rouge and a

24  sweeper in Kenner.

25     Q.  Do you know what the purpose of those

NON-CERTIFIED COPY

1    other concrete, and that did lead me to believe

2    that it was a repair.  But other that, I don't

3    have any, like, firsthand knowledge of that area

4    of repair, no.

5        Q.  It's fair to say that you saw a lot of

6    areas that were not repaired; isn't that true?

7        A.  I saw a lot of areas that were not -- I

8    saw a lot of areas that were damaged.

9        Q.  That were not repaired, am I correct?

10       A.  Yes.

11       Q.  All right.  Do you agree with the

12   statement in the geotech report that maintenance

13   includes, but not limited to, cleaning and

14   resealing joints, sealing cracks and immediate

15   repairs of damaged areas?

16       A.  Say that again, please?

17       Q.  Do you agree with the statement in the

18   geotech report that maintenance of the pavement

19   includes, but is not limited to, cleaning and

20   resealing joints, sealing cracks and immediate

21   repairs of damaged areas?

22       A.  Yes.  But in this case, I mean, the

23   joints aren't working.

24       Q.  Okay.  I just asked you if you -- and

25   you said, "yes," right?

NON-CERTIFIED COPY

Page 56

1    A.  Right.

2    Q.  You agree with that statement?

3    A.  I agree with the statement.

4    Q.  Okay.  Look at the second page, the next

5   page of the report, sir.

6         It says about halfway down, "Panel sizes

7   should not exceed 15 feet in any direction."

8         Do you see that?

9    A.  Uh-huh (affirmative response).

10   Q.  Do you agree with that?

11   A.  Uh-huh (affirmative response).

12        Do I agree with it?  I think that's a

13  safe number.  The DOTD says that you can't go

14  any wider than 16 foot by 20 foot long, so it's

15  within that parameter.

16   Q.  Are you aware that there's some panels

17  at Baton Rouge that exceed 15 feet in any

18  direction, sir?

19   A.  I think I may have read that in an

20  expert report, but I don't know how many panels

21  there are.

22        I think in Kenner there's only one panel

23  that's longer than 15 feet.

24   Q.  And, sir, it's fair to say you've never

25  designed pavement; is that true?

NON-CERTIFIED COPY

Page 57

1     A.  No, I've never designed pavement.

2     Q.  And are you aware that this geotech

3  report also -- the design in this geotech report

4  also depends on frequency of traffic?

5     A.  This report, I didn't -- I didn't notice

6  that, no.

7     Q.  All right.  Look at 8.0 for me.

8     A.  (Witness complying.)

9     Q.  It says, "No specific traffic data were

10  provided; therefore, pavement recommendations

11  for this site are based upon the following

12  assumed daily traffic frequencies."

13        Do you see that?

14     A.  Uh-huh (affirmative response).

15     Q.  You see that?

16     A.  Yes.  I see that.

17     Q.  The design of paved area depends on the

18  frequency of traffic, doesn't it, Mr. Drennan?

19     A.  In this case, it does, yes.

20     Q.  I'm talking about any case.  Doesn't it?

21     A.  To me, it depends on the load, which I

22  guess can take into account frequency.

23     Q.  So you don't know, or you can't tell me,

24  sir, that the design of pavement for equipment

25  depends on frequency of traffic?

NON-CERTIFIED COPY

Page 69

1    to concrete areas and they just score the

2    concrete for decoration.  Sometimes they saw all

3    the way through it.  They just do what you tell

4    them to do.

5        Q.  But that's contrary to what you said

6    just now about the standard being a quarter of

7    the thickness of the pavement, isn't it?  There

8    is a standard, isn't there?

9        A.  I believe we're talking about two

10   different things.

11          Concrete sawcut subcontractors just

12   don't saw joints.  I would say the majority of

13   what they do is saw a full depth for the removal

14   of roadways.

15          And they just do what you tell them to

16   do, do what the plans show.  In fact, they tell

17   you you have to lay out the joints for them,

18   where they go.

19       Q.  Mr. Drennan, what is the standard of

20   care for this design?  Where is that standard of

21   care?

22          MS. MINCE:

23              Object to form.

24   EXAMINATION BY MR. FRANCO:

25       Q.  The design of the concrete at Baton

NON-CERTIFIED COPY

1    Rouge, where is that standard of care laid out?

2         MS. MINCE:

3              Same.

4         THE WITNESS:

5              I don't know what you are talking

6    about, "standard of care."

7    EXAMINATION BY MR. FRANCO:

8         Q.  You don't know anything about standard

9    of care?

10        A.  I'm not familiar with design --

11        Q.  Is it your opinion that the design in

12   Baton Rouge didn't meet the standard of care?

13        A.  I don't think it's adequate, no.

14        Q.  My question is:  Is it your opinion that

15   the design in Baton Rouge didn't meet the

16   standard of care for the engineer?

17        MS. MINCE:

18             Object to form.

19        THE WITNESS:

20             I don't believe -- I don't believe

21   the design is adequate.

22   EXAMINATION BY MR. FRANCO:

23        Q.  That's not an answer to my question,

24   with all due respect.

25             Do you believe that it met the standard

NON-CERTIFIED COPY

1  of care for an engineer in the community?

2     A.  You need to define "standard of care"

3  for me to be able to answer that question.

4     Q.  That's my question to you.

5         What is the standard of care?  Where is

6  the standard of care indicated for the design of

7  the pavement in Baton Rouge?

8         MS. MINCE:

9             Object to form.

10 EXAMINATION BY MR. FRANCO:

11     Q.  Where is that standard?

12     A.  To be able to look for it, you've got to

13 tell me what the definition of it is in this

14 case.

15     Q.  You can't tell me the definition?

16     A.  No.

17     Q.  Now, is the depth of the joint indicated

18 in the East Baton Rouge plans the exact same as

19 what's noted in the Department of Transportation

20 specifications or plans?

21     A.  I believe they differ slightly.

22     Q.  So even those plans differ as to how far

23 the depth is supposed to be cut, correct?

24     A.  I'd have to compare whether it's maybe

25 one set of plans doesn't address -- one set of

NON-CERTIFIED COPY

Page 76

1    weakest area to crack, and usually that means

2    that it's looking for an area that's -- it's

3    less material than it has to pull apart.

4            In case of these corners, if you have

5    four panels meeting each other, and you have

6    rebar 24 inches on center, it's possible there's

7    actually no rebar in that -- in the area inside

8    the corner crack because of the spacing, and

9    that becomes one of the weakest areas of the

10   slab, and corners are already weak.  And this

11   just exacerbates the problem to create that

12   corner crack.

