C-626308
21/D
07/12/2018

"The Court has before it a Motion to Continue the Trial filed on behalf of URS, and the Court notes for the record that this is a Reurged Motion to Continue the Trial in this matter. The Court has previously denied a Motion to Continue the Trial. The Court has before it a matter of protracted litigation having been vociferously litigated for the last several years. The Court has conducted many hearings, conferences, settlement and otherwise. It is firmly of the opinion that the parties hereto are unable to resolve their dispute absent a full Trial on the Merits. The Court has reviewed the jurisprudence cited in support of the Motion for New Trial and finds no mandatory grounds upon which this Court would be constrained to grant the Motion to Continue the Trial. The Court further notes for the record that this matter has been set for several months, and it portends a five-day Jury Trial, a big hole in the Court's docket. Because of the length of time and the complexity of the issues, this matter has received quite a bit of attention, and so the Court conducted this hearing with a view toward trying to ascertain some discretionary grounds upon which the Motion to Continue would be warranted. Having done so and having looked at this matter for the last 48 hours, the Court finds no compelling reason to justify use of its discretion. Consequently, the Court denies the Motion to Continue the Trial. Notify Counsel electronically or by fax."
(Lori Achee, Thursday, July 12, 2018)



**POSTED**

AUG - 2 2017



| | | |
|---|---|---|
| H&E EQUIPMENT SERVICES, INC. | * | SUIT NO. 626,308     DIV.: D |
| | * | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF EAST BATON ROUGE |
| URS CORPORATION | * | |
| ARCHITECTURE, P.C., URS | * | STATE OF LOUISIANA |
| CORPORATION, L. O'NEAL | | |
| JOHNSON AND THOMAS E. RYAN, | | COST OK $_____ |
| III | | |

19TH JUDICIAL DISTRICT COURT

STATE OF LOUISIANA

COST OK $_____

AUG 0 1 2017

DEPUTY CLERK OF COURT

---

### DEFENDANTS' PROPOSED JURY VERDICT FORM

**NOW INTO COURT,** through undersigned counsel, come URS CORPORATION

ARCHITECTURE, P.C. ("URS Architecture"), URS CORPORATION ("URS Corporation"), L.

O'NEAL JOHNSON ("Johnson") and THOMAS E. RYAN, III, ("Ryan") (all collectively

referred to hereinafter as "Defendants"), who respectfully submit the following proposed Jury

Verdict Form, which they request be given to the jury at the trial of this case.  Defendants submit

this based upon their current understanding of how this case is to be tried—in light of prior

rulings of this Court and the applicable law—and specifically reserve the right to submit

amendments, changes, and/or additions to this Proposed Jury Verdict Form as warranted by the

further proceedings before and during trial.

EBR4246069

1



**EXHIBIT**

tabbies®

**H&E's Claims against Defendants Regarding the Baton Rouge Facility**

1.     Do you find that the 2009 Agreement applies to the services alleged to be deficient with regards to the Baton Rouge facility?

        YES _____          NO _____

2.     Do you find that the defendants were at fault for breaching the applicable standards of professional care in the performance of services with regards to the Baton Rouge facility?

| | | |
|---|---|---|
| URS: | YES _____ | NO _____ |
| Mr. Johnson: | YES _____ | NO _____ |
| Mr. Ryan: | YES _____ | NO _____ |

*If you answered Question No. 2 "No" for all defendants, go to Question No. 8. Otherwise, go to Question No. 3.*

3.     Do you find that the defendants were grossly negligent with regards to the Baton Rouge facility?

| | | |
|---|---|---|
| URS: | YES _____ | NO _____ |
| Mr. Johnson: | YES _____ | NO _____ |
| Mr. Ryan: | YES _____ | NO _____ |

*If you answered Question No. 1 "Yes" and if you also answered Question No. 3 "No" for all defendants, go to Question No. 8. Otherwise, go to Question No. 4.*

4.     Do you find that H&E suffered an injury at the Baton Rouge facility?

        YES _____          NO _____

*If you answered Question No. 4 "No", go to Question No. 8. Otherwise, go to Question No. 5.*

5. Do you find that one or more of the following caused or contributed to the injury to H&E at the Baton Rouge facility?

| | | |
|---|---|---|
| URS: | YES _____ | NO _____ |
| Mr. Johnson: | YES _____ | NO _____ |
| Mr. Ryan: | YES _____ | NO _____ |
| H&E: | YES _____ | NO _____ |
| Benchmark Group, L.L.C.: | YES _____ | NO _____ |
| Milton J. Womack, Inc.: | YES _____ | NO _____ |
| Terracon Consultants, Inc. | YES _____ | NO _____ |

*If you answered Question No. 5 "No" for URS, Mr. Johnson and Mr. Ryan, go to Question No. 8. Otherwise, go to Question No. 6.*

6. Please state the percentage of fault, if any, attributable to each of the following regarding the Baton Rouge facility. *The total of your percentages must be 100%.*

| | |
|---|---|
| H&E: | _____% |
| URS: | _____% |
| Mr. Johnson: | _____% |
| Mr. Ryan: | _____% |
| Benchmark Group, L.L.C.: | _____% |
| Milton J. Womack, Inc.: | _____% |
| Terracon Consultants, Inc. | _____% |

*If your answer to Question No. 6 was 0% for URS, 0% for Mr. Johnson and 0% for Mr. Ryan, go to Question No. 8. Otherwise, go to Question No. 7.*

7. Without deducting any sums for the percentage of fault, if any, which you have assigned above to H&E, please state what sum of money, if any, would reasonably and fairly compensate H&E for injury caused at the Baton Rouge facility:

$_____

**H&E's Claims against Defendants Regarding the Belle Chasse Facility**

8. Do you find that the 2009 Agreement applies to the services alleged to be deficient with regards to the Belle Chasse facility?