13       Q.  Did you investigate whether the

14   contractor actually installed the pavement at

15   the correct thickness?

16       A.  I did not see any core information.

17       Q.  So the answer is "no"?

18       A.  The answer is "no."  I have no core

19   information, no.

20       Q.  Did you investigate, especially in

21   connection with any random cracking across the

22   panels, did you investigate any other cause for

23   that other than design?

24       MS. MINCE:

25            Object to form.

NON-CERTIFIED COPY

Page 77

1          THE WITNESS:

2              I just said basically -- did I

3     invest -- I considered a base cause, and that

4     was it.

5     EXAMINATION BY MR. FRANCO:

6          Q.  Okay.  So you didn't look at improper

7     concrete mix design, did you?

8          A.  No.  I have not seen the concrete mixes

9     on it.  I've asked for it, but I don't know if

10    we've gotten it or not yet.

11         Q.  You didn't investigate excessive slump,

12    did you?

13         A.  I looked at all the testing lab reports.

14    Slump is a very imprecise measurement depending

15    on what's in the mix design, so -- and

16    throughout, what you could see in a mix design,

17    I couldn't tell you if this slump --

18         Q.  But you didn't -- so the answer -- I'm

19    sorry.  I interrupted you.  Go ahead.

20         A.  I looked at the slumps on all the

21    concrete tickets, but without having further

22    information as to the mix design -- but, slump,

23    again -- slump is extremely imprecise.

24              It's just a general guideline of the

25    flowability of the concrete.  And as long as the

NON-CERTIFIED COPY

1    Q. A corner --

2    A. If it was a corner crack and there was a

3  base failure, the pavement would be down. It

4  would just collapse (indicating).

5    Q. So none of the corner cracks in your

6  opinion have anything to do with the base?

7    A. No.

8    Q. Not one of them?

9    A. None that I recall, no.

10    Q. And any other of the random cracking

11  across the panels has nothing do with the base?

12    A. No.

13    Q. Or the thickness?

14    A. Or the thickness of what?

15    Q. Of the concrete.

16    A. Like I said, I did not investigate the

17  thickness, but I do not believe it does.

18    Q. So if the contractor only laid five

19  inches of that, instead of the six or eight

20  inches that was specified, that wouldn't be a

21  reason for cracking across the panel?

22    A. It could be more of a weakened plane,

23  but the panel wouldn't crack if it had the right

24  joint.

25    Q. So it wouldn't crack even if it had five

NON-CERTIFIED COPY

Page 84

1    could be less.

2        Q.  What is the purpose of the tracks on

3    tracked equipment?

4        A.  What is the purpose of the track?

5        Q.  Yes, sir.

6        A.  The purpose of the track is to actually

7    spread the load out and allow the vehicle to

8    operate on the top of the dirt without getting

9    stuck.

10       Q.  So, in other words, the purpose, one of

11   the purposes is to spread the load, whereas, on

12   rubber-tired equipment, the load is concentrated

13   where the rubber tire is.  Fair statement?

14       A.  Yes.

15       Q.  So what's the standard in the industry

16   for concrete for heavy-tracked equipment?

17   What's the thickness?

18       A.  I'm not aware of any industry standard

19   for heavy equipment, but I do know that the

20   vehicles are substantially lighter than a

21   50,000-pound backhoe.

22       Q.  When you said there was no industry

23   standard for heavy equipment, you meant

24   heavy-tracked equipment?

25       A.  Heavy-tracked equipment and heavy

NON-CERTIFIED COPY

1    rubber-tired equipment.

2        Q.  Well, there is an industry standard for

3    heavy rubber-tired equipment, isn't there, on

4    concrete?

5        A.  Yes.  I mean, heavy loads on concrete,

6    yes.

7        Q.  All right.  So I want to make sure I

8    understood your prior statement.

9            You said there was no industry standard

10   for heavy-tracked equipment on concrete.  Fair

11   statement?

12       A.  I'm not aware of one, no.

13       Q.  Let's talk a little bit about Kenner.

14           On Page 5 of your report, you say the

15   contraction joint shows a sawcut of one-quarter

16   inch depth of concrete.

17           Do you see that?

18       A.  Yes, I do.

19       Q.  Have you looked at that same drawing

20   recently, Mr. Drennan?

21       A.  I don't recall the last time I saw it.

22       Q.  The drawing that you referred to, sir --

23   I thought I had -- would you put my other

24   drawing back again?  Would you put those back

25   together for me so we don't get them all screwed

NON-CERTIFIED COPY

Page 94

1  actually in the ground or in the pavement, do

2  you, as you sit here?

3      A.  To my knowledge, it was the No. 3 rebar,

4  but I do not -- I did not demolish the concrete

5  to determine what was in there.

6      Q.  That's my question.

7          You don't know, as you sit here,

8  actually what reinforcement was used and

9  installed at Kenner?

10     A.  No, I did not see it.

11     Q.  We can cover this individually, but

12  let's see if we can summarize it.

13         It's fair to say that all the things

14 that I asked you, whether you checked into as

15 alternate causes at Baton Rouge, the testimony

16 here would be the same with respect to Kenner.

17 Is that a fair statement?

18     A.  Yes.

19     Q.  And the same questions on maintenance

20 that I asked about Baton Rouge would apply to

21 Kenner, correct?

22     A.  Yes.

23     Q.  And the same testimony on repairs that I

24 asked you about at Baton Rouge, would apply to

25 Kenner, as well, correct, the repairs that would

NON-CERTIFIED COPY

Page 100

1    equipment.

2        Q.  All of what you just said, obviously,

3    increases the costs, doesn't it?

4        A.  Yes, it does.

5        Q.  Are you aware that H&E rejected armored

6    joints?

7        A.  I have no knowledge of that.

8        MS. MINCE:

9            Object to the form.

10   EXAMINATION BY MR. FRANCO:

11       Q.  Okay.  I'm looking at your list of

12   projects, Mr. Drennan, and --

13       A.  I do not have that.

14       Q.  Okay.  Well, I'm not sure you are going

15   to need it, but if you do, you can look at my

16   copy.

17           Is there any project on here where your

18   company did a concrete area for heavy-tracked

19   steel equipment?

20       A.  No.

21       Q.  And so, consistent with your earlier

22   testimony, it looks to me like you do a lot of

23   street work for public entities.  Fair

24   statement?