YES _____ NO _____

9. Do you find that the defendants were at fault for breaching the applicable standards of professional care in the performance of services with regards to the Belle Chasse facility?

| | | |
|---|---|---|
| URS: | YES _____ | NO _____ |
| Mr. Johnson: | YES _____ | NO _____ |
| Mr. Ryan: | YES _____ | NO _____ |

*If you answered Question No. 9 "No" for all defendants, go to Question No. 15. Otherwise, go to Question No. 10.*

10. Do you find that the defendants were grossly negligent with regards to the Belle Chasse facility?

| | | |
|---|---|---|
| URS: | YES _____ | NO _____ |
| Mr. Johnson: | YES _____ | NO _____ |
| Mr. Ryan: | YES _____ | NO _____ |

*If you answered Question No. 8 "Yes" and if you also answered Question No. 10 "No" for all defendants, go to Question No. 15. Otherwise, go to Question No. 9.*

11. Do you find that H&E suffered an injury at the Belle Chasse facility?

YES _____ NO _____

*If you answered Question No. 11 "No", go to Question No. 15. Otherwise, go to Question No. 12.*

12. Do you find that one or more of the following caused or contributed to the injury to H&E at the Belle Chasse facility?

| | | |
|---|---|---|
| URS: | YES _____ | NO _____ |
| Mr. Johnson: | YES _____ | NO _____ |
| Mr. Ryan: | YES _____ | NO _____ |
| H&E: | YES _____ | NO _____ |
| Benchmark Group, L.L.C.: | YES _____ | NO _____ |
| Ryan Gootee General Contractors, L.L.C.: | YES _____ | NO _____ |
| Riverlands Surveying Co.: | YES _____ | NO _____ |

*If you answered Question No. 12 "No" for URS, Mr. Johnson and Mr. Ryan, go to Question No. 15. Otherwise, go to Question No. 13.*

13. Please state the percentage of fault, if any, attributable to each of the following regarding the Belle Chasse facility. *The total of your percentages must be 100%.*

| | |
|---|---|
| H&E: | _____% |
| URS: | _____% |
| Mr. Johnson: | _____% |
| Mr. Ryan: | _____% |
| Benchmark Group, L.L.C.: | _____% |
| Milton J. Womack, Inc.: | _____% |
| Terracon Consultants, Inc. | _____% |

*If your answer to Question No. 13 was 0% for URS, 0% for Mr. Johnson and 0% for Mr. Ryan, go to Question No. 15. Otherwise, go to Question No. 14.*

14. Without deducting any sums for the percentage of fault, if any, which you have assigned above to H&E, please state what sum of money, if any, would reasonably and fairly compensate H&E for injury caused at the Belle Chasse facility:

$_____

<u>**URS's Claim against H&S Regarding Unpaid Invoices:**</u>

15.     How much, if any, does H&E owe URS for unpaid invoices?

$_____

16.     What do you find to be the amount of URS's reasonable attorney fees for the

prosecution and collection of the claim for unpaid invoices?

$_____

**QUESTION NO. 16 IS REQUESTED TO THE EXTENT NEEDED.  HOWEVER,**

**DEFENDANTS REQUEST THAT THE ISSUE OF ATTORNEYS' FEES BE TRIED BY**

**THE JUDGE AFTER THE OTHER ISSUES ARE TRIED TO THE JURY.**

*Please have the jury foreperson sign and return the verdict form.*

_____

JURY FOREPERSON

_____

DATE

Respectfully submitted,

**ADAMS AND REESE LLP**

_____
Philip A. Franco (Bar #5819), TA
Ron Sholes (Bar # 14436)
Kellen J. Mathews (Bar #31860)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Fax: (504) 566-0210
**Attorneys for Defendants,
URS Corporation Architecture, P.C.;
URS Corporation; L. O'Neal Johnson
and Thomas E. Ryan, III**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading was served upon all counsel of record via e-mail and/or United States Mail, postage prepaid and properly addressed, this 1st day of August, 2017.

_____
Kellen J. Mathews


FILED
2017 AUG -1 PM 2: 16

```
 1              19TH JUDICIAL DISTRICT COURT
                PARISH OF EAST BATON ROUGE
 2                  STATE OF LOUISIANA

 3

 4

 5
    H&E EQUIPMENT SERVICES, INC    *    DOCKET NO.
 6                                 *    626,308
    VERSUS                         *
 7                                 *    SECTION:  "D"
    URS CORPORATION ARCHITECTURE,  *
 8  P.C., URS CORPORATION, L.      *
    O'NEAL JOHNSON, AND THOMAS E.  *
 9  RYAN, III                      *
                                   *
10  *   *   *   *   *   *   *   *   *   *

11

12

13

14
           Deposition of NEAL JOHNSON, 668 South Foster
15  Drive, Suite 101, Baton Rouge, Louisiana, 70806, taken
    in the offices of Fishman Haygood, 201 St. Charles
16  Avenue, 46th Floor, New Orleans, Louisiana,
    70170-4600, commencing at 9:56 a.m., on Thursday, the
17  4th day of August, 2016.

18

19

20
    APPEARANCES:
21

22      FISHMAN HAYGOOD
        (By:  Brett B. Barriere, Esquire)
23      201 St. Charles Avenue
        46th Floor
24      New Orleans, Louisiana  70170-3500
           (Attorneys for the Plaintiff)
25
```