25       A.  Yes.

NON-CERTIFIED COPY

1   there's about 20 or so general definitions of

2   specifications.  And so it's referred to -- it's

3   somewhere in my specs on pouring concrete.

4       Q.  In your mind, are specifications for the

5   highways and roads and bridges the same as

6   specifications for a private parking lot?

7           MS. MINCE:

8               Object to the form.

9           THE WITNESS:

10              It can be.

11  EXAMINATION BY MR. FRANCO:

12      Q.  Well, what's the standard?

13          MS. MINCE:

14              Object to form.

15          THE WITNESS:

16              It depends on who the engineer is.

17              Engineers tend to use what is out

18  there for specifications, and sometimes they do

19  it in accordance with DOTD.

20              But they have their own special

21  specs, and their specs say, "Here's the item,

22  then do it, go to the DOTD."

23              And you can do stuff as according to

24  the DOTD and ACI at the same time.

25  EXAMINATION BY MR. FRANCO:

NON-CERTIFIED COPY

1    Q.  And you could also do it based on your

2    experience as an engineer, can't you?

3    A.  Yes, you can.  Yeah.

4    Q.  Now, Mr. Drennan, we talked about your

5    visits to the sites, both sites, Kenner and

6    Baton Rouge.

7         Is the entire paved area at both of

8    those sites serviceable or not?

9    A.  What does "serviceable" mean?

10    Q.  Is the Company able to use the pavement

11    for the work that the Company does?

12    A.  I mean, they can store heavy equipment

13    on it, yeah.

14    Q.  Is there anything that indicates to you

15    that they have not been able to move heavy

16    equipment on the concrete pavements at either

17    Kenner or Baton Rouge?

18    A.  I have no knowledge of where -- where or

19    why they are putting equipment in certain areas

20    or when.

21         For some reason, in Baton Rouge, it

22    appears that there was a cluster of equipment in

23    the center, and I don't know why that was.

24    Q.  Okay.  Do you have your estimates with

25    you?

NON-CERTIFIED COPY

Page 114

1     A.  The layout of the joints is -- you know,

2  they have a layout on the plans, but you have to

3  kind of, I guess, make sure all the joints work,

4  if that makes any sense.

5     Q.  Okay.  Is there any protection to the

6  expansion joints, any extra protection?  Are

7  they cambered, are they protected with armored

8  plates?  Any protection to the joints?

9     A.  You keep saying the word "camber."

10    Q.  Chamfer --

11    A.  Camfer and camber are --

12    Q.  Chamfer.  Sorry.

13    A.  Except for a radius arm, you know, when

14  you finish the joint up, there's no protection

15  on the expansion joints.

16        Now, the sealant on expansion joints is

17  installed -- anchored joints -- contraction

18  joints is installed below the top of the joint.

19    Q.  Okay.  So what is going to prevent the

20  spalling of the expansion joints and contraction

21  joints by the use of heavy-tracked earth-moving

22  equipment?

23    A.  I did not address these in these

24  estimates -- I did not address that issue.

25    Q.  All right.  So it's fair to say you

NON-CERTIFIED COPY

1    Q. That's your target?

2    A. Yes.

3    Q. And this estimate replaces even those

4    paved areas that don't have any damage at all,

5    correct?

6    A. The entire site.

7    Q. The answer is "yes"?

8    A. Yes. This is the entire -- this

9    replaces the entire site. I just want to be

10    clear on that.

11    Q. I want to be clear --

12    A. Whether damaged or not, it replaces the

13    entire site.

14    Q. Okay. Did you do this estimate?

15    A. No. This estimate was done -- well, yes

16    and no. This estimate was done according to our

17    normal procedure on how we bid jobs. Was

18    treated like that.

19        I have a full-time estimator, Tim

20    Morgan, who basically does a hundred percent of

21    our estimating, and then after he is complete

22    and we're ready to put the -- you know, finish

23    the bid, he and I sit down together and we go

24    over the bid pretty much in its entirety.

25        And I double-check things. I'm normally

NON-CERTIFIED COPY

Page 134

1      A.   Yes.

2      Q.   About 2.8 million; is that correct, or

3  not?

4      A.   I'm not -- I'm not adding it up.

5      Q.   Let me see.  Hold on.  11, 15 -- I get

6  about 2,100,000.  You can't tell me whether

7  that's correct or not?

8      A.   No, I can't.

9      Q.   You are aware that H&E bid out the

10  original contract for Baton Rouge?

11      A.   Not -- no, not really.  I'm not aware of

12  that in Baton Rouge.

13      Q.   Are you a customer of H&E?

14      A.   Yes, I am.

15      Q.   To what extent?  You buy or you rent

16  from them, or both?

17      A.   We could rent, but mostly we buy

18  Komatsus, Komatsu excavators.

19      Q.   And can you tell me approximately how

20  much you've bought in terms of dollars in the

21  last two or three years?

22      A.   We buy about 400 to $500,000 of

23  equipment a year across all people, so I would

24  say H&E is maybe $200,000 a year.

25           They didn't even know I was a customer.

NON-CERTIFIED COPY

Page 135

1    Nobody put two and two together when I went and

2    visited the sites --

3        Q.  Okay.

4        A.  -- when I introduced myself.

5        MR. FRANCO:

6            Let's take a little break.  We might

7    be close to finishing.

8            (Brief recess held.)

9    EXAMINATION BY MR. FRANCO:

10       Q.  Mr. Drennan, during the break, did you

11   talk about this case?

12       A.  A little bit.

13       Q.  To who or with who?

14       A.  Brent, Lori, me and Bob.

15       Q.  Okay.  What did you discuss?

16       A.  Concrete cores, how come we don't have

17   certain documents.

18       Q.  Say again.  I didn't hear that.

19       A.  How come we didn't get certain

20   documents.  That's really -- just kind of

21   general stuff.

22       Q.  Okay.  What about concrete cores?  What

23   did you discuss?

24       A.  That -- I looked over the Terracon

25   testing laboratory reports, report summary --

NON-CERTIFIED COPY

Page 136

1  and other reports, too, but the summary, and I

2  was wondering why there's no reference to why

3  anyone didn't core the concrete after it was

4  poured to check the thickness.

5      Q.  By whom?  Who would core that?

6      A.  It would be Terracon, I would think, or

7  -- I don't know.

8      Q.  Are you suggesting that's what is

9  normally done?