EXHIBIT
C

1  Baton Rouge project you morphed into both a project
2  manager and a team leader, correct?
3      A.    Yes.
4      Q.    Was it your team that was assigned to the
5  H&E Baton Rouge project?
6      A.    Yes.
7      Q.    And besides yourself, who were the members
8  of your team assigned to the Baton Rouge project?
9      A.    I'm not trying to avoid that question.
10 There were a lot of folks over a period of years.
11 Everybody that worked in URS facilities during that
12 tenure worked on the H&E project.
13     Q.    Fair enough.
14          We don't need to have a laundry list of 27
15 humans. Let's focus on the core employees, besides
16 yourself, who were on the Baton Rouge project. I know
17 you were here for Mr. Ryan's deposition. I'm going to
18 refer to these three projects as Baton Rouge, Kenner
19 and Belle Chasse.
20     A.    Sure.
21     Q.    I understand you were involved in Baton
22 Rouge. You were also the lead architect on Kenner; is
23 that correct?
24     A.    Yes, sir.
25     Q.    What involvement did you have with Belle

1  Chasse, if any?

2      A.   I was the lead architect -- or, actually,

3  the term is "architect of record."  My seal was on the

4  documents.

5      Q.   You were the architect of record also with

6  respect to Kenner and Baton Rouge; is that correct?

7      A.   Yes, sir.

8      Q.   Who do you identify as sort of the core

9  URS personnel involved in the Baton Rouge project,

10  besides yourself?

11      A.   Thomas Ryan, James Hohensee, Kim Nunez,

12  Robert Rusca for a short period of time.  Then he went

13  on assignment.

14      Q.   Okay.  How about Kenner?  Who were the key

15  core URS employees assigned to the Kenner project?

16      A.   Joseph Poitevin, P-O-T-E-I-V-I-E-N (sic).

17  Something close to that.

18      Q.   Was Mr. Poitevin an architect?

19      A.   Yes, sir.

20      Q.   Was he a licensed architect at the time of

21  the Kenner project?

22      A.   I don't recall.

23      Q.   Fair enough.

24      A.   I say he was licensed.  I know he was

25  licensed in Mississippi.  I don't know if he was

1     A.    No.  It was predominantly Kim Nunez and
2  Thomas Ryan or myself.

3     Q.    How often do you generate observation
4  reports?

5     A.    Every time you go on the site for an
6  observation.  We went out there for meetings and other
7  stuff.

8     Q.    Okay.  How often did you typically go on
9  the site for observations?  Once a week?  Twice a
10  week?

11     A.    It was random.  Sometimes twice a day.
12  Sometimes five times a week.  It varied with the
13  amount of work that was going on.

14     Q.    Fair enough.

15     So we have as possible explanations for
16  the defects in the concrete that caused the cracking
17  and spalling to appear, excessive moisture, the broad
18  category, sloppy work.  And you gave us some
19  illustrations of what qualified as sloppy work in your
20  view.

21     Anything else that you look to as a cause
22  or a reason for the concrete to crack and experience
23  spalling?

24     A.    Base failure could contribute to that.

25     Q.    What do you mean by that term?

1  read it to you at the top of the page.

2        MR. FRANCO:

3              I'm sorry.  Where are you?

4        MR. BARRIERE:

5              Page 11, part of Section 8.2.

6  EXAMINATION BY MR. BARRIERE:

7        Q.    "The concrete pavement should contain

8  adequate wire mesh reinforcement for structural

9  strength and to reduce temperature expansion affects.

10  Adequate joints should be provided for expansion and

11  contraction."

12              Did URS entrust to Benchmark the task for

13  designing contraction and expansion joints?

14        A.    Yes.

15        Q.    Did you personally ever review the details

16  for those joints?

17        A.    Yes.

18        Q.    In what context?

19        A.    Seeing if they had been addressed and

20  quantity of information, not quality of information.

21        Q.    Did you or anyone else from URS attempt to

22  determine whether the details for contraction and

23  expansion joints called for by Benchmark were

24  consistent with Louisiana Department of Transportation

25  specifications?

1      A.    No, sir.

2      Q.    Did you or anyone else from URS attempt to

3 determine whether those details were consistent with

4 East Baton Rouge Parish specifications?

5      A.    No.

6      Q.    Did you or anyone from URS attempt to

7 determine whether all or any part of the work designed

8 by Benchmark for the yard was compliant with Louisiana

9 Department of Transportation specifications?

10     A.    No.

11     Q.    Did you or anyone else from URS attempt to

12 determine whether all or any of the part of the work

13 for the yard designed by Benchmark was consistent with

14 East Baton Rouge Parish specifications?

15     A.    Yes.

16     Q.    What did you do in that regard?

17     A.    I inquired to Murray McCullough during the

18 permit process that he had conferred with the East

19 Baton Rouge Parish Department of Public Works

20 engineers to make sure we had the most current

21 information on the permit drawings.