10     A.  I tried -- I looked for some coring

11 information in the specifications.  I didn't see

12 anything.

13        It just says testing in accordance with

14 these standards, and I didn't go any further.

15 That is what is normally done on anything bigger

16 than a driveway, in my business, and cores get

17 done.

18        And there's a penalty for

19 underthickness.  And so if it's under -- just an

20 example.  If it's underthickness by a quarter

21 inch, it's no penalty.  A half an inch, it's a

22 10 percent penalty.  And if it's more than that,

23 it's "Take it out, put it back because it's not

24 functional."

25     Q.  More than how much?  An inch?

NON-CERTIFIED COPY

Page 139

1          I'd like to see that.  I mentioned

2     earlier in my testimony that I don't know if the

3     water/cement ratio was exceeded or not by slump.

4     I'd like to see what other add mixtures they had

5     in there because it's going to be a recipe of

6     what's in that load of concrete.

7        Q.  Okay.  And, again, you want to see the

8     concrete tickets.  Again, that's in reference to

9     what the contractor's actually putting down,

10    correct?  To see what the contractor's actually

11    putting down in concrete, isn't it?

12       A.  Yes.  And I think one of the experts in

13    one of the reports mentioned something about

14    while the concrete met requirements of the DOTD,

15    it didn't meet the requirements for ACI or STE.

16    I don't know which one.

17          And I was just trying to verify that

18    fact, if it did or didn't meet those

19    requirements.  And I can't do that unless I see

20    the batch weight where he took the mix design.

21          That's another thing.  I don't have a

22    copy of the approved mix design for the

23    concrete.

24       Q.  When we broke for lunch, did you discuss

25    changing any of your prior testimony?

NON-CERTIFIED COPY

1  see a lot of that.

2      Q.  Okay.  Well, you answered my question.

3          You can't eliminate that possibility

4  that the spalling occurred first and allowed

5  moisture in and it deteriorated the --

6      A.  No, I don't know if the chicken came

7  before the egg.

8      Q.  All right.  You can put that one aside.

9          Now I'm going to show you Photo 74106,

10  which we will label as Exhibit 9.

11          What kind of crack is that?

12      A.  This is a corner crack only on one

13  corner.

14      Q.  Okay.

15      A.  And looks to be at the intersection of

16  an expansion joint and a contraction joint.

17      Q.  All right.

18      A.  There's kind of an issue with expansion

19  joints for when the slab expands, but since the

20  slab is all bound together with rebar on both

21  sides of the expansion joint, the only place it

22  can contract is at expansion joints, which is

23  basically more movement than would be if it

24  could crack every 15 foot over the saw joints.

25          So there's a lot going on in the

NON-CERTIFIED COPY

1    expansion joint that's not normally there --

2    normally occurs.

3         Q.   Okay.  But you see a lot of spalling in

4    this photo, as well, don't you?

5         A.   Yes, you do see spalling along the

6    joint.

7         Q.   Okay.  And --

8         A.   And interesting, though, the spalling is

9    mostly on the photograph on the left side of the

10   joint and not the right side of the joint,

11   except for one instance.

12        Q.   And what does that indicate to you?

13        A.   That whatever is going on, more is going

14   on on the left side than the right side.

15        Q.   That's all it indicates to you.  Is it

16   possible --

17        A.   Actually, I take that back.  The right

18   side could be causing what's happening on the

19   left side.

20        Q.   Okay.  And it's also possible that with

21   that kind of spalling, that moisture and water

22   gets in that, and could have caused that corner

23   cracking; isn't that true, sir?

24        A.   It's true.  But if it was, in fact, just

25   wet base course doesn't really mean that the

NON-CERTIFIED COPY

Page 159

1    base is going to fail.

2         If the base failed, that means there

3    would be a void underneath this piece of

4    concrete.  And if you were running heavy

5    equipment on top this piece of concrete, it

6    would have moved up or down.  It's just not

7    going to hang up in the air by itself.

8        Q.  What's the reason you seal expansion

9    joints and contraction joints, Mr. Drennan?

10       A.  The reason you seal them?

11       Q.  Yes, sir.  What's the reason you seal

12   them?

13       A.  Is to stop the water from going down the

14   joints.

15       Q.  Okay.

16       A.  In a lot of cases, we don't really have

17   it here, but they have what they call

18   freeze-thaw, and so when water gets in there and

19   it freezes, it really expands, and can cause

20   this kind of damage, but we don't have that case

21   here.

22       Q.  Why do we do it here?

23       A.  To stop the water from getting into the

24   joint.

25       Q.  And what happens when the water gets

NON-CERTIFIED COPY

1   up an hour later.  I don't know.  I mean, it had

2   to spend a certain amount of time on top of the

3   concrete.

4       Q.  Not if you wash it off before it comes

5   off the truck, correct?

6           Not in your facility, it doesn't, does

7   it?

8       A.  No.  We wash it off on the job sites.

9       Q.  Okay.  So it doesn't come on your

10  concrete where you store your track equipment,

11  does it?

12      A.  I don't have any concrete where I store

13  my track equipment.

14      Q.  Why is that?

15      A.  Because concrete is very expensive.

16      Q.  And it's also -- and that kind of

17  equipment damages concrete pretty readily,

18  doesn't it?

19      A.  Some of it does, yes.

20      Q.  Okay.  Heavy-tracked steel equipment

21  damages concrete, doesn't it?

22      A.  Yeah.  Mainly, bulldozers.

23      Q.  Right.  And if bulldozers run over those

24  rocks, it causes additional stress at that point

25  in the concrete, doesn't it?

NON-CERTIFIED COPY

Page 179

1    depending on the type of trailers and trucks

2    that this company has, if it's a lowboy, to get

3    the piece of equipment off, you actually drop

4    the trailer from the truck, lower the trailer to

5    the ground and move the truck out the way.

6         You have to have room enough around all

7    that stuff to drop the trailer, put the truck --

8    pull the truck away and then have him drive off

9    from it.

10        So if you have more than one trailer in

11   there, in a washroom, the next one could be, you

12   know, a hundred feet over.  The driver's going

13   to stay way clear of this guy for safety

14   reasons, for all kind of stuff.

15        But, yes, in an operable situation, when

16   nothing else is in the way, you want to get as

17   close to the washroom as you can, but the truck

18   can't get close because he can't make that last

19   turn and he would stay even further away.  You

20   just --

21   Q.  It's difficult to prevent damage to

22   concrete when bulldozers are using it.  Isn't

23   that a fair statement?