22     Q.    And what did he tell you?

23     A.    Yes.

24     Q.    At the time of the punch list debate about

25 the spalling and cracking, did you or anyone else with

1  URS attempt to determine whether the yard as built was
2  compliant with Louisiana Department of Transportation
3  specifications?

4      A.    No.

5      Q.    How about with respect to East Baton Rouge
6  Parish specifications?

7      A.    No.

8      Q.    Other than asking Murray for confirmation
9  that he was compliant with the East Baton Rouge Parish
10 specifications, did you do anything to verify that, in
11 fact, the work designed by Benchmark was compliant
12 with either the LADOT specs or the East Baton Rouge
13 specs?

14     A.    No.

15     Q.    Let me show you what I'll mark as No. 3.
16 It's an e-mail from you to Rene Borrel.  There's a
17 number of other addressees.

18          (Whereupon, the document as described
19 above is so marked as "Johnson Exhibit No. 3" for
20 identification.)

21 EXAMINATION BY MR. BARRIERE:

22     Q.    Who is Mr. Borrel?

23     A.    Mr. Borrel was the structural engineer in
24 the Marksville office that I referred to earlier.

25     Q.    You're sending to him, among other

```
  1              19th JUDICIAL DISTRICT COURT
                 PARISH OF EAST BATON ROUGE
  2                   STATE OF LOUISIANA

  3

  4   H&E EQUIPMENT SERVICES,       *    DOCKET NO.
      INC.                          *    626,308
  5                                 *
      VERSUS                        *
  6                                 *    SECTION: "D"
      URS CORPORATION               *
  7   ARCHITECTURE, P.C., URS       *
      CORPORATION, L. O'NEAL        *
  8   JOHNSON, AND THOMAS E.        *
      RYAN, III                     *
  9
         *    *    *    *    *    *    *    *    *    *
 10

 11

 12

 13            Deposition of THOMAS EDMOND RYAN, II,
      37414 Provence Pointe, Prairieville, Louisiana
 14   70769, taken in the Law Offices of ADAMS and
      REESE, LLP, Suite 4500, One Shell Square, 701
 15   Poydras Street, New Orleans, Louisiana  70139,
      commencing at 12:50 o'clock p.m., on Monday, the
 16   26th day of September 2016.

 17

      APPEARANCES:
 18

 19       FISHMAN HAYGOOD, L.L.P.
          Attorneys at Law
 20       (By:  BRENT B. BARRIERE, Esquire
          bbarriere@fishmanhaygood.com
 21       Suite 4600
          201 St. Charles Avenue
 22       New Orleans, Louisiana  70170-4600
          (Attorneys for the Plaintiff,
 23        H&E Equipment Services, Inc.)

 24

 25
```

EXHIBIT
D

1 ready to go. So I was -- I was one of the team

2 members that brought the project to completion and

3 through the bidding and permitting process.

4     Q.    Besides yourself, who else were members of

5 the URS team on the Baton Rouge project?

6     A.    Let's see. Several members had some

7 involvement in it. Do you -- are you talking heavy

8 involvement or just drafting?

9     Q.    Who would you identify as the principal

10 team members? Let's start with that.

11     A.    I think I would probably be the principal

12 team member. Kim Nunez was a good -- had a good

13 portion of the construction administration along with

14 me.

15         I'm drawing a blank. James Hohensee was a

16 member of the Baton Rouge team.

17     Q.    Do you have a spelling on that name?

18     A.    H-O-H-E-N-S-E-E.

19     Q.    Is Ms. Nunez an architect?

20     A.    She was at one time. I -- I don't know

21 where she is now.

22     Q.    But she was a licensed Louisiana architect

23 at the time she was working with you on the Baton

24 Rouge project?

25     A.    As far as I know, yes.

54

1 Would it be your testimony that all of the details set

2 forth in C501, whether in the large set or this

3 e-mail, were generated exclusively by Benchmark?

4     A.    Yes.

5     MR. FRANCO:

6         I can't read this.

7 EXAMINATION BY MR. BARRIERE:

8     Q.    All right.  Now before Mr. Franco is the

9 Project Manual.  I'm going to hand you a copy, sir.

10 It's dated March 16th, 2011.

11         Can you describe for the jury what role, if

12 any, you played in the preparation of that Project

13 Manual?

14     A.    The majority of it was already put together

15 when it was handed to me.  I just reviewed it for

16 completeness and marked it up and finalized it, for

17 lack of a better word.

18     MR. BARRIERE:

19         All right.  I'll just go ahead and attach

20     the whole thing.  Just put a sticker on there.

21     We'll call it Ryan 5.

22     MR. FRANCO:

23         This is 5?

24     MR. BARRIERE:

25         Uh-huh (indicating affirmatively).

1     Q.    Can you describe in any further detail how
2  maintenance was lacking?

3     A.    The joints were supposed to be kept free of
4  dirt and gravel.

5     Q.    During your visits to the yard, what did
6  you observe with respect to the maintenance that was
7  taking place there?

8     MR. FRANCO:

9         Objection to the form.  That assumes
10       maintenance was taking place.  Subject to that,
11      you can answer the question.

12     A.    Could you repeat the question, please?

13  EXAMINATION BY MR. BARRIERE:

14     Q.    Sure.  You visited the yard from time to
15  time; is that correct?

16     A.    Yes.

17     Q.    Before this job was finished, before this
18  project was finished, how routinely would you visit
19  the yard?