24   A.  Bulldozers specifically, yes, with metal

25   tracks on them.

NON-CERTIFIED COPY

1      A.  It depends on what kind of rock it is.

2   I mean, you have -- this looks to be some kind

3   of gray rock, but if it's Mexican limestone,

4   which is more of a yellowish color, you can cut

5   it with your pocketknife and it wouldn't hurt

6   the pavement at all.  Just crushes it and makes

7   it a powder, almost do it with your foot.

8      Q.  That's not what we're looking at here,

9   though, is it?

10     A.  I don't know what these rocks are.

11     Q.  So you can't tell us if heavy-tracked

12  equipment ran over that whether it would cause

13  additional stress at that part of the pavement,

14  could you?

15     A.  No.

16     Q.  All right.  I'm going to show you the

17  next exhibit, which is Exhibit 11, H&E 74136.

18         Okay.  Take a look at that.

19     A.  (Witness complying.)

20     Q.  Tell me what that looks like, what that

21  metal bar is.  What is that?

22     A.  This is a No. 3 rebar that appears to

23  have been put into the slab and somehow it was

24  put in extremely high -- I mentioned this

25  earlier, that I saw a piece of rebar on the top

NON-CERTIFIED COPY

1   of the slab.  It appeared to go across the

2   existing joint.  I mean, that's this piece of

3   rebar.

4       Q.  And you can see cracking that seems to

5   emanate from that exposed piece of rebar.  Is

6   that a fair statement?

7       A.  Some, yes.

8       Q.  All right.  That's not the location the

9   rebar was supposed to be installed, is it,

10  depthwise?

11      A.  No, it's not.

12      Q.  That's a contractor problem, isn't it?

13      A.  Yes.  It's a contractor problem unless

14  some kind of -- I've seen some rebar come to the

15  top with some slabs in different kinds of

16  structures where the stress is in them that I

17  don't really understand, as far as being an

18  engineer.  So I don't know if there were some

19  kind of stresses on this to cause it to do this.

20      Q.  All right.  But it's pretty clear that

21  that's not installed at the depth it's specified

22  to be installed.  Fair statement for that rebar?

23      A.  Again, I don't know if something caused

24  it to move as far as some other forces going on,

25  but the rebar should be installed at half the

NON-CERTIFIED COPY

1    A.  I see a little smattering of rocks --

2    Q.  Right.

3    A.  -- going left to right.

4    Q.  Okay.

5    A.  I mean, while I was at this site and

6    even while I was at the other site, both the

7    sweepers were running.

8    Q.  And you still have rocks on the

9    concrete, don't you?

10   A.  That's correct.  But you are going to

11   have rocks on the concrete until it gets swept

12   up.

13   Q.  And you can't sweep them up while the

14   piece of equipment is running with gravel and

15   rocks in the treads, can you?

16   A.  No.

17   Q.  Let me show you the next exhibit, which

18   is Exhibit 13.  This is 74186, photograph.

19        Now, we're still in Baton Rouge?

20   A.  That's a good one.

21   Q.  What kind of joint is this?

22   A.  It appears to be a contraction joint.  I

23   don't know which location this came from.

24   Q.  Okay.  Well --

25   A.  I don't recall the picture.

NON-CERTIFIED COPY

Page 168

1      Q.  I accept that.

2          That joint is covered with dirt, isn't

3   it?  Completely covered with dirt in some part.

4      A.  Which joint?  There's one going left to

5   right and one going up and down.

6      Q.  Well, I only see one going up and down,

7   so let's talk about that one first.

8      A.  Some of it is covered --

9      Q.  Is the joint going up and down --

10     A.  In this picture, 50 percent of it is

11  covered with dirt.

12     Q.  Okay.  And you are suggesting there's

13  another joint running right to left or left to

14  right?

15     A.  Yes.

16     Q.  Where is that?

17     A.  Well, if you look at the grass line --

18     Q.  There's grass growing out of that joint?

19     A.  Yes.  It happens all the time.

20     Q.  Is that proper maintenance of a joint?

21     A.  No.  But I don't see it causing any

22  problems.

23     Q.  You don't see it causing any problems?

24  You don't see that joint spalling?

25     A.  Not where the grass is.

NON-CERTIFIED COPY

1    A.  No.  It could have been right on the

2    side of the joint.

3    Q.  Okay.  Which is even worse, because then

4    that's even more pressure that causes spalling,

5    correct?

6    A.  It could have.  I mean, the corners are

7    the weakest spots in the concrete.

8    Q.  Let me show you this picture, which I'm

9    going to label as Exhibit 14.  I'm sorry.  The

10    Bates stamp is 74236; is that right?

11    A.  Correct.  74236.

12    Q.  Again, you can't tell me particularly

13    what location this is, can you?

14    A.  I'm pretty sure this is at Baton Rouge.

15    Q.  Okay.

16    A.  On the side of -- no, wait, wait, wait.

17    I can't tell you positively.

18    Q.  That's okay.  It's okay.

19    A.  You know what I can -- it's -- it is

20    Kenner, because I can tell by the aggregate

21    type.

22    Q.  What could you tell about the aggregate

23    type at Kenner, as opposed to Baton Rouge?

24    A.  Baton Rouge is gravel, and this is some

25    kind of whitish stone, Mexican limestone or

NON-CERTIFIED COPY

1   fluorite.  That was something I call fluorite.

2       Q.  Okay.  What are those bars that we see

3   protruding through the concrete?

4       A.  Half-inch smooth dowels.

5       Q.  All right.  And what does that indicate?

6   What depth were those dowels supposed to be at?

7   Strike that.

8           This is an expansion joint, am I

9   correct?

10      A.  Correct.

11      Q.  Okay.  These were the dowels that were

12  supposed to be at what depth of the concrete?

13      A.  I think half.

14      Q.  Does that indicate that those dowels

15  were at half the depth, sir, when you see them

16  like that?

17      A.  I don't -- with the dowels coming out of

18  the concrete, clearly, it's not at half the

19  depth.  I don't know how much it goes down from

20  there to the joint, and this is another one of

21  those, I want to say, busy expansion joints.

22          There's something going on here to cause

23  this joint.  It's acting as a contraction and

24  expansion, and there must be a lot of movement

25  or stress around it to do all of that.

NON-CERTIFIED COPY

Page 172

1    Q.  You can't eliminate the fact that these

2    dowels were not installed properly by the

3    contractor at the proper depth, can you?