20     A.    It varied, but I would say once a week.  At
21  the beginning, once a week.  Toward the end, once
22  every couple of weeks.

23     Q.    Okay.  Did you observe maintenance taking
24  place at the yard?

25     A.    No.

United States Courts
Southern District of Texas
ENTERED

APR 2 6 2004

Michael N. Milby, Clerk of Court

DONNA FRANZ AND ALLAN R. FRANZ §
§
      Plaintiffs, §
§
versus §    CIVIL ACTION NO. H-04-0169
§
WYETH, JAY MONT, M.D. AND §
HAL B. BOONE, JR., M.D. §
§
      Defendants. §

## ORDER

Pending before the Court is Plaintiffs' Combined Emergency Motion and Memorandum to Reconsider the Denial of Remand and Transfer to this Court. **(Instrument No. 13)**. Based on the arguments of the parties contained in the pleadings and the applicable law, the Court finds that Plaintiffs' motion to remand should be **GRANTED**.

## I.

In November 2003, Plaintiffs Donna and Allen Franz ("Plaintiffs") filed this personal injury case in Galveston County Court. The alleged personal injury is the result of Donna Franz's use of the diet drugs Pondimin and Redux. Plaintiffs filed this suit against Wyeth, the manufacturer of the drugs in question, and Doctors Jay Mont and Hal Boone, the two prescribing physicians. Wyeth is a Delaware corporation with its principal place of business in New Jersey. Plaintiffs and Doctors Mont and Boone are all Texas residents. The case proceeded through discovery and was scheduled to begin jury selection in County Court at Law No. 3 of Galveston County, Texas on January 14, 2004.

2 1



EXHIBIT
E

On January 12, 2004, Defendant Wyeth became aware of an agreement drafted pursuant to Tex. R. Civ. P. 11 (the "Rule 11 Agreement") which would potentially dismiss both Dr. Mont and Dr. Boone from the suit. Specifically the Rule 11 Agreement stated:

### Rule 11 Agreement

This Rule 11 Agreement applies to the trial or any retrial of *Franz, et al. v. Wyeth*, Cause No. 49594. The parties in this case will agree to dismiss Dr. Mont and Dr. Boone under the following conditions:

- All parties agree not to remove the case from County Court at Law No. 3, Galveston, Texas, to any federal court;
- All parties agree not to seek any change of venue;
- All parties agree that this Agreement is inadmissible as evidence in any proceeding and applicable to Franz v. Wyeth, No. 49594 only;
- All parties agree that no party will argue or allege that Dr. Boone or Dr. Mont was negligent or that Dr. Boone or Dr. Mont withheld any information from Mrs. Franz;
- Neither the negligence of Dr. Mont nor the negligence of Dr. Boone or any party other than the remaining Defendant shall be submitted to the jury; and
- No party will argue or mention the existence or timeliness of this Agreement.

(Instrument No. 17, Exh. A).

On January 13, 20004, approximately seventeen hours after receiving the above Rule 11 Agreement, Defendants filed their Notice of Removal with the United States District Court for the Southern District of Texas, Galveston Division, pursuant to 28 U.S.C. § 1446(a). Based upon the Rule 11 Agreement, Defendants claimed that the federal District Court in Galveston had diversity jurisdiction, pursuant to 28 U.S.C. § 1441; 28 U.S.C. § 1332. (Instrument No. 17, at 2). The following day, January 14th, United States District Judge Samuel B. Kent, held a hearing on Plaintiffs' Emergency Motion to Remand.

Judge Kent found that at the time this case was originally filed, it was not removable since Plaintiffs and Doctors Mont and Boone were all Texas residents, thus the parties were not

completely diverse. Judge Kent also stated that "Defendants and Plaintiffs agree that the claims against the doctors were viable and that Plaintiffs intended to pursue them at the inception of this case." (Instrument No. 16, Exh. B, at 3). Judge Kent also found "that the proposed agreement proves that Plaintiffs have, at least as of now, no good-faith intention of pursuing the claims against the non-diverse Defendants. Since Plaintiffs have no intention to pursue a claim against the doctors, their further inclusion in the case is improper, and they can now be considered fraudulently joined." (Id.). Judge Kent goes on to state in a footnote that "[i]t is imperative to note that Plaintiffs did not propose to *settle* the claims, but rather to simply terminate them." (Id.) (emphasis in original). Judge Kent concluded that, "when a Plaintiff, at whatever time and for whatever reason, indicates a desire to completely abandon the claims against all non-diverse defendants, those defendants are fraudulently joined, and the case becomes removable at that moment." (Id.). Judge Kent found the proposed Rule 11 Agreement served as the basis for removal, thus denied Plaintiffs motion to remand and *sua sponte* transferred the case to this Court because the Plaintiff resides in and was being treated in Harris County. Thereafter, the court felt that "[g]iven the overwhelming connection between this case and the Houston Division, . . . the case would more appropriately be heard in that venue." (Id.).

On January 21, 2004 Plaintiffs filed their Combined Emergency Motion and Memorandum to Reconsider the Denial of Remand and Transfer to this Court in this case. (Instrument No. 13). Plaintiffs claim that Judge Kent should have granted their motion to remand and request that this Court vacate Judge Kent's order denying remand, and the subsequent order of transfer to this Court, as void for lack of subject matter jurisdiction, and order the action remanded and transferred to the Galveston County court. (Id., at 3). Plaintiffs

contend that Fifth Circuit law requires remand. Plaintiffs assert that they have actively pursued their case against the doctors, noting that they have opposed the doctors' motions for summary judgment on causation filed in September 2003, which motions were subsequently denied by the Galveston state court. Additionally, both doctors were deposed in December 2003.