4    A.  No, I can't eliminate that.

5    Q.  And if they are not installed at the

6    proper depth, then they don't operate properly,

7    do they?

8    A.  That's incorrect.

9    Q.  If they are not installed at the proper

10   depth, what's the consequence of that?

11   A.  They are just shallower than they are

12   supposed to be.

13   Q.  And what happens?

14   A.  But they still -- they still allow the

15   concrete to expand and contract.

16   Q.  And what happens to the load?

17   A.  The concrete has -- the load's the same,

18   but the bar doesn't have enough -- doesn't have

19   as much concrete to, I want to say, support it.

20   Q.  There's a reason why the dowels are

21   installed or supposed to be installed at half

22   the depth, isn't there?

23   A.  Yes.

24   Q.  Okay.  And this indicates they were not

25   installed at the proper depth.  Fair statement?

NON-CERTIFIED COPY

Page 173

1    A.  Again, where it's coming out the ground,

2    clearly that's not the proper depth.  I don't

3    know at what depth the bar's installed at the

4    joint itself.

5    Q.  Is that water that I see to the right

6    top of this picture?

7    A.  Yes.

8    Q.  Okay.  And you can see where the water's

9    actually in one of the cracks near the joint.

10   Do you see that?

11   A.  Yes.

12   Q.  You also see grass growing on the

13   concrete, don't you?

14   A.  Yeah.  A little bit in the corner on the

15   right.

16   Q.  Does that indicate proper maintenance to

17   you?

18   A.  No.

19   Q.  Okay.  Let me show you the next exhibit,

20   which will be No. 15, which is 74261.

21        Now, this one shows water over one of

22   the joints and some cracks, am I correct?

23   A.  Yes.  That's what's going to happens

24   when it rains.

25   Q.  Okay.  And that's why you want your

NON-CERTIFIED COPY

Page 175

1    do you?

2        A.  No, but I'm sure they got some kind of

3    schedule for their sweeping.

4        Q.  Are you aware the testimony is there is

5    no schedule for sweeping?

6        A.  I haven't -- I have no knowledge.

7        Q.  Let me show you the next exhibit, which

8    is Exhibit 16, H&E 74299.  What does this show

9    you?

10       A.  Two joints -- looks like two contraction

11   joints that intercept each other.

12       Q.  Okay.  And you see that track mark right

13   over those joints?

14       A.  The rusty one or the other one?

15       Q.  The other one.  There's two tract joints

16   actually, but one is sort of almost diagonal to

17   the joint.

18       A.  Yes, I see that one.

19       Q.  Okay.  That's a track mark from a piece

20   of equipment, isn't it?

21       A.  Yes, it is.

22       Q.  What did it cause at that joint?

23       A.  It caused that vertical -- the vertical

24   corners to ravel.

25       Q.  This is not a spalling, this situation.

NON-CERTIFIED COPY

1   EXAMINATION BY MR. FRANCO:

2       Q.  When you read the DOTD specs, do you

3   read anything about parking lots?

4          MS. MINCE:

5              Object to form.

6          THE WITNESS:

7              I read something about Portland

8   Cement Concrete Paving, and that's what we have

9   here.

10  EXAMINATION BY MR. FRANCO:

11      Q.  Is that a "yes" or a "no"?

12      A.  I do not see anything about the words

13  "parking lot."

14      Q.  Okay.  Do you see anything in the DOTD

15  specs about tracked equipment?

16      A.  I don't believe so, no.

17      Q.  Do you see anything in the DOTD specs

18  about tracked equipment with teeth?

19      A.  I'm sorry.  Teeth are the things on the

20  end of the bucket, on a piece of equipment on an

21  excavator.

22      Q.  Do you want to go back and --

23      A.  We can talk about --

24      Q.  Do you want to pull up the testimony

25  where you described them as teeth?

NON-CERTIFIED COPY

```
 1        MS. MINCE:

 2             Cleats.

 3        THE WITNESS:

 4             Cleats.

 5   EXAMINATION BY MR. FRANCO:

 6      Q.  Cleats.  I'm sorry.  Cleats.

 7      A.  Okay.

 8      Q.  Do you see anything in the DOTD specs

 9   for heavy-tracked equipment with cleats?

10      A.  No, I don't.

11      Q.  And you can't tell us, as you sit here,

12   a difference in load between a rubber-tired

13   piece of equipment with the same weight as a

14   piece of tracked equipment?  You can't tell us

15   the difference in load, can you?

16        MS. MINCE:

17             Object to form.

18        THE WITNESS:

19             I mean, you have a piece of

20   rubber-tired equipment that has, say, four

21   tires.

22             So whatever its weight divided by

23   four, and how much tire is touching the ground

24   is how much load it's putting on four points.

25             And on a bulldozer, it's spread
```

NON-CERTIFIED COPY

1   across all the cleats that are touching the

2   ground.

3   EXAMINATION BY MR. FRANCO:

4       Q.  Which means the load is spread?.

5       A.  It's spread.  It's spread.  But it is --

6   the cleats are -- you know, if one panel of a

7   track is 6 inches wide by 2 feet across the

8   machine, the cleat may be half to 3 inches thick

9   at the bottom by, you know, the things we've

10  had, 24 inches.  So just that little piece is

11  touching right there, not the whole track or

12  pad.

13          I want to say something else about the

14  standard specifications for the DOTD.

15          I keep asking -- being asked questions

16  about design.  The standard specifications and

17  the standard plans, they do not tell anybody how

18  to design the work.  The are not design

19  guidelines.  They are construction guidelines.

20          The DOTD has manuals for design.

21  They've got manuals for everything.  They've got

22  papers on how to do this and how to do that, and

23  I'm not referring to those manuals.

24          The standard specs are the results of a

25  design, but it does not tell you what thickness

NON-CERTIFIED COPY

1    of concrete to put on a roadway.  In fact, Item

2    601 is concrete, and then it tells you to use a

3    letter designation for what different

4    thicknesses the designer wants to design.

5            Those guidelines on how to design that

6    are in different books and different manuals of

7    DOTD.  They are not in the Standard

8    Specifications For Roads and Bridges.

9        Q.  So in your report, you are not talking

10   about defective designs, are you?

11       A.  What I'm saying is --

12       Q.  Yes or no?

13       MS. MINCE:

14            He doesn't have to say "yes" or

15   "no."