On January 26, 2004, Defendant Wyeth filed their Response to Plaintiffs' Combined Emergency Motion and Memorandum to Reconsider the Denial of Remand and Transfer to this Court. (Instrument No. 16). Wyeth argues that Plaintiffs' attorney has a distinct pattern, in other suits, of naming non-diverse prescribing physicians as defendants in order to defeat federal diversity jurisdiction, only to later express a willingness to dismiss all claims against the doctors once the promise of a state forum seemed secure. Wyeth also claims that it filed its notice of removal without delay, as soon as removal was proper. (Id., at 2). Wyeth urges this Court to uphold Judge Kent's order and find the removal proper and timely.

## II.

While the law disfavors a court's reconsideration of another judge's ruling, Judge Kent pointed out that due to the transfer, Plaintiffs could file a motion to remand with this Court. *See e.g. Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1460 n.24 (5th Cir. 1992); (Instrument No. 16, at 3).

Under 28 U.S.C. § 1441(a), a defendant may remove to federal court any civil action brought in state court if the federal court would have had original jurisdiction. Diversity jurisdiction exists where the matter in controversy exceeds $50,000 and is between citizens of different states. 28 U.S.C. § 1332 (a)(1).

4

Title 28 U.S.C. § 1446(b) requires that "[t]he notice of removal . . . shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based." Because removal deprives a state court of a case properly before it and thus implicates federalism concerns, the removal statute is strictly construed. *Rivet v. Regions Bank of Louisiana, FSB*, 108 F.3d 576, 582 (1997). The defendant generally has the burden of establishing proper removal jurisdiction. *Id.* An untimely removal petition constitutes an improvident removal, which must be remanded under 28 U.S.C. § 1447(c). *Royal v. State Farm Fire and Casualty. Co.*, 685 F.2d 124 (5th Cir. 1982).

The Fifth Circuit found that generally, the remand of a case that has been removed to federal court is governed by the statutory provisions found at 28 U.S.C. §§ 1441(c) and 1447(c). Under these two sections, the district court has general authority to remand a case under any of the following circumstances: 1) it has discretion to remand state law claims that were removed along with one or more federal question claims; 2) it must act on a timely motion to remand based on a defect in removal procedure; and 3) it must remand a case over which it has no subject matter jurisdiction. No other authority to remand a case is established by statute, but . . . one additional jurisprudential authority for discretionary remand does exist. *Buchner v. FDIC*, 981 F.2d 816, 819 (5th Cir. 1993). "[A] district court has discretion to remand to state court a removed case involving [only] pendent claims upon a proper determination that retaining jurisdiction over the case would be inappropriate." *Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988).

The Fifth Circuit has consistently held that "when section 1447(c) speaks of any defect in removal procedure, it includes within its reach the bringing of an action not within the court's

removal jurisdiction but that could have been brought originally in that court." *Hopkins v. Dolphin Titan Int'l*, 976 F.2d 924, 926 (5th Cir. 1992) (quoting *Baris v. Sulpicio Lines, Inc.*, 932 F.2d 1540, 1544-45 (5th Cir. 1991).

## III.

In the January 14, 2004 order, issued by Judge Kent denying the motion to remand, the court did not find that the proposed Rule 11 Agreement was binding or enforceable, thus "effectively eliminating" the doctors as parties to the suit. Judge Kent used the Rule 11 Agreement to demonstrate that "Plaintiffs have, at least as of now, no good-faith intention of pursuing a claim against the doctors." (Instrument No. 16, at Exh. B, 3). Judge Kent then found that the doctors could be considered fraudulently joined. Plaintiffs contend, however, that "the claims against the doctors were viable and the Plaintiffs intended to pursue them at the inception of this case." (Instrument No. 16, Exh. B, at 3). Defendants do not dispute and Judge Kent's order confirms this assertion. In addition, the parties have given this Court no indication that the viability of the claims has changed. The question before this Court is whether it is fraudulent joinder if, after fourteen months of litigation, Plaintiffs choose not to pursue, what the state court and all the parties consider viable claims against the non-diverse parties.[1]

### A.

Traditionally, to prove allegations of fraudulent joinder, the removing party must

---

[1]The state court denied the doctors' motions for summary judgment on causation. (Instrument No. 13, at 4). As well as Defendants do not allege that Plaintiffs' claims against the doctors are not viable.

demonstrate that there is no possibility that the plaintiffs would be able to establish a cause of action against either defendant in state court. *Dodson v. Spiliada Maritime Corp.*, 951 F.2d 40, 42 (5th Cir. 1992) *See Jernigan v. Ashland Oil, Inc.*, 989 F.2d 812 (5th Cir.), *cert. denied*, 114 S.Ct. 192 (1993); *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 (5th Cir. 1981). A removing party's claim of fraudulent joinder is similar to a motion for summary judgment in that the court may "pierce the pleadings to determine whether, under controlling state law, the non-removing party has a valid claim against the non-diverse parties." *Id.*; *Jernigan*, 989 F.2d at 935. *See LeJeune v. Shell Oil Co.*, 950 F.2d 267, 271 (5th Cir. 1992). In evaluating claims of fraudulent joinder, the court resolves all factual disputes and ambiguities in the controlling state law in favor of the non-removing party. *Dodson*, 951 F.2d at 42; *Jernigan*, 989 F.2d at 935. The question is not whether the plaintiffs will prevail on the merits but instead whether there exists any possibility of recovery against any single defendant. If any such possibility exists, then joinder is not fraudulent and remand is proper.