16       MR. FRANCO:

17            Oh, yes, he does.  If it can be

18   answered "yes" or "no," he has to say "yes" or

19   "no."  Then he can explain it unless he says he

20   can't answer it "yes" or "no."  That's the law.

21       THE WITNESS:

22            All right.  So "yes" or "no."  What

23   I'm saying is --

24       MR. FRANCO:

25            Hold on.  Give me my question back,

NON-CERTIFIED COPY

LA CONTRACTORS

LICENSE NO. 1033

(5M) euooo
FAX

(5N) 836-2939

WCD

Wallace C.

# Drennan, Inc.

### General Contractors

P.O. BOX 16438

70175-6438

NEW ORLEANS, LA

July 28, 2016

E-MAIL

Fishman Haygood, L.L.P.
201 St. Charles Ave., 40 Floor
New Orleans, La. 70170
Attention: Lori Mince

Re: H&E Equipment Services, Inc. v. URS Corporation Architecture, P.C., et al., Suit No. 626,308, 1ᵗʰ JDC, Parish ofEast Baton Rouge, State ofLouisiana

Dear Ms. Mince:

Fishman Haygood, L.L.P. has asked Wallace C. Drennan, Inc. ("WCD") to prepare a report addressing issues related to cracking and spalling of concrete pavement at the H&E Equipment Services ("H&E") facilities in Baton Rouge and Kenner, Louisiana. This report is in response to Fishman Haygood's request and summarizes my opinions.

For this assignment, I relied on the following materials provided to me:

H&EBaton Rouge Facility

1. As-Built Plans sheet nos. C-201, C-202, C-203, C-204, C-205, C-206, C-207, C-301, C-302, C-303, C-304, C-305, C-306 and C-501.

2. STE Geotechnical Investigation Proposed H & E Buildings Pecue Lane, Baton Rouge, Louisiana dated January 1-1, 2007. (H&E-0000211 to 0000259).

3. URS Project Specifications - Project Manual Sec. 2516 (URS 062010062242).

EXHIBIT

B

DRENNAN

EXHIBIT NO. 1

K. DONNELLY

NON-CERTIFIED COPY

H&E Kenner Facility

      1. MAPP As-Built Plans sheet nos. 0.1, C7.o, C5.o, C6.o, C7.o, C8.o and C9.0.

CONSTRUCTING FOR OVER 50 YEARS

      2. Terracon Geotechnical Engineering Report H&E Equipment-Addition and Renovation Kenner, Louisiana dated February 9, 2011. (H&E 0009535 to 0009577).

      3. Terracon Geotechnical Report — Pavement Addendum dated August 5, 2011 (URS 033265 to 033267).

      4. URS Specifications for Kenner (URS 066295-066356).

During the course of my review and evaluation, I also referred to the following sources:

      1. Louisianan Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet nos. 1, 2 and 3.

      2. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

      3. City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 18, 2008, 502-01, sheet nos. 1, 2 and 3.

      4. WCD Photographs taken during site visits June 30, 2016 and July 7, 2016.

In addition, I conducted site inspections on June 30, 2016 at both the Baton Rouge and Kenner, Louisiana facilities. On July 7, 2017, I conducted a follow-up site visit to the Kenner facility.

## DISCUSSION

The observed damage to the concrete pavement at both facilities includes the following:

      1. Random Cracking across panels of PCCP.

      2. Diagonal Corner Cracking at the intersections of Joints (CJ and CJ/CJ and EJ/EJ and EJ).

      3. Joint Spalling (breaking off and chipping of joint edges) of either side of the PCCP Control/Contraction/Construction Joints ("CJ") and Expansion Joints ("EJ").

## BATON ROUGE

I have reviewed the plans and specifications prepared by URS Corporation for the Baton Rouge facility. The plans for the Baton Rouge facility include design details for the PCCP

NON-CERTIFIED COPY

including the CJ (see detail no. 4 as shown plan sheet no. C-501) and EJ (see detail no. 3 as shown plan sheet no. C-501). The design of the pavement for the Baton Rouge facility is defective in numerous respects, including the following:

    1. The design of the CJ does not include smooth dowels and it is defective. This omission is not in conformance with the following:

        a. Louisianan Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet nos. 1, 2 and 3.

        b. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

        c. City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 1 8, 2008, 502-01, sheet nos. l, 2 and 3.

        d. STE Geotechnical Investigation Proposed H & E Buildings Pecue Lane, Baton Rouge, Louisiana dated January 1 1, 2007. (H&E 0000211 to 0000259).
            Wfically, it is not in compliance with section no. 8.2 "Rigid Pavement" of this

    2. The plans (see detail no. I & 2 as shown on plan sheet no. C-501) reflect #3 rebar running across the CJs. This is not consistent with standards promulgated in nos. I .a., 1 b. and 1 c. in the paragraph above. Additionally, using this design does not permit the CJs to contract. Therefore, it is not a functioning CJ and is defective.

    3. The design of the typical CJ (see detail no. 4 as shown plan sheet no. C-501) reflects a saw cut joint of h inch depth. This depth is not in accordance with standards promulgated nos. l.a,, 1b. and lc. above. Additionally, based on my professional experience, this depth hinders the functioning of the CJ and is inadequate. Table 1, as shown on the City of Baton Rouge, Parish of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans dated, January 1 8, 2008, 502-01 , sheet no. 1, calls for a "MINIMUM DEPTH OF JOINT" of 2 inches for 6 inch PCCP thickness and 3 inches for 8 inch PCCP thickness.

    4. The design of the EJ contained in the plans reflects the use of #4 (1/2") smooth dowels spaced at 18 inch on center. The size and placement of these dowel bars is not in accordance with standards promulgated nos. l.a., 1b. and lc. above. In my opinion the dowel bars are too small and should be spaced on 12 inch center not 18 inch. Table 1, as shown on City of Baton Rouge, Parish Of East Baton Rouge Parish Department of Public Works Engineering Division Standard Plans, January 1 8, 2008, 502-01, sheet no. 1, calls for a (#8) smooth dowels for 6 inch PCCP thickness and 1 1/4 inch smooth dowels for 8 inch PCCP thickness both on 12 inch center. Also, Table l, as shown on the Louisiana Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet no. 1 calls for 1 1/4" (#10) smooth dowels for 8 inch PCCP thickness on 12 inch center.

    The design defects referred to above are consistent with random cracking across panels of PCCP and diagonal comer cracking at the intersections of Joints (CJ and CJ/CJ and EJ).