Defendants cite a more recent Fifth Circuit case as identifying an additional reason for finding a non-diverse defendant is fraudulently joined. In *Griggs v. State Farm Lloyds*, the Fifth Circuit held first that the plaintiffs' pleadings alone did not set forth an actionable claim against the non-diverse defendant, thus, the case met the traditional standard to find fraudulent joinder. 181 F.3d 694, 699 (5th Cir. 1999). "Moreover, [the court said] the record does not support any inference that Griggs intended to actively pursue claims against Blum." *Id.* Defendants cite this as support for an alternative standard for fraudulent joinder. (Instrument No. 16, at 7).

In addition, Defendants and Judge Kent cite *Wilson v. Republic Iron & Steel* to support the finding of an additional standard–no intent to pursue a claim against the non-diverse

defendant–to find fraudulent joinder. 257 U.S. 92, 98 (1921). In *Wilson*, an employment injury case, the defendant removed the action asserting that plaintiff fraudulently joined his co-employee to defeat diversity jurisdiction. Defendant based this assertion on the fact that the plaintiff had previously brought the same action in state court against the employer only, involving the exact same incident, and had dismissed that action voluntarily; "the plaintiff personally and intimately knew every person who could by any possible chance have caused his injuries and knew the coemployee was not in any degree whatsoever responsible therefor; and that, as the plaintiff well knew all along, the coemployee was not guilty of any joint negligence with the employer, was not present when the plaintiff's injuries were received, and did no act or deed which caused or contributed to such injuries." *Wilson*, 257 U.S. 92, 94 (1921). The district court denied plaintiff's motion to remand because the plaintiff failed to take issue with any of the statements made by the defendant in its notice of removal. Thus, the district court took plaintiff's silence on those issues as assent, holding that defendant's assertions "were sufficient, in that they disclosed that the joinder was a sham and fraudulent and hence was not a legal obstacle to the removal or to the retention of the cause by the [state] District Court." Id., at 38.

Because *Wilson* was very fact specific, it does not support Defendants' contention that lack of intent or good-faith effort to pursue a claim against a non-diverse defendant is an additional standard for fraudulent joinder. The Court in *Wilson* also found that at the time of joinder plaintiff included the non-diverse defendant in order to defeat diversity and that plaintiff did so without any purpose to prosecute the action. Those are not the facts of the case before the Court today. In this case, Plaintiffs have actively pursued their claim against the doctors by deposing them and opposing and defeating the doctors' motions for summary judgment.

8

In *Chicago, R. I. & P. R. Co. v. Schwyhart*, the Court denied removal and held that, the Court was only required to consider "whether there was a real intention to get a joint judgment and whether there was a colorable ground for it shown as the record stood when the removal was denied." 227 U.S. 184, 194 (1913). However, in 1962 the Fifth Circuit interpreted *Schwyhart* as follows:

> we take the rule to be that there can be no fraudulent joinder unless it be clear that there can be no recovery under the law of the state on the cause alleged, or on the facts in view of the law as they exist when the petition to remand is heard. One or the other at least would be required before it could be said that there was no real intention to get a joint judgment, and that there was no colorable ground for so claiming.

*Parks v. N.Y. Times Co.*, 308 F.2d 474, 478 (5th Cir. 1962).

Proof of fraudulent joinder requires that the plaintiffs have either committed "outright fraud in the pleading of the jurisdictional facts" or filed a complaint which has "absolutely no possibility" of being successfully proved in state court. *Griggs v. State Farm Lloyds*, 181 F.3d 694, 699 (5th Cir.1999) (citing *Burden v. General Dynamics Corp.*, 60 F.3d 213, 216-17 (5th Cir.1995); *Cavallini v. State Farm Mut. Auto. Ins. Co.*, 44 F.3d 256, 259 & 262 n. 13 (5th Cir.1995)). All contested factual questions and ambiguous or uncertain points of state law are to be resolved in the favor of the plaintiff. *Griggs,* 181 F.3d at 699 (citing *Burden,* 60 F.3d at 217-18; *Cavallini,* 44 F.3d at 259).

The Defendants do not allege outright fraud in the pleadings, but rather that the Plaintiffs, by sending an unsigned proposed Rule 11 Agreement, have in effect voluntarily abandoned their claims. That is simply not enough to show outright fraud. Moreover, even if this Court were to find that the doctors were now to be considered fraudulently joined, Defendants removal comes after the statutes one-year bar on removal.

**B.**

The one-year removal bar is found in 28 U.S.C. § 1446(b):

> If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable, *except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action.*

(emphasis added).