NON-CERTIFIED COPY

Page 4

In addition to the foregoing, the design of the concrete calls for 8 inch pavement in the area immediately surrounding the branch office and 6 inch pavement in all other areas. In areas where H&E operates its equipment (i.e. all parts of the facility other than the parking lot in front of the office building), it is my opinion that 6 inch thickness is inadequate. Based on my professional experience, the standard in the industry is minimum of 7 inches and preferably 8 inches or greater in areas where heavy equipment will be operated.

The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJs and EJs outlined above is three million three hundred seventy thousand dollars ($3,370,000), The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJs and EJs and increase the concrete thickness to 8 inches in all areas is three million six hundred ninety thousand dollars ($3,690,000). All estimated costs are rounded to the nearest thousand dollars. The estimated costs do not include any contingency costs which are normally 100/0 to 20% of the estimated costs. The estimated costs include 8% for engineering costs. According to the State of Louisiana Facility Planning & Control A/E Consulting Fees Spreadsheet for a project of this size, the Fee % is 7.7%. The estimated costs do not include the costs of a testing laboratory. Add 1% for testing.

## KENNER

I have also reviewed the plans and specifications prepared by URS Corporation for the Kenner facility. As with the Baton Rouge facility, the plans for the Kenner facility include design details for the PCCP including the CJ (see details plan sheet no. C-7.0) and EJ (see details plan sheet no. C-7.0) as well as various general notes regarding the pavement. The plans and specifications for the Kenner facility are deficient in numerous respects, including the following:

1. The design of the CJ does not include smooth dowels and it is defective. This omission is not in conformance with the following:

    a. Louisiana Department of Transportation and Developments ("LADOTD") Standard Plans CP-OI, sheet nos. 1, 2 and 3.

    b. LADOTD Standard Specifications for Roads and Bridges 2006 Edition, Section 601 Portland Cement Concrete Pavement ("PCCP").

    c. Terracon Geotechnical Engineering Report Equipment-Addition and Renovation Kenner, Louisiana dated February 9, 2011. (H&E 0009535 to 0009577).

2. The plans and specifications reflect #3 rebar running across the CJs. This is not consistent with standards promulgated by LADOTD. Additionally, using this design

NON-CERTIFIED COPY

Page 5

does not permit the CJs to contract. Therefore, it is not a functioning CJ and is defective.

3. The CJ shows a saw-cut of 1/4" depth of concrete. This depth is not in accordance with standards promulgated by LADOTD. Additionally, based on my professional experience, this depth is inadequate.

4. The design of the typical transverse expansion joint contained in the plans reflects the use of #4 (1/2") smooth dowels spaced at 18 inch on center. The size and placement of these dowel bars is not in accordance with specifications for the ACI or the DOTD. In my opinion, the dowel bars are too small and should be spaced on 12 inch center not 18 inch.

The design defects referred to above are consistent with random cracking across panels of PCCP and diagonal corner cracking at the intersections of joints (CJ and CJ/CJ and EJ).

In addition to the foregoing, the design of the concrete calls for 7" of concrete. Given the extremely poor soils conditions in Kenner, based on my professional experience, a minimum of 8" of thickness is required in areas where heavy equipment is used.

Due to the nature of concrete, and its thermal expansion and contraction, it cracks without proper crack control. Properly designed CJs and EJs, reinforcement, and proper pavement thickness, are important to insuring the integrity of the concrete and preventing excess cracking and failure. The design deficiencies outlined above are consistent with the cracking observed at both the Baton Rouge and Kenner facilities. In both situations, had the joints been saw cut 2 inches deep for 6 inch PCCP and 3 inches deep for 8 inch PCCP, the #3 rebar crossing the joints stiff prohibited the CJs from contracting. Thus, the concrete was left to crack at areas of least resistance resulting in Diagonal Corner Cracking and Random Cracking.

In addition to the foregoing, the operation of metal track equipment across the pavement has resulted in spalling observed along the surface of the joints. It was foreseeable that the operation of H&E's equipment across the joints would cause spalling along the joints. URS should have recommended a design that would offer additional protection for the joints.

The estimated cost of removing and replacing the Concrete to correct the deficiencies in the CJs and FJs outlined above is one million six hundred fifty six thousand dollars ($1,656,000) The estimated cost of removing and replacing the concrete to correct the deficiencies in the CJ and EJs and increase the concrete thickness to 8 inches in all areas is one million seven hundred sixteen thousand dollars ($1,716,000). All estimated costs are rounded to the nearest thousand dollars. estimated costs do not include any contingency costs which normally to 20% of the estimated costs. The estimated costs include 8% for engineering costs. According to the State of Louisiana Facility Planning & Control ME Consulting Fees Spreadsheet for a project of this size, the Fee % is 7.7%. The estimated costs do not include the costs of a testing laboratory. Add for testing.

NON-CERTIFIED COPY

Page 6

## QUALIFICATIONS

| From | To | Description |
|------|-----|-------------|
| 1979 | 1981 | Tulane Universit |
| 1981 | 1983 | Universi of Alabama |
| 1983 | 1988 | Wallace C. Drennan, Inc. Concrete Paving Laborer, Equipment Operator and Foreman. Sewer Installation Foreman. Pro•ect Mana er. |
| 1988 | 1991 | Wallace C. Drennan, Inc. Secretary Treasurer, Estimator, Project Manager, Concrete Pavin E ui ment O erator |
| 1991 | Present | Wallace C. Drennan, Inc. President. Associated Builders and Contractors (ABC Board of Directors 1994-2000, President 1997 and 1998. |

Attached please find a listing of representative projects completed by Wallace C. Drennan, Inc.

## COMPENSATION

I am being compensated at the rate of $350.00 per hour for my work in this matter.

### PRIOR TESTIMONY AND PUBLICATIONS

I have not testified as an expert witness in any matter during the last 4 years. I have not authored any publications within the last 10 years.

Sincerely,

Wallace C. Drennan, Inc.

**Wallace C. Drennan III, President**

Enclosure

NON-CERTIFIED COPY



NON-CERTIFIED COPY

EXHIBIT

C

DRENNAN
EXHIBIT NO. 9
K. DONNELLY

H&E 074106



NON-CERTIFIED COPY

EXHIBIT

D

DRENNAN

EXHIBIT NO. 11

K. DONNELLY

H&E 074136



NON-CERTIFIED COPY



NON-CERTIFIED COPY



EXHIBIT

F

DRENNAN
EXHIBIT NO. 6

K. DONNELLY

NON CERTIFIED COPY