Defendants cite *Tedford v. Warner-Lambert Co.*, as the case that recognizes that this one-year time limit is subject to equitable exception. 327 F.3d 423, 428029 (5th Cir. 2003). The equitable exception can be applied at any time during the litigation. *See Heniford v. American Motors Sales Corp.*, 471 F.Supp. 328 (D.S.C. 1979) ("where the case does not become removable until its late stages due to the actions of plaintiff, plaintiff can not properly complain of the time of such removal"); see also Brosamle v. Mapco Gas Products, Inc., 1987 U.S. Dist. LEXIS 3042 (N.D. IA 1987) ("Where the action becomes removable shortly before, at, or during trial, the defendant may remove the case."). However, the Court would point out that, the equitable exception must be justified. In *Tedford,* the plaintiff, a resident of Eastland County, Texas, filed suit with Maria Castro, a resident of Johnson County, Texas, against Warner-Lambert and others. The original petition, filed in Johnson County, named only one nondiverse defendant, Dr. Stan Johnson. As it turned out, Dr. Johnson only treated Ms. Castro and Ms. Castro could not assert a cognizable claim because she had not yet suffered any injury from Rezulin. Prior to entry of the state court's order–dismissing Ms. Castro's claims and Dr. Johnson from the suit, Warner-Lambert informed Plaintiff Tedford of its intent to remove the

10

suit to federal court on the ground of diversity of citizenship because Dr. Johnson was not a proper defendant. Three hours later, Plaintiff Tedford amended her petition to name her treating physician, Dr. Robert DeLuca, a resident of Eastland County, as a defendant. Further, Plaintiff Tedford signed and post-dated the Notice of Nonsuit of Dr. DeLuca prior to the expiration of the one-year period, but did not file the document with the court or notify Warner-Lambert until after the one-year anniversary of the filing of the complaint. The court concluded that equity demanded that Plaintiff Tedford be estopped from seeking to remand the case on the basis of the one- year limit in § 1466(b). *See id.*, at 424. Therefore, the court held that plaintiff's consistent forum manipulation justified application of an equitable exception to the removal statute's one-year limit on removal, in the form of estoppel. *See id.*, at 427.

In this case, the proposed Rule 11 Agreement is the only evidence Defendants provide that they allege infers that Plaintiffs are involved in forum manipulation. Nothing else in the record indicates that Plaintiffs did not in good-faith intend to pursue their claim against the doctors through trial. To grant removal at this point would defeat the purpose of the one-year bar on removal. Congress intended to "reduc[e] opportunity for removal after substantial progress has been made in state court." H.R.Rep. No. 889, at 72(1988), *reprinted in* 1988 U.S.C.C.A.N. 5982, 6032; *see also* Federal Practice & Procedure § 3732, at 329 n. 57 (3d ed.1998). ("The result is a modest curtailment in access to diversity jurisdiction.").

Although an understandable argument might be made that to allow the joinder of a non-diverse defendant with the intent never to pursue the claim through judgment would permit the plaintiff to perpetrate a fraud upon the court, this scenario is recognized as a valid method of defeating federal jurisdiction:

> A plaintiff with the motive of defeating removal ... may be able to join as a defendant, in a case in which there is genuine diversity between the plaintiff and the other defendants, someone of nondiverse citizenship whom the plaintiff *does not really intend to sue* but who is arguably liable on the claim and hence properly joined under state law. The plaintiff can then just wait a year and drop that party ... dissolving the threat of federal jurisdiction.
>
> The one-year cutoff therefore has an anti-diversity ring to it. Congress acknowledged this, but called it a 'modest curtailment.'

David D. Siegel, Commentary on 1988 Revision of Section 1446, 28 U.S.C.A. § 1446 at 316-17 (West 1994) (emphasis added).

The one-year time limit expired in this case in November 2003, Plaintiffs did not propose to dismiss the non-diverse defendants until January 2004. Plaintiffs actively pursued their claims against the doctors, therefore, this Court finds that this case does not warrant the application of the *Tedford* exception.

The bar to removal concerning a forum defendant is governed by 28 U.S.C. § 1441(b). Section 1441(b) provides that any "action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b) (2001). The presence of a forum defendant in violation of § 1441(b) is a "defect in removal procedure," thus making applicable § 1447(c)'s thirty-day time limit for filing remand motions. *In re Shell Oil Co.*, 932 F.2d 1523, 1527 (5th Cir. 1991).

In this case, removal was sought by Wyeth based on Plaintiff's alleged fraudulent joinder of Dr. Mont and Dr. Boone. Plaintiff has timely sought remand based on Wyeth's removal in violation of § 1441(b). Thus, Plaintiff's Combined Emergency Motion and Memorandum to Reconsider the Denial of Remand and Transfer to this Court was based on Wyeth's "defect in removal procedure" in violation of § 1441(b). Because this Court found that Dr. Mont and Dr. Boone have not been fraudulently joined, Wyeth's removal is procedurally defective and, pursuant

to Rule 1447(c) of the Federal Rules of Civil Procedure this case shall be remanded.

## IV.

Based on the foregoing, the Court finds that the Plaintiffs' motion to remand is appropriate and should be granted. Whatever the motive of the Plaintiffs in proposing the Rule 11 Agreement, no showing of fraudulent joinder has been proved. IT IS THEREFORE ORDERED that the Plaintiffs' Combined Emergency Motion and Memorandum to Reconsider the Denial of Remand and Transfer to this Court **(Instrument No. 13)** is hereby **GRANTED,** and this case is remanded to the County Court at Law No. 3 of Galveston County, Texas.

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the ___ day of _____, 2004.

                                        _____
                                        **VANESSA D. GILMORE**
                                        **UNITED STATES DISTRICT JUDGE**